UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **ANSWER AND COUNTERCLAIM OF DEFENDANT LYCOS, INC.** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
| Trustee Process Defendant | ) ) | |

Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") responds to the numbered paragraphs of the complaint as follows:

1.      Lycos admits that its primary business is providing internet access, and that it has a principal place of business in Waltham, Massachusetts.  The remaining allegations in this paragraph are characterizations of plaintiff's complaint as to which no response is required.  To the extent a response is required, the remaining allegations in this paragraph are denied.

2.      Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.      Admitted.

4.   Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.   This paragraph states a legal conclusion as to which no response is required.

6.   This paragraph states a legal conclusion as to which no response is required.

7.   Lycos admits that plaintiff is in the business of leasing equipment. Lycos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7.

8.   Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.   Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.   Admitted, except that Lycos does not admit that the terms and conditions governing CSI's lease of equipment are accurately  "described in relevant part below." Lycos states that the documents evidencing the terms and conditions governing CSI's lease of equipment speak for themselves.

11.   Lycos admits the first sentence. Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence.

12.   Admitted.

13.   Admitted.

14.   Lycos admits that a true and accurate copy of Equipment Lease 100 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule One Hundred attached thereto. Lycos states that Equipment Lease 100 speaks for itself.

15.     Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 100.

16.     Lycos admits that a true and accurate copy of the Certificate of Acceptance for Equipment Lease 100 is attached to plaintiff's complaint, and states that the Certificate of Acceptance speaks for itself.

17.     Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 100 from the plaintiff in the amount of $6,082.29, and that it has paid all of these invoices through the October, 2004 invoice.  Lycos denies the remaining allegations contained in this paragraph.

18.     Lycos admits that it received invoices under Equipment Lease 100 from the plaintiff for the months of November and December of 2004 each in the amount of $6,082.29 and that true and accurate copies of these invoices are attached to plaintiff's complaint.  Lycos states that these invoices speak for themselves.  Lycos denies the remaining allegations contained in this paragraph.

19.     Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

20.     Admitted.

21.     Lycos admits that a true and accurate copy of Equipment Lease 200 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule Two Hundred attached thereto.  Lycos states that Equipment Lease 200 speaks for itself.

22.   Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 200. Lycos denies the remaining allegations contained in this paragraph.

23.   Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the Certificate of Acceptance for Equipment Lease 200 that is attached to plaintiff's complaint. Lycos states that the Certificate of Acceptance speaks for itself.

24.   Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 200 from the plaintiff in the amount of $43,954.35, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

25.   Lycos admits that it received invoices under Equipment Lease 200 from the plaintiff for the months of November and December of 2004 each in the amount of $43,954.35 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

26.   Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

27.   Lycos admits that it received a notice of default from the plaintiff dated December 8, 2004, and that a true and accurate copy of the notice of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

28.   Lycos states that the notice of default speaks for itself.

29.   Lycos admits that it did not respond to plaintiff's notice of default, and that it continued to refuse to pay the demanded amounts, but states that it had justification and legal

excuse for so refusing. Lycos admits that it received a notice of event of default from the plaintiff dated December 23, 2004, and that a true and accurate copy of the notice of event of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

30.    Lycos states that the notice of event of default speaks for itself, although Lycos denies that plaintiff's actions with respect thereto have been "proper" or "appropriate," or that plaintiff has any amount of money "due and owing" from Lycos.

31.    Denied.

## COUNT I
### (Breach of Master Lease and Equipment Schedules)

32.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 31.

33.    Denied.

34.    Denied.

35.    Denied.

## COUNT II
### (Breach of Sales Agreement)

36.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 35.

37.    Admitted.

38.    Lycos states that the Sales Agreement speaks for itself.

39.    Lycos states that the Sales Agreement speaks for itself.

40.    Denied.

41.    Denied.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff claims are barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff is equitably estopped from recovering on its claims.

## THIRD AFFIRMATIVE DEFENSE

Lycos is entitled to recoupment or setoff of all amounts claimed by plaintiff.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own fraud.

## LYCOS' COUNTERCLAIM

## NATURE OF THE ACTION

1.      This counterclaim seeks to redress a pattern and practice of misconduct committed by Computer Sales International, Inc ("CSI") with respect to equipment leases it entered into with Lycos. CSI, which purports to be one of the largest information technology leasing companies in the world, took advantage of its long-standing relationship with Lycos to obtain millions of dollars in undeserved profit. CSI intentionally and negligently misrepresented, made partial and misleading statements, and/or failed to disclose certain material features of its lease agreements with Lycos, leading Lycos to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.      CSI accomplished its ends using a method of "rolling up" equipment leases in a fraudulent and deceptive manner, which CSI concealed through affirmative misrepresentations, partial disclosures, and omissions of material fact that CSI was obligated to disclose to Lycos under accepted industry standards and guidelines, common law, and the Attorney General's

regulations promulgated pursuant to Massachusetts General Laws c. 93A, 940 C.M.R. 3.16(2). This "roll-up" scheme recast active equipment leases as longer team leases with lower monthly payments, something which, on its face, was beneficial to Lycos. Yet, these recast or "rolled-up" leases dramatically increased Lycos' cost to a total amount well in excess of the cost of the equipment plus imputed interest, while converting CSI's residual risk in the equipment into a guaranteed stream of rental payments which, because they exceeded the cost of the equipment, eliminated CSI's risk and ensured CSI an exorbitant profit. As a result of CSI's "roll up" scheme, Lycos unwittingly paid more than $72 million on leases of equipment costing approximately $47 million.

3.    To redress CSI's pattern and practice of misconduct, Lycos seeks:

A.    declarations that (i) it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, an amount that now approximates $300,000 and which amounts CSI seeks to recover in this action, and (ii) that Lycos is the owner of the leased equipment

B.    recovery of overpayments it made as a result of CSI's wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $14,000,000, plus interest and costs; and

C.    treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2 and 11.

## PARTIES

4.    Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

5.    Defendant Computer Sales International, Inc. is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

6.    This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

7.    This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

## FACTS

### *Computer Equipment Leasing Generally*

8.    Companies seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies, knowing that computer equipment becomes obsolete relatively quickly, elect to enter into short-term leases rather than purchase the equipment. Leasing also can provide accounting and operational benefits, such as capital preservation and financing that, under Generally Accepted Accounting Principles, are not required to be placed on the company's balance sheet. Leases permit the lessee to return the equipment to the lessor at the end of the lease term, leaving the lessor with the risk of technological obsolescence.

9.    To satisfy the lessee's present computer equipment needs and accommodate its anticipated needs for new and improved computer equipment in the future, the lessor and lessee typically enter into a master lease agreement. They then enter into one or more equipment schedules, over time, each of which incorporate the terms of the master lease agreement. Typically, an equipment schedule describes the equipment being leased, its cost (or lease basis), the fixed term of the lease, the commencement date, the repayment schedule, and the location of the equipment.

10.    There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the former is a true lease while the latter is essentially a conditional sale or loan. In a capital lease, the lease rental payments together with a required contracted purchase price are sufficient to cover the lessor's investment and provide a yield whereas with operating leases, the lease rental payments total only a percentage of the equipment cost (or lease basis).

11.    Under Financial Accounting Standards Board ("FASB") rules, for a lease to qualify for accounting treatment as an "operating lease," the present value of the minimum lease rental payments must not be greater than or equal to 90% of the original cost of the leased equipment (or lease basis).

12.    At the conclusion of the fixed term under an operating lease, the lessee generally has the option to return the equipment to the lessor, to renew the lease at an agreed rate (generally fair rental value) or purchase the equipment at an agreed price (generally fair market value). The value of the equipment at the end of the lease term is called the "residual" value, and the proceeds from the sale or re-lease of the equipment is known as "residual" proceeds.

13.    Because the lease rental payments total less than the original equipment cost (or lease basis), the lessor must either sell or re-lease the equipment (the proceeds of such activity being realization of the residual value) to achieve a yield or profit.  This difference between the original equipment cost and the total lease rental payments (discounted to present value) – existing in every operating lease – is the lessor's investment risk in the lease.

14.    On operating leases, to achieve a "yield" or profit, most lessors must re-lease or re-sell the leased equipment at the conclusion of the lease term, with the objective of obtaining an amount equal to at least the residual value the lessor assumed at the onset of the lease.  But CSI found a simpler way: "rolling up" equipment schedules to eliminate its investment risk and guarantee a profit for itself at Lycos' expense.

*Lycos' Computer Equipment Leases With CSI*

15.    In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment.  An unexecuted copy of this master lease agreement is attached hereto as Exhibit A (the "Master Lease Agreement").

16.    Between December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment schedules for the acquisition and lease of new items of technology equipment under the Master Lease Agreement.  The equipment schedules concerned, literally, thousands of pieces of computer equipment on which Lycos relied for its day-to-day operations.  According to the Master Lease Agreement, each equipment schedule constituted a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos.

An example of one of the lease schedules, Equipment Schedule 67E, is attached hereto as Exhibit B.

17.    The equipment schedules were structured as operating leases, with personal computing assets (i.e., PCs) on fixed terms of 24 months and network computing assets (i.e., Non-PCs) on fixed terms of 36 months.  A typical 24-month lease between Lycos and CSI was priced so that the present value of the minimum lease rental payments for the term of the lease equaled 85% of the cost of the equipment financed, while the present value for the typical 36-month lease was slightly less than 90%.  Thus, CSI's equity (i.e., "investment" or "risk") in the lease was 15% on the 24-month leases and 10% on the 36-month leases.

<em>CSI Gains the Trust of Lycos Personnel</em>

18.    CSI's account representative for Lycos, Paul Stenberg, who operated out of an office in Needham, Massachusetts, communicated regularly with Lycos personnel during the course of the parties' business relationship.  As that relationship grew over time into what Lycos thought was a collegial and long-term association, Lycos and CSI representatives also began interacting on a social as well as a business basis.  Such social interaction between Lycos and CSI representatives included golf outings, dinners and invitations to concerts and sporting events.  Through such activities, Mr. Stenberg gained the friendship and trust of Lycos' officers and employees.

19.    Lycos' personnel periodically changed over time, including those in key financial and oversight positions responsible for managing Lycos' lease portfolio with CSI.  As a result, and based on what appeared to be CSI's trustworthy and collegial approach toward Lycos, Lycos' personnel reposed confidence in the integrity of Mr. Stenberg and CSI with respect to the execution of equipment schedules.  Mr. Stenberg and CSI voluntarily assumed

- 11 -

and accepted this confidence. Lycos' placement of such trust in CSI, and CSI's acceptance of this confidence, was reasonable under the circumstances, particularly given CSI's superior knowledge and expertise with respect to the complicated equipment leases transactions involved.

20.    Notwithstanding Lycos' trust and confidence in CSI, and CSI's acceptance of this trust and confidence, CSI took advantage of it to CSI's benefit and Lycos' detriment through improper and wrongful utilization of "roll ups" of Lycos' equipment schedules.

*CSI's Consolidation or "Roll Up" of Lycos' Leases*

21.    Of the approximately 80 equipment schedules entered into between Lycos and CSI, only a handful reached their maturity dates in the normal course. Instead, just over a year after execution of the Master Lease Agreement and a full year before the normal expiration of the term of certain equipment schedules, several of the then-existing equipment schedules were terminated on or prior to their scheduled maturity dates and "rolled up" onto one or more new equipment schedules with fixed terms of 24 months or more.

22.    CSI's method of consolidation or "rolling up" equipment schedules worked as follows. Either on their normal expiration date or prior thereto, several equipment schedules would be terminated, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment schedule. In some cases, the equipment from one equipment schedule would be combined with the equipment from one or more other schedules and "rolled up" onto a single new equipment schedule. Some schedules were rolled even though Lycos had already made 100% of the lease payments required under those schedules and the computer equipment was, by then, outdated.

- 12 -

23.     Before consolidation onto a single new equipment schedule, the terminated equipment schedules sometimes had varying numbers of months remaining on their original lease terms. At the date these equipment schedules became effective under the new "roll-up" schedule, some would have no original monthly lease rental payments remaining, while others would have all but two or three monthly lease rental payments remaining. Some of these "rolled up" schedules were rolled up again into other equipment schedules. In fact, certain equipment schedules were "rolled up" several times.

24.     CSI represented to Lycos that the "roll-ups" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage. This was true, but it was only part of the truth. What CSI failed to disclose to Lycos was that (A) over time, Lycos would pay CSI considerably more than 100% of the value of the equipment as a result of these "roll ups," something Lycos could not reasonably have discovered on its own; and (B) CSI utilized these "roll-ups" to reduce significantly, and in most cases eliminate, CSI's investment risk in the "rolled" leases at Lycos' expense. This partial disclosure to Lycos was intended to and did induce Lycos to agree to "roll up" the lease schedules. If, however, CSI had made full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under them.

25.     Based on documentation prepared by CSI, the original cost of the equipment leased by Lycos from CSI under the 80 equipment schedules was approximately $47 million. Under these original lease schedules, prior to "roll-ups," Lycos would have paid CSI monthly lease rental payments of approximately $46 million. (The $46 million number exceeds 90% of the equipment cost because, on some leases, the present value of the minimum lease payments

- 13 -

was higher due in part to certain "soft" costs such as software, taxes, freight, and warranties being capitalized.) As a result of the "roll-ups," however, Lycos has paid CSI over $72 million in total monthly lease rental payments (exclusive of interim rent), an increase of more than $26 million.

### *Example of an Egregious and Unfair "Roll Up" – Equipment Schedule 67E*

26.     An examination of the history of one specific equipment lease schedule – Equipment Schedule 67E – demonstrates how CSI manipulated the "roll up" process to its favor and Lycos' detriment.

27.     On July 12, 2000, Lycos entered into Equipment Schedule 67E ("Schedule 67E"), a true and accurate copy of which is attached hereto as Exhibit B. Schedule 67E governed the lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months starting in October of 2000 and with a monthly rental payment of $42,075. Given a residual value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield from Schedule 67E was a reasonable 11%.

28.     On November 14, 2000, after only two monthly lease rental payments, Lycos entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is attached hereto as Exhibit C. Schedule 67H is a 34-month lease commencing on December 1, 2000. The assets leased under Schedule 67H are those same assets previously leased under Schedule 67E, which was terminated the day before Schedule 67H became effective. The monthly lease rental payment due under Schedule 67H was $36,438.41. A comparison of the terms of Schedules 67E and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment @10% | 84.27% | 99.35% | 104.53% |
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

29.    As reflected in the table above, the "refinancing" of Schedule 67H did reduce Lycos' monthly lease rental payment obligation by over $5,000. However, it increased Lycos' total lease rental obligations by more than $310,000 from $1,009,800 to $1,323,056 (under the combined equipment schedules). Additionally, CSI's risk in the transaction was completely eliminated because the total lease rental payments fully returned CSI its investment in the equipment and provided a yield of almost 14% prior to CSI receiving any residual proceeds at the end of the term of Schedule 67H (see the last row of the table above). While CSI frequently emphasized the short-term reduction in Lycos' monthly payments, CSI did not paint the full picture by conveniently failing to disclose these additional facts to Lycos. Moreover, Schedule 67H still required Lycos to either purchase, renew or return the equipment to CSI at the conclusion of its lease term.

30.    Although CSI had already completely eliminated its investment risk in the leased equipment under Schedule 67E, and had guaranteed itself a 14% profit through the "roll up" into Schedule 67H, CSI's failure to disclose to Lycos the full impact of the "roll-ups" continued.

31.     In October of 2001, allegedly again to reduce Lycos' monthly payments, CSI again rolled the equipment that had originally been leased pursuant to Schedule 67E. Two new lease schedules were the outcome of that "refinancing" activity. True and accurate copies of Equipment Schedules 93 and 94 are attached hereto as <u>Exhibits D and E</u> ("Schedule 93" and "Schedule 94", respectively).

32.     Schedules 93 and 94 reflected the "roll-up" of a large number of then-existing equipment schedules – including Schedule 67H – with the equipment divided into the two schedules by category: PCs onto Schedule 93 and Non-PCs onto Schedule 94. Schedule 93 had a 24-month term commencing November 1, 2001 and ending October 31, 2003, while Schedule 94 had a 36-month term commencing November 1, 2001 and ending October 31, 2004. A termination date of September 30, 2003 was established for Schedule 67H, which was the original end date of the lease. The additional lease obligations under Schedule 93 became one (1) payment of $3,751 payable October 1, 2003. The additional lease obligation under Schedule 94 became thirteen (13) monthly payments of $32,688 commencing October 1, 2003 (see table below).

| Equipment Schedule | 67E / 67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in Advance) | 2@ $42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2@ $42,075 34 @ $36,438 1@ $36,438 12@ $32,688 |
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payments @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos' monthly lease rental obligation did decline from $36,428 to $32,688.  However, Lycos' total fixed monthly lease rental obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment schedules).  Additionally, CSI further increased its yield or profit in the transaction before receipt of any residual proceeds to more than 27%.  CSI did not disclose this fact to Lycos.  Moreover, Schedules 93 and 94, however, did not end Lycos' obligation to CSI under the original Schedule 67E, but carried at its conclusion yet another obligation for Lycos to purchase, renew, or return the equipment to CSI.

### *CSI's Misrepresentations, Partial Disclosures and Omissions of Material Fact*

33.    The Equipment Leasing Association ("ELA") is a nonprofit trade organization that represents more than 800 member leasing companies.

34.    CSI is a member of the ELA.

35.    The ELA's standards for professional conduct reflect the standards of the equipment leasing industry in general.  They also govern the conduct of its members.

36.    The ELA has established a Code of Fair Business Practices, a true and accurate copy of which is attached as Exhibit F.  Paragraph 7 of Section I: General Standards of Professional Conduct, requires ELA members to "disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision."

37.    The Attorney General of the Commonwealth of Massachusetts has promulgated a regulation with similar provisions.  Section 3.16(2) of 940 C.M.R. provides that "an act or practice is a violation of M.G.L. c. 93A, § 2, if . . . (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."

- 17 -

940 C.M.R. 3.01 defines "buyer" to include "lessees" such as Lycos. The Attorney General has prosecuted companies for violating this regulation in business-to-business transactions, and interprets this regulation to apply to business-to-business transactions such as the instant one. True and accurate copy of complaints filed by the Attorney General for violating this regulation in business-to-business transactions against business are attached hereto as <u>Exhibit</u> <u>G</u>.

