UNITED STATES DISTRICT COURT
For the District of Massachusetts

COMPUTER SALES INTERNATIONAL INC.,  )
                                                  )
                Plaintiff,  )
v.  )
                                                  )
LYCOS, INC.,  )       C.A. No. 05-10017- RWZ
                                                  )
                Defendant,  )
and  )
                                                  )
BANK OR AMERICA f/k/a FLEET BANK,  )
                                                  )
         Trustee Process Defendant.  )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF COMPUTER SALES INTERNATIONAL, INC.'S
## <u>MOTION TO DISMISS DEFENDANT LYCOS INC.'S COUNTERCLAIM</u>

Submitted by:

Robert J. Kaler, BBO No. 542040
Eric Neyman, BBO No. 564803
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

*Counsel for Plaintiff Computer Sales
International, Inc.*

Dated:  March 10, 2005

*Table of Contents*

*Table of Contents*  ……………………………………………………………………… i

*Table of Authorities*  ……………….……………………………………………… ii

INTRODUCTION  …………………………………………………………… 1

SUMMARY OF ARGUMENT  …………………………………………………... 2

STATEMENT OF RELEVANT FACTS  ……………………………………… 3

ARGUMENT …………………………………………………………………… 7

    I.     LYCOS' "MONEY HAD AND RECEIVED" AND "UNJUST
        ENRICHMENT" COUNTS FAIL TO STATE LEGAL CLAIMS
        BECAUSE THE PAYMENTS THEY SEEK TO RECOVER
        WERE ADMITTEDLY REQUIRED BY THE CONTRACTS
        THAT LYCOS SIGNED  ……………………………………..……….8

    II.    LYCOS' TWO "DECLARATORY JUDGMENT" COUNTS
        FAIL TO STATE LEGAL CLAIMS BECAUSE THEY ARE
        DEPENDENT ON LYCOS' SUBSTANTIVE COUNTS, WHICH
        ARE LEGALLY INSUFFICIENT  …………………………………..…..10

    III.   LYCOS' FRAUDULENT MISREPRESENTATION COUNT
        FAILS TO STATE A LEGAL CLAIM ON ACCOUNT OF
        THE VERY FACTS ALLEGED IN LYCOS'
        COUNTERCLAIM……………………………..……………………….11

    IV.   LYCOS' NEGLIGENT MISREPRESENTATION COUNT FAILS
        TO STATE A LEGAL CLAIM FOR THE SAME REASONS
        THAT THE FRAUDULENT MISREPRESENTATION
        COUNT IS INSUFFICIENT, AND IT IS ALSO BARRED
        BY THE "ECONOMIC LOSS" RULE ………………………………17

    V.    LYCOS' M.G.L. c. 93A COUNT FAILS TO STATE A LEGAL
        CLAIM……………………………………………….……………………18

    VI.   LYCOS' BREACH OF IMPLIED COVENANT OF GOOD
        FAITH AND FAIR DEALING COUNT FAILS TO STATE
        A LEGAL CLAIM  ………………………..…………………………… 19

CONCLUSION ...………………………………………………………………… 20

*Table of Authorities*

*American Cyanamid Co. v. S.C. Johnson & Son, Inc.,* 729 F.Supp. 1018 (D.N.J., 1989) .........12

*American Std. Insurance Co. of Wisconsin v. Bracht,* 103 S.W.3d 281 (Missouri 2003) ......... 19

*Armstrong v. Rohm and Haas Co.,* 349 F.Supp. 71 (D. Mass. 2004) .................................. 16

*Arnold v. Erkmann,* 934 S.W.2d 621 (Mo. App. 1996) ................................................................12

*Bateman v. FDIC,* 112 F. Supp. 2d 89, 97 (D. Mass. 2000) ........................................................ 20

*BNY Financial Corp. v. Fitwell Dress Co., Inc.,* 6 Mass. L. Rptr. 373, 1997
    WL 42518 (Mass. Super.) ........................................................................................ 18

*Boyd v. Margolin,* 421 S.W.2d 761 (Mo. 1967) .......................................................... 9

*Childress Paintings and Assoc. Inc. v. John Q. Hammons Hotel Two,* L.P.,
    106 S.W.3d 558 ............................................................................................... 9

*Collegiate Enterprises, Inc. v. Otis Elevator Co.,* 650 F. Supp. 116 (E.D. Mo. 1986) ............ 17

*Comprehensive Care Corp. v. Rehab Care Corp.,* 98 F.3d 1063 (8th Cir. 1966) ..................... 20

*Cookson Group v. Flynn,* 1997 Mass. App. Div. 173 (1997) ..................................................... 9

*Cooprider v. John Hancock Mutual Life Insurance,* 1993 U.S. App. LEXIS 24979
    (1st Cir. 1993) (Zobel, J.) ............................................................................ 14

*Danca v. Taunton Savings Bank,* 385 Mass. (1982) .................................................... 14

*Dickey v. Royal Banks of Missouri,* 111 F.3d 580 (8th Cir. 1997) .............................................. 9

*Druker v. Roland Wm. Jutras Assoc.,* 370 Mass. 383 (1976) ................................................... 19

*Dunkin' Donuts Inc. v. N.A.S.T., Inc.,* 266 F.Supp. 2d 826 (D. Ill. 2003) ............................... 10

*Eagle Properties, Ltd. v. KPMG Peat Marwick,* 912 S.W.2d 825 (Tx. App. Ct. 1995) ............ 15

*Elias Brothers Restaurants, Inc., v. Acorn Enterprises, Inc.,* 831 F.Supp. 920
    (D. Mass. 1993) ................................................................................................ 16

*Express LLC v. Club Monaco U.S., Inc.,* 2002 WL 31973223 (Mass. Super 2002) ................ 18

*Gavett v. Roto Rooter Services Co.,* No. 01-01385-RWZ, 2001 U.S. Dist.
    LEXIS 20436 (D. Mass. Nov. 27, 2001) ........................................................ 17

*Gruzdanic v. Leisure Hills Ctr., Inc.* 25 F.Supp.2d 953 (D. Minn. 1998) ................................. 15

