UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., )<br><br>Plaintiff, )<br>v. )<br><br>LYCOS, INC., )<br><br>Defendant, )<br><br>and )<br><br>BANK OR AMERICA f/k/a FLEET BANK, )<br><br>Trustee Process Defendant. ) | C.A. No. 05-10017- RWZ |

## **AFFIDAVIT OF DANIELLE BOULIANE**

I, Danielle Bouliane, state that:

1.      I am a paralegal for the law firm of Gadsby Hannah LLP.

2.      On or about March 23, 2005, I received copies of the Answer and Counterclaim of Defendant Lycos, Inc., dated February 4, 2005 (the "Original Counterclaim") and the Amended Answer and Counterclaim of Defendant Lycos, Inc., dated March 22, 2005 (the "Amended Counterclaim") in the above captioned matter.

3.      Using optimal character recognition software, I had both documents scanned into Microsoft Word documents.

4.      I then conducted a delta view comparison, which created a red-lined version of the two documents in order to determine:

(1)      What text was removed from the Original Counterclaim,

(2)     What text was added to the Amended Counterclaim, and

(3)     What text had been moved from it's original position in the  Original Counterclaim.

5.     I then conducted a manual comparison of the two documents to verify the accuracy of the delta view comparison, to the best of my ability.

6.     The redlined version of this document is attached to this affidavit as Exhibit 1.

Sworn to under the pains and penalties of perjury this 31st day of March 2005.


_/s/ Danielle Bouliane_____
Danielle Bouliane

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | C.A. No. 05-10017- RWZ |
| COMPUTER SALES ) | |
| INTERNATIONAL INC., ) | |
| ) | |
|     Plaintiff and Defendant-in- ) | |
|     Counterclaim, ) | |
| v. ) | |
| ) | |
| LYCOS, INC., ) | |
| ) | |
|     Defendant and Plaintiff-in- ) | AMENDED ANSWER AND COUNTERCLAIM |
|     Counterclaim, ) | OF DEFENDANT LYCOS, INC. |
| ) | |
| and ) | |
| ) | |
| BANK OR AMERICA f/k/a FLEET ) | |
| BANK, ) | |
| ) | |
|     Trustee Process Defendant ) | |
| ) | |

Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") responds to the numbered paragraphs of the complaint as follows:

1.     Lycos admits that its primary business is providing internet access, and that it has a principal place of business in Waltham, Massachusetts. The remaining allegations in this paragraph are characterizations of plaintiff's complaint as to which no response is required. To the extent a response is required, the remaining allegations in this paragraph are denied.

2.     Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.     Admitted.

4.     Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.      This paragraph states a legal conclusion as to which no response is required.

6.      This paragraph states a legal conclusion as to which no response is required.

7.      Lycos admits that plaintiff is in the business of leasing equipment.  Lycos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7.

8.      Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.      Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.     Admitted, except that Lycos does not admit that the terms and conditions governing CSI's lease of equipment are accurately "described in relevant part below."  Lycos states that the documents evidencing the terms and conditions governing CSI's lease of equipment speak for themselves.

11.     Lycos admits the first sentence.  Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence.

12.     Admitted.

13.     Admitted.

14.     Lycos admits that a true and accurate copy of Equipment Lease 100 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule One Hundred attached thereto.  Lycos states that Equipment Lease 100 speaks for itself.

15.     Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 100.

16.     Lycos admits that a true and accurate copy of the Certificate of Acceptance for Equipment Lease  100 is attached to plaintiff's complaint, and states that the Certificate of Acceptance speaks for itself.

17.     Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease  100 from the plaintiff in the amount of $6,082.29, and that it has paid all of these invoices through the October, 2004 invoice.  Lycos denies the remaining allegations contained in this paragraph.

18.     Lycos admits that it received invoices under Equipment Lease  100 from the plaintiff for the months of November and December of 2004 each in the amount of $6,082.29 and that true and accurate copies of these invoices are attached to plaintiff's complaint.  Lycos states that these invoices speak for themselves.  Lycos denies the remaining allegations contained in this paragraph.

19.     Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

20.     Admitted.

21.     Lycos admits that a true and accurate copy of Equipment Lease  200 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule Two Hundred attached thereto.  Lycos states that Equipment Lease 200 speaks for itself.

22.     Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease  200.  Lycos denies the remaining allegations contained in this paragraph.

23.     Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the Certificate of Acceptance for Equipment Lease 200 that is attached to plaintiff's complaint. Lycos states that the Certificate of Acceptance speaks for itself.

24.     Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 200 from the plaintiff in the amount of $43,954.35, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

25.     Lycos admits that it received invoices under Equipment Lease 200 from the plaintiff for the months of November and December of 2004 each in the amount of $43,954.35 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

26.     Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

27.     Lycos admits that it received a notice of default from the plaintiff dated December 8, 2004, and that a true and accurate copy of the notice of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

28.     Lycos states that the notice of default speaks for itself.

29.     Lycos admits that it did not respond to plaintiff's notice of default, and that it continued to refuse to pay the demanded amounts, but states that it had justification and legal excuse for so refusing. Lycos admits that it received a notice of event of default from the plaintiff dated December 23, 2004, and that a true and accurate copy of the notice of event of

- 4 -

default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

30.    Lycos states that the notice of event of default speaks for itself, although Lycos denies that plaintiff's actions with respect thereto have been "proper" or "appropriate," or that plaintiff has any amount of money "due and owing" from Lycos.

