UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., )<br><br>Plaintiff,<br>v.<br><br>LYCOS, INC.,<br><br>Defendant,<br>and<br><br>BANK OR AMERICA f/k/a FLEET BANK,<br><br>Trustee Process Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 05-10017- RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF**

**PLAINTIFF COMPUTER SALES INTERNATIONAL, INC.'S
MOTION FOR SUMMARY JUDGMENT AS TO ITS COMPLAINT**
*AND*
**PLAINTIFF'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT
<u>AS TO THE AMENDED COUNTERCLAIM OF DEFENDANT LYCOS, INC.</u>**

Submitted by:

Robert J. Kaler, BBO No. 542040
Eric Neyman, BBO No. 564803
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

*Counsel for Plaintiff Computer Sales
International, Inc.*

Dated:  March 31, 2005

## *Table of Contents*

*Table of Contents*  ………………………………………………………… i

*Table of Authorities* ..................................................................................... ii

INTRODUCTION ..................................................................................................1

STATEMENT OF UNDISPUTED FACTS .........................................…………… 1

ARGUMENT…………………………………………………………………… 9

   I.     CSI IS ENTITLED TO A DISMISSAL OR SUMMARY
         JUDGMENT AS TO LYCOS' AMENDED COUNTERCLAIM ......................10

        A.     Lycos Cannot Sustain Its Claim for Fraudulent
               Misrepresentation Because It Cannot Satisfy the
               Legal Requirement of "Reasonable Reliance" .........................................11

        B.     Lycos Cannot Sustain a Claim of "Unconscionability"
               as to the Sales Agreement .........................................................................14

        C.     Lycos' Claims for Negligent Misrepresentation, M.G.L. c.93A
               Sec. 2 and 11, Money Had and Received, Unjust Enrichment,
               and Declaratory Judgment Fail to State Claims Upon
               Which Relief May Be Granted. ...............................................................17

   II.    CSI IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR
         AS TO THE CLAIMS SET FORTH IN ITS VERIFIED COMPLAINT .............18

CONCLUSION ......................................................................................................20

*Table of Authorities*

*Boston Helicopter Charter, Inc. v. Agusta Aviation Corp*., 767 F. Supp. 363, 375
(D. Mass. 1991)...........................................................................................15

*Celtic Development Corp. v. FDIC*, 836 F.Supp. 926, 939 (D. Mass. 1993) ...........................12

*Collins v. Huculak*, 57 Mass. App. Ct. 387, 783 N.E.2d 834 (2003).........................................12

*Cooprider v. John Hancock Mutual Life Inc. Co*., 1993 U.S. App.
LEXIS 24979 (1st Cir. 1993)......................................................................13

*dB Sales, Inc. v. Digital Equipment Corp*., 951 F.Supp. 1322 (N.D. Ohio. 1996)....................13

*Elias Brothers Restaurant, Inc. v. Acorn Enterprises, Inc.*, 1993
WL 337023 (D. Mass. August 27, 1993) at *2.....................................12, 14

*Eureka Broadband Corp. v. Wentworth Leasing Corp.,* 2005 U.S.App.
LEXIS 3746 (1st Cir. Mar. 7, 2005) ...............................................................3

*Fleischmann Distilling Corp. v. Distillers Co. Ltd*., 395 F. Supp. 221, 233
(S.D.N.Y. 1975) .........................................................................................15

*Gromacki v. Armour & Co*., 76 F.Supp. 752, 754 (W.D. Mo 1948) .......................................12

*Harris v. Howell,* 739 F.Supp. 565, 567-568 (N.D. Ala. 1989) ...............................................13

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp*., 438 Mass.
459, 468, 781 N.E 2d 787 (2003)...............................................................12

*Liberty Financial Mgmt Co., v. Beneficial Data Processing Corp.*,
670 S.W.2d 40, 50 (Mo. App. 1984) ..........................................................17

*McAdams v. Mass. Mutual Life Ins. Co.,* No. 99 30284 FHF, 2002
U.S. Dist. LEXIS 9944 (D. Mass. May 15, 2002) .......................................11

*Modern Enterprises, Inc. v. Allen*, 802 F.2d 312, 314 (8th Cir. 1986) .......................................11

*Nasco, Inc. v. Public Storage, Inc*., 1995 U.S. Dist. LEXIS 7815 at *14-15
(D. Mass. 1995)......................................................................................16,17

*Nedlloyd Lines B.V. v. Superior Court,* 3 Cal. 4th 459, 834 P.2d 1148, 1155
(Cal. 1991) ...............................................................................................11

*Pizzeria Uno of Kingston, Inc. v. Independence Mall Group, Inc.,*
11 Mass. L. Rep. 241, 1995 Mass. Super. LEXIS 866
(Mass. Super. July 13, 1995) ......................................................................12

*Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ...................13

*U.S. ex rel. Bussen Quarries, Inc. v. Thomas*, 938 F.2d 831, 834 (8th Cir. 1991) .....................12

*Waters v. Min Ltd.*, 412 Mass. 64, 69 (1992) ..........................................................................15

*Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980) ....................................................15, 16

**Statutes**

Mass. Gen. Laws Chapter 93A .....................................................................................3, 11, 17

**Treatises**

*Restatement (Second) of Torts* § 541, Comment A....................................................................13

## INTRODUCTION

This is an action to recover an account receivable which is owed to the plaintiff under several computer equipment leases that it entered into with the defendant years ago. The defendant is seeking to avoid liability, and pursue damages against the plaintiff, based on the theory that it has been deceived for years because the plaintiff supposedly never disclosed to it that it was paying too much under those leases.

