UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **COMPUTER SALES INTERNATIONAL, INC.,** | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) ) | |
| v. | ) ) | |
| **LYCOS, INC.,** | ) ) | **AFFIDAVIT OF BRIAN LUCY** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) ) | |
| and | ) ) | |
| **BANK OF AMERICA f/k/a FLEET BANK,** | ) ) ) ) | |
| Trustee Process Defendant | ) | |

**I, Brian Lucy, do hereby depose under oath and state as follows:**

1.  I was employed at Lycos, Inc. in Waltham, Massachusetts from July, 1996 to October, 2004. Except as to those matters stated to be on information and belief, I have personal knowledge of the facts set forth herein.

**Background and Qualifications**

2.  I was licensed as a Certified Public Accountant by the Commonwealth of Massachusetts in or about 1995, after being awarded a Bachelor of Arts from Villanova in 1988 and a Bachelor of Science in accounting from Salem State in 1991.

3.  After graduating Salem State, I worked at KPMG in public accounting until going to work for Lycos in July, 1996. At KPMG, I assisted in the audit of public and private companies.

4.      At Lycos, I served as Accounting Manager from July, 1996 through the end of 1997. In this capacity, I was responsible for, among other things, accounts payable. People reporting to me received the lease bills from CSI and arranged for payment of those bills. Sometimes, Lycos made payments directly to CSI. On other occasions, Lycos was directed by CSI to make payments to five to ten financial institutions to which CSI had reportedly assigned the stream of payments.

5.      At the end of 1997, I became Assistant Controller at Lycos, a position I served in until the end of 1999, when I became the Controller. In these capacities, I became familiar with the records maintained by Lycos with respect to the equipment leased by CSI and the payments made by Lycos on account of the leases with CSI.

6.      I was appointed as Chief Financial Officer of Lycos in February, 2001. As CFO, I was the person who communicated with CSI concerning and was responsible for Lycos' decision to "roll-up" certain lease schedules in October, 2001. I continued to be aware of the records maintained by Lycos with respect to the equipment leased by CSI and the payments made by Lycos on account of the leases with CSI. I was also the person at Lycos responsible in July, 2003 for the purchase of the equipment Lycos had leased from CSI for $3.775 million.

**Lycos' Financial Records With Respect
to Equipment Leased from CSI**

7.      From time to time, Lycos would identify the equipment it wanted to lease, and CSI would purchase and pay for that equipment. Generally, CSI would also pay for the "soft" costs associated with the equipment. The "soft" costs included shipping, and sometimes

software, and maintenance and support. Thus, CSI paid the vendor more than just the hard cost of the equipment.

8. At some point, CSI would assign the equipment to a specific lease schedule. Once a lease schedule was prepared, Lycos would make monthly payments under that schedule. All told, Lycos and CSI entered into dozens of equipment schedules for the lease of technology equipment. The equipment schedules concerned thousands of pieces of equipment on which Lycos relied for its day-to-day operations.

9. As each new lease schedule began, it was important for Lycos to know the total original cost of the specific equipment being placed on that schedule since that calculation allowed Lycos to ensure that it was being charged the proper monthly rent under that particular lease schedule. Once that calculation was performed, however, Lycos did not envision or anticipate any other use for the original equipment cost figures. Accordingly, Lycos did not record the original equipment costs for the individual equipment nor did it keep track of the aggregate original cost of the thousands of pieces of equipment it leased from CSI. From an accounting perspective, because the leases were operating leases, and thus the equipment was not required to appear on Lycos' books and records, there was no reason for Lycos to keep track of the original cost of that equipment. Indeed, even if Lycos had aggregated those costs, the total would not have matched the "hard" cost of the equipment because, as noted above, the original equipment costs included both "hard" and "soft" costs.

10. Lycos did record and keep track of the monthly lease payments it made under the equipment leases. Some of the monthly payments were sent directly to CSI. At CSI's request, other payments were made to various financial institutions to which CSI had reportedly assigned the stream of lease payments. The identity of the payee varied depending

on the particular lease schedule, and would sometimes change even during the course of one individual schedule. For example, there were several occasions where Lycos made interim rent payments and perhaps the first several months of lease payments to CSI under a particular lease schedule, and then (at CSI's request) Lycos would redirect the subsequent monthly payments to one of several different financial institutions.

