UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **COMPUTER SALES INTERNATIONAL, INC.,** | ) ) ) | C.A. No. 05-10017-RWZ |
|     **Plaintiff and Defendant-in-Counterclaim,** | ) ) ) ) | |
| v. | ) ) | |
| **LYCOS, INC.,** | ) ) | **AFFIDAVIT OF SUSAN FRANKLIN** |
|     **Defendant and Plaintiff-in-Counterclaim,** | ) ) ) ) | |
| and | ) ) | |
| **BANK OF AMERICA f/k/a FLEET BANK,** | ) ) ) | |
|     **Trustee Process Defendant** | ) | |

I, Susan Franklin, do hereby depose under oath and state as follows:

1.      I am the Chief Executive Officer of LeaseForum, LLC f/k/a LeaseForum, Inc. ("LeaseForum").  LeaseForum is a small consulting firm that specializes in helping businesses that lease commercial equipment improve the management and control the cost of their equipment leases.  I have personal knowledge of the facts set forth herein.

**Background and Qualifications**

2.      I began working in the commercial equipment leasing industry in 1986 when I went to work for American Finance Group ("AFG"), where I was employed until 1998. During all or a portion of this period, AFG was the eleventh largest commercial leasing

company in the United States. It had over five hundred customers and over $3 billion in assets. These assets consisted primarily of equipment leases.

3.  My first assignment at AFG was working in lease administration. I was responsible for managing a portfolio of commercial equipment leases – i.e., for underwriting and servicing the leases. In this position, I was involved in purchasing equipment, placing that equipment on lease schedules and underwriting the non-recourse assignment of all or a portion of their rental streams to lenders who loaned money to AFG.

4.  In 1991 I was promoted to Vice President of Lease Administration tasked with developing a custom lease accounting and asset management system with IBM. Later in 1994, I became Vice President of Operations at AFG. In this capacity, I was responsible for AFG's underwriting of over $200 million annually in operating and direct finance leases, servicing of $1.8 billion of assets on lease to over 400 lessees, and managing compliance on its securitization facility and off-shore leasing fund. In 1997, I was promoted to Senior Vice President of Operations where I was charged with maximizing return on investment through various lease products. In 1991 I began serving on AFG's Officer's Committee and became a voting member of its Investment Committee.

5.  During my twelve years at AFG, I became familiar with the equipment leasing industry in general, and in particular with the mechanics by which lessors and lessees lease equipment. As AFG actively purchased leases in the market from other lessors, I became familiar with typical lease contracts and the information typically included by lessors in lease contracts.

6.  In 1998, I left AFG and began to work on behalf of lessees that leased equipment from companies like AFG. In this capacity, I became familiar with the extent to

which lessees lacked the expertise and necessary support systems to analyze and internalize both the cost of equipment leasing, as well as the methods by which AFG and its fellow commercial equipment leasing competitors did business.

7. I founded LeaseForum in 1999. LeaseForum provides lessees with a number of services related to the design and management of equipment leasing programs, including, at the direction of lessees, reviewing lessee requirements, evaluating lease options and lessor offers, and analyzing existing lease portfolios to assess the total cost to the company of leasing certain equipment. LeaseForum's analyses help companies determine whether it might be in their best interests to extend a lease term without a firm termination date, renew a lease for a fixed term, or purchase the equipment from the lessor at or before the end of the lease term. It also, at the request and direction of the company, negotiates, or assists companies in negotiating, restructured lease terms and prices for purchasing leased equipment and/or concluding lease obligations. In the approximately seven years since I founded LeaseForum, LeaseForum has worked with over forty lessees and in that capacity, worked with or evaluated the transactions of over one hundred commercial equipment lessors.

## Common Leasing Practices

8. In my experience, more than eighty percent of lessors state the original equipment cost ("OEC") on the equipment lease schedules they prepare for execution by the lessee and lessor. Further, these schedules are appended with an exhibit listing each item of equipment being leased which commonly includes a detailed description of the items of equipment, the purchase order and/or vendor invoice under which it was attained, its respective OEC and its location. Often, rent is listed on the exhibit at the line item level as well. As such, most lessees do not typically maintain in another medium a line item detail of

leased equipment or its OEC.  In fact, for a variety of reasons including the fact that equipment leased pursuant to operating leases is not required to be listed on the lessee's balance sheet, lessees typically do not maintain accounting records reflecting the original cost of the equipment leased.

