UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| LYCOS, INC., | ) | C.A. No. 05-10017- RWZ |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant. | ) | |
| | ) | |

**PLAINTIFF COMPUTER SALES INTERNATIONAL, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR**
**RECONSIDERATION OF ORDER OF DECEMBER 6, 2005**

Plaintiff Computer Sales International, Inc. ("CSI") has respectfully moved for reconsideration of this Court's Memorandum of Decision dated December 6, 2005 (the "Decision") on grounds that the Decision is predicated on **(1)** a significant mistake as to an admitted fact pertaining to Count I of Lycos' counterclaim, which alleges that Lycos was fraudulently induced to enter into certain "roll-ups" of its equipment leases; **(2)** a significant error in the conflict of laws analysis as to Count II of Lycos' counterclaim, which alleges that Lycos was fraudulently induced to enter into a subsequent Sales Agreement; and **(3)** a mistake as to the residency of the plaintiff CSI, the locus of the acts in question, and the applicability of Massachusetts law to Lycos' other claims.

This memorandum of law, and the attached transcript of the May 12, 2005 hearing in this case, is submitted in support of that motion.

-2-

## ARGUMENT

**I.    THE DECISION AS TO LYCOS' COUNT I IS MISTAKEN BECAUSE ALL THE ROLL-UP CONTRACTS HAD ALREADY BEEN EXECUTED WHEN THE ALLEGEDLY FALSE E-MAIL WAS RECEIVED, AND LYCOS ADMITTEDLY DID NOT RELY ON THE E-MAIL IN ENTERING INTO THE ROLL-UPS.**

Although it was reasonably clear at oral argument, the Decision mistakenly asserts that:

> …Lycos alleges that CSI's representative Paul Stemberg, in a March 2002 email response to an inquiry from Lycos, affirmatively misrepresented the original cost of the equipment, ***thereby misleading Lycos as it decided whether to enter into the rolled-up schedules*** and, eventually, the Sales Agreement.

Decision at 7.  In fact, Lycos is not claiming that it relied on the March 2002 email in entering into the rolled-up schedules, and it admitted at oral argument that <u>all</u> the rolled-up schedules preceded the March 2002 email:

> MR. BEAN:    ... Mr. Kaler has said to you today that the original equipment cost was around $50 million.  In writing and [*sic*] e-mail says $63 million, off by $13 million.
>
> THE COURT:      He agrees that he was off?
>
> MR. BEAN:       I'm sorry?
>
> THE COURT:      He agrees he was off?
>
> MR. BEAN:       Yes, he – well, his –
>
> THE COURT:      But he says that the timing of the off statement about the original equipment cost was such that you couldn't have relied on it because the conduct that you – your conduct preceded it.
>
> MR. BEAN:       ***The roll-up conduct did precede it.***  The purchase conduct was after it, okay?  ***So we're not saying we relied on it for the roll-ups; he's right***.

*See* Exhibit 1 hereto (Transcript of May 12, 2005 Hearing) at pp. 36-37 (emphasis added).  Thus, Lycos admittedly can make no argument that it relied on the March 2002 email in entering the roll-ups, all of which preceded that email.

-3-

In this regard, Lycos' pleadings do not allege that it relied on the March 2002 email in entering into the roll-ups.  Rather, Lycos' Amended Complaint alleges only that the email was intended "to induce it [Lycos] *to continue to make payments* under the roll-ups," *see* Amended Answer and Counterclaim at ¶41 (emphasis added), because it is undisputed the roll-ups had already been executed when the email was sent.  Thus, it is not correct, as the Decision states at page 11, that "CSI argues that Lycos could not have relied on Stenberg's March 2002 email because it had entered into *some* of the rolled up schedules prior to that date." (emphasis added).  Rather CSI is pointing out, as Lycos admitted above at oral argument, that ***all*** of the rolled up schedules had already been executed at the time of that email.

Because the March 2002 email is the only false statement that Lycos has alleged, the fact that it was not relied on by Lycos in entering into the roll ups (because it did not exist then) leaves Lycos, as to its Count I fraudulent inducement claim concerning the roll-ups, with only the argument that "the half truth is, 'your monthly payments are going down,' without telling us the consequence, the magnitude of the consequence," *see* Exhibit 1 hereto (May 12, 2005 Hearing Transcript) at p. 36, in terms of the roll-ups requiring Lycos to pay more than the original equipment cost to extend these equipment leases.  Lycos has already admitted, however, that it ***knew*** its costs would go up as a result of the rollups.  *Id.* at p. 36 ("MR. BEAN:  Did we know that the costs would go up modestly?  Yes.  Any business person knows that").

Thus, in Count I, Lycos is proffering a claim that would hold CSI liable in a commercial setting for speaking truthfully, yet failing to explain something so elementary that "any business person knows" it already.  This is not fair, and it is not consistent with the law of either Massachusetts or Missouri.  At page 7 of the Decision, for example, *V.S.H Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 414 (1st Cir. 1985) is cited for the proposition that a party who discloses

-4-

partial information that may be misleading has a duty to reveal all material facts known to avoid deceiving the other party. Ostensibly, this refers to the March 2002 Stemberg mail, but that message, as has now been demonstrated, was not sent until *after* the rollups had all been executed. The only statement that Lycos can therefore point to as a "half-truth" is the very truthful statement by CSI that the roll ups would reduce Lycos's monthly rental payments while extending its lease of the equipment. As a matter of law and common sense, this statement of truth is not partial, and cannot be viewed as misleading, where its recipient *knows* that the flip side of a deal is that its overall costs will go up.

The "magnitude of the consequences" of the roll-ups was for Lycos' business and legal officials to determine – not for CSI to explain – and they did so by entering into the relevant contracts. *See Collins v. Huculak*, 57 Mass. App. Ct. 387, 394-95, 783 N.E.2d 834 (2003)(affirming dismissal of fraudulent misrepresentation claim); *Pizzeria Uno of Kingston, Inc. v. Independence Mall Group, Inc.*, 11 Mass. L. Rep. 241, 1995 Mass. Super. LEXIS 866 (Mass. Super. July 13, 1995) at *16 ("the allegedly fraudulent statements relied upon by the complaining parties are not actionable…[t]he plaintiffs in this case are sophisticated business people who were represented by counsel when presented with the Leases for execution.").[1]

No other conclusion makes common sense, particularly in a business setting where the parties were (and were represented by) sophisticated businessmen, active and experienced in the area, dealing at arm's length without any fiduciary or confidential relationships or expectations.

---

[1] *See also Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 468, 781 N.E 2d 787 (2003) (finding unreasonable as a matter of law reliance on representations at odds with terms of written agreement; alleged misrepresentation contradicted by what party knew or obviously could have determined with available information); *Celtic Development Corp. v. FDIC*, 836 F.Supp. 926, 939 (D. Mass. 1993)("Plaintiffs [claim]…that they did not know about the three year due date or that the loan was past due…[but t]his court finds such reliance unreasonable as a matter of law.")(emphasis added).

*See Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 678-679, 42 N.E.2d 808 (1942); *Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass.App.Ct. 73, 77, 628 N.E.2d 1291 (1994); *Wolf v. Prudential-Bache Secs. Inc.*, 41 Mass.App.Ct. 474, 476-78, 672 N.E.2d 10 (1996). *See also Davidson v. General Motors Corp.*, 57 Mass.App.Ct. 637, 643, 786 N.E.2d 845 (2003) ("A business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other party"); *Central Mass. Television, Inc. v. Amplicon, Inc.*, 930 F.Supp. 16, 25 (D.Mass.1996) ("[t]he mere existence of a prior contractual relationship does not, by itself, create a confidential relationship or impose a duty of disclosure").

In this regard, the Decision states that "[a]ccording to Lycos, CSI subsequently consolidated, or rolled up, some of the equipment schedules," as if to suggest that CSI is alleged to have done so unilaterally. *See* Decision at 2. In reality, Lycos own pleadings admit that it voluntarily entered into those roll-ups, each constituting a separate and independent contract. *See* Amended Answer and Counterclaim at ¶¶ 16, 21, 26, 28 ("Lycos entered into Equipment Schedule 67H …"). There is no claim, for example, that CSI forced Lycos to enter into these roll-ups. They were mutually negotiated contracts, and the rationale for Lycos was that it could continue to use large quantities of computer equipment that would otherwise have to be returned to CSI, at a reduced monthly rental rate, despite the increase in overall cost, of which Lycos was admittedly aware. *Id.* at p. 36 ("MR. BEAN: Did we know that the costs would go up modestly? Yes. Any business person knows that").

It is hornbook law that a party is presumed to have read and understood the contents of what he or she, or it, is signing. *Leasecomm Corp. v. Rivera*, 1994 Mass.App.Div. 115, 117 (1994). If the law permitted sophisticated businesses to claim, after they entered into a contract, that they should be allowed to void their own transactions solely on grounds that particular

negative aspects of those transactions were not fully appreciated by them at the time they signed their contracts, and should have been disclosed to them by the other contracting parties -- who spoke only of the positive aspects of the deals -- the result would hopelessly confound almost every company's ability to ever make a deal favorable to itself on anything.  The law does not permit this, nor should this Court.

