UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMPUTER SALES INTERNATIONAL, INC.,<br><br>Plaintiff and Defendant-<br>in-Counterclaim,<br><br>v.<br><br>LYCOS, INC.,<br><br>Defendant and Plaintiff-<br>in-Counterclaim,<br><br>and<br><br>BANK OR AMERICA f/k/a FLEET BANK,<br><br>Trustee Process Defendant. | C.A. No. 05-10017- RWZ |

## LYCOS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND TO RESOLVE DISPUTE OVER PROPOSED CONFIDENTIALITY AGREEMENT

Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby moves to compel

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc. ("CSI"), to produce

documents responsive to Lycos' First Request for Production of Documents. To date, CSI has

produced no documents in response to that request (and Lycos has not produced any documents

in response to CSI's request), because of a dispute over the terms of the Confidentiality

Agreement the parties have been negotiating. Specifically, CSI has demanded that Lycos agree

that Lycos will not use non-confidential documents and other discovery material produced by

CSI for any purpose other than this litigation. Lycos is not amenable to this proposed "gag

order"; further, CSI's demand is unsupported by applicable law.

In further support thereof, Lycos states as follows:

1.    On December 27, 2005, more than forty-five days ago, Lycos served its First

Request for Production of Documents.  A true and accurate copy of that request is attached

hereto as *Exhibit A.*

2.    Since some time in January, 2006, Lycos and CSI have been negotiating the terms

of a Confidentiality Stipulation and Order.  After exchanging drafts and engaging in discussion

thereon, it became apparent that one particular paragraph requested by CSI presented a

disagreement the parties could not resolve.  CSI has demanded that Lycos agree as follows:

> 8.    *All documents and discovery materials produced in this action,*
> *whether or not designated as "CONFIDENTIAL" or not [sic], shall be*
> *used by the persons receiving the materials only for the purpose of*
> *preparing for and conducting this action*; provided, however, that nothing
> herein shall impose any restrictions on the use or disclosure by a party or
> witness of –
>
> (a)    documents or information obtained by such party or witness
> independently of the formal or informal discovery proceedings in this
> action if the source of such information was not obligated to hold such
> documents or information in confidence; or
>
> (b)    public and other documents obtained or obtainable, from
> another source or already in the possession or knowledge of, or previously
> known to a witness, his employer, or another person who is not obligated
> to maintain such documents in confidence.

(emphasis added).  A true and accurate copy of a recent, if not the most recent, draft of the

Confidentiality Stipulation and Order Lycos received from CSI containing this paragraph 8 is

attached hereto as *Exhibit B.*

3.    Lycos is not agreeable to a "gag order" that would prohibit it from disclosing non-

confidential documents and discovery material produced by CSI in this case.  Specifically, but

without limitation, the rules of the Equipment Leasing Association ("ELA") permit persons such

as Lycos to file complaints against equipment lessors who violate the ELA's Code of Fair

Business Practices. *See* Part III(2) of ELA's Code of Fair Business Practices, a true and accurate

copy of which is attached hereto as *Exhibit C* ("A proceeding alleging that an ELA Member

violated the Code [of Fair Business Practices] may be initiated by . . . a non-member of ELA

which has suffered injury as a participant in an equipment lease or finance transaction with a

Member.") Lycos is a "non-member of ELA" that has suffered injury in an equipment lease

transaction with a member of the ELA, CSI. *See* Lycos' Amended Answer and Counterclaim

and CSI's response thereto, ¶ 35, in which Lycos alleges and CSI admits that it is a member of

the ELA. Thus, Lycos has the right to file a complaint with the ELA. Lycos has already alleged

in this action that CSI has violated paragraph 7 of ELA's Code of Fair Business Practices. *See*

Lycos' Amended Answer and Counterclaim, ¶¶ 34-37, 71(D). That paragraph states: "A

Member shall disclose all relevant information as to the terms and conditions of a transaction or

service which may affect the Client's decision."

   4. During the course of this litigation, Lycos may wish to make a complaint to the

ELA about CSI's violation of paragraph 7 of the ELA's Code of Fair Business Practices. Lycos

may wish to rely in part on documents and discovery material produced by CSI in this case in

making that complaint. In addition, Lycos may wish to file a complaint with the Office of the

Massachusetts Attorney General, and ask the Attorney General to investigate CSI's business

practices. Lycos may also wish to use documents and other discovery material produced by CSI

for other legal purposes.

   5. CSI's refusal to produce documents properly requested by Lycos based on its

demand that Lycos agree to a "gag order" is wholly incompatible with settled law. In *Public*

*Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 780 (1st Cir. 1988), the First Circuit stated:

the Supreme Court has noted that parties have general first amendment freedoms with regard to information gained through discovery and that, absent a valid court order to the contrary, they are entitled to disseminate the information as they see fit. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-36 . . . (1984).

The Court also said:

> Prior to entry of [the protective] order the situation was this: the parties were not required to release publicly the discovery materials by filing them, but they were free to disseminate them if they chose to do so. *Cf. Oklahoma Hospital Ass'n*, 748 F.2d at 1424 ("While it may be conceded that parties to litigation have a constitutionally protected right to disseminate information gained by them through the discovery process absent a valid protective order, it does not follow that they can be compelled to disseminate such information.")

