## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

COMPUTER SALES                     )
INTERNATIONAL, INC.,               )
                                   )
    Plaintiff and Defendant-in-    )
    Counterclaim,                  )
                                   )
v.                                 )
                                   )      C.A. No. 05-10017-RWZ
LYCOS, INC.,                       )
                                   )
    Defendant and Plaintiff-in-    )
    Counterclaim,                  )
                                   )
and                                )
                                   )
BANK OF AMERICA f/k/a FLEET        )
BANK,                              )
                                   )
    Trustee Process Defendant      )

## LYCOS' MOTION FOR LEAVE TO FILE
## SECOND AMENDED ANSWER AND COUNTERCLAIM

Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby moves pursuant to Fed. R. Civ. P. 15(a) for leave to file a Second Amended Answer and Counterclaim in this action. A copy of Lycos' proposed Second Amended Answer and Counterclaim is attached hereto as Exhibit 1; a copy of it black-lined against Lycos' Amended Answer and Counterclaim (without exhibits) is attached hereto as Exhibit 2.

In brief, Lycos seeks to file the Second Amended Counterclaim to, among other things, add Counts V-VIII concerning its assertion that two of the schedules pursuant to which CSI "leased" equipment to Lycos -- Schedules 93 and 94 --

- evidence loans and security agreements, within the meaning of section 1-201(37) of the Uniform Commercial Code as adopted in Massachusetts and Missouri, rather than "true leases";

- that the interest rate charged by CSI on those loans -- over 400% -- was usurious in violation of M.G.L. c. 271, § 49(a);[1]

- that Lycos' usury claims are governed by Massachusetts law; and

- that CSI's imposition of an usurious interest rate violates M.G.L. c. 93A, § 2 and 940 C.M.R. 3.16(3).

For the reasons set forth below, the Court should grant Lycos leave to file the Second Amended Answer and Counterclaim.

1.    Plaintiff and Defendant-in-Counterclaim, Computer Sales International ("CSI") commenced this action by filing a Verified Complaint on January 5, 2005. After Lycos filed its Amended Answer and Counterclaim and CSI moved to dismiss or for summary judgment on its claims and those of Lycos' counterclaim, this Court in December, 2005, denied CSI's motions as to eight of the nine counts of Lycos' counterclaim and as to the claims in CSI's complaint. Discovery had been stayed in this action pending disposition of CSI's motions. Docket Nos. 20 and 46.

2.    On January 10, 2006, the Court held a status conference pursuant to which is tentatively scheduled discovery to end on January 31, 2007. See docket, electronic clerk's notes entered 1/10/06.

3.    To date, CSI has served a request for production of documents, to which Lycos has responded, but it has not served any other written discovery nor has it taken any depositions. (It has, however, noticed a Rule 30(b)(6) deposition of Lycos for April 26, 2006.)

---

[1]  Lycos also alleges in the Second Amended Answer and Counterclaim that CSI failed to file the notice with the Attorney General of the Commonwealth permitted by M.G.L. c. 271, § 49(d). Under that section, the state's usury prohibitions do not apply to persons who file such notices.

4.    Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a party's pleading "shall be freely given when justice so requires." "This phrase is usually interpreted as an affirmation of the liberal approach to pleading taken by the modern rules, see, e.g. Foman v. Davis, 371 U.S. 178 (1962), and as an encouragement to district judges to decide a plaintiff's claim on the merits whenever possible." McMillan v. Mass. Society for the Prevention of Cruelty to Animals, 168 F.R.D. 94, 97 (D. Mass. 1995) (internal parallel citations omitted). It applies to "counterclaims" in precisely the same way as it does to "claims" asserted by way of a complaint. Id.

5.    "Rule 15(a) amendments are typically allowed 'in the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [or] futility of the amendment'" Resnick v. Copyright Clearance Center, 2006 WL 721535 (D. Mass. March 16, 2006) (Zobel, J.) quoting Vargas v. McNamara, 608 F.2d 15, 18 (1st Cir. 1979); accord, Chiara v. Dizoglio, 59 F.Supp.2d. 193, 198 (D. Mass. 1999)( "Rule 15(a) requires that leave to amend be given freely in the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive or undue prejudice to the opposing party.")

7.    Here, none of the grounds for denying Lycos leave to amend is present:

A.    There has been no undue delay, bad faith, or dilatory motive because Lycos proposes to file the Second Amended Answer and Counterclaim soon after the grounds for filing it became apparent based on, among other things, documents produced by CSI in discovery and Lycos' deposition of one CSI employee;

B.    There can be no prejudice to CSI because Lycos proposes to file the Second Amended Answer and Counterclaim in the early stages of discovery before CSI has served any written discovery, other than a document request, or taken any depositions; and

C.    The Second Amended Counterclaim is not "futile" because Lycos does not seek merely to add facts and arguments already set forth in its amended counterclaim. Finnern v. Sunday River Skiway Corp., 984 F.2d 530, 536 (1st Cir. 1993) (amendment is "futile" within the meaning of Rule 15(a) when merely adding facts and arguments already set forth by the previously filed pleadings). Instead, as noted above, it seeks to add four new counts and make other changes to its pleading.

8.    As leave to amend should be freely granted, and none of the reasons for denying leave is present here, this Court should grant Lycos leave to file the Second Amended Answer and Counterclaim.

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1.    Granting it leave to file the Second Amended Answer and Counterclaim; and

2.    Grant it such other relief as may be appropriate and just under the circumstances.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated:  April 14, 2006

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton  (BBO# 654641)
McDermott, Will & Emery, LLP
28 State Street
Boston, Massachusetts 02209
(617) 535-4000

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2006, I caused a true and accurate copy of the within document to be delivered by hand to Robert J. Kaler, Gadsby Hannah, LLP, 225 Franklin Street, Boston, MA 02111.

/s/ Thomas O. Bean
Thomas O. Bean

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **SECOND AMENDED ANSWER AND COUNTERCLAIM OF DEFENDANT LYCOS, INC.** |
|     Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|     Trustee Process Defendant | ) | |

Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") responds to the numbered paragraphs of the complaint as follows:

1.    Lycos admits that its primary business is providing internet access, and that it has a principal place of business in Waltham, Massachusetts. The remaining allegations in this paragraph are characterizations of plaintiff's complaint as to which no response is required. To the extent a response is required, the remaining allegations in this paragraph are denied.

2.    Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.    Admitted.

4.    Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.    This paragraph states a legal conclusion as to which no response is required.

6.    This paragraph states a legal conclusion as to which no response is required.

7.    Lycos admits that plaintiff is in the business of leasing equipment. Lycos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7.

8.    Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.    Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.    Admitted, except that Lycos does not admit that the terms and conditions governing CSI's lease of equipment are accurately "described in relevant part below." Lycos states that the documents evidencing the terms and conditions governing CSI's lease of equipment speak for themselves.

11.    Lycos admits the first sentence. Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence.

12.    Admitted.

13.    Admitted.

14.    Lycos admits that a true and accurate copy of Equipment Lease 100 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule One Hundred attached thereto. Lycos states that Equipment Lease 100 speaks for itself.

15.    Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 100.

- 2 -

16.    Lycos admits that a true and accurate copy of the Certificate of Acceptance for Equipment Lease 100 is attached to plaintiff's complaint, and states that the Certificate of Acceptance speaks for itself.

17.    Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 100 from the plaintiff in the amount of $6,082.29, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

18.    Lycos admits that it received invoices under Equipment Lease 100 from the plaintiff for the months of November and December of 2004 each in the amount of $6,082.29 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

19.    Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

20.    Admitted.

21.    Lycos admits that a true and accurate copy of Equipment Lease 200 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule Two Hundred attached thereto. Lycos states that Equipment Lease 200 speaks for itself.

22.    Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 200. Lycos denies the remaining allegations contained in this paragraph.

- 3 -

23.    Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the Certificate of Acceptance for Equipment Lease 200 that is attached to plaintiff's complaint. Lycos states that the Certificate of Acceptance speaks for itself.

24.    Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 200 from the plaintiff in the amount of $43,954.35, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

25.    Lycos admits that it received invoices under Equipment Lease 200 from the plaintiff for the months of November and December of 2004 each in the amount of $43,954.35 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

26.    Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

27.    Lycos admits that it received a notice of default from the plaintiff dated December 8, 2004, and that a true and accurate copy of the notice of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

28.    Lycos states that the notice of default speaks for itself.

29.    Lycos admits that it did not respond to plaintiff's notice of default, and that it continued to refuse to pay the demanded amounts, but states that it had justification and legal excuse for so refusing. Lycos admits that it received a notice of event of default from the plaintiff dated December 23, 2004, and that a true and accurate copy of the notice of event of

- 4 -

default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

      30.    Lycos states that the notice of event of default speaks for itself, although Lycos denies that plaintiff's actions with respect thereto have been "proper" or "appropriate," or that plaintiff has any amount of money "due and owing" from Lycos.

      31.    Denied.

<div align="center">

**COUNT I**
**(Breach of Master Lease and Equipment Schedules)**

</div>

      32.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 31.

      33.    Denied.

      34.    Denied.

      35.    Denied.

<div align="center">

**COUNT II**
**(Breach of Sales Agreement)**

</div>

      36.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 35.

      37.    Admitted.

      38.    Lycos states that the Sales Agreement speaks for itself.

      39.    Lycos states that the Sales Agreement speaks for itself.

      40.    Denied.

      41.    Denied.

BST99 1489627-3 057077 0012

## AFFIRMATIVE DEFENSES

Lycos incorporates by reference the allegations of its counterclaim, set forth below, in support of each of the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff claims are barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff is equitably estopped from recovering on its claims.

## THIRD AFFIRMATIVE DEFENSE

Lycos is entitled to recoupment or setoff of all amounts claimed by plaintiff.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own fraud.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own negligent misrepresentations.

## LYCOS' COUNTERCLAIM

## NATURE OF THE ACTION

1.      This counterclaim seeks to redress a pattern and practice of misconduct committed by Computer Sales International, Inc ("CSI") with respect to equipment leases it entered into with Lycos. CSI, which claims to be one of the largest independent information technology leasing companies in the world, took advantage of its long-standing relationship with Lycos to obtain millions of dollars in undeserved profit. CSI intentionally and negligently misrepresented facts, made partial and misleading statements, and failed to disclose certain

- 6 -

material features of its lease agreements with Lycos, leading Lycos to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.     CSI accomplished its ends using a method of "rolling up" equipment leases in a fraudulent and deceptive manner. CSI concealed this practice through affirmative misrepresentations, partial disclosures, and omissions of material facts that CSI was obligated to disclose to Lycos under accepted industry standards and guidelines, common law, and the Attorney General's regulations promulgated pursuant to Massachusetts General Laws c. 93A, § 2(c), 940 C.M.R. 3.05(1) and 3.16(2). This "roll-up" scheme recast active equipment leases as longer term leases with lower monthly payments, something which, on its face, was beneficial to Lycos. Yet, these recast or "rolled-up" leases dramatically increased Lycos' cost to a total amount well in excess of the cost of the equipment plus imputed interest, while converting CSI's residual risk in the equipment into a guaranteed stream of rental payments which, because they exceeded the cost of the equipment, eliminated CSI's risk and ensured CSI an exorbitant profit. As a result of CSI's "roll up" scheme, Lycos unwittingly paid more than $72 million on leases of equipment costing approximately $47 million.

3.     CSI also charged Lycos interest of several hundred percent on two particular equipment schedules referred to by CSI and Lycos as Schedules 93 and 94. In late 2001, CSI agreed to "roll over" the equipment from approximately fifteen equipment lease schedules onto two schedules, one twenty-four months in length (schedule 93) and the other thirty-six months in length (schedule 94). At the time the equipment rolled over onto these schedules, Lycos had leased all the computer equipment for at least thirty-six months and, in many cases, for more than five years. Accordingly, the value of that equipment at the time of the rollover was a small fraction of its original cost, and its remaining economic life was shorter than the length of

- 7 -

Schedules 93 and 94. As a result of the forgoing, the fact that Lycos did not have the right to return the equipment, and several other factors, Schedules 93 and 94 were, as a matter of law, "loans and security agreements" rather than "true leases." The amount Lycos paid in interest on the principal amount loaned by CSI on Schedules 93 and 94 was usurious in violation of M.G.L. c. 271, § 49.

    4.      To redress CSI's pattern and practice of misconduct, Lycos seeks, among other things,

        A.      declarations that (i) it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, an amount that now approximates $300,000 and which amounts CSI seeks to recover in this action, and (ii) that Lycos is the owner of the leased equipment;

        B.      recovery of overpayments it made as a result of CSI's wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $14,000,000, plus interest and costs; and treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2 and 11; and

        C.      With respect to schedules 93 and 94,

            (1) Declarations that

                (a)      those schedules each evidence a "loan and security agreement" rather than a "true lease"; and

                (b)      Massachusetts law applies to Lycos' usury claims;

            (2) avoidance of Schedules 93 and 94 as a result of CSI's imposition of an usurious interest rate, and entry of an order requiring CSI to repay Lycos amounts

paid in connection therewith, plus interest and costs; and

(3) treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices – violation of M.G.L. c. 271, § 49, regulations promulgated by the Attorney General under chapter 93A, and charging an usurious interest rate - in violation of M.G.L. c. 93A, §§ 2 and 11.

## PARTIES

5.      Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

6.      Defendant Computer Sales International, Inc. is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

8.      This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

## FACTS

### *Computer Equipment Leasing Generally*

9.      Companies seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies, knowing that computer equipment becomes obsolete relatively quickly, elect to enter into short-term leases rather than purchase the equipment. Leasing also can provide accounting and operational benefits, such as

- 9 -

capital preservation and financing that, under Generally Accepted Accounting Principles, are not required to be placed on the company's balance sheet. Leases permit the lessee to return the equipment to the lessor at the end of the lease term, leaving the lessor with the risk of technological obsolescence.

10.    To satisfy the lessee's present computer equipment needs and accommodate its anticipated needs for new and improved computer equipment in the future, the lessor and lessee typically enter into a master lease agreement. They then enter into one or more equipment schedules, over time, each of which incorporate the terms of the master lease agreement. Typically, an equipment schedule describes the equipment being leased, its cost (or lease basis), the fixed term of the lease, the commencement date, the repayment schedule, and the location of the equipment.

11.    There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the former is a true lease while the latter is essentially a conditional sale or loan. In a capital lease, the lease rental payments together with a required contracted purchase price are sufficient to cover the lessor's investment and provide a yield. In contrast, with operating leases, the lease rental payments total only a percentage of the equipment cost (or lease basis).

12.    Under Financial Accounting Standards Board ("FASB") rules, for a lease to qualify for accounting treatment as an "operating lease," the present value of the minimum lease rental payments must not be greater than or equal to 90% of the original cost of the leased equipment (or lease basis).

13.    At the conclusion of the fixed term under an operating lease, the lessee generally has the option to return the equipment to the lessor, to renew the lease at an agreed rate

- 10 -

(generally fair rental value) or purchase the equipment at an agreed price (generally fair market value). The value of the equipment at the end of the lease term is called the "residual" value, and the proceeds from the sale or re-lease of the equipment is known as "residual" proceeds.

14.    Because the lease rental payments total less than the original equipment cost (or lease basis), the lessor must either sell or re-lease the equipment (the proceeds of such activity being realization of the residual value) to achieve a yield or profit. This difference between the original equipment cost and the total lease rental payments (discounted to present value) – existing in every operating lease – is the lessor's investment risk in the lease.

15.    On operating leases, to achieve a "yield" or profit, most lessors must re-lease or re-sell the leased equipment at the conclusion of the lease term, with the objective of obtaining an amount equal to at least the residual value the lessor assumed at the onset of the lease. But CSI found a simpler way: "rolling up" equipment schedules to eliminate its investment risk and guarantee a profit for itself at Lycos' expense.

16.    In the case of Schedules 93 and 94, CSI's practice of "rolling up" leases created in substance loans and security agreements rather than "true leases." Section 1-201(37) of the Uniform Commercial Code sets forth the standards for when a document styled as a lease is, in fact, a loan and security agreement. Under that section, where, as here, the lessee does not have the right to terminate the lease and return the equipment before the end of the lease term, and the length of the lease term exceeds the economic life of the equipment, the "lease" is considered and treated as a loan and security agreement. Thus, CSI was a "lender" with respect to Schedules 93 and 94. As a lender, CSI was required to comply with Massachusetts' usury laws. It did not.

*Lycos' Computer Equipment Leases With CSI*

17.    In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment. An unexecuted copy of this master lease agreement is attached hereto as <u>Exhibit A</u> (the "Master Lease Agreement").

18.    Between December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment schedules for the acquisition and lease of new items of technology equipment under the Master Lease Agreement. The equipment schedules concerned, literally, thousands of pieces of computer equipment on which Lycos relied for its day-to-day operations. According to the Master Lease Agreement, each equipment schedule constituted a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos.

19.    The equipment schedules were structured as operating leases, with personal computing assets (i.e., PCs) on fixed terms of 24 months and network computing assets (i.e., Non-PCs) on fixed terms of 36 months. A typical 24-month lease between Lycos and CSI was priced so that the present value of the minimum lease rental payments for the term of the lease equaled 85% of the cost of the equipment financed, while the present value for the typical 36-month lease was slightly less than 90%. Thus, CSI's equity (i.e., "investment" or "risk") in the lease was 15% on the 24-month leases and 10% on the 36-month leases.

20.    In connection with the equipment schedules, the vendors from which CSI purchased the equipment it leased to Lycos caused that equipment to be delivered directly to Lycos in Massachusetts, such that CSI did not take possession of the equipment before lease commencement.

- 12 -

21.    The locus of equipment schedules was in Massachusetts. Specifically, among other things,

A.    The negotiation of those schedules occurred in Massachusetts;

B.    Lycos signed the schedules in Massachusetts;

C.    Lycos took delivery of and possessed the great majority of the equipment in Massachusetts;

D.    Lycos made payments on those schedules from Massachusetts; and

E.    Lycos and CSI maintain offices in Massachusetts.

### CSI Gains the Trust of Lycos Personnel

22.    CSI's account representative for Lycos, Paul Stenberg, who operated out of an office in Needham, Massachusetts, communicated regularly with Lycos personnel in Waltham, Massachusetts, during the course of the parties' business relationship. As that relationship grew over time into what Lycos thought was a collegial and long-term association, Lycos and Mr. Stenberg also began interacting on a social as well as a business basis. Such social interaction between Lycos personnel and Mr. Stenberg included golf outings, dinners and invitations to concerts and sporting events. Through such activities, Mr. Stenberg gained the friendship and trust of Lycos' officers and employees.

23.    Lycos' personnel periodically changed over time, including those in key financial and oversight positions responsible for managing Lycos' lease portfolio with CSI. As a result, and based on what appeared to be CSI's trustworthy and collegial approach toward Lycos, Lycos' personnel reposed confidence in the integrity of Mr. Stenberg with respect to the execution of equipment schedules. Mr. Stenberg and CSI voluntarily assumed and accepted this confidence. Lycos' placement of such trust in CSI, and CSI's acceptance of this confidence, was

- 13 -

reasonable under the circumstances, particularly given CSI's superior knowledge and expertise with respect to the complicated equipment leases transactions involved.

24.    Notwithstanding Lycos' trust and confidence in CSI, and CSI's acceptance of this trust and confidence, CSI took advantage of it to CSI's benefit and Lycos' detriment through improper and wrongful utilization of "roll ups" of Lycos' equipment schedules.

### CSI's Consolidation or "Roll Up" of Lycos' Leases

25.    Of the approximately 80 equipment schedules entered into between Lycos and CSI, only a handful reached their maturity dates in the normal course. Instead, just over a year after execution of the Master Lease Agreement and a full year before the normal expiration of the term of certain equipment schedules, several of the then-existing equipment schedules were terminated on or prior to their scheduled maturity dates and "rolled up" onto one or more new equipment schedules with fixed terms of 24 months or more.

26.    CSI's method of consolidation or "rolling up" equipment schedules worked as follows. Either on their normal expiration date or prior thereto, several equipment schedules would be terminated, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment schedule. In some cases, some of the equipment from one equipment schedule would be combined with the equipment from one or more other schedules and "rolled up" onto a single new equipment schedule; other equipment from those same schedules were rolled up onto a different schedule. Indeed, some of the schedules were rolled even though Lycos had already made 100% of the lease payments required under those schedules and the computer equipment was, by then, outdated.

27.    Before consolidation onto one or more new equipment schedules, the terminated equipment schedules sometimes had varying numbers of months remaining on their original

- 14 -

lease terms. At the date these equipment schedules became effective under the new "rolled-up" schedule, some would have no original monthly lease rental payments remaining, while others would have all but two or three monthly lease rental payments remaining. Some of these "rolled up" schedules, or some of the equipment on them, were rolled up again into other equipment schedules. In fact, certain schedules and certain equipment were "rolled up" several times.

28.    CSI represented to Lycos that the "roll-ups" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage. While this was true, it was only part of the truth. CSI failed to disclose to Lycos that (a) over time, Lycos would pay CSI considerably more than 100% of the value of the equipment as a result of these "roll ups," something Lycos could not reasonably have discovered on its own even if it had known the original equipment cost at lease schedule inception because of the movement of equipment from schedule-to-schedule over multiple roll-ups; and (b) Lycos had already paid amounts well in excess of the original equipment cost of some of the leased equipment. CSI knowingly and intentionally failed to disclose these basic and material facts to Lycos. CSI's partial disclosure to Lycos was intended to and did induce Lycos to agree to numerous "roll ups" of the lease schedules. If, however, CSI had made full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under them.

29.    Under these original lease schedules, prior to "roll-ups," Lycos would have paid CSI monthly lease rental payments of less than $46 million. As a result of the "roll-ups," however, Lycos has paid CSI over $72 million in total monthly lease rental payments (exclusive of interim rent), an increase of more than $26 million.

- 15 -

*Example of an Egregious and Unfair "Roll Up" – Equipment Schedule 67E*

30.     An examination of the history of one specific equipment lease schedule –

equipment Schedule 67E – demonstrates how CSI manipulated the "roll up" process to its favor

and Lycos' detriment.

31.     On July 12, 2000, Lycos entered into equipment Schedule 67E ("Schedule 67E"),

a true and accurate copy of which is attached hereto as Exhibit B.  Schedule 67E governed the

lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months

starting in October of 2000 and with a monthly rental payment of $42,075.  Given a residual

value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield

from Schedule 67E was a reasonable 11%.

32.     On November 14, 2000, after only two monthly lease rental payments, Lycos

entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is

attached hereto as Exhibit C.  Schedule 67H is a 34-month lease commencing on December 1,

2000.  The assets leased under Schedule 67H are those same assets previously leased under

Schedule 67E, which was terminated the day before Schedule 67H became effective.  The

monthly lease rental payment due under Schedule 67H was $36,438.41.  A comparison of the

terms of Schedules 67E and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment @10% | 84.27% | 99 35% | 104.53% |
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

- 16 -

33.     As reflected in the table above, the "refinancing" of Schedule 67H did reduce
Lycos' monthly lease rental payment obligation by over $5,000. However, it <u>increased</u> Lycos'
total lease rental obligations by more than $310,000 from $1,009,800 to $1,323,056 (under the
combined equipment schedules). Additionally, CSI's risk in the transaction was completely
eliminated because the total lease rental payments fully returned CSI its investment in the
equipment <u>and</u> provided a yield of almost 14% prior to CSI receiving any residual proceeds at
the end of the term of Schedule 67H (see the last row of the table above). While CSI frequently
emphasized the short-term reduction in Lycos' monthly payments, CSI did not paint the full
picture by conveniently failing to disclose these additional facts to Lycos. Moreover, Schedule
67H still required Lycos to either purchase, renew or return the equipment to CSI at the
conclusion of its lease term.

