UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | | |
|---|---|---|
| | ) | |
| COMPUTER SALES INTERNATIONAL INC., | ) | *** ***Oral Argument Requested*** |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | |
| LYCOS, INC., | ) | C.A. No. 05-10017- RWZ |
| Defendant, | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| Trustee Process Defendant. | ) | |
| | ) | |

**OPPOSITION OF COMPUTER SALES INTERNATIONAL,
INC. TO "LYCOS' MOTION FOR LEAVE TO FILE
SECOND AMENDED ANSWER AND COUNTERCLAIM"**

Plaintiff Computer Sales International, Inc. ("CSI") respectfully but vigorously opposes defendant Lycos, Inc.'s ("Lycos") motion to add legally insufficient and groundless "usury" claims to its Counterclaim in this case. *See* Lycos' Motion for Leave to File Second Amended Answer and Counterclaim, dated April 14, 2006 ("Lycos' Motion").

Now that document discovery has revealed that Lycos **(i)** *knew all along* the aggregate original cost of the equipment it leased from CSI; **(ii)** *carefully tracked* the financial implications of its repeated extensions of its leases with CSI; and **(iii)** *informed its auditors* of these facts (contrary to all its prior submissions to this Court); Lycos is belatedly seeking to introduce yet another argument to buttress its panoply of defensive claims in this case -- "usury."

Usury clearly does not lie here, though, and the attempt to introduce it at this stage of the case should be denied as futile and untimely (if such a claim had been timely pled last year, as it obviously could have been, CSI would have been entitled to have it dismissed at that time along with Lycos' "unconscionability" count, which was dismissed).

## STATEMENT OF RELEVANT FACTS

1.      This is an action by CSI seeking to recover a $301,000 account receivable owed to it by Lycos under a series of computer equipment leases that Lycos entered into with CSI several years ago (the "Equipment Leases").  *See* Verified Complaint at pp. 1, 3-10.  There is no dispute that Lycos voluntarily entered into the Equipment Leases, made effective use of the leased equipment for years, and repeatedly agreed to pay CSI the amounts that CSI is now seeking to recover.  *Id.*

2.      Lycos is seeking to offset its liability to CSI in this action with a multi-million dollar counterclaim (the "Counterclaim") in which it alleges that CSI somehow "defrauded" it into entering into **(a)** certain other "roll-up" leases of other computer equipment (the "Other Equipment Leases"), and **(b)** a subsequent "Sales Agreement No. 199614," dated July 15, 2003 (the "Sales Agreement"), by which Lycos agreed to purchase essentially all the equipment that it was then leasing from CSI, and to make all the remaining lease payments that it then owed to CSI -- including those claimed by CSI in its complaint in this case.  *Id.* at p. 9, ¶ 38.  *See* Amended Answer and Counterclaim of Lycos, Inc., filed March 22, 2005.

3.      Lycos' existing counterclaim alleges that it was somehow deceived into entering into the Other Equipment Leases, and the Sales Agreement, because **(a)** CSI never disclosed to it that it would be paying too much under those agreements, and **(b)** CSI allegedly misstated certain "original equipment cost" information ***that Lycos claims it did not have*** -- in an email sent after the Other Equipment Leases were signed, but before the Sales Agreement was executed.  *See* Amended Answer and Counterclaim of Lycos, Inc. at pp 6-31.

4.     Early last year, CSI moved for dismissal or summary judgment as to these claims.[1]   That motion was denied in a memorandum and order dated December 6, 2005.  Since then, CSI has moved this Court to reconsider that order based on what CSI genuinely believes are several specific factual and legal mistakes in the Order.[2]   That motion to reconsider is still pending.  In the meantime, according to the schedule set by the Court at a January 10, 2006 Status Conference in this case, discovery has proceeded.

