## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | **LYCOS'S OPPOSITION TO COMPUTER** |
| LYCOS, INC., | ) ) | **SALES INTERNATIONAL, INC.'S** **MOTION TO DISMISS,** |
|     Defendant and Plaintiff-in-Counterclaim, | ) ) ) | **OR IN THE ALTERNATIVE,** **TO COMPEL** |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|     Trustee Process Defendant | ) | |

## INTRODUCTION

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc. ("CSI")

requests that this Court take the unprecedented step of dismissing Lycos, Inc.'s ("Lycos")

counterclaims in the middle of discovery on the basis that Lycos allegedly filed two false

affidavits in support of its Opposition to CSI's Motion for Summary Judgment (it did not).

Ironically, review of the record demonstrates that it is CSI that has misled the Court throughout

its moving papers by resorting to patently unsupported and, in many instances, directly

contradicted, characterizations of discovery taken in this case to date. CSI has not even deposed

the very affiants (Brian Lucy and Susan Franklin) whom it erroneously accuses of lying to the

Court, and, therefore, accuses those affiants of giving false testimony without so much as having

probed their statements with them. CSI makes these allegations, all the while failing to grasp the

plain import of the documents it cites and ignoring Lycos's deposition testimony consistent with the challenged affidavits.

All told, CSI fails to cite a shred of admissible, undisputed evidence to support its argument that the affidavits previously filed by Lycos contain false statements. Rather, CSI does nothing more than put forth its own interpretation of Lycos's documents and attempts to pass that off as evidence. It not only grossly mischaracterizes Lycos's deposition testimony, but, in many cases, simply (and conveniently) ignores testimony directly on point and contrary to its positions. Indeed, rather than properly apprising the Court of the relevant testimony that sheds light on the very documents upon which it relies or even providing the Court with a copy of the transcript of the testimony, CSI simply misleads the Court by summarily declaring, among other things, that CSI's purported statements of fact are "clearly confirm[ed]." (Memorandum in Support of Cross-Motion to Dismiss or Compel ("Mem.") at 7).

In reality, however, nothing, except for CSI's own wishful interpretation of produced documents, is even remotely confirmed. Lycos continues to refute, with good reason and ample support, those positions that CSI claims are definitively established. In short, CSI's *opinions* as to the meaning of Lycos's documents should have no bearing at this stage of the case and are more properly left for trial, especially in light of actual evidence contradicting those opinions.

The obvious question, of course, is why would CSI choose now to lay bare its arguments in this case, while attempting, for the *fourth* time, to convince the Court, absent any legal precedent, to dismiss Lycos's counterclaims? Lycos believes it knows the answer. Contrary to CSI's conclusory assertions otherwise, discovery in this case to date has revealed that CSI's fraud was even greater and more pervasive than Lycos alleged in its Amended Answer and Counterclaim. CSI's current Motion is a transparent, albeit futile, effort to stave off a more-

detailed inquiry into its fraudulent business practices.

CSI has moved, in the alternative, to compel Lycos to produce certain documents it mistakenly claims Lycos has failed to produce. While Lycos addresses each of the categories of documents below, CSI's cross-motion to compel is nothing more than a veiled defense to its own failure to produce clearly responsive and discoverable materials, as outlined in the Motion to Compel Production of Documents filed by Lycos several weeks ago. (Dkt. No. 74) The big difference between Lycos's Motion to Compel and CSI's Motion to Compel, however, is that CSI admittedly has the documents subject to Lycos's Motion but is refusing to produce them, whereas Lycos does not possess the hard copies of documents sought by CSI. Lycos has repeatedly advised CSI that it has produced all non-privileged, responsive documents in its possession, custody, or control. Unlike CSI, if Lycos had the requested documents, it would produce them. Again, Lycos is not refusing to produce documents; it cannot produce documents that which it does not possess.

For documents in electronic form, Lycos advised CSI long before filing its Motion to Compel that it would produce specified documents in electronic form if CSI would do the same.[1] CSI did not accept this offer. When it comes to discovery, as the First Circuit has noted in a different context, "what is sauce for the goose is sauce for the gander." *See Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1134 (1st Cir. 1995).

For the reasons stated above, and as set forth more fully below, CSI's Motion to Dismiss or Compel should be denied.

---

[1]    *See* e-mail from Thomas Bean to Edward Little on May 25, 2006, a true and accurate copy of which is attached hereto as *Exhibit A*.

BST99 1510136-4.057077.0012

I.    **THERE IS NO LEGAL OR FACTUAL BASIS FOR THIS COURT TO DISMISS LYCOS'S COUNTERCLAIM.**

Its previous efforts having been denied, CSI now "cross-moves" to dismiss Lycos's counterclaims in the middle of discovery.[2]  The alleged basis for this extraordinary relief is its unfounded accusation that two affidavits submitted by Lycos in support of its Opposition to CSI's Motion for Summary Judgment were false. Yet, CSI's Memorandum in Support of its Cross-Motion to Dismiss or Compel is noteworthy for three things:

- its failure to cite a single rule or case that stands for the proposition that this Court may dismiss Lycos's counter-claim in the middle of discovery, even if, as CSI alleges, Lycos filed false affidavits (which it did not);

- its failure to submit exhibits marked at Lycos's deposition which, in conjunction with CSI's answers to interrogatories, prove that Lycos did not file false affidavits; and

- its failure to submit any evidence that supports its assertion that Lycos's affidavits falsely stated that Lycos did not know or track the aggregate cost of all equipment leased from CSI or the aggregate lease payments it made to or for the benefit of CSI over time.

A.    **None of the Cases CSI Cites Stands for the Proposition that this Court Has the Authority to Dismiss Lycos's Counterclaim in the Middle of Discovery for Allegedly Filing False Affidavits.**

This Court has already denied CSI's Motion for Summary Judgment and its Motion for Reconsideration thereof; it also held that CSI's Motion to Dismiss was moot.  *See generally*, Docket Nos. 46 and 73.  CSI now, in the middle of discovery, seeks a fourth bite at the apple on the basis that Lycos allegedly filed two false affidavits.  (Mem. at 13-14).  While not citing any rule that would give this Court authority to dismiss a civil action in the middle of discovery for

---

[2]  It is unclear why CSI has "cross-moved" to dismiss, as Lycos has not moved to dismiss CSI's claims.

filing false affidavits,[3]  CSI relies on three cases for the apparent proposition that this Court has the authority to dismiss a civil action if it finds that a party has filed intentionally false affidavits. However, none of these cases stands for that proposition.  While this Court has inherent authority to enter sanctions for improper conduct, Lycos has found no case in this District where a court has dismissed an entire civil case, or even the portion of one to which the false affidavits went, for filing false affidavits.

CSI cites *Otoki Group, Inc. v. Gibraltar, P.R., Inc.*, 2001 WL 845752 (1st Cir. 2001), for the unremarkable proposition that a trial court may impose sanctions when it finds that its process has been abused.  *Gibraltar*, however, does not address a trial court's authority to dismiss a case in the middle of discovery for filing a false affidavit.  The holding of the case was simply that the "district court did not abuse its discretion in dismissing Otoki's complaint without prejudice[4] as a sanction for Otoki's failure to comply with the district court's order that Otoki file a status report."[5]

CSI's citation to *Kilgallen v. Network Solutions, Inc.* is equally unavailing.  99 F.Supp.2d 125, 130 (D. Mass. 2000).  There, the Court *denied* the plaintiff's request for unspecified sanctions – as opposed to a request for dismissal - after declining to find that an inaccurate exhibit to an affidavit was filed with an intent to mislead.  Significantly, the Court said nothing about its authority in the event that the affidavit were found to be intentionally false.

---

[3]  Although CSI's Cross-Motion fails to cite any rule of civil procedure under which it is moving, presumably, CSI is moving pursuant to Fed. R. Civ. P. 41(c).  That rule permits involuntary dismissal of a counter-claim under Rule 41(b).  Rule 41(b) permits involuntary dismissal only for "failure . . . to prosecute or comply with these rules or any order of court . . ."  Yet, CSI has not alleged that Lycos has failed to prosecute its counter-claim, or comply with any particular rule or order of the Court.

[4]  CSI's Motion to Dismiss does not specify whether it seeks dismissal with or without prejudice.

[5]  This result is not surprising as Fed. R. Civ. P. 41(b) expressly permits involuntary dismissal for failure to comply with an order of the Court.  *See* n. 3, *supra*.

BST99 1510136-4.057077.0012

Finally, CSI misreads the footnote it cites from *In re Turner.* 80 B.R. 618, 619 n. 3 (Bankr. D.Mass. 1987).  In *Turner*, the Court, in discussing the procedural history of the case, noted that it had dismissed claims "which were based upon *allegedly* false affidavits . . . " (emphasis added).  In other words, it had dismissed claims that had been asserted based on allegedly false affidavits, not that it had dismissed claims *because of* allegedly false affidavits.  Had the Court dismissed the claims because of and after finding that the affidavits were false, it would not have said that the affidavits were "allegedly" false.

Thus, none of the cases CSI cites holds or even remotely supports the view that this Court has the authority to exercise the draconian remedy of dismissing a civil case in the middle of discovery, particularly when CSI does not even assert that Lycos filed the false affidavits intentionally.  (Mem. at 13-14).  As noted earlier, there does not appear to be any precedent in this District for such an extraordinary remedy.

**B.    CSI's Assertion that Lycos Knew the Original Cost of the Equipment is Contradicted by Lycos's Deposition Testimony, the Documents CSI Marked at that Deposition, and CSI's Answers to Interrogatories.**

CSI's ubiquitous refrain throughout its Memorandum that Lycos "clearly" tracked and knew the aggregate original cost of the equipment as well as the aggregate amount of all payments made in relation to that equipment is both unsupported by the record and, given the plain contents of the documents cited by CSI and other information discovered to date, erroneous.  Although Lycos has admitted all along that it knew the cost of each individual piece of equipment at the time of purchase, Lycos did *not* track and hence did *not* know the aggregate

- 6 -

original cost of that equipment.[6]  Lycos simply did not have any tracking mechanism for, nor did

it keep a running log of, the more than 5,500 pieces of equipment leased from CSI over several

years.  Nor did Lycos "track" the aggregate amount of literally hundreds of payments it made

over a seven-year period, including interim or "stub" payments, to CSI and the multitude of

lender assignees whom CSI required Lycos to pay directly.  As such, the statements in the

affidavits of Brian Lucy and Susan Franklin cited by CSI were and are entirely accurate.  Lycos

did *not* file false affidavits.

Indeed, a simple comparison of Schedule A to CSI's Answers to Interrogatories with one

of the exhibits marked at Lycos's deposition demonstrates precisely the opposite of what CSI

alleges, *i.e.*, that Lycos did *not* track the original cost of the equipment.  Moreover, CSI's

assertion that Lycos admitted during its deposition that it tracked and understood the original

cost of the equipment is belied by the plain language of the transcript of that deposition CSI

---

[6]  Even if Lycos knew the relationship between the aggregate original cost of the equipment and the aggregate amount it had paid to or for the benefit of CSI related to that equipment (which it did not), that knowledge alone, contrary to CSI's apparent view of the case, would not be dispositive of Lycos's counter-claims for a number of reasons.  First, whether Lycos knew the relationship between these two numbers goes to the reasonableness of Lycos's reliance on CSI's intentional and negligent misrepresentations.  This Court has already held that that is a question for the jury.  Memorandum of Decision dated December 6, 2005, at 8 citing *Rodi v. Southern New England School of Law*, 389 F.3d 5, 16 (1st Cir. 2004).  Additionally, Lycos's c. 93A claim is *not* dependent on the reasonableness of its reliance. *Int'l Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 850, 443 N.E.2d 1308, 1314 (1983) ("This Court has rejected the proposition that a plaintiff must show proof of actual reliance on a misrepresentation under c. 93A, § 9.  We see no reason to reach a different result under c. 93A, § 11.").  *Accord, Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 103 (D. Mass. 1998) *quoting Fraser Engineering Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104, 524 N.E.2d 110, 113 (1988).  Second, regardless of whether Lycos ever knew the relationship between the aggregate cost and aggregate payments, other information not produced by CSI and not readily available to Lycos, such as, among other things, the total cost of equipment on rolled schedules (especially after equipment was rolled multiple times and divided among many different schedules), the then-current "value" of that equipment (most of the time, years after purchase), and total payments made on that equipment, had a significant impact on Lycos's ability to assess the economic impact of the rolls.  As the thousands of pieces of equipment were rolled and divided up time and time again, and absent disclosure by CSI of the cost of equipment contained on rolled schedules (as it had on the original schedules), Lycos reasonably relied on its trust and confidence in CSI, its long-time business partner, to structure the leases in ways that would benefit Lycos as a client.  Although Lycos understood that CSI deserved and would receive a profit from its services, Lycos never expected that CSI would intentionally orchestrate a scheme to provide CSI with a windfall, while pilfering Lycos.  For every roll orchestrated by CSI, its profit margin went up exponentially and lucrative commissions were triggered for Mr. Stenberg (combined, Mr. Stenberg personally reaped millions of dollars in commissions on the rolls and Sales Agreement alone).

elected not to provide to the Court.[7]

CSI cites page 76 of the transcript of Lycos's deposition for the proposition that "Lycos had internally computed . . . that the total original equipment cost under all of the lease schedules was $43,510,135." (Mem. at 6, citing Tr. 76). On page 76 and succeeding pages, the witness discussed a document marked as Exhibit 4:

> Q.    Do you see the column [on Exhibit 4] headed Equipment Value?
>
> A.    Yes, I do.
>
> Q.    And if you go down that column to where you reach CSI Scenario 1, convert all equipment schedules to capital leases, do you see the figure $43,510,135, that's dollars right?
>
> A.    Yes it is.
>
> Q.    That was Lycos' record of the original cost of the equipment that had been purchased and leased to it by CSI as of that time, correct?
>
> . . .
>
> A.    I believe that this *wasn't* – I believe that what this is was it wasn't done [sic] to see the impact on the financial statements. It was done to see more of the cash impact and to see if the buy-outs were reasonable. (emphasis added)

The witness went on to say:

> A.    I believe this number rolls up from other schedules that we had and it was Monique's *best attempt* to pull together the equipment value based on base value off of leasing schedules.
>
> . . .
>
> A.    This figure would have been Monique's *best guess* at the cost. It was *not* my understanding of what the cost was.
>
> . . .

---

[7] CSI repeatedly cites to the transcript of Lycos's deposition, but, curiously, elects not to submit the transcript pages to the Court. Review of the transcript suggests why: in most cases, the transcript pages do not support CSI's claims as to what they say.

