# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | C.A. No. 05-10017-RWZ |
| | ) | |
|     Plaintiff and Defendant-in-Counterclaim, | ) | |
| | ) | |
| v. | ) | **LYCOS'S OPPOSITION TO COMPUTER** |
| | ) | **SALES INTERNATIONAL, INC.'S MOTION** |
| LYCOS, INC., | ) | **TO COMPEL ENFORCEMENT OF** |
| | ) | **SUBPOENAS SERVED ON** |
|     Defendant and Plaintiff-in-Counterclaim, | ) | **LEASEFORUM, INC. AND ITS PRINCIPALS** |
| | ) | |
| and | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
|     Trustee Process Defendant | ) | |

## INTRODUCTION

In seeking to compel Lycos, Inc.'s ("Lycos") former leasing consultant, LeaseForum, Inc. ("LeaseForum"),[1] to produce documents covered by the attorney-client privilege and work-product immunity doctrines, Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc. ("CSI"), has launched yet another motion before the Court with highly inflammatory, irrelevant, unsupported and/or misleading allegations masquerading as so-called "facts."[2] The eight pages of misinformation at the beginning of CSI's Motion serves no plausible purpose other than to cast unsolicited aspersions toward Lycos and once again present

---

[1] Because Lycos has asserted the attorney-client and work-product immunity doctrine as a defense to LeaseForum's production of certain documents, Lycos is filing this Opposition to address those issues. LeaseForum will be filing an Opposition to address other issues presented in the Motion.

[2] Telling of its retaliatory motives and posturing, CSI filed this Motion only after Lycos filed its recent Motion to Compel and eleven days before the July 27 status conference—six months after serving its subpoena on LeaseForum and three months after it received the privilege log from LeaseForum.

to the Court CSI's misguided and unfounded *opinions* of the discovery had in this case to date – irrespective of their immateriality to the issue at hand:[3] whether Lycos has appropriately asserted a privilege over documents in the possession of LeaseForum that were prepared in connection with LeaseForum's role as a leasing consultant and advisor to Lycos and Lycos's counsel?

At the direction of Lycos and its counsel, LeaseForum used its specialized knowledge of the leasing industry to analyze and help Lycos and its counsel understand the complex relationship between Lycos and CSI, thereby facilitating communications between Lycos and its counsel that resulted in Lycos filing a civil action against CSI on December 12, 2004. LeaseForum's efforts, in anticipation of and during litigation, have been indispensable in assisting Lycos's counsel in providing effective legal advice to Lycos.

Because the subpoenaed documents to which Lycos has asserted a privilege (a) were highly useful to effective consultation between Lycos and its counsel, and (b) were created in anticipation of and/or during litigation for the purpose of allowing Lycos to obtain legal advice from its counsel, they are protected from disclosure by the attorney-client privilege and work product immunity doctrines. *Cavallaro v. U.S.*, 284 F.3d 236 (1st Cir. 2002) (discussing applicability of the attorney-client privilege to documents created by or for a third party); *In re Grand Jury Subpoena,* 220 F.R.D. 130, 142 n.6 (D. Mass. 2004) (same as to work product doctrine). Accordingly, the Motion should be denied to the extent it seeks to compel production of those documents.

---

[3] As with its Opposition to Lycos's Motion to Compel and its Motion to Dismiss or Compel, CSI's repeated refusal to stick to the matters at hand in its zeal to present its case to the Court at every turn is not only improper but, perhaps by design, unnecessarily obfuscates the real issues. Nonetheless, Lycos is not interested in taking CSI's bait and further wasting the Court's time with irrelevant discussions. Thus, consistent with its handling of CSI's similar tangents in the past, Lycos will not respond to the numerous immaterialities presented in this Motion. It will save its response for a time when such issues are properly before the Court.

BST99 1511510-1.057077.0012

## I.    STATEMENT OF RELEVANT FACTS

### A.    The Documents Requested by CSI and the Privilege Log.

1.    In its subpoena to LeaseForum, dated January 18, 2006, CSI sought production of all documents in LeaseForum's possession that concern Lycos.  *See* Ex. J to CSI's Memorandum of Law in Support of its Motion to Compel Enforcement of Subpoenas Served on LeaseForum, Inc. and its Principals (the "Memorandum").  In response, LeaseForum produced thousands of pages of documents, including its agreement with Lycos, dated October 8, 2003, entitled Statement of Work No. 2.  Pursuant to that agreement, Lycos retained LeaseForum to "analyze past and current leasing activity with [CSI] with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from" Lycos.  A true and correct copy of Statement of Work No. 2 is attached hereto as *Exhibit 1* ("SOW2").

2.    On January 23, 2006, after receiving a copy of the subpoena, Lycos sent LeaseForum a letter, with a copy to CSI's counsel, stating that Lycos

> has not waived and does not waive any privilege applicable to its communications with Ms. Franklin and [LeaseForum]. Accordingly, but without limitation, Lycos objects to Ms. Franklin's and [LeaseForum's] producing any documents in response to the subpoenas that are in any way privileged, and to their providing testimony in contravention of a privilege.

A true and correct copy of that letter is attached hereto as *Exhibit 2*.

3.    Thereafter, pursuant to Fed. R. Civ. P. 45(c)(2)(B), LeaseForum served on CSI an objection to the subpoena in which it referenced Lycos's assertion of the applicable privileges. *See* Ex. L to the Memorandum.

4.    On or about April 19, 2006, LeaseForum served a privilege log on CSI that provided the bates number of each privileged document, the date of each privileged document,

BST99 1511510-1.057077.0012

the name of the sender of each document, the name of the recipient of the document, the name of

any person copied on each document, the privilege claimed for each document, and a general

description of the subject matter of each document. *See* Ex. M to the Memorandum (the

"Privilege Log").[4]

### B.     LeaseForum's Work for Lycos on the Buyout of Equipment from CSI.

5.     In late 2002 and early 2003, CSI and Lycos discussed the possibility of Lycos

purchasing the equipment that Lycos had "leased" from CSI.

6.     In late May or early June, 2003, after CSI and Lycos were already engaged in

buyout discussions, LeaseForum, unsolicited, contacted Lycos to offer its expertise in connection

with Lycos's leasing of equipment. Transcript of Deposition of Lycos, Inc. (Apr. 26, 2006) at

103-06. True and correct copies of the relevant portions of that transcript are attached hereto as

*Exhibit 3.*

7.     Because, among other reasons, the Lycos employee who was given the

responsibility of discussing the buyout was new to the relationship with CSI and relatively

inexperienced in equipment leasing practices and transactions, and because CSI was not

cooperating with Lycos's requests for information relating to the buyout, Lycos engaged

LeaseForum to assist it in negotiating a buyout with CSI and acceptable outcomes for leases it

had with four other equipment leasing companies. Ex. A to the Memorandum

¶ 12; Ex. 3 at 103-06; Statement of Work No. 1 between Lycos and LeaseForum, a true and

correct copy of which is attached hereto as *Exhibit 4.*

---

[4]  Although CSI was aware of the substance of LeaseForum's role from SOW2 and Lycos's assertion of the
privilege, CSI filed the Motion without discussing the merits of it with Lycos as required by the spirit, if not the
letter, of Local Rule 37.1. In the three months between the time LeaseForum served the privilege log and CSI filed
the Motion, CSI never engaged Lycos in any substantive discussion as to the basis for its assertion of attorney-client
privilege and work product immunity to ascertain if, at the very least, the parties could narrow the issues in dispute.
As a result, CSI could not and did not "certify" that it had held a conference with Lycos concerning Lycos's
assertion of the attorney-client privilege and work-product immunity doctrines.

8.      Before LeaseForum's involvement in those negotiations, CSI had quoted Lycos a buyout price of $4.69 million to purchase the equipment at the end of the terms of the equipment schedules.

9.      After engaging LeaseForum, Lycos requested that CSI's account representative for Lycos, Paul Stenberg, speak with LeaseForum about this price and end-of-lease arrangements.[5]  Before speaking with LeaseForum, and in an apparent effort to avoid speaking with them, Mr. Stenberg offered to reduce the purchase price by $75,000 if Lycos would agree to the buyout that day.  A true and correct copy of Mr. Stenberg's e-mail to Lycos reflecting this offer is attached hereto as *Exhibit 5*.  Lycos declined this offer and advised Mr. Stenberg that if he refused to speak with LeaseForum, Lycos would have LeaseForum conduct an audit of the CSI-Lycos relationship. A true and correct copy of Lycos's response to Mr. Stenberg's offer is attached hereto as *Exhibit 6*.

10.     When Mr. Stenberg and LeaseForum's President, Susan Franklin, finally spoke by telephone in early July, 2003, Mr. Stenberg, in an effort to persuade her and Lycos that the $4.69 million purchase price was reasonable, represented to her that the original cost of the equipment exceeded $60 million.[6]

---

[5] Given the late arrival of LeaseForum in the negotiations with CSI, and its lack of any knowledge of the parties' six-years' worth of leasing transactions involving over 5,500 pieces of equipment and approximately eighty schedules, LeaseForum had little time to absorb a lot of information.  Although LeaseForum tried to review some of the records in Lycos's possession, it did not have nearly enough time to review all of Lycos's records or analyze in a meaningful way the documents it did review.  Nor did it have time to follow-up sufficiently with CSI regarding documents and information not found among, or ascertainable from, Lycos's records.

[6] Lycos learned during discovery in this case that CSI would have sold the equipment, which had little or no value at that point, to Lycos for as little as $350,000.  *See* Transcript of Deposition of Jeffrey Rousseau (Mar. 8, 2006) at 138-140.  A true and correct copy of the relevant pages from that transcript is attached hereto as *Exhibit 7*. However, Mr. Stenberg had an enormous financial incentive to procure a buyout for as much money as possible, and that is exactly what he did (albeit with the help of obstructive and coercive tactics because he was going to earn a commission based on the margin by which the sale price exceeded the minimum threshold of $350,000).

11.     Shortly after Ms. Franklin's discussions with Mr. Stenberg, CSI all of a sudden reduced the buyout price from $4.69 million to $3.775 million but informed Lycos, through Mr. Stenberg, that it had to accept that offer by July 15, 2005 or else CSI would take the offer off the table. *See* Ex. 3 at 185, ln. 18-24.

12.     On or about July 15, 2003, operating under the CSI-imposed deadline and several misapprehensions of fact because of CSI's failure to disclose basic and material information to Lycos, and in reliance on CSI's misrepresentations as to the original equipment cost, Lycos agreed to: (a) pay CSI a purchase price of $3.775 million; and (b) continue making monthly payments until the end of the remaining equipment schedules' terms, at which time, Lycos would "own" the equipment. *See* Lycos's Am. Answer and Countercl. ¶ 46; Ex. I thereto (the "Sales Agreement").[7]

13.     CSI's reluctance to negotiate with LeaseForum, and willingness to lower the buyout price by 20% so quickly, raised a red flag. *See, e.g.,* Ex. 3 at 183-185.[8]

14.     LeaseForum then approached Lycos about performing an audit of the CSI-Lycos relationship.  While Lycos's Controller was interested in proceeding with such an audit, Lycos's Chief Financial Officer, Brian Lucy – the person at Lycos primarily responsible for the Lycos-CSI relationship at that time and the ultimate decision-maker in connection with whether Lycos would engage LeaseForum for additional work – was hesitant to proceed with the audit because of Lycos's long and trusted relationship with Mr. Stenberg. *See* Ex. 3 at 201; *see also* Ex. C to

---

[7]  It appears that Lycos executed the same Sales Agreement again on August 8, 2003.  This Sales Agreement was also signed by CSI and was the exhibit used in Lycos's 30(b)(6) deposition.  Both iterations of the Sales Agreement provide that the Sales Agreement is dated July 15, 2003.  The $3.775 million payment contemplated under the Sales Agreement was made by Lycos to CSI on August 5, 2003. A true and correct copy of the e-mail reflecting that this payment was made on August 5, 2003 is attached hereto as *Exhibit 8.*

[8]  Because of the arbitrary deadline set by CSI for Lycos to accept its offer, LeaseForum did not have time to conduct an audit and review CSI's activities before Lycos entered the Sales Agreement.

BST99 1511510-1.057077.0012

Memorandum (Aff. of B. Lucy) ¶¶ 13, 16-18, 21-23. Thus, while LeaseForum proposed commencing SOW2 in August, 2003, approximately a month after the parties had reached agreement on the buyout price, Lycos neither decided to nor did authorize LeaseForum to proceed with the audit until October, 2003—months after Lycos agreed to the buyout price and the Sales Agreement was executed. *See* Ex. 1.[9]

> **B. LeaseForum Commences Work Under SOW2 In Anticipation of Litigation: Documents Dated Between October 8, 2003 and December 12, 2003.**

15.  In connection with SOW2, Lycos provided LeaseForum with copies of the master lease agreement, equipment schedules and other lease documents Lycos had in its possession, e-mails and other correspondence between Lycos and CSI, and other pertinent documents that Lycos had available to it. *See* Ex. 1 at 1. LeaseForum was also given access to Lycos personnel and communicated regularly with Lycos's in-house counsel concerning its audit. *See id.*

16.  LeaseForum prepared spreadsheets, memoranda, presentations, and other documents summarizing its analysis of the CSI-Lycos leasing transactions. LeaseForum also made inquiries of, and responded to questions posed by, Lycos and its counsel, orally and via e-mail.

---

[9] The foregoing demonstrates that, just as Lycos's 30(b)(6) witness testified and contrary to CSI's repeated assertions in its Opposition to Lycos's Motion to Compel and its Memorandum, Lycos and LeaseForum did *not* have a "secret and covert plan" or "conspiracy" to implement a "euphemistic" "Phase 2" at the time Lycos signed the Sales Agreement. *See, e.g.*, Memorandum at 1. Although, like a trashy novel, it sounds good on paper and shows signs of imagination, CSI's theory in this regard has no substance. Indeed, if LeaseForum had commenced its audit work *before* the execution of SOW2 on October 8, 2003, there would presumably be many documents listed on the Privilege Log dated in August or September, 2003, as such work would have been in anticipation of potential litigation. There are not. *See generally* Exhibit M to the Memorandum.

There are two documents on the Privilege Log, both dated August 13, 2003, that are identified as being to and from John Kirk of LeaseForum and an Andrew "Feinberg." Mr. Feinberg was then the General Counsel of Lycos. Mr. Feinberg, however, was not the recipient of these e-mails and their inclusion on the log was the result of a typographical error. In fact, those communications were between Mr. Kirk and Andrew *Franklin*'s wife, Susan Franklin, who used Mr. Franklin's e-mail account for those communications. Copies of these documents were already produced, albeit with different bates numbers (bates no. AR01297-AR01299), in LeaseForum's production.

17.    Based on LeaseForum's initial factual analysis, Lycos began seeking outside counsel in October, 2003.

18.    On or about December 2, 2003, Thomas O. Bean and the law firm of Nutter, McClennen & Fish, LLP were retained by Lycos.  On December 12, 2003, Lycos filed a civil action against CSI in Middlesex Superior Court (the "First Civil Action").  A true and accurate copy of that Complaint is attached hereto as *Exhibit 9.*

19.    As evidenced by the descriptions of the documents on the Privilege Log, some of the documents CSI seeks pursuant to its subpoena constitute LeaseForum's work product, i.e., Excel spreadsheets, notes and memoranda, and communications with Lycos and its counsel, created during the period from its retention under SOW2 on October 8, 2003 through the commencement of the First Civil Action on December 12, 2003.

C.    **LeaseForum's Analysis of Lease Transactions and Assistance to Counsel Continues: Documents Dated Between December 12, 2003 and April 5, 2004.**

20.    In the First Civil Action, Lycos sought a declaration that it had no obligation to pay any further amounts to CSI under the extant equipment schedules; it also sought recovery for overpayments it had made to CSI.  *See* Ex. 9 ¶ 1.  After Lycos filed the Complaint, CSI removed the action to this Court.

21.    On February 11, 2004, Lycos delivered to CSI's counsel a draft Amended Complaint in which it asserted many of the same causes of action asserted in its Amended Counterclaim in this action.  That Amended Complaint provides background information about the leasing industry provided by LeaseForum in addition to facts uncovered by LeaseForum concerning the CSI-Lycos relationship.  A true and accurate copy of the cover letter and draft Amended Complaint are attached hereto as *Exhibit 10.*  As evidenced by the detailed discussion of the leasing industry and the analysis of some of CSI's equipment schedules with Lycos,

LeaseForum played an indispensable role in assisting Lycos's counsel in preparing that Amended Counterclaim. *Id.* ¶¶ 8-50. Ultimately, Lycos dismissed the First Civil Action without prejudice on April 5, 2004.

22.    CSI's subpoena to LeaseForum seeks documents created during the pendency of the First Civil Action when LeaseForum was providing indispensable services as Lycos's leasing consultant. This work product was prepared after the retention of Mr. Bean and while the First Civil Action was pending—i.e., the period from December 12, 2003 through April 5, 2004. These documents comprise the majority of the documents to which Lycos has asserted a privilege or immunity from production.

**D.    January 5, 2005 to the Present: the Pending Action Between CSI v. Lycos.**

23.    On January 5, 2005, CSI commenced the instant action. Subsequently, Lycos filed its Counterclaim, and then an Amended Counterclaim. As with the Amended Complaint, LeaseForum provided advice to Lycos and its counsel and assisted in the drafting of the Amended Counterclaim. Its work in this regard was indispensable to counsel's representation of Lycos.

24.    In its subpoena, CSI seeks work product and privileged communications prepared *after* the filing of the instant litigation. These documents comprise nearly all of the remaining documents withheld by LeaseForum at the request of Lycos.

25.    None of the documents on the Privilege Log were created after February 24, 2006, the date Lycos sent CSI a letter advising it that LeaseForum would not serve as a testifying expert on Lycos's behalf in this case. A true and correct copy of that letter is attached hereto as *Exhibit 11.*

**E.**     **Documents Subpoenaed that are Undated.**

26.     In its Memorandum, CSI focuses on the documents on the Privilege Log that are undated. *E.g.*, Memorandum at 11.   Some of these documents were LeaseForum's internal notes and memoranda. *See* Ex. M to Memorandum at 23-24.[10]   The great majority of the remaining undated documents are Excel spreadsheets prepared by LeaseForum and sent to Mr. Bean who, as noted earlier, was not retained until December 2, 2003. *See* Ex. M to Memorandum at 14-16, 26-27, 29-30, 32.   These documents were prepared in anticipation of and during the First Civil Action.   Lycos has no objection to the Court reviewing these documents *in camera* if it would enable the Court to determine whether they were properly withheld.

## III.     ARGUMENT

**A.**     **The Documents Were Properly Withheld Because They are Communications Between Lycos and/or Its Counsel with a Third Party That Were Necessary for Effective Consultation Between Lycos and Its Counsel and Were Made for the Purposes of Lycos Obtaining Legal Advice.**

27.     In *Cavallaro v. U.S.*, the First Circuit employed a two-part test for determining when documents created by or disclosed to a third party who assists an attorney in rendering legal advice are protected by the attorney-client privilege: when (1) the third party is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer . . ." and (2) the communication was made "for the purpose of obtaining legal advice from the lawyer." 284 F.3d 236, 247 (1st Cir. 2002).[11]   Both of *Cavallaro*'s requirements are met here.

---

[10] As such, these documents were also identified on the Privilege Log as having no recipient.

[11]  In support of the arguments made in its Memorandum, CSI relies on *Church of Scientology v. United States Dep't of Justice,* 30 F.3d 224 (1st Cir. 1994). Memorandum at 15.  As *Cavallaro* was decided eight years after the *Church of Scientology*, and specifically addresses third-party consultants, *Church of Scientology* is inapposite.

BST99 1511510-1.057077.0012

**(1)    LeaseForum was Highly Useful, if not Indispensable, in Facilitating Communications Between Lycos and Its Counsel.**

28.    In an effort to sell its services, CSI represents to the public that equipment leasing is highly complex (and you can "trust" CSI "to help you navigate the process" and "mountains of details").  Attached hereto as *Exhibit 12* are pages from CSI's website in which CSI asserts that there are inherent complexities in leasing.  As such, CSI cannot in good faith dispute that the leasing industry is highly complex and that understanding it requires specialized skills and knowledge.

29.     In fact, familiarity with the equipment leasing industry and its customs and practices was especially critical in this case.  For example, LeaseForum knew, but Lycos did not, that CSI eliminated its risk of obtaining the residual value of the equipment at lease-end by "rolling" and "rewriting" the equipment schedules. *See* Lycos' Am. Answer and Countercl. ¶ 34-42.  LeaseForum was also able to calculate CSI's percentage of profit based on an assumed residual percentage. *See id.* ¶ 33.

30.    With respect to original equipment cost, while Lycos attempted unsuccessfully to develop some numbers for the value of the equipment it was leasing through CSI,[12] it was not until Lycos retained LeaseForum pursuant to SOW2 that Lycos was able to begin to make sense of the numbers and understand how and the extent to which CSI defrauded it. *See id.* ¶ 32.  The difficulty in determining original equipment cost for "rolled" schedules cannot be overstated.  Even CSI, in responding to Interrogatories served on it by Lycos in this case, has implicitly acknowledged that in several instances it cannot figure out the original cost of the equipment.  *See* Schedule A of CSI's Answers to Interrogatories, attached hereto as *Exhibit 13*, wherein CSI

---

[12] This is discussed in greater detail in Lycos's Opp'n. to CSI's Motion to Dismiss or in the Alternative, to Compel, which is being filed herewith.

has provided only a "dash" in its chart of original equipment costs for several of the rolled equipment schedules.

31.    For these reasons, and the reasons set forth in great detail above, at each step in this dispute, LeaseForum provided Lycos and its counsel with information about the industry and its analysis of the equipment schedules that was indispensable in facilitating communications between Lycos and its counsel.  Lycos and its counsel simply did not have the industry knowledge or "number-crunching" expertise to uncover CSI's wrongdoing on their own.

**(2)    The Communications to and From LeaseForum Allowed Lycos to Obtain Legal Advice From Its Counsel.**

32.    Virtually all of the documents to which Lycos asserts a privilege were created within one of three time periods:

(A)    documents prepared because of the prospect of litigation during the period from exertion of SOW2 on October, 8, 2003 through commencement of litigation on December 12, 2003;

(B)    documents prepared during the First Civil Action from December 2, 2003 through April 5, 2004; and

(C)    documents prepared during the present litigation.

33.    As to documents that fall within time periods (B) and (C), those documents were properly withheld as subject to the attorney-client privilege because they were highly useful and enabled Mr. Bean to provide legal advice to Lycos.  These documents included Excel spreadsheets created by LeaseForum reflecting its analysis of the equipment schedules.  *See* Ex. M to the Memorandum at 14-16, 26-27, 29-30, 31-32.  As noted above, without these communications, Mr. Bean simply would not have been able to advise Lycos as effectively.  As to documents that fall within time period (A), as is also set forth above, those documents were prepared in anticipation of litigation and were equally useful and enabled Lycos in-house

BST99 1511510-1.057077.0012

counsel, and Mr. Bean, to provide effective legal advice to Lycos.[13]  As such, Lycos is able to

satisfy *Cavallaro*'s requirements.

> **B.    The Documents Withheld by LeaseForum Are Protected by the Work-**
> **Product Immunity Doctrine.**

34.    Fed. R. Civ. P. 26(b)(3) expressly provides qualified immunity from discovery

from materials that are: (a) documents and tangible things; (b) prepared in anticipation of

litigation or for trial; (c) by or for another party or for that other party's representative.[14]  The

Rule expressly covers, *inter alia*, documents prepared by a party's consultant in anticipation of

litigation or for trial. *Id.*  It allows discovery only upon an opposing party's showing of

"substantial need for the documents and a showing that the party cannot obtain the substantial

equivalent of the materials by other means." *Id.*  In those rare instances that a court does order

the production of documents prepared by a consultant in anticipation of litigation, "the court

shall protect against disclosure of mental impressions, conclusions, opinions, or legal theories of

. . . other representatives of a party concerning the litigation." *Id.*

35.    In *In re Grand Jury Subpoena*, the Court considered the application of the work

product doctrine to non-attorneys such as LeaseForum.  It observed that many courts have held

that the work product doctrine applies to litigation-related documents and other tangible things

---

[13]  CSI expresses outrage in suggesting, albeit erroneously, that Lycos implemented a "Phase 2" investigation in
August, 2003. Memorandum at 1, 9-10, 11, 12.  Yet, it ridicules Lycos for withholding documents "***because of the
prospect of litigation.***" Memorandum at 16 (emphasis in original).  CSI cannot have it both ways.

[14]  Fed. R. Civ. P. 26(b)(3) states: "Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain
discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and
prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative
(including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the
party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party
is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering
discovery of such materials when the required showing has been made, the court shall protect against disclosure of
mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party
concerning the litigation."

"produced by non-attorneys," and that those holdings appear to be the best reading of Rule 26(b)(3), which speaks of "materials prepared in anticipation of litigation or for trial by or for another party or for that party's representative (including the party's . . . *consultant* . . .)." 220 F.R.D. 130, 142 n.6 (D. Mass. 2004) (citations omitted; emphasis supplied). The Court went on to state:

> Although non-attorneys are not officers of the court, and thus do not have the same public responsibilities as attorney's, *there can be little doubt that their role in assembling a case for a party is often at least as important as an attorney's.* In turn, the careful assembly, sifting, and organization of facts and ideas is a necessary part of making our adversary system of justice work.

*Id.* at 142 (emphasis supplied).

