UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | **Oral Argument Requested** |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| LYCOS, INC., ) | C.A. No. 05-10017- RWZ |
| Defendant, ) | |
| ) | |
| BANK OF AMERICA f/k/a FLEET BANK, ) | |
| ) | |
| Trustee Process Defendant. ) | |

REPLY MEMORANDUM
IN SUPPORT OF COMPUTER SALES INTERNATIONAL, INC.'S
MOTION TO EXCEED TEN DEPOSITIONS

Plaintiff Computer Sales International, Inc. a/k/a CSI Leasing ("CSI") respectfully submits this brief Reply Memorandum in further support of its Motion to Exceed Ten Depositions, filed Oct. 13, 2006 ("CSI's Motion"), and in reply to Lycos's Opposition to CSI's Motion to Exceed Ten Depositions, filed Friday, Oct. 27, 2006 (the "Lycos Opposition").

Among other things, this Reply attaches the Lycos interrogatory answers identifying the specific individuals, listed by Lycos only last week, who need to be deposed in this case.

SUMMARY OF ARGUMENT

Lycos, a well-established company that was sold to Terra Networks in Spain for over $6 billion in 2000, held more than $3 billion in cash during many of the years that it dealt with CSI, and is now owned by the Korean telecommunications giant Daum, *see* Exh. 1 hereto (D&B Report listing the number of Lycos employees as 770) (*ie.* Lycos is not and was not, by any stretch, a "small" company), has opposed CSI's request for more than ten depositions in this case

despite the fact that it has identified literally *dozens* of individuals as supposedly having knowledge supporting its multimillion dollar fraud and other claims against CSI.

Lycos has based its opposition to the CSI Motion largely on procedural grounds, claiming that CSI cannot request leave to go beyond the 10-deposition limit in advance of reaching that limit. This is incorrect, and avoids the substantive issue that CSI is raising – the need for flexibility, rather than rigidity, in the ability of both parties to conduct more than ten depositions, in the reasonable discretion of counsel, and subject to the right of either party to seek a protective order if the privilege is abused, in this admittedly very complex case – in which CSI has just filed a motion to amend its complaint based on new and important evidence recently uncovered in discovery. *See* Docket Nos. 104, 105, 106.

In this regard, Lycos' own attached interrogatory answers, served last week, identify *thirty witnesses* as having knowledge supporting its fraud and related counterclaims against CSI. Those answers simultaneously *decline to say which of those individuals Lycos will call as witnesses at trial, or the substance of their testimony* -- necessitating, at this point, that they all be deposed, given that a verdict for Lycos in the amount of damages it is claiming (close to $20 million of actual damages, before what Lycos claims should be a trebling of damages under c.93A) would be very damaging. Lycos' production, only ten (10) days ago, of 42,000 pages of electronic files -- in addition to the thousands of documents already produced by both sides relating directly to the CSI-Lycos lease transactions -- further demonstrates the magnitude of CSI's discovery task here.

For all of these reasons, and for the reasons set forth below and in CSI's original motion, the Lycos Opposition is insufficient, and CSI's Motion should be allowed with reasonable conditions to be set by the Court.

## NEW RELEVANT FACTS

1.      Four (4) business days ago, on October 25, 2006, well after the filing of CSI's Motion to Exceed Ten Depositions on October 13th, Lycos issued 28 pages of answers to CSI's contention interrogatories concerning Lycos' counterclaims in this case.  A copy of those answers is attached hereto.  *See* Exh. 2.  In those answers, Lycos identifies thirty (30) people – almost all of whom are current Lycos employees, former Lycos employees, current Lycos consultants, or former Lycos consultants –  as persons with personal knowledge concerning its counterclaims against CSI.  *See* Exh. 1 at pp. 23-25.  It also identifies more than half a dozen auditors who worked on its accounts during the relevant time periods, and are expected to have knowledge of the Lycos-CSI leases in issue in this case.  *Id*. at pp. 25-27.  Only a handful of these witnesses have yet been deposed.

2.      In the same responses, Lycos has declined to state who its witnesses at trial will be, or what they will say, leaving CSI to try to devine that information from document review and guesswork.  *Id*. at pp. 21-22 ("Q:  Identify, and give the substance of the testimony that you will offer from, all individuals that you intend to call as witnesses at the trial of this action, including fact witnesses…  A: *Lycos objects to Interrogatory No. 8 on the grounds that it seeks information subject to the work product privilege*…") (emphasis added).

3.      Lycos has also reserved the right, in its recent interrogatory responses, to change its witnesses, its theory, and its evidence at will.  *Id*. at p. 1 ("Fact discovery in this case is ongoing…Lycos reserves the right to amend, modify, withdraw or supplement these Objections and Responses…").  *Id.* at p. 4 ("Q: State the basis for, including all evidence supporting, your claim that you have suffered damages…  A:  Lycos objects to Interrogatory No. 1 on grounds

that it is premature, with more than three months remaining in fact discovery, Lycos is still gathering and developing facts to prove all its damages").

4.      At the same time, while declining to identify who its trial witnesses will be, Lycos increased its damages claim against CSI, in its aforesaid interrogatory answers, to almost $20 million. *See* Exhibit 1 hereto (Lycos Interrogatory Answers) at p. 8 ("Lycos's actual damages, before any trebling, are in the amount of approximately $18.775-$19.775 million"). Significantly, it has done so without committing to a damages theory – instead reserving its right to decide later how it is calculating its damages. *See* Exh. 1 at p. 1 ("While there may be a number of ways in which Lycos may calculate its damages on the Rolled-Up Equipment Schedules, *one possible formulation is*…"); at p. 2 ("While there may be a number of ways in which Lycos may calculate its damages on the Rewritten Equipment Schedules, *one possible formulation is*…")(emphasis added).

5.      As a practical matter, CSI cannot defend against Lycos' enormous damages claims without a full and fair opportunity for discovery by deposition from all the witnesses who may have relevant information concerning those claims, nor can it conduct complete discovery of the financial facts relevant to Lycos' claimed damages without full disclosure from Lycos of its method of calculating those damages (which has not yet occurred) -- and neither of these goals can be accomplished in the six (6) remaining depositions that CSI would otherwise have under Local Rule 26. In seeking to limit CSI to those six remaining depositions, the Lycos Opposition is unreasonably seeking to deny CSI the opportunity for full discovery of the relevant facts. If this were allowed, Lycos would have the unfair tactical advantage of CSI not knowing all the evidence that Lycos plans to present against it at trial, and not having the opportunity to effectively rebut it. Hence the CSI Motion at this time.

## ARGUMENT

**I.    DENIAL OF CSI'S MOTION FOR LEAVE TO TAKE MORE THAN TEN DEPOSITIONS WOULD CONDEMN IT TO TRIAL BY AMBUSH ON LYCOS' COUNTERCLAIM**

The First Circuit has repeatedly condemned trial by ambush.  *See Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003) ("an important object of these rules [the Fed. R. Civ. P.] is to avoid trial by ambush"); *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1172 (1st Cir. 1995) ("The truth-seeking function of our adversarial system of justice is disserved when the boundaries of a suit remain ill-defined and litigants are exposed to the vicissitudes of trial by ambush.  At a bare minimum … a defendant must be afforded both adequate notice of any claims asserted against him and *a meaningful opportunity to mount a defense.*")(emphasis added); *Klonoski v. Mahlab*, 156 F.3d 255, 271 (1st Cir. 1998) ("We have recently condemned trial by ambush tactics ….").  *See also Taylor v. Woods*, 2006 WL 3007483, *3 (D.R.I. Sept. 29, 2006) ("Plaintiff continues to stone-wall the defendants and still has not provided them with any information regarding the nature of []his claims, the witness he relies upon, or any other documents or exhibits which substantiate, in whole or in part, his claims.  The Federal Rules of Civil Procedure prevent trial by ambush, and so does this Court.").

In this case, Lycos' attached interrogatory answers demonstrate that it has identified thirty (30) potential witnesses that it may call to support its claims.  *See* Exh. 2.  In addition to those, it has identified four (4) different public accounting firms, and eight (8) different individual auditors, that worked with and would have reviewed its CSI lease files.  Given the complexity of Lycos' method of calculating its alleged damages, *see* Exh. 2 at pp. 4-19, these auditors will clearly have to be deposed, and their records examined.

It is impossible to obtain discovery from all these witnesses in an orderly way under the strictures of a 10-deposition limit, and the risk to CSI of being forced to limit its discovery to an arbitrary number, and as a result to be unable to depose key Lycos witnesses, and to fail to discover critical evidence needed to support its defense at trial, is great. Hence the CSI Motion, which seeks only a reasonable relaxation of the local rule requirement – under the supervision of the Court.

## II.    LYCOS' PROCEDURAL ARGUMENT IS INAPPLICABLE, AND MAKES NO SENSE, WHERE DISCOVERY HAS ALREADY ADVANCED TO THE POINT WHERE THE NEED TO EXCEED TEN DEPOSITIONS IS CLEAR.

