# EXHIBIT 1

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 1

UNITED STATES DISTRICT COURT

For the District of Massachusetts

No. 05-10017-RWZ

* * * * * * * * * * * * * * * * * * * * * *

COMPUTER SALES INTERNATIONAL, INC.,

                  Plaintiff,

vs.

LYCOS, INC.,

                  Defendant,

BANK OF AMERICA f/k/a FLEET BANK,

                  Trustee Process Defendant.

* * * * * * * * * * * * * * * * * * * * * *

    VIDEOTAPED DEPOSITION OF: JULIE CALLAGEE, a witness in

the above-entitled cause, taken before CINDY BERGLUND, CSR,

Registered Professional Reporter and Notary Public pursuant

to the applicable provisions of the Massachusetts Rules of

Civil Procedure, at the offices of GADSBY & HANNAH, LLP, 225

Franklin Street, Boston, MA 02110, on the 26th day of APRIL,

2006, commencing at 9:15 A.M.

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 202 | Page 204 |
|---|---|

**Page 202**

1  A. I just want to say in good conscious what I was
2  trying to explain was he proposed this to me and I
3  wasn't the decision-maker.
4  Q. I'm just not asking whether you were the
5  decision-maker. The fact is that on August 8, Mr. Kirk
6  proposed to Lycos that Lycos have him proceed with
7  Phase 2. In fact, he said it was already underway and
8  he told you that the purpose of Phase 2 was to set up a
9  negotiation with CSI to reduce the amount of lease
10  payments that Lycos was going to have to make to CSI,
11  right?
12  A. That's right.
13  Q. And he told you that on the same day that Lycos
14  had specifically agreed to make all those payments in
15  full, correct?
16  ATTY. BEAN: Objection.
17  Q. You can answer.
18  A. Just for clarity that, you know, I just want to be
19  careful here because this is written by me. So John
20  and I did have this discussion, but because I'm
21  testifying for the company, Brian has to speak for
22  Brian, like you said.
23  Q. I'm not asking you to speak for Brian. Again,
24  I'll ask the question a third time.

**Page 203**

1  A. Thank you.
2  Q. On August 8th of 2003, LeaseForum sent you an
3  e-mail proposing to Lycos, and, in fact, saying that a
4  Phase 2 stage of work was underway and that the goal of
5  that work was to set up a negotiation with CSI to force
6  a reduction in the lease payments that Lycos was going
7  to have to make to CSI in the future, correct?
8  ATTY. BEAN: Objection
9  Q. That's right, isn't it?
10  ATTY. BEAN: Objection.
11  Q. You can answer.
12  A. That the e-mail, that it was going to reduce the
13  amount that we would have to pay in the future,
14  correct.
15  Q. Yes. And in response to LeaseForum's proposal to
16  you that what they were going to do in Phase 2 was to
17  try to set up a negotiation to reduce Lycos' obligation
18  to make the payments that it had just that day agreed
19  to make, you said to him, quote, Can you send me your
20  proposed fee schedule for CSI Phase 2. Brian is
21  expecting a much lower rate than Phase 1, unquote.
22  Correct?
23  ATTY. BEAN: Objection.
24  THE WITNESS: I said that, yes.

**Page 204**

1  Q. Okay. You didn't say Brian was hesitating, did
2  you?
3  A. No, but I -- if the question is what the e-mail
4  says, we can all read the e-mail.
5  Q. And then the portion of the e-mail in which
6  Mr. Kirk told you that they were going to set up a
7  negotiation, that their goal was going to be to reduce
8  Lycos' remaining future payment obligations to CSI, the
9  ones that Lycos had just agreed to make that day, that
10  language on reducing the lease payment obligations,
11  that appears again in the Statement of Work that we
12  have marked as Exhibit 13A where the parties agreed
13  that LeaseForum would work towards a financial
14  settlement that would include, but not be limited to,
15  reduction in lease payment obligations. That language
16  appeared again, correct?
17  A. Correct.
18  Q. And so that was the deal, wasn't it? That was the
19  deal?
20  ATTY. BEAN: Objection.
21  Q. Lycos and LeaseForum got together and agreed that
22  LeaseForum would go out and try to set up a negotiation
23  with CSI, force a financial settlement with CSI that
24  would reduce Lycos' lease payment obligations even

**Page 205**

1  though Lycos had just agreed to make all those lease
2  payment obligations in Exhibit 23A. Isn't that true?
3  ATTY. BEAN: Objection.
4  Q. You can answer.
5  A. Force a financial settlement?
6  Q. Let's see, In an effort to set up a negotiation to
7  reduce Lycos' remaining future payment obligations.
8  That was the deal, wasn't it?
9  A. The deal was what's here in Statement of Work 2,
10  yes.
11  Q. And you knew as of the time that Lycos signed
12  Exhibit 23A in August of 2003, that even though Lycos
13  had specifically agreed to make all the lease payments
14  described in that agreement, you knew that LeaseForum
15  was going to try and negotiate a way out of it for
16  Lycos, correct?
17  ATTY. BEAN: Objection.
18  Q. You can answer.
19  A. No.
20  Q. Certainly, on August 8th of 2003 on the very day
21  that Lycos signed the buy-out agreement with CSI that
22  we have marked as Exhibit 23A, on that very day you
23  were being told by LeaseForum that the effort to reduce
24  Lycos' remaining future payment obligations to CSI had

52 (Pages 202 to 205)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 242

1  Q. That's why I'm asking from your memory. I can't
2  at the moment answer because I don't have all of the
3  electronic records, but I'm assuming you may have a
4  memory having seen Exhibit 26 -- in fact, if you look
5  at Exhibit 26, do you see where it says, Great speaking
6  with you?
7  A. Yes.
8  Q. You had just talked to Mr. Kirk, right?
9  A. Yes.
10 Q. And he was indicating to you in Exhibit 26 that he
11 thought it would make good sense to get the commercial
12 arrangements for what we have called Phase 2 done with
13 respect to CSI, right?
14 A. Yes.
15 Q. And it is true that at that time as of August 12,
16 2003, Lycos and LeaseForum had generally reached an
17 understanding that they would proceed with Phase 2 and
18 the issue was what were the specific commercial
19 arrangements going to be particularly with regard to
20 what fee was going to be paid to LeaseForum?
21     ATTY. BEAN: Objection.
22 Q. Isn't that true?
23 A. I think that I wanted us to proceed in exchanging
24 correspondence and things. I'm not sure that Lycos --

Page 243

1  that Brian wanted to proceed at that point.
2  Q. Well, it wasn't Brian's final decision to make
3  anyway, was it?
4  A. To proceed with Statement of Work 2?
5  Q. Yes.
6  A. Why would you say that?
7  Q. I'm asking you -- you are using a technique called
8  question the questioner and I appreciate that, but I
9  would have to ask you to just try to stay with my
10 questions.
11 A. You said it wasn't, was it.
12 Q. You keep passing it off to Mr. Lucy. I'm
13 suggesting it wasn't his decision to make, was it?
14 A. Well, it was his decision to make. Maybe he would
15 be consulting general counsel and other people at that
16 level. It wasn't mine. I wasn't an officer of the
17 company or an executive of the company.
18 Q. You were the relationship manager for Lycos in all
19 it's dealings with LeaseForum, correct?
20 A. I had no -- I had no authority to sign contracts
21 or to enter into contractual relationships with anyone.
22 Q. But you were the individual who was charged with
23 supervising the activities of LeaseForum, correct?
24 A. I was the relationship manager, yes.

Page 244

1  Q. Okay. You have been designated as a Rule 30(B)(6)
2  designee of the company now to testify about that
3  relationship, right?
4  A. Yes.
5  Q. And as of August 12th of 2003, LeaseForum was
6  sending you an e-mail saying that you ought to go ahead
7  and get the commercial arrangements done as if the
8  decision had already been made to proceed with Phase 2?
9  A. I think that this is the pushy salesperson wanting
10 to proceed with Phase 2.
11 Q. In fact, you were just as pushy about proceeding
12 with Phase 2 as Mr. Kirk was, weren't you?
13 A. No. I was not as pushy, no.
14 Q. But you wanted to proceed with it, right?
15 A. Yes.
16 Q. And at this time, regardless of what you say about
17 the -- whether the decision had been made, we know that
18 as of August 12, Mr. Kirk is saying to you we ought to
19 go ahead and get the commercial arrangements done and
20 the commercial arrangements that you knew he was
21 referring to was sort of a standard Statement of Work?
22 A. I'm sorry, you said regardless of what I say?
23 Q. Yes.
24 A. What does that mean?

