UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **ANSWER TO CSI'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM OF LYCOS, INC.** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
| Trustee Process Defendant | ) | |

Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") responds to the numbered paragraphs of the complaint as follows:

1.       Lycos admits that its primary business is providing internet access, and that it has a principal place of business in Waltham, Massachusetts.  The remaining allegations in this paragraph are characterizations of plaintiff's complaint as to which no response is required.  To the extent a response is required, the remaining allegations in this paragraph are denied.

2.       Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.       Admitted.

4.       Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.     This paragraph states a legal conclusion as to which no response is required.

6.     This paragraph states a legal conclusion as to which no response is required.

7.     Lycos admits that plaintiff is in the business of leasing equipment.  Lycos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 7.

8.     Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.     Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.     Admitted, except that Lycos does not admit that the terms and conditions governing CSI's lease of equipment are accurately  "described in relevant part below."  Lycos states that the documents evidencing the terms and conditions governing Computer Sales International, Inc.'s (n/k/a CSI Leasing, Inc.) ("CSI") lease of equipment speak for themselves.

11.     Lycos admits the first sentence.  Lycos is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence.

12.     Admitted.

13.     Admitted.

14.     Lycos admits that a true and accurate copy of Equipment Lease 100 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule One Hundred attached thereto.  Lycos states that Equipment Lease 100 speaks for itself.

15.     Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 100.

- 2 -

16.    Lycos admits that a true and accurate copy of the Certificate of Acceptance for Equipment Lease 100 is attached to plaintiff's complaint, and states that the Certificate of Acceptance speaks for itself.

17.    Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 100 from the plaintiff in the amount of $6,082.29, and that it has paid all of these invoices through the October, 2004 invoice.  Lycos denies the remaining allegations contained in this paragraph.

18.    Lycos admits that it received invoices under Equipment Lease 100 from the plaintiff for the months of November and December of 2004 each in the amount of $6,082.29 and that true and accurate copies of these invoices are attached to plaintiff's complaint.  Lycos states that these invoices speak for themselves.  Lycos denies the remaining allegations contained in this paragraph.

19.    Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

20.    Admitted.

21.    Lycos admits that a true and accurate copy of Equipment Lease 200 is attached to plaintiff's complaint, except that Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the First Amendment to Equipment Schedule Two Hundred attached thereto.  Lycos states that Equipment Lease 200 speaks for itself.

22.    Lycos admits that both it and plaintiff executed a Certificate of Acceptance for Equipment Lease 200.  Lycos denies the remaining allegations contained in this paragraph.

BST99 1525729-3.057077.0012

23.     Lycos is without knowledge or information sufficient to form a belief as to the authenticity of the Certificate of Acceptance for Equipment Lease 200 that is attached to plaintiff's complaint.  Lycos states that the Certificate of Acceptance speaks for itself.

24.     Lycos admits that, starting in 2002, it began to receive monthly invoices under Equipment Lease 200 from the plaintiff in the amount of $43,954.35, and that it has paid all of these invoices through the October, 2004 invoice.  Lycos denies the remaining allegations contained in this paragraph.

25.     Lycos admits that it received invoices under Equipment Lease 200 from the plaintiff for the months of November and December of 2004 each in the amount of $43,954.35 and that true and accurate copies of these invoices are attached to plaintiff's complaint.  Lycos states that these invoices speak for themselves.  Lycos denies the remaining allegations contained in this paragraph.

26.     Lycos admits that it has refused to pay these invoices despite several written demands from the plaintiff, but denies that it is without justification or legal excuse for so refusing, and denies the remaining allegations contained in this paragraph.

27.     Lycos admits that it received a notice of default from the plaintiff dated December 8, 2004, and that a true and accurate copy of the notice of default is attached to plaintiff's complaint.  Lycos denies the remaining allegations contained in this paragraph.

28.     Lycos states that the notice of default speaks for itself.

29.     Lycos admits that it did not respond to plaintiff's notice of default, and that it continued to refuse to pay the demanded amounts, but states that it had justification and legal excuse for so refusing.  Lycos admits that it received a notice of event of default from the plaintiff dated December 23, 2004, and that a true and accurate copy of the notice of event of

- 4 -

default is attached to plaintiff's complaint.  Lycos denies the remaining allegations contained in this paragraph.

30.     Lycos states that the notice of event of default speaks for itself, although Lycos denies that plaintiff's actions with respect thereto have been "proper" or "appropriate," or that plaintiff has any amount of money "due and owing" from Lycos.

31.     Denied.

## COUNT I
### (Breach of Master Lease and Equipment Schedules)

32.     Lycos repeats and incorporates by reference its responses to paragraphs 1 through 31.

33.     Denied.

34.     Denied.

35.     Denied.

## COUNT II
### (Breach of Sales Agreement)

36.     Lycos repeats and incorporates by reference its responses to paragraphs 1 through 35.

37.     The first sentence is denied.  The second sentence is denied except that a true copy of a sales agreement dated July 15, 2003 is attached as Exhibit 10 to CSI's Amended Complaint.

38.     Lycos states that the sales agreement the parties entered into speaks for itself.

39.     Denied.  Answering further, Lycos states that the sales agreement the parties entered into speaks for itself.

40.     Denied.

41.    Denied.

## COUNT III
## (Fraud)

42.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 41.

43.    Denied.  Answering further, Lycos states that the sales agreement speaks for itself.

44.    Denied except that Lycos admits that John Kirk sent an e-mail to Julie Callagee dated August 8, 2006.

45.    Denied.

46.    Denied.

## COUNT IV
## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

47.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 46.

48.    Denied.

49.    This paragraph states a legal conclusion to which no answer is required.  To the extent it asserts factual allegations to which a response is required, such allegations are denied.

## COUNT V
## (Abuse of Process)

50.    Lycos repeats and incorporates by reference its responses to paragraphs 1 through 49.

51.    Denied.

52.    Denied.

- 6 -

53.     This paragraph states a legal conclusion to which no answer is required.  To the extent it asserts factual allegations to which a response it required, such allegations are denied.

## COUNT V
## (M.G.L. c. 93A)

54.     Lycos repeats and incorporates by reference its responses to paragraphs 1 through 53.

55.     This paragraph states legal conclusion to which no answer is required.  To the extent it asserts factual allegations to which a response is required, such allegations are denied.

## AFFIRMATIVE DEFENSES

Lycos incorporates by reference the allegations of its counterclaim, set forth below, in support of each of the following affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff is equitably estopped from recovering on its claims.

### THIRD AFFIRMATIVE DEFENSE

Lycos is entitled to recoupment or setoff of all amounts claimed by plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own fraud.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own negligent and intentional misrepresentations.

BST99 1525729-3.057077.0012

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims under Counts III-VI are barred by the statute of limitations.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail to state a claim upon which relief may be granted.

## LYCOS'S COUNTERCLAIM

## NATURE OF THE ACTION

1.      This counterclaim seeks to redress a pattern and practice of misconduct committed by Computer Sales International, Inc. (n/k/a CSI Leasing, Inc.) ("CSI") with respect to equipment leases it entered into with Lycos, Inc. ("Lycos").  CSI, which claims to be one of the largest independent information technology leasing companies in the world, took advantage of its long-standing relationship with Lycos, an Internet start-up company inexperienced and unsophisticated in equipment leasing, to obtain millions of dollars in undeserved profit.  CSI intentionally and negligently misrepresented facts, made partial and misleading statements, and failed to disclose certain material features of its lease agreements with Lycos, leading Lycos to pay more than 168% of the original cost of the equipment leased by Lycos from CSI.

2.      CSI accomplished its ends using a method of "rolling up" and "rewriting" equipment leases in a fraudulent and deceptive manner.  CSI concealed this practice through affirmative misrepresentations, partial disclosures, and omissions of material facts that CSI was obligated to disclose to Lycos under accepted industry standards and guidelines, common law, and the Attorney General's regulations promulgated pursuant to Massachusetts General Laws c. 93A, § 2(c), 940 C.M.R. 3.05(1) and 3.16(2).  This "roll-up" and "rewrite" scheme recast active equipment leases as longer term leases with lower monthly payments, something which, on its face, was beneficial to Lycos.  Yet, these "rolled-up" and "rewritten" leases contained

undisclosed and non-negotiated mark-ups that had the effect of dramatically increasing Lycos's cost to a total amount not only well-in-excess of the cost of the equipment plus imputed interest, but also the cost of the equipment if Lycos had not refinanced, while eliminating CSI's residual risk in the equipment and making CSI an exorbitant profit. As a result of CSI's "roll-up" and "rewrite" scheme, Lycos unwittingly paid rent of more than $72 million on leases of equipment costing less than $46 million. CSI, on the other hand, realized a return on equity of approximately double its customary rate, while its account executive for Lycos procured millions of dollars n in commissions on the Lycos account alone.

3.       CSI also effectively charged Lycos interest of several hundred percent on two particular equipment schedules referred to by CSI and Lycos as Schedules 93 and 94. In late 2001, at the suggestion of CSI, Lycos agreed to "roll over" the equipment from approximately fifteen equipment lease schedules onto two schedules, one twenty-four months in length (Schedule 93) and the other thirty-six months in length (Schedule 94). At the time the equipment rolled over onto these schedules, Lycos had leased that equipment for at least thirty-six months and, in some cases, for more than five years. Accordingly, the value of that equipment at the time of the rollover was a tiny fraction of its original cost and its remaining economic life was shorter than the length of Schedules 93 and 94. As a result of the foregoing and the fact that, among other factors, Lycos did not have the right to return the equipment without paying the discounted present value of the remaining lease payments, Schedules 93 and 94 were, as a matter of law, "loans and security agreements" rather than "true leases." The amount Lycos paid in interest on the principal amount loaned by CSI on Schedules 93 and 94 was therefore usurious in violation of M.G.L. c. 271, § 49.

4.     In or about July, 2003, Lycos entered into a Sales Agreement pursuant to which it agreed to pay CSI $3.775 million to purchase the equipment on the extant equipment schedules – which then had de minimis value according to CSI – subject only to making the remaining lease payment.  To the extent there was any doubt before entry into the Sales Agreement whether Schedules 93 and 94 were loans and security agreements, the Sales Agreement eliminated that doubt.

5.     To redress CSI's well-orchestrated pattern and practice of misconduct, Lycos seeks, among other things:

A.     declarations that (i) it has no obligation to pay any further amounts to CSI under the outstanding equipment schedules between Lycos and CSI, and (ii) that Lycos is the owner of the leased equipment;

B.     recovery of overpayments it made as a result of CSI's wrongful and tortious conduct in an amount to be determined at trial, but in no event less than $14,200,000, plus interest and costs; and treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2 and 11; and

C.     With respect to Schedules 93 and 94:

(1)  Declarations that

(a)     those schedules each evidence a "loan and security agreement" rather than a "true lease"; and

(b)     Massachusetts law applies to Lycos's usury claims;

(2) avoidance of Schedules 93 and 94 as a result of CSI's imposition of an usurious interest rate, and entry of an order requiring CSI to repay Lycos amounts paid pursuant

- 10 -

to those schedules, plus interest and costs; and

(3) treble damages and reasonable attorneys' fees and costs arising from CSI's willful and intentional deceptive acts and practices – violation of M.G.L. c. 271, § 49, regulations promulgated by the Attorney General under chapter 93A, and charging an usurious interest rate – in violation of M.G.L. c. 93A, §§ 2 and 11.

## PARTIES

6.      Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

7.      Defendant Computer Sales International, Inc. (n/k/a CSI Leasing, Inc.) is a Delaware corporation qualified to do business in the Commonwealth with a place of business at 197 First Street, Needham, Massachusetts 02494.

## JURISDICTION

8.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

9.      This Court has personal jurisdiction over CSI under M.G.L. c. 223A, § 3 because CSI transacts business in the Commonwealth.

## FACTS

### *Lycos's Computer Equipment Leases With CSI*

10.     In December of 1996, Lycos and CSI entered into a master lease agreement for the lease of technology assets, including computer equipment.  A true copy of this master lease agreement is attached hereto as Exhibit A (the "Master Lease Agreement").

11.     Between December of 1996 and January of 2002, Lycos and CSI entered into approximately one hundred and twenty-five equipment schedules for the lease of technology

- 11 -

equipment under the Master Lease Agreement.  The equipment schedules concerned more than 5500 pieces of computer equipment.  According to the Master Lease Agreement, each equipment schedule represented a separate and independent lease, incorporating by reference all terms contained in the Master Lease Agreement and adding certain additional terms, such as the specific equipment leased, the lease expiration dates, and the monthly lease rental payments due to CSI by Lycos.

12.    Some of the equipment schedules were written as 24-month leases; others were written as 36-month leases.  Still others were written originally as 24-month leases, then quickly "rewritten" onto new schedules with a total of 36-month terms.

13.    The locus of the parties' lease relationship was in Massachusetts.  Specifically, among other things:

A.    Discussions between CSI's account executive and Lycos concerning the equipment schedules occurred in Massachusetts;

B.    Lycos signed the Master Lease Agreement and the equipment schedules in Massachusetts;

C.    Lycos took delivery of the equipment directly from the vendors in Massachusetts, such that CSI did not take possession of the equipment before it was delivered to Lycos;

D.    Lycos possessed the great majority of the equipment in Massachusetts;

E.    Lycos made payments to CSI with respect to the equipment schedules from Massachusetts; and

F.    Lycos and CSI maintain offices in Massachusetts.

*CSI Gains the Trust of Lycos Personnel*

14.     CSI's account representative for Lycos, Paul Stenberg, operated out of an office in Needham, Massachusetts.  He communicated regularly with Lycos personnel in Waltham, Massachusetts, during the course of the parties' approximately seven-year business relationship. With Mr. Stenberg as the lone constant in the parties' relationship over time (Lycos personnel changed many times during the relationship), that relationship evolved into what Lycos considered to be a collegial business association and leasing partnership.  Lycos and Mr. Stenberg interacted on a social as well as business level.  Such social interaction between Lycos personnel and Mr. Stenberg included golf outings, dinners, concerts and sporting events.

15.     Through his professional and social interactions with Lycos employees, Mr. Stenberg sought to gain Lycos's trust, confidence, and dependency.  He succeeded.  When each new Lycos employee took over responsibility for equipment leasing, that person entered a long-entrenched, ongoing relationship that appeared to be friendly and trustworthy.

16.     Indeed, Lycos's personnel even reposed confidence in Mr. Stenberg's integrity with respect to the execution of equipment schedules.  Mr. Stenberg and CSI desired this result and voluntarily assumed and accepted such confidence.  Lycos's placement of its trust in CSI, and CSI's acceptance thereof, was reasonable under the circumstances, particularly given CSI's role vis-à-vis lessees (as demonstrated on its website), as well as its superior knowledge and expertise with respect to the complicated equipment lease transactions involved in this case.

17.     CSI's efforts to have its account executives gain the trust, confidence, and dependency of its customers was not unique to Mr. Stenberg.  CSI promotes itself as much more than just a financing resource for its customers.  It claims to be a full-service lease administrator and solution provider, and "partner" in leasing.  CSI has written on its web-site, from time –to-time:

A.      "For 34 years, CSI Leasing has been helping companies implement leasing solutions that reduce the costs, risks and hassles of using technology equipment."

B.      "Led by your Account Executive and Lease Administrator, your service team will work with you one-on-one to handle the details, learn your preferences, and answer the phone when you call."

C.      "Our customers trust CSI to manage the leasing process efficiently and ethically, while catering to their own unique needs."

D.      "At CSI, we understand the importance of developing strong business relationships and adding real value to those relationships with creativity, consistency and true leasing expertise. Our foundation of superior customer service and strong financial resources allow us to implement customized leasing arrangements for virtually any computer and networking project."

18.     Notwithstanding Lycos's trust and confidence in CSI, and CSI's acceptance of this trust and confidence, CSI took advantage of its position for CSI's own benefit and to Lycos's detriment through a complicated and wrongful scheme of "roll ups" and "rewrites" of its equipment schedules with Lycos.

### CSI's "Rolling Up" and "Rewriting" of Lycos's Leases

19.     Of the approximately one hundred and twenty-five equipment schedules entered into between Lycos and CSI, only a handful reached their maturity dates in the normal course. Instead, shortly a year after execution of the Master Lease Agreement, and well before the normal expiration of the term of certain equipment schedules, CSI began to propose to terminate early several equipment schedules and to "roll-them up" onto new schedules with extended terms.  This process of early-termination and roll-up and rewrite continued over the course of the

- 14 -

parties' relationship.

20.    CSI's method of "rewriting" or "rolling up" equipment schedules worked as follows.  Generally, before the expiration date of the schedules, and sometimes just a few months into a schedule, one or more equipment schedules would be terminated early, assigned a new equipment schedule number, and given a new lease term and monthly lease rental payment amount.  In some cases, some of the equipment from one equipment schedule was combined with the equipment from one or more other schedules and "rolled up" onto a single new equipment schedule; other times, equipment from the same schedule was separated and rolled up onto different schedules.  Certain schedules and certain equipment were "rolled up" numerous times.

21.    Unbeknownst to Lycos, CSI established certain commission programs that encouraged its account executives to, among other things, "rewrite" equipment schedules containing personal computers.  CSI proposed, and Lycos rewrote, more than a dozen equipment schedules, often just two to four months into an individual schedule.  As a result of these rewrites, CSI's account executive for the Lycos account, Mr. Stenberg, earned significant additional commissions.  As it turns out, the only parties that benefited from these rewrites were CSI and Mr. Stenberg.

