UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action #05-10017-RWZ

Computer Sales International, Inc. (CSI)
    Plaintiff and Defendant in Counterclaim

v.

Lycos, Inc. (Lycos)
    Defendant and Plaintiff in Counterclaim

DISCOVERY MASTER REPORT # 2

February 16-March 1, 2007

In its February 8, 2007, tailored request on the subject, CSI sought an Order for the "prompt production of, and the prompt response to reasonable deposition questions concerning the post-October 7, 2003 materials and communications …that were sent to and received from, and/or generated by Leaseforum [or] its principals, including Susan Franklin [and John Kirk]" (hereinafter, collectively LF). CSI further narrows its request ("for the moment") by excluding from the ambit of its Motion "communications to Leaseforum actually written by attorneys from Lycos," comprising, CSI says, about 40 of the 192 withheld documents noted in LF's privilege log. CSI also seeks several of the "about 340 documents" listed in Lycos' privilege log that CSI in its submission the following day, February 9th, says it had just received earlier that week. After initial disagreement on the issue, both parties now seek a ruling on Lycos' lawyer-client privilege and work-product immunity claims. Their multiple submissions, the most recent from

both sides on February 10th, are extraordinarily thoughtful and highly useful. I commend counsel for their effort (and passion!).

CSI's Motion is, in large measure, ALLOWED.

Introductory Comment:

The disclosure and response claims at issue here lie amidst cross-currents of at least five major Discovery considerations, all contested: Lycos' (1) privilege and (2) immunity claims, (3) CSI's claim that its "substantial need" trumps even a valid work-product claim (which CSI claims does not exist here), (4) the nature of Susan Franklin's (Franklin) witness status and its consequence for our purposes here, and (5) the effect, if any, of LeaseForum's (LF) percentage fee, contingent as it is on Lycos' success in its Counterclaim.

As the parties' aforementioned submissions note or reflect, clarity in this Discovery area has yet to be achieved. Compare, e.g., Nexxus, 188 F.R.D. 7 (D. Mass. 1999), and In re Pioneer Hi-Bred, 238 F.3d 1370 (Fed. Cir. 2001). As some of the cases express, decisions in this area are case-by-case, i.e., fact-based. That approach suits and is taken here. Moreover, since the relevant parties, Lycos and LF, had a working relationship well before lawyers became involved and, at least facially, outside any prospect of a privilege or immunity claim, it seems useful if not necessary in evaluating Lycos' contentions, especially as they relate to the critical, pivotal role played by Franklin, LF's Chief Executive Officer, to start where LF began. What follows therefore are basic facts determined for the sole purpose of

considering the Discovery issues dealt with, then discussion/rulings, and concluding remarks.

A final introductory note. As so often happens, the most complicated Discovery issues tend to hang on until the Discovery deadline looms – as seems to have occurred here. As a consequence of that time pressure, and in addition to this Report's other deficiencies, the virtue of as speedy as practicable a response to the contested issues, has, I regret, sometimes overcome the need to note the source of every fact and every case citation.

2. Background facts.

Because the details of the LF and Lycos arrangement are viewed as critical in analyzing the nature of their relationship, close attention is paid to background circumstances and to the only two known contracts they entered into.

a. The first contract (SOW 1)

LeaseForum, Inc. is "a small consulting firm that specializes in helping businesses that lease commercial equipment improve the management and control the cost of their equipment leases," (Affidavit of Franklin, April 29, 2005, para.1) After working twelve years for the eleventh largest leasing company in the United States, in 1998 Franklin switched sides and began to work for lessees, founding LF in 1999 (id., 6, 7). About May, 2003, LF's John Kirk made a "cold call" to Lycos. (LF and Lycos had never done business together.) He described LF as "experts in the leasing industry,"

(1/31/07 Lycos submission, Exhibit 2, Deposition of Julie Callegee, p. 102.) ("Callagee") and offered to provide its "expertise" in analyzing Lycos' lease arrangements with CSI and four other of Lycos' equipment leasing companies. (1/31/07 Lycos submission, p.2.). Lycos had begun earlier to consider "buying out" its equipment leases and, one distills from Callagee's testimony, seemed at sea in how best to go about doing so, "new to the relationship with CSI and relatively inexperienced in equipment leasing practices and transactions." 1/31/07 Lycos submission, p. 2. Thus, Lycos must have considered Kirk's call a godsend or, as Callagee described it, "serendipitous." (id., Callagee, pp. 27, 28 (102-107.) Lycos accepted LF's offer.

