## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **LYCOS'S RESPONSE TO THE OBJECTION OF COMPUTER SALES INTERNATIONAL, INC. UNDER FED. R. CIV. P. 53 TO DISCOVERY MASTER'S ORDER DENYING PRODUCTION OF LYCOS'S PEOPLESOFT DATABASE** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
| Trustee Process Defendant | ) ) | |

Fact discovery has revealed that Computer Sales International, Inc. ("CSI") defrauded, violated Massachusetts regulations, and reaped undue profits from Lycos, Inc. ("Lycos") through the use of undisclosed "mark-ups" on refinanced equipment schedules—a plan so adept that two leasing experts retained by Lycos during the course of the parties' relationship were unable to discover the nature and extent of CSI's fraud. Indeed, Lycos discovered the refinance fraud scheme only after obtaining access to CSI's internal business records during this litigation.

Rather than addressing the substance of Lycos's claims, CSI has spent months seeking to obtain additional fact discovery after the February 23, 2007 deadline (a deadline it requested) by fishing for something the previous sixteen months of fact discovery did not provide it with: a defense to Lycos's fraud claims.

CSI's Objection is merely its latest cry for "more."  In October, 2006, CSI requested leave to take "more" depositions than is permitted under the Local Rules.  After leave was granted to take up to ninety hours of deposition time,[1] CSI exhausted that time.  It then asked the Discovery Master for "more" time.  It then not only exhausted that time, but exceeded it before seeking further leave for even "more" time.  All told, CSI has now taken over 20 depositions accumulating over 107 hours.  Along the way, CSI has belatedly pressed for, among other things, electronic versions of documents previously produced, documents withheld on the basis of privilege and work-product, and PeopleSoft.  As discovery was set to end for a second time, CSI requested that the Discovery Master reconsider an earlier ruling and order Lycos to produce a privileged memorandum that he had previously declined to order Lycos to produce, as well as PeopleSoft.  While the Discovery Master granted CSI's request for the memo, he denied for a second time its request for PeopleSoft.  Incredibly, some three-months after the fact discovery deadline that CSI insisted was necessary to prevent discovery from "spinning out of control",[2] CSI has objected and again seeks "more."

To get the discovery it wants, CSI has repeatedly made the bald assertion that the requested information is "critical"[3].  Disappointed that the "critical" Asset Portal, and "critical" documents prepared by third-party LeaseForum were not the panacea that CSI promised the

---

[1]  See endorsed Order; Dkt. Entry on Nov. 2, 2006.
[2]  Dkt. No. 101 (filed under seal with the Court) at 15-16.
[3]  *See, e.g.*, e-mail from CSI to Discovery Master dated Feb. 23, 2007 (10:38 a.m.) at 2 (arguing Lycos employee Deborah Bibbo is an "important" witness and that, as such, CSI should – for at least the second time—be allowed to exceed its authorized deposition time; e-mail from CSI to Discovery Master dated Feb. 23, 2007 (5:57 p.m.) at 1 (stressing "how important the recovery of" Asset Portal "will be to a fair resolution of this case"); Letter from CSI to Discovery Master dated March 15, 2007 at 1-2 ((a) claiming documents Lycos withheld on the basis of privilege/work product were "critical records"; (b) arguing CSI should be allowed to depose third-party witness Susan Franklin for the third time because she "may well be the most important witness at the trial of this very large case").  True and correct copies of these representative samples, with underlining provided by Lycos to identify the pertinent material, are attached hereto as **Exhibit 1**.  *See also* Exhibit 13 hereto and discussion at 11, *infra* (another example of the same type of rhetoric from CSI).

BST99 1543220-5.057077.0012

Discovery Master they would be, CSI has now pinned its fleeting hopes on yet another so-called "critical" piece of information – an accounts payable purchasing system known as PeopleSoft that CSI has known about since March, 2006, relevant portions of which (a) were produced in hard copy to CSI over a year ago; and (b) are contained in the same Asset Portal that CSI references in its Objection.

Because it has no meritorious defense to Lycos's fraud claims, CSI has sought to manufacture fraud and conspiracies by Lycos,[4] Lycos's counsel,[5] LeaseForum,[6] and a third party lessor/consultant, Avnet.[7] CSI's Objection is just another iteration of that; nothing more than an attempt to create a sideshow in the vain hope of ultimately showing that Lycos somehow misrepresented something to the Court. Lycos did no such thing. The Discovery Master—who has dealt with the parties varying discovery issues for months—has already repeatedly rejected the same arguments CSI rehashes in its Objection. This Court should do the same and put an end to CSI's repeated efforts for "more."

CSI's Objection to the Discovery Master's Order (Dkt. No. 135, the "Objection") should be overruled because it (a) is untimely; (b) seeks information duplicative of information Lycos has already produced; and (c) is based on allegations that are not only unsupported by citation to the record, but are false. [8]

---

[4] *See* CSI's Amended Compl., ¶¶ 42 *et seq*.

[5] *See* Obj. generally.

[6] *See* CSI's Amended Compl., ¶¶ 42 *et seq*.

[7] *See* Computer Sales International Inc.'s Opp. to Motion of Avnet, Inc., to Modify Subpoena (Dkt. No. 128) ("For almost five months, in close coordination with the defendant Lycos, Inc. . . . . ." and accusing Avnet, an unrelated third-party with no interest in the outcome of this litigation, of "deliberately obstruct[ing]" CSI's efforts while secretly communicating with Lycos's attorneys.)

[8] CSI makes two contentions in its Objection that, while not directly relevant to the Objection, Lycos will address briefly. First, contrary to CSI's wishful claims, Asset Portal was not a lease tracking system. That is nothing more than a catch-phrase CSI has chosen to obscure the true function of Asset Portal. Nowhere within the documents produced in this case, or within Asset Portal itself, is Asset Portal identified as a lease tracking system. It was not. Rather, Asset Portal was a tool that Lycos's Operations Department developed in 2001—years after CSI implemented its refinance fraud scheme on Lycos— to identify the *location* of *some* of the thousands of pieces of

(continued…)

In further support of this Response, Lycos states as follows:

equipment owned and leased by Lycos.  Unlike CSI's bald assertions as to what the Asset Portal was, attached hereto as **Exhibit 2** is a true and correct copy of the statement that Lycos prepared for the 30(b)(6) deposition in which testimony was given, under oath, concerning what Asset Portal was and was not.  A copy of the corresponding transcript will be provided upon request.  Lycos also has witnesses—including former employees with no interest in the outcome of this litigation—that will testify as such at trial.

Second, CSI's suggestion that Lycos hid the existence of Asset Portal is equally false.  Lycos's Quote.com business was sold in the ordinary course of business to a third-party in March, 2006.  Neither Lycos's Operations Department personnel, nor Lycos's legal team working on that sale, knew that Asset Portal resided on a server that happened to host parts of Quote.com's business.  As part of that sale, that server was transferred to the third-party purchaser so that the purchaser could continue operation of Quote.com's online business without interruption.  The server remained in the same location that it had been in before the sale as the third-party subleased the existing datacenter space from Lycos.  Having no knowledge of Asset Portal's residency on this server, Lycos could not possibly have intended to hide the Asset Portal via its transfer in connection with that sale.

Lycos's lack of intent is further corroborated by its transparent actions with respect to Asset Portal in discovery. First, Lycos's March, 2006 production contained hard copy pages derived from, and made specific references to, Asset Portal. *E.g.*, LYC18112-18113; LYC11830.  Subsequent productions contained thousands of pages of documents from Asset Portal itself. *E.g.*, LYC69974 - LYC70200; LYC62984-LYC64073 (back-up tape materials mutually exchanged between the parties in October, 2006).  True and correct copies of relevant samples of these documents are attached hereto as **Exhibit 3**.  The first time CSI asked Lycos questions related to Asset Portal, Lycos answered those questions completely and forthrightly. When, for example, Lycos was asked in interrogatories whether it had implemented any of the recommendations that a third-party consultant had made concerning the monitoring of its inventory of equipment, Lycos expressly identified and discussed Asset Portal in its response. Attached hereto as **Exhibit 4** is a true and correct copy of the relevant portions (*see* page 21) of Lycos's Responses to CSI's Third Set of Interrogatories served January 29, 2007.  Lycos witnesses also answered questions concerning Asset Portal when asked. *E.g.*, Dep. of T. Wright at 11-12 (relevant portions of which are attached hereto as **Exhibit 5**).  Given the above, it simply defies logic to allege that Lycos intended to conceal Asset Portal.

Moreover, until the developer of Asset Portal was deposed in February, 2007, Lycos believed the server on which Asset Portal was located had been liquidated during one of the many datacenter consolidations Lycos underwent between 2003 and 2005.  Based on his testimony, Lycos determined the relevant server had been transferred in March, 2006.  Once Lycos learned that, it promptly and proactively contacted that third-party and asked them to preserve the server.  By agreement, and with the consent of the Discovery Master, CSI served a subpoena on that third-party and Lycos allowed, at CSI's request, CSI's experts to retrieve Asset Portal from that server.

More importantly, Asset Portal has been retrieved and restored to functionality.  As part of that process, Lycos has learned that Asset Portal has back-up versions of itself embedded in it such that it can be restored to the condition it was in as of March, 2005—*before* the parties began exchanging documents.  Lycos has already performed a forensic analysis comparing the structure and lease data in the portal from March, 2005 to the portal as it exists today and has *definitively concluded that both the structure and lease data are identical in both versions*—eliminating any spoliation claim or concern that the third-party had altered it.  In fact, the third-party did not even know the Asset Portal resided on the relevant server either.

- 4 -

## PROCEDURAL BACKGROUND

1.      In March, 2006, when the parties first exchanged documents in this case, Lycos produced hard copies of printouts of reports from PeopleSoft to CSI.[9]

2.      On September 18, 2006, CSI examined a former Lycos employee concerning PeopleSoft.  At that deposition, CSI also marked hard copies of documents from PeopleSoft that Lycos had produced.[10]

3.      On September 29, 2006, CSI filed its Reply Status Memorandum (Dkt. No. 101, filed under seal with the Court) in which it responded to Lycos's claims that it had failed to produce relevant documents, requested that the scope of discovery be narrowed so as not to allow it to "spin out of control," and complained that Lycos had failed to produce PeopleSoft (which it referred to as a "tracking" system). *Id*. at 15-16.

4.      After the Discovery Master was appointed on December 1, 2006, CSI and Lycos briefed him on the matters then in dispute.  Among other things, Lycos pressed its earlier request that CSI be required to produce an electronic copy of the information contained on its internal BOSS system[11]—information that Lycos believed (and still believes) was important to demonstrate the amount of rent Lycos had paid as well as the information CSI had available to it

---

[9]  *E.g.,* LYC17170-178; LYC18109.

[10]  A true and correct copy of Exhibit 38, which was marked by CSI at that deposition, is attached hereto as **Exhibit 6**.  Also attached hereto as **Exhibits 7 and 8** are examples from the transcripts of Monique Walsh (pages 61-64; 145-46) and Sam Ziba (pages 215-216) in which CSI's counsel asks about their use of PeopleSoft to "track" information.  Ms. Walsh and Mr. Ziba were the persons that monitored Lycos's payments to CSI during much of the period from 1999 through 2003.  As that testimony shows, Mr. Ziba did not use PeopleSoft at all.  To the extent Ms. Walsh used PeopleSoft, those reports were produced in hard copy form by Lycos in March, 2006.

[11]  BOSS refers to CSI's "Buy Order Sales System". Tr. of F. O'Neal at 38, lines 12-13.  BOSS is an internal accounting and financial system used by CSI during the relationship with Lycos that contained, among other relevant information, the original equipment cost for each piece of equipment that CSI leased to Lycos. *Id.* at 67, lines 9-21.  It also contained the amount of date of payments by equipment schedule. *Id.* at 262, lines 1-7.

during various times in the relationship.  CSI opposed Lycos's request, arguing that BOSS was duplicative of other information produced by CSI.[12]

5.    Those briefings culminated in a hearing on January 19, 2007.  At that hearing, the Discovery Master denied Lycos's request for BOSS.[13]

6.    On February 23, 2007, the day the Discovery Master had set for the completion of fact discovery,[14] CSI renewed its request for the production of PeopleSoft, arguing that it should be produced because it was "linked" to the Asset Portal.[15]

7.    Given the symmetry between PeopleSoft and BOSS in that, among other things, both contained inactive electronic information, Lycos renewed its request for BOSS.  In response, CSI argued in an e-mail that it forwarded to the Discovery Master:

> You [Lycos] have the information [contained in BOSS in question, *and just as Lycos has objected and not produced duplicative backup electronic systems such as PeopleSoft*, its General Ledger, etc., we adhere to the position that the Master has already upheld twice now – Boss archival data and backups need not and will [not] be restored or produced.[16]

Thus, when CSI opposed production of certain of its own electronic information, it argued and admitted that PeopleSoft was a "duplicative backup electronic system." *Id.*

8.    In another submission to the Discovery Master made on March 13, 2007, CSI reiterated its position:

---

[12]  CSI further opposed Lycos's efforts to obtain an extension of the January 31, 2007 discovery cutoff saying that discovery "has already lasted more than a year, has become very burdensome, and now seems intended by Lycos mainly as a vehicle for open-ended discovery into CSI's financial and other records . . . .")  Attached hereto as **Exhibit 9** is a true and correct copy CSI's January 16, 2007 letter to the Discovery Master with underlining provided by Lycos to show the pertinent material.

[13]  *See* CSI's summary of Discovery Master's rulings, dated January 22, 2007, at 3 (Request No. 16).  A true and correct copy of that summary is attached hereto as **Exhibit 10**.

[14]  *See* Discovery Master Report No. 3 (Dkt. No. 134) at 1.

[15]  *See* Exhibit 1 (Feb. 23, 2007 letter, 10:38 a.m.) at 1-2.

[16]  (Emphasis supplied.) Attached hereto as **Exhibit 11** is a true and correct copy of that March 13, 2007 e-mail.

- 6 -

> Just as Lycos has not been required to try to reconstitute backed up
> General Ledger and PeopleSoft accounting files concerning the CSI
> leases, CSI has not tried to reconstruct backed-up archived Boss files,
> nor is it required to try to assume that burden and expense . . . .[17]

9.      In that same submission, as well as at the hearing before the Discovery Master, in

an effort to sway the Discovery Master to allow CSI to exceed for the second time even the

expanded deposition limits authorized by the Court, CSI represented that "[w]e believe, at this

point, that" additional time to depose Ms. Franklin and the former Lycos employee "is all that

should be necessary to bring discovery to a close." *Id.* at 3-4.

10.     On March 21, 2007, two months before CSI filed its Objection, the Discovery

Master ordered as follows:

> Satisfied that Lycos' desire for the "Boss" data—which it would be
> very hard and expensive to extract—*is no more worthy than CSI's
> for "PeopleSoft,"* Lycos' motion for reconsideration of the denial of
> its claim to the "Boss" system is denied.

The Discovery Master also allowed CSI limited additional deposition time for the two

witnesses.[18]

11.     Despite CSI's assurances that all it needed was additional deposition time for two

witnesses, on May 10, 2007, CSI asked the Discovery Master to reconsider its request for

PeopleSoft, making essentially the same arguments it has made in its Objection.[19]  In opposing

CSI's request, Lycos argued that, (a) the Discovery Master had previously denied CSI's request

for PeopleSoft; (b) implicit in CSI's request was that Asset Portal, contrary to CSI's previous

assertions, was *not* the lease tracking system that CSI had promised it would be; (c) fact

---

[17]  A true and correct copy of the relevant pages of that letter are attached hereto as **Exhibit 12** with underlining
provided by Lycos to show the pertinent material.
[18]  Discovery Master Report No. 3 at 3.
[19]  A true and correct copy of that letter is attached hereto as **Exhibit 13**.

- 7 -

discovery was over; and (d) after sixteen months of fact discovery, CSI's latest fishing expedition must be stopped.

12.    Acknowledging the merits of Lycos's arguments, and perhaps tiring of CSI's repeated requests for "critical" information, the very next day the Discovery Master denied CSI's renewed request, concluding that "any potential Discovery 'gain' is considered outweighed by Lycos' opposing arguments."[20]

## BASES FOR OVERRULING THE OBJECTION

**A.    CSI's Objection is Untimely and Production of PeopleSoft would be Cumulative.**

Under Rule 53(g)(2), an objection to an order of a discovery master must be filed within twenty days after the order being objected to is served.[21]  The Discovery Master denied CSI's request for PeopleSoft on or before March 21, 2007.  On that date, he wrote "Lycos' desire for the "Boss" data . . . *is no more worthy than CSI's for 'PeopleSoft.'*"[22]  CSI did not file its Objection until two months later when the Discovery Master denied what was, in effect, a motion for reconsideration.  There is no indication in Rule 53, or the Advisory Committee Notes, that a party may extend the twenty-day clock for filing an objection by simply filing a motion for reconsideration fifty days after the initial request was denied.  Were that the case, than parties could routinely circumvent the twenty-day time limit in Rule 53(g)(2) by simply filing belated motions for reconsideration.

Except for the very limited discovery permitted on the discrete issues enumerated in Discovery Master Report No. 3, fact discovery ended on February 23, 2007.  On March 21,

---

[20] A true and correct copy of that denial is attached to the Objection.
[21] Fed. R. Civ. P. 53(g)(2).
[22] (Emphasis supplied.)  Lycos has been unable to locate a reference in the Discovery Master's reports to his denial of CSI's request for PeopleSoft.  This language, however, demonstrates that it was denied either prior to or on March 21, 2007.

2007, the Discovery Master identified the only issues on which fact discovery could be had after that date: (a) a copy of the Asset Portal could be retrieved from a third party; (2) a stipulation on the contents of CSI's website at various times; and (3) the deposition of Ms. Bibbo and continued deposition of Ms. Franklin. PeopleSoft was *not* one of the issues on which the Master permitted discovery after that date.[23]

Faced with the fact that its Objection is untimely, CSI argues that the significance of PeopleSoft became apparent "only after [it] had a chance to examine a related Lycos lease tracking system called 'Asset Portal". Obj. at 1. This argument is disingenuous. First, CSI deemed PeopleSoft sufficiently significant last September to examine Lycos employees about it and present them with exhibits from it.[24] Second, CSI deemed PeopleSoft sufficiently significant last September to complain to the Court about Lycos's refusal to produce it.[25] Third, CSI made repeated requests to the Discovery Master for PeopleSoft.[26] Fourth, the only way CSI can argue that PeopleSoft is within the ambit of the limited discovery allowed by the Discovery Master after February 23, 2007 is by noting that PeopleSoft and Asset Portal are "linked" and implying that the request for PeopleSoft is really just an extension of its request for Asset Portal. This argument fails substantively because to the extent Asset Portal is linked to PeopleSoft, *the Asset Portal that CSI already has in its possession already has the PeopleSoft data imported into it*. Thus, regardless of what information is in PeopleSoft, its production in electronic form would only be cumulative of information CSI already possesses.

