**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
|  ) | |
| Plaintiff, ) | |
| v. ) | |
|  ) | |
| LYCOS, INC., ) | C.A. No. 05-10017- RWZ |
| Defendant, ) | |
|  ) | **REDACTED—LEAVE TO FILE** |
| BANK OF AMERICA f/k/a FLEET BANK, ) | **UNREDACTED STATEMENT** |
|  ) | **UNDER SEAL GRANTED** |
| Trustee Process Defendant. ) | **JULY 23, 2007** |

**LYCOS'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS WITH RESPECT TO ITS MOTION FOR SUMMARY JUDGMENT ON <u>ALL</u> COUNTS OF COMPUTER SALES INTERNATIONAL'S AMENDED COMPLAINT**

In accordance with Local Rule 56.1, defendant and plaintiff-in-counterclaim, Lycos, Inc. ("Lycos"), sets forth the following Statement of Undisputed Material Facts[1] in connection with its Motion for Summary Judgment on All Counts of Computer Sales International's Amended Complaint (the "Motion"), filed herewith.

1. Between 1996 and 2002, Lycos and CSI entered into more than 125 equipment schedules,[2] each of which incorporated by reference the terms of a Master Lease Agreement entered into by the parties in December 1996 (the "Master Lease Agreement").[3]

---

[1] All of the Exhibits referred to in this Memorandum are attached to the Affidavit of Peter M. Acton, Jr., filed herewith.

[2] Ex. 16, ¶ 5 and Exhibit B thereto. Ex. 1, ¶ 3; Ex. 2, ¶ 3; Ex. 3, ¶ 9.

[3] Ex 1 to CSI's Am. Compl. (Dkt. No. 121), ¶ 5 (Dec. 4, 2006).

2.    The Master Lease Agreement provided, in pertinent part, that:

> [Lycos's] obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that [Lycos] may have as against [CSI]. . . . It is the express intention of [CSI] and [Lycos] that all Monthly Rental payable by [Lycos] under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term of thereof.[4]

CSI has referred to this provision as a "hell or high water" clause that obligated Lycos to make all monthly payments regardless of defense or excuse.[5]

3.    Beginning in 1998 and continuing through 2001, CSI and Lycos entered into approximately 125 renewals or refinancings of existing equipment schedules.[6]

4.    In late 2001, Lycos and CSI entered into the largest of such refinancings combining over thirty of the extant equipment schedules onto two schedules known as schedules 93 and 94.[7] Lycos's obligation to make the monthly payments due under these schedules was secured by a ███████████████████████████████████████████████████████████████████████████████████████████████.[8] Subsequently, Paul Stenberg, CSI's account representative for Lycos,[9] wrote to CSI's Chairman that he had ███████████████████████████████████████████████████████████████.[10]

---

[4] *Id.*

[5] CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. at 3 (Dkt. No. 16) (Mar. 10, 2005).

[6] *E.g.*, Ex. 4; Ex. 5 at CSI0035654.

[7] Ex. 6 at CSI027498; CSI0027565-67; Ex. 7 at CSI0027656; CSI0027741-43.

[8] Ex. 8 at CSI0025463, CSI0025466-468; *see* Ex. 6 at CSI00CSI0027566, ¶ 3; Ex. 7 at CSI0027742, ¶ 4.

[9] Ex. 32 at 29:20-30:19; 31:15-32:7.

[10] Ex. 35 at CSI042454.

5.   On June 16, 2003, CSI offered to sell for $4.69 million the equipment on all extant equipment schedules that Lycos had been leasing from CSI.[11]  The draft sales agreement that CSI's Associate General Counsel, Joan Kersting, sent to Lycos provided that Lycos would ███████████████████████████████████████.[12]  That draft did *not*, however, contain an affirmative statement that Lycos would make all remaining payments due on those schedules.[13]

6.   In June 2003, Lycos retained a lease consulting firm known as LeaseForum to assist it with its equipment lease buyout negotiations with CSI and Lycos's other technology equipment lessors,[14] and notified CSI that it had done so.[15]  Mr. Stenberg, however, did not want to negotiate with a lease consulting firm.[16]

