# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | C.A. No. 05-10017-RWZ |
| Plaintiff, ) | |
| v. ) | **LEAVE TO FILE** |
| ) | **MEMORANDUM OF UP TO** |
| LYCOS, INC., ) | **THIRTY PAGES GRANTED** |
| ) | **JUNE 13, 2007** |
| Defendant, ) | |
| ) | **REDACTED—LEAVE TO FILE** |
| BANK OF AMERICA f/k/a FLEET BANK, ) | **UNREDACTED MEMORANDUM** |
| ) | **UNDER SEAL GRANTED** |
| Trustee Process Defendant. ) | **JULY 23, 2007** |

## LYCOS'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON <u>ALL</u> COUNTS OF CSI'S AMENDED COMPLAINT

This case is about a company, Computer Sales International, Inc. ("CSI"), that defrauded and reaped undue profits from Lycos, Inc. ("Lycos") through, among other things, the use of undisclosed "mark-ups" on refinanced computer equipment leases.

Despite defrauding Lycos out of more than $13.7 million, CSI sued Lycos for $301,000 when Lycos declined to make the final few payments due under two equipment schedules. In response to CSI's breach of contract claims, Lycos asserted its fraud and other counterclaims. Apparently believing that "the best defense is a good offense," six months later CSI amended its complaint to add four new counts. There are no genuine issues of material fact in dispute as to these new claims and Lycos is entitled to judgment as a matter of law for the following reasons:[1]

---

[1] Summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Torres-Martinez v. Puerto Rico Dep't of Corrections*, 485 F.3d 19, 22 (1st Cir. 2007) (quoting *Calero-Cerezo v. United States DOJ*, 355 F.3d 6, 19 (1st Cir. 2004)).

- In Count III of its Amended Complaint, CSI alleges that it was fraudulently induced to enter into a Sales Agreement with Lycos because Lycos did not intend to make all of the remaining payments under the extant equipment schedules to which it agreed in the Sales Agreement. In light of the undisputed facts, CSI cannot satisfy its burden of showing that Lycos did not intend to make the remaining monthly payments at the time it entered into the Sales Agreement. In fact, the undisputed evidence is that Lycos did intend to make those payments. Moreover, Lycos made every single payment required under those equipment schedules during the fourteen months after the Sales Agreement was signed, payments aggregating approximately $13.5 million; it failed only to make the final few payments totaling approximately $301,000 after the company was sold and the Chief Financial Officer replaced. Thus, according to CSI's theory, this so-called intent of Lycos back in July-August 2003 must then have passed to, and been adopted and carried out by, an entirely new regime having no prior connection to Lycos. Additionally, because CSI offered to sell the equipment for the agreed-on purchase/sale price *before* Lycos ever made the alleged misrepresentation, Lycos could not have made it with the intent for CSI to rely on it. Finally, CSI could not, as a matter of law, have relied on the alleged misrepresentation because, in the words of CSI's Associate General Counsel, that representation merely "reaffirmed" Lycos's pre-existing duty to make the payments.

- In Count IV, CSI alleges that Lycos breached the implied covenant of good faith and fair dealing because Lycos did not make the last several lease payments required under the Sales Agreement. This claim fails because CSI has adduced no evidence of bad faith on the part of Lycos as the law requires. To the contrary, Lycos relied on the report of its leasing experts who advised Lycos that it had been dramatically overcharged by CSI for the equipment in

deciding not to make those few final payments. Since then, both fact and expert discovery in this case have provided even further support for Lycos's claims.[2]

- In Count V, CSI alleges that Lycos abused process because it sued CSI in Massachusetts Superior Court and filed counterclaims against CSI in this case. Yet, CSI has adduced no evidence to support its contention that Lycos used legal process for an ulterior or illegitimate purpose. To the contrary, the undisputed facts prove that Lycos's purpose in asserting claims against CSI has, at all times, been to recover ill-gotten money from CSI, period.

- In Count VI, CSI claims, apparently as a result of all of the foregoing, that Lycos has violated M.G.L. c. 93A. As each of the foregoing claims fail, so, too, does CSI's 93A claim. To the extent CSI's 93A claim purports to be based on Lycos's "plain vanilla" breach of contract, it fails because this Court has already determined that Missouri law governs the parties' contract claims such that chapter 93A is inapplicable.

With respect to CSI's breach of contract claims against Lycos (Counts I and II), if the Court grants (1) Lycos's Motion for Partial Summary on Certain of its Claims in Counts VII, XII, and XIII, (2) its Motion for Summary Judgment on Counts III-VI of CSI's Amended Complaint, and (3) its Motion to Dissolve Trustee Process Attachment,[3] filed herewith, Lycos would have no objection to the Court granting CSI summary judgment on Count I in the amount of $301,050.34, plus statutory interest thereon, plus reasonable attorneys' fees incurred in drafting its Complaint filed January 5, 2005, *provided* the Court offsets that against the amount awarded to Lycos on its claims against CSI.[4] This approach will obviate the need for any trial in

---

[2]  *See generally* Ex. 16.

[3]  CSI obtained a trustee process attachment in the amount of $310,000 at the outset of this case. *See* Electronic Order granting Dkt. No. 2, CSI's Mot. For Trustee Process (Jan. 5, 2005).

[4]  CSI is also seeking repossession of the equipment. If Lycos were to make those final payments through offset to its judgment, it will have paid for all of the equipment giving CSI no right to repossess.

this case[5] as the claims in Count II are resolved by the setoff provided by Count I such that once

it has effected the setoff, the Court will be able to grant summary judgment to Lycos on Count II.

## FACTS[6]

### A.    Lycos's Obligation to Make Monthly Payments.

Between 1996 and 2002, Lycos and CSI entered into more than 125 equipment

schedules,[7] each of which incorporated by reference the terms of a Master Lease Agreement

entered into by the parties in December 1996 (the "Master Lease Agreement").[8]  The Master

Lease Agreement provided, in pertinent part, that:

> [Lycos's] *obligation to pay the Monthly Rental and all other sums due hereunder*
> *shall be absolute and unconditional* and shall not be subject to any setoff,
> abatement, counterclaim, recoupment, defense, cancellation, repudiation,
> rejection of Equipment, revocation of acceptance of Equipment or any other right
> that [Lycos] may have as against [CSI]. . . . *It is the express intention of [CSI]*
> *and [Lycos] that all Monthly Rental payable by [Lycos] under each Equipment*
> *Schedule shall be, and continue to be, payable in all events throughout the term*
> *of thereof.*[9]

CSI has argued in this case that this "hell or high water" clause obligated Lycos to make all

monthly payments regardless of defense or excuse.[10]

Beginning in 1998, CSI and Lycos began to rewrite or refinance existing equipment

schedules.[11]  In late 2001, Lycos and CSI entered into the largest of such refinancings combining

over thirty of the extant equipment schedules onto two schedules known as schedules 93 and

---

[5]  If the Court grants Lycos's Motions for Summary Judgment, Lycos will stay the remaining counts of its
counterclaim and dismiss them upon entry of a final, non-appealable judgment.

