UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| LYCOS, INC., ) | C.A. No. 05-10017- RWZ |
| Defendant, ) | |
| ) | **REDACTED—LEAVE TO FILE** |
| BANK OF AMERICA f/k/a FLEET BANK, ) | **UNREDACTED STATEMENT** |
| ) | **UNDER SEAL GRANTED** |
| Trustee Process Defendant. ) | **JULY 23, 2007** |

**LYCOS'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS WITH RESPECT TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS IN COUNTS VII, XII, AND XIII OF ITS COUNTERCLAIM**

In accordance with Local Rule 56.1, Lycos, Inc. ("Lycos"), sets forth the following Statement of Undisputed Material Facts in connection with its Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII and XIII of its Counterclaims.

For ease of reference, Lycos has divided this Rule 56.1 Statement into five sections because some facts are material to some of Lycos's claims but not others.

**I.   Count VII: Violation of 940 C.M.R. 3.05(1) and 3.16(2) and M.G.L. c. 93A, §§ 2 and 11**

   A.   Undisputed Facts Material to Lycos's Claim that CSI Violated 940 C.M.R. 3.05(1) and 3.16(2) and thus M.G.L. c. 93A, §§ 2 and 11

   1.   When Lycos and CSI entered into a Master Lease Agreement in December 1996 (the "Master Lease Agreement"),[1] CSI had been in the computer equipment leasing business for almost twenty-five years.[2] Lycos was a less than two-year-old Internet company based in Massachusetts.[3]

---

[1] CSI's First Am. Compl., ¶ 11 (Dkt. No. 121) (Dec. 4, 2006); Ex. 1 to CSI's Am. Compl. at 1 (Dkt. No. 121).

2. While the person at Lycos responsible for leasing changed many times during the parties' seven-year relationship,[4] CSI had a single account executive for Lycos the entire time: Paul Stenberg.[5] Mr. Stenberg had more than fifteen years experience in computer equipment sales and leasing at the time the relationship began.[6]

3. Mr. Stenberg operated out of CSI's offices in Newton and Needham, Massachusetts.[7] He communicated regularly with Lycos personnel in Massachusetts and delivered lease documents to Lycos there.[8] Lycos executed lease documents in Massachusetts and made payments to CSI from Massachusetts banks during the parties' relationship.[9]

4. During their relationship, CSI and Lycos executed a Master Lease Agreement[10] and approximately 125 equipment schedules with respect thereto.[11] Pursuant to these documents, CSI leased to Lycos over 6,000 pieces of computer-related equipment[12] between 1997 and 2005.[13] The Master Lease Agreement contemplates the execution of one or more equipment schedules incorporate by reference the terms of the Master Lease Agreement, list the specific equipment being

---

[2] Ex. 1 at 14:2-10. The reference to exhibit numbers in this 56.1 statement are to the exhibits attached to the Affidavit of Thomas O. Bean, filed herewith.

[3] Ex. 4 at PHIL000241.

[4] Ex. 50 at 33:15-35:22; Ex. 7 at 26:10-27:11; Ex. 8 at 136:24-137:7; Ex. 9 at 27:17-28:7; Ex. 10 at 48:16-19, 55:4-15; *see infra* note 15.

[5] Ex. 50 at 29:20-30:13.

[6] Ex. 50 at 16:22-19:2.

[7] Ex. 50 at 22:14-22.

[8] Ex. 6, ¶ 5; Ex. 11, ¶ 5 ; Ex. 12, ¶ 13.

[9] *See supra* note 8.

[10] Ex. 1 to CSI's Am. Compl. (Dkt. No. 121).

[11] Ex. 51, ¶ 5 and Exhibit B thereto.

[12] Ex. 13 at CSI0027499-564 and Ex. 14 at CSI0027657-740.

