# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) | |
| Plaintiff, | ) | C.A. No. 0-510017-RWZ |
| v. | ) | **LEAVE TO FILE MEMORANDUM OF UP TO THIRTY PAGES GRANTED JUNE 13, 2007** |
| LYCOS, INC., | ) | |
| Defendant, | ) | **REDACTED—LEAVE TO FILE UNREDACTED MEMORANDUM UNDER SEAL GRANTED JULY 23, 2007** |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| Trustee Process Defendant. | ) | |

## LYCOS'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS IN COUNTS VII, XII, AND XIII OF ITS COUNTERCLAIM

This case is about an experienced leasing company, Computer Sales International, Inc. ("CSI"), that defrauded a less than two-year-old internet company, Lycos, Inc. ("Lycos"), out of millions of dollars through, among other things, the use of undisclosed "mark-ups" on the repeated refinancing of equipment leases. When Lycos filed its counterclaim in this action against CSI in early 2005, it did not know precisely how CSI had extracted from it over $75.775 million to lease, and then buy, computer equipment that had an original cost of approximately $47 million.[1] Only through an equipment leasing expert spending hundreds of hours analyzing CSI's internal financial records produced in discovery has Lycos learned about the existence and full extent of CSI's "mark-up" scheme, a scheme that enabled CSI to reap a profit almost double its usual rate of return and over ███ million in commissions for its account executive for Lycos. All told, CSI's scheme caused Lycos over $16.5 million in damages.

Although fact discovery has proven that CSI made numerous affirmative misrepresentations and told many half-truths to Lycos -- misconduct that will be the subject of trial if this case proceeds

---

[1] Lycos has learned in discovery that the original cost of the equipment was even lower, approximately $45 million.

-- Lycos's focus on summary judgment is directed only to those claims on which there are no genuine issues of material fact in dispute and Lycos is entitled to judgment as a matter of law.

In Count VII, Lycos maintains that CSI violated M.G.L. c. 93A, §§ 2 and 11 by violating Attorney General regulations 940 C.M.R. 3.05(1) and 3.16(2) (together, the "Regulations").  CSI violated the Regulations by telling Lycos "half-truths" in connection with its "churning," i.e., the refinancing, refinancing again and, in some cases, refinancing again, of equipment lease[2] schedules. Specifically, CSI addressed the cost of refinancing by telling Lycos that its monthly payments would go down and its use of the equipment extended if it refinanced, but it did not tell Lycos that it was embedding "mark-ups" in the monthly payments that would cause Lycos to pay $13.7 million above and beyond the millions of dollars in additional lease interest it would pay on the refinancings.

In Counts XII and XIII, Lycos maintains that CSI also has been unjustly enriched by having been paid twice for the equipment on schedules numbered "93" and "94."  As those schedules were, as a matter of law, installment sales contracts rather than true leases, Lycos purchased the equipment on them by making all of the required monthly payments.  Yet, when Lycos later entered into a Sales Agreement to purchase the equipment on those two and certain other schedules, it paid for that very same equipment a second time.  Lycos is entitled to restitution of the portion of the amounts paid under the sales agreement attributable to schedules 93 and 94, an amount equal to $2,854,602.

While CSI does not dispute that it charged Lycos mark-ups, or that the Lycos refinancings were considered ███████" at CSI, it has chided Lycos for not having "done the math" to uncover its mark-up scheme.[3]  This defense is irrelevant because, as a matter of law, CSI's "half-truths" gave rise to a duty to disclose the mark-ups and absolved Lycos of any obligation to discover them.  It is

---

[2]  While Lycos uses the words "lease" and "rent" in this memorandum, two of the equipment schedules – schedules 93 and 94 – were not true leases but installment sales contracts. *See* Part II(A), *infra*.  Lycos does not mean to imply by the use of the words "lease" and "rent" generally herein that schedules 93 and 94 were, in fact, true leases.

[3]  CSI's Mem. in Supp. of its Mot. to Dismiss Def. Countercl. at 3, 12 (Dkt. No. 16) (Mar. 10, 2005) ("The nub of Lycos' fraud claim, therefore, is that it simply never 'did the math' . . . .")

also misplaced because CSI structured the refinancings to make it exceedingly difficult (if not impossible) for Lycos to uncover its mark-up scheme. Lest there be any doubt about the difficulty of discovering that scheme, two leasing experts Lycos retained during the parties' relationship did not uncover it. Only through a leasing expert who has a Ph.D in mathematics examining CSI's internal financial records produced during discovery has the extent of CSI's duplicity been revealed.

## FACTS

### A.    Overview of CSI-Lycos relationship and Mr. Stenberg's compensation program.

When the parties' relationship began in December 1996,[4] CSI had been in the computer equipment leasing business for almost twenty-five years.[5] During their relationship, it advertised on its website that it was its customers' leasing "partner," and that CSI's customers "trust [it] to manage the leasing process efficiently and ethically . . . ."[6] Lycos, on the other hand, was then a less-than-two-year-old, Massachusetts-based internet company[7] with little prior experience in equipment leasing.[8] While the person at Lycos responsible for leasing changed many times during the parties' seven-year relationship,[9] CSI had a single account executive for Lycos the entire time: Paul Stenberg.[10] Mr. Stenberg had more than fifteen years experience at the time the relationship began.[11]

---

[4] CSI's Am. Compl., ¶ 11 (Dkt. No. 121) (Dec. 4, 2006); Ex. 1 to CSI's Am. Compl., ¶ 1 (Dkt. No. 121).

[5] Ex. 1 at 14:2-10.

[6] Ex. 2, second page; Ex. 3 at IA000040. Lycos has bates numbered the Internet Archive affidavit.

[7] Ex. 4 at PHIL000241.

[8] The person who signed the Master Lease Agreement had no prior experience in equipment leasing. Ex. 5 at 20:22-21:17; Ex. 6, ¶ 3.

[9] Ex. 50 at 33:15-35:22; Ex. 7 at 26:10-27:11; Ex. 8 at 136:24-137:7; Ex. 9 at 27:17-28:7; Ex. 10 at 48:16-19, 55:4-15; *see* note 15, *infra*.

[10] Ex. 50 at 29:20-30:13. Mr. Stenberg operated out of CSI's offices in Newton and Needham, Massachusetts. Ex. 50 at 22:14-22. He communicated regularly with Lycos's personnel in its Massachusetts offices and delivered lease documents to Lycos there. Ex. 6, ¶ 5; Ex. 11, ¶ 5 ; Ex. 12, ¶ 13. Lycos executed the lease documents in Massachusetts and made monthly payments to CSI from banks in the Commonwealth during the parties' relationship. *Id.* Accordingly, the acts and practices that are the subject of Lycos's claims occurred substantially within Massachusetts as required by M.G.L. c. 93A. Mem. of Dec. at 5-6 (Dkt. No. 46) (Dec. 6, 2005).

[11] Ex. 50 at 16:22-19:2.

CSI and Lycos executed a Master Lease Agreement[12] and approximately 125 related equipment schedules[13] pursuant to which CSI leased to Lycos over 6,000 pieces of computer-related equipment[14] between 1997 and 2005.[15]  More than one-third of these schedules were refinancings of earlier schedules, and many of them were themselves refinancings of earlier refinancings.[16]  The various financings and refinancings enabled CSI to receive approximately $72.5 million in monthly payments from Lycos,[17] over $45 million of which -- more than 63% of the total monthly payments -- were made pursuant to the refinanced schedules.[18]

These repeated refinancings were not an accident.  Mr. Stenberg was compensated primarily on a commission basis pursuant to a detailed compensation plan developed by CSI.[19]  His commissions were based primarily on ███████████████████████████████████████████████ ██████████████████████████████████████████████████████.[20]  These commissions applied both to the lease of "new" equipment *and* to the refinancing of equipment already under lease.[21]  Accordingly, every time one of his customers refinanced equipment, Mr. Stenberg earned another commission on top of the commission he had earned when he originally leased it.  In addition, from July 1, 1999 through June 30, 2001, CSI instituted what it referred to as

---

[12]  Ex. 1 to CSI's Am. Compl. (Dkt. No. 121).

[13]  Ex. 51, ¶ 5 and Exhibit B thereto.

[14]  Ex. 13 at CSI0027499-564 and Ex. 14 at CSI0027657-740.

[15]  Ex. 15 at CSI000236 (initial term commencing January 1, 1997); Ex. 16 at CSI0023528 (initial term of 36 months commencing May 1, 2002).

[16]  Ex. 51, ¶ 5 and Exhibit B thereto.

[17]  Ex. 17 at Response No. 3.

[18]  Ex. 51, ¶ 34.  For a detailed breakdown, *see id.* at Exhibit G thereto.

[19]  Ex. 52; Ex. 53; Ex. 54;  Ex. 55; Ex. 56.

[20]  Ex. 98 at 102:11-22.  Ex. 52 at CSI44229, CSI44232, CSI44241; Ex. 53 at CSI44260, CSI44268, CSI44277; Ex. 54 at CSI44303-304, CSI44315; Ex. 55 at CSI44340-341, CSI44352; Ex. 56 at CSI44376-377, CSI44388; Ex. 57 at CSI044468, CSI044477, CSI044482; Ex. 58 at CSI044470, CSI044497, CSI044502.

