UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | | |
|---|---|---|
| | ) | |
| COMPUTER SALES INTERNATIONAL INC., | ) | C.A. No. 05-10017- RWZ |
| Plaintiff, | ) | |
| v. | ) | **LEAVE TO FILE** |
| | ) | **MEMORANDUM OF UP TO** |
| LYCOS, INC., | ) | **THIRTY PAGES GRANTED** |
| Defendant, | ) | **JUNE 13, 2007** |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | **ORAL ARGUMENT** |
| Trustee Process Defendant. | ) | **REQUESTED** |
| | ) | |

**PLAINTIFF COMPUTER SALES INTERNATIONAL'S OPPOSITION
TO LYCOS'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
"CERTAIN CLAIMS" IN COUNTS VII, XII, AND XIII OF ITS COUNTERCLAIM**


Submitted by:

Robert J. Kaler, BBO No. 542040
Edward W. Little, BBO No. 628985
Kelly A. Gabos, BBO No. 666219
McCarter & English LLP
265 Franklin Street
Boston, MA  0211
Tel. (617) 449-6500

*Counsel for Plaintiff Computer Sales
International, Inc.*

Dated:  November 19, 2007

ME1 6895444v.1

# TABLE OF CONTENTS

**Section**                                                                                                      **Page**

INTRODUCTION……………...……………..…………………………….………..1

SUMMARY OF ARGUMENT…..…………………..…………………………….……..1

STATEMENT OF RELEVANT FACTS……………………..……………………….……6

ARGUMENT……………………………………………………………………………9

I.      LYCOS'S RECITATION OF THE PURPORTED "FACTS" OF THIS
        CASE IS UNTRUE, AND HAS BEEN MANUFACTURED AFTER THE
        FACT USING CONTINGENTLY PAID WITNESSES, AND AFFIDAVIT
        TESTIMONY WHICH DIRECTLY CONTRADICTS WITNESS'S
        DEPOSITION TESTIMONY………………………………………….…...……10

II.     LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT
        VII OF ITS COUNTERCLAIM DEMANDING A REFUND OF MOST
        OF CSI'S GROSS PROFITS UNDER THE EXTENDED LEASES......…..……13

        A.      Lycos Is Estopped From Arguing that Its Operating Leases With
                CSI Were Loans, Or That They Had a "Balance" Above Which
                No Profit Could Be Charged in Excess of a Certain Interest Rate
                When They Were Extended Without That Portion of the Profit
                Being Expressly Disclosed………………………………………………14

        B.      Neither M.G.L. c. 93A nor 940 C.M.R. 3.05(1) and 3.16(2) Required
                CSI to Calculate and Disclose to Lycos What Portion of Its Gross
                Profit on Extended Leases Exceeded What Lycos Now Claims Was
                the "Balance" on the Prior Leases ………………………….……………15

        C.      The Regulation on Which Lycos Primarily Relies, 940 C.M.R.
                3.16(2), Does Not Apply to Arm's Length Business
                Transactions Between Sophisticated Business Entities
                Such as Lycos and CSI ……………………………………………………17

        D.      Lycos's Claims That It Was Told "Half Truths" Material to Its
                Decision-Making Are Disputed by CSI's Witnesses, and by
                the Evidence That Lycos Had All The Information
                It Needed to Make Informed Economic Decisions
                on Whether to Extend Its Leases……..……………………………………19

        E.      The Purported "Facts" On Which Lycos Relies For Its $13.7
                Million Damages Calculation Are Both Disputed and Legally
                Insufficient ………………………………………………………………..21

**III.   LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT ON
ITS CLAIM FOR "RESTITUTION" OF AMOUNTS IT PAID TO
CSI UNDER THE PARTIES' AUGUST 2003 SALES AGREEMENT** ……..….22

   **A.   Lycos Is Estopped From Arguing that Its Last Two Extended
   Leases With CSI Were "Installment Sales Contracts" Because
   It Consistently Treated Them As Leases From a Tax and
   Accounting Standpoint, Gaining Valuable Financial Benefits
   and Reaffirmed Their Validity as Leases to CSI
   in the Sales Agreement**…………………………..………………………..22

   **B.   There Is No Basis In Any Event For Lycos to Claim That Its
   Last Two Extended Leases With CSI Were "Installment Sales
   Contracts" Because The Requirements For Such Treatment Were
   Not Satisfied** …………………………………………………………24

   **C.   Lycos Did Not Enter Into The Sales Agreement By Mistake
   and Received A Substantial Benefit From Treating the
   Extended Leases as Leases** ……………………………………………..28

**CONCLUSION** ……..……………………………………………………………...29

ii

## INTRODUCTION

Plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") respectfully submit this memorandum of law in opposition to Defendant Lycos, Inc.'s Motion for Partial Summary Judgment as to Certain Claims in Counts VII, XII and XIII of its Counterclaim (Docket No. 146) (hereinafter the "Lycos' SJ Motion").

## SUMMARY OF ARGUMENT

This action, filed on January 5, 2005, began as an effort to recover a $310,000 account receivable which is owed to the plaintiff CSI Leasing, Inc. ("CSI") under the last two of a long series of computer equipment leases (the "Leases") that CSI entered into with the defendant Lycos, Inc. ("Lycos" or "the defendant") over a seven year period from 1996 to 2002. *See* Verified Complaint, dated January 5, 2007 (Docket No. 1).

The case has morphed into something more complicated as a result of the defendant's counterclaims, which -- in their most recent iteration[1] -- **(1)** seek to revisit and rescind, and refund to Lycos most of the gross profit earned by CSI on, any Leases that extended the amount of time that Lycos could continue to use equipment that it had already leased from CSI

---

[1]     Lycos' original theory, as it explained to the Court in 2005, was that it had been defrauded, and had overpaid CSI, because its Lease payments wound up totaling about 65% more than the original cost of the equipment it had leased (the "Equipment"), and that supposedly, it had never kept track of that original Equipment cost, and therefore did not know how much CSI was making on the Leases over and above its Equipment cost. *See generally* Transcript of Hearing of May 12, 2005 at Docket No. 43). Discovery subsequently revealed, however, that Lycos could and did keep track of the original cost of the Equipment -- because it selected and ordered it. It also revealed that rather than returning the equipment at the end of each Lease term, Lycos had repeatedly extended the Leases in order to keep those assets off its balance sheet, conserve its cash, and avoid having to locate, return, and replace the assets.

As a result, Lycos has **shifted its theory** to one in which it is now claiming that as a result of discovery in this case, it has supposedly "uncovered" that the total amount it paid pursuant to some of the later, extended Leases was higher than the residual value for the Equipment carried on CSI's books at the time, and that under Mass. Attorney General's regulations and M.G.L. c.93A, CSI should have disclosed to Lycos what portion of Lycos' payments on each Lease extension constituted this portion of the gross profit being earned by CSI -- in order to allow Lycos to make decision as to whether each transaction was "economically justifiable."

(hereinafter "Extended Leases");[2] and **(2)** also seek to rescind, and refund to Lycos most of the purchase price it paid to CSI under, a Sales Agreement in which Lycos agreed, in August of 2003, to buy virtually all the equipment it had previously leased from CSI, and not yet returned.[3]

**1.**    As to the first of the above categories of counterclaims, seeking to rescind the Extended Leases, Lycos argues[4] that the monthly payments it agreed to make under the Extended Leases improperly included an amount of gross profit in excess of what Lycos' now claims a fair rate of return would have been **(a)** if Lycos' original Leases of the relevant Equipment *are viewed as loans*; **(b)** if the present value of the remaining payments due on these original Leases when they were each extended, plus CSI's then-booked "residual value"[5] for the relevant Equipment covered by each Lease, are viewed as *outstanding principal balances* on a series of loans; and **(c)** if the Extended Leases are viewed as *loan refinancings*.

Having set forth its position in this way, Lycos argues that CSI's action in charging Lycos what it did on each Extended Lease, even though the total amount of the agreed monthly payment was fully disclosed, was like a lender secretly increasing, or "marking up," the principal amount due on a loan when a borrower refinances and extends that loan,[6] because CSI charged it more than what it now thinks fair rate of return would have been, based on its review of CSI's internal accounting and profitability records in discovery -- which admittedly were not available to Lycos at the time of the relevant transactions, but were produced by CSI in response to

---

[2]    *See* Lycos Memorandum of Law in Support of Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaims, Docket No. 148 ("Lycos SJ Memo") at pp. 12-25 ("Argument" Part "I").

