UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC. | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| LYCOS, INC., | )    C.A. No. 05-10017- RWZ |
| Defendant, | ) |
| | ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) |
| | ) |
| Trustee Process Defendant. | ) |

**RESPONSE OF COMPUTER SALES INTERNATIONAL, INC. TO LYCOS'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS WITH RESPECT TO LYCOS'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS IN COUNTS VII, XII, AND XIII OF ITS COUNTERCLAIM**

Pursuant to Local Rule 56.1, plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") responds as follows to *Lycos's Local Rule 56.1 Statement of Undisputed Material Facts With Respect to Its Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim*, dated September 4, 2007 (the "Lycos Statement").

**I.    Count VII:  940 C.M.R. 3.05(1) and 3.16(2) and M.G.L. c. 93A, §§ 2 and 11[1]**

    **A.    Facts Concerning Lycos's Claim that CSI Violated 940 C.M.R. 3.05(1) and 3.16(2) and thus M.G.L. c. 93A, §§ 2 and 11**

    1.    Disputed as misleading.  Lycos had some of the most sophisticated business entrepreneurs available at the time.  Ted Philip, Lycos' Chief Financial Officer, received an M.B.A degree from Harvard Business School and had spent years in the financial world,

---

[1] The use of Lycos' headings in its statement of facts is for ease of reference only and are disputed in their entirety to the extent a response is required.

including at some of the world's largest financial institutions and corporations.[2]   Thomas Guilfoile, Lycos' Senior Vice President of Finance and Administration, is a certified public accountant who worked at the international accounting firm of Ernst & Young prior to joining Lycos.[3]   Among his work with Ernst & Young, Mr. Guilfoile performed lease audits for clients to determine whether their leases qualified as capital leases or operating leases.[4]   Both gentlemen signed the majority of the CSI-Lycos equipment schedules on behalf of Lycos.

2.      Disputed as misleading.   Lycos' intended implication here is that changes in Lycos personnel over time somehow contributed to a lack of understanding on Lycos' part of the need to track its leased assets or a general misunderstanding of leasing in general.   As stated above, Lycos had very sophisticated officers overseeing its leasing and, in particular, leasing of equipment from CSI.[5]   In addition, Lycos had available an in-house staff of lawyers and accountants as well as access to some of the most highly regarded outside accountants and lawyers.   Lycos admits that, on occasion, it hired outside leasing consultants (including Leaseforum, Inc. and Avnet Enterprise Solutions, Inc.) to review its leasing practices.   In fact, Avnet Enterprise Solutions, Inc. ("Avnet") performed an audit of Lycos' leasing practices and advised Lycos as early as December 2000 that it had serious problems because of its failure to track all of its leased assets.   Among other things, Avnet told Lycos in December 2000 that "identification and return of [leased] assets, at end of term is nearly impossible **because Lycos lacks an accurate asset inventory**.   This results in costly evergreen payments or the buyout of non-productive assets."[6]   Nowhere in its detailed report does Avnet blame these problems on any

---

[2]      Deposition of Edward Philip, dated Nov. 6, 2006 ("Philip Dep.") at 11:10-21, attached as Ex. 1 to the accompanying Declaration of Kelly A. Gabos ("Gabos Decl.").
[3]      Deposition of Thomas Guilfoile, dated Dec. 7, 2006 ("Guilfoile Dep.") at 10:13-11:2 (Gabos Decl. Ex. 2).
[4]      Gabos Decl. Ex. 2 at 16:21-17:4
[5]      *See supra* ¶ 1.
[6]      Affidavit of Thomas Bean ("Bean Aff.") Ex. 24 at LYC14559 (emphasis added).

ME1 6696078v.1

of Lycos' lessors, including CSI.

