UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | | |
|---|---|---|
| ) | | |
| COMPUTER SALES INTERNATIONAL INC., ) | C.A. No. 05-10017- RWZ | |
| Plaintiff, ) | | |
| v. ) | **LEAVE TO FILE** | |
| ) | **MEMORANDUM OF UP TO** | |
| LYCOS, INC., ) | **THIRTY PAGES GRANTED** | |
| Defendant, ) | **JUNE 13, 2007** | |
| ) | | |
| BANK OF AMERICA f/k/a FLEET BANK, ) | | |
| ) | **ORAL ARGUMENT** | |
| Trustee Process Defendant. ) | **REQUESTED** | |
| ) | | |

**COMPUTER SALES INTERNATIONAL'S OPPOSITION TO LYCOS'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF CSI'S AMENDED COMPLAINT**

Submitted by:

Robert J. Kaler, BBO No. 542040
Edward W. Little, BBO No. 628985
Kelly A. Gabos, BBO No. 666219
McCarter & English LLP
265 Franklin Street
Boston, MA  0211
Tel. (617) 449-6500

*Counsel for Plaintiff Computer Sales
International, Inc.*

Dated:  November 19, 2007

## TABLE OF CONTENTS

**Section**                                                                 **Page**

**INTRODUCTION**……………………………………………………………………..1

**SUMMARY OF ARGUMENT**……………………………………………….…………1

**STATEMENT OF RELEVANT FACTS**…………….……………………………………7

**ARGUMENT..**…………………………………………………………………………12

I.      **LYCOS'S RECITATION OF THE PURPORTED "FACTS" RELEVANT
        TO CSI'S AMENDED CLAIMS IS INACCURATE AND INCOMPLETE,
        RELIES ON ONE-SIDED INTERPRETATIONS OF DOCUMENTS,
        AND IS IMPROPERLY BASED ON THE STATEMENTS OF
        CONTINGENTLY PAID WITNESSES**……………………………………..………13

II.     **LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING
        CSI'S FRAUD CLAIM** ………….……………………………………………14

        A.      **There is Ample Evidence Supporting CSI's Fraud Claim,
                and Disputed Issues of Material Fact Clearly Exist As To
                Lycos's Intentions** ……………………………………………………..14

        B.      **The Pre-Contract Negotiations Cited By Lycos Do Not Alter
                the Legal Effect of the Specific Representations It Made in the
                Sales Agreement, and Cannot in Any Way Bar CSI's Fraud Claim**……….19

        C.      **The "Pre-Existing Duty" Rule Has Nothing to Do With This
                Case, and Does Not in Any Way Bar CSI's Fraud Claim**………………..19

III.    **LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S
        BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR
        DEALING CLAIM** ……………………………………………………………...20

        A.      **There Is Disputed But Legally Sufficient Evidence That
                Lycos Acted in Breach of Its Implied Covenant of Good Faith
                and Fair Dealing Imposed on It By Operation of Law as
                a Result of Its Entering Into the Sales Agreement** …………………………20

IV.    LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S
       ABUSE OF PROCESS CLAIM……………………………………………22

       A.    There Is Disputed But Legally Sufficient Evidence
             Supporting CSI's Abuse of Process Claim………………………………22

V.     LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S
       UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM
       UNDER M.G.L. c. 93A…………………………………………………………26

       A.    Massachusetts Law Applies to CSI's Deceptive Practices Claim………26

       B.    CSI's Claims For Violation of Chapter 93A Do Not Relate
             Solely to Lycos's Breach of Contract……………………………………26

VI.    LYCOS'S OFFER TO "NOT OBJECT" TO THE ENTRY OF
       SUMMARY JUDGMENT ON COUNT I OF CSI'S AMENDED
       COMPLAINT IS INEFFECTIVE AS IT IS CONDITIONED ON
       THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF LYCOS
       ON ITS COUNTERCLAIMS, TO WHICH IT IS NOT ENTITLED…………28

VII.   LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO
       COUNT II OF CSI'S AMENDED COMPLAINT …...…………………………28

CONCLUSION ……………………………………………………………………………29

## INTRODUCTION

Plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") respectfully submit this memorandum of law in opposition to Defendant Lycos, Inc.'s Motion for Summary Judgment on All Counts of CSI's Amended Complaint (hereinafter "Lycos' SJ Motion").

## SUMMARY OF ARGUMENT

This action, filed on January 5, 2005, began as an effort to recover a $310,000 account receivable which is owed to the plaintiff CSI Leasing, Inc. ("CSI") under the last two of a long series of computer equipment leases (the "Leases") that CSI entered into with the defendant Lycos, Inc. ("Lycos" or "the defendant") over a seven year period from 1996 to 2002.[1]

In response to the original complaint, Lycos filed a counterclaim seeking to avoid liability, and to pursue damages against CSI, on the theory that it had overpaid for the Leases because its Lease payments wound up totaling much more than the original cost of the equipment it had leased (the "Equipment"), and that it never truly understood the financial impact of the Lease extensions it was signing because it somehow could not keep track of the total original cost of all the Equipment it was leasing.[2]

Discovery subsequently revealed, however, that Lycos had paid more, in total, than the original cost of Equipment because, rather than returning the Equipment at the end of each Lease term, it had repeatedly extended the Leases in order to keep those assets off its balance sheet, conserve its cash, and avoid having to locate, return, and replace the Equipment at the end of each lease term.[3]  Discovery also revealed that Lycos actually could and did keep track of the original cost of the Equipment it had leased, and knew that cost from the beginning because it

---

[1]    *See* Verified Complaint, dated January 5, 2005 (Docket No. 1).
[2]    See Lycos' Answer, dated Feb. 4, 2005 (Docket No. 11).
[3]    *See generally* Affidavit of James S. Schallheim, Ph.D. ("Schallheim Aff."), attached as Ex. 3 to the Declaration of Kelly A. Gabos, dated Nov. 19, 2007 and filed herewith ("Gabos Decl."); Affidavit of James M. Johnson, Ph.D. ("Johnson Aff.") (Gabos Decl. Ex. 4); Affidavit of Michael Fleming ("Fleming Aff.") (Gabos Decl. Ex. 5).

issued the purchase orders for that Equipment.

As a result, Lycos has shifted its theory to one in which it is now claiming that as a result of discovery in this case, it has supposedly "uncovered" that the then-present values of the amounts it agreed to pay under the particular CSI Leases that extended the amount of time that it could continue to use Equipment that it had already leased from CSI (hereinafter "Extended Leases") were higher than the present values of the remaining lease payments due under their predecessor Leases, plus the residual value for that Equipment carried on CSI's internal books at the time. This theory is without merit.[4]

Lycos now refers to the differences between these two theoretical present value figures as "mark-ups," and argues that under Mass. Attorney General's regulations and M.G.L. c.93A, CSI should have calculated and disclosed to Lycos what Lycos now calls the "mark-ups" each time it entered into an Extended Lease with Lycos, supposedly in order to allow Lycos to decide whether each transaction was "economically justifiable" -- hence the opening sentence of the Lycos SJ Motion here, claiming that "[t]his case is about a company, . . .CSI . . . that defrauded and reaped undue profits from Lycos . . . through . . . the use of undisclosed mark-ups."[5]

