UNITED STATES DISTRICT COURT
For the District of Massachusetts

|  |  |  |
|---|---|---|
| COMPUTER SALES INTERNATIONAL INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | |
| LYCOS, INC., | ) | C.A. No. 05-10017- RWZ |
| Defendant, | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant. | ) | |

**RESPONSE OF COMPUTER SALES INTERNATIONAL, INC. TO LYCOS'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS WITH RESPECT TO LYCOS'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF COMPUTER SALES INTERNATIONAL'S AMENDED COMPLAINT**

Pursuant to Local Rule 56.1, plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") responds as follows to *Lycos's Local Rule 56.1 Statement of Undisputed Material Facts With Respect to Its Motion for Summary Judgment on All Counts of Computer Sales International's Amended Complaint*, dated September 4, 2007 (the "Lycos Statement."

1.      Undisputed.

2.      Disputed as misleading, but not material.  Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease") to which both CSI and Lycos agreed at the inception of their relationship.[1]   As CSI has explained in previous submissions, the quoted provision – as with the other provisions in the Master Lease governing the rights and obligations of ***both parties*** – is necessary as it the "enforceability of these clauses

---

[1]      *See* Master Lease § 5, attached as Ex. 1 to the accompanying Declaration of Edward W. Little, Jr. (hereinafter, "Little Decl.").

that permits equipment finance companies [such as CSI] themselves to obtain the financing that they need to do business."[2]

3.      Disputed.  During the relevant time, Lycos negotiated and entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it.[3]  These were not "refinancings"[4] – a term Lycos continually employs to equate the leases with loans (and which was rejected by the Court) – but were new leases which helped Lycos achieve its stated goals of lowering monthly rent payments.[5]  Lycos's officers – including its Vice President of Finance and Administration Thomas Guilfoile – have confirmed under oath that Lycos not only understood them to be leases but were reported as such in the company's public financial statements.[6]

4.      Disputed as misleading, but not material.  The equipment schedules that were re-written into Schedules 93 and 94 are clearly identified in the documentation exchanged between CSI and Lycos.[7]  At the time of execution of Schedules 93 and 94, the parties agreed that CSI's performance under the new schedules was "conditioned upon [Lycos'] delivery to [CSI] of an irrevocable, unconditional standby letter of credit" under agreeable terms.[8]  In an effort to assist Lycos, the $11 million amount of the letter of credit was actually much less than it otherwise would have been, as CSI structured the deal to leave the existing debt in place on the existing

---

[2]      *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim*, dated Mar. 10, 2005, at 3-4 (Docket No. 16).

[3]      *See*, for example, Ex. 26 to the summary judgment Affidavit of Peter Acton ("Acton Aff."), dated September 4, 2007 (equipment schedule 66B stating clearly that the equipment thereunder was already "installed at [Lycos'] location under  Equipment Schedules Forty-three and Forty-eight" to the Master Lease).

[4]      Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (all attached, respectively as Exs. 3-5 to the Declaration of Kelly A. Gabos, dated Nov. 12, 2007 and filed herewith ("Gabos Decl."); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[5]      Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Little Decl. Exh. 3).

[6]      Deposition of Thomas Guilfoile ("Guilfoile Dep.") at 203:4-11 (Little Decl. Ex. 2).

[7]      Acton Aff. Exs. 6, 7.

[8]      Acton Aff. Ex. 6 at CSI0027566 ¶ 3; Ex. 7 at CSI0027742 ¶ 3.

schedules.[9]

     5.     Disputed.  The draft offer to sell equipment at $4.69 million was just that – an "offer" – which was rejected by Lycos.[10]  The conditions of the draft offer to sell the equipment to Lycos were clear, and included among other things, that (a) CSI would retain title to the equipment until all of the existing leases terminated at their stated times (including some in late 2004 and one in 2005) and (b) title would only pass at that time provided Lycos was not then in default under the leases, including in its lease payment obligations.[11]  Lycos is incorrect that there was no "affirmative statement that Lycos would make all remaining payments due on those schedules," as the proposed agreement from Ms. Kersting made clear that title would not pass until all payments were made.  Moreover, CSI has made clear that it relied on these statements and agreed to sell the equipment to Lycos "which it would not have done but for Lycos' misrepresentations."[12]

     6.     Disputed and misleading.  The letter from Julie Callagee of Lycos informing Paul Stenberg of CSI that Lycos had "retained Leaseforum, Inc. to perform various services with respect to the assessment, negotiation and execution of leases" is dated June 27, 2003.[13]  Leaseforum, through its principal Susan Franklin, had contacted Mr. Stenberg by phone earlier that day.[14]  Mr. Stenberg testified he received this call "out of the blue' and had "no idea that was coming."[15]  When he received her call, Mr. Stenberg was unsure whether Ms. Franklin represented Lycos and, after being informed by Lycos that she did, he negotiated with her.

