UNITED STATES DISTRICT COURT
For the District of Massachusetts

COMPUTER SALES INTERNATIONAL, INC.,     )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )
                                        )
LYCOS, INC.,                            )     C.A. No. 05-10017- RWZ
                    Defendant,          )
                                        )
BANK OF AMERICA f/k/a FLEET BANK,       )
                                        )
                    Trustee Process Defendant.   )
                                        )

**DECLARATION OF KELLY A. GABOS ATTACHING RELEVANT PORTIONS OF
THE CASE RECORD IN OPPOSITION TO LYCOS, INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO "CERTAIN CLAIMS" IN COUNTS VII, XII, AND XIII
OF ITS COUNTERCLAIM**

I, Kelly A. Gabos, being duly sworn, do hereby depose as follows:

1.    I am an attorney with McCarter & English, LLP, the law firm that is counsel to

the plaintiff/counterdefendant Computer Sales International, Inc. ("CSI") in this matter. I

make this affidavit based upon my personal knowledge unless otherwise stated.

2.    Attached hereto as Exhibit 1 are selections from the deposition of Edward

Michael Philip taken on November 6, 2006.

3.    Attached hereto as Exhibit 2 are selections from the deposition of Thomas

Edward Guilfoile taken on December 7, 2006.

4.    Attached hereto as Exhibit 3 is Affidavit of James S. Schallheim, Ph.D. dated

November 18, 2007.

5.    Attached hereto as Exhibit 4 is Affidavit of James M. Johnson, Ph.D. dated

November 18, 2007.

6.    Attached hereto as Exhibit 5 is Affidavit of Michael Fleming dated November 18, 2007.

7.    Attached hereto as Exhibit 6 are selections from the deposition of Ernesto Galvan taken on February 20, 2007.

8.    Attached hereto as Exhibit 7 are selections from the deposition of Julie Callagee taken on April 26, 2006.

9.    Attached hereto as Exhibit 8 are selections from the deposition of Paul H. Stenberg , Jr. taken on January 19, 2007, and August 24, 2006.

10.   Attached hereto as Exhibit 9 are selections from the deposition of Timothy Wright taken on January 12, 2007.

11.   Attached hereto as Exhibit 10 are selections from the deposition of Joseph Philip Cagney taken on September 27, 2006.

12.   Attached hereto as Exhibit 11 are selections from the deposition of Joan Kersting taken on December 13, 2006.

13.   Attached hereto as Exhibit 12 are selections from the deposition of Brian Reale taken on January 31, 2007.

14.   Attached hereto as Exhibit 13 are selections from the deposition of Eric Ausubel taken on January 5, 2007.

15.   Attached hereto as Exhibit 14 is an e-mail from John Kirk to Julie Callagee dated July 22, 2003 previously marked as Plaintiff's Deposition Exhibit 240.

16.   Attached hereto as Exhibit 15 is an e-mail from Michael Ripps to Peter Karol dated September 6, 2000, previously marked as Plaintiff's Deposition Exhibit 340.

2

17.  Attached hereto as Exhibit 16 are selections from the deposition of Peter D. Karol taken on December 8, 2006.

18.  Attached hereto as Exhibit 17 are selections from the depositionof Bruce Dudley Smith taken on November 9, 2007.

19.  Attached hereto as Exhibit 18 is a memo from John McMahon to Lycos Network Employees dated May 8, 2001, previously marked as Plaintiff's Exhibit 297A.

20.  Attached hereto as Exhibit 19 are selections from the deposition of Brian Lucy taken on January 10, 2007.

21.  Attached hereto as Exhibit 20 is an e-mail from John Kirk to Andrew Feinberg, Tom Bean and A. Goudiss dated January 7, 2004, previously marked as Plaintiff's Exhibit 659.

22.  Attached hereto as Exhibit 21 are selections from the deposition of Susan Franklin taken on February 21, 2007 and October 25, 2006.

23.  Attached hereto as Exhibit 22 is Nacomex Expert Report of Robert J. Zises, ASA dated August 30, 2007.

24.  Attached hereto as Exhibit 23 is a spreadsheet previously marked as Plaintiff's Exhibit 191A.

25.  Attached hereto as Exhibit 24 is Expert Report of Nancy J. Moore dated August 31, 2007.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS _19th_ DAY OF NOVEMBER, 2007.

Kelly A. Gabos

# EXHIBIT 1

# O'BRIEN & LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Edward Michael Philip

# November 6, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL



James

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

11

```
1        Q.    Where?

2        A.    New Hampshire.

3        Q.    What's the address?

4        A.    34 Rupert Road.

5        Q.    Have you ever been convicted of a crime?

6        A.    No.

7        Q.    Can you just briefly describe your educational

8   background by years beginning with your graduation from

9   high school?

10       A.    I graduated from Christian Brothers High School in

11  1983, graduated from Vanderbilt University in 1987, and I

12  graduated from Harvard Business School in 1991.

13       Q.    And can you briefly describe your employment

14  history from that time to the present?

15       A.    I worked for Salomon Brothers from 1987 to 1989; I

16  worked for Morgan Stanley in the summer of '90; I worked

17  for the Walt Disney Company from 1991 to 1995; I worked for

18  Lycos from 1995 through, I'm not exactly sure what my

19  resignation date was, but around 2003; I worked for

20  Decision Matrix Group from 2004 to 2005; and from 2006 to

21  the present, I work at Highland Capital Partners.

22       Q.    Other than meeting with counsel, have you done

23  anything to prepare for the deposition?

24       A.    I looked at some documents.
```

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

51

```
 1      Q.    AP?  I'm sorry.  EP, I mean.

 2      A.    EP.

 3      Q.    EP.  And that's on LYC 00149?

 4      A.    Correct.

 5      Q.    Okay.  Could you just circle those initials and

 6   just initial it.  Just circle the whole area.  Thanks.

 7           The area that you've circled and initialed on page

 8   LYC 00149 of Exhibit 266 is a portion of the printed text

 9   where there's a handwritten change made in the contract

10   deleting the word one hundred -- the number 120 and

11   changing it to 60 before the words "days in advance"; is

12   that right?

13      A.    Correct.

14      Q.    Is that a change to the contract that you made?

15      A.    It appears so.

16      Q.    And that was in the early termination paragraph

17   dealing with the rights that Lycos had to terminate the

18   lease that it was entering into with CSI; is that right?

19      A.    It appears so, yes.

20      Q.    Why did you want to reduce the amount of time, the

21   amount of written notice that Lycos would have to give to

22   CSI to terminate this lease?

23      A.    I don't recall why.

24      Q.    Do you recall having any conversations with anyone
```

# EXHIBIT 2

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Thomas Edward Guilfoile

# December 7, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL



James A. Scally  21971

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

1      Q.    When did you first become a certified public

2    accountant?

3      A.    I believe it was 1989.

4      Q.    And you took the exam in Massachusetts?

5      A.    I did, yes.

6      Q.    And how long did you remain licensed as a

7    certified public accountant here in Massachusetts?

8      A.    I don't know precisely.

9      Q.    Approximately.

10     A.    Approximately around, until about 1996 or 1997.

11     Q.    About the time you joined Lycos?

12     A.    Yes.

13     Q.    At the time you joined Lycos in -- in or about

14    December of 1996, you were still a licensed certified

15    public accountant; is that right?

16     A.    I was.

17     Q.    And it was sometime after that that you allowed

18    your license to lapse?

19     A.    Yes.

20     Q.    Can you briefly describe your employment

21    background beginning with your graduation from high school?

22    Excuse me.   Graduation from college.

23     A.    College.   I was a -- I worked at Ernst & Young in

24    Boston until 1996, with Lycos until 2001, the Decision

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

11

1    Matrix Group until 2005, and now currently Highland

2    Consumer Fund.

3         Q.    What was the Decision Matrix Group?

4         A.    It was a company that was formed to acquire

5    companies in the research and consulting industries.

6         Q.    You received a subpoena to produce documents in

7    this case?

8         A.    I did, yes.

9         Q.    And you have produced through your counsel some

10   documents?

11        A.    Yes, I have.

12        Q.    I just want to mark portions of those for the

13   record.

14                  MR. KALER:  There appear to be two

15               volumes relating to a stock offering by

16               Lycos at the beginning of 2000.  The first

17               volume is Bates number GUIL 000001

18               sequentially through 000790, and we'll mark

19               that as Exhibit 435 -- 433.

20                  And the -- what appears to be the

21               second volume is Bates number GUIL 000791

22               sequentially through GUIL 001388.  We will

23               mark that as Exhibit 434.

24                  Exhibit 434 has what appears to be a

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

16

1      Q.    Did you work on the audits of any public

2   companies?

3      A.    Yes.

4      Q.    What public companies did you work on the audits

5   of while you were at Ernst & Young?

6      A.    The Boston Celtics limited partnership, Open

7   Environment Corporation are two that I recall.

8      Q.    And what were some of the larger private companies

9   that you worked on the audits of while you were at Ernst &

10  Young?

11     A.    Let's see.  I worked on a company such as Molton

12  Metal Technologies, Amray.  Let's see.  Corporate Software,

13  Sheraton Hotels Private Partnership, Canyon Ranch.

14     Q.    Any others you remember?

15     A.    I think that's a representative sample, anyway.

16     Q.    During the decade that you worked at Ernst &

17  Young, did you in connection with the audits of various

18  companies that you worked on examine lease accounting

19  issues?

20     A.    Yes.

21     Q.    What kind of lease accounting issues did you

22  examine during the decade that you were working with Ernst

23  & Young?

24     A.    We performed various audit procedures related to

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

17

1    leasing.

2        Q.    What type of audit procedures relating to leasing?

3        A.    Primarily determining whether a lease qualified as

4    a capital lease or an operating lease.

5        Q.    And what's your understanding of the distinction

6    between the two?

7        A.    There are certain criteria that must exist in a

8    lease in order for it to be classified as a capital lease.

9        Q.    Can you briefly describe them?

10        A.    An agreement which contains a bargain purchase

11    option would be required to be capitalized as a lease.  An

12    agreement that in which the term of the lease exceeds 75

13    percent of the useful life of that asset is required to be

14    capitalized.  I believe if the terms of the lease indicate

15    that the net present value of the lease payments exceed 90

16    percent of the fair value of that asset, it would also

17    require capitalization.

18        Q.    And what do you mean by capitalization?  If

19    something must be capitalized, what does that mean?

20        A.    It means that the assets which were purchased

21    under that lease are required to be reported on the

22    company's balance sheet as both an asset and a liability.

23        Q.    When you say the assets purchased under that

24    lease, do you mean the assets leased under that lease?

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

79

1    accounted for, correct?

2        A.    Correct.

3        Q.    And in determining how the company's leases with

4    CSI and other leasing companies would be accounted for, one

5    of the things Lycos had to do was determine whether they

6    had to be capitalized or whether they could be treated as

7    operating leases, correct?

8        A.    Correct.

9        Q.    And in order to make that determination, one of

10   the things that Lycos had to do was to determine the net

11   present value of the future payments that it was going to

12   have to make under each of its leases with CSI and the

13   other leasing companies, correct?

14       A.    Correct.

15       Q.    And in order to determine the net present value of

16   the future lease payments that it was going to have to pay

17   under those leases, it first had to determine what the

18   total aggregate amount of the future lease payments was

19   before then reducing it back to present value, right?

20       A.    Correct.

21       Q.    Okay.  And so as part of your duties and

22   responsibilities, although you may not have done it

23   personally, you arranged for people within Lycos to

24   calculate what the future lease payments were that Lycos

80

1    had to make under its leases with CSI whenever you were

2    doing, you know, the accounting calculation to determine

3    how those leases should be accounted for, correct?

4        A.    Correct.

5        Q.    And you did that on an annual -- at least an

6    annual basis, because you issued annual financial

7    statements; is that right?

8        A.    We would do them on each individual lease as we

9    entered into them.

10       Q.    Okay.  And so each time Lycos entered into a lease

11   with CSI, it would determine what the total future lease

12   payments were that it was going to have to make under that

13   lease, correct?

14       A.    Correct.

15       Q.    Okay.  And you had been talking before the break

16   about -- we'd been having what might be described as an

17   argument over the issue of cash flow projections and et

18   cetera.  Would you like to explain to me what the method of

19   expense budgeting was and the point that you were trying to

20   make?

21       A.    Sure.  What I was trying to say is that our focus

22   in the budgeting process was on the expense, not on the

23   cash flow.  So, for example, if you were to buy a piece of

24   equipment and pay for it on day one, the cash is out the

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

203

1    Q.    Do you still hold any options in stock relating to

2    successors of Lycos?

3    A.    I do not.

4    Q.    CSI's leases, or Lycos' leases with CSI were

5    always reported as leases by Lycos during the time you were

6    there, in other words, not -- not loans.  They were

7    reported as leases, right?

8                    MR. BEAN:  Objection.

9                    MR. DOWDEN:  Objection.

10   Q.    You can answer.

11   A.    My recollection, yes.

12   Q.    Okay.  And the reporting of -- by Lycos of CSI's,

13   of its leases with CSI as leases occurred both in its

14   filings with the Securities and Exchange Commission and in

15   its reports to shareholders and in its financial

16   statements, correct?

17                   MR. DOWDEN:  Objection.

18                   MR. BEAN:  Objection.

19   Q.    You can answer.

20   A.    I'm sorry, can you repeat that?

21   Q.    The reporting of Lycos' leases with CSI as leases

22   occurred both in Lycos' filings with the US Securities and

23   Exchange Commission and in its proxy statements and various

24   other reports to shareholders and in its financial

# EXHIBIT 3

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| LYCOS, INC., | ) ) C.A. No. 05-10017- RWZ |
| Defendant, | ) |
| and | ) ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) |
| Trustee Process Defendant. | ) |

## AFFIDAVIT OF JAMES S. SCHALLHEIM, Ph.D.

I, James S. Schallheim, being duly sworn, do hereby depose as follows:

1.      I have been retained as an expert on behalf of Computer Sales International, Inc.

("CSI") in this case to provide opinions concerning certain leasing issues.  I am being

compensated for time spent and expenses reasonably incurred.  I have no financial interest in the

outcome of this litigation.

2.      I make this affidavit based on my personal knowledge and expert opinions, unless

otherwise indicated, and in support of CSI's opposition to Lycos' motions for summary

judgment.  In addition, certain points below contradict the summary judgment Affidavit of Bruce

D. Smith submitted by Lycos.

### Background

3.      I am the Jake Garn Professor of Finance at the David Eccles School of Business at

the University of Utah, a position I have held since 2000.  I have been a professor at the

University of Utah since 1980 upon receiving my Ph.D. in Finance from Purdue University.  I

have also held the positions of visiting professor at Vanderbilt University (1988-89), the University of California at Berkeley (1994), and the University of Florida (2004-5). I received my undergraduate degree (B.A. in Economics with a minor in Mathematics) from the University of California Santa Barbara in 1973 and my Masters in Business Administration (MBA) from Wright State University in 1977.

4.    I have published extensively in academic journals such as the Journal of Finance, Journal of Political Economy, Review of Financial Studies, Journal of Financial Economics, Journal of Business, Journal of Financial and Quantitative Analysis, and Financial Management. My research and teaching interests are corporate finance, leasing, and stock markets in the U.S. and Japan. I am co-founder and co-organizer of the Utah Winter Finance Conference, and I am also an Associate Editor of the Journal of Applied Finance and a member of the Editorial Review Board of the Journal of Equipment Lease Financing.

5.    I am a scholar in the area of equipment leasing and have published the book *Lease or Buy: Principles for Sound Corporate Decision Making* (published by the Harvard Business School Press, Boston, 1994). I have served as a consultant for several corporations and government agencies, as set forth in my resume, a copy of which has been provided with my expert report in this matter. I also serve as a member of the Board of Directors for the Financial Management Association, the Equipment Leasing and Finance Foundation, and LCA Bank.

### Review of Documents and Testimony

6.    Based on my expertise, including my years of study of and instruction/teaching in the leasing industry, my review of documents produced by the parties in this case, and my review of deposition transcripts of witnesses for both parties, I have concluded that CSI has done nothing improper or contrary to industry standards in its dealings with Lycos concerning Lycos' leasing of tens of millions of dollars of computer technology equipment during the period 1999

2

through 2004.  As explained below, in my opinion Lycos decided for its own reasons, and to

what it apparently considered its benefit, to extend its equipment leases with CSI.  Lycos

received all disclosures which are usual and customary in the industry, and Lycos' has simply

created its theory of "mark-ups," which is nothing more than CSI's gross profits on these

consensual transactions.

### Terms of Master Lease and Equipment Schedules Were Commercially Reasonable

7.      The terms of the Master Lease and equipment schedules entered into by CSI and

Lycos (and the terms of those agreements) were commercially reasonable and standard within

the leasing industry.  Moreover, CSI made all the disclosures to Lycos that were required and

necessary for Lycos to determine whether it was in Lycos' economic interest (a) to enter into

initial schedules for the lease of new equipment from CSI, (b) to re-write schedules to extend the

terms of its leases of certain equipment from CSI, and (c) to ultimately purchase equipment that

it had previously leased from CSI in August of 2003.

8.      CSI acted in a manner consistent with proper and generally accepted commercial

leasing practices in connection with the extension or "re-writing" of Lycos' leases of equipment

from CSI from 1997 through 2002, and in connection with the negotiation and execution of the

Sales Agreement pursuant to which Lycos purchased that equipment from CSI in August of

2003.

9.      Lycos' allegations in this case against CSI – that CSI acted unfairly or in a

manner not consistent with proper and generally accepted leasing practices, and/or overcharged

or defrauded Lycos, in connection with the extension or "re-writing" of Lycos' leases of

equipment from CSI from 1997 through 2002, or in connection with the negotiation and

execution of the Sales Agreement pursuant to which Lycos purchased that equipment from CSI

in August of 2003 – are without merit.

3

10.     CSI did not engage in a pattern and practice of misconduct, and did not take advantage of Lycos to obtain millions of dollars in undeserved profits, in connection with the extension or "re-writing" of Lycos' leases of equipment from CSI from 1997 through 2002 nor did it do so in connection with the negotiation and execution of the Sales Agreement pursuant to which Lycos purchased that equipment from CSI in August of 2003, as Lycos claims in this case.

### Transactions are Leases, Not Loans

11.     A lease fundamentally differs from a loan due to the future and uncertain residual value. After all loan payments are made on secured debt, the asset belongs to the borrower. By contrast, after all the lease payments are made on a lease contact, the asset typically still belongs to the lessor. Because the future asset value, or residual value, is unknown at the beginning of the lease, the residual value cannot be considered to be the equivalent of a balloon payment on a loan which is a contracted amount.

12.     Lycos' expert Bruce Smith states "[e]conomically, there is little difference between requiring a transfer of cash or requiring a transfer of a tangible asset having a cash value."[1] This statement is incorrect. A contract that requires the transfer of a fixed cash amount is not equivalent to a contract that required the transfer of a tangible asset that has an uncertain future value (the residual value). This is one of the fundamental economic differences between a loan and a lease.

### The Inappropriate Term "Mark-up"

13.     Lycos alleges that a "mark-up" occurred at the time Lycos' leases were "refinanced" or "rolled-up," but his is not correct.[2] There was no "mark-up," and at the time of

---

[1]     Page 5, paragraph 10, Affidavit of Bruce D. Smith, July 31, 2007.

[2]     Pages 6-14, Section VI, Affidavit of Bruce D. Smith, July 31, 2007 and pages 20-24, Section 10, Expert Witness Report of Charles Cross, August 31, 2007.

the "refinancing" or "roll-up," the "cost" of the equipment should be the economic value to Lycos.

14.    The economic value of the equipment to Lycos should include the replacement cost of the equipment, the cost of locating, removing, and transporting the equipment as specified in the contract, and the cost and time required to load software, reconfigure computer equipment, and test the equipment. In other words, the economic value of the equipment to Lycos should include all the expenses required to replace the CSI equipment which may be totally integrated into the production process required by Lycos' businesses.

**CSI Disclosed All Relevant and Necessary Information to Lycos**

15.    As I state in my book *Lease or Buy?*: "In the leasing market, equilibrium is represented by the consummation of a lease contract and the agreed-upon schedule of lease payments." In other words, the lessee and lessor negotiate on the terms of the lease which are **the schedule of lease payments**. CSI, the lessor, is under no obligation to reveal its residual value assumptions to Lycos, the lessee, nor are they relevant to the economic decisions the lessee must make. Similarly, Lycos is under no obligation to reveal its residual assumptions or discount rates to CSI. The lease payment schedule is the agreed upon "price" for leasing contracts.

16.    It is generally accepted leasing practice for parties **not** to disclose their residual value assumptions to other parties, and those assumptions are typically irrelevant to the decisions that other parties need to make. First, there are three residual values in practice: book value for financial reporting purposes, book value for tax reporting purposes, and economic value. For financial reporting purposes, straight-line depreciation and resulting salvage (residual) values are often assumed. For tax reporting purposes, accelerated depreciation is favored and the resulting residual value is usually lower. For lease or buy analysis, the economic residual value is what is

5

important, because this is the value that the lessee (in this case Lycos) is giving up by leasing and not purchasing the asset. Economic residual value can differ between lessee and lessor for several reasons. The residual value may have higher value to the lessee, for example, than it does to the lessor, because the asset is being deployed in the production process and generating economic profits for the lessee.

17.     In my opinion, Lycos was well aware of costs of the equipment it leased from CSI because the lessee is the party who usually chooses the equipment and then refers payment to the lessor. It is not the responsibility of the lessor to keep track of equipment costs and residuals for the lessee, unless this is negotiated in the lease contract. As an example, the PayNet database is used by many lessors to evaluate the credit risk of lessees. This massive database does <u>not</u> contain residual value or equipment cost – only lease payment schedules and the payment record of the lessee. To the best of my knowledge, there are no available data sources on individual lease contracts that collect residual value information.

18.     Lycos experts Smith and Cross claim that CSI's internal financial documents were not made available by CSI to Lycos or its consultants, Avnet Enterprise Solutions, Inc. ("Avnet") and LeaseForum, and should have been.[3] I do not agree. In my opinion, the release of internal information such as this is unheard of in the leasing industry (and most other industries that I am aware). Moreover, the lessor's book value is irrelevant in the lease or buy decision. It is the economic value to Lycos that matters. In general, the actual residual values at the end of the lease differ from the book values that are determined at the beginning of the lease.[4]

---

[3]      Page 61-66, Section 12, Expert Witness Report of Bruce D. Smith, August 14, 2007 and pages 31-32, Section 11 (b)(v), Expert Witness Report of Charles Cross, August 31, 2007.

[4]      Page 166, Table 8.4, Schallheim, James, *Lease or Buy:  Principles for Sound Corporate Decision Making*, Harvard Business School Press, Boston, 1994. Examples based on the Equipment Leasing Association, *Survey of Industry Activity*, show the <u>average</u> ratios of residual values recovered to book values ranging from 98% to 190%.

19.     Mr. Cross in fact admits that it is general industry practice for lessors not to disclose booked residual value. Mr. Cross then suggests that the end-of-lease terms in CSI/Lycos contracts are contrary to industry practice. It is my opinion that end-of-lease terms are highly variable, especially for large leases as represented in this case. My knowledge of the industry suggests that lease contracts may or may not contain various options such as purchase options, options to extend the lease, or options to cancel the lease. However, in many cases, in order to comply with tax and accounting standards, purchase and extension options are frequently avoided. It is also my opinion that stipulated loss values tend to protect the lessor in that it represents an early payoff of the lease contract. Stipulated loss values discourage lessees from declaring equipment a "loss" in order to gain advantage (such as used equipment values in some instances). That is, there is usually an early payoff premium built into these stipulated loss values schedules.

20.     Mr. Cross suggests that CSI should have disclosed the "terminating lease balance under the existing Equipment Schedule with respect to each item of Equipment as compared to the new lease balance for each item on a new Refinance Schedule." In my opinion, however, such a disclosure is not required, is not consistent with a standard and acceptable industry practice, and would not be relevant or helpful to a lessee's decision on whether to extend a lease. Furthermore, the information Mr. Cross suggests should be disclosed, the "terminating lease balance," is a loan or debt concept, **not a leasing concept**. This is another example where Lycos' experts attempt to equate leases with loans. A lease differs from a loan, however, due to the unknown, uncertain, and future residual value. Under a loan, the lender has a set of contracted loan payments with an expectation of repayment of the defined principle. Under a lease, the lessors assume the risk of the residual value.

7

## Lycos Benefited from Treating the Transactions as Leases

21.     Leasing allows the lessee the opportunity to qualify the leases as operating leases that are not reported on the lessee's balance sheet (they are disclosed, but in a footnote to the balance sheet).  The record indicates that during the relevant time period, Lycos had a policy that all computer equipment would be leased:  "It is Lycos' policy to not buy any equipment that can be leased."[5]  The benefit to this policy is that Lycos reports no long-term debt or capital leases on the balance sheet.[6]  This is a reasonable business decision on the part of Lycos because internet companies generally do not show long-term debt on their balance sheets.

22.     Lycos also appeared to be concerned about the impact on the income statement due to lease payments.  The record also shows that Lycos was interested in "rewriting" or extending leases in order to reduce lease payments, and that his was motivated by a desire "to achieve profitability."[7]

23.     Lycos' preference for leasing in order to achieve off-balance sheet reporting and in order to obtain higher profits is difficult to quantify in a traditional lease or buy analysis. Nevertheless, these factors are very important in Lycos' preference for leasing.

24.     Lycos expert David Truesdell suggests that I stated in my initial report "without any stated basis or timeframe, that Lycos was motivated by a desire to achieve profitability." Mr. Truesdell is incorrect.  My statement about the desire "to achieve profitability" was a direct quote from the deposition of former Lycos official Sam Ziba.  Those were not my words "to achieve profitability."

25.     Again, the reason Lycos preferred operating leases to capital leases or debt

---

[5]     Plaintiff's Exhibit No. 627, Ernesto J Galvan, Tax Department Memorandum.

[6]     Exhibit 272, Lycos Annual Report, 1999.

[7]     Excerpt of Ziba deposition, p. 255.

financing was to achieve off-balance sheet status. Mr. Truesdell suggests that I was "either unaware of or simply ignore the fact that the internet stock bubble was still growing rapidly in 1999." If one examines the capital structure of the internet stocks at that time, one would find little or no long-term debt and capital leases on the financial statements of those companies. It is my opinion that Lycos favored operating leases in order to meet market expectations and maintain their high stock price.

### Purchase Option

26.    Purchase options are not a necessary component of a lease contract. Both the tax and accounting rules discourage any kind of a "bargain" purchase option or the automatic transfer of ownership at the end of the lease. In fact, allowing a purchase option into a lease may mitigate in favor of disallowing operating lease treatment for the transaction – something Lycos apparently did not want to happen.

27.    Lycos expert Cross implies that the lack of a purchase option in the lease gave all the bargaining power to CSI at the end of the lease.[8] This argument is incorrect. The lease contract states the either party can terminate the lease.[9] So Lycos could have returned the equipment to CSI at the end of any of these lease contracts. Lycos also had the option to pay the Stipulated Loss Value or replace any equipment with identical equipment in the event the equipment is lost or damaged.[10] In some cases, if the original equipment was returned, CSI would have suffered a loss and this is one of the major risks faced by CSI.

### Inexperience of the Lessee

28.    Mr. Cross claims that Lycos management was "generally inexperienced,

---

[8]    Page 32, Section 11 (c), Expert Witness Report of Charles Cross, August 31, 2007.

[9]    Section 2.2, Master Lease Agreement between CSI and Lycos (Exhibit 1).

[10]   Section 9.2, Master Lease Agreement between CSI and Lycos (Exhibit 1).

unsophisticated and uniformed about leasing and leasing products." I do not agree. Typically, MBA students (and many undergraduate finance majors) are taught lease or buy analysis, or can easily pick up the basic idea. It is not that difficult and you absolutely do not need an advanced degree to figure it out. Finally, there are many professionals offering their services to instruct any group of employees on the basics of leases and lease or buy analysis.

29.     Because of this alleged inexperience with leasing, Mr. Cross opines that Lycos "was therefore susceptible to rewrites, renewals and extensions that offered temporary relief but consigned it to economic serfdom."[11] I do not agree. Given the billions of dollars that other companies were willing to pay for Lycos in the capital markets and the experience of its management team, the term "economic serfdom" could hardly apply.

30.     Mr. Cross claims that "tracking of balances with respect to each individual item of equipment is a monumental task if there are thousands of items of equipment . . . ."[12] This is normal and required bookkeeping for any business, however small or large. That fact that Lycos did not follow sound and normal business practices is not the fault of CSI.

31.     Mr. Cross suggests that because Lycos or other lessees had "their own core businesses to run," they cannot be expected to be leasing or equipment experts. I find this argument to be fallacious because the managers of businesses are not "experts" in many areas that are critical to business survival (accounting, finance, information technology, etc.) and are not part of their "core business." Businesses generally hire such expertise (both in-house as well as outside consultants). Furthermore, it appears disingenuous to me to suggest that Lycos had no expertise in the computer equipment marketplace because computers are the core tool of their industry.

---

[11]     Page 9, Section 8 (d), Expert Witness Report of Charles Cross, August 31, 2007.

[12]     Page 23, Section 10 (a)(iii), Expert Witness Report of Charles Cross, August 31, 2007.

### Lycos' Failure to Track its Leased Assets

32.    Lycos offers an opinion from one of its experts that, if the lease contracts in this case are "commercially reasonable and standard within the leasing industry" as I state in my initial report, then "the entire industry would be cast in an unfavorable light." I totally disagree with these statement. It is not the fault of CSI that Lycos could not keep track of the equipment or the leases. It was not the fault of CSI that Lycos could not locate equipment to return to CSI as Lycos agreed in the contracts. It is incorrect to blame the leasing industry for the poor business practices of Lycos.

### Extensions or "Re-writing" of the Equipment Schedules

33.    In my book *Lease or Buy?*, I state "lease contracts include many different options. There are options to: (1) purchase the asset, (2) renew the lease, and/or (3) cancel the lease. These options can be very valuable, although they are difficult to price."[13] The fact that CSI and Lycos agreed to extend or re-write the leases during the period 1997 to 2002 is totally normal and proper commercial leasing practice.

34.    Lycos complaint about unfair treatment in the lease extensions is without merit. At the end of each lease term, Lycos had the option to return the equipment to CSI. The only economic explanation for the fact that Lycos did not return the equipment is that it was worth more to Lycos to continue using the computer equipment than to return the equipment.

35.    The record shows ample evidence that Lycos was inadequate in keeping track of the equipment leased from CSI and others.[14] This is evidence of poor business practice. In fact, Lycos attempted to rectify the situation by hiring the consulting firm Avnet to help track the ""

---

[13]    Page 168, Schallheim, James, *Lease or Buy: Principles for Sound Corporate Decision Making*, Harvard Business School Press, Boston, 1994.

[14]    Wright's deposition, pages 35 and 48.

equipment.[15]  Again, it appears to be poor business practice on the part of Lycos for not implementing their recommendations concerning inventory management.  The end result of all of this is to make the equipment more valuable to Lycos because it appears to be very costly for Lycos to locate and remove the equipment.

36.    Lycos freely negotiated and re-negotiated leases for computer equipment that Lycos now (ex-post facto) argues was not worth the payments.  If the equipment had been returned to CSI under the original leases and it had been worthless, however, CSI would have taken a large loss on the transaction.  Therefore, there are two problems with Lycos' argument.  First, there is the ex-ante vs. ex-post fallacy.  Before-the-fact (ex-ante), there is risk to both parties in the transaction because the residual values are uncertain.  The outcomes after-the-fact (ex-post) could have favored one party or the other.  This is unknown at the signing of the lease contracts.  The second problem is that the equipment must have been more valuable to Lycos, otherwise they would have returned the equipment to CSI.

37.    The analysis found in Lycos' Answer to CSI's First Amended Complaint and Counterclaim repeats the same error above.[16]  In the example found in Lycos' Counterclaim, the "roll-up" or lease extension is analyzed by including payments that occurred **prior** to the new contract.  This is an incorrect analysis because all lease or by analysis is performed on future lease payments (ex-ante), not past payments (ex-post).  The following table shows the example corrected for this error:

---

[15]    Plaintiff's Exhibit 122, Avnet, Lease Assessment and Asset Inventory Analysis Report, December 15, 2000.

[16]    Lycos' Answer & Counterclaim to Amended Complaint, paragraph 25, p. 17-18.

| Equipment Schedule | 67E | 67H |
|---|---|---|
| Equipment Cost | 1,091,002 | 1,091,002 |
| Fixed Term | 24 months | 34 months |
| Monthly Lease Payment (in advance) | $42,075 | $36,438 |
| Residual Assumption | 21% | 16% |
| Yield at Residual Assumed | 11.34% | 17.58% |
| Yield at 0% Residual | -7.93% | 9.50% |

38.    As the above table shows, the "roll-up" or extended lease has a much lower expected yield than represented in Lycos' Answer to CSI's First Amended Complaint and Counterclaim: 17.6% vs. 20.8%. Also, contrary to the claim that CSI has "guaranteed itself a 14% profit through the 'roll up,'" CSI has a risky expected return of 9.5%. It was not clear at the time and CSI could not assume that Lycos is a riskfree company offering riskfree or certain returns.

39.    Lycos repeats this error by including past lease payments in its analysis of future contracts. Furthermore, Lycos' analysis is incomplete by, in each case, ignoring the alternative scenario. That is, if Lycos terminated a lease with CSI and returned the equipment, they are likely to need replacement equipment. The replacement equipment is the alternative that Lycos fails to incorporate in its analysis.

### Lycos' Damage Theory is Faulty

40.    Lycos' expert Bruce Smith has calculated what he considers to be Lycos' damages based on the amount of the alleged "mark-ups" – that is, that Lycos, had it known about these "mark-ups" would not have extended any of the leases with CSI.

41.    In this report, Dr. Smith calculates the so-called mark up of around $13.7 million

13

as the basis for Lycos' claim of damages. In fact, Dr. Smith simply attributes a portion of CSI's gross profits – which are entirely proper in these situations – and labeling them as improper based on the idea that CSI has some obligation to disclose a portion of them up front (as explained above, it did not have any such obligation).

42.    In response to several questions by CSI's counsel at his November 9, 2007 deposition, Dr. Smith's statements were unclear about the cost to Lycos of replacing the equipment under lease, as Lycos would have had to replace equipment it had been leasing from CSI in the event it had simply returned the equipment. He seems to claim that the replacement costs to Lycos are equivalent to the residual value for each schedule which CSI was carrying on its books;   and if the CSI book residual is zero, then the replacement cost to Lycos is zero. This is incorrect.

43.    As I have stated previously, the replacement costs to Lycos are not equivalent to the residual values used by CSI on its books for accounting purposes. The cost to Lycos, had it returned the equipment to CSI at the end of all original leases, is the *replacement cost* of the equipment including the cost of locating, removing, and transporting the equipment as specified in the contract, as well as the following replacement costs:

      a)  cost of replacement hardware

      b)  cost of new software if needed

      c)  configuration of new hardware and software

      d)  cost of downtime

      e)  loss of data

      f)  waiting for hardware to come (causes more downtime)

      g)  reconfiguring hardware and software that wasn't setup correctly in step c

      h)  downtime if new hardware arrives and some doesn't work

44.    Based on the analysis and appraisal done by the computer appraisal expert Robert

J. Zises, Lycos' cost to replace the equipment it leased from CSI at the end of the original lease

terms for that equipment, had it not extended those terms as it did, would have been

$25,000,000.[17]  Clearly, this amount exceeds the Smith damage estimate of $13.7 million by a

wide margin.  As a result, it is clear that Lycos did not suffer any "damages" from the

extensions of its leases with CSI.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th
DAY OF NOVEMBER, 2007.

_____

James S. Schallheim

---

[17]    Page 12, Expert Rebuttal Report of Robert J. Zises.

15

# EXHIBIT 4

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>LYCOS, INC., )<br>Defendant, )<br>and )<br><br>BANK OF AMERICA f/k/a FLEET BANK, )<br><br>Trustee Process Defendant. ) | C.A. No. 05-10017- RWZ |

## AFFIDAVIT OF JAMES M. JOHNSON, Ph.D.

I, James M. Johnson, being duly sworn, do hereby depose as follows:

1.     I have been retained as an expert on behalf of Computer Sales International, Inc.

("CSI") in this case to provide opinions concerning leasing, which are set forth below and in the

expert reports which have been provided in this case to Lycos, Inc. ("Lycos"), as well as the

bases for those opinions.  I am being compensated for time spent and expenses reasonably

incurred.  I have no financial interest in the outcome of this litigation.

2.     I make this affidavit based on my personal knowledge and expert opinions, unless

otherwise indicated, and in support of CSI's opposition to Lycos' motions for summary

judgment.  In addition, certain points below will rebut the summary judgment Affidavit of Bruce

D. Smith submitted by Lycos.

### Background

3.     I am a Professor of Finance at Northern Illinois University, a position I have held

since 1990.  I received my Ph.D. in 1975 from the Ohio State University, where I majored in

1

Finance (minor in Real Estate). I received my undergraduate degree (B.B.A.) in Finance (minor in Accounting) *cum laude* from Western Michigan University, and my Masters in Business Administration (M.B.A.) *with honors* from Western Michigan University. My full resume has been provided to counsel in connection with my expert reports submitted in this case.

4.     Prior to my present position at Northern Illinois University, I served at the school as an Associate Professor of Finance from 1987 to 1989. Prior to that, I held the position as Associate Professor of Finance at Bentley College (from 1983-1987), at the University of Notre Dame (1976-1983), and Western Michigan University (1974-1976). Prior to that, I was a Teaching Fellow in the Department of Finance at the Ohio State University (1971-1974).

5.     The focus of my research and teaching is in the leasing industry. I serve on the Board of Trustees of the Equipment Leasing and Finance Foundation, and I am a founding member of, and serve on the Editorial Review Board of the *Journal of Equipment Lease Financing*. I have conducted over 300 workshops for both lessors and lessees, educating and training such clients as Blue Cross/Blue Shield, the Government of Canada, Cargill Corporation, ChevronTexaco, the City of Detroit, Coca Cola Financial, DaimlerChrysler, Huntington Bank Equipment Finance, HSBC and others. These workshops cover such topics as lease structuring, finance for non-financial managers, the leasing credit decision, the economics of leasing, negotiations, tax-motivated transaction structuring, extensive contractual issues, accounting issues and industry practices.

6.     I am the author of several publications, including the industry standard textbook *Fundamentals of Finance for Equipment Lessors* (published by the Equipment Leasing Association, 2d ed. 1990). More recently, my works have included *Power Tools for Successful Leasing* (2000), *Technology Leasing:  Power Tools for Lessees* (2002), and *Power Tools for*

*Small Ticket Leasing* (2004), all published by the Leasing Power Tools Press, and co-authored with Barry S. Marks, Esq. I have also authored over sixty articles appearing in numerous journals, including the *Chief Information Officer*, *Journal of Finance*, *Journal of Accountancy*, *Journal of Portfolio Management*, *Financial Management*, the *Equipment Leasing Monitor*, *The Turnaround Management Journal*, and ELA's *Journal of Equipment Lease Financing*.

### Review of Documents and Testimony

7.      Based on my expertise, including my years of study of and instruction/teaching in the leasing industry, my review of documents produced by the parties in this case, and my review of deposition transcripts of witnesses for both parties, I have concluded that CSI has done nothing improper or contrary to industry standards in its dealings with Lycos concerning Lycos' leasing of tens of millions of dollars of computer technology equipment during the period 1999 through 2004. As explained below, Lycos decided for its own reasons, and to what it apparently considered its benefit, to extend its equipment leases with CSI. Lycos received all disclosures which are common in the industry, and Lycos' has simply created its theory or "mark-ups," which is nothing more than CSI's gross profits on these mutually agreed upon transactions.

### "Mark-Up" Analysis by Lycos is Contrived

8.      Lycos alleges that CSI did not disclose to Lycos what its experts call "mark-ups." This allegation is without merit. The term "mark-ups" is not found in the leasing industry and is inappropriate and misleading as used by Lycos – and it is designed by Lycos' experts to make it appear that CSI did not disclose something it had a duty to disclose (which is not the case).

9.      Of the approximately 125 schedules agreed to and signed by Lycos, 75 of them were original leases. The vast bulk of the original leases had the characteristic that the present value of the lease payments plus the residual value booked by CSI was greater than the original equipment cost of the equipment – something which Lycos' experts have improperly described

3

as a "mark-up." This characteristic, however, is simply a matter of the negotiated pricing for the lease and is part of the lessor's profit.

10.     In this regard, a lessor has a duty to provide a lessee only with a proposed lease payment and a proposed term for a given schedule. CSI did so in these transactions – on 125 different occasions.   Providing a lessee with what Lycos calls a "balance" – calculated using the lessor's booked residual value or the lessor's interest rate implicit in the lease – is not required. In a free market such as the equipment leasing industry, these issues are not relevant to the lessee's decision, which is influenced by the alternative prices available to the lessee in the financing marketplace and not by what return any given lessor may be making on the transaction.

11.     Lycos knew the monthly rent payment it was making for each existing schedule prior to each proposed re-written schedule.   It also knew the proposed rent payment under the re-written schedule.  This is full disclosure.  That is all Lycos needs to make an informed decision whether to enter into a re-write or not.  Because Lycos had produced the purchase order for equipment it was leasing, Lycos knew the original equipment cost.  The "old" and "new" rent payments and the number of payments under each were also known or knowable.  This is full disclosure.

12.     If Lycos did not like any given re-write offer it received from CSI, it was always free to reject the proposal or renegotiate it.  Lycos was under no compulsion to accept any lease transaction proposed by Lycos, and it was free to engage anyone (consultants, attorneys, accountants) to examine the proposals or to solicit offers from other leasing companies.  Offers of restructured lease schedules are a common practice, but they are just that – the lessee decides whether to accept, reject or negotiate them.

13.     When both parties to a lease arrangement sign a schedule or a re-written schedule,

4

with neither being under compulsion to sign, this means both parties had the opportunity to agree, change or reject the proposal. It is inappropriate to claim that the new rent proposed and contractually agreed upon is in any sense "non-negotiated." The term "non-negotiated" suggests that Lycos had no option but to sign a re-written schedule. That is simply not the case. Among the many options available to Lycos would be to simply run each lease schedule to the end of its term, yet the Lycos experts would have us believe Lycos had no choice but to sign each schedule. This is simply not the case,

### Schedules and Master Lease Represent Leases, Not Loans

14.    Lycos' senior management indicated in depositions that it conducted testing for each equipment schedule – whether original or a "re-write" – to determine whether the schedule could be considered an operating versus a capital lease. For example, Kevin Baillie, a senior financial officer of Lycos, indicated that the CSI leases were leases, not loans, and Mr. Guilfoile indicated each schedule was accounting tested as it arose.

15.    In its 1999 annual report (or 10-K) which it filed with the SEC, Lycos disclosed "operating" leases in its footnotes to financial statements. Lycos did not report any capital leases, further supporting testimony that Lycos had tested all of its CSI leases and determined they were operating, and not capital, leases. Under accounting rules, operating leases are indicative of the temporary use or possession of assets. Capital leases are indicative of sufficiently long-term use that the assets should be recorded as "owned." Lycos did not report any assets as "owned" for the 1999 fiscal year in their financial statements.

16.    Indicative of the fact that the transactions at issue were leases and not loans, CSI booked a residual value in the Lycos leases, indicative of CSI ownership of the leased assets – Lycos did not book any residual value while it leased the equipment that could be discerned by reviewing their financial statements. Further, the Master Lease Agreement between CSI and

Lycos (the "Master Lease") has a detailed portion (§ 7) related to delivery and return of leased equipment and require the lessee (Lycos) to return the leased equipment at lease end to a location designated by CSI, indicating CSI expects its property to be returned at end of lease, and contained no provision for the lessee to acquire the equipment at the end of the lease. The Master Lease itself provides that it "is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest" (§ 18).

17.     Characterizing these financial transactions as loans and not leases is a recurring theme in Lycos' expert reports. These transactions are leases (not loans), however, and are designed to provide an equipment user (Lycos) with the use of another firm's property (CSI's).

18.     Lycos' experts go so far as to assert that there is little difference between a lease and a loan with a balloon payment, which is simply not true. A loan of money with a balloon payment provides the lender with a contractual promise by the borrower to repay the lender, and it further provides the lender with remedies should the borrower not honor its promise to pay. A loan contract provides the lender with a contract to receive 100 percent of its money back. In contrast, a lease provides the lessor with at least three different sources of cash to recover its investment—the lease payment stream from the lessee, the residual value anticipated by the lessor, and the benefits of tax depreciation accorded the lessor as owner of the equipment. In a lease, only the payment stream is backed by a contract.

19.     One of Lycos' experts, Mr. Smith, opines that "there is little difference between requiring a transfer of cash or requiring a transfer of a tangible asset having a cash value." Presumably, Smith is attempting to show how similar a loan is to a lease. I disagree. A leasing company looks to tax depreciation as a source of investment recovery, plus the lessee's payment stream, plus an uncertain residual value the lessor hopes to recover. A loan with a balloon

payment is entirely contractual, and the lender is contractually assured of both. A lease only contractually assures the lessor of the lease payment stream, whereas the residual value and value of depreciation are not assured.

20.    In a lease situation, neither the residual value nor the value of depreciation is assured but are estimates. While Lycos' experts refer repeatedly to "lease balances" – again trying to characterize these transactions as the equivalent of loans, which they are not.

### Residual Values Booked by Lessor Are Not "Fair Value" of Equipment

21.    Lycos attempts to argue that a residual value booked by the lessor for accounting purposes at the inception of the lease reflects a forecast of the "fair value" of the leased property at the end of the lease. Lycos asserts that a residual value booked at zero is "evidence" that the lessor estimates the equipment will have no value at the end of the lease term. This is not the case, as lessors generally book very conservative estimates of residual value.

22.    In addition, the residual value booked by a lessor is often much lower than the in-place value of that equipment to the lessee. Lycos had over 6,000 pieces of equipment under lease, and the costs to de-install and return leased equipment, plus acquire substitute equipment, would have to be considered part of the in-place value of that equipment.

23.    Lycos also knew at any given lease commencement what the fair value was of the equipment it was leasing or re-writing – and that value was apparently substantial. Mr. Guilfoile, Lycos' Senior Vice President of Finance, testified that Lycos ran the so-called "90 percent test" to determine how to classify each original lease and re-written lease either as an operating or a capital lease under FAS 13, since each re-write amounts to a new lease. Thus, for every equipment schedule, Lycos has testified it ran the accounting tests, which means it knew in every instance what the fair value of the leased equipment was, and that the present value of lease payments were less than 90 percent of that value.

## Residual Values Booked by Lessors Are Not Disclosed

24.    For each lease schedule, Lycos knew the cost of the equipment, as it ordered the equipment under a purchase order it negotiated. Therefore, the only disclosures Lycos required to determine whether to lease with CSI were the lease rate, the lease term, and the stipulated loss table. Lessors do not, and are under no requirement – legally, ethically or otherwise – to disclose their booked residual values to their lessees, and that information is irrelevant to the lessee's decision, since the equipment is not being purchased by the lessee.

## Lycos Received Disclosure of Information Needed

25.    Lycos asserts that CSI did not provide it with the information Lycos needed to make the best economic decision. This is not the case, as Lycos was always provided with the terms of each proposed lease (whether an original lease or a re-write). In 125 separate instances, Lycos signed the proposed leasing schedules. Had Lycos not been in possession of additional information it deemed essential to making a decision to accept a schedule, it would have been straightforward to make the production of such information a precondition for considering or agreeing to any proposed lease schedule.

26.    The records I have seen in connection with preparing my expert reports, however, indicate that making the best economic decision was not a significant priority to Lycos. Lycos' interests, according to the documents I have examined, were in lowering their current period operating expenses and keeping assets off its balance sheet. These objectives would be served by recording its leases of computer equipment as operating leases, and extending lease terms— both of which Lycos did on dozens of occasions.

27.    In its dealings with CSI, Lycos always had the option of making a counteroffer to CSI of any proposed schedule, rejecting it outright, shopping the schedule with other lessors (it dealt with several other leasing companies), borrowing money to buy the equipment it needed, or

paying for the equipment with cash. Lycos chose to lease with CSI in most instances. Since Lycos was free to demand whatever additional information it might have felt was important and did not do so, it is my opinion that obtaining the information it now claims it lacked was not a priority to Lycos at the time. The claim that two of Lycos' own consultants could not determine the particulars of some of the schedules years later does not signify that relevant information was withheld, as Lycos did not demand the information the consultants sought in the first place.

### Master Lease, Schedules and Sales Agreement Are Consistent With Industry Practice

28.    Lease agreements and lease schedules are negotiated between two parties – the lessor and the lessee. Both sides must agree in writing to a given transaction for it to result in a contract. The terms and conditions in the Master Lease are designed to spell out provisions that the parties will want to apply each time they agree to a new schedule. Master Leases typically include what will trigger commencement of the lease, what the lessee's return requirements will be at end of lease, what state will have governing law in the event of a dispute, what will result in a default in the lease and what remedies the lessor may pursue to cure the default, what maintenance obligations are required, who will pay property taxes on the equipment, insurance requirements, and other such terms.

29.    Parties may, through negotiation, agree on many other provisions for incorporation into a Master Lease. A Master Lease may govern the terms of many subsequent equipment schedules. It would not be uncommon for a substantial business to have several hundred schedules referencing the same Master Lease. Each schedule indicates specific pieces of equipment to be leased, the lease rate that will apply, the term of the schedule and the like. Schedules may be very brief, since the Master Lease contains most of the provisions that will govern each schedule. The CSI Master contains provisions that are common in technology lease Master Lease Agreements, and the specific terms of the Master Lease are representative of

9

technology Master Lease Agreements.

      30.    CSI and Lycos negotiated a Master Lease, which is the document that governs most of the terms and conditions that will apply to a lease schedule subsequent to the Master Lease. Both parties signed the Master and agreed to be bound by its terms and conditions. The provisions in the Master Lease and the provisions in the schedules are representative of Master Lease and schedule provisions in the industry.

      31.    The Sales Agreement of August 2003 between Lycos and CSI is a fairly standard sales agreement between a lessor and a lessee. Sometimes called a "buyout," a sales agreement sets forth the terms and conditions that will govern the purchase of equipment by the lessee. A typical buyout agreement indicates the purchase price to be paid by the lessee and whether there are additional terms necessary to effect the buyout. Additional terms may indicate the lessee is required to continue to abide by the terms of the Master Lease until all amounts due and to become due to the lessor, including the buyout price, that the lessee will owe property taxes that are due or will become due until the lessor has been paid all monies owed or to be owed the lessor, that the property must continue to be insured, and the like.

      32.    The CSI/Lycos Sales Agreement indicates that Lycos may purchase the equipment under lease at a buyout price of approximately $3.7 million, specifies that Lycos will be obligated to make all remaining lease payments required under each schedule, and provides that Lycos will "pay any and all other charges arising under the Lease."

      33.    The re-writing of schedules is not uncommon for technology equipment employed by rapidly growing companies, such as Lycos, as their situation is quite fluid. In a high growth service business, the needs of the lessee may change very quickly. In the case of Lycos, the company was growing rapidly and had a need to acquire millions of dollars of technology

equipment. A major consideration for Lycos was to acquire equipment when needed to launch

new products quickly. Lycos, as a company losing money, also had a desire to reduce their

monthly expenses. Re-writing lease schedules was a logical method of reducing Lycos monthly

payments. Lycos executives indicated they were focused upon expenses, not cash flow, and Mr.

Philips indicated in a document on Lycos' website the progress they were making in achieving

their EBITDA profit margin, which included operating lease payments as expenses. Extending

lease terms resulted in lowering current period lease payments.

34.     Lycos further claims that terms in the CSI Master Lease or in the schedules

between the parties are either missing (in which case, their absence is detrimental to Lycos) or

too onerous (thereby making Lycos' compliance with them impossible). I disagree for the

following reasons:

a.     <u>Purchase Options</u>. Lycos' expert Charles Cross asserts that typically a lessee has

the contractual ability to purchase the equipment under lease at the end of the

lease "for a price that is either (1) fair market value, (2) a fixed price estimated to

be fair market value or (3) some other fixed price which is at least equal to the

Lessor's booked residual value…" He goes on to say it is "nearly universal,

practice to include one of the purchase options noted above in leases of this type."

He then bolsters his assertion by summarizing the purchase options in the four

lessor "Representative Leases" table. I disagree. Of the more than one hundred

technology leases I have reviewed over the years, I estimate no more than half

had purchase options. I conducted three-day workshops for over ten years from

1994 through 2005 for technology lessees – in the range of thirty such workshops

for professionals that were involved in the leasing (as lessees) of technology

equipment. I published a survey of 260 technology lessees during the time period at issue in this case (Technology Leasing Priorities: What Do Lessees Want?, *Journal of Equipment Leasing Financing*, Fall, 1998, pp. 23-29) and had lessees rate 35 lease contract issues. Having a right to purchase at end of lease ranked 27 out of 35. Having a fixed price purchase option ranked 32 out of 35. Thus, purchase options, in my opinion, are not "nearly universal practice" and are not a major issue in the opinion of 260 technology lessees.

b.    <u>Renewal Options</u>. Lycos' expert Mr. Cross does not indicate here that renewal options are "nearly universal practice," but he relies on his "Representative Leases" to contend that only one "Representative Lease" did not contain a renewal option for a fixed term or a term to be mutually agreed "at a rent that is either mutually agreed, based on fair market rental value or is at a fixed rate below the initial term rate." I disagree with the stated or inferred assertion that such renewals are typical. The Master Lease agreed to by the parties does provide for four-month renewals should the lessee not give notice to CSI of its intention to return CSI's equipment. This is a renewal. In approximately twenty negotiations with lessors on behalf of technology equipment lessees, my experience indicates that lessors are generally unwilling to reduce the lease rate for a renewal (even if asked for before the lease is signed) unless a considerable renewal period is being proposed. I have encountered very few leases that do not provide for month-to-month, or quarter-to-quarter or other automatic renewals if the lessee should not provide timely notification of its intent to return the lessor's equipment at end of lease. These are renewals. As to how important renewal options are, I again cite

my survey outlined in point a above. The survey results indicate that being able

to renew with a lower rental (lease) payment ranked 26 out of 35 contract issues.

Further, the survey indicates that the importance of having a fixed rate renewal

option ranked 32 out of 35. In my opinion, based upon my experience and

research, renewal options are not "typical" and are not considered by technology

lessees to be of much importance.

c.    <u>Maintenance/Return Provisions</u>.  Mr. Cross appears to switch gears on this point,

as he, for the first time, discusses what a lessee should do, as opposed to what is

common practice. He indicates that contract provisions regarding maintenance

and return provisions "must be carefully drafted…otherwise, they may be onerous

or impossible to perform." Since this section of Mr. Cross's report is titled

"Customary Industry Practices," I kept looking for his opinion as to same, and did

not find it. Since he does not appear to indicate what standard industry practices

are, he instead indicates what a lessee should do – but does not provide an

indication of what industry practice is. But he then, without comment, provides a

summary of the maintenance and return provisions of the "Representative

Leases."  The Master Lease that was negotiated by CSI and Lycos contains

maintenance and return provisions that I have seen in a number of technology

equipment leases, and appears quite typical and standard.

d.    <u>Stipulated Loss Values</u>.  Mr. Cross indicates that stipulated loss values are

"typically prepared for specific transactions by the pricing or accounting

disciplines with the lessor based on the economics of the specific lease transaction

and typically track the lessor's lease balance." As evidence of his assertion as to

what is typical, Mr. Cross refers to his "Representative Leases" for support. His "Representative Leases" show Stipulated Loss or Casualty Value schedules in only two cases. Further, Mr. Cross asserts that the Stipulated Loss Values in the CSI-Lycos lease schedules bore little relationship to CSI's "lease balance." Cross indicates the Stipulated Loss Values were frozen at an artificially high level, "even if the Lessee continued to make full monthly rents under the evergreen extension provisions." I disagree with these characterizations. Cross refers to a "lease balance" as if these were loans, which they are not. He refers to these as "evergreen leases" which they are not. In the case of each schedule, Lycos was required to initial the page containing the stipulated loss schedule—it was right above the initial line on each schedule. The stipulated loss schedules were not hidden or undisclosed—they were right in front of the contract signer, requiring their initialing in each case.

### CSI's Conduct in Re-Writing and Negotiating Sales Agreement Was Proper

35.    The terms of the Master Lease and equipment schedules are standard in the leasing of technology equipment.

36.    In my review of the documents and testimony in this case, Lycos appears to have chosen to re-write its leases in order to reduce the periodic payment Lycos would be required to pay. In the case of each lease schedule, Lycos was offered re-write terms by CSI which were acceptable to, and accepted by, Lycos. If either side wanted to change the terms of the offer, they were free to negotiate the desired changes. Lycos had other leasing companies with which it leased equipment, and, to the extent it felt its needs could be better met by another leasing company, Lycos could have easily diverted business to one of its other lessors.

37.    It is not improper to offer a lease re-write to a customer in order to lower the

14

customer's periodic payment – especially where such a goal is desired by the customer/lessee. The customer is always free to accept the offer of a re-write, attempt to negotiate changes, or reject it. The customer (Lycos) controls the destiny of the proposed re-write.

38.    With the intense competition among lessors, it would have been a simple matter for Lycos to "shop" their lease schedules with a number of lessors, had they chosen to. If Lycos did not like the terms of a proposed re-write, or wanted to see what other bids it could obtain by soliciting indications of interest, it was free to do so. Lycos did not have to accept any re-write proposal it received from CSI, and it is very likely that Lycos was more focused on equipment availability, monthly reportable expenses and off-balance sheet financing than on what funding option would result in the lowest cost over the life of a lease. If minimum overall cost was a major issue for Lycos, it could have shopped each schedule to all available lessors as the need for additional equipment arose, or pursued other financing options.

39.    In the case of the Sales Agreement, Lycos wanted to buy the equipment it had been leasing – the evidence showing that its then parent company in Spain wanted it to "capitalize" leases it had treated for years as operating leases. The buy-out offer made by CSI was approximately $4.7 million. Lycos made a counter offer of $3.7 million, which was accepted by CSI. Lycos expressed a desire to enter into a buyout of the equipment under lease, and CSI proposed the terms under which the buyout would be acceptable to CSI. With give and take, a final buyout price of approximately $3.7 million was agreed upon. This is a typical buyout negotiation in technology leasing.

## Master Lease Agreement and Schedules are Commercially Reasonable

40.    The Master between Lycos and CSI is typical of technology lease contracts that I have seen over the past fifteen years. The Master between CSI and Lycos contains standard sections and provisions. Lycos representatives negotiated the Master with CSI, as evidenced by

Addendum One to Master Lease Agreement No. 144874. If other terms of the Master were unacceptable to Lycos, they could have attempted to negotiate what they believed to be more favorable terms with a different leasing company. The reduction of the notice period from Lycos to CSI that the equipment would be returned from 120 days to 60 days—was a change favorable to Lycos. The discount rate that would be used by CSI to discount remaining obligations to the present in the event of default was increased from 4 percent to 6 percent. This change was favorable to Lycos as it would reduce Lycos' remaining obligations in the event of a default.

41.     The assertion by Lycos that the CSI contract is onerous as it requires the lessee to make all remaining payments is not valid. Virtually all lease contracts require that lessees honor their commitment to make all payments due under the lease. Virtually all leases, including the CSI Master with Lycos, make it clear that they are "hell or high water" leases, which means the lessee may not cancel the lease for any reason whatsoever. This provision is both critical to lessors and a standard provision. It is critical since many lessors will assign the payment stream under a schedule to a funding source to raise a substantial portion of the money necessary to pay for the equipment being leased. If a lease could be canceled, it would be fatal to the lessor's ability to assign the payment stream and secure financing to pay for the equipment under lease. This unconditional obligation to pay is set forth in Section 5 of the CSI/Lycos Master: "Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense......" This is not an onerous provision, and is typical of equipment leases.

42.     The schedules between Lycos and CSI are typical of technology lease schedules that I have seen over the past fifteen years. A schedule is generally subject to the terms of the Master. The language in a CSI/Lycos schedule is "Lessor and Lessee.....agree that...all of the

terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof." This is typical language. The standard schedule details specific pieces of equipment that are being leased, and for the lease rate specified for the number of periods specified. The Stipulated Loss table is also incorporated into each schedule, as it indicates the liquidated damages the lessee agrees to pay in the event of a casualty loss. These provisions are standard in the industry.

**Lycos Did Not Receive Misleading Information**

43.     Lycos' experts allege that CSI provided Lycos with misleading information, and point to an email sent by CSI's sales rep, Mr. Stenberg, to Lycos' Mr. Lucy. The term "misleading information," however, is a mischaracterization of information provided by CSI to Lycos as a basis for decision making for two reasons. First, the email was sent to Mr. Lucy months after the transactions in question were signed and agreed to. Second, Mr. Stenberg indicated "this is what I have so far" which means it is a work in process—not a finished product. It is not possible to rely on an email as the basis for making a decision if the decision was made months prior.

**Reducing Operating Costs Benefited Lycos' Management with Higher Stock Prices**

44.     When I correlated Lycos' stock price with either Lycos' operating expenses other than research and development, or with Lycos' general and administrative expenses, they both had higher correlations with Lycos' stock price than its revenue. This means expenses do matter, and they have a stronger relationship with stock price than revenue. As monthly or other periodic operating expenses decrease, there is a higher correlation with an increase in the company's stock price – which benefits those holding equity in the company – than with an increase in revenues.

45.     In his analysis concluding that Lycos' revenue (and not expenses) drove the

company's stock price, Lycos' expert Mr. Truesdell sets up a standard of materiality as to whether the lease re-writes would influence an investor. He concludes that the 1999 re-writes exceeded his own threshold for materiality, but then dismisses it because he thinks Lycos' stock price was "influenced" more by Lycos' revenue that net losses.

### Lycos Was Not Trapped By the Terms of the Master Lease or Schedules

46.     Lycos asserts that its leases with CSI amounted to "evergreen leases" – i.e., leases that renewed automatically without any ability for Lycos to get out of them – and that Lycos was therefore required to pay on these leases indefinitely. I disagree. Lycos agreed to maintain the equipment it was borrowing from CSI and return it at the end of the lease. They chose not to keep track of the equipment for return or to make provisions for the return of the equipment, and this was no fault of CSI's.

47.     The Master Lease provides that a lease schedule will be renewed for four-month increments until Lycos gives notice it would return the equipment. Period-to-period renewals of this type are common and are not an unending "trap," as Lycos argues.   If Lycos could not produce CSI's equipment that was lost, stolen or destroyed while it was in Lycos' possession, Lycos was required to pay the "stipulated loss value" – that is, a pre-negotiated price which Lycos would have to pay for its inability to return CSI's equipment – and Lycos would then have no further obligation to pay rent on that equipment. That does not constitute an "evergreen clause."

### No Pattern of Misconduct By CSI

48.     CSI was chosen as one of Lycos' leasing companies—there were several others. If at anytime Lycos felt they could better meet their leasing needs with a different lessor, they were free to pursue that strategy.   As competition in the equipment leasing business is intense, it is unreasonable to presume that Lycos did not have other financing alternatives.

49.    CSI leased computer equipment to Lycos on dozens of schedules. Each schedule's terms and conditions were agreed to by both parties in writing. Neither party was obligated to sign the agreements. If Lycos believed it could obtain better terms and conditions elsewhere, it could – and any time – cease doing new business with CSI and pursue other financing alternatives.

50.    A number of lease schedule re-writes were offered to Lycos to assist Lycos in achieving one of its objectives—lowering its monthly payment obligations. Each re-written schedule was agreed to by both parties in writing. Neither party was obligated to sign the agreements. Lycos was free to reject any re-write proposals, attempt to negotiate changes in the re-written schedule terms and conditions, accept the re-write proposals, or close the door on new business with CSI and pursue other financing options.

51.    Lycos asked for a buyout of the equipment under lease and negotiated a purchase price approximately $1 million less than CSI had originally offered. The terms and conditions of the buyout were agreed to by both parties in writing. Neither party was obligated to sign the agreement. It is further noted that CSI was under no obligation to offer Lycos a buyout, as there is no provision in the Master giving Lycos that option.

52.    In the case of each lease schedule or schedule re-write, terms were proposed by CSI for that schedule. In each case, Lycos was provided with the lease rate, which was the only information necessary for CSI to provide. Equipment cost was known by Lycos as they negotiated the purchase orders. The residual values booked by CSI were irrelevant to Lycos decision process, and no lessor is required to disclose such information to its lessees. The lessee is free to decide whether they want to lease or buy equipment, and which of a number of lessor bids to select, if any.

**In Preferring Operating Lease Treatment, Lycos Failed to Manage its Leased Equipment**

53.     Though Lycos' lease schedules with CSI were signed by senior company officers – either Lycos' Vice President of Finance or its Chief Financial Officer – Lycos chose not to devote much time or resources to negotiating their leases.  In fact, the evidence shows that Lycos' legal counsel did not participate in the lease negotiations, which is not standard practice.  The evidence further indicates that Lycos received no advice from its inside accountants or outside auditors regarding the re-written leases.

54.     Schedules 93 and 94 – the largest of the so-called "re-writes" – were signed by the then Chief Financial Officer of Lycos.  It is unclear if he looked at any information, reports or data prior to signing Schedules 93 and 94, as his deposition testimony indicated he did not remember much of anything about this major leasing schedule re-write.  It should be noted, however, that it is common, if not incumbent upon a Chief Financial Officer to know what he is obligating his company's shareholders to, and to find out if he does not have sufficient information to make an informed decision on behalf of Lycos shareholders.

55.     Had Lycos' CFO looked at nothing prior to signing schedules 93 and 94, then it would not be possible to know whether these re-writes were in the interests of Lycos' shareholders.  If he did examine information he deemed sufficient to make an informed decision, then his signing the contracts affirmed his opinion that they were satisfactory.

56.     In December 2000, another leasing company, Avnet Enterprise Solutions, Inc. ("Avnet"), produced to Lycos a detailed study of its leases, making a number of recommendations to Lycos as to how they could improve their leasing practices, including that it needed to better track and account for its leased assets.  I have seen no evidence that Lycos acted on the recommendations contained in the Avnet study.  This would suggest again that controlling its leased assets was a low priority to Lycos, if one at all.  Most significant lessees with which I

am familiar develop policies and procedures to track their leased equipment to ensure they are complying with the lease agreements they agreed to be bound by.

57.    Lycos did attempt to improve upon and utilize a firm-wide computer tracking system – which it names "Asset Portal" – as a tool to finally get control of their leases and leased equipment.  According to testimony, Lycos could not get their own employees to use it.  This would clearly indicate a lack of interest or priority given to abiding by the terms and conditions of their leased equipment.

58.    Further evidence of Lycos' lack of attention or concern to tracking its leased assets was found in the testimony of Lycos' Chief Information Officer ("CIO"), who testified that the location of equipment under lease was not always known and that equipment was moved around between locations.  This again shows little regard for complying with the terms of the Master Lease to which Lycos agreed to be bound.  Lycos' CIO indicated that whether assets were leased or purchased was not something he thought about much – it was a very low or nonexistent priority.

59.    The documents I have reviewed, and discussions between Lycos managers that I have read about, indicate that they blamed *themselves* for not having better control over their leased assets.  One of the executives lamented that he just settled out with Compaq on the lease of equipment for $500,000 related to equipment Lycos could not produce, and he indicated Lycos needed to get better control of its CSI leased equipment.

### Lycos Knew All Relevant Facts When It Agreed to Schedules 93 and 94

60.    Lycos claims that had it known how much additional rent they would be paying under Schedules 93 and 94 – which were roll-ups of many individual schedules – it might have to "unwind" those schedules.  But Lycos internally produced a report in November of 2001 indicating they in fact did know by how much the rent would increase and proceeded to roll up

the schedules anyway.

61.     Although schedules 93 and 94 had been signed in October of 2001, a condition of the schedules was Lycos producing a standby letter of credit by December.  Had Lycos failed to produce the standby letter of credit, Schedules 93 and 94 would not have been valid, and the roll-ups would have been undone by Lycos' inaction.  With knowledge of this through their internal study, Lycos management decided to comply and produce the letter of credit.

62.     The Lycos internal study (Plaintiff's Exh. 86), dated November, 2001, which suggests that the so-called "roll-up" of Schedules 93 and 94 would result in a total lease payment of $11 million – is significantly flawed.  The most glaring flaw is in ignoring what it would cost Lycos to replace the equipment it rolled into schedules 93 and 94, rather than rolling it into two extended schedules.  The report purported to show that the roll-ups would result in total lease payments increasing from approximately $18 million to approximately $29 million, or an increase of $11 million.

63.     Lycos is asserting that had it known the cost of the Schedule 93 and 94 "re-writes" relative to the cost of allowing the existing schedules to run their course, it would not have agreed to enter Schedules 93 and 94.  If there was some significant information they believed they needed to decide whether to roll up the schedules into 93 and 94, there is no evidence they asked for it prior to entering those re-written schedules.

64.     If Lycos believed the lease rates under Schedules 93 and 94 were too high, it could have engaged an appraiser to tell the company what the equipment under lease was worth. It could also have contacted another leasing company and asked for a bid on equipment to replace the equipment they were rolling into schedules 93 and 94.  This was not an emergency situation-- – if Lycos was in doubt as to their best financing alternative at the time that Schedules

93 and 94 were proposed by CSI, it could have waited until it believed it had the information it required.

### Lycos Never Relied on Mr. Stenberg or His March 18, 2002 E-Mail

65.    I disagree with Lycos that the email of March 18, 2002, between CSI's Paul Stenberg and Lycos' Brian Lucy is misleading. Lycos' expert Smith interprets the Paul Stenberg email of March 18, 2002 as an "inaccurate and misleading comparison" when Stenberg shows the difference in lease payments before and after the schedules are re-written in Schedules 93 and 94. The email refers to Schedules 93 and 94, which had been signed by both parties the previous year – and therefore the email could not contain information on which Lycos relied to make a decision months earlier.

66.    Further, Mr. Stenberg says in the email that "this is what I have so far . . . ." He did not indicate this was a definitive document, but a work in progress and should be read as such. In addition, the material I have reviewed does not indicate Mr. Lucy followed up after receipt of this email. Thus, the email was a work in process and was a work in process statement made months after Lycos had already decided to sign the schedule.

67.    More generally concerning Mr. Stenberg, Lycos' expert Mr. Cross asserts that Lycos was inexperienced and relied heavily on Mr. Stenberg, as the sales representative from CSI. As "evidence" that Lycos was inexperienced, Mr. Cross points to certain contract provisions that a lessee "with even a modicum of leasing knowledge would have expressly negotiated." I disagree. I am familiar with a number of technology equipment lessees that find their lease terms to be of less importance than other issues they face.

68.    In general, businesses set their priorities as they see fit. If Lycos had thought it was not sufficiently experienced in equipment leasing, it could have retained the services of an expert to negotiate on its behalf, and in fact did so in 2003. Lycos always had accountants and

attorneys (both inside and outside the company) to assist it with these issues, if it felt that were necessary. Moreover, Lycos was experienced in leasing, as it was leasing from multiple lessors and receiving advice from Avnet. Again, the records I reviewed indicate Lycos' priorities lay elsewhere—in keeping equipment off their balance sheet and reducing their monthly payments. The assertions Mr. Cross makes suggest that he somehow knows more about Lycos' objectives than they did, which is not the case.

## Damages Determined by Lycos Expert Are Inappropriate

69.    In his reports, Lycos expert Smith estimates the damages to Lycos of approximately $13.7 million, which is the so-called "mark-ups" on the refinanced schedules. Smith, in his deposition, indicates that the amount Lycos would have spent on their leases had they not re-written them, would be equal to the present value of the remaining rents plus CSI's booked residual values. Smith refers to the booked residual values as his estimate of economic cost (Smith deposition, page 335). On page 352 of his deposition, he reverses himself by saying he made a judgment as to the fair value of the equipment that would replace the existing equipment under lease, even though he used the conservative CSI booked residual values as an important component of determining his so-called "mark-up." I indicated earlier that lessors book conservative residual values, and that the in-place value of equipment to a lessee can be substantially higher that the lessor's conservatively booked residual value.

70.    A valuation expert for CSI, Robert Zises, has estimated that the cost of replacing the equipment Lycos had under lease at approximately $25 million. This compares to the often zero residual values employed by Smith because they were "unambiguous." This is a serious flaw in Smith's analysis. He is relying upon accounting rules to determine so-called damages. Under accounting rules, assets may be written down but not up—the "lower of cost or market" guideline. He made no attempt to determine the cost of financing comparable equipment over a

comparable term in estimating his so-called damages and as a result there is no fair assessment available in his reports.

71.    To illustrate, assume a lease matures at the end of this month, and the lessor is showing a zero residual value on the lessor's books. Further assume the lessee wishes to extend the maturing lease for a year at a mutually agreed upon payment of $1,000. Under Smith's definition of "markup", the old "lease balance" is zero, and the entire mutually agreed upon extension payments would be defined as "markup" and thus damage to the lessee. That does not make sense. In this simple yet illuminating example, the question of what the lessee would do for needed equipment if it did not renew needs to be addressed. In this example, that "what would the lessee otherwise do" question has not been answered. The lessor's booked residual value has no necessary connection to the in-place value of the leased equipment to the lessee in the instant case. The concept of "mark-up" that Smith uses, by his own admission, does not reflect what the value of equipment would be to replace the CSI leased equipment. It is my opinion, therefore, that the theory of damages advanced by Smith is seriously lacking and without merit.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF NOVEMBER, 2007.

James M. Johnson, Ph.D.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| LYCOS, INC., ) | C.A. No. 05-10017- RWZ |
| Defendant, ) | |
| and ) | |
| ) | |
| BANK OF AMERICA f/k/a FLEET BANK, ) | |
| ) | |
| Trustee Process Defendant. ) | |

## AFFIDAVIT OF MICHAEL FLEMING

I, Michael Fleming, being duly sworn, do hereby depose as follows:

1.    I have been retained as an expert on behalf of Computer Sales International, Inc. ("CSI") in this case to provide opinions concerning leasing, which are set forth below and in the expert reports which have been provided in this case to Lycos, Inc. ("Lycos"), as well as the bases for those opinions. I am being compensated for time spent and expenses reasonably incurred. I have no financial interest in the outcome of this litigation.

2.    I make this affidavit based on my personal knowledge and expert opinions, unless otherwise indicated, and in support of CSI's opposition to Lycos' motions for summary judgment. In addition, certain points below will contradict the summary judgment Affidavit of Bruce D. Smith submitted by Lycos.

### Background

3.    I hold a bachelor and masters degrees in history and economics from Drake University in Des Moines, Iowa. I have also attended executive education programs on subjects

official industry testimony before federal congressional committees and administration agencies. In addition, I met with state officials, legislators and attorneys general, to provide background of equipment leasing in general and specific legal issues in particular.

8.     The equipment leasing business, like many other businesses, operates in an open competitive market. Companies and transactions are subject to normal contract law including the Uniform Commercial Code and the bankruptcy code. The structure of leases is not proscribed in law but rather responds to the demands of the marketplace. Industry leaders, therefore, have actively supported a strategy of internal promotion and enforcement of good practice. In a business in which there are an estimated 20,000 transactions every business day, it can be safely concluded from the facts that the equipment leasing industry is an industry of good practice.

9.     Most recently, I have provided background reviews to national business magazines and papers on pending changes to financial accounting for leases. I serve as an advisor to organizations and emerging economy national governments on the development of national laws and regulations for equipment leasing and finance. I provide commentary to the International Institute for the Unification of Private Law – UNIDROIT – on the impact of proposed provisions of a model law for leasing. I have authored several publications within the past several years, and a list of these has been provided to Lycos.

**Review of Documents and Testimony**

10.     Based on my expertise, including my years working in the equipment leasing industry at the ELA, my review of documents produced by the parties in this case, and my review of deposition transcripts of witnesses for both parties, I have concluded that CSI has done nothing improper or contrary to industry standards in its dealings with Lycos concerning Lycos' leasing of tens of millions of dollars of computer technology equipment during the period 1999

3

through 2004.  As explained below, Lycos decided for its own reasons, and to what it apparently considered its benefit, to extend its equipment leases with CSI.  Lycos received all disclosures which are common in the industry, and Lycos' has simply created its theory or "mark-ups," which is nothing more than CSI's gross profits, including capital costs, operating costs and taxes, on these consensual transactions.

### Lycos' Created Theory of "Mark-Ups"

11.    Lycos's experts, especially Messrs. Cross and Smith, have come up with the concept of "mark ups" – a term not found in the leasing industry – and, once they have presumed that these exist, those experts opine that they are improper.  In fact, these "mark-ups" are nothing more than a portion of the lessor's gross profits on its entirely proper transactions.  Again, the Lycos-CSI transactions at issue are leases, not loans.  Lycos did not buy or invest anything in the ownership of the equipment while it was leasing that equipment.

12.    Though Lycos uses the term "mark up" repeatedly in its expert reports and court filings, the term cannot be found even in the definitive professional book on financial reporting and analysis by Revsine, Collins and Johnson.  "Mark up" is an imprecise term most often used in retailing to refer to amounts added on to a base cost to cover operations, transaction and distribution costs and provide a profit.  Profit is a key component of America's business process.  Further, competition controls profit in the equipment leasing business.

13.    Lycos' expert Charles Cross's analogy of the CSI-Lycos lease transactions to loans allows him to introduce the concept of a "refinancing fee" and compare it to what he refers to as a "markup."  This analogy is totally erroneous.  Every transaction between willing parties has a cost because the elements of risk and reward change and there are costs.  Lycos could easily calculate the costs of restructuring leases from the information it had.

14.    The statements of Lycos' experts to the effect that it is typical for a lessor to

4

disclose fees in a restructured transaction is grossly misleading and over-simplified. Disclosed

fees are those which a lessee is or could be explicitly responsible for including but are not

limited to such as:

- Application fees
- Credit evaluation
- Appraisals (if any)
- Documentation fees
- Late fees
- Taxes
- Insurance
- Requests for special listed services

Fees do not include such things as the lessor's operating costs, compensation, profit levels and

other matters for which the lessee does not have direct responsibility. In fact, CSI disclosed

everything for which Lycos would have direct responsibility.

    15.    Lycos' expert Cross states that "[w]hile an explicit fee is, by definition, disclosed

and known to the parties, a mark-up must be calculated and the ability to calculate depends on

information available to each party and the ability of the party to manage and use such

information." Mr. Cross acknowledges the difference between the explicit fee and transaction

information that is disclosed and the need for parties to make calculations based on the

information. However, after he so acknowledges, he reverts to language of ". . . charged

undisclosed mark-ups". This is very inconsistent.

    16.    Lycos had all of the information it needed to make its calculations at the time of

each transaction if it chose to do so. In fact, several expert witnesses have done all of the

calculations from what was clearly available. Furthermore, a background in equipment leasing is

not necessary to do the calculations to compare costs. Any business person could do the

calculations necessary to determine the present value of the balance of lease payments under the

original leases and total obligations of restructured and extended leases or verify the calculations

of others.  This information was transparent to Lycos.  Lycos employees may have been

negligent but they were not incapable.

## Transactions Are Not Loans or "Refinancings"

17.     The transactions at issue between Lycos and CSI are leases, not "refinancings,"

as Lycos erroneously claims.  The 2% figure that is cited by Lycos' expert Cross as a "mark-up"

has relationship only to a fee that is typically paid as a broker's commission when buying a

transaction from a third party.  From my experience, I am not aware of studies that collect

numbers from companies that represent overhead, capital cost or profit targets on transactions.

These transactions are not brokered transactions – they are extensions or restructures of leases.

The spread or margin (what Cross calls an improper "mark-up") is apparent from the documents

available to Lycos.  To calculate the spread on the transactions, a person would have to be able to

calculate the difference between the remaining obligation to be paid under the original lease and

the total amount to be paid under the restructured lease.  These numbers would be present value

discounted using a lessee's internal borrowing rate and is not difficult to do.  Several of Lycos'

own experts completed the calculations and included them in their reports.

18.     The Financial Accounting Standards Board, in its standard on lease accounting,

provides that the lessee use its incremental borrowing rate to determine whether the present value

of the lease payments is higher or lower than the 90% of original equipment cost in determining

whether a lease is a capital lease or an operating lease.  The record indicates that Lycos and its

auditors did perform this test frequently.

19.     Though Lycos's experts attempt to portray all of the CSI-Lycos leases as

"refinancings" or loans, these transactions are neither financings originally nor refinancings at

the time of restructuring.  Any arguments based on concepts of loans are invalid on their face.

20.     The CSI-Lycos transactions are leases and were treated by each party as leases for

6

federal tax purposes and accounting purposes. As the lessee, Lycos deducted the lease payments as business expenses and did not carry the equipment on its books as an asset. A lessor such as CSI is the owner for tax purposes and is thereby entitled to depreciate the equipment.

21.    Lycos' experts' attempt to compare these lease transactions to buying or investing in equipment. There is nothing about the transactions to suggest that Lycos was "buying" anything other than the temporary use of equipment. No option to purchase the equipment even existed at the end of the leases. One of Lycos' experts makes an analogy of the residual value in the lease transactions at issue in this case to "balloon payments" under a loan. This analogy simply does not work and is an oversimplification. There is no *option* with a balloon payment in a loan – the borrower has to pay it. In a lease, by contrast, if the lessee has a fair market purchase option, it may or may not exercise the option and the lessor always has to assume that risk.

### CSI Acted Consistent With Proper and Accepted Commercial Leasing Practices

22.    In my opinion, based on the information I have reviewed and my experience, CSI acted in a manner consistent with proper and generally accepted commercial leasing practices in connection with extension or "rewriting" of Lycos' leases with CSI during the period 1997 to 2002, and in connection with the negotiation and execution of the Sales Agreement pursuant to which Lycos purchased that equipment in August of 2003. Further, CSI acted in manner consistent with accepted standards and practices of the equipment leasing business.

23.    The equipment leasing business, and specifically computer leasing, is characterized as maintaining flexibility in relations between the lessor and lessee. This is due to several reasons. First, computer leasing is usually an operating lease business in which the lessee's focus is on access to a technology solution provided in whole or in part by the lessor. The lessee client's needs change on a short cycle, technology changes and the lessor must be

7

flexible to accommodate these changes in a relationship and solutions oriented manner. Both parties understand that the greater flexibility and subsequent change does carry a price, but it is considered part of the value. The cost of this value is related to risk and risk's companion – i.e., uncertainty. The latter is a different situation from a purchase of equipment and /or a loan for the purchase of equipment. In plain ownership or a loan, the risks are different and there is greater certainty – but there is little flexibility for changing conditions.

24.    Indeed, throughout the relationship between Lycos and CSI from 1996 through 2003, I see constant changes to accommodate the desires, circumstances and needs of Lycos. There is no evidence of inflexibility or unwillingness by CSI to accommodate Lycos. This attitude even extends to agreeing to the negotiated end of transactions buyout in August of 2003. There is a willingness to restructure, to accept returned equipment and to settle for a final buyout of responsibilities.   I see no evidence of CSI attempting to compel action fro Lycos in a manner to take advantage of it.

25.    CSI's behavior consistently reflects the accepted marketing strategy and practices of the computer leasing business. In my opinion, CSI acted in a manner consistent with proper and generally accepted commercial leasing practices. It neither defrauded nor overcharged Lycos. The restructured transactions were very straight-forward. Essentially, the only provisions of any given equipment schedule that were changed in a rewrite/restructuring of the leases were the lease rate (lower) and the number of months (more). All other terms and conditions remained the same. Consequently, everything was disclosed to Lycos in the restructuring. Restructuring the lease transactions was one of several alternatives always open to Lycos as it managed its equipment needs. CSI could not coerce Lycos into any action. Lycos selected the restructuring option.

8

26.     Lycos was a strong public company, at least through 2000, with a great deal of cash, and after 2000 it had large sophisticated international parents. It had access to alternative actions, cash, knowledge, and strong ownership structure. It had personnel experienced in dealing with other leasing companies and transaction experience. These are not conditions that would permit coercion into an unwise or fraudulent situations.

27.     I have seen no evidence in the Lycos claims of an actual practice that is fraudulent or even outside of accepted industry practice. Though Lycos claims there is a responsibility for a lessor to disclose its own internal interest rate, there is no interest rate in an operating lease and there is no accepted practice of lessors disclosing their internal costs of doing business, including the cost of capital.

28.     Lycos also claims that the residual value booked by CSI for each equipment schedule should have been disclosed to Lycos. The booked residual value was not relevant to Lycos' decision-making process, however, and is almost never disclosed unless there is some unique provision related to a purchase option at the end of the lease, which was not the case in the CSI-Lycos leases.

29.     Lycos also raises a vague claim that CSI continued to include a value for the equipment under lease in calculating Lycos' obligations well after CSI had received rents alleged to more than equal the cost of the equipment. This is always the case, however – because equipment always has a value – in the leasing/renting business. If the equipment truly "had no value," as Lycos claims, Lycos would not have continued to use it in its operations as it did.

**CSI Did Not Engage in a Pattern and Practice of Misconduct or Overcharge Lycos**

30.     I have seen no evidence that CSI engaged in a pattern and practice of misconduct of any kind. Misconduct would include coercion, misappropriation, unwillingness to cooperate, unreasonable failure to communicate and unwillingness to try to resolve disagreements in good

9

faith.  In fact, Lycos itself was guilty of failing to adequately track and manage equipment leased

from CSI (even to the point of losing or selling leased equipment) and of failing to tell CSI of

this, or of its plan to try to re-negotiate the leases it was affirming in the August 2003 Sales

Agreement.

31.    Nor was Lycos overcharged by CSI.  I can find no overpayment using any

measure.  Lycos' theory that it was overcharged omits a key fact:  in all cases of equipment

schedule restructuring, Lycos received a significant additional benefit in terms of, in most cases,

a 50% increase in the length of use time of the leased equipment.  For this, it is reasonable that

Lycos would have paid more in rents overall for the use of the equipment for an extended period,

though Lycos' costs per month for use of the equipment decreased with each restructure.

32.    Lycos' business strategy and decisions indicate that keeping the total long-term

cost of using the equipment low was not the most important element in its plan.  Lycos preferred

to manage earnings and its balance sheet in short term ways, and it wanted low current cash

outflow.  Indeed in Exhibit 627, Ernesto Galvan (an auditor for Lycos) states, "[i]t is Lycos'

policy not to buy any equipment that can be leased."  Further, Galvan confirmed that all leased

equipment was not carried on Lycos' balance sheet as assets and that lease payments were shown

in the P&L as lease expenses. While perfectly acceptable objectives, Lycos is responsible for

those decisions.

33.    CSI worked with Lycos to accommodate the latter's needs.  CSI was certainly

within its rights under the transactions to commence legal action against Lycos for non-

performance when events came to that.

34.    Lycos further claims that it never knew the original cost of the equipment it was

leasing, but Lycos selected the equipment and had the purchase orders.  Lycos could easily do a

comparative analysis of what it would cost to buy the equipment it had selected with internal funds versus borrowing to buy the equipment versus leasing it. CSI provided the stream of payments (the payment amount and number of payments) for a lease in its proposal. The lessor's stream of payments covers its costs of doing business including capital, personnel, operations, risk and profit. Lycos could do a present value calculation ("PV") of the total lease payments easily and compare that PV to a PV of alternative equipment acquisition mechanisms for a net PV comparison of costs.

35.    Lycos also claims that it was misled or forced into extending its leases, but there is no evidence of that. Lycos always had options negotiate extensions or restructurings of the leases. However, had Lycos returned leased equipment at the end of every equipment schedule rather than restructuring those schedules, Lycos' would have incurred new costs to replace that equipment, whether by purchase of new replacement equipment or through leasing of replacement equipment. There could also have been significant costs to Lycos in terms of disruption of certain operations while equipment was replaced. As with any "rental type" product, if the transaction continues without the lessee/renter returning the equipment, the total payments grow and could easily exceed the original equipment cost. In addition, the equipment becomes older even though it still works. That is why a lessee/renter should have some idea of how long it wants to use the equipment, keep track of the equipment, and have a plan for what it will do with the equipment at the end of the lease.

36.    Through restructuring, Lycos had the use of CSI's equipment for a longer period of time *at a lower monthly and annual cost.* Lower costs per month and year is what Lycos said it wanted. Below are several illustrations of schedules to illustrate this point.

| Schedule | # of months | Monthly payment | Total of Payments for original term (not discounted) | Annual cost of leased equipment |
|---|---|---|---|---|
| 64 A | 24 | $12,219 | $293,256 | $146,628 |

37.     Schedule 64A was extended 34 months after 2 months in the original lease and became 64D.

| Schedule | # of months | Monthly payment | Total of Payments for extended term (not discounted) | Annual cost of leased equipment |
|----------|-------------|-----------------|-----------------------------------------------------|---------------------------------|
| 64 D | 36 | 34 @ $11,428<br>2 @ $12,219 | $412,990 | $137, 663 |

38.     Under the extension of 64 A into 64 D, Lycos received:  (a) the use of CSI's equipment for 50% longer;  (b) a monthly rate of $11,428 ($791 less); and  (c) an annual reduction in equipment rental costs of $8,965.  This is exactly what Lycos said it wanted.

| Schedule | # of months | Monthly payment | Total of Payments for original term (not discounted) | Annual cost of leased equipment |
|----------|-------------|-----------------|-----------------------------------------------------|---------------------------------|
| 64 C | 24 | $6,188 | $148,512 | $74,256 |

39.     Schedule 64C was extended 34 months after 2 months in the original lease and became 64F.

| Schedule | # of months | Monthly payment | Total of Payments for extended term (not discounted) | Annual cost of leased equipment |
|----------|-------------|-----------------|-----------------------------------------------------|---------------------------------|
| 64 F | 36 | 34 @ $5,545<br>2 @ $6,188 | $200,906 | $66,968 |

40.     Under the extension of 64 C into 64F, Lycos received:  (a) the use of CSI's equipment for 50% longer;  (b) a monthly rate of $5,545 ($643 less); and  (c) an annual reduction in equipment rental costs of $7,288.  This is exactly what Lycos said it wanted.

41.     An alternative way of looking at the rolled up leases is provided below.  For illustration, 64A extended to 64D will be used.

| 64 A | Year one cost of leasing equipment - $ 146,628 | Year two cost of leasing equipment - $146, 628 | Year three - equipment needs to be replaced through a new lease or purchase at a new annual cost.  $$$$ |
|------|------------------------------------------------|------------------------------------------------|--------------------------------------------------------------------------------------------------------|
| 64 D | Year one cost of leasing equipment - $137,663 | Year two cost of leasing equipment - $137,663 | Year three cost of leasing equipment - $137,663 |

42.     Following on this, to the extent Lycos is now claiming that it was "overcharged" on restructured equipment schedules or that restructured schedules were improperly "marked up"

(a term not used in the equipment leasing industry), this claim has no merit. To negotiate a mutually agreed to monthly rental payment is not "marking up". The lease payments in the extended lease would reflect only the normal factors on which a lease payment is calculated. These would have included equipment cost, risks associated with a longer lease term such as credit risk and asset depreciation risk, the cost of capital, transaction costs and profit. "Mark up" is not a term used in the leasing business. The references to "mark up" imply a randomly selected figure was stuck into the calculation. This is not the way pricing is done.

43.    Lycos appears to have had a clear business model, including capital utilization strategy, to enable it to go from a startup to public company in an unusually short period of time. In time, Lycos became part of a sophisticated international company. Lycos personnel were sophisticated in business and finance concepts based on education and experience. Based on this education and experience, decision makers and persons with responsibility and authority for managing assets at Lycos would easily understand all of the provisions and ramifications of leases with CSI.

### CSI Made All Disclosures Required and Necessary for Lycos

44.    CSI made all the disclosures to Lycos that were required and necessary for Lycos to determine whether it was in Lycos' economic interest (a) to enter into initial schedules for the lease of new equipment from CSI, (b) to restructure schedules to extend the terms of its leases of certain equipment from CSI, and (c) to ultimately purchase equipment that it had previously leased from CSI in August of 2003. Lycos was told the lower monthly lease payment and the total number of payments it would be required to make under the new proposed lease. This information, coupled with the information provided in the original transactions, would allow full analytic comparison of the proposed restructuring with the original transaction. It clearly is not CSI's strategy, as evidenced by the  history of the relationship, to take advantage of

13

Lycos.

45.     Further, CSI and Lycos negotiated a reasonable buyout of Lycos' lease obligations. Plaintiff's deposition exhibits 5, 6 and 23 are important in this regard. Each shows a thorough analysis and understanding by the parties and a willingness to manage a workable termination plan for the obligations.

46.     The failure of Lycos to adequately track its equipment and equipment leases is reflected in the testimony of Sam Ziba, David Mammen and Frank Flynn in their various capacities. Ziba's confirms that he tracked purchase orders and that Lycos knew the value of the equipment they were ordering, but he did not see his responsibility as keeping track of equipment, leased or owned.

47.     David Mammen, the consultant from Avnet Enterprise Solutions ("Avnet"), another leasing company that also provides leased asset tracking services, equipment inventory work and consulting in addition to leasing. Mammen's deposition reflects over and over again that Lycos was doing a poor job of tracking its leased assets. Avnet was contracted to do an inventory of leased assets and make recommendations regarding a leased asset tracking system. The Avnet inventory, conclusions and recommendations were provided to Lycos in a report dated December 15, 2000. Mammon states that he frequently raised the issues related to inadequate leased asset tracking to Lycos. He specifically told Lycos that it could end up paying more through extended leases if Lycos was unable to return equipment. He indicated that Lycos was told that they could end up paying for continued use of older equipment.

48.     Lycos was made aware of all of the problems associated with an inadequate tracking system, but did not commit to correcting the problem. Mammen made a proposal on behalf of Avnet to manage leased assets but received no response. He indicated that equipment

appeared to have been lost, shipped out of the country or otherwise disposed of. Mammen recommended that if equipment had a remaining useful life at the end of a lease, purchase it. Otherwise, he recommended returning all equipment if Lycos could do so.

49.     Lycos employee Frank Flynn recognized the need for a leased asset tracking system and set out to develop the system – Asset Portal. I have seen a demonstration of the system, Asset Portal, and it is my judgment that it would have done a good job of integrated asset tracking for Lycos if fully implemented. It is very comprehensive. Because it is a network system, it could integrate all of the actions or processes related to acquiring (purchase or lease) equipment, track its location and any maintenance and identify any action dates such as end of lease dates and options.

50.     All persons/departments at Lycos such as purchasing, accounting and operations could (should) utilize the network routinely to manage assets. From the evidence I was able to see, use of the system was temporary and uneven. It is my understanding based on Mr. Flynn's testimony and other internal Lycos correspondence that, when Mr. Flynn left employment at Lycos, use of the system ended and no subsequent effort to track assets (equipment) enterprise wide occurred.

51.     In summary, the issues involved with the development and use of Asset Portal are:

- Avnet had detailed to Lycos the need for an asset management system in 2000.
- Lycos recognized the need for a system for a variety of purposes.
- Flynn developed and implemented a system in 2001.
- The system was used irregularly for several years but then access and usage fell off in late 2004.

52.     It is my opinion that Lycos' failure to adequately manage a database of its assets reflected a careless approach to asset management in general and narrowed its options at the end

15

of lease transactions.

## CSI Complied with ELA Standards

53.    CSI properly and fully complied with all standards of the ELA, including the

provision of the ELA Code of Fair Business Practices ("CFBP" or "Code") Standard 7, which

states that "[i]n dealing with a Lessee, Lessor . . . should (1) disclose all relevant information as

to the terms and conditions of the lease which may affect the Lessee's decision," in connection

with extension or "restructuring" of Lycos' leases with CSI during the period 1997 to 2002, and

in connection with the negotiation and execution of the Sales Agreement pursuant to which

Lycos purchased that equipment in August of 2003.

54.    In its counterclaim, Lycos is attempting to expand the standard  for disclosure of

information by a party to a lease dramatically beyond anything intended or anticipated or

required by the Code.  The accepted standard for disclosure speaks to the terms and conditions of

the transaction itself.  These terms and conditions include the rights and obligations under the

lease.

- Monthly rental payment
- Term of the lease – when it begins and ends
- Lessee responsibilities during the lease:
- Taxes
- Insurance
- Maintenance
- Loss or damage
- Limitations on use or location
- Any fees
- End of lease provisions:
- Notices
- Return conditions
- Extensions or renewals
- Options to purchase
- Remedies

55.    The intent of the Standard 7 is that there be no surprise responsibilities or

conditions for the lessee in the transaction terms and conditions. It is assumed and expected

16

under the CFBP that the lessee has read and understands the transaction that it signs and will be responsible for its own business decisions and actions. This would be particularly true as it applies to a sophisticated company such as Lycos with experienced business personnel.

56.    The CFBP was adopted initially in a period when understanding of equipment leasing and the provisions of the transactions was still evolving, and  industry leaders intended that the code address practices which were considered unfair or misleading. Some of these practices were similar to those found in other businesses. The standards were to guide relations among lessors, between lessors and their lessee customers and between lessors and sources of funding. There was a recognition that the long term reputation and success of the industry depended on all parties understanding all of the risks, roles and responsibilities under the transaction. Among the early practices that the leasing community opposed were:

- Vague language that made responsibilities unclear.
- Side agreements not transparent to all parties that created expectations that may or may not be enforceable or realized.
- "Bait and switch" tactics related to the lease rate and terms and conditions of the lease.
- Unduly onerous return conditions for equipment.
- Unreasonable automatic lease renewal and extension practices and other end of lease practices.
- Unreasonable purpose and treatment of deposits and fees such as commitment fees and security deposits.
- Unreasonable treatment of payments and overpayments.
- Unreasonable timing of notices of required actions, usually related to exercise end of lease options.

57.    The previous list provides a flavor of the range of practices addressed by the code and confirms a 30 year plus history of industry attention to promoting good practice. Nothing in my review of the CSI documents leads me to believe that any of the unreasonable practices exist. I have not seen any evidence that CSI engaged in any unreasonable practices. In my opinion, the

claims of Lycos have no merit.

58.    Specifically, an equipment lessor is expected to disclose all things that the lessee may have to perform under the lease and the terms and conditions of the transaction. These customarily include:

- The commencement date and the expiration date of the lease.

- The amount of each payment and how and where payment is to be made.

- The number of payments.

- Any potential penalties and the conditions and amounts.

- Requirements during the lease including maintenance, insurance, mobility, conditions of use and taxes.

- All end of lease provisions, conditions and options

59.    Though an issue is made in this case regarding disclosure or notification of an interest rate charged by CSI, these claims, in my opinion, have no merit. These transactions are leases, not loans. Leases do not contain an "interest" component as do loans. As in all business activities, the cost of capital is a cost to a company such as CSI, a manufacturer or a retail store. It is a cost just as wages, raw materials, utilities, office space and travel. The details of these costs are proprietary for competitive reasons. A customer does not expect to be told the seller's costs when a purchase is made any more than it expects to be told the profit from the transaction.

**Lycos's Ability to Compare Original Lease Schedules with Potential Rewrites**

60.    Lycos had the information, capabilities and expertise to make any comparisons between original transactions and restructured transactions that it may have chosen to do. The original lease transactions and restructured transactions (except for 93 and 94) occurred sequentially over time, not all at once. Any complexity for comparisons at the point in time when a transaction was occurring for each transaction would be minimal. The concept portrayed

18

by Lycos' expert Smith of doing 6000 pieces of equipment on 126 schedules "at once" is not an

accurate picture of the comparison Lycos could have done over time as it contemplated rewriting

existing lease schedules.

     61.     For each lease schedule, Lycos had original equipment costs, number of

payments, payment amounts and the balance (nominal and PV) of remaining payments on

schedules. It also had a choice of accepted PV rates and knew its internal borrowing rate.

     62.     When Lycos entered a lease it had four options. The one that the parties probably

expected would be used was to return the equipment at the end of the lease under the return

provisions in the document. However, if that option was not followed, automatic short term

extensions could be used. In addition, Lycos could return substituted equipment if it were unable

to return the original equipment subject to the lease. Finally, extended or restructured leases

could be executed. Lycos had options and they were all clear to it.

### Not a Common Practice to Include Purchase Option in Equipment Leases

     63.     Lycos claims that purchase options are generally included in equipment leases –

and are, in fact, a "near universal practice" – and that CSI's failure to provide a purchase option

in its leases was improper. This allegation is very general and misleading. The greatest number

of leases in the industry occurs within the business model of what is called "small ticket

leasing," consisting primarily of office equipment (fax machines, photocopiers, and the like).

These are not operating leases (as were the equipment leases that Lycos carried on its books as

such), and are in fact, capital or sales type leases. These transactions essentially are conditional

sale financings in which the lessee can and usually does buy the equipment at the end of the lease

for a nominal amount or "bargain purchase" option price (for example, $1.00).

     64.     In contrast, however, CSI and most computer and other technology leasing

companies operate in an entirely different business model driven by technology equipment and

different customer needs. Typically, a lessee is focused on having and maintaining access to equipment that provides the best functionality or latest technology. In today's marketplace this is referred to as "lifecycle financing." Here, the lessee is seeking the use of equipment that will be replaced periodically by newer equipment. There is no desire to own the equipment and no notion of investing in assets. In this marketplace, depending on the type of equipment, it is replaced every 24 to 36 months. The old equipment is returned and new equipment put in place.

65. A purchase option is neither an important consideration nor provision in these leases. Lycos *could have* requested that a fair market purchase option be included for reasons of its own (and, on occasion, a purchase option was included in an equipment schedule with CSI), but to do so generally would be inconsistent with the Lycos' overall strategy. Further, my experience is that when fair market purchase options are included, they are exercised less than half of the time.

### Return and Extension Provisions Are Common

66. Lycos' expert Cross has opined that "compliance with the end-of-term provisions [in the CSI Master Lease] was practically impossible." I disagree. The return provisions were possible for any lessee that exercised a reasonable level of diligence in managing its equipment. The return provisions in CSI's lease cited by Mr. Cross are common in this business segment for good reasons, and Mr. Cross does not cite provisions that are uncommon or why they would be unreasonable.

67. Mr. Cross further claims that CSI's Master Lease "compelled perpetual evergreen extensions," implying that Lycos was trapped in an ever-renewing lease situation from which it could not escape. Again, I disagree. Based on my experience, this statement is overly simplified. Lycos always had the option of returning equipment at the end of a lease, in which case the lease would end. If Lycos could not return equipment, it was due to Lycos' own

20

negligence in tracking the equipment. However, even if Lycos could not return leased

equipment to CSI, it had the option to offer a substitution of similar equipment in a return, and

the lease would end. Substitute duplicate equipment would be plentiful in secondary markets as

attested by other defendant witnesses.

      68.     Further, the extension provisions are not a trap, as Lycos claims, in the CSI Lease

because of the following:

- The end of lease notice period used by CSI to have Lycos inform CSI of what Lycos intended to do at lease end was 60 days (this 60 days was negotiated by Lycos from a longer standard original CSI Master Lease notification period which reflects to me a level of sophistication by Lycos about leases).

- Lycos could end the lease by returning the equipment or by offering to substitute similar equipment.

- The automatic extensions were short term and clearly intended by CSI as a transition for its clients at the end of a lease. The four months rent is not material to either party compared to the lowered rents resulting from the longer term restructuring or extension of leases.

- Mr. Cross uses two terms together in (iii) of his report that are confusing and misleading. *". . . provision that automatically extended the Equipment Schedule **indefinitely** for successive **four-month periods** . . . unless and until Lycos furnished notice to terminate and returned all of the Equipment . . . ."* Four months is a short period in business in which Lycos could plan and exercise several options. An automatic extension period of four months is a reasonable time for Lycos to make decisions and plans if they had not focused on the original end of lease date and failed to give notice or prepare to return or substitute equipment. This is a transition option. **Indefinite** implies the lease goes on and on with no clear ending point. This is misleading and is not in conflict with a limited period – four months.

- Lycos did not decide to extend leases through subsequent Evergreen extensions of four months. Lycos' extended its leases through restructured transactions at lower rates than four month extensions would provide because the extensions are for a longer term, a certain term of 12 months, rather than an uncertain number of four months extensions.

      69.     Lycos is a multi-million dollar company, much larger than CSI, and Lycos at all

times knew its business needs better than CSI. It has a business and financial plan and strategy,

and it selected the equipment it needed to make that business plan work. Not only does Lycos have this superior knowledge about its business, but it also has the responsibilities that accompany the operation of a business. These are not CSI's responsibilities.

### Lycos's Inability to Return Equipment

70.    Lycos' expert Cross also opines that ". . . CSI recognizes the additional bargaining power it obtained from Lycos' inability to return equipment or exercise an option to purchase it." This assumes that CSI was aware Lycos was unable to return much of the leased equipment, which may not have been the case, but even it if were, there is nothing wrong with that.

71.    "Bargaining power" is not unilateral or coercive; it is simply knowing all of the possible alternatives. Lycos could take two actions: restructure/extend the leases or return original or substituted equipment. Even if CSI knew what Lycos' options were, that is not wrong.

### Equipment Valuation

72.    *Fair Market Value ("FMV").*  In general, the fair market value of equipment is important for three reasons:

- o    If the lessee is exercising a FMV purchase option.
- o    For the FASB to comply with GAAP.
- o    Determining the lease payment amount.

73.    In almost all of the equipment schedules, there is no purchase option. CSI complied with GAAP in its financials, and it most likely was aware of its equipment investment in its equipment that it leased.

74.    Even if the booked FMV for a lease is zero, the lessor properly bases its lease pricing on the economic value of the equipment working in place to deliver a desired functionality. This equipment may or may not have value in a sale to a third party, but it does

22

continue to have value in place to a current lessee user. Consequently, observations about residual value and its role in these transactions is not relevant. CSI and Lycos are operating in a competitive marketplace in which each had options. Neither could coerce the other.

75. **_Economic Usefulness of the Equipment._** Though Lycos appears to rely on the residual value that CSI booked for accounting purposes in arriving at a valuation for the leased equipment, this does not take into account the economic usefulness to Lycos that the leased equipment obviously had for Lycos.

76. The CSI-Lycos lease transactions are not financings with the payments amortizing to a zero "balance." The lessee makes rental payments and has no equity investment in the equipment. It is important to note that if the equipment values are as low as certain of the Lycos experts estimate, Lycos could easily and inexpensively substitute used equipment from the marketplace for return to CSI in place of leased equipment that Lycos had lost or sold.

77. Lease payments are based on original equipment cost before anything else such as operating costs and the cost of capital are considered. This is the leasing company's (in this case, CSI's) initial investment that must be recovered. This is also the figure that the lessee (Lycos) considers most important. The lessee (Lycos) knows this original equipment cost because it selects the equipment and then assigns the purchase order for the selected equipment to the lessor (CSI) for purchase. End of lease values are not important to Lycos's decisions since they did not request and do not have an option to purchase the equipment at the end of the lease.

78. **_Used Equipment Values._** Used equipment values have little role in this dispute with the exception that Lycos could obtain used equipment to substitute for equipment it was unable to return at the end of the lease.

79. The year 2001 was a time where the rapid expansion and exuberance of the

internet in general, and dot-com businesses specifically, hit a dramatic slowdown. This is usually referred to as the "dot-com" bust or "dot-bomb." This was a low point in equipment values. By October of 2003 and 2004, however, a pick up in technology equipment value was occurring.

80. During the period 2000 – 2003:

- There was not a significant change in technology for the equipment subject to the leases.
- The functionality of the equipment subject to the leases did not change materially.
- The perceived value of used equipment declined significantly in the early part of this period.
- There was imbalance in the supply / demand marketplace balance for similar used equipment – high levels of supply.

81. ***Highest and Best Use.*** Experts state that the "[h]ighest and best use is defined as the reasonable probable and legal use of personal property that is physically possible, appropriately supported, financially feasible, and results in the highest value in the appropriate marketplace, consistent with the purpose of the appraisal. It is the appraisers' opinion that valuing the assets on the premise that they would be used in their current configuration, for the purpose designed, by a buyer performing like activities, constitute the highest and best use." Therefore, if the current user of the equipment continues to use the equipment as defined above, the equipment would by definition "have value" because it is performing as originally expected.

## Materiality of Lease Rewrites

82. Lycos's expert David Truesdell concludes that reductions in monthly/annual lease payments for equipment – which was a goal of Lycos, based on the evidence – would not have a material effect on the financials of Lycos as used by investors and other third party users of Lycos' financials. However, Lycos seems to have believed that these reductions in monthly rents were material to its strategy at the time, and Mr. Truesdell is silent on the materiality to

cash flow considerations. Whether or not the investor community was influenced by changes in the financial statements, cash management and conservation as stated objectives of Lycos were material to the execution of its strategy. The extensions and restructurings did reduce the lease costs per period of equipment use.

### Conclusion

83.    Based on my review of the evidence (documents and deposition testimony) as well as my years of experience in the equipment leasing field, the claims of Lycos against CSI are without merit. Further, I question who stood to gain by walking away from the remaining payments on a negotiated settlement of Lycos' obligations to CSI concluded in 2003. Lycos had a current performing relationship with CSI for at least six years. Indeed, Lycos also has had a positive relationship with at least three other respected equipment leasing companies during that period.

84.    Lycos personnel understood leasing, they understood leasing's role and advantages for a rapidly growing technology company, and Lycos' priority was to quickly build an operating company that could be offered to the public. Lycos fulfilled that strategy. During this period of time, Lycos did not give the same level of attention to administration and operations as was given to selling services and preparing a public offering of the sale of the company. The best example of the latter observation is the inadequate job of tracking and managing equipment including equipment leased from CIS. This failure was a contributing factor to some of the lease extensions.

85.    Lycos did not overpay for the years of equipment usage for which it contracted with CSI. The computer leasing market is very competitive. Lycos dealt with at least four reputable and respected lessees. Any of the four would be quick to identify an opportunity provided by one of the others attempting to charge too high a rate or include undesirable

25

conditions. The original purchase price of equipment is not a comparison to a the total payments for use of the equipment over time. The total of payments for a 24 month lease compared to the total of payments for a 36 month lease are not comparable.

86.    Lycos had all of the information and expertise to make business decisions regarding leases over the years. Now, in retrospect, Lycos appears to have become dissatisfied with its decisions and would not accept responsibility for results. The evidence clearly shows, however, that Lycos' choices were its own. With respect to the buyout, for example, Lycos' General Counsel concluded that the negotiated 2003 buyout – culminating in the August 2003 Sales Agreement – was a good business option for Lycos to conclude its obligations to CSI.

87.    While there has been an appropriate amount of attention on the role of the ELA Code of Fair Business Practices as a guide or control for generally accepted behavior in the equipment leasing business, it is only one standard of suggested conduct. Of just as great importance is the existence of a very competitive equipment leasing marketplace. That marketplace neither holds secrets nor permits a pattern of unacceptable practice. From my years involved in this industry, I know that CSI has operated successfully with good reputation in that marketplace for three decades. There is no indication that other leasing companies believed or attempted to capitalize on bad behavior by CSI or a disgruntled Lycos. Lycos' claims appear to have grown out of a late tactic to avoid paying a mutually agreed to buyout of obligations.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF NOVEMBER, 2007.

_____
Michael Fleming

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

COMPUTER SALES                )
INTERNATIONAL, INC.,          )
                              )
        Plaintiff,            )
                              )
VS.                           )        CASE NUMBER: 05-10017-RWZ
                              )
LYCOS, INC., ET AL.           )
                              )
        Defendants.           )


ORAL AND VIDEOTAPED DEPOSITION OF

**ERNESTO GALVAN**

February 20, 2007





FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.

| 0 Shoal Creek Blvd. | ❖ Suite 200 W | ❖ Austin, Texas 78757 | ❖ | (800) 234-3376 | ❖ | (512)477-9911 | ❖ | (512) 345-1417 | Fax |
| reenway Plaza | ❖ Suite 3112 | ❖ Houston, TX 77046 | ❖ | (800) 234-3376 | ❖ | (713) 572-8897 | ❖ | (512) 345-1417 | Fax |
| N.E. Loop 410 | ❖ Suite 810 | ❖ San Antonio, TX 78209 | ❖ | (800) 767-9161 | ❖ | (210) 222-9161 | ❖ | (210) 225-1476 | Fax |

Page 32

1    correct?

2        A.    I do not remember it, but if it's there, yes.

3        Q.    And in including the statement that, quote, it

4    is Lycos' policy not to buy any equipment that can be

03:50  5    leased, unquote, you were recording information that you

6    had acquired as a result of your working at Lycos and

7    communicating with officials of Lycos, correct?

8                MR. ACTON:    Objection.

9        Q.    (BY MR. KALER)    You can answer.

03:50  10        A.    It was just stating general practice that the

11    company did.

12        Q.    Okay.   And "the company" being Lycos?

13        A.    Yes.

14        Q.    And at the time did you have an understanding

03:51  15    as to why it was Lycos' policy not to buy any equipment

16    that it could lease; in other words, to lease wherever

17    possible?

18                MR. ACTON:    Objection.

19        A.    No.

03:51  20        Q.    (BY MR. KALER)    Okay.   And when you said,

21    quote, It is Lycos' policy to not buy any equipment that

22    can be leased, you were referring to the fact that it

23    was the company's policy to lease equipment rather than

24    buy it wherever it could, correct?

03:51  25                MR. ACTON:    Objection.

# EXHIBIT 7

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Computer Sales International v. Lycos, Inc.

Transcript of the Testimony of:

# Julie Callagee

# April 26, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

Cindy Berglund   19122

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

31

1      department.

2      Q.    Okay.  So --

3      A.    Did you want me to go back and spell her last

4      name?  That's what I was doing if it looks like I was

5      fumbling.  I don't know how to spell it without writing

6      it, Cuculiza.

7      Q.    Sure.  You can write it if you want.

8      A.    If you don't need it, that's fine.

9      Q.    Cuculiza is spelled how?  You can just spell it

10     out.

11     A.    I think it's C-U-C-U-L-I-Z-A, but I'm not certain

12     of the spelling.  It's changed to Mauri shortly

13     thereafter.

14     Q.    Spelled?

15     A.    M-A-U-R-I.

16     Q.    When did it change to that?

17     A.    I'm not sure.

18     Q.    Is she still there?

19     A.    No.

20     Q.    When did she leave?

21     A.    Sandra left the company, I would have to review to

22     come up with the exact date.

23     Q.    Who took over as head of that department?

24     A.    Nobody took over as head of that department.

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

35

1       Lycos was obtaining, correct?

2            ATTY. BEAN:  Objection.

3            THE WITNESS:  They knew the cost of the individual

4       pieces of equipment?

5       Q.   Yes.

6       A.   Yes.

7       Q.   Okay.  And they were responsible for keeping track

8       of that cost, right?

9            ATTY. BEAN:  Objection.

10      Q.   You can answer.

11      A.   Keeping track of the cost?

12      Q.   Yes.

13      A.   No.  If I'm understanding the question, no.

14      Q.   What records were kept of the cost of the

15      equipment by Lycos during all the years you were there?

16      A.   Again --

17           ATTY. BEAN:  Objection.

18      Q.   You can answer.  He is going to object every time.

19      I'm just going to say you can answer every time.

20      A.   Equipment that was purchased by Lycos was put into

21      our accounting system and tracked through our fixed

22      assets system and that was the responsibility of the

23      general ledger group.

24      Q.   But most of your equipment was leased, right?

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

49

| | | |
|---|---|---|
| 1 | A. | Jerry, J-E-R-R-Y, Lipet, L-I-P-E-T. |
| 2 | Q. | But, otherwise, you had the other groups? |
| 3 | A. | Purchasing reported directly to Brian Lucy. |
| 4 | Q. | Where was Monique Walsh?  Was she in your |
| 5 | | department? |
| 6 | A. | Yes, she was. |
| 7 | Q. | What was her position at the time that you -- |
| 8 | A. | Staff accountant. |
| 9 | | ATTY. BEAN:  Let him finish his question. |
| 10 | Q. | Had she been reporting to you up to that time or |
| 11 | | prior to that time? |
| 12 | | ATTY. BEAN:  Objection. |
| 13 | Q. | You can answer. |
| 14 | A. | Yes. |
| 15 | Q. | How long had she been reporting to you? |
| 16 | A. | In 2003, approximately, a year or two. |
| 17 | Q. | Now, the reason Lycos wanted to buy out its CSI |
| 18 | | equipment leases was that Telephonica in Spain wanted |
| 19 | | Lycos here in the U.S. to capitalize the leases, |
| 20 | | correct? |
| 21 | A. | Lycos wanted to buy out of the leases.  One of the |
| 22 | | reasons would have been to record them as capital |
| 23 | | leases. |
| 24 | Q. | Now, at this time in March of 2003, Lycos had been |

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

50

1       acquired previously by Telephonica in Spain, correct?

2       A.    Terra Networks SA.

3       Q.    Terra Networks SA in Spain, correct?

4       A.    Yes.

5       Q.    And that had happened the previous year?

6       ATTY. BEAN:  Objection.

7       Q.    You can answer.

8       ATTY. BEAN:  Is she speaking as Julie Callagee or

9       the company because she hasn't been noticed as Julie

10      Callagee?

11      ATTY. KALER:  That's all right.  You can answer.

12      ATTY. BEAN:  Well, it may be all right with you,

13      but I resent the fact that you have chosen not to

14      notice her individually.  You are not limiting yourself

15      to the questions on the 30(B)(6) and she hasn't

16      prepared to be deposed as Julie Callagee.

17      ATTY. KALER:  I am.

18      ATTY. BEAN:  No, you are not.  You are not.  The

19      question -- I ask you to identify for me where it says

20      in the questions --

21      ATTY. KALER:  You cannot do this.

22      ATTY. BEAN:  Excuse me.

23      ATTY. KALER:  This is a complex, complicated area

24      where I need to lay foundation in a variety of areas to

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

143

1        Q.    And do you see where Mr. Ziba listed in his first

2        entry for CSI, which I'll mark on the Exhibit, if I

3        may, with just an ink mark, and Point A, the figure

4        of --

5            ATTY. KALER:  Did I give you a copy of this, Tom?

6            ATTY. BEAN:  Yes.

7            ATTY. KALER:  Okay.

8        Q.    The figure in the -- of $668,414 in that column?

9        A.    Do I see it?

10       Q.    Yes.  Do you see where he listed in the cost

11       column, $668,414?

12       A.     In the equipment value column?

13       Q.    Right.  The one we're talking about.

14       A.    Yes.

15       Q.    And then the next entry he listed under CSI was

16       $672,000 in that column?

17       A.    Yes.

18       Q.    And the next entry he listed was $4.2 million in

19       that column?

20       A.    Yes.

21       Q.    And then the next entry he listed was

22       $1,735,000 in that column?

23       A.    Yes.

24       Q.    Then the next entry he listed was $1,852,420 in

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

144

```
1        that column?

2        A.   Yes.

3        Q.   And then the next entry he listed was $3.5 million

4   in that column?

5        A.   Yes.

6        Q.   And the next entry he listed for CSI was

7   $1,255,213 in that column?

8        A.   Yes.

9        Q.   And then next item, $427,219 in that column?

10       A.   Yes.

11       Q.   The next item, $2,103,620?

12       A.   Yes.

13       Q.   And the next item, $1,631,405 in that column?

14       A.   $1,031,403.

15       Q.   Next item was $126,500 that he listed in that

16   column?

17       A.   Yes.

18       Q.   And the next item he listed was $800,000 in that

19   column?

20       A.   Yes.

21       Q.   And the next item he listed, again, going down the

22   CSI schedules was $1,440,000 in that column, correct?

23       A.   Yes.

24       Q.   And the next item he listed under CSI was
```

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

145

```
 1        $1,465,000 in that column?

 2        A.    Yes.

 3        Q.    The next item he listed was $530,000 --

 4        A.    Yes.

 5        Q.    -- in that column.  The next item he listed was

 6        $1,032,717?

 7        A.    No.

 8        Q.    I'm sorry, $1,082,717 is what he listed; is that

 9        right?

10        A.    Yes.

11        Q.    The next item he listed was $370,028 in that

12        column?

13        A.    Yes.

14        Q.    The next item he listed was $497,000 in that

15        column?

16        A.    Yes.

17        Q.    And the next item he listed was $196,000 in that

18        column, correct?

19        A.    No.

20        Q.    I'm sorry, $166,500 is what he listed in that

21        column, correct?

22        A.    No.

23        Q.    Is it just $166,000 that he listed?  Am I reading

24        correctly?
```

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

146

1        A.    Yes.

2        Q.    Okay.   The next item he put in was $1,091,002?

3        A.    Yes.

4        Q.    The next item was $985,000?  Again, this is still

5        CSI schedules, right?

6        A.    Yes.

7        Q.    The next item he listed in this column was the

8        $2,880,878, correct?

9        A.    Yes.

10       Q.    The next item he listed was $2,390,000, correct?

11       A.    Yes.

12       Q.    The next item he listed was $725,000, correct?

13       A.    Yes.

14       Q.    And the next item opposite CSI that he listed in

15       this column was $2,850,000, correct?

16       A.    Yes.

17       Q.    And the next item he listed was $618,000, correct?

18       A.    Yes.

19       Q.    The next item he listed was $1,034,500, correct?

20       A.    Yes.

21       Q.    And the next item he listed was $531,408, correct?

22       A.    Yes.

23       Q.    The next item he listed was $735,000, correct?

24       A.    Yes.

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

147

1    Q.    And then the last item opposite CSI on this page

2    that he listed was the $320,000?  Was that right?

3    A.    I believe that's a --

4    Q.    $735,000 was the last CSI entry for equipment cost

5    that he put in on this page of the Exhibit, correct?

6          ATTY. BEAN:  Objection.

7    Q.    You can answer.

8    A.    Yes.

9    Q.    Okay.  And if you go over to the next page, LYC

10   21491, he continued with the entries for CSI about an

11   inch down the page with an entry of 800 -- excuse me,

12   654 -- excuse me, $656,511.  Is that right?

13   A.    Yes.

14   Q.    And then the next entry in this column opposite

15   CSI he listed was $340,000, correct?

16   A.    Yes.

17   Q.    And the next item he listed in this column

18   opposite CSI was $240,000, correct?

19   A.    Yes.

20   Q.    And the next item he listed in this column

21   opposite CSI was $587,207, correct?

22   A.    Yes.

23   Q.    And the next item he listed in this column

24   opposite CSI was $31,404, correct?

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

148

1      A.   Yes.

2      Q.   And the next item that he listed in this column

3      opposite CSI was $72,362, correct?

4      A.   Yes.

5      Q.   And the next item he listed in this column under

6      CSI was $860,016, correct?

7      A.   Yes.

8      Q.   The last item he listed in this column opposite

9      CSI was $4,106,055, correct?

10     A.   Yes.

11     Q.   And those numbers that we just went through are

12     the numbers that Mr. Ziba entered for the original

13     equipment cost of the CSI leases on this page of the

14     spreadsheet, correct?

15          ATTY. BEAN:   Objection.

16     Q.   You can answer.

17     A.   I don't know.

18     Q.   You know that those numbers were part of Lycos'

19     records, all the ones that we read were part of Lycos'

20     records in June of 2001 when Mr. Ziba forwarded you

21     this spreadsheet, correct?

22     A.   Yes.

23     Q.   And those numbers add up to $44,656,877 if you

24     accept my math.

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

220

1      Q.   And is it your testimony then on behalf of Lycos

2      that Lycos was somehow forced to enter into Exhibit 23A

3      by CSI?

4          ATTY. BEAN:  Objection.

5          THE WITNESS:  I don't think I said that.

6      Q.   Okay.  In fact, Lycos was not forced by CSI to

7      enter into Exhibit 23A, was it?

8          ATTY. BEAN:  Objection.

9      Q.   You can answer.

10     A.   I don't know why forced or not forced -- I don't

11     know what we're using the word "forced" to mean, but

12     Lycos certainly had reasons to rush on this.

13     Q.   Regardless of that, CSI did not force Lycos to

14     sign Exhibit 23A or to agree to make the lease payments

15     described in there, did it?

16         ATTY. BEAN:  Objection.

17         THE WITNESS:  The reason why I guess -- you know,

18     I don't want to get into what the definition of forced

19     is, but we knew at the end of this lease term that

20     there was a stip loss value, a stipulated loss value

21     that was -- I would have to refer to the documents, but

22     the stipulated loss value was something enormous.

23         So Lycos facing not being able to return equipment

24     at the end of lease term, no buy-out dollar value, a

Julie Callagee 4-26-2006
Computer Sales International v. Lycos, Inc.

221

1    stipulated loss value that was astronomical, you know,

2    we did have to buy out.

3    Q.    It was not CSI's fault that Lycos was not in a

4    position to return the equipment, was it?

5    A.    It was not CSI -- excuse me one minute.  I think

6    that CSI knew the equipment couldn't be returned and

7    was it their fault, no.  I guess it wasn't their fault,

8    but it's common -- you know, Susan has educated me that

9    it's common that lessors know that you would be unable

10   to return the equipment at the end of the lease term.

11   Q.    In fact, equipment -- lessees return equipment all

12   the time.  In fact, Lycos did it with some of the CSI

13   equipment?

14   A.    That's true that some of the equipment had been

15   returned, but the nature of this 5,500 or so pieces of

16   equipment, cables had been leased and memory -- you

17   know, the equipment had to be restored to the original

18   condition and memory had been leased and very small

19   parts that it wasn't at all conducive to returning the

20   equipment.

21   Q.    Those decisions about what to lease and how to

22   handle what was leased were made by Lycos, correct?

23   A.    Yes.  What --

24   Q.    And the -- the decisions about whether to lease

# EXHIBIT 8
PART 1

# COPY

1

VOLUME 1

PAGES 1 - 434

EXHS. 1 - 45

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * *
                                 *
Computer Sales International,    *
Inc.,                           *
        Plaintiff and Defendant *
        in Counterclaim         *
                                 *
                                 *
v.                               *
                                 *        Civil Action
Lycos, Inc.,                     *
        Defendant and Plaintiff *         No. 05-10017-RWZ
        in Counterclaim         *
                                 *
v.                               *
                                 *
Bank of America f/k/a Fleet      *
Bank,                           *
        Trustee Process Defendant *
                                 *
* * * * * * * * * * * * * * * * *
```

Videotaped Deposition of Paul H. Stenberg, Jr.

Thursday, August 24, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109

-------------- JANIS T. YOUNG, RDR, CRR ------------
COURT REPORTER
FARMER ARSENAULT BROCK LLC        BOSTON, MASSACHUSETTS
617.728.4404
jyoung@fabreporters.com

Paul H. Stenberg, Jr.                    110

11:05:53  1      Q.     So you didn't tell them?

11:05:55  2      A.     I don't think the conversation ever came

11:05:56  3   up.

11:05:56  4      Q.     So you didn't tell them that, because the

11:05:58  5   conversation never came up?

11:06:00  6      A.     Correct.

11:06:02  7      Q.     Now, do you recall when your brother

11:06:07  8   started working for CSI?

11:06:09  9      A.     I don't.

11:06:09  10     Q.     Was it before or after you started working

11:06:12  11  for CSI?

11:06:13  12     A.     It was after.

11:06:13  13     Q.     Did you assist him in getting his job?

11:06:16  14     A.     I helped him with the interview.

11:06:18  15     Q.     Now, you said, I believe earlier, before

11:06:21  16  the break, that Ted Phillips told Brian Lucy in the

11:06:24  17  spring of 2001 that Mr. Phillips wanted to reduce

11:06:27  18  Lycos's monthly lease payments by about $400,000; is

11:06:31  19  that right?

11:06:31  20          MR. KALER:  Objection.  You can answer.

11:06:33  21     A.     Brian mentioned to me that Ted wants to

11:06:35  22  save money, about 400,000, on the current leases,

11:06:39  23  correct.

11:06:39  24     Q.     And Brian told you that in the spring of

*Paul H. Stenberg, Jr.*                    111

11:06:41  1    2001?

11:06:42  2        A.    That's correct.

11:06:43  3        Q.    And the Ted he was referring to was Ted

11:06:46  4    Phillips --

11:06:46  5        A.    That's correct.

11:06:46  6        Q.    -- in the spring of 2001?

11:06:48  7        A.    Yes.

11:06:49  8        Q.    I'm sorry; the court reporter can only

11:06:50  9    take down one person at a time.

11:06:54  10            How did your relationship with Lycos

11:06:57  11   originate?

11:06:57  12       A.    A vendor, a salesperson named Brian Casey,

11:07:05  13   who was selling equipment, and I was friendly with

11:07:08  14   him, he mentioned that there was a company, Lycos,

11:07:11  15   looking to buy some equipment.

11:07:13  16       Q.    Is Brian Casey someone you've known for a

11:07:17  17   while?

11:07:17  18       A.    We went to college together, correct.

11:07:21  19       Q.    Is he a friend of yours?

11:07:23  20       A.    Business associate.

11:07:25  21       Q.    Play golf with Mr. Casey?

11:07:28  22       A.    I have played golf with him.

11:07:30  23       Q.    As part of being the account executive for

11:07:33  24   Lycos, you entertained Lycos on a number of

*Paul H. Stenberg, Jr.*                    225

| | | |
|---|---|---|
| 02:11:09 | 1 | Q. Who's "them"? |
| 02:11:10 | 2 | A. To Lycos. |
| 02:11:11 | 3 | Q. And you're asking Lycos -- oh, in other |
| 02:11:12 | 4 | words, whether or not you were going to finance the |
| 02:11:15 | 5 | software, Lycos didn't know whether you were going |
| 02:11:17 | 6 | to finance the software? |
| 02:11:18 | 7 | A. Yes. |
| 02:11:19 | 8 | MR. KALER: Objection. |
| 02:11:19 | 9 | Q. And why did you say, "Isn't that what we |
| 02:11:22 | 10 | want"? |
| 02:11:23 | 11 | A. Well, we want as many invoices as we can. |
| 02:11:26 | 12 | We don't want deals -- we don't want other business |
| 02:11:29 | 13 | to go to purchase or them to buy it; we want all the |
| 02:11:32 | 14 | invoices we can get on a quarterly. |
| 02:11:37 | 15 | Q. Was CSI sending the invoices to Lycos to |
| 02:11:40 | 16 | pay the software bills? |
| 02:11:42 | 17 | A. Explain that again. |
| 02:11:43 | 18 | Q. Was CSI sending to Lycos the software |
| 02:11:48 | 19 | bills for Lycos to pay? |
| 02:11:51 | 20 | A. That, I don't know. |
| 02:11:54 | 21 | Q. And by the phrase, "Isn't that what we |
| 02:11:58 | 22 | want," was you meant that CSI wanted to finance the |
| 02:12:01 | 23 | software? Is that right? |
| 02:12:03 | 24 | A. Yes. At this point, we didn't have a |

*Paul H. Stenberg, Jr.*                                   226

02:12:06   1   software lease rate factor; we only had a hardware

02:12:10   2   lease rate factor.  So we had nowhere to put these

02:12:12   3   invoices.  So Fred said, please put a software

02:12:15   4   invoice on.  And going down here, that's how I

02:12:18   5   figured it out.  I said that's what we want.

02:12:20   6        And Fred said, well, put a software lease

02:12:23   7   rate factor on it.

02:12:24   8        Q.   All right.  At some point in the

02:12:26   9   relationship with Lycos, you learned that Lycos

02:12:29  10   would be unable to return leased equipment?

02:12:33  11        MR. KALER:  Objection to form, but you

02:12:35  12   can --

02:12:35  13        Q.   Right?

02:12:36  14        A.   No.  That conversation never came up, "We

02:12:39  15   can't return it."

02:12:40  16        Q.   Lycos never told you that it had lost

02:12:42  17   equipment or couldn't identify its present location?

02:12:44  18        A.   Bits or pieces, but not major, major

02:12:47  19   assets.

02:12:47  20        Q.   So as far as you knew, Lycos had the

02:12:51  21   ability to return the great bulk of the equipment at

02:12:54  22   the end of each lease term; is that right?

02:12:55  23        A.   Oh, yes.

02:13:00  24        Q.   Have you had any sales training at CSI

*Paul H. Stenberg, Jr.*                    244

| | | |
|---|---|---|
| 02:36:23 | 1 | MR. KALER:  Objection.  But you can |
| 02:36:26 | 2 | respond. |
| 02:36:26 | 3 | A.    There are rewards to do original lease |
| 02:36:30 | 4 | financings, leases, original leases.  There's |
| 02:36:33 | 5 | rewards to rewrite them.  And there's rewards to |
| 02:36:36 | 6 | sell them off lease and when we get the equipment |
| 02:36:40 | 7 | back, we sell the equipment. |
| 02:36:45 | 8 | Q.    The greatest reward is for rewriting the |
| 02:36:47 | 9 | schedules, isn't it, based on the commission plans |
| 02:36:50 | 10 | you had? |
| 02:36:50 | 11 | MR. KALER:  Objection.  But you can |
| 02:36:51 | 12 | respond. |
| 02:36:52 | 13 | A.    Not necessarily. |
| 02:36:53 | 14 | Q.    No? |
| 02:36:54 | 15 | A.    Lot of times rewrites don't make sense. |
| 02:36:56 | 16 | Q.    When does a rewrite not make sense? |
| 02:36:59 | 17 | A.    When -- First of all, you know, when |
| 02:37:01 | 18 | there's too much software or the time of the lease |
| 02:37:07 | 19 | frame has not gone on long enough. |
| 02:37:09 | 20 | Q.    So it doesn't make -- So it sometimes |
| 02:37:12 | 21 | doesn't make sense to rewrite a lease too early in |
| 02:37:14 | 22 | the schedule? |
| 02:37:14 | 23 | A.    It really depends what the customer wants |
| 02:37:15 | 24 | and what they're willing to do. |

*Paul H. Stenberg, Jr.*                                    352

04:48:47  1          (Stenberg Deposition Exhibit 38 marked for
04:48:48  2     identification.)
04:48:48  3          What's marked as Exhibit 38, Mr. Stenberg,
04:48:51  4     is a two-page document, LYC 24631 and 32.  Most of
04:48:58  5     it appears to be an e-mail that you sent to Kevin
04:49:02  6     Baille and Brian Lucy on March 18, 2002.  Do you
04:49:09  7     recognize what's been marked as Exhibit 38?
04:49:11  8          A.     Yes.
04:49:11  9          Q.     And you sent this e-mail March 18, 2002,
04:49:15  10    to Mr. Baille and Mr. Lucy.  Correct?
04:49:17  11         A.     Yes.
04:49:17  12         Q.     And this was in response to provide them
04:49:21  13    with some information as to the reasons for the
04:49:24  14    difference between the 17 million and the 29
04:49:26  15    million.  Correct?
04:49:28  16                MR. KALER:  Objection.  But you can
04:49:29  17    respond.
04:49:29  18         A.     Say that again?
04:49:30  19         Q.     Well, what were you seeking to do in this
04:49:32  20    e-mail, Mr. Stenberg?
04:49:35  21         A.     Answer their question.
04:49:36  22         Q.     What was their question?
04:49:38  23         A.     Why the variance.
04:49:41  24         Q.     The variance between the 17 million and

*Paul H. Stenberg, Jr.*                     353

04:49:43  1  the 29.2 million?

04:49:49  2      *A.*    Mm-hmm.

04:49:49  3      *Q.*    Right?

04:49:50  4      *A.*    Yes.

04:49:51  5      *Q.*    Now, let's take this from the beginning.

04:49:52  6  You say that Schedule 65 expired on 10/1 but was

04:49:57  7  included in the refinance.  Right?  I'm looking at

04:50:02  8  the first sentence of the third paragraph of your

04:50:06  9  e-mail March 18, 2002.

04:50:08  10      *A.*    Okay, all right.

04:50:09  11      *Q.*    Schedule 65 expired on 10/1 but was

04:50:12  12  included in the refinance.

04:50:14  13      *A.*    Yes.

04:50:14  14      *Q.*    Why was Schedule 65 included in the

04:50:16  15  refinance?

04:50:20  16      *A.*    Because that was an existing schedule;

04:50:22  17  that was open.

04:50:23  18      *Q.*    Well, it had expired.  Right?

04:50:25  19      *A.*    It expired, correct.

04:50:28  20      *Q.*    And why would it be included in the

04:50:32  21  refinance if it had expired?

04:50:35  22      *A.*    We were talking about total lease

04:50:36  23  commitments.  When we were doing the deal over a

04:50:40  24  million dollars, we brought it down to 833, and part

*Paul H. Stenberg, Jr.*                    354

04:50:42  1    of that analysis was 10/1.  Now, if they went -- If

04:50:48  2    65 went another two years, three years, conceivably

04:50:54  3    have been month to month for those two years because

04:50:56  4    they wanted the equipment for that long.

04:50:58  5        Q.    So your thinking, going back to Exhibit 36

04:51:08  6    under CSI Leases After Refinancing, page 162 --

04:51:14  7        A.    Okay.

04:51:15  8        Q.    At the top of the page it refers to

04:51:17  9    Schedule 65.

04:51:18  10       A.    Yes.

04:51:19  11       Q.    So is it your view that that $20,649.01 a

04:51:26  12   month should have carried across the remaining

04:51:28  13   months?

04:51:31  14       A.    It was included in the financing so it did

04:51:34  15   not.

04:51:35  16       Q.    So it did not?

04:51:36  17       A.    It did not.

04:51:37  18       Q.    But you say on Exhibit 38 in the third

04:51:42  19   paragraph, "This was not included in the analysis."

04:51:46  20   What did you mean by that?

04:51:48  21       A.    Well, this is Monique's analysis and she

04:51:53  22   didn't include that.  I believe she did not include

04:51:55  23   it.

04:52:00  24       Q.    Where did she not include it?

*Paul H. Stenberg, Jr.*                    355

04:52:18   1      A.    Well, she didn't include the fact that it
04:52:21   2   could have gone month to month.
04:52:23   3      Q.    What would you expect Ms. Walsh to have
04:52:25   4   done?  What do you think she should have done?
04:52:27   5      A.    I don't know what she should have done.
04:52:33   6      Q.    Well, you said she didn't include it in
04:52:34   7   her analysis.
04:52:36   8      A.    I don't recall what I meant by that.
04:52:44   9      Q.    But she did include it in her analysis as
04:52:47   10  far as 10/1 was concerned.  Right?
04:52:48   11     A.    As far as 10/1.
04:52:50   12     Q.    And why should she have included it after
04:52:52   13  10/1?
04:52:53   14     A.    Again, I don't know why I mentioned that.
04:52:56   15     Q.    Okay.
04:52:56   16           You say "Monique's total for the new lease
04:52:59   17  obligation was wrong.  She took the total monthly
04:53:02   18  payment times the length of the deal.  You must look
04:53:05   19  at the present value base and not include the
04:53:07   20  interest."  You see what you wrote there?
04:53:09   21     A.    Yes, I do.
04:53:10   22     Q.    And so you think Monique's mistake was not
04:53:12   23  taking the present value of the future lease
04:53:15   24  payments under 93 and 94?

*Paul H. Stenberg, Jr.*                356

04:53:20  1      A.    When I did this, yeah.  I mean, I don't
04:53:23  2   remember doing the calculations.
04:53:25  3      Q.    Do you know what discount rate -- You said
04:53:28  4   the present value of the lease was $23,727,000.  Do
04:53:33  5   you see that?
04:53:33  6      A.    Yes.
04:53:34  7      Q.    And do you understand the concept of a
04:53:36  8   discount rate?
04:53:37  9      A.    Yes.
04:53:37  10     Q.    Okay.  What is a discount rate?
04:53:38  11     A.    It's the interest rate that you would use
04:53:41  12   to discount the leases.
04:53:43  13     Q.    And what interest rate did you use to
04:53:46  14   discount 93 and 94 to come up with a present value
04:53:48  15   of 23,727,000?
04:53:50  16     A.    This is 2002.  I don't know what rate I
04:53:53  17   used.
04:53:54  18     Q.    Would you have used the rate on Schedules
04:53:56  19   93 and 94?
04:53:58  20     A.    Again, I don't know what rate I used.
04:54:00  21     Q.    Now, when you say the obligation of the
04:54:02  22   old leases is 20,215,000, how did you calculate
04:54:06  23   that?
04:54:09  24     A.    I'm not sure how I calculated it.  Again,

*Paul H. Stenberg, Jr.*                    357

| | | |
|---|---|---|
| 04:54:11 | 1 | it was four years ago. |
| 04:54:13 | 2 | Q.    Did you determine -- Did you discount to |
| 04:54:16 | 3 | present value the payments under the old leases? |
| 04:54:19 | 4 | A.    I don't know what -- Again, I don't know |
| 04:54:23 | 5 | what discount rate I used. |
| 04:54:24 | 6 | Q.    Well, the total payments under the old |
| 04:54:27 | 7 | leases according to Ms. Walsh on page 164 of Exhibit |
| 04:54:36 | 8 | 36 were 17.8 million.  Correct? |
| 04:54:39 | 9 | A.    Mm-hmm, okay. |
| 04:54:39 | 10 | Q.    How do you get from 17.8 million in total |
| 04:54:42 | 11 | payments not discounted to present value to saying |
| 04:54:46 | 12 | the obligations under the old leases are 20,215,000? |
| 04:54:51 | 13 | A.    I just told you, I don't know what -- It |
| 04:54:54 | 14 | was four years ago.  I don't know what I used. |
| 04:54:56 | 15 | Q.    You don't know what you did? |
| 04:54:57 | 16 | A.    I don't know what I did. |
| 04:54:59 | 17 | Q.    Did you do the math to calculate the |
| 04:55:02 | 18 | present value of the new lease schedules? |
| 04:55:05 | 19 | A.    Did I do the math?  Explain that to me. |
| 04:55:08 | 20 | Q.    Well, you came up with a number.  You |
| 04:55:09 | 21 | wrote the number $23,727,000.  Correct? |
| 04:55:16 | 22 | A.    I wrote that, correct. |
| 04:55:17 | 23 | Q.    And that was based on a calculation that |
| 04:55:19 | 24 | you performed personally? |

*Paul H. Stenberg, Jr.*                    358

04:55:20  1    A.    Yes.  It says this is what I have so far.

04:55:23  2    Q.    But that was a calculation you personally

04:55:25  3  performed.  Right?

04:55:26  4    A.    Could have been off the back of an

04:55:27  5  envelope.  I'm not sure.

04:55:30  6    Q.    When you say off the back of an envelope,

04:55:32  7  you mean --

04:55:33  8    A.    I don't know how -- I don't remember doing

04:55:35  9  it.  I mean, I do remember doing some calculations;

04:55:37  10  I don't know how I did it.  I don't remember how I

04:55:40  11  did those calculations.

04:55:40  12    Q.    But you didn't get those calculations that

04:55:43  13  resulted from anyone else at CSI, did you?

04:55:46  14    A.    No.

04:55:46  15    Q.    You personally came up with the

04:55:12  16  $23,727,000?

04:55:50  17    A.    Yes.

04:55:50  18    Q.    And you personally came up with the

04:55:52  19  20,215,000.  Correct?

04:55:53  20    A.    Yes.

04:55:54  21    Q.    And you don't remember how you did that

04:55:56  22  calculation either?

04:55:56  23    A.    I do not remember.

04:55:57  24    Q.    And you represented to Lycos that the

Paul H. Stenberg, Jr.                    359

04:55:59  1    difference was $3,512,000.  Correct?

04:56:02  2                MR. KALER:  Objection.  But you can

04:56:03  3    respond.

04:56:04  4        A.    Yeah, I don't know how I got the

04:56:10  5    3.5 million, though.

04:56:12  6        Q.    You say the value of the current lease is

04:56:15  7    around 29 million.  What do you mean by that, the

04:56:18  8    value of the lease?

04:56:19  9        A.    It's the total lease obligations.

04:56:21  10       Q.    The total lease obligations meaning the

04:56:24  11   nondiscounted payments as Ms. Walsh calculated them?

04:56:29  12       A.    Yes.  The total lease -- The total lease

04:56:33  13   obligations.

04:56:34  14       Q.    Okay.

04:56:35  15       A.    Total cost to Lycos.

04:56:36  16       Q.    Then you say the total cost of the

04:56:37  17   equipment was around 63 million.

04:56:40  18       A.    The cost to Lycos.

04:56:42  19       Q.    The total cost to Lycos of the equipment

04:56:45  20   was 63 million?

04:56:46  21       A.    The total cost to Lycos was right around

04:56:50  22   $60 million, yeah.

04:56:52  23       Q.    Of the equipment?

04:56:53  24       A.    No, the total cost to Lycos.

*Paul H. Stenberg, Jr.*                    360

04:56:55  1      Q.    You mean the total monthly lease payments

04:56:57  2  were 63 million?

04:56:59  3      A.    Over that time, correct.

04:57:01  4      Q.    But that's not what it says here.  It says

04:57:03  5  the total cost of the equipment was around 63

04:57:06  6  million.

04:57:08  7            MR. KALER:  Objection, argumentative.  But

04:57:11  8  you can -- Are you asking him the question?

04:57:13  9  BY MR. BEAN:

04:57:13  10     Q.    You said that the total cost of the

04:57:14  11  equipment was around 63 million.  Correct?

04:57:15  12     A.    Total cost to Lycos.  We were talking --

04:57:21  13  remember Lucy's e-mail -- the lease commitments were

04:57:26  14  17 million, now the lease commitment was 29 million.

04:57:31  15  Total cost to Lycos was around $63 million.

04:57:36  16     Q.    Total cost of the equipment?

04:57:37  17     A.    Total cost to Lycos.

04:57:39  18     Q.    Well, but you wrote the total cost of the

04:57:41  19  equipment was around 63 million.  Correct?

04:57:43  20     A.    Was the total cost to Lycos.

04:57:47  21     Q.    Am I reading your memo correctly,

04:57:49  22  Mr. Stenberg, when I say that you wrote, quote, "The

04:57:51  23  total cost of the equipment was around 63 million"?

04:57:54  24     A.    We were --

*Paul H. Stenberg, Jr.*                    361

04:57:55  1     Q.   Did I read that correctly?

04:57:56  2     A.   No, you didn't.

04:57:57  3     Q.   I didn't read that correctly?

04:57:58  4     A.   You took it out of context.  It was the

04:58:00  5  total cost to Lycos.

04:58:03  6        MR. KALER:  Of the equipment?

04:58:05  7     A.   No, total cost of the lease.

04:58:07  8        MR. BEAN:  Let him testify.

04:58:08  9        MR. KALER:  Okay.

04:58:09  10     A.   The total cost to Lycos of the lease

04:58:11  11  obligations.

04:58:12  12     Q.   Let me just ask you one more time, and see

04:58:14  13  if I can read this sentence correctly; and then

04:58:16  14  we'll talk about what you think it means.  Okay?

04:58:19  15  You wrote, quote, "The total cost of the equipment

04:58:21  16  was around $63 million," end quote.

04:58:23  17     A.   I wrote that.

04:58:25  18     Q.   Yes, you did.  Right?

04:58:26  19     A.   Right.

04:58:27  20     Q.   Now, what do you say that means?

04:58:28  21     A.   That's the total cost to Lycos.

04:58:32  22     Q.   Of what?

04:58:33  23     A.   Of all their lease obligations.

04:58:34  24     Q.   Under all the equipment schedules?

*Paul H. Stenberg, Jr.*                     362

04:58:36  1      A.      All the equipment schedules.

04:58:39  2      Q.      From Schedule Number 1 through what,

04:58:43  3  Schedule 200?

04:58:45  4      A.      What it was at the time.  I went back

04:58:49  5  and....

04:58:50  6      Q.      Okay.  So you say that what you did was

04:58:52  7  add up all the total payments of all the schedules

04:58:59  8  that would be due as of March 18, 2002?

04:59:07  9      A.      Well, I looked at Monique's analysis, I

04:59:10  10  looked at the e-mails, and we were always talking

04:59:11  11  the total cost to Lycos.  It wasn't the total cost

04:59:15  12  of the equipment; it was the total cost to Lycos.

04:59:22  13      Q.      So what did you do to come up with that

04:59:23  14  $63 million number?

04:59:28  15      A.      I probably went into my desk, got all the

04:59:31  16  equipment schedules, wrote down the term, the

04:59:36  17  payment, and add 'em all up.

04:59:39  18      Q.      That's what you think you did?

04:59:41  19      A.      That's what I would have done.

04:59:43  20      Q.      That's a lot of work, because there were a

04:59:45  21  lot of schedules.  Right, Mr. Stenberg?

04:59:48  22      A.      Well, an hour, two hours.

04:59:56  23      Q.      All right.

04:59:58  24              Did you communicate with anyone at CSI in

*Paul H. Stenberg, Jr.*                363

05:00:01  1    St. Louis in an effort to ascertain the accuracy of

05:00:04  2    the statement that the total payments were

05:00:08  3    approximately 63 million?

05:00:13  4        A.    Say that again?  I was interrupted.

05:00:15  5        Q.    Sorry.

05:00:16  6              Did you communicate with anyone else at

05:00:19  7    CSI in St. Louis or otherwise to ascertain whether

05:00:24  8    your calculation that the total cost of all payments

05:00:28  9    was around 63 million was accurate?

05:00:31  10       A.    I didn't recall calling anyone up.  I had

05:00:34  11   the documents right there.  I probably just went

05:00:37  12   into the desk, did it, and that was it.

05:00:44  13       Q.    Of what relevance to Lycos was it that the

05:00:47  14   total cost of the payments under all the schedules

05:00:51  15   was around 63 million?  How was that relevant to

05:00:53  16   Lycos' present inquiry?

05:00:57  17       A.    Well, we were talking about lease

05:00:59  18   commitments and we're talking about -- I mentioned

05:01:01  19   the total lease commitments to Lycos was 63 million.

05:01:05  20       Q.    Well, that's not what you wrote, is it?

05:01:08  21       A.    The total cost of equipment was around,

05:01:11  22   and we're talking, if you look at Lucy's, he's

05:01:16  23   saying lease commitments.  We're talking about lease

05:01:18  24   commitments and I was talking about lease

*Paul H. Stenberg, Jr.* 364

| | | |
|---|---|---|
| 05:01:20 | 1 | commitments. |
| 05:01:22 | 2 | Q. When he was talking about lease |
| 05:01:23 | 3 | commitments, he was comparing 17 million and 29 |
| 05:01:26 | 4 | million. Correct? |
| 05:01:28 | 5 | A. Correct, correct. |
| 05:01:29 | 6 | Q. And then you come back with the total cost |
| 05:01:32 | 7 | of the equipment was around 63 million. Correct? |
| 05:01:37 | 8 | A. I said total cost to Lycos was 63 million. |
| 05:01:42 | 9 | Q. Do you see the words "to Lycos" anywhere? |
| 05:01:45 | 10 | A. But we were speaking about the total lease |
| 05:01:48 | 11 | commitments. |
| 05:01:52 | 12 | Q. That was your understanding? But you had |
| 05:01:54 | 13 | already -- |
| 05:01:55 | 14 | A. Well, this is both of our understandings. |
| 05:01:58 | 15 | I mean, he says thanks a bunch. |
| 05:02:02 | 16 | Q. I understand. |
| 05:02:03 | 17 | A. So we were all on the same page. |
| 05:02:05 | 18 | Q. Well, you wrote to him that the total cost |
| 05:02:07 | 19 | of the equipment was around 63 million. You didn't |
| 05:02:09 | 20 | write to him that the total payments were around 63 |
| 05:02:12 | 21 | million, did you? |
| 05:02:14 | 22 | MR. KALER: Note my objection. It's |
| 05:02:16 | 23 | argumentative. I mean, he wrote what he wrote, but |
| 05:02:19 | 24 | you can respond. But I object, it's argumentative. |

*Paul H. Stenberg, Jr.*                365

05:02:21  1       A.    We were speaking about the lease

05:02:23  2    commitments.  That was our, what we were speaking

05:02:25  3    about:  the lease commitments.

05:02:27  4       Q.    Well, what I'm still not clear on is how

05:02:29  5    the total lease commitment of around 63 million is

05:02:33  6    relevant to Lycos' inquiry as to the increase in

05:02:37  7    payments from 17 million to 29 million.

05:02:41  8             MR. KALER:  Objection.

05:02:42  9    BY MR. BEAN:

05:02:43  10      Q.    How is the fact that the total payments

05:02:45  11   would be 63 million under all schedules in any way

05:02:48  12   relevant to the reason for the increase in payments

05:02:52  13   from 17 to 29 million?

05:02:56  14            MR. KALER:  Objection.  But you can

05:02:57  15   respond.

05:02:57  16      A.    It was a reference that the total lease

05:03:01  17   commitments to Lycos was 63 million.

05:03:03  18      Q.    I understand that that's what you're

05:03:05  19   saying.

05:03:05  20      A.    Okay, then you understand.

05:03:07  21      Q.    I'm trying to understand how that has

05:03:08  22   anything to do with the reasons for the increase in

05:03:12  23   the commitments from 17 to 29 million.

05:03:16  24      A.    Any reason?  Relevance?

*Paul H. Stenberg, Jr.*                    366

05:03:19   1      Q.     What relevance does that have to do with

05:03:21   2   that?

05:03:24   3      A.     We were speaking in terms of, I put it

05:03:27   4   out, don't forget we did 63 million in financing

05:03:35   5   total cost to Lycos.  I'm not sure what you mean by

05:03:37   6   relevance.

05:03:38   7      Q.     What did the fact -- What did the total

05:03:41   8   commitments as you say that sentence refers to have

05:03:43   9   anything to do with the reasons for the increase

05:03:45   10   from 17 to 29 million?

05:03:49   11      A.     It gives them a basis to realize that the

05:03:54   12   total cost, the lease commitments was 63 million.  I

05:03:57   13   don't understand your question.

05:03:58   14      Q.     Well, the whole inquiry, Lycos was trying

05:04:00   15   to figure out why its payments went up from 17 to 29

05:04:04   16   million.  Right?  Right?

05:04:06   17      A.     Well, it's fair enough to say that they

05:04:08   18   extended them out.  You are going to pay more over

05:04:11   19   time, you know.

05:04:11   20      Q.     They went from 17 to 29.  That's a pretty

05:04:14   21   dramatic increase.

05:04:15   22              MR. KALER:  Objection.  That's just

05:04:17   23   argumentative.  You can respond if you can answer

05:04:22   24   the question.

*Paul H. Stenberg, Jr.*                                    367

05:04:22  1      A.     No, I was looking at something.  Go ahead.

05:04:24  2             MR. KALER:  I'm sorry.  Can you restate

05:04:26  3      your question?

05:04:26  4      BY MR. BEAN:

05:04:27  5      Q.     What does the fact -- Lycos' inquiry was

05:04:29  6      why are the payments going from 17 to 29 million.

05:04:31  7      Correct?

05:04:31  8      A.     Correct.

05:04:33  9      Q.     What relevance does the reason for that

05:04:38  10     increase have to do with that the total commitments

05:04:41  11     were 63 million?

05:04:43  12            MR. KALER:  Objection.  Can you explain

05:04:47  13     what you -- ?  Well, objection to the question.

05:04:50  14     BY MR. BEAN:

05:04:50  15     Q.     I don't see any -- What is the

05:04:52  16     relationship, if any, between a total commitment of

05:04:54  17     63 million and the reason for the increase from 17

05:04:57  18     to 29 million?  What does one have to do with the

05:05:04  19     other?

05:05:04  20     A.     I don't understand.  We were talking, it

05:05:06  21     was a point of reference that your total lease

05:05:08  22     commitments was 63 now.  They were 17, now they're

05:05:16  23     going to 29.

05:05:16  24     Q.     So you think that's what you were talking

*Paul H. Stenberg, Jr.* 368

| | | |
|--|--|--|
| 05:05:19 | 1 | about here? |
| 05:05:19 | 2 | A. Yeah, pretty sure that's what I was |
| 05:05:21 | 3 | talking about. |
| 05:05:21 | 4 | Q. Well, do you have any doubt about that? |
| 05:05:26 | 5 | A. I was talking about the lease commitments |
| 05:05:28 | 6 | to Lycos. |
| 05:05:28 | 7 | Q. And is it accurate to say that Lycos' |
| 05:05:30 | 8 | total lease commitments under all schedules that had |
| 05:05:33 | 9 | been executed as of March 18, 2002, was |
| 05:05:37 | 10 | approximately 63 million? |
| 05:05:39 | 11 | A. Rough estimate. Very rough. |
| 05:05:42 | 12 | Q. Well, rough estimate, very rough? |
| 05:05:44 | 13 | A. Again, I probably went to my desk, took |
| 05:05:47 | 14 | out everything, rounded everything off, rounded up |
| 05:05:52 | 15 | terms and so on, came up with the 63 million. |
| 05:05:56 | 16 | Q. Did you expect Lycos to rely on the |
| 05:05:58 | 17 | information in this e-mail that you sent on March |
| 05:06:01 | 18 | 18, 2002? |
| 05:06:02 | 19 | A. Rely on in what sense? |
| 05:06:07 | 20 | Q. Rely on the information. Well, Lycos had |
| 05:06:09 | 21 | asked you a question. Right? |
| 05:06:11 | 22 | A. Yes. |
| 05:06:11 | 23 | Q. And you said that part of your job as an |
| 05:06:13 | 24 | account executive was to respond to questions from |

*FARMER ARSENAULT BROCK LLC*
*617.728.4404*

*Paul H. Stenberg, Jr.*                         369

| 05:06:14 | 1 | your customers, and you were responding to a |

05:06:14  1  your customers, and you were responding to a

05:06:18  2  question from your customer.  Correct?

05:06:20  3      A.    Yeah, correct.

05:06:21  4      Q.    And you were providing information to

05:06:22  5  Lycos.  Correct?

05:06:23  6      A.    Yes.

05:06:23  7      Q.    And you expected Lycos to rely on that

05:06:25  8  information you were providing, didn't you?

05:06:26  9          MR. KALER:  Objection.  You can respond.

05:06:27  10     A.    Well, they should rely on the information

05:06:29  11  that they have in their records.

05:06:31  12     Q.    Well, but then why did they even need to

05:06:34  13  ask you, Mr. Stenberg?  Obviously their records

05:06:36  14  caused them to question you.

05:06:38  15         MR. KALER:  Objection.  That's

05:06:40  16  argumentative.

05:06:41  17  BY MR. BEAN:

05:06:41  18     Q.    Did you expect -- You expected Lycos to

05:06:43  19  rely on the information in your e-mail of March 18,

05:06:47  20  2002, didn't you?

05:06:48  21     A.    No.

05:06:49  22         MR. KALER:  Objection.

05:06:49  23     A.    They're going to rely on my e-mail?  They

05:06:52  24  have records of everything.  They had analysis.

# EXHIBIT 8
PART 2

*Paul H. Stenberg, Jr.*                          370

05:06:55  1    They didn't rely on my e-mail.

05:06:57  2        Q.    Well, maybe -- They didn't rely on your

05:06:59  3    e-mail?

05:06:59  4        A.    I couldn't tell you if they did.

05:07:01  5        Q.    Right.  You don't know --

05:07:04  6        A.    He never said, you know, "We're relying on

05:07:05  7    your e-mail."

05:07:06  8        Q.    After receiving your e-mail, Lycos ceased

05:07:08  9    its consideration of unwinding Schedules 93 and 94,

05:07:11  10   didn't it?

05:07:12  11           MR. KALER:  Objection.  I object to the

05:07:15  12   lack of foundation for this witness having any

05:07:17  13   personal knowledge of what Lycos was doing --

05:07:19  14           MR. BEAN:  Oh, I understand.

05:07:22  15           MR. KALER:  -- at that point in time.

05:07:23  16   BY MR. BEAN:

05:07:23  17       Q.    Did Lycos have any further communications

05:07:24  18   with you after March 18, 2002, about unwinding

05:07:29  19   Schedules 93 and 94?

05:07:30  20       A.    I'm not sure.

05:07:31  21       Q.    You don't know?

05:07:32  22       A.    I don't know.

05:07:35  23       Q.    Okay, all right.

05:07:35  24           You say "When we refinanced we extended

*Paul H. Stenberg, Jr.*                    371

| 05:07:40 | 1 | our lease and recouped about 5 to 7 percent, thus |
| 05:07:43 | 2 | the 3.5 million."  What do you mean by that? |
| 05:07:46 | 3 | A.    I forget.  I don't have the numbers in |
| 05:07:48 | 4 | front of me anymore. |
| 05:07:52 | 5 | Q.    Did you do some calculations? |
| 05:07:54 | 6 | A.    Yeah. |
| 05:07:54 | 7 | Q.    To come up with the 63 million? |
| 05:07:56 | 8 | A.    Rough estimates as I said.  I looked at |
| 05:07:59 | 9 | everything and figured it all out. |
| 05:08:00 | 10 | Q.    Did you tell Lycos that the 63 million was |
| 05:08:03 | 11 | a rough estimate? |
| 05:08:05 | 12 | A.    Was around. |
| 05:08:08 | 13 | Q.    You said it was around? |
| 05:08:09 | 14 | A.    Around. |
| 05:08:10 | 15 | Q.    Okay.  And you did math to calculate that |
| 05:08:11 | 16 | 63 million.  Right? |
| 05:08:12 | 17 | A.    I -- |
| 05:08:14 | 18 | Q.    Did you do it on a computer?  Did you do |
| 05:08:16 | 19 | it on an Excel spreadsheet?  Did you do it on paper? |
| 05:08:18 | 20 | A.    I did it on an HP12C. |
| 05:08:20 | 21 | Q.    That's your calculator? |
| 05:08:21 | 22 | A.    Yes. |
| 05:08:23 | 23 | Q.    And did you print anything out that |
| 05:08:25 | 24 | reflected that calculation of approximately |

*Paul H. Stenberg, Jr.*                                372

05:08:26  1  63 million?

05:08:27  2      A.    No, I did not.

05:08:30  3      Q.    Now, just so I'm clear, the 63 million

05:08:32  4  then represents your calculation of the aggregate

05:08:37  5  payments under every single schedule that Lycos had

05:08:41  6  executed as of March 18, 2002.  Is that right?

05:08:46  7      A.    It's a rough estimate, right around there.

05:08:49  8      Q.    But it represents the total of every

05:08:51  9  payment under every schedule executed as of March

05:08:56 10  18, 2002.  Right?

05:08:58 11      A.    Yes.

05:09:02 12      Q.    Now, you say -- I'm still trying to

05:09:05 13  understand -- "We recouped about 5 to 7 percent,

05:09:09 14  thus the 3.5 million."  What did you mean by that?

05:09:12 15  What do you mean by recouping 5 to 7 percent?

05:09:20 16      A.    When we financed, when we extended the

05:09:22 17  leases, we recouped 3-1/2 million, right around.  I

05:09:25 18  don't have the exact numbers, I don't have my notes.

05:09:28 19      Q.    What do you mean by recoup?

05:09:30 20      A.    Well, as we've been talking about, once

05:09:33 21  you extend and rewrite, you get back some of your

05:09:36 22  residual investment.

05:09:36 23      Q.    So you recouped approximately 3-1/2

05:09:39 24  million dollars of your original investment when you

*Paul H. Stenberg, Jr.* 373

| | | |
|---|---|---|
| 05:09:40 | 1 | refinanced 93 and 94?  Is that what you're -- |
| 05:09:45 | 2 | A.    Again, I don't know.  That was a rough |
| 05:09:46 | 3 | estimate. |
| 05:09:48 | 4 | Q.    But that's conceptually what you meant, |
| 05:09:50 | 5 | that you had recouped approximately $3-1/2 million |
| 05:09:54 | 6 | of your investment when you rewrote 93 and 94. |
| 05:09:57 | 7 | Correct? |
| 05:10:01 | 8 | A.    Our lease?  I'm not sure what lease I was |
| 05:10:04 | 9 | talking about. |
| 05:10:08 | 10 | Q.    Well, this whole memo deals with 93 and |
| 05:10:10 | 11 | 94, doesn't it? |
| 05:10:11 | 12 | A.    Yeah.  But I'm not sure which lease |
| 05:10:13 | 13 | I looked at, if I looked at just one or the other. |
| 05:10:15 | 14 | Q.    Well, you say when we refinanced.  Who is |
| 05:10:17 | 15 | the we, by the way? |
| 05:10:19 | 16 | A.    Well, "we" would be CSI and Lycos. |
| 05:10:22 | 17 | Q.    And when we refinanced, you were referring |
| 05:10:25 | 18 | to the refinancing of 93 and 94.  Right? |
| 05:10:27 | 19 | A.    Well, again, I don't know which one I |
| 05:10:29 | 20 | looked at.  It was either one or the other or both. |
| 05:10:32 | 21 | I'm not sure. |
| 05:10:33 | 22 | Q.    As between 93 -- You don't know whether |
| 05:10:36 | 23 | you're referring to 93 and/or 94? |
| 05:10:38 | 24 | A.    I'm not sure which ones or both.  I'm not |

*Paul H. Stenberg, Jr.*                          374

05:10:40  1  sure which ones I looked at.

05:10:43  2      Q.    But you recouped about $3-1/2 million of

05:10:46  3  your investment?

05:10:47  4      A.    I assume we did that, correct.

05:10:49  5      Q.    You assume that?

05:10:51  6      A.    Yeah.

05:10:51  7      Q.    What was the basis for your assumption?

05:10:53  8      A.    I just kind of looked at the total lease

05:10:54  9  cost that they were paying us and how much, you

05:10:57  10  know, we're getting back.

05:10:59  11      Q.    Well, did you at any point determine what

05:11:01  12  your equity investment in the leases was before the

05:11:07  13  execution of 93 and 94?

05:11:10  14      A.    No.

05:11:11  15      Q.    Well, how do you know you even had

05:11:14  16  $3-1/2 million of equity in an investment

05:11:18  17  outstanding that hadn't already been recouped?

05:11:19  18      A.    Because I went back to certain documents

05:11:21  19  and see what the equity we put on it was.

05:11:23  20      Q.    So how much equity was outstanding as far

05:11:30  21  as you determined before Lycos and CSI executed

05:11:33  22  Schedules 93 and 94?

05:11:36  23      MR. KALER:  Objection.

05:11:36  24      A.    I don't know the figure.

*Paul H. Stenberg, Jr.*                    375

05:11:37  1        Q.    But you calculated that you recouped about

05:11:39  2   5 to 7 percent of that?

05:11:41  3        A.    That was a rough estimate.

05:11:42  4        Q.    And take me through the math of how you

05:11:45  5   came up with 5 to 7 percent.

05:11:48  6        A.    Again, I don't have the -- I don't have

05:11:49  7   the documents.  It was four years ago.

05:11:52  8        Q.    And you don't recall how you did it?

05:11:53  9        A.    No.

05:11:54 10        Q.    And looking at it right here, you don't

05:11:56 11   know how you would do it.  Is that right?

05:11:58 12        A.    I would need all the information.

05:11:59 13        Q.    What information would you need?

05:12:02 14        A.    What exactly I did.  I'd need to see my

05:12:05 15   notes, how I did it.

05:12:06 16        Q.    Did you take any notes?

05:12:08 17        A.    No.  I did it off the cuff of my head,

05:12:12 18   taking the equipment schedules and doing them on my

05:12:15 19   12C.

05:12:16 20        Q.    And did your 12C print out any pieces of

05:12:20 21   paper?

05:12:20 22        A.    No.  It's a piece of -- it's a calculator.

05:12:22 23        Q.    But some calculators you can print off.

05:12:24 24        A.    Yeah, but not this 12C.

*Paul H. Stenberg, Jr.* 376

| | | |
|---|---|---|
| 05:12:26 | 1 | Q.    Yours doesn't? |
| 05:12:27 | 2 | A.    No. |
| 05:12:29 | 3 | Q.    Now, you say "Don't forget on the original |
| 05:12:31 | 4 | leases CSI injects between a 10 to 13 percent |
| 05:12:35 | 5 | residual for every million dollars spent." You see |
| 05:12:38 | 6 | that? |
| 05:12:38 | 7 | A.    Yes. |
| 05:12:44 | 8 | Q.    So did you then conclude that -- Is that |
| 05:12:49 | 9 | how Lycos satisfies the 90 percent test, because |
| 05:12:52 | 10 | you're injecting 10 to 13 percent residual?  Do |
| 05:12:58 | 11 | those two bear any relation to each other? |
| 05:13:01 | 12 | MR. KALER:  Objection.  But you can |
| 05:13:02 | 13 | respond. |
| 05:13:02 | 14 | A.    I'm not sure how they calculate operating |
| 05:13:07 | 15 | leases. |
| 05:13:07 | 16 | Q.    I'm sorry? |
| 05:13:08 | 17 | A.     I'm not sure how they calculate operating |
| 05:13:07 | 18 | leases. |
| 05:13:09 | 19 | Q.    How who calculates -- |
| 05:13:11 | 20 | A.    Well, I don't know.  Your question was, |
| 05:13:13 | 21 | again? |
| 05:13:13 | 22 | Q.    You said "CSI injects a 10 to 13 percent |
| 05:13:16 | 23 | residual for every million dollars spent."  Right? |
| 05:13:19 | 24 | A.    That's what I said, correct. |

*Paul H. Stenberg, Jr.*                    377

| | | |
|---|---|---|
| 05:13:21 | 1 | Q.    And that was a true statement? |
| 05:13:22 | 2 | A.    It's what I said. |
| 05:13:24 | 3 | Q.    Well, okay.  And it was a true statement? |
| 05:13:29 | 4 | I know you said it.  Was it true when you said it? |
| 05:13:32 | 5 | A.    True in what way? |
| 05:13:33 | 6 | Q.    Accurate. |
| 05:13:34 | 7 | A.    Accurate did we inject? |
| 05:13:37 | 8 | Q.    Yes. |
| 05:13:37 | 9 | A.    For over -- ?  A lot of cases, yes. |
| 05:13:42 | 10 | Q.    Well, a lot of cases or all cases? |
| 05:13:44 | 11 | A.    Well, in this case at Lycos we couldn't |
| 05:13:48 | 12 | inject that much because of the credit risk. |
| 05:13:52 | 13 | Q.    How much did you inject in terms of |
| 05:13:58 | 14 | equity?  How much equity did you inject in the |
| 05:13:59 | 15 | original Lycos schedules? |
| 05:14:01 | 16 | A.    That I'm not sure.  That comes from |
| 05:14:04 | 17 | St. Louis. |
| 05:14:04 | 18 | Q.    How would you calculate the amount of |
| 05:14:06 | 19 | equity that CSI injected in the Lycos schedules? |
| 05:14:10 | 20 | A.    How would I calculate them? |
| 05:14:12 | 21 | Q.    Yes. |
| 05:14:12 | 22 | A.    You would have to go to St. Louis. |
| 05:14:15 | 23 | I can barely see. |
| 05:14:16 | 24 | Q.    I'm sorry.  Is the sun bothering you? |

*Paul H. Stenberg, Jr.*                378

| | | |
|---|---|---|
| 05:14:18 | 1 | A.    No, just the glare. |
| 05:14:19 | 2 | Q.    I'm sorry. |
| 05:14:20 | 3 |       MR. KALER:  Can you just turn the light |
| 05:14:24 | 4 | around? |
| 05:14:24 | 5 |       THE WITNESS:  Or push the thing down. |
| 05:14:26 | 6 | Does that shade go down? |
| 05:14:28 | 7 |       (Discussion off the record.) |
| 05:14:44 | 8 |       THE VIDEOGRAPHER:  The time is 5:14. |
| 05:14:49 | 9 | We're off the record. |
| 05:15:07 | 10 |      (Pause) |
| 05:15:28 | 11 |      MR. BEAN:  Back on the record, please. |
| 05:15:29 | 12 |      THE VIDEOGRAPHER:  The time is 5:14.  We |
| 05:15:31 | 13 | are back on the record. |
| 05:15:32 | 14 | BY MR. BEAN: |
| 05:15:33 | 15 | Q.    So how would you -- Tell me, are you able |
| 05:15:37 | 16 | to do the math to calculate how much equity |
| 05:15:41 | 17 | investment CSI made in the Lycos schedules? |
| 05:15:45 | 18 | A.    Yes. |
| 05:15:46 | 19 | Q.    How would you calculate that? |
| 05:15:48 | 20 | A.    Take the monthly payment and divide it |
| 05:15:52 | 21 | into the -- or use that and the acquisition cost, |
| 05:15:56 | 22 | and you can figure it out. |
| 05:15:57 | 23 | Q.    Tell me how to do it.  What's the formula? |
| 05:16:01 | 24 | A.    All right.  You put the payment in, you |

*FARMER ARSENAULT BROCK LLC*
*617.728.4404*

*Paul H. Stenberg, Jr.*                    379

| | | |
|---|---|---|
| 05:16:04 | 1 | get the present value of the payment. |
| 05:16:05 | 2 | Q. Present value of the total payments on the |
| 05:16:07 | 3 | lease schedule? |
| 05:16:08 | 4 | A. On the lease schedule. |
| 05:16:09 | 5 | Q. Using what discount rate? |
| 05:16:10 | 6 | A. Well, it depends. It really depends on |
| 05:16:12 | 7 | the company, their credit. |
| 05:16:12 | 8 | Q. Let's talk about Lycos. What discount |
| 05:16:16 | 9 | rate would you use? |
| 05:16:16 | 10 | A. What time are you -- ? What year? |
| 05:16:19 | 11 | Q. Okay, 2000. |
| 05:16:20 | 12 | A. Probably use 11 percent. |
| 05:16:23 | 13 | Q. And in 2001 what discount rate would you |
| 05:16:26 | 14 | use? |
| 05:16:26 | 15 | A. I can't -- I'm not sure. |
| 05:16:27 | 16 | Q. But in 2000 you used -- |
| 05:16:29 | 17 | A. Hypothetically 11 percent. |
| 05:16:31 | 18 | Q. So you take the total payments under a |
| 05:16:32 | 19 | lease schedule, you discount them by 11 percent, and |
| 05:16:35 | 20 | then what do you do? |
| 05:16:38 | 21 | A. The acquisition cost. |
| 05:16:39 | 22 | Q. You compare that to the acquisition cost? |
| 05:16:41 | 23 | A. Right. |
| 05:16:44 | 24 | Q. And the difference between the two would |

Paul H. Stenberg, Jr.                    380

05:16:47  1    represent CSI's equity investment?

05:16:49  2         A.    Correct.

05:16:51  3         Q.    And to do that calculation, Lycos would

05:16:54  4    need to know the acquisition cost of the equipment.

05:16:58  5    Correct?

05:16:58  6         A.    Yeah.  And they had it.

05:17:00  7         Q.    How do you know they had it?

05:17:06  8         A.    Exhibit 33 will show you all the P.O.

05:17:13  9    numbers and then they would rectify their P.O.

05:17:16  10   numbers --

05:17:17  11              MR. KALER:  Reconcile?

05:17:17  12        A.    Reconcile, yeah, excuse me, reconcile

05:17:20  13   their purchase order.  Okay?

05:17:23  14        Q.    So you'd have to go back to the P.O.'s?

05:17:27  15        A.    I wouldn't have; they would have to.

05:17:29  16        Q.    Right.  And that would be the only way to

05:17:31  17   calculate the original acquisition cost.  Is that

05:17:34  18   right?

05:17:34  19              MR. KALER:  Objection.  You may respond.

05:17:35  20   BY MR. BEAN:

05:17:36  21        Q.    That would be the only way for Lycos to

05:17:37  22   calculate the original acquisition cost.  Correct?

05:17:41  23              MR. KALER:  Objection.

05:17:41  24        A.    I'm not sure how Lycos -- I mean, they

*Paul H. Stenberg, Jr.*                    381

05:17:43    1    have their P.O.'s.

05:17:45    2        Q.    Well, that's the way you would propose

05:17:46    3    they do it.  Right?

05:17:47    4        A.    Yeah.

05:17:48    5        Q.    Now, you had Exhibit 2, right, the

05:17:52    6    SmartTrack schedule?

05:17:54    7        A.    Yes.

05:17:54    8        Q.    Which listed the actual equipment hardware

05:17:56    9    cost.  Right?

05:18:01   10        A.    Exhibit 2?  I don't have 2.  Not in the

05:18:21   11    right order.

05:18:21   12        Q.    You know what I mean by the SmartTrack

05:18:23   13    schedule.  Correct?

05:18:24   14            MR. KALER:  Let's pull it up.  Should be

05:18:26   15    right there.

05:18:26   16            THE WITNESS:  Should be there.  Someone

05:18:27   17    take it on me?

05:18:28   18            MR. KALER:  No, no.

05:18:34   19            MR. BEAN:  There, I think it's in your

05:18:36   20    hand, Bob.

05:18:36   21            MR. KALER:  Is it?  Here we go.

05:18:39   22    BY MR. BEAN:

05:18:39   23        Q.    Exhibit 2, the SmartTrack schedules.

05:18:43   24        A.    Mm-hmm.

*Paul H. Stenberg, Jr.*                          382

| 05:18:43 | 1 | Q.     That's not a document you ever provided to |
| 05:18:45 | 2 | Lycos.  Right? |
| 05:18:46 | 3 | A.     It's for commission purposes. |
| 05:18:49 | 4 | Q.     Let me ask you the question again.  You |
| 05:18:50 | 5 | never provided the SmartTrack schedules to Lycos, |
| 05:18:50 | 6 | did you? |
| 05:18:54 | 7 | A.     They had SmartTrack schedules, yeah. |
| 05:18:56 | 8 | Q.     The document marked as Exhibit 2, you gave |
| 05:18:59 | 9 | copies of that document to Lycos? |
| 05:19:02 | 10 | A.     This isn't -- You have two separate things |
| 05:19:05 | 11 | here. |
| 05:19:06 | 12 | Q.     Request for preparation of lease contract. |
| 05:19:07 | 13 | I'm sorry, I misspoke. |
| 05:19:09 | 14 | A.     Yeah. |
| 05:19:09 | 15 | Q.     That's a request for preparation of lease |
| 05:19:11 | 16 | contract, Exhibit 2.  Right? |
| 05:19:13 | 17 | A.     Yes. |
| 05:19:13 | 18 | Q.     And you didn't provide copies of the |
| 05:19:15 | 19 | request for preparation of lease contract to Lycos, |
| 05:19:15 | 20 | did you? |
| 05:19:19 | 21 | A.     No. |
| 05:19:19 | 22 | Q.     Now, going back to Exhibit 38, your memo, |
| 05:19:24 | 23 | your e-mail of March 18, where you said CSI injects |
| 05:19:28 | 24 | between 10 to 13 percent residual. |

*Paul H. Stenberg, Jr.*                    383

05:19:30   1        A.    Okay.

05:19:31   2        Q.    But insofar as Lycos was concerned,

05:19:34   3    because it was a credit risk, CSI did not inject 10

05:19:37   4    to 13 percent, did it?

05:19:38   5        A.    Sometimes we did.

05:19:39   6        Q.    And sometimes it didn't?

05:19:41   7        A.    Yeah.

05:19:42   8        Q.    But then you go on and say that Lycos'

05:19:46   9    obligation is 870.  Right?

05:19:48  10        A.    In a hypothetical situation, yes.

05:19:55  11        Q.    Okay.  And did you intend to mean that

05:19:57  12    Lycos should read this to say that CSI was injecting

05:20:01  13    a 10 to 13 percent residual on Lycos leases?

05:20:05  14        A.    We were talking in generalities.  I was

05:20:07  15    talking in generalities.

05:20:08  16        Q.    Well, but it says CSI injects 10 to 13

05:20:11  17    percent for every million.  Lycos' obligation is

05:20:13  18    870.  Right?

05:20:14  19        A.    In a hypothetical situation, yeah.

05:20:16  20        Q.    Okay, but Lycos --

05:20:18  21        A.    Hypothetical, yep.

05:20:19  22        Q.    I'm sorry.  Is the word "hypothetically"

05:20:21  23    in your memo?

05:20:22  24        A.    It is down low, "for example,

Paul H. Stenberg, Jr.                    384

05:20:25   1   hypothetically."

05:20:25   2       Q.    Okay, that's down there.  But in the

05:20:27   3   paragraph -- So you know how to put the word

05:20:30   4   "hypothetically" in when you want to be

05:20:31   5   hypothetical.  Right?

05:20:32   6       A.    Mm-hmm.

05:20:32   7       Q.    Right?

05:20:34   8       A.    Correct.

05:20:34   9       Q.    And you didn't put it in the next-to-last

05:20:37  10   paragraph on the first page of Exhibit 38, did you?

05:20:41  11       A.    Next-to-last paragraph?  No, I did not.

05:20:43  12       Q.    And so you expected Lycos to believe that

05:20:47  13   CSI was injecting the 10 to 13 percent on the Lycos

05:20:51  14   leases, didn't you?

05:20:52  15            MR. KALER:  Objection to the form of that

05:20:54  16   question.  But you can respond.

05:20:56  17       A.    Say that again?

05:20:57  18       Q.    You expected Lycos to read Exhibit 38 and

05:21:01  19   believe that CSI was injecting 10 to 13 percent of

05:21:04  20   equity on CSI's schedules with Lycos, didn't you?

05:21:09  21            MR. KALER:  Objection.  But you can

05:21:11  22   respond.

05:21:11  23       A.    I don't know what Lycos was to believe.

05:21:14  24   They had all their documents; they had all the lease

*Paul H. Stenberg, Jr.* 385

| | | |
|---|---|---|
| 05:21:18 | 1 | documents that said you're paying this amount for |
| 05:21:23 | 2 | this, here's your purchase orders. So I don't know |
| 05:21:26 | 3 | what Lycos believed. |
| 05:21:27 | 4 | Q.    I was going to your intent. |
| 05:21:29 | 5 | A.    My intent was in generalities, just like |
| 05:21:31 | 6 | the 63 million was in generalities. |
| 05:21:34 | 7 | Q.    You didn't use the word "hypothetically" |
| 05:21:36 | 8 | when referring to the 63 million, did you?  You |
| 05:21:40 | 9 | didn't say this is a generality? |
| 05:21:43 | 10 | A.    I did not. |
| 05:21:44 | 11 | Q.    And you didn't use the word |
| 05:21:46 | 12 | "hypothetically" when you were talking about |
| 05:21:48 | 13 | injecting a 10 to 13 percent residual, did you? |
| 05:21:51 | 14 | MR. KALER:  Objection. |
| 05:21:55 | 15 | A.    I did not use "hypothetically" up there, |
| 05:21:57 | 16 | no. |
| 05:21:59 | 17 | Q.    Now, in the last paragraph -- |
| 05:22:01 | 18 | MR. KALER:  Just for the record my |
| 05:22:02 | 19 | objection is he says he did it on the original |
| 05:22:04 | 20 | leases. |
| 05:22:04 | 21 | MR. BEAN:  I understand that. |
| 05:22:05 | 22 | MR. KALER:  Okay, all right.  So that's my |
| 05:22:06 | 23 | objection. |
| 05:22:07 | 24 | MR. BEAN:  It says what it says, |

*Paul H. Stenberg, Jr.*                           386

| | | |
|---|---|---|
| 05:22:08 | 1 | Mr. Kaler. |
| 05:22:09 | 2 | MR. KALER:  Right, understood, understood. |
| 05:22:11 | 3 | BY MR. BEAN: |
| 05:22:11 | 4 | Q.    So in the last paragraph on the first page |
| 05:22:13 | 5 | you say that "A good portion of the equipment was |
| 05:22:15 | 6 | taken from an over-30-month term and placed on a |
| 05:22:19 | 7 | 24-month term."  Right? |
| 05:22:20 | 8 | A.    I did say that.  I'm not -- Okay, yep. |
| 05:22:23 | 9 | Q.    And that was referring to the PCs. |
| 05:22:28 | 10 | A.    Yeah.  They wanted to take the PCs on 24 |
| 05:22:30 | 11 | months.  There might have been a schedule in this |
| 05:22:33 | 12 | case that they did for 36 months, but he wanted the |
| 05:22:40 | 13 | PCs on 24, so we shortened the term and obviously |
| 05:22:42 | 14 | the rate is going to go up. |
| 05:22:44 | 15 | Q.    The monthly payments are going to go up. |
| 05:22:46 | 16 | Right? |
| 05:22:46 | 17 | A.    Yes. |
| 05:22:52 | 18 | Q.    Let's go to the second page of your |
| 05:22:55 | 19 | e-mail.  You said "When you return the equipment"; |
| 05:23:00 | 20 | you put "when" in caps.  Correct? |
| 05:23:03 | 21 | A.    Yes. |
| 05:23:03 | 22 | Q.    Why did you do that? |
| 05:23:07 | 23 | A.    Well, because I was getting calls saying |
| 05:23:09 | 24 | that we're going to return some equipment, so I knew |

*Paul H. Stenberg, Jr.*                        387

05:23:12   1   they were going to return equipment.

05:23:13   2        Q.    "I will give you full FMV credit."  But

05:23:18   3   you were giving full FMV credit all along.  Right?

05:23:22   4        A.    What do you mean?

05:23:23   5        Q.    Had you been giving full FMV credit before

05:23:27   6   the refinancing of 93 and 94 when Lycos returned

05:23:30   7   equipment?

05:23:30   8        A.    There might have been bits and pieces when

05:23:32   9   we were doing it, but --

05:23:34   10        Q.    When Lycos returned equipment before March

05:23:37   11   18, 2002, had CSI been giving full fair market value

05:23:42   12   credit?

05:23:44   13        A.    I'm not sure of -- I'd have to look at the

05:23:48   14   documentation, but....  Of the returns.

05:23:52   15        Q.    Would that have been your expectation, to

05:23:55   16   give full fair market value credit, or did this

05:24:00   17   represent a change?

05:24:00   18        A.    No, we would have given full fair market

05:24:02   19   value.

05:24:03   20        Q.    So by saying you're going to give full

05:24:05   21   fair market value credit, that's not a change in any

05:24:07   22   way to the CSI-Lycos relationship, is it?

05:24:10   23        A.    When we were talking about this deal, all

05:24:15   24   along I was telling them when you return the

Paul H. Stenberg, Jr.                    388

| | | |
|---|---|---|
| 05:24:16 | 1 | equipment we'll give you full fair market value of |
| 05:24:20 | 2 | equipment. |
| 05:24:21 | 3 | Q.    Did you give Lycos any indication of what |
| 05:24:27 | 4 | you thought the fair market value of the equipment |
| 05:24:29 | 5 | was? |
| 05:24:31 | 6 | A.    I mentioned before it depends what type of |
| 05:24:35 | 7 | equipment it is, when it's coming out, so no. |
| 05:24:38 | 8 | Q.    How would you calculate fair market value |
| 05:24:40 | 9 | of equipment?  Suppose hypothetically Lycos had a |
| 05:24:45 | 10 | particular piece of equipment it wanted to return. |
| 05:24:47 | 11 | How would CSI calculate the fair market value of |
| 05:24:49 | 12 | that piece of equipment? |
| 05:24:50 | 13 | MR. KALER:  Objection.  But you can |
| 05:24:51 | 14 | respond. |
| 05:24:52 | 15 | A.    That would be done out of St. Louis. |
| 05:24:54 | 16 | Q.    So you're agreeing to give them full fair |
| 05:24:57 | 17 | market value credit but you don't know how that fair |
| 05:24:59 | 18 | market value credit would be calculated? |
| 05:25:00 | 19 | A.    No.  It's done out of St. Louis. |
| 05:25:02 | 20 | Q.    Who out in St. Louis would calculate that? |
| 05:25:04 | 21 | A.    Phil Cagney's group. |
| 05:25:28 | 22 | MR. BEAN:  Let's go off the record, take a |
| 05:25:30 | 23 | break. |
| 05:25:30 | 24 | THE VIDEOGRAPHER:  The time is 5:24.  We |

# COPY

Exhibits:  46-55                    Volume 2, Pages  435-728

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

Docket No. 05-10017-RWZ

----------------------------------------

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

----------------------------------------

VIDEOTAPED DEPOSITION OF PAUL H. STENBERG, JR.

Friday, January 19, 2007, 10:12 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

--------- Janis T. Young, RDR, CRR ---------

jyoung@fabreporters.com    www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

521

| | |
|---|---|
| 11:43:36 | 1 |
| 11:43:39 | 2 |
| 11:43:41 | 3 |
| 11:43:44 | 4 |
| 11:43:47 | 5 |
| 11:43:50 | 6 |
| 11:43:54 | 7 |
| 11:43:56 | 8 |
| 11:43:57 | 9 |
| 11:43:58 | 10 |
| 11:44:03 | 11 |
| 11:44:05 | 12 |
| 11:44:08 | 13 |
| 11:44:10 | 14 |
| 11:44:12 | 15 |
| 11:44:12 | 16 |
| 11:44:14 | 17 |
| 11:44:18 | 18 |
| 11:44:21 | 19 |
| 11:44:24 | 20 |
| 11:44:28 | 21 |
| 11:44:30 | 22 |
| 11:44:37 | 23 |
| 11:44:38 | 24 |

1  purchase/leasebacks, as I said, some were 18 months,

2  some were just stand-alone deals.

3           So we were always talking, and we

4  probably came up with these two -- these together.

5      Q.   So you think that you came up with a list

6  of schedules to roll over that are reflected on

7  Exhibit 46 based on your conversations with

8  Mr. Ripps; is that right?

9           MR. KALER:  Objection.

10     A.   Or with someone.  I don't know who was

11 there in '99.  Someone at the time.

12     Q.   And to quote the price $94,163 you would

13 have had to have a threshold before that from

14 Ms. Kapitski, right?

15          MR. KALER:  Objection.

16     A.   I said before, yes.

17     Q.   Now, when Ms. Kapitski gave you a

18 threshold, what did you do to come up with the price

19 of rent per period?

20     A.   I would get the debt rate from St. Louis.

21     Q.   Then what would you do?

22     A.   And I would look at what the lease term is

23 and mark it up accordingly.

24     Q.   And how would you decide how much to mark

522

| 11:44:41 | 1 | it up? |

11:44:42  2       MR. KALER:  Objection.

11:44:43  3       A.   It wasn't an exact science.  I don't know

11:44:46  4  how I decided.

11:44:46  5       Q.   When you used the word "mark up," by that,

11:44:52  6  you meant how much to mark it up over the threshold,

11:44:55  7  right?

11:44:56  8       A.   For commission purposes, yes.

11:44:58  9       Q.   And you said that the method you used to

11:45:02 10  mark it up was not an exact science, right?

11:45:04 11       A.   It was different every lease, yes.

11:45:06 12       Q.   It was different every lease?

11:45:07 13       A.   Yes.

11:45:08 14       Q.   What were the different methodologies that

11:45:10 15  you employed to determine how much to mark up the

11:45:13 16  price above the threshold?

11:45:15 17       MR. KALER:  Objection.

11:45:16 18       A.   This is eight years ago.  I don't know what

11:45:18 19  method I used, or I used during that time.

11:45:21 20       Q.   So you have no memory of how you decided

11:45:26 21  that?

11:45:27 22       A.   No.

11:45:27 23       Q.   And you never told Lycos that you were

11:45:29 24  marking up the monthly rent above your threshold,

696

| | | |
|---|---|---|
| 05:03:52 | 1 | Q.    You were asked some questions on direct |
| 05:03:56 | 2 | examination about the instances where Lycos rewrote |
| 05:04:13 | 3 | and extended leases.  Do you recall that? |
| 05:04:16 | 4 | A.    Yes. |
| 05:04:26 | 5 | Q.    And do you remember being asked whether -- |
| 05:04:36 | 6 | I think the question was put to you, if you had -- |
| 05:04:40 | 7 | why would Lycos have extended leases and incurred |
| 05:04:46 | 8 | more money in total in order to lower their monthly |
| 05:04:50 | 9 | rental payments?  Do you recall that? |
| 05:04:53 | 10 | A.    Yes. |
| 05:04:55 | 11 | Q.    Were there instances during your |
| 05:04:57 | 12 | relationship with Lycos when Lycos told you they |
| 05:05:02 | 13 | wanted to reduce their monthly expenses even though |
| 05:05:05 | 14 | they knew it was going to increase their costs in |
| 05:05:08 | 15 | the long term? |
| 05:05:09 | 16 | A.    Oh, yes. |
| 05:05:10 | 17 | Q.    And it was suggested to you that Lycos |
| 05:05:12 | 18 | would never -- that there was no rational reason for |
| 05:05:16 | 19 | doing that.  Do you recall that suggestion by |
| 05:05:18 | 20 | Lycos's counsel? |
| 05:05:19 | 21 |         MR. BEAN:   Objection. |
| 05:05:19 | 22 | A.    As far as what? |
| 05:05:21 | 23 | Q.    It was suggested to you, why would Lycos |
| 05:05:23 | 24 | incur more costs to reduce its monthly expenses.  Do |

697

| | | |
|---|---|---|
| 05:05:27 | 1 | you recall that? |
| 05:05:28 | 2 | A.   Yes. |
| 05:05:29 | 3 | Q.   And you said they might do it for a number |
| 05:05:31 | 4 | of reasons.  Can you explain to us why a customer |
| 05:05:35 | 5 | like Lycos might very well be willing to incur |
| 05:05:38 | 6 | additional costs over the long term to reduce its |
| 05:05:42 | 7 | monthly expenses? |
| 05:05:43 | 8 | MR. BEAN:  Objection. |
| 05:05:43 | 9 | Q.   You can answer. |
| 05:05:44 | 10 | A.   They were trying to lower their monthly |
| 05:05:50 | 11 | lease payments, and they were trying to look at |
| 05:05:59 | 12 | saving money today on their monthly rent, and that's |
| 05:06:03 | 13 | what they focused on; and it was all about saving |
| 05:06:09 | 14 | money on their monthly run rate. |
| 05:06:19 | 15 | MR. KALER:  Let's go off the record for |
| 05:06:21 | 16 | a minute. |
| 05:06:22 | 17 | THE VIDEOGRAPHER:  The time is 5:06. |
| 05:06:24 | 18 | We're off the record. |
| 05:06:26 | 19 | (Recess taken, 5:06 to 5:12 p.m.) |
| 05:12:25 | 20 | THE VIDEOGRAPHER:  The time is 5:12. |
| 05:12:37 | 21 | We're back on the record. |
| 05:12:39 | 22 | Q.   Mr. Stenberg, you talked earlier in your |
| 05:12:43 | 23 | testimony about you felt a bit overwhelmed by the |
| 05:12:49 | 24 | requests from Lycos for various tickets, |

# EXHIBIT 9

# O'BRIEN &2 LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Timothy Wright

# January 12, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

Nicole E. Guilbert   22498

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

94

1      Q.    (By Mr. Kaler)  And I will not ask you, sir, to
2    read your own article again.
3              MR. ACTON:  Well, I haven't seen this
4         so --
5              MR. KALER:  That's fine.
6      Q.    (By Mr. Kaler)  But I'll just ask you -- direct
7    your attention to the first sentence on the first page.
8    Didn't you say in this article that, quote, By January
9    2001, it was crystal clear that Lycos was in trouble?
10     A.    Terra Lycos.
11     Q.    Right.  But the company was going by the name of
12   Terra Lycos, right?
13     A.    Which was a global powerhouse, right, so it was
14   supplying internet services to Telefonica's very large
15   organization.  So the majority of Lycos -- Terra Lycos's
16   business was no longer in the U.S.
17     Q.    Sir, by -- you did say in Exhibit 501 that by
18   January 2001, it was crystal clear that your company,
19   Terra Lycos, was in trouble, correct?
20     A.    Yes, I did.
21     Q.    Okay.  And Lycos in the U.S. had a series of
22   lay-offs of personnel in 2001, partly because of the
23   downturn in its business, correct?
24              MR. ACTON:  Objection.

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

95

1      Q.    (By Mr. Kaler)  You can answer.

2      A.    We had some lay-offs, yeah, but I'm not sure in

3   what product sense or -- I, you know --

4      Q.    One of the things --

5      A.    As part of every acquisition, what you do is you

6   look for where you can consolidate product platforms,

7   where you can consolidate back office functions, you

8   know, whether it's a --

9      Q.    No, sir.  These weren't -- these were reductions

10  in force to -- because of the downturn in Lycos's

11  revenues and you know that --

12     A.    Is that right?

13     Q.    And you know that; isn't that true?

14           MR. ACTON:  Objection.  Objection.

15     Q.    (By Mr. Kaler)  You can answer.

16     A.    No.  I think that's a generalization that would

17  not categorize all of the -- all of the lay-offs.  It's

18  quite possible we laid people off due to changing

19  business environment.  Organizations do that all the

20  time.

21     Q.    The changing business environment resulted in

22  revenues being down, which led to lay-offs that year,

23  correct?

24           MR. ACTON:  Objection.

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

102

1    in those regions thereby reducing overall expenses of

2    the business.

3        Q.    And one of the expenses that you would have

4    looked at in 2001 with an eye to its reducing if you

5    could, was the expense of acquiring computer equipment,

6    right?

7        A.    Constantly, yes.

8        Q.    And the document that I just want to show you now

9    has been previously marked as Exhibit 341.    Exhibit 341

10   has been identified by Mr. Stenberg -- Mr. Lucy as an

11   e-mail exchange that he had with Paul Stenberg of CSI in

12   September of 2001.    Mr. Stenberg being the CSI

13   representative.    Did you ever meet Paul Stenberg?

14       A.    No.

15       Q.    And there's been testimony that CSI,

16   Mr. Stenberg, was discussing here rewriting and

17   extending a series of CSI leases that existed between

18   CSI and Lycos so as to reduce payment.    And do you see,

19   if you go down to the seventh line, quote, Payment goes

20   from $1,190,000 a month to $828,915 a month.    Do you see

21   that?

22       A.    Mm-hmm.    Yes, I do.

23       Q.    And there's a response above that from Mr. Lucy

24   to Mr. Stenberg that says in the second paragraph,

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

103

1    quote, I'll talk to Tim, referring to you, about

2    refinancing this equipment in order to spread the

3    liability, unquote.  Do you see that?

4        A.    I do.

5        Q.    Mr. Lucy has also testified that one of the

6    reasons they wanted to adjust the leases in this way was

7    to reduce monthly expenses.

8                    MR. ACTON:  Objection.

9        Q.    (By Mr. Kaler)  The question is:  Do you recall

10   generally talking with Mr. Lucy in or about 2001 about

11   mending or refinancing Lycos's leases --

12       A.    No.

13       Q.    -- to lower monthly expenses?

14       A.    No.

15       Q.    But that is the kind of discussion about reducing

16   expenses and trying to meet budget that you were having

17   with people within Lycos in 2001 in light of the revenue

18   shortfall, wasn't it?

19       A.    It would have been one of the discussions.

20       Q.    Do you have any memory of Computer Sales

21   International leases particularly being something that

22   you discussed with anybody --

23       A.    No.

24       Q.    -- at any time?

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

104

```
1        A.    No.

2        Q.    I mean, there were probably so many things you

3   were discussing?

4        A.    Yeah.

5        Q.    That doesn't mean you didn't talk about it.  It

6   just means you don't remember?

7        A.    No.  I -- yeah.  It doesn't mean I didn't but I

8   don't remember any discussions on any leasing company.

9        Q.    Okay.  Just happened too long ago?

10       A.    Yeah.

11       Q.    Let me just come back, if I could, to this

12  Exhibit 122, the Avnet report, which I think you may

13  have opened still?

14       A.    This one here?

15       Q.    Yeah, you do.  And we should be on page 31.  And

16  in December of 2000, in this report, as being the

17  previous year from 2001 -- we were talking about 2001 a

18  moment ago, now we're back into 2000 -- the other points

19  that were made under the Maintenance Schedule Only

20  portion of the report was that --

21       A.    Where are you now?  Oh, you're on the same page.

22       Q.    I'm looking at the second bullet point.  They

23  reported to you at that time that inadequate asset

24  tracking and asset management has resulted in assets
```

# EXHIBIT 10

# COPY

1

PAGES 1 - 354

EXHS. 1 - 21

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                               *
Computer Sales International,                  *
Inc.,                                          *
        Plaintiff and Defendant                *
        in Counterclaim                        *
                                               *
                                               *
v.                                             *
                                               *       Civil Action
Lycos, Inc.,                                   *
        Defendant and Plaintiff                *       No. 05-10017-RWZ
        in Counterclaim                        *
v.                                             *
                                               *
Bank of America f/k/a Fleet                    *
Bank,                                          *
        Trustee Process Defendant              *
                                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Videotaped Deposition of Joseph Philip Cagney

Wednesday, September 27, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109

----------- *J. EDWARD VARALLO, RMR, CRR* ----------
*COURT REPORTER*
*FARMER ARSENAULT BROCK LLC       BOSTON, MASSACHUSETTS*
*617.728.4404*
*evarallo@fabreporters.com*

*Joseph Philip Cagney* 245

1    for example, is that instead of terminating all of

2    the leases at 10/31 like we originally anticipated,

3    we left some of the leases in place and those would

4    renew later.  Instead of at 11/1, they would renew

03:05PM  5    further down the line, so we could keep the existing

6    debt in place.

7        Q.    And the decision to structure the 93 this

8    way by keeping some leases in place was your idea?

9        A.    It was in concert with one of the

03:06PM  10   requirements, one of the -- I don't know if

11   requirements is the right word -- what Paul wanted

12   to do, which was to minimize the amount of the

13   letter of credit that Lycos would have to get to

14   secure this deal.

03:06PM  15       Q.    And how does terminating -- How does

16   keeping some schedules in place minimize the amount

17   of the letter of credit?

18       A.    Because those leases were financed with

19   banks and we would not have to pay the bank off.

03:06PM  20       Q.    Now, this million 891, so that represents

21   what then?

22       A.    That represents schedules that were

23   remaining in place as of November 1st of '01 that

24   would then later renew into Schedule 93 at a later

*Joseph Philip Cagney*                    256

1    *A.*    I don't know by what margin.

2    *Q.*    So your testimony then is that debt was

3    left in place to reduce the amount of the letter of

4    credit.  Is that right?

03:20PM    5    *A.*    Yes.

6    *Q.*    And Lycos was still required to post an

7    $11 million letter of credit.  Right?

8    *A.*    11 million is what was required for the

9    new schedules, yes.

03:20PM    10    *Q.*    Who required the $11 million letter of

11    credit?

12    *A.*    CSI did.

13    *Q.*    And how did you determine the $11 million

14    amount?

03:20PM    15    *A.*    That was the -- Similar to what this

16    calculation is, that's the present value that is not

17    secured by bank debt.

18    *Q.*    The difference between 13 million -- What

19    two numbers leaves a balance of $11 million?

03:20PM    20    *A.*    Well, and again it depends on what

21    interest rate you use, and I actually on this one

22    actually underestimated the 11 million; it probably

23    should have been more like 13 million.  But I had

24    used a high debt rate to begin with and then later

*Joseph Philip Cagney*                      348

1    term went to Schedule 2 that later went to Schedule

2    3.

3         Q.    I'm saying equipment on Schedule 12, for

4    example, got split up and went to Schedules 14 and

05:52PM    5    17.

6         A.    It's possible that it happened.  I mean,

7    so not the same asset, so some assets on 12 went to

8    one schedule, some other assets went to a different

9    schedule.

05:53PM    10        Q.    Right.

11        A.    Yes.

12        Q.    And on other occasions you saw as many as

13   five to seven schedules early terminated and then

14   the equipment rolled onto a single schedule or two?

05:53PM    15        A.    A consolidation, mm-hmm.

16        Q.    Do you know why that would have happened?

17        A.    Not really.  I mean, lessees, at various

18   times sometimes they want to keep track of it by

19   equipment; sometimes they want to keep track of it

05:53PM    20   by location.  There's all sorts of different reasons

21   why assets are grouped the way they are.

22        Q.    But CSI determines the structure for these

23   equipment schedules, does it not?

24             MR. LITTLE:  Objection.

*Joseph Philip Cagney*                                    349

1      A.      Not always.  As far as what assets go on

2   which schedules, that's not always our making, if

3   you will.

4      Q.      But it is typically your making, is it

05:53PM   5   not?

6              MR. LITTLE:   Objection.

7      A.      No.

8      Q.      Not all?

9      A.      No.

05:54PM  10      Q.      How about who decides what numbers to put

11   on equipment schedules?  I don't know if you're

12   aware of this, but one of the things that I've

13   wondered in this case is, we've got Schedules 1, 2,

14   3, 4, and then 5A, B, C, D, E, F, G.

05:54PM  15      A.      Okay.

16      Q.      Who decided how schedules got numbered or

17   numbered and lettered?  Who at CSI decided that?

18      A.      Generally the legal department sets that.

19   Sometimes the letters are used to group equipment

05:54PM  20   under a number of different reasons why we would use

21   the letters.

22      Q.      Do you have any idea why, for example, a

23   schedule in the 60s would be numbered in the 60s if

24   it was executed after schedules executed in the 70s?

# EXHIBIT 11

COPY

1

Volume 1, Pages 1-285

Exhibits:  1-30

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

------------------------------------

VIDEOTAPED DEPOSITION OF JOAN KERSTING

Wednesday, December 13, 2006, 9:06 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


---------- Alan H. Brock, RDR, CRR ----------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

76

| | | |
|---|---|---|
| 10:47:05 | 1 | Schedules 48A, 50B, 58, and 69 with respect to |
| 10:47:09 | 2 | Contract 68C; correct? |
| 10:47:11 | 3 | A.   Yes. |
| 10:47:12 | 4 | MR. LITTLE:  Objection. |
| 10:47:13 | 5 | Q.   Are you aware of the circumstances -- and |
| 10:47:16 | 6 | I'm not necessarily limiting it to a specific |
| 10:47:20 | 7 | schedule, marked as Exhibit 1 -- the circumstances |
| 10:47:23 | 8 | under which -- |
| 10:47:24 | 9 | What would cause an account executive's |
| 10:47:26 | 10 | request that six schedules be rewritten onto a |
| 10:47:29 | 11 | single schedule, to change and have them be split |
| 10:47:32 | 12 | onto two separate schedules? |
| 10:47:37 | 13 | A.   I don't recall specifically in this case |
| 10:47:39 | 14 | why it was done. |
| 10:47:41 | 15 | Q.   Generally? |
| 10:47:42 | 16 | A.   Generally it could be done because they |
| 10:47:45 | 17 | call up and they say, no, the customer doesn't want |
| 10:47:49 | 18 | them on one lease, they want them on two.  There |
| 10:47:53 | 19 | could be many reasons. |
| 10:47:54 | 20 | Q.   What might be other reasons? |
| 10:47:56 | 21 | A.   Another reason could be that they had |
| 10:47:59 | 22 | stated to us that they wanted things at different |
| 10:48:02 | 23 | locations, and so we kept things from the previous |
| 10:48:04 | 24 | leases at different locations in two different |

77

| | | |
|---|---|---|
| 10:48:08 | 1 | leases or more than two leases. |
| 10:48:09 | 2 | Q.   Might one of the reasons be because of the |
| 10:48:11 | 3 | way CSI had financed the schedules with its banks? |
| 10:48:19 | 4 | A.   In a renewal situation?  I'm not sure. |
| 10:48:22 | 5 | Q.   Would CSI ever make the decision -- CSI |
| 10:48:29 | 6 | could make the decision to structure a renewal to |
| 10:48:42 | 7 | split schedules the customer had requested into two |
| 10:48:45 | 8 | separate schedules; right? |
| 10:48:47 | 9 | A.   Could you state that again? |
| 10:48:50 | 10 | Q.   Sure.  On Exhibit 1 we see that there's a |
| 10:48:55 | 11 | request from the account executive to put six |
| 10:48:58 | 12 | separate schedules on a single schedule; right? |
| 10:49:01 | 13 | A.   Yes. |
| 10:49:01 | 14 | Q.   And yet when those schedules were written |
| 10:49:04 | 15 | up as lease contracts, those six schedules were put |
| 10:49:07 | 16 | on two separate schedules; correct? |
| 10:49:10 | 17 | MR. LITTLE:  Objection. |
| 10:49:11 | 18 | A.   I don't know. |
| 10:49:11 | 19 | Q.   You don't know.  But that appears to be the |
| 10:49:13 | 20 | case from Exhibit 2? |
| 10:49:15 | 21 | MR. LITTLE:  Objection. |
| 10:49:16 | 22 | A.   Again, I'm not familiar with Exhibit 2. |
| 10:49:18 | 23 | I'd have to look at the contracts. |
| 10:49:20 | 24 | Q.   So you'd have to look at Schedules 68B and |

# EXHIBIT 12

COPY

1

Volume 1, Pages 1-127

Exhibit: 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

        Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

        Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

        Trustee Process Defendant

        ------------------------------------

VIDEOTAPED DEPOSITION OF BRIAN REALE

Wednesday, January 31, 2007, 9:56 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

--------- Alan H. Brock, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

11

| | | |
|---|---|---|
| 10:04:28 | 1 | he meant just by saying that Paul was doing what |
| 10:04:32 | 2 | Lycos was asking him to do. |
| 10:04:35 | 3 | Q.    Did Mr. Ziba relay to you during this call |
| 10:04:38 | 4 | what he meant by Mr. Stenberg providing Lycos with, |
| 10:04:41 | 5 | quote, "options," end quote? |
| 10:04:44 | 6 | A.    He mentioned that "We," meaning Lycos, |
| 10:04:49 | 7 | "were looking for ways to lower our monthly rent, |
| 10:04:52 | 8 | and Paul would give us options to do that," and they |
| 10:04:55 | 9 | would choose which option they wanted. |
| 10:05:04 | 10 | Q.    Did he say what options Mr. Stenberg had |
| 10:05:08 | 11 | given Lycos? |
| 10:05:08 | 12 | A.    No, he did not. |
| 10:05:18 | 13 | Q.    What did you tell Mr. Stenberg, anything |
| 10:05:21 | 14 | that Mr. Ziba had said to you? |
| 10:05:23 | 15 | A.    Yes, I pretty much relayed the information |
| 10:05:32 | 16 | I just gave to you. |
| 10:05:37 | 17 | Q.    Other than that telephone call with Mr. |
| 10:05:39 | 18 | Ziba -- |
| 10:05:39 | 19 | You said it was one to two years ago. |
| 10:05:42 | 20 | A.    Yes. |
| 10:05:42 | 21 | Q.    Can you pin it down any better, more |
| 10:05:44 | 22 | precisely, in terms of time? |
| 10:05:46 | 23 | A.    Maybe a year and a half.  I think it was a |
| 10:05:52 | 24 | little more than a year ago. |

# EXHIBIT 13

1          IN THE UNITED STATES DISTRICT COURT

           DISTRICT OF MASSACHUSETTS

2

     COMPUTER SALES INTERNATIONAL,    )

3    INC.,                    )

                              )

4         Plaintiff and       )

          Defendant in        )

5         Counterclaim,       )

                              )

6    V.                       )

                              ) No. 05-10017-RWZ

7    LYCOS, INC.,             )

                              )

8         Defendant and       )

          Plaintiff in        )

9         Counterclaim,       )

     V.                       )

10                            )

     BANK OF AMERICA f/k/a FLEET    )

11   BANK,                    )

                              )

12        Trustee Process     )

          Defendant.          )

13

14

15        VIDEOTAPED DEPOSITION OF ERIC AUSUBEL, produced,

16   sworn and examined on January 5, 2007, at the offices of

17   Husch & Eppenberger, 190 Carondelet Plaza, in the City of

18   Clayton, State of Missouri, before Debra M. Musielak,

19   Certified Court Reporter within and for the States of

20   Missouri and Illinois, in a certain cause now pending in

21   the United States District Court, District of

22   Massachusetts.

23

24

25

1   limited to cash burn credit period.  It's a cash burn

2   credit, comma, if you evaluate it independently from its

3   parents.  Unfortunately, its parent was a cash burn

4   credit.

5       Q.    Okay.  Let's go back to the paragraph that

6   begins with "Lycos is interested in this structure."  If

7   you could read that aloud, please.

8       A.    Hang on one second.  Which paragraph now?

9       Q.    The one that begins with "Lycos is interested

10  in this structure."

11      A.    "Lycos is interested in this structure because

12  it will allow them to reduce the monthly IT expense as

13  the IT department is evaluated as a cost center not a

14  profit center."

15      Q.    Where did you get the information on which you

16  based that statement?

17      A.    I honestly -- you know, I don't remember.

18      Q.    That's not something that you had as

19  independent knowledge; right?

20      A.    No.  That information would have been conveyed

21  to me and -- because I did not know that personally.

22      Q.    All right.  Who might have conveyed that to

23  you?

24          MR. KALER:  Objection.

25          THE WITNESS:  I don't know.  I don't know

# EXHIBIT 14

| From: | John Kirk <jkirk@LeaseForum.com> |
|---|---|
| Sent: | Tuesday, July 22, 2003 11:33 AM |
| To: | "'Julie.Callagee@corp.terralycos.com'" <Julie.Callagee@corp.terralycos.com> |
| Subject: | RE: URGENT Leases Liabilities |

Sounds good. That should do it. Good luck. John

-----Original Message-----
From: Julie.Callagee@corp.terralycos.com
[mailto:Julie.Callagee@corp.terralycos.com]
Sent: Tuesday, July 22, 2003 11:11 AM
To: John Kirk; Susan S. Franklin
Subject: Re: URGENT Leases Liabilities

**EXHIBIT**

**240**

Here you go.

----- Forwarded by Julie Callagee/Lycos on 07/22/2003 11:11 AM -----

    Brian Lucy

                    To:    Andrew
Feinberg/Lycos@Lycos

        07/22/2003 09:57    cc:    Julie
Callagee/Lycos@Lycos, Peter Karol/Lycos@Lycos

        AM            Subject: Re: URGENT
Leases Liabilities(Document link: Julie Callagee)

How's this

Operational feasibility of returning the equipment
Based on discussions with our finance group and through a cursory review
of
our contractual obligations with our Lessor, it is our understanding
that
we are contractually obligated to return all of the leased equipment to
our
lessor in exactly the same  way it was received.  This would include
identifying several hundred pieces of equipment and decommissioning them

LYC 19624

in
accordance with each lease expiration. We believe this to be operational
impossibility, especially in light of lower headcount and the migration to
Tdata in Miami. We may be able to negotiate more favorable terms, but because Lycos ceased leasing new equipment from the lessor two years ago,
we believe our Lessor would have diminished interest in negotiating in good
faith. Based on discussions with Finance, Lycos will not be returning any
equipment - now or when these leases terminate.

Financial exposure of not taking current buy-out offer
Furthermore, once we fail to return all the equipment exactly as it was received and in accordance with the lease expiration date (on time), the Agreement states that we must buy out of any unreturned equipment at an (average) of 58% of original cost. We may be able to negotiate a more favorable rate (less than 58%), but because Lycos ceased leasing new equipment from the lessor two years ago and because we have no contractual
rights as far as a buy out negotiation, we believe our Lessor would have diminished interest in negotiating in good faith. The contractual buy out
would be approximately $34 million (rough estimate), compared to the existing buyout price of approx. $3.8 million. Obviously, buying out now
eliminates significant risks to the Company.

Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the
lease term (when we admit to our Lessor that we cannot return this equipment and HAVE TO buy out), we support Brian's decision to buy out of
the leases immediately.




Andrew Feinberg

To:    Brian
Lucy/Lycos@Lycos, Julie Callagee/Lycos@Lycos, Peter Karol/Lycos@Lycos

LYC 19625

07/22/2003 09:17    cc:

      AM         Subject: Re: URGENT
Leases Liabilities

Brian/Julie/Peter:  Here's the proposed email.  What say you?

Pepe,

In response to your request, I have attached below Peter Karol's evaluation
of our rights, obligations and alternatives with respect to the leases.  My
understanding of the facts from our finance group is that we cannot return
all of the equipment, let alone in the original condition.  While it might
be possible to negotiate something better than the full penalty cost if we
were to try to return the equipment that we have identified and can locate,
we would be likely forsaking the buyout opportunity if we tried.  We
collectively believe it is not possible to achieve a negotiation that
lowers the penalty price (approximately >$34 million) to anywhere near the
buyout price (approx. $3 million).

Please let me know if I can provide any further information.

Andy
----- Forwarded by Andrew Feinberg/Lycos on 07/22/2003 09:12 AM -----

      Peter Karol

            To:   Julie
Callagee/Lycos@Lycos

      07/21/2003 06:05   cc:   Andrew
Feinberg/Lycos@Lycos

      PM         Subject: Re: URGENT
Leases Liabilities(Document link: Andrew Feinberg)

LYC 19626

According to the Lease, in the event we cannot return any piece of
Equipment, we either have to buy an identical piece of Equipment to
replace
it, or pay the Stipultaed Loss Value of such piece of Equipment
(according
to the Schedules, the Stipulated Loss Value for any Equipment piece is
either 73.3% or 55% of its original cost). Since we will not be
returning
any Equipment, we are talking about paying EITHER approximately 58% (a
blended rate) of approximately 66 million dollars (the full original
cost
of all the Equipment) OR the buyout amount that LeaseForum negotiated,
which is approximately 3 million.

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

Julie Callagee

To:     Peter
Karol/Lycos@Lycos

        07/21/2003 05:55       cc:     Andrew
Feinberg/Lycos@Lycos

        PM              Subject: Re: URGENT
Leases Liabilities(Document link: Peter Karol)

Confirmed. One item to note  - the percentage on two of the lease

LYC 19627

schedules is 73.3% and on the other two is 55%.

Peter Karol

To:    Julie Callagee/Lycos@Lycos

07/21/2003 04:24    cc:    Andrew Feinberg/Lycos@Lycos

PM    Subject: Re: URGENT Leases Liabilities(Document link: Julie Callagee)

According to the Lease, in the event we cannot return any piece of
Equipment, we either have to buy an identical piece of Equipment to
replace
it, or pay the Stipultaed Loss Value of such piece of Equipment
(according
to the Schedule, the Stipulated Loss Value for any Equipment piece is
73.3%
of its original cost). Since we will not be returning any Equipment, we
are
talking about paying either 73.3% of roughly 60 million dollars (the
full
original cost of all the Equipment) OR the buyout amount that LeaseForum
negotiated, which is roughly 3 million. [Julie please confirm these
numbers].

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

LYC 19628

Julie Callagee

          To:   Andrew
Feinberg/Lycos@Lycos, Peter Karol/Lycos@Lycos

     07/21/2003 03:51    cc:

     PM       Subject: Re: URGENT
Leases Liabilities(Document link: Peter Karol)

Peter,

Attached please find a summary of the Terms & Conditions that Jos=E9 Mateu
references. I will bring down the original contracts and the schedules
that provide the stipulated loss values.

The schedules stipulate that if we do not return all of the leased
equipment we must pay CSI

  73.3% of the original equipment value on schedules 93 & 200
  55% of the original equipment value on schedules 94 & 100

Thanks,

Julie

(See attached file: Pertinent Terms and Conditions.doc)

```
*****************************************************************
Julie Callagee                Assistant Controller
*****************************************************************
```
Lycos Inc.
A subsidiary of Terra Networks S.A.
100 Fifth Avenue,
Waltham, MA 02451
Phone 781.370.2827
Fax 781.370.2892

LYC 19629

Andrew Feinberg

                    To:
JoseF.Mateu@corp.terra.com

          07/21/2003 01:53     cc:    Brian
Lucy/Lycos@Lycos, Julie Callagee/Lycos@Lycos

          PM           Subject: Re: URGENT
Leases Liabilities(Document link: Julie Callagee)

Understood.

Brian/Julie, could you provide me with a copy of the applicable leases?
Many thanks.

Andy

          JoseF.Mateu@corp

          .terra.com       To:
andrew.feinberg@corp.terralycos.com

               cc:
peter.karol@corp.terralycos.com, elias.rv@corp.terra.com,

     07/21/2003 02:00
Ignacio.Ponce@corp.terra.com, Brian.Lucy@corp.terralycos.com

          PM           Subject: URGENT Leases
Liabilities

Dear Andy,

LYC 19630

Lycos leases of software, hardware, office equipment, etc... seem to have a
penalization clause in case that after the expiration of the contract the
goods which have been leased cannot be returned or in an acceptable state.
Because, according to the finance department, the level of this risk occurring is real and high in its materiality, discussions have been initiated with the lessors to change the lease into a purchase whose consideration would be lower than the cost of the risks occurring.

Assuming as a correct assumption the general statements above mentionned, I
need urgently to know the real scope of our duties and liabilities with respect to the return of the assets to the lessors after the expiration of
the contract.

Regards,

Jos=E9 Mateu

P.D. Although I am not in such a hurry with respect to the nightsurf interpretation request of its representations and subsequent disclaimers I
would like to have your opinion by the end of the week the latest.

Este mensaje se dirige exclusivamente a su destinatario y puede contener informaci=F3n CONFIDENCIAL sometida a secreto profesional o cuya divulgaci=F3n
est=E9 prohibida en virtud de la legislaci=F3n vigente. Si ha recibido este mensaje por error, le rogamos que nos lo comunique inmediatamente por esta
misma v=EDa o por tel=E9fono (34 91 4523913) y proceda a su destrucci=F3n.
N=F3tese que el correo electr=F3nico v=EDa Internet no permite asegurar ni la confidencialidad de los mensajes que se transmiten ni la correcta recepci=F3n
de los mismos.  En el caso de que el destinatario de este mensaje no

LYC 19631

consintiera la utilizaci=F3ñ del correo electr=F3nico v=EDa Internet, rogamos lo
ponga en nuestro conocimiento de manera inmediata.

This message is intended exclusively for its addressee and may contain
information that is CONFIDENTIAL and protected by a professional privilege
or which disclosure is prohibited by law. If this message has been received
in error, please immediately notify us via e-mail or by telephone (34 91
4523913) and delete it.
Please note that Internet e-mail does not guarantee the confidentiality or
the proper receipt of the messages sent.  If the addressee of this message
does not consent to the use of Internet e-mail, please communicate it to us
immediately.

LYC 19632

# EXHIBIT 15

EXHIBIT
340

| From: | Michael Ripps <mripps@lycos-asia.com> |
|---|---|
| Sent: | Wednesday, September 6, 2000 9:48 AM |
| To: | Peter Karol/O=Lycos@Lycos |
| Subject: | RE: FW: |
| Attach: | att1.eml |

fucking goy! tell him we'll pay CSI "shortly".

-----Original Message-----
From: pkarol@lycos-inc.com
To: Michael Ripps
Sent: 9/6/00 9:26 PM
Subject: Re: FW:

The Guy is a worthless liar! See below, he already responded to your prior email
AUgust 16! He's now acting like he just got it. He called me yesterday and
introduced himself as a representative from my credit card company wanting to
know why I didn't pay my bill yet. What an asshole.

Brian agreed last week to run this through Lycos, so I'll get reimbursed for the
meal next paycheck (next Friday). THe irony is that if his check really does get
here today, I have to sign it over to Brian and lose another week's float.

I hate Stenburg - he should offer me something for the inconvenience.

ANyway, in the big picture, not a big deal. Thanks for following up.

Hope all's well over there, and you and Dan are enjoying yourselves this week.

Michael Ripps <mripps@lycosasia.com> on 08/15/2000 08:28:48 PM

LYC 22245

To:    Peter Karol/Lycos@Lycos

cc:

Subject: FW:

Unfortunately, he needs to be pushed; his number is 617-928-3535 if you want
to harass him.
-----Original Message-----
From: Paul Stenberg [mailto:PHS@mktg.csileasing.com]
Sent: Wednesday, August 16, 2000 1:54 AM
To: mripps@lycos-inc.com
Subject: RE:

Hey , great hearing from you.  Please, please, keep in touch.  Hope the
family is adjusting fine.

I will call him shortly.

-----Original Message-----
From: mripps@lycos-inc.com [mailto:mripps@lycos-inc.com]
Sent: Tuesday, August 15, 2000 10:17 AM
To: phs@mktg.csileasing.com
Cc: pkarol@lycos-inc.com; mripps@lycosasia.com

LYC 22246

Subject:

Hello Paul,

I hope all is well with you and you've had a good summer - I'm sorry I missed
you on my last couple of weeks in Boston.   Before I left, we had a dinner
at
Morton's which you graciously offered to cover (even though you unfortunately
couldn't make it);  Pete Karol in our legal group picked up the tab, and I
believe that I forwarded you the receipt a while ago for reimbursement. Do
you
mind following up to see if you received the bill, and if you didn't please
let
me know (via e-mail)?  And if you did receive it, could you forward Pete the
money? Pete has gambling debts to cover and would really appreciate the funds
(joking), but seriously Pete did everyone a favor by picking up the check.

Thanks in advance and drop me a note to let me know how everything is going;
I
can still be reached at my old e-mail address.

Michael

<<att1.eml>>  - att1.eml

LYC 22247

# EXHIBIT 16

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Peter D. Karol

# December 8, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   21994

Peter D. Karol 12-8-2006
Computer Sales International, Inc. v. Lycos, Inc.

168

1      that was alleged to be owed to CSI, yes.

2          Q.    Okay.

3          A.    In the amount of I believe, $300,000,

4      approximately.

5          Q.    Were there any other conversations that you recall

6      having with anyone at Lycos about LeaseForum?

7          A.    I do not recall.

8          Q.    Do you recall any conversations that you had with

9      anyone at Lycos when you were at Lycos about CSI?

10         A.    Yes.

11         Q.    What conversations do you recall?

12         A.    Other than the conversations we've talked about so

13     far today, I remember a conversation I had with Brian Lucy.

14         Q.    When was that?

15         A.    I don't recall when.

16         Q.    Do you recall the year?

17         A.    I do not recall the year.  I'm sorry.

18         Q.    Were you general counsel at that time?

19         A.    No, I was not.

20         Q.    Okay.  What was the substance of the conversation?

21         A.    Mr. Lucy indicated to me that he couldn't get"

22     the -- he couldn't get the numbers to match his analysis,

23     the payments to CSI to match what he thought they should

24     be.

Peter D. Karol 12-8-2006
Computer Sales International, Inc. v. Lycos, Inc.

169

1      Q.    Do you remember who was there when he said this?

2      A.    It was just me and him.

3      Q.    Do you recall anything else that he said or you

4      said?

5      A.    Yes.

6      Q.    What else?

7      A.    He said, "But I trust Paul Stenberg.  He told me

8      that the payments were accurate."

9            And I said, "Why do you trust Paul?"

10           He said, Brian said, "He's a friend of mine."

11           And I said, "But, Brian, he doesn't work for

12     Lycos."

13           And Brian said, "But he's a friend of mine.  He

14     would never lie to me," or to that effect, the last part.

15     And that's all I recall of that conversation.

16     Q.    Where were the two of you when this conversation

17     occurred?

18     A.    I was in Mr. Lucy's office.

19     Q.    What was Mr. Lucy's position at the time of this

20     conversation?

21     A.    I don't recall when -- when exactly it happened,

22     but I believe he was the CFO at that time.  Excuse me.

23     Q.    And you know that he became the CFO in or about

24     spring of 2001?

# EXHIBIT 17

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc., et al.

Transcript of the Testimony of:

# Bruce Dudley Smith

# November 9, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   26587

Bruce Dudley Smith 11-9-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

266

```
1        A.    The text is, yeah.

2        Q.    And if you go to page 9, is that another portion

3    of the "Seasoned Lease Assets" portion?

4        A.    Yes.

5        Q.    And page 10, is that another portion of the

6    "Seasoned Lease Assets"?

7        A.    Yes.

8        Q.    And is this web site intended to appeal primarily

9    to lessors?

10       A.    It's an analysis from the point of view of the

11   lessee, but it might be conceivably used by a lessor

12   salesperson who is trying to provide an analysis to a

13   lessee to suggest that a particular lease might be a

14   wise -- a wise form of financing.

15       Q.    Okay.  On page 8 you wrote, quote, "Leasing

16   companies often find themselves with seasoned assets on

17   their books that have a current market value well in excess

18   of the book value," unquote.  Do you see that?

19       A.    I do.

20       Q.    And you were referring there to leasing companies,

21   meaning lessors like CSI?

22       A.    I was -- it was a very general statement to -- to

23   leasing companies.  When you say leasing companies like

24   CSI, since CSI is in the computer leasing market, I didn't
```

Bruce Dudley Smith 11-9-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

267

1      mean this comment to apply specifically, necessarily --

2          Q.    Okay.

3          A.    -- to computer lessors.

4          Q.    Applied generally to lessors?

5          A.    Applied generally to lessors.

6          Q.    Okay.  Meaning -- lessors meaning people who lease

7      equipment to others?

8          A.    Correct.

9          Q.    Okay.  You said, "Leasing companies often find

10     themselves with seasoned assets on their books," and by "on

11     their books," you meant in their -- their own books and

12     records?

13         A.    I mean the recorded estimated residual value that

14     appears on their balance sheet.

15         Q.    Okay.  And the recorded residual value, in this

16     case, at least, on the CSI books is what you looked at in

17     your calculation, right?

18         A.    I -- I took that number from the journal entry,

19     but, yes, I would presume that to represent that --

20         Q.    Okay.

21         A.    -- that type of value.

22         Q.    Okay.  You said, "Leasing companies often find

23     themselves with seasoned" -- when you said "seasoned

24     assets," you're referring to equipment that has been --

Bruce Dudley Smith 11-9-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

268

1    well, what are you referring to when you say "seasoned

2    assets"?

3        A.    I'm referring to assets that have been under lease

4    for some -- some period of time.

5        Q.    Okay.

6        A.    Some lengthy period of time.

7        Q.    And you said, "Leasing companies often find

8    themselves with seasoned assets on their books that have a

9    current market value well in excess of the book value,"

10    unquote.  Do you see that?

11       A.    Uh-huh.  Yes, I do.

12       Q.    And you were saying there that leasing companies,

13    or lessors, often find themselves with seasoned assets,

14    that is, equipment that's been out on lease for a period of

15    time on their books that -- that have a current market

16    value that's well in excess of the residual value that they

17    have booked in their accounting records, right?

18       A.    That's what I'm saying, yeah.

19       Q.    Okay.

20       A.    Yeah.

21       Q.    And you go on to say, "Yet current accounting

22    rules prohibit writing up the residual to current market

23    value."  Do you see that?

24       A.    Yes, I see that.

1        Q.    And you're referring there to the accounting rules

2    that prohibit leasing companies from writing up or

3    increasing the amount, the residual value that they're

4    carrying on their books for leased equipment, even in

5    situations where the current market value of that equipment

6    is higher than what they have booked, right?

7        A.    Yes, that's what I'm referring to.

8        Q.    Okay.  And it is true that leasing companies often

9    find themselves with seasoned assets, equipment that is,

10   for example, that has been out on lease for a period of

11   time, being carried on their books with a residual value

12   that is well less than the current market value, correct?

13       A.    I believe that's true.

14       Q.    Okay.  And in the case of your analysis in this

15   case, however, what consideration, if any, did you give to

16   the fact that the residual values carried on CSI's books

17   for the seasoned assets that they had leased to Lycos might

18   have a current market value well in excess of what CSI had

19   booked them at?

20       A.    What -- what consideration --

21       Q.    If any.

22       A.    -- did I give to that?

23       Q.    Yes.

24       A.    I -- I definitely considered the possibility that

Bruce Dudley Smith 11-9-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

270

```
 1     they might in fact have a higher current market value than

 2     what is recorded on -- on CSI's books, but I concluded that

 3     there was no reasonable or -- or definitive manner in

 4     which -- there was no record of or data that I could look

 5     to in any -- in any organized fashion that might indicate

 6     in a -- in a -- in a relatively dependable fashion what

 7     that value might be.

 8                    MR. KALER:  Just change the tape.

 9                    THE VIDEOGRAPHER:  Now going off the

10            record.  The time is 4:21 p.m.

11                    (Recess.)

12                    THE VIDEOGRAPHER:  Now going back on

13            the record.  This is tape number 5.  The

14            time is 4:23 p.m.

15     BY MR. KALER:

16        Q.    Mr. Smith --

17        A.    Can I add something --

18        Q.    -- you understand --

19        A.    -- to a previous -- oh.

20        Q.    You understand you're still under oath?

21        A.    I do.

22        Q.    Okay.

23        A.    Can I, before we continue this or after we

24     continue this particular line of questions, could I add
```

# EXHIBIT 18

**10%** Discount for FC readers

**FUCKED** COMPANY

Fuckedcompany.com | InternalMemos.com | JungleScan.com | HttpAds.com | Bizient.com

What is it? | Happy Fun Slander | Message Board | T-shirts & Crap | Hall of Fame | Newswire | Contact Pud

**To Terra Lycos employees**

From:  John McMahon
Date:  05/08/2001 03:10 AM
To:    Lycos Network Employees
Subject:  Organizational Update

EXHIBIT
297 A

To all Terra Lycos U.S. employees,

Early this morning we released our Q1 financial results.  As a global
company and in compliance with Spanish and U.S. regulators, it was
necessary to issue the release before the market opened in Spain.

As you will read in the release, we are sharpening our focus on bottom
line results while continuing to push our top line revenue results.  As part
of our First Quarter release, we announced that we completed several
expense reduction initiatives that we believe will allow us to achieve our
aggressive financial goals in this uncertain market.  After exploring
all possible cost control measures, the current economic climate
necessitates that we eliminate approximately 15% of our worldwide headcount.  Terra
Lycos has already eliminated more than 300 positions around the world
since the first of the year.  Approximately 160 Terra Lycos U.S. positions
are being eliminated today.  Employees are being notified today and the
reductions are effective immediately. We are offering competitive
severance packages and outplacement services to all those whose jobs have been
eliminated.

Today is an extremely difficult day for all members of the Terra Lycos
family. There is no easy way to communicate this information.  This was
a difficult decision but was necessary for our business to remain strong.
We are committed to treating all of our employees with dignity and respect
through this process and will do whatever possible to help those
affected employees transition to their next opportunity.  We are grateful for
all of your contributions in making Terra Lycos what it is today.

Regards,

John McMahon

# EXHIBIT 19

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Brian Lucy

# January 10, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

Linda Bernis   22525

52

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Then you see where in E, that's another copy |
| 3 | | of Mr. Stenberg's e-mail back to you and F |
| 4 | | is a copy of your e-mail back to him asking |
| 5 | | for the final four ticks. |
| 6 | | Do you see that? |
| 7 | A. | I do. |
| 8 | Q. | Then directing your attention to the e-mail |
| 9 | | which we've marked as G, which begins on the |
| 10 | | second page of Exhibit 88 and continues over |
| 11 | | to the top of the third page, LYC 24631 and |
| 12 | | 32. |
| 13 | | Is that e-mail that we've marked G, |
| 14 | | a copy of an e-mail that you received from |
| 15 | | Mr. Stenberg in or about late March of 2002 |
| 16 | | with a copy to Mr. Baillie? |
| 17 | A. | It appears. |
| 18 | Q. | Do you remember receiving the e-mail? |
| 19 | A. | No. |
| 20 | Q. | What was your understanding of what this |
| 21 | | e-mail meant when you received it? |
| 22 | A. | I don't recall receiving it. |
| 23 | Q. | So you don't recall what your understanding |
| 24 | | was concerning this e-mail in March of 2002 |

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

53

| | | |
|---|---|---|
| 1 | | because you don't recall receiving it? |
| 2 | A. | That's right. |
| 3 | Q. | Do you recall relying in any way on any of |
| 4 | | the statements that Mr. Stenberg made in |
| 5 | | this e-mail? |
| 6 | | MR. BEAN:  Objection. |
| 7 | | MR. DAVIDSON:  Objection. |
| 8 | Q. | You can answer. |
| 9 | A. | I don't recall. |
| 10 | Q. | The e-mail marked H says, it appears to be |
| 11 | | an e-mail that you wrote back to Mr. |
| 12 | | Stenberg on March 18, 2002 in which you |
| 13 | | said, "Thanks a bunch for doing this.  Kevin |
| 14 | | is out this week.  When he gets back, we |
| 15 | | will take a look.  Brian." |
| 16 | | Is that correct? |
| 17 | A. | That's right. |
| 18 | Q. | Do you recall sending that e-mail back to |
| 19 | | Mr. Stenberg? |
| 20 | A. | No. |
| 21 | Q. | Did you have any conversations with Mr." |
| 22 | | Stenberg at any time about this issue of the |
| 23 | | variance or difference between what Lycos |
| 24 | | had been obligated to pay under its leases |

# EXHIBIT 20

| From: | "John P. Kirk" <jkirk@leaseforum.com> |
|---|---|
| Sent: | Wednesday, January 7, 2004 12:59 PM |
| To: | <Andrew.Feinberg@corp.terralycos.com>; <ssf@leaseforum.com>; <tbean@nutter.com>; <agoudiss@shearman.com>; <Brian.Lucy@corp.terralycos.com>; <Julie.Callagee@corp.terralycos.com> |
| Subject: | CSI OEC |

Team,

Just a special note to reiterate that the email activity between Brian and Paul dated March 7, 2002 to March 18, 2002 regarding attachments Lycos Rental Stream.xls, and CSI_Refinancing 93&94.xls. may be important. The text of the emails appears to reference the definition of the original equipment costs for schedules 93 and 94 and further detail may be contained in the emails' attachments. We cannot be sure of any particulars until we review the attachments. Please forward as soon as possible.

LF

PRIVILEGED AND CONFIDENTIAL.
WORK PRODUCT PREPARED AT THE REQUEST OF COUNSEL.

659

EXHIBIT NO._____

D. RUMSON

# EXHIBIT 21

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Susan S. Franklin

# October 25, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   20864

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 115

| | | |
|---|---|---|
| 11:41:37 | 1 | **A.**   Yes. |
| 11:41:38 | 2 | Q.   And you -- we see there's a reference to $700,000, |
| 11:41:41 | 3 | and, again, you had referred to that as a previous -- in |
| 11:41:47 | 4 | previous testimony? |
| 11:41:50 | 5 | **A.**   Uh-huh. |
| 11:41:50 | 6 | Q.   I think I had asked you what you thought the |
| 11:41:53 | 7 | $700,000 was referring to, and what did you -- I think you |
| 11:41:57 | 8 | wanted to see the document? |
| 11:41:58 | 9 | **A.**   Yes. |
| 11:41:58 | 10 | Q.   What were you referring to there? |
| 11:42:01 | 11 | **A.**   That's the note I wrote down in my June 27th phone |
| 11:42:05 | 12 | **call with Paul Stenberg.** |
| 11:42:07 | 13 | Q.   And what were you referring to when you wrote the |
| 11:42:10 | 14 | 700,000? |
| 11:42:19 | 15 | **A.**   Actually, it was my July 7th call with Paul |
| 11:42:24 | 16 | **Stenberg that I wrote that down.** |
| 11:42:25 | 17 | Q.   Okay.  These notes on page AR 000748 of Exhibit |
| 11:42:31 | 18 | 191 were notes that you made during your July 7th telephone |
| 11:42:34 | 19 | call with Mr. Stenberg? |
| 11:42:36 | 20 | **A.**   Correct. |
| 11:42:38 | 21 | Q.   And what were you referring to when you -- |
| 11:42:43 | 22 | **A.**   I was noting Mr. Stenberg's comment that certain |
| 11:42:48 | 23 | **schedules had not been rolled and CSI held a residual of** |
| 11:42:52 | 24 | **approximately 700,000 on those schedules.** |

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 116

| 11:42:56 | 1 | Q. Did he identify the schedules? |
| 11:43:00 | 2 | **A. No.** |
| 11:43:02 | 3 | Q. And what's the next number that you wrote a |
| 11:43:06 | 4 | reference to, the $6,680,029? If you recall. |
| 11:43:20 | 5 | **A. Mr. Stenberg had made a comment about equity in** |
| 11:43:23 | 6 | **the transaction.** |
| 11:43:27 | 7 | Q. What had he said? |
| 11:43:30 | 8 | **A. He said that CSI had 11 points in the deal.** |
| 11:43:41 | 9 | Q. All right. I was asking you what -- what prompted |
| 11:43:43 | 10 | you to make the note "$6,680,029" on this page? |
| 11:43:51 | 11 | MR. FELDMAN: Objection. |
| 11:43:53 | 12 | Q. You can answer. |
| 11:43:54 | 13 | **A. I believe it's 11 percent of the 65,737,632.** |
| 11:44:06 | 14 | Q. In other words, it's 11 percent of the figure that |
| 11:44:13 | 15 | you had calculated was the total amount of term rents that |
| 11:44:17 | 16 | Lycos had paid and was scheduled to pay in the future under |
| 11:44:21 | 17 | the existing leases? |
| 11:44:25 | 18 | MR. BEAN: Objection. |
| 11:44:26 | 19 | Q. As reflected on the first page of Exhibit 191 |
| 11:44:28 | 20 | opposite the letter A? |
| 11:44:30 | 21 | MR. BEAN: Objection. |
| 11:44:30 | 22 | Q. It's that number? |
| 11:44:32 | 23 | **A. It's 11 percent of --** |
| 11:44:35 | 24 | Q. Of that number? |

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 117

| Time | Line | |
|---|---|---|
| 11:44:36 | 1 | **A.    -- of that number.** |
| 11:44:37 | 2 | Q.    Okay.  And Mr. Stenberg never mentioned to you a |
| 11:44:44 | 3 | 65-million-dollar original equipment cost number, did he? |
| 11:44:48 | 4 | MR. FELDMAN:  Objection. |
| 11:44:49 | 5 | MR. BEAN:  Objection. |
| 11:44:50 | 6 | Q.    You can answer. |
| 11:44:51 | 7 | **A.    Mr. Stenberg mentioned multiple equipment costs in** |
| 11:44:54 | 8 | **our original phone call.** |
| 11:44:57 | 9 | Q.    The question that I asked you was specific. |
| 11:45:02 | 10 | **A.    Did he say 65,737,623?  No.** |
| 11:45:07 | 11 | Q.    Did Mr. Stenberg ever tell you the original |
| 11:45:10 | 12 | equipment cost was $65 million? |
| 11:45:14 | 13 | **A.    He said it was in the sixties.** |
| 11:45:15 | 14 | Q.    You're saying he told you it was in the sixties in |
| 11:45:18 | 15 | the July 7th call or earlier? |
| 11:45:20 | 16 | **A.    The June 27th call.** |
| 11:45:21 | 17 | Q.    Well, we'll go back to the June 27th call.  Do you |
| 11:45:25 | 18 | have any notes of the June 27th call? |
| 11:45:27 | 19 | **A.    Those would be the notes I told you I did not** |
| 11:45:31 | 20 | **maintain.** |
| 11:45:32 | 21 | Q.    Okay.  So the only notes that you claim to have of |
| 11:45:34 | 22 | the June 27 call in which you claim that Mr. Stenberg told |
| 11:45:38 | 23 | you that original equipment cost was in the sixties you -- |
| 11:45:42 | 24 | you did not keep? |

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 139

| Time | Line | Text |
|---|---|---|
| 12:06:32 | 1 | approximately $25 million, that a number of lease |
| 12:06:35 | 2 | schedules, based on the analysis, had rolled into 93 and |
| 12:06:38 | 3 | 94, so 4 million 690 represented about 20 percent of $25 |
| 12:06:44 | 4 | million, and that seemed extremely high for technology |
| 12:06:49 | 5 | equipment that had been five years old or older. |
| 12:06:53 | 6 | Q.   What were you referring to when you said 25 |
| 12:06:55 | 7 | million? |
| 12:06:58 | 8 | A.   The base value stated on the two largest contracts |
| 12:07:02 | 9 | that remained active, 93 and 94, which we had at the time |
| 12:07:08 | 10 | of the analysis noted were a roll-up of prior lease |
| 12:07:17 | 11 | schedules. |
| 12:07:17 | 12 | Q.   All right.  What was said next? |
| 12:07:21 | 13 | A.   Mr. Stenberg corrected me and told me the OEC was |
| 12:07:23 | 14 | in the forties.  So, therefore, the number that they were |
| 12:07:28 | 15 | asking for was not 20 percent but 10. |
| 12:07:32 | 16 | Q.   When he said OEC was in the forties, you |
| 12:07:35 | 17 | understood him to be saying it was in the 40 -- 40 |
| 12:07:38 | 18 | millions? |
| 12:07:39 | 19 | A.   40 millions.  Yes, 40 millions. |
| 12:07:39 | 20 | Q.   And that, you understood him to be saying that the |
| 12:07:41 | 21 | original equipment costs, or OEC, was original equipment |
| 12:07:45 | 22 | cost? |
| 12:07:45 | 23 | A.   Yes. |
| 12:07:46 | 24 | Q.   Okay.  That is to say, you understood him to be |

8d03dd97-4b63-4c46-843f-a3e095762199

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 140

| | | |
|---|---|---|
| 12:07:48 | 1 | telling you that the original equipment cost of the |
| 12:07:50 | 2 | equipment covered by these leases was in the range of the |
| 12:07:52 | 3 | 40 millions of dollars? |
| 12:07:53 | 4 | **A.    Was in the forties was what he said, yes.** |
| 12:07:56 | 5 | Q.    Okay.  By in the forties, you mean -- |
| | 6 | **A.    In the --** |
| 12:08:00 | 7 | Q.    -- 42, 43, 44 -- |
| | 8 | **A.    -- forties of millions of dollars.** |
| 12:08:01 | 9 | Q.    -- 45 millions of dollars? |
| 12:08:02 | 10 | **A.    At the time of the comment, I didn't know exactly** |
| 12:08:07 | 11 | **where.  In the forties.  In the forties of millions of** |
| 12:08:10 | 12 | **dollars.** |
| 12:08:10 | 13 | Q.    Okay.  Now at the time that he made that comment, |
| 12:08:13 | 14 | you had Exhibit 191 in front of you, correct? |
| 12:08:17 | 15 | **A.    Correct.** |
| 12:08:17 | 16 | Q.    And you had referred on the first page of Exhibit |
| 12:08:19 | 17 | 191 to that original equipment cost as being $44,816,217, |
| 12:08:27 | 18 | correct? |
| 12:08:27 | 19 | MR. BEAN:  Objection. |
| 12:08:28 | 20 | **A.    That's what is listed, yes.** |
| 12:08:30 | 21 | Q.    That's what you had listed on the document that |
| 12:08:32 | 22 | you were looking at, right? |
| 12:08:33 | 23 | **A.    That's correct.** |
| 12:08:33 | 24 | Q.    Okay.  So what he told you was consistent with |

8d03dd97-4b63-4c46-843f-a3e095762199

# O'BRIEN *&* LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Susan S. Franklin

# February 28, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

Deborah G. Rumson   23105

Susan S. Franklin 2-28-2007
Computer Sales International, Inc. v. Lycos, Inc.

347

1           CONTINUED VIDEOTAPED DEPOSITION OF

2     SUSAN S. FRANKLIN, a witness called on

3     behalf of the Plaintiff and

4     Defendant-in-Counterclaim taken pursuant to

5     the Federal Rules of Civil Procedure, before

6     Deborah G. Rumson, Registered Professional

7     Reporter and Notary Public, in and for the

8     Commonwealth of Massachusetts, at the

9     Offices of McCarter & English, 265 Franklin

10    Street, Boston, Massachusetts, on Wednesday,

11    February 21, 2007, commencing at 9:32 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

Susan S. Franklin 2-28-2007
Computer Sales International, Inc. v. Lycos, Inc.

373

```
 1            meant the base value.

 2   Q.   I didn't ask you what you now claim it

 3            meant.

 4                 MR. FELDMAN:  Objection.

 5   Q.   You have a contingent financial interest in

 6            the outcome of this case, don't you?

 7                 MR. ACTON:  Objection.

 8   A.   Yes.

 9   Q.   Okay.  And if Lycos recovers money in this

10            case, you have a contract with them to

11            receive 20 percent of that money, right?

12                 MR. ACTON:  Objection.

13                 MR. FELDMAN:  Objection.

14   A.   Less payments received under the retainer.

15   Q.   You have a contract with Lycos for them to

16            pay you 20 percent of any moneys they

17            recover from CSI in this case, minus any

18            retainer payments that they have made to you

19            on account already, correct?

20   A.   That is correct.

21   Q.   So if Lycos recovers money from CSI in this

22            case, you know that you will personally

23            benefit financially, correct?

24                 MR. ACTON:  Objection.
```

# EXHIBIT 22

Project: #94574

# NACOMEX

## Expert Report

## of Robert J Zises, ASA

## submitted in the matter of

## CSI Leasing, Inc., Plaintiffs

## v.

## Lycos, Inc., Defendants

## (Civil Action No. 05-10017)

**Submitted August 30, 2007**

Project #94574

# TABLE OF CONTENTS

**SECTION I.  Introduction,**
- Background  and Qualifications

**SECTION II. Valuation Opinion**
- Introduction
- Approaches to Value
- Valuation Analysis
- Valuation Conclusions

**SECTION III. Exhibits**
- A -- Equipment Description and Value Itemization
- B -- Appraisal Certification
- C -- Statement of Contingent & Limiting Conditions
- D -- Documentation Reviewed
- E -- Expert Witness and Deposition Appearances
- F -- Curriculum Vitae
- G -- Compensation Rates
- H -- Valuation Summaries by Schedule

- **Appendices**
- A. -- USPAP 2006 Edition, Standards 7 & 8
- B. -- U.S. Department of Labor, PPI Industry Data

Project #94574

# Section I.

# Expert Report of Robert J. Zises, ASA

# submitted in the matter of

# CSI Leasing, Inc., Plaintiffs

# v.

# Lycos, Inc., Defendants

# (Civil Action No. 05-10017)

Project #94574

## Expert Report of Robert J. Zises, ASA

## SECTION 1.  INTRODUCTION

I have been retained by the law firm McCarter & English, LLP (McCarter), in connection with the litigation that is captioned CSI Leasing, Inc., (CSI) Plaintiffs v. Lycos, Inc., (Lycos) Defendants, to examine and, if possible, to opine on the value of certain computer equipment and related issues in the above-referenced litigation.  These issues include:

1.  What would the cost to Lycos have been to replace their leased equipment by purchasing comparable new equipment at the conclusion of the then existing lease terms rather than extending the leases by executing Schedules 93 and 94 in the Fall 2001?

2.  What was the fair market value of the equipment sold to Lycos by CSI in August 2003?

The opinions expressed in this Report are based on my review and analyses of (1) the documents provided to me by McCarter and/or CSI and described and listed in Exhibit D of this Report, (2) the transactional evidence obtained through research in and of the computer marketplace during the relevant time periods and maintained and referenced in the NACOMEX USA Inc. (NACOMEX) database, as well as (3) my background and qualifications.

## Background and Qualifications

I am an Accredited Senior Appraiser in the Discipline of Machinery and Technical Specialties, a designation awarded by the American Society of Appraisers.  I have been an instructor for the "Principles of Valuation, Methodology" course offered by the Society as well as an instructor or presenter in many symposia and seminars related to computer valuation and leasing issues.  I hold a Bachelors of Business Administration degree from the City College of New York.  Since 1987, I have been President and Senior Appraiser for NACOMEX, a computer appraisal and expert witness consultancy.  I formed the firm in 1987 as the National Computer Exchange, a brokerage firm trading in the used computer marketplace.  Prior to forming NACOMEX USA Inc., I served as President of Technopsis, Inc., a market research firm specializing in the trading activity of high-technology assets from 1963 to 1987.

I have been recognized as an expert in computer appraisal issues by federal, state and county courts.  In addition to appearing at trial, I served as an expert consultant in computer leasing cases which were settled prior to trial or are pending.  A list of all the cases in which I have deposition and/or trial testimony during the past four years are included in Exhibit E.

Project #94574

I have published a large number of articles in prominent valuation journals including *Valuation Strategies, Property Tax Alert, Assessment Journal, Journal of Property Valuation and Taxation,* and *Journal of Multi-State Taxation and Incentives* as well as others.  Most of these articles concern computer appraisal and leasing issues.  A complete listing of all my publications within the past 10 years is included in my curriculum vitae, which is included in this Report as Exhibit F.  Our fee for this project is based on hourly rates which vary by task and are included in this Report as Exhibit G.

Respectfully submitted,

Robert J. Zises, ASA

8/30/07
Date

Project #94574

# Section II.

# Expert Opinions

# of Robert J. Zises, ASA

# submitted in the matter of

# CSI Leasing, Inc., Plaintiffs

# v.

# Lycos, Inc., Defendants

# (Civil Action No. 05-10017)

# INTRODUCTION

We have been asked by McCarter to retrospectively appraise certain leased computer tangible assets related to the aforementioned litigation.

## *Purpose and Objective of the Appraisal*

The objectives of the appraisal is 1) to determine the cost to Lycos to replace their leased equipment by purchasing comparable new equipment at the conclusion of the then existing lease terms rather than extending those leases through the execution of Schedules 93 and 94 in the Fall 2001, and 2) to retrospectively determine the fair market value of the subject computer assets as of August 2003.

The purpose of the appraisal is to provide independent valuation opinions to assist in the representation of your client.

We understand that we may be called upon to offer expert testimony regarding the independent valuation opinions expressed in this summary appraisal report.

## *Definition and Premise of Value*

For purposes of this appraisal report, we define the term "fair market value" as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, with both seeking their maximum economic self-interests, and assuming the price is not affected by undue stimulus, but without considering the fact that some or all of such equipment may be subject to a lease or existing liens, or the amount of rental payments pursuant to leases then in effect.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: 1. Buyer and seller are typically motivated; 2. Both parties are well informed or well advised, and acting in what they consider their best interests; 3. A reasonable time is allowed for exposure in the open market; 4. Payment is made in terms of cash in dollars or in terms of financial arrangements comparable thereto; and 5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition contemplates the willing buyer and willing seller as hypothetical persons dealing at arm's length, rather than any "particular" buyer or seller. Therefore, a price would not be considered representative of fair market value if influenced by special motivations not characteristic of a typical buyer or seller.

We have appraised the subject equipment under the premise of value-installed, which contemplates that the assets are valued at the price the property would sell for to a purchaser desiring to buy, including shipping, tax and installation.

Based upon our analysis, and in our opinion, this premise of value is consistent with the highest and best use of the subject assets. "Highest and best use" is the reasonably probable and legal use of the property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value in the appropriate marketplace.

### Description of the Subject Computer Assets

The subject computer assets are listed and described in Exhibit A.

We did not conduct an asset-by-asset inventory of the equipment.   Accordingly, we have relied on the descriptions which were provided by McCarter and/or CSI as the basis upon which we have developed our opinions.  We have assumed that all of the equipment valued has been maintained in a good and serviceable manner.

Project #94574

## APPROACHES TO VALUE

The generally accepted approaches to tangible personal property valuation include the cost approach, market approach, and income approach.

### Income Approach

The income approach measures the present worth of anticipated future economic benefits (i.e. net income or net cash flow). The net income or net cash flow is projected over an appropriate period and is then capitalized at an appropriate capitalization or discount rate. An essential concept in the income approach is the time value of money, i.e. a dollar received today is worth more than a dollar received in the future.

### Cost Approach

The cost approach considers the concept of replacement as an indicator of value. The principle of substitution applies: a prudent investor would pay no more for an asset than the amount for which he could replace the asset new.

The main definitions of cost are reproduction cost and replacement cost. While reproduction cost contemplates the construction of an exact replica of the tangible asset, replacement cost contemplates the cost to recreate the functionality or utility of the subject tangible asset. Thus, in replacement cost, the form or appearance may be very different from the original asset.

The cost approach commonly measures value by estimating the current cost of a new asset, then deducting for various elements of depreciation, including physical deterioration and functional and external obsolescence to arrive at "depreciated cost new". The "cost" may be either reproduction or replacement cost. The logic behind this method is that an indication of value of the asset is its cost (reproduction or replacement) less a charge against various forms of obsolescence such as functional, technological and economic as well as physical deterioration if any.

Thus:          Current Cost of Replacement or Reproduction New
                                    less
                            Physical Deterioration
                                    less
                        Functional Obsolescence
                                    less
                          External Obsolescence
                                  results in
                            Fair Market Value

The availability and cost of the substitute asset is directly affected by shifts in the supply and demand of the utility. Utility may be measured in many ways including functionality, desirability, etc. Costs typically include the costs of all material, labor, overhead, and entrepreneurial profit (or return on the investment in the subject tangible personal property).

### Market Approach

The theory behind the market approach is that a prudent investor can go to the marketplace and purchase equipment that provides similar output. The market approach is applied in the secondary equipment market to establish value by analysis of sales of comparative property near the time of the valuation date.

In the market approach, sometimes also called the "sales comparison" approach, sales of similar property are gathered to arrive at an indication of the most probable selling price of the property being appraised. The basic procedure is to gather data, determine the parameters to be compared, and apply the results to the subject.

The market approach is considered to be the best method to estimate the value of tangible personal property, especially when an actual and active secondary market exists and verifiable sales data are available to provide a good indicator of value for the asset.

### Valuation Synthesis

Appraisers may use more than one of these approaches to estimate the value of tangible personal property. Selection of the method or methods can depend on the availability of data and appropriateness of the method in light of all facts and circumstances of the valuation. When more than one approach is employed, the appraiser will synthesize the valuation evidences to reach a final indication of value. Assessment of the quantity and quality of the available data and the merits of each valuation approach with respect to the particular appraisal is critical for the valuation synthesis.

Sometimes, it is not possible or practical to apply more than one valuation approach when valuing tangible personal property. In such situations, the appraiser must select the most appropriate method, based on the constraints of the quality and quantity of data and existing circumstances, and rely on this approach to conclude the estimate of value.

# VALUATION ANALYSIS

## *Appropriate Approaches*

In reviewing the various approaches which we considered appropriate for the appraisal of these assets, several factors were taken into consideration. These factors included, but were not necessarily limited to, premise of value, availability of data, uses of the equipment, and marketability of the equipment.

Based on the factors we considered, we concluded that the market approach would be most appropriate in this case. The market approach is appropriate because identical and comparable assets with similar utility are traded in the secondary marketplace.

## *Appropriate Market Level*

Personal property is commonly bought and sold in or at several market levels depending on the quantity, quality and condition of the property. Examples of market levels include, but are not limited to, Retail Market Level, Wholesale Market Level, and Orderly Liquidation Market Level. Orderly liquidation market level is a market in which similar property is regularly sold to willing buyers with time constraints, but in an orderly and advertised manner. Wholesale market level is the price at which wholesalers buy from the market or sell to the trade. Retail market level is the most common price at which a property is sold to an end-user.

Based on our analysis of the above issues, we determined the appropriate exchange market for the subject assets was the retail market level. This determination is consistent with the principle of "highest and best use".

## *Classification of Property*

Since the owner of the subject property is a lessor, we classified this assemblage as an "investment property". Investment property is defined by Babcock as "one which is produced, acquired, or held for the sake of monetary income or monetary profit." Since identical or similar equipment is traded in the secondary computer marketplace, we further classified this assemblage as a "marketable investment property". The marketability of an investment property is derived from the expectancy of economic or monetary returns. Its value is influenced by the risk, sometimes called the "risk rate", to the investor relative to other available investments. The degree of risk in a particular investment at a particular time is measured more or less accurately by the "market".

Project #94574

### Scope of Work

The credibility of the value conclusions depends on the reliability of the data from which they are developed.

In the course of our twenty years experience in applying the market approach to the appraisal of computer assets, we have developed a database of actual sales offers and transactions in the new and secondary computer marketplace (the "NACOMEX database"). Thousands of the observations in the database are our own sales transactions. In addition, we supplement our own sales data with sales observations from other dealers and trading partners throughout the country. We further supplement our database with sales observations obtained from other appraisers and other reliable sources.

Observations in the database have captured information including a) name of manufacturer, b) model name, c) model number, d) equipment configuration, e) any other value-making information on the transaction, f) sale price, g) sale date, and h) market level (i.e. end-user, wholesale, liquidation). Each observation has been further confirmed as an arm's length transaction and has been verified for accuracy.

In this case, end-user transactions of "comparable" and identical models available to us on and around the effective date of the appraisal were collected from the NACOMEX database. These data are referenced and maintained in our database. Through our investigation of manufacturers' catalogs and literature, interviews with dealers, references to sales literature and specification sheets, we collected additional information regarding market transactions, conditions and industry economics at the time of the comparable observations as well as during the effective date of the appraisal.

### Methodology

**For Purchase of New Replacement Equipment at End of Lease Terms Prior to Lease Extension Schedules 93 & 94 in Fall of 2001:** We noted the Producer Price Index for Personal Computers (U.S. Department of Labor, Bureau of Labor Statistics) (see Appendix B) during the relevant years and applied the percentage decline from the midpoint of the range of acquisition dates of the original equipment to the end of the lease term just prior to the lease extensions represented by Schedules 93 and 94. The resulting value conclusion represents an "in exchange" value which does not include the additional costs of tax, shipping and installation of the new equipment as well as the purchase of new software licenses to run the new replacement equipment. Additional costs are also associated with de-installing, packing, insuring, and shipping the replaced leased equipment back to the Lessor as required under the existing lease requirements. Note that this value conclusion excludes the original Schedules 89, 89A, 90, 100 and 200 which were not incorporated into Schedules 93 and 94.

Project #94574

**For FMV as of August 2003:** We noted and quantified the relevant parameters of comparison including the unit's technology class. For systems, this includes processor, speed, hard drive size, and RAM. For printers, the variables include speed (pages per minute), color and resolution. Each peripheral sub-category has its own set of variables and characteristics that translate into value. We also considered function, quantity, condition, marketability, time of sale, etc., but not the issue of any new software licenses that might be necessary to run the new replacement equipment. Based on the above, we selected end-user transaction of identical and comparable equipment from the NACOMEX database. These data are referenced and maintained in our database. We then adjusted the sale price of the identical or comparable transaction to approximate the status of the subject computer assets based on the relevant parameters of comparison resulting in an indicated "in exchange" value. We then converted this "in exchange" indication of value to an "installed" indication of value by considering the related costs of shipping, installation and taxes inherent to the subject assets. We added 1.5% for shipping and 2.5% for installation with $20 as the minimum installation and $5 as the minimum shipping costs. The appropriate sales tax was then added based on the location of the equipment resulting in our final "installed" conclusion of value.

Project #94574

## VALUE CONCLUSIONS

Based upon the appraisal procedures used as stated in the Uniform Standards of Professional Appraisal Practice (USPAP)(see Appendix A), and in our opinion, a) the cost to Lycos to purchase comparable new replacement equipment at the end of the then existing lease terms rather than extending the leases by executing Schedules 93 and 94 in the Fall 2001 of the subject computer assets, and b) the fair market value of the subject assets itemized in Exhibit A as of August 2003, are as follows:

| A.<br>New Equipment Cost as of End of Lease<br>Terms Preceding Lease Extensions 93 & 94 | B.<br>FMV Appraisal<br>as of August 2003 |
|:---:|:---:|
| $13,000,000. | $3,000,000. |

Summaries of Values A and B by schedule is presented in Exhibit H. An itemized valuation of the assets resulting in Total B is presented in Exhibit A. This itemization shows twelve assets with an indicated value of "N/A" because they are either software, phone systems, or have too little information to reliably value.

*Summary*

During this appraisal, we were provided with unaudited information regarding the subject assets by McCarter and CSI. We have accepted these data without independent verification or confirmation.

In accordance with the guidelines set out by the American Society of Appraisers, we are independent of McCarter and CSI. We have no current or prospective financial interest in the assets appraised. Our fee for this appraisal is in no way influenced by the results of our valuation analysis. For our hourly compensation in this project, see Exhibit G.

This valuation report is prepared solely for the purpose stated herein. No other purpose is intended or should be inferred.

The attached appraisal certification, (see Exhibit B) and statement of contingent and limiting conditions (see Exhibit C) are integral parts of this valuation opinion.

# EXHIBIT 23

[scanned court-filing header — illegible]

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Notes | 11,869,546. | | | | | | | | | |
| Status | | | | | | | | | Nopriot CEN (A) | |
| Orginal Lease | 44,816,271 | | | | | | | | | |
| Carry OEC | 32,946,571 | 656,511 | 240,000 | 340,000 | 166,000 | | 672,000 | 1,440,000 | 1,465,000 | |
| Rolled to | | 93/94 | | | | | | | | |
| Prior Lease | | | | | | | | | | |
| Schedule | All | 64 | 64B | 64A | 64D | 64C | various | 65 | 66A | |
| OEC | 656,511 | 240,000 | 240,000 | 340,000 | 340,000 | 166,000 | 166,000 | 672,000 | 1,440,000 | 1,465,000 |
| Term | 51 | 24 | | 24 | | 24 | | 24 | 36 | 36 |
| Start | | 02/01/2000 | 03/01/2000 | 05/01/2000 | 06/01/2000 | 08/01/2000 | 10/01/2000 | 12/01/2000 | 10/01/1999 | 10/01/1999 |
| End | | 01/31/2002 | 02/28/2002 | 04/30/2002 | 05/31/2002 | 07/31/2002 | 09/30/2002 | 11/30/2002 | 09/30/2002 | 09/30/2002 |
| Adj End | | 01/31/2002 | 02/28/2003 | 04/30/2003 | 05/31/2003 | 07/31/2003 | 09/30/2003 | 11/30/2002 | 10/31/2001 | 09/30/2002 |
| Rent | 26,888 | | | | | | | | | 47,519 |
| IRR | 4.0564% | | | | | | | | | 3.243629% |

| # | Month | Total CF | 26,888 | 9,278 | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Oct-99 | 618,220 | 26,888 | | | | | 30,471 | 46,644 | 47,519 |
| 2 | Nov-99 | 618,220 | 26,888 | | | | | 30,471 | 46,644 | 47,519 |
| 3 | Dec-99 | 618,220 | 26,888 | | | | | 30,471 | 46,644 | 47,519 |
| 4 | Jan-00 | 747,431 | 26,888 | | | | | 30,471 | 46,644 | 47,519 |
| 5 | Feb-00 | 774,320 | 26,888 | | | | | 30,471 | 46,644 | 47,519 |
| 6 | Mar-00 | 888,219 | 26,888 | 9,278 | | | | 30,471 | 46,644 | 47,519 |
| 7 | Apr-00 | 887,149 | 26,888 | 9,278 | | | | 30,471 | 46,644 | 47,519 |
| 8 | May-00 | 887,149 | 26,888 | 9,278 | | | | 30,471 | 46,644 | 47,519 |
| 9 | Jun-00 | 957,428 | 26,888 | | 8,067 | 12,219 | | 30,471 | 46,644 | 47,519 |
| 10 | Jul-00 | 961,855 | 26,888 | | 8,067 | 12,219 | | 30,471 | 46,644 | 47,519 |
| 11 | Aug-00 | 958,462 | 26,888 | | 8,067 | | | 30,471 | 46,644 | 47,519 |
| 12 | Sep-00 | 956,462 | 26,888 | | 8,067 | 11,428 | | 30,471 | 46,644 | 47,519 |
| 13 | Oct-00 | 1,154,391 | 26,888 | | 8,067 | 11,428 | 6,188 | 30,471 | 46,644 | 47,519 |
| 14 | Nov-00 | 1,154,391 | 26,888 | | 8,067 | 11,428 | 6,188 | 30,471 | 46,644 | 47,519 |
| 15 | Dec-00 | 1,127,560 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 16 | Jan-01 | 1,232,759 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 17 | Feb-01 | 1,232,759 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 18 | Mar-01 | 1,221,877 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 19 | Apr-01 | 1,394,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 20 | May-01 | 1,394,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 21 | Jun-01 | 1,394,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 22 | Jul-01 | 1,394,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 23 | Aug-01 | 1,396,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 24 | Sep-01 | 1,396,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 25 | Oct-01 | 1,396,978 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 26 | Nov-01 | 1,349,871 | 26,888 | | 8,067 | 11,428 | 5,545 | 30,471 | 46,644 | 47,519 |
| 27 | Dec-01 | 1,349,871 | 26,888 | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 28 | Jan-02 | 1,349,871 | 26,888 | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 29 | Feb-02 | 1,328,039 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 30 | Mar-02 | 1,328,039 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 31 | Apr-02 | 1,378,075 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 32 | May-02 | 1,378,075 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 33 | Jun-02 | 1,378,075 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 34 | Jul-02 | 1,374,890 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 35 | Aug-02 | 1,374,890 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 36 | Sep-02 | 1,374,890 | | | 8,067 | 11,428 | 5,545 | | 46,644 | 47,519 |
| 37 | Oct-02 | 1,050,496 | | | 8,067 | 11,428 | | | | 47,519 |
| 38 | Nov-02 | 1,050,496 | | | 8,067 | 11,428 | | | | |
| 39 | Dec-02 | 1,050,496 | | | 8,067 | 11,428 | | | | |
| 40 | Jan-03 | 1,047,880 | | | 8,067 | 11,428 | | | | |
| 41 | Feb-03 | 1,047,880 | | | 8,067 | 11,428 | | | | |
| 42 | Mar-03 | 1,047,880 | | | 8,067 | 11,428 | | | | |
| 43 | Apr-03 | 1,013,208 | | | | 11,428 | | | | |
| 44 | May-03 | 1,013,208 | | | | 11,428 | | | | |
| 45 | Jun-03 | 1,047,880 | | | | 11,428 | | | | |
| 46 | Jul-03 | 1,047,880 | | | | | | | | |
| 47 | Aug-03 | 1,047,880 | | | | | | | | |
| 48 | Sep-03 | 1,047,880 | | | | | | | | |
| 49 | Oct-03 | 1,053,425 | | | | | | | | |
| 50 | Nov-03 | 910,017 | | | | | | | | |
| 51 | Dec-03 | 910,017 | | | | | | | | |
| 52 | Jan-04 | 904,891 | | | | | | | | |
| 53 | Feb-04 | 904,891 | | | | | | | | |
| 54 | Mar-04 | 904,891 | | | | | | | | |
| 55 | Apr-04 | 898,809 | | | | | | | | |
| 56 | May-04 | 898,809 | | | | | | | | |
| 57 | Jun-04 | 898,809 | | | | | | | | |
| 58 | Jul-04 | 898,809 | | | | | | | | |
| 59 | Aug-04 | 723,708 | | | | | | | | |
| 60 | Sep-04 | 723,708 | | | | | | | | |
| 61 | Oct-04 | 723,708 | | | | | | | | |
| 62 | Nov-04 | 43,954 | | | | | | | | |
| 63 | Dec-04 | 43,954 | | | | | | | | |
| 64 | Jan-05 | 43,954 | | | | | | | | |
| 65 | Feb-05 | 43,954 | | | | | | | | |
| 66 | Mar-05 | 43,954 | | | | | | | | |
| | Total CF | 65,737,632 | | | | | | | | |
| | Excess OEC | 20,921,414 | | | | | | | | |
| | Free CF | 46.68% | | | | | | | | |

EXHIBIT
191 A

AR 000744

| Notes/Status | Org OEC | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Lease | | | | | | | | | | | | | |
| Org OEC | 530,000 | 1,082,717 | 1,082,717 | 497,000 | | 370,028 | | 985,000 | | 2,850,000 | 618,000 | 1,034,500 | 735,000 |
| Carry OEC | | 1,082,717 | | 497,000 | | 370,028 | 370,028 | 985,000 | 985,000 | 2,850,000 | 618,000 | 1,034,500 | 735,000 |
| Rolled In | 93/94 | | 93/94 | 66E | 93/94 | 66G | 93/94 | 66I | 94 | 93/94 | 93/94 | 93/94 | 67D |
| Prior Lease | 43/48 | 66C | 57 | | | 66G | | 66I | | various | various | various | |
| Schedule | 66B | 57 | 57 | 74 | 66E | 66G | | | | 67A | 67B | | 75 |
| OEC | 530,000 | 1,082,717 | 1,082,717 | 497,000 | 497,000 | 370,028 | 370,028 | 985,000 | 985,000 | 2,850,000 | 618,000 | 1,034,500 | 735,000 |
| Term | 36 | 34 | 34 | 24 | 34 | 34 | 24 | 34 | 36 | 36 | 36 | 34 | 24 |
| Start | 10/01/1999 | 01/01/2000 | 03/01/2000 | 04/01/2000 | 06/01/2000 | 06/01/2000 | 08/01/2000 | 10/01/2000 | 12/01/2000 | 10/01/1999 | 10/01/1999 | 03/01/2000 | 04/01/2000 |
| Adj End | 09/30/2002 | 10/31/2002 | 12/31/2002 | 03/31/2002 | 03/31/2003 | 03/31/2003 | 07/31/2002 | 07/31/2003 | 11/30/2003 | 09/30/2002 | 09/30/2002 | 12/31/2002 | 05/31/2002 |
| LRF | 3.24358% | 3.40541% | 3.40541% | 3.85855% | 3.35795% | 3.35795% | | 3.32943% | 3.16423% | 3.16423% | 3.24417% | 3.40541% | 3.85150% |
| Oct-99 | 17,191 | | | | | 3.36104% | 3.33996% | | | | 20,049 | | |
| Nov-99 | 17,191 | | | | | | | | | 91,668 | 20,049 | | |
| Dec-99 | 17,191 | | | | | | | | | 91,668 | 20,049 | | |
| Jan-00 | 17,191 | 41,863 | | | | | | | | 91,668 | 20,049 | | |
| Feb-00 | 17,191 | 41,863 | | | | | | | | 91,668 | 20,049 | | |
| Mar-00 | | | 36,871 | | | | | | | | | | |
| 7 Apr-00 | 17,191 | | 36,871 | 19,177 | | | | | | 91,668 | 20,049 | 35,229 | |
| 8 May-00 | 17,191 | | 36,871 | 19,177 | | | | | | | 20,049 | 35,229 | 28,382 |
| 9 Jun-00 | 17,191 | | 36,871 | 16,689 | 13,941 | | | | | 91,668 | 20,049 | 35,229 | 28,382 |
| 10 Jul-00 | 17,191 | | 36,871 | 16,689 | 13,941 | | | | | 91,668 | 20,049 | 35,229 | |
| 11 Aug-00 | 17,191 | | 36,871 | 16,689 | | 12,439 | | | | 91,668 | 20,049 | 35,229 | |
| 12 Sep-00 | 17,191 | | 36,871 | 16,689 | | 12,439 | | | | 91,668 | 20,049 | 35,229 | |
| 13 Oct-00 | 17,191 | | 36,871 | 16,689 | | 12,439 | | | | 91,668 | 20,049 | 35,229 | |
| 14 Nov-00 | 17,191 | | 36,871 | 16,689 | | 12,439 | 37,727 | | | 91,668 | 20,049 | 35,229 | |
| 15 Dec-00 | 17,191 | | 36,871 | 16,689 | | 12,439 | 37,727 | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 16 Jan-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 17 Feb-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 18 Mar-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 19 Apr-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 20 May-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 21 Jun-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 22 Jul-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 23 Aug-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 24 Sep-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 25 Oct-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 26 Nov-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 27 Dec-01 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 28 Jan-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 29 Feb-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 30 Mar-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 31 Apr-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 32 May-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 33 Jun-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 34 Jul-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 35 Aug-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 36 Sep-02 | 17,191 | | 36,871 | 16,689 | | 12,439 | | 32,898 | | 91,668 | 20,049 | 35,229 | |
| 37 Oct-02 | | | 36,871 | 16,689 | | 12,439 | | 32,898 | | | | 35,229 | |
| 38 Nov-02 | | | 36,871 | 16,689 | | 12,439 | | 32,898 | | | | 35,229 | |
| 39 Dec-02 | | | 36,871 | 16,689 | | 12,439 | | 32,898 | | | | 35,229 | |
| 40 Jan-03 | | | | 16,689 | | 12,439 | | 32,898 | | | | 35,229 | |
| 41 Feb-03 | | | | 16,689 | | 12,439 | | 32,898 | | | | | |
| 42 Mar-03 | | | | 16,689 | | 12,439 | | 32,898 | | | | | |
| 43 Apr-03 | | | | | | 12,439 | | 32,898 | | | | | |
| 44 May-03 | | | | | | 12,439 | | 32,898 | | | | | |
| 45 Jun-03 | | | | | | | | 32,898 | | | | | |
| 46 Jul-03 | | | | | | | | 32,898 | | | | | |
| 47 Aug-03 | | | | | | | | 32,898 | | | | | |
| 48 Sep-03 | | | | | | | | 32,898 | | | | | |
| 49 Oct-03 | | | | | | | | 32,898 | | | | | |
| 50 Nov-03 | | | | | | | | | | | | | |
| 51 Dec-03 | | | | | | | | | | | | | |
| 52 Jan-04 | | | | | | | | | | | | | |
| 53 Feb-04 | | | | | | | | | | | | | |
| 54 Mar-04 | | | | | | | | | | | | | |
| 55 Apr-04 | | | | | | | | | | | | | |
| 56 May-04 | | | | | | | | | | | | | |
| 57 Jun-04 | | | | | | | | | | | | | |
| 58 Jul-04 | | | | | | | | | | | | | |
| 59 Aug-04 | | | | | | | | | | | | | |
| 60 Sep-04 | | | | | | | | | | | | | |
| 61 Oct-04 | | | | | | | | | | | | | |
| 62 Nov-04 | | | | | | | | | | | | | |
| 63 Dec-04 | | | | | | | | | | | | | |
| 64 Jan-05 | | | | | | | | | | | | | |
| 65 Feb-05 | | | | | | | | | | | | | |
| 66 Mar-05 | | | | | | | | | | | | | |
| Total CF | | | | | | | | | | | | | |
| Excess OEC | | | | | | | 98,693 | | | | | | |
| Free CF | | | | | | | | | | | | | |

AR 000745

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Notes | | | | | | | | | | | | |
| Status | N | Y | (A) | Y | Y | | | | | | | |
| Orginal Lease | | | | | | | | | | | | |
| Org OEC | | 1,091,002 | | 531,408 | | 4,200,000 | 1,735,000 | 1,852,420 | 3,500,000 | 427,219 | 2,103,620 | N | 800,000 |
| Carry OEC | 735,000 | 1,091,002 | | 531,408 | | 4,200,000 | 1,735,000 | 1,852,420 | 3,500,000 | 427,219 | 2,103,620 | | 800,000 |
| Rolled to | 93/94 | | 93/94 | 67H | 93/94 | 67E | 93/94 | | 93/94 | | 93/94 | 89C | 93/94 | 89E |
| Prior Lease | 75 | | 67B | | 67C | various | | | 43/44 | | 89A | | |
| Schedule | 67D | 67E | 67H | | 67F | | 36 | | 89C | | 89A | | 73 |
| OEC | 735,000 | 1,091,002 | 1,091,002 | 531,408 | 531,408 | | 1,852,420 | 1,500,000 | 427,219 | 2,103,620 | | 2,103,620 | 800,000 |
| Term | 34 | 34 | 34 | 34 | 34 | 36 | 36 | 36 | 36 | 36 | 24 |
| Start | 06/01/2000 | 10/01/2000 | 12/01/2000 | 06/01/2000 | 08/01/2000 | 10/01/1999 | 10/01/1999 | 11/01/1999 | 01/01/2000 | 03/01/2000 | 04/01/2000 |
| End | 03/31/2003 | 09/30/2002 | 09/30/2003 | 05/31/2002 | 05/31/2003 | 09/30/2002 | 09/30/2002 | 10/31/2002 | 12/31/2001 | 12/31/2002 | 03/31/2002 |
| Adj End | 03/31/2003 | 11/30/2002 | 09/30/2003 | 07/31/2002 | 05/31/2003 | 09/30/2002 | 09/30/2002 | 10/31/2002 | 12/31/2001 | 12/31/2002 | 05/31/2002 |
| Rent | 24,868 | 42,075 | 36,438 | 19,122 | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | 77,253 | 71,637 |
| LRF | 3.38340% | 3.85653% | 3.3410% | 3.59837% | 3.36164% | | | 3.2413% | 3.2451% | | 3.8723% | 3.4054% | 3.9215% |
| Nov-99 | | | | | | | 56,166 | 60,095 | 113,544 | | | |
| Dec-99 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | | | |
| Jan-00 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | | | |
| Feb-00 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | 77,253 | | |
| Mar-00 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | | | |
| Apr-00 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| May-00 | | | | | | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 | 31,371 |
| Jun-00 | 24,868 | | | 19,122 | | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 | 31,371 |
| Jul-00 | 24,868 | | | 19,122 | | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Aug-00 | 24,868 | | | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Sep-00 | 24,868 | | | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Oct-00 | 24,868 | 42,075 | | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Nov-00 | 24,868 | 42,075 | | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Dec-00 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jan-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Feb-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Mar-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Apr-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| May-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jun-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jul-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Aug-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Sep-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Oct-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Nov-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Dec-01 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jan-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Feb-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Mar-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Apr-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| May-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jun-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Jul-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Aug-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Sep-02 | 24,868 | | 36,438 | | 17,864 | 134,873 | 56,166 | 60,095 | 113,544 | | 71,637 |
| Oct-02 | 24,868 | | 36,438 | | 17,864 | | | | | | 71,637 |
| Nov-02 | 24,868 | | 36,438 | | 17,864 | | | | | | 71,637 |
| Dec-02 | 24,868 | | 36,438 | | 17,864 | | | | | | 71,637 |
| Jan-03 | 24,868 | | 36,438 | | 17,864 | | | | | | 71,637 |
| Feb-03 | 24,868 | | 36,438 | | 17,864 | | | | | | |
| Mar-03 | 24,868 | | 36,438 | | 17,864 | | | | | | |
| Apr-03 | | | 36,438 | | 17,864 | | | | | | |
| May-03 | | | 36,438 | | 17,864 | | | | | | |
| Jun-03 | | | 36,438 | | | | | | | | |
| Jul-03 | | | 36,438 | | | | | | | | |
| Aug-03 | | | 36,438 | | | | | | | | |
| Sep-03 | | | 36,438 | | | | | | | | |
| Oct-03 | | | | | | | | | | | |
| Nov-03 | | | | | | | | | | | |
| Dec-03 | | | | | | | | | | | |
| Jan-04 | | | | | | | | | | | |
| Feb-04 | | | | | | | | | | | |
| Mar-04 | | | | | | | | | | | |
| Apr-04 | | | | | | | | | | | |
| May-04 | | | | | | | | | | | |
| Jun-04 | | | | | | | | | | | |
| Jul-04 | | | | | | | | | | | |
| Aug-04 | | | | | | | | | | | |
| Sep-04 | | | | | | | | | | | |
| Oct-04 | | | | | | | | | | | |
| Nov-04 | | | | | | | | | | | |
| Dec-04 | | | | | | | | | | | |
| Jan-05 | | | | | | | | | | | |
| Feb-05 | | | | | | | | | | | |
| Mar-05 | | | | | | | | | | | |
| Total CF | | | | | | | | | | | |
| Excess OEC | | 100,315 | | | | | | | | | |
| Free CF | | | | | | | | | | | |

AR 000746

| | | | | | | | (A) | estimated | | (A) | refinance | (A) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Notes** | | | | | | | | | | | | | |
| **Status** | N | Y | N | Y | (A) | | Y | Y | (A) | | (A) | | |
| **Original Lease** | | | | | | | | | | | | | |
| Org OEC | 1,031,403 | | 2,880,878 | | | 103,765 | 2,991,623 | | 3,115,800 | | | 500,000 | |
| Carry OEC | 800,000 | 1,031,403 | 2,880,878 | 2,880,878 | | 103,765 | 2,991,623 | | 3,115,800 | 2,390,000 | 725,000 | | |
| Rolled to | 93/94 | 69G | 93/94 | 69I | 93/94 | | 69 | NR | 85 | 84 | ? | 85A | |
| Prior Lease | 73 | | 69D | | 69F | | 81 | | 63 | 89 | 82 | 82 | 89A |
| Schedule | | 69G | | 69I | 69F | | 81 | | 69 | 69 | | | 89A |
| OEC | 800,000 | 1,031,403 | 1,031,403 | 2,880,878 | 2,880,878 | | 103,765 | 2,991,623 | 2,991,623 | 3,115,800 | 2,390,000 | 725,000 | 500,000 |
| Term | 54 | 24 | 24 | 24 | 24 | | 24 | 24 | 36 | 34 | 34 | 34 | |
| Start | 06/01/2000 | 06/01/2000 | 03/01/2000 | 10/01/2002 | 12/01/2000 | | 01/01/2000 | 07/31/2000 | 04/01/2001 | 01/01/2001 | 03/01/2001 | 03/01/2001 | 04/01/2001 |
| End | 03/31/2005 | 05/31/2002 | 05/31/2005 | 09/30/2002 | 09/30/2003 | | 12/31/2000 | 05/31/2002 | 03/01/2005 | 12/31/2003 | 12/31/2003 | 03/31/2002 | |
| Adj End | 03/31/2005 | 07/31/2000 | 07/31/2000 | 11/30/2000 | 09/30/2002 | | 07/31/2002 | 05/31/2002 | 02/28/2002 | 12/31/2003 | 10/31/2003 | 07/31/2002 | |
| Rent | 27,067 | 36,514 | 34,672 | 111,939 | 96,217 | 10,095 | 4,427 | 110,000 | 106,548 | 105,198 | 73,476 | 20,840 | 16,932 |
| LRF | 3.38338% | 3.54023% | 3.36163% | 3.88590% | 3.33989% | | 3.06610% | 3.67603% | 3.56155% | 3.3775% | 3.07431% | 2.87448% | 3.12847% |

| # | Date | 27,067 | 36,514 | 34,672 | 111,939 | 96,217 | 10,095 | 4,427 | 110,000 | 106,548 | 105,198 | 73,476 | 20,840 | 15,642 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Oct-99 | | | | | | 10,095 | | | | | | | |
| 2 | Nov-99 | | | | | | 10,095 | | | | | | | |
| 3 | Dec-99 | | | | | | 10,095 | | | | | | | |
| 4 | Jan-00 | | | | | | 10,095 | | | | | | | |
| 5 | Feb-00 | | | | | | 10,095 | | | | | | | |
| 6 | Mar-00 | | | | | | 10,095 | | | | | | | |
| 7 | Apr-00 | | | | | | 10,095 | | | | | | | |
| 8 | May-00 | | | | | | 10,095 | | | | | | | |
| 9 | Jun-00 | 27,067 | 36,514 | | | | 10,095 | | | | | | | |
| 10 | Jul-00 | 27,067 | 36,514 | | | | 10,095 | 4,427 | | | | | | |
| 11 | Aug-00 | 27,067 | | 34,672 | | | 10,095 | 4,427 | | | | | | |
| 12 | Sep-00 | 27,067 | | 34,672 | | | 10,095 | 4,427 | | | | | | |
| 13 | Oct-00 | 27,067 | | 34,672 | 111,939 | | 10,095 | 4,427 | | | | | | |
| 14 | Nov-00 | 27,067 | | 34,672 | 111,939 | | 10,095 | 4,427 | | | | | | |
| 15 | Dec-00 | 27,067 | | 34,672 | | | 10,095 | 4,427 | | | | | | |
| 16 | Jan-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | | | | | |
| 17 | Feb-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | | 105,198 | | | |
| 18 | Mar-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | | 105,198 | | | |
| 19 | Apr-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | | | 73,476 | 20,840 | |
| 20 | May-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | 110,000 | | | 73,476 | 20,840 | 15,642 |
| 21 | Jun-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | 110,000 | | | 73,476 | 20,840 | 15,642 |
| 22 | Jul-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | 110,000 | | | 73,476 | 20,840 | 15,642 |
| 23 | Aug-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | 110,000 | | | 73,476 | 20,840 | |
| 24 | Sep-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | 106,548 | | 73,476 | 20,840 | |
| 25 | Oct-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | 106,548 | | 73,476 | 20,840 | |
| 26 | Nov-01 | 27,067 | | 34,672 | | 96,217 | 10,095 | 4,427 | | 106,548 | | 73,476 | 20,840 | |
| 27 | Dec-01 | 27,067 | | 34,672 | | 96,217 | | 4,427 | | 106,548 | | 73,476 | | |
| 28 | Jan-02 | 27,067 | | 34,672 | | 96,217 | | 4,427 | | 106,548 | | 73,476 | | |
| 29 | Feb-02 | 27,067 | | 34,672 | | 96,217 | | 4,427 | | 106,548 | | 73,476 | | |
| 30 | Mar-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 31 | Apr-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 32 | May-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 33 | Jun-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 34 | Jul-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 35 | Aug-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 36 | Sep-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 37 | Oct-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 38 | Nov-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 39 | Dec-02 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 40 | Jan-03 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 41 | Feb-03 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 42 | Mar-03 | 27,067 | | 34,672 | | 96,217 | | | | 106,548 | | 73,476 | | |
| 43 | Apr-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 44 | May-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 45 | Jun-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 46 | Jul-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 47 | Aug-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 48 | Sep-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 49 | Oct-03 | | | | | 96,217 | | | | 106,548 | | 73,476 | | |
| 50 | Nov-03 | | | | | | | | | 106,548 | | 73,476 | | |
| 51 | Dec-03 | | | | | | | | | 106,548 | | 73,476 | | |
| 52 | Jan-04 | | | | | | | | | 106,548 | | 73,476 | | |
| 53 | Feb-04 | | | | | | | | | 106,548 | | | | |
| 54 | Mar-04 | | | | | | | | | 106,548 | | | | |
| 55 | Apr-04 | | | | | | | | | 106,548 | | | | |
| 56 | May-04 | | | | | | | | | 106,548 | | | | |
| 57 | Jun-04 | | | | | | | | | 106,548 | | | | |
| 58 | Jul-04 | | | | | | | | | 106,548 | | | | |
| 59 | Aug-04 | | | | | | | | | 106,548 | | | | |
| 60 | Sep-04 | | | | | | | | | | | | | |
| 61 | Oct-04 | | | | | | | | | | | | | |
| 62 | Nov-04 | | | | | | | | | | | | | |
| 63 | Dec-04 | | | | | | | | | | | | | |
| 64 | Jan-05 | | | | | | | | | | | | | |
| 65 | Feb-05 | | | | | | | | | | | | | |
| 66 | Mar-05 | | | | | | | | | | | | | |
| | Total CF | | | | | | | | | | | | | |
| | Excess OEC | | | 288,652 | | | | | | | | | | |
| | Free CF | | | | | | | | 1,385,124 | | 440,856 | | | |

AR 000747



| | | | | | | |
|---|---|---|---|---|---|---|
| Notes | | | | | | |
| Status | A | Y | A | A | A | A |
| Original Lease | N | Y | NY | N | | N |
| Org OEC | | 1,574,513 | | 196,273 | 1,417,620 | |
| Carry OEC | | | | | | |
| Rolled to | | | NR | NR | NR | NR | NR |
| Prior Lease | 83A | | | | | |
| Schedule | 83A | 54 | 20 | 100 | 20 | Various |
| OEC | 500,000 | 1,574,513 | 1,574,513 | 196,273 | 1,417,620 | |
| Term | | 38 | 36 | 30 | 24 | |
| Start | 08/01/2001 | 04/01/2001 | 08/01/2001 | 04/01/2002 | 04/01/2002 | 11/01/2001 |
| End | 07/31/2004 | 03/31/2004 | 07/31/2004 | 03/31/2004 | 03/31/2005 | 10/31/2004 |
| Adj End | 07/31/2004 | 03/31/2004 | 07/31/2004 | 03/31/2004 | 03/31/2005 | 10/31/2004 |
| Rent | 16,070 | 47,459 | 47,459 | 6,082 | 43,954 | See Stream |
| LRF | 3.21400% | 3.01425% | 3.33328% | 3.09889% | 3.10057% | 0.00000% |

| # | Month | | | | | | |
|---|---|---|---|---|---|---|---|
| | Oct-99 | | | | | | |
| 1 | Nov-99 | | | | | | |
| 2 | Dec-99 | | | | | | |
| 3 | Jan-00 | | | | | | |
| 4 | Feb-00 | | | | | | |
| 5 | Mar-00 | | | | | | |
| 6 | Apr-00 | | | | | | |
| 7 | May-00 | | | | | | |
| 8 | Jun-00 | | | | | | |
| 9 | Jul-00 | | | | | | |
| 10 | Aug-00 | | | | | | |
| 11 | Sep-00 | | | | | | |
| 12 | Oct-00 | | | | | | |
| 13 | Nov-00 | | | | | | |
| 14 | Dec-00 | | | | | | |
| 15 | Jan-01 | | | | | | |
| 16 | Feb-01 | | | | | | |
| 17 | Mar-01 | | | | | | |
| 18 | Apr-01 | | 47,459 | | | | |
| 19 | May-01 | | 47,459 | | | | |
| 20 | Jun-01 | | 47,459 | | | | |
| 21 | Jul-01 | | 47,459 | | | | |
| 22 | Aug-01 | 16,070 | | 52,483 | | | |
| 23 | Sep-01 | 16,070 | | 52,483 | | | |
| 24 | Oct-01 | 16,070 | | 52,483 | | | |
| 25 | Nov-01 | 16,070 | | 52,483 | | | |
| 26 | Dec-01 | 16,070 | | 52,483 | | | 14,300 |
| 27 | Jan-02 | 16,070 | | 52,483 | | | 14,300 |
| 28 | Feb-02 | 16,070 | | 52,483 | | | 19,356 |
| 29 | Mar-02 | 16,070 | | 52,483 | | | 19,356 |
| 30 | Apr-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 19,356 |
| 31 | May-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 19,356 |
| 32 | Jun-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 19,356 |
| 33 | Jul-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 20,598 |
| 34 | Aug-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 20,598 |
| 35 | Sep-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 20,598 |
| 36 | Oct-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 79,436 | 210,061 |
| 37 | Nov-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 79,436 | 210,061 |
| 38 | Dec-02 | 16,070 | | 52,483 | 6,082 | 43,954 | 79,436 | 210,061 |
| 39 | Jan-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 97,360 | 333,259 |
| 40 | Feb-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 97,360 | 333,259 |
| 41 | Mar-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 97,360 | 333,259 |
| 42 | Apr-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 109,004 | 398,306 |
| 43 | May-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 109,004 | 398,306 |
| 44 | Jun-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 121,507 | 462,206 |
| 45 | Jul-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 121,507 | 462,206 |
| 46 | Aug-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 121,507 | 462,206 |
| 47 | Sep-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 121,507 | 462,206 |
| 48 | Oct-03 | 16,070 | | 52,483 | 6,082 | 43,954 | 143,408 | 611,403 |
| 49 | Nov-03 | 16,070 | | 52,483 | 6,082 | 43,954 | | 611,403 |
| 50 | Dec-03 | 16,070 | | 52,483 | 6,082 | 43,954 | | 611,403 |
| 51 | Jan-04 | 16,070 | | 52,483 | 6,082 | 43,954 | | 678,754 |
| 52 | Feb-04 | 16,070 | | 52,483 | 6,082 | 43,954 | | 679,754 |
| 53 | Mar-04 | 16,070 | | 52,483 | 6,082 | 43,954 | | 679,754 |
| 54 | Apr-04 | 16,070 | | 52,483 | | 43,954 | | 679,754 |
| 55 | May-04 | 16,070 | | 52,483 | | 43,954 | | 679,754 |
| 56 | Jun-04 | 16,070 | | 52,483 | | 43,954 | | 679,754 |
| 57 | Jul-04 | 16,070 | | 52,483 | | 43,954 | | 679,754 |
| 58 | Aug-04 | | | | | 43,954 | | 679,754 |
| 59 | Sep-04 | | | | | 43,954 | | 679,754 |
| 60 | Oct-04 | | | | | 43,954 | | 679,754 |
| 61 | Nov-04 | | | | | 43,954 | | |
| 62 | Dec-04 | | | | | 43,954 | | |
| 63 | Jan-05 | | | | | 43,954 | | |
| 64 | Feb-05 | | | | | 43,954 | | |
| 65 | Mar-05 | | | | | 43,954 | | |
| 66 | Total CF | | | | | | | |
| | Excess OEC | 208,910 | | 682,279 | 54,741 | 923,041 | 507,928 | 10,018,368 |
| | Free CF | | | | | | | |

Handwritten annotations: $700,000 · $6,680,029 · $3.9M · $10.5M

AR 000748



.24   .175   .57   2.7

3.7M

# 13,689,262

AR 000749

| | Original Schedule | 67E | Part 67H | Part 67H | | |
|---|---|---|---|---|---|---|
| | Rollup Schedule | 67E | 67H | 93 | 94 | Combined |
| | DEC | 1,091,002 | 1,091,002 | 96,591 | 994,411 | 1,091,002 |
| | Term | | 24 | | 36 | |
| | Start | 10/01/2000 | 10/01/2000 | 10/01/2003 | 10/01/2003 | 10/01/2000 |
| | End | 09/30/2002 | 09/30/2003 | 10/31/2003 | 10/31/2004 | 09/30/2003 |
| | Adj End | 11/30/2000 | 09/30/2003 | 10/31/2003 | 10/31/2004 | 10/31/2004 |
| | Rent | 42,075 | 36,438 | 3,226 | 33,213 | See Stream |
| | NPV | | | | | 1,445,408 @10% |
| | NPV % | 84% | 105% | | 132% | 132.46% |
| | IRR | | | | | 27.26% |
| 1 | Oct-00 | 42,075 | - | - | - | 42,075 | 1,048,927.21 |
| 2 | Nov-00 | 42,075 | - | - | - | 42,075 | 42,075 |
| 3 | Dec-00 | 36,438 | 36,438 | - | - | 36,438 | 36,438 |
| 4 | Jan-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 5 | Feb-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 6 | Mar-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 7 | Apr-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 8 | May-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 9 | Jun-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 10 | Jul-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 11 | Aug-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 12 | Sep-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 13 | Oct-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 14 | Nov-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 15 | Dec-01 | - | 36,438 | - | - | 36,438 | 36,438 |
| 16 | Jan-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 17 | Feb-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 18 | Mar-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 19 | Apr-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 20 | May-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 21 | Jun-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 22 | Jul-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 23 | Aug-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 24 | Sep-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 25 | Oct-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 26 | Nov-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 27 | Dec-02 | - | 36,438 | - | - | 36,438 | 36,438 |
| 28 | Jan-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 29 | Feb-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 30 | Mar-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 31 | Apr-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 32 | May-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 33 | Jun-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 34 | Jul-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 35 | Aug-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 36 | Sep-03 | - | 36,438 | - | - | 36,438 | 36,438 |
| 37 | Oct-03 | | | 3,226 | 33,213 | 36,438 | 36,438 |
| 38 | Nov-03 | | | | 33,213 | 33,213 | 33,213 |
| 39 | Dec-03 | | | | 33,213 | 33,213 | 33,213 |
| 40 | Jan-04 | | | | 33,213 | 33,213 | 33,213 |
| 41 | Feb-04 | | | | 33,213 | 33,213 | 33,213 |
| 42 | Mar-04 | | | | 33,213 | 33,213 | 33,213 |
| 43 | Apr-04 | | | | 33,213 | 33,213 | 33,213 |
| 44 | May-04 | | | | 33,213 | 33,213 | 33,213 |
| 45 | Jun-04 | | | | 33,213 | 33,213 | 33,213 |
| 46 | Jul-04 | | | | 33,213 | 33,213 | 33,213 |
| 47 | Aug-04 | | | | 33,213 | 33,213 | 33,213 |
| 48 | Sep-04 | | | | 33,213 | 33,213 | 33,213 |
| 49 | Oct-04 | | | | 33,213 | 33,213 | 33,213 |

AR 000750

# EXHIBIT 24

UNITED STATES DISTRICT COURT
For the District of Massachusetts

ORIGINAL

|  |  |  |
|---|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LYCOS, INC., | ) | C.A. No. 05-10017- RWZ |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant. | ) | |

**EXPERT REPORT OF  PROFESSOR NANCY J. MOORE
PURSUANT TO FED. R. CIV. P.  26(a)(2)**

## EXPERT REPORT OF PROFESSOR NANCY J. MOORE
## PURSUANT TO FED. R. CIV. P. 26(a)(2)

### BACKGROUND, QUALIFICATIONS, AND COMPENSATION

I have been retained by the law firm of McCarter & English to provide expert services in this case.

I am the Nancy Barton Scholar Professor of Law at Boston University School of Law. I joined the Boston University Law School faculty on January 1, 1999, from the Rutgers School of Law in Camden, New Jersey. At Rutgers School of Law, I served as an Assistant, Associate, and later Professor of Law and as Associate Dean for Academic Affairs. A copy of my resume is attached as Exhibit A.

I received my undergraduate degree from Smith College (Phi Beta Kappa), with honors in my major of English. I received my juris doctor (J.D.) degree from Columbia Law School, where I served on the Board of Editors of the Columbia Law Journal and was a Harlan Fiske Stone Scholar. I am an attorney currently licensed to practice law in the following jurisdictions: Massachusetts (active) and Pennsylvania (inactive). Prior to serving on the faculty at Rutgers School of Law and now Boston University School of Law, I was an Assistant Attorney General in the Office of the Special Prosecutor for the Commonwealth of Pennsylvania. Prior to that, I was an associate attorney in private practice at Debevoise, Plimpton, Lyons & Gates (now Debevoise & Plimpton) in New York, New York.

The focus of my scholarship is in the field of legal ethics or professional responsibility. A list of my fellowships, grants, professional recognitions, lectures, publications and other activities in the field of professional responsibility and ethics is included in my resume (Exhibit A). These include my current service as Chair of the Multistate Professional Responsibility Examination Drafting Committee (since 1991 a member; Chair since 1995) and as a member of the American Bar Association Center for Professional Responsibility's Committee on Policy Implementation (since 2002), and my former service as Chief Reporter of the American Bar Association Commission on the Evaluation of Rules of Professional Conduct (otherwise known as "Ethics 2000") (from 1997 to 2002, the latter four years of which were as Chief Reporter).

I was also an adviser to the American Law Institute's Restatement of the Law (Third) Governing Lawyers, and I served twice as Chair of the Professional Responsibility Section of the Association of American Law Schools. I have authored numerous articles on various aspects of legal ethics. I have testified as an expert on legal ethics via deposition, declaration, and in various tribunals, including hearings or trials

before state and/or federal courts in Florida, Maine, Maryland, Massachusetts, New Jersey, New York and Pennsylvania.

I have spoken on legal ethics numerous times in the last twenty-five years at continuing legal education seminars and professional responsibility conferences. I have regularly taught courses in legal ethics since 1978. In addition to regularly teaching the basic course in Professional Responsibility (at both Rutgers and BU), I teach a seminar on Lawyering in the 21st Century.

I am familiar with the Massachusetts Rules of Professional Conduct, which were adopted by Massachusetts on June 9, 1997, went into effect on January 1, 1998, and have been amended from time to time. These rules are based, with some variation, on the American Bar Association's Model Rules for Professional Conduct. The Rules of Professional Conduct are designed to regulate the conduct of attorneys in those states (such as Massachusetts) where the rules are adopted. The purpose of adopting rules regulating attorney conduct is, among other things, to instill confidence in those who deal with lawyers that the lawyers will act fairly and ethically with third parties and will zealously represent their clients within the bounds of law. The Rules of Professional Conduct are also designed to ensure that court proceedings are fair and honest, as lawyers are considered officers of the courts in those jurisdictions where they practice.

Attached as part of Exhibit A is a listing of my academic and other publications is included in my resume, along with a list of publications within the past ten years. Attached as Exhibit B is a listing of other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

I am being compensated for my work on this matter at the hourly rate of $550 per hour, plus expenses actually and reasonably incurred, based on the time I spend in analyzing the relevant issues, forming my opinions, preparing this report, and if necessary testifying to my opinions either in deposition or at trial. I have no personal involvement or interest, financial or otherwise, in the outcome of this case, and my compensation is not based in any way on the result of the case.

ISSUES ADDRESSED

I have been asked to give my expert opinions on the following issues:

1.     Whether Lycos's attorneys violated the Massachusetts Rules of Professional Conduct---particularly Rule 3.4(g), which states that a "lawyer shall not...pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case"--- when they:

      a.   negotiated and approved the execution of contracts between Lycos and LeaseForum that gave Susan Franklin, a witness for Lycos in support of certain claims that Lycos has brought against CSI in this lawsuit and a previous lawsuit ("the Claims"), a contingent financial interest in the outcome of the Claims;

      b.   submitted to the Court in this case an *Affidavit of Susan Franklin*, dated April 29, 2005 (the "Franklin Affidavit"), offering expert testimony by Ms. Franklin in opposition to CSI's motion seeking to dismiss the Claims, and further, did so without disclosing Ms. Franklin's contingent financial interest in the outcome of this case and the Claims;

      c.   identified and continued to rely on Ms. Franklin as a witness on Lycos's behalf to testify in support of the Claims notwithstanding her contingent financial interest in the outcome of this case and the Claims.

    2.    Whether the exchange of correspondence between Lycos's counsel and Ms. Franklin's counsel in May and June of 2007, in which Lycos purported to terminate the contingent fee arrangement based on concerns about its counsel being the subject of claims of ethical violations, and Ms. Franklin's counsel responded by stating that the contingent fee agreement was still in full force and effect, cures any violations of the Massachusetts Rules of Professional Conduct that had previously occurred or were then outstanding.

## MATERIALS CONSIDERED AND RELIED UPON

A list of the materials that I considered and/or relied upon in arriving at my opinions is attached as Exhibit C.

## OPINIONS

It is my professional opinion, within a reasonable degree of certainty, that:

    1.    Lycos's attorneys violated the Massachusetts Rules of Professional Conduct when they: (a) negotiated and approved the execution of contracts between Lycos and LeaseForum that gave Ms. Franklin a contingent financial interest in the outcome of this case and the Claims; (b) submitted to the Court in this case the *Affidavit of Susan Franklin*; and (c) identified and continued to rely on Ms. Franklin as a witness on Lycos's behalf notwithstanding her contingent interest in the outcome of this case and the Claims.

    2.    The exchange of correspondence between Lycos's counsel and Ms. Franklin's counsel in May and June of 2007 did not cure the violations of the Massachusetts Rules of Professional Conduct that had previously occurred and were then outstanding.

<u>ANALYSIS AND BASIS FOR OPINIONS</u>

<u>The Prohibition on Contingent Witness Fees</u>

Rule 3.4(g) of the Massachusetts Rules of Professional Conduct provides in relevant part that a lawyer shall not "pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case." This rule is similar to but more explicit than the ABA Model Rules of Professional Conduct, which provide in the text of Rule 3.4(b) that a lawyer shall not "offer an inducement to a witness that is prohibited by law" and then note in Comment [3] that "[t]he common law in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to·pay an expert witness a contingent fee." See also Restatement (Third) of the Law Governing Lawyers §117(2) (prohibiting paying witness consideration "contingent on the content of the witness's testimony or the outcome of the litigation") In adopting Rule 3.4(g) of the Massachusetts Rules of Professional Conduct, the Massachusetts Supreme Judicial Court elected to carry forward the language of the former Massachusetts Code of Professional Responsibility, DR 7-109(C), which was based on the former ABA Code of Professional Responsibility.

The purpose behind these Rules is stated in EC 7-28 of the former ABA Code of Professional Responsibility: "Witnesses should always testify truthfully and should be free from any financial inducements that might tempt them to do otherwise." Or, as one court stated, "A contingent witness fee agreement...raises the specter of an auctioning of the truth and casts a pall over the entire fact finding process." Wirth v. State Bd. Of Tax Com'rs, 613 N.E.2d 874, 876 (Ind. Tax 1993). Contingent witness fees "inevitably tend to bias the witness and encourage perjury." In re Mushroom Transp. Co., Incl, 70 B.R. 416, 418 (E.D. Pa. 1987). See also New England Tel. & Tel. Co. v. Bd. of Assessors of Boston, 468 N.E.2d 263, 265 (Mass. 1984) ("It is the potentially adverse influence of the motivation to enhance his compensation that makes a contingent fee arrangement for an expert witness inappropriate."); Crowe v. Bolduc, 334 F.3d 124, 132 (1st Cir. 2003) ("[the] rule was adopted precisely to avoid even potential bias"). It is the "tendency of such contracts which serves to generate their undesirability," and "[i]mproper conduct or bias can be predicted easily when the compensation of the witness is directly related to the absolute amount of an award which may in turn be dependent to a great degree on the testimony of the same witness." Belfonte v. Miller, 243 A.2d 150, 153 (Pa. Super. 1968). It does not matter whether the attorney believes that the witness will testify truthfully, as these contracts violate "the very essence of the integrity of the judicial system," The Florida Bar v. Jackson, 490 So.2d 935, 936 (Fla. 1986), and "[t]he payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration· of justice as to pay him to testify to what is not true." In re Robinson, 136 N.Y.S. 548, 445 (1912), affirmed, 209 N.Y. 354 (1913).

<u>The Execution of Statement of Work No. 2 and Amendment A</u>

In October 2003 and February 2004 Lycos's inside and outside counsel negotiated and approved contracts between Lycos and LeaseForum, including Statement of Work No. 2 and Amendment A thereto, that gave LeaseForum a fee equal to 20% of the gross amount, if any, that Lycos may collect from CSI, "whether by judgment or through a negotiated settlement" of the Claims that are the subject of this case. At the time these contracts were executed, Lycos clearly contemplated litigation of the Claims. Amendment A was designed to include "services [from LeaseForum] that are intended to support, and which were performed in anticipation of litigation between [Lycos and CSI]." Similarly, Amendment A references the provision by LeaseForum of "broader services in anticipation of the Litigation, including without limitation, in support of the work of counsel retained by [Lycos] to commence the Litigation." Ms. Franklin is the Chief Executive Officer of LeaseForum, and thus it is clear that she has a contingent interest in the outcome of this Case. See Accrued Financial Services, Inc. v. Prime Retain, Inc. 298 F.3d 291, 299 (4th Cir. 2002) (testimony by employees of company that had a contingent fee agreement violated public policy against providing expert testimony for a contingent fee). Indeed, she acknowledged in her February 28, 2007 deposition that she has a contingent financial interest in the outcome of this case. (Franklin deposition at pp 373-374).

At the time these contracts were executed, both LeaseForum and Lycos must have been aware that it was highly likely, indeed almost inevitable, that Lycos would offer Ms. Franklin as a witness in this Case. Lycos's Claims are based in part on allegations of fraud and negligent misrepresentation by CSI in negotiating Sales Agreement Number 199614, dated July 15, 2003, between CSI and Lycos ("the Sales Agreement"). Those negotiations were conducted on Lycos's behalf primarily by Ms. Franklin. Indeed, a significant aspect of Lycos's Claims in this case is a claim that CSI engaged in fraudulent or negligent misrepresentation in a telephone call on or about June 27, 2003, between Paul Stenberg of CSI and Ms. Franklin, who was acting on behalf of Lycos. Ms. Franklin is the only person other than CSI's Mr. Stenberg who can testify as to what Mr. Stenberg said in that telephone call.

It is irrelevant that the contingent fee contract between Lycos and LeaseForum calls for LeaseForum to provide an array of litigation support services in addition to the testimony of Ms. Franklin. For example, in Weinberg v. Magid, 285 Mass. 237 (1934), the Supreme Judicial Court of Massachusetts refused to enforce a contract to pay a physician a percentage of the verdict in a patient's personal injury action despite the fact that the contract was for medical services throughout her illness and did not mention any testimony by the physician in that action. The trial court found that the facts clearly warranted the inference that the parties contemplated that the physician would testify on the patient's behalf, and this was sufficient to void the contract as a champertous agreement: "it provides for a sharing in the fruits of litigation; it is an agreement in which the champertor had no previous interest in the subject matter of the litigation; and it provides that the fruit of the litigation contracted for shall be the only compensation the champetor is to receive." 285 Mass at 239. See also, e.g., In re Mushroom Transp. Co., Inc. Bkrtcy, 40 B.R. 416 (E.D.Pa. 1987) ( finding violation of DR 7-109(C) and rejecting any distinction "between a contingent fee contract to serve as a witness and a more

general services contract that may incidentally lead the expert to serve as a witness only after providing other services" given that the parties "at least contemplated litigation" when the agreement was made, citing Belafonte v. Miller, 212 Pa.Super. 508 (1968), to the same effect). But cf. Zenith Electronics Corp. Bkrtcy., 241 B.R. 92 (D.Del 1999) (rejecting argument that investment banking officers should be barred from testifying because of contingent fee, noting without discussion that the company had been engaged for a substantial array of services and not for testimony at confirmation hearing; no discussion of potential violation of ethical rules).

Nor is it relevant that at least initially, Lycos may have contemplated providing Ms. Franklin as a fact witness only. Although the rule is invoked most often in the case of expert witnesses, Massachusetts Rule 3.4(g) (as well as ABA Model Rule 3.4(b) and ABA Model Code DR 7-109(C)) is not limited to expert witnesses, and there are numerous cases in which the rule against continent witness agreements has been applied to fact witnesses. See, e.g., Wagner v. Lehman Bros. Kuhn Loeb Inc., 646 F.Supp. 643 (N.D. Ill. 1986) (DR 7-109(C) violated when attorney knew of client's promise to pay fact witness portion of client's recovery); In re Telcar Group, Inc. Bkrtcy, 363 B.R. 345 (E.D.N.Y. 2007) (DR 7-109(C) violated when fact witness who was central figure in the history of the debtor was given agreement to share in trustee's recovery).

For the reasons set forth above, it is my professional opinion that Lycos's inside and outside counsel violated Massachusetts Rule 3.4(g) when they negotiated and approved the Statement of Work No. 2 and Amendment A between Lycos and LeaseForum, which gave Ms. Franklin, a likely witness for Lycos in this lawsuit, a contingent financial interest in the outcome of the Claims.

The Submission of the Franklin Affidavit

On April 29, 2005, Lycos's outside counsel filed a brief in opposition to CSI's motion to dismiss the claims and/or for summary judgment. In conjunction with that brief, Lycos's outside counsel submitted to the court the Franklin Affidavit, offering expert testimony by Ms. Franklin, without disclosing Ms. Franklin's financial interest in the outcome of this case and the Claims. Lycos's outside counsel had participated in the negotiation and execution of the contingent fee agreement; therefore, counsel was clearly aware of its existence when counsel offered Ms. Franklin's expert affidavit.

As set forth above, the rule prohibiting contingent witness fees, including Massachusetts Rule 3.4(g), applies to both fact and expert witnesses. Nevertheless, courts have been most vehement in their disapproval of such arrangements in the case of an expert witness. This is because "[t]he assistance a jury is to receive from an expert opinion should not be tempered by the need to speculate how much of a discount to allow for personal interest." Gediman v. Sears, Roebuck & Co., 484 F.Supp. 1244, 1248 (D.C. Mass. 1980) (further noting: "The very fact that a jury needs expert testimony means it lacks qualifications to make such a judgment. An agreement to give an opinion on a contingent basis, particularly on an arithmetical scale, attacks the very core of expert testimony.") Thus, it is my professional opinion that Lycos's outside counsel violated

Massachusetts Rule 3.4(g) when counsel submitted the Franklin Affidavit to this court, knowing of Ms. Franklin's contingent financial interest in the outcome of this case and the Claims.

Courts differ in their willingness to allow either fact or expert testimony when the witness has a contingent financial interest in the outcome of the case in violation of the ethics rules. Compare, e.g., Farmer v. Ramsay, 159 F.Supp. 2d 873 (D.Md. 2001) (striking expert report because it was obtained in violation of Maryland common law and Maryland Rule 3.4) with, e.g., New England Telephone & Telegraph Co. v. Bd. of Assessors of Boston, 392 Mass. 865 (1984) (tax board should not have totally disregarded expert witness's testimony, even if expert believed he had contingent fee arrangement at time he testified). When witnesses are permitted to testify, however, courts recognize that the existence of the contingent financial interest is "classic evidence of bias, which is routinely permitted on cross-examination," and which is "considered vital" in assessing the witness's credibility. Crowe v. Bolduc, 334.F3d 124, 132 (1st Cir.2003) (upholding exclusion of evidence only because court was reluctant to second-guess trial judge's ruling that the probative value of the impeaching evidence was outweighed in that case by the risk of jury confusion). Thus, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires that expert reports must disclose, inter alia, the compensation to be paid to the expert for both study and testimony.

As Lycos's outside counsel was clearly aware, CSI and its counsel had no knowledge of Ms. Franklin's contingent financial interest in the outcome of this case at the time Lycos's outside counsel submitted the Franklin affidavit. Moreover, because the affidavit was being submitted as part of Lycos's opposition to CSI's motion to dismiss and/or for summary judgment, it was obvious that CSI would have no opportunity at that time to cross-examine Ms. Franklin regarding any compensation she expected to receive in return for her testimony. Rule 8.4(d) of the Massachusetts Rules of Professional Conduct provides that it is "professional misconduct for a lawyer to…engage in conduct that is prejudicial to the administration of justice." In my opinion, the failure to disclose Ms. Franklin's financial interest in the outcome of the case was contrary to the administration of justice, in that the court would have no opportunity to weigh the credibility of her expert testimony on the basis of substantial impeaching evidence. Cf. Creative Dimensions in Management v. Thomas Group, Inc., 1999 WL 135155 (E.D.Pa.) ("The concealment of a contingent financial arrangement with a witness would be unconscionable.") Therefore, it is my professional opinion that Lycos's outside counsel violated Rule 8.4(d) of the Massachusetts Rules of Professional Conduct when he submitted the Franklin affidavit without disclosing Ms. Franklin's contingent financial interest in the outcome of this case and the Claims.

Continued Reliance on Ms. Franklin's Testimony

In Lycos's responses to CSI's first set of interrogatories, Lycos identified Ms. Franklin as a witness who will testify to a telephone call between Ms. Franklin and Mr. Stenberg in which Lycos claims that Mr. Stenberg made intentional misrepresentations to Ms. Franklin. Moreover, in his letter of May 11, 2007, to LeaseForum's counsel, Lycos's

outside counsel reiterated Lycos's intention of relying on the testimony of LeaseForum employees, including Ms. Franklin and/or John Kirk. Regardless of whether Ms. Franklin and/or John Kirk are to testify as fact or expert witnesses, for the reasons set forth above it is my professional opinion that Lycos's outside counsel violated Rule 3.4(g) of the Massachusetts Rules of Professional Conduct by continuing to rely on testimony by LeaseForum executives, given LeaseForum's contingent financial interest in the outcome of this case and the Claims.

## Effect of Lycos's Purported Effort to Terminate LeaseForum's Contingent Fee Agreement

In his letter of May 11, 2007, to LeaseForum's counsel, Lycos's outside counsel purported to terminate the agreement between Lycos and LeaseForum containing the contingent fee provision. He did so for the express purposes of avoiding "even an arguable violation of the Rules of Professional Conduct." LeaseForum's counsel responded by denying that Lycos has authority to terminate the contract and stating that if LeaseForum "is required to commence litigation to enforce its rights, [it] will seek a damages award of three times [LeaseForum's] actual damages, in addition [to] reimbursement of attorney's fees and costs."

In his May 11 letter, Lycos's outside counsel attempted to avoid any finding that he previously violated Rule 3.4(g) by claiming that at the time [Statement of Work 2] was signed, and at the time it was amended in February, 2004, no one could have known that LeaseForum's testimony might be necessary in a suit commenced by CSI in January, 2005." This statement, however, is not credible. As set forth above, litigation between Lycos and CSI was clearly contemplated at the time these agreements were signed: indeed, Amendment A specifically refers to services "in anticipation of litigation between [Lycos and CSI]." Moreover, given the role performed by both LeaseForum and Ms. Franklin in negotiating the Sales Agreement with CSI, particularly Ms. Franklin's participation in the critical telephone call with Mr. Stenberg, it was highly likely, indeed almost inevitable, that Lycos would offer Ms. Franklin as witness in this case. In any event, in April 2005, Lycos's outside counsel knowingly offered the Franklin affidavit, without disclosing her contingent financial interest of which he was fully aware. As a result, nothing in the May 2007 correspondence between counsel for LeaseForum and Lycos changes my opinions regarding the previous and continuing violations of the Massachusetts Rules of Professional Conduct that I described above.

August 31, 2007

*Nancy J. Moore*
Nancy J. Moore

EXHIBIT A

# NANCY J. MOORE
89 Carlton Street
Brookline, MA 02446
nmoore@bu.edu

TELEPHONE:    Work   617-358-0501    FAX:    Work   617-353-3077
              Home   617-232-2202            Home 617-232-9955

## EDUCATION:

--------Columbia Law School

    Degree: J.D. 1973
    Member of the Board of Editors, <u>Columbia Law Review</u>
    Harlan Fiske Stone Scholar
    Class of 1912 Prize

--------Smith College

    Degree: B.A. 1970, <u>magna cum laude</u>
    Major:  English Honors
    Honors: Phi Beta Kappa

## EMPLOYMENT:

----------January 1, 1999 to present:

    Professor of Law and Nancy Barton Scholar
    Boston University School of Law
    765 Commonwealth Avenue
    Boston, MA 02215

    Subjects taught: Professional Responsibility, Lawyering in the 21st Century, Torts.

----------July 1, 1989 to December 31, 1998:

    Professor of Law
    Rutgers School of Law - Camden
    Fifth and Penn Streets
    Camden, New Jersey 08102

    (1976-1980: Assistant Professor of Law; 1980-1989: Associate Professor of Law;
    1994-1997: Associate Dean for Academic Affairs)

    Subjects taught include Professional Responsibility, Law and Biomedical Ethics,
    Torts, Evidence, and Seminar in Professional Ethics.

1

----------Spring, 1987: Visiting Lecturer
                    University of Graz
                    Graz, Austria

----------Summer, 1988: Visiting Associate Professor of Law
                    University of North Carolina at Chapel Hill
                    Chapel Hill, North Carolina

----------1974-1976: Assistant Attorney General. Commonwealth of Pennsylvania, Office of the
       Special Prosecutor. Philadelphia, PA.

----------1973-1974: Associate. Debevoise, Plimpton, Lyons & Gates (now Debevoise &
       Plimpton). New York, NY.


## PUBLICATIONS:

----------"*Mr. Prinzo's Breakthrough* and the Limits of Confidentiality," 51 St. Louis L.J. 1059
       (Summer 2007);

----------"Informed Consent in the Practice of Law," in 4 Encyclopedia of Philosophy 680 (2d ed.
       2006);

----------"Regulating Law Firm Conflicts in the 21st Century: Implications of the Globalization of
       Legal Services and the Growth of the 'Mega Firm,'" 18 *Georgetown J. Legal Ethics*
       521 (2005);

----------"Who Should Regulate Class Action Lawyers?" 2003 *U. of Illinois Law Review* 1477;

----------Regulating Self-Referrals and Other Physician Conflicts of Interest," 15 *Healthcare
       Ethics Forum* 134 (2003);

----------"'In the Interests of Justice': Balancing Client Loyalty and the Public Good in the
       Twenty-First Century," 70 *Fordham Law Review* 1775 (2002);

----------"Lawyer Ethics Code Drafting in the Twenty-First Century," 30 *Hofstra Law Review* 923
       (2002)

----------"Foreward: Lawyering for the Middle Class," 70 *Fordham Law Review* 623 (2001);

----------"What Doctors Can Learn From Lawyers About Conflicts of Interest," 81 *BU Law
       Review* 445 (April 2001);

----------"Ethics Matters, Too: The Significance of Professional Regulation of Attorney Fees and
       Costs in Mass Tort Litigation—A Response to Judith Resnik," 148 *University of
       Pennsylvania Law Review* 2209 (2000);

----------"The Ethical Role and Responsibilities of a Lawyer-Ethicist: The Case of the
Independent Counsel's Independent Counsel," 68 *Fordham Law Review* 771 (1999)
(symposium: ethics issues raised by Independent Counsel investigation of Pres. Clinton);

--------"The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits," 41
*South Texas Law Review* 149 (1999) (symposium on emerging professional responsibility
issues in litigation);

---------"Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of
the Attorney-Employee," 39 *South Texas Law Review* 497 (1998);

---------"The Ethical Dilemmas of Insurance Defense Lawyers: Are Special Solutions Required?"
4 *Connecticut Insurance Law Journal* 259(1997);

----------"Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm,"
16 *Texas Review of Litigation* 586 (1997);

----------"Restating the Law of Lawyer Conflicts" 10 *Georgetown J. Legal Ethics* 541 (1997);

----------"Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics," 28
*Rutgers L.J* 57 (1996);

---------"Conflicts of Interests in Representing Children," 64 *Fordham L. Rev.* 1819 (1996);

----------"Entrepreneurial Doctors and Lawyers: Regulating Business Activities in the Medical
and Legal Professions, in R. Spece and R. Shimm, eds., *Conflicts of Interest in Medical
Practice* (1995, Oxford University Press);

----------"Expanding Duties of Attorneys to 'Non-Clients': Reconceptualizing the Attorney-Client
Relationship in Entity Representation and Other Inherently Ambiguous Situations," 45 *S.
Carolina L.Rev.* 659 (1994)

----------"Intra-Professional Warfare Between Prosecutors and Defense Attorneys: A Plea For an
End to the Current Hostilities," 53 *U. Pitt. L.Rev.* 515 (1992)

----------"Professionalism: Rekindled, Reconsidered or Reformulated?" 19 *Cap. U.L. Rev.* 1121
(1990)

----------"The Usefulness of Ethical Codes," 1989 *Ann. Surv. Amer. Law* 7

----------"'Two Steps Forward, One Step Back:' An Analysis of New Jersey's Latest `Right-To-
Die' Decisions," 19 *Rutgers Law Journal* 955 (1988);

3

----------"Professionalism Reconsidered," 1987 *ABF Res. J* 773;

----------"Commentary," 4 *Bus. & Prof. Ethics J.* 83 (1985) (essay reviewing article by Professor David Luban on equality of access to legal services);

--------- "Limits to Attorney-Client Confidentiality: A Philosophically Informed' and Comparative Approach to Medical and Legal Ethics" 36 *Case Western Res. L. Rev.* 177 (1985-86);

---------"Conflicts of Interest in the Simultaneous Representation of Multiple Clients: A Proposed Solution to the Current Confusion and Controversy," 61 *Tex. L. Rev.* 211 (1982);

---------"Disqualification of an Attorney Representing Multiple Witnesses Before a Grand Jury: Legal Ethics and the Stonewall Defense," 27 *UCLA Law Rev.* 1 (1979);

---------"Implications of the *Younger* Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending," 72 *Colum. L. Rev.* 874 (1972) (student note).

## PRACTICE PUBLICATIONS:

----------"Ethical Issues in Transnational Legal Practice: the U.S. Lawyer Goes Abroad," ___Bar Examiner___ (forthcoming 2007);

----------"Not Quite a Client," 90 ABAJ 50 (Jan. 2004);

----------"Sex with a Client: Adopt the ABA's Specific Prohibition," 19 GPSolo 37 (2002);

----------"Lawyer Ethics in a State of Flux: Revisions, Not Revolution," 88 ABAJ 48 (2002);

----------"Ethics Code Rework: Written Communications," 87 ABAJ 62 (2001);

----------ALI-ABA Committee on Continuing Professional Education, *A Practical Guide to Achieving Excellence in the Practice of Law* (1992)(Chief Reporter);

----------"Professional Liability of Lawyer to Clients and Non-Clients under United States Common Law," in Jonge Balie Congress 1991, *Bereopsaansprakelijkheid: Recht op een scheve schaats* 139 (W.E.J. Tjeenk Willink Azwolle 1991)(prepared for conference of Young Dutch Lawyers Organization in Noordwijk, The Netherlands).

## FELLOWSHIPS AND GRANTS:

----------1988-1990: Director, N.J. Department of Higher Education Humanities Grant, "Introducing Ethics into the Core Curriculum of Undergraduate Legal Education";

----------1987-1990: Participant, N.J. Department of Higher Education Technological Grant, "AIDS:A Course in Science, Technology and Society" (one of three participants planning and team-teaching a required interdisciplinary undergraduate course);

----------1985-1986: Co-Director, N.J. Department of Higher Education Humanities Grant, "Humanistic Concerns in Legal and Medical Education" (introduction of law and medical ethics courses in law and medical schools; development of humanistic perspectives);

----------1983-1984: Fellow, Center for the Study of Values, University of Delaware.

## PRESENTATION OF SCHOLARLY PAPERS:

----------Apr. 2007: "The ALI Draft Proposal to Bypass the Aggregate Rule." Clifford Symposium on Challenges to the Attorney/Client Relationship." DePaul University College of Law. Chicago, IL.

----------Apr. 2002: "Who Should Regulate Class Action Lawyers?" Symposium on Ethics 2000 and Beyond: Reform or Professional Responsibility as Usual? Univ. of Illinois, Champaign, IL.

----------Feb. 2002: "Who Should Regulate Class Action Lawyers?" Faculty Workshop, Rutgers School of Law, Camden, NJ.

----------Feb. 2001: "Conflicts of Interest in Patent Representation." Patenting Genomics and Proteomics. American Conference Institute. New York, NY.

----------Nov. 1999: "Ethics Matters, Too: A Response to Judith Resnik." Mass Torts: A Symposium sponsored by the David Berger Program on Complex Litigation and the University of Pennsylvania Law School in conjunction with the Advisory Committee of Civil Rules of the Judicial Conference of the United States. Philadelphia, PA.

----------Mar. 1999: "The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits." Symposium on Emerging Professional Responsibility Issues in Litigation sponsored by South Texas Law Review. Houston, Texas.

----------Sept. 1997: "Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of the Attorney-Employee." Annual Ethics Symposium sponsored by the South Texas Law Review. Houston, Texas.

## FELLOWSHIPS AND GRANTS:

----------1988-1990: Director, N.J. Department of Higher Education Humanities Grant, "Introducing Ethics into the Core Curriculum of Undergraduate Legal Education";

----------1987-1990: Participant, N.J. Department of Higher Education Technological Grant, "AIDS:A Course in Science, Technology and Society" (one of three participants planning and team-teaching a required interdisciplinary undergraduate course);

----------1985-1986: Co-Director, N.J. Department of Higher Education Humanities Grant, "Humanistic Concerns in Legal and Medical Education" (introduction of law and medical ethics courses in law and medical schools; development of humanistic perspectives);

----------1983-1984: Fellow, Center for the Study of Values, University of Delaware.

## PRESENTATION OF SCHOLARLY PAPERS:

----------Apr. 2007: "The ALI Draft Proposal to Bypass the Aggregate Rule." Clifford Symposium on Challenges to the Attorney/Client Relationship." DePaul University College of Law. Chicago, IL.

----------Apr. 2002: "Who Should Regulate Class Action Lawyers?" Symposium on Ethics 2000 and Beyond: Reform or Professional Responsibility as Usual? Univ. of Illinois, Champaign, IL.

----------Feb. 2002: "Who Should Regulate Class Action Lawyers?" Faculty Workshop, Rutgers School of Law, Camden, NJ.

----------Feb. 2001: "Conflicts of Interest in Patent Representation." Patenting Genomics and Proteomics. American Conference Institute. New York, NY.

----------Nov. 1999: "Ethics Matters, Too: A Response to Judith Resnik." Mass Torts: A Symposium sponsored by the David Berger Program on Complex Litigation and the University of Pennsylvania Law School in conjunction with the Advisory Committee of Civil Rules of the Judicial Conference of the United States. Philadelphia, PA.

----------Mar. 1999: "The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits." Symposium on Emerging Professional Responsibility Issues in Litigation sponsored by South Texas Law Review. Houston, Texas.

----------Sept. 1997: "Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of the Attorney-Employee." Annual Ethics Symposium sponsored by the South Texas Law Review. Houston, Texas.

5

----------Feb. 1997: "Restating the Law of Lawyer Conflicts." Symposium on the Restatement of the Law Governing Lawyers sponsored by the Georgetown Journal of Legal Ethics. Georgetown University Law Center. Washington, D.C.

----------Feb. 1997: "Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm." Conflicts of Interest Symposium sponsored by University of Texas Review of Litigation and Texas Center for Ethics and Professionalism. Austin, Texas.

----------Jan. 1997: "The Ethical Dilemmas of Insurance Defense Lawyers: Are Special Solutions Required?" Joint Session of AALS Sections on Insurance Law and Professional Responsibility. AALS Annual Meeting. Washington, D.C.

----------May 1996: "Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics." Conference on the Entire Controversy Doctrine. Rutgers Law School. Camden, N.J.

----------Sept. 1992: "Elaborating Standards of Professional Conduct." Strategic Planning Session of the Law Society of Upper Ontario. Toronto, Ontario, Canada.

----------Feb., 1990: "Professionalism: Rekindled, Reconsidered or Reformulated?" Symposium on Legal Ethics. Capital University Law Center. Columbus, Ohio.

----------Sept. 1989: "The Usefulness of Ethical Codes." University of Texas Law School Faculty Seminar. Austin, Texas.

----------April, 1989: "The Usefulness of Ethical Codes." Symposium on "Legal Ethics: The Social Responsibility of the Lawyer." NYU Annual Survey of American Law. NYU School of Law. New York, New York.

----------Oct. 1987: "The History and Present Status of the Right of a Competent Patient to Refuse Life-Sustaining Medical Treatment." Annual General Meeting of the American Society of Law and Medicine. Boston, Mass.

----------April, 1984: "Limits to Attorney-Client Confidentiality: A `Philosophically Informed' and Comparative Approach to Medical and Legal Ethics." Faculty Seminar. Center for the Study of Values. University of Delaware. Newark, Delaware.

PROFESSIONAL RECOGNITION AND ACTIVITIES:

----------Chair, Multistate Professional Responsibility Examination Drafting Committee (member since 1991, chair since 1995);

----------Member, ABA Center for Professional Responsibility Policy Implementation Committee (since 2002);

6

----------Member, Editorial Board, ABA/BNA Lawyers' Manual on Professional Conduct (since 2006)

----------Co-Chair, Ethics in Class Action Subcommittee of ABA Section on Employment and Labor Law (since 2006);

----------Member, Warren G. Burger Prize Committee, American Inns of Court (2004; 2005);

----------Advisor to ALI-ABA Board of Directors Program Committee for Professional Responsibility (since 2006);

----------Member, ALI Principles of Aggregate Litigation Members Consultative Group (since 2005);

---------- Member, Supreme Court of Rhode Island Committee to Review Rules of Professional Conduct (2002-2006);

----------Chief Reporter, ABA Commission on Evaluation of the Rules of Professional Conduct ("Ethics 2000") (Co-Reporter, 1997-1998; Chief Reporter, 1998-Aug. 2002);

----------Member, Advisers for the Restatement of the Law, Third, The Law Governing Lawyers (1989-2000); member, American Law Institute (elected 1992);

----------Chair, AALS Section on Professional Responsibility (1997-1998)(1987-1988);

----------Chair, Planning Committee for Fall 1998 AALS Workshop on Professional Responsibility;

----------Member, New Jersey Supreme Court Committee on Women in the Courts (1994-1998);

----------Member, New Jersey Supreme Court Special Committee on Matrimonial Litigation (1996-1998);

----------Reporter, ALI-ABA Practice Evaluation Project (1988-91)(drafted *How to Achieve Excellence in the Practice of Law*);

----------Member, ALI-ABA group reviewing standards for continuing legal education programs (1988-90);

----------Member, Planning Committee for Spring 1988 AALS- sponsored Workshop on Teaching of Professional Responsibility (1987-88);

----------Trustee, N.J. Citizen's Committee on Biomedical Ethics (1988-1991);

----------Member, Institutional Review Board/Committee for the Protection of Human Subjects,

UMDNJ-School of Osteopathic Medicine (1987-89)

----------Selected Recent Lectures and Panel Discussions:

June 2007: "Joint Representation and Aggregate Settlement." Panel participant. Annual Meeting of Association of Professional Responsibility Lawyers. San Francisco, CA.

June 2006: "Ethics in Transnational Legal Practice." Panel participant. 32nd National Conference on Professional Responsibility. Vancouver, Canada.

Oct. 2005: "Impact Litigation: Ethical Issues in Representing Workers in Class, Collective & Multiple Plaintiff Action." Panel participant. Conference of National Employment Lawyers Association. Boston, MA.

June 2005: "Contract Lawyering Risks." Panel participant. ABA Counsel Connect teleconference.

April 2005: "Contract Lawyering." Panel participant. Spring 2005 ABA National Legal Malpractice Conference." Boston, MA.

Sept. 2004: "Ethics and Media Relations." Speaker, Association of Defense Trial Attorneys, New England Regional Conference. Framingham, MA.

Aug. 2004:"Attorney-Client Privilege and Work Product in the Post-Enron Era: Confidentiality Under Siege." Panel Participant, ABA Annual Meeting. Atlanta, GA.

Jun. 2004: "What is Fraud and Why Does it Matter?" Moderator, Panel Discussion. 30th National Conference on Professional Responsibility. Naples, FL.

Apr. 2004: "Lawyers Caught in the Enron Spotlight." Panel Participant. ABA Section of Business Law. Seattle, WA

Jan. 2004: "Ethics and Class Action Reform." Panel Participant. AALS Annual Meeting, Section on Professional Responsibility. Atlanta, GA.

Jan. 2003: "Hot Topics in Legal Ethics." Mid-year meeting of Conference of Chief Justice. Williamsburg, VA.

Jun. 2002: "General Counsel and the Model Rules of Professional Conduct: When Ethical Issues Are Up-Close and Personal." Panelist. Nat'l Assoc. Of College and University Attorneys 42nd Annual Conference. Boston, MA.

May, 2002: "Ethics 2000: What Have They Done and Where Do We Go From Here?" Moderator, Panel Discussion. 28th Nat'l Conference on Professional Responsibility. Vancouver, British Columbia, Canada.

Apr. 2002: "The Assault on the Citadel of Privilege." Primary speaker. St. Thomas More Society of Rhode Island Fourth Annual Spring Seminar. Providence, RI.

Oct. 2001: "New Influences on Professional Responsibility." Principal speaker. 11th Annual Dan K. Moore Program in Ethics. Chapel Hill, NC.

June 2001: "Lawyers' Duties to Non-clients." Rhode Island Bar Association Annual Meeting. Providence, RI.

May 2001: "Changing the ABA Model Rules on Ethics: An Update." Moderator, ABA Teleconference program.

May 2001: "An Ethics 2000 Town Hall." Moderator, Panel Discussion. Annual meeting of Professional Responsibility Lawyers. Miami, FL.

May 2001: "Multijurisdictional Practice." Conference on "Stewardship of Bar Admissions: Maintaining Integrity in a Changing World sponsored by the National Conference of Bar Examiners. Madison, WI.

April 2001: "The Impact of Ethics 2000 and Restatement on Finance Practice." Co-presenter, Spring meeting of American College of Investment Counsel. Chicago, IL.

Feb. 2001: "Conflicts of Interest in Patent Representation." Conference on Patenting Genomics sponsored by the American Conference Institute.

July 2000: "Ethics 2000." Presentation and Panel Discussion. Annual Meeting of Conference of Chief Justices of State Supreme Courts. Rapid City, So. Dakota.

June 2000: "Ethics 2000." Moderator, Panel Discussion. ABA National Conference of Professional Responsibility Lawyers. New Orleans, LA.

Aug. 1999: "Lawyers Investing In and Doing Business With Their Clients." Panel discussion. ABA Section of Litigation. ABA Annual Meeting. Atlanta, Georgia.

March 1997: "Ethics Issues in Third Party Payment." Faculty Colloquium. Roger Williams University School of Law. Briston, RI.

Sept. 1996: "Is the Restatement Necessary?" Annual Meeting of Colorado Bar Association. Vail, CO.

April 1995: "Implications for Legal Malpractice of the ALI's Restatement of the Law Governing Lawyers." ABA Section on Professional Liability. Phoenix, Arizona.

Aug. 1993: "Professionalism and Law Firm Culture." American Bar Association Annual Meeting. New York, NY.

Sept. 1992: "Quality Assurance and the Practice Evaluation Project." State Bar of New Mexico Annual Convention. Ruidoso, New Mexico.

April 1992: "The ALI-ABA Practice Evaluation Project." Annual Conference of ABA Standing Committee on Lawyers' Liability. New Orleans.

November 1991: "Professional Liability of Lawyers to Clients and Non-Clients under United States Common Law." Conference of Young Dutch Lawyers' Organization. Noordwijk, The Netherlands.

Apr. 1991: "Legal and Ethical Aspects of Informed Consent." Rutgers-Camden undergraduate anthropology class in Death and Dying. Camden, N.J. (Lecture also given in same class and in a graduate anthropology seminars in 1987-89 and in 1990.)

Feb. 1990: "Topics in Medical Malpractice." Course for fourth year medical students at UMDNJ-Rutgers-Camden. Camden, N.J. (Similar lectures also given in the winter terms of 1986-89).

Jan. 1990: "The Law of Informed Consent." Course in law and medicine. Pennsylvania College of Podiatric Medicine. (Similar lecture given in 1989.)

October 1989: "A Video Guide to Professional Conduct: Conflicts of Interest" (participant in panel discussion made available to subscribers of the ALI-ABA Video Law Review).

Dec. 1988: "Termination of Life-Sustaining Medical Treatment." Special law and medicine course for third-year medical students at UMDNJ-School of Osteopathic Medicine. Stratford, N.J.

Mar. 1988: "Teaching Demonstration.: AALS Teaching Workshop on Professional Responsibility. Arlington, Va. (Member of Planning Committee and Faculty).

Jan. 1988: "Professionalism: Rekindle or Reconsider?". Annual meeting of AALS Section on Professional Responsibility. Miami Beach, Fla. (Prepared and moderated panel discussion).

10

# EXHIBIT B

## List of Expert Witness Testimony 2003-2007
### Professor Nancy J. Moore

| <u>Date</u> | <u>Case</u> | <u>Court</u> | <u>Testimony</u> | <u>Law</u> <u>Firm</u> | <u>Issue/Side</u> |
|---|---|---|---|---|---|
| 2003 | Broussard v. Shelton Smith | Dist. Ct. TX 2001-32577 | deposition | John A. Davis, Jr. Houston, TX | legal malpractice/ conflict of inter-est (P) |
| 2004 | Ahan v. Grammas et al | Cir. Ct. MD CAL 02-09937 | deposition/ trial | Charles Wayne Piper Rudnick Washington, DC | legal malpractice/ br. of fiduciary duty/conflicts (D) |
| 2004 | Marks v. Citi-zens | U.S. Dist. Ct. Arizona | deposition | Michael Shannon Brown Raysman New York, NY | unlawful term. of employment (D) confidentiality |
| 2005 | Congoleum v. ACE American Ins. Co., et al | N.J. Super. | deposition | Jack Gerstein Ross Dixon & Bell Washington, D.C. | disqualification/ conflicting int. (D insurers) |
| 2005 | Glenwood Farms et al v. Garve Ivey et al. | U.S. District Ct. Maine | deposition/ trial (2006) | William Robitzek Berman & Simmons Lewiston, ME | legal malpractice/ conflict interest (P) |
| 2005 | In re Sonus Net-work Sec. Lit. | U.S. Dist. Ct. MA 02-CV-113515 (MLW) | affidavit | Robert Berg Bernstein Liebhard New York, NY | motion for sanctions |
| 2005 | In re Jaeggi, et al | U.S. Dist. Ct. E.D.N.Y. 2:04 Cr-519-LDW-2 | affidavit | William Hauptman Sherman & Stearling New York, NY    (D) | criminal case/ motion for judicial recusal |
| 2005 | Simon v. KPMG et al | U.S. Dist. Ct. NJ 00-6003 | affidavit/ testimony | Erik Sandstedt Bernstein Litowitz New York, NY | hearing on motion to dis-qualify (objector) |
| 2005 | Mt. Ivy Press v. Palmer & Dodge | Sup. Ct. MA C.A. 04-1116 | affidavit | Timothy Daly Wellesley, MA | legal malpractice/ breach of fiduciary duty (P) |
| 2006 | Boswell v. Boswell | Cir. Ct. FLA 50-2003-CA 011 883XXOCAN | testimony | Lawrence J. Fox Drinker Biddle Philadelphia, PA | hearing on motion to dis-qualify (D-co) |
| 2006 | Sisson v DuPont | Cir. Ct. FLA 03-CA-11178 | deposition | Eileen Moss Shook Hardy & Bacon Miami, FLA | fraud/conspiracy (conflicts/reten-tion agreement) (D-co) |
| 2006 | Vt. Pure, et al v. Sobol, et a | Super. Ct. MA 06-1814-BLS1 | affidavit | Jan Schlictman Pride's Crossing, MA | legal malpractice (conflicts) (P) |

| 2007 | In re Enron Corp. Sec. Litigation | U.S. Dist. Ct. S.D. TX MDL 1446 | deposition | Pepe & Hazard Hartford, CT et al | aiding & abetting fraud (P) |
|------|-----------------------------------|----------------------------------|------------|----------------------------------|------------------------------|
| 2007 | In re Staples S. Hughes | NC State Bar Griev. Cmte | affidavit | Richard Rosen Chapel Hill, NC | confidentiality (L) |
| 2007 | In the Matter of Carlos Loumiet, Esq. | US Dep't Treas. Office of Comptroller of Curr. | deposition | Lee Straus OCC Washington, D.C. | conflicts (P) |

EXHIBIT C

## MATERIALS CONSIDERED AND RELIED UPON

Materials which I considered and/or relied upon in arriving at my opinions

include the following:

- General Services Agreement ("GSA") between Lycos, Inc. and Leaseforum, and Statements of Work ("SOW") numbers 1 and 2 (Deposition Exhibits 13 and 13A)

- Lycos's Complaint of December 2003 (Deposition Exhibit 278)

- Notice of Dismissal of Lycos's December 2003 Complaint

- Lycos's Draft Complaint (February 2004)

- CSI's Complaint of January 2005

- CSI's Motions to Dismiss and for Summary Judgment

- Affidavit of Susan Franklin (April 2005)

- Portions of Susan Franklin's testimony acknowledging a personal financial interest in the outcome of the case

- Portions of Interrogatory Answers from Lycos (stating that Ms. Franklin will be a witness in the case as well as a summary of her testimony)

- Discovery Master Order #2.

- Lycos' Opposition to CSI's Motion for Summary Judgment

- Cases concerning Massachusetts Rules of Professional Conduct

- Deposition Ex. 692 (E-mail from J. Kirk to T. Bean dated December 19, 2003)

- Letter to R. Feldman from T. Bean dated May 11, 2007, stating Lycos was terminating relationship with LeaseForum.

- Letter to T. Bean from R. Feldman dated July 12, 2007, responding to May 11, 2007 letter

- Letter to R. Feldman from T. Bean dated July 24, 2007 responding to R. Feldman's July 12, 2007 letter

- Sales Agreement Number 199614, dated July 15, 2003, between CSI and Lycos

UNITED STATES DISTRICT COURT
For the District of Massachusetts

|  |  |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| LYCOS, INC., | ) |
| Defendant, | ) |
| and | ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) |
| Trustee Process Defendant. | ) |

C.A. No. 05-10017- RWZ

## AFFIDAVIT OF MICHAEL FLEMING

I, Michael Fleming, being duly sworn, do hereby depose as follows:

1.     I have been retained as an expert on behalf of Computer Sales International, Inc. ("CSI") in this case to provide opinions concerning leasing, which are set forth below and in the expert reports which have been provided in this case to Lycos, Inc. ("Lycos"), as well as the bases for those opinions.  I am being compensated for time spent and expenses reasonably incurred.  I have no financial interest in the outcome of this litigation.

2.     I make this affidavit based on my personal knowledge and expert opinions, unless otherwise indicated, and in support of CSI's opposition to Lycos' motions for summary judgment.  In addition, certain points below will contradict the summary judgment Affidavit of Bruce D. Smith submitted by Lycos.

### Background

3.     I hold a bachelor and masters degrees in history and economics from Drake University in Des Moines, Iowa.  I have also attended executive education programs on subjects

including Strategic Decision Making, Strategic Thinking and Marketing, Financial Analysis and

Corporate Governance at graduate schools of business including the Kellogg School, Wharton

and the University of Chicago Graduate School of Business.  I also hold a Certified Association

Executive (CAE) credential awarded by The American Society of Association Executives.

4.    In July 2006, I retired after twenty-seven years as President of the Equipment

Leasing & Finance Association of America (the "ELA"), which changed its name in October of

2006 to the Equipment Leasing & Finance Association of America.  ELA is the leading trade

association for the equipment leasing and finance industry, providing programs and services in

the areas of advocacy, professional competency, access to capital and research.

5.    For over thirty years, ELA has been the leading promoter of good practice in the

equipment leasing business not only through its Code of Fair Business Practices, but through

workshops and studies.  During this period, I led the association and its interpretation of norms

of good business practice.  The latter has evolved as the industry has grown, matured and

business in general has become more transparent.

6.    As President of the ELA, I acted as the primary equipment leasing industry leader

and spokesperson on business, policy, regulatory and legislative matters for twenty-seven years.

I had direct responsibility for the ELA's programming related to public policy development,

legal and regulatory initiatives, changing industry trends and business strategies, industry

practices, access to funding and capital and analyzing emerging industry market and product

opportunities.

7.    While at the ELA, I met regularly with members and staff of the Financial

Accounting Standards Board (FASB), International Accounting Standards Board (IASB) and

Accounting Standards Board (UK).  I also provided, on behalf of ELA and the industry, all

official industry testimony before federal congressional committees and administration agencies. In addition, I met with state officials, legislators and attorneys general, to provide background of equipment leasing in general and specific legal issues in particular.

8.     The equipment leasing business, like many other businesses, operates in an open competitive market.  Companies and transactions are subject to normal contract law including the Uniform Commercial Code and the bankruptcy code.  The structure of leases is not proscribed in law but rather responds to the demands of the marketplace.  Industry leaders, therefore, have actively supported a strategy of internal promotion and enforcement of good practice.  In a business in which there are an estimated 20,000 transactions every business day, it can be safely concluded from the facts that the equipment leasing industry is an industry of good practice.

9.     Most recently, I have provided background reviews to national business magazines and papers on pending changes to financial accounting for leases.  I serve as an advisor to organizations and emerging economy national governments on the development of national laws and regulations for equipment leasing and finance.  I provide commentary to the International Institute for the Unification of Private Law – UNIDROIT – on the impact of proposed provisions of a model law for leasing.  I have authored several publications within the past several years, and a list of these has been provided to Lycos.

### Review of Documents and Testimony

10.     Based on my expertise, including my years working in the equipment leasing industry at the ELA, my review of documents produced by the parties in this case, and my review of deposition transcripts of witnesses for both parties, I have concluded that CSI has done nothing improper or contrary to industry standards in its dealings with Lycos concerning Lycos' leasing of tens of millions of dollars of computer technology equipment during the period 1999

3

through 2004.  As explained below, Lycos decided for its own reasons, and to what it apparently considered its benefit, to extend its equipment leases with CSI.  Lycos received all disclosures which are common in the industry, and Lycos' has simply created its theory or "mark-ups," which is nothing more than CSI's gross profits, including capital costs, operating costs and taxes, on these consensual transactions.

### Lycos' Created Theory of "Mark-Ups"

11.     Lycos's experts, especially Messrs. Cross and Smith, have come up with the concept of "mark ups" – a term not found in the leasing industry – and, once they have presumed that these exist, those experts opine that they are improper.  In fact, these "mark-ups" are nothing more than a portion of the lessor's gross profits on its entirely proper transactions.  Again, the Lycos-CSI transactions at issue are leases, not loans.  Lycos did not buy or invest anything in the ownership of the equipment while it was leasing that equipment.

12.     Though Lycos uses the term "mark up" repeatedly in its expert reports and court filings, the term cannot be found even in the definitive professional book on financial reporting and analysis by Revsine, Collins and Johnson.  "Mark up" is an imprecise term most often used in retailing to refer to amounts added on to a base cost to cover operations, transaction and distribution costs and provide a profit.  Profit is a key component of America's business process.  Further, competition controls profit in the equipment leasing business.

13.     Lycos' expert Charles Cross's analogy of the CSI-Lycos lease transactions to loans allows him to introduce the concept of a "refinancing fee" and compare it to what he refers to as a "markup."  This analogy is totally erroneous.  Every transaction between willing parties has a cost because the elements of risk and reward change and there are costs.  Lycos could easily calculate the costs of restructuring leases from the information it had.

14.     The statements of Lycos' experts to the effect that it is typical for a lessor to

4

disclose fees in a restructured transaction is grossly misleading and over-simplified. Disclosed

fees are those which a lessee is or could be explicitly responsible for including but are not

limited to such as:

- Application fees
- Credit evaluation
- Appraisals (if any)
- Documentation fees
- Late fees
- Taxes
- Insurance
- Requests for special listed services

Fees do not include such things as the lessor's operating costs, compensation, profit levels and

other matters for which the lessee does not have direct responsibility. In fact, CSI disclosed

everything for which Lycos would have direct responsibility.

15.    Lycos' expert Cross states that "[w]hile an explicit fee is, by definition, disclosed

and known to the parties, a mark-up must be calculated and the ability to calculate depends on

information available to each party and the ability of the party to manage and use such

information." Mr. Cross acknowledges the difference between the explicit fee and transaction

information that is disclosed and the need for parties to make calculations based on the

information. However, after he so acknowledges, he reverts to language of ". . . charged

undisclosed mark-ups". This is very inconsistent.

16.    Lycos had all of the information it needed to make its calculations at the time of

each transaction if it chose to do so. In fact, several expert witnesses have done all of the

calculations from what was clearly available. Furthermore, a background in equipment leasing is

not necessary to do the calculations to compare costs. Any business person could do the

calculations necessary to determine the present value of the balance of lease payments under the

original leases and total obligations of restructured and extended leases or verify the calculations

5

of others.  This information was transparent to Lycos.  Lycos employees may have been

negligent but they were not incapable.

### Transactions Are Not Loans or "Refinancings"

17.     The transactions at issue between Lycos and CSI are leases, not "refinancings,"

as Lycos erroneously claims.  The 2% figure that is cited by Lycos' expert Cross as a "mark-up"

has relationship only to a fee that is typically paid as a broker's commission when buying a

transaction from a third party.  From my experience, I am not aware of studies that collect

numbers from companies that represent overhead, capital cost or profit targets on transactions.

These transactions are not brokered transactions – they are extensions or restructures of leases.

The spread or margin (what Cross calls an improper "mark-up") is apparent from the documents

available to Lycos.  To calculate the spread on the transactions, a person would have to be able to

calculate the difference between the remaining obligation to be paid under the original lease and

the total amount to be paid under the restructured lease.  These numbers would be present value

discounted using a lessee's internal borrowing rate and is not difficult to do.  Several of Lycos'

own experts completed the calculations and included them in their reports.

18.     The Financial Accounting Standards Board, in its standard on lease accounting,

provides that the lessee use its incremental borrowing rate to determine whether the present value

of the lease payments is higher or lower than the 90% of original equipment cost in determining

whether a lease is a capital lease or an operating lease.  The record indicates that Lycos and its

auditors did perform this test frequently.

19.     Though Lycos's experts attempt to portray all of the CSI-Lycos leases as

"refinancings" or loans, these transactions are neither financings originally nor refinancings at

the time of restructuring.  Any arguments based on concepts of loans are invalid on their face.

20.     The CSI-Lycos transactions are leases and were treated by each party as leases for

federal tax purposes and accounting purposes. As the lessee, Lycos deducted the lease payments as business expenses and did not carry the equipment on its books as an asset. A lessor such as CSI is the owner for tax purposes and is thereby entitled to depreciate the equipment.

21.    Lycos' experts' attempt to compare these lease transactions to buying or investing in equipment. There is nothing about the transactions to suggest that Lycos was "buying" anything other than the temporary use of equipment. No option to purchase the equipment even existed at the end of the leases. One of Lycos' experts makes an analogy of the residual value in the lease transactions at issue in this case to "balloon payments" under a loan. This analogy simply does not work and is an oversimplification. There is no *option* with a balloon payment in a loan – the borrower has to pay it. In a lease, by contrast, if the lessee has a fair market purchase option, it may or may not exercise the option and the lessor always has to assume that risk.

### CSI Acted Consistent With Proper and Accepted Commercial Leasing Practices

22.    In my opinion, based on the information I have reviewed and my experience, CSI acted in a manner consistent with proper and generally accepted commercial leasing practices in connection with extension or "rewriting" of Lycos' leases with CSI during the period 1997 to 2002, and in connection with the negotiation and execution of the Sales Agreement pursuant to which Lycos purchased that equipment in August of 2003. Further, CSI acted in manner consistent with accepted standards and practices of the equipment leasing business.

23.    The equipment leasing business, and specifically computer leasing, is characterized as maintaining flexibility in relations between the lessor and lessee. This is due to several reasons. First, computer leasing is usually an operating lease business in which the lessee's focus is on access to a technology solution provided in whole or in part by the lessor. The lessee client's needs change on a short cycle, technology changes and the lessor must be

7

flexible to accommodate these changes in a relationship and solutions oriented manner. Both parties understand that the greater flexibility and subsequent change does carry a price, but it is considered part of the value. The cost of this value is related to risk and risk's companion – i.e., uncertainty. The latter is a different situation from a purchase of equipment and /or a loan for the purchase of equipment. In plain ownership or a loan, the risks are different and there is greater certainty – but there is little flexibility for changing conditions.

24.    Indeed, throughout the relationship between Lycos and CSI from 1996 through 2003, I see constant changes to accommodate the desires, circumstances and needs of Lycos. There is no evidence of inflexibility or unwillingness by CSI to accommodate Lycos. This attitude even extends to agreeing to the negotiated end of transactions buyout in August of 2003. There is a willingness to restructure, to accept returned equipment and to settle for a final buyout of responsibilities. I see no evidence of CSI attempting to compel action fro Lycos in a manner to take advantage of it.

25.    CSI's behavior consistently reflects the accepted marketing strategy and practices of the computer leasing business. In my opinion, CSI acted in a manner consistent with proper and generally accepted commercial leasing practices. It neither defrauded nor overcharged Lycos. The restructured transactions were very straight-forward. Essentially, the only provisions of any given equipment schedule that were changed in a rewrite/restructuring of the leases were the lease rate (lower) and the number of months (more). All other terms and conditions remained the same. Consequently, everything was disclosed to Lycos in the restructuring. Restructuring the lease transactions was one of several alternatives always open to Lycos as it managed its equipment needs. CSI could not coerce Lycos into any action. Lycos selected the restructuring option.

8

26.     Lycos was a strong public company, at least through 2000, with a great deal of cash, and after 2000 it had large sophisticated international parents. It had access to alternative actions, cash, knowledge, and strong ownership structure. It had personnel experienced in dealing with other leasing companies and transaction experience. These are not conditions that would permit coercion into an unwise or fraudulent situations.

27.     I have seen no evidence in the Lycos claims of an actual practice that is fraudulent or even outside of accepted industry practice. Though Lycos claims there is a responsibility for a lessor to disclose its own internal interest rate, there is no interest rate in an operating lease and there is no accepted practice of lessors disclosing their internal costs of doing business, including the cost of capital.

28.     Lycos also claims that the residual value booked by CSI for each equipment schedule should have been disclosed to Lycos. The booked residual value was not relevant to Lycos' decision-making process, however, and is almost never disclosed unless there is some unique provision related to a purchase option at the end of the lease, which was not the case in the CSI-Lycos leases.

29.     Lycos also raises a vague claim that CSI continued to include a value for the equipment under lease in calculating Lycos' obligations well after CSI had received rents alleged to more than equal the cost of the equipment. This is always the case, however – because equipment always has a value – in the leasing/renting business. If the equipment truly "had no value," as Lycos claims, Lycos would not have continued to use it in its operations as it did.

**CSI Did Not Engage in a Pattern and Practice of Misconduct or Overcharge Lycos**

30.     I have seen no evidence that CSI engaged in a pattern and practice of misconduct of any kind. Misconduct would include coercion, misappropriation, unwillingness to cooperate, unreasonable failure to communicate and unwillingness to try to resolve disagreements in good

faith. In fact, Lycos itself was guilty of failing to adequately track and manage equipment leased from CSI (even to the point of losing or selling leased equipment) and of failing to tell CSI of this, or of its plan to try to re-negotiate the leases it was affirming in the August 2003 Sales Agreement.

31.    Nor was Lycos overcharged by CSI. I can find no overpayment using any measure. Lycos' theory that it was overcharged omits a key fact: in all cases of equipment schedule restructuring, Lycos received a significant additional benefit in terms of, in most cases, a 50% increase in the length of use time of the leased equipment. For this, it is reasonable that Lycos would have paid more in rents overall for the use of the equipment for an extended period, though Lycos' costs per month for use of the equipment decreased with each restructure.

32.    Lycos' business strategy and decisions indicate that keeping the total long-term cost of using the equipment low was not the most important element in its plan. Lycos preferred to manage earnings and its balance sheet in short term ways, and it wanted low current cash outflow. Indeed in Exhibit 627, Ernesto Galvan (an auditor for Lycos) states, "[i]t is Lycos' policy not to buy any equipment that can be leased." Further, Galvan confirmed that all leased equipment was not carried on Lycos' balance sheet as assets and that lease payments were shown in the P&L as lease expenses. While perfectly acceptable objectives, Lycos is responsible for those decisions.

33.    CSI worked with Lycos to accommodate the latter's needs. CSI was certainly within its rights under the transactions to commence legal action against Lycos for non-performance when events came to that.

34.    Lycos further claims that it never knew the original cost of the equipment it was leasing, but Lycos selected the equipment and had the purchase orders. Lycos could easily do a

10

comparative analysis of what it would cost to buy the equipment it had selected with internal funds versus borrowing to buy the equipment versus leasing it. CSI provided the stream of payments (the payment amount and number of payments) for a lease in its proposal. The lessor's stream of payments covers its costs of doing business including capital, personnel, operations, risk and profit. Lycos could do a present value calculation ("PV") of the total lease payments easily and compare that PV to a PV of alternative equipment acquisition mechanisms for a net PV comparison of costs.

35.     Lycos also claims that it was misled or forced into extending its leases, but there is no evidence of that. Lycos always had options negotiate extensions or restructurings of the leases. However, had Lycos returned leased equipment at the end of every equipment schedule rather than restructuring those schedules, Lycos' would have incurred new costs to replace that equipment, whether by purchase of new replacement equipment or through leasing of replacement equipment. There could also have been significant costs to Lycos in terms of disruption of certain operations while equipment was replaced. As with any "rental type" product, if the transaction continues without the lessee/renter returning the equipment, the total payments grow and could easily exceed the original equipment cost. In addition, the equipment becomes older even though it still works. That is why a lessee/renter should have some idea of how long it wants to use the equipment, keep track of the equipment, and have a plan for what it will do with the equipment at the end of the lease.

36.     Through restructuring, Lycos had the use of CSI's equipment for a longer period of time *at a lower monthly and annual cost.* Lower costs per month and year is what Lycos said it wanted. Below are several illustrations of schedules to illustrate this point.

| Schedule | # of months | Monthly payment | Total of Payments for original term (not discounted) | Annual cost of leased equipment |
|----------|-------------|-----------------|------------------------------------------------------|---------------------------------|
| 64 A | 24 | $12, 219 | $293,256 | $146, 628 |

11

37.    Schedule 64A was extended 34 months after 2 months in the original lease and became 64D.

| Schedule | # of months | Monthly payment | Total of Payments for extended term (not discounted) | Annual cost of leased equipment |
|---|---|---|---|---|
| 64 D | 36 | 34 @ $11,428 2 @ $12,219 | $412,990 | $137, 663 |

38.    Under the extension of 64 A into 64 D, Lycos received:  (a) the use of CSI's equipment for 50% longer;  (b) a monthly rate of $11,428 ($791 less); and  (c) an annual reduction in equipment rental costs of $8,965.  This is exactly what Lycos said it wanted.

| Schedule | # of months | Monthly payment | Total of Payments for original term (not discounted) | Annual cost of leased equipment |
|---|---|---|---|---|
| 64 C | 24 | $6,188 | $148,512 | $74,256 |

39.    Schedule 64C was extended 34 months after 2 months in the original lease and became 64F.

| Schedule | # of months | Monthly payment | Total of Payments for extended term (not discounted) | Annual cost of leased equipment |
|---|---|---|---|---|
| 64 F | 36 | 34 @ $5,545 2 @ $6,188 | $200,906 | $66,968 |

40.    Under the extension of 64 C into 64F, Lycos received:  (a) the use of CSI's equipment for 50% longer;  (b) a monthly rate of $5,545 ($643 less); and  (c) an annual reduction in equipment rental costs of $7,288.  This is exactly what Lycos said it wanted.

41.    An alternative way of looking at the rolled up leases is provided below.  For illustration, 64A extended to 64D will be used.

| 64 A | Year one cost of leasing equipment - $ 146,628 | Year two cost of leasing equipment - $146, 628 | Year three - equipment needs to be replaced through a new lease or purchase at a new annual cost.  $$$$ |
|---|---|---|---|
| 64 D | Year one cost of leasing equipment - $137,663 | Year two cost of leasing equipment - $137,663 | Year three cost of leasing equipment - $137,663 |

42.    Following on this, to the extent Lycos is now claiming that it was "overcharged" on restructured equipment schedules or that restructured schedules were improperly "marked up"

12

(a term not used in the equipment leasing industry), this claim has no merit. To negotiate a mutually agreed to monthly rental payment is not "marking up". The lease payments in the extended lease would reflect only the normal factors on which a lease payment is calculated. These would have included equipment cost, risks associated with a longer lease term such as credit risk and asset depreciation risk, the cost of capital, transaction costs and profit. "Mark up" is not a term used in the leasing business. The references to "mark up" imply a randomly selected figure was stuck into the calculation. This is not the way pricing is done.

43.    Lycos appears to have had a clear business model, including capital utilization strategy, to enable it to go from a startup to public company in an unusually short period of time. In time, Lycos became part of a sophisticated international company. Lycos personnel were sophisticated in business and finance concepts based on education and experience. Based on this education and experience, decision makers and persons with responsibility and authority for managing assets at Lycos would easily understand all of the provisions and ramifications of leases with CSI.

## CSI Made All Disclosures Required and Necessary for Lycos

44.    CSI made all the disclosures to Lycos that were required and necessary for Lycos to determine whether it was in Lycos' economic interest (a) to enter into initial schedules for the lease of new equipment from CSI, (b) to restructure schedules to extend the terms of its leases of certain equipment from CSI, and (c) to ultimately purchase equipment that it had previously leased from CSI in August of 2003. Lycos was told the lower monthly lease payment and the total number of payments it would be required to make under the new proposed lease. This information, coupled with the information provided in the original transactions, would allow full analytic comparison of the proposed restructuring with the original transaction. It clearly is not CSI's strategy, as evidenced by the  history of the relationship, to take advantage of

Lycos.

45.      Further, CSI and Lycos negotiated a reasonable buyout of Lycos' lease

obligations.  Plaintiff's deposition exhibits 5, 6 and 23 are important in this regard.  Each shows

a thorough analysis and understanding by the parties and a willingness to manage a workable

termination plan for the obligations.

46.      The failure of Lycos to adequately track its equipment and equipment leases is

reflected in the testimony of Sam Ziba, David Mammen and Frank Flynn in their various

capacities.  Ziba's confirms that he tracked purchase orders and that Lycos knew the value of the

equipment they were ordering, but he did not see his responsibility as keeping track of

equipment, leased or owned.

47.      David Mammen, the consultant from Avnet Enterprise Solutions ("Avnet"),

another leasing company that also provides leased asset tracking services, equipment inventory

work and consulting in addition to leasing.  Mammen's deposition reflects over and over again

that Lycos was doing a poor job of tracking its leased assets.  Avnet was contracted to do an

inventory of leased assets and make recommendations regarding a leased asset  tracking system.

The Avnet inventory, conclusions and recommendations were provided to Lycos in a report

dated December 15, 2000.  Mammon states that he frequently raised the issues related to

inadequate leased asset tracking to Lycos.  He specifically told Lycos that it could end up paying

more through extended leases if Lycos was unable to return equipment. He indicated that Lycos

was told that they could end up paying for continued use of older equipment.

48.      Lycos was made aware of all of the problems associated with an inadequate

tracking system, but did not commit to correcting the problem.  Mammen made a proposal on

behalf of Avnet to manage leased assets but received no response.  He indicated that equipment

14

appeared to have been lost, shipped out of the country or otherwise disposed of. Mammen

recommended that if equipment had a remaining useful life at the end of a lease, purchase it.

Otherwise, he recommended returning all equipment if Lycos could do so.

49.    Lycos employee Frank Flynn recognized the need for a leased asset tracking

system and set out to develop the system – Asset Portal. I have seen a demonstration of the

system, Asset Portal, and it is my judgment that it would have done a good job of integrated asset

tracking for Lycos if fully implemented. It is very comprehensive. Because it is a network

system, it could integrate all of the actions or processes related to acquiring (purchase or lease)

equipment, track its location and any maintenance and identify any action dates such as end of

lease dates and options.

50.    All persons/departments at Lycos such as purchasing, accounting and operations

could (should) utilize the network routinely to manage assets. From the evidence I was able to

see, use of the system was temporary and uneven. It is my understanding based on Mr. Flynn's

testimony and other internal Lycos correspondence that, when Mr. Flynn left employment at

Lycos, use of the system ended and no subsequent effort to track assets (equipment) enterprise

wide occurred.

51.    In summary, the issues involved with the development and use of Asset Portal

are:

- ▪ Avnet had detailed to Lycos the need for an asset management system in
    2000.
- ▪ Lycos recognized the need for a system for a variety of purposes.
- ▪ Flynn developed and implemented a system in 2001.
- ▪ The system was used irregularly for several years but then access and usage
    fell off in late 2004.

52.    It is my opinion that Lycos' failure to adequately manage a database of its assets

reflected a careless approach to asset management in general and narrowed its options at the end

of lease transactions.

## CSI Complied with ELA Standards

53.    CSI properly and fully complied with all standards of the ELA, including the provision of the ELA Code of Fair Business Practices ("CFBP" or "Code") Standard 7, which states that "[i]n dealing with a Lessee, Lessor . . . should (1) disclose all relevant information as to the terms and conditions of the lease which may affect the Lessee's decision," in connection with extension or "restructuring" of Lycos' leases with CSI during the period 1997 to 2002, and in connection with the negotiation and execution of the Sales Agreement pursuant to which Lycos purchased that equipment in August of 2003.

54.    In its counterclaim, Lycos is attempting to expand the standard for disclosure of information by a party to a lease dramatically beyond anything intended or anticipated or required by the Code. The accepted standard for disclosure speaks to the terms and conditions of the transaction itself. These terms and conditions include the rights and obligations under the lease.

- Monthly rental payment
- Term of the lease – when it begins and ends
- Lessee responsibilities during the lease:
- Taxes
- Insurance
- Maintenance
- Loss or damage
- Limitations on use or location
- Any fees
- End of lease provisions:
- Notices
- Return conditions
- Extensions or renewals
- Options to purchase
- Remedies

55.    The intent of the Standard 7 is that there be no surprise responsibilities or conditions for the lessee in the transaction terms and conditions. It is assumed and expected

16

under the CFBP that the lessee has read and understands the transaction that it signs and will be responsible for its own business decisions and actions. This would be particularly true as it applies to a sophisticated company such as Lycos with experienced business personnel.

56.    The CFBP was adopted initially in a period when understanding of equipment leasing and the provisions of the transactions was still evolving, and industry leaders intended that the code address practices which were considered unfair or misleading. Some of these practices were similar to those found in other businesses. The standards were to guide relations among lessors, between lessors and their lessee customers and between lessors and sources of funding. There was a recognition that the long term reputation and success of the industry depended on all parties understanding all of the risks, roles and responsibilities under the transaction. Among the early practices that the leasing community opposed were:

- Vague language that made responsibilities unclear.
- Side agreements not transparent to all parties that created expectations that may or may not be enforceable or realized.
- "Bait and switch" tactics related to the lease rate and terms and conditions of the lease.
- Unduly onerous return conditions for equipment.
- Unreasonable automatic lease renewal and extension practices and other end of lease practices.
- Unreasonable purpose and treatment of deposits and fees such as commitment fees and security deposits.
- Unreasonable treatment of payments and overpayments.
- Unreasonable timing of notices of required actions, usually related to exercise end of lease options.

57.    The previous list provides a flavor of the range of practices addressed by the code and confirms a 30 year plus history of industry attention to promoting good practice. Nothing in my review of the CSI documents leads me to believe that any of the unreasonable practices exist. I have not seen any evidence that CSI engaged in any unreasonable practices. In my opinion, the

claims of Lycos have no merit.

58.    Specifically, an equipment lessor is expected to disclose all things that the lessee may have to perform under the lease and the terms and conditions of the transaction. These customarily include:

- The commencement date and the expiration date of the lease.

- The amount of each payment and how and where payment is to be made.

- The number of payments.

- Any potential penalties and the conditions and amounts.

- Requirements during the lease including maintenance, insurance, mobility, conditions of use and taxes.

- All end of lease provisions, conditions and options

59.    Though an issue is made in this case regarding disclosure or notification of an interest rate charged by CSI, these claims, in my opinion, have no merit. These transactions are leases, not loans. Leases do not contain an "interest" component as do loans. As in all business activities, the cost of capital is a cost to a company such as CSI, a manufacturer or a retail store. It is a cost just as wages, raw materials, utilities, office space and travel. The details of these costs are proprietary for competitive reasons. A customer does not expect to be told the seller's costs when a purchase is made any more than it expects to be told the profit from the transaction.

### Lycos's Ability to Compare Original Lease Schedules with Potential Rewrites

60.    Lycos had the information, capabilities and expertise to make any comparisons between original transactions and restructured transactions that it may have chosen to do. The original lease transactions and restructured transactions (except for 93 and 94) occurred sequentially over time, not all at once. Any complexity for comparisons at the point in time when a transaction was occurring for each transaction would be minimal. The concept portrayed

by Lycos' expert Smith of doing 6000 pieces of equipment on 126 schedules "at once" is not an accurate picture of the comparison Lycos could have done over time as it contemplated rewriting existing lease schedules.

61.    For each lease schedule, Lycos had original equipment costs, number of payments, payment amounts and the balance (nominal and PV) of remaining payments on schedules. It also had a choice of accepted PV rates and knew its internal borrowing rate.

62.    When Lycos entered a lease it had four options. The one that the parties probably expected would be used was to return the equipment at the end of the lease under the return provisions in the document. However, if that option was not followed, automatic short term extensions could be used. In addition, Lycos could return substituted equipment if it were unable to return the original equipment subject to the lease. Finally, extended or restructured leases could be executed. Lycos had options and they were all clear to it.

### Not a Common Practice to Include Purchase Option in Equipment Leases

63.    Lycos claims that purchase options are generally included in equipment leases – and are, in fact, a "near universal practice" – and that CSI's failure to provide a purchase option in its leases was improper. This allegation is very general and misleading. The greatest number of leases in the industry occurs within the business model of what is called "small ticket leasing," consisting primarily of office equipment (fax machines, photocopiers, and the like). These are not operating leases (as were the equipment leases that Lycos carried on its books as such), and are in fact, capital or sales type leases. These transactions essentially are conditional sale financings in which the lessee can and usually does buy the equipment at the end of the lease for a nominal amount or "bargain purchase" option price (for example, $1.00).

64.    In contrast, however, CSI and most computer and other technology leasing companies operate in an entirely different business model driven by technology equipment and

19

different customer needs. Typically, a lessee is focused on having and maintaining access to equipment that provides the best functionality or latest technology. In today's marketplace this is referred to as "lifecycle financing." Here, the lessee is seeking the use of equipment that will be replaced periodically by newer equipment. There is no desire to own the equipment and no notion of investing in assets. In this marketplace, depending on the type of equipment, it is replaced every 24 to 36 months. The old equipment is returned and new equipment put in place.

65.    A purchase option is neither an important consideration nor provision in these leases. Lycos *could have* requested that a fair market purchase option be included for reasons of its own (and, on occasion, a purchase option was included in an equipment schedule with CSI), but to do so generally would be inconsistent with the Lycos' overall strategy. Further, my experience is that when fair market purchase options are included, they are exercised less than half of the time.

### Return and Extension Provisions Are Common

66.    Lycos' expert Cross has opined that "compliance with the end-of-term provisions [in the CSI Master Lease] was practically impossible." I disagree. The return provisions were possible for any lessee that exercised a reasonable level of diligence in managing its equipment. The return provisions in CSI's lease cited by Mr. Cross are common in this business segment for good reasons, and Mr. Cross does not cite provisions that are uncommon or why they would be unreasonable.

67.    Mr. Cross further claims that CSI's Master Lease "compelled perpetual evergreen extensions," implying that Lycos was trapped in an ever-renewing lease situation from which it could not escape. Again, I disagree. Based on my experience, this statement is overly simplified. Lycos always had the option of returning equipment at the end of a lease, in which case the lease would end. If Lycos could not return equipment, it was due to Lycos' own

negligence in tracking the equipment.  However, even if Lycos could not return leased

equipment to CSI, it had the option to offer a substitution of similar equipment in a return, and

the lease would end.  Substitute duplicate equipment would be plentiful in secondary markets as

attested by other defendant witnesses.

    68.      Further, the extension provisions are not a trap, as Lycos claims, in the CSI Lease

because of the following:

- The end of lease notice period used by CSI to have Lycos inform CSI of what Lycos intended to do at lease end was 60 days (this 60 days was negotiated by Lycos from a longer standard original CSI Master Lease notification period which reflects to me a level of sophistication by Lycos about leases).

- Lycos could end the lease by returning the equipment or by offering to substitute similar equipment.

- The automatic extensions were short term and clearly intended by CSI as a transition for its clients at the end of a lease.  The four months rent is not material to either party compared to the lowered rents resulting from the longer term restructuring or extension of leases.

- Mr. Cross uses two terms together in (iii) of his report that are confusing and misleading.  *". . . provision that automatically extended the Equipment Schedule **indefinitely** for successive **four-month periods** . . . unless and until Lycos furnished notice to terminate and returned all of the Equipment . . . ."* Four months is a short period in business in which Lycos could plan and exercise several options.  An automatic extension period of four months is a reasonable time for Lycos to make decisions and plans if they had not focused on the original end of lease date and failed to give notice or prepare to return or substitute equipment.  This is a transition option.  **Indefinite** implies the lease goes on and on with no clear ending point.  This is misleading and is not in conflict with a limited period – four months.

- Lycos did not decide to extend leases through subsequent Evergreen extensions of four months.  Lycos' extended its leases through restructured transactions at lower rates than  four month extensions would provide because the extensions are for a longer term, a certain term of 12 months, rather than an uncertain number of  four months extensions.

    69.      Lycos is a multi-million dollar company, much larger than CSI, and Lycos at all

times knew its business needs better than CSI.  It has a business and financial plan and strategy,

and it selected the equipment it needed to make that business plan work. Not only does Lycos have this superior knowledge about its business, but it also has the responsibilities that accompany the operation of a business. These are not CSI's responsibilities.

### Lycos's Inability to Return Equipment

70.    Lycos' expert Cross also opines that ". . . CSI recognizes the additional bargaining power it obtained from Lycos' inability to return equipment or exercise an option to purchase it." This assumes that CSI was aware Lycos was unable to return much of the leased equipment, which may not have been the case, but even it if were, there is nothing wrong with that.

71.    "Bargaining power" is not unilateral or coercive; it is simply knowing all of the possible alternatives. Lycos could take two actions: restructure/extend the leases or return original or substituted equipment. Even if CSI knew what Lycos' options were, that is not wrong.

### Equipment Valuation

72.    *Fair Market Value ("FMV").* In general, the fair market value of equipment is important for three reasons:

- o    If the lessee is exercising a FMV purchase option.
- o    For the FASB to comply with GAAP.
- o    Determining the lease payment amount.

73.    In almost all of the equipment schedules, there is no purchase option. CSI complied with GAAP in its financials, and it most likely was aware of its equipment investment in its equipment that it leased.

74.    Even if the booked FMV for a lease is zero, the lessor properly bases its lease pricing on the economic value of the equipment working in place to deliver a desired functionality. This equipment may or may not have value in a sale to a third party, but it does

continue to have value in place to a current lessee user.  Consequently, observations about residual value and its role in these transactions is not relevant.  CSI and Lycos are operating in a competitive marketplace in which each had options.  Neither could coerce the other.

75.  ***Economic Usefulness of the Equipment.***  Though Lycos appears to rely on the residual value that CSI booked for accounting purposes in arriving at a valuation for the leased equipment, this does not take into account the economic usefulness to Lycos that the leased equipment obviously had for Lycos.

76.  The CSI-Lycos lease transactions are not financings with the payments amortizing to a zero "balance."  The lessee makes rental payments and has no equity investment in the equipment.  It is important to note that if the equipment values are as low as certain of the Lycos experts estimate, Lycos could easily and inexpensively substitute used equipment from the marketplace for return to CSI in place of leased equipment that Lycos had lost or sold.

77.  Lease payments are based on original equipment cost before anything else such as operating costs and the cost of capital are considered.  This is the leasing company's (in this case, CSI's) initial investment that must be recovered.  This is also the figure that the lessee (Lycos) considers most important.  The lessee (Lycos) knows this original equipment cost because it selects the equipment and then assigns the purchase order for the selected equipment to the lessor (CSI) for purchase.  End of lease values are not important to Lycos's decisions since they did not request and do not have an option to purchase the equipment at the end of the lease.

78.  ***Used Equipment Values.***  Used equipment values have little role in this dispute with the exception that Lycos could obtain used equipment to substitute for equipment it was unable to return at the end of the lease.

79.  The year 2001 was a time where the rapid expansion and exuberance of the

internet in general, and dot-com businesses specifically, hit a dramatic slowdown. This is usually referred to as the "dot-com" bust or "dot-bomb." This was a low point in equipment values. By October of 2003 and 2004, however, a pick up in technology equipment value was occurring.

80.    During the period 2000 – 2003:

- There was not a significant change in technology for the equipment subject to the leases.
- The functionality of the equipment subject to the leases did not change materially.
- The perceived value of used equipment declined significantly in the early part of this period.
- There was imbalance in the supply / demand marketplace balance for similar used equipment – high levels of supply.

81.    ***Highest and Best Use.***    Experts state that the "[h]ighest and best use is defined as the reasonable probable and legal use of personal property that is physically possible, appropriately supported, financially feasible, and results in the highest value in the appropriate marketplace, consistent with the purpose of the appraisal. It is the appraisers' opinion that valuing the assets on the premise that they would be used in their current configuration, for the purpose designed, by a buyer performing like activities, constitute the highest and best use." Therefore, if the current user of the equipment continues to use the equipment as defined above, the equipment would by definition "have value" because it is performing as originally expected.

## Materiality of Lease Rewrites

82.    Lycos's expert David Truesdell concludes that reductions in monthly/annual lease payments for equipment – which was a goal of Lycos, based on the evidence – would not have a material effect on the financials of Lycos as used by investors and other third party users of Lycos' financials. However, Lycos seems to have believed that these reductions in monthly rents were material to its strategy at the time, and Mr. Truesdell is silent on the materiality to

24

cash flow considerations. Whether or not the investor community was influenced by changes in the financial statements, cash management and conservation as stated objectives of Lycos were material to the execution of its strategy. The extensions and restructurings did reduce the lease costs per period of equipment use.

## Conclusion

83.     Based on my review of the evidence (documents and deposition testimony) as well as my years of experience in the equipment leasing field, the claims of Lycos against CSI are without merit. Further, I question who stood to gain by walking away from the remaining payments on a negotiated settlement of Lycos' obligations to CSI concluded in 2003. Lycos had a current performing relationship with CSI for at least six years. Indeed, Lycos also has had a positive relationship with at least three other respected equipment leasing companies during that period.

84.     Lycos personnel understood leasing, they understood leasing's role and advantages for a rapidly growing technology company, and Lycos' priority was to quickly build an operating company that could be offered to the public. Lycos fulfilled that strategy. During this period of time, Lycos did not give the same level of attention to administration and operations as was given to selling services and preparing a public offering of the sale of the company. The best example of the latter observation is the inadequate job of tracking and managing equipment including equipment leased from CIS. This failure was a contributing factor to some of the lease extensions.

85.     Lycos did not overpay for the years of equipment usage for which it contracted with CSI. The computer leasing market is very competitive. Lycos dealt with at least four reputable and respected lessees. Any of the four would be quick to identify an opportunity provided by one of the others attempting to charge too high a rate or include undesirable

conditions. The original purchase price of equipment is not a comparison to a the total payments for use of the equipment over time. The total of payments for a 24 month lease compared to the total of payments for a 36 month lease are not comparable.

86.    Lycos had all of the information and expertise to make business decisions regarding leases over the years. Now, in retrospect, Lycos appears to have become dissatisfied with its decisions and would not accept responsibility for results. The evidence clearly shows, however, that Lycos' choices were its own. With respect to the buyout, for example, Lycos' General Counsel concluded that the negotiated 2003 buyout – culminating in the August 2003 Sales Agreement – was a good business option for Lycos to conclude its obligations to CSI.

87.    While there has been an appropriate amount of attention on the role of the ELA Code of Fair Business Practices as a guide or control for generally accepted behavior in the equipment leasing business, it is only one standard of suggested conduct. Of just as great importance is the existence of a very competitive equipment leasing marketplace. That marketplace neither holds secrets nor permits a pattern of unacceptable practice. From my years involved in this industry, I know that CSI has operated successfully with good reputation in that marketplace for three decades. There is no indication that other leasing companies believed or attempted to capitalize on bad behavior by CSI or a disgruntled Lycos. Lycos' claims appear to have grown out of a late tactic to avoid paying a mutually agreed to buyout of obligations.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF NOVEMBER, 2007.

_____
Michael Fleming