# EXHIBIT 4

UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., )<br><br>Plaintiff, )<br>v. )<br><br>LYCOS, INC., )<br>Defendant, )<br>and )<br><br>BANK OF AMERICA f/k/a FLEET BANK, )<br><br>Trustee Process Defendant. ) | C.A. No. 05-10017- RWZ |

## AFFIDAVIT OF JAMES M. JOHNSON, Ph.D.

I, James M. Johnson, being duly sworn, do hereby depose as follows:

1.      I have been retained as an expert on behalf of Computer Sales International, Inc. ("CSI") in this case to provide opinions concerning leasing, which are set forth below and in the expert reports which have been provided in this case to Lycos, Inc. ("Lycos"), as well as the bases for those opinions.  I am being compensated for time spent and expenses reasonably incurred.  I have no financial interest in the outcome of this litigation.

2.      I make this affidavit based on my personal knowledge and expert opinions, unless otherwise indicated, and in support of CSI's opposition to Lycos' motions for summary judgment.  In addition, certain points below will rebut the summary judgment Affidavit of Bruce D. Smith submitted by Lycos.

### Background

3.      I am a Professor of Finance at Northern Illinois University, a position I have held since 1990.  I received my Ph.D. in 1975 from the Ohio State University, where I majored in

1

Finance (minor in Real Estate).  I received my undergraduate degree (B.B.A.) in Finance (minor in Accounting) *cum laude* from Western Michigan University, and my Masters in Business Administration (M.B.A.) *with honors* from Western Michigan University.  My full resume has been provided to counsel in connection with my expert reports submitted in this case.

4.      Prior to my present position at Northern Illinois University, I served at the school as an Associate Professor of Finance from 1987 to 1989.  Prior to that, I held the position as Associate Professor of Finance at Bentley College (from 1983-1987), at the University of Notre Dame (1976-1983), and Western Michigan University (1974-1976).  Prior to that, I was a Teaching Fellow in the Department of Finance at the Ohio State University (1971-1974).

5.      The focus of my research and teaching is in the leasing industry.  I serve on the Board of Trustees of the Equipment Leasing and Finance Foundation, and I am a founding member of, and serve on the Editorial Review Board of the *Journal of Equipment Lease Financing*.  I have conducted over 300 workshops for both lessors and lessees, educating and training such clients as Blue Cross/Blue Shield, the Government of Canada, Cargill Corporation, ChevronTexaco, the City of Detroit, Coca Cola Financial, DaimlerChrysler, Huntington Bank Equipment Finance, HSBC and others.  These workshops cover such topics as lease structuring, finance for non-financial managers, the leasing credit decision, the economics of leasing, negotiations, tax-motivated transaction structuring, extensive contractual issues, accounting issues and industry practices.

6.      I am the author of several publications, including the industry standard textbook *Fundamentals of Finance for Equipment Lessors* (published by the Equipment Leasing Association, 2d ed. 1990).  More recently, my works have included *Power Tools for Successful Leasing* (2000), *Technology Leasing:  Power Tools for Lessees* (2002), and *Power Tools for*

*Small Ticket Leasing* (2004), all published by the Leasing Power Tools Press, and co-authored with Barry S. Marks, Esq. I have also authored over sixty articles appearing in numerous journals, including the *Chief Information Officer, Journal of Finance, Journal of Accountancy, Journal of Portfolio Management, Financial Management*, the *Equipment Leasing Monitor, The Turnaround Management Journal*, and ELA's *Journal of Equipment Lease Financing*.

### Review of Documents and Testimony

7.      Based on my expertise, including my years of study of and instruction/teaching in the leasing industry, my review of documents produced by the parties in this case, and my review of deposition transcripts of witnesses for both parties, I have concluded that CSI has done nothing improper or contrary to industry standards in its dealings with Lycos concerning Lycos' leasing of tens of millions of dollars of computer technology equipment during the period 1999 through 2004. As explained below, Lycos decided for its own reasons, and to what it apparently considered its benefit, to extend its equipment leases with CSI. Lycos received all disclosures which are common in the industry, and Lycos' has simply created its theory or "mark-ups," which is nothing more than CSI's gross profits on these mutually agreed upon transactions.

### "Mark-Up" Analysis by Lycos is Contrived

8.      Lycos alleges that CSI did not disclose to Lycos what its experts call "mark-ups." This allegation is without merit. The term "mark-ups" is not found in the leasing industry and is inappropriate and misleading as used by Lycos – and it is designed by Lycos' experts to make it appear that CSI did not disclose something it had a duty to disclose (which is not the case).

9.      Of the approximately 125 schedules agreed to and signed by Lycos, 75 of them were original leases. The vast bulk of the original leases had the characteristic that the present value of the lease payments plus the residual value booked by CSI was greater than the original equipment cost of the equipment – something which Lycos' experts have improperly described

3

as a "mark-up." This characteristic, however, is simply a matter of the negotiated pricing for the lease and is part of the lessor's profit.

