UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LYCOS, INC., | ) C.A. No. 05-10017- RWZ |
| Defendant, | ) |
| | ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) |
| | ) |
| Trustee Process Defendant. | ) |

**DECLARATION OF EDWARD W. LITTLE, JR. ATTACHING RELEVANT PORTIONS OF THE CASE RECORD IN OPPOSITION TO LYCOS, INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF CSI'S AMENDED COMPLAINT**

I, Edward W. Little, Jr., being duly sworn, do hereby depose as follows:

1.      I am an attorney with McCarter & English, LLP,  the law firm that is counsel to the plaintiff/counterdefendant Computer Sales International, Inc. ("CSI") in this matter.  I make this affidavit based upon my personal knowledge unless otherwise stated.

2.      Attached hereto as Exhibit 1 is Master Lease Agreement Number 144874 previously marked as Plaintiff's Deposition Exhibit 258.

3.      Attached hereto as Exhibit 2 are selections from the deposition of Thomas Edward Guilfoile taken on December 7, 2006.

4.      Attached hereto as Exhibit 3 are selections from the deposition of Brian Reale taken on January 31, 2007.

5.      Attached hereto as Exhibit 4 are selections from the deposition of Joseph Philip Cagney taken on September 27, 2006.

6.      Attached hereto as Exhibit 5 are selections from the deposition of Susan S.

ME1 6928829v.1

Franklin taken on October 25, 2006 and selections from the deposition of Susan S. Franklin taken on May 1, 2007.    (***PORTION FILED UNDER SEAL***)

7.    Attached hereto as Exhibit 6 are the Plaintiff's Responses to Defendant's Second Set of Interrogatories dated January 24, 2007. ***(FILED UNDER SEAL)***

8.    Attached hereto as Exhibit 7 is an e-mail dated July 24, 2003 from Brian Lucy to Paul Stenberg previously marked as Plaintiff's Deposition Exhibit 494.    ***(FILED UNDER SEAL)***

9.    Attached hereto as Exhibit 8 is an e-mail dated October 24, 2002 from Paul Stenberg to Brian Lucy previously marked as Plaintiff's Deposition Exhibit 103.

10.    Attached hereto as Exhibit 9 is an e-mail dated October 22, 2002 from Paul Stenberg to Brian Lucy previously marked as Plaintiff's Deposition Exhibit 102.    ***(FILED UNDER SEAL)***

11.    Attached hereto as Exhibit 10 are selections from the deposition of Brian Lucy taken on January 10, 2007.

12.    Attached hereto as Exhibit 11 is an e-mail dated August 1, 2003 from Peter Karol to Brian Lucy and Julie Callagee previously marked as Plaintiff's Deposition Exhibit 457.

13.    Attached hereto as Exhibit 12 are selections from the deposition of Paul H. Stenberg, Jr. taken August 24, 2006.

14.    Attached hereto as Exhibit 13 is Sales Agreement Number 199614 dated August 8, 2003 previously marked as Plaintiff's Deposition Exhibit 23A.

15.    Attached hereto as Exhibit 14 are selections from the deposition of Andrew Feinberg taken on December 5, 2006.

16.    Attached hereto as Exhibit 15 are selections from the deposition of Kenneth B.

Steinback taken on November 3, 2006.

17.    Attached hereto as Exhibit 16 are selections from the deposition of Jeffrey L. Rousseau taken on March 8, 2006.

18.    Attached hereto as Exhibit 17 is the General Services Agreement dated July 17, 2003 between Lycos and LeaseForum previously marked as Plaintiff's Deposition Exhibit 13.

19.    Attached hereto as Exhibit 18 is a LeaseForum PowerPoint Presentation dated October 23, 2003, previously marked as Plaintiff's Deposition Exhibit 687.  (***FILED UNDER SEAL***.)

20.    Attached hereto as Exhibit 19 is an e-mail from John Kirk to Julie Callagee dated August 8, 2003 previously marked as Plaintiff's Deposition Exhibit 24.

21.    Attached hereto as Exhibit 20 is an e-mail from Julie Callagee dated August 10, 2003 previously marked as Plaintiff's Deposition Exhibit 25.


SIGNED BY ME UNDER THE PAINS AND PENALTIES OF PERJURY THIS *19th* DAY OF NOVEMER, 2007.

_____
Edward W. Little, Jr.

3

# EXHIBIT 1

**EXHIBIT**
*258*



MASTER LEASE AGREEMENT NUMBER  144874

| COMPUTER SALES INTERNATIONAL, INC. | | |
|---|---|---|
| 10845 Olive Boulevard | MAILING ADDRESS: | In California: CSI Leasing, Inc. |
| St. Louis, Missouri 63141 | Post Office Box 16264 | In Florida: CSI Computer Sales, Inc. |
| (314) 997-7010 | St. Louis, MO 63105 | |

MASTER LEASE AGREEMENT dated as of **December 4, 1996** by and between COMPUTER SALES INTERNATIONAL, INC. (hereinafter called "Lessor") having its principal office and place of business at 10845 Olive Boulevard, St. Louis, Missouri 63141, and

LYCOS, INC.

(hereinafter called "Lessee") having its principal office and place of business at

293 Boston Post Road West
Marlboro, Massachusetts  01752

IN CONSIDERATION of the mutual agreements hereinafter set forth and the payment of rent as herein provided for, the parties hereto agree as follows:

### 1. LEASE AGREEMENT

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor all of the equipment and other tangible personal property described in each of the Equipment Schedules which are executed from time to time by Lessor and Lessee pursuant to this Master Lease. Each Equipment Schedule shall constitute a separate lease on the terms and conditions stated therein and, to the extent not inconsistent with the Equipment Schedule, on the terms and conditions stated in the Master Lease which shall be incorporated by reference in the Equipment Schedule. The term "Equipment" as used herein shall mean, with respect to any Equipment Schedule, the Equipment described therein. The term "Unit" as used herein shall mean an individual machine or an Equipment Schedule or an individual feature when such feature is leased separately from a machine. The term of this Master Lease shall begin on the date set forth above and shall continue in effect so long as any Equipment Schedule entered into pursuant to this Master Lease remains in effect.

### 2. TERM

2.1 COMMENCEMENT DATE:  The commencement date ["Commencement Date"] for each Unit of Equipment will be the date on which such Unit is installed by the manufacturer or other installer, except that, in the event there is a delay in the installation of a Unit and such delay is attributable to Lessee, then the Commencement Date for such Unit shall be five [5] working days following the date upon which Lessee has been given notice that such Unit is available for installation. If requested by Lessor, Lessee will promptly execute and deliver to Lessor a certificate confirming the Commencement Date(s).

2.2 INITIAL TERM: The "Initial Term" of an Equipment Schedule shall mean the period beginning on the Commencement Date of the Unit having the latest Commencement Date of the Units on such Equipment Schedule if such Commencement Date is the first day of a month, and otherwise, the Initial Term shall begin on the first day of the month immediately following the month in which such latest Commencement Date falls. The Initial Term of an Equipment Schedule shall continue for the number of months specified therein and shall automatically be extended for successive four month periods thereafter at the same Monthly Rental unless and until terminated by either party giving the other party not less than 180 days prior written notice. Any termination (i) must relate to all of the Equipment described on the Equipment Schedule to which the notice applies, (ii) will be effective only on the last day of the Initial Term or on the last day of any successive four month period, (iii) will be effective only if Lessee returns all of the Equipment to Lessor in accordance with the terms of the Equipment Schedule by the day after the scheduled termination date, and (iv) may not be unilaterally revoked.

### 3. MONTHLY RENTAL

Lessee shall pay to Lessor the monthly rental ["Monthly Rental"] for each Unit as set forth in the relevant Equipment Schedule. The Monthly Rental shall be payable at the above mailing address of Lessor or at such other place as Lessor may from time to time designate in a written notice to Lessee. The Monthly Rental for each Unit shall commence on the Commencement Date of such Unit and shall be due and payable in advance and without demand on the first day of each month thereafter during the term of this Lease. If the Commencement Date for a Unit is a day other than the first day of a month, Daily Rental shall be payable ["Daily Rental" shall equal one-thirtieth of the Monthly Rental for such Unit] for each day from, and including, the Commencement Date to, but not including, the first day of the Initial Term, and such total Daily Rental amount shall be due and payable on the first day of the Initial Term.

### 4. WARRANTIES

4.1 AFFIRMATIVE WARRANTIES: Lessor represents and warrants that:

[a]  The Equipment shall be eligible for the manufacturer's standard prime shift maintenance contract upon installation, provided Lessee requests such coverage in writing prior to installation of the Equipment.

[b]  During the term of this Master Lease, if no Event of Default has occurred, Lessee's quiet enjoyment and peaceable possession of the Equipment shall not be interrupted by Lessor or anyone claiming solely through or under Lessor.

4.2 DISCLAIMER OF WARRANTIES:  THE AFFIRMATIVE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES OF LESSOR. LESSOR MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, FITNESS, CAPACITY OR SUITABILITY FOR

ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT, OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. Without limiting the generality of the foregoing, Lessor shall not be liable to Lessee for any liability, claim, loss, damage or expense of any kind or nature (including strict liability in tort) caused directly or indirectly by the Equipment, any inadequacy thereof for any purpose, any deficiency or defect therein, whether known or unknown to Lessor. In any event, Lessor shall not be liable to Lessee for any loss of business or any other incidental or consequential loss or damage resulting from any cause whatsoever.

4.3 ASSIGNMENT OF WARRANTIES: Lessor hereby assigns to Lessee any and all manufacturer's warranties, if assignable, and any other such rights that are assignable as Lessor may have against the manufacturer of the Equipment provided, however, that Lessee's sole remedy for the breach of any such warranty or right shall be against the manufacturer and not Lessor.

4.4 SELECTION: Lessee acknowledges, represents and warrants that it has made the selection of the Equipment based on its own judgment and expressly disclaims any reliance upon statements made by the Lessor. The Equipment is being leased for commercial or business purposes only, and will not be used for consumer, personal, home, or family purposes.

## 5. NET LEASE

Each Equipment Schedule constitutes a net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, and operation of the Equipment. Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that Lessee may have against Lessor. Except as expressly provided for herein, neither this Master Lease, nor any Equipment Schedule, shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, or any loss or destruction of the Equipment or any Unit from any cause whatsoever, or the interference with the use thereof by any private person, corporation, or governmental authority or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Monthly Rental payable by Lessee under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term thereof.

## 6. TAXES

6.1 PAYMENT OF TAXES: Lessee covenants and agrees to pay to the appropriate taxing authority, and discharge before the same become delinquent, all taxes, fees, or other charges of any nature whatsoever, without pro-ration, together with any related interest or penalties ("Impositions") now or hereafter imposed, assessed or payable during the term of the relevant Equipment Schedule including any extension thereof (or an Imposition relating to a record date or status date that fell within the term of the relevant Equipment Schedule including any extension thereof or is otherwise associated with Lessee's leasing, possession or use of the Equipment) against Lessor, Lessee or the Equipment by any federal, state, county or local government or taxing authority upon or with respect to [i] the Equipment or any Unit, [ii] upon the leasing, ordering, purchase, sale, ownership, use, operation, return or other disposition thereof, [iii] the Monthly Rental or any other sums due hereunder with respect to any Equipment Schedule, or [iv] the leasing of the Equipment [excepting only federal, state and local taxes measured by the net income of Lessor or any franchise tax upon Lessor measured by Lessor's capital, capital stock or net worth]. Because the payment due date or reimbursement date for an Imposition may occur after the expiration or termination of the term of the relevant Equipment Schedule, it is understood and agreed that Lessee's liability for such Impositions shall survive the expiration or termination of the term of the relevant Equipment Schedule.

6.2 BILLING: Lessee shall, to the extent permitted by law, cause all Impositions to be billed to Lessee. Lessee shall, at its expense, timely file all forms and returns and timely do all things required to be done in connection with the levy, assessment and payment of any Impositions, and Lessor hereby appoints Lessee as Lessor's attorney-in-fact where necessary for such purposes. Lessee shall submit written evidence to Lessor of the payment of all Impositions required to be paid by Lessee hereunder promptly after such payment. Notwithstanding the foregoing, Lessor, in its sole discretion, may pay any Imposition itself or file any forms or returns with respect thereto. If Lessor pays an Imposition, Lessee shall, when billed, reimburse Lessor for such payment.

6.3 CONTEST: Lessee may contest any Imposition by appropriate legal proceedings provided the nonpayment of such Imposition thereof, or such proceedings, will not, in the opinion of counsel for Lessor, adversely affect the title, property interest or rights of Lessor in the Equipment and provided further that, if requested by Lessor, Lessee has given to Lessor security, sufficient in form and amount, in Lessor's reasonable judgment, to fully satisfy the amount of the contested Imposition.

