# EXHIBIT 6

FILED UNDER SEAL

# EXHIBIT 7

FILED UNDER SEAL

# EXHIBIT 8



**Paul Stenberg**
&lt;Paul.Stenberg@csile
asing.com&gt;

10/24/2002 08:02 AM

To: "Brian. Lucy@corp. terralycos. com (E-mail)"
        &lt;Brian.Lucy@corp.terralycos.com&gt;
cc: "Kevin. Baillie@corp. terralycos. com (E-mail)"
        &lt;Kevin.Baillie@corp.terralycos.com&gt;, "Monique. Walsh@corp.
        terralycos. com (E-mail)" &lt;Monique.Walsh@corp.terralycos.com&gt;
Subject:

Per your request, outlined would be the scenario;

- Lycos to pay CSI $4,691,000

- CSI will amend all current releases to reflect that Title will pass to Lycos at the expirations of these
leases.

Any questions, please let me know.



PLAINTIFF'S
EXHIBIT
tabbies
103

LYC 08743

# EXHIBIT 9

FILED UNDER SEAL

# EXHIBIT 10

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Brian Lucy

# January 10, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130   888.825.DEPO(3376)**

ORIGINAL



Linda Bernis   22525

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

178

1   Q.   Look at Exhibit 457.  Is the first page of

2        Exhibit 457 an e-mail that you received from

3        Peter Carroll on August 1st telling you that

4        you could proceed with the transaction?

5   A.   It appears, yes.

6                  (Exhibit 23A marked

7                   for identification.)

8   Q.   And Exhibit 23A.  Exhibit 23A, Bates number

9        CSI 0012363 through 13366, a copy of the

10       sales agreement that you signed on behalf of

11       Lycos with CSI on August 8, 2003?

12  A.   Yes, it appears to be my signature.

13  Q.   And is that your signature on the third page

14       of the exhibit and your initials on the

15       schedule attached to it?

16  A.   Yes, it appears.

17  Q.   I'm going to show you -- sorry -- 24.

18              Let me show you what's been marked

19       as Exhibit 24.  On Friday August 8, 2003

20       when you signed the sales agreement that we

21       marked as Exhibit 23A, did you have any

22       conversations with Julie Callagee about the

23       sales agreement or the CSI leases?

24  A.   I don't recall.

# EXHIBIT 11

PLAINTIFF'S
EXHIBIT
457

**From:**      Peter Karol/O=Lycos
**Sent:**      Friday, August 1, 2003 8:42 AM
**To:**        Brian Lucy/O=Lycos@Lycos; Julie Callagee/O=Lycos@Lycos
**Cc:**        Andrew Feinberg/O=Lycos@Lycos
**Subject:**   Re: Lycos Leases - URGENTE
**Attach:**    Memo leases.Legal.doc

Looks like we can proceed

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com
----- Forwarded by Peter Karol/Lycos on 08/01/2003 08:44 AM -----

diego.colchero@corp.terra.com
08/01/2003 08:15 AM

To: andrew.feinberg@corp.terralycos.com, peter.karol@corp.terralycos.com
cc:
Subject: Re: Lycos Leases - URGENTE

FYI: email below states Pepe's support to the negotiated solution for the
Leases (i.e. your email from earlier this week/past week).

----- Remitido por Diego Colchero Paetz/TERRA/TERRA con fecha 01/08/03 02:04
p.m. -----
Jose Francisco Mateu Isturiz
01/08/03 12:05 p.m.
     Para:    Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA@TERRA
     cc:      Ignacio Ponce Gutierrez/TERRA/TERRA@TERRA, (cco: Diego
Colchero Paetz/TERRA/TERRA)   Asunto:   Re: Lycos Leases -
URGENTEVinculo

Elias,

He estado haciendo todas las averiguaciones razonables que en un caso como este
conviene hacer (busqueda de posibles precedentes, dobles opiniones, debate con
los gestores, usos y costumbres en el mercado Usa, etc...) la conclusion final
es que puestas en una balanza las alternativas contrapuestas, compra por valor

