## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | |
| | ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) | |
| | ) | |
| v. | ) | **LYCOS'S MOTION TO STRIKE PORTIONS** |
| | ) | **OF CSI'S LOCAL RULE 56.1 STATEMENT** |
| LYCOS, INC., | ) | **WITH RESPECT TO LYCOS'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT ON ALL COUNTS** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) | **OF CSI'S AMENDED COMPLAINT, AND TO HAVE LYCOS'S STATEMENT OF** |
| | ) | **UNDISPUTED MATERIAL FACTS** |
| and | ) | **BE DEEMED ADMITTED** |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) | |
| | ) | |
| Trustee Process Defendant | ) | |

Pursuant to Fed. R. Civ. P. 56(e) and Local District Court Rule 56.1, Lycos, Inc.

("Lycos") moves to strike certain portions of the Response of Computer Sales International, Inc.

to Lycos's Local Rule 56.1 Statement of Undisputed Facts With respect to Lycos's Motion for

Summary Judgment on All Counts of CSI's Amended Complaint (Dkt. No. 166) (the

"Response"), and to have those facts in Lycos's Local Rule 56.1 Statement that CSI has not

controverted be deemed admitted for purposes of summary judgment.

Local Rule 56.1 requires that the non-moving party submit a "concise statement of the

material facts of record as to which it is contended that there exists a genuine issue to be tried,

with page references to affidavits, depositions and other documentation." It provides further that

"material facts of record set forth in the statement to be served by the moving party *will* be

deemed for purposes of the motion to be admitted by opposing parties unless controverted by the

statement required to be served by opposing parties." (emphasis added).

Here, rather than controvert the facts in Lycos's Rule 56.1 Statement by means of specific facts in evidence, CSI has chosen to recite a non-responsive, opposing statement of facts, and flout the rules by (a) engaging in speculation as to the intended implications of the facts alleged by Lycos rather than addressing the facts themselves; (b) proffering "argument" instead of fact; (c) averring facts that are not supported by the record; and (d) averring facts that are not supported by citations to record evidence that would be admissible at trial. In all such cases, CSI's responses should be stricken, and Lycos's facts should be deemed admitted.

For example, CSI's assertion in paragraphs 5, 9, 11, 12, 15, and 22 of the Response -- that it would not have entered into the Sales Agreement with Lycos if Lycos had not reaffirmed its obligation to make monthly rent payments to CSI -- should be stricken because the sole record evidence CSI cites to support this "fact" is a portion of its Answers to Lycos's Second Set of Interrogatories (the "Interrogatory Answers"). Because those answers that were *not* based on the personal knowledge of the CSI employee who verified them, the Court may not consider that fact on summary judgment. Because it cannot establish that fact, CSI cannot overcome summary judgment on Count III of its Amended Complaint for fraud in the inducement of the Sales Agreement.

Accordingly, for the reasons set forth more fully below, Lycos requests that the Court (a) strike the portions of the Response that do not comply with Rule 56(e) and Local Rule 56.1, and (b) deem admitted under Local Rule 56.1 for purposes of summary judgment the facts in Lycos's Local Rule 56.1 Statement that CSI has failed to properly controvert.

- 2 -

A.     **CSI's Factual Assertion That It Would Not have
Entered into the Sales Agreement if Lycos had Not
Reaffirmed its Obligation to Make Monthly Rent Payments
Is Not Supported by Admissible Evidence.**

1.     To prevail on its claim in Count III of its Amended Complaint for fraud in the inducement of the Sales Agreement, CSI must prove, among other things, that it reasonably relied to its detriment on Lycos's commitment in the Sales Agreement to make the remaining rent payments under the equipment schedules referenced in that Sales Agreement.[1]  Because CSI bears the burden of proof on this element of its claim, to defeat summary judgment it "must point to evidence affirmatively tending to prove th[is] fact in its favor."[2]

2.     The evidence on which CSI relies to satisfy its affirmative burden must be admissible at trial,[3] based on personal knowledge of an affiant,[4] and provided by someone competent to testify as to the subject matter of the affidavit.[5]  The First Circuit has held: "[i]n summary judgment proceedings, answers to interrogatories are subject to exactly the same infirmities as affidavits.  Although such answers may be given effect so far as they are admissible under the rules of evidence, they should be accorded no probative force where they are not based on personal knowledge or are otherwise deficient."[6]

3.     CSI states at least seven times in its Response that "it would not have consummated the Sales Agreement [in August 2003] without Lycos reaffirming its

---

[1]  *RLI Ins. Co. v. Wood Recycling, Inc.*, 2006 U.S. Dist. LEXIS 30596, at *5 (D. Mass. March 30, 2006) (Zobel, J.).
[2]  *FDIC v. Elder Care Srvs.*, 82 F.3d 524, 526 (1st Cir. 1996).
[3]  *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990)
[4]  *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001) ("Personal knowledge is the touchstone" of Rule 56(e) affidavits); *Schubert v. Nissan Motor Corp. in U.S.A.*, 148 F.3d 25, 30 (1st Cir. 1998) (upholding trial court's exclusion of affidavits not based on personal knowledge because "in the summary judgment context, it is Rule 56(e) which requires affidavits to be made on personal knowledge'").
[5]  *Hernandez-Santiago v. Ecolab, Inc.*, 397 F.3d 30, 35 (1st Cir. 2005) ("For an affidavit to constitute evidence in a summary judgment proceeding, it must be based on personal knowledge and show that the affiant is competent to testify to the matter stated in the affidavit.")
[6]  *Garside*, 895 F.2d at 49 (internal citation omitted).

obligations to make all payments under the existing leases." Response, ¶ 9; *accord* ¶¶ 5, 11, 12, 14, 15, and 22. Ignoring for the moment that the cited reaffirmation of Lycos had no legal import at the time (Lycos was already obligated under the Master Lease Agreement and equipment schedules to make all lease payments, a proposition CSI has argued to this Court in its own summary judgment papers back in 2005 citing the Master Lease's "hell or high water" clause), the sole record "evidence" to which it cites to support this assertion is its Interrogatory Answers. *See* fn. 12, 21, 25, 28, 33, 36,[7] 57 to the Response citing to Ex. 6 to the Declaration of Edward Little, i.e., CSI's Interrogatory Answers.

    4.    CSI's Interrogatory Answers were verified by Jeffrey L. Rousseau, an "officer" of CSI. Mr. Rousseau's Verification reads as follows:

**VERIFICATION**

> I, Jeffrey L. Rousseau, being duly sworn, hereby depose and state that I am an officer of Computer Sales International, Inc. I verify that the foregoing response to the interrogatories set forth in Lycos's Second Set of Interrogatories to Computer Sales International, Inc. [sic] are made on behalf of Computer Sales International, Inc., that certain of the matters stated herein are not within my personal knowledge, and that the facts stated herein have been assembled by agents of Computer Sales International, Inc. I believe that the facts stated herein are true according to the information in my possession and in the possession of others at the company at this time.[8]

While the Verification implies by the statement, "certain of the matters stated herein are not within my personal knowledge," that Mr. Rousseau has personal knowledge of at least some of the facts, he fails to identify which of the facts in the Interrogatory Answers are within his personal knowledge and which are not. Nowhere does he state, or even suggest, that he has

---

[7] While CSI also cites in n. 36 to an e-mail from October 2002 (Little Decl., Ex. 8), concerning Lycos's purchase of the equipment, that e-mail does not even address whether Lycos was going to reaffirm its obligation to make the monthly payments. Moreover, even if it had, CSI did *not* include this requirement in the draft it sent to Lycos in June 2003 (*see infra* ¶ 5 and n. 16) – the version that was modified but ultimately signed – thereby negating CSI's assertion that it would not have signed the Sales Agreement if Lycos had not added the language reaffirming its obligation to make the monthly rent payments and upon which CSI's misrepresentation claim is based.

[8] *See* Exhibit 6 to the Declaration of Edward Little (Dkt. No. 168) filed in support of the Response, at 22.

personal knowledge of the statements on pages 15-16 of those answers that CSI cites for the proposition that CSI would not have entered into the Sales Agreement without Lycos's reaffirmation of its preexisting commitment to make the remaining monthly rent payments. Mr. Rousseau goes on to suggest that *none* of the facts in the Interrogatory Answers are within his personal knowledge by his statement that "the facts stated herein have been assembled by agents of CSI," and that he "believes" them to be true, rather than he "knows" them to be true, based on information in his possession and the possession of others;[9] in fact, he does not even state whether he was one of the agents of CSI who *assembled* the facts. The Verification is therefore deficient such that CSI's assertion that it would not have entered into the Sales Agreement had Lycos not reaffirmed its rent payment obligations should be stricken.

5.      Moreover, although Lycos is not required to prove that Mr. Rousseau does *not* have personal knowledge of the facts in the Interrogatory Answers on which CSI relies in the Response to prevail on the instant Motion (indeed, it is CSI's burden to establish burden personal knowledge), it is noteworthy that Mr. Rousseau testified during his deposition that Joan Kersting, an attorney at CSI senior to him,[10] was the CSI employee involved in the negotiation and drafting of the Sales Agreement,[11] that he did not participate in the negotiation or drafting of the Sales Agreement,[12] and that he did not even review the Sales Agreement at the time it was executed.[13] This testimony supports the conclusion that Mr. Rousseau does *not* have personal

---

[9]  As the Court may recall, this is not the first time in this case that CSI has sought to rely on Mr. Rousseau for facts on summary judgment on which Mr. Rousseau does not have personal knowledge. *See* Dkt. No. 4 (*Affidavit of Jeffrey Rousseau re: Motion for Trustee Process*), Dkt. No. 24 (*Second Affidavit of Jeffrey Rousseau*); and Dkt. No. 29 (*Motion to Strike CSI's Verified Complaint and Affidavits of Jeffrey L. Rousseau* by Lycos Inc.).

[10]  Ms. Kersting is the Associate General Counsel of CSI while Mr. Rousseau is its Assistant General Counsel. *See* Ex. B, at 9:23-10:9, pertinent pages from the transcript of the deposition of Jeffrey Rousseau, and Ex. C, at 11:4-12:12, pertinent pages from the deposition of Joan Kersting.

[11]  Ex. B, at 209:10-14.

[12]  *Id.*, 232:6-9.

[13]  *Id.*, 234:18-20.

knowledge of whether CSI would have entered into the Sales Agreement without Lycos's commitment to reaffirm its payment obligations. As Ms. Kersting testified in her deposition that (a) she was the person who drafted and negotiated the Sales Agreement,[14] (b) it was her understanding that Lycos was simply reaffirming its obligation to make the monthly payments,[15] (c) the proposal to include a reaffirmation of its obligation to pay rents came from Lycos, not CSI,[16] and (d) she did not request the reaffirmation,[17] it is not surprising that CSI did not seek to obtain an affidavit from her as to whether CSI would have entered into the Sales Agreement without the reaffirmation.

6.    Because Mr. Rousseau's Verification of the Interrogatory Answers does not establish that he has personal knowledge of whether CSI would have entered into the Sales Agreement without Lycos reaffirming its commitment to pay the monthly rents, and his deposition testimony demonstrates that he does *not* have such personal knowledge, CSI's statements to that effect in the Response must be stricken. Once those statements are stricken, CSI will have cited no admissible evidence in support of its contention that it would not have entered into the Sales Agreement absent reaffirmation of Lycos. It will therefore be unable to prove an essential element of its claim in Count III of its Amended Complaint for purposes of surviving summary judgment.

**B.    The Facts Lycos Alleged But Which CSI Has Not Controverted Should be Deemed Admitted; CSI'S Improper Responses to Lycos's Facts**

---

[14]  Ex. C, at 91:8.
[15]  *Id.*, 258:18-24.
[16]  *Id.*, 258:14-17 and 259:1-7.
[17]  *Id.*, 259:1-7.

**Should be Stricken.**

7.    As noted above, Local Rule 56.1 provides that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."[18]  In construing this Rule, the First Circuit has held that "[p]roperly supported facts set forth by the moving party are deemed admitted unless controverted by the factual statement of the opposing party."[19]  It has similarly held, when construing Puerto Rico's version of Local Rule 56.1, that parties ignore [this rule] at their peril."[20]

8.    To properly controvert a fact asserted by Lycos, CSI must use *evidence* and *specific facts* to show that there is a genuine issue for trial.[21]  "Factual disputes that are irrelevant or unnecessary will not be counted."[22]

9.    Here, CSI has to averred evidence and specific facts controverting few, if any, of the facts asserted by Lycos in its Statement of Undisputed Material Facts.

10.    Additionally, CSI has acknowledged that while it disagrees with certain facts alleged by Lycos, its disagreement with some is "irrelevant" or "immaterial."  In addition, CSI claims that certain facts are "disputed as misleading but not material."  This Court should, in the

---

[18] *Carreiro v. Rhodes Gill and Co., Ltd.*, 68 F.3d 1443, 1446 n.3 (1st Cir. 1995); *accord Brown v. Armstrong*, 957 F.Supp. 1293, 1297 (D. Mass. 1997) (quoting Rule 56.1); *see also Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000) ("[F]ailure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.") (construing Puerto Rico's local equivalent to Rule 56.1).
[19] *Carreiro,* 68 F.3d at 1446 n.3.
[20] *Ruiz Rivera*, 209 F.3d at 28.
[21] Fed. R. Civ. P. 56(c) and (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Brown v. Armstrong*, 957 F.Supp. 1293, 1297 (D. Mass. 1997) (The non-movant's response must "state what *specific facts* are disputed to prevent summary judgment.").
[22] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added); *accord Caputo v. Boston Edison Company*, 924 F.2d 11, 13 (1st Cir. 1991).

words of the Supreme Court in *Anderson*, "ignore" these irrelevant and immaterial

disagreements and conclude that these so-called disputes do not create genuine issue of material

fact.

       11.       Finally, CSI's Response to Lycos's facts should be stricken to the extent:

       A.       the facts it alleges are unsupported by citation to record evidence.[23]  For

example, in paragraph 9, CSI states: "Again, all that the parties had reached agreement on

was the price for a transaction, and other terms had to be negotiated along with final

approval from Lycos' parent company in Spain — a point which Lycos made clear to CSI."

Yet, CSI cites no record evidence to support these assertions.

       B.       the facts it alleges are unsupported by the record evidence to which CSI

cites.  For example, in paragraph 11 of its Response, CSI states:

> Moreover, the requirement that Lycos reaffirm these lease obligations was a
> condition set back months earlier, in October 2002, when Mr. Stenberg gave
> Lycos the options for buyout of either paying $26 million to end all obligations
> and take immediate title of the equipment or paying $4.69 million with title to
> pass to Lycos only upon complying with the remaining lease obligations
> (including payment through the end of the current terms which continued into
> 2004 and 2005).

citing to Ex. 8 and 9 of the Declaration of Edward Little.  Yet, the brief e-mails from October

2002 appearing as Exhibits 8 and 9 to Mr. Little's Declaration, copies of which are attached

hereto as *Exhibits D* and *E*, say nothing about Lycos "reaffirming" its lease obligations in any

buyout arrangement.

