## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | |
| | ) | |
| | ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) | |
| | ) | |
| | ) | **LYCOS'S MOTION TO STRIKE PORTIONS** |
| v. | ) | **OF CSI'S LOCAL RULE 56.1 STATEMENT** |
| | ) | **WITH RESPECT TO LYCOS'S MOTION FOR** |
| LYCOS, INC., | ) | **PARTIAL SUMMARY JUDGMENT ON** |
| | ) | **COUNTS VII, XII, AND XIII OF ITS** |
| Defendant and Plaintiff-in-Counterclaim, | ) | **COUNTERCLAIM, AND TO HAVE LYCOS'S** |
| | ) | **STATEMENT OF UNDISPUTED MATERIAL** |
| and | ) | **FACTS BE DEEMED ADMITTED** |
| | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| | ) | |
| Trustee Process Defendant | ) | |

Rather than controverting the facts contained in Lycos's Rule 56.1 Statement filed with
respect to its Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and
XIII of its Counterclaim (Dkt. No.147), CSI spends most of its Response (Dkt. No. 164)(the
"Response") asserting new, irrelevant facts and making arguments that are improper in a 56.1
Statement.  Most of these additional facts and all of its arguments should be stricken because
they:

    (a)     are not based on any citation to the record or they are based on a citation to
material that does not support the factual assertion;

    (b)     rely on evidence that would be inadmissible at trial as hearsay or for some other
evidentiary reason (e.g., lack of foundation/personal knowledge);

    (c)     rely on expert opinions that are conclusory and lack an evidentiary basis,
regurgitate legal arguments of CSI, and/or address subjects that are irrelevant;

    (d)     constitute impermissible argument for a Rule 56.1 statement; and/or

(e)    misstate Lycos's legal theories and claims solely for the purpose of arguing against them, i.e., setting up a straw man and knocking it down, a tactic repeatedly employed by CSI in this litigation.

As a result of the foregoing, Lycos moves pursuant to Fed R. Civ. P. 56(e) and Local Rule 56.1 to strike certain portions of the Response and to have those facts that CSI has not controverted be deemed admitted for purposes of summary judgment.

This memorandum sets forth the law supporting Lycos's request to have certain facts asserted by Lycos deem admitted and/or have certain facts and arguments averred by CSI stricken.  This memorandum further applies these legal principles to some of the facts on which CSI seems to place great reliance.  Attached hereto as **Exhibit A** is a chart listing the paragraph number and facts asserted by Lycos, CSI's response, and the reason(s) Lycos's facts should be deemed admitted and/or CSI's response should be stricken in whole or in part.  The reasons to strike the statements in CSI's Response are categorized as follows:

| Abbreviation | Reason(s) to Strike/Deem Admitted |
|---|---|
| *Inadmissible— Unsupported* | The fact averred by CSI is inadmissible because it is unsupported by any citation to the record or the record cite does not support the stated fact. |
| *Not Disputed or Dispute is Immaterial* | The statement made by CSI does not respond to the corresponding factual assertions made by Lycos.  The statement offered in CSI's Response is immaterial to the factual assertion made by Lycos and immaterial to the bases upon which Lycos seeks summary judgment. |
| *Argumentative* | CSI's statement is argument rather than factual and, in some cases, misstates Lycos's theory of the case and bases for summary judgment just to criticize it, i.e., create a "straw-man" for the purpose of knocking it down. |
| *Inadmissible— Evidentiary* | CSI's assertion is inadmissible as hearsay or for some other evidentiary reason (e.g., hearsay, lack foundation/personal knowledge). |
| *Inadmissible—Expert* | Represents conclusory expert opinion without evidentiary basis, improper legal conclusion of expert, or opinion that contradicts testimony given by the expert under oath in deposition. |

Where appropriate, in the "Comment" column of Exhibit A, Lycos has included a specific explanation as to why a given proposition from CSI's Response should be stricken.

In further support of its Motion, Lycos states as follows.

## GROUNDS FOR RELIEF

**A.    This Court Should Deem Admitted Those Facts Asserted by Lycos That CSI Has Failed to Controvert Through Use of Evidence and Specific Facts.**

1.    Local Rule 56.1 provides that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."[1]  In construing this Rule, the First Circuit has held that "[p]roperly supported facts set forth by the moving party are deemed admitted unless controverted by the factual statement of the opposing party."[2]  It has similarly held, when construing Puerto Rico's version of Local Rule 56.1, that "parties ignore [this rule] at their peril."[3]

2.    To properly controvert a fact asserted by Lycos, CSI must use *evidence* and *specific facts* to show that there is a genuine issue for trial.[4]  "Factual disputes that are irrelevant or unnecessary will not be counted."[5]

3.    Here, CSI has all but ignored the law and the above warnings by failing, in most instances, to aver evidence and specific facts that even respond  to the facts asserted by Lycos in its Rule 56.1 Statement.  CSI has instead set forth a litany of non-responsive, irrelevant and often unsupported "facts" of its own and otherwise used its Response improperly to proffer arguments.  In other instances, CSI has acknowledged that while it disagrees with certain facts

---

[1]  *Carreiro v. Rhodes Gill and Co., Ltd.*, 68 F.3d 1443, 1446 n.3 (1st Cir. 1995); *Brown v. Armstrong*, 957 F. Supp. 1293, 1297 (D. Mass. 1997) (quoting Rule 56.1); *see also Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000) ("[F]ailure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.") (construing Puerto Rico's local equivalent to Rule 56.1).
[2]  *Carreiro*, 68 F.3d at 1446 n.3.
[3]  *Ruiz Rivera*, 209 F.3d at 28.
[4]  Fed. R. Civ. P. 56(c) and (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Brown*, 957 F. Supp. at 1297 (The non-movant's response must "state what *specific facts* are disputed to prevent summary judgment.").
[5]  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Caputo v. Boston Edison Co.* 924 F.2d 11, 13 (1st Cir. 1991).

alleged by Lycos, its describes its disagreement as "irrelevant" or "immaterial." This Court

should, in the words of the Supreme Court in *Anderson*, "ignore" these irrelevant and

immaterial disagreements and conclude that these so-called disputes do not create genuine

issues of material fact.[6]

4.    By way of example, CSI relies exclusively on the opinions of its experts for three

propositions that are irrelevant and therefore do not create genuine issues of material fact:

A.    CSI cites its experts repeatedly to argue that the term "mark-up," as used

by Lycos and one of its experts, is not a standard term used in the equipment leasing industry.[7]

Yet, neither Lycos nor its expert has *ever* suggested that such term is standard in the industry.

Lycos's expert has used the term "mark-up" simply as a defined term to describe Lycos's theory

of damages and as a short-hand for the methodology he used to calculate them. Accordingly,

whether that term is standard in the industry is immaterial and does not create a genuine issue of

material fact.

B.    CSI cites the expert report of Robert Zises[8] for the proposition that the

fair market value of the equipment Lycos leased from CSI was $3 million as of August 2003.[9]

Whatever the merits of this assertion, Mr. Zises has not valued the equipment as of a legally

relevant date. To the contrary, it is the value of the equipment "as of the end of the lease terms"

that is relevant to the Court's determination under § 1-201(37) of the Uniform Commercial

---

[6] A fact is "material" only if it is one that might affect the outcome of the suit under the governing law. *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

[7] *See* Response, ¶¶ I.A 8, 10, 14; I.B 1-2; I.C 3, 14 and corresponding n. 18, 25, 29, 40, 43, 44, 49, and 77

[8] Mr. Zises did not submit an affidavit in support of CSI's papers opposing Lycos's summary judgment motion. Instead, CSI submitted Mr. Zises expert report which was not sworn to under oath. As such, Mr. Zises' report is inadmissible hearsay. *Davila v. Corporacion de Puerto Rico*, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment.")

[9] Response, ¶ II.A 5 and corresponding n. 88.

Code of Lycos's claim that schedules 93 and 94 were, as a matter of law, installment sales contracts rather than true leases.[10]  Mr. Zises' valuation date -- August 2003[11] -- was not the end of the term for schedules 93 or 94.[12]  Accordingly, any issue raised by Mr. Zises' valuation is legally immaterial and thus cannot create a genuine issue of material fact.

      C.      CSI cites its experts for the proposition that it would not be standard in the industry for CSI to disclose its gross profits on a transaction to Lycos.[13]  Whatever the merits of this assertion, it is irrelevant because Lycos does not contend that CSI should have disclosed its gross profits to Lycos.  As in other instances, CSI simply misstates Lycos's claim for the purpose of setting up a straw man and knocking it down.

**B.      To the Extent that CSI's Response is Based on the Inadmissible Opinions of its Experts, Those Responses Should be Stricken.**

      5.      CSI relies in its Response on the opinions of three experts.  Most of those experts' opinions should be stricken for the following reasons:

      A.      Where, as here, the experts have, with respect to many of their opinions, submitted "nothing but conclusions – no facts, no hint of an inferential process, [and] no discussion of hypotheses considered and rejected, such testimony will be insufficient to defeat a motion for summary judgment." [14]  Their opinions must "at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment."[15]  In contrast, CSI's experts' reports and cited opinions more often than not provide

---

[10]  *See* M.G.L. c. 106, § 1-201(37); Mo. Rev. St. c. 400.1-201(37).

[11]  *See* Dkt. No. 167 (Affidavit of Kelly A. Gabos), Ex. 22 thereto (Expert Report of Robert J. Zises), at 4; Dkt. No. 168 (Affidavit of Edward W. Little), Ex. 13 thereto (Sales Agreement) ¶ 2.

[12]  Schedule 93 terminated on October 31, 2003 and schedule 94 terminated on October 31, 2004.  *See* Dkt. No. 168, Ex. 13 thereto (Sales Agreement) ¶ 2.

[13]  *See* Response ¶¶ I.A., 10; I.C. 6 and corresponding n. 18, 25, 29, and 59.

[14]  *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993) (internal quotation marks omitted).

[15]  *Id.*

nothing more than unadorned and conclusory assertions of so-called fact and/or improper legal argument.[16]

For example, CSI relies on one of its experts, Michael Fleming, for its contention that Lycos could "easily calculate" the cost of the refinancings.[17] As a threshold matter, this contention is improper argument for a Rule 56.1 response; it is also immaterial as a matter of law because CSI had a duty to disclose information under 940 C.M.R. 3.16(2) and the law concerning half-truths, regardless of whether Lycos could have "easily calculated" the cost of refinancing.[18] Second, despite making this definitive statement in his affidavit, Mr. Fleming, a long-time former president of the leasing industry's chief trade association and Washington, D.C. lobbyist for the leasing industry, admitted in deposition that he did not review *a single refinanced equipment schedule*.[19] In fact, of the 126 total equipment schedules in this case, Mr. Fleming admitted he "skimmed" only seven or eight of them,[20] and none of these was a refinanced schedule.[21] He further admitted that he "ha[d] no opinion one way or the other" on whether the approximately 115 schedules, including all of the refinanced schedules, that he did not review at all were commercially reasonable or not.[22]

Perhaps more importantly, neither Mr. Fleming nor any of CSI's other purported experts presented any information in their respective affidavits indicating that they even once performed

---

[16] Although Lycos will address the many deficiencies in CSI's expert reports at a later time, suffice it to say that CSI has called on a cavalry of long-time industry insiders (including lobbyists) as supposedly objective and unbiased experts to circle the wagons around it and has sought to use these industry insiders simply to parrot its legal positions and arguments in this case irrespective of the record facts (which, in most cases, the experts have not even seen; all told, CSI's experts have been provided with and have reviewed less than 5% of the total evidence in this case.

[17] Response, ¶¶ I.A 8, 10 and corresponding n. 19, 26, and 30.

[18] *V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 415 (1st Cir. 1985).

[19] *See* excerpts from the transcript of the deposition of Michael Fleming attached as Exhibit B ("Fleming Tr.") at 28:24-29:7.

[20] Fleming Tr., Ex. B, at 77:18-23.

[21] *Id.* at 28:24-29:7 and at 246:22-247:4.

[22] *Id.* at 75:24-78:7.

- 6 -

the calculation on a refinanced schedule that CSI claims Lycos could "easily" have performed.[23]

That is because they did not. Mr. Fleming, for instance, despite offering his opinion on this

issue, testified as follows:

> Q. And you said that you thought that Lycos could have compared the aggregate amount of rent on a group of schedules that were rolled onto another group of schedules to compare the costs, right?
>
> A. When we were talking about 93 and 94, yes.
>
> Q. And you didn't do any analytics to see whether that could be determined, did you?
>
> A. No.[24]

Thus, in an effort to bolster CSI's defense and stave off Lycos's request for summary judgment,

CSI has submitted to this Court, and Mr. Fleming has willingly signed, an affidavit that both CSI

and Mr. Fleming know has no factual basis.

Accordingly, in the absence of any factual foundation for the experts' conclusions, the

experts' opinion on this issue should be stricken.

B.    CSI cites its experts' affidavits repeatedly for the proposition that the

transactions between Lycos and CSI were leases rather than loans.[25] Yet, none of CSI's experts

is a lawyer,[26] and none of CSI's experts indicate in their affidavits that they conducted any

analysis to determine whether the transactions were in fact leases rather than loans.[27] Moreover,

at deposition, although each of CSI's experts admitted that whether a transaction constitutes a

lease or loan is a matter of economic substance not form, each admitted to doing no substantive

---

[23] Response ¶¶ I.A,8, 10.

[24] Fleming Tr., Ex. B, at 317:12-21.

[25] *See* Response ¶¶ I.A 7, 8, 10; I.C 5, 7; II.A 5 and corresponding n. 16, 20, 27, 55, 60, 88, and 89.

[26] Fleming Tr., Ex. B, at 105:11-12; excerpts from the transcript of the deposition of James Johnson, attached as Exhibit C ("Johnson Tr."), at 29:3-4; and excerpts from the transcript of the deposition of James Schallheim, attached as Exhibit D ("Schallheim Tr."), at 112:13-14.

[27] *See* Dkt. No. 167 (Affidavit of Kelly A. Gabos), Ex. 3, ¶¶ 11-12 (Schallheim Aff.); Ex. 4, ¶¶ 14-20 (Johnson Aff.); Ex. 5, ¶¶ 17-21 (Fleming Aff.).

BST99 1560605-2.057077.0012

analysis whatsoever as to any of the refinanced equipment schedules, including the only

schedules relevant to Lycos's claim (93 and 94), to render a proper loan-v.-lease determination.[28]

For instance, Mr. Fleming, who opines definitively in his affidavit that each of the equipment

schedules were true leases not loans,[29] -- even though he admitted reviewing only seven or eight

schedules -- testified as follows:

> Q. Well, do you know how to determine whether or not a document is a lease or a loan?

> A. I think I do.

> Q. And how do you understand that to occur?

> A. Well, a lease – are you talking about this for accounting purposes?  There's a lot of tests for it.

> Q. Let's go with accounting purposes.

> A. Well, for accounting, the primary tests are present-valuing the total number of payments to see whether or not it's higher or lower than 90 percent of the original equipment value.

> Q. Okay, and did you do that for any of the schedules listed on Schedule 191B?

> A. No, I did not.  That wasn't one of the things I was looking for.

> Q. Okay, did you – what are the other tests for determining whether a document is a true lease or loan?

> A. Basically, if you a – if the document – if the equipment can pass to the user of the equipment at the end of the transaction, it's not considered a loan – I mean considered a lease.

. . .

> Q. And you didn't look at any of the underlying schedules for the restructured transactions to determine whether any of them [contained a purchase option], right?

> A. No.[30]

. . .

---

[28] Fleming Tr., Ex. B, at 66:5-67:19; Johnson Tr., Ex. C, at 142:1-4; Schallheim Tr., Ex. D, at 230:19-231:11.
[29] Ex. 5 to Gabos Decl. (Dkt. No. 167) – Affidavit of Michael Fleming, ¶ 19.
[30] Fleming Tr., Ex. B, at 33:8- 35:7.

Q. Just because a lease is called a lease on the face of the document does not mean it's a true lease, right?

A. That's true.

Q. Now, did you make any effort to determine whether any of the original schedules – that's for new equipment that CSI and Lycos entered into – were themselves full-payout leases?

A. I did. I looked at the schedules that we've already stipulated I looked at.  They were 24 months.  And the amortization of the payments over a 24-month period on a PV'd basis would not have covered more than 89.9 percent of the value of the equipment.

. . .

Q. You decided to pick those seven [schedules]?

A. Well, I picked them out because they were – you know, they were leases that had not been rolled up yet, they were original leases, and so they were easy ones to do.

Q. So you selected the schedules from the 125 that you would consider?

A. That's right.

Q. And you specifically did not choose any of the restructured schedules, is that right?

. . .

A. No, not – I didn't choose any of those.  I was looking at the original schedules.[31]

Thus, again, CSI submits and Mr. Fleming willingly signs off on an opinion they know has no credible basis, i.e, an opinion on the economic substance of refinanced schedules, particularly refinanced schedules 93 and 94, that Mr. Fleming admittedly did not review and did not analyze for purposes of determining whether they were true leases or loans.[32]

Nonetheless, even if CSI's experts had conducted such an analysis, whether a transaction is a lease or loan under § 1-201(37) of the Uniform Commercial Code is a legal determination

---

[31]  Fleming Tr., Ex. B, at 243:13-245:10.

[32] In addition, even if he had reviewed the refinanced schedules, Mr. Fleming is not otherwise qualified to render expert opinion on such matters – he is neither a lawyer nor an accountant, and admittedly has had no formal training or taken any classes in finance (his master's degree is in history and political science, and he has spent most of his career as an advocate and lobbyist for the leasing industry).

for the Court on summary judgment.[33]  Because CSI's experts state no foundation to render an

opinion on whether the relevant transactions were leases or loans and they otherwise did not do

the substantive economic analyses of the refinanced schedules that they have admitted to being

necessary for making such a determination, their opinions are conclusory, and because this is a

subject that is properly within the province of the Court on summary judgment, CSI's experts'

opinions as to whether the transactions were leases or loans should be stricken.[34]

        C.      Certain of the expert opinions on which CSI relies directly contradicts the

experts' sworn deposition testimony.  It is well settled that a party cannot defeat summary

judgment with an affidavit that is "clearly contradictory" to a statement previously made under

oath at a deposition.[35]  For example, CSI cites its experts for the proposition that Lycos could

have returned the equipment at the end of the lease term or substituted alternative equipment.[36]

CSI's experts, however, conceded at deposition that Lycos's ability to substitute alternative

---

[33] *See Nieves-Vallenueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("[Q]uestions of law are not 'to be decided by the trier of fact'; rather it is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case and to decide any purely legal issue."); *Chapman v. Bernard's Inc.*, 167 F. Supp. 2d 406, 421 (D. Mass. 2001) (experts are not qualified to state conclusions of law because such conclusions do not assist the trier of fact).

[34] CSI also relies on the opinion of Lycos's non-lawyer employees who also never analyzed the economic substance of those transactions but rather testified based on the form of the transactions alone for its conclusion that the transactions were leases rather than loans. *See* Response,  ¶¶ I.A.7, 8, 10, and accompanying notes 17, 20, 27.  In fact, CSI knows full well that any substantive economic analysis of the refinanced schedules, and surely any such analysis of schedules 93 and 94, would show that those schedules were, without a doubt, loans and not leases.  For that reason, CSI, as well as its experts, has steadfastly avoided testing the actual substance of those transactions and has instead adopted a strategy of obfuscation by asserting baseless opinions of its experts (who, despite admittedly not doing the analyses themselves, have nevertheless been willing to parrot CSI's position) and irrelevant opinions of former Lycos executives.

[35] *Torres v. E.I. DuPont Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000).  This rule is partly concerned with the credibility of changed testimony, but also applied as a matter of policy:  "if prior statements under oath could be disavowed at will after a motion is made, the other side would be faced with a constantly moving target and summary dispositions made almost impossible."  *Hernandez-Loring v. Universidad Metropolitina*, 233 F.3d 49, 54 (1st Cir. 2000) (court entitled to disregard "new" information not disclosed in deposition).

[36] *See* Response ¶¶ I.C.1, 15 and corresponding n. 47 and 80.

equipment was also at the sole discretion of CSI.[37]  Accordingly, these opinions should be stricken.

**C.    To the Extent CSI's Response is Based on Facts Without Support in the Record or Is Argument, It Should be Stricken.**

6.    As set forth more fully on the chart attached hereto as Exhibit A, CSI's Response to Lycos's facts should be stricken to the extent:

A.    the facts it alleges are unsupported by citation evidence in the record.[38]

For example, in its response to Lycos's paragraph I.C.3, CSI states:

> The import of Lycos' statements is that Mr. Stenberg did not disclose to Mr. Ripps his "commissionable threshold" — that is, the threshold he is provided internally for accounting purposes to determine his commission — which is akin to a company disclosing its gross profits on a deal to a customer.

Yet, as evidenced by the lack of any footnotes in the foregoing, CSI fails to cite any record evidence to support its "facts."  (This sentence should also be stricken because it is argument rather than fact.)

B.    the facts it alleges are unsupported by the record evidence to which CSI cites.  For example, in its response to Lycos's paragraph I.A.5, CSI states: "Further, it was Lycos' policy at all times not to buy equipment that could be leased instead.[39]"  Yet, the testimony to which CSI cites is silent on when during the parties seven-year relationship this so-called "policy" -- which the witness actually describes as a "practice" rather than a "policy" – was supposedly in effect.  (Moreover, whether Lycos had a policy or practice of leasing is immaterial.)

---

[37]  Fleming Tr., Ex. B, at 236:16-239:14;  Johnson Tr., Ex. C, at 65:22-68:16; Schallheim Tr., Ex. D, at 211:5-213:20.

[38]  *See supra*, n. 5; *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) ("The court will disregard any such conclusory statements as well as purported statements of 'fact' not properly supported by citations to the record."); *Powell v. City of Pittsfield*, 143 F. Supp. 2d 94, 101 n.1 (D. Mass. 2001) ("in accord with Local Rule 56.1, the court has had to ignore proffered 'facts' that contain no record citation").

[39]  Deposition of Ernesto Galvan, dated Feb 20, 2007 ("Galvan Dep ") at 32:3-1.3 (Gabos Decl. Ex. 6).

C.    it contains "argument" rather than "facts."  For example, in its response to Lycos's paragraph I.A.8, CSI argues "the term "mark-up" is . . . a fabricated theory without merit."  Argument is not permitted in Rule 56.1 statements.[40]

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1.    Deeming admitted the facts asserted by Lycos in its Rule 56.1 Statement;

2.    Striking the factual assertions in CSI's Response on which it improperly relies on the opinions of its experts;

3.    Striking those portions of CSI's Response that are unsupported by citation evidence in the record constitutes argument, rather than "facts"; and

---

[40]  *O'Brien*, 440 F. Supp.2d at 5 n.1 ("Defendants' [Local Rule 56.1 statement] . . . also includes inappropriately argumentative statements. . . . the court will disregard any legal arguments contained in Defendants' Statement of Facts."); *Powell*, 143 F. Supp. 2d at 101 n.1 ("Particularly frustrating was the fact that *arguments* had been inserted in various parties' Local Rule 56.1 *factual* statements.") (emphases in original).

BST99 1560605-2.057077.0012

4.    Granting Lycos such other relief as may be appropriate and just.

Respectfully submitted,
LYCOS, INC.
By its attorneys,
Dated: December 28, 2007          /s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel for Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. certifies that he has conferred with Robert Kaler, counsel for Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc. ("CSI"), and attempted in good faith to resolve or narrow the issues presented by this Motion.

  /s/ Thomas O. Bean
Thomas O. Bean

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December, 2007, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

/s/ Peter M. Acton, Jr.
Peter M. Acton Jr.

