UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC. | ) |
| | ) |
| Plaintiff, | ) |
| **v.** | ) |
| | ) |
| LYCOS, INC., | )   C.A. No. 05-10017- RWZ |
| Defendant, | ) |
| | ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) |
| | ) |
| Trustee Process Defendant. | ) |

**OPPOSITION OF PLAINTIFF CSI LEASING, INC. TO LYCOS' MOTION TO STRIKE
PORTIONS OF CSI'S LOCAL RULE 56.1 STATEMENT WITH RESPECT TO
LYCOS'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF COMPUTER
SALES INTERNATIONAL'S AMENDED COMPLAINT**

Plaintiff and counterdefendant CSI Leasing, Inc. f/k/a Computer Sales International, Inc.

("CSI") respectfully submits this memorandum of law in opposition to *Lycos's Motion to Strike*

*Portions of CSI's Local Rule 56.1 Statement with Respect to Lycos's Motion for Summary*

*Judgment on All Counts of Computer Sales International's Amended Complaint, and to Have*

*Lycos's Statement of Undisputed Material Facts be Deemed Admitted* (Docket No. 174)

(hereinafter "the Motion" or "Mot.").

## ARGUMENT

Disregarding the Court's Order of June 13, 2007 that there be "***no replies*** or excessive

briefs"(emphasis added)[1]  defendant and counterplaintiff Lycos, Inc. ("Lycos") has submitted the

equivalent of a huge summary judgment reply brief, without leave to do so, under the guise of a

meritless motion to strike.  *See* Lycos Motion (attaching lengthy spreadsheet with voluminous

_____

[1]      *See* Court docket entry of June 13, 2007 (unnumbered) between entry numbers 138 and 139.

reply arguments). The Motion should be denied because it is legally and factually deficient, and because its submission is an inappropriate attempt to circumvent the Order that the parties not burden the Court with reply briefs on their summary judgment motions.

**A. Contrary to the Claims in the Lycos Motion, CSI Has Admissible Evidence It Would Not Have Entered into the August 2003 Sales Agreement Absent a Reaffirmation from Lycos' of Its Existing Obligations**

Common sense dictates that a lessor, such as CSI, would not have entered the Sales Agreement in August 2003 – under which Lycos, in exchange for a payment of $3.77 million, would become the owner of the leased equipment *upon making all remaining lease payments* – without requiring that Lycos reaffirm its obligations to make all remaining lease payments. Common sense further dictates that any lessor, had it known its lessee was secretly planning to seek renegotiation of its remaining lease obligations on the very day it was simultaneously reaffirming them, would have refused outright to consummate a Sales Agreement in which it would give up title to the equipment.

Contrary to the suggestions in the Lycos Motion, CSI has provided ample evidence – the form of interrogatory responses, testimony, and contemporaneous documents – that Lycos' agreement to reaffirm its obligations was a *sine qua non* of CSI's entering the Sales Agreement. In this regard, the Lycos Motion attacks only one piece of CSI's evidence that it would not have entered the Sales Agreement in August 2003 had it known of Lycos' secret plan to renege on its continuing lease obligations[2] --- namely, CSI's sworn interrogatory responses, which Lycos admits are clear on this point, stating that it would not have entered into the Sales Agreement if Lycos had not agreed to pay off the remaining leases. Lycos Motion at 3-4.

---

[2] *See, e.g., Response of CSI to Lycos' Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos's Motion for Summary Judgment on All Counts of CSI's Amended Complaint* (Docket No. 166) ¶ 16.

Notwithstanding that Rule 56(c) expressly allows "answers to interrogatories" to serve as evidence at the summary judgment stage, Lycos argues that CSI's sworn interrogatories must be wholly disregarded supposedly because it cannot determine whether Jeffrey Rousseau – the signatory for CSI's interrogatory answers and an undisputed officer of CSI[3] – has insufficient personal knowledge. Lycos Motion at 4. Though Lycos makes much of the "verification" attached to CSI's interrogatories – in which the affiant, a corporate officer, states that the information is based on personal knowledge and information available to him as an officer – Lycos itself has used the similar verification language when its corporate officers have responded to interrogatories.[4]

Moreover, this Court has clearly held that a corporation may speak only through its authorized officers[5], and that is precisely what both CSI and Lycos have done in answering interrogatories – which CSI now properly uses pursuant to Rule 56(c) to demonstrate a material factual issue which precludes Lycos' motion for summary judgment. Plainly, this is sufficient to show the corporation's intent, and to establish a disputed issue of material fact, on this point.

There is also other evidence, however, which the Lycos Motion either ignores or attempts to minimize, demonstrating that CSI would not have entered the August 2003 Sales Agreement had Lycos not reaffirmed the validity of the leases, or had it known of Lycos' scheme to try to force a renegotiation of those leases after the Sales Agreement was signed. For example, at the Rule 30(b)(6) deposition of Lycos, Mr. Rousseau – testifying under oath and speaking on behalf

---

[3]    Mr. Rousseau stated in his Verification to the Interrogatories in question (Little Aff. Ex. 6) and in testimony that he is an officer of CSI. Rule 30(b)(6) Deposition of CSI per Mr. Rousseau, dated February 21, 2007 ("CSI Dep.") at 189:4-6 (attached as Exh. C).

[4]    *See Lycos' Objections and Responses to CSI's First Set of Interrogatories*, dated October 25, 2006 (attached hereto as Exh. D), in which Lycos's affiant Kevin Baillie verifies that he is an "officer" of Lycos and that "most of the matters stated herein are not within my personal knowledge." *Id.* at 28.

[5]    *See In re Fidelity/Micron Securities Litig.*, 964 F. Supp. 539, 544 n.10 (D. Mass. 1997) ("No one disputes that a corporation can speak through its directors or officers"); *In re Fidelity Guarantee Mortgage Corp.*, 150 B.R. 864, 867 (D. Mass. 1993) (stating that "a corporation can speak and act only through its agents"); *Mompoint v. Lotus Dev. Corp.*, 110 F.R.D. 414, 416 (D. Mass. 1986) (same).

3

of CSI as the corporation's 30(b)(6) designee – affirmed that CSI would not have entered into the

Sales Agreement had it known of Lycos' scheme (referred to between Lycos and its agent

Leaseforum as "Phase II"):

> Q.  It says in subpar – in paragraph B in the middle of the page [of CSI's responses to interrogatories], quote – and I'm four lines from the bottom of paragraph B, "***CSI would not have entered into the sales agreement to sell Lycos the equipment and would not have given up its right to return the – require the return of the equipment in accordance with the provisions of the leases or compensation for the loss of equipment." And I gather that's if it had known about Phase II; is that right***?
>
> A.  **Yes**.

Rule 30(b)(6) Deposition of CSI, dated February 22, 2007, at 435:15-436:13 (attached as <u>Exh.</u>

<u>B</u>).  This testimony alone, given under oath at deposition from a corporate designee who is

educated pursuant to Fed. R. Civ. P. 30(b)(6) to speak on behalf of the corporation (CSI), is

perfectly sufficient to establish a disputed issue of fact, and to defeat a summary judgment, on

this point.  As this Court has held,

> The testimony elicited at the Rule 30(b)(6) deposition ***represents the knowledge of the organization . . . not of the individual deponents***. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).  "If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."  *Id.*; *see also Medic Alert Foundation v. Corel Corp.*, 43 F. Supp.2d 933, 942 n.2 (N.D. Ill. 1999) (***a party's rule 30(b)(6) expert witness "is competent to testify to matters within the company's knowledge, not only to those within her personal knowledge"***).

*McLellan Highway Corp. v. United States*, 95 F. Supp.2d 1, 9 (D. Mass. 2000) (emphasis

supplied).  In this regard, the personal knowledge requirement for a corporation submitting an

affidavit is satisfied by the testimony of a corporate officer because "[c]orporate officers are

considered to have personal knowledge of the acts of their corporations and an affidavit setting

forth those facts is sufficient for summary judgment." *AGI Realty Serv. Group, Inc. v. Red Robin Int'l, Inc.*, 81  F.3d 160, 1996 WL 143465 (6th Cir. 1996) at *4 (unpublished opinion) (citing *Catawba Indian Tribe of South Carolina v. State of South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992)); *see also WYCQ, Inc. v. National Music Marketing, Inc.*, No. 3:05-cv-0979, 2008 WL 56027 (M.D. Tenn. Jan. 3, 2008) at *4 (slip op.) (citing *AGI Realty* and holding that president of corporate party had personal knowledge sufficient for summary judgment purposes despite that "he was not personally involved in the negotiation" of agreement at issue); *Giles v. University of Toledo*, 241 F.R.D. 466, 470 (N.D. Ohio 2007)(personal knowledge of a corporate officer providing an affidavit may be inferred given the close relationship among officers in a corporation.)

But there is yet additional evidence already in the record – which Lycos improperly attempts to minimize by "spinning" it with its own interpretation, Lycos Motion at 4 n.7 – that CSI required Lycos, as early as October 2002, to affirm its remaining lease obligations as a condition to CSI agreeing to sell it the equipment for the price it did.

Specifically, there is clear evidence in the record that when Lycos was first considering buying out its CSI leases at the fall of 2002, Mr. Stenberg provided Lycos with two options:  it could either (a) do a "lump sum" payout of $26,819,623 and take immediate title to the equipment upon payment (which Lycos rejected), or (b) pay $4.69 million immediately, continue paying all of its lease obligations into the future, and take title upon final payment on the leases. *See* E-mails dated October 22, 2002 and October 24, 2002, from Mr. Stenberg (CSI) to Messrs. Lucy and Baillie (Lycos), attached as Exhs. 8 and 9 to the summary judgment Declaration of Edward W. Little, Jr. ("Little Decl.") (Docket No. 168).  Under the latter option (which Lycos ultimately chose, though at a lesser dollar amount), CSI made clear that "CSI will amend all

current releases to reflect that Title will pass to Lycos at the expiration of those leases" – Little Decl. Ex. 8 – a statement is even stronger than the summary judgment inference to which CSI is entitled.

Lycos's argument – that CSI's conditioning the Sales Agreement on reaffirming Lycos's lease obligations was essentially an afterthought to CSI – is simply an effort to persuade this Court to adopt its "spin" on facts which clearly demonstrate that this condition was raised by CSI months earlier than July 2003.[6]   Summary judgment cannot be based on the moving party's "spin" of the facts – rather, all reasonable inferences from the evidence must be drawn in favor of the non-moving party – in this case, CSI.   *See J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118, 118 (1st Cir. 1990).   In any event, though not required to do so, CSI is submitting additional evidence in the form of an affidavit from its president making clear that CSI would not have entered the August 2003 Sales Agreement without Lycos' reaffirming of its remaining lease obligations or had it known that Lycos had secretly commenced what it called "Phase 2," which was a concerted effort to renegotiate the very leases it had affirmed to CSI.   *See* accompanying Affidavit of Edgar William Gillula, dated January 10, 2007, ¶¶ 3-4.

**B.    CSI Has Controverted All of Lycos' Alleged "Material Undisputed" Facts, as Well As Those Which Are Immaterial and Misleading**

Continuing what is essentially a reply brief, the Lycos Motion asserts that CSI has not properly "controverted" Lycos' summary judgment fact statements – all of which it concludes are "material" to summary judgment.   While CSI has addressed all material facts which are disputed – and provided those disputed facts for the Court's review – CSI also addressed a host of other purported "material facts" alleged by Lycos which, in fact, are either Lycos' own argument or "spin" on the case record or immaterial issues irrelevant for summary judgment.

---

[6]        E-mails of October 22 and 24, 2002 from Paul Stenberg to Brian Lucy (Little Decl. Exs. 8, 9).

For example, Lycos is incorrect that CSI's "disagreement with some [of Lycos' factual assertions] is `irrelevant' or `immaterial.'" Mot. at 7. In fact, CSI's responsive summary judgment fact statements attempt to point out *where Lycos itself has* brought forth immaterial or irrelevant facts – though CSI goes on to controvert those immaterial/irrelevant facts with specific evidence. In this regard, CSI is addressing in a separate document, attached hereto as <u>Exhibit A</u>, each of the specific paragraphs Lycos is moving to strike. CSI briefly addresses below, however, the few examples set forth in Lycos' Motion:

A.    Lycos quotes (Mot. at 8) only a small selection of paragraph 9 from CSI's responsive statement of disputed material facts (Docket No. 166) – the entirety of which is set forth below (footnotes and citations therein omitted), with Lycos' small selection underlined:

> 9. Disputed and misleading. Lycos is alleging that the parties had reached a deal prior to any discussion concerning a "reaffirming" by Lycos of its obligations to make payments under the lease – thereby implying that the obligation to "reaffirm" was not material to CSI. In fact, CSI has made clear that it would not have consummated the Sales Agreement without Lycos reaffirming its obligations to make all payments under the existing leases.[7] Also, months earlier in October 2002, CSI had given Lycos a buyout price of $4.69 million under which it expressly provided that "[t]itle [of equipment] will pass to Lycos *at the expirations of these leases*."[8] <u>Again, all that the parties had reached agreement on was the price for a transaction, and other terms had to be negotiated along with final approval from Lycos' parent company in Spain – a point which Lycos made clear to CSI</u>. As stated previously, the draft offer submitted to Lycos on July 16, 2003, by Ms. Kersting of CSI's legal department makes clear that payment on the leases must continue (and, in fact, title in the equipment being sold expressly did not pass to Lycos[9] until all remaining rent payment were made).

CSI used the language "again" to refer to what it had already addressed in the preceding paragraphs of its responsive statement – specifically, paragraphs 5-8 (Docket No. 166) – and is not, as Lycos asserts, simply making assertions without factual support. That CSI did not repeat

---

[7]    Little Decl. (Docket No. 168) Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories).
[8]    E-mail from Paul Stenberg to Brian Lucy (Little Decl. Ex. 8) (emphasis added).
[9]    Acton Aff. Ex. 9 at CSI0023157 ¶ 4.

verbatim in paragraph 9 what it had already addressed in preceding paragraphs lends no support to Lycos' attempt to truncate the full record.

B.    Lycos challenges (Mot. at 8-9) a portion of paragraph 11 of CSI's responsive fact statement (Docket No. 166) – not because of any purported lack of citation by CSI to evidence, but because Lycos disagrees with CSI on the proper inference for that evidence. This is improper on summary judgment, only highlights the existence of a factual dispute on this issue, and should be disregarded out of hand – on the merits as well as for the fact that this is essentially an argument for a reply brief, which Lycos never sought leave to file and which the Court specifically ordered could not be filed. *See* Docket entry of June 13, 2007. In fact, the October 2002 emails which Lycos attempts to downplay are addressed above herein, and show two scenarios offered by CSI for the requested buyout of equipment by Lycos – the first being a lump sum payout of nearly $27 million (which Lycos rejected) and the second being a one time payout of much less money with an "amend[ing] of all current releases to reflect that Title will pass to Lycos at the expiration of these leases." Little Aff. Exhs. 8, 9. The reasonable inferences to which CSI is entitled at summary judgment are that – months before the August 2003 equipment buyout by Lycos – CSI was conditioning the buyout scenario ultimately chosen by Lycos on "amending" its current equipment leases with title to the equipment to pass only upon full compliance with all lease obligations, including full payment. Again, as a matter of common sense it would have been unreasonable for any lessor to simply sell equipment to a lessee in mid-term of those leases without a commitment from the lessee that it would comply with its lease obligations going forward. Those are the assurances which Lycos expressly provided to CSI and on which CSI relied in going forward with the Sales Agreement in August 2003 under the

8

framework selected by Lycos.  *See, e.g.*, CSI's Responsive Statement of Disputed Facts (Docket No. 166) ¶¶ 8-13.

C.      Lycos further argues (Mot. at 9) that certain portions of CSI's responsive fact statement are "argumentative" rather than factual.  In the example proffered, it singles out one sentence of paragraph 16 of CSI's statement (Docket No. 166) which states that "Lycos' agent is confirming that it had already `commenced' an action to undo the very assurances it had just made to CSI that day."  This is, in fact, an accurate description of (a) Mr. Kirk's e-mail of August 8, 2003, stating that "Phase 2 has commenced" and (b) that the Sales Agreement, indisputably dated by Brian Lucy of Lycos that same day (August 8, 2003), specifically provided in Section 4 that Lycos would "satisfy its lease obligations" and would "pay to Lessor [CSI] the number of Monthly Rental payments remaining" on the existing schedules.  *See* Affidavit of Peter Acton (Docket No. 145) Exh. 18 ("Phase 2" e-mail of Mr. Kirk) and Little Decl. (Docket No. 168) Exh. 13.  Far from being argumentative, CSI is simply setting forth the facts from which reasonable inferences may be drawn.  In any event, CSI was responding here to Lycos' statement, among other assertions, that "[a]t all time before and as of the time it entered into the Sales Agreement, Lycos intended to make all of the remaining payments required under the extant equipment schedules."  Lycos' summary judgment statement of facts (Docket No. 143) ¶ 16.  To the extent CSI's response is "argumentative" (which it is not), Lycos' is likewise.

## Conclusion

For the foregoing reasons and those set forth in the attachments hereto – as well as the evidence brought to the Court's attention by CSI in its responsive fact statements and supporting affidavits (Docket Nos. 164, 166, 167, 168) – CSI respectfully requests that the Court ***deny***

*Lycos's Motion to Strike Portions of CSI's Local Rule 56.1 Statement* (Docket No. 174) and

provide CSI such other and further relief as this Court deems proper.

<div style="margin-left:40%;">

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  0211
Tel. (617) 449-6500

</div>

Dated:  January 11, 2008

<div style="text-align:center;">

**Certificate of Service**

</div>

  I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by hand this 11th day of January 2008.