      38.    CSI failed to disclose to Lycos the more than $26 million increase in aggregate payments resulting from the "roll-ups" and elimination of residual, and presented only half the truth about the "roll ups" to induce Lycos' continued participation in CSI's scheme notwithstanding,

A.    CSI's duty to make disclosures to Lycos of information relevant to Lycos' decision to enter into the lease-roll-ups as a result of (i) Lycos' trust and confidence in CSI and CSI's acceptance of that trust and confidence; and (ii) CSI's partial disclosure of relevant facts, i.e., Lycos' reduced monthly payments pay under the lease "roll-ups";

B.    the Attorney General's regulation, 940 C.M.R. 3.16(2);

C.    CSI's membership in the ELA and representation on its web-site that it "engag[es] in the highest levels of business conduct with regard to ethics";

D.    CSI's knowledge of the economic windfall it would enjoy at Lycos' expense from the "roll-ups," and

E.    CSI's knowledge that Lycos' understanding of the effect of the lease schedule "roll-ups" was simply that the term of the equipment schedule would be extended and the amount of the monthly lease rental payments reduced.

39.    If CSI had fully disclosed the impact of the "roll-ups" on, among other things, the total price being paid by Lycos on them, Lycos would not have entered into them and/or would not have continued performing under them.

40.    Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups" as it was obligated to do, but CSI intentionally misrepresented material facts to Lycos to induce it to continue making payments under the "roll-ups." Specifically, but without limitation, when Lycos asked Mr. Stenberg about the original cost of the equipment leased pursuant to Schedules 93 and 94, he sent Lycos an e-mail dated March 18, 2002 in which CSI represented that the total original equipment cost under the Lycos lease schedules was $63 million. A true and accurate copy of this e-mail is attached hereto as Exhibit H.

41.    On information and belief, Mr. Stenberg knew, at the time he sent this e-mail that:

A.    Lycos would use this figure during its (Lycos') internal review to determine whether to continue performance under the "rolled up" leases or whether Lycos would insist on "unwinding" those leases;

B.    this $63 million amount overstated the original equipment cost by more than $16 million; and

C.    his statements would delay or prevent Lycos from discovering the true original equipment cost and the nature of CSI's "roll up" scheme.

### Lycos' Purchase of the Leased Equipment

42.    In 2003, before Lycos had discovered the true financial impact of the "roll ups," Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules. As part of that discussion, Lycos also

requested what, if anything, would be required to convert the remaining lease obligations to capital leases such that at the conclusion of the lease terms, Lycos would own the equipment.

43.    Although CSI had a duty to disclose to Lycos that Lycos had already made or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.

44.    The proposed structure consisted of a one-time payment (purchase price), plus payment of the then remaining monthly lease rental payments on their original due dates.

45.    Ultimately, in July of 2003, Lycos agreed to and did pay CSI a purchase price of $3.775 million. Lycos also agreed to continue making monthly lease rental payments until the end of the lease term, at which time, Lycos would "own" the equipment. Of course, CSI did not tell Lycos that Lycos had already paid substantially more than the cost of the equipment. Had CSI made a full disclosure, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the leased equipment. A true and accurate copy of the July, 2003 purchase agreement is attached hereto as Exhibit I.

46.    It was not until after Lycos had entered into the July, 2003 purchase agreement that Lycos discovered – and then only through the analysis of an expert leasing consultant it engaged to analyze all of the CSI leases – the true nature of CSI's "roll up" scheme, and the negligent and intentional misrepresentations, partial disclosures, and omissions of material fact used by CSI to induce Lycos' participation and continued performance. Because of, among other things, CSI's movement of hundreds of pieces of equipment from one lease schedule to another, the complexity of those "roll-ups," CSI's misrepresentations, partial disclosures, and omissions, Lycos' trust and confidence in CSI, and the fact that expertise was required to

discover the impact of the "roll-ups," Lycos should not and could not have reasonably have been expected to discover the impact of the roll-ups prior to that time.

## COUNT I
### (Money Had and Received)

47.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 46 above.

48.    The original cost of the equipment leased by Lycos from CSI was approximately $47 million.

49.    Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling $46 million.

50.    As a result of CSI's repeated "roll-up" of the lease schedules, Lycos has paid CSI (i) more than $72 million in addition to interim rent; and (ii) $3.775 million to purchase the equipment.

51.    CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

52.    Equity and good conscience demand that this excess, in an amount to be determined at trial but not less than $14,000,000, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
### (Unjust Enrichment)

53.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 52 above.

- 21 -

54.    CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

55.    CSI accepted such monies knowing that it was receiving an economic windfall.

56.    CSI's retention of these monies would be unjust and inequitable.

57.    As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT III
## (Declaratory Judgment)

58.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 57 above.

59.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

60.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

61.    Lycos seeks a judicial declaration that

A.    it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

B.    it is the owner of the equipment leased pursuant to the Master Equipment Lease and schedules with respect thereto.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IV
### (Declaratory Judgment)

62.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 61 above.

63.     A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules, as described above.

64.     Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT V
### (Fraudulent Misrepresentation)

65.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 64 above.

66.     Because of the trust Lycos reposed in CSI and CSI accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the "roll-up" transactions, and 940 C.M.R. 3.16(2), CSI was obligated to fully disclose to Lycos (a) the impact of the "roll-ups" in terms of the amount to be paid by Lycos relative to the original equipment cost; and (b) the fact that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for the leased equipment.

67.     CSI's failure to disclose all facts material to Lycos' decision to enter into the "roll-ups" was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.

- 23 -

68.    Had CSI made a full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under the "rolled up" leases.

69.    As a result of CSI's intentional misrepresentations and breach of duty to disclose material facts, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

70.    In addition, CSI intentionally misrepresented that the original cost of the leased equipment was $63 million. CSI made this representation with knowledge of its falsity or at least with reckless disregard for its truthfulness. CSI made this representation with the intent that Lycos rely on it. Lycos reasonably and justifiably relied on this misrepresentation and, as a result, suffered substantial damages.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VI
### (Negligent Misrepresentation)

71.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 70 above.

72.    To the extent CSI performed its duty to provide Lycos with all information relevant to Lycos' decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

73.    Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment. Lycos also justifiably relied on the misleading half-truth that the "roll ups" would decrease Lycos'

- 24 -

monthly rental payments, without also being informed that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for the leased equipment.

74.    As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VII
### (G.L. c. 93A, §§ 2 and 11)

75.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 74 above.

76.    CSI is engaged in trade or commerce as that term is defined in G.L. c. 93A.

77.    CSI has engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2 and 11 including, but not limited to:

A.    its collection of money from Lycos well above any reasonable or fair total compensation as a result of the "roll up" of various equipment schedules;

B.    its intentional and negligent misrepresentations, and omissions of material facts pertinent to Lycos' decision to enter into the lease "roll-ups" that CSI was obligated, under common law, to disclose;

C.    its failure to disclose to Lycos, as required by 940 C.M.R. 3.01, Definition of Buyer, and 940 C.M.R. 3.16(2), facts that may have influenced Lycos' decision to enter into the lease "roll-ups"; and

- 25 -

D.    its failure to comply with industry standards established by the ELA by not "disclos[ing] to [Lycos] all relevant information as to the terms and conditions" of the lease "roll-ups."

78.    At all times material and relevant hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts.

79.    The violations of G.L. c. 93A, §§ 2 and 11 described above were knowingly, willfully and intentionally committed by CSI.

80.    By reason of CSI's unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $14,000,000.

81.    Such damages should be trebled pursuant to G.L. c. 93A, § 11, and Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT VIII
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

82.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 81 above.

83.    In entering into the Master Lease Agreement and related lease schedules, CSI was bound to act in good faith and fair dealing with Lycos.

84.    Through its fraudulent and/or negligent misrepresentations in connection with the "roll up" of various equipment schedules, as described above, CSI has unfairly and in bad faith extracted money from Lycos well above any reasonable or fair total compensation under the leases.

85.    As a result of CSI's actions described above, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

### JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

### PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Counts I-II, V-VI and VIII, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $14,000,000, together with interest and costs;

B.    On Count III, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment lease schedules between Lycos and CSI, and that Lycos owns the equipment leased pursuant to the Master Equipment Lease and related lease schedules free and clear of any claim of CSI;

C.    On Count IV, enter judgment declaring that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial but not less than $14,000,000, together with interest and costs;

D.    On Count VII, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of G.L. c. 93A, and awarding plaintiff actual damages in an amount to be determined at trial but not less than $14,000,000, trebled, together with interest, costs and attorneys' fees; and

- 27 -

E.    Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated:  February 4, 2005

*Erik Bartenhagen*

Thomas O. Bean (BBO# 548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for plaintiff, Robert J. Kaler, Gadsby Hannah LLP, 225 Franklin Street, Boston, MA 02110, by hand on February 4, 2005.

*Erik Bartenhagen*

Erik P. Bartenhagen

1400060.4

- 28 -





**MASTER LEASE AGREEMENT NUMBER 144874**

MASTER LEASE AGREEMENT dated as of December 4, 1996 by and between COMPUTER SALES INTERNATIONAL, INC. (hereinafter called "Lessor") having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141, and

LYCOS, INC.

(hereinafter called "Lessee") having its principal office and place of business at

293 Boston Post Road West
Marlboro, Massachusetts 01752

IN CONSIDERATION of the mutual agreements hereinafter set forth and the payment of rent as herein provided for, the parties hereto agree as follows:

### 1. LEASE AGREEMENT

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor all of the equipment and other tangible personal property described in each of the Equipment Schedules which are executed from time to time by Lessor and Lessee pursuant to this Master Lease. Each Equipment Schedule shall constitute a separate lease on the terms and conditions stated therein and, to the extent not inconsistent with the Equipment Schedule, on the terms and conditions stated in the Master Lease which shall be incorporated by reference in the Equipment Schedule. The term "Equipment" as used herein shall mean, with respect to any Equipment Schedule, the Equipment described therein. The term "Unit" as used herein shall mean an individual machine or an Equipment Schedule or an individual feature when such feature is leased separately from a machine. The term of this Master Lease shall begin on the date set forth above and shall continue in effect so long as any Equipment Schedule entered into pursuant to this Master Lease remains in effect.

### 2. TERM

2.1 COMMENCEMENT DATE: The commencement date ["Commencement Date"] for each Unit of Equipment will be the date on which such Unit is installed by the manufacturer or other installer, except that, in the event there is a delay in the installation of a Unit and such delay is attributable to Lessor, then the Commencement Date for such Unit shall be five [5] working days following the date upon which Lessor has been given notice that such Unit is available for installation. If requested by Lessor, Lessee will promptly execute and deliver to Lessor a certificate confirming the Commencement Dated.

2.2 INITIAL TERM: The "Initial Term" of an Equipment Schedule shall mean the period beginning on the Commencement Date of the Unit having the latest Commencement Date of the Units on such Equipment Schedule if such Commencement Date is the first day of a month, and otherwise, the Initial Term shall begin on the first day of the month immediately following the month in which such latest Commencement Date falls. The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rental unless and until terminated by either party giving the other party not less than 120 days prior written notice. Any termination (i) must relate to all of the Equipment described on the Equipment Schedule to which the notice applies, (ii) will be effective only on the last day of this initial term or on the last day of any successive such month period, (iii) will be effective only on the last day of this initial term or on the last day of any successive four month period, (iii) will be effective only on the last day of this initial term or on the last day of any successive four month period, (iii) will be effective only if Lessee returns all of the Equipment to Lessor in accordance with the terms of the Equipment Schedule by the day after the scheduled termination date, and (iv) may not be unilaterally revoked.

### 3. MONTHLY RENTAL

Lessee shall pay to Lessor the monthly rental ["Monthly Rental"] for each Unit as set forth in the relevant Equipment Schedule. The Monthly Rental shall be payable at the above mailing address of Lessor or at such other place as Lessor may from time to time designate in a written notice to Lessee. The Monthly Rental for each Unit shall commence on the Commencement Date of each Unit and shall be due and payable in advance and without demand on the first day of each month thereafter during the term of this Lease. If the Commencement Date for a Unit is a day other than the first day of a month, Daily Rental shall be payable ["Daily Rental"] shall equal one-thirtieth of the Monthly Rental for such Unit for each day from, and including, the Commencement Date to, but not including, the first day of the Initial Term, and such total Daily Rental amount shall be due and payable on the first day of the Initial Term.

### 4. WARRANTIES

4.1 AFFIRMATIVE WARRANTIES: Lessor represents and warrants that:

[a] The Equipment shall be eligible for the manufacturer's standard prime shift maintenance contract upon installation, provided Lessee requests such coverage in writing prior to installation of the Equipment.

[b] During the term of this Master Lease, if no Event of Default has occurred, Lessee's quiet enjoyment and peaceable possession of the Equipment shall not be interrupted by Lessor or anyone claiming solely through or under Lessor.

4.2 DISCLAIMER OF WARRANTIES: THE AFFIRMATIVE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES OF LESSOR. LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, FITNESS, CAPACITY OR SUITABILITY FOR

Page No. 1 of 6                    LYCOS, INC.                    Master Lease No. 144874
                                                                 December 4, 1996

PS/BOST.

LYC 00002

ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT, OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. Without limiting the generality of the foregoing, Lessor shall not be liable to Lessee for any liability, claim, loss, damage or expense of any kind or nature (including strict liability in tort) caused directly or indirectly by the Equipment, any inadequacy thereof for any purpose, any deficiency or defect therein, whether known or unknown to Lessor. In any event, Lessor shall not be liable to Lessee for any loss of business or any other incidental or consequential loss or damage resulting from any cause whatsoever.

4.3 ASSIGNMENT OF WARRANTIES. Lessor hereby assigns to Lessee any and all manufacturer's warranties, if assignable, and any other such rights that are assignable to Lessee may have against the manufacturer of the Equipment provided, however, that Lessee's sole remedy for the breach of any such warranty or right shall be against the manufacturer and not Lessor.

4.4 SELECTION: Lessee acknowledges, represents and warrants that it has made the selection of the Equipment based on its own judgment and expressly disclaims any reliance upon statements made by the Lessor. The Equipment is being leased for commercial or business purposes only, and will not be used for consumer, personal, home, or family purposes.

## 5. NET LEASE

Each Equipment Schedule constitutes a net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, and operation of the Equipment. Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that Lessee may have against Lessor. Except as expressly provided for herein, neither this Master Lease, nor any Equipment Schedule, shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, or any loss or destruction of the Equipment or any Unit from any cause whatsoever, or the interference with the use thereof by any private person, corporation, or governmental authority or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Monthly Rental payable by Lessee under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term thereof.

## 6. TAXES

6.1 PAYMENT OF TAXES: Lessee covenants and agrees to pay to the appropriate taxing authority, and discharge before the same become delinquent, all taxes, fees, or other charges of any nature whatsoever, without pro-ration, together with any related interest or penalties ("Impositions") now or hereafter imposed, assessed or payable during the term of the relevant Equipment Schedule including any extension thereof for an imposition relating to a record date or status date that fall within the term of the relevant Equipment Schedule including any extension thereof or is otherwise associated with Lessee's leasing, possession or use of the Equipment against Lessee, Lessor or the Equipment by any federal, state, county or local government or taxing authority upon or with respect to (i) the Equipment or any Unit; (ii) upon the leasing, ordering, purchase, sale, ownership, use, operation, return or other disposition thereof; (iii) the Monthly Rental or any other sums due hereunder with respect to any Equipment Schedule, or (iv) the leasing of the Equipment. Exception only federal, state and local taxes measured by the net income of Lessor or any franchise tax upon Lessor measured by Lessor's capital, capital stock or net worth). Because the payment due date for reimbursement date for an imposition may occur after the expiration or termination of the term of the relevant Equipment Schedule, it is understood and agreed that Lessee's liability for such impositions shall survive the expiration or termination of the term of the relevant Equipment Schedule.

6.2 BILLING: Lessee shall, to the extent permitted by law, cause all impositions to be billed to Lessee. Lessee shall, at its expense, timely file all forms and returns and timely do all things required to be done in connection with the levy, assessment and payment of any impositions, and Lessor hereby appoints Lessee as Lessor's attorney-in-fact where necessary for such purposes: Lessee shall submit written evidence to Lessor of the payment of all impositions required to be paid by Lessee hereunder promptly after such payment. Notwithstanding the foregoing, Lessor, in its sole discretion, may pay any imposition itself or file any forms or returns with respect thereto. If Lessor pays any imposition, Lessee shall, when billed, reimburse Lessor for such payment.

6.3 CONTEST: Lessee may contest any imposition by appropriate legal proceedings provided the nonpayment of such imposition thereof, or such proceedings, will not, in the opinion of counsel for Lessor, adversely affect the title, property interest or rights of Lessor in the Equipment and provided further that, if requested by Lessor, Lessee has given to Lessor security, sufficient in form and amount, in Lessor's reasonable judgment, to fully satisfy the amount of the contested imposition.

## 7. DELIVERY AND RETURN

Lessor shall arrange for delivery, and Lessee shall pay, when billed, all delivery expenses (including, without limitation, transportation costs and the cost of in-transit insurance) associated with the delivery of each Unit from its previous location to the location specified in the relevant Equipment Schedule. Lessee shall inspect each Unit upon delivery, identify any observable damage prior to accepting delivery, and note any such damage on the bill of lading. Costs of repair which are not recoverable from the carrier because of Lessee's failure to properly inspect for observable damage shall be borne and promptly paid by Lessee. Lessee shall provide a suitable place for installation of the Equipment with all appropriate facilities as specified by the manufacturer. Lessor shall arrange and Lessee shall pay for the installation of each Unit [if Lessee wishes to have the Equipment installed by an installer other than the manufacturer or some other party approved in writing by Lessor, then Lessee shall accept the Equipment "as is" and Lessee's warranty set forth in Paragraph 4.1 (a) shall not apply). Upon the termination of Lessee's right to possession of any Unit (by expiration of the term of the relevant Equipment Schedule or otherwise), Lessee shall, in accordance with Lessor's instructions and at Lessee's expense (including without limitation transportation costs and costs of in-transit insurance) return the Unit to such location within the Continental United States as shall be designated by Lessor. Lessee shall reimburse Lessor for all expenses paid by Lessee associated with return of the Unit when billed. Lessee shall return each Unit in the same operating order, repair, condition and appearance as when received, excepting only normal wear and tear, and with all engineering changes prescribed by the manufacturer prior to the termination of Lessee's right of possession incorporated in the Unit. Lessee shall, at its expense, shall make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance contract upon its return and shall have the Unit certified as eligible for the same. At the time the Equipment is returned, Lessee shall provide a letter from the manufacturer certifying such maintenance eligibility.