*In Re Lupron Mktg and Sales Practice Litig.,* 295 F.Supp. 2d 148 ........................................... 10

*In Re New England Dental Centers v. Aquino,* 291 B.R. 229 2003
    U.S. Dist. LEXIS 5837 (March 31, 2003) ..................................................... 13

*Joel Bianco Kawasaki Plus, Inc. v. Meramec Valley Bank,* 81 S.W. 3d 528
    (Missouri S. Ct. 2002)..................................................... 14

*John T. Brown, Inc. v. Weber Implement & Auto Co.,* 260 S.W.2d 751,
    755 (Mo. 1953) ..................................................... 14

*Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798 (1st Cir. 1987)......................................... 14,16

*Knapp Shoes Inc. v. Sylvania Shoe Mfg. Corp.,* 418 Mass. 737 640
    N.E.2d 1101 (1994).................................................... 13

*Krupnick & Associates v. Hellmick,* 378 S.W.2d 562 (Mo. 1965) ............................................ 10

*Lacroix v. FDIC,* 1993 U.S. Dist. LEXIS 5103 (D. Mass. 1993) (Zobel, J.) ........................... 18

*Massey v. Tandy Corp.,* 987 F.2d 1307 (8th Cir. 1993) ...................................................... 20

*McAdams v. Mass. Mutual Life Ins. Co.,* No. 99 30284 FHF, 2002 U.S. Dist.
    Lexis 9944 (D. Mass. May 15, 2002) ............................................... 8

*McLaughlin v. Exchange Trust Co.,* 272 Mass. 158 (1930) ...................................................... 9

*Mead Corp. v. Stevens Cabinets, Inc.,* 938 F.Supp. 87 (D. Mass. 1996)................................. 18

*Microsoft Corp. v. BEC Computer Co.,* 818 F.Supp. 1313 (C.D.Cal. 1992)............................12

*Mill-Bern Associates, Inc. v. Dallas Demiconductor Corp.,* 2002 Mass. Super.
    LEXIS 181 (Mass. Super. 2002)............................................... 19

*Nedlloyd Lines B.V. v. Superior Court,* 3 Ca. 4th 459, 834 P.2d 1148,
    1155 (Cal. 1992) ............................................... 8

*Oggiono v. Fabmet Corp.,* 1993 U.S. Dist. LEXIS 11266 (D. Mass. 1993)
    (Zobel, J.).............................................................. 18,19

*Pizzeria Uno of Kingston, Inc. v. Independence Mall Group,* 11 Mass. L. Rep. 241
    1995 Mass. Super. LEXIS 866, 1995 WL 419932 (Mass. Super.)............................... 16

*Ramadan Shabaza v. Kathleen Cole and James Matesanz,* 69 F.Supp. 2d
    210 (D. Mass. 1999).................................................10

*Saxon Theatre Corp. v. Sage,* 347 Mass. 662 (1964) ............................................... 14

*Schopler v. Smilovits,* 689 So.2s 1189 (Fla. 4th DCA 1997).................................... 15

iii

*Sheehy v. Lipton Industries, Inc.,* 24 Mass. App. Ct. 188 (1987) .............................................. 20

*Sound Techniques, Inc. v. Hoffman,* 50 Mass. App. Ct. 425 (2000) ........................................... 18

*Symes v. Bahama Joe's, Inc.,* 1988 U.S. Dist. LEXIS 9611 (D. Mass. 1988)
    (Zobel, J.) ............................................................................................................ 19

*Turner v. Johnson & Johnson,* 809 F.2d 90 (1st Cir. 1986) .......................................... 16

*Universal CIT Credit Corp. v. Tatro,* 416 S.W.2d 696 (Mo. App. 1967) .................................. 14

*Uproar Co. v. National Broadcasting Co.,* 81 F.2d 373 (1st Cir.)
    *cert. denied,* 298 U.S. 670 (1936) .................................................................................. 19

*Verderber v. Perry,* No. 98-1625, 1999 U.S. App. LEXIS 3821  (1st Cir. March 8, 1999) ....... 10

*Zarum v. Brass Mill Materials Corp.,* 334 Mass. 81 (1956) ................................................... 10

**Statutes**

Mass. Gen. Laws Chapter 93A ........................................................................................7,18, 19

**Treatises**

*Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud
    and Negligent Misrepresentation Claims,* 41 Wm and Mary L. Rev.
    1789 (2000) ........................................................................................................ 17

# INTRODUCTION

Plaintiff Computer Sales International, Inc. ("CSI"), a privately held St. Louis-based computer leasing company, commenced this action on January 5, 2005 seeking to collect an account receivable of $301,050 from defendant Lycos, Inc. ("Lycos"), a publicly traded Massachusetts-based internet service company.  *See* Verified Complaint at p. 1, ¶1.  Lycos owes this money to CSI under two computer equipment leases, designated Equipment Schedules 100 and 200, that Lycos entered into with CSI in January of 2002 to effectuate its lease of certain computer equipment from CSI.  *Id.* at pp. 4-7.  These schedules, which were signed by both parties, were executed pursuant to the terms of a master lease contract (the "Master Lease") that Lycos and CSI entered into in December of 1996.[1]  Under that Master Lease, these and dozens of other equipment schedules were executed and paid by Lycos over the years.

At the time it commenced this action, CSI sought and obtained an *ex parte* attachment of Lycos' bank accounts at trustee defendant Bank of America f/k/a Fleet Bank ("Fleet") in the amount of $310,000, based on the facts set forth in its Verified Complaint, and in the accompanying Affidavit of Jeffrey Rousseau.[2]  Lycos has not sought to dissolve that attachment, but rather has filed a counterclaim seeking to void its obligations not only under Equipment Schedules 100 and 200, but under **all** the equipment schedules that it entered into with CSI pursuant to the Master Lease over the last nine (9) years.  CSI has now moved to dismiss this counterclaim for failure to state a claim.