31.    Denied.

## COUNT I
### (<u>Breach of Master Lease and Equipment Schedules</u>)

32.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 31.

33.    Denied.

34.    Denied.

35.    Denied.

## COUNT II
### (<u>Breach of Sales Agreement</u>)

36.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 35.

37.    Admitted.

38.    Lycos states that the Sales Agreement speaks for itself.

39.    Lycos states that the Sales Agreement speaks for itself.

40.    Denied.

41.    Denied.

## <u>AFFIRMATIVE DEFENSES</u>

Lycos incorporates by reference the allegations of its counterclaim, set forth below, in support of each of the following affirmative defenses.

- 5 -

B0407135v1

## FIRST AFFIRMATIVE DEFENSE

Plaintiff claims are barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff is equitably estopped from recovering on its claims.

## THIRD AFFIRMATIVE DEFENSE

Lycos is entitled to recoupment or setoff of all amounts claimed by plaintiff.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own fraud.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own ~~fraud.~~negligent misrepresentations.

## LYCOS' COUNTERCLAIM

## NATURE OF THE ACTION

1.      This counterclaim seeks to redress a pattern and practice of misconduct committed by Computer Sales International, Inc ("CSI") with respect to equipment leases it entered into with Lycos.  CSI, which purports to be one of the largest information technology leasing companies in the world, took advantage of its long-standing relationship with Lycos to obtain millions of dollars in undeserved profit.  CSI intentionally and negligently misrepresented, made partial and misleading statements, and~~/or~~ failed to disclose certain material features of its lease agreements with Lycos, leading Lycos to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.      CSI accomplished its ends using a method of "rolling up" equipment leases in a fraudulent and deceptive manner, which CSI concealed through affirmative misrepresentations, partial disclosures, and omissions of material fact that CSI was obligated to disclose to Lycos

- 6 -

under accepted industry standards and guidelines, common law, and the Attorney General's regulations promulgated pursuant to Massachusetts General Laws c. 93A, 940 C.M.R. 3.16(2). This "roll-up" scheme recast active equipment leases as longer team leases with lower monthly payments, something which, on its face, was beneficial to Lycos. Yet, these recast or "rolle d-up" leases dramatically increased Lycos' cost to a total amount well in excess of the cost of the equipment plus imputed interest, while converting CSI's residual risk in the equipment into a guaranteed stream of rental payments which, because they exceeded the cost of the equipment, eliminated CSI' s risk and ensured CSI an exorbitant profit. As a result of CSI's "roll up" scheme, Lycos unwittingly paid more than $72 million on leases of equipment costing approximately $47 million.

　　　　3.　　　　To redress CSI's pattern and practice of misconduct, Lycos seeks: , among other things.

　　　　　　　　A.　　　　declarations that (i) it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, an amount that now approximates $300,000 and which amounts CSI seeks to recover in this action, and (ii) that Lycos is the owner of the leased equipment

　　　　　　　　B.　　　　recovery of overpayments it made as a result of CSI' s wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $14,000,000, plus interest and costs; and

　　　　　　　　C.　　　　treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G. L. c. 93A, §§ 2 and 11.

## PARTIES

4.      Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

5.      Defendant Computer Sales International, Inc. is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

6.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

7.      This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

## FACTS

### *Computer Equipment Leasing Generally*

8.      Companies seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies, knowing that computer equipment becomes obsolete relatively quickly, elect to enter into short-term leases rather than purchase the equipment. Leasing also can provide accounting and operational benefits, such as capital preservation and financing that, under Generally Accepted Accounting Principles, are not required to be placed on the company's balance sheet. Leases permit the lessee to return the equipment to the lessor at the end of the lease term, leaving the lessor with the risk of technological obsolescence.

9.      To satisfy the lessee's present computer equipment needs and accommodate its anticipated needs for new and improved computer equipment in the future, the lessor and lessee

- 8 -

typically enter into a master lease agreement. They then enter into one or more equipment schedules, over time, each of which incorporate the terms of the master lease agreement. Typically, an equipment schedule describes the equipment being leased, its cost (or lease basis), the fixed term of the lease, the commencement date, the repayment schedule, and the location of the equipment.

10. There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the former is a true lease while the latter is essentially a conditional sale or loan. In a capital lease, the lease rental payments together with a required contracted purchase price are sufficient to cover the lessor's investment and provide a yield whereas with operating leases, the lease rental payments total only a percentage of the equipment cost (or lease basis).

11. Under Financial Accounting Standards Board ("FASB") rules, for a lease to qualify for accounting treatment as an "operating lease," the present value of the minimum lease rental payments must not be greater than or equal to 90% of the original cost of the leased equipment (or lease basis).