On the undisputed facts, the defendant's claim is legally insupportable, partly because the defendant cannot show reasonable reliance on any of the misrepresentations or nondisclosures that it has pled. As a result, the plaintiff is entitled to judgment in its favor as a matter of law, both on its own complaint, and the defendants' counterclaim.

## STATEMENT OF UNDISPUTED FACTS

1.     Plaintiff Computer Sales International, Inc. ("CSI"), a privately held St. Louis-based computer leasing company, commenced this action on January 5, 2005 seeking to collect an account receivable of $301,050 from defendant Lycos, Inc. ("Lycos"), a publicly traded Massachusetts-based internet service company. *See* Verified Complaint at 1. Lycos owes this money to CSI under two computer equipment leases, designated Equipment Schedules 100 and 200, that Lycos entered into with CSI in January of 2002 to effectuate its lease of certain computer equipment from CSI. *Id*. at 4-7.

2.     These and many other equipment schedules were executed by CSI and Lycos over a period of several years pursuant to the terms of a master lease that those two companies signed in December of 1996 (the "Master Lease"). *Id.* at 4. Under those schedules and the Master Lease, Lycos leased thousands of pieces of equipment (the "Equipment") from CSI. *Id.* Then, in July of 2003, Lycos purchased the Equipment outright pursuant to a heavily negotiated purchase

and sale agreement (the "Sales Agreement") which expressly stated that it constituted the "entire agreement" of the parties, and that no representations outside of it would be binding.[1]

3.    Under the Sales Agreement, Lycos was required, *inter alia*, to make the remaining lease payments that it owed to CSI under Equipment Schedules 100 and 200 (the validity of which was expressly confirmed in the Sales Agreement), whose terms extended until March of 2005.[2]  Lycos made those payments until November of 2004, and then stopped.  *See* First Rousseau Aff. at p. 2, ¶¶4-5.  At that point, CSI declared a default, gave Lycos the contractually specified notice and opportunity to cure, *id*., and then, when Lycos failed to cure the default, commenced this action to recover the remaining payments.  *Id.*

4.    When it filed its Verified Complaint, CSI obtained an *ex parte* attachment of Lycos' bank account at trustee-defendant Bank of America in the amount of $310,000.  *See* Order of January 5, 2005 Allowing Plaintiff's Motion for *Ex Parte* Approval of Attachment on Trustee Process.  In response, Lycos did not seek to dissolve the attachment, but instead filed an answer denying liability, and a counterclaim seeking to retroactively void its obligations not only under Equipment Schedules 100 and 200, but also under **(a)** *all* the other equipment schedules that it entered into with CSI pursuant to the Master Lease from 1996 to 2002, *and* **(b)** the July 2003 Sales Agreement that it signed.  *See* Answer and Counterclaim of Defendant Lycos, Inc., filed February 5, 2005.

---

[1]    *See, e.g.,* Answer and Counterclaim of Defendant Lycos, Inc., filed February 4, 2005, at 19-20 ("*Lycos' Purchase of the Leased Equipment*"), Exh. I, p. 3, §9A ("This Agreement is the entire agreement between Seller and Buyer…and no representation or statement not contained in this Agreement is binding…").  *See also* Amended Answer and Counterclaim of Defendant Lycos, Inc., filed March 22, 2005, at 20-21, Exh. I, p. 3, §9A.

[2]    *See* Amended Answer and Counterclaim of Defendant Lycos, Inc., filed March 22, 2005, at 20-21 ("Lycos agreed [in the Sales Agreement] to continue making monthly lease rental payments until the end of the lease term…").

2

5.    The purported basis for Lycos' February 5, 2005 counterclaim was the allegation
that, in essence, it had been deceived for years because CSI supposedly had not disclosed to it
that it was paying much more to lease and then buy the Equipment than the Equipment had cost.
*Id.*  By way of relief, Lycos sought a declaration that it owed no more money to CSI, and a
judgment allowing it to recoup millions of dollars of contract payments that it had made to CSI
over the previous eight years.  *Id.*  It pled the following causes of action: **(1)** money had and
received, **(2)** unjust enrichment, **(3)** declaratory judgment that it had no further payment
obligations to CSI, **(4)** declaratory judgment that it should recover at least $14 million of what it
had already paid CSI, **(5)** fraudulent misrepresentation, **(6)** negligent misrepresentation, **(7)**
violation of M.G.L. c. 93A, §§ 2, 11, and **(8)** breach of the implied covenant of good faith and
fair dealing.  *Id.* at pp. 21-27, ¶¶ 47-85.

6.    On March 10, 2005, CSI moved to dismiss Lycos' counterclaim for failure to
state a claim, pointing out, in its supporting memorandum (which is incorporated herein by
reference), that given the undisputed provisions of the parties' contracts, including the so-called
"hell or high water" clauses in the Equipment Leases[3] and the integration clause in the Sales
Agreement,[4] Lycos' counterclaim failed to state claims upon which relief could be granted.  *See*

---

[3]    This clause appears in Article 5 of the Master Lease (in both the unsigned copy attached to Lycos'
Counterclaim, and in the signed and verified copy attached to CSI's Verified Complaint), which states, *inter
alia*, that:  **"Lessee's obligation to pay the Monthly Rental and all other sums due hereunder *shall be
unconditional and shall not be subject to* any setoff, abatement, counterclaim, *recoupment*, defense,
cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other
right that Lessee may have against Lessor."**  *See* Verified Complaint at Exh. 1, p. 2.  *See also* Lycos
Answer/Counterclaim at Exh. A, p. 2, Article 5. (emphasis added).