11.   While Lycos kept track of the number of payments it had made on each particular lease schedule to ensure that it made payments only through the expiration of any given lease term, Lycos did not maintain records that would have allowed it to readily calculate the cumulative total lease payments it had made on the numerous lease schedules with CSI. Moreover, there were at least three layers of complexity to determining the amount Lycos had paid in rent at any particular time. First, upon information and belief, some of the lease schedules had been "rolled" at least once before they were "rolled" when I was CFO. Second, payments were being made to several different institutions in addition to CSI (as noted above). So, calculating the total amount paid would have involved much more than simply adding up the total payments made to CSI. Finally, CSI would bill Lycos separately for the annual personal property tax on the equipment. These payments would need to be deducted from the total amounts Lycos had paid to CSI.

**Lycos' Relationship with CSI's Account**
**Representative, Paul Stenberg**

12.   Paul Stenberg was CSI's account representative with respect to Lycos. I communicated with him concerning payment of Lycos' bills, the "roll" of several of the lease schedules in October, 2001, and Lycos' purchase of the leased equipment in July, 2003. I never had any communications whatsoever with a Jeffrey Rousseau concerning Lycos' business

relationship with CSI until after Lycos purchased the leased equipment from CSI in July of 2003.

13.  As CFO, I came to trust and rely on Mr. Stenberg for his advice concerning Lycos' business relationship with CSI for at least three reasons.

    A.  First, my predecessors as CFO had worked with Mr. Stenberg for years and, as such, I believe, came to trust him.

    B.  Second, Mr. Stenberg led me to believe that he fully understood the leasing business; there was much of it that I did not understand. In fact, I am unaware of anyone at Lycos who fully understood the leasing business during my tenure at Lycos. I relied on Mr. Stenberg's expertise and integrity to advise Lycos of the full business and financial implications of "rolling up" the equipment lease schedules; I viewed him and CSI as a business partner. I believed that Mr. Stenberg assumed and accepted this trust and confidence.

    C.  Finally, we socialized on a number of occasions in the Boston area over several years. As a result, Mr. Stenberg gained my friendship as well as my trust.

14.  Based on the foregoing, I believed I had no reason to investigate the relationship between the total payments Lycos had made and the original cost of the equipment, or the impact of refinancing on the total lease payments Lycos was making.

15.  At some point in 2001, Mr. Stenberg presented me with a proposed refinancing transaction of certain equipment lease schedules, called "roll-ups." I understood that the "roll-ups" would reduce Lycos' monthly rental payment obligations and that there would be some modest increase in total cost. However, he did not tell me (and I did not know) what the impact of the "roll-ups" would be on Lycos' cumulative payment obligations, or the

relationship between the cumulative payment obligation and the total original cost of the equipment Lycos had leased through CSI.

16. In March of 2002, Lycos asked Mr. Stenberg to conduct an analysis of certain of Lycos' lease obligations to CSI. He responded by sending me an e-mail, a true copy of which is attached hereto as Exhibit A, in which he advised me that the total original equipment cost of all of the equipment that had been leased by Lycos at that time was "around $63 million." Because I trusted Mr. Stenberg, I had no reason to (and in fact did not) investigate the truthfulness of this assertion.

17. In fact, even if Lycos personnel (including myself) had wanted to investigate the truthfulness of this assertion, I do not believe that we would have had the necessary resources or expertise to calculate the original equipment cost, the total monthly payments, or the relationship between those two figures. In part, this is because of the sheer complexity of the "roll-up" mechanism, which I have since come to understand involved the movement of hundreds of pieces of equipment from one lease schedule to another, with the terminated equipment schedules sometimes having varying numbers of months remaining on their original lease terms and with certain schedules and certain equipment being "rolled up" several times. This complexity, when combined with Lycos' lack of record-keeping concerning the original cost of the leased equipment, the lack of leasing expertise of Lycos personnel, and the distinction between "hard" costs and "soft" costs would have made it practically impossible for Lycos to verify Mr. Stenberg's representation.