9. Based on my knowledge and experience, lessors generally know that lessees have difficulty managing their lease portfolio.  Some lessees attempt to maintain in addition to the lease contracts themselves, certain information in an Excel© spreadsheet but in my experience, this is generally ineffective to meet the needs of managing a company's lease portfolio.  Portfolios grow, mature and diversify.  They are often comprised of multiple contracts, lease structures, locations, equipment types and end of lease options.  The portfolio undergoes constant change as new leases and equipment are introduced, active leases expire or renew, equipment is upgraded, purchased, returned, sold, disposed, lost or damaged beyond repair.  In my experience, an Excel© spreadsheet is not well suited for managing such diverse details in an environment of consistent change.  I am unaware of any system designed and dedicated to managing equipment leases having been in use at any of the lessee companies financed by AFG or serviced by LeaseForum.

10. In addition, although the lessee may know the OEC and the number and amount of contracted rents at the onset of a lease schedule, in my experience, since the lessee makes rent payments as instructed by the lessor to the lessor and/or its assignee, often makes payments to a lessor or assignee for multiple lease schedules on a single check, and makes other payments with respect to the lease schedule for property taxes and other sums due and owing under the lease, the aggregate payments made on a particular lease schedule or group of lease schedules is not easily ascertained from accounting records.

11.  Because of the foregoing, it would be atypical for a lessee to be readily able to determine the total amount of rent it had paid under a group of lease schedules relative to the original cost of the equipment leased. As mentioned above, this determination becomes exceedingly more difficult as the lease portfolio matures and would likely be exacerbated significantly when lease schedules are "rolled" one or more times.

**Engagement by Lycos and
Negotiation of a Purchase of the
<u>CSI Equipment Leases</u>**

12.  In 2003, LeaseForum was engaged by Lycos, Inc. ("Lycos") to assist it in evaluating, and at the request and direction of Lycos, assist the company in its negotiating of acceptable outcomes for the leases it had with five leasing companies, including Computer Sales International, Inc. ("CSI"). I was the person at LeaseForum responsible for LeaseForum's work for Lycos.

13.  Lycos advised me that it had decided to put its lease obligations on its balance sheet by converting them from operating leases to capital leases. Lycos intended to convert the leases by accelerating the purchase of the equipment and paying the remaining rents as they were originally due and payable, or concluding lease obligations by accelerating the remaining rents and purchasing the equipment. With respect to CSI specifically, Lycos advised me that to restructure the leases as $1 buyout leases, CSI had given it a price of $4.76 million for the purchase of the equipment, and that Lycos had no way to evaluate the reasonableness of this quote. Lycos asked me to review the lease documents pertaining to their active CSI equipment lease schedules, confirm the remaining rents payable and, at the direction of Lycos, and operating within their guidelines, negotiate a price for the accelerated purchase of the equipment.

14.     At the direction of Lycos, I reviewed Lycos' lease files with respect to CSI.  I reviewed, without limitation, the Master Lease Agreement, the active equipment lease schedules, those acceptance certificates present in the files, some purchase orders and invoices, and some internal spreadsheets Lycos had prepared and miscellaneous email correspondence.  Because, as noted above, commercial equipment lessees generally do not maintain accounting records of the original cost of the equipment, I was not surprised when I ascertained that Lycos did not have any documents or reports that would enable me to readily determine the total original cost of the equipment leased from CSI.  Additionally, the active lease schedules I reviewed were predominantly "rolls" of earlier schedules and did not list any cost whatsoever for the underlying equipment.

15.     At the direction of Lycos, my subsequent review of the approximately 80 lease schedules for equipment acquired by lease executed by Lycos and CSI showed that only a handful of the original lease schedules reached their contracted maturity.  I discovered that most of lease schedules had been terminated prior to their scheduled maturity dates and combined and "rolled" onto one or more new lease schedules under modified terms, and designated with unrelated lease schedule numbers.  In fact, I discovered some of the "rolled" schedules or certain equipment on the "rolled" schedules had been "rolled" several times.