## II.    THE CHOICE OF LAW CLAUSE IN THE SALES AGREEMENT SPECIFIED THAT MISSOURI LAW WOULD GOVERN "ALL MATTERS" RELATING TO THE "VALIDITY" OF THAT CONTRACT, WHICH MEANS MISSOURI LAW GOVERNS FRAUDULENT INDUCEMENT CLAIMS AS TO THAT CONTRACT.

In applying Massachusetts law to Lycos' Count II claim for fraudulent inducement as to the Sales Agreement (which did post-date the March 2002 email), the Decision mistakenly disregards the dispositive language in that choice of law clause specifying that "all matters of construction, *validity*, performance and enforcement" (emphasis added) are governed by "the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law." *See* Amended Answer and Counterclaim at Exh. I, p. 3, ¶ 9(C).

None of the Massachusetts cases cited in the Decision dealt with this kind of "validity"-related choice of law provision,[2] but courts outside Massachusetts have uniformly held that

---

[2]    None of the cases cited in the Decision contained choice of law clauses stating that the foreign law would cover matters pertaining to the "validity" of the relevant contract.  In *Kitner v. CTW Transport, Inc.*, 762 N.E.2d 867 (Mass. App. Ct. 2002)(cited on page 4 of the Order), for example, the choice of law provision stated only that North Dakota law would "govern the identity, construction, enforcement, and interpretation" of the contract.  762 N.E.2d at 871.  In *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, 611 (1st Cir. 1993)(cited on page 5 of the Order), the choice of law provision stated that the agreement "is to be construed under and governed by the laws of the State of California," which the Court held related only to interpretation and enforcement of the contract. *Id.*  In *Jacobson v. Mailboxes Etc. USA, Inc.*, 419 Mass. 572 (1995)(also cited on page 5 of the Order), the choice of law clause stated only that the agreement in issue was "to be construed under and governed by the laws of the State of California." *Id.*  It did not address the law to be applied to matters pertaining to the "validity" of that contract – as the clause in the Sales Agreement does.

where a choice of law clause specifies the law applicable to the *validity* of a contract, that law governs fraudulent inducement claims, since by their very nature they raise a question as to the validity of the contract in issue. *See, e.g., Woodling v. The Garrett Corp.*, 813 F.2d 543, 551-52 (2nd Cir. 1987) (release providing that "*validity*, effect and enforceability…shall be governed, construed and interpreted" in accordance with law of Connecticut included claims that plaintiff "had been induced to sign [the release] as a result of material misrepresentations").[3]

Thus, it is not correct, as the Decision states at page 5, that claims raising allegations of fraud or misrepresentation "do not" fall within the purview of choice-of-law provisions governing contracts. In fact, they do fall within the purview of that clause, where (as here) the clause so provides. *See* Restatement Second of Conflict of Laws, Section 201, Comment c: ("[t]he fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice of law provision will be denied effect."). Moreover, important issues of public policy militate in favor of the enforcement of such clauses, as the Restatement points out:

> Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may be best obtained by *letting the parties choose the law to govern the validity of the contract* and the results created thereby. In this way, certainty and predictability of result are most likely to be secured.

---

[3]     *See also Corestates Bank, N.A. v. Signet Bank*, C.A. No. 96-3199, 1996 U.S. Dist. LEXIS 12673 (E.D. Pa. Aug. 27, 1996) at *12 & n.3 (choice of law clause providing that rights and obligations of the parties "including all matters of construction, *validity* and performance" would be decided under Virginia law was enforced for claims of fraud in the inducement, which was a tort claim "directly assail[ing] the validity of the contract"); *Mashreqbank v. Heller Financial, Inc.*, C.A. No. 99-4748, 2001 U.S. Dist. LEXIS 28 (S.D.N.Y. Jan. 3, 2001) at * 6-7 & n.2 ("issues of validity or voidability of a release have been considered matters of substance as to which the parties' choice of law is honored.").

-8-

*Id.* at Section 187, Comment e (emphasis added). *See also, id.* at Section 201 ("The effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application the rules of §§ 187-188.").

In this regard, *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, 611 (1st Cir. 1993), on which the Decision relies on this point, does **not** stand for the proposition that choice of law provisions cannot apply to fraud in the inducement claims, as a federal district court in Illinois recently pointed out:

> [Plaintiff] cites *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, 611 (1st Cir. 1993), for the general proposition that choice-of-law provisions do not apply when contract formation is at issue. **That case does not stand for that proposition**. Instead, Northeast Data held that the particular language of the choice-of-law provision involved *in that case* did not provide that it was applicable to formation issues.

*Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 300 F. Supp. 2d 606, 615 n.10 (N.D. Ill. 2003) (emphasis added).

In fact, as a matter of law, choice of law clauses specifying the law to govern the "validity" of a contract do encompass fraud in the inducement claims concerning that contract, *see* Footnote 3, *supra*, and accompanying text, and it is settled law that such clauses are not to be disregarded unless it is alleged that the specific choice of law clause **itself** was procured by fraud:

> [a] claim of fraudulent inducement of a contract is insufficient to invalidate a forum selection or choice of law clause found in that contract. Rather, **it is the inclusion of those specific clauses** plaintiffs seek to avoid that must have been induced by fraud. *See Scheck v. Alberto-Culver Co.*, 417 U.S. 506, 519, n.1, … (1974)(involving arbitration clause); *Prima Paint v. Flodd & Conklin Mfg. Co.,* 388 U.S. 395, 402-404 … (1967)(same); *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10 (2d Cir. 1995)(forum selection clause specifying Greece) … Therefore, to overcome the presumed validity of the FS [forum selection] and COL [choice of law] clauses, plaintiff must plead specific acts or statements by which defendants induced their consent **to these clauses**.

*Stamm v. Barclay's Bank of New York,* 960 F.Supp. 724, 729 (S.D.N.Y. 1997). *See also*

*Jacobson*, 419 Mass. at 579 (1995)("A plaintiff should not be allowed to vitiate the effect of a

forum selection clause simply by alleging peripheral claims that fall outside its apparent scope").

No such allegation has been made here.

In sum, the choice of law clause in the Sales Agreement, in which the parties agreed that

the law of Missouri would govern all matters pertaining to the "validity" of the Sales Agreement,

does encompass to Lycos' Count II fraud in the inducement claim, and in all fairness that choice

of law selection should be honored, as there is no claim of fraud in the procurement of this

specific provision.

**III.  THE PARTIES ARE *NOT* BOTH RESIDENTS OF MASSACHUSETTS, THE
      CONDUCT AT ISSUE DID *NOT* OCCUR SOLELY IN MASSACHUSETTS, AND
      APPLICATION OF THE RELEVANT CONFLICT OF LAWS PRINCIPLES
      FAVORS THE APPLICATION OF MISSOURI LAW, NOT MASSACHUSETTS
      LAW.**

After concluding (mistakenly as to the Sales Agreement) that no choice of law provisions

apply in this case, the Decision states that "[b]ecause both parties reside in Massachusetts," and

because "the conduct at issue occurred in Massachusetts," the law of Massachusetts should

supercede Missouri law wherever the two conflict.  *See* Decision at p. 6.  These conclusions are

not correct, not fair, and not consistent with the parties' legitimate expectations – formed through

years of contracting with each other.

First, both parties do ***not*** reside in Massachusetts.  CSI resides in Missouri, where it has

its headquarters (it is a Delaware corporation).  Second, the conduct in issue did ***not*** all occur in

Massachusetts – to the contrary, the equipment lease and lease roll-up contracts that Lycos

alleges failed to disclose "the magnitude" of its additional costs were prepared ***in Missouri***,

where the courts have held that the relationship between a creditor and a corporation is that of

-10-

contract, not one of trust, and where the disclosure requirements that Lycos seeks to retroactively impose on CSI do not exist. *See Drummond Co. v. St. Louis Coke & Foundry Supply*, 2005 WL 2648443 (Mo.App. E.D. 2005); *Premier Bank v. Tierney*, 114 F.Supp.2d 877, 886-87 (W.D.Mo.2000) (applying Missouri law).

Third, Lycos chose not to negotiate for the application of Massachusetts law to any aspect of its relationship with CSI. Instead, it repeatedly agreed to the application of Missouri law, even though it had many opportunities, through the various equipment schedules as well as the ultimate Sales Agreement, to negotiate for the law of Massachusetts to apply. As a result, since it first contracted with CSI in the 1996 Master Lease until its most recent Sales Agreement with CSI in 2003, there has never been a doubt between the parties that their relationship was governed by Missouri law.

Under all of these circumstances, it is extremely unfair, and creates a fundamental due process problem, for Lycos to be allowed to now go back and seek a retroactive judicial determination that the vague "consumer disclosure" precepts of 940 C.M.R. 3.16(2) should apply to a series of sophisticated equipment lease transactions – particularly where Missouri law has no such requirements, and Lycos agreed that Missouri law would govern its leases.