The First Circuit's statements quoted above are consistent with the decisions of the four Courts of Appeals that have addressed the issue. *Jepson Incorporated v. Makita Electric Works, Limited*, 30 F.3d 854, 858 (7th Cir. 1994) ("Absent a protective order, parties to a law suit may disseminate materials obtained during discovery as they see fit."); *Harris v. Amoco Production Co.*, 768 F.2d 669, 683 (5th Cir. 1985) ("A party may generally do what it wants with material obtained through the discovery process, as long as it wants to do something legal."); *Oklahoma Hosp. Association v. Oklahoma Publishing Company*, 748 F.2d 1421, 1424 (10th Cir. 1984) (quoted above); *see also Foltz v. State Farm Mutual Automobile Insurance Company*, 331 F.3d 1122, 1128 n.1 (9th Cir. 2003) ( "Absent court order or a private agreement, the *Foltz* parties would be free to disclose their discovered materials to collateral litigants.")

　　　　6.　　While CSI may argue that none of the above-cited cases occurred in the business-to-business context, that distinction is immaterial and inconsistent with the broad principles enunciated in the cases cited above. Neither constitutional rights nor the federal rules change

- 4 -

simply because both parties are businesses. Accordingly, CSI may not refuse to produce

documents as required by Rule 34 simply because Lycos will not agree to a "gag order."

      7.      Lycos acknowledges that this Court may enter a protective order to restrict

dissemination by Lycos of specific documents produced by CSI to particular persons if and when

CSI is able to satisfy the requirements Fed. R. Civ. P. 26(c). In fact, Lycos proposed to CSI

before filing this Motion a procedure that would allow CSI to seek a protective order from this

Court if Lycos decides to disseminate discovery obtained from CSI to parties such as the ELA.

Specifically, by e-mail dated February 13, 2006, Lycos proposed the following to CSI's counsel:

> One possible compromise would be to put in the confidentiality stip that before
> either party uses discovery produced by the other for a purpose other than the
> litigation, it give the other side fourteen days notice in which it (a) identifies the
> discovery material produced by the other side that it intends to disseminate to a
> third party; and (b) identifies the person to whom the party proposes to distribute
> that information. The party receiving that notice could then seek emergency relief
> from the court to prevent the dissemination of that information.

However, CSI summarily rejected this proposal and maintained its blanket refusal to enter into a

Confidentiality Stipulation and Order and produce documents without the "gag order" it

demanded.

      WHEREFORE, Lycos requests that this Court enter an Order:

      1.      Compelling CSI to produce documents responsive to Lycos' First Request for

Production of Documents upon execution of a confidentiality stipulation and order acceptable to

both parties that does not contain any restriction on Lycos' right to disseminate non-confidential

documents and discovery material received by it from CSI during this case;[1] and

---

[1] While the parties have other disagreements about the proposed form of the Confidentiality Stipulation and Order,
Lycos has reason to believe that the parties should be able to resolve them.

2.    Granting Lycos such other relief as may be appropriate and just including, without

limitation, its reasonable attorneys' fees and costs in bringing this motion.

Respectfully submitted,

LYCOS, INC.,
By its attorneys,

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY, LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2006, I caused a true and accurate copy of the within document to be delivered by hand to Robert J. Kaler, Gadsby Hannah, LLP, 225 Franklin Street, Boston, MA 02111.

/s/ Thomas O. Bean
Thomas O. Bean

- 6 -

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|    Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **FIRST REQUEST FOR PRODUCTION OF DOCUMENTS OF DEFENDANT AND PLAINTIFF-IN-COUNTERCLAIM, LYCOS, INC., TO COMPUTER SALES INTERNATIONAL, INC.** |
|    Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|    Trustee Process Defendant | ) | |

Pursuant to Federal Rule of Civil Procedure 34, Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos"), submits the following requests for production of documents to Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc.

Documents should be produced to Lycos at McDermott, Will & Emery, 28 State Street, Boston, MA 02109 Attn: Thomas O. Bean, on or before the date thirty days after the date hereof.

## DEFINITIONS AND INSTRUCTIONS

As used in these Requests, the terms listed below are defined as follows:

1.      "You" or "Your" or "CSI" means Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc., its officers, directors, agents, attorneys and employees.

2.      "Complaint" means the Complaint filed by CSI on or about January 4, 2005, commencing this action.

3.    "Concerning" means referring to, describing, evidencing, or constituting.

4.    "Counterclaim" means the Counterclaim asserted by Lycos against CSI set forth in the Amended Answer and Counterclaim of Defendant Lycos, Inc. dated March 22, 2005.

5.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.    As used herein, the terms "Document" or "Documents" means writings, drawings, graphs, charts, photographs, phone records, and other data compilations from which information can be obtained. This definition includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, advertisements, correspondence, contracts, agreements, bills, orders, receipts, records, books, e-mail, spreadsheets, word processed documents, slide presentations, computer tapes and print-outs, intracorporation communications, memoranda, notes, notebooks, maps, sketches, cablegrams, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, printed forms, manuals, brochures, lists, publications, catalogues, directories, videotapes, other tape recordings, films, microfilm, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody or control of plaintiff or any other past or present officer, director, agent, employee consultant, or attorney for plaintiff or any person acting on behalf of plaintiff. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

7.    "Equipment" means the pieces of equipment, individually and collectively,

- 2 -

leased by CSI to Lycos pursuant to the Leases.

8.    "Equipment Schedules" means the Equipment Schedules, individually and collectively, entered into by Lycos and CSI that incorporate the terms of the Master Lease Agreement, and all exhibits, amendments, modifications, and addenda thereto.