34.     Although CSI had already completely eliminated its investment risk in the leased
equipment under Schedule 67E, and had guaranteed itself a 14% profit through the "roll up" into
Schedule 67H, CSI's failure to disclose to Lycos the full impact of the "roll-ups" continued.

35.     In October of 2001, allegedly again to reduce Lycos' monthly payments, CSI
again rolled the equipment that had originally been leased pursuant to Schedule 67E. Two new
schedules were the outcome of that "refinancing" activity. Portions of equipment Schedules 93
and 94 are attached hereto as <u>Exhibits D and E</u> ("Schedule 93" and "Schedule 94", respectively).

36.     According to Schedule 93, certain schedules, including the following, were
"rolled up" onto Schedule 93: 64, 64B, 64D, 64F, 66, 66A, 66B, 66C, 66E, 67A, 67B, 67D, 67F,
67H, 68. Yet, according to Schedule 94, the very same equipment from these schedules was
being rolled up onto that schedule. <u>Compare</u> Exhibits D and E. Accordingly, ascertaining which
equipment on each "rolled" schedule was being assigned to which new schedule would have

- 17 -

been a Herculean if not impossible task for Lycos, as would have figuring out the total amount of lease payments for each piece of equipment. Only after Lycos hired an expert leasing consultant did it learn the financial impact of the roll-up onto Schedules 93 and 94.

37.    The additional payment obligations under Schedule 93 became one (1) payment of $3,751 payable October 1, 2003. The additional payment obligations under Schedule 94 became thirteen (13) monthly payments of $32,688 commencing October 1, 2003 (see table below).

| Equipment Schedule | 67E / 67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in Advance) | 2@ $42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2@ $42,075 34 @ $36,438 1@ $36,438 12@ $32,688 |
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payments @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos' monthly payment obligation did decline from $36,428 to $32,688. However, Lycos' total fixed monthly lease rental obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment schedules). Additionally, CSI further increased its yield or profit in the transaction before receipt of any residual proceeds to more than 27%. CSI did not disclose this fact to Lycos. Moreover, Schedules 93 and 94, however, did not end Lycos' obligation to CSI under the original Schedule 67E, but carried at its conclusion yet another obligation: for Lycos to purchase, renew, or return the equipment to CSI.

*CSI's Misrepresentations, Partial Disclosures and Omissions of Material Fact*

- 18 -

38.     The Equipment Leasing Association ("ELA") is a nonprofit trade organization that represents more than 800 member leasing companies.

39.     CSI is a member of the ELA.

40.     The ELA has established a Code of Fair Business Practices, a true and accurate copy of which is attached as Exhibit F. Paragraph 7 of Section I: General Standards of Professional Conduct, requires ELA members to "disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision."

41.     The ELA's standards for fair business practices reflect the standards of the equipment leasing industry in general.

42.     As a member of the ELA, CSI has implicitly or explicitly agreed to comply with the ELA's Code of Fair Business Practices.

43.     The Attorney General of the Commonwealth of Massachusetts has promulgated regulations with provisions similar to paragraph 7 of the ELA's Code of Fair Business Practices:

    A.      Section 3.05(1) of 940 C.M.R. provides that "No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect." 940 C.M.R. 3.01 defines "products" to include "services" such as the financial services provided by CSI.

    B.      Section 3.16(2) of 940 C.M.R. provides that "an act or practice is a violation of M.G.L. c. 93A, § 2, if . . . (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 C.M.R. 3.01 defines "buyer" to include "lessees" such as Lycos.

- 19 -

44.     The Attorney General interprets 940 C.M.R. 3.05(1) and 940 C.M.R. 3.16(2) to apply to business-to-business transactions such as the instant one. A true and accurate copy of a letter written by the Office of the Attorney General with respect to this issue is attached hereto as Exhibit G. As noted in that letter, the Attorney General has prosecuted several private parties for violating these regulations in business-to-business transactions.

45.     CSI and its representative in Massachusetts, Mr. Stenberg, failed to disclose to Lycos the more than $26 million increase in aggregate payments resulting from the "roll-ups" and elimination of residual, and presented only half the truth about the "roll ups" to induce Lycos' continued participation in CSI's scheme notwithstanding,

A.     CSI's duty to make disclosures to Lycos of information relevant to Lycos' decision to enter into the lease-roll-ups as a result of (i) CSI's cultivation of Lycos' trust and confidence in CSI and CSI's acceptance of that trust and confidence; and (ii) CSI's partial disclosure of relevant facts, i.e., Lycos' reduced monthly payments pay under the lease "roll-ups";

B.     the Attorney General's regulations, 940 C.M.R. 3.05(1) and 3.16(2);

C.     CSI's membership in the ELA and representation on its web-site that it "engag[es] in the highest levels of business conduct with regard to ethics";

D.     CSI's knowledge of the economic windfall it would enjoy at Lycos' expense from the "roll-ups," and

E.     CSI's knowledge that: (i) Lycos' understanding of the effect of the lease schedule "roll-ups" was simply that the term of the equipment schedule would be extended and the amount of the monthly payments reduced; (ii) Lycos did not understand the full impact of the "roll-ups" on the total amount Lycos would be

- 20 -

obligated to pay; and (iii) Lycos was unaware that it had already paid well in excess of the cost of some of the equipment.

46.    If CSI had fully disclosed the full impact of the "roll-ups" on, among other things, the total price being paid by Lycos on them and the amounts Lycos had already paid relative to the original equipment cost, Lycos would not have entered into them.

47.    Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups" as it was obligated to do, but CSI intentionally misrepresented material facts to Lycos to induce it to continue making payments under the "roll-ups." Specifically, but without limitation, when Lycos asked Mr. Stenberg about the original cost of the equipment leased pursuant to Schedules 93 and 94, he sent Lycos an e-mail dated March 18, 2002 in which CSI represented that the total original equipment cost under the Lycos lease schedules was "around $63 million." A true and accurate copy of this e-mail is attached hereto as Exhibit H. In fact, the original equipment cost was less than $47 million.

48.    On information and belief, Mr. Stenberg knew, at the time he sent this e-mail that:

A.    Lycos would use this figure during its (Lycos') internal review to determine whether to continue performance under the "rolled up" leases or whether Lycos would insist on "unwinding" those leases;

B.    this $63 million amount overstated the original equipment cost by more than $16 million; and

C.    his statements would delay or prevent Lycos from discovering the true original equipment cost and the nature of CSI's "roll up" scheme.

*Lycos' Purchase of the Equipment*

- 21 -

49.     In late 2002, before Lycos had discovered the true financial impact of the "roll ups," and CSI's and Mr. Stenberg's misrepresentation as to the original cost of the equipment, Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules. As part of that discussion, Lycos also requested what, if anything, would be required to convert the remaining obligations so that at the conclusion of the terms, Lycos would own the equipment.

50.     At some point during the first few days of July of 2003, Mr. Stenberg represented to Lycos' leasing consultant during a telephone call that the original cost of the equipment exceeded $60 million. He also quoted Lycos a buyout price of over $4.6 million even though CSI would have consummated the buyout for $350,000.

51.     The proposed structure of the buyout consisted of a one-time payment (purchase price), plus payment of the then remaining monthly lease rental payments on their original due dates.

52.     In July, 2003, operating under several misapprehensions of fact because of CSI's failure to disclose basic and material information to Lycos despite Lycos' request – misapprehensions which CSI knew or should have known about – and in reliance on CSI's multiple misrepresentations as to the original equipment cost, Lycos agreed to: (a) and did pay CSI a purchase price of $3.775 million; and (b) continue making monthly payments until the end of the Schedules' terms, at which time, Lycos would "own" the equipment. A copy of the July, 2003 purchase agreement is attached hereto as Exhibit I (the "Sales Agreement").

53.     Although CSI had a duty to disclose to Lycos that it (CSI) had over-stated the original cost of the equipment in Mr. Stenberg's March 18, 2002 e-mail and again in early July, 2003, and Lycos had already paid well-in-excess of the original cost of some of the leased

- 22 -

equipment or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.

54.     Indeed, CSI knowingly and intentionally refused to tell Lycos that Lycos had already paid substantially more than the cost of the equipment, that Mr. Stenberg's March 18, 2002 e-mail was in error, and that his representation to Lycos' leasing consultant in early July, 2003, was in error.

55.     Had CSI made a full and accurate disclosure of the original cost of the equipment, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the equipment.

56.     It was not until after Lycos had entered into the Sales Agreement that Lycos discovered – and then only through the analysis of an expert leasing consultant it engaged to analyze all of the CSI schedules – the true nature of CSI's "roll up" scheme, and the negligent and intentional misrepresentations – including CSI's misrepresentation concerning the original cost of the equipment – partial disclosures, and omissions of material fact used by CSI to induce Lycos' participation and continued performance.

### *CSI'S Pattern or Practice of Deception*

57.     Because of, among other things, CSI's movement of hundreds of pieces of equipment from one lease schedule to another, the complexity of those "roll-ups," CSI's misrepresentations, partial disclosures, and omissions, CSI's cultivation of Lycos' trust and confidence in CSI, and the fact that expertise was required to discover the original equipment cost of equipment rolled up multiple times and the total impact of the "roll-ups," Lycos should not and could not have reasonably have been expected to discover the impact of the roll-ups prior

- 23 -

to that time. Indeed, CSI's successful effort to gain the trust of Lycos' personnel was designed to and did induce Lycos personnel *not* to seek to discover the foregoing.

58.    Upon information and belief, CSI knows that its customers generally do not have the expertise to discover the impact of roll-ups. It relies on: (a) this lack of expertise and its intentional failure to disclose some of the basic and material facts to induce its customers to enter into them; and (b) the establishment of a trusting relationship with its customers such as the one it established with Lycos personnel to induce them not to seek to discover the impact. Upon information and belief, this is CSI's mode of doing business with many of its customers.

<div align="center">

**COUNT I**
**(Fraudulent Misrepresentation in the Inducement of Rolled-Up Lease Schedules)**

</div>

59.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 58 above.

60.    Because of the trust Lycos reposed in CSI and CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the "roll-up" transactions, and 940 C.M.R. 3.05(1) and 3.16(2), CSI was obligated to disclose to Lycos: (a) the impact of the "roll-ups" in terms of the amount to be paid by Lycos relative to the original equipment cost; (b) the fact that Lycos had already paid amounts well in excess of the cost of some of the leased equipment; and (c) the fact that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for the leased equipment.

61.    CSI's failure to disclose facts basic and material to Lycos' decision to enter into the "roll-ups" was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.

<div align="center">

- 24 -

</div>

62.    Had CSI made a full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under the "rolled up" leases.

63.    As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $10,225,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
### (Fraudulent Misrepresentation in the Inducement of Sales Agreement)

64.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 63 above.

65.    CSI represented in March, 2002, that the original cost of the leased equipment was around $63 million. It again represented to Lycos that the original cost exceeded $60 million during the first few days of July, 2003. These representations were false. CSI knew they were false at the time they were made. CSI made these representations with the intent to induce Lycos to purchase the leased equipment, which Lycos did.

66.    Because of CSI's cultivation of Lycos' trust and the trust Lycos reposed in CSI which CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the Sales Agreement, CSI's intentional misrepresentation concerning the original cost of the leased equipment, and 940 C.M.R. 3.05(1) and 3.16(2), CSI was obligated to: (a) correct its misstatement concerning the original equipment cost; and (b) disclose to Lycos the fact that Lycos had already paid amounts well in excess of the cost and fair rental compensation for some of the leased equipment.

67.    CSI's failure to disclose facts basic and material to Lycos' decision to enter into the Sales Agreement was made with the intent to induce Lycos to enter into the Sales

- 25 -

Agreement, which Lycos did. Furthermore, Lycos relied on CSI's misrepresentations as to the original cost of the equipment in entering into the Sales Agreement.

68.    Had CSI made a full disclosure, Lycos would not have purchased the equipment for $3.775 million.

69.    As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $3,775,000.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT III
### (Negligent Misrepresentation in the Inducement)

70.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 69 above.

71.    To the extent CSI performed its duty to provide Lycos with all information relevant to Lycos' decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

72.    Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment. Lycos also justifiably relied on the misleading half-truth that the "roll ups" would decrease Lycos' monthly rental payments, without also being told other facts basic and material to Lycos' decision to enter into the roll-ups and purchase the leased equipment.

73.    As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

- 26 -

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IV
## (G.L. c. 93A, §§ 2 and 11)

74.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 73 above.

75.    Both Lycos and CSI are engaged in trade or commerce as that term is defined in M.G.L. c. 93A.

76.    CSI has engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 2 including, but not limited to:

A.    its collection of money from Lycos well above any reasonable or fair total compensation as a result of the "roll up" of various equipment schedules;

B.    its intentional and negligent misrepresentations, and omissions of facts basic and material to Lycos' decision to enter into the lease "roll-ups" that CSI was obligated, under common law, to disclose;

C.    CSI's knowledge of the full impact of the roll-ups on Lycos, that the full impact of the roll-ups was material to Lycos' decision to enter into them, and that CSI failed to disclose to Lycos, the full impact of the roll-ups, all in violation of 940 C.M.R. 3.01, Definitions of Buyer and Product, and 940 C.M.R. 3.05(1) and 3.16(2);

D.    its failure to comply with industry standards established by the ELA by not "disclos[ing] to [Lycos] all relevant information as to the terms and conditions" of the lease "roll-ups"; and

E.    its intentional misrepresentations concerning the original cost of the leased equipment that induced Lycos to enter into the Sales Agreement; and

- 27 -

F.    its knowledge that Lycos had paid in full for much of the leased

equipment before executing the Sales Agreement, that Lycos' payment in full for

much of the leased equipment was material to Lycos' decision to enter into the

Sales Agreement, and that CSI failed to disclose to Lycos that Lycos had already

paid well-in-excess of (i) the original cost of the equipment and (ii) any fair rental

value, all in violation of 940 C.M.R. 3.01, Definitions of Buyer and Product, and

940 C.M.R. 3.05(1) and 3.16(2).

77.    At all times material and relevant hereto, the events, transactions and occurrences

described herein occurred substantially and primarily within the Commonwealth of

Massachusetts. Specifically, CSI's communications with Lycos were made by Mr. Stenberg

while CSI was conducting business in Massachusetts.

78.    The violations of M.G.L. c. 93A, § 2 described above were knowingly, willfully

and intentionally committed by CSI.

79.    By reason of CSI's unfair and deceptive business acts or practices, Lycos has

incurred damages in an amount to be determined at trial but not less than $14,000,000.

80.    Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and Lycos

should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT V
### (Declaratory Relief – Schedules 93 and 94
### Each Evidence a Loan and Security Agreement)

81.    Lycos repeats and incorporates by reference the allegations contained in

paragraphs 1 through 80 above.

- 28 -

82.    In late 2001, CSI rolled-up approximately fifteen schedules onto Schedules 93 and 94. At the time the equipment from those schedules rolled onto Schedules 93 and 94, Lycos had already leased that equipment for at least three years and, in many cases, more than five years.

83.    Because that computer equipment had been in service for many years, it had an average value of less than five percent of the original cost of that equipment at the time it rolled onto Schedules 93 and 94.

84.    Pursuant to Schedules 93 and 94, Lycos agreed to make monthly payments to CSI for an initial term of 24 and 36 months, respectively. As the equipment had depreciated in value from 100% of its original equipment cost to less than 10% thereof at the time the equipment rolled onto Schedules 93 and 94, these twenty-four and thirty-six month schedules exceeded the remaining economic life of the equipment listed on them. Indeed, at the time the Sales Agreement was executed, CSI knew that equipment was worth so little that it would have been willing to sell it to Lycos for only $350,000, less than 1% of the original cost of that equipment.

85.    Under the Sales Agreement, title to the equipment was to pass to Lycos at the end of the term of Schedules 93 and 94 for no additional consideration.

86.    Lycos did not have the right under the Schedules 93 and 94 to return the equipment under those schedules before the end of the lease terms without being obligated to make the monthly rental payments through the end of the lease terms.

87.    As a result of the foregoing, under section 1-201(37) of the Uniform Commercial Code as adopted in Missouri and Massachusetts, Schedules 93 and 94 were not "true leases," but instead were loans and security agreements.

- 29 -

88.    In addition, the "economic realities" of Schedules 93 and 94, which incorporate

by reference the Master Lease Agreement, demonstrate that they were loans and security

agreements under section 1-201(37) of the Uniform Commercial Code. Specifically,

A.    Lycos selected the equipment it "leased" from CSI from a third-party

supplier;

B.    the Master Lease Agreement:

1.    disclaims all warranties that are typically found in a lease; and

2.    requires Lycos to be solely responsible for all costs and expenses

of every nature arising from the possession, use and operation of the equipment including,

without limitation, payment of taxes, insurance equal to the replacement cost of the equipment,

maintenance, and damages to or loss of the equipment.

C.    CSI was not an equipment supplier but was a financing company that

operated very much like a bank or other lending institution; and

D.    the equipment "leased" by Lycos was shipped directly from the vendor to

Lycos such that at no time before lease inception did CSI have possession of the equipment.

89.    CSI filed UCC-1 financing statements with the Massachusetts Secretary of State

with respect to Schedules 93 and 94 in an effort to perfect its security interest in the equipment

financed pursuant to those schedules.

90.    At the time Schedules 93 and 94 were being negotiated, CSI considered Lycos to

be a bankruptcy risk and a "dot.com" that could fail like many other "dot.coms" then

experiencing financial difficulty. Because of this, and the fact that CSI knew that the equipment

leased pursuant to Schedules 93 and 94 was worth only a small fraction of the approximately

$14.5 million that would be due under those schedules, CSI demanded that Lycos obtain an $11

- 30 -

million letter of credit for the benefit of CSI to secure Lycos' obligations under Schedules 93 and 94.

91.     Lycos in fact obtained the $11 million letter of credit to secure its obligations under Schedules 93 and 94. That letter of credit provided, among other things: "Lycos, Inc., as security for its performance of any and all of its obligations under [Schedules 93 and 94, will furnish CSI with an unconditional irrevocable Letter of Credit from a bank acceptable to [CSI] in the amounts set forth below."

92.     CSI, which is one of the largest if not the largest independent leasing company in the United States and is expert in the field of computer equipment leasing, knew or should have known before Schedules 93 and 94 were executed, and again after the Sales Agreement was executed, that those Schedules were actually loans and security agreements under 1-201(37) of the Uniform Commercial Code rather than true leases. In contrast, Lycos had no such knowledge.

93.     CSI, upon information and belief, nevertheless maintains that Schedules 93 and 94 are "true leases."

94.     A controversy or dispute exists between the parties concerning whether or not Schedules 93 and 94 evidence "true leases" or loans and security agreements.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT VI**
**(Declaratory Judgment as to Whether Missouri or**
**Massachusetts Law Governs Lycos' Claim that Schedules 93 and 94**
**are Usurious and Violative of 93A)**

</div>

95.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 94 above.

96.     Pursuant to Schedules 93 and 94, CSI demanded and Lycos agreed to and did pay

<div align="center">- 31 -</div>

CSI, at least $14.5 million. Pursuant to the Sales Agreement, Lycos paid CSI an additional $3.775 million to purchase the equipment on those Schedules.

97.    Because Schedules 93 and 94 evidence loans and security agreement rather than true leases, the at least $18.275 million Lycos paid to CSI under those Schedules and the Sales Agreement constituted payment of principal equal to the fair market value of the equipment at the time the equipment rolled onto those schedules, plus interest.

98.    As the value of the equipment at the time it rolled onto Schedules 93 and 94 was less than $3 million, the amount paid represented payment of principal of at most that amount plus at least $15.275 million in interest.

99.    Although the Master Lease Agreement provides that it and the schedules shall "be governed by, and construed and interpreted under the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law," questions as to the validity of equipment Schedules 93 and 94, are governed by Massachusetts law – the locus of Schedules 93 and 94.

100.    In addition, Missouri law does not permit a cause of action for usury in business-to-business transactions such as the transaction evidenced by Schedules 93 and 94 between Lycos and CSI. Massachusetts, on the other hand, makes it a crime under M.G.L. c. 271, § 49, for one business to charge another an usurious interest rate to business.

101.    The prohibition against usury lending, as reflected especially in the criminal sanctions imposed by M.G.L. c. 271, § 49, is an important public policy of the Commonwealth.

102.    Upon information and belief, CSI maintains that, notwithstanding the foregoing, Missouri law governs Lycos' claims for usury. Accordingly, a controversy or dispute exists between the parties concerning whether Missouri or Massachusetts law should apply to Lycos'

- 32 -

usury claims hereunder.

103.    This Court should declare that Massachusetts law applies to Lycos' claims for usury.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VII
## (Usury, M.G.L. c. 271, § 49)

104.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

105.    Of the aggregate amount of more than $18.275 million paid by Lycos to CSI pursuant to Schedules 93 and 94 and the Sales Agreement, less than $3 million represented repayment of principal, i.e., the aggregate value of the equipment at the time it rolled onto Schedules 93 and 94, and the balance of at least $15,275,000 represented payment of interest.

106.    As a result of CSI charging Lycos at least $15.275 million in interest on loans with a two or three year term and an aggregate original principal balance of less than $3 million, CSI charged Lycos interest well in excess of the 20% per annum allowed by M.G.L. c. 271, § 49(a).

107.    CSI has not provided notice to the Attorney General of the Commonwealth that it intended to charge interest on loans in the Commonwealth in excess of 20% as permitted by M.G.L. c. 271, § 49(d).

108.    The loans made by CSI to Lycos pursuant to Schedules 93 and 94 are not regulated by any provision of general or special law or regulations promulgated thereunder. CSI is a privately-held corporation not subject to control, regulation, or examination by any state or federal regulatory agency.

109.    The interest rate charged by CSI pursuant to Schedules 93 and 94 was usurious in

- 33 -

violation of M.G.L. c. 271, § 49.

110.    Lycos has been damaged by CSI's imposition of an usurious rate of interest.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT VIII
### (M.G.L. c. 93A, §§ 2 and 11)

111.    Lycos repeats and incorporates by reference the allegations contained in
paragraphs 1 through 110 above.

112.    Both Lycos and CSI are engaged in trade or commerce, as that term is defined in
M.G.L. c. 93A.

113.    At all times material and relevant hereto, the events, transactions and occurrences
described herein occurred substantially and primarily within the Commonwealth of
Massachusetts.

114.    Under 940 C.M.R. 3.16(3), an "act or practice is a violation of M.G.L. c. 93A, § 2
if: . . . (3) It fails to comply with existing statutes . . . meant for the protection of the public's
health, safety or welfare promulgated by the Commonwealth intended to provide the consumers
of this Commonwealth protection . . ."

115.    The Massachusetts usury statute, M.G.L. c. 271, § 49, is a statute enacted by the
Commonwealth that was meant to provide protection of the public welfare of consumers of the
Commonwealth.

116.    CSI's violation of M.G.L. c. 271, § 49 as described herein is a violation of 940
C.M.R. 3.16(3) and therefore a violation of M.G.L. c. 93A, § 2.