5.     On January 13, 17, and 18, 2006, CSI served subpoenas *duces tecum* on Lycos' accounting firms Arthur Andersen and Deloitte Touche, and on the Lycos' leasing consultants, American River Partners, Inc. a/k/a Leaseforum and Susan Franklin, who assisted Lycos in negotiating the purchase and sale agreement that Lycos claims it was "fraudulently induced" to enter into, and who have submitted an affidavit in this case.  *See* Affidavit of Susan Franklin, filed April 29, 2005.  CSI also served Rule 34 requests on Lycos.

6.     CSI's subpoenas and document requests have finally forced the production of dozens of records revealing that Lycos was ***fully aware*** of the aggregate original cost of the equipment it leased from CSI, ***understood very well*** the financial implications of its repeated extensions of its leases with CSI, and was ***in no way*** "misled" by CSI.   To the contrary, Lycos kept detailed computer records and spreadsheets, and specific lease file records, recording the very information that it has claimed in this case, up to now, it had "no way to determine."

7.     The evidence also shows – unequivocally – that ***at the very moment*** it signed the Sales Agreement with CSI on August 8, 2003, Lycos and its consultant Leaseforum ***were***

---

[1]    *See* Plaintiff Computer Sales International, Inc.'s Motion to Dismiss or For Summary Judgment, filed March 31, 2005 (Docket No. 21)

[2]    *See* Plaintiff Computer Sales International, Inc.'s Motion for Reconsideration of Order of December 6, 2005 (Docket No. 47)

*conspiring in writing*, in a plan they euphemistically referred to as **"Phase II,"** to renege on the very lease payment obligations that Lycos was at that moment promising to make in the Sales Agreement, and were planning instead to try to force CSI into a "financial settlement" that would reduce those obligations.  (Several months later, Lycos first threatened CSI, and then secretly sued CSI – pleading substantially the same claims that it is now asserting here – in the Massachusetts Superior Court.)

8.    Recognizing the damning effect of this evidence on its existing Counterclaim, Lycos has now moved to amend its Counterclaim again, this time to add a claims that its equipment leases with CSI – which its financial statements consistently described as "operating leases," and later "capital leases" – were somehow loans as to which it was supposedly charged a "usurious" interest rate.  CSI now opposes that motion.

## ARGUMENT

### A.    LEAVE TO AMEND A COUNTERCLAIM SHOULD BE DENIED WHEN THE PROPOSED AMENDMENT WOULD BE FUTILE AND UNTIMELY

The First Circuit specifically held that the principle that leave to amend should be freely given when justice so requires "does ***not*** mean that a trial court must mindlessly grant every request for leave to amend."  *Aponte-Torres v. University of Puerto Rico*, -- F.3d --, 2006 WL 964756, *6 (1st Cir. April 14, 2006) (quoting Fed. R. Civ. P. 15(a)) (citations omitted).  To the contrary, the Court has emphasized that "[w]hen a proffered amendment comes too late, would be an exercise in futility, or otherwise would serve no useful purpose, the district court need not allow it."  *Id*.

In this regard, as a case progresses, and the issues are joined, the burden on a claimant seeking to amend a claim "becomes more exacting.  *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).  Where, as here, "the motion to amend is filed after the opposing party has

timely moved for summary judgment, a [party] is required to show 'substantial and convincing evidence' to justify a belated attempt to amend a [pleading].'" *Id.* (citing *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994)).  The Lycos Motion cannot show *any* legitimate basis for a usury claim, and it certainly has not come forward with "substantial and convincing evidence" justifying such a claim, or excusing its inexplicable delay in asserting it.[3]

### B.     LYCOS' PROPOSED "USURY" AMENDMENT IS FUTILE

The Lycos Motion should be denied because its proposed amendment is futile.  *See F.D.I.C.*, 1993 WL 623751 at *3 (denying leave to amend pursuant to Rule 13(f) on the grounds the proposed amendment would be futile).  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (citations omitted).  In reviewing for "futility," the Court should apply the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion. *See id.*