BST99 1510136-4.057077.0012

A.    It was a starting point that Monique asked Paul [Stenberg] to verify and Paul came back with a number closer to 60 million. 63 million dollars. So this was our *starting* point.

. . .

Q.    Regardless of what you say or claim Monique said or Paul said, this was Lycos' record as of March 2003 of what it thought the original equipment cost was of all the equipment it had leased from CSI up to that point . . . ?

A.    *No.* (emphasis added)

. . .

A.    This [the $43,510,135] was our *best guess.*  We *didn't know* the equipment cost.

. . .

A.    This analysis is one piece of information that lead us to believe that, you know, that we still needed to do some work on that number we didn't have.  We hadn't accurately captured the equipment value.  We were working towards that and asking Paul to verify that number when he came back with the 60 million dollar number, but it appeared that the buy-out percentage, the buy-out number was too high.  So we weren't sure of our number and we thought there certainly must be more equipment because the buy-out was too high and then Paul later told us that the number was higher.

Tr. at 78-79 (emphasis added).  True and correct copies of cited pages of the transcript of the deposition of Lycos's 30(b)(6) witness are attached hereto as *Exhibit B.*

Still not satisfied with Ms. Callagee's truthful and consistent answers (to that point, asked and answered at least seven times), CSI's counsel nevertheless forged ahead undaunted, and even began to interject his own opinions:

Q.    I'll ask the question again because you know that this 43.5 million dollar number appears throughout Lycos' records for 2003 as a representation of what it thought the cost of the equipment that it had leased from CSI was in total.  You know that, don't you?

A.    *No.* (emphasis added).

Ex. B, Tr. at 80 (emphasis added).[8]  Ignoring Ms. Callagee's further denial that this document illustrated Lycos's knowledge of the aggregate original cost of the equipment (at a minimum, her eighth such denial), CSI's counsel went to the well yet again:

> Q.    And you know that, in fact, that is what the original equipment cost was in total at that point of all the equipment that CSI had leased to Lycos over the previous years, approximately, don't you?
>
> A.    I still don't know that we know what the original – exactly what the original equipment cost was.

*Id.* at 81.  Having been stymied for at least the ninth time, CSI's counsel finally proceeded to other topics before once again returning later in the deposition to Lycos's alleged knowledge of the total original equipment cost:

> Q.    Okay.  And in order to calculate ten percent of the original cost of that equipment, Lycos had to know what the original cost of that equipment was, didn't it?
>
> A.    . . . it's my understanding that we came up with the best number we had to calculate the equipment value.  Not that we knew for sure what the original equipment value was from speaking to Monique and other people who worked at Lycos.  What we were doing was we were using the best data that we had, but we didn't feel comfortable that the equipment value was accurate and we had asked for confirmation of that number because we weren't confident in our numbers.

*Id.*, at 156-57.  Undaunted, CSI's counsel still refused to accept Ms. Callagee's consistent answers on this point (her tenth at the very least) and, in true form, began to interject his own testimony once again:

---

[8]   Apparently frustrated because Ms. Callagee would not agree with his personal premise, CSI's counsel proceeded to further badger the witness and testify on his own:  "Q.  Well, I suggest to you, Miss, that the documents prove otherwise.  And that your understanding based on conversations that you claim to have had with Monique Walsh will have to be the subject of discovery on another day, but that right now I'm taking you through records that Lycos produced which reveal what Lycos knew at certain points in time."  Ex. B, Tr. at 159.  Indeed, CSI's counsel got so frustrated that he began to insult the Ms. Callagee:  "Regardless, again, of your opinion about what Brian would have been hesitant to do which really isn't based on anything, is it."  Ex. B, Tr. at 201.

Q.  I'm suggesting that Lycos knew all along what the original equipment cost is and let's just proceed through the documents because every single one of them shows it. . . ."

At that point, Ms. Callagee had had enough:

A.  Mr. Kaler, in response to your last question, we can go through the documents, but my understanding that we didn't know what the value was, that we were making our best attempt to pull it together is not going to change." [sic]  *Id.*, at 158-59.

Despite this repeated and unequivocal testimony that the numbers shown on Lycos's documents represented nothing more than a "best guess," a "best attempt," and a "starting point," CSI shamelessly, not to mention erroneously, gloms onto one three-word snippet to assert that Ms. Callagee later acknowledged that she knew the total original equipment cost was "in the 40's." (Mem. at 6).  While ignoring the litany of negative responses to his prior questions, what CSI's counsel fails to inform the Court, however, is that the antecedent question to Ms. Callagee's response was posed in the *present*, meaning that Ms. Callagee was asked about her *present* knowledge.  Ex. B, Tr. at 81-82.[9]  Thus, Ms. Callagee's response acknowledged nothing more than that she presently knows the original cost was "in the 40's."

Lest there be any doubt, the true nature of Ms. Callagee's supposed "acknowledgment" is confirmed at least two times later in her deposition.  Omitted from the Memorandum, CSI's counsel later re-questioned Ms. Callagee about this very testimony:  "Q. . . . You testified previously that you understood that the original equipment cost for the CSI leases was in the 40's, 40 million range, correct?"  Construing this question as relating to her previous testimony about her *present* knowledge, Ms. Callagee responded, "Yes."  Ex. B, Tr. at 149.  In her Errata Sheet, Ms. Callagee made sure to clarify this response because it was apparent that CSI's counsel was, as here, misconstruing her earlier testimony.  She clarified that response to read:  "Yes, I

---

[9] In fact, two pages after this response, Ms. Callagee reiterated that "Monique was very unsure of this [43 million dollar] number and that's what she presented to me." Ex. B, Tr. at 84.

learned that during the course of this litigation." *See* Tr. errata sheet.  Consistent with this clarification, she had testified precisely on point at yet another juncture in the deposition:  "Q. You testified earlier in your deposition that you knew [the original cost of the equipment was in the 40's] as well?";  "A.  I learned that during – I had learned that during the prep for this deposition."  Ex. B, Tr. at 226.  It is, of course, no accident that CSI omits from its Memorandum these highly relevant responses that show conclusively that the only thing Ms. Callagee acknowledged during her deposition was that she learned for the first time of the total original equipment cost being "in the 40's" during the course of this litigation.  CSI's suggestion to the Court that Ms. Callagee's response was somehow an acknowledgment of Lycos's knowledge at the time in question is simply disingenuous.[10]

Accordingly, the record demonstrates that Lycos's witness did *not* testify that Lycos knew the original cost of the equipment or that the original cost of the equipment was in fact $43,510,135.  Rather, she denied such knowledge at least ten times, and testified that Lycos had a number representing its "best guess" and "starting point" but that Lycos was not confident in its number and that such number did not match Paul Stenberg's $60 million number.  Ex. B, Tr. at 79.  In fact, Ms. Callagee testified that Lycos was asking Paul Stenberg for cost information during the same time period.  It therefore makes no sense to suggest that Lycos both tracked and knew the original equipment cost.  If that were true, Lycos would have had no reason to ask Mr.

---

[10]  CSI's misleading of the Court in its Memorandum is only one aspect of its disingenuousness.  At Lycos's 30(b)(6) deposition, Lycos challenged some of the questions asked as being beyond the scope of the topics listed in the 30(b)(6) notice.  In an effort to allay Lycos's concerns about the effect of the witness's testimony on the scope of topics beyond those noticed CSI's counsel said: "I'm going to tomorrow issue a notice of deposition for Ms. Callagee in her individual capacity.  I'm going to continue with the deposition today in the 30(b)(6).  I'm going to issue a notice to Ms. Callagee tomorrow for her to appear next week or some convenient date in her individual capacity."  Ex. B, Tr. at 55.  It has now been three months since that time and CSI's counsel has yet to notice Ms. Callagee's deposition in her individual capacity.

Stenberg for that information.[11]

Moreover, even if, for the sake of argument alone, the Court ignored the testimony of Lycos's 30(b)(6) designee and considered the documents cited by CSI in isolation, those documents simply do not support the conclusions drawn by CSI's counsel. Exhibit 21A from Lycos's deposition, a copy of which is attached hereto as *Exhibit C*, is a list Lycos prepared of approximately thirty-five of the approximately eighty CSI-Lycos equipment schedules. Next to each numbered schedule is a dollar amount. These dollar amounts, which appear on other exhibits (including Exhibit 4) on which CSI relies in its Memorandum, appear under the heading "Equipment Value," aggregate $43,510,135, precisely the number CSI claims was Lycos's number for the equipment's original cost. (Mem. at 6). In arguing that Lycos knew the original equipment cost was $43,510,135, CSI apparently maintains that this list represents Lycos's tracking of original equipment costs. CSI is just plain wrong. Comparison of these dollar amounts by equipment schedule on Exhibit 21A (*see Exhibit C* hereto) with the list of "total equipment costs" by equipment schedule produced by CSI in response to an interrogatory (*see Exhibit D* hereto), reveals that:

- CSI listed original equipment costs for approximately sixty schedules with numbers between 1 and 61; Lycos listed a value for none of these, thereby demonstrating that Lycos was not "tracking" original equipment costs;

- For those approximately thirty-five schedules for which Lycos did list an equipment value on Exhibit 21A, Lycos's number did not match CSI's number for total equipment cost for approximately thirty of them; and

---

[11] Indeed, the very fact that Lycos had to conduct the analysis described by Ms. Callagee that led to the creation of those documents relied upon by CSI shows just the opposite, *i.e.*, that Lycos had not "tracked" the original equipment cost. If it had, the original equipment cost would have been readily available and months' worth of analysis that ultimately provided no valid answer would have been unnecessary. Lycos's analysis at that time was nothing more than an attempt, after the fact, to ascertain that cost. Again, if anything, this shows that Lycos had not kept "track" of this information.

BST99 1510136-4.057077.0012

- For approximately twenty-five of the equipment schedules listed in its answers to interrogatories, CSI listed nothing more than a "dash," thereby suggesting that, notwithstanding CSI's mantra throughout this case that Lycos should have just "done the math" to calculate original equipment cost, CSI – even with the sophisticated computer system of the self-proclaimed largest independent information technology leasing company in the country - could not "do the math."[12]

The foregoing demonstrates that Lycos's list of "equipment values" bears little relationship to CSI's list of actual equipment costs. Far from "clearly confirm[ing]" that Lycos was tracking original cost information, this comparison demonstrates that not only did Lycos not know the original cost of the equipment on each schedule, but that CSI, even with thirty days to respond to interrogatories, sophisticated computers to aid it, and countless documents that Lycos did not have access to when it was allegedly "tracking" original equipment costs, CSI could not figure out the original equipment cost for more than twenty-five schedules. CSI's answers to interrogatories serve only to bolster Lycos's position that it did not know, and could not have figured out (absent extraordinary measures) the original equipment costs for numerous schedules.

So what was Lycos actually listing on Exhibit 21A? Because CSI failed to provide Lycos with the original equipment costs for the schedules, a Lycos employee made her best effort years after Lycos had entered the original leases to develop some number for the value of the equipment. Using the only information Lycos had, the employee listed on Exhibit 21A numbers referred to in the lease documents as "Base Value."[13] However, for reasons that are not apparent

---

[12] Although not evident from the face of CSI's list of actual equipment costs, CSI also failed to list an original equipment cost or even a dash for more than ten of the CSI-Lycos equipment schedules.

[13] "Base Value" is a number which, when multiplied by a percentage, yields the amount Lycos would have been required to pay CSI if it were unable to return the equipment at the end of the lease term. The product of the Base Value and the percentage is known as the "Stipulated Loss Value." True and accurate copies of the documents evidencing the "Base Value" for the equipment schedules appearing on Exhibit 21A are attached hereto as *Exhibit E*. There is a 1:1 correspondence between the Base Values listed on these documents and the amounts listed on Exhibit 21A.

from the face of the document, this employee listed a "Base Value" for fewer than half of the

approximately eighty equipment schedules.

If CSI had bothered to compare the numbers that Lycos listed on Exhibit 21A with its

numbers for original equipment cost in its Answers to Interrogatories, it would have readily

discovered what Lycos described in the bullet points above: that the so-called "clearly

confirmed" positions in the Memorandum are fallacious.  Even a cursory examination of the

documents would also have made it abundantly clear to CSI before filing this Motion that Lycos

was merely (albeit incorrectly) equating, for almost all of its schedules,[14] Base Value with

Original Equipment Cost.[15]  Thus, contrary to CSI's assertion and entirely consistent with

Lycos's deposition testimony, Lycos was *not* "tracking" original equipment costs; rather, it was

listing, years after the original leases were executed and for fewer than half the schedules, the

"Base Value" for virtually all of those schedules.  In fact, CSI's Memorandum serves only to

---

[14]   For reasons that are not clear to Lycos at this time, the employee did not use the Base Value in her list for a handful of the later schedules.

[15]   That the $43 million number shown on Exhibit 21A happened to come close to the actual aggregate original equipment cost of the equipment was mere fortuity.  As Ms. Callagee testified time and time again, in Lycos's mind, this number was nothing more than a "best attempt" and a "starting point," and that Lycos was neither comfortable with nor confident in its accuracy.  As Lycos was able to list  "Base Value" numbers (itself an inaccurate indicator of equipment cost) for less than half the approximately eighty schedules further underscores, and supports Ms. Callagee's testimony, that Lycos did not believe it had captured a complete and accurate record of the aggregate cost of all equipment leased from CSI.  Hence, why Lycos was attempting to procure additional records and information from Mr. Stenberg at the same time, which, rather than providing the requested documentation, resulted in Mr. Stenberg's $63 million misrepresentation in March, 2002.  Because Lycos's $43million number was derived from "Base Values" listed on only a small percentage of the total schedules and Mr. Stenberg, a person whom Lycos trusted, was in a much better position to ascertain the true amount and later re-confirmed that the total cost was around $60 million right before the buyout in July, 2003, it was entirely reasonable for Lycos to rely upon this higher total."

highlight what Lycos has been alleging all along: that Lycos did *not* know the aggregate original cost of the equipment despite its many efforts to ascertain that information.[16]

Accordingly, viewing the discovery discussed thus far in its entirety, the Lycos affidavits were not false. The Motion to Dismiss must therefore be denied, and Lycos should be awarded its reasonable attorneys' fees and costs for having to defend CSI's frivolous and fourth attempt to dispose of this case before trial.