36.    Here, Lycos retained LeaseForum on October 8, 2003 to investigate the CSI-Lycos relationship and perhaps negotiate a settlement of future payments. To fulfill this task, LeaseForum analyzed the lease documents, prepared Excel spreadsheets, took notes of conversations with Lycos employees, and communicated its findings to Lycos and its counsel before and during litigation. It used its knowledge of the leasing industry and its analysis to assist counsel in preparing the Complaint and draft Amended Complaint in the First Civil Action, and the Counterclaim and Amended Counterclaim in this case. *See, e.g.,* Ex. M to the Memorandum at 18-21, 28; Ex. 8 ¶¶ 8-47; Lycos's Amended Countercl. ¶¶ 8-50. It also reviewed Lycos's request for production of documents. *See, e.g.,* Ex. M to the Memorandum at 29. In performing these tasks, LeaseForum's role was as important as counsel's in assisting Lycos.

37.    Thus, from October 8, 2003 through December 12, 2003, LeaseForum's actions were performed in anticipation of litigation. Thereafter, once the First Civil Action and, subsequently, this case were filed, its actions were performed in anticipation of trial.

BST99 1511510-1.057077.0012

Accordingly, the withheld documents are also protected from disclosure by the work product immunity doctrine.

## CONCLUSION

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1.  Denying the Motion to the extent it seeks to compel the production of the documents to which Lycos has asserted a privilege; and

2.  Granting Lycos such other relief as may be appropriate and just under the circumstances.

Dated: July 31, 2006

Respectfully submitted,

LYCOS, INC.,
By its attorneys,

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY, LLP
28 State Street
Boston MA 02109
(617) 535-4000

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2006, I caused a true and accurate copy of the foregoing documents to be delivered by hand to Robert J. Kaler, McCarter & English, LLP, 225 Franklin Street, Boston, MA 02111.

/s/ Thomas O. Bean
Thomas O. Bean

BST99 1511510-1.057077.0012

# EXHIBIT 1





**LEASEFORUM**

**Statement of Work No. 002**
**End of Lease Workout Services**

**Service Commencement Date:**
This Statement of Work No. 002 ("SOW") is entered into and effective as of the date below written ("Service Commencement Date") by and between Lycos, Inc. ("Client") and LeaseForum, Inc. ("LeaseForum") and shall be subject to all terms and conditions set forth in the General Services Agreement ("GSA") or ("Agreement") dated June 17, 2003 ("Effective Date"). All terms and conditions set forth on the GSA are hereby incorporated by reference. In the event of a conflict between the terms hereof and the GSA, the terms of the SOW shall govern.

**Work:**
Client desires to continue a partnership with LeaseForum, and LeaseForum desires to provide to Client, the End of Lease Workout Services described below.

LeaseForum will, on behalf of Client, analyze past and current leasing activity with Computer Sales International ("CSI") with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from Client. Such a settlement may include but will not be limited to early termination, reduction in lease payment obligations, or the payment by CSI to Client of a settlement amount (or the reduction in future obligations by the settlement amount) ("Settlement").

In support of this effort Client will provide, in a timely fashion, all documents requested by LeaseForum, (including all exhibits and attachments thereto, acceptance certificates, stipulated loss (or casualty) tables, return conditions, end of lease options, lease economics and equipment lists) and its respective master lease (including any amendments) equipment lists, equipment specifications, purchase and sale orders, vendor invoices, proposal and award letters, miscellaneous letters, notes and emails, deemed necessary by LeaseForum to establish a complete picture of Client's end of lease obligations ("Contracts"), and Client will make accessible to LeaseForum information regarding invoices paid by Client to CSI. Client will provide LeaseForum access to key personnel, including the members of the finance, accounting and legal departments and various administrative support staff, to the extent reasonably necessary for LeaseForum to perform the Services.

**Fees to LeaseForum:**
With respect to the Settlement, LeaseForum will invoice Client and Client will pay LeaseForum within ten (10) days of the invoice date, an amount equal to twenty percent (20%) of the difference between the Settlement and the "Baseline" as herein after defined ("LF Fee")

For purposes of the foregoing, "Baseline" shall mean $10,602,142.

LeaseForum shall have the exclusive right to perform the Work set forth above. It is expressly understood by Client that they are solely responsible for any and all (i) amounts due and payable to a lessor under all CSI leases, the Settlement and (iii) all third party costs and expenses incurred with respect to achieving the Settlement.

**Term:**
The Term of this SOW shall commence on the date set forth above (the "Service Commencement Date") and shall expire upon Client's full payment to LeaseForum of the LF Fee.

Page 1 of 2

LYC 18887

**Representatives:**
Each Party's Representatives for Services performed under this SOW shall be:

| Relationship Manager Julie Callagee ~~Director of Accounting~~ ~~400-2 Totten Pond Road~~ Waltham, MA 02451 P: 781-370-2700 Ext: 2827 Julie.callagee@corp.terralycos.com | *Asst. Controller* *10 Firm Ave* | LeaseForum's Relationship Manager John Kirk Vice President 313 Congress Street Boston, MA 02210 P: (617) 443-9916 F: (617) 443-9915 jkirk@leaseforum.com | LeaseForum's Project Manager Susan Franklin CEO 313 Congress Street Boston, MA 02210 P: (617) 443-9914 F: (617) 443-9915 ssf@leaseforum.com |
|---|---|---|---|

**IN WITNESS WHEREOF**, the parties have caused this SOW No. 002 to be executed and delivered this eigth day of October, 2003, and do each hereby warrant and represent that their respective signatory, whose signature appears below, has and is on the date of this SOW duly authorized by all necessary and appropriate corporate actions to execute and deliver this Agreement.

REVIEWED BY
TERRA LYCOS LEGAL *PDV*

LEASEFORUM, INC.

By: _____

Name: Susan S. Franklin

Title:   Chief Executive Officer

LYCOS, INC.

By: _____

Name: _____

Title:  *CFO*

Please execute two copies of this Statement of Work and return both originals to:

LeaseForum, Inc.
313 Congress Street
Boston, MA 02210
Attn: Susan S. Franklin
Phone: (617) 443-9914
Fax: (617) 443-9915

LeaseForum will execute and return one original to your attention.

LYC 18888

# EXHIBIT 2

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington. D C

Thomas O Bean
tbean@mwe.com
617 535 4426

January 23, 2006

**VIA FACSIMILE - 617.307.6101**

Robert Feldman
Birnbaum & Godkin, LLP
280 Summer Street – 5th Floor
Boston, MA 02110

   Re:  Computer Sales International, Inc v. Lycos, Inc.,
      <u>Case No. 05-10017-RWZ</u>

Dear Rob:

   This firm represents Lycos, Inc. in the above-referenced matter. I write with respect to the subpoenas served by Computer Sales International, Inc. ("CSI") on your clients, Ms. Susan Franklin and American River Partners, LLC (a/k/a LeaseForum) ("ARP").

   Please be advised that Lycos, Inc. (as defined in the subpoena) has not waived and does not waive any privilege applicable to its communications with Ms. Franklin and ARP. Accordingly, but without limitation, Lycos objects to Ms. Franklin's and ARP's producing any documents in response to the subpoenas that are in any way privileged, and to their providing testimony in contravention of a privilege.

   Thank you for your attention to this matter. If you have any questions concerning it, please do not hesitate to contact me.

         Very truly yours,

         Thomas O. Bean

cc:  Robert Kaler, Esq.

U.S. practice conducted through McDermott Will & Emery LLP.
28 State Street Boston. Massachusetts  02109-1775   Telephone: 617 535 4000   Facsimile: 617.535.3800   www.mwe.com
BST99 1488548-1 057077 0012

# EXHIBIT 3

Case 1:05-cv-10017-RWZ    Document 86-4    Filed 07/31/2006    Page 2 of 8

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 1

UNITED STATES DISTRICT COURT

For the District of Massachusetts


No. 05-10017-RWZ


* * * * * * * * * * * * * * * * * * * * * * * *


COMPUTER SALES INTERNATIONAL, INC.,

                    Plaintiff,

vs.


LYCOS, INC.,

                    Defendant,

BANK OF AMERICA f/k/a FLEET BANK,

                    Trustee Process Defendant.

* * * * * * * * * * * * * * * * * * * * * * * *


      VIDEOTAPED DEPOSITION OF: JULIE CALLAGEE, a witness in

the above-entitled cause, taken before CINDY BERGLUND, CSR,

Registered Professional Reporter and Notary Public pursuant

to the applicable provisions of the Massachusetts Rules of

Civil Procedure, at the offices of GADSBY & HANNAH, LLP, 225

Franklin Street, Boston, MA 02110, on the 26th day of APRIL,

2006, commencing at 9:15 A.M.

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 102

1  Brian Lucy who was dealing directly with Monique Walsh
2  more than you on this issue. Is that what you are
3  trying to suggest?
4  A. Yes.
5  Q. That's what you are saying?
6  A. That's what I'm saying.
7  Q. All right. How did it come to pass that principal
8  responsibility for these analyses passed, if you will,
9  from Brian to you in or about, I think, the early June
10 of 2003 when LeaseForum came on board?
11 A. John Kirk from LeaseForum called me, made a cold
12 call to me.
13 Q. Meaning you had not -- you didn't know him before?
14 A. That's right.
15 Q. Had you had any prior contact or familiarity with
16 LeaseForum or Susan Franklin before?
17 A. No.
18 Q. So the company was a stranger to you?
19 A. Yes.
20 Q. You didn't know any of the people at it prior to
21 the involvement with Lycos?
22 A. No.
23 Q. Okay. When he initially called you, do you
24 remember what he told you? What was the pitch, so to

Page 103

1  speak?
2  A. He told me that his company was -- the company he
3  represented were experts in the leasing industry and
4  they could offer assistance to companies in this very
5  complex business.
6  Q. Had you ever had a cold call like that from a
7  lease consulting company before?
8  A. Not to my recollection. Although, I did receive
9  cold calls on a regular basis.
10 Q. But not from lease consulting companies?
11 A. No. I don't believe so.
12 Q. Prior to his call, had you had any general
13 awareness that there were such things as consulting
14 companies that were engaged in the business of trying
15 to advise companies on how they should deal with their
16 equipment leases?
17 A. I'm not sure.
18 Q. Nothing you can remember anyway?
19 A. I don't know that I had -- I don't know that I
20 stopped to think about it at that time. I just thought
21 that I needed them.
22 Q. I beg your pardon?
23 A. I just thought that I needed them. I don't know
24 if I --

Page 104

1  Q. When he called, you were receptive to the idea?
2  A. That's right.
3  Q. Did he tell you how he had been prompted to call
4  Lycos?
5  A. At that time?
6  Q. Yes.
7  A. No. I'm not sure that I -- I'm not sure.
8  Q. In other words, to your knowledge, was it just a
9  coincidence that right in the middle of the year that
10 Lycos was planning to do a buy-out of the CSI and other
11 leases, a lease consulting company called you?
12 A. It seemed serendipitous to me that he -- when he
13 called me, yes.
14 Q. You mean it seemed lucky?
15 A. It seemed lucky, yes. He called me and I said I
16 need your help, but I'm too busy right now and he
17 called me back and made a couple of, several calls to
18 me before we actually got to meet.
19 Q. Did you subsequently find out any information
20 about how Mr. Kirk or whether Mr. Kirk had gotten any
21 information about Lycos' plans to buy out its leases
22 before he called you?
23 A. Plans to buy out of the leases?
24 Q. Yes.

Page 105

1  A. No.
2  ATTY. KALER: Mark this.
3  (Exhibit 8, E-MAIL, marked for identification.)
4
5  ATTY. KALER: This will be Exhibit 8.
6  Q. Is this a copy of an e-mail that you received from
7  Mr. Kirk on or about June 3rd of 2003?
8  A. Yes.
9  Q. Is that when you had your telephone call with him?
10 A. Prior to -- prior to receiving this, yes.
11 Q. Do you see where it says, Great talking with you
12 again today. I thought maybe you had already talked to
13 him?
14 A. Yes. I had.
15 Q. Do you remember how long before you had talked to
16 him?
17 A. The time -- this day or previously?
18 Q. No. I assume it means you maybe talked to him
19 prior to June 3, but perhaps not?
20 A. Yes. I had talked to him prior to June 3. Yes, I
21 had.
22 Q. Approximately, how long prior to June 3 was it
23 that you had your first contact with LeaseForum?
24 A. I don't know. I believe that I talked to him

27 (Pages 102 to 105)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 106

1  possibly through the end of May, June. They were just
2  cold calls so I didn't track them. I just knew that he
3  had to call me a couple of times before I did set up a
4  meeting.
5  Q.  So at the time John Kirk called you initially,
6  Brian Lucy was taking the lead on supervising Monique
7  Walsh's generation of internal financial reports about
8  the CSI leases. Is that fair?
9  A.  Yes.
10  Q.  But when you got the cold call from Kirk, what
11  happened? Did you suggest to someone you should take
12  over that responsibility?
13  A.  Yes. I would -- I either suggested it or Brian
14  said -- Brian would have had to approve. Brian would
15  have signed -- Brian would have signed the statements
16  of work and Brian would have said at that time that it
17  was okay and that I should handle it.
18  Q.  What's your best memory of what happened? I mean,
19  you did not -- this was an area at least in terms of
20  internal financials that you said Brian Lucy was
21  handling?
22  A.  Right.
23  Q.  You got a cold call. Did you go to Brian and say,
24  look, maybe I should take this over and work with this

Page 107

1  company?
2  A.  I said I found this company that can help us with
3  our buy-out situation and, you know, Brian said, I
4  don't recall specifically, but good. You do it. That
5  would have been the sentiment, Good. You go do it.
6  ATTY. KALER: We'll mark this.
7  (Exhibit 9, E-MAIL, marked for identification.)
8
9  Q.  Is Exhibit 9 a copy of another e-mail that you got
10  from Mr Kirk on June 5th of '03?
11  A.  Yes.
12  Q.  Now, by this time, you had explained to Mr. Kirk
13  that Lycos was going to be trying to capitalize its
14  leases by buying them out, hadn't you?
15  A.  Yes.
16  Q.  And you see where he said in the first sentence,
17  quote, Wanted to follow up with a couple of other items
18  regarding LeaseForum and our end of term equipment
19  leasing services which might be useful in your meeting
20  with Brian today, unquote. Do you see that?
21  A.  Yes.
22  Q.  You had told him you were going to be meeting with
23  Brian Lucy?
24  A.  Yes.

Page 108

1  Q.  And you had told him that you were going to be
2  telling Brian Lucy in that meeting about LeaseForum and
3  how, perhaps, he should have LeaseForum get involved
4  with helping Lycos in connection with the buy-out?
5  A.  Yes. Either that or I wanted him to sign
6  something, yes. Yes.
7  Q.  There is a reference in the last paragraph to, the
8  second to last sentence, After we talk, the next steps
9  are to execute a nondisclosure agreement.
10  A.  So this was me explaining the preliminary
11  relationship -- me explaining -- yes, me telling Brian
12  about them.
13  Q.  Okay. And the plan, according to Mr. Kirk in the
14  last paragraph, was that once the non-disclosure
15  agreement was in place he says, quote, We will review
16  your master lease agreements and any corresponding
17  schedules and in parallel putting a contract in place
18  to support our work together, end quote.
19  Was that generally the plan at that point assuming
20  that Brian approved it?
21  A.  Yes.
22  ATTY. KALER: Let's mark this.
23  (Exhibit 10, E-MAIL, marked for identification.)
24

Page 109

1  Q.  I'm going to show you what's been marked Exhibit
2  10. Is this a copy of an e-mail that you sent to
3  Monique Walsh on or about June 10, 2003 concerning the
4  effort to get LeaseForum involved?
5  A.  Yes.
6  Q.  And at that time, you told her that, quote, Brian
7  and I would like to get John Kirk involved in our
8  current leasing and lease buy-out situation, end quote.
9  Is that right?
10  A.  Excuse me one minute, please?
11  Q.  Sure. Take your time.
12  A.  Yes.
13  Q.  Okay. And the "Brian" again was Brian Lucy,
14  correct?
15  A.  Yes.
16  Q.  Okay. Did Monique Walsh respond to your
17  communication to her that you were going to bring
18  LeaseForum involved? Did she have any view?
19  A.  I don't recall.
20  ATTY. KALER: We'll mark this as 11.
21  (Exhibit 11, E-MAIL, marked for identification.)
22
23  Q.  Is Exhibit 11 a copy of an e-mail that you sent to
24  Mr. Kirk later in the day on June 10 attaching a

28  (Pages 106 to 109)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

# EXCERPT FROM PAGES 182-185

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

## Page 182

1  Q. Okay. And because you were the relationship
2  manager for Lycos in your dealings with LeaseForum, you
3  had communications with Mr. Kirk and Ms. Franklin
4  concerning the negotiations about this sales agreement
5  leading up to its execution, correct?
6  A. Yes.
7  Q. And you had occasion prior to the agreement being
8  finally executed to review drafts of the agreement and
9  to discuss terms of the agreement with the folks at
10 LeaseForum who were representing Lycos in the
11 negotiations, correct?
12     ATTY. BEAN: Objection.
13 Q. You can answer.
14 A. Yes.
15 Q. And you were aware when Lycos entered into this
16 agreement with CSI, that there was this provision on
17 the second page of Exhibit 23A in Paragraph 4 which was
18 entitled, Satisfaction of lease obligations and which
19 said that, quote, Lessee shall pay to Lessor the number
20 of monthly rental payments remaining -- I should back
21 up. It said, quote, The leases solely with respect to
22 monthly rental set forth on Exhibit 1 shall continue in
23 full force and effect and Lessee shall pay to Lessor
24 the number of monthly rental payments remaining plus

## Page 183

1  applicable taxes, if any, beginning with the payment
2  due for the month of August 2003 and continuing to and
3  including the final rent payment date set forth on
4  Exhibit 1, parens, remaining rental payments, close
5  parens.
6      You were aware there was that provision in the
7  agreement, correct?
8  A. Yes.
9  Q. And Lycos executed the agreement and agreed to
10 that provision on August 8th of 2003 as indicated by
11 the signature on the third page of Exhibit 23A,
12 correct?
13     ATTY. BEAN: Objection.
14 Q. You can answer.
15 A. Yes.
16 Q. Okay. Now, on the same day that Lycos signed that
17 agreement, you received an e-mail from John Kirk at
18 LeaseForum, which we'll mark as Exhibit 24.
19     (Exhibit 24, E-MAIL, marked for identification.)
20
21 Q. And is Exhibit 24 a copy of an e-mail that you
22 received from John Kirk at LeaseForum on August 8th of
23 2003?
24 A. Yes.

## Page 184

1  Q. And on that date, Mr. Kirk wrote to you in this
2  e-mail and in particular in the paragraph which I've
3  put a square box to the left of and marked in blue with
4  the letter A, he said to you, quote, We have completed
5  Phase 1 of the work with CSI, unquote. Do you see
6  that?
7  A. Yes.
8  Q. And he went on to say, quote, Phase 2 has
9  commenced, unquote. Do you see that?
10 A. Yes.
11 Q. By Phase 1, you understood him to be referring to
12 the phase of LeaseForum's work in connection with CSI
13 that culminated in the execution of the contract that
14 we have marked as Exhibit 23A, correct?
15 A. Can I just read the beginning here?
16 Q. Sure.
17 A. Yes.
18 Q. Okay. And having completed that Phase 1 of the
19 work, Mr. Kirk went on to say, quote, Phase 2 has
20 commenced, and went on to say, quote, the Phase 2
21 effort is a continuation under Statement of Work 001.
22 Our current work on the CSI/Lycos relationship is aimed
23 at setting up a negotiation to reduce Lycos' remaining
24 future payment obligations to CSI, end quote. Correct?

## Page 185

1  A. Yes.
2  Q. And --
3  A. Correct. That's what it says, yes.
4  Q. You understood that Mr. Kirk was referring there
5  to setting up a negotiation to reduce the amount of the
6  future payment obligations to CSI that Lycos had just
7  agreed that very day in Exhibit 23A to pay, correct?
8      ATTY. BEAN: Objection.
9  Q. You can answer.
10 A. It looks like John is a little eager here and they
11 wanted to continue to -- to continue working, yes.
12 Q. And regardless of whether you say he was eager,
13 what he was referring to here when he talked about
14 Phase 2, was an effort that was underway to move in the
15 direction of setting up a negotiation with CSI with the
16 goal being to, as he put it, quote, Reduce Lycos'
17 remaining future payment obligations to CSI, unquote?
18 A. I think what he's referring to is that when Susan
19 was negotiating the buy-out, the price dropped very,
20 very quickly and in a short amount of time, and we
21 wanted to further look into why when we got Susan
22 involved with the threat of auditing everything, did
23 the payment come down so quickly. I think that's what
24 he's referring to here.

47 (Pages 182 to 185)

# EXCERPT FROM PAGES 198-201

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 198

1    that Brian who was the CFO was agreeing to anything
2    that John said when he said it. Just that I can speak
3    to the fact that we did agree to Statement of Work 2
4    when we signed Statement of Work 2.
5    Q. Okay. But the fact is that Statement of Work 2
6    was formalizing an understanding that had been
7    originally proposed by Mr. Kirk back in August in his
8    e-mail to you on August 8 in which he said they were
9    going to try to enter into a negotiation to reduce
10   Lycos' remaining future payment obligations?
11   A. Yes. I think John proposed that, but I don't know
12   that Brian went for it until --
13   Q. In fact --
14       ATTY. BEAN: Let her finish.
15   Q. Go ahead.
16   A. I don't know that -- I think that John was a
17   pretty eager guy and I think he proposed it, but I
18   don't think that Brian actually agreed to it. I think
19   it took a while for Brian to agree to this Statement of
20   Work 2.
21   Q. But you don't know -- all you know is that what
22   you said in response almost immediately on August 10th
23   of 2003 was, Can you send me your proposed fee schedule
24   for CSI Phase 2. Brian is expecting a much lower rate

Page 199

1    than Phase 1 given the favorable outcome there.
2        Do you see that portion of your e-mail on the
3    first page of Exhibit 25?
4    A. I do. I think that I was pretty eager, too.
5    Q. Eager to go forward with Phase 2?
6    A. Well, I don't know. I was eager to respond to
7    John, I guess.
8    Q. When you did respond to John, you said, quote, Can
9    you send me your proposed fee schedule for CSI Phase 2
10   and then you said Brian is expecting a much lower rate
11   than Phase 1. You were referring to a lower rate for
12   Phase 2, correct?
13   A. Yes.
14   Q. And, therefore, you had discussed Mr. Kirk's Phase
15   2 proposal with Brian Lucy before you sent this e-mail
16   on August 10, hadn't you?
17       ATTY. BEAN: Objection.
18   Q. You can answer.
19   A. I may have. It does look like I did. I may have
20   been trying to give John a dig, too, and get him
21   prepped for a lower rate. I was -- I think that it was
22   Brian probably dragging his feet until October. Not
23   dragging his feet. Brian probably took a while to make
24   this decision.

Page 200

1    Q. Well, regardless of what your opinion may be about
2    whether Brian took a while to make the decision, if we
3    assume that your e-mail was honest and was not a
4    fabrication, you will agree with me that you could not
5    have found out from Brian Lucy that he was expecting a
6    much lower rate for Phase 2 than Phase 1 unless you had
7    discussed Phase 2 with Brian Lucy prior to writing this
8    e-mail on August 10, correct?
9        ATTY. BEAN: Objection.
10   Q. You can answer.
11   A. I probably discussed going further with Brian. I
12   just don't -- I don't necessarily know that I had his
13   buy-in to that.
14   Q. But you had clearly discussed with Brian the Phase
15   2 proposal that Mr. Kirk had made to you on August 8,
16   correct?
17       ATTY. BEAN: Objection.
18   Q. You can answer.
19   A. I probably did.
20   Q. Okay. And there is -- the response that you had
21   got from Brian was not that he had any hesitancy about
22   Lycos moving forward with Phase 2, but, rather, that he
23   was expecting a much lower rate of compensation that
24   Lycos would have to pay to LeaseForum in Phase 2?

Page 201

1    A. I think that Brian was pretty -- Paul and Brian
2    were friends. I wasn't friends with Paul. So I think
3    that --
4    Q. We're talking about John.
5    A. Oh, no. No. I'm just saying that Brian would
6    have been hesitant to move ahead with Statement of Work
7    2. Not me.
8    Q. Regardless, again, of your opinion about what
9    Brian would have been hesitant to do which really isn't
10   based on anything, is it?
11   A. I think I'm missing the point. I'm sorry.
12       ATTY. BEAN: Please don't insult the witness, Mr.
13   Kaler. You have done that several times. Your opinion
14   is not based on anything, that's really unnecessary and
15   inappropriate.
16   Q. I'm not asking you your opinion as to whether
17   Mr. Lucy would have hesitated or not. We can ask
18   Mr. Lucy what he was doing.
19       I'm looking at your e-mail and what you said in
20   response to Mr. Kirk when he told you, okay, now we
21   have agreed with CSI to pay them under the leases. Now
22   I'm going to turn around and try to negotiate with CSI
23   in an effort to reduce those lease payments. That's
24   what he was proposing, right?

51 (Pages 198 to 201)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

# EXHIBIT 4



 

**LEASEFORUM**

**Statement of Work No. 001**
**End of Lease Workout Services**

**Service Commencement Date:**
This Statement of Work No. 001 ("SOW") is entered into and effective as of June 17, 2003 ("Service Commencement Date") by and between Lycos Inc. ("Client") and LeaseForum, Inc. ("LeaseForum") and shall be subject to all terms and conditions set forth in the General Services Agreement ("GSA") or ("Agreement") dated June 17, 2003. All terms and conditions set forth on the GSA are hereby incorporated by reference. In the event of a conflict between the terms hereof and the GSA, the terms of the SOW shall govern.

**Work:**

For lease schedules designated by Client and entered into the "Assigned Lease Schedules" list below (each, a "Lease"), LeaseForum will research, direct, consult and negotiate end of lease strategies, purchase prices, renewal rates or other costs or penalties related to satisfying Client's end of lease obligations ("Lease Satisfaction Amounts").