Lycos' reliance on *Whittingham v. Amherst College*, 163 F.R.D. 170 (D. Mass. 1995), for the contention that no relief from the ten-deposition limit can be sought in this case at this time is mistaken. *Whittingham* is distinguishable on its facts, and as at least one other court has cited it, the case stands mainly for the proposition that "a party must, at the very least, commence discovery before making such a motion [to exceed ten depositions]." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2006 U.S. Dist. LEXIS 59095 (D.N.J. 2006) at *9. Clearly that has occurred here.

Moreover, although the Court in *Whittingham* did interpret Local Rule 26, in that case, as requiring the individual plaintiff Michael Whittingham, who was suing Amherst College, to "exhaust available discovery" before seeking leave to take more than ten depositions, that was in the context of no discovery whatsoever having been conducted, and the plaintiff not being able to identify the discovery he thought he needed.

In this case, by contrast, considerable discovery has been conducted, and as the Lycos' Opposition notes at page 2, footnote 2, CSI has already identified many of the additional depositions it needs by issuing Notices of Deposition for the proposed additional witnesses,

including Ted Philip, Brian Lucy, Kevin Bailee, Michael Ripps, Andrew Feinberg, Peter Karol, and Lycos' auditors. The other depositions required, including depositions of the specific Lycos outside audit partners that were just identified last week in Lycos' interrogatory answers, and depositions of the other witnesses identified in those answers, are also known.

Under all of these circumstances, it is not unreasonable for CSI to approach the Court with this request at this time. The alternative would be for CSI to try to make a Hobbesian choice as to which ten depositions it most needs to take before knowing whether it will be allowed more, and before even having complete disclosure of Lycos' liability and damages claims. This is not the intent of the applicable local rules.

### Request for Oral Argument

CSI respectfully requests oral argument on this motion if the Court considers that it would be helpful, and estimates that 15 minutes would be sufficient to cover the issues involved.

### Conclusion

For all of the foregoing reasons, CSI's Motion to Exceed Ten Depositions should be allowed on reasonable terms and conditions.

<div style="margin-left:40%">

COMPUTER SALES INTERNATIONAL, INC.
By its attorneys,

/s/ Robert J. Kaler
Robert J. Kaler, Esq., BBO No. 542040
rkaler@ghlaw.com
Edward W. Little, Esq., BBO No. 628985
elittle@ghlaw.com
David Himelfarb, BBO No. 649596
dhimelfarb@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  0211
Tel. (617) 345-7000

</div>

Dated:  October 31, 2006

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I, Robert J. Kaler, counsel for CSI, hereby certify pursuant to Local Rule 7.1(A)(2) that I have corresponded with counsel for Lycos to attempt to resolve or narrow the issues raised in this motion, but have been unable to do so.

/s/ Robert J. Kaler
Robert J. Kaler

## CERTIFICATE OF SERVICE

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing motion to be served on counsel for Lycos through the Court's ECF system and by hand, this 31[sh] day of October 2006.

/s/ Robert J. Kaler
Robert J. Kaler



**Decide with Confidence**

## Business Information Report

To save report(s) to your PC, click here for instructions.            📄 Print this Report

Copyright 2006 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 037017757L

ATTN: **99999-00000-2907/lycos**             Report Printed: OCT 30 2006

### BUSINESS SUMMARY

**LYCOS INC**
    (FOREIGN PARENT IS DAUM COMMUNICATIONS
CORPORATION, SEOUL, KOREA.)
    TERRA LYCOS
**100 5th Ave**
**Waltham, MA 02451**



**Now included with this Report**   *NEW!*

**D&B's Credit Limit Recommendation**
D&B's industry and risk-based limit guidance
▸ Learn More              ▸ View Now

**Payment Trends Profile**
Payment trends and industry benchmarks
▸ Learn More              ▸ View Now

This is a **headquarters (subsidiary)** location.
Branch(es) or division(s) exist.

| | |
|---|---|
| **Web site:** | www.lds-matchmaker.com |
| **Telephone:** | 781 622-5100 |
| **Fax:** | 781 370-2600 |
| **Chief executive:** | ALFRED TOLLE, CEO |
| **Year started:** | 1995 |
| **Management control:** | 2004 |
| **Employs:** | 770 (500 here) |
| **History:** | CLEAR |
| **SIC:** | 7375 |
| **Line of business:** | Internet site |

| | |
|---|---|
| **D-U-N-S Number:** | 92-781-7601 |
| **D&B Rating:** | 1R4 |
| **Number of employees:** | 1R is **10 or more** employees. |
| **Composite credit appraisal:** | 4 is **limited.** |

**D&B PAYDEX®:**

**12-Month D&B PAYDEX: 55**
When weighted by dollar amount, payments to
suppliers average 26 days beyond terms.

```
    0                          ▽              100
 ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━┫━━━━━━━━━━━━━
120 days slow       30 days slow    Prompt Anticipates
```

Based on trade collected over last 12 months.

*NEW!* Enhanced payment trends and industry
benchmarks are available on this business

### SPECIAL EVENTS

07/12/2006
**SALE OF ASSET:** According to published reports, LYCOS, Inc. (Waltham, MA) announced the sale of its award-
winning Wired News property for $25.0 million to Conde Nast Publications (New York, NY).

03/07/2006

**SALE OF ASSET:** According to published reports, Interactive Data Corporation (Bedford, MA) announced the closing
of the Company's acquisition of the assets of Quote.com (Mountain View, CA) and certain other related assets from
Lycos, Inc. (Waltham, MA) for $30 million in cash. The assets of Quote.com will now be operated as part of

Interactive Data's eSignal business.

**02/02/2006**
**ANNOUNCED SALE OF ASSET:** According to published reports, Interactive Data Corporation (Bedford, MA) announced a definitive agreement to acquire Quote.com (Mountain View, CA) and related assets from Lycos, Inc. (Waltham, MA) for $30.0 million in cash. The acquisition is expected to close during the first quarter, subject to customary closing conditions including governmental approvals. Assuming the transaction closes during the first quarter of 2006, Interactive Data anticipates that the transaction will be earnings neutral in 2006, and through a combination of planned revenue growth and operational synergies, accretive to earnings in 2007 and beyond.

**08/23/2005**
**CHANGE OF CHIEF EXECUTIVE:** According to published reports, Lycos, Inc. announced that Alfred Tolle recently joined Lycos as its Chief Executive Officer.

**06/08/2005**
**OFFICER CHANGE:** According to published reports, Lycos, Inc. announced the appointment of two executives to the Lycos senior management team. Dan Sullivan rejoined Lycos as the new Senior Vice President and General Counsel and Brian Kalinowski rejoined Lycos as the Chief Content Officer.

**04/20/2005**
On April 19, 2005, an outside source stated Lycos Inc, Waltham, MA was acquired by Daum Communications Corporation, Seoul, Korea as of October 2004. The acquired business now operates as a 100% owned subsidiary of Daum Communications Corporation. Further details are unavailable at this time.

Business started Jun 1995. Present control succeeded Oct 2004.

**SUMMARY ANALYSIS**

| D&B Rating: | 1R4 |
| --- | --- |
| **Number of employees:** | 1R indicates **10 or more** employees. |
| **Composite credit appraisal:** 4 is limited. | |

The 1R and 2R ratings categories reflect company size based on the total number of employees for the business. They are assigned to business files that do not contain a current financial statement. In 1R and 2R Ratings, the 2, 3, or 4 creditworthiness indicator is based on analysis by D&B of public filings, trade payments, business age and other important factors. 2 is the highest Composite Credit Appraisal a company not supplying D&B with current financial information can receive. For more information, see the D&B Rating Key.

Below is an overview of the company's rating history since 04/20/05:

| D&B Rating | Date Applied |
| --- | --- |
| 1R4 | 04/20/05 |

The Summary Analysis section reflects information in D&B's file as of October 30, 2006.

| *NEW!*    How does LYCOS INC's payment record compare to its industry? | |
| --- | --- |
| A Payment Trends Profile will show you - View Now | |

**INVESTIGATIVE SERVICES**

**\*\*\* Update available on request \*\*\***

**This information is being provided to you immediately in the interest of speed. This report may not reflect the current status of this business. D&B can investigate this business and update the information based on the results of that investigation.**

**By ordering a standard investigation the same day you order this report, an updated report will be provided to you at no extra cost.**

**CUSTOMER SERVICE**

If you have questions about this report, please call our Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. If you are outside the U.S. contact your local D&B office.

D&B Business Information Report: LYCOS INC                                    Page 3 of 11

*** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry. Call Dun & Bradstreet's Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. or visit our website at www.dnb.com.

**HISTORY**

The following information was reported **08/01/2006**:

Officer(s):     ALFRED TOLLE, CEO
                STEPHEN KILLEEN, PRES
                JOAQUIM AGUT, EXEC CHM
                BRIAN LUCY, TREAS-CFO
                DAN SULLIVAN, SVP-GEN COUNSEL
                BRIAN KALINOWSKI, CHIEF CONTENT OFFICER

                THE OFFICER(S)

Business started Jun 1995. Present control succeeded Oct 2004. 100% of capital stock is owned by parent company.