Page 245

1      ATTY. BEAN: He is insulting you again.
2  Q. No.
3  A. Please don't insult me.
4  Q. I think you offered -- prompting from counsel is
5  unnecessary.
6      ATTY. BEAN: Insulting the witness is unnecessary,
7  too. We try to treat each other with respect.
8      ATTY. KALER: I'm trying to get a straight answer
9  to the question.
10     ATTY. BEAN: You got it.
11     ATTY. KALER: There's already a record made of
12 counsel prompting the witness. I don't want to take
13 this discussion much further.
14 Q. So I'm just going to keep going and ask you not to
15 give me your opinions, but just stay with my questions,
16 if you could.
17 A. I don't know how to respond to a question that
18 says regardless of what I say.
19 Q. I don't remember -- I think you offered an opinion
20 in the previous answer.
21     But let's try to stay with this question: As of
22 August 12th of 2003, LeaseForum was telling you that
23 they thought you folks ought to go ahead with the
24 commercial arrangements between Lycos and LeaseForum

62 (Pages 242 to 245)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc

274

1    PLEASE ATTACH TO THE DEPOSITION OF JULIE CALLAGEE

2    CASE:  CSI, INC. V. LYCOS, INC.

3    DATE TAKEN:  4/26/06

4                        ERRATA SHEET

5    Please refer to Page 273 for errata sheet instructions and

6    distribution instructions.

7    PAGE    LINE         CHANGE              REASON

8    149     23    *add* Yes, I learned that during

9               the course of this litigation    Clarification

10   202     1    the word "conscious"

11             should be "conscience"           type

12

13

14

15

16

17   I have read the foregoing transcript of my deposition and

18   except for any corrections or changes noted above, I hereby

19   subscribe to the transcript as  an accurate record of the

20   statements made by me.

21

22   Executed this _216th_ day of _May_____, 2006.

23              _Juli_____

24              JULIE CALLAGEE

# EXHIBIT 2



Peter M Acton/BST/MWE
10/19/2006 05:38 PM

To  "Little, Edward" <ELittle@mccarter com>
cc
bcc
Subject  Re: Back-Up Tapes

Ted-

I am not trying to be a pest, but pursuant to my voice message please let me know if you are going to be sending your back-up tape production to us this evening. Thanks, peter

**Peter M. Acton, Jr. | McDermott Will & Emery LLP** |28 State Street, Boston MA 02109
Office: 617-535-4412 | Fax: 617-535-3800 |Cell: 978-463-3198| pacton@mwe.com | www.mwe.com
"Little, Edward" <ELittle@mccarter com>



"Little, Edward"
<ELittle@mccarter.com>
10/16/2006 04:22 PM

To  TBean@mwe com
cc  PActon@mwe com
Subject  Back-Up Tapes

Tom --

We should be ready by this Wednesday to exchange the production from our back-up tape.  I recall Bob and Peter had some conversations about this.  Will you be ready to exchange on Wednesday as well?

Ted.

**Edward W. Little, Jr.**
**McCarter & English, LLP  |  225 Franklin Street  |  Boston, MA  02110**
**Telephone:  (617) 345-7018  |  Facsimile:  (617) 204-8018**
**elittle@mccarter.com  |  www.mccarter.com**

**BALTIMORE  BOSTON  HARTFORD  NEW YORK  NEWARK  PHILADELPHIA  STAMFORD
WILMINGTON**

**Effective June 1, 2006, the law firm of Gadsby Hannah has become part of McCarter & English, LLP.  Going forward please make a note of the new email addresses for Gadsby Hannah personnel.  These new email addresses can be found on the McCarter & English website at www.mccarter.com**

This email message from the law firm of McCarter & English, LLP is for the sole use of the

intended recipient(s)and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email (or <u>helpdesk@mccarter.com</u> ) and destroy all copies of the original message.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure:  To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

_____

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system.  Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please visit http://www.mwe.com/ for more information about our Firm.

# EXHIBIT 3



"Kaler, Robert"
<RKaler@mccarter.com>

10/02/2006 10:44 AM

To  TBean@mwe.com

cc  "Little, Edward" <ELittle@mccarter.com>

Subject  RE: CSI v  Lycos

Sure 10/25 is fine.  Will call you Wed  PM
-----Original Message-----
**From:** TBean@mwe.com [mailto:TBean@mwe.com]
**Sent:** Monday, October 02, 2006 10:24 AM
**To:** Kaler, Robert
**Cc:** Little, Edward
**Subject:** Re: CSI v. Lycos


Bob, thanks for getting back to me.  Two questions:

1.  what time on Wednesday would you be free to speak re: document discovery.

2.  in part because I am going to Dartmouth this week-end for three days, and only in part, I would like a two-week extension of time to answer the ints so they are due on 10/25.  There are no depositions of current or former Lycos employees scheduled during that two week period.  please let me know at your earliest convenience so that if you decline the request, I may seek relief from the Court.


Thank you.



Thomas O. Bean
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109
(617) 535-4426 (ph)
(617) 535-3800 (fax)
tbean@mwe.com

"Kaler, Robert" <RKaler@mccarter.com>

09/29/2006 04:53 PM
To TBean@mwe.com

cc "Little, Edward" <ELittle@mccarter.com>

Subject Re: CSI v. Lycos

Tom -

    I'm over here in the Czech Republic on business until next week, but
I'll give you  a call when I get back. (I have been flat out for a week
now, but should be able to talk on Wednesday)

                Bob.


-----Original Message-----
From: TBean@mwe.com <TBean@mwe.com>
To: Kaler, Robert <RKaler@mccarter.com>
Sent: Fri Sep 29 15:44:23 2006
Subject: CSI v. Lycos


Bob, I understand you advised the Court today that you wanted the
parties to seek to resolve their discovery disputes on their own.  Yet,
you have not responded to either of my two e-mails in the past week
requesting a conference to discuss those disputes.  Would you be
available on Monday any time to have such a conference?  Please let me
know at your earliest convenience.

Thomas O. Bean
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109
(617) 535-4426 (ph)
(617) 535-3800 (fax)
tbean@mwe.com


**************************************************************************
**********************************************
IRS Circular 230 Disclosure:  To comply with requirements imposed by the
IRS, we inform you that any U.S. federal tax advice contained herein
(including any attachments), unless specifically stated otherwise, is
not intended or written to be used, and cannot be used, for the purposes
of (i) avoiding penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any transaction or
matter herein.

_____

This message is a PRIVATE communication. This message and all
attachments are a private communication sent by a law firm and may be
confidential or protected by privilege. If you are not the intended
recipient, you are hereby notified that any disclosure, copying,
distribution or use of the information contained in or attached to this
message is strictly prohibited.  Please notify the sender of the
delivery error by replying to this message, and then delete it from your
system.  Thank you.
***********************************************************************
******************************************

Please visit http://www.mwe.com/ for more information about our Firm.

--------------------------------------------------------

Effective June 1, 2006, the law firm of Gadsby Hannah has become part of
McCarter & English, LLP.  Going forward please make a note of the new
email addresses for Gadsby Hannah personnel.  These new email addresses
can be found on the McCarter & English website at www.mccarter.com

--------------------------------------------------------

This email message from the law firm of McCarter & English, LLP is for
the sole use of the intended recipient(s)and may contain confidential
and privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient,
please contact the sender by reply email (or helpdesk@mccarter.com ) and
destroy all copies of the original message.

*************************************************************************************************************************
***
IRS Circular 230 Disclosure:  To comply with requirements imposed by the IRS, we inform you
that any U.S. federal tax advice contained herein (including any attachments), unless specifically
stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i)
avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending
to another party any transaction or matter herein.

_____

—

This message is a PRIVATE communication. This message and all attachments are a private
communication sent by a law firm and may be confidential or protected by privilege. If you are not
the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of
the information contained in or attached to this message is strictly prohibited. Please notify the
sender of the delivery error by replying to this message, and then delete it from your system.
Thank you.
*************************************************************************************************************************
***

Please visit http://www.mwe.com/ for more information about our Firm.