22.    CSI represented to Lycos that the "roll-ups" and "rewrites" would reduce the monthly lease rental payments by extending the lease term and consequently the number of monthly payments, similar to the refinancing of a mortgage.  While this was true, it was only part of the truth.  CSI failed to disclose to Lycos that, among other things:

A.    over time, Lycos would pay CSI considerably more than 100% of the original cost of the equipment as a result of these "roll ups" and "rewrites," something Lycos

could not reasonably have discovered on its own because (i) CSI did not disclose the original cost of the equipment to Lycos, although CSI kept that information for new equipment schedules on its computers, and (ii) even if it had known the original equipment cost at lease schedule inception, because of the movement of equipment from schedule-to-schedule over multiple roll-ups;

        B.      Lycos had already paid amounts well in excess of the original equipment cost of some of the leased equipment;

        C.      the net present value of the stream of lease payments Lycos would be making under the proposed rolled-up and rewritten equipment schedules included substantial, non-negotiated "mark-ups" over the net present value of the amounts owed under the existing equipment schedule(s), such that Lycos would have to pay millions of dollars above what the rental payments should have been as a result of refinancing the schedules;

        D.      it had inflated the "Base Value" of the equipment on the rolled-up and rewritten equipment schedules above the original cost of the equipment, as had been stated on the original schedules;

        E.      it maintained a well-orchestrated and targeted internal scheme to manipulate the leasing process and cause Lycos to rewrite leases repeatedly, even though such rewrites were not in the best interest of, and caused damage to, Lycos by, among other things, causing Lycos to be dependent upon Mr. Stenberg for his expertise in leasing and thus inducing Lycos not to investigate fully, or at all, Mr. Stenberg's representations to it;

        F.      it had perpetrated a scheme to put Lycos in the position of having to either rewrite equipment lease schedules indefinitely or buy-out the leased equipment at a price substantially in excess of the then fair market value of the equipment;

- 16 -

G.      the Stipulated Loss Value percentages contained in the Stipulated Loss

Value Schedule exceeded industry norms by many-fold.

23.      Under the original lease schedules, before the roll-ups or rewrites, Lycos would

have paid CSI monthly lease rental payments aggregating less than $46 million.  As a result of

the "roll-ups" and "rewrites," however, Lycos paid CSI over $72 million in total monthly lease

rental payments, an increase of more than $26 million.

*Example of an Egregious and Unfair "Roll Up" – Equipment Schedule 67E*

24.      An examination of the history of one specific equipment lease schedule –

equipment Schedule 67E – demonstrates how CSI manipulated the "roll up" process to its favor

and Lycos's detriment.

25.      On July 12, 2000, Lycos entered into equipment Schedule 67E ("Schedule 67E"),

a true and accurate copy of which is attached hereto as Exhibit B.  Schedule 67E governed the

lease of equipment with an original equipment cost of $1,091,002, at a term of 24 months

starting in October of 2000 and with a monthly rental payment of $42,075.  Given a residual

value assumption of 21% as is typical for a 24-month lease of this nature, CSI's anticipated yield

from Schedule 67E was a reasonable 11%.

On November 14, 2000, after only two monthly lease rental payments, Lycos entered into

Equipment Schedule 67H ("Schedule 67H"), a true and accurate copy of which is attached hereto

as Exhibit C.  Schedule 67H is a 34-month lease commencing on December 1, 2000.  The assets

leased under Schedule 67H are those same assets previously leased under Schedule 67E, which

was terminated the day before Schedule 67H became effective.  The monthly lease rental

payment due under Schedule 67H was $36,438.41.  A comparison of the terms of Schedules 67E

and 67H appears below:

| Equipment Schedule | 67E | 67H | Combined |
|---|---|---|---|
| Cost of Equipment | 1,091,002 | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months | 36 months |
| Commencement Date | 10/01/00 | 12/01/00 | |
| Lease Rental (Monthly in advance) | $42,075 | $36,438 | |
| Total Lease Payments | $1,009,800 | | $1,323,042 |
| PV of Minimum Lease Payment @10% | 84.27% | 99.35% | 104.53% |
| Residual Assumption | 21% | | 16% |
| Lessor's Anticipated Yield | 11.34% | | 20.85% |
| Yield at 0% Residual | -7.93% | | 13.92% |

26.    As reflected in the table above, the "refinancing" of Schedule 67H did reduce Lycos's monthly lease rental payment obligation by over $5,000.  However, it increased Lycos's total lease rental obligations by an exorbitant amount – by more than $310,000 from $1,009,800 to $1,323,056 (under the combined equipment schedules).  Such a large increase on just one equipment schedule can neither be explained by the increased lease term or an increase in applicable interest rates, if any.  The only explanation is that CSI in effect charged Lycos an undisclosed "mark-up" or "fee" to rewrite or roll up the schedules.

27.    Additionally, by getting Lycos to rewrite, CSI was able to substantially eliminate in some cases, and completely eliminate in others,  its risk in the transaction because the total lease rental payments fully returned CSI its investment in the equipment and provided a yield of almost 14% prior to CSI receiving any residual proceeds at the end of the term of Schedule 67H (see the last row of the table above).  While CSI frequently emphasized the short-term reduction in Lycos's monthly payments, CSI did not paint the full picture by conveniently failing to disclose these additional facts to Lycos.  Moreover, Schedule 67H still required Lycos to either purchase, renew or return the equipment to CSI at the conclusion of its lease term.

- 18 -

28.     Although CSI had already completely eliminated its investment risk in the leased equipment under Schedule 67E, and had guaranteed itself a 14% profit through the "roll up" into Schedule 67H, CSI's failure to disclose to Lycos the full impact of the "roll-ups" continued.

29.     In October of 2001, again, allegedly to reduce Lycos's monthly payments, CSI again rolled the equipment that had originally been leased pursuant to Schedule 67E. Two new schedules were the outcome of that "refinancing" activity.  Portions of equipment Schedules 93 and 94 are attached hereto as Exhibits D and E ("Schedule 93" and "Schedule 94", respectively).

30.     According to Schedule 93, certain schedules, including the following, were "rolled up" onto it: 64, 64B, 64D, 64F, 66, 66A, 66B, 66C, 66E, 67A, 67B, 67D, 67F, 67H, 68. Yet, according to Schedule 94, the very same equipment from these schedules was being rolled up onto that schedule.  Compare Exhibits D and E.  Accordingly, ascertaining which equipment on each "rolled" schedule was being assigned to which new schedule would have been a Herculean if not impossible task for Lycos, as would have figuring out the total amount of lease payments for each piece of equipment.  Only after Lycos hired an expert leasing consultant did it begin to learn the true financial impact, although not the full impact, of the roll-up onto Schedules 93 and 94.

The additional payment obligations under Schedule 93 became one (1) payment of $3,751 payable October 1, 2003.  The additional payment obligations under Schedule 94 became thirteen (13) monthly payments of $32,688 commencing October 1, 2003 (see table below).

| Equipment Schedule | 67E / 67H Combined | 93 | 94 | Combined |
|---|---|---|---|---|
| Cost of Equipment | 1,091,002 | | | 1,091,002 |
| Fixed Term | 36 months | 1 month | 13 months | 49 |
| Commencement Date | 10/01/00 | 10/01/03 | 10/1/03 | 10/1/00 |
| Lease Rental (Monthly in Advance) | 2@ $42,075 34 @ $36,438 | 1 @ $3,751 | 13 @ 32,688 | 2@ $42,075 34 @ $36,438 1@ $36,438 12@ $32,688 |
| Residual Assumption | 16% | | | |
| PV of Minimum Lease Payments @10% | 104.53% | | | 132.46% |
| Lessor's Anticipated Yield | 20.85% | | | |
| Yield at 0% Residual | 13.92% | | | 27.26% |

After the first payment due under Schedules 93 and 94, Lycos's monthly payment obligation did decline from $36,428 to $32,688.  However, Lycos's total fixed payment obligation to CSI increased from $1,323,056 to $1,715,751 (under all of the combined equipment schedules). Additionally, CSI further increased its yield or profit in the transaction before receipt of any residual proceeds to more than 27%.  CSI did not disclose this fact to Lycos.  Moreover, Schedules 93 and 94, however, did not end Lycos's obligation to CSI under the original Schedule 67E, but carried at its conclusion yet another obligation: for Lycos to purchase, renew, or return the equipment to CSI.

### CSI's Partial Disclosures and Omissions of Material Fact

31.    The Equipment Leasing and Finance Association f/k/a the Equipment Leasing Association ("ELA") is a nonprofit trade organization that represents more than 800 member leasing companies.

32.    CSI was, during the entire relationship between Lycos and CSI, a member of the ELA.  CSI listed the ELA logo on its letterhead at all times relevant to this action.

33.    The ELA Code of Fair Business Practices in effect during the period when CSI

leased equipment to Lycos required ELA members to "disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision."  See paragraph 7 of Section I: General Standards of Professional Conduct, a true and accurate copy of which is attached as Exhibit F.

34.    The ELA's standards for fair business practices reflect the standards of the equipment leasing industry.

35.    As a member of the ELA, CSI has agreed to comply with the ELA's Code of Fair Business Practices.

36.    The Attorney General of the Commonwealth of Massachusetts has promulgated regulations with provisions similar to paragraph 7 of the ELA's Code of Fair Business Practices:

A.    Section 3.05(1) of 940 C.M.R. provides that "No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect."  940 C.M.R. 3.01 defines "products" to include "services" such as the financial services provided by CSI.

B.    Section 3.16(2) of 940 C.M.R. provides that "an act or practice is a violation of M.G.L. c. 93A, § 2, if . . . (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."  940 C.M.R. 3.01 defines "buyer" to include "lessees" such as Lycos.

37.    The  Attorney General interprets 940 C.M.R. 3.05(1) and 940 C.M.R. 3.16(2) to apply to business-to-business transactions such as the instant one.  A true and accurate copy of a letter written by the Office of the Attorney General with respect to this issue is attached hereto as

- 21 -

Exhibit G.  As noted in that letter, the Attorney General has prosecuted several private parties for violating these regulations in business-to-business transactions.

38.     CSI and its representative in Massachusetts, Mr. Stenberg, failed to disclose to Lycos the millions of dollars in mark-ups CSI charged Lycos as a result of the "roll-ups" and "rewrites," and the information that would have enabled Lycos to discover such mark-ups, even though it was obligated to do so, to induce Lycos's continued participation in CSI's scheme, notwithstanding:

A.     CSI's duty to make disclosures to Lycos of information relevant to Lycos's decision to enter into the lease-roll-ups as a result of (i) CSI's cultivation of Lycos's trust and confidence in CSI and CSI's acceptance of that trust and confidence; and (ii) CSI's disclosure of only some of the material facts, i.e., Lycos's reduced monthly payments pay and the length of the new lease term under the "roll-ups" and "rewrites";

B.     the Attorney General's regulations, 940 C.M.R. 3.05(1) and 3.16(2);

C.     CSI's membership in the ELA and representation on its website that it "engag[es] in the highest levels of business conduct with regard to ethics";

D.     CSI's knowledge of the economic windfall it would enjoy at Lycos's expense from the "roll-ups" and representations on its website that CSI offers "fair" lease solutions and "value-added" services throughout the equipment lifecycle, and that CSI reduces the customer's "total cost of ownership"; and

E.     CSI's knowledge that (i) Lycos's understanding of the effect of the lease schedule "roll-ups" and "rewrites" was simply that the term of the equipment schedule would be extended and the amount of the monthly payments reduced; (ii) Lycos did not understand the full impact of the "roll-ups" and "rewrites" on the total amount Lycos would be obligated to pay; and

(iii) Lycos was unaware that it had already paid well in excess of the cost of some of the equipment.

39.    If CSI had fully disclosed the full impact of the "roll-ups" and "rewrites" on, among other things, the present value of the amount Lycos was paying on them and the amounts Lycos had already paid relative to the original equipment cost, Lycos would not have entered into them.

<u>*CSI's Affirmative Misrepresentations of Material Facts*</u>

40.    Not only did CSI fail to disclose to Lycos the financial impact of the "roll-ups" and "rewrites" as it was obligated to do, but CSI intentionally misrepresented material facts to Lycos to induce it to continue making payments under the "roll-ups." Specifically, in March, 2002, Lycos asked Mr. Stenberg to explain whether the rent was increasing by almost $12 million as a result of having rewritten numerous equipment schedules onto Schedules 93 and 94, something that if not explained satisfactorily would cause Lycos to "unwind" Schedules 93 and 94.

41.    In response, Mr. Stenberg sent Lycos an e-mail dated March 18, 2002 in which he represented to Lycos that:

A.    the present value of the payments due under Schedules 93 and 94 was $23,727,000, when he knew or could readily have ascertained from CSI employees in St. Louis that that the present value of those payments exceeded $25,900,000;

B.    Lycos's obligations under the "old leases" totaled $20,215,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the *un*discounted payment obligations under those leases totaled approximately $17.6 million, and the total

obligations under those leases, when discounted to present value, were several million less than that;

C.    the difference between the present value of the payments Lycos would be required to make under Schedules 93 and 94 and the obligations under the "old leases" was $3,512,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the difference between the present value of the payments under Schedules 93 and 94 and the *un*discounted obligations under the old leases exceeded $8.0 million, and the difference between the discounted payments under Schedules 93 and 94 and the discounted payments under the old leases was several million higher;

D.    when he used a discounted present value number for Schedules 93 and 94 and an *un*discounted number for the "old schedules," he knew that such a comparison was misleading because the comparison was between "apples" and "oranges";

E.    when the leases were refinanced, CSI recouped about 5-7% of the $3.5 million differential, when he knew or could readily have ascertained from CSI employees in St. Louis that both the percentage and the differential were false;

F.    CSI injected a 10-13% residual in the original leases, when he knew or could readily have ascertained from CSI employees in St. Louis that, because of the multiple refinancings that had occurred before Schedules 93 and 94, CSI's remaining residual on the schedules that rolled onto Schedules 93 and 94 was at most a few percent, such that it was misleading to advise Lycos that CSI had originally injected a 10-13% residual; and

G.    the total cost of the equipment on Schedules 93-94 was "around $63 million," when he knew or could have readily ascertained from CSI employees in St. Louis that

the total cost was substantially less than that. A true and accurate copy of the e-mail sent by Mr. Stenberg to certain employees of Lycos is attached hereto as <u>Exhibit H</u>.

42.    On information and belief, Mr. Stenberg knew, at the time he sent this e-mail that:

A.    Lycos would use this figure during its (Lycos's) internal review to determine whether to continue performance under Schedules 93 and 94; and

B.    his statements would delay or prevent Lycos from discovering the true original equipment cost and the nature of CSI's "roll up" and "rewrite" scheme, thereby protecting his substantial commissions on those transactions alone.

<em><u>Lycos's Purchase of the Equipment</u></em>

43.    In late 2002, before Lycos had discovered the true financial impact of the "roll ups" and "rewrites," and CSI's and Mr. Stenberg's misrepresentations in his March 18, 2002 email including, without limitation, as to the original cost of the equipment, Lycos approached CSI to request the terms under which Lycos could fully accelerate its obligations under the remaining equipment schedules.  As part of that discussion, Lycos also requested what, if anything, would be required to convert the remaining obligations so that at the conclusion of the terms, Lycos would own the equipment.

44.    During a telephone conversation on or about June 27, 2003, Mr. Stenberg represented to Lycos's leasing consultant that the original cost of the equipment exceeded $60 million.  He also quoted Lycos a buyout price of over $4.6 million even though CSI internally had set a minimum threshold at which the buyout could have been consummated at a substantially lower number.  CSI did not disclose the minimum threshold to Lycos.

45.     The proposed structure of the buyout consisted of a one-time payment (purchase price), plus payment of the then remaining monthly lease rental payments on their original due dates.

46.     Soon thereafter, Lycos accepted CSI's offer to sell the equipment for $3.775 million.

47.     Subsequently, pursuant to a sales agreement dated July 15, 2003 (the "Sales Agreement), and operating under several misapprehensions of fact because of CSI's failure to disclose basic and material information to Lycos despite Lycos's requests – misapprehensions which CSI knew or should have known about – and in reliance on CSI's multiple misrepresentations including, without limitation, as to the original equipment cost, Lycos: (a) paid CSI the purchase price of $3.775 million; and (b) continued to make monthly payments until the end of the schedules' terms.  Before CSI commenced this action, Lycos had made every payment required under equipment schedules 69I, 64F, 66I, 67H, 85, 86, 89, 89A, 90, 93 and 94.

48.     Although CSI had a duty to disclose to Lycos that CSI had over-stated the original cost of the equipment in Mr. Stenberg's March 18, 2002 e-mail, and again in late, June, 2003, and Lycos had already paid well in-excess of the original cost of some of the leased equipment or was contracted to make total payments under the leases equaling 168% of the original cost of the leased equipment, CSI failed to do so.

49.     Indeed, CSI knowingly and intentionally refused to tell Lycos that Lycos had already paid substantially more than the cost of the equipment, that Lycos had paid substantially more than it would have had CSI not rewritten and rolled up the equipment schedules, that the representations in Mr. Stenberg's March 18, 2002 e-mail were false and/or misleading, and that his representation to Lycos's leasing consultant in late June, 2003, was false.