On and effective June 17, 2003, the parties executed two LF-form contracts. One is entitled "LEASEFORUM Statement of Work No. 001, End of Lease Workout Services." A two-page Agreement (SOW 1) (id., Exhibit 3), it incorporates by reference the second LF-form, entitled "General Services Agreement" (GSA). (id.) Describing the "Relationship of Parties," paragraph 5 of the GSA expresses their mutual understanding "that LeaseForum is an independent contractor and not an employee or agent of Client [i.e., Lycos]." (2/1/07 CSI email.) Under the terms of SOW 1, LF was to review each lease and other designated related matters, and "[b]ased on such review, LF will outline available options, work with [Lycos] to determine a course of action, including but not limited to early termination, purchase or renewal to a purchase ('EOL Transaction') and negotiate and finalize the Lease Satisfaction Amount due each lessor." (id., Exhibit 3. Emphasis added.) For its work under SOW 1, LF was to be paid 25% of the "gain" it achieved, the difference between what SOW 1 describes as "The

Lease Satisfaction Amount" and an agreed-upon baseline. (SOW 1 says that the baseline is "as herein set forth," but no such figure appears in the SOW 1 form provided the undersigned. However, as respect to CSI that figure seems to be uncontested, $4,690,000.) In a matter of days, LF's Franklin successfully negotiated – with CSI's Paul Stenberg – a buyout of the Lycos leased equipment for $3.775,000, resulting in a Lycos "gain" of $915,000, and an LF 25% fee ($228,750). The buyout, completed in early August, 2003, ended what John Kirk described as Phase 1 of SOW 1. (Collagee, p. 47 (184).) In effecting the buyout, Franklin served as Lycos' agent, but "for the [limited] purpose of negotiating" it. (1/31/07 Lycos' submission, Exhibit 1, p. 19 (70, 72).) (As will be discussed later, Lycos is considered to have overstated the effect of that "agent" designation.)

Some time later, Franklin claimed that in the course of a telephone call on/about June 27, 2003, (i.e., while negotiating the buyout) Paul Stenberg had "intentionally misrepresented" to her "that the original cost of the equipment Lycos leased from CSI exceeded $60 million, when he knew or could readily have ascertained from CSI employees in St. Louis, that the original cost thereof was much lower." (See 1/31/07 CSI submission, Exhibit 1, pp 11, 12, Lycos' Answers to CSI Interrogatories. That submission does not note the date of those Answers.)

Soon after the buyout, LF had begun what it characterized as "Phase 2 [of the SOW 1] effort... a continuation [of the work] under [SOW 1] … aimed at setting up a negotiation to reduce Lycos' remaining future payment obligations to CSI." (Collagee, p. 47 (184).) Emphasis added.). Indeed, Franklin claims to have begun that work from the very beginning, in June,

2003. Franklin Affidavit, September 13, 2006 (paragraph 7). But LF balked at having to continue to pay at the 25% contingent fee rate of SOW 1 (id., (189)), and, on October 8, 2007, Lycos and LF entered into their second agreement, executing "LEASEFORUM Statement of Work 002, End of Lease Workout Services" (SOW 2) (1/31/07 Lycos submission, exhibit 5.)

### b. The Second Contract. (SOW 2)

Again a two-page LF-form Agreement, SOW 2 effects few changes. It again incorporates "all the Terms and Conditions [of the aforementioned GSA dated June 17, 2003], including the aforementioned agreement on LF's status as an independent contractor and not as an agent or employee of Lycos. It calls on LF is to "analyze past and current leasing activity with CSI, [i.e., CSI is now the only lessor involved] with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from client [Lycos]. Such a settlement may include but will not be limited to early termination, reduction in lease payment obligations, or the payment of a settlement amount (or the reduction of future obligations by the settlement amount) ("Settlement")." In turn, Lycos is obliged to provide LF all documents "deemed necessary by LF to establish a complete picture of [Lycos'] end of lease obligations." Lycos is also to provide "access to key personnel, including the members of the finance, accounting and legal departments [and others]…" For LF's work, Lycos is to pay LF within ten days of the invoice date "an amount equal to [20%] of the difference between the Settlement and [the baseline, $10,602,142]."