In sum, CSI's request for Peoplesoft is clearly outside the limited scope of fact discovery that it was permitted to have after February 23, 2007 and is duplicative of information produced

---

[23] *See* generally Discovery Master Report No. 3.
[24] *See* note 10 and accompanying text, *supra*.
[25] *See* discussion at 5, *supra*.
[26] *See* discussion at 5-8, *supra*.

BST99 1543220-5.057077.0012

in hard copy form and within Asset Portal.  The Objection should be overruled on those bases

alone.

**B.**  **PeopleSoft Does Not Contain  "Critical" Information.**

While the Court has not been present at the parties' interactions with the Discovery

Master, CSI's repeated willingness to say whatever is expedient in the moment is self-evident

even from the few relevant facts enumerated in this Response.  When it needed to, CSI

represented to the Discovery Master that BOSS, just like PeopleSoft, was duplicative because it

did not want to produce BOSS.  Yet, CSI is now willing to represent to this Court that

PeopleSoft is "critical" and the "final piece of the puzzle." Obj. at 3.

In seeking reconsideration of the Discovery Master's denial of its request for PeopleSoft,

CSI argued that a section of Asset Portal:

> meticulously tracked equipment cost and expense information on
> CSI leased equipment – information that Lycos has long claimed it
> could not and did not track.  That section (a) stored detailed
> purchase order, cost,[27] and location information on equipment that
> Lycos leased from CSI, (b) had an electronic marker stating "This
> list of PO's is exported from PeopleSoft (emphasis added), and (c)
> contains indications of an electronic link into Asset Portal from
> PeopleSoft meaning that persons accessing the latter would
> automatically also access the former.[28]

Again, to the extent Asset Portal and PeopleSoft were linked and information from

PeopleSoft was exported to Asset Portal that information is already on Asset Portal.  Thus, if

Asset Portal did "meticulously track" certain information with respect to the CSI leases were true

as CSI claims, production of PeopleSoft in electronic form would be cumulative of information

CSI already has.  Conversely, if Asset Portal did not "meticulously track" the information CSI

claims with respect to the CSI leases, which is indeed the case, then CSI should not be rewarded

---

[27]  While the Asset Portal did have a "field" for cost, that field was rarely populated with information.
[28]  *See* Exhibit 13 at 3-4 with underlining provided by Lycos to show the pertinent material.

with additional discovery for making false statements to the Discovery Master. Either way, CSI is not entitled to PeopleSoft.

Just as it misstated the significance of Asset Portal to the Discovery Master, CSI misrepresents to the Court that PeopleSoft "apparently holds precisely the kind of equipment cost and payment information concerning the CSI leased equipment that Lycos has repeatedly claimed it did not track and could not determine."[29] For starters, the hard copies of printouts from PeopleSoft that Lycos produced over a year ago demonstrate that this is untrue.[30] Furthermore, over-promising about what is contained in materials it has never seen is also nothing new for CSI. When CSI requested a memorandum prepared by LeaseForum well after the February 23, 2007 discovery deadline, it claimed it "very much" needed the "obviously significant . . . communication" because it was written during a "*critical* time period" in the relationship between CSI and Lycos.[31] CSI went on to describe for the Discovery Master what the memo—a memo it had never seen—would "reveal" about Lycos's fraud claims. Of course, the memo in question had nothing to do with what CSI promised the Discovery Master it would reveal and was not at all a "significant communication." This situation is no different. Just as Asset Portal is not the panacea that CSI promised it would be—PeopleSoft is not either. Just as CSI did not want to incur the cost and expense of producing a duplicative, decommissioned BOSS system, Lycos does not want to incur the cost and expense of producing the duplicative, decommissioned PeopleSoft system.

Accordingly, just as the Discovery Master concluded that CSI should not have access to PeopleSoft, so, too, should this Court reject CSI's false promises and overrule the Objection.

---

[29] Obj. at 3.
[30] *See, e.g.,* notes 9-10, *supra*.
[31] *See* Exhibit 13 at 1-3.

- 11 -

The parties have had sixteen months to discover this case and argue why they are entitled to information that they each think is critical to their respective cases. It is time to move on to expert discovery and resolution of this case on the merits.

WHEREFORE, Lycos requests that the Court enter an Order:

1.     Overruling the Objection; and

2.     Granting Lycos such other relief as may be appropriate and just.

Dated: June 7, 2007                    Respectfully submitted,

LYCOS, INC.,

By its attorneys,

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2007, I caused a true and accurate copy of the within document to be delivered by hand delivery to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

/s/ Thomas O. Bean
Thomas O. Bean

# EXHIBIT 1



"Kaler, Robert"
<RKaler@McCarter.com>
02/23/2007 10:38 AM

To  hhershfang@comcast.net

cc  TBean@mwe.com, PActon@mwe.com, "Little, Edward"
    <ELittle@McCarter.com>, "Pellerin, Eileen"
    <EPellerin@McCarter.com>

bcc

Subject  CSI v. Lycos

History:        ⏎ This message has been replied to and forwarded.

Dear Judge Hershfang:

     Since today is the previously scheduled fact discovery cut-off date in this case, we wish to formally request that CSI be permitted the additional discovery described below after today to deal with the issues described below.

     **1.**     First, yesterday's Rule 30(b)(6) deposition of Lycos revealed that, as we had expected, Lycos did in fact possess, when this lawsuit was filed in January of 2005 (and also possessed when Lycos' filed its prior lawsuit against CSI in December of 2003), the Asset Portal database that Lycos used to track the CSI leases, and to link each piece of equipment leased from CSI to the purchase order under which it was acquired (which showed the cost of that piece of equipment), by connecting to a related Lycos database, called Peoplesoft, which held those purchase orders electronically, and which is currently stored on a server at Lycos.

     The Rule 30(b)(6) deposition yesterday also revealed, however, that 11 months ago, in March of last year (2006), during the discovery period of this case, Lycos disposed of the Asset Portal database by tranferring it to another company along with the server that hosted that database.  Because the Asset Portal database was well within the scope of CSI's then outstanding Rule 34 Requests for Documents and Electronic Records concerning the CSI leases -- which Lycos is claiming in this case it could not track or link to their respective purchase orders, or obtain the original equipment costs for -- the transfer of this database to another company was in violation of federal discovery rules -- and if it cannot be recovered, the prejudice to CSI will be substantial.

     As soon as we learned of this in yesterday's deposition, we asked Lycos to attempt to retrieve the database from the company to whom it transferred it in March of 2006, but we do not know their progress on this front.  What we do know is that Lycos still has not released to us the disk they obtained from their former Database Manager Frank Flynn in December of last year, but did not produce to us at that time, which they have said supposedly contains a copy of a version of Asset Portal as it existed when Mr. Flynn left Lycos back in November of 2004.  Although this would not be a substitute for the actual database as it existed when Lycos disposed on it in March of 2006, it would still be helpful, and could have been used yesterday in our Rule 30(b)(6) deposition of Lycos on this issue if we had been able to gain access to it.

     We respectfully submit that these circumstances warrant addition discovery time being

allowed to CSI to explore and complete our discovery on this issue, and if needed to obtain appropriate discovery orders requiring the prompt production of the Asset Portal disk obtained by Lycos from Mr. Flynn months ago, the Asset Portal database that Lycos disposed of last year, and the Peoplesoft database previously linked to Asset Portal.

**2.** Secondly, a number of serious issues arose during the Susan Franklin deposition, which we could not complete earlier this week because we did not have the previously withheld the materials that Lycos had agreed to produce on Tuesday, but then declined to produce out of concern over the waiver issue, and also did not have the remaining materials whose production we have sought in our challenge to Lycos' privilege and work product claims, or the electronic versions of them from Leaseforum, which Ms. Franklin said she would need to look at to date many of the excel spreadsheet analyses that we just obtained earlier this week and showed to her in the deposition.

On the privilege issue, I understand that Lycos counsel will be reviewing Lycos remaining withheld documents today and identifying those that could be produced to us (again without anyone waiving their rights), and that thereafter, whatever remained could be made available to Your Honor to rule on. Once that occurred, we would be in a position to resume and conclude the deposition of Ms. Franklin (who has confirmed in her testimony this week that she does have a 20% contingent interest in the outcome of this case).

Leaseforum and Lycos have taken the position that Mr. Franklin's deposition is over, however, or alternatively, Leaseforum's attorney has said that further questioning should be "limited." We do not agree with either position, however, and respectfully submit that CSI would be severely prejudiced if it could not complete the deposition of Ms. Franklin without the restrictions that Leaseforum's counsel seeks to impose. In this regard, however, we are confident we could finish Ms. Franklin's deposition in one remaining day if we could get the materials we need, and if certain other serious issues relating to the deposition procedure, primarily dealing with Leaseforum not Lycos, could be addressed in advance.

**3.** Lastly, we had one short deposition of Lycos' employee Deb Bibbo cancelled this week because of illness in her family, which we anticipate would only take a few hours and which we would like to schedule when appropriate, as she is an important witness on Lycos' list. 

Under these circumstances, we respectfully request an in-person hearing with Your Honor next week to address and hopefully resolve these issues so that we can continue the process of bringing fact discover in this case to a close.

Thank you for your attention to this matter.

**Robert J. Kaler, Esq.**
**Partner**
**McCarter & English LLP**
**265 Franklin Street**
**Boston, MA 02110**
**Direct Tel. 617-449-6507**



"Kaler, Robert"
<RKaler@McCarter.com>
02/23/2007 05:57 PM

To  TBean@mwe.com, hhershfang@comcast.net

cc  "Little, Edward" <ELittle@McCarter.com>, TBean@mwe.com

bcc

Subject  RE: CSI v. Lycos

History:          ⤷ This message has been forwarded.

Dear Judge Hershfang:

I am travelling and have limited access to my email this weekend, but have seen Lycos' counsel's below email of this afternoon. That communication is a demomonstrably inaccurate attempt to distract attention from the serious evidence spoliation issue relating to Asset Portal that has recently arisen, and to "paint" CSI as supposedly having been discovered, during my deposition of Lycos yesterday, to have "a list in electronic form of all the equipment from it leased to Lycos."

As Mr. Bean knows full well, although he was not at my deposition of Lycos yesterday, the "list in electronic form" that he is telling Your Honor CSI has is simply my law firm's scanned database of the CSI-Lycos equipment leases, which I referred to in my questioning of Lycos' Rule 30(b)(6) witness as evidence that Lycos could easily determine what pieces of equipment it still has in use that were originally leased by Lycos from CSI by comparing the serial numbers of the equipment on its inventory list with the serial numbers on the CSI-Lycos equipment schedules. The witness had claimed it was too burdensome for Lycos to do that, and therefore that it could not say what equipment it was still using that it had originally leased from CSI, but I pointed out that both our law firm and Lycos' lawyers had scanned the CSI-Lycos leases into electronic databases, and that since the Lycos inventory was an excel spreadsheet, the two could be compared electronically.

Lycos below email further misstates, badly, the facts pertaining to both the Asset Portal database (which for months Lycos denied it ever had during the pendency of this case), and its contents and capabilities. I have therefore asked my office to hand deliver to Your Honor this afternoon, and have asked Mr. Little to email Your Honor key excerpts from, the sworn testimony of Lycos' former Database Manager Frank Flynn -- who created and developed the Asset Portal database, and hass personal knowledge in detail as to its capabilties. The exhibits from hid deposition are also being delivered. Lycos' Rule 30(b)(6) witnesses had far more limited knowledge about Asset Portal than Mr. Flynn did, but importantly, Lycos' Rule 30(b)(6) witness on this issue acknowledged that he had read Mr. Flynn's recent deposition and did not disagree with anything Mr. Flynn had said.

If Your Honor reads the Flynn transcript, with exhibits, Your Honor will see how badly the below email misstates the facts surrounding this issue, and how important the recovery of this database will be to a fair resolution of this case. As to the privilege issues, I believe we have already addressed these in my prior correspondence to Your Honor. An in-person conference on these and the other issues we have raised on Wednesday of next week, as the last part of the 

below email suggests, would be fine with CSI if convenient for Your Honor.

Thank you for your attention to this matter.

**Robert J. Kaler, Esq.**
**Partner**
**McCarter & English LLP**
**265 Franklin Street**
**Boston, MA 02110**
**Direct Tel. 617-449-6507**
**Direct Fax: 617-607-9141**
**Email: rkaler@mccarter.com**
**Boston New York Philadelphia Baltimore Hartford Newark Stamford Wilmington**

> -----Original Message-----
> **From:** TBean@mwe.com [mailto:TBean@mwe.com]
> **Sent:** Friday, February 23, 2007 3:03 PM
> **To:** hhershfang@comcast.net
> **Cc:** Kaler, Robert
> **Subject:** CSI v. Lycos

Judge Hershfang, I want to respond to Mr. Kaler's e-mail of this morning and to make a proposal for the exchange of information that each side is seeking.

1.    The Asset Portal. In March, 2006, Lycos liquidated one of its business units in California. Lycos learned two days ago that a server that happened to contain the Asset Portal was among the assets sold. At the time of that sale, the Asset Portal had not been in use at Lycos for well over a year and Lycos did not know that it resided on the transferred server, which hosted multiple applications. Regardless, after learning of the former Portal, Lycos sought and obtained a copy of the Portal made in November, 2004 by the Portal's creator, Frank Flynn. Because Lycos no longer runs the software on which the Portal was built and because the Portal has otherwise nothing to tie into at Lycos, Lycos has been unable to make the Portal function.

Unfortunately, CSI's comments about the information on and capabilities of the Portal contained in this morning's e-mail are simply inaccurate. The Portal did not have the functionality that CSI seems to think it had. Lycos's 30(b)(6) designee testified yesterday as the Portal's purpose – to track the location of equipment -- and its limited information and capabilities during the relevant time period. This should have been enough to persuade CSI that the Portal will not assist it in proving its case. Nevertheless, Lycos has, as requested by CSI, contacted the company to which the server was transferred to inquire about its current status.

Lycos is prepared to deliver a copy of the Portal (either the copy received from Mr. Flynn or a copy from the company that purchased the server) to CSI contemporaneous with CSI's delivery to Lycos of certain information essential to Lycos's case that Lycos has been

seeking. Specifically, Lycos learned yesterday that CSI has a list in electronic form of all equipment it leased to Lycos. Lycos believes this list probably also contains the original cost of each piece of equipment. During yesterday's 30(b)(6) deposition of Lycos, CSI asked Lycos to compare its current inventory of equipment with the list of equipment that Lycos leased from CSI to determine whether Lycos is still in possession of any of that equipment. With an electronic copy of the list of equipment, Lycos could reasonably do that; without the electronic copy, and having only hundreds of pages of lists of equipment, Lycos cannot reasonably do it. CSI's electronic copy was well-within Lycos's discovery requests made over a year ago. Unfortunately, CSI has not produced it. If CSI will produce that electronic copy of the equipment with the original cost of each piece of equipment, along with information concerning payments made by Lycos to CSI that Lycos has been requesting for **months** from CSI's BOSS system and that CSI admittedly has, Lycos will provide the Asset Portal to CSI. Given the relevant time period at issue in this case and that Lycos no longer used the Portal following Mr. Flynn's departure in November 2004, Lycos finds no merit in CSI's supposition that the copy of the Portal obtained from Mr. Flynn is somehow not a worthy substitute for the copy of the Portal residing on the server.

2.    Depositions. With respect to continuation of the depositions of Ms. Franklin, Ms. Bibbo, and the 30(b)(6) of Lycos, Lycos believes that CSI has exhausted the 102 hours afforded for depositions; indeed, CSI has deposed Ms. Franklin over two days exceeding 11.5 hours – a time period longer than any other witness in this case. CSI has twice requested and twice obtained enlargements of deposition time well beyond that provided for in the local rules. With fact discovery ending and CSI having exceeded the number of hours for depositions, fact depositions should be over in this case.

Moreover, CSI voluntarily chose not to press the instant privilege issues last summer, despite filing a motion to compel. That it belatedly changed its mind and chose to press those issues as the parties were approaching the end of fact discovery (an end CSI attempted to hasten) does not justify use of those issues to extend the discovery date and yet again seek more deposition time. Even if CSI had had all the documents it claims it needed for Ms. Franklin's deposition this past Wednesday, and had taken an additional seven hours of her deposition, because of the 102-hour time limit on depositions, it would not have been able to take all of the 30(b)(6) of Lycos and the deposition of Ms. Bibbo.

3.    Privileged Documents. At your honor's request, Lycos will review them and advise you on Monday when it has completed that review.

4.    Next Hearing. Lycos has no objection to an in-person hearing next week to address the above issues. Perhaps Wednesday morning would work.

Thank you for your consideration of this matter.


Thomas O. Bean



March 15, 2007

VIA E-MAIL and BY HAND

The Honorable Herbert Hershfang
Discovery Master
64 W. Rutland Square
Boston, MA 02118

RE:    *Computer Sales International, Inc. v. Lycos, Inc.*, C.A. No. 05-10017

Robert J. Kaler
Partner
T 617 449 6507
F 617 607 9141
rkaler@McCarter.com

Dear Judge Hershfang:

In response to CSI's letter submission of March 13, Lycos' letter of this afternoon (the "Lycos Letter") regrettably ignores the distinguishing features of the Susan Franklin situation, and seeks to bury them in an avalanche of severely incorrect and in many cases irrelevant assertions.

McCarter & English LLP
265 Franklin Street
Boston MA 02110
T 617 449 6500
F 617 607 9200
www.mccarter.com

It also frustratingly ignores the fundamental MRPC Rule 3.4(g) problem here, which will not go away, and with which we are trying to deal in a practical way that preserves our client's right not to be confronted at trial (as it was on summary judgment), in violation of this rule, with a contingently compensated witness against whom a thorough cross-examination cannot be mounted because her deposition was incomplete, and most of her key materials withheld from CSI until it was too late.

We would like to finish discovery as much as anyone, but we cannot do so without at least another day of deposition of Susan Franklin, legible copies of her powerpoint presentations and any other electronic records pertaining to CSI, a few hours of deposition with Deb Bibbo, and a copy of the Asset Portal database from Interactive Data, and any records Interactive has referring to it -- which have been subpoenaed and which Interactive has been prepared to produce for over a week now.

BALTIMORE

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

Clearly, a large volume of underlined(critical records) showing the nature of Ms. Franklin's and Leaseforum's involvement in this case has been mistakenly withheld by Lycos for over a year, and have just been produced. Those documents prove, among other things, that she has an improper contingent fee arrangement *that was actually negotiated by Lycos' attorneys.* See Exh. A hereto. The letter Your Honor received today make it clear that those attorneys intend to do *nothing* about this problem. We are not asking Your Honor to solve it, only to permit us the reasonable discovery we need to combat it. In a more perfect world, the problem would not exist, but it does, and we cannot just ignore it, as the Lycos Letter implies, *sub silentio*, that we should.

ME1 6244440v.1

The Honorable Herbert Hershfang
March 15, 2007
Page 2

The First Circuit has held that if contingently compensated witnesses are permitted to testify at trial at all, it is "vital" that the opposing party be afforded full rights of cross-examination on all issues pertaining thereto. *See, e.g., Crowe v Bolduc,* 334 F.3d 124, 132 (1st Cir. 2003)("Where witnesses under contingent fee agreements are permitted to testify, examination on the contingent fee is considered *vital* . . . Part of the trade-off [in not excluding the testimony of such witnesses] . . . [is] that there [ ] be vigorous cross-examination for bias.") (emphasis added).