7.   On July 1, 2003, Lycos's Chief Financial Officer informed Mr. Stenberg that if he were unwilling to negotiate with LeaseForum, Lycos would authorize LeaseForum to perform a full audit of the CSI-Lycos leases.[17]  After cautioning Mr. Lucy by saying "easy tough guy,"[18] Mr. Stenberg advised LeaseForum that CSI would reduce its price for the equipment to $3.775 million but that this offer would expire if not accepted by July 15, 2003.[19]

---

[11] Ex. 9 at CSI0023156 and CSI0023157, ¶ 3.

[12] *Id*., ¶ 4.

[13] *See generally id*.

[14] Ex. 10 at LYC18884 (definition of "Work").

[15] Ex. 11.

[16] Ex. 32 at 295:9-17.

[17] Ex. 12.

[18] Ex. 36.

[19] Ex. 32 at 309:7-11.

8.  On July 14, 2003, Susan Franklin of LeaseForum sent an e-mail to Mr. Stenberg, on behalf of Lycos, accepting the $3.775 million offer.[20] Mr. Stenberg, who negotiated the sale on behalf of CSI, admitted at his deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[21] Ms. Kersting, who negotiated the legal aspects of the Sales Agreement through Mr. Stenberg,[22] ▮ admitted at her deposition that there was an agreement on price on July 14, 2003.[23]

9.  Attached to Ms. Franklin's July 14th e-mail accepting CSI's $3,775,000 offer was an attachment that, for the first time, restated Lycos's pre-existing obligation to continue making the monthly rental payments due under the equipment schedules then in effect.[24] Ms. Kersting testified at her deposition that this statement did *not* impose any new payment obligations on Lycos under the existing equipment schedules.[25]

10. Specifically, Ms. Kersting testified:

>   Q.  And the obligation to pay rent under those leases predated execution of the sales agreement, right?
>
>   [Objection by counsel]
>
>   A.  The obligation to pay rent on the leases commenced on the day the leases started and were signed by the parties.[26]
>
>   Q.  And the sales agreement did not impose any additional obligation to pay monthly rent under the schedules listed in Paragraph 2, did it?

---

[20] Ex. 29 at AR001433.

[21] Ex. 32 at 309:12-21.

[22] Ex. 13 at 195:7-196:14.

[23] *Id*. at 252:2-7. Ms. Kersting is an officer at CSI. Ex. 15 at 288:4.

[24] Ex 29 at AR001434, ¶ 2.

[25] Ex. 13. at 216:5-219:9; 258:18-24; *see* CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. at 3 (Dkt. No. 16).

[26] *Id*. at 217:12-18.

> [Objection by counsel]
>
> A.   The rental remained the same.
>
> Q.   And the number of rental payments remained the same, right?
>
> A.   Yes.[27]

11.   When asked by her own counsel at deposition about her understanding of paragraph 4 of the Sales Agreement, the paragraph in which Lycos restated its obligation to make the monthly payments,[28] she said "[m]y understanding is that they [Lycos] are *reaffirming* the monthly rental obligations under the leases, beginning with the payments due August 1 and continuing through the final rent date on the exhibit."[29]

12.   Ms. Kersting further testified that the language in which Lycos "reaffirmed" its payment obligations was proposed by Lycos, not CSI.[30]

13.   On August 1, 2003, Lycos wired the $3,775,000 purchase price[31] and faxed a copy of the sales agreement that Lycos's Chief Financial Officer had signed on July 18, 2003 to CSI.[32]

14.   In an internal CSI e-mail dated August 1, 2003, Ms. Kersting stated that ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████[33]

---

[27] *Id.* at 217:19-218:2.

[28] Ex. 10 to CSI's Am. Compl., ¶ 4 (Dkt. No. 121).

[29] Ex. 13. at 258:18-24 (emphasis added).

[30] *Id.* at 258:14-259:7.

[31] Ex. 14; Ex. 33 at 179:19-22.