[6]  All of the Exhibits referred to in the footnotes to this Memorandum are attached to the Affidavit of Peter M.
Acton, Jr., filed herewith.

[7]  Ex. 16, ¶ 5 and Exhibit B thereto. Ex. 1, ¶ 3; Ex. 2, ¶ 3; Ex. 3, ¶ 9.

[8]  Ex 1 to CSI's Am. Compl., ¶ 1 (Dkt. No. 121) (Dec. 4, 2006).

[9]  *Id.,* ¶ 5 (emphasis supplied).

[10]  CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. at 3 (Dkt. No. 16) (Mar. 10, 2005).

[11]  *E.g.,* Ex. 4; Ex. 5 at CSI0035654.

94.[12] Lycos's obligation to make the monthly payments due under these schedules was secured by ████████████████████████████████████████████████████████

████████████████████████████████████[13] Subsequently, Paul Stenberg,

CSI's account representative for Lycos, wrote to CSI's Chairman that he had ████████████

████████████████████████████████[14]

### B.    Lycos Purchases the Equipment from CSI Pursuant to a Sales Agreement.

On June 16, 2003, CSI offered to sell Lycos the equipment on all extant equipment

schedules for $4.69 million.[15]  The draft sales agreement that CSI's Associate General Counsel,

Joan Kersting, sent to Lycos provided that Lycos would ████████████████████████████████

██████████████████████████[16]  That draft did *not* contain an affirmative statement that

Lycos would make the remaining payments due on those schedules.[17]

In June 2003, Lycos retained a lease consulting firm known as LeaseForum to assist it

with buyout negotiations with CSI and Lycos's other technology equipment lessors[18] and

notified CSI that it had done so.[19]  Mr. Stenberg, ████████████████████████████████████████

████████████████[20]  In response, Lycos's Chief Financial Officer informed Mr. Stenberg that if he

were unable to negotiate with LeaseForum, then Lycos would authorize LeaseForum to perform

a full audit of the CSI-Lycos leases.[21]  Within days after Mr. Lucy made that threat, CSI advised

---

[12]  Ex. 6 at CSI027498; CSI0027565-67; Ex. 7 at CSI0027656; CSI0027741-43.

[13]  Ex. 8 at CSI0025463, CSI0025466-468; *see* Ex. 6 at CSI0027566, ¶ 3; Ex. 7 at CSI0027742, ¶ 4.

[14]  Ex. 35 at CSI042454.

[15]  Ex. 9 at CSI0023156-157, ¶ 3.

[16]  *Id.*, ¶ 4.

[17]  *See generally id.*

[18]  Ex. 10 at LYC18884 (definition of "Work").

[19]  Ex. 11.

[20]  Ex. 32 at 295:9-17.

[21]  Ex. 12.

LeaseForum that it would reduce its offer to sell the equipment to ███████████ ████████████████████████████████[22]

On July 14, 2003, Susan Franklin of LeaseForum sent an e-mail on behalf of Lycos to Mr. Stenberg accepting the $3.775 million offer.[23] Mr. Stenberg, the CSI account executive who negotiated the sale on behalf of CSI, has admitted █████████████████████ █████████████[24] Ms. Kersting, who negotiated the legal aspects of the Sales Agreement through Mr. Stenberg,[25] has ████ admitted that there was an agreement on price on July 14, 2003.[26]

Attached to Ms. Franklin's e-mail accepting CSI's $3.775 million offer was an attachment that, for the first time, contained a restatement of Lycos's pre-existing obligation to continue making the monthly rental payments due under the equipment schedules then in effect.[27] Ms. Kersting admitted that the proposed restatement was Lycos's idea, not CSI's,[28] and did not impose any new obligations on Lycos.[29] She also admitted that when this concept was incorporated into the final Sales Agreement, Lycos was simply "*reaffirming* [its] monthly rental obligations under the leases . . . ."[30]

On August 1, 2003, Lycos wired the $3.775 million purchase price[31] and faxed a copy of the Sales Agreement signed by Lycos's Chief Financial Officer on July 18, 2003 to CSI.[32]

---

[22] Ex. 32 at 309:7-11.

[23] Ex. 29 at AR001433.

[24] Ex. 32 at 309:12-21.

[25] Ex. 13 at 195:7-196:14.

[26] *Id.* at 252:2-7. Ms. Kersting is an officer at CSI. Ex. 15 at 288:4.

[27] Ex. 29 at AR001434, ¶ 2.

[28] Ex. 13 at 258:14-259:7.

[29] *Id.* at 216:5-219:9.

[30] *Id.* at 258:18-24 (emphasis supplied).

[31] Ex. 14; Ex. 33 at 179:19-22.

[32] Ex. 3 at Exhibit A thereto; Ex. 34 at CSI045125; Ex. 13 at 206:6-11.

In an internal CSI e-mail on August 1, 2003, Ms. Kersting acknowledged ███████

███████████████████████████████████████████████████████

███████████████████████████████████.[33]  On August 8, 2003 and August 11,

2003, Lycos and CSI, respectively, re-signed a version of the Sales Agreement correcting those

and other minor errors.[34]

Although not its burden to prove, at all times before and as of the time it signed the Sales

Agreement on July 18, 2003, and again at all times before and as of the time it re-signed that

agreement on August 8, 2003,[35] and having already paid CSI $3.775 million under that

agreement a week earlier, Lycos intended to make all of the remaining payments required under

the extant equipment schedules.[36]  In fact,  Lycos paid CSI approximately $13.5 million from

and after August 1, 2003 through late 2004.[37]  That amount represented every penny in monthly

payments due CSI after execution of the Sales Agreement other than the approximately $301,000

CSI seeks to recover in this action that became due from and after November 2004.[38]

### C.    LeaseForum Proposes to and Audits the Lycos-CSI Relationship.

On August 8, 2003, John Kirk, who was responsible for generating new business for

LeaseForum,[39] sent an e-mail to Lycos's Assistant Controller, Julie Callagee,[40] that CSI has

---

[33] Ex. 34 at CSI045125.

[34] *Compare* Ex. A to Ex. 3 *with* Ex. 10 to CSI's Am. Compl. (Dkt. No. 121); *see* Ex. 13 at 220:15-223:5.

[35] Ex. 10 to CSI's Am. Compl. (Dkt. No. 121).

[36] Ex. 3, ¶ 12.

[37] The monthly payments totaled approximately $13.8 million. Ex. 16 ¶ 44 and Exhibit K thereto, column headed "Rent Payments On and After 01-Aug-2003." As Lycos paid all of the remaining rents due other than approximately $301,000 (Ex. 15 at 450:5-10 – the person making the statement was an officer of CSI (*id.* at 189:4-6)), CSI is seeking to recover for non-payment only on schedules 100 and 200. CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121). Accordingly, the amount paid by Lycos totaled approximately $13.5 million.

[38] *See supra* note 37.