[13] Ex. 15 at CSI000236 (initial term commencing January 1, 1997); Ex. 16 at CSI0023528 (initial term of 36 months commencing May 1, 2002).

leased pursuant to that schedule, and contain other terms such as monthly rent and the term of the schedule.[14]

5. Forty-four of the approximately 125 schedules were refinancings of earlier schedules.[15] Many of these refinancings were themselves refinancings of earlier refinancings.[16]

6. The forty-four refinanced schedules were numbered 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69C, 69E, 69G, 69I, 85, 86, 89, 89A, 90, 93, and 94 (individually and collectively, the "Refinanced Schedules".)[17] As part of these refinancings, equipment from a single schedules was sometimes split into two or more separate schedules, and equipment from two or more schedules was sometimes combined on a single schedule. Attached as **Exhibit C** to the Affidavit of Bruce D. Smith,[18] which is being filed herewith, is a flow chart that shows the history of financings and refinancings of Lycos equipment schedules including the splitting and combining of equipment described above.

7. At the time of the refinancings, CSI told Lycos it its new monthly payment would be[19]--almost always an amount lower than it had been on the schedules being refinanced[20]--and that Lycos would be able to retain the equipment for an extended term.[21] With respect to at least certain

---

[14] CSI's Am. Compl., ¶ 11 (Dkt. No. 121); Ex. 1 to *id*.

[15] Ex. 51, ¶ 5 and Exhibit B thereto.

[16] *Id.*

[17] *Id.*

[18] Ex. 51.

[19] Ex. 64; Ex 50 at 258:13-263:19; Ex. 20 at 81:22-82:2. *Compare* the $36,514.00 monthly rent on the terminating schedule 69D (Ex. 21 at CSI0012816, ¶ 2) with the $34,672.00 monthly rent on the refinanced schedule (Ex. 21 at CSI0012803); *compare* the $129,978.99 monthly rent on schedule 83 (Ex. 22 at CSI0007677, ¶ 2), *with* the $106,548.00 monthly rent on schedule 89 (Ex. 22 at CSI0007659).

[20] *See supra* note 19.

[21] *See* supra note 19.

schedules, Lycos expected that it would pay slightly more over the life of a refinanced schedule because it had use of the equipment for a longer period of time thus resulting in it paying more interest.[22]

8.  What Lycos did not expect,[23] and what CSI did not disclose,[24] was that CSI embedded a mark-up in the monthly payments on almost every refinancing.[25] ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄.[26] CSI internal accounting records show that CSI marked-up[27] the amounts of the monthly payments on the Refinanced Schedules such that the value of each of the Refinanced Schedules (i.e., the present value of the payments plus the present value of the residual of the equipment, the amount CSI expected to realize at the end of the lease term), exceeded the value of the terminating schedules (i.e., the present value of the payments plus the present value of the residual.)[28] Using the language of a loan, the outstanding principal balance of the loan as of the moment *after* the refinancing *exceeded* the outstanding principal balance as of the moment *before* the refinancing even though no points, fees, or mark-up was disclosed.

9.  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄.[29]

10. The internal refinancing process at CSI was such that CSI knew it was charging Lycos ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ not only before each refinanced equipment schedule was signed, but before it was even prepared. That process worked as follows:

---

[22] Ex. 23 at LYC24633; Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[23] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[24] *See supra* note 23.  Ex. 50 at 258:13-263:19; Ex. 65 at 522:23-524:2.

[25] Ex. 51, ¶¶ 8-30 and Exhibit G thereto, column "C".

[26] Ex. 65 at 521:12-522:13.

[27] Ex. 51, ¶ 12 and discussion, *infra*.

[28] Ex. 51, ¶ 12.

[29] Ex. 65 at 521:12-522:13.

- 5 -

      a.    When an account executive such as Mr. Stenberg asked for pricing on a refinancing, CSI would calculate a ▇▇▇▇▇▇▇▇▇▇,"[30] i.e., ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."[34]

      b.    Mr. Stenberg would then, in his words, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[35] If it appeared the refinancing would proceed, Mr. Stenberg would complete the ▇▇▇▇▇▇ of a form called Request for Contract.[36] Among other things, he would fill in the boxes entitled ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."[39]

---

[30] Ex. 87 at 160:24-161:8.

[31] Ex. 52 at CSI44229-232; Ex. 53 at CSI44265-268, Ex. 54 at CSI44303-306; Ex. 55 at CSI44340-343; Ex. 56 at CSI44376-379.