[21]  *Id. Compare* list of Refinanced Schedules in Ex. 51, ¶ 5 and Exhibit B thereto *with* commissions earned per schedule at Ex. 59 *and* Ex. 51 at Exhibit L thereto.

the ███████████████████████████████████████

███████████████████████████████[23] Finally, Mr. Stenberg also ███████

███████████████████████████████████████[24] As with

refinancings, his commission on a sale of equipment was based on ██████████████████

██████████████[25]

Summarizing his view of CSI's business in an internal e-mail he called his ████████

████████████ Mr. Stenberg once expounded: ████████████████████████████

███████████████████████████████████████████

██████████████[26] He implemented this "mission statement" to perfection with

Lycos, and even cited Lycos in this e-mail as his sole example of what this CSI business model could

achieve.[27] Validating Mr. Stenberg's choice of Lycos as his example, of the more than ████ million

in commissions he earned from churning the Lycos equipment schedules,[28] he reaped more than ████

million -- or ████ of his total commissions -- from the refinancings alone.[29] He earned an additional

████████ in commissions when, per his own "Mission Statement," he sold the equipment to Lycos.[30]

---

[22]  Ex. 60.

[23]  Ex. 55 at CSI44364; Ex. 56 at CSI044399-400.

[24]  Ex. 52 at CSI44229-232, 235; Ex. 53 at CSI44268-271; Ex. 54 at CSI44306-310; Ex. 55 at CSI44341, CSI44343; Ex. 56 at CSI44379-383; Ex. 57 CSI044483; Ex. 58 at CSI0044502-503; *see* Ex. 63.

[25]  *Id.*

[26]  Ex. 61 at CSI0042468.

[27]  *Id.*

[28]  Ex. 51, ¶ 49 and Exhibit L thereto.  At the same time that Mr. Stenberg was "churning" Lycos's leases and earning millions from that account (1997-2001), he was "churning" ███████████████████████████████████████ 

[29]  Ex. 51, ¶ 49 and Exhibit L thereto; *see* Ex. 59.

[30]  Ex. 51, ¶ 50.  Mr. Stenberg earned a ████ commission (Ex. 63. at CSI38418) on the ████████████ the sales price of $3,775,000 (Ex. 10 to CSI's Am. Compl. (Dkt. No. 121)) and ████████████████████ (Ex. 19).

**B.    CSI's Mark-Up Scheme.**

At the time of the refinancings, CSI told Lycos what its new monthly payment would be[31] --
almost always an amount lower than it had been on the schedules being refinanced[32] -- and that
Lycos would be able to retain the equipment for an extended term.[33] With respect to at least certain
schedules, Lycos expected that it would pay slightly more over the term of a refinanced schedule
because it had use of the equipment for a longer period of time.[34]

What Lycos did not expect,[35] and what CSI did not disclose,[36] was that CSI embedded a
mark-up in the monthly payments on almost every refinancing.[37] ███████████████████

███████████████████[38] Depending on the refinancing, the mark-ups ranged from a few
dollars to millions, causing Lycos to pay more than $13.7 million above and beyond the additional
interest it paid over the life of the extended lease terms.[39] *Lycos would not have entered into the
refinancings on the terms that it did if CSI had told it about these mark-ups.*[40]

It was not until Lycos obtained CSI's internal accounting records during discovery in this
case and had them examined by an expert[41] that it learned how CSI had caused Lycos to make over
$72 million in rent payments on account of equipment that had an original cost of approximately $45

---

[31] Ex. 64; Ex 50 at 258:13-263:19; Ex. 20 at 81:22-82:21. *Compare* the $36,514.00 monthly rent on the terminating
schedule 69D (Ex. 21 at CSI0012816, ¶ 2) with the $34,672.00 monthly rent on the refinanced schedule (Ex. 21 at
CSI0012803); *compare* the $129,978.99 monthly rent on schedule 83 (Ex. 22 at CSI0007677, ¶ 2) with the
$106,548.00 monthly rent on schedule 89 (Ex. 22 at CSI0007659).

[32] *See supra* note 31.

[33] *See supra* note 31.

[34] Ex. 23 at LYC24633; Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[35] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[36] *Id.* Ex. 50 at 258:13-263:19; Ex. 65 at 522:23-524:2.

[37] Ex. 51, ¶¶ 8-30 and Exhibit G thereto, column "C".

[38] Ex. 65 at 521:12-522:13.

[39] Ex. 51, ¶ 34 and Exhibit G thereto, column "C".

[40] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[41] *Compare* Lycos's Am. Answer and Countercl. (Dkt. No. 122) (Dec. 14, 2006) in which Lycos makes no reference
to the mark-ups, *with* Response Nos. 1 and 2 to Lycos's Ans. to First Set of Inter. Ex. 2 to Dkt. No. 109 (Oct. 31,
2006), in which Lycos discusses the mark-ups at some length. Ex. 51, ¶¶ 1-4.

million.[42]  Those records reveal that CSI marked up the value of the refinanced schedules such that the present value of the payments plus the estimated residual value on the refinanced schedule(s) *exceeded* the present value of the payments plus the estimated residual on the terminating schedule(s).[43]  Using the language of a loan,[44] the outstanding principal balance of the loan as of the moment *after* the refinancing *exceeded* the outstanding principal balance as of the moment *before* the refinancing even though no points, fees, or mark-ups were disclosed.  Thus, while CSI advised Lycos as to the cost of refinancing by saying the refinancing would lower Lycos's monthly payments and enable it to retain the equipment for a longer period of time, CSI disclosed only "half the truth" by not telling Lycos about the mark-ups buried in the monthly rent.  CSI's methodology for implementing the mark-ups was such that two leasing experts retained by Lycos during the parties' relationship did not uncover it.[45]  Indeed, in some cases CSI took equipment from a single schedule and split it between multiple new schedules while, in others, it took only a portion of the equipment from a schedule and transferred it to a new schedule(s) with the remaining equipment continuing under the existing schedule.[46]  Perhaps that is why CSI's co-CFO described the structure and documentation of two of the refinancings as ███████████████████████ ."[47]

---

[42]  Exhibit A to Ex. 66.

[43]  Ex. 51, ¶ 12 and discussion, *infra*.  Equipment lessors make money from the receipt of interest implicit in the monthly rent payments, tax benefits, and resale of the equipment when it is returned at the end of the lease, the latter of which is referred to as the "residual value"  1 Ian Shrank & Arnold G. Gough Jr., *Equipment Leasing—Leveraged Leasing*, § 2:4.5 at 2-18-19 (4th ed. 2007).  As a general matter, the longer a lease, (1) the greater the aggregate amount paid (because the lessee pays the implicit interest for a longer period of time), and (2) the lower the residual value at the end of the extended term.  Accordingly, absent a mark-up or other change in the financing terms, the value of the leases being refinanced (present value of rents and residual) should equal the value of the leases (present value of rents and residual) after they are refinanced.  In the language of a loan, absent the financing of points or fees, the outstanding principal balance of the loan as of the moment *before* the refinancing should equal the outstanding principal balance on the loan as of the moment *after* the refinancing.

[44]  CSI's own accountants refer to its income ██████████." Ex. 67 at CB0064 ██████████████████████████████████████████████████████████ .")

[45]  Ex. 51, ¶¶ 31-33; *see generally* Ex. 24; Ex. 25.

[46]  Ex. 51, ¶ 5 and Exhibit B thereto; *see* Ex. 26 at CSI0029730, ¶ 2; Ex. 27 at CSI0031362, ¶ 2; Ex. 28 at CSI0010121, ¶ 2 (all having equipment moving from schedule 43); and Ex. 14 at CSI0027741 (equipment moving from over 30 schedules).

[47]  Ex. 68; *see* Ex. 51, ¶ 5 and Exhibit B thereto.

CSI's structuring of the schedules and failure to disclose the mark-ups were part of a calculated business plan consistent with the philosophy of its co-founder, Chairman, and CEO, Kenneth Steinback. Notwithstanding his "party line" that he expects account executives to conduct themselves with "honesty, integrity, forthrightness, and dignity,"[48] when asked at deposition whether CSI gives any information to a customer in connection with a refinancing other than the new monthly rent and the new term, he responded: "It depends – it depends on what they ask for."[49]

This "don't ask, don't tell" philosophy permeated the CSI-Lycos relationship.[50] Just months after CSI's ██████████████████ became effective in July 1999,[51] and days after Mr. Stenberg asked CSI's co-CFO about ████████████ under it,[52] CSI refinanced ████████████████████ ████████[53] In connection with these refinancings, ████████████████████████████ ████████████████████████,[54] █████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████[55] When Mr. Stenberg specifically asked that a chart be prepared for Lycos showing the effect of the refinancings, however, he asked that the chart list ████████████████████ ████████████████████████[56] The chart did *not* disclose the present value

---

[48] Ex. 1 at 119:20-120:1-9. ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

[49] Ex. 20 at 82:22-83:12.

[50] Mr. Stenberg once wrote to the co-CFOs of CSI about Lycos: ████████████████ ████████████████████████████████████████████████████████ Ex. 69.