[3]    *See* Lycos SJ Memo at 25-30 ("Argument" Part "II").

[4]    *See* Lycos SJ Memo at 12-25 ("Argument" Part "I").

[5]    The terms "residual value," in this context, refers to the straight line depreciated dollar amount that CSI is permitted to "book," or record as an asset amount in its financial records, to represent the value of its ownership of the Equipment it had leased to Lycos. The "in place" value of that Equipment to Lycos would obviously be much higher. *See* Affidavit of James S. Schallheim, Ph.D. ("Schallheim Aff.") ¶ 43, attached as Ex. 3 to Declaration of Kelly A. Gabos ("Gabos Decl."); Affidavit of James M. Johnson, Ph.D. ("Johnson Aff.") ¶ 22 (Gabos Decl. Ex. 4); Affidavit of Michael Fleming ("Fleming Aff.") ¶ 74 (Gabos Decl. Ex. 5).

[6]    *See* Lycos SJ Memo (Docket No. 148) at 6-7.

2

discovery requests in this case.

What is fatal to Lycos' argument on these points from a legal standpoint is that, as Lycos' own Vice President of Finance and Administration Thomas Guilfoile admitted in his deposition, Lycos' transactions with CSI "were leases, not loans,"[7] and no law or regulation limits the amount that a willing lessor can charge a willing lessee for a lease or lease extension--rather, that is a matter governed by the free market, which in the leasing area is highly competitive.[8]

Moreover, it is undisputed that Lycos accounted for all the Extended Leases as ***operating leases*** throughout its history, reporting them as such in its annual audited financial statements (thereby gaining substantial benefits from treating them as such), confirmed to CSI in writing that it recognized them as valid leases, and ***never*** treated them as loans -- which would have had to be reflected on its balance sheets as long-term debt.  Under these circumstances, basic principles of estoppel prohibit Lycos from now claiming that the transactions were really loans, or have to be evaluated as such, and that it is therefore entitled to a refund.[9]

In addition, Lycos' arguments about what it "expected" it was paying, and what CSI supposedly "did not disclose" or "should have disclosed" to it, are hotly disputed factually -- in part by CSI's officials, in part by conflicting testimony from Lycos' own witnesses, and also by professional opinions from five (5) different expert witnesses retained by CSI's counsel to testify in this case, including two Ph.D. finance professors specializing in the economics and practice of equipment leasing, a Certified Public Accountant ("CPA") specializing in equipment lease

---

[7]     *See* Deposition of Thomas Guilfoile ("Guilfoile Dep.") at 203:4-11 (Gabos Decl. Ex. 2).

[8]     See Fleming Aff. ¶¶ 8, 17-21 (Gabos Decl. Ex. 5); Johnson Aff. ¶¶ 10, 14-20 (Gabos Decl. Ex. 4); Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Ex. 3).

[9]     As the Court held in *In re Martin Brothers Toolmakers, Inc*., 796 F.2d 1435 (11th Cir. 1986), a party's treatment of an agreement as a lease through beneficial tax and other financial structuring estops the party from later arguing that the lease was not a lease but a security agreement or a mortgage.  *Id*. at 1441 ("The inconsistency here is appellant's assertion of mortgagor status after it has entered into a lease agreement with appellee.  This turnabout is particularly offensive to equitable principles since [the claimant] Martin Bros. has received significant benefits, namely lower rent and operating costs, from executing a lease agreement….").

accounting, a professional Computer Equipment Appraiser, and the immediate past President of the Equipment Finance & Leasing Association -- all of whom have testified that Lycos' arguments about the Lease Extensions have no merit, and are based on faulty reasoning.[10]

2.    The current basis for Lycos' second category of counterclaims -- seeking to rescind the August 2003 Sales Agreement, and force a refund of a portion of the purchase price paid under it -- is the argument by Lycos[11] that although it accounted for all the Extended Leases as "off-balance sheet" operating leases throughout its history, the last two major extensions, nos. 93 and 94, are more properly viewed, in retrospect, as part of ***"installment sales contracts"*** under the Uniform Commercial Code -- supposedly because CSI's booked residual value on much of the equipment had depreciated down to zero at the time of those Extensions.

Based on this argument, Lycos claims that **(a)** no further payment for the purchase of the Equipment covered by those last two extensions was owed to CSI at the end of those Extension Lease terms, **(b)** the portion of the Sales Agreement lump sum purchase price of $3.7 Million "attributable" to the purchase of that Equipment constituted "double payment" for that Equipment, and **(c)** the Sales Agreement should be simply "rescinded," and that portion of the purchase price refunded to Lycos.[12]

What is fatal to this argument from a legal standpoint is that for years, Lycos consistently took the position, with the IRS, its shareholders, CSI, and the general public, that the last two Extended Leases were properly accounted for in its financial statements and tax returns ***as operating leases*** -- not conditional sales contracts as to which taxes would have been immediately due, and different financial and accounting treatment required.  It also expressly agreed, in the Sales Agreement, that the Extended Leases were all ***valid and enforceable leases***.

---

[10]    See *generally* Schallheim Aff., Johnson Aff., Fleming Aff. (Gabos Decl. Exs. 3-5).
[11]    *See* Lycos SJ Memo at 25-30 ("Argument" Part "II") (Docket No. 148).
[12]    *See* Lycos SJ Memo at 25-30 ("Argument" Part "II") (Docket No. 148).

Under basic principals of estoppel, Lycos cannot argue now, in an effort to obtain a refund from CSI, that the last two Extended Leases were really conditional sales contracts and that the August 2003 Sales Agreement constituted "paying twice" for the equipment.  *See supra* note 2.[13]  In addition, Lycos' arguments on these points as well are disputed factually -- in part by CSI's officials, in part by conflicting testimony from Lycos' own witnesses, and also by expert testimony.[14]  For all of these reasons, as more fully set forth below, Lycos' demand for "partial summary judgment" on "certain claims" in its counterclaims must be properly denied, because there are multiple disputed issue of material fact relevant to those claims, and because the claims themselves are barred as a matter of law.

There is also another issue, however.  These counterclaims are frivolous, and were brought *in bad faith*.  As the evidence cited herein, in CSI's Local Rule 56.1 Statements, and in CSI's Opposition to Lycos's Motion for Summary Judgment as to CSI's Amended Complaint demonstrates,[15] Lycos conspired to challenge the validity of its Leases with CSI at the very moment it was signing a contract with CSI confirming the validity of all the Leases, and promising to pay them in full.

Then, Lycos improperly offered and agreed, through its legal counsel and in direct violation of Disciplinary Rule 3.4(g),[16] to pay a huge contingent fee compensation to a key witness, who then reviewed Lycos' CFO's files looking for evidence to support a "fraud" claim against CSI -- even though the Lycos CFO had specifically told them that there was nothing of

---

[13]     Fleming Aff. ¶¶ 63-64 (Gabos Decl. Ex. 5).

[14]     *See generally* Fleming Aff., Johnson Aff., Schallheim Aff. (Gabos Decl. Exs. 3-5); *see also* Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5 (expressly detailing under August 2003 Sales Agreement that title to equipment did *not* pass to Lycos until all conditions of remaining leases were satisfied).

[15]     *See* Response of Computer Sales International, Inc. to Lycos's Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Summary Judgment on All Counts of CSI's Amended Complaint, dated Nov. 19, 2007 and filed herewith, at ¶¶ 12-18.