3.      Disputed as misleading.  During the relevant time, CSI and Lycos had agreed that Missouri law would apply to their relationship.  The Master Lease Agreement Number 144874 dated December 4, 1996 ("Master Lease"), which governed the parties' rights and obligations as well as the terms of the subsequent equipment lease schedules between CSI and Lycos, expressly provided that Missouri law would apply:

> 18.6  GOVERNING LAW:  THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW.  NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE [Lycos] UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE.  This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.[7]

4.      Disputed as misleading.  The Master Lease is a written document executed by Lycos' then Chief Operating Officer Ted Philip on December 20, 1996.  It contemplates equipment schedules to be entered between the parties for equipment to be leased subsequently by Lycos, as well as other aspects of the parties' relationship such as payment of taxes, delivery and return of the leased equipment, care of the equipment, loss or damage to the equipment, defaults and remedies, among other provisions.[8]  Though the specific length of any subsequent equipment schedules under the Master Lease are specified in each schedule, the Master Lease provides that the initial term of each schedule "shall automatically be extended for successive four month periods"[9] unless terminated by either party providing sixty (60) days notice (a term

---

[7]        Master Lease § 18.6, attached as Ex. 1 to CSI's First Amended Complaint, dated Dec. 4, 2006 (Docket No. 121) (emphasis in original).

[8]        *See generally* Ex. 1 to CSI's First Amended Complaint (Docket No. 121).

[9]        Master Lease § 2.2, attached as Ex. 1 to CSI's First Amended complaint (Docket No. 121).

ME1 6696078v.1

negotiated by the parties down from 120 days).[10]  During the relevant time, Lycos entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it.

5.    Disputed as misleading.  The evidence suggests that Lycos sought operating lease treatment for its lease of assets.[11]  Further, it was Lycos' policy at all times not to buy equipment that could be leased instead.[12]  For its own reasons – including an effort to lower its monthly expenses[13] –  Lycos agreed to extend its leases with CSI until finally required by its parent company in Spain to "buyout" the leases.[14]

6.    Disputed as misleading.   The decision how to allocate equipment between schedules on a lease extension could be for many reasons – including a lessee's desire to keep track of the leased equipment by type or location.[15]  It was not simply a decision by the lessor, which Lycos implies is intended to confuse or obfuscate.

7.    Disputed.  Lycos never understood that it was "paying more in interest" on its extended schedules, as this is a loan (not a lease) concept.[16]  Mr. Guilfoile, who signed many of the equipment schedules on behalf of Lycos, testified he understood the schedules were reported by Lycos as leases, not loans.[17]  Lycos always knew exactly what it was agreeing to pay, and had to in order to account for each lease properly.

---

[10]      Philip Dep. at 51:7-13 (Gabos Decl. Ex. 1).
[11]      Affidavit of James Schallheim, Ph.D. ("Schallheim Aff.") ¶¶ 25-26; Affidavit of James Johnson, Ph.D. ("Johnson Aff.") ¶¶26, 33, 39; Affidavit of Michael Fleming ("Fleming Aff.") ¶¶18, 63-64.  These affidavits from experts retained on behalf of CSI are attached as Exhs. 3-5, respectively, to the Affidavit of Kelly A. Gabos.
[12]      Deposition of Ernesto Galvan, dated Feb. 20, 2007 ("Galvan Dep.") at 32:3-13 (Gabos Decl. Ex. 6).
[13]      Deposition of Paul Stenberg, dated Jan. 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated January 12, 2007 ("Wright Dep.") at 102:15-104:4 (Gabos Decl. Ex. 9).
[14]      Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl. Ex. 7).
[15]      Deposition of Philip Cagney, dated Sept. 27, 2006 ("Cagney Dep.") at 348:12-349:9 (Gabos Decl. Ex. 10); Deposition of Joan Kersting, dated Dec. 13, 2006 ("Kersting Dep.") at 76:9-77:1 (Gabos Decl. Ex. 11).
[16]      Fleming Aff. ¶¶ 11, 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively).
[17]      Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

8.      Disputed.  According to three of CSI's experts – two with doctorates in finance and many years of academic study in leasing and one with over twenty years of experience as the president of the Equipment Leasing Association ("ELA") – who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[18]  Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[19]  Nor is it proper to "us[e] the language of a loan," as Lycos claims, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and **not** loans.[20]  The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked-up" the leases is misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was create well after Mr. Stenberg gave his deposition).  Mr. Stenberg testified that he "market-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[21] – not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment.  The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[22]