CSI's response, and that of its expert witnesses, is that this argument, like the various other arguments that Lycos has advanced to support its counterclaim, is without merit, and that like Lycos' previous claims, it is being advanced as part of a conscious strategy, originated by a Lycos leasing consultant in the Summer of 2003, and accepted by Lycos at that time, to "manufacture" a claim against CSI for fraud (even though no fraud occurred and Lycos was, at that very moment, reaffirming the validity of the Leases, and promising to pay them in an August 2003 Sales Agreement), and then to threaten to publicize its "fraud" claim to CSI's customers

---

[4]     *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5).
[5]     Lycos SJ Motion at 1.

unless CSI forgave all Lycos' debt to it, turned over to Lycos title to all the Equipment, and paid Lycos a "settlement" in which the Consultant would take a huge share.[6]

On October 30, 2006, after finally accumulating sufficient evidence of this strategy, known to Lycos as "Phase II," CSI moved to amend its complaint to add four additional counts (hereinafter the "Amended Claims") alleging fraud, breach of implied covenant of good faith and fair dealing, abuse of process, and violation of M.G.L. c.93A against Lycos. That motion was allowed by this Court in December of last year. *See* Docket No. 120 (Memorandum of Decision and Order, dated December 1, 2006). In opposing that motion, Lycos argued, **precisely as it does in the Lycos SJ Motion here**, that the Amended Claims should not be allowed because it ultimately made most of the Lease payments that were due after August of 2003, and therefore cannot have intended not to make them.[7]

This argument, however, is directly contrary to the evidence -- which is that in pursuit of its "Phase II" strategy, which the evidence indicates had already been commenced when it signed the Sales Agreement on August 8, 2003,[8] Lycos thereafter **(1) deliberately withheld its December 2003 and January 2004 Lease payments**, and sued CSI (in December of 2003) claiming that it had no obligation to make any of the Lease payments that it had represented in

---

[6]      *See* Affidavit of Peter Acton, dated Sept. 4, 2007 ("Acton Aff.") Ex. 18 (portion of e-mail from John Kirk of Leaseforum to Julie Callagee marked "A"); *see generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5).

[7]      *See* Lycos' Opposition to CSI's Motion to Amend Its Complaint, dated Nov. 13, 2006, at 11 ("the substance of CSI's fraud claim itself does not even pass the 'red face' test . . . . CSI's proposed claims lack any rational basis") (Docket No. 113).

[8]      It is undisputed that on August 8, 2003, Leaseforum advised Lycos that Phase II was underway, and that on August 10, 2003, before CSI signed the Sales Agreement, Lycos' controller Julie Callagee confirmed that Phase II was underway in her email saying that Lycos expected a better percentage fee arrangement for the work than it had had for Phase I. *See Response of Computer Sales International, Inc. to Lycos's Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Summary Judgment on All Counts of Computer Sales International's Amended Complaint* (hereinafter, "CSI's Facts on CSI's Claims") ¶¶ 16-20.

the Sales Agreement it would make, causing CSI to incur unanticipated costs and burdens;[9] **(2) stopped its Lease payments again in late 2004 and early 2005**, again causing CSI to incur unanticipated costs and burdens; **(3) thereafter repeatedly took the position**, in and out of court, that the Leases were **_not_** "in full force and effect," that it did **_not_** have to make any more Lease payments, and that **_not_** have title to the Equipment on each Lease until the last Lease payment was made, again causing expense and burden to CSI; and **(4) to this day has failed to make over $300,000 of the payments** due CSI under the Leases, which it expressly represented in the Sales Agreement it would make.

All of these actions directly contradicted Lycos' specific representations in the Sales Agreement that the Master Lease and Equipment Schedules would remain in full force and effect until their specified expiration dates, that Lycos would make all the remaining payments to CSI that Lycos was required to make thereunder, and that title to the equipment would remain with CSI until all such payments by Lycos were made.[10]  A major issue of fact for trial on the Amended Claims, therefore, is the extent to which Lycos already planned to take these positions with CSI when it made the representations in the Sales Agreement, and there is more than sufficient evidence that it did for that those claims to go to the jury.[11]

In this regard, Lycos' argument for summary judgment dismissing CSI's Count III fraud claim -- that "the undisputed evidence is that Lycos did intend to make those [Lease]

---

[9]    CSI's Response to Second Interrogatories, dated Jan. 22, 2007, at 15-16, attached as Ex. 6 to the Declaration of Edward W. Little, Jr., dated Nov. 19, 2007, and filed herewith ("Little Decl.").

[10]    Sales Agreement No. 199614 ("Sales Agreement") §§ 4, 5 (Ex. 10 to CSI's Amended Complaint, Docket No. 121).

[11]    In this regard, it is well-settled that "[t]he granting of summary judgment in a case where a party's state of mind or motive constitutes an essential element of the cause of action is disfavored." *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 86 (1984); *see also Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975)("[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind").

payments"[12] -- is not only mistaken, but also fails to address the portions of CSI's fraud claim alleging that Lycos' specific acknowledgements and representations in the Sales Agreement that the Master Lease and Equipment Schedules would "remain in full force and effect," and that title to the equipment would remain with CSI until all such payments by Lycos were made, were duplicitous and fraudulent at the time they were made.

Lycos' other argument for summary judgment dismissing CSI's Count III fraud claim -- that the representations it made in the Sales Agreement cannot form the basis for a fraud claim because they merely "reaffirmed" what Lycos calls "a pre-existing duty" it had[13] -- is a *non-sequitur*, and misapplies a doctrine of contract law relating to the sufficiency of consideration, the "pre-existing duty rule," to an intentional tort claim where it has no relevance or effect.

Lycos is similarly mistaken in arguing that it should be granted summary judgment dismissing CSI's Count IV breach of implied covenant of good faith and fair dealing claim because supposedly, "there is no evidence of bad faith on the part of Lycos as the law requires."[14]  Simply put, this argument ignores the evidence that Lycos deliberately signed the Sales Agreement with all the representations in it discussed above, knowing perfectly well that it intended to try to deprive CSI of the benefits of that agreement by pursuing its "Phase II" strategy of attacking the validity of the Leases after the Sales Agreement was signed.

Lycos is also mistaken in arguing that it should be granted summary judgment dismissing CSI's Count V abuse of process claim, based on the suggestion that there is somehow no evidence that it "used legal process for an ulterior or illegitimate purpose."[15]  In fact, there is

---

[12]     *See* Lycos SJ Memo at 2.
[13]     *See* Lycos SJ Memo at 2.
[14]     *See* Lycos SJ Memo at 20.
[15]     Contrary to Lycos's argument, improperly using litigation to coerce a favorable settlement can be grounds for an abuse of process claim.  *See American Velodur Metal v. Schinabeck*, 20 Mass. App. Ct. 460 (1985)(wife presented "ample evidence" of husband's abuse of process by alleging that he initiated litigation for ulterior purpose "to influence the[ir] divorce settlement by coercion").  Likewise, initiating litigation to leverage negotiations can be

ample evidence that it did just that -- and the argument that it was innocently pursuing good faith claims is belied by the evidence that it first duped CSI into agreeing to the Sales Agreement by representing that it viewed all the Leases as being valid and in full force, and then sprung on CSI its "Phase II" argument, which CSI's experts have debunked, that it had somehow been "overcharged," and should have a refund of over $15 Million of what it had already paid under those Leases.[16]

In addition, Lycos' offer to "not object" to the entry of summary judgment on Count I of CSI's Amended Complaint (Breach of the Leases) is ineffective as it is conditioned by Lycos on the entry of a summary judgment in its favor on its counterclaims against CSI to which it is not entitled,[17] and Lycos argument for summary judgment in its favor as to Count II of the Amended Complaint (Breach of the Sales Agreement) is without merit because it relies on the mistaken argument that Lycos is somehow entitled to summary judgment on its counterclaim against CSI, which it is not.[18]