---

[9]     Deposition of Philip Cagney ("Cagney Dep.") at 245:7-19; 256:2-9 (Little Decl. Ex. 4).

[10]     Deposition of Susan Franklin, dated Oct. 25, 2006 ("Franklin Dep.") at 129:5-14 (stating that parties were engaged in counterproposals at this time of negotiation).

[11]     Acton Aff. Ex. 9 at CSI0023157 ¶¶ 2, 4.

[12]     *Plaintiff Computer Sales International Inc.'s Response to Defendant Lycos Inc.'s Second Set of Interrogatories*, dated Jan. 22, 2007, at 15-16 (Little Decl. Ex. 6).

[13]     Acton Aff. Ex. 11.

[14]     Franklin Dep. at 117:15-118:10 (Little Decl. Ex. 5).

[15]     Acton Aff. Ex. 32 at 295:12-17.

ME1 6695088v.1

7.      Disputed and misleading.  The implication of Lycos' statement is that Mr. Stenberg was intimidated by Lycos' threat to do an audit of the CSI-Lycos leases.  In fact, Mr. Stenberg testified he was not worried about any audit and he told Mr. Lucy of Lycos to "go ahead and do it [the audit]."[16]

8.      Disputed.  Though the parties may have agreed by July 14, 2004, on one of many terms for a buyout – that being the price (without which further negotiation would not occur) – Ms. Franklin's July 14, 2003 e-mail makes clear that this is but one step in concluding a deal. After agreeing to the purchase price of $3.775, Ms. Franklin states:

> Please prepare and present the appropriate documentation to my attention to review and comment, if any.  ***I will forward the documents to Lycos for their acceptance*** and facilitate the execution thereof.  Lycos will exercise its best efforts to turn the documentation around by July 15th and wire the purchase price by July 18th.[17]

Ms. Franklin also attaches to her e-mail an addendum of additional terms for CSI's review.[18] That Lycos needed and was waiting for the approval of its parent company, Spanish telecommunications conglomerate Terra Networks, is undisputed, as is clear in Brian Lucy's e-mail to Paul Stenberg of July 24, 2003, in which he states

> I'm in Spain right now for the earnings release.  At the same time I'm trying to get my boss, Elias, to give me the green light.  ***He's close to approving this, but hasn't formally done so just yet***.[19]

In fact, there is no dispute that Sales Agreement Number 199614 (the "Sales Agreement") was not executed by Lycos until August 8, 2003 (by Mr. Lucy), followed by CSI's execution three days later on August 11, 2003.[20]

9.      Disputed and misleading.  Lycos is alleging that the parties had reached a deal

---

[16]      Acton Aff. Ex. 32 at 295:21-24.
[17]      Acton Aff. Ex. 29 at AR001433.
[18]      *Id.*
[19]      E-mail from Brian Lucy to Paul Stenberg dated July 24, 2003 (Little Decl. Ex. 7).
[20]      Little Decl. Ex. 13 (executed Sales Agreement).

prior to any discussion concerning a "reaffirming" by Lycos of its obligations to make payments under the lease – thereby implying that the obligation to "reaffirm" was not material to CSI. In fact, CSI has made clear that it would not have consummated the Sales Agreement without Lycos reaffirming its obligations to make all payments under the existing leases.[21] Also, months earlier in October 2002, CSI had given Lycos a buyout price of $4.69 million under which it expressly provided that "[t]itle [of equipment] will pass to Lycos *at the expirations of these leases*."[22] Again, all that the parties had reached agreement on was the price for a transaction, and other terms had to be negotiated along with final approval from Lycos' parent company in Spain – a point which Lycos made clear to CSI. As stated previously, the draft offer submitted to Lycos on July 16, 2003, by Ms. Kersting of CSI's legal department makes clear that payment on the leases must continue (and, in fact, title in the equipment being sold expressly did not pass to Lycos[23] until all remaining rent payment were made).