10.     In this regard, a lessor has a duty to provide a lessee only with a proposed lease payment and a proposed term for a given schedule.  CSI did so in these transactions – on 125 different occasions.   Providing a lessee with what Lycos calls a "balance" – calculated using the lessor's booked residual value or the lessor's interest rate implicit in the lease – is not required. In a free market such as the equipment leasing industry, these issues are not relevant to the lessee's decision, which is influenced by the alternative prices available to the lessee in the financing marketplace and not by what return any given lessor may be making on the transaction.

11.     Lycos knew the monthly rent payment it was making for each existing schedule prior to each proposed re-written schedule.  It also knew the proposed rent payment under the re-written schedule.  This is full disclosure.  That is all Lycos needs to make an informed decision whether to enter into a re-write or not.  Because Lycos had produced the purchase order for equipment it was leasing, Lycos knew the original equipment cost.  The "old" and "new" rent payments and the number of payments under each were also known or knowable.  This is full disclosure.

12.     If Lycos did not like any given re-write offer it received from CSI, it was always free to reject the proposal or renegotiate it.  Lycos was under no compulsion to accept any lease transaction proposed by Lycos, and it was free to engage anyone (consultants, attorneys, accountants) to examine the proposals or to solicit offers from other leasing companies.  Offers of restructured lease schedules are a common practice, but they are just that – the lessee decides whether to accept, reject or negotiate them.

13.     When both parties to a lease arrangement sign a schedule or a re-written schedule,

with neither being under compulsion to sign, this means both parties had the opportunity to agree, change or reject the proposal. It is inappropriate to claim that the new rent proposed and contractually agreed upon is in any sense "non-negotiated." The term "non-negotiated" suggests that Lycos had no option but to sign a re-written schedule. That is simply not the case. Among the many options available to Lycos would be to simply run each lease schedule to the end of its term, yet the Lycos experts would have us believe Lycos had no choice but to sign each schedule. This is simply not the case,

### Schedules and Master Lease Represent Leases, Not Loans

14.     Lycos' senior management indicated in depositions that it conducted testing for each equipment schedule – whether original or a "re-write" – to determine whether the schedule could be considered an operating versus a capital lease. For example, Kevin Baillie, a senior financial officer of Lycos, indicated that the CSI leases were leases, not loans, and Mr. Guilfoile indicated each schedule was accounting tested as it arose.

15.     In its 1999 annual report (or 10-K) which it filed with the SEC, Lycos disclosed "operating" leases in its footnotes to financial statements. Lycos did not report any capital leases, further supporting testimony that Lycos had tested all of its CSI leases and determined they were operating, and not capital, leases. Under accounting rules, operating leases are indicative of the temporary use or possession of assets. Capital leases are indicative of sufficiently long-term use that the assets should be recorded as "owned." Lycos did not report any assets as "owned" for the 1999 fiscal year in their financial statements.

16.     Indicative of the fact that the transactions at issue were leases and not loans, CSI booked a residual value in the Lycos leases, indicative of CSI ownership of the leased assets – Lycos did not book any residual value while it leased the equipment that could be discerned by reviewing their financial statements. Further, the Master Lease Agreement between CSI and

Lycos (the "Master Lease") has a detailed portion (§ 7) related to delivery and return of leased

equipment and require the lessee (Lycos) to return the leased equipment at lease end to a location

designated by CSI, indicating CSI expects its property to be returned at end of lease, and

contained no provision for the lessee to acquire the equipment at the end of the lease. The

Master Lease itself provides that it "is intended to be a true lease and not a lease intended as

security or lease in the nature of a security interest" (§ 18).

17.     Characterizing these financial transactions as loans and not leases is a recurring

theme in Lycos' expert reports. These transactions are leases (not loans), however, and are

designed to provide an equipment user (Lycos) with the use of another firm's property (CSI's).

18.     Lycos' experts go so far as to assert that there is little difference between a lease

and a loan with a balloon payment, which is simply not true. A loan of money with a balloon

payment provides the lender with a contractual promise by the borrower to repay the lender, and

it further provides the lender with remedies should the borrower not honor its promise to pay. A

loan contract provides the lender with a contract to receive 100 percent of its money back. In

contrast, a lease provides the lessor with at least three different sources of cash to recover its

investment—the lease payment stream from the lessee, the residual value anticipated by the

lessor, and the benefits of tax depreciation accorded the lessor as owner of the equipment. In a

lease, only the payment stream is backed by a contract.

19.     One of Lycos' experts, Mr. Smith, opines that "there is little difference between

requiring a transfer of cash or requiring a transfer of a tangible asset having a cash value."

Presumably, Smith is attempting to show how similar a loan is to a lease. I disagree. A leasing

company looks to tax depreciation as a source of investment recovery, plus the lessee's payment

stream, plus an uncertain residual value the lessor hopes to recover. A loan with a balloon

payment is entirely contractual, and the lender is contractually assured of both. A lease only contractually assures the lessor of the lease payment stream, whereas the residual value and value of depreciation are not assured.