## 7. DELIVERY AND RETURN

Delivery shall arrange for delivery, and Lessee shall pay, when billed, all delivery expenses (including, without limitation, transportation costs and the cost of in-transit insurance) associated with the delivery of each Unit from its previous location to the location specified in the relevant Equipment Schedule. Lessee shall inspect each Unit upon delivery, identify any observable damage prior to accepting delivery, and note any such damage on the bill of lading. Costs of repair which are not recoverable from the carrier because of Lessee's failure to properly inspect for observable damage shall be borne and promptly paid by Lessee. Lessee shall provide a suitable place for installation of the Equipment with all appropriate facilities as specified by the manufacturer. Lessor shall arrange and Lessee shall pay for the installation of each Unit (if Lessee wishes to have the Equipment installed by an installer other than the manufacturer or some other party approved in writing by Lessor, then Lessee shall accept the Equipment "as is" and Lessor's warranty set forth in Paragraph 4.1 (a) shall not apply). Upon the termination of Lessee's right to possession of any Unit (by expiration of the term of the relevant Equipment Schedule or otherwise), Lessee shall, in accordance with Lessor's instructions and at Lessee's expense [including without limitation transportation costs and costs of in-transit insurance] return the Unit to such location within the Continental United States as shall be designated by Lessor. Lessee shall reimburse Lessor for all expenses paid by Lessor associated with return of the Unit when billed. Lessee shall return each Unit in the same operating order, repair, condition and appearance as when received, excepting only normal wear and tear, and with all engineering changes prescribed by the manufacturer prior to the termination of Lessee's right of possession incorporated in the Unit. Lessee, at its expense, shall make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance contract upon its return and shall have the Unit certified as eligible for the same., At the time the Equipment is returned, Lessee shall provide a letter from the manufacturer certifying such maintenance eligibility.

## 8. CARE OF EQUIPMENT

8.1 USE AND MAINTENANCE: Lessee shall, at its expense, maintain the Equipment in good operating order, repair, and condition. Lessee shall not use the Equipment for any purpose other than that for which it was designed. Prior to the delivery date and before any action is taken to install the Equipment, Lessee shall make a written request to the manufacturer for continued coverage of the Equipment under one of the manufacturer's standard maintenance agreements, and shall, at its expense, enter into and maintain in force such maintenance agreement for each Unit and provide Lessor with a copy of such agreement. IF LESSEE FAILS TO MAKE THE PROPER WRITTEN REQUEST TO THE MANUFACTURER FOR COVERAGE UNDER ONE OF THE MANUFACTURER'S STANDARD MAINTENANCE

AGREEMENTS, THEN LESSEE SHALL ACCEPT THE EQUIPMENT "AS IS" AND LESSOR'S WARRANTY SET FORTH IN PARAGRAPH 4.1(A) SHALL NOT APPLY. In no event, however, shall Lessee be required to enter into such a contract for any Unit so long as that Unit is under a manufacturer's warranty which provides substantially similar coverage.

8.2  ALTERATIONS AND ATTACHMENTS:  With the prior written consent of the Lessor, Lessee may, at its expense, make alterations or add attachments to the Equipment which are removable and which do not interfere with the normal and satisfactory operation or maintenance of the Equipment or Lessee's ability to obtain the maintenance contract required in Section 8.1 above. Upon the termination of Lessee's right to possession of any Unit, any alterations or attachments to such Unit shall become the property of Lessor unless removed at Lessee's expense prior to such termination. Lessor shall have the right, following termination of Lessee's right to possession of any Unit, to remove any attachments or alterations made by Lessee to such Unit and dispose of the same without any liability therefor to Lessee and Lessee shall pay the costs of such removal when billed.

8.3  INSPECTION:  Lessee shall make the Equipment available to Lessor, Secured Party [hereinafter defined] and Assignee [hereinafter defined] or the designees of any of them during normal working hours for inspection or for any other reasonable purpose.

## 9.  LOSS OR DAMAGE

9.1  RISK OF LOSS:  Lessee shall be responsible for and hereby assumes the entire risk of the Equipment being lost, damaged, destroyed, stolen, or otherwise rendered unfit for use from the date of delivery to Lessee to the date of return to Lessor.

9.2  OCCURRENCE OF LOSS:  If any Unit is lost, damaged, destroyed, stolen, or otherwise rendered unfit for use, Lessee shall give to Lessor immediate notice thereof, and this Master Lease and the applicable Equipment Schedule shall continue in full force and effect without any abatement in the Monthly Rental. Lessee shall determine within fifteen (15) days after the date of the occurrence of damage whether such Unit can be repaired. In the event Lessee determines that such Unit can be repaired, Lessee, at its expense, shall cause such Unit to be promptly repaired. If a Unit is lost, destroyed or stolen or if Lessee determines that a damaged Unit cannot be repaired, Lessee shall, at Lessor's direction, within thirty [30] days of such event either replace the Unit with an identical Unit, the title to which shall thereupon vest in Lessor and which thereafter shall be considered the Unit subject to the Equipment Schedule with no abatement in the Monthly Rental or, in Lessor's sole discretion, pay to Lessor an amount equal to the Stipulated Loss Value of the Unit determined as of the date of payment in accordance with the Stipulated Loss Value Schedule attached to the applicable Equipment Schedule together with all unpaid Monthly Rental which is due and payable through the date of payment. Upon such payment, Lessee's obligation to pay further Monthly Rental for such Unit shall cease.

## 10.  INSURANCE

10.1  PROPERTY INSURANCE:  Throughout the term of each Equipment Schedule, Lessee shall, at its expense, maintain in full force and effect "all risk" extended coverage, fire and casualty insurance for the Equipment. Such insurance shall provide for coverage in an amount equal to the ~~greater of the Stipulated Loss Value or~~ the replacement cost of the Equipment at the time of loss. Lessor shall be named as the Loss Payee on such policy. In addition, the policy shall, by means of a standard mortgage clause, name the Secured Party and Assignee as additional insureds and loss payees as their interest shall appear. Such policy shall provide that it may not be canceled or materially altered unless thirty [30] days prior written notice is given to all parties named therein. Upon Lessor's written request, Lessee shall provide Lessor with a Certificate of Insurance evidencing such insurance coverage. If, within two weeks after Lessee's receipt of such request, Lessee has not provided Lessor with a satisfactory Certificate, then Lessee may, at Lessor's option, obtain such insurance until Lessee provides the Certificate, and Lessee shall reimburse Lessor for the cost of such insurance when billed.

10.2  LIABILITY INSURANCE:  During the term of this Master Lease, Lessee shall, at its expense, maintain reasonable, commercial general liability and property damage insurance with respect to the use, possession and operation of the Equipment in an amount not less than one million dollars for each occurrence.

## 11.  INDEMNIFICATION

Lessee shall and does hereby indemnify and hold Lessor, any Assignee, and any Secured Party, harmless from and against any and all claims, costs, reasonable attorneys' fees, expenses, damages, and liabilities [including those resulting from the application of strict liability doctrines or statutes] arising out of Lessee's selection, possession, leasing, operation, control, use, maintenance, delivery, or return of the Equipment. Notwithstanding the foregoing, Lessee shall not be required to indemnify a party for any claim resulting from acts of that party which constitute willful misconduct or gross negligence.

## 12.  ASSIGNMENT, SUBLEASE OR RELOCATION BY LESSEE

UPON AT LEAST THIRTY [30] DAYS PRIOR WRITTEN NOTICE TO LESSOR, LESSEE MAY ASSIGN OR SUBLEASE A UNIT TO ANY PARTY, OR RELOCATE A UNIT TO ANY LOCATION, WITHIN ANY STATE OF THE CONTINENTAL UNITED STATES, PROVIDED THAT LESSOR, ASSIGNEE, AND SECURED PARTY, IN SUCH PARTIES' SOLE DISCRETION, SHALL HAVE APPROVED SUCH ASSIGNEE, SUBLESSEE, OR LOCATION, AND PROVIDED FURTHER THAT [i] ALL COSTS OF ANY NATURE WHATSOEVER [INCLUDING ANY ADDITIONAL IMPOSITIONS AND ANY ADDITIONAL EXPENSES ASSOCIATED WITH FILING NEW PRECAUTIONARY UNIFORM COMMERCIAL CODE FINANCING STATEMENTS] RESULTING FROM ANY RELOCATION, ASSIGNMENT OR SUBLEASE SHALL BE BORNE BY LESSEE; [ii] ANY ASSIGNMENT OR SUBLEASE SHALL BE MADE EXPRESSLY SUBJECT AND SUBORDINATE TO THE TERMS OF THIS LEASE; AND [iii] LESSEE SHALL ASSIGN ITS RIGHTS UNDER SUCH ASSIGNMENT OR SUBLEASE TO LESSOR, ASSIGNEE, OR SECURED PARTY AS ADDITIONAL COLLATERAL AND SECURITY FOR LESSEE'S OBLIGATIONS HEREUNDER. In the event of a relocation, assignment, or sublease, Lessee and its assignee or its sublessee shall cooperate with Lessor in taking all reasonable measures to protect the title of Lessor or Assignee and the interest of any Secured Party to and in the Equipment. No relocation, assignment, or sublease shall relieve Lessee of its primary obligations under the relevant Equipment Schedule and this Master Lease.

## 13.  ASSIGNMENT BY LESSOR

Lessor shall have the right to assign as security its interest or grant a security interest in any or all of the Equipment Schedules which may from time to time be executed and the Units described in any such Equipment Schedules to a security assignee ["Secured Party"]. Lessor shall also have the right to sell or otherwise dispose of any or all of the Units described in any Equipment Schedule, subject to the prior right of Lessee in such Units, and to assign its interest as Lessor under such Equipment Schedule, to any assignee ["Assignee"]. Any such assignment shall not in any way release Computer Sales International, Inc. from liability for performance of the Lessor's obligations hereunder. Lessee acknowledges that any assignment by Lessor will not materially change Lessee's duties or obligations under the Equipment Schedule nor materially increase the burden or risk imposed on Lessee. Lessee hereby consents to and shall acknowledge such assignment or assignments as shall be designated by written notice to Lessee by Lessor. Lessee further covenants and agrees that:

[a]  Any such Secured Party or Assignee shall have and be entitled to exercise any and all discretions, rights and powers of Lessor under the Equipment Schedule in which it has an interest, provided that a Secured Party or Assignee shall not be obligated to perform any of the obligations of Lessor other than Lessor's obligations under Paragraph 4.1 [b].

[b]  Lessee shall pay directly to the Secured Party or Assignee all Monthly Rental and all other sums due upon receipt of notice of any assignment and of instructions to do so; and

[c] After an assignment to a Secured Party or Assignee, Lessee's obligations hereunder including its obligation to pay the Monthly Rental and any and all other amounts payable under the Equipment Schedule by Lessee shall be absolute and unconditional and shall not be subject to any abatement, reduction, recoupment, defense, setoff, or counterclaim available to Lessee against Lessor for any reason whatsoever.

[d] Only one executed counterpart of any Equipment Schedule shall be marked "Original"; any other executed counterparts shall be marked "Non-original" or "Copy". No security interest in any Equipment Schedule may be created through the transfer and possession of any counterpart other than the "Original", nor shall any sale, assignment or transfer of any interest in an Equipment Schedule be effective or be binding upon Lessee through the transfer and possession of any counterpart other than the "Original".

## 14.  EVENTS OF DEFAULT

The occurrence of any one or more of the following events ["Events of Default"] shall constitute a default under the relevant Equipment Schedule:

[a] Lessee fails to pay the Monthly Rental, or any other amount due hereunder, on or before the date the same is due and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[b] any financial statements or information or any other representation or warranty given to Lessor proves to have been materially false or misleading as of the date it was given by or on behalf of Lessee;

[c] Lessee fails to observe or perform any other term, condition, obligation, agreement or covenant set forth herein, and such failure continues for a period of ten [10] days after receipt of written notice thereof from Lessor;

[d] Lessee assigns or attempts to assign this Master Lease or any Equipment Schedule, or removes, transfers, encumbers, sublets or parts with possession of any Unit, attempts to do any of the foregoing, or suffers or permits any of the foregoing to occur except as expressly permitted herein;

[e] Lessee ceases doing business as a going concern, or it or its shareholders take any action looking to its dissolution or liquidation;

[f] the entry of an order for relief under the United States federal bankruptcy laws or other decree or order by a court having jurisdiction in the premises adjudging the Lessee a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Lessee under the United States federal bankruptcy laws or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the ordering, the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

[g] the commencement by the Lessee of a voluntary case under the United States federal bankruptcy laws, or the institution by the Lessee of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, an arrangement with creditors or an order for relief under the United States federal bankruptcy laws or any other applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator [or other similar official] of the Lessee or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts as they become due, or, to the knowledge of the Lessor, the taking of corporate action by the Lessee in furtherance of any such action.