LYC 22692

residual versus pago indemnizaciones, la enorme cuantía de la segunda respecto
a la primera parece que no deja opción diferente que la primera maxime teniendo
en cuenta el alto grado de exigibilidad jurídica de la indemnización por no
devolución en tiempo y forma

B 1

Un saludo,

José Mateu

Este mensaje se dirige exclusivamente a su destinatario y puede contener
información CONFIDENCIAL sometida a secreto profesional o cuya divulgación esté
prohibida en virtud de la legislación vigente. Si ha recibido este mensaje por
error, le rogamos que nos lo comunique inmediatamente por esta misma vía o por
teléfono (34 91 4523913) y proceda a su destrucción.
Nótese que el correo electrónico vía Internet no permite asegurar ni la
confidencialidad de los mensajes que se transmiten ni la correcta recepción de
los mismos.  En el caso de que el destinatario de este mensaje no consintiera
la utilización del correo electrónico vía Internet, rogamos lo ponga en nuestro
conocimiento de manera inmediata.

This message is intended exclusively for its addressee and may contain
information that is CONFIDENTIAL and protected by a professional privilege or
which disclosure is prohibited by law. If this message has been received in
error, please immediately notify us via e-mail or by telephone (34 91 4523913)
and delete it.
Please note that Internet e-mail does not guarantee the confidentiality or the
proper receipt of the messages sent.  If the addressee of this message does not
consent to the use of Internet e-mail, please communicate it to us immediately.

Elias Jesus Rodriguez-Viña Cancio
29/07/2003 15:56
    Para:     Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:    Ignacio Ponce Gutierrez/TERRA/TERRA@TERRA
    Asunto:    Lycos Leases - URGENTE

Pepe, por favor pronúnciate sobre este asunto ya mismo, pues estamos en serio

LYC 22693

riesgo de que quede sin validez lo acordado con la Cia de leasing.

----- Remitido por Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA con fecha
29/07/2003 15:45 -----
Elias Jesus Rodriguez-Viña Cancio
25/07/2003 15:45
    Para:     Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:
    Asunto:    Lycos Leases - URGENTE


Pepe, desde Boston insisten en ir adelante con esta operación. Necesitamos tu
pronunciamiento con URGENCIA.


----- Remitido por Elias Jesus Rodriguez-Viña Cancio/TERRA/TERRA con fecha
25/07/2003 15:35 -----
Elias Jesus Rodriguez-Viña Cancio
24/07/2003 13:52
    Para:     Jose Francisco Mateu Isturiz/TERRA/TERRA@TERRA
    cc:
    Asunto:    Lycos Leases


Pepe,

Te agradecería si puedes leer lo antes posible el memo que adjunto que hemos
preparado en FINANZAS y si me confirmas nuestro entendimiento del riesgo. Como
ya comentamos ayer, parece extraño que el output final de un contrato sea el
que parece que es, de ahí que te pido que tú mismo lo evalúes antes de aprobar
una salida de caja de casi $ 4 millones.
Un abrazo

LYC 22694

*Area de Finanzas Corporativas*        

*Memo*

Asunto: Leases de Lycos
A:      Jose Francisco Mateu
De:     Elías Rodríguez-Viña
Fecha:  24 de julio de 2003

Estimado Pepe,

en relación al memo de Peter Karol, remitido por Andrew Feinberg, sobre las obligaciones contractuales a las que está sujeto Lycos Inc. en virtud del contrato de leases firmado con CSI, me gustaría que por favor me confirmaras el riesgo derivado de dichos contratos, y en concreto del "equipment schedule 94" al representar aprox. el 70%, a la vista de la imposibilidad declarada por el equipo de operaciones de Lycos de devolver todos los equipos en iguales condiciones a las que se recibieron, ya sea por haber sido adaptados o modificados, por formar parte de otros equipos o por estar dispersados en distintas oficinas, etc.