---

[23]  *See supra,* n. 20; *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) ("The court will
disregard any such conclusory statements as well as purported statements of 'fact; not properly supported by
citations to the record."); *Powell v. City of Pittsfield*, 143 F. Supp. 2d 94, 101 n.1 (D. Mass. 2001) ("in accord with
Local Rule 56.1, the court has had to ignore proffered 'facts' that contain no record citation").

C.      it improperly contains "arguments" rather than "facts."[24]   For example, in paragraph 16, CSI construes the meaning of a quotation from an e-mail saying, "Lycos' agent is confirming that it had already "commenced" an action to undo the very assurances it had just made to CSI that day."

12.      Attached hereto as *Exhibit A* is a document that restates, by numbered paragraph, the facts asserted in Lycos's Statement of Undisputed Material Facts and CSI's Response. Following CSI's response is a brief statement as to the reason certain facts asserted by Lycos should be deemed admitted and which portions of CSI's response should be stricken.  Each numbered paragraph is presented on a separate page for the convenience of the Court.

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1.      Striking all references in CSI's Response, including those in paragraphs 5, 9, 11, 12, 15, and 22, asserting that it would not have entered into the Sales Agreement if Lycos had not reaffirmed its commitment to pay the monthly rent;

2.      Deeming admitted for purposes of summary judgment the facts asserted by Lycos;

3.      Striking those portions of CSI's Response that are unsupported by citation to record evidence or supported by the record evidence to which CSI cites, or constitute argument rather than "facts"; and

---

[24]   *O'Brien*, 440 F. Supp.2d at 5 n.1 ("Defendants' [Local Rule 56.1 statement] . . . also includes inappropriately argumentative statements. . . . the court will disregard any legal arguments contained in Defendants' Statement of Facts."); *Powell*, 143 F.Supp.2d at 101("Particularly frustrating was the fact that *arguments* had been inserted in various parties' Local Rule 56.1 *factual* statements.") (emphases in original).

BST99 1559399-6.057077.0012

4.      Granting Lycos such other relief as may be appropriate and just.

Respectfully submitted,
LYCOS, INC.
By its attorneys,

Dated: December 28, 2007

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel for Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. certifies that he has conferred with Robert Kaler, counsel for Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc. ("CSI"), and attempted in good faith to resolve or narrow the issues presented by this Motion.

/s/  Thomas O. Bean
Thomas O. Bean

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

/s/ Peter M. Acton, Jr.
Peter M. Acton Jr.

- 10 -

# EXHIBIT A

# EXHIBIT A

(Lycos has reproduced below, verbatim, the numbered paragraphs from Lycos's Rule 56.1
Statement and CSI's Response. Accordingly, the footnotes are from the original 56.1
statements, and refer to materials cited by the parties.)


      1.      <u>Lycos's Statement</u>. Between 1996 and 2002, Lycos and CSI entered into more than 125
equipment schedules,[1] each of which incorporated by reference the terms of a Master Lease Agreement
entered into by the parties in December 1996 (the "Master Lease Agreement").[2]

              <u>CSI's Response</u>. Undisputed.

---

[1]  Ex. 16, ¶ 5 and Exhibit B thereto. Ex. 1, ¶ 3; Ex. 2, ¶ 3; Ex. 3, ¶ 9.
[2]  Ex 1 to CSI's Am. Compl. (Dkt. No. 121), ¶ 5 (Dec. 4, 2006).

## EXHIBIT A

(Lycos has reproduced below, verbatim, the numbered paragraphs from Lycos's Rule 56.1 Statement and CSI's Response. Accordingly, the footnotes are from the original 56.1 statements, and refer to materials cited by the parties.)

      1.     <u>Lycos's Statement</u>. Between 1996 and 2002, Lycos and CSI entered into more than 125 equipment schedules,[1] each of which incorporated by reference the terms of a Master Lease Agreement entered into by the parties in December 1996 (the "Master Lease Agreement").[2]

            <u>CSI's Response</u>. Undisputed.

---

[1]  Ex. 16, ¶ 5 and Exhibit B thereto. Ex. 1, ¶ 3; Ex. 2, ¶ 3; Ex. 3, ¶ 9.

[2]  Ex 1 to CSI's Am. Compl. (Dkt. No. 121), ¶ 5 (Dec. 4, 2006)

2.    <u>Lycos's Facts</u>.  The Master Lease Agreement provided, in pertinent part, that:

> [Lycos's] obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of acceptance of Equipment or any other right that [Lycos] may have as against [CSI]. . . . It is the express intention of [CSI] and [Lycos] that all Monthly Rental payable by [Lycos] under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term of thereof.[3]

CSI has referred to this provision as a "hell or high water" clause that obligated Lycos to make all monthly payments regardless of defense or excuse.[4]

    <u>CSI's Response</u>.  Disputed as misleading, but not material.  Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease") to which both CSI and Lycos agreed at the inception of their relationship.[5]  As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of ***both parties*** — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CS]] themselves to obtain the financing that they need to do business."[6]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•  Because CSI admits that its "dispute" with Lycos's factual assertion is not "material," CSI's disagreement with Lycos's facts cannot create a genuine issue of material fact.

•  Lycos's facts should be deemed admitted because CSI does not provide any specific facts controverting those facts, i.e., that Lycos's quotation from the Master Lease Agreement or its statement that the "hell or high water" clause required Lycos to make all monthly payments regardless of defense or excuse, are inaccurate.

•  CSI's statements about the meaning of the language in the Master Lease Agreement should be stricken as improper "argument" in a Statement of Undisputed Facts.

---

[3] *Id*
[4] CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. at 3 (Dkt. No. 16) (Mar. 10, 2005).
[5] *See* Master Lease § 5, attached as Ex. 1 to the accompanying Declaration of Edward W Little, Jr. (hereinafter, "Little Decl.").
[6] *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim*, dated Mar. 10, 2005, at 3-4 (Dkt. No. 16)

BST99 1561028-1 057077 0012

3.    Lycos's Fact.  Beginning in 1998 and continuing through 2001, CSI and Lycos entered into approximately 125 renewals or refinancings of existing equipment schedules.[7]

CSI's Response. Disputed. During the relevant time, Lycos negotiated and entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it.[8] These were not "refinancings"[9]— a term Lycos continually employs to equate the leases with loans (and which was rejected by the Court) — but were new leases which helped Lycos achieve its stated goals of lowering monthly rent payments.[10] Lycos's officers — including its Vice President of Finance and Administration. Thomas Guilfoile — have confirmed under oath that Lycos not only understood them to be leases but were reported as such in the company's public financial statements.[11]

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•    Because CSI provides no specific evidence that the parties did not enter into approximately 125 renewals or refinancings of existing equipment schedules from 1998 through 2001, Lycos's facts should be deemed admitted.

•    CSI assertion that the transactions are not "refinancings" but new leases is, in addition to being only a semantic dispute, is improper argument improper argument that should be stricken.  Indeed, the word the word "refinancing" does not determine or even imply whether, as a matter of law under the Uniform Commercial Code, a transaction is a loan or a lease.  The term is used in both lease and loan transactions.  Finally, CSI's allegations that are not responsive to Lycos's facts should be stricken as non-responsive.

---

[7]  *E.g.*, Ex. 4; Ex. 5 at CSI0035654.

[8]  *See,* for example, Ex. 26 to the summary judgment Affidavit of Peter Acton ("Acton Aff., dated September 4, 2007 (equipment schedule 66B stating clearly that the equipment thereunder was already "installed at Lycos location under Equipment Schedules Forty-three and Forty-eight" to the Master Lease).

[9]  Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (all attached, respectively as Exs. 3-5 to the Declaration of Kelly A Gabos, dated Nov 12, 2007 and filed herewith ("Gabos Decl."); Guilfoile Dep at 203:4-11 (Gabos Decl Ex. 2).

[10]  Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Little Decl Ex. 3).

[11]  Deposition of Thomas ("Guilfoile Dep.") at 203:4-11 (Little Decl Ex. 2)

4.    <u>Lycos's Facts</u>. In late 2001, Lycos and CSI entered into the largest of such refinancings combining over thirty of the extant equipment schedules onto two schedules known as schedules 93 and 94.[12] Lycos's obligation to make the monthly payments due under these schedules was secured by a declining balance $11 million letter of credit on which CSI could draw if Lycos defaulted on its obligation to make the payments under those schedules.[13]  Subsequently, Paul Stenberg, CSI's account representative for Lycos,[14] wrote to CSI's Chairman that he had eliminated the credit risk that Lycos might default with that letter of credit.[15]

<u>CSI's Response</u>. Disputed as misleading, but not material. The equipment schedules that were rewritten into Schedules 93 and 94 are clearly identified in the documentation exchanged between CSI and Lycos.[16] At the time of execution of Schedules 93 and 94, the parties agreed that CSI's performance under the new schedules was "conditioned upon [Lycos'] delivery to [CSI] of an irrevocable, unconditional standby letter of credit" under agreeable terms.[17]   In an effort to assist Lycos, the $11 million amount of the letter of credit was actually much less than it otherwise would have been, as CSI structured the deal to leave the existing debt in place on the existing Schedules.[18]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

- Because CSI admits that its "dispute" with Lycos's factual assertion is not "material," CSI's disagreement with Lycos's facts cannot create a genuine issue of material fact.

- Lycos's facts, all of which are undisputed in the record, should be deemed admitted because CSI does not provide any specific facts controverting those facts.

- The last sentence should be stricken as argumentative.

---

[12] Ex. 6 at CSI027498; CSI0027565-67; Ex. 7 at CSI0027656; CSI0027741-43.
[13] Ex. 8 at CSI0025463, CSI0025466-468; *see* Ex. 6 at CSI00CSI0027566, ¶ 3; Ex. 7 at CSI0027742, ¶ 4
[14] Ex. 32 at 29:20-30:19; 31:15-32:7.
[15] Ex. 35 at CSI042454.
[16] Acton Aff. Exs. 6,7
[17] Acton Aff. Ex. 6 at CSI0027566 ¶ 3; Ex 7 at CSI0027742 ¶ 3.
[18] Deposition of Philip Cagney ("Cagney Dep.") at 245:7-19; 256:2-9 (Little Decl. Ex. 4).

- 4 -

5.    <u>Lycos's Facts</u>.  On June 16, 2003, CSI offered to sell for $4.69 million the equipment on all extant equipment schedules that Lycos had been leasing from CSI.[19]  The draft sales agreement that CSI's Associate General Counsel, Joan Kersting, sent to Lycos provided that Lycos would "take full title" to the equipment at the end of the term of each schedule.[20]  That draft did *not,* however, contain an affirmative statement that Lycos would make all remaining payments due on those schedules.[21]

<u>CSI's Response</u>.  Disputed.  The draft offer to sell equipment at $4.69 million was just that — an "offer" — which was rejected by Lycos.[22]  The conditions of the draft offer to sell the equipment to Lycos were clear, and included among other things, that (a) CSI would retain title to the equipment until all of the existing leases terminated at their stated times (including some in late 2004 and one in 2005) and (b) title would only pass at that time provided Lycos was not then in default under the leases, including in its lease payment obligations.[23]  Lycos is incorrect that there was no "affirmative statement that Lycos would make all remaining payments due on those schedules," as the proposed agreement from Ms. Kersting made clear that title would not pass until all payments were made.  Moreover, CSI has made clear that it relied on these statements and agreed to sell the equipment to Lycos "which it would not have done but for Lycos' misrepresentations."[24]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•    Lycos's Facts should be deemed admitted because they are supported by the record and CSI does not provide specific facts to controvert them.

•    The first sentence of the Response should be stricken as improper argument.

•    The first clause of the second sentence should be stricken because it is not supported by citation to the record to the extent that it suggests that title to none of the equipment on any lease would pass until Lycos had made all the payments on all the leases.  The draft Sales Agreement speaks for itself.  Paragraph 4 of the draft agreement, to which CSI cites, states: "With respect to each Lease, Seller retains full title to the Equipment until the date the Lease terminates as listed in paragraph 2 above."  Acton Aff., Ex. 9, ¶4.

•    The third sentence should be stricken because it contains no citation to the record.

•    The fourth sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person who signed and verified them.

•    In sum, if the inclusion of language in the draft Sales Agreement and exclusion of it in the Sales Agreement that was executed means anything, it means that the parties did not intend to include the language on which CSI now seeks to rely in the final agreement.

---

[19]  Ex. 9 at CSI0023156 and CSI0023157, ¶ 3.

[20]  *Id.*, ¶ 4.

[21]  *See generally id.*

[22]  Deposition of Susan Franklin, dated Oct. 25, 2006 ("Franklin Dep.") at 129:5-14 (stating that parties were engaged in counterproposals at this time or negotiation).

[23]  Acton Aff. Ex 9 at CSI0023157 ¶¶ 2, 4.

[24]  *Plaintiff Computer Sales International Inc 's Response to Defendant Lycos Inc 's Second Set of Interrogatories,* dated Jan 22, 2007, at 15-16 (Little Decl. Ex. 6).

6.    <u>Lycos's Facts.</u> In June 2003, Lycos retained a lease consulting firm known as LeaseForum to assist it with its equipment lease buyout negotiations with CSI and Lycos's other technology equipment lessors,[25] and notified CSI that it had done so.[26] Mr. Stenberg, however, did not want to negotiate with a lease consulting firm.[27]

<u>CSI's Response.</u> Disputed and misleading. The letter from Julie Callagee of Lycos informing Paul Stenberg of CSI that Lycos had "retained Leaseforum, Inc, to perform various services with respect to the assessment, negotiation and execution of leases" is dated June 27, 2003.[28] Leaseforum through its principal Susan Franklin, had contacted Mr. Stenberg by phone earlier that day.[29] Mr. Stenberg testified he received this call "out of the blue' and had "no idea that was coming."[30] When he received her call, Mr. Stenberg was unsure whether Ms. Franklin represented Lycos and, after being informed by Lycos that she did, he negotiated with her.

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.</u>

•    CSI while providing additional information, does not dispute any of Lycos's properly supported factual assertions. Accordingly, Lycos's facts should be deemed admitted.