- 13 -

EXHIBIT A

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | **I. Count VII: Violation of 940 C.M.R. 3.05(1) and 3.16(2) and M.G.L. c. 93A, §§ 2 and 11** | | |
| | A. Undisputed Facts Material to Lycos's Claim that CSI Violated 940 C.M.R. 3.05(1) and 3.16(2) and thus M.G.L. c. 93A, §§ 2 and 11[1] | | |
| 1. | When Lycos and CSI entered into a Master Lease Agreement in December 1996 (the "Master Lease Agreement"), CSI had been in the computer equipment leasing business for almost twenty-five years. Lycos was a less than two-year-old Internet company based in Massachusetts. | Disputed as misleading. Lycos had some of the most sophisticated business entrepreneurs available at the time. Ted Philip, Lycos' Chief Financial Officer, received an M.B.A. degree from Harvard Business School and had spent years in the financial world, including at some of the world's largest financial institutions and corporations.[2] Thomas Guilfoile, Lycos' Senior Vice President of Finance and Administration, is a certified public accountant who worked at the international accounting firm of Ernst & Young prior to joining Lycos.[3] Among his work with Ernst & Young, Mr. Guilfoile performed lease audits for clients to determine whether their leases qualified as capital leases or operating leases.[4] Both gentlemen signed the majority of the CSI-Lycos equipment schedules on behalf of Lycos. | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• Statements such as "most sophisticated business entrepreneurs available" should be stricken as argumentative. |
| 2. | While the person at Lycos responsible for leasing changed many times during the parties' seven-year relationship, CSI had a single account executive for Lycos the entire time: Paul Stenberg. Mr. Stenberg | Disputed as misleading. Lycos' intended implication here is that changes in Lycos personnel over time somehow contributed to a lack of understanding on Lycos' part of the need to track its leased assets or a general misunderstanding of leasing in general. As | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted. |

---

[*] To avoid confusion, Lycos has included only the footnotes from CSI's 56.1 Response, and omitted the footnotes from its own 56.1 Statement. To the extent the Court wishes to examine the evidence that Lycos has used to support a given proposition, Lycos refers the Court to Dkt. No. 147.

[1] The use of Lycos' headings in its statement of facts is for ease of reference only and are disputed in their entirety to the extent a response is required.

[2] Deposition of Edward Philip, dated Nov. 6, 2006 ("Philip Dep.") at 11:10-21, attached as Ex 1. to the accompanying Declaration of Kelly A. Gabos ("Gabos Decl.").

[3] Deposition of Thomas Guilfoile, dated Dec 7, 2006 ("Guilfoile Dep.") at 10:13-11:2 (Gabos Decl. Ex. 2).

[4] Gabos Decl. Ex. 2 at 16:21-17:4.

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | had more than fifteen years experience in computer equipment sales and leasing at the time the relationship began. | stated above, Lycos had very sophisticated officers overseeing its leasing and, in particular, leasing of equipment from CSI.[5] In addition, Lycos had available an in-house staff of lawyers and accountants as well as access to some of the most highly regarded outside accountants and lawyers. Lycos admits that, on occasion, it hired outside leasing consultants (including Leaseforum, Inc. and Avnet Enterprise Solutions, Inc.) to review its leasing practices. In fact, Avnet Enterprise Solutions, Inc. ("Avnet") performed an audit of Lycos' leasing practices and advised Lycos as early as December 2000 that it had serious problems because of its failure to track all of its leased assets. Among other things, Avnet told Lycos in December 2000 that "identification and return of [leased] assets, at end of term is nearly impossible ***because Lycos lacks an accurate asset inventory.*** This results in costly evergreen payments or the buyout of non-productive assets."[6] Nowhere in its detailed report does Avnet blame these problems on any of Lycos' lessors, including CSI. | • *Argumentative.* Statements such as Lycos having "very sophisticated officers overseeing its leasing" are argumentative and should be stricken. CSI's speculation in the first sentence about Lycos's intended implication should be stricken.<br><br>• *Unsupported.* The third, fourth, and last sentences should be stricken because they lack any citation to the record.<br><br>• *Immaterial.* Whether Lycos could have retained outside counsel or accountants is irrelevant to whether CSI had a duty to disclose the information to Lycos that Lycos has averred it should have disclosed. |
| 3. | Mr. Stenberg operated out of CSI's offices in Newton and Needham, Massachusetts. He communicated regularly with Lycos personnel in Massachusetts and delivered lease documents to Lycos there. Lycos executed lease documents in Massachusetts and made payments to CSI from Massachusetts banks during the parties' relationship. | Disputed as misleading. During the relevant time, CSI and Lycos had agreed that Missouri law would apply to their relationship. The Master Lease Agreement Number 144874 dated December 4, 1996 ("Master Lease"), which governed the parties' rights and obligations as well as the terms of the subsequent equipment lease schedules between CSI and Lycos, expressly provided that Missouri law would apply:<br><br>18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• In its December 6, 2005 Memorandum of Decision denying CSI's Motion to Dismiss or for Summary Judgment, the Court found that, notwithstanding the choice-of-law provision in the Master Lease, Massachusetts law applied to Lycos's fraud in the inducement claims because, *inter alia,* both parties reside in Massachusetts and the conduct occurred in Massachusetts. Mem. of Dec. at 4. |

---

[5] *See supra* ¶ 1.

[6] Affidavit of Thomas Bean ("Bean Aff.") Ex. 24 at LYC14559 (emphasis added).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI,[7] | |
| 4. | During their relationship, CSI and Lycos executed a Master Lease Agreement and approximately 125 equipment schedules with respect thereto. Pursuant to these documents, CSI leased to Lycos over 6,000 pieces of computer-related equipment between 1997 and 2005. The Master Lease Agreement contemplates the execution of one or more equipment schedules incorporate by reference the terms of the Master Lease Agreement, list the specific equipment being leased pursuant to that schedule, and contain other terms such as monthly rent and the term of the schedule. | Disputed as misleading. The Master Lease is a written document executed by Lycos' then Chief Operating Officer Ted Philip on December 20, 1996. It contemplates equipment schedules to be entered between the parties for equipment to be leased subsequently by Lycos, as well as other aspects of the parties' relationship such as payment of taxes, delivery and return of the leased equipment, care of the equipment, loss or damage to the equipment, defaults and remedies, among other provisions.[8] Though the specific length of any subsequent equipment schedules under the Master Lease are specified in each schedule, the Master Lease provides that the initial term of each schedule "shall automatically be extended for successive four month periods"[9] unless terminated by either party providing sixty (60) days notice (a term negotiated by the parties down from 120 days).[10] During the relevant time, Lycos entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it. | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• *Unsupported.* The last sentence contains no citation to the record and should therefore be stricken.<br><br>• *Bad Faith.* Again, CSI is unwilling to admit even the most fundamental background facts. |
| 5. | Forty-four of the approximately 125 schedules were refinancings of earlier schedules. Many of these refinancings were themselves refinancings of earlier refinancings. | Disputed as misleading. The evidence suggests that Lycos sought operating lease treatment for its lease of assets."[11] Further, it was Lycos' policy at all times not to buy equipment that could be leased instead.[12] For its own reasons — including an effort to lower its | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be |

---

[7] Master Lease § 18.6, attached as Ex. 1 to CSI's First Amended Complaint, dated Dec. 4, 2006 (Docket No. 121) (emphasis in original).

[8] *See generally* Ex. 1 to CSI's First Amended Complaint (Docket No 121).

[9] Master Lease § 2.2, attached as Ex. 1 to CSI's First Amended Complaint (Docket No. 121).

[10] Philip Dep. at 51:7-13 (Gabos Decl. Ex. 1).

[11] Affidavit of James Schallheim, Ph.D ("Schallheim Aff.")[1]; Affidavit of James Johnson, Ph.D. ("Johnson Aff.") ¶¶26, 33, 39; Affidavit of Michael Fleming ("Fleming Aff")[1] ¶¶18, 63-64. These affidavits from experts retained on behalf of CSI are attached as Exs. 3-5, respectively, to the Affidavit of Kelly A. Gabos.

[12] Deposition of Ernesto Galvan, dated Feb 20, 2007 ("Galvan Dep") at 32:3-1.3 (Gabos Decl. Ex. 6).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | monthly expenses[13]- Lycos agreed to extend its leases with CSI until finally required by its parent company in Spain to "buyout" the leases.[14] | deemed admitted. In fact, CSI's bad faith is evident from its failure even to admit the most basic facts of the case. <br><br> • *Argumentative and Immaterial*. CSI's assertion in the first sentence of what the evidence "suggests" should be stricken. Then, instead of citing the record evidence it believes "suggests" that Lycos wanted operating lease treatment, it cites only its experts. Furthermore, whether Lycos wanted "operating lease treatment" is immaterial to the facts averred by Lycos and to Lycos's non-disclosure claims. <br><br> • *Unsupported*. CSI's assertion that Lycos had a particular policy "at all times" is not supported by the two-paragraph memo to which it cites. The memo was written years after the parties' relationship commenced, and does not specify any time period whatsoever. <br><br> • *Inadmissible-expert*. In paragraph 25 of his affidavit, Mr. Schallheim makes vague/conclusory reference to "capital structure" of "internet stocks at that time". He does not state he undertook any analysis with respect to those stocks (statement is in passive voice) let alone explain what analysis he undertook. He does not state in his affidavit which stocks he looked at, how he picked them, why it was appropriate to compare those stocks to Lycos, whether there were stocks he looked at that were inconsistent with his conclusory opinion, how he analyzed the stocks, whether there was anything in the record to suggest Lycos was aware of this purported practice among "internet stocks, or for which time period his assertion applies. Because Mr. Schallheim's statement provide no facts or analysis, but simply conclusion, his opinions should be stricken. <br><br> • *Inadmissible-expert*. In paragraph 33 of his affidavit, Mr. Johnson makes a vague reference to unnamed Lycos "executives" being |

---

[13] Deposition of Paul Stenberg, dated Jan, 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated January 12, 2007 ("Wright Dep.") at 102:15-104:4 (Gabos Decl., Ex. 9).

[14] Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl. Ex. 7).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | | "focused" on expenses (without saying whether those "executives" were even responsible for expenses), and an unspecified document (which is not identified) in which Mr. Philip allegedly indicated Lycos was making progress in "achieving their EBITDA profit margin"—a statement that does not support the statement that the best economic decision was not a priority for Lycos. Mr. Johnson did not review transcripts for any Lycos executives that would have been responsible for controlling operating expenses (and, if he had, he would have found testimony that reducing expenses was not Lycos's priority during the years Lycos was a public company); as such, there is no factual basis for his opinion.<br><br>• *Inadmissible-expert.* In paragraph 18 of his affidavit, Mr. Fleming states the "record indicates that Lycos and its auditors did perform this test frequently." There is no basis for making this statement because he did not review any of Lycos's auditors records or any records from Lycos in which the test was performed. The remaining statements made by Mr. Fleming are general, conclusory, unsupported. In his deposition, Mr. Fleming admitted he did not do any analysis to see if any of the refinanced leases, in fact, qualified as operating leases. Fleming Tr., Ex. B, at 66:23-67:2. (If he had, he would have found that none of the refinanced schedules would have qualified for operating lease treatment.) |
| 6. | The forty-four refinanced schedules were numbered 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 66I, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69C, 69E, 69G, 69I, 85, 86, 89, 89A, 90, 93, and 94 (individually and collectively, the "Refinanced Schedules".) As part of these refinancings, equipment from a single schedules was sometimes split into two or more separate | Disputed as misleading. The decision how to allocate equipment between schedules on a lease extension could be for many reasons — including a lessee's desire to keep track of the leased equipment by type or location.[15] It was not simply a decision by the lessor, which Lycos implies is intended to confuse or obfuscate. | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• *Unsupported.* fn. 15: CSI relies on Mr. Cagney for the proposition of how equipment was allocated between schedules. But, in the portion of the transcript CSI cites to, Mr. Cagney specifically states he did "not really" know why equipment was allocated as it was on the Lycos-CSI schedules he was being examined about. It is |

---

[15] Deposition of Philip Cagney, dated Sept, 27, 2006 ("Cagney Dep.") at 348:12- 349:9 (Gabos Decl., Ex. 10); Deposition of Joan Kersting, dated Dec, 13, 2006 ("Kersting Dep.") at 76:9-77:1 (Gabos Decl. Ex. 11).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | schedules, and equipment from two or more schedules was sometimes combined on a single schedule. Attached as **Exhibit C** to the Affidavit of Bruce D. Smith, which is being filed herewith, is a flow chart that shows the history of financings and refinancings of Lycos equipment schedules including the splitting and combining of equipment described above. | | undisputed, for example, that CSI allocated equipment on schedules 93 and 94. Cagney Tr. (Ex. E) at 164:22-166:13, 244:23-245:14.<br><br>• *Unsupported.* There is no citation for the last sentence of this paragraph. It should therefore be stricken. |
| 7. | At the time of the refinancings, CSI told Lycos it its new monthly payment would be--almost always an amount lower than it had been on the schedules being refinanced--and that Lycos would be able to retain the equipment for an extended term. With respect to at least certain schedules, Lycos expected that it would pay slightly more over the life of a refinanced schedule because it had use of the equipment for a longer period of time thus resulting in it paying more interest. | Disputed. Lycos never understood that it was "paying more in interest" on its extended schedules, as this is a loan (not a lease) concept.[16] Mr. Guilfoile, who signed many of the equipment schedules on behalf of Lycos, testified he understood the schedules were reported by Lycos as leases, not loans.[17] Lycos always knew exactly what it was agreeing to pay, and had to in order to account for each lease properly. | • *Inadmissible-expert.* Whether a transaction is a lease or a loan is a decision left to the Court on summary judgment and not experts. While Messrs. Fleming, Johnson, and Schallheim opine that the Lycos-CSI transactions are leases, they each admitted in deposition that they did not perform any analysis to determine whether, in fact, the transactions are leases or loans. Fleming Tr., Ex. B, 66:5-67:19; Johnson Tr., Ex. C, 142:1-4; Schallheim Tr., Ex. D, 230:19-231:11. Indeed, none of them is a lawyer or an accountant.<br><br>• *Inadmissible-Evidentiary.* Whether Mr. Guilfoile, a former Lycos employee who is not a lawyer, believes Lycos reported the schedules as leases or loans is irrelevant to the factual statements made by Lycos in its 56.1 Statement. Whether the transactions are leases or loans is a question of law.<br><br>• *Inadmissible-Unsupported.* The last sentence of CSI's Response contains no citation to the record and should therefore be stricken. |
| 8. | What Lycos did not expect, and what CSI did not disclose, was that CSI embedded a mark-up in the monthly payments on almost every refinancing. Mr. Stenberg himself has admitted that he | Disputed. According to three of CSI's experts — two with doctorates in finance and many years of academic study in leasing and one with over twenty years of experience as the president of the Equipment Leasing Association ("ELA") — who directly refute | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be |

---

[16] Fleming Aff "¶¶ 11, 17-21; Johnson Alf ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl Exs. 3-5, respectively).

[17] Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | "marked-up" the leases   CSI internal accounting records show that CSI marked-up the amounts of the monthly payments on the Refinanced Schedules such that the value of each of the Refinanced Schedules (i.e., the present value of the payments plus the present value of the residual of the equipment, the amount CSI expected to realize at the end of the lease term), exceeded the value of the terminating schedules (i.e., the present value of the payments plus the present value of the residual.)  Using the language of a loan, the outstanding principal balance of the loan as of the moment *after* the refinancing *exceeded* the outstanding principal balance as of the moment *before* the refinancing even though no points, fees, or mark-up was disclosed. | Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[18]  Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[19]  Nor is it proper to "us[e] the language of a loan," as Lycos claims, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and *not loans*.[20]  The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked-up" the leases is misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was create well after Mr. Stenberg gave his deposition).  Mr. Stenberg testified that he "marked-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[21] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment.  The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[22] | deemed admitted.<br><br>• *Immaterial Dispute* - Whether the term "mark-up" is an industry term is irrelevant.  Neither Lycos nor its expert have argued the "mark-up" is such a term.  Lycos's expert is simply using the term "mark-up" to define the portion of the profits wrongly earned by CSI and thus Lycos's damages.  Lycos's cited to Mr. Stenberg's use of the term "mark-up" because he voluntarily used it.  Lycos is not suggesting that he has adopted Lycos's expert's definition of the term.<br><br>• *Argumentative.*  The use of phrases such as "fabricated theory without merit" is argumentative and should therefore be stricken.<br><br>• *Argumentative.*  CSI misstates Lycos's theory.  Lycos agrees CSI was entitled to earn a profit on the refinancings and Lycos's damage calculation does not include the profits that CSI is rightfully entitled to receive for Lycos's extended use of the equipment.  Whether CSI had to disclose its gross profits is not at issue.<br><br>• *Inadmissible-Expert.* (n. 19) Mr. Fleming's conclusory statement that Lycos "could easily calculate the costs of restructuring leases from the information it had," is belied by his admitted lack of analysis.  *See* Motion, at 6.<br><br>• *Inadmissible-Expert.* (n. 19) Mr. Johnson's affidavit contradicts his deposition testimony.  Mr. Johnson admitted that where equipment was split or rolled one would have to go piece by piece of |

---

[18] Fleming Aff. ¶¶ 14-52; Johnson Aff.¶¶ 25-26; Schallheim Aff. ¶¶15-20 (Gabos Decl. Exs. 3-5, respectively).

[19] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[20] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[21] Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).

[22] *See generally* Fleming Aff.; Johnson Aff. ; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | | equipment to compare rents and that this could not be done for some schedules (and he undertook no analysis to see if it could be done). Johnson Tr., Ex. C, at 183:18-184:15, 185:7-193:7. He also admitted Lycos would need to know the end-of-lease costs. *Id.* at 184:24-185:2. Ultimately, he admitted that he did not undertake "any analysis of the cost to Lycos of rewriting any of the schedules, in other words, comparing the rent on the old schedule with the rent on a new schedule where the equipment was split between schedules" and that the sole basis of his opinion was Mr. Smith's (Lycos's summary judgment expert affiant) report (Johnson Tr. at 193:1-7), wherein Mr. Smith concludes that Lycos lacked the information to perform this analysis.<br><br>• *Inadmissible-Expert, Non-responsive.* (n. 19) The paragraphs cited by CSI from Mr. Schallheim's affidavit are conclusory and, with respect to paragraph 14 of his affidavit, irrelevant. |
| 9. | Mr. Stenberg has admitted that he marked-up the leases. | Disputed. As stated, Mr. Stenberg did not "admit" to the mark-up theory created by Lycos' experts. The testimony of Mr. Stenberg that Lycos cites as an admission is misleading, as Mr. Stenberg is only testifying that he "market-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[23] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment. The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[24] | • *Undisputed Facts.* Because Lycos does not contend that Mr. Stenberg has admitted to the mark-up theory created by Lycos's experts, Lycos's facts are undisputed.<br><br>• *Argumentative.* The last sentence of the paragraph that refers to what it claims is Lycos's "underlying and faulty assumption" is argumentative and should therefore be stricken.<br><br>• *Irrelevant.* CSI's dispute as to the last sentence is irrelevant because Lycos is not arguing that CSI was not entitled to charge more than its booked residual when Lycos extended the leases of equipment. |
| 10. | The internal refinancing process at CSI was such | Disputed. According to three of CSI's experts who directly refute Lycos' | • *Undisputed Facts.* Lycos's allegations in this paragraph concerns |

---

[23] Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).

[24] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | that CSI knew it was charging Lycos a mark-up and the approximate magnitude of that mark-up not only before each refinanced equipment schedule was signed, but before it was even prepared. That process worked as follows: (a) When an account executive such as Mr. Stenberg asked for pricing on a refinancing, CSI would calculate a "commissionable threshold," i.e., the amount above which he would earn a commission. This "threshold" would be based on the value of the terminating schedule(s), i.e., the present value of the remaining lease payments plus the present value of the residual on the existing schedule(s), less an amount equal to the present value of the estimated residual on the new schedule(s), an amount CSI sometimes referred to as "equity in." (b) Mr. Stenberg would then, in his words, "mark-up" this threshold and quote a price to Lycos. If it appeared the refinancing would proceed, Mr. Stenberg would complete the "left" side of a form called Request for Contract. Among other things, he would fill in the boxes entitled "Total threshold PV" – the commissionable threshold he had been given plus soft costs, the "Estimated PV" – the estimated present value of the rents on the new schedule(s), and the "estimated margin" – the difference between the "Total threshold PV" and "Estimated PV." (c) After completing the RFC, | expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[25] Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction exists, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[26] Nor is it proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and *not* loans.[27] What Lycos terms an improper and undisclosed "mark-up" is simply profit on a transaction in which Lycos had chosen to maintain possession of equipment it was leasing from CSI for, in some cases, an additional 50% time period.[28] | the internal refinancing process at CSI. CSI does not dispute any of Lycos's facts concerning that process. Accordingly, those facts should be deemed admitted. <br><br>• *Immaterial Dispute.* Lycos is not claiming mark-up is a term used in the industry. Lycos is also not claiming that CSI had a duty to disclose its gross profits. Whether the term to describing the rewriting of equipment schedules is "renewal" or "refinancing" is also immaterial. <br><br>• *Inadmissible–Expert.* As noted above, the question of whether the transactions are "leases" or "loans" is for the Court to decide. Moreover, as noted above, CSI's experts admittedly performed no analysis to determine whether the transactions were leases or loans. |

---

[25] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[26] Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[27] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11. (Gabos Decl. Ex. 2).

[28] Fleming Aff. ¶¶ 31 (Gabos Decl. Ex. 3).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | Mr. Stenberg would send it to Ms. Kersting or someone in the legal department, who would circulate it for approval. If the request were approved, someone in the legal department would then prepare the lease contract. | | |
| 10. | Because CSI had calculated both the Total Threshold PV and the "Estimated PV" before each refinanced schedule was prepared, and thus before it was executed, CSI knew that:<br>the present value of the rents on the new schedule(s) > the present value of the remaining rents plus<br>the present value of the estimated residual value on the schedule(s) being refinanced, minus the present value of the residual on the new schedule(s). | 10. [sic] Disputed. CSI had internal records concerning how it booked a given lease transaction, but there is no evidence that Lycos "knew" anything concerning the "mark-up" theory now advocated by Lycos. Again, CSI has evidence that directly refutes the "mark-up" theory created by Lycos' expert Bruce Smith, including that the term "mark-up" is not used in the industry and is a fabricated theory without merit.[29] Even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether there exists a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as the contracts clearly stated the monthly payment and the term of each schedule).[30] | • *Undisputed Facts.* Again, Lycos's facts concern the internal refinancing process at Lycos. CSI not dispute this process as described by Lycos. Accordingly, Lycos's facts should be deemed admitted.<br>• *Immaterial Dispute.* As noted above, Lycos is not claiming that "mark-up" is a term used in the industry.<br>• *Argumentative.* The statement that "there is no evidence that Lycos 'knew' anything concerning the 'mark-up' . . ." is argumentative and relevant only in that it is an admission that CSI did not disclose the mark-up to Lycos. Lycos does not contend that CSI should have disclosed its gross profits to it. |
| 11. | In addition, because he estimated his "margin," i.e., an amount equal to the Estimated PV minus the Threshold PV, Mr. Stenberg and CSI knew the approximate magnitude of the mark-up before the CSI legal department even prepared an equipment schedule. | Disputed. The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked-up" the leases or "knew the approximate magnitude of the mark-up" is misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was created well after Mr. Stenberg gave his deposition). Mr. Stenberg testified that he "marked-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[31] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment. Moreover, the testimony of Mr. Stenberg cited by Lycos is mischaracterized, as Mr. Stenberg was reviewing a specific | • *Undisputed Facts.* Lycos's facts concern what Mr. Stenberg and CSI knew before the parties entered into a refinancing. CSI does not dispute what they knew and when they knew it.<br>• *Immaterial Dispute.* As noted above, Lycos does not contend that "mark-up" is a term used in the equipment leasing industry.<br>• *No Dispute.* Lycos does not contend that "somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of equipment." |

---

[29] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[30] Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[31] Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex. 8).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | document that he was unsure he himself had filled out, and he is discussing a present value calculation of a rental stream at 11 percent — with no mention of residual values, which is a component of Lycos' "mark-up" theory.[32] The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[33] | |
| 12. | [sic] Omitted. | Omitted. | |
| 13. | Lycos would not have entered into any of the Refinanced Schedules on the terms that it did if CSI had told it about the mark-ups. | Disputed. The only evidence Lycos has that it would not have entered into any lease extensions if it had known about the mark-ups are found in the summary judgment affidavits of its former officers who are defending their involvement in lease extensions which Lycos now alleges were bad business decisions.[34] CSI, on the other hand, has contrary evidence that Lycos wanted or needed to extend their leases with CSI for many business reasons, including Lycos' desire not to capitalize the leases[35] (and instead continue to claim operating lease accounting treatment for them),[36] their desire to lessen monthly expenses[37] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94), and their inability to | • CSI acknowledges that the Affidavits of its former officers establish that Lycos would not have entered into the refinancings if they had known of the mark-ups. It provides no evidence to refute these affidavits. Lycos's facts should therefore be deemed admitted.<br>• *Inadmissible-Unsupported.* Whether Lycos had a policy to lease equipment, or sought operating lease treatment of its leases, is immaterial. The memo cited by CSI in does not support the proposition that Lycos did not want to capitalize the leases. |

---

[32] Bean Aff. Ex. 65 at 490:3-491:23.