<div style="margin-left:40%;">

/s/ Robert J. Kaler_____
Robert J. Kaler

</div>

ME1 7049676v.1

**EXHIBIT A**

## EXHIBIT A

*(In responding to Lycos's claims that paragraphs of CSI's responsive summary judgment statements of fact – **Docket No. 166** – should be stricken or deemed admitted, in whole or in part, CSI has reproduced below, verbatim, the numbered paragraphs from Lycos's Rule 56.1 Statement, CSI's Response, and the purported reasons why Lycos believes the provisions should be struck or deemed admitted. The footnotes are from the original 56.1 statements, and refer to materials cited by the parties.)*

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| 1. | Between 1996 and 2002, Lycos and CSI entered into more than 125 equipment schedules,[1] each of which incorporated by reference the terms of a Master Lease Agreement entered into by the parties in December 1996 (the "Master Lease Agreement").[2] | Undisputed. | | N/A |
| 2. | The Master Lease Agreement provided, in pertinent part, that: [Lycos'] obligation to pay the Monthly Rental and all other sums due hereunder shall be absolute and unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of Equipment, revocation of | Disputed as misleading, but not material. Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease to which both CSI and Lycos agreed at the inception of their relationship.[5] As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of **both parties** — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CS]] themselves to obtain the financing that they need to do business."[6] | • Because CSI admits that its "dispute" with Lycos's factual assertion is not "material," CSI's disagreement with Lycos's facts cannot create a genuine issue of material fact. <br><br> • Lycos's facts should be deemed admitted because CSI does not provide any specific facts controverting those facts, i.e., that Lycos' quotation from the Master Lease Agreement or its statement that the "hell or high water" clause required Lycos to make all monthly payments regardless of defense or | • Lycos misinterprets CSI's statements. CSI is not stating that its "dispute" with Lycos is immaterial; rather, CSI states that the points raised by Lycos are "immaterial" or "misleading," but that CSI is addressing them with its own evidence. <br><br> • Lycos' purported "facts" are either taken out of context, misleading, and/or imply information contrary to the reasonable inferences to which CSI, as nonmoving party, is |

[1] Ex. 16, ¶ 5 and Exhibit B thereto.  Ex. 1, ¶ 3; Ex, 2, ¶ 3; Ex. 3, ¶ 9.
[2] Ex. 1 to CSI's Am. Compl. (Dkt. No. 121), ¶ 5 (Dec. 4,2006).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | acceptance of Equipment or any other right that [Lycos] may have as against [CSI]. It is the express intention of [CSI] and [Lycos] that all Monthly Rental payable by [Lycos] under each Equipment Schedule shall be, and continue to be, payable in all events throughout the term of thereof.[3]<br><br>CSI has referred to this provision as a "hell or high water" clause that obligated Lycos to make all monthly payments regardless of defense or excuse.[4] | | excuse, are inaccurate.<br><br>• CSI's statements about the meaning of the language in the Master Lease Agreement should be stricken as improper "argument" in a Statement of Undisputed Facts. | entitled. CSI is entitled to put forward its own contrary evidence and explain the reasonable inferences of that evidence which are in its favor.<br><br>• The improper "argument" of which Lycos complains is, again, an explanation of the contrary facts to which CSI cites as well as an explanation of the reasonable inferences to be drawn in CSI's favor from those facts. |
| 3. | Beginning in 1998 and continuing through 2001, CSI and Lycos entered into approximately 125 renewals or refinancings of existing equipment schedules.[7] | Disputed. During the relevant time, Lycos negotiated and entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it[8]. These were not "refinancings"[9] - a term Lycos continually employs to equate the | • Because CSI provides no specific evidence that the parties did not enter into approximately 125 renewals or refinancings of existing equipment schedules from 1998 through 2001, | • CSI has already said above (¶ 1) that it does not dispute that it entered into 125 equipment schedules. It does not agree – and has disputed evidence |

---

[3] *Id.*
[4] CSI's Mem. Supp. Mot. Dismiss Def's Contercl. at 3 (Dkt. No. 16) (Mar. 10, 2005).
[5] See Master Lease § 5, attached as Ex. 1 to the accompanying Declaration of Edward W Little, Jr. (hereinafter, "Little Decl.").
[6] CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc.'s Motion to Dismiss Defendant Lycos, Inc.'s Counterclaim, dated Mar. 10, 2005, at 3-4 (Dkt. No. 16).
[7] E.g., Ex. 4; Ex. 5 at CSI0035654.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | leases with loans (and which was rejected by the Court) — but were new leases which helped Lycos achieve its stated goals of lowering monthly rent payments.[10] Lycos's officers — including its Vice President of Finance and Administration. Thomas Guilfoile — have confirmed under oath that Lycos not only understood them to be leases but were reported as such in the company's public financial statements.[11] | Lycos's facts should be deemed admitted.<br><br>• CSI assertion that the transactions are not "refinancings" but new leases is, in addition to being only a semantic dispute, is improper argument that should be stricken. Indeed, the word "refinancing" does not determine or even imply whether, as a matter of law under the Uniform Commercial Code, a transaction is a loan or a lease. The term is used in both lease and loan transactions. Finally, CSI's allegations that are not responsive to Lycos's facts should be stricken as non-responsive. | which it cites – negating Lycos' statements that there were "refinancings," a term more suited to loans. CSI has already provided evidence in its responses that none of these equipment schedules – whether original schedules of extensions – were loans or could be construed as loans.<br><br>• Lycos' protestations that the terms it uses do not imply the transactions were loans is at odds with the UCC § 1-201(37) arguments it makes, and it provides no citation for the position that "refinancings" is a term used in both lese and loan transactions.<br><br>• CSI's statements are responsive to Lycos' citation of "facts," including contrary record facts as well as the inferences to be reasonably drawn from those facts |

---

[8] *See*, for example, Ex. 26 to the summary judgment Affidavit of Peter Acton ("Acton Aff., dated September 4, 2007 (equipment schedule 66B stating clearly that the equipment thereunder was already "installed at Lycos location under Equipment Schedules Forty-three and Forty-eight" to the Master Lease).

[9] Fleming Aff. ¶¶ 17-21; Johnson Aff. ¶¶ 14-20; Schallheim Aff. ¶¶ 11-12 (all attached, respectively as Exs. 3-5 to the Declaration of Kelly A. Gabos, dated Nov. 12, 2007 and filed herewith ("Gabos Decl."); Guilfoile Dep. At 203:4-11 (Gabos Decl. Ex. 2).

[10] Deposition of Brian Real ("Real Dep.") at 11:3-0 (Little Decl. Ex. 3).

[11] Deposition of Thomas ("Guilfoile Dep." At 203:4-11 (Little Decl. Ex. 2).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| 4. | In late 2001, Lycos and CSI entered into the largest of such refinancings combining over thirty of the extant equipment schedules onto two schedules known as schedules 93 and 94.[12] Lycos's obligation to make the monthly payments due under these schedules was secured by a declining balance $11 million letter of credit on which CSI could draw if Lycos defaulted on its obligation to make the payments under those schedules.[13] Subsequently, Paul Stenberg, CSI's account representative for Lycos,[14] wrote to CSI's Chairman that he had eliminated the credit risk that Lycos might default with that letter of credit.[15] | Disputed as misleading, but not material. The equipment schedules that were rewritten into Schedules 93 and 94 are clearly identified in the documentation exchanged between CSI and Lycos.[16] At the time of execution of Schedules 93 and 94, the parties agreed that CSI's performance under the new schedules was "conditioned upon [Lycos'] delivery to [CSI] of an irrevocable, unconditional standby letter of credit" under agreeable terms.[17] In an effort to assist Lycos, the $11 million amount of the letter of credit was actually much less than it otherwise would have been, as CSI structured the deal to leave the existing debt in place on the existing Schedules.[18] | • Because CSI admits that its "dispute" with Lycos's factual assertion is not "material," CSI's disagreement with Lycos's facts cannot create a genuine issue of material fact.<br><br>• Lycos's facts, all of which are undisputed in the record, should be deemed admitted because CSI does not provide any specific facts controverting those facts.<br><br>• The last sentence should be stricken as argumentative. | • Lycos misinterprets CSI's statements. CSI is not stating that its "dispute" with Lycos is immaterial; rather, CSI states that the points raised by Lycos are "immaterial" or "misleading," but that CSI is addressing them with its own evidence.<br><br>• CSI disputes Lycos' "facts" as misleading and provides additional facts demonstrating why the inferences Lycos asks this Court to draw are improper, given that it is the moving party on summary judgment.<br><br>• The last sentence is not "argumentative" and is in fact derived from deposition testimony in this case (and it is cited to such). |

---

[12] Ex. 6 at CSI027498; CSI0027565-67; Ex. 7 at CSI0027656; CSI0027741-43.

[13] Ex. 8 at CSI0025463; CSI0025466-468; *see* Ex. 6 at CSI00CSI0027566; ¶ 3; Ex. 7 at CSI0027742, ¶ 4.

[14] Ex. 32 at 29:20-30:19; 31:15-32:7.

[15] Ex. 35 at CSI042454.

[16] Acton Aff. Exs. 6, 7.

[17] Acton Aff. Ex. 6 at CSI0027566; Ex. 7 at CSI0027742 ¶ 3.

[18] Deposition of Philip Cagney ("Cagney Dep.") at 245:7-19; 256:2-0 (Little Decl. Ex. 4).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| 5. | On June 16, 2003, CSI offered to sell for $4.69 million the equipment on all extant equipment schedules that Lycos had been leasing from CSI.[19] The draft sales agreement that CSI's Associate General Counsel, Joan Kersting, sent to Lycos provided that Lycos would "take full title" to the equipment at the end of the term of each schedule.[20] That draft did not, however, contain an affirmative statement that Lycos would make all remaining payments due on those schedules.[21] | Disputed. The draft offer to sell equipment at $4.69 million was just that — an "offer" — which was rejected by Lycos.[22] The conditions of the draft offer to sell the equipment to Lycos were clear, and included among other things, that (a) CSI would retain title to the equipment until all of the existing leases terminated at their stated times (including one in late 2004 and one in 2005) and (b) title would only pass at that time provided Lycos was not then in default under the leases, including in its lease payment obligations.[23] Lycos is incorrect that there was no "affirmative statement that Lycos would make all remaining payments due on those schedules," as the proposed agreement from Ms. Kersting made clear that title would not pass until all payments were made. Moreover, CSI has made clear that it relied on these statements and agreed to sell the equipment to Lycos "which it would not have done but for Lycos' misrepresentations."[24] | • Lycos's Facts should be deemed admitted because they are supported by the record and CSI does not provide specific facts to controvert them.<br><br>• The first sentence of the Response should be stricken as improper argument.<br><br>• The first clause of the second sentence should be stricken because it is not supported by citation to the record to the extent that it suggests that title to none of the equipment on any lease would pass until Lycos had made all the payments on all the leases. The draft Sales Agreement speaks for itself. Paragraph 4 of the draft agreement, to which CSI cites, states: "With respect to each Lease, Seller retains full title to the Equipment until the date the Lease terminates as listed in paragraph 2 above." Acton Aff., Ex. 9, ¶4.<br><br>• The third sentence should be stricken because it contains no citation to the | • Lycos' conclusory statement that its "facts" are uncontroverted ignores that CSI likewise cites to the record evidence. As explained, the "offer" at issue was only an invitation to negotiate on all of the terms of the sale, and CSI disputes that there was no affirmative statement in draft agreement concerning Lycos' obligations to make all remaining payments – the draft required that title to the equipment would not pass until termination of the lease obligations including full payments on all the leases. CSI cites to that supporting evidence.<br><br>• The first sentence is not "argument" but a fact that the initial "offer" Lycos raises was rejected.<br><br>• That Lycos is arguing over interpretation of the draft Sales |

[19] Ex. 9 at CSI0023156 and CSI0023157, ¶ 3.
[20] *Id.*, ¶ 4.
[21] *See generally id.*
[22] Deposition of Susan Franklin, dated Oct. 25, 2006 "Franklin Dep.") at 129:5-14 (stating that parties were engaged in counterproposals at this time or negotiation).
[23] Acton Aff. Ex 9 at CSI0023157 ¶¶ 2, 4.
[24] *Plaintiff Computer Sales International Inc.'s Response to Defendant Lycos Inc.'s Second Set of Interrogatories*, dated Jan. 22, 2007, at 15-16 (Little Decl. Ex. 6).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | record. | Agreement – and states that the "document speaks for itself" – highlights that there is a factual dispute as to the intent of the parties based on what is written in the draft agreement. The intent of the parties cannot be resolved on summary judgment. |
| | | | • The fourth sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person who signed and verified them. | |
| | | | • In sum, if the inclusion of language in the draft Sales Agreement and exclusion of it in the Sales Agreement that was executed means anything, it means that the parties did not intend to include the language on which CSI now seeks to rely in the final agreement. | • Claims that every sentence in a response must be "cited" misreads LR 56.1. Only "material" facts must be address, though CSI addresses all of the immaterial facts raised by Lycos. CSI is also entitled, in its response, to explain the contrary facts it brings forward in addition to the reasonable inferences in its favor based on those facts. |
| | | | | • Lycos' final point is purely argumentative and offers its own "spin" on the clear factual dispute. This is appropriate for closing statements and not a dispositive motion. |
| 6. | In June 2003, Lycos retained a lease consulting firm known as LeaseForum to assist it with its equipment lease buyout negotiations with CSI and | Disputed and misleading. The letter from Julie Callagee of Lycos informing Paul Stenberg of CSI that Lycos had "retained Leaseforum, Inc., to perform various services with respect to the assessment, negotiation and execution of | • CSI while providing additional information, does not dispute any of Lycos's properly supported factual assertions. Accordingly, Lycos's | • Lycos' "facts" are misleading and incomplete, and CSI therefore disputes them with contrary evidence as stated. For example, though Lycos |

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | Lycos's other technology equipment lessors,[25] and notified CSI that it had done so.[26] Mr. Stenberg, however, did not want to negotiate with a lease consulting firm.[27] | leases" is dated June 27, 2003.[28] Leaseforum through its principal Susan Franklin, had contacted Mr. Stenberg by phone earlier that day.[29] Mr. Stenberg testified he received this call "out of the blue' and had "no idea that was coming."[30] When he received her call, Mr. Stenberg was unsure whether Ms. Franklin represented Lycos and, after being informed by Lycos that she did, he negotiated with her. | facts should be deemed admitted. | claims Mr. Stenberg "did not want to negotiate" with Lycos' agent Leaseforum, Mr. Stenberg's denies this (and CSI cites this). This is a clear factual dispute. |
| 7. | On July 1, 2003, Lycos's Chief Financial Officer informed Mr. Stenberg that if he were unwilling to negotiate with LeaseForum, Lycos would authorize LeaseForum to perform a full audit of the CSI-Lycos leases.[31] After cautioning Mr. Lucy by saying "easy tough guy,"[32] Mr. Stenberg advised LeaseForum that CSI would reduce its price for the equipment to $3.775 million but that this offer would expire if not accepted by July 15, 2003.[33] | Disputed and misleading. The implication of Lycos' statement is that Mr. Stenberg was intimidated by Lycos' threat to do an audit of the CSI-Lycos leases. In fact, Mr. Stenberg testified he was not worried about any audit and he told Mr. Lucy of Lycos to "go ahead and do it [the audit]."[34] | • Because CSI responds only to what it calls the "implication" of Lycos' statement and does not provide any specific evidence of any dispute to dispute Lycos's properly supported facts, Lycos's facts should be deemed admitted. | • Lycos is ignoring that Mr. Stenberg testified that he told Mr. Lucy to "go ahead and do it [the audit]." He clearly was not cowed into lowering CSI's asking price, which is the inference Lycos gives its facts – and which Lycos disputes with its own facts showing a more favorable inference in its favor (as is required toward the nonmoving party at summary judgment). |

---

[25] Ex. 10 at LYC18884 (definition of "Work").
[26] Ex. 11.
[27] Ex. 32 at 295:9-17.
[28] Acton Aff. Ex. 11.
[29] Franklin Dep. At 117:15-118:10 (Little Decl. Ex. 5).
[30] Acton Aff. Ex. 32 at 295:12-17.
[31] Ex. 12.
[32] Ex. 36.
[33] Ex. 32 at 309:7-11.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | |
| 8. | On July 14, 2003, Susan Franklin of LeaseForum sent an e-mail to Mr. Stenberg, on behalf of Lycos, accepting the $3.775 million offer.[35] Mr. Stenberg, who negotiated the sale on behalf of CSI, admitted at his deposition that the parties reached an agreement on price on July 14, 2003.[36] Ms. Kersting, who negotiated the legal aspects of the Sales Agreement through Mr. Stenberg,[37] also admitted at her deposition that there was an agreement on price on July 14, 2003.[38] | Disputed.  Though the parties may have agreed by July 14, 2004, on one of many terms for a buyout — that being the price (without which further negotiation would not occur) — Ms. Franklin's July 14, 2003 e-mail makes clear that this is but one step in concluding a deal. After agreeing to the purchase price of $3.775 [sic], Ms. Franklin states:<br><br>Please prepare and present the appropriate documentation to my attention to review and comment, if any. ***I will forward the documents to Lycos for their acceptance*** and facilitate the execution thereof; Lycos will exercise its best efforts to turn the documentation around by July 15th and wire the purchase price by July 18th.[39]<br><br>Ms. Franklin also attaches to here-mail an addendum of additional terms for CSI's review.[40]  That Lycos needed and was waiting for the approval of its parent company, Spanish telecommunications conglomerate Terra | • Lycos's facts state only that the parties had agreed on a price for the buyout as of July 14, 2003.  In the third sentence of its response to paragraph 9, CSI admits this; CSI also implies its admission of this fact in the first sentence of this paragraph.  Accordingly, Lycos's facts should be deemed admitted.  The balance of CSI's response should be stricken as non-responsive and improperly argumentative.<br><br>• Moreover, the timing of Lycos's acceptance of CSI's offer and the specific point at which the parties reached a binding agreement as a matter of law is immaterial to CSI's reliance.  What is material is when CSI was willing to enter into the Sales Agreement and on what terms it was willing to agree at that time.  CSI was willing to sign and enter into the Sales Agreement before July 14, 2003, even | • Lycos cannot use the terms "offer" and "acceptance" without implying that a contract for sale of the leases equipment was reached as of July 14, 2003 – which is absolutely false.  The reasonable inference in CSI's favor, as shown by the evidence it cites, is that the parties agreed on only one term – price – but had more terms to work out in the drafting process.<br><br>• CSI uses the facts cited in its response in opposing the arguments in Lycos' summary judgment papers.  Striking them is therefore not an proper.<br><br>• Lycos' argument concerning "reliance" is just that – an |