## 8. CARE OF EQUIPMENT

8.1 USE AND MAINTENANCE: Lessee shall, at its expense, maintain the Equipment in good operating order, repair, and condition. Lessee shall not use the Equipment for any purpose other than that for which it was designed. Prior to the delivery date and before any action is taken to install the Equipment, Lessee shall make a written request to the manufacturer for continued coverage of the Equipment under one of the manufacturer's standard maintenance agreements, and shall, at its expense, enter into and maintain in force such maintenance agreement for each Unit and provide Lessor with a copy of such agreement. IF LESSEE FAILS TO MAKE THE PROPER WRITTEN REQUEST TO THE MANUFACTURER FOR COVERAGE UNDER ONE OF THE MANUFACTURER'S STANDARD MAINTENANCE

LYC 00003

AGREEMENTS, THEN LESSEE SHALL ACCEPT THE EQUIPMENT "AS IS" AND LESSOR'S WARRANTY SET FORTH IN [PARAGRAPH 4.1(A)] SHALL NOT APPLY. In no event, however, shall Lessee be required to enter into such a contract for any Unit so long as that Unit is under a manufacturer's warranty which provides substantially similar coverage.

**8.2 ALTERATIONS AND ATTACHMENTS:** With the prior written consent of the Lessor, Lessee may, at its expense, make alterations to and attachments to the Equipment which are removable and which do not interfere with the normal and satisfactory operation or maintenance of the Equipment or Lessee's ability to obtain the maintenance contract required in Section 8.1 above. Upon the termination of Lessee's right to possession of any Unit, any alterations or attachments to such Unit shall become the property of Lessor unless removed at Lessee's expense prior to such termination. Lessee shall have the right, following termination of Lessee's right to possession of any Unit, to remove any attachments or alterations made by Lessee to such Unit and dispose of the same without any liability thereto to Lessee and Lessee shall pay the costs of such removal when billed.

**8.3 INSPECTION:** Lessee shall make the Equipment available to Lessor, Secured Party (hereinafter defined) and Assignee (hereinafter defined) or the designees of any of them during normal working hours for inspection or for any other reasonable purpose.

## 9. LOSS OR DAMAGE.

**9.1 RISK OF LOSS:** Lessee shall be responsible for and hereby assumes the entire risk of the Equipment being lost, damaged, destroyed, stolen, or otherwise rendered unfit or unavailable for use from the date of delivery to Lessee to the date of return to Lessor.

**9.2 OCCURRENCE OF LOSS:** If any Unit is lost, damaged, destroyed, stolen, or otherwise rendered unfit for use, Lessee shall give to Lessor immediate notice thereof, and this Master Lease and the applicable Equipment Schedule shall continue in full force and effect without any abatement in the Monthly Rental. Lessee shall determine within fifteen (15) days after the date of the occurrence of damage whether such Unit can be repaired. In the event Lessee determines that such Unit can be repaired, Lessee, at its expense, shall cause such Unit to be promptly repaired. If a Unit is lost, destroyed or stolen or if Lessee determines that a damaged Unit cannot be repaired, Lessee shall, at Lessee's direction, within thirty [30] days of such event either replace the Unit with an identical Unit, the title to which shall thereupon vest in Lessor and which thereafter shall be considered the Unit subject to the Equipment Schedule with no abatement in the Monthly Rental or, in Lessor's sole discretion, pay to Lessor an amount equal to the Stipulated Loss Value of the Unit determined as of the date of payment in accordance with the Stipulated Loss Value Schedule attached to the applicable Equipment Schedule together with all unpaid Monthly Rental which is due and payable through the date of payment. Upon such payment, Lessee's obligation to pay further Monthly Rental for such Unit shall cease.

## 10. INSURANCE.

**10.1 PROPERTY INSURANCE:** Throughout the term of each Equipment Schedule, Lessee shall, at its expense, maintain in full force and effect "all risk" extended coverage, fire and casualty insurance for the Equipment. Such insurance shall provide for coverage in an amount equal to the greater of the Stipulated Loss Value or the replacement cost of the Equipment at the time of loss. Lessee shall be named as the Loss Payee on such policy. In addition, the policy shall, by means of a standard mortgage clause, name the Secured Party and Assignee as additional insureds and loss payees as their interest shall appear. Such policy shall provide that it may not be canceled or materially altered unless thirty [30] days prior written notice is given to all parties named therein. Upon Lessor's written request, Lessee shall provide Lessor with a Certificate of Insurance evidencing such insurance coverage. If, within two weeks after Lessee's receipt of such request, Lessee has not provided Lessor with a satisfactory Certificate; then Lessor may, at Lessor's option, obtain such insurance until Lessee provides the Certificate, and Lessee shall reimburse Lessor for the cost of such insurance when billed.

**10.2 LIABILITY INSURANCE:** During the term of this Master Lease, Lessee, at its expense, shall maintain reasonable, commercial general liability and property damage insurance with respect to the use, possession and operation of the Equipment in an amount not less than one million dollars for each occurrence.

## 11. INDEMNIFICATION

Lessee shall and does hereby indemnify and hold Lessor, any Assignee, and any Secured Party, harmless from and against any and all claims, costs, reasonable attorneys' fees, expenses, damages, and liabilities including those resulting from the application of strict liability doctrines or statutes) arising out of Lessee's selection, possession, leasing, operation, control, use, maintenance, delivery, or return of the Equipment. Notwithstanding the foregoing, Lessee shall not be required to indemnify a party for any claim resulting from acts of that party which constitute willful misconduct or gross negligence.

## 12. ASSIGNMENT, SUBLEASE OR RELOCATION BY LESSEE

UPON AT LEAST THIRTY [30] DAYS PRIOR WRITTEN NOTICE TO LESSOR, LESSEE MAY ASSIGN OR SUBLEASE A UNIT TO ANY PARTY, OR RELOCATE A UNIT TO ANY LOCATION, WITHIN ANY STATE OF THE CONTINENTAL UNITED STATES, PROVIDED THAT LESSOR, ASSIGNEE, AND SECURED PARTY, IN SUCH PARTIES' SOLE DISCRETION, SHALL HAVE APPROVED SUCH ASSIGNEE, SUBLESSEE, OR LOCATION, AND PROVIDED FURTHER THAT [i] ALL COSTS OF ANY NATURE WHATSOEVER INCLUDING ANY ADDITIONAL IMPOSITIONS AND ANY ADDITIONAL EXPENSES ASSOCIATED WITH FILING NEW PRECAUTIONARY UNIFORM COMMERCIAL CODE FINANCING STATEMENTS RESULTING FROM ANY RELOCATION, ASSIGNMENT OR SUBLEASE SHALL BE BORNE BY LESSEE; [ii] ANY ASSIGNMENT OR SUBLEASE SHALL BE MADE EXPRESSLY SUBJECT AND SUBORDINATE TO THE TERMS OF THIS LEASE AND [iii] LESSEE SHALL ASSIGN ITS RIGHTS UNDER SUCH ASSIGNMENT OR SUBLEASE TO LESSOR, ASSIGNEE, OR SECURED PARTY AS ADDITIONAL COLLATERAL AND SECURITY FOR LESSEE'S OBLIGATIONS HEREUNDER. In the event of a relocation, assignment, or sublease, Lessee and its assignee or its sublessee shall cooperate with Lessor in taking all reasonable measures to protect the title of Lessor or Assignee and the interest of any Secured Party to and in the Equipment. No relocation, assignment, or sublease shall relieve Lessee of its primary obligations under the relevant Equipment Schedule and this Master Lease.

## 13. ASSIGNMENT BY LESSOR

Lessor shall have the right to assign as security its interest in any or all of the Equipment Schedules which may from time to time be executed and the Units described in any such Equipment Schedule to a security assignee ["Secured Party"]. Lessor shall also have the right to sell or otherwise dispose of any or all of the Units described in any Equipment Schedule, subject to the prior right of Lessee in such Units, and to assign its interest as Lessor under such Equipment Schedule, to any assignee ["Assignee"]. Any such assignment shall not in any way release Computer Sales International, Inc. from liability for performance of the Lessor's obligations hereunder. Lessee acknowledges that any assignment by Lessor will not materially change Lessee's duties or obligations under the Equipment Schedule nor materially increase the burden or risk imposed on Lessee. Lessee hereby consents to and shall acknowledge such assignment or assignments as shall be designated by written notice to Lessee by Lessor. Lessee further covenants and agrees that:

[a] Any such Secured Party or Assignee shall have and be entitled to exercise any and all discretions, rights and powers of Lessor under the Equipment Schedule to which it has an interest, provided that a Secured Party or Assignee shall not be obligated to perform any of the obligations of Lessor other than Lessor's obligations under Paragraph 4.1 [b].

[b] Lessee shall pay directly to the Secured Party or Assignee all Monthly Rental and all other sums due upon receipt of notice of any assignment and of instructions to do so; and

LYC 00004

(c) After an assignment to a Secured Party or Assignee, Lessee's obligations hereunder including its obligation to pay the Monthly Rental and any and all other amounts payable under the Equipment Schedule by Lessee shall be absolute and unconditional and shall not be subject to any abatement, reduction, recoupment, defense, setoff, or counterclaim available to Lessee against Lessor for any reason whatsoever.

(d) Only one executed counterpart of any Equipment Schedule shall be marked "Original," any other executed counterparts shall be marked "Non-original" or "Copy". No security interest in any Equipment Schedule may be created through the transfer and possession of any counterpart other than the "Original", nor shall any sale, assignment or transfer of any interest in an Equipment Schedule be effective or be binding upon Lessee through the transfer and possession of any counterpart other than the "Original".

## 14. EVENTS OF DEFAULT

The occurrence of any one or more of the following events ("Events of Default") shall constitute a default under the relevant Equipment Schedule:

(a) Lessee fails to pay the Monthly Rental, or any other amount due hereunder, on or before the date the same is due and such failure continues for a period of ten (10) days after receipt of written notice thereof from Lessor;

(b) any financial statements or information or any other representation or warranty given to Lessor proves to have been materially false or misleading as of the date it was given by or on behalf of Lessee;

(c) Lessee fails to observe or perform any other term, condition, obligation, agreement or covenant set forth herein, and such failure continues for a period of ten (10) days after receipt of written notice thereof from Lessor;

(d) Lessee assigns or attempts to assign this Master Lease or any Equipment Schedule, or removes, transfers, encumbers, sublets or parts with possession of any Unit, attempts to do any of the foregoing, or suffers or permits any of the foregoing to occur except as expressly permitted herein;

(e) Lessee ceases doing business as a going concern, or it or its shareholders take any action looking to the dissolution or liquidation;

(f) the entry of an order for relief under the United States federal bankruptcy laws or the entry of any other decree or order by a court having jurisdiction in the premises adjudging the Lessee a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Lessee under the United States federal bankruptcy laws or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Lessee or of any substantial part of its property, or the ordering, the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(g) the commencement by the Lessee of a voluntary case under the United States federal bankruptcy laws, or the institution by the Lessee of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, an arrangement with creditors or an order for relief under the United States federal bankruptcy laws or any other applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Lessee or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts as they become due, or, to the knowledge of the Lessor, the taking of corporate action by the Lessee in furtherance of any such action.

## 15. REMEDIES

15.1 EXPRESS REMEDIES. If an Event of Default occurs, Lessor may, at its option, do any or all of the following:

(a) proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the relevant Equipment Schedule, and the covenants and terms of this Master Lease to the extent it pertains to such Equipment Schedule, and to recover from Lessee any and all damages or expenses, including reasonable attorneys' fees, which Lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder, or

(b) by notice to Lessee, declare immediately due and payable all monies to be paid by Lessee during the initial Term (or any extended term then in effect) of the Equipment Schedule, as liquidated damages, and not as a penalty, and Lessor shall have the right, to the extent permitted by law, to (i) recover all monies so declared due and payable, discounted to the date of payment at the rate of 3% per annum, or one-half of the then-prevailing prime interest rate charged by principal New York banks, whichever is less, as liquidated damages, and not as a penalty; (ii) recover all other amounts which are due or which become due under the Equipment Schedule (iii) terminate Lessee's right to possession (but not Lessee's obligations under this Lease) and to retake immediate possession of the Equipment without any process of law and for such purpose Lessor may enter upon premises where the Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the negligence of Lessor, Lessor's assignee or their respective agents and representatives or may incur by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder, and (iv) pursue any other remedy permitted by law or equity. The possibility of a re-lease or resale under Paragraph 15.2 shall not exempt prompt payment in full by Lessee under this Paragraph 15.1.

15.2 RE-LEASE OR RESALE. Lessee shall make a reasonable, good faith effort to retake possession of the Equipment and, if Lessor succeeds in retaking possession of any Unit, Lessor shall sell or lease each Unit with the privilege of becoming the purchaser thereof, at public or private sale, for cash at an credit. Lessor's share of the proceeds of any such sale or lease ("Lessor's Share") shall be the lesser of (a); the amount by which the Re-Lease Proceeds or the Resale Proceeds of such Unit exceed the Remarketing Costs of such Unit, and (b); the amount payable by Lessee to Lessor pursuant to Paragraph 15.1 (iii) above with respect to such Unit. Lessor shall credit Lessor's Share against all amounts owed by Lessee to Lessor under Paragraph 15.1 or otherwise and the remainder of Lessor's share, if any, shall be paid to Lessee. EXCEPT AS SET FORTH IN THIS PARAGRAPH, LESSEE HEREBY WAIVES ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY REQUIRE LESSOR TO MITIGATE ITS DAMAGES OR MODIFY OR LIMIT ANY OF LESSOR'S RIGHTS OR REMEDIES STATED HEREIN. In applying this provision, the following definitions shall apply:

(a) The "Re-Lease Proceeds" of a Unit shall mean the present value (discounted to the date of payment using the interest rate at which Lessor has non-recourse financing or a non-recourse financing commitment with respect to the re-lease) of the monthly rental payments for the Unit under a re-lease to a third party, taking into account only those monthly rental payments under the re-lease which are payable on or before the last day of the initial Term or the last day of any extended term then in effect with respect to the Unit under the Equipment Schedule. If the re-lease is not financeable, the Re-Lease Proceeds shall be the monthly rental payments for such period as received.

(b) The term "Resale Proceeds" of a Unit shall mean the amount by which the proceeds of any sale of the Unit exceed the Lessor's estimate of the fair market value of the Unit at the end of the initial Term or at the end of any extended term then in effect with respect to the Unit under this Master Lease.

(c) The term "Remarketing Costs" of a Unit shall mean all expenses incurred directly or indirectly by Lessor in re-leasing or selling the Unit and in obtaining a financing commitment in the case of a re-lease of a Unit, including, without limitation, reasonable fees and commissions (including a reasonable fee to Lessor) incurred in locating a buyer, a subsequent lessee or a financing

LYC 00005

commitment, attorneys' fees, the cost of recovering the Unit from the Lessee and transportation, installation, refurbishing, reconditioning and storage charges.

**15.3 NO WAIVER.** The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of a breach of any other obligation, or of any subsequent breach of the same or any other obligation. The subsequent acceptance of rental payments hereunder by Lessor shall not be deemed a waiver of any prior existing breach by Lessee regardless of Lessor's knowledge of such prior existing breach at the time of acceptance of such rental payments.

**15.4 CUMULATION.** To the extent permitted by law, the above remedies shall be deemed cumulative and may be exercised successively or concurrently.

## 16. PERFORMANCE AND EXECUTION

Lessee represents and warrants to Lessor [i] that the execution and performance of this Master Lease and each Equipment Schedule have been duly authorized by Lessee and that upon execution by Lessee and Lessor this Master Lease and each Equipment Schedule will constitute a valid obligation binding upon, and enforceable against, Lessee in accordance with the terms of this Master Lease and each Equipment Schedule; [ii] that neither the execution of this Master Lease or any Equipment Schedule nor the due performance thereof by Lessee will result in any breach of, or constitute any default under or violation of, Lessee's certificate or articles of incorporation, Lessee's by-laws or any agreement to which Lessee is a party or by which any interest of Lessee may be affected; [iii] that Lessee is in good standing in its state of incorporation and in the states where any Unit is to be located; [iv] the persons executing this Master Lease and each Equipment Schedule on behalf of Lessee have been duly authorized to do so; and [v] that any and all financial statements and other information with respect to Lessee heretofore furnished by Lessee to Lessor in connection with negotiations concerning one or more outstanding omissions, excepting any changes which have been disclosed in a written notice to Lessor.

## 17. ADDITIONAL DOCUMENTATION

Lessee shall promptly deliver to Lessor the documentation listed below which may from time to time be requested by Lessor. If such a request is made prior to the delivery of any Unit, receipt of such documentation shall be a condition precedent to Lessor's obligation to deliver such Unit:

(a) financial information including, without limitation, a copy of Lessee's balance sheet and income statement for Lessee's three prior fiscal years, certified by independent certified public accountants and such other current financial information representing the financial condition and operations of Lessee as Lessor may from time to time reasonably request;

(b) a certificate of the resolutions of the Board of Directors of Lessee duly authorizing or ratifying this Master Lease or any Equipment Schedule executed hereunder;

(c) a certificate of incumbency setting forth names and signatures of those persons authorized to execute this Master Lease or any Equipment Schedule on behalf of Lessee;

(d) landlord's and/or mortgagee's waiver, in form and substance satisfactory to any Assignee or Secured Party, from any landlord or mortgagee of any premises upon which any Unit is located;

(e) an opinion of counsel for Lessee as to the matters set forth in Paragraph 16, [i through iv] above, and as to such other matters as Lessor may reasonably request; and

(f) such document confirming the execution of the Lease necessary or desirable to effect an assignment, to perfect an interest of Lessor, a Secured Party or Assignee, or for such other purpose relating to the Master Lease and/or any Equipment Schedule or to an assignment as Lessor may reasonably request. Lessee hereby appoints Lessor as Lessee's agent to prepare, execute and file in Lessee's name precautionary Uniform Commercial Code financing statements in connection with each Equipment Schedule showing the interest of Lessor, and any Assignee or Secured Party in the Equipment as appropriate.

## 18. GENERAL

**18.1 TITLE:** This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest. Lessee shall, at its expense, protect and defend Lessor's title to the Equipment and the interest of any Assignee or Secured Party against all persons claiming against or through Lessee. Lessee shall keep and maintain the Equipment and this Master Lease free and clear of all liens and encumbrances [other than those placed on the same by Lessor and the liens for related taxes not yet payable].

**18.2 FIXTURES:** Lessee will not affix any Unit of the Equipment to any real property if, as a result thereof, the Unit will become a fixture under applicable law.

**18.3 ENTIRE AGREEMENT:** This Agreement [together with all schedules and attachments herein] constitutes the entire agreement between Lessor and Lessee, and no provision hereof may be amended or modified except in writing signed by Lessor and Lessee. NO PROVISION OF THIS AGREEMENT MAY BE WAIVED EXCEPT IN WRITING SIGNED BY THE PARTY FROM WHOM SUCH WAIVER IS SOUGHT, AND ANY SUCH WAIVER SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN.