---

[1]    The Master Lease, which was incorporated by reference into each schedule, provided that Lycos would be unconditionally responsible for all lease payments once it accepted the equipment, which it did.  *See* Verified Complaint at Exhs. 3, 6 (Lycos' Certificates of Acceptance); *See also, e.g.,* Answer and Counterclaim of Defendant Lycos, Inc. ("Lycos Answer/Counterclaim") at Exhs. C, D, E.

[2]    *See also* Memorandum of Law in Support of Plaintiff's *Ex Parte* Motion for Approval of Attachment on Trustee Process, dated and filed January 5, 2005.

## SUMMARY OF ARGUMENT

In its counterclaim, Lycos alleges that it was "fraudulently" or "negligently" induced to enter into **(i)** certain equipment schedules that it signed pursuant to the Master Lease, during the period 1996-2002, which extended the lease terms for various categories of equipment that Lycos was then using, and lowered Lycos monthly payments (the "lease extensions"), *see* Lycos' Answer/Counterclaim at pp.10-20, Exhs. A-F; and **(ii)** a July 2003 purchase and sale agreement pursuant to which Lycos subsequently agreed to buy the equipment covered by those lease extensions, and a number of others, for $3.77 million. *Id.* at p.20, ¶ 45, Exh. I.

Lycos alleges that it entered into the lease extensions unwittingly because CSI supposedly did not fully disclose the total amount that Lycos would have to pay, or the profit that CSI would make, as a result of these lease extensions. *Id.* at pp. 10-17. Lycos further alleges that it agreed to purchase the equipment in July of 2003 only because "CSI did not tell Lycos that Lycos had already paid substantially more than the total cost of the equipment," *id.* at p. 20, ¶ 45, and at one point supposedly overstated that cost in an email. *Id.* at p. 19, ¶¶ 40-41. As a result of this alleged "misconduct," Lycos argues that CSI has obtained an undeserved profit that it should now be forced to return to Lycos based on principles of "[e]quity and good conscience." *Id.* at p. 21-27, ¶¶ 47-85.

These allegations, as they are set forth in the Counterclaim, do not state a legal claim upon which relief can be granted. Lycos has simply (and somewhat shamelessly, for a sophisticated public company) advanced a series of inapplicable quasi-contractual, statutory, and tort claims in an unfair attempt to void valid lease contracts, and a duly executed purchase and sale agreement (which, ironically, is marked "REVIEWED BY TERRA LYCOS LEGAL" on the very page where it was signed by Lycos, *id.* at Exh. I, p. 3), to which it agreed years ago.

As set forth in detail below, even assuming that everything Lycos alleges is true, it has no claim against CSI in the face of the contracts that it has admittedly signed, and the facts that its own pleadings admit.  What Lycos is really attempting to do is revisit what its new management apparently perceives were bad business decisions by their predecessors.  The law does not permit this, however.  Lycos made its choices in the contracts that it signed with CSI years ago, and it cannot avoid those obligations now based on a belated reassessment of the wisdom of those contracts – nor can it state a claim for relief by alleging that the contracts were "unfair," or that information that Lycos could have ascertained for itself by simply "doing the math" (which it now does in its counterclaim) was somehow not "disclosed" to it by CSI.

For all of these reasons, and based on the more detailed facts and authorities set forth below, Lycos counterclaim should be dismissed pursuant to Fed. R. Civ. 12(b)(6).

## STATEMENT OF RELEVANT FACTS

The following key facts are genuinely uncontested in the pleadings, and in many cases are actually alleged and/or admitted in the Lycos Answer/Counterclaim:

1.      CSI is engaged in the business of purchasing computer equipment selected by its customers, and then leasing that equipment to its customers pursuant to written leases that contain clauses making the customers unconditionally responsible for all lease payments once they have accepted the equipment.  These types of clauses, known as "hell or high water" provisions, are specifically enforceable under the Uniform Commercial Code, and are critical to the equipment finance leasing industry, because they require the lessee to make payments under the lease "come hell or high water," without regard to defenses that the lessee might wish to assert against the lessor, and without any right of recoupment.  *See* Footnote 3, *below*.  It is the enforceability of these clauses that permits equipment finance companies themselves to obtain

the financing that they need to do business. *See* Verified Complaint at ¶ 7; Lycos'
Answer/Counterclaim at p. 2, ¶ 7.

2.    Defendant Lycos was founded in the 1990's as an internet start up company.
Rather than purchase its own computer equipment, and carry the heavy debt associated with such
a purchase on its books, it chose, beginning in December of 1996, to lease virtually all of its
equipment from CSI. *See* Lycos' Answer/Counterclaim at p. 8, ¶ 8 ("short term leases…are not
required to be placed on the company's balance sheet"). The terms and conditions governing
Lycos' lease of that equipment were set forth in a series of contracts that it entered into with CSI
from 1996 through 2003, which are described in relevant part below. *See* Verified Complaint at
¶ 10; Lycos' Answer/Counterclaim at p. 2, ¶ 10 ("Lycos states that the documents evidencing the
terms and conditions governing CSI's lease of equipment speak for themselves").

3.    First, in December of 1996, Lycos and CSI entered into a master lease (the
"Master Lease") providing that, from time to time, they would execute so-called "equipment
schedules," each of which would be considered a separate and independent lease incorporating
by reference all the terms contained in the Master Lease, and pursuant to which CSI would lease
certain computer equipment to Lycos on specified terms and conditions. A true copy of the
Master Lease – which contained a standard "hell or high water" clause[3] – is attached to CSI's
Verified Complaint as Exhibit 1. *See* Verified Complaint at ¶ 11; Lycos' Answer/Counterclaim
at p. 2, ¶ 11 (allegation partially admitted).

---

[3]    This clause appears in Article 5 of the Master Lease (in both the unsigned copy attached to Lycos'
Counterclaim, and in the signed and verified copy attached to CSI's Verified Complaint), which states, *inter
alia*, that: **"Lessee's obligation to pay the Monthly Rental and all other sums due hereunder *shall be
unconditional and shall not be subject to* any setoff, abatement, counterclaim, *recoupment*, defense,
cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other
right that Lessee may have against Lessor."** *See* Verified Complaint at Exh. 1, p. 2. *See also* Lycos
Answer/Counterclaim at Exh. A, p. 2, Article 5. (emphasis added).