12. At the conclusion of the fixed term under an operating lease, the lessee generally has the option to return the equipment to the lessor, to renew the lease at an agreed rate (generally fair rental value) or purchase the equipment at an agreed price (generally fair market value). The value of the equipment at the end of the lease term is called the "residual" value, and the proceeds from the sale or re-lease of the equipment is known as "residual" proceeds.

13. Because the lease rental payments total less than the original equipment cost (or lease basis), the lessor must either sell or re-lease the equipment (the proceeds of such activity being realization of the residual value) to achieve a yield or profit. This difference between the

original equipment cost and the total lease rental payments (discounted to present value) - existing in every operating lease - is the lessor's investment risk in the lease.

14.    On operating leases, to achieve a "yield" or profit, most lessors must re-lease or re-sell the leased equipment at the conclusion of the lease term, with the objective of obtaining an amount equal to at least the residual value the lessor assumed at the onset of the lease.  But CSI found a simpler way:  "rolling up" equipment schedules to eliminate its investment risk and guarantee a profit for itself at Lycos' expense.

*Lycos' Computer Equipment Leases With CSI*

15.    In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment.  An unexecuted copy of this master lease agreement is attached hereto as <u>Exhibit  A</u> (the "Master Lease Agreement").

16.    Between December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment schedules for the acquisition and lease of new items of technology equipment under the Master Lease Agreement.  The equipment schedules concerned, literally, thousands of pieces of computer equipment on which Lycos relied for its day-to-day operations.  According to the Master Lease Agreement, each equipment schedule constituted a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos.  An example of one of the lease schedules, Equipment Schedule 67E, is attached hereto as Exhibit B.

17.    The equipment schedules were structured as operating leases, with personal computing assets (i.e., PCs) on fixed terms of 24 months and network computing assets (i.e., Non-PCs) on fixed terms of 36 months.  A typical 24-month lease between Lycos and CSI was priced so that the present value of the minimum lease rental payments for the term of the lease

equaled 85% of the cost of the equipment financed, while the present value for the typical 36-month lease was slightly less than 90%. Thus, CSI's equity (i.e., "investment" or "risk") in the lease was 15% on the 24-month leases and 10% on the 36-month leases.

### *CSI Gains the Trust of Lycos Personnel*

18.    CSI's account representative for Lycos, Paul Stenberg, who operated out of an office in Needham, Massachusetts, communicated regularly with Lycos personnel in Waltham, Massachusetts, during the course of the parties' business relationship. As that relationship grew over time into what Lycos thought was a collegial and long-term association, Lycos and ~~CSI~~Mr. ~~representatives~~Stenberg also began interacting on a social as well as a business basis. Such social interaction between Lycos personnel and ~~CSI~~Mr. ~~representatives~~Stenberg included golf outings, dinners and invitations to concerts and sporting events. Through such activities, Mr. Stenberg gained the friendship and trust of Lycos' officers and employees.

19.    Lycos' personnel periodically changed over time, including those in key financial and oversight positions responsible for managing Lycos' lease portfolio with CSI. As a result, and based on what appeared to be CSI's trustworthy and collegial approach toward Lycos, Lycos' personnel reposed confidence in the integrity of Mr. Stenberg ~~and CSI~~ with respect to the execution of equipment schedules. Mr. Stenberg and CSI voluntarily assumed and accepted this confidence. Lycos' placement of such trust in CSI, and CSI's acceptance of this confidence, was reasonable under the circumstances, particularly given CSI's superior knowledge and expertise with respect to the complicated equipment leases transactions involved.

20.    Notwithstanding Lycos' trust and confidence in CSI, and CSI's acceptance of this trust and confidence, CSI took advantage of it to CSI's benefit and Lycos' detriment through improper and wrongful utilization of "roll ups" of Lycos' equipment schedules.

*CSI's Consolidation or "Roll Up" of Lycos' Leases*

21.     Of the approximately 80 equipment schedules entered into between Lycos and CSI, only a handful reached their maturity dates in the normal course.  Instead, just over a year after execution of the Master Lease Agreement and a full year before the normal expiration of the term of certain equipment schedules, several of the then-existing equipment schedules were terminated on or prior to their scheduled maturity dates and "rolled up" onto one or more new equipment schedules with fixed terms of 24 months or more.

22.     CSI's method of consolidation or "rolling up" equipment schedules worked as follows.  Either on their normal expiration date or prior thereto, several equipment schedules would be terminated, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment schedule.  In some cases, some of the equipment from one equipment schedule would be combined with the equipment from one or more other schedules and "rolled up" onto a single new equipment schedule; other equipment from those same schedules were rolled up onto a different schedule.  SomeIndeed, some of the schedules were rolled even though Lycos had already made 100% of the lease payments required under those schedules and the computer equipment was, by then, outdated.