At the time that CSI's March 10, 2005 motion to dismiss Lycos' counterclaim was filed, the First Circuit had
just held, three days earlier, in *Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 2005 U.S. App. LEXIS
3746 (1st Cir. Mar. 7, 2005), that a "hell or high water" clause would not preclude a claim of egregious fraud
going to the heart of the transaction.  In *Eureka*, however, it was alleged and proven that the equipment leasing
company *never bought the equipment* that it purported to lease, which is obviously not the case here.

[4]    *See also* Lycos Answer/Counterclaim at Exh. I, p. 3, §9A ("This Agreement is the entire agreement between
Seller and Buyer…and **no representation or statement not contained in this Agreement is binding**…").

3

Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos' Counterclaim, filed March 10, 2005.

7.    Among other things, CSI's March 10, 2005 Memorandum noted that the gravamen of Lycos' counterclaim were the allegations that CSI had made too much money on its transactions with Lycos, had never told Lycos that its lease payments exceeded the original cost of the Equipment, and at one point (in an email) had allegedly overstated that cost figure.  *Id*. at pp. 1-2.  CSI then pointed out that these allegations failed to state a valid claim for relief, in part because Lycos, a sophisticated corporation, admittedly knew the original cost of the Equipment, and was chargeable with knowledge as to the effect of its own leases and Sales Agreements.  *Id*.

8.    On March 15, 2005, this Court held a Rule 16 conference in this case.  During that conference, CSI pointed out that a key fact relevant to its motion to dismiss, undisputed in the pleadings, was that Lycos knew the original cost of the Equipment ***because it had ordered it***.  Lycos counsel was asked whether Lycos would stipulate to this, and he responded that he would check with his client.  It was then decided that by March 31st, CSI would file, along with its motion to dismiss Lycos' counterclaim (which would be treated as a motion for summary judgment if appropriate), a separate motion for summary judgment as to its complaint, and that Lycos would respond to both motions by April 30th.

9.    Before CSI could file its summary judgment motion, however, Lycos filed, on March 22, 2005, an Amended Counterclaim attaching the same exhibits as its original counterclaim, and containing substantially the same factual allegations, but setting forth several new causes of action (*e.g.* "unconscionability" as to the Sales Agreement, separate "fraud in the inducement" counts), and deleting several others (*e.g.* the previously-pled "breach of implied

4

covenant of good faith and fair dealing" claim, and the portion of the fraud claim that alleged

that a March 2003 email had induced Lycos to sign pre-2003 leases, etc.).[5]

10.     Then, although Lycos admitted through counsel that it ordered and knew the cost

of the Equipment at the time it was purchased by CSI, *see* Second Affidavit of Jeffrey Rousseau

("Second Rousseau Aff.") at Exh. 1, it refused to agree to a stipulation to that effect unless CSI

agreed to other extraneous language that was either untrue or made no sense to CSI.   This

extraneous language seemed primarily intended to help Lycos "argue around" the fact that it

knew the cost of the Equipment when it ordered it.   *Id.*   CSI was not comfortable agreeing to this

language, however, and as a result, the parties have filed no stipulation on this issue.   *Id*.

11.     The pleadings themselves, however, and Lycos own proposed drafts of the

stipulation, as well as the Second Rousseau Aff. (filed herewith) and its exhibits, show that it is

genuinely undisputed that Lycos ordered the Equipment, and knew the cost of the Equipment at

the time it was ordered.   *See* Lycos Original Counterclaim at p. 14, ¶27 ("Schedule 67E governed

the lease of equipment with an original equipment cost of $1,091,002").   *See also* Second

Rousseau Aff. at Exh. 1.   In fact, under the agreed Master Lease and equipment schedules, Lycos

was required to (and did) select, negotiate the price for, and order that equipment from vendors

that it chose.   *See* Verified Complaint at 8, and Exhibit 1.   ***Lycos then confirmed its approval of***

***each purchase price in writing, and authorized CSI to pay it***.   *See* Second Rousseau Aff. at pp.

2-3.   Examples of Lycos' written approvals of each purchase price, for the very Equipment

---

[5]     Lycos' new Amended Counterclaim, a redlined version of which (showing the changes from Lycos' original counterclaim) is attached to the Affidavit of Danielle Bouliane as Exhibit 1, pleads the following: **(1)** "fraudulent misrepresentation in the inducement of rolled-up lease schedules;" **(2)** "fraudulent misrepresentation in the inducement of sales agreement;" **(3)** "unconscionability in sales agreement;" (4) "negligent misrepresentation in the inducement;" **(5)** G.L. c. 93A, Sec. 2 and 11; **(6)** money had and received; **(7)** unjust enrichment; **(8)** declaratory judgment that it has no further payment obligations to CSI; and **(9)** declaratory judgment "that CSI must disgorge and return all overpayments made by Lycos to CSI."