18. Had I known the extent to which the amount Lycos had paid under the equipment lease schedules exceeded the original cost of that equipment, I would not have caused Lycos to "roll-up" the lease schedules in October, 2001.

**Lycos' Purchase of Equipment**
**from CSI**

19.   In 2000, Lycos was sold to a Spanish company. At some point, the Spanish company asked Lycos to convert its operating leases to capital leases by "buying out" the remaining leases it had with CSI. Lycos received an initial "buyout" quote from CSI.

20.   Because neither I nor anyone else at Lycos had the information or the expertise to evaluate the reasonableness of this quote, Lycos retained LeaseForum, Inc. ("LeaseForum") to assist Lycos in evaluating the reasonableness of this quote and in negotiating a fair buyout price with CSI.

21.   Shortly after Lycos retained LeaseForum, I was advised by Susan Franklin of LeaseForum that Mr. Stenberg had not been responding to her telephone calls or e-mails. I contacted Mr. Stenberg to ask him to respond to Ms. Franklin's inquiries. Mr. Stenberg expressed displeasure at Lycos' decision to hire LeaseForum.

22.   Ultimately, based in part on the $63 million original equipment cost figure provided by Mr. Stenberg, and the trust and reliance I placed in him, in July of 2003 I agreed on behalf of Lycos to purchase the items then under lease with CSI for $3.775 million, and the parties signed a purchase agreement for this amount.

23.   Had I known the extent to which the amount Lycos had paid under the equipment lease schedules exceeded the total original cost of that equipment, not to mention just the hard cost of that equipment, I would not have agreed to have Lycos purchase the equipment for $3.775 million.

- 8 -

**Signed under the penalties of perjury, this 27th day of April, 2005.**

**/s/_Brian Lucy**
**Brian Lucy**

**1424120.4**

# EXHIBIT A

## BRIAN LUCY AFFIDAVIT



**Brian Lucy**
03/18/2002 10:06 AM

To: Paul Stenberg <Paul.Stenberg@csileasing.com>
cc:
Subject: Re: Analysis

Thanks a bunch for doing this.

Kevin is out this week, but when he gets back, we'll take a look.

Brian


Paul Stenberg <Paul.Stenberg@csileasing.com>



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>
03/18/2002 08:42 AM

To: "Kevin. Baillie@corp. terralycos. com (E-mail)"
<Kevin.Baillie@corp.terralycos.com>, Brian.Lucy@corp.terralycos.com
cc:
Subject: Analysis


I have come up with the following so far;

Monique's analysis does not include Schedules that Lycos was still obligated for, but because our Lenders wanted to decrease exposure, we lowered them (I explained this back in Sept.) Equipment Schedules 64,81,68,66 and 86 rents were decreased substantially from the October payment to the November. For example, #64 was due to expire 1/31/02 @ $26,888/mo. We decreased that to $5055/mo, but contractually Lycos stilled owed the $26,888/mo.

Schedule # 65 expired 10/1 but was included in the re-finance. This was not included in the Analysis.

Monique's total for the new lease obligation was wrong. She took the Total Monthly Payment x the Length of the deal. You must look at it at a Present Value base and not include the Interest. Its like taking your Mortgage payment x 30 years.


This is what I have so far so you can rest easy;

Present Value of Lease $23,727,000

Obligation of old Leases $20,215,000

Difference              $3,512,000

Now the Value of the current lease is around $29,000,000 . The total cost of the equipment was around $63mm. When we re-financed, we extended our the lease and re-couped about 5-7% thus the 3.5mm. Don't forget, on the Orginal leases, CSI injects between 10-13% residual so for every $1mm spent, Lycos obligation is $870k

I addition, a good portion of the equipment was taken from an over 30 month term and placed on a 24 month term. For example( hypothetical); a million dollar of PC's that had 33 months left was refinanced to 24 mo. So, in affect, that groups payments are going to be higher.

BUT, as I said all along, WHEN you return the equipment, I will give you Full FMV credit. So you won't be obligated for all the payments.

There are still areas that I am doing this week and I will get back to you.