16.     I noted that unlike the lease schedules prepared in my experience by over eighty percent of equipment lessors, all or substantially all of CSI's lease schedules did not list the OEC by item of equipment and as mentioned previously, the "rolled" schedules did not list it at all.

17. In my review, I was also not surprised to discover that Lycos did not have documentation or records that would enable me to readily determine the amount of rent Lycos had paid on account of the CSI equipment leases, given that, as noted above, the accounts payable journals of most lessees do not reflect the aggregate payments made on a particular lease schedule or group of lease schedules.

18. I noted that each of the five leasing companies from which Lycos leased equipment with the exeception of CSI listed the OEC on the all of the lease schedules they prepared. As a result, I was able to readily assist Lycos in negotiating acceptable outcomes for those specific equipment leases.

19. At the direction of Lycos, and operating within their guidelines, I negotiated the purchase price with CSI's representative, Mr. Stenberg. At the time of those negotiations, I was unaware and Lycos could not provide me information with respect to the actual total equipment cost of all of the equipment leased from CSI by Lycos and the total rent payments made or to be made under all the Schedules executed by Lycos and CSI.

20. During the process of negotiating the purchase of the leased equipment at Lycos' direction, the only representative of CSI with whom I communicated was Mr. Stenberg. To conclude the paperwork, I forwarded contracts acceptable to Lycos' counsel to Joan Kersting in Missouri. I did not communicate at any time with a Jeffrey Rousseau.

**Determining the Relationship
Between the OEC of Two
Pieces of Equipment and the
<u>Total Rent Paid for that Equipment</u>**

21. At the request of Lycos, I was asked to perform an analysis to ascertain how easy or difficult it would be to determine the relationship between the original equipment cost

for certain pieces of equipment and the amount paid for that equipment.  In April, 2005, I reviewed certain of Lycos' books and records and performed this analysis on two (2) Digital Servers:  Prioris 1200 MP Base Systems ("Specified Equipment").  Based on invoices, I determined that the OEC for the Specified Equipment was $39,458.

22.    The Specified Equipment was originally leased for eighteen months, but ultimately remained on lease for eighty-four months under four separate lease schedules.  Three of these schedules were terminated prior to their originally established lease terms, and the Specified Equipment was placed on new schedules under new terms – in other words, the Specified Equipment was "rolled" three times.  Even though I have fifteen years of experience in equipment leasing and knew what to do, the complexity presented by the three "rolls" resulted in my taking two hours to establish the relationship between the OEC of the Specified Equipment (just two of the thousands of items of equipment leased by Lycos) and the total amount Lycos had paid for that equipment.  As set forth below, my analysis shows that Lycos made rent payments for the Specified Equipment totaling nearly twice the OEC of the Specified Equipment.

23.    On November 12, 1997, Lycos and CSI entered into Schedule 11, a schedule with an original term of 18 months.  The lease basis for the Schedule was $114,867, comprised of a sale-leaseback on $56,639 of equipment plus $58,228 of equipment ordered under a single purchase order (No. 425) issued by Lycos to the vendor and a single invoice issued by the vendor to CSI.  The total rent payable for the eighteen month term of Schedule 11 was $113,670, of which the total rent for the Specified Equipment was scheduled to be $34,236.  Schedule 11 was assigned to Pullman Bank and Trust and at the direction of CSI a portion of the lease payments were remitted directly to Pullman Bank and Trust.

24. After approximately fourteen months had elapsed under Schedule 11, Lycos and CSI entered into Schedule 38 with an original term of twenty-four months. The Schedule was comprised entirely of equipment that had been leased under four earlier schedules, including Schedule 11. Those schedules were terminated early and the equipment was then leased under Schedule 38.

25. The total equipment leased under Schedule 38 consisted of 315 items, two of which were the Specified Equipment. Schedule 38 provided for twenty-four equal monthly rent payments of $34,656. Of this amount, the monthly rental payment for the Specified Equipment was $1,444 per month. Thus, the total rent for the Specified Equipment under Schedule 38, if it had run its course, would have been $34,656.

26. Thus, upon execution of Schedule 38, the cumulative rents paid and owing for the Specified Equipment after adjustment for rents eliminated upon the termination of Schedule 11 totaled $64,284. The Lycos files reviewed did not contain any information regarding the assignment of Schedule 38 to a lender, so I am therefore not aware whether all rent paid under Schedule 38 was remitted to CSI.