As the Court recognizes at page 4, n. 1, resolution of the conflict of laws issue "may be dispositive" as Lycos' 93A claim because "Missouri's unfair and deceptive practices law is limited to consumer transactions." *See* Decision at 4. It may be dispositive as to other claims as well since, as the Decision notes, Lycos's claims of money had and received and unjust enrichment (counts VI and VII), as well as its declaratory judgment claims (counts VIII and IX), are dependent on the fraudulent inducement claims it has brought challenging the validity of the lease roll-ups and the Sales Agreement. *See* Decision at 14-16. In addition, Missouri adheres to

a strong version of the economic loss rule that would preclude Lycos' negligent misrepresentation claims. *See Collegiate Enterprises, Inc. v. Otis Elevator, Co.*, 650 F. Supp. 116, 118 (E.D. Mo. 1986).

For all of these reasons, the choice of law analysis set forth in the decision should be reconsidered. The fraud in the inducement claim as to the Sales Agreement is a matter questioning the validity of that contract, and is clearly governed by Missouri law. As to Lycos' other claims, under the "functional" approach to choice of law issues employed by Massachusetts, the following factors are supposed to be considered:

(a) the needs of the interstate system;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states;

(d) the protection of justified expectations;

(e) the basic policies underlying the law;

(f) predictability and uniformity of result; and

(g) the ease in the application of the law to be applied.

*Stathis v. National Car Rental Sys., Inc.,* 109 F. Supp. 2d 55, 57 (D. Mass. 2000). *See also Reicher v. Affiliated Podiatrists, P.A.*, 360 F.3d 1, 6 (1st Cir. 2004) (applying Maryland law using Massachusetts choice of law factors).

Both Missouri and Massachusetts have a relationship to and an interest in this case. Both states have an interest in providing resolution under their law to the parties. Both have an interest in seeing that laws protecting against breaches of agreements as well as claims for fraud are resolved. Significantly, however, both also have an interest in making sure that the parties legitimate expectations are met and enforced – leading to uniformity of result in parties' contract negotiations. This is why the parties own repeated choice of Missouri law should govern all the

-12-

issues here.  Additionally, payments under the agreements were made to CSI in Missouri.  *See*
*Reicher*, 360 F.3d at 6 (noting insurance premiums were paid in Maryland, not Massachusetts).

Lycos had many opportunities – through the various equipment schedules as well as the
ultimate Sales Agreement – to negotiate for Massachusetts or another state's law to apply.  It
chose instead to repeatedly agree on Missouri law, and to enter into contracts with Missouri
corporation specifying that law.  Now it seeks to set those contracts aside by convincing this
Court to use Massachusetts law.  Applying the relevant choice of law factors, there is no good
reason for it to be allowed to do so.

## CONCLUSION

For all of these reasons, plaintiff CSI respectfully requests that the Decision of December
6, 2005, and the question of whether the remaining counts of Lycos' complaint should be
dismissed, be reconsidered, and that those counts be dismissed.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.
By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, Esq., BBO No. 542040
rkaler@ghlaw.com
Eric Neyman, Esq., BBO No. 564803
eneyman@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

Dated:  December 21, 2005

### Certificate of Service

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be
serve on counsel for the other parties in this action by hand this 21st day of December 2005.

/s/Robert J. Kaler
Robert J. Kaler



UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES INTERNATIONAL, INC.,    )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )  Civil Action
                                       )  No. 05-10017-RWZ
                                       )
LYCOS, INC.,                           )
                                       )
            Defendant.                 )
                                        )
and                                     )
                                       )
BANK OF AMERICA f/k/a FLEET BANK,      )
                                       )
            Trustee Process Defendant. )