9.    "Identify" means, with respect to a person or entity, the person's or entity's full name, present or last known address, and when referring to a natural person, the present or last known place of employment.

10.   "Leases" means the Master Equipment Lease and the Equipment Schedules, collectively.

11.   "Lycos" means Lycos, Inc., Defendant and Plaintiff-in-Counterclaim, its officers, directors, attorneys, agents, and employees.

12.   "Master Equipment Lease" means the Master Lease Agreement Number 144874 attached as <u>Exhibit 1</u> to the Complaint, and all amendments, modifications and addenda thereto.

13.   The term "Person" means, in the plural, as well as the singular, any natural person, firm, association, partnership, corporation, or other entity.  All references herein to any person shall include its employees, agents or representatives of such person or entity.

14.   "Stenberg" means Paul Stenberg, CSI's account representative for Lycos.

15.   "Sales Agreement" means Sales Agreement number 199614 between CSI and Lycos.

16.   "Stipulated Loss Value" shall have the meaning given to it in the applicable Equipment Schedule.

17.   Whenever used herein, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular; the masculine shall be deemed to include the

- 3 -

feminine and the feminine shall be deemed to include the masculine; and disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); and each of the functional words "each," "every," "and," and "all" shall be deemed to include each of the other functional words.

18.    Where anything has been deleted or redacted from a Document produced in response to a Request, specify:

        a.    the nature of the material deleted or redacted; and

        b.    the reason for the deletion or redaction.

19.    Where any copy or copies of any Document whose production is sought is/are not identical to any other copy thereof, by reason of any alterations, notes, comments, or other material contained thereon or attached thereto, or otherwise, all such non-identical copies shall be produced separately.

20.    In producing Documents, all Documents which are physically attached to each other in files, shall be left so attached. Documents which are segregated or separated from other Documents, whether by inclusion in binders, files, subfiles, or by use of dividers, tabs, or any other method, shall be left so segregated or separated. Documents shall be produced in the order in which they were maintained.

21.    As to each Document herein requested which is withheld on the grounds of privilege, or for any other reason whatsoever, you must state the following:

        a.    date;

        b.    names, title and positions of all persons who prepared the Document, or assisted in its preparation, or in whose name the Document was prepared;

  c. names and positions of all persons to whom the Document was addressed,

    or who have been sent, have seen, have had possession or custody of, or

    have had disclosed to them the contents of, the Document or any copies;

  d. subject matter of the Document; and

  e. the grounds for withholding the Document.

22. If any information requested by this discovery was at one time in existence but is

no longer in existence, or has been made unavailable in any manner, you must state the

following:

  a. identify the nature of the information and state the date on which it ceased

    to exist;

  b. identify the circumstances under which it ceased to exist and the identity

    of all persons having knowledge of the contents thereof.

24. For requests 1 through 6, Documents created, generated, or in use during the

period from (a) the earlier of July 1, 1996 and (b) the date ninety (90) days before CSI made its

first proposal to Lycos to lease equipment, through December 31, 2004, shall be produced.

25. For requests 7 through 16, Documents created, generated, or in use during the

period from (a) the earlier of July 1, 1996 and (b) the date ninety (90) days before CSI made its

first proposal to Lycos to lease equipment, through the date of your response to this Request,

shall be produced.

## REQUESTS FOR PRODUCTION

Produce for examination and copying all Documents responsive to the following requests that are in Your possession, custody or control (including those Documents in the possession of your agents, attorneys, trustees or others acting at your direction or on your behalf):

1. All Documents Concerning the Leases including, without limitation, all:

   a. the Equipment Schedules, sales agreements, acceptance certificates, and estoppel letters or certificates;

   b. to the extent not covered by the foregoing, all Documents Concerning the terms under which Lycos leased the Equipment from CSI including, without limitation, Documents Concerning the reasons CSI required Lycos to cause a letter of credit to be posted;

   c. Documents Concerning the aggregate amount paid by Lycos to CSI (other than for taxes) with respect to each Equipment Schedule;

   d. Documents concerning the aggregate amount of taxes paid by Lycos to CSI with respect to each Equipment Schedule;

   e. Documents Concerning the aggregate amount Lycos would have paid CSI with respect to each Equipment Schedule (other than for taxes) if none of the Equipment Schedules had been rolled, extended, rewritten, or restructured;

   f. Documents Concerning the aggregate amount Lycos paid CSI (other than for taxes) with respect to the Leases;

   g. Documents Concerning the aggregate amount Lycos paid CSI for taxes with respect to the Leases;

- 6 -

h.     Documents Concerning the aggregate amount Lycos would have paid CSI with respect to the Leases (other than for taxes) if none of the Equipment Schedules had been rolled, extended, rewritten, or restructured;

i.     Documents Concerning economic or financial analyses prepared by or on behalf of CSI with respect to each Equipment Schedule such as Documents reflecting how CSI determined the lease price for each Equipment Schedule, revenue projections for each Equipment Schedule, profit analyses for each Equipment Schedule, and analyses of internal rates of return for each Equipment Schedule;

j.     Documents Concerning rolling, extending, rewriting, or restructuring any or all of the Equipment Schedules;

k.     Documents delivered by CSI to Lycos to establish, justify, explain or disclose to Lycos the financial impact on Lycos of rolling, extending, rewriting, or restructuring the Equipment Schedules including, without limitation, Documents Concerning the dollar amount or percentage by which Lycos' monthly lease payments would decrease and aggregate lease payments would increase, as a result of rolling, extending, rewriting, or restructuring the Equipment Schedules.