117.    Additionally, regardless of the applicability of M.G.L. c. 271, § 49 and/or 940
C.M.R. 3.16(3) to Schedules 93 and 94, CSI's imposition of a several hundred percent interest
rate on Schedules 93 and 94, particularly when it knew or should have known that those

- 34 -

Schedules were, as a matter of law, loans and security agreements, constituted unfair and deceptive practices in violation of M.G.L. c. 93A, § 2.

118.    The violations of M.G.L. c. 93A, § 2 described above were knowingly, willfully and intentionally committed by CSI.

119.    By reason of CSI's unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $15.275 million.

120.    Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT IX
### (Money Had and Received)

121.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 120 above.

122.    After Lycos executed the Sales Agreement, Lycos' leasing consultants determined that the original cost of the equipment leased by Lycos from CSI was approximately $47 million.

123.    Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling less than $46 million.

124.    As a result of CSI's repeated "roll-up" of the lease schedules, Lycos paid CSI (a) more than $72 million in addition to interim rent; and (b) $3.775 million to purchase the equipment.

125.    CSI received more than $18.275 million pursuant to Schedules 93 and 94 and the Sales Agreement.

126.    CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to

- 35 -

Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

127.    Equity and good conscience demand that this excess, in an amount to be determined at trial, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT X
### (Unjust Enrichment)

128.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above.

129.    CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

130.    CSI accepted such monies knowing that it was receiving an economic windfall.

131.    CSI's retention of these monies would be unjust and inequitable.

132.    As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT XI
### (Declaratory Judgment as to Whether Lycos Owes any Money to CSI)

133.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 132 above.

134.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

135.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

- 36 -

136.    Lycos seeks a judicial declaration that:

    A.    it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

    B.    it is the owner of the equipment purchased pursuant to the Sales Agreement, free and clear of any claims of CSI.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT XII**
**(Declaratory Judgment as to Whether Lycos May Retain the Equipment)**

</div>

137.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 136 above.

138.    A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules and Lycos' purchase of the equipment pursuant to the Sales Agreement, described above.

139.    Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**JURY DEMAND**

</div>

Lycos demands a trial by jury on all claims so triable.

<div align="center">

**PRAYERS FOR RELIEF**

</div>

WHEREFORE, Lycos respectfully requests that this Court:

    A.    On Counts I and III, enter judgment rescinding the rolled-up lease schedules CSI fraudulently and negligently induced Lycos to enter into;

<div align="center">

- 37 -

</div>

B.    On Count I, enter judgment against CSI, and in favor of Lycos, in an amount to be
      determined at trial but not less than $10,225,000, together with interest and costs;

C.    On Counts II, enter judgment against CSI, and in favor of Lycos, requiring CSI to
      disgorge the $3,775,000 Lycos paid CSI under the Sales Agreement, together with
      interest and costs;

D.    On Count III, enter judgment against CSI, and in favor of Lycos, in an amount to
      be determined at trial but not less than $14,000,000, together with interest and
      costs;

E.    On Count IV, enter judgment declaring that CSI has willfully and intentionally
      engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A,
      §§ 2 and 11, and awarding Lycos damages in an amount to be determined at trial
      but not less than $14,000,000, trebled, together with interest, costs and attorneys'
      fees;

F.    On Count V, enter judgment against CSI, and in favor of Lycos, declaring that
      Schedules 93 and 94 evidence loans and security agreements, rather than true
      leases;

G.    On Count VI, enter judgment against CSI, and in favor of Lycos, declaring that
      Massachusetts law governs Lycos' claim that Schedules 93 and 94 are usurious
      and violate M.G.L. c. 93A, § 2.

H.    On Count VII, enter judgment against CSI, and in favor of Lycos, voiding
      Schedules 93 and 94 and the Sales Agreement as usurious pursuant to M.G.L. c.
      271, § 49, and awarding Lycos damages in an amount not less than $15,275,000,
      together with interest and costs;

- 38 -

I. On Count VIII, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, and awarding Lycos damages in an amount to be determined at trial but not less than $15,275,000, trebled, together with interest, costs and attorneys' fees;

J. On Counts IX and X, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial, together with interest, costs and attorneys' fees;

K. On Count XI, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment lease schedules between Lycos and CSI, and that Lycos owns the equipment purchased pursuant to the Sales Agreement free and clear of any claims of CSI;

L. On Count XII, enter judgment declaring that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial, together with interest and costs; and

M. Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated: April 14, 2006

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton (BBO# 654641)
McDermott, Will & Emery, LLP
28 State Street
Boston, Massachusetts 02209
(617) 535-4000

- 39 -

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for plaintiff, Robert J. Kaler, Gadsby Hannah LLP, 225 Franklin Street, Boston, MA 02110, by hand on April 14, 2006.

/s/ Thomas O. Bean
Thomas O. Bean

BST99 1489627-3 057077 0012

# EXHIBITS A-I

## to Second Amended Answer & Counterclaim of Defendant Lycos, Inc.

# EXHIBIT A





## MASTER LEASE AGREEMENT NUMBER 144874



MASTER LEASE AGREEMENT dated as of December 4, 1996 by and between COMPUTER SALES INTERNATIONAL, INC. (hereinafter called "Lessor") having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141, and

LYCOS, INC.

(hereinafter called "Lessee") having its principal office and place of business at

293 Boston Post Road West
Marlboro, Massachusetts 01752

IN CONSIDERATION of the mutual agreements herein set forth and the payment of rent as herein provided for, the parties hereto agree as follows:

**1. LEASE AGREEMENT**

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor all of the equipment and other tangible personal property described in each of the Equipment Schedules which are executed from time to time by Lessor and Lessee pursuant to this Master Lease. Each Equipment Schedule shall constitute a separate lease on the terms and conditions stated therein and, to the extent not inconsistent with the Equipment Schedule, on the terms and conditions stated in the Master Lease which shall be incorporated by reference in the Equipment Schedule. The term "Equipment" as used herein shall mean, with respect to any Equipment Schedule, the Equipment described therein. The term "Unit" as used herein shall mean an individual machine on an Equipment Schedule or an individual feature when such feature is leased separately from a machine. The term of this Master Lease shall begin on the date set forth above and shall continue in effect so long as any Equipment Schedule entered into pursuant to this Master Lease remains in effect.

**2. TERM**

2.1 COMMENCEMENT DATE: The commencement date ("Commencement Date") for each Unit of Equipment will be the date on which such Unit is installed by the manufacturer or other installer, except that, in the event there is a delay in the installation of a Unit and such delay is attributable to Lessee, then the Commencement Date for such Unit shall be five [5] working days following the date upon which Lessee has been given notice that such Unit is available for installation. If requested by Lessor, Lessee will promptly execute and deliver to Lessor a certificate confirming the Commencement Date(s).

2.2 INITIAL TERM: The "Initial Term" of an Equipment Schedule shall mean the period beginning on the Commencement Date of the Unit having the latest Commencement Date of the Units on such Equipment Schedule. If such Commencement Date is the first day of a month, and otherwise, the Initial Term shall begin on the first day of the month immediately following the month in which such latest Commencement Date falls. The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rental unless and until terminated by either party giving the other party not less than 120 days prior written notice. Any termination (i) must relate to all of the Equipment described on the Equipment Schedule to which the notice applies, (ii) will be effective only on the last day of the Initial Term or on the last day of any successors and interim period, (iii) will become only a Lessee returns all of the Equipment to Lessor in accordance with the terms of the Equipment Schedule by the day after the scheduled termination date, and (iv) may not be unilaterally revoked.

**3. MONTHLY RENTAL**

Lessee shall pay to Lessor the monthly rental ("Monthly Rental") for each Unit as set forth in the relevant Equipment Schedule. The Monthly Rental shall be payable at the above mailing address of Lessor or at such other place as Lessor may from time to time designate in a written notice to Lessee. The Monthly Rental for each Unit shall commence on the Commencement Date of such Unit and shall be due and payable in advance and without demand on the first day of each month thereafter during the term of this Lease. If the Commencement Date for a Unit is a day other than the first day of a month, Daily Rental shall be payable ("Daily Rental" shall equal one-thirtieth of the Monthly Rental for such Unit) for each day from, and including, the Commencement Date to, but not including, the first day of the Initial Term, and such total Daily Rental amount shall be due and payable on the first day of the Initial Term.

**4. WARRANTIES**

4.1 AFFIRMATIVE WARRANTIES: Lessor represents and warrants that:

[a] The Equipment shall be eligible for the manufacturer's standard prime shift maintenance contract upon installation, provided Lessee requests such coverage in writing prior to installation of the Equipment.

[b] During the term of this Master Lease, if no Event of Default has occurred, Lessee's quiet enjoyment and peaceable possession of the Equipment shall not be interrupted by Lessor or anyone claiming solely through or under Lessor.

4.2 DISCLAIMER OF WARRANTIES: THE AFFIRMATIVE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES OF LESSOR. LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, FITNESS, CAPACITY OR SUITABILITY FOR

Page No. 1 of 6                    LYCOS, INC.                    Master Lease No. 144874
                                                                  December 4, 1996

PS/BOST.

ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT, OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. Without limiting the generality of the foregoing, Lessor shall not be liable to Lessee for any liability, claim, loss, damage or expense of any kind or nature including strict liability in tort) caused directly or indirectly by the Equipment, any inadequacy thereof for any purpose, any deficiency or defect therein, whether known or unknown to Lessor. In any event, Lessor shall not be liable to Lessee for any loss of business or any other incidental or consequential loss or damage resulting from any cause whatsoever.

4.3 ASSIGNMENT OF WARRANTIES: Lessor hereby assigns to Lessee any and all manufacturer's warranties, if assignable, and any other such rights that are assignable as Lessor may have against the manufacturer of the Equipment provided, however, that Lessee's sole remedy for the breach of any such warranty or right shall be against the manufacturer and not Lessor.

4.4 SELECTION: Lessee acknowledges, represents and warrants that it has made the selection of the Equipment based on its own judgment and expressly disclaims any reliance upon statements made by the Lessor. The Equipment is being leased for commercial or business purposes only, and will not be used for consumer, personal, home, or family purposes.

## 5. NET LEASE

Each Equipment Schedule constitutes a net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, and operation of the Equipment. Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that Lessee may have against Lessor. Except as expressly provided for herein, neither this Master Lease, nor any Equipment Schedule, shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, or any loss or destruction of the Equipment or any Unit from any cause whatsoever, or the interference with the use thereof by any private person, corporation, or governmental authority or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Monthly Rental payable by Lessee under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term thereof.

## 6. TAXES

6.1 PAYMENT OF TAXES: Lessee covenants and agrees to pay to the appropriate taxing authority, and discharge before the same become delinquent, all taxes, fees, or other charges of any nature whatsoever, without pro-ration, together with any related interest or penalties ("Impositions") now or hereafter imposed, assessed or payable during the term of the relevant Equipment Schedule (including any extension thereof or an Imposition relating to a record date or status date that fall within the term of the relevant Equipment Schedule) including any extension thereof or is otherwise associated with Lessee's leasing, possession or use of the Equipment against Lessor, Lessee or the Equipment by any federal, state, county or local government or taxing authority upon or with respect to (i) the Equipment or Rental or any other sums due hereunder with respect to any Equipment Schedule, or (ii) the leasing of the Equipment (excepting only federal, state and local taxes measured by the net income of Lessee or any franchise tax upon Lessee measured by Lessor's capital, capital stock or net worth). Because the payment or the date of reimbursement date for an Imposition may occur after the expiration or termination of the relevant Equipment Schedule, it is understood and agreed that Lessee's liability for such Impositions shall survive the expiration or termination of the term of the relevant Equipment Schedule.

6.2 BILLING: Lessee shall, to the extent permitted by law, cause all Impositions to be billed to Lessee. Lessee shall, at its expense, timely file all forms and returns and timely do all things required to be done in connection with the levy, assessment and payment of any Impositions, and Lessor hereby appoints Lessee as Lessor's attorney-in-fact when necessary for such purposes. Lessee shall submit written evidence to Lessor of the payment of all Impositions required to be paid by Lessee hereunder promptly after such payment. Notwithstanding the foregoing, Lessor, in its sole discretion, may pay any Imposition itself or file any forms or returns with respect thereto. If Lessor pays any Imposition, Lessee shall, when billed, reimburse Lessor for such payment.

6.3 CONTEST: Lessee may contest any Imposition by appropriate legal proceedings provided the nonpayment of such Imposition thereof, or such proceedings, will not, in the opinion of counsel for Lessor, adversely affect the title, property interest or rights of Lessor in the Equipment and provided further that, if requested by Lessor, Lessee has given to Lessor security, sufficient in form and amount, in Lessor's reasonable judgment, to fully satisfy the amount of the contested Imposition.

## 7. DELIVERY AND RETURN

Lessee shall arrange for delivery, and Lessee shall pay, when billed, all delivery expenses (including, without limitation, transportation costs and the cost of in-transit insurance) associated with the delivery of each Unit from its previous location to the location specified in the relevant Equipment Schedule. Lessee shall inspect each Unit upon delivery, identify any observable damage prior to accepting delivery, and note any such damage on the bill of lading. Costs of repair which are not recoverable from the carrier because of Lessee's failure to properly inspect for observable damage shall be borne and promptly paid by Lessee. Lessee shall provide a suitable place for installation of the Equipment with all appropriate facilities as specified by the manufacturer. Lessee shall arrange and Lessee shall pay for the installation of each Unit (if Lessee wishes to have the Equipment installed by, an installer other than the manufacturer or some other party approved in writing by Lessor, then Lessee shall accept the Equipment "as is" and Lessee's warranty set forth in Paragraph 4.1 (a) shall not apply). Upon the termination of Lessee's right to possession of any Unit (by expiration of the term of the relevant Equipment Schedule or otherwise), Lessee shall, in accordance with Lessor's instructions and at Lessee's expense (including without limitation transportation costs and costs of in-transit insurance) return the Unit to such location within the Continental United States as shall be designated by Lessor. Lessee shall reimburse Lessor for all expenses paid by Lessor associated with return of the Unit when billed. As Lessee shall return each Unit in the same operating order, repair, condition and appearance as when received, excepting only normal wear and tear, and with all engineering changes prescribed by the manufacturer prior to the termination of Lessee's right of possession incorporated in the Unit. Lessee, at its expense, shall make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance contract upon its return and shall have the Unit certified as eligible for the same. At the time the Equipment is returned, Lessee shall provide a letter from the manufacturer certifying such maintenance eligibility.

## 8. CARE OF EQUIPMENT

8.1 USE AND MAINTENANCE: Lessee shall, at its expense, maintain the Equipment in good operating order, repair, and condition. Lessee shall not use the Equipment for any purpose other than that for which it was designed. Prior to the delivery date and before any action is taken to install the Equipment, Lessee shall make a written request to the manufacturer for continued coverage of the Equipment under one of the manufacturer's standard maintenance agreements, and shall, at its expense, enter into and maintain in force such maintenance agreement for each Unit and provide Lessor with a copy of such agreement. IF LESSEE FAILS TO MAKE THE PROPER WRITTEN REQUEST TO THE MANUFACTURER FOR COVERAGE UNDER ONE OF THE MANUFACTURER'S STANDARD MAINTENANCE

LYC 00003

AGREEMENTS, THEN LESSEE SHALL ACCEPT THE EQUIPMENT "AS IS" AND LESSOR'S WARRANTY SET FORTH IN PARAGRAPH 4.1(b) SHALL NOT APPLY. In the event, however, shall Lessee be required to enter into such a contract for any Unit so long as that Unit is under a manufacturer's warranty which provides substantially similar coverage.

8.2 ALTERATIONS AND ATTACHMENTS: With the prior written consent of the Lessor, Lessee may, at its expense, make alterations or add attachments to the Equipment which are removable and which do not interfere with the normal and satisfactory operation or maintenance of the Equipment or Lessee's ability to obtain the maintenance contract required in Section 8.1 above. Upon the termination of Lessee's right to possession of any Unit, any alterations or attachments to such Unit shall become the property of Lessor unless removed at Lessor's expense prior to such termination. Lessee shall have the right, following termination of Lessee's right to possession of any Unit, to remove any attachments or alterations made by Lessee to such Unit and dispose of the same without any liability therefor to Lessee and Lessee shall pay the costs of such removal when billed.

8.3 INSPECTION: Lessee shall make the Equipment available to Lessor, Secured Party (hereinafter defined) and Assignee (hereinafter defined) or the designees of any of them during normal working hours for inspection or for any other reasonable purpose.

## 9. LOSS OR DAMAGE.

9.1 RISK OF LOSS: Lessee shall be responsible for and hereby assumes the entire risk of the Equipment being lost, damaged, destroyed, stolen, or otherwise rendered unfit or unavailable for use from the date of delivery to Lessee to the date of return to Lessor.

9.2 OCCURRENCES OF LOSS: If any Unit is lost, damaged, destroyed, stolen, or otherwise rendered unfit for use, Lessee shall give to Lessor immediate notice thereof, and this Master Lease and the applicable Equipment Schedule shall continue in full force and effect without any abatement in the Monthly Rental. Lessee shall determine within fifteen (15) days after the date of the occurrence of damage whether such Unit can be repaired. In the event Lessee determines that such Unit can be repaired, Lessee, at its expense, shall cause such Unit to be promptly repaired. If a Unit is lost, destroyed or stolen or if Lessee determines that a damaged Unit cannot be repaired, Lessee shall, at Lessor's direction, within thirty (30) days of such event either replace the Unit with an identical Unit, in which shall thereupon vest in Lessor and which thereafter shall be considered the Unit subject to the Equipment Schedule with no abatement in the Monthly Rental or, at Lessee's sole discretion, pay to Lessor an amount equal to the Stipulated Loss Value of the Unit determined as of the date of payment in accordance with the Stipulated Loss Value Schedule attached to the applicable Equipment Schedule together with all unpaid Monthly Rental which is due and payable through the date of payment. Upon such payment, Lessee's obligation to pay further Monthly Rental for such Unit shall cease.

## 10. INSURANCE.

10.1 PROPERTY INSURANCE: Throughout the term of each Equipment Schedule, Lessee shall, at its expense, maintain in full force and effect "all risk" extended coverage, fire and casualty insurance for the Equipment. Such insurance shall provide for coverage in an amount equal to the greater of the Stipulated Loss Value or the replacement cost of the Equipment at the time of loss. Lessor shall be named as the Loss Payee on such policy. In addition, the policy shall, by means of a standard mortgage clause, name the Secured Party and Assignee as additional insureds and loss payees or their interest shall appear. Such policy shall provide that it may not be cancelled or materially altered unless thirty (30) days prior written notice is given to all parties named therein. Upon Lessor's written request, Lessee shall provide Lessor with a Certificate of Insurance evidencing such insurance coverage. If, within two weeks after Lessor's receipt of each request, Lessee has not provided Lessor with a satisfactory Certificate, then Lessee may, at Lessor's option, obtain such insurance until Lessor provides the Certificate, and Lessee shall reimburse Lessor for the cost of such insurance when billed.

10.2 LIABILITY INSURANCE: During the term of this Master Lease, Lessee, at its expense, shall maintain reasonable, commercial general liability and property damage insurance with respect to the use, possession and operation of the Equipment in an amount not less than one million dollars for each occurrence.

## 11. INDEMNIFICATION

Lessee shall and does hereby indemnify and hold Lessor, any Assignee, and any Secured Party, harmless from and against any and all claims, costs, reasonable attorneys' fees, expenses, damages, and liabilities (including those resulting from the application of strict liability doctrines or statutes) arising out of Lessee's selection, possession, leasing, operation, control, use, maintenance, delivery, or return of the Equipment. Notwithstanding the foregoing, Lessee shall not be required to indemnify a party for any claim resulting from acts of that party which constitute willful misconduct or gross negligence.

## 12. ASSIGNMENT, SUBLEASE OR RELOCATION BY LESSEE

UPON AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE TO LESSOR, LESSEE MAY ASSIGN OR SUBLEASE A UNIT TO ANY PARTY, OR RELOCATE A UNIT TO ANY LOCATION, WITHIN ANY STATE OF THE CONTINENTAL UNITED STATES, PROVIDED THAT LESSOR, ASSIGNEE, AND SECURED PARTY, IN SUCH PARTIES' SOLE DISCRETION, SHALL HAVE APPROVED SUCH ASSIGNEE, SUBLESSEE, OR LOCATION, AND PROVIDED FURTHER THAT IF ALL COSTS OF ANY NATURE WHATSOEVER INCLUDING ANY ADDITIONAL IMPOSITIONS AND ANY ADDITIONAL EXPENSES ASSOCIATED WITH FILING NEW PRECAUTIONARY UNIFORM COMMERCIAL CODE FINANCING STATEMENTS RESULTING FROM ANY RELOCATION, ASSIGNMENT OR SUBLEASE SHALL BE BORNE BY LESSEE. [a] ANY ASSIGNMENT OR SUBLEASE SHALL BE MADE EXPRESSLY SUBJECT AND SUBORDINATE TO THE TERMS OF THIS LEASE, AND THE LESSEE SHALL ASSIGN ITS RIGHTS UNDER SUCH ASSIGNMENT OR SUBLEASE TO LESSOR, ASSIGNEE, OR SECURED PARTY AS ADDITIONAL COLLATERAL AND SECURITY FOR LESSEE'S OBLIGATIONS HEREUNDER. In the event of a relocation, assignment, or sublease, Lessee and its assignee or its sublessee shall cooperate with Lessor in taking all reasonable measures to protect the title of Lessor or Assignee and the interest of any Secured Party to and in the Equipment. No relocation, assignment, or sublease shall relieve Lessee of its primary obligations under the relevant Equipment Schedule and this Master Lease.

## 13. ASSIGNMENT BY LESSOR

Lessor shall have the right to assign as security its interest or grant a security interest in any or all of the Equipment Schedules which may from time to time be executed and the Units described in any such Equipment Schedules to a security assignee ["Secured Party"]. Lessor shall also have the right to sell or otherwise dispose of any or all of the Units described in any Equipment Schedule, subject to the prior right of Lessee in such Units, and to assign its interest as Lessor under each Equipment Schedule, to any assignee ["Assignee"]. Any such assignment shall not in any way release Computer Sales International, Inc. from liability for performance of the Lessor's obligations hereunder. Lessee acknowledges that any assignment by Lessor will not materially change Lessee's duties or obligations under the Equipment Schedule nor materially increase the burden or risk imposed on Lessee. Lessee hereby consents to and shall acknowledge such assignment (or assignments as shall be designated by written notice to Lessee by Lessor. Lessee further covenants and agrees that:

[a] Any such Secured Party or Assignee shall have and be entitled to exercise any and all discretions, rights and powers of Lessor under the Equipment Schedule to which it has an interest, provided that a Secured Party or Assignee shall not be obligated to perform any of the obligations of Lessor other than Lessor's obligations under Paragraph 4.1 [b]

[b] Lessee shall pay directly to the Secured Party or Assignee all Monthly Rental and all other sums due upon receipt of notice of any assignment and of instructions to do so; and

LYC 00004

[c] After an assignment to a Secured Party or Assignee, Lessee's obligations hereunder including its obligation to pay the Monthly Rental and any and all other amounts payable under the Equipment Schedule by Lessee shall be absolute and unconditional and shall not be subject to any abatement, reduction, recoupment, defense, setoff, or counterclaim available to Lessee against Lessor for any reason whatsoever.