Lycos' proposed Second Amended Complaint seeks to add the following four new counts:  Count V – Declaratory Relief – Schedules 93 and 94 Each Evidence a Loan and Security Agreement; Count VI – Declaratory Judgment as to Whether Missouri or Massachusetts Law Governing Lycos' Claim that Schedules 93 and 94 are Usurious and Violative of 93A; Count VII – Usury, M.G.L. c. 271, § 49, and Count VIII – M.G.L. c. 93A, §§ 2 and 11.  While the end result of these several counts is basically to add a usury claim to this action, Lycos is required to use multiple counts and contorted and flawed logic to reach this result because the settled rule in Massachusetts – which Lycos does not dispute – is that leases are not subject to the Massachusetts usury law.

---

[3] It also bears noting that although Lycos's Motion was brought pursuant to Fed. R. Civ. P. 15(a), it is actually Fed. R. Civ. P. 13(f) that governs.  Under Rule 13(f), "…the pleader may by leave of court set up the counterclaim by amendment." *Id. See also F.D.I.C. v. Cullen*, 1993 WL 62371, *3  (D. Mass. Feb. 16, 1993) (Zobel, J.); *Cabana v. Forcier*, 200 F.R.D. 9, 13 (D. Mass. 2001).

### 1.    Leases Are Not Subject to M.G.L. c. 271, § 49

The Massachusetts usury law, which is a criminal statute, is set forth at M.G.L. c. 271, §

29.  "The law is designed to protect the necessitous debtor from outrageous demands by

lenders." *Begelfer v. Najarian*, 381 Mass. 177, 182 (1980).  The law provides, in pertinent part:

> Whoever in exchange for either a loan of money or other property knowingly
> contracts for, charges, takes or receives, directly or indirectly, interest and
> expenses the aggregate of which exceeds an amount greater than twenty per
> centum per annum upon the sum loaned or the equivalent rate for a longer or
> shorter period, shall be guilty of criminal usury ….
>
> (c) Any loan at a rate of interest proscribed under the provisions of paragraph (a)
> may be declared void by the supreme judicial or superior court in equity upon
> petition by the person to whom the loan was made.
>
> (d) The provisions of paragraph (a) to (c), inclusive, shall not apply to any person
> who notifies the attorney general of his intent to engage in a transaction or
> transactions which, but for the provisions of this paragraph, would be proscribed
> under the provisions of paragraph (a) providing any such person maintains
> records of any such transaction….

*Id.*  The statute is notable in numerous respects relevant here.  First, the statute is a criminal

statute, not a civil remedy.  The only civil remedy afforded by the statute is set forth in

subsection (c), which provides that a usurious loan ***may*** be declared void by a court in equity.

Thus, to the extent this statute applies in this case, and as will be shown below, it does not,

Lycos's sole remedy would be to attempt to void the leases at issue.  Its request for damages in

proposed Count VII is improper and could not be allowed.

Second, there is no *per se* policy against usury in the Commonwealth, as evidenced by

subsection (d) which allows usurious loans so long as an adequate disclosure is made.  *See*

*Begelfer*, 381 Mass. at 184 ("parties [may] contract for an amount of interest greater than twenty

per cent so long as the lender complies with the registration and record-keeping requirements of

G.L. c. 271, § 49"). Thus, at best, Lycos seeks to apply a reporting provision of the usury statute.

Third, and perhaps most importantly, the statute on its face only applies to "loans." *See Peck v. Coffman*, 1995 WL 809892 (Mass. Super. June 19, 1995) ("The usury statute, by its own language, does not apply to transactions other than loans of money or property."); *Allegheny Int'l Credit Corp. v. Bio-Energy of Lincoln, Inc.*, 21 Mass. App. Ct. 155, 159-61 (1986) (holding that the usury statute does not apply to leases); *Human Resources Development Press, Inc. v. IKON Office Solutions Company, Inc.*, 2006 WL 149043, *7 (D. Mass. Jan. 12, 2006) ("section 49 was not intended to protect leases of personal property ... in which no loan terms are evident.... [T]he transformation of the lease into a loan would be patently untenable as a matter of law....").