C.    **Lycos Did Not Know the Aggregate Amount it Had Paid to or for the Benefit of CSI On Account of the Equipment Schedules.**

CSI observes that Lycos's former Chief Financial Officer, Brian Lucy, stated in an affidavit that "Lycos did not maintain records that would have allowed it to readily calculate the cumulative total lease payments it had made on the numerous lease schedules with CSI."[17] It attaches to its Memorandum numerous documents in support of its claim that Lycos was tracking the monthly payments it made on account of certain equipment schedules. However, not one of these exhibits reflects that Lycos tracked or knew the aggregate amount of payments made with respect to the approximately eighty equipment schedules on which it made payments from 1997 through 2004. Rather than attach any documents reflecting a compendium of payments, it attaches payments made or to be made to various leasing companies for one or a few months. *See* Mem. Ex. D. It also attaches one of the approximately eighty schedules that lists the original

---

[16] Again, having difficulties ascertaining complete and accurate cost information internally, Lycos was, at the same time, attempting to obtain additional information from Paul Stenberg. Because Mr. Stenberg repeatedly failed to provide or delayed the provision of such information over the span of many months, Lycos at one point threatened Mr. Stenberg that it would seek to rescind the major refinancing entered under Schedules 93 and 94 if he did not cooperate. Mr. Stenberg finally responded – his response was that the total original equipment cost was $63 million, an amount CSI now admits was false.

[17] For reasons that are unclear, CSI also quotes statements by Lycos's counsel and its 30(b)(6) witness that it says were false. Memorandum at 4-5. The relevance of these statements to its Motion to Dismiss is not apparent as CSI has not moved to dismiss on the basis of false statements by Lycos's counsel or false testimony by its witness.

cost of certain equipment. *See Id.* Ex. F. Moreover, because of CSI's decision to rewrite the schedules every few months to Lycos's continuing detriment, any spreadsheet of projected payments, such as that attached as Exhibit H, became obsolete soon after it was prepared.

The inescapable conclusion is that CSI has adduced no evidence whatsoever to demonstrate that Mr. Lucy's affidavit falsely represented that Lycos did not know the aggregate amount of payments it had made to and for the benefit of CSI with respect to the equipment schedules. In fact, Lycos firmly maintains that it did not know that information. Accordingly, the Motion to Dismiss must be denied for this reason as well.

## II.    LYCOS'S RESPONSE TO CSI'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS.

CSI's claims with respect to its alternative motion to compel production of documents fall into three categories: 1) certain documents in electronic form that Lycos has offered to produce provided CSI agrees to make a reciprocal production of specified documents in electronic form; 2) documents CSI claims Lycos has or should have, but, after a diligent search, have not been located anywhere at Lycos; and 3) e-mails Lycos is in the process of having restored from back-up tapes that *may* contain responsive documents. Lycos will address these seriatim.

A.    **Documents in Electronic Form.** Lycos has certain documents in electronic form that CSI has requested; similarly, CSI has documents in electronic form that Lycos has requested. By e-mail dated May 25, 2006, Lycos expressly offered to produce documents in electronic form if CSI would produce certain documents in electronic form as well, including Paul Stenberg's computer hard drive. *See* Exhibit A. CSI chose not to accept that offer. Lycos, nevertheless, did produce electronic copies of four spreadsheets introduced as exhibits at its deposition that CSI had requested. Lycos has no objection to the Court ordering both sides to

produce electronic copies of specified documents along with any applicable software and instructions so that the electronic documents are in a usable form.

B.    **Bonus Information.**  CSI admits that it asked for bonus information for certain identified employees on June 12, 2006.  Then, it complains that Lycos did not produce some of that information until the day Lycos filed its Motion, eight days later, on June 20, 2006.  Lycos has, to the extent available, assembled the requested bonus information and produced it to CSI.

C.    **Avnet Appendices.**  Lycos has repeatedly advised CSI that it does not have appendices A-M to the Avnet Lease Assessment and Asset Inventory Analysis Report.  This was a document prepared by Avnet that Lycos had in hardcopy only.  Lycos has diligently searched its records and has not located any of the appendices requested by CSI.  Lycos does not know if it ever received them.  Whether or not CSI wants to accept Lycos's representation that it does not have these documents, Lycos cannot produce what it does not have.

D.    **"Leasing Data" Documents.**  As for the "lease calculation documents" attached to the Memorandum as Exhibit L, although Lycos did produce these documents, it did not create them.  These documents were produced from Lycos's hardcopy files and there is no indication, electronic or otherwise, that Lycos prepared them.  Lycos likely received these documents from a third party.  Lycos does not have any additional "Leasing Data" documents.

E.    **Lease Conversion Documents.**  CSI has everything in Lycos's possession, custody and control in the form of lease conversion/accounting records.  Indeed, CSI has subpoenaed and obtained documents from all of the accounting firms Lycos used during the relevant period.  Once again, CSI is requesting additional documents which Lycos simply does not have.

F.   **Internal/External Accounting Records.**  Similarly, Lycos does not have copies of any documents that it provided to its auditors other than those it has already produced; if it did, it would have produced them.  In fact, if Lycos had given them to the auditors, CSI presumably would have obtained them from the auditors.  Apparently, it did not, thereby reinforcing Lycos's assertion that it did not provide any additional documents to its auditors.

G.   **Documents Concerning Mr. Stenberg's e-mail of March 18, 2002.**  Mr. Stenberg's e-mail is not, contrary to CSI's assertion, the "linchpin" of its entire case.  Mr. Stenberg not only represented to Lycos that the original equipment cost exceeded $60 million in writing to Lycos on March 18, 2002, but he repeated that representation again in early July, 2003.  Lycos is also aware of, and has alleged, other fraud committed by CSI.

In part because Lycos would like to ascertain if there are other documents concerning this e-mail, Lycos has – at its own considerable expense – caused certain of its back-up tapes to be restored with respect to those individuals who might have knowledge of facts relevant to this case.  After months of review and restoration by an independent expert in the field, Lycos has only recently received those restored e-mails and is reviewing them for production.  Upon information and belief, CSI has not even made an effort to review its back-up tapes, never mind to restore any of them.

H.   **Documents in the Possession, Custody, or Control of LeaseForum**.  Lycos is preparing a separate response to CSI's Motion to Compel Production of Documents from LeaseForum, Inc. and its Principals with respect to the privileged documents.

BST99 1510136-4.057077.0012

WHEREFORE, Lycos requests that this Court enter an Order:

1.    Denying Lycos's Motion to Dismiss;

2.    Denying Lycos's alternative Motion to Compel except to the extent it orders the parties to make a mutual exchange of documents in electronic form; and

3.    Granting Lycos such other relief as may be appropriate and just under the circumstances.

Dated: July 31, 2006                          Respectfully submitted,

                                              LYCOS, INC.,
                                              By its attorneys,

                                              /s/ Thomas O. Bean
                                              Thomas O. Bean (BBO# 548072)
                                              Peter M. Acton, Jr. (BBO# 654641)
                                              McDERMOTT WILL & EMERY, LLP
                                              28 State Street
                                              Boston MA 02109
                                              (617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2006, I caused a true and accurate copy of the within Opposition to be delivered by hand to Robert J. Kaler, McCarter & English, LLP, 225 Franklin Street, Boston, MA 02111.

                                              /s/ Thomas O. Bean
                                              Thomas O. Bean

BST99 1510136-4.057077.0012

# EXHIBIT A

| Thomas O Bean/BST/MWE | To | "Little, Edward" <ELittle@ghlaw.com> |
|---|---|---|
| 05/25/2006 01:58 PM | cc | pacton@mwe com, "Kaler, Robert" <RKaler@ghlaw.com> |
| | bcc | |
| | Subject | RE: FW: CSI |

Ted, I, too, am frustrated  I have been pressing for paper documents that were requested months ago, i.e., compensation plans, Stenberg compensation, complete expense reports, etc.  In addition, notwithstanding your assertions, we still don't have all the lease information. More on that in a subsequent e-mail.  Moreover, we learned for the first time in your e-mail that CSI produced either an Operating Lease Journal Entry or a Sales Type Lease Journal entry.

As for electronic discovery, our position has been consistent.  We believe electronic productions should be reciprocal.  You should allow us to have an expert image Stenberg's without irrelevant or personal information and CSI should produce the sub-ledger cards in electronic form; you have refused to do so. There needs to be reciprocity.

The bottom line is this: if we can't work things out, and this has been dragging for quite some time, we should go to the Court.  Please let me know if you think that makes sense at this point.

Thomas O. Bean
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109
(617) 535-4426 (ph)
(617) 535-3800 (fax)
tbean@mwe.com

# EXHIBIT B

# O'BRIEN & LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International v. Lycos, Inc.

Transcript of the Testimony of:

# Julie Callagee

# April 26, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Cindy Berglund   19122

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 54 |
| --- |

1   Deborah Bibbo, and Diane McKay.
2   Q. And are they all staff accountants?
3   A. No. They all have different roles.
4   Q. What are their roles?
5   A. Thomas Hoye is the accounting manager.
6   Q. For the company?
7   A. Yes.
8   Q. And Cole?
9   A. Senior accountant. Debbie Bibbo is purchasing and
10  accounts payable.
11  Q. Yes?
12  A. And Diane McKay does payroll and billing and then
13  there is one more.
14  Q. Who is that?
15  A. Kristen Lyons. She does collections.
16  Q. And you, in your position as controller of Lycos
17  over the last five years, you've been managing the
18  people in the accounting department except for, I
19  think, for a period of time when the payable group
20  reported to somebody else pretty continuously, right?
21     ATTY. BEAN: Objection.
22  Q. You can answer.
23  A. Yes.
24  Q. All right.

| Page 55 |
| --- |

1     ATTY. KALER: For the record, I think what I'm
2  going to do is issue tomorrow a notice of deposition
3  for Ms Callagee in her individual capacity. She's
4  clearly a managing agent of Lycos --
5     COURT REPORTER: I'm having a hard time hearing
6  you.
7     ATTY. KALER: I'm going to tomorrow issue a notice
8  of deposition for Ms. Callagee in her
9  individual capacity. I'm going to continue with the
10  deposition today in the 30(B)(6) I'm going to issue a
11  notice to Ms. Callagee tomorrow for her to reappear
12  next week or some convenient date in her individual
13  capacity.
14     She is clearly a managing agent of Lycos, and,
15  therefore, her deposition statements are admissible
16  just as if she was a 30(B)(6) deponent either way.
17  There's no distinction in my view between her
18  deposition statements.
19     So, in any event, you can reserve any rights that
20  you want to, Tom, but I would appreciate it if we could
21  just continue today. I'll try to cover as much as I
22  can cover, but I won't be constrained in any way
23  because she's clearly a managing agent. So it doesn't
24  matter.

| Page 56 |
| --- |

1   Q. (By Atty. Kaler) To just pick up where we left
2  off, I'm trying to orient us in time.
3     We were talking about the period at the, sort of
4  the end of March of 2003 when you had come back from
5  leave. You had replaced Mr. Bailey functionally in the
6  controller capacity, right?
7  A. Yes.
8  Q. And we were talking about the -- that one of your
9  responsibilities that you had assumed was Lycos'
10  involvement in this lease buy-out effort which you've
11  already described, correct?
12  A. Yes.
13  Q. Okay. And you had said, I assumed responsibility
14  for buying out the leases. Do you recall that?
15  A. Yes.
16  Q. Okay. And one of the things I had suggested to
17  you was that the impetus for the buy-out of the leases
18  had come from Terra Networks in Spain wanting to have
19  the Terra Lycos, as Lycos was then known, leases
20  capitalized and I'm not sure whether you had agreed in
21  part with that or in total or?
22  A. That was one of the reasons, yes.
23  Q. That was clearly one of the reasons. Would you
24  say that was the primary reason? That the parent

| Page 57 |
| --- |

1  wanted you folks to capitalize the leases?
2     ATTY. BEAN: Objection.
3     THE WITNESS: I don't know if it was the parent
4  company or Lycos itself. I believe it was a
5  combination.
6  Q. Okay Well, Lycos had up to that time treated its
7  equipment leases with CSI as operating leases, correct?
8  A. Yes.
9  Q. And you know from your accounting background that
10  operating leases can be treated as off the book -- what
11  they call off-the-books transactions in the sense that
12  they don't affect -- there's a footnote on your
13  statement that they don't affect your debt equity
14  ratios. You know that, right?
15     ATTY. BEAN: Objection
16     THE WITNESS: I wouldn't refer to them to as off
17  the books, but you don't capitalize -- you don't have
18  the fixed asset on your books.
19  Q. Some people refer to them as off the books, don't
20  they?
21     ATTY. BEAN: Objection.
22     THE WITNESS: Maybe not -- it has a different
23  connotation now.
24  Q. Today it does, I suppose, after Enron.

15  (Pages 54 to 57)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

---

**Page 74**

1  Q.  You can answer.
2  A.  No.
3  Q.  What about what I said is incorrect?
4  A.  I believe that this was done to calculate the
5  buy-out.  Not to specifically address the conversion on
6  the financial statements to capital leases.
7  Q.  In fact, Miss, it was to address exactly the
8  conversion of the leases.  It makes no reference, in
9  the title at least, to anything other than Lycos, Inc.
10  lease analysis-conversion of leases at March 31, 2003,
11  correct?
12      ATTY. BEAN: Objection.
13  Q.  You can answer.
14  A.  Yes.
15  Q.  And then the second item down under CSI, I'll ask
16  you to circle the word in blue and write your initials
17  and the date around CSI, parens, lease conversion and
18  then circle Scenario 1 as well in the same circle.
19      Doesn't it say, Convert all equipment schedules to
20  capital leases?
21  A.  (Witness complies).
22  Q.  Just mark that with the letter A and your
23  initials.
24  A.  (Witness complies).  Yes.