LeaseForum will, to the extent provided by Client, review each Lease (including all exhibits and attachments thereto, acceptance certificates, stipulated loss (or casualty) tables, return conditions, end of lease options, lease economics and equipment lists) and its respective master lease (including any amendments) equipment lists, equipment specifications, purchase and sale orders, vendor invoices, miscellaneous letters, notes and emails, deemed necessary by LeaseForum to establish a complete picture of Client's end of lease obligations. Based on such review, LeaseForum will outline available options, work with Client to determine a course of action, including but not limited to early termination, purchase or renewal to a purchase ("EOL Transaction") and negotiate and finalize the Lease Satisfaction Amount due each lessor.

**Fees to LeaseForum:**
For each Lease, upon acceptance of a Lease Satisfaction Amount by a lessor, LeaseForum will invoice Client and Client will pay LeaseForum within thirty (30) days of the invoice date, an amount equal to twenty five percent (25%) of the difference between the Lease Satisfaction Amount and the "Baseline" as herein set forth.

LeaseForum shall have the exclusive right to perform the Work set forth above.

It is expressly understood by Client that they are solely responsible for any and all (i) amounts due and payable to a lessor under any Lease, (ii) the Lease Satisfaction Amount and (iii) all third party costs and expenses incurred with respect to any EOL Transaction.

**Term:**
The Term of this SOW shall commence on the date set forth above and shall expire upon client's payment of the End of Lease Workout Services Fee to LeaseForum as described above for the leases identified in the "Assigned Lease Schedules" document below.

**Representatives:**
Each Party's Representatives for Services performed under this SOW shall be:

Page 1 of 3

LYC 18884

LYC18884

| Terra Lycos' Relationship Manager Julie Callagee Director of Accounting *Asst Cashier* 100 Fifth Avenue Waltham, MA 02451 781-370-2700 ext 2827<br><br>Julie.Callagee@corp.terralycos.com | LeaseForum's Relationship Manager John Kirk Vice President 313 Congress Street Boston, MA 02210<br>P: (617) 443-9916 F: (617) 443-9915 jkirk@leaseforum.com | LeaseForum's Project Manager Susan Franklin CEO 313 Congress Street Boston, MA 02210<br>P: (617) 443-9914 F: (617) 443-9915 ssf@leaseforum.com |
| --- | --- | --- |

IN WITNESS WHEREOF, the parties have caused this SOW No. 001 to be executed and delivered, and do each hereby warrant and represent that their respective signatory, whose signature appears below, has and is on the date of this SOW duly authorized by all necessary and appropriate corporate actions to execute and deliver this Agreement

LEASEFORUM, INC.

By: _____

Name:  Susan S. Franklin

Title:   Chief Executive Officer

Date:   June 17, 2003


LYCOS, INC.

By: _____

Name: _____

Title:  CFO

Date:   June 17, 2003


Please execute two copies of this Statement of Work and return both originals to:

LeaseForum, Inc.
313 Congress Street
Boston, MA 02210
Attn:  Susan S. Franklin
Phone:  (617) 443-9914
Fax:  (617) 443-9915

REVIEWED BY
TERRA LYCOS LEGAL PDK

LeaseForum will execute and return one original to your attention

LYC 18885

LYC18885

 

**LEASEFORUM**

# Assigned Lease Schedule(s)

| Lessor | Master-lease date | Lease-schedule date | Description | Baseline |
|---|---|---|---|---|
| **Avnet Computer** | 11/22/1996 | | | |
| Schedule 21 | | 9/30/2003 | Various Equip. | $704,975 |
| | | | | |
| **Compaq/HP** | 1/12/2001 | | | $1,979,913 |
| Schedule 101003-1 | | 2/29/2004 | Various Equip. | |
| Schedule 101003-2 | | 3/31/2004 | Various Equip. | |
| | | | | |
| **Panthus (Optimus Sol.)** | 5/16/2001 | | Various Equip. | $175,826 |
| Lease # 3851 | | 5/31/2004 | | |
| | | | | |
| **Computer Sales Int'l. (CSI)** | 12/4/1996 | | | $20,270,849 |
| Schedule 93 | | 10/31/2003 | Various Equip. | |
| Schedule 100 | | 3/31/2004 | Various Equip. | |
| Schedule 89 | | 7/31/2004 | Various Equip. | |
| Schedule 89A | | 7/31/2004 | Various Equip. | |
| Schedule 90 | | 7/31/2004 | Various Equip. | |
| Schedule 94 | | 10/31/2004 | Various Equip. | |
| Schedule 200 | | 3/31/2005 | Various Equip. | |
| | | | | |
| **Bank of America** | 5/1/2001 | | | $2,766,968 |
| Schedule 1 | | 9/30/2004 | Various Equip. | |
| Schedule 2 | | 12/31/2005 | Various Equip. | |

LYC 18886

LYC18886

# EXHIBIT 5

**Message 5183**

**Subject:** Re:
**From:** Brian.Lucy@corp.terralycos.com
**Date:** 6/30/2003 4:15:35 PM
**To:** Paul Stenberg

**Message Body**

I'm at the dentist right now. They are telling me that they would like me to ask you to work with them to review the math supporting the buyout number.

B

_____

Sent from my BlackBerry Wireless Handheld

_____

----- Original Message -----
From: Paul Stenberg [Paul Stenberg@csileasing.com]
Sent: 06/30/2003 04:12 PM
To: "Brian Lucy@corp.terralycos. Lucy (E-mail)" <Brian Lucy@corp.terralycos.com>

I gather your out.

Well, my approval from the banks expire today. If you chose to do it, I suggest you sign it w/ a contigency ( upon Terra' corps approval) and fax it to Barb Minch at 314-997 7844 tonight. If you do it, take 75k off the price and initial it.

I am sure lease forum would like a check for 19k for doing nothing

e-mail me and let me know.

y

**Outlook Header Information**

Sender Name: Brian.Lucy@corp.terralycos.com
Received By: Paul Stenberg
Delivery Time: 6/30/2003 4:15:35 PM
Creation Time: 6/30/2003 4:14:32 PM
Modification Time: 6/30/2003 7:15:42 PM
Submit Time: 6/30/2003 4:19:18 PM
Importance: Normal
Priority: Normal

CSI042367
CONFIDENTIAL

CSI042367

# EXHIBIT 6

**Message3194**

**Subject: LeaseForum discussions**

**From:** Brian.Lucy@corp.terralycos.com

**Date:** 7/1/2003 10:45:16 AM

**To:** Paul Stenberg

**CC:** Julie Callagee

**Message Body**

Paul- If LeaseForum and CSI cannot arrive at
a reasonable negotiated settlement for the restructuring of the active CSI
leases, Lycos has authorized LeaseForum to perform a full audit of all CSI
/ Lycos lease arrangements.

Please work directly with LeaseForum to come to a mutually acceptable
resolution.

Thanks,

Brian

––––––––––––––––––––

Sent from my BlackBerry Wireless Handheld

**Outlook Header Information**

Conversation Topic: LeaseForum discussions
Sender Name: Brian.Lucy@corp.terralycos.com
Received By: Paul Stenberg
Delivery Time: 7/1/2003 10:45:16 AM
Creation Time: 7/1/2003 10:44:18 AM
Modification Time: 7/1/2003 4:37:32 PM
Submit Time: 7/1/2003 10:49:03 AM
Importance: Normal
Priority: Normal
Sensitivity: Normal
Flags: 1 = Read
Size: 5726

**Standard Header Information**

Received: from CSISMTP ([10.1.13.76]) by CSIEXG02.csileasing.com with SMTP (Microsoft
Exchange Internet Mail Service Version 5.5.2653.13)
id NYAR06AX; Tue, 1 Jul 2003 09:44:18 -0500
Received: from Unknown [209.202.242.8] by csismtp - SurfControl E-mail Filter (4.6), Tuesday,
01 July 2003, 09:44:17
Message-ID: <OF5C02C356.19CE8ADB-ON85256D56.00516520@ma.lycos.com>

CSI042369
CONFIDENTIAL

CSI042369

From: Brian.Lucy@corp.terralycos.com
To: "Paul Stenberg" <Paul.Stenberg@csileasing.com>
Cc: "Julie Callagee" <julie.callagee@corp.terralycos.com>
Date: Tue, 1 Jul 2003 10:49:03 -0400
Subject: LeaseForum discussions
MIME-Version: 1.0
Content-Type: text/plain; charset=iso-8859-1
Content-Transfer-Encoding: quoted-printable
X-MIMETrack: Serialize by Router on BBMail01/Lycos(Release 5.0.12 |February 13, 2003) at
07/01/2003 10:49:05 AM

CSI042370
CONFIDENTIAL

CSI042370

# EXHIBIT 7

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff and Defendant-in-Counterclaim | ) | |
| | ) | C.A. No. 05-10017-RWZ |
| vs. | ) | |
| | ) | |
| LYCOS, INC., | ) | |
| | ) | |
| Defendant and Plaintiff-in-Counterclaim, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant | ) | |

VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU
Taken on behalf of Lycos, Inc
March 8, 2006

Reported by Victoria Menaugh Fauser
CCR No. 903
CSR Missouri and Illinois

METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MO 63126
(636) 349-3333

---

**Page 2**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff and Defendant-in-Counterclaim | ) | |
| | ) | C.A. No. 05-10017-RWZ |
| vs. | ) | |
| | ) | |
| LYCOS, INC., | ) | |
| | ) | |
| Defendant and Plaintiff-in-Counterclaim, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| BANK OF AMERICA F/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant | ) | |

VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU, produced, sworn, and examined on behalf of Lycos, Inc. on March 8, 2006, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of that day, at the law offices of Husch Eppenberger, 190 Carondelet Plaza - Suite 600, St. Louis, Missouri 63105, before VICTORIA MENAUGH FAUSER, a Certified Shorthand Reporter and a Notary Public within and for the State of Missouri

---

**Page 3**

A P P E A R A N C E S

FOR COMPUTER SALES INTERNATIONAL, INC

Gadsby Hannah
Robert, J. Kaler
225 Franklin Street
Boston, Massachusetts 02110

FOR THE LYCOS, INC.

McDermott, Will & Emery
Thomas O. Bean
28 State Street
Boston, Massachusetts 02109

Also Present: Lorrain S. Cherrick, Senior Vice
President and General Counsel CSI
Leasing

---

**Page 4**

INDEX OF EXHIBITS

DEFENDANT'S EXHIBIT NOS. 1 - 9

| EXHIBIT NO | PAGE NO IDENTIFIED |
|---|---|
| 1 | 47 |
| 2 | 53 |
| 3 | 72 |
| 4 | 96 |
| 5 | 97 |
| 6 | 104 |
| 7 | 152 |
| 8 | 182 |
| 9 | 194 |

137

```
 1  be approved by -- in St. Louis
 2       Q    (BY MR BEAN)  Who in St Louis would
 3  need to approve the price?
 4       A    I believe it was Phil Cagney
 5       Q    Are you familiar with the process by
 6  which CSI determines how much to quote for a
 7  buy-out price?
 8       A    No. not particularly
 9       Q    Mr Cagney would be familiar with
10  that: is that right?
11       A    Yes  I suspect he would be  He would
12  have some knowledge on a -- you know, if you had a
13  particular question  I m not sure if you re just
14  asking generally or specifically?
15       Q    I'm thinking generally  I m trying to
16  understand -- I asked you if you were familiar with
17  the process CSI uses to determine a buy-out price
18  and I believe your answer was no: is that right?
19       A    I m generally familiar, yes  Our
20  sales people present a sales price to a customer
21  In this Lycos example I wasn t familiar with how
22  numbers were arrived at
23       Q    Well, I'm asking -- I m not looking
24  for the Lycos specifically because you said you
25  weren t aware of that  I'm just wondering
```

138

```
 1  generally are you familiar with the process that
 2  CSI employs to determine a buy-out price quote?
 3       A    Yes  I'm generally familiar with it
 4       Q    What is that process?
 5       A    Well, you know  the sales price is
 6  ultimately -- it may be set by contract where there
 7  is an option at the end of the contract where a
 8  lessee may have negotiated it could buy it at the
 9  end of the lease for a predetermined amount
10            Or there is circumstances that a
11  lessee may have negotiated a fair market value
12  purchase option of the equipment and there is a
13  process for, you know  reaching that number
14            Or the third option is just that CSI
15  and the customer generally agree what will the
16  sales amount be, which I think is what happened in
17  Lycos is that CSI originally proposed 4 6 million
18  and CSI -- Lycos countered and offered to purchase
19  it for 3 775 million and we accepted Lycos' almost
20  million dollar reduction in the price
21       Q    Okay  Let's go to the case where the
22  parties have not negotiated at lease inception a
23  formula for the -- determining the amount of the
24  buy-out, the Lycos type situation  What is the
25  methodology that CSI employs to determine what
```

139

```
 1  price to quote to the lessee for the buy-out?
 2            MR KALER: Objection  But you can
 3  respond again
 4       A    CSI calculates -- you know, the
 5  salesman presents the number to the customer  What
 6  goes into that  you know, it's specific to that
 7  transaction  So there is not necessarily an
 8  overall it's always done the same way  It depends
 9  on the transaction
10       Q    Did you ever discuss -- well. who
11  would come out -- typically who would come up with
12  up the buy-out number? Would it be the salesperson
13  in the first instance or someone in St  Louis?
14            MR KALER: Objection  But you can
15  respond
16       A    Generally are we talking?
17       Q    (BY MR BEAN)  Yes
18       A    Someone in St  Louis would give the
19  salesperson what we call a threshold  And the
20  salesman  if he's able to, and the other side is
21  willing and agreeable to the price will agree to a
22  price that has to meet that minimum threshold
23  amount  Otherwise CSI won't approve the sale
24       Q    Do you know whether there was a
25  threshold number on the sale by CSI for Lycos?
```

140

```
 1       A    Yes
 2       Q    What was the threshold number?
 3       A    I believe it was 350 000
 4       Q    Do you know how CSI determined that
 5  $350 000 number?
 6       A    No
 7       Q    Do you know who would have been
 8  involved in making that determination?
 9       A    I think Phil Cagney
10       Q    Does the $350,000 number represent
11  CSI s assessment of the then fair market value of
12  the equipment?
13            MR  KALER: Objection  But you can
14  respond
15       Q    (BY MR BEAN)  By fair market value
16  we'll go back to my definition earlier, a willing
17  buyer and willing seller in case that's ambiguous
18       A    I wasn t involved in the pricing of
19  that schedule so I don t know
20       Q    Would it have been customary for the
21  salesperson to work with Mr  Cagney in determining
22  what the threshold amount should be?
23            MR  KALER: Objection  But you can
24  respond
25       A    I don t know
```

# EXHIBIT 8

**From:** Phil Cagney
**Sent:** Tuesday, August 05, 2003 4:25 PM
**To:** Joan Kersting; Kathy Bradley; Nikki Douglas
**Cc:** Fred O'Neal; Bill Gillula
**Subject:** Lycos Sales Tax

I talked to Paul on the Lycos sales tax issue.

If we did not get the $226,xxx of sales tax on the $3,775,000, then let's get it billed right away.   Then whenever the acceleration of the lease payment sales tax is calculated, we will bill that separately.

However, Paul also mentioned that he had heard from Nikki or Joan that Lycos actually wired over $4 million.  That would imply that maybe we really did get the sales tax already (on the sale).   Please clarify what we received via wire.

thanks
Phil

CONFIDENTIAL
CSI0038505

# EXHIBIT 9

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
C.A. No.

LYCOS, INC.,

Plaintiff,

v.

COMPUTER SALES
INTERNATIONAL, INC.,

Defendant.

03-5057

```
FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FO°)        ?EX
DEC 1 2 2003

            CLERK
```

**COMPLAINT**

```
12/12/03 15:38#0000 1442 CLERK E
    CIVIL        240.00
    SURCHARGE     15.00
    SECC          20.00
    035057 #
    SUBTTL       275.00
    TOTAL 275.00
    CHECK        275.00
```

## NATURE OF THE ACTION

1.    In this action, the plaintiff, Lycos, Inc. ("Lycos"), a lessee with respect to personal property from defendant/lessor Computer Sales International, Inc. ("CSI"), seeks a declaration under G.L. c. 231A, § 1, that it has no obligation to pay any further amounts to CSI under certain equipment leases between Lycos and CSI. It also seeks recovery of overpayments made by Lycos to CSI in an amount to be determined at trial, but in no event less than $15,000,000.

## PARTIES

2.    Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451

3.    Defendant Computer Sales International, Inc. is an Oklahoma corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter pursuant to G.L. c. 231A, § 1.

5.     This Court has personal jurisdiction over CSI under G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

6.     Venue is proper in this county pursuant to G.L. c. 223, §§ 1, 8(2).

## FACTS

7.     In late 1996, Lycos and CSI entered into a Master Lease Agreement whereby CSI agreed to lease to Lycos certain computer equipment that would be identified in one or more equipment lease schedules.

8.     Between December of 1996 and April of 2002, Lycos and CSI entered into dozens of equipment lease schedules pursuant to the terms of the Master Lease Agreement. According to the Master Lease Agreement, each separate equipment schedule constituted a separate lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and monthly rental amounts due to CSI by Lycos. As of the date hereof, there are approximately eight outstanding equipment schedules under which CSI claims Lycos owes it millions of dollars.

9.     At some point after execution of the Master Equipment Lease, the terms of several equipment lease schedules were consolidated or "rolled up" into one or more new lease schedules. Some of these "rolled up" schedules were rolled up again into other schedules. In fact, certain schedules were rolled up several times.

-2-

10.    Lycos' understanding of these "roll ups" was that the term of the lease schedule would be extended and the monthly payments would be reduced, similar to the refinancing of a mortgage. However, unbeknownst to Lycos, CSI rewrote the lease schedules so that, over time, Lycos would pay CSI over 175% of the original base rent. As a result, Lycos has already paid CSI in full (and more) for all equipment leased to it.

## COUNT I
### (Declaratory Judgment – G.L. c. 231A, § 1)

11.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 10 above.

12.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

13.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing.

14.    Lycos seeks a judicial declaration that it has no further payment obligations to CSI.

## COUNT II
### (Money Had and Received)

15.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 14 above.

16.    CSI owes Lycos for monies it unknowingly overpaid to CSI as a result of the "roll up" of various equipment schedules, as described above.

17.    CSI has obtained money from Lycos well above any reasonable or fair rental payment amount which in equity and good conscience must be returned to Lycos, in an amount to be determined at trial but not less than $15,000,000.

## JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Count I, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding computer equipment lease schedules between Lycos and CSI;

B.    On Count II, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $15,000,000, together with interest and costs;

C.    award Lycos its reasonable attorneys' fees and costs incurred in prosecuting this action; and

D.    grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,



Thomas O. Bean (BBO# 548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
(617) 439-2000

Of Counsel:

Alan Goudiss
Shearman & Sterling
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000

Dated:  December 12, 2003

1279499.2

MIDDLESEX, ss.    **Commonwealth of Massachusetts**
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file
and of record made by photographic process, I hereunto
set my hand and affix the seal of said Superior Court
this twenty-ninth day of January 2004.

Anne M. Cherubino

Deputy                Assistant Clerk

# EXHIBIT 10

 **Nutter**

Thomas O. Bean
Direct Line: 617-439-2348
Fax: 617-310-9348
E-mail: tbean@nutter.com

February 11, 2004
105401-1

**By Hand**

Robert J. Kaler, Esq.
Gadsby Hannah LLP
225 Franklin Street
Boston, MA 02110

Re:    Lycos, Inc. v. Computer Sales International, Inc.

Dear Bob:

Per your request, enclosed is a draft of Lycos' First Amended Complaint.  It has not been filed yet.  Please call me once you and your client have had a chance to review it.

Very truly yours,

Thomas O. Bean

TOB/caf
Enclosure

Nutter McClennen & Fish LLP ▪ Attorneys at Law

World Trade Center West ▪ 155 Seaport Boulevard ▪ Boston, MA 02210-2604 ▪ 617-439-2000 ▪ Fax: 617-310-9000 ▪ www.nutter.com

Robert J. Kaler, Esq.
February 11, 2004
Page 2


bcc:    Andrew W. Feinberg, Esq.
        Alan S. Goudiss, Esq.
        John Kirk
        Susan Franklin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LYCOS, INC.,                             )          C.A. No. 04-10212-RWZ
                                         )
        Plaintiff,                       )
                                         )
v.                                       )          **FIRST AMENDED COMPLAINT**
                                         )
COMPUTER SALES                           )          *DRAFT*
INTERNATIONAL, INC.,                     )
                                         )
        Defendant.                       )

## NATURE OF THE ACTION

1.      This is an action to halt and redress a pattern and practice of misconduct
committed by Computer Sales International, Inc ("CSI") with respect to certain equipment leases
it entered into with Lycos. CSI, which purports to be one of the largest information technology
leasing companies in the world, took advantage of its long-standing relationship with Lycos to
obtain millions of dollars in undeserved profit. CSI intentionally and negligently misrepresented
and failed to disclose certain material features of its lease agreements with Lycos, leading Lycos
to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.      CSI accomplished its ends through a fraudulent and deceptive method of "rolling
up" equipment leases. The "roll-up" scheme recast active equipment leases as longer team
leases with lower monthly payments, something which, on its face, was beneficial to Lycos. Yet,
these recast or "rolled-up" leases actually converted CSI's residual risk in the equipment into a
guaranteed stream of rental payments which, in total, far exceeded the cost of the equipment,
thereby eliminating CSI's risk and ensuring CSI an exorbitant no-risk profit. As a result of CSI's
"roll up" scheme, Lycos unwittingly paid more than $75 million on leases of equipment costing
approximately $47 million.

3.    To halt and redress CSI's pattern and practice of misconduct, Lycos seeks:

• a declaration that it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, an amount that now approximates $7,800,000;

• recovery of overpayments it made as a result of CSI's wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $13,000,000, plus interest and costs; and

• treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G.L. c. 93A.

## PARTIES

4.    Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

5.    Defendant Computer Sales International, Inc. is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

6.    This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

7.    This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3, because CSI transacts business in the Commonwealth.

## FACTS

### *Computer Equipment Leasing Generally*

8.     Companies seeking to acquire computer equipment for use in their businesses have two main options: purchasing and leasing. Many companies, knowing that computer equipment becomes obsolete relatively quickly, elect to enter into short-term leases rather than purchase the equipment. Leasing also can provide accounting and operational benefits such as capital preservation. Leases permit the lessee to return the equipment to the lessor at the end of the lease term, leaving the lessor with the risk of technological obsolescence.

9.     To satisfy the lessee's present computer equipment needs and accommodate its anticipated needs for new and improved computer equipment in the future, the lessor and lessee typically enter into a master lease agreement. They then enter into one or more equipment schedules, over time, each of which incorporate the terms of the master lease agreement. Typically, an equipment schedule describes the equipment being leased, its cost (or lease basis), the fixed term of the lease, the commencement date, the repayment schedule, and the location of the equipment.

10.     There are two types of equipment leases used in the technology sector: operating leases and capital leases. The basic distinction between these two is that the former is a true lease while the latter is essentially a conditional sale or loan. In a capital lease, the lease rental payments together with a required contracted purchase price are sufficient to cover the lessor's investment and provide a yield whereas with operating leases, the lease rental payments total only a percentage of the equipment cost (or lease basis).

11.     Under Financial Accounting Standards Board ("FASB") rules, for a lease to qualify for accounting treatment as an "operating lease," the present value of the minimum lease rental payments must not be greater than or equal to 90% of the original cost of the leased equipment (or lease basis).

12.     At the conclusion of the fixed term under an operating lease, the lessee generally has the option to return the equipment to the lessor, to renew the lease at an agreed rate (generally fair rental value) or purchase the equipment at an agreed price (generally fair market value).  The value of the equipment at the end of the lease term is called the "residual" value, and the proceeds from the sale or re-lease of the equipment is known as "residual" proceeds.

13.     Because the lease rental payments total less than the original equipment cost (or lease basis), the lessor must either sell or re-lease the equipment (the proceeds of such activity being realization of the residual value) to achieve a yield or profit.  This difference between the original equipment cost and the total lease rental payments (discounted to present value) – existing in every operating lease – is the lessor's investment risk in the lease.

14.     On operating leases, to achieve a "yield" or profit, lessors must re-lease or re-sell the leased equipment at the conclusion of the lease term, with the objective of obtaining an amount equal to at least the residual value the lessor assumed at the onset of the lease.  But CSI found a simpler way: "rolling up" equipment schedules to eliminate its investment risk and guarantee a profit for itself at Lycos' expense.

### *Lycos' Computer Equipment Leases With CSI*

15.     In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment.  A true and accurate copy of this master lease agreement is attached hereto as <u>Exhibit A</u> (the "Master Lease Agreement").

16.    Between December of 1996 and April of 2002, Lycos and CSI entered into approximately 80 equipment schedules for the acquisition and lease of new items of technology equipment under the Master Lease Agreement. The equipment schedules concerned, literally, thousands of pieces of computer equipment on which Lycos relied for its day-to-day operations. According to the Master Lease Agreement, each equipment schedule constituted a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional specific terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos. An example of one of the lease schedules, Equipment Schedule 67E, is attached hereto as Exhibit B.

17.    The equipment schedules were structured as operating leases, with personal computing assets (i.e., PCs) on fixed terms of 24 months and network computing assets (i.e., Non-PCs) on fixed terms of 36 months. A typical 24-month lease between Lycos and CSI was priced so that the present value of the minimum lease rental payments for the term of the lease equaled 85% of the cost of the equipment financed, while the present value for the typical 36-month lease was slightly less than 90%. Thus, CSI's equity (i.e., "investment" or "risk") in the lease was 15% on the 24-month leases and 10% on the 36-month leases.