In Oct 2000, Lycos, Inc announced that its stockholders voted in favor of the combination of Lycos, Inc and Terra Networks, SA to create Terra Lycos and have completed their combination. Lycos stockholders received 2.15 Terra shares for every Lycos share currently owned. The new shares began trading on the Nasdaq National Market under the symbol TRLY and the Spanish stock exchanges under the symbol TRR on October 31, 2000. As a result of the merger, Lycos now operates as a subsidiary of Terra Networks, S A.

Prior to the merger, the Common Stock of the Company was traded on the NASDAQ Stock Market under the symbol LCOS since the Company's initial public offering on April 2, 1996. Prior to that time, there was no public market for the Company's Common Stock.

**RECENT ACQUISITIONS:**

On July 29, 2006, Kathy O'Reilly, director of public relations for Lycos Inc, Waltham, MA stated that the company has sold its Wired News division in San Francisco, CA for $25.0 million to Cond Nast Publications, owner of WIRED Magazine. The current transaction includes the sale of Wired.com and Wired News assets only. Lycos will retain Hotbot, Hotwired and Webmonkey. Upon completion of the transaction, the assets of Wired News will be operated as part of Cond Nast Publication's web division, CondeNet.

On April 19, 2005, an outside source stated Lycos Inc, Waltham, MA was acquired by Daum Communications Corporation, Seoul, Korea as of October 2004. The acquired business now operates as a 100% owned subsidiary of Daum Communications Corporation.

In Jun 1999, the Company completed the acquisition of Wired Ventures, Inc. Based in San Francisco, CA.

In Jul 1999, the Company completed the acquisition of Internet Music Distribution, Inc. Based in San Francisco, CA.

On Aug 13, 1998, the Company acquired WhoWhere?, Inc. in a stock-for-stock transaction valued at approximately $159.1 million, resulting in intangible assets of $161.3 million.

On Apr 30 1998, the Company acquired WiseWire Inc for a purchase price of $39.4 million.

On Feb 12, 1998, the Company acquired Tripod Inc for total purchase consideration of $61.4 million.

**OFFICERS BACKGROUND:**

ALFRED TOLLE. Tolle currently sits on the Board of Directors of Daum Communications Corporation.

STEPHEN KILLEEN. Antecedents not available.

JOAQUIM AGUT. Chairman of Terra Networks, SA. Prior to joining Terra, Agut was leader of the European Corporate Executive Council (CEC) of General Electric (GE) and was the first executive of General Electric in Europe. Agut earned a bachelor of science degree in electrical engineering from the University Politcnica de Catalunya in Barcelona, Spain, and a MBA from IESE at Universidad de Navarra.

BRIAN LUCY. Antecedents not available.

D&B Business Information Report: LYCOS INC

DAN SULLIVAN. Sullivan served as Vice President, Senior Corporate Counsel at Lycos from May 1998 through July 2004.

BRIAN KALINOWSKI. Kalinowski served as General Manager for the Lycos Entertainment group and director of the Multimedia Services team responsible for strategic planning, development and go-to-market activities.

Business address has changed from 400-2 Totten Pond Rd, Waltham, MA, 02451 to 100 5th Ave, Waltham, MA, 02451.

**CORPORATE FAMILY**

Click below to buy a Business Information Report on that family member.
For an expanded, more current corporate family view, use D&B's Global Family Linkage product.

Buy Selected Report(s)

**Parent:**

| | | |
|---|---|---|
| Daum Communications Corp. | Seoul, Republic Of Korea | DUNS # 68-800-6449 |

**Subsidiaries (US):**

| | | |
|---|---|---|
| Raging Bull Inc | Waltham, MA | DUNS # 05-478-4488 |
| Tripod, Inc. | Waltham, MA | DUNS # 80-748-2435 |
| Wired Digital Lycos, Inc | Waltham, MA | DUNS # 88-313-1757 |

**Branches (US):**

| | | |
|---|---|---|
| Lycos Inc | Los Angeles, CA | DUNS # 08-475-9138 |
| Lycos Inc | Mountain View, CA | DUNS # 18-952-0765 |
| Lycos Inc | Miami, FL | DUNS # 01-819-3081 |
| Lycos Inc | Boston, MA | DUNS # 02-676-2380 |
| Lycos Inc | Dallas, TX | DUNS # 07-240-4788 |

**Affiliates (International):** *(Affiliated companies share the same parent company as this business.)*

| | | |
|---|---|---|
| CAREERDAUM Co.,Ltd | SEOUL, KOREA, REPUBLIC OF | DUNS # 68-845-0159 |
| Daum Game | SEOUL, KOREA, REPUBLIC OF | DUNS # 68-838-4358 |
| JYP Entertainment | SEOUL, KOREA, REPUBLIC OF | DUNS # 68-828-2693 |
| NAMU Communications Co., Ltd. | SEOUL, KOREA, REPUBLIC OF | DUNS # 68-845-0766 |
| OI Music Co., Ltd. | SEOUL, KOREA, REPUBLIC OF | DUNS # 68-823-9172 |
| TAON CORP. | CHIYODA-KU, JAPAN | DUNS # 69-753-2042 |

Buy Selected Report(s)

**BUSINESS REGISTRATION**

CORPORATE AND BUSINESS REGISTRATIONS PROVIDED BY MANAGEMENT OR OTHER SOURCE

The Corporate Details provided below may have been submitted by the management of the subject business and may not have been verified with the government agency which records such data.

| | |
|---|---|
| **Registered Name:** | LYCOS INC |

| | | | |
|---|---|---|---|
| **Business type:** | CORPORATION | **Common stock** | |
| **Corporation type:** | PROFIT | Authorized shares: | 6,000,000 |

D&B Business Information Report: LYCOS INC                                           Page 5 of 11

| | | | |
|---|---|---|---|
| **Date incorporated:** | JUN 01 1995 | Par value: | $0.0100 |
| **State of incorporation:** | DELAWARE | | |
| **Filing date:** | JUN 01 1995 | | |
| **Status:** | ACTIVE | | |
| **Status attained:** | JUN 01 1995 | | |

**Where filed:**         SECRETARY OF STATE/CORPORATIONS DIVISION, DOVER, DE

**OPERATIONS**

08/01/2006

**Description:**       Foreign parent is Daum Communications Corporation, Seoul, Korea. DUNS #68-800-6449 and reference is made to that report for background information on the parent company and its management.

The Company operates as a network of globally branded media properties and aggregated content distributed primarily through the World Wide Web. The Company provides aggregated third party content, Web search and directory services, community and personalization features, personal Web publishing, and online shopping.

Revenues are derived from advertising and licensing revenue and electronic commerce fees. Sells to general public and commercial concerns. Territory : International.

**Employees:**        770 which includes officer(s). 500 employed here. The Company also employs 35 independent contractors.

**Facilities:**         Leases 77,000 sq. ft. in a building.

**Location:**         Central business section on main street.

**Branches:**        Maintains branch operations in Williamstown, MA and Mountainview, CA.

**Global Activity:**    The following section is a global summary and is intended to assist D&Bs non-U.S. customers when evaluating D&B reports on U.S. companies.

**Import/Export**     No major countries of export reported.
**Activity:**

**8-Digit SIC:**       Based on information in our file, D&B has assigned this company an extended 8 digit SIC. D&Bs use of 8 digit SICs enables us to be more specific to a company's operations than if we use the standard 4 digit code.

73750000

**Subsidiaries:**      This business has multiple subsidiaries, detailed subsidiary information is available in D & B's linkage or family tree products.

**SIC & NAICS**

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

73750000         Information retrieval services

**NAICS:**
518111   Internet Service Providers

**D&B PAYDEX**

*NEW!* Enhanced payment trends and industry benchmarks are available on this business

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | LYCOS'S OBJECTIONS AND RESPONSES |
| LYCOS, INC., | ) ) | TO CSI'S FIRST SET OF INTERROGATORIES |
|     Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|     Trustee Process Defendant | ) | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby submits its Objections and Responses to

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc.'s ("CSI"), First Set

of Interrogatories to Lycos.

**PRELIMINARY STATEMENT**

Fact discovery in this case is ongoing. It is scheduled to close on January 31, 2007, more

than three months from now. In addition, no expert discovery has been taken in this case to date.

Accordingly, as set forth in the General Objections below, the responses provided herein are

based upon the present knowledge of Lycos after reasonable investigation and inquiry. Lycos

reserves the right to amend, modify, withdraw, or supplement these Objections and Responses to

Interrogatories as it deems necessary to ensure their accuracy. If it is subsequently determined

that Lycos has omitted information from these responses, such omission is neither intended to be nor shall it be construed as, a waiver by Lycos or a limitation on Lycos's rights or remedies.

In responding to any Interrogatory, Lycos reserves all objections as to the admissibility at trial of any information provided or documents identified herein. The following responses are made solely for the purpose of this action and for no other purpose. The fact that Lycos has responded to any Interrogatory or part thereof is not intended, and shall not be construed as, a waiver by Lycos of any objection. The fact that Lycos has not responded or objected to any Interrogatory or part thereof is not an admission that Lycos accepts or admits the existence of any facts or documents set forth in, or assumed by, such request or that such response or objection constitutes admissible evidence.