**Effective June 1, 2006, the law firm of Gadsby Hannah has become part of McCarter & English, LLP. Going forward please make a note of the new email addresses for Gadsby Hannah personnel. These new email addresses can be found on the McCarter & English website at www.mccarter.com**

This email message from the law firm of McCarter & English, LLP is for the sole use of the intended recipient(s)and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email (or helpdesk@mccarter.com ) and destroy all copies of the original message.

***********************************************************************************************************

IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

_____

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
***********************************************************************************************************

Please visit http://www mwe.com/ for more information about our Firm.

# EXHIBIT 4

John Patrick Kirk 10-24-2006
Computer Sales International, Inc. v. Lycos, Inc.

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4     ----------------------------x

5   COMPUTER SALES INTERNATIONAL, INC.,

6        Plaintiff and Defendant-in-

         Counterclaim

7                                    Civil Action

    vs.                              No. 05-10017-RWZ

8

    LYCOS, INC.,

9

         Defendant and Plaintiff-in-

10       Counterclaim

11   and

12   BANK OF AMERICA f/k/a FLEET BANK,

13       Trustee Process Defendant

14   ----------------------------x

15

16          DEPOSITION OF JOHN PATRICK KIRK, a witness

17     called by and on behalf of the Plaintiff, taken

18     pursuant to the applicable provisions of the Federal

19     Rules of Civil Procedure, before James A. Scally,

20     RMR, CRR, a Notary Public in and for the Commonwealth

21     of Massachusetts, at the offices of McCarter &

22     English, 225 Franklin Street, Boston, Massachusetts,

23     on Tuesday, October 24, 2006, commencing at 9:10 a.m.

24

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

John Patrick Kirk 10-24-2006
Computer Sales International, Inc. v. Lycos, Inc.

366

1  first page, the typewritten part is dated, but it shows it
2  was signed on August 8th of 2003, on the third page, if you
3  turn to that part.
4      A. (Pause) Okay.
5      Q. Did you see that sales agreement at some point in
6  the summer of '03?
7          MR. BEAN: Objection.
8      Q. After it was signed?
9          MR. BEAN: Objection.
10     A. I don't recall seeing it after it was signed.
11     Q. Do you know whether you did see it after it was
12  signed or not?
13     A. No, I don't recall.
14     Q. Do you recognize Ms. Franklin's signature on it?
15         MR. BEAN: Objection.
16         MR. FELDMAN: Objection.
17     A. This doesn't have Susan Franklin's signature on
18  it.
19     Q. I'm sorry. Do you recognize either of the
20  signatures on it?
21     A. I believe that's Brian Lucy's signature, but I
22  don't recognize it.
23     Q. Okay. So you don't know whether you saw — ever
24  saw a signed version of the sales agreement?

367

1      A. I don't recall.
2      Q. Did you become aware on or about August 8th of
3  2003 that the sales agreement had been signed?
4      A. At some point I became aware that the sales
5  agreement had been signed, yes.
6      Q. And was it in or about early August of 2003 that
7  you became aware of that?
8          MR. BEAN: Objection.
9      Q. You can answer.
10     A. I don't recall. It would have been shortly after
11  it was signed.
12     Q. Okay. I'm going to show you what's been
13  previously marked as Exhibit 24.
14     A. Do you want this in my stack over here or does
15  that go back to you?
16     Q. You can put it right there. That's fine.
17         Is Exhibit 24 a copy of an e-mail that you wrote
18  to Julie Callagee on August 8th of 2003 at or about 12:49
19  p.m.?
20     A. (Pause) Yes. Okay.
21     Q. Is Exhibit 24 Bates numbered LYC 19440 and 441 a
22  copy of an e-mail that you sent to Julie Callagee at Lycos
23  on August 8th, 2003, at or about 12:49 p.m.?
24     A. Yes.

368

1      Q. I show you what's been marked as Callagee Exhibit
2  25. Is this a copy of an e-mail that you sent to Julie
3  Callagee on August 10th of 2003 or — strike that.
4          Is this a copy of an e-mail that you received back
5  from Julie Callagee on August 10th, 2003?
6      A. Let me just quickly read it. The second half is
7  the same as the one that I just reviewed; is that correct?
8      Q. Yes, agree. Bottom of the first page, top of the
9  second page, do you recognize that as a copy of your e-mail
10  to her which is Exhibit 24?
11     A. Yeah. Okay. (Pause) Okay. Yes. As far as the
12  date and time.
13     Q. Okay. In other words, the e-mail on the top half
14  of the first page of Exhibit 23 is the e-mail that you
15  received back from Julie Callagee on August 10th of 2003 in
16  response to your e-mail that you had sent her on August 8th
17  in Exhibit 24; is that right?
18     A. Yes.
19     Q. And I'll show you what's been previously marked as
20  Exhibit 27, Bates numbered AR 000806 and 807. Do you
21  recognize this document?
22     A. Yes.
23     Q. What do you recognize it to be?
24     A. Well, this appears to be — maybe I spoke too

369

1  quickly. This appears to be a statement of work number 1.
2  It's not signed.
3      Q. On the second page, it shows a date of August
4  13th, 2003.
5      A. Right. So at first I thought this was a statement
6  of work number 1. That's what it says up at the top.
7      Q. Uh-huh.
8      A. But then it does have a date but no signature, and
9  it has — and then it refers to statement of work number 2.
10  So I don't know, I'll just have to read the whole thing.
11     Q. Okay. Take a look at it.
12     A. (Pause) Okay. Do I recognize this document?
13     Q. Yes.
14     A. I don't recall it, but this — this document with
15  typos and a couple of mistakes, but.
16     Q. Is this a draft that you prepared sometime in or
17  about August of 2003?
18     A. I don't recall.
19     Q. Do you see where it says — it purports to be a
20  statement of work number 2 dated August 12 of 2003 in the
21  first paragraph?
22         MR. FELDMAN: Objection.
23     A. You just said it says a statement of work dated
24  August 12. I think it says here — it was August 15th it

93 (Pages 366 to 369)

394

1  Lycos?

2  MR. KALER: Objection.

3  A. In response to the questions you've asked me just

4  now? Yes.

5  Q. Yes.

6  MR. BEAN: Thank you.

7  MR. KALER: Okay. I do have

8  redirect, but it's, as I said, after 7:00,

9  and I have more basic direct, so we'll

10  suspend the deposition at this time with

11  everyone reserving their rights, and I'll

12  seek the appropriate order to have the

13  witness come back and finish the

14  deposition.

15  But in the event that we're not able

16  to do that or the court disagrees with the

17  ruling, the deposition is freely available

18  to be used at trial, because he's cross-

19  examined, Mr. Bean has cross-examined.

20  Thank you. We're concluding for today.

21  THE VIDEOGRAPHER: The time is 7:21.

22  We are now off record. This marks the end

23  of the deposition.

24  (Time noted: 7:22 p.m.)

396

1  PLEASE ATTACH TO THE DEPOSITION OF JOHN PATRICK KIRK

2  CASE: COMPUTER SALES INTERNATIONAL, INC. VS. LYCOS, INC.

3  DATE TAKEN: OCTOBER 24, 2006

4  ERRATA SHEET

5  Please refer to Page 395 for Errata Sheet Instructions and

6  distribution instructions.

7  PAGE  LINE  CHANGE     REASON

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  I have read the foregoing transcript of my

16  deposition, and except for any corrections or changes noted

17  above, I hereby subscribe to the transcript as an accurate

18  record of the statements made by me.

19

20  Executed this _____ day of _____, 2006

21

22  _____

23  JOHN PATRICK KIRK

24

395

1  ERRATA SHEET DISTRIBUTION INFORMATION

2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4

5  ERRATA SHEET DISTRIBUTION INFORMATION

6

7  The original of the Errata Sheet has been delivered

8  to Robert N. Feldman, Esquire.

9  When the Errata Sheet has been completed by the

10  deponent and signed, a copy thereof should be delivered to

11  each party of record and the ORIGINAL forwarded to Robert

12  J. Kaler, Esquire, to whom the original deposition

13  transcript was delivered.