50.     Had CSI made a full and accurate disclosure of the original cost of the equipment,

Lycos would not have agreed to pay CSI an additional $3.775 million to "purchase" the

equipment.

51.     It was not until after Lycos had entered into the Sales Agreement that Lycos

discovered, in part – and then only through the analysis of an expert leasing consultant it

engaged to analyze all of the CSI equipment schedules – the true nature of CSI's "roll up" and

"rewrite" scheme, and the negligent and intentional misrepresentations – including, but not

limited to, CSI's misrepresentation concerning the original cost of the equipment – partial

disclosures, and omissions of material fact used by CSI to induce Lycos's participation and

continued performance.  It was not until Lycos received substantial discovery in this litigation

that Lycos discovered more about CSI's scheme and method of implementation.

<u>CSI's Pattern or Practice of Deception</u>

52.     Because of, among other things, CSI's movement of hundreds of pieces of

equipment from one lease schedule to another, the complexity of those "roll-ups" and "rewrites,"

CSI's misrepresentations, partial disclosures, and omissions, CSI's cultivation and exploitation

of Lycos's trust and confidence in CSI, and the fact that expertise was required to discover the

original equipment cost of equipment rolled up multiple times and the total impact of the "roll-

ups," Lycos should not and could not reasonably have been expected to discover the impact of

the roll-ups prior to that time.  Indeed, CSI's successful effort to gain the trust of Lycos's

personnel was designed to and did induce Lycos personnel *not* to seek to discover the foregoing.

53.     Upon information and belief, CSI knows that its customers generally do not have

the expertise to discover the impact of roll-ups.  It relies on: (a) this lack of expertise and its

intentional failure to disclose some of the basic and material facts to induce its customers to enter

into them; and (b) the establishment of a trusting relationship with its customers such as the one

it established with Lycos personnel to induce them not to seek to discover the impact.  Upon

information and belief, this is CSI's mode of doing business with many of its customers.

**COUNT I**
**(Fraudulent Misrepresentation in the Inducement of Rolled-Up**
**and Rewritten Equipment Schedules)**

54.     Lycos repeats and incorporates by reference the allegations contained in

paragraphs 1 through 53 above.

55.     Because of the trust Lycos reposed in CSI and CSI knowingly and voluntarily

accepted, CSI's partial and misleading disclosure of facts pertinent to Lycos's decision to enter

into the "roll-up" transactions, and 940 C.M.R. 3.05(1) and 3.16(2), CSI was obligated to

disclose to Lycos: (a) the impact of the "roll-ups" and "rewrites" in terms of the amount to be

paid by Lycos relative to the original equipment cost; (b) the fact that Lycos had already paid

amounts well in excess of the cost of some of the leased equipment; and (c) the fact that the total

amount to be paid by Lycos after the "roll-ups" and "rewrites" substantially exceeded any

reasonable or fair total rental compensation for the leased equipment.

56.     CSI's failure to disclose facts basic and material to Lycos's decision to enter into

the "roll-ups" and "rewrites" was made with the intent to induce Lycos to enter into the "roll-

ups," which Lycos did.

57.     Had CSI made a full disclosure, Lycos would not have entered into the "rolled

up" and "rewritten" equipment schedules and would not have continued to perform under them.

58.     As a result of CSI's intentional misrepresentations and breach of duty to disclose

basic and material facts, Lycos has been damaged in an amount to be determined at trial but not

less than $14,200,000.

- 28 -

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
### (Negligent Misrepresentation in the Inducement of Rolled-Up and Rewritten Equipment Schedules)

59.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 58 above.

60.    To the extent CSI performed its duty to provide Lycos with all information relevant to Lycos's decision whether to "roll-up" certain lease schedules, CSI acted negligently and failed to exercise reasonable care or competence in communicating material facts to Lycos concerning, among other things, the amount of total compensation made or to be made relative to the total original cost of the leased equipment.

61.    Lycos justifiably relied on the information provided by CSI including, without limitation, information concerning the original cost of the leased equipment.  Lycos also justifiably relied on the misleading half-truth that the "roll ups" would decrease Lycos's monthly rental payments, without also being told other facts basic and material to Lycos's decision to enter into the roll-ups and purchase the leased equipment.

62.    As a result of CSI's negligent misrepresentations of material fact, Lycos has been damaged in an amount to be determined at trial but not less than $14,200,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT III
### (Fraudulent Misrepresentation in the Inducement of Sales Agreement)

63.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 62 above.

64.    CSI represented in March, 2002, that the original cost of the leased equipment was around $63 million.  It again represented to Lycos that the original cost exceeded $60

million on or about June 27, 2003.  These representations were false.  CSI knew they were false at the time they were made.  CSI made these representations with the intent to induce Lycos to purchase the leased equipment, which Lycos did.

65.    In addition, CSI failed to disclose to Lycos numerous facts relevant to Lycos's decision to enter into the Sales Agreement.  CSI failed to disclose these facts to Lycos even though it had a duty to do so, with the intent to induce Lycos to purchase the leased equipment, which Lycos did.

66.    Because of CSI's cultivation of Lycos's trust and the trust Lycos reposed in CSI which CSI knowingly and voluntarily accepted, CSI's partial disclosure of facts pertinent to Lycos's decision to enter into the Sales Agreement, CSI's intentional misrepresentation concerning the original cost of the leased equipment, and 940 C.M.R. 3.05(1) and 3.16(2), CSI was obligated to: (a) correct its misrepresentation concerning the original equipment cost; (b) disclose to Lycos the fact that Lycos had already paid amounts well in excess of the cost and fair rental compensation for some of the leased equipment; and (c) make numerous other disclosures to Lycos.

67.    CSI's failure to disclose facts basic and material to Lycos's decision to enter into the Sales Agreement was made with the intent to induce Lycos to enter into the Sales Agreement, which Lycos did.  Furthermore, Lycos relied on CSI's misrepresentations as to the original cost of the equipment in entering into the Sales Agreement.

68.    Had CSI made a full disclosure, Lycos would not have purchased the equipment for $3.775 million.

69.     As a result of CSI's intentional misrepresentations and breach of duty to disclose basic and material facts, Lycos has been damaged in an amount to be determined at trial but not less than $3,775,000.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT IV
### (Violation of M.G.L. c. 231, § 85J)

70.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 69 above.

71.     M.G.L. c. 231, § 85J provides that "[w]hoever, by deceit or fraud, sells personal property shall be liable in tort to a purchaser in treble the amount of damages sustained by him."

72.     CSI's sale of computer equipment to Lycos pursuant to the Sales Agreement constituted a sale of personal property.

73.     As set forth more fully in Count III, CSI committed fraud in the inducement of the Sales Agreement.

74.     At the time Lycos purchased the equipment pursuant to the Sales Agreement for $3.775 million, the equipment was of no value.  Accordingly, Lycos suffered damages by paying such amount to CSI.

75.     Accordingly, Lycos is entitled to treble the amount of the damages sustained by it in connection with the Sales Agreement.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT V
### (Violation of M.G.L. c. 93A, §§ 2 and 11
### by Violating M.G.L. c. 231, § 85J and 940 C.M.R. 3.16(3))

76.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 75 above.

77.     M.G.L. c. 231, § 85J is a statute meant for the protection of the public's health safety or welfare promulgated by the Commonwealth intended to provide consumers with protection.

78.     CSI's violation of M.G.L. c. 231, § 85J is a violation of 940 C.M.R. 3.16(3).

79.     CSI's violation of 940 C.M.R. 3.16(3) is a per se violation of M.G.L. c. 93A, § 2. WHEREFORE, Lycos requests the relief set forth below.

## COUNT VI
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

80.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 79 above.

81.     In entering into the Master Lease Agreement and related schedules, CSI was bound to act in good faith and fair dealing with Lycos.

82.     Through its fraudulent and/or negligent misrepresentations in connection with the "roll up" and "rewriting" of various equipment schedules, as described above, CSI has unfairly and in bad faith extracted money from Lycos well above any reasonable or fair total compensation under the equipment schedules and Sales Agreement.

83.     CSI also, in bad faith, employed a methodology for establishing "Base Value" and Stipulated Loss Value percentages designed to extract funds from Lycos. Specifically, although the equipment schedules for leasing new equipment specifically provided for the Base Value to be the "equipment cost," CSI claims to have set the Base Value for equipment schedules pursuant to which Lycos leased new equipment at the higher of the original cost of the equipment and the present value of the stream of lease payments. CSI set the Base Value months after Lycos had signed these new equipment schedules. On rewrites and roll-ups, Lycos has

- 32 -

learned that Base Value had nothing to do with the original cost of the equipment.  CSI maintains

that it set the Base Value at the present value of the stream of lease payments and sometimes

higher.  These methodologies resulted in Lycos believing, at the time of the Sales Agreement,

that it would be required to pay CSI over $34 million because Lycos could not return the leased

equipment and caused Lycos to pay $3.775 million, pursuant to the Sales Agreement, for

equipment that was worthless.

84.     As a result of CSI's actions described above, Lycos has been damaged in an

amount to be determined at trial but not less than $17,975,000.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT VII
### (Violation of G.L. c. 93A, §§ 2 and 11 in
### Entering into the Rewrites and Roll-Ups,
### and the Sales Agreement)

85.     Lycos repeats and incorporates by reference the allegations contained in

paragraphs 1 through 84 above.

86.     Both Lycos and CSI are engaged in trade or commerce as that term is defined in

M.G.L. c. 93A.

87.     CSI has engaged in unfair and deceptive acts and practices in violation of M.G.L.

c. 93A, § 2 including, but not limited to:

A.     its collection of money from Lycos well above any reasonable or fair total

compensation as a result of the "roll up" and "rewrite" of various equipment schedules;

B.     its intentional and negligent misrepresentations, and omissions of facts

basic and material to Lycos's decision to enter into the "roll-ups" and "rewrites" that CSI was

obligated, under common law, to disclose;

C.    CSI's knowledge of the full impact of the roll-ups and rewrites on Lycos, that the full impact of the roll-ups and rewrites was material to Lycos's decision to enter into them, and that CSI failed to disclose to Lycos, the full impact of the roll-ups, all in violation of 940 C.M.R. 3.01, Definitions of Buyer and Product, and 940 C.M.R. 3.05(1) and 3.16(2);

D.    its failure to comply with industry standards established by the ELA by not "disclos[ing] to [Lycos] all relevant information as to the terms and conditions" of the lease "roll-ups"; and

E.    its intentional misrepresentations concerning, among other things, the original cost of the equipment, that induced Lycos to enter into the Sales Agreement;

F.    its knowledge that Lycos had paid in full for much of the leased equipment before executing the Sales Agreement, that Lycos's payment in full for much of the leased equipment was material to Lycos's decision to enter into the Sales Agreement, and that CSI failed to disclose to Lycos that Lycos had already paid well-in-excess of (i) the original cost of the equipment and (ii) any fair rental value, all in violation of 940 C.M.R. 3.01, Definitions of Buyer and Product, and 940 C.M.R. 3.05(1) and 3.16(2); and

G.    Gaining and exploiting Lycos's trust.

88.    At all times material and relevant hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts. Specifically, CSI's communications with Lycos were made by Mr. Stenberg while CSI was conducting business in Massachusetts.

89.    The violations of M.G.L. c. 93A, § 2 described above were knowingly, willfully and intentionally committed by CSI.

90.    By reason of CSI's unfair and deceptive business acts or practices, Lycos has

- 34 -

incurred damages in an amount to be determined at trial but not less than $17,975,000.

91.    Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and Lycos

should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT VIII
### (Declaratory Relief – Schedules 93 and 94
### Each Evidence a Loan and Security Agreement)

92.    Lycos repeats and incorporates by reference the allegations contained in

paragraphs 1 through 91 above.

93.    In late 2001, CSI rolled-up approximately fifteen schedules onto Schedules 93

and 94.  At the time the equipment from those schedules rolled onto Schedules 93 and 94, Lycos

had already leased that equipment for at least three years and, in many cases, more than five

years.

94.    Pursuant to Schedules 93 and 94, Lycos agreed to make monthly payments to CSI

for an initial term of 24 and 36 months, respectively.  Because the computer equipment had

already been leased by CSI to Lycos for several years, the length of Schedules 93 and 94

exceeded the remaining economic life of the equipment.  Indeed, at some point during the life of

Schedules 93 and 94, CSI booked the residual value of those schedules at zero.  Under Financial

Accounting Standards Board 13, ¶ 5(h), the estimated residual value of leased property is to

equal the estimated "fair value" of the leased property at the end of the lease term.  Paragraph

5(c) of FASB defines the "fair value" of leased property to be the "price for which the property

could be sold in an arm's-length transaction between unrelated parties."  Thus, as CSI believed

that the equipment had no value at the end of Schedules 93 and 94, CSI believed that the length

of the term of Schedules 93 and 94 exceeded the economic life of the equipment on those schedules.

95.     Lycos did not have the right under the Schedules 93 and 94 to return the equipment under those schedules before the end of the lease terms without being obligated to make the monthly rental payments through the end of the lease terms.

96.     As a result of the foregoing, under section 1-201(37) of the Uniform Commercial Code, Schedules 93 and 94 were not "true leases" at the time they were executed, but instead were loans and security agreements.

97.     In addition, the "economic realities" of Schedules 93 and 94, which incorporate by reference the Master Lease Agreement, demonstrate that they were loans and security agreements under section 1-201(37) of the Uniform Commercial Code.  Specifically:

   A.     Lycos selected the equipment it "leased" from CSI from a third-party supplier;

   B.     the Master Lease Agreement:

      1.     disclaims all warranties that are typically found in a lease; and

      2.     requires Lycos to be solely responsible for all costs and expenses of every nature arising from the possession, use and operation of the equipment including, without limitation, payment of taxes, insurance equal to the replacement cost of the equipment, maintenance, and damages to or loss of the equipment.

   C.     CSI was not an equipment supplier but was a financing company that operated very much like a bank or other lending institution; and

   D.     the equipment "leased" by Lycos was shipped directly from the vendor to Lycos such that at no time before lease inception did CSI have possession of the equipment.

- 36 -

98.     CSI filed UCC-1 financing statements with the Massachusetts Secretary of State with respect to Schedules 93 and 94 in an effort to perfect its security interest in the equipment financed pursuant to those schedules.

99.     At the time Schedules 93 and 94 were being negotiated, CSI considered Lycos to be a bankruptcy risk and a "dot.com" that could fail like many other "dot.coms" then experiencing financial difficulty.  Because of this, and the fact that CSI knew that the equipment leased pursuant to Schedules 93 and 94 was worth only a small fraction of the approximately $14.5 million that would be due under those schedules, CSI demanded that Lycos obtain an $11 million letter of credit for the benefit of CSI to secure Lycos's obligations under Schedules 93 and 94.

100.    Lycos, in fact, entered into a Letter of Credit Agreement with CSI that was drafted by CSI concerning that $11 million letter of credit.  That Letter of Credit Agreement provided, among other things: "Lycos, Inc., as security for its performance of any and all of its obligations under [Schedules 93 and 94], will furnish CSI with an unconditional irrevocable Letter of Credit from a bank acceptable to [CSI] in the amounts set forth below."

101.    CSI, which is one of the largest if not the largest independent leasing company in the United States and is expert in the field of computer equipment leasing, knew or should have known before Schedules 93 and 94 were executed, and again after the Sales Agreement was executed, that those schedules were actually loans and security agreements under 1-201(37) of the Uniform Commercial Code rather than true leases.  In contrast, Lycos had no such knowledge.

102.    Even if there were any doubt as to whether Schedules 93 and 94 were "true leases" at the time CSI and Lycos entered into them, that doubt was eliminated once the parties

- 37 -

signed the Sales Agreement. The Sales Agreement provides that Lycos becomes the owner of the equipment upon payment of the $3.775 million purchase price and associated taxes, and payment of the usual monthly rent for the equipment on the schedules. Thus, Lycos was to become the owner of the equipment at the end of the lease terms for no additional consideration. Accordingly, even if Schedules 93 and 94 were true leases when they were signed, they became loans and security agreements when the Sales Agreement was executed.

103.    A controversy or dispute exists between the parties concerning whether or not Schedules 93 and 94 evidence "true leases" or loans and security agreements.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT IX
### (Declaratory Judgment as to Whether Missouri or Massachusetts Law Governs Lycos's Claim that Schedules 93 and 94 are Usurious)

104.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

105.    Pursuant to Schedules 93 and 94, CSI demanded and Lycos agreed to and did pay CSI, at least $14.5 million. Pursuant to the Sales Agreement, Lycos paid CSI an additional $3.775 million to purchase the equipment on those schedules for equipment that, according to CSI, had no value.

106.    Because Schedules 93 and 94 evidence loans and security agreement rather than true leases, the at least $18.275 million Lycos paid to CSI under those schedules and the Sales Agreement constituted payment of principal equal to the fair market value of the equipment at the time the equipment rolled onto those schedules, plus interest.

107.    As the value of the equipment at the time it rolled onto Schedules 93 and 94 was less than $2 million, the amount paid represented payment of principal of at most that amount

- 38 -

plus at least $16.275 million in interest.