Clearly, LF had been working on that analysis before SOW 2, for, on October 27, 2003, soon after that agreement was executed, LF presented its results to un-named Lycos personnel, plus Lycos' in-house counsel who that day called Lycos' outside litigation counsel in New York. Lycos hired its current counsel, Thomas Bean, Esq., December 2, 2003, the firm date by which Lycos establishes that litigation was contemplated. (Although an Affidavit by counsel in New York (2/9/07 Lycos submission, exhibit 3), says that on October 28th he "opened a matter on Lycos' behalf", no evidence reflects any work was undertaken relevant to this dispute before Mr. Bean was retained.) The nature and proper characterization of LF's work (before and) since that date is subject to dispute.

Some in Lycos or in LF may have considered litigation prior to that October 27th presentation, but there is no evidence any change was effected in LF"s work or direction, the thrust of whose efforts, as expressed in both SOW agreements, was "negotiation," Collagee, p. 47 (184), and "settlement" (SOW 2, above, at p. 6). Accordingly, I do not approach the issues here by parsing the pre-litigation time periods. (Compare 2/9/07 Lycos submission.)

3. Lycos' claim of waiver is Denied.

Lycos' 1/31/07 submission asserts that CSI has waived its claim to the sought-after Discovery material. (Lycos' 2/9/07 submission doesn't touch on this issue.) Lycos specifies as the basis of its position that CSI had first raised the issue in its motion filed July 17, 2006, and given up its chance to have the matter heard in Court the following month. Lycos adds more broadly that CSI effected waiver, "by delaying resolution of the issue." (id.,

p. 1.)

Lycos' claim overreaches. To begin, the very August 3, 2006, CSI letter to
the court (via Ms. Urso), relied on by Lycos as constituting CSI's waiver –
in that letter CSI limits its request for a hearing to one issue, not the one
contested here -- CSI expressly "reserves the right to press the other issues
raised in its motion to compel (e.g., the privilege claims [at issue here]." CSI
credibly claims that it thereafter sought to resolve that dispute by "active
discussion" with Lycos (See, e.g., 1/31/07 CSI submission, p.1), an
approach encouraged in contested issues, and, failing in that effort, kept
Lycos apprised of its desire not to give it up. In its Counterclaim, Lycos
seeks scores of millions of dollars. LF has played a central supporting role
in that effort, and, as noted, LF's 20% financial reward is contingent on its
success. As further noted, (p. 1, above) CSI did not get Lycos' privilege log
until this month. In these circumstances, waiver of access to the requested
LF information should not readily be ascribed to CSI. See, e.g., CP Kelco
U.S., Inc, v. Pharmacia Corp., 213 F.R.D. 176, 179 (U.S.D.C., D. Delaware,
2003) ("Waiver is the deliberate relinquishment of a right which might
otherwise be claimed." Finally, except perhaps for now having to deal with
the issue and its consequences, unavoidably adding to the work both sides
must complete in the rush to the Discovery deadline, Lycos has shown no
prejudice that cannot be accommodated. In sum, overall circumstances
militate against Lycos' claim of waiver.

4. Lycos' substantive claims.

      a. Lycos' lawyer-client privilege claim is Denied.

LF is an independent corporate entity, with its own counsel. It never retained Lycos' counsel. To succeed in asserting its lawyer-client privilege claim in connection with withheld documents involving LF, Lycos must effect two tasks. First, it must establish the basis of its claimed lawyer-client relationship with LF. Then it must persuade that materials sought to be shielded under that privilege fall within its protection. I conclude that it has not satisfied the first of those requirements and hence find no need to deal with the second.

The lynchpin of Lycos' claim to have satisfied the first of those requirements is that LF was its agent. Relying on its assertion of Franklin's role as agent in the buyout, Lycos claims the privilege protects communications between Lycos and/or its counsel and LF for and concerning the entire period from LF's engagement by Lycos until the buyout, i.e., June 17-early August, 2003. (2/9/07 Lycos submission.)