***Simply put, we have not had a fair opportunity to question Ms. Franklin about her records,*** many of the most revealing of which have only been produced ***in the last week.*** In fact, we did not receive any of them until the night before her last deposition, and had very little time to review each of them with her in her deposition, which was cut off well before the end of that day. As a result, we have not been able to lay the foundation for a proper cross-examination of her at trial. We have also not received electronic copies of the spreadsheets that were to have been produced, *see* RJK E-Mail No. 1 forwarded with this letter, and are still left with largely illegible copies of a number of her most important powerpoint presentations, copies of which were submitted with my letter to Leaseforum's counsel of March 9, 2007 copied to your honor last week. CSI obviously needs and is entitled to these records to defend itself.

Ms. Franklin, if she is allowed to testify over CSI's objection, may well be the most important witness at the trial of this very large case. CSI's right to effectively cross-examine her on her claims that she and Lycos were "defrauded" by statements made to her by Paul Stenberg will be significantly impaired if we do not have the time, and the material, to fully discover the nature of her involvement and analyses, how her bias has affected them, and how her influence has affected the bias of other witnesses.[1] *See In re Mushroom Transp. Co., Inc.,* 70 B.R. 416, 418, n. 5 (E.D. Pa. 1987)("any pretrial assistance rendered to other witnesses [by the witness who had the contingent fee agreement] may be raised by [the opposing party] as grounds for impeachment of those witnesses"). We therefore request that we be allowed the discovery sought in the third paragraph on page 1 of this letter. 

As to the balance of Lycos Letter, we have following comments. There is no reason, other than leverage to try to prevent CSI from pressing to get the

---

[1]    *See McPherson v. School Dist. No. 186,* 465 F. Supp. 749, 764 (S.D. Ill., 1978); *Keyes v School Dist No. 1,* 439 F. Supp. 393, 419 (D.Colo 1977). *Cf. Person v. Association of Bar of City of New York,* 554 F.2d 534 (2 Cir., 1977) cert. denied, 434 U.S. 924, 98 S. Ct. 403, 54 L. Ed. 2d 282. Such a contingent fee agreement with a witness is classified by <u>Williston on Contracts</u>, 3d ed. 1972, § 1716 under "Bargains Obstructing Justice." *See also* <u>Restatement of the Law, Contracts</u>, 1932 § 552(2).

ME1 6244440v.1

The Honorable Herbert Hershfang
March 15, 2007
Page 3

limited additional discovery it needs, for Lycos to be requesting further
deposition time with Paul Stenberg or Ken Steinback -- both of whose
depositions *Lycos itself formally concluded* earlier this year (by contrast, CSI
has never concluded Ms. Franklin's deposition; on both days - she has been
deposed for a total of a day and a half - she and her attorney simply walked out
at a time they set). Lycos has never asked for more time with these witnesses
before, and in fact agreed that it would not when they each agreed to appear a
second time. For all of these reasons, it's demand for *quid pro quo* is out of
place.

Similarly, the comments in the Lycos Letter about archival data on CSI's Boss
system are completely insupportable, and are not supported by any citation to
*any* of the extensive testimony of CSI witnesses concerning this issue -- which
established long ago that the material is not useable or retrievable in the way
that active data files are -- which is why CSI itself, as its witnesses have
explained under oath, have not tried to reconstruct or use it (just as Lycos has
not produced its back-up financial systems, called General Ledger and
Peoplesoft), but rather relies on the relevant historical hardcopy records, which
take time to review, but which have been explained to Lycos counsel *ad
nauseum* in depositions.

More importantly, the statements in the Lycos Letter about needing an
electronic list of equipment leased from CSI are directly contradicted by the fact
that Lycos *was given such a list* during the parties relationship, produced a
copy to CSI in this case, and was sent another copy by CSI's undersigned
counsel only a few weeks ago. *See* RJK E-Mail No. 2 forwarded with this letter,
and attached electronic spreadsheet. Clearly, Lycos already has such a list. In
fact, CSI has been trying, without success, to get Lycos to agree on what
equipment it still has, or recently sold, that it originally leased from CSI -- but it
will not, so CSI will just have to prove it from these and Lycos own inventory
records. The comments in the Lycos Letter on this issue are thus simply
insupportable.

Finally, Lycos' obstruction of CSI's simple subpoena to Interactive Data seeking
the Asset Portal system that Lycos disposed of last year, and any records
referring to it (*e g* to help locate it, see if it was altered in any way, etc.) -- which
was preceded by a long telephone conference between CSI's undersigned
counsel and Interactive's Law Department explaining exactly what was being
sought -- has made matters very difficult.

When the subpoena was issued, it was not clear how difficult it would be for
Interactive to locate Asset Portal, so the subpoena described it broadly -- both
by name [which the Lycos Letter omits from its quotation of the subpoena], and
by the type of software that Mr. Flynn said he used in creating it. The subpoena

The Honorable Herbert Hershfang
March 15, 2007
Page 4

also sought any documents concerning it, including communication with Lycos about it that might reveal if it was altered in any way, which were limited and we thought legitimate requests. We sent Lycos a copy of the subpoena when we issued it, and received no objection, so we assumed that the process would proceed routinely.

It was not until this past week that Lycos began objecting to Interactive producing the server holding Asset Portal here in Boston (which Interactive had agreed to do, and which our experts had said would be much safer and more convenient than trying to copy in California), and then belatedly objected to the scope of our subpoena, thereby freezing the entire production process. Subsequently, we learned that Lycos had attempted to have a former employee who now works for Interactive copy the Asset Portal system off of that server while it was subject to our subpoena, which is textbook interference with process.

Nevertheless, for the last several days, we have been attempting to no avail to negotiate an agreement with Lycos to copy Asset Portal in California using leading experts in the field from the Seattle-based firm of Electronic Evidence Discovery, but Lycos simply will not respond. It seems to want the issue, rather than a resolution, and it apparently does not want us to see Asset Portal until Your Honor limits further discovery. Had our subpoena not been obstructed by Lycos counsel, we would have already reviewed Asset Portal, and would know if it contains information about which we need to question anyone further (which we do not expect will be necessary, in view of Mr. Flynn's fairly comprehensive testimony, but must reserve our right to seek).

In short, the Lycos Letter is an unfortunate smokescreen intended to obscure CSI's legitimate need for the limited additional discovery it seeks with groundless and demonstrably unsupported allegations. In all fairness, it should not be allowed to do so. CSI can complete what it needs in a week to ten days; all it is asking is leave to do so.

Thank you for your attention to this matter.

Respectfully submitted,


Robert J. Kaler
*Counsel for CSI*

cc:    Thomas Bean, Esq.
       Robert N. Feldman, Esq.
Enclosure


ME1 6244440v.1

# EXHIBIT 2


PLAINTIFF'S EXHIBIT
664

**30(b)(6) Deposition of Lycos**

1. What knowledge relevant to CSI's lease and subsequent sale of equipment to Lycos is possessed by each of the individuals designated by Lycos in its local rule disclosures other than those who have been deposed to date in this case.

- I am designated to respond to this question for persons with knowledge about the asset portal.

  - Victor Turner – purchasing and sale of certain equipment; asset portal

  - Dean Batten

2. All information known or reasonably available to Lycos concerning the "Asset Portal" database referenced by Frank Flynn at his deposition, and all versions thereof, including without limitation – for all times since the creation of the database – where the database was located (i.e., hosted), the persons and entities involved in maintaining the software and hardware used to run the database, the back-up procedures for the database, the categories and types of data entered into and kept in the database and the person who entered the data into the database, and the use of that database.

3. The use and disposition of the "Asset Portal" database since its creation, including without limitation all persons who entered information into the database, the date and reasons for any disposition and/or decommissioning of the database, and the present location of all copies of the database in whatever form, and including the use and disposition of the database since November 2004.

- Pursuant to Avnet Statement of Work No. LYC070001A, in the fall of 2000, Avnet performed a partial physical inventory of Lycos's datacenters located throughout the United States. This inventory did not include MIS equipment or equipment located in Lycos's offices.

- Avnet's work was done under the auspices of Lycos's operations department.

- As a general matter, Avnet performed this partial inventory in an overall effort to persuade Lycos to consolidate all of its leases with it. Avnet was already one of Lycos's lessors.

- The objective of Avnet's inventory was to locate and identify Lycos's equipment within those datacenters. Among other things, this would help Lycos track the physical location of assets and determine what was in or not in use for purposes of purchasing decisions, identify equipment coming off lease in order to make end-of-lease decisions, and identify equipment the company wanted to return.

- As part its work, Avnet both took a physical inventory of some of the equipment and reviewed many, but not all, then-active lease schedules between Lycos and its lessors, including some of the then-active lease schedules between Lycos and CSI. Avnet did not review old and inactive lease schedules, invoices or purchase orders.

- At the same time, it created a database with a variety of fields in which it input certain information obtained by it from its inventory and review of the lease schedules. Although Avnet included many fields in its database, not all fields were populated with information.

- Where readily available from the schedules, Avnet generally included a serial number, description of equipment, location, lessor, lease schedule number, lease start and end dates, and monthly rental payments. If it could be gleaned from the lease schedules themselves, Avnet also filled in fields for PO numbers and original cost information.

- With respect to many of Lycos's equipment schedules with CSI, Avnet could not and did not include PO numbers in the database because CSI did not provide that information in such equipment schedules.

- With respect to all of Lycos's equipment schedules with CSI, Avnet could not and did not include original equipment cost information in the database because CSI did not provide that information in its equipment schedules as did the other lessors, such as Avnet and Bank of America.

- In December 2000, Avnet delivered to Lycos a database containing its partial inventory of equipment in Lycos's datacenters at that time.

- Upon receipt, Lycos learned that the database and asset inventory had numerous and significant problems and was generally of little value to Lycos other than as an information dump, albeit incomplete and containing many errors.

- Among the problems found by Lycos were: 1. the database was missing thousands of pieces of equipment (according to Avnet's own records, 60% of the assets on the lease schedules could not be "matched" to items that were inventoried); 2. there were also problems with some of the equipment in the database that supposedly did "match" to an equipment schedule – when tested by Lycos personnel, certain pieces of equipment that were inventoried and supposedly "matched" to an equipment schedule did not, in fact, match the equipment schedule identified by Avnet; 3. the database had very limited functionality including, for example, certain features and buttons that did not work; 4. the database could not be updated by multiple users from multiple locations (i.e, there was no web or access portal that would enable someone to update the database remotely from a location other than the computer on which it resided), which made its use impractical; 5. many of the report functions did not work and the database repeatedly crashed; and 6. Lycos personnel, including its database operators, did not use or support the Microsoft Access platform on which the database was created.

- Beginning on or around December 2000,2000, Lycos attempted an inventory of the thousands of pieces of equipment that Avnet could not locate during the physical inventory it conducted that fall. It also conducted subsequent inventories. In the end, only around 75-80% of the equipment was ever identified or located.

- As late as June 2003, despite many efforts by Lycos, the Portal still lacked identifiable information for thousands of pieces of equipment owned and leased by Lycos. Because those pieces of equipment could not be located, they were deemed missing by Lycos.

- After receipt of the Avnet database, Frank Flynn of Lycos's operations department worked on and developed a new database, called the "Asset Portal," on a different platform than the one provided by Avnet.

- The Asset Portal was launched and became operational at Lycos in or around early 2001. The Portal was hosted on a server in Lycos's former Santa Clara, CA datacenter.

- To populate the Asset Portal, much of the raw inventory and lease data from the Avnet database was dumped directly into the Portal. That initiative was undertaken by, among other Lycos employees, Frank Flynn, Frank Treu, Vance Nakamoto, Rich Webster, Sam Ziba, Andy Smith, Matt Connors, and Dave Crandall.

- The Asset Portal therefore began with basically the same type and amount of information as contained in the Avnet database. In particular, the Portal contained little financial information, including, without limitation, no financial information related to original cost of equipment or total payments made for equipment leased from CSI to date.

- The Portal also had little historical information, i.e., information pertaining to old and inactive leases from which equipment on current leases had migrated over time. Thus, with respect to CSI leases especially, the Portal could not be used to track pieces of equipment back to their original lease schedules or to ascertain how much had been paid for pieces of equipment over time.

- The Portal also did not contain such financial information as the net present value of lease payments, residual value, lease rate factors, or interest. The Portal also did not indicate the age or fair market value of the equipment.

- The Asset Portal was an operations initiative and an operations tool, first and foremost. The main objective of the Portal was simply to identify and locate the thousands of pieces of equipment possessed by Lycos. The purpose was to assist in identifying equipment for return to lessors, to assist in figuring out when equipment was scheduled to come off lease, and to assist in making purchasing decisions.

- The Portal was a forward-looking, not backward-looking tool. It was concerned with the present and future location of equipment and lease status.

- The Portal was maintained by the operations department, principally by Frank Flynn.

- However, many individuals inputted data into the database over time. With respect to the information dumped from the Avnet database into the Portal, ie, information pertaining to those leases already in effect at the time Avnet performed its inventory and the Portal was launchlaunched, that initiative was undertaken by Frank Flynn, Frank Treu, Vance Nakamoto, Rich Webster, Sam Ziba, Andy Smith, Matt Connors, and Dave Crandall.

- With respect to new equipment and leases, i.e., equipment received and leases entered after the Portal's launch, Lycos's operations personnel responsible for receiving equipment would be responsible for inputting the relevant information into the Portal. Among those individuals were Victor Turner, Jason Rogers, Mike Bodnar, Gary Chalifoux, Steve Caisse, Dean Batten, and many others that worked in the operations department over time.

- At a certain point after the Portal launched, an attempt was made to identify the status of each piece of equipment that could be identified and located, i.e., whether it was in use or not and, if in use, what it was being used for. Based on that assessment, Lycos attempted to make determinations regarding whether to return the equipment, retain it under lease, buy it out, or otherwise. A field was added in 2003 to the Portal to document these decisions.

- At some point after the Portal launched, Lycos also developed protocols for returning identifiable equipment at the end of various equipment schedules already in effect at the time Portal was put into operation—including an early warning system that would notify appropriate personnel when equipment schedules were coming to the end of the lease term so that timely end-of-lease decisions could be made. That initiative was undertaken and led by, among other Lycos personnel, Kevin Baillie, Victor Turner, and Monique Walsh.

- Quite some time after the Portal launched (unsure when exactly), Lycos also added features to the Portal that tied into Lycos's then-existing purchase order and Peoplesoft systems. Thus, after that feature was added, an individual who received equipment at a datacenter could theoretically insert the relevant purchase order number into the Portal and, after some additional steps, hit a button to automatically populate the Portal with information from that purchase order.

- The above feature was intended for use with new and incoming equipment. That feature was not and could not be used with respect to leases already in effect and equipment already in use as of Avnet's inventory and the Portal's launch. Many of the same deficiencies with the information in the Portal regarding older leases,

including its lack of completeness and that the purchase order system did not contain many of the older purchase orders, made it impossible to use with past leases. In addition, the Asset Portal was a forward-looking tool.

• Lycos personnel's entry of information into the Portal and use of the automatic PO feature with respect to new equipment was sporadic for many reasons: 1. equipment was usually received before any schedule existed and needed to be installed as soon as possible; personnel often did not have time to populate the database before installation; 2. equipment was often moved and difficult to keep track of for purposes of changing information already in the portal; 3. there was very little training on using the PO feature; 4. use of the PO feature was not very easy and required multiple steps to complete, and, with no formal training, many personnel simply did not know how to use it well enough; and 5. many personnel also did not entirely understand the various ties between the Portal and other systems that were created over time (e.g., PO system and Peoplesoft).

• Thus, the Portal, albeit already incomplete and unreliable, quickly became out of date and more unreliable.

• The Asset Portal was used by the operations department to search for and locate equipment that could be identified when Lycos wanted to return that equipment to a lessor. It was also used to identify when equipment would be coming off lease.

• Because the Portal was considered first and foremost an inventory database, contained very little relevant financial information especially with respect to old leases (very little cost or payment information), and it was otherwise incomplete and unreliable, finance personnel rarely used the Portal. Finance used the Portal indirectly to locate equipment it wanted to return and as an alert when equipment was coming off lease. In those instances, however, a member of the operations department would conduct the search and/or inform finance when leases were coming to an end.

• At some point in 2002 and into 2003, Monique Walsh was in the process of analyzing Lycos's equipment leases and preparing a financial spreadsheet and chart regarding those leases, including those with CSI. Kevin Baillie told Ms. Walsh to see if the Portal could be used to populate some of the data. Ms. Walsh attempted to use the Portal for this purpose, but found that the Portal lacked financial information she needed, was incomplete, and generally unreliable and unhelpful for her purposes. Moreover, even with serial numbers in hand, there were many times that a search for equipment came up empty and could not be tied to any of Lycos's lessors. Ms. Walsh therefore had to conduct a review of lease schedules themselves and attempt to obtain information directly from the various lessors, including CSI.

• Among the relevant financial information the Portal lacked, especially with respect to older leases and equipment, included, among other things, cost and payment information, the history and migration of equipment over time (e.g., when it was originally leased, on what schedule it began, how much it cost, especially for CSI leases

how many times it was rewritten and/or rolled, and how much Lycos had paid for that equipment over time), principle balance amounts, net present value of rental payments, residual values, and fair market value amounts.

- In conjunction with datacenter moves in 2003, Lycos's operations department attempted to use the Portal to locate equipment and document its movement. However, the Portal proved to be unreliable and not flexible enough to track the movement of equipment. Operations therefore had to switch to using regular spreadsheets to ease the process at that time.

- After the moves, in July 2004, those spreadsheets were sent to Frank Flynn to update the Portal as to the movement and/or sale of Lycos's equipment. Mr. Flynn left a few months later and it is unknown whether he in fact began or completed those updates by that time. In general, operations was not actively using the portal much at that time, and ceased using it altogether after Mr. Flynn left. There was no one at Lycos to maintain and manage the database after Mr. Flynn departed, and conventional spreadsheets were otherwise deemed more practical for keeping an inventory, as they could be updated from the datacenters themselves, whereas the Portal could not be.

- Eventually, the operations department conducted a new physical inventory from scratch and has maintained that inventory in an excel spreadsheet ever since. That spreadsheet contains information asset tag identification, make and model, location, and other things. That spreadsheet contains no financial information, however.

- In 2005, Lycos once again consolidated and moved datacenters. As part of that move, Lycos's Santa Clara, CA datacenter was shut down and the equipment there was either moved to Boston or liquidated.

- Although Lycos previously believed that the server on which the former Asset Portal was located was likely liquidated at that time, based on Mr. Flynn's testimony last week, that server has now been identified as a server that was transferred in the sale of Lycos's former Quote.com business to InterActive Data Corporation in March 2006. At the time of the sale, that server was still located in the Santa Clara datacenter. It is now owned by InterActive Data Corp. and may continue to be used in Quote.com's ongoing business. Lycos does not know what IDC has done with the server, or whether it is still using it.