[32] Ex. 3 at Ex. A; Ex. 34 at CSI045125; Ex. 13 at 206:6-11.

[33] Ex. 34 at CSI045125.

15.     On August 8, 2003 and August 11, 2003, Lycos and CSI, respectively, re-signed a version of the sales agreement correcting ███████ minor errors.[34] That version of the sales agreement provides, in pertinent part:

> A.  "Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules . . . effective on their respective termination dates, except as stated in paragraph 5 below . . . ."[35];
>
> B.  "Each Lease will terminate on its respective Terminate Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease."[36]  Paragraph 2 states lists the "Terminate Date" for each schedule;
>
> C.  "With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date."[37]; and
>
> D.  " . . . (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims and encumbrances of any kind except those caused or incurred by Buyer, if any . . ."[38]

16.     At all times before and as of the time it entered into the Sales Agreement, Lycos intended to make all of the remaining payments required under the extant equipment schedules.[39] In addition to making the $3.775 million payment under the Sales Agreement, Lycos subsequently paid CSI approximately $13.5 million in monthly payments owed under the extant

---

[34] *Compare* Ex. 3 at Ex. A *with* Ex. 10 to CSI's Am. Compl. (Dkt. No. 121); *see* Ex. 13 at 220:15-223:5.

[35] Ex. 10 to CSI's Am. Compl., ¶ 1 (Dkt. No. 121).

[36] *Id.*, ¶ 2.

[37] *Id.*, ¶ 5.

[38] *Id.*, ¶ 7.

[39] Ex. 3, ¶ 12.

equipment schedules during the next fourteen months.[40] In fact, Lycos paid CSI all of the monthly amounts due CSI after the July 15, 2003 date of the Sales Agreement other than the approximately $301,000 CSI seeks to recover in Counts I and II of its Amended Complaint, an amount that became due from and after November 2004.[41]

17.     On August 8, 2003, John Kirk, who was responsible for generating new business for LeaseForum,[42] sent an e-mail to Lycos's Assistant Controller, Julie Callagee,[43] that CSI has alleged provides the basis for its fraud claim.[44]  In that e-mail, Mr. Kirk states that "Phase 2 has commenced.  The phase 2 effort is a continuation under statement of work 001.  Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI."[45]

18.     When questioned about the e-mail at her deposition, Ms. Callagee testified that: "It looks like John is a little eager here and they wanted to continue to—to continue working, yes."[46]  Ms. Callagee also specifically and repeatedly testified that Lycos did not authorize LeaseForum to perform the work described in Mr. Kirk's e-mail until an agreement between LeaseForum and Lycos was signed in October 2003.[47]  Ms. Callagee further testified that, as

---

[40] The monthly payments due totaled approximately $13.8 million. Ex. 16, ¶ 44 and Exhibit K, column headed "Rent Payments On and After 01-Aug-2003.  Because Lycos paid all of the remaining rents due other than approximately $301,000, (Ex. 15 at 450:5-10 (the witness, Jeffrey Rousseau, was an officer of CSI at the time he testified, *id*. at 189:4-6) CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121) (seeking to recover only for non-payment on schedules 100 and 200)), Lycos paid approximately $13.5 million of this amount.

[41] CSI's Am. Compl., ¶¶ 18, 25 (Dkt. No. 121).

[42] Ex. 17 at 87:21-88:23.

[43] Ex. 18.

[44] CSI's Am. Compl., ¶ 44 (Dkt. No. 121); Ex. 18 at LYC19440.

[45] Ex. 18 at LYC19440.

[46] Ex. 20 at 185:4-11.

[47] *Id.* at 197:21-198:20; 199:14-201:7.