[39] Ex. 17 at 87:21-88:23.

[40] Ex. 18.

alleged provides the basis for its fraud claim.[41]  In that e-mail, Mr. Kirk states that "Phase 2 has commenced.  The phase 2 effort is a continuation under statement of work 001.  Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos [sic] remaining future payment obligations to CSI."[42]  When questioned about the e-mail at her deposition, Ms. Callagee testified that: "It looks like John is a little eager here and they wanted to continue to—to continue working, yes."[43]  Ms. Callagee also specifically and repeatedly testified that Lycos did not authorize LeaseForum to perform the work described in Mr. Kirk's e-mail until an agreement between LeaseForum and Lycos was signed in October 2003.[44]  Ms. Callagee further made clear that as Lycos's Assistant Controller in 2003, she did not even have the authority to enter into any contracts on behalf of Lycos[45] -- including with respect to the work LeaseForum had proposed -- and that Lycos's Chief Financial Officer, Mr. Lucy, who was reticent to proceed with the audit, would need to authorize it.[46]  Consistent with that, in her e-mail response to Mr. Kirk two days later on August 10, 2003, Ms. Callagee requested a proposed fee schedule for the work and stated that Mr. Lucy "is expecting a much lower rate" for LeaseForum's services.[47]

On August 13, 2003, LeaseForum exchanged e-mails internally concerning a "first pass" draft of a statement of work for the proposed audit of the CSI-Lycos relationship.[48]  Among other things, that draft did not specify the rate LeaseForum would charge Lycos.[49]  Thus, as of

---

[41]  CSI's Am. Compl., ¶ 44 (Dkt. No. 121); Ex. 18 at LYC19440.

[42]  Ex. 18 at LYC19440.

[43]  Ex. 20 at 185:4-11.

[44]  *Id.* at 197:21-198:20; 199:14-201:7.

[45]  *Id.* at 243:2-21

[46]  *Id.*; *see id.* at 190:7-24; 201:16-202:3; 205:11-19.

[47]  Ex. 19 at LYC23992.

[48]  Ex. 21; Ex. 22 at AR000806.

[49]  Ex. 21; Ex. 22 at AR000806.

August 13, 2003 -- one month after Lycos had accepted CSI's $3.775 million offer to buy the equipment, two weeks after Lycos had paid CSI that purchase price, and almost a week after Lycos had re-signed the Sales Agreement to correct minor errors -- LeaseForum and Lycos still had no agreement in place with respect to LeaseForum's proposed audit.

Not until almost two months passed did Lycos and LeaseForum actually enter into a statement of work with respect to LeaseForum's audit of the CSI-Lycos lease relationship.[50]  In a statement of work dated October 8, 2003,[51] Lycos and LeaseForum agreed that: "LeaseForum *will* . . . analyze past and current leasing activity with [CSI] with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from" Lycos.[52]  It went on to say that Lycos:

> *will* provide, in a timely fashion, all documents requested by LeaseForum . . . deemed necessary by LeaseForum *to establish a complete picture of [Lycos's] end of lease obligations* . . . and [Lycos] *will* make accessible to LeaseForum information regarding invoices paid by [Lycos] to CSI.  [Lycos] *will* provide LeaseForum access to key personnel . . . to the extent reasonably necessary for LeaseForum *to perform* the Services.[53]

It was not until October 27, 2003 that LeaseForum delivered a presentation and report to Lycos summarizing the results of its audit.[54]  Among other things, that report revealed that:

- In an expected market outcome, Lycos would have paid CSI $46.3 million to lease equipment with an original cost of $43.59 million, yielding CSI a return of 13.48 to 21.44%.[55]

- As a result of the CSI-Lycos refinancings, Lycos was expected to pay CSI $82.5 million to lease equipment that had an original cost of $43.59 million.[56]

---

[50] Ex. 23; *see* Ex. 20 at 197:21-198:20; 199:14-24.

[51] Ex. 23; *see* Ex. 20 at 197:21-198:20; 199:14-24.

[52] Ex. 23 at LYC18887 (emphasis supplied).

[53] *Id.* (definition of "Work").

[54] Ex. 30.  LeaseForum claims to hold a contingent interest in the outcome of this litigation.

[55] *See* Ex. 30 at LYC20752.

[56] *Id.*

- 9 -

On November 19, 2003, LeaseForum made a presentation to Lycos's outside counsel similar to the one it made to Lycos at the end of October.[57]

### D.    Lycos Sues CSI and Files Counterclaims in this Action.

Having received information from LeaseForum that it had paid CSI substantially more than it should have, in mid-December 2003, Lycos filed a "bare bones" complaint against CSI in Massachusetts Superior Court seeking (1) a declaration that it did not have any further payment obligations to CSI, and (2) return of the amounts it had overpaid CSI.[58]  Before serving the complaint, Lycos corresponded and spoke with CSI in an effort to settle the matter.[59]  After CSI removed that action to this Court, Lycos dismissed it voluntarily in April 2004.[60]  At the time of that dismissal, Lycos was in the process of being sold.[61]

In October, 2004, Lycos was sold and Mr. Lucy was replaced as CFO.[62]  Having received LeaseForum's report and satisfied all of its payment obligations under all of the extant schedules other than schedules 100 and 200,[63] Lycos new ownership and CFO stopped making payments to CSI under schedules 100 and 200.[64]  Even though CSI knew of Lycos's potential claims against it from the earlier dismissed action, CSI nonetheless commenced this action to recover $301,000.[65]  Lycos admitted in its Answer, filed less than thirty days after CSI filed this case, that it had refused to pay the approximately $301,000 CSI had demanded.[66]  It also asserted

---

[57] Ex. 31.

[58] Ex. 26 at 1.

[59] *E.g.*, Ex. 27 at 216:1-218:13; Ex. 28.

[60] *Lycos, Inc. v. Computer Sales International, Inc.*, Case No. 04-10212-RWZ, Dkt. Nos. 1 and 2.

[61] Ex. 3, ¶ 14.

[62] *Id.*, ¶¶ 1, 14.

[63] *See supra* note 37.

[64] *See* CSI's Am. Compl., ¶¶ 18-19, 25, 26 (Dkt. No. 121).

[65] *Id.*

[66] CSI's Compl. ¶¶ 19, 26, 29 (Dkt. No. 1) (Jan. 5, 2005); Lycos's Answer & Countercl. ¶¶ 16, 26, 29 (Dkt. No. 11) (Feb. 4, 2005).

counterclaims, based on the work of LeaseForum, that it had, among other things, been defrauded by CSI.[67]

## ARGUMENT

I.    **Lycos is Entitled to Summary Judgment on CSI's Fraud Claim in Count III Because It Did Not Make an Intentional Misrepresentation of a Material Fact and Did Not Intend to Induce CSI's Reliance on the Alleged Misrepresentation.  As a Matter of Law, CSI Could Not Have Relied on a Misrepresentation that was Merely a Reaffirmation of Pre-Existing Duty.**

To prevail on its claim for fraud in the inducement, CSI is required to show, among other things, that (A) Lycos made a false representation of a material fact (B) for the purpose of inducing CSI to act and (C) CSI reasonably relied on that representation to its detriment.[68]  CSI cannot satisfy any of these elements, let alone all of them.