[32] Ex. 87 at 40:5-16.

[33] Ex. 98 at 101:2-6.

[34] On a new equipment schedule, CSI determines this threshold by deducting the "equity in," i.e., the present value of the residual value (Ex. 98 at 101:2-6) from the hardware costs. *Id.* at 122:24-123:2.

[35] Ex. 65 at 521:12-522:13.

[36] Ex. 50 at 82:15-20; Ex. 42 at 37:13-38:21. Copies of certain Requests for Contract are attached as Ex. 88; Ex. 89; Ex. 90; Ex. 91; Ex. 92.

[37] Ex. 98 at 123:14-17. While Mr. Cagney testified that "Total threshold PV" also included "soft costs," such as software, freight, and installation (*Id.* at 123:7-9), there were no soft costs on the Lycos refinanced schedules because the equipment was already installed (e.,g., Ex. 41 at CSI0005632, ¶ 6) and no new equipment was added (*e.g.*, Ex. 22 at CSI0007677, ¶ 2).

[38] Ex. 65 at 491:7-14.

[39] *Id.* at 491:18-21. The "actual margin" equals the actual present value of the rents minus the Total Threshold PV. Ex. 98 at 123:18-20.



      c.      After completing the RFC, Mr. Stenberg would send it to Ms. Kersting or someone in the legal department,[40] who would circulate it for approval.[41]  If the request were approved, someone in the legal department would then prepare the lease contract.[42]

      10.      Because ███████████████████████████████████████████████ " before each refinanced schedule was prepared, and thus before it was executed, ███████ :

the present value of the rents on the new schedule(s) $>$ the present value of the remaining rents plus the present value of the estimated residual value on the schedule(s) being refinanced, minus the present value of the residual on the new schedule(s)

      11.      In addition, because ████████████████████████████████████████████ ████████████████████████████████████ the approximate magnitude of the mark-up before the CSI legal department even prepared an equipment schedule.

      13.      Lycos would not have entered into any of the Refinanced Schedules on the terms that it did if CSI had told it about the mark-ups.[44]

      14.      CSI's failure to disclose the mark-ups took place in the business context.[45]

---

[40] *Ex.* 42 at 37:13-38:16.

[41] *Id.* at 41:21-42:7.

[42] *Id.* at 42:18-43:1. *See* Ex. 50 at 82:4-20.

[43] *Ex.* 65 at 491:18-21.

[44] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[45] CSI's Am. Compl. (Dkt. No. 121) ¶ 7, 11 (Dec. 4, 2006) (describing CSI and Lycos as businesses and stating Lycos leased equipment from CSI for business purposes); Ex. 6, ¶ 3; Ex. 11, ¶ 3; Ex. 12, ¶ 8.

B.  Undisputed Facts Material to Lycos's Claim for Actual Damages

1. Lycos paid CSI more than $72 million in rent payments[46] on account of equipment that had an original acquisition cost of approximately $45 million.[47] Over $45.5 million of these monthly payments (more than 63% of the total monthly payments) were made pursuant to the Refinanced Schedules.[48] Of the over $27 million difference between the approximately $45 million original acquisition cost and more than $72 million in monthly payments, more than $13.708 million resulted from CSI's undisclosed mark-ups on the Refinanced Schedules.[49]

2. A chart presenting the amount of the mark-up, by Refinanced Schedule, along with a column from CSI's journal entries headed "gross profit," is attached to the Affidavit of Bruce D. Smith, filed herewith, as **Exhibit G**. On many occasions, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ equaled the precise amount of "mark-up" calculated by Lycos's expert.[50]

C.  Additional Undisputed Facts Material to Lycos's Claim for Multiple Damages Under M.G.L. c. 93A, § 11

1. Mr. Stenberg was compensated primarily on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[51] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[46] Ex. 17 at Response No. 3.

[47] Exhibit A to Ex. 66.

[48] Ex. 51, ¶ 34. For a detailed breakdown, *see id.* at Exhibit G thereto.