[51] Ex. 55 at CSI44364; Ex. 50 at 20:1-5.

[52] Ex. 60 at CSI0041994.

[53] Ex. 70.

[54] Ex. 71 at CSI0041902, CSI0041904-905 (column ████"); Ex. 72; Ex. 29 at 55:2-8; 69:19-24.

[55] Ex. 71 at CSI0041902 (column ████████); Ex. 87 at 40:5-16. See also Ex. 98 at 67: 6-14; Ex 98 at 67:6-14, 85:1-86:2.

[56] Ex. 29 at 119:14-120:23 (chart prepared for Lycos); Ex. 73 (Ms. Kopitsky's notes of conversation with Mr. Stenberg concerning chart for Lycos); Ex. 64 (chart provided to Lycos). *Compare* Ex. 64 (provided to Lycos) *with* Ex. 72 (provided to Mr. Stenberg/CSI).

of the payments due under the existing leases CSI had calculated or the of millions of dollars in mark-ups charged on those transactions.[57] These refinancings led to ███████████████ in commissions and bonus commissions for Mr. Stenberg.[58] Later, CSI's co-CFO referred to Mr. Stenberg's refinancings with Lycos as ████████[59]

In July 2001, CSI ██████████████████████████.[60] Employees promoted to this position at CSI typically ████████████████████████████ ████████████████████████[61] Months later, Lycos entered into what CSI referred to internally as the ████████[62] -- a refinancing of over thirty schedules, almost all of which themselves had been refinancings[63] -- onto two new schedules known as schedules 93 and 94.[64] CSI developed a structure that terminated some schedules early and caused some, but not all, of the equipment to roll onto schedule 94 immediately while allowing other schedules to run their term until rolling onto schedules 93 and 94 more than a year later.[65] These were the schedules CSI's co-CFO described as "complex" and "convoluted."[66]

A few months after the commencement of schedules 93 and 94, Lycos discovered what appeared to be an increase of more than $11 million in the gross payments it would be required make under those schedules as compared with the amounts it would have been required to make had it not refinanced.[67] Lycos's CFO, Brian Lucy,[68] wrote an e-mail to Mr. Stenberg in which he said:

---

[57] *See* Ex. 64. *Compare* schedules identified in Ex. 64 *with* Ex. 51 at Exhibit G thereto; *see* Ex. 29 at 120:4-23.

[58] *Compare* schedules identified on Ex. 64 *with* Ex. 59 at CSI44442 *and* Ex. 51 at Exhibit L.

[59] Ex. 30 at CSI0041088.

[60] Ex. 57 at CSI044468.

[61] Ex. 50 at 177:17-23.

[62] Ex. 68 at CSI0038426.

[63] Ex. 13 at CSI0027565, ¶ 2; Ex. 14 at CSI0027741, ¶ 2; Ex. 51 at Exhibit B.

[64] *Id.*

[65] *Id.* Ex.98 at 164:22-165.

[66] Ex. 68.

[67] Ex. 31 at LYC24612 (Bracket B).

[68] Ex. 11, ¶ 1.

I would expect a slight increase in our O[ut]/S[tanding] commitment,[69] but this is a problem that would need to be rectified in short order. If these numbers are in fact correct, I would have to ask to unwind the refinancing.[70]

In response, Mr. Stenberg, who made over ▇ million dollars in commissions on these refinancings alone,[71] wrote an e-mail to Mr. Lucy assuring him that the difference was much lower:

This is what I have so far so you can rest easy.

| | |
|---|---|
| Present Value of Lease | $23,727,000 |
| Obligation of old Leases | $20,215,000 |
| Difference | $ 3,512,000[72] |

Mr. Lucy, who had no background in equipment leasing and trusted Mr. Stenberg, did not pursue the matter further.[73] When Mr. Stenberg wrote this e-mail, he had more than twenty years experience in the industry,[74] and had earned the highest possible rating on his performance evaluations for his ▇▇▇▇▇▇▇ and his ability to earn the "trust and dependency of the decision-maker" at Lycos.[75] Yet, the gross difference in the amount of the payments on schedules 93 and 94, contrary to Mr. Stenberg's representation, exceeded the payments on the schedules refinanced by almost $10.5 million.[76] Even when using the discount rate that Mr. Stenberg used when he requested preparation of those schedules in 2001,[77] the difference was almost $▇▇▇,[78] more than ▇▇▇ the $3.5 million he represented to Lycos.

---

[69] Ex. 32 at 35:1-4.

[70] Ex. 23 at LYC24633.

[71] Ex. 59 at CSI44451-452; Ex. 51 ¶ 49 and Exhibit L thereto.

[72] Ex. 46 at LYC24631.

[73] Ex. 11, ¶ 7; Ex. 33, ¶ 16.

[74] Ex. 50 at 16:22-19:2.

[75] Ex.74 at CSI044215 (under headings ▇▇▇▇▇▇▇")- CSI044216 (under heading "▇▇▇▇▇▇▇"); Ex. 75 at CSI044219-220 same); *see* Ex. 74 at CSI44212.

[76] Ex. 51, ¶¶ 36-41.

[77] Ex. 51, ¶ 38, which refers to the Requests for Contract found at Ex. 76 and Ex. 77.

[78] Ex. 51, ¶¶ 36-41.

Of the more than $27 million difference between the more than $72 million in monthly payments Lycos made to CSI and the approximately $45 million original acquisition cost of the leased equipment, more than $13.7 million represented CSI's undisclosed mark-ups.[79] The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules[80] and approximately double its average rate of return on its equipment leases generally.[81]

### C.    The Sales Agreement.

In Summer 2003, Mr. Stenberg effected the last piece of his mission statement when he sold the equipment on the thirteen extant schedules to Lycos subject to Lycos making the remaining monthly payments on those schedules.[82]  Although CSI's undiscounted residual value for the equipment on those schedules was approximately $320,000 when it booked them[83] (it was *zero* on schedules 93 and 94),[84] and CSI gave him a threshold of $350,000 to sell the equipment[85] (meaning he would earn a commission based on the extent to which he could sell the equipment for an amount above $350,000),[86] Mr. Stenberg quoted Lycos a purchase price of $4.69 million.[87]  Only after Lycos retained a leasing consultant[88] and threatened to audit the parties' lease relationship[89] -- in response to his reluctance to cooperate with that consultant – did Mr. Stenberg reduce CSI's offer to $3.775

---

[79]  Ex. 51, ¶ 34 and Exhibit G thereto, column "C".

[80]  Ex. 51, ¶ 35.

[81]  *Compare* rate of return on refinanced schedules (███████████████ Ex. 51, ¶ 35 and Exhibit I thereto) *with* CSI's usual rate of return (████████ Ex. 1 at 104:11-20.

[82]  Ex. 10 to CSI's Am. Compl., ¶¶ 1-5 (Dkt. No. 121).

[83]  Ex. 51 at Exhibit K thereto (column "residual"); Ex. 98 at 154:12-16; Ex. 78; Ex. 79; Ex. 80; Ex. 81; Ex. 82.

[84]  Ex. 51 at Exhibit K thereto, column headed "residual"; Ex. 98 at 154:12-16, 299:15-23; Ex. 83; Ex. 84. The booked present value of the residual value on the sales type lease journal entry for schedules 93 and 94 is ██████████████████████████████████████████. Ex. 98 at 154:9-11.

[85]  Ex. 98 at 299:15-23; Ex. 19; Ex. 34 at 139:24-140:5.

[86]  Ex. 98 at 312:17-20; Ex. 52 at CSI44235; Ex. 53 at CSI44268-271; Ex. 54 at CSI44306-310; Ex. 55 at CSI44341, CSI44343; Ex. 56 at CSI44379-383; Ex. 57 at CSI044483; Ex. 58 at CSI0044502-503. *See* Ex. 63.

[87]  Ex. 35 at CSI0023157; Ex. 36.

[88]  Ex. 37 at LYC18884.

[89]  Ex. 38.

million if Lycos accepted by July 15, 2003, which Lycos did.[90]  Lycos paid CSI the $3.775 million

on August 1, 2003,[91] and made all the remaining monthly payments required under all the schedules

(approximately $13.5 million) except for approximately $301,000 due on schedules 100 and 200.[92]

Mr. Stenberg earned ███████ in commissions on this sale.  Despite having been paid more than ███

million in commissions on the Lycos account, Mr. Stenberg complained to CSI's chairman that his

commission on the sale was too low.[93]

## ARGUMENT

**I.    LYCOS IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VII BECAUSE CSI VIOLATED 940 C.M.R. 3.05(1) AND 3.16(2), AND M.G.L. c. 93A, §§ 2 AND 11.[94]**

### A.    The Regulations Required CSI to Disclose the Mark-Ups to Lycos.

*1.    Common law and, according to CSI, industry standards, impose a duty to disclose upon telling of a half-truth.*

To prevail on its 93A claim, Lycos must prove that CSI's conduct fell within "the penumbra

of some common-law, statutory or other established concept of unfairness . . . ."[95]  In *Kannavos v.