[16]     *See generally* Expert Report of Professor Nancy J. Moore Pursuant to Fed. R. Civ. P. 26(a)(2), dated Aug. 31, 2007 ("Moore Report") (attached as Ex. 24 to Gabos Decl.) (Boston University Professor of Law concluding that contingent compensation to witness by Lycos' counsel violated ethical rules).

significance in those files -- and found an irrelevant and inconsequential email from a CSI sales representative that is now the centerpiece of that "fraud" claim.[17]

Now, in support of its summary judgment motion, Lycos has improperly submitted an affidavit from that same former CFO directly contradicting his deposition testimony that he **never** relied on, and in fact **did not even recall receiving**,[18] the March 2002 email from a CSI sales representative that the Lycos SJ Memo argues, at pages 9-11, was a misrepresentation that the CFO supposedly relied on because he "trusted" the CSI sales rep.[19]

What the consequences of these actions will be is not yet clear, but what is clear is that Lycos' repeated allegations of "misconduct" against CSI mask a darker manipulation of the legal process by Lycos than is readily apparent on the surface, and will only become apparent at trial.[20] Until then, the one thing that is certain is that summary judgment for Lycos on any of its counterclaims would not be appropriate.

## STATEMENT OF RELEVANT FACTS[21]

1.    CSI is a St. Louis-based independent computer equipment leasing company doing business throughout the United States and abroad.[22]   In December of 1996, CSI and Lycos

---

[17]    *See* E-mail from John Kirk to Lycos' Litigation "Team," dated Jan. 7, 2004 (Gabos Decl. Ex. 20).

[18]    *See* Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep.") at 52:8-53:20 (Gabos Decl. Ex. 19).

[19]    Moreover, Lycos apparently never trusted CSI's sales representative, given the way it referred to him internally.  In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps dated September 6, 2000, for example, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg.  *See* Gabos Decl. Ex. 15.  In addition, Mr. Karol testified that he told Brian Lucy – the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg – "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos."  Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

[20]    *See generally* CSI's Memorandum in Opposition to Lycos's Motion for Summary Judgment Dismissing All Counts of CSI's Amended Complaint, dated Nov. 19, 2007 and filed herewith.

[21]    **For a detailed recitation of the facts, CSI respectfully refers the Court to its two responsive statement of disputed facts, with citations, which it submits herewith pursuant to Local Rule 56.1**: (a) *Response of Computer Sales International, Inc. to Lycos's Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Summary Judgment on All Counts of Computer Sales International's Amended Complaint*, and (b) *Response of Computer Sales International, Inc. to Lycos's Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim.*

[22]    CSI's Amended Complaint ¶ 2 (Docket No. 121).

entered into a Master Lease containing standard terms and conditions for computer equipment leases,[23] and over the next several years, it leased huge amounts of computer equipment to Lycos that Lycos used to conduct its internet search operations.

2.      Lycos was founded in 1995 as a Massachusetts-based internet start-up company and quickly went public in 1996.  During the period 1996 to 2000, Lycos exploded into a huge internet conglomerate through a series of public stock offerings and acquisitions of other companies.  During that time, Lycos was fully aware of the cost of the Equipment it was leasing from CSI because it selected that Equipment, and issued purchase orders for it that were then assigned to CSI for payment.[24]

3.      Also during those years, Lycos' policy was never to buy equipment when it could lease it,[25] as leasing allowed it to keep the equipment off its balance sheet and conserve its cash.  As leases came up for expiration in these years, Lycos would typically renew and extend them, rather than try to buy the Equipment, because by doing so it kept the Equipment off its balance sheet, and conserved its cash.[26]  (Lycos treated its equipment leases as "off balance sheet" operating leases, which meant that it did not have to record the debt associated with them.[27])

4.      Lycos' rapid growth during the period 1996 - 2000 culminated in the $12 Billion acquisition of Lycos by the Spanish telecommunications giant Telefonica in October of 2000 -- a transaction which resulted in the original senior management of Lycos, who had run the company since 1996, receiving large stock options payouts in the tens of millions of dollars, and then departing from the company.

---

[23]     Ex. 10 to CSI's Amended Complaint (Docket No. 121).
[24]     Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 31, 35, 143-48 (Gabos Decl. Ex. 7).
[25]     Deposition of Ernesto Galvan, dated Feb. 20, 2007 ("Galvan Dep.") at 32:3-13 (Gabos Decl. Ex. 6).
[26]     Johnson Aff. ¶¶ 26, 33 (Gabos Decl. Ex. 4); Fleming Aff. ¶ 32 (Gabos Decl. Ex. 5).
[27]     Callagee Dep. at 31, 35 (Gabos Decl. Ex. 7); *see also* Johnson Aff. ¶¶ 26, 33 (Gabos Decl. Ex. 4); Fleming Aff. ¶ 32 (Gabos Decl. Ex. 5).

7

5.    Shortly thereafter, in 2001, the internet boom collapsed, and an industry-wide recession occurred which caused a dramatic reduction in the revenues of the company, which was then known as "Terra Lycos" (as it was a wholly-owned subsidiary of Telefonica's "Terra Networks" internet division).  As a result, the company, which was then under new management, began a cost-cutting program, laying off hundreds of employees in 2001,[28] and further extending all its leases of computer equipment (most of which were with CSI) -- even equipment that it had already had under lease for several years -- in an effort to slash operating expenses.

6.    As part of that cost-cutting program, in October 2001, Terra Lycos chose, rather than trying to buy the thousands of pieces of Equipment that it was then leasing from CSI, to simply extend for several years its Leases of that Equipment -- at a 30% reduction in its monthly lease payments (*i.e.,* its monthly rent was reduced from $1.2 million to approximately $850,000). The result of that extension was that it incurred an aggregate increase in its total future Lease payment obligations of approximately $11 Million -- which Lycos fully understood it was incurring at the time because it had to post an $11 Million Letter of Credit in favor of CSI to secure that added obligation before this major extension of its Leases became effective.[29]

7.    In 2002, Terra Lycos' parent company instructed it to capitalize the Leases, and it requested quotes from CSI to buy out the Equipment, which it received.[30]  It did not pursue a buy-out negotiation in earnest until the middle of 2003, however, and at that time, it retained expert leasing consultants represent and advise it in its negotiations with CSI.  As a result of those negotiations, it executed the Sales Agreement with CSI in August of 2003, reaffirming the

---

[28]    E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18); Deposition of Timothy Wright ("Wright Dep.") at 94:21-95:3 (Gabos Decl. Ex. 9).

[29]    Deposition of Philip Cagney, dated Sept. 27, 2006 ("Cagney Dep.") at 245:7-19; 256:2-9 (Gabos Decl. Ex. 10).

[30]    Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7); E-mail from Paul Stenberg to Brian Lucy, attached to the Declaration of Edward W. Little, Jr., filed herewith ("Little Decl.")as Ex. 8.

validity of the Leases and representing that it would make all payments under them when due.

## **ARGUMENT**

This court has repeatedly held that before summary judgment can be properly considered, the moving party (in this case Lycos) must make out a *prima facie* case, based on the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Davis v. Protection One Alarm Monitoring, Inc.*, 456 F. Supp. 2d 243, 248-49 (D. Mass. 2006) (citing Fed. R. Civ. P. 56(c)).

If the moving party can do so, the burden shifts to the non-moving party (in this case CSI) to set forth specific facts showing that there is a genuine, triable issue. *Id.* at 249 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)), and in considering the motion, the Court views the entire record in the light most hospitable to the non-moving party, and indulges all reasonable inferences in its favor. *Id.* (citation omitted).

In this case, Lycos cannot make out even a *prima facie* case for judgment in its favor because on the undisputed facts, it is estopped as a matter of law from arguing (a) that the Extended Leases were loans (or that, therefore, there was any "mark-up" of a "balance" on the original Leases when they were extended); or (b) that the Extended Leases were "installment sales contracts" (and therefore that there was any "unjust enrichment" in CSI being paid the purchase price to which Lycos agreed in the Sales Agreement).

Furthermore, Lycos' arguments about what it supposedly "expected" it was paying, and what CSI supposedly "did not disclose" and "should have disclosed" to Lycos, are hotly disputed factually -- in part by CSI's officials, in part by conflicting testimony from Lycos' own witnesses, and also by professional opinions from the different expert witnesses retained by

CSI's counsel to testify in this case.[31]    In addition, Lycos has severely misconstrued Massachusetts consumer regulations by seeking to twist and extend them into a sophisticated commercial setting to which they are not applicable.  In this regard, Lycos has not demonstrated, and cannot show, that the common law, M.G.L. c. 93A, or the Massachusetts Attorney General regulations, would under any circumstances require a commercial vendor to disclose the amount of its gross profits on particular transactions to its commercial customers.