---

[18]      Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).
[19]      Fleming Aff. ¶¶ 14-52; Johnson Aff. ¶¶ 25-26; Schallheim Aff. ¶¶ 15-20 (Gabos Decl. Exs. 3-5, respectively).
[20]      Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).
[21]      Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).
[22]      *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

ME1 6696078v.1

9.    Disputed.  As stated, Mr. Stenberg did not "admit" to the mark-up theory created by Lycos' experts.  The testimony of Mr. Stenberg that Lycos cites as an admission is misleading, as Mr. Stenberg is only testifying that he "market-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[23] – not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment.  The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[24]

10.    Disputed.  According to three of CSI's experts who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[25]  Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction exists, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[26]  Nor is it proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and ***not*** loans.[27]  What Lycos terms an improper and undisclosed "mark-up" is simply profit on a transaction in which Lycos had chosen to maintain possession of equipment it was leasing from CSI for, in some cases, an

---

[23]    Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).

[24]    *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[25]    Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[26]    Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[27]    Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

additional 50% time period.[28]

10.[sic]     Disputed. CSI had internal records concerning how it booked a given lease transaction, but there is no evidence that Lycos "knew" anything concerning the "mark-up" theory now advocated by Lycos. Again, CSI has evidence that directly refutes the "mark-up" theory created by Lycos' expert Bruce Smith, including that the term "mark-up" is not used in the industry and is a fabricated theory without merit.[29] Even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether there exists a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[30]

11.     Disputed. The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked-up" the leases or "knew the approximate magnitude of the mark-up" is misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was created well after Mr. Stenberg gave his deposition). Mr. Stenberg testified that he "marked-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[31] – not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment. Moreover, the testimony of Mr. Stenberg cited by Lycos is mischaracterized, as Mr. Stenberg was reviewing a specific document that he was unsure he himself had filled out, and he is discussing a present value calculation of a rental stream at 11 percent – with no mention of residual values, which is a

---

[28]     Fleming Aff. ¶ 31 (Gabos Decl. Ex. 3).
[29]     Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).
[30]     Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).
[31]     Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).

component of Lycos' "mark-up" theory.[32]  The underlying and faulty assumption in Lycos'
entire statement is the notion that somehow CSI was not entitled to charge more than the booked
residual value of equipment when Lycos extended its leases of that equipment, which CSI's
experts confirmed is not the case.[33]

  12.[sic]  Omitted.

  13.  Disputed.  The only evidence Lycos has that it would not have entered into any
lease extensions if it had known about the mark-ups are found in the summary judgment
affidavits of its former officers who are defending their involvement in lease extensions which
Lycos now alleges were bad business decisions.[34]  CSI, on the other hand, has contrary evidence
that Lycos wanted or needed to extend their leases with CSI for many business reasons,
including Lycos' desire not to capitalize the leases[35] (and instead continue to claim operating
lease accounting treatment for them)[36], their desire to lessen monthly expenses[37] (including an
approximate $400,000 monthly savings by entering into Schedules 93 and 94), and their inability
to return a large portion of the leased equipment because they could not locate it (a fact they kept
from CSI, the owner of the equipment).[38]  In fact, in trying to convince its parent company to
agree to the proposed $3.77 million buyout of the CSI leases, an internal email sent by Lycos'
Assistant Controller to its in-house counsel makes clear that it could not return CSI's equipment

---

[32] Bean Aff. Ex. 65 at 490:3-491:23.
[33] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).
[34] Bean Aff. Exs. 6, 1, 12.
[35] Lycos' policy was not to buy when it could lease instead.  Galvan Dep. at 32:3-13 (Gabos Decl. Ex. 6).
[36] In fact, it was Lycos' parent company in Spain, Terra Networks, that eventually required Lycos to
capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales
Agreement in August 2003. Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7).  Moreover, Mr. Guilfoile, Lycos'
Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested
each schedule it entered into with CSI to see that it met the standard for operating lease classification.  Guilfoile
Dep. at 79:21-80:9 (Gabos Decl. Ex. 2).
[37] Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Gabos Decl. Exh. 12); Deposition of Eric Ausubel,
dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-
111:7.
[38] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.