Finally, the Lycos SJ Motion challenges CSI's Amended Claims based on a version of the "facts" that is inaccurate, incomplete, predicated on one-sided interpretations of documents, impermissibly based on the alleged statements and intent of contingently paid witnesses, and disputed by CSI's witnesses. For all of the reasons set forth above and herein, summary judgment for Lycos dismissing any of Amended Claims is not appropriate or permissible under

---

grounds for abuse of process. *See Farard Real Estate Development Corp. v. Metro-Boston Broadcasting, Inc.*, 345 F. Supp. 2d 147, 153 (D. Mass. 2004)(allegation that plaintiff recorded *lis pendens* to "leverage concessions in negotiations" regarding an easement on land that defendant's affiliate owned was sufficient to survive motion to dismiss). Moreover, courts have upheld abuse of process claims where the allegation is that an action was brought to force reimbursement of monies allegedly due. *See Medford Co-Operative Bank v. Skerry*, 2004 WL 1853343, at *4 (Mass. App. Div. Aug. 12, 2004)(bank's conversion claim against Skerry individually "was designed to pressure [Skerry] into quickly concluding the action by reimbursing the Bank" as administrator of decedent's estate).

[16]    *See generally* Fleming Aff.; Johnson Aff., Schallheim Aff. (Gabos Decl. Exs. 3-5).

[17]    *See* CSI's Opposition to Lycos Motion for Summary Judgment as to Certain Claims in Counts VII, XII, and XIII of Its Counterclaim, filed herewith.

[18]    *See* CSI's Opposition to Lycos Motion for Summary Judgment as to Certain Claims in Counts VII, XII, and XIII of Its Counterclaim, filed herewith.

ME1 6898121v.1

the applicable legal standards.

## STATEMENT OF RELEVANT FACTS[19]

1.      CSI is a St. Louis-based independent computer equipment leasing company doing business throughout the United States and abroad.[20]  In December of 1996, CSI and Lycos entered into a Master Lease containing standard terms and conditions for computer equipment leases,[21] and over the next several years, it leased huge amounts of computer equipment to Lycos that Lycos used to conduct its internet search operations.

2.      Lycos was founded in 1995 as a Massachusetts-based internet start-up company and quickly went public in 1996.  During the period 1996 to 2000, Lycos exploded into a huge internet conglomerate through a series of public stock offerings and acquisitions of other companies.  During that time, Lycos was fully aware of the cost of the Equipment it was leasing from CSI because it selected that Equipment, and issued purchase orders for it that were then assigned to CSI for payment.[22]

3.      Also during those years, Lycos' policy was never to buy equipment when it could lease it,[23] as leasing allowed it to keep the equipment off its balance sheet and conserve its cash. As leases came up for expiration in these years, Lycos would typically renew and extend them, rather than try to buy the Equipment, because by doing so it kept the Equipment off its balance sheet, and conserved its cash.[24]  (Lycos treated its equipment leases as "off balance sheet"

---

[19]      **For a detailed recitation of the facts, CSI respectfully refers the Court to its two responsive statement of disputed facts, with citations, which it submits herewith pursuant to Local Rule 56.1**: (a) CSI's Facts on CSI's Claims and (b) *Response of Computer Sales International, Inc. to Lycos's Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim* (hereinafter, "CSI's Facts on Lycos' Counterclaims").

[20]      CSI's Amended Complaint ¶ 2 (Docket No. 121).

[21]      Ex. 10 to CSI's Amended  Complaint (Docket No. 121).

[22]      Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 31, 35, 143-48 (Gabos Decl. Ex. 7).

[23]      Deposition of Ernesto Galvan, dated Feb. 20, 2007 ("Galvan Dep.") at 32:3-13 (Gabos Decl. Ex. 6).

[24]      Johnson Aff. ¶¶ 26, 33 (Gabos Decl. Ex. 4); Fleming Aff. ¶ 32 (Gabos Decl. Ex. 5).

operating leases, which meant that it did not have to record the debt associated with them.[25])

4.     Lycos' rapid growth during the period 1996 - 2000 culminated in the $12 Billion acquisition of Lycos by the Spanish telecommunications giant Telefonica in October of 2000 -- a transaction which resulted in the original senior management of Lycos, who had run the company since 1996, receiving large stock options payouts in the tens of millions of dollars, and then departing from the company.

5.     Shortly thereafter, in 2001, the internet boom collapsed, and an industry-wide recession occurred which caused a dramatic reduction in the revenues of the company, which was then known as "Terra Lycos" (as it was a wholly-owned subsidiary of Telefonica's "Terra Networks" internet division).  As a result, the company, which was then under new management, began a cost-cutting program, laying off hundreds of employees in 2001,[26] and further extending all its leases of computer equipment (most of which were with CSI) -- even equipment that it had already had under lease for several years -- in an effort to slash operating expenses.

6.     As part of that cost-cutting program, in October 2001, Terra Lycos chose, rather than trying to buy the thousands of pieces of Equipment that it was then leasing from CSI, to simply extend for several years its Leases of that Equipment -- at a 30% reduction in its monthly lease payments (*i.e.,* its monthly rent was reduced from $1.2 million to approximately $850,000). The result of that extension was that it incurred an aggregate increase in its total future Lease payment obligations of approximately $11 Million -- which Lycos fully understood it was incurring at the time because it had to post an $11 Million Letter of Credit in favor of CSI to

---

[25]     Callagee Dep. at 31, 35 (Gabos Decl. Ex. 7); *see also* Johnson Aff. ¶¶ 26, 33 (Gabos Decl. Ex. 4); Fleming Aff. ¶ 32 (Gabos Decl. Ex. 5).
[26]     E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18); Deposition of Timothy Wright ("Wright Dep.") at 94:21-95:3 (Gabos Decl. Ex. 9).

secure that added obligation before this major extension of its Leases became effective.[27]

7.    In 2002, Terra Lycos' parent company instructed it to capitalize the Leases, and it requested quotes from CSI to buy out the Equipment, which it received.[28]  It did not pursue a buy-out negotiation in earnest until the middle of 2003, however, and at that time, it retained expert leasing consultants represent and advise it in its negotiations with CSI.

8.    Susan Franklin, one of the leasing experts at LeaseForum that Lycos hired to monitor its equipment leases, admitted that *in June and July of 2003*, she analyzed and reported to Lycos on how much money CSI made on the Extended Leases, and in fact had prepared a spreadsheet[29] showing a detailed breakdown of CSI's original equipment cost, lease rental revenue, and total gross profit on all its Leases with Lycos.

9.    On August 8, 2003, *more than a month after Ms. Franklin explained to Lycos the financial impact of the Extended Leases*, and how much gross profit CSI had made on them, Lycos executed the Sales Agreement, in which it expressly reaffirmed the validity of the Leases and expressly represented that it would fulfill its payment obligations thereunder:

> Lessee [Lycos] shall pay to Lessor [CSI] the number of monthly rental payments remaining (plus applicable taxes, if any) beginning with the payment due for the month of August, 2003, and continuing to and including the Final Rental Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").[30]

On that same day, however, Lycos's leasing consultant confirmed to it in writing that work on a so-called "Phase II" plan for "setting up a negotiation *to reduce Lycos' remaining future payment obligations to CSI*", which it was at that moment representing in the Sales Agreement it

---

[27]    Deposition of Philip Cagney, dated Sept. 27, 2006 ("Cagney Dep.") at 245:7-19; 256:2-9 (Gabos Decl. Ex. 10).