10.    Disputed as misleading. When Lycos was first considering buying out its CSI leases at the end of 2002, it had two options:  it could either (a) do a "lump sum" payout of $26,819,623 and take title to the equipment upon payment, or (b) pay $4.69 million now, continue paying all of its lease obligations into the future and take title upon final payment on the leases. These scenarios were provided by Mr. Stenberg to Mr. Lucy back in October 2002, and Lycos is incorrect that "reaffirming" Lycos' lease obligations was discussed "for the first time" in July 2003 after the parties discussed price terms.[24]

11.    Disputed as misleading. Ms. Kersting testified that she understood Lycos was "reaffirming the monthly rental obligations under the leases." However, CSI has testified that,

---

[21]    Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories).
[22]    E-mail from Paul Stenberg to Brian Lucy (Little Decl. Ex. 8) (emphasis added).
[23]    Acton Aff. Ex. 9 at CSI0023157 ¶ 4.
[24]    E-mails of October 22 and 24, 2002 from Paul Stenberg to Brian Lucy (Little Decl. Exs. 8, 9).

without these assurances that rental amounts would continue, CSI would not have entered into the Sales Agreement.[25]  Moreover, the requirement that Lycos reaffirm these lease obligations was a condition set back months earlier, in October 2002, when Mr. Stenberg gave Lycos the options for buyout of either paying $26 million to end all obligations and take immediate title of the equipment or paying $4.69 million with title to pass to Lycos only upon complying with the remaining lease obligations (including payment through the end of the current terms which continued into 2004 and 2005).[26]

12.    Disputed and misleading.  In October 2002, CSI first required that Lycos reaffirm its lease obligations in the event Lycos chose one of the two options it suggested to Lycos for a buyout.[27]  That Lycos' agent Leaseforum may have proposed language concerning this which was ultimately set forth in the executed Sales Agreement in early August 2003 is immaterial – reaffirming of the leases was always an important and material aspect of CSI's agreeing to the lower buyout scenario, and it would not have done the deal without those assurances.[28]

13.    Disputed as misleading.  Though Mr. Lucy may have signed a version of the Sales Agreement on or about July 16, 2003, Mr. Lucy made clear to Mr. Stenberg on July 27, 2003, that Lycos' parent company in Spain had not as of that time authorized any buyout.[29]  Though Mr. Lucy testified he was authorized to proceed with the transaction on August 1, 2003[30], it is undisputed that the operative executed Sales Agreement was not signed by Lycos until Mr. Lucy signed it on August 8, 2003 – and that was because tax issues that arose on an earlier version

---

[25]    Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories).
[26]    Little Decl. Exs. 8, 9.
[27]    Little Decl. Ex. 8.
[28]    Little Decl. Ex. 6.
[29]    Little Decl. Ex. 7.
[30]    Deposition of Brian Lucy ("Lucy Dep.") at 178:1-5 (Little Decl. Ex. 10); e-mail from Peter Karol, Lycos in-house counsel, to Brian Lucy dated August 1, 2003 (Little Decl. Ex. 11).

required some changes to the agreement – and was signed by CSI on August 11, 2003.[31]

14.    Disputed, but irrelevant.  Ms. Kersting's e-mail of August 1, 2003, notes errors in the prior draft that need to be corrected as well as an issue concerning sales tax acceleration, and she testifies to substantive changes made in the Agreement finally executed by the parties.[32] Regardless of this, however, there is no dispute that the operative agreement containing the representations that Lycos would continue to perform its lease obligations (§ 4) – on which CSI relied[33] – was executed by Lycos on August 8, 2003.[34]

15.    Disputed as misleading.  CSI and Lycos did not simply "re-sign" a version of the Sales Agreement on August 8 and August 11, 2003, respectively; in fact, they signed the operative version of the Sales Agreement which governed the buyout, including the representations – originally required by CSI as early as the preceding October – that Lycos agree to satisfy all obligations under existing leases, including the obligation to pay them in full.[35] Again, this was a condition of the transaction upon which CSI relied and without which CSI would not have executed.[36]

16.    Disputed.  Lycos' sole cited evidence that it "intended" to make all remaining lease payments under the Sales Agreement is the self-serving summary judgment affidavit of its former Chief Financial Officer, Brian Lucy, and the fact that it actually made several rental payments after entering into the Sales Agreement.  CSI has evidence, however, that on August 8, 2003 – *the very day on which Mr. Lucy executed the Sales Agreement* which was countersigned by Lycos three days later – Lycos' agent Leaseforum, a consultant it had hired to negotiate the