20.     In a lease situation, neither the residual value nor the value of depreciation is assured but are estimates. While Lycos' experts refer repeatedly to "lease balances" – again trying to characterize these transactions as the equivalent of loans, which they are not.

### Residual Values Booked by Lessor Are Not "Fair Value" of Equipment

21.     Lycos attempts to argue that a residual value booked by the lessor for accounting purposes at the inception of the lease reflects a forecast of the "fair value" of the leased property at the end of the lease. Lycos asserts that a residual value booked at zero is "evidence" that the lessor estimates the equipment will have no value at the end of the lease term. This is not the case, as lessors generally book very conservative estimates of residual value.

22.     In addition, the residual value booked by a lessor is often much lower than the in-place value of that equipment to the lessee. Lycos had over 6,000 pieces of equipment under lease, and the costs to de-install and return leased equipment, plus acquire substitute equipment, would have to be considered part of the in-place value of that equipment.

23.     Lycos also knew at any given lease commencement what the fair value was of the equipment it was leasing or re-writing – and that value was apparently substantial. Mr. Guilfoile, Lycos' Senior Vice President of Finance, testified that Lycos ran the so-called "90 percent test" to determine how to classify each original lease and re-written lease either as an operating or a capital lease under FAS 13, since each re-write amounts to a new lease. Thus, for every equipment schedule, Lycos has testified it ran the accounting tests, which means it knew in every instance what the fair value of the leased equipment was, and that the present value of lease payments were less than 90 percent of that value.

7

## Residual Values Booked by Lessors Are Not Disclosed

24.     For each lease schedule, Lycos knew the cost of the equipment, as it ordered the equipment under a purchase order it negotiated.  Therefore, the only disclosures Lycos required to determine whether to lease with CSI were the lease rate, the lease term, and the stipulated loss table.  Lessors do not, and are under no requirement – legally, ethically or otherwise – to disclose their booked residual values to their lessees, and that information is irrelevant to the lessee's decision, since the equipment is not being purchased by the lessee.

## Lycos Received Disclosure of Information Needed

25.     Lycos asserts that CSI did not provide it with the information Lycos needed to make the best economic decision.  This is not the case, as Lycos was always provided with the terms of each proposed lease (whether an original lease or a re-write).  In 125 separate instances, Lycos signed the proposed leasing schedules.  Had Lycos not been in possession of additional information it deemed essential to making a decision to accept a schedule, it would have been straightforward to make the production of such information a precondition for considering or agreeing to any proposed lease schedule.

26.     The records I have seen in connection with preparing my expert reports, however, indicate that making the best economic decision was not a significant priority to Lycos.  Lycos' interests, according to the documents I have examined, were in lowering their current period operating expenses and keeping assets off its balance sheet.  These objectives would be served by recording its leases of computer equipment as operating leases, and extending lease terms— both of which Lycos did on dozens of occasions.

27.     In its dealings with CSI, Lycos always had the option of making a counteroffer to CSI of any proposed schedule, rejecting it outright, shopping the schedule with other lessors (it dealt with several other leasing companies), borrowing money to buy the equipment it needed, or

paying for the equipment with cash.  Lycos chose to lease with CSI in most instances.  Since

Lycos was free to demand whatever additional information it might have felt was important and

did not do so, it is my opinion that obtaining the information it now claims it lacked was not a

priority to Lycos at the time.  The claim that two of Lycos' own consultants could not determine

the particulars of some of the schedules years later does not signify that relevant information was

withheld, as Lycos did not demand the information the consultants sought in the first place.

### Master Lease, Schedules and Sales Agreement Are Consistent With Industry Practice

28.    Lease agreements and lease schedules are negotiated between two parties – the

lessor and the lessee.  Both sides must agree in writing to a given transaction for it to result in a

contract.  The terms and conditions in the Master Lease are designed to spell out provisions that

the parties will want to apply each time they agree to a new schedule.  Master Leases typically

include what will trigger commencement of the lease, what the lessee's return requirements will

be at end of lease, what state will have governing law in the event of a dispute, what will result in

a default in the lease and what remedies the lessor may pursue to cure the default, what

maintenance obligations are required, who will pay property taxes on the equipment, insurance

requirements, and other such terms.

29.    Parties may, through negotiation, agree on many other provisions for

incorporation into a Master Lease.  A Master Lease may govern the terms of many subsequent

equipment schedules.  It would not be uncommon for a substantial business to have several

hundred schedules referencing the same Master Lease.  Each schedule indicates specific pieces

of equipment to be leased, the lease rate that will apply, the term of the schedule and the like.

Schedules may be very brief, since the Master Lease contains most of the provisions that will

govern each schedule.  The CSI Master contains provisions that are common in technology lease

Master Lease Agreements, and the specific terms of the Master Lease are representative of

technology Master Lease Agreements.