## 15.  REMEDIES

15.1 EXPRESS REMEDIES:  If an Event of Default occurs, Lessor may, at its option, do any or all of the following:

[a] proceed by appropriate court action or actions either at law or in equity to enforce performance by Lessee of the relevant Equipment Schedule, and the covenants and terms of this Master Lease to the extent it pertains to such Equipment Schedule, and to recover from Lessee any and all damages or expenses, including reasonable attorneys' fees, which Lessor shall have sustained or incurred by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder, or

[b] by notice to Lessee, declare immediately due and payable all monies to be paid by Lessee during the Initial Term [or any extended term then in effect] of the Equipment Schedule, as liquidated damages, and not as a penalty, and Lessor shall have the right, to the extent permitted by law, to [i] recover all monies so declared due and payable, discounted to the date of payment at the rate of 4% per annum, or one-half of the then-prevailing prime interest rate charged by principal New York banks, whichever is less, as liquidated damages, and not as a penalty; [ii] recover all other amounts which are due or which become due under the Equipment Schedule; [iii] terminate Lessee's right to possession [but not Lessee's obligations under this Lease] and to retake immediate possession of the Equipment without any process of law and for such purpose Lessor may enter upon premises where the Equipment may be located and may remove the same therefrom without notice, and without being liable to Lessee therefor, except that Lessor shall be liable for damages resulting from the negligence of Lessor, Lessor's assignee or their respective agents and representatives in any such entry or repossession; [iv] recover all expenses, including reasonable attorneys' fees, which Lessor shall have incurred or may incur by reason of the Event of Default or on account of Lessor's enforcement of its remedies hereunder; and [v] pursue any other remedy permitted by law or equity.  The possibility of a re-lease or resale under Paragraph 15.2 shall not excuse prompt payment in full by Lessee under this Paragraph 15.1.

15.2 RE-LEASE OR RESALE:  Lessor shall make a reasonable, good faith effort to retake possession of the Equipment and, if Lessor succeeds in retaking possession of any Unit, Lessor shall sell or lease each Unit with the privilege of becoming the purchaser thereof, at public or private sale, for cash or on credit.  Lessee's share of the proceeds of any such sale or lease ["Lessee's Share"] shall be the lesser of [x], the amount by which the Re-Lease Proceeds or the Resale Proceeds of such Unit exceed the Remarketing Costs of such Unit, and [y], the amount payable by Lessee to Lessor pursuant to Paragraph 15.1 [b][i] above with respect to such Unit.  Lessor shall credit Lessee's Share against all amounts owed by Lessee to Lessor under Paragraph 15.1 or otherwise and the remainder of Lessee's share, if any, shall be paid to Lessee.  EXCEPT AS SET FORTH IN THIS PARAGRAPH, LESSEE HEREBY WAIVES ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE WHICH MAY REQUIRE LESSOR TO MITIGATE ITS DAMAGES OR MODIFY OR LIMIT ANY OF LESSOR'S RIGHTS OR REMEDIES STATED HEREIN.  In applying this provision, the following definitions shall apply:

[a] The "Re-Lease Proceeds" of a Unit shall mean the present value [discounted to the date of payment using the interest rate at which Lessor has non-recourse financing or a non-recourse financing commitment with respect to the re-lease] of the monthly rental payments for the Unit under a re-lease to a third party, taking into account only those monthly rental payments under the re-lease which are payable on or before the last day of the Initial Term or the last day of any extended term then in effect with respect to the Unit under the Equipment Schedule.  If the re-lease is not financeable, the Re-Lease Proceeds shall be the monthly rental payments for such period as received.

[b] The term "Resale Proceeds" of a Unit shall mean the amount by which the proceeds of any sale of the Unit exceed the Lessor's estimate of the fair market value of the Unit at the end of the Initial Term or at the end of any extended term then in effect with respect to the Unit under this Master Lease.

[c] The term "Remarketing Costs" of a Unit shall mean all expenses incurred directly or indirectly by Lessor in re-leasing or selling the Unit and in obtaining a financing commitment in the case of a re-lease of a Unit, including, without limitation, reasonable fees and commissions [including a reasonable fee to Lessor] incurred in locating a buyer, a subsequent lessee or a financing

commitment, attorneys' fees, the cost of recovering the Unit from the Lessee and transportation, installation, refurbishing, reconditioning and storage charges.

15.3 NO WAIVER: The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of a breach of any other obligation or of any subsequent breach of the same or any other obligation. The subsequent acceptance of rental payments hereunder by Lessor shall not be deemed a waiver of any prior existing breach by Lessee regardless of Lessor's knowledge of such prior existing breach at the time of acceptance of such rental payments.

15.4 CUMULATION: To the extent permitted by law, the above remedies shall be deemed cumulative and may be exercised successively or concurrently.

## 16. PERFORMANCE AND EXECUTION

Lessee represents and warrants to Lessor [i] that the execution and performance of this Master Lease and each Equipment Schedule have been duly authorized by Lessee and that upon execution by Lessee and Lessor this Master Lease and each Equipment Schedule will constitute a valid obligation binding upon, and enforceable against, Lessee in accordance with the terms of the Master Lease and each Equipment Schedule; [ii] that neither the execution of this Master Lease or any Equipment Schedule nor the due performance thereof by Lessee will result in any breach of, or constitute any default under or violation of, Lessee's certificate or articles of incorporation, Lessee's by-laws or any agreement to which Lessee is a party or by which any interest of Lessee may be affected; [iii] that Lessee is in good standing in its state of incorporation and in the states where any Unit is to be located; [iv] the persons executing this Master Lease and each Equipment Schedule on behalf of Lessee have been duly authorized to do so; and [v] that any and all financial statements and other information with respect to Lessee heretofore furnished by Lessee to Lessor in connection with negotiations concerning one or more Equipment Schedules were, when furnished, and remain at the time of execution of any Equipment Schedule, true and without any misleading omissions, excepting any changes which have been disclosed in a written notice to Lessor.

## 17. ADDITIONAL DOCUMENTATION

Lessee shall promptly deliver to Lessor the documentation listed below which may from time to time be requested by Lessor. If such a request is made prior to the delivery of any Unit, receipt of such documentation shall be a condition precedent to Lessor's obligation to deliver such Unit:

[a] financial information including, without limitation, a copy of Lessee's balance sheet and income statement for Lessee's three prior fiscal years, certified by independent certified public accountants and such other current financial information representing the financial condition and operations of Lessee as Lessor may from time to time reasonably request;

[b] a certificate of the resolutions of the Board of Directors of Lessee duly authorizing or ratifying this Master Lease or any Equipment Schedule executed hereunder;

[c] a certificate of incumbency setting forth names and signatures of those persons authorized to execute this Master Lease or any Equipment Schedule on behalf of Lessee;

[d] landlord's and/or mortgagee's waiver, in form and substance satisfactory to any Assignee or Secured Party, from any landlord or mortgagee of any premises upon which any Unit is located;

[e] an opinion of counsel for Lessee as to the matters set forth in Paragraph 16, [i] through [v] above, and as to such other matters as Lessor may reasonably request; and

[f] such document confirming the execution of the Lease necessary or desirable to effect an assignment, to perfect an interest of Lessor, a Secured Party or Assignee, or for such other purpose relating to the Master Lease and/or any Equipment Schedule or to an assignment as Lessor may reasonably request. Lessee hereby appoints Lessor as Lessee's agent to prepare, execute and file in Lessee's name precautionary Uniform Commercial Code financing statements in connection with each Equipment Schedule showing the interest of Lessor, and any Assignee or Secured Party in the Equipment as appropriate.

## 18. GENERAL

18.1 TITLE: This Master Lease is intended to be a true lease and not a lease intended as security or lease in the nature of a security interest. Lessee shall, at its expense, protect and defend Lessor's title to the Equipment and the interest of any Assignee or Secured Party against all persons claiming against or through Lessee. Lessee shall keep and maintain the Equipment and this Master Lease free and clear of all liens and encumbrances [other than those placed on the same by Lessor and the liens for current taxes not yet payable].

18.2 FIXTURES: Lessee will not affix any Unit of the Equipment to any real property if, as a result thereof, the Unit will become a fixture under applicable law.

18.3 ENTIRE AGREEMENT: This Agreement [together with all schedules and attachments hereto] constitutes the entire agreement between Lessor and Lessee, and no provision hereof may be amended or modified except in writing signed by Lessor and Lessee. NO PROVISION OF THIS AGREEMENT MAY BE WAIVED EXCEPT IN WRITING SIGNED BY THE PARTY FROM WHOM SUCH WAIVER IS SOUGHT, AND ANY SUCH WAIVER SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN.

LESSEE'S
INITIALS : _____

18.4 NOTICES: All notices hereunder shall be in writing and shall be delivered in person or sent by registered or certified mail, to the address of the party contained herein, and shall be deemed received three [3] days after deposit in the United States mail with postage prepaid. Either party may change its address for notice purposes by notifying the other party in the manner aforesaid of such change. Lessee shall also send copies of all notices sent to Lessor, to Secured Party, or Assignee [if any].

18.5 SEVERABILITY: Any provision hereof prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of this Agreement provided, however, that where the provisions of any such applicable law may be waived, they are hereby waived by Lessee and Lessor to the full extent permitted by law.

18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAW. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE UNLESS EXPRESSLY GRANTED IN THIS MASTER LEASE OR AN EQUIPMENT SCHEDULE. This Master Lease and Equipment Schedules are subject to acceptance by Lessor at its home office.

18.7 PERFORMANCE OF LESSEE'S OBLIGATIONS: If Lessee shall fail to make any payment or perform any act required by this Master Lease or any Equipment Schedule, Lessor may at Lessee's expense, but shall not be obligated to, make such payment or perform such act without notice to or demand upon Lessee and without waiving or releasing any obligation or default. Lessee shall, when billed, reimburse Lessor for any expense incurred hereunder by Lessor in performing Lessee's obligations. LESSEE MAY NOT ASSIGN ITS RIGHTS OR OBLIGATIONS, EXCEPT AS SPECIFICALLY PROVIDED IN PARAGRAPH 12 OF THIS MASTER LEASE.

18.8 SURVIVAL: All representations, warranties, indemnities, and covenants contained in this Master Lease and in any Equipment Schedule, which by their nature would continue beyond the termination, cancellation or expiration of the Lease, including, by way of illustration only and not limitation, those in Paragraphs 6, 10, 11 and 18, shall continue in full force and effect and shall survive

notwithstanding the full payment of all amounts due hereunder or the termination of Lessee's right to possession of any Unit.

18.9  HEADINGS:  Headings and captions are for convenience of reference only and shall not be construed as part of the Lease.

18.10  OVERDUE PAYMENTS:  Any Monthly Rental due Lessor under this Master Lease, if not paid by the fifth day of the month in which payment became due, shall accrue interest until paid at a rate equal to one and one-half percent per month, or the maximum rate permissible by law, whichever is lower.  Any other amounts payable to Lessor by Lessee under this Master Lease are due and payable within fifteen (15) days after the billing date, and, if not paid on or before such due date, shall accrue interest from the due date until paid at a rate equal to one and one-half percent per month, or the maximum rate permitted by law, whichever is lower.

18.11  CONSENT OR APPROVAL:  With respect to any provision herein which calls for the consent or approval of a party, such consent or approval shall not be unreasonably withheld.

18.12  SUBSTITUTION OF EQUIPMENT:  If, at any time during the term of an Equipment Schedule, Lessor's right to lease the Equipment expires, Lessor shall promptly provide identical substitute Equipment, and all expenses of such substitution, including installation, installation and transportation expenses, shall be borne by Lessor.

18.13  DELIVERY FOR EXAMINATION:  Submission of the form of this Master Lease for examination shall not bind Lessor in any manner, and no obligations shall arise until this instrument is signed by both Lessor and Lessee.

18.14  TERMS IN EQUIPMENT SCHEDULES:  If the provisions of any Equipment Schedule are inconsistent with the provisions of this Master Lease, then the provisions of such Equipment Schedule shall control.

| LESSOR: | LESSEE: |
|---|---|
| COMPUTER SALES INTERNATIONAL, INC. | LYCOS, INC. |
| BY: | BY: _E____ M P___ |
| TITLE: E. WILLIAM CILLULA | TITLE: COO |
| CHIEF OPERATING OFFICER & CFO | |
| DATE: | DATE: 12/20/96 |
| JAN 1 0 1997 | (Please initial page 5, section 18.3) |

ML 4/96

ADDENDUM ONE TO MASTER LEASE AGREEMENT NO. 144874

This Addendum One to Master Lease Agreement No. 144874 (the "Lease") is dated as of December 4, 1996 and is entered into by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith, and in consideration of the mutual promises, covenants, and conditions contained in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflict as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Section 2.2 Initial Term:** In line 6, delete "120" and insert "60."

3. **Section 15.1 Express Remedies:** In subsection [b][i], delete "4%" and insert "6%."

4. **Section 15.2 Re-lease or Resale:** In line 7, after "PARAGRAPH," insert "AND TO THE EXTENT PERMITTED BY LAW."

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.                    LYCOS, INC.

BY: _____            BY: _____
        E. WILLIA J GILLULA
TITLE:  CHIEF OPERATING OFFICER & CFO   TITLE: CHIEF OPERATING OFFICER

DATE: _____JAN 1 0 1997_____        DATE: DECEMBER 20, 1996

PS/Bost.

144874-00Addm1(lrc)

## FIRST AMENDMENT TO MASTER LEASE NO. 144874

This Amendment to Master Lease Agreement No. 144874 (the "Master Lease") is dated February 28, 2001, and is between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Lessor and Lycos, Inc., a Delaware corporation, as lessee previously entered into the Master Lease and various Equipment Schedules thereunder for the lease of computer equipment. Lycos, Inc. subsequently merged with another company and the parties want to amend the Master Lease, and each Equipment Schedule thereunder, to change the lessee accordingly. In consideration of the foregoing and the promises and covenants contained in this Amendment, the parties agree to amend the Master Lease and each Equipment Schedule on the terms and conditions set forth below:

1. The Lessee is changed to LYCOS, INC., a Virginia corporation, which assumes all the obligations under the Master Lease and all current Equipment Schedules thereunder.