Nuestro entendimiento es que el impacto financiero de estas cláusulas sobre el "equipment schedule 94" es el siguiente:

1. En el momento de vencimiento de los leases, Lycos será penalizado con el pago de 4 meses de leases por no devolver los equipos, lo que acarreará un coste aprox. de $2.7Mn (679.754 x 4).

2. Transcurridos estos 4 meses de penalización, si Lycos continúa sin poder devolver los equipos, CSI podría obligar a Lycos al pago del "stipulated loss value" consistente en una cantidad equivalente al 55% del coste original del equipo, implicando un coste de $12 Mn (21.836.761 x 55%).

Para evitar esta contingencia, los gestores de Lycos proponen convertir los operating leases en capital leases con el consiguiente de pago a día de hoy de $3.78Mn, con lo que Lycos obtendría la titularidad de los equipos a vencimiento, por un precio simbólico de $1 y eliminaría la obligación de devolución de los mismos.

Necesitamos tener plena certeza de que no existe otra alternativa más favorable, y de que estamos actuando en el mejor de los intereses de nuestros accionistas.

A la espera de tu confirmación recibe un cordial saludo

CONFIDENCIAL                    1                    07/24/03

LYC 22695

# EXHIBIT 12

# COPY

1

VOLUME 1                                    PAGES 1 - 434

                                           EXHS. 1 - 45

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * *
                                *
Computer Sales International,   *
Inc.,                          *
        Plaintiff and Defendant *
        in Counterclaim        *
                                *
v.                              *
                                *   Civil Action
Lycos, Inc.,                    *
        Defendant and Plaintiff *   No. 05-10017-RWZ
        in Counterclaim        *
v.                              *
                                *
Bank of America f/k/a Fleet    *
Bank,                          *
        Trustee Process Defendant *
                                *
* * * * * * * * * * * * * * * *
```

Videotaped Deposition of Paul H. Stenberg, Jr.

Thursday, August 24, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109

-------------- JANIS T. YOUNG, RDR, CRR ------------
COURT REPORTER
FARMER ARSENAULT BROCK LLC      BOSTON, MASSACHUSETTS
617.728.4404
jyoung@fabreporters.com

*Paul H. Stenberg, Jr.*                    310

03:55:18  1          MR. BEAN:  Mark that as the next exhibit,

03:55:20  2    please.

03:55:20  3          (Stenberg Deposition Exhibit 29 marked for

03:55:30  4    identification.)

03:55:30  5    BY MR. BEAN:

03:55:30  6     Q.    What's marked as Exhibit 29 is CSI 0041890

03:55:34  7    through 41893.  Do you recognize this document,

03:55:40  8    Mr. Stenberg?

03:55:41  9     A.    It's a -- What is this? -- sales agreement

03:55:45  10   for all the equipment schedules.

03:55:46  11    Q.    And it was signed -- It's dated by

03:55:49  12   Mr. Lucy on July 18, 2003.  Correct?

03:55:51  13    A.    Okay, okay.

03:55:52  14    Q.    Is that right?

03:55:52  15    A.    Yes.

03:55:53  16    Q.    And it was sent by Lycos on August 1st,

03:55:58  17   2003, according to the fax line.  Right?  It was

03:56:03  18   faxed by Lycos to --

03:56:05  19    A.    Sure, yeah.

03:56:05  20    Q.    Apparently to CSI, since CSI produced this

03:56:08  21   document.

03:56:09  22          Now, Mr. Lucy subsequently executed the

03:56:12  23   sales agreement again or a similar sales agreement.

03:56:18  24   Correct?

# EXHIBIT 13

# CSI                    SALES AGREEMENT NUMBER 199614    COPY

**COMPUTER SALES INTERNATIONAL, INC.**
9990 Old Olive Street Road, Suite 101
St. Louis, Missouri 63141
(314) 997-7010

## SALES AGREEMENT

This Sales Agreement dated July 15, 2003 (the "Agreement") is between **COMPUTER SALES INTERNATIONAL, INC.** (the "Seller") and **LYCOS, INC.**, which has a principal place of business at 100 5th Avenue, Waltham, Massachusetts 02451 (the "Buyer").