---

[25]  Ex. 10 at LYC18884 (definition of "Work").
[26]  Ex. 11.
[27]  Ex. 32 at 295:9-17.
[28]  Acton Aff. Ex 11.
[29]  Franklin Dep at 117:15-118:10 (Little Decl Ex. 5).
[30]  Acton Aff. Ex. 32 at 295:12-17.

7.    Lycos's Facts.  On July 1, 2003, Lycos's Chief Financial Officer informed Mr. Stenberg that if he were unwilling to negotiate with LeaseForum, Lycos would authorize LeaseForum to perform a full audit of the CSI-Lycos leases.[31]  After cautioning Mr. Lucy by saying "easy tough guy,"[32] Mr. Stenberg advised LeaseForum that CSI would reduce its price for the equipment to $3.775 million but that this offer would expire if not accepted by July 15, 2003.[33]

CSI's Response.  Disputed and misleading.  The implication of Lycos' statement is that Mr. Stenberg was intimidated by Lycos' threat to do an audit of the CSI-Lycos leases.  In fact, Mr. Stenberg testified he was not worried about any audit and he told Mr. Lucy of Lycos to "go ahead and do it [the audit]."[34]

Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.  Because CSI responds only to what it calls the "implication" of Lycos's statement and does not provide any specific evidence of any dispute to dispute Lycos's properly supported facts, Lycos's facts should be deemed admitted.

---

[31]  Ex. 12.
[32]  Ex. 36.
[33]  Ex. 32 at 309:7-11.
[34]  Acton Aff. Ex. 32 at 295:21-24.

- 7 -

8.    <u>Lycos's Facts</u>. On July 14, 2003, Susan Franklin of LeaseForum sent an e-mail to Mr. Stenberg, on behalf of Lycos, accepting the $3.775 million offer.[35] Mr. Stenberg, who negotiated the sale on behalf of CSI, admitted at his deposition that the parties reached an agreement on price on July 14, 2003.[36] Ms. Kersting, who negotiated the legal aspects of the Sales Agreement through Mr. Stenberg,[37] also admitted at her deposition that there was an agreement on price on July 14, 2003.[38]

    <u>CSI's Response</u>. Disputed. Though the parties may have agreed by July 14, 2004, on one of many terms for a buyout — that being the price (without which further negotiation would not occur) — Ms. Franklin's July 14, 2003 e-mail makes clear that this is but one step in concluding a deal. After agreeing to the purchase price of $3.775 [sic], Ms. Franklin states:

> Please prepare and present the appropriate documentation to my attention to review and comment, if any. *I will forward the documents to Lycos for their acceptance* and facilitate the execution thereof. Lycos will exercise its best efforts to turn the documentation around by July 15[th] and wire the purchase price by July 18[th].[39]

Ms. Franklin also attaches to her e-mail an addendum of additional terms for CSI's review.[40] That Lycos needed and was waiting for the approval of its parent company, Spanish telecommunications conglomerate Terra Networks, is undisputed, as is clear in Brian Lucy's e-mail to Paul Stenberg of July 24, 2003, in which he states:

> I'm in Spain right now for the earnings release. At the same time I'm trying to get my boss, Elias, to give me the green light. *He's close to approving this, but hasn't formally done so just yet.*[41]

In fact, there is no dispute that Sales Agreement Number 199614 (the "Sales Agreement") was not executed by Lycos until August 8, 2003 (by Mr. Lucy), followed by CSI's execution three days later on August 11, 2003.[42]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>. Lycos's facts state only that the parties had agreed on a price for the buyout as of July 14, 2003. In the third sentence of its response to paragraph 9, CSI admits this; CSI also implies its admission of this fact in the first sentence of this paragraph. Accordingly, Lycos's facts should be deemed admitted. The balance of CSI's response should be stricken as non-responsive and improperly argumentative.

    Moreover, the timing of Lycos's acceptance of CSI's offer and the specific point at which the parties reached a binding agreement as a matter of law is immaterial to CSI's reliance. What is material is when CSI was willing to enter into the Sales Agreement and on what terms it was willing to agree at that time. CSI was willing to sign and enter into the Sales Agreement before July 14, 2003, even though the draft agreement it sent to Lycos in June, 2003, did not contain the affirmative representation of Lycos

---

[35] Ex. 29 at AR001433
[36] Ex. 32 at 309:12-21
[37] Ex. 13 at 195:7-196:14
[38] *Id.* at 252:2-7. Ms. Kersting is an officer at CSI. Ex. 15 at 288:4.
[39] Acton Aff. Ex 29 at AR001433
[40] *Id.*
[41] E-mail from Brian Lucy to Paul Stenberg dated July 24, 2003 (Little Decl. Ex. 7).
[42] Little Decl. Ex 13 (executed Sales Agreement)

- 8 -

on which CSI relies to support its fraud claim. Indeed, as CSI concedes, all that was required at that point was Lycos's acceptance.

9.    Lycos's Facts. Attached to Ms. Franklin's July 14th e-mail accepting CSI's $3,775,000 offer was an attachment that, for the first time, restated Lycos's pre-existing obligation to continue making the monthly rental payments due under the equipment schedules then in effect.[43] Ms. Kersting testified at her deposition that this statement did *not* impose any new payment obligations on Lycos under the existing equipment schedules.[44]

CSI's Response. Disputed and misleading. Lycos is alleging that the parties had reached a deal prior to any discussion concerning a "reaffirming" by Lycos of its obligations to make payments under the lease — thereby implying that the obligation to "reaffirm" was not material to CSI. In fact, CSI has made clear that it would not have consummated the Sales Agreement without Lycos reaffirming its obligations to make all payments under the existing leases.[45] Also, months earlier in October 2002, CSI had given Lycos a buyout price of $4.69 million under which it expressly provided that "[t]itle [of equipment] will pass to Lycos *at the expirations of these leases.*"[46] Again, all that the parties had reached agreement on was the price for a transaction, and other terms had to be negotiated along with final approval from Lycos' parent company in Spain — a point which Lycos made clear to CSI. As stated previously, the draft offer submitted to Lycos on July 16, 2003, by Ms. Kersting of CSI's legal department makes clear that payment on the leases must continue (and, in fact, title in the equipment being sold expressly did not pass to Lycos[47] until all remaining rent payments were made).

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

• While CSI responds to what it thinks Lycos's facts "imply," as opposed to what they say, it does not provide specific facts to controvert them. Accordingly, Lycos's properly supported facts should be deemed admitted.

• The first and fourth sentences (beginning with the words "Lycos is alleging" and "Again") of the Response are not supported by any citation to the record. Accordingly, they should be stricken.

• The second sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.

• The final sentence of CSI's response, which addresses what it thinks the July 16, 2003 offer by Ms. Kersting "makes clear," should be stricken as improper argument.

• Finally, as with many of its previous responses, CSI's response should be stricken not only as non-responsive, but wholly immaterial as a matter of law. CSI once again attempts to confuse the issues by citing in its response language that is not a statement of Lycos and is not the affirmative language on which it claims to rely to support its fraud claim.

---

[43]  Ex. 29 at AR001434, ¶ 2.
[44]  Ex. 13 at 216:5-219:9; 258:18-24; *see* CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. at 3 (Dkt. No. 16)
[45]  Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories)
[46]  E-mail from Paul Stenberg to Brian Lucy (Little Decl. Ex. 8) (emphasis added).
[47]  Acton Aff. Ex. 9 at CSI0023157 ¶ 4.

10.    Lycos's Facts.

Specifically, Ms. Kersting testified:

Q.    And the obligation to pay rent under those leases predated
execution of the sales agreement, right?

[Objection by counsel]

A.    The obligation to pay rent on the leases commenced on the day the
leases started and were signed by the parties.[48]

Q.    And the sales agreement did not impose any additional obligation
to pay monthly rent under the schedules listed in Paragraph 2, did
it?

[Objection by counsel]

A.    The rental remained the same.

Q.    And the number of rental payments remained the same, right?

A.    Yes.[49]

CSI's Response. Disputed as misleading. When Lycos was first considering buying out
its CSI leases at the end of 2002, it had two options: it could either (a) do a "lump sum" payout
of $26,819,623 and take title to the equipment upon payment, or (b) pay $4.69 million now,
continue paying all of its lease obligations into the future and take title upon final payment on the leases.
These scenarios were provided by Mr. Stenberg to Mr. Lucy back in October 2002, and Lycos is
incorrect that "reaffirming" Lycos' lease obligations was discussed "for the first time" in July 2003
after the parties discussed price terms.[50]

Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•    Because CSI does not provide specific evidence controverting the accuracy of Lycos's
quotation from the transcript of Ms. Kersting's deposition, Lycos's facts should be deemed admitted.

•    The first sentence of CSI's response should be stricken because it is unsupported by any
citation to the record and is argumentative.

•    While CSI contends in the second sentence that Lycos was "incorrect" in suggesting that
the parties discussed "reaffirming" Lycos's lease obligations for the first time in July, 2003, nothing in
Lycos's quotation from Ms. Kersting's transcript even addresses this issue. Thus, CSI's response is
wholly non-responsive and fails to provide any specific evidence disputing a fact averred by Lycos.

[48] *Id.* at 217:12-18.
[49] *Id.* at 217:19-218:2.
[50] E-mails of October 22 and 24, 2002 from Paul Stenberg to Brian Lucy (Little Decl. Exs. 8, 9).

BST99 1561028-1 057077.0012

- The citations at the end of the second sentence to two e-mails appearing as Exhibits 8 and 9 to the Little Declaration do not even address whether CSI would require Lycos to <u>reaffirm</u> its rent obligations as a condition of a buyout, let alone support CSI's assertion of a specific discussion of the issue between the parties in 2002. There is no evidence of such a discussion in the record, and CSI cites to none. Moreover, as noted above, there was no specific representation reaffirming Lycos's lease payments even in the drafts created by CSI and sent to Lycos in June, 2003. Accordingly, the second sentence should be stricken because the record citation does not support it.

- 12 -

11.    Lycos's Facts.  When asked by her own counsel at deposition about her understanding of paragraph 4 of the Sales Agreement, the paragraph in which Lycos restated its obligation to make the monthly payments,[51] she said "[m]y understanding is that they [Lycos] are *reaffirming* the monthly rental obligations under the leases, beginning with the payments due August 1 and continuing through the final rent date on the exhibit."[52]

CSI's Response.  Disputed as misleading.  Ms. Kersting testified that she understood Lycos was "reaffirming the monthly rental obligations under the leases." However, CSI has testified that, without these assurances that rental amounts would continue, CSI would not have entered into the Sales Agreement.[53]  Moreover, the requirement that Lycos reaffirm these lease obligations was a condition set back months earlier, in October 2002, when Mr. Stenberg gave Lycos the options for buyout of either paying $26 million to end all obligations and take immediate title of the equipment or paying $4.69 million with title to pass to Lycos only upon complying with the remaining lease obligations (including payment through the end of the current terms which continued into 2004 and 2005).[54]

Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•    Because CSI does not provide specific evidence controverting Lycos's one-sentence quotation from the transcript of Joan Kersting, Lycos's facts should be deemed admitted.  In fact, although CSI contends that this quotation is disputed as misleading, it then concedes that Ms. Kersting testified exactly as Lycos asserted, thereby rendering undisputed that Lycos's voluntary representation upon which CSI relies merely reaffirmed a preexisting obligation.

•    The second sentence should be stricken because, as set forth in the Motion,

•    the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.  The second sentence should also be stricken as non-responsive and immaterial.

•    The third sentence should be stricken because the record evidence (Ex. 8 and 9 to the Little Declaration) to which it cites does not even address whether CSI would require Lycos to specifically reaffirm its monthly rent obligations.  That Lycos would remain obligated to continue paying the monthly rents per the Master Lease Agreement says nothing about whether Lycos would be required to reaffirm that fact in the Sales Agreement, and nowhere does CSI cite admissible material indicating that it would not enter into that agreement but for the reaffirmation.  As noted earlier, CSI neither requested nor added the specific representation it now claims to rely upon for its fraud claim.  Additionally, even if it did, the response addresses a subject – the parties' discussions in October, 2002 – that was not even addressed by Lycos and therefore cannot create a genuine issue of material fact.

---

[51]  Ex. 10 to CSI's Am. Compl., ¶ 4 (Dkt No. 121)
[52]  Ex. 13 at 258:18-24 (emphasis added).
[53]  Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories)
[54]  Little Decl Ex. 8, 9.

12.    <u>Lycos's Facts</u>. Ms. Kersting further testified that the language in which Lycos "reaffirmed" its payment obligations was proposed by Lycos, not CSI.[55]

<u>CSI's Response</u>. Disputed and misleading. In October 2002, CSI first required that Lycos reaffirm its lease obligations in the event Lycos chose one of the two options it suggested to Lycos for a buyout.[56] That Lycos' agent Leaseforum may have proposed language concerning this which was ultimately set forth in the executed Sales Agreement in early August 2003 is immaterial — reaffirming of the leases was always an important and material aspect of CSI's agreeing to the lower buyout scenario, and it would not have done the deal without those assurances.[57]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•    Because CSI does not provide specific evidence controverting Lycos's restatement of Ms. Kersting's testimony, Lycos's well-supported facts should be deemed admitted. CSI's responsive should also be stricken as non-responsive and immaterial to the instant issue, i.e., that Lycos, not CSI, proposed the specific language upon which CSI now relies to support its fraud claim.

•    The first sentence in CSI's response should be stricken because, as explained above, the record evidence to which it cites - Little Decl. Ex. 8 - does not support CSI's assertion that CSI required Lycos then to reaffirm its lease obligations in October 2002.

•    CSI's assertion after the hyphen in the last sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them. That assertion is also nonsensical. CSI could not have known in October 2002 that it would agree to lower its buyout quote in July 2003, and CSI did not add the specific representation upon which it now relies in support of its fraud claim.

---

[55] *Id* at 258:14-259:7.
[56] Little Decl. Ex. 8.
[57] Little Decl. Ex. 6

- 14 -

13.    Lycos's Facts.  On August 1, 2003, Lycos wired the $3,775,000 purchase price[58] and faxed a copy of the sales agreement that Lycos's Chief Financial Officer had signed on July 18, 2003 to CSI. [59]

CSI's Response.  Disputed as misleading. Though Mr. Lucy may have signed a version of the Sales Agreement on or about July 16, 2003, Mr. Lucy made clear to Mr. Stenberg on July 27, 2003, that Lycos' parent company in Spain had not as of that time authorized any buyout.[60] Though Mr. Lucy testified he was authorized to proceed with the transaction on August 1, 2003,[61] it is undisputed that the operative executed Sales Agreement was not signed by Lycos until Mr. Lucy signed it on August 8, 2003 — and that was because tax issues that arose on an earlier version required some changes to the agreement, and was signed by CSI on August 11, 2003.[62]

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•    Because CSI admits that it disputes Lycos's facts only because they are "misleading," and has not presented any specific facts controverting them, they should be deemed admitted.