[33] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[34] Bean Aff. Exs. 6, 1, 12.

[35] Lycos's policy was not to buy when it could lease instead. Galvan Dep. at 32:3-13 (Gabos Decl. Ex. 6).

[36] In fact, it was Lycos' parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003. Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7). Moreover, Mr. Guilfoile, Lycos Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification. Guilfoile Dep. at 79:21-80:9 (Gabos Decl. Ex. 2).

[37] Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Gabos Decl. Ex. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-111:7.

BST99 1559384-6 057077.0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | return a large portion of the leased equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment).[38] In fact, in trying to convince its parent company to agree to the proposed $3.77 million buyout of the CSI leases, an internal email sent by Lycos' Assistant Controller to its in-house counsel makes clear that it could not return CSI's equipment and was at a negotiating disadvantage:<br><br>[I]t is our understanding that we [Lycos] are contractually obligated to return all of the leased equipment to our lessor [CSI] in exactly the same way it was received. ***This would include identifying several hundred pieces of equipment and decommissioning them in accordance with each lease expiration. We believe this to be operational impossibility,*** . . . Obviously, buying out now eliminates significant risks to the Company. Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the lease term ***(when we admit to our Lessor that we cannot return this equipment*** and HAVE TO buy out), we support Brian [Lucy's] decision to buy out of the leases immediately.[39] | |
| 14. | The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules and approximately double its average rate of return on its equipment leases | Disputed.  Again, the term "mark-ups" is not used in the industry and is a theory that CSI's experts have opined is without merit.[40]  There is no obligation for a lessor to Disclose what is essentially an element of its profits, and | • *Undisputed Facts.*  Because CSI does not even respond to Lycos's assertion as to CSI's yield resulting from the mark-ups, Lycos's facts should be deemed admitted.<br><br>• *Immaterial Dispute and Argument.*  Lycos does not contend that |

---

[38] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.

[39] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625 (capitalization in original; emphasis supplied).

[40] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶13-14 (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | generally. | Lycos at all times was given the information that it needed to decide whether to enter into the lease extensions of which it now complains.[41] | "mark-up" is a term used in the industry or that CSI was required to disclose its profits. |
| | B.    Facts Concerning Lycos's Claim for Actual Damages | | |
| 1. | Lycos paid CSI more than $72 million in rent payments on account of equipment that had an original acquisition cost of approximately $45 million. Over $45.5 million of these monthly payments (more than 63% of the total monthly payments) were made pursuant to the Refinanced Schedules. Of the over $27 million difference between the approximately $45 million original acquisition cost and more than $72 million in monthly payments, more than $13.708 million resulted from CSI's undisclosed mark-ups on the Refinanced Schedules. | Disputed. Lycos did pay a total of approximately $72 million to lease, over a five to seven year period, equipment owned by CSI which had an original cost of $45 million. The characterization of the payments as including something improper — i.e., "mark-ups" — sets a false premise and is Lycos' belated and argumentative characterization of the payments and, according to CSI's experts, lacks merit.[42]  As stated previously, CSI has presented evidence that the "mark-up" theory created by Lycos has no basis in fact or industry practice, and that CSI acted properly.[43] | • *Undisputed Facts.* While CSI claims to dispute certain facts, it then proceeds to admit many of the facts Lycos alleged, and provides no evidence to dispute any of the facts alleged. Accordingly, Lycos's facts should be deemed admitted.<br><br>• *Immaterial Dispute.* Lycos does not contend that "mark-up" is a term used in the leasing industry. |
| 2. | A chart presenting the amount of the mark-up, by Refinanced Schedule, along with a column from CSI's journal entries headed "gross profit," is attached to the Affidavit of Bruce D. Smith, filed herewith, as **Exhibit G**. On many occasions, the "gross profit" recorded by CSI on its Sales Type Lease Journal Entries equaled the precise amount of "mark-up" calculated by Lycos's expert. | Disputed. For the reasons stated above, there are no "mark-ups," as Lycos is using that term in its theory that CSI failed to disclose its profits, and CSI's disclosures and actions concerning Lycos's lease extensions were proper and within industry standards.[44] | • *Undisputed Facts.* While CSI claims to dispute facts, it does not even respond to Lycos's facts concerning the manner in which he was compensated. It claims that his manner of compensation is irrelevant. Hence there is no genuine issue of material fact in dispute and Lycos's facts should be deemed admitted.<br><br>• *Inadmissible –Unsupported.* The first two sentences contain no citation to the record and therefore must be stricken. |

---

[41] Fleming Aff. ¶¶ 60-62; *see generally* Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[42] Fleming Aff. ¶¶ 11-16; Johnson Aff. 8-13; Schallheim Aff. ¶¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[43] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

[44] Fleming Aff. ¶¶ 22-29; Johnson Aff. ¶¶ 28-39; Schallheim Aff. ¶¶ 7-10, 15-20 (Gabos Decl. Exs. 3-5, respectively).

- 13 -

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | | |
| | C.    Additional Undisputed Facts Material to Lycos's Claim for Multiple Damages Under M.G.L. c. 93A, § 11 | | |
| 1. | Mr. Stenberg was compensated primarily on a commission basis pursuant to a detailed compensation plan developed by CSI. His commissions were calculated in significant part on the extent to which the present value of the monthly payments on an equipment lease exceeded an internal "commissionable threshold" amount set by CSI. This commission plan applied both to the lease of new equipment as well as to the refinancing of used equipment already under lease. Accordingly, every time a customer refinanced an equipment schedule, Mr. Stenberg would earn another commission on equipment that was already under lease. During the period from July 1, 1999 through June 30, 2001, CSI also provided Mr. Stenberg with a 20% bonus commission every time one of his customers refinanced an equipment schedule with personal computers on it. CSI referred to this as the "PC rewrite bonus" program. Mr. Stenberg also earned commissions when CSI sold equipment to one of his customers that had been under lease based on the extent to which the | Disputed, but irrelevant. Mr. Stenberg, as other sales representatives at CSI, earned a portion of his compensation in commissions which were based on leasing that CSI did with customers — but this is irrelevant. The implication of Lycos' statements is that Mr. Stenberg, due to a purported incentive to do additional leases, somehow convinced a sophisticated company like Lycos to enter into bad business transactions that they otherwise would not have done. This is contradicted by the following evidence, among others: (a) Lycos was run by several highly-educated and experienced business leaders, including many entrepreneurs who, in addition to their own expertise, also had available to them accountants, lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in December 2000 that its leasing practices were problematic);[45] (b) Lycos itself never trusted Mr. Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony demonstrate;[46] and (c) it was purely Lycos's decision to extend its leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[47] | • *Undisputed Facts.* CSI concedes that any dispute as to Lycos's facts is irrelevant. Because CSI does not provide any specific evidence to dispute those facts, those facts should be deemed admitted. <br><br> • *Undisputed Facts.* The first sentence is without citation to the record and should therefore be stricken. <br><br> • *Argumentative.* The second sentence is pure argument, and should therefore be stricken. <br><br> Note: That one of CSI's in-house counsel thought Mr. Stenberg was a "worthless liar" and counseled Mr. Lucy not to trust him demonstrates that Mr. Lucy did trust Mr. Stenberg. |

[45] *See supra* ¶¶ 1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl Ex. 14).

[46] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]the Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg. *See* Gabos Decl. Ex. 15. In addition, Mr. Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg — "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

[47] Fleming Aff. ¶ 62; Johnson Aff. ¶ 22 (Gabos Decl. Exs. 3-4, respectively).

- 14 -

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | price for which CSI sold the equipment exceeded his "threshold" set by CSI. | | |
| 2. | Within months after the PC rewrite bonus program became effective in July 1999, Mr. Stenberg asked CSI's co-CFO about that program to ascertain the commissions he would receive if he refinanced Lycos equipment schedules. | Disputed, but irrelevant. Again, Mr. Stenberg earned a portion of his compensation in commissions. The implication of Lycos's statements, however, is that any incentive Mr. Stenberg for his customers to extend their leases translates into an ability to pressure a sophisticated company like Lycos to enter into business transactions that they otherwise would not have done. This is contradicted by the evidence already set forth in the preceding paragraph. | • *Undisputed Facts.* Not only does CSI admit that any disputes are irrelevant, but not one assertion in this paragraph is supported by citation to the record. Accordingly, CSI's "facts" should be stricken and Lycos's facts deemed admitted. |
| 3. | CSI then prepared a chart for internal use that calculated Mr. Stenberg's threshold, a calculation that necessitated calculating the present value of the payments on the schedules being refinanced and the booked residual value of the equipment on those schedules. When Mr. Stenberg asked that a chart be prepared for Lycos showing the effect of the refinancings, however, he asked that the chart list the schedules being refinanced, the new rent, the old rent, the "savings," and the new term. The chart did not disclose the existence of millions of dollars in mark-ups charged on those refinancings. | Disputed, but irrelevant. The import of Lycos' statements is that Mr. Stenberg did not disclose to Mr. Ripps his "commissionable threshold" — that is, the threshold he is provided internally for accounting purposes to determine his commission — which is akin to a company disclosing its gross profits on a deal to a customer. As CSI's experts have made clear, that is not done in the industry, and there is no obligation to make such a disclosure.[48] Again, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[49] The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[50] | • *Undisputed Facts.* CSI admits that any factual dispute is irrelevant, and does not provide specific evidence of any disputes. Accordingly, Lycos's facts should be deemed admitted.<br><br>• *Argumentative, unsupported, non-responsive.* The first sentence of CSI's Response is argument unsupported by citation to the record. It should therefore be stricken. The balance is argument that misstates Lycos' position as Lycos does not contend that CSI was not entitled to charge more than its booked residual value or that mark-up is a term used in the leasing industry. |
| 4. | Soon thereafter, CSI and Lycos refinanced, in the | Disputed and misleading. CSI's evidence demonstrates that it | • *Undisputed Facts.* Because CSI does not provide specific evidence |

---

[48] Fleming Aff. ¶¶ 44-52; Johnson Aff. ¶¶ 25-27; Schallheim Aff. ¶ 7 (Gabos Decl. Exs. 3-5, respectively).

[49] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[50] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

- 15 -

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | words of CSI's co-CFO, "almost every Lycos schedule out there." In addition to resulting in millions of dollars of mark-ups for CSI, Mr. Stenberg earned hundreds of thousands of dollars in commissions and bonus commissions on these refinancings. | was *Lycos's* desire to re-write its CSI lease portfolio because it wanted to lower its monthly rental payments.[51]   Just months earlier in May 2001, Lycos' Human Resources Officer John McMahon had notified all employees that Lycos was "sharpening our focus on bottom line results," which included "expense reduction initiatives"[52] — i.e., layoffs and other measures.[53] As stated previously, CSI's experts reject Lycos' theory concerning mark-ups and the notion that these transactions were "refinancings" of loans rather than true leases.[54] | to dispute any of Lycos's facts, Lycos's facts should be deemed admitted. • *Non-responsive.* The transactions at issue in Lycos's 56.1 Statement took place in fall, 1999 (see Ex. 70 to Decl. of T. Bean); what McMahon wrote in 2001 is of no import. • *Inadmissible-Expert.* As discussed above, whether the refinancings were leases or loans is a question of law for the Court. |
| 5. | Mr. Stenberg himself that addressed the role of refinancing as part of CSI's business in an e-mail he wrote to CSI managers that he called his "Tom Cruise Mission Statement." He wrote: "What is our business? It's getting deals and eventually turning them into Smart track and then re-writing them. At the expiration of the lease, we sell it to them. Period." Mr. Stenberg even cited Lycos in this e-mail as his sole example of what CSI's business model could achieve. | Disputed and misleading. Mr. Stenberg does not mention "refinancings" of loans, and it is clear from the testimony of CSI's experts to testimony from Lycos itself that these transactions were always treated and accounted as leases.[55] Further, Mr. Stenberg's testimony makes clear why it is not CSI's business model to always advocate lease extensions because there are a "[l]ot of times rewrites don't make sense."[56] | • *Undisputed Facts.* While Stenberg may have referred to the "refinancings," as "rewrites, this distinguish is immaterial. Because CSI has simply sought to explain the quotations from its web-site and Mr. Stenberg but does not disputed them, Lycos's facts should be deemed admitted |

---

[51] Deposition of Paul Stenberg, dated Jan. 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated Jan. 12, 2007 ("Wright Dep.") at 102:15-104:4 (Gabos Decl. Ex. 9).

[52] E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18).

[53] Wright Dep at 94:21-95:3 (Gabos Decl. Ex. 9).

[54] Fleming Aff. ¶¶ 11-21; Johnson Aff. ¶¶ 8-20; Schallheim Aff. ¶¶ 11-14 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[55] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[56] Stenberg Dep. Aug 24, 2006, at 244:8-15 (Gabos Decl. Ex. 8).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| 6. | According to CSI's website in effect during all or a portion of the parties' relationship, CSI's customers "trust [it] to manage the leasing process efficiently and ethically, while catering to their own unique needs." CSI's chairman also testified that he expected the company's account executives to conduct themselves with "honesty, integrity, forthrightness, and dignity." Notwithstanding that, when Lycos asked him in deposition whether CSI gives any information to a customer in connection with a refinancing other than the new monthly rate and the new term he responded: "It depends – it depends on what they ask for." Mr. Stenberg also once wrote to the co-CFOs of CSI: "Because they trust us to do quarterly's and pay a significant amount of stub, they don't always not know what is being invoice to us <isn't that what we want?" | Disputed and misleading. Lycos' citations to CSI's website and out-of-context testimony[57] concerning what CSI discloses to customers is irrelevant to whether CSI was required to disclose any portion of its gross profit on its lease transactions (which Lycos calls an improper "mark up") — and which CSI's experts state is not done or required in the industry.[58] As to Mr. Stenberg's comment ("isn't that what we want?"), he explained in his deposition that customers may want to add the software costs into the leases with the hardware cost rather than pay out of pocket separately for the software.[59] | • *Undisputed Facts.* CSI does not dispute Lycos's quotations from its web-site, the deposition of its chairman, or the deposition of Stenberg. Instead, it seeks to explain those statements. Accordingly, Lycos's facts should be deemed admitted. |
| 7. | As a result of these "infamous" refinancings, of the more than $4.7 million in commissions Mr. Stenberg earned on the Lycos equipment schedules alone, he reaped more than $3.4 million – 72% of his total commissions—from refinancings. | Disputed and irrelevant. Again, the transactions were leases, not loans that were "refinanced," and Lycos understood this and treated them as such.[60] | • *Undisputed Facts.* Because CSI does not even respond to Lycos's facts let alone provide specific evidence to dispute them, Lycos's facts should be deemed admitted. <br><br> • *Immaterial Dispute.* The use of the word "refinancing" rather than "rewrite" is a semantic disagreement. |
| 8. | In July 2001, Mr. Stenberg was promoted to Regional Manager. Employees promoted to this | Disputed and misleading. The evidence shows that Lycos wanted to lessen its monthly spending for many reasons including: (a) the "expense | • *Undisputed Facts.* Because CSI does not respond to Lycos's facts, let alone provide specific evidence to dispute them, Lycos's facts |

---

[57] CSI's Chairman answered Lycos' questioning by stating that information provided to customers is essentially fact specific Bean Aff. Ex. 20 at 83:1-84:20 (testimony of Kenneth Steinback) For example, there is no need to disclose equipment cost information to customers because "[t]hey have it" already, as they — not CSI— select and procure the equipment they ultimately lease from CSI. Id.

[58] CSI's experts have opined that the term "mark ups" are not used in the industry and are a fabrication of Lycos for purpose of this litigation. Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively). Further, these types of disclosures are neither required nor common in the industry Id

[59] Stenberg Dep. at 225:21-226:7 (Gabos Decl. Ex. 8).

[60] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | position at CSI typically give up their individual accounts, but CSI deviated from the norm and permitted Mr. Stenberg to retain the Lycos account. A few months later, CSI and Lycos entered into what CSI referred to internally as the "big one" – a refinancing of over thirty schedules, almost all of which themselves had previously been refinanced – onto two new schedules known as schedules 93 and 94. CSI developed a structure that terminated some schedules early and caused some, but not all, of the equipment to roll onto schedule 94 immediately while allowing other schedules to run their term until rolling onto schedules 93 and 94 more than a year later. CSI's co-CFO himself described the structure and the documents evidencing this refinancing in an internal CSI email as "complex" and "convoluted." Mr. Stenberg, who earned the highest possible scores on his performance evaluations for knowledge of equipment leasing and gaining the trust of the decision-maker at his customers, made over $2 million dollars in commissions on the refinancing of schedules 93 and 94 alone. | reduction initiatives" mentioned in Mr. McMahon's memorandum to all employees[61]; (b) Lycos' desire not to capitalize the leases[62] (and instead continue to claim operating lease accounting treatment for them)[63]; (c) its stated desire to lessen monthly expenses[64] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94); and (d) its inability to return a large portion of the leased equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment).[65] Furthermore, CSI structured the deal to benefit Lycos and minimize the amount of the letter of credit it had to post by leaving the existing debt in place on the existing schedules.[66] | should be deemed admitted.<br><br>• *Immaterial Facts.* Whether Lycos wanted to reduce its monthly expenses, treat them as operating leases, or had a policy of not purchasing equipment it could lease, is immaterial to the question of whether CSI failed to disclose information it was required, as a matter of law, to disclose.<br><br>• *Unsupported Facts.* There is no evidence to support the proposition that Lycos wanted to "lower its monthly payments" to "claim operating lease treatment." Neither the Callagee transcript citation nor the Guilfoile transcript citation (which misstates his testimony- he later corrected himself and stated he did not know whether Lycos tested each schedule for operating lease classification) support the proposition for which CSI offers them. Further, Ms. Callagee's e-mail, sent in July, 2003 (fn 65), is irrelevant as it was sent two years after the transaction described in the Lycos's facts.<br><br>• *Unsupported Facts.* Mr. Cagney testified that the structure was what Mr. Stenberg (of CSI) "wanted to do" (Tr. at 245:7-19). Whether the structure "benefited" Lycos or CSI as CSI now claims is not supported by Mr. Cagney's testimony and is irrelevant because there is no evidence to suggest Lycos requested a letter of credit as small as possible and, more importantly, does not obviate |

---

[61] E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18).

[62] Lycos' policy was not to buy anything that it could lease instead. Galvan Dep. at 32:3-13 (Gabos Decl. Ex. 6).

[63] In fact, it was Lycos's parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003. Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7). Moreover, Mr. Guilfoile, Lycos' Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification. Guilfoile Dep. at 79:21-80:9 (Gabos Decl. Ex 2).

[64] Deposition of Brian Reale ("Reale Dep.") at 11:3-9 (Gabos Decl. Exh. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg (Aug. 24, 2006) at 110:15-111:7.

[65] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.

[66] Cagney Dep. at 245:7-19; 256:2-9 (Gabos Decl. Ex. 10).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | | the fact that Mr. Cagney testified that the structure was "complex" and "convoluted." |
| 9. | A few months after the commencement of schedules 93 and 94, Lycos discovered what appeared to be a more than $11 million increase in the gross payments it would be required make under those schedules as compared with the amounts it would have been required to make had it not refinanced. In response, Lycos's Chief Financial Officer, Brian Lucy, wrote an e-mail to Mr. Stenberg in which he said: I would expect a slight increase in our O[ut]/S[tanding] commitment, but this is a problem that would need to be rectified in short order. If these numbers are in fact correct, I would have to ask to unwind the refinancing. | Disputed and misleading, Mr. Lucy's e-mail to Mr. Stenberg in March 2002 was written *long after* Lycos had already entered into Schedules 93 and 94 and begun paying its new lower monthly rent — and therefore the e-mail could not have formed any basis for Lycos entering into those transactions. Further, it was based on information admittedly given to it by Mr. Stenberg months earlier;[67] that Lycos did not bother to review that information prior to executing Schedules 93 and 94 only highlights that Lycos needed to achieve the cost savings and other goals for which Lycos extended its leases *(see preceding paragraph).* As for the implication that Lycos could "unwind the refinancing" even if it wanted to, Lycos presents no evidence that it had the right to rescind a deal that it had voluntarily entered months before and prior to its review of information it allegedly was now questioning. | • *Undisputed Facts.* Because CSI does not dispute Lycos's facts, let alone with specific evidence, Lycos's facts should be deemed admitted. <br><br> • *Argumentative.* CSI's entire response is an argument as to why Mr. Stenberg's e-mail in March, 2002 – an e-mail not even mentioned in Lycos's facts – is irrelevant to the discussion. |

---

[67] Bean Aff. Ex. 31 at LYC24612 ("The obligations under the new refinanced leases came from the schedule below that you mailed to Monique [Walsh, of Lycos]").

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| 10. | Mr. Stenberg responded in an e-mail to Mr. Lucy assuring him that this was not the amount of the difference, in which he wrote:<br><br>This is what I have so far so you can rest easy.<br>Present Value of Lease $23,727,000<br>Obligation of old Leases $20,215,000<br>Difference  3,512,000 | Disputed as misleading. Again, the e-mail from Mr. Stenberg came well after Schedules 93 and 94 were entered into by the parties. It was described by Mr. Stenberg as a work in progress ("I have come up with the following so far"), and said he would "take a look" at it — but the evidence shows that he never responded to Mr. Stenberg on this. CSI has evidence that no one at Lycos ever relied on this e-mail in any event[68] — and, in fact, importance was only attached to the email when litigation started between the parties. At his deposition in this case, Mr. Lucy never recalled receiving the March 18, 2002 e-mail from Mr. Stenberg and did not recall relying "in any way" on the statements made by Mr. Stenberg in the e-mail.[69] In fact, it was not until January 7, 2004 — after Lycos had first filed suit against CSI — that Leaseforum's John Kirk informed the "Team" (including Lycos' outside counsel) that he had found the March 18, 2002 e-mail and that it "*may* be important."[70] It is clear that Lycos never relied on any statements made by Mr. Stenberg in the March 2002 e-mail and that it was not until Lycos had filed suit and was searching for a claim did it attribute any importance to this e-mail. | • *Undisputed Facts.* Because CSI does not even respond to Lycos's quotation from Mr. Stenberg's e-mail, let alone refute it with specific facts, Lycos's facts should be deemed admitted.<br><br>• *Argumentative.* Whether Lycos relied on this e-mail is immaterial to Lycos's c. 93A claims. The question is whether Mr. Stenberg made knowing and willful misrepresentations. |
| 11. | Mr. Lucy, who had no background in equipment leasing and trusted Mr. Stenberg, did not pursue the matter further. | Disputed. Mr. Stenberg has testified at length concerning the March 18, 2003 email.[71] However, it was not a matter of "trust" that caused Mr. Lucy not to "pursue the matter further." Lycos did not trust Mr. Stenberg — at times, Lycos referred to him as a "worthless liar" — and its in-house counsel cautioned Mr. Lucy not to rely on Mr. Stenberg because "he [Stenberg] doesn't work for Lycos."[72] In | • *Undisputed Facts.* CSI does not even respond to Lycos's facts, let alone controvert them with specific evidence. Accordingly, Lycos's facts should be deemed admitted.<br><br>• *Argumentative.* That one in-house lawyer at Lycos cautioned Mr. Lucy against trusting Mr. Stenberg demonstrates, or at least |

---

[68] Johnson Aff. ¶¶ 65-68 (Gabos Decl. Ex. 4).