---

[34] Acton Aff. Ex. 32 at 295:21-24.
[35] Ex. 29 at AR001433.
[36] Ex. 32 at 309:12-21.
[37] Ex. 13 at 195:7-196:14.
[38] *Id.* at 252:20-7.  Ms. Kersting is an officer at CSI.  Ex. 15 at 288:4.
[39] Acton Aff. Ex. 29 at AR001433.
[40] *Id.*
[41] E-mail from Brian Lucy to Paul Stenberg dated July 24, 2003 (Little Decl. Ex. 7).
[42] Little Decl. Ex. 13 (executed Sales Agreement).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | Networks, is undisputed, as is clear in Brian Lucy's e-mail to Paul Stenberg of July 24, 2003, in which he states:<br><br>I'm in Spain right now for the earnings release. At the same time I'm trying to get my boss, Elias, to give me the green light. **He's close to approving this, but hasn't formally done so just yet.**[41]<br><br>In fact, there is no dispute that Sales Agreement Number 199614 (the "Sales Agreement") was not executed by Lycos until August 8, 2003 (by Mr. Lucy), followed by CSI's execution three days later on August 11, 2003.[42] | though the draft agreement it sent to Lycos in June, 2003, did not contain the affirmative representation of Lycos on which CSI relies to support its fraud claim. Indeed, as CSI concedes, all that was required at that point was Lycos's acceptance. | argument that discusses Lycos' particular "spin" on the facts. This is not proper on summary judgment and only highlights the existence of factual disputes.<br><br>• Lycos cannot state that "CSI was willing to sign and enter into the Sales Agreement before July 14, 2003" in light of the evidence cited by CSI that there were additional terms to discuss and given that continuation of the payments under the leases had been discussed in connection with any sale as early as October 2002. |
| 9. | Attached to Ms. Franklin's July 14th e-mail accepting CSI's $3,775,000 offer was an attachment that, for the first time, restated Lycos's pre-existing obligation to continue making the monthly rental payments due under the equipment schedules then in effect.[43] Ms. Kersting testified at her deposition that this statement did not impose any new payment obligations on Lycos | Disputed and misleading. Lycos is alleging that the parties had reached a deal prior to any discussion concerning a "reaffirming" by Lycos of its obligations to make payments under the lease — thereby implying that the obligation to "reaffirm" was not material to CSI. In fact, CSI has made clear that it would not have consummated the Sales Agreement without Lycos reaffirming its obligations to make all payments under the existing leases.[45] Also, months earlier in October 2002, CSI had given Lycos a buyout price of $4.69 million under | • While CSI responds to what it thinks Lycos's facts "imply," as opposed to what they say, it does not provide specific facts to controvert them. Accordingly, Lycos's properly supported facts should be deemed admitted.<br><br>• The first and fourth sentences (beginning with the words "Lycos is alleging" and "Again") of the Response are not supported by any | • CSI cites specific evidence rebutting Lycos' assertions that CSI was willing to sign a sales agreement with Lycos without any provision requiring that Lycos affirm its lease obligations. The material facts cited by CSI rebut this.<br><br>• Not every sentence in a response to facts needs a |

---

[43] Ex. 29 at AR001434, ¶ 2.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | under the existing equipment schedules.[44] | which it expressly provided that "[t]itle [of equipment] will pass to Lycos at the expirations of these leases.[46] Again, all that the parties had reached agreement on was the price for a transaction, and other terms had to be negotiated along with final approval from Lycos' parent company in Spain — a point which Lycos made clear to CSI. As stated previously, the draft offer submitted to Lycos on July 16, 2003, by Ms. Kersting of CSI's legal department makes clear that payment on the leases must continue (and, in fact, title in the equipment being sold expressly did not pass to Lycos[47] until all remaining rent payments were made). | citation to the record. Accordingly, they should be stricken.<br><br>• The second sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.<br><br>• The final sentence of CSI's response, which addresses what it thinks the July 16, 2003 offer by Ms. Kersting "makes clear," should be stricken as improper argument.<br><br>• Finally, as with many of its previous responses, CSI's response should be stricken not only as non-responsive, but wholly immaterial as a matter of law. CSI once again attempts to confuse the issues by citing in its response language that is not a statement of Lycos and is not the affirmative language on which it claims to rely to support its fraud claim. | citation – only those facts which are material, which CSI has done.<br><br>• CSI disputes that it cannot rebut Lycos' facts with facts set forth in its interrogatory responses, which are made under oath by a CSI officer. Rule 56(c) permits interrogatory responses to be used, and this issue is addressed in CSI's Opposition brief. Additionally, CSI has provided additional supporting evidence in the form of an affidavit from CSI's president on this issue.<br><br>• CSI's reference to Ms. Kersting's testimony is a citation to the record, cites admissible evidence, and is a proper identification of not only the facts in her testimony but the reasonable inferences there from to be drawn in CSI's favor<br><br>• Lycos' claim that CSI's evidence is "immaterial as a |

---

[44] Ex. 13 at 216:5-219:9; 258:18-24; *see* CSI's Mem. Supp. Mot. Dismiss Def.'s Contercl. At 3 (Dkt. No. 16).
[45] Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories).
[46] E-mail from Paul Stenberg to Brian Lucy (Little Decl. Ex. 8) (emphasis added).
[47] Acton Aff. Ex. 9 at CSI0023157 ¶ 4.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | matter of law" is a determination for the Court. The evidence offered by CSI bears directly on – and contradicts – Lycos' assertions that CSI was not concerned with Lycos affirming its lease obligations. CSI's evidence shows that CSI was concerned and would not have entered the Sales Agreement without such assurances. |
| 10. | Specifically, Ms. Kersting testified:<br><br>Q. And the obligation to pay rent under those leases predated execution of the sales agreement, right?<br><br>[Objection by counsel]<br><br>A. The obligation to pay rent on the leases commenced on the day the leases started and were signed by the parties.[48] | Disputed as misleading. When Lycos was first considering buying out its CSI leases at the end of 2002, it had two options: it could either (a) do a "lump sum" payout of $26,819,623 and take title to the equipment upon payment, or (b) pay $4.69 million now, continue paying al of its lease obligations into the future and take title upon final payment on the leases. These scenarios were provided by Mr. Stenberg to Mr. Lucy back in October 2002, and Lycos is incorrect that "reaffirming" Lycos' lease obligations was discussed "for the first time" in July 2003 after the parties discussed price terms.[50] | • Because CSI does not provide specific evidence controverting the accuracy of Lycos's quotation from the transcript of Ms. Kersting's deposition, Lycos's facts should be deemed admitted.<br><br>• The first sentence of CSI's response should be stricken because it is unsupported by any citation to the record and is argumentative.<br><br>• While CSI contends in the second sentence that Lycos was "incorrect" in suggesting that the parties discussed "reaffirming" Lycos's lease obligations for the first time in July, 2003, nothing in Lycos's quotation | • The testimony of Ms. Kersting proffered by Lycos is incomplete and misleading. Accordingly, CSI's citation to additional evidence controverting the incomplete selection of testimony is proper and necessary to bring to the Court's attention the contrary evidence and reasonable inferences there from which preclude summary judgment on this issue.<br><br>• Lycos' unsupported statement that CSI's statement is "argumentative" is without merit for reasons previously |

---

[48] *Id* at 217:12-18.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | Q.  And the sales agreement did not impose any additional obligation to pay monthly rent under the schedules listed in Paragraph 2, did it?<br><br>[Objection by counsel]<br><br>A.  The rental remained the same.<br><br>Q.  And the number of rental payments remained the same, right?<br><br>A.  Yes.[49] | | from Ms. Kersting's transcript even addresses this issue.  Thus, CSI's response is wholly non-responsive and fails to provide any specific evidence disputing a fact averred by Lycos.<br><br>• The citations at the end of the second sentence to two e-mails appearing as Exhibits 8 and 9 to the Little Declaration do not even address whether CSI would require Lycos to <u>reaffirm</u> its rent obligations as a condition of a buyout, let alone support CSI's assertion of a specific discussion of the issue between the parties in 2002.  There is no evidence of such a discussion in the record, and CSI cites to none.  Moreover, as noted above, there was no specific representation reaffirming Lycos's lease payments even in the drafts created by CSI and sent to Lycos in June, 2003.  Accordingly, the second sentence should be stricken because the record citation does not support it. | stated.<br><br>• CSI has evidence – in the form of the draft Sales Agreement but also in the e-mail offers of Mr. Stenberg from months earlier in October 2002 – that the options for the sale included either a lump-sum payment with title to the equipment passing or a much lower payment with title passing only upon completion of all remaining lease obligations.  One such obligation is the obligation to pay rent as required under the leases.  CSI has evidence to which it cited that it would not have done the deal without this assurance <u>and</u> would not have done the sale had it known that Lycos was already at that time working with its agent Leaseforum to renegotiate those very leases.<br><br>• Lycos' reading of the October 2002 e-mails is incorrect and does not put them in context, credit their language in its totality, or provide the reasonable inferences from |

---

[49] *Id* at 217:19-218:2.
[50] E-mails of October 22 and 24, 2002 from Paul Stenberg to Brian Lucy (Little Decl. Exs. 8, 9).

ME1 7040819v.1

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | those e-mails – in connection with CSI's other evidence on this issue – to which CSI (the nonmoving party) is entitled. |
| 11. | When asked by her own counsel at deposition about her understanding of paragraph 4 of the Sales Agreement, the paragraph in which Lycos restated its obligation to make the monthly payments,[51] she said "[m]y understanding is that they [Lycos] are *reaffirming* the monthly rental obligations under the leases, beginning with the payments due August 1 and continuing through the final rent date on the exhibit."[52] | Disputed as misleading.  Ms. Kersting testified that she understood Lycos was "reaffirming the monthly rental obligations under the leases." However, CSI has testified that, without these assurances that rental amounts would continue, CSI would not have entered into the Sales Agreement.[53]  Moreover, the requirement that Lycos reaffirm these lease obligations was a condition set back months earlier, in October 2002, when Mr. Stenberg gave Lycos the options for buyout of either paying $26 million to end all obligations and take immediate title of the equipment or paying $4.69 million with title to pass to Lycos only upon complying with the remaining lease obligations (including payment through the end of the current terms which continued into 2004 and 2005).[54] | • Because CSI does not provide specific evidence controverting Lycos's one-sentence quotation from the transcript of Joan Kersting, Lycos's facts should be deemed admitted.  In fact, although CSI contends that this quotation is disputed as misleading, it then concedes that Ms. Kersting testified exactly as Lycos asserted, thereby rendering undisputed that Lycos's voluntary representation upon which CSI relies merely reaffirmed a preexisting obligation.  <br><br>• The second sentence should be stricken because, as set forth in the Motion, [sic]  <br><br>• the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.  The second sentence should also be stricken as non-responsive and | • The testimony of Ms. Kersting proffered by Lycos is incomplete and misleading.  Accordingly, CSI's citation to additional evidence controverting the incomplete selection of testimony is proper and necessary to bring to the Court's attention the contrary evidence and reasonable inferences there from which preclude summary judgment on this issue.  <br><br>• As stated above, CSI has addressed in it Opposition the issue concerning its interrogatory responses, signed under oath by a corporate officer, and the additional evidence that CSI would not have entered the August 2003 Sales Agreement without the reaffirmation of |

---

[51] Ex. 10 to CSI's Am Compl., ¶ 4 (Dkt No. 121).
[52] Ex. 13 at 258:18-24 (emphasis added).
[53] Little Decl. Ex. 6 at 15-16 (CSI's Responses to Second Interrogatories).
[54] Little Decl. Ex. 8, 9.

ME1 7040819v.1

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | immaterial.<br><br>• The third sentence should be stricken because the record evidence (Ex. 8 and 9 to the Little Declaration) to which it cites does not even address whether CSI would require Lycos to specifically reaffirm its monthly rent obligations. That Lycos would remain obligated to continue paying the monthly rents per the Master Lease Agreement says nothing about whether Lycos would be required to reaffirm that fact in the Sales Agreement, and nowhere does CSI cite admissible material indicating that it would not enter into that agreement but for the reaffirmation. As noted earlier, CSI neither requested nor added the specific representation it now claims to rely upon for its fraud claim. Additionally, even if it did, the response addresses a subject — the parties' discussions in October, 2002— that was not even addressed by Lycos and therefore cannot create a genuine issue of material fact. | Lycos' lease obligations or had it known of Lycos' and Leaseforum's undisclosed plan to renegotiate the leases it was simultaneously reaffirming.<br><br>• Lycos' reading of the October 2002 e-mails is incorrect and does not put them in context, credit their language in its totality, or provide the reasonable inferences from those e-mails – in connection with CSI's other evidence on this issue – to which CSI (the nonmoving party) is entitled.<br><br>• Lycos' points raised on this issue are, again, purely argument: the "spin" it places on disputed material facts. All reasonable inferences are to be drawn in CSI's favor, and Lycos' arguments are proper for trial, not for a summary judgment motion. |
| 12. | Ms. Kersting further testified that the language in which Lycos "reaffirmed" its payment | Disputed and misleading. In October 2002, CSI first required that Lycos reaffirm its lease obligations in the event Lycos chose one of the | • Because CSI does not provide specific evidence controverting Lycos's restatement of Ms. Kersting's | • The testimony of Ms. Kersting proffered by Lycos is incomplete and misleading. |

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | obligations was proposed by Lycos, not CSI.[55] | two options it suggested to Lycos for a buyout.[56] That Lycos' agent Leaseforum may have proposed language concerning this which was ultimately set forth in the executed Sales Agreement in early August 2003 is immaterial — reaffirming of the leases was always an important and material aspect of CSI's agreeing to the lower buyout scenario, and it would not have done the deal without those assurances.[57] | testimony, Lycos's well-supported facts should be deemed admitted. CSI's responsive [sic] should also be stricken as non-responsive and immaterial to the instant issue, i.e., that Lycos, not CSI, proposed the specific language upon which CSI now relies to support its fraud claim.<br><br>• The first sentence in CSI's response should be stricken because, as explained above, the record evidence to which it cites - Little Decl. Ex. 8 - does not support CSI's assertion that CSI required Lycos then to reaffirm its lease obligations in October 2002.<br><br>• CSI's assertion after the hyphen in the last sentence should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them. That assertion is also nonsensical. CSI could not have known in October 2002 that it would agree to lower its buyout quote in July 2003, and CSI did not add the specific representation upon which it now relies in support of its fraud claim. | Accordingly, CSI's citation to additional evidence controverting the incomplete selection of testimony is proper and necessary to bring to the Court's attention the contrary evidence and reasonable inferences there from which preclude summary judgment on this issue.<br><br>• Lycos' reading of the October 2002 e-mails is incorrect and does not put them in context, credit their language in its totality, or provide the reasonable inferences from those e-mails – in connection with CSI's other evidence on this issue – to which CSI (the nonmoving party) is entitled.<br><br>• As stated above, CSI has addressed in it Opposition the issue concerning its interrogatory responses, signed under oath by a corporate officer, and the additional evidence that CSI would not have entered the August 2003 Sales Agreement without the reaffirmation of |

---

[55] *Id* at 258:14-259:7.
[56] Little Decl. Ex. 8.
[57] Little Decl. Ex. 6.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | Lycos' lease obligations or had it known of Lycos' and Leaseforum's undisclosed plan to renegotiate the leases it was simultaneously reaffirming. CSI's evidence is not "nonsensical," in that it is purely common sense that a lessor would not agree to sell millions of dollars of equipment to a lessee without assurances that remaining lease obligations would be honored (including payment) and that the Sales Agreement would not be construed to alter those obligations. |
| 13. | On August 1, 2003, Lycos wired the $3,775,000 purchase price[58] and faxed a copy of the sales agreement that Lycos's Chief Financial Officer had signed on July 18, 2003 to CSI.[59] | Disputed as misleading. Though Mr. Lucy may have signed a version of the Sales Agreement on or about July 16, 2003, Mr. Lucy made clear to Mr. Stenberg on July 27, 2003, that Lycos' parent company in Spain had not as of that time authorized any buyout.[60] Though Mr. Lucy testified he was authorized to proceed with the transaction on August 1, 2003,[61] it is undisputed that the operative executed Sales Agreement was not signed by Lycos until Mr. Lucy signed it on August 8, 2003 — and that was because tax issues that arose on an earlier | • Because CSI admits that it disputes Lycos's facts only because they are "misleading," and has not presented any specific facts controverting them, they should be deemed admitted. | • CSI has presented evidence controverting Lycos' assertion that a deal was completed in July 2003 by the signature of one party (Lycos) and the wiring of funds. CSI's cited evidence shows that the operative agreement between the parties was not signed by Lycos until August 8, 2003 -- which is indisputably the day in which Lycos' agent |

---

[58] Ex. 14; Ex. 33 at 179:19-22.

[59] Ex. 3 at Ex. A; Ex. 34 at CSI045125; Ex. 13 at 206:6-11.

[60] Little Decl. Ex. 7.