LESSEE'S
INITIALS: ___

**18.4 NOTICES:** All notices hereunder shall be in writing and shall be delivered in person or sent by registered or certified mail, to the address of the party contained herein, and shall be deemed received three [3] days after deposit in the United States mail with postage prepaid. Either party may change its address for notice purposes by notifying the other party in the manner aforesaid of such change. Lessee shall also send copies of all notices sent to Lessee, to Secured Party, or Assignee [if any].

**18.5 SEVERABILITY:** Any provision hereof prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of this Agreement provided, however, that where the provisions of any such applicable law may be waived, they are hereby waived by Lessee and Lessor to the full extent permitted by law.

**18.6 GOVERNING LAW:** THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE. This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.

**18.7 PERFORMANCE OF LESSEE'S OBLIGATIONS:** If Lessee shall fail to make any payment or perform any act required by this Master Lease or any Equipment Schedule, Lessor may at Lessee's expense, but shall not be obligated to, make such payment or perform such act without notice to or demand upon Lessee and without waiving or releasing any obligation or default. Lessee shall, when billed, reimburse Lessor for any expense incurred hereunder by Lessor in performing Lessee's obligations. LESSEE MAY NOT ASSIGN ITS RIGHTS OR OBLIGATIONS, EXCEPT AS SPECIFICALLY PROVIDED IN PARAGRAPH 12 OF THIS MASTER LEASE.

**18.8 SURVIVAL:** All representations, warranties, indemnities, and covenants contained in this Master Lease and in any Equipment Schedule, which by their nature would continue beyond the termination, cancellation or expiration of the Lease, including, by way of illustration only and not limitation, those in Paragraphs 6, 10, 11 and 16, shall continue in full force and effect and shall survive

LYCOS, INC.

LYC 00006

notwithstanding the full payment of all amounts due hereunder or the termination of Lessor's right to possession of any Unit.

18.9 HEADINGS: Headings and captions are for convenience of reference only and shall not be construed as part of the Lease.

18.10 OVERDUE PAYMENTS: Any Monthly Rental due Lessor under this Master Lease, if not paid by the fifth day of the month in which payment became due, shall accrue interest until paid at a rate equal to one and one-half percent per month, or the maximum rate permissible by law, whichever is lower. Any other amounts payable to Lessor by Lessee under this Master Lease are due and payable within fifteen (15) days after the billing date, and, if not paid on or before such due date, shall accrue interest from the due date until paid at a rate equal to one and one-half percent per month, or the maximum rate permitted by law, whichever is lower.

18.11 CONSENT OR APPROVAL: With respect to any provision herein which calls for the consent or approval of a party, such consent or approval shall not be unreasonably withheld.

18.12 SUBSTITUTION OF EQUIPMENT: If, at any time during the term of an Equipment Schedule, Lessor's right to lease the Equipment expires, Lessor shall promptly provide identical substitute Equipment, and all expenses of such substitution, including de-installation, installation and transportation expenses, shall be borne by Lessor.

18.13 DELIVERY FOR EXAMINATION: Submission of the form of this Master Lease for examination shall not bind Lessor in any manner, and no obligations shall arise until this instrument is signed by both Lessor and Lessee.

18.14 TERMS IN EQUIPMENT SCHEDULES: If the provisions of any Equipment Schedule are inconsistent with the provisions of this Master Lease, then the provisions of such Equipment Schedule shall control.

LESSOR:
COMPUTER SALES INTERNATIONAL, INC.

LESSEE:
LYCOS, INC.

BY: _____

BY: _____

TITLE: _____

TITLE: _____

DATE: _____

DATE: _____

(Please initial page 5, section 18.3)

ML 4/96

LYCOS, INC.

Master Lease No. 144874
December 4, 1996

LYC 00007

## FIRST AMENDMENT TO MASTER LEASE NO. 144874

This Amendment to Master Lease Agreement No. 144874 (the "Master Lease") is dated February 28, 2001, and is between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Lessor and Lycos, Inc., a Delaware corporation, as lessee previously entered into the Master Lease and various Equipment Schedules thereunder for the lease of computer equipment. Lycos, Inc. subsequently merged with another company and the parties want to amend the Master Lease, and each Equipment Schedule thereunder, to change the lessee accordingly. In consideration of the foregoing and the promises and covenants contained in this Amendment, the parties agree to amend the Master Lease and each Equipment Schedule on the terms and conditions set forth below:

1. The Lessee is changed to LYCOS, INC., a Virginia corporation, which assumes all the obligations under the Master Lease and all current Equipment Schedules thereunder.

2. All other terms and conditions of the Master Lease and each Equipment Schedule remain unchanged and in full force and effect.

The parties have executed this Amendment as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.     LYCOS, INC.

By: _Lorraine S Cherrick_                By: _Brent C. D_____

Title: _SVP + Gen'l Counsel_             Title: _CFO_

Date: _3/28/01_                          Date: _3/16/01_

144874-000.altrev(pw).doc
PHS/BOST

LYC 00008

### ADDENDUM ONE TO MASTER LEASE AGREEMENT NO. 144.

This Addendum One to Master Lease Agreement No. 144874 (the "Lease") December 4, 1996 and is entered into by and between COMPUTE. INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parti dated on even date herewith, and in consideration of the mutual promises, covenan ...i conditions contained in the Lease and contained herein, and for other good and va..able consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflict as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Section 2.2 Initial Term:** In line 6, delete "120" and insert "60."

3. **Section 15.1 Express Remedies:** In subsection [b][i], delete "4%" and insert "6%."

4. **Section 15.2 Re-lease or Resale:** In line 7, after "PARAGRAPH," insert "AND TO THE EXTENT PERMITTED BY LAW."

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.

BY: _____

TITLE: E. WILLIA . CILLOLA
CHIEF OPERATING OFFICER & SEC

DATE: _____ JAN 1 0 1997 _____

LYCOS, INC.

BY: _____

TITLE: CHIEF OPERATING OFFICER

DATE: DECEMBER 20, 1996

PS/Boni.
144874-00Addm1(frn)

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

## EQUIPMENT SCHEDULE NO. 67E Dated as of June 16, 2000

LESSOR:                          LESSEE:    **LYCOS, INC.**

**COMPUTER SALES INTERNATIONAL, INC.**        400-2 Totten Pond Road
Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------------------|
|     |                    |                             |             |          |           |                                     |
| A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF ONE PAGE. |
| EQUIPMENT LOCATION: | | 1675 NORTH SHORELINE BLVD. MOUNTAIN VIEW, CALIFORNIA 94043 | | | | |

2. Monthly Lease Rate Factor for all Units:  **See Addendum One**
3. Initial Term:  **Twenty-four (24) months**
4. Anticipated Installation Date:  **June 15, 2000 through September 30, 2000**
5. Addendum One hereto is incorporated herein by this reference.  ☒ (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before June 23, 2000.

**COMPUTER SALES INTERNATIONAL, INC.**  **LESSEE: LYCOS, INC.**

By: _____            By: _____

Title: _____PRESIDENT_____               Title: _____CFO_____

Date: _____JUL 18 2000_____              Date: _7/12/00_

PHS/BOST
144874-067E(sad).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

### EXHIBIT "A"
### LYCOS, INC.
### EQUIPMENT SCHEDULE 67E TO MASTER LEASE 144874

| QTY | DESCRIPTION | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|-------------|-----------|-----------------------------------|
| * | Desktop PC's and PC Servers, with a processor speed of 500 Mhz Monitors Other Printers | NEW | .03875 times Unit cost |
| * | Miscellaneous standalone hardware, with its own serial number, e.g. Copiers, Scanners, FAX Machines, Clone PC's | NEW | .043 times Unit cost |
| * | Miscellaneous hardware, without its own serial number or a relation to other Units on this Lease, e.g. Cards, Memory, Modems | NEW | .0463 times Unit cost |

Initialed by:    Lessor _____

Lessee _____

**PHS/BOST**
144874-067E(aad).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67E
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67E, Master Lease Agreement No. 144874" (the "Lease"), is dated as of June 16, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Lessor's Purchase of Equipment:**

a) Lessor will purchase the Equipment directly from the vendor(s) designated by Lessee.

b) The Total Cost of the Lease (hardware, software license fees and other costs) is not to exceed $500,000.00. If Lessee wants this Lease to cover costs greater than $500,000.00, Lessor, in its sole discretion, may pay the additional costs.

c) Lessor is not liable for any failure or delay in delivery caused by the manufacturer, vendor or any other party or condition not within Lessor's control.

*3.    **Quantities; Monthly Rental:**

a) This Equipment Schedule covers all machines of the type(s) listed that are installed at Lessee's facilities between June 15, 2000 and September 30, 2000, inclusive. At this time, Lessee is unable to specify exactly how many Units will be installed; therefore, the "quantity" column has been left blank. As Lessee determines the quantities of Equipment it requires, Lessee shall have the applicable vendor send to Lessor invoices which will reference this Lease and which will specify machine type(s), quantities, equipment location(s), sales price, serial number(s) and installation date(s) of the Units ordered by Lessee. Upon receipt of each properly prepared invoice, Lessor shall remit the sales price to the vendor.

b) Monthly Rental per Unit will equal the "Monthly Lease Rate Factor" for that Unit, which is specified in the Equipment Schedule or on Exhibit "A", multiplied by the Unit's cost. On October 1, 2000, or as soon thereafter as is reasonably practicable, Lessee shall execute a Certificate of Acceptance for all installed Equipment, which Certificate verifies the actual quantities of machines; and the Monthly Rental per Unit and the total Monthly Rental for the Equipment Schedule, both of which will be expressed as dollar amounts.

4.    **Initial Term:**  The twenty-four (24) month Initial Term shall start on October 1, 2000, and expire on September 30, 2002. Lessee shall pay to Lessor Daily Rental as set forth in Section 3 of the Master Lease, for each Unit of Equipment for each day from, and including, its installation date through, but not including, October 1, 2000. Daily Rental shall be due in a lump sum on October 1, 2000.

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

5.     **Stipulated Loss Value**:  Because the actual quantities of Equipment are unknown at this time, a specific dollar amount Base Value cannot be listed on the Stipulated Loss Value Schedule.  Instead, "Equipment Cost" has been specified so that, at the time of a loss, the Stipulated Loss Value shall be equal to the cost of the Unit times the applicable percentage.  The parties agree, however, that a specific dollar amount Base Value will be set forth in the Certificate of Acceptance referred to above.

6.     **Software License Fees and Other Costs**:  In consideration of Lessee's entering into this Lease, Lessor shall pay on Lessee's behalf various operating and/or application software license fees so that Lessee may use such software packages in connection with the Equipment.  Lessor may also pay other costs related to the Equipment, on Lessee's behalf.  Lessee shall reimburse Lessor for such costs by (i) paying a daily charge equal to one-thirtieth of the Soft Cost Factor set forth below times the cost of the software license fee or other cost for each day from and including the date Lessor pays such fees or costs through, but not including October 1, 2000, such total daily charges to be paid in a lump sum on October 1, 2000, and (ii) making a monthly payment to Lessor equal to .04646 (the "Soft Cost Factor") times the cost of the applicable software license fees or other costs.  The resulting monthly payment amount will then be assigned on a pro-rata basis (pro-rated by Unit cost) to Units of Equipment and will be treated as additional rental for the lease of the Equipment.  The total amount of software license fees and other costs will not exceed five percent (5%) of the Total Cost of the Lease, without Lessor's prior written consent.  Because Lessor makes payments as invoices are received throughout the installation period, the percent of software license fees and other costs to the Total Cost of the Lease is generally not known until the final reconciliation of the Lease.  If Lessor determines that the total amount of software license fees and other costs exceed five percent (5%) of the Total Cost of the Lease, Lessor shall have the option to exclude the excess software license fees and other costs from this Lease and Lessee agrees to reimburse Lessor for such amounts.

7.     **Interest Rate Contingency**:  The Lease Rate and Soft Cost Factors (the "Rate Factors") specified in this Lease are based upon the yield to maturity of U.S. Treasury notes maturing in September 2002 (the "Treasury Yield"); the Treasury Yield is currently 6.54%.  Lessor intends to obtain a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral (the "Loan").  If, at the time the Loan is closed, the *then current* Treasury Yield exceeds 6.54%, then the Rate Factors shall be increased by .0001 for each 25 basis points by which the *then current* Treasury Yield exceeds the current Treasury Yield of 6.54%.  The Rate Factors will be increased only until the *then current* Treasury Yield exceeds the current Treasury Yield by 300 basis points.  Any increases in the Treasury Yield in excess of 300 basis points will have no further effect on the Rate Factors.  Increases of the Treasury Yield by increments of less than 25 basis points will have no effect on the Rate Factors.

        IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67E, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.                LYCOS, INC.

By: _____                      By: _____

Title: _____                   Title: _____

Date: _____                    Date: _____

PHS/BOST

144874-067E(aad).doc

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: Equipment Cost

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-067E(aad).doc

# NON-ORIGINAL

# CSI

## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. 67H Dated as of October 30, 2000**

LESSOR:            **LESSEE:**    **LYCOS, INC.**

**COMPUTER SALES INTERNATIONAL, INC.**     400-2 Totten Pond Road
Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF FIVE PAGES.

| EQUIPMENT LOCATION: | 400-2 TOTTEN POND ROAD WALTHAM, MASSACHUSETTS 02154-2000 |
|---|---|

2. Monthly Rental for all Units: **$36,438.41**

3. Initial Term: **December 1, 2000 through September 30, 2003; Thirty-four (34) months**

4. Anticipated Installation Date: **Already installed and accepted**

5. Addendum One hereto is incorporated herein by this reference. ☒ (check box if applicable)

6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.

7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before November 6, 2000.

**COMPUTER SALES INTERNATIONAL, INC.**    **LESSEE: LYCOS, INC.**

By: _____

       E. WILLIAM GILLULA
       PRESIDENT & COO

By: _Thomas E. Guyprile_

Title: _____

Title: _VP FINANCE & ADMIN_

Date: **NOV 2 9 2000**

Date: _11·14·00_

PHS/BOST
144874-067H(aad)

LYC 05453

**NON-ORIGINAL**

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 67H, MASTER LEASE NO. 144874

$36,438.41

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A14UEC29S2CJ | | ULTRA 2 2300 | 913H2884 | 93901 | USED | $667.95 |
| | | X5229A (1) | 9.1GB HARD DRIVE | 913H2891 | | | |
| | | X1018A (1) | INTERFACE CARD | | | | |
| | | X3856A (1) | SCSI CABLE | | | | |
| | | MEMORY (1) | 512MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | CD-ROM (1) | CD-ROM | | | | |
| 2 | SUN SGXDSK060C54 | | 54GB EXTERNAL MULTIPAC | 912C0119 | 93901 | USED | $286.88 |
| | | | | 912C0120 | | | |
| 1 | SUN SGXTAPDLT021 | | 35/70GB STOREDGE FLEXIPAC | 909C0018 | 93901 | USED | $241.99 |
| | | | PO NUMBER: 2550 ✓ | | | | |
| 4 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92250952 | 98362 | USED | $437.17 |
| | | MEMORY (1) | 256MB MEMORY | 92250951 | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | 92540468 | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | 92540467 | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| | | X6601A (1) | 8BAY INT STORAGE EXPANSION | | | | |
| 1 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92540466 | 98362 | USED | $397.21 |
| | | MEMORY (1) | 256MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| 4 | SUN X7119A | | 19" MONITOR | 9851KE0273 | 98362 | USED | $27.80 |
| | | | | 9851KE0276 | | | |
| | | | | 9918KE0621 | | | |
| | | | | 9918KE0622 | | | |
| | | | PO NUMBER: 3419 ✓ | | | | |
| 2 | SUN A25-MR6B | | ENTERPRISE 450 400 | 92SH356A | 98361 | USED | $747.16 |
| | | MEMORY (1) | 512MB MEMORY | 92SH399A | | | |
| | | DRIVE (1) | 9.1GB HARD DRIVE | | | | |
| | | X311L (1) | POWER CORD | | | | |
| 3 | SUN SGXLIBDLT128 | | STOREDGE 1280 TAPE LIBRARY. 280-560GB | 9917R05959 | 98361 | USED | $736.76 |
| | | X1062A (1) | SBUS DIFF SCSI2 HOST ADAPTER | 9917R05937 | | | |
| | | X7005A (2) | 512MB MEMORY | 9917R05954 | | | |
| | | | PO NUMBER: 3421 ✓ | | | | |
| 8 | SUN X7004A | | 256MB MEMORY | N/A | 1991 | USED | $48.60 |
| | | | PO NUMBER: 4250 ✓ | | | | |

LYC 05454

Page No. 1 of 5
144874-067H-EX(aad).xls

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|------|--------------------|----------------------------|-------------|----------|-----------|-----------|-------------------------|
| 6 | CISCO CS-150-LAN-04 | | CS-150 SWITCH/16PORT LOAD BALANCER | 21140011614 | 162462 | USED | $595.54 |
| | | | | 21140011666 | 171983 | | |
| | | | | 21180014078 | | | |
| | | | | 21180014081 | | | |
| | | | | 21180014105 | | | |
| | | | | 21180014152 | | | |

PO NUMBER: 4468

| QTY. | MACHINE TYPE/MODEL | FEATURE | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL |
|------|--------------------|---------|-------------|----------|-----------|-----------|----------------|
| 1 | SUN A34ULD19S002E | | ENTERPRISE 220R 450 | S016H3932 | 96865 | USED | $844.62 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 18GB HARD DRIVE | | | | |
| | | VIDEO (1) | 4MB VIDEO MEMORY | | | | |
| | | X311L (1) | POWER CORD | | | | |

PO NUMBER: 4921

| 1 | SUN A34ULD19S001EJ | | ENTERPRISE 220R 450 | S021H2FDB | 97171 | USED | $683.88 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 1GB HARD DRIVE | | | | |
| | | X1195A (1) | ULTRASPARC II 450MHZ PROCESSOR | | | | |
| | | X311L (1) | POWER CORD | | | | |

PO NUMBER: 4935

| 2 | IBM 2645-4EU | | THINKPAD 600X 7/500 | 78TAXK8 | BZ46002 | USED | $103.42 |
| | | | | 78TAYN8 | BZ26273 | | |

PO NUMBER: 5005

| 2 | BIGIRON | | 4000 CHASSIS | 4108 | 16058 | USED | $1,521.47 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | 4109 | | | |
| | | MODULE (3) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (1) | REDUNDANT POWER SUPPLY | | | | |