4.     As specifically alleged in Lycos' counterclaim, "each equipment schedule constituted a separate and independent lease incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the *specific equipment leased*, the *lease expiration dates*, and the *monthly lease rental payments* due to CSI by Lycos." *See* Lycos Answer/Counterclaim at p. 10, ¶ 16 (emphasis added). As Lycos' counterclaim further alleges, "[b]etween December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment leases for the acquisition and lease of new items of technology equipment under the Master Lease Agreement." *Id.*

5.     During the period from December 1996 through April of 2002, the parties agreed several times to substitute new equipment schedules for old ones, in the process reducing Lycos' monthly payments, and extending the lease terms, for the equipment covered by those schedules. *See* Lycos Answer/Counterclaim at pp. 12-13. This process, referred to by Lycos as "rolling up" the old schedules into new ones, typically had the effect of extending Lycos' term of use of the equipment (before it would have to either buy it or return it to CSI), and reducing Lycos' monthly payment obligation – which enhanced its cash situation (a key financial metric for an internet start-up company). *See* Lycos Answer/Counterclaim at p. 13, ¶ 24 ("the 'roll-ups' would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage. *This was true*…")(emphasis added).

6.     An example is alleged in Lycos' counterclaim at pages 14-15, supposedly as an illustration of "how CSI manipulated the 'roll up' process" to "its favor and Lycos' detriment":

> 27. On July 12, 2000, Lycos entered into Equipment Schedule 67E ("Schedule 67E"), a true and accurate copy of which is attached hereto as Exhibit B … at a term of <u>24 months</u> with a monthly rental payment of <u>$42,075</u>. …

5

28.  On November 14, 2000, after only two monthly lease payments, Lycos entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is attached hereto as Exhibit C … a <u>34-month</u> lease … [of the] same assets previously leased under Schedule 67E … The monthly lease rental payment due under Schedule 67H was <u>$36,438.41</u>

*See* Lycos Answer/Counterclaim at p. 14, ¶¶ 27-28 (emphasis added).  While admitting that this roll-up "did reduce Lycos' monthly lease rental payment obligation by over $5,000," the counterclaim complains that "it increased Lycos total rental obligations by more than $310,000 from $1,009,800 to $1,323,056," and that "Schedule 67H still required Lycos to either purchase, renew or return the equipment to CSI at the conclusion of the lease term." *Id.* at p. 15, ¶ 29.

7.    The counterclaim repeats this same allegation with respect to other equipment schedule roll-ups to which the parties admittedly agreed at the time.  *See id*. at pp. 16-17 ("Schedules 93 and 94 reflected the 'roll-up' of a large number of then-existing equipment schedules…After the first payment…, Lycos' monthly lease rental obligations did decline from $36,482 to 32,688.  However, Lycos' total fixed monthly lease rental obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment schedules)").   The counterclaim then argues that CSI's return on its investment was unduly high. *Id.*.

8.    In essence, the counterclaim is alleging that the equipment schedule roll-ups were bad deals for Lycos – for reasons that the counterclaim alleges are evident through an "examination" of the "history" of these deals, including mathematical calculations comparing the scheduled lease payments in the "rolled up" equipment schedules with the "original equipment cost" for the specified equipment.  *See* Lycos Answer/Counterclaim at p. 14, ¶¶ 26-27.  Significantly, however, there is no allegation in the counterclaim which provides Lycos with grounds to raise that issue now – years after it entered into these transactions – particularly when all it had to do at the time to arrive at the same conclusions it says it has now reached was to "do the math" on each deal.

**9.**    In this regard, the counterclaim admits that Lycos knew the cost of each piece of equipment it leased.  *See* Lycos Answer/Counterclaim at p. 14, ¶ 27 ("Schedule 67E governed the lease of equipment with an original equipment cost of $1,091,002").   In fact, under the agreed Master Lease and equipment schedules, Lycos was required to (and did) select, negotiate the price for, and order that equipment from vendors that it chose.  *See* Verified Complaint at ¶ 8, and Exhibit 1.  It then assigned the purchase orders to CSI, which paid for the equipment and leased it to Lycos.  *Id.*  Thus, Lycos cannot claim, and has not alleged, that it was ignorant of the cost of any of the equipment that it purchased and assigned to CSI for leaseback to it.

**10.**    Instead, the Lycos counterclaim simply alleges that "[i]t was not until after Lycos had entered into the July, 2003 purchase agreement that Lycos discovered – and then only through the analysis of an expert leasing consultant it engaged to analyze all the CSI leases – the true nature of CSI's 'roll-up' scheme."  *See* Lycos Answer/Counterclaim at p. 20, ¶ 46.  There is no allegation that Lycos could not have retained such a consultant to advise it on these issues at the time it was negotiating the various equipment schedules, however.

## ARGUMENT

Lycos' counterclaim sets out eight purported causes of action based on its aforesaid allegations: **(1)** money had and received, **(2)** unjust enrichment, **(3)** a declaratory judgment that Lycos has no further payment obligations under its contracts with CSI, **(4)** a declaratory judgment that Lycos should recover at least $14 million of what it has already paid CSI under those contracts, **(5)** fraudulent misrepresentation, **(6)** negligent misrepresentation, **(7)** violation of M.G.L. c. 93A, §§ 2, 11, and **(8)** breach of the implied covenant of good faith and fair dealing. *See* Lycos Answer/Counterclaim at pp. 21-27 ¶¶ 47-85.

Based on the facts that Lycos itself has pled, none of these counts lie – either under the applicable Missouri law,[4] or under Massachusetts law.