23.     Before consolidation onto a singleone or more new equipment scheduleschedules, the terminated equipment schedules sometimes had varying numbers of months remaining on their original lease terms.  At the date these equipment schedules became effective under the new "rollrolled up" schedule, some would have no original monthly lease rental payments remaining, while others would have all but two or three monthly lease rental payments remaining.  Some of these "rolled up" schedules, or some of the equipment on them, were rolled up again into other equipment schedules.  In fact, certain equipment schedules and certain equipment were "rolled up" several times.

- 12 -

24.    CSI represented to Lycos that the "roll-ups" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage.  This was true, but it was only part of the truth.  ~~What~~ CSI failed to disclose to Lycos ~~was~~ that (~~A~~a)  over time, Lycos would pay CSI considerably more than 100% of the value of the equipment as a result of these "roll ups," something Lycos could not reasonably have discovered on its own even if it had known the original equipment cost at lease schedule inception because of the movement of equipment from schedule-to-schedule over multiple roll-ups; and (~~B~~b)  Lycos had already paid amounts well in excess of the original equipment cost of some of the leased equipment.  CSI ~~utilized~~knowingly and intentionally failed, to disclose these ~~"roll-ups" to reduce significantly, and in most cases eliminate,~~basic and material facts to Lycos.  CSI's ~~investment risk in the "rolled" leases at Lycos' expense.  This~~partial disclosure to Lycos was intended to and did induce Lycos to agree to numerous "roll ~~up~~ups ~~of~~ the lease schedule~~s~~.  If, however, CSI had made full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under them.

25.    ~~Based on documentation prepared by CSI, the original cost of the equipment leased by Lycos from CSI under the 80 equipment schedules was approximately $47 million.~~  Under these original lease schedules, prior to "roll-ups," Lycos would have paid CSI monthly lease rental payments of approximately $46 million.  ~~(The $46 million number exceeds 90% of the equipment cost because, on some leases, the present value of the minimum lease payments was higher due in part to certain "soft" costs such as software, taxes, freight, arid warranties being capitalized.)~~  As a result of the "roll-ups," however, Lycos has paid CSI over $72 million

- 13 -

in total monthly lease rental payments (exclusive of interim rent), an increase of more than $26 million.

*Example of an Egregious and Unfair "Roll Up" - Equipment Schedule 67E*

26.     An examination of the history of one specific equipment lease schedule - Equipment Schedule 67E - demonstrates how CSI manipulated the "roll up" process to its favor and Lycos' detriment.

27.     On July 12, 2000, Lycos entered into Equipment Schedule 67E ("Schedule 67E"), a true and accurate copy of which is attached hereto as <u>Exhibit B</u>. Schedule 67E governed the lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months starting in October of 2000 and with a monthly rental payment of $42,075. Given a residual value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield from Schedule 67E was a reasonable 11%.

28.     On November 14, 2000, after only two monthly lease rental payments, Lycos entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is attached hereto as <u>Exhibit C</u>. Schedule 67H is a 34-month lease commencing on December 1, 2000. The assets leased under Schedule 67H are those same assets previously leased under Schedule 67E, which was terminated the day before Schedule 67H became effective. The monthly lease rental payment due under Schedule 67H was $36,438.41. A comparison of the terms of Schedules 67E and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment | 84.27% | 99.35% | 104.53% |

| @10% | | | |
|---|---|---|---|
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

29.     As reflected in the table above, the "refinancing" of Schedule 67H did reduce Lycos' monthly lease rental payment obligation by over $5,000.  However, it increased Lycos' total lease rental obligations by more than $310,000 from $1,009,800 to $1,323,056 (under the combined equipment schedules).  Additionally, CSI's risk in the transaction was completely eliminated because the total lease rental payments fully returned CSI its investment in the equipment and provided a yield of almost 14% prior to CSI receiving any residual proceeds at the end of the term of Schedule 67H (see the last row of the table above).  While CSI frequently emphasized the short-term reduction in Lycos' monthly payments, CSI did not paint the full picture by conveniently failing to disclose these additional facts to Lycos.  Moreover, Schedule 67H still required Lycos to either purchase, renew or return the equipment to CSI at the conclusion of its lease term.

30.     Although CSI had already completely eliminated its investment risk in the leased equipment under Schedule 67E, and had guaranteed itself a 14% profit through the "roll up" into Schedule 67H, CSI's failure to disclose to Lycos the full impact of the "roll-ups" continued.

31.     In October of 2001, allegedly again to reduce Lycos' monthly payments, CSI again rolled the equipment that had originally been leased pursuant to Schedule 67E.  Two new lease schedules were the outcome of that "refinancing" activity.  True and accurate copies of Equipment Schedules 93 and 94 are attached hereto as Exhibits D and E ("Schedule 93" and "Schedule 94", respectively).