Schedule 67E that Lycos uses as an example in its counterclaim, are attached as Exhibit 1 to the Second Rousseau Aff. *Id*.

12.    As a result, Lycos has no basis for claiming that it did not know the cost of the Equipment, and obviously no basis for claiming that it did not know what it was paying to lease the Equipment – since its payment obligations were set forth in the contracts it signed. *See* Second Rousseau Aff. at p. 2, ¶ 3.  It is also undisputed that the Master Lease, the equipment schedules, the Sales Agreement, and all the other acknowledgement and acceptance documents that Lycos signed in connection with its multiyear leases and eventual purchase of the Equipment were signed by authorized representatives of Lycos, and in many cases reviewed by its legal department. *See* Second Rousseau Aff. at pp. 4-5.

13.    The facts supporting CSI's complaint are similarly undisputed.  CSI and Lycos entered into the Master Lease in December of 1996.  It which provided that, from time to time, CSI and Lycos would execute so-called "equipment schedules," each of which would incorporate by reference all the terms contained in the Master Lease, pursuant to which CSI would lease certain IT equipment to Lycos on specified terms and conditions.  *See* Verified Complaint at Exhibit 1.

14.    CSI and Lycos entered into series of equipment schedules pursuant to the Master Lease.  One of these equipment schedules was signed by them in January of 2002, amended in May of 2002, and identified as "Equipment Schedule No. 100 dated as of December 12, 2001" (as amended, "Equipment Schedule 100").  Another one of the equipment schedules entered into by CSI and Lycos pursuant to the Master Lease was executed by them in January of 2002, amended in May of 2002, and identified as "Equipment Schedule No. 200 dated as of December 12, 2001" (as amended, "Equipment Schedule 200").  *See* Verified Complaint.

**15.** True copies of Equipment Schedules 100 and 200 are attached to the Verified Complaint herein as Exhibits 2 and 5. Each of these schedules incorporated by reference all the terms contained in the Master Lease, and each one identified the specific items of equipment being leased by Lycos pursuant to it, and the lease terms, expiration dates, and monthly lease rental payment that Lycos would make to CSI for the equipment listed in that schedule -- expressed as a fraction of the cost of the referenced equipment. *See* Verified Complaint.

**16.** Thereafter, Lycos evidenced its acceptance of the equipment listed on Equipment Schedules 100 and 200 by issuing written certificates of acceptance, executed by both Lycos and CSI in June of 2002, for that equipment. True copies of these Certificates of Acceptance are attached to the Verified Complaint herein as Exhibits 3 and 6. Among other things, these Certificates of Acceptance confirm that Lycos' monthly rental payments under Equipment Schedules 100 and 200, expressed in dollars, were $6,082.29 per month for the Equipment Schedule 100 items, and $43,954.35 per month for the Equipment Schedule 200 items. *See* Verified Complaint.

**17.** Beginning in or about July of 2002, CSI began invoicing Lycos, approximately six weeks in advance of the date each payment was due, for each monthly payment obligation that Lycos had under Equipment Schedules 100 and 200, and until approximately thirty (30) days before the commencement of this action, Lycos had always made those payments (though in some cases late). In August of last year, however, Lycos was acquired by a Korean company, and in the last two months of that year, it defaulted on and failed to satisfy its November 1, 2004 and December 1, 2004 payment obligations. *Id.*

**18.** When Lycos failed to make the payments that it owed CSI under Equipment Schedules 100 and 200, CSI exercised its rights under the Master Lease to declare a default, and

sent Lycos the required formal notice of default on December 8, 2004.  A true copy of the notice

of default (the 12/8/04 Notice of Default") is attached to the Verified Complaint as Exhibit 8.  In

the 12/8/04 Notice of Default, CSI notified Lycos of Lycos' failure to make the contractually

required lease payments, and advised Lycos that if it failed to cure that default within ten days

after its receipt of the 12/8/04 Notice of Default, then CSI had the right to declare the entire

remaining amounts under the Master Lease and Equipment Schedules immediately due and

payable, and to recover interest on those amounts, and any attorneys fees it incurred.  *See*

Verified Complaint.

19.     Thereafter, Lycos failed to cure or even respond to the 12/8/04 Notice of Default.

Accordingly, on December 23, 2004, CSI declared a formal Event of Default pursuant to the

Master Lease and Equipment Schedules, and sent Lycos the required formal notice of an event of

default (the "12/23/04 Notice of Event of Default") on that date.  *See* Verified Complaint at

Exhibit 9.  In the 12/23/04 Notice of Event of Default, CSI properly declared all the remaining

payments under the Master Lease and Equipment Schedules immediately due and payable

pursuant to Section 15.1(b) of the Master Lease, and specified the total amount due and owing by

Lycos as a result of the acceleration, which was $301,050.34.  *Id.*  This amount consisted of **(a)**

six payments of $6,082.29 each under Equipment Schedule 100, covering the months of

November 2004, December 2004, January 2005, February 2005, March 2005 and April 2005

payment – a subtotal of $36,493.74; and **(b)** six payments of approximately $43,954.35 each

under Equipment Schedule 200 (discounted to present value), covering the months of November

2004, December 2004, January 2005, February 2005, March 2005 and April 2005 payment.  *Id.*

20.     The Master Lease also provides, in Section 15 (Remedies), that the lessor, CSI, is

entitled to recover from the lessee, Lycos, "all damages or expenses, including reasonable

8

attorney's fees, which lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder." *See* Verified Complaint at Exh. 1, p. 4. CSI has incurred and is incurring such damages and expenses, including significant attorneys fees and costs, on account of Lycos' default, and in enforcing its remedies.