27. In September of 1999, after approximately nine months had lapsed under Schedule 38, Lycos and CSI entered into yet another lease schedule, Schedule 68 with an original term of thirty-six months. That Schedule was comprised entirely of equipment that had been leased under ten earlier schedules (which themselves were comprised of equipment leased under at least ten earlier schedules), including Schedule 38. All those schedules were terminated early and the equipment was then leased under Schedule 68. The total equipment leased under Schedule 68 consisted of 1,174 items, two of which were the Specified Equipment. Schedule 68 provides for thirty-six equal monthly rent payments of $134,873. Of

this amount, the monthly rental payment for the Specified Equipment was $1,060 under Schedule 68. Thus, if Schedule 68 had run its course, Lycos would have paid a total of $38,157 in rent for the Specified Equipment and the cumulative rents paid and owing for the Specified Equipment after adjustment for rents eliminated upon the termination of Schedule 38 totaled $77,781. Schedule 68 was assigned to GE Capital, and at the direction of CSI, a portion of the lease payments were remitted directly to GE Capital.

28. In October of 2001, after approximately twenty-five months had lapsed under Schedule 68, Lycos and CSI entered into yet another schedule, Schedule 94, with an original term of thirty-six months. That Schedule was comprised of equipment that had been leased under thirty-one earlier schedules (which themselves were comprised of equipment leased under numerous earlier schedules), including Schedule 68. Upon termination of the previous schedules, all the equipment leased under those schedules became subject to lease under Schedule 94. The total equipment leased under Schedule 94 consisted of 3,774 items, two of which were the Specified Equipment. For the Specified Equipment, Schedule 94 started with eleven rent-free months followed by twenty-five equal monthly rent payments of $424. Thus, total rent for the Specified Equipment over the term of that Schedule was anticipated to be $10,600.

29. As stated above, the OEC of the Specified Equipment was $39,458. Assuming that Lycos made all of the payments required under Schedule 94 for the Specified Equipment, the total rent it paid for the Specified Equipment under Schedules 11, 38, 68 and 94 – after deducting the amounts not payable due to early termination – was $76,722, for equipment that had an OEC of $39,458. Thus, the payments for the Specified Equipment, after having been rolled over multiple times with thousands of pieces of equipment from more than fifty separate

schedules, increased the total original rent payable under the initial Schedule 11 entered into for the leasing of the Specified Equipment by $42,396 and resulted in rents totaling 194% of the OEC. This is reflected in the following table:

Table:  Cumulative Rent for the Lease of the Specified Equipment

| Schedule/Event | Rent | Cumulative Rent | Percentage of OEC |
|---|---|---|---|
| 11 | 34,326 | 34,326 | 87% |
| Early Term 11 | < 7,608> | 29,928 | 75% |
| 38 | 34,656 | 64,284 | 163% |
| Early Term 38 | < 21,660> | 39,624 | 100% |
| 68 | 38,157 | 77,781 | 197% |
| Early Term 68 | < 11,659> | 66,122 | 168% |
| 94 | 10,600 | 76,722 | 194% |

30.     Based on my review and experience, there was no ready way to ascertain from Lycos' records the total rent paid by Lycos for the Specified Equipment, or for all of the items originally leased under Schedule 11 (or under any schedule for that matter), because (a) the rents paid under a given schedule are in most instances not paid entirely to CSI but are paid to multiple parties under assignment from CSI, (b) the rents paid or to be paid are difficult to track and follow because of the number of earlier schedules that are combined when "rolled" onto new lease schedules, (c) the terms of the earlier schedules that had been combined onto the "rolled" schedules vary from schedule to schedule, (d) the fact that the "rolled" schedules were given consecutive numbers and did not carry any reference to the earlier schedule under which the equipment had previously been leased (for example, "Schedule 11" rolled to "Schedule 38" combined with other schedules, rather than "Schedule 11" rolling individually to "Schedule 11R" and the other schedules "rolling" individually to schedules carrying their original nomenclature) and (e) in addition to payments of rent, Lycos remitted amounts to CSI for taxes, expense reimbursements and freight charges.

**Signed under the pains and penalties of perjury, this 29th day of April, 2005.**

_____//s//_____
**Susan Franklin**

1425739.2