**SUMMARY JUDGMENT MOTION HEARING**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
May 12, 2005
2:31 p.m.


\* \* \* \* \*


CATHERINE A. HANDEL, CM
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

1  APPEARANCES:

2  For the Plaintiff:

3  Gadsby Hannah LLP
   (By Robert J. Kaler, Esq., and
4  Eric Neyman, Esq.)
   225 Franklin Street
5  Boston, MA 02110

6

7  For the Defendant:

8  McDermott Will & Emery LLP
   (by Thomas O. Bean, Esq.)
9  28 State Street
   Boston, MA 02109-1775

10

11

12  ALSO PRESENT:

13  Jeffrey Rousseau, Esq.
    Associate General Counsel for
14  Computer Sales International, Inc.

15  Mark Blais, Esq.
    Associate General Counsel
16  for Lycos, Inc.

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2               (The following proceedings were held in open court
 3    before the Honorable Rya W. Zobel, United States District
 4    Judge, United States District Court, District of Massachusetts,
 5    at the John J. Moakley United States Courthouse, 1 Courthouse
 6    Way, Boston, Massachusetts, on May 12, 2005.)
 7               THE COURT:  Who is here for plaintiff?
 8               MR. KALER:  Eric Neyman and Robert Kaler, from
 9    Gadsby Hannah, for the plaintiff, Computer Sales International,
10    and with the Court's permission, this is Mr. Jeffrey Rousseau,
11    who is the associate --
12               THE COURT:  I'm sorry?
13               MR. KALER:  This is Mr. Jeffrey Rousseau.  He's the
14    associate general counsel.
15               THE COURT:  The affiant?
16               MR. KALER:  That is correct.
17               THE COURT:  He doesn't speak of his own personal
18    knowledge?
19               MR. KALER:  As it happens, he is the affiant.  He's
20    also the associate general counsel up from St. Louis.  He has
21    not entered an appearance in the case, your Honor.  I just ask
22    the privilege of him sitting at counsel table.
23               THE COURT:  You don't object, do you?
24               MR. BEAN:  No, your Honor.
25               THE COURT:  And for Lycos?
```

1        MR. BEAN:  Yes, your Honor.  My name is Thomas

2   Bean, with McDermott, Will & Emery.  With me is an associate

3   general counsel from Lycos, Mr. Mark Blais.  If he may also --

4   he also does not have an appearance in the case.

5        THE COURT:  B-l-a-i-s-e?

6        MR. BEAN:  No "e" at the end, your Honor.

7        MR. BLAIS:  B-l-a-i-s, your Honor.

8        THE COURT:  Now, I have a pile of motions.  I thank

9   you for the roadmap.  It was necessary, after all.  Have you

10  seen the roadmap?

11       MR. KALER:  Yes, your Honor.

12       THE COURT:  Do you agree with it?

13       MR. KALER:  No, your Honor.  I don't think that --

14       THE COURT:  Of course not.

15       MR. KALER:  -- as formalistic an approach to

16  resolution of the motions is warranted because there are so

17  many facts that are genuinely undisputed.  Some of the motions

18  are procedural and, specifically, the questions about

19  Mr. Rousseau's affidavit and the verified complaint, much of

20  what is set forth there is undisputed under the local rules.

21       THE COURT:  What we're really here for are the

22  motions for summary judgment.  It's no longer a motion to

23  dismiss, right?  I mean, we're really talking about summary

24  judgment motions with respect to the counterclaims or the

25  amended complaint and to the -- no.  With respect to the

1    complaint and to the amended counterclaim.

2              MR. KALER:  Yes, I think that's a fair

3    characterization.

4              THE COURT:  And the others fall beneath that.

5    There was one motion to file an excessive brief, which I

6    allowed since, in fact, we're talking about so many motions.

7    So, that's done.  That's No. 27, Lisa.

8              I think there are largely -- well, we started with

9    CSI's motions, so I'll hear CSI first.

10             MR. KALER:  Thank you, your Honor.  According to

11   published statistics, approximately 30 percent --

12             THE COURT:  Although, wait one second.  Let me just

13   ask Mr. Bean.

14             MR. BEAN:  Yes, your Honor.

15             THE COURT:  Is it not the case that the essential

16   claim here is, as CSI, I think, says in some of its papers,

17   that they charged too much?

18             MR. BEAN:  The charges were well in excess of what

19   was fair and reasonable under the circumstances, that's

20   correct, your Honor.

21             THE COURT:  But there was nothing underhanded about

22   that?

23             MR. BEAN:  Yes, there was, your Honor.

24             THE COURT:  How?

25             MR. BEAN:  They should have disclosed to Lycos the

1     original cost of the equipment and they --

2            THE COURT: But Lycos bought it.

3            MR. BEAN: Lycos bought this machine. This

4     equipment rolled over so many times, it took an expert two

5     hours to figure out the original equipment cost and the amount

6     paid for --

7            THE COURT: Well, leaving out that, the fact is, is

8     it not -- I mean, or is it disputed that Lycos went out and

9     decided what equipment it wanted and then told CSI what

10     equipment it wanted and, in fact, Lycos bought it and CSI then

11     paid for it?

12            MR. BEAN: That's correct, your Honor. We don't

13     dispute that --

14            THE COURT: How can Lycos say that it didn't know

15     the cost of the equipment?

16            MR. BEAN: Because it knew the initial cost of the

17     equipment.

18            THE COURT: But that's what we need to know.

19            MR. BEAN: But, your Honor, this equipment was

20     rolled over onto so many schedules, so many times, there was no

21     reason to keep track of it from an accounting perspective, and

22     when we did ask them what the original equipment --

23            THE COURT: Why not?

24            MR. BEAN: There was no reason because -- this is

25     technical to the leasing business. From a tax perspective, we

1   do not pay tax on the equipment that we lease.  That's one of

2   the reasons for leasing, okay?  So, there was no reason to keep

3   track of it, and when we did ask CSI what the original

4   equipment cost was, they told us an amount which was false.  It

5   was an intentional misrepresentation of a material fact and

6   which we relied to our detriment.

7                   THE COURT:  When did you ask them?

8                   MR. BEAN:  In March of 2002.

9                   THE COURT:  At a time when the negotiation to

10  purchase the equipment was in progress?

11                  MR. BEAN:  Well before that, your Honor.  The

12  purchase of equipment occurred in July of '03 and the request

13  was in March of '02 for that original --

14                  THE COURT:  At that time you asked them for the

15  original price of each of the items that were then to be

16  purchased?

17                  MR. BEAN:  No.  We asked them for the information

18  we didn't have, the aggregate cost.

19                  THE COURT:  Of all of the equipment?

20                  MR. BEAN:  Of all of the equipment.

21                  THE COURT:  Well, what would that tell you?

22                  MR. BEAN:  Well, it would tell us what we wanted to

23  know and -- one of the facts Mr. Kaler ignores is -- there are

24  sort of two components here; what was the aggregate original

25  equipment cost and how much did we pay in overall lease

1    payments.  Mr. Kaler does not address the second one.

2           THE COURT:  Well, I, frankly, don't understand the

3    relevance of the second one.

4           MR. BEAN:  Well, the relevance is how much are we

5    paying in lease payments relevant to the original cost of the

6    equipment.  When you get to the purchases, what should we be

7    paying as a fair purchase price at the end.  We have paid in

8    lease payments over 150 percent of the original equipment

9    cost.  We relied on their representation as to the original

10   equipment cost when we negotiated the buy-out price, and it

11   turned out that we paid almost $4 million for equipment where

12   we had already paid 150 percent of the original cost of the

13   equipment.  So, there are two components here that we think --

14   and, actually, you know, all --

15          THE COURT:  Which are you complaining about, the

16   150 percent or the added-on purchase price?

17          MR. BEAN:  Both, your Honor.  We are complaining

18   about the fact that CSI would continually give us -- CSI does

19   something that 80 percent of the leasing companies -- they

20   don't do what 80 percent of the companies do, and we have this

21   in Miss Franklin's affidavit.  Most leasing companies fully

22   disclose the original cost of the equipment on each lease

23   schedule so that the customer can see it and that is carried

24   through if the lease schedules are ever rolled up.  CSI doesn't

25   do it.  They hide that information.

1          And, also, because of all these roll-ups and

2    because we weren't paying directly to CSI much of the time --

3    we were paying money to bank lenders to whom they had assigned

4    the stream of lease payments -- we didn't have a way to keep

5    track of how much was being paid on account of the CSI lease

6    payments.  We were leasing from other companies as well.  So,

7    we didn't know the aggregate original equipment cost.  We

8    didn't know what the total payments were, and both of those --

9    they haven't put in any evidence as to whether we knew about

10   the aggregate original equipment cost.  We have affidavits

11   saying we --

12          THE COURT:  I don't understand why you need the

13   aggregate original.  If you buy ten machines, each for $100,

14   you know that you've just bought $1,000 worth of machines.

15          MR. BEAN:  If there were ten machines, that would

16   be true, your Honor.  Here we are dealing with literally

17   thousands of machines that were purchased -- pieces of

18   equipment that were purchased over time, and those pieces of

19   equipment were put on one lease schedule originally and we did

20   know what the original cost on that initial schedule was, but

21   then that equipment went to another schedule; some went here,

22   some went to another schedule, some went to a third schedule,

23   and, finally, it just kept -- the tree kept -- branches kept

24   spreading and the equipment got all spread out, so there was no

25   way for us to track, and, as I said, it would take an expert --

1          THE COURT: Are you serious that there was no way

2     to track or are you saying that nobody tracked?

3          MR. BEAN: I'm saying that nobody tracked and it

4     would take an expert probably -- and I'm guesstimating here

5     because -- I talked to Miss Franklin. As I said, it took her

6     two hours to deal with two pieces of equipment. It would take

7     hundreds and hundreds of hours, not to mention the expertise

8     that no one at Lycos has. CSI knows this. They're in the

9     leasing business, and part of what they do is they take

10    advantage of the fact that their customers do not know this

11    information. CSI even has on its Website something called, "My

12    CSI." It says, "Here is information about your leases so you

13    can learn about it," perhaps because they know that leasing

14    companies do not track this information and do not have the

15    expertise to track this information. This is not simply a

16    matter of taking up a few pieces of paper and adding them up

17    and seeing what they total. If it were, we wouldn't be here.

18          THE COURT: Explain to me what a roll-up -- how a

19    roll-up works.

20          MR. BEAN: Okay. A roll-up works like this, your

21    Honor. Let's assume that we have a lease schedule with 100

22    pieces of equipment on it. What they do is they take some

23    number of those pieces of equipment and they put them on --