l.     Communications by, between and among CSI employees Concerning the Leases, the Equipment Schedules, or Lycos;

m.     Communications between CSI and Lycos;

n.     Documents Concerning sales presentation or training materials in which CSI's lease of equipment to Lycos was explicitly or implicitly referred to;  and

- 7 -

o.     Documents Concerning the financing, refinancing, paydown of financings or refinancings, or assignment of the Leases or the Lease Schedules by CSI to any actual or potential lender to or investor in, CSI, regardless of whether the documents were actually delivered to the potential lender or investor or were received from the actual or potential lender or investor.

2.   All Documents Concerning the Equipment including, without limitation,

a.     Documents listing or otherwise describing the quantity and type of Equipment;

b.     Documents Concerning the original cost (preferably by Equipment Schedule) of each piece of equipment leased by CSI to Lycos;

c.     Documents Concerning the aggregate original cost by Equipment Schedule of the equipment leased by CSI to Lycos pursuant to that schedule;

d.     Documents Concerning the aggregate original cost of the Equipment;

e.     Documents Concerning the aggregate original cost of all Equipment that had been leased by CSI to Lycos on or before March 18, 2002;

f.     Documents Concerning CSI's analyses, by Equipment Schedule or type of equipment, with respect to the residual value of that equipment had Lycos returned it to CSI at the end of the original 24 or 36 month term of each Equipment Schedule including, without limitation, CSI's actual booked residual value and any changes thereto;

- 8 -

g.    Documents Concerning the price for which CSI sold any and all Equipment after Lycos returned it to CSI at the end of the term of an Equipment Schedule;

h.    Documents Concerning the information contained in the e-mail attached as Exhibit H to the Counterclaim including, without limitation, all Documents provided by CSI to Stenberg, or consulted, considered or relied on by Stenberg, in providing to Lycos the information contained in that e-mail;

i.    Documents Concerning payments made by CSI to or invoices received from vendors Concerning the Equipment;

j.    Communications between CSI and any third-party financial institution with respect to the financing, refinancing, or paydowns of financing or refinancing, of the Equipment;

k.    Documents Concerning the aggregate original cost of the Equipment relative to the total amount paid by Lycos to CSI (other than for taxes) pursuant to the Leases; and

l.    Documents Concerning CSI's calculation of the Stipulated Loss Value reflected on the Equipment Schedules including, without limitation, the method of calculation and the inputs and assumptions used to make those calculations.

3.    All Documents Concerning equipment leasing proposals made by CSI to Lycos including, without limitation:

a.    proposals made by CSI to Lycos to lease equipment, whether such proposals were accepted by Lycos or not;

b.    Documents analyzing, evaluating, or otherwise characterizing any

- 9 -

proposals made by CSI to Lycos with respect to the lease of equipment;

c.    Documents Concerning proposals developed by CSI to lease equipment to Lycos that were not presented to Lycos;

d.    Documents Concerning pricing, profits, the financial aspects or economics of any proposals made by CSI to Lycos, whether accepted by Lycos or not; and

e.    requests for information or requests for price quotations made by Lycos to CSI.

4.    All Documents Concerning Stenberg and the people to whom he reported, directly or indirectly, including, without limitation,

a.    Documents Identifying the People to whom Stenberg reported, directly or indirectly;

b.    Documents Concerning CSI's training or education of Stenberg;

c.    Documents Identifying customers of CSI for whom Stenberg served as an account representative;

d.    Documents Concerning efforts by Stenberg to assist any employee of Lycos including, without limitation Monique Walsh, in obtaining new or different employment;

e.    Documents Concerning parties, dinners, golf outings or other events to which Stenberg invited Lycos employees, along with a list of all Persons who attended such events and the cost of such events;

f.    Documents Concerning requests for reimbursement of expenses submitted by Stenberg arising from or relating to CSI's relationship to Lycos;

BST99 1485045-2 057077 0012

g.    Documents Concerning compensation, bonuses, awards, rewards, prizes, trips or vacations received by Stenberg arising from or relating to the Leases, the Equipment Schedules, or Lycos;

h.    Documents Concerning reviews or performance evaluations of Stenberg by CSI;

i.    Documents concerning incentive or bonus compensation made available to Stenberg and any other CSI employee who performed services in connection with, or received compensation, as a result of the Leases or Equipment Schedules;

j.    Documents Concerning the amount of base compensation, along with the amount of any incentive or bonus compensation, received by Stenberg and any other CSI employee who performed services in connection with the Leases or Equipment Schedules; and

k.    Stenberg's quarterly and annual business plans, sales targets, and sales objectives.

l.    Stenberg's goals, objectives, strategies and tactics for retaining existing customers and obtaining new customers.