[d] Only one executed counterpart of any Equipment Schedule shall be marked "Original", any other executed counterparts shall be marked "Non-original" or "Copy". No security interest in any Equipment Schedule may be created through the transfer and possession of any counterpart other than the "Original", nor shall any sale, assignment or transfer of any interest in an Equipment Schedule be effective or be binding upon Lessee through the transfer and possession of any counterpart other than the "Original".

## 14. EVENTS OF DEFAULT

The occurrence of any one or more of the following events ("Events of Default") shall constitute a default under the relevant Equipment Schedule:

[a] Lessee fails to pay the Monthly Rental, or any other amount due hereunder, on or before the date the same is due and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor.

[b] any financial statements or information or any other representation or warranty given to Lessor proves to have been materially false or misleading as of the date it was given by or on behalf of Lessee.

[c] Lessee fails to observe or perform any other term, condition, obligation, agreement or covenant set forth herein, and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor.

[d] Lessee assigns or attempts to assign this Master Lease or any Equipment Schedule, or removes, transfers, encumbers, sublets or parts with possession of any Unit, attempts to do any of the foregoing, or suffers or permits any of the foregoing to occur except as expressly permitted herein.

[e] Lessee ceases doing business as a going concern, or it or its shareholders take any action looking to its dissolution or liquidation.

[f] the entry of an order for relief under the United States federal bankruptcy laws or the entry of any other decree or order by a court having jurisdiction in the premises adjudging the Lessee a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Lessee under the United States federal bankruptcy laws or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the ordering, the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

[g] the commencement by the Lessee of a voluntary case under the United States federal bankruptcy laws, or the consent by the Lessee of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, arrangement with creditors or an order for relief under the United States federal bankruptcy laws or any other applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts as they become due, or, to the knowledge of the Lessor, the taking of corporate action by the Lessee in furtherance of any such action.

## 15. REMEDIES

15.1 EXPRESS REMEDIES: If an Event of Default occurs, Lessor may, at its option, do any or all of the following:

[a] proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the relevant Equipment Schedule, and the covenants and terms of this Master Lease to the extent it pertains to such Equipment Schedule, and to recover from Lessee any and all damages or expenses, including reasonable attorneys' fees, which Lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder.

[b] by notice to Lessee, declare immediately due and payable all monies to be paid by Lessee during the initial term [or any extended term then in effect] of the Equipment Schedule, as liquidated damages, and not as a penalty, and Lessor shall have the right [to the extent permitted by law, to [i] recover all monies so declared due and payable, discounted to the date of payment at the rate of 6% per annum, or one-half of the then-prevailing prime interest rate charged by principal New York banks, whichever is less, as liquidated damages, and not as a penalty; [ii] recover all other amounts which are due or which become due under the Equipment Schedule; [iii] terminate Lessee's right to possession but not Lessee's obligations under this Lease] and to retake immediate possession of the Equipment without any process of law and for such purpose Lessor may enter upon any premises where the Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the negligence of Lessor, Lessor's assignee or their respective agents and representatives to any such entry or repossession [iv] recover all expenses, including reasonable attorneys' fees, which Lessor shall have incurred or may incur by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder; and [v] pursue any other remedy permitted by law or equity. The possibility of a re-lease or resale under Paragraph 15.2 shall not excuse prompt payment in full by Lessee under this Paragraph 15.1.

15.2 RE-LEASE OR RESALE: Lessee shall make a reasonable, good faith effort to retake possession of the Equipment and, if Lessor succeeds in retaking possession of any Unit, Lessee shall sell or lease each Unit with the privilege of becoming the purchaser thereof, at public or private sale, for cash or for credit. Lessee's share of the proceeds of any such sale or lease ["Lessee's Share"] shall be the lesser of [a] the amount by which the Re-Lease Proceeds or the Resale Proceeds of such Unit exceed the Remarketing Costs of such Unit, and [b] the amount payable by Lessee to Lessor pursuant to Paragraph 15.1 [iii] above with respect to such Unit. Lessor shall credit Lessee's Share against all amounts owed by Lessor to Lessee under Paragraph 15.1 or otherwise and the remainder of Lessee's share, if any, shall be paid to Lessee. EXCEPT AS SET FORTH IN THIS PARAGRAPH LESSEE HEREBY WAIVES ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY REQUIRE LESSOR TO MITIGATE ITS DAMAGES OR MODIFY OR LIMIT ANY OF LESSOR'S RIGHTS OR REMEDIES STATED HEREIN. In applying this provision, the following definitions shall apply:

[a] The term "Re-Lease Proceeds" of a Unit shall mean the amount value [discounted to the date of payment using the interest rate at which Lessor has non-recourse financing or a non-recourse financing commitment with respect to the re-lease] of the monthly rental payments for the Unit under a re-lease to a third party, taking into account only those monthly rental payments under the re-lease which are payable on or before the last day of the initial term or the last day of any extended term then in effect with respect to the Unit under the Equipment Schedule. If the re-lease is not financeable, the Re-Lease Proceeds shall be the monthly rental payments for such period as received.

[b] The term "Resale Proceeds" of a Unit shall mean the amount by which the proceeds of any sale of the Unit exceed the Lessor's estimate of the fair market value of the Unit at the end of the initial term or at the end of any extended term then in effect with respect to the Unit under this Master Lease.

[c] The term "Remarketing Costs" of a Unit shall mean all expenses incurred directly or indirectly by Lessor in re-leasing or selling the Unit and in obtaining a financing commitment in the case of a re-lease of a Unit, including, without limitation, reasonable fees and commissions [including a reasonable fee to Lessor] incurred in locating a buyer, a subsequent lessee or a financing

LYC 00005

containment, attorneys' fees, the cost of recovering the Unit from the Lessee and transportation, installation, refurbishing, reconditioning and storage charges.

15.3 NO WAIVER. The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of a breach of any other obligation, or of any subsequent breach of the same or any other obligation. The subsequent acceptance of rental payments hereunder by Lessor shall not be deemed a waiver of any prior existing breach by Lessee regardless of Lessor's knowledge of such prior existing breach at the time of acceptance of such rental payments.

15.4 CUMULATION. To the extent permitted by law, the above remedies shall be deemed cumulative and may be exercised successively or concurrently.

## 16. PERFORMANCE AND EXECUTION

Lessee represents and warrants to Lessor [i] that the execution and performance of this Master Lease and each Equipment Schedule have been duly authorized by Lessee and that upon execution by Lessee and Lessor this Master Lease and each Equipment Schedule will constitute a valid obligation binding upon, and enforceable against, Lessee in accordance with the terms of the Master Lease and each Equipment Schedule; [ii] that neither the execution of this Master Lease or any Equipment Schedule nor the due performance thereof by Lessee will result in any breach of or constitute any default under or violation of, Lessee's certificate or articles of incorporation, Lessee's by-laws or any agreement to which Lessee is a party or by which any interest of Lessee may be affected; [iii] that Lessee is in good standing in its state of incorporation and in the states where any Unit is to be located; [iv] the persons executing this Master Lease and each Equipment Schedule on behalf of Lessee have been duly authorized to do so; and [v] that any and all financial statements and other information with respect to Lessee heretofore furnished by Lessee to Lessor in connection with negotiations concerning one or more Equipment Schedules were, when furnished, and remain at the time of execution of any Equipment Schedule, true and without any misleading omissions, excepting any changes which have been disclosed in a written notice to Lessor.

## 17. ADDITIONAL DOCUMENTATION

Lessee shall promptly deliver to Lessor the documentation listed below which may from time to time be requested by Lessor. If such a request is made prior to the delivery of any Unit, receipt of such documentation shall be a condition precedent to Lessor's obligation to deliver such Units:

[a] financial information including, without limitation, a copy of Lessee's balance sheet and income statement for Lessee's three prior fiscal years, certified by independent certified public accountants and such other current financial information representing the financial condition and operations of Lessee as Lessor may from time to time reasonably request;

[b] a certificate of the resolutions of the Board of Directors of Lessee duly authorizing or ratifying this Master Lease or any Equipment Schedule executed hereunder;

[c] a certificate of incumbency setting forth names and signatures of those persons authorized to execute this Master Lease or any Equipment Schedule on behalf of Lessee;

[d] landlord's and/or mortgagee's waiver, in form and substance satisfactory to any Assignee or Secured Party, from any landlord or mortgagee of any premises upon which any Unit is located;

[e] an opinion of counsel for Lessee as to the matters set forth in Paragraph 16, [i through iv] above, and as to such other matters as Lessor may reasonably request; and

[f] such document confirming the execution of the Lease necessary or desirable to effect an assignment, to perfect an interest of Lessee, a Secured Party or Assignee, or for such other purpose relating to the Master Lease and/or any Equipment Schedule or to an assignment as Lessor may reasonably request. Lessee hereby appoints Lessor as Lessee's agent to prepare, execute and file in Lessee's name precautionary Uniform Commercial Code financing statements in connection with each Equipment Schedule showing the interest of Lessor, and any Assignee or Secured Party in the Equipment as appropriate.

## 18. GENERAL

18.1 TITLE: This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest. Lessee shall, at its expense, protect and defend Lessor's title to the Equipment and the interest of any Assignee or Secured Party against all persons claiming against or through Lessee. Lessee shall keep and maintain the Equipment and this Master Lease free and clear of all liens and encumbrances [other than those placed on the same by Lessor and the liens for current taxes not yet payable].

18.2 FIXTURES: Lessee will not affix any Unit of the Equipment to any real property if, as a result thereof, the Unit will become a fixture under applicable law.

18.3 ENTIRE AGREEMENT. This Agreement [together with all schedules and attachments, herein] constitutes the entire agreement between Lessor and Lessee, and no provision hereof may be amended or modified except in writing signed by Lessor and Lessee. NO PROVISION OF THIS AGREEMENT MAY BE WAIVED EXCEPT IN WRITING SIGNED BY THE PARTY FROM WHOM SUCH WAIVER IS SOUGHT. AND ANY SUCH WAIVER SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN.

Ả LESSEE'S
INITIALS:

18.4 NOTICES: All notices hereunder shall be in writing and shall be delivered in person or sent by registered or certified mail, to the address of the party contained herein, and shall be deemed received three [3] days after deposit in the United States mail with postage prepaid. Either party may change its address for notice purposes by notifying the other party in the manner aforesaid of such change. Lessee shall also send copies of all notices sent to Lessor, to Assignee or Secured Party, or Assignee [if any].

18.5 SEVERABILITY: Any provision hereof prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of this Agreement provided, however, that where the provisions of any such applicable law may be waived, they are hereby waived by Lessee and Lessor to the full extent permitted by law.

18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE. This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.

18.7 PERFORMANCE OF LESSEE'S OBLIGATIONS: If Lessee shall fail to make any payment or perform any act not required by this Master Lease or any Equipment Schedule, Lessor may act Lessee's expense, but shall not be obligated to, make such payment or perform such act without notice to or demand upon Lessee and without waiving or releasing any obligation or default. Lessor shall, when billed, reimburse Lessor for any expense incurred hereunder by Lessor in performing Lessee's obligations. LESSEE MAY NOT ASSIGN ITS RIGHTS OR OBLIGATIONS, EXCEPT AS SPECIFICALLY PROVIDED IN PARAGRAPH 12 OF THIS MASTER LEASE.

18.8 SURVIVAL: All representations, warranties, indemnities, and covenants contained in this Master Lease and in any Equipment Schedule, which by their nature would continue beyond the termination, cancellation or expiration of the Lease, including, by way of illustration only and not limitation, those in Paragraphs 6, 10, 11 and 10, shall continue in full force and effect and shall survive

LYG 00006

notwithstanding the full payment of all amounts due hereunder or the termination of Lessor's right to possession of any Unit.

**18.9 HEADINGS:** Headings and captions are for convenience of reference only and shall not be construed as part of the Lease.

**18.10 OVERDUE PAYMENTS:** Any Monthly Rental due Lessor under this Master Lease, if not paid by the 8th day of the month in which payment became due, shall accrue interest until paid at a rate equal to one and one-half percent per month, or the maximum rate permissible by law, whichever is lower. Any other amounts payable to Lessor by Lessee under this Master Lease are due and payable within fifteen (15) days after the billing date, and, if not paid on or before such due date, shall accrue interest from the due date until paid at a rate equal to one and one-half percent per month, or the maximum rate permitted by law, whichever is lower.

**18.11 CONSENT OR APPROVAL:** With respect to any provision herein which calls for the consent or approval of a party, such consent or approval shall not be unreasonably withheld.

**18.12 SUBSTITUTION OF EQUIPMENT:** If, at any time during the term of an Equipment Schedule, Lessor's right to lease the Equipment expires, Lessor shall promptly provide identical substitute Equipment, and all expenses of such substitution, including the installation, installation and transportation expenses, shall be borne by Lessor.

**18.13 DELIVERY FOR EXAMINATION:** Submission of the form of this Master Lease for examination shall not bind Lessor in any manner, and no obligations shall arise until this instrument is signed by both Lessor and Lessee.

**18.14 TERMS IN EQUIPMENT SCHEDULES:** If the provisions of any Equipment Schedule are inconsistent with the provisions of this Master Lease, then the provisions of such Equipment Schedule shall control.

LESSOR:                                          LESSEE:
COMPUTER SALES INTERNATIONAL, INC.               LYCOS, INC.

BY: _____                      BY: _____

TITLE: _____                      TITLE: _____

DATE: _____                      DATE: _____

                                                 (Please initial page 5, section 18.3).

SIL 4/96

LYC 00007

FIRST AMENDMENT TO MASTER LEASE NO. 144874

This Amendment to Master Lease Agreement No. 144874 (the "Master Lease") is dated February 28, 2001, and is between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Lessor and Lycos, Inc., a Delaware corporation, as lessee previously entered into the Master Lease and various Equipment Schedules thereunder for the lease of computer equipment. Lycos, Inc. subsequently merged with another company and the parties want to amend the Master Lease, and each Equipment Schedule thereunder, to change the lessee accordingly. In consideration of the foregoing and the promises and covenants contained in this Amendment, the parties agree to amend the Master Lease and each Equipment Schedule on the terms and conditions set forth below:

1. The Lessee is changed to LYCOS, INC., a Virginia corporation, which assumes all the obligations under the Master Lease and all current Equipment Schedules thereunder.

2. All other terms and conditions of the Master Lease and each Equipment Schedule remain unchanged and in full force and effect.

The parties have executed this Amendment as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.    LYCOS, INC.

By: _Lorraine S Cherrick_    By: _Brian O'Ky_

Title: _SVP + Gen'l Counsel_    Title: _CFO_

Date: _3/28/01_    Date: _3/16/01_

144874-000.a1rev(gw).doc
FHS/BOST

### ADDENDUM ONE TO MASTER LEASE AGREEMENT NO. 144

This Addendum One to Master Lease Agreement No. 144874 (the "Lease"), December 4, 1996 and is entered into by and between COMPUTE. INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parti. dated on even date herewith, and in consideration of the mutual promises, covenan ... conditions contained in the Lease and contained herein, and for other good and va.. able consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflict as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Section 2.2 Initial Term:** In line 6, delete "120" and insert "60."

3. **Section 15.1 Express Remedies:** In subsection [b][i], delete "4%" and insert "6%."

4. **Section 15.2 Re-lease or Resale:** In line 7, after "PARAGRAPH," insert "AND TO THE EXTENT PERMITTED BY LAW."

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Master Lease No. 144874, as of the date set forth below.

| COMPUTER SALES INTERNATIONAL, INC. | LYCOS, INC. |
|---|---|
| BY: | BY: |
| E. WILLIAM CILLOBA | |
| CHIEF MANAGING OFFICER & CFO | TITLE: CHIEF OPERATING OFFICER |
| DATE: JAN 10 1997 | DATE: DECEMBER 20, 1996 |

PR/Bont.
144874-00A/Am(Idid)

# EXHIBIT B

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 67E Dated as of June 16, 2000

LESSOR:

LESSEE: **LYCOS, INC.**
400-2 Totten Pond Road
Waltham, Massachusetts 02154-2000

### COMPUTER SALES INTERNATIONAL, INC.

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF ONE PAGE.

| EQUIPMENT LOCATION: | 1675 NORTH SHORELINE BLVD. MOUNTAIN VIEW, CALIFORNIA 94043 |
|---|---|

2. Monthly Lease Rate Factor for all Units: See Addendum One

3. Initial Term: **Twenty-four (24) months**

4. Anticipated Installation Date: **June 15, 2000 through September 30, 2000**

5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)

6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.

7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before June 23, 2000.

**COMPUTER SALES INTERNATIONAL, INC.**   LESSEE: **LYCOS, INC.**

By: _____   By: _____

Title: _PRESIDENT_   Title: _CFO_

Date: _JUL 1 8 2000_   Date: _7/12/00_

PHS/BOST
144874-067E(ssd).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## EXHIBIT "A"
## LYCOS, INC.
## EQUIPMENT SCHEDULE 67E TO MASTER LEASE 144874

| QTY | DESCRIPTION | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|-------------|-----------|-------------------------------------|
| * | Desktop PC's and PC Servers, with a processor speed of 500 Mhz Monitors Other Printers | NEW | .03875 times Unit cost |
| * | Miscellaneous standalone hardware, with its own serial number, e.g. Copiers, Scanners, FAX Machines, Clone PC's | NEW | .043 times Unit cost |
| * | Miscellaneous hardware, without its own serial number or a relation to other Units on this Lease, e.g. Cards, Memory, Modems | NEW | .0463 times Unit cost |

Initialed by:    Lessor _____

Lessee _____

PHS/BOST
144874-067E(std).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67E
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67E, Master Lease Agreement No. 144874" (the "Lease"), is
dated as of June 16, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC.
("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even
date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual
promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree
as follows:

1.     **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read
together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms
and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall
control.

2.     **Lessor's Purchase of Equipment:**

a) Lessor will purchase the Equipment directly from the vendor(s) designated by Lessee.

b) The Total Cost of the Lease (hardware, software license fees and other costs) is not to exceed
$500,000.00. If Lessee wants this Lease to cover costs greater than $500,000.00, Lessor, in its sole discretion, may
pay the additional costs.

c) Lessor is not liable for any failure or delay in delivery caused by the manufacturer, vendor or any other
party or condition not within Lessor's control.

*3.     **Quantities; Monthly Rental:**

a) This Equipment Schedule covers all machines of the type(s) listed that are installed at Lessee's facilities
between June 15, 2000 and September 30, 2000, inclusive. At this time, Lessee is unable to specify exactly how
many Units will be installed; therefore, the "quantity" column has been left blank. As Lessee determines the
quantities of Equipment it requires, Lessee shall have the applicable vendor send to Lessor invoices which will
reference this Lease and which will specify machine type(s), quantities, equipment location(s), sales price, serial
number(s) and installation date(s) of the Units ordered by Lessee. Upon receipt of each properly prepared invoice,
Lessor shall remit the sales price to the vendor.

b) Monthly Rental per Unit will equal the "Monthly Lease Rate Factor" for that Unit, which is specified in
the Equipment Schedule or on Exhibit "A", multiplied by the Unit's cost. On October 1, 2000, or as soon thereafter
as is reasonably practicable, Lessee shall execute a Certificate of Acceptance for all installed Equipment, which
Certificate verifies the actual quantities of machines; and the Monthly Rental per Unit and the total Monthly Rental
for the Equipment Schedule, both of which will be expressed as dollar amounts.

4.     **Initial Term:**  The twenty-four (24) month Initial Term shall start on October 1, 2000, and expire on
September 30, 2002. Lessee shall pay to Lessor Daily Rental as set forth in Section 3 of the Master Lease, for each
Unit of Equipment for each day from, and including, its installation date through, but not including, October 1, 2000.
Daily Rental shall be due in a lump sum on October 1, 2000.

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

5.    **Stipulated Loss Value**: Because the actual quantities of Equipment are unknown at this time, a specific dollar amount Base Value cannot be listed on the Stipulated Loss Value Schedule. Instead, "Equipment Cost" has been specified so that, at the time of a loss, the Stipulated Loss Value shall be equal to the cost of the Unit times the applicable percentage. The parties agree, however, that a specific dollar amount Base Value will be set forth in the Certificate of Acceptance referred to above.

6.    **Software License Fees and Other Costs**: In consideration of Lessee's entering into this Lease, Lessor shall pay on Lessee's behalf various operating and/or application software license fees so that Lessee may use such software packages in connection with the Equipment. Lessor may also pay other costs related to the Equipment, on Lessee's behalf. Lessee shall reimburse Lessor for such costs by (i) paying a daily charge equal to one-thirtieth of the Soft Cost Factor set forth below times the cost of the software license fee or other cost for each day from and including the date Lessor pays such fees or costs through, but not including October 1, 2000, such total daily charges to be paid in a lump sum on October 1, 2000, and (ii) making a monthly payment to Lessor equal to .04646 (the "Soft Cost Factor") times the cost of the applicable software license fees or other costs. The resulting monthly payment amount will then be assigned on a pro-rata basis (pro-rated by Unit cost) to Units of Equipment and will be treated as additional rental for the lease of the Equipment. The total amount of software license fees and other costs will not exceed five percent (5%) of the Total Cost of the Lease, without Lessor's prior written consent. Because Lessor makes payments as invoices are received throughout the installation period, the percent of software license fees and other costs to the Total Cost of the Lease is generally not known until the final reconciliation of the Lease. If Lessor determines that the total amount of software license fees and other costs exceed five percent (5%) of the Total Cost of the Lease, Lessor shall have the option to exclude the excess software license fees and other costs from this Lease and Lessee agrees to reimburse Lessor for such amounts.

7.    **Interest Rate Contingency**: The Lease Rate and Soft Cost Factors (the "Rate Factors") specified in this Lease are based upon the yield to maturity of U.S. Treasury notes maturing in September 2002 (the "Treasury Yield"); the Treasury Yield is currently 6.54%. Lessor intends to obtain a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral (the "Loan"). If, at the time the Loan is closed, the *then current* Treasury Yield exceeds 6.54%, then the Rate Factors shall be increased by .0001 for each 25 basis points by which the *then current* Treasury Yield exceeds the current Treasury Yield of 6.54%. The Rate Factors will be increased only until the *then current* Treasury Yield exceeds the current Treasury Yield by 300 basis points. Any increases in the Treasury Yield in excess of 300 basis points will have no further effect on the Rate Factors. Increases of the Treasury Yield by increments of less than 25 basis points will have no effect on the Rate Factors.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67E, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.            LYCOS, INC.

By: _____            By: _____

Title: E. William Bilula          Title: CFO
       President

Date: JUL 18 2000            Date: 7/2/00

PHS/BOST
144874-067E(tad).doc

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: Equipment Cost

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-067E(aid).doc

# EXHIBIT C

## NON-ORIGINAL

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. 67H Dated as of October 30, 2000**

**LESSOR:**

**COMPUTER SALES INTERNATIONAL, INC.**

**LESSEE:** **LYCOS, INC.**
400-2 Totten Pond Road
Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|-----|-----|-----|-----|-----|-----|
| | | | | | | |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF FIVE PAGES.

EQUIPMENT LOCATION:      400-2 TOTTEN POND ROAD
WALTHAM, MASSACHUSETTS 02154-2000

2. Monthly Rental for all Units: $36,438.41
3. Initial Term: December 1, 2000 through September 30, 2003; Thirty-four (34) months
4. Anticipated Installation Date: Already installed and accepted
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before November 6, 2000.