The *Human Resources Development Press, Inc.* case is particularly instructive. There, IKON and its financing arm, IKON Financial Services, entered into two contracts with Human Resources Development Press, Inc. ("HRDP"), for the lease of two commercial grade copiers. HRDP argued that the leases were usurious under M.G.L. c. 271, § 49. The court rejected the claim. First, the court noted that c. 271, § 49 "is designed to prevent overbearing lenders from taking advantage of poorly situated borrowers" whereas the case at hand involved "commercial leases for equipment which only addressed price, term, breach, assignment and remedies. Nowhere in the leases was there any mention of a 'loan' or 'principal' or, for that matter, 'interest.'" *Id.* at *6 (citation omitted).

Thus, the court concluded, for plaintiff's contention that its leases were really loans in disguise to have effect, "Plaintiff would have the court torture both the facts and the law." *Id.* Indeed, the court found it would be impossible to apply § 49 to the leases at issue because there would be no realistic way "to even estimate, let alone precisely calculate, the amount of any

'interest' supposedly charged …" and the court declined Plaintiff's invitation to "engage in conjecture to establish the 'usurious interest rate' …" by trying to "determine the fair market rental value of the equipment and then guess the amount allocated to 'principal' and 'interest.'" *Id.*  Such an exercise, the court noted, "is speculation at its worst." *Id.*  In sum, the court concluded that, "[g]iven the mathematical contortions which Plaintiff suggests, it is clear why … section 49 does not apply to commercial leases."

Because the transactions at issue in this case are on all fours with those in the *Human Resources Development Press, Inc.* case, this Court should also find that the agreements at issue are leases not subject to the Massachusetts usury statute.  As in *Human Resources Development Press*, there is no way for the Court to find any transaction usurious because there is no way to determine which part of the leases here would constitute principle and which parts would constitute interest (this information is obviously not contained anywhere on the lease documents given that there was no contemplation in those documents that the parties' were entering into anything but leases) and any estimates that Lycos may try to make in this regard can be nothing but rank speculation.

Clearly, turning leases into loans subject to the Massachusetts usury statute would have a serious detrimental effect on the law of leasing, which is why the courts have consistently declined to do so.  Under Lycos's theory, if any lessee, either an equipment lessee or a real estate lessee, at some point determined that it has paid more in rent than the property is worth, it could bring a claim for usury.   As the courts have repeatedly recognized, this approach is clearly *not* the intent of the usury statute, and would impose obligations hereto unknown in this Commonwealth.   In fact, even calling these transactions loans strains credulity because the leases, by their terms, make no provision for Lycos to take ownership of the equipment.

It is also highly disingenuous for Lycos to now claim that its leases with CSI were really loans, because it admits in the Proposed Second Amended Counterclaim that the very reason it entered into these equipment leases with CSI was so that it could treat them as operating leases which it could keep off of its balance sheet. Lycos states in its Proposed Second Amended Counterclaim:

> Companies [*i.e.*, Lycos] seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies [*i.e.*, Lycos] ... elect to enter into short-term leases rather than purchase the equipment. Leasing … can provide ***accounting … benefits***, such as … financing that, under Generally Accepted Accounting Principles, ***are not required to be placed on the company's balance sheet***… [*Id.*, ¶ 9 (emphasis added).]

> There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the ***former*** [*i.e.*, operating leases] ***is a true lease while the latter*** [*i.e.*, capital leases] ***is essentially a conditional sale or loan***…. [*Id.*, ¶ 11 (emphasis added).]

> Under Financial Accounting Standards Board ("FASB") rules, for a lease to quality for accounting treatment as an "operating lease," the present value of the minimum lease rental payments must not be greater than or equal to 90% of the original leased equipment (or lease basis). [*Id.*, ¶ 12.]