---

**Page 75**

1  Q.  Within what you've marked as the letter A under
2  Scenario 1, this projection said, Convert all equipment
3  schedules to capital leases.  Do you see that?
4  A.  Yes.
5  Q.  All these references, Miss, to conversion refer to
6  converting the CSI leases from an accounting standpoint
7  from operating leases to capital leases, correct?
8  A.  Yes.
9  Q.  And this analysis was done when -- rather, this
10  analysis when it referred to converting equipment
11  schedules opposite Scenario 1, it referred at that
12  point under CSI, to the various equipment schedules
13  that Lycos had entered into with CSI over the years,
14  correct?
15  A.  Can you say the very last part again?
16  Q.  Sure.  Where it said under CSI -- may I take your
17  Exhibit for a second?
18  A.  Yes.
19  Q.  You've circled in A, CSI lease conversion, and
20  then Scenario 1 and Scenario 2 on this Exhibit, right?
21  A.  Yes.
22  Q.  Who prepared this, by the way?
23  A.  Does it say on the document?  Lycos.
24  Q.  Okay.  And did you personally prepare it or did

---

**Page 76**

1  Ms. Walsh or someone else for that matter?
2      ATTY. BEAN: Objection.
3  THE WITNESS: I don't know who prepared this
4  schedule.  I don't believe that I prepared the
5  schedule.
6  Q.  Okay.  But you know what it is?
7  A.  I do know what it is.
8  Q.  Do you see the column headed, Equipment Value?
9  A.  Yes, I do.
10  Q.  And if you go down that column to where you reach
11  CSI Scenario 1, Convert all equipment schedules to
12  capital leases, do you see the figure 43,510,135,
13  that's dollars, right?
14  A.  Yes, it is
15  Q.  That was Lycos' record of the original cost of the
16  equipment that had been purchased and leased to it by
17  CSI as of that time, correct?
18      ATTY. BEAN: Objection.
19  Q.  You can answer.
20  A.  I believe that this wasn't -- I believe that what
21  this is was it wasn't done to see the impact on the
22  financial statements.  It was done to see more of the
23  cash impact and to see if the buy-outs were reasonable
24  Q.  Regardless of why it was done, that figure of

---

**Page 77**

1  $43,510,135 was Lycos' record of what the original
2  equipment cost was of the equipment that CSI had leased
3  to Lycos over the years, correct?
4      ATTY. BEAN: Objection.
5  THE WITNESS: I believe that this number rolls up
6  from other schedules that we had and it was Monique's
7  best attempt to pull together the equipment value based
8  on base value off of leasing schedules.
9  Q.  Is what I said correct or not because if you want
10  to deny it, you can deny it.  But this is squarely one
11  of the subject matters that you were noticed about on
12  behalf of the corporation.  If you want to deny on
13  behalf of Lycos that this is not the cost of that
14  equipment, then you can do so.  I want it to be crystal
15  clear for the record.  It doesn't matter at this point,
16  either you do or you don't
17      I'll ask the question again.  Isn't it true that
18  this figure of $43,510,135 was Lycos' record at that
19  time of the original equipment cost of all the
20  equipment that it had leased from CSI over the years up
21  to that point, except for any equipment you would have
22  returned?
23      ATTY. BEAN: Objection.
24  Q.  You can answer.

20  (Pages 74 to 77)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  A. This figure would have been Monique's best guess
2  at the cost. It was not my understanding of what the
3  cost was.
4  Q. But it was her record at the time within Lycos of
5  what she thought the cost was, correct?
6  A. It was a starting point that Monique asked Paul to
7  verify and Paul came back with a number closer to
8  60 million, 63 million dollars. So this was our
9  starting point.
10  Q. Regardless of what you say or claim Monique said
11  or Paul said, this was Lycos' record as of March 2003
12  of what it thought the original equipment cost was of
13  all the equipment it had leased from CSI up to that
14  point, except for any that might have been returned.
15  Isn't that true?
16      ATTY. BEAN: Objection.
17  Q. You can answer.
18  A. No.
19  Q. It was Lycos --
20  A. This was our best guess. We didn't know the
21  equipment cost.
22  Q. This was -- what your sworn testimony is then is
23  that this was Lycos' best guess as to what the original
24  equipment cost was of all the equipment that it had

**Page 79**

1  leased from CSI over the years, except for any that it
2  might have returned. Is that a fair statement?
3  A. This was Monique's best guess based on the
4  information available to her, but as a company we had
5  different numbers.
6  Q. In fact, Miss, these were the numbers that you had
7  in March of 2003 for the original equipment cost of all
8  the equipment that Lycos had leased from CSI. This was
9  the number you had at that time, correct?
10  A. This was our starting point for the number and
11  when this schedule was put together, the buy-out figure
12  that was proposed was more than ten percent of the
13  equipment buy-out which lead us to believe that, well,
14  we were trying to work up to that number, we were
15  missing some of the equipment value because the buy-out
16  figure was too high.
17  Q. Did you mean it was more than ten percent of the
18  equipment cost?
19  A. This analysis is one piece of information that
20  lead us to believe that, you know, that we still needed
21  to do some work on that number that we didn't have. We
22  hadn't accurately captured the equipment value. We
23  were working towards that and asking Paul to verify
24  that number when he came back with the 60 million

**Page 80**

1  dollar number, but it appeared that the buy-out
2  percentage, the buy-out number was too high. So we
3  weren't sure of our number and we thought there
4  certainly must be more equipment because the buy-out
5  was too high and then Paul later told us that the
6  number was higher.
7  Q. Move to strike that portion of your answer that
8  goes beyond my question.
9  A. Sorry.
10  Q. I'll ask the question again because you know that
11  this 43.5 million dollar number appears throughout
12  Lycos' records for 2003 as a representation of what it
13  thought the cost of the equipment that it had leased
14  from CSI was in total. You know that, don't you?
15  A. No.
16  Q. We'll show you the documents, including some with
17  your name on them. But let's just take it one step at
18  a time and get into any issues with Monique Walsh and
19  Paul Stenberg later.
20      Did you ever have any conversations with Paul
21  Stenberg about what the original equipment cost was?
22  A. I don't believe I did.
23  Q. All right. Well, then, let's confine ourselves to
24  what these documents show for the moment.

**Page 81**

1      Certainly at this time in late March of 2003,
2  Lycos was recording on Exhibit 4 that it thought the
3  original cost of the equipment it had leased from CSI
4  in total was 43.5 million dollars, correct?
5      ATTY. BEAN: Objection.
6  Q. That's what it set down on this spreadsheet,
7  correct?
8      ATTY. BEAN: Objection.
9      THE WITNESS: No.
10  Q. Do you see the $43,510,135 figure?
11  A. Yes.
12  Q. And you know that, in fact, that is what the
13  original equipment cost was in total at that point of
14  all the equipment that CSI had leased to Lycos over the
15  previous years, approximately, don't you?
16  A. I still don't know that we know what the
17  original -- exactly what the original equipment cost
18  was.
19  Q. I don't say exactly. But approximately you know
20  that the total original equipment cost of all the
21  equipment that CSI leased to Lycos over the years up to
22  this point was, in fact, approximately 43 and a half
23  million dollars, don't you?
24      ATTY. BEAN: Objection.

21  (Pages 78 to 81)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 82 | Page 84 |
|---|---|
| 1  THE WITNESS: In the 40's. | 1  Q. And she did them at your direction? |
| 2  Q. I'm sorry? | 2  A. She did them at Kevin's direction. |
| 3  A. In the 40's. | 3  Q. But as of March 31, you took over Kevin Baillie's |
| 4  Q. In the low 40's. Be it 43 or 44, but somewhere in | 4  position, correct? |
| 5  that range, correct? | 5  A. Yes. |
| 6  A. In the 40's. | 6  Q. And you began giving direction to Monique Walsh, |
| 7  Q. And it was your understanding in March of 2003 | 7  correct? |
| 8  when you looked at this schedule, you said a moment ago | 8  A. Monique reported to me. |
| 9  that the buy-out figure was greater than ten percent of | 9  Q. And you understood that Monique Walsh, in |
| 10  the 43.5 million dollar figure, correct? | 10  preparing this lease analysis and others like it, that |
| 11  A. Yes. | 11  it contained the 43.5 million dollar number. You |
| 12  Q. And the buy-out figure that you were referring to | 12  understood that she had access to the accounting |
| 13  was the $4,669,000 number immediately to the right of | 13  records of Lycos to the extent they existed concerning |
| 14  the 43.5 million dollar number, correct? | 14  the CSI leases, right? |
| 15  A. Yes. | 15  A. Monique was very unsure of this number and that's |
| 16  Q. And that number appeared under the column if you | 16  what she presented to me. |
| 17  go to the top of the page, Current quote at March 31st | 17  Q. I move to strike your answer and point out, Miss, |
| 18  of 2003. Correct? | 18  that there's nothing on Exhibit 4 that indicates that |
| 19  A. Yes. | 19  anybody was unsure of anything, is there? |
| 20  Q. And when you said ten percent -- that that figure, | 20  A. No. |
| 21  4,669,000 was greater than ten percent of the | 21  Q. Okay. |
| 22  43.5 million dollar number to the left, you were | 22  ATTY. KALER: We'll mark this document, please. |
| 23  referring to the sort of general industry rule on | 23  (Exhibit 5, 5/03 INTERNAL DOCUMENT, marked for |
| 24  buying out leases for ten percent of the original | 24  identification.) |

| Page 83 | Page 85 |
|---|---|
| 1  equipment cost as a sort of general norm or guideline, | 1  Q. I'm going to show you what's been marked as |
| 2  right? | 2  Exhibit 5. This is an internal presentation or an |
| 3  ATTY. BEAN: Objection. | 3  internal document that Lycos prepared in May of 2003, |
| 4  Q. You can answer. | 4  correct? This is an internal presentation that Lycos |
| 5  A. No. | 5  prepared in 2003, correct? |
| 6  Q. You were referring, however, to the ten percent | 6  A. Yes. |
| 7  figure -- you were referring to the 4.6 million as | 7  Q. Did you prepare it? |
| 8  being a reference to a quote to buy out the leases -- | 8  A. No. |
| 9  A. Yes. | 9  Q. Who prepared it? |
| 10  Q. -- that CSI had entered into, right? | 10  A. I believe that originally it would have been |
| 11  A. Yes. | 11  prepared by Monique under Kevin's direction. |
| 12  Q. And the calculation that was done here was done by | 12  Q. Well, this is May of '03. Kevin had been gone for |
| 13  one of Lycos' own staff accountants in March of 2003, | 13  over a month, hadn't he? |
| 14  correct? | 14  A. Yes. |
| 15  ATTY. BEAN: Objection. | 15  Q. It was prepared under your direction, wasn't it? |
| 16  Q. You can answer. | 16  A. No. This had already been prepared. |
| 17  A. I believe so. | 17  Q. It had already been prepared when you took over at |
| 18  Q. Okay. Now, there were a whole series of these | 18  the end of March of '03? |
| 19  lease analyses done in the spring of 2003, weren't | 19  A. Yes. |
| 20  there? | 20  Q. And did you give the presentation? |
| 21  A. There were, yes. | 21  ATTY. BEAN: Objection. |
| 22  Q. And were they all pretty much done by Monique | 22  THE WITNESS: No. |
| 23  Walsh? | 23  Q. Was it a presentation that was given within Lycos |
| 24  A. I believe so. | 24  of information that Lycos had? |

22  (Pages 82 to 85)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 146

1  A. Yes.
2  Q. Okay. The next item he put in was $1,091,002?
3  A. Yes.
4  Q. The next item was $985,000? Again, this is still
5  CSI schedules, right?
6  A. Yes.
7  Q. The next item he listed in this column was the
8  $2,880,878, correct?
9  A. Yes.
10 Q. The next item he listed was $2,390,000, correct?
11 A. Yes.
12 Q. The next item he listed was $725,000, correct?
13 A. Yes.
14 Q. And the next item opposite CSI that he listed in
15 this column was $2,850,000, correct?
16 A. Yes.
17 Q. And the next item he listed was $618,000, correct?
18 A. Yes.
19 Q. The next item he listed was $1,034,500, correct?
20 A. Yes.
21 Q. And the next item he listed was $531,408, correct?
22 A. Yes.
23 Q. The next item he listed was $735,000, correct?
24 A. Yes.

Page 147

1  Q. And then the last item opposite CSI on this page
2  that he listed was the $320,000? Was that right?
3  A. I believe that's a --
4  Q. $735,000 was the last CSI entry for equipment cost
5  that he put in on this page of the Exhibit, correct?
6  ATTY. BEAN: Objection.
7  A. You can answer.
8  A. Yes.
9  Q. Okay. And if you go over to the next page, LYC
10 21491, he continued with the entries for CSI about an
11 inch down the page with an entry of 800 -- excuse me,
12 654 -- excuse me, $656,511. Is that right?
13 A. Yes.
14 Q. And then the next entry in this column opposite
15 CSI he listed $340,000, correct?
16 A. Yes.
17 Q. And the next item he listed in this column
18 opposite CSI was $240,000, correct?
19 A. Yes.
20 Q. And the next item he listed in this column
21 opposite CSI was $587,207, correct?
22 A. Yes.
23 Q. And the next item he listed in this column
24 opposite CSI was $31,404, correct?

Page 148

1  A. Yes.
2  Q. And the next item that he listed in this column
3  opposite CSI was $72,362, correct?
4  A. Yes.
5  Q. And the next item he listed in this column under
6  CSI was $860,016, correct?
7  A. Yes.
8  Q. The last item he listed in this column opposite
9  CSI was $4,106,055, correct?
10 A. Yes.
11 Q. And those numbers that we just went through are
12 the numbers that Mr. Ziba entered for the original
13 equipment cost of the CSI leases on this page of the
14 spreadsheet, correct?
15 ATTY. BEAN: Objection.
16 A. You can answer.
17 A. I don't know.
18 Q. You know that those numbers were part of Lycos'
19 records, all the ones that we read were part of Lycos'
20 records in June of 2001 when Mr. Ziba forwarded you
21 this spreadsheet, correct?
22 A. Yes.
23 Q. And those numbers add up to $44,656,877 if you
24 accept my math.

Page 149

1  ATTY. BEAN: Objection.
2  Q. Do you want to go through the calculation and add
3  it up?
4  A. Do you want me to verify the number?
5  Q. Sure.
6  A. You want me to add up these numbers?
7  Q. Let's assume they add up to this number,
8  $44,656,877, okay. Probably no need to add them up.
9  I'll represent to you that they add up to that amount.
10 A. Okay.
11 Q. Okay. And you had said before that you were
12 generally aware that the original equipment cost for
13 the CSI leases that Lycos entered into CSI was in
14 the range of the 40 millions, correct?
15 ATTY. BEAN: Objection.
16 THE WITNESS: Could you repeat the question,
17 please?
18 Q. Did you not understand the question or are you
19 just asking me to repeat it for clarity? You testified
20 previously that you understood that the original
21 equipment cost for the CSI leases was in the 40's,
22 40 million range, correct?
23 A. Yes.
24 Q. Okay. And, in fact, Lycos' records recorded that

38 (Pages 146 to 149)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

---

Page 154

1   ATTY. KALER: Please mark this place in the
2   transcript, okay. Just put a marker and we'll come
3   back to it and mark this spot on the video, too.
4       I'm sorry, what was my previous question?
5
6   (*Question read back)
7
8   Q.  Who took his place?
9   A.  With regard to leases, his responsibilities went
10  to Kevin Bailey.
11  Q.  Okay. And then after Kevin Bailey left, they went
12  to you?
13  A.  Part of the responsibilities came to me, yes.
14  Q.  I'm going to show you another document.
15      (Exhibit 20, DOCUMENT, marked for identification.)
16
17  Q.  Showing you what's been marked Exhibit 20. This
18  also is a document that was part of the records of
19  Lycos concerning the CSI leases, correct?
20  A.  Yes.
21  Q.  And we see that in the middle of the first page of
22  Exhibit 20 there was a calculation as of November 1st
23  of 2002 on the subject of analysis for turning
24  operating leases into capital leases; is that correct?