### CSI Gains the Trust of Lycos Personnel

18.    CSI's account representative for Lycos, Paul Stenberg, communicated regularly with Lycos personnel during the course of the parties' business relationship. As that relationship grew over time into what Lycos thought was a collegial and long-term association, Lycos and CSI representatives also began interacting on a social as well as a business basis. Such social interaction between Lycos and CSI representatives included golf outings, dinners and invitations

to concerts and sporting events. Through such activities, Mr. Stenberg gained the friendship and trust of Lycos' officers and employees.

19. Lycos' personnel periodically changed over time, including those in key financial and oversight positions responsible for managing Lycos' lease portfolio with CSI. As a result, and based on what appeared to be CSI's trustworthy and collegial approach toward Lycos, Lycos' personnel placed their trust in CSI's business advice with respect to the execution of equipment schedules. Lycos' placement of such trust in CSI was understandable, particularly given CSI's superior knowledge and expertise with respect to the complicated equipment leases transactions involved.

20. This combination of personnel turnover at Lycos, CSI's superior expertise in equipment leasing, and the complexity of the lease arrangements, caused Lycos to rely on Mr. Stenberg's input and guidance with respect to the equipment schedules. Mr. Stenberg knew of the trust placed in him by Lycos. Yet, he and CSI took advantage of it to CSI's benefit and Lycos' detriment through utilization of "roll ups" of Lycos' equipment schedules.

### *CSI's Consolidation or "Roll Up" of Lycos' Leases*

21. Of the approximately 80 equipment schedules entered into between Lycos and CSI, only a handful reached their termination dates in the normal course and therefore only a very small percentage of the computer equipment leased thereunder has been either purchased by Lycos or returned to CSI. Instead, just over a year after execution of the Master Lease Agreement and a full year before the normal expiration of the term of certain equipment schedules, several of the then-existing equipment schedules were terminated and "rolled up" onto one or more new equipment schedules with fixed terms of 24 months or more.

22.    CSI's method of consolidation or "rolling up" equipment schedules worked as follows. Either on their normal expiration date or prior thereto, several equipment schedules would be terminated, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment schedule. In some cases, the equipment from one equipment schedule would be combined with the equipment from one or more other schedules and "rolled up" onto a single new equipment schedule.

23.    Before consolidation onto a single new equipment schedule, the terminated equipment schedules sometimes had varying numbers of months remaining on their original lease terms. At the date these equipment schedules became effective under the new "roll-up" schedule, some would have no original monthly lease rental payments remaining, while others would have all but two or three monthly lease rental payments remaining. Some of these "rolled up" schedules were rolled up again into other equipment schedules. In fact, certain equipment schedules were rolled up several times.

24.    CSI represented to Lycos that the "roll-ups" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage. This was true.

25.    However, unbeknownst to Lycos, CSI made intentional and negligent misrepresentations to Lycos to induce Lycos to agree to "roll up" the lease schedules so that, over time, Lycos paid CSI considerably more than 100% of the value of the equipment. In fact, without telling Lycos, CSI utilized these "roll-ups" to reduce significantly, and in most cases eliminate, CSI's investment risk in the "rolled" leases at Lycos' expense.

26.    Based on documentation prepared by CSI, the original cost of the equipment leased by Lycos from CSI under the 80 equipment schedules was approximately $47 million.

Under these original lease schedules, prior to "roll-ups," Lycos would have paid CSI monthly

lease rental payments of approximately $46 million. (The forty-six million number exceeds 90%

of the equipment cost because, on some leases, the present value of the minimum lease payments

was higher due in part to certain "soft" costs such as software, taxes, freight, and warranties

being capitalized). As a result of the "roll-ups," however, Lycos has paid and is contracted to

pay CSI over $72 million in total monthly lease rental payments (exclusive of interim rent), an

increase of more than $26 million.

### *Example of an Unfair "Roll Up" – Equipment Schedule 67E*

27.    An examination of the history of one specific equipment lease schedule –

Equipment Schedule 67E – demonstrates how CSI manipulated the "roll up" process to its favor

and Lycos' detriment.

28.    On July 12, 2000, Lycos entered into Equipment Schedule 67E ("Schedule 67E"),

a true and accurate copy of which is attached hereto as Exhibit B. Schedule 67E governed the

lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months

starting in October of 2000 and with a monthly rental payment of $42,075. Given a residual

value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield

from Schedule 67E was a reasonable 11%.

29.    On November 14, 2000, after only two monthly lease rental payments, Lycos

entered into Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is

attached hereto as Exhibit C. Schedule 67H is a 34-month lease commencing on December 1,

2000. The assets leased under Schedule 67H are those same assets previously leased under

Schedule 67E, which was terminated the day before Schedule 67H became effective. The

monthly lease rental payment due under Schedule 67H was $36,438.41. A comparison of the

terms of Schedules 67E and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment @10% | 84.27% | 99.35% | 104.53% |
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

30.    As reflected in the table above, the "refinancing" of Schedule 67H did reduce

Lycos' monthly lease rental payment obligation by over $5,000. However, it increased Lycos'

total lease rental obligations by more than $300,000, from $1,009,800 to $1,323,056 (under the

combined equipment schedules). Additionally, CSI's risk in the transaction was completely

eliminated because the total lease rental payments fully returned CSI its investment in the

equipment and provided a yield of almost 14% prior to CSI receiving any residual proceeds at

the end of the term of Schedule 67H (see the last row of the table above). CSI did not disclose

this fact to Lycos. Moreover, Schedule 67H still required Lycos to either purchase, renew or

return the equipment to CSI at the conclusion of its lease term.

31.    Although CSI had already completely eliminated its investment risk in the leased

equipment under Schedule 67E, and had guaranteed itself a 14% profit through the "roll up" into

Schedule 67H, CSI's failure to disclose to Lycos the impact of the "roll-ups" continued.

32.    In October of 2001, allegedly again to reduce Lycos' monthly payments, CSI

again rolled the equipment that had originally been leased pursuant to Schedule 67E. Two new

lease schedules were the outcome of that "refinancing" activity. True and accurate copies of

Equipment Schedules 93 and 94 are attached hereto as <u>Exhibits D and E</u> ("Schedule 93" and

"Schedule 94", respectively).

     33.     Schedules 93 and 94 reflected the "roll-up" of a large number of then-existing

equipment schedules – including Schedule 67H – with the equipment divided into the two

schedules by category: PCs onto Schedule 93 and Non-PCs onto Schedule 94. Schedule 93 had

a 24-month term commencing November 1, 2001 and ending October 31, 2003, while Schedule

94 had a 36-month term commencing November 1, 2001 and ending October 31, 2004. A

termination date of September 30, 2003 was established for Schedule 67H, which was the

original end date of the lease. The additional lease obligations under Schedule 93 became one

(1) payment of $3,751 payable October 1, 2003. The additional lease obligation under Schedule

94 became thirteen (13) monthly payments of $32,688 commencing October 1, 2003 (see table

below).

| Equipment Schedule | 67E / 67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in Advance) | 2@ $42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2@ $42,075 34 @ $36,438 1@ $36,438 12@ $32,688 |
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payments @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos' monthly lease rental obligation

did decline from $36,428 to $32,688. However, Lycos' total fixed monthly lease rental

obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment

schedules). Additionally, CSI further increased its yield or profit in the transaction before receipt

of any residual proceeds to more than 27%. CSI did not disclose this fact to Lycos. Moreover,

Schedules 93 and 94, however, did not end Lycos' obligation to CSI under the original Schedule 67E, but carried at its conclusion yet another obligation for Lycos to purchase, renew, or return the equipment to CSI.

<em>CSI's Misrepresentations and Omissions of Material Fact</em>

34.     The Equipment Leasing Association ("ELA") is a nonprofit trade organization that represents more than 800 member leasing companies.

35.     CSI is a member of the ELA.

36.     The ELA's standards for professional conduct reflect the standards of the equipment leasing industry in general. They also govern the conduct of its members.

37.     The ELA has established a Code of Fair Business Practices, a true and accurate copy of which is attached as Exhibit F. Paragraph 7 of Section I: General Standards of Professional Conduct, requires ELA members to "disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision."

38.     Notwithstanding (a) this duty, (b) its representation on its web-site that it "engag[es] in the highest levels of business conduct with regard to ethics," (c) its knowledge of the economic windfall it would enjoy at Lycos' expense from the "roll-ups," and (d) its knowledge that Lycos' understanding of the "roll-ups" was simply that the term of the equipment schedule would be extended and the monthly lease rental payments reduced, CSI failed to disclose to Lycos the more than $26 million increase in aggregate payments resulting from the "roll-ups" and elimination of residual. CSI thus permitted Lycos to continue operating and making future decisions with respect to the leases under its mistaken perception of the financial impact of the "roll-ups."

39.    Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups," but CSI intentionally misrepresented material facts to Lycos to induce it to enter into certain "roll-ups." Specifically, but without limitation, during the period Lycos was considering entering into certain "roll-ups," Lycos inquired as to the terms of the refinancing of Schedules 93 and 94. Mr. Stenberg, who operates out of an office in Needham, sent an e-mail dated March 18, 2002 to Lycos in which CSI represented that the total original equipment cost under the Lycos lease schedules was $63 million. A true and accurate copy of this e-mail is attached hereto as Exhibit G.

40.    On information and belief, Mr. Stenberg knew that Lycos would use this figure during its (Lycos') internal review to determine whether to enter into the Schedule 93 and 94 "roll-up." On information and belief, he also knew that this $63 million amount overstated the original equipment cost by more than $16 million.

### Lycos' Purchase of the Leased Equipment

41.    In 2003, before Lycos had discovered the true financial impact of the "roll ups," Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules. As part of that discussion, Lycos also requested what, if anything, would be required to convert the remaining lease obligations to capital leases such that at the conclusion of the lease terms, Lycos would own the equipment.

42.    Although CSI had a duty to disclose to Lycos that Lycos had already made or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.

43.    The proposed structure, for which a number of quotes were submitted by CSI to

Lycos, consisted of a one-time payment (purchase price), plus payment of the then remaining

monthly lease rental payments on their original due dates.

44.    Ultimately, in July of 2003, Lycos agreed to and did pay CSI a purchase price

$3.775 million. Lycos also agreed to continue making monthly lease rental payments until the

end of the lease term, at which time, under the transaction CSI proposed, Lycos would "own" the

equipment. Of course, CSI did not tell Lycos that in most cases, Lycos had already paid more

than the cost of the equipment. A true and accurate copy of the July, 2003 purchase agreement is

attached hereto as Exhibit H.

### *CSI's Further Bad Faith and Lycos' Compliance with the Leases*

45.    After Lycos discovered the true financial impact of the "roll ups," it initially

decided not to make certain monthly lease payments, and brought the substance of its findings to

CSI's attention. It offered to present those findings to CSI's representatives to give CSI an

opportunity to explain or refute such findings. Despite having received over $60,000,000 from

Lycos over the course of seven years, CSI refused to even meet with Lycos' representatives to

discuss the matter.

46.    Instead, to coerce Lycos into continuing to make payments, CSI sent Lycos a

letter dated January 8, 2004, in which it threatened, among other things, to declare defaults of the

outstanding lease schedules. CSI has also wielded a variety of legal and economic threats,

including drawing on a multi-million letter of credit and the possible repossession of the leased

equipment. The latter would threaten to shut down Lycos' operations entirely.

47.    Although Lycos did not believe it was obligated to make any further payments under the outstanding lease schedules because of CSI's intentional and negligent misrepresentations and its "strong-arm" tactics, Lycos nonetheless had no choice. It therefore made the payments demanded by CSI. Indeed, Lycos has made all payments required under the Master Lease Agreement and related schedules, and otherwise satisfied its obligations thereunder.

## COUNT I
### (Money Had and Received)

48.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 47 above.

49.    The original cost of the equipment leased by Lycos from CSI was approximately $47 million.

50.    Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling $46 million.

51.    As a result of CSI's repeated "roll-up" of the lease schedules, Lycos has paid CSI (a) more than $64 million in addition to interim rent, with $7.8 million due to be paid; and (b) $3.775 million to purchase the equipment.

52.    CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the term of the "rolled up" schedules.

53.    Equity and good conscience demand that this excess, in an amount to be determined at trial but not less than $13,000,000, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
## (Unjust Enrichment)

54.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 53 above.

55.    CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

56.    CSI accepted such monies knowing that it was receiving an economic windfall.

57.    CSI's retention of these monies would be unjust and inequitable.

58.    As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial but not less than $13,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT III
## (Declaratory Judgment)

59.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 58 above.

60.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

61.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing.

62.    Lycos seeks a judicial declaration that it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that as of the date hereof is approximately $7,800,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT IV
### (Declaratory Judgment)

63.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 62 above.

64.    A controversy or dispute exists between the parties concerning CSI's obligations to disgorge and return overpayments made by Lycos as a result of the "roll up" of various equipment schedules, as described above.

65.    Lycos seeks a judicial declaration that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial but not less than $13,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT V
### (Fraudulent Misrepresentation)

66.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 65 above.

67.    CSI's written representation that the original cost of the leased equipment was $63 million was false. CSI made this representation with knowledge of its falsity or at least with reckless disregard for its truthfulness. CSI made this representation with the intent that Lycos rely on it. Lycos reasonably and justifiably relied on this misrepresentation and, as a result, suffered substantial damages.

68.    In addition, prior to and during the course of Lycos' analysis of whether to enter into the "roll up" of various equipment schedules, CSI owed a duty to Lycos to disclose facts basic and relevant to Lycos' decision to enter into such "roll-ups" including, without limitation, (a) the impact of the "roll-ups" on the amount to be paid by Lycos relative to the original equipment cost; and (b) the fact that the total amount to be paid by Lycos after the "roll-ups" substantially exceeded any reasonable or fair rental total compensation for the leased equipment.

69.    Such duty arose from, among other things, the standards in the industry, as evidenced by the ELA's Code of Fair Business Conduct, and CSI's knowledge that Lycos was entering into the "roll-ups" under mistake or misapprehension concerning the amount being paid relative to a fair total compensation. Such duty also arose from the relationship of known trust between the parties, combined with CSI's superior expertise and the complexity of the lease arrangements.

70.    CSI's failure to fulfill its duty to disclose facts material to Lycos' decision to enter into the "roll-ups" was made with the intent to induce Lycos to enter into the "roll-ups," which Lycos did.

71.    As a result of CSI's intentional misrepresentations and breach of duty to disclose material facts, Lycos has been damaged in an amount to be determined at trial but not less than $13,000,000.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT VI
### (Negligent Misrepresentation)

72.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 71 above.

- 17 -

73.    To the extent CSI performed its duty to provide Lycos with information relevant to Lycos' decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

74.    Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment.

75.    As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $13,000,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VII
### (G.L. c. 93A, § 11)

76.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 75 above.

77.    CSI is engaged in trade or commerce as that term is defined in G.L. c. 93A.

78.    CSI has engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2 and 11. Such violations include, but are not limited to, CSI's collection of money from Lycos well above any reasonable or fair total compensation as a result of the "roll up" of various equipment schedules, as described above, and CSI's intentional and negligent misrepresentations and omissions of material fact prior to and during the course of Lycos' analysis of whether to enter into such "roll ups."

79.    At all times material and relevant hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts.

- 18 -

80.     The violations of G.L. c. 93A, §§ 2 and 11 described above were knowingly, willfully and intentionally committed by CSI.

81.     By reason of CSI's unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $20,800,000.

82.     Such damages should be trebled pursuant to G.L. c. 93A, § 11. Lycos should also be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VIII
## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

83.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 82 above.

84.     In entering into The Master Lease Agreement and related lease schedules, CSI was bound to act in good faith and fair dealing with Lycos.

85.     Through its fraudulent and/or negligent misrepresentations in connection with the "roll up" of various equipment schedules, as described above, and its failure to meet with Lycos even to discuss Lycos' claims, CSI has unfairly and in bad faith extracted money from Lycos well above any reasonable or fair total compensation under the leases.

86.     As a result of CSI's actions described above, Lycos has been damaged in an amount to be determined at trial but not less than $20,800,000.

WHEREFORE, Lycos requests the relief set forth below.

## JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Counts I-II, V-VI and VIII, enter judgment against CSI, and in favor of Lycos, in an amount to be determined at trial but not less than $13,000,000, together with interest and costs;

B.    On Count III, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding computer equipment lease schedules between Lycos and CSI;

C.    On Count IV, enter judgment declaring that CSI must disgorge and return all overpayments made by Lycos to CSI in an amount to be determined at trial but not less than $13,000,000, together with interest and costs;

D.    On Count VII, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of G.L. c. 93A, and awarding plaintiff actual damages in an amount to be determined at trial but not less than $20,800,000, trebled, together with interest, costs and attorneys' fees; and

F.    Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

**DRAFT**

Dated: February ___, 2004

_____
Thomas O. Bean (BBO# 548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2000

Of Counsel:

Alan S. Goudiss
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000

1292368.2

# EXHIBIT A



**CSI**    MASTER LEASE AGREEMENT NUMBER 144874



MASTER LEASE AGREEMENT dated as of December 4, 1996 by and between COMPUTER SALES INTERNATIONAL, INC. (hereinafter called "Lessor") having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141, and

LYCOS, INC.
(hereinafter called "Lessee") having its principal office and place of business at

293 Boston Post Road West
Marlboro, Massachusetts  01752

IN CONSIDERATION of the mutual agreements hereinafter set forth and the payment of rent as herein provided for, the parties hereto agree as follows:

**1. LEASE AGREEMENT**

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor all of the equipment and other tangible personal property described in each of the Equipment Schedules which are executed from time to time by Lessor and Lessee pursuant to this Master Lease. Each Equipment Schedule shall constitute a separate lease on the terms and conditions stated therein and, to the extent not inconsistent with the Equipment Schedule, on the terms and conditions stated in the Master Lease which shall be incorporated by reference in the Equipment Schedule. The term "Equipment" as used herein shall mean, with respect to any Equipment Schedule, the Equipment described therein. The term "Unit" as used herein shall mean an individual machine on an Equipment Schedule or an individual feature when such feature is leased separately from a machine. The term of this Master Lease shall begin on the date set forth above and shall continue in effect so long as any Equipment Schedule entered into pursuant to this Master Lease remains in effect.

**2. TERM**

2.1 COMMENCEMENT DATE: The commencement date ("Commencement Date") for each Unit of Equipment will be the date on which such Unit is installed by the manufacturer or other installer, except that, in the event there is a delay in the installation of a Unit and such delay is attributable to Lessee, then the Commencement Date for such Unit shall be five [5] working days following the date upon which Lessee has been given notice that such Unit is available for installation. If requested by Lessor, Lessee will promptly execute and deliver to Lessor a certificate confirming the Commencement Date(s).

2.2 INITIAL TERM: The "Initial Term" of an Equipment Schedule shall mean the period beginning on the Commencement Date of the Unit having the latest Commencement Date of the Units on such Equipment Schedule if such Commencement Date is the first day of a month, and otherwise, the Initial Term shall begin on the first day of the month immediately following the month in which such latest Commencement Date falls. The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rental unless and until terminated by either party giving the other party not less than 120 days prior written notice. Any termination (i) must relate to all of the Equipment described on the Equipment Schedule to which the notice applies, (ii) will be effective only on the last day of the Initial Term or on the last day of any successive four month period, (iii) will be effective only if Lessee returns all of the Equipment to Lessor in accordance with the terms of the Equipment Schedule by the day after the scheduled termination date, and (iv) may not be unilaterally revoked.

**3. MONTHLY RENTAL**

Lessee shall pay to Lessor the monthly rental ("Monthly Rental") for each Unit as set forth in the relevant Equipment Schedule. The Monthly Rental shall be payable at the above mailing address of Lessor or at such other place as Lessor may from time to time designate in a written notice to Lessee. The Monthly Rental for each Unit shall commence on the Commencement Date of such Unit and shall be due and payable in advance and without demand on the first day of each month thereafter during the term of this Lease. If the Commencement Date for a Unit is a day other than the first day of a month, Daily Rental shall be payable ("Daily Rental" shall equal one-thirtieth of the Monthly Rental for each Unit) for each day from, and including, the Commencement Date to, but not including, the first day of the Initial Term, and such total Daily Rental amount shall be due and payable on the first day of the Initial Term.

**4. WARRANTIES**

4.1 AFFIRMATIVE WARRANTIES: Lessor represents and warrants that:

[a] The Equipment shall be eligible for the manufacturer's standard prime shift maintenance contract upon installation, provided Lessee requests such coverage in writing prior to installation of the Equipment.

[b] During the term of this Master Lease, if no Event of Default has occurred, Lessee's quiet enjoyment and peaceable possession of the Equipment shall not be interrupted by Lessor or anyone claiming solely through or under Lessor.

4.2 DISCLAIMER OF WARRANTIES: THE AFFIRMATIVE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES OF LESSOR. LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN, OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, FITNESS, CAPACITY OR SUITABILITY FOR

Page No. 1 of 6    LYCOS, INC.    Master Lease No. 144874
December 4, 1996

PS/BOST.

ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT, OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. Without limiting the generality of the foregoing, Lessor shall not be liable to Lessee for any liability, claim, loss, damage or expense of any kind or nature (including strict liability in tort) caused directly or indirectly by the Equipment, any inadequacy thereof for any purpose, any deficiency or defect therein, whether known or unknown to Lessor. In any event, Lessor shall not be liable to Lessee for any loss of business or any other incidental or consequential loss or damage resulting from any cause whatsoever.

4.3 ASSIGNMENT OF WARRANTIES: Lessor hereby assigns to Lessee any and all manufacturer's warranties, if assignable, and any other such rights that are assignable as Lessor may have against the manufacturer of the Equipment provided, however, that Lessee's sole remedy for the breach of any such warranty or right shall be against the manufacturer and not Lessor.

4.4 SELECTION: Lessee acknowledges, represents and warrants that it has made the selection of the Equipment based on its own judgment and expressly disclaims any reliance upon statements made by the Lessor. The Equipment is being leased for commercial or business purposes only, and will not be used for consumer, personal, home, or family purposes.

## 5. NET LEASE

Each Equipment Schedule constitutes a net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, and operation of the Equipment. Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that Lessee may have against Lessor. Except as expressly provided for herein, neither this Master Lease, nor any Equipment Schedule, shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, or any loss or destruction of the Equipment or any Unit from any cause whatsoever, or the interference with the use thereof by any private person, corporation, or governmental authority or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Monthly Rental payable by Lessee under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term thereof.

## 6. TAXES

6.1 PAYMENT OF TAXES: Lessee covenants and agrees to pay to the appropriate taxing authority, and discharge before the same become delinquent, all taxes, fees, or other charges of any nature whatsoever, without pro-ration, together with any related interest or penalties ("Impositions") now or hereafter imposed, assessed or payable during the term of the relevant Equipment Schedule (including any extension thereof) for an Imposition relating to a record date or status date that fell within the term of the relevant Equipment Schedule including any extension thereof or is otherwise associated with Lessee's leasing, possession or use of the Equipment) against Lessor or Lessee or the Equipment by any federal, state, county or local government or taxing authority upon or with respect to [i] the Equipment or any Unit; [ii] upon the leasing, ordering, purchase, sale, ownership, use, operation, return or other disposition thereof; [iii] the Monthly Rental or any other sums due hereunder with respect to any Equipment Schedule, or [iv] the leasing of the Equipment (excepting only Lessor of the Equipment by any federal, state, county or local government or taxing authority upon or with respect to [i] the Equipment or any Unit; [ii] upon the leasing, ordering, purchase, sale, ownership, use, operation, return or other disposition thereof; [iii] the Monthly Rental or any other sums due hereunder with respect to any Equipment Schedule, or [iv] the leasing of the Equipment (excepting only federal, state and local taxes measured by the net income of Lessor or any franchise tax upon Lessee measured by Lessor's capital, capital stock or net worth). Because the payment due date or reimbursement date for an Imposition may occur after the expiration or termination of the term of the relevant Equipment Schedule, it is understood and agreed that Lessee's liability for such Impositions shall survive the expiration or termination of the term of the relevant Equipment Schedule.

6.2 BILLING: Lessee shall, to the extent permitted by law, cause all Impositions to be billed to Lessee. Lessee shall, at its expense, timely file all forms and returns and timely do all things required to be done in connection with the levy, assessment and payment of any Impositions; and Lessor hereby appoints Lessee as Lessor's attorney-in-fact where necessary for such purposes. Lessee shall submit written evidence to Lessor of the payment of all Impositions required to be paid by Lessee hereunder promptly after such payment. Notwithstanding the foregoing, Lessor, in its sole discretion, may pay any Imposition itself or file any forms or returns with respect thereto. If Lessor pays any Imposition, Lessee shall, when billed, reimburse Lessor for such payment.

6.3 CONTEST: Lessee may contest any Imposition by appropriate legal proceedings provided the nonpayment of such Imposition thereof, or such proceedings, will not, in the opinion of counsel for Lessor, adversely affect the title, property interest or rights of Lessor in the Equipment and provided further that, if requested by Lessor, Lessee has given to Lessor security, sufficient in form and amount, in Lessor's reasonable judgment, to fully satisfy the amount of the contested Imposition.