## GENERAL OBJECTIONS

The following General Objections are applicable to, and are hereby incorporated by reference into, Lycos's specific responses to each Interrogatory:

1.    To the extent that specific General Objections are cited in a specific response, those specific citations are provided because they are believed to be particularly applicable to the specific Interrogatory and are not to be construed as a waiver of any other General Objection applicable to that Interrogatory.

2.    Lycos objects to the "Instructions" and "Local Rule Definitions" set forth in the Interrogatories to the extent that they seek discovery of documents or information beyond the reasonable scope of discovery set forth in Fed. R. Civ. P. 26(b) and to the extent they seek to impose discovery obligations upon Lycos that differ from or exceed those set forth in the Federal Rules of Civil Procedure and the Local Rules for the District of Massachusetts.

- 2 -

3.     Lycos objects to each and every Interrogatory to the extent that it calls for the production of information protected by applicable law, including without limitation, the attorney-client privilege, the work product doctrine, or any other relevant statutory or common law privilege from disclosure.

4.     Lycos reserves the right to answer any Interrogatory, in whole or in part, by producing business records pursuant to Fed. R. Civ. P. 33(d).

5.     Lycos objects to the Interrogatories, including the Definitions therein, to the extent that they seek information that is not within Lycos's possession, custody, or control, and to the extent that they are overbroad, vague, or unduly burdensome.

6.     Lycos objects to the Interrogatories, including the Definitions therein, to the extent that they require the disclosure of any information that constitutes, reflects or reveals trade secrets or confidential proprietary information not protected by the existing protective order in this case unless appropriate safeguards are agreed upon to prevent unrestricted disclosure of such information.

7.     Lycos objects to CSI's failure to number as separate interrogatories the subparts in Interrogatories 1 and 2 as separate interrogatories in violation of Local Rule 26.1(C).  Lycos reserves the right to object at a later date to the extent CSI attempts later to propound interrogatories in excess of the number permissible under that Local Rule.

8.     Lycos's objections and responses are based upon information known at this time. Lycos has not completed discovery or preparation for trial in this action and reserves its right to amend, modify, withdraw, or supplement the responses and objections set forth below.  More specifically, many of the persons who are believed to be knowledgeable about the information requested are no longer employed by Lycos.  While Lycos is working diligently to obtain

BST99 1517349-4.057077.0012

relevant information, speak with persons knowledgeable about the issues, and provide the requested information, it necessary reserves all rights.

Without waiving the foregoing General Objections, Lycos further responds to the Interrogatories as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 1:

1.    State the basis for, including all evidence supporting, your claim that you have suffered damages as a result of the acts and omissions of CSI that are alleged in your amended answer and counterclaim in this action – explaining in your answer, *inter alia*, exactly what dollar amount(s) of damages you have suffered, how each dollar amount of damages was calculated, which dollar amount of damages you claim was caused by which acts and omissions of CSI, and why each dollar amount of alleged damages would not have incurred anyway in order for Lycos to have had the use of the equipment it leased from CSI for the period it used it.

### RESPONSE TO INTERROGATORY NO. 1:

Lycos objects to Interrogatory No. 1 on the grounds that it is overly broad and unduly burdensome, as well as premature, with more than three months remaining in fact discovery. Lycos is still gathering and developing facts to prove all of its damages. Those facts also may be subject to expert analysis and opinion. Subject to and without waiving the foregoing objections or its General Objections, Lycos states as follows:

Rolled Up Equipment Schedules[1] - While there may be a number of ways in which Lycos may calculate its damages on the Rolled Up Equipment Schedules, one possible formulation is that its damages equal the amount by which (a) the net present value of the stream of lease payments on each Rolled-Up Equipment Schedule *plus* the net present value of the residual value of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b) the net present

---

[1]  The "Rolled-Up Equipment Schedules" include schedules 17, 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61, 65, 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C, 93 and 94.

- 4 -

value of the payments that were to have been made during the remaining term of the immediately preceding equipment schedule(s) but that were cancelled according to the terms of the Rolled-Up Equipment Schedule, *plus* the net present value of the residual value of the equipment on the immediately preceding schedule(s) attributable to assets that were leased pursuant to the Rolled-Up Equipment Schedules. In performing the analysis under sub-paragraph "(b)" above, the present value is to be calculated as of the commencement date of each Rolled Up Equipment Schedule using, as a discount rate, the implicit rate determined by CSI for the immediately preceding equipment schedule(s).

For example, schedules 45, 49, 49A, and 61 were rolled-up onto schedule 67. CSI's "FMV (Higher of C or D)" under "(a)" from the formula above equals $2,970,525.52.[2] The net present value of the remaining rents that were to have been paid under the preceding schedules totaled $2,165,212.53.[3] The net present value of the residual value of the equipment on the immediately preceding schedules attributable to assets that were leased pursuant to Schedule 67 was $271,110.65.[4] The total for sub-paragraph "(b)" is therefore $2,436,323.18. Thus, the amount of CSI's mark-up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-paragraph "(b)," was $534,202.34, or approximately 22% of the terminating values from Schedules 45, 49, 49A and 61.

Rewritten Equipment Schedules[5] - While there may be a number of ways in which Lycos may calculate its damages on the Rewritten Equipment Schedules, one possible formulation is that those damages equal the amount by which (a) the net present value of the stream of lease

---

[2] CSI0039434.

[3] This is the total of the following present values of the stream of remaining lease payments for the following schedules: 45 - $527,328..39; 49 - $429,622.99; 49A - $591,501.41; 61 - $616,759.74.

[4] The discount rate used in calculating the above present values was as follows for the following schedules: 45 -- 9.21%; 49 and 49A -- 9.25%; and 61 -- 9.08%.

[5] The Rewritten Equipment Schedules include schedules 64B, 64D, 64F, 66C, 66E, 66G, 66I, 67B, 67D, 67F, 67H, 69C, 69E, 69G, 69I, 85, 86, 89, 89A, and 90.

payments on each Rewritten Equipment Schedule *plus* the net present value of the residual value of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b)(i) the net present value of the stream of lease payments over the term of the schedule it replaced *plus* (ii) the net present value of the inferred residual value of the equipment on such replaced schedule, had that schedule been booked. In making the net present value calculations under sub-paragraph "(b)," the same discount rates used under sub-paragraph "(a)" should be used. To infer the residual value under sub-paragraph "(b)(ii)", a declining balance calculation should be employed. To do this, one should start with the original cost of the equipment and the residual value actually booked by CSI on each Rewritten Equipment Schedule, and then calculate CSI's implied monthly reduction in the value of the asset as a constant percentage of the remaining asset value at the beginning of each month, and then use that constant percentage rate to infer a residual value as of the end of the term of the schedule that was combined with each Rewritten Equipment Schedule.

For example, Schedule 66D was rewritten as Schedule 66G two months into Schedule 66D. The "FMV (Higher of C or D)" on Schedule 66G was $408,369.80.[6] The net present value of the stream of lease payments on Schedule 66D was $308,510.51. The net present value of the inferred residual was $30,125.90.[7] The total was $338,636.41. Thus, the amount of CSI's mark-up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-paragraph "(b)," was 69,733.39, or approximately 22% of the original tangible equipment cost.

---

[6] CSI0039420. The number used by CSI and the number used herein are a penny different due to rounding.
[7] The original cost of the hardware was $321,105.00. CSI's booked a residual value for that equipment of $13,550 after 36 months. *Id.* That implies a monthly erosion in tangible asset value of 8.417252%. Thus, the implied residual after 24 months would have been $38,920.21.

The bates numbers of the documents from which Lycos's damages on the Rolled-Up Equipment Schedules and the Rewritten Equipment Schedules may be determined are listed in the e-mail (and the accompanying attachment) from Eileen Pellerin to Thomas Bean dated August 23, 2006 and the letter from Edward Little to Thomas Bean dated September 11, 2006 (collectively, the "CSI Letters"). Other documents that contain pertinent information include, without limitation, CSI0041651-41668.

While Lycos has not yet calculated the precise amount of its damages applying the foregoing formulae to each of the Rewritten and Rolled-Up Equipment Schedules (further analysis and perhaps discovery is necessary), it has determined that (a) its damages are approximately $1.3 million and $6.1 million on Schedules 93 and 94, respectively, and (b) that its aggregate damages for all Rolled-Up and Rewritten Equipment Schedules are in the range of $15.0 - $16.0 million. Lycos is also entitled to interest at the statutory rate on such amount.

The acts and omissions committed by CSI that caused damage to Lycos and of which Lycos is presently aware are described in response to Interrogatory Nos. 2 and 3. These acts and omissions damaged Lycos by at least the dollar amounts set forth above. To the extent Lycos might be required to prove which dollar amount of damages was caused by which acts and omissions of CSI, Lycos states that it has not yet made that determination because discovery remains ongoing. Lycos states generally that the acts and omissions described sub-paragraphs "A", "B" and "D" of the Response to Interrogatory No. 2 and the Response to Interrogatory No. 3 caused these damages.

Lycos would not have incurred such damages if it had known of CSI's fraudulent acts and omissions during the parties' relationship. In particular, it would not have entered into the

- 7 -

Rolled-Up and Rewritten Equipment Schedules and paid the excessive amounts required under those documents.