14

15  INSTRUCTIONS TO DEPONENT

16

17  After reading this volume of your deposition, please

18  indicate any corrections or changes to your testimony and

19  the reasons therefor on the Errata Sheet supplied to you

20  and sign it. DO NOT make marks or notations on the

21  transcript volume itself. Add additional sheets if

22  necessary. Please refer to the above instructions for

23  Errata Sheet distribution information.

24

397

1  COMMONWEALTH OF MASSACHUSETTS       SUFFOLK, SS.

2

3  I, JAMES A. SCALLY, RMR, CRR, a Certified

4  Shorthand Reporter and Notary Public duly commissioned and

qualified in and for the Commonwealth of Massachusetts, do

hereby certify that there came before me on the 24th day of

5  October, 2006, at 9:10 a.m., the person hereinbefore named,

JOHN PATRICK KIRK, who provided satisfactory evidence of

6  identification as prescribed by Executive Order 455 (03-13)

issued by the Governor of the Commonwealth of

7  Massachusetts, was by me duly sworn to testify to the truth

and nothing but the truth of his knowledge concerning the

8  matters in controversy in this cause; that he was thereupon

examined upon his oath, and his examination reduced to

9  typewriting under my direction; and that this is a true

record of the testimony given by the witness to the best of

10  my ability.

I further certify that I am neither

11  attorney or counsel for, nor related to or employed by, any

of the parties to the action in which this deposition is

12  taken, and further, that I am not a relative or employee of

any attorney or counsel employed by the parties hereto or

13  financially interested in the action.

14

15  My Commission Expires: May 2, 2008

16

17

18

_____

19  James A. Scally, RMR, CRR

CSR/Notary Public

20

21

22

23

24

100 (Pages 394 to 397)

# EXHIBIT 5

STANDBY LETTER OF CREDIT NO. MS1296639
DATE OF ISSUE: NOVEMBER 23, 2001

ISSUING BANK:
FLEET NATIONAL BANK
C/O GLOBAL TRADE OPERATIONS
1 FLEET WAY, MAIL STOP: PAEH0802SM
SCRANTON PA 18507-1999

APPLICANT:
LYCOS, INC.
400-2 TOTTEN POND ROAD
WALTHAM, MA 02451

BENEFICIARY:
COMPUTER SALES INTERNATIONAL, INC.
9990 OLD OLIVE STREET ROAD
ATTN: DON PRATT
ST. LOUIS, MO 63141



AMOUNT/CURRENCY:
USD 11,000,000.00
ELEVEN MILLION AND 00/100'S US DOLLARS
DATE AND PLACE OF EXPIRY:
NOVEMBER 30, 2002 AT OUR COUNTERS

GENTLEMEN:

WE HEREBY ISSUE THIS IRREVOCABLE LETTER OF CREDIT NO. MS1296639 IN YOUR FAVOR,
FOR THE ACCOUNT OF LYCOS, INC., FOR UP TO AN AGGREGATE AMOUNT OF USD
11,000,000.00 (ELEVEN MILLION AND 00/100 U.S. DOLLARS) AVAILABLE BY YOUR
DRAFT(S) DRAWN ON US AT SIGHT, ACCOMPANIED BY THE FOLLOWING:

1. BENEFICIARY'S WRITTEN, DATED STATEMENT ON BENEFICIARY LETTERHEAD SIGNED BY A
PURPORTED OFFICER READING:

QUOTE
LYCOS, INC. HAS NOT COMPLIED WITH THE TERMS AND CONDITIONS OF EITHER OR BOTH
EQUIPTMENT SCHEDULES 93 OR 94 TO MASTER LEASE 144874 BETWEEN LYCOS, INC. AND
COMPUTER SALES INTERNATIONAL, INC., WE HEREBY DRAW UPON THIS LETTER OF CREDIT
USD_____ BEING THE AMOUNT DUE US.
UNQUOTE

2. THE ORIGINAL OF THIS LETTER OF CREDIT AND AMENDMENT(S), IF ANY.

DATA CONTENT OF ANY REQUIRED DOCUMENTS PRESENTED UNDER THIS LETTER OF CREDIT
MUST BE CONSISTENT WITH THE DATA CONTENT OF ANY OTHER REQUIRED DOCUMENT(S)
PRESENTED UNDER THIS LETTER OF CREDIT.

CONFIDENTIAL
CSI0037331

PAGE:     2

THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: MS1296639

PARTIAL DRAWINGS ARE PERMITTED.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT THE AMOUNT AVAILABLE HEREUNDER
SHALL BE AUTOMATICALLY REDUCED, WITHOUT AMENDMENT,  ACCORDING TO THE FOLLOWING
SCHEDULE:

| PERIOD OF AVAILABILITY | AGGREGATE AMOUNT AVAILABLE |
|---|---|
| 11/23/01 THROUGH 03/31/03 | $11,000,000.00 |
| 04/01/03 THROUGH 06/30/03 | $10,500,000.00 |
| 07/01/03 THROUGH 09/30/03 | $ 9,250,000.00 |
| 10/01/03 THROUGH 12/31/03 | $ 7,750,000.00 |
| 01/01/04 THROUGH 03/31/04 | $ 6,000,000.00 |
| 04/01/04 THROUGH 06/30/04 | $ 4,500,000.00 |
| 07/01/04 THROUGH 09/30/04 | $ 2,750,000.00 |
| 10/01/04 THROUGH 11/30/04 | $ 1,000,000.00 |

HOWEVER, IN THE EVENT,THAT A DRAWING(S) EFFECTED HEREUNDER SHOULD, AT THE TIME
OF SUCH DRAWING, REDUCE THE ACTUAL AVAILABLE AMOUNT HEREUNDER BELOW THAT AMOUNT
AVAILABLE AS SHOWN IN THE ABOVE SCHEDULE, THEN THE AMOUNT AVAILABLE HEREUNDER
SHALL REMAIN AT THE THEN CURRENT AVAILABLE AMOUNT, IRRESPECTIVE OF THE ABOVE
SCHEDULE, UNTIL SUCH TIME THAT THE THEN CURRENT AVAILABLE AMOUNT SHALL EXCEED
THE CORRESPONDING AMOUNT PER THE ABOVE SCHEDULE.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE AUTOMATICALLY
EXTENDED WITHOUT AMENDMENT FOR PERIOD(S) OF ONE YEAR EACH FROM THE CURRENT OR
ANY FUTURE EXPIRATION DATE UNLESS AT LEAST THIRTY (30) DAYS PRIOR TO THE THEN
CURRENT EXPIRATION DATE WE SHALL NOTIFY THE BENEFICIARY IN WRITING, VIA
REGISTERED MAIL, AT THE ABOVE LISTED ADDRESS OF OUR INTENTION NOT TO RENEW THIS
LETTER OF CREDIT.

ANY SUCH NOTICE SHALL BE EFFECTIVE WHEN SENT BY US AND UPON SUCH NOTICE TO YOU,
YOU MAY DRAW HEREUNDER, UP TO THE FULL AMOUNT THEN AVAILABLE, BY PRESENTATION OF
YOUR SIGHT DRAFT DRAWN ON US ACCOMPANIED BY THE ORIGINAL OF THIS LETTER OF
CREDIT, AND ALL AMENDMENTS THERETO, AND YOUR STATEMENT, ON YOUR LETTERHEAD
PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE, STATING THAT YOU ARE IN
RECEIPT OF FLEET NATIONAL BANK'S NOTICE OF NONRENEWAL UNDER LETTER OF CREDIT NO.
MS1296639 AND APPLICANT HAS FAILED TO EXTEND SAID LETTER OF CREDIT OR PROVIDE A
REPLACEMENT LETTER OF CREDIT IN A FORM ACCEPTABLE TO YOU.

THIS LETTER OF CREDIT WILL NOT BE AUTOMATICALLY EXTENDED BEYOND THE FINAL
MATURITY DATE OF NOVEMBER 30, 2004.

DRAFT(S) MUST STATE: "DRAWN UNDER FLEET NATIONAL BANK STANDBY LETTER OF CREDIT
NO. MS1296639 DATED NOVEMBER 23, 2001."