108.    Although the Master Lease Agreement provides that it and the schedules shall "be governed by, and construed and interpreted under the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law," questions as to the validity of equipment Schedules 93 and 94, are governed by Massachusetts law – the locus of Schedules 93 and 94.

109.    In addition, Missouri law does not permit a cause of action for usury in business-to-business transactions such as the transaction evidenced by Schedules 93 and 94 between Lycos and CSI.  Massachusetts, on the other hand, makes it a crime under M.G.L. c. 271, § 49, for one business to charge another an usurious interest rate to business.

110.    The prohibition against usury lending, as reflected especially in the criminal sanctions imposed by M.G.L. c. 271, § 49, is an important public policy of the Commonwealth. Application of Missouri law to Lycos's usury claim would thus offend an important public policy of the Commonwealth.

111.    Upon information and belief, CSI maintains that, notwithstanding the foregoing, Missouri law governs Lycos's claims for usury.  Accordingly, a controversy or dispute exists between the parties concerning whether Missouri or Massachusetts law should apply to Lycos's usury claims hereunder.

112.    This Court should declare that Massachusetts law applies to Lycos's claims for usury.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT X
### (Usury, M.G.L. c. 271, § 49)

113.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 112 above.

BST99 1525729-3.057077.0012

114.     Of the aggregate amount of more than $18.275 million paid by Lycos to CSI pursuant to Schedules 93 and 94 and the Sales Agreement, less than $2 million represented repayment of principal, i.e., the aggregate value of the equipment at the time it rolled onto Schedules 93 and 94, and the balance of at least $16,275,000 represented payment of interest.

115.     As a result of CSI charging Lycos at least $16.275 million in interest on loans with a two or three year term and an aggregate original principal balance of less than $2 million, CSI charged Lycos interest well in excess of the 20% per annum allowed by M.G.L. c. 271, § 49(a).

116.     CSI has not provided notice to the Attorney General of the Commonwealth that it intended to charge interest on loans in the Commonwealth in excess of 20% as permitted by M.G.L. c. 271, § 49(d).

117.     The loans made by CSI to Lycos pursuant to Schedules 93 and 94 are not regulated by any provision of general or special law or regulations promulgated thereunder.  CSI is a privately-held corporation not subject to control, regulation, or examination by any state or federal regulatory agency.

118.     The interest rate charged by CSI pursuant to Schedules 93 and 94 was usurious in violation of M.G.L. c. 271, § 49.

119.     Lycos has been damaged by CSI's imposition of an usurious rate of interest.

WHEREFORE, Lycos requests the relief set forth below.

### COUNT XI
### (Violation of M.G.L. c. 93A, §§ 2 and 11-
### Imposition of Excessive Interest)

120.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 119 above.

121.     Under 940 C.M.R. 3.16(3), an "act or practice is a violation of M.G.L. c. 93A, § 2 if: . . . (3) It fails to comply with existing statutes . . . meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth intended to provide the consumers of this Commonwealth protection . . ."

122.     The Massachusetts usury statute, M.G.L. c. 271, § 49, is a statute enacted by the Commonwealth that was meant to provide protection of the public welfare of consumers of the Commonwealth.

123.     CSI's violation of M.G.L. c. 271, § 49 as described herein is a violation of 940 C.M.R. 3.16(3) and therefore a violation of M.G.L. c. 93A, § 2.

124.     Additionally, regardless of the applicability of M.G.L. c. 271, § 49 and/or 940 C.M.R. 3.16(3) to Schedules 93 and 94, CSI's imposition of a several hundred percent interest rate on Schedules 93 and 94, particularly when it knew or should have known that those schedules were, as a matter of law, loans and security agreements, constituted unfair and deceptive practices in violation of M.G.L. c. 93A, § 2.

125.     The violations of M.G.L. c. 93A, § 2 described above were knowingly, willfully and intentionally committed by CSI.

126.     By reason of CSI's unfair and deceptive business acts or practices, Lycos has incurred damages in an amount to be determined at trial but not less than $16.275 million.

127.     Such damages should be trebled pursuant to M.G.L. c. 93A, § 11, and Lycos should be awarded its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT XII
### (Money Had and Received)

128.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above.

129.    After Lycos executed the Sales Agreement, Lycos's leasing consultants determined that the original cost of the equipment leased by Lycos from CSI was approximately $47 million.

130.    Under the equipment schedules as originally written, Lycos was to make monthly payments to CSI totaling less than $46 million.

131.    As a result of CSI's repeated "roll-up" of the lease schedules, Lycos paid CSI (a) more than $72 million in addition to interim rent; and (b) $3.775 million to purchase the equipment.

132.    CSI received more than $18.275 million pursuant to Schedules 93 and 94 and the Sales Agreement.

133.    CSI has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos's) obligations at the end of the term of the "rolled up" schedules.

134.    Equity and good conscience demand that this excess, in an amount to be determined at trial, be returned to Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT XIII
## (Unjust Enrichment)

135.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 134 above.

136.    CSI has been unjustly enriched by the receipt of monies well in excess of a reasonable or fair total compensation at the expense of Lycos.

137.    CSI accepted such monies knowing that it was receiving an economic windfall.

138.    CSI's retention of these monies would be unjust and inequitable.

139.    As a result of CSI's unjust enrichment, CSI must make restitution to Lycos in an amount to be determined at trial.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT XIV
## (Declaratory Judgment as to Whether Lycos Owes any Money to CSI)

140.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 139 above.

141.    A controversy or dispute exists between the parties concerning any obligations Lycos may have to make further payments to CSI.

142.    Specifically, CSI continues to seek monthly lease payments from Lycos that Lycos maintains are not due and owing, and has brought this action seeking these payments.

143.    Lycos seeks a judicial declaration that it has no further payment obligations to CSI under the Master Lease Agreement and any and all outstanding schedules, an amount that CSI claims to be approximately $300,000; and

WHEREFORE, Lycos requests the relief set forth below.

## COUNT XV
## (Declaratory Judgment as to Whether Lycos May Retain the Equipment)

144.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 143 above.

145.     A controversy or dispute exists between the parties concerning whether Lycos owns the equipment purchased pursuant to the Sales Agreement.

146.     Lycos paid all amounts due under the equipment schedules and the Sales Agreement for equipment schedules 69I, 64F, 66I, 67H, 85, 86, 89, 89A, 90, 93 and 94.

147.     Lycos seeks a judicial declaration that it is the owner of all of the equipment described in the equipment schedules enumerated in the Sales Agreement, free and clear of liens, claims, and encumbrances.

## JURY DEMAND

Lycos demands a trial by jury on all claims so triable.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.     On Counts I and II, enter judgment against CSI and in favor of Lycos either (i) in an amount to be determined at trial but not less than $14,200,000, together with interest and costs; or (ii) rescinding the rolled-up and rewritten equipment schedules CSI fraudulently and negligently induced Lycos to enter into and requiring CSI to repay Lycos the amounts Lycos paid to CSI thereunder;

B.     On Count III, enter judgment against CSI and in favor of Lycos requiring CSI to disgorge the $3,775,000 Lycos paid CSI under the Sales Agreement, together with interest and costs;

C.  On Count IV, enter judgment against CSI and in favor of Lycos in an amount equal to treble Lycos's damages of $3,775,000, plus interest and costs;

D.  On Count V, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, in connection with the Sales Agreement, and awarding Lycos damages in an amount to be determined at trial but not less than $3,775,000, trebled, together with interest, costs, and attorneys' fees and costs;

E.  On Count VI, enter judgment against CSI and in favor of Lycos in an amount to be determined at trial but not less than $17,975,000, plus interest and costs;

F.  On Count VII, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, in connection with the rolled-up and rewritten equipment schedules, and awarding Lycos damages in an amount to be determined at trial but not less than $17,975,000, trebled, together with interest, costs, and attorneys' fees and costs;

G.  On Count VIII, enter judgment against CSI and in favor of Lycos declaring that Schedules 93 and 94 evidence loans and security agreements, rather than true leases;

H.  On Count IX, enter judgment against CSI and in favor of Lycos declaring that Massachusetts law governs Lycos's claim that Schedules 93 and 94 are usurious and violate M.G.L. c. 93A, § 2;

I.  On Count X, enter judgment against CSI and in favor of Lycos voiding Schedules 93 and 94 and the Sales Agreement as usurious pursuant to M.G.L. c. 271, § 49, and ordering CSI to repay Lycos the amounts Lycos paid thereunder, together with interest and costs;

J.      On Count XI, enter judgment declaring that CSI has willfully and intentionally engaged in one or more deceptive acts or practices in violation of M.G.L. c. 93A, §§ 2 and 11, and awarding Lycos damages in an amount to be determined at trial but not less than $16,275,000, trebled, together with interest, costs and attorneys' fees;

K.      On Counts XII and XIII, enter judgment against CSI and in favor of Lycos in an amount to be determined at trial, together with interest, costs and attorneys' fees;

L.      On Count XIV, enter judgment declaring that Lycos has no further payment obligations to CSI with respect to any and all of the outstanding equipment schedules between Lycos and CSI;

M.      On Count XV, enter judgment declaring that Lycos is the owner of all of the equipment described in the equipment schedules enumerated in the Sales Agreement, free and clear of any liens, claims, and encumbrances; and

N.      On all Counts, grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated: December 14, 2006

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02209
(617) 535-4000

- 46 -

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for plaintiff, Robert J. Kaler, McCarter & English, LLP, 225 Franklin Street, Boston, MA 02110, by hand on December 14, 2006.

<u>/s/ Peter M. Acton, Jr.</u>
Peter M. Acton, Jr.

BST99 1525729-3.057077.0012

# EXHIBIT A



 **MASTER LEASE AGREEMENT NUMBER  144874**



MASTER LEASE AGREEMENT dated as of December 4, 1996 by and between COMPUTER SALES INTERNATIONAL, INC. (hereinafter called "Lessor") having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141, and

LYCOS, INC.

(hereinafter called "Lessee") having its principal office and place of business at

293 Boston Post Road West
Marlboro, Massachusetts 01752

IN CONSIDERATION of the mutual agreements hereinafter set forth and the payment of rent as herein provided for, the parties hereto agree as follows:

### 1. LEASE AGREEMENT

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor all of the equipment and other tangible personal property described in each of the Equipment Schedules which are executed from time to time by Lessor and Lessee pursuant to this Master Lease. Each Equipment Schedule shall constitute a separate lease on the terms and conditions stated therein and, to the extent not inconsistent with the Equipment Schedule, on the terms and conditions stated in the Master Lease which shall be incorporated by reference in the Equipment Schedule. The term "Equipment" as used herein shall mean, with respect to any Equipment Schedule, the Equipment described therein. The term "Unit" as used herein shall mean an individual machine or an Equipment Schedule or an individual feature when such feature is leased separately from a machine. The term of this Master Lease shall begin on the date set forth above and shall continue in effect so long as any Equipment Schedule entered into pursuant to this Master Lease remains in effect.

### 2. TERM

2.1  COMMENCEMENT DATE:  The commencement date ("Commencement Date") for each Unit of Equipment will be the date on which such Unit is installed by the manufacturer or other installer, except that, in the event there is a delay in the installation of a Unit and such delay is attributable to Lessee, then the Commencement Date for such Unit shall be five (5) working days following the date upon which Lessee has been given notice that such Unit is available for installation. If requested by Lessee, Lessor will promptly execute and deliver to Lessee a certificate confirming the Commencement Date(s).

2.2  INITIAL TERM:  The "Initial Term" of an Equipment Schedule shall mean the period beginning on the Commencement Date of the Unit having the latest Commencement Date of the Units on such Equipment Schedule if such Commencement Date is the first day of a month, and otherwise, the Initial Term shall begin on the first day of the month immediately following the month in which such latest Commencement Date falls. The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rental unless and until terminated by either party giving the other party not less than 120 days prior written notice. Any termination (i) must relate to all of the Equipment described on the Equipment Schedule to which the notice applies, (ii) will be effective only on the last day of the Initial Term or on the last day of any successive four month period, (iii) will be effective only if Lessee returns all of the Equipment to Lessor in accordance with the terms of the Equipment Schedule by the day after the scheduled termination date, and (iv) may not be unilaterally revoked.

### 3. MONTHLY RENTAL

Lessee shall pay to Lessor the monthly rental ("Monthly Rental") for each Unit as set forth in the relevant Equipment Schedule. The Monthly Rental shall be payable at the above mailing address of Lessor or at such other place as Lessor may from time to time designate in a written notice to Lessee. The Monthly Rental for each Unit shall commence on the Commencement Date of such Unit and shall be due and payable in advance and without demand on the first day of each month thereafter during the term of this Lease. If the Commencement Date for a Unit is a day other than the first day of a month, Daily Rental shall be payable ("Daily Rental" shall equal one-thirtieth of the Monthly Rental for such Unit) for each day from, and including, the Commencement Date to, but not including, the first day of the Initial Term, and such total Daily Rental amount shall be due and payable on the first day of the Initial Term.

### 4. WARRANTIES

4.1  AFFIRMATIVE WARRANTIES:  Lessor represents and warrants that:

(a)  The Equipment shall be eligible for the manufacturer's standard prime shift maintenance contract upon installation, provided Lessee requests such coverage in writing prior to installation of the Equipment.

(b)  During the term of this Master Lease, if no Event of Default has occurred, Lessee's quiet enjoyment and peaceable possession of the Equipment shall not be interrupted by Lessor or anyone claiming solely through or under Lessor.

4.2  DISCLAIMER OF WARRANTIES:  THE AFFIRMATIVE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES OF LESSOR. LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, FITNESS, CAPACITY OR SUITABILITY FOR

PS/BOST.

LYC 00002

ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT, OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. Without limiting the generality of the foregoing, Lessor shall not be liable to Lessee for any liability, claim, loss, damage or expense of any kind or nature (including strict liability in tort) caused directly or indirectly by the Equipment, any inadequacy thereof for any purpose, any deficiency or defect therein, whether known or unknown to Lessor. In any event, Lessor shall not be liable to Lessee for any loss of business or any other incidental or consequential loss or damage resulting from any cause whatsoever.

4.3 ASSIGNMENT OF WARRANTIES: Lessor hereby assigns to Lessee any and all manufacturer's warranties, if assignable, and any other such rights that are assignable as Lessor may have against the manufacturer of the Equipment provided, however, that Lessee's sole remedy for the breach of any such warranty or right shall be against the manufacturer and not Lessor.

4.4 SELECTION: Lessee acknowledges, represents and warrants that it has made the selection of the Equipment based on its own judgment and expressly disclaims any reliance upon statements made by the Lessor. The Equipment is being leased for commercial or business purposes only, and will not be used for consumer, personal, home, or family purposes.

## 5. NET LEASE

Each Equipment Schedule constitutes a net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, and operation of the Equipment. Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that Lessee may have against Lessor. Except as expressly provided for herein, neither this Master Lease, nor any Equipment Schedule, shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, or any loss or destruction of the Equipment or any Unit from any cause whatsoever, or the interference with the use thereof by any private person, corporation, or governmental authority or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Monthly Rental payable by Lessee under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term thereof.

## 6. TAXES

6.1 PAYMENT OF TAXES: Lessee covenants and agrees to pay to the appropriate taxing authority, and discharge before the same become delinquent, all taxes, fees, or other charges of any nature whatsoever, without pro-ration, together with any related interest or penalties ("Impositions") now or hereafter imposed, assessed or payable during the term of the relevant Equipment Schedule including any extension thereof for an imposition relating to a record date or status date that fell within the term of the relevant Equipment Schedule, including any extension thereof or is otherwise associated with Lessee's leasing, possession or use of the Equipment against Lessor or Lessee or the Equipment by any federal, state, county or local government or taxing authority upon or with respect to [i] the Equipment or any Unit; [ii] upon the leasing, ordering, purchase, sale, ownership, use, operation, return or other disposition thereof; [iii] the Monthly Rental or any other sums due hereunder with respect to any Equipment Schedule, or [iv] the leasing of the Equipment [excepting only federal, state and local taxes measured by the net income of Lessor or any franchise tax upon Lessee measured by Lessor's capital, capital stock or net worth]. Because the payment due date or reimbursement date for an imposition may occur after the expiration or termination of the term of the relevant Equipment Schedule, it is understood and agreed that Lessee's liability for such Impositions shall survive the expiration or termination of the term of the relevant Equipment Schedule.

6.2 BILLING: Lessee shall, to the extent permitted by law, cause all Impositions to be billed to Lessee. Lessee shall, at its expense, timely file all forms and returns and timely do all things required to be done in connection with the levy, assessment and payment of any Impositions, and Lessor hereby appoints Lessee as Lessor's attorney-in-fact where necessary for such purposes; Lessee shall submit written evidence to Lessor of the payment of all Impositions required to be paid by Lessee hereunder promptly after such payment. Notwithstanding the foregoing, Lessor, in its sole discretion, may pay any Imposition itself or file any forms or returns with respect thereto. If Lessor pays any Imposition, Lessee shall, when billed, reimburse Lessor for such payment.

6.3 CONTEST: Lessee may contest any Imposition by appropriate legal proceedings provided the nonpayment of such Imposition thereof, or such proceedings, will not, in the opinion of counsel for Lessor, adversely affect the title, property interest or rights of Lessor in the Equipment and provided further that, if requested by Lessor, Lessee has given to Lessor security, sufficient in form and amount, in Lessor's reasonable judgment, to fully satisfy the amount of the contested Imposition.