Indeed, as both parties have for their separate purposes at different times contended (See 2/9/07 Lycos submission, p.2), and the facts set forth above (p. 5) reflect, LF did serve as Lycos' "agent" when effecting the buyout. But, Marya v. Slakey, 190 F. Supp. 2d 95 (D. Mass. 2001), relied on by Lycos, is inapt. There, for the purpose of considering defendant's Summary Judgment motion, apparent authority is found and ascribed to defendant landlord with respect to her tenant's allegedly unlawful ethnic-prejudice action. While Marya illustrates that an agency relationship may be found to exist outside the parties' intention, here LF's status -- as independent contractor and not as Lycos' employee or agent -- was agreed upon in SOW

1 (and reconfirmed in SOW 2).

Only after Franklin made contact with CSI on Lycos' behalf did Lycos send CSI (sought after?) assurance that "LF can speak for us" to effect the buyout. Thus, the status of "agent," its very creation, existence and purpose – advising CSI that, yes, LF is authorized to negotiate and reach agreement on our behalf – was solely for Lycos' convenience, Lycos didn't have to be there! The designation was neither designed to nor did it change LF's agreed-upon independent contractor status nor subject Franklin to Lycos' control. (See 1/31/07 Lycos submission, exhibit 1, p. 19 (70, 72).) " In re Shulman Transport Enterprises, Inc. 744 F. 2d 293, 295 (2d Cir. 1984). ("Even though a person is termed an agent, he may, in fact, act as such in some matters but not in others.)

Indeed, here, as the foregoing facts reflect, LF was the expert, Lycos was at sea, in no position to subject LF to the kind of direction and control characteristic of the agency arrangement. Franklin 4/29/05 Affidavit, especially paragraphs 14, 17, 19. Assertions in that "post facto" Affidavit to the contrary (2/9/07 Lycos submission, p.5), simply defy logic, even apart from considering the possible effect participation by Lycos' counsel may have exerted in its creation (See, e.g., 1/31/07 Lycos submission, exhibit 11, Bates Nos. 10494-10523, 10429-10438, 10439-10451, 10494-10504, 10722-10734, 10735-10747, 10806-10817, and 10869-10881.) In engaging LF to effect the buyout, Lycos' "instructions," if there were any, likely went something like this: "Look, we can't get a price better than $4.655, 000. You claim you're the experts, and you'll get 25% of anything below that, so, good luck!"

The buyout situation here was like a homeowner's calling the local "Salvage Center" to confirm its authority to charge him for items to be selected by the owner's independent contractor, and at prices the contractor negotiates. In that case, too, it is for the owner's convenience that the contractor becomes the owner's "agent" for selecting those items and negotiating their price. The parties in that arrangement obviously do not intend to nor does its existence effect a change in the contractor's ongoing independent contractor status. In that situation, too, to allow the homeowner's lawyer to assert the lawyer-client privilege vis-à-vis the contractor, who has his own lawyer, as LF has its own lawyer here, would stand the purpose of the privilege on its head.

Relying on In re Bieter Company, 16 F. 3d 929, 937 (8th Cir. 1994), Lycos additionally asserts its lawyer-client privilege claim because of the nature of LF's work following the buyout. I believe the reliance misplaced. First, even were Bieter the law in this circuit, its facts are notably distinguishable. Indeed, those differences actually strengthen the conclusion reached here. In Bieter, an individual, Klohs, the independent consultant considered by that court to have been the functional equivalent of client's employee for purposes of lawyer-client privilege, had been intimately involved in client's unsuccessful real estate development. As a Bieter team member, Klohs "received direction from Ronald Cornwell, a principal of Bieter Company as [to] his duties and responsibilities" and worked together with Cornwell on a daily basis. id, at 939. In sharp contrast, Franklin is not working individually, but as a principal of and for LF, which arrived on this scene a stranger, near the end of the road of this case's "development," and, as

noted, (p. 4, above) not subject to direction, there having been no one at Lycos capable of providing any. Thus, however useful it may be to Lycos that LF assists Lycos' counsel, and, indeed, however ready LF may be to do so in view of its contingent fee agreement with Lycos, LF was hired for purposes other than to counsel Lycos' lawyers. Cavallaro v. United States, 284 F.3d. 236, 240 (1st. Cir. 2002).

              b.  Lycos' work product claim.