- Until Mr. Flynn's deposition, no one at Lycos knew where the Portal was located, as it was not in use and had not been used in a long time. Other than the copy received from Frank Flynn on December 29, 2006, Lycos has found no copy of the Portal anywhere in its possession, custody or control.

- Until Mr. Flynn's deposition, no one at Lycos knew or had reason to believe that it was possible, as Mr. Flynn claims, to track the changes made to the Portal by perhaps using some type of forensic analysis. Mr. Flynn testified that he himself has

never tried to use this feature and has advised Lycos that he is unsure if that feature would work.

- Because the Portal had not been used in quite some time and was no longer neededhad been replaced by a new method of tracking the location of equipment, Lycos's operations department did not thinkbelieve it was necessary to retain a copy of it, and, in any event, did not even know where the Portal was located on its systems. The datacenter moves and identification of the servers for Quote.com were handled completely by Lycos's operations department and managed by Dean Batten, with no input or consultation from legal or finance. Lycos's operations department neither looked for nor identified the Asset Portal on the servers that were transferred to IDC in March 2006. Lycos's belief that the Asset Portal was on such server is based solely on the testimony of Frank Flynn and a review of its records to determine what happened to the server identified by Mr. Flynn. Dean Batten was not aware of the CSI litigation at that time, nor was Lycos legal was not aware of the existence of the former Asset Portal at the time that it was transferred to IDC.

- Lycos does not know the back-up procedures that were used with respect to the Asset Portal. Lycos, however, has no reason to disagree with Frank Flynn's testimony regarding the back-up procedures relating to the Portal. Lycos does not know whether any back-up tapes containing the Asset Portal still exist. If any such tapes still exist, they would be at Iron Mountain. Iron Mountain's records are not detailed enough to determine whether the Asset Portal is contained on any of them.

- Lycos received a copy of the Portal on December 29, 2006 from Frank Flynn, and is in possession of that copy.

- Above information based on information from Lycos documents produced in this litigation, Victor Turner, Kevin Baillie, deposition transcript of Frank Flynn, company records and/or personal knowledge.

# EXHIBIT 3

LYC_069974

| | | | | EndDate | | |
|---|---|---|---|---|---|---|
| Count of EndDate | | | | | | |
| Action | AssetType | StartDate | LeaseNum | 04/30/03 | 06/30/03 | 09/30/03 |
| Found | | | | 29 | 34 | 72 |
| | Adapter | | | 5 | 1 | 1 |
| | | 04/01/00 | L5649-19 | 5 | | |
| | | | | 5 | | |
| | | 06/01/00 | L5649-20 | | 1 | |
| | | | | | 1 | |
| | | 09/29/00 | L5649-21 | | | 1 |
| | | | | | | 1 |
| | Cabinet | | | | | |
| | | 04/01/00 | L5649-19 | 4 | | |
| | | | | 4 | | |
| | | | | 4 | | |
| | | 10/01/00 | 144874-94 | | | |
| | Disks | | | | | |
| | | 10/01/00 | 144874-94 | | | |
| | | 01/01/01 | 144874-89 | | | |
| | Drive | | | | | 19 |
| | | 06/01/00 | L5649-20 | | 18 | |
| | | | | | 18 | |
| | | | | | 18 | |
| | | 09/29/00 | L5649-21 | | | 19 |
| | | | | | | 19 |
| | | 10/01/00 | 144874-94 | | | |
| | | 11/01/01 | 144874-93 | | | |
| | Keyboard | | | | | |
| | | 10/01/00 | 144874-94 | | | |
| | Monitor | | | | | |
| | | 04/01/00 | L5649-19 | 1 | 1 | 1 |
| | | | | 1 | | |
| | | | | 1 | | |
| | | 06/01/00 | L5649-20 | | 1 | |
| | | | | | 1 | |

LYC_069975

| | 10/31/03 | 02/29/04 | 03/31/04 | 07/31/04 | 09/30/04 | 10/31/04 | 03/31/05 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| | 40 | 94 | 88 | 15 | 19 | 186 | 11 | 588 |
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | 588 |
| 5 | | | | | | | | 7 |
| 6 | | | | | | | | 5 |
| 7 | | | | | | | | 5 |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | 1 |
| 11 | | | | | | | | 1 |
| 12 | | | | | | | | |
| 13 | | | | | | | | 1 |
| 14 | | | | | | | | 1 |
| 15 | | | | | | | | |
| 16 | | | | | | 13 | | 17 |
| 17 | | | | | | | | 4 |
| 18 | | | | | | | | 4 |
| 19 | | | | | | | | |
| 20 | | | | | | 13 | | 13 |
| 21 | | | | | | 13 | | 13 |
| 22 | | | | 1 | | | | |
| 23 | | | | | | 20 | | 21 |
| 24 | | | | | | 20 | | 20 |
| 25 | | | | | | 20 | | 20 |
| 26 | | | | | | | | |
| 27 | | | | 1 | | | | 1 |
| 28 | | | | 1 | | | | 1 |
| 29 | 4 | | | | | | | |
| 30 | | | | | | 22 | | 63 |
| 31 | | | | | | | | 18 |
| 32 | | | | | | | | 18 |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | 19 |
| 36 | | | | | | | | 19 |
| 37 | | | | | | 22 | | 22 |
| 38 | | | | | | 22 | | 22 |
| 39 | | | | | | | | |
| 40 | 4 | | | | | | | 4 |
| 41 | 4 | | | | | | | 4 |
| 42 | | | | | | | | |
| 43 | | | | | | 2 | | 2 |
| 44 | | | | | | 2 | | 2 |
| 45 | | | | | | 2 | | 2 |
| 46 | | 1 | | | 3 | | | |
| 47 | 6 | | | | | | | 13 |
| 48 | | | | | | | | 1 |
| 49 | | | | | | | | 1 |
| 50 | | | | | | | | |
| 51 | | | | | | | | 1 |
| 52 | | | | | | | | 1 |

LYC_069976

| # | 1 — Ready to Return Now | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| 261 | | | | | | | |
| 262 | | Adapter | 11/01/01 | 144874-93 | | | 1 |
| 263 | | | | | | | |
| 264 | | | | | | | |
| 265 | | | | | | | |
| 266 | | Cabinet | 10/01/00 | 144874-94 | | | |
| 267 | | | | | | | |
| 268 | | | | | | | |
| 269 | | | | | | 1 | |
| 270 | | Disks | | | | 1 | |
| 271 | | | | | | 1 | |
| 272 | | | 06/01/00 | L5649-20 | | | |
| 273 | | | | | | | |
| 274 | | | 10/01/00 | 144874-94 | | | |
| 275 | | | | | | | |
| 276 | | | | | | | |
| 277 | | Drive | 06/01/00 | L5649-20 | | 4 | |
| 278 | | | | | | 4 | |
| 279 | | | 10/01/00 | 144874-94 | | 4 | |
| 280 | | | | | | | |
| 281 | | | | | | | |
| 282 | | | | | | | |
| 283 | | Laptop | | | | | |
| 284 | | | 10/01/00 | 144874-100 | | | |
| 285 | | | | | | | |
| 286 | | | | | | | |
| 287 | | | 01/01/01 | 144874-89 | | | |
| 288 | | | | | | | |
| 289 | | | | | | | |
| 290 | | | 04/01/01 | 144874-90 | | | |
| 291 | | | | | | | |
| 292 | | | | | | | |
| 293 | | | 10/10/01 | BOA-Schedule 2 | | | |
| 294 | | | | BOA-Schedule 3 | | | |
| 295 | | | | | | | |
| 296 | | | | | | | |
| 297 | | | 11/01/01 | 144874-93 | | | |
| 298 | | | | | | | |
| 299 | | | | | | | |
| 300 | | Monitor | | | | 1 | |
| 301 | | | 01/01/00 | 101,003,000,002 | | | |
| 302 | | | | | | | |
| 303 | | | | | | | |
| 304 | | | 04/00 | L5649-19 | 1 | | |
| 305 | | | | | 1 | | |
| 306 | | | | | | | |
| 307 | | | 09/29/00 | L5649-21 | | | |
| 308 | | | | | | | |
| 309 | | | | | | | |
| 310 | | | 10/01/00 | 144874-94 | | | 1 |
| 311 | | | | | | | 1 |
| 312 | | | | | | | |

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | **LYCOS'S OBJECTIONS AND RESPONSES** |
| LYCOS, INC., | ) ) | **TO CSI'S THIRD SET OF** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) | **INTERROGATORIES** |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
| Trustee Process Defendant | ) | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby submits its Objections and Responses to

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc.'s ("CSI"), Third Set

of Interrogatories to Lycos.

### PRELIMINARY STATEMENT

Lycos is still in the process of taking and analyzing fact discovery in this case. In

addition, no expert discovery has yet been taken. Accordingly, as set forth in the General

Objections below, the responses provided herein are based upon the present knowledge and

understanding of Lycos after reasonable investigation, inquiry, and analysis. Lycos reserves the

right to amend, modify, withdraw, and/or supplement these Objections and Responses as it

deems necessary to ensure their accuracy. If it is subsequently determined that Lycos has

Further information responsive to this interrogatory may be derived or ascertained from the business records of CSI and Lycos that have already been produced in this matter, and the burden of deriving or ascertaining such information is substantially the same for CSI as it would be for Lycos.

## INTERROGATORY NO. 23:

23.    Were any of the recommendations that Avnet made to Lycos in the Avnet "Lease Assessment and Asset Inventory Report", dated December 15, 2000 (copy marked as Plaintiff's Exhibit 122 herein), implemented by Lycos, and if so, which ones, how were they implemented, who at Lycos was responsible for implementing them, and how was the database created by Avnet for Lycos (as referenced in that report) used, if at all, to implement them?

## RESPONSE TO INTERROGATORY NO. 23:

Lycos objects to Interrogatory No. 23 on the grounds that it is overbroad and seeks information not relevant to the claims or defenses of the parties as required by amended Fed. R. Civ. P. 26(b)(1) (permitting discovery as to matters "relevant to the claim or defense of any party") in that it seeks information up to and including the present date, which has no bearing on this litigation. In addition, the interrogatory is vague and misleading in that whereas Lycos did implement measures concerning the inventory or financial management of its assets, those initiatives may or may not have been as a result of any recommendations that are contained in the Avnet report. Moreover, although there are "proposed actions" discussed on, for example, pages 4 and 5 of the Avnet report, many of the proposed "action items" and "options" discussed throughout the report are internally inconsistent and not fully developed so as to be actionable items. Subject to and without waiving the foregoing objections or its General Objections, Lycos states as follows:

Pursuant to Avnet Statement of Work No. LYC070001A, in the year 2000, and in an effort to persuade Lycos to consolidate all of its leases with Avnet, Avnet performed a partial

- 19 -

physical inventory of Lycos's datacenters located throughout the United States. Avnet's inventory was an initiative intended to locate and identify Lycos's equipment within those datacenters. As the Avnet database demonstrates, Avnet included cost information in that inventory where the information was readily available from the relevant lease schedules, such as with respect to the Avnet and Bank of America equipment schedules. With respect to all or nearly all of Lycos's equipment schedules with CSI, Avnet could not and did not include equipment cost information (other than monthly rent) in the database because CSI did not provide that information in its equipment schedules as the other lessors had done.

In December 2000, Avnet delivered to Lycos a database containing a partial inventory of equipment possessed by Lycos in its datacenters at that time. That database and asset inventory had numerous and significant problems and, as such, was of little value to Lycos other than as an incomplete and error-containing information dump. The problems included the following: first, the database was missing thousands of pieces of equipment (according to Avnet's records produced in this case, 60% of the assets on the lease schedules could not be "matched" to items that were inventoried). Second, Lycos understands that there were even problems with the equipment in the database that supposedly did "match" to an equipment schedule. When Lycos employees tested the accuracy of the database, they discovered that certain pieces of equipment that were inventoried and supposedly "matched" to an equipment schedule did not, in fact, match the equipment schedule identified by Avnet. Third, the database had very limited functionality including, for example, features and buttons that did not work. Fourth, the database could not be updated by multiple users from multiple locations (i.e, there was no web or access portal that would enable someone to update the database remotely from a location other than the computer on which it resided), which made its use impractical. Fifth, many of the report functions did not

- 20 -

work and the database regularly crashed. Sixth, Lycos personnel, including its database operators, did not use or support Microsoft Access, the platform used by Avnet for the databse. As a result of the foregoing, and as Avnet's records reflect, Lycos expressed its disappointment with the incompleteness of the inventory at the time Avnet presented the database to Lycos. As further evidence of Lycos's dissatisfaction with the database and the report, and Avnet's awareness thereof, Lycos decided not to pay Avnet for the report and Avnet did not press for such payment.

Avnet included certain financial information in its report in an effort to secure additional business from Lycos  That information was, however, self-serving, factually incorrect in numerous substantive respects, and reflected a general lack of understanding of, and viable solutions with respect to, Lycos's financial situation and Lycos's leases as of December, 2000. For example and without limitation, one of Avnet's proposed solutions for "consolidat[ing] resources and reduce[ing] the costs associated with information-technology and infrastructure support" was to purchase Avnet's "Technology Assessment Services." Avnet report at 40; (*see also e g., id.* at 35, 50-52). In fact, according to Avnet's records produced in this case, Avnet performed over $100,000 worth of work but charged Lycos only approximately $23,000 in the hope of securing future business from Lycos. Moreover, Avnet's proposals with respect to "lease consolidation" were predicated on the timely return of the equipment to the lessor and were, by Avnet's own admission, "not . .. cost-effective" for the CSI leases until they entered the final year of those leases. *Id.* at 33.

Beginning in December, 2000, Lycos attempted to develop an inventory of the thousands of pieces of equipment that Avnet could not locate during the physical inventory it conducted in the fall of 2000. Lycos also attempted to develop an Asset Portal on a different platform than the

- 21 -

one provided by Avnet that resolved some of the problems with the Avnet database. Much of the raw inventory and lease data from the Avnet database was "dumped" into the Asset Portal. That initiative was undertaken by, among other Lycos employees, Frank Flynn, Frank Treu, Vance Nakamoto, Rich Webster, Sam Ziba, Andy Smith, Matt Connors, and Dave Crandall. Like with the Avnet database, the Asset Portal lacked financial information including, without limitation, financial information related to original cost for equipment leased from CSI. In addition, as late as June, 2003, and despite many efforts by Lycos, the Asset Portal still lacked identifiable information for thousands of pieces of equipment owned and leased by Lycos. Because those pieces of equipment could not be located, they were deemed missing by Lycos.

Lycos also further developed protocols for returning identifiable equipment at the end of various equipment schedules—including an early warning system wherein appropriate personnel would be notified that certain equipment schedules were coming to the end of the lease term. That initiative was undertaken and led by, among other Lycos personnel, Kevin Baillie, Victor Turner, and Monique Walsh.

Lycos also converted its operating leases to capital leases. That initiative was undertaken and led by, among other Lycos personnel, Brian Lucy, Kevin Baillie, and Julie Callagee.

Further information responsive to this Interrogatory may be derived or ascertained from the business records of CSI and Lycos that have already been produced in this matter, and the burden of deriving or ascertaining such information is substantially the same for CSI as it would be for Lycos.

## INTERROGATORY NO. 24:

24.    Explain exactly what Lycos knew, and when it knew it, about the prices at which CSI purchased the equipment that it then leased to Lycos, during the years that it did so - - including in your answer an explanation of how Lycos recorded that information.

- 22 -

## VERIFICATION

I, Kevin Baillie, being duly sworn, hereby depose and state that I am an officer of Lycos,

Inc. I verify that the foregoing Responses to CSI's Third Set of Interrogatories to Lycos, Inc. are

made on behalf of Lycos, Inc., that most of the matters stated therein are not within my personal

knowledge, and that the facts stated therein have been assembled by persons assisting Lycos, Inc.

in this case. Upon information and belief, the facts stated therein are true and correct based on

the information in the possession of Lycos, Inc. and its professionals at this time.

_____
Kevin Baillie

AS TO OBJECTIONS:

_____
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I, Peter M. Acton, Jr., hereby certify that on this 29th day of January, 2007, a true and
correct copy of the foregoing document was served by electronic mail and first-class mail on the
following:

Robert J. Kaler
Edward W. Little, Jr.
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
rkaler@mccarter.com
elittle@mccarter.com

/s/ Peter M. Acton, Jr.
_____
Peter M. Acton

- 25 -

# EXHIBIT 5

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Timothy Wright

# January 12, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Nicole E. Guilbert   22498

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4      -------------------------------x