Lycos's Assistant Controller in 2003, she did not have the authority to enter into any contracts on behalf of Lycos[48]—including with respect to the work LeaseForum had proposed—and that Lycos's Chief Financial Officer, Mr. Lucy, who was reticent to proceed with the audit, would need to authorize it.[49] In her e-mail response to Mr. Kirk two days later, Ms. Callagee requested a proposed fee schedule for the work and stated that Mr. Lucy "is expecting a much lower rate" for LeaseForum's services.[50]

19. On August 13, 2003, LeaseForum exchanged e-mails internally concerning a "first pass" draft of a statement of work for the proposed audit of the CSI-Lycos relationship.[51] Among other things, that draft did not specify the rate LeaseForum would charge Lycos.[52]

20. Not until almost two months passed did Lycos and LeaseForum actually enter into an agreement with respect to LeaseForum's audit of the CSI-Lycos lease relationship.[53] In a statement of work dated October 8, 2003, the parties agreed that "LeaseForum will . . . analyze past and current leasing activity with [CSI] with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from" Lycos.[54] It went on to say that Lycos:

> will provide, in a timely fashion, all documents requested by LeaseForum . . . deemed necessary by LeaseForum to establish a complete picture of [Lycos's] end of lease obligations . . and [Lycos] will make accessible to LeaseForum information regarding invoices paid by [Lycos] to CSI. [Lycos] will provide

---

[48] *E.g., id.* at 243:2-21.

[49] *Id.*; *see id.* at 190:7-24; 201:16-202:3; 205:11-19.

[50] Ex. 19 at LYC23992.

[51] Ex. 21; Ex. 22 at AR000806.

[52] AR000806.

[53] Ex. 23; *see* Ex. 20 at 197:21-198:20; 199:14-24; Ex. 24 at 564:10-23.

[54] Ex. 23 at LYC18887 (emphasis supplied).

> LeaseForum access to key personnel . . . to the extent reasonably necessary for LeaseForum to perform the Services.[55]

21.  Not until October 27, 2003, did LeaseForum deliver a presentation and report to Lycos summarizing the results of its audit.[56] Among other things, that report stated that:

- In an "expected market outcome," Lycos would have paid CSI $46.3 million to lease equipment with an original cost of $43.59 million, yielding CSI a return of 13.48 to 21.44%;[57]

- As a result of the CSI-Lycos refinancings, Lycos was expected to pay CSI $82.5 million to lease equipment that had an original cost of $43.59 million.[58]

22.  On November 19, 2003, LeaseForum made a presentation to Lycos's outside counsel similar to the one it had made to Lycos at the end of October.[59]

23.  Having received information from LeaseForum that indicated that Lycos had paid CSI substantially more than it should have, in mid-December 2003, Lycos filed a "bare-bones" complaint against CSI in Massachusetts Superior Court seeking (1) a declaration that it did not have any further payment obligations to CSI, and (2) return of the amounts it had overpaid CSI.[60]

24.  Before serving the complaint, Lycos corresponded and spoke with CSI in an effort to settle the matter.[61] After CSI removed that action to this Court, Lycos dismissed it

---

[55] *Id.* (definition of "Work").

[56] Ex. 30.

[57] *See* Ex. 30 at LYC20752.

[58] *Id*.

[59] Ex. 31.

[60] Ex. 26 at 1.

[61] *E.g.*, Ex. 27 at 216:1-218:13; Ex. 28.

voluntarily in April 2004.[62] At the time of that dismissal, Lycos was in the process of being sold, which sale was consummated in October 2004.[63]

25.  In October, 2004, Lycos was sold and Mr. Lucy was replaced as CFO.[64] Having received LeaseForum's report and satisfied all of its payment obligations under all of the extant schedules other than schedules 100 and 200,[65] Lycos stopped making payments to CSI under schedules 100 and 200.[66]

LYCOS, INC.

Dated: September 4, 2007

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

---

[62] *Lycos, Inc. v. Computer Sales International, Inc.*, Case No. 04-10212-RWZ, Dkt. Nos. 1 and 2.

[63] Ex. 3, ¶ 14.

[64] *Id.*, ¶¶ 1, 14.

[65] *See supra* ¶¶ 15 and 16note 36.

[66] *See* CSI's Am. Compl., ¶¶ 18-19, 25, 26 (Dkt. No. 121).

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 4th day of September, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

                                              /s/ Peter M. Acton, Jr.
                                              Peter M. Acton Jr.