First, CSI has unearthed no evidence demonstrating that Lycos did not intend to make the payments.  To the contrary, the former CFO of Lycos who signed the Sales Agreement has testified that Lycos did intend to make the payments.  In fact, the undisputed evidence shows that Lycos made approximately $13.5 million in monthly payments during the fourteen months after signing the Sale Agreement[69] and failed to make only the last few payments on two schedules aggregating $301,000 out of the approximately $13.8 million in monthly payments that became due from and after August 1, 2003,[70] and then only after Lycos was sold.

Second, Lycos's alleged misrepresentation *post-dated* its acceptance of CSI's offer to sell the equipment for $3.775 million.[71]  As such, it is impossible for Lycos to have intended CSI to rely on its alleged misrepresentation.

---

[67]  *See generally*, Lycos's Answer & Countercl. (Dkt. No. 11).

[68]  *RLI Ins. Co. v. Wood Recycling, Inc.*, 2006 U.S. Dist. LEXIS 30596, at *5 (D. Mass. March 30, 2006) (Zobel, J.) (setting forth elements of proof for misrepresentation claim).

[69]  *See supra* note 37.

[70]  CSI's Am. Compl., ¶¶ 1, 18-19, 25-26 (Dkt. No. 121); Ex. 9 at *id.*

[71]  *See supra* discussion at notes 22-30 and accompanying text.

Finally, CSI has admitted that Lycos's alleged misrepresentation was nothing more than a "reaffirmation" of a pre-existing and independent obligation to make payments on the equipment schedules through the end of their terms.[72]  CSI could not, as a matter of law, have relied on a reiteration of a pre-existing duty.

### A.    CSI cannot satisfy its burden of demonstrating that, at the time it entered into the Sales Agreement, Lycos did not intend to honor its obligations under the extant equipment schedules.

This Court has previously held that, under Massachusetts law, statements that promise future performance are not actionable as fraud unless the plaintiff can show that "at the time [the defendant] made the statements . . . he did not intend to act as he said he would act in the future."[73]  In *RLI Insurance v. Wood Recycling, Inc.*, this Court wrote:

> the intention of the promissor not to perform an . . . agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into.[74]

CSI must therefore prove that Lycos did not intend to make the remaining approximately $13.8 million in monthly payments "at the time" it entered into the Sales Agreement.[75]  Thus, even if CSI were able to prove that Lycos decided *after* signing the agreement not to make certain payments, that would not suffice to support CSI's fraud claim.[76]  Accordingly, Lycos's cessation of payments after making approximately $13.5 million in payments during the fourteen months after signing the Sales Agreement  -- after the company was sold and the CFO replaced -- is not

---

[72]  Ex. 13 at 216:21-218:2; 258:18-24.

[73]  *RLI Ins.,* 2006 U.S. Dist. LEXIS 30596, at *9.

[74]  *Id.* at **9-10 (quoting *Zhang,* 46 Mass. App. Ct. at 605, 708 N.E.2d at 135).

[75]  *Id.* at at *10 (summary judgment warranted where there was no evidence that statement was false "at the time" it was made); *Zhang,* 46 Mass. App. Ct. at 605; 708 N.E.2d at 135 (same).

[76]  *RLI Ins. Co.,* 2006 U.S. Dist. LEXIS 30596, at **8-10 (the fact that insurer "eventually interpreted" the insurance agreement to warrant non-performance of its prior promise to provide coverage was insufficient to prove that the insurer had fraudulent intent when it made the promise to provide coverage).

proof that Lycos did not intend to make the payments at the time it signed the Sales Agreement.[77] That Lycos paid CSI approximately $13.5 million after that time suggests just the opposite.

Brian Lucy, Lycos's former CFO who signed the Sales Agreement, has testified that Lycos intended to make the payments under the extant equipment schedules at the time he signed that agreement.[78]  Absent evidence creating a genuine issue of material fact concerning Mr. Lucy's testimony, that is the end of the inquiry.  CSI has not established any such evidence.

CSI's only basis for claiming that Lycos did not intend to honor its payment obligations at the time it entered into the Sales Agreement is its own speculation based on an e-mail sent by LeaseForum's Mr. Kirk to Lycos's Ms. Callagee on August 8, 2003.[79]

There are six reasons why that e-mail does not create a genuine issue of material fact or otherwise satisfy CSI's burden of showing that Lycos intended not to make the future lease payments at the time it signed the Sales Agreement, any one of which is sufficient to grant Lycos summary judgment.  First, Mr. Lucy's testimony regarding Lycos's intent at the time it entered into the Sales Agreement, and Ms. Callagee's testimony and August 10th e-mail response to Mr. Kirk's email, establish indisputably that, even as of August 10, 2003, (1) Lycos had not yet agreed to engage LeaseForum for the proposed audit, and (2) LeaseForum had not yet even proposed a price for such work.  Thus, assuming *arguendo* that LeaseForum was doing work on Phase 2, it was doing so without authority or compensation from Lycos.  Indeed, Ms. Callagee's testimony that Lycos did not approve LeaseForum's proposed work "aimed at setting up a negotiation with CSI" until October 8, 2003 is undisputed.[80]

---

[77]  *See id.*; *see also* Restatement (Second) of Torts § 530 cmt.b (1977) ("[O]ne who acts in reliance upon [a statement] cannot maintain an action of deceit if the maker *for any reason changes his mind* and fails or refuses to carry out his expressed intention into effect.") (emphasis added).

[78]  Ex. 3, ¶ 12.

[79]  CSI's Am. Compl., ¶ 44 (Dkt. No. 121).

[80]  Ex. 18 at LYC19440.

Second, LeaseForum sent its draft Statement of Work to Lycos at the earliest on August 13, 2003, *after* Lycos had accepted CSI's offer to sell the equipment, signed the original Sales Agreement, paid CSI the $3.775 million purchase price, and re-signed the Sales Agreement following the correction of minor errors.[81]  Apart from CSI's speculation based on LeaseForums's desire to sell additional services to Lycos, CSI has no basis for demonstrating that Lycos did not intend to make the payments under the existing schedules at either time Lycos signed Sales Agreement.[82]

Third, CSI conveniently omits from its Amended Complaint that *Lycos*, not CSI, proposed to add the statement to the Sales Agreement that Lycos would make the remaining payments under the extant equipment schedules.[83]  By alleging that Lycos did not intend to make the payments required under extant equipment schedules at the time it entered into the Sales Agreement, CSI is arguing that Lycos proposed to make a commitment, one which CSI had not requested, that Lycos had no intention of keeping.  Such speculation defies common sense.