[49] *Id.*

[50] For example, CSI's recorded ▮▮▮▮▮▮▮▮▮▮" and Lycos's expert's determination of the amount of the mark-up were the same on, among other schedules 60, 61, 66, 66A, 67, 68, 68A, and 68B. *Compare* the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ for these schedules at Ex. 99 with Exhibit G to Exhibit 51. For the schedules that were rewritten just a few months into their existence, because CSI combined the booking of the original schedules with that of the refinancing, the ▮▮▮▮▮▮▮▮▮▮ does not equal the amount of the mark-up. Instead, the ▮▮▮▮▮▮▮▮ includes any interim rent, the mark-up on the original schedule, and the mark-up on the refinance schedule. *See* Ex. 51, ¶¶ 19-26.

[51] Ex. 52; Ex. 53; Ex. 54; Ex. 55; Ex. 56.

███████████████████████████████████████.[52] This commission plan applied both to the lease of new equipment as well as to the refinancing of used equipment already under lease.[53] Accordingly, every time a customer refinanced an equipment schedule, Mr. Stenberg would earn another commission on equipment that was already under lease.[54] During the period from July 1, 1999 through June 30, 2001, CSI also provided Mr. Stenberg ███████████████ ██████████████████████████████████████████████████[55] ██ ████████████████████████████████████[56] Mr. Stenberg also earned commissions when CSI sold equipment to one of his customers that had been under lease based on the extent to which the price for which CSI sold the equipment exceeded his "threshold" set by CSI.[57]

2.  Within months after the ████████████████████████████████,[58] Mr. Stenberg asked CSI's co-CFO █████████████████████ ███████████████████████████.[59]

3.  ███████████████████████████████████████████ ███████████████████████████████████████████

---

[52] Ex. 98 at 102:11-22; Ex. 52 at CSI44229, CSI44232, CSI44241; Ex. 53 at CSI44260, CSI44268, CSI44277; Ex. 54 at CSI44303-304, CSI44315; Ex. 55 at CSI44340-341, CSI44352; Ex. 56 at CSI44376-377, CSI44388; Ex. 57 at CSI044468, CSI044477, CSI044482; Ex. 58 at CSI044470, CSI044497, CSI044502.

[53] *See supra* note 52. *Compare* list of Refinanced Schedules in Ex. 51, ¶ 5 and Exhibit B thereto *with* commissions earned per schedule at Ex. 59 *and* Ex. 51 at Exhibit L thereto.

[54] *See supra* note 53.

[55] Ex. 55 at CSI44364; Ex. 56 at CSI044399-400.

[56] Ex. 60.

[57] Ex. 52 at CSI44229-232, CSI44235; Ex. 53 at CSI44268-271; Ex. 54 at CSI44306-310; Ex. 55 at CSI44341, CSI44343; Ex. 56 at CSI44379-383; Ex. 57 at CSI044483; Ex. 58 at CSI0044502-503. *See* Ex. 63.

[58] Ex. 55 at CSI44364; Ex. 50 at 20:1-5.

[59] Ex. 60 at CSI0041994.

[60] Ex. 71 at CSI0041902, CSI0041904-905 (column "TH"); Ex. 72; Ex. 29 at 55:2-8; 69:19-24.

██████████████████████████████████████████████████████.[61] When Mr. Stenberg asked that a chart be prepared for Lycos showing the effect of the refinancings, however, he asked that the chart list ████████████████████████████████████████████

██████████████[62] The chart did not disclose the existence of millions of dollars in mark-ups charged on those refinancings.[63]

4.   Soon thereafter, CSI and Lycos refinanced, in the words of CSI's co-CFO, ██████

████████████████████████,"[64] In addition to resulting in millions of dollars of mark-ups for CSI, Mr. Stenberg earned ██████████████████████████████████████████████ on these refinancings.[65]

5.   Mr. Stenberg himself that addressed the role of refinancing as part of CSI's business in an e-mail he wrote to CSI managers that he called his "████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Mr. Stenberg even cited Lycos in this e-mail ████████████████████████████████████████████████.[67]

6.   According to CSI's website in effect during all or a portion of the parties' relationship, CSI's customers "trust [it] to manage the leasing process efficiently and ethically, while

---

[61] Ex. 71 at CSI0041902 (column PVLP@7%); Ex. 87 at 40:5-16. *See also* Ex. 98 at 67:6-14; 85:1-86:2; Ex. 87 at 40:5-16.