Annino*, the Supreme Judicial Court restated the well-established common law principle that "if [a

party] speak[s] with reference to a given point of information, voluntarily or at the other's request, he

is bound to speak honestly and to divulge *all* the material facts bearing upon the point that lie within

his knowledge."[96]  The First Circuit has similarly written in a business-to-business case in which the

---

[90]  Ex. 50 at 309:7-21; Exhibit No. 10 to CSI's Am. Compl., ¶ 3 (Dkt. No. 121); Ex. 47 at AR001433.

[91]  Ex. 39; Ex. 86 at 179:19-22.

[92]  Ex. 18 at 450:5-10; CSI's Am. Compl., ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121) (seeking to recover only for non-payment on schedules 100 and 200).

[93]  See *supra* note 28.

[94]  This Court has ruled twice in this case that Massachusetts law governs Lycos's claims for fraud in the inducement and 93A. Mem. Of Dec. at 4-6 (Dkt. No. 46); Mem. Of Order at 3-5 (Dkt. No. 73) (July 11, 2006) (denying CSI's request for reconsideration of choice-of-law determination).  Lycos will therefore refrain from rearguing this issue a third time.

[95]  *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1484 (1st Cir. 1996) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)).

[96]  356 Mass. 42, 48, 247 N.E.2d 708, 711 (1969) (emphasis added); *see V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985) ("There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid

(continued...)

defendant allegedly disclosed "half-truths" that the "duty [to disclose] to avoid misrepresentation is so strong that the deceived party is not charged with failing to discover the truth."[97]

CSI itself has argued that leasing industry standards impose a duty to disclose to avoid representations from being misleading.  When alleging in its Amended Complaint that Lycos had failed to disclose certain information that it believed was required to be disclosed, CSI argued, ". . . Lycos did not disclose to CSI, although it had a duty to do so under law and generally accepted commercial and industry standards (in order, *inter alia*, to make its aforesaid representations in the Sales Agreement not misleading) . . ."[98]  By making this assertion in its Amended Complaint, CSI has judicially admitted[99] that both the law and "generally accepted commercial and industry standards" impose a duty on a commercial equipment lessee such as Lycos (who is not in the business of equipment leasing) to disclose information to prevent a representation from being misleading.  As CSI has judicially admitted that a lessee who is not in the business of equipment leasing has a duty to disclose under generally accepted commercial and industry standards, a *fortiori*, a lessor such as CSI that *is* in the business has at least the same duty under the same standards.

> 2.    *The Regulations, at a minimum, codify the common law rule regarding half-truths.*

At a minimum, the Regulations codify the common law rule that a lessor who makes a representation that is a half-truth is obligated to disclose all additional information that would be

---

deceiving the other party."); *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 610 (D. Mass. 1997) (same).  *See generally*, Restatement (Second) of Torts, § 529 (1977) (collecting cases).

[97]  *V.S.H. Realty*, 757 F.2d at 415.

[98]  CSI's Am. Compl., ¶ 45 (Dkt. No. 121).

[99]  *Schott Motorcycle Supply v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of a fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.")

material to the lessee's decision to enter into the transaction so as to prevent the half-truth from deceiving the lessee.[100]  Section 3.16(2) of 940 C.M.R. specifically provides:

> Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c. 93A, § 2 if: . . . any person or other legal entity subject to this act fails to disclose to a buyer[101] or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.[102]

Similarly, section 3.05(1) states:

> No claim or representation shall be made by any means concerning a product[103] which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers[104] or prospective buyers in any material respect.[105]

The Supreme Judicial Court recently reiterated that these Regulations are "authorized by G.L. c. 93A, § 2(c), have the force of law, and 'set standards the violations of which . . . constitute violations of [G.L.] c. 93A.'"[106]

### 3. *The Regulations apply to business-to-business transactions.*

At least to the extent they codify the common law principles requiring full disclosure upon the issuance of a half-truth, the Regulations apply to business-to-business transactions.  As a threshold matter, the Attorney General has interpreted and enforced the Regulations as applying business-to-

---

[100]  *Sheehy v. Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 195, 507 N.E.2d 781, 785 (1987) (Greaney, J.).  For that reason, among others, these Regulations are in accordance with decisions of the Supreme Judicial Court and the Appeals Court based on the common law. *See, e.g., Homsi v. C.H. Babb Co.*, 10 Mass. App. Ct. 474, 478-79, 409 N.E.2d 219, 224 (1980) (collecting cases).

[101]  Section 3.01 of 940 C.M.R. defines "buyers," as used in 940 C.M.R. 3.16(2) and in 940 C.M.R. 3.05(1), to include "lessees" such as Lycos.

[102]  940 C.M.R. § 3.16(2) (1993).

[103]  940 C.M.R. 3.01 defines "product[s]," as used in section 3.05(1), to include both "goods," such as computer equipment, and "services," such as the leasing of computer equipment.

[104]  *See supra* note 101.

[105]  940 C.M.R. 3.05(1) (1993).

[106]  *Aspinall v. Philip Morris Companies,* 442 Mass. 381, 396 n.18, 813 N.E.2d 476, 488 n.18 (2004) (quoting *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 769-71, 407 N.E.2d 297, 304 (1980)); *see Greenery Rehabilitation Group v. Antaramian*, 36 Mass. App. Ct. 73, 78, 628 N.E.2d 1291, 1294 (1994) ("One can violate § 2 of G.L. c. 93A, as interpreted in 940 Code Mass.Regs. § 3.16(2) . . . by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase."), *cited with approval* in *Aspinall*, 442 Mass. at 395, 813 N.E.2d at 487.

business;[107] her interpretation is entitled to "substantial deference"[108] and will be overturned only if it is "arbitrary, unreasonable or inconsistent with the plain terms of the rule itself."[109]  Because the Appeals Court in *Commonwealth v. AmCan Enterprises*[110] has already upheld the Attorney General's enforcement of the Regulations business-to-business, the Attorney General's interpretation can hardly be said to be arbitrary, unreasonable, or inconsistent.  Private parties have also enforced the Regulations business-to-business and appellate courts, including the First Circuit, have upheld trial court findings of violations of the Regulations in this context.[111]

> 4.    *Understanding Knapp Shoes and First New England.*

In *Knapp Shoes v. Sylvania Shoe Manufacturing*, the Supreme Judicial Court held that 940 C.M.R. 3.08(2) did not apply to business-to-business transactions.  In so holding, the Court relied on the Attorney General's explicit use of the word "consumer" in sub-sections (1) and (3) of section 3.08 to conclude that section 3.08(2) applied only to consumers.[112]

Applying this same analysis to the Regulations at issue here further establishes that the Regulations *do* apply in the business-to-business context.  More specifically, section 3.16(2) applies to "buyers"[113] and "lessees"[114] while section 3.16(3) protects the arguably narrower class of

---

[107]  Ex. 40.  The Attorney General's interpretation of the Regulations in the Affidavit of Jesse Caplan and accompanying letter is, by law, not a "formal" opinion of the Attorney General because the Attorney General is authorized to give "formal" opinions only to state officers.  8 *Mass. Practice* § 20 at 70, n. 9 (1986) ("persons other than state officers are not entitled to the opinion of the Attorney General").  If the Court has questions about the Attorney General's interpretation of the Regulations, it may invite her to file an amicus brief.  *Rucker v. Lee Holding Co.*, 471 F.3d 6, 12 (1st Cir. 2006) (Court requested amicus brief seeking Department of Labor's opinion of a regulation it promulgated and administered.)

[108]  *Smith v. Winter Place LLC*, 447 Mass. 363, 367-68, 851 N.E.2d 417, 421 (2006).

[109]  *Purity Supreme,* 380 Mass. at 782, 407 N.E.2d at 310.

[110]  47 Mass. App. Ct. 330, 340, 712 N.E.2d 1205, 1212 (1999).

[111]  *See, e.g., V.S.H. Realty*, 757 F.2d at 417; *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 125, 646 N.E.2d 888, 897 (1989); *Homsi*, 10 Mass. App. Ct. at 478, 409 N.E.2d at 224; *Gloucester Holding Corp. v. U.S. Tape and Sticky Prod., LLC*, 832 A.2d 116, 126 (Del. Ch. 2003) (construing 940 C.M.R. 3.16(2)).

[112]  418 Mass. 737, 744-45, 640 N.E.2d 1101, 1105 (1994).

[113]  940 C.M.R. 3.16(2) and (3) provide as follows: "Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c. 93A, § 2 if: . . .

(continued…)

"consumers." Nevertheless, Judge Young recently held that section 3.16(3) applies to claims brought pursuant to both sections 9 *and* 11 of 93(A).[115] If section 3.16(3) applies to section 11 claims, and section 3.16(3) protects an arguably narrower class than the class protected by section 3.16(2), *a fortiori* section 3.16(2) protects claimants under section 11.[116]

Although in *First New England Dental Centers,* Judge Young held that section 3.16 did not apply in business-to-business transactions,[117] that decision is inapposite. As a threshold matter, Judge Young has since retreated from that holding.[118] In addition, it appears Judge Young was unaware when he wrote *First New England* that the Attorney General construes the Regulations as applying business-to-business and that the Attorney General reissued the Regulations twenty years *after* the adoption of section 11.[119] More fundamentally, however, the plaintiff/buyer in *First New England* alleged that the seller of certain dental centers had not disclosed that revenue in the centers had decreased, that patients had been reassigned, and the practices closed.[120] The plaintiff argued that the seller had a duty to disclose these facts and that it would not have purchased the practices if it

---

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection[.]