Finally, Lycos' recitation of the purported "facts" of this case is demonstrably untrue in critical respects, and has been manufactured after the fact using contingently paid witnesses.

I.    **LYCOS'S RECITATION OF THE PURPORTED "FACTS" OF THIS CASE IS UNTRUE, AND HAS BEEN MANUFACTURED AFTER THE FACT USING CONTINGENTLY PAID WITNESSES, AND AFFIDAVIT TESTIMONY WHICH DIRECTLY CONTRADICTS WITNESS'S DEPOSITION TESTIMONY**

In discussing its view of the "facts," the Lycos SJ Memo claims, at p. 1, that this is a case

> about how an experienced leasing company…defrauded a less than two year old internet company, Lycos, Inc.,…out of millions of dollars through…undisclosed 'mark-ups'" on computer equipment leases.

Lycos further argues that CSI made "numerous affirmative misrepresentations" and told "many half-truths" to Lycos -- which it says constituted "misconduct" that "will be the subject of trial."[32]    It then goes on, at pages 3-11, to give an account of the "Facts" of this case in which it claims that Lycos was a naïve "two year old" taken advantage of by CSI's account executive, and that Lycos was overcharged on the Extended Leases.

The detailed review of the evidence set forth in CSI's Local Rule 56.1 Statement in opposition to the Lycos SJ Motion, however, shows that Lycos's view of the "facts" relevant to Lycos' counterclaims is inaccurate and incomplete, relies on one-sided interpretations of

---

[31]    *See generally* Schallheim Aff., Johnson Aff., Fleming Aff. (Gabos Decl. Exs. 3-5).
[32]    *See* Lycos SJ Memo at 1.

documents, is improperly based on the statements of contingently paid witnesses,[33] and is contradicted by CSI's witnesses.[34]    CSI hereby incorporates its aforesaid Local Rule 56.1 Statement herein by reference, and respectfully refers the Court to it as evidence of some of the key disputed issues of material fact that precluding the summary judgment that Lycos seeks.

In a nutshell, the evidence shows that Lycos' counterclaims make no sense.  For most of the years of its relationship with CSI, Lycos was a huge public company with hundred of millions of dollars in cash on its balance sheet, Cravath Swaine & Moore and other major corporate law firms as its legal counsel, and a succession of big six accounting firms as its auditors.  The evidence also shows that far from being "defrauded" into extending its Leases, Lycos did so at every stage only after evaluating the market and determining that it was cheaper for it to enter into the Extended Leases than to devote the time and energy that would have been required to return and replace the relevant Equipment, or the money to buy it - taking into account, for example, Lycos' desire not to capitalize the leases[35] (and instead continue to claim operating lease accounting treatment for them)[36], their desire to lessen monthly expenses[37] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94), and their inability to return a large portion of the leased equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment).[38]

---

[33]    Moore Report (Gabos Decl. Ex. 24)

[34]    See *generally* Schallheim Aff., Johnson Aff., Fleming Aff. (Gabos Decl. Exs. 3-5).

[35]    Lycos' policy was not to buy anything that it could lease instead.  Galvan Dep. at 32:3-13 (Gabos Decl. Ex. 6).

[36]    In fact, it was Lycos' parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003.  Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7).  Moreover, Mr. Guilfoile, Lycos' Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification.  Guilfoile Dep. at 79:21-80:9 (Gabos Decl. Ex. 2).

[37]    Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Gabos Decl. Exh. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-111:7.

[38]    E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.

In this regard, there is no evidence of "numerous affirmative misrepresentations" and "many half-truths" being conveyed by CSI to Lycos. To the contrary, all indications are that CSI made no material misrepresentations of any kind to Lycos, and certainly did not make any intentional misrepresentations.[39] What Lycos has done, however, is simply manufacture claims that there were misrepresentations in order to try to extort concessions from CSI -- in a classic abuse of process.

In this regard, the evidence is almost indisputable that Lycos conspired to challenge the validity of its Leases with CSI at the very moment it was signing a contract with CSI, on August 8, 2003, confirming the validity of all the Leases, and promising to pay them in full.[40] Then, it embarked on a plan to try to embarrass CSI by publicizing bogus claims of "fraud" and "overcharging" in the media -- in an effort to extort concessions from CSI reducing the amount of its agreed payment obligations, using the threat that a witness with whom its attorneys had improperly negotiated a contingent fee arrangement (in direct violation of Rule 3.4(g) of the Mass. Rules of Professional Responsibility)[41] would testify that it had been defrauded.

Lycos then caused that contingently paid witness to review Lycos' CFO's files looking for evidence to support a "fraud" claim against CSI,[42] and took what that witness found -- an irrelevant inconsequential email from a CSI sales rep to Lycos' then-CFO which the CFO admitted in deposition that he did not even call receiving, and never relied on it[43] -- to assert that CSI had somehow defrauded it.

Now, in support of the Lycos SJ Motion, Lycos has improperly submitted an affidavit

---

[39]    *See generally* Schallheim Aff., Johnson Aff., Fleming Aff. (Gabos Decl. Exs. 3-5).
[40]    *See* Response of CSI to Lycos' Local Rule 56.1 Statement with Respect to Lycos' Motion for Summary Judgment on All Counts of CSI's Amended Complaint, dated Nov. 19, 2007 and filed herewith, ¶ 16.
[41]    *See generally* Moore Report (Gabos Decl. Ex. 24).
[42]    E-mail from John Kirk to Lycos' Litigation "Team," dated Jan. 7, 2004 (Gabos Decl. Ex. 20).
[43]    Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep.") at 52:8-53:20 (Gabos Decl. Ex. 19).

ME1 6895444v.1

from that same former CFO *directly contradicting* his deposition testimony that he never relied

on, and in fact did not even recall receiving,[44] that email -- and alleging that somehow, he now

does recall receiving it, and did rely on it.  It has then taken that affidavit and used it to support

the argument at pp. 9-11 of the Lycos SJ Memo that the email was a misrepresentation that

Lycos supposedly relied on because its CFO "trusted" the CSI sales rep.[45]  Similarly, it has used

the testimony of its contingently compensated witness to support its claims of other alleged

"affirmative misrepresentations" which the evidence shows were not misrepresentations at all.

In short, the account of the "Facts" in the Lycos SJ Memo is based on "evidence" which

has been manufactured after the fact using contingently paid witnesses, and affidavit testimony

that directly contradicts witness's deposition testimony.  Even if this evidence was undisputed,

which it is *not*, it could not be relied upon to enter a summary judgment in favor of Lycos.  *See*

*Gillen v. Fallon Ambulance Service, Inc*., 293 F.3d 11, 26 (1st Cir. 2002)("a party opposing

summary judgment cannot create a genuine issue of material fact by the simple expedient of

filing an affidavit that contradicts clear answers to unambiguous questions in an earlier

deposition").[46]

## II.    LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT VII OF ITS COUNTERCLAIM DEMANDING A REFUND OF MOST OF CSI'S GROSS PROFITS UNDER THE EXTENDED LEASES

Section I of the "Argument" portion of the Lycos SJ Memo argues that Lycos is entitled

to a refund of most of CSI's gross profit under the Lease Extensions supposedly because CSI's

gross profit included "undisclosed mark-ups."  This claim is mistaken for the following reasons.

---

[44]    Lucy Dep. at 52:8-53:20 (Gabos Dec. Ex. 19).

[45]    As stated, whether Lycos' ever "trusted" Mr. Stenberg -- even if that is relevant as a matter of law -- there is ample evidence that Lycos never trusted Mr. Stenberg.  *See* Gabos Decl. Ex. 15 (e-mail of in-house counsel calling Mr. Stenberg a "worthless liar" and other derogatory remarks.  Mr. Lucy himself was told by in-house counsel not to trust Mr. Stenberg because "he doesn't work for Lycos."  Karol Dep. at 168:21-169:15 (Little Decl. Ex. 16).

[46]    *See also Murphy v. Ford Motor Co*., 170 F.R.D. 82, 85 (D. Mass. 1997)(striking those portions of nonmovant's affidavit in support of summary judgment which contradicted prior deposition testimony).