and was at a negotiating disadvantage:

> [I]t is our understanding that we [Lycos] are contractually obligated to return all of the leased equipment to our lessor [CSI] in exactly the same way it was received. ***This would include identifying several hundred pieces of equipment and decommissioning them in accordance with each lease expiration. We believe this to be operational impossibility***, . . .
>
> Obviously, buying out now eliminates significant risks to the Company. Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the lease term (***when we admit to our Lessor that we cannot return this equipment*** and HAVE TO buy out), we support Brian [Lucy's] decision to buy out of the leases immediately.[39]

14.    Disputed. Again, the term "mark-ups" is not used in the industry and is a theory that CSI's experts have opined is without merit.[40] There is no obligation for a lessor to disclose what is essentially an element of its profits, and Lycos at all times was given the information that it needed to decide whether to enter into the lease extensions of which it now complains.[41]

B.    Facts Concerning Lycos's Claim for Actual Damages

1.    Disputed. Lycos did pay a total of approximately $72 million to lease, over a five to seven year period, equipment owned by CSI which had an original cost of $45 million. The characterization of the payments as including something improper – i.e., "mark-ups" – sets a false premise and is Lycos' belated and argumentative characterization of the payments and, according to CSI's experts, lacks merit.[42] As stated previously, CSI has presented evidence that the "mark-up" theory created by Lycos has no basis in fact or industry practice, and that CSI acted properly.[43]

2.    Disputed. For the reasons stated above, there are no "mark-ups," as Lycos is

---

[39]    E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625 (capitalization in original; emphasis supplied).

[40]    Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[41]    Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[42]    Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[43]    *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

using that term in its theory that CSI failed to disclose its profits, and CSI's disclosures and

actions concerning Lycos' lease extensions were proper and within industry standards.[44]

      C.      Disputed Facts Concerning Lycos's Additional "Material" Facts on its Claim for
            Multiple Damages Under M.G.L. c. 93A

      1.      Disputed, but irrelevant.  Mr. Stenberg, as other sales representatives at CSI,

earned a portion of his compensation in commissions which were based on leasing that CSI did

with customers – but this is irrelevant.  The implication of Lycos' statements is that Mr.

Stenberg, due to a purported incentive to do additional leases, somehow convinced a

sophisticated company like Lycos to enter into bad business transactions that they otherwise

would not have done.  This is contradicted by the following evidence, among others:  (a) Lycos

was run by several highly-educated and experienced business leaders, including many

entrepreneurs who, in addition to their own expertise, also had available to them accountants,

lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in

December 2000 that its leasing practices were problematic);[45] (b) Lycos itself never trusted Mr.

Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony

demonstrate;[46] and (c) it was purely Lycos' decision to extend its leases, as it had other options

available to it, including return of the leased equipment (or substitution, if the equipment was

lost or damaged).[47]

      2.      Disputed, but irrelevant.  Again, Mr. Stenberg earned a portion of his

---

[44]      Fleming Aff. ¶¶ 22-29; Johnson Aff. ¶¶ 28-39; Schallheim Aff. ¶¶ 7-10, 15-20 (Gabos Decl. Exs. 3-5, respectively).

[45]      *See supra* ¶¶ 1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl. Ex. 14);

[46]      In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a\*\*hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg.  *See* Gabos Decl. Ex. 15.  In addition, Mr. Karol testified that he told Brian Lucy – the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg – "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos."  Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

[47]      Fleming Aff. ¶ 62; Johnson Aff. ¶ 22 (Gabos Decl. Exs. 3-4, respectively).

ME1 6696078v.1

compensation in commissions. The implication of Lycos' statements, however, is that any incentive Mr. Stenberg for his customers to extend their leases translates into an ability to pressure a sophisticated company like Lycos to enter into business transactions that they otherwise would not have done. This is contradicted by the evidence already set forth in the preceding paragraph.