[28]    Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7); E-mail from Paul Stenberg to Brian Lucy, attached to the Declaration of Edward W. Little, Jr., filed herewith ("Little Decl.")as Ex. 8.

[29]    Gabos Decl. Ex. 23.

[30]    Sales Agreement § 4 (Ex. 10 to CSI's Second Amended Complaint, Docket No. 121).

would honor, was already underway and would be continue.[31]

10.     Two days later, on August 10, 2003 -- **before** CSI had countersigned the Sales Agreement -- the Lycos manager in charge of its relationship with its leasing consultant **expressly acknowledged** the Phase II plan, and **told the consultant that Lycos' CFO was "expecting a much lower rate" on what she called "CSI Phase II"** -- referring to the contingent fee that Lycos had agreed to pay the consultant for helping it implement the Phase II to try to force CSI, after the Sales Agreement was signed, to reduce the Lease payments required under it.[32]

11.     Then, on August 11, 2003, CSI signed the Sales Agreement, **explicitly relying** on Lycos' representations in that document that the Master Lease and Equipment Schedules would remain in full force and effect until their specified expiration dates, that Lycos would make all the remaining payments to CSI that Lycos was required to make thereunder, and that title to the equipment would remain with CSI until all such payments by Lycos were made.[33]

12.     Thereafter, in the months following the parties' execution of the Sales Agreement, Lycos and its leasing consultant, unbeknownst to CSI, continued strategizing on how they would implement the Phase II plan to extort money and other concessions from CSI -- discussing how Lycos, in conjunction with its consultant, could implement that plan.[34]

13.     Then, on December13, 2003, in furtherance of the Phase II plan, Lycos failed to make its December 1, 2003 Lease payment when due, and filed a bogus lawsuit against CSI in the Massachusetts Superior Court for Middlesex County entitled *Lycos, Inc. v. Computer Sales International, Inc.*, Civil Action No. 03-5057.  In that lawsuit, it **challenged** the validity and

---

[31]     Acton Aff. Ex. 18.
[32]     Acton Aff. Ex. 19.
[33]     Sales Agreement (Ex. 10 to CSI's Second Amended Complaint, Docket No. 121) (signature page).
[34]     Acton Aff. Exs. 30, 31.  Some additional materials concerning this have been designated by other parties as "confidential" pursuant to the Protective Order **and are therefore being filed under seal**.

enforceability of the Leases, claimed that they would **not** remain "in full force and effect" until their specified expiration dates, claimed that Lycos would **not** make all the remaining payments to CSI that Lycos was required to make thereunder, and claimed that title to the equipment would **not** remain with CSI until all such payments by Lycos were made.[35]

14.    As part of its Phase II strategy, Lycos did not immediately inform CSI that it had filed suit against it, and CSI was initially informed that the missed December 2003 payment was simple administrative delay.  Then, in a continuation of its Phase II plan, Lycos failed to make its January 1, 2004 Lease payment when due.

15.    Finally, in a teleconference in mid-January, 2004, Lycos revealed to CSI **(a)** that its failure to make the January 1, 2004 rent payments was not a simple administrative delay, but was the result of a conscious decision by Lycos not to honor the Leases, and **(b)** that it had filed a $15 million lawsuit against CSI challenging the validity of the Leases, and claiming that it had no further obligation to make the Lease payments.  CSI responded by removing Lycos's state court lawsuit to this Court, after which Lycos dismissed it without prejudice.[36]

16.    Then, in late 2004, as part of the same Phase II plan, and working in cooperation with the same leasing consultants, Lycos defaulted again on its Lease payments to CSI, and then, when legitimate legal action was brought to collect those obligations, which totaled over $300,000, Lycos renewed, as counterclaims in this action, the claims it had made in its prior state court lawsuit.  The result has been that in addition to the damages it suffered as a result of the prior Lycos default and lawsuit, CSI has been burdened with the damages and expense of having to conduct extensive litigation in this case to defend itself against, and uncover the truth about,

---

[35]    CSI removed this state case to federal court, after which Lycos voluntarily dismissed it.  *See Lycos, Inc. v. Computer Sales International, Inc.*, C.A. No. 04-10212-RWZ (Docket No. 2).

[36]    *See supra* note 35.

Lycos's bogus counterclaims.[37]

## ARGUMENT

This Court has repeatedly held that before summary judgment can be considered, the moving party (in this case Lycos) must make out a prima facie case, based on the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Davis v. Protection One Alarm Monitoring, Inc*., 456 F. Supp. 2d 243, 248-49 (D. Mass. 2006) (citing Fed. R. Civ. P. 56(c)). Once the moving party has done so, the burden shifts to the non-moving party (in this case CSI) to set forth specific facts showing that there is a genuine, triable issue. *Id*. at 249 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In considering the motion, the Court must view the entire record in the light most hospitable to the non-moving party, and indulge all reasonable inferences in its favor. *Id*. (citation omitted).

In this case, Lycos cannot make out even a *prima facie* case for summary judgment in its favor as to CSI's Amended Complaint because there are clearly disputed issues of material fact concerning each of the Amended Claims, there is compelling evidence to support them, and Lycos has failed to demonstrate the requisite absence of disputed issues of material fact concerning them, or that it is entitled to judgment as a matter of law -- particularly where, as here, intent is a key element of all the Amended Claims, and "[t]he granting of summary judgment in a case where a party's state of mind or motive constitutes an essential element of the cause of action is disfavored." *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 86 (1984). *See also Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975)("State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind").

---

[37]     CSI's Response to Second Interrogatories, dated Jan. 22, 2007, at 15-16 (Little Decl. Ex. 6).

ME1 6898121v.1

I.  **LYCOS'S RECITATION OF THE PURPORTED "FACTS" RELEVANT TO CSI'S AMENDED CLAIMS IS INACCURATE AND INCOMPLETE, RELIES ON ONE-SIDED INTERPRETATIONS OF DOCUMENTS, AND IS IMPROPERLY BASED ON THE STATEMENTS OF CONTINGENTLY PAID WITNESSES**

In discussing its view of the "facts," the Lycos SJ Memo claims, at p. 1, that this is supposedly a case about "a company…CSI…that defrauded and reaped undue profits from Lycos…through…undisclosed 'mark-ups'" on refinanced computer equipment leases."[38]  It then argues that CSI amended its Complaint in this case last year "[a]pparently believing that 'the best defense is a good offense.'"  It then proceeds, at pages 3-11, to give an account of the "Facts" of this case in which it argues for its own one-sided interpretation of selected documents relevant to CSI's Amended Claims.  A simple review of the actual evidence, however, shows that Lycos view of the "facts" relevant to CSI's Amended Claims is inaccurate and incomplete, relies on one-sided interpretations of documents, is improperly based on the statements of contingently paid witnesses,[39] and is contradicted by CSI's witnesses.[40]

The evidence is almost indisputable, for example, that Lycos conspired to challenge the validity of its Leases with CSI at the very moment it was signing a contract with CSI, on August 8, 2003, confirming the validity of all the Leases, and promising to pay them in full.[41]  Then, it

---

[38]    Lycos' original theory, as it explained to the Court in 2005, was that it had been defrauded, and had overpaid CSI, because its Lease payments wound up totaling about 65% more than the original cost of the equipment it had leased (the "Equipment"), and that supposedly, it had never kept track of that original Equipment cost, and therefore did not know how much CSI was making on the Leases over and above its Equipment cost. Discovery subsequently revealed, however, that Lycos could and did keep track of the original cost of the Equipment -- because it selected and ordered it.  It also revealed that rather than returning the equipment at the end of each Lease term, Lycos had repeatedly extended the Leases in order to keep those assets off its balance sheet, conserve its cash, and avoid having to locate, return, and replace the assets.