---

[31]    Deposition of Paul Stenberg, dated Aug. 24, 2006 ("Stenberg Dep.") at 310:22-311:6 (Little Decl. Ex. 12).
[32]    Acton Aff. Ex. 13 at 21:7-223:5 (testimony of Joan Kersting).
[33]    Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories).
[34]    Little Decl. Ex. 13 (executed Sales Agreement
[35]    Little Decl. Ex. 13 at § 4 (Lycos agrees to satisfy all lease obligations).
[36]    Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories); Little Decl. Ex. 8 (October 2002 proposal for buyout allowing passage of title to equipment from CSI to Lycos only upon completion of the leases).

ME1 6695088v.1

buyout of the CSI equipment,[37] confirmed with Julie Callagee, Lycos' Assistant Controller, their plan to renegotiate and reduce the remaining future lease payments it was simultaneously affirming to CSI that it would continue to pay:

> We have completed phase 1 of the work with CSI. **Phase 2 has commenced.** The phase 2 effort is a continuation under statement of work 001 [between Lycos and its agent Leaseforum]. **Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI. It is also conceivable that a cash settlement or payment by CSI to Lycos unrelated to the remaining payments could eventuate** and we would expect any such payment to be applied against the baseline as well as used as the basis for calculating Lease Forum's fees. In any event the final calculation of reduction in CSI baseline costs will of course take into account our mutual success in phase 1 in reducing Lycos' residual buy out of the CSI leases.[38]

Lycos' agent is confirming that it had already "commenced" an action to undo the very assurances it had just made to CSI that day. As explained above, Lycos is incorrect in dating the Sales Agreement as July 15, as it was not executed by Mr. Lucy on behalf of Lycos until August 8, 2003 and CSI three days later.[39] Again, Lucy had no authority to bind Lycos as of July 15.[40] In addition, Lycos claim that it paid all lease amounts other than $301,000 (which it continues to withhold) is not indicative of its intent at the time it entered into the Sales Agreement, and the evidence shows that Lycos was implementing its plan to renegotiate the CSI leases in October 2003, when Leaseforum advised Lycos to threaten CSI by taking certain steps detailed in materials **filed herewith under seal**.[41] Also, Lycos ceased paying on its leases much earlier in

---

[37]    Acton Aff. Ex. 11.

[38]    Acton Aff. Ex. 18 (portion of e-mail from John Kirk of Leaseforum to Julie Callagee marked "A") (emphasis added).

[39]    *See supra* ¶ 8.

[40]    *See supra* ¶ 13.

[41]    Franklin Dep. at 348:21-349:5 (Little Decl. Ex. 5); Leaseforum presentation to TerraLycos, dated October 23, 2003 (Little Decl. Ex. 18) at AR10944. These materials have been designated as "confidential" by Leaseforum and are therefore being filed under seal in a separate addendum.

8

2003, but it resumed payments[42] in order to ensure the completion of its sale to a new parent company, Korean media conglomerate Daum Communications, which closed in early fall 2004.[43]

17.     Disputed in part, and misleading. First, Mr. Kirk had many duties for Leaseforum while he worked with Lycos, including "[t]o work with the members of the team to understand their strategy and their sales approach" and to "[h]elp clients [of Leaseforum] to get the most out of their leasing programs"[44] – not just to market service, as Lycos claims. Second, CSI is alleging that the e-mail from Mr. Kirk is only one piece of evidence manifesting Lycos' intent to defraud CSI.[45]

18.     Disputed. It is undisputed that Leaseforum was an agent of, and working for, Lycos long before August 8, 2003. In fact, Lycos and Leaseforum had executed a Statement of Work 1 ("SOW 1") as of June 17, 2003, in which Leaseforum would review Lycos' current leasing practices and, among other things, "outline available options" for Lycos.[46] Under SOW 1, Leaseforum was entitled to receive twenty-five percent (25%) of monies saved by Lycos in its lease negotiations with Lycos' lessors.[47] As of August 8, 2003, Mr. Kirk of Leaseforum was working for Lycos, and his e-mail to Ms. Callagee at Lycos does not say "Phase 2" was being contemplated or discussed, but that it "has commenced."[48] A reasonable inference arising from Ms. Callagee's e-mail back to Mr. Kirk two days later seeking "a much lower rate than phase

---

[42]     Deposition of Jeffrey Rousseau ("Rousseau Dep.") at 133:12-24 (Little Decl. Ex. 16); Deposition of Kenneth Steinback ("Steinback Dep.") at 89:18-90:3 (Little Decl. Ex. 15).