  30. CSI and Lycos negotiated a Master Lease, which is the document that governs most of the terms and conditions that will apply to a lease schedule subsequent to the Master Lease. Both parties signed the Master and agreed to be bound by its terms and conditions. The provisions in the Master Lease and the provisions in the schedules are representative of Master Lease and schedule provisions in the industry.

  31. The Sales Agreement of August 2003 between Lycos and CSI is a fairly standard sales agreement between a lessor and a lessee. Sometimes called a "buyout," a sales agreement sets forth the terms and conditions that will govern the purchase of equipment by the lessee. A typical buyout agreement indicates the purchase price to be paid by the lessee and whether there are additional terms necessary to effect the buyout. Additional terms may indicate the lessee is required to continue to abide by the terms of the Master Lease until all amounts due and to become due to the lessor, including the buyout price, that the lessee will owe property taxes that are due or will become due until the lessor has been paid all monies owed or to be owed the lessor, that the property must continue to be insured, and the like.

  32. The CSI/Lycos Sales Agreement indicates that Lycos may purchase the equipment under lease at a buyout price of approximately $3.7 million, specifies that Lycos will be obligated to make all remaining lease payments required under each schedule, and provides that Lycos will "pay any and all other charges arising under the Lease."

  33. The re-writing of schedules is not uncommon for technology equipment employed by rapidly growing companies, such as Lycos, as their situation is quite fluid. In a high growth service business, the needs of the lessee may change very quickly. In the case of Lycos, the company was growing rapidly and had a need to acquire millions of dollars of technology

equipment. A major consideration for Lycos was to acquire equipment when needed to launch

new products quickly. Lycos, as a company losing money, also had a desire to reduce their

monthly expenses. Re-writing lease schedules was a logical method of reducing Lycos monthly

payments. Lycos executives indicated they were focused upon expenses, not cash flow, and Mr.

Philips indicated in a document on Lycos' website the progress they were making in achieving

their EBITDA profit margin, which included operating lease payments as expenses. Extending

lease terms resulted in lowering current period lease payments.

34.     Lycos further claims that terms in the CSI Master Lease or in the schedules

between the parties are either missing (in which case, their absence is detrimental to Lycos) or

too onerous (thereby making Lycos' compliance with them impossible). I disagree for the

following reasons:

a.     <u>Purchase Options</u>. Lycos' expert Charles Cross asserts that typically a lessee has

the contractual ability to purchase the equipment under lease at the end of the

lease "for a price that is either (1) fair market value, (2) a fixed price estimated to

be fair market value or (3) some other fixed price which is at least equal to the

Lessor's booked residual value…" He goes on to say it is "nearly universal,

practice to include one of the purchase options noted above in leases of this type."

He then bolsters his assertion by summarizing the purchase options in the four

lessor "Representative Leases" table. I disagree. Of the more than one hundred

technology leases I have reviewed over the years, I estimate no more than half

had purchase options. I conducted three-day workshops for over ten years from

1994 through 2005 for technology lessees – in the range of thirty such workshops

for professionals that were involved in the leasing (as lessees) of technology

11

equipment.  I published a survey of 260 technology lessees during the time period

at issue in this case (Technology Leasing Priorities: What Do Lessees Want?,

*Journal of Equipment Leasing Financing*, Fall, 1998, pp. 23-29) and had lessees

rate 35 lease contract issues.  Having a right to purchase at end of lease ranked 27

out of 35.  Having a fixed price purchase option ranked 32 out of 35.  Thus,

purchase options, in my opinion, are not "nearly universal practice" and are not a

major issue in the opinion of 260 technology lessees.

b.      <u>Renewal Options</u>.  Lycos' expert Mr. Cross does not indicate here that renewal

options are "nearly universal practice," but he relies on his "Representative

Leases" to contend that only one "Representative Lease" did not contain a

renewal option for a fixed term or a term to be mutually agreed "at a rent that is

either mutually agreed, based on fair market rental value or is at a fixed rate

below the initial term rate."  I disagree with the stated or inferred assertion that

such renewals are typical.  The Master Lease agreed to by the parties does provide

for four-month renewals should the lessee not give notice to CSI of its intention to

return CSI's equipment.  This is a renewal.  In approximately twenty negotiations

with lessors on behalf of technology equipment lessees, my experience indicates

that lessors are generally unwilling to reduce the lease rate for a renewal (even if

asked for before the lease is signed) unless a considerable renewal period is being

proposed.  I have encountered very few leases that do not provide for month-to-

month, or quarter-to-quarter or other automatic renewals if the lessee should not

provide timely notification of its intent to return the lessor's equipment at end of

lease.  These are renewals.  As to how important renewal options are, I again cite

my survey outlined in point a above.  The survey results indicate that being able

to renew with a lower rental (lease) payment ranked 26 out of 35 contract issues.