2. All other terms and conditions of the Master Lease and each Equipment Schedule remain unchanged and in full force and effect.

The parties have executed this Amendment as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.     LYCOS, INC.

By: _Louanne S Cherick_          By: _Brian D Tye_

Title: _SVP & Gen'l Counsel_      Title: _CFO_

Date: _3|28|01_                   Date: _3|16|01_

144874-000.a1rev(pw).doc
PHS/BOST

# EXHIBIT 2

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Thomas Edward Guilfoile

# December 7, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

ORIGINAL



James A. Scally   21971

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

203

```
 1        Q.    Do you still hold any options in stock relating to
 2   successors of Lycos?
 3        A.    I do not.
 4        Q.    CSI's leases, or Lycos' leases with CSI were
 5   always reported as leases by Lycos during the time you were
 6   there, in other words, not -- not loans.   They were
 7   reported as leases, right?
 8                   MR. BEAN:   Objection.
 9                   MR. DOWDEN:   Objection.
10        Q.    You can answer.
11        A.    My recollection, yes.
12        Q.    Okay.   And the reporting of -- by Lycos of CSI's,
13   of its leases with CSI as leases occurred both in its
14   filings with the Securities and Exchange Commission and in
15   its reports to shareholders and in its financial
16   statements, correct?
17                   MR. DOWDEN:   Objection.
18                   MR. BEAN:   Objection.
19        Q.    You can answer.
20        A.    I'm sorry, can you repeat that?
21        Q.    The reporting of Lycos' leases with CSI as leases
22   occurred both in Lycos' filings with the US Securities and
23   Exchange Commission and in its proxy statements and various
24   other reports to shareholders and in its financial
```

# EXHIBIT 3

# COPY

1

Volume 1, Pages 1-127

Exhibit: 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

  Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

  Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

  Trustee Process Defendant

------------------------------------

VIDEOTAPED DEPOSITION OF BRIAN REALE

Wednesday, January 31, 2007, 9:56 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

--------- Alan H. Brock, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

11

| 10:04:28 | 1 | he meant just by saying that Paul was doing what |
| 10:04:32 | 2 | Lycos was asking him to do. |
| 10:04:35 | 3 | Q.    Did Mr. Ziba relay to you during this call |
| 10:04:38 | 4 | what he meant by Mr. Stenberg providing Lycos with, |
| 10:04:41 | 5 | quote, "options," end quote? |
| 10:04:44 | 6 | A.    He mentioned that "We," meaning Lycos, |
| 10:04:49 | 7 | "were looking for ways to lower our monthly rent, |
| 10:04:52 | 8 | and Paul would give us options to do that," and they |
| 10:04:55 | 9 | would choose which option they wanted. |
| 10:05:04 | 10 | Q.    Did he say what options Mr. Stenberg had |
| 10:05:08 | 11 | given Lycos? |
| 10:05:08 | 12 | A.    No, he did not. |
| 10:05:18 | 13 | Q.    What did you tell Mr. Stenberg, anything |
| 10:05:21 | 14 | that Mr. Ziba had said to you? |
| 10:05:23 | 15 | A.    Yes, I pretty much relayed the information |
| 10:05:32 | 16 | I just gave to you. |
| 10:05:37 | 17 | Q.    Other than that telephone call with Mr. |
| 10:05:39 | 18 | Ziba -- |
| 10:05:39 | 19 |          You said it was one to two years ago. |
| 10:05:42 | 20 | A.    Yes. |
| 10:05:42 | 21 | Q.    Can you pin it down any better, more |
| 10:05:44 | 22 | precisely, in terms of time? |
| 10:05:46 | 23 | A.    Maybe a year and a half.  I think it was a |
| 10:05:52 | 24 | little more than a year ago. |

# EXHIBIT 4

# COPY

1

PAGES 1 - 354

EXHS. 1 - 21

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                \*

Computer Sales International,  \*
Inc.,
     Plaintiff and Defendant  \*
     in Counterclaim          \*
                                 \*
v.                               \*  Civil Action
                                \*
Lycos, Inc.,                    \*  No. 05-10017-RWZ
     Defendant and Plaintiff \*
     in Counterclaim          \*
v.                               \*
                                \*
Bank of America f/k/a Fleet  \*
Bank,
     Trustee Process Defendant \*
                                \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Videotaped Deposition of Joseph Philip Cagney

Wednesday, September 27, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109

----------- *J. EDWARD VARALLO, RMR, CRR* ----------
*COURT REPORTER*
*FARMER ARSENAULT BROCK LLC     BOSTON, MASSACHUSETTS*
*617.728.4404*
*evarallo@fabreporters.com*

*Joseph Philip Cagney*                    245

1    for example, is that instead of terminating all of

2    the leases at 10/31 like we originally anticipated,

3    we left some of the leases in place and those would

4    renew later.  Instead of at 11/1, they would renew

03:05PM    5    further down the line, so we could keep the existing

6    debt in place.

7         Q.    And the decision to structure the 93 this

8    way by keeping some leases in place was your idea?

9         A.    It was in concert with one of the

03:06PM    10    requirements, one of the -- I don't know if

11    requirements is the right word -- what Paul wanted

12    to do, which was to minimize the amount of the

13    letter of credit that Lycos would have to get to

14    secure this deal.

03:06PM    15         Q.    And how does terminating -- How does

16    keeping some schedules in place minimize the amount

17    of the letter of credit?

18         A.    Because those leases were financed with

19    banks and we would not have to pay the bank off.

03:06PM    20         Q.    Now, this million 891, so that represents

21    what then?

22         A.    That represents schedules that were

23    remaining in place as of November 1st of '01 that

24    would then later renew into Schedule 93 at a later

*Joseph Philip Cagney*                    256

1      A.      I don't know by what margin.

2      Q.      So your testimony then is that debt was

3   left in place to reduce the amount of the letter of

4   credit.  Is that right?

03:20PM   5      A.      Yes.

6      Q.      And Lycos was still required to post an

7   $11 million letter of credit.  Right?

8      A.      11 million is what was required for the

9   new schedules, yes.

03:20PM   10      Q.      Who required the $11 million letter of

11   credit?

12      A.      CSI did.

13      Q.      And how did you determine the $11 million

14   amount?

03:20PM   15      A.      That was the -- Similar to what this

16   calculation is, that's the present value that is not

17   secured by bank debt.

18      Q.      The difference between 13 million -- What

19   two numbers leaves a balance of $11 million?

03:20PM   20      A.      Well, and again it depends on what

21   interest rate you use, and I actually on this one

22   actually underestimated the 11 million; it probably

23   should have been more like 13 million.  But I had

24   used a high debt rate to begin with and then later

# EXHIBIT 5

DISK ENCLOSED

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Susan S. Franklin

# October 25, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL



Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 117

| | | |
|---|---|---|
| 11:44:36 | 1 | **A.** **-- of that number.** |
| 11:44:37 | 2 | Q. Okay. And Mr. Stenberg never mentioned to you a |
| 11:44:44 | 3 | 65-million-dollar original equipment cost number, did he? |
| 11:44:48 | 4 | MR. FELDMAN: Objection. |
| 11:44:49 | 5 | MR. BEAN: Objection. |
| 11:44:50 | 6 | Q. You can answer. |
| 11:44:51 | 7 | **A.** **Mr. Stenberg mentioned multiple equipment costs in** |
| 11:44:54 | 8 | **our original phone call.** |
| 11:44:57 | 9 | Q. The question that I asked you was specific. |
| 11:45:02 | 10 | **A.** **Did he say 65,737,623? No.** |
| 11:45:07 | 11 | Q. Did Mr. Stenberg ever tell you the original |
| 11:45:10 | 12 | equipment cost was $65 million? |
| 11:45:14 | 13 | **A.** **He said it was in the sixties.** |
| 11:45:15 | 14 | Q. You're saying he told you it was in the sixties in |
| 11:45:18 | 15 | the July 7th call or earlier? |
| 11:45:20 | 16 | **A.** **The June 27th call.** |
| 11:45:21 | 17 | Q. Well, we'll go back to the June 27th call. Do you |
| 11:45:25 | 18 | have any notes of the June 27th call? |
| 11:45:27 | 19 | **A.** **Those would be the notes I told you I did not** |
| 11:45:31 | 20 | **maintain.** |
| 11:45:32 | 21 | Q. Okay. So the only notes that you claim to have of |
| 11:45:34 | 22 | the June 27 call in which you claim that Mr. Stenberg told |
| 11:45:38 | 23 | you that original equipment cost was in the sixties you -- |
| 11:45:42 | 24 | you did not keep? |

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 118

| 11:45:44 | 1 | A. No. |
| 11:45:44 | 2 | Q. You destroyed them? |
| 11:45:45 | 3 | A. No. Because I relayed the conversation to the |
| 11:45:47 | 4 | client, and I then threw out the notes. |
| 11:45:49 | 5 | Q. When did you throw out the notes of this |
| 11:45:51 | 6 | conversation that you claim to have had with Mr. Stenberg? |
| 11:45:55 | 7 | A. After my conversation with the client. |
| 11:46:01 | 8 | Q. Now, this was the first conversation that you had |
| 11:46:03 | 9 | had with Mr. Stenberg, the one in June where you claim he |
| 11:46:06 | 10 | talked about the original equipment cost being 65 million, |
| | 11 | correct? |
| 11:46:09 | 12 | A. Being in the sixties, correct. |
| 11:46:12 | 13 | Q. Okay. And how long a conversation was it? |
| 11:46:20 | 14 | A. I don't remember exactly. Less than a half hour. |
| 11:46:22 | 15 | Q. And one of the things you had been retained to do |
| 11:46:25 | 16 | was negotiate with Mr. Stenberg, correct? |
| 11:46:27 | 17 | MR. FELDMAN: Objection. |
| 11:46:29 | 18 | A. I had been -- I had been engaged to obtain a |
| 11:46:40 | 19 | purchase price acceptable to Lycos. |
| 11:46:42 | 20 | Q. And this was the first contact that you'd with Mr. |
| 11:46:45 | 21 | Stenberg, this conversation in June of 2003, correct? |
| 11:46:50 | 22 | A. I attempted to reach him a number of times, and |
| 11:46:55 | 23 | this is the time that I actually did get him on the phone. |
| 11:46:58 | 24 | Q. And you knew he was the person you were going to |

8d03dd97-4b63-4c46-843f-a3e095762199

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 129

| | | |
|---|---|---|
| 11:56:37 | 1 | mentioned to you this 6,680,029-dollar number that you |
| 11:56:42 | 2 | wrote down here, did he? |
| 11:56:43 | 3 | **A.   He did not say that number.** |
| 11:56:44 | 4 | Q.   Okay.  Fine.  And then you drew a symbol, a sort |
| 11:56:48 | 5 | of asterisk or star -- |
| 11:56:50 | 6 | **A.   A doodle, yes.** |
| 11:56:51 | 7 | Q.   A doodle, and then a line down, and in a box you |
| 11:56:54 | 8 | put the number $3.9M.  What were you referring to there? |
| 11:56:59 | 9 | **A.   The counterproposal presented by Mr. Stenberg in** |
| 11:57:04 | 10 | **the July 7th phone call.** |
| 11:57:05 | 11 | Q.   Okay.  It had been at about 4.7 prior to that? |
| 11:57:09 | 12 | **A.   4.69.** |
| 11:57:11 | 13 | Q.   Okay.  Had you presented to him your proposal of |
| 11:57:15 | 14 | the 2.7 million yet? |
| 11:57:17 | 15 | **A.   Yes.  That was presented in the June 27th phone** |
| 11:57:20 | 16 | **call.** |
| 11:57:20 | 17 | Q.   Okay.  And you wrote down the 3.9 million.  What |
| 11:57:25 | 18 | did he say to you at that time in connection with the 3.9 |
| 11:57:28 | 19 | million?  That is a number that he mentioned to you, right? |
| 11:57:32 | 20 | **A.   Yes, it is.** |
| 11:57:33 | 21 | Q.   Okay.  And what did he say to you about that |
| 11:57:37 | 22 | number in the conversation? |
| 11:57:42 | 23 | **A.   He said that it was their best number and it was** |
| 11:57:46 | 24 | **non-negotiable.** |

# FILED UNDER SEAL

# EXHIBIT 6

FILED UNDER SEAL

# EXHIBIT 7

FILED UNDER SEAL

# EXHIBIT 8



**Paul Stenberg**
<Paul.Stenberg@csile
asing.com>

10/24/2002 08:02 AM

To: "Brian. Lucy@corp. terralycos. com (E-mail)"
    <Brian.Lucy@corp.terralycos.com>
cc: "Kevin. Baillie@corp. terralycos. com (E-mail)"
    <Kevin.Baillie@corp.terralycos.com>, "Monique. Walsh@corp.
    terralycos. com (E-mail)" <Monique.Walsh@corp.terralycos.com>
Subject:

Per your request, outlined would be the scenario;

- Lycos to pay CSI $4,691,000

- CSI will amend all current releases to reflect that Title will pass to Lycos at the expirations of these leases.