WHEREAS, Buyer, as Lessee and Seller, as Lessor have entered into various equipment schedules (the "Equipment Schedules") subject to Master Lease Agreement No. 144874 dated December 4, 1996 (the "Master Lease") (the "Master Lease" together with the "Equipment Schedule(s)" hereinafter collectively referred to as the "Lease")

WHEREAS, certain Equipment Schedules originally executed pursuant to the Master Lease were consequently terminated in their entirety, and all items of equipment leased pursuant to the terminated Equipment Schedules, were made subject to replacement Equipment Schedules listed on Exhibit 1 attached hereto and made a part hereof ("Replacement Schedules");

WHEREAS, certain Equipment Schedules listed on Exhibit 1 originally executed pursuant to the Master Lease were not revised ("Original Schedules") and they, together with the Replacement Schedules remain in full force and effect as of the date of this Agreement (the "Original Schedules" together with the such "Replacement Schedules" collectively referred to as the "Existing Schedules")

WHEREAS, Lessee desires to restructure all of the Existing Schedules detailed on Exhibit 1 to $1.00 buyout leases;

WHEREAS, a prepayment of the fair market value of all of the Equipment (as hereinafter defined) is required in order to restructure each Lease to $1.00 buyout lease;

WHEREAS, Lessor has agreed to restructure said Leases to $1.00 buyout leases for the consideration set forth below;

NOW THEREFORE, in consideration of the foregoing, Lessee and Lessor agree as follows:

1.    SALE:  For the Sales Price described in Paragraph 3 below, Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules listed in Paragraph 2 below and on Exhibit 1 (the "Equipment") effective on their respective termination dates, except as stated in paragraph #5 below, and on the terms and conditions contained in this Agreement.

2.    EXISTING SCHEDULES:  The Equipment is installed at Buyer's location and has been accepted for lease under Equipment Schedules 69I, 64F, 66I, 67H, Eighty-five, Eighty-six, Eighty-nine, 89A, Ninety, Ninety-three, Ninety-four, One Hundred, and Two Hundred to Master Lease Agreement No. 144874 between the parties (the "Leases"). The Existing Schedules shall terminate on the "Termination Dates" set forth below:

        Equipment Schedules 69I, 64F, 66I and 67H will terminate on September 30, 2003
        Equipment Schedules Eighty-five and Eighty-six will terminate on December 31, 2003
        Equipment Schedules Eighty-nine, 89A, and Ninety will terminate on July 31, 2004
     X  Equipment Schedule Ninety-three will terminate on October 31, 2003
     X  Equipment Schedule Ninety-four will terminate on October 31, 2004
        Equipment Schedule One Hundred will terminate on April 30, 2005
        Equipment Schedule Two Hundred will terminate on April 30, 2005

Each Lease will terminate on its respective Termination Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease. Pursuant to the Leases, Buyer remains liable for any personal property tax liability, with respect to the Equipment, which



PLAINTIFF'S
EXHIBIT
Gallagee
4·26·06   CB

CONFIDENTIAL
CSI0013363

accrued or accrues during the term of the Leases. The Equipment is sold on an "AS IS, WHERE IS" basis, without any warranties of any kind, express or implied.

3.   **SALES PRICE:**  The Sales Price of the Equipment is $3,775,000.00 USD, plus applicable taxes, which Buyer shall pay on or before August 12, 2003 by wire transfer to the following bank and account:

> First Bank
> ABA #081009428
> For Further Credit to:  Computer Sales International, Inc.
> Account #9821914677
> Lycos, Inc.
> Sales Agreement No. 199614

Buyer shall pay on demand a late charge on such Sales Price if unpaid after it is due.  The late charge rate is the lower of (i) one and one half percent (1.5%) per month, or (ii) the highest rate permitted by law.

4.   **SATISFACTION OF LEASE OBLIGATIONS:**  The Leases, solely with respect to Monthly Rental (set forth on Exhibit 1) shall continue in full force and effect and Lessee shall pay to Lessor the number of Monthly Rental payments remaining (plus applicable taxes, if any), beginning with the payment due for the month of August 2003, and continuing to and including the Final Rent Payment Date set forth on Exhibit 1 ("Remaining Rental Payments").