---

[58]  Ex. 14; Ex. 33 at 179:19-22.

[59]  Ex. 3 at Ex. A; Ex. 34 at CSI045125; Ex. 13 at 206:6-11

[60]  Little Decl. Ex. 7.

[61]  Deposition of Brian Lucy ("Lucy Dep/") at 178:1-5 (Little Decl. Ex. 10); e-mail from Peter Karol, Lycos in-house counsel, to Brian Lucy dated August 1, 200 3 (Little Decl. Ex. 11)

[62]  Deposition of Paul Stenberg, dated Aug 24, 2006 ("Stenberg Dep.") at 310:22-311:6 (Little Decl. Ex 12).

14.    Lycos's Facts. In an internal CSI e-mail dated August 1, 2003, Ms. Kersting stated that CSI had received the signed sales agreement but that there were "errors in the termination dates for [schedules] 100 and 200" that needed to be corrected.[63]

CSI's Response. Disputed, but irrelevant. Ms. Kersting's e-mail of August 1, 2003, notes errors in the prior draft that need to be corrected as well as an issue concerning sales tax acceleration, and she testifies to substantive changes made in the Agreement finally executed by the parties.[64] Regardless of this, however, there is no dispute that the operative agreement containing the representations that Lycos would continue to perform its lease obligations (§ 4) — on which CSI relied[65] — was executed by Lycos on August 8, 2003.[66]

Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

• Because CSI does not provide any specific facts controverting Lycos's facts, Lycos's facts should be deemed admitted. In addition, because CSI admits that its purported disagreement with Lycos's facts is irrelevant, any disagreement cannot create a genuine issue of material fact.

• At the end of the first sentence, CSI cites over two hundred pages of Ms. Kersting's testimony (from pp. 221-223) in support of its assertion that Ms. Kersting testified the parties made "substantive" changes to the agreement. CSI's assertion that the changes were "substantive" should be stricken as argument and as not supported by the record. Ms. Kersting's testimony, at pp. 221-23, reflects that the changes were, in fact, minor. *See* Acton Aff., Ex. 13, at 221-23.

• CSI's assertion in the last sentence of its response that it relied on Lycos's commitment to perform its lease obligations should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.

---

[63] Ex. 34 at CSI045125.
[64] Acton Aff. Ex. 13 at 21:7-223:5 (testimony of Joan Kersting)
[65] Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories)
[66] Little Decl. Ex 13 executed Sales Agreement

- 16 -

15.    Lycos's Facts.  On August 8, 2003 and August 11, 2003, Lycos and CSI, respectively, re-signed a version of the sales agreement correcting those and other minor errors.[67]  That version of the sales agreement provides, in pertinent part:

A.    "Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules . . . effective on their respective termination dates, except as stated in paragraph 5 below . . . ."[68];

B.    "Each Lease will terminate on its respective Terminate Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease."[69]  Paragraph 2 states lists the "Terminate Date" for each schedule;

C.    "With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date."[70]; and

D.    " . . . (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims and encumbrances of any kind except those caused or incurred by Buyer, if any . . ."[71]

CSI's Response.  Disputed as misleading. CSI and Lycos did not simply "re-sign" a version of the Sales Agreement on August 8 and August 11, 2003, respectively; in fact, they signed the operative version of the Sales Agreement which governed the buyout, including the representations - originally required by CSI as early as the preceding October - that Lycos agree to satisfy all obligations under existing leases, including the obligation to pay them in full.[72] Again, this was a condition of the transaction upon which CSI relied and without which CSI would not have executed.[73]

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•    Because CSI admits that it disputes Lycos's facts only as "misleading" and does not provide any facts controverting Lycos's facts, Lycos's facts should be deemed admitted. Instead of *facts*, CSI makes an improper legal argument concerning which version of the Sales Agreement was the "operative" one and which one "governed the buyout."

•    Because the record evidence to which CSI cites - Little Decl. Ex. 13 - to support its assertion that CSI required Lycos as early as the preceding October to satisfy all obligations under existing leases, that citation does not and could not support CSI's assertion.  This assertion should therefore be stricken.

---

[67] *Compare* Ex. 3 at Ex. A *with* Ex. 10 to CSI's Am. Compl. (Dkt. No. 121); *see* Ex. 13 at 220:15-223:5.

[68] Ex. 10 to CSI's Am. Compl., ¶ 1 (Dkt. No. 121)

[69] *Id.*, ¶ 2.

[70] *Id.*, ¶ 5

[71] *Id.*, ¶ 7

[72] Little Decl. Ex. 13 at § 4 (Lycos agrees to satisfy all lease obligations).

[73] Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories); Little Decl. Ex. 8 (October 2002 proposal for buyout allowing passage of title to equipment from CSI to Lycos only upon completion of the leases).

- The last sentence of the response should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them

- The last sentence is also nonsensical. The claim that CSI would not have signed the final version of the Sales Agreement absent Lycos's purported representation is belied by the fact that CSI had accepted payment of the $3.775 million a week earlier. For CSI's position to make sense, the evidence would have to show that CSI was prepared to return that entire payment to Lycos if Lycos then did not agree to include the language and representation specifically reaffirming its monthly lease payment obligations, a representation CSI never requested. The record is devoid of such evidence.

- 18 -

16.    Lycos's Facts.  At all times before and as of the time it entered into the Sales Agreement, Lycos intended to make all of the remaining payments required under the extant equipment schedules.[74] In addition to making the $3.775 million payment under the Sales Agreement, Lycos subsequently paid CSI approximately $13.5 million in monthly payments owed under the extant equipment schedules during the next fourteen months.[75]  In fact, Lycos paid CSI all of the monthly amounts due after the July 15, 2003 date of the Sales Agreement other than the approximately $301,000 CSI seeks to recover in Counts I and II of its Amended Complaint, an amount that became due from and after November 2004.[76]

CSI's Response.  Disputed.  Lycos' sole cited evidence that it "intended" to make all remaining lease payments under the Sales Agreement is the sell-serving summary judgment affidavit of its former Chief Financial Officer, Brian Lucy, and the fact that it actually made several rental payments after entering into the Sales Agreement,. CSI has evidence, however, that on August 8, 2003 — *the very day on which Mr. Lucy executed the Sales Agreement* which was countersigned by Lycos three days later — Lycos' agent Leaseforum, a consultant it had hired to negotiate the buyout of the CSI equipment,[77] confirmed with Julie Callagee, Lycos' Assistant Controller, their plan to renegotiate and reduce the remaining future lease payments it was simultaneously affirming to CSI that it would continue to pay:

> We have completed phase 1 of the work with CSI. *Phase 2 has commenced*  The phase 2 effort is a continuation under statement of work 001 [between Lycos and its agent Leaseforum]. *Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future lease payment obligations to CSI It is also conceivable that a cash settlement or payment by CSI to Lycos unrelated to the remaining payments could eventuate* and we would expect any such payment to be applied against the baseline as well as used as the basis for calculating Lease Forum's fees.  In any event the final calculation of reduction in CSI baseline costs will of course take into account our mutual success in phase I in reducing Lycos' residual buy out of the CSI Leases.[78]

Lycos' agent is confirming that it had already "commenced" an action to undo the very assurances it had just made to CSI that day. As explained above, Lycos is incorrect in dating the Sales Agreement as July 15, as it was not executed by Mr. Lucy on behalf of Lycos until August 8, 2003 and CSI three days later.[79]  Again, Lucy had no authority to bind Lycos as of July 15.[80]  In addition, Lycos claim that it paid all lease amounts other than $301,000 (which it continues to withhold) is not indicative of its intent at the time it entered into the Sales Agreement, and the evidence shows that Lycos was implementing its plan to renegotiate the CSI leases in October 2003, when Leaseforum

---

[74]  Ex. 3, ¶ 12

[75]  The monthly payments due totaled approximately $13 8 million  Ex. 16, ¶ 44 and Exhibit K, column headed "Rent Payments On and After 01-Aug-2003  Because Lycos paid all of the remaining rents due other than approximately $301,000, (Ex  15 at 450:5-10 (the witness, Jeffrey Rousseau, was an officer of CSI at the time he testified, *id* at 189:4-6) CSI's Am  Compl  ¶¶ 18-19, 25-26, 30-31 (Dkt  No. 121)  (seeking to recover only for non-payment on schedules 100 and 200)), Lycos paid approximately $13 5 million of this amount

[76]  CSI's Am. Compl.  ¶¶ 18, 25 (Dkt  No. 121)

[77]  Acton Aff. Ex  11

[78]  Acton Aff. Ex  18 (portion of e-mail from John Kirk of Leaseforum to Julie Callagee marked "A" (emphasis added)

[79]  *See supra* ¶ 8

[80]  *See supra* ¶ 13

BST99 1561028-1 057077 0012

advised Lycos to threaten CSI by taking certain steps detailed in materials *filed herewith under seal.*[81] Also, Lycos ceased paying on its leases much earlier in 2003, but it resumed payments[82] in order to ensure the completion of its sale to a new parent company, Korean media conglomerate Daum Communications, which closed in early fall 2004.[83]

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

- Other than saying that Lycos is incorrect in dating the Sales Agreement as of July 15, 2003, CSI does not dispute the facts Lycos asserted. The fact is, the Sales Agreement CSI submitted to the Court with its summary judgment papers itself says it is dated as of July 15th. *See* Ex. 13 to Little Declaration. Accordingly, Lycos's facts should be deemed admitted, as the Sales Agreemtn speaks for itself.

- The portion of the second sentence, which suggests that Ms. Franklin and Ms. Callagee had a plan to renegotiate the remaining rent payments, should be stricken because it is argumentative and not supported by the quotation that follows and is contradicted by the record. The e-mail says only that LeaseForum has commenced work on Phase II and what LeaseForum's plan was. It says nothing about Ms. Callagee's or, more importantly, Lycos's agreeing with that plan. To the contrary, Ms. Callagee testified in deposition that she did not have the authority to enter agreements on behalf of Lycos, that she had not otherwise authorized LeaseForum to perform "Phase II," and that Brian Lucy, who signed the Sales Agreement and whose intent would be directly relevant to CSI's claim, had not authorized any such work by that time. *See* ¶ 18, *infra*. CSI does not provide any specific evidence controverting Ms. Callegee's testimony in its response to paragraph 18. In fact, despite having deposed LeaseForum's John Kirk and Susan Franklin over four days, CSI chose not to ask them whether anyone at Lycos had agreed to LeaseForum's "plan" or even authorized LeaseForum to provide any work on so-called "Phase II." In fact, it is undisputed that the parties did not enter into Statement of Work 2 until Octobe,r 2003.

- CSI's characterization of LeaseForum's "agent" for the purpose of conducting Phase II in an attempt to attribute LeaseForum's statements to Lycos should be stricken as argumentative and unsupported by any citation to the record. Given the uncontroverted evidence that Lycos had not authorized any further work by LeaseForum at that time, CSI cannot possibly show that LeaseForum was Lycos's agent in connection with Phase II.

- CSI's characterization of Mr. Lucy's affidavit as "self-serving" should be stricken as argumentative. Mr. Lucy left Lycos's employment in 2004, has no current relationship with Lycos or its parent, and no interest in this litigation.

---

[81] Franklin Dep. at 348:21-349:5 (Little Decl. Ex. 5); Leaseforum presentation to TerraLycos, dated October 23, 2003 (Little Decl. Ex. 18) at AR10944. These materials have been designated as "confidential" by Leaseforum and are therefore being filed under seal in a separate addendum.
[82] Deposition of Jeffrey Rousseau ("Rousseau Dep.") at 133:12-24 (Little Decl. Ex. 16); Deposition of Kenneth Steinback ("Steinback Dep.") at 89:18-90:3 (Little Decl. Ex. 15).
[83] Deposition of Andrew Feinberg ("Feinberg Dep.") at 261:1-7 (Little Decl. Ex. 14); *see also* Acton Aff. Ex. 3 ¶ 14 and *Lycos's Local Rule 56.1 Statement on All Counts of CSI's Amended Complaint,* dated September 4, 2007, ¶ 24.

17.     Lycos's Facts. On August 8, 2003, John Kirk, who was responsible for generating new business for LeaseForum,[84] sent an e-mail to Lycos's Assistant Controller, Julie Callagee,[85] that CSI has alleged provides the basis for its fraud claim.[86] In that e-mail, Mr. Kirk states that "Phase 2 has commenced. The phase 2 effort is a continuation under statement of work 001. Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI."[87]

CSI's Response. Disputed in part, and misleading, First, Mr. Kirk had many duties for Leaseforum while he worked with Lycos, including "[t]o work with the members of the team to understand their strategy and their sales approach" and to "[h]elp clients [of Leaseforum] to get the most out of their leasing programs"[88] not just to market service, as Lycos claims. Second, CSI is alleging that the e-mail from Mr. Kirk is only one piece of evidence manifesting Lycos' intent to defraud CSI.[89]

Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

•      CSI's response should be stricken as wholly non-responsive. Nowhere did Lycos claim that John Kirk's only responsibility was generating new business; it simply said that he as responsible for generating new business, a fact CSI does not dispute. Because CSI does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted.

•      With respect to the second sentence, nowhere did Lycos contend that Mr. Kirk's e-mail was the only basis for CSI's fraud claim. It simply relied on CSI's Amended Complaint for the assertion that the e-mail was the basis of its fraud claim. Accordingly, there is no genuine issue of material fact in dispute on this matter.