[69] Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep.") at 52:8-53:20 (Gabos Decl. Ex. 19).

[70] E-mail from John Kirk to Lycos' litigation "Team," dated Jan 7, 2004 (Gabos Decl. Ex. 20).

[71] Stenberg Dep. (Aug. 26, 2006) at 352:3-388:23 (Gabos Decl. Ex. 8).

[72] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]the Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg. *See* Gabos Decl. Ex. 15. In addition, Mr. Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg "[w]hy do you trust Paul [Stenberg]? [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | addition, the evidence is clear that Mr. Lucy cannot recall the March 2002 e-mail from Mr. Stenberg (much less any reliance he placed on it), and it was not until litigation had commenced that Lycos' litigation consultant and witness — who had and still has a contingent financial interest in the outcome of the case[73] — determined it could be of use in creating a claim against CSI *(see preceding paragraph)*. | implies, that Mr. Lucy did trust Mr. Stenberg. Otherwise, there would have been no point in in-house counsel's cautioning Mr. Lucy. |
| 12. | Yet, contrary to Mr. Stenberg's representation, the gross difference in the amount of the payments on schedules 93 and 94 exceeded the payments on the schedules refinanced by almost $10.5 million. CSI's internal accounting records also reveal that regardless of whether one used the 8.16% discount rate Mr. Lucy had used when he requested that CSI write schedules 93 and 94, or the 12.64% rate he apparently used to cause the gross payments on those schedules to equal his discounted number of $23,727,000, the difference was more than double the $3.5 million he represented to Lycos. | Disputed and irrelevant. Mr. Stenberg testified concerning the e-mail.[74] As stated, Lycos has no evidence that it ever relied (or even recalled) the March 18, 2002 e-mail from Mr. Stenberg. In fact, it was only upon commencement of litigation that the e-mail was reviewed and used as a basis for claims brought against CSI *(See preceding paragraph)*. | • *Undisputed Facts.* CSI does not dispute, let alone provide evidence of facts controverting, Lycos's facts. Accordingly, those facts should be deemed admitted.<br><br>• *Immaterial Facts.* Whether Lycos relied on Mr. Stenberg's e-mail is irrelevant to Lycos's c. 93A claim. |
| 13. | Two leasing experts Lycos retained during the course of its relationship with CSI – both of whom issued written reports to Lycos – did not uncover the existence of or CSI's methodology for implementing the mark-ups. Lycos uncovered them only through an expert with a Ph.D. in mathematics and twenty-eight years of experience in equipment leasing who spent hundreds of hours | Disputed. Lycos' "[t]wo leasing experts" did not uncover the "mark-ups" because there are no such things. CSI's experts have testified to that, as well as the fact that CSI made the necessary disclosures to Lycos and otherwise acted properly and within industry standards.[75] Lycos' expert PhD in mathematics essentially created this theory which has no basis in industry practice and, in essence, seeks to require disclosure of a lessor's profits on leasing transactions — which is not the case.[76] | • *Undisputed Facts.* CSI does not even respond to Lycos's facts, let alone provide specific evidence controverting them.<br><br>• *Immaterial Facts.* As noted above, whether the term "mark-up" is used in the leasing industry is immaterial to Lycos's claims. |

---

[73] Susan Franklin, founder and principal of Leaseforum, admitted under oath that Leaseforum holds a contingent financial interest in the outcome of this case. Deposition of Susan Franklin, dated Feb. 21, 2007 ("Franklin Dep.") at 373:5-8 (Gabos Decl. Ex. 21).

[74] Stenberg Dep. (Aug. 24, 2006) at 352:3-388:23 (Gabos Decl. Ex. 8).

[75] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶13-14 (Gabos Decl. Exs. 3-5, respectively).

[76] *See generally* Fleming Aff.; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | reviewing CSI's internal financial records and other material in this case | | |
| 14. | The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules and approximately double its average rate of return on its equipment leases generally. | Disputed and misleading. According to three of CSI's experts — two with doctorates in finance and many years of academic study in leasing and one with over twenty years of experience as the president of the Equipment Leasing Association ("ELA") — who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[77] | • *Undisputed Facts.* CSI does not provide evidence to refute Lycos's assertion that it earned almost double the rate of return it earned on new equipment schedules and approximately double its average rate of return. Accordingly, Lycos's facts should be deemed admitted.<br><br>• *Immaterial Facts.* Whether the term "mark-up" is used in the leasing industry is immaterial. |
| 15. | When CSI later sold the equipment to Lycos, Mr. Stenberg earned yet another commission, an additional $513,750 in commissions, an amount Mr. Stenberg complained to CSI's chairman and CEO to be inadequate. | Disputed as misleading, and irrelevant. Mr. Stenberg, as other sales representatives at CSI, earned a portion of his compensation in commissions which were based on leasing that CSI did with customers — but this is irrelevant. The implication of Lycos' statements is that Mr. Stenberg, due to a purported incentive to do additional leases, somehow convinced a sophisticated company like Lycos to enter into bad business transactions that they otherwise would not have done. This is contradicted by the following evidence, among others: (a) Lycos was run by several highly-educated and experienced business leaders, including many entrepreneurs who, in addition to their own expertise, also had available to them accountants, lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in December 2000 that its leasing practices were problematic);[78] (b) Lycos itself never trusted Mr. Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony demonstrate;[79] and (c) it was purely Lycos' decision to extend its leases, | • *Undisputed Facts.* CSI does not provide evidence controverting Lycos's facts as to the amount of commission Mr. Stenberg earned or that he complained to CSI's chairman about that amount. Accordingly, Lycos's facts should be deemed admitted. Indeed, CSI describes its disagreement with Lycos's facts as "irrelevant."<br><br>• *Unsupported Facts.* The first two sentences of CSI's response contain no citation to the record. Accordingly, they should be stricken. |

---

[77] Fleming Aff. ¶¶ 11-16; Johnson Aff. ¶¶ 8-13; Schallheim Aff. ¶ 13-14 (Gabos Decl. Exs. 3-5, respectively).

[78] *See Supra* ¶¶ 1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl. Ex. 14).

[79] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**ho le," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg. *See* Gabos Decl. Ex. 15. In addition, Mr. Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg — "why do you trust Paul [Stenberg]? [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex. 16).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[80] | |
| | **II.    Counts VII–XIII – Alleged Unjust Enrichment and Money Had and Received** | | |
| | A.    Alleged "Undisputed" Facts Material to Lycos' Claim that CSI is Liable to It on these Claims | | |
| 1. | The Master Lease Agreement provides, in pertinent part:<br><br>Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other right that Lessee may have against Lessor. | Disputed as misleading, but not material. Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease") to which both CSI and Lycos agreed at the inception of their relationship.[81]  As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of ***both parties*** — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the financing that they ne to do business."[82] | • *Undisputed Facts.*  Because CSI asserts that Lycos's facts are only "misleading," and does not provide specific evidence of any facts controverting Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• *Bad Faith.*  CSI's failure to admit language quoted directly from the Master Lease Agreement demonstrates its bad faith in responding to Lycos's facts. |
| 2. | In construing this clause, CSI argued earlier in this case that: These types of clauses, known as 'hell or high water' provisions . . . require the lessee to make payments under the lease 'come hell or high water,' without regard to defenses that the | Disputed as misleading, but not material. As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of *both parties* — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the financing that they need to do business."[83]  Both | • *Undisputed Facts.*  CSI admits that any dispute it has is "not material." Further CSI does not provide specific evidence to refute any of Lycos's facts.  Accordingly, Lycos's facts should be deemed admitted.<br><br>• *Bad Faith.*  CSI's failure to admit what it argued to the Court in the past is further evidence of its bad faith in responding to Lycos's |

---

[80] Fleming Aff. ¶62; Johnson Aff. ¶ 22 (Gabos Decl. Exs. 3-4, respectively).

[81] *See* Ex. 1 to CSI's Amended Complaint, ¶ 5 (Docket No. 121).

[82] *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim,* dated Mar. 10, 2005, at 3-4 (Docket No. 16).

[83] *CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim,* dated Mar. 10, 2005, at 3-4 (Docket No. 16).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
|  | lessee might wish to assert against the lessor, and without any right of recoupment. | parties agreed to the Master Lease, as evidenced by their signatures.[84] | facts. |
| 3. | Pursuant to equipment schedules 93 and 94 dated November 1, 2001, Lycos and CSI refinanced the equipment on thirty-one equipment schedules. Those schedules expired by their terms on October 31, 2003 and October 31, 2004, respectively. | Disputed. It is not proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and *not* loans.[85] | • *Undisputed Facts.* Because CSI does not provide any evidence disputing Lycos's facts, Lycos's facts should be deemed admitted. <br><br> • *Immaterial Dispute.* The use of the term "refinancing" rather than "rewrite" is a semantic difference. The word "refinancing" does not imply a transaction is a loan rather than a lease. Whether the CSI-Lycos transactions were loans or leases is a question for the Court. |
| 4. | CSI maintained sales type lease journal entries in accordance with Financial Accounting Standards 13 ("FASB 13"). Under FASB 13, CSI's "estimated residual value" was to equal the equipment's expected "fair value" at the end of the lease term. FASB 13 defines "fair value" as the "price for which the property could be sold in an arm's-length transaction between unrelated parties." | Disputed. While CSI maintained its records in accordance with Financial Accounting Standards Board ("FASB") standards generally, Lycos is incorrect that "CSI's `estimated residual value' was to equal the equipment's expected 'fair value' at the end of the lease term" — in fact, its own expert Bruce Smith disputes this. Mr. Smith admitted to the accuracy of a statement on his website that "[l]easing companies often find themselves with seasoned assets on their books that have a current market value well in excess of the book value" but that current accounting rules "prohibit writing up the residual to current market value."[86] | • *Undisputed Facts.* CSI admits that it maintained its books in accordance with FASB. Lycos then simply quotes FASB for what FASB provides. What FASB provides is not a dispute of material fact as the Court can read FASB and construe what it provides. |
| 5. | At the time CSI booked equipment schedules 93 and 94, it recorded an estimated residual value in accordance with FASB 13 of zero dollars for that equipment as of the end of their terms. | Disputed. Lycos is incorrect that FASB 13 required CSI to book its residual values at zero or that this approximated the true value of the equipment at the end of lease — in fact, Lycos' own expert Bruce Smith disputes this. Mr. Smith admitted to the accuracy of a statement on his website that "[l]easing companies often find themselves | • *Undisputed Facts.* Because CSI does not provide evidence controverting Lycos's fact as to the amount of residual value CSI had booked for schedules 93 and 94, Lycos's facts should be deemed admitted. |

[84] Ex. 1 to CSI's Amended Complaint (Docket No 121).

[85] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[86] Deposition of Bruce Smith, dated Nov. 9, 2007 ("Smith Dep."), attached as Ex. 17 to Gabos Decl.

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | with seasoned assets on their books that have a current market value well in excess of the book value" but that current accounting rules "prohibit writing up the residual to current market value.[87] Moreover, CSI's expert Robert Zises has appraised the equipment leased by Lycos from CSI as of August 2003 to have had a fair market value of approximately $3,000,000[88] - and there was also substantial "in-place" value to Lycos for the equipment.[89] | • *Immaterial Fact.* Under section 1-201(37) of the UCC, one question is whether the length of the lease term exceeded the economic life of the equipment. None of the lease terms ended in August 2003. Accordingly, Mr. Zises valuation of the equipment in August 2003 is immaterial. |
| 6. | In Summer 2003, CSI and Lycos entered into a Sales Agreement pursuant to which CSI sold to Lycos all of the equipment on thirteen equipment schedules, including schedules 93 and 94, on the terms set forth in that agreement including, without limitation, an up-front payment of $3.775 million. | Disputed as misleading. The Sales Agreement Number 199614 ("Sales Agreement") executed on August 8, 2003 by Lycos (and by CSI three days later) makes clear that CSI "retains title" to the leased equipment until the leases are satisfied in full.[90] Therefore, though Lycos had achieved its goal of capitalizing its leases as required by its parent company,[91] it did not have title to the equipment at that time or any time prior. | • *Undisputed Facts.* Because CSI does not provide specific evidence disputing the facts asserted by Lycos, Lycos's facts should be deemed admitted.<br><br>• *Argument.* Instead of responding to Lycos's facts, CSI makes argument based on the Sales Agreement. |
| | B.    Alleged "Undisputed" Facts Material to Lycos's Claim for Damages Under Theories of <u>Unjust Enrichment and Money Had and Received</u> | | |
| 1. | Lycos paid to CSI all the amounts due under equipment schedules 93 and 94. | Disputed as misleading, and irrelevant. Lycos has no damages.[92] In any event, Lycos' claim that it "paid twice" for Schedules 93 and 94 — that it, its argument that a percentage of the $3.77 million it paid to buyout its leases with CSI under the Sales Agreement it executed on | • *Undisputed Facts.* Because CSI adduces no evidence to refute Lycos's assertion that it paid all amounts due under schedules 93 and 94, Lycos's facts should be deemed admitted.<br><br>• *Argumentative.* Instead of responding to Lycos's facts, CSI |

---

[87] Deposition of Bruce Smith, dated Nov. 9, 2007 ("Smith Dep."), attached as Ex. 17 to Gabos Decl.

[88] Expert Report of Robert Zises, dated Aug. 30, 2007, at 14 (Gabos Decl. Ex. 22) (sections I and II).

[89] Fleming Aff. ¶¶ 29-74; Johnson Aff. ¶ 24; Schallheim Aff. ¶ 18 (Gabos Decl. Exs. 3-5, respectively).

[90] Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶5.

[91] Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl. Ex. 7).

[92] Johnson Aff. ¶¶ 69-71; Schallheim Aff. ¶¶ 40-44 (Gabos Decl. Exs. 4-5, respectively).

BST99 1559384-6 057077 0012

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Reason(s) to Strike/Deem Admitted |
|---|---|---|---|
| | | August 8, 2003 should be apportioned — ignores the fact that it could not have "paid twice" because title expressly did not pass to Lycos at the time of the August 2003 Sales Agreement.[93] | proffers legal argument. This argument should be stricken. |
| 2. | Lycos paid to CSI the $3.775 million due under the Sales Agreement on August 1, 2003. | Disputed as misleading, and irrelevant. *See* preceding paragraph. | • *Undisputed Facts.* Again, because CSI provides no evidence disputing any of Lycos's facts, Lycos's facts should be deemed admitted. |
| 3. | The Sales Agreement covered thirteen equipment schedules numbered 64F, 66I, 67H, 69I, 85, 86, 89, 89A, 90, 93, 94, 100 and 200 (the "Thirteen Schedules"). | Disputed as misleading, and irrelevant. *See* preceding paragraph. | • See above. |
| 4. | Apportioning the payment of $3,775,000 to the thirteen schedules in accordance with the value of the lease as represented by the present value of the remaining rents plus the present value of the residual as of August 1, 2003 (the date of the first rent payment following the date of the Sales Agreement) reveals that 75.618603% of this amount is attributable to schedules 93 and 94 together with the six schedules that subsequently rolled into 93 and 94. | Disputed as misleading, and irrelevant. *See* preceding paragraph. | • See above. |
| 5. | Multiplying this apportionment percentage times the total payment of $3,775,000, reflects that Lycos paid $2,854,602 in connection with such schedules. | Disputed as misleading, and irrelevant. *See* preceding paragraph. | • See above. |

---

[93] Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5.

BST99 1559384-6 057077 0012

# EXHIBIT B

Volume 1, Pages 1-333

Exhibits:  1-28

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

　　　　Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

　　　　Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

　　　　Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MICHAEL J. FLEMING

Wednesday, November 14, 2007, 9:12 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


- - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404  Fax 617-728-4403

Michael J. Fleming
Volume 1 - November 14, 2007

8 (Pages 26 to 29)

|  | 26 |
|---|---|
| 1 | You can answer. |
| 2 | **A. These appear to be the documents.** |
| 3 | Q. Okay. You said you reviewed a good sample |
| 4 | of the schedules. How many schedules did you |
| 5 | review? |
| 6 | **A. Seven or eight.** |
| 7 | Q. And those seven or eight are within Exhibit |
| 8 | 4, if you reviewed as many as seven or eight; right? |
| 9 | **A. Uh-huh.** |
| 10 | MR. KALER: Objection. |
| 11 | **A. Yes.** |
| 12 | Q. And you know that there were approximately |
| 13 | 126 schedules; right? |
| 14 | **A. Yes.** |
| 15 | Q. And you considered seven or eight to be a |
| 16 | good sample; is that right? |
| 17 | **A. Yes.** |
| 18 | Q. None of those seven or eight were |
| 19 | restructured transactions, as you have defined them, |
| 20 | were they? |
| 21 | **A. Well, they -- in most instances -- well, in** |
| 22 | **all instances that I looked at, the amount of the** |
| 23 | **payment changed and the number of payments was** |
| 24 | **extended and the term of the transaction was** |

|  | 28 |
|---|---|
| 1 | **A. Did you want me to read which exhibits are** |
| 2 | **the ones?** |
| 3 | Q. Sure. Which exhibits represent lease |
| 4 | documents -- by "lease documents," we're referring |
| 5 | to something that Lycos and CSI signed, representing |
| 6 | an equipment schedule; right? |
| 7 | **A. Right.** |
| 8 | Q. So which exhibits that you reviewed |
| 9 | constitute an equipment schedule evidencing a |
| 10 | restructured transaction signed by Lycos and CSI? |
| 11 | **A. Well, let me see which ones are signed,** |
| 12 | **because I'm not sure which ones were signed. Most** |
| 13 | **of them that I looked at were schedules.** |
| 14 | Q. Okay, which are the schedules? |
| 15 | **A. Let me read the exhibit.** |
| 16 | Q. Sure. |
| 17 | A. 23 A. |
| 18 | Q. Let's just take a look at that one for a |
| 19 | second. Callagee 23 A? |
| 20 | **A. Yes. 21 A, 22, 191, 191 A, 191 B, 192,** |
| 21 | **696 -- or is it 646? 696 -- 636, 635, and 194 were** |
| 22 | **documents that I looked at to see the impact of the** |
| 23 | **restructured transactions.** |
| 24 | Q. Of the documents that you just listed, sir, |

|  | 27 |
|---|---|
| 1 | **extended.** |
| 2 | Q. Which of the schedules that are contained |
| 3 | within Exhibit 4 have schedules that reflect |
| 4 | restructuring of early transactions -- earlier |
| 5 | transactions that changed the term and the payment, |
| 6 | if any? |
| 7 | **A. Well, let me go -- I'll go back through** |
| 8 | **them.** |
| 9 | MR. KALER: You need to look through all |
| 10 | of Exhibit 4, because there's a lot of material |
| 11 | there, in addition to the ones that -- |
| 12 | The objection is you did not identify |
| 13 | all the portions that have schedules in them, Tom, |
| 14 | of Exhibit 4. |
| 15 | MR. BEAN: If there are seven or eight |
| 16 | and he can find them in Exhibit 4, that's fine. |
| 17 | Q. Here's your assignment, Mr. Fleming: |
| 18 | Identify for me which exhibits within Exhibit 4 are |
| 19 | restructured transactions, as you have defined that |
| 20 | term earlier this morning. |
| 21 | **A. Okay.** |
| 22 | MR. KALER: And you need to go through |
| 23 | to the bottom of the exhibit. |
| 24 | Q. And go through the whole pile, sir. |

|  | 29 |
|---|---|
| 1 | is any one of them an equipment schedule? |
| 2 | **A. No, I don't believe they are.** |
| 3 | Q. So isn't it the case, then, sir, that you |
| 4 | did not review a single equipment schedule |
| 5 | reflecting the restructuring, as you've defined that |
| 6 | term earlier? |
| 7 | **A. Not the schedule of equipment.** |
| 8 | MR. KALER: Objection. |
| 9 | Q. So on what did you base -- to determine |
| 10 | whether or not the restructuring of the equipment |
| 11 | was commercially reasonable, as you've described it, |
| 12 | you would have had to compare an original equipment |
| 13 | schedule and a restructured equipment schedule, |
| 14 | would you not? |
| 15 | **A. I looked at the results of the schedule.** |
| 16 | Q. The results of the restructured -- |
| 17 | **A. The numbers, what the obligations were for** |
| 18 | **payments.** |
| 19 | Q. Which of the exhibits that you have just |
| 20 | identified reflect the obligations -- the payments |
| 21 | and the obligations? |
| 22 | **A. Well, several of them -- several of them** |
| 23 | **had those. 191 is a worksheet. 191 A is a** |
| 24 | **worksheet. 191 B was a worksheet that worked** |