[61] Deposition of Brian Lucy ("Lucy Dep") at 178:1-5 (Little Decl. Ex. 10); e-mail from Peter Karol, Lycos in-house counsel, to Brian Lucy dated August 1, 2003 (Little Decl. Ex. 11).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | version required some changes to the agreement, and was signed by CSI on August 11, 2003.[62] | | reaffirmed (in an undisclosed email to Lycos management) that it was working on "Phase 2," designed to renegotiate the leases it was simultaneously affirming in the Sales Agreement. |
| 14. | In an internal CSI e-mail dated August 1, 2003, Ms. Kersting stated that CSI had received the signed sales agreement but that there were "errors in the termination dates for [schedules] 100 and 200" that needed to be corrected.[63] | Disputed, but irrelevant. Ms. Kersting's e-mail of August 1, 2003, notes errors in the prior draft that need to be corrected as well as an issue concerning sales tax acceleration, and she testifies to substantive changes made in the Agreement finally executed by the parties.[64] Regard less of this, however, there is no dispute that the operative agreement containing the representations that Lycos would continue to perform its lease obligations (§ 4)— on which CSI relied[65] — was executed by Lycos on August 8, 2003.[66] | • Because CSI does not provide any specific facts controverting Lycos's facts, Lycos's facts should be deemed admitted.  In addition, because CSI admits that its purported disagreement with Lycos's facts is irrelevant, any disagreement cannot create a genuine issue of material fact.<br><br>• At the end of the first sentence, CSI cites over two hundred pages of Ms. Kersting's testimony (from pp. 221-223) in support of its assertion that Ms. Kersting testified the parties made "substantive" changes to the agreement.  CSI's assertion that the changes were "substantive" should be stricken as argument and as not supported by the record.  Ms. Kersting's testimony, at pp. 221-23, | • CSI provides citation to relevant evidence controverting the facts, though irrelevant, proffered by Lycos.<br><br>• CSI did not intentionally cite to 200 pages of testimony; as Lycos has understood, the citation is to only a few pages of Ms. Kersting's testimony; Lycos' assertion that the changes to the agreement were not "substantive" is its own particular, though incorrect, spin on the facts in dispute, and it must be ignored on summary judgment<br><br>• Lycos' motion to strike is clearly an attempt to |

---

[62] Deposition of Paul Stenberg, dated Aug. 24, 2006, ("Stenberg Dep.") at 310:22-311:6 (Little Decl. Ex. 12).
[63] Ex. 34 at CSI045125.
[64] Acton Aff. Ex. 13 at 21:7-223:5 (testimony of Joan Kersting).
[65] Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories).
[66] Little Decl. Ex. 13 executed Sales Agreement.

17

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | reflects that the changes were, in fact, minor. See Acton Aff., Ex. 13, at 221-23.<br><br>• CSI's assertion in the last sentence of its response that it relied on Lycos's commitment to perform its lease obligations should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them. | circumvent the Court's June 13, 2007 ruling that "no replies" be filed in the summary judgment process; its motion is in fact a reply filed under the guise of a motion to strike, and no leave to do so has been sought.<br><br>• CSI disputes that it cannot rebut Lycos' facts with facts set forth in its interrogatory responses, which are made under oath by a CSI officer. *See* CSI's opposition brief on this point. Rule 56(c) permits interrogatory responses to be used, and this issue is addressed in CSI's Opposition brief. Additionally, CSI has provided additional supporting evidence in the form of an affidavit from CSI's president on this issue. |
| 15. | On August 8,2003 and August 11,2003, Lycos and CSI, respectively, re-signed a version of the sales agreement collecting those and other minor errors.[67] That version of the sales agreement provides, in pertinent | Disputed as misleading. CSI and Lycos did not simply "re-sign" a version of the Sales Agreement on August 8 and August 11, 2003, respectively; in fact, they signed the operative version of the Sales Agreement which governed the buyout, including the representations - originally required by CSI as early as the | • Because CSI admits that it disputes Lycos's facts only as "misleading" and does not provide any facts controverting Lycos's facts, Lycos's facts should be deemed admitted. Instead of facts, CSI makes an improper legal argument concerning | • Lycos misses the point: CSI is disputing the assertions of Lycos because they are presented in a misleading manner without reference to the full record. CSI corrects this with specific, and |

---

[67] *Compare* Ex. 3 at Ex. A *with* Ex. 10 to CSI's Am. Compl (Dkt. No. 121); *see* Ex. 13 at 220:15-223:5.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | part:<br><br>A. "Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules … effective on their respective termination dates, except as stated in paragraph 5 below …";[68]<br><br>B. "Each Lease will terminate on its respective Terminate Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease."[69] Paragraph 2 states lists the "Terminate Date" for each schedule; | preceding October - that Lycos agree to satisfy all obligations under existing leases, including the obligation to pay them in full.[72]  Again, this was a condition of the transaction upon which CSI relied and without which CSI would not have executed.[73] | which version of the Sales Agreement was the "operative" one and which one "governed the buyout."<br><br>• Because the record evidence to which CSI cites - Little Decl. Ex. 13 - to support its assertion that CSI required Lycos as early as the preceding October to satisfy all obligations under existing leases, that citation does not and could not support CSI's assertion.  This assertion should therefore be stricken.<br><br>• The last sentence of the response should be stricken because, as set forth in the Motion, the sole citation is to CSI's Answers to Interrogatories, and those answers were not signed based on the personal knowledge of the person signing them.<br><br>• The last sentence is also nonsensical. The claim that CSI would not have signed the final version of the Sales Agreement absent Lycos's purported representation is belied by the fact that CSI had accepted payment of the | contrary, citations to the record.<br><br>• CSI has evidence – in the form of the draft Sales Agreement but also in the e-mail offers of Mr. Stenberg from months earlier in October 2002 – that the options for the sale included either a lump-sum payment with title to the equipment passing or a much lower payment with title passing only upon completion of all remaining lease obligations.  One such obligation is the obligation to pay rent as required under the leases.  CSI has evidence to which it cited that it would not have done the deal without this assurance <u>and</u> would not have done the sale had it known that Lycos was already at that time working with its agent Leaseforum to renegotiate those very leases. |

---

[68] Ex. 10 to CSI's Am. Compl., ¶ 1 (Dkt. No. 121).

[69] *Id.*, ¶ 2.

[70] *Id.*, ¶ 5.

[71] *Id.*, ¶ 7.

[72] Little Decl. Ex. 13 at § 4 (Lycos agrees to satisfy all lease obligations).

[73] Little Decl. Ex. 6 at 15-16 (CSI's Response to Second Interrogatories); Little Decl. Ex. 8 (October 2002 proposal for buyout allowing passage of title to equipment from CSI to Lycos only upon completion of the leases.)

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | C. "With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date"[70]; and<br><br>D. "… (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims and encumbrances of any kind except those caused or incurred by Buyer, if any …"[71] | | $3.775 million a week earlier. For CSI position to make sense, the evidence would have to show that CSI was prepared to return that entire payment to Lycos if Lycos then did not agree to include the language and representation specifically reaffirming its monthly lease payment obligations, a representation CSI never requested. The record is devoid of such evidence. | • CSI disputes that it cannot rebut Lycos' facts with facts set forth in its interrogatory responses, which are made under oath by a CSI officer. Rule 56(c) permits interrogatory responses to be used, and this issue is addressed in CSI's Opposition brief. Additionally, CSI has provided additional supporting evidence in the form of an affidavit from CSI's president on this issue.<br><br>• Lycos' final point is simply argument and is itself nonsensical: it is not disputed that the operative Sales Agreement was signed by Lycos on August 8, 2003 and by CSI on August 11, 2003. There were previous drafts which contained errors. |
| 16. | At all times before and as of the time it entered into the Sales Agreement, Lycos intended to make all of the remaining payments required under the extant equipment schedules.[74] In addition to making the $3.775 million payment under the Sales Agreement, Lycos subsequently | Disputed. Lycos' sole cited evidence that it "intended" to make all remaining lease payments under the Sales Agreement is the sell-serving summary judgment affidavit of its former Chief Financial Officer, Brian Lucy, and the fact that it actually made several rental payments after entering into the Sales Agreement. CSI has evidence, however, that on August 8, 2003 — *the very day on which* | • Other than saying that Lycos is incorrect in dating the Sales Agreement as of July 15, 2003, CSI does not dispute the facts Lycos asserted. The fact is, the Sales Agreement CSI submitted to the Court with its summary judgment papers itself says it is dated as of July 15th. See Ex. 13 to Little Declaration. | • Lycos is incorrect. CSI is disputing Lycos' factual assertions, including the date of the agreement – it was signed by the parties on August 8 and August 11, 2003, respectively – and that Lycos "intended" to pay all remaining leases, which is |

---

[74] Ex. 3, ¶ 12.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | paid CSI approximately $13.5 million in monthly payments owed under the extant equipment schedules during the next fourteen months.[75]  In fact, Lycos paid CSI all of the monthly amounts due CSI after the July 15, 2003 date of the Sales Agreement other than the approximately $301,000 CSI seeks to recover in Counts I and II of its Amended Complaint, an amount that became due from and after November 2004.[76] | *Mr. Lucy executed the Sales Agreement* which was countersigned by Lycos three days later — Lycos' agent Leaseforum, a consultant it had hired to negotiate the buyout of the CSI equipment,[77] with Julie Callagee, Lycos' Assistant Controller, their plan to renegotiate and reduce the remaining future lease payments it was simultaneously affirming to CSI that it would continue to pay:<br><br>We have completed phase 1 of the work with CSI. *Phase 2 has commenced*. The phase 2 effort is a continuation under statement of work 001 [between Lycos and its agent Leaseforum]. *Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI.  It is also conceivable that a cash settlement or payment by CSI to Lycos* | Accordingly, Lycos's facts should be deemed admitted, as the Sales Agreement speaks for itself.<br><br>• The portion of the second sentence, which suggests that Ms. Franklin and Ms. Callagee had a plan to renegotiate the remaining rent payments, should be stricken because it is argumentative and not supported by the quotation that follows and is contradicted by the record.  The e-mail says only that LeaseForum has commenced work on Phase II and what LeaseForum's plan was.  It says nothing about Ms. Callagee's or, more importantly, Lycos's agreeing with that plan.  To the contrary, Ms. Callagee testified in deposition that she did not have the authority to enter agreements on behalf of Lycos, that | factually disputed by the evidence cited by CSI.<br><br>• Lycos' point concerning Ms. Callagee's and Ms. Franklin's e-mails is nothing but a reply to CSI's contrary facts, which the Court has not allowed. Lycos can "spin" the facts whichever  way it chooses, but CSI has provided contrary facts, the favorable inference from which is that Lycos had already begun a "Phase 2" at the time it was simultaneously actively planning to renegotiate the very leases it was reaffirming.<br><br>• There is no "uncontroverted" evidence that Lycos was not |

[75] The monthly payments due totaled approximately $13.8 million.  Ex. 16, ¶ 44 and Exhibit K, column headed "Rent Payments On and After 01-Aug-2003.  Because Lycos paid all of the remaining rents due other than approximately $301,000, (Ex. 15 at 450:5-10 (the witness, Jeffrey Rousseau, was an officer of CSI at the time he testified, *id* at 189:4-6) CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121) (seeking to recover only for non-payment on schedules 100 and 200)), Lycos paid approximately $13.5 million of this amount.

[76] CSI's Am. Compl. ¶¶ 18, 25 (Dkt. No. 121).

[77] Acton Aff. Ex. 11.

[78] Acton Aff. Ex. 18 (portion of e-mail from John Kirk of Leaseforum to Julie Callagee marked "A" (emphasis added).

[79] *See supra* ¶ 8.

[80] *See supra* ¶ 13.

[81] Franklin Dep. At 348:21-349:5 (Little Decl. Ex. 5); Leaseforum presentation to TerraLycos, dated October 23, 2003 (Little Decl. Ex. 18) at AR10944.  These materials have been designated as "confidential" by Leaseforum and are therefore being filed under seal in a separate addendum.

[82] Deposition of Jeffrey Rousseau ("Rousseau Dep.") at 133:12-24 (Little Decl Ex. 16); Deposition of Kenneth Steinback ("Steinback Dep.") at 89:18-90:3 (Little Decl. Ex. 15).

[83] Deposition of Andrew Feinberg ("Feinberg Dep.") at 261:1-7 (Little Decl. Ex. 14); *see also* Acton Aff. Ex. 3 ¶ 14 and *Lycos's Local Rule 56.1 Statement on All Counts of CSI's Amended Complaint*, dated September 4, 2007, ¶ 24.

ME1 7040819v.1

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | *unrelated to the remaining payments could eventuate* and we would expect any such payment to be applied against the baseline as well as used as the basis for calculating Lease Forum's fees.  In any event the final calculation of reduction in CSI baseline costs will of course take into account our mutual success in phase I in reducing Lycos' residual buy out of the CSI Leases.[78]<br><br>Lycos' agent is confirming that it had already "commenced" an action to undo the very assurances it had just made to CSI that day.  As explained above, Lycos is incorrect in dating the Sales Agreement as July 15, as it was not executed by Mr. Lucy on behalf of Lycos until August 8, 2003 and CSI three days later.[79]  Again, Lucy had no authority to bind Lycos as of July 15.[80]  In addition, Lycos claim that it paid all lease amounts other than $301,000 (which it continues to withhold) is not indicative of its intent at the time it entered into the Sales Agreement, and the evidence shows that Lycos was implementing its plan to renegotiate the CSI leases in October 2003, when Leaseforum advised Lycos to threaten CSI by taking certain steps detailed in materials *filed herewith under seal*.[81]  Also, Lycos ceased paying on its leases much earlier in 2003, but it resumed payments[82] in order to ensure the completion of its sale to a new parent company, Korean media conglomerate Daum Communications, which closed in early fall 2004.[83] | she had not otherwise authorized LeaseForum to perform "Phase II," and that Brian Lucy, who signed the Sales Agreement and whose intent would be directly relevant to CSI's claim, had not authorized any such work by that time.  *See* ¶ 18, *infra*.  CSI does not provide any specific evidence controverting Ms. Callegee's testimony in its response to paragraph 18.  In fact, despite having deposed LeaseForum's John Kirk and Susan Franklin over four days, CSI chose not to ask them whether anyone at Lycos had agreed to LeaseForum's "plan" or even authorized LeaseForum to provide any work on so-called "Phase II."  In fact, it is undisputed that the parties did not enter into Statement of Work 2 until October 2003.<br><br>• CSI's characterization of LeaseForum's "agent" for the purpose of conducting Phase II in an attempt to attribute LeaseForum's statements to Lycos should be stricken as argumentative and unsupported by any citation to the record.  Given the uncontroverted evidence that Lycos had not authorized any further work by LeaseForum at that time, CSI cannot possibly show that LeaseForum was Lycos's agent in connection with Phase II. | aware of what Leaseforum, with whom it had an agency relationship, was doing on its behalf.  In fact, it never attempted to correct the email it received on August 8, 2003 from Mr. Kirk – the inference being that it approved that its agent Leaseforum had "commenced" Phase 2, its effort to renegotiate the CSI leases.<br><br>• CSI's statement that Mr. Lucy's summary judgment affidavit is "self-serving" reflects on Lycos, in that it is Lycos that is submitting an affidavit from Mr. Lucy that directly contradicts his deposition testimony.  This is addressed in CSI's opposition brief. |

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | • CSI's characterization of Mr. Lucy's affidavit as "self-serving" should be stricken as argumentative. Mr. Lucy left Lycos's employment in 2004, has no current relationship with Lycos or its parent, and no interest in this litigation. | |
| 17. | On August 8, 2003, John Kirk, who was responsible for generating new business for LeaseForum,[84] sent an e-mail to Lycos's Assistant Controller, Julie Callagee,[85] that CSI has alleged provides the basis for its fraud claim.[86] In that e-mail, Mr. Kirk states that "Phase 2 has commenced. The phase 2 effort is a continuation under statement of work 001. Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI."[87] | Disputed in part, and misleading. First, Mr. Kirk had many duties for Leaseforum while he worked with Lycos, including "[t]o work with the members of the team to understand their strategy and their sales approach" and to "[h]elp clients [of Leaseforum] to get the most out of their leasing programs"[88] not just to market service, as Lycos claims. Second, CSI is alleging that the e-mail from Mr. Kirk is only one piece of evidence manifesting Lycos' intent to defraud CSI.[89] | • CSI's response should be stricken as wholly non-responsive. Nowhere did Lycos claim that John Kirk's only responsibility was generating new business; it simply said that he as responsible for generating new business, a fact CSI does not dispute. Because CSI does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• With respect to the second sentence, nowhere did Lycos contend that Mr. Kirk's e-mail was the only basis for CSI's fraud claim. It simply relied on CSI's Amended Complaint for the assertion that the e-mail was the basis of its fraud claim. Accordingly, there is no genuine issue of material fact in | • CSI has provided evidence controverting Lycos' assertion and its implication. Again, CSI is entitled to all reasonable inferences on summary judgment, and the evidence provided by CSI in its response does that.<br><br>• Lycos alleged that the e-mail in question provides "the" basis for CSI's fraud claim. Its reasoning after the fact does not undo or negate its earlier assertion, to which CSI responded. |