PO NUMBER: 5091

| 1 | NETWORK APPLIANCE | | STORAGESHELF FC9 | NA0000000004276 | 34972 | USED | $482.83 |
| | | DRIVE (7) | 18GB HARD DRIVE | | | | |
| | | X8006 (2) | POWER CABLE | | | | |

PO NUMBER: 5148

| 5 | SUN A21UJC1A9PC6C | | ULTRA 5 400 | SFW02540187 | 98470 | USED | $147.14 |
| | | MEMORY (1) | 256MB MEMORY | SFW02540224 | 97452 | | |
| | | DRIVE (1) | 9GB HARD DRIVE | SFW02540243 | | | |
| | | CD ROM (1) | 32X CD ROM | SFW02610237 | | | |
| | | X1131A (1) | PCI OPTION CARD | SFW02610248 | | | |
| | | X3515A (1) | US COUNTRY KIT | | | | |
| | | X471A (1) | 10" VIDEO ADAPTER | | | | |
| | | X3668A (1) | PGX32 COLOR FRAME BUFFER CABLE | | | | |

| 5 | SUN X7136A | | 21" MONITOR | S0013LB1447 | 97452 | USED | $44.00 |
| | | | | S0013LB1449 | | | |
| | | | | S0013LB1451 | | | |
| | | | | S0013LB1453 | | | |
| | | | | S0013LB1455 | | | |

PO NUMBER: 5186

LYC 05455

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | COMPAQ | | DECSERVER 900TM 32 MJ8 CONNECTOR | N/A | BZ85812 | USED | $165.35 |
| | | TRANCEIVER (2) | MICRO TRANSCEIVER | | BZ70364 | | |
| | | DEHUA-CA (2) | DECHUB ONE | | BZ91755 | | |
| | | CARD (1) | 2MB FLASH CARD | | CA21642 | | |
| | | | | | CA35610 | | |
| | | | | | CA86642 | | |
| | | | | | CB19485 | | |

**PO NUMBER: 5257** ☑

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 3 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550H5Y9 | 292703 | USED | $114.86 |
| | | | | 550H5K3 | 294540 | | |
| | | | | 550H5R8 | | | |
| 3 | VIEWSONIC | | 17" MONITOR | AY02012042 | 292703 | USED | $8.98 |
| | | | | AY02012047 | | | |
| | | | | AY02012046 | | | |
| 7 | IBM 6594-92U | | PC300PL P3/667 | 23RD279 | 293500 | USED | $72.61 |
| | | | | 23RF000 | | | |
| | | | | 23RF134 | | | |
| | | | | 23RF334 | | | |
| | | | | 23RF512 | | | |
| | | | | 23RF529 | | | |
| | | | | 23RD504 | | | |
| 3 | IBM 6594-92U | | PC300PL P3/667 | 23RD375 | 293806 | USED | $72.02 |
| | | | | 23RD806 | 293500 | | |
| | | | | 23RF433 | | | |
| 10 | VIEWSONIC | | 19" MONITOR | 304002200212 | 293500 | USED | $14.30 |
| | | | | 304002203313 | | | |
| | | | | 304002200211 | | | |
| | | | | 304002203309 | | | |
| | | | | 304002203304 | | | |
| | | | | 304002203308 | | | |
| | | | | 304002200208 | | | |
| | | | | 304002200207 | | | |
| | | | | 304002203305 | | | |
| | | | | 304002203314 | | | |

**PO NUMBER: 5416** ☑

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | BIGIRON | | 8PORT GIG SX MODULE | CH24002212 | 17384 | USED | $769.24 |
| | | SWITCH (1) | FASTIRON 24PORT WG SWITCH | CH24002271 | | | |
| | | SWITCH (1) | NETIRON 16PORT SWITCH | | | | |

**PO NUMBER: 5418** ☑

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 1 | SUN A34-ULD1-9S-512CX | | ENTERPRISE 220R 450 | S032A0888 | 13510 | USED | $1,526.88 |
| | | CACHE (1) | 4MB CACHE | | 13614 | | |
| | | X1195A (4) | 450MHZ PROCESSOR OPTION | | | | |
| | | X3508A (2) | TYPE 6 COUNTRY KIT | | | | |
| | | X7003A (4) | 128MB MEMORY | | | | |
| | | X1034A (3) | FAST ENET CONTROLLER PCI ADAPTER | | | | |

**PO NUMBER: 5454** ☑

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN X2240A | | 300MHZ/2MB PROCESSOR OPTION | S352943 | 13242 | USED | $90.07 |
| | | | | S353019 | | | |

**PO NUMBER: 5576** ☑

LYC 05456

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | SUN N06-UKC1-9S-256AT1 | | NETRA T1 MODEL 105 440 | S023C114F | 13526 | USED | $302.87 |
| | | MEMORY (1) | 256MB MEMORY | S023C111C | | | |
| | | CACHE (1) | 2MB CACHE | S023C1138 | | | |
| | | DRIVE (1) | 18GB HARD DRIVE | S024C0370 | | | |
| | | X5229A (1) | 9.1GB HARD DRIVE | S024C05B6 | | | |
| | | X6971A (1) | CD ROM | | | | |
| | | | **PO NUMBER: 5601** | | | | |
| 1 | VIEWSONIC | | 22" MONITOR | QW02905877 | CO46206 | USED | $32.00 |
| | | | **PO NUMBER: 5451** | | | | |
| 4 | ALTEON | | ACE SWITCH 180E | 60CF4582A0 | 805795 | USED | $573.66 |
| | | | | 60CF45B550 | | | |
| | | | | 60CF44BF60 | | | |
| | | | | 60CF44E530 | | | |
| | | | **PO NUMBER: 5656** | | | | |
| 1 | FASTIRON | POWER (1) | 72PORT 10/100 + 4PORT MGMT MODULE REDUNDANT POWER SUPPLY | 1464 | 19079 | USED | $617.54 |
| | | | **PO NUMBER: 5713** | | | | |
| 1 | FASTIRON | | 72PORT 10/100 + 4PORT MGMT MODULE | 1465 | 19080 | USED | $558.15 |
| | | | **PO NUMBER: 5734** | | | | |
| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550L5NO | 297583 | USED | $105.31 |
| | | | **PO NUMBER: 10150** | | | | |
| 2 | CISCO 7206VX | | 7206VX BUNDLE W/NPE-300 | 72704917 | 276-026594 | USED | $787.17 |
| | | PWR-7200/2 (1) | DUAL AC POWER SUPPLY | 72704931 | 276-026593 | | |
| | | MEM-I/O-FLD48M (1) | 48MB MEMORY | | | | |
| | | MEM-SD-NPE-128M | 128MB MEMORY | | | | |
| | | PA-A3-T3 (1) | 1PORT ATM ENH DS3 PORT ADAPTER | | | | |
| | | | **PO NUMBER: 90013** | | | | |
| 1 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZKR | 298561 | USED | $52.33 |
| 1 | VIEWSONIC | | 19" MONITOR | 304002200331 | 298561 | USED | $14.05 |
| | | | **PO NUMBER: 90019** | | | | |
| 3 | IBM 6892-26U | | PC300PL P3/600 | 78ZYYZH | 298559 | USED | $52.60 |
| | | | | 78ZYZMG | | | |
| | | | | 78ZYYAV | | | |
| 3 | VIEWSONIC | | 19" MONITOR | 304002203094 | 298559 | USED | $14.32 |
| | | | | 304002203098 | | | |
| | | | | 304002200637 | | | |
| | | | **PO NUMBER: 90020** | | | | |
| 4 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZLL | 298397 | USED | $55.37 |
| | | | | 78ZYYBF | | | |
| | | | | 78ZYYZR | | | |
| | | | | 78ZYZKM | | | |

LYC 05457

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | VIEWSONIC | | 19" MONITOR | 304002201116 | 298397 | USED | $17.09 |
| | | | | 304002201118 | | | |
| | | | | 304002201124 | | | |
| | | | | 304001600981 | | | |

PO NUMBER: 90021 ∂

| 8 | IBM 6594-B1U | | PC300PL P3/733 | 23FTX06 | 299252 | USED | $72.57 |
| | | | | 23FTY17 | | | |
| | | | | 23FTW24 | | | |
| | | | | 23FTV07 | | | |
| | | | | 23FTV49 | | | |
| | | | | 23FTW18 | | | |
| | | | | 23FTP78 | | | |
| | | | | 23FTP13 | | | |
| 8 | VIEWSONIC | | 19" MONITOR | 304002201122 | 299252 | USED | $14.62 |
| | | | | 304002201117 | | | |
| | | | | 304002201121 | | | |
| | | | | 304001601284 | | | |
| | | | | 304001600986 | | | |
| | | | | 304001600964 | | | |
| | | | | 304001600980 | | | |
| | | | | 304001600983 | | | |

PO NUMBER: 90022 ∂

| 4 | IBM 2647-21U | | THINKPAD T20 7/650 | 78BKA69 | CL86299 | USED | $97.01 |
| | | | | 78BKB04 | CL35085 | | |
| | | | | 78BKB69 | | | |
| | | | | 78BKA90 | | | |

PO NUMBER: 90023 ∂

| 1 | BIGIRON | | 4000 CHASSIS | F00009376 | 21359 | USED | $1,878.82 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | | 21180 | | |
| | | MODULE (2) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (2) | REDUNDANT POWER SUPPLY | | | | |
| | | MODULE (1) | 72PORT 10/100 + 4PORT MGMT MODULE | | | | |
| 1 | BIGIRON | | 4000 CHASSIS | F00009377 | 21359 | USED | $2,092.93 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | | 21180 | | |
| | | MODULE (3) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (2) | REDUNDANT POWER SUPPLY | | | | |
| | | MODULE (1) | 72PORT 10/100 + 4PORT MGMT MODULE | | | | |

PO NUMBER: 90030 √

| 10 | IBM 9495-AG1 | | 17" MONITOR | 55C5966 | CL70844 | USED | $52.55 |
| | | | | 55C5968 | | | |
| | | | | 55C5969 | | | |
| | | | | 55C5970 | | | |
| | | | | 55C5971 | | | |
| | | | | 55C5972 | | | |
| | | | | 55C5973 | | | |
| | | | | 55C5975 | | | |
| | | | | 55C5984 | | | |
| | | | | 55C5987 | | | |

PO NUMBER: 90033 √

*Traced all P.O's to file*
*√ 11/9/00*

LYC 05458

# NON-ORIGINAL

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67H
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67H, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 30, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Commencement Date:** The Equipment is installed at Lessee's location under Equipment Schedule 67E to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 67E expires on November 30, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is December 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 67E is October 1, 2000, and the total Monthly Rental is $42,074.79.

3. **Serial Number Substitution:**

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical defect, or a casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

LYC 05459

# NON-ORIGINAL

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67H, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.

By: _E. WILLIAM GILLULA_

Title: _PRESIDENT & COO_

Date: _NOV 2 9 2000_

LYCOS, INC.

By: _Thomas E. Guiffile_

Title: _VP Finance & Adm_

Date: _11/24/00_

PHS/BOST

144874-067H(aad)

LYC 05460

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

# CSI

---

## *COMPUTER SALES INTERNATIONAL, INC.*
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. NINETY-THREE Dated as of October 2, 2001**

LESSOR:                              LESSEE:    **LYCOS, INC.**
                                                400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**          Waltham, Massachusetts  02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4,
1996, are hereby incorporated herein and made a part hereof:

1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 66 pages.

**EQUIPMENT LOCATION:**   See Attached Exhibit "A"

2. Monthly Rental for all Units:  **See Addendum One**
3. Initial Term:  **November 1, 2001 through October 31, 2003; Twenty-four (24) months**
4. Anticipated Installation Date:  **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before October 9, 2001.

COMPUTER SALES INTERNATIONAL, INC.  LESSEE: LYCOS, INC.

By: ___E. WILLIAM GILLULA___          By: _____
         PRESIDENT & COO

Title: _____         Title: ____CFO_____
          DEC 1 0 2001

Date: _____          Date: ____10/4/01_____

PHS/BOSTON
144874-093(skb)

**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-THREE
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-three, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.   **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.   **Commencement Dates; Start of Initial Term; Total Monthly Rental:**  The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, and 81 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below.  The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-four between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date | Total Monthly Rental for Units from terminating Equipment Schedule(s) |
|---|---|---|---|
| 65 | 10/31/01 | 11/1/01 | $14,299.85 |
| 64 | 1/31/02 | 2/1/02 | $5,055.76 |
| 81 | 6/30/02 | 7/1/02 | $1,242.25 |
| 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C | 9/30/02 | 10/1/02 | $58,838.59 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 | $17,923.69 |
| 64B, 66E, 67D, 69E | 3/31/03 | 4/1/03 | $11,644.10 |
| 64D, 67F, 69G | 5/31/03 | 6/1/03 | $12,502.28 |
| 64F, 67H, 69I | 9/30/03 | 10/1/03 | $21,901.71 |

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

Accordingly, the total Monthly Rental under the Lease is as follows:

| | |
|---|---|
| for months November 1, 2001 through January 31, 2002: | $14,299.85; |
| for months February 1, 2002 through June 30, 2002: | $19,355.61; |
| for months July 1, 2002 through September 30, 2002: | $20,597.86 |
| for months October 1, 2002 through December 31, 2002: | $79,436.45 |
| for months January 1, 2003 through March 31, 2003: | $97,360.14 |
| for months April 1, 2003 through May 31, 2003: | $109,004.24 |
| for months June 1, 2003 through September 30, 2003: | $121,506.52 |
| for months October 1, 2003 through October 31, 2003: | $143,408.23 |

3. <u>Letter of Credit:</u> Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-four is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-three, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.

By: _____

Title: E. WILLIAM GILLULA
PRESIDENT & COO

Date: DEC 1 0 2001

LYCOS, INC.

By: _____

Title: CFO

Date: 10/4/01

PHS/BOSTON
144874-093(skh)

LYC 07696

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

# CSI

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-THREE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,320,039.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | | |
| 1 | 108.5 | 13 | 90.1% |
| 2 | 106.9 | 14 | 88.6 |
| 3 | 105.4 | 15 | 87.1 |
| 4 | 103.9 | 16 | 85.6 |
| 5 | 102.4 | 17 | 84.0 |
| 6 | 100.8 | 18 | 82.5 |
| 7 | 99.3 | 19 | 81.0 |
| 8 | 97.8 | 20 | 79.4 |
| 9 | 96.3 | 21 | 77.9 |
| 10 | 94.7 | 22 | 76.4 |
| 11 | 93.2 | 23 | 74.9 |
| 12 | 91.7 | 24 and thereafter | 73.3 |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: **BD** _____

PHS/BOSTON

144874-093(skh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. NINETY-FOUR Dated as of October 2, 2001

LESSOR:                          LESSEE:   LYCOS, INC.
                                           400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**     Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    |                             |             |          |           |                         |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 84 pages.

**EQUIPMENT LOCATION:**   See attached Exhibit "A"

2. Monthly Rental for all Units:  See Addendum One
3. Initial Term:  November 1, 2001 through October 31, 2004; Thirty-six (36) months
4. Anticipated Installation Date:  Already installed and accepted
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before October 9, 2001.

COMPUTER SALES INTERNATIONAL, INC.   LESSEE: LYCOS, INC.

By: _____         By: _____
        E. WILLIAM GILLULA                   
        PRESIDENT & COO

Title: _____         Title: _____CFO_____

Date: _____         Date: _____10|4|01_____
        DEC 0 5 2001

PHS/BOSTON
144874-094(skh)

LYC 07699

LYC 07784

# NON-ORIGINAL
No security interest in an Equipment Schedule may be created or perfected by possession of this copy.

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-FOUR
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-four, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Dates; Start of Initial Term:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, 76, 81, 85 and 86 to Master Lease Agreement No. 144874.  Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001.  The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. In consideration of Lessee's entering into this Lease, Lessor agrees to early terminate Lessee's rental obligations under Equipment Schedules 64, 65, 66, 66A, 66B, 67, 68, 76, 81 and 86, for the units leased hereunder, effective on October 31, 2001. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-three between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date |
|---|---|---|
| 64, 65, 66, 66A, 66B, 67, 68, 76, 81, 86 | 10/31/01 | 11/1/01 |
| 67A, 68A, 68B, 68C | 9/30/02 | 10/1/02 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 |
| 64B, 66E, 67D, 69E | 3/31/03 | 4/1/03 |
| 64D, 66G, 67F, 69G | 5/31/03 | 6/1/03 |
| 64F, 66I, 67H, 69I | 9/30/03 | 10/1/03 |
| 85 | 12/31/03 | 1/1/04 |

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

3. **Total Monthly Rental**:  The Monthly Rentals per Unit are set forth on the attached Exhibit "A." However, the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 64, 66, 66A, 66B, 76 and 81 will be $0 for the months of November 1, 2001 through December 31, 2002; and the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 65, 67, 68 and 86 will be $0 for the months of November 1, 2001 through September 30, 2002.  Accordingly, the total Monthly Rental under the Lease is as follows:

| | |
|---|---|
| for months November 1, 2001 through September 30, 2002: | $0; |
| for months October 1, 2002 through December 31, 2002: | $210,061.03; |
| for months January 1, 2003 through March 31, 2003: | $333,258.78 |
| for months April 1, 2003 through May 31, 2003: | $398,305.68 |
| for months June 1, 2003 through September 30, 2003: | $462,206.40 |
| for months October 1, 2003 through December 31, 2003: | $611,403.34 |
| for months January 1, 2004 through October 31, 2004: | $679,753.85 |

4. **Letter of Credit**:  Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-three is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-four, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By:  E. WILLIAM GILLULA                     By: _____
          PRESIDENT & COO

Title:  DEC 0 5 2001                         Title:  CEO

Date: _____                       Date:  10/4/01

PHS/BOSTON
144874-094(add)

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-FOUR

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $21,836,791.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: BDC _____

PHS/BOSTON

144874-094(akb)

Equipment Leasing Association

ELA Home
User Login
Member Directory

Building A Better Climate For Growth & Prosperity

search 🔘

## ELA Code of Fair Business Practices

- <u>Purpose</u>
- <u>Preamble</u>
- <u>Section I: General Standards of Professional Conduct</u>
- <u>Section II: Exchange of Credit Information</u>
- <u>Section III: Enforcement Provisions</u>

### Purpose

The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

Equipment Leasing
Association
4301 N. Fairfax Drive
Suite 550
Arlington, VA
22203-1627
Phone: 703-527-8655
Fax: 703-527-2649

<u>Back to Top</u>

### Preamble

Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal and State laws:

<u>Back to Top</u>

### Section I: General Standards of Professional Conduct

1.  A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2.  A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry.

3.  A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement.

4.  A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry.

5.  A Member shall use proper care and exercise independent professional judgment.

6.  A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7.  A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8.  A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9.  A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis.