## I.    LYCOS' "MONEY HAD AND RECEIVED" AND "UNJUST ENRICHMENT" COUNTS FAIL TO STATE LEGAL CLAIMS BECAUSE THE PAYMENTS THEY SEEK TO RECOVER WERE ADMITTEDLY REQUIRED BY THE CONTRACTS THAT LYCOS SIGNED

In Counts 1 and 2 of its counterclaim, Lycos asserts claims for "money had and received" and "unjust enrichment," demanding that it be allowed to recoup more than $14 million of the payments that it has already made to CSI under the lease extensions and the purchase and sale agreement.  The very facts that Lycos has alleged, however, preclude it from asserting such claims against CSI, because the payments it is seeking to recover were admittedly required by the contracts that Lycos entered into with CSI, and those contracts expressly prohibited any claims for recoupment of those payments by Lycos.  *See* Verified Complaint at Exh. 1, p. 2.  *See also* Lycos Answer/Counterclaim at Exh. A, p. 2, Article 5 ("Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be unconditional and shall not be subject to any…recoupment…").

Under Missouri law, an action for money had and received is an equitable remedy which applies only in situations where payments that were not due and owing by contract have been made by mistake or under duress – it is not a vehicle for avoiding one's contract obligations.  *See*

---

[4]    The contracts in this case expressly provided that the law of Missouri, not Massachusetts, would govern the transactions between the parties.  *See* Lycos Answer/Counterclaim at Exh. I, p. 3, §9C ("GOVERNING LAW: This Agreement, including all matters of construction, validity, performance or enforcement, is governed by the laws of the state of Missouri, without giving effect to principles of conflicts or choice of laws").  *Id.* at Exh. 1, p. 5, §18.6 ("THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI…").  These types of choice of law provisions have been routinely interpreted by this Court to include contract-related tort claims.  *See McAdams v. Mass. Mutual Life Ins. Co.*, No. 99-30284-FHF, 2002 U.S. Dist. Lexis 9944 (D. Mass. May 15, 2002), citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Ca. 4th 459, 834 P.2d 1148, 1155 (Cal. 1992) (noting that sophisticated business parties would not intend "that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship").

*Dickey v. Royal Banks of Missouri*, 111 F.3d 580, 583 (8th Cir. 1997) (payment of a debt that was owed could not be called unjust). Similarly, an action for "money had and received" will only lie under Massachusetts law "where the defendant has received money or its equivalent, which in equity and good conscience belongs to the plaintiff." *Cookson Group v. Flynn*, 1997 Mass. App. Div. 173 (1997). It does not lie when the payments were made voluntarily pursuant to a binding contract, even if they were made under protest. *See McLaughlin v. Exchange Trust Co.*, 272 Mass. 158, 160 (1930) (affirming directed verdict in action for money had and received where mortgage notes provided for commissions that were paid).

As to unjust enrichment claims, Missouri law requires that the defendant accepted and retained a benefit under circumstances rendering that retention "inequitable" *Childress Painting and Assoc. Inc. v. John Q. Hammons Hotels Two, L.P.*, 106 S.W.3d 558, 562 (Mo. 2003). As a matter of law, however, the existence of an express contract requiring that certain payments be made to the defendant precludes a claim that those payments were "inequitable," and in any event, the Missouri Supreme Court has clearly held that the existence of express contracts precludes quasi-contractual claims such as unjust enrichment. *Boyd v. Margolin*, 421 S.W.2d 761 (Mo. 1967); *Krupnick & Associates v. Hellmick*, 378 S.W.2d 562 (Mo. 1964). *See also American Std. Insurance Co. of Wisconsin v. Bracht*, 103 S.W.3d 281, 292-293 (Mo. 2003) (rejecting claim for unjust enrichment on grounds that "parties are free to agree upon insurance contracts of their choice so long as the policy provisions are not ambiguous and meet the minimum requirements of the law.").

In this case, Lycos' counterclaim admits that it entered into a series of express contracts with CSI (which it does ***not*** claim that CSI has in any way breached), and made payments to CSI pursuant to those contracts that it is now seeking to recover on an "unjust enrichment" theory.

Such a claim is not permitted under the applicable Missouri law, however, nor would it be permitted under Massachusetts law. *See In re Lupron Mktg and Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 ("[w]here a contract does govern the parties' relationship the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies."); *Verderber v. Perry*, No. 98-1625, 1999 U.S. App. LEXIS 3821 at *16-17 (1st Cir. March 8, 1999) ("Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment.") *Accord Dunkin'Donuts Inc. v. N.A.S.T., Inc.*, 266 F. Supp. 2d 826, 831-32 (D. Ill. 2003) (held that Massachusetts law clearly does not permit an unjust enrichment claim when litigants' relationship is governed by contract); *Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81 (1956). As a result, Lycos' counterclaim counts for "unjust enrichment" or "money had and received" should be dismissed.

## II.    LYCOS' TWO "DECLARATORY JUDGMENT" COUNTS FAIL TO STATE LEGAL CLAIMS BECAUSE THEY ARE DEPENDENT ON LYCOS' SUBSTANTIVE COUNTS, WHICH ARE LEGALLY INSUFFICIENT

In Counts 3 and 4 of its Counterclaim, Lycos seeks a declaratory judgment that it has no further payment obligations under the contracts, and a declaratory judgment that it should recover at least $14 million of what it has already paid under the contracts. Those declaratory judgment counts are not independent legal claims, but rather are derivative of, and dependent upon, Lycos' substantive legal claims. Since the substantive legal claims are deficient (*see* Argument I, *supra*, and Arguments III-VI, *infra*) the declaratory judgment actions based on them must also be dismissed. *See Ramadan Shabazz v. Kathleen Cole and James Matesanz*, 69 F.Supp. 2d 210, 224 (D. Mass. 1999), *citing American Telephone & Telegraph Company v. IMR Capital Corp.*, 888 F.Supp. 221, 257 (D. Mass. 1995)(dismissing declaratory judgment count to the extent plaintiff failed to state a claim of relief with respect to the underlying claims").