- 15 -

32.     According to Schedule 93, certain schedules, including the following, were being terminated and "rolled up" onto Schedule 93:  64, 64B, 64D, 64F, 66, 66A, 66B, 66C, 66E, 67A, 67B, 67D, 67F, 67H, 68.  Yet, according to Schedule 94, the very same equipment from these schedules was being rolled up onto that schedule.  Compare Exhibits D and E.  Accordingly, ascertaining which equipment on each "rolled" schedule was being assigned to which new schedule would have been a Herculean if not impossible task for Lycos, as would have figuring out the total amount of lease payments for each piece of equipment.  Only after Lycos hired an expert leasing consultant did it learn the financial impact of the roll-up onto Schedules 93 and 94.

32.33.  Schedules 93 and 94 reflected the "roll up" of a large number of then existing equipment schedules  including Schedule 67H  with the equipment divided into the two schedules by category: PCs onto Schedule 93 and Non PCs onto Schedule 94.  Schedule 93 had a 24-month term commencing November 1, 2001 and ending October 31, 2003, while Schedule 94 had a 36 month term commencing November 1, 2001 and ending October 31, 2004.  A termination date of September 30, 2003 was established for Schedule 67H, which was the original end date of the lease.  The additional lease obligations under Schedule 93 became one (1) payment of $3,751 payable October  1, 2003.  The additional lease obligation under Schedule 94 became thirteen (13) monthly payments of $32,688 commencing October  1, 2003 (see table below).

| Equipment Schedule | 67E/67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in advance) | 2 @$42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2 @ $42,075 34 @ $36,438 1 @ $36,438 |

| | | | | 12 @ $32,688 |
|---|---|---|---|---|
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payment @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos' monthly lease rental obligation did decline from $36,428 to $32,688. However, Lycos' total fixed monthly lease rental obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment schedules). Additionally, CSI further increased its yield or profit in the transaction before receipt of any residual proceeds to more than 27%. CSI did not disclose this fact to Lycos. Moreover, Schedules 93 and 94, however, did not end Lycos' obligation to CSI under the original Schedule 67E, but carried at its conclusion yet another obligation; for Lycos to purchase, renew, or return the equipment to CSI.

*CSI's Misrepresentations, Partial Disclosures and Omissions of Material Fact*

33.34.  The Equipment Leasing Association ("ELA") is a nonprofit trade organization that represents more than 800 member leasing companies.

34.35.  CSI is a member of the ELA.

35.36.  The ELA's standards for professional conduct reflect the standards of the equipment leasing industry in general. They also govern the conduct of its members.

36.37.  The ELA has established a Code of Fair Business Practices, a true and accurate copy of which is attached as Exhibit F. Paragraph 7 of Section I: General Standards of Professional Conduct, requires ELA members to "disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision."

- 17 -

~~37.~~ 38.  The Attorney General of the Commonwealth of Massachusetts has promulgated a regulation with similar provisions.  Section 3.16(2) of 940 C.M.R. provides that "an act or practice is a violation of M.G.L. c.  93A, §  2, if … (2)  Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."  940 C.M.R. 3.01 defines "buyer" to include "lessees" such as Lycos.  The Attorney General has prosecuted companies for violating this regulation in business-to-business transactions, and interprets this regulation to apply to business-to-business transactions such as the instant one.  True and accurate copy of complaints filed by the Attorney General for violating this regulation in business-to-business transactions ~~against business~~ are attached hereto as Exhibit G.

~~38.~~ 39.  CSI and its representative in Massachusetts, Mr. Stenberg, failed to disclose to Lycos the more than $26  million increase in aggregate payments resulting from the "roll-ups" and elimination of residual, and presented only half the truth about the "roll ups" to induce Lycos' continued participation in CSI's scheme notwithstanding,

> A.    CSI's duty to make disclosures to Lycos of information relevant to Lycos' decision to enter into the lease-roll-ups as a result of (i)  Lycos' trust and confidence in CSI and CSI's acceptance of that trust and confidence; and (ii) CSI's partial disclosure of relevant facts, i.e., Lycos' reduced monthly payments pay under the lease "roll-ups";

> B.    the Attorney General's regulation, 940 C.M.R.  3.16(2);

> C.    CSI's membership in the ELA and representation on its web-site that it "engage[es] in the highest levels of business conduct with regard to ethics";

D.    CSI's knowledge of the economic windfall it would enjoy at Lycos' expense from the "roll-ups," and

E.    CSI's knowledge that: (i) Lycos' understanding of the effect of the lease schedule "roll-ups" was simply that the term of the equipment schedule would be extended and the amount of the monthly lease rental payments reduced~~39. If CSI had fully disclosed~~: (ii) Lycos did not understand the full impact of the "roll-ups" on~~, among things,~~ the total ~~price being~~amount Lycos would be obligated to pay; and (iii) Lycos was unaware that it had already paid well in excess of the cost of some of the leased equipment.

40.    If CSI had fully disclosed the full impact of he "roll-ups" on, among other things, the total price being paid by Lycos on them and the amounts Lycos had already paid relative to the original equipment cost, Lycos would not have entered into them ~~and/or would not have continued performing under them~~.