### ARGUMENT

Relying on the same points and authorities set forth in the memorandum it filed in support of its previous motion to dismiss, *see* Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos' Counterclaim, dated: March 10, 2005 ("CSI's First Motion to Dismiss Memo") – ***which memorandum CSI respectfully incorporates herein by reference, since in large part it is just as applicable now as it was when it was filed*** – CSI has now moved to dismiss or for summary judgment as to Lycos' Amended Counterclaim. *See* Plaintiff Computer Sales International, Inc.'s Motion to Dismiss or for Summary Judgment as to Defendant Lycos' Amended Counterclaim (dated and filed March 31, 2005).

At the same time, CSI has moved for summary judgment as to its Complaint for the unpaid amounts owed to it under Equipment Schedules 100 and 200. <u>*See*</u> Plaintiff Computer Sales International, Inc.'s Motion for Summary Judgment as to Its Complaint (Dated: March 31, 2005). That motion is based on the Verified Complaint and affidavits that are already a part of the record in this case. *See* Verified Complaint; First Rousseau Aff.; Plaintiff Computer Sales International's Memorandum of Law in Support of Ex Parte Motion for Attachment on Trustee Process (Filed: January 5, 2005).

For the reasons set forth herein, and in CSI's previous filings, both motions should be allowed.

I.      **CSI IS ENTITLED TO A DISMISSAL OR SUMMARY JUDGMENT AS TO LYCOS' AMENDED COUNTERCLAIM**

In its Amended Counterclaim, Lycos alleges that it entered into the Equipment Schedules and the Sales Agreement unwittingly because CSI supposedly did not fully disclose to it the total amount that it would have to pay, or the profit that CSI would make, as a result of these lease extensions.  *Id.* at pp. 10-17.  Lycos further alleges that it agreed to purchase the equipment in July of 2003 only because "CSI did not tell Lycos that Lycos had already paid substantially more than the total cost of the equipment," *id.* at p. 20, ¶ 45, and at one point supposedly overstated that cost in an email.  *Id.* at p. 19, ¶¶ 40-41.  As a result of this alleged "misconduct," Lycos argues that CSI has obtained an undeserved profit that it should now be forced to return to Lycos based on principles of "[e]quity and good conscience."  *Id.* at p. 21-27, ¶¶ 47-85.

These allegations, as they are set forth in the Amended Counterclaim, do not state a legal claim upon which relief can be granted, particularly given the undisputed facts in this case.  Lycos has simply (and shamelessly, for a sophisticated public company) advanced a series of inapplicable quasi-contractual, statutory, and tort claims in an unfair attempt to void valid lease contracts, and a duly executed Sales Agreement (which, ironically, is marked "REVIEWED BY TERRA LYCOS LEGAL" on the very page where it was signed by Lycos, *id.* at Exh. I, p. 3), to which it agreed years ago.

It is indisputable that Lycos knew the cost of the Equipment it was leasing from CSI, and knew what it was paying to lease and then purchase that Equipment, when it signed the relevant agreements.  *See* Second Rousseau Aff.  All that Lycos is attempting to do now, therefore, is revisit what its new management apparently perceives were bad business decisions by their predecessors – but the law does not permit this.  Lycos made its choices in the contracts that it signed with CSI years ago, and it cannot avoid those obligations now based on a belated

10

reassessment of the wisdom of those contracts – nor can it void those contracts by claiming that they were somehow "unfair," or that information that Lycos could have ascertained for itself by simply "doing the math" (which it now does in its Amended Counterclaim) was somehow not "disclosed" to it by CSI.

Nevertheless, Lycos' new Amended Counterclaim, a redlined version of which (showing the changes from Lycos' original counterclaim) is attached to the Affidavit of Danielle Bouliane, dated March 31, 2005 (filed herewith), as Exhibit 1, pleads the following causes of action: **(1)** "fraudulent misrepresentation in the inducement of rolled-up lease schedules;" **(2)** "fraudulent misrepresentation in the inducement of sales agreement;" **(3)** "unconscionability in sales agreement;" **(4)** "negligent misrepresentation in the inducement;" **(5)** G.L. c. 93A, Sec. 2 and 11; **(6)** money had and received; **(7)** unjust enrichment; **(8)** declaratory judgment that it has no further payment obligations to CSI; and **(9)** declaratory judgment "that CSI must disgorge and return all overpayments made by Lycos to CSI." *Id.*

For the reasons set forth below, none of these claims can be sustained.

A.    **Lycos Cannot Sustain Its Claims for Fraudulent Misrepresentation Because It Cannot Satisfy the Legal Requirement of "Reasonable Reliance"**

Under the applicable Missouri law,[6] it is well-settled that "a party who fails to avail itself of means of knowledge within his reach cannot complain that he was defrauded." *Modern*

---

[6]    The contracts in this case expressly provided that the law of Missouri, not Massachusetts, would govern the transactions between the parties. *See* Lycos Answer/Counterclaim at Exh. I, p. 3, §9C ("GOVERNING LAW: This Agreement, including all matters of construction, validity, performance or enforcement, is governed by the laws of the state of Missouri, without giving effect to principles of conflicts or choice of laws"). *Id.* at Exh. 1, p. 5, §18.6 ("THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI…"). These types of choice of law provisions have been routinely interpreted by this Court to include contract-related tort claims. *See McAdams v. Mass. Mutual Life Ins. Co.*, No. 99-30284-FHF, 2002 U.S. Dist. Lexis 9944 (D. Mass. May 15, 2002), citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Ca. 4th 459, 834 P.2d 1148, 1155 (Cal. 1992) (noting that sophisticated business parties would not intend "that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship").