24          THE COURT: Who is the "they"?

25          MR. BEAN: CSI and Lycos. CSI and Lycos.

1          THE COURT:  The parties together?

2          MR. BEAN:  The parties together.  CSI would decide

3     which equipment went onto which schedule.  We didn't decide

4     which equipment went --

5          THE COURT:  But you knew what happened?

6          MR. BEAN:  We signed and we knew that the equipment

7     was going different places.

8          THE COURT:  So, there was no reason why you

9     couldn't keep track at that point --

10         MR. BEAN:  Well, your Honor --

11         THE COURT:  -- even if you have a thousand pieces

12    of equipment on the first schedule.

13         MR. BEAN:  And then you have 500 going here and 500

14    going here and then you have 250 --

15         THE COURT:  But they're identified by some serial

16    numbers or something, aren't they?

17         MR. BEAN:  Yes, there are serial numbers, your

18    Honor, but the problem is the serial numbers are not even

19    listed on the lease schedules in many, many cases.  We have

20    submitted Schedules 93 and 94 as part of the record here.

21    There is no information about what equipment is going where on

22    those schedules.  It's simply not provided to us, and we were

23    not able to track it.  As I said, this is what is -- it may

24    look like Lycos was not doing what it should have been here

25    done, your Honor, but this is what is customary in the leasing

1    industry and that's what the evidence will show, that it is

2    customary for the lessee not to keep track of this equipment,

3    this information.  The lessor knows it and the lessor benefits

4    when the equipment goes from 250 pieces -- 1,000 on one

5    schedule, to 500 on two schedules, to 250 all across the

6    board.  Tracking that all back to the original invoice price --

7    I'm not going to say it's impossible, your Honor, but I'm going

8    to say that even for an expert, it was extraordinarily

9    difficult.  The same is true for the other side of the

10    equation, which --

11         THE COURT:  It's not true as it happens.  I mean,

12    you can track it while it's happening, can't you?

13         MR. BEAN:  If there were software to enable that to

14    happen, yes.  Miss Franklin has testified that -- she's an

15    expert, you know, that she has been in this industry for 15

16    years --

17         THE COURT:  Why do you need software?  I mean, you

18    can do it with pen and pencil even with a thousand pieces.

19         MR. BEAN:  Your Honor, there were thousands of

20    pieces -- there are thousands of purchase orders, thousands of

21    invoices and thousands of pieces of equipment.  It is simply

22    not that simple.  It is not that simple, and if it were that

23    simple, we wouldn't be here today.  The situation wouldn't have

24    gotten out of hand the way it did.  What happened here is that

25    CSI refused -- had a duty to provide Lycos with the most basic

1    information, the aggregate cost of the equipment.  They didn't

2    provide it and when we asked for it, they gave us false

3    information and they knew it was false at the time.

4                THE COURT:  You mean false numbers?

5                MR. BEAN:  A false number, that's right, and that's

6    part of the reason, your Honor.  They knew it was false.  One

7    of the reasons that Lycos was able to negotiate a reduced

8    purchase price for the buy-out at the end is because Lycos

9    threatened to have Miss Franklin and LeaseForum do an audit and

10   figure out what really happened here, and that's why the price

11   dropped by about a million dollars on the buy-out at the end

12   from the original quote that Lycos got to the price that was

13   actually agreed upon.  Lycos threatened to have LeaseForum do

14   an audit and Lycos -- and CSI was very unhappy when LeaseForum

15   got involved and they initially refused to communicate with

16   LeaseForum because they were going to be caught in what they

17   had done.  So, what happened here, your Honor, is -- if it were

18   simply a matter of math, we wouldn't be here.  This is

19   extraordinarily difficult.  That's why we put in the affidavit

20   of Miss Franklin, to show your Honor just how difficult this

21   is.

22               THE COURT:  Why do roll-ups occur?

23               MR. BEAN:  Roll-ups occur -- can occur because the

24   parties want to lower the monthly payments on the lease, lower

25   the monthly payments.

1        THE COURT:  So, they extend the time of the lease?

2        MR. BEAN:  Exactly, your Honor.  But you know what,

3   that makes no sense in my mind in this case.  In many cases the

4   lease schedule is for 24 or 36 months.  The roll-ups would

5   occur two or three months into a lease schedule, way before the

6   end of the lease term, and then two or three months later they

7   would be rolled up again.

8        THE COURT:  But that does make sense because if you

9   have to pay $1,000 over two years, the monthly payments, if

10  they're equal payments, are less than if you were to do it --

11  or more than if you were going to do it over three years.  So,

12  I can understand that they might want to extend the time.

13       MR. BEAN:  I understand that, but what you have --

14  what I don't understand is why the roll-ups were done

15  repeatedly; why you're two months into a lease schedule and you

16  reduce the monthly payments and then it gets rolled again and

17  gets rolled again.  The two pieces of equipment that Miss

18  Franklin, you know, tracked through that, which took her hours,

19  went through four roll-ups, four roll-ups.  There's no reason

20  for that.  It makes no sense.  What you have here is CSI

21  getting a lot more money, not disclosing basic information to

22  Lycos, and when Lycos asks for the information, providing

23  intentionally false information.

24       We have genuine issues -- your Honor, let me just

25  drop back procedurally for a minute.  It's their burden to show

1    there's no genuine issue of material fact. They --

2               THE COURT:  No, I understand all that.  I'll let

3    you argue the case.  Let me now turn to --

4               MR. BEAN:  Thank you, your Honor.

5               THE COURT:  -- to the plaintiff.

6               What is the truth, as far as you're concerned,

7    about the aggregate purchase cost?

8               MR. KALER:  Well --

9               THE COURT:  Did they ask you?

10              MR. KALER:  No, there's no evidence that they asked

11   us.

12              THE COURT:  Did you tell them?

13              MR. KALER:  There was an e-mail that was forwarded

14   to them in 2002, which is the basis for the first prong of

15   their fraud claim, in which Mr. Stenberg is alleged to have

16   overstated the original equipment cost by saying that it was

17   approximately $63 million when, in reality, the allegation is,

18   that the original equipment cost was $47 million.

19              THE COURT:  What was it?

20              MR. KALER:  It depends on how you calculate it.

21              THE COURT:  How can you calculate original cost any

22   way other than as an original cost, what was paid for it?

23              MR. KALER:  Well, it does depend on how you

24   calculate it, and I think that from our standpoint, looking at

25   the numbers, that information was not accurate, the $63 million

1    equipment cost figure.  However it was calculated by

2    Mr. Stenberg was not accurate.  It's closer to $50 million,

3    depending on what costs you add into it, but there was no

4    request to Mr. Stenberg in the record at that time that he

5    provide specific information.  It simply came up in the context

6    of an e-mail exchange and that's the e-mail that they're

7    relying on and, specifically, it's the e-mail that's attached

8    to --

9              THE COURT:  What is the effect of the wrong

10   number?

11             MR. KALER:  It has no effect from a legal

12   standpoint for the following reason:  The cases that come out

13   of common law on reasonable reliance are an outgrowth of those

14   situations in which the courts were confronted with plaintiffs

15   who came to the Court and said, "Look, here's a

16   misrepresentation," and everyone conceded, this information in

17   this representation that passed from the defendant to the

18   plaintiff was not accurate, for whatever reason, leave aside

19   issues of intent.  The problem is that the plaintiff, as a

20   matter of law, has in its possession the means and, as in this

21   case, the information necessary to determine for itself what

22   the true fact is.

23             THE COURT:  You mean Lycos?

24             MR. KALER:  That is correct.  The allegation -- the

25   three points -- or the two points that my colleague just made

1    were the first -- the first point is in one of their

2    affidavits.  It's an opinion.  Lycos had no reason to track the

3    original equipment cost as the invoices were paid by -- you

4    know, the invoices came in.  Admittedly, they could have

5    tracked it.  The allegation is they had no reason to track it.

6    That's an opinion that the Court does not have to accept,

7    particularly when you take into account the undisputed master

8    lease agreement, which said at the end of the lease term, you

9    can buy the equipment.  Any sophisticated company entering into

10   an equipment lease -- and in this country, according to

11   published statistics, 30 percent of all equipment is leased

12   under equipment finance leases structured the same way these

13   were.

14            THE COURT:  Is it the case that CSI did, in fact,

15   collect lease and purchase payments far more than the original

16   cost of the equipment?

17            MR. KALER:  The statistical analysis suggests that

18   the result of the amendments is that it's something in the

19   range of -- total lease payments were about 165 percent of the

20   original equipment cost as a result of --

21            THE COURT:  Over what period of time?

22            MR. KALER:  Over a period of time approximately

23   eight years, in the aggregate.

24            THE COURT:  But per equipment, per piece of

25   equipment, it was probably not more than two or three years,

1  right?

2         MR. KALER:  I think that's probably true, except

3  that each piece of equipment was rolled up at a different time

4  and, so, in order to determine what each piece of equipment

5  would have cost in lease payments vis-a-vis the original

6  equipment cost is somewhat more complicated than to do it in

7  the aggregate, but what we're really saying is that the

8  original master lease agreement was an open-ended lease.  In

9  other words, at the end of the lease term, as with a car, Lycos

10  knew that it could buy the equipment, and the question is, if

11  you want to know at that point what a fair price for the

12  equipment is and you want to take into account what you paid

13  for it in lease payments, you can simply keep track of it and

14  that's a very good reason to keep track of it.

15         One of the reasons that 30 percent of the equipment

16  in this country, over $200 billion, is leased is that those

17  equipment finance leases can be kept off the balance sheets and

18  they were kept off the balance sheets of Lycos, which means

19  they don't record the debt, which means their cash balances are

20  very high, which has an immediate impact on their stock price

21  and the value in immediate terms to a rising -- or rising stock

22  price far exceeds the extension of these leases, at least in

23  the opinion of many companies that repeatedly roll them over in

24  this fashion.

25         THE COURT:  At whose insistence do the roll-overs

1    occur?

2            MR. KALER:  Well, it's a negotiated decision

3    between the client and CSI.  In this instance, the client is