5.    All Documents Concerning the Sales Agreement including, without limitation,

a.    the Sales Agreement;

b.    Communications between CSI and Lycos Concerning the purchase of equipment by Lycos from CSI that culminated in the Sales Agreement;

c.    Communications between or among CSI employees Concerning the sale of equipment by CSI to Lycos that culminated in the Sales Agreement;

- 11 -

d.     Communications between CSI and any lender, investor, or assignee of any

of the Equipment Schedules, the sale of equipment by CSI to Lycos;

e.     Documents Concerning analyses conducted by or on behalf CSI with

respect to the market value, as of July 14, 2003, of the equipment sold pursuant

the Sales Agreement;

f.     Documents Concerning the aggregate original cost of the Equipment sold

pursuant to the Sales Agreement.

g.     Documents Concerning the residual value, as of July 14, 2003, of the

equipment sold pursuant to the Sales Agreement.

h.     Documents Concerning the book value on CSI's books and records, as of

the last date before July 15, 2003 on which those books and records

reflected a book value, of the equipment sold by CSI to Lycos pursuant to the

Sales Agreement;

i.     Documents Concerning the amount of CSI's gain or loss on the sale of the

equipment sold by CSI to Lycos pursuant to the Sales Agreement; and

j.     Documents Concerning the several price quotations for which CSI

proposed selling the equipment to Lycos that was ultimately sold pursuant to the

Sales Agreement including, without limitation, Documents Concerning the

analyses that led to those quotations.

6.     All Documents summarizing or analyzing the percentage of the original

equipment cost for which CSI was able to sell desktop computers, laptop computers, printers,

monitors, servers, storage devices, routers, and switches, after those items were returned to CSI

at the end of twenty-four and thirty-six month equipment schedules.

- 12 -

7.    All documents concerning the training or education of employees of CSI, or policies of CSI, Concerning, the sale or lease of computer equipment including, all:

    a.    Documents describing sales methods used or to be used;

    b.    phone scripts and templates, standardized forms, letters, and e-mails to be used;

    c.    Documents Concerning rolling, extending, rewriting, or restructuring leases or equipment lease schedules;

    d.    Documents Concerning policies with respect to disclosing to CSI customers the original cost of the equipment leased to those customers; and

    e.    Documents Concerning policies with respect to disclosing to CSI customers the financial impact on those customers of rolling, extending, rewriting, or restructuring leases or equipment lease schedules

7.    All Documents provided to any customers of CSI disclosing the financial impact on those customers of rolling, extending, rewriting, and restructuring leases or equipment lease schedules.

8.    All Documents Concerning any incentive or bonus plans made available by CSI to its employees

9.    All Documents Concerning sales awards and sales award criteria for CSI employees, including Documents Concerning the Identity of the recipients of such awards and speeches and presentations made in connection with the receipt of any award.

- 13 -

10.    All Documents Concerning Lycos, the Leases, or the Lease Schedules that were prepared for or used by CSI in connection with any internal or external meetings, forums, presentations, or gatherings.

11.    All Communications received by CSI from the Equipment Leasing Association, any governmental authority, or any customer of CSI other than Lycos, Concerning the propriety, legality, or absence of sufficient disclosure by CSI with respect to CSI's rolling, extending, rewriting, or restructuring of leases or equipment lease schedules.

12.    All Documents Concerning (A) the date CSI started the "MyCSI" portion of the CSI website and (B) the reason(s) CSI started MyCSI.

13.    All Documents Concerning communications by, between or among CSI employees concerning any and all claims and counterclaims filed by Lycos against CSI concerning the Leases.

14.    All Documents Concerning accruals made on CSI's books and records or reserves established by CSI arising from claims and counterclaims filed by Lycos against CSI.

15.    All Documents evidencing settlements, accommodations, sales, or lease price adjustments made by CSI arising from informal or formal claims by CSI's customers arising from the rolling, extending, rewriting, or restructuring of leases or equipment lease schedules.

- 14 -

16.    Documents Concerning CSI's policy or policies for retaining Documents.

Respectfully submitted,

LYCOS, INC.,

By its attorneys,

Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY, LLP
28 State Street
Boston MA 02109
(617) 535-4000

Dated:  December 27, 2005

BST99 1485045-2 057077 0012

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of December, 2005, I caused a true and accurate copy of the within document to be delivered by hand to Robert J. Kaler, Gadsby Hannah, LLP, 225 Franklin Street, Boston, MA 02111.

Thomas O. Bean

BST99 1485045-2 057077 0012

# EXHIBIT B



"Kaler, Robert"
<RKaler@ghlaw.com>

02/09/2006 04:28 PM

To  <TBean@mwe com>

cc  "Little, Edward" <ELittle@ghlaw.com>

bcc

Subject

History:      🖅 This message has been replied to and forwarded.

Tom --

    Attached is a redlined and a clean version of the draft with my latest revisions to your last set of revisions.  Please let me know if you have any problem opening it, as we have no trouble at this end, and I will have our IT people look at it.

Tks. Bob.

Robert J. Kaler
Gadsby Hannah LLP
225 Franklin Street
Boston, MA 02110
Tel: 617-345-7007
Fax: 617-204-8007
Email: rkaler@ghlaw.com

To ensure compliance with requirements imposed by the U.S Internal Revenue Service, Gadsby Hannah LLP informs you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax related matters addressed herein.