**COMPUTER SALES INTERNATIONAL, INC.**   **LESSEE: LYCOS, INC.**

By: _____        By: _Thomas E. Guyprile_

Title: E. WILLIAM GILLULA              Title: _VP FINANCE & ADMIN_
PRESIDENT & COO

Date: NOV 2 9 2000                     Date: _11·14·00_

PHS/BOST
144874-067H(sad)

LYC 05453

**NON-ORIGINAL**

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 6711, MASTER LEASE NO. 144874

$36,438.41

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A14UEC28S2CJ | | ULTRA 2 2300 | 913H2884 | 93901 | USED | $667.95 |
| | | X5229A (1) | 9.1GB HARD DRIVE | 913H2891 | | | |
| | | X1018A (1) | INTERFACE CARD | | | | |
| | | X3856A (1) | SCSI CABLE | | | | |
| | | MEMORY (1) | 512MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | CD-ROM (1) | CD-ROM | | | | |
| 2 | SUN SGXDSK060C54 | | 54GB EXTERNAL MULTIPAC | 912C0119 | 93901 | USED | $286.88 |
| | | | | 912C0120 | | | |
| 1 | SUN SGXTAPDL.T021 | | 35/70GB STOREDGE FLEXIPAC | 909C0018 | 93901 | USED | $241.99 |

PO NUMBER: 2550 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92250952 | 98362 | USED | $437.17 |
| | | MEMORY (1) | 256MB MEMORY | 92250951 | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | 92540468 | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | 92540467 | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| | | X6601A (1) | 8BAY INT STORAGE EXPANSION | | | | |
| 1 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92540466 | 98362 | USED | $397.21 |
| | | MEMORY (1) | 256MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| 4 | SUN X7119A | | 19" MONITOR | 9851KEO273 | 98362 | USED | $27.80 |
| | | | | 9851KEO276 | | | |
| | | | | 9918KEO621 | | | |
| | | | | 9918KEO622 | | | |

PO NUMBER: 3419 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A25-MR6B | | ENTERPRISE 450 400 | 925H356A | 98361 | USED | $747.16 |
| | | MEMORY (1) | 512MB MEMORY | 925H359A | | | |
| | | DRIVE (1) | 9.1GB HARD DRIVE | | | | |
| | | X311L (1) | POWER CORD | | | | |
| 3 | SUN SGXL1BDLT128 | | STOREDGE 1280 TAPE LIBRARY 280-560GB | 9917R05959 | 98361 | USED | $736.76 |
| | | X1062A (1) | SBUS DIFF SCSI HOST ADAPTER | 9917R05937 | | | |
| | | X7005A (2) | 512MB MEMORY | 9917R05954 | | | |

PO NUMBER: 3421 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 8 | SUN X7004A | | 256MB MEMORY | N/A | 1991 | USED | $48.60 |

PO NUMBER: 4250 ✓

LYC 05454

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 6 | CISCO CS-150-LAN-04 | | CS-150 SWITCH/16PORT LOAD BALANCER | 21140011614 21140011666 21180014078 21180014081 21180014105 21180014152 | 162462 171983 | USED | $595.54 |
| | | | PO NUMBER: 4465 | | | | |
| 1 | SUN A34ULD19S001E | | ENTERPRISE 220R 450 | S016H3932 | 96865 | USED | $841.62 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 18GB HARD DRIVE | | | | |
| | | VIDEO (1) | 4MB VIDEO MEMORY | | | | |
| | | X311L (1) | POWER CORD | | | | |
| | | | PO NUMBER: 4921 | | | | |
| 1 | SUN A34ULD19S001EJ | | ENTERPRISE 220R 450 | S021H2FDB | 97171 | USED | $683.88 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 1GB HARD DRIVE | | | | |
| | | X1195A (1) | ULTRASPARC II 450MHZ PROCESSOR | | | | |
| | | X311L (1) | POWER CORD | | | | |
| | | | PO NUMBER: 4935 | | | | |
| 2 | IBM 2645-4EU | | THINKPAD 600X 7/500 | 78TAXK8 78TAYN8 | BZ46002 BZ26273 | USED | $103.43 |
| | | | PO NUMBER: 5005 | | | | |
| 2 | DIGIRON | | 4000 CHASSIS | 4108 | 16058 | USED | $1,521.47 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | 4109 | | | |
| | | MODULE (3) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (1) | REDUNDANT POWER SUPPLY | | | | |
| | | | PO NUMBER: 5091 | | | | |
| 1 | NETWORK APPLIANCE | | STORAGESHELF FC9 | NA0000000004276 | 34972 | USED | $482.83 |
| | | DRIVE (7) | 18GB HARD DRIVE | | | | |
| | | X8006 (2) | POWER CABLE | | | | |
| | | | PO NUMBER: 5148 | | | | |
| 5 | SUN A21U/C1A9PC6C | | ULTRA 5 400 | SFW02540187 | 98470 | USED | $147.14 |
| | | MEMORY (1) | 256MB MEMORY | SFW02540224 | 97452 | | |
| | | DRIVE (1) | 9GB HARD DRIVE | SFW02540243 | | | |
| | | CD ROM (1) | 32X CD ROM | SFW02610237 | | | |
| | | XH31A (1) | PCI OPTION CARD | SFW02610248 | | | |
| | | X3515A (1) | US COUNTRY KIT | | | | |
| | | X471A (1) | 10" VIDEO ADAPTER | | | | |
| | | X3668A (1) | PGX32 COLOR FRAME BUFFER CABLE | | | | |
| 5 | SUN X7136A | | 21" MONITOR | S0013LB1447 S0013LB1449 S0013LB1451 S0013LB1453 S0013LB1455 | 97452 | USED | $44.00 |
| | | | PO NUMBER: 5186 | | | | |

LYC 05455

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|------|--------------------|-----------------------------|-------------|----------|-----------|----------|-------------------------|
| 5 | COMPAQ | | DECSERVER 900TM 32 MJ8 CONNECTOR | N/A | BZ85812 | USED | $165.35 |
| | | TRANCEIVER (2) | MICRO TRANSCEIVER | | BZJ0364 | | |
| | | DEHUA-CA (2) | DECHUB ONE | | BZ91755 | | |
| | | CARD (1) | 2MB FLASH CARD | | CA21642 | | |
| | | | | | CA35610 | | |
| | | | | | CA66642 | | |
| | | | | | CB19485 | | |

| | | | PO NUMBER: 5257 | | | | |
|---|---|---|---|---|---|---|---|
| 3 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550HSY9 | 292703 | USED | $114.86 |
| | | | | 550HSK3 | 294540 | | |
| | | | | 550HSR8 | | | |
| 3 | VIEWSONIC | | 17" MONITOR | AY02012042 | 292703 | USED | $8.98 |
| | | | | AY02012047 | | | |
| | | | | AY02012046 | | | |
| 7 | IBM 6594-92U | | PC300PL P3/667 | 23RD279 | 293500 | USED | $72.61 |
| | | | | 23RF000 | | | |
| | | | | 23RF134 | | | |
| | | | | 23RF334 | | | |
| | | | | 23RF512 | | | |
| | | | | 23RF539 | | | |
| | | | | 23RD504 | | | |
| 3 | IBM 6594-92U | | PC300PL P3/667 | 23RD375 | 293806 | USED | $72.02 |
| | | | | 23RD806 | 293500 | | |
| | | | | 23RF433 | | | |
| 10 | VIEWSONIC | | 19" MONITOR | 304002200212 | 293500 | USED | $14.30 |
| | | | | 304002203313 | | | |
| | | | | 304002200211 | | | |
| | | | | 304002203309 | | | |
| | | | | 304002203304 | | | |
| | | | | 304002203308 | | | |
| | | | | 304002200208 | | | |
| | | | | 304002200207 | | | |
| | | | | 304002203305 | | | |
| | | | | 304002203314 | | | |

| | | | PO NUMBER: 5416 | | | | |
|---|---|---|---|---|---|---|---|
| 2 | BIGIRON | | 8PORT GIG 5X MODULE | CH24002212 | 17384 | USED | $769.24 |
| | | SWITCH (1) | FASTIRON 24PORT WG SWITCH | CH24002271 | | | |
| | | SWITCH (1) | NETIRON 16PORT SWITCH | | | | |

| | | | PO NUMBER: 5418 | | | | |
|---|---|---|---|---|---|---|---|
| 1 | SUN A34-ULD1-9S-512CX | | ENTERPRISE 220R 450 | S03ZA0888 | 13510 | USED | $1,526.88 |
| | | CACHE (1) | 4MB CACHE | | 13614 | | |
| | | X1195A (4) | 450MHZ PROCESSOR OPTION | | | | |
| | | X3508A (2) | TYPE 6 COUNTRY KIT | | | | |
| | | X7003A (4) | 128MB MEMORY | | | | |
| | | X1034A (3) | FAST ENET CONTROLLER PCI ADAPTER | | | | |

| | | | PO NUMBER: 5454 | | | | |
|---|---|---|---|---|---|---|---|
| 2 | SUN X2240A | | 300MHZ/2MB PROCESSOR OPTION | S352943 | 13242 | USED | $90.07 |
| | | | | S353019 | | | |

PO NUMBER: 5576

LYC 05456

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|------|--------------------|-----------------------------|-------------|----------|-----------|-----------|-------------------------|
| 5 | SUN N06-UKC1-9S-256AT1 | MEMORY (1) CACHE (1) DRIVE (1) X5229A (1) X6971A (1) | NETRA T1 MODEL 105 440 256MB MEMORY 2MB CACHE 18GB HARD DRIVE 9.1GB HARD DRIVE CD ROM | S023C114F S023C111C S023C1138 S024C0370 S024C05B6 | 13526 | USED | $302.67 |
| | | | **PO NUMBER: 5601** | | | | |
| 1 | VIEWSONIC | | 22" MONITOR | QW02505877 | CG46206 | USED | $32.00 |
| | | | **PO NUMBER: 5651** | | | | |
| 4 | ALTEON | | ACE SWITCH 180E | 60CF4582A0 60CF458550 60CF44BF60 60CF44E530 | 805795 | USED | $573.66 |
| | | | **PO NUMBER: 5656** | | | | |
| 1 | FASTIRON | POWER (1) | 72PORT 10/100 + 4PORT MGMT MODULE REDUNDANT POWER SUPPLY | 1464 | 19079 | USED | $617.54 |
| | | | **PO NUMBER: 5713** | | | | |
| 1 | FASTIRON | | 72PORT 10/100 + 4PORT MGMT MODULE | 1465 | 19080 | USED | $558.15 |
| | | | **PO NUMBER: 5734** | | | | |
| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550L5NO | 297583 | USED | $105.31 |
| | | | **PO NUMBER: 10150** | | | | |
| 2 | CISCO 7206VX | PWR-7200/2 (1) MEM-I/O-FLD48M (1) MEM-SD-NPE-128M PA-A3-T3 (1) | 7206VX BUNDLE W/NPE-300 DUAL AC POWER SUPPLY 48MB MEMORY 128MB MEMORY 1PORT ATM ENH DS3 PORT ADAPTER | 72704917 72704931 | 276-026594 276-026593 | USED | $787.17 |
| | | | **PO NUMBER: 90013** | | | | |
| 1 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZKR | 298561 | USED | $52.33 |
| 1 | VIEWSONIC | | 19" MONITOR | 304002200331 | 298561 | USED | $14.05 |
| | | | **PO NUMBER: 90019** | | | | |
| 3 | IBM 6892-26U | | PC300PL P3/600 | 78ZYYZH 78ZYZMG 78ZYYAV | 298559 | USED | $52.60 |
| 3 | VIEWSONIC | | 19" MONITOR | 304002203094 304002203098 304002200637 | 298559 | USED | $14.32 |
| | | | **PO NUMBER: 90020** | | | | |
| 4 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZLL 78ZYYBF 78ZYYZR 78ZYZKM | 298397 | USED | $55.37 |

LYC 05457

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | VIEWSONIC | | 19" MONITOR | 304002201116 304002201118 304002201124 304001600981 | 298397 | USED | $17.09 |

PO NUMBER: 90021

| 8 | IBM 6594-B1U | | PC300PL P3/733 | 23FTX06 23FTY17 23FTW24 23FTV07 23FTV49 23FTW18 23FTP78 23FTP13 | 299252 | USED | $72.57 |
| 8 | VIEWSONIC | | 19" MONITOR | 304002201122 304002201117 304002201121 304001601284 304001600986 304001600964 304001600980 304001600983 | 299252 | USED | $14.62 |

PO NUMBER: 90022

| 4 | IBM 2647-21U | | THINKPAD T20 7/650 | 78BKA69 78BKB04 78BKB69 78BKA90 | CL86299 CL35085 | USED | $97.01 |

PO NUMBER: 90023

| 1 | BIGIRON | | 4000 CHASSIS | F00009376 | 21359 21180 | USED | $1,878.82 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | | | | |
| | | MODULE (2) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (2) | REDUNDANT POWER SUPPLY | | | | |
| | | MODULE (1) | 72PORT 10/100+4PORT MGMT MODULE | | | | |
| 1 | BIGIRON | | 4000 CHASSIS | F00009377 | 21359 21180 | USED | $2,092.93 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | | | | |
| | | MODULE (3) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (2) | REDUNDANT POWER SUPPLY | | | | |
| | | MODULE (1) | 72PORT 10/100+4PORT MGMT MODULE | | | | |

PO NUMBER: 90030

| 10 | IBM 9495-AG1 | | 17" MONITOR | 55C5966 55C5968 55C5969 55C5970 55C5971 55C5972 55C5973 55C5975 55C5984 55C5987 | CL70844 | USED | $52.55 |

PO NUMBER: 90033

*Traced all P.O's to file*

*11/9/00*

LYC 05458

**NON-ORIGINAL**

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67H
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67H, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 30, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    <u>Controlling Terms</u>:  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    <u>Commencement Date</u>:  The Equipment is installed at Lessee's location under Equipment Schedule 67E to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 67E expires on November 30, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is December 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 67E is October 1, 2000, and the total Monthly Rental is $42,074.79.

3.    <u>Serial Number Substitution</u>:

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical or casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

LYC 05459

# NON-ORIGINAL

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67H, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: _____                 By: _____

Title: _____                 Title: _____

Date: _____                 Date: _____

PHS/BOST
144874-067H(aad)

LYC 05460

# EXHIBIT D

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

## EQUIPMENT SCHEDULE NO. NINETY-THREE Dated as of October 2, 2001

LESSOR:                          LESSEE:    **LYCOS, INC.**
                                            400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**      Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4,
1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 66 pages.

**EQUIPMENT LOCATION:**    See Attached Exhibit "A"

2. Monthly Rental for all Units:  See Addendum One
3. Initial Term: November 1, 2001 through October 31, 2003; Twenty-four (24) months
4. Anticipated Installation Date:  Already Installed and accepted
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before October 9, 2001.

**COMPUTER SALES INTERNATIONAL, INC.**  LESSEE: **LYCOS, INC.**

By: _____      By: _____
        E. WILLIAM GILLULA
        PRESIDENT & COO

Title: _____       Title: _____

Date: _____DEC 1 0 2001_____         Date: _____10/4/01_____

FHS/BOSTON
144874-093(djb)

LYC 07628

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

### ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-THREE
### MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-three, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.  **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.  **Commencement Dates; Start of Initial Term; Total Monthly Rental:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66B, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, and 81 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-four between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date | Total Monthly Rental for Units from terminating Equipment Schedule(s) |
|---|---|---|---|
| 65 | 10/31/01 | 11/1/01 | $14,299.85 |
| 64 | 1/31/02 | 2/1/02 | $5,055.76 |
| 81 | 6/30/02 | 7/1/02 | $1,242.25 |
| 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C | 9/30/02 | 10/1/02 | $58,838.59 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 | $17,923.69 |
| 64B, 66B, 67D, 69E | 3/31/03 | 4/1/03 | $11,644.10 |
| 64D, 67F, 69G | 5/31/03 | 6/1/03 | $12,502.28 |
| 64F, 67H, 69I | 9/30/03 | 10/1/03 | $21,901.71 |

LYC 07695

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

Accordingly, the total Monthly Rental under the Lease is as follows:

| | |
|---|---|
| for months November 1, 2001 through January 31, 2002: | $14,299.85; |
| for months February 1, 2002 through June 30, 2002: | $19,355.61; |
| for months July 1, 2002 through September 30, 2002: | $20,597.86 |
| for months October 1, 2002 through December 31, 2002: | $79,436.45 |
| for months January 1, 2003 through March 31, 2003: | $97,360.14 |
| for months April 1, 2003 through May 31, 2003: | $109,004.24 |
| for months June 1, 2003 through September 30, 2003: | $121,506.52 |
| for months October 1, 2003 through October 31, 2003: | $143,408.23 |

**3.  Letter of Credit:**  Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-four is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-three, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: _____          By: _____
      E. WILLIAM GILLULA
Title: ____PRESIDENT & COO___          Title: ____CFO___

Date: _____DEC 1 0 2001_____          Date: ____10/4/01____

PHS/BOSTON
144874-093(skh)

LYC 07696

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-THREE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,320,039.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee: _____

PHS/BOSTON

144874-093(skh)

LYC 07697

# EXHIBITS E-F
## to Amended Answer & Counterclaim of Defendant Lycos, Inc.

# EXHIBIT E

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. NINETY-FOUR Dated as of October 2, 2001

LESSOR:                          LESSEE:    **LYCOS, INC.**
                                            400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**      Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4,
1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    |                             |             |          |           |                         |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 84 pages.

**EQUIPMENT LOCATION:**    See attached Exhibit "A"

2. Monthly Rental for all Units: See Addendum One
3. Initial Term: November 1, 2001 through October 31, 2004; Thirty-six (36) months
4. Anticipated Installation Date: Already installed and accepted
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before October 9, 2001.

**COMPUTER SALES INTERNATIONAL, INC.**    **LESSEE: LYCOS, INC.**

By: _____    By: _____
        E. WILLIAM GILLULA
        PRESIDENT & COO

Title: _____    Title: ___CFO_____
        DEC 0 5 2001

Date: _____    Date: ___10/4/01_____

PHS/BOSTON
144874-094(dlb)

LYC 07699

LYC 07784

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-FOUR
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-four, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Dates; Start of Initial Term:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, 76, 81, 85 and 86 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. In consideration of Lessee's entering into this Lease, Lessor agrees to early terminate Lessee's rental obligations under Equipment Schedules 64, 65, 66, 66A, 66B, 67, 68, 76, 81 and 86, for the units leased hereunder, effective on October 31, 2001. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-three between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date |
|---|---|---|
| 64, 65, 66, 66A, 66B, 67, 68, 76, 81, 86 | 10/31/01 | 11/1/01 |
| 67A, 68A, 68B, 68C | 9/30/02 | 10/1/02 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 |
| 64B, 66B, 67D, 69B | 3/31/03 | 4/1/03 |
| 64D, 66G, 67F, 69G | 5/31/03 | 6/1/03 |
| 64F, 66I, 67H, 69I | 9/30/03 | 10/1/03 |
| 85 | 12/31/03 | 1/1/04 |

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

3. **Total Monthly Rental**: The Monthly Rentals per Unit are set forth on the attached Exhibit "A." However, the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 64, 66, 66A, 66B, 76 and 81 will be $0 for the months of November 1, 2001 through December 31, 2002; and the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 65, 67, 68 and 86 will be $0 for the months of November 1, 2001 through September 30, 2002. Accordingly, the total Monthly Rental under the Lease is as follows:

for months November 1, 2001 through September 30, 2002: $0;
for months October 1, 2002 through December 31, 2002:      $210,061.03;
for months January 1, 2003 through March 31, 2003:         $333,258.78
for months April 1, 2003 through May 31, 2003:             $398,305.68
for months June 1, 2003 through September 30, 2003:        $462,206.40
for months October 1, 2003 through December 31, 2003:      $611,403.34
for months January 1, 2004 through October 31, 2004:       $679,753.85

4. **Letter of Credit**: Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-three is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-four, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: **E. WILLIAM GILLULA**                  By:
        PRESIDENT & COO

Title:     DEC 0 5 2001                      Title: CFO

Date:                                        Date: 10/4/01

PHS/BOSTON
144874-094(add.)

LYC 07396

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER:  NINETY-FOUR

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $21,836,791.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee: BDL_____

PHS/BOSTON

144874-094(blb)

LYC 07786

# EXHIBIT F



Building A Better Climate For Growth & Prosperity

**ELA Home**

User Login

Membership Info

search GO!

Advanced Search

Site Map | Site Updates

News ▶
Member Directories ▶
ELA Store
Events and Training ▶
Research & Legal ▶
Funding Home ▶
State Tax Manual
Govt Relations ▶
Email Discussions
About ELA ▶
Press Room
Sponsor/Advertise

Equipment Leasing
Association
4301 N. Fairfax Drive
Suite 550
Arlington, VA
22203-1627
Phone: 703-527-8655
Fax: 703-527-2649

# ELA Code of Fair Business Practices

- Purpose
- Preamble
- Section I: General Standards of Professional Conduct
- Section II: Exchange of Credit Information
- Section III: Enforcement Provisions

## Purpose

The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

Back to Top

## Preamble

Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal and State laws:

Back to Top

## Section I: General Standards of Professional Conduct

1. A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2. A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry.

3. A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement.

4. A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry.

5. A Member shall use proper care and exercise independent professional judgment.

6. A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7. A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8. A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9. A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis.

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11. A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client.

12. A Member shall not make payments to a representative of another party without the consent of that party.

13. A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction.

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

Back to Top

## Section II: Exchange of Credit Information

The exchange of credit information is an integral part of a well functioning equipment leasing and financing industry. In addition to complying with all government laws and regulations, the Members shall adhere to The Robert Morris Associates' Code of Ethics for the Exchange of Credit Information.

Back to Top

**Section III: Enforcement Provisions**

Article VIIB of the ELA Bylaws provides that a Member may be censured, suspended or expelled from the Association for violating the Code of Fair Business Practices of the Association. Accordingly, the disciplinary actions that the Association may take in the event of a violation of the Code include: (a) private censure; (b) public censure; (c) probationary membership with such conditions as may be determined by the Association; (d) suspension of membership for a term and on such conditions as may be determined by the Association; (e) expulsion from membership; and (f) non-renewal of the membership of the Member.

The following provisions, consistent with the provisions of Article VIIB of the ELA Bylaws, set forth the procedures to be followed in proceedings involving alleged violations of the Code.

1. An ELA Fair Business Practices Committee (the "Committee"), consisting of three members of the ELA Board of Directors and three former officers or directors of the ELA, shall be appointed by the Chairman of the Association who shall also designate one member of the Committee as Chairman of the Committee.

2. A proceeding alleging that an ELA Member violated the Code may be initiated by a Member of ELA (other than any ELA Member who has an official on the Committee), by the Executive Committee of the Association or by a non-member of ELA which has suffered injury as a participant in an equipment lease or finance transaction with a Member ("complainant"). The proceeding shall be initiated by filing a written Complaint with the ELA President at ELA Headquarters by registered mail. The Complaint must identify the section or sections of the Code alleged to be violated, set forth in detail the facts claimed to support the charges of Code violation, and include documents in the possession of the complainant which are pertinent to the Complaint. In addition, the complainant may submit affidavits from the complainant and others in support of the Complaint.

3. Copies of the Complaint and supporting documents, if any, shall be sent by the President to the members of the Committee. If the Committee deems the Complaint to be insufficient, it may request the complainant to provide more information, documents or affidavits in support of the Complaint.