> The equipment schedules ***were structured as operating leases*** [*i.e.*, "true leases"] …. A typical 24-month lease between Lycos and CSI was priced so the present value of the minimum lease rental payments for the term of the lease equaled 85% of the cost of the equipment financed, which the present value for the typical 36-month lease was slightly less than 90%. [*Id.*, ¶ 19.]

In short, Lycos admits in its Counterclaims: (a) that its leases with CSI were operating or "true leases;" and (b) it purposefully structured its transactions with CSI so that the equipment leases could be considered as such and need not be placed on Lycos's balance sheet as would have been the case if the leases were really conditional sales or loans.[4] Having succeeded in keeping these

---

[4]    Companies like Lycos who have taken on too much debt strive to keep transactions off their balance sheets so as to make their debt-to-equity ratios appear stronger than they really are in the eyes of the market (as anyone who has been following the Kenneth Lay/Jeffrey Skilling trial can attest to). By structuring a transaction as a lease, the transaction is kept "off balance sheet" and only has to be recorded as a monthly expense on a company's income

transactions off of its books on the grounds that they were "true leases," Lycos cannot now argue that the transactions were really loans all along.

## 2.     Sometimes a Lease is Just a Lease

Recognizing that the usury statute does not apply to leases, Lycos asks the Court to exercise its discretion to declare that the documents that were entitled leases, and were treated as leases so that Lycos did not have to reflect the transaction on its balance sheet, are actually loans and security agreements under § 1-201(37) of the Uniform Commercial Code.  *See* Proposed Second Amended Complaint, Counterclaim ¶¶ 82-92.  Lycos makes this argument even though, as noted above, it expressly structured the leases to *not be loans* so it would not have to recognize them on its balance sheet and even though the Master Lease expressly states, "***This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest***."  Master Lease ¶ 18.1 (emphasis added).[5]  This makes no sense.

Furthermore, even if the leases at issue were security agreements, which, as discussed below, is not the case, this would not necessarily make the leases loans subject to the usury statute.  The purpose behind § 1-201(37) is to determine rights among competing claimants to the goods at issue.  (This is why the majority of § 1-201(37) cases come up in the bankruptcy context.)  Thus, while a lease that falls within the ambit of § 1-201(37) may be recharacterized as a "security interest," nothing in § 1-201(37) provides that the transaction should further be treated as a loan.  For instance, in *Human Resources Development Press, Inc.*, the court found that while it was premature to determine whether the leases at issue were actually security agreements pursuant to § 1-207(37), it nevertheless dismissed the usury count finding that "the

---

statement, rather than as a liability on the balance sheet.  If the transaction was a loan, however, the transaction would be required to show up on Lycos' balance sheet.

[5]     The Court may consider this document as it is appended to the proposed Second Amended Complaint as Exhibit A and therefore incorporated by reference.  *See Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

transformation of the lease into a loan would be patently untenable as a matter of law ….” *Id.* at *7. In other words, determining whether the leases are really security agreements is a wholly academic exercise because, either way, they would not be loans subject to the Massachusetts usury statute.

In any event, it is clear under UCC § 1-201(37), which has been adopted in both Massachusetts and Missouri (*see* M.G.L. c. 106, §1-201(37); Mo. Rev. St. ch. 400, § 400-001.201(37)) that the leases in question in this case are not security agreements. § 1-201(37) provides, in pertinent part:

> Whether a transaction creates a lease or “security interest” is determined by the facts of each case; however, ***a transaction creates a “security interest” if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee***, and:
>
> (a) the ***original term of the lease*** is equal to or greater than the remaining economic life of the goods,
>
> (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (c) the lessee has an option to renew the lease for the remaining economic life of the goods ***for no additional consideration or nominal additional consideration*** upon compliance with the lease agreement, or
>
> (d) the lessee has an option to ***become the owner of the goods for no additional consideration or nominal additional consideration*** upon compliance with the lease agreement.
>
> For purposes of this subsection:
>
> (a) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised ….