---

Page 155

1   A.  Yes.
2   Q.  And did Monique Walsh generate these, the best you
3   know?
4   A.  I would guess that these were generated by
5   Monique.
6   Q.  Have you seen them before?
7   A.  I would have seen a version. I'm not sure if
8   these exact schedules, but a version of them.
9   Q.  But, again, they were part of Lycos' records
10  concerning the CSI leases and other leases, right?
11  A.  Yes.
12  Q.  And you see where on the first page of Exhibit 20
13  there's a column that is the second column from the
14  right it says, Ten percent buy-out of original cost.
15  Do you see that?
16  A.  Yes.
17  Q.  And that's a reference -- at this time, November
18  of 2002, Lycos was already considering buying out the
19  leases, right?
20  A.  Yes.
21  Q.  And part of what it did as part of preparing to do
22  that was it used sort of the industry standard, just to
23  see what it would look like, figure of ten percent of
24  the original cost of the equipment as a likely or

---

Page 156

1   possible buy-out price, right?
2   A.  Ten percent is the term that was the buy-out,
3   stated buy-out value on some of our other leases. It
4   wasn't stated on CSI. I'm not sure if it is common in
5   the industry.
6   Q.  Well, you know from your dealings with Susan
7   Franklin, Miss, in fact I've read the e-mails where she
8   told you ten percent of cost was a standard by which to
9   go. Do you not recall them?
10  A.  When this was prepared -- ten percent, yes. Now
11  that you say that, that sounds familiar. Although I
12  can't speak from that -- having that personal
13  experience.
14  Q.  In any event, in Exhibit 20 on the first page we
15  see that as of November 2002, in the second column from
16  the right, Lycos was at least calculating out in the
17  case of the CSI leases and the other leases, what ten
18  percent of the original equipment cost was for those
19  leases just to look at what the figure looked like,
20  correct?
21  A.  Yes.
22  Q.  Okay. And in order to calculate ten percent of
23  the original cost of that equipment, Lycos had to know
24  what the original cost of that equipment was, didn't

---

Page 157

1   it?
2   A.  Concerning some of the equipment on this schedule,
3   we -- it's my understanding that we came up with the
4   best number we had to calculate the equipment value.
5   Not that we knew for sure what the original equipment
6   value was from speaking to Monique and other people who
7   worked at Lycos. What we were doing was we were using
8   the best data that we had, but we didn't feel
9   comfortable that the equipment value was accurate and
10  we had asked for confirmation of that number because we
11  weren't confident in our numbers.
12  Q.  In fact, Miss, that's only what you and Lycos are
13  saying now years later in the middle of a 30 million
14  dollar lawsuit. It was never stated anywhere on this
15  spreadsheet that the numbers were in any way
16  questionable, was it?
17      ATTY. BEAN: Objection.
18      THE WITNESS: The first part of the question is
19  not true.
20  Q.  Then look --
21  A.  And the second part of the question whether it's
22  stated, no, it's not. But when this document was
23  passed, the disclaimer was given and if you look at the
24  e-mails that Monique had sent to Paul, she sends Paul

---

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 158

1  e-mails, Paul Stenberg from CSI that says, Paul, are
2  these numbers right. Do we have the right EOC here.
3  Q. In fact, she doesn't do that
4  A. Okay. I understand through conversations with
5  Monique that she had and I can't -- you know, I can
6  speak for my conversations with Monique and that was my
7  understanding through conversations with Monique then
8  that we weren't sure of the number and now through
9  conversations with Monique now, that she wasn't sure of
10 the number.
11 Q. Move to strike your answers as nonresponsive and
12 as hearsay.
13 A. Nonresponsive, you --
14 Q. I'm suggesting that Lycos knew all along what the
15 original equipment cost was and let's just proceed
16 through the documents because every single one of them
17 shows it
18     This document, Exhibit 20, in the second column
19 from the right purports to list, does it not, figures
20 representing ten percent of the original cost of the
21 equipment covered by the various schedules, correct?
22 In that it says ten percent buy-out of original cost in
23 the top of the column?
24 A. Mr. Kaler, in response to your last question, we

Page 159

1  can go through the documents, but my understanding that
2  we didn't know what the value was, that we were making
3  our best attempt to pull it together is not going to
4  change.
5  Q. Well, I suggest to you, Miss, that the documents
6  prove otherwise And that your understanding based on
7  conversations that you claim to have had with Monique
8  Walsh will have to be the subject of discovery on
9  another day, but that right now I'm taking you through
10 records that Lycos produced which reveal what Lycos
11 knew at certain points in time.
12     So let's go through them because we're going to
13 come again to the mid 40's figure that we have already
14 acknowledged is the correct number. If we go to the
15 first one --
16 A. Excuse me, I have to get a tissue behind me.
17 Q. Sure.
18     THE VIDEOGRAPHER: Bob, I would like to change a
19 tape now. We're now starting the third video cassette
20 at 2:41 p m.
21 Q. Okay Exhibit 20 was generated in November of
22 2002, correct?
23 A. It appears that it was.
24 Q. Okay. Now, the e-mail from Mr. Stenberg to which

Page 160

1  you refer was dated March of 2002, some six or eight
2  months earlier, wasn't it?
3  A. Could I see the e-mail, please?
4  Q. No. Just your memory. You never saw the e-mail
5  when it came in, right?
6  ATTY. BEAN: Objection.
7  THE WITNESS: I never saw the e-mail from -- I've
8  never seen the -- which e-mail is it that you are
9  referring? Can you show me the specific e-mail?
10 Q. You referred in your answer a moment ago to
11 Mr. Stenberg and e-mail exchanges between he and
12 Monique Walsh Do you recall that?
13 A. Yes.
14 Q. Okay. Did you ever see prior to the litigation,
15 the e-mail from Mr Stenberg to Ms. Walsh in which you
16 had said previously Mr. Stenberg gave another original
17 equipment cost figure?
18 A. The e-mail that -- excuse me for a minute. Let me
19 just think. I believe I have seen the e-mail. I don't
20 know if we're speaking about the same e-mail, but I can
21 refer to the documents.
22 Q. Let's stay with this document. I've marked on
23 Exhibit 20, if I may, the number A above the ten
24 percent column and then I'll mark the number B above

Page 161

1  the third column from the left.
2      We see that on this spreadsheet generated by Lycos
3  in November of 2002, under the column, Ten percent of
4  original cost, for example, the first entry for CSI is
5  $108,272 indicating that someone is reflecting on the
6  schedule that $108,272 is ten percent of the original
7  cost of the equipment covered by that schedule, right?
8  A. Yes.
9  Q. And then we see in the column headed -- written
10 with the letter B in blue above --
11 A. Excuse me one minute. I just want to clarify.
12 This A number is ten percent of B. B is the equipment
13 value. The original equipment value -- I don't want to
14 get into a discussion here about whether that includes,
15 you know, what that includes. It's the equipment --
16 this is ten percent of the number labeled, Equipment
17 Value.
18 Q. I'm not sure what you are responding to, Miss. I
19 was starting to ask a question and you just made a
20 statement. So I'll just try to go back to my question.
21     The first CSI related entry in the column, Ten
22 percent buy-out of original cost was $108,272, right?
23 A. Yes.
24 Q. Okay. And Lycos -- in this record, this Lycos

41 (Pages 158 to 161)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 226 | Page 228 |
|---|---|

**Page 226**

1 heavily negotiated between LeaseForum on behalf of
2 Lycos and Mr. Stenberg on behalf of CSI, correct?
3    ATTY. BEAN: Objection.
4    THE WITNESS: I don't know that.
5    ATTY. BEAN: I asked for a bathroom break about
6 twenty minutes ago.
7    ATTY. KALER: Yes. Just one second.
8    Q. The purchase price -- the buy-out price in Exhibit
9 23A was $3,775,000, correct?
10    A. Yes.
11    Q. And that price to which CSI agreed, you now know
12 was less than ten percent of the original cost of the
13 equipment covered by the CSI leases, don't you?
14    A. When reviewing for this -- when preparing for this
15 deposition --
16    Q. Yes.
17    A. -- in Mr. Rousseau's testimony I read that CSI
18 says that it's in the mid 40's.
19    Q. You testified earlier in your deposition that you
20 knew that as well?
21    A. I learned that during -- I had learned that during
22 the prep for this deposition.
23    Q. In fact --
24    ATTY. BEAN: Please don't reveal communications

**Page 227**

1 with counsel, okay. If you learned it during the
2 course of the litigation, fine. But let's not talk
3 about communications with counsel.
4    Q. You knew before --
5    A. I'm sorry --
6    Q. You testified this morning that you knew that the
7 original equipment cost for the equipment covered by
8 the CSI leases was in the range of the 40 million
9 dollar range, right? In the 40's?
10    A. Yes.
11    Q. And you know, therefore, that the purchase price
12 that CSI agreed on with Lycos in Exhibit 23A, the
13 $3,775,000 was less than ten percent of the original
14 cost of the equipment covered by the leases being
15 bought out, correct?
16    A. Are we talking about hindsight? Like what I know
17 now after reviewing all the documents and --
18    Q. Yes. What you know now. You know that now the
19 purchase price was less than ten percent of the
20 original cost of the equipment, correct?
21    A. Yes.
22    Q. And a lease buy-out of ten percent of the original
23 cost of the equipment covered by the leases is, in
24 fact, the industry norm for lease buy-outs as you

**Page 228**

1 testified previously, isn't it?
2    ATTY. BEAN: Objection. She did not testify.
3 Please don't mischaracterize her testimony. You have
4 been trying to mislead her all day, Mr. Kaler.
5    ATTY. KALER: You can't do that and I'm going to
6 take the transcript with your comments right to Judge
7 Zobel.
8    ATTY. BEAN: Please do. Be my guest.
9    ATTY. KALER: Because you'll find this testimony
10 will alter the case considerably.
11    ATTY. BEAN: Be my guest. Don't mischaracterize
12 her testimony.
13    Q. You testified previously that ten percent of
14 original cost was a figure that was, some people had
15 talked to you about it and you saw it on Lycos' own
16 charts, was a figure that you understood to be one
17 standard by which people customarily estimated what the
18 buy-out costs should be on leases. Do you recall that
19 testimony?
20    A. I believe that what I said was ten percent was the
21 stated buy-out on some of our other leases with other
22 vendors.
23    Q. Okay. Other vendors frequently mentioned ten
24 percent of the original cost as a buy-out price, right?

**Page 229**

1    A. Ten percent was the stated buy-out on some of the
2 other leases that Lycos had with other vendors.
3    Q. And you had had specific conversations with Susan
4 Franklin during your communications with Terra Networks
5 in Spain, and, in fact, you informed Terra Networks in
6 Spain that ten percent of original equipment cost was
7 sort of an industry standard buy-out price for leases,
8 correct?
9    A. That's what you said previously.
10    Q. And you agree that's true, isn't it? That you had
11 been told by Susan Franklin and had, in turn,
12 communicated to Terra Networks that ten percent of
13 original equipment cost was sort of a standard way of
14 calculating what a lease buy-out cost typically would
15 be, right?
16    ATTY. BEAN: Objection.
17    Q. You can answer.
18    A. That could be.
19    Q. In other words, Susan had told you that, right?
20    A. As I said before, I don't have any expertise in
21 the leasing industry.
22    Q. No, but Susan did and she told you about the ten
23 percent of original cost rule, right?
24    A. (Witness nods)

58  (Pages 226 to 229)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4-26-2006
Computer Sales International v Lycos, Inc

274

1    PLEASE ATTACH TO THE DEPOSITION OF JULIE CALLAGEE

2    CASE:  CSI, INC. V. LYCOS, INC.

3    DATE TAKEN:  4/26/06

4                    ERRATA SHEET

5    Please refer to Page 273 for errata sheet instructions and

6    distribution instructions.

7    PAGE    LINE           CHANGE              REASON

8    149    23    ~add~ Yes, I learned that during

9                 the course of this litigation    Clarification

10   202    1    the word "conscious"

11               should be "conscience"            typo

12   _____

13   _____

14   _____

15   _____

16   _____

17   I have read the foregoing transcript of my deposition and

18   except for any corrections or changes noted above, I hereby

19   subscribe to the transcript as  an accurate record of the

20   statements made by me.