## 7. DELIVERY AND RETURN

Lessor shall arrange for delivery, and Lessee shall pay, when billed, all delivery expenses (including, without limitation, transportation costs and the cost of in-transit insurance) associated with the delivery of each Unit from its previous location to the location specified in the relevant Equipment Schedule. Lessee shall inspect each Unit upon delivery, identify any observable damage prior to accepting delivery, and note any such damage on the bill of lading. Costs of repair which are not recoverable from the carrier because of Lessee's failure to properly inspect for observable damage shall be borne and promptly paid by Lessee. Lessee shall provide a suitable place for installation of the Equipment with all appropriate facilities as specified by the manufacturer. Lessor shall arrange and Lessee shall pay for the installation of each Unit [if Lessee wishes to have the Equipment installed by an installer other than the manufacturer or some other party approved in writing by Lessor, then Lessee shall accept the Equipment "as is" and Lessor's warranty set forth in Paragraph 4.1 (a) shall not apply]. Upon the termination of Lessee's right to possession of any Unit [by expiration of the term of the relevant Equipment Schedule or otherwise], Lessee shall, in accordance with Lessor's instructions and at Lessee's expense [including without limitation transportation costs and costs of in-transit insurance] return the Unit to such location within the Continental United States as shall be designated by Lessor. Lessee shall reimburse Lessor for all expenses paid by Lessee associated with return of the Unit when billed. Lessee shall return each Unit in the same operating order, repair, condition and appearance as when received, excepting only normal wear and tear, and with all engineering changes prescribed by the manufacturer prior to the termination of Lessee's right of possession incorporated in the Unit. Lessee, at its expense, shall make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance contract upon its return and shall have the Unit certified as eligible for the same. At the time the Equipment is returned, Lessee shall provide a letter from the manufacturer certifying such maintenance eligibility.

## 8. CARE OF EQUIPMENT

8.1 USE AND MAINTENANCE: Lessee shall, at its expense, maintain the Equipment in good operating order, repair, and condition. Lessee shall not use the Equipment for any purpose other than that for which it was designed. Prior to the delivery date and before any action is taken to install the Equipment, Lessee shall make a written request to the manufacturer for continued coverage of the Equipment under one of the manufacturer's standard maintenance agreements, and shall, at its expense, enter into and maintain in force such maintenance agreement for each Unit and provide Lessor with a copy of such agreement. IF LESSEE FAILS TO MAKE THE PROPER WRITTEN REQUEST TO THE MANUFACTURER FOR COVERAGE UNDER ONE OF THE MANUFACTURER'S STANDARD MAINTENANCE

LYC 00003

AGREEMENTS, THEN LESSEE SHALL ACCEPT THE EQUIPMENT "AS IS" AND LESSOR'S WARRANTY SET FORTH IN PARAGRAPH 4.1(A) SHALL NOT APPLY. In no event, however, shall Lessee be required to enter into such a contract for any Unit so long as that Unit is under a manufacturer's warranty which provides substantially similar coverage.

8.2  ALTERATIONS AND ATTACHMENTS:  With the prior written consent of the Lessor, Lessee may, at its expense, make alterations or add attachments to the Equipment which are removable and which do not interfere with the normal and satisfactory operation or maintenance of the Equipment or Lessee's ability to obtain the maintenance contract required in Section 8.1 above. Upon the termination of Lessee's right to possession of any Unit, any alterations or attachments to such Unit shall become the property of Lessor unless removed at Lessee's expense prior to such termination. Lessor shall have the right, following termination of Lessee's right to possession of any Unit, to remove any attachments or alterations made by Lessee to such Unit and dispose of the same without any liability therefor to Lessee and Lessee shall pay the costs of such removal when billed.

8.3  INSPECTION:  Lessee shall make the Equipment available to Lessor, Secured Party (hereinafter defined) and Assignee (hereinafter defined) or the designee of any of them during normal working hours for inspection or for any other reasonable purpose.

## 9.  LOSS OR DAMAGE

9.1  RISK OF LOSS:  Lessee shall be responsible for and hereby assumes the entire risk of the Equipment being lost, damaged, destroyed, stolen, or otherwise rendered unfit for use from the date of delivery to Lessee to the date of return to Lessor.

9.2  OCCURRENCE OF LOSS:  If any Unit is lost, damaged, destroyed, stolen, or otherwise rendered unfit for use, Lessee shall give to Lessor immediate notice thereof, and this Master Lease and the applicable Equipment Schedule shall continue in full force and effect without any abatement in the Monthly Rental. Lessee shall determine within fifteen (15) days after the date of the occurrence of damage whether such Unit can be repaired. In the event Lessee determines that such Unit can be repaired, Lessee, at its expense, shall cause such Unit to be promptly repaired. If a Unit is lost, destroyed or stolen or if Lessee determines that a damaged Unit cannot be repaired, Lessee shall, at Lessor's direction, within thirty (30) days of such event either replace the Unit with an identical Unit, the title to which shall thereupon vest in Lessor and which thereafter shall be considered the Unit subject to the Equipment Schedule with no abatement in the Monthly Rental or, in Lessor's sole discretion, pay to Lessor an amount equal to the Stipulated Loss Value of the Unit determined as of the date of payment in accordance with the Stipulated Loss Value Schedule attached to the applicable Equipment Schedule together with all unpaid Monthly Rental which is due and payable through the date of payment.  Upon such payment, Lessee's obligation to pay further Monthly Rental for such Unit shall cease.

## 10.  INSURANCE

10.1  PROPERTY INSURANCE:  Throughout the term of each Equipment Schedule, Lessee shall, at its expense, maintain in full force and effect "all risk" extended coverage, fire and casualty insurance for the Equipment.  Such insurance shall provide for coverage in an amount equal to the greater of the Stipulated Loss Value or the replacement cost of the Equipment at the time of loss. Lessee shall be named as the Loss Payee on such policy.  In addition, the policy shall, by means of a standard mortgage clause, name the Secured Party and Assignee as additional insureds and loss payees as their interest shall appear.  Such policy shall provide that it may not be canceled or materially altered unless thirty (30) days prior written notice is given to all parties named therein.  Upon Lessor's written request, Lessee shall provide Lessor with a Certificate of Insurance evidencing such insurance coverage. If, within two weeks after Lessee's receipt of such request, Lessee has not provided Lessor with a satisfactory Certificate, then Lessor may, at Lessor's option, obtain such insurance until Lessee provides the Certificate, and Lessee shall reimburse Lessor for the cost of such insurance when billed.

10.2  LIABILITY INSURANCE:  During the term of this Master Lease, Lessee, at its expense, shall maintain reasonable, commercial general liability and property damage insurance with respect to the use, possession and operation of the Equipment in an amount not less than one million dollars for each occurrence.

## 11.  INDEMNIFICATION

Lessee shall and does hereby indemnify and hold Lessor, any Assignee, and any Secured Party, harmless from and against any and all claims, costs, reasonable attorneys' fees, expenses, damages, and liabilities (including those resulting from the application of strict liability doctrines or statutes) arising out of Lessee's selection, possession, leasing, operation, control, use, maintenance, delivery, or return of the Equipment. Notwithstanding the foregoing, Lessee shall not be required to indemnify a party for any claim resulting from acts of that party which constitute willful misconduct or gross negligence.

## 12.  ASSIGNMENT, SUBLEASE OR RELOCATION BY LESSEE

UPON AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE TO LESSOR, LESSEE MAY ASSIGN OR SUBLEASE A UNIT TO ANY PARTY, OR RELOCATE A UNIT TO ANY LOCATION, WITHIN ANY STATE OF THE CONTINENTAL UNITED STATES, PROVIDED THAT LESSOR, ASSIGNEE, AND SECURED PARTY, IN SUCH PARTIES' SOLE DISCRETION, SHALL HAVE APPROVED SUCH ASSIGNEE, SUBLESSEE, OR LOCATION, AND PROVIDED FURTHER THAT (i) ALL COSTS OF ANY NATURE WHATSOEVER (INCLUDING ANY ADDITIONAL IMPOSITIONS AND ANY ADDITIONAL EXPENSES ASSOCIATED WITH FILING NEW PRECAUTIONARY UNIFORM COMMERCIAL CODE FINANCING STATEMENTS) RESULTING FROM ANY RELOCATION, ASSIGNMENT OR SUBLEASE SHALL BE BORNE BY LESSEE; (ii) ANY ASSIGNMENT OR SUBLEASE SHALL BE MADE EXPRESSLY SUBJECT AND SUBORDINATE TO THE TERMS OF THIS LEASE; AND (iii) LESSEE SHALL ASSIGN ITS RIGHTS UNDER SUCH ASSIGNMENT OR SUBLEASE TO LESSOR, ASSIGNEE, OR SECURED PARTY AS ADDITIONAL COLLATERAL AND SECURITY FOR LESSEE'S OBLIGATIONS HEREUNDER.  In the event of a relocation, assignment, or sublease, Lessee and its Assignee or its sublessee shall cooperate with Lessor in taking all reasonable measures to protect the title of Lessor or Assignee and the interest of any Secured Party to and in the Equipment.  No relocation, assignment, or sublease shall relieve Lessee of its primary obligations under the relevant Equipment Schedule and this Master Lease.

## 13.  ASSIGNMENT BY LESSOR

Lessor shall have the right to assign as security its interest or grant a security interest in any or all of the Equipment Schedules which may from time to time be executed and the Units described in any such Equipment Schedules to a security assignee ("Secured Party"). Lessor shall also have the right to sell or otherwise dispose of any or all of the Units described in any Equipment Schedule, subject to the prior right of Lessee in such Units, and to assign its interest as Lessor under such Equipment Schedule, to any assignee ("Assignee"). Any such assignment shall in any way release Computer Sales International, Inc. from liability for performance of the Lessor's obligations hereunder. Lessee acknowledges that any assignment by Lessor will not materially change Lessee's duties or obligations under the Equipment Schedule nor materially increase the burden or risk imposed on Lessee. Lessee hereby consents to and shall acknowledge such assignment or assignments as shall be designated by written notice to Lessee by Lessor. Lessee further covenants and agrees that:

[a]  Any such Secured Party or Assignee shall have and be entitled to exercise any and all discretions, rights and powers of Lessor under the Equipment Schedule in which it has an interest, provided that a Secured Party or Assignee shall not be obligated to perform any of the obligations of Lessor other than Lessor's obligations under Paragraph 4.1 [4].

[b]  Lessee shall pay directly to the Secured Party or Assignee all Monthly Rental and all other sums due upon receipt of notice of any assignment and of instructions to do so; and

LYC 00004

[c] After an assignment to a Secured Party or Assignee, Lessee's obligations hereunder including its obligation to pay the Monthly Rental and any and all other amounts payable under the Equipment Schedule by Lessee shall be absolute and unconditional and shall not be subject to any abatement, reduction, recoupment, defense, setoff, or counterclaim available to Lessee against Lessor for any reason whatsoever.

[d] Only one executed counterpart of any Equipment Schedule shall be marked "Original"; any other executed counterparts shall be marked "Non-original" or "Copy". No security interest in any Equipment Schedule may be created through the transfer and possession of any counterpart other than the "Original", nor shall any sale, assignment or transfer of any interest in an Equipment Schedule be effective or be binding upon Lessee through the transfer and possession of any counterpart other than the "Original".

## 14. EVENTS OF DEFAULT

The occurrence of any one or more of the following events ["Events of Default"] shall constitute a default under the relevant Equipment Schedule:

[a] Lessee fails to pay the Monthly Rental, or any other amount due hereunder, on or before the date the same is due and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[b] any financial statements or information or any other representation or warranty given to Lessor proves to have been materially false or misleading as of the date it was given by or on behalf of Lessee;

[c] Lessee fails to observe or perform any other term, condition, obligation, agreement or covenant set forth herein, and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[d] Lessee assigns or attempts to assign this Master Lease or any Equipment Schedule, or removes, transfers, encumbers, sublets or parts with possession of any Unit, attempts to do any of the foregoing, or suffers or permits any of the foregoing to occur except as expressly permitted herein;

[e] Lessee ceases doing business as a going concern, or it or its shareholders take any action looking to its dissolution or liquidation;

[f] the entry of an order for relief under the United States federal bankruptcy laws or the entry of any other decree or order by a court having jurisdiction in the premises adjudging the Lessee a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Lessee under the United States federal bankruptcy laws or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the ordering, the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

[g] the commencement by the Lessor of a voluntary case under the United States federal bankruptcy laws, or the institution by the Lessee of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, an arrangement with creditors or an order for relief under the United States federal bankruptcy laws or any other applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts as they become due, or, to the knowledge of the Lessor, the taking of corporate action by the Lessee in furtherance of any such action.

## 15. REMEDIES

15.1 EXPRESS REMEDIES: If an Event of Default occurs, Lessor may, at its option, do any or all of the following:

[a] proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the relevant Equipment Schedule, and the covenants and terms of this Master Lease to the extent it pertains to such Equipment Schedule, and to recover from Lessee any and all damages or expenses, including reasonable attorneys' fees, which Lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder, or

[b] by notice to Lessee, declare immediately due and payable all monies to be paid by Lessee during the Initial Term [or any extended term then in effect] of the Equipment Schedule, as liquidated damages, and not as a penalty, and Lessor shall have the right to the extent permitted by law, to [i] recover all monies so declared due and payable, discounted to the date of payment at the rate of ¾% per annum, or one-half of the then-prevailing prime interest rate charged by principal New York banks, whichever is less, as liquidated damages, and not as a penalty; [ii] recover all other amounts which are due or which become due under the Equipment Schedule; [iii] terminate Lessee's right to possession [but not Lessee's obligations under this Lease] and to retake immediate possession of the Equipment without any process of law and for such purpose Lessor may enter upon premises where the Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the negligence of Lessor, Lessor's assignee or their respective agents and representatives in any such entry or repossession [iv] recover all expenses, including reasonable attorneys' fees, which Lessor shall have incurred or may incur by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder; and [v] pursue any other remedy permitted by law or equity. The possibility of a re-lease or resale under Paragraph 15.2 shall not excuse prompt payment in full by Lessee under this Paragraph 15.1.

15.2 RE-LEASE OR RESALE: Lessor shall make a reasonable, good faith effort to retake possession of the Equipment and, if Lessor succeeds in retaking possession of any Unit, Lessor shall sell or lease each Unit with the privilege of becoming the purchaser thereof, at public or private sale, for cash or on credit. Lessee's share of the proceeds of any such sale or lease ["Lessee's Share"] shall be the lesser of [x]: the amount by which the Re-Lease Proceeds or the Resale Proceeds of such Unit exceed the Remarketing Costs of such Unit, and [y]: the amount payable by Lessee to Lessor pursuant to Paragraph 15.1 [i][ii] above with respect to such Unit. Lessor shall credit Lessee's Share against all amounts owed by Lessee to Lessor under Paragraph 15.1 or otherwise and the remainder of Lessee's share, if any, shall be paid to Lessee. EXCEPT AS SET FORTH IN THIS PARAGRAPH, LESSEE HEREBY WAIVES ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY REQUIRE LESSOR TO MITIGATE ITS DAMAGES OR MODIFY OR LIMIT ANY OF LESSOR'S RIGHTS OR REMEDIES STATED HEREIN. In applying this provision, the following definitions shall apply:

[a] The "Re-Lease Proceeds" of a Unit shall mean the present value [discounted to the date of payment using the interest rate at which Lessor fixes non-recourse financing or a non-recourse financing commitment with respect to the re-lease] of the monthly rental payments for the Unit under a re-lease to a third party, taking into account only those monthly rental payments under the re-lease which are payable on or before the last day of the Initial Term or the last day of any extended term then in effect with respect to the Unit under the Equipment Schedule. If the re-lease is not financeable, the Re-Lease Proceeds shall be the monthly rental payments for such period as received.

[b] The term "Resale Proceeds" of a Unit shall mean the amount by which the proceeds of any sale of the Unit exceed the Lessor's estimate of the fair market value of the Unit at the end of the Initial Term or at the end of any extended term then in effect with respect to the Unit under this Master Lease.

[c] The term "Remarketing Costs" of a Unit shall mean all expenses incurred directly or indirectly by Lessor in re-leasing or selling the Unit and in obtaining a financing commitment in the case of a re-lease of a Unit, including, without limitation, reasonable fees and commissions [including a reasonable fee to Lessor] incurred in locating a buyer, a subsequent lessee or a financing

LYC 00005

commitment, attorneys' fees, the cost of recovering the Unit from the Lessee and transportation, installation, refurbishing, reconditioning and storage charges.

15.3 NO WAIVER. The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of a breach of any other obligation, or of any subsequent breach of the same or any other obligation. The subsequent acceptance of rental payments hereunder by Lessor shall not be deemed a waiver of any prior existing breach by Lessee regardless of Lessor's knowledge of such prior existing breach at the time of acceptance of such rental payments.

15.4 CUMULATION.  To the extent permitted by law, the above remedies shall be deemed cumulative and may be exercised successively or concurrently.

## 16. PERFORMANCE AND EXECUTION

Lessee represents and warrants to Lessor [i] that the execution and performance of this Master Lease and each Equipment Schedule have been duly authorized by Lessee and that upon execution by Lessee and Lessor this Master Lease and each Equipment Schedule will constitute a valid obligation binding upon, and enforceable against, Lessee in accordance with the terms of the Master Lease and each Equipment Schedule; [ii] that neither the execution of this Master Lease or any Equipment Schedule nor the due performance thereof by Lessee will result in any breach of, or constitute any default under or violation of, Lessee's certificate or articles of incorporation, Lessee's by-laws or any agreement to which Lessee is a party or by which any interest of Lessee may be affected; [iii] that Lessee is in good standing in its state of incorporation and in the states where any Unit is to be located; [iv] the persons executing this Master Lease and each Equipment Schedule on behalf of Lessee have been duly authorized to do so; and [v] that any and all financial statements and other information with respect to Lessee heretofore furnished by Lessee to Lessor in connection with negotiations concerning one or more Equipment Schedules were, when furnished, and remain at the time of execution of any Equipment Schedule, true and without any misleading omissions, excepting any changes which have been disclosed in a written notice to Lessor.

## 17. ADDITIONAL DOCUMENTATION

Lessee shall promptly deliver to Lessor the documentation listed below which may from time to time be requested by Lessor.  If such a request is made prior to the delivery of any Unit, receipt of such documentation shall be a condition precedent to Lessor's obligation to deliver such Unit:

[a] financial information including, without limitation, a copy of Lessee's balance sheet and income statement for Lessee's three prior fiscal years, certified by independent certified public accountants and such other current financial information representing the financial condition and operations of Lessee as Lessor may from time to time reasonably request;

[b] a certificate of the resolutions of the Board of Directors of Lessee duly authorizing or ratifying this Master Lease or any Equipment Schedule executed hereunder;

[c] a certificate of incumbency setting forth names and signatures of those persons authorized to execute this Master Lease or any Equipment Schedule on behalf of Lessee;

[d] landlord's and/or mortgagee's waiver, in form and substance satisfactory to any Assignee or Secured Party, from any landlord or mortgagee of any premises upon which any Unit is located;

[e] an opinion of counsel for Lessee as to the matters set forth in Paragraph 16, [i] through [v] above, and as to such other matters as Lessor may reasonably request; and

[f] such document confirming the execution of the Lease necessary or desirable to effect an assignment, to perfect an interest of Lessor, a Secured Party or Assignee, or for such other purpose relating to the Master Lease and/or any Equipment Schedule or to an assignment as Lessor may reasonably request. Lessee hereby appoints Lessor as Lessee's agent to prepare, execute and file in Lessee's name precautionary Uniform Commercial Code financing statements in connection with each Equipment Schedule showing the interest of Lessor, and any Assignee or Secured Party in the Equipment as appropriate.

## 18. GENERAL

18.1 TITLE: This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest. Lessee shall, at its expense, protect and defend Lessor's title to the Equipment and the interest of any Assignee or Secured Party against all persons claiming against or through Lessee. Lessee shall keep and maintain the Equipment and this Master Lease free and clear of all liens and encumbrances other than those placed on the same by Lessee and the liens for current taxes not yet payable.

18.2 FIXTURES: Lessee will not affix any Unit of the Equipment to any real property if, as a result thereof, the Unit will become a fixture under applicable law.

18.3 ENTIRE AGREEMENT: This Agreement [together with all schedules and attachments hereto] constitutes the entire agreement between Lessor and Lessee, and no provision hereof may be amended or modified except in writing signed by Lessor and Lessee. NO PROVISION OF THIS AGREEMENT MAY BE WAIVED EXCEPT IN WRITING SIGNED BY THE PARTY FROM WHOM SUCH WAIVER IS SOUGHT, AND ANY SUCH WAIVER SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN.

*LESSEE'S
INITIALS: _____

18.4 NOTICES: All notices hereunder shall be in writing and shall be delivered in person or sent by registered or certified mail, to the address of the party contained herein, and shall be deemed received three [3] days after deposit in the United States mail with postage prepaid. Either party may change its address for notice purposes by notifying the other party in the manner aforesaid of such change. Lessee shall also send copies of all notices sent to Lessor, to Secured Party, or Assignee [if any].

18.5 SEVERABILITY: Any provision hereof prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of this Agreement provided, however, that where the provisions of any such applicable law may be waived, they are hereby waived by Lessee and Lessor to the full extent permitted by law.

18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW.  NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE. This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.

18.7 PERFORMANCE OF LESSEE'S OBLIGATIONS: If Lessee shall fail to make any payment or perform any act required by this Master Lease or any Equipment Schedule, Lessor may at Lessee's expense, but shall not be obligated to, make such payment or perform such act without notice to or demand upon Lessee and without waiving or releasing any obligation or default. Lessee shall, when billed, reimburse Lessor for any expense incurred hereunder by Lessor in performing Lessee's obligations.  LESSEE MAY NOT ASSIGN ITS RIGHTS OR OBLIGATIONS, EXCEPT AS SPECIFICALLY PROVIDED IN PARAGRAPH 12 OF THIS MASTER LEASE.

18.8 SURVIVAL: All representations, warranties, indemnities, and covenants contained in this Master Lease and in any Equipment Schedule, which by their nature would continue beyond the termination, cancellation or expiration of the Lease, including, by way of illustration only and not limitation, those in Paragraphs 6, 10, 11 and 18, shall continue in full force and effect and shall survive

LYC 00006

notwithstanding the full payment of all amounts due hereunder or the termination of Lessor's right to possession of any Unit.

18.9 HEADINGS: Headings and captions are for convenience of reference only and shall not be construed as part of the Lease.

18.10 OVERDUE PAYMENTS: Any Monthly Rental due Lessor under this Master Lease, if not paid by the fifth day of the month in which payment became due, shall accrue interest until paid at a rate equal to one and one-half percent per month, or the maximum rate permissible by law, whichever is lower. Any other amounts payable to Lessor by Lessee under this Master Lease are due and payable within fifteen (15) days after the billing date, and, if not paid on or before such due date, shall accrue interest from the due date until paid at a rate equal to one and one-half percent per month, or the maximum rate permitted by law, whichever is lower.

18.11 CONSENT OR APPROVAL: With respect to any provision herein which calls for the consent or approval of a party, such consent or approval shall not be unreasonably withheld.

18.12 SUBSTITUTION OF EQUIPMENT: If, at any time during the term of an Equipment Schedule, Lessor's right to lease the Equipment expires, Lessor shall promptly provide identical substitute Equipment, and all expenses of such substitution, including de-installation, installation and transportation expenses, shall be borne by Lessor.

18.13 DELIVERY FOR EXAMINATION: Submission of the form of this Master Lease for examination shall not bind Lessor in any manner, and no obligations shall arise, until this instrument is signed by both Lessor and Lessee.

18.14 TERMS IN EQUIPMENT SCHEDULES: If the provisions of any Equipment Schedule are inconsistent with the provisions of this Master Lease, then the provisions of such Equipment Schedule shall control.

LESSOR:                                         LESSEE:
COMPUTER SALES INTERNATIONAL, INC.              LYCOS, INC.


BY: _____              BY: _____

TITLE: _____              TITLE: _____

DATE: _____              DATE: _____

                                                (Please initial page 5, section 18.3)

ML-4/96

LYC 00007

FIRST AMENDMENT TO MASTER LEASE NO. 144874

This Amendment to Master Lease Agreement No. 144874 (the "Master Lease") is dated February 28, 2001, and is between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Lessor and Lycos, Inc., a Delaware corporation, as lessee previously entered into the Master Lease and various Equipment Schedules thereunder for the lease of computer equipment. Lycos, Inc. subsequently merged with another company and the parties want to amend the Master Lease, and each Equipment Schedule thereunder, to change the lessee accordingly. In consideration of the foregoing and the promises and covenants contained in this Amendment, the parties agree to amend the Master Lease and each Equipment Schedule on the terms and conditions set forth below:

1. The Lessee is changed to LYCOS, INC., a Virginia corporation, which assumes all the obligations under the Master Lease and all current Equipment Schedules thereunder.

2. All other terms and conditions of the Master Lease and each Equipment Schedule remain unchanged and in full force and effect.

The parties have executed this Amendment as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.   LYCOS, INC.

By: _Lorraine S Cherrick_         By: _Brian O___

Title: _SVP + Gen'l Counsel_       Title: _CFO_

Date: _3/28/01_                    Date: _3/16/01_

144874-000.a1rev(pw).doc
PHS/BOST

LYC 00008

ADDENDUM ONE TO MASTER LEASE AGREEMENT NO. 144(

This Addendum One to Master Lease Agreement No. 144874 (the "Lease"),
December 4, 1996 and is entered into by and between COMPUTE.
INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parti
dated on even date herewith, and in consideration of the mutual promises, covenan    и
conditions contained in the Lease and contained herein, and for other good and va. able
consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto
covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall
be read together with the Lease as one single document. To the extent that there shall be any
conflict as between the terms and provisions contained in the Lease and those contained herein,
the terms and provisions set forth herein shall control.

2. **Section 2.2 Initial Term:** In line 6, delete "120" and insert "60."

3. **Section 15.1 Express Remedies:** In subsection [b][i], delete "4%" and insert
"6%."

4. **Section 15.2 Re-lease or Resale:** In line 7, after "PARAGRAPH," insert "AND
TO THE EXTENT PERMITTED BY LAW."