Sales Agreement - Lycos states that its damages in relation to the Sales Agreement are in the amount of $3.775 million, before statutory interest. As a result of the acts and omissions committed by CSI, through Paul Stenberg, as described in the Responses to Interrogatory Nos. 2 and 3 below, CSI fraudulently induced Lycos to enter into the Sales Agreement at a purchase price of $3.775 million, when the subject equipment had little or no market value. Indeed, CSI itself had determined that the fair market value threshold of the equipment was only $350,000 as early as November, 2002, a long time prior to Lycos's eventual purchase of that equipment (after that equipment had declined even further in value). CSI0041643-41646. CSI's booked residual for the equipment at the end of the equipment schedules was approximately $230,000. CSI0038070-71, CSI0039692, and CSI0039698. Neither of those facts was ever disclosed to Lycos.

Lycos's damages with respect to the Sales Agreement were caused by the acts and omissions described in response to Interrogatory Nos. 2 and 3. Specifically, Lycos overpaid by $3.775 million as a result of CSI's fraud. Because Lycos's damages arise from fraud in the sale of personal property, those damages will be automatically trebled pursuant to M.G.L. ch. 231, § 85J.

In total, therefore, based on the above, Lycos's actual damages, before any trebling, are in the amount of approximately $18.775 - $19.775 million. Lycos also would be entitled to interest at the statutory rate on its damages and to its reasonable attorneys' fees and costs.

**INTERROGATORY NO. 2:**

State the basis for, including all evidence supporting, your claim that CSI engaged in fraudulent or negligent misrepresentation that caused harm to Lycos as alleged in your amended

- 8 -

answer and counterclaim in this action – explaining in your answer, *inter alia,* exactly which individuals representing CSI engaged in which fraudulent or negligent misrepresentation in their dealings with which individuals representing Lycos, each date or dates when they did so, exactly what they said or failed to disclose that you claim constituted fraudulent or negligent misrepresentation, what you claim they should have disclosed that they failed to disclose, who at Lycos relied on any such statements or omissions to their detriment, what they did in reliance thereon, and when and how they did so.

## RESPONSE TO INTERROGATORY NO. 2:

Lycos objects to Interrogatory No. 2 on the grounds that it is overly broad and unduly burdensome, as well as premature with more than three months remaining in fact discovery. Lycos is still gathering and developing the facts to prove all of its claims. Those facts also may be subject to expert analysis and opinion. Subject to and without waiving the foregoing objections or its General Objections, Lycos states as follows:

CSI, through Mr. Stenberg, made fraudulent and negligent misrepresentations in its dealings with several Lycos employees and/or representatives of Lycos including, without limitation, Edward Philip, Thomas Guilfoile, Michael Ripps, Sam Ziba, Brian Lucy, Kevin Baillie, Julie Callagee, Monique Walsh, and Susan Franklin. CSI's fraudulent and negligent misrepresentations included, without limitation, the following:

A.    Fraudulent Acts of Commission - Mr. Stenberg intentionally misrepresented to Messrs. Lucy and Baillie in an e-mail dated March 18, 2002, that:

1.    the present value of the payments due under Equipment Schedules 93 and 94 was $23,727,000, when he knew or could readily have ascertained from CSI employees in St. Louis that that the present value of those payments exceeded $25,900,000;

2.    Lycos's obligations under the "old leases" totaled $20,215,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the *un*discounted payment obligations under those leases totaled approximately $17.6 million, and the total

obligations under those leases, when discounted to present value, were several million less than that;

3.     the difference between the present value of the payments Lycos would be required to make under Schedules 93 and 94 and the obligations under the "old leases" was $3,512,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the difference between the present value of the payments under Schedules 93 and 94 and the *un*discounted obligations under the old leases exceeded $8.0 million, and the difference between the discounted payments under Schedules 93 and 94 and the discounted payments under the old leases was several million higher.

4.     when he used a discounted present value number for Schedules 93 and 94 and an *un*discounted number for the "old schedules," he knew that such a comparison was misleading because the comparison was between "apples" and "oranges";

5.     when the leases were refinanced, CSI recouped about 5-7% of the $3.5 million differential, when he knew or could readily have ascertained from CSI employees in St. Louis that both the percentage and the differential were false;

6.     CSI injected a 10-13% residual in the original leases, when he knew or could readily have ascertained from CSI employees in St. Louis that, because of the multiple refinancings that had occurred before Schedules 93 and 94, CSI's remaining residual on the schedules that rolled onto Schedules 93 and 94 was at most a few percent, such that it was misleading to advise Lycos that CSI had originally injected a 10-13% residual; and

7.     the total cost of the equipment on Schedules 93-94 was "around $63 million," when he knew or could have readily ascertained from CSI employees in St. Louis that

- 10 -

CSI's records reflected an original total cost of the equipment on those schedules, according to CSI, was approximately $34.3 million. CSI046071.

Documents evidencing the falsity of Mr. Stenberg's representations include those identified in the CSI Letters, CSI041653, and Mr. Stenberg's e-mail to Messrs. Lucy and Baillie dated March 18, 2002, LYC24631-32.

Mr. Stenberg made the foregoing misrepresentations at a time when he knew Lycos was considering "unwinding" Schedules 93 and 94 and in response to pointed questions from Messrs. Lucy and/or Baillie about the economic impact on Lycos of those schedules. *See* LYC24633. Mr. Stenberg, knowing that Lycos was relying on him for information, made such misrepresentations in an effort to induce Lycos *not* to pursue an unwinding of Schedules 93 and 94, thereby preserving a multi-million dollar windfall for CSI and himself (indeed, an unwinding may have resulted in Mr. Stenberg losing more than $1 million in commissions on those schedules alone). *See* CSI039750. Lycos would have had the right to unwind those schedules because of, among other things, the acts and omissions described in sub-paragraph "D" of this Response No. 2. Lycos, through Messrs. Lucy and Baillie, reasonably relied on Mr. Stenberg's misrepresentations. Had they known these representations were false, Lycos would (i) have unwound the transactions and/or stopped payment of monthly rent; and (ii) not have agreed to pay CSI an additional $3.775 million pursuant to the Sales Agreement.

B.  <u>Fraudulent Acts of Commission</u> - Echoing a misrepresentation he made in his email of March 18, 2002, Mr. Stenberg intentionally misrepresented to Susan Franklin of LeaseForum, who was acting on behalf of Lycos at the time, during a telephone call on or about June 27, 2003, that the original cost of the equipment Lycos leased from CSI exceeded $60 million, when he knew, or could readily have ascertained from CSI employees in St. Louis, that

the original cost thereof was much lower.  The evidence demonstrating these statements were false will include the testimony of Ms. Franklin and Mr. Rousseau, CSI's Answers to Lycos's First Set of Request for Admissions, CSI's Answers to Lycos's Interrogatories, bates nos. AR00868-869 and CSI046071, and the documents referenced in the CSI Letters.

The persons at Lycos who relied on Mr. Stenberg's intentional misrepresentations to Ms. Franklin included Mr. Lucy and Julie Callagee.  Mr. Lucy and Ms. Callagee relied on the foregoing intentional misrepresentations in (1) causing Lycos to make more than $12 million in monthly rent payments to and for the benefit of CSI with respect to the schedules then outstanding between Lycos and CSI; (2) entering into the Sales Agreement; and (3) causing Lycos to pay CSI $3.775 million pursuant to the Sales Agreement.

     C.    <u>Fraudulent Acts of Commission</u> -  By email of June 30, 2003, in an attempt to pressure Lycos to agree to purchase all equipment on outstanding equipment schedules for $4.691 million on that day, Mr. Stenberg intentionally misrepresented to Brian Lucy that his "approval from the banks [would] expire today"[8] when he knew that no bank approval was necessary for CSI to enter the transaction and thus there was no approval expiration date on that day or any day.  Mr. Stenberg made this statement, unbeknownst to Lycos, in an attempt to secure a commission for himself on the Sales Agreement before the end (June 30, 2003) of CSI's 2003 fiscal year.

On July 1, 2003, Lycos advised CSI, through Mr. Stenberg, that if LeaseForum and CSI could not arrive at a reasonable settlement for Lycos to purchase the equipment, CSI would have LeaseForum perform a full audit of all CSI/Lycos equipment schedules. CSI042716-42717.  In response to that information, in addition to repeating his false claim that bank approval of the

---

[8] CSI042367.

deal had expired the previous day, Mr. Stenberg responded with yet another falsity, "easy tough guy I am not sure if I can do it anymore." *Id.* Mr. Stenberg knew at that time that his ability to enter the Sales Agreement was wholly unaffected by the passage of one day. In a subsequent e-mail on July 1, 2003 and again on July 23, 2003, Mr. Stenberg repeated his misrepresentation that he needed the banks' approval for the Sales Agreement. CSI042375-42376, AR11507.