THIS LETTER OF CREDIT IS TRANSFERABLE IN FULL AND NOT IN PART. ANY TRANSFER MADE
HEREUNDER MUST CONFORM STRICTLY TO THE TERMS HEREOF AND TO THE CONDITIONS OF
RULE 6 OF THE INTERNATIONAL STANDBY PRACTICES (ISP98) FIXED BY THE INTERNATIONAL
CHAMBER OF COMMERCE, PUBLICATION NO. 590.

SHOULD YOU WISH TO EFFECT A TRANSFER UNDER THIS CREDIT, SUCH TRANSFER WILL BE
SUBJECT TO THE RETURN TO US OF THE ORIGINAL CREDIT INSTRUMENT, ACCOMPANIED BY

CONFIDENTIAL
CSI0037332

PAGE:     3

THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: MS1296639

OUR FORM OF TRANSFER, PROPERLY COMPLETED AND SIGNED BY AN AUTHORIZED SIGNATORY
OF YOUR FIRM, BEARING YOUR BANKERS STAMP AND SIGNATURE AUTHENTICATION AND
SUBJECT TO YOUR PAYMENT OF OUR CUSTOMARY TRANSFER CHARGES OF 1/4 OF 1% MINIMUM
$200.00.

DRAFTS AND DOCUMENTS MUST BE PRESENTED AT OUR OFFICE ADDRESSED: FLEET NATIONAL
BANK, C/O FLEET PENNSYLVANIA SERVICES INC., 1 FLEET WAY, SCRANTON, PA 18507-
1999, ATTN: TRADE SERVICES DEPT. - STANDBY UNIT.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS LETTER OF CREDIT SHALL BE DULY HONORED UPON DUE PRESENTATION TO
US.

THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES (ISP98),
THE INTERNATIONAL CHAMBER OF COMMERCE, PUBLICATION NO. 590.

AUTHORIZED SIGNATURE

THIS DOCUMENT CONSISTS OF 3 PAGE(S).

CONFIDENTIAL
CSI0037333

# EXHIBIT 6

**Lycos:  Letter of Credit Requirement**

| Month | # | 24 Month | 36 Month | Combined | Declining Balance | Letter of Credit Amount |
|-------|---|----------|----------|----------|-------------------|-------------------------|
| Nov-01 | 1 | $14,299.85 | $0.00 | $14,299.85 | $12,330,776.45 | $11,000,000 |
| Dec-01 | 2 | $14,299.85 | $0.00 | $14,299.85 | $12,316,571.30 | $11,000,000 |
| Jan-02 | 3 | $14,299.85 | $0.00 | $14,299.85 | $12,302,460.22 | $11,000,000 |
| Feb-02 | 4 | $19,355.61 | $0.00 | $19,355.61 | $12,283,486.62 | $11,000,000 |
| Mar-02 | 5 | $19,355.61 | $0.00 | $19,355.61 | $12,264,638.67 | $11,000,000 |
| Apr-02 | 6 | $19,355.61 | $0.00 | $19,355.61 | $12,245,915.54 | $11,000,000 |
| May-02 | 7 | $19,355.61 | $0.00 | $19,355.61 | $12,227,316.41 | $11,000,000 |
| Jun-02 | 8 | $19,355.61 | $0.00 | $19,355.61 | $12,208,840.45 | $11,000,000 |
| Jul-02 | 9 | $20,597.86 | $0.00 | $20,597.86 | $12,189,308.90 | $11,000,000 |
| Aug-02 | 10 | $20,597.86 | $0.00 | $20,597.86 | $12,169,908.71 | $11,000,000 |
| Sep-02 | 11 | $20,597.86 | $0.00 | $20,597.86 | $12,150,633.00 | $11,000,000 |
| Oct-02 | 12 | $79,436.45 | $210,061.03 | $289,497.48 | $11,881,540.11 | $11,000,000 |
| Nov-02 | 13 | $79,436.45 | $210,061.03 | $289,497.48 | $11,614,229.30 | $11,000,000 |
| Dec-02 | 14 | $79,436.45 | $210,061.03 | $289,497.48 | $11,348,688.76 | $11,000,000 |
| Jan-03 | 15 | $97,360.14 | $333,258.78 | $430,618.92 | $10,956,320.85 | $11,000,000 |
| Feb-03 | 16 | $97,360.14 | $333,258.78 | $430,618.92 | $10,566,551.42 | $11,000,000 |
| Mar-03 | 17 | $97,360.14 | $333,258.78 | $430,618.92 | $10,179,363.23 | $11,000,000 |
| Apr-03 | 18 | $109,004.24 | $398,305.68 | $507,309.92 | $9,726,239.66 | $10,500,000 |
| May-03 | 19 | $109,004.24 | $398,305.68 | $507,309.92 | $9,276,116.91 | $10,500,000 |
| Jun-03 | 20 | $121,506.52 | $462,206.40 | $583,712.92 | $8,761,633.67 | $10,500,000 |
| Jul-03 | 21 | $121,506.52 | $462,206.40 | $583,712.92 | $8,250,557.61 | $9,250,000 |
| Aug-03 | 22 | $121,506.52 | $462,206.40 | $583,712.92 | $7,742,866.15 | $9,250,000 |
| Sep-03 | 23 | $121,506.52 | $462,206.40 | $583,712.92 | $7,238,536.89 | $9,250,000 |
| Oct-03 | 24 | $143,408.23 | $611,403.34 | $754,811.57 | $6,590,696.95 | $7,750,000 |
| Nov-03 | 25 | | $611,403.34 | $611,403.34 | $6,069,416.68 | $7,750,000 |
| Dec-03 | 26 | | $611,403.34 | $611,403.34 | $5,551,588.60 | $7,750,000 |
| Jan-04 | 27 | | $679,753.85 | $679,753.85 | $4,979,683.74 | $6,000,000 |
| Feb-04 | 28 | | $679,753.85 | $679,753.85 | $4,411,566.34 | $6,000,000 |
| Mar-04 | 29 | | $679,753.85 | $679,753.85 | $3,847,211.30 | $6,000,000 |
| Apr-04 | 30 | | $679,753.85 | $679,753.85 | $3,286,593.72 | $4,500,000 |
| May-04 | 31 | | $679,753.85 | $679,753.85 | $2,729,688.83 | $4,500,000 |
| Jun-04 | 32 | | $679,753.85 | $679,753.85 | $2,176,472.05 | $4,500,000 |
| Jul-04 | 33 | | $679,753.85 | $679,753.85 | $1,626,918.97 | $2,750,000 |
| Aug-04 | 34 | | $679,753.85 | $679,753.85 | $1,081,005.30 | $2,750,000 |
| Sep-04 | 35 | | $679,753.85 | $679,753.85 | $538,706.96 | $2,750,000 |
| Oct-04 | 36 | | $679,753.85 | $679,753.85 | ($0.00) | $1,000,000 |
| | | $1,420,177.13 | $10,924,899.17 | $12,345,076.30 | | |

CONFIDENTIAL
CSI0041662

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **LYCOS'S OPPOSITION TO CSI'S MOTION TO AMEND ITS COMPLAINT** |
|     Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|     Trustee Process Defendant | ) ) | |

CSI's Motion to Amend its Complaint (the "Motion to Amend") seeks leave to add four new counts emanating from CSI's contention that Lycos fraudulently induced CSI to enter into the Sales Agreement.[1]  In an effort to persuade the Court that the Motion to Amend, filed ten months into and ninety days before the end of fact discovery, was timely filed and that CSI was not dilatory in filing it, CSI claims that "newly discovered evidence" has "finally" given it a good faith basis to assert these counts.  CSI states: "This [Ms. Franklin's] testimony, combined with Mr. Kirk's testimony earlier this week that he did indeed send the August 8, 2003 'Phase II' email to Lycos on August 8, 2003, has *finally* created an unquestionable good faith basis, under Fed. R. Civ. P. 11, for the amendments that CSI is now seeking to add to its Complaint."

---

[1]  CSI has alleged claims for fraud, breach of the implied covenant of good faith and fair dealing, abuse of process, and violation of Chapter 93A. *See* Exhibit 1 to Motion to Amend.

Memorandum in Support of Motion to Amend ¶ 16 (emphasis added).[2]  This statement is simply

untrue.[3]  But the Court need not sift through competing affidavits and documents to sort out the

truth: it may rely exclusively on statements *made by CSI* in filings with this Court.