## 7. DELIVERY AND RETURN

Lessor shall arrange for delivery, and Lessee shall pay, when billed, all delivery expenses (including, without limitation, transportation costs and the cost of in-transit insurance) associated with the delivery of each Unit from its previous location to the location specified in the relevant Equipment Schedule. Lessee shall inspect each Unit upon delivery, identify any observable damage prior to accepting delivery, and note any such damage on the bill of lading. Costs of repair which are not recoverable from the carrier because of Lessee's failure to properly inspect for observable damage shall be borne and promptly paid by Lessee. Lessee shall provide a suitable place for installation of the Equipment with all appropriate facilities as specified by the manufacturer. Lessor shall arrange and Lessee shall pay for the installation of each Unit [if Lessee wishes to have the Equipment installed by an installer other than the manufacturer or some other party approved in writing by Lessor, then Lessee shall accept the Equipment "as is" and Lessor's warranty set forth in Paragraph 4.1 (a) shall not apply]. Upon the termination of Lessee's right to possession of any Unit [by expiration of the term of the relevant Equipment Schedule or otherwise], Lessee shall, in accordance with Lessor's instructions and at Lessee's expense [including without limitation transportation costs and costs of in-transit insurance] return the Unit to such location within the Continental United States as shall be designated by Lessor. Lessee shall reimburse Lessor for all expenses paid by Lessor associated with return of the Unit when billed. Lessee shall return each Unit in the same operating order, repair, condition and appearance as when received, excepting only normal wear and tear, and with all engineering changes prescribed by the manufacturer prior to the termination of Lessee's right of possession incorporated in the Unit. Lessee, at its expense, shall make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance contract upon its return and shall have the Unit certified as eligible for the same. At the time the Equipment is returned, Lessee shall provide a letter from the manufacturer certifying such maintenance eligibility.

## 8. CARE OF EQUIPMENT

8.1 USE AND MAINTENANCE: Lessee shall, at its expense, maintain the Equipment in good operating order, repair, and condition. Lessee shall not use the Equipment for any purpose other than that for which it was designed. Prior to the delivery date and before any action is taken to install the Equipment, Lessee shall make a written request to the manufacturer for continued coverage of the Equipment under one of the manufacturer's standard maintenance agreements, and shall, at its expense, enter into and maintain in force such maintenance agreement for each Unit and provide Lessee with a copy of such agreement. IF LESSEE FAILS TO MAKE THE PROPER WRITTEN REQUEST TO THE MANUFACTURER FOR COVERAGE UNDER ONE OF THE MANUFACTURER'S STANDARD MAINTENANCE

LYC 00003

AGREEMENTS, THEN LESSEE SHALL ACCEPT THE EQUIPMENT "AS IS" AND LESSOR'S WARRANTY SET FORTH IN PARAGRAPH 4.1(A) SHALL NOT APPLY. In no event, however, shall Lessee be required to enter into such a contract for any Unit so long as that Unit is under a manufacturer's warranty which provides substantially similar coverage.

8.2  ALTERATIONS AND ATTACHMENTS:  With the prior written consent of the Lessor, Lessee may, at its expense, make alterations or add attachments to the Equipment which are removable and which do not interfere with the normal and satisfactory operation or maintenance of the Equipment or Lessee's ability to obtain the maintenance contract required in Section 8.1 above. Upon the termination of Lessee's right to possession of any Unit, any alterations or attachments to such Unit shall become the property of Lessor unless removed at Lessee's expense prior to such termination. Lessee shall have the right, following termination of Lessee's right to possession of any Unit, to remove any attachments or alterations made by Lessee to such Unit and dispose of the same without any liability therefor to Lessee and Lessee shall pay the costs of such removal when billed.

8.3  INSPECTION.  Lessee shall make the Equipment available to Lessor, Secured Party (hereinafter defined) and Assignee (hereinafter defined) or the designees of any of them during normal working hours for inspection or for any other reasonable purpose.

## 9.  LOSS OR DAMAGE.

9.1  RISK OF LOSS:  Lessee shall be responsible for and hereby assumes the entire risk of the Equipment being lost, damaged, destroyed, stolen, or otherwise rendered unfit or unavailable for use from the date of delivery to Lessee to the date of return to Lessor.

9.2  OCCURRENCE OF LOSS:  If any Unit is lost, damaged, destroyed, stolen, or otherwise rendered unfit for use, Lessee shall give to Lessor immediate notice thereof, and this Master Lease and the applicable Equipment Schedule shall continue in full force and effect without any abatement in the Monthly Rental. Lessee shall determine within fifteen (15) days after the date of the occurrence of damage whether such Unit can be repaired. In the event Lessee determines that such Unit can be repaired, Lessee, at its expense, shall cause such Unit to be promptly repaired. If a Unit is lost, destroyed or stolen or if Lessee determines that a damaged Unit cannot be repaired, Lessee shall, at Lessor's direction, within thirty (30) days of such event either replace the Unit with an identical Unit, the title to which shall thereupon vest in Lessor and which thereafter shall be considered the Unit subject to the Equipment Schedule with no abatement in the Monthly Rental or, to Lessor's sole discretion, pay to Lessor an amount equal to the Stipulated Loss Value of the Unit determined as of the date of payment in accordance with the Stipulated Loss Value Schedule attached to the applicable Equipment Schedule together with all unpaid Monthly Rental which is due and payable through the date of payment.  Upon such payment, Lessee's obligation to pay further Monthly Rental for such Unit shall cease.

## 10.  INSURANCE.

10.1  PROPERTY INSURANCE:  Throughout the term of each Equipment Schedule, Lessee shall, at its expense, maintain in full force and effect "all risk" extended coverage, fire and casualty insurance for the Equipment. Such insurance shall provide for coverage in an amount equal to the greater of the Stipulated Loss Value or the replacement cost of the Equipment at the time of loss. Lessor shall be named as the Loss Payee on such policy. In addition, the policy shall, by means of a standard mortgage clause, name the Secured Party and Assignee as additional insureds and loss payees as their interest shall appear. Such policy shall provide that it may not be canceled or materially altered unless thirty (30) days prior written notice is given to all parties named therein. Upon Lessor's written request, Lessee shall provide Lessor with a Certificate of Insurance evidencing such insurance coverage. If, within two weeks after Lessee's receipt of such request, Lessee has not provided Lessor with a satisfactory Certificate then Lessor may, at Lessor's option, obtain such insurance until Lessor provides the Certificate, and Lessee shall reimburse Lessor for the cost of such insurance when billed.

10.2  LIABILITY INSURANCE:  During the term of this Master Lease, Lessee, at its expense, shall maintain reasonable, commercial general liability and property damage insurance with respect to the use, possession and operation of the Equipment in an amount not less than one million dollars for each occurrence.

## 11.  INDEMNIFICATION

Lessee shall and does hereby indemnify and hold Lessor, any Assignee, and any Secured Party, harmless from and against any and all claims, costs, reasonable attorneys' fees, expenses, damages, and liabilities (including those resulting from the application of strict liability doctrines or statutes) arising out of Lessee's selection, possession, leasing, operation, control, use, maintenance, delivery, or return of the Equipment. Notwithstanding the foregoing, Lessee shall not be required to indemnify a party for any claim resulting from acts of that party which constitute willful misconduct or gross negligence.

## 12.  ASSIGNMENT, SUBLEASE OR RELOCATION BY LESSEE

UPON AT LEAST THIRTY (30) DAYS PRIOR WRITTEN NOTICE TO LESSOR, LESSEE MAY ASSIGN OR SUBLEASE A UNIT TO ANY PARTY, OR RELOCATE A UNIT TO ANY LOCATION, WITHIN ANY STATE OF THE CONTINENTAL UNITED STATES, PROVIDED THAT LESSOR, ASSIGNEE, AND SECURED PARTY, IN SUCH PARTIES' SOLE DISCRETION, SHALL HAVE APPROVED SUCH ASSIGNEE, SUBLESSEE, OR LOCATION, AND PROVIDED FURTHER THAT (I) ALL COSTS OF ANY NATURE WHATSOEVER INCLUDING ANY ADDITIONAL IMPOSITIONS AND ANY ADDITIONAL EXPENSES ASSOCIATED WITH FILING NEW PRECAUTIONARY UNIFORM COMMERCIAL CODE FINANCING STATEMENTS) RESULTING FROM ANY RELOCATION, ASSIGNMENT OR SUBLEASE SHALL BE BORNE BY LESSEE; (II) ANY ASSIGNMENT OR SUBLEASE SHALL BE MADE EXPRESSLY SUBJECT AND SUBORDINATE TO THE TERMS OF THIS LEASE; AND (III) LESSEE SHALL ASSIGN ITS RIGHTS UNDER SUCH ASSIGNMENT OR SUBLEASE TO LESSOR, ASSIGNEE, OR SECURED PARTY AS ADDITIONAL COLLATERAL AND SECURITY FOR LESSEE'S OBLIGATIONS HEREUNDER.  In the event of a relocation, assignment, or sublease, Lessee and its assignee or its sublessee shall cooperate with Lessor in taking all reasonable measures to protect the title of Lessor or Assignee and the interest of any Secured Party to and in the Equipment. No relocation, assignment, or sublease shall relieve Lessee of its primary obligations under the relevant Equipment Schedule and this Master Lease.

## 13.  ASSIGNMENT BY LESSOR

Lessor shall have the right to assign as security its interest or grant a security interest in any or all of the Equipment Schedules which may from time to time be executed and the Units described in any such Equipment Schedules to a security assignee ("Secured Party"). Lessor shall also have the right to sell or otherwise dispose of any or all of the Units described in any Equipment Schedule, subject to the prior right of Lessee to such Units, and to assign its interest as Lessor under such Equipment Schedule, to any assignee ("Assignee"). Any such assignment shall not in any way release Computer Sales International, Inc. from liability for performance of the Lessor's obligations hereunder. Lessee acknowledges that any assignment by Lessor will not materially change Lessee's duties or obligations under the Equipment Schedule nor materially increase the burden or risk imposed on Lessee.  Lessee hereby consents to and shall acknowledge such assignment or assignments as shall be designated by written notice to Lessee by Lessor. Lessee further covenants and agrees that:

[a]  Any such Secured Party or Assignee shall have and be entitled to exercise any and all discretions, rights and powers of Lessor under the Equipment Schedule to which it has an interest, provided that a Secured Party or Assignee shall not be obligated to perform any of the obligations of Lessor other than Lessor's obligations under Paragraph 4.1 (b).

[b]  Lessee shall pay directly to the Secured Party or Assignee all Monthly Rental and all other sums due upon receipt of notice of any assignment and of instructions to do so; and

LYC 00004

[c] After an assignment to a Secured Party or Assignee, Lessee's obligations hereunder including its obligation to pay the Monthly Rental and any and all other amounts payable under the Equipment Schedule by Lessee shall be absolute and unconditional and shall not be subject to any abatement, reduction, recoupment, defense, setoff, or counterclaim available to Lessee against Lessor for any reason whatsoever.

[d] Only one executed counterpart of any Equipment Schedule shall be marked "Original"; any other executed counterparts shall be marked "Non-original" or "Copy". No security interest in any Equipment Schedule may be created through the transfer and possession of any counterpart other than the "Original", nor shall any sale, assignment or transfer of any interest in an Equipment Schedule be effective or be binding upon Lessee through the transfer and possession of any counterpart other than the "Original".

## 14. EVENTS OF DEFAULT

The occurrence of any one or more of the following events ["Events of Default"] shall constitute a default under the relevant Equipment Schedule:

[a] Lessee fails to pay the Monthly Rental, or any other amount due hereunder, on or before the date the same is due and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[b] any financial statements or information or any other representation or warranty given to Lessor proves to have been materially false or misleading as of the date it was given by or on behalf of Lessee;

[c] Lessee fails to observe or perform any other term, condition, obligation, agreement or covenant set forth herein, and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[d] Lessee assigns or attempts to assign this Master Lease or any Equipment Schedule, or removes, transfers, encumbers, sublets or parts with possession of any Unit, attempts to do any of the foregoing, or suffers or permits any of the foregoing to occur except as expressly permitted hereto;

[e] Lessee ceases doing business as a going concern, or it or its shareholders take any action looking to its dissolution or liquidation;

[f] the entry of an order for relief under the United States federal bankruptcy laws or the entry of any other decree or order by a court having jurisdiction in the premises adjudging the Lessee a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Lessee under the United States federal bankruptcy laws or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

[g] the commencement by the Lessee of a voluntary case under the United States federal bankruptcy laws, or the institution by the Lessee of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, an arrangement with creditors or an order for relief under the United States federal bankruptcy laws or any other applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts as they become due, or, to the knowledge of the Lessee, the taking of corporate action by the Lessee in furtherance of any such action.

## 15. REMEDIES

15.1 EXPRESS REMEDIES: If an Event of Default occurs, Lessor may, at its option, do any or all of the following:

[a] proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the relevant Equipment Schedule, and the covenants and terms of this Master Lease to the extent it pertains to such Equipment Schedule, and to recover from Lessee any and all damages or expenses, including reasonable attorneys' fees, which Lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder, or

[b] by notice to Lessee, declare immediately due and payable all monies to be paid by Lessee during the Initial Term [or any extended term then in effect] of the Equipment Schedule, as liquidated damages, and not as a penalty, and Lessor shall have the right, to the extent permitted by law, to [i] recover all monies so declared due and payable, discounted to the date of payment at the rate of ¼% per annum, or one-half of the then-prevailing prime interest rate charged by principal New York banks, whichever is less, as liquidated damages, and not as a penalty; [ii] recover all other amounts which are due or which become due under the Equipment Schedule [iii] terminate Lessee's right to possession [but not Lessee's obligations under this Lease] and to retake immediate possession of the Equipment without any process of law and for such purpose Lessor may enter upon premises where the Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the negligence of Lessor, Lessor's assignee or their respective agents and representatives [or may such entry or repossession] [iv] recover all expenses, including reasonable attorneys' fees, which Lessor shall have incurred or may incur by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder; and [v] pursue any other remedy permitted by law or equity. The possibility of a re-lease or resale under Paragraph 15.2 shall not excuse prompt payment in full by Lessee under this Paragraph 15.1.

15.2 RE-LEASE OR RESALE: Lessor shall make a reasonable, good faith effort to retake possession of the Equipment and, if Lessor succeeds in retaking possession of any Unit, Lessor shall sell or lease each Unit with the privilege of becoming the purchaser thereof, at public or private sale, for cash or on credit. Lessee's share of the proceeds of any such sale or lease ["Lessee's Share"] shall be the lesser of [a] the amount by which the Re-Lease Proceeds or the Resale Proceeds of such Unit exceed the Remarketing Costs of such Unit, and [b] the amount payable by Lessee to Lessor pursuant to Paragraph 15.1 [iii] above with respect to such Unit. Lessor shall credit Lessee's Share against all amounts owed by Lessee to Lessor under Paragraph 15.1 or otherwise and the remainder of Lessee's share, if any, shall be paid to Lessee. EXCEPT AS SET FORTH IN THIS PARAGRAPH LESSEE HEREBY WAIVES ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY REQUIRE LESSOR TO MITIGATE ITS DAMAGES OR MODIFY OR LIMIT ANY OF LESSOR'S RIGHTS OR REMEDIES STATED HEREIN. In applying this provision, the following definitions shall apply:

[a] The "Re-Lease Proceeds" of a Unit shall mean the present value [discounted to the date of payment using the interest rate at which Lessor has non-recourse financing or a non-recourse financing commitment with respect to the re-lease] of the monthly rental payments for the Unit under a re-lease to a third party, taking into account only those monthly rental payments under the re-lease which are payable on or before the last day of the Initial Term or the last day of any extended term [in effect] with respect to the Unit under the Equipment Schedule. If the re-lease is not financeable, the Re-Lease Proceeds shall be the monthly rental payments for such period as received.

[b] The term "Resale Proceeds" of a Unit shall mean the amount by which the proceeds of any sale of the Unit exceed the Lessor's estimate of the fair market value of the Unit at the end of the Initial Term or at the end of any extended term then in effect with respect to the Unit under this Master Lease.

[c] The term "Remarketing Costs" of a Unit shall mean all expenses incurred directly or indirectly by Lessor in re-leasing or selling the Unit and in obtaining a financing commitment in the case of a re-lease of a Unit, including, without limitation, reasonable fees and commissions [including a reasonable fee to Lessor] incurred in locating a buyer, a subsequent lessee or a financing

LYC 00005

commitment, attorneys' fees, the cost of recovering the Unit from the Lessee and transportation, installation, refurbishing, reconditioning and storage charges.

15.3 NO WAIVER: The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of a breach of any other obligation, or of any subsequent breach of the same or any other obligation. The subsequent acceptance of rental payments hereunder by Lessor shall not be deemed a waiver of any prior existing breach by Lessee regardless of Lessor's knowledge of such prior existing breach at the time of acceptance of such rental payments.

15.4 CUMULATION: To the extent permitted by law, the above remedies shall be deemed cumulative and may be exercised successively or concurrently.