LF's work in connection with this case and its antecedent litigation surely has created documents that would qualify for work-product protection. And, Lycos' position with respect to the broad ambit to be given work/product, citing to Maine v. U.S., is persuasive. (See 2/9/07 Lycos' submission, pp. 5, 6.) On the other hand, however useful if not critical Susan Franklin may be to Lycos' case, her testimony, for at least Discovery purposes, is at least as critical in CSI's defense of Lycos' Counterclaim, a condition further complicated by LF's contingent fee based on the success of that Counterclaim. Thus, Franklin is an appropriate target of inquiry, on "factual" and well as "prejudice" grounds. More on this later.

What can be said now is that Franklin's work in connection with the buyout took but days. Franklin's later key disclosure of her alleged conversation with Stenberg during that period, and questions about Franklin's not including that conversation in her Affidavit (see e.g., paragraph 19), are fair targets of Discovery.

With respect to any work-product claim concerning LF's work before

October 27, 2003, (pre-October 8 documents have not been withheld), recall that if Lycos intended for LF to help prepare for litigation before October 27th, it could have expressed that objective in SOW 2, executed October 8th. But SOW 2 says not a word about litigation. Instead, its emphasis is on "settlement," which, supported in the remaining language of SOW 2, (see p. 6, above) leave LF in control, a role it would lose, and then did, when litigation was undertaken.

### c. "Substantial need"

However broad may be Lycos' "post-litigation" work-product claim, it is subject and yields to CSI's establishing "substantial need." Earlier comment reflects satisfaction of that requirement vis-à-vis documents concerning the preparation and filing of Franklin's 4/29/05 Affidavit (p. 10, above.) unless and to the extent protected by "thought process" or similar exceptions. (From the standpoint of law, the Affidavit language, quoted in Lycos' 2/9/07 submission, e.g., at p. 9, seems remarkably wise.) Whether and to what extent other of the withheld documents may fall under the "needs" exception turns on the nature of Franklin's role(s).

### d. Franklin's status

The issue of Franklin's status and her shifting roles is complicated, as the many submissions on aspects of this subject attest. We know that LF's services were sold on the basis of her "expertise" and that LF was described by John Kirk as "experts in the leasing industry," (See p.4, above.) Franklin manifested that expertise in successfully and expeditiously effecting the

buyout, and soon thereafter in analyzing the CSI-Lycos financial data in a way found so convincing, Lycos decided to hire litigation counsel and bring suit. Since then, Franklin and LF, changing roles, have counseled in connection with that case and this. Franklin's grasp of the facts in this case (and, from Lycos' point of view, their meaning) is apparently indispensable. Her April 29, 2005, Affidavit contains expressions of more than lay witness observations. (See, e.g., paragraphs, 22, 30.) LF's 20% fee contingent on its success adds a complicating dynamic. In these circumstances, unless one or more other witnesses are to be called to fill the gap, (as presumably is the case with non-expert treating physician witnesses) Lycos' representation that Franklin's testimony as a fact witness will remain confined to her knowledge of the personal role in the unfolding of the events at issue is a pill not easily swallowed.

That Franklin has since been designated a fact witness may not be the answer. Compare, Gomez v. Rivera Rodriguez, 344 F. 3d 103, 113-114 (1st Cir. 2003). The result in Gomez is different, and thus cited as support by Lycos. But what Gomez says supports CSI's position. Rule 26's expert witness requirements are triggered not by the status of the witness, "but, rather the essence of the proffered testimony." id. Similarly, while Consolidated Freightways Corp. v. Delaware, 189 F.R.D. 316, 318 (S.D.N.Y. 1999) looks at the question from the other side, (lay witness said to be offering expert testimony) it, too, is nonetheless instructive.("A person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person.") The trial implications of Franklin's 'hybrid' status is left to the court.

LF's fee contingency and its actual or perceived affect on Franklin's motivation, bias and credibility brings an additional complicating feature here. Not present in any known case, its existence tilts the scales toward making LF's documents available notwithstanding their otherwise protected work-product status. In the face of the size of Lycos' Counterclaim, it is not enough that its existence will be made known to the jury. Thus, LF withheld documents deserve review from this perspective, as well.