 5   COMPUTER SALES INTERNATIONAL,

 6   INC.,

 7                        Plaintiff

 8                                      Civil Action

 9   vs.                            No. 05-10017-RWZ

10

11   LYCOS, INC.,

12                        Defendant

13      -------------------------------x

14

15     VIDEOTAPED DEPOSITION OF TIMOTHY WRIGHT,

16         a witness called by and on behalf of the

17         Plaintiff, taken pursuant to applicable

18         provisions of the Massachusetts Rules of Civil

19         Procedure, before Nicole E. Guilbert, a Notary

20         Public in and for the Commonwealth of

21         Massachusetts, at McCarter & English, 225

22         Franklin Street, Boston, Massachusetts, on

23         Friday, January 12, 2007, commencing at

24         9:36 a.m.
```

1

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

10

1 Lycos?
2 A. '99
3 Q. And what was the position you held when you
4 started?
5 A. CIO.
6 Q. Meaning chief information officer?
7 A. Correct.
8 Q. According to the Arthur Andersen records, you
9 served as senior vice president and chief technology
10 officer responsible for the day-to-day operation and
11 administration of all the properties in the Terra Lycos
12 network after the acquisition; is that correct?
13 A. That's correct.
14 Q. And did you pretty much do the same thing but for
15 Terra -- for Lycos alone before --
16 A. No.
17 Q. -- the acquisition?
18 A. No. My role changed in the acquisition.
19 Q. How did it change?
20 A. Prior to the acquisition, I was responsible for
21 the operations of the website. Subsequent to the
22 acquisition, I was responsible for the development, Q/A,
23 and live operations. And I think at that point -- I'm
24 not exactly sure on the time -- but I also got IT, which

11

1 was the -- what traditionally will be called MIS.
2 Q. Did you do anything to prepare for this
3 deposition -- meeting with counsel, reviewing documents,
4 things like that?
5 A. I met with counsel.
6 Q. Who did you meet with?
7 A. Peter.
8 Q. When? Just today?
9 A. Wednesday.
10 Q. Okay. Meet with anybody else?
11 A. No.
12 Q. Did you do anything else to prepare?
13 A. Nope.
14 Q. During the time that you were at Lycos and then
15 Terra Lycos, did you always have the title of chief
16 information officer?
17 A. Yes.
18 Q. And in that capacity when you were working with
19 Lycos prior to the acquisition, did you come -- become
20 familiar with a project called Asset Portal?
21 A. I was familiar to the extent that it was an
22 ongoing project amongst many that we had going on, yeah.
23 Q. What was the Asset Portal project?
24 A. It was an attempt to enable my organization to

12

1 manage or at least understand what assets were used to
2 run the products in our network.
3 Q. Did you review any documents when you met with
4 Lycos' counsel a few days ago?
5 A. I did.
6 Q. What did you review?
7 MR. ACTON: I'm going to object.
8 Q. (By Mr. Kaler) Well, did you review anything
9 that refreshed your recollection?
10 A. Yeah.
11 Q. What'd you review? You can answer.
12 THE WITNESS: What's it called? I
13 don't know what the thing's called. The --
14 it was an Avnet report.
15 Q. (By Mr. Kaler) Exhibit 122, which I show you
16 now?
17 MR. ACTON: Do you have a copy for
18 me?
19 MR. KALER: I do.
20 THE WITNESS: This was it, yep.
21 Q. (By Mr. Kaler) And have you seen that -- you saw
22 that report before this week, right?
23 A. I would imagine I did. I can't recall seeing it.
24 Q. The -- when you started in 1999, when -- what was

13

1 the month in 1999 that you started? Do you recall?
2 A. November.
3 Q. Now, at that time, had you been involved in
4 equipment leases before?
5 A. No.
6 Q. How many people were working at Lycos when you
7 started there in November of '99? Do you remember?
8 A. No.
9 Q. How big a company was it?
10 MR. ACTON: Objection.
11 Q. (By Mr. Kaler) You can answer.
12 A. In what terms?
13 Q. Financial or number of employees.
14 A. I don't remember, to be honest.
15 Q. Give us a general sense of what the company was
16 like when you started.
17 MR. ACTON: Objection.
18 THE WITNESS: It was a large,
19 web-based, entrepreneurial, exciting
20 company.
21 Q. (By Mr. Kaler) It was using a certain amount of
22 computer hardware for its operations, right?
23 A. All sorts of computer hardware, yeah.
24 Q. When you assumed the position of chief

4 (Pages 10 to 13)

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

---

134

1    A   I was
2    Q.  Do you have any knowledge of any fraud or
3    misconduct by CSI in connection with its dealings with
4    Lycos?
5        MR. ACTON: Objection.
6    Q.  (By Mr. Kaler) You can answer.
7    A   No
8    Q.  Did you have any dealings yourself with anybody
9    from CSI?
10   A   No
11   Q.  Did you ever rely on anything that CSI or any of
12   its representatives said in any of your actions?
13       MR. ACTON: Objection.
14   Q.  (By Mr. Kaler) You can answer.
15   A   If CSI supplied information to finance and
16   finance shared it with me, I would assume that it was
17   accurate.
18   Q.  But you don't know -- to your knowledge, you
19   didn't yourself rely on anything personally said to you?
20       MR. ACTON: Objection
21       THE WITNESS: No
22       MR. KALER: All right. I have
23   nothing further. Any questions?
24       MR. ACTON: No questions.

---

135

1        THE VIDEOGRAPHER: Now going off the
2    record. The time is 12:43 p.m.
3        (The witness was excused.)
4        (Whereupon, the deposition concluded
5    at 12:43 p.m.)
6        (Exhibits 497 through 508 were marked
7    in today's proceedings.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

136

1    COMMONWEALTH OF MASSACHUSETTS    MIDDLESEX, SS
2
3        I, NICOLE E. GUILBERT, a Certified
     Shorthand Reporter and Notary Public duly
4    commissioned and qualified in and for the
     Commonwealth of Massachusetts, do hereby
5    certify that there came before me on the 12th
     day of January, 2007, at 9:36 a.m., the person
6    hereinbefore named, TIMOTHY WRIGHT. who
     provided satisfactory evidence of
7    identification as prescribed by Executive
     Order 455 (03-13) issued by the Governor of
8    the Commonwealth of Massachusetts, was by me
     duly sworn to testify to the truth and nothing
9    but the truth of his knowledge concerning the
     matters in controversy in this cause; that he
10   was thereupon examined upon his oath, and his
     examination reduced to typewriting under my
11   direction; and that this is a true record of
     the testimony given by the witness to the best
12   of my ability
         I further certify that I am neither
13   attorney or counsel for, nor related to or
     employed by, any of the parties to the action
14   in which this deposition is taken, and
     further, that I am not a relative or employee
15   of any attorney or counsel employed by the
     parties hereto or financially interested in
16   the action
17
18   My Commission Expires:  May 7, 2010
19
20
21
22              Nicole E. Guilbert
                CSR/Notary Public
23
24

---

137

1        ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5        ERRATA SHEET DISTRIBUTION INFORMATION
6
7    The original of the Errata Sheet has been delivered
8    to Peter M. Acton, Jr., Esquire.
9    When the Errata Sheet has been completed by the
10   deponent and signed. a copy thereof should be delivered to
11   each party of record and the ORIGINAL forwarded to
12   Robert J. Kaler, Esquire, to whom the original deposition
13   transcript was delivered
14
15        INSTRUCTIONS TO DEPONENT
16
17   After reading this volume of your deposition, please
18   indicate any corrections or changes to your testimony and
19   the reasons therefor on the Errata Sheet supplied to you
20   and sign it. DO NOT make marks or notations on the
21   transcript volume itself. Add additional sheets if
22   necessary. Please refer to the above instructions for
23   Errata Sheet distribution information
24

---

35 (Pages 134 to 137)

# EXHIBIT 6

**Folder:**  \Lycos vs CSI\LEASES 2001

**Filename:**  Lease Billings.xls

**Author**  Monique Walsh

**Organization**  Lycos, Inc.

**DateCreated**  9/18/2001

**TimeCreated:**  11:44 AM

**DateLastMod**  2/1/2006

**TimeLastMod**  12:36 PM



| | | | 144874-83 | | | | 144874-83A | | | | 144874-84 | | |
| | | | Paid | | | | Paid | | | | | Paid | |
| | Invoice # | Invoice Amt. | Check# | Date | Invoice # | Invoice Amt. | Check# | Date | Invoice # | Invoice Amt. | Check# | Date |
| Jan-01 | 444905 | 73,398.08 | 9632 | 8/21/2001 | | | | | 444772 | 2,162.14 | 9632 | 8/21/2001 |
| Feb-01 | 444906 | 127,648.96 | 9632 | 8/21/2001 | | | | | 444773 | 20,297.19 | 9632 | 8/21/2001 |
| Mar-01 | 444907 | 133,777.01 | 9632 | 8/21/2001 | | | | | 444774 | 38,536.85 | 9632 | 8/21/2001 |
| Apr-01 | 444921 | 137,858.90 | 9632 | 8/21/2001 | 445515 | 16,680.85 | 9754 | 8/21/2001 | 444798 | 50,442.04 | 9632 | 8/21/2001 |
| May-01 | 444922 | 137,858.90 | 9632 | 8/21/2001 | 445516 | 16,680.85 | 9754 | 8/21/2001 | 444799 | 50,442.04 | 9632 | 8/21/2001 |
| Jun-01 | 444923 | 137,858.90 | 9632 | 8/21/2001 | 445517 | 16,680.85 | 9754 | 8/21/2001 | 444800 | 50,442.04 | 9632 | 8/21/2001 |
| Jul-01 | 444924 | 137,858.90 | 9632 | 8/21/2001 | 445518 | 16,680.85 | 9754 | 8/21/2001 | 444801 | 50,442.04 | 9632 | 8/21/2001 |
| | | 886,260.55 | | | | 66,723.40 | | | | 202,764.34 | | |
| Aug-01 | 444925 | 137,858.90 | 9632 | 8/21/2001 | 445519 | 16,680.85 | 9754 | 8/21/2001 | 444802 | 50,442.04 | 9632 | 8/21/2001 |
| Sep-01 | 446841 | 137,858.90 | 9632 | 8/21/2001 | 445520 | 16,680.85 | 9754 | 8/21/2001 | 446842 | 50,442.04 | 9632 | 8/21/2001 |
| Oct-01 | | | | | | | | | | | | |
| Nov-01 | | | | | | | | | | | | |
| Dec-01 | | | | | | | | | | | | |
| | | 275,717.80 | | | | 33,361.70 | | | | 100,884.08 | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | $ 557,660.04 | Amount Need to be Paid for Aug - Sept 2001 for Leases# 89, 89A & 90 | | | | | | | | | |
| | | $ (409,963.58) | Amount Paid Aug - Sept 2001 for Leases# 83, 83A & 90 | | | | | | | | | |
| | | $ 147,696.46 | Amount Due per Leases# 89, 89A & 90 | | | | | | | | | |

LYED202242

| | 144874-89 | | 144874-89A | | 144874-90 |
|---|---|---|---|---|---|
| Invoice # | Invoice Amt. | Invoice # | Invoice Amt. | Invoice # | Invoice Amt. |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| 453332 | 112,967.42 | 453335 | 17,142.71 | 453336 | 55,776.55 |
| 453333 | 112,967.42 | 453337 | 17,142.71 | 453338 | 55,776.55 |
| 453334 | 112,967.42 | 453339 | 17,142.71 | 453340 | 55,776.55 |
| | | | | | |
| | 338,902.26 | | 51,428.13 | | 167,329.65 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

LYED202243

| Lease# | 2000 | | | | 2001 | | | | | County of Tax Rate | Monthly Lease Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lease Amount | Property Tax | Tax Amt. | Total | Lease Amount | Property Tax | Prop.Tax as % of Lease Amt. | Tax Amt. | Total | | |
| 14487-4-64B | 240,000 | 1,397.38 | 115.28 | 1,512.66 | 240,000 | 339.66 | 0.14% | 27.17 | 366.83 | Mt. View, CA | 6,726.67 |
| 14487-4-65C | 1,082,717 | | | - | 1,082,717 | 2,423.70 | 0.22% | 193.90 | 2,617.60 | Santa Clara, CA | 27,130.32 |
| 14487-4-65C | 1,082,717 | | | - | 1,082,717 | 96.51 | 0.01% | 7.72 | 104.23 | Mt. View, CA | 27,130.32 |
| 14487-4-65E | 497,000 | | | - | 497,000 | 425.99 | 0.09% | 34.08 | 460.07 | Santa Clara, CA | 17,332.88 |
| 14487-4-65G | 370,028 | | | - | 370,028 | 189.10 | 0.05% | 15.13 | 204.23 | Santa Clara, CA | 13,002.25 |
| 14487-4-66I | 985,000 | | | - | 985,000 | 99.65 | 0.01% | 7.97 | 107.62 | Santa Clara, CA | 34,556.40 |
| 14487-4-67 | 2,850,000 | 18,863.03 | 1,546.77 | 20,409.80 | 2,850,000 | 11,464.36 | 0.40% | 917.15 | 12,381.51 | Mt. View, CA | 93,300.49 |
| 14487-4-67A | 618,000 | 4,837.70 | 396.69 | 5,234.39 | 618,000 | 69.76 | 0.01% | 5.58 | 75.34 | Sunnyvale, CA | 21,653.03 |
| 14487-4-67A | 618,000 | 9.76 | 0.82 | 10.58 | 618,000 | 3,011.43 | 0.49% | 240.91 | 3,252.34 | Mt. View, CA | 21,653.03 |
| 14487-4-67A | 618,000 | 111.40 | 9.13 | 120.53 | 618,000 | | | | | | |
| 14487-4-67B | 1,034,500 | | | - | 1,034,500 | 4,249.13 | 0.41% | 339.93 | 4,589.06 | Mt. View, CA | 33,444.43 |
| 14487-4-67D | 735,000 | | | - | 735,000 | 5,309.74 | 0.72% | 424.78 | 5,734.52 | Mt. View, CA | 26,857.40 |
| 14487-4-67F | 531,408 | | | - | 531,408 | 755.21 | 0.14% | 60.42 | 815.63 | Mt. View, CA | 19,161.14 |
| 14487-4-67F | 531,408 | | | - | 531,408 | 1,938.86 | 0.36% | 155.11 | 2,093.97 | Mt. View, CA | 19,161.14 |
| 14487-4-68B | 1,852,420 | 1,436.87 | 117.82 | 1,554.69 | 1,852,420 | 919.95 | 0.05% | 73.60 | 993.55 | Santa Clara, CA | 58,663.83 |
| 14487-4-68C | 3,500,000 | 10,672.34 | 875.13 | 11,547.47 | 3,500,000 | 6,766.54 | 0.19% | 541.32 | 7,307.86 | Santa Clara, CA | 120,397.66 |
| 14487-4-69A | 427,219 | | | - | 427,219 | 178.60 | 0.04% | 14.29 | 192.89 | Santa Clara, CA | 13,266.84 |
| 14487-4-69C | 2,103,620 | | | - | 2,103,620 | 2,234.10 | 0.11% | 178.73 | 2,412.83 | Santa Clara, CA | 75,739.63 |
| 14487-4-69E | 600,000 | 312.16 | 25.75 | 337.93 | 600,000 | 717.74 | 0.09% | 57.42 | 775.16 | Santa Clara, CA | 26,578.34 |
| 14487-4-69G | 1,031,403 | | | - | 1,031,403 | 286.10 | 0.03% | 22.89 | 308.99 | Santa Clara, CA | 36,464.80 |
| 14487-4-69I | 2,880,878 | | | - | 2,880,878 | 1,405.39 | 0.05% | 112.43 | 1,517.82 | Santa Clara, CA | 101,244.63 |
| 14487-4-82 | 3,115,000 | | | - | 3,115,000 | 659.56 | 0.02% | 52.76 | 712.32 | Santa Clara, CA | 99,758.02 |
| 14487-4-82 | 3,115,000 | | | - | 3,115,000 | 4,572.24 | 0.15% | 365.78 | 4,938.02 | Mt. View, CA | 99,758.02 |
| 14487-4-82 (orig=85686) | 3,115,000 | | | - | 3,115,000 | 3,885.16 | 0.12% | 320.53 | 4,205.69 | S.F., CA | 99,758.02 |
| | | | | 40,726.05 | | | | | 56,168.08 | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| 14487-4-64 | | 3201.84 | 264.15 | | | | | | | | |
| 14487-4-64D | | 2333.63 | 192.54 | | | | | | | | |
| 14487-4-64F | | 1108.45 | 91.45 | | | | | | | | |
| 14487-4-70 | | 5377.26 | 0 | | | | | | | | |
| 14487-4-57 | | 3856.42 | 317.05 | | | | | | | | |
| 14487-4-57 | | 159.23 | 13.06 | | | | | | | | |
| 14487-4-58A | | 3474.64 | 284.92 | | | | | | | | |
| 14487-4-56A | | 13436.82 | 1101.82 | | | | | | | | |

LYED202244

# EXHIBIT 7

# O'BRIEN &LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Monique Walsh

# September 18, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Nicole E. Guilbert   20511

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MASSACHUSETTS

3

4        ---------------------------------x

5    COMPUTER SALES INTERNATIONAL, INC.,

6                         Plaintiff

7                                           Civil Action

8    vs.                             No. 05-10017-RWZ

9

10    LYCOS, INC.,

11                        Defendant,

12

13    BANK OF AMERICA f/k/a FLEET BANK,

14            Trustee Process Defendant

15       ---------------------------------x

16           VIDEOTAPED DEPOSITION OF MONIQUE WALSH, a

17        witness called by and on behalf of the

18        Plaintiff, taken pursuant to Federal Rules of

19        Civil Procedure, before Nicole E. Guilbert, a

20        Notary Public in and for the Commonwealth of

21        Massachusetts, at McCarter & English, 225

22        Franklin Street, Boston, Massachusetts, on

23        Monday, September 18, 2006, commencing at

24        9:16 a.m.

1

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

| 58 | | 60 | |
|---|---|---|---|
| 1 | MR. BEAN: Objection. | 1 | Q. I have all the e-mails. There aren't any that |
| 2 | THE WITNESS: I see there's a lease | 2 | pertain directly to this. |
| 3 | column, yes. | 3 | A. Well, I don't know why I would have done it. |
| 4 | Q. (By Mr. Kaler) Okay. A Lease Number column? | 4 | Q. Can you tell us what you were doing? It appears |
| 5 | A. Mm-hmm. Yes. | 5 | you were calculating property tax and tax amounts, right, |
| 6 | Q. And do those appear to be the numbers for leases | 6 | on the last page anyway? |
| 7 | that Lycos had with somebody? | 7 | A. That's what the titles say but I don't know why. |
| 8 | A. What happened to -- | 8 | Q. Well, you had to pay property tax, right? |
| 9 | Q. What are you looking for? The previous one? | 9 | A. Property tax came in on a bill. We didn't |
| 10 | A. The -- that thing. | 10 | calculate it. |
| 11 | Q. Which exhibit are you looking at? Oh, 19? | 11 | Q. Right. But you kept track of it, correct? |
| 12 | A. Nineteen. | 12 | A. That's what this is -- looks like what it's |
| 13 | Q. Okay. | 13 | saying. |
| 14 | A. Yes. They're on the schedule. | 14 | Q. So you were keep track -- keeping track of the |
| 15 | Q. Are they the CSI leases or at least some of them? | 15 | taxes that were being paid? |
| 16 | A. Yes | 16 | A. That's what it looks like it's doing. |
| 17 | Q. So on the last page of Exhibit 38, you were | 17 | Q. That's what it looks like you were doing? |
| 18 | listing CSI leases and then setting forth lease amounts and | 18 | A. I don't remember doing this spreadsheet. |
| 19 | property tax and tax amounts; is that right? Is that the | 19 | Q. Do you remember doing any spreadsheets relating to |
| 20 | original 19? | 20 | leases in the summer of 2001? |
| 21 | A. No. | 21 | A. Sure. I remember this one. |
| 22 | Q. I think I showed you the copy. I want to make | 22 | Q. Okay. |
| 23 | sure you have a copy of Exhibit 19 handy. I think that's | 23 | A. This schedule. |
| 24 | the witness's copy. Okay. So Exhibit 38 on the last | 24 | Q. The last two pages of Exhibit 19; is that right? |

| 59 | | 61 | |
|---|---|---|---|
| 1 | page -- | 1 | A. Yes. |
| 2 | A. Truthfully, I just don't remember creating the | 2 | (Exhibit 39, Spreadsheet, marked for |
| 3 | schedule. | 3 | identification.) |
| 4 | Q. Part of the process, Miss, that we're going to go | 4 | Q. (By Mr. Kaler) Let me show you what's been marked |
| 5 | through today is to refresh your recollection as much as | 5 | as Exhibit 39. Do you recognize that as a spreadsheet, |
| 6 | possible in the ordinary way that I would refresh your | 6 | another spreadsheet regarding CSI leases, this one shows |