Fourth, even considering the evidence in the light most favorable to CSI, it shows that, as of August 10, 2003 -- two days after Lycos re-signed the Sales Agreement -- Lycos was at most *considering* engaging LeaseForum to investigate the CSI leases.  Lycos's mere contemplation of engaging LeaseForum to investigate the CSI equipment leases at some point in the future falls far short of establishing that Lycos misstated its intent to continue making payments when it signed and re-signed the Sales Agreement days and weeks earlier.[84]

---

[81]  *See supra* discussion at notes 22-33 and accompanying text.

[82]  *See Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir. 2003) (plaintiff "may not rely upon conclusory allegations, improbable inferences, or unsupported speculation to defeat summary judgment").

[83]  *See generally*, CSI's Am. Compl. (Dkt. No. 121).

[84]  *See, e.g., RLI Ins. Co.,* 2006 U.S. Dist. LEXIS 30596, at **9-10. (plaintiff must show that defendant did not intend to perform a future act when the promise was made).

Fifth, even assuming *arguendo* that when Lycos signed the Sales Agreement it contemporaneously thought that it *might* retain LeaseForum to audit the relationship and that the audit *might* later serve as a basis for renegotiating future payments, this would not support a finding that Lycos's statement that it intended to make the remaining monthly payments was fraudulent at the time it was made. Indeed, the plain language of Mr. Kirk's e-mail, the sole piece of evidence on which CSI concocted this theory in the first place, itself proposes nothing more than the prospect of setting up a "negotiation" with CSI.[85] The e-mail does not propose that LeaseForum audit the leases to create the prospect of unilaterally stopping payments to CSI. The prospect of "negotiating" necessarily implies a mutual agreement between CSI and Lycos rather than a unilateral act by Lycos. Even if Lycos had contemplated the possibility of entering into such a negotiation at the time it signed the Sales Agreement – and there is no evidence that it did – there is nothing fraudulent about Lycos seeking to assemble relevant information to determine whether to commence such a negotiation. In light of the outstanding letter of credit, Lycos had no practical ability to act unilaterally in stopping significant payments to CSI. Any reduction in lease payments necessarily required CSI's agreement.

Lastly, as a practical matter, because the Sales Agreement states that Lycos does not become the owner of the leased equipment on a particular schedule until it makes the payments required under that schedule, it would have been nonsensical for Lycos to wire $3.775 million to CSI on August 1, 2003 if Lycos did not intend to make the payments under each schedule because Lycos would have risked receiving nothing in return for those millions. Lycos made that payment, as well as an additional approximately $13.5 million in monthly payments, both of which belie any suggestion of fraudulent intent at the time it entered into the Sales Agreement.

---

[85] Ex. 18.

**B.    CSI cannot satisfy its burden of showing that Lycos intended to deceive CSI into entering into the Sales Agreement by agreeing to make the future monthly payments.**

In its Amended Complaint, CSI contends that:

> [It] reasonably relied to its detriment on Lycos' . . . fraudulent misrepresentations and concealment by, *inter alia,* (a) entering into the Sales Agreement on August 11, 2003, which it would not have entered into but for Lycos' . . . fraudulent misrepresentations and concealment, (b) agreeing, in the Sales Agreement, to an almost one million dollar reduction in its originally quoted price for the equipment, and (c) agreeing, in the Sales Agreement, to sell Lycos large quantities of equipment that CSI had no obligation to sell . . . .[86]

CSI failed to advise the Court that (a) it had offered to sell the equipment to Lycos for $3.775 million before July 14, 2003 with no condition that Lycos reaffirm its pre-existing commitment to make the monthly lease payments, and (b) when Lycos accepted CSI's offer on July 14, 2003, Lycos had not yet proposed to restate its obligation to make the monthly payments.  These facts are undisputed.  Because CSI's offer to sell the equipment for $3.775 million in early-mid July 2003 was not conditioned on and *pre-dated* Lycos's addition of language to restate its obligation to make the monthly payments, Lycos could not, as a matter of law – not to mention common sense – have made the statement concerning payment of the remaining lease payments with the intent to induce CSI to sell it the equipment, reduce the purchase price, or enter into the Sales Agreement because CSI had already agreed to sell Lycos that equipment.[87]  Moreover, that CSI did not require this reaffirmation as a condition to Lycos's acceptance of its offer is no surprise given both this pre-existing duty and the protection already afforded to it by the outstanding letter of credit.

---

[86] CSI's Am. Compl., ¶ 46 (Dkt. No. 121).

[87] *See, e.g., Hodgkins v. N.E. Tel. Co.*, 82 F.3d 1226, 1234 (1st Cir. 1996) (plaintiff "cannot claim to have relied upon" a statement by his employer because the statement was made *after* he had decided to retire); *DSF Investors, LLC v. Lyme Timber Co.,* 19 Mass. L. Rep. 411, 2004 Mass. Super. LEXIS 665, at *53 (Dec. 21, 2004) (Botsford, J.) (misrepresentation claim "must fail for lack of reasonable reliance" to the extent that it was based on statements made *after* parties agreed to terms).

**C.**     **CSI could not, as a matter of law, have relied on the representation because Lycos was already obligated to make the monthly payments under the extant <u>equipment schedules</u>.**

At the time the parties entered into the Sales Agreement, Lycos was under a pre-existing duty to make the monthly rental payments under the extant equipment schedules through the end of their terms.  CSI's counsel on the transaction, Ms. Kersting, has already admitted this:

> Q.     And the obligation to pay rent under those leases predated execution of the sales agreement, right?
>
> [Objection by counsel]
>
> A.     The obligation to pay rent on the leases commenced on the day the leases started and were signed by the parties.[88]

Ms. Kersting also noted that Lycos's obligations under the equipment schedules were not modified or impacted in any way by the Sales Agreement:

> Q.     And the sales agreement did not impose any additional obligation to pay monthly rent under the schedules listed in Paragraph 2, did it?
>
> [Objection by counsel]
>
> A.     The rental remained the same.
>
> Q.     And the number of rental payments remained the same, right?
>
> A.     Yes.[89]

Indeed, when asked by CSI's counsel about paragraph 4 of the Sales Agreement -- the paragraph that addressed Lycos's restatement of its monthly payment obligations -- she testified that she understood Lycos to be "reaffirming" those payment obligations.[90]  Because Lycos's agreement to make the monthly payments merely restated a pre-existing duty, that agreement did not

---

[88]  Ex. 13 at 217:12-18.

[89]  *Id.* at 217:19-218:2.

[90]  *Id.* at 258:18-24.

constitute valid consideration.[91]  As such, CSI could not, as a matter of law, have relied on it in entering into the Sales Agreement.

## II.    Lycos is Entitled to Summary Judgment on Count IV Because it Did Not Breach The Implied Covenant of Good Faith and Fair Dealing by Failing to Make the Final $301,000 in Rent Payments.