[62] Ex. 29 at 119:20-120:23 (chart prepared for Lycos); Ex. 73 (notes of conversation between Ms. Kopitsky and Mr. Stenberg concerning chart for Lycos); Ex. 64 (chart provided to Lycos). *Compare* Ex. 64 (provided to Lycos) *with* Ex. 72 (provided to Mr. Stenberg/CSI).

[63] See Ex. 64. *Compare* schedules identified in Ex. 64, *with* Ex. 51 at Exhibit G thereto; *see* Ex. 29 at 120:4-23.

[64] Ex. 70; *see supra* notes 56 and 57.

[65] *Compare* schedules identified on Ex. 64, *with* Ex. 59, at CSI44442 *and* Ex. 51 at Exhibit L.

[66] Ex. 61 at CSI0042468.

[67] *Id.*

catering to their own unique needs."[68]  CSI's chairman also testified that he expected the company's account executives to conduct themselves with "honesty, integrity, forthrightness, and dignity."[69] Notwithstanding that, when Lycos asked him in deposition whether CSI gives any information to a customer in connection with a refinancing other than the new monthly rate and the new term he responded: "It depends – it depends on what they ask for."[70] ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[71]

7. As a result of these "infamous" refinancings,[72] of the more than ██████ in ██████ Mr. Stenberg earned on the Lycos equipment schedules alone,[73] he reaped more than ████████████████████████ from refinancings.[74]

8. In July 2001, ████████████████████████████.[75] Employees promoted to this position at CSI typically ████████████████████████ ████████████████████████████████████.[76]  A few months later, CSI and Lycos entered into what CSI referred to internally as the ██████,"[77] – a refinancing of over thirty schedules, almost all of which themselves had previously been refinanced[78] – onto two new

---

[68] Ex. 2, second page; Ex. 3 at IA000040.  For ease of reference, Lycos has bates numbered the Internet Archive affidavit.

[69] Ex. 1 at 119:20-120:1-9.

[70] Ex. 20 at 82:22-83:12.

[71] Ex. 69.

[72] CSI's co-CFO referred to Mr. Stenberg's refinancings with Lycos as "infamous." Ex. 30 at CSI0041088.

[73] Ex. 51, ¶ 49 and Exhibit L thereto; *see* Ex. 59.

[74] *Id.*

[75] Ex. 57 at CSI044468.

[76] Ex. 50 at 177:17-23.

[77] Ex. 68.

[78] Ex. 13 at CSI0027565, ¶ 2; Ex. 14 at CSI0027741, ¶ 2; Ex. 51 at Exhibit B.

schedules known as schedules 93 and 94.[79]  CSI developed a structure that terminated some schedules early and caused some, but not all, of the equipment to roll onto schedule 94 immediately while allowing other schedules to run their term until rolling onto schedules 93 and 94 more than a year later.[80]  CSI's co-CFO himself described the structure and the documents evidencing this refinancing in an internal CSI email as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇."[81]  Mr. Stenberg, who earned the highest possible scores on his performance evaluations for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ gaining the trust of the decision-maker at his customers,[82] made over $▇ million dollars in commissions on the refinancing of schedules 93 and 94 alone.[83]

9.   A few months after the commencement of schedules 93 and 94, Lycos discovered what appeared to be a more than $11 million increase in the gross payments it would be required make under those schedules as compared with the amounts it would have been required to make had it not refinanced.[84]  In response, Lycos's Chief Financial Officer, Brian Lucy,[85] wrote an e-mail to Mr. Stenberg in which he said:

> I would expect a slight increase in our O[ut]/S[tanding] commitment,[86] but this is a problem that would need to be rectified in short order.  If these numbers are in fact correct, I would have to ask to unwind the refinancing.[87]

---

[79] *See supra* note 78.