[114] 940 C.M.R. 3.01 (definition of "Buyer").

[115] *J.E. Pierce Apothecary v. Harvard Pilgrim Health Care*, 365 F. Supp. 2d 119, 145 (D. Mass. 2005).

[116] If the Attorney General had intended to limit section 3.16(2) to transactions under section 9, she at least would have used the narrower word "consumers" in both sections 2 and 3 of section 3.16 rather than only in section 3. The Appeals Court in *AmCan Enterprises* implicitly agreed with the foregoing when it affirmed a trial court's summary judgment against a business for violating the Regulations years *after* the SJC decided *Knapp Shoes*.

[117] *In re First New England Dental Centers, Inc.,* 291 B.R. 229, 241 (D. Mass. 2003).

[118] *J.E. Pierce Apothecary,* 365 F. Supp. 2d at 144-45.

[119] This is a reasonable inference as Judge Young did not refer in *First New England* to the Attorney General's construction of section 3.16(2) or the fact that the AG had reissued the regulation *after* Massachusetts adopted 93A, § 11. Judge Young observed in *J.E. Pierce Apothecary* that the SJC in *Knapp Shoes* based its holding in part on its observation that section 3.08(2) had been adopted *before* 93A, § 11 had been enacted. 365 F. Supp. 2d at 143. In contrast, section 3.16(2) was reissued twenty years after section 11 was adopted.

[120] 291 B.R. at 240-41.

had known them.[121]  The plaintiff did not allege, however, that the seller had disclosed half-truths that under common law obliged the seller to disclose these additional facts.  Instead, it relied solely on the language of section 3.16(2) for the duty to disclose.  The Court concluded that "to require complete disclosure from both ends of a business deal, would eviscerate the very notion of negotiating."[122]

Unlike the plaintiff in *First New England*, Lycos's claims under the Regulations are rooted in the well-settled common law duty to disclose in business-to-business transactions that arises upon the issuance of a half-truth, a duty that CSI maintains is also rooted in "general commercial and industry standards."  Far from arguing for an interpretation that would "eviscerate the very notion of negotiating," Lycos is seeking here only to enforce the Regulations to the extent they codify that common law duty -- i.e., that the Regulations required CSI to disclose facts to prevent its statements from being misleading half-truths or having a "tendency to deceive" Lycos.  The Regulations therefore apply to Lycos's claim in Count VII against CSI.

**B.    CSI's Failure to Disclose the Mark-Ups Violated the Regulations.**

*1.    Lycos can satisfy all elements for showing a violation of the Regulations.*

CSI's failure to disclose the mark-ups was violated both Regulations.  With respect to Regulation section 3.05(1), the Appeals Court in *AmCan Enterprises* reiterated that the "'tendency to deceive' standard [of section 3.05(1) is] to be construed in the context of a reasonable [business] consumer, and that the representation [must] be material," i.e., that the practice reasonably could be found to have caused the plaintiff to act differently than he or she otherwise would have acted.[123]  It affirmed the trial court's grant of summary judgment to the plaintiff reasoning that the defendant's representations made while soliciting business, including implied representations, were deceptive as a

---

[121]  *Id.*

[122]  *Id.* at 241.

[123]  47 Mass. App. Ct. at 335; 712 N.E.2d at 1209 (citing *Purity Supreme, Inc.,* 380 Mass. at 777, 407 N.E.2d at 307).

matter of law.  CSI's conduct here -- representing that Lycos's monthly payments would go down if it refinanced but failing to disclose that it had embedded a mark-up in those payments on the refinanced schedules that would cause its total payments to increase substantially -- caused Lycos to act differently[124] and was thus deceptive as a matter of law.

With respect to regulation 3.16(2), Lycos can readily satisfy the four-part test for proving a violation of that section: (1) that CSI knew it was charging the mark-ups to Lycos before the parties executed the refinanced schedules and/or the Sales Agreement;[125] (2) the mark-ups were a material circumstance that, if disclosed to Lycos, might have influenced Lycos not to enter into the refinanced schedules and/or the Sales Agreement;[126] (3) CSI failed to disclose the mark-ups;[127] and (4) CSI's failure to disclose the mark-ups took place in the business context. [128]

(1)    The internal refinancing process at CSI was such that it knew it was charging Lycos ██████████████████████████████████████ not only before each refinanced equipment schedule was signed, but before it was even prepared.  That process was as follows:

a.    When an account executive such as Mr. Stenberg asked for pricing on a refinancing, CSI would calculate a ███████████████," [129] i.e., ███████████████████
████████████████[130] ███████████████████████████████████████

██████████████████████████████████████████████████████

---

[124] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[125] *Sheehy,* 24 Mass. App. Ct. at 195, 507 N.E.2d at 785 (Greaney, J.).

[126] *Greenery Rehabilitation Group,* 36 Mass. App. Ct. at 78, 628 N.E.2d at, 1294 ("One can violate § 2 of G.L. c. 93A, as interpreted in 940 Code Mass.Regs. § 3.16(2) (1986), by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase.") (emphasis added).  While *Sheehy,* decided several years before *Greenery Rehabilitation,* used the phrase "would have led" the plaintiff not to enter into the transaction, *Greenery Rehabilitation's* use of the phrase "might have influenced," as quoted with approval by the SJC in 2004 in *Aspinal,* and as used in *AmCan Enterprises* in 1999, is more faithful to the phrase "*may* have influenced" in section 3.16(2) and the phrase "tendency to deceive" in section 3.05(1) (emphases added).

[127] *Sheehy,* 24 Mass. App. Ct. at 195, 507 N.E.2d at 785.

[128] *Id.*

[129] Ex. 87 at 160:24-161:8.

[130] Ex. 52 at CSI44229-232; Ex. 53 at CSI44265-268, Ex. 54 at CSI44303-306; Ex. 55 at CSI44340-343; Ex. 56 at CSI44376-379.

████████████████████████████████████████████████████████

████████████████████████████████████████████ ,,[133]

      b.     Mr. Stenberg would then, in his words, ██████████████████

███████████.[134]  If it appeared the refinancing would proceed, Mr. Stenberg would complete the

████████ a form called Request for Contract ("RFC").[135]  Among other things, he would fill in

the boxes entitled ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[138]

      c.     After completing the RFC, Mr. Stenberg would send it to Ms. Kersting or

someone in the legal department,[139] who would circulate it for approval.[140]  If the request were

approved, someone in the legal department would then prepare the lease contract.[141]

     Because ██████████████ ██████████████████████ before

each refinanced schedule was prepared, and thus before it was executed, ██████████:

---

[131]  Ex. 87 at 40:5-16.

[132]  Ex. 98 at 101:2-6.

[133]  On a new equipment schedule, CSI determines this ██████████████████████████
███████████████████. *Id.* at 122:24-123:2.

[134]  Ex. 65 at 521:12-522:13.

[135]  Ex. 50 at 82:15-20; Ex. 42 at 37:13-38:21.  Copies of certain Requests for Contract are attached as Ex. 88; Ex. 89; Ex. 90; Ex. 91; Ex. 92.

[136]  Ex. 98 at 123:14-17.  While Mr. Cagney testified that ████████████████████████████
██████████████████████████ there were no soft costs on the Lycos refinanced schedules because the equipment was already installed (*e.g.,* Ex. 41 at CSI0005632, ¶ 6) and no new equipment was added (e.g., Ex. 22 at CSI0007677, ¶ 2).

[137]  Ex. 65 at 491:7-14.

[138]  *Id.* at 491:18-21. The ████████████████████████████████████████.
Ex. 98 at 123:18-20.

[139]  Ex. 42 at 37:13-38:16.

[140]  *Id.* at 41:21-42:7.

[141]  *Id.* at 42:18-43:1. *See* Ex. 50 at 82:4-20.

| the present value of the rents on the new schedule(s) |  | the present value of the remaining rents plus the present value of the estimated residual value on the schedule(s) being refinanced, minus the present value of the residual on the new schedule(s) |
|---|---|---|

In addition, because he estimated his ███████████████████████████████ ████████████████[142] ███████████████████████ the approximate magnitude of the mark-up before the CSI legal department even prepared an equipment schedule.

(2)     Because none of the individuals who signed the refinanced schedules would have signed them on the terms they did if they had known about the mark-ups,[143] the mark-ups constituted material circumstances that, if disclosed, not only "might" have influenced, but would have influenced Lycos not to enter into the refinanced schedules and subsequently, the Sales Agreement. Thus, CSI's failure to disclose the mark-ups was material to Lycos's decision to enter into the refinancings and actually deceived it into entering them.

(3)-(4) CSI did not disclose the mark-ups to Lycos[144] and the refinanced schedules were executed in the business-to-business context.[145]

Thus, the undisputed facts show that CSI's half-truths had a "tendency to deceive" Lycos as a matter of law under § 3.05(1) and that the four requirements for a violation of § 3.16(2), are satisfied. As a violation of the Regulations is a *per se* violation of 93A § 2,[146] Lycos is entitled to judgment for liability under 93A, § 2, and its reasonable attorneys' fees and costs under § 11.[147]

---

[142] *Ex.* 65 at 491:18-21.