ME1 6895444v.1

**A.    Lycos Is Estopped From Arguing that Its Operating Leases With CSI Were Loans, or That They Had a "Balance" Which No Profit Could Be Charged in Excess of a Certain Interest Rate When They Were Extended Without that Portion of the Profit Being Expressly Disclosed**

Lycos is clearly estopped from arguing that the Extended Leases it entered into with CSI were loans, or that they had a "balance" like a loan would have at the time they were extended. As the Court held in *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435 (11th Cir. 1986), a party's treatment of an agreement as a lease to claim beneficial tax and other financial structuring estops the party from later arguing that the lease was not a lease but a security agreement or a mortgage. *Id.* at 1441 ("The inconsistency here is appellant's assertion of mortgagor status after it has entered into a lease agreement with appellee.  This turnabout is particularly offensive to equitable principles since [the claimant]… has received significant benefits, namely lower rent and operating costs, from executing a lease agreement….").

As Lycos' own CFO admitted, the transactions with CSI were leases, not loans, and throughout all the years of its relationship with CSI, Lycos accounted for and reported the Leases as operating *leases*, never reporting those obligations as debt.[47]   Lycos also treated the transactions *as leases* in all of its dealings with CSI, expressly reaffirmed in writing that the transactions *were leases*,[48] and caused CSI to rely on that fact.

Under these circumstances, Lycos cannot now suddenly reverse course, and in the interest of advancing an "overcharge" claim years later, argue that its Leases with CSI were really loans carrying a "balance" above which no profit could be charged in excess of a certain interest rate when they were extended without that portion of the profit being expressly "disclosed" to Lycos (even though it is undisputed that Lycos knew the total price of each Lease

---

[47]    Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).
[48]    Master Lease § 18.1 (leases are "true leases" and not "security interests")(Ex. 1 to CSI's Amended Complaint, Docket No. 121); Sales Agreement §§ 4, 5 (specifying leases and stating title remains with CSI) (Ex. 10 to CSI's Amended Complaint, Docket No. 121).

14

extension).  The law does not permit this.  *See id.; see also Plumley v. Southern Container, Inc.*, 303 F.3d 364, 374 (1st Cir. 2002)("[E]quitable estoppel prevents one from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith"); *Moran v. Gala*, 66 Mass. App. Ct. 135, 141 (2006); *MacKeen v. Kasinskas,* 222 Mass. 695, 698 (1956).  Nevertheless, that is precisely what Lycos is arguing.

**B.    Neither M.G.L. c. 93A Nor 940 C.M.R. 3.05(1) and 3.16(2) Required CSI to Disclose to Lycos What Portion of Its Gross Profit on Extended Leases Exceeded What Lycos Now Claims Was the "Balance" on the Prior Leases**

It is well-settled, and CSI's experts have confirmed, that companies are allowed to charge prices for goods or services that are above their cost in order to earn the highest profit they can.[49] It is also well-settled that a business is not required to disclose the amount of its profits on particular transaction in which it is providing goods or services.  *See, e.g., Castelli v. Lien*, 910 S.W.2d 420, 429-30 (1995)("merchants are entitled to make a profit and, except for the most extreme circumstances, are not required to divulge to their customers their profit margin, overhead, operating costs, or other similar information").  This is true even though the parties to a negotiation would obviously be influenced not to enter into a transaction if they knew the other side's profit margin, and thought it was too high.  *Id.*  The idea is that in a free market economy, price competition among suppliers -- not disclosure of profit margins -- is what acts as a check on unreasonably high profits.

Despite these common sense axioms, Lycos has constructed an argument here that M.G.L. c. 93A and its related consumer protection regulations somehow require the disclosure of how much a supplier of services has marked up its charges to a customer above its cost for that particular transaction.  As a matter of law, though, this argument is mistaken, because such disclosure is not required.  *See Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 403

---

[49]    Fleming Aff. ¶¶ 10-16; Johnson Aff. ¶¶ 7-13; Schallheim ¶¶ 6, 40-43 (Gabos Decl. Exs. 3-5).

Mass. 722, 730 n. 3 (1989)(a health insurer was not liable under Chapter 93A for its failure to disclose its rate making policies and standards).

Significantly, Lycos can point to no case law or authorities holding that a lessor or seller in an arm's-length business transaction must disclose the amount of profit it has earned as a result of the prices negotiated by the parties, and no such authority exists. *See Indus. General Corp. v. Sequoia Pacific Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995)("…[Chapter 93A,] section 11 'probably does not contain a general duty of disclosure'") (quoting MICHAEL C. GILLERAN, *The Law of Chapter 93A* § 4:10 (1989 & Supp. 1994)); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 11 (1st Cir. 1994). Thus, as a matter of law, CSI had no duty in any event to disclose its profits from the Extended Leases to Lycos.[50]

Absent such a duty, CSI's failure to disclose its profits cannot constitute meet the level of rascality or egregiousness contemplated by Chapter 93A, § 11. *See Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass. App. Ct. 73, 78-79 (1994)("in the circumstances of a transaction at arm's length between experienced, worldly-wise businessmen advised by counsel, we find nothing chargeable to the defendants that sank to the level of 'rascality' made actionable by § 11 of the statute regarding dealings between businessmen [51] And notwithstanding Lycos's

---

[50] In addition, aside from the lack of authority regarding the disclosure of profits, the types of disclosure contemplated by 3.16(2) and 3.05(1) involve physical characteristics and attributes of what the buyer is contemplating purchasing, not the seller's gross profits. *See Hadar v. Concordia Yacht Builders, Inc.*, 886 F. Supp. 1082, 1102 (S.D.N.Y. 1995)(whether supplier violated 3.05(1) and 93A by failing to disclose that resin used to build plaintiff's boat was not compatible with other materials used in its construction); *Aspinall v. Philip Morris Co., Inc.*, 442 Mass. 381, 396-97 (2004)(whether defendant's failure to disclose true nature of cigarettes marketed as "light" violated 3.05(1) and 93A); *Sargent v. Koulisas*, 29 Mass. App. Ct. 956, 958 (1990) (sellers violated 3.16(2) and Chapter 93A by failing to disclose to buyers the true condition of equipment essential to operation of business); *Sheehy v. Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 195-96 (1987) (seller of real property failing to disclose under 3.16(2) presence of hazardous waste when asked condition of property).

[51] Businesses seeking relief under Section 11 "are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct." CHAPTER 93A RIGHTS AND REMEDIES, 2-68 (Hon. Margot Bostford, ed., Supp. 2002)(discussing rascality standard). In fact, business behavior must be egregious to constitute a violation of chapter 93A.

16

argument to the contrary, "rascality" **is** still the standard for Chapter 93A liability in a business context.[52]

### C.    The Regulation on Which Lycos Primarily Relies, 940 C.M.R. 3.16(2), Does Not Apply to Arm's Length Business Transactions Between Sophisticated Business Entities Such as Lycos and CSI

Pursuant to the authority under M.G.L. c. 93A ("Chapter 93A"), the Massachusetts Attorney General promulgated certain consumer protection regulations, including 940 CMR § 3.16(2) (hereinafter "3.16(2)") and 940 CMR § 3.05(1) (hereinafter "3.05(1)").    When the Attorney General originally contemplated and enacted 3.16(2), Chapter 93A was solely concerned with protecting consumers from sophisticated and unscrupulous businesses, because § 11 had not yet been enacted.  *See Levings v. Forbes & Wallace*, 8 Mass. App. Ct. 498, 501 (1979) (original purpose of 93A was to create equity between consumers and businesses).

Consistent with the history of § 11 and 3.16(2), Massachusetts courts recognized that the Attorney General regulations enacted prior to § 11 do not apply to transactions between sophisticated business entities.  *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 745 (1994)(discussing 940 CRM § 3.08(2)).    The court explicitly held that because the regulations were so "deeply rooted" in § 9, the pre-§ 11 regulations do not apply to arm's-length business transactions.  *Id.* at 743-45.  Likewise, Judge Young of the Federal District Court for the District of Massachusetts found that ***3.16(2) does not apply to transactions between sophisticated businesses*** and rejected a purchasing business's argument the selling business violated 3.16(2) by failing to disclose decreased revenues.  *In re First New England Dental,* 291

---

[52] Lycos cites to *Mass. Employers Ins. Exch. v. Propac-Mass, Inc*., for the proposition that rascality applies only to the concept of "unfairness" under Chapter 93A, and that courts have since abandoned the rascality inquiry.   Both arguments, however, ignore recent case law.  See *Daley v. Twin Disc, Inc*., 440 F. Supp. 2d 48, 53 (D. Mass. 2006)(Zobel, J.) ("Chapter 93A encompasses only misconduct that rises to a 'level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.'")(citation omitted); *L.B. Corp. v. Schweizer-Mauduit Int'l*, 121 F. Supp. 2d 147, 154 (D. Mass. 2000) (discussing disclosure under 3.16(2) and stating that "there is no evidence that [the nondisclosure] rises to the level of 'rascality' required in transactions between business under § 11").