3.    Disputed, but irrelevant. The import of Lycos' statements is that Mr. Stenberg did not disclose to Mr. Ripps his "commissionable threshold" – that is, the threshold he is provided internally for accounting purposes to determine his commission – which is akin to a company disclosing its gross profits on a deal to a customer. As CSI's experts have made clear, that is not done in the industry, and there is no obligation to make such a disclosure.[48] Again, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[49] The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[50]

4.    Disputed and misleading. CSI's evidence demonstrates that it was ***Lycos'*** desire to re-write its CSI lease portfolio because it wanted to lower its monthly rental payments.[51] Just months earlier in May 2001, Lycos' Human Resources Officer John McMahon had notified all employees that Lycos was "sharpening our focus on bottom line results," which included "expense reduction initiatives"[52] – i.e., layoffs and other measures.[53] As stated previously, CSI's experts reject Lycos' theory concerning mark-ups and the notion that these transactions were

---

[48]    Fleming Aff. ¶¶ 44-52; Johnson Aff. ¶¶ 25-27; Schallheim Aff. ¶ 7 (Gabos Decl. Exs. 3-5, respectively).
[49]    Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).
[50]    *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).
[51]    Deposition of Paul Stenberg, dated Jan. 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated Jan. 12, 2007 ("Wright Dep.") at 102:15-104:4 (Gabos Decl. Ex. 9).
[52]    E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18).
[53]    Wright Dep. at 94:21-95:3 (Gabos Decl. Ex. 9).

11

"refinancings" of loans rather than true leases.[54]

5.     Disputed and misleading.  Mr. Stenberg does not mention "refinancings" of loans, and it is clear from the testimony of CSI's experts to testimony from Lycos itself that these transactions were always treated and accounted as leases.[55]  Further, Mr. Stenberg's testimony makes clear why it is not CSI's business model to always advocate lease extensions because there are a "[l]ot of times rewrites don't make sense."[56]

6.     Disputed and misleading.  Lycos' citations to CSI's website and out-of-context testimony[57] concerning what CSI discloses to customers is irrelevant to whether CSI was required to disclose any portion of its gross profit on its lease transactions (which Lycos calls an improper "mark up") – and which CSI's experts state is not done or required in the industry.[58]  As to Mr. Stenberg's comment ("isn't that what we want?"), he explained in his deposition that customers may want to add the software costs into the leases with the hardware cost rather than pay out of pocket separately for the software.[59]

7.     Disputed and irrelevant.  Again, the transactions were leases, not loans that were "refinanced," and Lycos understood this and treated them as such.[60]

8.     Disputed and misleading.  The evidence shows that Lycos wanted to lessen its

---

[54]     Fleming Aff. ¶¶ 11-21; Johnson Aff. ¶¶ 8-20; Schallheim Aff. ¶¶ 11-14 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[55]     Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[56]     Stenberg Dep., Aug. 24, 2006, at 244:8-15 (Gabos Decl. Ex. 8).

[57]     CSI's Chairman answered Lycos' questioning by stating that information provided to customers is essentially fact specific. Bean Aff. Ex. 20 at 83:1-84:20 (testimony of Kenneth Steinback).  For example, there is no need to disclose equipment cost information to customers because "[t]hey have it" already, as they – not CSI – select and procure the equipment they ultimately lease from CSI. Id.

[58]     CSI's experts have opined that the term "mark ups" are not used in the industry and are a fabrication of Lycos for purpose of this litigation. Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).  Further, these types of disclosures are neither required nor common in the industry. Id.

[59]     Stenberg Dep. at 225:21-226:7 (Gabos Decl. Ex. 8).