As a result, Lycos has shifted its theory to one in which it is now claiming that as a result of discovery in this case, it has supposedly "uncovered" that the total amount it paid pursuant to some of the later, extended Leases was higher than the residual value for the Equipment carried on CSI's books at the time, and that under Mass. Attorney General's regulations and M.G.L. c.93A, CSI should have disclosed to Lycos what portion of Lycos' payments on each Lease extension constituted this portion of the gross profit being earned by CSI -- in order to allow Lycos to make decision as to whether each transaction was "economically justifiable."

[39]    Gabos Decl. Ex. 24 (Expert Report of Professor Nancy J. Moore) ("Moore Report").
[40]    See generally Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5).
[41]    CSI's Facts on CSI's Claims ¶¶ 16-20.

ME1 6898121v.1

embarked on a plan to try to embarrass CSI by publicizing bogus claims of "fraud" and "overcharging" -- in an effort to extort concessions from CSI reducing the amount of its agreed payment obligations, using the threat that a witness with whom its attorneys had improperly negotiated a contingent fee arrangement (in direct violation of Rule 3.4(g) of the Mass. Rules of Professional Responsibility) would testify that it had been defrauded.[42]

There is clearly sufficient evidence in the record, discussed in greater detail below, from which a jury could conclude that Lycos's "Phase II" scheme to challenge the validity of the CSI Leases, and to stop payment of them notwithstanding its representations in the August 8, 2003 Sales Agreement, was already in effect at the time it made those representations, and that they were therefore fraudulent.

## II.    LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR AS TO CSI'S FRAUD CLAIM

### A.    There is Ample Evidence Supporting CSI's Fraud Claim, and Disputed Issues of Material Fact Clearly Exist As To Lycos's Intentions

In seeking a summary dismissal of CSI's fraud claim, the Lycos SJ Memo argues that "CSI has unearthed no evidence demonstrating that Lycos did not intend to make the lease payments," and that "[a]lthough not its burden to prove, … Lycos intended to make all of the remaining payments required under the extant equipment schedules."[43]  As support for the latter claim, it cites to an affidavit from the former CFO of Lycos,[44] claiming that "that is the end of the inquiry" since in its view there is an "[a]bsen[ce]" of "evidence creating a genuine issue of material fact, concerning Mr. Lucy's testimony."[45]  Nothing could be further from the truth.

First, it is well-settled, as a matter of law, that "[a] person's intent is a question of fact `to

---

[42]    Gabos Decl. Ex. 24 (Moore Report).
[43]    *See* Lycos SJ Memo at 7.
[44]    *See* Lycos SJ Memo at 7 n. 36; s*ee also id.* at 11, 13 n. 78.
[45]    *See* Lycos SJ Memo at 13.

be determined from his declarations, conduct and motive, and all the attending circumstances.' [The purchaser's] affidavit to the opposite effect *merely places his intent in dispute*. Because the issue of [ ] intent at the time [the purchaser] took title is material to the outcome of the case, and because his intent is in dispute, summary judgment was not appropriate." *Town of Sudbury v. Scott*, 439 Mass. 288, 302 (2003)(*quoting Galotti v. United States Trust Co*., 335 Mass. 496, 501 (1957)). Second, the facts of this case (discussed below) thoroughly belie Mr. Lucy's self-serving claim, as does the fact that the record shows that in other portions of the same affidavit, Mr. Lucy directly contradicted his prior testimony - raising serious questions as to his credibility.

On the very day that Lycos signed the Sales Agreement, for example, Lycos' lease consultant (and authorized representative in dealing with CSI) informed Mr. Lucy's assistant, Julie Callagee, the Lycos controller, that "Phase I" of its plan for dealing with CSI had been completed, and that "Phase II," which it said "aimed at setting up a negotiation to reduce Lycos' remaining future payment obligations to CSI," had "commenced.[46]   The near-immediate response from her, on August 10, 2003, was "Can you send me your proposed fee schedule for CSI phase II? *Brian [Lucy] is expecting a much lower rate* that phase one given the favorable outcome there."[47]

Lycos attempts to downplay this email, arguing that at the time, the consultant supposedly was not working on Phase II, or, if it was, "it was doing so without authority or compensation from Lycos,"[48] but this argument is contradicted by the evidence, and in any event misses the point. It is the overall sequence of events, both before and after the critical August email exchange, that raises the strong inference of fraud, and that is important here.

First, it is undisputed that Lycos leasing consultant Susan Franklin had been analyzing

---

[46]     Acton Aff. Ex. 18.
[47]     Acton Aff. Ex. 19.
[48]     *See* Lycos SJ Memo at 13.

Lycos's leases for months *prior to* its execution of the Sales Agreement, and the evidence shows that she provided detailed information to Lycos on the financial impact of Extended Leases, how much gross profit CSI had made on those Leases, and what the original equipment cost relating to them was, ***in June and July of 2003***.

Second, on August 8, 2003, more than a month after Ms. Franklin explained to Lycos the financial impact of the Extended Leases, Lycos executed the Sales Agreement -- in which it expressly reaffirmed the validity of the Leases and expressly represented that it would fulfill its payment obligations thereunder -- ***but on that same day***, Lycos's leasing consultant confirmed to Lycos in writing that its work had ***already*** commenced on the "Phase II" plan for "setting up a negotiation to ***reduce*** Lycos' remaining ***future payment obligations*** to CSI," which Lycos was at that moment representing, in the Sales Agreement, it would honor.

Third, two days later, on August 10, 2003 -- ***before*** CSI had countersigned the Sales Agreement -- Mr. Lucy's assistant Ms. Callagee expressly acknowledged the existence of the project she called "CSI Phase II", and told Lycos' leasing consultant that Lycos' CFO, Mr. Lucy, "expected a much lower rate" on it -- referring to the contingent fee that Lycos had agreed to pay the consultant for helping it implement the Phase II to try to force CSI, after the Sales Agreement was signed, to reduce the Lease payments required under it.[49] These facts support the conclusion that Mr. Lucy and Lycos were aware of and had sanctioned the plan at that time, and that it had been underway for some time.

Fourth, on August 11, 2003, CSI signed the Sales Agreement, ***explicitly relying*** on Lycos' representations in that document that the Master Lease and Equipment Schedules would remain in full force and effect until their specified expiration dates, that Lycos would make all the remaining payments to CSI that Lycos was required to make thereunder, and that title to the

---

[49] CSI's Facts on CSI's Claims ¶¶ 16-20.