[43]     Deposition of Andrew Feinberg ("Feinberg Dep.") at 261:1-7 (Little Decl. Ex. 14); *see also* Acton Aff. Ex. 3 ¶ 14 and *Lycos's Local Rule 56.1 Statement on All Counts of CSI's Amended Complaint*, dated September 4, 2007, ¶ 24.

[44]     Acton Aff. Ex. 17 at 88:7-10; 89:11-12.

[45]     *See supra* ¶ 16,

[46]     Statement of Work No. 1, dated June 17, 2003, between Leaseforum and Lycos (Little Decl. Ex. 17).

[47]     Little Decl. Ex. 17 at LYC18884.

[48]     Acton Aff. Ex. 18 at LYC19440.

one given the favorable outcome there"[49] is that Lycos simply wants a better price for work that its agent had already started – not that Leaseforum may not continue implementation of the stated plan "to reduce Lycos remaining future payment obligations to CSI" or to achieve a "cash settlement or payment by CSI to Lycos."[50]   Importantly, there is no evidence that anyone at Lycos (including Ms. Callagee) ever responded to Mr. Kirk that Leaseforum should stop work on implementing "Phase 2."

19.    Disputed.  As stated above, Mr. Kirk stated on August 8, 2003 that "Phase 2 has commenced," which includes the "current work . . . aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI" – which Lycos had just represented to CSI that day it would pay in full – and to seek a "cash settlement or payment by CSI to Lycos."  It is reasonable to infer from this that work had already begun, and Ms. Callagee's e-mail two days later states only that Lycos wanted a better price, not that the work begun by Leaseforum should not continue.  The draft Statement of Work No. 001 – which provided that Leaseforum would "negotiate with [CSI] . . . with the objective of establishing a financial 'settlement' regarding the business relationship" between CSI and Lycos – did not specify the "Baseline" the parties would use to determine Leaseforum's compensation, but it did specify that Leaseforum would receive twenty percent (20%) of the "difference between the Settlement and the 'Baseline,'" once the baseline was set.[51]

20.    Disputed and misleading.  Again, when the actual agreement was signed which memorialized "Phase 2" – admittedly begun at least as of August 8, 2003, according to Mr. Kirk's e-mail of that date[52] – is not relevant.  In fact, the signed Statement of Work No. 002

---

49    Acton Aff. Ex. 19 at LYC23992.
50    Acton Aff. Ex. 18 at LYC19440.
51    Acton Aff. Ex. 22 at AR000806.
52    Acton Aff. Ex. 18.

10

states that "Client [Lycos] desires **to continue a partnership** with LeaseForum,"[53] a reasonable inference being that this was simply memorializing a course of action that had "commenced" at least as early as August 8, 2003.

21.     Disputed as misleading.  Again, it is not relevant at what point Leaseforum may have formally presented its findings of its "Phase 2" investigation of the CSI-Lycos leases; what is relevant is whether Phase 2 began at or before the time Lycos entered into the Sales Agreement reaffirming its obligations to satisfy its obligations under the leases with CSI.  Mr. Kirk's e-mail of August 8, 2007, clearly states that "Phase 2" had already "commenced" on or before the date that Lycos entered the Sales Agreement (August 8, 2003).[54]  The formal presentation made by Leaseforum to Lycos in October is, however, significant for other reasons.[55] that a   Leaseforum had communicated its findings to Lycos well prior to the execution of the Sales Agreement, and was restating them in the presentation mentioned in this paragraph.

22.     Disputed as misleading.  That Leaseforum communicated its formal findings of the investigation to Lycos outside counsel in November 2003 is not relevant; again, what is relevant is whether Lycos had begun its "Phase 2" at or before the time it executed the Sales Agreement affirming its obligations to perform all of its ongoing leases[56] – upon which CSI relied and without which would not have entered the Sales Agreement.[57]  It is also a reasonable inference that, just as Leaseforum had formally communicated its findings to Lycos in October