Further, the survey indicates that the importance of having a fixed rate renewal

option ranked 32 out of 35.  In my opinion, based upon my experience and

research, renewal options are not "typical" and are not considered by technology

lessees to be of much importance.

c.      Maintenance/Return Provisions.  Mr. Cross appears to switch gears on this point,

as he, for the first time, discusses what a lessee should do, as opposed to what is

common practice.  He indicates that contract provisions regarding maintenance

and return provisions "must be carefully drafted…otherwise, they may be onerous

or impossible to perform."  Since this section of Mr. Cross's report is titled

"Customary Industry Practices," I kept looking for his opinion as to same, and did

not find it.  Since he does not appear to indicate what standard industry practices

are, he instead indicates what a lessee should do – but does not provide an

indication of what industry practice is.  But he then, without comment, provides a

summary of the maintenance and return provisions of the "Representative

Leases."   The Master Lease that was negotiated by CSI and Lycos contains

maintenance and return provisions that I have seen in a number of technology

equipment leases, and appears quite typical and standard.

d.      Stipulated Loss Values.  Mr. Cross indicates that stipulated loss values are

"typically prepared for specific transactions by the pricing or accounting

disciplines with the lessor based on the economics of the specific lease transaction

and typically track the lessor's lease balance."  As evidence of his assertion as to

what is typical, Mr. Cross refers to his "Representative Leases" for support. His "Representative Leases" show Stipulated Loss or Casualty Value schedules in only two cases. Further, Mr. Cross asserts that the Stipulated Loss Values in the CSI-Lycos lease schedules bore little relationship to CSI's "lease balance." Cross indicates the Stipulated Loss Values were frozen at an artificially high level, "even if the Lessee continued to make full monthly rents under the evergreen extension provisions." I disagree with these characterizations. Cross refers to a "lease balance" as if these were loans, which they are not. He refers to these as "evergreen leases" which they are not. In the case of each schedule, Lycos was required to initial the page containing the stipulated loss schedule—it was right above the initial line on each schedule. The stipulated loss schedules were not hidden or undisclosed—they were right in front of the contract signer, requiring their initialing in each case.

## CSI's Conduct in Re-Writing and Negotiating Sales Agreement Was Proper

35.     The terms of the Master Lease and equipment schedules are standard in the leasing of technology equipment.

36.     In my review of the documents and testimony in this case, Lycos appears to have chosen to re-write its leases in order to reduce the periodic payment Lycos would be required to pay. In the case of each lease schedule, Lycos was offered re-write terms by CSI which were acceptable to, and accepted by, Lycos. If either side wanted to change the terms of the offer, they were free to negotiate the desired changes. Lycos had other leasing companies with which it leased equipment, and, to the extent it felt its needs could be better met by another leasing company, Lycos could have easily diverted business to one of its other lessors.

37.     It is not improper to offer a lease re-write to a customer in order to lower the

14

customer's periodic payment – especially where such a goal is desired by the customer/lessee. The customer is always free to accept the offer of a re-write, attempt to negotiate changes, or reject it. The customer (Lycos) controls the destiny of the proposed re-write.

38.    With the intense competition among lessors, it would have been a simple matter for Lycos to "shop" their lease schedules with a number of lessors, had they chosen to. If Lycos did not like the terms of a proposed re-write, or wanted to see what other bids it could obtain by soliciting indications of interest, it was free to do so. Lycos did not have to accept any re-write proposal it received from CSI, and it is very likely that Lycos was more focused on equipment availability, monthly reportable expenses and off-balance sheet financing than on what funding option would result in the lowest cost over the life of a lease. If minimum overall cost was a major issue for Lycos, it could have shopped each schedule to all available lessors as the need for additional equipment arose, or pursued other financing options.

39.    In the case of the Sales Agreement, Lycos wanted to buy the equipment it had been leasing – the evidence showing that its then parent company in Spain wanted it to "capitalize" leases it had treated for years as operating leases. The buy-out offer made by CSI was approximately $4.7 million. Lycos made a counter offer of $3.7 million, which was accepted by CSI. Lycos expressed a desire to enter into a buyout of the equipment under lease, and CSI proposed the terms under which the buyout would be acceptable to CSI. With give and take, a final buyout price of approximately $3.7 million was agreed upon. This is a typical buyout negotiation in technology leasing.

### Master Lease Agreement and Schedules are Commercially Reasonable

40.    The Master between Lycos and CSI is typical of technology lease contracts that I have seen over the past fifteen years. The Master between CSI and Lycos contains standard sections and provisions. Lycos representatives negotiated the Master with CSI, as evidenced by

Addendum One to Master Lease Agreement No. 144874. If other terms of the Master were unacceptable to Lycos, they could have attempted to negotiate what they believed to be more favorable terms with a different leasing company. The reduction of the notice period from Lycos to CSI that the equipment would be returned from 120 days to 60 days—was a change favorable to Lycos. The discount rate that would be used by CSI to discount remaining obligations to the present in the event of default was increased from 4 percent to 6 percent. This change was favorable to Lycos as it would reduce Lycos' remaining obligations in the event of a default.