Any questions, please let me know.

PLAINTIFF'S
EXHIBIT
103

LYC 08743

# EXHIBIT 9

FILED UNDER SEAL

# EXHIBIT 10

# O'BRIEN&LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Brian Lucy

# January 10, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL



Linda Bernis  22525

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

178

1    Q.    Look at Exhibit 457.  Is the first page of

2          Exhibit 457 an e-mail that you received from

3          Peter Carroll on August 1st telling you that

4          you could proceed with the transaction?

5    A.    It appears, yes.

6                  (Exhibit 23A marked

7                    for identification.)

8    Q.    And Exhibit 23A.  Exhibit 23A, Bates number

9          CSI 0012363 through 13366, a copy of the

10         sales agreement that you signed on behalf of

11         Lycos with CSI on August 8, 2003?

12   A.    Yes, it appears to be my signature.

13   Q.    And is that your signature on the third page

14         of the exhibit and your initials on the

15         schedule attached to it?

16   A.    Yes, it appears.

17   Q.    I'm going to show you -- sorry -- 24.

18               Let me show you what's been marked

19         as Exhibit 24.  On Friday August 8, 2003

20         when you signed the sales agreement that we

21         marked as Exhibit 23A, did you have any

22         conversations with Julie Callagee about the

23         sales agreement or the CSI leases?

24   A.    I don't recall.

# EXHIBIT 11

PLAINTIFF'S
EXHIBIT
457

| | |
|---|---|
| **From:** | Peter Karol/O=Lycos |
| **Sent:** | Friday, August 1, 2003 8:42 AM |
| **To:** | Brian Lucy/O=Lycos@Lycos; Julie Callagee/O=Lycos@Lycos |
| **Cc:** | Andrew Feinberg/O=Lycos@Lycos |
| **Subject:** | Re: Lycos Leases - URGENTE |
| **Attach:** | Memo leases.Legal.doc |

Looks like we can proceed

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com
----- Forwarded by Peter Karol/Lycos on 08/01/2003 08:44 AM -----

diego.colchero@corp.terra.com
08/01/2003 08:15 AM

To: andrew.feinberg@corp.terralycos.com, peter.karol@corp.terralycos.com
cc:
Subject: Re: Lycos Leases - URGENTE

FYI: email below states Pepe's support to the negotiated solution for the
Leases (i.e. your email from earlier this week/past week).

----- Remitido por Diego Colchero Paetz/TERRA/TERRA con fecha 01/08/03 02:04
p.m. -----
Jose Francisco Mateu Isturiz
01/08/03 12:05 p.m.
     Para:     Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA@TERRA
     cc:     Ignacio Ponce Gutierrez/TERRA/TERRA@TERRA, (cco: Diego
Colchero Paetz/TERRA/TERRA)     Asunto:    Re: Lycos Leases -
URGENTEVinculo

Elias,

He estado haciendo todas las averiguaciones razonables que en un caso como este
conviene hacer (busqueda de posibles precedentes, dobles opiniones, debate con
los gestores, usos y costumbres en el mercado Usa, etc...) la conclusion final
es que puestas en una balanza las alternativas contrapuestas, compra por valor

LYC 22692

residual versus pago indemnizaciones, la enorme cuantía de la segunda respecto
a la primera parece que no deja opción diferente que la primera maxime teniendo
en cuenta el alto grado de exigibilidad jurídica de la indemnización por no
devolución en tiempo y forma

Un saludo,

José Mateu

**B 1**

Este mensaje se dirige exclusivamente a su destinatario y puede contener
información CONFIDENCIAL sometida a secreto profesional o cuya divulgación esté
prohibida en virtud de la legislación vigente. Si ha recibido este mensaje por
error, le rogamos que nos lo comunique inmediatamente por esta misma vía o por
teléfono (34 91 4523913) y proceda a su destrucción.
Nótese que el correo electrónico vía Internet no permite asegurar ni la
confidencialidad de los mensajes que se transmiten ni la correcta recepción de
los mismos. En el caso de que el destinatario de este mensaje no consintiera
la utilización del correo electrónico vía Internet, rogamos lo ponga en nuestro
conocimiento de manera inmediata.

This message is intended exclusively for its addressee and may contain
information that is CONFIDENTIAL and protected by a professional privilege or
which disclosure is prohibited by law. If this message has been received in
error, please immediately notify us via e-mail or by telephone (34 91 4523913)
and delete it.
Please note that Internet e-mail does not guarantee the confidentiality or the
proper receipt of the messages sent. If the addressee of this message does not
consent to the use of Internet e-mail, please communicate it to us immediately.

Elias Jesus Rodriguez-Viña Cancio
29/07/2003 15:56
    Para:    Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:    Ignacio Ponce Gutierrez/TERRA/TERRA@TERRA
    Asunto:    Lycos Leases - URGENTE

Pepe, por favor pronúnciate sobre este asunto ya mismo, pues estamos en serio

LYC 22693

riesgo de que quede sin validez lo acordado con la Cia de leasing.

----- Remitido por Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA con fecha
29/07/2003 15:45 -----
Elias Jesus Rodriguez-Viña Cancio
25/07/2003 15:45
    Para:     Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:
    Asunto:    Lycos Leases - URGENTE


Pepe, desde Boston insisten en ir adelante con esta operación. Necesitamos tu
pronunciamiento con URGENCIA.


----- Remitido por Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA con fecha
25/07/2003 15:35 -----
Elias Jesus Rodriguez-Viña Cancio
24/07/2003 13:52
    Para:     Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:
    Asunto:    Lycos Leases


Pepe,

Te agradecería si puedes leer lo antes posible el memo que adjunto que hemos
preparado en FINANZAS y si me confirmas nuestro entendimiento del riesgo. Como
ya comentamos ayer, parece extraño que el output final de un contrato sea el
que parece que es, de ahí que te pido que tú mismo lo evalúes antes de aprobar
una salida de caja de casi $ 4 millones.
Un abrazo

LYC 22694

*Area de Finanzas Corporativas*    

*Memo*

---

Asunto: Leases de Lycos
A:      Jose Francisco Mateu
De:     Elías Rodríguez-Viña
Fecha:  24 de julio de 2003

---

Estimado Pepe,

en relación al memo de Peter Karol, remitido por Andrew Feinberg, sobre las obligaciones contractuales a las que está sujeto Lycos Inc. en virtud del contrato de leases firmado con CSI, me gustaría que por favor me confirmaras el riesgo derivado de dichos contratos, y en concreto del "equipment schedule 94" al representar aprox. el 70%, a la vista de la imposibilidad declarada por el equipo de operaciones de Lycos de devolver todos los equipos en iguales condiciones a las que se recibieron, ya sea por haber sido adaptados o modificados, por formar parte de otros equipos o por estar dispersados en distintas oficinas, etc.

Nuestro entendimiento es que el impacto financiero de estas cláusulas sobre el "equipment schedule 94" es el siguiente:

1.  En el momento de vencimiento de los leases, Lycos será penalizado con el pago de 4 meses de leases por no devolver los equipos, lo que acarreará un coste aprox. de $2.7Mn (679.754 x 4).

2.  Transcurridos estos 4 meses de penalización, si Lycos continúa sin poder devolver los equipos, CSI podría obligar a Lycos al pago del "stipulated loss value" consistente en una cantidad equivalente al 55% del coste original del equipo, implicando un coste de $12 Mn (21.836.761 x 55%).

Para evitar esta contingencia, los gestores de Lycos proponen convertir los operating leases en capital leases con el consiguiente de pago a día de hoy de $3.78Mn, con lo que Lycos obtendría la titularidad de los equipos a vencimiento, por un precio simbólico de $1 y eliminaría la obligación de devolución de los mismos.

Necesitamos tener plena certeza de que no existe otra alternativa más favorable, y de que estamos actuando en el mejor de los intereses de nuestros accionistas.

A la espera de tu confirmación recibe un cordial saludo

---

LYC 22695

# EXHIBIT 12

# COPY

1

VOLUME 1

PAGES 1 - 434

EXHS. 1 - 45

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
Computer Sales International,    \*
Inc.,                           \*
        Plaintiff and Defendant \*
        in Counterclaim         \*
                                \*
v.                              \*
                                \*    Civil Action
Lycos, Inc.,                    \*
        Defendant and Plaintiff \*    No. 05-10017-RWZ
        in Counterclaim         \*
v.                              \*
                                \*
Bank of America f/k/a Fleet     \*
Bank,                           \*
        Trustee Process Defendant \*
                                \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


Videotaped Deposition of Paul H. Stenberg, Jr.

Thursday, August 24, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109


-------------- JANIS T. YOUNG, RDR, CRR ------------
COURT REPORTER
FARMER ARSENAULT BROCK LLC      BOSTON, MASSACHUSETTS
617.728.4404
jyoung@fabreporters.com

Paul H. Stenberg, Jr.                    310

03:55:18   1          MR. BEAN:  Mark that as the next exhibit,
03:55:20   2   please.
03:55:20   3          (Stenberg Deposition Exhibit 29 marked for
03:55:30   4   identification.)
03:55:30   5   BY MR. BEAN:
03:55:30   6      Q.    What's marked as Exhibit 29 is CSI 0041890
03:55:34   7   through 41893.  Do you recognize this document,
03:55:40   8   Mr. Stenberg?
03:55:41   9      A.    It's a -- What is this? -- sales agreement
03:55:45   10  for all the equipment schedules.
03:55:46   11     Q.    And it was signed -- It's dated by
03:55:49   12  Mr. Lucy on July 18, 2003.  Correct?
03:55:51   13     A.    Okay, okay.
03:55:52   14     Q.    Is that right?
03:55:52   15     A.    Yes.
03:55:53   16     Q.    And it was sent by Lycos on August 1st,
03:55:58   17  2003, according to the fax line.  Right?  It was
03:56:03   18  faxed by Lycos to --
03:56:05   19     A.    Sure, yeah.
03:56:05   20     Q.    Apparently to CSI, since CSI produced this
03:56:08   21  document.
03:56:09   22          Now, Mr. Lucy subsequently executed the
03:56:12   23  sales agreement again or a similar sales agreement.
03:56:18   24  Correct?

# EXHIBIT 13

## CSI     SALES AGREEMENT NUMBER 199614     COPY

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314) 997-7010

## SALES AGREEMENT

This Sales Agreement dated July 15, 2003 (the "Agreement") is between **COMPUTER SALES INTERNATIONAL, INC.** (the "Seller") and **LYCOS, INC.**, which has a principal place of business at **100 5th Avenue, Waltham, Massachusetts 02451 (the "Buyer").**

WHEREAS, Buyer, as Lessee and Seller, as Lessor have entered into various equipment schedules (the "Equipment Schedules") subject to Master Lease Agreement No. 144874 dated December 4, 1996 (the "Master Lease") (the "Master Lease", together with the "Equipment Schedule(s)" hereinafter collectively referred to as the "Lease")

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were consequently terminated in their entirety, and all items of equipment leased pursuant to the terminated Equipment Schedules, were made subject to replacement Equipment Schedules listed on Exhibit 1 attached hereto and made a part hereof ("Replacement Schedules");

WHEREAS, certain Equipment Schedules listed on Exhibit 1 originally executed pursuant to the Master Lease were not revised ("Original Schedules") and they, together with the Replacement Schedules remain in full force and effect as of the date of this Agreement (the "Original Schedules" together with the such "Replacement Schedules" collectively referred to as the "Existing Schedules")

WHEREAS, Lessee desires to restructure all of the Existing Schedules detailed on Exhibit 1 to $1.00 buyout leases;

WHEREAS, a prepayment of the fair market value of all of the Equipment (as hereinafter defined) is required in order to restructure each Lease to $1.00 buyout lease;

WHEREAS, Lessor has agreed to restructure said Leases to $1.00 buyout leases for the consideration set forth below;

NOW THEREFORE, in consideration of the foregoing, Lessee and Lessor agree as follows:

1.   <u>SALE</u>: For the Sales Price described in Paragraph 3 below, Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules listed in Paragraph 2 below and on Exhibit 1 (the "Equipment") effective on their respective termination dates, except as stated in paragraph #5 below, and on the terms and conditions contained in this Agreement.

2.   <u>EXISTING SCHEDULES</u>:  The Equipment is installed at Buyer's location and has been accepted for lease under Equipment Schedules 69I, 64F, 66I, 67H, Eighty-five, Eighty-six, Eighty-nine, 89A, Ninety, Ninety-three, Ninety-four, One Hundred, and Two Hundred to Master Lease Agreement No. 144874 between the parties (the "Leases"). The Existing Schedules shall terminate on the "Termination Dates" set forth below:

   Equipment Schedules 69I, 64F, 66I and 67H will terminate on September 30, 2003
   Equipment Schedules Eighty-five and Eighty-six will terminate on December 31, 2003
   Equipment Schedules Eighty-nine, 89A, and Ninety will terminate on July 31, 2004
X Equipment Schedule Ninety-three will terminate on October 31, 2003
X Equipment Schedule Ninety-four will terminate on October 31, 2004
   Equipment Schedule One Hundred will terminate on April 30, 2005
   Equipment Schedule Two Hundred will terminate on April 30, 2005

Each Lease will terminate on its respective Termination Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease. Pursuant to the Leases, Buyer remains liable for any personal property tax liability, with respect to the Equipment, which



PLAINTIFF'S
EXHIBIT
_Gallagee_
4·26·__   CB

CONFIDENTIAL
CSI0013363

accrued or accrues during the term of the Leases. The Equipment is sold on an "AS IS, WHERE IS" basis, without any warranties of any kind, express or implied.