In the event of a Casualty (as defined in the Lease) or any other event impacting the Monthly Rental payable on an Existing Schedule, the Remaining Rental Payment with respect to such Existing Schedule, shall be adjusted accordingly, consistent with such event.

Seller acknowledges that receipt of the Sales Price and each of the Remaining Rental Payments in full, plus applicable taxes, if any ("Lease Satisfaction Amount"), shall fully satisfy Buyer's obligations to Seller with respect to the Leases and all obligations under the Leases shall, on the Final Rent Payment Date, cease in their entirety.

Buyer and Seller agree that this Agreement and the payment of the Lease Satisfaction Amount satisfies all monetary obligations and notice obligations of Buyer under the Leases (with the exception of notices required under Section 14 of the Master Lease), and no other payment, written or oral notification is required by Buyer in order to effectuate (a) the full satisfaction of its obligations under the Leases and (b) its ownership interest in the Equipment.

5.   **SELLER RETAINS TITLE:**  With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date .  With respect to Equipment Schedule 85, certain items of Equipment shall on its respective Termination Date, become subject to Equipment Schedule Ninety-four.  Upon receipt of the Lease Satisfaction Amount in full, without further action on the part of Buyer or Seller, title to the Equipment will automatically pass to Buyer, free and clear of all liens and encumbrances.

6.   **DELIVERY:**  The Equipment is already installed and accepted by Buyer pursuant to the Leases.

7.   **WARRANTIES:**  Seller warrants that (i) on termination of the applicable Lease, except as noted in paragraph # 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims, and encumbrances of any kind except those caused or incurred by Buyer, if any; and (ii) Seller has the full right, power and authority to sell the Equipment.  OTHER THAN THE FOREGOING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONDITION, DESIGN OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.  SELLER HAS NO LIABILITY TO BUYER FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH (i) ANY DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO BUYER, (ii) ANY DEFECT IN THE EQUIPMENT, (iii) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (iv) ANY INTERRUPTION OR LOSS OF SERVICE OR USE OF THE EQUIPMENT, OR (v) ANY LOSS OF BUSINESS, OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, PATENT INFRINGMENT ACTIONS.

8.   **TAXES:**  Buyer shall pay all sales and use taxes (including interest and penalties) levied or based on the sales price or on this Agreement or the Equipment.  If Buyer is purchasing for resale or if Buyer is exempt from sales/use tax, Buyer will issue to Seller an appropriate exemption certificate in form reasonably acceptable to Seller prior to

CONFIDENTIAL
CSI0013364

the delivery date. Personal property taxes assessable on the Equipment on or after the date of delivery will be borne by Buyer.

9. REMEDIES: If Buyer refuses or is unable to timely perform its obligations hereunder, Seller may, following the delivery date, do any or all of the following: (i) terminate the Agreement on five days' notice, (ii) retain or repossess the Equipment, or (iii) recover from Buyer all damages and expenses, including reasonable attorney's fees, which Seller has incurred or may incur by reason of Buyer's failure to perform under this Agreement. Seller may retain any monies paid by Buyer to Seller prior to Buyer's nonperformance as an offset to Seller's damages and expenses.

10. MISCELLANEOUS:

A. ENTIRE AGREEMENT: This Agreement is the entire agreement between Seller and Buyer regarding the purchase and sale of the Equipment and no representation or statement not contained in this Agreement is binding on Seller or Buyer as a warranty, or otherwise, unless in writing and executed by the party to be bound. Any purchase order Buyer issues is merely for its internal recordkeeping purposes and as a means of confirmation of Buyer's acceptance of this Agreement, and does not as supercede, modify or serve as a counter-offer to the terms and conditions in this Agreement.