---

[84] Ex. 17 at 87:21-88:23
[85] Ex. 18
[86] CSI's Am. Compl., ¶ 44 (Dkt. No. 121); Ex. 18 at LYC19440.
[87] Ex. 18 at LYC19440
[88] Acton Aff. Ex. 17 at 88:7-10; 89:1 1-12
[89] See supra ¶ 16/

18.    <u>Lycos's Facts</u>.  When questioned about the e-mail at her deposition, Ms. Callagee testified that: "It looks like John is a little eager here and they wanted to continue to—to continue working, yes."[90]  Ms. Callagee also specifically and repeatedly testified that Lycos did not authorize LeaseForum to perform the work described in Mr. Kirk's e-mail until an agreement between LeaseForum and Lycos was signed in October 2003.[91]  Ms. Callagee further testified that, as Lycos's Assistant Controller in 2003, she did not have the authority to enter into any contracts on behalf of Lycos[92]—including with respect to the work LeaseForum had proposed—and that Lycos's Chief Financial Officer, Mr. Lucy, who was reticent to proceed with the audit, would need to authorize it.[93]  In her e-mail response to Mr. Kirk two days later, Ms. Callagee requested a proposed fee schedule for the work and stated that Mr. Lucy "is expecting a much lower rate" for LeaseForum's services.[94]

<u>CSI's Response</u>.  Disputed.  It is undisputed that Leaseforum was an agent of, and working for, Lycos long before August 8, 2003.  In fact, Lycos and Leaseforum had executed a Statement of Work 1 ("SOW 1") as of June 17, 2003, in which Leaseforum would review Lycos' current leasing practices and, among other things, "outline available options" for Lycos.[95]  Under SOW 1, Leaseforum was entitled to receive twenty-five percent (25%) of monies saved by Lycos in its lease negotiations with Lycos' lessors.[96]  As of August 8, 2003, Mr. Kirk of Leaseforum was working for Lycos, and his e-mail to Ms. Callagee at Lycos does not say "Phase 2" was being contemplated or discussed, but that it "has commenced."[97]  A reasonable inference arising from Ms. Callagee's e-mail back to Mr. Kirk two days later seeking "a much lower rate than phase one given the favorable outcome there"[98] is that Lycos simply wants a better price for work that its agent had already started — not that Leaseforum may not continue implementation of the stated plan "to reduce Lycos remaining future payment obligations to CSI" or to achieve a "cash settlement or payment by CSI to Lycos."[99]  Importantly, there is no evidence that anyone at Lycos (including Ms. Callagee) ever responded to Mr. Kirk that Leaseforum should stop work on implementing "Phase 2."

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•    Lycos's facts are based exclusively on the testimony of Ms. Callagee and an e-mail Ms. Callagee sent.  While CSI claims to dispute Lycos's facts, because it has not provided any specific evidence controverting those facts, those facts should be deemed admitted.  In fact, despite having taken four days of Ms. Franklin's and Mr. Kirk's depositions, CSI chose not to elicit testimony from them on this issue.  It also chose not to elicit testimony from Mr. Lucy on it either.

•    The penultimate sentence of the paragraph, which purports to set forth a "reasonable inference" from Ms. Callagee's e-mail, is argument that should be stricken.  That so-called "inference" is directly rebutted by Ms. Callagee's uncontroverted testimony.

•    Because the last sentence is not supported by citation to the record, it, too, should be stricken.

---

[90]  Ex. 20 at 185:4-11
[91]  *Id.* at 197:21-198:20; 199:14-201:7
[92]  *E.g., id.* at 243:2-21
[93]  *Id.*; *see id.* at 190:7-24; 201:16-202:3; 205:11-19.
[94]  Ex. 19 at LYC23992
[95]  Statement of Work No. 1, dated June 17, 2003, between Leaseforum and Lycos (Little Decl. Ex. 17).
[96]  Little Decl. Ex. 17 at LYC18884.
[97]  Acton Aff. Ex 18 at LYC19440.
[98]  Acton Aff. Ex. 19 at LYC23992
[99]  Acton Aff. Ex. 18 at LYC19440

BST99 1561028-1 057077 0012

19.    <u>Lycos's Facts</u>. On August 13, 2003, LeaseForum exchanged e-mails internally concerning a "first pass" draft of a statement of work for the proposed audit of the CSI-Lycos relationship.[100] Among other things, that draft did not specify the rate LeaseForum would charge Lycos.[101]

<u>CSI's Response</u>. Disputed As stated above, Mr. Kirk stated on August 8, 2003 that "Phase 2 has commenced," which includes the "current work, . . ." aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI" - which Lycos had just represented to CSI that day it would pay in full - and to seek a "cash settlement or payment by CSI to Lycos." It is reasonable to infer from this that work had already begun, and Ms. Callagee's e-mail two days later states only that Lycos wanted a better price, not that the work begun by Leaseforum should not continue. The draft Statement of Work No 001 - which provided that Leaseforum would "negotiate with [CSI] .... with the objective of establishing a financial 'settlement' regarding the business relationship" between CSI and Lycos - did not specify the "Baseline" the parties would use to determine Leaseforum's compensation, but it did specify that Leaseforum would receive twenty percent (20%) of the "difference between the Settlement and the 'Baseline,'" once the baseline was set.[102]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

• Because CSI does not provide specific facts controverting the facts in the first sentence of Lycos's facts, those facts should be deemed admitted.

• As for the second sentence of Lycos's facts, the last sentence of CSI's response indicates that CSI's dispute is not "material."

• The second sentence of CSI's response, which again addresses what CSI believes "it is reasonable to infer," is improper argument that should be stricken.

---

[100]  Ex. 21; Ex. 22 at AR000806
[101]  AR000806
[102]  Acton Aff. Ex. 22 at AR000806

BST99 1561028-1 057077 0012

20.    Lycos's Facts. Not until almost two months passed did Lycos and LeaseForum actually enter into an agreement with respect to LeaseForum's audit of the CSI-Lycos lease relationship.[103] In a statement of work dated October 8, 2003, the parties agreed that "LeaseForum will . . . analyze past and current leasing activity with [CSI] with the objective of establishing a financial settlement regarding compensation received, or contracted future obligations due CSI from" Lycos.[104]  It went on to say that Lycos:

> will provide, in a timely fashion, all documents requested by LeaseForum . . . deemed necessary by LeaseForum to establish a complete picture of [Lycos's] end of lease obligations . . and [Lycos] will make accessible to LeaseForum information regarding invoices paid by [Lycos] to CSI. [Lycos] will provide LeaseForum access to key personnel . . to the extent reasonably necessary for LeaseForum to perform the Services.[105]

CSI's Response. Disputed and misleading. Again, when the actual agreement was signed which memorialized "Phase 2" - admittedly begun at least as of August 8, 2003, according to Mr. Kirk's e-mail of that date[106] - is not relevant. In fact, the signed Statement of Work No. 002 states that "Client [Lycos] desires *to continue a partnership* with LeaseForum,"[107] a reasonable inference being that this was simply memorializing a course of action that had "commenced" at least as early as August 8, 2003.

### Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.

• CSI does not dispute the date of SOW2; it simply says the date is irrelevant. Because CSI has not provide specific evidence controverting Lycos's facts, and because CSI's assertion is argument rather than fact, Lycos's well-supported facts should be deemed admitted.

• The portions of the second sentence of CSI's Response that reflects CSI's "reasonable inference" should be stricken because it is argument, not fact. In addition, CSI's purported inference is misleading as this statement in SOW2 refers to the parties work on the buyout and Sales Agreement under SOW1. There is no evidence that this statement refers to the work contemplated under SOW2, and CSI has elicited no testimony from any witnesses to support its claim that it did.

---

[103]  Ex. 23; *see* Ex. 20 at 197:21-198:20; 199:14-24; Ex. 24 at 564:10-23.
[104]  Ex. 23 at LYC18887 (emphasis supplied)
[105]  *Id.* (definition of "Work").
[106]  Acton Aff. Ex. 18.
[107]  Acton Aff. Ex. 23 at LYC18887.

- 24 -

21.    <u>Lycos's Facts</u>. Not until October 27, 2003, did LeaseForum deliver a presentation and report to Lycos summarizing the results of its audit.[108] Among other things, that report stated that:

- In an "expected market outcome," Lycos would have paid CSI $46.3 million to lease equipment with an original cost of $43.59 million, yielding CSI a return of 13.48 to 21.44%;[109]

- As a result of the CSI-Lycos refinancings, Lycos was expected to pay CSI $82.5 million to lease equipment that had an original cost of $43.59 million.[110]

<u>CSI's Response</u>. Disputed as misleading. Again, it is not relevant at what point Leaseforum may have formally presented its findings of its "Phase 2" investigation of the CSI-Lycos leases; what is relevant is whether Phase 2 began at or before the time Lycos entered into the Sales Agreement reaffirming its obligations to satisfy its obligations under the leases with CSI. Mr. Kirk's e-mail of August 8, 2007, clearly states that "Phase 2" had already "commenced" on or before the date that Lycos entered the Sales Agreement (August 8, 2003).[111] The formal presentation made by Leaseforum to Lycos in October is, however, significant for other reasons[112] that Leaseforum had communicated its findings to Lycos well prior to the execution of the Sales Agreement, and was restating them in the presentation mentioned in this paragraph.

<u>Lycos's Facts Should be Deemed Admitted</u>. While CSI says that it "disputes" Lycos's assertions, it then admits that its dispute is immaterial and fails to respond to the cited fats. Therefore, Lycos's facts should be deemed admitted. The last part of the last sentence, in which CSI claims that Lycos had communicated its findings well prior to execution of the Sales Agreement, is unsupported by citation and should be stricken.

---

[108]  Ex. 30.

[109]  *See* Ex. 30 at LYC20752.

[110]  *Id*.

[111]  Acton Aff. Ex. 18.

[112]  The presentation, for example, states that a Lycos "event" at some point between January 1997 and June 2003 was "Pressure on Operating Cash Flow," the solution for which, according to Leaseforum's investigation, was "Reduce Monthly Payments." Acton Aff. Ex. 30 at LYC20749. This contradicts Lycos' denial in this case that it was Lycos' idea to lower monthly lease payments (and thereby ease "pressure on operating cash flow") by extending its leases. Among the "options" suggested by Leaseforum was a recognition that the "contracts" between the parties required payment "as billed" of $11 million in remaining rents. <u>Id</u>. at LYC20754. Leaseforum also suggested "legal action" concerning "excess payments" for claims of unfair business practices, usury and fraud — all of which Lycos has brought or tried to bring in this case. <u>Id</u>.

- 25 -

22.    <u>Lycos's Facts</u>.  On November 19, 2003, LeaseForum made a presentation to Lycos's outside counsel similar to the one it had made to Lycos at the end of October.[113]

<u>CSI's Response</u>.  Disputed as misleading. That Leaseforum communicated its formal findings of the investigation to Lycos outside counsel in November 2003 is not relevant; again, what is relevant is whether Lycos had begun its "Phase 2" at or before the time it executed the Sales Agreement affirming its obligations to perform all of its ongoing leases[114] — upon which CSI relied and without which would not have entered the Sales Agreement.[115] It is also a reasonable inference that, just as Leaseforum had formally communicated its findings to Lycos in October 2003 prior to communicating them to outside Lycos counsel in November, Leaseforum had communicated its informal findings to Lycos much earlier, including before August 8, 2003 — which is reasonable, given Mr. Kirk's e-mail of August 8, 2003 in which he claims to have already started "Phase 2" which was "aimed at setting up a negotiation to reduce" the remaining lease payments as well as prompt a "cash settlement or payment by CSI to Lycos."[116]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•    Because CSI does not present any facts to controvert Lycos's facts, Lycos's facts should be deemed admitted. In addition, any dispute CSI has is admittedly "not relevant," and therefore cannot create a genuine issue of material fact.

•    The second sentence of CSI's response, beginning with the phrase, "It is also a reasonable inference," should be stricken because it is improper argument and not fact.

---

[113]  Ex 31
[114]  *See supra* ¶ 21
[115]  Little Decl Ex 6 (CSI's Response to Second Interrogatories).
[116]  Acton Aff Ex 18 at LYC19440

- 26 -

23.    Lycos's Facts. Having received information from LeaseForum that indicated that Lycos had paid CSI substantially more than it should have, in mid-December 2003, Lycos filed a "bare-bones" complaint against CSI in Massachusetts Superior Court seeking (1) a declaration that it did not have any further payment obligations to CSI, and (2) return of the amounts it had overpaid CSI.[117]

CSI's Response. Disputed as misleading, though irrelevant. First, Lycos' implication that it had only learned of its alleged claims for paying "more than it should have" in December 2003 is directly contradicted by Mr. Kirk's August 8, 2003 e-mail, Ms. Callagee's response concerning receiving a better price (and not asking Leaseforum to cease all Phase 2 work), and presentations of the formal findings to years and its counsel in October and November —all of which demonstrate that the "ball had begun rolling" on its lawsuit as early as, or before, the date it entered the Sales Agreement (August 8, 2003)[118] Lycos filing of a complaint in December 2003 is, at best, simply the culmination of work begun months earlier and not the start of the process, as Lycos claims. Moreover, Lycos had not paid CSI "more than it should have;" rather, Lycos paid CSI exactly what it had contracted to pay under the terms Lycos itself agreed to in the Master Lease and in each of the equipment schedules which it indisputably signed.[119]

<u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response.</u>

•    Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide any specific evidence controverting Lycos's facts, those facts should be deemed admitted. In addition, any dispute CSI has is admittedly "irrelevant," and therefore cannot create a genuine issue of material fact.

•    The balance of the paragraph – addressing what CSI describes as "Lycos's implication" – should be stricken as improper argument.

---

[117]  Ex. 26 at 1
[118]  See supra ¶¶ 16-21
[119]  There is no evidence in the case that Lycos' senior officers - in most cases, either Ted Philip (Lycos' CFO) or Tom Guilfoile (Lycos' Senior VP of Finance and Administration) - did not execute the Master Lease and all equipment schedules with CSI. Adding up the rents for the term of each schedule easily allowed Lycos to determine what its total payments would be under any given proposed lease re-write or new schedule. Lycos cannot dispute that it could calculate exactly what it was agreeing to pay under each schedule.

- 27 -

24.     <u>Lycos's Facts</u>.  Before serving the complaint, Lycos corresponded and spoke with CSI in an effort to settle the matter.[120]  After CSI removed that action to this Court, Lycos dismissed it voluntarily in April 2004.[121]  At the time of that dismissal, Lycos was in the process of being sold, which sale was consummated in October 2004.[122]

        <u>CSI's Response</u>.  Disputed as misleading, but not relevant. Lycos wrongfully concealed the very existence of the December 2003 lawsuit from Lycos and refused to even send CSI a copy of the alleged "report" from Leaseforum containing the claim of overcharging, until after "discussing" matter with CSI.[123]

        <u>Reasons to Deem Lycos's Facts Admitted and/or Strike CSI's Response</u>.

•     Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted.  In addition, any dispute CSI has is admittedly "not relevant," and therefore cannot create a genuine issue of material fact.

•     CSI's assertion about what "Lycos wrongfully concealed" should be stricken as argument.

---

[120]  *E g*, Ex. 27 at 216:1-218:13; Ex. 28.
[121]  *Lycos, Inc v Computer Sales International, Inc*, Case No. 04-10212-RWZ, Dkt. Nos. 1 and 2
[122]  Ex. 3, ¶ 14.
[123]  Feinberg Dep. at 228:17-229:5 (Little Decl. Ex. 14).