Michael J. Fleming
Volume 1 - November 14, 2007

9 (Pages 30 to 33)

| | 30 |
|---|---|
| 1 | through examples of an original schedule and |
| 2 | transaction that then was subsequently rolled into |
| 3 | another one. |
| 4 | Q. Well, for example, let's take a look at 191 |
| 5 | B; okay? |
| 6 | A. Uh-huh. |
| 7 | Q. Tell me which transaction -- what did you |
| 8 | consider a restructured schedule? Which of the |
| 9 | schedules listed on 190 B is a restructured |
| 10 | transaction? |
| 11 | A. Well, let's see. It would be a |
| 12 | transaction -- |
| 13 | Let's see. 64 A was rolled into 64 D. |
| 14 | Q. And how do you know that, sir? |
| 15 | A. I'm relying on the accuracy of this |
| 16 | document. |
| 17 | Q. Okay. So you didn't go to look at the |
| 18 | underlying document, did you? |
| 19 | A. No, I did not. |
| 20 | Q. And what was the rent on 64 A before it was |
| 21 | restructured? |
| 22 | A. $12,219 is what this worksheet indicates. |
| 23 | Q. All right, and what was the rent after it |
| 24 | was restructured? |

| | 31 |
|---|---|
| 1 | A. $14,428. |
| 2 | Q. Where did you see that, sir? |
| 3 | A. In the next -- in the next column of the |
| 4 | rollup -- well, where you see 64 A was rolled to 64 |
| 5 | D, and then we would have to go and find -- and we'd |
| 6 | have to find 64 D. And 64 D is the next column. |
| 7 | Q. All right. So the rent on 64 A was how |
| 8 | much? |
| 9 | A. The original rent was 12,219. |
| 10 | Q. Right. |
| 11 | A. And the new rent appears to be 14,428. |
| 12 | Q. Okay, so the rent went up when it was |
| 13 | restructured? |
| 14 | A. No, the rent went down, from 12,000 down to |
| 15 | 11,000. |
| 16 | Q. I'm sorry, I thought you said 14,000. |
| 17 | A. I'm sorry. |
| 18 | Q. All right. But you don't know whether any |
| 19 | of the information in 191 B is accurate, do you? |
| 20 | A. No, I am relying on this document. |
| 21 | Q. So identify for me any other restructured |
| 22 | schedules that you can see on 191 B? |
| 23 | A. Well, you have 64 C was rolled into 64 F. |
| 24 | And you have 74 was rolled into 66 E. |

| | 32 |
|---|---|
| 1 | Q. Is that it? |
| 2 | A. Well, I can go on and on. |
| 3 | Q. Well, what was rolled into 93 and 94? Can |
| 4 | you tell, looking at this, sir? |
| 5 | A. Well, when you go over to those schedules, |
| 6 | of course, it relates to various. And I did -- and |
| 7 | I think -- I'm trying to recall, I believe, seeing a |
| 8 | diagram, but I don't recall where, you know, what |
| 9 | the source of it was that tracked these through. |
| 10 | I primarily was looking at transactions |
| 11 | like 83 A becoming 89 A and so on and so forth. |
| 12 | Q. Let's take a look at 64 A and D, that |
| 13 | you've identified. Looking at Schedule 191 B, do |
| 14 | you know whether the same equipment that was on 64 A |
| 15 | is on 64 D? |
| 16 | A. No, I am assuming in those that it was the |
| 17 | same equipment. I didn't see the underlying |
| 18 | schedule of equipment. |
| 19 | Q. Why didn't you ask for the underlying |
| 20 | schedule of equipment, sir? |
| 21 | A. I didn't think that was necessary for |
| 22 | why -- for the reasons that I was looking at this |
| 23 | document. |
| 24 | Q. Well you were being asked -- so you don't |

| | 33 |
|---|---|
| 1 | know, looking at this document, whether any |
| 2 | additional fees were charged to Lycos in connection |
| 3 | with any of these restructurings, do you? |
| 4 | A. I don't know -- I don't know the details of |
| 5 | any fees that might have been. |
| 6 | Q. Okay, and did you do any calculations at |
| 7 | all to determine -- |
| 8 | Well, do you know how to determine |
| 9 | whether or not a document is a lease or a loan? |
| 10 | A. I think I do. |
| 11 | Q. And how do you understand that to occur? |
| 12 | A. Well, a lease -- are you talking about this |
| 13 | for accounting purposes? There's a lot of tests for |
| 14 | it. |
| 15 | Q. Let's go with accounting purposes. |
| 16 | A. Well, for accounting, the primary tests are |
| 17 | present-valuing the total number of payments to see |
| 18 | whether or not it's higher or lower than 90 percent |
| 19 | of the original equipment value. |
| 20 | Q. Okay, and did you do that for any of the |
| 21 | schedules listed on Schedule 191 B? |
| 22 | A. No, I did not. That wasn't one of the |
| 23 | things I was looking for. |
| 24 | Q. Okay. Did you -- what are the other tests |

Michael J. Fleming
Volume 1 - November 14, 2007

10 (Pages 34 to 37)

---

34

1 for determining whether a document is a true lease
2 or a loan?
3 **A. Basically, if you have a -- if the**
4 **document -- if the equipment can pass to the user of**
5 **the equipment at the end of the transaction, it's**
6 **typically not considered a loan -- I mean,**
7 **considered a lease.**
8 Q. Anything else? And did you look at any of
9 the schedules, any of the restructured schedules to
10 determine whether the equipment would pass to Lycos
11 at the end of the term?
12 **A. I looked at the master lease agreement.**
13 Q. But you understand that dollar purchase
14 options are often contained in the equipment
15 schedules; right, sir?
16 **A. But not in these, but not in the master**
17 **lease.**
18 Q. I understand
19 **A. The master lease governs.**
20 Q. I understand, but the master lease
21 incorporates the terms of the equipment schedules,
22 does it not?
23 **A. Yes.**
24 Q. And you understand from your years of

---

35

1 experience that equipment schedules often specify
2 whether there's a purchase option; right?
3 **A. They can.**
4 Q. And you didn't look at any of the
5 underlying schedules for the restructured
6 transactions to determine whether any of them did.
7 **A. No.**
8 MR. KALER: Objection to the question.
9 Q. Sir, you said you looked at seven or eight
10 of 126 of the schedules; is that right?
11 **A. I looked at seven or eight of the -- of the**
12 **worksheets on particular schedules to look at how**
13 **and when they were rolled up and what changed in the**
14 **economics.**
15 Q. In fact, in terms of actual schedules, you
16 only looked at four; isn't that right?
17 MR. KALER: Objection to the question.
18 You can respond.
19 Q. And by "schedules" I mean equipment
20 schedules that are signed by the parties. Isn't
21 that right, sir?
22 **A. Yes.**
23 MR. KALER: Objection to the question.
24 Q. So you looked at four equipment schedules.

---

36

1 MR. KALER: Objection.
2 Q. And then --
3 MR. BEAN: What's the objection?
4 MR. KALER: There's more than four in
5 the exhibit. Neither of you have pointed them out,
6 but they're there, and there's a set of restructured
7 schedules in Exhibit 194. It's sitting right there.
8 194 -- the email from Susan Franklin to Julie
9 Callagee has 67 E to 67 H, the restructured
10 schedules.
11 Q. Is that one of the ones that you pulled
12 out, sir, that you looked at?
13 **A. Well, I would have reviewed all of them. I**
14 **would have reviewed all of them.**
15 Q. All right. So other than Schedules 67 E to
16 67 H, did you review any restructured equipment
17 schedules?
18 **A. Not the equipment schedule.**
19 Q. And would it be fair to say, then, the only
20 documents you reviewed that relate to those
21 restructured equipment schedules are the numbers you
22 referenced a few minutes ago, 21, 22, 23 A, 191, 191
23 A, 19 B, 192, 696, 635, and 194?
24 MR. KALER: Objection. You can respond.

---

37

1 **A. Well, they're the ones -- they're the ones**
2 **I recall right here and now reviewing.**
3 Q. Well, you went through that complete list
4 of Exhibit 4, didn't you?
5 **A. I know.**
6 Q. And you took your time doing that?
7 MR. KALER: Excuse me. You just need to
8 let him answer and then --
9 You go ahead and answer. He cut you off
10 as much as you're cutting him off.
11 **A. I'm saying, in looking through this large**
12 **amount of documents, I was looking for the things I**
13 **primarily recalled visually, which were schedules of**
14 **payments, timing of when they were redone, new**
15 **amounts; and that's primarily what I looked at.**
16 Q. On what basis, without -- so you don't know
17 whether -- so knowing that the payment went --
18 What was the basis for your conclusion
19 that the restructurings were straightforward?
20 **A. Well, the restructurings are**
21 **straightforward in that there's nothing unusual**
22 **about taking an existing transaction and making a**
23 **new transaction out of it, either by extending the**
24 **term, combining equipment, upgrading equipment,**

---

Michael J. Fleming
Volume 1 - November 14, 2007

18 (Pages 66 to 69)

66

1    A. Because they have correspondence from the
2  auditors that these were operating leases, they
3  didn't book them as assets, which they would do if
4  they were finance leases.
5    Q. Did you know that CSI had subpoenaed all of
6  the auditors' workpapers from Lycos's accountants?
7    A. No.
8    Q. Did you look through those to determine
9  whether or not the auditors had indeed done any
10  testing to see whether they were operating leases?
11    A. No.
12    Q. So you don't know whether the auditors did
13  determine that they were in fact operating leases,
14  did you?
15        MR. KALER: Objection.
16    A. Somewhere in here there was
17  correspondence -- I saw notes -- that in effect
18  indicated they were.
19    Q. Did you personally do any math to determine
20  whether any of the original schedules were in fact
21  operating leases?
22    A. No.
23    Q. Did you do any math whatsoever to determine
24  whether any of the restructured schedules were

67

1  operating leases?
2    A. No.
3    Q. Did you do any math or other analysis to
4  determine whether any of the original schedules were
5  true leases?
6    A. I did not do the math.
7    Q. Did you do any analysis whatsoever to
8  determine whether any of the original schedules were
9  true leases?
10        MR. KALER: Objection. Go ahead.
11    A. Well, I did the analysis that typically a
12  24-month lease on this kind of equipment -- you
13  know, at that payment level would meet the primary
14  test, which is the 89.9 percent test. But I did not
15  do the calculation.
16    Q. Did you do any calculations or analysis to
17  determine whether any of the restructured leases
18  were true leases?
19    A. No.
20    Q. If CSI had booked -- you're familiar with a
21  finance lease; right?
22    A. Yes.
23    Q. What do you understand a finance lease to
24  be?

68

1        MR. KALER: Objection. But I'll let you
2  respond.
3    A. Well, a finance lease, again, is an
4  accounting term. It's also a term in the UCC,
5  Article 2 A. But it basically refers to a lease
6  where the lessee is deemed to be the owner of the
7  equipment for accounting purposes.
8    Q. Okay, and is a finance lease ever a true
9  lease?
10        MR. KALER: Objection, same grounds.
11  But you can respond.
12    A. A finance -- a true lease is a tax term,
13  and a finance lease could be a true lease for tax
14  purposes.
15    Q. But for tax purposes. So if you didn't do
16  any calculations to determine whether or not any of
17  the Lycos leases were in fact true leases, what is
18  the basis of your opinion that they were true
19  leases?
20        MR. KALER: Objection, but you can
21  answer.
22    A. Well, my opinion is that, first of all, the
23  original term of the leases was what it was,
24  two-year term, and so on that basis the -- that's

69

1  the primary --
2        They were designated as leases and
3  treated that way.
4    Q. And that's on the original schedules.
5    A. That's on the original schedules.
6    Q. The restructured schedules are not true
7  leases, are they?
8        MR. KALER: Objection.
9    A. I don't know how the auditors treated the
10  original leases.
11    Q. In terms of an objective assessment --
12  forgetting how they may have treated them for a
13  moment, but looking at the math -- you would need
14  to -- you didn't do anything to determine whether or
15  not the restructured schedules were in fact true
16  leases or conditional sales contracts, did you?
17    A. No.
18        MR. KALER: You need to let him finish.
19    A. I didn't do any analysis, no.
20    Q. And so there's no basis for any opinion
21  that you might give that the restructured schedules
22  were in fact true leases; right?
23        MR. KALER: Objection.
24    A. There's no analytical basis, no.

Michael J. Fleming
Volume 1 - November 14, 2007

20 (Pages 74 to 77)

74

1  rent was on those pieces of equipment when they were
2  on Schedule 66 B, were you not?
3        MR. KALER:  Objection.
4     **A. Right.**
5     Q. And in fact, you were not even sure that
6  you could identify those two pieces of equipment on
7  Schedule 66 B; isn't that right?
8        MR. KALER:  Objection.
9     **A. True. But that's not complicated. That's**
10  **just inadequate recordkeeping and information.**
11    Q. Okay. And so it's your testimony, then,
12  that the information on Schedules 93 and 94 contains
13  inadequate information and recordkeeping; is that
14  right?
15       MR. KALER:  Objection.
16    **A. I'm saying it doesn't have enough**
17  **information to answer the question you want me to**
18  **answer.**
19       MR. BEAN:  Let's take a break.
20       THE VIDEOGRAPHER:  The time is 11:05.
21  This is the end of Cassette 1. We're off the
22  record.
23       (Recess taken.)
24       THE VIDEOGRAPHER:  The time is 11:23

75

1  a.m. This is the beginning of Cassette No. 2 in the
2  deposition of Michael Fleming. We're on the record.
3     Q. Mr. Fleming, do you understand you're still
4  under oath?
5     **A. Yes.**
6        MR. BEAN:  Just note, we broke at 11:05.
7  We're now at 11:23. Mr. Kaler, you'd asked to keep
8  breaks short so Mr. Fleming could make his flight.
9  I think we need to have breaks shorter than that if
10  he's going to be able to make his flight.
11    Q. Mr. Fleming, did you discuss your testimony
12  with anyone during the break?
13    **A. No.**
14    Q. Did you discuss this case with anyone
15  during the break?
16    **A. No.**
17    Q. You acknowledge there were approximately
18  126 equipment schedules; right?
19    **A. That's what I understand, yes.**
20    Q. And of the at least 115 that you did not
21  review, you don't know whether those documents were
22  any -- in any sort of industry-standard form, do
23  you?
24    **A. The only document that I really looked at**

76

1     was the master lease, which is a standard,
2     straightforward document.
3        Q. Okay, but for the 115 -- so you didn't look
4     at any of the equipment schedules?
5        **A. No.**
6        Q. Of the 126, you didn't look at any of them;
7     is that your testimony?
8           MR. KALER:  Objection.
9        **A. The list of the equipment on each**
10    **individual schedule?**
11       Q. Did you look at the form of the schedule?
12       **A. I may have, but I just -- it would have**
13    **been very just superficial, because that's not**
14    **something I was really studying. I was looking**
15    **primarily at the master lease.**
16       Q. Okay, so would it be fair to say, then,
17    that you didn't look carefully at any of the 126
18    schedules?
19          MR. KALER:  Objection.
20       **A. Carefully? You know, whatever**
21    **"carefully" --**
22          **I just skimmed the schedules. I focused**
23    **on the master lease.**
24       Q. Okay. So for the schedules that you did

77

1     have, the seven or eight schedules you did have, you
2     skimmed them; right?
3        **A. Yes.**
4        Q. And for the 115 or more that you didn't
5     have, you didn't look at them at all; right?
6        **A. No.**
7        Q. And so you don't know whether those
8     schedules are in a commercially reasonable form, do
9     you?
10          MR. KALER:  Objection.
11       **A. I don't know one way or the other.**
12       Q. And you don't know whether the transactions
13    evidenced by those 115 schedules that you didn't
14    review, whether they were commercially reasonable,
15    do you?
16       **A. You're talking about the extensions and the**
17    **restructured transactions?**
18       Q. I'm talking about -- you said you reviewed
19    seven or eight of 126 schedules.
20       **A. That's correct.**
21       Q. And your review consisted of skimming them;
22    right?
23       **A. That's right.**
24       Q. And so for the schedules that you didn't

Michael J. Fleming
Volume 1 - November 14, 2007

21 (Pages 78 to 81)

<table>
<tr><td>

78

1  review at all, you have no opinion as to whether
2  those schedules were commercially reasonable, do
3  you?
4          MR. KALER: Objection.
5      A. I have no opinion one way or the other on
6  those, as long as they were -- because they were all
7  tied to the original master lease.
8      Q. We'll get to the master lease later.
9          Have you ever observed in your 27 years
10 with the ELA the volume of restructuring in any
11 other matter like the volume that went on in this
12 case?
13         MR. KALER: Objection.
14     A. I wouldn't have any occasion to see
15 individual customer-company relations, so I couldn't
16 really -- I mean, I would have no basis on which to
17 say anything about that.
18     Q. And in your capacity as president of the
19 ELA, you didn't have occasion, then, to review
20 master lease agreements of various companies, did
21 you?
22     A. I did see master lease agreements of
23 companies.
24     Q. How many have you seen in your 27 years?

</td><td>

80

1      A. Really only on one kind of equipment. That
2  was laptops.
3      Q. And so with respect to laptops, the lessor
4  would every three years take out the old equipment
5  and bring in the new equipment; right?
6          MR. KALER: Objection.
7      A. Every two or three years they would -- we
8  would cycle the laptops.
9      Q. And that's good practice, for the lessor to
10 cycle the old laptops into new laptops, is it not?
11         MR. KALER: Objection.
12     A. Well, I don't -- I wouldn't quite agree
13 with that. I think it's good practice for the
14 lessee and the lessor.
15     Q. You didn't -- you remember testifying
16 before the break that you thought that Lycos could
17 have calculated the difference in the rents before
18 the restructured transactions in the aggregate and
19 compared them with the aggregate rents on the
20 restructured transactions, did you not?
21     A. Yes.
22     Q. And you didn't write any of that in your
23 reports, did you?
24         MR. KALER: Objection.

</td></tr>
<tr><td>

79

1      A. Oh, maybe, individual agreements, in total,
2  20, 25.
3      Q. Restructuring rarely occurs with
4  high-technology equipment; isn't that right?
5          MR. KALER: Objection.
6      A. No, I wouldn't agree with that.
7      Q. Well, the life of high-technology equipment
8  is approximately three years, is it not?
9          MR. KALER: Objection.
10     A. It depends on the item of equipment.
11     Q. Well, the Equipment Leasing Association, it
12 leased high-tech equipment when you were president,
13 did it not?
14     A. Yes.
15     Q. And it had a refresh program, did it not?
16     A. We did.
17     Q. And you replaced that equipment every three
18 years, did you not?
19     A. Not all equipment. Some we did. Some went
20 on for four, five, six years.
21     Q. But you had your equipment lessor take out
22 the old and bring in the new with respect to
23 high-tech equipment, did you not?
24         MR. KALER: Objection.

</td><td>

81

1      A. What? That they could have done it?
2      Q. In that manner.
3          MR. KALER: Objection.
4      A. Not in that form I just stated, no.
5      Q. And part of the reason for that is that the
6  idea of calculating them in the aggregate is
7  something that you've heard in the past week from
8  CSI's counsel, is it not?
9          MR. KALER: Objection.
10     A. No.
11     Q. You got that from reading the deposition of
12 Bruce Smith, did you not?
13         MR. KALER: Objection.
14     A. I knew -- I knew that already. That's
15 just -- that's a pretty practical -- that's just a
16 pretty practical business observation, that I didn't
17 learn from anybody in the last week or month.
18     Q. Is that an important point, as far as your
19 analysis goes?
20         MR. KALER: Objection.
21     A. Well, I think the only point I'm making is
22 that by the time these transactions and this
23 equipment had been in place a number of years and
24 had gotten to the final two rollup schedules, I

</td></tr>
</table>

Michael J. Fleming
Volume 1 - November 14, 2007

27 (Pages 102 to 105)

102

1    Q. Fraudulent.
2        MR. KALER: Objection.
3    A. I guess I'm trying to think what they would
4    be.
5    Q. Well, let me give you an example.
6    A. Okay.
7    Q. If the employee represented to the ELA that
8    he had entertained a customer, took the customer out
9    to dinner, for example, when in fact the ELA
10   representative took his family out to dinner, which
11   had nothing to do with a business purpose, you would
12   consider that a fraudulent expense report if the
13   employee sought reimbursement on those terms, would
14   you not?
15       MR. KALER: Objection.
16   A. I don't know if those would be my words,
17   but I would -- you know, we wouldn't approve it.
18   Q. Well, but you wouldn't know if the employee
19   had said that he -- that it was for a legitimate
20   business purpose; right?
21       MR. KALER: Objection.
22   A. Well, I mean, you know, if somebody
23   files -- if somebody files an expense account and
24   you look at it and you have real reason to believe

103

1    that this isn't for real, then you would ask about
2    it, you'd check on it; and if they said, "Oh, yes,
3    this is for real" and they could prove to me it was
4    real, then we would reimburse it.
5        Now, on the other hand, they might say,
6    "Lookit, it was something else," then we wouldn't
7    reimburse it.
8    Q. But let's assume that you did reimburse it,
9    because on its face it looked legitimate.
10   A. Okay.
11   Q. And subsequently you discovered that the
12   employee of the ELA had filed tens of thousand of
13   dollars of these false expense reports. Okay?
14   A. Uh-huh. Yes.
15   Q. You would fire that employee, would you
16   not?
17       MR. KALER: Objection.
18   A. Well, I would certainly consider some
19   discipline. There would be some action taken.
20   Q. You might consider not firing someone who
21   had filed tens of thousands of dollars of fraudulent
22   expense reports?
23       MR. KALER: Objection.
24   A. The test I would give, was it fraudulent or

104

1    were they just totally misinterpreting something?
2    But if it was clearly over -- just, you know, way
3    over the line, then some disciplinary action would
4    be considered.
5    Q. What type of disciplinary action?
6        MR. KALER: Objection.
7    A. It could be everything from reimbursement
8    required to, you know, holding back any employee
9    increase in their compensation, not giving them
10   their bonus, or it could be firing.
11   Q. So you wouldn't necessarily fire someone
12   who had embezzled money from the ELA?
13       MR. KALER: Objection.
14   A. Now we're up to embezzlement. Now we're up
15   to a different standard. If somebody embezzled
16   money, most likely they would be terminated.
17   Q. Intentionally filing false expense reports,
18   that would be embezzlement, would it not?
19       MR. KALER: Objection.
20   A. I'd want to know the context. I think I've
21   said that.
22   Q. I think I gave you an example. If the
23   employee took his family on vacation, took his wife
24   out to dinner, took his buddies to a strip club --

105

1    A. Right.
2    Q. -- and that had nothing to do with a
3    business purpose, that would be embezzlement if the
4    employee filed false expense reports for those,
5    wouldn't it?
6        MR. KALER: Objection.
7    A. It could very well be. You know, if this
8    will help: I mean, most likely the person would be
9    fired. But, you know, I think everything has to be
10   looked at in its own context.
11   Q. You're not a lawyer, are you?
12   A. No, I'm not.
13   Q. You're not a CPA, are you?
14   A. No.
15   Q. You're not a tax professional; right?
16   A. No.
17   Q. The ELA recently changed its name from the
18   Equipment Leasing Association to the Equipment
19   Leasing & Finance Association, did it not?
20   A. Right.
21   Q. That was simply a name change, rather than
22   a substantive change in the mission of the
23   organization?
24   A. I would say that's a true statement.