---

[84] Ex. 17 at 87:21-88:23.
[85] Ex. 18.
[86] CSI's Am Compl., ¶ 44 (Dkt. No. 121); Ex. 18 at LYC19440.
[87] *See supra* ¶ 16.
[88] Acton Aff. Ex. 17 at 88:7-10; 89:1 1-12.
[89] *See supra* ¶ 16.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | dispute on this matter. | |
| 18. | When questioned about the e-mail at her deposition, Ms. Callagee testified that: "It looks like John is a little eager here and they wanted to continue to—to continue working, yes."[90] Ms. Callagee also specifically and repeatedly testified that Lycos did not authorize LeaseForum to perform the work described in Mr. Kirk's e-mail until an agreement between LeaseForum and Lycos was signed in October 2003.[91] Ms. Callagee further testified that, as Lycos's Assistant Controller in 2003, she did not have the authority to enter into any contracts on behalf of Lycos[92] - including with respect to the work LeaseForum had proposed—and that Lycos's Chief Financial Officer, Mr. Lucy, who was reticent to proceed with the audit, would need to authorize it.[93] In her e-mail response to Mr. Kirk two days later, Ms. Callagee requested a proposed fee schedule for the work and stated that Mr. Lucy "is expecting a much lower | Disputed. It is undisputed that Leaseforum was an agent of, and working for, Lycos long before August 8, 2003. In fact, Lycos and Leaseforum had executed a Statement of Work 1 ("SOW 1") as of June 17, 2003, in which Leaseforum would review Lycos' current leasing practices and, among other things, "outline available options" for Lycos.[95] Under SOW 1, Leaseforum was entitled to receive twenty-five percent (25%) of monies saved by Lycos in its lease negotiations with Lycos' lessors.[96] As of August 8, 2003, Mr. Kirk of Leaseforum was working for Lycos, and his e-mail to Ms. Callagee at Lycos does not say "Phase 2" was being contemplated or discussed, but that it "has commenced."[97] A reasonable inference arising from Ms. Callagee's e-mail back to Mr. Kirk two days later seeking "a much lower rate than phase one given the favorable outcome there"[98] is that Lycos simply wants a better price for work that its agent had already started — not that Leaseforum may not continue implementation of the stated plan "to reduce Lycos remaining future payment obligations to CSI" or to achieve a "cash settlement or payment by CSI to Lycos."[99] Importantly, there is no evidence that anyone at Lycos (including Ms. Callagee) ever responded to Mr. Kirk that Leaseforum should stop work on | • Lycos's facts are based exclusively on the testimony of Ms. Callagee and an e-mail Ms.. Callagee sent. While CSI claims to dispute Lycos's facts, because it has not provided any specific evidence controverting those facts, those facts should be deemed admitted. In fact, despite having taken four days of Ms. Franklin's and Mr. Kirk's depositions, CSI chose not to elicit testimony from them on this issue. It also chose not to elicit testimony from Mr. Lucy on it either.<br><br>• The penultimate sentence of the paragraph, which purports to set forth a "reasonable inference" from Ms. Callagee's e-mail, is argument that should be stricken. That so-called "inference" is directly rebutted by Ms. Callagee's uncontroverted testimony.<br><br>• Because the last sentence is not supported by citation to the record, it, too, should be stricken. | • Lycos is simply incorrect. Among other contrary evidence cited, CSI puts for the detailed agreements between Lycos and Leaseforum, one of which allows Leaseforum – which it knew would be a witness in this case – an improper contingent interest in the outcome of the litigation. Again, a reasonable inference from the August 8, 2003 email and the other facts, including the relationship between Lycos and Leaseforum, is that Lycos had "commenced" is efforts to renegotiate leases in connection with an agreement it had signed that day which reaffirmed its obligations under those leases.<br><br>• Ms. Callagee's testimony is not "uncontroverted," as Lycos alleges. The facts cited by CSI, and the reasonable inferences from them, controvert her self-serving |

[90] Ex. 20 at 185:4-11.
[91] Id. at 197:21-198:20; 199:14-201:7.
[92] E.g., id. at 243:2-21.
[93] Id.; see id. at 190:724; 201:16-202:3; 205:11-19.

24

ME1 7040819v.1

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | rate" for LeaseForum's Services.[94] | implementing "Phase 2." | | testimony given on behalf of Lycos as its Rule 30(b)(6) designee.<br><br>• Lycos argument concerning the "last sentence" seeks CSI's proving of a negative. Lycos still has come forward with no evidence that Lycos asked its agent Leaseforum to cease "Phase 2" which Leaseforum said it had "commenced." |
| 19. | On August 13, 2003, LeaseForum exchanged e-mails internally concerning a "first pass" draft of a statement of work for the proposed audit of the CSI-Lycos relationship.[100] Among other things, that draft did not specify the rate LeaseForum would charge Lycos.[101] | Disputed. As stated above, Mr. Kirk stated on August 8, 2003 that "Phase 2 has commenced," which includes the "current work, … " aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI - which Lycos had just represented to CSI that day it would pay in full - and to seek a "cash settlement or payment by CSI to Lycos." It is reasonable to infer from this that work had already begun, and Ms. Callagee's e-mail two days later states only that Lycos wanted a better price, not that the work begun by Leaseforum | • Because CSI does not provide specific facts controverting the facts in the first sentence o Lycos's facts, those facts should be deemed admitted.<br><br>• As for the second sentence of Lycos's facts, the last sentence of CSI's response indicates that CSI's dispute is not "material."<br><br>• The second sentence of CSI's response, which again addresses what | • CSI has provided specific facts to controvert Lycos' assertions. Lycos' saying that CSI did not does not make it so.<br><br>• As stated, it is not the "dispute" that is not material – there is a dispute of fact on the point raised by Lycos. However, the fact raised by Lycos is not "material" to |

[94] Ex. 19 at LYC23992.
[95] Statement of Work No. 1, dated June 17, 2003, between LeaseForum and Lycos (Little Decl. Ex. 17).
[96] Little Decl. Ex. 17 at LYC18884.
[97] Acton Aff. Ex. 18 at LYC19440.
[98] Acton Aff. Ex. 19 at LYC23992.
[99] Acton Aff. Ex. 18 at LYC19440.
[100] Ex. 21; Ex. 22 at AR000806.
[101] AR000806.

ME1 7040819v.1

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | should not continue. The draft Statement of Work No. 001 - which provided that Leaseforum would negotiate with [CSI] … with the objective of establishing a financial 'settlement' regarding the business relationship" between CSI and Lycos - did not specify the "Baseline" the parties would use to determine Leaseforum's compensation, but it did specify that Leaseforum would receive twenty percent (20%) of the "difference between the Settlement and the 'Baseline,'" once the baseline was set.[102] | CSI believes "it is reasonable to infer," is improper argument that should be stricken. | Lycos's motion for summary judgment.<br><br>• It is not "improper argument" to present facts and explain their reasonable inference in favor of the nonmoving party. In fact, allowing the nonmoving party all reasonable inferences is required on summary judgment. *See, e.g., Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c)). |
| 20. | Not until almost two months passed did Lycos and LeaseForum actually enter into an agreement with respect to LeaseForum's audit of the CSI-Lycos lease relationship.[103] In a statement of work dated October 8, 2003, the parties agreed that "LeaseForum will … analyze past and current leasing activity with [CSI] with the objective of establishing a financial settlement regarding compensation received, | Disputed and misleading. Again, when the actual agreement was signed which memorialized "Phase 2" - admittedly begun at least as of August 8, 2003, according to Mr. Kirk's e-mail of that date[106] - is not relevant. In fact, the signed Statement of Work No. 002 states that "Client [Lycos] desires ***to continue a partnership*** with LeaseForum,"[107] a reasonable inference being that this was simply memorializing a course of action that had "commenced" at least as early as August 8, 2003. | • CSI does not dispute the date of SOW2; it simply says the date is irrelevant. Because CSI has not provide specific evidence controverting Lycos's facts, and because CSI's assertion is argument rather than fact, Lycos's well-supported facts should be deemed admitted.<br><br>• The portions of the second sentence of CSI's Response that reflects CSI's "reasonable inference" should be | • CSI's evidence demonstrates that the signing of the Statement of Work memorialized the "continuation" of a pre-existing partnership between Leaseforum and Lycos. The remaining points by Lycos are simply argument.<br><br>• Lycos' second point is argument and provides no basis to strike CSI's evidence. |

---

[102] Acton Aff. Ex. 22 at AR000806.
[103] Ex. 23; *see* Ex. 20 at 197:21-198:20; 199:14-24; Ex. 24 at 564:10-23.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | or contracted future obligations due CSI from" Lycos.[104]  It went on to say that Lycos:<br><br>will provide, in a timely fashion, all documents requested by LeaseForum … deemed necessary by LeaseForum to establish a complete picture of end of lease obligations … and [Lycos] will make accessible to LeaseForum information regarding invoices paid by [Lycos] to CSI.  [Lycos] will provide LeaseForum access to key personnel … to the extent reasonably necessary for LeaseForum to perform the Services.[105] | | stricken because it is argument, not fact.  In addition, CSI's purported inference is misleading as this statement in SOW2 refers to the parties work on the buyout and Sales Agreement under SOW1.  There is no evidence that this statement refers to the work contemplated under SOW2, and CSI has elicited no testimony from any witnesses to support its claim that it did. | See previous point. |
| 21. | Not until October 27, 2003, did LeaseForum deliver a presentation and report to Lycos summarizing the results of its audit.[108]  Among other things, that report stated that: | Disputed as misleading.  Again, it is not relevant at what point Leaseforum may have formally presented its findings of its "Phase 2" investigation of the CSI-Lycos leases; what is relevant is whether Phase 2 began at or before the time Lycos entered into the Sales Agreement reaffirming its obligations to satisfy | • While CSI says that it "disputes" Lycos's assertions, it then admits that its dispute is immaterial and fails to respond to the cited facts.  Therefore, Lycos's facts should be deemed admitted.  The last part of the last | • CSI is not saying that the dispute on the facts is "immaterial" – only that the facts initially proffered by Lycos are not material to its summary judgment motion.  In |

[104] Ex. 23 at LYC18887 (emphasis supplied).
[105] *Id*. (definition of "Work").
[106] Acton Aff. Ex. 18.
[107] Acton Aff. Ex. 23 at LYC18887.
[108] Ex. 30.

ME1 7040819v.1

27

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | • In an "expected market outcome," Lycos would have paid CSI $46.3 million to lease equipment with an original cost of $43.59 million, yielding CSI a return of 13.48 to 21.44%;[109]<br><br>• As a result of the CSI-Lycos refinancings, Lycos was expected to pay CSI $82.5 million to lease equipment that had an original cost of $43.59 million.[110] | its obligations under the leases with CSI. Mr. Kirk's e-mail of August 8,2007, clearly states that "Phase 2" had already "commenced" on or before the date that Lycos entered the Sales Agreement (August 8, 2003).[111]  The formal presentation made by Leaseforum to Lycos in October is, however, significant for other reasons[112] that Leaseforum had communicated its findings to Lycos well prior to the execution of the Sales Agreement, and was restating them in the presentation mentioned in this paragraph. | sentence, in which CSI claims that Lycos had communicated its findings well prior to execution of the Sales Agreement, is unsupported by citation and should be stricken. | fact, CSI disputes Lycos' assertions with facts, and it cites to those facts. |
| 22. | On November 19, 2003, LeaseForum made a presentation to Lycos's outside counsel similar to the one it had made to Lycos at the end of October.[113] | Disputed as misleading.  That Leaseforum communicated its formal findings of the investigation to Lycos outside counsel in November 2003 is not relevant; again, what is relevant is whether Lycos had begun its "Phase 2" at or before the time it executed the Sales Agreement affirming its obligations to perform all of its ongoing leases[114] — upon which CSI | • Because CSI does not present any facts to controvert Lycos's facts, Lycos's facts should be deemed admitted. In addition, any dispute CSI has admittedly "not relevant," and therefore cannot create a genuine issue of material fact. | • CSI is not saying that the dispute on the facts is "not relevant" – only that the facts initially proffered by Lycos are not material to its summary judgment motion.  In fact, CSI disputes Lycos' assertions with facts, and it |

---

[109] *See* Ex. 30 at LYC20752.

[110] *Id.*

[111] Acton Aff. Ex. 18.

[112] The presentation, for example, states that a Lycos "event" at some point between January 1997 and June 2003 was "Pressure on Operating Cash Flow," the solution for which, according to Leaseforum's investigation, was "Reduce Monthly Payments."  Acton Aff. Ex. 30 at LYC20749.  This contradicts Lycos' denial in this case that it was Lycos' idea to lower monthly lease payments (and thereby ease "pressure on operating cash flow") by extending its leases.  Among the "options" suggested by Leaseforum was a recognition that the "contracts" between the parties required payment "as billed" of $11 million in remaining rents.  *Id.* at LYC20754  Leaseforum also suggested "legal action" concerning "excess payments" for claims of unfair business practices, usury and fraud - all of which Lycos has brought or tried to bring in this case.  <u>Id</u>.

[113] Ex. 31.

[114] *See supra* ¶ 21.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | relied and without which would not have entered the Sales Agreement.[115]  It is also a reasonable inference that, just as Leaseforum had formally communicated its findings to Lycos in October 2003 prior to communicating them to outside Lycos counsel in November, Leaseforum had communicated its informal findings to Lycos much earlier, including before August 8, 2003 — which is reasonable, given Mr. Kirk's e mail of August 8, 2003 in which he claims to have already started "Phase 2" which was "aimed at setting up a negotiation to reduce" the remaining lease payments as well as prompt a "cash settlement or payment by CSI to Lycos."[116] | • The second sentence of CSI's response, beginning with the phrase, "It is also a reasonable inference," should be stricken because it is improper argument and not fact. | cites to those facts.<br><br>• It is not "improper argument" to present facts and explain their reasonable inference in favor of the nonmoving party. In fact, allowing the nonmoving party all reasonable inferences is required on summary judgment. *See, e.g.*, *Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c)). |
| 23. | Having received information from LeaseForum that indicated that Lycos had paid CSI substantially more than it should have, in mid-December 2003, Lycos filed a "bare-bones" complaint against CSI in Massachusetts Superior Court seeking (1) a declaration that it did not have any further payment obligations to CSI, and (2) return of the amounts it had overpaid CSI.[117] | Disputed as misleading, though irrelevant. First, Lycos' implication that it had only learned of its alleged claims for paying "more than it should have" in December 2003 is directly contradicted by Mr. Kirk's August 8, 2003 e-mail, Ms. Callagee's response concerning receiving a better price (and not asking Leaseforum to cease all Phase 2 work), and presentations of the formal findings to years and its counsel in October and November—all of which demonstrate that the "ball had begun rolling" on its lawsuit as early as, or before, the date it entered the Sales Agreement (August 8, 2003).[118]  Lycos filing of | • Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide any specific evidence controverting Lycos's facts, those facts should be deemed admitted.  In addition, any dispute CSI has is admittedly "irrelevant," and therefore cannot create a genuine issue of material fact.<br><br>• The balance of the paragraph — addressing what CSI describes as "Lycos's implication" — should be | • CSI is not saying that the dispute on the facts is "misleading" – only that the facts initially proffered by Lycos are misleading and not appropriate to its summary judgment motion.  In fact, CSI disputes Lycos' assertions with facts, and it cites to those facts.<br><br>• It is not "improper argument" to present facts and explain their reasonable inference in |

---

[115] Little Decl. Ex. 6 (CSI's Response to Second Interrogatories).
[116] Acton Aff. Ex. 18 at LYC19440.
[117] Ex. 26 at 1.
[118] See supra ¶¶ 16-21.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | a complaint in December 2003 is, at best, simply the culmination of work begun months earlier and not the start of the process, as Lycos claims. Moreover, Lycos had not paid CSI "more than it should have;" rather, Lycos paid CSI exactly what it had contracted to pay under the terms Lycos itself agreed to in the Master Lease and in each of the equipment schedules which it indisputably signed."[119] | stricken as improper argument. | favor of the nonmoving party. In fact, allowing the nonmoving party all reasonable inferences is required on summary judgment. *See, e.g., Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c)). |
| 24. | Before serving the complaint, Lycos corresponded and spoke with CSI in an effort to settle the matter.[120] After CSI removed that action to this Court, Lycos dismissed it voluntarily in April 2004.[121] At the time of that dismissal, Lycos was in the process of being sold, which sale was consummated in October 2004.[122] | Disputed as misleading, but not relevant. Lycos wrongfully concealed the very existence of the December 2003 lawsuit from Lycos and refused to even send CSI a copy of the alleged "report" from Leaseforum containing the claim of overcharging, until after "discussing" matter with CSI.[123] | • Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted. In addition, any dispute CSI has is admittedly "not relevant," and therefore cannot create a genuine issue of material fact.<br><br>• CSI's assertion about what "Lycos wrongfully concealed" should be stricken as argument. | • CSI is not saying that the dispute on the facts is "misleading" – only that the facts initially proffered by Lycos are misleading and not appropriate to its summary judgment motion. In fact, CSI disputes Lycos' assertions with facts, and it cites to those facts.<br><br>• It is not "improper argument" to present facts and explain their reasonable inference in favor of the nonmoving party. In fact, allowing the |

---

[119] There is no evidence in the case that Lycos' senior officers - in most cases, either Ted Philip (Lycos' CFO) or Tom Guilfoile (Lycos' Senior VP of Finance and Administration) - did not execute the Master Lease and all equipment schedules with CSI. Adding up the rents for the term of each schedule easily allowed Lycos to determine what its total payments would be under any given proposed lease re-write or new schedule. Lycos cannot dispute that it could calculate exactly what it was agreeing to pay under each schedule.
[120] *E.g.*, Ex. 27 at 216:1-218:13; Ex. 28.
[121] *Lycos, Inc. v. Computer Sales International, Inc.*, Case No. 04-10212-RWZ, Dkt. Nos. 1 and 2.
[122] Ex. 3, ¶ 14.
[123] Feinberg Dep. At 228:17-229:5 (Little Decl. Ex. 14).