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11. A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client.

12. A Member shall not make payments to a representative of another party without the consent of that party.

13. A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction.

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

Back to Top

## Section II: Exchange of Credit Information

The exchange of credit information is an integral part of a well functioning equipment leasing and financing industry. In addition to complying with all government laws and regulations, the Members shall adhere to The Robert Morris Associates' Code of Ethics for the Exchange of Credit Information.

Back to Top

http://www.elaonline.com/aboutELA/elacode.cfm

### Section III: Enforcement Provisions

Article VIIB of the ELA Bylaws provides that a Member may be censured, suspended or expelled from the Association for violating the Code of Fair Business Practices of the Association. Accordingly, the disciplinary actions that the Association may take in the event of a violation of the Code include: (a) private censure; (b) public censure; (c) probationary membership with such conditions as may be determined by the Association; (d) suspension of membership for a term and on such conditions as may be determined by the Association; (e) expulsion from membership; and (f) non-renewal of the membership of the Member.

The following provisions, consistent with the provisions of Article VIIB of the ELA Bylaws, set forth the procedures to be followed in proceedings involving alleged violations of the Code.

1. An ELA Fair Business Practices Committee (the "Committee"), consisting of three members of the ELA Board of Directors and three former officers or directors of the ELA, shall be appointed by the Chairman of the Association who shall also designate one member of the Committee as Chairman of the Committee.

2. A proceeding alleging that an ELA Member violated the Code may be initiated by a Member of ELA (other than any ELA Member who has an official on the Committee), by the Executive Committee of the Association or by a non-member of ELA which has suffered injury as a participant in an equipment lease or finance transaction with a Member ("complainant"). The proceeding shall be initiated by filing a written Complaint with the ELA President at ELA Headquarters by registered mail. The Complaint must identify the section or sections of the Code alleged to be violated, set forth in detail the facts claimed to support the charges of Code violation, and include documents in the possession of the complainant which are pertinent to the Complaint. In addition, the complainant may submit affidavits from the complainant and others in support of the Complaint.

3. Copies of the Complaint and supporting documents, if any, shall be sent by the President to the members of the Committee. If the Committee deems the Complaint to be insufficient, it may request the complainant to provide more information, documents or affidavits in support of the Complaint.

4. If the Committee determines by majority vote that the Complaint and supporting documents, on their face, do not satisfy the requirements of Paragraph 2 or do not state facts constituting a violation of the Code, the complainant shall be so notified by the Chairman of the Committee, and no further action shall be taken.

5. If the Committee determines that the Complaint and supporting documents meet the requirements of Paragraph 2 and allege facts which, if true, could constitute a Code violation, the Chairman of the Committee shall request the ELA President to send a copy of the Complaint and supporting documents, by registered mail, to the party complained against (the "respondent"). The President shall also provide the respondent and complainant with a copy of the Code.

6. The respondent shall be afforded an opportunity to Answer the Complaint. The respondent's Answer shall respond to the specific allegations contained in the Complaint. The Answer shall also notify the Committee whether or not the respondent requests a hearing on the allegations in the Complaint, and provide the Committee with documents or affidavits from respondent or others supporting the Answer. The Answer, supporting documents and affidavits shall be sent to the ELA President by registered mail within 30 days of respondent's receipt of the Complaint. The ELA President shall promptly forward the Answer and supporting documents to the Committee and to the

complainant by registered mail, and shall notify complainant of the right to request, within 30 days of receipt of the respondent's Answer, a hearing on the Complaint before the Committee.

7.  Irrespective of whether the parties request a hearing on the Complaint, the Committee shall have the authority by majority vote to dismiss the Complaint if it determines, based upon the submissions made, that it is clear there is no violation of the Code. Should the Committee dismiss the Complaint, the parties shall be notified and no further action on the Complaint shall be taken.

8.  In the event the Complaint is not dismissed and a party has requested a hearing or the Committee determines a hearing is necessary, then the Committee shall notify complainant and respondent of the date, time and location of the hearing and their right to be represented by counsel at the hearing. During the hearing, the parties shall be afforded a reasonable opportunity to present evidence, cross-examine witnesses and be heard on matters alleged in the Complaint and Answer. The Committee may also permit others to testify at the hearing.

9.  The Committee shall vote on whether or not the respondent has violated the Code based upon the record, and, if so, what disciplinary action, if any, should be taken against the respondent as a consequence of such violation. A two-thirds vote of the Committee members is required to censure, suspend or expel a respondent.

10. The Committee's decision must be in writing and shall be sent to the respondent and complainant by registered mail. The Committee shall notify the respondent of the right to appeal an adverse decision within 30 days of receipt of the decision. The respondent's appeal, if any, shall be sent by registered mail to the ELA President and shall set forth the reasons why the Committee's decision should be set aside. The ELA President shall promptly forward the respondent's appeal, if any, to the Complainant via registered mail. If the respondent does not timely appeal the Committee's decision, the decision shall be final and binding upon respondent.

11. If the respondent elects to appeal the Committee's decision, then the matter shall be transmitted for a hearing on the existing record before the ELA Board of Directors (the "Board"). The Board shall notify the parties via registered mail of the date, time and location of the hearing, and the schedule for filing written submissions with the Board. The respondent and the complainant may be represented by counsel and shall be permitted to provide written submissions and present oral argument to the Board. No additional documents may be filed or any testimony taken, unless ordered or requested by the Board. The Board shall vote on whether the Committee's decision should be affirmed, modified or reversed. A decision by the Board which censures, suspends or expels the respondent must be by two-thirds vote of the members present and voting. No member of the Committee, and no Director that is a representative of an ELA member that initiated the Complaint or of the respondent, may be present during, or participate in, the voting.

Back to Top

Cant find it? -|- Send us feedback!



© 1996-2005, Equipment Leasing Association. All rights reserved.
The Equipment Leasing Association (ELA) is a national organization comprised of member companies within the equipment leasing and finance industry. Disclaimer | Privacy Policy

Created by Matrix Group International, Inc.

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. **O3-2561 F**

COMMONWEALTH OF MASSACHUSETTS,  )
)
Plaintiff   )
)
vs.   )
)
LEASECOMM CORPORATION, and   )
MICROFINANCIAL INCORPORATED,   )
)
Defendants   )



## COMPLAINT

1.    This is a civil action brought in the public interest by the Attorney General on behalf of the Commonwealth of Massachusetts, pursuant to G. L. c. 93A, § 4. The Defendants in this action are Massachusetts corporations engaged primarily in the business of leasing and financing small business opportunities and other items provided to individuals through a network of vendors throughout the United States. This action alleges that during the course and conduct of their business, the Defendants have committed unfair or deceptive acts or practices, in violation of G. L. c. 93A, § 2(a).

1

## JURISDICTION AND VENUE

2.    The Attorney General is authorized to bring this action pursuant to G. L. c. 93A, § 4 and G. L. c. 12, § 10.

3.    This Court has jurisdiction over the subject matter of this action pursuant to G. L. c. 214, § 1 and G. L. c. 93A, § 4.

4.    Venue is proper in Suffolk County pursuant to G. L. c. 223, § 5 and G. L. c. 93A, § 4.

## PLAINTIFF

5.    The plaintiff is the Commonwealth of Massachusetts ("Commonwealth") represented by the Attorney General who brings this action in the public interest.

## DEFENDANTS

6.    The Defendant, MicroFinancial Incorporated ("MicroFinancial"), is a Massachusetts corporation with corporate headquarters located at 10M Commerce Way, Woburn, Massachusetts. MicroFinancial stock is publicly traded on the New York Stock Exchange.

7.    The Defendant, Leasecomm Corporation ("Leasecomm"), is a wholly-owned subsidiary of MicroFinancial with a principal place of business also located at 10M Commerce Way, Woburn, Massachusetts.

## DEFINITIONS FOR PURPOSES OF THIS COMPLAINT

8.    "Customer" is any natural person who is individually liable to pay Leasecomm for financing, either directly or indirectly, *e.g.*, as a cosignor, guarantor, proprietor, or signatory general partner.

9.    "Business venture" includes purported profit making ventures (*e.g.*, multilevel marketing programs, pyramid schemes, buyers' clubs, coupon clipping programs, investment

opportunities, etc.), regardless of how participation in the venture is characterized (*e.g.*, as investors, members, donors, etc.), seminars, or promotions that seek to induce customers to make money through business or investment, or similar intangible items.

## DEFENDANTS' BUSINESS ACTIVITIES

10.     Leasecomm's principal business since at least 1997 has been providing financing through contracts it calls "leases" to individuals and small businesses throughout the United States. The contracts purport to be leases for items such as point-of-sale credit card swiping machines ("POS machines") and Internet-based, online payment systems ("virtual terminals"), which have often been sold as part of a purchase of a business opportunity or profit making venture.  The business opportunities and profit making ventures include Internet web malls, multilevel marketing programs, pyramid schemes, medical billing software, coupon clipping programs, and similar, often worthless get-rich-quick schemes that customers have been duped into buying by deceptive practices of the business opportunity sellers.  A typical lease requires total payments between $3,000 to $4,000 over a three to four year period.

11.     Customers usually make no up-front payment for their business venture purchase. Instead, the business venture vendors, acting as Leasecomm's agents for selling financing, procure customers' signatures on Leasecomm financing contracts for all or most of the cost of the business venture.  After making a successful sales pitch, the vendor presents the Leasecomm contract to the customer amid the various papers the customer signs.  Customers have little opportunity to read or understand the complex Leasecomm contract, which the vendors usually do not explain to them. Even if customers did read all the fine print in the contract, it is unlikely that they would understand the rights and remedies that the fine print attempts to take away from them. Leasecomm expressly

3

prohibits the vendors from changing any of the contract's boilerplate terms. Vendors, however, frequently make assertions that certain provisions will not apply to the customer.

12.    Typically, the only payment the vendor receives for the business opportunity is a lump-sum payment from Leasecomm. In some cases, Leasecomm splits the payment between the vendor and a supplier of other goods or services associated with the business opportunity, like the provider of a POS machine or merchant account services. Thus, Leasecomm is actually financing the whole business venture.

13.    Often times, based on the sales pitch by the vendors, customers believe that they are signing a financing agreement for the entire business venture they are purchasing. Even though the lease amount is often the full price of the business venture package plus finance charges, the lease purports to only finance a POS machine or virtual terminal, a computer software license, or some other item that is an incidental part of the business opportunity. For example, a typical sales contract lists many items being sold as part of a business venture (*e.g.*, training, web site design, customer leads, a manual, forms, software, merchant account) for a specified price per month (*e.g.*, $70) over a specified term (e.g., 4 years). The corresponding Leasecomm contract in this example would also be for the $70 per month and over 4 years, but would state as the item being financed only one component of the business venture (*e.g.*, a POS machine). Nonetheless, frequently what the customers believe is that for payments of $70 per month over a 4 year period, they are buying the entire business venture.

14.    Leasecomm does not allow its vendors to fill in finance contracts with a truthful description of the business venture. Leasecomm makes the finance contract look like an equipment lease, because Uniform Commercial Code Article 2A ("UCC Art. 2A") equipment lease provisions

4

are significantly more favorable to lessors than the provisions relating to non-lease finance contracts. Finance contracts for business opportunities and other general intangible items do not qualify as UCC Art. 2A leases.

15.    For web-based business ventures, the specified item financed in the Leasecomm lease is often a "virtual terminal." This is not a tangible piece of equipment that can be owned by Leasecomm as a lessor or the customer. Rather, it is simply the setting up of an online P.O.S. system and the information necessary to access that account. Virtual terminals are typically available from merchant account providers and processors, who then charge the customer a commission when charges or debits are made, plus a small monthly fee.

16.    The customer will receive a contract for merchant account services included in the papers the vendor provides, along with the sales contract for the principal items being sold (*e.g.*, training, web site design, customer leads, a manual, forms, software, merchant account) and the Leasecomm contract. The virtual terminal service contracts are generally cancelable by either party upon relatively short notice (*e.g.*, one month). Typically, the "lease" that Leasecomm writes for the virtual terminal is non-cancelable for 36-48 months.

17.    The deception continues when Leasecomm and the vendors fail to disclose to customers material facts about the transaction that would lead them to question whether they should enter into the business venture transaction or the finance contract with Leasecomm. Leasecomm and its vendors do not explain the involvement of Leasecomm in the transaction so that customers are often unaware that they are entering into a financing transaction with a third party. They also do not explain that the contract makes the customer's obligation to pay Leasecomm absolute. This obligation to pay is based on the customer's acceptance of the POS machine, virtual terminal, or

5

other item financed. In the contract, the customer is agreeing to waive defenses, including the defense of fraud in the inducement. Finally, the vendors do not explain that the contract provides that any disputes under the contract will be resolved in a Massachusetts court, a forum which in most instances is distant from the customer's residence. These provisions may not be enforceable under applicable contract laws.

18.    Leasecomm drafts its lease contracts to ensure that customers pay even when the agreement to enter into the lease or the underlying business venture transaction is induced by the vendors' misrepresentations or fraud, or when the products or services fail to perform as represented. Most lease contracts contain a provision that tells customers that they cannot assert any defense or counterclaim:

> I fully recognize your [Leasecomm's] right to enforce the lease free from any current or future defenses, offsets or counterclaims.

Most lease contracts also contain a second provision that sets the location for filing collection suits in Massachusetts, regardless of where the customer resides or signed the contract. A typical form of that provision is:

> The Parties hereby . . . consent and submit to the jurisdiction of the Courts of the Commonwealth of Massachusetts and express[ly] agree to such exclusive forum for the bringing of any suit, action or other proceeding arising out of their obligations hereunder, and expressly waive any objection to venue in any such Courts . . .

Another provision requires that customers agree to automatic debiting of their bank accounts and requires that customers sign a personal guarantee of the lease contract. Additionally, quite often the obligation to Leasecomm does not end after the end of the lease term. A provision in the lease automatically renews the lease agreement for an additional year, unless the customer notifies Leasecomm thirty (30) days prior to the end of the lease term and returns the leased equipment.

6

19.    Leasecomm knows that many of its vendors engage in deceptive practices to sell their business ventures.    Leasecomm employees maintain a close relationship with its vendors. Leasecomm uses a computerized system to track delinquent accounts, default rates, and customer complaints of vendor fraud or misrepresentation. The default rate with respect to particular business ventures often exceeds 30%, and with some vendors has exceeded 50%. Leasecomm also receives large numbers of customer complaints about misrepresentation or fraud concerning these vendors. Despite possessing evidence of serious problems with vendors, Leasecomm rarely terminates a vendor. Instead, it simply reduces the payment it makes to the vendor, retaining a larger share of the customers' payments for itself.

20.    Leasecomm does not apply the usual finance industry standards for granting credit. First, the value of the equipment purportedly leased by Leasecomm has no relationship to the value of the lease. POS terminals, which Leasecomm leases for as much as $4,000, have a retail value of approximately $400 and wholesale cost of approximately $250.  Virtual terminals, leased for the same amount, have a retail value of approximately $300 or less.  Second, the credit worthiness of the customer is rarely used to deny credit.  Instead, Leasecomm applies a matrix for rating both the vendor and the customer to set a rate for the lease.

21.    Leasecomm imposes a loss and damage waiver fee.  Leasecomm claims that this fee is equivalent to an insurance on the product or equipment leased.  This fee, however, is typically not equivalent to the fair market value of insuring the product or equipment.  Furthermore, Leasecomm imposes this fee on intangible items such as virtual terminals and business opportunities. Additionally, Leasecomm fails to clearly and conspicuously disclose the amount of the loss and damage waiver fee to customers prior to the signing of the contract.

7

22.    Leasecomm's approach to debt collection is very aggressive. It uses the contract provisions described in Paragraph 18, above, to the fullest extent possible to obtain payment from customers and obtain judgments, if necessary. This is true even when the customers have been defrauded and received nothing of value.

23.    Leasecomm is rarely responsive to customers' disputes or claims of fraud against vendors. It relies heavily on the wording of the contract to tell customers that they have no defenses to Leasecomm's demand for payment. For example, collectors will point out that the customer accepted a POS machine and that was the only product named in the lease. When the customers argue that the lease really financed an entire business opportunity that was fraudulent, and the POS machine was worthless without the rest of the package, the collectors will still insist that obligation to pay in full is absolute and that the customers have no defenses.

24.    One example of how Leasecomm treated complaints of fraud involved InfoDirect, a vendor that ran a pyramid scheme. Its organizers made their money by requiring the purchase of overpriced computers, financed by Leasecomm, to participate in the scheme. According to Leasecomm's own complaint records, the computers, if delivered at all, were typically low-end or used and defective models leased for $3,300. The total lease volume was $5.2 million. Of the 1,882 deals, 1,483 went into default, most early in the lease term.

25.    Leasecomm wrote letters to InfoDirect complaining about the poor payment rate. Nonetheless, it continued to accept new leases for nearly a full year after it had notice from customer complaints and defaults that a serious problem existed with the product delivered. Leasecomm also sued one-third of the InfoDirect consumers in Massachusetts courts for non-payment, utilizing its venue waiver contract provision.

8

26.    Another example involves one of Leasecomm's largest vendors for virtual terminal business opportunities at seminars, Executive Credit Services. This company accounted for $16 million of business during 1999-2000, with nine thousand customers and a default rate of over 30%. Leasecomm's internal records show many complaints about software and websites never working. Leasecomm rejected virtually every claim. An example of a "reason" for rejecting a claim was:

> [Eighty-three] 83 year old lessee claims he was misled. [Lessee] signed a non-cancelable lease agreement/merchant acct application ext all docs showed what the charges were for each/ it states right on the lease that if the person does not understand the lease they should seek legal advice (sic).

The fact that Executive Credit Services sold its business opportunities at seminars means that customers had little chance to read over all the purchase and finance documents, and no opportunity to consult with a lawyer before signing them.

27.    Another example involves Roma computer, a company selling worthless website business ventures. Leasecomm financed the computers that customers purchased, ostensibly to access their website. One customer complained that she "received the equipment, but never used it; still has equipment; was under the impression after seminar that they would get a website and could make lots of money." [Cryptic spellings from Leasecomm's complaint database expanded for readability.] The customer also complained about not receiving a expected printer. Leasecomm denied the complaint completely because "the free printer has nothing to do with the lease agreement." Leasecomm simply ignored the complaint about the worthless website business venture.