### III.    LYCOS' FRAUDULENT MISREPRESENTATION COUNT FAILS TO STATE A LEGAL CLAIM ON ACCOUNT OF THE VERY FACTS ALLEGED IN LYCOS' COUNTERCLAIM

In Count 5 of its Counterclaim, Lycos alleges fraudulent misrepresentation based on allegations that CSI **(a)** purportedly failed to disclose to Lycos the "impact" of the lease extensions "in terms of the amount to be paid by Lycos relative to the original equipment cost," and failed to disclose "the fact that the total amount to be paid by Lycos after the 'roll-ups' substantially exceeded any reasonable or fair total compensation for the leased equipment," *see* Lycos Answer/Counterclaim at p. 23, ¶ 66; and **(b)** "intentionally misrepresented that the original cost of the leased equipment was $63 million" in an email sent to Lycos by a CSI employee, Paul Stenberg, on March 18, 2002. *Id*.at p. 19, ¶¶ 40-41, p. 24, ¶ 70, Exh. H.

Neither of these allegations is sufficient to make out a claim of fraudulent misrepresentation, however, because **(1)** Lycos ***admittedly negotiated the purchase prices*** for all the equipment that it selected, assigned the purchase orders to CSI for, and then leased from CSI, *see* Statement of Relevant Facts, *supra*, at ¶ 9; and **(2)** Lycos obviously ***knew***, from the beginning, what it was required to pay under the equipment schedule leases – because, as Lycos' own Counterclaim alleges, "each equipment schedule…add[ed] additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos." *See* Lycos Answer/Counterclaim at p. 10, ¶ 16.

In this regard, the equipment schedules themselves, as well as Lycos' certificates of acceptance of that equipment, referenced Lycos' own purchase order numbers, *see, e.g.,* Verified Complaint at Exhs. 3, 6; Lycos Answer/Counterclaim at Exh. C, pp. 2-6, and the prices paid to the vendors were obviously known to both parties when these deals were done -- because the documents attached to Lycos' own counterclaim show that the monthly rental would often be

11

alternatively expressed as a fraction of the "Unit cost" of the equipment. *Id*. at Exh. B, p. 2. Also, Lycos' own counterclaim evidences that it has always known what the "original equipment cost" was. *See* Lycos Answer/Counterclaim at p. 14, ¶ 27 ("Schedule 67E governed the lease of equipment *with an original equipment cost of $1,091,002*") (emphasis added).

The nub of Lycos' fraud claim, therefore, is that it simply never "did the math," and somehow never realized that by repeatedly extending its leases (which obviously reduced its monthly payments, and allowed it to continue to use these items of equipment without incurring the much greater expense of actually buying them), it might wind up having to pay more in total than the original equipment cost. This is not unusual in the equipment leasing world, however, as a typical Dell advertisement in the February 2005 edition of the ABA Journal – offering a desktop computer for sale at $987, or for lease for 48 months at $27/month (a total of $1,296, or 131% of the cost to buy it) – clearly demonstrates.[5] Nor is it unusual in any type of extended lease arrangement (*e.g.* automobile lease, etc.).

Nevertheless, the Lycos counterclaim argues that "because of the trust Lycos reposed in CSI," and the requirements of "940 C.M.R. 3.16(2)," CSI had some obligation to "disclose" this information independently to Lycos. *See* Lycos Answer/Counterclaim at p. 23. The applicable Missouri law is clear, however, that a fiduciary duty in a buyer/seller relationship *is not created* by a unilateral decision to repose trust and confidence; rather, it can only derive from an undertaking of obligations, and it requires control. *Arnold v. Erkmann*, 934 S.W.2d 621, 629-30 (Mo.App. 1996). Lycos does not plead here, nor could it, that CSI controlled Lycos' decision-making process, nor is it alleged that CSI had a contractual agreement to act on Lycos' behalf.

---

[5]   The Court may take judicial notice of the substance of magazine articles and advertisements. *See Microsoft Corp. v. BEC Computer Co.*, 818 F.Supp. 1313, 1319 (C.D.Cal. 1992); *American Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F.Supp. 1018 (D.N.J. 1989).

Lycos' argument that a duty to disclose was created by the Massachusetts Attorney General regulation, 940 C.M.R. 3.16(2), is similarly deficient because **(i)** Missouri law, not Massachusetts law, clearly governed the relevant transactions, *see* Footnote 4, *supra*, and **(ii)** both this Court, and the Massachusetts Supreme Judicial Court, have clearly held that 940 C.M.R. § 3.16 applies "only to transactions involving private consumers, and not to business to business transactions" such as the ones involved in this case. *See In Re New England Dental Centers v. Aquino*, 291 B.R. 229, 241, 2003 U.S. Dist. LEXIS 5837, *29 (March 31, 2003). *See also Knapp Shoes Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 743-44, 640 N.E.2d 1101 (1994).

Lycos also attempts to create a duty based on language contained in the code of conduct of a trade group called the Equipment Leasing Association ("ELA"), which allegedly states that members should provide customers with relevant information as to the "terms and conditions" of a transaction. Even if such a code could create a legal duty, however (which it cannot), it is obviously referring to actual lease terms such as rental rates, lease commencement and expiration dates, taxes, equipment location, etc., and there is no allegation that these were not disclosed here. Rather, Lycos' claim is that the original cost of the equipment it leased was somehow not accurately "disclosed" to it. *See* Lycos Answer/Counterclaim at p. 19.

That claim makes no sense, though, because it is undisputed that Lycos issued the purchase orders for the equipment, and *knew* its cost. *See* Statement of Relevant Facts at ¶ 9, *supra*. In fact, Exhibit C to Lycos' counterclaim contains a note confirming that Lycos had "traced all P.O.s to file," making its awareness of the original equipment costs all the more apparent. Thus, there is no issue with the ELA code at all, and it certainly provides no basis for a fraud claim.

In order to establish a claim for fraudulent misrepresentation under Missouri law, "it (is) essential…to establish a representation; its falsity; its materiality; the speaker's knowledge of its falsity; his intent that it be acted on by the hearer and in the manner reasonably contemplated; *the hearer's ignorance* of its falsity; his reliance on its truth; *his right to rely thereon*; and his consequent and proximate injury." *Joel Bianco Kawasaki Plus, Inc. v. Meramec Valley Bank*, 81 S.W. 3d 528 (Missouri S. Ct. 2002)(emphasis added). *Accord John T. Brown, Inc. v. Weber Implement & Auto Co.*, 260 S.W.2d 751, 755 (Mo. 1953). As a matter of law, "[w]hen parties stand on an equal footing and have an equal opportunity for discerning the truth or falsity of a representation, the representation generally is not actionable." *Universal CIT Credit Corp. v. Tatro*, 416 S.W.2d 696, 703 (Mo. App. 1967).