~~40.~~ 41. Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups" as it was obligated to do, but CSI intentionally misrepresented material facts to Lycos to induce it to continue making payments under the "roll-ups."  Specifically, but without limitation, when Lycos asked Mr. Stenberg about the original cost of the equipment leased pursuant to Schedules 93 and 94, he sent Lycos an e-mail dated March 18, 2002 in which CSI represented that the total original equipment cost under the Lycos lease schedules was $63 million.  A true and accurate copy of this e-mail is attached hereto as Exhibit H.

~~41.~~42.  On information and belief, Mr. Stenberg knew, at the time he sent this e-mail that:

- 19 -

A.    Lycos would use this figure during its (Lycos') internal review to determine whether to continue performance under the "rolled up" leases or whether Lycos would insist on "unwinding" those leases;

B.    this $63 million amount overstated the original equipment cost by more than $16 million; and

C.    his statements would delay or prevent Lycos from discovering the true original equipment cost and the nature of CSI's "roll up" scheme.

### *Lycos' Purchase of the Leased Equipment*

~~42.~~43.  In 2003, before Lycos had discovered the true financial impact of the "roll ups," and CSI's and Mr. Stenberg's misrepresentation as to the original cost of the equipment, Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules.  As part of that discussion, Lycos also requested what, if anything, would be required to convert the remaining lease obligations to capital leases such that at the conclusion of the lease terms, Lycos would own the equipment.

~~43.~~ 44. Although CSI had a duty to disclose to Lycos that it (CSI) had previously over stated the original cost of the equipment in Mr. Stenberg's March 18, 2003 e-mail, and Lycos had already ~~made~~paid well-in-excess of the original cost of some of the leased equipment or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.

~~44.~~ 45.  The proposed structure consisted of a one-time payment (purchase price), plus payment of the then remaining monthly lease rental payments on their original due dates.

~~45.    Ultimately, in~~46.        In July of 2003, operating under several misapprehensions of fact because of CSI's failure to disclose basic and material information to Lycos despite Lycos' request — misapprehensions which CSI knew or should have known about —, and in

- 20 -

reliance on CSI's misrepresentation as to the original equipment cost, Lycos agreed to: (a) and did pay CSI a purchase price of $3.775 million. Lycos also agreed to: and (b) continue making monthly lease rental payments until the end of the lease term, at which time, Lycos would "own" the equipment. Of course, CSI did not tell Lycos that Lycos had already paid substaintially more than the cost of the equipment. Had CSI made a full disclosure, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchas" the lease equipment. A true and accurate copy of the July, 2003 purchase agreement is attached hereto as Exhibit I (the "Sales Agreement").

47.    CSI knowingly and intentionally refused to tell Lycos that Lycos had already paid substantially more than the cost of the equipment and that Mr. Stenberg's March 18, 2002 e-mail was in error. Had CSI made a full disclosure, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the leased equipment. A true and accurate copy of the July, 2003 purchase agreement is attached hereto as Exhibit I.

46. 48. It was not until after Lycos had entered into the July, 2003 purchase agreementSales Agreement that Lycos discovered - and then only through the analysis of an expert leasing consultant it engaged to analyze all of the CSI leases - the true nature of CSI's "roll up" scheme, and the negligent and intentional misrepresentations: — including CSI's misrepresentation concerning the original cost of the equipment — partial disclosures, and omissions of material fact used by CSI to induce Lycos' participation and continued performance.

### *CSI'S Pattern or Practice of Deception*

49.    Because of, among other things, CSI's movement of hundreds of pieces of equipment from one lease schedule to another, the complexity of those "roll-ups," CSI's misrepresentations, partial disclosures, and omissions, Lycos' trust and confidence in CSI, and

the fact that expertise was required to discover the original equipment cost of equipment rolled up multiple times and the total impact of the "roll-ups," Lycos should not and could not have reasonably have been expected to discover the impact of the roll-ups prior to that time. Indeed, CSI's successful effort to gain the trust of Lycos' personnel was designed to and did induce Lycos personnel not to seek to discover the foregoing.

50.     Upon information and belief, CSI knows that its customers generally do not have the expertise to discover the impact of roll-ups. It relies on: (a) this lack of expertise and its intentional failure to disclose some of the basic and material facts to induce its customers to enter into them; and (b) the establishment of a trusting relationship with its customers such as the one it established with Lycos personnel to induce them not to seek to discover the impact.

## COUNT I
### (Money Had and Received)

### Fraudulent Misrepresentation in the Inducement of Rolled-Up Lease Schedules)

47. 51.  Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 46 50 above.

48.     The original cost of the equipment leased by Lycos from CSI was approximately $47 million.

49.     Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling $46 million.

50.     As a result of CSI's repeated "roll-up" of the lease schedules, Lycos has paid CSI (i) more than $72 million in addition to interim rent; and (ii) $3.775 million to purchase the equipment.

- 22 -

51.    CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

52.    Equity and good conscience demand that this excess, in an amount to be determined at trial but not less than $14,000,000, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

**COUNT II**
**(Unjust Enrichment)**

53.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 52 above.