11

*Enterprises, Inc. v. Allen*, 802 F.2d 312, 314 (8th Cir. 1986)(affirming grant of directed verdict dismissing fraudulent misrepresentation claims)(applying Missouri law). *See also U.S. ex rel. Bussen Quarries, Inc. v. Thomas*, 938 F.2d 831, 834 (8th Cir. 1991)(reversing fraud verdict where claimant "could have read the indemnity agreement and discovered it covered any bonds"); *Gromacki v. Armour & Co.*, 76 F.Supp. 752, 754 (W.D. Mo 1948)(granting motion to dismiss fraud claim where "[t]he means of knowledge were at hand…it is the rule that where a party fails to avail himself of means of knowledge within his reach he cannot complain if he is defrauded).

Under Massachusetts law, the rule is the same. *See Collins v. Huculak*, 57 Mass. App. Ct. 387, 783 N.E.2d 834 (2003)(affirming dismissal of fraudulent misrepresentation claim on grounds of no reasonable reliance); *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 468, 781 N.E 2d 787 (2003); *Celtic Development Corp. v. FDIC*, 836 F.Supp. 926, 939 (D. Mass. 1993)("Plaintiffs [claim]…that they did not know about the three year due date or that the loan was past due. Consequently, they reason that the bank fraudulently induced them to enter into the March 1988 note…[but *t]his court finds such reliance unreasonable as a matter of law.*")(emphasis added); *Elias Brothers Restaurant, Inc. v. Acorn Enterprises, Inc.*, 1993 WL 337023 (D. Mass. August 27, 1993) at *2; *Pizzeria Uno of Kingston, Inc. v. Independence Mall Group, Inc.,* 11 Mass. L. Rep. 241, 1995 Mass. Super. LEXIS 866 (Mass. Super. July 13, 1995)("in the present case, the allegedly fraudulent statements relied upon by the complaining parties are not actionable because there could be no reasonable reliance on what the plaintiffs claim was told to them…[t]he plaintiffs in this case are sophisticated business people who were represented by counsel when presented with the Leases for execution.").

In affirming this Court's grant of summary judgment dismissing a fraud claim on summary judgment in *Cooprider v. John Hancock Mutual Life Inc. Co.*, 1993 U.S. App. LEXIS 24979 (1ˢᵗ Cir. 1993), for example, the First Circuit explained that

> Record evidence on the issue of authority also renders summary judgment appropriate on Cooprider's claim that he was fraudulently induced to enter into a relationship with John Hancock based on misrepresentations regarding the terms of his employment. In order to make out a claim for fraudulent misrepresentation, a party must show reasonable reliance on the alleged misrepresentations. *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1ˢᵗ Cir. 1986). Cooprider was admittedly aware of Wooley's lack of authority. *Any reliance on the handwritten agreement was, therefore, unreasonable as a mater of law.*

*Id.* at **7-8 (emphasis added). *See also* Restatement (Second) of Torts, § 541, Comment A.

The same rule is consistently applied in other jurisdictions as well to preclude fraud claims based on allegations that facts which the claimants could have ascertained for themselves were allegedly "concealed" or "misrepresented." *See, e.g., Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)("where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance"); *dB Sales, Inc. v. Digital Equipment Corp.*, 951 F.Supp. 1322 (N.D. Ohio. 1996)("Any party, whether or not sophisticated, must prove reasonable reliance in order to show fraud. And a reasonableness inquiry involves what the contracting party knew or should have known with respect to the contents of the contract."); *Harris v. Howell,* 739 F.Supp. 565, 567-568 (N.D. Ala. 1989)("It is fundamental that a plaintiff cannot blindly accept statements from the defendant as true, as 'it is the policy of the courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests'").

In this case, Lycos admittedly negotiated the purchase prices for all the Equipment, and knew its cost because it had to approve CSI paying for it. *See* Second Rousseau Aff. It also

13

knew, from the beginning, what it was required to pay under the various equipment schedule leases – because, as Lycos' own Counterclaim alleges, "each equipment schedule…add[ed] additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos." *See* Answer and Counterclaim of Defendant Lycos. Inc. at pp. 10, 16.

As a result, Lycos cannot claim that CSI defrauded it by failing to disclose, or by misrepresenting, the amount by which Lycos' lease payments exceeded the cost of the Equipment – because Lycos had the ability to calculate this on its own simply by "doing the math" (*i.e.* comparing the total cost of all the Equipment it had leased with the total lease payments it was making). Nor can Lycos claim that CSI "fraudulently induced" it into entering into the Sales Agreement to buy the Equipment in July of 2003 by failing to disclose that Lycos had already paid more in lease payments than the original cost of the Equipment – because Lycos already knew what the Equipment had cost. *See* Second Rousseau Aff. Moreover, these contracts had integration clauses that make reliance on oral representation problematic to begin with.[7] For all of these reasons, Lycos simply cannot sustain a fraud claim here.