4    Mr. Lucy, who is a Certified Public Account, who, according to

5    his affidavit, has extensive experience in --

6            THE COURT:  He worked for Lycos or for CSI?

7            MR. KALER:  He worked for Lycos.  He was their

8    chief financial officer, and he has submitted the affidavit

9    upon which Lycos relies, and one of the features of this

10   particular motion is that the affidavits that Lycos has

11   submitted help CSI's position in many respects, in the sense

12   that Mr. Lucy admits they kept track of the payments monthly

13   under the leases.  They knew what they were paying.  It is

14   conceded that because Lycos procured the computer equipment,

15   they knew the cost.  Mr. Lucy concedes that he knew that the

16   effect of the roll-ups was to increase the total cost that

17   Lycos would have to pay over time.  He simply complains that he

18   did not understand the magnitude of it.

19            But in terms of the negotiations between the

20   parties on the roll-ups, Lycos presents the argument as if CSI

21   forced them to do roll-ups.  In each instance, the lease

22   payment -- the benefit of -- the immediate short-term benefit

23   of the roll-up was to reduce monthly payments and to extend the

24   lease term.  A company like Lycos, watching its stock price and

25   its cash balances, is inevitably in a quandary when it has all

1    of its equipment subject to equipment finance leases, which

2    look great in the beginning and still look pretty good, but

3    they're facing a situation where now they're coming to the end

4    of a series of extended lease terms and they want to buy the

5    equipment.  The singular feature of this case is that this is

6    not a case where Lycos is claiming that the equipment didn't

7    work or there was --

8            THE COURT:  What kind of equipment was it,

9    computers?

10            MR. KALER:  It's all kinds of computer equipment,

11    computer servers, computer work stations, computer screens, all

12    of the equipment that you would -- you could buy if you wanted

13    to capitalize it, but can be leased in this fashion, and if

14    it's an operating lease from an accounting standpoint, the

15    effects can hardly be understated for a company like Lycos

16    because it keeps it off the --

17            THE COURT:  So, the average time that the equipment

18    was under lease before purchase was somewhere around two or

19    three years, even with the roll-ups or is it longer?

20            MR. KALER:  I think that's probably a fair guess.

21    I don't think we've added it up.  Some of the equipment was

22    leased at the beginning and then more equipment was leased.

23    For example, our complaint, curiously enough, the leases that

24    we are seeking to recover the $300,000 on are not roll-ups.

25    They're original leases, and if one looks through the Lycos

1     papers, Lycos is only alleging fraud as to the roll-ups and the

2     purchase and sale agreement, and if we focus on the -- so,

3     arguably -- it's a technical argument.  I don't press it, but I

4     simply point out that the leases that were left that we sued on

5     are not roll-ups, and they may argue some kind of set-off based

6     on a successful fraud claim, but they can't argue, really, a

7     defense of fraudulent inducement as to those particular

8     agreements because they say they're --

9           THE COURT:  As to those agreements, what is the

10     amount that has been recovered in lease payments relevant to

11     the original cost?

12           MR. KALER:  I cannot answer that.  I know that they

13     were not rolled up.  So, my expectation is that we do not have

14     a situation there where you're talking up in the range of 165

15     percent.  That's a rough aggregate figure.  You're talking a

16     much more conservative assessment, but if we focus in on the

17     specifics of the -- there are really two levels at which this

18     issue can be addressed; one is sort of set back globally and

19     the other is in specific terms.  Let me just stay with the

20     specifics, since we're on them.

21           THE COURT:  Let me ask you one question before you

22     do that.

23           MR. KALER:  Please.

24           THE COURT:  The 165 percent represents in dollars

25     about how much over the eight years?

1          MR. KALER:  I think what the Court is asking is how

2   much did Lycos pay in total in lease payments over the seven-

3   or eight-year period.

4          THE COURT:  Right.

5          MR. KALER:  And the exact figure I'm not sure I

6   have.

7          THE COURT:  Approximately.

8          MR. KALER:  The approximate figure as to -- can't

9   be that because it's...

10          (Off record discussion.)

11          MR. KALER:  I think what the Court is asking is how

12   much did Lycos pay in total lease payments.

13          MR. BEAN:  Your Honor, it was about $72 million.

14          MR. KALER:  $72 million.

15          THE COURT:  So, about $34 million is over cost,

16   approximately?

17          MR. KALER:  I think it's about $25 million, is the

18   gap.

19          THE COURT:  Well, if it's 165, the cost is about

20   two-thirds of that, right?

21          MR. KALER:  Yes, your Honor.  I'm adding up --

22   there's $47 million in original equipment cost and they paid a

23   total of $72 million in all their lease payments until the

24   end.  So, the difference between those two is $25 million.

25          THE COURT:  You're right.  You're right.

1          MR. KALER:  So, in return for the privilege of --

2          THE COURT:  The reason I'm asking this is because

3     what is involved in this lawsuit is $310,000, right?

4          MR. KALER:  Well, the counterclaim is the claim

5     back for about $20 million.  They're looking for $14 million

6     back on the counterclaim.  The lawsuit in some respects, and I

7     hate to say, it's the tail wagging the dog.  I mean, we brought

8     the action to collect the $300,000.  Are we that concerned with

9     the $300,000?  No.  Are we concerned with the counterclaim?

10    Very much so, because this is a very big industry.  $200

11    billion worth of equipment is leased pursuant to the financial

12    arrangements precisely like this, and if this case were even to

13    proceed into discovery, it's arguably a change in the landscape

14    of the law where -- it's not as if we didn't deliver the

15    equipment or that it wasn't paid for pursuant to the

16    contracts.  The affidavits establish all of that.  It's a

17    serious case because of the implications, and one of the things

18    I would like to point out is that we have the issue of the

19    equipment lease roll-ups and since the e-mail that we just

20    spoke about earlier did not occur until after the last of the

21    equipment lease roll-ups, it can't have induced it and there's

22    no argument it did, and one of the reasons that Lycos amended

23    was to split out the fraud and inducement claims.

24         So, if we stay with that e-mail, the only

25    transaction that that e-mail could have allegedly have induced,

1    leaving aside the reasonable reliance argument, is the purchase

2    and sale agreement.  Now, at the time of the purchase and sale

3    agreement, Miss Franklin admits that she was advising Lycos.

4    She was retained to negotiate, and one of the things that's not

5    in the affidavits, but which my colleague has pointed out, and

6    I was -- I hadn't heard this before, was that -- except for my

7    own record, that Lycos negotiated a reduced price with CSI at

8    the time they bought the equipment because they threatened to

9    do an audit.  They said, "Look, reduce the price.  We think we

10   paid a lot here.  So, you reduce the price."  And then they

11   went ahead with the transaction in which the purchase and sale

12   agreement has an integration clause and says Lycos is not

13   relying on anything other than what's in the agreement.

14          More clearly than in almost any other aspect of

15   this chronology, I think, at that point Lycos can't come back

16   and say, "Well, we did the transaction.  We got the price

17   reduced a million dollars by threatening to do an audit on the

18   very issue of the gap between what we paid and what the

19   equipment cost," and now come back and say, "No, we still have

20   a fraud claim."  That's probably the strongest part, as I see

21   it now, of our argument, which means the e-mail goes out.  It

22   can't have induced prior transactions.

23          Secondly, what we're left with on the prior

24   transactions is this notion that Lycos had -- excuse me -- that

25   CSI had a duty to do more than it did in connection with the

1    roll-ups.  There are two points:  The first is the premise of

2    Lycos' argument that nobody would enter into these kinds of

3    transactions where you pay more to lease than the equipment

4    cost.  It runs contrary to common sense.  Dell Computer will

5    lease a $900 PC for $1100 in total lease payments over 18

6    months.  There was an ad in the ABA Journal that we submitted

7    that shows that.  Everyone knows that if you lease a car and

8    then you just renew the lease, you're going to wind up paying

9    more than the car is worth.

10           In the context of public companies who engage in

11    equipment finance leasing, which under the accounting rules of

12    operating leases, the FASB rules, you can keep that off your

13    balance sheet.  You don't carry that debt.  The trade-off is --

14    there are all kinds of reasons to do what they did and it sort

15    of explains why someone with Mr. Lucy's background and

16    qualifications as a CPA would go ahead and do it.

17           So, the argument on the operating leases comes down

18    to the notion that even though Lycos knew the original

19    equipment cost and was in a position, obviously, to keep track

20    of what it was paying every month, did keep track of what it

21    was paying every month and, yet, somehow does not -- was duped

22    into entering into these amendments is something which, if we

23    focus on the reasonable reliance requirement in the cases that

24    we cited on that issue, the *Collins* case, the *Gromacki* case out

25    of Missouri -- the Missouri case is particularly instructive,

1    if one assumes Missouri laws applies, and I think there's

2    really no substantive distinction between Missouri and

3    Massachusetts.  The Missouri court in *Gromacki* is quoted as

4    saying, "The representations alleged to have been made were

5    very important.  The means of knowledge were at hand.  It would

6    have been a simple matter for him to make inquiry to the proper

7    authorities and it is the rule that where a party fails to

8    avail himself of the means of knowledge within his reach, he

9    cannot complain if he is defrauded."

10             Now, I accept that there's a line of cases in

11   Massachusetts.  Judge Garrity, I think, was the writer of the

12   opinion in the *V.S.H.* case.  They all involve purchases of real

13   property and the allegation was being made by the defendants

14   you can't accuse us of fraud.  You could have come on to the

15   property and discovered that there was oil contamination, and

16   Judge Garrity in *V.S.H.* said, "Well, I'm not convinced that

17   that's necessarily a bar to fraud under these circumstances."

18   They had the distinguishing factual feature they were all

19   purchases of real property.  The facts in question are not, as

20   these were in the Lycos case, really in the possession of the

21   plaintiff.  It was more a situation where the courts were

22   drawing a line that said, "No, you can pursue a fraud claim up

23   to this point."  I mean, I think no one would dispute that

24   plaintiff is pushing the edge of the envelope here and we