This message is a CONFIDENTIAL communication. If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others.
Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

          

RJK Edits to Bean Edits (B0448181-1) doc  RJK Edits to Bean Edits (B0448181-2) DOC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                               )
COMPUTER SALES INTERNATIONAL, INC., )
                               )
              Plaintiff and Defendant- )
              in-Counterclaim, )
                               )
v.                             )
                               )
LYCOS, INC.,                   )
                               )        C.A. No. 05-10017-RWZ
              Defendant and Plaintiff- )
              in-Counterclaim, )
                               )
and                            )
                               )
BANK OR AMERICA f/k/a FLEET BANK, )
                               )
              Trustee Process Defendant. )
_____)
```

### STIPULATION AND ORDER REGARDING THE HANDLING
### OF CONFIDENTIAL INFORMATION PRODUCED IN DISCOVERY

Plaintiffs Computer Sales International, Inc. a/k/a CSI Leasing, Inc. ("CSI") and

defendant Lycos, Inc. ("Lycos") hereby stipulate and agree, and IT IS HEREBY ORDERED by

the Court, as follows:

1.      Either party to this case may designate any information produced in this action by

it or by a third-party (hereinafter a "Designating Party"), whether in the form of documents,

discovery responses (*i.e.* deposition testimony, interrogatory answers, etc.) or other tangible or

intangible things (hereinafter the "Information") as "CONFIDENTIAL" in accordance with the

provisions hereof if it believes in good faith that such information qualifies for such designation

under the provisions of paragraph 2 hereof. Any such designation shall be made by marking the

documents, discovery responses, or other tangible things that contain the information being

-2-

designated as "CONFIDENTIAL." If a third party is subpoenaed to produce documents, and a party believes in good faith that those documents may satisfy the requirements set forth in paragraph 2 for confidentiality, that party may designate documents marked for copying by the subpoenaing party as CONFIDENTIAL, and the copies of those documents made by the subpoenaing party shall be marked as such. Unless and until a CONFIDENTIAL designation is dissolved pursuant to the provisions hereof, the information covered by the designation shall be treated by the party receiving it (the "Receiving Party") in the manner required hereby.

2.      Information may be designated as "CONFIDENTIAL" in accordance with the provisions hereof only if it consists of or contains confidential information of a Designating Party (e.g. sensitive information regarding the financial, manufacturing, cost, pricing or marketing areas of the Designating Party's business), trade secrets or other non-public research, development or commercial information of or about the Designating Party; and only if it is so designated at the time it is produced for inspection, or at the time copies of it are delivered to the party receiving it (hereinafter the "Receiving Party").

3.      Information of any kind (including documents, electronic records, interrogatory answers, and deposition testimony) that satisfies the requirements for such designation set forth herein may be designated "CONFIDENTIAL" in the following manner and at the following times, unless otherwise agreed in writing between the parties:

(a)      documents may be designated "CONFIDENTIAL" either by marking them to that effect prior to or at the time of their initial production to the Receiving Party for inspection and copying;

-3-

(b)    interrogatory answers may be designated "CONFIDENTIAL" either by marking them to that effect prior to or at the time of their service on the Receiving Party for inspection and copying; and

(c)    deposition testimony may be designated "CONFIDENTIAL" by counsel for the Producing Party making a statement for inclusion in the deposition transcript identifying, immediately after an answer is given, what portions of the answer are subject to the claim of confidentiality.

4.    In the event the Receiving Party objects to any designations of information as "CONFIDENTIAL", the Receiving Party's counsel shall advise the Designating Party of such objection, and the reasons therefore, in writing.   Counsel for the Designating Party shall then have ten (10) days within which to respond in writing setting forth the rationale for designating the information in question as "CONFIDENTIAL." At the expiration of that ten (10) day period, if counsel for the Receiving Party disagrees with the rationale for Designating Party's designating the material as "CONFIDENTIAL," or fails to receive a written response from the Producing Party setting forth any rational for the designation, the Receiving Party may file a motion to set aside the designation, and in connection with proceedings on that motion, the Designating Party shall bear the burden of proving that the designation was appropriate.

5.    Information designated "CONFIDENTIAL" pursuant to this Stipulation and Order shall be treated as follows:

(a)    The Receiving Party may disclose information designated "CONFIDENTIAL" only to "Qualified Persons," which is hereby defined to mean:

(i)    the Court, in the manner provided by Paragraph 8 hereof;

(ii)    court reporters or stenographers whose services are used in connection

with this action, and other persons working for such reporters or stenographers;

        (iii)    the parties (including current and former employees of parties);

        (iv)    counsel of record for the parties to this action and members and employees of the law firms of the counsel of record, and in-house legal counsel and legal staff of the parties;

        (v)    consultants or experts retained by the parties in connection with this litigation, provided that each such consultant or expert provides to the party retaining him or her the certification set forth in Exhibit "A" to this Agreement, unless otherwise agreed in writing by the parties; and

        (vi)    to the extent necessary, to non-party witnesses or prospective witnesses in this action, although they shall not be provided, except temporarily for purposes of questioning them, with copies of any material designated "CONFIDENTIAL" pursuant to this Order.

        7.    Nothing in this Confidentiality Stipulation and Protective Order shall be construed to prohibit a Receiving Party from producing documents, material, or information designated as "CONFIDENTIAL" in its possession pursuant to a subpoena or other legal process provided that the Receiving Party, if subpoenaed to produce such material, shall give the person or party who designated the document as "CONFIDENTIAL" notice of the subpoena within five (5) business days after receiving the subpoena, and shall not produce such material in response to the subpoena for a period of at least seven (7) business days after giving the required notice to the designating party. If, within seven (7) business days of receiving such notice, the designating party moves to quash the production, then the Receiving Party shall not release the material pending a decision on that motion.