4. If the Committee determines by majority vote that the Complaint and supporting documents, on their face, do not satisfy the requirements of Paragraph 2 or do not state facts constituting a violation of the Code, the complainant shall be so notified by the Chairman of the Committee, and no further action shall be taken.

5. If the Committee determines that the Complaint and supporting documents meet the requirements of Paragraph 2 and allege facts which, if true, could constitute a Code violation, the Chairman of the Committee shall request the ELA President to send a copy of the Complaint and supporting documents, by registered mail, to the party complained against (the "respondent"). The President shall also provide the respondent and complainant with a copy of the Code.

6. The respondent shall be afforded an opportunity to Answer the Complaint. The respondent's Answer shall respond to the specific allegations contained in the Complaint. The Answer shall also notify the Committee whether or not the respondent requests a hearing on the allegations in the Complaint, and provide the Committee with documents or affidavits from respondent or others supporting the Answer. The Answer, supporting documents and affidavits shall be sent to the ELA President by registered mail within 30 days of respondent's receipt of the Complaint. The ELA President shall promptly forward the Answer and supporting documents to the Committee and to the

complainant by registered mail, and shall notify complainant of the right to request, within 30 days of receipt of the respondent's Answer, a hearing on the Complaint before the Committee.

7. Irrespective of whether the parties request a hearing on the Complaint, the Committee shall have the authority by majority vote to dismiss the Complaint if it determines, based upon the submissions made, that it is clear there is no violation of the Code. Should the Committee dismiss the Complaint, the parties shall be notified and no further action on the Complaint shall be taken.

8. In the event the Complaint is not dismissed and a party has requested a hearing or the Committee determines a hearing is necessary, then the Committee shall notify complainant and respondent of the date, time and location of the hearing and their right to be represented by counsel at the hearing. During the hearing, the parties shall be afforded a reasonable opportunity to present evidence, cross-examine witnesses and be heard on matters alleged in the Complaint and Answer. The Committee may also permit others to testify at the hearing.

9. The Committee shall vote on whether or not the respondent has violated the Code based upon the record, and, if so, what disciplinary action, if any, should be taken against the respondent as a consequence of such violation. A two-thirds vote of the Committee members is required to censure, suspend or expel a respondent.

10. The Committee's decision must be in writing and shall be sent to the respondent and complainant by registered mail. The Committee shall notify the respondent of the right to appeal an adverse decision within 30 days of receipt of the decision. The respondent's appeal, if any, shall be sent by registered mail to the ELA President and shall set forth the reasons why the Committee's decision should be set aside. The ELA President shall promptly forward the respondent's appeal, if any, to the Complainant via registered mail. If the respondent does not timely appeal the Committee's decision, the decision shall be final and binding upon respondent.

11. If the respondent elects to appeal the Committee's decision, then the matter shall be transmitted for a hearing on the existing record before the ELA Board of Directors (the "Board"). The Board shall notify the parties via registered mail of the date, time and location of the hearing, and the schedule for filing written submissions with the Board. The respondent and the complainant may be represented by counsel and shall be permitted to provide written submissions and present oral argument to the Board. No additional documents may be filed or any testimony taken, unless ordered or requested by the Board. The Board shall vote on whether the Committee's decision should be affirmed, modified or reversed. A decision by the Board which censures, suspends or expels the respondent must be by two-thirds vote of the members present and voting. No member of the Committee, and no Director that is a representative of an ELA member that initiated the Complaint or of the respondent, may be present during, or participate in, the voting.

Back to Top


© 1996-2005, Equipment Leasing Association. All rights reserved.
The Equipment Leasing Association (ELA) is a national organization comprised of member companies within the equipment leasing and finance industry. Disclaimer | Privacy Policy

Cant find it? -|- Send us feedback!

Created by Matrix Group International, Inc.

# EXHIBIT G



THE COMMONWEALTH OF MASSACHUSETTS

OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE

BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

March 13, 2006

Thomas O. Bean, Esquire
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109

Re:    Application of 940 CMR 3.05(1) and 940 CMR 3.16(2) in Business-to-Business
       Transactions

Dear Mr. Bean:

I understand that a question has been raised as to whether conduct in a business-to-business transaction can give rise to a violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, §2(a), under the Attorney General's Consumer Protection Regulations at 940 CMR 3.05(1) and 940 CMR 3.16(2)

940 CMR 3.05(1) provides:

> No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. This prohibition includes, but is not limited to, representations or claims relating to the construction, durability, reliability, manner or time of performance, safety, strength, condition, or life expectancy of such product, or financing relating to such product, or the utility of such product or any part thereof, or the ease with which such product may be operated, repaired, or maintained or the benefit to be derived from the use thereof

940 CMR 3.16(2) provides:

> Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L c 93A, § 2 if: . . . (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.

LYC 23345

Thomas O. Bean, Esquire
McDermott Will & Emery, LLP
March 13, 2006

Page 2

The Attorney General has brought enforcement actions in at least three cases in which we alleged violations of 940 CMR 3.05(1) or 940 CMR 3.16(2) in the context of business-to-business transactions. These cases included Comm. v. AMCAN Enterprises, Inc., 47 Mass. App. Ct. 330 (1999) (affirming summary judgment finding violations of both 940 CMR 3.05(1) and 3.16(2)), Comm. v. Lease Funding Services, Inc., Suffolk Sup. Ct. 02-2809-H (allegations of violations of both 940 CMR 3.05(1) and 3.16(2) resolved by Consent Judgment), and Comm. v. Allied Lighting Products, Inc., Suffolk Sup. Ct. 01-03467-F (allegations of violation of 940 CMR 3.05(1) resolved by Consent Judgment)[1]. The Attorney General brought each of these cases after G.L. c. 93A, §11, was enacted

Although I am not providing you with a formal opinion of the Attorney General, I believe these cases demonstrate a consistent position of the Attorney General's Office that conduct in a business-to-business transaction can give rise to a violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, §2(a), under the Attorney General's Consumer Protection Regulations at 940 CMR 3.05(1) and 940 CMR 3.16(2)

Sincerely yours,

Jesse M. Caplan, Chief
Consumer Protection &
Antitrust Division

---

[1] In Allied Lighting, we also alleged, and the Consent Judgment resolved, violations of 940 CMR 3.16(1), which provides that:

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2, if: (1) It is oppressive or otherwise unconscionable in any respect

LYC 23346

# EXHIBIT H



**Brian Lucy**
03/18/2002 10:08 AM

To: Paul Stenberg <Paul.Stenberg@csileasing.com>
cc:
Subject: Re: Analysis

Thanks a bunch for doing this.

Kevin is out this week, but when he gets back, we'll take a look.

Brian

Paul Stenberg <Paul.Stenberg@csileasing.com>



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>
03/18/2002 08:42 AM

To: "Kevin. Baillie@corp. terralycos. com (E-mail)"
<Kevin.Baillie@corp.terralycos.com>, Brian.Lucy@corp.terralycos.com
cc:
Subject: Analysis

I have come up with the following so far;

Monique's analysis does not include Schedules that Lycos was still obligated for, but because our Lenders wanted to decrease exposure , we lowered them (I explained this back in Sept.) Equipment Schedules 64,81,68,66 and 86 rents were decreased substantially from the October payment to the November. For example, #64 was due to expire 1/31/02 @ $26,888/mo. We decreased that to $5055/mo. but contractually Lycos stilled owed the $26,888/mo.

Schedule # 65 expired 10/1 but was included in the re-finance. This was not included in the Analysis.

Monique's total for the new lease obligation was wrong. She took the Total Monthly Payment x the Length of the deal. You must look at it at a Present Value base and not include the interest. Its like taking your Mortgage payment x 30 years.

This is what I have so far so you can rest easy;

Present Value of Lease  $23,727,000

Obligation of old Leases $20,215,000

Difference          $3,512,000

Now the Value of the current lease is around $29,000,000 . The total cost of the equipment was around $63mm. When we re-financed, we extended our lease and re–couped about 5-7% thus the 3.5mm. Don't forget, on the Orginal leases, CSI injects between 10-13% residual so for every $1mm spent, Lycos obligation is $870k

I addition, a good portion of the equipment was taken from an over 30 month term and placed on a 24 month term. For example( hypothetical); a million dollar of PC's that had 33 months left was refinanced to 24 mo. So, in effect, that groups payments are going to be higher.

BUT, as I said all along, WHEN you return the equipment, I will give you Full FMV credit. So you won't be obligated for all the payments.

There are still areas that I am doing this week and I will get back to you.

# EXHIBIT I

# CSI                    SALES AGREEMENT NUMBER 199614

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314) 997-7010

## SALES AGREEMENT

This Sales Agreement dated July 15, 2003 (the "Agreement") is between **COMPUTER SALES INTERNATIONAL, INC.** (the "Seller") and **LYCOS, INC.**, which has a principal place of business at 100 5th Avenue, Waltham, Massachusetts 02451 (the "Buyer").

WHEREAS, Buyer, as Lessee and Seller, as Lessor have entered into various equipment schedules (the "Equipment Schedules") subject to Master Lease Agreement No. 144874 dated December 4, 1996 (the "Master Lease") (the "Master Lease" together with the "Equipment Schedule(s)" hereinafter collectively referred to as the "Lease")

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were consequently terminated in their entirety, and all items of equipment leased pursuant to the terminated Equipment Schedules, were made subject to replacement Equipment Schedules listed on Exhibit 1 attached hereto and made a part hereof ("Replacement Schedules");

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were not revised ("Original Schedules") and they, together with the Replacement Schedules remain in full force and effect as of the date of this Agreement (the "Original Schedules" together with the such "Replacement Schedules" collectively referred to as the "Existing Schedules")

WHEREAS, Lessee desires to restructure all of the Existing Schedules detailed on Exhibit 1 to $1.00 buyout leases;

WHEREAS, a prepayment of the fair market value of all of the Equipment (as hereinafter defined) is required in order to restructure each Lease to $1.00 buyout lease;

WHEREAS, Lessor has agreed to restructure said Leases to $1.00 buyout leases for the consideration set forth below;

NOW THEREFORE, in consideration of the foregoing, Lessee and Lessor agree as follows:

1.  **SALE:** For the Sales Price described in Paragraph 3 below, Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Leases listed in Paragraph 2 below (the "Equipment") effective on their respective termination dates, except as stated in paragraph 4 below, and on the terms and conditions contained in this Agreement.

2.  **EXISTING EQUIPMENT SCHEDULES:** The Equipment is installed at Buyer's location and has been accepted for lease under Equipment Schedules 69I, 64F, 66I, 67H, Eighty-five, Eighty-six, Eighty-nine, 89A, Ninety, Ninety-three, Ninety-four, One Hundred, and Two Hundred to Master Lease Agreement No. 144874 between the parties (the "Leases"). The Existing Equipment Schedules shall terminate on the "Termination Dates" set forth below:

> Equipment Schedules 69I, 64F, 66I and 67H will terminate on September 30, 2003
> Equipment Schedules Eighty-five and Eighty-six will terminate on December 31, 2003
> Equipment Schedules Eighty-nine, 89A, and Ninety will terminate on July 31, 2004
> Equipment Schedule Ninety-three will terminate on October 31, 2003
> Equipment Schedule Ninety-four will terminate on October 31, 2004
> Equipment Schedule One Hundred will terminate on March 31, 2004
> Equipment Schedule Two Hundred will terminate on March 31, 2005

Each Lease will terminate on its respective Termination Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make all Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease. Pursuant to

the Leases, Buyer remains liable for any personal property tax liability, with respect to the Equipment, which accrued or accrues during the term of the Leases. The Equipment is sold on an "AS IS, WHERE IS" basis, without any warranties of any kind, express or implied.

3.   SALES PRICE:  The Sales Price of the Equipment is $33,775,000.00 USD, plus applicable taxes, which Buyer shall pay on or before July 18, 2003 by wire transfer to the following bank and account:

> First Bank
> ABA #081009428
> For Further Credit to:  Computer Sales International, Inc.
> Account #9821914677
> Lycos, Inc.
> Sales Agreement No. 199614

Buyer shall pay on demand a late charge on such Sales Price if unpaid after it is due.  The late charge rate is the lower of (i) one and one half percent (1.5%) per month, or (ii) the highest rate permitted by law.

4.   SATISFACTION OF LEASE OBLIGATIONS:  The Leases, solely with respect to Monthly Rental (set forth on Exhibit 1) shall continue in full force and effect and Lessee shall pay to Lessor the number of Monthly Rental payments remaining (plus applicable taxes, if any), beginning with the payment due for the month of August 2003, and continuing to and including the Final Rent Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").

Seller acknowledges that receipt of the Sales Price and each of the Remaining Rental Payments in full, plus applicable taxes, if any ("Lease Satisfaction Amount"), shall fully satisfy Buyer's obligations to Seller with respect to the Leases and all obligations under the Leases shall, on the Final Rent Payment Date, cease in their entirety.

Buyer and Seller agree that this Agreement and the payment of the Lease Satisfaction Amount satisfies all monetary obligations and notice obligations of Buyer under the Leases (with the exception of notices required under Section 14 of the Master Lease), and no other payment, written or oral notification is required by Buyer in order to effectuate (a) the full satisfaction of its obligations under the Leases and (b) its ownership interest in the Equipment.

SELLER RETAINS TITLE:  With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date .  With respect to Equipment Schedule 85, certain items of Equipment shall on its respective Termination Date, become subject to Equipment Schedule Ninety-four.  Upon receipt of the Lease Satisfaction Amount in full, without further action on the part of Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.

5.   DELIVERY:  The Equipment is already installed and accepted by Buyer pursuant to the Leases.

6.   WARRANTIES:  Seller warrants that (i) on termination of the applicable Lease, except as noted in paragraph 4 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims, and encumbrances of any kind except those caused or incurred by Buyer, if any; and (ii) Seller has the full right, power and authority to sell the Equipment.  OTHER THAN THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONDITION, DESIGN OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.  SELLER HAS NO LIABILITY TO BUYER FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH (i) ANY DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO BUYER, (ii) ANY DEFECT IN THE EQUIPMENT, (iii) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (iv) ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE EQUIPMENT, OR (v) ANY LOSS OF BUSINESS, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PATENT INFRINGEMENT ACTIONS.

7.   TAXES:  Buyer shall pay all sales and use taxes (including interest and penalties) levied or based on the sales price or on this Agreement or the Equipment.  If Buyer is purchasing for resale or if Buyer is exempt from sales/use tax, Buyer will issue to Seller an appropriate exemption certificate in form reasonably acceptable to Seller prior to the delivery date.  Personal property taxes assessable on the Equipment on or after the date of delivery will be borne by Buyer.

8.  REMEDIES:  If Buyer refuses or is unable to timely perform its obligations hereunder, Seller may, following the delivery date, do any or all of the following:  (i) terminate the Agreement on five days notice, (ii) retain or repossess the Equipment, or (iii) recover from Buyer all damages and expenses, including reasonable attorney's fees, which Seller has incurred or may incur by reason of Buyer's failure to perform under this Agreement.  Seller may retain any monies paid by Buyer to Seller prior to Buyer's nonperformance as an offset to Seller's damages and expenses.

9.  MISCELLANEOUS:

A.  ENTIRE AGREEMENT:  This Agreement is the entire agreement between Seller and Buyer regarding the purchase and sale of the Equipment and no representation or statement not contained in this Agreement is binding on Seller or Buyer as a warranty, or otherwise, unless in writing and executed by the party to be bound. Any purchase order Buyer issues is merely for its internal recordkeeping purposes and as a means of confirmation of Buyer's acceptance of this Agreement, and does not as supercede, modify or serve as a counter-offer to the terms and conditions in this Agreement.

B.  NOTICES:  Any notice relating to this Agreement must be in writing and sent by electronic facsimile transmission, by overnight courier service or by registered or certified mail, postage prepaid, addressed to the party for which it is intended at the address set forth in the beginning of this Agreement or to such other address as either party indicates in writing. Notice is effective on the earlier of receipt or three days from the date of mailing.

C.  GOVERNING LAW:  This Agreement, including all matters of construction, validity, performance and enforcement, is governed by the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law.

D.  SEVERABILITY:  Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law or any jurisdiction will be ineffective as to the jurisdiction without invalidating the remaining provisions of this Agreement, but where the provisions of applicable law may be waived, they are waived to the full extent permitted by law.

E.  SURVIVAL:  All representations, warranties and covenants contained in this Agreement continue in full force and effect and survive the sale of Equipment.

F.  SELECTION:  Buyer acknowledges that it has exercised its own judgment in selecting the Equipment purchased, and that it has not relied on Seller for assistance and advice in making such selection.

G.  ASSIGNMENT: This Agreement may not be assigned by Buyer without the prior written consent of Seller.

The parties have executed this Agreement on the date written below.  At Seller's option, this Agreement is not effective unless signed by Buyer and returned to Seller by July 15, 2003.

| BUYER: | SELLER |
|---|---|
| LYCOS, INC. | COMPUTER SALES INTERNATIONAL, INC. |
| By: | By: |
| Title: CFO | Title: |
| Date: 7/18/03 | Date: |

REVIEWED BY
TERRA LYCOS LEGAL PDK

Exhibit 1
to
Sales Agreement No. 108514

# *CSI*

## COMPUTER SALES INTERNATIONAL INC
PO BOX 775485 / ST LOUIS, MISSOURI 63177-5485 / 314-997-7010

TO: LYCOS INC
100 5TH AVENUE
WALTHAM, MASSACHUSETTS 02451

INVOICE: 532645-1
DUE DATE: 06/30/03
DATE: 06/26/03
SALESMAN:

ATTENTION: PETER CARROLL

| DESCRIPTION | AMOUNT |
|---|---|
| CONTRACT NUMBER: 199614 | |
| SALE: | $3,775,000.00 |
| SALES TAX: | $229,830.89 |
| LESS PAYMENT | ($3,775,000.00) |
| REMARKS: | |

*Sales tax on sale*

WIRE TRANSFER TO:
FIRST BANK
ABA #081009428
CREDIT CSI INC ACCT #9821914877

TOTAL
AMOUNT DUE: $229,830.89

## TERMS PER CONTRACT

.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) ) | |
| v. | ) ) | **SECOND AMENDED ANSWER AND** |
| LYCOS, INC., | ) ) | **COUNTERCLAIM** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) ) | **OF DEFENDANT LYCOS, INC.** |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) ) | |
| Trustee Process Defendant | ) | |

Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") responds to the numbered

paragraphs of the complaint as follows:

1.    1.——Lycos admits that its primary business is providing internet access, and

that it has a principal place of business in Waltham, Massachusetts. The remaining allegations in

this paragraph are characterizations of plaintiff's complaint as to which no response is required.

To the extent a response is required, the remaining allegations in this paragraph are denied.

2.    2.——Lycos is without knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 2.

3.    3.——Admitted.

4.    4.——Lycos is without knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 4.

5.      5.——This paragraph states a legal conclusion as to which no response is required.

6.      6.——This paragraph states a legal conclusion as to which no response is required.

7.      7.——Lycos admits that plaintiff is in the business of leasing equipment. Lycos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7.

8.      8.——Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.      9.——Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.      10.——Admitted, except that Lycos does not admit that the terms and conditions governing CSI's lease of equipment are accurately "described in relevant part below." Lycos states that the documents evidencing the terms and conditions governing CSI's lease of equipment speak for themselves.

11.      11.——Lycos admits the first sentence. Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence.

12.      12.——Admitted.

13.      13.——Admitted.

14.      14.——Lycos admits that a true and accurate copy of Equipment Lease 100 is attached to plaintiff's complaint, except that Lycos is without knowledge or information

- 2 -

sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule One Hundred attached thereto. Lycos states that Equipment Lease 100 speaks for itself.

15.    ~~15.~~——Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 100.

16.    ~~16.~~——Lycos admits that a true and accurate copy of the Certificate of Acceptance for Equipment Lease 100 is attached to plaintiff's complaint, and states that the Certificate of Acceptance speaks for itself.

17.    ~~17.~~——Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 100 from the plaintiff in the amount of $6,082.29, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

18.    ~~18.~~——Lycos admits that it received invoices under Equipment Lease 100 from the plaintiff for the months of November and December of 2004 each in the amount of $6,082.29 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

19.    ~~19.~~——Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

20.    ~~20.~~——Admitted.

21.    ~~21.~~——Lycos admits that a true and accurate copy of Equipment Lease 200 is attached to plaintiff's complaint, except that Lycos is without knowledge or information

- 3 -

sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule Two Hundred attached thereto. Lycos states that Equipment Lease 200 speaks for itself.

22. 22. Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 200. Lycos denies the remaining allegations contained in this paragraph.

23. 23. Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the Certificate of Acceptance for Equipment Lease 200 that is attached to plaintiff's complaint. Lycos states that the Certificate of Acceptance speaks for itself.

24. 24. Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 200 from the plaintiff in the amount of $43,954.35, and that it has paid all of these invoices through the October, 2004 invoice. Lycos denies the remaining allegations contained in this paragraph.

25. 25. Lycos admits that it received invoices under Equipment Lease 200 from the plaintiff for the months of November and December of 2004 each in the amount of $43,954.35 and that true and accurate copies of these invoices are attached to plaintiff's complaint. Lycos states that these invoices speak for themselves. Lycos denies the remaining allegations contained in this paragraph.

26. 26. Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

27. 27. Lycos admits that it received a notice of default from the plaintiff dated December 8, 2004, and that a true and accurate copy of the notice of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

- 4 -

28.     ~~28.~~——Lycos states that the notice of default speaks for itself.

BST99 1489627-3.057077.0012

29. ~~29.~~ Lycos admits that it did not respond to plaintiff's notice of default, and that it continued to refuse to pay the demanded amounts, but states that it had justification and legal excuse for so refusing. Lycos admits that it received a notice of event of default from the plaintiff dated December 23, 2004, and that a true and accurate copy of the notice of event of default is attached to plaintiff's complaint. Lycos denies the remaining allegations contained in this paragraph.

30. ~~30.~~ Lycos states that the notice of event of default speaks for itself, although Lycos denies that plaintiff's actions with respect thereto have been "proper" or "appropriate," or that plaintiff has any amount of money "due and owing" from Lycos.

31. ~~31.~~ Denied.

## COUNT I
## (Breach of Master Lease and Equipment Schedules)

32. ~~32.~~ Lycos repeats and incorporates by reference its responses to paragraphs 1 through 31.

33. ~~33.~~ Denied.

34. ~~34.~~ Denied.

35. ~~35.~~ Denied.

## COUNT II
## (Breach of Sales Agreement)

36. ~~36.~~ Lycos repeats and incorporates by reference its responses to paragraphs 1 through 35.

37. ~~37.~~ Admitted.

38. ~~38.~~ Lycos states that the Sales Agreement speaks for itself.

39. ~~39.~~ Lycos states that the Sales Agreement speaks for itself.

40. ~~40.——~~Denied.

41. ~~41.——~~Denied.

## AFFIRMATIVE DEFENSES

Lycos incorporates by reference the allegations of its counterclaim, set forth below, in support of each of the following affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff claims are barred by the doctrine of unclean hands.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff is equitably estopped from recovering on its claims.

### THIRD AFFIRMATIVE DEFENSE

Lycos is entitled to recoupment or setoff of all amounts claimed by plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own fraud.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own negligent misrepresentations.