*See* M.G.L. c. 106, §1-201(37) (emphasis added).

The issue of when an equipment lease is to be treated as a security agreement under the Uniform Commercial Code was specifically addressed in *Carlson v. Giacchetti*, 35 Mass. App. Ct. 57 (1993). There, the court summarized § 1-201(37) as follows: "if the obligations of the lessee under the lease are not subject to termination by the lessee, and if the lease is for the full economic life of the goods (or if the lessee may, without further consideration, acquire all rights in the goods for the full economic life of the goods) then a security interest is created. But if the lessor retains a reversionary interest in the goods, then the transaction is a true lease." *Id.* at 63.

Presently, the Maser Lease contains a provision permitting Lycos to terminate the lease. Under section 2.2 of the lease, "The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rent unless terminated by either party giving the other party not less than 60 days prior written notice." The right to terminate upon 60 days notice instead of 120 days, as the Master Lease originally provided, was expressly agreed to as Addendum One to the Master Lease.[6] Under §1-201(37), if such a right to terminate exists, however, then the lease is a true lease and no further inquiry is necessary.

Nevertheless, Lycos also cannot meet any of the remaining requirements of § 1-201(37) (*i.e.*, subsections (a), (b), (c), or (d)). First Lycos fails to contend that the original term of the lease exceeded the remaining economic life of the goods, nor can it make this claim in good faith because it was willing to pay nearly $4 million for these goods at the conclusion of the leases – clearly evidencing that Lycos did not believe the economic life of the goods had been exceeded. Second, nothing in the lease documents required Lycos to renew the leases for their remaining

---

[6]     This Addendum is also part of Exhibit A of the proposed Second Amended Complaint.

-13-

economic life or to become the owner of the goods.  Third, nothing in the leases gave Lycos the option to become the owner of the goods for no additional consideration or for nominal consideration.

Fourth, nothing in the leases gave Lycos the option to own the goods for no additional consideration or nominal consideration upon compliance with the lease agreement.  Indeed, the fact that, under the Master Lease, Lycos ***had no right to purchase or otherwise become the owner of the goods*** evidences that the lease is a true lease, not a security agreement.  *See Carlson*, 35 Mass. App. Ct. at 63 ("if the lessor retains the reversionary interest in the goods, then the transaction is a true lease").  Lycos attempts to soft-pedal this point by pleading that "Under the Sales Agreement, title to the equipment was to pass to Lycos at the end of the term of Schedules 93 and 94."  Proposed Second Amended Complaint, Counterclaim ¶ 85.  Importantly, however, this right flowed from an entirely separate contract negotiated at a later date.  Nothing in the leases themselves, which is the pertinent inquiry under § 1-201(37), gave Lycos any right of ownership to the leased equipment.

Lastly, none of the "economic realities" referenced by Lycos in ¶¶ 88-92 merit a different result.  For instance, although Lycos makes much of the fact that the Master Lease disclaims all warranties and requires Lycos to assume all costs concerning the equipment, §1-201(37) specifically provides that, "A transaction does not create a 'security interest' because it provides that: … (b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods …."  Likewise, nothing about filing a UCC Financing Statement is inconsistent with the leases being "true leases" under the UCC.  *See* M.G.L. c. 106, §9-406; Mo. Rev. St. ch. 400, § 400.9-407(c).

Under these circumstances, it is clear, as a matter of law, that the Master Lease and Equipment Schedules 93 and 94[7] evidence true leases and not security agreements.