21

22   Executed this _26th_ day of _May_____, 2006.

23   _____Julie X_____

24            JULIE CALLAGEE

O'Brien & Levine Court Reporting Services
888 825 DEPO(3376) * www.court-reporting.com

# EXHIBIT C



| | | |
|---|---|---|
| CSI | 144874-65 | 672,000.00 |
| CSI | 144874-64 | 656,511.00 |
| CSI | 144874-64B | 240,000.00 |
| CSI | 144874-66E | 497,000.00 |
| CSI | 144874-67D | 735,000.00 |
| CSI | 144874-69E | 800,000.00 |
| CSI | 144874-66G | 370,028.00 |
| CSI | 144874-67F | 531,408.00 |
| CSI | 144874-66 | 1,440,000.00 |
| CSI | 144874-66A | 1,465,000.00 |
| CSI | 144874-66B | 530,000.00 |
| CSI | 144874-67 | 2,850,000.00 |
| CSI | 144874-67A | 618,000.00 |
| CSI | 144874-68 | 4,200,000.00 |
| CSI | 144874-68A | 1,735,000.00 |
| CSI | 144874-68B | 1,852,420.00 |
| CSI | 144874-68C | 3,500,000.00 |
| CSI | 144874-69A | 427,218.96 |
| CSI | 144874-67B | 1,034,500.00 |
| CSI | 144874-69C | 2,103,620.00 |
| CSI | 144874-89 | 2,991,623.37 |
| CSI | 144874-89A | 361,396.13 |
| CSI | 144874-64D | 340,000.00 |
| CSI | 144874-69G | 1,031,403.00 |
| CSI | 144874-64F | 166,000.00 |
| CSI | 144874-66I | 985,000.00 |
| CSI | 144874-67H | 1,091,002.00 |
| CSI | 144874-69I | 2,880,878.00 |
| CSI | 144874-66C | 1,082,717.00 |
| CSI | 144874-85 | 2,390,000.00 |
| CSI | 144874-86 | 725,000.00 |
| CSI | 144874-90 | 1,489,750.73 |
| CSI | 144874-100 | 196,273.00 |
| CSI | 144874-200 | 1,417,620.00 |
| | | |
| **ThinkingBytes** | | |
| CSI Thinkingbytes | 144874-81 | 31,403.93 |
| CSI | 144874-81 | 72,361.50 |
| | | |
| | | 43,510,134.62 |

Lycos, Inc.
Lease Analysis - Conversion of Leases @ March 31, 2003
2/6/2006 21:53

| Lessors | Equipment Value | Current Quote @ 3/31/03 | As % of Equip.Value | Previous Quote @ 12/31/02 | As % of Equip.Value | Estimated Payout Amount | As % Equip.Value |
|---|---|---|---|---|---|---|---|
| **COMPAQ** | | | | | | | |
| (Lease Conversion) | | | | | | | |
| 1 | 1,962,067 | 353,733.16 | | 803,788 | | | |
| 2 | 2,582,117 | 418,500.16 | | - | | 454,418 | 10.0% |
| | 4,544,184 | 772,233 | 17.0% | 803,788 | 17.7% | | |
| **CSI** | | | | | | | |
| (Lease Conversion) | | | | | | | |
| All | 43,510,135 | 4,669,000 | 10.7% | 4,669,000 | 10.7% | 4,691,000 | 10.8% |
| **Avnet** | | | | | | | |
| (Lease Conversion) | | | | | | | |
| 19 | 1,080,249 | 142,154 | | 166,872 | | | |
| 20 | 898,730 | 181,069 | | 181,127 | | | |
| 21 | 2,691,668 | 535,095 | | 538,235 | | 467,065 | 10.0% |
| | 4,670,647 | 858,318 | 18.4% | 886,234 | 19.0% | | |
| **Penthus (Optimus Solutions)** | | | | | | | |
| (Lease Conversion) | | | | | | | |
| 3851 | 320,000 | 64,378 | 20.1% | 72,263 | 22.6% | 32,000 | 10.0% |
| **TOTAL** | 53,044,966 | 6,363,930 | 12.0% | 6,431,285 | 12.1% | 5,644,483 | 10.0% |
| | | Avg % of Equip. | 16% | | | | |

53,044,966
15.643%

8,298,030

8,299,000
15.645%

| Lessors | Equipment Value | Current Quote @ 3/31/03 | As % of Equip.Value | | Term Date | Rentals Due |
|---|---|---|---|---|---|---|
| **Avnet** | | | | | | |
| (Buyout @ End of Term) | | | | | | |
| 19 | 1,080,249 | 146,560 | | | 4/30/2003 | 28,195.51 |
| 20 | 898,730 | 156,289 | | | 6/30/2003 | 80,596.83 |
| 21 | 2,691,668 | 464,175 | | | 9/30/2003 | 507,487.26 |
| | 4,670,647 | 767,024 | 16.4% | | | 616,279.60 |
| **BOA** | | | | | | |
| (Buyout @ 3/31/2003) | | | | | | |
| 1 | 2,311,210 | 1,399,825 | | | 9/30/2004 | - |
| 2 | 1,715,743 | 1,181,245 | | | 12/31/2005 | - |
| | 4,026,953 | 2,581,070 | 64.1% | | | - |

* According to BOA lease contract & BOA rep , converting lease violates the lease contract, therefore our only options are to continue "as is" or buyout of lease completely

Notes:
1 - All amounts are pretax and do not include any amounts that would be required payable for property tax
2 - Leases that are converted to capital leases will still require payment of lease rentals until original end of term

LYC 17773

| | | | In Use | | | | LeaseNum | | | Action |
|---|---|---|---|---|---|---|---|---|---|---|
| 676 Waltham QA Lab | Gainesville | | In Use | Server | Compaq DL360 Dhorixline | | | | | Found |
| 750 SJC-Old Ironside (SCB) | MyLycos | 01YC10017597 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 752 SJC-Old Ironside (SCB) | MyLycos | 01YC10017601 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 753 SJC-Old Ironside (SCB) | MyLycos | 01YC10017597 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 754 SJC-Old Ironside (SCB) | NetOps | 01YC10017599 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 755 SJC-Old Ironside (SCB) | NetOps | 01YC10017600 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 756 SJC-Old Ironside (SCB) | NetOps | 01YC10017602 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 757 SJC-Old Ironside (SCB) | NetOps | 01YC10017522 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1443 SJC-Old Ironside (SCB) | Emerging Destinations | 01YC20002532 | In Use | Switch | Catalyst 2924TP 10/100BT Switch | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1444 SJC-Old Ironside (SCB) | Emerging Destinations | 01YC20002533 | In Use | Switch | Catalyst 2924TP 10/100BT Switch | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1445 SJC-Old Ironside (SCB) | Emerging Destinations | 01YC20002535 | In Use | Switch | Catalyst C2924XL | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1446 SJC-Old Ironside (SCB) | Emerging Destinations | 01YC20002536 | In Use | Switch | Catalyst 2924TP 10/100BT Switch | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1528 SJC-Old Ironside (SCB) | NetOps | 01YC20002622 | In Use | Server | Proliant DL360 RMAN | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1594 Waltham IDC Lycos Search | MyLycos | 01YC10018002 | In Use | Server | DL360 | BO500HB1 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1604 SJC-Old Ironside (SCB) | MyLycos | 01YC10018003 | In Use | Server | Proliant DL360R | SIC003A4 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1625 DC3 | MyLycos | 01YC10017722 | In Use | Server | Proliant DL360R | DCA001A1 | 101003000001 | 2/28/2000 Open | HV MIA | Found |
| 1626 DC3 | MyLycos | 01YC10017726 | In Use | Server | Proliant DL360R | DCA001B1 | 101003000001 | 2/28/2000 Open | HV MIA | Found |
| 1627 DC3 | MyLycos | 01YC10017725 | In Use | Server | Proliant DL360R | DCA001C1 | 101003000001 | 2/28/2000 Open | HV MIA | Found |

LYC 17774

| Asset | Location | Barcode | Type | Model | Serial | Number | Date | Status | Found |
|---|---|---|---|---|---|---|---|---|---|
| 1628 DC3 | MyLycos | 01LYC10017730 In Use | Server | Proliant DL360R | DCA001D1 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1629 DC3 | MyLycos | 01LYC10017736 In Use | Server | Proliant DL360R | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1630 DC3 | MyLycos | 01LYC10017725 In Use | Server | Proliant DL360R | DCA001D2 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1632 DC3 | MyLycos | 01LYC10017744 In Use | Server | Proliant DL360R | DCA001B3 | 101003050001 | 2/28/2000 Open | MV MIA | Found |
| 1633 DC3 | MyLycos | 01LYC10017757 In Use | Server | Compaq proliant DL360 | DCA001C3 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1634 DC3 | MyLycos | 01LYC10017739 In Use | Server | Proliant DL360R | DCA001A4 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1635 DC3 | MyLycos | 01LYC10017740 In Use | Server | Proliant DL360R | DCA00184 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1636 DC3 | MyLycos | 01LYC10017744 In Use | Server | Proliant DL360R | DCA001D4 | 101003000005 | 2/28/2000 Open | MV MIA | Found |
| 1637 DC3 | MyLycos | 01LYC10017743 In Use | Server | Proliant DL360R | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1638 DC3 | MyLycos | 01LYC10017742 In Use | Server | Compaq proliant DL360 | DCA001B5 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1639 DC3 | MyLycos | 01LYC10017745 In Use | Server | Proliant DL360R | DCA001C5 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1640 DC3 | MyLycos | 01LYC10017726 In Use | Server | Proliant DL360R | DCA001D5 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1641 DC3 | MyLycos | 01LYC10017747 In Use | Server | Proliant DL360R | DCA001A6 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1642 DC3 | MyLycos | 01LYC10017748 In Use | Server | Compaq proliant DL360 | DCA001B6 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1643 DC3 | MyLycos | 01LYC10017729 In Use | Server | Compaq Proliant DL360 | DCA001C6 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1644 DC3 | MyLycos | 01LYC10017730 In Use | Server | Proliant DL360R | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1717 DC3 | MyLycos | 01LYC10017725 In Use | Server | Proliant DL360R | DCA00286 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1719 DC3 | MyLycos | 01LYC10017771 In Use | Server | Compaq Proliant DL360 | DCA001B2 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1720 DC3 | MyLycos | 01LYC10017720 In Use | Server | Compaq Proliant DL360 | DCA00245 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1721 DC3 | MyLycos | 01LYC10017719 In Use | Server | COMPAQ PROLIANT DL360 | DCA00285 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1722 DC3 | MyLycos | 01LYC10017771 In Use | Server | Compaq Proliant DL360 | DCA00204 | 101003000001 | 2/28/2000 Open | MV MIA | Found |
| 1724 DC3 | MyLycos | 01LYC10017715 In Use | Server | COMPAQ PROLIANT DL360 | DCA00284 | 101003000001 | 2/28/2000 Open | MV MIA | Found |

LYC 17775

| Asset / Location | Group | Status | Type | Description | Name | ID | Date | Moving | Found |
|---|---|---|---|---|---|---|---|---|---|
| 1729 Waltham QA Lab | Engineering | In Use | Server | Compaq proliant DL360 | LATAM MT1 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1744 Waltham IDC | Lycos | In Use | Server | proliant dl360 | BOSUSDPENFE10 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1745 Waltham QA Lab | Engineering | In Use | Server | | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1746 Waltham IDC | Lycos | In Use | Server | | no name | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1747 Waltham QA Lab | Engineering | In Use | Server | | LATAM FE1 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1748 Waltham IDC | Lycos | In Use | Server | dl360 | bos-vxramd1 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1951 DC3 | Raging Bull | In Use | Server | Atlas: FE18 | DC3-RB-B5 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1954 DC3 | Raging Bull | In Use | Server | Atlas: QUOTES6 | DC3-RB-ICS2 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1955 DC3 | Raging Bull | In Use | Server | atlas: FE19 Flat Panel Monitor | DC3-RB-B6 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 1963 SDC-Old Ironside (SC8) | HotWired | In Use | Monitor | | | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2151 Waltham IDC | Items | In Use | Server | dl360 | bos0d2s6 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2152 Waltham IDC | Lycos | In Use | Other | dl360 | bos0d2s6 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2153 Waltham IDC | Lycos | In Use | Other | dl360 | bos0d3s6 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2155 Waltham IDC | News | In Use | Server | dl360 | bos0d2s5 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2157 Waltham IDC | Lycos | In Use | Server | dl360 | bos0d3s5 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2159 Waltham IDC | News | In Use | Server | dl360 | bos0d3s4 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2161 Waltham IDC | Lycos | In Use | Server | dl360 | bos0d3s4 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2163 Waltham IDC | Items | In Use | Server | dl360 | bos0d2c3 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2165 Waltham IDC | Lycos | In Use | Server | dl360 | bosworkflow2 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2167 Waltham IDC | Items | In Use | Server | dl360 | bos0d3s2 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2168 Waltham IDC | Items | In Use | Server | dl360 | bos0d3s2 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2169 Waltham IDC | Lycos | In Use | Server | dl360 | bosworkflow1 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2171 Waltham IDC | News | In Use | Server | dl360 | bos0d3c1 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2173 Waltham IDC | Lycos | In Use | Server | dl360 | bos0d3a1 | 101003000001 | 2/28/2000 Open | NV MIA | Found |
| 2307 Waltham QA | Engineering | In Use | Server | Compaq DL360 | NTFEW15 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2308 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW15 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2309 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW14 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2310 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW14 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2311 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW1 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2312 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW12 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2313 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW10 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2314 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW10 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2316 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW9 | 101003000001 | 2/28/2000 Open | Not moving | Found |
| 2317 Waltham QA Lab | Engineering | In Use | Server | Compaq DL360 | NTFEW9 | 101003000001 | 2/28/2000 Open | Not moving | Found |

LYC 17776

# EXHIBIT D

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC.,<br>Plaintiff,<br>v.<br><br>LYCOS, INC.,<br>Defendant,<br><br>BANK OF AMERICA f/k/a FLEET BANK,<br>Trustee Process Defendant. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 05-10017- RWZ<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF COMPUTER SALES INTERNATIONAL INC.'S
## RESPONSE TO DEFENDANT LYCOS INC.'S FIRST INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff and

Counterclaim Defendant Computer Sales International, Inc. ("CSI") hereby responds as

follows to the *First Set of Interrogatories* ("Interrogatories") of Defendant and

Counterclaim Plaintiff Lycos, Inc.'s ("Lycos'") as follows.

### GENERAL OBJECTIONS

1.      CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they attempt to impose upon CSI obligations beyond those allowed by the

Federal Rules of Civil Procedure.

2.      CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they seek information protected from discovery by applicable law, including

without limitation the work-product doctrine, the attorney-client privilege, or any other

applicable privilege from disclosure.

3.      CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they seek information not relevant to the claim or defense of any party in this

action or information not reasonably calculated to lead to the discovery of admissible evidence.

4.    CSI objects to the Interrogatories, including the Definitions therein, to the extent that they seek information that is not within CSI's possession, custody, or control, and to the extent that they are overbroad, vague, or unduly burdensome.

5.    CSI objects to the Interrogatories, including the Definitions therein, to the extent that they require disclosure of any information that constitutes, reflects or reveals trade secrets or confidential proprietary information not protected by the existing protective order in this matter and unless appropriate safeguards are agreed upon to prevent unrestricted disclosure of such information.

6.    CSI objects to the numbering of separate interrogatories as "subparts" in Interrogatory No. 1 as a violation of Local Rule 26.1(C)  These are not "subparts" as defined under that local rule, and CSI reserves the right to object at a later date to the extent Lycos attempts later to propound interrogatories in excess of the permissible amount.

7.    CSI reserves its right to make additional objections to these Interrogatories, including the Definitions therein, and hereby incorporates the aforesaid General Objections into each specific response below as if set forth in full therein.

## DEFINITIONS

1.    CSI objects to Definition 1 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure.

2.    CSI objects to Definition 2 to the extent it is overbroad, vague, unduly

2

burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "would have appeared on those documents" as calling for speculation.

3.    CSI objects to Definition 3 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "would have appeared on those Journal Entries" as calling for speculation.

4.    CSI objects to Definition 5 to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the footnote 1 to the extent Lycos now attempts to redefine the term "lease" to coincide with its new claims (not yet ruled upon) that its arrangements with CSI were anything other than lease arrangements.