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Master
Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL,        LYCOS, INC.
INC/

BY:                                  BY: _____

TITLE: E. WILLIA.. CILLOLA           TITLE: CHIEF OPERATING OFFICER
       CHIEF OPERATING OFFICER & CFO

DATE:        JAN 1 0 1997            DATE: DECEMBER 20, 1996

PS/Bost.
144874-00Add ent(fte)

# EXHIBIT B

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 67E Dated as of June 16, 2000

LESSOR:                          LESSEE:    **LYCOS, INC.**
                                            400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**      Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4,
1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF ONE PAGE.

EQUIPMENT LOCATION:     1675 NORTH SHORELINE BLVD.
                        MOUNTAIN VIEW, CALIFORNIA 94043

2. Monthly Lease Rate Factor for all Units: **See Addendum One**
3. Initial Term: **Twenty-four (24) months**
4. Anticipated Installation Date: **June 15, 2000 through September 30, 2000**
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before **June 23, 2000**.

COMPUTER SALES INTERNATIONAL, INC.   LESSEE: LYCOS, INC.

By: _____   By: _____
        E. William Gillula

Title: _____PRESIDENT_____            Title: __CFO__

Date: ____JUL 18 2000____             Date: __7/12/00__

PHS/BOST
144874-067E(aad) doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

### EXHIBIT "A"
### LYCOS, INC.
### EQUIPMENT SCHEDULE 67E TO MASTER LEASE 144874

| QTY | DESCRIPTION | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|-------------|-----------|-------------------------------------|
| * | Desktop PC's and PC Servers, with a processor speed of 500 Mhz Monitors Other Printers | NEW | .03875 times Unit cost |
| * | Miscellaneous standalone hardware, with its own serial number, e.g. Copiers, Scanners, FAX Machines, Clone PC's | NEW | .043 times Unit cost |
| * | Miscellaneous hardware, without its own serial number or a relation to other Units on this Lease, e.g. Cards, Memory, Modems | NEW | .0463 times Unit cost |

Initialed by:    Lessor _____

Lessee _____

PHS/BOST
144874-067E(aad).doc

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67E
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67E, Master Lease Agreement No. 144874" (the "Lease"), is dated as of June 16, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Lessor's Purchase of Equipment:**

a) Lessor will purchase the Equipment directly from the vendor(s) designated by Lessee.

b) The Total Cost of the Lease (hardware, software license fees and other costs) is not to exceed $500,000.00. If Lessee wants this Lease to cover costs greater than $500,000.00, Lessor, in its sole discretion, may pay the additional costs.

c) Lessor is not liable for any failure or delay in delivery caused by the manufacturer, vendor or any other party or condition not within Lessor's control.

*3.    **Quantities; Monthly Rental:**

a) This Equipment Schedule covers all machines of the type(s) listed that are installed at Lessee's facilities between June 15, 2000 and September 30, 2000, inclusive. At this time, Lessee is unable to specify exactly how many Units will be installed; therefore, the "quantity" column has been left blank. As Lessee determines the quantities of Equipment it requires, Lessee shall have the applicable vendor send to Lessor invoices which will reference this Lease and which will specify machine type(s), quantities, equipment location(s), sales price, serial number(s) and installation date(s) of the Units ordered by Lessee. Upon receipt of each properly prepared invoice, Lessor shall remit the sales price to the vendor.

b) Monthly Rental per Unit will equal the "Monthly Lease Rate Factor" for that Unit, which is specified in the Equipment Schedule or on Exhibit "A", multiplied by the Unit's cost. On October 1, 2000, or as soon thereafter as is reasonably practicable, Lessee shall execute a Certificate of Acceptance for all installed Equipment, which Certificate verifies the actual quantities of machines; and the Monthly Rental per Unit and the total Monthly Rental for the Equipment Schedule, both of which will be expressed as dollar amounts.

4.    **Initial Term:**  The twenty-four (24) month Initial Term shall start on October 1, 2000, and expire on September 30, 2002. Lessee shall pay to Lessor Daily Rental as set forth in Section 3 of the Master Lease, for each Unit of Equipment for each day from, and including, its installation date through, but not including, October 1, 2000. Daily Rental shall be due in a lump sum on October 1, 2000.

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

5.    **Stipulated Loss Value**: Because the actual quantities of Equipment are unknown at this time, a specific dollar amount Base Value cannot be listed on the Stipulated Loss Value Schedule. Instead, "Equipment Cost" has been specified so that, at the time of a loss, the Stipulated Loss Value shall be equal to the cost of the Unit times the applicable percentage. The parties agree, however, that a specific dollar amount Base Value will be set forth in the Certificate of Acceptance referred to above.

6.    **Software License Fees and Other Costs**: In consideration of Lessee's entering into this Lease, Lessor shall pay on Lessee's behalf various operating and/or application software license fees so that Lessee may use such software packages in connection with the Equipment. Lessor may also pay other costs related to the Equipment, on Lessee's behalf. Lessee shall reimburse Lessor for such costs by (i) paying a daily charge equal to one-thirtieth of the Soft Cost Factor set forth below times the cost of the software license fee or other cost for each day from and including the date Lessor pays such fees or costs through, but not including October 1, 2000, such total daily charges to be paid in a lump sum on October 1, 2000, and (ii) making a monthly payment to Lessor equal to .04646 (the "Soft Cost Factor") times the cost of the applicable software license fees or other costs. The resulting monthly payment amount will then be assigned on a pro-rata basis (pro-rated by Unit cost) to Units of Equipment and will be treated as additional rental for the lease of the Equipment. The total amount of software license fees and other costs will not exceed five percent (5%) of the Total Cost of the Lease, without Lessor's prior written consent. Because Lessor makes payments as invoices are received throughout the installation period, the percent of software license fees and other costs to the Total Cost of the Lease is generally not known until the final reconciliation of the Lease. If Lessor determines that the total amount of software license fees and other costs exceed five percent (5%) of the Total Cost of the Lease, Lessor shall have the option to exclude the excess software license fees and other costs from this Lease and Lessee agrees to reimburse Lessor for such amounts.

7.    **Interest Rate Contingency**: The Lease Rate and Soft Cost Factors (the "Rate Factors") specified in this Lease are based upon the yield to maturity of U.S. Treasury notes maturing in September 2002 (the "Treasury Yield"); the Treasury Yield is currently 6.54%. Lessor intends to obtain a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral (the "Loan"). If, at the time the Loan is closed, the *then current* Treasury Yield exceeds 6.54%, then the Rate Factors shall be increased by .0001 for each 25 basis points by which the *then current* Treasury Yield exceeds the current Treasury Yield of 6.54%. The Rate Factors will be increased only until the *then current* Treasury Yield exceeds the current Treasury Yield by 300 basis points. Any increases in the Treasury Yield in excess of 300 basis points will have no further effect on the Rate Factors. Increases of the Treasury Yield by increments of less than 25 basis points will have no effect on the Rate Factors.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67E, Master Lease No. 144874, as of the date set forth below.

| COMPUTER SALES INTERNATIONAL, INC. | LYCOS, INC. |
|---|---|
| By: | By: |
| Title: PRESIDENT | Title: CFO |
| Date: JUL 18 2000 | Date: 7/12/00 |

PHS/BOST

144874-067E(and).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: Equipment Cost

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST
144874-067E(aad).doc

# EXHIBIT 10

# EXHIBIT C

## NON-ORIGINAL

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 67H Dated as of October 30, 2000

LESSOR:                           LESSEE:    **LYCOS, INC.**
                                             400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**       Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF FIVE PAGES.

| EQUIPMENT LOCATION: | 400-2 TOTTEN POND ROAD WALTHAM, MASSACHUSETTS 02154-2000 |
|---|---|

2. Monthly Rental for all Units: **$36,438.41**

3. Initial Term: **December 1, 2000 through September 30, 2003; Thirty-four (34) months**

4. Anticipated Installation Date: **Already installed and accepted**

5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)

6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.

7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before November 6, 2000.

COMPUTER SALES INTERNATIONAL, INC.   LESSEE: LYCOS, INC.

By: _____   By: _Thomas E. Guyther_

Title: _____E. WILLIAM GILLULA_____   Title: _VP Finance & Admin_
            PRESIDENT & COO

Date: _____NOV 2 9 2000_____   Date: _11·14·00_

PHS/BOST
144874-067H(aad)

LYC 05453

**NON-ORIGINAL**

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 67H, MASTER LEASE NO. 144874

$36,438.41

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A14UEC29S2CJ | | ULTRA 2 2300 | 913H2884 | 93901 | USED | $667.95 |
| | | X5229A (1) | 9.1GB HARD DRIVE | 913H2891 | | | |
| | | X1018A (1) | INTERFACE CARD | | | | |
| | | X3856A (1) | SCSI CABLE | | | | |
| | | MEMORY (1) | 512MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | CD-ROM (1) | CD-ROM | | | | |
| 2 | SUN SGXDSK060C54 | | 54GB EXTERNAL MULTIPAC | 912C0119 | 93901 | USED | $286.88 |
| | | | | 912C0120 | | | |
| 1 | SUN SGXTAPDLT021 | | 35/70GB STOREDGE FLEXIPAC | 909C0018 | 93901 | USED | $241.99 |

PO NUMBER: 2550 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92250952 | 98362 | USED | $437.17 |
| | | MEMORY (1) | 256MB MEMORY | 92250951 | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | 92540468 | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | 92540467 | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| | | X6601A (1) | 8BAY INT STORAGE EXPANSION | | | | |
| 1 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92540466 | 98362 | USED | $397.21 |
| | | MEMORY (1) | 256MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| 4 | SUN X7119A | | 19" MONITOR | 9851KEO273 | 98362 | USED | $27.80 |
| | | | | 9851KEO276 | | | |
| | | | | 9918KEO621 | | | |
| | | | | 9918KEO622 | | | |

PO NUMBER: 3419 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A25-MR6B | | ENTERPRISE 450 400 | 9251H356A | 98361 | USED | $747.16 |
| | | MEMORY (1) | 512MB MEMORY | 9251H359A | | | |
| | | DRIVE (1) | 9.1GB HARD DRIVE | | | | |
| | | X311L (1) | POWER CORD | | | | |
| 3 | SUN SGXLIBDLT128 | | STOREDGE L280 TAPE LIBRARY, 280-560GB | 9917R05959 | 98361 | USED | $736.76 |
| | | X1062A (1) | SBUS DIFF SCSI2 HOST ADAPTER | 9917R05937 | | | |
| | | X7005A (2) | 512MB MEMORY | 9917R05954 | | | |

PO NUMBER: 3421 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 8 | SUN X7004A | | 256MB MEMORY | N/A | 1991 | USED | $48.60 |

PO NUMBER: 4250 ✓

LYC 05454



# NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 6 | CISCO CS-150-LAN-04 | | CS-150 SWITCH/16PORT LOAD BALANCER | 21140011614 | 162462 | USED | $595.54 |
| | | | | 21140011666 | 171983 | | |
| | | | | 21180014078 | | | |
| | | | | 21180014081 | | | |
| | | | | 21180014105 | | | |
| | | | | 21180014152 | | | |
| | | | **PO NUMBER: 4468** | | | | |
| 1 | SUN A34ULD19S002E | | ENTERPRISE 220R 450 | S016H3932 | 96865 | USED | $844.62 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 18GB HARD DRIVE | | | | |
| | | VIDEO (1) | 4MB VIDEO MEMORY | | | | |
| | | X311L (1) | POWER CORD | | | | |
| | | | **PO NUMBER: 4921** | | | | |
| 1 | SUN A34ULD19S001EJ | | ENTERPRISE 220R 450 | S021H2FDB | 97171 | USED | $683.88 |
| | | MEMORY (1) | 4MB MEMORY | | | | |
| | | DRIVE (1) | 1GB HARD DRIVE | | | | |
| | | X1195A (1) | ULTRASPARC II 450MHZ PROCESSOR | | | | |
| | | X311L (1) | POWER CORD | | | | |
| | | | **PO NUMBER: 4935** | | | | |
| 2 | IBM 2645-4EU | | THINKPAD 600X 7/500 | 78TAXK8 | BZ46002 | USED | $103.42 |
| | | | | 78TAYN8 | BZ26273 | | |
| | | | **PO NUMBER: 5005** | | | | |
| 2 | BIGIRON | | 4000 CHASSIS | 4108 | 16058 | USED | $1,521.47 |
| | | MODULE (1) | 8PORT GIG+ MGMT II MODULE | 4109 | | | |
| | | MODULE (3) | 24PORT 10/100 ENET MODULE | | | | |
| | | POWER (1) | REDUNDANT POWER SUPPLY | | | | |
| | | | **PO NUMBER: 5091** | | | | |
| 1 | NETWORK APPLIANCE | | STORAGESHELF FC9 | NA0000000004276 | 34972 | USED | $482.83 |
| | | DRIVE (7) | 18GB HARD DRIVE | | | | |
| | | X800E (2) | POWER CABLE | | | | |
| | | | **PO NUMBER: 5148** | | | | |
| 5 | SUN A21UJC1A9PC6C | | ULTRA 5 400 | SFW02540187 | 98470 | USED | $147.14 |
| | | MEMORY (1) | 256MB MEMORY | SFW02540224 | 97452 | | |
| | | DRIVE (1) | 9GB HARD DRIVE | SFW02540243 | | | |
| | | CD ROM (1) | 32X CD ROM | SFW02610237 | | | |
| | | X1131A (1) | PCI OPTION CARD | SFW02610248 | | | |
| | | X3515A (1) | US COUNTRY KIT | | | | |
| | | X471A (1) | 10" VIDEO ADAPTER | | | | |
| | | X3668A (1) | PGX32 COLOR FRAME BUFFER CABLE | | | | |
| 5 | SUN X7136A | | 21" MONITOR | S0013LB1447 | 97452 | USED | $44.00 |
| | | | | S0013LB1449 | | | |
| | | | | S0013LB1451 | | | |
| | | | | S0013LB1453 | | | |
| | | | | S0013LB1455 | | | |
| | | | **PO NUMBER: 5186** | | | | |

LYC 05455

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | COMPAQ | | DECSERVER 900TM 32 MJ8 CONNECTOR | N/A | BZ85812 | USED | $165.35 |
| | | TRANCEIVER (2) | MICRO TRANSCEIVER | | BZ70364 | | |
| | | DEHUA-CA (2) | DECHUB ONE | | BZ91755 | | |
| | | CARD (1) | 2MB FLASH CARD | | CA21642 | | |
| | | | | | CA35610 | | |
| | | | | | CA86642 | | |
| | | | | | CB19485 | | |

PO NUMBER: 5257 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 3 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550H5Y9 | 292703 | USED | $114.86 |
| | | | | 550H5K3 | 294540 | | |
| | | | | 550H5R8 | | | |
| 3 | VIEWSONIC | | 17" MONITOR | AY02012042 | 292703 | USED | $8.98 |
| | | | | AY02012047 | | | |
| | | | | AY02012046 | | | |
| 7 | IBM 6594-92U | | PC300PL P3/667 | 23RD279 | 293500 | USED | $72.61 |
| | | | | 23RF000 | | | |
| | | | | 23RF134 | | | |
| | | | | 23RF334 | | | |
| | | | | 23RF512 | | | |
| | | | | 23RF529 | | | |
| | | | | 23RD504 | | | |
| 3 | IBM 6594-92U | | PC300PL P3/667 | 23RD375 | 293806 | USED | $72.02 |
| | | | | 23RD806 | 293500 | | |
| | | | | 23RF433 | | | |
| 10 | VIEWSONIC | | 19" MONITOR | 304002200212 | 293500 | USED | $14.30 |
| | | | | 304002203313 | | | |
| | | | | 304002200211 | | | |
| | | | | 304002203309 | | | |
| | | | | 304002203304 | | | |
| | | | | 304002203308 | | | |
| | | | | 304002200208 | | | |
| | | | | 304002200207 | | | |
| | | | | 304002203305 | | | |
| | | | | 304002203314 | | | |

PO NUMBER: 5416 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | BIGIRON | | 8PORT GIG SX MODULE | CH24002212 | 17384 | USED | $769.24 |
| | | SWITCH (1) | FASTIRON 24PORT WG SWITCH | CH24002271 | | | |
| | | SWITCH (1) | NETIRON 16PORT SWITCH | | | | |

PO NUMBER: 5418 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 1 | SUN A34-ULD1-9S-512CX | | ENTERPRISE 220R 450 | S032A0888 | 13510 | USED | $1,526.88 |
| | | CACHE (1) | 4MB CACHE | | 13614 | | |
| | | X1195A (4) | 450MHZ PROCESSOR OPTION | | | | |
| | | X3508A (2) | TYPE 6 COUNTRY KIT | | | | |
| | | X7003A (4) | 128MB MEMORY | | | | |
| | | X1034A (3) | FAST ENET CONTROLLER PCI ADAPTER | | | | |

PO NUMBER: 5454 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN X2240A | | 300MHZ/2MB PROCESSOR OPTION | S352943 | 13242 | USED | $90.07 |
| | | | | S353019 | | | |

PO NUMBER: 5576 ✓

LYC 05456

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | SUN N06-UKCI-9S-256ATI | MEMORY (1) CACHE (1) DRIVE (1) X5229A (1) X6971A (1) | NETRA T1 MODEL 105 440 256MB MEMORY 2MB CACHE 18GB HARD DRIVE 9.1GB HARD DRIVE CD ROM | S023C114F S023C111C S023C1138 S024C0370 S024C05B6 | 13526 | USED | $302.67 |
| | | | PO NUMBER: 5601 | | | | |
| 1 | VIEWSONIC | | 22" MONITOR | QW02505877 | CG46206 | USED | $32.00 |
| | | | PO NUMBER: 5651 | | | | |
| 4 | ALTEON | | ACE SWITCH 180E | 60CF4582A0 60CF458550 60CF44BF60 60CF44E530 | 805795 | USED | $573.66 |
| | | | PO NUMBER: 5656 | | | | |
| 1 | FASTIRON | POWER (1) | 72PORT 10/100 + 4PORT MGMT MODULE REDUNDANT POWER SUPPLY | 1464 | 19079 | USED | $617.54 |
| | | | PO NUMBER: 5713 | | | | |
| 1 | FASTIRON | | 72PORT 10/100 + 4PORT MGMT MODULE | 1465 | 19080 | USED | $558.15 |
| | | | PO NUMBER: 5734 | | | | |
| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 55OL5NO | 297583 | USED | $105.31 |
| | | | PO NUMBER: 10150 | | | | |
| 2 | CISCO 7206VX | PWR-7200/2 (1) MEM-I/O-FLD48M (1) MEM-SD-NPE-128M PA-A3-T3 (1) | 7206VX BUNDLE W/NPE-300 DUAL AC POWER SUPPLY 48MB MEMORY 128MB MEMORY 1PORT ATM ENH DS3 PORT ADAPTER | 72704917 72704931 | 276-026594 276-026593 | USED | $787.17 |
| | | | PO NUMBER: 90013 | | | | |
| 1 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZKR | 298561 | USED | $52.33 |
| 1 | VIEWSONIC | | 19" MONITOR | 304002200331 | 298561 | USED | $14.05 |
| | | | PO NUMBER: 90019 | | | | |
| 3 | IBM 6892-26U | | PC300PL P3/600 | 78ZYYZH 78ZYZMG 78ZYYAV | 298559 | USED | $52.60 |
| 3 | VIEWSONIC | | 19" MONITOR | 304002203094 304002203098 304002200637 | 298559 | USED | $14.32 |
| | | | PO NUMBER: 90020 | | | | |
| 4 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZLL 78ZYYBF 78ZYYZR 78ZYZKM | 298397 | USED | $55.37 |

LYC 05457

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | VIEWSONIC | | 19" MONITOR | 304002201116 304002201118 304002201124 304001600981 | 298397 | USED | $17.09 |

PO NUMBER: 90021

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 8 | IBM 6594-B1U | | PC300PL P3/733 | 23FTX06 23FTY17 23FTW24 23FTV07 23FTV49 23FTW18 23FTP78 23FTP13 | 299252 | USED | $72.57 |
| 8 | VIEWSONIC | | 19" MONITOR | 304002201122 304002201117 304002201121 304001601284 304001600986 304001600964 304001600980 304001600983 | 299252 | USED | $14.62 |

PO NUMBER: 90022

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | IBM 2647-21U | | THINKPAD T20 7/650 | 78BKA69 78BKB04 78BKD69 78BKA90 | CL86299 CL35085 | USED | $97.01 |

PO NUMBER: 90023

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 1 | BIGIRON | MODULE (1) MODULE (2) POWER (2) MODULE (1) | 4000 CHASSIS 8PORT GIG+ MGMT II MODULE 24PORT 10/100 ENET MODULE REDUNDANT POWER SUPPLY 72PORT 10/100+4PORT MGMT MODULE | F00009376 | 21359 21180 | USED | $1,878.82 |
| 1 | BIGIRON | MODULE (1) MODULE (3) POWER (2) MODULE (1) | 4000 CHASSIS 8PORT GIG+ MGMT II MODULE 24PORT 10/100 ENET MODULE REDUNDANT POWER SUPPLY 72PORT 10/100+4PORT MGMT MODULE | F00009377 | 21359 21180 | USED | $2,092.93 |

PO NUMBER: 90030

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 10 | IBM 9495-AG1 | | 17" MONITOR | 55C5966 55C5968 55C5969 55C5970 55C5971 55C5972 55C5973 55C5975 55C5984 55C5987 | CL70844 | USED | $52.55 |

PO NUMBER: 90033

Traced all P.O's to file
11/9/00

LYC 05458

NON-ORIGINAL

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67H
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67H, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 30, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.     **Commencement Date:**  The Equipment is installed at Lessee's location under Equipment Schedule 67E to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 67E expires on November 30, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is December 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 67E is October 1, 2000, and the total Monthly Rental is $42,074.79.

3.     **Serial Number Substitution:**

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical defect, or a casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

# NON-ORIGINAL

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67H, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.       LYCOS, INC.

By: _____            By: _____

Title: E. WILLIAM GILLULA                Title: _VP Finance & Adm_
       PRESIDENT & COO

Date: _____NOV 2 9 2000_____           Date: _____11/24/00_____

PHS/BOST
144874-067H(aad)

LYC 05460

# EXHIBIT D

**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

**·COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. NINETY-THREE Dated as of October 2, 2001**

LESSOR:                           LESSEE:    **LYCOS, INC.**
                                             400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**       Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4,
1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    |                             |             |          |           |                         |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 66 pages.

**EQUIPMENT LOCATION:**    See Attached Exhibit "A"

**2. Monthly Rental for all Units: See Addendum One**
**3. Initial Term: November 1, 2001 through October 31, 2003; Twenty-four (24) months**
**4. Anticipated Installation Date: Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before **October 9, 2001.**

**COMPUTER SALES INTERNATIONAL, INC.**    LESSEE: **LYCOS, INC.**

By: _____E. WILLIAM GILLULA_____      By: _____Bill Cg_____
            PRESIDENT & COO

Title: _____    Title: ____CFO____
            DEC 1 0 2001

Date: _____    Date: ___10/4/01___

PHS/BOSTON
144874-093(db)

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

### ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-THREE
### MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-three, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Dates; Start of Initial Term; Total Monthly Rental:**  The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, and 81 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-four between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date | Total Monthly Rental for Units from terminating Equipment Schedule(s) |
|---|---|---|---|
| 65 | 10/31/01 | 11/1/01 | $14,299.85 |
| 64 | 1/31/02 | 2/1/02 | $5,055.76 |
| 81 | 6/30/02 | 7/1/02 | $1,242.25 |
| 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C | 9/30/02 | 10/1/02 | $58,838.59 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 | $17,923.69 |
| 64B, 66E, 67D, 69E | 3/31/03 | 4/1/03 | $11,644.10 |
| 64D, 67F, 69G | 5/31/03 | 6/1/03 | $12,502.28 |
| 64F, 67H, 69I | 9/30/03 | 10/1/03 | $21,901.71 |

LYC 07695

**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

Accordingly, the total Monthly Rental under the Lease is as follows:

| | |
|---|---|
| for months November 1, 2001 through January 31, 2002: | $14,299.85; |
| for months February 1, 2002 through June 30, 2002: | $19,355.61; |
| for months July 1, 2002 through September 30, 2002: | $20,597.86 |
| for months October 1, 2002 through December 31, 2002: | $79,436.45 |
| for months January 1, 2003 through March 31, 2003: | $97,360.14 |
| for months April 1, 2003 through May 31, 2003: | $109,004.24 |
| for months June 1, 2003 through September 30, 2003: | $121,506.52 |
| for months October 1, 2003 through October 31, 2003: | $143,408.23 |

3. **Letter of Credit:** Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-four is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-three, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.                LYCOS, INC.

By: _____            By: _____
        E. WILLIAM GILLULA
        PRESIDENT & COO

Title: _____            Title: CFO

Date: DEC 1 0 2001                              Date: 10/4/01

PHS/BOSTON
144874-093(skh)

NON-ORIGINAL
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-THREE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,320,039.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

    Lessee: BD C

PHS/BOSTON

144874-093(skh)

LYC 07697

# EXHIBIT E

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. NINETY-FOUR Dated as of October 2, 2001

LESSOR:                                   LESSEE:    LYCOS, INC.
                                                     400-2 Totten Pond Road
COMPUTER SALES INTERNATIONAL, INC.                   Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4,
1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    |                             |             |          |           |                         |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 84 pages.

**EQUIPMENT LOCATION:**   See attached Exhibit "A"

2. Monthly Rental for all Units: See Addendum One
3. Initial Term: **November 1, 2001 through October 31, 2004; Thirty-six (36) months**
4. Anticipated Installation Date: **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before **October 9, 2001.**

COMPUTER SALES INTERNATIONAL, INC.    LESSEE: LYCOS, INC.