      D.    <u>Fraudulent Acts of Omission</u> - CSI, through Mr. Stenberg told Lycos "half-truths" in connection with each Rewritten and each Rolled-Up Equipment Schedule by disclosing to Lycos the amount of the proposed new monthly payment and lease term, but failing to disclose, as he was required to do under the common law and the Attorney General's Regulations including, without limitation, 940 C.M.R. 3.16(2), and Equipment Leasing Association's Fair Business Practice provision number 7 then in effect, the following:

      1.    that the net present value of the stream of lease payments Lycos would be making under the proposed Rolled-Up and Rewritten Equipment Schedules included substantial "mark-ups" in the net present value outstanding under the existing equipment schedule(s) such that Lycos would have to pay millions of dollars above what the rental payments should have been after refinancing the schedules. For example, the net present value of the remaining stream of payments of the equipment schedules that were cancelled and rolled onto Schedule 93 plus the net book value of the respective outstanding residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687. The net present value of the stream of payments plus the net book value of the respective outstanding residuals under Schedule 93 was $1,441,368.10. *See* CSI039686 and documents identified in the CSI Letters. Thus, CSI charged Lycos a mark-up of over 930% simply to refinance the equipment onto Schedule 93. CSI failed to disclose this fact

- 13 -

to Lycos. The bates numbers of the documents supporting the foregoing factual assertions are identified in the CSI Letters.

      2.    the net present value outstanding on each equipment schedule at the time each schedule was rewritten or rolled-up. For example, CSI failed to disclose to Lycos that the net present value of the remaining stream of payments of the equipment schedules that were cancelled and rolled onto Schedule 93 plus the net present value of the respective outstanding residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687.

      3.    that the "Base Value"[9] with respect to the equipment on the Rolled-Up and Rewritten Equipment Schedules, would *not* equal the original equipment cost but, instead, would be inflated to a number selected by CSI well above that cost.[10] Throughout the parties' relationship, Addendum No. 1 to the original equipment schedules between Lycos and CSI stated that the "Base Value" would equal the "vendor list price," the "equipment cost" or the "manufacturer's list price." *See generally* the documents evidencing the original equipment schedules identified in the CSI Letters and more specifically, but without limitation, CSI034306-34309, LYC00087, and CSI004710-4712. Yet, on the Rewritten and Rolled-Up Equipment Schedules, the Base Value generally did not equal the "vendor list price" or "equipment cost." Indeed, there was no apparent relationship between the two. For example, Addendum No. 1 to Schedule 67E states that the Base Value of the equipment on that schedule was to be the "Equipment Cost." CSI032166-32168. The cost of the hardware on that schedule totaled $907,993.82. (Even if soft costs and freight were to be added to this number, the total cost was

---

[9] The Stipulated Loss Value Schedules establish the formula for determining the amount Lycos would be required to pay CSI if the equipment Lycos leased from CSI were lost or damaged. The "Base Value" is the number by which a percentage is multiplied to determine how much Lycos would be required to pay.

[10] The documents evidencing this allegation include the documents identified in the CSI Letters.

BST99 1517349-4.057077.0012

$966,572.05.) Yet, when the equipment on Schedule 67E was rolled onto Schedule 67H, *and no new equipment was added*, CSI set the Base Value more than $125,000 higher at $1,091,002.00. CSI0032727. If anything, the fair market value of the equipment when it went onto Schedule 67H was lower than it was when it was purchased because the equipment was used when it went onto 67H. *See* documents identified in the CSI Letters and Exhibit A to CSI's Answers to Lycos's First Set of Interrogatories.

4.     the original acquisition cost of the equipment on all but a few of the equipment schedules. CSI maintained the original acquisition cost of the equipment on its computers and had the ability to run a report with respect to these costs within minutes. *See* Tr. of Deposition of Michelle Thompson. It even printed out those costs for its internal use,[11] but did not give Lycos the portion of the printout containing the original equipment cost until very late in the parties' relationship. *Compare, e.g.,* CSI040995-41001 with LYC07559-7563. Rather, CSI intentionally provided Lycos with a version of its printout that omitted the original acquisition cost of the equipment in an effort to make it near-impossible for Lycos to figure out the acquisition cost.

5.     it maintained a well-orchestrated and targeted internal scheme to manipulate the leasing process and cause Lycos to rewrite leases repeatedly, even though such rewrites caused damage to Lycos. Specifically, CSI maintained Sales Compensation Plans for each fiscal year that governed, among other things, the triggering of commission payments and the amount of commissions to be paid to account executives such as Mr. Stenberg. These plans were designed to provide incentives to account executives such as Mr. Stenberg to cause CSI's customers to rewrite by not only making rewrites commissionable events, but also by rewarding

---

[11] *See, e.g.,* CSI045807, 45828, 45832, 45836, 45844, 45851, 45856, 45862, 45868, and 45877.

account executives during certain years with greatly enhanced commission percentages on
rewrites of outdated personal computers. *See* CSI Compensation Plans for Paul Stenberg,
CSI44223-44257, CSI44258-44296, CSI44297-44333, CSI44334-44369, CSI44370-44406,
CSI044468-44469, CSI044473-044492, CSI044470-44472, CSI44493-44512, and PC Rewrite
program, CSI44407.

> 6.      it perpetrated a scheme to cause Lycos to trust and depend on Mr.

Stenberg for his expertise in leasing, and induced Lycos not to investigate Mr. Stenberg's
intentional misrepresentations and "half-truths" described herein. CSI evaluated Mr. Stenberg
based on his ability to "develop an ongoing business and personal bond of camaraderie, trust and
dependency with [the] decision maker" at Lycos. *See, e.g.*, CSI044211-44222. His supervisor
concluded that he had succeeded in this and gave him the highest possible rating in his
performance evaluations. CSI044216, CSI044220. His supervisor's evaluation of him was well-
founded. Mr. Stenberg indeed gained Lycos's trust and dependency by, among other things,
responding to certain of its requests for information, entertaining Lycos employees on occasion,
and acting as Lycos's account executive for the entire seven-year relationship. Mr. Stenberg
worked for CSI during a time when Lycos was a fledgling internet start-up company and when
the internet boom took flight in the late 1990s. As Mr. Stenberg was aware, this era of the
Internet required fast movement and Lycos executives and employees at the time were consumed
with their day-to-day responsibilities. Mr. Stenberg also knew that Lycos lacked expertise in
leasing. As a result, Lycos looked to and trusted Mr. Stenberg to provide sound leasing solutions
and advice and Mr. Stenberg was aware that Lycos was largely dependent upon him in this role.

Moreover, Mr. Stenberg was the only person consistently involved in the CSI-Lycos
lease relationship during the years that relationship existed. Given the nature of the times and

Internet businesses in general, Mr. Stenberg worked with a series of different people at Lycos on the leasing of equipment. Each time a new person from Lycos took over the leases, Mr. Stenberg enjoyed a significant advantage in information, as he knew the entire history of the parties' leasing practices and transactions. Mr. Stenberg (ab)used Lycos's trust in and reliance on him, as well as his informational advantage, to defraud Lycos and reap millions of dollars in commissions.

7.    it had perpetrated a scheme to put Lycos in the position of having to either rewrite equipment lease schedules indefinitely or buy-out the leased equipment at a price substantially in excess of the then fair market value of the equipment. CSI implemented this scheme, in part, by inflating the Base Value, as discussed above, and establishing Stipulated Loss Value Percentages which, if paid, would enable CSI to recover an exorbitant amount, well in excess of not only the then reasonable value of the equipment, but any industry norm or reasonable profit as well. For example, under Schedule 48, according to CSI, the net present value of the stream of payments Lycos was required to make totaled 108% of the original cost of the equipment. CSI039222. Yet, if Lycos were unable to return that equipment at the end of the 36 month lease term, Lycos would have been contractually obligated to pay an additional 55% of the Base Value, for a total of 163% of the original cost of the equipment, equipment that would have had little or no resale value and that CSI would prefer not to have had returned. CSI0014610. The documents cited in the CSI Letters and the testimony of Philip Cagney are among the evidence on which Lycos intends to rely to support this claim.

The effect of the inflated Base Value and Stipulated Loss Value percentages came to a head when Lycos sought to negotiate a purchase price for the equipment it had been leasing from CSI. At that time, in summer, 2003, Lycos had already paid interim and monthly rent to and for

- 17 -

the benefit of CSI aggregating more than $55.8 million on account of equipment that CSI claims had an original cost of less than $46 million, and had an obligation to pay significant additional monies.

The fair market value threshold of the equipment Lycos wanted to purchase was $350,000. CSI determined that Mr. Stenberg would earn a commission if he sold the equipment for more than that amount. Mr. Stenberg, who knew Lycos was unable to return the equipment for a variety of reasons (including CSI's stringent equipment return policies), then quoted Lycos a purchase price of $4.691 million for the equipment, more than *twelve* times the equipment's booked residual value. Lycos determined that because it could not return the equipment, it would be required either to extend the equipment leases again or make stipulated loss payments to CSI at the end of equipment schedules totaling more than $30 million (for obsolete equipment having little or no resale whatsoever). Thus, CSI's scheme of establishing unreasonably high base values and stipulated loss value percentages put Lycos in the position of having to pay an unreasonably high price relative to the then fair market value of the equipment. While Lycos was able to negotiate a purchase price of $3.775 million after threatening to audit CSI's equipment schedules, Lycos still paid CSI more than ten times the amount of the equipment's booked residual value and an even greater multiple above the fair market value of the equipment.