For example, in its Opposition to Lycos's Motion to File an Amended Counterclaim,

filed more than six months ago on May 2, 2006, CSI represented to the Court:

> The evidence also shows -- *unequivocally* -- that at the very moment it signed the
> Sales Agreement with CSI on August 8, 2003, Lycos and its consultant
> LeaseForum were conspiring in writing, in a plan they euphemistically referred to
> as "Phase II," to renege on the very lease payment obligations that Lycos was at
> the moment promising to make in the Sales Agreement, and were planning
> instead to try to force CSI into a "financial settlement" that would reduce those
> obligations.

Dkt. No. 64 at 3-4 (emphasis added).  Assuming CSI and its counsel had a good faith basis under

Rule 11 *six months ago* to represent to this Court that the evidence of Lycos's fraud based on

"Phase II" was "unequivocal," *a fortiori*, CSI's so-called "newly discovered evidence" could not

and did not "finally" create a good faith basis under Rule 11 for CSI to file the Motion to

Amend.  Indeed, as set forth more fully below, CSI has made the allegations concerning Lycos's

alleged "Phase II" fraud in at least *four* documents it filed with this Court between May and

September of this year.  These documents, signed by CSI's counsel under Rule 11, demonstrate

---

[2]  CSI's counsel repeated this statement virtually verbatim in his substantive affidavit filed under oath in support of the Motion to Amend.  However, rather than saying that the testimony has "finally created an unquestionable good faith basis, under Fed. R. Civ. P. 11, for the amendments that CSI is now seeking to add to its Complaint," CSI's counsel stated that the testimony "*is considered to have* finally created an unquestionable good faith basis, under Fed. R. Civ. P. 11, for the amendments that CSI is now seeking to add to its Complaint." Affidavit of Counsel ¶ 16 (Dkt. No. 106) (emphasis added).  Lycos will not speculate about the thinking of CSI's counsel in including the passive voice phrase "is considered to have" in his Affidavit but excluding it from the Memorandum.

[3]  CSI's misrepresentations in the Motion to Amend are more of the same—they just add to the litany of misrepresentations it has made to the Court throughout this case.  Lycos will not, however, address all of them here because they are not pertinent to disposition of the Motion to Amend.

unambiguously that the claimed "newly discovered evidence"[4] did *not* make the difference in satisfying Rule 11.[5] As such, the Motion to Amend should be denied as untimely.

CSI's Motion to Amend should also be denied because allowing it would be prejudicial to Lycos and because CSI filed it in bad faith. Indeed, CSI filed it on the second business day after Lycos served its Answers to Interrogatories, answers that apparently caused CSI to conclude that "the best defense is a good offense," even to the point of filing a Motion to Amend replete with misrepresentations and half-truths, and directly contradicting its prior statements to the Court.

## I.    CSI'S MOTION TO AMEND SHOULD BE DENIED BECAUSE IT IS UNTIMELY, PREJUDICIAL, AND FILED IN BAD FAITH

The First Circuit has held that although leave to amend should be freely given when justice so requires, this "does not mean that a trial court must mindlessly grant every request for leave to amend." *Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50, 57-58 (1st. Cir. 2006) (quoting Fed. R. Civ. P. 15(a)) (citations omitted). To the contrary, "[w]hen a proffered amendment comes too late, would be an exercise in futility, or otherwise would serve no useful purpose, the district court need not allow it." *Id.* Indeed, as a case progresses and the issues are

---

[4] In fact, as set forth in footnote 11 hereof, some of the claimed "newly discovered evidence" is not "new," and the rest of it does not, on its face, have anything to do with CSI's "Phase II" claims.

[5] Rule 11 provides that an attorney who signs or files a written motion or other paper with the Court certifies that, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . ." It therefore follows that CSI's counsel was obliged to have a good faith basis when it alleged to the Court in four prior submissions that Lycos had embarked upon a "secret" and "covert" scheme with LeaseForum to negotiate a settlement with CSI as of the very day it signed the Sales Agreement and that Lycos had admitted to this very contention in its deposition in late April 2006. If CSI's counsel had a good faith basis on which to make those assertions in the past, then its contention that it only recently obtained a good faith basis to make these claims now is necessarily erroneous. On the other hand, if CSI continues to maintain that it only recently obtained a good faith basis to satisfy its Rule 11 obligations in asserting the proposed claims, then it must follow that CSI's counsel violated his Rule 11 obligations in CSI's prior filings. CSI cannot have it both ways. At a minimum, it either deceived the Court before or it is deceiving the Court now. Frankly, given the current record, Lycos does not believe CSI had a good faith basis to assert these claims before or now. *See* Part "C", *infra.*

- 3 -

joined, the burden on a claimant seeking to amend a claim "becomes more exacting." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). Where, as here, fact discovery has been ongoing for ten months and is less than ninety days from completion,[6] the standard for amendment based on new facts is high. *Id.*

### A.    CSI'S Motion to Amend Should be Denied Because It is Untimely and CSI Has Offered No Valid Reason for Delay.

In its Motion to Amend, CSI, apparently anticipating Lycos's opposition to its Motion, argues that it "is not in *any way* guilty of delay, bad faith, or dilatory conduct."[7] Memorandum at 2 (emphasis added). This contention, however, is directly contradicted by CSI's own previous filings with this Court. Not only did CSI first assert, without any qualification or hesitation whatsoever, its so-called "Phase II fraud" claims in its May 2, 2006 filing with this Court (as quoted, in part, above), but it repeated those allegations in at least three subsequent filings with the Court between July and September of this year. Specifically, in its Memorandum of Law in Support of its Motion to Compel Enforcement of Subpoenas to LeaseForum, filed more than three months ago on July 17, 2006, CSI represented to the Court that:

> In its Rule 30(b)(6) deposition in this matter, Lycos *clearly admitted* that, on the day it signed the Sales Agreement with CSI, it embarked (with LeaseForum's assistance) on 'Phase 2' which was designed to negotiate further reductions in those lease payments being affirmed and to eventually seek a 'cash settlement or payment by CSI to Lycos.' *See* Deposition of Lycos dated April 26, 2006 ('Lycos Dep.') at 183:21-187:9; 194:5-197:7; 207:13-24.

Dkt. No. 80 at 9 (emphasis added).

---

[6]  *See* Dkt. Entry on January 10, 2006 setting January 31, 2007 as the "tentative" date for completion of fact discovery. The undersigned recalls that the date was tentative because CSI had requested that date and Lycos had requested October, 2006 as the date for completion of fact discovery. Thus, the deadline was "tentative" because the time for discovery was subject to being shortened.

[7]  Indeed, CSI's Motion to Amend reads more like a reply than a moving paper, as it repeatedly argues in the defensive rather than the affirmative. Lycos believes this is telling of CSI's lack of good faith basis in bringing this Motion in the first place.

That same day, CSI wrote in its Memorandum of Law in Support if its Cross-Motion to

Dismiss or, Alternatively to Compel:

> The evidence also shows – unequivocally – that *at the very moment* it signed the
> Sales Agreement with CSI on August 8, 2003, Lycos and its leasing consultant
> and "expert" Leaseforum, Inc. *were conspiring in writing,* in a plan they
> euphemistically referred to as "*Phase II*," to renege on the very lease payment
> obligations that Lycos was at that moment promising to make in the Sales
> Agreement, and were planning instead to try to force CSI into a "financial
> settlement" that would reduce those obligations.

Dkt. No. 79 at 3 (emphases in original).

Most recently, in its Reply Status Memorandum, filed with the Court on September 29,

2006, CSI represented that:

> Discovery has revealed, however, that [Lycos's] 'fraud' claims have been
> manufactured – in accordance with the 'Phase II' plan discussed by Leaseforum
> and Lycos officials in August of 2003, see Exhs. 5-6 hereto – to coerce CSI into a
> 'settlement' that would reduce Lycos' Lease payment obligations under the Sales
> Agreement.