## 16. PERFORMANCE AND EXECUTION

Lessee represents and warrants to Lessor [i] that the execution and performance of this Master Lease and each Equipment Schedule have been duly authorized by Lessee and that upon execution by Lessee and Lessor this Master Lease and each Equipment Schedule will constitute a valid obligation binding upon, and enforceable against, Lessee in accordance with the terms of the Master Lease and each Equipment Schedule [ii] that neither the execution of this Master Lease or any Equipment Schedule nor the due performance thereof by Lessee will result in any breach of, or constitute any default under or violation of, Lessee's certificate or articles of incorporation, Lessee's by-laws or any agreement to which Lessee is a party or by which any interest of Lessee may be affected; [iii] that Lessee is in good standing in its state of incorporation and in the states where any Unit is to be located; [iv] the persons executing this Master Lease and each Equipment Schedule on behalf of Lessee have been duly authorized to do so; and [v] that any and all financial statements and other information with respect to Lessee heretofore furnished by Lessee to Lessor in connection with negotiations concerning one or more Equipment Schedules were, when furnished, and remain at the time of execution of any Equipment Schedule, true and without any misleading omissions, excepting any changes which have been disclosed in a written notice to Lessor.

## 17. ADDITIONAL DOCUMENTATION

Lessee shall promptly deliver to Lessor the documentation listed below which may from time to time be requested by Lessor. If such a request is made prior to the delivery of any Unit, receipt of such documentation shall be a condition precedent to Lessor's obligation to deliver such Unit:

[a] financial information including, without limitation, a copy of Lessee's balance sheet and income statement for Lessee's three prior fiscal years, certified by independent certified public accountants and such other current financial information representing the financial condition and operations of Lessee as Lessor may from time to time reasonably request;

[b] a certificate of the resolutions of the Board of Directors of Lessee duly authorizing or ratifying this Master Lease or any Equipment Schedule executed hereunder;

[c] a certificate of incumbency setting forth names and signatures of those persons authorized to execute this Master Lease or any Equipment Schedule on behalf of Lessee;

[d] landlord's and/or mortgagee's waiver, in form and substance satisfactory to any Assignee or Secured Party, from any landlord or mortgagee of any premises upon which any Unit is located;

[e] an opinion of counsel for Lessee as to the matters set forth in Paragraph 16. [i] through [v] above, and as to such other matters as Lessor may reasonably request; and

[f] such document confirming the execution of the Lease necessary or desirable to effect an assignment, to perfect an interest of Lessor, a Secured Party or Assignee, or for such other purpose relating to the Master Lease and/or any Equipment Schedule or to an assignment as Lessor may reasonably request. Lessee hereby appoints Lessor as Lessee's agent to prepare, execute and file in Lessee's name precautionary Uniform Commercial Code financing statements in connection with each Equipment Schedule showing the interest of Lessor, and any Assignee or Secured Party in the Equipment as appropriate.

## 18. GENERAL

18.1 TITLE: This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest. Lessee shall, at its expense, protect and defend Lessor's title to the Equipment and the interest of any Assignee or Secured Party against all persons claiming against or through Lessee. Lessee shall keep and maintain the Equipment and this Master Lease free and clear of all liens and encumbrances (other than those placed on the same by Lessor and the liens for current taxes not yet payable).

18.2 FIXTURES: Lessee will not affix any Unit of the Equipment to any real property if, as a result thereof, the Unit will become a fixture under applicable law.

18.3 ENTIRE AGREEMENT: This Agreement (together with all schedules and attachments hereto) constitutes the entire agreement between Lessor and Lessee, and no provision hereof may be amended or modified except in writing signed by Lessor and Lessee. NO PROVISION OF THIS AGREEMENT MAY BE WAIVED EXCEPT IN WRITING SIGNED BY THE PARTY FROM WHOM SUCH WAIVER IS SOUGHT, AND ANY SUCH WAIVER SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN.

**[LESSEE'S**

**INITIALS:** _____

18.4 NOTICES: All notices hereunder shall be in writing and shall be delivered in person or sent by registered or certified mail, to the address of the party contained herein, and shall be deemed received three [3] days after deposit in the United States mail with postage prepaid. Either party may change its address for notice purposes by notifying the other party in the manner aforesaid of such change. Lessee shall also send copies of all notices sent to Lessor, to Secured Party, or Assignee [if any].

18.5 SEVERABILITY: Any provision hereof prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of this Agreement provided, however, that where the provisions of any such applicable law may be lawfully waived, they are hereby waived by Lessee and Lessor to the full extent permitted by law.

18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE. This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.

18.7 PERFORMANCE OF LESSEE'S OBLIGATIONS: If Lessee shall fail to make any payment or perform any act required by this Master Lease or any Equipment Schedule, Lessor may at Lessee's expense, but shall not be obligated to, make such payment or perform such act without notice to or demand upon Lessee and without waiving or releasing any obligation or default. Lessee shall, when billed, reimburse Lessor for any expense incurred hereunder by Lessor in performing Lessee's obligations. LESSEE MAY NOT ASSIGN ITS RIGHTS OR OBLIGATIONS, EXCEPT AS SPECIFICALLY PROVIDED IN PARAGRAPH 12 OF THIS MASTER LEASE.

18.8 SURVIVAL: All representations, warranties, indemnities, and covenants contained in this Master Lease and in any Equipment Schedule, which by their nature would continue beyond the termination, cancellation or expiration of the Lease, including, by way of illustration only and not limitation, those in Paragraphs 6, 10, 11 and 18, shall continue in full force and effect and shall survive

LYC 00006

notwithstanding the full payment of all amounts due hereunder or the termination of Lessor's right to possession of any Unit.

**18.9 HEADINGS:** Headings and captions are for convenience of reference only and shall not be construed as part of the Lease.

**18.10 OVERDUE PAYMENTS:** Any Monthly Rental due Lessor under this Master Lease, if not paid by the fifth day of the month to which payment became due, shall accrue interest until paid at a rate equal to one and one-half percent per month, or the maximum rate permissible by law, whichever is lower. Any other amounts payable to Lessor by Lessee under this Master Lease are due and payable within fifteen (15) days after the billing date, and, if not paid on or before such due date, shall accrue interest from the due date until paid at a rate equal to one and one-half percent per month, or the maximum rate permitted by law, whichever is lower.

**18.11 CONSENT OR APPROVAL:** With respect to any provision herein which calls for the consent or approval of a party, such consent or approval shall not be unreasonably withheld.

**18.12 SUBSTITUTION OF EQUIPMENT:** If, at any time during the term of an Equipment Schedule, Lessor's right to lease the Equipment expires, Lessor shall promptly provide identical substitute Equipment, and all expenses of such substitution, including de-installation, installation and transportation expenses, shall be borne by Lessor.

**18.13 DELIVERY FOR EXAMINATION:** Submission of the form of this Master Lease for examination shall not bind Lessor in any manner, and no obligations shall arise until this instrument is signed by both Lessor and Lessee.

**18.14 TERMS IN EQUIPMENT SCHEDULES:** If the provisions of any Equipment Schedule are inconsistent with the provisions of this Master Lease, then the provisions of such Equipment Schedule shall control.

LESSOR:                                          LESSEE:
COMPUTER SALES INTERNATIONAL, INC.               LYCOS, INC.


BY: _____                      BY: _____

TITLE: _____                   TITLE: _____

DATE: _____                    DATE: _____
                                                 (Please initial page 5, section 18.3).


ML 4/96

LYC 00007

## FIRST AMENDMENT TO MASTER LEASE NO. 144874

This Amendment to Master Lease Agreement No. 144874 (the "Master Lease") is dated February 28, 2001, and is between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Lessor and Lycos, Inc., a Delaware corporation, as lessee previously entered into the Master Lease and various Equipment Schedules thereunder for the lease of computer equipment. Lycos, Inc. subsequently merged with another company and the parties want to amend the Master Lease, and each Equipment Schedule thereunder, to change the lessee accordingly. In consideration of the foregoing and the promises and covenants contained in this Amendment, the parties agree to amend the Master Lease and each Equipment Schedule on the terms and conditions set forth below:

1. The Lessee is changed to LYCOS, INC., a Virginia corporation, which assumes all the obligations under the Master Lease and all current Equipment Schedules thereunder.

2. All other terms and conditions of the Master Lease and each Equipment Schedule remain unchanged and in full force and effect.

The parties have executed this Amendment as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.        LYCOS, INC.

By: _Lorraine S Cherick_                   By: _Brian O Ly_

Title: _SVP + Gen'l Counsel_               Title: _CFO_

Date: _3/28/01_                            Date: _3/16/01_

144874-000.a1rev(pw).doc
PHS/BOST

## ADDENDUM ONE TO MASTER LEASE AGREEMENT NO. 144...

This Addendum One to Master Lease Agreement No. 144874 (the "Lease"), December 4, 1996 and is entered into by and between COMPUTE. INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parti dated on even date herewith, and in consideration of the mutual promises, covenan ... conditions contained in the Lease and contained herein, and for other good and va. able consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflict as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Section 2.2 Initial Term:** In line 6, delete "120" and insert "60."

3. **Section 15.1 Express Remedies:** In subsection [b][i], delete "4%" and insert "6%."

4. **Section 15.2 Re-lease or Resale:** In line 7, after "PARAGRAPH," insert "AND TO THE EXTENT PERMITTED BY LAW."

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.

BY: _____
        E. WILLIAM CILLOGA
        CHIEF OPERATING OFFICER & CFO

TITLE: _____

DATE: _____ JAN 1 0 1997 _____

LYCOS, INC.

BY: _____

TITLE: _CHIEF OPERATING OFFICER_

DATE: _DECEMBER 20, 1996_

PS/Bost,
144874-00Addm1(lfc)

LYC 00018

# EXHIBIT B

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 67E Dated as of June 16, 2000

LESSOR:                                  LESSEE:   **LYCOS, INC.**
                                                    400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**             Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4,
1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|--------------------|------------------------------|-------------|----------|-----------|-------------------------------------|
|     |                    |                              |             |          |           |                                     |
| A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF ONE PAGE. | | | | | | |
| EQUIPMENT LOCATION: | | 1675 NORTH SHORELINE BLVD. MOUNTAIN VIEW, CALIFORNIA 94043 | | | | |

2. Monthly Lease Rate Factor for all Units: **See Addendum One**
3. Initial Term: **Twenty-four (24) months**
4. Anticipated Installation Date: **June 15, 2000 through September 30, 2000**
5. Addendum One hereto is incorporated herein by this reference. ☒ (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before **June 23, 2000.**

COMPUTER SALES INTERNATIONAL, INC.  LESSEE: LYCOS, INC.

By: _E. William Grinta_                By: _Ed d M P g_

Title: _PRESIDENT_                      Title: _CFO_

Date: _JUL 1 8 2000_                    Date: _7|12|00_

PHS/BOST
144874-067E(asd).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## EXHIBIT "A"
## LYCOS, INC.
## EQUIPMENT SCHEDULE 67E TO MASTER LEASE 144874

| QTY | DESCRIPTION | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|-----|-------------|-----------|-------------------------------------|
| * | Desktop PC's and PC Servers, with a processor speed of 500 Mhz Monitors Other Printers | NEW | .03875 times Unit cost |
| * | Miscellaneous standalone hardware, with its own serial number, e.g. Copiers, Scanners, FAX Machines, Clone PC's | NEW | .043 times Unit cost |
| * | Miscellaneous hardware, without its own serial number or a relation to other Units on this Lease, e.g. Cards, Memory, Modems | NEW | .0463 times Unit cost |

Initialed by:   Lessor _____

Lessee _____

PHS/BOST
144874-067E(aad).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67E
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67E, Master Lease Agreement No. 144874" (the "Lease"), is dated as of June 16, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Lessor's Purchase of Equipment:**

a) Lessor will purchase the Equipment directly from the vendor(s) designated by Lessee.

b) The Total Cost of the Lease (hardware, software license fees and other costs) is not to exceed $500,000.00. If Lessee wants this Lease to cover costs greater than $500,000.00, Lessor, in its sole discretion, may pay the additional costs.

c) Lessor is not liable for any failure or delay in delivery caused by the manufacturer, vendor or any other party or condition not within Lessor's control.

*3.    **Quantities; Monthly Rental:**

a) This Equipment Schedule covers all machines of the type(s) listed that are installed at Lessee's facilities between June 15, 2000 and September 30, 2000, inclusive. At this time, Lessee is unable to specify exactly how many Units will be installed; therefore, the "quantity" column has been left blank. As Lessee determines the quantities of Equipment it requires, Lessee shall have the applicable vendor send to Lessor invoices which will reference this Lease and which will specify machine type(s), quantities, equipment location(s), sales price, serial number(s) and installation date(s) of the Units ordered by Lessee. Upon receipt of each properly prepared invoice, Lessor shall remit the sales price to the vendor.

b) Monthly Rental per Unit will equal the "Monthly Lease Rate Factor" for that Unit, which is specified in the Equipment Schedule or on Exhibit "A", multiplied by the Unit's cost. On October 1, 2000, or as soon thereafter as is reasonably practicable, Lessee shall execute a Certificate of Acceptance for all installed Equipment, which Certificate verifies the actual quantities of machines; and the Monthly Rental per Unit and the total Monthly Rental for the Equipment Schedule, both of which will be expressed as dollar amounts.

4.    **Initial Term:**  The twenty-four (24) month Initial Term shall start on October 1, 2000, and expire on September 30, 2002. Lessee shall pay to Lessor Daily Rental as set forth in Section 3 of the Master Lease, for each Unit of Equipment for each day from, and including, its installation date through, but not including, October 1, 2000. Daily Rental shall be due in a lump sum on October 1, 2000.

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

5.    **Stipulated Loss Value**: Because the actual quantities of Equipment are unknown at this time, a specific dollar amount Base Value cannot be listed on the Stipulated Loss Value Schedule. Instead, "Equipment Cost" has been specified so that, at the time of a loss, the Stipulated Loss Value shall be equal to the cost of the Unit times the applicable percentage. The parties agree, however, that a specific dollar amount Base Value will be set forth in the Certificate of Acceptance referred to above.

6.    **Software License Fees and Other Costs**: In consideration of Lessee's entering into this Lease, Lessor shall pay on Lessee's behalf various operating and/or application software license fees so that Lessee may use such software packages in connection with the Equipment. Lessor may also pay other costs related to the Equipment, on Lessee's behalf. Lessee shall reimburse Lessor for such costs by (i) paying a daily charge equal to one-thirtieth of the Soft Cost Factor set forth below times the cost of the software license fee or other cost for each day from and including the date Lessor pays such fees or costs through, but not including October 1, 2000, such total daily charges to be paid in a lump sum on October 1, 2000, and (ii) making a monthly payment to Lessor equal to .04646 (the "Soft Cost Factor") times the cost of the applicable software license fees or other costs. The resulting monthly payment amount will then be assigned on a pro-rata basis (pro-rated by Unit cost) to Units of Equipment and will be treated as additional rental for the lease of the Equipment. The total amount of software license fees and other costs will not exceed five percent (5%) of the Total Cost of the Lease, without Lessor's prior written consent. Because Lessor makes payments as invoices are received throughout the installation period, the percent of software license fees and other costs to the Total Cost of the Lease is generally not known until the final reconciliation of the Lease. If Lessor determines that the total amount of software license fees and other costs exceed five percent (5%) of the Total Cost of the Lease, Lessor shall have the option to exclude the excess software license fees and other costs from this Lease and Lessee agrees to reimburse Lessor for such amounts.

7.    **Interest Rate Contingency**: The Lease Rate and Soft Cost Factors (the "Rate Factors") specified in this Lease are based upon the yield to maturity of U.S. Treasury notes maturing in September 2002 (the "Treasury Yield"); the Treasury Yield is currently 6.54%. Lessor intends to obtain a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral (the "Loan"). If, at the time the Loan is closed, the *then current* Treasury Yield exceeds 6.54%, then the Rate Factors shall be increased by .0001 for each 25 basis points by which the *then current* Treasury Yield exceeds the current Treasury Yield of 6.54%. The Rate Factors will be increased only until the *then current* Treasury Yield exceeds the current Treasury Yield by 300 basis points. Any increases in the Treasury Yield in excess of 300 basis points will have no further effect on the Rate Factors. Increases of the Treasury Yield by increments of less than 25 basis points will have no effect on the Rate Factors.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67E, Master Lease No. 144874, as of the date set forth below.

| COMPUTER SALES INTERNATIONAL, INC. | LYCOS, INC. |
|---|---|
| By: | By: |
| Title: E. William Bizula President | Title: CFO |
| Date: JUL 18 2000 | Date: 7/12/00 |

PHS/BOST

144874-067E(aad).doc

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67E

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: Equipment Cost

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-067E(aad).doc

# EXHIBIT C

# NON-ORIGINAL

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 67H Dated as of October 30, 2000

LESSOR:                          LESSEE:     **LYCOS, INC.**

**COMPUTER SALES INTERNATIONAL, INC.**           400-2 Totten Pond Road
Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or
any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4,
1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

A DETAILED LIST OF EQUIPMENT IS SET FORTH ON THE ATTACHED EXHIBIT "A" WHICH CONSISTS OF FIVE PAGES.

| EQUIPMENT LOCATION: | 400-2 TOTTEN POND ROAD WALTHAM, MASSACHUSETTS 02154-2000 |
|---|---|

2. Monthly Rental for all Units: **$36,438.41**
3. Initial Term: **December 1, 2000 through September 30, 2003; Thirty-four (34) months**
4. Anticipated Installation Date: **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary
   Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor
   on or before November 6, 2000.