5. The upshot.

A finite number of documents have been withheld on work-product grounds. CSI has represented it will seek to reduce that list further. How to deal with the rest?

As the parties concede, no known accepted formula exists for resolving the conflicts this case presents. Nor -- in the abstract -- can any contested withheld document be weighed on the factors noted, i.e, whether each can properly be withheld or must be released. As the parties today discussed, and if the numbers do not overwhelm, the undersigned will undertake this coming Tuesday the task of weighing each of the contested withheld documents and deciding then which are to be turned over.

#

Addendum

February 20, 2007. At a conference today, CSI targeted LF's and Lycos' "privilege log" entries that it considered warranted release or, at the least, in- camera review. A portion of the so-identified items were reviewed and decisions reached within the time available. In addition, Lycos sought modification or clarity on some of the "Findings" set out above. To facilitate possible appeal, it seems useful to list the results of that effort.

1. Following review of some of the Franklin Affidavit-related documents (see above, at p. 10), the conclusion reached was that their privilege claim was justified. CSI does not press for further review.

2. While as earlier noted inquiry of Franklin concerning whether there were conversations with Lycos' counsel over the terms of Franklin's Affidavit is appropriate, questions should not seek what either party said in any of those discussions, nor in any conversation involving Lycos' (or CSI's) counsel.

3. Franklin's spreadsheet work, regardless when undertaken, is considered not within work-product protection, and thus subject to discovery, at least in part because whether undertaken before or after litigation was contemplated, manifestly analytical in nature, it is considered subject matter beyond the range of a fact witness. Moreover, here, it is the product of a third party with a contingent interest in the outcome of the Counterclaim.

4. Lycos and CSI each has a recognized right to appeal these Discovery rulings. To encourage the continuance of the ongoing Discovery process in the waning days before its scheduled end, compliance with those rulings by making available to CSI the formerly withheld documents, or withholding any from CSI, is not to be considered a waiver of either's right to appeal with respect to any of them.

5. Nothing in this Report should be read as implying that Franklin's work on her "analysis" (see, e.g., p.6, above) was continuous.

6. To conclude rulings on the remaining contested privileged documents it may be necessary for in camera review. If so, that review is expected to be undertaken within days.

Addendum #2

February 28, 2007. Following the foregoing events, and with the encouragement of the undersigned it do so, Lycos further reviewed LF's and its "privilege logs" and, if directed by the undersigned, was prepared to turn them over to CSI. An in-camera review on February 26th of the remaining withheld documents resulted in some additions. At a conference at the offices of CSI' counsel today, the resulting "packet" was turned over at the direction of the undersigned from Lycos' counsel to CSI's counsel. The documents thus turned over are believed to comprise the following respective Bates-numbered documents:

    a. LF (each preceded By "AR,"):
        10201-02, 10325-30, 10350-53 (sanitized), 10360-90, 10682, 10693, 10832-3, 10841-46, 10868, 10882-89, 10933-99, 11104-11110, 11119-31, 11256-61, 11302-59, 11488-604, 11605-875.

    b. Lycos (each preceded by "LYC,")
        19858, 20728-32, 20733-4, 20737-54, 20794-95, 20811-13, 20851-55, 20981-3 (sanitized), 21013, 21030, 21032-37, 21040, 21420, 21423, 21498-564, 21448-50, 21498-564, 22696-748, 22783,4, 22842, 22844, 22906, 22915, 22942, 22944-50, 23521-30, 23533, 23772, 24075-6, 24081, 24086-89, 070560, 070575-79.

LF is to turn over to CSI by Wednesday, March 7th all Franklin's electronic spreadsheets. By that Friday, March 9th, CSI is to submit any request for additional time to further depose Ms. Franklin, including the time requested and the subject matter it proposes to cover. Ms. Bibbo's deposition, postponed because of her illness, is to be considered then, as well.

(The several other matters discussed at today's meeting were resolved, and are thought not to require comment.)

                    Respectfully submitted,
                    Herbert Hershfang
                    Discovery Master