| 7 | memory if you were not testifying under oath. I'm going to | 7 | you created it on October 2nd of 2001? |
| 8 | show you documents, presumably that jar your memory | 8 | A. I don't remember this spreadsheet. |
| 9 | about things that you would not otherwise recall, the way | 9 | Q. The name you gave it was "propertytax.xls"; do you |
| 10 | life normally works. If you sat down for several hours | 10 | see that on the first page? |
| 11 | with Lycos attorneys and you went through documents, your | 11 | A. Mm-hmm. |
| 12 | memory would be refreshed and you could tell them something | 12 | Q. And then, again, you appear to be listing accrued |
| 13 | about them. | 13 | property tax on a lease-by-lease basis; do you see that? |
| 14 | That's what I'm trying to do with you, okay. Just | 14 | MR. BEAN: Objection. |
| 15 | give us your best memory as you see the documents. | 15 | THE WITNESS: It's not on a |
| 16 | A. I would actually have to see the actual documents | 16 | lease-by-lease. |
| 17 | themselves in order -- and the e-mails of where it came | 17 | Q. (By Mr. Kaler) What -- on what basis is it? |
| 18 | from to be able to understand why I did this, if I did do | 18 | A. It looks like a download from the system. |
| 19 | it. | 19 | Q. Okay. What was the system that you were |
| 20 | Q. Well, the why -- there's no question you did it. | 20 | downloading it from? |
| 21 | We have the electronic version of it. Would it help you to | 21 | A. PeopleSoft. |
| 22 | see the electronic version of it? | 22 | Q. And what was PeopleSoft? |
| 23 | A. Help me to understand the context. if there's | 23 | A. The business system. |
| 24 | other e-mails that went in with this, to see -- | 24 | Q. The business system for tracking leases? |

16 (Pages 58 to 61)

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc

---

**62**

1   A. No. For AP payments and GL payments or GL journal
2   entries.
3   Q. Accounts payable and general ledger?
4   A. Yes.
5   Q. What kind of information about the leases that
6   Lycos had of equipment was recorded on the PeopleSoft
7   system?
8   A. Payments. All of these are from the AP module.
9   Q. These being on the second page --
10  A. All the AP -- source AP codes, those are the AP
11  payments.
12  Q. Column headed, I'm sorry, can you just --
13  A. Source.
14  Q. -- just mark that. Here?
15  A. Yep, Source.
16  Q. Let's mark a letter "A" and blue above the column
17  that you've called Source. And so that was data that came
18  off the PeopleSoft system that recorded where it came from?
19  A. Yes.
20  Q. And as you go across the columns, what pieces of
21  information are being recorded there?
22  A. It says. "Unit" -- is that what you want me to go
23  through? Do you want me to go through all the columns?
24  Q. Well, I was looking at the columns on the second

---

**63**

1   page.
2   A. So unit --
3   Q. What's unit?
4   A. It's just what they assign in PeopleSoft.
5   Q. Okay. What's the next item?
6   A. Business unit description, which is Lycos; account
7   is the account it's hitting; account description is --
8   year; journal ID; journal date; source; post date; operator
9   ID; journal reference; line description; sum total amount;
10  journal amount; from account; to account; and then just
11  voucher.
12  Q. So -- okay. So this is just a download from the
13  PeopleSoft system where you asked it to generate --
14  A. Yes.
15  Q. -- what was recorded for these particular leases
16  in these particular files; is that right?
17      MR. BEAN: Objection.
18      THE WITNESS: No.
19  Q. (By Mr. Kaler) These particular leases --
20  A. I would have queried a specific account.
21  Q. Okay. And this was the accrued property tax
22  account?
23  A. Yes.
24  Q. What else, other than payments, did the PeopleSoft

---

**64**

1   system record?
2   A. There's GL entries for accruals, also AR
3   payments --
4   Q. Well, I don't mean just with respect to that entry
5   or that particular exhibit. I'm just asking, generally,
6   what type of information the PeopleSoft system recorded
7   about the leases?
8   A. That would be it, pretty much; payments, accruals,
9   and refunds, if we got any.
10  Q. Was Ziba's spreadsheet, the last two pages of
11  Exhibit 19, on the PeopleSoft system or was that a
12  separate --
13  A. No, that was Excel.
14      (Exhibit 40, Facsimile, marked for
15      identification.)
16  Q. (By Mr. Kaler) Let me show you what's been marked
17  Exhibit 40. Is that a copy of a fax that you wrote in
18  October of 2001 to Paul Stenberg at CSI?
19  A. Yes.
20  Q. Why did you write that?
21  A. Looks like I was asking for executed copies of
22  renewal leases.
23  Q. Do you remember anything about this?
24  A. Not this specific request. I was always asking

---

**65**

1   him for information.
2       THE VIDEOGRAPHER: Here ends Tape
3   Number 1. Off the record, 10:46 a.m.
4       (A brief recess was taken.)
5       THE VIDEOGRAPHER: Here begins
6   Videotape Number 2 in today's deposition of
7   Monique Walsh. Back on the record 10:47
8   a.m.
9       (Exhibit 41, Facsimile, marked for
10      identification.)
11  Q. (By Mr. Kaler) And I show you what's been marked
12  Exhibit 41. Is that a fax you received in response from
13  CSI giving you a copy of Schedule 89?
14  A. That's what it looks like.
15  Q. And who was Kathi Schamel?
16  A. All I remember is she was from -- someone from
17  CSI. I don't remember her exact title or her function.
18  Q. Who was Barb Minch who's referred to in Exhibit
19  40?
20  A. Again, that's someone at CSI, but I don't know
21  what she did.
22  Q. Well, they both, Miss, sent you schedules, didn't
23  they?
24  A. I just don't remember what their job functions

---

17 (Pages 62 to 65)

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

142

1    A. That's what it says. I don't recall if we met.
2        (Exhibit 70, E-mail, marked for
3        identification.)
4    Q. (By Mr. Kaler) Take a look at Exhibit 70. Is
5    this an e-mail that you wrote to Mr. Stenberg and the
6    response that he gave you in January of '02?
7    A. Yes.
8    Q. Second page, Item 1, you asked for a formal
9    written buyout quote, and he responded, "Just please let me
10   know what you want and I'll give you the appropriate
11   paperwork for that quote"?
12   A. That's what it says.
13   Q. Does this refresh your recollection at all as to
14   what was done with that equipment and the quote?
15   A. No.
16   Q. Still no memory?
17   A. I don't know if the deal was ever signed.
18   Q. Do you have any memory of it ever being signed?
19   A. No.
20   Q. Do you know why it wasn't signed?
21       MR. BEAN: Objection.
22       THE WITNESS: I don't know if it was
23   signed.
24   Q. (By Mr. Kaler) I beg your pardon? Well, if it

143

1    was signed, you would remember it, wouldn't you?
2        MR. BEAN: Objection.
3    Q. (By Mr. Kaler) You can answer.
4    A. Not necessarily.
5    Q. You mean that if all the equipment on that —
6    those schedules that we've seen had been returned to CSI
7    and CSI had given Lycos a credit reduction on its monthly
8    payments and accepted a lump sum payment from Lycos, and if
9    Lycos had then taken all that equipment and then sold it to
10   a liquidator, it's possible that all that happened and you
11   just don't remember it?
12       MR. BEAN: Objection.
13   Q. (By Mr. Kaler) Is that —
14   A. Four years later, yes.
15   Q. Four years later, right. Well, having seen —
16   spent a couple of hours looking at the records, you still
17   have no memory as to whether —
18   A. No.
19   Q. — it was returned?
20       (Exhibit 71, E-mail, marked for
21       identification.)
22   Q. (By Mr. Kaler) Let me show you what's been marked
23   Exhibit 71. Is that an e-mail exchange that you had with
24   Mr. Stenberg in January of '02?

144

1    A. It was just a forward of something sent in
2    December.
3    Q. Why were you asking for this information?
4    A. What was — why was I asking the question?
5    Q. Mm-hmm.
6    A. We were trying to understand what equipment was
7    going on Schedules 93 and 94.
8    Q. "We" is who?
9    A. Kevin and myself.
10   Q. Why didn't you already know that?
11   A. We were waiting for the documentation from CSI
12   Q. The extensions had been signed months earlier.
13   Why didn't you know by then?
14   A. I wasn't given the backup for it.
15   Q. Who within the company had the backup?
16       MR. BEAN: Objection.
17   Q. (By Mr. Kaler) You can answer.
18   A. I do not know if anyone did.
19   Q. And —
20       MR. KALER: Let's mark as Exhibit
21   72...
22       (Exhibit 72, Spreadsheet, marked for
23       identification.)
24   Q. (By Mr. Kaler) We'll have to pull this one up on

145

1    the screen. We're looking at the file which is Numbered 18
2    on Exhibit 44 entitled "Leasepayments.xls"; author, Monique
3    Walsh; date created, January 29, 2002. Hard copy of the
4    metadata is Exhibit 72 —
5        MR. BEAN: How do we know that?
6    Q. (By Mr. Kaler) Did you create this spreadsheet?
7        MR. BEAN: How do we know that?
8        MR. KALER: Because we're pulling it
9    right off the disk. I'm just identifying
10   it for the record. You can confirm it when
11   you —
12       MR. BEAN: Okay. Well, I don't know
13   whether it is or it isn't.
14       MR. KALER: That's all right. We
15   can ..
16   Q. (By Mr. Kaler) Do you recognize the — this
17   spreadsheet?
18   A. I don't remember doing it but, again, it's just a
19   download from PeopleSoft.
20   Q. A download from PeopleSoft.
21       MR. KALER: Can you take us to the
22   CSI tab, Eileen.
23   Q. (By Mr. Kaler) And this download from PeopleSoft,
24   what does it tell you with respect to CSI or CSI leases?

37 (Pages 142 to 145)

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

| 146 | |
|---|---|
| 1 | A.  Can you go over to the left? |
| 2 | Q.  Sure. |
| 3 | A.  AP payments to CSI. |
| 4 | Q.  So was this a download of the record of Lycos |
| 5 | payments to CSI going back as far as early 2001; in fact, |
| 6 | going back into 2000; is that what it was, Miss? |
| 7 | A.  Where's the 2000? |
| 8 | Q.  There's a series of December 2000 invoices.  Can |
| 9 | you scroll up to the top, see which column is – okay. |
| 10 | Invoice date, invoice number – what's the accounting date? |
| 11 | Is that the date it was paid? |
| 12 | A.  That's the date it was entered into the system. |
| 13 | Q.  Okay.  Payment date, that would reflect the date |
| 14 | it was paid? |
| 15 | A.  Correct. |
| 16 | Q.  So was this a download of accounting records that |
| 17 | you created, then, in January of '02 from the PeopleSoft – |
| 18 | MR. BEAN:  Objection. |
| 19 | Q.  (By Mr. Kaler) – system?  You can answer. |
| 20 | A.  I don't recall if I created it.  But it is a |
| 21 | download from PeopleSoft. |
| 22 | Q.  You see the metadata reflecting you as the author |
| 23 | of the file? |
| 24 | A.  Yes. |

| 147 | |
|---|---|
| 1 | Q.  Was it your practice to create downloads from the |
| 2 | PeopleSoft software when you wanted information from it? |
| 3 | A.  Yes. |
| 4 | Q.  And then to rename them as files? |
| 5 | A.  Yes. |
| 6 | Q.  Okay.  And could we look at Sheet 1 and Sheet 2. |
| 7 | Did you do this every month? |
| 8 | MR. BEAN:  Objection. |
| 9 | Q.  (By Mr. Kaler) You can answer. |
| 10 | A.  No. |
| 11 | Q.  How often did you do it? |
| 12 | A.  I don't remember. |
| 13 | Q.  Can you tell us why you did it when you did it? |
| 14 | A.  I don't know why I did this. |
| 15 | Q.  Can you tell us what Sheet 2 depicted? |
| 16 | A.  Can you go over to the right a little bit? |
| 17 | MS. PELLERIN:  I'm sorry, can I what? |
| 18 | THE WITNESS:  Can you go over to the |
| 19 | right. |
| 20 | Q.  (By Mr. Kaler) I'm sorry.  Did you answer with |
| 21 | respect to Sheet 2? |
| 22 | A.  It just looks like a download of an account.  If |
| 23 | you go over to the left, it's an account. |
| 24 | Q.  Okay. |

| 148 | |
|---|---|
| 1 | A.  GL account. |
| 2 | Q.  Now, next to CSI, there's Lincoln.  Was Lincoln |
| 3 | another lessor? |
| 4 | A.  No.  That was one of the banks that CSI lease was |
| 5 | under, was remit to. |
| 6 | Q.  Yes.  So was GE Capital and so was Sovereign, |
| 7 | correct? |
| 8 | A.  I'm not certain. |
| 9 | Q.  Click on Lincoln.  Lycos' computer system kept |
| 10 | track of the payments that it was making to – directly to |
| 11 | CSI's financing entities as well as to CSI, correct? |
| 12 | A.  Yes.  The invoices came in under or remit to Bank |
| 13 | of Lincolnwood. |
| 14 | Q.  And then if we scroll to the right here, we see |
| 15 | that Lycos kept track of its payments to CSI's lenders by |
| 16 | payment amount, payment date, check number, and so on, |
| 17 | correct? |
| 18 | MR. BEAN:  Objection. |
| 19 | Q.  (By Mr. Kaler) You can answer. |
| 20 | A.  We'd keep – kept track? |
| 21 | Q.  Yeah.  You recorded them on the system? |
| 22 | A.  Yes. |
| 23 | Q.  So you were keeping track of them, right? |
| 24 | A.  Yes. |

| 149 | |
|---|---|
| 1 | Q.  And the same was true with respect to – if we go |
| 2 | to tab GE Capital, the payments that Lycos was making to GE |
| 3 | Capital were being tracked as well, correct? |
| 4 | A.  Yes. |
| 5 | Q.  And if we go to Sovereign, the payments that Lycos |
| 6 | was making to Sovereign were being tracked as well, |
| 7 | correct? |
| 8 | MR. BEAN:  Objection. |
| 9 | Q.  (By Mr. Kaler) You can answer. |
| 10 | A.  Yes. |
| 11 | Q.  Who was Amy Renner? |
| 12 | A.  I'm not sure. |
| 13 | Q.  She was at Avnet.  Ring a bell? |
| 14 | A.  No. |
| 15 | (Exhibit 73. E-mail, marked for |
| 16 | identification.) |
| 17 | Q.  (By Mr. Kaler) Let me show you Exhibit 73.  I |
| 18 | think we can take this one down for now. |
| 19 | MR. BEAN:  Sorry. 73? |
| 20 | MR. KALER:  Mm-hmm. |
| 21 | Q.  (By Mr. Kaler) Is this a copy of an e-mail |
| 22 | exchange that you had with Amy Renner in or about this time |
| 23 | period, January of 2002? |
| 24 | A.  Yes. |

38 (Pages 146 to 149)

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

270

1  COMMONWEALTH OF MASSACHUSETTS    MIDDLESEX, SS.
2
3    I, NICOLE E. GUILBERT, a Certified
     Shorthand Reporter and Notary Public duly
4    commissioned and qualified in and for the
     Commonwealth of Massachusetts, do hereby
5    certify that there came before me on the 18th
     day of September, 2006, at 9:16 a.m., the
6    person hereinbefore named, MONIQUE WALSH, who
     provided satisfactory evidence of
7    identification as prescribed by Executive
     Order 455 (03-13) issued by the Governor of
8    the Commonwealth of Massachusetts, was by me
     duly sworn to testify to the truth and nothing
9    but the truth of her knowledge concerning the
     matters in controversy in this cause; that she
10   was thereupon examined upon her oath, and her
     examination reduced to typewriting under my
11   direction; and that this is a true record of
     the testimony given by the witness to the best
12   of my ability.
       I further certify that I am neither
13   attorney or counsel for, nor related to or
     employed by, any of the parties to the action
14   in which this deposition is taken; and
     further, that I am not a relative or employee
15   of any attorney or counsel employed by the
     parties hereto or financially interested in
16   the action.
17
18   My Commission Expires:  May 7, 2010
19
20
21
22          Nicole E. Guilbert
            CSR/Notary Public
23
24

272

1  PLEASE ATTACH TO THE DEPOSITION OF MONIQUE WALSH
2  CASE: 05-10017-RWZ
3  DATE TAKEN: SEPTEMBER 18, 2006
4          ERRATA SHEET
5  Please refer to Page 271 for Errata Sheet instructions and
6  distribution instructions
7  PAGELINE CHANGE      REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15    I have read the foregoing transcript of my
16 deposition, and except for any corrections or changes noted
17 above, I hereby subscribe to the transcript as an accurate
18 record of the statements made by me
19
20    Executed this _____ day of _____, 2006
21
22          _____
23
24

271

1       ERRATA SHEET DISTRIBUTION INFORMATION
2       DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5       ERRATA SHEET DISTRIBUTION INFORMATION
6
7    The original of the Errata Sheet has been delivered
8  to Thomas O. Bean, Esquire.
9    When the Errata Sheet has been completed by the
10 deponent and signed, a copy thereof should be delivered to
11 each party of record and the ORIGINAL forwarded to
12 Robert J. Kaler, Esquire, to whom the original deposition
13 transcript was delivered
14
15       INSTRUCTIONS TO DEPONENT
16
17   After reading this volume of your deposition, please
18 indicate any corrections or changes to your testimony and
19 the reasons therefor on the Errata Sheet supplied to you
20 and sign it. DO NOT make marks or notations on the
21 transcript volume itself. Add additional sheets if
22 necessary. Please refer to the above instructions for
23 Errata Sheet distribution information
24

69 (Pages 270 to 272)

# EXHIBIT 8

# O'BRIEN & LEVINE
## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Sam Ziba

# September 19, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Nicole E. Guilbert  20512

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4      ------------------------------------x

 5   COMPUTER SALES INTERNATIONAL, INC.,

 6                   Plaintiff

 7                                       Civil Action

 8   vs.                             No. 05-10017-RWZ

 9

10   LYCOS, INC.,

11                   Defendant,

12

13   BANK OF AMERICA f/k/a FLEET BANK,

14          Trustee Process Defendant

15      ------------------------------------x

16          VIDEOTAPED DEPOSITION OF SAM ZIBA, a

17          witness called by and on behalf of the

18          Plaintiff, taken pursuant to Federal Rules of

19          Civil Procedure, before Nicole E. Guilbert, a

20          Notary Public in and for the Commonwealth of

21          Massachusetts, at McCarter & Englilsh, 225

22          Franklin Street, Boston, Massachusetts, on

23          Monday, September 19, 2006, commencing at

24          9:12 a.m.
```