CSI contends that Lycos breached the implied covenant of good faith and fair dealing by (a) failing to make the final several payments due under schedules 100 and 200, (b) seeking to coerce CSI to reduce Lycos's payment obligations under the extant schedules and refund other payments already made to CSI, and (c) asserting groundless claims against CSI.[92]  Disposition of this Count hinges on whether, as a matter of law, Lycos engaged in bad faith when it took those actions.[93]  A material breach of contract does not, by itself, rise to the level of a breach of the implied covenant absent "substantial evidence of bad faith."[94]  Bad faith "generally implies or involves actual or constructive fraud or a design to mislead or deceive another.  It is not an action prompted by an honest mistake but rather by some interested or sinister motive."[95]

---

[91]  *See In re Lloyd Carr & Co*., 617 F.2d 882, 890 (1st Cir. 1980) ("the performance of a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is owed to the promisor, or the public at large").  At the time the parties signed the Sales Agreement, Lycos's obligation to make the monthly payments under the pre-existing equipment schedules was not the subject of dispute between CSI and Lycos.

[92]  CSI's Am. Compl., ¶¶ 47-49 (Dkt. No. 121).

[93]  The Master Lease Agreement contains a choice-of-law provision for Missouri law. Ex. 1 to CSI's Am. Compl., ¶18.6 (Dkt. No. 121).  This Court has previously ruled in this case that claims sounding in contract, such as a claim for breach of the implied covenant of good faith and fair dealing, are governed by Missouri law.  Mem. of Dec., at 4 (Dkt. No. 46) (Dec. 6, 2005); Mem. of Dec., at 5 (Dkt. No. 73) (July 11, 2006).  Under Missouri law, claims for breach of the implied covenant of good faith and fair dealing require "substantial" evidence of bad faith.  *Howard v. Columbia Pub. Sch. Dist*., 363 F.3d 797, 805 (8th Cir. 2004); *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. Ct. App. 1996) (same).

[94]  *Howard,* 363 F.3d at 805; *Margolies v. McCleary, Inc*., 447 F.3d 1115, 1125-26 (8th Cir. 2006); *accord Christensen v. Kingston Sch. Comm*., 360 F. Supp. 2d 212, 229 (D. Mass. 2005) ("[C]laims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage.").

[95]  *See Bunge Corp. v. Recker*, 519 F.2d 449, 452 (8th Cir. 1975) (citation and quotation omitted).  In *Bunge,* the court was interpreting a Missouri stature, Mo. Rev. Stat. § 400.2-103(b), that defines "good faith" as "honesty in fact in the observance of reasonable commercial standards of fair dealing in the trade."  This definition is markedly

(continued…)

Here, Lycos's refusal to make the final payments due under schedules 100 and 200 was nothing more than a run-of-the-mill withholding in a contractual dispute. Having received LeaseForum's report indicating that CSI had overcharged it by tens of millions of dollars and having received little cooperation from CSI in trying to resolve the issue, Lycos's new management stopped making payments as a setoff to its damages. In fact, although Lycos is not obligated to prove as such, Lycos's decision to withhold payment was based on its good faith belief that CSI had defrauded it. Accordingly, CSI will not be able to sustain its burden of proving that Lycos acted in bad faith when in it filed a complaint against CSI in Massachusetts Superior Court in December 2003, when it subsequently requested that CSI enter into negotiations with respect to Lycos's future payments obligations, or when it asserted its counterclaims in this case.

Finally, even if Lycos is wrong about the merits of its defense to payment, it is still entitled to summary judgment on CSI's claim for breach of the implied covenant because it acted in good faith.[96] Lycos's ample commitment of time and resources to this litigation underscores its good-faith belief in the validity of its claims and thus contradicts the allegation that it acted in "bad faith" for the sole purpose of avoiding paying $301,000 to CSI; this litigation has cost Lycos more than seven times that amount, and, absent a good faith belief in its claims, the suggestion that Lycos would invest millions of dollars to avoid paying $301,000 is absurd.

---

similar to that which applies under § 205 of The Restatement (Second) of Contracts ("Duty of Good Faith and Fair Dealing").

[96] *See Bunge Corp.*, 519 F.2d at 452 ("an honest mistake" does not amount to bad faith); *Kraus v. Paul Revere Ins. Group,* 129 Fed. Appx. 369, 371 (9th Cir. 2005) (insurer who erroneously contested plaintiff's claim was not liable for breach of the implied covenant due to absence of bad faith)*; Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996) ( "[t]he record supports no conclusion that [defendant] acted with the sort of dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing."); *Scapa Tapes N. Am., Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 561 (D. Conn. 2005) (even if a party's interpretation of a contract proves to be wrong, summary judgment of claim for breach of the implied covenant of good faith and fair dealing was warranted because "there is no evidence that [defendant] interpreted the contract in bad faith").

III.     **Lycos Is Entitled to Summary Judgment on CSI's Abuse of Process Claim in Count V Because There is No Evidence That CSI Used Legal Process to Achieve an Ulterior or Illegitimate Purpose.**

CSI's abuse of process claim is based on its allegation that Lycos filed claims in Massachusetts Superior Court, and counterclaims in this Court, for the "ulterior and illegitimate" purpose of coercing CSI to refund and reduce its monthly payments.[97]  Lycos is entitled to summary judgment because CSI cannot satisfy its burden of showing that Lycos filed claims for an ulterior or illegitimate purpose.[98]

A party is said to have an ulterior or illegitimate purpose when "it is attempting to exact through litigation something other than its due."[99]  Thus, a party claiming abuse of process must show that its opponent's claim was filed with the goal of achieving something other than that for which legal process is intended, such as filing suit to thwart a competitor[100] or instituting a criminal action to collect an unrelated civil debt.[101]  Even a lawsuit that is groundless, or based on untested legal theories, does not constitute an abuse of process without proof that the party filed the claim to gain "a collateral advantage, not properly involved in the proceeding itself."[102]

Here, there is not only a lack of evidence, but a lack of any suggestion that Lycos used legal process to obtain a collateral advantage.  To the contrary, CSI contends that Lycos brought

---

[97]  CSI's Am. Compl., ¶ 52 (Dkt. No. 121).

[98]  *LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 142 (D. Mass. 2007) (granting summary judgment on abuse of process claim due to lack of evidence that defendant acted with ulterior or illegitimate purpose).

[99]  *FD Holding Corp. v. Danbury Bowlarama Corp.*, 2000 U.S. Dist. LEXIS 17284, at *14 (D. Mass. Oct. 13, 2000) (citing *Framingham Auto Sale, Inc., v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418, 671 N.E.2d 963 (1996)).

[100]  *See, e.g., Savin Corp. v. Rayne*, 2001 U.S. Dist. LEXIS 20574, at *4 (D. Mass. April 4, 2001).

[101]  *See, e.g., Fiske v. Town of N. Attleboro*, 22 Mass. L. Rep. 242, 2007 Mass. Super. LEXIS 69, at **32-33 (Feb. 14, 2007).