[80] *See supra* note 79.  Ex. 98 at 164:22-165:9.

[81] Ex. 68.

[82] Ex. 74 at CSI044215 (under headings "Technical-Equipment" and "Financial-Leasing"); CSI044216 (under heading "Builds and Maintains Relationships through Professional and Social Skills"); Ex. 75 at CSI044219-220 (same); *see* Ex. 74 at CSI044212.

[83] Ex. 59 at CSI44451-452; Ex. 51 ¶ 49 and Exhibit L thereto.

[84] Ex. 31 at LYC24612 (Bracket B).

[85] Ex. 11, ¶ 1.

[86] Ex. 32 at 35:1-4.

[87] Ex. 23 at LYC24633.

10. Mr. Stenberg responded in an e-mail to Mr. Lucy assuring him that this was not the amount of the difference, in which he wrote:

This is what I have so far so you can rest easy.

| | |
|---|---|
| Present Value of Lease | $23,727,000 |
| Obligation of old Leases | $20,215,000 |
| Difference | $ 3,512,000[88] |

11. Mr. Lucy, who had no background in equipment leasing and trusted Mr. Stenberg, did not pursue the matter further.[89]

12. Yet, contrary to Mr. Stenberg's representation, the gross difference in the amount of the payments on schedules 93 and 94 exceeded the payments on the schedules refinanced by almost $10.5 million.[90] CSI's internal accounting records also reveal that regardless of whether one used the ▊▊▊▊▊▊▊▊ Mr. Stenberg had used when he requested that CSI write schedules 93 and 94,[91] or the ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ the $3.5 million he represented to Lycos.[92]

13. Two leasing experts Lycos retained during the course of its relationship with CSI – both of whom issued written reports to Lycos – did not uncover the existence of or CSI's methodology for implementing the mark-ups.[93] Lycos uncovered them only through an expert with

---

[88] Ex. 46 at LYC24631.

[89] Ex. 11, ¶ 7; Ex. 33, ¶ 16.

[90] Ex. 51, ¶¶ 36-41.

[91] Ex. 51, ¶ 38, which refers to the Requests for Contract found at Ex. 76; Ex. 77.

[92] Ex. 51, ¶¶ 36-41.

[93] Ex. 51, ¶¶ 31-33; *see generally* Ex. 24; Ex. 25.

a Ph.D. in mathematics and twenty-eight years of experience in equipment leasing who spent hundreds of hours reviewing CSI's internal financial records and other material in this case.[94]

14. The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules[95] and approximately double its average rate of return on its equipment leases generally.[96]

15. When CSI later sold the equipment to Lycos, Mr. Stenberg earned yet another commission, an additional ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[98]

## II.   Counts XII-XIII – Unjust Enrichment and Money Had and Received

A. Undisputed Facts Material to Lycos's Claim that CSI is Liable to it Under Theories of Unjust Enrichment and Money Had and Received

1. The Master Lease Agreement provides, in pertinent part:

Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other right that Lessee may have against Lessor.[99]

2. In construing this clause, CSI argued earlier in this case that:

These types of clauses, known as 'hell or high water' provisions . . . require the lessee to make payments under the lease 'come hell or high water,' without regard

---

[94] *Compare* Lycos's Am. Answer and Countercl. (Dkt. No. 122) in which Lycos makes no reference to the mark-ups, *with* Response Nos. 1 and 2 to Lycos's Ans. to First Set of Inter. Ex. 2 to Dkt. No. 109 (Oct. 31, 2006), in which Lycos discusses the mark-ups at some length. Ex. 51, ¶¶ 1-4.

[95] Ex. 51, ¶ 35.

[96] *Compare* rate of return on refinanced schedules (approximately 26%, Ex. 51, ¶ 35 and Exhibit I thereto), *with* CSI's usual rate of return (12 to 15%). Ex. 1 at 104:11-20.

[97] Ex. 51, ¶ 50. Mr. Stenberg earned a 15% commission (Ex. 63) on the difference between the sales price of $3,775,000 (Ex. 10 to CSI's Am. Compl.) and the $350,000 threshold established by CSI (Ex. 19).