[143] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[144] Ex. 6, ¶ 4; Ex. 11, ¶ 4; Ex. 12, ¶ 9.

[145] CSI's Am. Compl., ¶¶ 7, 11 (Dkt. No. 121) (describing CSI and Lycos as businesses and stating Lycos leased equipment from CSI for business purposes).

[146] *Supra* note 106.

[147] *Star Fin. Srvs., Inc. v. AAStar Mortgage Corp.*, 89 F.3d 5, 14 (1st Cir. 1996); *see also* M.G.L. c. 93A, § 11, ¶ 6.

2.    *Lycos does not need to prove that it relied on CSI's failure to disclose or that CSI's conduct was rascalous to establish 93A liability under the Regulations.*

Lycos is not required to prove that it relied, reasonably or otherwise, on CSI's failure to disclose the mark-ups[148] or that it could not have discovered the mark-ups.[149]  And, although the facts in this case – *e.g.*, CSI's "churning" of the Lycos schedules, repeated failure to disclose the mark-ups, misrepresentation of the difference between the amount Lycos was required to pay under schedules refinanced onto schedules 93 and 94 and the amounts it would pay on new schedules 93 and 94, combined with a compensation system specifically designed to encourage refinancings, was in fact "rascalous,"[150] Lycos is not required to prove "rascality" to be prevail under 93A, §§ 2 and 11.  That is because the First Circuit has held in a business-to-business case that rascality is *not* required to establish a violation of the Regulations.[151]  In addition, the rascality concept applies only to the "unfairness" component of 93A, § 2, and CSI's non-disclosures were "deceptive" as well as

---

[148] *Int'l Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 850, 443 N.E.2d 1308, 1314 (1983) ("This Court has rejected the proposition that a plaintiff must show proof of actual reliance on a misrepresentation under c. 93A, § 9. . . .  We see no reason to reach a different result under c. 93A, § 11.").

[149] *V.S.H. Realty*, 757 F.2d at 416, 418 (the duty existing on the utterance of a half-truth "is so strong that the deceived party is not charged with failing to discover the truth . . . .  Sophistication of the parties is not mentioned in 93A and the amendment of 93A to cover business entities did not limit the statute's protection to small, unsophisticated businesses."); *see Kannavos*, 356 Mass. at 49-50, 247 N.E.2d at 712-13 (a plaintiff is "not barred . . . from recovery merely because [it] 'did not use due diligence when [it] could readily have ascertained from records what the true facts were").

[150] *See Cambridge Plating Co., Inc. v. NAPCO, Inc.*, 876 F. Supp. 326, 338 (D. Mass. 1995) (defendant's failure to disclose relevant information in its possession attained a "level of 'rascality' warranting a finding of liability under" chapter 93A"), *aff'd in relevant part*, 85 F.3d 752 (1st Cir. 1999).

[151] *Cablevision of Boston v. Public Improvement Comm'n of Boston,* 184 F.3d 88, 106 (1st Cir. 1999) ("One can commit a chapter 93A violation without behaving like a 'rascal,' if one violates consumer protection or public safety laws.") (citing 940 C.M.R. 3.16); *J.E. Pierce Apothecary*, 365 F.Supp.2d at 144 (same).  Although the First Circuit ruled against Cablevision because it concluded that it did not appear that the defendant had violated the particular consumer protection statutes identified by Cablevision, the Court would not have conducted the analysis it did if it had not considered Cablevision to be a "consumer" protected by 940 C.M.R. 3.16.  *See Brennan v. Carvel Corp.*, 929 F.2d 801, 813 (1st Cir. 1991) ("in [*Sheehy* and] other cases where a court found chapter 93A liability for violations of Mass. Regs. Code tit. 940, § 3.16(2), no mention was made of the 'rascality' standard"); *AmCan Enter.* 47 Mass. App. Ct. at 335-36, 712 N.E.2d at 1209-10 (affirming summary judgment against a business for violating the regulations without discussing rascality).

"unfair."[152]  "Deceptive" conduct, by itself, is sufficient to impose liability and damages under 93A,

§§ 2 and 11.[153]

**C.      CSI's Failure to Disclose Mark-Ups Caused Lycos $13.708 Million in Damages.**

To obtain an award of actual damages under 93A, § 11, Lycos need only show (a) a violation

of a regulation promulgated under section 2(c) of that chapter,[154] and (b) that CSI's violation of the

Regulations caused it damage.[155]  Lycos has already shown a violation of a regulation promulgated

under § 2(c).  Lycos has further satisfied the latter requirement by demonstrating that it would not

have entered into the refinancings on the terms that it did if it had known of the mark-ups and that it

paid the mark-ups to CSI.  Lycos is therefore entitled to its *actual* damages.[156]

The purpose of damages is to return the parties to the status quo prior to the transaction.[157]  If

Lycos had refused to enter the refinancings with the mark-ups, it follows that it would not have paid

those mark-ups or the interest implicit in the refinanced schedules.  Lycos acknowledges, however,

---

[152] The concept of "rascality" was used for a period of time in Massachusetts as a short-hand way of thinking about the meaning of the word "unfair" as used in 93A.  *See Mass. Emp. Ins. Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 42, 648 N.E.2d 4335, 438 (1995).  In *Propac*, the SJC abandoned the rascality concept. *Id.* ("[W]e view as uninstructive phrases such as 'level of rascality' . . . in deciding questions of unfairness under G.L. c. 93A.  We focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination.")

[153]  M.G.L. c. 93A, § 11, first para. (permitting an action against a person who engages in an unfair "or" deceptive act.).  *See Mass. Farm Bureau Fed'n, Inc., v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 532 N.E.2d 660, 664 (1989) (under 93A, §§ 2 and 11 "[a]n act or practice may be 'unfair' within the statutory meaning *without* being deceptive or fraudulent.") (emphasis added).

[154]  M.G.L. c. 93A, § 11, first para.

[155]  *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 800-01, 840 N.E.2d 526, 534-35 (2006).

[156]  While Lycos is required to show that CSI's violation of the Regulations was "willful" or "knowing" to obtain *multiple* damages under section 11, there is no such requirement for Lycos to obtain its *actual* damages. *See, e.g., Pierce v. Dew,* 626 F. Supp. 386, 388 (D. Mass. 1986) ("state of mind" issues do not impact a plaintiff's right to recover actual damages).  Further, as noted, the court in *AmCan Enterprises* upheld a trial court's grant of summary judgment concluding that advertising materials were deceptive as a matter of law in violating the Regulations.  47 Mass. App. Ct. 330, 336-37, 712 N.E.2d 1205, 1210-11 (1999).  Finally, trial courts have granted summary judgment in favor of claimants for violations of 940 C.M.R. 3.16(3) and 940 C.M.R. 3.16(4) *without* inquiring into the defendant's state of mind. *J.E. Pierce Apothecary, Inc.*, 365 F. Supp. 2d at 148, 150 (summary judgment on 940 C.M.R. 3.16(3)); *McGonagle v. Home Depot U.S.A., Inc.*, 15 Mass. L. Rep. 487 (2002) (same); *see also Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170, 176 (1st Cir. 2004) (summary judgment on 940 C.M.R. 3.16(4)); *Martin v. Sands,* 62 F. Supp. 2d 196, 201 (D. Mass. 1999) (same).

[157]  *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 82, 575 N.E.2d 70, 77 (1991).

that it also would not have had use of the equipment for the extended lease term.  Accordingly, Lycos is not seeking on summary judgment return of the interest it paid for use of the equipment during the extended term of the refinancings even though much of that interest was paid on the mark-ups themselves.  Rather, Lycos is seeking only return of the actual amount of the mark-ups.

Lycos's calculation of the amount of the mark-ups and hence its damages cannot be disputed because Lycos has simply "done the math" relying exclusively on CSI's financial records.  Specifically, Lycos has used the journal entries that CSI used to create its general ledger[158] and, in those cases where CSI did not produce a journal entry, the Requests for Contract prepared by CSI before a lease was documented.[159]  Lycos has totaled, on the refinanced schedules, the extent to which (a) the present value ("PV") of the rents plus the present value of the estimated residual value on the refinanced schedule(s), discounted at the implicit rate used by CSI on its general ledger for that refinanced schedule exceeded (b) the outstanding balance on the schedules being refinanced that CSI actually transferred to the refinanced schedule.  In loan terms, it has determined the extent to which the outstanding principal on the refinanced loan exceeded the outstanding principal on the loan that was refinanced.

Indeed, for many of the refinancings, the amount of the mark-up Lycos has calculated matches the "gross profit" CSI recorded on the applicable journal entries.[160]  For example, the following is the calculation of the mark-up arising from the refinancing of schedules 45, 49, 49A and 61 onto schedule 67.

---

[158]  Ex. 43 at 129:2-19.

[159]  *See supra* note 135 and accompanying text.