B.R. 229, 241 (D. Mass. 2003)("the regulation attaches only to transactions involving private consumers, and not to business to business transactions").

> As the court in *Knapp* suggested, the regulations [including 3.16(2)] were not meant to apply to mundane negotiations between businesses and business people.  Indeed, to so apply them, and thereby to require complete disclosure from both ends of a business deal, would eviscerate the very notion of negotiating . . . .  Therefore, New England Dental was under no obligation to provide information as to revenues in the context of the asset purchase.

*Id.*  Lycos's argument that Judge Young "retreated" from this well-reasoned holding in *J.E. Pierce Apothecary, Inc. v. Harvard Health Care, Inc.* such that the 3.16(2) disclosure requirements apply in business-to-business transactions is misguided.[53]

A fair reading of *J.E. Pierce* demonstrates that it discussed only, 3.16*(3)*, and specifically found that under *only* that subsection, a distinction between § 9 and § 11 was unnecessary because the regulation governed the standard of lawful conduct, by which both consumers and businesses must always abide.  365 F. Supp. 2d 119, 144-45 (D. Mass. 2005).  Indeed, Judge Young clearly distinguished *J.E. Pierce* from *First New England Dental*, a fact that Lycos conveniently omits in its analysis:

> Undergirding . . . *New England Dental* is a belief that the disclosure aspects of [3.16(2)] were promulgated to heighten the protection of **consumers** who may not be attuned to the harsh practices of the business world.  This is not the case at hand . . . [3.16(3)] is distinguishable from the regulations requiring heightened discloses . . . ."

*Id.*.  Therefore, 3.16(2) does not apply to the lease extensions between Lycos and CSI.

---

[53]    *See* Lycos SJ Memo at p. 16.  Similarly, Lycos's reliance on *Greenery Rehabilitation Group, Inc. v. Antaramian* and *V.S.H. Realty, Inc. v. Texaco, Inc.*, for the application of 3.16(2) to business-to-business transactions is also misguided because these cases were decided *prior* to *First New England Dental*.

**D.    Lycos's Claims That It Was Told "Half Truths" Material to Its Decision-making Are Contradicted by CSI's Witnesses, and by the Evidence That Lycos Had All the Information It Needed to Make Informed Economic Decisions on Whether to Extend Its Leases**

Lycos's argument that CSI's profits on lease extensions were really undisclosed mark-ups fraudulently hidden via "half-truths" cannot support summary judgment in Lycos's favor. First, what Lycos conveniently characterize as "mark-ups" in an attempt to argue that the lease extensions were really loans were simply the amounts charged to it for extending the lease terms for the equipment it rented from CSI--essentially CSI's gross profits. Lycos cites the testimony of Mr. Stenberg for the proposition that CSI supposedly marked up Lycos's monthly payments "such that the value of each of the Refinanced Schedules (i.e. the present value of the payments plus the present value of the residual of the equipment, the amount CSI expected to realize at the end of the lese term), exceeded the value of the terminating schedules (i.e. the present value of the payments plus the present value of the residual)."[54]    However, a true reading of Mr. Stenberg's testimony does not support its argument. Mr. Stenberg simply said "he would look at what the lease term" was and mark up the amount of the lease payments above the threshold figure he as given for commission purposes accordingly. The underlying and faulty assumption in the entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment. In fact, if that were the case, Mr. Stenberg would never have earned a commission because, with respect to extensions, his commission was based on the amount above threshold (i.e. the mark-up he referred to) that he was able to negotiate with the customer.

Second, Lycos cites authority wherein the "half-truths" were such that the relying party would have required outside investigations to uncover the true nature of the transaction. *See*

---

[54]    *See* Lycos SJ Motion at 18-19.

*V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414-15 (1st Cir. 1985)(defendant failed to fully respond to "repeated inquiries" from plaintiff and deliberately concealed the existence of oil leaks on the property at issue).  In contrast, Lycos always knew precisely what it was agreeing to pay when it entered into the Extended Leases.  CSI fully disclosed and Lycos was fully aware of both the original purchase price of the equipment and the monthly payments under the Extended Leases.[55]  It was also fully aware that this equipment was older, and had ample knowledge to calculate the equipment's worth, and in fact had to do so whenever it did a lease extension.[56]

Third, in contrast to Lycos's argument that the common-law duty of disclosure with respect to "half-truths" is codified by the regulations, the regulations focus on the duty to disclose *material* facts.[57]  S*ee Sheehy v. Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 195 (1987)(discussing (3.16(2)); *Commonwealth v. AmCan Enterprises, Inc.*, 47 Mass. App. Ct. 330, 335 (1999)(discussing 3.05(1)).  However, there is ample evidence that CSI's gross profits under the Extended Leases were not material to Lycos's decision to enter into those transactions.

Quite simply, Lycos entered into the agreement simply because it was the most financially prudent course.  Lycos wanted to decrease its monthly payments and it did not want

---

[55]     Moreover, Lycos admits that it inquired into the terms of the refinancing, and CSI's alleged "half-truth" occurred, "[a] few months *after* the commencement of schedules 93 and 94."  *See* Lycos's Local Rule 56.1 Statement of Undisputed Material Facts, ¶ 9 (emphasis added).  Accordingly, it cannot have possibly relied on any "half-truths" in entering into the refinancing as required under the common law.  But even if there were evidence that Lycos relied on misstatements, whether a sophisticated business *reasonably* relied on another party's representations is a question of fact.  *See Sheehy*, 24 Mass. App. Ct. at 194; *see also Collins v. Huculak*, 57 Mass. App. Ct. 387, 392 (2003)("whether the plaintiff exercised due diligence and was justified in placing confidence in the statement of the defendant or should have known from the beginning that [the statement was false] is one of fact")(internal quotations and citation omitted).

[56]     However, it was not CSI's job or obligation to hold Lycos's hand and ensure that it fully understood every economic aspect of the transaction.  *See Zayre Corp. v. Computer Sys. of America, Inc.*, 24 Mass. App. Ct. 559, 570 (1987)(no violation of 93A, § 11 because "CSA, as a sophisticated business entity . . . could not reasonably view [the] misrepresentation as any assurance that there would be no termination" of the 1973 lease); *see also Davidson v. General Motors Corp.*, 57 Mass. App. Ct. 637, 643 (2003) (plaintiffs could not prevail on claim that defendants misled them into purchasing automobile dealership because "[i]n a business context when sophisticated parties have reduced their understandings to writing, they cannot be heard to allege that they didn't really mean what they said or that they didn't understand what they were doing").

[57]     Presumably, Lycos asserts this argument to attempt to make up for the fact that it could not have possibly relied on CSI's statements that were made months *after* the Extended Leases at the end of 2001.

20

to finance the purchase of new equipment.  Moreover, if Lycos did not extend the leases, it would have had to purchase the equipment because its poor treatment of the equipment precluded returning it to CSI, as the Master Lease and equipment schedules specifically required, and thus Lycos would be forced to pay "astronomical" stipulated loss values.[58]  *See New England Fin. Resources, Inc. v. Coulouras*, 30 Mass. App. Ct. 140, 148 (1991) (affirming "[the] judge['s] [decision] that there was no deception-that the defendants … knew precisely what they were doing" before they entered into the transaction).  Lycos cannot now claim that CSI should have disclosed information that was in no way material to its decision to enter into a transaction it subsequently disliked, and summary judgment is not appropriate because "[t]he materiality of the nondisclosures to [Lycos's] decisions and the reasonableness of [Lycos's] reliance on what was [said] . . . is for a fact finder to determine." *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass. App. Ct. 747, 764 (2003).