[60]     Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

ME1 6696078v.1

monthly spending for many reasons including: (a) the "expense reduction initiatives" mentioned in Mr. McMahon's memorandum to all employees[61]; (b) Lycos' desire not to capitalize the leases[62] (and instead continue to claim operating lease accounting treatment for them)[63]; (c) its stated desire to lessen monthly expenses[64] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94); and (d) its inability to return a large portion of the leased equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment).[65] Furthermore, CSI structured the deal to benefit Lycos and minimize the amount of the letter of credit it had to post by leaving the existing debt in place on the existing schedules.[66]

9.    Disputed and misleading. Mr. Lucy's e-mail to Mr. Stenberg in March 2002 was written **long after** Lycos had already entered into Schedules 93 and 94 and begun paying its new lower monthly rent – and therefore the e-mail could not have formed any basis for Lycos entering into those transactions. Further, it was based on information admittedly given to it by Mr. Stenberg months earlier;[67] that Lycos did not bother to review that information prior to executing Schedules 93 and 94 only highlights that Lycos needed to achieve the cost savings and other goals for which Lycos extended its leases (*see* preceding paragraph). As for the implication that Lycos could "unwind the refinancing" even if it wanted to, Lycos presents no

---

[61]    E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18).
[62]    Lycos' policy was not to buy anything that it could lease instead. Galvan Dep. at 32:3-13 (Gabos Decl. Ex. 6).
[63]    In fact, it was Lycos' parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003. Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7). Moreover, Mr. Guilfoile, Lycos' Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification. Guilfoile Dep. at 79:21-80:9 (Gabos Decl. Ex. 2).
[64]    Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Gabos Decl. Exh. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-111:7.
[65]    E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.
[66]    Cagney Dep. at 245:7-19; 256:2-9 (Gabos Decl. Ex. 10).
[67]    Bean Aff. Ex. 31 at LYC24612 ("The obligations under the new refinanced leases came from the schedule below that you emailed to Monique [Walsh, of Lycos]").

evidence that it had the right to rescind a deal that it had voluntarily entered months before and prior to its review of information it allegedly was now questioning.

10.    Disputed as misleading.  Again, the e-mail from Mr. Stenberg came well after Schedules 93 and 94 were entered into by the parties.  It was described by Mr. Stenberg as a work in progress ("I have come up with the following so far"), and Mr. Lucy said he would "take a look" at it – but the evidence shows that he never responded to Mr. Stenberg on this.  CSI has evidence that no one at Lycos ever relied on this e-mail in any event[68] – and, in fact, importance was only attached to the email when litigation started between the parties.  At his deposition in this case, Mr. Lucy never recalled receiving the March 18, 2002 e-mail from Mr. Stenberg and did not recall relying "in any way" on the statements made by Mr. Stenberg in the e-mail.[69]  In fact, it was not until January 7, 2004 – after Lycos had first filed suit against CSI – that Leaseforum's John Kirk informed the "Team" (including Lycos' outside counsel) that he had found the March 18, 2002 e-mail and that it "*may* be important."[70]  It is clear that Lycos never relied on any statements made by Mr. Stenberg in the March 2002 e-mail and that it was not until Lycos had filed suit and was searching for a claim did it attribute any importance to this e-mail.

11.    Disputed.  Mr. Stenberg has testified at length concerning the March 18, 2003 e-mail.[71]  However, it was not a matter of "trust" that caused Mr. Lucy not to "pursue the matter further."  Lycos did not trust Mr. Stenberg – at times, Lycos referred to him as a "worthless liar" – and its in-house counsel cautioned Mr. Lucy not to rely on Mr. Stenberg because "he [Stenberg] doesn't work for Lycos."[72]  In addition, the evidence is clear that Mr. Lucy cannot

---

[68]    Johnson Aff. ¶¶ 65-68 (Gabos Decl. Ex. 4).
[69]    Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep.") at 52:8-53:20 (Gabos Decl. Ex. 19).
[70]    E-mail from John Kirk to Lycos' Litigation "Team," dated Jan. 7, 2004 (Gabos Decl. Ex. 20).
[71]    Stenberg Dep. (Aug. 26, 2006) at 352:3-388:23 (Gabos Decl. Ex. 8).
[72]    In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg.  *See* Gabos Decl. Ex. 15.  In addition, Mr. Karol testified that

ME1 6696078v.1

recall the March 2002 e-mail from Mr. Stenberg (much less any reliance he placed on it), and it was not until litigation had commenced that Lycos' litigation consultant and witness – who had and still has a contingent financial interest in the outcome of the case[73] – determined it could be of use in creating a claim against CSI (*see* preceding paragraph).