-16-

equipment would remain with CSI until all such payments by Lycos were made.[50]

    <u>Fifth</u>, in the months following the parties' execution of the Sales Agreement, Lycos and its leasing consultant, unbeknownst to CSI, continued strategizing on how they would implement the Phase II plan to extort money and other concessions from CSI -- discussing how Lycos, in conjunction with its consultant, could implement that plan. Thereafter, in the months following the parties' execution of the Sales Agreement, Lycos and its leasing consultant, unbeknownst to CSI, continued strategizing on how they would implement the Phase II plan to extort money and other concessions from CSI -- discussing how Lycos, in conjunction with its consultant, could implement that plan.[51]

    <u>Sixth</u>, on December 13, 2003, in furtherance of the Phase II plan, Lycos failed to make its December 1, 2003 Lease payment when due, and filed a bogus lawsuit against CSI in the Massachusetts Superior Court for Middlesex County entitled *Lycos, Inc. v. Computer Sales International, Inc.*, Civil Action No. 03-5057. In that lawsuit, it ***challenged*** the validity and enforceability of the Leases, claimed that they would ***not*** remain "in full force and effect" until their specified expiration dates, claimed that Lycos would ***not*** make all the remaining payments to CSI that Lycos was required to make thereunder, and claimed that title to the equipment would ***not*** remain with CSI until all such payments by Lycos were made.

    <u>Seventh</u>, in a continuation of its Phase II plan, Lycos failed to make its January 1, 2004 Lease payment when due, and then revealed to CSI **(a)** that its failure to make the rent payments was the result of a conscious decision by Lycos not to honor the Leases, and to seek a "settlement" from CSI that would reduce its obligations under those Leases, and give it immediate title to the Equipment; and **(b)** that it had filed a $15 million lawsuit against CSI

---

[50]    Acton Aff. Ex. 9 at CSI0023157 ¶¶ 2, 4.

[51]    These materials ***are being filed under seal*** as they were designated by Lycos lease consultant as "Confidential" under this Court's Order.

challenging the validity of the Leases, and claiming that it had no further obligation to make the Lease payments. CSI responded by removing Lycos's state court lawsuit to this Court, after which Lycos dismissed it without prejudice -- later stopping its Lease payments again at the end of 2005, and renewing its challenge to validity of the Leases in this case in its counterclaim.

Regardless of when Lycos claims it signed a written "Statement of Work No. 2" with its leasing consultant, these facts are more than sufficient to support the amended fraud claim in CSI's Complaint, because a jury could easily find, from these facts, that Lycos knowingly misrepresented its intentions in the Sales Agreement in order to induce CSI to agree to it, all the while planning to renege on its terms when it was ready to "spring" that trap -- which is classic fraudulent inducement. *See Starr v. Fordham*, 420 Mass. 178, 187 (1995)("Statements of present intention as to future conduct may be the basis for a fraud action, if 'the statements misrepresent the actual intention of the speaker…"), *quoting McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 709 (1990). *See also Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 77-8 (1991)(*quoting Snyder v. Sperry & Hutchinson Co.*, 368 Mass. 433, 444 (1975)).

There is also evidence in the record which would support a jury finding that Lycos had a motive for this fraudulent concealment of its intentions -- specifically that its own personnel had recognized, in July of 2003, that there would be significant cost implications if Lycos did not enter into the Sales Agreement with CSI:

> Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer [the Sales Agreement] and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the lease terms (when we have to admit to our Lessor [CSI] that we cannot return this equipment and HAVE TO buy it out), we support Brian's [the Lycos' CFO's] decision to buy out of the leases immediately.[52]

---

[52]    Gabos Decl. Ex. 15 at LYC19625 (capitals in original).

**B.    The Pre-Contract Negotiations Cited By Lycos Do Not Alter the Legal Effect of the Specific Representations It Made in the Sales Agreement, and Cannot in Any Way Bar CSI's Fraud Claim**

Lycos further argues that the sequence of pre-contract negotiations relating to the Sales Agreement precludes CSI's fraud claim, supposedly because "Lycos accepted CSI's offer [to buy the equipment under lease] on July 14," and "Lycos had not yet proposed to restate its obligation to make the monthly payments [under the Leases]."[53]

This claim, however, as set forth in CSI's Local Rule 56.1 Statement herein, is hotly disputed,[54] and in any event does not change the undisputed fact that CSI did not sign the Sales Agreement until after Lycos made the affirmative representations in it acknowledging the validity of the Leases, and representing that it intended to make all payments required under them when due.

Under these circumstances, the argument by Lycos that CSI cannot have relied on these representations because they were not contained in the draft contract that existed when the price terms was agreed upon makes no sense.  Clearly, it could have and did rely on it,[55] and that is all that is required for a fraud claim.  *See Fisch v. Bd. of Registration in Medicine*, 437 Mass. 128, 139 (2002)("[F]raudulent intent may be shown by proof that a party knowingly made a false statement and that the subject of that statement was susceptible of actual knowledge") .

**C.    The "Pre-Existing Duty" Rule Has Nothing to Do With This Case, and Does Not in Any Way Bar CSI's Fraud Claim**

Lycos also argues, mistakenly, that CSI's fraud claim is barred under a contract law doctrine--the "pre-existing duty rule"--relating to the sufficiency of consideration under a contract.  The case that Lycos cites for this proposition, however, *In re Lloyd, Carr and Co.*, 617

---

[53]    *See* Lycos SJ Memo at 16.
[54]    *See* CSI's Facts on CSI's Claims ¶¶ 8-15.
[55]    *See* CSI's Facts on CSI's Claims ¶ 5.

F.2d 882 (1st Cir. 1980), did not involve a fraud claim, and simply restated the general rule of contract law that the pre-existing duty rule is intended "to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *Id.* at 890.

Regardless of whether Lycos was already under a duty to make payments under its Leases at the time it negotiated the Sales Agreement, it clearly was not at liberty to deliberately misrepresent in the Sales Agreement that it considered the Leases valid and enforceable, and would make all payments due under them, when this was not its true intention, in order to induce CSI to sign the Sales Agreement. *See Starr v. Fordham*, 420 Mass. 178, 187 (1995)("Statements of present intention as to future conduct may be the basis for a fraud action, if `the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage'"). The evidence suggests, however, that it did just that.[56]

For these reasons, summary judgment dismissing CSI's fraud claim would not be appropriate or permissible here.

## III.   LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM

### A.   There Is Disputed But Legally Sufficient Evidence That Lycos Acted in Breach of Its Implied Covenant of Good Faith and Fair Dealing Imposed on It By Operation of Law as a Result of Its Entering Into the Sales Agreement

Under the applicable law, the implied covenant of good faith and fair dealing "imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruit of the contract and to do everything that the contract presupposes they will do to accomplish its purpose." *Conoco Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, (8th Cir. 1985). *See also Blue Hills Office Park LLC v. J.P. Morgan Chase Bank* , 477 F.Supp.2d 366, 374 (D. Mass. 2007)

---

[56]     CSI's Facts on CSI's Claims ¶¶ 8-20.

("conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned . . . breaches the implied covenant of good faith and fair dealing).

In this case, there is compelling evidence that Lycos fraudulently induced CSI to enter into a Sales Agreement by misrepresenting in that Agreement that it acknowledged the validity of millions of dollars worth of Equipment Leases, and intended to pay all amounts owed under those Leases when due -- while *at the same time* pursuing a "Phase II" plan to renege on those payment obligations, challenge the validity of the Leases, and try to force a "negotiation" with CSI, and if necessary a litigation, that would result in CSI being deprived of the benefits of the Sales Agreement.[57]

Under these circumstances, Lycos's argument that it should somehow be granted summary judgment dismissing CSI's breach of implied covenant of good faith and fair dealing claim -- supposedly because there is "no evidence" of Lycos's "bad faith" -- is seriously mistaken.  In fact, the record of this case contains ample evidence that Lycos planned to, and then did, deliberately withhold payments that it owed to CSI under the Leases, and then challenged their validity, as part of a scheme to force concessions from CSI that would deprive CSI of the benefits under the Sales Agreement that it had negotiated.