---

[53]     Action Aff. Ex. 23 at LYC18887.
[54]     Acton Aff. Ex. 18.
[55]     The presentation, for example, states that a Lycos "event"  at some point between January 1997 and June 2003 was "Pressure on Operating Cash Flow," the solution for which, according to Leaseforum's investigation, was "Reduce Monthly Payments."  Acton Aff. Ex. 30 at LYC20749.  This contradicts Lycos' denial in this case that it was Lycos' idea to lower monthly lease payments (and thereby ease "pressure on operating cash flow") by extending its leases.  Among the "options" suggested by Leaseforum was a recognition that the "contracts" between the parties required payment "as billed" of $11 million in remaining rents.  Id. at LYC20754.  Leaseforum also suggested "legal action" concerning "excess payments" for claims of unfair business practices, usury and fraud – all of which Lycos has brought or tried to bring in this case.  Id.
[56]     See supra ¶ 21.
[57]     Little Decl. Ex. 6 (CSI's Response to Second Interrogatories).

2003 prior to communicating them to outside Lycos counsel in November, Leaseforum had communicated its informal findings to Lycos much earlier, including before August 8, 2003 – which is reasonable, given Mr. Kirk's e-mail of August 8, 2003 in which he claims to have already started "Phase 2" which was "aimed at setting up a negotiation to reduce" the remaining lease payments as well as prompt a "cash settlement or payment by CSI to Lycos."[58]

23.    Disputed as misleading, though irrelevant.  First, Lycos' implication that it had only learned of its alleged claims for paying "more than it should have" in December 2003 is directly contradicted by Mr. Kirk's August 8, 2003 e-mail, Ms. Callagee's response concerning receiving a better price (and not asking Leaseforum to cease all Phase 2 work), and presentations of the formal findings to Lycos and its counsel in October and November – all of which demonstrate that the "ball had begun rolling" on its lawsuit as early as, or before, the date it entered the Sales Agreement (August 8, 2003).[59]  Lycos filing of a complaint in December 2003 is, at best, simply the culmination of work begun months earlier and not the start of the process, as Lycos claims.  Moreover, Lycos had not paid CSI "more than it should have;" rather, Lycos paid CSI exactly what it had contracted to pay under the terms Lycos itself agreed to in the Master Lease and in each of the equipment schedules which it indisputably signed.[60]

24.    Disputed as misleading, but not relevant.  Lycos wrongfully concealed the very existence of the December 2003 lawsuit from Lycos and refused to even send CSI a copy of the alleged "report" from Leaseforum containing the claim of overcharging, until after "discussing"

---

[58]    Acton Aff. Ex. 18 at LYC19440.

[59]    *See supra* ¶¶ 16-21.

[60]    There is no evidence in the case that Lycos' senior officers – in most cases, either Ted Philip (Lycos' CFO) or Tom Guilfoile (Lycos' Senior VP of Finance and Administration) – did not execute the Master Lease and all equipment schedules with CSI.  Adding up the rents for the term of each schedule easily allowed Lycos to determine what its total payments would be under any given proposed lease re-write or new schedule.  Lycos cannot dispute that it could calculate exactly what it was agreeing to pay under each schedule.

matter with CSI.[61]

    25.    Disputed as misleading.  Lycos was not justified in stopping its payments because it believed it had "satisfied all of its payment obligations," as it procured the Sales Agreement through fraud by representing it would honor all of the existing lease terms without the present intent to do so.[62]  Lycos stopped its payments to CSI within a few months after signing the Sales Agreement and sued CSI claiming that it should not have to make any more payments.  A few months later, it dismissed that suit because the company was being sold, but then in late 2004, it again stopped its lease payments, and claimed again that it had no obligation to make them, and that CSI had to refund its previous payments.

    Respectfully submitted,

    COMPUTER SALES INTERNATIONAL, INC.

    By its attorneys,

    /s/ Robert J. Kaler_____
    Robert J. Kaler, BBO No. 542040
    rkaler@mccarter.com
    Edward W. Little, Jr., BBO No. 628985
    elittle@mccarter.com
    McCarter & English LLP
    225 Franklin Street
    Boston, MA  0211
    Tel. (617) 345-7000

Dated:  November 19, 2007

## Certificate of Service

    I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by hand this 19th day of November 2007.

    /s/ Robert J. Kaler_____
    Robert J. Kaler

---

[61]    Feinberg Dep. at 228:17-229:5 (Little Decl. Ex. 14).

[62]    *See* e-mail from Lycos' agent Leaseforum on August 8, 2003, stating that "Phase 2" – designed to reduce its lease obligations and negotiate a cash payment or settlement – had already "commenced."  Acton Aff. Ex. 18.

ME1 6695088v.1