41.     The assertion by Lycos that the CSI contract is onerous as it requires the lessee to make all remaining payments is not valid. Virtually all lease contracts require that lessees honor their commitment to make all payments due under the lease. Virtually all leases, including the CSI Master with Lycos, make it clear that they are "hell or high water" leases, which means the lessee may not cancel the lease for any reason whatsoever. This provision is both critical to lessors and a standard provision. It is critical since many lessors will assign the payment stream under a schedule to a funding source to raise a substantial portion of the money necessary to pay for the equipment being leased. If a lease could be canceled, it would be fatal to the lessor's ability to assign the payment stream and secure financing to pay for the equipment under lease. This unconditional obligation to pay is set forth in Section 5 of the CSI/Lycos Master: "Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense......" This is not an onerous provision, and is typical of equipment leases.

42.     The schedules between Lycos and CSI are typical of technology lease schedules that I have seen over the past fifteen years. A schedule is generally subject to the terms of the Master. The language in a CSI/Lycos schedule is "Lessor and Lessee.....agree that...all of the

terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof." This is typical language. The standard schedule details specific pieces of equipment that are being leased, and for the lease rate specified for the number of periods specified. The Stipulated Loss table is also incorporated into each schedule, as it indicates the liquidated damages the lessee agrees to pay in the event of a casualty loss. These provisions are standard in the industry.

## Lycos Did Not Receive Misleading Information

43.     Lycos' experts allege that CSI provided Lycos with misleading information, and point to an email sent by CSI's sales rep, Mr. Stenberg, to Lycos' Mr. Lucy. The term "misleading information," however, is a mischaracterization of information provided by CSI to Lycos as a basis for decision making for two reasons. First, the email was sent to Mr. Lucy months after the transactions in question were signed and agreed to. Second, Mr. Stenberg indicated "this is what I have so far" which means it is a work in process—not a finished product. It is not possible to rely on an email as the basis for making a decision if the decision was made months prior.

## Reducing Operating Costs Benefited Lycos' Management with Higher Stock Prices

44.     When I correlated Lycos' stock price with either Lycos' operating expenses other than research and development, or with Lycos' general and administrative expenses, they both had higher correlations with Lycos' stock price than its revenue. This means expenses do matter, and they have a stronger relationship with stock price than revenue. As monthly or other periodic operating expenses decrease, there is a higher correlation with an increase in the company's stock price – which benefits those holding equity in the company – than with an increase in revenues.

45.     In his analysis concluding that Lycos' revenue (and not expenses) drove the

company's stock price, Lycos' expert Mr. Truesdell sets up a standard of materiality as to whether the lease re-writes would influence an investor. He concludes that the 1999 re-writes exceeded his own threshold for materiality, but then dismisses it because he thinks Lycos' stock price was "influenced" more by Lycos' revenue that net losses.

### Lycos Was Not Trapped By the Terms of the Master Lease or Schedules

46.    Lycos asserts that its leases with CSI amounted to "evergreen leases" – i.e., leases that renewed automatically without any ability for Lycos to get out of them – and that Lycos was therefore required to pay on these leases indefinitely. I disagree. Lycos agreed to maintain the equipment it was borrowing from CSI and return it at the end of the lease. They chose not to keep track of the equipment for return or to make provisions for the return of the equipment, and this was no fault of CSI's.

47.    The Master Lease provides that a lease schedule will be renewed for four-month increments until Lycos gives notice it would return the equipment. Period-to-period renewals of this type are common and are not an unending "trap," as Lycos argues. If Lycos could not produce CSI's equipment that was lost, stolen or destroyed while it was in Lycos' possession, Lycos was required to pay the "stipulated loss value" – that is, a pre-negotiated price which Lycos would have to pay for its inability to return CSI's equipment – and Lycos would then have no further obligation to pay rent on that equipment. That does not constitute an "evergreen clause."

### No Pattern of Misconduct By CSI

48.    CSI was chosen as one of Lycos' leasing companies—there were several others. If at anytime Lycos felt they could better meet their leasing needs with a different lessor, they were free to pursue that strategy. As competition in the equipment leasing business is intense, it is unreasonable to presume that Lycos did not have other financing alternatives.

49.     CSI leased computer equipment to Lycos on dozens of schedules. Each schedule's terms and conditions were agreed to by both parties in writing. Neither party was obligated to sign the agreements. If Lycos believed it could obtain better terms and conditions elsewhere, it could – and any time – cease doing new business with CSI and pursue other financing alternatives.

50.     A number of lease schedule re-writes were offered to Lycos to assist Lycos in achieving one of its objectives—lowering its monthly payment obligations. Each re-written schedule was agreed to by both parties in writing. Neither party was obligated to sign the agreements. Lycos was free to reject any re-write proposals, attempt to negotiate changes in the re-written schedule terms and conditions, accept the re-write proposals, or close the door on new business with CSI and pursue other financing options.

51.     Lycos asked for a buyout of the equipment under lease and negotiated a purchase price approximately $1 million less than CSI had originally offered. The terms and conditions of the buyout were agreed to by both parties in writing. Neither party was obligated to sign the agreement. It is further noted that CSI was under no obligation to offer Lycos a buyout, as there is no provision in the Master giving Lycos that option.