3.   SALES PRICE:  The Sales Price of the Equipment is $3,775,000.00 USD, plus applicable taxes, which Buyer shall pay on or before August 12, 2003 by wire transfer to the following bank and account:

>     First Bank
>     ABA #081009428
>     For Further Credit to:  Computer Sales International, Inc.
>     Account #9821914677
>     Lycos, Inc.
>     Sales Agreement No. 199614

Buyer shall pay on demand a late charge on such Sales Price if unpaid after it is due.  The late charge rate is the lower of (i) one and one half percent (1.5%) per month, or (ii) the highest rate permitted by law.

4.   SATISFACTION OF LEASE OBLIGATIONS:  The Leases, solely with respect to Monthly Rental (set forth on Exhibit 1) shall continue in full force and effect and Lessee shall pay to Lessor the number of Monthly Rental payments remaining (plus applicable taxes, if any), beginning with the payment due for the month of August 2003, and continuing to and including the Final Rent Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").

In the event of a Casualty (as defined in the Lease) or any other event impacting the Monthly Rental payable on an Existing Schedule, the Remaining Rental Payment with respect to such Existing Schedule, shall be adjusted accordingly, consistent with such event.

Seller acknowledges that receipt of the Sales Price and each of the Remaining Rental Payments in full, plus applicable taxes, if any ("Lease Satisfaction Amount"), shall fully satisfy Buyer's obligations to Seller with respect to the Leases and all obligations under the Leases shall, on the Final Rent Payment Date, cease in their entirety.

Buyer and Seller agree that this Agreement and the payment of the Lease Satisfaction Amount satisfies all monetary obligations and notice obligations of Buyer under the Leases (with the exception of notices required under Section 14 of the Master Lease), and no other payment, written or oral notification is required by Buyer in order to effectuate (a) the full satisfaction of its obligations under the Leases and (b) its ownership interest in the Equipment.

5.   SELLER RETAINS TITLE:  With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date .  With respect to Equipment Schedule 85, certain items of Equipment shall on its respective Termination Date, become subject to Equipment Schedule Ninety-four.  Upon receipt of the Lease Satisfaction Amount in full, without further action on the part of Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.

6.   DELIVERY:  The Equipment is already installed and accepted by Buyer pursuant to the Leases.

7.   WARRANTIES:  Seller warrants that (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims, and encumbrances of any kind except those caused or incurred by Buyer, if any; and (ii) Seller has the full right, power and authority to sell the Equipment.  OTHER THAN THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONDITION, DESIGN OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.  SELLER HAS NO LIABILITY TO BUYER FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH (i) ANY DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO BUYER, (ii) ANY DEFECT IN THE EQUIPMENT, (iii) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (iv) ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE EQUIPMENT, OR (v) ANY LOSS OF BUSINESS, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PATENT INFRINGMENT ACTIONS.

8.   TAXES:  Buyer shall pay all sales and use taxes (including interest and penalties) levied or based on the sales price or on this Agreement or the Equipment.  If Buyer is purchasing for resale or if Buyer is exempt from sales/use tax, Buyer will issue to Seller an appropriate exemption certificate in form reasonably acceptable to Seller prior to

CONFIDENTIAL
CSI0013364

the delivery date. Personal property taxes assessable on the Equipment on or after the date of delivery will be borne by Buyer.

9.  REMEDIES: If Buyer refuses or is unable to timely perform its obligations hereunder, Seller may, following the delivery date, do any or all of the following: (i) terminate the Agreement on five days' notice, (ii) retain or repossess the Equipment, or (iii) recover from Buyer all damages and expenses, including reasonable attorney's fees, which Seller has incurred or may incur by reason of Buyer's failure to perform under this Agreement. Seller may retain any monies paid by Buyer to Seller prior to Buyer's nonperformance as an offset to Seller's damages and expenses.

10.  MISCELLANEOUS:

A.  ENTIRE AGREEMENT: This Agreement is the entire agreement between Seller and Buyer regarding the purchase and sale of the Equipment and no representation or statement not contained in this Agreement is binding on Seller or Buyer as a warranty, or otherwise, unless in writing and executed by the party to be bound. Any purchase order Buyer issues is merely for its internal recordkeeping purposes and as a means of confirmation of Buyer's acceptance of this Agreement, and does not as supercede, modify or serve as a counter-offer to the terms and conditions in this Agreement.

B.  NOTICES: Any notice relating to this Agreement must be in writing and sent by electronic facsimile transmission, by overnight courier service or by registered or certified mail, postage prepaid, addressed to the party for which it is intended at the address set forth in the beginning of this Agreement or to such other address as either party indicates in writing. Notice is effective on the earlier of receipt or three days from the date of mailing.

C.  GOVERNING LAW: This Agreement, including all matters of construction, validity, performance and enforcement, is governed by the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law.

D.  SEVERABILITY: Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law or any jurisdiction will be ineffective as to the jurisdiction without invalidating the remaining provisions of this Agreement, but where the provisions of applicable law may be waived, they are waived to the full extent permitted by law.

E.  SURVIVAL: All representations, warranties and covenants contained in this Agreement continue in full force and effect and survive the sale of Equipment.

F.  SELECTION: Buyer acknowledges that it has exercised its own judgment in selecting the Equipment purchased, and this it has not relied on Seller for assistance and advice in making such selection.

G.  ASSIGNMENT: This Agreement may not be assigned by Buyer without the prior written consent of Seller.

The parties have executed this Agreement on the date written below. At Seller's option, this Agreement is not effective unless signed by Buyer and returned to Seller by August 8, 2003.

BUYER:
LYCOS, INC.

By: _____

Title: _____CFO_____

Date: ____8 8 03_____

REVIEWED BY
TERRA LYCOS LEGAL  _PDK_

SELLER
COMPUTER SALES INTERNATIONAL, INC.

By: _____

Title: _____

Date: ____8/11/03_____

CONFIDENTIAL
CSI0013365

RJC
8/8/07

| Description | Revised 2 | Revised 2 | Revised 2 | Revised 2 | Revised 5 | Revised 5 | Revised 12 | Revised 12 | Revised 12 | Original 9 | Original 21 | Replacement 3 | Replacement 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. Remaining Rental Payments | 2 | 2 | 2 | 2 | 5 | 5 | 12 | 12 | 12 | 9 | 21 | 3 | 15 |
| August Rent Payment Date | 8/1/2003 | 9/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 12/1/2003 | 8/1/2003 | 7/1/2004 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 |
| Final Rent Payment Date | 9/1/2003 | 9/1/2003 | 9/20/2003 | 9/20/2003 | 12/1/2003 | 12/1/2003 | 7/1/2004 | 7/1/2004 | 8/1/2003 | 7/1/2005 | | 10/1/2003 | 10/1/2004 |
| Monthly Rental | 98,217 | 5,545 | 32,998 | 34,438 | 73,476 | 629 | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | Steps | Steps |
| 1 Aug-03 | 98,217 | 5,545 | 32,998 | 34,438 | 73,476 | 629 | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | 120,049 | 459,825 |
| 2 Sep-03 | 98,217 | 5,545 | 32,998 | 35,438 | 73,476 | 629 | 105,598 | 16,070 | 52,483 | 6,042 | 43,954 | 120,099 | 459,825 |
| 3 Oct-03 | | | | | 73,476 | 629 | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | 111,991 | 607,422 |
| 4 Nov-03 | | | | | 73,476 | 629 | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 607,422 |
| 5 Dec-03 | | | | | 73,476 | 629 | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 607,422 |
| 6 Jan-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 7 Feb-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 8 Mar-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 9 Apr-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 10 May-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 11 Jun-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 12 Jul-04 | | | | | | | 105,548 | 16,070 | 52,483 | 6,042 | 43,954 | | 678,172 |
| 13 Aug-04 | | | | | | | | | | 6,042 | 43,954 | | 678,172 |
| 14 Sep-04 | | | | | | | | | | 6,042 | 43,954 | | 728,209 |
| 15 Oct-04 | | | | | | | | | | 6,042 | 43,954 | | 728,209 |
| 16 Nov-04 | | | | | | | | | | 6,042 | 43,954 | | 50,037 |
| 17 Dec-04 | | | | | | | | | | 6,042 | 43,954 | | 50,037 |
| 18 Jan-05 | | | | | | | | | | 6,042 | 33,954 | | 50,037 |
| 19 Feb-05 | | | | | | | | | | 6,042 | 43,954 | | 50,037 |
| 20 Mar-05 | | | | | | | | | | 6,042 | 43,954 | | 50,037 |
| 21 Apr-05 | | | | | | | | | | | 43,954 | | 50,037 |

CONFIDENTIAL
CSI0013366

# EXHIBIT 14

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Andrew Feinberg

# December 5, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

Nicole E. Guilbert   21992

Andrew Feinberg 12-5-2006
Computer Sales International, Inc. v. Lycos, Inc.

228

1    A.    At the time that I wrote this letter, Mr. Bean and

2    Mr. Goudiss were retained by Lycos.    I'm not sure what your

3    question was.

4    Q.    Right.    You were consulting with them during the

5    time that you were communicating with Mr. Rousseau about

6    those communications - forwarding what Mr. Rousseau had

7    written to Lycos and forwarding to them what you were

8    writing back, right?

9    A.    I believe I copied Mr. Goudiss and Mr. Bean on

10   communications I had with Mr. Rousseau, yes.

11   Q.    And you consulted with them about what you should

12   write in your communications to CSI, correct?

13                MR. BEAN:    I instruct you not to

14            answer any questions that reveal the

15            substance of any conversations you may have

16            had with outside counsel, Mr. Feinberg.

17   Q.    (By Mr. Kaler)    This letter that you wrote,

18   Exhibit 419, you said, "As you know, CSI's notices followed

19   our repeated invitations and requests to discuss serious

20   and then argue alarming evidence of wrongful conduct and

21   bad faith on the part of CSI."    Do you see that?

22   A.    I do.

23   Q.    You had refused, even as of this date, to provide

24   CSI with any of the evidence of that wrongful conduct

Andrew Feinberg 12-5-2006
Computer Sales International, Inc. v. Lycos, Inc.

229

1    unless they first agreed to a sit-down meeting with you,

2    correct?

3        A.   Well, that's not true.  I had described to

4    Mr. Rousseau what I had learned, but I had not agreed to

5    give him the report prior to a sit-down meeting.

6        Q.   Well, all you had described to Mr. Rousseau, as

7    you explained, was that you had gotten a report that said

8    that Lycos had paid millions of dollars more than what the

9    equipment was worth to CSI, right?

10       A.   Well, what I said to Mr. Rousseau is what I

11   described in --

12       Q.   Right.

13       A.   -- a fairly long answer about 20 minutes ago.

14       Q.   And you had not provided CSI with any evidence

15   that CSI had done anything wrong, had you?

16       A.   Well, I don't know how to answer that.  I -- I had

17   provided Mr. Rousseau with the information which I

18   described in my answer.  I had not provided Mr. Rousseau

19   with the report.

20       Q.   Well, you agree with me that saying something

21   doesn't make it so, correct?

22       A.   I will agree with you that saying something does

23   not make it so.

24       Q.   So your saying to Mr. Rousseau that you had gotten

Andrew Feinberg 12-5-2006
Computer Sales International, Inc. v. Lycos, Inc.

260

```
 1   originally filed against CSI in December of '03 after the
 2   lawsuit had been removed to federal court?
 3        A.   Yeah, I don't remember the timing, but I do recall
 4   -- I believe that we dismissed the lawsuit, that's right.
 5        Q.   Why was it dismissed?
 6             MR. BEAN:  Instruct the witness not
 7             to answer the question.
 8        Q.   (By Mr. Kaler)  At the time that the --
 9             MR. KALER:  Is the objection
10             attorney-client privilege?
11             MR. BEAN:  Attorney-client and work
12             product.
13        Q.   (By Mr. Kaler)  Did you participate in the
14   decision to dismiss the lawsuit in 2004, the first lawsuit?
15        A.   Yes, I believe I did.
16        Q.   At that time that the lawsuit -- first lawsuit
17   with Lycos they had brought in December of 2003 was
18   dismissed, was Lycos being marketed for sale?
19        A.   What was the timing of the dismissal?
20        Q.   Spring of 2004.
21        A.   Can you be more specific?
22        Q.   April.
23        A.   I just don't remember precisely when that process
24   began.
```

Andrew Feinberg 12-5-2006
Computer Sales International, Inc. v. Lycos, Inc.

261

1       Q.    Okay.  The company was, in fact, sold to Daum

2   Communications in the summer of 2004 a few months before

3   you left, right?

4       A.    October.  I believe it closed either the last day

5   of September, first day of October '04.

6       Q.    October 2004?

7       A.    Correct.

8       Q.    And how many months before that were there

9   negotiations and discussions under way?  For several months

10  at least?