B. NOTICES: Any notice relating to this Agreement must be in writing and sent by electronic facsimile transmission, by overnight courier service or by registered or certified mail, postage prepaid, addressed to the party for which it is intended at the address set forth in the beginning of this Agreement or to such other address as either party indicates in writing. Notice is effective on the earlier of receipt or three days from the date of mailing.

C. GOVERNING LAW: This Agreement, including all matters of construction, validity, performance and enforcement, is governed by the laws of the State of Missouri, without giving effect to principles of conflicts or choice of law.

D. SEVERABILITY: Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law or any jurisdiction will be ineffective as to the jurisdiction without invalidating the remaining provisions of this Agreement, but where the provisions of applicable law may be waived, they are waived to the full extent permitted by law.

E. SURVIVAL: All representations, warranties and covenants contained in this Agreement continue in full force and effect and survive the sale of Equipment.

F. SELECTION: Buyer acknowledges that it has exercised its own judgment in selecting the Equipment purchased, and this it has not relied on Seller for assistance and advice in making such selection.

G. ASSIGNMENT: This Agreement may not be assigned by Buyer without the prior written consent of Seller.

The parties have executed this Agreement on the date written below. At Seller's option, this Agreement is not effective unless signed by Buyer and returned to Seller by August 8, 2003.

BUYER:
LYCOS, INC.

By: _____

Title: CFO

Date: 8/8/03

SELLER
COMPUTER SALES INTERNATIONAL, INC.

By: _____

Title: _____

Date: 8/11/03

REVIEWED BY
TERRA LYCOS LEGAL PDK

CONFIDENTIAL
CSI0013365

BC
8/8/07

| Designation | Revised 2 | Revised 2 | Revised 2 | Revised 5 | Revised 5 | Revised 12 | Revised 12 | Revised 12 | Original 9 | Digital 21 | Replacement 3 | Replacement 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. Remaining Rental Payments | 2 | 2 | 2 | 5 | 5 | 12 | 12 | 12 | 9 | 21 | 3 | 15 |
| August Rent Payment Date | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 | 8/1/2003 |
| Final Rent Payment Date | 9/1/2003 | 9/1/2003 | 9/20/2003 | 12/1/2003 | 12/1/2003 | 7/1/2004 | 7/1/2004 | 7/1/2004 | 7/1/2004 | 4/1/2005 | 10/1/2003 | 10/1/2004 |
| Monthly Rental | 98,217 | 5,545 | 32,398 | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | Steps | Steps |
| Aug-03 | 98,217 | 5,545 | 32,398 | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | 120,049 | 458,825 |
| Sep-03 | 98,217 | 5,545 | 32,398 | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | 120,089 | 458,825 |
| Oct-03 | | | | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | 111,891 | 607,422 |
| Nov-03 | | | | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 607,422 |
| Dec-03 | | | | 73,476 | 629 | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 678,172 |
| Jan-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 678,172 |
| Feb-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 678,172 |
| Mar-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 676,172 |
| Apr-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 676,172 |
| May-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 676,172 |
| Jun-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 676,172 |
| Jul-04 | | | | | | 106,548 | 16,070 | 52,483 | 6,082 | 43,954 | | 676,172 |
| Aug-04 | | | | | | | | | 6,082 | 43,954 | | 676,172 |
| Sep-04 | | | | | | | | | 6,082 | 43,954 | | 676,172 |
| Oct-04 | | | | | | | | | 6,082 | 43,954 | | |
| Nov-04 | | | | | | | | | 6,082 | 43,954 | | |
| Dec-04 | | | | | | | | | 6,082 | 43,954 | | |
| Jan-05 | | | | | | | | | 6,082 | 43,954 | | |
| Feb-05 | | | | | | | | | | 43,954 | | |
| Mar-05 | | | | | | | | | | 43,954 | | |
| Apr-05 | | | | | | | | | | 43,954 | | |

CONFIDENTIAL
CSI0013366