- 28 -

25.    <u>Lycos's Facts</u>.  In October, 2004, Lycos was sold and Mr. Lucy was replaced as CFO.[124] Having received LeaseForum's report and satisfied all of its payment obligations under all of the extant schedules other than schedules 100 and 200,[125] Lycos stopped making payments to CSI under schedules 100 and 200.[126]

<u>CSI's Response</u>.  Disputed as misleading.  Lycos was not justified in stopping its payments because it believed it had "satisfied all of its payment obligations," as it procured the Sales Agreement through fraud by representing it would honor all of the existing lease terms without the present intent to do so.[127] Lycos stopped its payments to CSI within a few months after signing, the Sales Agreement and sued CSI claiming that it should not have to make any more payments.  A few months later, it dismissed that suit because the company was being sold, but then in late 2004, it again stopped its lease payments, and claimed again that it had no obligation to make them, and that CSI had to refund its previous payments.

<u>Lycos's Facts Should be Deemed Admitted</u>.

- Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted.

- The first sentence of CSI's Response about what it claims "Lycos was not justified" in doing should be stricken as argument.

- The second and third sentences should be stricken because there are citations to the record supporting any of the statements in them.

---

[124] *Id*., ¶¶ 1, 14

[125] *See supra* ¶¶ 15 and 16

[126] *See* CSI's Am. Compl., ¶¶ 18-19, 25, 26 (Dkt. No. 121).

[127] *See* e-mail from Lycos' agent Leaseforum on August 8, 2003, stating that "Phase 2" — designed to reduce its lease obligations and negotiate a cash payment or settlement — had already "commenced." Acton Aff. Ex 18.

- 29 -

# EXHIBIT B

ORIGINAL  IN THE UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS


COMPUTER SALES                 )
INTERNATIONAL, INC.,           )
                               )
                               )
  Plaintiff and Defendant-     )
  in-Counterclaim              )
                               )  C.A. No. 05-10017-RWZ
vs.                            )
                               )
                               )
LYCOS, INC.,                   )
                               )
                               )
  Defendant and Plaintiff-     )
  in-Counterclaim,             )
                               )
                               )
vs.                            )
                               )
                               )
BANK OF AMERICA                )
f/k/a FLEET BANK,              )
                               )
                               )
  Trustee Process Defendant.)



     VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU
         Taken on behalf of Lycos, Inc.
                March 8, 2006

      Reported by Victoria Menaugh Fauser
                CCR No. 903
           CSR Missouri and Illinois



        METRO COURT REPORTING, INC.
              P.O. BOX 29548
           ST. LOUIS, MO  63126
              (636) 349-3333

```
 1        Q      What is CSI?
 2        A      The name of the company is CSI
 3   Leasing
 4        Q      How long has that been the name of the
 5   company?
 6        A      The name changed from Computer Sales
 7   International to CSI Leasing I think in the summer
 8   of 2004
 9        Q      And the name before it was CSI Leasing
10   was Computer Sales International?
11        A      Yes
12        Q      How long have you been -- if I use the
13   term CSI today can we take that to mean both
14   Computer Sales International and CSI Leasing?
15        A      Yes
16        Q      How long have you been employed at
17   CSI?
18        A      2000
19        Q      In what -- have you been employed in
20   the same capacity since the year 2000?
21        A      I'm not sure I understand the
22   question
23        Q      Has your job title changed since the
24   year 2000?
25        A      Yes
```

```
 1        Q      When you went to work at CSI Leasing
 2   what was your job title?
 3        A      Corporate attorney
 4        Q      And did your job title change at some
 5   point?
 6        A      It was changed to Assistant General
 7   Counsel and Assistant Vice-President
 8        Q      And when did that change occur?
 9        A      2001
10        Q      Did your duties change when you became
11   an Assistant General Counsel and Assistant
12   Vice-President from what they had been when you
13   were corporate attorney?
14        A      No
15        Q      And prior to going to work for
16   Computer Sales International were you employed?
17        A      Yes
18        Q      Where were you employed?
19        A      Brown & James
20        Q      What is Brown & James?
21        A      A law firm in St Louis Missouri
22        Q      And during what period of time were
23   you employed at Brown & James?
24        A      1998 to 2000
25        Q      And what -- did you have a title at
```

```
 1   Brown & James?
 2        A      Associate
 3        Q      What sort of work did you do at
 4   Brown & James?
 5        A      Bankruptcy and some commercial work
 6        Q      When did you leave Brown & James?
 7        A      2000
 8        Q      What month?
 9        A      October I believe
10        Q      And did you immediately go to work for
11   CSI?
12        A      Yes  I took a one-week -- I took off
13   one week and then I went to CSI
14        Q      Before joining Brown & James were you
15   employed?
16        A      Yes
17        Q      Where?
18        A      Thompson Coburn
19        Q      What is Thompson Coburn?
20        A      A law firm in St Louis Missouri
21        Q      And during what period of time were
22   you employed at Thompson & Coburn?
23        A      1997 to '98
24        Q      Okay  And did you have a title at
25   Thompson Coburn?
```

```
 1        A      I think it was staff attorney
 2        Q      And did you have an area of practice?
 3        A      Class actions
 4        Q      Plaintiff or defendant side?
 5        A      Defendant
 6        MR  KALER:  Can I just interject for a
 7   moment?  That sound is getting picked up on the
 8   video and I m wondering if there is any way you can
 9   eliminate it   I'm concerned that -- I don't know
10   how audible his testimony is
11        MR  BEAN:  Off the record for a
12   second
13   (WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS HELD)
14        Q      (BY MR BEAN)  Prior to joining
15   Thompson Coburn were you employed?
16        A      That was when I graduated from law
17   school
18        Q      When did you graduate from law school?
19        A      1997
20        Q      When in 1997?
21        A      May
22        Q      And from what law school did you
23   graduate?
24        A      Stetson University
25        Q      Okay  I want to focus on your work at
```

210

1    Q    Do you know who at CSI was involved in
2  the drafting of the Sales Agreement pursuant to
3  which Lycos purchased equipment in August of 2003?
4    A    My understanding is that it was
5  drafted with substantial input and revisions by
6  Lease Forum who was a independent leasing expert
7  consultant retained by Lycos   Lease Forum worked
8  with and provided proposals I believe to Joan
9  Kersting at CSI
10    Q    So Joan Kersting was the CSI person
11  who was involved with the Sales Agreement --
12    A    Yes
13    Q    -- the lawyer?
14    A    Yes
15    Q    I apologize if I asked you this
16  before. but what policies if any does CSI have in
17  place to assure that its employees and
18  representatives comply with the ELA code of fair
19  business practices?
20          MR  KALER:  Objection   This was gone
21  over before   But you can respond again
22    A    I'm not familiar with all of our
23  policies   It may be in our employee manual. it may
24  not   I just haven't reviewed it for at least five
25  years

211

1  Group   It could have been   you know, the MIS
2  Department
3    Q    Who is the head of the Marketing
4  Group?
5    A    At?
6    Q    CSI
7    A    Again, I'm not sure exactly of the
8  chain of command in the Marketing Group   There is
9  salesmen   We have four Regional Managers   I'm not
10  sure who the Regional Managers report to, if
11  anyone   I don't want to guess
12    Q    How many salesmen are there in the
13  field employed by CSI?
14    A    Approximately 40
15    Q    And they report to four Regional
16  Managers?
17    A    Yes
18    Q    What territory does Paul Stenberg's
19  region cover?
20    A    Principally the northeast
21    Q    Does that include New York, New
22  Jersey?
23    A    I think New York but not New Jersey
24    Q    So New York and north?
25    A    Somewhat west   I know he goes to

212

1  Pittsburgh   And I think he goes to Detroit   It's
2  not strictly based on a clean map where we cut the
3  country in four corners   It zig-zags a bit
4    Q    Are you familiar with any CSI policies
5  concerning whether a sales rep is to -- the
6  circumstances under which a sales rep is to refer
7  questions by a customer to Finance at CSI?
8    A    I'm not sure I understand your
9  question
10    Q    Let me rephrase that   I didn't do a
11  very good job of that   Are you aware of the
12  circumstances under which CSI has requested that
13  its sales representatives refer customers with
14  questions to the Finance Department at CSI?
15          MR  KALER:  Objection   But you can
16  respond
17    A    No, I'm not a salesman
18    Q    (BY MR  BEAN)  I understand that   I'm
19  just wondering if you're aware of any CSI policies?
20    A    I am not familiar with the policies
21  that CSI's salesmen practice referring questions to
22  the Finance Department
23    Q    Is Mr  Stenberg a Vice-President?
24    A    Yes, as far as I know
25    Q    All right   Let's go over the

1    Q    (BY MR  BEAN)  So you're not aware of
2  whether there are any policies to comply with it?
3    A    That's correct
4    Q    Are you familiar with -- have you ever
5  had a chance to look at CSI's website?
6    A    Yes
7    Q    Are you familiar with an aspect of
8  that website called "My CSI?"
9    A    "Yes
10    Q    Do you know when CSI made "My CSI"
11  available to its website?
12    A    No
13    Q    Do you know what prompted CSI to make
14  "My CSI" available on its website?
15    A    I wasn't involved in that   It was
16  something outside of my activity
17    Q    Who at CSI was responsible for
18  generating the concept of "My CSI?"
19          MR  KALER:  Objection   But you can
20  respond
21    A    I don't know who was the one person
22  who did it   It may have been multiple people
23    Q    (BY MR  BEAN)  What department or
24  group would that have come under?
25    A    It could have been the Marketing

1  believe was a Lease Forum insertion    Paragraph 2 I
2  believe that Lease Forum modified in some way  or
3  at least prepared some of those numbers
4         I remember that one of the issues was
5  that Lease Forum was putting the wrong termination
6  dates on some of the leases and had to be
7  corrected
8         The next paragraph I m not sure who
9  inserted that provision  The sales price was the
10 number that Lease Forum and Lycos agreed to pay CSI
11 3 775 million dollars  That number was put in by
12 Lease Forum
13        Satisfaction of lease obligations
14 Section 4. stating that all of the existing leases
15 were to remain in full force and effect and that
16 Lycos shall pay to CSI the remaining payments   I'm
17 not sure who inserted that   I know that the
18 Exhibit 1 referenced on that was created by Lease
19 Forum
20        The next section about a casualty
21 event as defined in the lease which I believe would
22 refer to the Stip Loss Tables you were talking
23 about earlier  it s stating that the remaining
24 rental payments with respect to each equipment
25 schedule shall be adjusted accordingly consistent

1  with such event
2         I think the next section, I m not sure
3  who drafted that   I think it was Lease Forum   It
4  doesn't sound like something that CSI had in its
5  original contract   Stating that Lease Forum was
6  requesting CSI to acknowledge that all of Lycos
7  obligations with respect to all of the leases would
8  be ceased -- you know  they would be all satisfied
9  if Lycos performed according to the terms of this
10 agreement and paid all the lease payments and the
11 sales price   The next one  I'm not sure who
12 created that one
13        Section 5.  I'm not sure who drafted
14 that one, that section   Section 6 I suspect was
15 created by CSI, not by Lease Forum   Schedule --
16 Section 7  I'm not sure who drafted that section
17 It looks like that it's been amended in some way
18 I think it was amended by Lycos to cross out
19 certain paragraphs and replace it with Section 5
20 which would state that CSI is retaining title to
21 the equipment until all the payments have been
22 made
23        Section 8 on taxes, I m not sure   I
24 suspect it was CSI drafted  The remedies section
25 Section 9  I m not sure who created that   Section

1  10-A is the statement that the agreement between
2  CSI and Lycos with respect to the sale of the
3  equipment that there has been no representation or
4  statement made outside of this agreement which is
5  binding on any party   The next section, 10-B is on
6  notices  I believe that to be a CSI provision
7  Governing law, Section 10-C states that --
8         Q     I know what it states   I'm interested
9  in who proposed it
10        A     I'm not sure who proposed it   The
11 Master Lease and equipment schedules are governed
12 by Missouri law pursuant to the agreements so
13 that s consistent with the leases   D  E  I m
14 not -- I suspect that CSI drafted that   That looks
15 like some language we would have used in other
16 contracts   Section 10-F which is stating that
17 Lycos hasn t relied on CSI for any advice or
18 assistance in making its selection to purchase the
19 equipment   I m not sure who drafted that either
20 which side
21        Section G I suspect that was drafted
22 by CSI  but I'm not sure   Then the final dates
23 look like that was probably prepared by Lease Forum
24 because I think they sent this form to us so we
25 were ultimately agreeing to the terms Lease Forum

1  wanted us to approve, and then reviewed by the Tara
2  Lycos Legal Department is not something that we
3  would stamp on our documents   It was stamped by
4  Lycos after their Legal Department reviewed this
5  agreement
6         Q     You didn t participate in the
7  negotiation or drafting of the Sales Agreement; did
8  you?
9         A     No
10        Q     So how do you know what changes were
11 proposed by Lycos or Lease Forum?
12        A     I m familiar with this Sales Agreement
13 and I was familiar with the original Sales
14 Agreement that CSI had sent to Lycos, Lycos then
15 gave to Lease Forum and I compared the two in the
16 past  but not recently  This agreement is in a
17 different form than the original agreement that CSI
18 sent to Lycos for review
19        Q     Did CSI believe at the time this Sales
20 Agreement was executed that the fair market value
21 of the equipment was 3 775 million?
22        MR  KALER:  Objection   But you can
23 respond.
24        A     I don't know what CSI believed at the
25 time  I think CSI believed that at bottom this was

1 the negotiated price between Lycos, Lycos  expert
2 Lease Forum and CSI as to what that price should
3 be
4      Q      (BY MR  BEAN)  But you don t know
5 whether CSI believed that the fair market value was
6 3 775 million?
7           MR  KALER:  Objection
8      Q    (BY MR  BEAN)  Do you?
9           MR  KALER:  But you can respond
10      A    I don't see a fair market value is
11 defined in this --
12      Q    (BY MR  BEAN)  Here's my question   If
13 you look at the next to last recital  a prepayment
14 of the fair market value of all of the equipment is
15 hereinafter defined as required in order to
16 restructure each lease to a $1 00 buy-out   Do you
17 see that?
18      A    Yes
19      Q    And then the amount that's being paid
20 is 3 775 million?
21      A    Yes
22      Q    Do you have an understanding that CSI
23 believed that 3 775 million was the fair market
24 value of all the equipment?
25           MR  KALER:  Objection  But you can