FARMER ARSENAULT BROCK LLC

Michael J. Fleming
Volume 1 - November 14, 2007

60 (Pages 234 to 237)

|  | 234 |
|---|---|
| 1 | Q. What's the basis -- do you have knowledge |
| 2 | based on something you've reviewed that said Lycos |
| 3 | wanted to bring these schedules to conclusion in a |
| 4 | buyout, or is that speculation on your part? |
| 5 | MR. KALER: Objection. |
| 6 | A. Well, I think I would deduct that from the |
| 7 | various documents related to the role of Susan |
| 8 | Franklin. She apparently wasn't doing this for no |
| 9 | good reason. |
| 10 | Q. Was Susan Franklin the impetus for the |
| 11 | buyout, as you understand it? |
| 12 | MR. KALER: Objection. |
| 13 | A. I think she was -- you know, I don't know |
| 14 | if she was the impetus. She was one of the |
| 15 | factors -- not her so much as her study that she had |
| 16 | been asked to do. |
| 17 | Q. When was she asked to do a study? |
| 18 | A. I believe it was in 2002 sometime. I'm |
| 19 | going by my recollection now. I don't have a time |
| 20 | line here. But I think that they had asked her to |
| 21 | come in and inventory and do an analysis. |
| 22 | Q. Okay, and you think that was in 2002? |
| 23 | A. It seemed to me that it was in, sometime in |
| 24 | 2002, early -- sometime in that time period. |

|  | 235 |
|---|---|
| 1 | Q. And so you think that the buyout emanated |
| 2 | from her analysis; right? |
| 3 | MR. KALER: Objection. |
| 4 | A. I think that it in part emanated from |
| 5 | her -- the work that she had done. |
| 6 | Q. Given the profits that CSI was earning from |
| 7 | the repeated rewriting of these equipment schedules, |
| 8 | what basis do you have for believing that CSI wanted |
| 9 | to bring this relationship to a buyout close? |
| 10 | MR. KALER: Objection. |
| 11 | A. I'm not sure. I don't know. |
| 12 | Q. That's just something you're speculating? |
| 13 | MR. KALER: Objection. |
| 14 | A. Well, they agreed to it; so if they agreed |
| 15 | to it, I'm assuming -- you know, on its face, if |
| 16 | they signed it and they weren't coerced into it.... |
| 17 | Q. So your basis for believing that CSI wanted |
| 18 | to bring the relationship to a close was simply that |
| 19 | they signed the buyout agreement? |
| 20 | A. That they were willing -- because there was |
| 21 | no other compulsion. They had to be willing or else |
| 22 | they didn't have to do it. |
| 23 | Q. Okay. Now, going back to this agreement: |
| 24 | If Lycos couldn't return all the equipment with a |

|  | 236 |
|---|---|
| 1 | certification of eligibility for prime-shift |
| 2 | maintenance contract, Lycos would not have had the |
| 3 | right to terminate any schedule. |
| 4 | A. That's right. |
| 5 | MR. KALER: Objection. |
| 6 | Q. And then if Lycos could not terminate a |
| 7 | schedule because it could not satisfy the |
| 8 | requirements for a prime-shift maintenance contract, |
| 9 | the schedule with CSI would go on in perpetuity in |
| 10 | four-month increments; right? |
| 11 | MR. KALER: Objection. |
| 12 | A. I am assuming that unless there was some |
| 13 | other agreements by the parties, that's what would |
| 14 | happen. But I'm just going on the basis of what the |
| 15 | document said. |
| 16 | Q. Now, you opined that Lycos had the right to |
| 17 | substitute equipment and return it in exchange for |
| 18 | any equipment that had been lost or damaged; right? |
| 19 | A. Yes. |
| 20 | Q. I direct your attention to Article 9.2, |
| 21 | and specifically the sentence in the middle of the |
| 22 | paragraph that begins with the phrase, "If the unit |
| 23 | is lost, destroyed, or stolen." Do you see that? |
| 24 | A. Yeah. Do you want me to read that? |

|  | 237 |
|---|---|
| 1 | Q. I'll read it aloud. "If the unit is lost, |
| 2 | destroyed, or stolen or if lessee determines that a |
| 3 | damaged unit cannot be repaired, lessee shall, at |
| 4 | lessor's direction, within 30 days of such event |
| 5 | either replace the unit with an identical unit, the |
| 6 | title to which shall thereupon vest in lessor and |
| 7 | which thereafter shall be considered the unit |
| 8 | subject to the equipment schedule with no abatement |
| 9 | in the monthly rental, or in lessor's sole |
| 10 | discretion pay to lessor an amount equal to the |
| 11 | stipulated loss value of the unit, determined as of |
| 12 | the date of payment in accordance with the |
| 13 | stipulated loss value schedule attached to the |
| 14 | applicable equipment schedule, together with all |
| 15 | unpaid monthly rental which is due and payable |
| 16 | through the date of payment." Did I read that |
| 17 | correctly, sir? |
| 18 | A. I think, yes. |
| 19 | Q. And you see here that it is the lessor's |
| 20 | discretion on whether Lycos could return an |
| 21 | identical unit or be required to pay the stipulated |
| 22 | loss value of the unit; right? |
| 23 | MR. KALER: Objection. |
| 24 | A. Well, that's -- I'm just agreeing that |

Michael J. Fleming
Volume 1 - November 14, 2007

61 (Pages 238 to 241)

238

1   that's what the provision says.
2     Q. Okay. Well, so Lycos did not have the
3   right, as you opined in your report --
4     A. Well, they had the right, but it was
5   subject to CSI's agreement in lieu of paying a stip
6   value loss.
7     Q. And the stip loss-value table where the end
8   percentage on a 24-month lease was 73.3 percent and
9   55 percent on a three-year lease would always be
10   more valuable than a substitute piece of equipment;
11   right?
12     A. I would think it would, yes.
13     Q. And so CSI had every economic incentive to
14   refuse Lycos's request to submit a substitute
15   identical piece of equipment; right?
16     MR. KALER: Objection.
17     A. They could, yes.
18     Q. And so your opinion that Lycos had the
19   right to substitute a piece of equipment --
20     A. It's conditional.
21     Q. It's conditional. So they don't have a
22   right; right?
23     MR. KALER: Objection.
24     A. No, they have a right, but it is

239

1   conditioned, and there's no indication that CSI ever
2   told them they couldn't.
3     Q. But the point is, it's not a right that
4   they can choose to exercise on their own; right?
5     MR. KALER: Objection, on grounds that
6   is your point, that is not his point.
7     A. I mean, I've answered the question.
8     Q. All right. Do you stand by your statement
9   in your report that Lycos had the right to
10   substitute equipment?
11     MR. KALER: Objection.
12     A. I would stand by it with the caveat that it
13   is conditioned on CSI agreeing instead of the stip
14   value, yes.
15     Q. Now, the ELA publishes a journal called the
16   Journal of Equipment Lease Finance, does it not?
17     A. Well, its foundation does.
18     Q. I'm sorry, what foundation does?
19     A. The Foundation for Equipment Leasing and
20   Finance.
21     Q. And what's the relationship between the
22   Foundation for Equipment Leasing and Finance and the
23   Equipment Leasing & Finance Association?
24     A. Well, it's the sponsor of it.

240

1     Q. The Equipment Leasing & Finance Association
2   is the sponsor of the foundation?
3     A. It is a sponsor -- I mean, in the sense
4   that they are housed at the association and they
5   provide them some office, operations services.
6     Q. And when an article is published in the
7   Journal of Equipment Lease Finance, that reflects
8   the views of the foundation, does it not?
9     A. No. Those are all -- those are all
10   independently prepared articles.
11     Q. Do you have an understanding of the phrase
12   "full-payout lease"?
13     A. I believe I do.
14     Q. What do you understand it to mean?
15     A. I believe a full-payout lease is when the
16   payments, the present value of the payments
17   essentially pay all of the costs of the -- original
18   equipment costs of the equipment or software,
19   whatever else was provided.
20     Q. And you're aware that many of the
21   restructured equipment schedules, if not most of
22   them, were full-payout leases?
23     MR. KALER: Objection.
24     A. They may have become that.

241

1     MR. KALER: Objection.
2     Q. When you say they may have become that,
3   what do you mean by that?
4     A. Well, I think that one of the difficulties
5   is that you classify a lease at the beginning. And
6   eventually, of course, if you continue to roll up or
7   extend or restructure leases, at some point, in
8   terms of "full payout," you are going to have paid
9   an amount equal to the original cost of the
10   equipment.
11     Q. And so if an original new equipment
12   schedule paid off 89.9 percent of the original
13   equipment cost, on a restructured schedule, as soon
14   as that remaining 10.1 percent were paid off, the
15   restructured schedule would become a full-payout
16   lease; right?
17     MR. KALER: Objection.
18     Q. Would have become.
19     A. Well, they'd start all over again with the
20   new lease. You know, again, I'm not a CPA, so I
21   don't want to oversimplify this thing -- or, I mean,
22   try and overexplain it.
23     So now you have the restructured lease,
24   and you would do the classification tests again, and

Michael J. Fleming
Volume 1 - November 14, 2007

62 (Pages 242 to 245)

242

1  you would start from whatever the base was again.
2  And it indeed may not in that next sequence be in
3  fact a full payout. But I think where we have a
4  series of, some cases, three of these, the third
5  restructure, you are probably getting very close to
6  that. But it's always based on, you know, whatever
7  you are imputing as the original cost.
8        But I think that -- but within that
9  context, I think a lot of these restructured leases
10  would become finance leases.
11   Q. And by becoming finance leases, they become
12  installment sales contracts; right?
13   A. No.
14       MR. KALER: Objection.
15   A. No.
16       MR. KALER: Excuse me. Objection again
17  on grounds we're getting way beyond the expertise
18  area for which the witness is being proffered. I'll
19  let him answer.
20       MR. BEAN: The witness has opined that
21  all of these leases were true leases, not loans, so
22  it's not beyond that which he's opined.
23       MR. KALER: It is  You are in an
24  area --

243

1        MR. BEAN: Are you withdrawing that
2  opinion that he's giving?
3        MR. KALER: The CFO of Lycos said they
4  were not loans. You're saying that they're loans.
5  But your saying it doesn't make it so.
6        So again, just objection to the
7  question.
8     Q. Mr. Fleming, just because a lease says it's
9  a lease doesn't mean it's a loan as opposed to an
10  installment sales contract; right?
11       MR. KALER: Objection.
12    A. Pardon me?
13    Q. Just because a lease is called a lease on
14  the face of the document does not mean it's a true
15  lease; right?
16    A. That's true.
17       MR. KALER: Objection.
18    Q. Now, did you make any effort to determine
19  whether any of the original schedules -- that's for
20  new equipment that CSI and Lycos entered into --
21  were themselves full-payout leases?
22       MR. KALER: Objection.
23    A. I did. I looked at the schedules that
24  we've already stipulated I looked at. They were 24

244

1  months. And the amortization of the payments over a
2  24-month period on a PV'd basis would not have
3  covered more than 89.9 percent of the value of the
4  equipment.
5    Q. What discount rate did you use when you did
6  that analysis?
7       MR. KALER: Objection.
8    A. As I recall, I was using a discount rate of
9  something around 8 percent, just as a number --
10  because I --
11       But the discount rate is just what I
12  would use. I have no idea what number Lycos used.
13    Q. And you did that analysis for the seven or
14  eight schedules that you considered; right?
15    A. Right.
16    Q. Who picked out which of the over 100
17  schedules --
18    A. I did.
19    Q. You decided to pick those seven?
20    A. Well, I picked them out because they
21  were -- you know, they were leases that had not been
22  rolled up yet, they were original leases, and so
23  they were easy ones to do.
24    Q  So you selected the schedules from the 125

245

1  that you would consider?
2    A. That's right.
3    Q. And you specifically did not choose any of
4  the restructured schedules; is that right?
5       MR. KALER: Objection.
6    A. Pardon me?
7    Q. You specifically did not choose any of the
8  originals, the restructured schedules.
9    A. No, not -- I didn't choose any of those. I
10  was looking at the original schedules.
11    Q. And you chose those because it was easier
12  to do the math?
13    A. Well, because they were in front of me.
14  They were in the documents I was looking at. I
15  mean, there was nothing unique about them as opposed
16  to some others. I just chose those.
17    Q. I'm sorry, maybe I wasn't clear. Did you
18  ever have the opportunity at the offices of CSI's
19  counsel to review all 125 schedules and pick which
20  ones you would take home with you to review?
21       MR. KALER: Objection.
22    A. I did not -- I had -- you and I -- let's
23  make sure we understand what we're talking about.
24       I had the option -- I saw or had as

Michael J. Fleming
Volume 1 - November 14, 2007

63 (Pages 246 to 249)

**246**

1  exhibits the cash-flow analysis for all these, but I
2  didn't have the equipment schedule. But I did have
3  the analysis of prior payment, new payment
4  schedules, and things like that. I just chose
5  these. I was not guided to it. I was not led to
6  it. I just chose these.
7      Q. Okay, to do your analysis you chose that
8  group because that was available to you. What I'm
9  saying to you is, did you have the opportunity to
10  choose among all 126 schedules?
11      A. And I'm saying to you yes.
12      Q. But you only chose those seven or eight?
13      A. As I have stated.
14      Q. And what was the rationale that you
15  employed for choosing those seven or eight?
16      A. Well, because they were ones where I
17  could -- you know, they had not been restructured.
18  I could look at them. They were in front of me.
19  There was nothing unique or different about those
20  from some other original schedules. I just chose
21  them.
22      Q. But because they were all original
23  schedules and none of them were restructured
24  schedules, they were by definition not

**247**

1  representative of all the schedules that were there;
2  right?
3          MR. KALER: Objection.
4      A. No, they were just original schedules.
5      Q. You know Professor James Johnson, do you
6  not?
7      A. I do know him.
8      Q. How do you know him?
9      A. Well, he is a person that has been an
10  academic specialist in the equipment-leasing area
11  for over 30 years.
12      Q. Have you known him for 30 years?
13      A. I've known him from the first time I came
14  to the association, yes.
15      Q. And you've written a chapter in a book that
16  he's published, have you not?
17      A. It might have been a while ago. But that
18  was a while ago. But I can't remember. Because
19  he's updated the new edition, so I'm not sure where
20  it was. But, yes, I know Professor Johnson.
21      Q. And you respect his work?
22          MR. KALER: Objection to questions about
23  who respects who.
24      A. Yes.

**248**

1      Q. What's been marked as Exhibit 20, sir, is
2  an article that Professor Johnson wrote with a
3  Mr. Barry Marks. I show you what's been marked as
4  Exhibit 20. Have you seen this article before?
5          (Exhibit Fleming 20 marked for
6  identification.)
7      A. I don't know if I have or not. I'll have
8  to look at it, read it, and see.
9      Q. My only question, sir, is have you seen it
10  before?
11          MR. KALER: Let him read it.
12          MR. BEAN: He doesn't need to read the
13  whole thing to tell me --
14          MR. KALER: You put it in front of him.
15  He's going to read it first.
16          MR. BEAN: You're just trying to delay.
17          MR. KALER: I am not.
18          MR. BEAN: You want him to make his
19  plane.
20          MR. KALER: He will make his plane
21  regardless of this question. Go ahead and read it,
22  sir.
23          THE WITNESS: I'm reading as fast as I
24  can.

**249**

1          MR. KALER: Go ahead. Take your time.
2      A. Okay.
3      Q. I direct your attention to Page 17.
4      A. Okay.
5      Q. And specifically, the middle of the second
6  paragraph in the left-hand column. Do you see where
7  it says, five lines from the bottom of that
8  paragraph, "We find the automatic renewal clause
9  difficult to support when the initial lease is a
10  full-payout arrangement and the extended period at
11  the initial rental rate constitutes a windfall for
12  the lessor"? Do you see that?
13      A. This is the left-hand column, the second
14  paragraph.
15      Q. Yes, sir, five lines from the bottom. "We
16  find the automatic renewal." Do you see that?
17      A. No, but I'm looking.
18      Q. Do you see the paragraph that begins with
19  the words, "To date"?
20      A. This is on Page?
21      Q. 17, sir.
22      A. Oh, Page 17. Sorry.
23          Yes, I gotcha.
24      Q. Go ahead. Go up above. "We find the

Michael J. Fleming
Volume 1 - November 14, 2007

80 (Pages 314 to 317)

**314**

1   time you worked on this matter?
2       A. Of course.
3       Q. And when you were last president of the --
4   when you were last year's president of the ELA, what
5   was your annual compensation?
6       A. Well, my last year was probably $450,000.
7       Q. And approximately how much have you billed
8   CSI in this case?
9       A. Roughly 40, 50 thousand dollars, something
10  like that. That's an approximation.
11      Q. So would it be fair to say that you've
12  earned a comfortable sum of money in your career
13  through the equipment leasing industry?
14          MR. KALER: Objection.
15      A. Pardon me? I worked there 27 years.
16          MR. KALER: Objection.
17      Q. And it's provided you with a good income
18  during that time, has it not?
19          MR. KALER: Objection.
20      A. Over the 27 years?
21      Q. Yes, sir.
22      A. Yes.
23      Q. And you continue to work in the equipment
24  leasing industry, do you not?

**315**

1       A. Well, I'm a consultant in the equipment
2   leasing industry and finance industry.
3       Q. And if the industry -- if public confidence
4   in the industry were to be damaged by a judgment in
5   favor of Lycos in this case, that would impede or
6   impair your ability to earn future income in the
7   industry; is that right?
8       A. No, not at all.
9           MR. KALER: Objection.
10          MR. BEAN: Let's take a break.
11          THE VIDEOGRAPHER: The time is 5:45 p.m.
12  We're off the record.
13          (Recess taken.)
14          THE VIDEOGRAPHER: The time is 6:02 p.m.
15  We're on the record.
16      Q. Mr. Fleming, we looked previously at
17  Fleming Exhibit 10, where Mr. Stenberg said that
18  when Lycos returned the equipment, he would give
19  Lycos full FMV credit. Right?
20      A. Right.
21      Q. Do you know what he intended to do, by
22  giving Lycos full FMV credit?
23          MR. KALER: Objection.
24      A. I'm not sure what he meant.

**316**

1       Q. That language is not clear, is it?
2           MR. KALER: Objection.
3       A. You know, literally it would mean whatever
4   the fair market value of the equipment was worth in
5   a secondary market, he would give it to them. This
6   is what it would say to me.
7       Q. And this is sort of a side agreement
8   between Mr. Stenberg on behalf of CSI and Lycos;
9   right?
10          MR. KALER: Objection.
11      A. If he has the authority to do that, yes,
12  that's what that would be.
13      Q. And this is the kind of side agreement that
14  the industry frowns on; right?
15          MR. KALER: Objection.
16      A. Well, but it only frowns on it when it's
17  not known to all parties. Most side agreements that
18  are frowned on are side agreements that are made as
19  part of originating new transactions.
20      Q. Mr. Fleming, your opinions on the
21  standardness of the CSI-Lycos master lease agreement
22  concern only the master lease agreement and not an
23  opinion on the standardness of the schedules; right?
24          MR. KALER: Objection.

**317**

1       A. That's true.
2       Q. You didn't do an analytic comparison
3   between the present value of the rents on any
4   original schedule and any succeeding restructured
5   schedule, did you?
6       A. Not present value, no. But I did, as I
7   say, in some of the worksheets -- there were
8   agreements and other testimony -- there were
9   numbers, there were columns, there were totals. I
10  looked at those. But I didn't do any further
11  analytics.
12      Q. And you said that you thought that Lycos
13  could have compared the aggregate amount of rent on
14  a group of schedules that were rolled onto another
15  group of schedules to compare the costs; right?
16          MR. KALER: Objection.
17      A. When we were talking about 93 and 94, yes.
18      Q. And you didn't do any analytics to see
19  whether that could be determined, did you?
20          MR. KALER: Objection.
21      A. No.
22      Q. And if you looked at it only on a gross
23  basis, group of schedules, you couldn't do the 90
24  percent test to determine whether the restructured

# EXHIBIT C

James M. Johnson, Ph.D.                                    11/02/2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES INTERNATIONAL,      )
INC.,                              )
      Plaintiff and                )
      Counterclaim Defendant,      )
                                   )
      vs.                          )
                                   )
LYCOS, INC.,                       )        CIVIL ACTION
      Defendant and                )    NO. 05-10017-RWZ
      Counterclaim Plaintiff,      )
                                   )
      vs.                          )
                                   )
BANK OF AMERICA, f/k/a             )
FLEET BANK,                        )
      Trustee Process Defendant.   )


          Videotaped deposition of JAMES M. JOHNSON,

Ph.D., taken before NADINE J. WATTS, CSR, RPR, and

Notary Public, pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, at Suite 4500,

227 West Monroe Street, in the City of Chicago, Cook

County, Illinois, commencing at 9:05 o'clock a.m. on the

2nd day of November, A.D., 2007.

James M. Johnson, Ph.D.                                                    11/02/2007

Page 26

1      Q  Did you ask CSI's counsel, Mr. Kaler and/or
2  Mr. Little, whether you could have copies of those sales
3  type lease journal entries and requests for contract?
4      A  I don't recall if it was my request or if they
5  sent me an additional package of information  I don't
6  remember who initiated the query when I was then sent
7  those documents
8      Q  Okay. Now, you list some requests for contract
9  in your third report; is that right?
10     Let me rephrase that. Some of the documents
11 listed on page 2 that were exhibits to the depositions
12 of Joan Kersting and/or Frederick O'Neal were sales type
13 lease journal entries and/or requests for contract,
14 right?
15     A  Yes.
16     Q  And you didn't receive the documents listed as
17 O'Neal exhibits or Kersting exhibits until after you had
18 submitted your second report; is that right?
19     A  I believe that's correct
20     Q  Okay. So in preparing your second report — So
21 you didn't ask Mr. Kaler or Mr. Little after you had
22 completed your first report and after you had read
23 Mr. Smith's report whether you could have copies of the
24 sales type lease journal entries and requests for

Page 27

1  contract on which Mr. Smith relied, did you?
2      A  Mr. Bean, that's a really long question  Could
3  we try it again, please?
4      Q  I'm sorry. Sure, happy to accommodate. You
5  didn't ask Mr. Kaler or Mr. Little after reading Bruce
6  Smith's first report for copies of the requests for
7  contract or sales type lease journal entries on which he
8  relied, did you?
9      A  I honestly don't remember --
10     Q  Okay.
11     A  -- when that came up
12     Q  Okay. But you don't list those documents --
13 those sales type lease journal entries or requests for
14 contract in your second report, do you?
15     A  No, I don't.
16     Q  When you did receive Exhibits 5, 6, 7, 8, 13 and
17 14 to the deposition of Joan Kersting and Exhibits 5
18 through 10 to the deposition of Frederick O'Neal, did
19 you do any analysis of any kind of those documents?
20     A  Could you tell me what you mean by analysis
21 please?
22     Q  No, I have to defer to you. What did you -- Let
23 me ask you this  What did you do -- did you do anything
24 other than read those exhibits, sir? For example, did

Page 28

1  you do any computations, any calculations, any
2  regressions, anything like that?
3      MR. KALER: Well, objection  The question is too
4  vague, but you can respond
5      THE WITNESS: What was the last thing you said?
6      MR. KALER: Anything like that.
7      MR. BEAN: Q  All right, let me rephrase the
8  question  Other than reading the depositions,
9  Exhibits -- the exhibits to the deposition of Joan
10 Kersting and Frederick O'Neal, did you do anything else?
11     A  I put the exhibits next to the deposition
12 testimony and tried to follow along as if I had been in
13 the room to see what they were referring to
14     Q  Anything else?
15     A  I don't believe so
16     Q  So you didn't do any mathematical computations,
17 did you?
18     A  No
19     Q  You didn't do any regression analysis, did you?
20     A  No
21     Q  You've been teaching finance for over 30 years,
22 have you not?
23     A  Yes
24     Q  And you have a Ph.D. in finance from Ohio State;

Page 29

1  is that right?
2      A  Yes.
3      Q  You're not a lawyer, are you?
4      A  No
5      Q  You're not a certified public accountant?
6      A  No, I'm not.
7      Q  You're not a tax professional, are you?
8      A  No
9      Q  Do you hold any licenses or certifications?
10     A  I'm trying to remember the designation  I'm a
11 certified technology procurement executive
12     Q  And what does that mean?
13     A  There's a program in an organization called --
14 it's a subsidiary of International Computer Negotiations
15 in Florida called Caucus, which is an organization of
16 technology procurement professionals, and I was one of
17 the people asked to help design a certification program
18 for them to get them educated and schooled in software
19 licensing, tax issues, procurement issues, channel
20 management and lease financing.
21     Q  Are you a member of any professional
22 associations related to equipment leasing?
23     A  If I define that broadly, I'm on the board of
24 trustees of the Foundation -- sorry, the -- I keep

8 (Pages 26 to 29)

James M. Johnson, Ph.D.                                                11/02/2007

Page 62

1      MR BEAN: Q  No. Sir, one last time. Are there
2  provisions -- if you were teaching a class and you were
3  holding up the CSI master lease agreement as the lease
4  to study, you would advise your students that there were
5  certain provisions in that agreement that were
6  undesirable from the lessee's perspective, would you
7  not?
8      MR KALER: Objection, but you can respond
9      THE WITNESS: I don't know how else to say it. I
10  can give you the answer I gave you, and that is we have
11  to know what the objectives are before I can tell them
12  what would be undesirable and that they ought to change.
13      MR BEAN: Q  Is it ever desirable to have an
14  automatic renewal provision that could go on in
15  perpetuity?
16      A  If that's --
17      MR KALER: Objection
18      THE WITNESS: If we're characterizing CSI's lease,
19  that's not part of their lease
20      MR BEAN: That wasn't my question, sir
21      MR KALER: It was implied
22      MR BEAN: Q  Is it ever desirable to have an
23  automatic renewal provision that can go on in
24  perpetuity?