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | nonmoving party all reasonable inferences is required on summary judgment. *See, e.g., Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c)). |
| 25. | In October, 2004, Lycos was sold and Mr. Lucy was replaced as CFO.[124] Having received LeaseForum's report and satisfied all of its payment obligations under all of the extant schedules other than schedules 100 and 200,[125] Lycos stopped making payments to CSI under schedules 100 and 200.[126] | Disputed as misleading. Lycos was not justified in stopping its payments because it believed it had "satisfied all of its payment obligations," as it procured the Sales Agreement through fraud by representing it would honor all of the existing lease terms without the present intent to do so.[127] Lycos stopped its payments to CSI within a few months after signing the Sales Agreement and sued CSI claiming that it should not have to make any more payments. A few months later, it dismissed that suit because the company was being sold, but then in late 2004, it again stopped its lease payments, and claimed again that it had no obligation to make them, and that CSI had to refund its previous payments. | • Because CSI admittedly disputes Lycos's facts only as "misleading," and does not provide specific evidence controverting Lycos's facts, Lycos's facts should be deemed admitted.<br><br>• The first sentence of CSI's Response about what it claims "Lycos was not justified" in doing should be stricken as argument.<br><br>• The second and third sentences should be stricken because there are citations to the record supporting any of the statements in them. | • CSI is not saying that the dispute on the facts is "misleading" – only that the facts initially proffered by Lycos are misleading and not appropriate to its summary judgment motion. In fact, CSI disputes Lycos' assertions with facts, and it cites to those facts.<br><br>• CSI provides citations to the record which controvert the initial assertions made by Lycos, which are misleading.<br><br>• The last sentences are citations to the procedural history of this case, which are shown on the docket and are known to |

[124] *Id.*, ¶¶ 1, 14.
[125] *See supra* ¶¶ 15 and 16.
[126] *See* CSI's Am. Compl., ¶¶ 18-19, 25, 26 (Dkt. No. 121).
[127] *See* e-mail from Lycos' agent Leaseforum on August 8, 2003, stating that "Phase 2" - designated to reduce its lease obligations and negotiate a cash payment or settlement - had already "commenced." Acton Aff. Ex. 18.

| ¶# | Lycos' 56.1 Statement | CSI's Response | Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|----|----------------------|----------------|-----------------------------------|-----------------------------------|
| | | | | the Court.  Further, Lycos does not claim that it disputes any of those assertions.<br><br>• Lycos cannot file a reply under the guise of a motion to strike where it has not sought leave to do so and where the Court expressly ruled in advance that "no replies" would be accepted. |

ME1 7040819v.1

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMPUTER SALES                      )
INTERNATIONAL, INC.,                )
                                    )
        Plaintiff and               )
        Defendant in                )
        Counterclaim,               )
                                    )
v.                                  )  No. 05-10017-RWZ
                                    )
LYCOS, INC.,                        )
                                    )
        Defendant and               )
        Plaintiff in                )
        Counterclaim,      &        )
                                    )
v.                                  )
                                    )
BANK OF AMERICA f/k/a FLEET         )
BANK,                               )
                                    )
        Trustee Process             )
        Defendant.                  )
                         /

VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU, ESQ.
        TAKEN BY THOMAS O. BEAN, ESQ.
ON BEHALF OF THE DEFENDANT AND PLAINTIFF IN
                COUNTERCLAIM
              FEBRUARY 22, 2007


               VOLUME II

             CONFIDENTIAL


         REPORTED BY DEBRA M. MUSIELAK
            Certified Court Reporter
         Registered Diplomate Reporter
          Certified Realtime Reporter
                MO CCR #681
              IL CSR #084-001684

         METRO COURT REPORTING, INC.
              (636) 349-3333

                                                281

1      **A.  I'm sorry, but I think I am answering**

2      **your questions.  You --**

3            MR. LITTLE:  Just calm down.  He's

4      just pushing your buttons.

5            Q.  (By Mr. Bean)  If CSI would have --

6      does CSI contend that Lease Forum and Lycos entered

7      into an agreement with respect to Phase II prior to

8      July 15th, 2003?

9            MR. LITTLE:  Objection.  Foundation.

10     Beyond the scope.  And he's already testified on this.

11           Q.  (By Mr. Bean)  Well, all right.  Let

12     me focus you then.  Go to page 15 of the answers to

13     interrogatories.

14           **A.  Okay.**

15           Q.  It says in subpar -- in paragraph B in

16     the middle of the page, quote -- and I'm four lines

17     from the bottom of paragraph B, "CSI would not have

18     entered into the sales agreement to sell Lycos the

19     equipment and would not have given up its right to

20     return the -- require the return of the equipment in

21     accordance with the provisions of the leases or

22     compensation for the loss of equipment."  And I gather

23     that's if it had known about Phase II; is that right?

24           **A.  Yes.**

25           Q.  And the agreement on price that was

1    entered between Lycos and CSI was agreed to, you

2    testified yesterday, by July 15th, 2003, correct?

3         MR. LITTLE:  Objection.

4         THE WITNESS:  No.  There was no

5    agreement.  The agreement and terms were still being

6    negotiated and there's no agreement until everyone has

7    signed it.  The price aspect of it -- the price by

8    that point had been lowered from four-six to

9    three-seven but, for instance, the remaining payments

10    due under the leases were still -- those had to be

11    ratified as part of the sale, and I think there was

12    some communications back and forth as to how many

13    months were remaining on certain leases.

14         Q.   In fact, CSI never put in its draft

15    sales agreement that the remaining payments under the

16    existing leases had to be ratified, isn't that right?

17         MR. LITTLE:  Objection.

18         THE WITNESS:  Susan Franklin modified

19    the sales agreement.

20         Q.   (By Mr. Bean) Excuse me.  Would you

21    answer my question, please.  CSI --

22         MR. LITTLE:  Okay.  I think it's

23    time -- I think it's time -- if you're going to treat

24    the witness like that, then we're going to take a

25    break.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMPUTER SALES )
INTERNATIONAL, INC., )
)
   Plaintiff and )
   Defendant in )
   Counterclaim, )
)
v. ) No. 05-10017-RWZ
)
LYCOS, INC., )
)
   Defendant and )
   Plaintiff in )
   Counterclaim, ) **CERTIFIED COPY**
)
V. )
)
BANK OF AMERICA f/k/a FLEET )
BANK, )
)
   Trustee Process )
   Defendant. )


VIDEOTAPED DEPOSITION OF JEFFREY L. ROUSSEAU, ESQ.
TAKEN BY THOMAS O. BEAN, ESQ.
ON BEHALF OF THE DEFENDANT AND PLAINTIFF IN
COUNTERCLAIM
FEBRUARY 21, 2007


VOLUME I

CONFIDENTIAL


REPORTED BY DEBRA M. MUSIELAK
Certified Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
MO CCR #681
IL CSR #084-001684

METRO COURT REPORTING, INC.
(636) 349-3333

1

1        Q.   And she's an officer of the company?

2            MR. LITTLE:  Objection.

3            THE WITNESS:  Yes.

4        Q.   (By Mr. Bean)  And you're an officer

5    of the company, are you not?

6        **A.   Yes.**

7        Q.   What facts did you find during your

8    investigation of Mr. Stenberg's expense reports?

9            MR. LITTLE:  Objection.  I'm not going

10   to allow him to answer that question on the grounds of

11   attorney-client privilege and work product.

12           MR. BEAN:  I'm looking only for facts

13   and there's no privilege as to facts.

14           MR. LITTLE:  Well, right now I'm not

15   going to let him answer.  I'll think about that

16   tonight.  We can question him about that tomorrow.

17   But that I believe is getting into the substance of

18   communications, the substance of work that he did

19   which he undertook in connection with this litigation.

20           MR. BEAN:  The reason I put the

21   word -- I was very careful about putting in the word

22   "facts" in topic number 3 on Exhibit 2, Mr. Little,

23   and I would ask you to think about this.  I'm only

24   looking for facts.

25           MR. LITTLE:  I will think about that

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **LYCOS'S OBJECTIONS AND RESPONSES TO CSI'S FIRST SET OF INTERROGATORIES** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
| Trustee Process Defendant | ) ) | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby submits its Objections and Responses to

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc.'s ("CSI"), First Set

of Interrogatories to Lycos.

## PRELIMINARY STATEMENT

Fact discovery in this case is ongoing. It is scheduled to close on January 31, 2007, more

than three months from now. In addition, no expert discovery has been taken in this case to date.

Accordingly, as set forth in the General Objections below, the responses provided herein are

based upon the present knowledge of Lycos after reasonable investigation and inquiry. Lycos

reserves the right to amend, modify, withdraw, or supplement these Objections and Responses to

Interrogatories as it deems necessary to ensure their accuracy. If it is subsequently determined

that Lycos has omitted information from these responses, such omission is neither intended to be nor shall it be construed as, a waiver by Lycos or a limitation on Lycos's rights or remedies.

In responding to any Interrogatory, Lycos reserves all objections as to the admissibility at trial of any information provided or documents identified herein. The following responses are made solely for the purpose of this action and for no other purpose. The fact that Lycos has responded to any Interrogatory or part thereof is not intended, and shall not be construed as, a waiver by Lycos of any objection. The fact that Lycos has not responded or objected to any Interrogatory or part thereof is not an admission that Lycos accepts or admits the existence of any facts or documents set forth in, or assumed by, such request or that such response or objection constitutes admissible evidence.

## GENERAL OBJECTIONS

The following General Objections are applicable to, and are hereby incorporated by reference into, Lycos's specific responses to each Interrogatory:

1.  To the extent that specific General Objections are cited in a specific response, those specific citations are provided because they are believed to be particularly applicable to the specific Interrogatory and are not to be construed as a waiver of any other General Objection applicable to that Interrogatory.

2.  Lycos objects to the "Instructions" and "Local Rule Definitions" set forth in the Interrogatories to the extent that they seek discovery of documents or information beyond the reasonable scope of discovery set forth in Fed. R. Civ. P. 26(b) and to the extent they seek to impose discovery obligations upon Lycos that differ from or exceed those set forth in the Federal Rules of Civil Procedure and the Local Rules for the District of Massachusetts.

- 2 -

BST99 1517349-4.057077.0012

3.      Lycos objects to each and every Interrogatory to the extent that it calls for the production of information protected by applicable law, including without limitation, the attorney-client privilege, the work product doctrine, or any other relevant statutory or common law privilege from disclosure.

4.      Lycos reserves the right to answer any Interrogatory, in whole or in part, by producing business records pursuant to Fed. R. Civ. P. 33(d).

5.      Lycos objects to the Interrogatories, including the Definitions therein, to the extent that they seek information that is not within Lycos's possession, custody, or control, and to the extent that they are overbroad, vague, or unduly burdensome.

6.      Lycos objects to the Interrogatories, including the Definitions therein, to the extent that they require the disclosure of any information that constitutes, reflects or reveals trade secrets or confidential proprietary information not protected by the existing protective order in this case unless appropriate safeguards are agreed upon to prevent unrestricted disclosure of such information.

7.      Lycos objects to CSI's failure to number as separate interrogatories the subparts in Interrogatories 1 and 2 as separate interrogatories in violation of Local Rule 26.1(C). Lycos reserves the right to object at a later date to the extent CSI attempts later to propound interrogatories in excess of the number permissible under that Local Rule.

8.      Lycos's objections and responses are based upon information known at this time. Lycos has not completed discovery or preparation for trial in this action and reserves its right to amend, modify, withdraw, or supplement the responses and objections set forth below. More specifically, many of the persons who are believed to be knowledgeable about the information requested are no longer employed by Lycos. While Lycos is working diligently to obtain

- 3 -

relevant information, speak with persons knowledgeable about the issues, and provide the

requested information, it necessary reserves all rights.

Without waiving the foregoing General Objections, Lycos further responds to the

Interrogatories as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 1:

1.    State the basis for, including all evidence supporting, your claim that you have
suffered damages as a result of the acts and omissions of CSI that are alleged in your amended
answer and counterclaim in this action – explaining in your answer, *inter alia,* exactly what
dollar amount(s) of damages you have suffered, how each dollar amount of damages was
calculated, which dollar amount of damages you claim was caused by which acts and omissions
of CSI, and why each dollar amount of alleged damages would not have incurred anyway in
order for Lycos to have had the use of the equipment it leased from CSI for the period it used it.

### RESPONSE TO INTERROGATORY NO. 1:

Lycos objects to Interrogatory No. 1 on the grounds that it is overly broad and unduly

burdensome, as well as premature, with more than three months remaining in fact discovery.

Lycos is still gathering and developing facts to prove all of its damages.  Those facts also may be

subject to expert analysis and opinion.  Subject to and without waiving the foregoing objections

or its General Objections, Lycos states as follows:

Rolled Up Equipment Schedules[1] - While there may be a number of ways in which Lycos

may calculate its damages on the Rolled Up Equipment Schedules, one possible formulation is

that its damages equal the amount by which (a) the net present value of the stream of lease

payments on each Rolled-Up Equipment Schedule *plus* the net present value of the residual value

of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease

Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b) the net present

---

[1]  The "Rolled-Up Equipment Schedules" include schedules 17, 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61,
65, 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C, 93 and 94.

- 4 -

value of the payments that were to have been made during the remaining term of the immediately preceding equipment schedule(s) but that were cancelled according to the terms of the Rolled-Up Equipment Schedule, *plus* the net present value of the residual value of the equipment on the immediately preceding schedule(s) attributable to assets that were leased pursuant to the Rolled-Up Equipment Schedules. In performing the analysis under sub-paragraph "(b)" above, the present value is to be calculated as of the commencement date of each Rolled Up Equipment Schedule using, as a discount rate, the implicit rate determined by CSI for the immediately preceding equipment schedule(s).

For example, schedules 45, 49, 49A, and 61 were rolled-up onto schedule 67. CSI's "FMV (Higher of C or D)" under "(a)" from the formula above equals $2,970,525.52.[2] The net present value of the remaining rents that were to have been paid under the preceding schedules totaled $2,165,212.53.[3] The net present value of the residual value of the equipment on the immediately preceding schedules attributable to assets that were leased pursuant to Schedule 67 was $271,110.65.[4] The total for sub-paragraph "(b)" is therefore $2,436,323.18. Thus, the amount of CSI's mark-up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-paragraph "(b)," was $534,202.34, or approximately 22% of the terminating values from Schedules 45, 49, 49A and 61.

Rewritten Equipment Schedules[5] - While there may be a number of ways in which Lycos may calculate its damages on the Rewritten Equipment Schedules, one possible formulation is that those damages equal the amount by which (a) the net present value of the stream of lease

---

[2] CSI0039434.
[3] This is the total of the following present values of the stream of remaining lease payments for the following schedules: 45 - $527,328..39; 49 - $429,622.99; 49A - $591,501.41; 61 - $616,759.74.
[4] The discount rate used in calculating the above present values was as follows for the following schedules: 45 – 9.21%; 49 and 49A – 9.25%; and 61 – 9.08%.
[5] The Rewritten Equipment Schedules include schedules 64B, 64D, 64F, 66C, 66E, 66G, 66I, 67B, 67D, 67F, 67H, 69C, 69E, 69G, 69I, 85, 86, 89, 89A, and 90.

payments on each Rewritten Equipment Schedule *plus* the net present value of the residual value

of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease

Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b)(i) the net present

value of the stream of lease payments over the term of the schedule it replaced *plus* (ii) the net

present value of the inferred residual value of the equipment on such replaced schedule, had that

schedule been booked. In making the net present value calculations under sub-paragraph "(b),"

the same discount rates used under sub-paragraph "(a)" should be used. To infer the residual

value under sub-paragraph "(b)(ii)", a declining balance calculation should be employed. To do

this, one should start with the original cost of the equipment and the residual value actually

booked by CSI on each Rewritten Equipment Schedule, and then calculate CSI's implied

monthly reduction in the value of the asset as a constant percentage of the remaining asset value

at the beginning of each month, and then use that constant percentage rate to infer a residual

value as of the end of the term of the schedule that was combined with each Rewritten

Equipment Schedule.

For example, Schedule 66D was rewritten as Schedule 66G two months into Schedule

66D. The "FMV (Higher of C or D)" on Schedule 66G was $408,369.80.[6] The net present value

of the stream of lease payments on Schedule 66D was $308,510.51. The net present value of the

inferred residual was $30,125.90.[7] The total was $338,636.41. Thus, the amount of CSI's mark-

up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-paragraph "(b)," was 69,733.39,

or approximately 22% of the original tangible equipment cost.

---

[6] CSI0039420. The number used by CSI and the number used herein are a penny different due to rounding.
[7] The original cost of the hardware was $321,105.00. CSI's booked a residual value for that equipment of $13,550 after 36 months. *Id.* That implies a monthly erosion in tangible asset value of 8.417252%. Thus, the implied residual after 24 months would have been $38,920.21.

BST99 1517349-4.057077.0012

The bates numbers of the documents from which Lycos's damages on the Rolled-Up Equipment Schedules and the Rewritten Equipment Schedules may be determined are listed in the e-mail (and the accompanying attachment) from Eileen Pellerin to Thomas Bean dated August 23, 2006 and the letter from Edward Little to Thomas Bean dated September 11, 2006 (collectively, the "CSI Letters"). Other documents that contain pertinent information include, without limitation, CSI0041651-41668.

While Lycos has not yet calculated the precise amount of its damages applying the foregoing formulae to each of the Rewritten and Rolled-Up Equipment Schedules (further analysis and perhaps discovery is necessary), it has determined that (a) its damages are approximately $1.3 million and $6.1 million on Schedules 93 and 94, respectively, and (b) that its aggregate damages for all Rolled-Up and Rewritten Equipment Schedules are in the range of $15.0 - $16.0 million. Lycos is also entitled to interest at the statutory rate on such amount.

The acts and omissions committed by CSI that caused damage to Lycos and of which Lycos is presently aware are described in response to Interrogatory Nos. 2 and 3. These acts and omissions damaged Lycos by at least the dollar amounts set forth above. To the extent Lycos might be required to prove which dollar amount of damages was caused by which acts and omissions of CSI, Lycos states that it has not yet made that determination because discovery remains ongoing. Lycos states generally that the acts and omissions described sub-paragraphs "A", "B" and "D" of the Response to Interrogatory No. 2 and the Response to Interrogatory No. 3 caused these damages.

Lycos would not have incurred such damages if it had known of CSI's fraudulent acts and omissions during the parties' relationship. In particular, it would not have entered into the

- 7 -

Rolled-Up and Rewritten Equipment Schedules and paid the excessive amounts required under those documents.