28.    Contrary to representations by Leasecomm, customers have a number of substantive defenses that could be raised, particularly where business ventures or other intangible items are

financed. The most significant is that business ventures or other intangible items are not subject to being leased under UCC Art. 2A and that, therefore, the leases may be voidable or uneforceable in whole or part. Under applicable contract law, those provisions of the lease that Leasecomm claims require payment regardless of performance or fraud may be unenforceable. Customers may have other defenses, such as that the customers did not actually accept the products, have a reasonable opportunity to inspect the product before acceptance, or that their entry into the contract was induced by fraud or deception.

29. Customers rarely have the opportunity to raise any defenses. Leasecomm regularly files its collection suits in Massachusetts, despite the fact that most of the customers reside in other states. Leasecomm has sued over 27,000 customers in the past three years in Massachusetts. Few of the customers can afford the expense of litigation in a distant forum and nearly all cases have ended in default judgments. Thus, customers have no real opportunity to raise defenses to the validity of the contract.

30. Even customers who do obtain counsel are hampered by the misleading Leasecomm contracts. Courts may take individual contracts at face value unless evidence exists that the contract is part of a pattern and practice of fraud and deception. Given the amounts in controversy, typically under $5,000, it would be extremely difficult for customers' lawyers to develop the evidence to show Leasecomm's regular practice of incorrectly describing what was financed. Making complex arguments about the inappropriate use of UCC Art. 2A by Leasecomm would also be very costly. Finally, the potential witnesses for the customer are likely to be in the customer's local area and not in the Massachusetts jurisdiction. Thus, customer challenge to the distant forum clause in the Leasecomm's contracts is difficult.

10

31.    Leasecomm aggressively enforces its judgments in the customers' local forum. With a judgment already entered, it is almost impossible for customers to challenge Leasecomm in the subsequent judgment enforcement actions. Had Leasecomm filed the suits in the local forum in the first instance, customers might have been able to appear and present a defense, either with an attorney or on their own.

32.    Leasecomm adds to the customer injury by imposing high collection fees, not only for late payments, but for every collection call it makes and letter it sends. These fees provide significant profits to Leasecomm and grossly exceed the cost of collection to Leasecomm. On the Leasecomm lease agreement, a provision provides that Leasecomm will charge the lessee $5.00 per collection call and letter. Leasecomm sends lessees multiple collection letters, even though, the lessee has filed a complaint disputing the bill. Furthermore, Leascomm customer service agents make multiple calls to lessees. Evidence exists that customer service agents even make multiple calls to a lessee on the same day. Leasecomm supports this practice by awarding bonus pay to its customer service agents when the agents collect amounts from customers. Moreover, Leasecomm frequently fails to clearly and conspicuously identify the basis for fees imposed on its invoices. Thus, in many cases, by the time Leasecomm commences collection in court, the amount sought substantially exceeds the total payments due under the lease.

33.    Leasecomm customer service agents during collection calls frequently harass or threaten customers into paying Leasecomm. Customer service agents tell customers that if they do not pay Leasecomm, Leasecomm will garnish their wages, call the police on them, report them to a credit reporting agency, and/or sue them in court in Massachusetts. Furthermore, customer service agents use abusive language.

## VIOLATIONS OF MASSACHUSETTS CONSUMER PROTECTION ACT

### COUNT I

34.    The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

35.    In numerous instances, in connection with the financing of small business ventures, Leasecomm represents, expressly or by implication, directly or indirectly, that the finance contract the customer is entering into with Leasecomm finances all or a substantial portion of the customer's purchase of the business venture.

36.    In truth and in fact, in most or all cases the finance contract, by its terms, finances only discrete equipment or services associated with the business venture, such as a credit card swiping terminal or a virtual terminal.

37.    Therefore, the representations set forth in Paragraph 35 above are false or misleading and constitute deceptive acts or practices in violation of G. L. c. 93A, § 2(a).

### COUNT II

38.    The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

39.    In numerous instances, in connection with the financing of small business ventures, Leasecomm represents, expressly or by implication, directly or indirectly, that it is financing the customer's purchase of a business venture.

40.    Leasecomm fails to disclose:

a.    That the financing agreement is with Leasecomm and not with the business venture vendor.

12

b.     That the financing agreement purports to make the obligation to pay Leasecomm absolute and unrelated to the terms, conditions, or performance of any other agreement, between the consumer and the business venture vendor, and that this agreement may be unenforceable under applicable contract law.

c.     That the obligation to pay Leasecomm in full is based entirely upon acceptance of a credit card swiping machine or virtual terminal.

d.     That Leasecomm's contract requires or has the effect of requiring that customers waive all defenses that they might have, including, but not limited to, fraud in the inducement of the contract, and that this provision may be unenforceable under applicable contract law.

e.     That any disputes concerning the financing agreement will be resolved in a forum distant from the customer's place of residence.

41.     These facts would be material to consumers in their purchase or use of the product. The failure to disclose these facts, in light of the representation made in Paragraph 39 above, is a deceptive act in violation of G. L. c. 93A, § 2(a) and G. L. c. 106, § 2A-515.

## COUNT III

42.     The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

43.     In numerous instances in connection with the financing of business ventures, Leasecomm represents, expressly or by implication, directly or indirectly, that customers have waived all defenses, or are precluded from raising any defenses or counterclaims, including defenses of fraud in the inducement or that material provisions of the financing contract are unenforceable.

13

44.     In truth and in fact, in numerous instances, customers have and can raise defenses and counterclaims, including defenses of fraud in the inducement or that material provisions of the financing contract are unenforceable.

45.     Therefore, the representations set forth in Paragraph 43 are false or misleading and constitute deceptive acts or practices in violation of G. L. c. 93A, § 2(a).

## COUNT IV

46.     The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

47.     In numerous instances, in connection with the financing of small business ventures, Leasecomm's practices of including in its finance contracts provisions authorizing it to file lawsuits in venues other than the customer's place of residence or the location where the customer executed the contract, and of filing lawsuits under finance contracts in venues other than the customer's place of residence or the location where the customer executed the contract, are likely to cause substantial injury that cannot be reasonably avoided, and are not outweighed by countervailing benefits to consumers or competition.

48.     Therefore, Leasecomm's practices, as alleged in paragraph 47 above, are unfair and violate G. L. c. 93A, § 2(a).

## COUNT V

49.     The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

50.     In the course of providing financing to consumers, defendants have regularly conditioned the extension of credit on the consumers signing a contract that includes compulsory

14

electronic funds transfers from accounts established primarily for personal, family, or household purposes, in violation of G. L. c. 93A, § 2(a).

## COUNT VI

51.    The Commonwealth re-alleges all preceding paragraphs of this complaint and incorporates them herein.

52.    The defendants have harassed or threatened customers through their collection practices. Furthermore, the collection fees grossly exceed the cost of collections.

53.    Therefore, Leasecomm's practices, as alleged in paragraph 52 above, are unfair and violate G. L. c. 93A, § 2(a) and 940 CMR 7.04(1)(b)(c)(f) and (g).

## CONSUMER INJURY

54.    Consumers throughout the United States have suffered substantial monetary loss as a result of the Defendants' unlawful acts or practices. In addition, the Defendants have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, the Defendants are likely to continue to injure consumers and to harm the public interest.

55.    The Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injury caused by Defendants' violations.

## PRAYER FOR RELIEF

The Commonwealth requests that this Court grant the following relief:

1.    Enter judgment against Defendants and in favor of the Commonwealth for each violation alleged in this complaint.

2.    Permanently enjoin and restrain Defendants from violating the Consumer Protection Act, G. L. c. 93A.

15

3.     Award such relief as this Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the Consumer Protection Act, G. L. c. 93A, including but not limited to, reformation or rescission of contracts, and the cancellation of purported debts.

4.     Impose a civil penalty pursuant to G. L. c. 93A, § 4, in the amount of $5,000 for each violation of G. L. c. 93A, § 2, found against the Defendants.

5.     Award the Commonwealth the costs of bringing this action, as well as such other and additional equitable relief as this Court may determine to be just and proper.

Dated: May 29, 2003

FOR THE COMMONWEALTH,

THOMAS F. REILLY
ATTORNEY GENERAL

By: _____
BETSY S. WHITTEY
BBO#: 645593

_____
GEOFFREY G. WHY
BBO#: 641267
Assistant Attorneys General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200

16

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                  SUPERIOR COURT    0 2 – 2 8 0 9  H
                                             CIVIL ACTION No. _____

---

)
COMMONWEALTH OF MASSACHUSETTS,      )
         Plaintiff,                 )
                                    )
         v.                         )        COMPLAINT
                                    )
LEASE FUNDING SERVICE, INC.; and    )
STEPHEN P. GAMES;                   )
                                    )
         Defendants.                )

---

INTRODUCTION

1.    This is a civil action brought by the Attorney General in the public interest

pursuant to G.L. c. 93A, § 4 arising out of the defendants' unfair and deceptive acts and practices

in connection with the solicitation and sale of lease financing brokerage services. From their

Massachusetts headquarters, Lease Funding Services, Inc. ("Lease Funding") and Stephen P.

Games (collectively, "defendants") purported to arrange lease financing to assist small businesses

in leasing business equipment. By misrepresenting that Lease Funding had secured a lender to

purchase and lease equipment to Lease Funding customers, defendants induced companies to pay

Lease Funding advance fees – which it claimed were "first and last months rental payments" on

the purported lease – ranging between $1,000 and $45,000 per customer. With respect to

approximately forty companies, defendants failed to arrange financing and, even though the

promised lease never occurred, Lease Funding refused to return the advance payments it

received. Defendants have refused to return approximately $200,000 in fraudulently induced

advance fees to approximately forty small business owners nationwide.

2.    These acts and practices violate G.L. c. 93A, § 2 and the Attorney General's regulations promulgated thereunder. By this action, the Attorney General seeks permanent injunctive relief prohibiting the defendants from committing unfair and deceptive acts and practices in the future. The Attorney General also seeks restitution for persons injured by the defendants' unlawful actions, civil penalties, attorneys' fees, and the costs of prosecuting this action, pursuant to G.L. c. 93A, § 4.

## JURISDICTION AND VENUE

3.    This court has jurisdiction over the subject matter and defendants of this action pursuant to G.L. c. 93A, § 4 and G.L. c. 223A, § 3 (a) and (b).

4.    In accordance with G.L. c. 93A, § 4 and G.L. c. 223, § 5, venue is proper in this Court.

## THE PARTIES

5.    The plaintiff is the Commonwealth of Massachusetts, represented by the Attorney General who brings this action in the public interest pursuant to G.L. c. 93A, § 4 and G.L. c. 12, § 10.

6.    The defendant, Lease Funding Services, Inc. ("Lease Funding"), is a Massachusetts for-profit corporation which previously maintained offices in Beverly and Peabody, Massachusetts and more recently maintained its office in Medford, Massachusetts.

7.    The defendant, Stephen P. Games ("Games") is a natural person who resides in Medford, Massachusetts. Games is the sole shareholder of Lease Funding and also is the president, treasurer and clerk of Lease Funding. Games controlled and was directly responsible for the operations of Lease Funding and individually made misrepresentations to prospective

-2-

customers to induce payment of advance fees, as described herein.

## FACTS

8.    Beginning in or before 1998, Lease Funding began advertising and offering for sale lease financing brokerage services.  Using lists of businesses purchased from suppliers including American Business List and Dun & Bradstreet, Lease Funding sent unsolicited advertisements to businesses nationwide, typically by facsimile, but sometimes by mail or through telemarketing.

9.    In its facsimile advertisement, Lease Funding told potential customers that they were pre-qualified for a "lease line of credit" from Lease Funding.  In this initial solicitation, Lease Funding stated:

> "We've pre-qualified your company through D&B for a lease line-of-credit.  You can use your line of credit to finance new or used equipment with the vendor of your choice, or refinance existing equipment."

Lease Funding encouraged businesses to "activate" their credit line by calling Lease Funding or by faxing a credit request form:

> "Call toll free (888) 978-2890 or just complete the information update form and fax it back to us at (978) 536-2790.  After a quick phone verification, usually just a reference on your business checking account, your company will have access to your line of credit."
> . . . .
> Once the equipment is installed to your satisfaction, Lease Funding Service will pay the vendor and your lease will begin 30 days later."

10.    Lease Funding's initial solicitation also stated:  "With our direct banking affiliation there are NO MIDDLEMAN LEASING BROKERS to inflate the cost to you."  Although its solicitation indicated that Lease Funding itself provided financing for the lease transaction and purchased the equipment to be leased to the customer, and that Lease Funding

was <u>not</u> a broker, Lease Funding in fact served only as a broker. Lease Funding itself did not purchase equipment on behalf of its customers and did not serve as a lending source. Instead, Lease Funding sought to arrange financing through various lending sources, in order to earn a commission upon finalization of a lease transaction. During its solicitation of potential new customers, Lease Funding did not accurately disclose that it earned a commission and did not disclose the amount of Lease Funding's commission.

11.    When potential customers responded to Lease Funding's solicitation, Lease Funding's representatives, including Games and salesperson Michael Sheehan, encouraged the potential customer to submit an "information update" form in order for Lease Funding to review the prospect's credit history. Lease Funding's representatives typically sought to: conduct a credit check on prospective customers, learn the nature and cost of the equipment that the customer intended to acquire, and then determine whether Lease Funding could find a lender to finance the lease transaction and upon what terms.

12.    After receiving the prospect's information update form, Lease Funding typically notified the prospective customer, either in writing or by phone, that the customer had been "approved" for lease financing. Although Lease Funding sometimes had obtained a lender's conditional commitment to fund the lease transaction at that stage, Lease Funding often notified potential customers of an "approval" even though Lease Funding had no commitment from a lender and sometimes even when the transaction had been rejected by lenders. Even when Lease Funding had obtained a conditional commitment from a lending source, Lease Funding did not disclose to its potential customers that a number of conditions had to be satisfied before any lender had actually "approved" the lease transaction. Lease Funding also typically did not

-4-

identify the lender that supposedly had "approved" the customer's lease transaction.

13.    After notifying prospective customers that they had been "approved," Lease Funding forwarded to the customer a package of documents which Lease Funding required to be signed in order to release the customer's funds. Lease Funding forwarded a cover letter together with a form lease agreement and related documents, as well as an "Invoice" from Lease Funding.

14.    Lease Funding's cover letter requested that the customer sign the lease documents and return them to Lease Funding together with a check payable to Lease Funding, stating: "When all of the documents have been completed, please return them to me here at Lease Funding Service, Inc., along with your company check for the advanced rentals due as invoiced."

15.    The "Invoice" issued by Lease Funding demanded payment of "First and Last Months Payment Due on Equipment Lease" as well as a $350.00 "administrative" or "documentation" fee. Like the cover letter's reference to "advanced rental payments," the Invoice told the customer that the advance payment comprised the first and last months' lease payments on the lease transaction that Lease Funding supposedly had arranged. By these documents and over the phone, Lease Funding represented to customers that, in order to obtain the "approved" lease financing promised by Lease Funding, the customer needed only to sign the lease documents and pay the first and last months lease payments up-front, together with the $350.00 fee. On occasion, the Invoice issued by Lease Funding or All Business Credit demanded the first and last *two* or *three* months lease payments.

16.    Lease Funding also forwarded a "Release Authorization" by which the prospective customer authorized Lease Funding or a potential lender to obtain the customer's credit and financial information. The Release Authorization form received by many customers

-5-

stated:

> "We have processed your application for your 'business express equipment card'. Your company has been approved for your lease line of credit. Please sign this bank authorization form that your bank has requested. This will enable us to score your company for the lowest rates."

17.    Lease Funding also forwarded a standardized form "Lease Agreement" and related forms which it required its customer to sign. This form lease agreement identified the lessee, the supplier/vendor, and the equipment to be leased, provided a schedule of monthly lease payments, and contained sections captioned "Lease Acceptance," "Unconditional Guaranty," and "Delivery & Acceptance" (by which lessee would acknowledge receipt of the leased equipment). The reverse side of the lease agreement also contained 25 numbered paragraphs of terms and conditions. Among other terms, the "Lease Acceptance" section on the front page of the lease agreement provided: "This Lease is not binding until accepted by Lessor."

18.    Through the lease documents which Lease Funding required customers to sign and through Lease Funding's express representations, Lease Funding and Games purposely generated the impression in the prospective lessee that the lease transaction had been finalized and the customer needed only to sign the documents and pay the two months' "advance rentals" to complete the transaction.

19.    In fact, at the time defendants forwarded the lease documentation to the prospective customer for signature, Lease Funding and Games had not secured a lender's final commitment to finance the proposed lease transaction and, on some occasions, had not obtained even a preliminary commitment to fund the proposed transaction.

20.    Based upon defendants' representations that defendants had secured financing for

-6-

customers' lease transactions (as described above), approximately forty companies paid

defendants advance lease payments and administrative fees, but then never received the lease

financing promised by Lease Funding. These companies paid Lease Funding advance payments

– ranging between $1,000 and $47,000 per customer – on non-existent leases. These companies

paid Lease Funding a total of approximately $200,000 in advance payments and administrative

fees but never received lease financing through Lease Funding.

21.    Even though, with respect to approximately forty companies, defendants failed to

obtain lease financing as promised and no lease ever came into existence, Lease Funding and

Games have refused to return advance payments paid by the would-be lessees. Each of the

approximately forty customers demanded repayment but defendants have refused or simply

ignored these requests.

22.    When customers requested that their advance payments be returned after

defendants failed to obtain lease financing, defendants typically ignored those requests and

refused, for weeks or even months, to respond to customer inquiries and phone calls. Defendants

often claimed that additional information was necessary to complete the lease, or that financing

had been delayed. When defendants ultimately failed to secure financing, in order to deflect

responsibility defendants often blamed the customers by, for instance, citing irregularities in

customer information, a bounced deposit check, or claiming that the applicant had lied in its

application, misrepresented the equipment to be purchased or otherwise engaged in fraud.

Defendants also told customers their advance payments would be returned but then failed to do

so.

23.    Eventually, defendants told many customers demanding refunds that Lease

-7-

Funding was entitled to keep the advance lease payments. Defendants relied upon certain terms of the form "lease agreement" signed by the customer, for instance, the terms that "advance payments shall be deemed earned upon lease acceptance" and that "[o]nce Lessee signs this lease and lessor accepts it, this lease will be non-cancellable for the full lease term." Defendants relied upon these terms of the purported lease agreement even though no lessor ever "accepted" or signed the lease form and, thus, the contract never came into existence.

24. None of the approximately $200,000 collected by defendants as "advance lease payments" for roughly forty aforementioned customers was directed toward a lease payment, because the anticipated lease transactions never occurred. Lease Funding and Games did not segregate the advance payments. Lease Funding and Games instead deposited the money in their business accounts and used the money to pay expenses, including commissions and compensation paid to Games.