Similarly, in order to establish a claim for fraudulent misrepresentation under Massachusetts law, a plaintiff must prove that "the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir. 1987) quoting *Danca v. Taunton Savings Bank*, 385 Mass. 1, 8 (1982). In addition, Massachusetts law further requires that a plaintiff's reliance upon the alleged fraudulent misrepresentation be "reasonable." *Id.* citing *Saxon Theatre Corp. v. Sage*, 347 Mass. 662, 666-67 (1964). *See also Cooprider v. John Hancock Mutual Life Insurance*, 1993 U.S. App. LEXIS 24979 at *7-8 (1st Cir. 1993) (Zobel, J.) ("In order to make out a claim for fraudulent misrepresentation, a party must show reasonable reliance on the alleged misrepresentations.").

In the present case, Lycos has not alleged, and cannot plead, the required elements of ignorance of the nondisclosed facts, inducement and reasonable reliance. Lycos alleges that it

entered into the roll-ups at issue in this case in 2000 and 2001, for example. *See* Lycos Answer/Counterclaim at pp. 14-17, ¶¶ 28-32. The only alleged misrepresentation regarding the total cost of the leased equipment, however, was purportedly made by Mr. Stenberg on March 18, 2002, several months *after* all of the roll-ups had occurred. Lycos Answer/Counterclaim at pp. 19, 24, ¶¶ 40, 70. Thus, Lycos could not have relied upon this statement to its detriment.

In this regard, the receipt of a false statement *after* a transaction is entered into cannot provide the basis for voiding that transaction on a "fraud in the inducement" theory. *See, e.g., Eagle Properties, Ltd. V. KPMG Peat Marwick*, 912 S.W.2d 825, 827 (Tx. App. Ct. 1995) ("A representation made after a transaction is complete, no matter how false, cannot give rise to an action for a fraud."); *Gruzdanic v. Leisure Hills Ctr., Inc.* 25 F.Supp.2d 953,990 (D.Minn. 1998) (fraud cannot be predicated on an after-the-fact misrepresentation); *Schopler v. Smilovits*, 689 So.2d 1189, 1190 (Fla. 4th DCA 1997) (actual reliance is a critical element of fraud and cannot be based upon after-the-fact reliance).

Similarly, Lycos cannot sustain a pleading of fraud based on the contention that CSI failed to disclose the sum total of the payments that Lycos would ultimately have to make as a result of the lease extensions, or that those payments were somehow "unfair." Lycos is a large, sophisticated business which itself ordered and knew the price of the equipment that CSI leased back to it, and it admittedly entered into a lease and schedules which contained all the agreed-upon terms of payments. *See, e.g.*, Lycos Answer/Counterclaim at Exhs. A-E. As a matter of both fact and law, therefore, Lycos knew what it agreed to pay, and cannot pursue claims of fraud based on allegations that CSI failed to tell it that those amounts were "unfair," or that the total amount of its payments would be increased if it extended its leases.

This is particularly true where, as here, the parties' agreements, which are incorporated into Lycos' Counterclaim, contain valid integration clauses stipulating that they constituted the "entire agreement" of the parties with respect thereto, and that no representations outside the agreements would be considered binding.  *See* Verified Complaint at Exh. 1, p. 5, §18.3 ("This Agreement [together with all schedule and attachments hereto] constitutes the entire agreement between Lessor and Lessee…").  *See also* Lycos Answer/Counterclaim at Exh. I, p. 3, §9A ("This Agreement is the entire agreement between Seller and Buyer…and no representation or statement not contained in this Agreement is binding…").

These types of provisions preclude the parties to a contract from arguing that the other party's conduct "outside of the contract" was "reasonably" relied upon by them.  *See, e.g., Armstrong v. Rohm and Haas Co*., 349 F. Supp. 2d 71, 76 n. 5 (D. Mass. 2004).  As the First Circuit recently held in addressing this issue:

> where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, *plaintiffs may not raise as fraudulent any prior oral assertion* inconsistent with a contract provision that specifically addressed the particular point at tissue.  While we do not condone misrepresentations in contract negotiations, we also reject the notion that courts or juries should rewrite a fully negotiated contractual agreement…

*Turner v. Johnson & Johnson*, 809 F.2d 90, 97-98 (1st Cir. 1986).[6]  *Accord Kennedy v. Josephthal*, 814 F.2d 798, 805 (1st Cir. 1987); *Elias Brothers Restaurants, Inc., v. Acorn Enterprises, Inc*., 831 F. Supp. 920, 926 (D. Mass. 1993); *Pizzeria Uno of Kingston, Inc. v. Independence Mall Group*, 11 Mass. L. Rep. 241, 1995 Mass. Super. LEXIS 866, 1995 WL 419932 at *6 (Mass. Super.).  The reasoning of *Turner* is applicable here, and Lycos' fraudulent misrepresentation count should be dismissed.

---

[6]   Significantly, the *Turner* case involved alleged fraudulent "omissions" as well as statements.  *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1st Cir. 1986)

IV.    **LYCOS' NEGLIGENT MISREPRESENTATION COUNT FAILS TO STATE A LEGAL CLAIM FOR THE SAME REASONS THAT THE FRAUDULENT MISREPRESENTATION CLAIM IS INSUFFICIENT, AND IT IS ALSO BARRED BY THE "ECONOMIC LOSS" RULE**

In Count 6 of its Counterclaim, Lycos alleges negligent misrepresentation, and seeks to recover millions of dollars in economic losses under that theory.    Missouri and Massachusetts court have both held, however, that "economic losses" are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.  *Gavett v. Roto Rooter Services Co.*, No. 01-01385-RWZ, 2001 U.S. Dist. LEXIS 20436 at * 7 (D. Mass. Nov. 27, 2001) (citations omitted).  *See also Collegiate Enterprises, Inc. v. Otis Elevator Co.*, 650 F. Supp. 116, 118 (E.D.Mo.. 1986).