54.    CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

55.    CSI accepted such monies knowing that it was receiving an economic windfall.

56.    CSI's retention of these monies would be unjust and inequitable.

57.    As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

**COUNT III**
**(Declaratory Judgment)**

58.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 57 above.

59.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

60.     Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

61.     Lycos seeks a judicial declaration that

A.     it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

B.     it is the owner of the equipment leased pursuant to the Master Equipment Lease and schedules with respect thereto.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IV
### (Declaratory Judgment)

62.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 61 above.

63.     A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules, as described above.

64.     Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT V
### (Fraudulent Misrepresentation)

65.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 64 above.

B0407135v1

66. 52.  Because of the trust Lycos reposed in CSI and CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the "roll-up" transactions, and 940  C.M.R.  3.16(2), CSI was obligated to fully disclose to Lycos : (a)  the impact of the "roll-ups" in terms of the amount to be paid by Lycos relative to the original equipment cost; and (b)  the fact that Lycos had already paid amounts well in excess of the cost of some of the leased equipment; and (c) the fact that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for the leased equipment.

67. 53. CSI' s failure to disclose all facts basic and material to Lycos' decision to enter into the "roll-ups" was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.

68. 54. Had CSI made a full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under the "rolled up" leases.

69. 55.  As a result of CSI' s intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000. 10,225,000.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT II
### (Fraudulent Misrepresentation in the Inducement of Sales Agreement)

56.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 55 above.

70. 57.  In addition, CSI intentionally misrepresented that the original cost of the leased equipment was $63 million. CSI made, and then failed to correct this representation with knowledge of its falsity or at least with reckless disregard for its truthfulness.  CSI made this

representation with the intent that Lycos rely on it.  Lycos reasonably and justifiably relied on this misrepresentation andin connection with, as a resultamong other things, suffered substantial damages. Lycos' purchase of the leased equipment.

58.     Because of the trust Lycos reposed in CSI and CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the Sales Agreement, CSI's intentional misrepresentation concerning the original cost of the leased equipment, and 940 C.M.R. 3.16(2), CSI was obligated to:  (a) correct its misstatement concerning the original equipment cost; and (b) disclose to Lycos the fact that Lycos had already paid amounts well in excess of the cost and fair rental compensation for some of the leased equipment.

59.     CSI's failure to disclose facts basic and material to Lycos' decision to enter into the Sales Agreement was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.  Furthermore, Lycos relied on CSI's representation with respect to the $63 million original cost of the equipment in entering into the Sales Agreement.

60.     Had CSI made a full disclosure, Lycos would not have purchased the equipment for $3.775 million.

61.     As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $3,775,000.

WHEREFORE, Lycos requests the relief set forth below.

**COUNT ~~VI~~III**
**(Unconscionability in Sales Agreement)**

62.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 61 above.

- 26 -

63.     CSI's sale of the leased equipment to Lycos pursuant to the Sales Agreement constitutes a "sale of goods" within the meaning of Article 2 of the Uniform Commercial Code.

64.     In light of Lycos' payment to CSI of amounts well-in-excess of the original cost of the equipment and the then fair market value of that equipment, the $3,775,000 purchase price paid by Lycos for the leased equipment was unconscionable.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT IV
### (Negligent Misrepresentation in the Inducement)

71. 65.  Lycos repeats and incorporates by reference the allegations contained in paragraphs  1 through 70 64 above.

72. 66.  To the extent CSI performed its duty to provide Lycos with all information relevant to Lycos' decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

73. 67.  Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment.  Lycos also justifiably relied on the misleading half-truth that the "roll ups" would decrease Lycos' monthly rental payments, without also being informed that the total amount told other facts basic and material to be paid by Lycos after' decision to enter into the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for and purchase the leased equipment.

74. 68.  As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

WHEREFORE, Lycos requests the relief set forth below.

**COUNT ~~VII~~V**
**(G.L. c. 93A, §§ 2 and 11)**

~~75.~~69. Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~74~~ 68 above.

~~76.~~70. CSI is engaged in trade or commerce as that term is defined in G.L. c. 93A.

~~77.~~71. CSI has engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2 and 11 including, but not limited to:

A.    its collection of money from Lycos well above any reasonable or fair total compensation as a result of the "roll up" of various equipment schedules;

B.    its intentional and negligent misrepresentations, and omissions of facts basic and material ~~facts pertinent~~ to Lycos' decision to enter into the lease "roll-ups" that CSI was obligated, under common law, to disclose;

C.    ~~its failure~~CSI's knowledge of the full impact of the roll-ups on Lycos, that the full impact of the roll-ups was material to Lycos' decision to enter into them, and that CSI failed to disclose to Lycos, ~~as required by~~the full impact of the roll-ups, all in violation of 940 C.M.R. 3.01, Definition of Buyer, and 940 C.M.R. 3.16(2)~~, facts that may have influenced Lycos' decision to enter into the lease "roll-ups"; and~~

D.    its failure to comply with industry standards established by the ELA by not "disclos[ing] to [Lycos] all relevant information as to the terms and conditions" of the lease "roll-ups~~.~~"; and

E.    its intentional misrepresentation concerning the original cost of the leased equipment that induced Lycos to enter into the Sales Agreement; and

F.      its knowledge that Lycos had paid in full for much of the leased equipment before executing the Sales Agreement, that Lycos' payment in full for much of the leased equipment was material to Lycos' decision to enter into the Sales Agreement, and that CSI failed to disclose to Lycos that Lycos had already paid well-in-excess of (i) the original cost of the equipment and (ii) any fair rental value, all in violation of 940 C.M.R. 3.01, Definition of Buyer, and 940 C.M.R. 3.16(2).