### B.    Lycos Cannot Sustain a Claim of "Unconscionability" as to the Sales Agreement

Lycos claim of "unconscionability" in connection with the July 2003 Sales Agreement is equally unavailing. Lycos is a highly sophisticated internet service company, *see* Second Rousseau Aff. at p. 4, and the doctrine of unconscionability is only applied in commercial

---

[7]    The parties' agreements contain valid integration clauses stipulating that they constituted the "entire agreement" of the parties with respect thereto, and that no representations outside the agreements would be considered binding. *See* Verified Complaint at Exh. 1, p. 5, §18.3 ("This Agreement [together with all schedule and attachments hereto] constitutes the entire agreement between Lessor and Lessee…"). *See also* Lycos Answer/Counterclaim at Exh. I, p. 3, §9A ("This Agreement is the entire agreement between Seller and Buyer…and no representation or statement not contained in this Agreement is binding…"). *See Elias Brothers Restaurants, Inc., v. Acorn Enterprises, Inc*., 831 F. Supp. 920, 926 (D. Mass. 1993) ("the direct, precise terms of the franchise agreements serve as a bar to any reasonable reliance by the defendants on prior oral representations."

dealings between business entities in exceptional circumstances.  *See Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 375 (D. Mass. 1991)("the doctrine of unconscionability is not typically applied to commercial dealings between business entities, but has been invoked more often in consumer transactions); *Fleischmann Distilling Corp. v. Distillers Co. Ltd.*, 395 F. Supp. 221, 233 (S.D.N.Y. 1975) ("it is the exceptional commercial setting where a claim of unconscionability will be allowed. . . particularly where the cries of unconscionability are made by large corporations (internal citations omitted)); *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980).

Under Massachusetts law, a contract is not considered unconscionable unless it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Waters v. Min Ltd.*, 412 Mass. 64, 69 (1992) (citations omitted).  The issue of unconscionability is determined as a matter of law.  *Zapatha*, 381 Mass. at 294 (same).  Insofar as the Master Lease involves a transaction in goods, the unconscionability provision of the Uniform Commercial Code governs.  *Id.* at 289.

The relevant consideration is the circumstances at the time the contract was made, and not the circumstances as they later developed.  *Boston Helicopter Charter, Inc.*, 767 F. Supp. at 375.  Furthermore, in determining whether a contract is unconscionable, Massachusetts courts may take into account a myriad of factors including the commercial sophistication of the party claiming unconscionability; whether such party was represented by counsel; whether the clause was obscure or buried in fine print, whether the relationship between the parties was arms length, and whether the party seeking to enforce the challenged provision took unfair advantage of the other party's weakness, vulnerability, or dependency, or used unfair or improper means to place

15

the other party in such position.  *Nasco, Inc. v. Public Storage, Inc.*, 1995 U.S. Dist. LEXIS 7815 at *14-15 (D. Mass. 1995).

In this case, it is undisputed that Lycos was represented by counsel at the time of the relevant transactions.  Indeed, the Sales Agreement at issue is marked "REVIEWED BY TERRA LYCOS LEGAL" on the very page where it was signed by Lycos.  See Answer/Counterclaim at Exh. I, p. 3.  Moreover, prior to entering into the purchase agreement, Lycos engaged an expert leasing consultant named "LeaseForum," which negotiated the purchase price from $4.6MM to $3.775MM.  *Id.*  The relationship between the parties was arms-length and not quasi-fiduciary.

Lycos admits that it initiated the sales agreement negotiations when it requested "what, if anything, would be required to convert the remaining lease obligations to capital leases such that at the conclusion of the lease terms, Lycos would own the equipment."  Amended Answer/Counterclaim at p. 20, ¶ 43.  At the time that Lycos entered into the sales agreement, Lycos employed the services of LeaseForum, a consulting expert, to aid it in the purchase of the agreement.  Second Rousseau Aff.  Thus, not only did Lycos initiate the purchase of the computer equipment; it also negotiated the purchase price, with knowledge of the original cost of the computer equipment.

The fact that Lycos now believes, in hindsight, that it struck a bad deal is not grounds for a claim of unconscionability, as a matter of law.  *Zapatha*, 381 Mass. at 297, n. 17.  *See also Nasco, Inc.*, 1995 U.S. Dist. LEXIS 7815 at *17 ("If the price offered by [seller] was indeed too good for [buyer] to refuse, it is not unconscionable to hold [buyer] to other, integral aspects of that same deal which it now finds unattractive.").  Lycos' sophistication, its knowledge of the cost of all of the computer equipment that it selected, the arms-length negotiations that took place, its initiation of the process to purchase the computer equipment, and its use of

LeaseForum to assist it in those negotiations, there is no evidence that CSI took advantage of any "weakness, vulnerability, or dependency, or used unfair or improper means to place [Lycos] in such position." *Nasco, Inc.*, 1995 U.S. Dist. LEXIS 7815 at *14-15.

Analysis of a claim of unconscionability under Missouri law compels the same result. Missouri has adopted the same UCC unconscionability provision as Massachusetts. Mo. Rev. Stat. § 400.2-302 (same language as M.G.L. c. 106, § 2-302). Missouri courts have focused their analysis on the concepts of substantive and procedural unconscionability, neither of which is present here. The law is stated in *Liberty Financial Mgmt Co., v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 50 (Mo. App. 1984): "By substantive unconscionability is meant an undue harshness in the contract terms themselves. On the other hand, procedural unconscionability in general is involved with the contract formation process, and focuses on high pressure exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining position. Generally there must be both procedural and also substantive unconscionability before a contract or clause can be voided under sec. 2-302."

Lycos' purchase of the computer equipment was the result of arms-length negotiations during which Lycos was represented by legal counsel and by a leasing expert of its choosing. Lycos chose the equipment at issue, was aware of its original cost of this equipment, and knew what it was paying to lease it. It cannot claim "unconscionability" now.

### C. Lycos' Claims for Negligent Misrepresentation, M.G.L. c. 93A, Sec. 2 and 11, Money Had and Received, Unjust Enrichment, and Declaratory Judgment Fail to State Claims Upon Which Relief May Be Granted

As explained in CSI's First Motion to Dismiss Memo, (1) Lycos' claims for "money had and received" and "unjust enrichment" do not lie here, where valid contracts exist, *id.* at pp. 8-10; (2) Lycos' negligent misrepresentation claim is barred by, *inter alia*, the economic loss rule,

17

the integration clauses in the relevant contracts,[8] and the fact that, under the applicable Missouri law, CSI owed no duty to Lycos, *id.* at pp. 16-18; (3) Lycos' M.G.L. c. 93A claim is barred because the parties expressly agreed that the law of Missouri, not Massachusetts, would govern their transactions, and also because Lycos' underlying fraud claims cannot stand, *id.* at pp. 18-19; and (4) Lycos' declaratory judgment counts are dependent on Lycos underlying substantive claims, and therefore are legally insufficient. *Id.* at p. 10.

## II.    CSI IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR AS TO THE CLAIMS SET FORTH IN ITS VERIFIED COMPLAINT

It is undisputed that the amounts that CSI is claiming in its Verified Complaint are due and owing under the terms of the two computer equipment leases, designated Equipment Schedules 100 and 200, that Lycos entered into with CSI in January of 2002 to effectuate its lease of certain computer equipment from CSI. *Id.* at pp. 4-7. These schedules, which were signed by both parties, were executed pursuant to the terms of a master lease contract (the "Master Lease") that Lycos and CSI admittedly entered into in December of 1996, containing, among other things, a standard "hell or high water " clause.[9]

The Verified Complaint, which is detailed, attaches and authenticates the contract documents executed by Lycos, and the related certificates of acceptance issued by Lycos, which establish that Lycos had a contractual obligation to make payments to CSI of approximately $50,000 per month in November and December of last year, failed to do so, was defaulted, failed

---

[8]    As the Massachusetts SJC pointed out in *Sound Techniques, Inc. v. Hoffman*, 50 Mass. App. Ct. 425, 429 (2000), "[t]o ignore a merger clause and allow recovery for a negligent misrepresentation does little to promote honesty and fair dealing in business relationships." *Id.* at 432.

[9]    The Master Lease, which was incorporated by reference into each schedule, provided that Lycos would be unconditionally responsible for all lease payments once it accepted the equipment, which it did. *See* Verified Complaint at Exhs. 3, 6 (Lycos' Certificates of Acceptance); *See also, e.g.,* Answer and Counterclaim of Defendant Lycos, Inc. ("Lycos Answer/Counterclaim") at Exhs. C, D, E.

to cure the default, and then was properly declared liable for the entire unpaid balances of the relevant equipment leases – an amount in excess of $300,000. *See* Verified Complaint.

CSI has also submitted the Affidavit of Jeffrey L Rousseau, one of its Vice-Presidents, evidencing the fact that Lycos was acquired by a Korean company in August of last year, that Lycos' new CFO contacted CSI complaining that Lycos had "paid too much" under the leases, and that shortly thereafter, Lycos stopped payment on a series of checks, totalling almost $100,000, that Lycos' Accounting Department had previously sent to CSI in the ordinary course of business in recognition of the November 1, 2004 and December 1, 2004 payment obligations. *See* Affidavit of Jeffrey L. Rousseau, dated January 4, 2005.

In its responsive pleadings, Lycos has not disputed that it entered into the aforesaid contracts with CSI, agreed in writing to make the aforesaid payments, and then failed to do so. *See* Amended Answer and Counterclaim of Defendant Lycos, Inc. Nor has it disputed that it has had the benefit of the Equipment for years, and in fact is still using much of it. Instead, Lycos' only defense is the belated claim that in entering into the relevant contracts, it agreed to pay more than it should have, and was improperly "induced" to do so by CSI's failure to alert it to the fact that in total, it was paying more than the original cost of the Equipment. *Id.*

For the reasons set forth herein, however, this claim is not sustainable, nor are any of the counts set forth in Lycos' Amended Counterclaim. Accordingly, Lycos has no defense to CSI's action to recover the amounts that are owed it, and CSI is entitled to summary judgment in its favor on those claims.

## CONCLUSION

For all of these reasons, plaintiff CSI respectfully submits that its Motion to Dismiss or for Summary Judgment as to Lycos' Amended Counterclaim should be allowed, and that its Motion for Summary Judgment as to its own Complaint should also be allowed.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,


/s/ Robert J. Kaler_____
Robert J. Kaler, Esq., BBO No. 542040
Eric Neyman, Esq., BBO No. 564803
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

Dated:  March 31, 2005