25   are --

1          THE COURT:  Plaintiffs, CSI?

2          MR. KALER:  I misspoke.  Plaintiff in the

3     counterclaim, Lycos, is pushing the outer edge of the envelope

4     with the counterclaim.  I think I revealed my thinking on it

5     that the $300,000 is not the issue here.  It's the counterclaim

6     which seeks to unwind the series of --

7          THE COURT:  Which was, however, elicited by the

8     complaint.

9          MR. KALER:  Well, there is the school of thought

10    that says that the counterclaim was going to come anyway since

11    it was filed a year ago before Lycos was sold, and there is the

12    school of thought that -- well, it really doesn't matter what

13    the school of thought is.

14          But, in any event, my point is, with respect to the

15    roll-ups, that Lycos' claim, if it has one, would depend on

16    this Court imposing a duty on CSI that would really wreak havoc

17    in all kinds of complex commercial transactions.  We have the

18    opinion from Judge Young, which we cited, which said the

19    Attorney General regulation in Massachusetts doesn't apply to

20    business-to-business transactions.  That regulation about

21    disclosing facts that the disclosure of which would influence

22    someone not to enter into a transaction was enacted in the

23    context of pursuing --

24          THE COURT:  Is that regulation the basis of a

25    separate claim in the counterclaim?

1          MR. KALER:  No.  It's part of their 93A claim.

2          THE COURT:  Part of the 93A claim?

3          MR. KALER:  I think so.  And it really -- it can't

4    be right that those kinds of regulations get extended, and we

5    relied on Judge Young's opinion in this regard, and I think

6    it's consistent with common sense, really.

7               So, in a nutshell, what we're saying is that the

8    two prongs of the fraud claim really don't survive close

9    scrutiny, and one of the reasons why we wanted to challenge

10   this at the outset, and I appreciate the opportunity to do so,

11   is that --

12         THE COURT:  Are we still at the outset?

13         MR. KALER:  At the outset of this case.  Did I

14   misspeak again?

15         THE COURT:  No.  It's just that I would urge you to

16   come to conclusion with the argument.

17         MR. KALER:  I think at the outset of the case was

18   that this is a typical transaction.  It's not a case where they

19   didn't get what they bargained for.  In fact, the affidavit of

20   counsel says the business terms were acceptable.

21         THE COURT:  Tell me, the affidavits that are at

22   issue, Mr. Rousseau's affidavits, are they made on personal

23   knowledge, and if so, how do I know it?

24         MR. KALER:  Well, they're made on personal

25   knowledge as to the facts that are within his chronological

 1    reach.  I think it's probably fair to say that if some of the

 2    facts in his affidavit were challenged by Lycos and

 3    were generally disputed --

 4             THE COURT:  Because they are.

 5             MR. KALER:  Some of them are, but only in a limited

 6    sense in the sense that, yes, we knew the cost, but we didn't

 7    know the aggregate cost, which to us is a distinction without a

 8    difference.

 9             Yes, I concede that, frankly, I could take issue

10    with the affidavits on both sides.  The affidavits are rarely

11    so precise as to show personal knowledge as to every statement,

12    but one of the reasons we have the local Rule 56.1 is that, at

13    least in the summary judgment context, the courts want to know

14    what's really disputed and what's not.  We don't elevate

15    formalistic challenges to affidavits if there's no reason to do

16    so, and because this is a case that could hurt people,

17    certainly at CSI, and would have an impact on the industry as a

18    whole, and particularly where it's a case where Lycos got what

19    it bargained for and is really just arguing that it didn't

20    quite understand what it was bargaining for or didn't

21    appreciate the implications of it, as a matter of law, it's our

22    position that they really cannot survive on a motion for

23    summary judgment at this stage and the discovery they're

24    looking for isn't relevant.

25             THE COURT:  Thank you.

1          MR. KALER:  Thank you, your Honor.

2          THE COURT:  Mr. Bean.

3          MR. BEAN:  Thank you, your Honor.

4          I would like to make five points, if I can.  First

5     some background:  Mr. Kaler suggests that denying summary

6     judgment would wreak havoc in the industry.  We have put in as

7     -- I've already told the Court, we have an affidavit that says

8     CSI acts different from 80 percent of the industry.  Besides,

9     you have before you, your Honor, the ethics, the business

10    practices of the Equipment Leasing Association, of which CSI is

11    a member, and those -- in Paragraph 7 of those fair business

12    practices say, quote, "A member shall" --

13         THE COURT:  Where are they in the papers?

14         MR. BEAN:  Yes, they are, your Honor.

15         THE COURT:  Where?  Where?

16         MR. BEAN:  They are Exhibit F to our amended

17    counterclaim claim.  It says, "A member shall disclose all

18    relevant information as to the terms and conditions of the

19    transaction or service which may affect the client's

20    decision."

21         The problem here is not the industry.  The industry

22    with ethics like that is fine.  The problem is CSI, which does

23    not comply with the ethical practices of its industry and

24    doesn't provide original equipment costs, the way 80 percent of

25    the lessors do.

1          The second point, just in terms of background, is

2     are we being greedy or are we trying to get the money back?

3     $72 million is how much we paid.  The original equipment cost

4     was about $47 million, a $25 million spread.  Our claim is for

5     $14 million.  That means they would make an $11 million

6     profit.  We pay $11 million for the privilege of leasing $47

7     million of equipment.  It's not as if we're seeking to get back

8     the $25 million.  We're seeking to get back the overpayment,

9     your Honor, and we took a lot of time figuring out how much to

10    ask for.  So, just in terms of background, the problem here is

11    this company does not behave the way the industry does.

12          Second, procedurally -- and then I'm going to get

13    to the arguments of genuine issue of material fact on fraud in

14    Chapter 93A.  Procedurally, it's their burden to show that

15    there's no genuine issue of material fact in dispute.  If you

16    take their papers by themselves as they submitted them, they

17    haven't met that burden because Mr. Rousseau's affidavit should

18    be stricken.

19          Now, the caselaw replete says, "He who relies on

20    that, acts at his peril."  So, we didn't rely on that.  We've

21    put in our own affidavits, which, unlike theirs, are carefully

22    based on personal knowledge and competency.  We satisfied the

23    requirements of Rule 56.  So, I would suggest, your Honor,

24    simply because they have put nothing before the Court by way of

25    facts, they shouldn't be allowed to get summary judgment.  Yes,

1    it's true that under the local rule, that if we don't dispute a

2    fact, it's deemed admitted, but before you even get to that

3    point, they have to competently put that fact before the Court,

4    and they haven't done so.

5            THE COURT:  Mr. Bean, is it the case that the

6    industry in general structures these lease agreements in such a

7    way that the lessee does not pay more than the original cost

8    over the life of the lease?

9            MR. BEAN:  At the outset, yes, your Honor.

10    Assuming no roll-up, that is correct.

11            THE COURT:  But roll-ups are common in the

12    industry, are they not?

13            MR. BEAN:  I don't know, your Honor.  I guess they

14    do happen.  They do happen, certainly.

15            THE COURT:  When roll-ups occur, then the cost of

16    the lease exceeds the original cost of the equipment?

17            MR. BEAN:  The cost does go up, your Honor, yes.

18    As I said, we're not looking for a freebie here.  We're saying

19    they get $11 million profit on $47 million worth of equipment,

20    20-some percent.  It's the $14 million that we're seeking

21    back.

22            The real question here, your Honor, is whether

23    there was a genuine issue of material fact in dispute.  This is

24    on the fraud claim, and then I'll get to 93A.  The real

25    question is whether there was a genuine issue of material fact

1   in dispute on the reasonableness of the reliance.   The First

2   Circuit has held in the *Rodi* case and the SJC in the *Moran*

3   case, whether there is reasonable reliance is generally a

4   question of fact for the jury, and that's the case here.   The

5   only time the courts look elsewhere and decide a matter of

6   law --

7                    THE COURT:   What did Lycos rely on?

8                    MR. BEAN:   Lycos relied on CSI and its trusting

9   relationship with CSI for CSI to provide Lycos with the

10   relevant information.   The information --

11                    THE COURT:   Which was what?

12                    MR. BEAN:   The original equipment cost and the

13   amount of the payments.   That's what we relied --

14                    THE COURT:   You didn't know how much you paid?

15                    MR. BEAN:   Because we were not just paying CSI; we

16   were paying multiple equipment lessors, paying multiple banks,

17   because they assign the stream of payments.   That's where they

18   get -- they get the money to buy the equipment by borrowing it

19   from a bank and assigning the stream of payments to the bank,

20   okay?   We're not ignorant -- as Mr. Kaler said, this is the way

21   the industry is structured.

22                    Mr. Kaler said that we do not put this equipment on

23   our balance sheet.   We don't keep track of it.   We have no

24   reason to keep track of it and, frankly, Lycos didn't have the

25   capability, and I would suggest that most companies, based on

1    Miss Franklin's affidavit, do not have the capability, but

2    we're here at summary judgment, and the real question is, is

3    there a genuine issue of material fact as to the reasonable

4    reliance as to the fraud claim, and I think the answer to that

5    is there is a genuine issue of material fact. It must go

6    before a jury. The only cases where they say no reasonable

7    reliance as a matter of law is when the statement was palpably

8    false. In other words, on its face the hearer should know that

9    the statement was false, and all the cases cited by Mr. Kaler

10   are cases where there were affirmative misrepresentations. How

11   is it we're supposed to investigate when they're not telling us

12   something? They're not telling us the information. So, one,

13   there's a genuine issue of material fact.

14          THE COURT: I still don't understand what the fact

15   is that you may or may not have relied upon.

16          MR. BEAN: Well, the fact that is in dispute is did

17   we know the aggregate original equipment cost, and the answer

18   is no.

19          THE COURT: Are you relying on this e-mail?

20          MR. BEAN: Among other things, yes, your Honor.

21   The e-mail -- unlike most of their non-disclosures, which the

22   Equipment Leasing Association requires them to make, the e-mail

23   is an affirmative false statement. In all of the cases that

24   deal with reasonable reliance where they talk about

25   investigation -- let me read from *Kuwaiti Danish Computer*, an

1   SJC decision:  "The receipt of a fraudulent misrepresentation

2   of fact.  The recipient of a misrepresentation of fact is

3   justified in relying upon its truth, although he might have

4   ascertained the falsity of the representation had he made an

5   investigation.  The recipient of a fraudulent misrepresentation

6   is not justified in relying upon its truth if he knows it is

7   false or the falsity is obvious to him."

8          THE COURT:  Here the misrepresentation is the

9   failure to disclose something?

10          MR. BEAN:  Exactly, your Honor, and the

11   false statement --

12          THE COURT: But is there a duty to disclose it?

13          MR. BEAN:  Most definitely, your Honor.

14   Most definitely.

15          THE COURT:  Where does that come from, these

16   ethical rules?

17          MR. BEAN:  No.  Well, we think they should have

18   under the ethical rules.  The duty to disclosure arises from

19   three places:  One is the trusting relationship that was

20   established.  That is based in our papers and that is

21   undisputed.  They knew we didn't know what was going on with

22   these leases.

23          THE COURT:  But you didn't want to know.

24          MR. BEAN:  But, secondly, they -- and this is the

25   V.S.H. case from the First Circuit.  They told us half truths,

1    and when there's a half truth, there is a duty to disclosure

2    and the First Circuit in *V.S.H.* said --

3              THE COURT:  That's the e-mail?

4              MR. BEAN:  The half truth is the e-mail and the

5    half truth is, "Your monthly payments are going down," without

6    telling us the consequence, the magnitude of the consequence.

7    Did we know that the costs would go up modestly?  Yes.  Any

8    business person knows that.  The extent of the cost increase

9    over the various roll-ups we did not know.  If we did, we

10   wouldn't be here today.  We didn't know that.  So, the false

11   statements are the failure to disclosure, and I'm sorry if I

12   wasn't clear on that, and the affirmative misrepresentation.

13             Mr. Kaler has said to you today that the original

14   equipment cost was around $50 million.  In writing and e-mail

15   says $63 million, off by $13 million.

16             THE COURT:  He agrees that he was off?

17             MR. BEAN:  I'm sorry?

18             THE COURT:  He agrees he was off?

19             MR. BEAN:  Yes, he -- well, his --

20             THE COURT:  But he says that the timing of the off

21   statement about the original cost was such that you couldn't

22   have relied on it because the conduct that you -- your conduct

23   preceded it.

24             MR. BEAN:  The roll-up conduct did precede it.  The

25   purchase conduct was after it, okay?  So, we're not saying we

1   relied on it for the roll-ups; he's right.

2              THE COURT:  But you haven't paid the purchase

3   price, have you?

4              MR. BEAN:  Yes, we have.  We paid the $3.775

5   million.

6              THE COURT:  So, that's one-seventh of what you're

7   seeking to recover?

8              MR. BEAN:  That's correct, your Honor.  That's

9   correct.  And I'm sorry if I'm not clear.  There are two

10  components to our claim and we've segmented them in the amended

11  complaint to make it easier to follow.  There's a claim for the

12  roll-ups fraudulent misrepresentation, non-disclosure.  There's

13  a claim in the purchase agreement for both non-disclosure and

14  misrepresentation, but we were also -- and the whole reason

15  for reliance, I think, frankly, goes out the window.

16             We were induced not to investigate by virtue of the

17  trusting relationship that we had with CSI, and the caselaw is

18  replete that when someone is lulled into non-investigation, as

19  we were here, we are not charged with reliance.  So, that's the

20  fraud piece on reliance.

21             But let me speak to 93A for a minute, because the

22  whole reliance -- we are not required as a matter of law under

23  93A to prove reasonable reliance.  The First Circuit has said

24  so, and we have the SJC, and those cases are in our papers.

25  We're not required to prove reasonable reliance.

1          Second, we have in our papers -- we changed our

2     position based on their failure to disclosure and the SJC said

3     in the *Purity Supreme* case -- and it's Page 777; I think our

4     papers said 778-79 -- said when a party changes its position,

5     does something it wouldn't have done based on a

6     misrepresentation or a failure to disclosure, that is

7     actionable under Chapter 93A.

8               THE COURT:  What would you not have done?

9               MR. BEAN:  We would not have done the roll-ups, and

10    as to these two leases which Mr. Kaler is correct that were not

11    roll-ups which they're suing on, we would not have done

12    business with these people.  Having been ripped off to the

13    extent to which we were, had we known that, we never would have

14    signed those two leases with this company.  We wouldn't have

15    done business with them.  We certainly wouldn't have paid them

16    $3.775 million to purchase the equipment at the end of the

17    lease term.

18              And the third basis for the 93A claim -- and,

19    again, these all exist independently of the fraud claim, is the

20    Attorney General regulation, which --

21              THE COURT:  But the Attorney General regulation

22    does not give rise to a separate private right of action, does

23    it?

24              MR. BEAN:  There are many cases which it has

25    brought under a private right of action.

1          THE COURT:  Based on the regulation?

2          MR. BEAN:  Yes, your Honor, and I can provide the

3    Court with those cases.  I was running out of paper and I was

4    debating what to leave out and I left out the private right of

5    action cases.

6          THE COURT:  Don't worry about it.

7          MR. BEAN:  Okay.  It was just a decision I made.

8    Maybe I was wrong.

9          The AG construes this regulation as applying to

10   business-to-business transactions and there have been cases

11   brought by private parties under -- look at *V.S.H.*, your

12   Honor.  *V.S.H.* was two private parties and it was brought under

13   the Attorney General regulation.  So, there's a case where

14   there was a private right of action and the case -- and the

15   First Circuit allowed that case to go forward.  So, the AG

16   construes this regulation applying business-to-business, and,

17   as this Court is aware, this Court should defer to the agency's

18   construction.  Yes, your Honor, it's in our papers.  It's

19   there.

20         THE COURT:  I wasn't shutting you off.  I was

21   slowing you down.

22         MR. BEAN:  Oh, I'm sorry.

23         THE COURT:  It's okay.  I know I encourage you to

24   speak fast by --

25         MR. BEAN:  Well, I know you have another matter on

1    for hearing.  I try to be sensitive to that, your Honor.

2              So, we have several bases for the 93A action that

3    are independent of the fraudulent misrepresentation action.

4    Does Massachusetts law apply?  Yes, under *Northeast Data*.

5    *Northeast Data* is directly on point on the question of when you

6    have a claim for fraud in the inducement concerning the

7    formation of a contract, then those claims fall outside a

8    choice of law provision.  So, I think we have caselaw directly

9    on point.  In that case, as in this one, the parties filed,

10   asserting a 93A claim, and alleged that it was fraud in the

11   inducement, exactly as we have alleged here.

12             So, what do we have?  Your Honor, there are so many

13   bases for denying this summary judgment motion.  It's

14   procedurally defective.  There's not a single affidavit that

15   the Court should consider in ruling on it.  So, on that basis

16   alone, it should be denied.  They have failed to satisfy their

17   burden of demonstrating that there's an absence of genuine

18   issue of material fact and they're entitled to judgment as a

19   matter of law.

20             Second, there's a genuine issue of material fact on

21   the fraud count even if we have to show reasonable reliance,

22   which we don't think we have to show for two reasons; one is

23   we're dealing with non-disclosure; and, second, we were lulled

24   into not investigating.  Unconscionability, it's just a gross

25   disparity in terms of what we paid relative to the original

1    equipment cost, and, again, we're not seeking to be greedy

2    here.  They're entitled to an $11 million profit.  If we got

3    every penny we're seeking, they have an $11 million profit on

4    $47 million of original equipment.  And on the 93A, we have

5    three independent bases for that claim proceeding.  So, this

6    summary -- there are so many bases, your Honor, for denying

7    this.  Thank you.

8                THE COURT:  Thank you.

9                MR. KALER:  May I just make one -- just a couple

10   of -- the two critical points that I discussed at the original

11   conference with the Court were the gap, the original cost of

12   the equipment and the total lease payments by Lycos.  When we

13   reached the end of the road, we come back to the beginning,

14   which is those two figures; original equipment cost, what they

15   paid in total, and the gap between the two, which is what

16   they're complaining about.

17                In our reply brief, three pages, we cited to the

18   local rule statement of Lycos where they admit that they

19   ordered the equipment and knew the cost of each piece and they

20   admit that they did record or keep track of the monthly lease

21   payments.  Everything else, so to speak, is window dressing,

22   and you can construct a whole variety of claims, but when you

23   look at the chronology, they signed original leases, they

24   extended them because they didn't want to buy the equipment.

25   The easiest way to avoid having to buy the equipment is to

1    extend the leases, and then they finished extending the leases,

2    and at that point they got an e-mail that was inaccurate on the

3    original equipment cost, and then they did a purchase and sale

4    and bought the equipment with the advice of Susan Franklin and

5    they got a reduced price because she said, "Well, we'll do an

6    audit if you don't reduce it."  They bought the equipment

7    pursuant to a purchase and sale agreement that had an

8    integration clause, said we won't rely on anything.  That

9    purchase and sale agreement also said you got to complete

10   outstanding lease payments and they completed them all except

11   the last three and then we filed suit.

12           On those undisputed facts, in a transaction between

13   sophisticated parties, they can't make a fraud claim alleging

14   that they were inadequately informed about the gap or that the

15   e-mail they were sent was actionable.  That's the nub of the

16   argument.  If we're not right, we lose.  But I submit that we

17   are right on that and that common sense suggests that when one

18   looks at all the facts in the record, it doesn't make common

19   sense to allow a claim like this to proceed, and if it doesn't

20   make common sense, it can't make legal sense.

21           THE COURT:  Thank you both.  I will take the

22   papers.

23           MR. KALER:  Thank you, your Honor.

24           MR. BEAN:  Thank you, your Honor.

25           (Adjourned, 3:21 p.m.)

```
 1
 2                        CERTIFICATE
 3        I, Catherine A. Handel, Official Court Reporter of
 4   the United States District Court, do hereby certify that
 5   the foregoing transcript, from Page 1 to Page 43,
 6   constitutes to the best of my skill and ability a true
 7   and accurate transcription of my stenotype notes taken
 8   in the matter of Civil No. 05-10017-RWZ, Computer Sales
 9   International, Inc. vs. Lycos, Inc.
10
11
12   5-16-05                    Catherine A. Handel, RPR-CM
     Date
13
14
15
16
17
18
19
20
21
22
23
24
25
```