-5-

8.      All documents and discovery materials produced in this action, whether or not designated as "CONFIDENTIAL" or not, shall be used by the persons receiving the materials only for the purpose of preparing for and conducting this action; provided, however, that nothing herein shall impose any restrictions on the use or disclosure by a party or witness of-

(a)      documents or information obtained by such party or witness independently of the formal or informal discovery proceedings in this action if the source of such information was not obligated to hold such documents or information in confidence; or

(b)      public and other documents obtained, or obtainable, from another source or already in the possession or knowledge of, or previously known to a witness, his employer, or another person who is not obligated to maintain such documents in confidence.

9.      If documents, deposition transcripts, things, or other materials designated as confidential are filed with the Court or included in any papers filed with the Court, such discovery materials or papers, after the entry of an appropriate Court Order, shall be labeled "CONFIDENTIAL -- SUBJECT TO COURT ORDER" and filed under seal and kept under seal until further Order of the Court; provided, however, that such information shall be available to the Court and to counsel of record for the parties.

10.      Non-parties producing documents, testimony or other materials during the course of this action may designate the same as "CONFIDENTIAL" under this Protective Order by following the procedures set forth in paragraphs 2 and 3 above, and such information shall thereafter be treated by the Receiving Parties under this Protective Order in the same manner as if produced by a Producing Party to this action and so designated hereunder.

11.      Within 180 days after the final termination of this litigation, all parties or their counsel in possession, custody or control of documents or things produced to them during

discovery containing information designated "CONFIDENTIAL" shall:

> (a)    return the documents, things or other materials to the Designating Party, or destroy them; and

> (b)    with respect to documents, things or other materials prepared by the Receiving Party that incorporate or are derived from the Designating Party's Confidential Information, the Receiving Party shall, at its discretion, destroy or return such documents, things, or other materials. If such documents are destroyed, the corporate officer or person who supervised such destruction shall certify in writing the complete destruction of each document.

10.    Entering into, agreeing to, and/or complying with the terms of this Confidentiality Stipulation and Protective Order shall not:

> (a)    operate as an admission for evidentiary purposes;

> (b)    prejudice the right of either party to contest the alleged relevancy, admissibility, or discoverability of Information designated as CONFIDENTIAL;

> (c)    prejudice in any way the right of a party at any time to seek a determination by the Court or agreement by other parties as to whether any particular document should be subject to the terms of this Confidentiality Stipulation and Protective Order; or

> (d)    prejudice the right of a party to introduce at the trial of the action information designated as "CONFIDENTIAL" pursuant to this Confidentiality Stipulation and Protective Order.

COMPUTER SALES INTERNATIONAL, INC.    LYCOS, INC.

By its attorneys,    By its attorneys,

-7-

-

| | |
|---|---|
| Robert J. Kaler, Esq. | Thomas O. Bean, Esq. |
| Edward Little, Esq. | Peter M. Acton, Esq. |
| Gadsby Hannah LLP | McDermott Will & Emery LLP |
| 225 Franklin Street | 28 State Street |
| Boston, MA 02110 | Boston, MA 02110 |
| Tel. (617) 345-7007 | Tel. 617.535.4426 |

Dated: February __, 2006

SO ORDERED:

_____

UNITED STATES DISTRICT JUDGE

*EXHIBIT "A"*

      I hereby attest to my understanding that information or documents designated "CONFIDENTIAL" will be provided to me pursuant to the terms and conditions and restrictions of the Confidentiality Stipulation and Protective Order signed by counsel for the parties on _____ 2006, and entered as an Order of Court on _____ 2006 in a civil action entitled *Computer Sales International, Inc v. Lycos, Inc* , C.A. No. 05-10017- RWZ, pending in the United States District Court for the District of Massachusetts, and that:

      (a)    I have been given a copy of and have read the Confidentiality Stipulation and Protective Order and have had its meaning and effect explained to me by the attorneys providing me with such information or documents;

      (b)    I agree to be bound by it and its terms;

      (c)    I shall not disclose such information or documents to others, except in accordance with the Confidentiality Stipulation and Protective Order;

      (d)    I am obligated to honor the confidentiality of such information or documents after the termination of this legal proceeding;

      (e)    If I fail to abide by the terms of the Protective Order, I may be subject to sanctions, including sanctions by way of contempt imposed by the Court and any other remedies available including those in law and equity

_____      _____

Date                        Signature

                                   _____

                                   Name (Print)

-9-

Formatted: Font: 9 pt

B0448181v2

# EXHIBIT C



**Equipping lease professionals for success**

# ELA Code of Fair Business Practices

- <u>Purpose</u>

- <u>Preamble</u>

- <u>Section I: General Standards of Professional Conduct</u>

- <u>Section II: Exchange of Credit Information</u>

- <u>Section III: Enforcement Provisions</u>


## Purpose

The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

<u>Back to Top</u>

## Preamble

Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal

Case 05-44017-BLAZ    Document 55-4    Filed 02/15/2006    Page 2 of 5

and State laws:

Back to Top

## Section I: General Standards of Professional Conduct

1.  A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2.  A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry

3   A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement

4   A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry

5.  A Member shall use proper care and exercise independent professional judgment

6.  A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7   A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8.  A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9   A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11  A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client

12  A Member shall not make payments to a representative of another party without the consent of that party

13  A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

Back to Top

## Section II: Exchange of Credit Information

The exchange of credit information is an integral part of a well functioning equipment leasing and financing industry. In addition to complying with all government laws and regulations, the Members shall adhere to The Robert Morris Associates' Code of Ethics for the Exchange of Credit Information.

Back to Top

## Section III: Enforcement Provisions

Article VIIB of the ELA Bylaws provides that a Member may be censured, suspended or expelled from the Association for violating the Code of Fair Business Practices of the Association. Accordingly, the disciplinary actions that the Association may take in the event of a violation of the Code include: (a) private censure; (b) public censure; (c) probationary membership with such conditions as may be determined by the Association; (d) suspension of membership for a term and on such conditions as may be determined by the Association; (e) expulsion from membership; and (f) non-renewal of the membership of the Member.

The following provisions, consistent with the provisions of Article VIIB of the ELA Bylaws, set forth the procedures to be followed in proceedings involving alleged violations of the Code.

1. An ELA Fair Business Practices Committee ("the Committee"), consisting of two members of the ELA Board of Directors and three other individuals, shall be appointed by the Chairman of the Association who shall also designate one member of the Committee as Chairman of the Committee.

2. A proceeding alleging that an ELA Member violated the Code may be initiated by a Member of ELA (other than any ELA Member who has an official on the Committee), by the Executive Committee of the Association or by a non-member of ELA which has suffered injury as a participant in an equipment lease or finance transaction with a Member ("complainant"). The proceeding shall be initiated by filing a written Complaint with the ELA President at ELA Headquarters by registered mail. The Complaint must identify the section or sections of the Code alleged to be violated, set forth in detail the facts claimed to support the charges of Code violation, and include documents in the possession of the complainant which are pertinent to the Complaint. In addition, the complainant may submit affidavits from the complainant and others in support of the Complaint.

3. Copies of the Complaint and supporting documents, if any, shall be sent by the President to the members of the Committee. If the Committee deems the Complaint to be insufficient, it may request the complainant to provide more information, documents or affidavits in support of the Complaint.

4. If the Committee determines by majority vote that the Complaint and supporting documents, on their face, do not satisfy the requirements of Paragraph 2 or do not state facts constituting a violation of the Code, the complainant shall be so notified by the Chairman of the Committee, and no further action shall be taken.

5.   If the Committee determines that the Complaint and supporting documents meet the requirements of Paragraph 2 and allege facts which, if true, could constitute a Code violation, the Chairman of the Committee shall request the ELA President to send a copy of the Complaint and supporting documents, by registered mail, to the party complained against (the "respondent")  The President shall also provide the respondent and complainant with a copy of the Code

6    The respondent shall be afforded an opportunity to Answer the Complaint. The respondent's Answer shall respond to the specific allegations contained in the Complaint. The Answer shall also notify the Committee whether or not the respondent requests a hearing on the allegations in the Complaint, and provide the Committee with documents or affidavits from respondent or others supporting the Answer  The Answer, supporting documents and affidavits shall be sent to the ELA President by registered mail within 30 days of respondent's receipt of the Complaint. The ELA President shall promptly forward the Answer and supporting documents to the Committee and to the complainant by registered mail, and shall notify complainant of the right to request, within 30 days of receipt of the respondent's Answer, a hearing on the Complaint before the Committee

7    Irrespective of whether the parties request a hearing on the Complaint, the Committee shall have the authority by majority vote to dismiss the Complaint if it determines, based upon the submissions made, that it is clear there is no violation of the Code. Should the Committee dismiss the Complaint, the parties shall be notified and no further action on the Complaint shall be taken

8.   In the event the Complaint is not dismissed and a party has requested a hearing or the Committee determines a hearing is necessary, then the Committee shall notify complainant and respondent of the date, time and location of the hearing and their right to be represented by counsel at the hearing. During the hearing, the parties shall be afforded a reasonable opportunity to present evidence, cross-examine witnesses and be heard on matters alleged in the Complaint and Answer. The Committee may also permit others to testify at the hearing

9.   The Committee shall vote on whether or not the respondent has violated the Code based upon the record, and, if so, what disciplinary action, if any, should be taken against the respondent as a consequence of such violation  A two-thirds vote of the Committee members is required to censure, suspend or expel a respondent

10   The Committee's decision must be in writing and shall be sent to the respondent and complainant by registered mail  The Committee shall notify the respondent of the right to appeal an adverse decision within 30 days of receipt of the decision. The respondent's appeal, if any, shall be sent by registered mail to the ELA President and shall set forth the reasons why the Committee's decision should be set aside  The ELA President shall promptly forward the respondent's appeal, if any, to the Complainant via registered mail. If the respondent does not timely appeal the Committee's decision, the decision shall be final and binding upon respondent.

11.  If the respondent elects to appeal the Committee's decision, then the matter shall be transmitted for a hearing on the existing record before the ELA Board of Directors (the "Board")  The Board shall notify the parties via registered mail of the date, time and location of the hearing, and the schedule for filing written submissions with the Board  The respondent and the complainant may be represented by counsel and shall be permitted to provide written submissions and present oral argument to the Board  No additional documents may be filed or any testimony taken, unless ordered or requested by the Board  The Board shall vote on whether the Committee's decision should be affirmed, modified or reversed  A decision by the Board which censures, suspends or expels the respondent must be by two-thirds vote of the members present and voting  No member of the Committee, and no Director that is a representative of an ELA member that initiated the Complaint or of the respondent, may be present during, or participate in, the voting.