## LYCOS' COUNTERCLAIM

## NATURE OF THE ACTION

1. ~~1.——~~This counterclaim seeks to redress a pattern and practice of misconduct committed by Computer Sales International, Inc ("CSI") with respect to equipment leases it entered into with Lycos. CSI, which ~~purports~~claims to be one of the largest independent

- 7 -

information technology leasing companies in the world, took advantage of its long-standing relationship with Lycos to obtain millions of dollars in undeserved profit. CSI intentionally and negligently misrepresented facts, made partial and misleading statements, and failed to disclose certain material features of its lease agreements with Lycos, leading Lycos to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.   2.——CSI accomplished its ends using a method of "rolling up" equipment leases in a fraudulent and deceptive manner, which. CSI concealed this practice through affirmative misrepresentations, partial disclosures, and omissions of material factfacts that CSI was obligated to disclose to Lycos under accepted industry standards and guidelines, common law, and the Attorney General's regulations promulgated pursuant to Massachusetts General Laws c. 93A, § 2(c), 940 C.M.R. 3.05(1) and 3.16(2). This "roll-up" scheme recast active equipment leases as longer teamterm leases with lower monthly payments, something which, on its face, was beneficial to Lycos. Yet, these recast or "rolled-up" leases dramatically increased Lycos' cost to a total amount well in excess of the cost of the equipment plus imputed interest, while converting CSI's residual risk in the equipment into a guaranteed stream of rental payments which, because they exceeded the cost of the equipment, eliminated CSI's risk and ensured CSI an exorbitant profit. As a result of CSI's "roll up" scheme, Lycos unwittingly paid more than $72 million on leases of equipment costing approximately $47 million.

3.   CSI also charged Lycos interest of several hundred percent on two particular equipment schedules referred to by CSI and Lycos as Schedules 93 and 94. In late 2001, CSI agreed to "roll over" the equipment from approximately fifteen equipment lease schedules onto two schedules, one twenty-four months in length (schedule 93) and the other thirty-six months in length (schedule 94). At the time the equipment rolled over onto these schedules, Lycos had

- 8 -

leased all the computer equipment for at least thirty-six months and, in many cases, for more than five years.  Accordingly, the value of that equipment at the time of the rollover was a small fraction of its original cost, and its remaining economic life was shorter than the length of Schedules 93 and 94.  As a result of the forgoing, the fact that Lycos did not have the right to return the equipment, and several other factors, Schedules 93 and 94 were, as a matter of law, "loans and security agreements" rather than "true leases."  The amount Lycos paid in interest on the principal amount loaned by CSI on Schedules 93 and 94 was usurious in violation of M.G.L. c. 271, § 49.

    4.     3.——To redress CSI's pattern and practice of misconduct, Lycos seeks, among other things,

    A.    declarations that (i) it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, an amount that now approximates $300,000 and which amounts CSI seeks to recover in this action, and (ii) that Lycos is the owner of the leased equipment;

    B.    recovery of overpayments it made as a result of CSI's wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $14,000,000, plus interest and costs; and treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2 and 11; and

    C.    With respect to schedules 93 and 94,

    (1) Declarations that

    (a)    those schedules each evidence a "loan and security agreement" rather than a "true lease"; and

- 9 -

(b)    Massachusetts law applies to Lycos' usury claims;

(2) avoidance of Schedules 93 and 94 as a result of CSI's imposition of an usurious interest rate, and entry of an order requiring CSI to repay Lycos amounts paid in connection therewith, plus interest and costs; and

(3) treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices – violation of M.G.L. c. 271, § 49, regulations promulgated by the Attorney General under chapter 93A, and charging an usurious interest rate - in violation of M.G.L. c. 93A, §§ 2 and 11.

## PARTIES

5.    4.——Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

6.    5.——Defendant Computer Sales International, Inc. is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

7.    6.——This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

8.    ——7.——This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

## FACTS

### *Computer Equipment Leasing Generally*

- 10 -

9.    ~~8.~~    Companies seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies, knowing that computer equipment becomes obsolete relatively quickly, elect to enter into short-term leases rather than purchase the equipment. Leasing also can provide accounting and operational benefits, such as capital preservation and financing that, under Generally Accepted Accounting Principles, are not required to be placed on the company's balance sheet. Leases permit the lessee to return the equipment to the lessor at the end of the lease term, leaving the lessor with the risk of technological obsolescence.

10.    ~~9.~~    To satisfy the lessee's present computer equipment needs and accommodate its anticipated needs for new and improved computer equipment in the future, the lessor and lessee typically enter into a master lease agreement. They then enter into one or more equipment schedules, over time, each of which incorporate the terms of the master lease agreement. Typically, an equipment schedule describes the equipment being leased, its cost (or lease basis), the fixed term of the lease, the commencement date, the repayment schedule, and the location of the equipment.

11.    ~~10.~~    There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the former is a true lease while the latter is essentially a conditional sale or loan. In a capital lease, the lease rental payments together with a required contracted purchase price are sufficient to cover the lessor's investment and provide a yield ~~whereas,~~ In contrast, with operating leases, the lease rental payments total only a percentage of the equipment cost (or lease basis).

12.    ~~11.~~    Under Financial Accounting Standards Board ("FASB") rules, for a lease to qualify for accounting treatment as an "operating lease," the present value of the

- 11 -

minimum lease rental payments must not be greater than or equal to 90% of the original cost of the leased equipment (or lease basis).

13.    ——12.——At the conclusion of the fixed term under an operating lease, the lessee generally has the option to return the equipment to the lessor, to renew the lease at an agreed rate (generally fair rental value) or purchase the equipment at an agreed price (generally fair market value). The value of the equipment at the end of the lease term is called the "residual" value, and the proceeds from the sale or re-lease of the equipment is known as "residual" proceeds.

14.    ——13.——Because the lease rental payments total less than the original equipment cost (or lease basis), the lessor must either sell or re-lease the equipment (the proceeds of such activity being realization of the residual value) to achieve a yield or profit. This difference between the original equipment cost and the total lease rental payments (discounted to present value) – existing in every operating lease – is the lessor's investment risk in the lease.

15.    ——14.——On operating leases, to achieve a "yield" or profit, most lessors must re-lease or re-sell the leased equipment at the conclusion of the lease term, with the objective of obtaining an amount equal to at least the residual value the lessor assumed at the onset of the lease. But CSI found a simpler way: "rolling up" equipment schedules to eliminate its investment risk and guarantee a profit for itself at Lycos' expense.

16.    In the case of Schedules 93 and 94, CSI's practice of "rolling up" leases created in substance loans and security agreements rather than "true leases." Section 1-201(37) of the Uniform Commercial Code sets forth the standards for when a document styled as a lease is, in fact, a loan and security agreement. Under that section, where, as here, the lessee does not have the right to terminate the lease and return the equipment before the end of the lease term, and the

- 12 -

length of the lease term exceeds the economic life of the equipment, the "lease" is considered and treated as a loan and security agreement. Thus, CSI was a "lender" with respect to Schedules 93 and 94. As a lender, CSI was required to comply with Massachusetts' usury laws. It did not.

<center>*Lycos' Computer Equipment Leases With CSI*</center>

17. ——— 15.——In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment. An unexecuted copy of this master lease agreement is attached hereto as Exhibit A (the "Master Lease Agreement").

18. ——— 16.——Between December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment schedules for the acquisition and lease of new items of technology equipment under the Master Lease Agreement. The equipment schedules concerned, literally, thousands of pieces of computer equipment on which Lycos relied for its day-to-day operations. According to the Master Lease Agreement, each equipment schedule constituted a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos.

19. ——— 17.——The equipment schedules were structured as operating leases, with personal computing assets (i.e., PCs) on fixed terms of 24 months and network computing assets (i.e., Non-PCs) on fixed terms of 36 months. A typical 24-month lease between Lycos and CSI was priced so that the present value of the minimum lease rental payments for the term of the lease equaled 85% of the cost of the equipment financed, while the present value for the typical

<center>- 13 -</center>

36-month lease was slightly less than 90%. Thus, CSI's equity (i.e., "investment" or "risk") in the lease was 15% on the 24-month leases and 10% on the 36-month leases.

20.    In connection with the equipment schedules, the vendors from which CSI purchased the equipment it leased to Lycos caused that equipment to be delivered directly to Lycos in Massachusetts, such that CSI did not take possession of the equipment before lease commencement.

21.    The locus of equipment schedules was in Massachusetts. Specifically, among other things,

A.    The negotiation of those schedules occurred in Massachusetts;

B.    Lycos signed the schedules in Massachusetts;

C.    Lycos took delivery of and possessed the great majority of the equipment in Massachusetts;

D.    Lycos made payments on those schedules from Massachusetts; and

E.    Lycos and CSI maintain offices in Massachusetts.

*CSI Gains the Trust of Lycos Personnel*

22.    ——18.——CSI's account representative for Lycos, Paul Stenberg, who operated out of an office in Needham, Massachusetts, communicated regularly with Lycos personnel in Waltham, Massachusetts, during the course of the parties' business relationship. As that relationship grew over time into what Lycos thought was a collegial and long-term association, Lycos and Mr. Stenberg also began interacting on a social as well as a business basis. Such social interaction between Lycos personnel and Mr. Stenberg included golf outings, dinners and invitations to concerts and sporting events. Through such activities, Mr. Stenberg gained the friendship and trust of Lycos' officers and employees.

- 14 -

23. ——19.——Lycos' personnel periodically changed over time, including those in key financial and oversight positions responsible for managing Lycos' lease portfolio with CSI. As a result, and based on what appeared to be CSI's trustworthy and collegial approach toward Lycos, Lycos' personnel reposed confidence in the integrity of Mr. Stenberg with respect to the execution of equipment schedules. Mr. Stenberg and CSI voluntarily assumed and accepted this confidence. Lycos' placement of such trust in CSI, and CSI's acceptance of this confidence, was reasonable under the circumstances, particularly given CSI's superior knowledge and expertise with respect to the complicated equipment leases transactions involved.

24. 20.——Notwithstanding Lycos' trust and confidence in CSI, and CSI's acceptance of this trust and confidence, CSI took advantage of it to CSI's benefit and Lycos' detriment through improper and wrongful utilization of "roll ups" of Lycos' equipment schedules.

### CSI's Consolidation or "Roll Up" of Lycos' Leases

25. 21.——Of the approximately 80 equipment schedules entered into between Lycos and CSI, only a handful reached their maturity dates in the normal course. Instead, just over a year after execution of the Master Lease Agreement and a full year before the normal expiration of the term of certain equipment schedules, several of the then-existing equipment schedules were terminated on or prior to their scheduled maturity dates and "rolled up" onto one or more new equipment schedules with fixed terms of 24 months or more.

26. 22.——CSI's method of consolidation or "rolling up" equipment schedules worked as follows. Either on their normal expiration date or prior thereto, several equipment schedules would be terminated, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment schedule. In some cases, some of the equipment from one equipment schedule would be combined with the equipment from one or more other

- 15 -

schedules and "rolled up" onto a single new equipment schedule; other equipment from those same schedules were rolled up onto a different schedule. Indeed, some of the schedules were rolled even though Lycos had already made 100% of the lease payments required under those schedules and the computer equipment was, by then, outdated.

27. ~~23.~~——Before consolidation onto one or more new equipment schedules, the terminated equipment schedules sometimes had varying numbers of months remaining on their original lease terms. At the date these equipment schedules became effective under the new "rolled-up" schedule, some would have no original monthly lease rental payments remaining, while others would have all but two or three monthly lease rental payments remaining. Some of these "rolled up" schedules, or some of the equipment on them, were rolled up again into other equipment schedules. In fact, certain schedules and certain equipment were "rolled up" several times.

28. ~~24.~~——CSI represented to Lycos that the "roll-ups" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage. ~~This~~While this was true, ~~but~~ it was only part of the truth. CSI failed to disclose to Lycos that (a) over time, Lycos would pay CSI considerably more than 100% of the value of the equipment as a result of these "roll ups," something Lycos could not reasonably have discovered on its own even if it had known the original equipment cost at lease schedule inception because of the movement of equipment from schedule-to-schedule over multiple roll-ups; and (b) Lycos had already paid amounts well in excess of the original equipment cost of some of the leased equipment. CSI knowingly and intentionally failed to disclose these basic and material facts to Lycos. CSI's partial disclosure to Lycos was intended to and did induce Lycos to agree to numerous "roll ups" of the lease

- 16 -

schedules. If, however, CSI had made full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under them.

29. 25.——Under these original lease schedules, prior to "roll-ups," Lycos would have paid CSI monthly lease rental payments of approximatelyless than $46 million. As a result of the "roll-ups," however, Lycos has paid CSI over $72 million in total monthly lease rental payments (exclusive of interim rent), an increase of more than $26 million.

*Example of an Egregious and Unfair "Roll Up" – Equipment Schedule 67E*

30. 26.——An examination of the history of one specific equipment lease schedule – Equipmentequipment Schedule 67E – demonstrates how CSI manipulated the "roll up" process to its favor and Lycos' detriment.

31. 27.——On July 12, 2000, Lycos entered into Equipmentequipment Schedule 67E ("Schedule 67E"), a true and accurate copy of which is attached hereto as Exhibit B. Schedule 67E governed the lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months starting in October of 2000 and with a monthly rental payment of $42,075. Given a residual value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield from Schedule 67E was a reasonable 11%.

32. 28.——On November 14, 2000, after only two monthly lease rental payments, Lycos entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is attached hereto as Exhibit C. Schedule 67H is a 34-month lease commencing on December 1, 2000. The assets leased under Schedule 67H are those same assets previously leased under Schedule 67E, which was terminated the day before Schedule 67H became

- 17 -

effective. The monthly lease rental payment due under Schedule 67H was $36,438.41. A comparison of the terms of Schedules 67E and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment @10% | 84.27% | 99.35% | 104.53% |
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

33.   ──── 29.──── As reflected in the table above, the "refinancing" of Schedule 67H

did reduce Lycos' monthly lease rental payment obligation by over $5,000.  However, it

increased Lycos' total lease rental obligations by more than $310,000 from $1,009,800 to

$1,323,056 (under the combined equipment schedules).  Additionally, CSI's risk in the

transaction was completely eliminated because the total lease rental payments fully returned CSI

its investment in the equipment and provided a yield of almost 14% prior to CSI receiving any

residual proceeds at the end of the term of Schedule 67H (see the last row of the table above).

While CSI frequently emphasized the short-term reduction in Lycos' monthly payments, CSI did

not paint the full picture by conveniently failing to disclose these additional facts to Lycos.

Moreover, Schedule 67H still required Lycos to either purchase, renew or return the equipment

to CSI at the conclusion of its lease term.

34.   ──── 30.──── Although CSI had already completely eliminated its investment

risk in the leased equipment under Schedule 67E, and had guaranteed itself a 14% profit through

the "roll up" into Schedule 67H, CSI's failure to disclose to Lycos the full impact of the "roll-

ups" continued.

- 19 -

35.    ———31.———In October of 2001, allegedly again to reduce Lycos' monthly payments, CSI again rolled the equipment that had originally been leased pursuant to Schedule 67E. Two new lease schedules were the outcome of that "refinancing" activity. True and accurate copies of EquipmentPortions of equipment Schedules 93 and 94 are attached hereto as Exhibits D and E ("Schedule 93" and "Schedule 94", respectively).

36.    ———32.———According to Schedule 93, certain schedules, including the following, were being terminated and "rolled up" onto Schedule 93: 64, 64B, 64D, 64F, 66, 66A, 66B, 66C, 66E, 67A, 67B, 67D, 67F, 67H, 68. Yet, according to Schedule 94, the very same equipment from these schedules was being rolled up onto that schedule. Compare Exhibits D and E. Accordingly, ascertaining which equipment on each "rolled" schedule was being assigned to which new schedule would have been a Herculean if not impossible task for Lycos, as would have figuring out the total amount of lease payments for each piece of equipment. Only after Lycos hired an expert leasing consultant did it learn the financial impact of the roll-up onto Schedules 93 and 94.

37.    ———33.———The additional leasepayment obligations under Schedule 93 became one (1) payment of $3,751 payable October 1, 2003. The additional lease obligationpayment obligations under Schedule 94 became thirteen (13) monthly payments of $32,688 commencing October 1, 2003 (see table below).

- 20 -

| Equipment Schedule | 67E / 67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in Advance) | 2@ $42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2@ $42,075 34 @ $36,438 1@ $36,438 12@ $32,688 |
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payments @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos' monthly lease-rentalpayment

obligation did decline from $36,428 to $32,688. However, Lycos' total fixed monthly lease

rental obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined

equipment schedules). Additionally, CSI further increased its yield or profit in the transaction

before receipt of any residual proceeds to more than 27%. CSI did not disclose this fact to

Lycos. Moreover, Schedules 93 and 94, however, did not end Lycos' obligation to CSI under the

original Schedule 67E, but carried at its conclusion yet another obligation: for Lycos to purchase,

renew, or return the equipment to CSI.

### *CSI's Misrepresentations, Partial Disclosures and Omissions of Material Fact*

38.    34.——The Equipment Leasing Association ("ELA") is a nonprofit trade

organization that represents more than 800 member leasing companies.

39.    35.——CSI is a member of the ELA.

36.    The ELA's standards for professional conduct reflect the standards of the

equipment leasing industry in general. They also govern the conduct of its members.

40.    37.——The ELA has established a Code of Fair Business Practices, a true and

- 21 -

accurate copy of which is attached as Exhibit F. Paragraph 7 of Section I: General Standards of

Professional Conduct, requires ELA members to "disclose all relevant information as to the

terms and conditions of a transaction or service which may affect the Client's decision."

41. The ELA's standards for fair business practices reflect the standards of the

equipment leasing industry in general.

42. As a member of the ELA, CSI has implicitly or explicitly agreed to comply with

the ELA's Code of Fair Business Practices.

43. The Attorney General of the Commonwealth of Massachusetts has promulgated

regulations with provisions similar to paragraph 7 of the ELA's Code of Fair Business Practices:

A. Section 3.05(1) of 940 C.M.R. provides that "No claim or representation

shall be made by any means concerning a product which directly, or by implication, or by failure

to adequately disclose additional relevant information, has the capacity or tendency or effect of

deceiving buyers or prospective buyers in any material respect." 940 C.M.R. 3.01 defines

"products" to include "services" such as the financial services provided by CSI.

38.    The Attorney General of the Commonwealth of Massachusetts has promulgated a

regulation with similar provisions. B. Section 3.16(2) of 940 C.M.R. provides that "an act or

practice is a violation of M.G.L. c. 93A, § 2, if . . . (2) Any person or other legal entity subject to

this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may

have influenced the buyer or prospective buyer not to enter into the transaction." 940 C.M.R.

3.01 defines "buyer" to include "lessees" such as Lycos. The Attorney General has prosecuted

companies for violating this regulation in business-to-business transactions, and interprets this

regulation to apply to business-to-business transactions such as the instant one. True and

accurate copy of complaints filed by the Attorney General for violating this regulation in

~~business-to-business transactions are attached hereto as Exhibit G.~~

44.    The Attorney General interprets 940 C.M.R. 3.05(1) and 940 C.M.R. 3.16(2) to apply to business-to-business transactions such as the instant one.  A true and accurate copy of a letter written by the Office of the Attorney General with respect to this issue is attached hereto as Exhibit G.  As noted in that letter, the Attorney General has prosecuted several private parties for violating these regulations in business-to-business transactions.

45.    ~~39.~~—CSI and its representative in Massachusetts, Mr. Stenberg, failed to disclose to Lycos the more than $26 million increase in aggregate payments resulting from the "roll-ups" and elimination of residual, and presented only half the truth about the "roll ups" to induce Lycos' continued participation in CSI's scheme notwithstanding,

> A.    CSI's duty to make disclosures to Lycos of information relevant to Lycos' decision to enter into the lease-roll-ups as a result of (i) CSI's cultivation of Lycos' trust and confidence in CSI and CSI's acceptance of that trust and confidence; and (ii) CSI's partial disclosure of relevant facts, i.e., Lycos' reduced monthly payments pay under the lease "roll-ups";

> B.    the Attorney General's ~~regulation~~regulations, 940 C.M.R. 3.05(1) and 3.16(2);

> C.    CSI's membership in the ELA and representation on its web-site that it "engag[es] in the highest levels of business conduct with regard to ethics";

> D.    CSI's knowledge of the economic windfall it would enjoy at Lycos' expense from the "roll-ups," and

> E.    CSI's knowledge that: (i) Lycos' understanding of the effect of the lease schedule "roll-ups" was simply that the term of the equipment schedule would be

- 23 -

extended and the amount of the monthly ~~lease rental~~ payments reduced; (ii) Lycos did not understand the full impact of the "roll-ups" on the total amount Lycos would be obligated to pay; and (iii) Lycos was unaware that it had already paid well in excess of the cost of some of the ~~leased~~ equipment.

46.    ———40.———If CSI had fully disclosed the full impact of ~~he~~the "roll-ups" on, among other things, the total price being paid by Lycos on them and the amounts Lycos had already paid relative to the original equipment cost, Lycos would not have entered into them.

47.    41.———Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups" as it was obligated to do, but CSI intentionally misrepresented material facts to Lycos to induce it to continue making payments under the "roll-ups." Specifically, but without limitation, when Lycos asked Mr. Stenberg about the original cost of the equipment leased pursuant to Schedules 93 and 94, he sent Lycos an e-mail dated March 18, 2002 in which CSI represented that the total original equipment cost under the Lycos lease schedules was "around $63 million." A true and accurate copy of this e-mail is attached hereto as Exhibit H. In fact, the original equipment cost was less than $47 million.

48.    42.———On information and belief, Mr. Stenberg knew, at the time he sent this e-mail that:

      A.    Lycos would use this figure during its (Lycos') internal review to determine whether to continue performance under the "rolled up" leases or whether Lycos would insist on "unwinding" those leases;

      B.    this $63 million amount overstated the original equipment cost by more than $16 million; and

      C.    his statements would delay or prevent Lycos from discovering the true

original equipment cost and the nature of CSI's "roll up" scheme.

### *Lycos' Purchase of the ~~Leased~~ Equipment*

<u>49.</u>    43.——In ~~2003,~~<u>late 2002,</u> before Lycos had discovered the true financial impact of the "roll ups," and CSI's and Mr. Stenberg's misrepresentation as to the original cost of the equipment, Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules. As part of that discussion, Lycos also requested what, if anything, would be required to convert the remaining ~~lease~~ obligations ~~to capital leases such~~<u>so</u> that at the conclusion of the ~~lease~~ terms, Lycos would own the equipment.

~~44.——Although CSI had a duty to disclose to Lycos that it (CSI) had previously over-~~ ~~stated the original cost of the equipment in Mr. Stenberg's March 18, 2003 e-mail, and Lycos~~ ~~had already paid well in excess of the original cost of some of the leased equipment or was~~ ~~contracted to make total payments under the leases equaling 168% of the original cost of the~~ ~~leased equipment, CSI failed to do so.~~

<u>50.    At some point during the first few days of July of 2003, Mr. Stenberg represented to Lycos' leasing consultant during a telephone call that the original cost of the equipment exceeded $60 million. He also quoted Lycos a buyout price of over $4.6 million even though CSI would have consummated the buyout for $350,000.</u>

<u>51.</u>    45.——The proposed structure <u>of the buyout</u> consisted of a one-time payment (purchase price), plus payment of the then remaining monthly lease rental payments on their original due dates.

<u>52.</u>    46.——In July ~~of~~<u>,</u> 2003, operating under several misapprehensions of fact because of CSI's failure to disclose basic and material information to Lycos despite Lycos' request –

misapprehensions which CSI knew or should have known about – and in reliance on CSI's ~~misrepresentation~~multiple misrepresentations as to the original equipment cost, Lycos agreed to: (a) and did pay CSI a purchase price of $3.775 million; and (b) continue making monthly ~~lease rental~~ payments until the end of the ~~lease term~~Schedules' terms, at which time, Lycos would "own" the equipment. ~~A true and accurate~~ copy of the July, 2003 purchase agreement is attached hereto as <u>Exhibit I</u> (the "Sales Agreement").

<u>53.</u>    <u>Although CSI had a duty to disclose to Lycos that it (CSI) had over-stated the original cost of the equipment in Mr. Stenberg's March 18, 2002 e-mail and again in early July, 2003, and Lycos had already paid well-in-excess of the original cost of some of the leased equipment or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.</u>

<u>54.</u>    ~~47.~~ <u>Indeed,</u> CSI knowingly and intentionally refused to tell Lycos that Lycos had already paid substantially more than the cost of the equipment ~~and~~<u>,</u> that Mr. Stenberg's March 18, 2002 e-mail was in error<u>, and that his representation to Lycos' leasing consultant in early July, 2003, was in error</u>. ~~Had CSI made a full disclosure, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the leased equipment.~~

<u>55.</u>    <u>Had CSI made a full and accurate disclosure of the original cost of the equipment, Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the equipment.</u>

<u>56.</u>    ~~48.~~ It was not until after Lycos had entered into the Sales Agreement that Lycos discovered – and then only through the analysis of an expert leasing consultant it engaged to analyze all of the CSI ~~leases~~<u>schedules</u> – the true nature of CSI's "roll up" scheme, and the negligent and intentional misrepresentations – including CSI's misrepresentation concerning the

- 26 -

original cost of the equipment – partial disclosures, and omissions of material fact used by CSI to induce Lycos' participation and continued performance.

<div align="center"><em>CSI'S Pattern or Practice of Deception</em></div>

57. ~~49.~~ Because of, among other things, CSI's movement of hundreds of pieces of equipment from one lease schedule to another, the complexity of those "roll-ups," CSI's misrepresentations, partial disclosures, and omissions, <u>CSI's cultivation of</u> Lycos' trust and confidence in CSI, and the fact that expertise was required to discover the original equipment cost of equipment rolled up multiple times and the total impact of the "roll-ups," Lycos should not and could not have reasonably have been expected to discover the impact of the roll-ups prior to that time. Indeed, CSI's successful effort to gain the trust of Lycos' personnel was designed to and did induce Lycos personnel *not* to seek to discover the foregoing.

58. ~~50.~~ Upon information and belief, CSI knows that its customers generally do not have the expertise to discover the impact of roll-ups. It relies on: (a) this lack of expertise and its intentional failure to disclose some of the basic and material facts to induce its customers to enter into them; and (b) the establishment of a trusting relationship with its customers such as the one it established with Lycos personnel to induce them not to seek to discover the impact. <u>Upon information and belief, this is CSI's mode of doing business with many of its customers.</u>

<div align="center">

**COUNT I**
**(Fraudulent Misrepresentation in the Inducement of Rolled-Up Lease Schedules)**

</div>

59. ~~51.~~ Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~50~~<u>58</u> above.

60. ~~52.~~ Because of the trust Lycos reposed in CSI and CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the "roll-up" transactions, and 940 C.M.R. <u>3.05(1) and</u> 3.16(2), CSI was obligated to disclose to

<div align="center">- 27 -</div>

Lycos: (a) the impact of the "roll-ups" in terms of the amount to be paid by Lycos relative to the original equipment cost; (b) the fact that Lycos had already paid amounts well in excess of the cost of some of the leased equipment; and (c) the fact that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair total rental compensation for the leased equipment.

61. 53. CSI's failure to disclose facts basic and material to Lycos' decision to enter into the "roll-ups" was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.

62. 54. Had CSI made a full disclosure, Lycos would not have entered into the "rolled up" leases and would not have continued to perform under the "rolled up" leases.

63. 55. As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $10,225,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
### (Fraudulent Misrepresentation in the Inducement of Sales Agreement)

64. 56. Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 5563 above.

65. 57. CSI intentionally misrepresentedCSI represented in March, 2002, that the original cost of the leased equipment was around $63 million, and then failed to correct this misrepresentation in connection with, among other things, Lycos' purchase of. It again represented to Lycos that the original cost exceeded $60 million during the first few days of July, 2003. These representations were false. CSI knew they were false at the time they were made.

- 28 -

CSI made these representations with the intent to induce Lycos to purchase the leased equipment, which Lycos did.

66.    ~~58.~~ Because of CSI's cultivation of Lycos' trust and the trust Lycos reposed in CSI ~~and~~which CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos' decision to enter into the Sales Agreement, CSI's intentional misrepresentation concerning the original cost of the leased equipment, and 940 C.M.R. 3.05(1) and 3.16(2), CSI was obligated to: (a) correct its misstatement concerning the original equipment cost; and (b) disclose to Lycos the fact that Lycos had already paid amounts well in excess of the cost and fair rental compensation for some of the leased equipment.

67.    ~~59.~~ CSI's failure to disclose facts basic and material to Lycos' decision to enter into the Sales Agreement was made with the intent to induce Lycos to enter into the ~~"roll-ups,"~~Sales Agreement, which Lycos did. Furthermore, Lycos relied on CSI's ~~representation with respect~~misrepresentations as to the ~~$63 million~~ original cost of the equipment in entering into the Sales Agreement.

68.    ~~60.~~ Had CSI made a full disclosure, Lycos would not have purchased the equipment for $3.775 million.

69.    ~~61.~~ As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $3,775,000.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT III**
~~**(Unconscionability in Sales Agreement)**~~

</div>

~~62.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 61 above.~~

<div align="center">

- 29 -

</div>

63.    ~~CSI's sale of the leased equipment to Lycos pursuant to the Sales Agreement constitutes a "sale of goods" within the meaning of Article 2 of the Uniform Commercial Code.~~

64.    ~~In light of Lycos' payment to CSI of amounts well in excess of the original cost of the equipment and the then fair market value of that equipment, the $3,775,000 purchase price paid by Lycos for the leased equipment was unconscionable.~~

~~WHEREFORE, Lycos requests the relief set forth below.~~

<div align="center">

### ~~COUNT IV~~
### (Negligent Misrepresentation in the Inducement)

</div>

65.    ~~Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 64 above.~~

70.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 69 above.

71.    ~~66.~~    To the extent CSI performed its duty to provide Lycos with all information relevant to Lycos' decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

72.    ~~67.~~    Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment. Lycos also justifiably relied on the misleading half-truth that the "roll ups" would decrease Lycos' monthly rental payments, without also being told other facts basic and material to Lycos' decision to enter into the roll-ups and purchase the leased equipment.

73.    ~~68.~~    As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $14,000,000.

<div align="center">

- 30 -

</div>

WHEREFORE, Lycos requests the relief set forth below.

## COUNT ~~V~~IV
### (G.L. c. 93A, §§ 2 and 11)

74.    ~~69.~~ Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~68~~73 above.

75.    ~~70.~~ Both Lycos and CSI ~~is~~are engaged in trade or commerce as that term is defined in M.G.L. c. 93A.

76.    ~~71.~~ CSI has engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§§ 2~~and 11~~ including, but not limited to:

A.    its collection of money from Lycos well above any reasonable or fair total compensation as a result of the "roll up" of various equipment schedules;

B.    its intentional and negligent misrepresentations, and omissions of facts basic and material to Lycos' decision to enter into the lease "roll-ups" that CSI was obligated, under common law, to disclose;

C.    CSI's knowledge of the full impact of the roll-ups on Lycos, that the full impact of the roll-ups was material to Lycos' decision to enter into them, and that CSI failed to disclose to Lycos, the full impact of the roll-ups, all in violation of 940 C.M.R. 3.01, ~~Definition~~Definitions of Buyer and Product, and 940 C.M.R. 3.05(1) and 3.16(2);

D.    its failure to comply with industry standards established by the ELA by not "disclos[ing] to [Lycos] all relevant information as to the terms and conditions" of the lease "roll-ups"; and

E.    its intentional ~~misrepresentation~~misrepresentations concerning the original cost of the leased equipment that induced Lycos to enter into the Sales

- 31 -

Agreement; and

F.      its knowledge that Lycos had paid in full for much of the leased

equipment before executing the Sales Agreement, that Lycos' payment in full for

much of the leased equipment was material to Lycos' decision to enter into the

Sales Agreement, and that CSI failed to disclose to Lycos that Lycos had already

paid well-in-excess of (i) the original cost of the equipment and (ii) any fair rental

value, all in violation of 940 C.M.R. 3.01, ~~Definition~~Definitions of Buyer and

Product, and 940 C.M.R. 3.05(1) and 3.16(2).

77.      ~~72.~~——At all times material and relevant hereto, the events, transactions and

occurrences described herein occurred substantially and primarily within the Commonwealth of

Massachusetts.  Specifically, CSI's communications with Lycos were made by Mr. Stenberg

while CSI was conducting business in Massachusetts.

78.      ~~73.~~——The violations of M.G.L. c. 93A, §§§ 2 ~~and 11~~ described above were

knowingly, willfully and intentionally committed by CSI.

79.      ~~74.~~——By reason of CSI's unfair and deceptive business acts or practices, Lycos

has incurred damages in an amount to be determined at trial but not less than $14,000,000.

80.      ~~75.~~——Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and

Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT V
## (Declaratory Relief – Schedules 93 and 94
## Each Evidence a Loan and Security Agreement)

81.      Lycos repeats and incorporates by reference the allegations contained in

paragraphs 1 through 80 above.

- 32 -

82.   In late 2001, CSI rolled-up approximately fifteen schedules onto Schedules 93 and 94. At the time the equipment from those schedules rolled onto Schedules 93 and 94, Lycos had already leased that equipment for at least three years and, in many cases, more than five years.

83.   Because that computer equipment had been in service for many years, it had an average value of less than five percent of the original cost of that equipment at the time it rolled onto Schedules 93 and 94.

84.   Pursuant to Schedules 93 and 94, Lycos agreed to make monthly payments to CSI for an initial term of 24 and 36 months, respectively. As the equipment had depreciated in value from 100% of its original equipment cost to less than 10% thereof at the time the equipment rolled onto Schedules 93 and 94, these twenty-four and thirty-six month schedules exceeded the remaining economic life of the equipment listed on them. Indeed, at the time the Sales Agreement was executed, CSI knew that equipment was worth so little that it would have been willing to sell it to Lycos for only $350,000, less than 1% of the original cost of that equipment.

85.   Under the Sales Agreement, title to the equipment was to pass to Lycos at the end of the term of Schedules 93 and 94 for no additional consideration.

86.   Lycos did not have the right under the Schedules 93 and 94 to return the equipment under those schedules before the end of the lease terms without being obligated to make the monthly rental payments through the end of the lease terms.

87.   As a result of the foregoing, under section 1-201(37) of the Uniform Commercial Code as adopted in Missouri and Massachusetts, Schedules 93 and 94 were not "true leases," but instead were loans and security agreements.

88.    In addition, the "economic realities" of Schedules 93 and 94, which incorporate by reference the Master Lease Agreement, demonstrate that they were loans and security agreements under section 1-201(37) of the Uniform Commercial Code. Specifically,

    A.    Lycos selected the equipment it "leased" from CSI from a third-party supplier;

    B.    the Master Lease Agreement:

        1.    disclaims all warranties that are typically found in a lease; and

        2.    requires Lycos to be solely responsible for all costs and expenses of every nature arising from the possession, use and operation of the equipment including, without limitation, payment of taxes, insurance equal to the replacement cost of the equipment, maintenance, and damages to or loss of the equipment.

    C.    CSI was not an equipment supplier but was a financing company that operated very much like a bank or other lending institution; and

    D.    the equipment "leased" by Lycos was shipped directly from the vendor to Lycos such that at no time before lease inception did CSI have possession of the equipment.

89.    CSI filed UCC-1 financing statements with the Massachusetts Secretary of State with respect to Schedules 93 and 94 in an effort to perfect its security interest in the equipment financed pursuant to those schedules.

90.    At the time Schedules 93 and 94 were being negotiated, CSI considered Lycos to be a bankruptcy risk and a "dot.com" that could fail like many other "dot.coms" then experiencing financial difficulty. Because of this, and the fact that CSI knew that the equipment leased pursuant to Schedules 93 and 94 was worth only a small fraction of the approximately $14.5 million that would be due under those schedules, CSI demanded that Lycos obtain an $11

- 34 -

million letter of credit for the benefit of CSI to secure Lycos' obligations under Schedules 93 and 94.

91.    Lycos in fact obtained the $11 million letter of credit to secure its obligations under Schedules 93 and 94.  That letter of credit provided, among other things: "Lycos, Inc., as security for its performance of any and all of its obligations under [Schedules 93 and 94, will furnish CSI with an unconditional irrevocable Letter of Credit from a bank acceptable to [CSI] in the amounts set forth below."

92.    CSI, which is one of the largest if not the largest independent leasing company in the United States and is expert in the field of computer equipment leasing, knew or should have known before Schedules 93 and 94 were executed, and again after the Sales Agreement was executed, that those Schedules were actually loans and security agreements under 1-201(37) of the Uniform Commercial Code rather than true leases.  In contrast, Lycos had no such knowledge.

93.    CSI, upon information and belief, nevertheless maintains that Schedules 93 and 94 are "true leases."

94.    A controversy or dispute exists between the parties concerning whether or not Schedules 93 and 94 evidence "true leases" or loans and security agreements.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VI
### (Declaratory Judgment as to Whether Missouri or Massachusetts Law Governs Lycos' Claim that Schedules 93 and 94 are Usurious and Violative of 93A)

95.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 94 above.

96.    Pursuant to Schedules 93 and 94, CSI demanded and Lycos agreed to and did pay

- 35 -

CSI, at least $14.5 million. Pursuant to the Sales Agreement, Lycos paid CSI an additional $3.775 million to purchase the equipment on those Schedules.

97. Because Schedules 93 and 94 evidence loans and security agreement rather than true leases, the at least $18.275 million Lycos paid to CSI under those Schedules and the Sales Agreement constituted payment of principal equal to the fair market value of the equipment at the time the equipment rolled onto those schedules, plus interest.

98. As the value of the equipment at the time it rolled onto Schedules 93 and 94 was less than $3 million, the amount paid represented payment of principal of at most that amount plus at least $15.275 million in interest.

99. Although the Master Lease Agreement provides that it and the schedules shall "be governed by, and construed and interpreted under the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law," questions as to the validity of equipment Schedules 93 and 94, are governed by Massachusetts law – the locus of Schedules 93 and 94.

100. In addition, Missouri law does not permit a cause of action for usury in business-to-business transactions such as the transaction evidenced by Schedules 93 and 94 between Lycos and CSI. Massachusetts, on the other hand, makes it a crime under M.G.L. c. 271, § 49, for one business to charge another an usurious interest rate to business.

101. The prohibition against usury lending, as reflected especially in the criminal sanctions imposed by M.G.L. c. 271, § 49, is an important public policy of the Commonwealth.

102. Upon information and belief, CSI maintains that, notwithstanding the foregoing, Missouri law governs Lycos' claims for usury. Accordingly, a controversy or dispute exists between the parties concerning whether Missouri or Massachusetts law should apply to Lycos'

usury claims hereunder.

103.    This Court should declare that Massachusetts law applies to Lycos' claims for usury.

        WHEREFORE, Lycos requests the relief set forth below.

## COUNT VII
### (Usury, M.G.L. c. 271, § 49)

104.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

105.    Of the aggregate amount of more than $18.275 million paid by Lycos to CSI pursuant to Schedules 93 and 94 and the Sales Agreement, less than $3 million represented repayment of principal, i.e., the aggregate value of the equipment at the time it rolled onto Schedules 93 and 94, and the balance of at least $15,275,000 represented payment of interest.

106.    As a result of CSI charging Lycos at least $15.275 million in interest on loans with a two or three year term and an aggregate original principal balance of less than $3 million, CSI charged Lycos interest well in excess of the 20% per annum allowed by M.G.L. c. 271, § 49(a).

107.    CSI has not provided notice to the Attorney General of the Commonwealth that it intended to charge interest on loans in the Commonwealth in excess of 20% as permitted by M.G.L. c. 271, § 49(d).

108.    The loans made by CSI to Lycos pursuant to Schedules 93 and 94 are not regulated by any provision of general or special law or regulations promulgated thereunder. CSI is a privately-held corporation not subject to control, regulation, or examination by any state or federal regulatory agency.

109.    The interest rate charged by CSI pursuant to Schedules 93 and 94 was usurious in

- 37 -

violation of M.G.L. c. 271, § 49.

110. Lycos has been damaged by CSI's imposition of an usurious rate of interest.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VIII
## (M.G.L. c. 93A, §§ 2 and 11)

111. Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 110 above.

112. Both Lycos and CSI are engaged in trade or commerce, as that term is defined in M.G.L. c. 93A.

113. At all times material and relevant hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts.

114. Under 940 C.M.R. 3.16(3), an "act or practice is a violation of M.G.L. c. 93A, § 2 if: . . . (3) It fails to comply with existing statutes . . . meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth intended to provide the consumers of this Commonwealth protection . . ."

115. The Massachusetts usury statute, M.G.L. c. 271, § 49, is a statute enacted by the Commonwealth that was meant to provide protection of the public welfare of consumers of the Commonwealth.

116. CSI's violation of M.G.L. c. 271, § 49 as described herein is a violation of 940 C.M.R. 3.16(3) and therefore a violation of M.G.L. c. 93A, § 2.

117. Additionally, regardless of the applicability of M.G.L. c. 271, § 49 and/or 940 C.M.R. 3.16(3) to Schedules 93 and 94, CSI's imposition of a several hundred percent interest rate on Schedules 93 and 94, particularly when it knew or should have known that those

- 38 -

Schedules were, as a matter of law, loans and security agreements, constituted unfair and deceptive practices in violation of M.G.L. c. 93A, § 2.

118.   The violations of M.G.L. c. 93A, § 2 described above were knowingly, willfully and intentionally committed by CSI.

119.   By reason of CSI's unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $15.275 million.

120.   Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IX
### (Money Had and Received)

121.   ~~76.~~ Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~75~~120 above.

122.   ~~77.~~ After Lycos executed the Sales Agreement, Lycos' leasing consultants determined that the original cost of the equipment leased by Lycos from CSI was approximately $47 million.

123.   ~~78.~~ Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling less than $46 million.

124.   ~~79.~~ As a result of CSI's repeated "roll-up" of the lease schedules, Lycos paid CSI (a) more than $72 million in addition to interim rent; and (b) $3.775 million to purchase the equipment.

125.   CSI received more than $18.275 million pursuant to Schedules 93 and 94 and the Sales Agreement.

126.   ~~80.~~ CSI has unjustly received and obtained possession of money from Lycos

- 39 -

well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

    127.    81.——Equity and good conscience demand that this excess, in an amount to be determined at trial, be returned to Lycos.

    WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT ~~VII~~X**
**(Unjust Enrichment)**

</div>

    128.    82.——Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~81~~127 above.

    129.    83.——CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

    130.    84.——CSI accepted such monies knowing that it was receiving an economic windfall.

    131.    85.——CSI's retention of these monies would be unjust and inequitable.

    132.    86.——As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial.

    WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT ~~VIII~~XI**
**(Declaratory Judgment as to Whether Lycos Owes any Money to CSI)**

</div>

    133.    87.——Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through ~~86~~132 above.

    134.    88.——A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

<div align="center">

- 40 -

</div>

135. 89.——Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

136. 90.——Lycos seeks a judicial declaration that:

A. it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

B. it is the owner of the equipment purchased pursuant to the Sales Agreement, free and clear of any claims of CSI.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IXXII
### (Declaratory Judgment as to Whether Lycos May Retain the Equipment)

137. 91.——Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 90136 above.

138. 92.——A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules and Lycos' purchase of the equipment pursuant to the Sales Agreement, described above.

139. 93.——Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial.

WHEREFORE, Lycos requests the relief set forth below.

## JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

- 41 -

A.  On Counts I and IVIII, enter judgment rescinding the rolled-up lease schedules CSI fraudulently and negligently induced Lycos to enter into;

B.  On Count I, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $10,225,000, together with interest and costs;

C.  On Counts II and III, enter judgment against CSI, and in favor of Lycos, requiring CSI to disgorge the $3,775,000 Lycos paid CSI under the Sales Agreement, together with interest and costs;

D.  On Count IVIII, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $14,000,000, together with interest and costs;

E.  On Count VIV, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, and awarding Lycos damages in an amount to be determined at trial but not less than $14,000,000, trebled, together with interest, costs and attorneys' fees;

F.  On Counts VI and VIICount V, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial, together with interest, costs and attorneys' feesdeclaring that Schedules 93 and 94 evidence loans and security agreements, rather than true leases;

G.  On Count VIIIVI, enter judgment against CSI, and in favor of Lycos, declaring that Massachusetts law governs Lycos' claim that Schedules 93 and 94 are usurious and violate M.G.L. c. 93A, § 2.

- 42 -

H. On Count VII, enter judgment against CSI, and in favor of Lycos, voiding Schedules 93 and 94 and the Sales Agreement as usurious pursuant to M.G.L. c. 271, § 49, and awarding Lycos damages in an amount not less than $15,275,000, together with interest and costs;

I. On Count VIII, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, and awarding Lycos damages in an amount to be determined at trial but not less than $15,275,000, trebled, together with interest, costs and attorneys' fees;

J. On Counts IX and X, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial, together with interest, costs and attorneys' fees;

K. On Count XI, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment lease schedules between Lycos and CSI, and that Lycos owns the equipment purchased pursuant to the Sales Agreement free and clear of any claims of CSI;

H. L. On Count IX XII, enter judgment declaring that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial, together with interest and costs; and

I. M. Grant Lycos such further relief as this Court may deem just and proper.

<div style="margin-left:40%">

Respectfully submitted,

LYCOS, INC.

By its attorneys,

</div>

Dated: ~~March 22, 2005~~ April 14, 2006     /s/ Thomas O. Bean
                Thomas O. Bean (BBO# 548072)

<div style="text-align:center">- 43 -</div>

~~Erik P. Bartenhagen (BBO# 640003)~~
~~NUTTER, McCLENNEN & FISH, LLP~~
~~World Trade Center West~~
~~155 Seaport Boulevard~~
Peter M. Acton  (BBO# 654641)
McDermott, Will & Emery, LLP
28 State Street
Boston, Massachusetts ~~02210~~02209
(617) ~~439-2000~~535-4000


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for plaintiff, Robert J. Kaler, Gadsby Hannah LLP, 225 Franklin Street, Boston, MA 02110, by hand on ~~March 22, 2005.~~April 14, 2006.


/s/ Thomas O. Bean
Thomas O. Bean


~~/s/ Erik P. Bartenhagen~~
~~Erik P. Bartenhagen~~


~~BST99-1483954-1.057077.0012~~

~~1113159.3~~

Document comparison done by DeltaView on Friday, April 14, 2006 9:42:18 AM

| Input: | |
|---|---|
| Document 1 | interwovenSite://BSTDMS02/BST99/1483954/1 |
| Document 2 | interwovenSite://BSTDMS02/BST99/1489627/3 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 250 |
| Deletions | 223 |
| Moved from | 15 |
| Moved to | 15 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 503 |