### Missouri Law Applies to Lycos's Usury Claims

As Lycos concedes in the proposed Second Amended Complaint, "Missouri law does not permit a cause of action for usury in business-to-business transactions such as the transactions evidenced by Schedules 93 and 94 between Lycos and CSI." Proposed Second Amended Complaint, Counterclaim ¶ 100. *See also* Mo. Rev. St. ch. 408.060 ("no corporation shall … interpose the defense of usury in any such action, nor shall any bond, note, debt, contract or obligation of any corporation or any security therefor, be set aside, impaired or adjudged invalid by reason of the rate of interest which the corporation may have paid or agreed to pay hereon."); *Kroh Bros. Development Co. v. State Line Eighty-Nine, Inc.*, 506 S.W.2d 4, 13 (Mo. App. 1974) ("Since State Line was admittedly a corporation, the defense of claimed usury was unavailable to it and accordingly would be unavailable to Kleb, its guarantor.").

Lycos, therefore,. asks for a declaration that Massachusetts law applies to its proposed claims for usury. Proposed Second Amended Complaint, Counterclaim ¶ 103. In order to apply Massachusetts law in this case, however, Lycos would have the Court ignore entirely the parties' choice of law provision in the Master Lease which states, "THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW." Master Lease § 18.6 (all caps in original). As a usury claim seeks to attack the specific terms of a contract – *i.e.*, whether those terms exceed a given rate of interest – there can be no dispute that such a claim arises

---

[7]    Exhibits D and E, respectively, to the Proposed Second Amended Complaint.

under the agreement itself rather than being unrelated to the contract or relating to issues such as formation. This being the case, the choice of law provision must be properly enforced. *See Computer Sales Int'l, Inc. v. Lycos, Inc.*, 2005 WL 3307507, *2-3 (D. Mass. Dec. 6, 2005). And under the applicable Missouri law, Lycos cannot assert a usury claim.

Moreover, even if the Court could accept Lycos's argument that the leases were really disguised security agreements subject to the UCC (which it cannot), then the UCC would have to be applied to determine the proper choice of law. Under UCC § 1-105, adopted in both Massachusetts and Missouri (*see* M.G.L. ch. 106, §1-105(1); Mo. Rev. St. ch. 400.1-105(1)), "when a transaction bears a ***reasonable relation*** to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." *Id.* (emphasis added). Here, the transaction clearly bears a reasonable relation to Missouri because that is where CSI is based and the Master Lease indicates that it is between Lycos and CSI "having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141." *See* Master Lease at 1. Missouri's usury law, therefore, should apply.

In fact, the precise issue of which state's usury law should apply in a lease *qua* security agreement dispute was addressed in the case *Woods-Tucker Leasing Corp. of Georgia v. Hutcheson-Ingram Development Co.*, 642 F.2d 744 (5th Cir. 1981). In that case, Hutcheson-Ingram entered into a sale lease-back transaction with Woods-Tucker. The lease specifically provided that it was to be "governed by the law of the state of Mississippi." *Id.* at 746. Hutcheson-Ingram nevertheless sought to have the court apply Texas law to its usury claim because Texas law was more favorable to it. *Id.* at 747. In support of this argument, Hutcheson-Ingram pointed out that Texas had the most significant contacts to the transaction, given that

-16-

Woods-Tucker had four offices in Texas, engaged in multistate leasing, and the transaction at issue was originated in Texas by a Texas company. Indeed, the only Mississippi contacts were the fact that Woods-Tucker's home office was in Mississippi and the transaction at issue was approved by the home office (even though it was negotiated in Texas). *Id.* at 749. The court held that, under § 1-105(1), the term ***reasonable relation*** would almost always be satisfied unless the selected jurisdiction lacked a "normal relation to the transaction." *Id.* at 751. Further, the court found that a home office easily satisfies the reasonable relation test. *Id.*

Indeed, relying on *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403 (1927), the *Woods-Tucker* court found that even if the selected choice of law was specifically intended to evade another state's usury law, so long as the selected state bore some connection to the transaction, the choice of law provision should be upheld. *Id.* at 751 ("That the intent of their choice of law provision was to avoid the usury laws of some interested jurisdiction is immaterial they are perfectly free to do just that."). Such a reading is essential in keeping with the UCC's "underlying purpose of establishing a nationally uniform law to govern commercial transactions…. [And] [t]he Code's devotion to the principle of party autonomy, particularly in the choice of law, is but a reflection of that policy. By calling upon state courts to yield to party choices of law in multistate transactions, except where it would be unreasonable to do so, the Code attempts to achieve uniformity a uniformity arising from the ability of multistate contractants to select the law that will govern their transactions in the full expectation that their choice of law will be respected by whatever court might chance to hear their dispute." *Id.* at 751.

As the court did in *Woods-Tucker*, the Court here should properly apply Missouri's law as to the usury argument because that is the law that two sophisticated business parties selected. While Lycos, part of a large multinational corporation, may attempt to convince the Court that it

-17-

needs protection from the contracts its executives knowingly entered into, it can hardly be considered the necessitous debtor that the Massachusetts legislature envisioned when the usury statute was enacted.   Indeed, the transaction at issue here would not even be barred by Massachusetts' usury law if it had been disclosed to the Attorney General, but CSI had no reason to expect that it was required to do so because Lycos has only claimed now for the first time, after almost two years of litigation, that the leases in dispute were not really leases at all but security agreements.   Prior to that, Lycos consistently represented to CSI that it was only interested in entering into "true leases" because it did not want to reflect the leases as loans on its balance sheet.

In sum, because Missouri law applies to the parties' contracts and because that law does not allow corporations to bring usury claims, it would be futile to permit Lycos to amend its Complaint to bring such a claim.

### Ch. 93A Claim

Lycos' proposed c. 93A claim is based on its arguments that CSI violated the usury statute and entered into transactions that exceeded an allowable rate of interest.   Since the transaction was not usurious and there can be no c. 93A violation for entering into a valid contract, this claim too should not be allowed.

### C.    THE PROPOSED AMENDMENT IS UNTIMELY

While Lycos argues that its proposed amendment is timely, this is far from accurate.   The parties have already brought dispositive motions, including a motion for summary judgment, and discovery in this case is well underway and must be completed by January 31, 2007.   The parties are now in the thick of discovery and have already exchanged thousands of pages of documents. Further, CSI has already taken the 30(b)(6) deposition of Lycos and Lycos has taken the

deposition of one of CSI's key employees, Jeffrey Rousseau. As such, it would be burdensome for CSI to have to respond to four new claims at this point in the case.

Moreover, Lycos' contention that there has been no undue delay or dilatory motive because it only recently learned of the facts necessary to support this amendment is simply untrue. Nothing about its new usury allegations – which are based on its contorted reading of the parties' lease documents which it has had in its possession since October 2001 – can be considered new evidence. In truth, Lycos has no valid reason for waiting until now to bring such claims, particularly given that this action was filed on January 2005 and Lycos has had all the information necessary to assert its "new" claims for several years prior to the filing of this action.

For all of these reasons, the Lycos motion should be denied.

### *REQUEST FOR ORAL ARGUMENT*

CSI respectfully requests 15 to 20 minutes, at the Court's discretion, to argue this Opposition and to respond to any questions from the Court about it.

### CONCLUSION

For all of the foregoing reasons, the amendment should not be allowed, and the Lycos Motion should be denied.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.
By its attorneys,

/s/ Robert J. Kaler
Robert J. Kaler, BBO No. 542040
rkaler@ghlaw.com
Edward W. Little, Jr., BBO No. 628985
elittle@ghlaw.com
David Himelfarb, BBO No. 649596
dhimelfarb@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street

Boston, MA  0211
Tel. (617) 345-7000

Dated:  May 2, 2006


**<u>Certificate of Service</u>**

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this by hand this 2nd day of May 2006.

<u>/s/ Robert J. Kaler</u>
Robert J. Kaler