5.    CSI objects to Definition 6 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure.

6.    CSI objects to Definition 7 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "price at which an asset would change hands" as calling for speculation. CSI further objects to

Definition 7 to the extent it seeks to redefine a term already defined by applicable law.

7.    CSI objects to Definition 10 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action.

8.    CSI objects to Definition 13 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to Definition 13 to the extent it seeks to redefine a term already defined by applicable law.

9.    CSI objects to Definition 14 to the extent it is overbroad, vague, unduly burdensome.

10.    CSI objects to Definition 15 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "amount that would have appeared on those documents" as calling for speculation. CSI further objects to Definition 15 to the extent it seeks to redefine a term already defined by applicable law.

## INTERROGATORIES

**INTERROGATORY NO. 1 (LABELED AS SUBPART "A"):** For each numbered Equipment Schedule, identify, if at the time the Equipment Schedule became effective, CSI had leased some or all of the Equipment on that schedule to Lycos under a previously executed Equipment Schedule, the number of the previously executed Equipment Schedule, and the date the previously executed Equipment Schedule became effective.

**ANSWER TO INTERROGATORY NO. 1:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. The burden of deriving or ascertaining the answer is substantially the same for Lycos as it is to CSI, as each Equipment Schedule speaks for itself and indicates relevant dates and whether the equipment leased thereunder was previously leased by Lycos pursuant to another Equipment Schedule. See, for example, Lycos's counterclaim which tracks Equipment Schedule 67E.

**INTERROGATORY NO. 2 (LABELLED AS SUBPART "B"):** For each numbered Equipment Schedule, state the total Actual Equipment Cost of the Equipment on that Equipment Schedule.

**ANSWER TO INTERROGATORY NO. 2:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege. CSI further objects to this Interrogatory because the Lycos definition of "Actual Equipment Cost" is vague and ambiguous. As defined by Lycos, no "Request for Preparation of Lease Contract" produced by CSI has a provision for "Actual Equipment (HW) Cost." CSI further objects to this Interrogatory as calling for speculation because Lycos is asking CSI to speculate "the amount that would have appeared" had CSI made certain calculations that were not made by CSI at the time.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by CSI if Lycos reviews the actual "Request for Preparation of Lease Contract" documents and reviews the notations for "Actual Equip (HW) Cost." For example, the "Actual Equip (HW) Cost" for Equipment Schedule was $470,057 as shown on document CSI 40103. The burden of deriving or ascertaining the answer to this Interrogatory for all schedules is substantially the same for Lycos as it is for CSI. However, CSI does not admit that the amount appearing beside any notations for "Actual Equipment (HW) Cost" on "Requests for Preparation of Lease Contract" documents produced by CIS has the meaning defined by Lycos in its Definitions.

**INTERROGATORY NO. 3 (LABELED AS SUPBART "C"):** For each numbered Equipment Schedule, state the total of all costs other than the Actual Equipment Cost and any interest and finance costs, paid by CSI to acquire the Equipment leased pursuant to that Equipment Schedule;

**ANSWER TO INTERROGATORY NO. 3:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege. CSI further objects to this Interrogatory because the Lycos definition of "Actual Equipment Cost" is vague and ambiguous. As defined by Lycos, not every "Request for Preparation of Lease Contract" document produced by CSI has a provision for "Actual Equipment (HW) Cost."

In answering, CSI states that the equipment acquisition costs, exclusive of interest and finance costs, are attached hereto as Exhibit A.

**INTERROGATORY NO. 4 (LABELED AS SUBPART "D"):** For each numbered Equipment Schedule, state the total amount of interest and finance costs, if any, paid by

CSI to any entity that loaned it money in connection with acquisition of the Equipment on that Equipment Schedule;

## ANSWER TO INTERROGATORY NO. 4:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI did not actively maintain business records tracking the interest and finance costs paid by CSI to entities that had loaned CSI money in connection with the acquisition of equipment – equipment Lycos had selected and requested CSI to purchase on its behalf. However, CSI is attempting to calculate such amounts and will supplement this Interrogatory when able to do so.

**INTERROGATORY NO. 5 (LABELED AS SUBPART "E"):**    For each numbered Equipment Schedule, state the total amount of Interim Rent and Rent paid by Lycos to or for the benefit of CSI pursuant to that Equipment Schedule;

## ANSWER TO INTERROGATORY NO. 5:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege

In answering, as to "Interim Rent," the answer to this Interrogatory may be derived or ascertained from the journal entries already produced by CSI for each booked Equipment Schedule, as each journal entry has a notation for "Interim Rent," where applicable. For example, the Schedule 1 "Interim Rent" was $1,496.79 as shown on document CSI38938. In addition, "Interim Rent" may be ascertained from the subledger cards already produced by CSI in this case. Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer is substantially the same for Lycos as it is to CSI.

7

As to "Rent," the amount paid by Lycos pursuant to each Equipment Schedule may be derived or ascertained by reading the Equipment Schedules and Certificates of Acceptance produced by CSI and Lycos, as well as the subledger cards already produced by CSI in this case. Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer to this Interrogatory is substantially the same as to Lycos and CSI.

Both the "Interim Rent" and "Rent" can be derived from the Equipment Schedules and Certificates of Acceptance produced by both CSI and Lycos in this case. Lycos has the ability to calculate these amounts because these documents were in its possession prior to commencement of this lawsuit and before discovery. See Lycos's counterclaims and analysis of equipment schedules 67E and H therein.

**INTERROGATORY NO. 6 (LABELED AS SUPBART "F"):**   For each numbered Equipment Schedule, state the Stip Loss Base Value of the Equipment;

**ANSWER TO INTERROGATORY NO. 6:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. The "Stip Loss Base Value" is evident from the Stipulated Loss Value or Certificate of Acceptance from each Equipment Schedule already produced by CSI and Lycos in this case. The burden of deriving or ascertaining the answer to this Interrogatory is substantially the same for Lycos as it is for CSI, as each Equipment Schedule, Stip Loss Value Table and Certificate of Acceptance speaks

for itself. For example, the Stip Loss Base Value for Equipment Schedule 1 was

$71,745.92 as shown on LYC 00014.

**INTERROGATORY NO. 7 (LABELLED AS SUBPART "G"):** For each numbered
Equipment Schedule, state the Total Margin for that Equipment Schedule;

**ANSWER TO INTERROGATORY NO. 7:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this

Interrogatory may be derived or ascertained from the business records, specifically the

Request for Preparation of Lease Contract documents which have already been produced

by both CSI and Lycos in this case. The "Total Margin" for each Equipment Schedule is

evident from the "Total Margin" category from the Request for Preparation of Lease

Contract documents already produced by CSI. For example, the "Total Margin" for

Equipment Schedule 23 was $19,183 as shown on document CSI40110. The burden of

deriving or ascertaining the answer to the Interrogatory for all schedules is substantially

the same for both Lycos and CSI.

**INTERROGATORY NO. 8 (LABELED AS SUBPART "H"):** For each numbered
Equipment Schedule, state the name, total amount of compensation, and date
compensation was paid by CSI, for each person who received compensation as
commission, bonus, or otherwise (other than as part of base pay or draw) with respect to
that Equipment Schedule, whether paid at or about the commencement of that schedule or
thereafter;

**ANSWER TO INTERROGATORY NO. 8:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. Paul Stenberg is the only CSI employee commissioned or compensated directly from any Equipment Schedule CSI entered into with Lycos. The amount of his Commission is identified on the Request for Preparation of Lease Contract documents already produced in the category identified as "Commission." For example, his commission for Equipment Schedule 23 was $5,908 as shown on document CSI40110. The date for release of payment is indicated in the bottom right corner of each Request for Preparation of Lease Contract document already produced. For example, the payment release date for the Equipment Schedule 23 commission was October 14, 1998 as shown on document CSI40110. The burden of deriving or ascertaining the answer to this Interrogatory is substantially the same for Lycos as it is for CSI.

**INTERROGATORY NO. 9 (LABELED AS SUBPART "I"):** For each numbered Equipment Schedule, state the total Residual Value of the Equipment on that Equipment Schedule as of the moment CSI placed that Equipment Schedule on its books;

**ANSWER TO INTERROGATORY NO. 9:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. The "Residual Value" appears on each Operating Lease Journal Entry under the notation "NBV @ Term." The "Residual Value" appears on each Sales Type Lease Journal Entry and is notated as "Residual Value." For example, the Residual Value on Equipment Schedule 1 (Operating Lease Journal Entry) was $14,625.92 as shown on document CSI38938. The Residual Value on Equipment Schedule Two (Sales Type Lease Journal Entry) was $1,350 as shown on document CSI38942. The burden of deriving or ascertaining the answer to the Interrogatory for all schedules is thus substantially the same for both Lycos and CSI.

**INTERROGATORY NO. 10 (LABELLED AS SUBPOART "J"):** For each numbered Equipment Schedule, state the total Net Book Value of the Equipment Schedule and related Equipment as of the moment CSI placed that Equipment Schedule on its books;

**ANSWER TO INTERROGATORY NO. 10:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that it did not track "Net Book Value" as defined by Lycos and does not recognize the methodology employed by Lycos in its definition of "Net Book Value." In addition, the rents due pursuant to each Equipment Schedule are evident in the documents already produced by both Lycos and CSI, and CSI has identified the "Rents" and "Residual Value" for each Equipment Schedule herein and in documents previously produced as set forth in the Answers to Interrogatory No. 5 (labeled as subpart "E") and Interrogatory No. 9 (labeled as subpart "I"). The burden of

11

deriving or ascertaining the answer to the Interrogatory is thus substantially the same as

to Lycos and CSI.

**INTERROGATORY NO. 11  (LABELLED AS SUBPART "K"):**    For each
numbered Equipment Schedule, state the total Net Book Value of the Equipment
Schedule and related Equipment still under lease as of the moment before that Equipment
Schedule terminated; and

**ANSWER TO INTERROGATORY NO. 11:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege.

In answering, CSI states that it did not track "Net Book Value" as defined by

Lycos and does not recognize the methodology employed by Lycos in its definition of

"Net Book Value."  In addition, the rents due pursuant to each Equipment Schedule are

evident in the documents already produced by both Lycos and CSI, and CSI has

identified the "Rents" and "Residual Value" for each Equipment Schedule herein and in

documents previously produced as set forth in the Answers to Interrogatory No. 5

(labeled as subpart "E") and Interrogatory No. 9 (labeled as subpart "I").  The burden of

deriving or ascertaining the answer to the Interrogatory for all schedules is thus

substantially the same for both Lycos and CSI.

**INTERROGATORY NO. 12  (LABELLED AS SUBPART "L"):**For each numbered
Equipment Schedule, state the total Fair Market Value of the Equipment on that
Equipment Schedule as of the commencement of that Equipment Schedule.

**ANSWER TO INTERROGATORY NO. 12:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege. CSI further objects to Lycos'

definition of "Fair Market Value" on the grounds stated earlier herein.

In answering, CSI states that the fair market value of each Equipment Schedule is

the rental amount that CSI and Lycos negotiated as professional and sophisticated entities

in arms-length transactions. The answer to this Interrogatory may be derived or

ascertained from the business records, specifically the Equipment Schedules, already

produced by both CSI and Lycos in this case. For example, the amount Lycos agreed to

pay CSI with respect to Equipment Schedules 67E and H is identified by Lycos in its

counterclaims.

**INTERROGATORY NO. 13 (LABELLED AS INTERROGATORY 2):** If CSI
claims that it communicated to Lycos before CSI filed the Complaint any or all of the
information contained in CSI's response to interrogatory 1(B), (C), (D), (G), (H), (I), (J),
and/or (K) for any or all of the Equipment Schedules, Identify the Equipment Schedule(s)
for which the information was Communicated and State the Basis for that claim.

**ANSWER TO INTERROGATORY NO. 13:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory as overbroad because CSI and Lycos had hundreds, if not thousands, of

communications regarding the equipment Lycos was selecting for lease from vendors of

its choosing at prices Lycos had negotiated with those vendors. CSI and Lycos executed

over 100 leases over an approximately eight year period between 1996 and 2003 in arms-

length transactions between two sophisticated parties. Lycos selected the equipment it

desired CSI to purchase on its behalf; Lycos negotiated the purchase price of the

equipment from the vendors it had selected; and Lycos issued purchase orders for the

acquisition of the equipment it wanted to acquire and Lycos confirmed to CSI that CSI

should purchase the equipment on Lycos' behalf before CSI, in fact, paid for the

equipment Lycos desired. Lycos also tracked purchase order references Lycos gave CSI

and CSI put them in the lease documentation, which Lycos used to trace the purchase

orders to its own files before approving the signing of CSI leases. Lycos thus knew the

original acquisition cost of all equipment leased from CSI to Lycos. Lycos also

confirmed to CSI that the equipment was installed and operating correctly and executed

Certificates of Acceptance after reviewing the acquisition costs of the equipment.

Furthermore, Lycos reviewed each new Equipment Schedule to be certain that the

equipment placed on an Equipment Schedule was correct and that Lycos was paying the

proper amount of Interim Rent and Rent. The Stip Loss Value was negotiated and

communicated between CSI and Lycos on each Equipment Schedule.

In answering, CSI states that many communications concerning equipment

schedules are found in the e-mails and other documents produced by Lycos and CSI in

this matter, and CSI refers Lycos thereto pursuant to Fed. R. Civ. P. 33(d), as the burden

to do so will be the same for Lycos as it would be for CSI. Furthermore, due to the over

breadth of this request, if Lycos would narrow the scope of this Interrogatory by

identifying discrete and specific schedules, as well as a clearer view of specifically what

subjects of communications Lycos is requesting information on, CSI would be willing to

attempt to determine which individuals at CSI may have this information, if any, and

supplement this Interrogatory accordingly, if necessary.

**INTERROGATORY NO. 14 (LABELED AS INTERROGATORY 3):**  If You
contend that CSI does not have back-up computer tapes evidencing e-mail and other
computer-to-computer Communications occurring before May 31, 2002 between Paul
Stenberg and employees of CSI and/or third parties, State the Basis for that contention.

**ANSWER TO INTERROGATORY NO. 14:**

Without waiving the foregoing objections, CSI objects to this Interrogatory as vague and ambiguous with undefined terms.

In answering, CSI states that it does not have back-up email files or other back-up computer-to-computer files for Paul Stenberg before May 31, 2002. CSI also does not have back-up email files other back-up computer-to-computer files for its other employees before May 31, 2002.

## VERIFICATION

I, Jeffrey L. Rousseau, being duly sworn, hereby depose and state that I am an officer of Computer Sales International, Inc. I verify that the foregoing responses to the interrogatories set forth in *Lycos' First Set of Interrogatories to Computer Sales International, Inc.* are made on behalf of Computer Sales International, Inc., that certain of the matters stated herein are not within my personal knowledge, and that the facts stated herein have been assembled by agents of Computer Sales International, Inc. I believe that the facts stated herein are true according to the information in my possession and in the possession of others at the company at this time.

_____
Jeffrey L. Rousseau

AS TO OBJECTIONS:

_____
Robert J. Kaler, BBO No. 542040
rkaler@ghlaw.com
Edward W. Little, Jr., BBO No. 628985
elittle@ghlaw.com
McCARTER & ENGLISH, LLP
225 Franklin Street
Boston, MA 0211
Tel. (617) 345-7000

*Counsel for Computer Sales International, Inc.*

Dated: July 10, 2006

## CERTIFICATE OF SERVICE

I, Edward W. Little, Jr., hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this by hand this 10th day of July 2006.

_____
Edward W. Little, Jr.

16

B0470750v1

# EXHIBIT A

**LYCOS**
**COST OF SALE ANALYSIS**

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 001 | (71,745 92) |
| 144874 | 002 | (9,795 00) |
| 144874 | 004 | (92,413 64) |
| 144874 | 005 | (246,507 65) |
| 144874 | 005 | (12,366 00) |
| 144874 | 005 | 12,366 00 |
| 144874 | 005A | (41,747 70) |
| 144874 | 005B | (62,100 00) |
| 144874 | 005C | (622,814 00) |
| 144874 | 005D | (247,935 00) |
| 144874 | 005E | (99,120 00) |
| 144874 | 005G | (50,764 00) |
| 144874 | 006 | (117,477 00) |
| 144874 | 006A | 7,779 00 |
| 144874 | 006A | (7,779 00) |
| 144874 | 007 | (108,875 42) |
| 144874 | 008 | (169,538 00) |
| 144874 | 009 | (89,815 12) |
| 144874 | 010 | (80,174 63) |
| 144874 | 011 | (55,396 10) |
| 144874 | 011 | (58,228 00) |
| 144874 | 012 | (296,318 88) |
| 144874 | 013 | (359,870 79) |
| 144874 | 014 | (87,664 92) |
| 144874 | 015 | (112,312 02) |
| 144874 | 016 | (588,927 15) |
| 144874 | 017 | 146,935 00 |
| 144874 | 018 | (68,122 74) |
| 144874 | 019 | (76,660 43) |
| 144874 | 019 | (280,162 40) |
| 144874 | 020 | (230,287 75) |
| 144874 | 021 | (208,039 68) |
| 144874 | 022 | (441,139 00) |
| 144874 | 023 | (578,262 00) |
| 144874 | 024 | (118,324 63) |
| 144874 | 025 | (209,643 09) |
| 144874 | 026 | (546,102 10) |
| 144874 | 027 | (283,675 60) |
| 144874 | 028 | (240,807 00) |
| 144874 | 029 | (546,684 79) |
| 144874 | 030 | (349,403 97) |
| 144874 | 031 | (423,530 88) |
| 144874 | 032 | (894,894 24) |
| 144874 | 033 | (420,921 93) |
| 144874 | 034 | (487,317 20) |
| 144874 | 035 | (338,707 70) |
| 144874 | 036 | (331,586 91) |
| 144874 | 037 | (195,939 30) |
| 144874 | 038 | - |
| 144874 | 039 | (266,015 10) |
| 144874 | 040 | - |
| 144874 | 040 | (1,049,747 71) |
| 144874 | 040A | (1,194,843 48) |
| 144874 | 043 | - |
| 144874 | 044 | (465,966 69) |
| 144874 | 045 | (724,643 37) |
| 144874 | 047 | (785.734 50) |
| 144874 | 048 | (720,857 75) |

LYCOS
COST OF SALE ANALYSIS

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 048A | (1,108,495 67) |
| 144874 | 049 | (535,058 00) |
| 144874 | 049A | - |
| 144874 | 050 | (1,127,509 00) |
| 144874 | 050A | - |
| 144874 | 050B | - |
| 144874 | 051 | - |
| 144874 | 052 | - |
| 144874 | 053 | - |
| 144874 | 054 | - |
| 144874 | 055 | (453,911 00) |
| 144874 | 055A | - |
| 144874 | 056 | (630,595 00) |
| 144874 | 058 | (716,912 00) |
| 144874 | 060 | - |
| 144874 | 061 | - |
| 144874 | 064 | (656,511 00) |
| 144874 | 064B | (219,248 00) |
| 144874 | 064D | (300,179 20) |
| 144874 | 064F | (141,942 38) |
| 144874 | 065 | - |
| 144874 | 066 | - |
| 144874 | 066A | - |
| 144874 | 066B | - |
| 144874 | 066C | (976,079 00) |
| 144874 | 066E | (449,506 00) |
| 144874 | 066G | (324,055 23) |
| 144874 | 066I | (893,821 79) |
| 144874 | 067 | - |
| 144874 | 067A | - |
| 144874 | 067B | (876,212 00) |
| 144874 | 067D | (656,410 00) |
| 144874 | 067F | (464,961 80) |
| 144874 | 067H | (966,572 05) |
| 144874 | 068 | - |
| 144874 | 068A | - |
| 144874 | 068A | - |
| 144874 | 068B | - |
| 144874 | 068C | - |
| 144874 | 069 | (1,503,648 00) |
| 144874 | 069A | (427,219 00) |
| 144874 | 069C | (1,828,980 00) |
| 144874 | 069E | (730,576 00) |
| 144874 | 069G | (860,009 07) |
| 144874 | 069I | (2,640,439 17) |
| 144874 | 070 | - |
| 144874 | 076 | (582,814 00) |
| 144874 | 081 | (103,765 43) |
| 144874 | 082 | - |
| 144874 | 083 | 2,991,623 37 |
| 144874 | 083 | (2,991,623 37) |
| 144874 | 084 | 1,489,750 73 |
| 144874 | 084 | (1,489,750 73) |
| 144874 | 085 | (1,234,516 77) |
| 144874 | 086 | (1,208,106 78) |
| 144874 | 089 | (2,991,623 37) |
| 144874 | 089A | (361,396 13) |
| 144874 | 090 | (1,489,750 73) |
| 144874 | 091 | - |

LYCOS
COST OF SALE ANALYSIS

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 093 | - |
| 144874 | 094 | - |
| 144874 | 094 | - |
| 144874 | 094 | (528,905 00) |
| 144874 | 096 | - |
| 144874 | 100 | (196,273 38) |
| 144874 | 200 | (1,417,620 24) |
| 144874 | VAR | 7,527 00 |
| | | (45,596,723.07) |

# EXHIBIT E

NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $672,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-065(aad)



**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-FOUR

MASTER LEASE NUMBER: 144874

BASE VALUE: $656,510.88

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

LYC 04659

 # ORIGINAL 



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 64B

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $240,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

    Lessee: _____

PHS/BOSTON

144874-064B(skb)

LYC 04799



**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $497,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-066E(pw)

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67D

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $735,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-067D(pw)

LYC 05551

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 69E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $800,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-069E(skh)

# ORIGINAL



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66G

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $370,028.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

    Lessee:_____

PHS/BOST

144874-066G(skh)

LYC 05328

# NON-ORIGINAL
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67F

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $531,408.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:＿＿＿＿＿

Lessee:＿＿＿＿＿

PHS/BOST

144874-067F(skh)

LYC 05675



**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,440,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-066(aad)

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66A

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,465,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-066A(aad).doc



## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66B

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $530,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-066B(tkh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-SEVEN

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,850,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-067(tlj)

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67A

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $618,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-067A(pw)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-EIGHT

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $4,200,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-068(skh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 68A

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,735,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-068A(pw)

LYC 05913

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 68B

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,852,420.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-068B(aad)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 68C

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,500,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-068C(aad).doc



# ORIGINAL



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 69A

MASTER LEASE AGREEMENT NUMBER: 144874 ~~$~~  *427, 218.96*

BASE VALUE: ~~Manufacturer List Price~~  ~~$ of~~ *~~, ~~*

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:

Lessee:

PHS/BOST
144874-069A(p×)

CONFIDENTIAL
CSI0041334

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67B

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,034,500.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-067B(pw)

LYC 05474

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 69C

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,103,620.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 24 | 73.3% |
| 1 | 108.5 | 14 | 88.6 | 25 | 71.8 |
| 2 | 106.9 | 15 | 87.1 | 26 | 70.3 |
| 3 | 105.4 | 16 | 85.6 | 27 | 68.8 |
| 4 | 103.9 | 17 | 84.0 | 28 | 67.2 |
| 5 | 102.4 | 18 | 82.5 | 29 | 65.7 |
| 6 | 100.8 | 19 | 81.0 | 30 | 64.2 |
| 7 | 99.3 | 20 | 79.4 | 31 | 62.6 |
| 8 | 97.8 | 21 | 77.9 | 32 | 61.1 |
| 9 | 96.3 | 22 | 76.4 | 33 | 59.6 |
| 10 | 94.7 | 23 | 74.9 | 34 and thereafter | 58.1 |
| 11 | 93.2 | | | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-069C(aad)

LYC 06367

 

# ORIGINAL



## *COMPUTER SALES INTERNATIONAL, INC.*

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-NINE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,310,734.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: BDC _____

PHS/BOST
144874-089(aad)

CONFIDENTIAL
CSI0007679

10/04/2001 THU 09:27 FAX                                                    @008

NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 89A

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $500,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-089A(ssd)

LYC 07908

NON-ORIGINAL
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 64D

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $340,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor:_____

      Lessee: _C-S____

PHS/BOST

144874-064D(skh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 69G

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,031,403.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-069G(sbh)

LYC 06510

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



---

# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 64F

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $166,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-064F(gd)

LYC 04806



ORIGINAL



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 661

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $985,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:

Lessee:

PHS/BOST

144874-0661(pw)

CONFIDENTIAL
CSI0030754

NON-ORIGINAL



## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67H

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,091,002.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 12 | 91.7% | 24 | 73.3% |
| 1 | 108.5 | 13 | 90.1 | 25 | 71.8 |
| 2 | 106.9 | 14 | 88.6 | 26 | 70.3 |
| 3 | 105.4 | 15 | 87.1 | 27 | 68.8 |
| 4 | 103.9 | 16 | 85.6 | 28 | 67.2 |
| 5 | 102.4 | 17 | 84.0 | 29 | 65.7 |
| 6 | 100.8 | 18 | 82.5 | 30 | 64.2 |
| 7 | 99.3 | 19 | 81.0 | 31 | 62.6 |
| 8 | 97.8 | 20 | 79.4 | 32 | 61.1 |
| 9 | 96.3 | 21 | 77.9 | 33 | 59.6 |
| 10 | 94.7 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 11 | 93.2 | 23 | 74.9 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST
144874-067H(aad)

ORIGINAL



## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 691

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,880,878.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

   Lessee:_____

PHS/BOST

144874-0691(skh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66C

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,082,717.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-066C(skh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,390,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-085(tkh)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $725,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-086(gd)

LYC 07865

10/04/2001 THU 09:30 FAX

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,574,513.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the
Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly
Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment
Schedule.

Initialed by Lessor:_____

Lessee:___BX___

PHS/BOST
144874-090(xxd)

 



**COMPUTER SALES INTERNATIONAL, INC.**

*9990 Old Olive Street Road*
*St. Louis, MO 63141*
*(314) 997-7010*

# CERTIFICATE OF ACCEPTANCE

This Certificate is executed pursuant to Equipment Schedule Number **ONE HUNDRED**, dated as of **December 12, 2001**, to **Master Lease Number 144874**, dated December 4, 1996, between COMPUTER SALES INTERNATIONAL, INC. (the "Lessor") and **LYCOS, INC.** (the "Lessee").

Lessee hereby certifies that the Units set forth below, as also described in the above Equipment Schedule, have been delivered and accepted by Lessee as Units of Equipment under the Master Lease Agreement on the Lease Commencement Date indicated below.

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|-----|-----|-----|-----|-----|-----|
| | | | A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 2 pages. | | | |

**EQUIPMENT LOCATION:**    SEE ATTACHED EXHIBIT "A"

**LEASE COMMENCEMENT DATE: SEE ATTACHED EXHIBIT "A"**
LEASE EXPIRATION DATE: **04/30/2005**
MONTHLY RENTAL AMOUNT: **$6,082.29**
STIP LOSS BASE VALUE: **$196,273.38**

A photocopy of this Certificate may be filed as a precautionary Uniform Commercial Code financing statement to evidence Lessor's interest in the Equipment.

**COMPUTER SALES INTERNATIONAL, INC.**    LESSEE: **LYCOS, INC.**

By: _____    By: _____
    ANGIE BADER
Title: __VICE PRESIDENT_____    Title: __CFO_____

Date: _____June 6, 2002_____    Date: __6|27|02_____

PHS/BOST

**CONFIDENTIAL**
**CSI0023195**

 



**COMPUTER SALES INTERNATIONAL, INC.**

*9990 Old Olive Street Road*
*St. Louis, MO 63141*
*(314) 997-7010*

# CERTIFICATE OF ACCEPTANCE

This Certificate is executed pursuant to Equipment Schedule Number **TWO HUNDRED**, dated as of **December 12, 2001**, to **Master Lease Number 144874**, dated December 4, 1996, between COMPUTER SALES INTERNATIONAL, INC. (the "Lessor") and **LYCOS, INC.** (the "Lessee").

Lessee hereby certifies that the Units set forth below, as also described in the above Equipment Schedule, have been delivered and accepted by Lessee as Units of Equipment under the Master Lease Agreement on the Lease Commencement Date indicated below.

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    | A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 6 pages. |  |  |  |  |

**EQUIPMENT LOCATION:**    SEE ATTACHED EXHIBIT "A"

**LEASE COMMENCEMENT DATE: SEE ATTACHED EXHIBIT "A"**
**LEASE EXPIRATION DATE: 04/30/2005**
**MONTHLY RENTAL AMOUNT: $43,954.35**
**STIP LOSS BASE VALUE: $1,457,166.82**

A photocopy of this Certificate may be filed as a precautionary Uniform Commercial Code financing statement to evidence Lessor's interest in the Equipment.

**COMPUTER SALES INTERNATIONAL, INC.**    **LESSEE: LYCOS, INC.**

By: _____    By: _____
ANGIE BADER
Title:    VICE PRESIDENT    Title: CFO

Date: _____June 21, 2002_____    Date: 7/15/02

PHS/LEBJN

CONFIDENTIAL
CSI0023552