By: _____    By: _____
        E. WILLIAM GILLULA
         PRESIDENT & COO

Title: _____    Title: _____CFO_____
         DEC 0 5 2001

Date: _____    Date: _____10/4/01_____

PHS/BOSTON
144874-094(jkh)

LYC 07699

LYC 07784

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

### ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-FOUR
### MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-four, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Dates; Start of Initial Term:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, 76, 81, 85 and 86 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. In consideration of Lessee's entering into this Lease, Lessor agrees to early terminate Lessee's rental obligations under Equipment Schedules 64, 65, 66, 66A, 66B, 67, 68, 76, 81 and 86, for the units leased hereunder, effective on October 31, 2001. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-three between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date |
|---|---|---|
| 64, 65, 66, 66A, 66B, 67, 68, 76, 81, 86 | 10/31/01 | 11/1/01 |
| 67A, 68A, 68B, 68C | 9/30/02 | 10/1/02 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 |
| 64B, 66E, 67D, 69B | 3/31/03 | 4/1/03 |
| 64D, 66G, 67F, 69G | 5/31/03 | 6/1/03 |
| 64F, 66I, 67H, 69I | 9/30/03 | 10/1/03 |
| 85 | 12/31/03 | 1/1/04 |

## NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## *COMPUTER SALES INTERNATIONAL, INC.*

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-FOUR

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $21,836,791.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

      Lessee: BDC

PHS/BOSTON

144874-094(skh)

LYC 07786

EXHIBIT F

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

3. **Total Monthly Rental**: The Monthly Rentals per Unit are set forth on the attached Exhibit "A." However, the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 64, 66, 66A, 66B, 76 and 81 will be $0 for the months of November 1, 2001 through December 31, 2002; and the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 65, 67, 68 and 86 will be $0 for the months of November 1, 2001 through September 30, 2002. Accordingly, the total Monthly Rental under the Lease is as follows:

for months November 1, 2001 through September 30, 2002: $0;
for months October 1, 2002 through December 31, 2002:    $210,061.03;
for months January 1, 2003 through March 31, 2003:       $333,258.78
for months April 1, 2003 through May 31, 2003:           $398,305.68
for months June 1, 2003 through September 30, 2003:      $462,206.40
for months October 1, 2003 through December 31, 2003:    $611,403.34
for months January 1, 2004 through October 31, 2004:     $679,753.85

4. **Letter of Credit**: Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-three is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-four, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: _E. WILLIAM GILLULA_                     By: _____
        PRESIDENT & COO

Title: _____DEC 0 5 2001_____              Title: _CFO_____

Date: _____               Date: _10|4|61_____

PHS/BOSTON
144874-094(skb)

LYC 07785

Equipment Leasing Association

**ELA Home**

Members' Login

search

dvanced search  **Go!**

Site Map | Site Updates

ews

ember Directories

ore/Library

ents and Training

dustry Research

ingSource

ate Tax Manual

vt Relations

ail Discussions

out ELA

ess Room

onsor/Advertise

uipment Leasing
ssociation
201 N. Fairfax Drive
lite 550
lington, VA
2203-1627
one: 703-527-8655
x: 703-527-2649

Leasing Equips America

## ELA Code of Fair Business Practices

- Purpose
- Preamble
- Section I: General Standards of Professional Conduct
- Section II: Exchange of Credit Information
- Section III: Enforcement Provisions

### Purpose

The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

Back to Top

### Preamble

Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal and State laws:

Back to Top

### Section I: General Standards of Professional Conduct

1. A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2. A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry.

3. A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement.

4. A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry.

5. A Member shall use proper care and exercise independent professional judgment.

6. A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7. A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8. A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9. A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis.

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11. A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client.

12. A Member shall not make payments to a representative of another party without the consent of that party.

13. A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction.

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

Back to Top

## Section II: Exchange of Credit Information

The exchange of credit information is an integral part of a well functioning equipment leasing and financing industry. In addition to complying with all government laws and regulations, the Members shall adhere to The Robert Morris Associates' Code of Ethics for the Exchange of Credit Information.

Back to Top

## Section III: Enforcement Provisions

Article VIIB of the ELA Bylaws provides that a Member may be censured, suspended or expelled from the Association for violating the Code of Fair Business Practices of the Association. Accordingly, the disciplinary actions that the Association may take in the event of a violation of the Code include: (a) private censure; (b) public censure; (c) probationary membership with such conditions as may be determined by the Association; (d) suspension of membership for a term and on such conditions as may be determined by the Association; (e) expulsion from membership; and (f) non-renewal of the membership of the Member.

The following provisions, consistent with the provisions of Article VIIB of the ELA Bylaws, set forth the procedures to be followed in proceedings involving alleged violations of the Code.

1. An ELA Fair Business Practices Committee (the "Committee"), consisting of three members of the ELA Board of Directors and three former officers or directors of the ELA, shall be appointed by the Chairman of the Association who shall also designate one member of the Committee as Chairman of the Committee.

2. A proceeding alleging that an ELA Member violated the Code may be initiated by a Member of ELA (other than any ELA Member who has an official on the Committee), by the Executive Committee of the Association or by a non-member of ELA which has suffered injury as a participant in an equipment lease or finance transaction with a Member ("complainant"). The proceeding shall be initiated by filing a written Complaint with the ELA President at ELA Headquarters by registered mail. The Complaint must identify the section or sections of the Code alleged to be violated, set forth in detail the facts claimed to support the charges of Code violation, and include documents in the possession of the complainant which are pertinent to the Complaint. In addition, the complainant may submit affidavits from the complainant and others in support of the Complaint.

3. Copies of the Complaint and supporting documents, if any, shall be sent by the President to the members of the Committee. If the Committee deems the Complaint to be insufficient, it may request the complainant to provide more information, documents or affidavits in support of the Complaint.

4. If the Committee determines by majority vote that the Complaint and supporting documents, on their face, do not satisfy the requirements of Paragraph 2 or do not state facts constituting a violation of the Code, the complainant shall be so notified by the Chairman of the Committee, and no further action shall be taken.

5. If the Committee determines that the Complaint and supporting documents meet the requirements of Paragraph 2 and allege facts which, if true, could constitute a Code violation, the Chairman of the Committee shall request the ELA President to send a copy of the Complaint and supporting documents, by registered mail, to the party complained against (the "respondent"). The President shall also provide the respondent and complainant with a copy of the Code.

6. The respondent shall be afforded an opportunity to Answer the Complaint. The respondent's Answer shall respond to the specific allegations contained in the Complaint. The Answer shall also notify the Committee whether or not the respondent requests a hearing on the allegations in the Complaint, and provide the Committee with documents or affidavits from respondent or others supporting the Answer. The Answer, supporting documents and affidavits shall be sent to the ELA President by registered mail within 30 days of respondent's receipt of the Complaint. The ELA President shall promptly forward the Answer and supporting documents to the Committee and to the complainant by registered mail, and shall notify complainant of the right to request, within 30 days of receipt of the respondent's Answer, a hearing on

the Complaint before the Committee.

7. Irrespective of whether the parties request a hearing on the Complaint, the Committee shall have the authority by majority vote to dismiss the Complaint if it determines, based upon the submissions made, that it is clear there is no violation of the Code. Should the Committee dismiss the Complaint, the parties shall be notified and no further action on the Complaint shall be taken.

8. In the event the Complaint is not dismissed and a party has requested a hearing or the Committee determines a hearing is necessary, then the Committee shall notify complainant and respondent of the date, time and location of the hearing and their right to be represented by counsel at the hearing. During the hearing, the parties shall be afforded a reasonable opportunity to present evidence, cross-examine witnesses and be heard on matters alleged in the Complaint and Answer. The Committee may also permit others to testify at the hearing.

9. The Committee shall vote on whether or not the respondent has violated the Code based upon the record, and, if so, what disciplinary action, if any, should be taken against the respondent as a consequence of such violation. A two-thirds vote of the Committee members is required to censure, suspend or expel a respondent.

10. The Committee's decision must be in writing and shall be sent to the respondent and complainant by registered mail. The Committee shall notify the respondent of the right to appeal an adverse decision within 30 days of receipt of the decision. The respondent's appeal, if any, shall be sent by registered mail to the ELA President and shall set forth the reasons why the Committee's decision should be set aside. The ELA President shall promptly forward the respondent's appeal, if any, to the Complainant via registered mail. If the respondent does not timely appeal the Committee's decision, the decision shall be final and binding upon respondent.

11. If the respondent elects to appeal the Committee's decision, then the matter shall be transmitted for a hearing on the existing record before the ELA Board of Directors (the "Board"). The Board shall notify the parties via registered mail of the date, time and location of the hearing, and the schedule for filing written submissions with the Board. The respondent and the complainant may be represented by counsel and shall be permitted to provide written submissions and present oral argument to the Board. No additional documents may be filed or any testimony taken, unless ordered or requested by the Board. The Board shall vote on whether the Committee's decision should be affirmed, modified or reversed. A decision by the Board which censures, suspends or expels the respondent must be by two-thirds vote of the members present and voting. No member of the Committee, and no Director that is a representative of an ELA member that initiated the Complaint or of the respondent, may be present during, or participate in, the voting.

Back to Top

---



Cant find it? -|- Send us feedback!

© 1996-2004, Equipment Leasing Association. All rights reserved
The Equipment Leasing Association (ELA) is a national organization comprised of member companies within the equipment leasing and finance industry. Disclaimer | Privacy Policy

Created by Matrix Group International, Inc.

# EXHIBIT G



**Brian Lucy**
03/18/2002 10:08 AM

To: Paul Stenberg <Paul.Stenberg@csileasing.com>
cc:
Subject: Re: Analysis

Thanks a bunch for doing this.

Kevin is out this week, but when he gets back, we'll take a look.

Brian


Paul Stenberg <Paul.Stenberg@csileasing.com>



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>
03/18/2002 08:42 AM

To: "Kevin. Baillie@corp. terralycos. com (E-mail)"
    <Kevin.Baillie@corp.terralycos.com>, Brian.Lucy@corp.terralycos.com
cc:
Subject: Analysis


I have come up with the following so far;

Monique's analysis does not include Schedules that Lycos was still obligated for, but because our Lenders wanted to decrease exposure , we lowered them (I explained this back in Sept.) Equipment Schedules 64,81,68,66 and 86 rents were decreased substantially from the October payment to the November. For example, #64 was due to expire 1/31/02 @ $26,888/mo. We decreased that to $5055/mo, but contractually Lycos stilled owed the $26,888/mo.

Schedule # 65 expired 10/1 but was included in the re-finance. This was not included in the Analysis.

Monique's total for the new lease obligation was wrong. She took the Total Monthly Payment x the Length of the deal. You must look at it at a Present Value base and not include the Interest. Its like taking your Mortgage payment x 30 years.


This is what I have so far so you can rest easy;

Present Value of Lease  $23,727,000

Obligation of old Leases $20,215,000

Difference        $3,512,000

Now the Value of the current lease is around $29,000,000 . The total cost of the equipment was around $63mm. When we re-financed, we extended our the lease and re-couped about 5-7% thus the 3.5mm. Don't forget, on the Orginal leases, CSI injects between 10-13% residual so for every $1mm spent, Lycos obligation is $870k

I addition, a good portion of the equipment was taken from an over 30 month term and placed on a 24 month term. For example( hypothetical); a million dollar of PC's that had 33 months left was refinanced to 24 mo. So, in affect, that groups payments are going to be higher.

BUT, as I said all along, WHEN you return the equipment, I will give you Full FMV credit. So you won't be obligated for all the payments.

There are still areas that I am doing this week and I will get back to you.

# EXHIBIT H

# CSI      <u>SALES AGREEMENT NUMBER 199614</u>

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314) 997-7010

## SALES AGREEMENT

This Sales Agreement dated July 15, 2003 (the "Agreement") is between **COMPUTER SALES INTERNATIONAL, INC.** (the "Seller") and **LYCOS, INC.**, which has a principal place of business at **100 5ᵗʰ Avenue, Waltham, Massachusetts 02451** (the "Buyer").

WHEREAS, Buyer, as Lessee and Seller, as Lessor have entered into various equipment schedules (the "Equipment Schedules") subject to Master Lease Agreement No. 144874 dated December 4, 1996 (the "Master Lease") (the "Master Lease" together with the "Equipment Schedule(s)" hereinafter collectively referred to as the "Lease")

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were consequently terminated in their entirety, and all items of equipment leased pursuant to the terminated Equipment Schedules, were made subject to replacement Equipment Schedules listed on Exhibit 1 attached hereto and made a part hereof ("Replacement Schedules");

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were not revised ("Original Schedules") and they, together with the Replacement Schedules remain in full force and effect as of the date of this Agreement (the "Original Schedules" together with the such "Replacement Schedules" collectively referred to as the "Existing Schedules")

WHEREAS, Lessee desires to restructure all of the Existing Schedules detailed on Exhibit 1 to $1.00 buyout leases;

WHEREAS, a prepayment of the fair market value of all of the Equipment (as hereinafter defined) is required in order to restructure each Lease to $1.00 buyout lease;

WHEREAS, Lessor has agreed to restructure said Leases to $1.00 buyout leases for the consideration set forth below;

NOW THEREFORE, in consideration of the foregoing, Lessee and Lessor agree as follows:

1. **SALE:** For the Sales Price described in Paragraph 3 below, Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Leases listed in Paragraph 2 below (the "Equipment") effective on their respective termination dates, except as stated in paragraph 4 below, and on the terms and conditions contained in this Agreement.

2. **EXISTING EQUIPMENT SCHEDULES:** The Equipment is installed at Buyer's location and has been accepted for lease under Equipment Schedules 69I, 64F, 66I, 67H, Eighty-five, Eighty-six, Eighty-nine, 89A, Ninety, Ninety-three, Ninety-four, One Hundred, and Two Hundred to Master Lease Agreement No. 144874 between the parties (the "Leases"). The Existing Equipment Schedules shall terminate on the "Termination Dates" set forth below:

    Equipment Schedules 69I, 64F, 66I and 67H will terminate on September 30, 2003
    Equipment Schedules Eighty-five and Eighty-six will terminate on December 31, 2003
    Equipment Schedules Eighty-nine, 89A, and Ninety will terminate on July 31, 2004
    Equipment Schedule Ninety-three will terminate on October 31, 2003
    Equipment Schedule Ninety-four will terminate on October 31, 2004
    Equipment Schedule One Hundred will terminate on March 31, 2004
    Equipment Schedule Two Hundred will terminate on March 31, 2005

Each Lease will terminate on its respective Termination Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make all Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease. Pursuant to

the Leases, Buyer remains liable for any personal property tax liability, with respect to the Equipment, which accrued or accrues during the term of the Leases. The Equipment is sold on an "AS IS, WHERE IS" basis, without any warranties of any kind, express or implied.

3.   SALES PRICE:  The Sales Price of the Equipment is 3,775,000.00 USD, plus applicable taxes, which Buyer shall pay on or before July 18, 2003 by wire transfer to the following bank and account:

> First Bank
> ABA #081009428
> For Further Credit to:  Computer Sales International, Inc.
> Account #9821914677
> Lycos, Inc.
> Sales Agreement No. 199614

Buyer shall pay on demand a late charge on such Sales Price if unpaid after it is due.  The late charge rate is the lower of (i) one and one half percent (1.5%) per month, or (ii) the highest rate permitted by law.

4.   SATISFACTION OF LEASE OBLIGATIONS:  The Leases, solely with respect to Monthly Rental (set forth on Exhibit 1) shall continue in full force and effect and Lessee shall pay to Lessor the number of Monthly Rental payments remaining (plus applicable taxes, if any), beginning with the payment due for the month of August 2003, and continuing to and including the Final Rent Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").

Seller acknowledges that receipt of the Sales Price and each of the Remaining Rental Payments in full, plus applicable taxes, if any ("Lease Satisfaction Amount"), shall fully satisfy Buyer's obligations to Seller with respect to the Leases and all obligations under the Leases shall, on the Final Rent Payment Date, cease in their entirety.

Buyer and Seller agree that this Agreement and the payment of the Lease Satisfaction Amount satisfies all monetary obligations and notice obligations of Buyer under the Leases (with the exception of notices required under Section 14 of the Master Lease), and no other payment, written or oral notification is required by Buyer in order to effectuate (a) the full satisfaction of its obligations under the Leases and (b) its ownership interest in the Equipment.

SELLER RETAINS TITLE:  With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date .  With respect to Equipment Schedule 85, certain items of Equipment shall on its respective Termination Date, become subject to Equipment Schedule Ninety-four.  Upon receipt of the Lease Satisfaction Amount in full, without further action on the part of Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.

5.   DELIVERY:  The Equipment is already installed and accepted by Buyer pursuant to the Leases.

6.   WARRANTIES:  Seller warrants that (i) on termination of the applicable Lease, except as noted in paragraph 4 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims, and encumbrances of any kind except those caused or incurred by Buyer, if any; and (ii) Seller has the full right, power and authority to sell the Equipment.  OTHER THAN THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONDITION, DESIGN OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.  SELLER HAS NO LIABILITY TO BUYER FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH (i) ANY DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO BUYER, (ii) ANY DEFECT IN THE EQUIPMENT, (iii) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (iv) ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE EQUIPMENT, OR (v) ANY LOSS OF BUSINESS, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PATENT INFRINGMENT ACTIONS.

7.   TAXES:  Buyer shall pay all sales and use taxes (including interest and penalties) levied or based on the sales price or on this Agreement or the Equipment.  If Buyer is purchasing for resale or if Buyer is exempt from sales/use tax, Buyer will issue to Seller an appropriate exemption certificate in form reasonably acceptable to Seller prior to the delivery date.  Personal property taxes assessable on the Equipment on or after the date of delivery will be borne by Buyer.

8.  REMEDIES:  If Buyer refuses or is unable to timely perform its obligations hereunder, Seller may, following the delivery date, do any or all of the following: (i) terminate the Agreement on five days notice, (ii) retain or repossess the Equipment, or (iii) recover from Buyer all damages and expenses, including reasonable attorney's fees, which Seller has incurred or may incur by reason of Buyer's failure to perform under this Agreement.  Seller may retain any monies paid by Buyer to Seller prior to Buyer's nonperformance as an offset to Seller's damages and expenses.

9.  MISCELLANEOUS:

A.  ENTIRE AGREEMENT:  This Agreement is the entire agreement between Seller and Buyer regarding the purchase and sale of the Equipment and no representation or statement not contained in this Agreement is binding on Seller or Buyer as a warranty, or otherwise, unless in writing and executed by the party to be bound.  Any purchase order Buyer issues is merely for its internal recordkeeping purposes and as a means of confirmation of Buyer's acceptance of this Agreement, and does not as supercede, modify or serve as a counter-offer to the terms and conditions in this Agreement.

B.  NOTICES:  Any notice relating to this Agreement must be in writing and sent by electronic facsimile transmission, by overnight courier service or by registered or certified mail, postage prepaid, addressed to the party for which it is intended at the address set forth in the beginning of this Agreement or to such other address as either party indicates in writing.  Notice is effective on the earlier of receipt or three days from the date of mailing.

C.  GOVERNING LAW:  This Agreement, including all matters of construction, validity, performance and enforcement, is governed by the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law.

D.  SEVERABILITY:  Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law or any jurisdiction will be ineffective as to the jurisdiction without invalidating the remaining provisions of this Agreement, but where the provisions of applicable law may be waived, they are waived to the full extent permitted by law.

E.  SURVIVAL:  All representations, warranties and covenants contained in this Agreement continue in full force and effect and survive the sale of Equipment.

F.  SELECTION:  Buyer acknowledges that it has exercised its own judgment in selecting the Equipment purchased, and this it has not relied on Seller for assistance and advice in making such selection.

G.  ASSIGNMENT:  This Agreement may not be assigned by Buyer without the prior written consent of Seller.

The parties have executed this Agreement on the date written below.  At Seller's option, this Agreement is not effective unless signed by Buyer and returned to Seller by July 15, 2003.

| BUYER: | SELLER |
|---|---|
| LYCOS, INC. | COMPUTER SALES INTERNATIONAL, INC. |
| By: _____ | By: _____ |
| Title: CFO | Title: _____ |
| Date: 7/18/03 | Date: _____ |

REVIEWED BY
TERRA LYCOS LEGAL  PDK

Exhibit 1
to
Sales Agreement No. 199514

| Designation | Revised 2 | Revised 2 | Revised 2 | Revised 2 | Revised 5 | Revised 6 | Revised 12 | Revised 12 | Revised 12 | Original 8 | Original 20 | Replacement 3 | Replacement 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. Remaining Rental Payments | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 |
| August Rent Payment Date | 9/1/2003 | 12/1/2003 | 9/1/2003 | 9/20/2003 | 12/1/2003 | 12/1/2003 | 7/1/2003 | 7/1/2004 | 7/1/2003 | 3/1/2004 | 3/1/2005 | 10/1/2003 | 10/1/2004 |
| Final Rent Payment Date | 9/6,217 | 9/6,217 | 5,545 | 5,545 | 32,898 | 32,898 | 36,438 | 36,438 | 73,476 | 73,476 | 820 | 108,548 | 18,070 |
| Monthly Rental | | | | | | | | | | | | | |

| | Revised | Revised | Revised | Revised | Revised | Revised | Revised | Revised | Original | Original | Replacement | Replacement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug-03 | 96,217 | 5,545 | 32,898 | 36,438 | 73,476 | 820 | 108,548 | 18,070 | 52,453 | 6,082 | 43,954 | 121,507 | 462,208 |
| Sep-03 | 96,217 | 5,545 | 32,898 | 36,438 | 73,076 | 820 | 108,545 | 18,070 | 52,453 | 6,082 | 41,954 | 121,507 | 462,208 |
| Oct-03 | | | | | 73,476 | 820 | 103,545 | 16,070 | 52,453 | 5,082 | 43,954 | 143,406 | 611,463 |
| Nov-03 | | | | | 73,470 | 820 | 108,546 | 16,070 | 52,453 | 6,082 | 43,954 | | 611,463 |
| Dec-03 | | | | | 73,476 | 820 | 106,548 | 18,070 | 52,453 | 6,082 | 43,954 | | 672,154 |
| Jan-04 | | | | | | | 108,648 | 18,070 | 52,423 | 6,082 | 43,954 | | 672,154 |
| Feb-04 | | | | | | | 108,548 | 18,070 | 52,453 | 6,082 | 43,954 | | 672,154 |
| Mar-04 | | | | | | | 108,548 | 18,070 | 52,453 | | 43,954 | | 672,154 |
| Apr-04 | | | | | | | 108,548 | 18,070 | 52,453 | | 43,954 | | 672,154 |
| May-04 | | | | | | | 103,548 | 18,070 | 52,453 | | 43,954 | | 579,754 |
| Jun-04 | | | | | | | 103,548 | 18,070 | 52,453 | | 43,954 | | 579,754 |
| Jul-04 | | | | | | | 108,545 | 18,070 | 52,453 | | 43,954 | | 579,754 |
| Aug-04 | | | | | | | | | | | 43,954 | | 679,754 |
| Sep-04 | | | | | | | | | | | 43,954 | | 723,708 |
| Oct-04 | | | | | | | | | | | 43,954 | | 723,708 |
| Nov-04 | | | | | | | | | | | 43,954 | | 43,954 |
| Dec-04 | | | | | | | | | | | 43,954 | | 43,954 |
| Jan-05 | | | | | | | | | | | 43,954 | | 43,954 |
| Feb-05 | | | | | | | | | | | 43,954 | | 43,954 |
| Mar-05 | | | | | | | | | | | 43,954 | | 43,954 |

# EXHIBIT 11

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington D C

Thomas O Bean
tbean@mwe com
617 535 4426

February 24, 2006

**VIA HAND DELIVERY AND**
**BY FIRST CLASS MAIL**

Robert J. Kaler
Gadby Hannah LLP
225 Franklin Street
Boston, MA 02110

      Re:    Computer Sales International, Inc v. Lycos, Inc.,
             <u>Case No. 05-10017-RWZ</u>

Dear Bob:

      Please be advised that neither Susan Franklin nor John Kirk will serve as a testifying expert for Lycos in the above matter

      If you have any questions concerning this matter, please do not hesitate to contact me.

                        Very truly yours,

                        Thomas O. Bean

TOB/kgj

U.S. practice conducted through McDermott Will & Emery LLP.

28 State Street  Boston, Massachusetts  02109-1775  Telephone: 617 535 4000  Facsimile: 617 535 3800  www mwe com
BST99 1492959-1 057077 0012

# EXHIBIT 12



HOME • ABOUT CSI • RETURNS FACILITY • INTERNATIONAL • NEWS/EVENTS • CONTACT US

# CSI LEASING
the power of experience



## Asset Tracking

Lifecycle Services

Why Lease

Acquisition

**Asset Tracking** ▼

MyCSI

ShipTrack



Flexibility

Disposal

Keeping up with technology installed in multiple locations can be a full-time job. Let your people concentrate on implementing your projects, let ours handle data entry and asset tracking.

CSI Leasing has online solutions to reduce the costs associated with equipment tracking.

Stay on top of your leased assets with MyCSI.

Track your returned equipment with ShipTrack.

◁ Back                                    Next ▷

Home | About CSI | Returns Facility | International | News/Events | Contact Us | Site Map | MyCSI
Lifecycle Services | Why Lease | Acquisition | Asset Tracking | Flexibility | Disposal | ShipTrack

Copyright © 2005-2006 CSI LEASING, INC. All rights reserved



**CSI LEASING**
the power of experience





Lifecycle Services

**Why Lease**

Why Lease Your IT

Why Lease with CSI



Acquisition

Asset Tracking

Flexibility

Disposal

## Why Lease

It's tough enough deciding what equipment you need, and even tougher choosing how to acquire, finance and manage it. The decisions you make don't just affect the IT department - they affect the financial and operational viability of your company

- Should you buy or lease?
- Whom should you trust to help you navigate the process?
- How do you plan for future unknowns?
- How do you get the most equipment for your budget while minimizing the total cost of ownership?
- How do you protect your company from liability given current security and disposal laws?

Leasing may be the answer to many of these questions  CSI Leasing has the experience and expertise to design a solution that meets your needs

◁ Back                                    Next ▷

---

Copyright © 2005-2006 CSI LEASING. INC  All rights reserved



HOME  •  ABOUT CSI  •  RETURNS FACILITY  •  INTERNATIONAL  •  NEWS/EVENTS  •  CONTACT US



CSI LEASING
the power of experience



## Acquisition

Lifecycle Services

Why Lease

**Acquisition**

SmartTrack

Service Team



Asset Tracking

Flexibility

Disposal

When it comes to acquiring equipment, it makes a big difference to work with reliable people and a solid process  To help you handle the mountain of details and keep things running smoothly, CSI offers the following solutions:

- A dedicated service team
- Simplified ordering and invoicing
- Vendor administration, regardless of manufacturer
- Flexibility to acquire what you want, when you need it

Right from the start, we'll make sure your experience with CSI Leasing is one you'll feel good about

◁ Back                                                    Next ▷

Copyright © 2005-2006 CSI LEASING. INC  All rights reserved

# EXHIBIT 13

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., Plaintiff, | ) ) ) |
| v. | ) ) |
| LYCOS, INC., Defendant, | ) ) ) C.A. No. 05-10017- RWZ ) |
| BANK OF AMERICA f/k/a FLEET BANK, Trustee Process Defendant. | ) ) ) ) |

**PLAINTIFF COMPUTER SALES INTERNATIONAL INC.'S
RESPONSE TO DEFENDANT LYCOS INC.'S FIRST INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff and

Counterclaim Defendant Computer Sales International, Inc. ("CSI") hereby responds as

follows to the *First Set of Interrogatories* ("Interrogatories") of Defendant and

Counterclaim Plaintiff Lycos, Inc.'s ("Lycos'") as follows

**GENERAL OBJECTIONS**

1. CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they attempt to impose upon CSI obligations beyond those allowed by the

Federal Rules of Civil Procedure.

2. CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they seek information protected from discovery by applicable law, including

without limitation the work-product doctrine, the attorney-client privilege, or any other

applicable privilege from disclosure

3. CSI objects to the Interrogatories, including the Definitions therein, to the

extent that they seek information not relevant to the claim or defense of any party in this

action or information not reasonably calculated to lead to the discovery of admissible evidence.

     4.    CSI objects to the Interrogatories, including the Definitions therein, to the extent that they seek information that is not within CSI's possession, custody, or control, and to the extent that they are overbroad, vague, or unduly burdensome.

     5.    CSI objects to the Interrogatories, including the Definitions therein, to the extent that they require disclosure of any information that constitutes, reflects or reveals trade secrets or confidential proprietary information not protected by the existing protective order in this matter and unless appropriate safeguards are agreed upon to prevent unrestricted disclosure of such information.

     6.    CSI objects to the numbering of separate interrogatories as "subparts" in Interrogatory No. 1 as a violation of Local Rule 26.1(C). These are not "subparts" as defined under that local rule, and CSI reserves the right to object at a later date to the extent Lycos attempts later to propound interrogatories in excess of the permissible amount.

     7.    CSI reserves its right to make additional objections to these Interrogatories, including the Definitions therein, and hereby incorporates the aforesaid General Objections into each specific response below as if set forth in full therein.

## DEFINITIONS

     1.    CSI objects to Definition 1 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure.

     2.    CSI objects to Definition 2 to the extent it is overbroad, vague, unduly

burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "would have appeared on those documents" as calling for speculation.

      3.     CSI objects to Definition 3 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "would have appeared on those Journal Entries" as calling for speculation.

      4.     CSI objects to Definition 5 to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the footnote 1 to the extent Lycos now attempts to redefine the term "lease" to coincide with its new claims (not yet ruled upon) that its arrangements with CSI were anything other than lease arrangements.

      5.     CSI objects to Definition 6 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure.

      6.     CSI objects to Definition 7 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "price at which an asset would change hands" as calling for speculation. CSI further objects to

3

Definition 7 to the extent it seeks to redefine a term already defined by applicable law.

7.    CSI objects to Definition 10 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action.

8.    CSI objects to Definition 13 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to Definition 13 to the extent it seeks to redefine a term already defined by applicable law.

9.    CSI objects to Definition 14 to the extent it is overbroad, vague, unduly burdensome.

10.    CSI objects to Definition 15 to the extent it is overbroad, vague, unduly burdensome and seeks information not relevant to a claim or defense of a party in this action or information protected by the attorney-client privilege, work product doctrine, or other applicable privilege from disclosure. CSI further objects to the phrase "amount that would have appeared on those documents" as calling for speculation. CSI further objects to Definition 15 to the extent it seeks to redefine a term already defined by applicable law.

## INTERROGATORIES

**INTERROGATORY NO. 1 (LABELED AS SUBPART "A"):** For each numbered Equipment Schedule, identify, if at the time the Equipment Schedule became effective, CSI had leased some or all of the Equipment on that schedule to Lycos under a previously executed Equipment Schedule, the number of the previously executed Equipment Schedule, and the date the previously executed Equipment Schedule became effective.

**ANSWER TO INTERROGATORY NO. 1:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this

Interrogatory may be derived or ascertained from the business records already produced

by both CSI and Lycos in this case. The burden of deriving or ascertaining the answer is

substantially the same for Lycos as it is to CSI, as each Equipment Schedule speaks for

itself and indicates relevant dates and whether the equipment leased thereunder was

previously leased by Lycos pursuant to another Equipment Schedule. See, for example,

Lycos's counterclaim which tracks Equipment Schedule 67E.

**INTERROGATORY NO. 2 (LABELLED AS SUBPART "B"):** For each numbered
Equipment Schedule, state the total Actual Equipment Cost of the Equipment on that
Equipment Schedule.

**ANSWER TO INTERROGATORY NO. 2:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege. CSI further objects to this

Interrogatory because the Lycos definition of "Actual Equipment Cost" is vague and

ambiguous. As defined by Lycos, no "Request for Preparation of Lease Contract"

produced by CSI has a provision for "Actual Equipment (HW) Cost." CSI further objects

to this Interrogatory as calling for speculation because Lycos is asking CSI to speculate

"the amount that would have appeared" had CSI made certain calculations that were not

made by CSI at the time.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this

Interrogatory may be derived or ascertained from the business records already produced

by CSI if Lycos reviews the actual "Request for Preparation of Lease Contract"

documents and reviews the notations for "Actual Equip (HW) Cost." For example, the

"Actual Equip (HW) Cost" for Equipment Schedule was $470,057 as shown on

document CSI 40103. The burden of deriving or ascertaining the answer to this

Interrogatory for all schedules is substantially the same for Lycos as it is for CSI.

However, CSI does not admit that the amount appearing beside any notations for "Actual

Equipment (HW) Cost" on "Requests for Preparation of Lease Contract" documents

produced by CIS has the meaning defined by Lycos in its Definitions.

**INTERROGATORY NO. 3 (LABELED AS SUPBART "C"):**   For each numbered
Equipment Schedule, state the total of all costs other than the Actual Equipment Cost and
any interest and finance costs, paid by CSI to acquire the Equipment leased pursuant to
that Equipment Schedule;

**ANSWER TO INTERROGATORY NO. 3:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege. CSI further objects to this

Interrogatory because the Lycos definition of "Actual Equipment Cost" is vague and

ambiguous. As defined by Lycos, not every "Request for Preparation of Lease Contract"

document produced by CSI has a provision for "Actual Equipment (HW) Cost."

In answering, CSI states that the equipment acquisition costs, exclusive of interest

and finance costs, are attached hereto as Exhibit A.

**INTERROGATORY NO. 4 (LABELED AS SUBPART "D"):**   For each numbered
Equipment Schedule, state the total amount of interest and finance costs, if any, paid by

6

CSI to any entity that loaned it money in connection with acquisition of the Equipment on that Equipment Schedule;

## ANSWER TO INTERROGATORY NO. 4:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI did not actively maintain business records tracking the interest and finance costs paid by CSI to entities that had loaned CSI money in connection with the acquisition of equipment – equipment Lycos had selected and requested CSI to purchase on its behalf. However, CSI is attempting to calculate such amounts and will supplement this Interrogatory when able to do so.

**INTERROGATORY NO. 5 (LABELED AS SUBPART "E"):**   For each numbered Equipment Schedule, state the total amount of Interim Rent and Rent paid by Lycos to or for the benefit of CSI pursuant to that Equipment Schedule;

## ANSWER TO INTERROGATORY NO. 5:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, as to "Interim Rent," the answer to this Interrogatory may be derived or ascertained from the journal entries already produced by CSI for each booked Equipment Schedule, as each journal entry has a notation for "Interim Rent," where applicable. For example, the Schedule 1 "Interim Rent" was $1,496.79 as shown on document CSI38938. In addition, "Interim Rent" may be ascertained from the subledger cards already produced by CSI in this case. Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer is substantially the same for Lycos as it is to CSI.

7

As to "Rent," the amount paid by Lycos pursuant to each Equipment Schedule may be derived or ascertained by reading the Equipment Schedules and Certificates of Acceptance produced by CSI and Lycos, as well as the subledger cards already produced by CSI in this case. Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer to this Interrogatory is substantially the same as to Lycos and CSI.

Both the "Interim Rent" and "Rent" can be derived from the Equipment Schedules and Certificates of Acceptance produced by both CSI and Lycos in this case. Lycos has the ability to calculate these amounts because these documents were in its possession prior to commencement of this lawsuit and before discovery. See Lycos's counterclaims and analysis of equipment schedules 67E and H therein.

**INTERROGATORY NO. 6 (LABELED AS SUPBART "F"):**   For each numbered Equipment Schedule, state the Stip Loss Base Value of the Equipment;

**ANSWER TO INTERROGATORY NO. 6:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. The "Stip Loss Base Value" is evident from the Stipulated Loss Value or Certificate of Acceptance from each Equipment Schedule already produced by CSI and Lycos in this case. The burden of deriving or ascertaining the answer to this Interrogatory is substantially the same for Lycos as it is for CSI, as each Equipment Schedule, Stip Loss Value Table and Certificate of Acceptance speaks

8

for itself. For example, the Stip Loss Base Value for Equipment Schedule 1 was

$71,745.92 as shown on LYC 00014.

**INTERROGATORY NO. 7 (LABELLED AS SUBPART "G"):** For each numbered
Equipment Schedule, state the Total Margin for that Equipment Schedule;

**ANSWER TO INTERROGATORY NO. 7:**

Without waiving the foregoing objections, CSI additionally objects to this

Interrogatory to the extent it seeks information protected by the attorney-client privilege,

work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this

Interrogatory may be derived or ascertained from the business records, specifically the

Request for Preparation of Lease Contract documents which have already been produced

by both CSI and Lycos in this case. The "Total Margin" for each Equipment Schedule is

evident from the "Total Margin" category from the Request for Preparation of Lease

Contract documents already produced by CSI. For example, the "Total Margin" for

Equipment Schedule 23 was $19,183 as shown on document CSI40110. The burden of

deriving or ascertaining the answer to the Interrogatory for all schedules is substantially

the same for both Lycos and CSI.

**INTERROGATORY NO. 8 (LABELED AS SUBPART "H"):** For each numbered
Equipment Schedule, state the name, total amount of compensation, and date
compensation was paid by CSI, for each person who received compensation as
commission, bonus, or otherwise (other than as part of base pay or draw) with respect to
that Equipment Schedule, whether paid at or about the commencement of that schedule or
thereafter;

## ANSWER TO INTERROGATORY NO. 8:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. Paul Stenberg is the only CSI employee commissioned or compensated directly from any Equipment Schedule CSI entered into with Lycos. The amount of his Commission is identified on the Request for Preparation of Lease Contract documents already produced in the category identified as "Commission." For example, his commission for Equipment Schedule 23 was $5,908 as shown on document CSI40110. The date for release of payment is indicated in the bottom right corner of each Request for Preparation of Lease Contract document already produced. For example, the payment release date for the Equipment Schedule 23 commission was October 14, 1998 as shown on document CSI40110. The burden of deriving or ascertaining the answer to this Interrogatory is substantially the same for Lycos as it is for CSI.

**INTERROGATORY NO. 9 (LABELED AS SUBPART "I"):** For each numbered Equipment Schedule, state the total Residual Value of the Equipment on that Equipment Schedule as of the moment CSI placed that Equipment Schedule on its books;

## ANSWER TO INTERROGATORY NO. 9:

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that, pursuant to Fed. R. Civ. P. 33(d), the answer to this Interrogatory may be derived or ascertained from the business records already produced by both CSI and Lycos in this case. The "Residual Value" appears on each Operating Lease Journal Entry under the notation "NBV @ Term." The "Residual Value" appears on each Sales Type Lease Journal Entry and is notated as "Residual Value." For example, the Residual Value on Equipment Schedule 1 (Operating Lease Journal Entry) was $14,625.92 as shown on document CSI38938. The Residual Value on Equipment Schedule Two (Sales Type Lease Journal Entry) was $1,350 as shown on document CSI38942. The burden of deriving or ascertaining the answer to the Interrogatory for all schedules is thus substantially the same for both Lycos and CSI.

**INTERROGATORY NO. 10 (LABELLED AS SUBPOART "J"):**    For each numbered Equipment Schedule, state the total Net Book Value of the Equipment Schedule and related Equipment as of the moment CSI placed that Equipment Schedule on its books;

**ANSWER TO INTERROGATORY NO. 10:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that it did not track "Net Book Value" as defined by Lycos and does not recognize the methodology employed by Lycos in its definition of "Net Book Value." In addition, the rents due pursuant to each Equipment Schedule are evident in the documents already produced by both Lycos and CSI, and CSI has identified the "Rents" and "Residual Value" for each Equipment Schedule herein and in documents previously produced as set forth in the Answers to Interrogatory No. 5 (labeled as subpart "E") and Interrogatory No. 9 (labeled as subpart "I"). The burden of

11

deriving or ascertaining the answer to the Interrogatory is thus substantially the same as to Lycos and CSI.

**INTERROGATORY NO. 11 (LABELLED AS SUBPART "K"):**       For each numbered Equipment Schedule, state the total Net Book Value of the Equipment Schedule and related Equipment still under lease as of the moment before that Equipment Schedule terminated; and

**ANSWER TO INTERROGATORY NO. 11:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine or other applicable privilege.

In answering, CSI states that it did not track "Net Book Value" as defined by Lycos and does not recognize the methodology employed by Lycos in its definition of "Net Book Value." In addition, the rents due pursuant to each Equipment Schedule are evident in the documents already produced by both Lycos and CSI, and CSI has identified the "Rents" and "Residual Value" for each Equipment Schedule herein and in documents previously produced as set forth in the Answers to Interrogatory No. 5 (labeled as subpart "E") and Interrogatory No. 9 (labeled as subpart "I"). The burden of deriving or ascertaining the answer to the Interrogatory for all schedules is thus substantially the same for both Lycos and CSI.

**INTERROGATORY NO. 12 (LABELLED AS SUBPART "L"):**For each numbered Equipment Schedule, state the total Fair Market Value of the Equipment on that Equipment Schedule as of the commencement of that Equipment Schedule

**ANSWER TO INTERROGATORY NO. 12:**

Without waiving the foregoing objections, CSI additionally objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege,

12

work-product doctrine or other applicable privilege. CSI further objects to Lycos'
definition of "Fair Market Value" on the grounds stated earlier herein.

In answering, CSI states that the fair market value of each Equipment Schedule is
the rental amount that CSI and Lycos negotiated as professional and sophisticated entities
in arms-length transactions. The answer to this Interrogatory may be derived or
ascertained from the business records, specifically the Equipment Schedules, already
produced by both CSI and Lycos in this case. For example, the amount Lycos agreed to
pay CSI with respect to Equipment Schedules 67E and H is identified by Lycos in its
counterclaims.

**INTERROGATORY NO. 13 (LABELLED AS INTERROGATORY 2):** If CSI
claims that it communicated to Lycos before CSI filed the Complaint any or all of the
information contained in CSI's response to interrogatory 1(B), (C), (D), (G), (H), (I), (J),
and/or (K) for any or all of the Equipment Schedules, Identify the Equipment Schedule(s)
for which the information was Communicated and State the Basis for that claim.

**ANSWER TO INTERROGATORY NO. 13:**

Without waiving the foregoing objections, CSI additionally objects to this
Interrogatory as overbroad because CSI and Lycos had hundreds, if not thousands, of
communications regarding the equipment Lycos was selecting for lease from vendors of
its choosing at prices Lycos had negotiated with those vendors. CSI and Lycos executed
over 100 leases over an approximately eight year period between 1996 and 2003 in arms-
length transactions between two sophisticated parties. Lycos selected the equipment it
desired CSI to purchase on its behalf; Lycos negotiated the purchase price of the
equipment from the vendors it had selected; and Lycos issued purchase orders for the
acquisition of the equipment it wanted to acquire and Lycos confirmed to CSI that CSI
should purchase the equipment on Lycos' behalf before CSI, in fact, paid for the

13

equipment Lycos desired. Lycos also tracked purchase order references Lycos gave CSI

and CSI put them in the lease documentation, which Lycos used to trace the purchase

orders to its own files before approving the signing of CSI leases. Lycos thus knew the

original acquisition cost of all equipment leased from CSI to Lycos. Lycos also

confirmed to CSI that the equipment was installed and operating correctly and executed

Certificates of Acceptance after reviewing the acquisition costs of the equipment.

Furthermore, Lycos reviewed each new Equipment Schedule to be certain that the

equipment placed on an Equipment Schedule was correct and that Lycos was paying the

proper amount of Interim Rent and Rent. The Stip Loss Value was negotiated and

communicated between CSI and Lycos on each Equipment Schedule.

In answering, CSI states that many communications concerning equipment

schedules are found in the e-mails and other documents produced by Lycos and CSI in

this matter, and CSI refers Lycos thereto pursuant to Fed. R. Civ. P. 33(d), as the burden

to do so will be the same for Lycos as it would be for CSI. Furthermore, due to the over

breadth of this request, if Lycos would narrow the scope of this Interrogatory by

identifying discrete and specific schedules, as well as a clearer view of specifically what

subjects of communications Lycos is requesting information on, CSI would be willing to

attempt to determine which individuals at CSI may have this information, if any, and

supplement this Interrogatory accordingly, if necessary.

**INTERROGATORY NO. 14 (LABELED AS INTERROGATORY 3):** If You
contend that CSI does not have back-up computer tapes evidencing e-mail and other
computer-to-computer Communications occurring before May 31, 2002 between Paul
Stenberg and employees of CSI and/or third parties, State the Basis for that contention.

14

**ANSWER TO INTERROGATORY NO. 14:**

Without waiving the foregoing objections, CSI objects to this Interrogatory as vague and ambiguous with undefined terms.

In answering, CSI states that it does not have back-up email files or other back-up computer-to-computer files for Paul Stenberg before May 31, 2002. CSI also does not have back-up email files other back-up computer-to-computer files for its other employees before May 31, 2002.

## VERIFICATION

I, Jeffrey L. Rousseau, being duly sworn, hereby depose and state that I am an officer of Computer Sales International, Inc. I verify that the foregoing responses to the interrogatories set forth in *Lycos' First Set of Interrogatories to Computer Sales International, Inc.* are made on behalf of Computer Sales International, Inc., that certain of the matters stated herein are not within my personal knowledge, and that the facts stated herein have been assembled by agents of Computer Sales International, Inc. I believe that the facts stated herein are true according to the information in my possession and in the possession of others at the company at this time.

_____
Jeffrey L. Rousseau

AS TO OBJECTIONS:

_____
Robert J. Kaler, BBO No. 542040
rkaler@ghlaw.com
Edward W. Little, Jr., BBO No. 628985
elittle@ghlaw.com
McCARTER & ENGLISH, LLP
225 Franklin Street
Boston, MA 0211
Tel. (617) 345-7000

*Counsel for Computer Sales International, Inc.*

Dated: July 10, 2006

## CERTIFICATE OF SERVICE

I, Edward W. Little, Jr., hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this by hand this 10th day of July 2006.

_____
Edward W. Little, Jr.

B0470750v1

LYCOS
COST OF SALE ANALYSIS

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 001 | (71,745 92) |
| 144874 | 002 | (9,795 00) |
| 144874 | 004 | (92,413 64) |
| 144874 | 005 | (246,507 65) |
| 144874 | 005 | (12,366 00) |
| 144874 | 005 | 12,366 00 |
| 144874 | 005A | (41.747 70) |
| 144874 | 005B | (62,100 00) |
| 144874 | 005C | (622,814 00) |
| 144874 | 005D | (247,935 00) |
| 144874 | 005E | (99,120 00) |
| 144874 | 005G | (50,764 00) |
| 144874 | 006 | (117.477 00) |
| 144874 | 006A | 7,779 00 |
| 144874 | 006A | (7,779.00) |
| 144874 | 007 | (108,875 42) |
| 144874 | 008 | (169,538 00) |
| 144874 | 009 | (89,815 12) |
| 144874 | 010 | (80,174.63) |
| 144874 | 011 | (55,396 10) |
| 144874 | 011 | (58,228 00) |
| 144874 | 012 | (296,318 88) |
| 144874 | 013 | (359,870 79) |
| 144874 | 014 | (87,664 92) |
| 144874 | 015 | (112,312 02) |
| 144874 | 016 | (588.927 15) |
| 144874 | 017 | 146,935 00 |
| 144874 | 018 | (68,122 74) |
| 144874 | 019 | (76,660 43) |
| 144874 | 019 | (280,162 40) |
| 144874 | 020 | (230,287 75) |
| 144874 | 021 | (208,039 68) |
| 144874 | 022 | (441,139 00) |
| 144874 | 023 | (578,262 00) |
| 144874 | 024 | (118,324 63) |
| 144874 | 025 | (209,643 09) |
| 144874 | 026 | (546,102 10) |
| 144874 | 027 | (283,675.60) |
| 144874 | 028 | (240,807 00) |
| 144874 | 029 | (546,684 79) |
| 144874 | 030 | (349,403 97) |
| 144874 | 031 | (423,530 88) |
| 144874 | 032 | (894,894 24) |
| 144874 | 033 | (420,921 93) |
| 144874 | 034 | (487,317 20) |
| 144874 | 035 | (338,707 70) |
| 144874 | 036 | (331,586 91) |
| 144874 | 037 | (195,939 30) |
| 144874 | 038 | - |
| 144874 | 039 | (266,015.10) |
| 144874 | 040 | - |
| 144874 | 040 | (1,049,747 71) |
| 144874 | 040A | (1,194,843 48) |
| 144874 | 043 | - |
| 144874 | 044 | (465,966 69) |
| 144874 | 045 | (724,643 37) |
| 144874 | 047 | (785,734 50) |
| 144874 | 048 | (720,857 75) |

LYCOS
COST OF SALE ANALYSIS

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 048A | (1,108,495 67) |
| 144874 | 049 | (535,058 00) |
| 144874 | 049A | - |
| 144874 | 050 | (1,127,509 00) |
| 144874 | 050A | - |
| 144874 | 050B | - |
| 144874 | 051 | - |
| 144874 | 052 | - |
| 144874 | 053 | - |
| 144874 | 054 | - |
| 144874 | 055 | (453,911 00) |
| 144874 | 055A | - |
| 144874 | 056 | (630,595 00) |
| 144874 | 058 | (716,912 00) |
| 144874 | 060 | - |
| 144874 | 061 | - |
| 144874 | 064 | (656,511 00) |
| 144874 | 064B | (219,248 00) |
| 144874 | 064D | (300,179 20) |
| 144874 | 064F | (141,942 38) |
| 144874 | 065 | - |
| 144874 | 066 | - |
| 144874 | 066A | - |
| 144874 | 066B | - |
| 144874 | 066C | (976,079 00) |
| 144874 | 066E | (449,506 00) |
| 144874 | 066G | (324,055 23) |
| 144874 | 066I | (893,821 79) |
| 144874 | 067 | - |
| 144874 | 067A | - |
| 144874 | 067B | (876,212 00) |
| 144874 | 067D | (656,410 00) |
| 144874 | 067F | (464,961 80) |
| 144874 | 067H | (966,572 05) |
| 144874 | 068 | - |
| 144874 | 068A | - |
| 144874 | 068A | - |
| 144874 | 068B | - |
| 144874 | 068C | - |
| 144874 | 069 | (1,503,648 00) |
| 144874 | 069A | (427,219 00) |
| 144874 | 069C | (1,828,980 00) |
| 144874 | 069E | (730,576 00) |
| 144874 | 069G | (860,009 07) |
| 144874 | 069I | (2,640,439 17) |
| 144874 | 070 | - |
| 144874 | 076 | (582,814 00) |
| 144874 | 081 | (103,765 43) |
| 144874 | 082 | - |
| 144874 | 083 | 2,991,623 37 |
| 144874 | 083 | (2,991,623 37) |
| 144874 | 084 | 1,489,750 73 |
| 144874 | 084 | (1,489,750 73) |
| 144874 | 085 | (1,234,516 77) |
| 144874 | 086 | (1,208,106 78) |
| 144874 | 089 | (2,991,623 37) |
| 144874 | 089A | (361,396 13) |
| 144874 | 090 | (1,489,750 73) |
| 144874 | 091 | - |

LYCOS
COST OF SALE ANALYSIS

| MASTER LEASE | SCHEDULE | TOTAL COSTS |
|---|---|---|
| 144874 | 093 | - |
| 144874 | 094 | - |
| 144874 | 094 | - |
| 144874 | 094 | (528,905 00) |
| 144874 | 096 | - |
| 144874 | 100 | (196,273 38) |
| 144874 | 200 | (1,417,620 24) |
| 144874 | VAR | 7,527 00 |
| | | (45,596,723.07) |