Mr. Stenberg failed to make the foregoing disclosures at or shortly before Lycos executed each Rolled-Up or Rewritten Equipment Schedule. The individuals at Lycos who relied on one or more of CSI's "half-truths" described in sub-paragraph "D" above to the detriment of Lycos included Tom Guilfoile, Edward Philip, Sam Ziba, Mike Ripps, and Brian Lucy. These individuals relied on CSI's misrepresentations in (a) entering into the Rolled-Up and Rewritten Equipment Lease Schedules, (b) causing Lycos to make more than $58 million in payments to

- 18 -

and for the benefit of CSI with respect to the Rolled-Up and Rewritten Equipment Schedules; (c)

entering into the Sales Agreement; and (d) causing Lycos to pay CSI $3.775 million pursuant to

the Sales Agreement.

## INTERROGATORY NO. 3:

3.    State the basis for, including all evidence supporting, your claims that CSI "has
unjustly received and obtained money from Lycos well above any reasonable or fair total
compensation" and "has unjustly received and obtained possession of money from Lycos well
above any reasonable or fair total compensation, without CSI providing any consideration to
Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the terms of the
"rolled up schedules" – explaining, in your answer, *inter alia*, how much money you claim that
CSI has unjustly received, the date or dates when it unjustly received any such monies, and what
"consideration" you claim CSI should have given to Lycos.

## RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving its General Objections, Lycos refers to its answers to

Interrogatories Nos. 1 and 2 above.  In addition, Lycos states that: (a) CSI maintains that Lycos

paid CSI over $72 million to lease equipment that had, according to CSI, an original cost of

$45.5 million; (b) CSI, through Mr. Stenberg, quoted Lycos a buyout price for the equipment of

$4.691 million at various times during the period from November, 2002 through June, 2003 even

though CSI's booked residual value for the equipment, was approximately $1.5 million when

calculated in August, 2001,[12] and the equipment had a fair market value of little or nothing at the

time of the quote and the sale.

## INTERROGATORY NO. 4:

4.    State the basis for, including all evidence supporting, your claims that CSI has
violated the Massachusetts Unfair Trade Practices Statute, M.G.L. c. 93A, Sections 2 and 11 –
explaining in your answer, *inter alia*, exactly what unfair or deceptive acts or practices were
committed by CSI, who at CSI committed them and when, and what specific harm they caused
Lycos.

---

[12] CSI041655-41656.

BST99 1517349-4.057077.0012

**RESPONSE TO INTERROGATORY NO. 4:**

Subject to and without waiving its General Objections, Lycos refers to its answers to

interrogatories 1 through 3. Further answering, Lycos states that M.G.L. c. 231, § 85J and

M.G.L. c. 249, § 71 are statutes designed to protect consumers and the public welfare. As such,

CSI's violation of c. 271, § 49, in connection with the Rewritten and Rolled-Up Equipment

Schedules, and its violation of c. 231, § 85J, in connection with the Sales Agreement, are

violations of 940 C.M.R. 3.16(3), and thus *per se* violations of M.G.L. c. 93A, §§ 2 and 11.

**INTERROGATORY NO. 5:**

Did you receive competent legal advice from licensed attorneys for Lycos in connection
with the transactions with CSI that are described in your amended answer and counterclaim, and
if so identify those legal counsel and as to each, state which transactions with CSI they provided
legal advice to Lycos about, when they did so, and to whom they communicated that advice.

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving its General Objections, Lycos states that it did not receive

legal advice, competent or otherwise, in connection with the financial or business terms of the

Rolled-Up and Rewritten Equipment Schedules. Legal counsel did not participate in the

negotiation, if there was any, of such terms.

Per ordinary procedure, Lycos received legal advice and approval from Lycos's in-house

legal department concerning the legal terms of the Sales Agreement, such as, for example, the

indemnification and limitation of liability clauses. The counsel who provided that legal advice

included Peter Karol, who was not experienced in equipment leasing. Mr. Karol communicated

his legal advice to Brian Lucy in July, 2003.

Lycos received no legal advice, whether competent or otherwise or whether related to

business or legal terms, from any outside counsel before executing the Rolled-Up and Rewritten

Equipment Schedules and the Sales Agreement.

- 20 -

**INTERROGATORY NO. 6:**

Did you receive competent accounting advice from qualified accountants for Lycos in connection with the transactions with CSI that are described in your amended answer and counterclaim, and if so, identify those accountants and as to each, state which transactions with CSI they provided accounting advice to Lycos about, when they did so, and to whom they communicated that advice.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its General Objections, Lycos states that it did not receive

advice from qualified accountants in connection with its entry into the Rewritten or Rolled-Up

Equipment Schedules.  Lycos states that it received competent accounting advice from Deloitte

& Touche after the Sales Agreement was executed with respect to conversion of the equipment

schedules from operating leases to capital leases.  Deloitte & Touche communicated its advice to

Ms. Callagee and/or Mr. Lucy.

**INTERROGATORY NO. 7:**

Identify, by file name or other manner enabling CSI to locate them, which of the electronic records you have produced to CSI in this case constitute the electronic versions of which bates numbered hardcopy documents that you have produced.

**RESPONSE TO INTERROGATORY NO. 7:**

Lycos objects to Interrogatory No. 7 on the grounds that it is unduly broad, overly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections or its General Objections, Lycos states

that it has provided to CSI the electronic information and the hard-copies of that information.

Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer to this

Interrogatory is substantially the same for CSI as it is for Lycos.

**INTERROGATORY NO. 8:**

Identify, and give the substance of the testimony that you will offer from, all individuals that you intend to call as witnesses at the trial of this action, including fact witnesses, retained

experts, and non-retained experts, and as to any witnesses that you expect to offer expert opinions, as part of giving the substance of their testimony, state the basis for the opinions they will offer, and identify the qualifications of those witnesses to give those opinions.

**RESPONSE TO INTERROGATORY NO. 8:**

Lycos objects to Interrogatory No. 8 on the grounds that it seeks information subject to the work-product privilege, and is unduly broad and overly burdensome.  Subject to and without waiving the foregoing objections or its General Objections, Lycos reserves the right to supplement its response to this Interrogatory and/or deliver expert report(s) at an appropriate time.

**INTERROGATORY NO. 9:**

Identify which employees of Lycos signed each of the contracts (including lease schedules) that Lycos entered into with CSI, and state what their position with Lycos was at the time they signed each of those contracts.

**RESPONSE TO INTERROGATORY NO. 9:**

Subject to and without waiving its General Objections, Lycos states that the Master Lease Agreement was signed by Edward Philip.  At the time he signed the Master Lease Agreement, Mr. Philip was Chief Operating Officer of Lycos.  Mr. Philip also appears to have signed several of the equipment schedules.

Several other equipment schedules appear to have been signed by Thomas Guilfoile.  At the time he appears to have signed those equipment schedules, Mr. Guilfoile served as Vice President of Finance and Administration for Lycos.

A few of the equipment schedules, including Schedules 93 and 94, and the Sales Agreement, appear to have been signed by Brian Lucy.  At the time he appears to have signed those schedules and the Sales Agreement, Mr. Lucy served as Chief Financial Officer of Lycos.

- 22 -

The particular schedules each of the above gentlemen appears to have signed is evident from the signatures on the first page of the equipment schedules. The equipment schedules have the bates numbers contained in the CSI Letters.

**INTERROGATORY NO. 10:**

Identify the person answering these interrogatories for and on behalf of Lycos, and for each interrogatory, identify all persons who supplied information responsive to that interrogatory.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving its General Objections, Lycos states that the person answering these Interrogatories for and on behalf of Lycos is Kevin Baillie. Mr. Baillie received assistance from Lycos's professionals in answering these Interrogatories.

**INTERROGATORY NO. 11:**

Identify all persons known by you to have personal knowledge concerning (i.e. supporting, contradicting, etc.) any of the allegations that you have made against CSI in your amended answer and counterclaim in this case.

**RESPONSE TO INTERROGATORY NO. 11:**

Lycos objects to Interrogatory No. 11 on the grounds that it is overly burdensome as it includes current and former employees of Lycos, many of whom Lycos has not spoken with for years, let alone about this case. Subject to and without waiving the foregoing objections or its General Objections, Lycos states that, to the best of it knowledge, information and belief, the persons listed below have or may have personal knowledge of facts concerning the allegations made by Lycos against CSI in its Amended Answer and Counterclaim:

| Deborah Bibbo | Kevin Baillie |
|---|---|
| Associate Accountant | Chief Financial Officer |
| Lycos, Inc. | Lycos, Inc. |
| 100 Fifth Avenue | 100 Fifth Avenue |
| Waltham, MA 02451 | Waltham, MA 02451 |

- 23 -

| | |
|---|---|
| Michael Bunis<br>*(former Lycos Deputy General Counsel)*<br>19 Bowker Street<br>Brookline, MA 02445 | Peter Karol<br>*(former Lycos General Counsel)*<br>31 Cider Mill road<br>Sudbury, MA 01776 |
| Julie Callagee<br>1825 Washington Street<br>Canton, MA 02021 | Sachiko Kase<br>*(former Lycos Accountant)*<br>2 Appleton Street, Apartment 204<br>Waltham, MA 02453 |
| Ruth Campbell<br>*(former Lycos Accounts Payable Specialist)*<br>10 Estabrook Road<br>Roxbury, MA 02120 | Kenneth Lougheed<br>Accounts Payable Manager<br>Lycos, Inc.<br>100 Fifth Avenue<br>Waltham, MA 02451 |
| Judith Christensen<br>*(former Lycos Senior Accountant)* | |
| Beth Clancy<br>*(former Lycos Accounts Payable Specialist)*<br>65 Narragansett Avenue<br>Weymouth, MA 02188 | Brian Lucy<br>*(former Lycos Chief Financial Officer)*<br>42 Windkist Farm Road<br>North Andover, MA 01845 |
| Susan Crapo<br>*(former Lycos Senior Accounts Payable Specialist)*<br>585 Middlesex Turnpike<br>Billerica, MA 01821 | Karen Ann Nakouzi<br>*(former Lycos Accounts Payable Specialist)*<br>P.O. Box 71<br>Brockton, MA 02303 |
| Sandra Cucuiliza<br>*(Lycos Purchasing Director)* | Chad Pelletier<br>*(Lycos Senior Accountant)*<br>55 Concord Road<br>Chelmsford, MA 01824 |
| Andrew Feinberg<br>*(former Lycos General Counsel)*<br>56 Shadow Oak Drive<br>Sudbury, MA 01776 | Edward Philip<br>*(former Lycos Senior V.P. Special Projects)*<br>115 Draper Road<br>Wayland, MA 01778 |
| Frank Flynn<br>(unknown) | Donna Quach<br>*(former Lycos Accountant)*<br>217 B Street<br>Lowell, MA 01851 |
| Susan Franklin/John Kirk<br>American River Partners, LLC<br>380 Chief Justice Cushing Highway<br>Cohasset, MA 02025 | Michael Ripps<br>*(former Lycos – Asia JV COO)*<br>275 Cherokee Avenue<br>Athens, GA 30606 |
| Matt Fuller<br>*(former Lycos General Accounting Supervisor)*<br>138 Summer Street<br>Stoneham, MA 02180 | Jeff Snider<br>*(former Lycos Senior V.P. – Legal)*<br>56 Park Avenue<br>Newton, MA 02458 |
| Tom Guilfoile<br>*(former Lycos V.P. – Strategic Planning & M&A)*<br>116 Powder Point Avenue<br>Duxbury, MA 02332 | Paul Stenberg<br>*(CSI Account Executive)*<br>720 South St.,<br>Needham, MA |

BST99 1517349-4.057077.0012

| Kevin Streeter | Monique Walsh |
|---|---|
| *(former Lycos Financial Analyst)* | *(former Lycos Staff Accountant)* |
| 14 Park Way | 15 Carlson circle |
| North Andover, MA 01845 | Natick, MA  01760 |

| Jeff Tierney | Sam Ziba |
|---|---|
| *(former Lycos Accounts Payable Specialist)* | *(former Lycos Finance & Treasury Director)* |
| 26 Boulevard Terrace | 8 Francine Road |
| Allston, MA 02134 | Framingham, MA  01701 |

| Victor Turner | |
|---|---|
| 55 Fox Road #906 | |
| Waltham, MA 02451 | |

## INTERROGATORY NO. 12:

Identify who Lycos' outside auditors were during the period 1996 to the present, and as to each outside auditor, specify when (ie. What specific time periods) each one held that position, and which individual people employed by each outside auditor performed which particular tasks, and what their titles were at the time (e.g. staff accountant, manager, engagement partner, etc.)

## RESPONSE TO INTERROGATORY NO. 12:

Lycos objects to Interrogatory No. 12 on the grounds that it is overly burdensome in that

Lycos does not maintain records of individuals assigned to perform its audit, nor does it maintain

records concerning which particular individuals were assigned to particular tasks.  Answering

further, the decision on personnel assigned to an audit is made solely by the outside auditors and,

could be ascertained based on a review of the audit firms' work papers.  The audit firms' human

resources department would also likely have records of each auditor's title(s) at the time she or

he performed services in connection with any Lycos engagement.  In addition, the particular staff

assigned to an audit changed from year-to-year due to turnover and scheduling.  Compounding

this problem is the fact that the audit staff were involved with lower level Lycos personnel that

are no longer employed by Lycos.  Lycos management had contact with higher level

representatives from its audit firms and has identified those persons below.

- 25 -

BST99 1517349-4.057077.0012

Subject to and without waiving the foregoing objections or its General Objections, Lycos states that KPMG served as Lycos's outside auditors during the period from June 1, 1995 through the fiscal year ended July 31, 2000. The KPMG audit partner assigned to the Lycos account for most of this period was Jim Boyer. The KPMG audit senior manager assigned to the Lycos account for most of this period was Michael Maschio. Both KPMG individuals worked out of the KPMG Boston office at 99 High Street, Boston, MA 02110.

Arthur Andersen LLP audited Lycos after Lycos was acquired by Terra Networks, S.A. (a Spanish company) on October 27, 2000 until Arthur Andersen declared bankruptcy. Arthur Andersen audited the period from October 28, 2000 to December 31, 2000. The last period audited by Arthur Andersen was the year ended December 31, 2001. The audit partner assigned to the Lycos account was John Sullivan. The audit manager assigned to the Lycos account was Aaron Galis.

Deloitte & Touche LLP succeeded Arthur Andersen as Lycos's auditors. Deloitte & Touche audited Lycos for the years ended December 31, 2002 and December 31, 2003. The audit partner assigned to the Lycos account was Jeremy Perisho and the audit senior manager assigned to the account was Aaron Galis (who joined Deloitte & Touche from Arthur Andersen). Deloitte & Touche's address is 200 Berkeley Street, Boston, MA 02116.

After Terra sold Lycos to Daum Communications Corporation (a Korean company) on October 5, 2004, PricewaterhouseCoopers LLP audited Lycos for the period October 6, 2004 to December 31, 2004 and the year ended December 31, 2005. PricewaterhouseCoopers is Lycos's current auditor. The audit partners assigned to the Lycos account were Vic Petri for the period October 6, 2004 to December 31, 2004; Doug Kangos for the year ended December 31, 2005;

and Lisa Beauregard is presently the audit partner assigned to the Lycos account for the 2006

audit. PricewaterhouseCoopers' address is 125 High Street, Boston, MA 02110.

**INTERROGATORY NO. 13:**

Identify all documents or electronic records whose production has been requested by CSI
from Lycos in this action but which have not been produced, and as to each such document or
electronic record state the basis upon which you have not produced it to CSI including, as to
each, all facts supporting any claims of privilege, burdensomeness, relevance, or any other
objection or excuse.

**RESPONSE TO INTERROGATORY NO. 13:**

Subject to and without waiving its General Objections, Lycos states that it has produced,

or is in the process of producing, all non-privileged documents in its possession, custody or

control requested by CSI. Lycos will make a mutual exchange of privilege logs with CSI at a

mutually convenient time.

**INTERROGATORY NO. 14:**

For each of item of equipment leased and/or purchased by Lycos from CSI, identify
where that item of equipment is currently located, and if it is no longer possessed by Lycos, state
whether it was returned to CSI, sold or discarded, and if sold how much money Lycos was
credited or paid for it.

**RESPONSE TO INTERROGATORY NO. 14:**

Lycos objects to Interrogatory No. 14 on the grounds it overly broad and unduly

burdensome in that Lycos leased more than 5500 pieces of equipment from CSI starting in 1996,

and signed its last equipment schedule with CSI in January, 2002. Subject to and without

waiving the foregoing objections or its General Objections, Lycos states that CSI knows or

should know which of these pieces of equipment Lycos returned to CSI. Upon information and

belief, CSI maintains or maintained electronic records of same. As such, pursuant to Fed. R.

Civ. P. 33(d), the burden of deriving or ascertaining the answer to this Interrogatory, with respect

to any equipment that was returned, is no greater for CSI than it is for Lycos.

- 27 -

## VERIFICATION

I, Kevin Baillie, being duly sworn, hereby depose and state that I am an officer of Lycos,

Inc.  I verify that the foregoing Responses to CSI's First Set of Interrogatories to Lycos, Inc. are

made on behalf of Lycos, Inc., that most of the matters stated therein are not within my personal

knowledge, and that the facts stated therein have been assembled by persons assisting Lycos, Inc.

in this case.  Upon information and belief, the facts stated therein are true and correct based on

the information in the possession of Lycos, Inc. and its professionals at this time.

/s/ Kevin Baille
Kevin Baillie

AS TO OBJECTIONS:

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I, Peter M. Acton, Jr., hereby certify that on this 25th day of October, 2006, a true and
correct copy of the foregoing document was served by electronic mail and first-class mail on the
following:

Robert J. Kaler
Edward W. Little, Jr.
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
rkaler@mccarter.com
elittle@mccarter.com

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr.

- 28 -