Dkt. No. 101 at 7.[8]

Assuming CSI and its counsel believed when it represented to the Court that (a) the

evidence in support of Lycos's supposed conspiracy to renege on its lease payment obligations at

the very moment it was reaffirming its commitment to make such payments in the Sales

Agreement was "unequivocal" as of May 2, 2006, (b) Lycos had "clearly admitted" the Phase II

scheme in its April 26, 2006, 30(b)(6) deposition, and (c) the cited pages from the transcript of

---

[8]  The same CSI attorney who signed the Motion to Amend, and the Memorandum and Affidavit filed in support of
the Motion to Amend, signed the Memorandum of Law in Support of its Motion to Compel Enforcement of
Subpoenas to LeaseForum and the Reply Status Memorandum. *Compare* Dkt. Nos. 104, 105, and 106 with Dkt.
Nos. 80 and 101.

that deposition evidenced that scheme,[9] then CSI and its counsel must have had a good faith

basis for seeking to amend its complaint six months ago.  Thus, it necessarily follows that CSI's

contention in the Motion to Amend that "newly discovered evidence" "finally created" a good

faith basis under Rule 11 is false.[10]

Where, as here, considerable time has elapsed between the filing of the complaint and the

motion to amend, CSI has the burden of showing some valid reason for its neglect and delay.

*Resnick v. Copyright Clearance Center, Inc.*, 252 F. Supp. 2d 252, 255 (Zobel, J.) (D. Mass.

2006) (citing *Acosta-Mestre v. Hilton In't. of P.R.*, 156 F.3d 49, 52 (1st Cir. 1998).  This Court in

*Resnick* denied the motion to amend where no reason for the neglect and delay had been offered

by the moving party.  *Id.*  As demonstrated above, CSI has affirmatively offered what may

generously be described as an "inaccurate" reason for its undue delay: alleged "newly discovered

evidence" that just now gave rise to a good faith basis under Rule 11.  Because, as shown above,

CSI's claimed justification of "newly discovered evidence" as a basis for bringing its Motion is

plain false, CSI has offered no *valid* reason for its six-month delay and has therefore failed to

sustain its burden.  *See id.* (citing *Acosta-Mestre*).  Accordingly, with less than ninety days to go

---

[9]  In fact, far from "clearly admitting" in its April 26 deposition the existence of a Phase II conspiracy as of August 8, 2003, Lycos *unequivocally* denied that allegation.  CSI's counsel asked: "Q. And you knew as of the time that Lycos signed Exhibit 23A in August 2003, that even though Lycos had specifically agreed to make all the lease payments described in that agreement, you knew that LeaseForum was going to try and negotiate a way out of it for Lycos, correct?"; Lycos's response was: "A. No." *See* excerpts from Lycos's 30(b)(6) deposition transcript, true and correct copies of which are attached hereto as *Exhibit 1* at 205, lines 11-19. Lycos's witness, then Assistant Controller Julie Callagee, further clarified that she had no authority in August, 2003 to enter into such an agreement on behalf of Lycos and that Brian Lucy, the Chief Financial Officer and the person who actually signed the Sales Agreement and whose approval would have been necessary to enter any arrangement with LeaseForum, was not in agreement with Mr. Kirk's proposed commencement of a "Phase II" as of August 8, 2003. *Id.* at e.g., 242, beginning at line 22 through page 243, line 21.

[10]  That is, unless CSI's counsel admits that it violated Rule 11 in signing the four memoranda it filed between May and September. Even if that unlikely event were to occur, CSI should not be permitted to benefit from its misdeeds.

in fact discovery and more than thirteen depositions having been taken, the Motion to Amend

should be denied as untimely.[11]

> **B.** **CSI'S Motion to Amend Should be Denied Because, as CSI**
> **Argued in Response to Lycos's Motion to Amend, an Amendment that**
> **Would Require New Fact Discovery Would be Prejudicial at this Stage**
> **of the Litigation.**

CSI further contends, in its apparent belief that neither the Court nor Lycos would recall

its prior filings, that "these amendments will cause no undue prejudice to Lycos" because "no

definite discovery deadline has yet been set – only a tentative date of January 31, 2007, more

than three months away," Lycos "has only taken four (4) depositions" thus far, and "considerable

discovery by both sides remains to be accomplished."[12] Memorandum at 3-4. Yet, more than six

---

[11] CSI identifies in its Memorandum the so-called "new" evidence that finally created the good faith basis for its new claims: Ms. Franklin's testimony concerning a certain spreadsheet and conversations she had with Lycos concerning the impact of certain roll-ups and Mr. Kirk's admission that he sent a certain email on August 8, 2003. Memorandum ¶¶ 15-16. None of this alleged "new evidence" adds anything to CSI's claims, and certainly would not give rise to a sudden good faith basis if one did not previously exist. As for Mr. Kirk's admission that he sent the August 8 email, CSI concedes earlier in the Memorandum that Julie Callagee (Lycos's 30(b)(6) designee) admitted during Lycos's April 26, 2006 deposition that she had received the August 8, 2003 e-mail from Mr. Kirk. *Id.* ¶¶ 7, 9. That alone would be a sufficient basis to authenticate the email. That Mr. Kirk also admitted during his deposition that he "sent" the e-mail adds nothing to this purported admission for purposes of creating a good faith basis, if any. If anything, as the instant dispute is between Lycos and CSI, Ms. Callagee's alleged admission that she *received* the email is more helpful to CSI's case than Mr. Kirk's admission that he *sent* it. As to the former, not only does CSI not connect Ms. Franklin's supposed admissions to the so-called "Phase II," but Lycos has never disputed that Ms. Franklin began to analyze the CSI-Lycos lease relationship in connection with her negotiation of the buyout of those leases from CSI. In fact, Ms. Franklin negotiated the buyout price directly with CSI back in June-July 2003. Her work in that regard was no *secret.* Thus, even if CSI had *not* repeatedly represented to this Court in several filings since May that the evidence of Lycos's Phase II wrongdoing was "unequivocal," CSI has failed to demonstrate how these two supposedly "new" pieces of evidence "finally created" a good faith basis for its claims.

[12] In addition, apparently attempting to imply that Lycos was somehow dilatory in its production, CSI notes, in bold italics no less, that Lycos "has just produced to CSI, within the last ten days, 42,000 responsive electronic files concerning the issues in this case which have been sought for months . . . ." Memorandum at 4. Consistent with its unabashed willingness to mislead the Court throughout this case, CSI has failed to inform the Court that: (1) the newly-produced documents to which it refers are documents from back-up tapes of Lycos that Lycos restored voluntarily, without obligation to do so; (2) CSI initially swore under oath in Answers to Interrogatories that it had no relevant back-up tapes, but subsequently admitted that it *did* have at least one potentially relevant back-up tape; (3) the parties mutually agreed on a date certain to exchange all documents restored from back-up tapes, and the parties did in fact produce such documents on the same day; and (4) Lycos produced 42,000 pages in comparison to 1,200 pages produced by CSI. Thus, any suggestion by CSI that Lycos was somehow dilatory in its production is disingenuous. A true and correct copy of a mid-October e-mail exchange discussing the mutual exchange is attached hereto as *Exhibit 2.*

(continued…)

months ago, CSI argued to this Court in response to Lycos's Motion for Leave to File Second

Amended Answer and Counterclaim -- a motion the Court denied --

> While Lycos argues that its proposed amendment is timely, this is far from accurate. The parties have already brought dispositive motions, including a motion for summary judgment, and discovery in this case is *well underway* and *must* be completed by January 31, 2007. The parties are now in the thick of discovery and have already exchanged thousands of pages of documents. Further, CSI has already taken the 30(b)(6) deposition of Lycos and Lycos has taken the deposition of *one* of CSI's key employees, Jeffrey Rousseau. As such, it would be *burdensome for CSI* to have to respond to four new claims at this point in the case.

CSI's Opposition to Lycos's Motion for Leave to File Second Amended Answer and

Conterclaim (Dkt. No. 64) at 17-18 (emphasis added).[13]  If it would have been burdensome for

CSI to respond to four new claims approximately six months ago at a time when CSI and Lycos

had each taken only one deposition, it would be even more "burdensome" for Lycos to have to

respond to CSI's four new claims now when Lycos has already deposed five and is in the middle

of deposing a sixth CSI employee, and has cross-examined witnesses in two third-party

depositions taken by CSI, including one in California.  That CSI has offered to permit Lycos to

re-question prior witnesses[14] is an implicit admission that Lycos would be burdened with re-

deposing these witnesses. *See Acosta-Mestre,* 156 F.3d at 51 (when allowing amendment will

prejudice other party by causing further delay in the proceeding and require them to incur

---

Similarly, CSI notes that Lycos "only last week" answered CSI's contention interrogatories, after being granted 'several' extensions of time . . . ."  The latter statement is also a falsity.  CSI did not propound the subject interrogatories until September 11, 2006.  Lycos requested *one* extension of time until October 25, 2006.  A true and accurate copy of the e-mail exchange in which CSI's counsel granted Lycos's request for an extension is attached hereto as *Exhibit 3*.  Lycos served its answers to interrogatories on that date. *See* Exhibit 2 to Reply Memorandum in Support of Computer Sales International, Inc.'s Motion to Exceed Ten Depositions (Dkt. No. 109) at 28.

[13]  Consistent with past practice, CSI throws out arguments irrespective of whether it has argued or represented just the opposite in the past – its strategy appears to be whatever suits its then current position.

[14]  Memorandum at 3.

- 8 -

additional discovery costs denying leave to amend is appropriate), *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983) (denying motion to amend where amendment would have required additional discovery and placed additional burden on non-moving party).   Thus, in accordance with CSI's own argument many months ago, the Motion to Amend should be denied as unduly prejudicial to Lycos. *Id.*

### C.    CSI's Motion to Amend Should be Denied because it was Filed in Bad Faith.

When a motion to amend a complaint is filed in bad faith it must be denied. *See, e.g.,* Fed. R. Civ. P. 15(a) (2006); *Foman v. U.S.*, 371 U.S. 178, 182 (1962); *see generally*, Wright, Miller & Kane, *Federal Practice and Procedure* § 1487 (2006) (discussion of bad faith). CSI's bad faith is evident in at least three respects.

First, although CSI apparently had a good faith basis for *repeatedly* alleging as early as May 2, 2006 that Lycos and LeaseForum had "conspired" with respect to "Phase II" before execution of the Sales Agreement, CSI waited until October 30, 2006 to file the Motion to Amend.  It made this filing on the second business day after receiving Lycos's Answers to Interrogatories.  Those answers set forth in detail some of the evidence forming the factual bases for Lycos's claims and damages in this case. *See* Exhibit 2 to Reply Memorandum in Support of Computer Sales International, Inc.'s Motion to Exceed Ten Depositions (Dkt. No. 109), Responses to Interrogatories 1 and 2.  Apparently concerned about its exposure in light of the detailed acts of fraud described in those answers, and believing that the "best defense is a good offense," CSI decided, several months after advising this Court that Lycos had "clearly admitted" its fraud with LeaseForum, to file the Motion to Amend.  As noted above, that Motion and the accompanying Affidavit of counsel unfortunately contain statements under Rule 11 and under oath that directly contradict the representation implicit in each of the four previous papers

- 9 -

CSI filed with the Court: that CSI and its counsel had a good faith basis for making the assertions in those filings at the time they made them. That is the epitome of bad faith.

Second, CSI represents that it "has aggressively pursued the discovery of the relevant facts on this issue over the last six months and has in no way delayed in gathering all of the relevant pieces of information necessary" in support of its new claims. *E.g.*, Memorandum ¶ 16; *see also id.* at 2-3. It argues further that the "new evidence" that gave rise to the "unquestionable good faith basis" under Rule 11 for filing the Motion to Amend included the deposition testimony of John Kirk. *Id.* Again, these statements are at best "inaccurate."

At his deposition, CSI's counsel asked Mr. Kirk to admit that he authored and sent the August 8, 2003 email to Julie Callagee, then Assistant Controller of Lycos. Mr. Kirk admitted that he did send that e-mail. Yet, contrary to counsel's representation to the Court that he "aggressively pursued the discovery of the relevant facts on this issue . . . and has in no way delayed in gathering all of the relevant pieces of information necessary," counsel inexplicably and seemingly intentionally avoided *even a single follow-up question* of Mr. Kirk concerning the substance of his e-mail. For example, counsel did not ask whether the statements contained in the e-mail were true, what Mr. Kirk meant by the phrase "Phase II," or whether there was any agreement between Lycos and LeaseForum as of August 8, 2003 to seek to force CSI into a financial settlement to reduce Lycos's remaining lease payments. *See* excerpts from the transcript of Mr. Kirk, attached hereto as *Exhibit 4*. Similarly, in its deposition of Susan Franklin, a principal of LeaseForum and the person who ultimately conducted the review of Lycos's leases with CSI, counsel for CSI again failed to ask a single question about LeaseForum's alleged agreement with Lycos as of August 8, 2003 to seek concessions from CSI. Therefore, as the record now stands, the only testimony elicited by CSI on this point thus far is

- 10 -

the uncontradicted denials of Lycos's 30(b)(6) deponent, Ms. Callagee, taken in April 2006. *See*

n. 9, *supra*. Thus, CSI's claim that it has pursued discovery "aggressively" on this point is

without merit.

Finally, the substance of CSI's fraud claim itself does not even pass the "red face" test,

never mind the good faith threshold necessary to file such a claim. Although there are numerous

reasons why CSI's proposed claims lack any rational basis, the following are the most salient:

- As a threshold matter, the Master Equipment Lease contains a "hell or high water" clause that CSI has argued in this case required Lycos to make all monthly lease payments "come hell or high water." *See* Complaint ¶ 7 and Exhibit 1 thereto at 2, Art. 5. Thus, in CSI's view, regardless of Lycos's entry into the Sales Agreement or any attempt to negotiate a reduction in rent, Lycos was obligated to pay the monthly rent. Indeed, CSI argued to this Court that Lycos was required to pay monthly rents notwithstanding CSI's fraud. *See, e.g.,* Memorandum in Support of Motion to Dismiss Defendant Lycos Inc.'s Counterclaim (Dkt. No. 16) at 3, 18.

- After executing the Sales Agreement, Lycos paid CSI all but approximately $300,000 of the more than $8 million in remaining lease payments over the following year. What a great "fraud" plan! Pay millions of dollars of payments for fourteen months after signing the Sales Agreement and then stop making payments when only $300,000 is owed. CSI's position is silly.

- Perhaps most damning to CSI's proposed claims is that, in November, 2001, nearly two years before entering into the Sales Agreement, Lycos caused Fleet Bank, at CSI's demand, to issue an $11,000,000 declining letter of credit for the benefit of CSI to secure Lycos's monthly rent obligations to CSI. A true and accurate copy of that letter of credit is attached hereto as *Exhibit 5*. According to a schedule prepared by CSI comparing the amount available under the letter of credit with the aggregate rent due as of particular dates, at the time the Sales Agreement was signed, the amount of $9,250,000 available under the letter of credit exceeded the $8,250,557.61 remaining rent due by Lycos under the equipment schedules. *See id.*; *see also* the schedule maintained by CSI, a true and accurate copy of which is attached hereto as *Exhibit 6*. In other words, CSI argues that Lycos intended to negotiate a reduction in the amount owed when CSI had available to it a letter of credit exceeding the amount owed if Lycos defaulted under its lease obligations. Thus, even if Lycos desired to negotiate a reduction in its lease payment obligations, it had no leverage to do so. This case is a prime example. Lycos stopped payment on the last $300,000 worth of payments to CSI as a result of the discovery of clearly fraudulent conduct by CSI, and CSI not only ignored Lycos's findings altogether, but it brought an immediate collection action and attached Lycos's assets under the letter of credit. CSI cannot begin to

- 11 -

reconcile its apparent belief that Lycos was so naive with its repeated characterizations of Lycos as a sophisticated, multi-national corporation.

CSI's Motion to Amend, having been filed in bad faith, must be denied.

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1.    Denying the Motion to Amend; and

2.    Granting Lycos such other relief as may be appropriate and just.

LYCOS, INC.

Dated: November 13, 2006

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

- 12 -

**CERTIFICATE OF SERVICE**

I, Peter M. Acton, Jr., hereby certify that on this 13th day of November, 2006, I caused a true and correct copy of the foregoing document to be served by electronic mail and first-class mail, postage pre-paid, on the following:

Robert J. Kaler
Edward W. Little, Jr.
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
rkaler@mccarter.com
elittle@mccarter.com

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr

- 13 -