**COMPUTER SALES INTERNATIONAL, INC.   LESSEE: LYCOS, INC.**

By: _____               By: _Thomas E. Guyprile_
      **E. WILLIAM GILLULA**
      PRESIDENT & COO
Title: _____            Title: _VP FINANCE & ADMIN_

Date: _____             Date: _11·14·00_
      NOV 2 9 2000

PHS/BOST
144874-067H(aad)

**NON-ORIGINAL**

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 67H, MASTER LEASE NO. 144874

$36,438.41

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A14UEC29S2CJ | | ULTRA 2 2300 | 913H2884 | 93901 | USED | $667.95 |
| | | X5229A (1) | 9.1GB HARD DRIVE | 913H2891 | | | |
| | | X1018A (1) | INTERFACE CARD | | | | |
| | | X3856A (1) | SCSI CABLE | | | | |
| | | MEMORY (1) | 512MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | CD-ROM (1) | CD-ROM | | | | |
| 2 | SUN SGXDSK060CS4 | | 54GB EXTERNAL MULTIPAC | 912C0119 | 93901 | USED | $286.88 |
| | | | | 912C0120 | | | |
| 1 | SUN SGXTAPDLT021 | | 35/70GB STOREDGE FLEXIPAC | 909C0018 | 93901 | USED | $241.99 |

PO NUMBER: 2550 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92250952 | 98362 | USED | $437.17 |
| | | MEMORY (1) | 256MB MEMORY | 92250951 | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | 92540468 | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | 92540467 | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| | | X6601A (1) | 8 BAY INT STORAGE EXPANSION | | | | |
| 1 | SUN A21UHC1A9P6P | | ULTRA 5 333 | 92540466 | 98362 | USED | $397.21 |
| | | MEMORY (1) | 256MB MEMORY | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | | | | |
| | | X5229A (4) | 9.1GB HARD DRIVE | | | | |
| | | X7004A (2) | 256MB MEMORY | | | | |
| 4 | SUN X7119A | | 19" MONITOR | 9851KEO273 | 98362 | USED | $27.80 |
| | | | | 9851KEO276 | | | |
| | | | | 9918KEO621 | | | |
| | | | | 9918KEO622 | | | |

PO NUMBER: 3419 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN A2S-MR6B | | ENTERPRISE 450 400 | 925H356A | 98361 | USED | $747.16 |
| | | MEMORY (1) | 512MB MEMORY | 925H359A | | | |
| | | DRIVE (1) | 9.1GB HARD DRIVE | | | | |
| | | X311L (1) | POWER CORD | | | | |
| 3 | SUN SGXLIBDLT128 | | STOREDGE L280 TAPE LIBRARY. 280-560GB | 9917R05959 | 98361 | USED | $736.76 |
| | | X1062A (1) | SBUS DIFF SCSI2 HOST ADAPTER | 9917R05937 | | | |
| | | X7005A (2) | 512MB MEMORY | 9917R05954 | | | |

PO NUMBER: 3421 ✓

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 8 | SUN X7004A | | 256MB MEMORY | N/A | 1991 | USED | $48.60 |

PO NUMBER: 4250 ✗

LYC 05454

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 6 | CISCO CS-150-LAN-04 | | CS-150 SWITCH/16PORT LOAD BALANCER | 21140011614 21140011666 21180014078 21180014081 21180014105 21180014152 | 162462 171983 | USED | $595.54 |
| | | | PO NUMBER: 4468 | | | | |
| 1 | SUN A34ULD19S002E | | ENTERPRISE 220R 450 | S016H3932 | 96865 | USED | $844.62 |
| | | MEMORY (1) DRIVE (1) VIDEO (1) X311L (1) | 4MB MEMORY 18GB HARD DRIVE 4MB VIDEO MEMORY POWER CORD | | | | |
| | | | PO NUMBER: 4921 | | | | |
| 1 | SUN A34ULD19S001EJ | | ENTERPRISE 220R 450 | S021H2FDB | 97171 | USED | $683.88 |
| | | MEMORY (1) DRIVE (1) X1195A (1) X311L (1) | 4MB MEMORY 1GB HARD DRIVE ULTRASPARC II 450MHZ PROCESSOR POWER CORD | | | | |
| | | | PO NUMBER: 4935 | | | | |
| 2 | IBM 2645-4EU | | THINKPAD 600X 7/500 | 78TAXK8 78TAYN8 | BZ46002 BZ26273 | USED | $103.42 |
| | | | PO NUMBER: 5005 | | | | |
| 2 | BIGIRON | | 4000 CHASSIS | 4108 4109 | 16058 | USED | $1,521.47 |
| | | MODULE (1) MODULE (3) POWER (1) | 8PORT GIG+ MGMT II MODULE 24PORT 10/100 ENET MODULE REDUNDANT POWER SUPPLY | | | | |
| | | | PO NUMBER: 5091 | | | | |
| 1 | NETWORK APPLIANCE | | STORAGESHELF FC9 | NA0000000004276 | 34972 | USED | $482.83 |
| | | DRIVE (7) X800E (2) | 18GB HARD DRIVE POWER CABLE | | | | |
| | | | PO NUMBER: 5148 | | | | |
| 5 | SUN A21UJC1A9PC6C | | ULTRA 5 400 | SFW02540187 | 98470 | USED | $147.14 |
| | | MEMORY (1) DRIVE (1) CD ROM (1) X1131A (1) X3515A (1) X471A (1) X3668A (1) | 256MB MEMORY 9GB HARD DRIVE 32X CD ROM PCI OPTION CARD US COUNTRY KIT 10" VIDEO ADAPTER PGX32 COLOR FRAME BUFFER CABLE | SFW02540224 SFW02540243 SFW02610237 SFW02610248 | 97452 | | |
| 5 | SUN X7136A | | 21" MONITOR | S0013LB1447 S0013LB1449 S0013LB1451 S0013LB1453 S0013LB1455 | 97452 | USED | $44.00 |
| | | | PO NUMBER: 5186 | | | | |

LYC 05455

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | COMPAQ | | DECSERVER 900TM 32 MJ8 CONNECTOR | N/A | BZ85812 | USED | $165.35 |
| | | TRANCEIVER (2) | MICRO TRANSCEIVER | | BZ70364 | | |
| | | DEHUA-CA (2) | DECHUB ONE | | BZ91755 | | |
| | | CARD (1) | 2MB FLASH CARD | | CA21642 | | |
| | | | | | CA35610 | | |
| | | | | | CA86642 | | |
| | | | | | CB19485 | | |

PO NUMBER: 5257

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 3 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550H5Y9 | 292703 | USED | $114.86 |
| | | | | 550H5K3 | 294540 | | |
| | | | | 550H5R8 | | | |
| 3 | VIEWSONIC | | 17" MONITOR | AY02012042 | 292703 | USED | $8.98 |
| | | | | AY02012047 | | | |
| | | | | AY02012046 | | | |
| 7 | IBM 6594-92U | | PC300PL P3/667 | 23RD279 | 293500 | USED | $72.61 |
| | | | | 23RF000 | | | |
| | | | | 23RF134 | | | |
| | | | | 23RF334 | | | |
| | | | | 23RF512 | | | |
| | | | | 23RF529 | | | |
| | | | | 23RD504 | | | |
| 3 | IBM 6594-92U | | PC300PL P3/667 | 23RD375 | 293806 | USED | $72.02 |
| | | | | 23RD806 | 293500 | | |
| | | | | 23RF433 | | | |
| 10 | VIEWSONIC | | 19" MONITOR | 304002200212 | 293500 | USED | $14.30 |
| | | | | 304002203313 | | | |
| | | | | 304002200211 | | | |
| | | | | 304002203309 | | | |
| | | | | 304002203304 | | | |
| | | | | 304002203308 | | | |
| | | | | 304002200208 | | | |
| | | | | 304002200207 | | | |
| | | | | 304002203305 | | | |
| | | | | 304002203314 | | | |

PO NUMBER: 5416

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | BIGIRON | | 8PORT GIG SX MODULE | CH24002212 | 17384 | USED | $769.24 |
| | | SWITCH (1) | FASTIRON 24PORT WG SWITCH | CH24002271 | | | |
| | | SWITCH (1) | NETIRON 16PORT SWITCH | | | | |

PO NUMBER: 5418

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 1 | SUN A34-ULD1-9S-512CX | | ENTERPRISE 220R 450 | S032A0888 | 13510 | USED | $1,526.88 |
| | | CACHE (1) | 4MB CACHE | | 13614 | | |
| | | X1195A (4) | 450MHZ PROCESSOR OPTION | | | | |
| | | X3508A (2) | TYPE 6 COUNTRY KIT | | | | |
| | | X7003A (4) | 128MB MEMORY | | | | |
| | | X1034A (3) | FAST ENET CONTROLLER PCI ADAPTER | | | | |

PO NUMBER: 5454

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 2 | SUN X2240A | | 300MHZ/2MB PROCESSOR OPTION | S352943 | 13242 | USED | $90.07 |
| | | | | S353019 | | | |

PO NUMBER: 5576

LYC 05456

**NON-ORIGINAL**

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 5 | SUN N06-UKC1-9S-256AT1 | | NETRA T1 MODEL 105 440 | S023C114F | 13526 | USED | $302.67 |
| | | MEMORY (1) | 256MB MEMORY | S023C111C | | | |
| | | CACHE (1) | 2MB CACHE | S023C1138 | | | |
| | | DRIVE (1) | 18GB HARD DRIVE | S024C0370 | | | |
| | | X5229A (1) | 9.1GB HARD DRIVE | S024C05B6 | | | |
| | | X6971A (1) | CD ROM | | | | |

PO NUMBER: 5601

| 1 | VIEWSONIC | | 22" MONITOR | QW02505877 | CO46206 | USED | $32.00 |

PO NUMBER: 5651

| 4 | ALTEON | | ACE SWITCH 180E | 60CF4582A0 | 805795 | USED | $573.66 |
| | | | | 60CF458550 | | | |
| | | | | 60CF44BF60 | | | |
| | | | | 60CF44E530 | | | |

PO NUMBER: 5656

| 1 | FASTIRON | | 72PORT 10/100 + 4PORT MGMT MODULE | 1464 | 19079 | USED | $617.54 |
| | | POWER (1) | REDUNDANT POWER SUPPLY | | | | |

PO NUMBER: 5713

| 1 | FASTIRON | | 72PORT 10/100 + 4PORT MGMT MODULE | 1465 | 19080 | USED | $558.15 |

PO NUMBER: 5734

| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550L5NO | 297583 | USED | $105.31 |

PO NUMBER: 10150

| 2 | CISCO 7206VX | | 7206VX BUNDLE W/NPE-300 | 72704917 | 276-026594 | USED | $787.17 |
| | | PWR-7200/2 (1) | DUAL AC POWER SUPPLY | 72704931 | 276-026593 | | |
| | | MEM-I/O-FLD48M (1) | 48MB MEMORY | | | | |
| | | MEM-SD-NPE-128M | 128MB MEMORY | | | | |
| | | PA-A3-T3 (1) | 1PORT ATM ENH DS3 PORT ADAPTER | | | | |

PO NUMBER: 90013

| 1 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZKR | 298561 | USED | $52.33 |
| 1 | VIEWSONIC | | 19" MONITOR | 304002200331 | 298561 | USED | $14.05 |

PO NUMBER: 90019

| 3 | IBM 6892-26U | | PC300PL P3/600 | 78ZYYZH | 298559 | USED | $52.60 |
| | | | | 78ZYZMG | | | |
| | | | | 78ZYYAV | | | |
| 3 | VIEWSONIC | | 19" MONITOR | 304002203094 | 298559 | USED | $14.32 |
| | | | | 304002203098 | | | |
| | | | | 304002200637 | | | |

PO NUMBER: 90020

| 4 | IBM 6892-26U | | PC300PL P3/600 | 78ZYZLL | 298397 | USED | $55.37 |
| | | | | 78ZYYBF | | | |
| | | | | 78ZYYZR | | | |
| | | | | 78ZYZKM | | | |

LYC 05457

NON-ORIGINAL

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | VIEWSONIC | | 19" MONITOR | 304002201116 304002201118 304002201124 304001600981 | 298397 | USED | $17.09 |

PO NUMBER: 90021

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 8 | IBM 6594-B1U | | PC300PL P3/733 | 23FTX06 23FTY17 23FTW24 23FTV07 23FTV49 23FTW18 23FTP78 23FTP13 | 299252 | USED | $72.57 |
| 8 | VIEWSONIC | | 19" MONITOR | 304002201122 304002201117 304002201121 304001601284 304001600986 304001600964 304001600980 304001600983 | 299252 | USED | $14.62 |

PO NUMBER: 90022

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 4 | IBM 2647-21U | | THINKPAD T20 7/650 | 78BKA69 78BKB04 78BKB69 78BKA90 | CL86299 CL35085 | USED | $97.01 |

PO NUMBER: 90023

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 1 | BIGIRON | MODULE (1) MODULE (2) POWER (2) MODULE (1) | 4000 CHASSIS 8PORT GIG+ MGMT II MODULE 24PORT 10/100 ENET MODULE REDUNDANT POWER SUPPLY 72PORT 10/100 + 4PORT MGMT MODULE | F00009376 | 21359 21180 | USED | $1,878.82 |
| 1 | BIGIRON | MODULE (1) MODULE (3) POWER (2) MODULE (1) | 4000 CHASSIS 8PORT GIG+ MGMT II MODULE 24PORT 10/100 ENET MODULE REDUNDANT POWER SUPPLY 72PORT 10/100 + 4PORT MGMT MODULE | F00009377 | 21359 21180 | USED | $2,092.93 |

PO NUMBER: 90030

| QTY. | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|
| 10 | IBM 9495-AG1 | | 17" MONITOR | 55C5966 55C5968 55C5969 55C5970 55C5971 55C5972 55C5973 55C5975 55C5984 55C5987 | CL70844 | USED | $52.55 |

PO NUMBER: 90033

Traced all P.O's to file
11/9/00

LYC 05458

NON-ORIGINAL

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 67H
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 67H, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 30, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Date:** The Equipment is installed at Lessee's location under Equipment Schedule 67E to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 67E expires on November 30, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is December 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 67E is October 1, 2000, and the total Monthly Rental is $42,074.79.

3.    **Serial Number Substitution:**

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical defect, or a casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

## NON-ORIGINAL

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 67H, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: _____       By: _____

       E. WILLIAM GILLULA
        PRESIDENT & COO

Title: _____       Title: __VP Finance & Adm__

Date: ____NOV 2 9 2000_____              Date: ___11/24/00_____

PHS/BOST
144874-067H(aad)

LYC 05460



## NON-ORIGINAL



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 67H

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,091,002.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 12 | 91.7% | 24 | 73.3% |
| 1 | 108.5 | 13 | 90.1 | 25 | 71.8 |
| 2 | 106.9 | 14 | 88.6 | 26 | 70.3 |
| 3 | 105.4 | 15 | 87.1 | 27 | 68.8 |
| 4 | 103.9 | 16 | 85.6 | 28 | 67.2 |
| 5 | 102.4 | 17 | 84.0 | 29 | 65.7 |
| 6 | 100.8 | 18 | 82.5 | 30 | 64.2 |
| 7 | 99.3 | 19 | 81.0 | 31 | 62.6 |
| 8 | 97.8 | 20 | 79.4 | 32 | 61.1 |
| 9 | 96.3 | 21 | 77.9 | 33 | 59.6 |
| 10 | 94.7 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 11 | 93.2 | 23 | 74.9 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST
144874-067H(aad)

CONFIDENTIAL
CSI0032727

# EXHIBIT D

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. NINETY-THREE Dated as of October 2, 2001**

LESSOR:                          LESSEE:     **LYCOS, INC.**
                                              400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**        Waltham, Massachusetts  02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| | | | | | | |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 66 pages.

**EQUIPMENT LOCATION:**   See Attached Exhibit "A"

2. Monthly Rental for all Units:  See Addendum One
   Initial Term:  **November 1, 2001 through October 31, 2003; Twenty-four (24) months**
4. Anticipated Installation Date:  **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before October 9, 2001.

**COMPUTER SALES INTERNATIONAL, INC.**   LESSEE: **LYCOS, INC.**

By: _E. WILLIAM GILLULA_            By: _Bill Cy_
        PRESIDENT & COO

Title: _____       Title: _CFO_

Date: _DEC 1 0 2001_                 Date: _10|4|01_

PHS/BOSTON
144874-093(dd)

**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-THREE
## MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-three, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Commencement Dates; Start of Initial Term; Total Monthly Rental:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, and 81 to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001. The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-four between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date | Total Monthly Rental for Units from terminating Equipment Schedule(s) |
|---|---|---|---|
| 65 | 10/31/01 | 11/1/01 | $14,299.85 |
| 64 | 1/31/02 | 2/1/02 | $5,055.76 |
| 81 | 6/30/02 | 7/1/02 | $1,242.25 |
| 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C | 9/30/02 | 10/1/02 | $58,838.59 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 | $17,923.69 |
| 64B, 66E, 67D, 69E | 3/31/03 | 4/1/03 | $11,644.10 |
| 64D, 67F, 69G | 5/31/03 | 6/1/03 | $12,502.28 |
| 64F, 67H, 69I | 9/30/03 | 10/1/03 | $21,901.71 |

LYC 07695

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

Accordingly, the total Monthly Rental under the Lease is as follows:

| | |
|---|---|
| for months November 1, 2001 through January 31, 2002: | $14,299.85; |
| for months February 1, 2002 through June 30, 2002: | $19,355.61; |
| for months July 1, 2002 through September 30, 2002: | $20,597.86 |
| for months October 1, 2002 through December 31, 2002: | $79,436.45 |
| for months January 1, 2003 through March 31, 2003: | $97,360.14 |
| for months April 1, 2003 through May 31, 2003: | $109,004.24 |
| for months June 1, 2003 through September 30, 2003: | $121,506.52 |
| for months October 1, 2003 through October 31, 2003: | $143,408.23 |

**3. Letter of Credit:** Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-four is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-three, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.    LYCOS, INC.

By: _____ E. WILLIAM GILLULA _____    By: _____
    PRESIDENT & COO

Title: _____    Title: __CFO_____

Date: __DEC 1 0 2001_____    Date: __10/4/01_____

PHS/BOSTON
144874-093(skh)

NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-THREE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $3,320,039.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

    Lessee: RDC

PHS/BOSTON

144874-093(skh)

LYC 07697

# EXHIBIT E

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri  63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. NINETY-FOUR Dated as of October 2, 2001**

LESSOR:                                    LESSEE:    **LYCOS, INC.**
                                                      400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**               Waltham, Massachusetts  02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|--------------------------|
|     |                    |                             |             |          |           |                          |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 84 pages.

**EQUIPMENT LOCATION:**    See attached Exhibit "A"

2. Monthly Rental for all Units: See Addendum One
   Initial Term:  November 1, 2001 through October 31, 2004; Thirty-six (36) months
4. Anticipated Installation Date: Already installed and accepted
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before October 9, 2001.

COMPUTER SALES INTERNATIONAL, INC.  LESSEE: LYCOS, INC.

By: _____E. WILLIAM GILLULA_____          By: _____
              PRESIDENT & COO

Title: _____          Title: _____CFO_____
              DEC 0 5 2001

Date: _____          Date: _____10/4/01_____

PHS/BOSTON
144874-094(dh)

LYC 07699

LYC 07784

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy

### ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. NINETY-FOUR
### MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Ninety-four, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 2, 2001, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Dates; Start of Initial Term:** The Equipment is installed at Lessee's locations under Equipment Schedules 64, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69A, 69C, 69E, 69G, 69I, 76, 81, 85 and 86 to Master Lease Agreement No. 144874.    Lessee unconditionally accepts the Equipment for lease under this Lease. Notwithstanding the terms and conditions of the Master Lease, the first day of the Initial Term is November 1, 2001.    The Termination Date of each Equipment Schedule, and the Commencement Date of the Equipment under this Lease is set forth on the attached exhibit "A" and summarized below. In consideration of Lessee's entering into this Lease, Lessor agrees to early terminate Lessee's rental obligations under Equipment Schedules 64, 65, 66, 66A, 66B, 67, 68, 76, 81 and 86, for the units leased hereunder, effective on October 31, 2001. The remaining equipment under the leases referred to in this paragraph will continue to be leased thereunder and will then be leased under Equipment Schedule Ninety-three between the parties.

| Equipment Schedule(s) | Termination Date | Commencement Date |
|---|---|---|
| 64, 65, 66, 66A, 66B, 67, 68, 76, 81, 86 | 10/31/01 | 11/1/01 |
| 67A, 68A, 68B, 68C | 9/30/02 | 10/1/02 |
| 66C, 67B, 69A, 69C | 12/31/02 | 1/1/03 |
| 64B, 66E, 67D, 69B | 3/31/03 | 4/1/03 |
| 64D, 66G, 67F, 69G | 5/31/03 | 6/1/03 |
| 64F, 66I, 67H, 69I | 9/30/03 | 10/1/03 |
| 85 | 12/31/03 | 1/1/04 |

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

3. **Total Monthly Rental**: The Monthly Rentals per Unit are set forth on the attached Exhibit "A." However, the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 64, 66, 66A, 66B, 76 and 81 will be $0 for the months of November 1, 2001 through December 31, 2002; and the Monthly Rental per Unit for each Unit of Equipment terminating from Equipment Schedules 65, 67, 68 and 86 will be $0 for the months of November 1, 2001 through September 30, 2002. Accordingly, the total Monthly Rental under the Lease is as follows:

for months November 1, 2001 through September 30, 2002: $0;
for months October 1, 2002 through December 31, 2002:   $210,061.03;
for months January 1, 2003 through March 31, 2003:      $333,258.78
for months April 1, 2003 through May 31, 2003:          $398,305.68
for months June 1, 2003 through September 30, 2003:     $462,206.40
for months October 1, 2003 through December 31, 2003:   $611,403.34
for months January 1, 2004 through October 31, 2004:    $679,753.85

4. **Letter of Credit**: Lessor's performance of its obligations under this Lease and Equipment Schedule Ninety-three is conditioned upon Lessee's delivery to Lessor of an irrevocable, unconditional standby letter of credit, the terms and conditions of which are more fully described in the Letter of Credit Agreement, dated October 2, 2001, to be executed by the parties contemporaneously with this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Ninety-four, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.          LYCOS, INC.

By: _____E. WILLIAM GILLULA_____            By: _____
           PRESIDENT & COO

Title: _____DEC-0-5-2001_____             Title: ___CFO___

Date: _____                   Date: ___10|4|61___

PHS/BOSTON
144874-094(cki)

LYC 07385

# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

**CSI**

## COMPUTER SALES INTERNATIONAL, INC.

9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: NINETY-FOUR

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $21,836,791.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee: BDC _____

PHS/BOSTON

144874-094(skb)

# EXHIBIT F

**Equipment Leasing Association**

Building A Better Climate For Growth & Prosperity



ELA Home
User Login
Membership Info

search  GO!
Advanced Search
Site Map | Site Updates

News
Member Directories
ELA Store
Events and Training
Research & Legal
Funding Home
State Tax Manual
G. Relations
Email Discussions
About ELA
Press Room
Sponsor/Advertise

Equipment Leasing
Association
301 N. Fairfax Drive
Suite 550
Arlington, VA
2203-1627
Phone: 703-527-8655
Fax: 703-527-2649

## ELA Code of Fair Business Practices

- Purpose
- Preamble
- Section I: General Standards of Professional Conduct
- Section II: Exchange of Credit Information
- Section III: Enforcement Provisions

### Purpose

The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

Back to Top

### Preamble

Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal and State laws:

Back to Top

### Section I: General Standards of Professional Conduct

1. A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2. A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry.

3. A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement.

4. A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry.

5. A Member shall use proper care and exercise independent professional judgment.

6. A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7. A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8. A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9. A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis.

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11. A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client.

12. A Member shall not make payments to a representative of another party without the consent of that party.

13. A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction.

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

Back to Top

## Section II: Exchange of Credit Information

The exchange of credit information is an integral part of a well functioning equipment leasing and financing industry. In addition to complying with all government laws and regulations, the Members shall adhere to The Robert Morris Associates' Code of Ethics for the Exchange of Credit Information.

Back to Top

**Section III: Enforcement Provisions**

Article VIIB of the ELA Bylaws provides that a Member may be censured, suspended or expelled from the Association for violating the Code of Fair Business Practices of the Association. Accordingly, the disciplinary actions that the Association may take in the event of a violation of the Code include: (a) private censure; (b) public censure; (c) probationary membership with such conditions as may be determined by the Association; (d) suspension of membership for a term and on such conditions as may be determined by the Association; (e) expulsion from membership; and (f) non-renewal of the membership of the Member.

The following provisions, consistent with the provisions of Article VIIB of the ELA Bylaws, set forth the procedures to be followed in proceedings involving alleged violations of the Code.

1. An ELA Fair Business Practices Committee (the "Committee"), consisting of three members of the ELA Board of Directors and three former officers or directors of the ELA, shall be appointed by the Chairman of the Association who shall also designate one member of the Committee as Chairman of the Committee.

2. A proceeding alleging that an ELA Member violated the Code may be initiated by a Member of ELA (other than any ELA Member who has an official on the Committee), by the Executive Committee of the Association or by a non-member of ELA which has suffered injury as a participant in an equipment lease or finance transaction with a Member ("complainant"). The proceeding shall be initiated by filing a written Complaint with the ELA President at ELA Headquarters by registered mail. The Complaint must identify the section or sections of the Code alleged to be violated, set forth in detail the facts claimed to support the charges of Code violation, and include documents in the possession of the complainant which are pertinent to the Complaint. In addition, the complainant may submit affidavits from the complainant and others in support of the Complaint.

3. Copies of the Complaint and supporting documents, if any, shall be sent by the President to the members of the Committee. If the Committee deems the Complaint to be insufficient, it may request the complainant to provide more information, documents or affidavits in support of the Complaint.

4. If the Committee determines by majority vote that the Complaint and supporting documents, on their face, do not satisfy the requirements of Paragraph 2 or do not state facts constituting a violation of the Code, the complainant shall be so notified by the Chairman of the Committee, and no further action shall be taken.

5. If the Committee determines that the Complaint and supporting documents meet the requirements of Paragraph 2 and allege facts which, if true, could constitute a Code violation, the Chairman of the Committee shall request the ELA President to send a copy of the Complaint and supporting documents, by registered mail, to the party complained against (the "respondent"). The President shall also provide the respondent and complainant with a copy of the Code.

6. The respondent shall be afforded an opportunity to Answer the Complaint. The respondent's Answer shall respond to the specific allegations contained in the Complaint. The Answer shall also notify the Committee whether or not the respondent requests a hearing on the allegations in the Complaint, and provide the Committee with documents or affidavits from respondent or others supporting the Answer. The Answer, supporting documents and affidavits shall be sent to the ELA President by registered mail within 30 days of respondent's receipt of the Complaint. The ELA President shall promptly forward the Answer and supporting documents to the Committee and to the

complainant by registered mail, and shall notify complainant of the right to request, within 30 days of receipt of the respondent's Answer, a hearing on the Complaint before the Committee.

7.  Irrespective of whether the parties request a hearing on the Complaint, the Committee shall have the authority by majority vote to dismiss the Complaint if it determines, based upon the submissions made, that it is clear there is no violation of the Code. Should the Committee dismiss the Complaint, the parties shall be notified and no further action on the Complaint shall be taken.

8.  In the event the Complaint is not dismissed and a party has requested a hearing or the Committee determines a hearing is necessary, then the Committee shall notify complainant and respondent of the date, time and location of the hearing and their right to be represented by counsel at the hearing. During the hearing, the parties shall be afforded a reasonable opportunity to present evidence, cross-examine witnesses and be heard on matters alleged in the Complaint and Answer. The Committee may also permit others to testify at the hearing.

9.  The Committee shall vote on whether or not the respondent has violated the Code based upon the record, and, if so, what disciplinary action, if any, should be taken against the respondent as a consequence of such violation. A two-thirds vote of the Committee members is required to censure, suspend or expel a respondent.

10. The Committee's decision must be in writing and shall be sent to the respondent and complainant by registered mail. The Committee shall notify the respondent of the right to appeal an adverse decision within 30 days of receipt of the decision. The respondent's appeal, if any, shall be sent by registered mail to the ELA President and shall set forth the reasons why the Committee's decision should be set aside. The ELA President shall promptly forward the respondent's appeal, if any, to the Complainant via registered mail. If the respondent does not timely appeal the Committee's decision, the decision shall be final and binding upon respondent.

11. If the respondent elects to appeal the Committee's decision, then the matter shall be transmitted for a hearing on the existing record before the ELA Board of Directors (the "Board"). The Board shall notify the parties via registered mail of the date, time and location of the hearing, and the schedule for filing written submissions with the Board. The respondent and the complainant may be represented by counsel and shall be permitted to provide written submissions and present oral argument to the Board. No additional documents may be filed or any testimony taken, unless ordered or requested by the Board. The Board shall vote on whether the Committee's decision should be affirmed, modified or reversed. A decision by the Board which censures, suspends or expels the respondent must be by two-thirds vote of the members present and voting. No member of the Committee, and no Director that is a representative of an ELA member that initiated the Complaint or of the respondent, may be present during, or participate in, the voting.

Back to Top



© 1996-2005, Equipment Leasing Association. All rights reserved.
The Equipment Leasing Association (ELA) is a national organization comprised of member companies within the equipment leasing and finance industry. Disclaimer | Privacy Policy

Created by Matrix Group International, Inc.

# EXHIBIT G



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

THOMAS F REILLY
ATTORNEY GENERAL

(617) 727-2200
www ago state ma us

March 13, 2006

Thomas O. Bean, Esquire
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109

    Re:    Application of 940 CMR 3.05(1) and 940 CMR 3.16(2) in Business-to-Business
           Transactions

Dear Mr. Bean:

    I understand that a question has been raised as to whether conduct in a business-to-business transaction can give rise to a violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, §2(a), under the Attorney General's Consumer Protection Regulations at 940 CMR 3.05(1) and 940 CMR 3.16(2).

    940 CMR 3.05(1) provides:

> No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. This prohibition includes, but is not limited to, representations or claims relating to the construction, durability, reliability, manner or time of performance, safety, strength, condition, or life expectancy of such product, or financing relating to such product, or the utility of such product or any part thereof, or the ease with which such product may be operated, repaired, or maintained or the benefit to be derived from the use thereof.

    940 CMR 3.16(2) provides:

> Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if: . . . (2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.

Thomas O. Bean, Esquire
McDermott Will & Emery, LLP
March 13, 2006

Page 2


The Attorney General has brought enforcement actions in at least three cases in which we alleged violations of 940 CMR 3.05(1) or 940 CMR 3.16(2) in the context of business-to-business transactions. These cases included <u>Comm. v. AMCAN Enterprises, Inc.</u>, 47 Mass. App. Ct. 330 (1999) (affirming summary judgment finding violations of both 940 CMR 3.05(1) and 3.16(2)), <u>Comm. v. Lease Funding Services, Inc.</u>, Suffolk Sup. Ct. 02-2809-H (allegations of violations of both 940 CMR 3.05(1) and 3.16(2) resolved by Consent Judgment), and <u>Comm. v. Allied Lighting Products, Inc.</u>, Suffolk Sup. Ct. 01-03467-F (allegations of violation of 940 CMR 3.05(1) resolved by Consent Judgment)[1]. The Attorney General brought each of these cases after G.L. c. 93A, §11, was enacted.

Although I am not providing you with a formal opinion of the Attorney General, I believe these cases demonstrate a consistent position of the Attorney General's Office that conduct in a business-to-business transaction can give rise to a violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, §2(a), under the Attorney General's Consumer Protection Regulations at 940 CMR 3.05(1) and 940 CMR 3.16(2).

Sincerely yours,

Jesse M. Caplan, Chief
Consumer Protection &
Antitrust Division

----

[1] In <u>Allied Lighting</u>, we also alleged, and the Consent Judgment resolved, violations of 940 CMR 3.16(1), which provides that:

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2, if: (1) It is oppressive or otherwise unconscionable in any respect.

# EXHIBIT H



**Brian Lucy**
03/18/2002 10:08 AM

To: Paul Stenberg <Paul.Stenberg@csileasing.com>
cc:
Subject: Re: Analysis

Thanks a bunch for doing this.

Kevin is out this week, but when he gets back, we'll take a look.

Brian


Paul Stenberg <Paul.Stenberg@csileasing.com>



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>
03/18/2002 08:42 AM

To: "Kevin.Baillie@corp.terralycos.com (E-mail)"
    <Kevin.Baillie@corp.terralycos.com>, Brian.Lucy@corp.terralycos.com
cc:
Subject: Analysis


I have come up with the following so far;

Monique's analysis does not include Schedules that Lycos was still obligated for, but because our Lenders wanted to decrease exposure , we lowered them (I explained this back in Sept.) Equipment Schedules 64,81,68,66 and 86 rents were decreased substantially from the October payment to the November. For example, #64 was due to expire 1/31/02 @ $26,888/mo. We decreased that to $5055/mo, but contractually Lycos stilled owed the $26,888/mo.

Schedule # 65 expired 10/1 but was included in the re-finance. This was not included in the Analysis.

Monique's total for the new lease obligation was wrong. She took the Total Monthly Payment x the Length of the deal. You must look at it at a Present Value base and not include the Interest. Its like taking your Mortgage payment x 30 years.


This is what I have so far so you can rest easy;

Present Value of Lease  $23,727,000

Obligation of old Leases $20,215,000

Difference          $3,512,000

Now the Value of the current lease is around $29,000,000 . The total cost of the equipment was around $63mm. When we re-financed, we extended our the lease and re–couped about 5-7% thus the 3.5mm. Don't forget, on the Orginal leases, CSI injects between 10-13% residual so for every $1mm spent, Lycos obligation is $870k

I addition, a good portion of the equipment was taken from an over 30 month term and placed on a 24 month term. For example( hypothetical); a million dollar of PC's that had 33 months left was refinanced to 24 mo. So, in affect, that groups payments are going to be higher.

BUT, as I said all along,  WHEN you return the equipment, I will give you Full FMV credit   So you won't be obligated for all the payments.

There are still areas that I am doing this week and I will get back to you