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Sam Ziba 9-19-2006
Computer Sales International, Inc. v. Lycos, Inc.

214

1    A. As I stated, I remember a meeting with the Avnet
2    people. I don't recall.
3    Q. You don't remember whether they met with you
4    individually?
5    A. I don't remember, no.
6    Q. Look over at page 11. Do you see where the fourth
7    bullet point under Administration is an observation in
8    which the report states, quote, Fulfilling obligations to
9    lessors such as the identification and return of assets at
10   the end of lease term is nearly impossible because Lycos
11   lacks an accurate asset inventory. This results in costly
12   evergreen payments or the buyout of nonproductive assets,
13   unquote. Do you see that?
14   A. Yes. I read.
15   Q. Did you tell them that?
16   A. Did I tell them this statement?
17   Q. Mm-hmm. Yes.
18   A. I don't recall telling them that.
19   Q. Was it true at the time?
20        MR. BEAN: Objection.
21   Q. (By Mr. Kaler) You can answer.
22   A. Asset tracking was a true statement from my
23   perspective, but the rest I have no — I don't know what
24   that means, evergreening, and buyout of nonproductive.

215

1    Q. The statement, "Fulfilling obligations to lessors
2    such as the identification and return of assets at the end
3    of term is nearly impossible because Lycos lacks an
4    accurate asset inventory," that was a correct statement?
5    A. That's not my statement but that's —
6    Q. Right.
7    A. That's something I can — I think I can agree with
8    that at that point.
9    Q. Okay. Now, on page 13, the third bullet point
10   where it says, "All lease paperwork is currently managed by
11   Sam Ziba. In the future, it may be tracked in the future
12   using PeopleSoft Financials." Do you see that?
13   A. Yep.
14   Q. At any time during your tenure, did Lycos start to
15   track some of the lease paperwork using the PeopleSoft
16   software?
17   A. Not that I recall.
18   Q. Who managed the PeopleSoft software?
19        MR. BEAN: Objection.
20   Q. (By Mr. Kaler) You can answer.
21   A. I assume MIS.
22   Q. You don't know?
23   A. No. I didn't work with PeopleSoft at Lycos.
24   Q. Did you ever access or download information from

216

1    PeopleSoft?
2    A. Never.
3    Q. Turn over to page 14. Do you see that on the
4    bottom of page 14, there's a physical inventory schedule,
5    and they give a list of people opposite the date of
6    September 18 to 22, 2000, in Waltham, and they include
7    Mr. Mammon and a number of other people?
8    A. Okay.
9    Q. Did you meet with any of those people other than
10   Mr. Mammon?
11   A. It could have been in that big meeting we had that
12   — that I mentioned earlier. There was a big large
13   meeting, a bunch of people around
14   Q. How long a meeting was that?
15   A. An hour, hour and a half I'd say.
16   Q. And then weren't there individual interviews after
17   that?
18   A. I really don't recall.
19   Q. Do you remember any of the other people on this
20   list?
21   A. As a matter of fact. I don't know any of these
22   guys other —
23   Q. Other than Mammon, I think you said you
24   remembered?

217

1    A. Yeah. I don't know who Dean and Alvin and...
2    Q. Now, turn over with me to page 16.
3    A. (Witness complies.)
4    Q. Do you see where under the heading The Database
5    File, there's a statement, "One of the requirements of this
6    project is to provide Lycos with a database file that
7    organized asset information so it can be retrieved." Do
8    you see that?
9    A. Sure.
10   Q. And then it goes on to say, quote, The database
11   file is populated with data that reflects AES's current
12   understanding of the status of assets at these sites along
13   with the lease and service information. The database file
14   is current up to December 12th. Lycos must either maintain
15   the data itself or arrange with AES or some other service
16   provider to maintain the data for you, unquote. Do you see
17   that?
18   A. Yes
19   Q. Did you ever see that database file?
20   A. I saw a database file, an alpha version, as I
21   mentioned earlier.
22   Q. Why do you — your memory is specific enough to
23   call it an alpha version?
24   A. Because that's what I was told by the engineer.

55 (Pages 214 to 217)

Sam Ziba  9-19-2006
Computer Sales International, Inc. v. Lycos, Inc.

314

1    Q.  And it is your understanding that as of the time
2    you left in June of 2001, Monique Walsh took over from you
3    the tracking of Lycos leases, correct?
4         MR. BEAN:  Objection.
5    Q.  (By Mr. Kaler)  You can answer.
6    A.  I don't know what Monique did after I left Lycos.
7    Q.  But you understood from this e-mail when you
8    received it that Ms. Callagee was telling you that Monique
9    was going to be taking over from you the tracking of
10   leases, right?
11   A.  That's what the e-mail says.
12        MR. BEAN:  Objection.
13   Q.  (By Mr. Kaler)  Okay.  Did you have a meeting in
14   the morning with Monique and Julie to discuss the Lycos
15   leases and how you were -- you know, what you had --
16   A.  I don't recall having a meeting with Monique.  I
17   did talk to Julie at some point.
18   Q.  Do you remember ever talking to Monique about the
19   work you had done on leases or, you know, the transition?
20   A.  I don't recall.  I -- again, I remember talking to
21   Julie.
22   Q.  Do you remember whether anybody else was present
23   when you talked to Julie about the lease issues?
24   A.  No.

315

1    Q.  So it was just the two of you, as far as you know?
2    A.  I'm pretty sure, at least that's what I remember
3    but I don't recall.
4    Q.  After you left CSI in June of 2001, did you ever
5    go back to work at CSI?
6         MR. BEAN:  Objection.  This man never
7    worked for CSI.
8    Q.  (By Mr. Kaler)  I beg your pardon.  It's a little
9    late.  After you left Lycos --
10   A.  I was like --
11   Q.  After you left Lycos in June of 2001 --
12   A.  No, I never worked --
13   Q.  -- did you ever go back?
14   A.  To work for Lycos?
15   Q.  Yes.
16   A.  Never.
17        MR. KALER:  Do you have any
18   cross-examination?
19        MR. BEAN:  Not at this time.
20        MR. KALER:  All right.  We're done.
21   Thank you.
22        THE VIDEOGRAPHER:  Here ends today's
23   deposition.  Off the record 6:13 p.m.
24        (The witness was excused.)

316

1         (Whereupon, the deposition concluded
2    at 6:13 p.m.)
3         (Exhibits 118 through 166 were marked
4    in today's proceedings.)

317

1    COMMONWEALTH OF MASSACHUSETTS          MIDDLESEX, SS
2
3         I, NICOLE E. GUILBERT, a Certified
     Shorthand Reporter and Notary Public duly
4    commissioned and qualified in and for the
     Commonwealth of Massachusetts, do hereby
5    certify that there came before me on the 19th
     day of September, 2006, at 9:12 a.m., the
6    person hereinbefore named, SAM ZIBA, who
     provided satisfactory evidence of
7    identification as prescribed by Executive
     Order 455 (03-13) issued by the Governor of
8    the Commonwealth of Massachusetts, was by me
     duly sworn to testify to the truth and nothing
9    but the truth of his knowledge concerning the
     matters in controversy in this cause; that he
10   was thereupon examined upon his oath, and his
     examination reduced to typewriting under my
11   direction; and that this is a true record of
     the testimony given by the witness to the best
12   of my ability.
          I further certify that I am neither
13   attorney or counsel for, nor related to or
     employed by, any of the parties to the action
14   in which this deposition is taken, and
     further, that I am not a relative or employee
15   of any attorney or counsel employed by the
     parties hereto or financially interested in
16   the action.
17
18   My Commission Expires:  May 7, 2010
19
20
21
22            Nicole E. Guilbert
              CSR/Notary Public
23
24

80 (Pages 314 to 317)

Sam Ziba 9-19-2006
Computer Sales International, Inc. v. Lycos, Inc.

318

1       ERRATA SHEET DISTRIBUTION INFORMATION
2       DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5       ERRATA SHEET DISTRIBUTION INFORMATION
6
7       The original of the Errata Sheet has been delivered
8   to Thomas O. Bean. Esquire
9       When the Errata Sheet has been completed by the
10  deponent and signed. a copy thereof should be delivered to
11  each party of record and the ORIGINAL forwarded to
12  Robert J. Kaler. Esquire. to whom the original deposition
13  transcript was delivered.
14
15          INSTRUCTIONS TO DEPONENT
16
17      After reading this volume of your deposition. please
18  indicate any corrections or changes to your testimony and
19  the reasons therefor on the Errata Sheet supplied to you
20  and sign it  DO NOT make marks or notations on the
21  transcript volume itself  Add additional sheets if
22  necessary  Please refer to the above instructions for
23  Errata Sheet distribution information
24

319

1   PLEASE ATTACH TO THE DEPOSITION OF SAM ZIBA
2   CASE: 05-10017-RWZ
3   DATE TAKEN: SEPTEMBER 19, 2006
4           ERRATA SHEET
5   Please refer to Page 318 for Errata Sheet instructions and
6   distribution instructions
7   PAGELINE CHANGE       REASON
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      I have read the foregoing transcript of my
16  deposition, and except for any corrections or changes noted
17  above. I hereby subscribe to the transcript as an accurate
18  record of the statements made by me
19
20      Executed this _____ day of _____, 2006.
21
22          _____
23
24

81 (Pages 318 to 319)

# EXHIBIT 9



MᶜCARTER
ENGLISH
ATTORNEYS AT LAW

January 16, 2007

VIA E-MAIL and BY HAND

The Honorable Herbert Hershfang
Discovery Master
64 W. Rutland Square
Boston, MA 02118

RE:    *Computer Sales International, Inc. v. Lycos, Inc.*, C.A. No. 05-10017

Dear Judge Hershfang:

In accordance with Discovery Master Report No. 1, dated January 5, 2007 (the "Report"), CSI has **(1)** pared its invoking of "lack of mutuality" as an objection to Lycos' second set of document requests by producing information and material that it still has not received from Lycos; **(2)** redesignated as non-confidential various CSI records that were previously but perhaps unnecessarily marked "confidential" (out of concern about Lycos' publicizing of information concerning this case); and **(3)** produced a very knowledgeable computer systems person from its IT Department, Diane Kopitsky, who explained in detail, in a deposition of her taken by Lycos in St. Louis on January 4, 2007, that the information on the CSI sub-ledger cards already produced to Lycos is, as CSI has repeatedly explained to Lycos' counsel, the only source material available from CSI for calculating the total payments made to CSI years ago by Lycos -- and who also explained what each code on those sub-ledger cards meant.

These issues having been resolved in the Report, along with that of Mr. Stenberg's hard drive, we have communicated with Lycos over the last few weeks concerning its other discovery demands, including its effort to obtain a general extension of the January 31, 2007 discovery cutoff, which is something that CSI opposes. (N.B. CSI does not oppose discrete depositions that cannot be completed in January being scheduled for early February, but it is unwilling to agree to a general re-opening of the discovery period, which has already lasted more than a year, has become very burdensome, and now seems intended by Lycos mainly as a vehicle for open-ended discovery into CSI's financial and other records, which is not fair and not relevant to this case.)

After considerable discussion, however, Lycos' counsel has advised us that it will not be "paring down" the remaining demands for further discovery set forth in its letter to Your Honor of December 28, 2006. We are therefore constrained to respond to those remaining demands in this submission.

We also need to comment on -- because we anticipate having to seek some relief concerning -- a flurry of new records, new disclosures of witnesses, and

Robert J. Kaler
Partner
T  617 345 7007
F  617 607 9141
rkaler@mccarter.com

McCarter & English  LLP
225 Franklin Street
Boston, MA  02110
T  617 345 7000
F  617 345 7050
www.mccarter.com

BALTIMORE

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

ME1 6094733v 2

The Honorable Herbert Hershfang
January 16, 2007
Page 12

3.    **Lycos' Disposition of CSI's Equipment**

In order to test and challenge Lycos' claim for damages, and its assertion that the equipment it leased (and ultimately purchased) from Lycos "had little or no value,"[1] CSI needs to determine what Lycos has done with the CSI equipment. In Interrogatory No. 14, CSI asked Lycos to identify where each piece of equipment that Lycos leased and later purchased from CSI is located and, if it is no longer at Lycos, whether it was sold, discarded or returned, and if sold, at what price. Lycos has objected on the grounds of burdensomeness, but if it is claiming that this equipment had no value when it bought it, CSI clearly has the right to discovery on how much Lycos was able to use the equipment or sell it for after that purchase.

If Lycos sold any of this equipment, for example, its alleged "damages" would have to be reduced by the amount it obtained in such sales. Similarly, if Lycos is still using any of the equipment it leased and bought from CSI, then it cannot claim that the equipment never had any "value" (or has no value now). In short, these are important issues in the case, and CSI is entitled to this information. It also seems illogical that Lycos would have no record of its sale of this equipment, and no way of determining where it is now, if it is still using any of it -- because Lycos' records show that it tracked the equipment on, among other places, the Avnet database.

### Conclusion

In the past year, Lycos has obtained all of the information it needs from CSI to prosecute its claims and defend against CSI's claims. The only real issues that remain are some narrow areas of clearly relevant discovery that CSI needs, and is happy to try to cooperate with Lycos on obtaining in a useable form once a determination is made as to whether the information outlined in Sections 1-3 above, *see* pp. 11-12, *supra*, needs to be produced by Lycos.

There is also a need, however, to provide for an orderly conclusion of discovery that will preserve the Court's intention that discovery conclude on or about January 31, 2007, while at the same time permitting CSI to deal with the recent flurry of activity by Lycos (in part by being allowed a reasonable number of additional hours of deposition time to cover the newly designated witnesses), and to pursue follow-up discovery after the privilege and damages issues outlined in Sections 1 and 2 above are resolved. Perhaps a few weeks of time in February to wrap up the currently scheduled depositions would be sufficient,

---

[1]    Lycos makes these claims of "valuelessness" of the equipment in the context of a usury counterclaim it recently brought, without leave of Court and which was already once denied by Judge Zobel. For these reasons -- and those set forth in a pending motion to dismiss those claims -- Lycos' claims for usury fail.

The Honorable Herbert Hershfang
January 16, 2007
Page 13

so long as the privilege issue -related questioning could be conducted at a later
time after the privilege issues are resolved. -- without a general re-opening of
fact discovery.  In any event, we look forward to discussing these issues with
Your Honor at the conference in Lycos' counsel's office on Thursday of this
week, January 18, 2007, at 2 pm.

Respectfully submitted,

Robert J. Kaler
*Counsel for CSI*

cc:      Thomas Bean, Esq.

ME1 6094733v 2

# EXHIBIT 10

# M<sup>C</sup>CARTER ENGLISH

ATTORNEYS AT LAW

January 22, 2007

VIA HAND DELIVERY

Edward W. Little

T. 617 345 7018
F. 617.204 8018
elittle@mccarter.com

Thomas O. Bean, Esquire
Peter M. Acton, Esquire
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775

McCarter & English. LLP

225 Franklin Street
Boston. MA 02110

T. 617 345 7000
F. 617 345 7050
www.mccarter.com

Re:  *Lycos, Inc. v. Computer Sales International, Inc.,*
     <u>United States District Court – Massachusetts, C.A. No. 04-10017-RWZ</u>

Dear Tom and Peter:

As requested by Special Master Judge Hershfang at the discovery hearing last Thursday, January 19, below is a summary of my notes on the Master's rulings with regard to the remaining discovery issues raised by both sides:

## Lycos' December 28, 2007, Letter (Section A)

A.    <u>Lycos' Second Request for Documents</u>

**Request 1**.    (*Annual and Quarterly Financials*).    CSI will produce its annual statements for the years 1998, 1999 and 2000, and quarterly financial statements for the period January 1998 through June 2002 (*note:   CSI produced this information this past Friday, January 19*)

**Request 6**.    (*Analysis by CSI of relationship between residual value and gross/net proceeds at resale*).    Both parties will produce similar information concerning each other: i.e., CSI will produce all portions of its analysis concerning Lycos, and Lycos will produce all information concerning its sale, disposition, and/or continued usage of equipment leased and/or purchased from CSI.

**Request 7**.    (*CSI's communications with ELA re 1998 ELA survey*).    CSI has nothing concerning this and will advise Lycos of such in writing.    (*CSI hereby confirms this*).

**Request 9**.    (*CSI Board minutes mentioning Lycos/Stenberg and CSI's "business strategy"*).    CSI will produce portions of its Board of Directors minutes

BALTIMORE

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

Thomas O. Bean, Esq.
Peter M. Acton, Esq.
January 22, 2007
Page 2

mentioning Lycos and Lycos will produce portions of its Board of Directors minutes mentioning CSI. Otherwise, denied as reaching beyond the scope of permissible discovery

**Request 10.** (*Historic Information on CSI's website*). The parties will work out a stipulation as to the authenticity of the website information that Lycos has retrieved from the website www.archive.org.

**Request 19.** (*Private Offering Memorandum*). Denied.

**Request 20** (*Stenberg's performance evaluations not already produced*). Denied. In addition, per CSI, there are no further evaluations to provide.

### Lycos' December 28, 2006 Letter

**2B.** (*Commission and bonuses for Stenberg's supervisors*). Denied.

**2C.** (*Information on Lycos' lease payments*). Denied. The Master said he was "inclined to leave the parties where they are on this payment issue."

**2D.** (*Complete Expense Reports for Stenberg*). Denied, as the information Lycos seeks on other CSI customers is "remote."

**2E.** (*Job Descriptions for CSI Account Executives*). Denied. CSI already said it has none.

**3.** (*Third Party Subpoenas to EPC and Charlesbank*). No further discovery needed beyond what the third parties have already produced.

**4.** (*CSI's Back-Up Tape Review Protocol*). Denied, except that CSI is to check with Diane Kopitsky concerning back-up tape procedures for the BOSS computer system, and CSI will provide a list of all the search terms used to search its restored email back up tape. Lycos will search Ms. Cuculiza's and Ms. Bibbo's restored mailboxes for communications from Carolyn Berry (a/k/a Simmons-Berry) and concerning drafts of the Exh. A to Certificates of Acceptance.

### Lycos' January 16, 2007 Letter (Section B)

**B.** Lycos' Need for Clarification or Follow-Up - of CSI's Answers to 2nd Document Request

**Request 8.** (*Documents concerning financing, crediting, etc. of interim rent*). Denied, as CSI has already produced its subledger cards (in hard copy and electronically).

Thomas O. Bean, Esq.
Peter M. Acton, Esq.
January 22, 2007
Page 3

**Request 15**. (*Documents concerning payments made by CSI in connection with the equipment it purchased and leased to Lycos*). Denied, as CSI has already given this information, such as configuration summaries. At the hearing, CSI also provided an example of a "payment track" (see example CSI 40994), which have already been produced.

**Request 16**. (*Documents concerning destruction, disposal, decommissioning of information from CSI's computer systems*). Denied, except that CSI will check on Ms. Kopitsky's testimony concerning back-up tape procedures for the BOSS system.

**Request 17**. (*Documents concerning methodology for calculation of Base Values*). Denied, as Lycos already addressed this issue with Joan Kersting (CSI in-house counsel) at her deposition.

**Request 21**. (*Documents concerning payment by Lycos of $3.775 MM to CSI*). Denied, as the parties notified the Master that they had already exchanged wire transfer information on this earlier in the day.

### Additional Discovery Requested by CSI

**Lycos' Damages Theory**. The Court will consider requests for additional fact discovery for CSI on Lycos' damages after the close of fact discovery, including after Lycos discloses its anticipated expert testimony on this issue.

**Disposition of CSI Equipment by Lycos**. CSI will include this subject in its Rule 30(b)(6) deposition to Lycos, and Lycos' counsel will check again with Lycos to see if there are additional documents relating to this and produce such documents, if any.

**Leaseforum Privilege Issues**. Lycos may decide to produce a copy of Susan Franklin's report to counsel (dated 10/23/03), and may decide to produce (or require Leaseforum to produce) all other communications which are now being withheld.

### Additional Issues

a.      Discovery is extend to February 23, 2007 (and the Master has confirmed this with Judge Zobel).

b.      The deposition of CSI President Bill Gillula, currently scheduled for January 25, 2007, will proceed as scheduled. At that time, Lycos will inquire of him about the financial reports produced this past Friday by CSI as well as all other subjects. To the extent Lycos believes it needs further testimony from Mr. Gillula, the Court will consider that request in the event the parties cannot agree on further

Thomas O. Bean, Esq.
Peter M. Acton, Esq.
January 22, 2007
Page 4

testimony. Any further testimony of Mr. Gillula, however -- whether by agreement or order of the Master -- will take place in St. Louis.

c.      The parties will work to reschedule Frank Flynn's deposition in California (previously noticed for January 26, 2007) for a later, mutually agreeable date now that discovery has been extended until February 23.

d.      The parties have agreed with Susan Franklin's counsel that her deposition will resume on Friday, February 2, 2007.

e.      CSI is entitled to depose Sam Ziba again in light of additional discovery time and the recent production of the Avnet database.

f.      Because counsel cannot agree on CSI's request for up to three additional depositions and an additional fifteen hours of testimony, the Master will hear counsel on this issue today at 5:30 p.m.

Should you have any questions concerning the above, please contact us as soon as possible, as we would like to comply with the Master's request to provide him with our notes of last Thursday's hearing. Thank you.

Sincerely,

Edward W. Little, Jr.

EWL:orb

cc:    Robert J. Kaler, Esq.

# EXHIBIT 11



"Kaler, Robert"
<RKaler@McCarter.com>
03/12/2007 07:33 PM

To  "Herb Hershfang" <hhershfang@comcast.net>

cc  TBean@mwe.com, "Little, Edward"
    <ELittle@McCarter.com>, "Pellerin, Eileen"
    <EPellerin@McCarter.com>

bcc

Subject  FW: CSI/Lycos - Description

History:          🖅 This message has been forwarded.

The below is forwarded per my email of a moment ago.

Robert J. Kaler, Esq.
Partner
McCarter & English LLP
265 Franklin Street
Boston, MA 02110


-----Original Message-----
From: Kaler, Robert
To: 'TBean@mwe.com' <TBean@mwe.com>; Little, Edward
Sent: Fri Mar 09 17:40:02 2007
Subject: Re: CSI/Lycos - Description


Tom -

We are not going to respond to you any more on this issue.

You have successfully obstructed our effort to have the Asset Portal
database delivered to Boston this week, and persist in efforts to
manufacture an issue pertaining to the Boss system where none exists.

You have the information in question, and just as Lycos has objected and
not produced duplicative backup electronic systems such as Peoplesoft,
its General Ledger, etc., we adhere to the position  that the Master has
already upheld twice now - Boss archival data and backups need not and
will be restored or produced.  You already have the relevant
information, and from the same source on which CSI is relying in this
case.

Please do not raise this issue again.  It has nothing to do with the
Asset Portal problem or the issues with our getting the remaining
electronic copies of Susan Franklin's records.


-----Original Message-----
From: TBean@mwe.com <TBean@mwe.com>
To: Little, Edward
CC: Kaler, Robert
Sent: Fri Mar 09 16:45:14 2007
Subject: Re: CSI/Lycos - Description


Ted, two points:

1.  This statement proves that the information is available from the
BOSS system today, even if it is "less accessible than data in active

files." CSI has been demanding files in electronic form since the
outset of this case, even to the point of threatening third parties if
documents were not produced in electronic as well as hard copy.  Lycos
demands that CSI produce forthwith in electronic form all information
available from the BOSS system relative to the CSI-Lycos leases.  Please
advise me not later than noon on Tuesday whether this information will
be produced next week.

2.  The first paragraph is somewhat vague on when the information
"becomes inactive."  I understand the paragraph to mean that the
information becomes inactive for all schedules only when there are no
payments due under any schedule.  Is that understanding correct?

Query why this statement is not on McCarter letterhead.

Thomas O. Bean
McDermott Will & Emery, LLP
28 State Street
Boston, MA 02109
(617) 535-4426 (ph)
(617) 535-3800 (fax)
tbean@mwe.com


"Little, Edward" <ELittle@McCarter.com>

03/09/2007 04:34 PM
To
              tbean@mwe.com
cc
              "Kaler, Robert" <RKaler@McCarter.com>
Subject
              CSI/Lycos - Description




<<6231803_1.pdf>>

Tom --

Attached per our discussions is a description of the BOSS system.

Sincerely,

Ted.

_____
Edward W. Little, Jr.
McCarter & English, LLP  |  265 Franklin Street  |  Boston, MA  02110
Telephone:  (617) 449-6518  |  Facsimile:  (617) 326-3093
elittle@mccarter.com <mailto:elittle@mccarter.com>  |  www.mccarter.com
<http://www.mccarter.com/>

BALTIMORE    BOSTON    HARTFORD    NEW YORK    NEWARK    PHILADELPHIA
STAMFORD    WILMINGTON

# EXHIBIT 12



March 13, 2007

VIA E-MAIL and BY HAND

The Honorable Herbert Hershfang
Discovery Master
64 W. Rutland Square
Boston, MA 02118

RE:    *Computer Sales International, Inc. v. Lycos, Inc.*, C.A. No. 05-10017

Dear Judge Hershfang:

In its March 12 email submission opposing CSI's request for one (1) day of additional time to complete its deposition of Susan Franklin -- many of whose records have been withheld up to now based on invalid claims of privilege that CSI tried for months to negotiate with Lycos to withdraw -- Lycos talks about how important it is "for the judicial system to maintain its integrity" by adhering to "deadlines, rules and time limits." It is difficult not to see the irony in this.

Given Ms. Franklin's admitted 20% contingent fee arrangement with Lycos relating to this case,[1] using Ms. Franklin as a witness *at all* -- as Lycos has already done in proffering her affidavit to defeat Lycos' motion for summary judgment at the outset of this case, and as it has expressly stated it will do by calling her as a witness at trial (whether fact or expert),[2] -- *already* raises questions as to the integrity of the litigation process under Rule 3.4(g) of the Mass. R. Prof. C., which expressly provides that one shall not "pay, offer to pay,

Robert J. Kaler
Partner
T 617.449.6507
F 617.607.9141
rkaler@McCarter.com

McCarter & English, LLP
265 Franklin Street
Boston, MA  02110
T 617 449 6500
F 617 607 9200
www.mccarter.com

BALTIMORE

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

---

[1]    In her deposition a few weeks ago, Ms. Franklin finally confirmed what certain documents produced by Lycos and Leaseforum seemed to clearly show -- which is that Lycos has given her a 20% contingent interest in the outcome of this litigation. *See* Transcript of February 28, 2007 Susan Franklin ("Franklin Dep.") at p. 373 ("**Q: You have a contingent interest in the outcome of this case, don't you? ... A: Yes. .   Q:** You have a contract with Lycos for them **to pay you 20 percent of any moneys they recover from CSI in this case,** minus any retainer payments that they have made to you on account already, correct? **A:  *That is correct***" * * * Q: So it is your understanding, for example, that if Lycos recovered $10,000,000 in this case, you would receive $2,000,000 minus approximately the $200,000 that you had been paid or a net of something like $1,8 million, for example? A: It appears to be mathematically correct.) (emphasis added).

[2]    These restraints on contingent fee agreements are clearly applicable to fact witnesses as well as expert witness. *See, e.g., In re Telcar Group, Inc.*, 2007 WL 576046, at *9 (Bankr. E.D.N.Y.  Feb. 13, 2007); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1524-1525 (S.D. Fla. 1994) ("It is undisputed that Lloyds (with the active assistance of its counsel) paid substantial sums to fact witnesses   .")

The Honorable Herbert Hershfang
March 13, 2007
Page 4

Asset Portal server that we are now seeking to obtain pursuant to our subpoena. We therefore request this limited relief at this time.

Lastly, Lycos, in keeping with its previous threat to raise "the Boss issue" any time CSI requested anything further from anyone, has done so again, even though this issue has already been ruled on -- but it has gone too far this time. Nothing of what Lycos is now claiming in its counsel's emails about what Lycos supposedly "believes" is supported by any testimony from CSI witnesses, even though CSI witnesses have already been examined, and have testified in detail about, the Boss system, and have explained that its backed up archival files on the old CSI-Lycos leases are no longer readily accessible in the same way active files are, and any event are duplicated in the more accurate and complete hard copy records already produced, which is what CSI uses.

Just as Lycos has not been required to try to reconstitute backed up General Ledger and Peoplesoft accounting files concerning the CSI leases,[4] CSI has not tried to reconstruct backed-up archived Boss files, nor is it required to try to assume that burden and expense, which would be substantial even if it were possible, under the amended federal rules governing electronic discovery,[5] particularly where the information would admittedly be duplicative of what the parties already have. *See Cummings v. General Motors Corp.*, 365 F.3rd 944 (10th Cir. 2004)(denying discovery as to auto manufacturers' computer databases as duplicative). In short, this is not an issue. We do respectfully request Your Honor's consideration and resolution of the issues outlined on pages 1-3 hereof, however.

Thank you for your attention to this matter.

Respectfully submitted,


Robert J. Kaler

---

[4] As we pointed out in our letter to Your Honor of January 16, 2007, at page 4, Lycos own former CFO Brian Lucy has admitted that Lycos kept a General Ledger of its own reflecting all its payments to CSI and its other lessors, and although Lycos has produced only a small portion of that General Ledger, and none of it electronically, it has the data. CSI had originally requested that this General Ledger, including its related "Peoplesoft" system, be produced, but Lycos refused.

[5] *See* Fed. R. Civ. P. 26(b)(2)(B) (amendment to rules concerning electronically stored information, noting that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost").

The Honorable Herbert Hershfang
March 13, 2007
Page 5

*Counsel for CSI*

cc:     Thomas Bean, Esq.
        Robert N. Feldman, Esq.
Enclosure

# EXHIBIT 13



May 10, 2007

VIA EMAIL and BY HAND

The Honorable Herbert Hershfang
Discovery Master
64 W. Rutland Square
Boston, MA 02118

Robert J. Kaler
Partner
T 617 345 7007
F 617 607 9141
rkaler@McCarter.com

RE:    *Computer Sales International, Inc. v. Lycos, Inc.*, C.A. No. 05-10017

Dear Judge Hershfang:

We write to report on the two issues that Your Honor granted us time last week to examine and submit on.

I.

McCarter & English. LLP
225 Franklin Street
Boston  MA  02110
T 617 345 7000
F 617 345 7050
www.mccarter.com

As to the first issue, CSI is requesting production of a Leaseforum memorandum, which we now know is bates numbered LYC22780-22782, that ***was never properly disclosed*** on Lycos' Privilege Log, and instead was listed on that Log not as a "memorandum" -- which would have enabled CSI to recognize and pursue it as likely being the memorandum referred to in the various Leaseforum emails that Your Honor did order produced -- but as an "E-mail prepared in anticipation of litigation regarding case issues, timeline and conference call with counsel" dated 12/1/03. *See* Exh. 1 hereto (Page of Lycos Privilege Log) at "A"(emphasis added).

BALTIMORE

BOSTON

HARTFORD

Because no other memorandum was mentioned on the Lycos Privilege Log, and several Leaseforum memoranda had been produced per Your Honor's Order, CSI reasonably assumed that one of the produced memos had to be the one referred to in the 12/1/03 email marked as Exhibit 689. In the May 1, 2007 deposition of Susan Franklin, however, it was finally revealed, in testimony attached hereto as Exh. 2, that those memos were ***not*** what was attached to the 12/1/03 email:

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

Q:    Is the bottom half of this first page of this Exhibit 689 a copy of an e-mail that you got a copy of in December of 2003?

A:    Yes, it's an email I received in 2003.

Q:    There's a reference there to a, quote, "a memo which summarizes the open questions and items as we see them," unquote. And then at the top of the page Mr. Kirk refers to it as, quote, "our memo sent earlier which

The Honorable Herbert Hershfang
May 10, 2007
Page 2

> summarizes the legal issues as we see them," unquote  Do
> you see those references?  * * *

A:    That's what the e-mail says, yes

> * * *

Q:    ... if I show you what's been marked as Exhibit 690, is that
> the memo?

A:    *No.* ...

Q:    I'll show you what's been marked as Exhibit 691  ... Is this
> the memo being referred to in Exhibit [689] ...?

A:    ... I know *these two are not it*, because I know what these
> two are. * * *

> MR. KALER:  Then it appears, Mr. Feldman, that we have not
> received the memo. So I would ask for production of a copy of the
> memo that's referred to in Exhibit 689.  *I don't believe it was even
> on a privilege log.*"

*See* Exh  2 (May 1, 2007 Deposition of Susan Franklin) at pp. 367-368 (emphasis
added).  Counsel's recollection was correct -- this memo was never listed *as a
memo* on any privilege log.  Instead, it was "buried" on the Lycos Log under the
description "email" -- a category of records as to which there was heavy duplication.

Significantly, the very next entry on the Lycos Privilege Log, after the "email" entry
that actually encompassed the missing memo, was almost identically described as
an "E-mail chain prepared in anticipation of litigation regarding case issues, timeline
and conference call with counsel" dated 12/1/03.  See Exh. 1 hereto at "B."  Your
Honor ordered that document produced instead of the one above, *see* DSM 2,
presumably because it looked duplicative of the previous entry, which on the
Privilege Log it did.  Unfortunately, that version does not have the memorandum in
question attached.

Since the emails ordered produced are relevant only in that they show the timing of
the communication of the memorandum to Lycos on December 1, 2003, ordering
the emails produced without the memorandum does not appear to us to have been
the intent.  We therefore believe Your Honor intended the memorandum to be
produced, along with one copy of the covering email with which it was sent, but then
selected for release a copy of the email which referred to the memorandum but did
not attach it.

The memorandum in question -- which is admittedly not privileged in any way -- was
sent to Lycos by Leaseforum on December 1, 2003, during a critical time period in
which Lycos was preparing to try to force CSI to agree to further reductions in the
lease payments that Lycos had already agreed to make in the August 2003 Sales

The Honorable Herbert Hershfang
May 10, 2007
Page 3

Agreement. There are a number of key disputed facts about what Leaseforum was saying to Lycos during that specific time period that this memo, and possibly only this memo, can resolve.

Susan Franklin has denied, for example, that Leaseforum ever actually communicated to Lycos, during the Fall of 2003, that Lycos should publicize the results of the Leaseforum "audit" to gain leverage over CSI in their negotiations -- *even though that suggestion appears repeatedly in Leaseforum's draft presentations to Lycos,* which Ms. Franklin repeatedly stated in her deposition were never actually shown to Lycos, a claim which CSI questions. CSI very much needs the missing 12/1/03 memo because it will reveal how much of what was in the Leaseforum drafts on this subject was actually communicated to Lycos at that time on the publicity and other tactical issues.

CSI also needs the missing memo because it will reveal whether the "Paul Stenberg email" of March 2002 was even recognized as a part of Lycos' complaint against Lycos in December of 2003 -- since it likely would have been mentioned in the memo as part of the basis for Lycos' fraud claim against CSI if anyone had yet claimed it was evidence of fraud -- or whether it was something identified later as a communication that could be "used" to make out a stronger fraud claim.

Given that Ms. Franklin is a key witness in this case for Lycos, and is being contingently compensated for her testimony, Lycos should not be permitted to withhold what is obviously a very significant communication from her firm to Lycos at the time she was working with Lycos on this matter. CSI is therefore respectfully requesting at this time that this memorandum be directed to be produced to CSI, and again is agreeing not to seek further deposition testimony concerning it, but rather to simply use it at trial.

II.

As to the second issue discussed with Your Honor last week, we have undertaken a careful examination of the Asset Portal Tracking System ("AssetPortal") recently recovered from the California company to whom Lycos transferred it last year.

While this review is continuing, and will take considerable time to complete, we have now determined that the electronic logs of the system show that Lycos personnel who have testified that they had no knowledge of and never used AssetPortal nevertheless electronically accessed AssetPortal, using their personal user names, thousands of times during the period 2001 to 2006.

The question is how did they do so without knowing it - assuming their testimony is correct. The answer appears to lie in a section of AssetPortal that we have found to contain meticulously tracked equipment cost and expense information on CSI leased equipment -- information that Lycos has long claimed it could not and did not

The Honorable Herbert Hershfang
May 10, 2007
Page 4

track.[1]    That section (a) stored detailed purchase order, cost, and location information on equipment that Lycos leased from CSI, (b) had an electronic marker stating "This list of PO's *is exported from PeopleSoft*™" (emphasis added), and (c) contains indications of an electronic link into AssetPortal from PeopleSoft, meaning that persons accessing the latter would automatically also access the former. 

PeopleSoft is a Lycos purchase order and expense accounting system, shut down by Lycos in January of 2006 (according to the recent testimony of Deb Bibbo), that Lycos has long claimed is irrelevant to this case because it did not constitute a system that tracked cost, purchase order, or other information about the equipment Lycos leased from CSI.   AssetPortal's internal structure indicates that it was accessed through the PeopleSoft system, however, and was populated with data from PeopleSoft concerning the CSI leased equipment that Lycos has repeatedly claimed it did not track.

We need to prove that this data did exist, that these two systems were closely linked,[2] and that contrary to Lycos claims, these systems *together* were what Lycos used to track the CSI leases and leased equipment -- something which its witnesses and counsel have all argued it could not do.   To do this, we need the version(s) of PeopleSoft which was exporting CSI lease and equipment data into Asset Portal. We have reason to believe that Lycos still has this material, and it is well within the scope of our original Rule 34 requests in this case.   CSI is therefore respectfully requesting that its production be directed at this time.   Nothing else is being sought from Lycos.

---

[1]    When CSI suggested to the Court last year that Lycos had to have kept records on the cost of its own equipment, for example, Lycos' legal briefs to the Court argued that

> "Lycos simply did not have any tracking mechanism for, nor did it keep a running log of, the more than 5,500 pieces of equipment leased from CSI over several years."

*See* Lycos's Opposition to Computer Sales International, Inc.'s Motion to Dismiss, or in the Alternative, to Compel, dated July 31, 2006, at 6-7 (Docket No. 84-1).  AssetPortal, however, clearly shows that Lycos *was* tracking individual pieces of equipment – right down to the CSI lease schedule that each piece appeared on, the purchase order and invoice number for that piece, a description of the model number and the person at Lycos to whom that equipment was assigned, the monthly lease payment amount for that piece of equipment, and the unit price (original equipment cost) for that piece of equipment.

[2]    Although CSI and its experts have not yet been able to determine exactly how this "export" function from PeopleSoft worked – and a review of PeopleSoft itself is necessary to determine this – it is clear that data on the CSI Leases came into AssetPortal from PeopleSoft.

The Honorable Herbert Hershfang
May 10, 2007
Page 5


Thank you for your attention to this matter.  We will make ourselves available to discuss these issues at any time mutually convenient to Your Honor and Lycos' counsel.

Respectfully submitted,


/s/Robert J. Kaler
Robert J. Kaler
*Counsel for CSI*

cc:      Thomas Bean, Esq.
Attachments