[102]  *Cohen v. Hurley*, 20 Mass. App. Ct. 439, 442, 480 N.E.2d 658, 660-61 (1985) (quotation omitted); *see also FD Holding Corp.*, 2000 U.S. Dist. LEXIS 17284, at **13-14 ("consistent with the principle that the courts are open to all, a party has the right to test its legal theories in a judicial forum even when its prospects appear to have only the remotest chance of success) (citing *Quaker State Oil Refining v. Garrity Oil Co.*, 884 F.2d 1510, 1514 (1st Cir. 1989)).

its claims to "coerce . . . reductions" and "refunds" on its equipment schedule payments.[103]

Assuming *arguendo* that Lycos filed claims to coerce a settlement whereby CSI would reduce or return a portion of Lycos's payments under the schedules, this would *not* be an attempt to coerce a collateral benefit.[104]  Rather, it would simply be an attempt by Lycos to recover the very same remedy that it has sought through legal process – namely, compensation for the precise claims Lycos has asserted including, without limitation, CSI's violation of chapter 93A and fraud.[105] Because the use of legal process to recover the same remedy that would naturally flow from success in the litigation is not an abuse of process, Lycos is entitled to summary judgment on Count V. [106]

### IV.    Lycos Is Entitled to Summary Judgment on Count VI Because CSI's 93A Claim Fails to the Extent it is Derivative of its Common Law Claims and a Claim for Breach of Contract is Not Cognizable under 93A.

To the extent that CSI's 93A claim is derivative of the foregoing claims, Lycos is entitled to summary judgment on the 93A claim as well because those claims fail as a matter of law.[107]

To the extent CSI is relying on Lycos's failure to make the $301,000 in payments as the basis for its 93A claim, its claim fails as a matter of law for at least two reasons.

---

[103]  CSI's Am. Compl., ¶ 51 (Dkt. No. 121).  This is especially ludicrous given Lycos's willingness to spend millions of dollars to enforce its counterclaims in this litigation.

[104]  *See Broadway Mgmt. Srvs.,Ltd. v. Cullinet Software, Inc.*, 652 F. Supp. 1501, 1503 (D. Mass. 1987) (dismissing plaintiff's claim because the interest plaintiff claimed to be "'ulterior motives' [were] naturally tied up with interests properly part of the [the lawsuit]'"); *accord Tappen v. Ager*, 599 F.2d 376, 380 (10th Cir. 1979) ("[T]he desire . . . to settle the claim should not be considered a collateral purpose outside the scope of litigation.  Indeed, settlement of actions is a positive goal of the courts in order to avoid unnecessary and lengthy litigation.").

[105]  *See* Lycos's Answer to CSI's Am. Compl. and Countercl. at 8-46 (Dkt. No. 122) (Dec. 14, 2006).

[106]  *LaFrenier*, 478 F. Supp. 2d at 142 (summary judgment warranted on abuse of process claim because there was no evidence that defendant had acted with ulterior or illegitimate purpose); *see also Silvia v. Building Inspector*, 35 Mass. App. Ct. 451, 454, 621 N.E.2d 686, 688 (1993) (holding no abuse of process where defendants' "stated and actual objective" was the same; thus there was no "hidden agenda").

[107]  *See, e.g., Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) (summary judgment warranted on 93A because plaintiff's claim was "not even within earshot of a misrepresentation claim"); *Pembroke Country Club, Inc. v. Regency Sav. Bank*, 62 Mass. App. Ct. 34, 40-41, 815 N.E.2d 241, 247 (2004) (rejecting 93A claim that was "wholly derivative" of deficient common law claim).

First, this Court has already ruled that "embroidered contract claims or 93A claims essentially sounding in contract fall within the purview of [the] choice-of-law provision" set forth in the parties Master Lease Agreement.[108]  Thus, CSI cannot assert a 93A claim sounding in contract because the Court has already ruled, based on arguments *it* made, that Missouri law governs such claims.[109]

Second, even if Massachusetts law were to apply, it is well settled that a breach of contract, by itself, is insufficient to warrant liability under 93A.[110]  "To survive summary judgment, it is not enough for a plaintiff alleging breach of contract to sustain its 93A claim with conclusory allegations."[111]  Rather, a party who asserts a 93A claim based on breach of contract must show that the defendant's breach "'rises to the level of 'commercial extortion' or a similar degree of culpable conduct.'"[112]  This same rule applies even if the defendant's breach was "deliberate and for reasons of self-interest"[113] or the grounds for non-performance later proves invalid.[114]  For example, in *Levings v. Forbes & Wallace, Inc.,* the court held that the defendant's failure to make contract payments "[did] not give rise to a c. 93A action" because there was "a bona fide dispute" as to what was owed under the contract.[115]  Likewise, in *Framingham Auto Sales v. Workers' Credit Union*, a bank refused to honor a cashier's check because it had "a

---

[108]  Mem. of Dec. at 5 (Dkt. No. 46) (quotation omitted).

[109]  *Id.*; *see also* CSI's Mem. in Supp. of its Mot. to Dismiss or Summ. J. at 17-18 (Dkt. No. 25) (Mar. 31, 2005).

[110]  *See, e.g., Sunoco, Inc, v. Makol,* 2002 U.S. Dist. LEXIS 8966, at *21 (D. Mass. May 10, 2002) (to survive summary judgment, non-moving party must but forth "definite, competent evidence of improbity"), *aff'd,* 372 F.3d 31 (1st Cir. 2004); *Healthcare Collection Srvs., Inc. v. Protocare Inc.,* 1995 U.S. Dist. LEXIS 2879, at *9 (Zobel, J.) (citing *Whitinsville Plaza v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243, 251 (1979)).

[111]  *Sunoco, Inc*, 2002 U.S. Dist. LEXIS 8966, at *22.

[112]  *Id.* (quoting *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000)).

[113]  *Id.* ("A mere 'failure to perform obligations under a written lease, even though deliberate and for reasons of self-interest, does not present an occasion for invocation of ch. 93A remedies.'") (quoting *Atkinson v. Rosenthal,* 33 Mass. App. Ct. 219, 226, 598 N.E.2d 666 (1992)).

[114]  *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149, 153-54 (1979); *see also Framingham Auto Sales, Inc.,* 41 Mass. App. Ct. at 418, 671 N.E.2d at 965.

[115]  *Levings,* 8 Mass. App. Ct. at 504, 396 N.E.2d at 154.

good-faith belief that it had a meritorious defense" to honoring the check, and the court held that it could not be liable under 93A even though its defense later proved to be invalid.[116]  These cases, and the present case, stand in stark contrast to situations in which a party's breach is done to achieve "a pernicious purpose."[117]

As discussed above, Lycos withheld the final $301,000 in monthly payments only after receiving the report of LeaseForum,[118] after being sold, and after Mr. Lucy was replaced as CFO. Whether Lycos ultimately prevails on its fraud claims is immaterial to assessing its liability under 93A.  Rather, the salient issue is whether Lycos had "a good-faith belief that it had a meritorious defense" to payment.[119]  Based on the LeaseForum report, and the law that would allow it to rescind those schedules on the basis of fraud,[120] it most certainly did.  The record is devoid of any evidence that Lycos's failure to make the final payments resulted from anything other than a bona fide dispute.  Given this lack of evidence, Lycos is entitled to summary judgment on CSI's 93A claim.[121]

**V.    If the Court Grants Lycos's Summary Judgment Motions and its Motion to Dissolve Trustee Process Attachment, Lycos Would Not Object to the Court Setting Off the $301,050 CSI Seeks in Count I Against the Amounts Owed to It.**

CSI admits that Lycos made all payments required under all of the schedules other than the final payments due under schedules 100 and 200.[122]  Lycos admitted when it filed its Answer less than thirty days after this case was filed that it had not paid the remaining amounts due on

---

[116]  *Framingham Auto Sales, Inc.,* 41 Mass. App. Ct. at 417; 671 N.E.2d at 965.

[117]  *Id.* at 418; 671 N.E.2d at 965 (defendant "can hardly be branded unethical, oppressive, or unscrupulous" for attempting to minimize the impact of another person's fraud).

[118]  *See supra* Part II (breach of the implied covenant of good faith and fair dealing).  Moreover, the tremendous resources that Lycos has devoted to litigating its fraud claims, as compared with the amount at issue ($301,050.34), undercuts CSI's speculation that Lycos lacked a good-faith basis for believing it was defrauded.

[119]  *Framingham Auto Sales, Inc.,* 41 Mass. App. Ct. at 417; 671 N.E.2d at 965.

[120]  Mem. of Dec. at 5 (Dkt. No. 46).

[121]  *See, e.g., Sunoco, Inc.,* 2002 U.S. Dist. LEXIS 8966, at *21 (summary judgment warranted on 93A due to lack of evidence that contract breach was done with culpable intent).

[122]  *See supra* note 37.

those schedules.[123]  While this Court has already held that Lycos would have the right to rescind

these schedules if it were to prevail on its fraud claims,[124] if the Court grants (A) Lycos's Motion

for Partial Summary on Certain of its Claims in Counts VII, XII, and XIII, (B) Lycos's Motion

for Summary Judgment as to Counts III-VI of CSI's Amended Complaint; and (C) its Motion to

Dissolve Trustee Process Attachment,[125] both filed herewith, Lycos would have no objection to

the Court granting CSI summary judgment on Count I in the amount of $301,050.34, plus

statutory interest thereon, *provided* the Court offsets that against the amount awarded to Lycos

on its claims against CSI.

CSI has also requested payment of its reasonable attorneys' fees and costs.  While the

Master Lease Agreement affords CSI the right to recover those fees arising from Lycos's failure

to perform under that agreement, Lycos admitted in its Answer, filed less than thirty days after

commencement of this case, that it did not pay the last few payments on each of schedules 100

and 200.[126]  Accordingly, CSI has not had to incur any expenses, including reasonable attorneys'

fees, in recovering those amounts other than fees and expenses necessary to file the Complaint in

this action.  Lycos has no objection to the Court setting off CSI's reasonable attorneys' fees

incurred in filing the Complaint that commenced this action from Lycos's damages award.

## VI.    Lycos Is Entitled to Summary Judgment on Count II Because Lycos Will Have Made All the Payments Under All The Equipment Schedules if the Court Credits CSI the Amount Claimed Under Count I.

Count II is duplicative of Count I in that CSI is seeking damages and attorneys' fees

under the Sales Agreement arising from Lycos's failure to pay amounts due under schedules 100

---

[123]  Lycos's Answer, ¶¶ 19, 26, 29 (Dkt. No. 11) (Mar. 22, 2005).

[124]  Mem. of Dec. at 5 (Dkt. No. 46).

[125]  CSI obtained a trustee process attachment in the amount of $310,000 at the outset of this case. *See* Electronic Order granting CSI's Mot. For Trustee Process, Dkt. No. 2 (Jan. 5, 2005).

[126]  Lycos's Am. Answer, ¶¶ 19, 26, 29 (Dkt. No. 19); Lycos's Ans. to CSI's Am. Compl. and Countercl., ¶¶ 19, 26, 29 (Dkt. No. 122).

and 200.[127]  In Count II, CSI also seeks the right to repossess the equipment subject to the Sales

Agreement.[128]

 The Sales Agreement repeatedly states that, upon receipt of the monthly lease and tax

payments, title to the equipment will automatically pass to Lycos free and clear of all liens and

encumbrances:

- Paragraph 1 states in pertinent part: "Buyer agrees to buy and Seller
  agrees to sell all but not less than all of the items of equipment leased to
  Buyer under the Existing Schedules . . . effective on their respective
  termination dates, except as stated in paragraph 5 below . . ."[129]

- Paragraph 2 states lists the "Terminate Date" for each schedule and
  provides in pertinent part: "Each Lease will terminate on its respective
  Terminate Date, provided Buyer has then fulfilled all its obligations under
  the applicable Lease including, but not limited to, its obligation to timely
  make the Remaining Rental Payments (as defined in Section 4 below) and
  to pay any and all other charges arising under the Lease."[130]

- Paragraph 5 states in pertinent part: "With respect to each Lease, Seller
  retains full title to the Equipment until its respective Termination Date."[131]

- In Paragraph 7, CSI warranted that (i) on termination of the applicable
  Lease, except as noted in paragraph 5 above, and provided Buyer has paid
  the full sales price hereunder, Seller will pass to Buyer title to the
  Equipment free and clear of all liens, claims and encumbrances of any kind
  except those caused or incurred by Buyer, if any . . ."[132]

 Again, CSI has admitted that Lycos made all payments required under all schedules other

than 100 and 200.[133] Thus, title passed to Lycos long ago with respect to the equipment on all of

the schedules other than 100 and 200.[134] As Lycos is prepared to pay CSI the unpaid amounts on

---

[127]  CSI's Am. Compl., ¶¶ 36-41(Dkt. No. 121).

[128]  *Id.*

[129]  *Id.* at Ex. 10, ¶ 1.

[130]  *Id.* at ¶ 2.

[131]  *Id.* at ¶ 5.

[132]  *Id.* at ¶ 7.

[133]  *See supra* note 37.

[134]  Ex. 10 to CSI's Am. Compl., ¶¶ 4-5 (Dkt. No. 121).

those schedules as an offset to the amount of damages requested by Lycos in its summary judgment counterclaims, Lycos will become the owner of that equipment upon implementation of that offset.  Thus, Lycos is entitled to summary judgment on Count II as well.

## **CONCLUSION**

For the foregoing reasons, Lycos respectfully requests that the Court allow Lycos's Motion for Summary Judgment on All Counts of CSI's Amended Complaint.

LYCOS, INC.


Dated: September 4, 2007                    /s/ Thomas O. Bean
                                            Thomas O. Bean (BBO# 548072)
                                            Peter M. Acton, Jr. (BBO# 654641)
                                            McDERMOTT WILL & EMERY LLP
                                            28 State Street
                                            Boston MA 02109
                                            (617) 535-4000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of September, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

<u>/s/ Peter M. Acton, Jr.</u>
Peter M. Acton Jr.