[98] Ex. 100 at CSI0042454.

[99] Ex. 1 to CSI's Am. Compl., ¶ 5 (Dkt. No. 121).

to defenses that the lessee might wish to assert against the lessor, and without any right of recoupment.[100]

3. Pursuant to equipment schedules 93 and 94 dated November 1, 2001, Lycos and CSI refinanced the equipment on thirty-one equipment schedules.[101] Those schedules expired by their terms on October 31, 2003 and October 31, 2004, respectively.[102]

4. CSI maintained sales type lease journal entries in accordance with Financial Accounting Standards 13 ("FASB 13").[103] Under FASB 13, CSI's "estimated residual value" was to equal the equipment's expected "fair value" at the end of the lease term.[104] FASB 13 defines "fair value" as the "price for which the property could be sold in an arm's-length transaction between unrelated parties."[105]

5. At the time CSI booked equipment schedules 93 and 94, it recorded an estimated residual value in accordance with FASB 13 of zero dollars for that equipment as of the end of their terms.[106]

6. In Summer 2003, CSI and Lycos entered into a Sales Agreement pursuant to which CSI sold to Lycos all of the equipment on thirteen equipment schedules, including schedules 93 and 94, on the terms set forth in that agreement including, without limitation, an up-front payment of $3.775 million.[107]

---

[100] CSI's Mem. in Supp. of Mot. Dismiss Def.'s Countercl. at 3 (Dkt. No. 16) (March 10, 2005).

[101] Ex. 13 at CSI0027498, CSI0027565, ¶ 2; Ex. 14 at CSI0027656, CSI0027741, ¶ 2; Ex. 51 at Exhibit B.

[102] *See supra* note 99.

[103] Ex. 43 at 133:6-9.

[104] Ex. 45, ¶ 5(h).

[105] *Id.*, ¶ 5(c).

[106] Ex. 51 at Exhibit K thereto, column headed "residual"; Ex. 98 at 154:12-16, 299:15-23; Ex. 83; Ex. 84. The booked present value of the residual value on the sales type lease journal entry for schedules 93 and 94 is blank because the residual value on an undiscounted basis (account code 12520) is $0. Ex. 98 at 154:9-11.

[107] Ex. 10 to CSI's Am. Compl., ¶¶ 1-5 (Dkt. No. 121).

    **B.**     **Undisputed Facts Material to Lycos's Claim for Damages Under Theories of <u>Unjust Enrichment and Money Had and Received</u>**

    1.     Lycos paid to CSI all the amounts due under equipment schedules 93 and 94.[108]

    2.     Lycos paid to CSI the $3.775 million due under the Sales Agreement on August 1, 2003.[109]

    3.     The Sales Agreement covered thirteen equipment schedules numbered 64F, 66I, 67H, 69I, 85, 86, 89, 89A, 90, 93, 94, 100 and 200 (the "Thirteen Schedules").[110]

    4.     Apportioning the payment of $3,775,000 to the thirteen schedules in accordance with the value of the lease as represented by the present value of the remaining rents plus the present value of the residual as of August 1, 2003 (the date of the first rent payment following the date of the Sales Agreement) reveals that 75.618603% of this amount is attributable to schedules 93 and 94 together with the six schedules that subsequently rolled into 93 and 94.[111]

    5.     Multiplying this apportionment percentage times the total payment of $3,775,000, reflects that Lycos paid $2,854,602 in connection with such schedules.[112]

LYCOS, INC.

Dated: September 4, 2007

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

---

[108] Ex. 18 at 450:5-10; CSI's Am. Compl., ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121) (seeking to recover only for non-payment on schedules 100 and 200).

[109] Ex. 39; Ex. 86 at 179:19-22.

[110] Ex. 10 to CSI's Am. Compl., ¶¶ 2, 5 (Dkt. No. 121).

[111] Ex. 51, ¶¶ 45-46 and Exhibit K thereto.

[112] *Id.*

- 16 -

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 4th day of September, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.


                                    /s/ Peter M. Acton, Jr.
                                    Peter M. Acton Jr.