[160]  For example, CSI's recorded ███████ and Lycos's expert's determination of the amount of the mark-up were the same on, among others, schedules 60, 61, 66, 66A, 67, 68, 68A, and 68B.  *Compare* the Sales Type Lease Journal Entries for these schedules at Ex. 99 with Exhibit G to Exhibit 51.  For the schedules that were rewritten just a few months into their existence, because CSI combined the booking of the original schedules with that of the refinancing, CSI's ██████████' does not equal the amount of the mark-up.  Instead, the ██████ includes any interim rent, the mark-up on the original schedule, and the mark-up on the refinance schedule. *See* Ex. 51, ¶¶ 19-26.

Schedule 67



The $2,913,128.06 thus represents the "value" of schedule 67 to CSI; ███████████████

█████████████. The "value" of schedules 45, 49, 49A and 61 is set forth below.

| Schedule | 45 | 49 | 49A | 61 | Total |
|---|---|---|---|---|---|
| ███████████████████████████████████████████ | | | | | |
| ██████████████████████████████████████████████████████ | | | | | |
| ██████████████████████████████████████████████████████[163] | | | | | |

Thus, the difference or "mark-up" between the value of schedule 67 and the value of the schedules

that were terminated and "rolled" onto schedule 67 is:

| Value of Schedule 67 | $2,913,128.06 |
|---|---|
| Less: Value of preceding schedules | $2,436,322.81 |
| **Equals Mark-Up** | **$   476,805.25** |

The $476,805.25 is precisely the amount of ██████████████████ ██████████ for

schedule 67.[164]  The mark-ups on all the refinanced schedules total $13,708,008.[165]

---

[161]  Account code ███████████████████████████████████████. Ex. 43 at
142:15-19.

[162]  The booked present value of the residual value on ███████████████████
██████████████████. Ex. 98 at 154:9-11.

[163]  Ex. 44; Ex. 94; Ex. 95; Ex. 96; Ex. 97; Ex. 93; *see* Ex. 51, ¶ 18.

[164]  Ex. 93.

[165]  Ex. 51, ¶ 34.  There can be no doubt that regardless of whether CSI's conduct was "deceptive," charging Lycos
an undisclosed mark-up of this magnitude is "unfair" within the meaning of 93A. *Mass. Farm Bureau,* 403 Mass.
722, 729, 532 N.E.2d 660, 664  (under 93A, §§ 2 and 11 "[a]n act or practice may be 'unfair' within the statutory
meaning *without* being deceptive or fraudulent") (emphasis added).

### D.    Lycos Is Entitled to At Least Double Damages.

Lycos is entitled to at least double damages because CSI's violation of the

Regulations was "knowing and willful."[166] Specifically, although certainly not exhaustive:

- CSI knew of the mark-ups and intentionally did not disclose their existence or magnitude.  This knowing and intentional non-disclosure is particularly egregious here where, according to CSI itself, disclosure is required under "general commercial and industry standards." [167]

- When Lycos asked about schedules 93 and 94, Mr. Stenberg, who had over $2 million in commissions at stake, misrepresented, among other things, the difference between its new payments and the amount Lycos would have paid if it had not entered into schedules 93 and 94.  Because Mr. Stenberg was so experienced in the leasing industry and knew or should have known the truth, his misrepresentation was reckless if not intentional.

- CSI itself deemed the Lycos refinancings as ▮▮▮▮▮" and the structure of schedules 93 and 94 as ▮▮▮▮▮".

- Although CSI told the world on its website that it was its customers' leasing "partner," and that CSI's customers "trust [it] to manage the leasing process efficiently and ethically," CSI's chairman and CEO testified that disclosure of information to customers depended on "what they ask for," and Mr. Stenberg wrote, after observing that Lycos "trusted" CSI and did not know certain facts, ▮▮▮▮▮▮▮▮▮"

- CSI's compensation plan specifically encouraged refinancings and mark-ups, and, for a period of time, even included a special ▮▮▮▮▮▮ from which Mr. Stenberg sought and benefited on the Lycos account.

Both the First Circuit and the Massachusetts Appeals Court have affirmed awards of double damages

under 93A, § 11 where the violation was based on non-disclosure.[168]

---

[166]  *Shawmut Cmty. Bank, N.A. v. Zagami*, 30 Mass. App. Ct. 371, 376, 568 N.E.2d 1163, 1166 (1991), ("Intentional nondisclosures of material facts have been held willful and knowing violations of G.L. c. 93A, § 2.") (collecting cases), *aff'd in relevant part*, 411 Mass. 807 (1992). A finding of either "knowing" *or* "willful" entitles Lycos to at least double damages. *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 578 n.13, 487 N.E.2d 520, 527, n.13 (1986).

[167]  *See* CSI's Am. Compl., ¶ 45 (Dkt. No. 121).  *Mitchell v. Money Store Mass. Inc.,* 12 Mass. L. Rep. 348 (Mass. Super. Ct. 2000) (noncompliance with standard industry practices was evidence of willfulness).

[168]  *Clinton Hosp. Assoc. v. Corson Group, Inc.,* 907 F.2d 1260, 1261-62 (1st Cir. 1990) (affirming multiple damages on 93A § 11 claim based on defendant's non-disclosure); *Lily Transp. Corp. v. Royal Inst. Srvs., Inc.*, 64 Mass. App. Ct. 179, 187, 832 N.E.2d 666, 673-74 (2005) (same).

While Lycos believes that there is sufficient evidence to award double, if not triple, damages here, and it asks the Court to award same, if the Court is prepared to grant (a) Lycos summary judgment in the amount of $13.708 million on Count VII and $2.563 million on Counts XII-XIII, and (b) Lycos's summary judgment motion as to CSI's claims, Lycos will waive its request for multiple damages to bring this case to conclusion. *Sears Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 19-20 (1st Cir. 1997) (upholding a trial court's entry of summary judgment under 93A, §§ 2 and 11 after plaintiff waived its claim for multiple damages.

II.    **LYCOS IS ENTITLED TO RESTITUTION OF THE AMOUNT BY WHICH CSI WAS UNJUSTLY ENRICHED BECAUSE LYCOS PAID TWICE TO PURCHASE THE EQUIPMENT ON SCHEDULES 93 AND 94.**

A.    **Equipment Schedules 93 and 94 Were Installment Sales Contracts.**

In deciding whether a lease is "truly not a lease but an installment sale," courts in Massachusetts[169] and Missouri[170] apply section 1-201(37) of the Uniform Commercial Code to resolve "one of the most frequently litigated issues under the entire Uniform Commercial Code."[171]

The 1988 amendments to section 1-201(37), as adopted by Missouri and Massachusetts,[172] create an objective *per se* test for determining whether a lease is a "true lease" or an installment sales contract.  To satisfy the *per se* test, courts first consider whether "the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee."[173]  If this test is met, courts then consider whether at least one of four other factors is met including whether "(a) the original term of the lease is equal to or greater than the remaining *economic* life of the goods . . . ."[174]  These factors are commonly referred to as the "residual value factors" because they assess whether the equipment would have a "meaningful" residual value when returned to the lessor at the end of the lease term.[175]

As to the first requirement, the Master Lease Agreement provides:

---

[169]  *Carlson v. Giachetti*, 35 Mass. App. Ct. 57, 59, 616 N.E.2d 810, 811 (1993) ("We look to G.L. c. 106, §§ 9-102 and 1-201(37) to determine whether a contract, characterized by the parties as a lease, is a 'true lease' or a security agreement.").

[170]  *In re Hoskins*, 266 B.R. 154, 157-58 (Bankr. W.D. Mo. 2001).

[171]  4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 30-3, at 12 (4th ed. 1995).  As 1-201(37) is part of the "uniform" commercial code, courts in Missouri and Massachusetts look to decisions from other jurisdictions for guidance.  *Rational Software Corp. v. Sterling Corp.*, 393 F.3d 276, 279 (1st Cir. 2005); *Hoskins*, 266 B.R. at 159.

[172]  M.G.L. c. 106, § 1-201(37) and Mo. Rev. St. c. 400.1-201(37).

[173]  M.G.L. c. 106, § 1-201(37); Mo. Rev. St. c. 400.1-201(37).

[174]  M.G.L. c. 106, § 1-201(37)(a); Mo. Rev. St. c. 400.1-201(37)(a) (emphasis added).

[175]  *In re Pillowtex, Inc.*, 349 F.3d 711, 718 (3d Cir. 2003); *PSINet*, 271 B.R. at 45; *see In re QDS Components, Inc.*, 292 B.R. 313, 333 (Bankr. S.D. Ohio 2002) ("The hallmark of a lease is that it grants the lessee the right to use the property for a period less than its economic life with the concomitant obligation to return the property to the lessor while it retains some *substantial economic* life.") (emphasis added).

> Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other right that Lessee may have against Lessor.[176]

In construing this clause, CSI argued earlier in this case that:

> These types of clauses, known as 'hell or high water' provisions . . . require the lessee to make payments under the lease 'come hell or high water,' without regard to defenses that the lessee might wish to assert against the lessor, and without any right of recoupment.[177]

As Lycos was obliged to make the monthly payments come "hell or high water," Lycos has satisfied the first requirement under the *per se* test of 1-201(37).[178]

As to the residual value factors, the critical question is whether "the lessor has retained a *meaningful* residual interest in the goods at the end of the lease term."[179] Again, based on the plain language of 1-201(37)(a), the focus is on the equipment's expected "economic" value to the *lessor* at the time the "lease" was signed,[180] not whether the equipment would still have "useful" life for the lessee or whether the equipment proved at the end of the lease term to have *some* residual value.

CSI maintained sales type lease journal entries in accordance with Financial Accounting Standard 13 ("FASB 13").[181] In accordance with FASB 13, at the time CSI and Lycos entered into each schedule, CSI booked an expected residual value for each piece of equipment as of the end of the lease term.[182] Under FASB 13, CSI's "estimated residual value" was to equal the equipment's

---

[176] Ex. 1 to CSI's Am. Compl., ¶ 5.

[177] CSI's Mem. in Supp. of Mot. Dismiss Def.'s Countercl. at 3 (Dkt. No. 16).

[178] *Charles*, 278 B.R. at 222 ("hell or high water clause") satisfies the first requirement); *In re Triplex Marine Maint.*, 258 B.R. 659, 669 (Bankr. E.D. Tex. 2000) (same).

[179] *In re Copeland*, 238 B.R. 801, 804 (Bankr. E.D. Ark. 1999) (emphasis added); *accord In re Worldcom, Inc.*, 339 B.R. 56, 71 (Bankr. S.D.N.Y. 2006); *see In re Beckham*, 275 B.R. 598, 605 (D. Kan. 2002) (the principal characteristic of a lease is that the lessee may return the property to the lessor while it still has "*substantial* useful economic life.") (emphasis added); *QDS Components*, 292 B.R. at 333 (same).

[180] M.G.L. c. 106, § 1-201(37)(b) ("'remaining economic life of the goods' [is] to be determined with reference to the facts and circumstances at the time the transaction is entered into"); Mo. Rev. Stat, § 400.1-201(37)(b) (same).

[181] Ex. 43 at 133:6-9.

[182] Ex. 98 at 46:11-14.

expected "fair value."[183]  FASB 13 defines fair value to mean the "price for which the property could be sold in an arm's-length transaction between unrelated parties."[184]  Knowing that the equipment was already several years old and would be an additional two and three years old at the end of those schedules, CSI booked a residual value for the equipment on schedules 93 and 94 as *zero*.[185]  CSI thus expected the equipment to have *no* residual value, let alone a "meaningful" or "significant" residual value, at the end of the lease terms.[186]  Accordingly, the length of the term of schedules 93 and 94 equaled or exceeded the economic life of the equipment on those schedules.  Thus, under the *per se* test, schedules 93 and 94 were installment sales contracts rather than true leases and Lycos became the owner of that equipment when it made all the payments required under them.[187]

> ### B. Lycos is Entitled to Restitution of the Portion of the $3.775 Million Lycos Paid to CSI Attributable to the Equipment on Schedules 93 and 94 Because it Paid Twice to Purchase that Equipment.

Under the Sales Agreement, Lycos paid CSI $3.775 million to purchase the equipment on thirteen schedules, including schedules 93 and 94, subject to making the remaining payments due under those schedules.  As Lycos was to become the owner of the equipment on schedules 93 and 94 when it made the payments due on those schedules, the portion of the $3.775 million payment attributable to the equipment on schedules 93 and 94 was "double" payment for the same equipment.

---

[183]  Ex. 45, ¶ 5(h).

[184]  *Id.*, ¶ 5(c).

[185]  Ex. 51 at Exhibit K thereto, column headed "residual"; Ex. 98 at 154:12-16, 299:15-23; Ex. 83; Ex. 84. The booked present value of the residual value on the sales type lease journal entry for schedules 93 and 94 is blank because the residual value on an undiscounted basis (account code 12520) is $0. Ex. 98 at 154:9-11.

[186]  This is consistent with the observation that, at least historically, computer equipment becomes obsolete very quickly. 1 Shrank & Gough Jr., *Equipment Leasing—Leveraged Leasing*, § 2:4.1 at 2-13.

[187]  *See In re The Liquidation of United Sec. Pac. Equip. Leasing, Inc. v. FDIC*, 2000 Tenn. App. LEXIS 80, at *20 (2000) ("ownership of leased property remains vested in the lessor, while ownership of property purchased by installment contract is transferred to the purchaser").

Under Missouri law,[188] a party that pays twice is entitled to restitution for the double payment under theories of unjust enrichment and/or money had and received.[189]  Regardless of the theory under which restitution has been granted, courts have consistently enforced the "fundamental principle of equity that no person shall be unjustly enriched at the expense of another."[190]

Restitution based on unjust enrichment "is not confined to the form of action or by the traditional limits of law or equity jurisdiction." [191]  Rather, "it operates on equitable principles, but draws its source from law as well as equity."[192]  There are three elements to a claim for unjust enrichment: (1) the defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it would be unjust to allow the defendant to retain the benefit."[193] The requirements for money had and received are not materially different.  That doctrine, which is "favored in the law,"[194] applies when "the defendant has received money or obtained possession of the money of the plaintiff which, in equity and good conscience, he ought to pay over to the plaintiff."[195]  Here, the requirements for both doctrines are met: CSI was enriched by the money that Lycos paid to purchase the equipment when it made the payments under schedules 93 and 94, and (unjustly) enriched again when Lycos paid for that same equipment under the Sales Agreement.

While some courts have limited actions for unjust enrichment to cases where the double payment was made based on a mistake of fact rather than a mistake of law, the Missouri Supreme

---

[188]  Lycos acknowledges that its claim for "money had and received" is in the nature of a contract claim, and is thus governed by Missouri law.  Mem. of Dec. at 5 (Dkt. No. 46).

[189]  *See, e.g., O'Keefe v. McDonnell Douglas Corp.*, 918 F. Supp. 1338, 1344 (E.D. Mo. 1996) (party who received money to which it was not entitled was subject to claim for unjust enrichment); *Blue Cross Health Srvs., Inc. v. Sauer*, 800 S.W.2d 72, 76 (Mo. App. 1990) ("The appropriate action when one party has been unjustly enriched through the mistaken payment of money by the other party is an action at law for money had and received.").

[190]  *See, e.g., Handley v. Lyons*, 475 S.W.2d 451, 461 (Mo. App. 1971); *Glover v. Metro. Life Ins. Co.*, 664 F.2d 1101, 1104 (8th Cir. (Mo.) 1981).

[191]  *Petrie v. LeVan*, 799 S.W.2d 632, 635 (Mo. App. 1990).

[192]  *Id.*

[193]  *Id.* (citing R. Goff & G. Jones, *The Law of Restitution*, at 14 (1966)).

[194]  *Glover*, 664 F.2d at 1104 (quoting *Clifford Banking Co. v. Donovan Comm'n Co.*, 195 Mo. 262, 288, 94 S.W. 527, 535 (Mo. 1906)).

[195]  *Id.* at 1104.

Court and the Eighth Circuit have written that "the important question is not whether the mistake was one of law or of fact, but is whether the case falls within the fundamental principle of equity that no person shall be unjustly enriched at the expense of another."[196] Even if this Court were to draw a distinction between a mistake of law and a mistake of fact, "[i]t is well settled that restitution will be granted to remedy a payment made because of a mistake of law if the surrounding facts raise an independent equity, as when the mistake is induced, or is accompanied by inequitable conduct of the other party."[197] For the reasons set forth above, CSI's failure to disclose the mark-ups and Mr. Stenberg's misrepresentation concerning the difference between the payment obligations in connection with schedules 93 and 94 satisfy the requirement for inequitable conduct. While CSI may again blame Lycos for not discovering the "double payment," the law is settled that a payor's lack of discovery does not diminish his right to recover, or somehow justify retention of a windfall.[198]

### C.    Lycos is Entitled to Restitution of $2,854,602.

The measure of recovery in an action for unjust enrichment "is not the actual amount of the enrichment, but the amount of the enrichment which, as between the two parties, would be unjust for one party to retain."[199] It would be unjust for CSI to retain the portion of the $3.775 million attributable to the equipment on schedules 93 and 94 because Lycos paid for that equipment twice. The portion attributable to schedules 93 and 94 for which Lycos is entitled to restitution is $2,854,602.[200]

---

[196] *Id.*; *Handley*, 475 S.W.2d at 461.

[197] *W. Cas. & Sur. Co. v. Kohm*, 638 S.W.2d 798, 800 (Mo. App. 1982); *see Fid. & Deposit Co. of Md. v. FDIC*, 54 F.3d 507, 513 (8th Cir. (Mo.) (1995) (quoting *Kohm* and *Handley* as authority for Missouri law).

[198] *W. Cas. & Sur. Co.*, 638 S.W.2d at 801.

[199] *Koepke Const., Inc. v. Woodsage Const. Co.*, 844 S.W.2d 508, 515-16 (1992).

[200] Ex. 51, ¶¶ 45, 46 and Exhibit K thereto.

## CONCLUSION

Lycos respectfully requests that the Court enter an order allowing Lycos's Motion for Partial

Summary Judgment as to Certain of its Claims on Counts VII, XII and XIII of its Counterclaim.

LYCOS, INC.

Dated: September 4, 2007

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

/s/ Peter M. Acton, Jr.
Peter M. Acton Jr.