   E.    **The Purported "Facts" On Which Lycos Relies For Its $13.7 Million Damages Calculation Are Both Disputed and Legally Insufficient**

   While Lycos states that it need not prove reliance on CSI's alleged failures to disclose its gross profits in order to prevail on its Chapter 93A claim, "proof  of actual reliance is not required *so long as* the evidence warrants a finding of a *causal relationship between the [deceptive act] and the inju*ry . . . ." *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 103 (D. Mass. 1998) (where plaintiffs alleged that defendants made misrepresentations in violation of Chapter 93A) (emphasis supplied) (quoting *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass App. Ct. 99, 104 (1988)); *see also DSF Investors, Inc. v. Lyme  Timber Co.*, 2005 WL 1683928, at *2 (Mass. Super. May 11, 2005) ("It is true that reliance is not an element of a claim based on deceptive practices under Chapter 93A . . . However, under [ ] Chapter 93A, § 11, [plaintiff]

---

[58]      Callagee Dep. at 220:23-221:2 (Gabos Decl. Ex. 7).

must show that it suffered 'a loss of money or property' and that 'a causal connection [exists] between the deception and the loss . . . .") (quoting *Int'l Fidelity Ins. Co.*, 387 Mass. 841, 850 (1983)), *aff'd* 67 Mass. App. Ct. 1110 (2006).

Here, Lycos simply cannot demonstrate that CSI's failure to disclose its profits caused Lycos to enter into the Extended Leases or caused Lycos any harm. First, Mr. Stenberg's March, 2002 email occurred *after* the parties entered into the Extensions in late 2001, so his alleged "half-truth" could not have caused Lycos to enter into those transactions. Second, Lycos was fully aware of the original cost of the equipment and its monthly payments under the Extended Leases. *See Mass. Farm Bureau*, 403 Mass. at 730 (no causation under 93A because "Farm Bureau ma[de] no claim … that it misunderstood the terms of the second rate plan … and there was no evidence of any lack of understanding in that regard"). Third, and as discussed above, Lycos saved substantial money in extending the leases rather than having to (a) purchase new equipment to replace the equipment it was required to return to CSI, and (b) pay the stipulated loss amounts for the equipment it knew it could not find or rehabilitate to return to CSI.[59]

## III. LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR "RESTITUTION" OF AMOUNTS IT PAID TO CSI UNDER THE PARTIES' AUGUST 2003 SALES AGREEMENT

### A. Lycos Is Estopped From Arguing that Its Last Two Extended Leases With CSI Were "Installment Sales Contracts" Because It Consistently Treated Them As Leases From a Tax and Accounting Standpoint, Gaining Valuable Financial Benefits, and Reaffirmed Their Validity as Leases to CSI in the Sales Agreement

In Part II of the "Argument" section of the Lycos SJ Memo, Lycos argues that Extended Leases 93 and 94 were "installment sales contracts" rather than leases, and that as such, Lycos

---

[59]    In this regard, damages under Chapter 93A should not be disproportionate to the loss suffered, but rather, "must be premised on actual loss." DSF Investors, 2005 WL 1683928 at *2. As discussed herein, however, there are sufficient facts to demonstrate that awarding Lycos the damages it seeks would be highly disproportionate to any of its alleged losses because Lycos it would have cost Lycos far more money to return the equipment to CSI and purchase new equipment than it did to renew the leases under the Extended Leases.

has owned the equipment throughout the life of the leases and essentially "paid twice" by purchasing the equipment pursuant to the Sales Agreement.[60]  Basic principals of estoppel, however, preclude this kind of attempt to unwind and recharacterize one's own contractual obligations based on 20/20 hindsight, and the desire to claim a refund on transactions agreed to long ago.  As the Court held in *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435, 1441 (11th Cir. 1986), a party's treatment of an agreement as a lease to claim beneficial tax and other financial structuring estops the party from later arguing that the lease was not a lease but a security agreement or a mortgage.

In this case, it is undisputed that Lycos structured these transactions as leases rather than installment sales contracts and received all of the accounting benefits of that structuring.[61]  More specifically, Lycos treated its equipment leases as "off balance sheet" operating leases such that it did not have to record the debt associated wit it.  In contrast, if it had treated the equipment as if it owned it, Lycos would have had to pay taxes on the equipment.  Accordingly, it cannot now claim that the transactions were not "true leases" when it reaped such substantial benefit from its consistent treatment of the transactions as leases.  *See id.*

This is particularly true where CSI relied on Lycos' consistent treatment of the transactions as lease extensions in agreeing to sell Lycos the equipment at a reduced purchase price.  Moreover, Lycos reaffirmed the validity of the Extended Leases as leases in the Sales Agreement, which specifically stated that ***CSI retained title to the equipment:***

> 5.  SELLER RETAINS TITLE:  With respect to each Lease, Seller [CSI] retains full title to the Equipment until its respective Termination Date. . . . Upon receipt of the Lease Satisfaction Amount in full, without further

---

[60]    This is essentially Lycos's *fifth* attempt to argue that the Master Lease is not a true lease.  On four prior occasions, Lycos asserted that the Master Lease was really a "loan" and subject to usury claims, an argument that the Court declined to accept in its Order of August 29, 2007 dismissing those usury claims.

[61]    Consistent with Lycos's treatment of the equipment as non-assets for purposes of its balance sheets, CSI *did* treat the equipment as assets on its balance sheets.

action on the part of the Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.[62]

Allowing Lycos to now "unwind" these transactions by recharacterizing them as leases and to negate its voluntarily assumed contractual liability -- in spite of the benefits Lycos derived for years from classifying these transactions as leases -- all in an effort to shift *ex post facto* contractual liability on CSI, would be manifestly unfair. *See Plumley v. Southern Container, Inc.*, 303 F.3d 364, 374 (1st Cir. 2002)("[E]quitable estoppel prevents one from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.").

Moreover, Lycos never insisted on a mandatory buyback provision in any of the lease extensions. In fact, Lycos contracted to purchase the equipment pursuant to an entirely separate contract, which specifically did not vest title of the goods in Lycos until Lycos had made all rental payments under the existing schedules. Lycos is presumed to have understood the import of these contractual obligations. *See Moran v. Gala*, 66 Mass. App. Ct. 135, 141 (2006)("the test [for equitable estoppel] appears to be whether in all the circumstances of the case the conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct")(internal quotations and citation omitted).

**B.    There Is No Basis In Any Event For Lycos to Claim that Its Last Two Extended Leases With CSI Were "Installment Sales Contracts" Because The Requirements For Such Treatment Are Not Satisfied**

Lycos attempts to hinge its recharacterization of the lease extensions on the fact that the lease terms under the Extended Leases equaled or were greater than the "economic life" of the equipment, and thus were really security agreements under the Massachusetts and Missouri UCC

---

[62]    Sales Agreement of August 2003 at § 5, attached as Ex. 10 to CSI's Amended Complaint (Docket No. 121).

ME1 6895444v.1

statutes.[63]  Yet, the **only** evidence Lycos sets forth regarding the "economic life" of the goods at the time the parties entered into Schedules 93 and 94 is the fact that CSI booked a residual value of zero for internal accounting purposes, and Lycos never connects the dots, if you will, between CSI's internal accounting and what is meant by "economic life" under the U.C.C.[64]

Indeed, the UCC does not provide guidance as to how to determine the "remaining economic life" of goods, other than stating that the term "'remaining economic life of the goods' [is] to be determined with reference to the facts and circumstances at the time the transaction is entered into."  UCC § 1-201(37).  Lycos argues the "remaining economic life of the goods" is zero because CSI booked it as zero on its balance sheet.   The UCC is clear, however, that the intent of the parties is not determinative, and instead the Court must evaluate the economic realities of the situation.  See *In re QDS Components, Inc.*, 292 B.R. 313, 331 (Bankr. S.D. Oh. 2002)("In analyzing whether the lessor has retained an economically meaningful residual interest in the 'leased' property, courts must look to the economic effect of the purported lease agreement rather than the intent of the parties.").

Here, there is significant evidence in the record suggesting that at the time CSI and Lycos entered into the Extended Leases, there was no reason to believe that the goods would have no economic life at the end of the lease terms.  For instance, in CSI's expert reports, it has offered evidence that, at the time the Sales Agreement was entered into, the equipment had a value of $3 million.  There is no basis to conclude that the computer equipment would depreciate, between the time of the Sales Agreement and the end of the lease terms, from $3 million to $0.  Likewise,

---

[63]     *See* Lycos SJ Memo at 26-30.

[64]     Lycos's analysis is also conceptually flawed because it tries to refashion UCC § 1-201(37) into a mechanism to transfer title of goods from a lessor to a lessee once a lessee makes lease payments which exceed the fair market value of the goods.  Lycos provides no support for this argument, which is unsurprising given that § 1-201(37) expressly prohibits this: "A transaction does not create a 'security' interest because it provides that (a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal or greater than the fair marker value of the goods at the time the lease is entered into. *Id.*

in the Sales Agreement Lycos, agreed to pay the remainder of the lease payments under Schedules 93 and 94 plus nearly $4 million dollars.  This creates a strong inference that Lycos acknowledged that the computer equipment would have significant value at the end of the lease terms (of approximately $4 million, as this was the price it was effectively paying for the equipment).  On this record, there is simply no basis to grant summary judgment on this claim.

The Extended Leases required Lycos to maintain the computer equipment in good condition and to return working equipment to CSI.  While such equipment may have been technologically obsolete for purposes of a high-flying dot.com such as Lycos, case law is clear that the fact that the equipment may be outdated does not mean that the lease term exceeds the "economic life" of the goods.  *See In re Hardy*, 146 B.R. 206, 210 (Bankr. N.D. Ill. 1992)("[A]n old beeper can be refurbished and resold or relet.  Thus, the old beeper would have a value to [the lessor] . . . This scenarios suggests the agreement between the parties is a true lease."); *In re Telemax*, 12 UCC Rep. Serv. 742 (S.D.N.Y. 1973) ("technological advances" may have "affect[ed] [equipment's] acceptance by customers and reduce its desirability, but would not terminate its useful life").  Also, the fact that the Master Lease required Lycos to return the equipment to CSI at the end of the lease term alone is sufficient for a finding that the computer equipment had some value.  *See Carlson v. Giacchetti*, 35 Mass. App. Ct. 57, 63 (1993) ("[I]f the lessor retains the reversionary interest in the goods, then the transaction is a true lease.").[65]  The *Carlson* court further found that because "the lessee was obligated to keep the leased equipment in good repair and condition and, that at the end of the lease, to assemble and deliver the equipment to the lessor," the lessor could be deemed to have "reserved an economically

---

[65]     The Master Lease (Ex. 1 to CSI's Amended Complaint, Docket No. 121) also specifically states as follows in Section 18.1: "This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest."  *See Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 396 (8th Cir. 1986)("The paramount attribute of a lease, retention of title in the lessor, is found in a clause of the document, which states in clearest terms that the agreement is only a lease.").

26

significant reversionary interest in the goods." *Id.* at 64.

As discussed above, Lycos's treatment of the Extended Leases belies its attempt to demonstrate that they were anything but true leases. The very reason it entered into the Extended Leases was so that it could treat them as operating leases which it could keep off of its balance sheet. Moreover, Further, the most important factor in determining whether a lease is security agreement or a lease "is the absence of any manifestation that [Lycos] has the duty or even the option to purchase the computer equipment at the termination of the lease." *See Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 396 (8th Cir. 1986)(noting that because lessee did not have duty or option to purchase the equipment, lessee had to return the equipment to lessor, and "the possibility that the parties would enter a separate sales transaction at the termination of the lease agreement, an agreement in which [lessor] retained title and the ultimate right to possession, does not transform the lease into an installment sale."); *In re Rowe*, 369 B.R. 73, 79 (Bankr. D. Mass. 2007)(court found there was no evidence as to the remaining economic life of the equipment, and "most important to the Court's analysis, the Lease does not include an option to purchase the [equipment]; upon expiration or termination of the agreement, the [lessee] must return the equipment to [the lessor]").

Here, Schedules 93 and 94 and the Master Lease did not require Lycos to purchase the equipment at the end, or grant the option to purchase at "no additional or nominal consideration." *See* U.C.C. § 1-207(37). Indeed, Lycos had to enter into an entirely separate contract -- the Sales Agreement--to purchase the equipment. Moreover, Despite Lycos' argument under UCC § 1-201(37) that a "security interest" was created in schedules 93 and 94 – and the unsupported leap Lycos then tries to make to conclude that it somehow acquired title to the equipment at that time in November 2001 (which is unsupported by any authority) – Lycos itself expressly

acknowledges that title did not pass to it under the August 2003 Sales Agreement (or earlier), and would pass to Lycos only upon its full payment of the remaining lease obligations and the termination of the equipment schedules which was to occur in November 2004.

In sum, "when looking at all of the circumstances and the financial substance of the transaction," there are "controverted facts" rendering inappropriate an award of summary judgment as Lycos requests. *See In re American Eagle Coatings, Inc.*, 353 B.R. 656, 668-69 (Bankr. W.D. Mo. 2006)(denying summary judgment as to that issue).

### C.    Lycos Did Not Enter Into The Sales Agreement By Mistake And Received A Substantial Benefit In From Treating the Extended Leases as Leases

In support of its argument for summary judgment as to its counterclaims for unjust enrichment and money had and received, Lycos cites to law holding that money had and received is the proper claim where one party has paid another party via mistake, and other authorities that do not preclude a party's recovery based upon mistake. *See* Lycos Memorandum of Law, pp. 29-30. However, the mistakes and double payments contemplated in the cases Lycos cites are not remotely similar to the facts here. *See Glover v. Metropolitan Life Ins. Co.*, 664 F.2d 1101, 1102 (8th Cir. 1981)(insurer mistakenly paid life insurance proceeds to a policy holder's second wife when the proceeds should have properly been paid to the policy holder's first wife); *Blue Cross Health Services, Inc. v. Sauer*, 800 S.W.2d 72, 74 (Mo. App. 1990)(insurer mistakenly mailed a policy holder's benefit checks to another individual with the same name, who cashed and deposited the funds; *Handly v. Lyons*,   475 S.W.2d 451, 452 (Mo. App. 1971)(insurer mistakenly paid life insurance proceeds to the policy holder's executor rather than his beneficiaries).

Lycos did not make such a mistake in paying CSI under Schedules 93 and 94 or the Sales Agreement; Lycos knew exactly what it was doing when it entered into these agreements. By

refinancing pursuant to Schedules 93 and 94, Lycos extended its use of the equipment already in place. Likewise, in subsequently purchasing the equipment it already used and leased, Lycos did not need to purchase or lease new equipment once the lease term ran out. Purchasing the equipment also saved Lycos from having to the pay stipulated loss values set forth in Schedules 934 and 94 because it could not locate some of the equipment it had the obligation to return.

Under these facts, CSI has not been "unjustly" enriched, and "equity and good conscience" does not demand that CSO pay restitution because Lycos received tremendous benefit in refinancing and subsequently purchasing the equipment it was using at the time, rather than paying for new equipment and the return of equipment to CSI. Because CSI received only those payments it was owed--indeed, those payments for which Lycos voluntarily contracted in exchange for the continued use of the equipment--and because Lycos benefited from the transaction, there was no "windfall" for CSI. *Compare Glover*, 664 F.2d at 1104 (not requiring second wife to return the policy proceeds would be a "windfall" because she "was not entitled to the proceeds"). In sum, "[w]hether [Lycos] received any consideration for [its] [payments] is an issue of material fact" and it is therefore not entitled to summary judgment. *Haugland v. Parson*, 863 S.W.2d 609, 611 (Mo. Ct. App. 1992).

## CONCLUSION

For all of these reasons, plaintiff Computer Sales International, Inc. respectfully submits that Defendant Lycos's Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of its Counterclaim should be properly denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Computer Sales International, Inc. hereby requests oral argument on all issues raised in the above Opposition.

ME1 6895444v.1

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
Tel. (617) 449-6500

Dated:  November 19, 2007


### Certificate of Service

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by hand this 19th day of November, 2007.

/s/ Robert J. Kaler
Robert J. Kaler

ME1 6895444v.1