12.    Disputed and irrelevant.    Mr. Stenberg testified concerning the e-mail.[74]   As stated, Lycos has no evidence that it ever relied (or even recalled) the March 18, 2002 e-mail from Mr. Stenberg.  In fact, it was only upon commencement of litigation that the e-mail was reviewed and used as a basis for claims brought against CSI (*see* preceding paragraph).

13.    Disputed.  Lycos' "[t]wo leasing experts" did not uncover the "mark-ups" because there are no such things.  CSI's experts have testified to that, as well as the fact that CSI made the necessary disclosures to Lycos and otherwise acted properly and within industry standards.[75] Lycos' expert Ph.D. in mathematics essentially created this theory which has no basis in industry practice and, in essence, seeks to require disclosure of a lessor's profits on leasing transactions – which is not the case.[76]

14.    Disputed and misleading.    According to three of CSI's experts – two with doctorates in finance and many years of academic study in leasing and one with over twenty years of experience as the president of the Equipment Leasing Association ("ELA") – who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a

---

he told Brian Lucy – the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg – "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos."  Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

[73]      Susan Franklin, founder and principal of Leaseforum, admitted under oath that Leaseforum holds a contingent financial interest in the outcome of this case.  Deposition of Susan Franklin, dated Feb. 21, 2007 ("Franklin Dep.") at 373:5-8 (Gabos Decl. Ex. 21).

[74]      Stenberg  Dep. (Aug. 24, 2006) at 352:3-388:23 (Gabos Decl. Ex. 8).

[75]      Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[76]      *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

fabricated theory without merit.[77]

15. Disputed as misleading, and irrelevant. Mr. Stenberg, as other sales representatives at CSI, earned a portion of his compensation in commissions which were based on leasing that CSI did with customers – but this is irrelevant. The implication of Lycos' statements is that Mr. Stenberg, due to a purported incentive to do additional leases, somehow convinced a sophisticated company like Lycos to enter into bad business transactions that they otherwise would not have done. This is contradicted by the following evidence, among others: (a) Lycos was run by several highly-educated and experienced business leaders, including many entrepreneurs who, in addition to their own expertise, also had available to them accountants, lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in December 2000 that its leasing practices were problematic);[78] (b) Lycos itself never trusted Mr. Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony demonstrate;[79] and (c) it was purely Lycos' decision to extend its leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[80]

## II.  Counts VII-XIII – Alleged Unjust Enrichment and Money Had and Received

A. Alleged "Undisputed" Facts Material to Lycos' Claim that CSI is Liable to It on these Claims

1. Disputed as misleading, but not material. Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease") to which both CSI and

---

[77]     Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[78]     See supra ¶¶ 1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl. Ex. 14);

[79]     In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg. See Gabos Decl. Ex. 15. In addition, Mr. Karol testified that he told Brian Lucy – the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg – "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

[80]     Fleming Aff. ¶ 62; Johnson Aff. ¶ 22 (Gabos Decl. Exs. 3-4, respectively).

Lycos agreed at the inception of their relationship.[81]    As CSI has explained in previous submissions, the quoted provision – as with the other provisions in the Master Lease governing the rights and obligations of ***both parties*** – is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the financing that they need to do business."[82]

2.    Disputed as misleading, but not material.    As CSI has explained in previous submissions, the quoted provision – as with the other provisions in the Master Lease governing the rights and obligations of ***both parties*** – is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the financing that they need to do business."[83]    Both parties agreed to the Master Lease, as evidenced by their signatures.[84]

3.    Disputed.  It is not proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and ***not*** loans.[85]

4.    Disputed.    While CSI maintained its records in accordance with Financial Accounting Standards Board ("FASB") standards generally, Lycos is incorrect that "CSI's `estimated residual value' was to equal the equipment's expected `fair value' at the end of the lease term" – in fact, its own expert Bruce Smith disputes this.  Mr. Smith admitted to the accuracy of a statement on his website that "[l]easing companies often find themselves with seasoned assets on their books that have a current market value well in excess of the book value"

---

[81]    *See* Ex. 1 to CSI's Amended Complaint, ¶ 5 (Docket No. 121)..
[82]    *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim*, dated Mar. 10, 2005, at 3-4 (Docket No. 16).
[83]    *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim*, dated Mar. 10, 2005, at 3-4 (Docket No. 16).
[84]    Ex. 1 to CSI's Amended Complaint (Docket No. 121).
[85]    Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

but that current accounting rules "prohibit writing up the residual to current market value."[86]

5.    Disputed. Lycos is incorrect that FASB 13 required CSI to book its residual values at zero or that this approximated the true value of the equipment at the end of lease – in fact, Lycos' own expert Bruce Smith disputes this.  Mr. Smith admitted to the accuracy of a statement on his website that "[l]easing companies often find themselves with seasoned assets on their books that have a current market value well in excess of the book value" but that current accounting rules "prohibit writing up the residual to current market value."[87]  Moreover, CSI's expert Robert Zises has appraised the equipment leased by Lycos from CSI as of August 2003 to have had a fair market value of approximately $3,000,000[88] – and there was also substantial "in-place" value to Lycos for the equipment.[89]

6.    Disputed as misleading.  The Sales Agreement Number 199614 ("Sales Agreement") executed on August 8, 2003 by Lycos (and by CSI three days later) makes clear that CSI "retains title" to the leased equipment until the leases are satisfied in full.[90]  Therefore, though Lycos had achieved its goal of capitalizing its leases as required by its parent company,[91] it did not have title to the equipment at that time or any time prior.

B.    Alleged "Undisputed" Facts Material to Lycos' Claim for Damages Under Theories of Unjust Enrichment and Money Had and Received

1.    Disputed as misleading, and irrelevant.  Lycos has no damages.[92]  In any event, Lycos' claim that it "paid twice" for Schedules 93 and 94 – that it, its argument that a percentage of the $3.77 million it paid to buyout its leases with CSI under the Sales Agreement it executed on August 8, 2003 should be apportioned – ignores the fact that it could not have "paid twice"

---

[86]    Deposition of Bruce Smith, dated Nov. 9, 2007 ("Smith Dep."), attached as Ex. 17 to Gabos Decl.
[87]    Deposition of Bruce Smith, dated Nov. 9, 2007 ("Smith Dep."), attached as Ex. 17 to Gabos Decl.
[88]    Expert Report of Robert Zises, dated Aug. 30, 2007, at 14 (Gabos Decl. Ex. 22) (sections I and II).
[89]    Fleming Aff. ¶¶ 29-74; Johnson Aff. ¶ 24; Schallheim Aff. ¶ 18 (Gabos Decl. Exs. 3-5, respectively).
[90]    Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5.
[91]    Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl. Ex. 7).
[92]    Johnson Aff. ¶¶ 69-71; Schallheim Aff. ¶¶ 40-44 (Gabos Decl. Exs. 4-5, respectively).

18

because title expressly did not pass to Lycos at the time of the August 2003 Sales Agreement.[93]

   2.  Disputed as misleading, and irrelevant. *See* preceding paragraph.

   3.  Disputed as misleading, and irrelevant. *See* preceding paragraph.

   4.  Disputed as misleading, and irrelevant. *See* preceding paragraph.

   5.  Disputed as misleading, and irrelevant. *See* preceding paragraph.

      Respectfully submitted,

      COMPUTER SALES INTERNATIONAL, INC.

      By its attorneys,

      /s/ Robert J. Kaler_____
      Robert J. Kaler, BBO No. 542040
      rkaler@mccarter.com
      Edward W. Little, Jr., BBO No. 628985
      elittle@mccarter.com
      McCarter & English LLP
      225 Franklin Street
      Boston, MA  0211
      Tel. (617) 345-7000

Dated:  November 19, 2007

### Certificate of Service

  I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be served on counsel for the other parties in this action electronically and by hand this 19th day of November, 2007.

      /s/ Robert J. Kaler_____
      Robert J. Kaler

---

[93]  Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5.

ME1 6696078v.1