This is a classic breach of the implied covenant of good faith and fair dealing.  *See Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F.Supp.2d 366, 374 (D. Mass. 2007)("Th[e] implied covenant of good faith and fair dealing provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract").  *See also Eigerman v. Putnam Investments, Inc.*, 66 Mass. App. Ct. 222, 226 (2006)(the "purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance" under the

---

[57]      *See supra* at 8-11, 15-18.

contract).

In this regard, allegedly acting out of "financial self-interest" does not "excuse [] [Lycos] from performing its contractual obligations in good faith and fair dealing" especially where such self-interest is designed to "scuttle the deal" between the parties. *See BJC Health Sys. V. Columbia Cas. Co.*, 478 F.3d 908, 915 (8th Cir. 2007). Because there sufficient evidence to demonstrate that Lycos acted so as to "deny [CSI] the benefit of its bargain[,]" summary judgment as to CSI's claim for breach of the implied covenant of good faith and fair dealing is inappropriate. *BJC Health Sys. V. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007).

## IV.    LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S ABUSE OF PROCESS CLAIM

### A.    There Is Disputed But Legally Sufficient Evidence Supporting CSI's Abuse of Process Claim

The Lycos SJ Motion further argues that Lycos should be granted summary judgment on CSI's abuse of process claim because CSI supposedly cannot prove that Lycos sought an improper collateral advantage for an ulterior and illegitimate purpose. Again, this argument ignores the evidence here, and misapprehends the case law.

First, contrary to Lycos's argument, improperly using litigation to coerce a favorable settlement can be grounds for an abuse of process claim. *See American Velodur Metal v. Schinabeck*, 20 Mass. App. Ct. 460 (1985)(wife presented "ample evidence" of husband's abuse of process by alleging that he initiated litigation for ulterior purpose "to influence the[ir] divorce settlement by coercion"). Likewise, initiating litigation to leverage negotiations can be grounds for abuse of process. *See Farard Real Estate Development Corp. v. Metro-Boston Broadcasting, Inc.*, 345 F. Supp. 2d 147, 153 (D. Mass. 2004)(allegation that plaintiff recorded *lis pendens* to "leverage concessions in negotiations" regarding an easement on land that defendant's affiliate owned was sufficient to survive motion to dismiss). In fact, the Massachusetts courts have even

-22-

upheld abuse of process claims where the basic allegation was that an action was brought to force reimbursement of monies allegedly due. *See Medford Co-Operative Bank v. Skerry*, 2004 WL 1853343, at *4 (Mass. App. Div. Aug. 12, 2004)(bank's conversion claim against Skerry individually "was designed to pressure [Skerry] into quickly concluding the action by reimbursing the Bank" as administrator of decedent's estate).

In short, it all depends on the facts of each case, and the ulterior motive required for an abuse of process claim "may be shown by showing a direct demand for collateral advantage; or it may be inferred from what is said or done about the process." *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 406 (2000).[58]   In this case, discovery has revealed that Lycos, contrary to its own representations to CSI and with the aid of a witness with whom it had entered into an improper contingent fee compensation arrangement,[59] deliberately manufactured and pursued bogus claims against CSI, which it planned to publicize to the media, in a systematic attempt to coerce CSI to reduce Lycos's monthly payment obligations under the Leases, and prematurely transfer title to the Leased Equipment to Lycos.

In pursuit of that plan, Lycos then commenced a baseless action in the Massachusetts Superior Court for Middlesex County in December of 2003, entitled *Lycos, Inc. v. Computer Sales International, Inc*., Civil Action No. 03-5057, which it used in a deliberate attempt to coerce CSI to agree to negotiate a reduction in the amount of Lease payments that Lycos had to

---

[58]      In addition, "proof of ill will, bad intentions, or knowledge that a claim is groundless . . . is relevant in proving ulterior or illegitimate purpose" for an abuse of process claim. *Medford Co-Operative Bank v. Skerry*, 2004 WL 1853343, at *4 (Mass. App. Div. Aug. 12, 2004).

[59]      As the evidence cited herein, in CSI's Local Rule 56.1 Statements, and in CSI's Opposition to Lycos's Motion for Summary Judgment as to CSI's Amended Complaint demonstrates,  Lycos conspired to challenge the validity of its Leases with CSI at the very moment it was signing a contract with CSI confirming the validity of all the Leases, and promising to pay them in full.  Then, Lycos improperly offered and agreed, through its legal counsel and in direct violation of Disciplinary Rule 3.4(g), to pay a huge contingent fee compensation to a key witness, who then reviewed Lycos' CFO's files looking for evidence to support a "fraud" claim against CSI---even though the Lycos CFO had specifically told them that there was nothing of significance in those files---and found an irrelevant and inconsequential email from a CSI sales rep that is now the centerpiece of that "fraud" claim.   Then, in support of the Lycos SJ Motion, Lycos improperly submitted an affidavit from that same former CFO directly contradicting his deposition testimony that he never relied on, and in fact did not even recall receiving,  the email in question.

make under the Sales Agreement, and to refund payments it had already made under the Leases, and to force CSI to prematurely transfer title to the Leased Equipment to CSI.[60]

Clearly, there is sufficient evidence here to support an abuse of process claim, and "where state of mind is an essential element of the cause of action, summary judgment is disfavored." *Vittands v. Sudduth*, 49 Mass. App. Ct. at 407-8 (overruling trial judge's decision to grant defendants summary judgment on plaintiff's claim of abuse of process, because "a jury could reasonably infer that the neighbors" had an ulterior purpose "to maintain their access to [plaintiff's] private property by involving the property in protracted litigation before [its] sale could be finalized").

In this regard, Lycos's relies on reliance on case law discussing claims that are "naturally tied up" with a plaintiff's interests, such as *Broadway Mgmt. Servs., Ltd. v. Cullinet Software, Inc.*, 652 F. Supp. 1501 (1987),[61] is unavailing here because Lycos did not merely seek "financial benefit" from CSI, it sought premature transfer of title to thousands of pieces of equipment, and any financial benefit it sought, according to CSI's experts, was certainly not "properly part" of its complaint. Rather, Lycos' actions involved a complex, multi-phased, and fraudulent scheme -- which including stopping Lease payments, secretly filing suit against CSI, then trying to "squeeze" CSI with the threat of continued litigation and adverse publicity.

Moreover, the fact that Lycos filed suit against CSI challenging the Leases ***just three months*** after it signed a Sales Agreement in which it explicitly reaffirmed their validity, combined with evidence that at the time of the Sales Agreement, it had already commenced a "Phase II" plan to pursue such a challenge, clearly tends to negate, and would allow a jury to reject, any purported evidence that Lycos had a "proper purpose" in filing its various suits and

---

[60]    CSI's Facts on CSI's Claims ¶¶ 20-25.
[61]    *See* Lycos SJ Memo at 20-21.

counterclaims against CSI on these issues, and to support the opposite conclusion -- that Lycos was simply attempting to destroy CSI's rights under the Sales Agreement.  *See Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995)("conduct undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect . . . has a coercive quality").

The evidence that Lycos had a plan to go to the media with its claims against CSI to injure CSI's reputation, to force it to negotiate with Lycos, is further evidence that Lycos's had an improper ulterior motive in filing its suits -- and such evidence is sufficient to support an abuse of process claim.  *See North Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting, LLC*, 491 F. Supp. 2d 111, 130 (D. Mass. 2007)("[t]he First Circuit has recognized that the desire to injure a business or business reputation is an improper or ulterior motive sufficient to state a claim for abuse of process.").  In fact, this evidence alone would render summary judgment inappropriate.  *See id.*  (finding that decision to sue "was motivated by a desire to hurt [defendant's] ability to conduct its [ ] business" and denying motion for summary judgment on abuse of process claim).

In sum, there is ample evidence here that Lycos used its claim against CSI "as an 'instrument of persuasion rather than a means of satisfaction'" *Medford Co-Operative Bank v. Skerry*, 2004 WL 1853343, at *4 (Mass. App. Div. Aug. 12, 2004)(where bank's conversion claim was designed to obtain collateral advantage over administrator of estate)(quoting *Koonce v. Aldo Realty Trust*, 8 Mass. App. Ct. 199, 201 (1979)).  Accordingly, a summary dismissal of CSI's abuse of process claim would not be appropriate or permissible.

ME1 6898121v.1

V.     **LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO CSI'S UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM UNDER M.G.L. C. 93A**

A.     **Massachusetts Law Applies to CSI's Deceptive Practices Claim**

As this Court previously noted, it "looks to the 'predominant claims' and their 'principal focus'" in determining whether claims fall within the relevant choice-of-law provision.  Dec. 6, 2005 Memorandum of Decision, p. 4.  It is clear from even cursory overview of CSI's Amended Complaint that its claim as to violation of Chapter 93A is not limited to Lycos's alleged breach of the Sales Agreement, the Master Lease, and the Equipment Schedules.  Rather, CSI asserts, *inter alia*, that Lycos's fraudulent actions prior to the signing of the Sales Agreement induced , constitute unfair and deceptive trade practices.

As this Court also noted, "where a claim 'concerns the validity of the formation of the contract, it cannot be categorized as one involving the rights or obligations under the contract,' and there is not subject to the contract's choice-of-law provision."  Dec. 6, 2005 Memorandum of Decision, p. 4.  Indeed, this court quoted *Jacobsen v. Mailboxes Etc. U.S.A., Inc.* in support of this proposition, *See id.*, and *Jacobsen* is a case where the aggrieved party asserted claims for violation of Chapter 93A based upon fraud in the inducement, and the court held that such an allegation is not subject to a choice of law provision.  419 Mass. 572, 579 ("the forum selection clause does not apply to wrongs that Mailboxes allegedly committed before the parties entered into a contractual relationship, including allegations of precontract violations of G..L. c. 93A").  Thus, Massachusetts law applies and Lycos is subject to CSI's Chapter 93A claim.

B.     **CSI's Claims For Violation of Chapter 93A Do No Relate Solely To Lycos's Breach of Contract**

For the same reason that Lycos is subject to CSI's Chapter 93A claim, so too does this claim preclude summary judgment for Lycos.  CSI is not alleging that "a breach of contract, by itself," is the basis for Lycos's violation of Chapter 93A.  *See* Lycos's Memorandum of Law at

22.   Again, there is ample evidence that Lycos willfully engaged in a scheme to leverage negotiations with CSI for reduced rental payments or the return of payments to Lycos -- and did so on the very day that that it represented to CSI exactly the opposite.[62]

In so doing, Lycos attempted to extract an unfair advantage in its relationship with CSI. This extortion gives rise to a claim for violation of Chapter 93A.  *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55-6 (1st Cir. 1998)("Dooyang's wrongful purpose was to extract a favorable settlement from ADL for less than the amount Dooyang knew that it owed by repeatedly promising to pay, and not doing so, stringing out the process, and forcing ADL to sue"); *Atlantic Sport Boat Sales, Inc. v. Cigarette Racing Team, Inc.*, 695 F. Supp. 58, 62-3 (D. Mass. 1988)(denying motion for summary judgment on 93A count because "one could infer that the defendant intended to induce the plaintiff to rely on the Agreement while never intending" to abide by its obligation); *Mass. Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995)("Conduct undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect and jeopardizing the interests of subscribers in preserving their workers' compensation coverage has a coercive quality that, with the other facts, warranted a finding of unfair acts or practices."); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992)(Chapter 93A violation exists where a party "use[s] [] a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the party; i.e. the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness").

Therefore, regardless of what facts Lycos claims show a "good faith belief" that it was entitled to withhold the remaining lease payments, evidence exists demonstrating that it acted in bad faith.  As such, there is a dispute as to a material issue of fact, and awarding Lycos summary judgment on CSI's claim for is inappropriate.

---

[62]    CSI's Facts on CSI's Claims ¶¶ 8-25.

**VI.    LYCOS' OFFER TO "NOT OBJECT" TO THE ENTRY OF SUMMARY JUDGMENT ON COUNT I OF CSI'S AMENDED COMPLAINT IS INEFFECTIVE AS IT IS CONDITIONED ON THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF LYCOS ON ITS COUNTERCLAIMS, TO WHICH IT IS NOT ENTITLED**

In Part V of the "Argument" section of the Lycos SJ Memo, Lycos advises the Court that it "would not object" to the Court granting CSI summary judgment on Count I of its Amended Complaint herein, and "setting off" the more than $300,000 it owes to CSI -- **if** the Court were simultaneously to grant all three (3) of Lycos' outstanding motions, one seeking summary judgment against CSI for approximately $16 Million, one seeking summary judgment dismissing all of CSI's other claims in this case against Lycos, and one seeking a dissolution of the attachment.[63]

Although it does advance matters somewhat for Lycos to concede, as it appears to in this portion of its brief, that it owes CSI the more than $300,000 that CSI has claimed in Count I of its Amended Complaint, the exchange described above is obviously not a bargain that CSI can accept, as it does not owe anything to Lycos, and in any event, ***none*** of Lycos' aforesaid motions can be properly allowed -- for the reasons set forth in CSI's oppositions to them.

Thus, although Lycos's concession that it owes over $300,000 to CSI obviously militates in favor of leaving in place the attachment in that approximate amount approved by the Court at the outset of this action, Lycos's offer for summary judgment to enter against it on Count I of CSI's Amended Counterclaim is essentially ineffective, and cannot be acted on by the Court, due to the conditions Lycos has placed on it.

**VII.    LYCOS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO COUNT II OF CSI'S AMENDED COMPLAINT**

Likewise the offer in Part VI of the Lycos SJ Memo -- that "Lycos is prepared to pay CSI

---

[63]    *See* Lycos SJ Memo at 24.

ME1 6898121v.1

the unpaid amounts" claimed in Count II of CSI's Amended Complaint "as an offset to the amount of damages requested by Lycos in its summary judgment counterclaims" -- has been made contingent by Lycos on the Court granting its outstanding summary judgment motions, which cannot properly be allowed for the reasons set forth in CSI's oppositions to them.

Thus, Lycos clearly has no right to summary judgment dismissing Count II of the Complaint -- because it *admits* that the amounts claimed under that Count are due to CSI; it simply refuses to pay them absent a judgment in its favor against CSI on its counterclaims (to which it is not entitled).

## CONCLUSION

For all of the foregoing reasons, Lycos's Motion for Summary Judgment as to All Counts of CSI's Amended Complaint should be properly denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Computer Sales International, Inc. hereby requests oral argument on all issues raised in the above Opposition.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. (617) 449-6500

Dated:  November 19, 2007

## Certificate of Service

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by hand this 19th day of November, 2007.

/s/ Robert J. Kaler_____
Robert J. Kaler

ME1 6898121v.1