52.     In the case of each lease schedule or schedule re-write, terms were proposed by CSI for that schedule. In each case, Lycos was provided with the lease rate, which was the only information necessary for CSI to provide. Equipment cost was known by Lycos as they negotiated the purchase orders. The residual values booked by CSI were irrelevant to Lycos decision process, and no lessor is required to disclose such information to its lessees. The lessee is free to decide whether they want to lease or buy equipment, and which of a number of lessor bids to select, if any.

**In Preferring Operating Lease Treatment, Lycos Failed to Manage its Leased Equipment**

53.     Though Lycos' lease schedules with CSI were signed by senior company officers

– either Lycos' Vice President of Finance or its Chief Financial Officer – Lycos chose not to

devote much time or resources to negotiating their leases.  In fact, the evidence shows that

Lycos' legal counsel did not participate in the lease negotiations, which is not standard practice.

The evidence further indicates that Lycos received no advice from its inside accountants or

outside auditors regarding the re-written leases.

54.     Schedules 93 and 94 – the largest of the so-called "re-writes" – were signed by

the then Chief Financial Officer of Lycos.  It is unclear if he looked at any information, reports

or data prior to signing Schedules 93 and 94, as his deposition testimony indicated he did not

remember much of anything about this major leasing schedule re-write.  It should be noted,

however, that it is common, if not incumbent upon a Chief Financial Officer to know what he is

obligating his company's shareholders to, and to find out if he does not have sufficient

information to make an informed decision on behalf of Lycos shareholders.

55.     Had Lycos' CFO looked at nothing prior to signing schedules 93 and 94, then it

would not be possible to know whether these re-writes were in the interests of Lycos'

shareholders.  If he did examine information he deemed sufficient to make an informed decision,

then his signing the contracts affirmed his opinion that they were satisfactory.

56.     In December 2000, another leasing company, Avnet Enterprise Solutions, Inc.

("Avnet"), produced to Lycos a detailed study of its leases, making a number of

recommendations to Lycos as to how they could improve their leasing practices, including that it

needed to better track and account for its leased assets.  I have seen no evidence that Lycos acted

on the recommendations contained in the Avnet study.  This would suggest again that controlling

its leased assets was a low priority to Lycos, if one at all.  Most significant lessees with which I

am familiar develop policies and procedures to track their leased equipment to ensure they are complying with the lease agreements they agreed to be bound by.

57.     Lycos did attempt to improve upon and utilize a firm-wide computer tracking system – which it names "Asset Portal" – as a tool to finally get control of their leases and leased equipment.  According to testimony, Lycos could not get their own employees to use it.  This would clearly indicate a lack of interest or priority given to abiding by the terms and conditions of their leased equipment.

58.     Further evidence of Lycos' lack of attention or concern to tracking its leased assets was found in the testimony of Lycos' Chief Information Officer ("CIO"), who testified that the location of equipment under lease was not always known and that equipment was moved around between locations.  This again shows little regard for complying with the terms of the Master Lease to which Lycos agreed to be bound.  Lycos' CIO indicated that whether assets were leased or purchased was not something he thought about much – it was a very low or nonexistent priority.

59.     The documents I have reviewed, and discussions between Lycos managers that I have read about, indicate that they blamed *themselves* for not having better control over their leased assets.  One of the executives lamented that he just settled out with Compaq on the lease of equipment for $500,000 related to equipment Lycos could not produce, and he indicated Lycos needed to get better control of its CSI leased equipment.

## Lycos Knew All Relevant Facts When It Agreed to Schedules 93 and 94

60.     Lycos claims that had it known how much additional rent they would be paying under Schedules 93 and 94 – which were roll-ups of many individual schedules – it might have to "unwind" those schedules.  But Lycos internally produced a report in November of 2001 indicating they in fact did know by how much the rent would increase and proceeded to roll up

the schedules anyway.

61.    Although schedules 93 and 94 had been signed in October of 2001, a condition of the schedules was Lycos producing a standby letter of credit by December.  Had Lycos failed to produce the standby letter of credit, Schedules 93 and 94 would not have been valid, and the roll-ups would have been undone by Lycos' inaction.  With knowledge of this through their internal study, Lycos management decided to comply and produce the letter of credit.

62.    The Lycos internal study (Plaintiff's Exh. 86), dated November, 2001, which suggests that the so-called "roll-up" of Schedules 93 and 94 would result in a total lease payment of $11 million – is significantly flawed.  The most glaring flaw is in ignoring what it would cost Lycos to replace the equipment it rolled into schedules 93 and 94, rather than rolling it into two extended schedules.  The report purported to show that the roll-ups would result in total lease payments increasing from approximately $18 million to approximately $29 million, or an increase of $11 million.

63.    Lycos is asserting that had it known the cost of the Schedule 93 and 94 "re-writes" relative to the cost of allowing the existing schedules to run their course, it would not have agreed to enter Schedules 93 and 94.  If there was some significant information they believed they needed to decide whether to roll up the schedules into 93 and 94, there is no evidence they asked for it prior to entering those re-written schedules.

64.    If Lycos believed the lease rates under Schedules 93 and 94 were too high, it could have engaged an appraiser to tell the company what the equipment under lease was worth. It could also have contacted another leasing company and asked for a bid on equipment to replace the equipment they were rolling into schedules 93 and 94.  This was not an emergency situation-- – if Lycos was in doubt as to their best financing alternative at the time that Schedules

22

93 and 94 were proposed by CSI, it could have waited until it believed it had the information it required.

### Lycos Never Relied on Mr. Stenberg or His March 18, 2002 E-Mail

65.     I disagree with Lycos that the email of March 18, 2002, between CSI's Paul Stenberg and Lycos' Brian Lucy is misleading.  Lycos' expert Smith interprets the Paul Stenberg email of March 18, 2002 as an "inaccurate and misleading comparison" when Stenberg shows the difference in lease payments before and after the schedules are re-written in Schedules 93 and 94.  The email refers to Schedules 93 and 94, which had been signed by both parties the previous year – and therefore the email could not contain information on which Lycos relied to make a decision months earlier.

66.     Further, Mr. Stenberg says in the email that "this is what I have so far . . . ."  He did not indicate this was a definitive document, but a work in progress and should be read as such.  In addition, the material I have reviewed does not indicate Mr. Lucy followed up after receipt of this email.  Thus, the email was a work in process and was a work in process statement made months after Lycos had already decided to sign the schedule.

67.     More generally concerning Mr. Stenberg, Lycos' expert Mr. Cross asserts that Lycos was inexperienced and relied heavily on Mr. Stenberg, as the sales representative from CSI.  As "evidence" that Lycos was inexperienced, Mr. Cross points to certain contract provisions that a lessee "with even a modicum of leasing knowledge would have expressly negotiated."  I disagree.  I am familiar with a number of technology equipment lessees that find their lease terms to be of less importance than other issues they face.

68.     In general, businesses set their priorities as they see fit.  If Lycos had thought it was not sufficiently experienced in equipment leasing, it could have retained the services of an expert to negotiate on its behalf, and in fact did so in 2003.  Lycos always had accountants and

attorneys (both inside and outside the company) to assist it with these issues, if it felt that were necessary. Moreover, Lycos was experienced in leasing, as it was leasing from multiple lessors and receiving advice from Avnet. Again, the records I reviewed indicate Lycos' priorities lay elsewhere—in keeping equipment off their balance sheet and reducing their monthly payments. The assertions Mr. Cross makes suggest that he somehow knows more about Lycos' objectives than they did, which is not the case.

### Damages Determined by Lycos Expert Are Inappropriate

69.     In his reports, Lycos expert Smith estimates the damages to Lycos of approximately $13.7 million, which is the so-called "mark-ups" on the refinanced schedules. Smith, in his deposition, indicates that the amount Lycos would have spent on their leases had they not re-written them, would be equal to the present value of the remaining rents plus CSI's booked residual values. Smith refers to the booked residual values as his estimate of economic cost (Smith deposition, page 335). On page 352 of his deposition, he reverses himself by saying he made a judgment as to the fair value of the equipment that would replace the existing equipment under lease, even though he used the conservative CSI booked residual values as an important component of determining his so-called "mark-up." I indicated earlier that lessors book conservative residual values, and that the in-place value of equipment to a lessee can be substantially higher that the lessor's conservatively booked residual value.

70.     A valuation expert for CSI, Robert Zises, has estimated that the cost of replacing the equipment Lycos had under lease at approximately $25 million. This compares to the often zero residual values employed by Smith because they were "unambiguous." This is a serious flaw in Smith's analysis. He is relying upon accounting rules to determine so-called damages. Under accounting rules, assets may be written down but not up—the "lower of cost or market" guideline. He made no attempt to determine the cost of financing comparable equipment over a

comparable term in estimating his so-called damages and as a result there is no fair assessment available in his reports.

71.    To illustrate, assume a lease matures at the end of this month, and the lessor is showing a zero residual value on the lessor's books.  Further assume the lessee wishes to extend the maturing lease for a year at a mutually agreed upon payment of $1,000.  Under Smith's definition of "markup", the old "lease balance" is zero, and the entire mutually agreed upon extension payments would be defined as "markup" and thus damage to the lessee.  That does not make sense. In this simple yet illuminating example, the question of what the lessee would do for needed equipment if it did not renew needs to be addressed.  In this example, that "what would the lessee otherwise do" question has not been answered.  The lessor's booked residual value has no necessary connection to the in-place value of the leased equipment to the lessee in the instant case.  The concept of "mark-up" that Smith uses, by his own admission, does not reflect what the value of equipment would be to replace the CSI leased equipment.  It is my opinion, therefore, that the theory of damages advanced by Smith is seriously lacking and without merit.

SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF NOVEMBER, 2007.

James M. Johnson, Ph.D.