11      A.    Yes.  It was more than -- you know, it was more

12  than two months, less than six or seven.

13      Q.    Did Lycos' dismissal of its lawsuit against CSI,

14  was it caused in any way by Lycos contemplating that it

15  would be sold?

16                  MR. BEAN:  Instruct you not to answer

17              the question, Mr. Feinberg.

18                  (Exhibit 429, Memorandum, marked for

19              identification.)

20      Q.    (By Mr. Kaler)  I'll show you Exhibit 429, which

21  appears to be a Deloitte Touche memo regarding legal

22  matters from March of 2004.  It says in the third sentence,

23  "In accordance with AUD 61.16 and preparation for the

24  audit, we met with Andrew and solicited a listing of the

# EXHIBIT 15

COPY

Volume 1, Pages 1 - 313

Exhibits:  1 - 19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------------

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

----------------------------------------

VIDEOTAPED DEPOSITION OF KENNETH B. STEINBACK

Friday, November 3, 2006, 9:07 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

--------- Alan H. Brock, RDR, CRR ---------

--------- Janis T. Young, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

89

| | | |
|---|---|---|
| 10:41:07 | 1 | A.   Yes. |
| 10:41:08 | 2 | MR. KALER:   Objection, but you can |
| 10:41:09 | 3 | respond. |
| 10:41:09 | 4 | Q.   So when you take that equipment back, you |
| 10:41:11 | 5 | say you give the customer a credit for it. |
| 10:41:13 | 6 | A.   Uh-huh.   Yes. |
| 10:41:16 | 7 | Q.   What type of credit do you give them? |
| 10:41:18 | 8 | A.   Based on what the fair market value of that |
| 10:41:20 | 9 | equipment is at that point in time. |
| 10:41:20 | 10 | Q.   So if a customer wants to return -- |
| 10:41:23 | 11 | A.   Let me also clarify:   We're not obligated |
| 10:41:27 | 12 | contractually to give any credit. |
| 10:41:29 | 13 | Q.   And in fact, when a customer wants to |
| 10:41:32 | 14 | return equipment early, you require that customer to |
| 10:41:35 | 15 | pay the discounted present value of the remaining |
| 10:41:39 | 16 | lease payments for that piece of equipment, do you |
| 10:41:40 | 17 | not? |
| 10:41:41 | 18 | MR. KALER:   Objection. |
| 10:41:43 | 19 | A.   I don't understand your question.   You'll |
| 10:41:44 | 20 | have to ask it again. |
| 10:41:47 | 21 | Q.   If a customer wants to return equipment in |
| 10:41:49 | 22 | the middle of the lease term, CSI charges the |
| 10:41:51 | 23 | customer for doing that, does it not? |
| 10:41:53 | 24 | MR. KALER:   Objection. |

FARMER ARSENAULT BROCK LLC

90

| | | |
|---|---|---|
| 10:41:57 | 1 | A.   The customer has signed a hell-and-high- |
| 10:42:00 | 2 | water lease, which obligates them to make payments |
| 10:42:03 | 3 | to the financing source, no matter what CSI does. |
| 10:42:07 | 4 | So in order to pay off that note, we have to collect |
| 10:42:12 | 5 | that -- the present value of those payments. |
| 10:42:16 | 6 | Q.   And you didn't say in the article that when |
| 10:42:18 | 7 | a customer wants to return something early they have |
| 10:42:19 | 8 | to pay their present value of their remaining lease |
| 10:42:23 | 9 | payments, did you? |
| 10:42:26 | 10 | MR. KALER:  Objection. |
| 10:42:27 | 11 | A.   No. |
| 10:42:28 | 12 | Q.   Now, you said that you give the customer a |
| 10:42:31 | 13 | fair market value credit for the piece of equipment; |
| 10:42:33 | 14 | right? |
| 10:42:34 | 15 | A.   Yes. |
| 10:42:35 | 16 | Q.   How does CSI determine the fair market |
| 10:42:38 | 17 | value of that piece of equipment? |
| 10:42:40 | 18 | MR. KALER:  Objection.  You can answer. |
| 10:42:41 | 19 | A.   Because we trade that equipment at EPC, |
| 10:42:47 | 20 | usually on a daily or a monthly or a yearly basis. |
| 10:42:51 | 21 | We have 150 people that do nothing but trade |
| 10:42:54 | 22 | machines, basically, out there, and we know what the |
| 10:42:56 | 23 | used market is.  So we know what the value is. |
| 10:43:00 | 24 | Fair market value is determined a couple |

# EXHIBIT 16



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMPUTER SALES                    )
INTERNATIONAL, INC.,              )
                                  )
                                  )
   Plaintiff and Defendant-       )
   in-Counterclaim                )
                                  )  C.A. No. 05-10017-RWZ
vs.                               )
                                  )
                                  )
LYCOS, INC.,                      )
                                  )
                                  )
   Defendant and Plaintiff-       )
   in-Counterclaim,               )
                                  )
                                  )
vs.                               )
                                  )
                                  )
BANK OF AMERICA                   )
f/k/a FLEET BANK,                 )
                                  )
                                  )
   Trustee Process Defendant.)


**VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU**
Taken on behalf of Lycos, Inc.
March 8, 2006

Reported by Victoria Menaugh Fauser
CCR No. 903
CSR Missouri and Illinois


METRO COURT REPORTING, INC.
P.O. BOX 29548
ST. LOUIS, MO  63126
(636) 349-3333

1    CSI's lenders?

2         A.    Yes.

3         Q.    Do you know whether Lycos made all the

4    payments required under Schedule 93, all the rent

5    payments?

6              MR. KALER:   Objection.

7         Q.    (BY MR. BEAN)  Let me ask that in one

8    question.  Do you know whether Lycos made all the

9    monthly rent payments required under Schedule 93?

10             MR. KALER:   Objection.  But you can

11   respond.

12        A.    My recollection was that -- I know

13   that Lycos at one point stopped making payments

14   under Schedule 94.  I am not sure if Schedule 93

15   had already lapsed at that time.  So I believe that

16   they had made all the Schedule 93 payments.

17        Q.    Do you know whether as of today Lycos

18   has made all the rent payments required under

19   Schedule 94?

20        A.    Yes.  After the -- Lycos had stopped

21   paying under 94 in 2004, I believe.  They then

22   resumed paying and then they paid through the

23   termination of Schedule 94 which I think was

24   October 04.

25        Q.    I direct your attention again to Page

# EXHIBIT 17

PLAINTIFF'S
EXHIBIT 13
Gallagie
4-26-06  CB



**LEASEFORUM**

## GENERAL SERVICES AGREEMENT


ORIGINAL
COPY

This **General Services Agreement** ("Agreement") dated June 17, 2003 ("Effective Date") is entered into between **Lycos, Inc.** with offices at 100 Fifth Avenue, Waltham, MA 02451 ("Client"), and **LeaseForum, Inc.** located at 313 Congress Street, Boston, Massachusetts 02210 ("LeaseForum"), and describes the terms and conditions under which LeaseForum will provide services to Client.

### 1.  Performance of Services

From time to time, Client may request and LeaseForum shall provide services described in one or more Statements of Work entered into by the parties from time to time, and subject to the terms of this Agreement ("Services").

In order to perform Services for which it is engaged, Client will provide LeaseForum information regarding designated points of contact for managing and effectuating Services, including the name, phone number and e-mail address of such contact. Most of the Services shall be performed at LeaseForum's offices, however, when the delivery of a Service requires LeaseForum be at a client site, Client will make the Client Site accessible during regular business hours (or such other hours designated by Client) to LeaseForum employees or agents, designated in advance by LeaseForum, and will provide LeaseForum reasonably adequate space and access to facilities to allow LeaseForum to efficiently execute its responsibilities hereunder.

### 2.  Payment

LeaseForum will invoice Client upon the completion of the Services set forth in any Statement of Work. Client will make payment within thirty (30) days of the receipt of LeaseForum's invoice.  Outstanding invoices shall bear an interest charge of 1.5% per month from the due date until the date payment is received in full by LeaseForum.  LeaseForum will submit invoices to the address set forth above, or such other address that Client provides LeaseForum in writing.

### 3.  Change Orders

This Agreement or any Statement of Work may only be modified by a written document signed by authorized representatives of LeaseForum and Client ("Change Order").   If Client requests or LeaseForum recommends changes to Services described in a Statement of Work, LeaseForum will provide Client with a proposed Change Order setting forth the impact on the Statement of Work.  If accepted, a Change Order for execution by both parties that reflects the agreed upon changes will be prepared.  A proposed Change Order will be considered rejected if Client does not respond to it within 10 (ten) business days.

### 4.  Term.  Termination.

The term of this Agreement shall commence on the Effective Date and shall continue in full force and effect thereafter unless and until it is terminated or expires in accordance with the provisions of this Agreement or any Schedule or, if it is not terminated and no expiration is provided in any applicable Statement of Work, until satisfactory completion of the services provided for herein and in all Statements of Work and acceptance thereof by Client ("Project Completion").

Client may terminate this Agreement or any Statement of Work hereunder for any reason by giving the service provider ninety (90) days prior written notice of its election to terminate said Agreement or Statement of Work.  Either Party may terminate this Agreement at any time in the event of a material breach by the other Party which remains uncured after sixty (60) days written notice thereof (or such shorter period as may be specified in this Agreement or in any applicable Statement of Work).  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party (i) ceases to do business in the normal course, (ii) becomes or is declared insolvent or bankrupt, (iii) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) calendar days or (iv) makes an assignment for the benefit of creditors.

LYC 18880

If either Party terminates the Agreement, Client agrees to pay LeaseForum all fees earned and expenses incurred by LeaseForum, or for which a vendor obligation has been made based on a prior or pending approval. In the event Client terminates this Agreement or any Statement of Work prior to the completion of the services rendered under each Schedule, (a) LeaseForum shall be compensated a pro-rata share of the fee due to LeaseForum under this Agreement and the applicable Schedule, and (b) if applicable, Client shall pay LeaseForum for all progress milestones (as set forth in an applicable Schedule) completed and accepted by Client and a pro-rata share of the progress milestone LeaseForum may be working to complete at the time the applicable Schedule is terminated. Termination under this Agreement shall not affect Client's rights in and to work product created by LeaseForum pursuant to this Agreement prior to such termination.

5. **Relationship of Parties**
It is understood by the parties that LeaseForum is an independent contractor and not an employee or agent of Client. Client will not provide fringe benefits or insurance coverage on behalf of LeaseForum or its employees. LeaseForum shall be responsible for the withholding and/or payment, as required by law, of all federal, state and local taxes imposed on the Services performed hereunder and agrees to indemnify and hold Client harmless in the event Client is assessed any federal, state or local taxes on any of the Services performed under this Agreement. Client shall be solely responsible for the payment of any and all sales or other taxes based solely on Sales Proceeds derived from the sale of Assets.

6. **Limitation of Liability.**

A) EXCEPT FOR BREACH OF CONFIDENTIALITY, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF PROFITS) OF ANY KIND EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

B) EXCEPT FOR BREACH OF CONFIDENTIALITY, REGARDLESS OF THE FORM OF ANY CLAIM, EITHER PARTY'S REMEDY FOR ALL DAMAGES, INCLUDING COSTS AND EXPENSES, IS LIMITED TO $1,000,000.00

7. **Non-Solicitation**
Unless otherwise approved in writing, for the term of any Statement of Work and six months beyond, neither party will directly or indirectly recruit or solicit any key employee of the other, so long as the key employee is employed by such other party, or contract with, either individually or through a third party or contract with, either individually or through a third party, any key employee of the other. The foregoing restriction on recruitment and solicitation shall not apply to the usage of any general employment solicitation efforts such as newspaper, radio and Internet advertising.

8. **Assignment**
Neither party may assign its rights and/or obligations under this Agreement without the other party's prior written consent.

9. **Notices**
All notices, consents, and other communications to be delivered under or regarding this Agreement, shall be in writing and delivered by reputable delivery or courier service (and, optionally, by confirmed delivery fax) to the addresses set forth below. All notices shall be deemed to have been received on the date of actual receipt.

| If to Client | If to LeaseForum |
|---|---|
| 100 Fifth Avenue | 313 Congress Street, Boston, MA 02210 |
| Waltham, MA 02451 | Attn: Legal Services |
| Attn: General Counsel 781-370-2700 | Fax (617) 443-9915 |

General Services Agreement                                     Page 2

LYC 18881

**10. Severability**

If any provision of this Agreement or any Statement of Work shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. In such event, the invalid or unenforceable provision will be replaced by a mutually acceptable provision that comes closest to the original intent of the parties.

**11. Applicable Law. Arbitration**

This Agreement and any Statement of Work thereto shall be governed by the laws of the State of Massachusetts, excluding its choice of law principles. If mutually agreed upon, the parties may elect to have any controversy or claim arising out of, or relating to, this Agreement, or its breach, settled by arbitration in accordance with the then governing rules of the American Arbitration Association. Judgment upon any award rendered may be entered and enforced in any court of competent jurisdiction.

**12. Survival**

The following provisions will survive termination of this Agreement for any reason: Limitation of Liability and Solicitation of Employees.

**13. Entire Agreement**

This Agreement together with the mutual Non-Disclosure Agreement between the parties dated as of June 10, 2003, any Statement of Work contains the entire understanding of the parties and supersedes any oral or prior written agreements between Client and LeaseForum.

**14. No Waiver**

The failure of either party to insist upon strict adherence to one or more or all of the provisions of this Agreement, on any one or more occasions, shall not be construed as a waiver thereof, nor shall such course of action deprive either party of the right thereafter to require strict compliance with this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be signed by their respective duly authorized representative as of the date set forth below.

LEASEFORUM, INC.

By: _____

Name:  Susan S. Franklin

Title:    Chief Executive Officer

Lycos, Inc.

By: _____

Name: _____

Title: _____

REVIEWED BY

TERRA LYCOS LEGAL _____

General Services Agreement

Page 3

LYC 18882







**Statement of Work No. 001**
**End of Lease Workout Services**

**Service Commencement Date:**
This Statement of Work No. 001 ("SOW") is entered into and effective as of June 17, 2003 ("Service Commencement Date") by and between Lycos Inc. ("Client") and LeaseForum, Inc. ("LeaseForum") and shall be subject to all terms and conditions set forth in the General Services Agreement ("GSA") or ("Agreement") dated June 17, 2003. All terms and conditions set forth on the GSA are hereby incorporated by reference. In the event of a conflict between the terms hereof and the GSA, the terms of the SOW shall govern.

**Work:**

For lease schedules designated by Client and entered into the "Assigned Lease Schedules" list below (each, a "Lease"), LeaseForum will research, direct, consult and negotiate end of lease strategies, purchase prices, renewal rates or other costs or penalties related to satisfying Client's end of lease obligations ("Lease Satisfaction Amounts").

LeaseForum will, to the extent provided by Client, review each Lease (including all exhibits and attachments thereto, acceptance certificates, stipulated loss (or casualty) tables, return conditions, end of lease options, lease economics and equipment lists) and its respective master lease (including any amendments) equipment lists, equipment specifications, purchase and sale orders, vendor invoices, miscellaneous letters, notes and emails, deemed necessary by LeaseForum to establish a complete picture of Client's end of lease obligations. Based on such review, LeaseForum will outline available options, work with Client to determine a course of action, including but not limited to early termination, purchase or renewal to a purchase ("EOL Transaction") and negotiate and finalize the Lease Satisfaction Amount due each lessor.

**Fees to LeaseForum:**
For each Lease, upon acceptance of a Lease Satisfaction Amount by a lessor, LeaseForum will invoice Client and Client will pay LeaseForum within thirty (30) days of the invoice date, an amount equal to twenty five percent (25%) of the difference between the Lease Satisfaction Amount and the "Baseline" as herein set forth.

LeaseForum shall have the exclusive right to perform the Work set forth above.

It is expressly understood by Client that they are solely responsible for any and all (i) amounts due and payable to a lessor under any Lease, (ii) the Lease Satisfaction Amount and (iii) all third party costs and expenses incurred with respect to any EOL Transaction.

**Term:**
The Term of this SOW shall commence on the date set forth above and shall expire upon client's payment of the End of Lease Workout Services Fee to LeaseForum as described above for the leases identified in the "Assigned Lease Schedules" document below.

**Representatives:**
Each Party's Representatives for Services performed under this SOW shall be:

LYC 18884

| Terra Lycos' Relationship Manager Julie Callagee Director of Accounting  *Arst Cahll* 100 Fifth Avenue Waltham, MA 02451 781-370-2700 ext 2827 | LeaseForum's Relationship Manager John Kirk Vice President 313 Congress Street Boston, MA 02210 P: (617) 443-9916 F: (617) 443-9915 | LeaseForum's Project Manager Susan Franklin CEO 313 Congress Street Boston, MA 02210 P: (617) 443-9914 F: (617) 443-9915 |
|---|---|---|
| Julie.Callagee@corp.terralycos.com | jkirk@leaseforum.com | ssf@leaseforum.com |

**IN WITNESS WHEREOF,** the parties have caused this SOW No. 001 to be executed and delivered, and do each hereby warrant and represent that their respective signatory, whose signature appears below, has and is on the date of this SOW duly authorized by all necessary and appropriate corporate actions to execute and deliver this Agreement.

LEASEFORUM, INC.

By: _____

Name:  Susan S. Franklin

Title:   Chief Executive Officer

Date:   June 17, 2003

LYCOS, INC.

By: _____

Name: _____

Title: _____CFO_____

Date:   June 17, 2003  .

Please execute two copies of this Statement of Work and return both originals to:

LeaseForum, Inc.
313 Congress Street
Boston, MA  02210
Attn:  Susan S. Franklin
Phone: (617) 443-9914
Fax:  (617) 443-9915

REVIEWED BY
TERRA LYCOS LEGAL *PDK*

LeaseForum will execute and return one original to your attention.

LYC 18885

 

LEASEFORUM

# Assigned Lease Schedule(s)

| Lessor | Master-lease date | Lease-schedule date | Description | Baseline |
|---|---|---|---|---|
| **Avnet Computer** | 11/22/1996 | | | |
| Schedule 21 | | 9/30/2003 | Various Equip. | $704,975 |
| | | | | |
| **Compaq/HP** | 1/12/2001 | | | $1,979,913 |
| Schedule 101003-1 | | 2/29/2004 | Various Equip. | |
| Schedule 101003-2 | | 3/31/2004 | Various Equip. | |
| | | | | |
| **Panthus (Optimus Sol.)** | 5/16/2001 | | Various Equip. | $175,826 |
| Lease # 3851 | | 5/31/2004 | | |
| | | | | |
| **Computer Sales Int'l. (CSI)** | 12/4/1996 | | | $20,270,849 |
| Schedule 93 | | 10/31/2003 | Various Equip. | |
| Schedule 100 | | 3/31/2004 | Various Equip. | |
| Schedule 89 | | 7/31/2004 | Various Equip. | |
| Schedule 89A | | 7/31/2004 | Various Equip. | |
| Schedule 90 | | 7/31/2004 | Various Equip. | |
| Schedule 94 | | 10/31/2004 | Various Equip. | |
| Schedule 200 | | 3/31/2005 | Various Equip. | |
| | | | | |
| **Bank of America** | 5/1/2001 | | | $2,766,968 |
| Schedule 1 | | 9/30/2004 | Various Equip. | |
| Schedule 2 | | 12/31/2005 | Various Equip. | |

LYC 18886





LEASEFORUM

# Assigned Lease Schedule(s)

| Lessor | Master-lease date | Lease-schedule date | Description | Baseline |
|---|---|---|---|---|
| **Avnet Computer** | 11/22/1996 | | | |
| Schedule 21 | | 9/30/2003 | Various Equip. | $704,975 |
| | | | | |
| **Compaq/HP** | 1/12/2001 | | | $1,979,913 |
| Schedule 101003-1 | | 2/29/2004 | Various Equip. | |
| Schedule 101003-2 | | 3/31/2004 | Various Equip. | |
| | | | | |
| **Panthus (Optimus Sol.)** | 5/16/2001 | | Various Equip. | $175,826 |
| Lease # 3851 | | 5/31/2004 | | |
| | | | | |
| **Computer Sales Int'l. (CSI)** | 12/4/1996 | | | $20,270,849 |
| Schedule 93 | | 10/31/2003 | Various Equip. | |
| Schedule 100 | | 3/31/2004 | Various Equip. | |
| Schedule 89 | | 7/31/2004 | Various Equip. | |
| Schedule 89A | | 7/31/2004 | Various Equip. | |
| Schedule 90 | | 7/31/2004 | Various Equip. | |
| Schedule 94 | | 10/31/2004 | Various Equip. | |
| Schedule 200 | | 3/31/2005 | Various Equip. | |
| | | | | |
| **Bank of America** | 5/1/2001 | | | $2,766,968 |
| Schedule 1 | | 9/30/2004 | Various Equip. | |
| Schedule 2 | | 12/31/2005 | Various Equip. | |

Page 1 of 1

LYC 18886

# EXHIBIT 18

FILED UNDER SEAL

# EXHIBIT 19



**From:**      John Kirk <jkirk@LeaseForum.com>
**Sent:**      Friday, August 8, 2003 12:49 PM
**To:**        "'Julie.Callagee@corp.terralycos.com'" <Julie.Callagee@corp.terralycos.com>
**Subject:**   CSI Data requirements, Avnet, Asset recovery and next week's schedule, commercial terms

---

Hi Julie, ·

Please excuse the long header above and thank you for the payment
yesterday.  Both Susan and I are going on vacations end of August.
While next week is a busy one, we would like to get as much accomplished
for you as possible before the break.  In an attempt to kill a couple of
birds with one stone, here is an idea.



Is there a day next week when Susan and I could come out and meet with
the ops folks in charge of asset recovery?  If so Susan could then spend
the rest of the day on site doing an evaluation of the CSI stuff and any
appropriate work on the additional Avnet schedule. (If the Avnet
schedule is time sensitive, Susan could start on that before we come out
there.)

In addition, whether the above timing works or not, Susan needs a couple
of items to progress on her analysis ASAP.

1 - Payables activity for CSI schedules 7, 9, 10, 12, 15, 20, 25, and 65
as well as 91 (if there was any).  Susan mentioned Ken might be the
person to get this information.

2 - The usual contract and email background information on the
additional Avnet lease.

We have completed phase 1 of the work with CSI.  Phase 2 has commenced.
The phase 2 effort is a continuation under statement of work 001.  Our
current work on the CSI/Lycos relationship is aimed at setting up a
negotiation to reduce Lycos remaining future payment obligations to CSI.
It is also conceivable that a cash settlement or payment by CSI to Lycos
unrelated to the remaining payments could eventuate  and we would expect
any such payment to be applied against the baseline as well and used as
the basis for calculating Lease Forum's fees. In any event the final
calculation of reduction in CSI baseline costs will of course take into
account our mutual success in phase 1 in reducing Lycos' residual buy
out of the CSI leases.

Therefore the open items from a commercial standpoint will be arriving
at an arrangement for asset recovery and establishing a baseline for the
additional Avnet transaction.

Hope and trust that this is an accurate description of the situation.
Look forward to receiving the information requested and to seeing you

*next week.*

Best,  John

LYC 19441

# EXHIBIT 20

PLAINTIFF'S
EXHIBIT 25
Callagee
426-010        CB

| From: | Julie Callagee/O=Lycos |
|---|---|
| Sent: | Sunday, August 10, 2003 11:07 PM |
| To: | John Kirk <jkirk@LeaseForum.com> |
| Subject: | Re: CSI Data requirements, Avnet, Asset recovery and next week's sche dule, commercial terms |

John,

Quick update:

Ops guy  - I e-mailed you his contact info.  He is located on the West Coast so
I would say a meeting wont work.

My schedule - I am in the office Monday, Tuesday and Wednesday.  After that I
will be traveling on business until August 25.  Can you send me your proposed
fee schedule for CSI phase II?  Brian is expecting a much lower rate than phase
one given the favorable outcome there.

Avnet - I am working on pulling together that info.  I hope to have it all
together Monday.

I think that does it.

Thanks,

Julie

**********************************************************************
Julie Callagee                Assistant Controller
**********************************************************************
Lycos Inc.
A subsidiary of Terra Networks S.A.
100 Fifth Avenue,
Waltham, MA  02451
Phone 781.370.2827
Fax 781.370.2892



John Kirk <jkirk@LeaseForum.com>
08/08/2003 12:49 PM

To: "'Julie.Callagee@corp.terralycos.com'" <Julie.Callagee@corp.terralycos.com>
cc:
Subject: CSI Data requirements, Avnet, Asset recovery and next week's sche
dule, commercial terms

Hi Julie,

Please excuse the long header above and thank you for the payment yesterday. Both Susan and I are going on vacations end of August. While next week is a busy one, we would like to get as much accomplished for you as possible before the break. In an attempt to kill a couple of birds with one stone, here is an idea.

Is there a day next week when Susan and I could come out and meet with the ops folks in charge of asset recovery? If so Susan could then spend the rest of the day on site doing an evaluation of the CSI stuff and any appropriate work on the additional Avnet schedule. (If the Avnet schedule is time sensitive, Susan could start on that before we come out there.)

In addition, whether the above timing works or not, Susan needs a couple of items to progress on her analysis ASAP.

1 - Payables activity for CSI schedules 7, 9, 10, 12, 15, 20, 25, and 65 as well as 91 (if there was any). Susan mentioned Ken might be the person to get this information.

2 - The usual contract and email background information on the additional Avnet lease.

We have completed phase 1 of the work with CSI. Phase 2 has commenced. The phase 2 effort is a continuation under statement of work 001. Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI. It is also conceivable that a cash settlement or payment by CSI to Lycos unrelated to the remaining payments could eventuate and we would expect any such payment to be applied against the baseline as well and used as the basis for calculating Lease Forum's fees. In any event the final calculation of reduction in CSI baseline costs will of course take into account our mutual success in phase 1 in reducing Lycos' residual buy out of the CSI leases.

Therefore the open items from a commercial standpoint will be arriving at an arrangement for asset recovery and establishing a baseline for the additional Avnet transaction.

Hope and trust that this is an accurate description of the situation. Look forward to receiving the information requested and to seeing you next week.

Best, John

LYC 23993