1 respond again
2      A    I believe the fair market value of the
3 equipment to be what a willing buyer and a willing
4 seller would agree to pay   So in this situation
5 fair market value I believe is 3 775   That is what
6 Lycos negotiated downwards to arrive at and
7 apparently was happy with it because they signed
8 the agreement   I believe also that that prepayment
9 of the fair market value was something that Lease
10 Forum had put into the agreement  not CSI
11      Q    So your answer is yes  CSI considered
12 3 775 million to be the fair market value of the
13 equipment on the date of the Sales Agreement?
14           MR  KALER:  Objection --
15      Q    (BY MR  BEAN)  Is that right?
16           MR  KALER:  Objection   But you can
17 respond again
18      A    As I said, I didn't prepare this
19 agreement or review it at the time so I can't speak
20 to what CSI s position was at that moment   I can
21 only speak to what I believe a fair market value is
22 which is what two parties have agreed to pay for
23 the equipment
24           MR  BEAN:  I have no further questions
25 of Mr  Stenberg at this time

235

1           MR  KALER:  I have no questions of
2 Mr  Stenberg in this deposition -- excuse me   I
3 have no questions of Mr  Rousseau, and I think you
4 meant Mr  Rousseau
5           MR  BEAN:  I think I meant
6 Mr  Rousseau as well
7           MR  KALER:  I have no questions of
8 Mr  Rousseau in this deposition   We'll save our
9 questions for trial   Read and sign
10           (SIGNATURE OF THE WITNESS NOT WAIVED)

236

COMES NOW THE WITNESS  JEFFREY L
ROUSSEAU, and having read the foregoing transcript
of the deposition taken on March 8, 2006
acknowledges by signature hereto that it is a true
and accurate (corrected) transcript of the
testimony given on the date hereinabove mentioned


       JEFFREY L  ROUSSEAU
     Subscribed and sworn to before me
this_____ day of _____,
_____


     My Notary Commission
expires:_____


       NOTARY PUBLIC

COMPUTER SALES INTERNATIONAL  INC  vs  LYCOS  INC

# EXHIBIT C

Volume 1, Pages 1-285

Exhibits:  1-30

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF JOAN KERSTING

Wednesday, December 13, 2006, 9:06 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


- - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

4 (Pages 10 to 13)

Joan Kersting
Volume 1 - December 13, 2006

10

| | | |
|---|---|---|
| 1 | Q. In what capacity? | 09:13:06 |
| 2 | A. Counsel, I believe. | 09:13:07 |
| 3 | Q. And what were your duties as counsel at | 09:13:12 |
| 4 | First Nationwide? | 09:13:16 |
| 5 | A. I reviewed some litigation for them, and I | 09:13:17 |
| 6 | also did some of the real estate workout. | 09:13:20 |
| 7 | Q. When you say you reviewed litigation, what | 09:13:29 |
| 8 | do you mean by that? | 09:13:31 |
| 9 | A. I would take a look at legal bills and | 09:13:32 |
| 10 | those kind of things for ongoing litigation. | 09:13:34 |
| 11 | Q. Were you the person at First Nationwide who | 09:13:43 |
| 12 | would work with outside counsel on litigation | 09:13:46 |
| 13 | matters? | 09:13:47 |
| 14 | A. From time to time, yes. | 09:13:48 |
| 15 | Q. What sorts of litigation matters did you | 09:13:50 |
| 16 | work with outside counsel on while you were at First | 09:13:52 |
| 17 | Nationwide? | 09:13:55 |
| 18 | A. None really come to mind. It was any kind | 09:13:57 |
| 19 | of litigation that would come up in a bank. A | 09:14:03 |
| 20 | depositor had a question about a lawsuit. There | 09:14:06 |
| 21 | were bankruptcy matters in commercial loans. Just | 09:14:12 |
| 22 | any typical kind of bank.... | 09:14:18 |
| 23 | Q. Loan-recovery work? | 09:14:21 |
| 24 | A. Right. | 09:14:23 |

11

| | | |
|---|---|---|
| 1 | Q. And how long were you employed at First | 09:14:24 |
| 2 | Nationwide Bank as counsel? | 09:14:28 |
| 3 | A. A little over two years. | 09:14:29 |
| 4 | Q. Until about 1989? | 09:14:30 |
| 5 | A. I left in the spring of 1990. | 09:14:32 |
| 6 | Q. And were you -- was your title counsel when | 09:14:36 |
| 7 | you left in spring of 1990? | 09:14:40 |
| 8 | A. I don't remember. I think so. | 09:14:43 |
| 9 | Q. What did you do after leaving First | 09:14:44 |
| 10 | Nationwide? | 09:14:48 |
| 11 | A. I went to CSI | 09:14:49 |
| 12 | Q. In what capacity did you join CSI? | 09:14:51 |
| 13 | A. Counsel. | 09:14:53 |
| 14 | Q. Have you been employed by CSI continuously | 09:14:54 |
| 15 | from 1990 through today? | 09:15:07 |
| 16 | A. Yes. | 09:15:09 |
| 17 | Q. How long did you serve as counsel at CSI, | 09:15:14 |
| 18 | until what year approximately? | 09:15:20 |
| 19 | A. I would say four or five years. | 09:15:21 |
| 20 | Q. And did you receive a promotion at some | 09:15:24 |
| 21 | point? | 09:15:28 |
| 22 | A. To assistant general counsel. | 09:15:29 |
| 23 | Q. Was that in about 1995? | 09:15:31 |
| 24 | A. I think it was before then, but... . | 09:15:34 |

12

| | | |
|---|---|---|
| 1 | Q. 1994? | 09:15:37 |
| 2 | A. Somewhere around then. | 09:15:37 |
| 3 | Q. And how long did you serve as an assistant | 09:15:43 |
| 4 | general counsel? | 09:15:45 |
| 5 | A. For a few years, and then I was promoted to | 09:15:46 |
| 6 | associate general counsel, which is my current | 09:15:49 |
| 7 | title. | 09:15:51 |
| 8 | Q. What year did you become associate general | 09:15:51 |
| 9 | counsel? | 09:15:53 |
| 10 | A. I don't remember. I would say 1996 | 09:15:54 |
| 11 | Q. So you've been associate general counsel | 09:16:00 |
| 12 | for approximately ten years? | 09:16:02 |
| 13 | A. Yes. | 09:16:03 |
| 14 | Q. Are you an officer of CSI? | 09:16:03 |
| 15 | A. I am. | 09:16:04 |
| 16 | Q. In what year did you become an officer? | 09:16:05 |
| 17 | A. I would say probably '96. | 09:16:09 |
| 18 | Q. When you were promoted to associate general | 09:16:12 |
| 19 | counsel? | 09:16:15 |
| 20 | A. I think so | 09:16:15 |
| 21 | Q. Do you recall when in 1996 you were | 09:16:16 |
| 22 | promoted to associate general counsel? | 09:16:18 |
| 23 | A. I don't know | 09:16:20 |
| 24 | Q. So are you a vice-president or a senior | 09:16:22 |

13

| | | |
|---|---|---|
| 1 | vice-president? | 09:16:28 |
| 2 | A. I'm a senior vice-president | 09:16:30 |
| 3 | Q. And when did you become a senior vice- | 09:16:32 |
| 4 | president at CSI? | 09:16:34 |
| 5 | A. Three years ago | 09:16:35 |
| 6 | Q. In 2003? | 09:16:40 |
| 7 | A. I think so | 09:16:41 |
| 8 | Q. Were you a vice-president before you were a | 09:16:44 |
| 9 | senior vice-president? | 09:16:47 |
| 10 | A. Yes | 09:16:48 |
| 11 | Q. And when did you become a vice-president at | 09:16:48 |
| 12 | CSI? | 09:16:50 |
| 13 | A. I don't -- I'm not sure. I think it was | 09:16:50 |
| 14 | probably '95-'96 | 09:16:52 |
| 15 | Q. About when you were promoted to associate | 09:16:54 |
| 16 | general counsel? | 09:16:56 |
| 17 | A. I think so | 09:16:57 |
| 18 | Q. So you've been -- just to review, you | 09:16:58 |
| 19 | became a vice-president in or about 1996 and became | 09:17:01 |
| 20 | a senior vice-president in or about 2003; is that | 09:17:05 |
| 21 | right? | 09:17:10 |
| 22 | A. I think so, yes | 09:17:10 |
| 23 | Q. And you've been an officer at CSI during | 09:17:11 |
| 24 | that ten-year period; right? | 09:17:13 |

Joan Kersting
Volume 1 - December 13, 2006

|  | 90 |  |  | 92 |  |
|---|---|---|---|---|---|
| 1 | the lease term if the customer couldn't return the | 11:06:42 | 1 | MR. LITTLE: Objection | 11:08:57 |
| 2 | equipment? | 11:06:44 | 2 | A. Could you rephrase that? | 11:08:57 |
| 3 | A. My basis for believing that is our | 11:06:45 | 3 | Q. So you now understand that Lycos viewed its | 11:08:59 |
| 4 | reputation and the course of dealing with our | 11:06:47 | 4 | options as either paying CSI over $34 million or | 11:09:03 |
| 5 | customers. | 11:06:51 | 5 | agreeing to a purchase price with CSI; right? | 11:09:07 |
| 6 | Q. Any other basis for that belief? | 11:06:53 | 6 | MR. LITTLE: Objection. | 11:09:11 |
| 7 | A. I think that's pretty much it. | 11:06:55 | 7 | A. I understand that those were some of the | 11:09:12 |
| 8 | Q. When you refer to "course of dealing," what | 11:06:58 | 8 | factors that they considered, yes. | 11:09:13 |
| 9 | do you mean by that? | 11:07:10 | 9 | Q. What other factors do you understand that | 11:09:19 |
| 10 | A. How we've handled sales of equipment at the | 11:07:11 | 10 | Lycos considered? | 11:09:21 |
| 11 | end of lease with customers before. | 11:07:19 | 11 | A. I understand that they had a consultant | 11:09:21 |
| 12 | Q. Okay. But if a customer has never | 11:07:20 | 12 | looking at the sale for them, and I don't know what | 11:09:23 |
| 13 | purchased equipment from CSI before, it doesn't know | 11:07:22 | 13 | information she may have provided. | 11:09:26 |
| 14 | how CSI's going to deal with the sale of the | 11:07:26 | 14 | Q. What other factors do you understand Lycos | 11:09:29 |
| 15 | equipment at the end of the lease term, is it? | 11:07:28 | 15 | was considering? | 11:09:31 |
| 16 | MR. LITTLE: Objection. | 11:07:30 | 16 | A. I think that's -- I mean, I don't know of | 11:09:38 |
| 17 | A. They may not know directly, but they may | 11:07:31 | 17 | any other factors that they may have been | 11:09:40 |
| 18 | have talked to other customers. | 11:07:34 | 18 | considering | 11:09:42 |
| 19 | Q. Okay, but other than talking with other | 11:07:35 | 19 | Q. What did you do to prepare for your | 11:09:42 |
| 20 | customers, they would have no basis for knowing, | 11:07:37 | 20 | deposition today? | 11:09:46 |
| 21 | would they? | 11:07:40 | 21 | A. I met with our lawyers, and I reviewed some | 11:09:47 |
| 22 | MR. LITTLE: Objection | 11:07:41 | 22 | documents. | 11:09:49 |
| 23 | A. I don't know. | 11:07:43 | 23 | Q. What lawyers did you meet with? | 11:09:50 |
| 24 | Q. And you referred to your reputation in the | 11:07:43 | 24 | A. Ted Little, Bob Carol, Jeff Rousseau. | 11:09:52 |

|  | 91 |  |  | 93 |  |
|---|---|---|---|---|---|
| 1 | industry  What reputation are you referring to? | 11:07:47 | 1 | Q. Did you review any documents yesterday that | 11:09:58 |
| 2 | A. I think that we have a good reputation in | 11:07:49 | 2 | refreshed your recollection as to anything? | 11:10:00 |
| 3 | the industry | 11:07:53 | 3 | A. Yes | 11:10:03 |
| 4 | Q. And what's the basis for that belief? | 11:07:55 | 4 | Q. What did you review that refreshed your | 11:10:04 |
| 5 | A. Discussions with our customers | 11:07:58 | 5 | recollection? | 11:10:06 |
| 6 | Q. You were involved in the negotiation of the | 11:08:03 | 6 | MR. LITTLE: Objection  I'm going to | 11:10:06 |
| 7 | sales agreement between CSI and Lycos; right? | 11:08:12 | 7 | direct the witness not to answer that on work- | 11:10:07 |
| 8 | A. I drafted the sales agreement | 11:08:14 | 8 | product grounds | 11:10:09 |
| 9 | Q. Are you aware that Lycos in analyzing | 11:08:16 | 9 | MR. BEAN: We're talking about | 11:10:12 |
| 10 | whether to purchase the equipment from CSI for a | 11:08:20 | 10 | refreshing the recollection  We've been taking the | 11:10:13 |
| 11 | specified amount looked at its alternative of paying | 11:08:24 | 11 | view that if something refreshed the witness's | 11:10:15 |
| 12 | a stip loss value of over $34 million? | 11:08:29 | 12 | recollection, the witness would testify to it.  I | 11:10:17 |
| 13 | A. I'm not -- I wasn't aware of that at the | 11:08:32 | 13 | think that's the law  At least that's the way we've | 11:10:21 |
| 14 | time. | 11:08:36 | 14 | been doing it  You and I have had several | 11:10:23 |
| 15 | Q. Have you since become aware of that? | 11:08:36 | 15 | depositions in this case.  Is that still your | 11:10:26 |
| 16 | A. I have | 11:08:38 | 16 | instruction?  You're instructing the witness not to | 11:10:28 |
| 17 | Q. How have you become aware of that? | 11:08:38 | 17 | answer questions as to documents she reviewed that | 11:10:30 |
| 18 | A. I've become aware of it in looking at | 11:08:41 | 18 | refreshed her recollection? | 11:10:32 |
| 19 | documents. | 11:08:44 | 19 | MR. LITTLE: What I'm trying to avoid is | 11:10:34 |
| 20 | Q. In preparation for your deposition? | 11:08:45 | 20 | revelation of work product  You're asking did she | 11:10:36 |
| 21 | A. Yes | 11:08:47 | 21 | review certain documents to refresh her recollection | 11:10:39 |
| 22 | Q. So you understand that Lycos viewed itself | 11:08:47 | 22 | of things | 11:10:41 |
| 23 | as either agreeing to CSI -- a price with CSI or | 11:08:51 | 23 | MR. BEAN: Yes | 11:10:42 |
| 24 | paying over $34 million; right? | 11:08:54 | 24 | MR. LITTLE: The way I prefer to do it | 11:10:43 |

FARMER ARSENAULT BROCK LLC

Joan Kersting
Volume 1 - December 13, 2006

206

| 1 | Q  And you see that at the top of each page | 03:20:34 |
| 2 | after the first page there's a reference -- there's | 03:20:36 |
| 3 | a fax line of August 1, 2003, from Lycos.  Do you | 03:20:40 |
| 4 | see that? | 03:20:43 |
| 5 | A  Yes | 03:20:43 |
| 6 | Q  And you received the signed sales agreement | 03:20:47 |
| 7 | from Lycos on August 1, 2003; correct? | 03:20:49 |
| 8 | A  I believe I did, yes | 03:20:53 |
| 9 | Q  And you saw that it was signed by Mr. Lucy | 03:20:58 |
| 10 | on July 18, 2003; correct? | 03:21:02 |
| 11 | A  I see that now, yes | 03:21:08 |
| 12 | Q  You didn't see that on August 1st, 2003? | 03:21:09 |
| 13 | A  I may have, but I don't recall that I made | 03:21:11 |
| 14 | note of it | 03:21:14 |
| 15 | Q  Do you see that you say in the last line of | 03:21:16 |
| 16 | the email that's the first page of this exhibit, | 03:21:18 |
| 17 | "There are errors in the termination dates for ES's | 03:21:22 |
| 18 | 100 and 200."  Do you see that? | 03:21:27 |
| 19 | A  Yes | 03:21:29 |
| 20 | Q  And you worked over the week after August | 03:21:29 |
| 21 | 1, 2003, to get those errors corrected; right? | 03:21:33 |
| 22 | A  Yes | 03:21:37 |
| 23 | Q  And subsequently the sales agreement, after | 03:21:41 |
| 24 | some de minimis changes were made, was reexecuted; | 03:21:44 |

207

| 1 | right? | 03:21:47 |
| 2 |     MR LITTLE:  Objection | 03:21:49 |
| 3 | A  I don't know that it was reexecuted | 03:21:51 |
| 4 | Q  You don't know that it was reexecuted | 03:21:53 |
| 5 | Okay  Did CSI execute the form of the sales | 03:21:55 |
| 6 | agreement that is attached to your email of August | 03:22:00 |
| 7 | 1, 2003? | 03:22:02 |
| 8 | A  I don't know | 03:22:05 |
| 9 |     MR LITTLE:  Objection | 03:22:05 |
| 10 | Q  And you say that Lycos revised the sales | 03:22:09 |
| 11 | agreement to add the language about adding a dollar | 03:22:12 |
| 12 | purchase option; right? | 03:22:14 |
| 13 | A  Lycos -- right. | 03:22:19 |
| 14 | Q  Now, did Lycos redraft the sales agreement | 03:22:21 |
| 15 | that you had sent to it, or did you draft the sales | 03:22:24 |
| 16 | agreement that's attached to Exhibit 23? | 03:22:29 |
| 17 | A  This is not my draft | 03:22:39 |
| 18 | Q  It's not your draft | 03:22:40 |
| 19 | A  That's right | 03:22:42 |
| 20 | Q  Now, you understand that both on your draft | 03:22:47 |
| 21 | and on the draft attached to Exhibit 23 that Lycos | 03:22:49 |
| 22 | was to become the owner of the equipment on each | 03:22:54 |
| 23 | equipment schedule as of the date, the termination | 03:22:57 |
| 24 | date, of each equipment schedule; right? | 03:22:59 |

208

| 1 | A  Could you repeat that? | 03:23:03 |
| 2 | Q  Sure.  You understood that on your sales | 03:23:04 |
| 3 | agreement that you had sent to Lycos, marked as | 03:23:08 |
| 4 | Exhibit 22, along with the sales agreement attached | 03:23:18 |
| 5 | to Exhibit 23, that in both cases Lycos was to | 03:23:25 |
| 6 | become the owner of the equipment on the termination | 03:23:30 |
| 7 | date of each lease | 03:23:32 |
| 8 | A  Yes. | 03:23:40 |
| 9 | Q  And so with respect to Equipment Schedules | 03:23:40 |
| 10 | 69I, 64F, 66I, and 67H, which terminated on | 03:23:43 |
| 11 | September 30, 2003, Lycos became the owner of the | 03:23:48 |
| 12 | equipment on that date; is that right? | 03:23:52 |
| 13 | A  Under this agreement, yes. | 03:24:04 |
| 14 |     (Exhibit Kersting 24 marked for | 03:24:28 |
| 15 | identification ) | 03:24:40 |
| 16 | Q  What's been marked as Exhibit 24, | 03:24:40 |
| 17 | Ms  Kersting, is an email -- the first page is an | 03:24:42 |
| 18 | email from you to jcallagee@lycos with a copy to | 03:24:47 |
| 19 | Paul Stenberg  The documents are Bates No  CSI | 03:24:51 |
| 20 | 0038506 through 38516.  Do you recognize what's | 03:24:55 |
| 21 | marked as Kersting 24? | 03:25:00 |
| 22 | A  Yes | 03:25:02 |
| 23 | Q  Okay  What is it? | 03:25:32 |
| 24 | A  It's an email to Julie Callagee explaining | 03:25:34 |

209

| 1 | what the error was in the exhibit regarding | 03:25:38 |
| 2 | Equipment Schedule 100 | 03:25:44 |
| 3 | Q  So you were trying to clean up that error; | 03:25:45 |
| 4 | is that right? | 03:25:48 |
| 5 | A  I was trying to correct the termination | 03:25:50 |
| 6 | date, yes | 03:25:53 |
| 7 | Q  Was there anything else in the sales | 03:25:55 |
| 8 | agreement marked as Exhibit 34 that you believed -- | 03:26:00 |
| 9 | 24, excuse me -- needed correcting? | 03:26:03 |
| 10 | A  I can't tell -- I don't have an independent | 03:26:09 |
| 11 | recollection of it  It looks like I thought there | 03:26:21 |
| 12 | were errors in the termination dates for two | 03:26:23 |
| 13 | schedules, 100 and 200 | 03:26:26 |
| 14 | Q  Were you aware of any other errors that | 03:26:28 |
| 15 | needed to be corrected? | 03:26:31 |
| 16 | A  I would have to look at the version that | 03:26:36 |
| 17 | CSI signed, but I thought that there were other | 03:26:39 |
| 18 | changes regarding paragraph references or something | 03:26:44 |
| 19 | like that | 03:26:46 |
| 20 | Q  Those changes were minor? | 03:26:47 |
| 21 | A  Well, I don't know -- | 03:26:50 |
| 22 |     MR LITTLE:  Objection | 03:26:51 |
| 23 | A  I don't know If they were minor or not  I | 03:26:52 |
| 24 | would have to review it | 03:26:53 |

66 (Pages 258 to 261)

Joan Kersting
Volume 1 - December 13, 2006

258

| | |
|---|---|
| 1 | Lycos, or Terra Networks, concerning whether or not | 05:20:23 |
| 2 | Lycos would enter into this particular transaction? | 05:20:27 |
| 3 | MR. BEAN: Objection | 05:20:30 |
| 4 | A Susan's email says that she'll forward the | 05:20:34 |
| 5 | documents to Lycos for their acceptance to | 05:20:38 |
| 6 | facilitate the execution Other than that, I don't | 05:20:41 |
| 7 | know of any communications with Lycos over what | 05:20:43 |
| 8 | might have been required to accept the agreement. | 05:20:46 |
| 9 | Q If you would turn your attention, please, | 05:21:00 |
| 10 | back to Kersting 26, the sales agreement. I want to | 05:21:02 |
| 11 | specifically turn your attention to Paragraph 4 on | 05:21:12 |
| 12 | Page 2, Satisfaction of Lease Obligations | 05:21:14 |
| 13 | A Yes. | 05:21:17 |
| 14 | Q Is that a section that was inserted by you | 05:21:17 |
| 15 | in your initial draft of this or by Lycos at any | 05:21:21 |
| 16 | point, to your knowledge? | 05:21:26 |
| 17 | A It was inserted by Lycos | 05:21:27 |
| 18 | Q What is your understanding of Paragraph 4 | 05:21:31 |
| 19 | in the sales agreement? | 05:21:37 |
| 20 | A My understanding is that they are | 05:21:38 |
| 21 | reaffirming the monthly rental obligations under the | 05:21:41 |
| 22 | leases, beginning with the payments due August 1 and | 05:21:45 |
| 23 | continuing through the final rent date on the | 05:21:50 |
| 24 | exhibit | 05:21:55 |

259

| | |
|---|---|
| 1 | Q And that's something that Lycos, to your | 05:21:55 |
| 2 | understanding, wanted to include in the sales | 05:21:56 |
| 3 | agreement? | 05:21:59 |
| 4 | MR. BEAN: Objection | 05:22:01 |
| 5 | A. It came back to me with this language in | 05:22:01 |
| 6 | it. It's not something that I drafted So yes, it | 05:22:04 |
| 7 | came from Lycos. | 05:22:08 |
| 8 | MR. LITTLE: I have nothing further. | 05:22:16 |
| 9 | MR. BEAN: I just have a few questions. | 05:22:17 |
| 10 | If you'd give me five minutes, please. | 05:22:20 |
| 11 | THE VIDEOGRAPHER: The time is 5:22. | 05:22:22 |
| 12 | We're off the record. | 05:22:24 |
| 13 | (Recess taken.) | 05:22:30 |
| 14 | THE VIDEOGRAPHER: The time is 5:24 | 05:23:41 |
| 15 | We're on the record. | 05:24:35 |
| 16 | RE-EXAMINATION | 05:24:36 |
| 17 | BY MR. BEAN: | 05:24:37 |
| 18 | Q. Ms. Kersting, you testified that when CSI | 05:24:37 |
| 19 | borrowed money from a lender, those loans were | 05:24:40 |
| 20 | nonrecourse; correct? | 05:24:43 |
| 21 | A. Typically the loans that we do to finance | 05:24:45 |
| 22 | the leases are nonrecourse, yes | 05:24:48 |
| 23 | Q In fact, all of the Lycos leases that CSI | 05:24:50 |
| 24 | financed, other than Schedules 93 and 94, were | 05:24:54 |

260

| | |
|---|---|
| 1 | nonrecourse; correct? | 05:24:57 |
| 2 | A. I don't know that. | 05:24:59 |
| 3 | Q. When a loan is nonrecourse, it means that | 05:25:00 |
| 4 | no matter -- if the lessee fails to pay CSI, it | 05:25:03 |
| 5 | means that the lender cannot seek recovery of the | 05:25:07 |
| 6 | amounts due from CSI; correct? | 05:25:10 |
| 7 | A. In general, but there are exceptions to | 05:25:15 |
| 8 | that. | 05:25:18 |
| 9 | Q A nonrecourse loan means that the lender | 05:25:19 |
| 10 | cannot seek recourse to CSI; isn't that right? | 05:25:21 |
| 11 | MR. LITTLE: Objection. | 05:25:26 |
| 12 | A. No, our nonrecourse debt typically relies | 05:25:27 |
| 13 | on the rental stream, but there are exceptions that | 05:25:30 |
| 14 | make the loan recourse. | 05:25:34 |
| 15 | Q. Well, what exceptions are those? | 05:25:35 |
| 16 | A. A misrepresentation, any kind of | 05:25:37 |
| 17 | indemnification that we may have given them for a | 05:25:41 |
| 18 | documentation deficiency. | 05:25:44 |
| 19 | Q. All right. But the failure of a lessee to | 05:25:47 |
| 20 | pay monthly rent does not give rise by the lender to | 05:25:49 |
| 21 | recourse to CSI to recover that monthly rent. Isn't | 05:25:54 |
| 22 | that right? | 05:25:58 |
| 23 | MR. LITTLE: Objection. | 05:25:59 |
| 24 | A. It depends on why the lessee has failed to | 05:26:00 |

261

| | |
|---|---|
| 1 | make the monthly rental payment. | 05:26:07 |
| 2 | Q If the lessee simply defaults, doesn't make | 05:26:08 |
| 3 | the payment, the lender cannot seek recourse from | 05:26:12 |
| 4 | CSI; isn't that right? | 05:26:15 |
| 5 | A I would not put it that simply | 05:26:16 |
| 6 | MR. LITTLE: Objection | 05:26:18 |
| 7 | Q Okay, what exceptions are there -- what | 05:26:19 |
| 8 | reasons might there be for the lessee's failure to | 05:26:22 |
| 9 | pay rent for which the lender could seek recourse to | 05:26:24 |
| 10 | CSI? | 05:26:27 |
| 11 | A The lessee may stop making payments under | 05:26:28 |
| 12 | the lease because they think it's unenforceable, or | 05:26:32 |
| 13 | they may have some other objection to it There may | 05:26:35 |
| 14 | be a representation in the nonrecourse debt that we | 05:26:39 |
| 15 | made to the bank that is an exception to the | 05:26:44 |
| 16 | nonrecourse effect of the loan | 05:27:10 |
| 17 | Q So is it your testimony that if the lessee | 05:26:51 |
| 18 | doesn't make payments under the lease because the | 05:26:54 |
| 19 | lessee thinks that the lease is unenforceable, it's | 05:26:56 |
| 20 | your testimony that the lender can seek recourse | 05:26:59 |
| 21 | against CSI? | 05:27:03 |
| 22 | A If we made a representation in the | 05:27:05 |
| 23 | documents that the lease is enforceable and it's | 05:27:08 |
| 24 | later determined that it's not, I think that's an | 05:27:13 |

# EXHIBIT D



Paul Stenberg
<Paul.Stenberg@csile
asing.com>

10/24/2002 08:02 AM

To: "Brian. Lucy@corp. terralycos. com (E-mail)"
    <Brian.Lucy@corp.terralycos.com>
cc: "Kevin. Baillie@corp. terralycos. com (E-mail)"
    <Kevin.Baillie@corp terralycos.com>, "Monique. Walsh@corp.
    terralycos. com (E-mail)" <Monique Walsh@corp terralycos com>
Subject:

Per your request, outlined would be the scenario;

- Lycos to pay CSI $4,691,000

- CSI will amend all current releases to reflect that Title will pass to Lycos at the expirations of these leases.

Any questions, please let me know.



PLAINTIFF'S
EXHIBIT
103

LYC 08743

# EXHIBIT E

PLAINTIFF'S
EXHIBIT
102



Paul Stenberg
<Paul.Stenberg@csile
asing.com>

10/22/2002 04:12 PM

To: "Brian. Lucy@corp. terralycos. com (E-mail)"
    <Brian.Lucy@corp.terralycos.com>
cc: "Kevin. Baillie@corp. terralycos. com (E-mail)"
    <Kevin.Baillie@corp.terralycos.com>, "Monique. Walsh@corp.
    terralycos. com (E-mail)" <Monique.Walsh@corp.terralycos.com>
Subject:

Per Monique's request, the buyout of all existing leases will be $26,819,623. Once payment is receive, CSI will release the LOC in the amount of $11mm.

Any further questions, please call me.

REDACTED

CONFIDENTIAL
AR 11552