Page 63

1      A  By going on into perpetuity, do you mean that
2  there's no way the lessee can avoid having the lease go
3  on into perpetuity?
4      Q  I mean, in perpetuity means that the lessor, if
5  it chooses to, can keep the lease in place in
6  perpetuity.
7      A  That would not be desirable, no
8      Q  Okay. The CSI lease provision lease has an
9  automatic renewal provision, does it not?
10      A  Yes
11      Q  And that provision is illegal in the state of
12  New York, is it not?
13      MR KALER: Objection
14      THE WITNESS: It's not enforceable unless the lessor
15  has given lessee notice, but it has to give the lessor
16  notice
17      MR BEAN: Q  There's particular notice in New York
18  that the lessor is required to give the lessee; is that
19  right?
20      MR KALER: Objection
21      THE WITNESS: Yes
22      MR BEAN: Q  Okay  And what does that notice
23  provide?
24      A  As I think I just indicated, it provides that

Page 64

1  the lessor must give notice to the lessee on a timely
2  basis that the lessee needs to give notice to the
3  lessor.
4      Q  What notice needs -- what information needs to
5  be in that notice for the lessee?
6      A  That you have a notification date upcoming and
7  if you missed the notification date, you'll be in an
8  automatic renewal
9      Q  There are provisions in the master lease when
10  combined with the equipment schedules that you would
11  consider unjustified; isn't that right?
12      MR KALER: Objection  Number one, which master
13  lease are you talking about?
14      MR BEAN: The CSI master lease  There's only one,
15  sir
16      MR KALER: No, there isn't  You're going from
17  abstracts to specifics  I object
18      MR BEAN: All right  Let's take -- Can I have the
19  master lease? Let's mark it
20      (Document marked as Johnson Deposition
21      Exhibit 7 for identification )
22      MR BEAN: Q  What's been marked as Exhibit 7, sir,
23  is a document that appears -- You recognize Exhibit 7 as
24  the CSI/Lycos master lease agreement, do you not?

Page 65

1      A  Yes
2      Q  Okay  And you've reviewed some of the equipment
3  schedules that were executed in connection with this
4  master lease, have you not?
5      A  Yes
6      Q  And those equipment schedules, some of those
7  equipment schedules in conjunction with this master
8  lease contain provisions that you would consider
9  unjustifiable; isn't that right?
10      MR KALER: Objection
11      THE WITNESS: The schedule doesn't appear to be
12  here
13      MR BEAN: Q  No. I know, sir  You've reviewed the
14  schedules; isn't that right?
15      A  Yes
16      Q  Okay  In reviewing those schedules in
17  conjunction with the master lease, did you ever come to
18  the opinion that certain provisions in those schedules
19  in conjunction with the master lease were unjustifiable?
20      MR KALER: Objection
21      THE WITNESS: I don't believe so
22      MR BEAN: Q  I direct your attention to paragraph
23  7 of the master lease agreement that you have in front
24  of you

17 (Pages 62 to 65)

Page 66

1      Directing your attention to the fifth from the
2   bottom line, and I'll wait until you take out your
3   glasses  Fifth from the bottom line  It says, these
4   are the delivery and return provisions in Article 7;
5   isn't that right?
6      A  Yes
7      Q  And it says, lessee shall return each unit in
8   the same operating order, repair, condition and
9   appearance as when received, excepting only normal wear
10  and tear and with all engineering changes prescribed by
11  the manufacturer prior to the termination of the
12  lessee's right of possession incorporated in the unit.
13  That's what it says, right?
14     A  Yes
15     Q  And then it goes on to say, lessee, at its
16  expense, shall make any repairs necessary in order to
17  certify the equipment as eligible for the manufacturer's
18  prime shift maintenance contract upon its return and
19  shall have the unit certified as eligible for the same.
20  That's what it says, right?
21     A  Yes
22     Q  And you know that there is no such thing as a
23  prime shift maintenance contract for PCs, right?
24     MR. KALER: Objection.

Page 67

1      THE WITNESS: There are maintenance contracts.
2      MR BEAN: Q  Sir, you know that there's no such
3   thing as a prime shift maintenance contract for a PC,
4   right?
5      MR KALER: Objection
6      THE WITNESS: I know that there are maintenance
7   contracts  I don't know if it says prime shift or not.
8      MR BEAN: Q  Okay  Do you know what a prime shift
9   maintenance contract is, sir?
10     A  It means that during the 8:00 to 5:00 period of
11  time you have to have -- people have -- Let me back up.
12  It means you have -- you have a maintenance contract
13  where the equipment will be maintained during normal
14  business hours
15     Q  And so when the lessee returns the unit, it has
16  to be eligible for a prime shift maintenance contract?
17     A  That's what it says, yes
18     Q  Okay  And are -- is there such a thing as a
19  prime shift maintenance contract available for a
20  three-year-old personal computer?
21     MR KALER: Objection
22     THE WITNESS: I don't know if it says prime shift or
23  not, but there are maintenance agreements available for
24  PCs

Page 68

1      MR. BEAN: Q  And are they available for
2   three-year-old PCs?
3      A  I believe they are.
4      Q  And do you know if there's such a thing as a
5   private shift maintenance contract for a laptop that is
6   three years old?
7      A  Same answer
8      Q  And do you know that there's such a thing as a
9   prime shift maintenance contract for a cable?
10     MR KALER: Objection
11     THE WITNESS: Don't know.
12     MR BEAN: Q  Okay.  And there's no such thing as a
13  prime shift maintenance contract for a three-year-old
14  server, is there?
15     MR KALER: Objection
16     THE WITNESS: I'm not sure.
17     MR BEAN: Q  Okay.  If there weren't prime shift
18  maintenance contracts available for the types of
19  technology equipment that Lycos leased from CSI, then it
20  would have been impossible for Lycos to comply with
21  Article 7 of the master lease agreement; isn't that
22  right?
23     MR KALER: Objection, that calls for a conclusion
24  of law.  You can respond as best you're able to.

Page 69

1      THE WITNESS: I'm looking for another provision in
2   here, if you'll bear with me for a minute
3          If you'll look under paragraph 8 of the first
4   or second sentence on page No. 3 of 6, the contract
5   indicates that in no event shall lessee be required to
6   enter into such a contract so long as that unit is under
7   a manufacturer's warranty providing substantially
8   similar coverage
9      MR BEAN: Q  Let me ask you my question again,
10  sir  If Lycos leased technology equipment from CSI that
11  was not eligible for a prime shift maintenance contract
12  at the end of the lease, Lycos would not have been able
13  to return the equipment in compliance with Article 7 of
14  the lease; isn't that right?
15     MR KALER: Objection.
16     THE WITNESS: If they can provide a maintenance
17  contract -- And I don't know if we're arguing about the
18  prime shift sequence in front of that or not, but if
19  they can produce a maintenance contract covering the
20  equipment, I have every reason to believe that that
21  would be complying with the terms of the lease.
22     MR BEAN: Q  And if a maintenance contract is not
23  available, sir, they -- Lycos couldn't have complied
24  with the lease; isn't that right?

18 (Pages 66 to 69)

James M. Johnson, Ph.D.                                              11/02/2007

---

Page 142

1    MR BEAN: Q Did you do any analysis of any of the
2  leases to determine whether they were loans or true
3  leases under the Uniform Commercial Code?
4    A  No.
5    Q  Did you do any analysis under accounting
6  standards to determine whether the leases were true
7  leases or not?
8    MR KALER: Objection
9    THE WITNESS: Well, the term true lease I don't
10  believe applies to accounting
11    MR. BEAN: Q  Did you do any analysis to determine
12  whether any of the leases between CSI and Lycos, any of
13  the renewals would have qualified as operating leases?
14    A  I did --
15    MR KALER: Objection
16    THE WITNESS: -- what was necessary.
17    MR BEAN: Q  So you didn't do any?
18    MR KALER: Objection
19    THE WITNESS: I didn't do any because I didn't feel
20  it was necessary.
21    MR. BEAN: Q  And did you do any analysis at all to
22  determine whether any of the leases were true leases
23  under the tax law?
24    MR. KALER: Objection.

---

Page 143

1    THE WITNESS: The characteristics that I just
2  outlined, the equipment was to revert to the lessor at
3  the end of the term. they had no option to buy it, there
4  was no dollar out provision, et cetera.
5    MR. BEAN: Q  And to your understanding -- Well,
6  don't the IRS guidelines cap the lease term at 80
7  percent of the life -- economic life of the leased
8  equipment?
9    MR KALER: Objection
10    THE WITNESS: I think that -- I think that you can't
11  look at just one rule and say that each one is a hard
12  number
13    MR BEAN: Q  So it's your testimony then that
14  under the IRS guidelines a lease term can exceed 80
15  percent of the economic life of the equipment and still
16  have the lease be a true lease?
17    MR KALER: Objection
18    THE WITNESS: I think that's a possibility.
19    MR. BEAN: Q  Interim rent which CSI charged Lycos
20  on all of the original schedules is in your Rogue's
21  Gallery of Gotchas, isn't it --
22    MR KALER: Objection
23    MR BEAN: Q -- in the book entitled Technology
24  Leasing: Power Tools for Lessees on page 57?

---

Page 144

1    A  Yes
2    Q  Okay. Now, if a lessee has difficulty achieving
3  operating lease treatment on the payment of rents, a
4  lessor might use interim rent to help the lessee achieve
5  operating lease treatments on the rent payments, right?
6    A  It could
7    Q  Okay. In that situation, the lessor would
8  reduce the amount of the monthly rental payments, right?
9    A  If that was the purpose, yes
10    Q  And then charge the lessee interim rent, right?
11    A  If that was the strategy, yes
12    Q  Okay. So extending a lease from 24 months to 36
13  months or refinancing a lease from a 24-month period to
14  36 months, in financing the interim rent would not help
15  a lessee qualify for operating lease treatment, would
16  it?
17    MR KALER: Objection
18    THE WITNESS: I don't know
19    MR BEAN: Q  Well, if the present value of the
20  payments on a 24-month lease do not satisfy operating
21  lease treatment, financing the interim rent would not
22  enable it to -- the lease to satisfy operating lease
23  treatment, would it?
24    MR. KALER: Objection.

---

Page 145

1    THE WITNESS: I'm sorry. I think we've got two
2  scenarios going here
3    MR BEAN: Q  Sure  All right  Suppose the lessee
4  has a 24-month lease, okay, and the present value of
5  those payments equals 85 percent of the original cost of
6  the equipment
7    A  Okay
8    Q  That would qualify for operating lease
9  treatment, right?
10    A  All of the conditions satisfied, yes
11    Q  Okay. And now if the lessee decides it doesn't
12  want to pay interim rent but wants to finance the
13  interim rent and the interim rent is financed on what
14  now becomes a 36-month schedule, the present value of
15  the payments on the new schedule will exceed 85 percent
16  of the original cost of the equipment, right?
17    A  I'm not sure because it has to do with the
18  lessor's structuring rate and the lessee's discount
19  rate
20    Q  Well, let's assume all other things being equal.
21  The lessee has a discount rate, and using that discount
22  rate the monthly lease -- the present value of the
23  monthly lease payments is 85 percent of the original
24  equipment cost, okay?

37 (Pages 142 to 145)

James M. Johnson, Ph.D.                                           11/02/2007

Page 182

1    A  Because when you have an existing term that's
2   different than an extension term, you can't really
3   compare the two
4       MR BEAN: Okay  Why don't you give me equipment
5   schedule 94
6       MR SELLERS: 93?
7       MR. BEAN: 94
8       MR SELLERS: Oh, 94?
9       (Document marked as Johnson Deposition
10      Exhibit 11 for identification )
11      MR BEAN: Q  What's been marked as Johnson Exhibit
12  11 has been previously marked as Plaintiff's Exhibit 56
13  It's equipment schedule 94
14      You have had the opportunity -- Equipment
15  schedule 94 is one of the documents you've reviewed
16  previously; isn't that right?
17      A  Yes
18      Q  Okay. Now, and you -- Directing your attention
19  to the second-to-last page of schedule 94, you see under
20  the chart under paragraph 2?
21      A  I'm sorry, which page?
22      Q  I think you're on the right page. Page 741.
23      A  741
24      Q  Okay. You see the chart under paragraph 2?

Page 183

1    A  Excuse me  Yes
2    Q  And you understand that approximately 30
3   schedules had equipment that rolled onto schedule 94,
4   right?
5    A  Yes
6    Q  And those 30 schedules terminated at different
7   times, right?
8    A  Yes
9    Q  And you understand that some of the equipment
10  from some of those 30 schedules went onto schedule 93 as
11  well, right?
12   A  Yes
13   Q  Okay  If you wanted to figure out the cost of
14  whether it made sense for Lycos to enter into schedules
15  93 and 94, what information would you need?
16      MR KALER: Objection to the term made sense  It
17  doesn't have any meaning  Tom  You can respond, but --
18      MR BEAN: Q  Oh, okay  If you wanted to figure
19  out the economic cost for Lycos to enter into schedules
20  93 and 94 as compared to what it would have paid on the
21  existing schedules, how would you -- what information
22  would you have needed?
23   A  I would need to know the remaining term of each
24  of the terminated schedules or continuing-on schedules

Page 184

1   I'd need to know the rent for each schedule  I'd need
2   to know the rent under the new schedule
3       And for this particular schedule, I would need
4   to know how they would account for the fact that some of
5   these schedules are going to be running out before the
6   end of the 94 term  So this is that coterminous issue I
7   talked about before
8    Q  Okay.  You said the rent for each schedule.
9   Now, you know the equipment for most of the schedules
10  that rolled on in 94 were split between 93 and 94?
11   A  Yes
12   Q  And so you'd have to go piece of equipment by
13  piece of equipment to find out what the old rent was and
14  what the new rent was, right?
15   A  If the -- Yes
16   Q  Okay.
17      THE VIDEOGRAPHER: Counsel, could I change tapes?
18      MR KALER: Go ahead
19      THE VIDEOGRAPHER: Thank you.  Here concludes tape
20  2  We are going off the video record at 1:58 p m
21      (Recess was taken )
22      THE VIDEOGRAPHER: We are going back on the video
23  record at 2:00 o'clock p m  Here begins tape 3
24      MR. BEAN: Q  Okay.  And you'd also need to know

Page 185

1   again the end-of-lease costs, right?
2    A  Yes
3       (Document marked as Johnson Deposition
4       Exhibit 12 for identification )
5    Q  Okay.  What's been marked as Exhibit 12, sir, is
6   equipment schedule 68B.
7       Now, I would like to direct your attention to
8   page 2701 of schedule 94.  Excuse me, sir.
9
10   A  I'm sorry, 27 what?
11   Q  2701.  I'm sorry, 7701.  My mistake.  Are you
12  there, sir?
13   A  Yes
14   Q  Okay.  And so, for example, to do -- because you
15  have to do a piece-by-piece comparison of the rents
16  because the schedules were split, you'd have to take a
17  piece of equipment on schedule -- on page 7701 and trace
18  it back and find it on the earlier schedule from which
19  it came; is that right?
20      MR KALER: Objection
21      THE WITNESS: Yes
22      MR BEAN: Q  And you'd have to do that for each of
23  the thousands of pieces of equipment on schedule 94,
24  right?

47 (Pages 182 to 185)

James M. Johnson, Ph.D.                                      11/02/2007

Page 186

1    MR. KALER: Objection
2    THE WITNESS: I believe so
3    MR. BEAN: Q. Okay. The documents -- the original
4    lease, if you will, for the equipment listed on pages
5    7701 is schedule 68B, right?
6    A  I'm sorry, say it again
7    Q  I'm directing -- On page 7701, as part of
8    schedule 94, the predecessor lease for the equipment on
9    this page was for the -- all except for the bottom few,
10   was schedule 68B, right?
11   A  Yes
12   Q  Okay. And there's no description of the
13   equipment other than the vendor, the type and the model
14   and the serial number on page 7701, right?
15   A  That's what I see
16   Q  Okay. Directing your attention about ten --
17   Going under serial number, you see the reference about
18   ten from the top for 159893B? Do you see that serial
19   number?
20   A  Yes
21   Q  Can you find that serial number anywhere on
22   schedule 68B, sir?
23   MR. KALER: Well, objection
24   THE WITNESS: I don't see it, no.

Page 187

1    MR BEAN: Q  And so for at least that piece of
2    equipment there's no way Lycos could have compared the
3    rent on the old schedule with the rent on the new
4    schedule, right?
5    MR KALER: Objection
6    THE WITNESS: I don't know  Looking at this
7    schedule, I don't see it
8    MR BEAN: Q  Okay  And by this schedule, you mean
9    schedule 68B?
10   A  Yes
11   Q  Okay. Let's take a look at the next one, serial
12   No. 159893D, as in dog. Can you find that on schedule
13   68B?
14   A  I don't see it
15   Q  And so there's no way -- so based on the
16   information that CSI provided to Lycos, Lycos couldn't
17   have compared the cost for that piece of equipment of
18   rewriting schedule -- that piece of equipment?
19   MR KALER: Objection
20   THE WITNESS: Well, my understanding is they always
21   had the original purchase orders
22   MR BEAN: Q  Sir, you said to me -- Well, first of
23   all, what do you base that on?
24   A  Testimony of several people

Page 188

1    Q  Okay. Now, you testified a few minutes ago that
2    to do the economic analysis, compare the economic cost
3    of doing a rewrite, you had to know the rent on the
4    earlier schedule and the rent on the rewritten schedule,
5    right?
6    A  Yes
7    Q  And that information was not available to you
8    with respect to two pieces of equipment we've looked at
9    so far, right?
10   A  On this schedule, yes
11   Q  On schedule 68.
12   A  Yes
13   Q  Let's go on and look at another half a dozen
14   pieces of equipment.
15      You see on schedule 94, same page, you see the
16   group 16451201 through 1206?
17   A  I'm sorry, which page are we on?
18   Q  The same page of schedule 94, page 7701.
19   A  Okay
20   Q  Do you see the grouping 16451201 through 1206
21   under the serial number column? It's in the middle of
22   the page, sir.
23   A  Yes
24   Q  See if you can find any of those serial numbers

Page 189

1    on schedule 68B.
2    A  Five different ones or six different ones?
3    Q  There's six different ones.
4    A  I don't see them
5    Q  And so for these six additional pieces of
6    equipment Lycos could not have calculated based on the
7    information provided to it by CSI a comparison of the
8    rents on schedule 68B for those pieces of equipment with
9    the rent on schedule 94, could it?
10   MR KALER: Objection
11   THE WITNESS: Not looking at these two documents
12   MR BEAN: Q  And you're not aware of any
13   other documents that were provided by CSI to Lycos that
14   would provide the information, the rent, on schedule 68B
15   for the eight pieces of equipment that you sought that
16   you just looked for --
17   MR KALER: Objection.
18   MR BEAN: Q -- are you?
19   A  I remember seeing the documents that indicated
20   that on the original schedules there were serial numbers
21   available
22   Q  And you can't find them on schedule 68B, can
23   you?
24   A  I don't see it on schedule 68B  You asked me if

48 (Pages 186 to 189)

James M. Johnson, Ph.D.                                    11/02/2007

Page 190

1 there was a way of knowing  I thought I was answering
2 your question
3     Q  Okay.
4     MR. KALER: You were
5     MR BEAN: Q  You mean on the original schedules
6 you think the serial numbers that you were just looking
7 for might be there, sir?
8     A  Either on the final or on the draft that was
9 circulated
10     Q  Did you see -- What drafts were you referring
11 to?
12     A  The ones that Ms Kersting and Mr O'Neal
13 referred to
14     Q  Have you seen any drafts?
15     A  I haven't seen any, no
16     Q  Now, CSI -- when equipment was split between
17 schedules, as it was for 93 and 94, CSI should have told
18 Lycos what the rent was for the equipment from schedule
19 68B that was going onto 94, the total of the rent on
20 those pieces of equipment, and the total of the rent on
21 schedule 94 for those same pieces of equipment,
22 shouldn't it?
23     MR KALER: Objection
24     THE WITNESS: Yes.

Page 191

1     MR BEAN: Q  Okay
2     A  CSI could have either told them or else they
3 could have gone back to the original serial numbers that
4 they got when they did the original schedules
5     Q  Well, but the original serial numbers don't tell
6 you what the rent is on the schedule that's rolling onto
7 93 and 94, right?
8     MR KALER: Objection
9     THE WITNESS: I thought the draft did
10     MR KALER: It does
11     MR BEAN: Q  There is no draft for a rewritten
12 schedule like 68B, is there?
13     A  I don't believe so, but I believe that the
14 original schedules all had numbers that Lycos could
15 verify That's why they gave them the information.
16     Q  You testified a few minutes ago, Professor
17 Johnson, that to analyze the economic effect of
18 rewriting schedules onto 93 and 94 Lycos had to compare
19 the rent on the immediate predecessor's schedule for
20 each piece of equipment for that -- with that piece of
21 equipment's rent on schedule 93 and 94, right?
22     MR KALER: Objection  That is not what he said,
23 and you know that's not what he said  You just can't
24 keep doing this

Page 192

1     MR BEAN: Q  You may answer the question, sir
2     MR. KALER: Read it back again
3     MR BEAN: I'll ask it again
4     MR. KALER: Every second of this comes out of your
5 time.
6     MR. BEAN: Q  To do an analysis of the economic
7 effect of rewriting schedule 68B onto 93 and 94 Lycos
8 would have to know the rent for each piece of equipment
9 on 68B that was rolling onto 93 and 94, right?
10     MR. KALER: Objection
11     THE WITNESS: I would say so
12     MR. BEAN: Q  Okay. And so the rent that may have
13 been available on an original schedule that preceded
14 schedule 68B would not be relevant to that analysis,
15 would it?
16     MR. KALER: Objection
17     THE WITNESS: I don't know
18     MR. BEAN: Q  Well, if the rent on an original
19 schedule that preceded 68B was a different amount than
20 what it was on schedule 68B, using the rent from the
21 earlier schedule would lead to a misleading result,
22 wouldn't it?
23     MR. KALER: Objection
24     THE WITNESS: I don't know

Page 193

1     MR BEAN: Q  All right  Sir did you undertake to
2 do any analysis of the cost to Lycos of rewriting any of
3 the schedules, in other words, comparing the rent on the
4 old schedule with the rent on a new schedule where the
5 equipment was split between schedules?
6     A  I didn't personally  I relied on Mr. Smith's
7 report
8     Q  Did you find anything in Mr. Smith's report, his
9 analysis of the cost of doing that, that you found
10 incorrect?
11     A  Yes
12     MR. KALER: Objection
13     MR. BEAN: Q  What in Mr. Smith's computations did
14 you find to be erroneous, if anything?
15     A  I found it to be misleading because of what was
16 omitted, and in my opinion what was omitted was that
17 there was no cost estimate for the schedules that were
18 running out where the equipment would be expiring on
19 their leases  So it's back to a coterminous problem
20 again.
21     Q  If you present value the equipment -- if you
22 present value the leases, that problem is solved, isn't
23 it?
24     A  No

19 (Pages 190 to 193)

# EXHIBIT D

VOLUME 1

PAGES 1 - 327
EXHS. 1 - 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Computer Sales International,
Inc.,
        Plaintiff and Defendant
        in Counterclaim

v.

Lycos, Inc.,
        Defendant and Plaintiff
        in Counterclaim

v.

Bank of America f/k/a Fleet
Bank,
        Trustee Process Defendant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Civil Action

No. 05-10017-RWZ

Videotaped Deposition of James S. Schallheim, Ph.D.
Friday, November 16, 2007
McDermott Will & Emery LLP
28 State Street - 34th Floor
Boston, Massachusetts 02109

- - - - - - - - - -   J. EDWARD VARALLO, RMR, CRR   - - - - - - - - - -
COURT REPORTER
FARMER ARSENAULT BROCK LLC      BOSTON, MASSACHUSETTS
617.728.4404
evarallo@fabreporters.com

110

1  ago, so I couldn't tell you exactly anything about
2  those contracts.
3      Q.   You are not an expert regarding computer
4  equipment, are you?
5          MR. KALER: Objection, vagueness. But you
6  can respond. You mean the technical part?
7      A.   I do not consider myself to be a computer
8  equipment specialist.
9      Q.   And you are not an expert on the residual
10  values of computer equipment either, are you?
11          MR. KALER: Objection, vagueness. You can
12  respond.
13      A.   I have testified about the residual values
14  of computer equipment but as a financial economist,
15  not as a computer equipment specialist.
16      Q.   And you have never done any appraisal of
17  computer assets, have you?
18      A.   I have not.
19      Q.   In the Andantech case, one of your fellow
20  experts on behalf of the Government was a gentleman
21  by the name of Peter Daley. Do you recall that?
22      A.   Yes, I do.
23      Q    Did you have an impression of Mr. Daley?
24          MR. KALER: Objection to form. You may --

111

1      A.   At the time of Andantech I never met him.
2      Q.   Oh, you never met him in the Andantech
3  case?
4      A.   Not at that time.
5      Q.   Have you met him since then?
6      A.   Yes.
7      Q.   In what capacity have you met Mr. Daley?
8      A.   In the Long Term Capital Management case.
9      Q.   And did you develop an impression of
10  Mr. Daley's competence? Well, what is the nature of
11  Mr. Daley's work?
12          MR. KALER: Objection. But you can
13  respond to the second question.
14      A.   My impression of Mr. Daley is that he is a
15  computer equipment specialist, valuation specialist.
16      Q.   Did you have an impression as to his
17  competency when you saw him?
18          MR. KALER: Objection to the witness being
19  asked to give opinions as to the competence of other
20  people. It's not a proper question. You can
21  respond -- you have to respond -- but I do object.
22      A.   In some of those cases I relied on his
23  input as a component of my analysis. So based on
24  the use of the results of his appraisals, I would

112

1  say that, you know, he seems to be a competent
2  appraiser.
3      Q.   If you had seen what to you were flaws or
4  errors in his appraisals, you would not have relied
5  on his underlying information for your analysis,
6  would you?
7          MR. KALER: Objection.
8      A.   If I found flaws, I would not rely on
9  that, yes.
10      Q.   Do you hold any licenses or
11  certifications?
12      A.   I do not.
13      Q.   Are you a lawyer?
14      A.   No.
15      Q.   Are you an attorney -- ah, CPA?
16      A.   No.
17      Q.   Are you a tax professional?
18      A.   No.
19      Q.   Have you ever drafted a master equipment
20  lease?
21      A.   No.
22      Q.   You've never negotiated a master equipment
23  lease, have you?
24      A.   No.

113

1      Q.   You've never negotiated an equipment
2  schedule either, have you?
3      A.   No.
4      Q.   You've never signed an equipment lease,
5  have you?
6      A.   No.
7      Q.   And you've never taken any classes on the
8  negotiation or drafting of equipment leases, have
9  you?
10      A.   I'm just wondering if those classes
11  existed. But, no, I haven't.
12      Q.   You had an initial conversation with
13  Mr. Kaler about this case in August of this year.
14  Is that right?
15      A.   Yes.
16      Q.   How long did that conversation last?
17      A.   I don't remember the exact time.
18  Approximately an hour.
19      Q.   And what did he tell you during that call?
20      A.   You're referring to the initial call? I
21  believe he told me some of the outline of this
22  dispute and some of the background and certainly
23  asked me if I was interested in being an expert
24  witness in this case.

James S. Schallheim, Ph.D.
Volume 1 - November 16, 2007

54 (Pages 210 to 213)

---

**210**

1  reference in paragraph 19, the last sentence.
2  　A.　Right. That's what I was talking about.
3  And at the end, the last sentence in 19, page 7 of
4  my report.
5  　Q.　How many Internet companies did you look
6  at to come up with the conclusion that Internet
7  companies generally do not show long-term debt on
8  their balance sheets?
9  　A.　Well, when I wrote this report I took a
10 very quick look and then when I came back in my
11 subsequent reports, I did a more careful search.
12 But my --
13 　Q.　When you say --
14 　A.　This was based on my experience as a
15 finance professor, having lived through the Internet
16 bubble and having observed firms during that period.
17 You know, I had a pretty good feel for what was
18 happening. I just didn't have all the numbers to
19 back it up or evidence to back it up.
20 　Q.　But you said your belief that reporting
21 long-term debt on an Internet company's balance
22 sheet as affecting stock price was conjecture.
23 Right?
24 　　MR. KALER: Objection.

---

**211**

1  　A.　I used the word -- My conjecture was not
2  that the debt was on the balance sheet or not on the
3  balance sheet. My conjecture was that this had an
4  impact on their stock price.
5  　Q.　Now, you say in your report that Lycos
6  could have returned the equipment to CSI, do you
7  not?
8  　A.　I do say that.
9  　Q.　And did you before you wrote that sentence
10 review the return provisions in the master equipment
11 lease?
12 　A.　I did look at the provisions in the master
13 lease.
14 　Q.　And did you determine from reviewing --
15 Did you understand the return provisions in the
16 master equipment lease?
17 　A.　I'll say yes, as much as I understand any
18 contract language, but.... It seemed --
19 　Q.　Well, do you not feel like you
20 understand --
21 　　MR. KALER: I'm sorry. Just let him
22 finish.
23 　A.　I was just trying to be a little bit
24 facetious. I'm not a lawyer, but I did read the

---

**212**

1  contract.
2  　Q.　You read the master lease agreement?
3  　A.　Yes.
4  　Q.　What's a prime shift maintenance contract?
5  　　MR. KALER: Objection. But you may
6  respond.
7  　A.　I don't know for sure. I have asked what
8  that is and my understanding, and I stand to be
9  corrected, is that it has to do with the warranties
10 and any additional upgrades applying to computer
11 equipment over its life such that if and when it's
12 returned, that all evidence of upgrades and
13 manufacturers' warranties are maintained with the
14 equipment, something along those lines. But that's
15 my understanding.
16 　Q.　And that is based on what? How did you
17 gain that understanding?
18 　A.　I think I asked counsel about that.
19 　Q.　And did you gain any other basis for that
20 belief?
21 　A.　It sounded -- No, I didn't. It just
22 sounded true because the way I look at it is, if you
23 are a lessor and you're going to get equipment back,
24 which is not unusual, you should get it back in as

---

**213**

1  good a condition for resale or re-lease as you
2  possibly can. And having the manufacturer
3  warranties and user manuals and so forth is pretty
4  important.
5  　Q.　When you said counsel a minute ago, you
6  said you asked counsel, that meant you asked
7  Mr. Kaler?
8  　A.　I did not. Either on the telephone or --
9  The conversation was with Ted Little.
10 　Q.　Okay.
11 　　Now, do you know, based on your
12 understanding of what a prime shift maintenance
13 contract is as you learned from Mr. Little, do you
14 know whether prime shift maintenance contracts even
15 exist for the type of equipment that Lycos leased
16 from CSI?
17 　　MR. KALER: Objection.
18 　A.　I cannot answer that question.
19 　Q.　So the answer is you don't know?
20 　A.　I don't know.
21 　Q.　And so if there is no such thing as a
22 prime shift maintenance contract for the type of
23 equipment that Lycos leased from CSI, then Lycos
24 could not have returned the equipment to CSI in

---

**230**

1  if it had not entered into the rewritten equipment
2  schedules?
3      MR. KALER: Objection.
4    **A.  I didn't do that analysis.**
5    Q.   Are you familiar with the ELA fair
6  business practices?
7    **A.  I was -- Before this case I was vaguely**
8  **familiar that they existed, and that's about all I**
9  **can say.**
10   Q.   Now, are you aware -- You didn't read the
11  transcript of Paul Stenberg.  Right?
12   **A.  I did not read his transcript.**
13   Q.   And so you're not aware that Paul Stenberg
14  used the word markup to describe what he did to the
15  threshold given to him by CSI, are you?
16   **A.  Well, I'm aware that Smith and/or Cross**
17  **make reference to that fact, but I don't think**
18  **I have that.  I didn't look at that myself.**
19   Q.   Have you done any analysis to determine
20  whether the CSI/Lycos restructurings were loans,
21  true leases, or installment sales contracts?
22      MR. KALER: Objection.  Again, for tax
23  purposes you mean?
24      MR. BEAN: For any purpose.

**231**

1      MR. KALER: Well, I object to that,
2  because the question is impossible to answer unless
3  you understand the context in which you're asking
4  it.
5      MR. BEAN: Well, there are several
6  different possible ways of doing it and I want to
7  know whether he did an analysis under any possible
8  way.
9    **A.  I did not do the analysis to determine**
10  **whether they were operating versus capital leases or**
11  **true leases versus conditional sales contracts.**
12   Q.   You are aware that equipment leases almost
13  always have purchase options in them, are you not?
14      MR. KALER: Objection.
15   **A.  Well, I --**
16      MR. KALER: This question has been asked
17  and answered previously in the deposition and then
18  you took him to the section of his book on the
19  subject.  It's been asked and answered.
20      MR. BEAN: That's fine.
21      MR. KALER: I'll let you -- I mean, what
22  are you going to do?
23      MR. BEAN: I'm not asking you questions.
24  And if it's my time, I'll take it up, and the

**232**

1  problem I have is that you're taking it up.
2      MR. KALER: I'm talking to the witness.
3  The rule is, you can't keep asking him the same
4  question.
5      MR. BEAN: Look, I'm going to quote you on
6  that come Tuesday.
7      MR. KALER: Well, I don't.
8      MR. BEAN: Go ahead, sir.
9    **A.  I quibble with the term, I think you said**
10  **almost all contracts.  I would say many contracts**
11  **have purchase options, but I don't know the**
12  **percentage.  And I don't think anybody else does.**
13   Q.   Could either party, Lycos or CSI, have
14  terminated the master equipment lease in the middle
15  of a schedule?
16   **A.  Well, my understanding of the master lease**
17  **contract is that either party had the right to --**
18  **Well, now, let's see.  I've forgotten.  I'm sorry.**
19   Q.   The lease contract doesn't say that either
20  party can terminate it, does it?
21   **A.  No.  I don't think there is a termination**
22  **clause.**
23   Q.   Now, you understand that Dr. Smith
24  criticized the math you had done on page 9 of your

**233**

1  first report because you hadn't considered the first
2  two months of the lease.  You're aware of that,
3  right?
4    **A.  I am aware of that criticism.**
5    Q.   And you didn't respond to that particular
6  criticism in your third report, did you?
7    **A.  Well, this is the way I responded to him.**
8  **He used the example of the iPod as something that**
9  **depreciated very quickly.  And my response was that,**
10  **well, you know, for your iPod example I could show**
11  **something else that actually increased in value in**
12  **the few months after the lease began.**
13       **So I don't -- I mean, I think -- And I did**
14  **consider the fact that I was treating the equipment**
15  **two months after the purchase date without changing**
16  **its value.  I just simply was not in a position to**
17  **estimate two months of depreciation.  So I concede**
18  **the point; I think it's very small.**
19   Q.   You're not aware of any technology
20  equipment that appreciates in value in the months
21  after it is purchased, are you?
22      MR. KALER: Objection.
23   **A.  I don't have any examples right off the**
24  **top of my head.  But because of supply and demand,**

# EXHIBIT E

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 1

PAGES 1 - 354

EXHS. 1 - 21

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *
                              *
Computer Sales International,  *
Inc.,                         *
      Plaintiff and Defendant *
      in Counterclaim         *
                              *
v                             *     Civil Action
                              *
Lycos, Inc.,                  *
      Defendant and Plaintiff *     No  05-10017-RWZ
      in Counterclaim         *
                              *
v.                            *
                              *
Bank of America f/k/a Fleet   *
Bank,                         *
      Trustee Process Defendant *
                              *
* * * * * * * * * * * * * * *
```

Videotaped Deposition of Joseph Philip Cagney

Wednesday, September 27, 2006

McDermott Will & Emery LLP

28 State Street - 34th Floor

Boston, Massachusetts 02109

---------- J  EDWARD VARALLO, RMR, CRR ----------
COURT REPORTER
FARMER ARSENAULT BROCK LLC        BOSTON, MASSACHUSETTS
617.728.4404
evarallo@fabreporters.com

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 162

1  than the amount of the interim rent -- those in the
2  aggregate might be larger than the interim rent
3  because they include taxes  Correct?
4      MR LITTLE: Objection
5    A  It's possible  I don't know exactly what
6  format they use here, but it's possible  It's
7  possible  I don't know their -- Like I said, I'm
8  not familiar with this report exactly, so
9    Q  What reports are you familiar with that
10  reflect the payments made by a customer?
11    A  It's really not under my purview to look
12  at that
13    Q  Whose purview is that under?
14    A  That'd be Fred O'Neal
15    Q  Going back to Exhibit 4, the sales type
16  lease journal entry, you said this was prepared
17  after the lease documents were signed  Correct?
18    A.  That would normally be the case, yes
19    Q  They would be prepared, frankly, several
20  months after the lease documents were signed
21  Correct?
22    A.  Usually, yes
23    Q  And that is because normally there's a
24  two- or three-month installation period  Correct?

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 163

1    A  In the case of a SmartTrack lease like
2  this, yes
3    Q  So the information on the sales type lease
4  journal entry would not be disclosed to the customer
5  before the customer signed the lease schedule
6  Correct?
7      MR LITTLE: Objection
8    A  I believe so  I mean, this is an internal
9  accounting booking form
10    Q  The sales type lease journal entry, is
11  that ever provided to a sales representative?
12      MR LITTLE: Objection
13    A  Again, it's not under my purview, but I
14  don't think so
15    Q  There wouldn't be any reason to give it to
16  the sales representative, would there?
17      MR LITTLE: Objection
18    A  Conjecturing? No
19    Q  We talked about rewriting schedules, and
20  there are two types; I want to see if you
21  distinguish them in your mind in any way  There are
22  two ways in which schedules were rewritten between
23  CSI and Lycos  One is where there was an original
24  schedule and in the middle of that schedule, the

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 164

1  schedule was rewritten to a longer-schedule lease
2    A  Okay
3    Q  The other is, on occasion equipment from
4  multiple schedules were written onto a single
5  schedule
6    A  Okay
7    Q  Or let's say equipment might be on five
8  schedules and then get put on two schedules  Okay?
9    A  Okay
10    Q  Do you refer to both of those as rewrites?
11    A  Yes
12    Q  Who -- When equipment -- You talked about
13  one of the things that you provided training on was
14  the structuring of lease schedules, right, finance
15  structures?
16    A  I mean, training is a pretty loose word
17  I mean, on structure?  I don't know that I'd use
18  that word for what training I did
19    Q  Okay  You're familiar, you were involved
20  in the structuring of lease schedules  Correct?
21    A  By involved? I'm not sure --
22    Q  Well, for example, Schedules 93 and 94,
23  you're familiar with those.  Correct?
24    A  Yes

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 165

1    Q  You decided, you figured out the structure
2  for those schedules, did you not?
3      MR LITTLE: Objection
4    A  I was involved in structuring that, yes
5    Q  You were the chief architect, weren't you?
6      MR LITTLE: Objection
7    A  Chief architect is pretty strong  I mean,
8  I was responding to a salesman's request for a
9  particular lease structure, yes
10    Q  The salesman requested the lease
11  structure?  Is that your testimony?
12    A  He requested that we find a way to
13  terminate leases in order to save Lycos money, yes
14    Q.  To save Lycos money or to reduce--
15    A  To reduce their payment  By save money,
16  I meant on a monthly basis
17    Q  Okay  Beyond requesting that you figure
18  out a way to reduce Lycos' monthly payment, did he
19  give you any other indication of what he or Lycos
20  wanted to see in the new structure?
21    A  What he wanted to see?
22    Q  Let me rephrase the question
23    A  Okay
24    Q  Other than telling you that Lycos wanted

FARMER ARSENAULT BROCK LLC

415f173d-bc0f-443f-8579-5bdf6d5eaccb

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 166

```
 1  to reduce its monthly payments, did he give you any
 2  other information as to what Lycos wanted in a new
 3  structure?
 4      A   One thing I can think of is that they
 5  wanted to separate the PCs from the non-PCs so that
 6  there'd be a 24-month schedule and a 36-month
 7  schedule
 8      Q.  And Mr Stenberg told you that?
 9      A   Yes
10      Q   Did you ever have any conversation with
11  Lycos as to whether that's what Lycos had said it
12  wanted?
13      A   I did not
14      Q   You did not, okay
15          You testified earlier that you had an
16  understanding that Lycos sometimes financed its
17  interim rent payments  Correct?
18      A   Yes
19      Q   And that understanding, we don't need to
20  get into it, was based on your discussions with your
21  counsel  Right?
22      A   Right
23      Q   What documents, the types of documents
24  that you have before you or otherwise, could we look
```

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 168

```
 1      Q   If you were looking at -- And if part of
 2  Lycos' motivation for rewriting that schedule was to
 3  finance the interim rent, how would that manifest
 4  itself in the forms of documents that you have
 5  before you?
 6          MR LITTLE: Objection, if at all
 7      A   I mean, the contract should have stated
 8  when the -- I think it's a legal term what the
 9  commencement date of the lease would be  So, I
10  mean, the contract would say that
11      Q   The contract would say that interim rent
12  was being rolled in?
13      A   No
14      Q   How could you tell, if you could tell, by
15  looking at the lease documents or any other of the
16  form of documents you have before you whether Lycos
17  had financed interim rent?
18      A   The new contract, if I remember right,
19  would say that the commencement date -- Well, let me
20  give you an example  If the first schedule started
21  July 1st and if the second schedule -- and there
22  might have originally been interim rent due for the
23  period prior to July 1st, the new schedule would
24  then specify that -- and I'm not sure of the legal
```

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 167

```
 1  at to ascertain whether Lycos had financed its
 2  interim rent payments on any particular schedule?
 3      A   On these particular documents on Schedule
 4  83, I cannot tell that  Okay?
 5      Q   You can't tell whether Lycos financed any
 6  of the interim rent payments?
 7      A   On Schedule 83 --
 8          MR LITTLE: You're looking at Exhibit 3?
 9          THE WITNESS: Correct, I'm looking at
10  Exhibit 3  (Pause) On Schedule 83 itself, it looks
11  like they did not finance the interim rent
12      Q   And looking at Schedule 83, Exhibit 3,
13  what are you looking at that tells you that Lycos
14  did not finance the interim rent on that schedule?
15          MR LITTLE: Objection
16      A   I am not an attorney, but Section 4 of the
17  addendum, which talks about initial term and daily
18  rental being due in a lump sum in April, so the very
19  last line of the third page of the exhibit
20      Q   Now, you are aware that on some occasions,
21  on many occasions, CSI rewrote schedules for Lycos
22  four months into the lease schedule?
23      A   I'm not sure about four months but, yes,
24  we rewrote leases after the lease started
```

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 169

```
 1  term here and I'm not, I'm going off of memory
 2  here -- their commencement date under the new
 3  schedule would be July 1st  And there would be some
 4  language, and I don't remember exactly what it is,
 5  referring to the fact that, it didn't specify
 6  interim rent per se, but that the old schedule was
 7  either being terminated or voided or what-have-you
 8          I'm just going off of memory there  I
 9  would have to see a schedule in front of me to see
10  where it is
11      Q   So any time CSI rewrote a schedule with
12  Lycos some number of months into the lease, the
13  original schedule would be terminated  Correct?
14          MR LITTLE: Objection
15      A   I mean, my recollection would be that it
16  would either be terminated -- Yes, it would be
17  terminated
18      Q   So if an original schedule commenced July
19  1 and effective December 1 a rewrite was done
20  converting it to a 36-month lease, for example, that
21  36-month lease schedule would specify that the
22  schedule began July 1 if the interim rent was being
23  rolled in?
24      A   I mean, all I can say is that we tried to
```

FARMER ARSENAULT BROCK LLC

415f173d-bc0f-443f-8579-5bdf6d5eaccb

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 242

1 which were at August 31, we adjusted them or I was
2 involved a little bit closer in adjusting them for
3 September 30 and October 31
4   Q   Well, how did you calculate the threshold
5 of $2,030,000?
6   A   Again, the first threshold, which Michelle
7 gave out on August 6, I'm sure there were
8 calculations that she did that I would have
9 reviewed  Okay? And then -- So if you're asking
10 specifically for October 31, I would have taken
11 those thresholds and then allowed for the additional
12 payment that Lycos would have made in September and
13 then October to reduce the threshold down to account
14 for those payments
15   Q.  I'm interested in the math, what math
16 would have been performed  I see what Ms Thompson
17 did as of 8/31, she had a number of 2,272,000 and
18 you made some adjustments
19   A   Correct
20   Q   How was the number -- How did you
21 determine the 230? Excuse me  2 million 30
22   A   If we start with the first one, the
23 2 million 675, the payment on the non-PC side is
24 1,041,570 as judged by the bottom of that second

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 243

1 column there  I would have taken the 17 million
2 675, subtracted one payment of 1 million 041, and
3 then future-valued that at some interest rate to get
4 to 16 million 775 at September 30  And I would have
5 done the same thing to take 16 million 775, subtract
6 one payment of 1 million 042, and then future-valued
7 it one more month at an interest rate  And I don't
8 recall the interest rate
9   Q   And that's the threshold PV, though, for a
10 buyout on the non-PC side  Right?
11   A   It's for a 36-month renewal, yes
12   Q   Do you know how Ms Thompson derived the
13 $16,675,000 number?
14   A   Very similar to how we did before  I
15 don't have the exact document in front of me for how
16 she did her calculation, so I'm --
17   Q   But you take the present value of the
18 remaining lease stream?
19   A   Right, along with the present value of our
20 booked residuals, right
21   Q   And you would add those two together?
22   A   Correct
23   Q   And so on the PC side, 24-month renewal,
24 it says she calculated, based on the present value

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 244

1 of the lease stream plus the present value of the
2 residual threshold, a PV of 2,272,000  Correct?
3   A   Correct
4   Q   And you reduced that by the monthly
5 payments on the PC side of approximately 149,000
6 Correct?
7   A   Yeah  And on the PCs it wasn't -- there
8 was a little bit more to it, but not much, because
9 as you can see, there's a difference between 24 and
10 30 months  So we would have been reducing the
11 residual value as well a little bit for going out to
12 the 10/1 start and 11/1 start, but it's not going to
13 be material as far as that goes
14   Q   Now, going back to the third page, you say
15 the outstanding debt on Schedule 93 is $1,891,989
16 Correct? Correct?
17   A   That is what that line says, yes
18   Q.  And that's the aggregate of all remaining
19 payments of the equipment that's going to roll onto
20 93  Is that right?
21   A   Not exactly in this case
22   Q   What is it?
23   A   And we almost need to go back to how 93
24 and 94 are structured  But the difference in 93,

FARMER ARSENAULT BROCK LLC

Joseph Philip Cagney
Volume 1 - September 27, 2006

Page 245

1 for example, is that instead of terminating all of
2 the leases at 10/31 like we originally anticipated,
3 we left some of the leases in place and those would
4 renew later  Instead of at 11/1, they would renew
5 further down the line, so we could keep the existing
6 debt in place
7   Q   And the decision to structure the 93 this
8 way by keeping some leases in place was your idea?
9   A   It was in concert with one of the
10 requirements, one of the -- I don't know if
11 requirements is the right word -- what Paul wanted
12 to do, which was to minimize the amount of the
13 letter of credit that Lycos would have to get to
14 secure this deal.
15   Q   And how does terminating -- How does
16 keeping some schedules in place minimize the amount
17 of the letter of credit?
18   A   Because those leases were financed with
19 banks and we would not have to pay the bank off
20   Q   Now, this million 891, so that represents
21 what then?
22   A   That represents schedules that were
23 remaining in place as of November 1st of '01 that
24 would then later renew into Schedule 93 at a later

FARMER ARSENAULT BROCK LLC

415f173d-bc0f-443f-8579-5bdf6d5eaccb