Sales Agreement - Lycos states that its damages in relation to the Sales Agreement are in the amount of $3.775 million, before statutory interest. As a result of the acts and omissions committed by CSI, through Paul Stenberg, as described in the Responses to Interrogatory Nos. 2 and 3 below, CSI fraudulently induced Lycos to enter into the Sales Agreement at a purchase price of $3.775 million, when the subject equipment had little or no market value. Indeed, CSI itself had determined that the fair market value threshold of the equipment was only $350,000 as early as November, 2002, a long time prior to Lycos's eventual purchase of that equipment (after that equipment had declined even further in value). CSI0041643-41646. CSI's booked residual for the equipment at the end of the equipment schedules was approximately $230,000. CSI0038070-71, CSI0039692, and CSI0039698. Neither of those facts was ever disclosed to Lycos.

Lycos's damages with respect to the Sales Agreement were caused by the acts and omissions described in response to Interrogatory Nos. 2 and 3. Specifically, Lycos overpaid by $3.775 million as a result of CSI's fraud. Because Lycos's damages arise from fraud in the sale of personal property, those damages will be automatically trebled pursuant to M.G.L. ch. 231, § 85J.

In total, therefore, based on the above, Lycos's actual damages, before any trebling, are in the amount of approximately $18.775 - $19.775 million. Lycos also would be entitled to interest at the statutory rate on its damages and to its reasonable attorneys' fees and costs.

## INTERROGATORY NO. 2:

State the basis for, including all evidence supporting, your claim that CSI engaged in fraudulent or negligent misrepresentation that caused harm to Lycos as alleged in your amended

- 8 -

answer and counterclaim in this action -- explaining in your answer, *inter alia,* exactly which individuals representing CSI engaged in which fraudulent or negligent misrepresentation in their dealings with which individuals representing Lycos, each date or dates when they did so, exactly what they said or failed to disclose that you claim constituted fraudulent or negligent misrepresentation, what you claim they should have disclosed that they failed to disclose, who at Lycos relied on any such statements or omissions to their detriment, what they did in reliance thereon, and when and how they did so.

## RESPONSE TO INTERROGATORY NO. 2:

Lycos objects to Interrogatory No. 2 on the grounds that it is overly broad and unduly burdensome, as well as premature with more than three months remaining in fact discovery. Lycos is still gathering and developing the facts to prove all of its claims. Those facts also may be subject to expert analysis and opinion. Subject to and without waiving the foregoing objections or its General Objections, Lycos states as follows:

CSI, through Mr. Stenberg, made fraudulent and negligent misrepresentations in its dealings with several Lycos employees and/or representatives of Lycos including, without limitation, Edward Philip, Thomas Guilfoile, Michael Ripps, Sam Ziba, Brian Lucy, Kevin Baillie, Julie Callagee, Monique Walsh, and Susan Franklin. CSI's fraudulent and negligent misrepresentations included, without limitation, the following:

A.    Fraudulent Acts of Commission - Mr. Stenberg intentionally misrepresented to Messrs. Lucy and Baillie in an e-mail dated March 18, 2002, that:

1.    the present value of the payments due under Equipment Schedules 93 and 94 was $23,727,000, when he knew or could readily have ascertained from CSI employees in St. Louis that that the present value of those payments exceeded $25,900,000;

2.    Lycos's obligations under the "old leases" totaled $20,215,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the *un*discounted payment obligations under those leases totaled approximately $17.6 million, and the total

- 9 -

obligations under those leases, when discounted to present value, were several million less than that;

        3.     the difference between the present value of the payments Lycos would be required to make under Schedules 93 and 94 and the obligations under the "old leases" was $3,512,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the difference between the present value of the payments under Schedules 93 and 94 and the *un*discounted obligations under the old leases exceeded $8.0 million, and the difference between the discounted payments under Schedules 93 and 94 and the discounted payments under the old leases was several million higher.

        4.     when he used a discounted present value number for Schedules 93 and 94 and an *un*discounted number for the "old schedules," he knew that such a comparison was misleading because the comparison was between "apples" and "oranges";

        5.     when the leases were refinanced, CSI recouped about 5-7% of the $3.5 million differential, when he knew or could readily have ascertained from CSI employees in St. Louis that both the percentage and the differential were false;

        6.     CSI injected a 10-13% residual in the original leases, when he knew or could readily have ascertained from CSI employees in St. Louis that, because of the multiple refinancings that had occurred before Schedules 93 and 94, CSI's remaining residual on the schedules that rolled onto Schedules 93 and 94 was at most a few percent, such that it was misleading to advise Lycos that CSI had originally injected a 10-13% residual; and

        7.     the total cost of the equipment on Schedules 93-94 was "around $63 million," when he knew or could have readily ascertained from CSI employees in St. Louis that

- 10 -

CSI's records reflected an original total cost of the equipment on those schedules, according to CSI, was approximately $34.3 million. CSI046071.

Documents evidencing the falsity of Mr. Stenberg's representations include those identified in the CSI Letters, CSI041653, and Mr. Stenberg's e-mail to Messrs. Lucy and Baillie dated March 18, 2002, LYC24631-32.

Mr. Stenberg made the foregoing misrepresentations at a time when he knew Lycos was considering "unwinding" Schedules 93 and 94 and in response to pointed questions from Messrs. Lucy and/or Baillie about the economic impact on Lycos of those schedules. *See* LYC24633. Mr. Stenberg, knowing that Lycos was relying on him for information, made such misrepresentations in an effort to induce Lycos *not* to pursue an unwinding of Schedules 93 and 94, thereby preserving a multi-million dollar windfall for CSI and himself (indeed, an unwinding may have resulted in Mr. Stenberg losing more than $1 million in commissions on those schedules alone). *See* CSI039750. Lycos would have had the right to unwind those schedules because of, among other things, the acts and omissions described in sub-paragraph "D" of this Response No. 2. Lycos, through Messrs. Lucy and Baillie, reasonably relied on Mr. Stenberg's misrepresentations. Had they known these representations were false, Lycos would (i) have unwound the transactions and/or stopped payment of monthly rent; and (ii) not have agreed to pay CSI an additional $3.775 million pursuant to the Sales Agreement.

B.    Fraudulent Acts of Commission - Echoing a misrepresentation he made in his email of March 18, 2002, Mr. Stenberg intentionally misrepresented to Susan Franklin of LeaseForum, who was acting on behalf of Lycos at the time, during a telephone call on or about June 27, 2003, that the original cost of the equipment Lycos leased from CSI exceeded $60 million, when he knew, or could readily have ascertained from CSI employees in St. Louis, that

- 11 -

the original cost thereof was much lower.  The evidence demonstrating these statements were false will include the testimony of Ms. Franklin and Mr. Rousseau, CSI's Answers to Lycos's First Set of Request for Admissions, CSI's Answers to Lycos's Interrogatories, bates nos. AR00868-869 and CSI046071, and the documents referenced in the CSI Letters.

The persons at Lycos who relied on Mr. Stenberg's intentional misrepresentations to Ms. Franklin included Mr. Lucy and Julie Callagee.  Mr. Lucy and Ms. Callagee relied on the foregoing intentional misrepresentations in (1) causing Lycos to make more than $12 million in monthly rent payments to and for the benefit of CSI with respect to the schedules then outstanding between Lycos and CSI; (2) entering into the Sales Agreement; and (3) causing Lycos to pay CSI $3.775 million pursuant to the Sales Agreement.

C.    Fraudulent Acts of Commission -  By email of June 30, 2003, in an attempt to pressure Lycos to agree to purchase all equipment on outstanding equipment schedules for $4.691 million on that day, Mr. Stenberg intentionally misrepresented to Brian Lucy that his "approval from the banks [would] expire today"[8] when he knew that no bank approval was necessary for CSI to enter the transaction and thus there was no approval expiration date on that day or any day.  Mr. Stenberg made this statement, unbeknownst to Lycos, in an attempt to secure a commission for himself on the Sales Agreement before the end (June 30, 2003) of CSI's 2003 fiscal year.

On July 1, 2003, Lycos advised CSI, through Mr. Stenberg, that if LeaseForum and CSI could not arrive at a reasonable settlement for Lycos to purchase the equipment, CSI would have LeaseForum perform a full audit of all CSI/Lycos equipment schedules. CSI042716-42717.  In response to that information, in addition to repeating his false claim that bank approval of the

---

[8] CSI042367.

- 12 -

BST99 1517349-4.057077.0012

deal had expired the previous day, Mr. Stenberg responded with yet another falsity, "easy tough guy I am not sure if I can do it anymore." *Id.* Mr. Stenberg knew at that time that his ability to enter the Sales Agreement was wholly unaffected by the passage of one day. In a subsequent e-mail on July 1, 2003 and again on July 23, 2003, Mr. Stenberg repeated his misrepresentation that he needed the banks' approval for the Sales Agreement. CSI042375-42376, AR11507.

     D.     <u>Fraudulent Acts of Omission</u> - CSI, through Mr. Stenberg told Lycos "half-truths" in connection with each Rewritten and each Rolled-Up Equipment Schedule by disclosing to Lycos the amount of the proposed new monthly payment and lease term, but failing to disclose, as he was required to do under the common law and the Attorney General's Regulations including, without limitation, 940 C.M.R. 3.16(2), and Equipment Leasing Association's Fair Business Practice provision number 7 then in effect, the following:

     1.     that the net present value of the stream of lease payments Lycos would be making under the proposed Rolled-Up and Rewritten Equipment Schedules included substantial "mark-ups" in the net present value outstanding under the existing equipment schedule(s) such that Lycos would have to pay millions of dollars above what the rental payments should have been after refinancing the schedules. For example, the net present value of the remaining stream of payments of the equipment schedules that were cancelled and rolled onto Schedule 93 plus the net book value of the respective outstanding residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687. The net present value of the stream of payments plus the net book value of the respective outstanding residuals under Schedule 93 was $1,441,368.10. *See* CSI039686 and documents identified in the CSI Letters. Thus, CSI charged Lycos a mark-up of over 930% simply to refinance the equipment onto Schedule 93. CSI failed to disclose this fact

- 13 -

to Lycos. The bates numbers of the documents supporting the foregoing factual assertions are identified in the CSI Letters.

     2.    the net present value outstanding on each equipment schedule at the time each schedule was rewritten or rolled-up. For example, CSI failed to disclose to Lycos that the net present value of the remaining stream of payments of the equipment schedules that were cancelled and rolled onto Schedule 93 plus the net present value of the respective outstanding residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687.

     3.    that the "Base Value"[9] with respect to the equipment on the Rolled-Up and Rewritten Equipment Schedules, would *not* equal the original equipment cost but, instead, would be inflated to a number selected by CSI well above that cost.[10] Throughout the parties' relationship, Addendum No. 1 to the original equipment schedules between Lycos and CSI stated that the "Base Value" would equal the "vendor list price," the "equipment cost" or the "manufacturer's list price." *See generally* the documents evidencing the original equipment schedules identified in the CSI Letters and more specifically, but without limitation, CSI034306-34309, LYC00087, and CSI004710-4712. Yet, on the Rewritten and Rolled-Up Equipment Schedules, the Base Value generally did not equal the "vendor list price" or "equipment cost." Indeed, there was no apparent relationship between the two. For example, Addendum No. 1 to Schedule 67E states that the Base Value of the equipment on that schedule was to be the "Equipment Cost." CSI032166-32168. The cost of the hardware on that schedule totaled $907,993.82. (Even if soft costs and freight were to be added to this number, the total cost was

---

[9] The Stipulated Loss Value Schedules establish the formula for determining the amount Lycos would be required to pay CSI if the equipment Lycos leased from CSI were lost or damaged. The "Base Value" is the number by which a percentage is multiplied to determine how much Lycos would be required to pay.

[10] The documents evidencing this allegation include the documents identified in the CSI Letters.

- 14 -

$966,572.05.) Yet, when the equipment on Schedule 67E was rolled onto Schedule 67H, *and no new equipment was added*, CSI set the Base Value more than $125,000 higher at $1,091,002.00. CSI0032727. If anything, the fair market value of the equipment when it went onto Schedule 67H was lower than it was when it was purchased because the equipment was used when it went onto 67H. *See* documents identified in the CSI Letters and Exhibit A to CSI's Answers to Lycos's First Set of Interrogatories.

4.    the original acquisition cost of the equipment on all but a few of the equipment schedules. CSI maintained the original acquisition cost of the equipment on its computers and had the ability to run a report with respect to these costs within minutes. *See* Tr. of Deposition of Michelle Thompson. It even printed out those costs for its internal use,[11] but did not give Lycos the portion of the printout containing the original equipment cost until very late in the parties' relationship. *Compare, e.g.,* CSI040995-41001 with LYC07559-7563. Rather, CSI intentionally provided Lycos with a version of its printout that omitted the original acquisition cost of the equipment in an effort to make it near-impossible for Lycos to figure out the acquisition cost.

5.    it maintained a well-orchestrated and targeted internal scheme to manipulate the leasing process and cause Lycos to rewrite leases repeatedly, even though such rewrites caused damage to Lycos. Specifically, CSI maintained Sales Compensation Plans for each fiscal year that governed, among other things, the triggering of commission payments and the amount of commissions to be paid to account executives such as Mr. Stenberg. These plans were designed to provide incentives to account executives such as Mr. Stenberg to cause CSI's customers to rewrite by not only making rewrites commissionable events, but also by rewarding

---

[11] *See, e.g.,* CSI045807, 45828, 45832, 45836, 45844, 45851, 45856, 45862, 45868, and 45877.

- 15 -

account executives during certain years with greatly enhanced commission percentages on
rewrites of outdated personal computers. *See* CSI Compensation Plans for Paul Stenberg,
CSI44223-44257, CSI44258-44296, CSI44297-44333, CSI44334-44369, CSI44370-44406,
CSI044468-44469, CSI044473-044492, CSI044470-44472, CSI44493-44512, and PC Rewrite
program, CSI44407.

       6.     it perpetrated a scheme to cause Lycos to trust and depend on Mr.
Stenberg for his expertise in leasing, and induced Lycos not to investigate Mr. Stenberg's
intentional misrepresentations and "half-truths" described herein. CSI evaluated Mr. Stenberg
based on his ability to "develop an ongoing business and personal bond of camaraderie, trust and
dependency with [the] decision maker" at Lycos. *See, e.g.*, CSI044211-44222. His supervisor
concluded that he had succeeded in this and gave him the highest possible rating in his
performance evaluations. CSI044216, CSI044220. His supervisor's evaluation of him was well-
founded. Mr. Stenberg indeed gained Lycos's trust and dependency by, among other things,
responding to certain of its requests for information, entertaining Lycos employees on occasion,
and acting as Lycos's account executive for the entire seven-year relationship. Mr. Stenberg
worked for CSI during a time when Lycos was a fledgling internet start-up company and when
the internet boom took flight in the late 1990s. As Mr. Stenberg was aware, this era of the
Internet required fast movement and Lycos executives and employees at the time were consumed
with their day-to-day responsibilities. Mr. Stenberg also knew that Lycos lacked expertise in
leasing. As a result, Lycos looked to and trusted Mr. Stenberg to provide sound leasing solutions
and advice and Mr. Stenberg was aware that Lycos was largely dependent upon him in this role.

    Moreover, Mr. Stenberg was the only person consistently involved in the CSI-Lycos
lease relationship during the years that relationship existed. Given the nature of the times and

- 16 -

Internet businesses in general, Mr. Stenberg worked with a series of different people at Lycos on the leasing of equipment. Each time a new person from Lycos took over the leases, Mr. Stenberg enjoyed a significant advantage in information, as he knew the entire history of the parties' leasing practices and transactions. Mr. Stenberg (ab)used Lycos's trust in and reliance on him, as well as his informational advantage, to defraud Lycos and reap millions of dollars in commissions.

       7.      it had perpetrated a scheme to put Lycos in the position of having to either rewrite equipment lease schedules indefinitely or buy-out the leased equipment at a price substantially in excess of the then fair market value of the equipment. CSI implemented this scheme, in part, by inflating the Base Value, as discussed above, and establishing Stipulated Loss Value Percentages which, if paid, would enable CSI to recover an exorbitant amount, well in excess of not only the then reasonable value of the equipment, but any industry norm or reasonable profit as well. For example, under Schedule 48, according to CSI, the net present value of the stream of payments Lycos was required to make totaled 108% of the original cost of the equipment. CSI039222. Yet, if Lycos were unable to return that equipment at the end of the 36 month lease term, Lycos would have been contractually obligated to pay an additional 55% of the Base Value, for a total of 163% of the original cost of the equipment, equipment that would have had little or no resale value and that CSI would prefer not to have had returned. CSI0014610. The documents cited in the CSI Letters and the testimony of Philip Cagney are among the evidence on which Lycos intends to rely to support this claim.

The effect of the inflated Base Value and Stipulated Loss Value percentages came to a head when Lycos sought to negotiate a purchase price for the equipment it had been leasing from CSI. At that time, in summer, 2003, Lycos had already paid interim and monthly rent to and for

- 17 -

the benefit of CSI aggregating more than $55.8 million on account of equipment that CSI claims

had an original cost of less than $46 million, and had an obligation to pay significant additional

monies.

      The fair market value threshold of the equipment Lycos wanted to purchase was

$350,000. CSI determined that Mr. Stenberg would earn a commission if he sold the equipment

for more than that amount. Mr. Stenberg, who knew Lycos was unable to return the equipment

for a variety of reasons (including CSI's stringent equipment return policies), then quoted Lycos

a purchase price of $4.691 million for the equipment, more than *twelve* times the equipment's

booked residual value. Lycos determined that because it could not return the equipment, it

would be required either to extend the equipment leases again or make stipulated loss payments

to CSI at the end of equipment schedules totaling more than $30 million (for obsolete equipment

having little or no resale whatsoever). Thus, CSI's scheme of establishing unreasonably high

base values and stipulated loss value percentages put Lycos in the position of having to pay an

unreasonably high price relative to the then fair market value of the equipment. While Lycos

was able to negotiate a purchase price of $3.775 million after threatening to audit CSI's

equipment schedules, Lycos still paid CSI more than ten times the amount of the equipment's

booked residual value and an even greater multiple above the fair market value of the equipment.

      Mr. Stenberg failed to make the foregoing disclosures at or shortly before Lycos executed

each Rolled-Up or Rewritten Equipment Schedule. The individuals at Lycos who relied on one

or more of CSI's "half-truths" described in sub-paragraph "D" above to the detriment of Lycos

included Tom Guilfoile, Edward Philip, Sam Ziba, Mike Ripps, and Brian Lucy. These

individuals relied on CSI's misrepresentations in (a) entering into the Rolled-Up and Rewritten

Equipment Lease Schedules, (b) causing Lycos to make more than $58 million in payments to

BST99 1517349-4.057077.0012

and for the benefit of CSI with respect to the Rolled-Up and Rewritten Equipment Schedules; (c)

entering into the Sales Agreement; and (d) causing Lycos to pay CSI $3.775 million pursuant to

the Sales Agreement.

## INTERROGATORY NO. 3:

3.     State the basis for, including all evidence supporting, your claims that CSI "has unjustly received and obtained money from Lycos well above any reasonable or fair total compensation" and "has unjustly received and obtained possession of money from Lycos well above any reasonable or fair total compensation, without CSI providing any consideration to Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the terms of the "rolled up schedules" – explaining, in your answer, *inter alia*, how much money you claim that CSI has unjustly received, the date or dates when it unjustly received any such monies, and what "consideration" you claim CSI should have given to Lycos.

## RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving its General Objections, Lycos refers to its answers to

Interrogatories Nos. 1 and 2 above.  In addition, Lycos states that: (a) CSI maintains that Lycos

paid CSI over $72 million to lease equipment that had, according to CSI, an original cost of

$45.5 million; (b) CSI, through Mr. Stenberg, quoted Lycos a buyout price for the equipment of

$4.691 million at various times during the period from November, 2002 through June, 2003 even

though CSI's booked residual value for the equipment, was approximately $1.5 million when

calculated in August, 2001,[12] and the equipment had a fair market value of little or nothing at the

time of the quote and the sale.

## INTERROGATORY NO. 4:

4.     State the basis for, including all evidence supporting, your claims that CSI has violated the Massachusetts Unfair Trade Practices Statute, M.G.L. c. 93A, Sections 2 and 11 – explaining in your answer, *inter alia,* exactly what unfair or deceptive acts or practices were committed by CSI, who at CSI committed them and when, and what specific harm they caused Lycos.

---

[12] CSI041655-41656.

- 19 -

## RESPONSE TO INTERROGATORY NO. 4:

Subject to and without waiving its General Objections, Lycos refers to its answers to interrogatories 1 through 3. Further answering, Lycos states that M.G.L. c. 231, § 85J and M.G.L. c. 249, § 71 are statutes designed to protect consumers and the public welfare. As such, CSI's violation of c. 271, § 49, in connection with the Rewritten and Rolled-Up Equipment Schedules, and its violation of c. 231, § 85J, in connection with the Sales Agreement, are violations of 940 C.M.R. 3.16(3), and thus *per se* violations of M.G.L. c. 93A, §§ 2 and 11.

## INTERROGATORY NO. 5:

Did you receive competent legal advice from licensed attorneys for Lycos in connection with the transactions with CSI that are described in your amended answer and counterclaim, and if so identify those legal counsel and as to each, state which transactions with CSI they provided legal advice to Lycos about, when they did so, and to whom they communicated that advice.

## RESPONSE TO INTERROGATORY NO. 5:

Subject to and without waiving its General Objections, Lycos states that it did not receive legal advice, competent or otherwise, in connection with the financial or business terms of the Rolled-Up and Rewritten Equipment Schedules. Legal counsel did not participate in the negotiation, if there was any, of such terms.

Per ordinary procedure, Lycos received legal advice and approval from Lycos's in-house legal department concerning the legal terms of the Sales Agreement, such as, for example, the indemnification and limitation of liability clauses. The counsel who provided that legal advice included Peter Karol, who was not experienced in equipment leasing. Mr. Karol communicated his legal advice to Brian Lucy in July, 2003.

Lycos received no legal advice, whether competent or otherwise or whether related to business or legal terms, from any outside counsel before executing the Rolled-Up and Rewritten Equipment Schedules and the Sales Agreement.

- 20 -

**INTERROGATORY NO. 6:**

Did you receive competent accounting advice from qualified accountants for Lycos in connection with the transactions with CSI that are described in your amended answer and counterclaim, and if so, identify those accountants and as to each, state which transactions with CSI they provided accounting advice to Lycos about, when they did so, and to whom they communicated that advice.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to and without waiving its General Objections, Lycos states that it did not receive

advice from qualified accountants in connection with its entry into the Rewritten or Rolled-Up

Equipment Schedules. Lycos states that it received competent accounting advice from Deloitte

& Touche after the Sales Agreement was executed with respect to conversion of the equipment

schedules from operating leases to capital leases. Deloitte & Touche communicated its advice to

Ms. Callagee and/or Mr. Lucy.

**INTERROGATORY NO. 7:**

Identify, by file name or other manner enabling CSI to locate them, which of the electronic records you have produced to CSI in this case constitute the electronic versions of which bates numbered hardcopy documents that you have produced.

**RESPONSE TO INTERROGATORY NO. 7:**

Lycos objects to Interrogatory No. 7 on the grounds that it is unduly broad, overly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections or its General Objections, Lycos states

that it has provided to CSI the electronic information and the hard-copies of that information.

Pursuant to Fed. R. Civ. P. 33(d), the burden of deriving or ascertaining the answer to this

Interrogatory is substantially the same for CSI as it is for Lycos.

**INTERROGATORY NO. 8:**

Identify, and give the substance of the testimony that you will offer from, all individuals that you intend to call as witnesses at the trial of this action, including fact witnesses, retained

experts, and non-retained experts, and as to any witnesses that you expect to offer expert opinions, as part of giving the substance of their testimony, state the basis for the opinions they will offer, and identify the qualifications of those witnesses to give those opinions.

## RESPONSE TO INTERROGATORY NO. 8:

Lycos objects to Interrogatory No. 8 on the grounds that it seeks information subject to

the work-product privilege, and is unduly broad and overly burdensome. Subject to and without

waiving the foregoing objections or its General Objections, Lycos reserves the right to

supplement its response to this Interrogatory and/or deliver expert report(s) at an appropriate

time.

## INTERROGATORY NO. 9:

Identify which employees of Lycos signed each of the contracts (including lease schedules) that Lycos entered into with CSI, and state what their position with Lycos was at the time they signed each of those contracts.

## RESPONSE TO INTERROGATORY NO. 9:

Subject to and without waiving its General Objections, Lycos states that the Master Lease

Agreement was signed by Edward Philip. At the time he signed the Master Lease Agreement,

Mr. Philip was Chief Operating Officer of Lycos. Mr. Philip also appears to have signed several

of the equipment schedules.

Several other equipment schedules appear to have been signed by Thomas Guilfoile. At

the time he appears to have signed those equipment schedules, Mr. Guilfoile served as Vice

President of Finance and Administration for Lycos.

A few of the equipment schedules, including Schedules 93 and 94, and the Sales

Agreement, appear to have been signed by Brian Lucy. At the time he appears to have signed

those schedules and the Sales Agreement, Mr. Lucy served as Chief Financial Officer of Lycos.

- 22 -

The particular schedules each of the above gentlemen appears to have signed is evident from the signatures on the first page of the equipment schedules. The equipment schedules have the bates numbers contained in the CSI Letters.

**INTERROGATORY NO. 10:**

Identify the person answering these interrogatories for and on behalf of Lycos, and for each interrogatory, identify all persons who supplied information responsive to that interrogatory.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving its General Objections, Lycos states that the person answering these Interrogatories for and on behalf of Lycos is Kevin Baillie. Mr. Baillie received assistance from Lycos's professionals in answering these Interrogatories.

**INTERROGATORY NO. 11:**

Identify all persons known by you to have personal knowledge concerning (i.e. supporting, contradicting, etc.) any of the allegations that you have made against CSI in your amended answer and counterclaim in this case.

**RESPONSE TO INTERROGATORY NO. 11:**

Lycos objects to Interrogatory No. 11 on the grounds that it is overly burdensome as it includes current and former employees of Lycos, many of whom Lycos has not spoken with for years, let alone about this case. Subject to and without waiving the foregoing objections or its General Objections, Lycos states that, to the best of it knowledge, information and belief, the persons listed below have or may have personal knowledge of facts concerning the allegations made by Lycos against CSI in its Amended Answer and Counterclaim:

| Deborah Bibbo<br>Associate Accountant<br>Lycos, Inc.<br>100 Fifth Avenue<br>Waltham, MA 02451 | Kevin Baillie<br>Chief Financial Officer<br>Lycos, Inc.<br>100 Fifth Avenue<br>Waltham, MA 02451 |
| --- | --- |

BST99 1517349-4.057077.0012

| | |
|---|---|
| Michael Bunis<br>*(former Lycos Deputy General Counsel)*<br>19 Bowker Street<br>Brookline, MA 02445 | Peter Karol<br>*(former Lycos General Counsel)*<br>31 Cider Mill road<br>Sudbury, MA 01776 |
| Julie Callagee<br>1825 Washington Street<br>Canton, MA 02021 | Sachiko Kase<br>*(former Lycos Accountant)*<br>2 Appleton Street, Apartment 204<br>Waltham, MA 02453 |
| Ruth Campbell<br>*(former Lycos Accounts Payable Specialist)*<br>10 Estabrook Road<br>Roxbury, MA 02120 | Kenneth Lougheed<br>Accounts Payable Manager<br>Lycos, Inc.<br>100 Fifth Avenue<br>Waltham, MA 02451 |
| Judith Christensen<br>*(former Lycos Senior Accountant)* | |
| Beth Clancy<br>*(former Lycos Accounts Payable Specialist)*<br>65 Narragansett Avenue<br>Weymouth, MA 02188 | Brian Lucy<br>*(former Lycos Chief Financial Officer)*<br>42 Windkist Farm Road<br>North Andover, MA 01845 |
| Susan Crapo<br>*(former Lycos Senior Accounts Payable Specialist)*<br>585 Middlesex Turnpike<br>Billerica, MA 01821 | Karen Ann Nakouzi<br>*(former Lycos Accounts Payable Specialist)*<br>P.O. Box 71<br>Brockton, MA 02303 |
| Sandra Cucuiliza<br>*(Lycos Purchasing Director)* | Chad Pelletier<br>*(Lycos Senior Accountant)*<br>55 Concord Road<br>Chelmsford, MA 01824 |
| Andrew Feinberg<br>*(former Lycos General Counsel)*<br>56 Shadow Oak Drive<br>Sudbury, MA 01776 | Edward Philip<br>*(former Lycos Senior V.P. Special Projects)*<br>115 Draper Road<br>Wayland, MA 01778 |
| Frank Flynn<br>*(unknown)* | Donna Quach<br>*(former Lycos Accountant)*<br>217 B Street<br>Lowell, MA 01851 |
| Susan Franklin/John Kirk<br>American River Partners, LLC<br>380 Chief Justice Cushing Highway<br>Cohasset, MA 02025 | Michael Ripps<br>*(former Lycos – Asia JV COO)*<br>275 Cherokee Avenue<br>Athens, GA 30606 |
| Matt Fuller<br>*(former Lycos General Accounting Supervisor)*<br>138 Summer Street<br>Stoneham, MA 02180 | Jeff Snider<br>*(former Lycos Senior V.P. – Legal)*<br>56 Park Avenue<br>Newton, MA 02458 |
| Tom Guilfoile<br>*(former Lycos V.P. – Strategic Planning & M&A)*<br>116 Powder Point Avenue<br>Duxbury, MA 02332 | Paul Stenberg<br>*(CSI Account Executive)*<br>720 South St.,<br>Needham, MA |

- 24 -

| | |
|---|---|
| Kevin Streeter<br>*(former Lycos Financial Analyst)*<br>14 Park Way<br>North Andover, MA 01845 | Monique Walsh<br>*(former Lycos Staff Accountant)*<br>15 Carlson circle<br>Natick, MA 01760 |
| Jeff Tierney<br>*(former Lycos Accounts Payable Specialist)*<br>26 Boulevard Terrace<br>Allston, MA 02134 | Sam Ziba<br>*(former Lycos Finance & Treasury Director)*<br>8 Francine Road<br>Framingham, MA 01701 |
| Victor Turner<br>55 Fox Road #906<br>Waltham, MA 02451 | |

## INTERROGATORY NO. 12:

Identify who Lycos' outside auditors were during the period 1996 to the present, and as to each outside auditor, specify when (ie. What specific time periods) each one held that position, and which individual people employed by each outside auditor performed which particular tasks, and what their titles were at the time (e.g. staff accountant, manager, engagement partner, etc.)

## RESPONSE TO INTERROGATORY NO. 12:

Lycos objects to Interrogatory No. 12 on the grounds that it is overly burdensome in that

Lycos does not maintain records of individuals assigned to perform its audit, nor does it maintain

records concerning which particular individuals were assigned to particular tasks. Answering

further, the decision on personnel assigned to an audit is made solely by the outside auditors and,

could be ascertained based on a review of the audit firms' work papers. The audit firms' human

resources department would also likely have records of each auditor's title(s) at the time she or

he performed services in connection with any Lycos engagement. In addition, the particular staff

assigned to an audit changed from year-to-year due to turnover and scheduling. Compounding

this problem is the fact that the audit staff were involved with lower level Lycos personnel that

are no longer employed by Lycos. Lycos management had contact with higher level

representatives from its audit firms and has identified those persons below.

Subject to and without waiving the foregoing objections or its General Objections, Lycos states that KPMG served as Lycos's outside auditors during the period from June 1, 1995 through the fiscal year ended July 31, 2000. The KPMG audit partner assigned to the Lycos account for most of this period was Jim Boyer. The KPMG audit senior manager assigned to the Lycos account for most of this period was Michael Maschio. Both KPMG individuals worked out of the KPMG Boston office at 99 High Street, Boston, MA 02110.

Arthur Andersen LLP audited Lycos after Lycos was acquired by Terra Networks, S.A. (a Spanish company) on October 27, 2000 until Arthur Andersen declared bankruptcy. Arthur Andersen audited the period from October 28, 2000 to December 31, 2000. The last period audited by Arthur Andersen was the year ended December 31, 2001. The audit partner assigned to the Lycos account was John Sullivan. The audit manager assigned to the Lycos account was Aaron Galis.

Deloitte & Touche LLP succeeded Arthur Andersen as Lycos's auditors. Deloitte & Touche audited Lycos for the years ended December 31, 2002 and December 31, 2003. The audit partner assigned to the Lycos account was Jeremy Perisho and the audit senior manager assigned to the account was Aaron Galis (who joined Deloitte & Touche from Arthur Andersen). Deloitte & Touche's address is 200 Berkeley Street, Boston, MA 02116.

After Terra sold Lycos to Daum Communications Corporation (a Korean company) on October 5, 2004, PricewaterhouseCoopers LLP audited Lycos for the period October 6, 2004 to December 31, 2004 and the year ended December 31, 2005. PricewaterhouseCoopers is Lycos's current auditor. The audit partners assigned to the Lycos account were Vic Petri for the period October 6, 2004 to December 31, 2004; Doug Kangos for the year ended December 31, 2005;

and Lisa Beauregard is presently the audit partner assigned to the Lycos account for the 2006

audit. PricewaterhouseCoopers' address is 125 High Street, Boston, MA 02110.

**INTERROGATORY NO. 13:**

Identify all documents or electronic records whose production has been requested by CSI
from Lycos in this action but which have not been produced, and as to each such document or
electronic record state the basis upon which you have not produced it to CSI including, as to
each, all facts supporting any claims of privilege, burdensomeness, relevance, or any other
objection or excuse.

**RESPONSE TO INTERROGATORY NO. 13:**

Subject to and without waiving its General Objections, Lycos states that it has produced,

or is in the process of producing, all non-privileged documents in its possession, custody or

control requested by CSI. Lycos will make a mutual exchange of privilege logs with CSI at a

mutually convenient time.

**INTERROGATORY NO. 14:**

For each of item of equipment leased and/or purchased by Lycos from CSI, identify
where that item of equipment is currently located, and if it is no longer possessed by Lycos, state
whether it was returned to CSI, sold or discarded, and if sold how much money Lycos was
credited or paid for it.

**RESPONSE TO INTERROGATORY NO. 14:**

Lycos objects to Interrogatory No. 14 on the grounds it overly broad and unduly

burdensome in that Lycos leased more than 5500 pieces of equipment from CSI starting in 1996,

and signed its last equipment schedule with CSI in January, 2002. Subject to and without

waiving the foregoing objections or its General Objections, Lycos states that CSI knows or

should know which of these pieces of equipment Lycos returned to CSI. Upon information and

belief, CSI maintains or maintained electronic records of same. As such, pursuant to Fed. R.

Civ. P. 33(d), the burden of deriving or ascertaining the answer to this Interrogatory, with respect

to any equipment that was returned, is no greater for CSI than it is for Lycos.

- 27 -

BST99 1517349-4.057077 0012

## VERIFICATION

I, Kevin Baillie, being duly sworn, hereby depose and state that I am an officer of Lycos, Inc. I verify that the foregoing Responses to CSI's First Set of Interrogatories to Lycos, Inc. are made on behalf of Lycos, Inc., that most of the matters stated therein are not within my personal knowledge, and that the facts stated therein have been assembled by persons assisting Lycos, Inc. in this case. Upon information and belief, the facts stated therein are true and correct based on the information in the possession of Lycos, Inc. and its professionals at this time.

/s/ Kevin Baille
Kevin Baillie

AS TO OBJECTIONS:

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I, Peter M. Acton, Jr., hereby certify that on this 25th day of October, 2006, a true and correct copy of the foregoing document was served by electronic mail and first-class mail on the following:

Robert J. Kaler
Edward W. Little, Jr.
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
rkaler@mccarter.com
elittle@mccarter.com

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr.

- 28 -