25. At no time during its solicitation of advance lease or rental payments from prospective customers did defendants accurately disclose defendants' policies concerning the refund of advance deposits paid for lease transactions. At no time prior to customers' payment of advance lease payments did defendants disclose that defendants intended to keep the customers' advance payments regardless of whether the lease transaction ever took place and regardless of whether defendants were able to arrange lease financing.

26. In order to induce customers to pay Lease Funding an advance fee, Lease Funding and Games misrepresented to customers:

   i) that financing for the customer's lease transaction was approved and/or final;

   ii) Lease Funding's and Games' ability and/or intention to secure financing on behalf of

-8-

the customer;

iii) that the "first and last months" advance payment to Lease Funding comprised an advance payment on a finalized lease;

iv) that customers were "pre-qualified" and/or "approved" for lease financing by Lease Funding when customers were not and when Lease Funding itself did not provide financing;

v) that Lease Funding was not a broker or "middleman" and that no broker fees would be charged to customer.

27.    In order to induce customers to pay Lease Funding an advance fee, Lease Funding and Games failed to disclose to customers material information concerning defendants' services and the proposed lease transaction, including:

i) that no lender had finally approved the proposed transaction for financing;

ii) that even if a lender had conditionally or preliminarily approved a transaction for financing, the lender was not actually committed to finance the transaction until the lender itself – as distinct from Lease Funding – determined the credit worthiness of the applicant and the equipment;

iii) that, notwithstanding a customer's advance payment, neither Lease Funding nor any lender was obligated to actually provide financing for the lease;

iv) that Lease Funding would charge a fee for brokering a lease transaction and the amount of Lease Funding's commission;

v) that the payment to Lease Funding for two months "advanced rentals" would <u>not</u> be applied to the customer's lease payments, but instead would be kept by Lease Funding to pay its undisclosed commission; and

vi) that Lease Funding intended to keep the customer's advance payment of two months lease payments even if Lease Funding never secured lease financing and even if no lessor ever accepted the lease agreement.

28.    Games personally induced customers to pay advance fees by misrepresenting that Lease Funding had obtained lease financing when it had not, and by misrepresenting Lease

Funding's ability and intention to obtain lease financing. Games also failed to return advance deposits to customers and, while doing so, misrepresented Lease Funding's intention to return deposits, misrepresented to customers the reasons for Lease Funding's failure to obtain financing, and otherwise personally engaged in the unfair and deceptive conduct described above.

29.    The defendants knew or should have known that their actions were in violation of G.L. c. 93A, § 2.

30.    On or about April 10, 2002, pursuant to G.L. c. 93A, § 4, the Office of the Attorney General sent to defendants, by certified mail, a letter advising defendants of the Commonwealth's claims and providing an opportunity to discuss resolution of those claims.

COUNT ONE

**(Unfair or Deceptive Acts or Practices in Violation of G.L. c. 93A, § 2(a))**

31.    The allegations contained in paragraphs 1 through 30 of the Complaint are incorporated herein by reference.

32.    The defendants, Lease Funding and Games, have violated G.L. c. 93A, § 2(a) and regulations promulgated thereunder pursuant to G.L. c. 93A, § 2(c) by engaging in various unfair and deceptive acts or practices, including but not limited to the following:

a.    Misrepresenting to customers and potential customers material information, terms and conditions concerning the goods and/or services offered for sale, including misrepresenting defendants' ability and intention to secure lease financing, misrepresenting the purpose and character of the advance payments demanded by defendants, and misrepresenting the nature of and cost of defendants' brokerage services, in violation of G.L. c. 93A, § 2(a) and 940 C.M.R. § 3.05;

-10-

b.      Failing to disclose to customers and potential customers, prior to the receipt of

advance payments, material information concerning the services offered by defendants, including

failing to disclose material terms and conditions of the services offered, the nature of the advance

payments, the actual terms of all applicable cancellation and refund policies, and defendants'

intention to keep advance payments regardless of whether defendants secured lease financing, in

violation of G.L. c. 93A, § 2(a), 940 C.M.R. § 3.16(2), and 940 C.M.R. § 3.13(1) and (2).

c.      Failing to perform the services promised to customers and for which defendants

took money, including failing to arrange lease financing for customers, in violation of G.L. c.

93A, § 2(a).

d.      Failing to return to customers advance lease payments collected by defendants,

when no lease transaction occurred and when defendants failed to provide the services promised,

in violation of G.L. c. 93A, § 2(a).

e.      Refusing to respond to customers' inquiries and requests for return of deposits, in

violation of G.L. c. 93A, § 2(a).

f.      Claiming entitlement to keep advance deposits for transactions that never

occurred and/or for services not performed, by relying upon an unfair, untenable and

unconscionable interpretation of defendants' contracts, which in any event were not in effect, in

violation of G.L. c. 93A, § 2(a).

## COUNT TWO

### (Fraud/Deceit)

33.      The allegations contained in paragraphs 1 through 32 of the Complaint are

incorporated herein by reference.

34.    The defendants, Lease Funding and Stephen Games, knowingly or recklessly, made false statements to prospective customers in order to induce those persons to pay money to defendants under false pretenses, for services that defendants did not perform, and thereby engaged in fraud and deceit.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth requests that this court:

1.    Issue a permanent injunction prohibiting the defendants, Lease Funding and Stephen Games, their agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from:

a.    Receiving, accepting, soliciting or collecting fees, funds or any other consideration from any person for brokerage, assistance, consultation or instruction in connection with obtaining or arranging a lease or lease financing for others, unless such consideration is paid to a defendant only upon successful completion of the transaction at issue;

b.    Entering into any oral or written agreement or contract with any person to provide brokerage, assistance, consultation or instruction in connection with obtaining or arranging a lease or lease financing for others, unless any consideration to be paid to a defendant pursuant to such agreement shall be paid only upon successful completion of the transaction at issue;

c.    Refusing to issue, upon request by a person who paid any fees to a defendant in connection with lease financing or lease brokerage services, a complete refund of such fees paid to such defendant, if the lease transaction at issue was not actually and fully consummated;

d.    Misrepresenting to the public or any person material information, terms and conditions concerning any goods or services offered for sale by a defendant, including, but not

-12-

limited to, misrepresenting defendant's ability and intention to secure lease financing, misrepresenting the purpose and character of payments sought by defendants, and misrepresenting the nature of or cost of defendants' services;

e.    Failing to disclose to the public or any person, prior to acceptance, receipt or solicitation of any money for goods or services, material information concerning any goods or services offered for sale by a defendant, including failing to disclose material terms and conditions of the goods and services offered and the actual terms of all applicable cancellation and refund policies;

2.    Order the defendants to make full and complete restitution to each person injured by their unfair and deceptive acts or practices;

3.    Order the defendants to pay the Commonwealth civil penalties, attorneys' fees and costs pursuant to G.L. c. 93A, § 4.

4.    Grant such other and further relief as the Court deems equitable and proper.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

THOMAS P. REILLY
ATTORNEY GENERAL

Date: June **26**, 2002          By: _____

Christopher Barry-Smith, BBO # 565698
Assistant Attorney General
Consumer Protection and Antitrust Division
Public Protection Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200

-13-



**Brian Lucy**
03/18/2002 10:08 AM

To: Paul Stenberg <Paul.Stenberg@csileasing.com>
cc:
Subject: Re: Analysis

Thanks a bunch for doing this.

Kevin is out this week, but when he gets back, we'll take a look.

Brian

Paul Stenberg <Paul.Stenberg@csileasing.com>



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>

03/18/2002 08:42 AM

To: "Kevin. Baillie@corp. terralycos. com (E-mail)"
    <Kevin.Baillie@corp.terralycos.com>, Brian.Lucy@corp.terralycos.com
cc:
Subject: Analysis

I have come up with the following so far;

Monique's analysis does not include Schedules that Lycos was still obligated for, but because our Lenders wanted to decrease exposure , we lowered them (I explained this back in Sept.) Equipment Schedules 64,81,68,66 and 86 rents were decreased substantially from the October payment to the November. For example, #64 was due to expire 1/31/02 @ $26,888/mo. We decreased that to $5055/mo, but contractually Lycos stilled owed the $26,888/mo.

Schedule # 65 expired 10/1 but was included in the re-finance. This was not included in the Analysis.

Monique's total for the new lease obligation was wrong. She took the Total Monthly Payment x the Length of the deal. You must look at it at a Present Value base and not include the Interest. Its like taking your Mortgage payment x 30 years.

This is what I have so far so you can rest easy;

Present Value of Lease  $23,727,000

Obligation of old Leases $20,215,000

Difference        $3,512,000

Now the Value of the current lease is around $29,000,000 . The total cost of the equipment was around $63mm. When we re-financed, we extended our lease and re--couped about 5-7% thus the 3.5mm. Don't forget, on the Orginal leases, CSI injects between 10-13% residual so for every $1mm spent, Lycos obligation is $870k

I addition, a good portion of the equipment was taken from an over 30 month term and placed on a 24 month term. For example( hypothetical); a million dollar of PC's that had 33 months left was refinanced to 24 mo. So, in affect, that groups payments are going to be higher.

BUT, as I said all along, WHEN you return the equipment, I will give you Full FMV credit. So you won't be obligated for all the payments:

There are still areas that I am doing this week and I will get back to you.

# CSI                    SALES AGREEMENT NUMBER 199614

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314) 997-7010

## SALES AGREEMENT

This Sales Agreement dated July 15, 2003 (the "Agreement") is between **COMPUTER SALES INTERNATIONAL, INC.** (the "Seller") and **LYCOS, INC.,** which has a principal place of business at 100 5ᵗʰ Avenue, Waltham, Massachusetts 02451 (the "Buyer").

WHEREAS, Buyer, as Lessee and Seller, as Lessor have entered into various equipment schedules (the "Equipment Schedules") subject to Master Lease Agreement No. 144874 dated December 4, 1996 (the "Master Lease") (the "Master Lease" together with the "Equipment Schedule(s)" hereinafter collectively referred to as the "Lease")

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were consequently terminated in their entirety, and all items of equipment leased pursuant to the terminated Equipment Schedules, were made subject to replacement Equipment Schedules listed on Exhibit 1 attached hereto and made a part hereof ("Replacement Schedules");

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were not revised ("Original Schedules") and they, together with the Replacement Schedules remain in full force and effect as of the date of this Agreement (the "Original Schedules" together with the each "Replacement Schedules" collectively referred to as the "Existing Schedules")

WHEREAS, Lessee desires to restructure all of the Existing Schedules detailed on Exhibit 1 to $1.00 buyout leases;

WHEREAS, a prepayment of the fair market value of all of the Equipment (as hereinafter defined) is required in order to restructure each Lease to $1.00 buyout lease;

WHEREAS, Lessor has agreed to restructure said Leases to $1.00 buyout leases for the consideration set forth below;

NOW THEREFORE, in consideration of the foregoing, Lessee and Lessor agree as follows:

1. **SALE:** For the Sales Price described in Paragraph 3 below, Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Leases listed in Paragraph 2 below (the "Equipment") effective on their respective termination dates, except as stated in paragraph 4 below, and on the terms and conditions contained in this Agreement.

2. **EXISTING EQUIPMENT SCHEDULES:** The Equipment is installed at Buyer's location and has been accepted for lease under Equipment Schedules 69I, 64F, 66I, 67H, Eighty-five, Eighty-six, Eighty-nine, 89A, Ninety, Ninety-three, Ninety-four, One Hundred, and Two Hundred to Master Lease Agreement No. 144874 between the parties (the "Leases"). The Existing Equipment Schedules shall terminate on the "Termination Dates" set forth below:

    Equipment Schedules 69I, 64F, 66I and 67H will terminate on September 30, 2003
    Equipment Schedules Eighty-five and Eighty-six will terminate on December 31, 2003
    Equipment Schedules Eighty-nine, 89A, and Ninety will terminate on July 31, 2004
    Equipment Schedule Ninety-three will terminate on October 31, 2003
    Equipment Schedule Ninety-four will terminate on October 31, 2004
    Equipment Schedule One Hundred will terminate on March 31, 2004
    Equipment Schedule Two Hundred will terminate on March 31, 2005

Each Lease will terminate on its respective Termination Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make all Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease. Pursuant to

the Leases, Buyer remains liable for any personal property tax liability, with respect to the Equipment, which accrued or accrues during the term of the Leases. The Equipment is sold on an "AS IS, WHERE IS" basis, without any warranties of any kind, express or implied.

3.  **SALES PRICE:** The Sales Price of the Equipment is $3,775,000.00 USD, plus applicable taxes, which Buyer shall pay on or before July 18, 2003 by wire transfer to the following bank and account:

> First Bank
> ABA #081009428
> For Further Credit to: Computer Sales International, Inc.
> Account #9821914677
> Lycos, Inc.
> Sales Agreement No. 199614

Buyer shall pay on demand a late charge on such Sales Price if unpaid after it is due. The late charge rate is the lower of (i) one and one half percent (1.5%) per month, or (ii) the highest rate permitted by law.

4.  **SATISFACTION OF LEASE OBLIGATIONS:** The Leases, solely with respect to Monthly Rental (set forth on Exhibit 1) shall continue in full force and effect and Lessee shall pay to Lessor the number of Monthly Rental payments remaining (plus applicable taxes, if any), beginning with the payment due for the month of August 2003, and continuing to and including the Final Rent Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").

Seller acknowledges that receipt of the Sales Price and each of the Remaining Rental Payments in full, plus applicable taxes, if any ("Lease Satisfaction Amount"), shall fully satisfy Buyer's obligations to Seller with respect to the Leases and all obligations under the Leases shall, on the Final Rent Payment Date, cease in their entirety.

Buyer and Seller agree that this Agreement and the payment of the Lease Satisfaction Amount satisfies all monetary obligations and notice obligations of Buyer under the Leases (with the exception of notices required under Section 14 of the Master Lease), and no other payment, written or oral notification is required by Buyer in order to effectuate (a) the full satisfaction of its obligations under the Leases and (b) its ownership interest in the Equipment.

**SELLER RETAINS TITLE:** With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date . With respect to Equipment Schedule 85, certain items of Equipment shall on its respective Termination Date, become subject to Equipment Schedule Ninety-four. Upon receipt of the Lease Satisfaction Amount in full, without further action on the part of Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.

5.  **DELIVERY:** The Equipment is already installed and accepted by Buyer pursuant to the Leases.

6.  **WARRANTIES:** Seller warrants that (i) on termination of the applicable Lease, except as noted in paragraph 4 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims, and encumbrances of any kind except those caused or incurred by Buyer, if any; and (ii) Seller has the full right, power and authority to sell the Equipment. OTHER THAN THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONDITION, DESIGN OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE. SELLER HAS NO LIABILITY TO BUYER FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH (i) ANY DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO BUYER, (ii) ANY DEFECT IN THE EQUIPMENT, (iii) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (iv) ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE EQUIPMENT, OR (v) ANY LOSS OF BUSINESS, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PATENT INFRINGMENT ACTIONS.

7.  **TAXES:** Buyer shall pay all sales and use taxes (including interest and penalties) levied or based on the sales price or on this Agreement or the Equipment. If Buyer is purchasing for resale or if Buyer is exempt from sales/use tax, Buyer will issue to Seller an appropriate exemption certificate in form reasonably acceptable to Seller prior to the delivery date. Personal property taxes assessable on the Equipment on or after the date of delivery will be borne by Buyer.

8.  REMEDIES:  If Buyer refuses or is unable to timely perform its obligations hereunder, Seller may, following the delivery date, do any of all of the following: (i) terminate the Agreement on five days notice, (ii) retain or repossess the Equipment, or (iii) recover from Buyer all damages and expenses, including reasonable attorney's fees, which Seller has incurred or may incur by reason of Buyer's failure to perform under this Agreement. Seller may retain any monies paid by Buyer to Seller prior to Buyer's nonperformance as an offset to Seller's damages and expenses.

9.  MISCELLANEOUS:

A.  ENTIRE AGREEMENT:  This Agreement is the entire agreement between Seller and Buyer regarding the purchase and sale of the Equipment and no representation or statement not contained in this Agreement is binding on Seller or Buyer as a warranty, or otherwise, unless in writing and executed by the party to be bound. Any purchase order Buyer issues is merely for its internal recordkeeping purposes and as a means of confirmation of Buyer's acceptance of this Agreement, and does not as supercede, modify or serve as a counter-offer to the terms and conditions in this Agreement.

B.  NOTICES:  Any notice relating to this Agreement must be in writing and sent by electronic facsimile transmission, by overnight courier service or by registered or certified mail, postage prepaid, addressed to the party for which it is intended at the address set forth in the beginning of this Agreement or to such other address as either party indicates in writing. Notice is effective on the earlier of receipt or three days from the date of mailing.

C.  GOVERNING LAW:  This Agreement, including all matters of construction, validity, performance and enforcement, is governed by the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law.

D.  SEVERABILITY:  Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law or any jurisdiction will be ineffective as to the jurisdiction without invalidating the remaining provisions of this Agreement, but where the provisions of applicable law may be waived, they are waived to the full extent permitted by law.

E.  SURVIVAL:  All representations, warranties and covenants contained in this Agreement continue in full force and effect and survive the sale of Equipment.

F.  SELECTION:  Buyer acknowledges that it has exercised its own judgment in selecting the Equipment purchased, and this it has not relied on Seller for assistance and advice in making such selection.

G.  ASSIGNMENT:  This Agreement may not be assigned by Buyer without the prior written consent of Seller.

The parties have executed this Agreement on the date written below. At Seller's option, this Agreement is not effective unless signed by Buyer and returned to Seller by July 15, 2003.

| BUYER: | SELLER |
|---|---|
| LYCOS, INC. | COMPUTER SALES INTERNATIONAL, INC. |
| By: | By: |
| Title: CFO | Title: |
| Date: 7/18/03 | Date: |

REVIEWED BY
TERRA LYCOS LEGAL PDK

Exhibit 1
to
Sales Agreement No. 100814

# CSI

## COMPUTER SALES INTERNATIONAL INC

PO BOX 775485 / ST LOUIS, MISSOURI 63177-5485 / 314-997-7010

TO: LYCOS INC
100 5TH AVENUE
WALTHAM, MASSACHUSETTS 02451

ATTENTION: PETER CARROLL

INVOICE: 532545-1
DUE DATE: 06/30/03
DATE: 06/26/03
SALESMAN:

CONTRACT NUMBER: 199514

SALE: $3,775,000.00

SALES TAX: $229,830.89

LESS PAYMENT ($3,775,000.00)

REMARKS:

sales tax on sale

WIRE TRANSFER TO:
FIRST BANK
ABA #081009428
CREDIT CSI INC ACCT #9821914677

TOTAL
AMOUNT DUE: $229,830.89
SE

## TERMS PER CONTRACT