"The rationale behind the rule is that contract law and the Uniform Commercial Code (UCC) are expressly designed to deal with disappointed economic expectations and, therefore, the recovery of economic losses."  *Drowning in a Sea of Contract:  Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm and Mary L. Rev. 1789 (2000).  This reasoning is particularly applicable to the present case, in which Lycos, a sophisticated commercial entity, freely entered into a whole series of equipment financing leases with CSI that were specifically enforceable under Article 9 of the UCC.

Lycos' claim of negligent misrepresentation also suffers from the same deficiencies that plague its fraud claim – the absence of "ignorance" of the facts on the part of Lycos (which admittedly knew the facts, but allegedly never "did the math" until now), the lack of any duty on CSI's part, the lack of "reasonable reliance" by Lycos on CSI (in view of, among other things, the provisions of their contracts, including the integration clause), and the obvious lack of any actual reliance by Lycos on the Stenberg email, which postdated the lease extensions.  *See* Argument, Part III, *supra*.

These deficiencies, in addition to the "economic loss" rule, warrant dismissal of the negligent misrepresentation claim. *See, e.g., Lacroix v. FDIC*, 1993 U.S. Dist. LEXIS 5103 at *4 (D. Mass. 1993) (Zobel, J.) (Court allowed motion for summary judgment on negligent misrepresentation claim where defendant "did not make any representations to plaintiffs regarding the [condominium] appraisal *prior to or at the time of closing*."). *Sound Techniques, Inc. v. Hoffman*, 50 Mass. App. Ct. 425, 429, 432 (2000) ("To ignore a merger clause and allow recovery for a negligent misrepresentation does little to promote honesty and fair dealing in business relationships").

## V.    LYCOS' M.G.L. c. 93A COUNT FAILS TO STATE A LEGAL CLAIM

In Count 7 of its counterclaim, Lycos alleges a violation of M.G.L. c. 93A, but c. 93A does not apply where, as here, the dispute arises directly out of agreements which specifically provide that the law of a state other than Massachusetts shall govern the relevant transactions. *See Mead Corp. v. Stevens Cabinets, Inc.*, 938 F.Supp. 87 (D. Mass. 1996) ("a choice of law clause selecting some state's law (other than Massachusetts') to govern contract related claims *precludes a Chapter 93A claim* when that claim essentially reduces to a contract claim."). *See also BNY Financial Corp. v. Fitwell Dress Co., Inc.*, 6 Mass. L. Rptr. 373, 1997 WL 42518 (Mass. Super.) at *4 ("it is well-settled that a contractual provision making the law of another jurisdiction applicable to the agreement between the parties bars assertion of unfair trade practices claims under M.G.L. c. 93A if they amount, in substance, to embroidered breach of contract claims."); *Express LLC v. Club Monaco U.S., Inc.*, 2002 WL 31973223 (Mass. Super. 2002) (dismissing a c. 93A claim where the contract provided for New York law to apply).

Moreover, even if M.G.L. c. 93A did apply here, that claim would hinge on the viability of Lycos' common law claims, which, as set forth above, are legally insufficient. *See Oggiono v.*

*Fabmet Corp.*, 1993 U.S. Dist. LEXIS 11266 (D. Mass. 1993) (Zobel, J.) ("Given the failure of [the claim of breach of implied covenant], the correlative claim under chapter 93A fails as well"); *See Mill-Bern Associates, Inc. v. Dallas Semiconductor Corp.*, 2002 Mass. Super. LEXIS 181 at *33 (Mass. Super. 2002). In this regard, in order to constitute an "unfair and deceptive trade practice" under M.G.L. c. 93A, a practice must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of the commerce." *Symes v. Bahama Joe's, Inc.*, 1988 U.S. Dist. LEXIS 9611 at *14 (D. Mass. 1988) (Zobel, J.). The allegations of Lycos' counterclaim do not meet this standard.

This is a case where Lycos admits that it voluntarily entered into a series of contracts with CSI, and contractually agreed to make the rental payments that it now wants to avoid. It claims that it misapprehended the import of those schedules – but it does not, and cannot, argue that the terms of these contracts were unconscionable, or that CSI had unequal bargaining power. As a result, this Court is left with a claim that it should declare CSI in violation of c. 93A because it entered into perfectly valid contracts. This would not be permissible under the statute even if it applied, which it does not.

## VI.    LYCOS' BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING COUNT FAILS TO STATE A LEGAL CLAIM

Finally, in Count 8 of its Counterclaim, Lycos alleges a violation of the implied covenant of good faith and fair dealing, pursuant to which "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract…." *Druker v. Roland Wm. Jutras Assoc.*, 370 Mass. 383, 385 (1976), *quoting Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir.), *cert. denied*, 298 U.S. 670 (1936).

Under the applicable Missouri law, however, the implied covenant of good faith and fair dealing cannot create new obligations not contained in the parties' express contract, and it cannot

be used as "an everflowing cornucopia of wished-for legal duties." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (plaintiff's claim under implied covenant failed because defendant did nothing to deprive seller of its expected contractual rights). *See also Massey v. Tandy Corp.*, 987 F.2d 1307 (8th Cir. 1993) (no breach of implied covenant where plaintiff claimed that defendant's prices were excessive, but where the contract expressly allowed the defendant to set those prices).

Similarly, under Massachusetts law, "there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms." *Sheehy v. Lipton Industries, Inc.*, 24 Mass. App. Ct. 188, 194 (1987) *Bateman v. FDIC*, 112 F. Supp. 2d 89, 97 (D. Mass. 2000). In this case, that is all CSI has done. As a matter of law, this cannot give rise to a claim for breach of the implied covenant of good faith and fair dealing, and that count of Lycos' counterclaim should therefore be dismissed.

## CONCLUSION

For all of these reasons, defendant CSI. respectfully submits that its motion to dismiss the Lycos counterclaim should be allowed.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, Esq., BBO No. 542040
Eric Neyman, Esq., BBO No. 564803
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

Dated:  March 10, 2004

20