78. 72.  At all times material and relevant hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts. Specifically, CSI' s communications with Lycos were made by Mr. Stenberg while CSI was conducting business in Massachusetts.

79. 73.  The violations of G.L. c. 93A, §§ 2 and 11 described above were knowingly, willfully and intentionally committed by CSI.

80. 74.  By reason of CSI' s unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $14,000,000.

81. 75.  Such damages should be trebled pursuant to G.L. c. 93A, § 11, and Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VI
### (Money Had and Received)

76.      Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 75 above.

77.      After Lycos executed the Sales Agreement, Lycos' leasing consultants determined that the original cost of the equipment leased by Lycos from CSI was approximately $47 million.

- 29 -

78.     Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling $46 million.

79.     As a result of CSI's repeated "roll-up" of the lease schedules, Lycos paid CSI (a) more than $72 million in addition to interim rent; and (b) $3.775 million to purchase the equipment.

80.     CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

81.     Equity and good conscience demand that this excess, in an amount to be determined at trial, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

**COUNT VIII**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**COUNT VII**
**(Unjust Enrichment)**

82.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 81 above.

83.     In entering into the Master Lease Agreement and related lease schedules, CSI was bound to act in good faith and fair dealing with Lycos.

84.     Through its fraudulent and/or negligent misrepresentations in connection with the "roll up" of various equipment schedules, as described above, CSI has unfairly and in bad faith extracted money from Lycos well above any reasonable or fair total compensation under the

leases.CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

84.    CSI accepted such monies knowing that it was receiving an economic windfall.

85.    CSI's retention of these monies would be unjust and inequitable.

85. 86.  As a result of CSI's actions described above, Lycos has been damaged unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial but not less than $14,000,000

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VIII
### (Declaratory Judgment)

87.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 86 above.

88.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

89.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

90.    Lycos seeks a judicial declaration that:

A.    it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

B.    it is the owner of the equipment purchased pursuant to the Sales Agreement, free and clear of any claims of CSI.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IX
### (Declaratory Judgment)

B0407135v1

91.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 90 above.

92.    A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules and Lycos' purchase of the equipment, described above.

93.    Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial

WHEREFORE, Lycos requests the relief set forth below.

## JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Counts I ~~, II, V VI~~ and ~~VIII~~IV, enter judgment ~~against~~rescinding the rolled-up lease schedules CSI~~,~~ fraudulently and ~~in favor of~~negligently induced Lycos~~, in an amount~~ to ~~be determined at trial but not less than $14,000,000, together with interest and costs~~enter into;

~~B.    On Count III, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment lease schedules between Lycos and CSI, and that Lycos owns the equipment leased pursuant to the Master Equipment Lease and related lease schedules free and clear of any claim of CSI;~~

B.    On Count I, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $10,225,000, together with interest and costs;

C.    On ~~Count IV~~Counts II and III, enter judgment ~~declaring that~~against CSI ~~must disgorge and return all overpayments made by~~, and in favor of Lycos~~to~~, requiring CSI ~~in an amount to be determined at trial  but not less than~~ to disgorge the $~~14,000,000~~3,775,000 Lycos paid CSI under the Sales Agreement, together with interest and costs;

D.    On Count ~~VII~~ IV, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $14,000,000, together with interest and costs;

E.    On Count V, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L.  c. 93A, §§ 2 and 11, and awarding ~~plaintiff actual~~Lycos damages in an amount to be determined at trial but not less than $14,000,000, trebled, together with interest, costs and attorneys' fees; ~~and~~

F.    On Counts VI and VII, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial, together with interest, costs and attorneys' fees;

G.    On Count VIII, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment lease schedules between Lycos and CSI, and that Lycos owns the equipment purchased pursuant to the Sales Agreement free and clear of any claims of CSI;

H.    On Count IX, enter judgment declaring that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial, together with interest and costs; and

~~E.~~ I. Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated: ~~February 4,~~ March 22, 2005          ~~Erik Bartenhagen~~ /s/ Thomas O. Bean

Thomas O. Bean (BBO# 548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

B0407135v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for plaintiff, Robert J. Kaler, Gadsby Hannah LLP, 225 Franklin Street, Boston, MA 02110, by hand on ~~February 4,~~<u>March 22,</u> 2005.

<u>/s/</u> Erik P. Bartenhagen
<u>Erik P. Bartenhagen</u>

- 35 -

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |