UNITED STATES DISTRICT COURT
For the District of Massachusetts

_____

COMPUTER SALES INTERNATIONAL INC.    )
                                     )
            Plaintiff,               )
v.                                   )
                                     )
LYCOS, INC.,                         )     C.A. No. 05-10017- RWZ
            Defendant,               )
                                     )
BANK OF AMERICA f/k/a FLEET BANK,    )
                                     )
            Trustee Process Defendant.    )
_____

**OPPOSITION OF CSI LEASING, INC. TO LYCOS'S MOTION TO STRIKE
PORTIONS OF CSI'S LOCAL RULE 56.1 STATEMENT WITH RESPECT TO
LYCOS'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS
IN COUNTS VII, XII, AND XIII OF ITS COUNTERCLAIM**

Plaintiff and counterdefendant CSI Leasing, Inc. f/k/a Computer Sales International, Inc.

("CSI") respectfully submits this memorandum of law in opposition to *Lycos's Motion to Strike*

*Portions of CSI's Local Rule 56.1 Statement with Respect to Lycos's Motion for Partial*

*Summary Judgment on Counts VII, XII, and XIII of Its Counterclaim, and to Have Lycos's*

*Statement of Undisputed Material Facts be Deemed Admitted* (Docket No. 175) (hereinafter "the

Motion" or "Mot.").

**ARGUMENT**

Disregarding the Court's Order of June 13, 2007 that there be "***no replies*** or excessive

briefs"(emphasis added)[1]  defendant and counterplaintiff Lycos, Inc. ("Lycos") has submitted the

equivalent of a huge summary judgment reply brief, without leave to do so, under the guise of a

meritless motion to strike.  *See* Motion (attaching lengthy schedule with voluminous reply

_____

[1]     *See* Court docket entry of June 13, 2007 (unnumbered) between entry numbers 138 and 139.

arguments). The Motion should be denied because it is legally and factually deficient, and because its submission is an inappropriate attempt to circumvent the Order that the parties not burden the Court with reply briefs on their summary judgment motions.

In addition, the Motion states in certain places that certain of CSI's expert opinions "be stricken." *See, e.g.*, Mot. at 7. The Motion itself, however, makes no motion to strike any of CSI's experts, does not discuss or apply the applicable standards for challenging expert testimony under the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) and its progeny, and purports to address only CSI's response to Lycos' summary judgment statement of "undisputed" facts. To the extent Lycos intends to strike any of CSI's expert opinions, it must do so under the proper standards, and with the proper procedures, at which time CSI will respond accordingly.[2]

## A.    CSI Has Set Forth Admissible Evidence And Specific Facts Which Controvert Lycos' Summary Judgment "Facts"

As with Lycos' companion motion to strike CSI's responsive fact statement in connection with Lycos' other summary judgment motion[3], Lycos again misreads CSI's responses as indicating that CSI's "disagreement" with Lycos is "immaterial" or "irrelevant." Mot. at 4. CSI, in fact, was stating in its response that it was ***those facts asserted by Lycos*** which it considered to be immaterial or irrelevant – but, nevertheless, CSI would (and did) address them and provide contrary facts. Though CSI specifically rebuts each of Lycos' charges in detail in the attached Exhibit A, CSI addresses below those points specifically raised in Lycos' Motion:

A.    Lycos continues to be misleading with its use of the term "mark-up," the nefarious label it gives to what is essentially CSI's gross profit. It argues now that "neither [it]

---

[2]    CSI also reserves its rights to move to strike Lycos' expert opinions as well, whether by motion to strike or in limine – and, in either case, applying the appropriate *Daubert* standards.

[3]    *See Lycos's Motion to Strike Portions of CSI's Local Rule 56.1 Statement with Respect to Lycos's Motion for Summary Judgment on All counts of CSI's Amended Complaint* (Docket No. 174).

ME1 7033543v.1

nor its expert has *ever* suggested that such term is standard in the industry." Mot. at 4 (emphasis in original). Even a cursory reading of Lycos' summary judgment "fact" statement – as well as its many expert reports and its experts' testimony – demonstrate that Lycos consistently uses its made-up term as if it were a standard term of the leasing industry. It is not, CSI's experts concluded as such in response to Lycos' repeated use of the word, and CSI is entitled to rebut the contrary implication in Lycos' fact statement.

    B.    When arguing that one of CSI's experts (Bob Zises) did not value the leased equipment "as of a legally relevant date" or provides a "legally immaterial" valuation, Mot. at 4-5, Lycos exposes that its "motion to strike" is actually a reply brief arguing yet another point of law – improperly raised, given that it has sought no leave to do so and the Court disallowed summary judgment replies. Ironically, CSI has only recently learned – following a successful motion to compel production before Special Master Hershfang which, despite Lycos' opposition, was upheld by Judge O'Toole[4] – that Lycos' own expert secretly valued the equipment ***much higher*** than CSI's more conservative expert. For example, Lycos' expert valued all of the leased equipment to Lycos as of July 2003 – shortly before the August 2003 Sales Agreement was executed – at more than $7 million, compared to the $3 million value of CSI's expert. *See* Exhs. B and C hereto (testimony of Lycos' valuation Peter Daley and his valuation calculations). Lycos did not share this information with CSI, as Lycos opted to disclose only the lowest equipment value arrived at by its experts. Because Lycos has put at

---

[4]    *See* unnumbered entry dated December 5, 2007, between Docket Nos. 172 and 173. CSI learned at deposition of a Lycos expert that he had not produced all information on which he had relied in valuing the leased equipment at issue – including a valuation performed by another of Lycos' experts. On motion, Special Master Judge Hershfang ordered production of the information. When Lycos refused, CSI was forced to seek affirmation of the Master's order pursuant to Fed. R. Civ. P. 53(g)(2). After an emergency hearing, Judge O'Toole (as Judge Zobel was out of the country) confirmed the order and required Lycos to produce the information "forthwith." The information revealed that Lycos' own expert had valued the leased equipment in most cases higher than CSI's expert – though it had not disclosed these valuations in its expert reports, opting instead to reveal only the lowest valuation calculated by its expert.

issue the value of the equipment for which Lycos was extending its leases in November 2001 and later purchasing from CSI in August 2003, it cannot claim that CSI's expert valuations are "legally immaterial." In any event, a motion pursuant to the *Daubert* standards is the proper method to challenge CSI's expert opinions – not on a motion to strike a summary judgment fact statement.

          C.     As for its contention that CSI has "misstated" Lycos' claims (Mot. at 5), Lycos misstates its own claims when convenient in order to avoid the close scrutiny that summary judgment will bring. For example, Lycos argues that it is "irrelevant" that CSI's experts have opined that lessors such as CSI do not disclose their gross profits to lessees – as Lycos claims it is only arguing that the so-called "mark-ups" should have been disclosed. However Lycos likes to characterize its self-created term "mark-up," the evidence from Lycos' own experts demonstrates that what Lycos calls an improper "mark up" is nothing more than a portion of CSI's gross profits – which, as a matter of law[5] and of industry practice, no lessor is required to disclose to a lessee. CSI's experts are simply addressing that aspect of Lycos' claim, and their opinions are therefore not "irrelevant."

**B.**      **CSI's Responses Are Based on Permissible Expert Opinion**

     Without any *Daubert* challenge to CSI's experts, Lycos provides anecdotal "examples" of where it contends CSI's experts provided conclusory, irrelevant, or contradictory opinions that cannot support summary judgment. Mot. at 5-11. These examples are not only few in number but misleading as to the full opinions of these experts and the proper (and properly disclosed) bases therefore.

          A.     Though purely "conclusory" expert opinions may not form the basis of a

---

[5]     CSI intends to file shortly a summary judgment motion demonstrating, among other issues, that there is no legal duty to disclose one's gross profits, whatever term may be created to describe them.

summary judgment motion or opposition[6], CSI's experts – based on their review of relevant information pertaining to the case and their own skill, knowledge and experience – have provided admissible opinions which may properly be considered at summary judgment. The phrase in CSI's statement of facts which Lycos incorrectly paraphrases[7] is that

> Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as the contracts clearly stated the monthly payment and the term of each schedule).[8]

This is an opinion based on the review of several of CSI's experts– and not just that of Mr. Fleming – of the Master Lease and the equipment schedules, all of which clearly disclosed the monthly payment and the length of the lease term (in addition to other information) which would have provided Lycos the ability to determine what it would pay in total under an initial lease versus a proposed "re-write" of that lease into which it was considering entering.

Again, Lycos' contention that these opinions are "immaterial as a matter of law" (Mot. at 6) misses the point, mischaracterizes the experts' opinions and the bases therefore, and demonstrates that Lycos is using its motion to strike as a proxy for an impermissible reply brief on summary judgment. In addition, Lycos misconstrues Mr. Fleming's testimony, in that he stated he did not review the "schedule of equipment" for "restructured" schedules, but he did

---

[6]     Lycos cites the First Circuit's decision in *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88 (1st Cir. 1993) in support of its argument that certain of CSI's expert opinions should be disregarded. Notwithstanding that this decision was rendered within months of the Supreme Court's decision in Daubert – and makes no mention of this decision – it was the "causation" issue concerning an auto accident that the Court found was not fully considered by the experts. In the present case, by contrast, the few snippets of expert testimony proffered by Lycos as deficient in fact show – in conjunction with the entirety of their opinions, as shown in their testimony and several submitted expert reports –  that CSI's experts provided adequate bases for their opinions.

[7]     Lycos incorrectly paraphrases the expert opinions as stating that "Lycos could `easily calculate' the cost of the refinancings" (Mot. at 6) – misconstruing that the experts' opinion was that the contract documents concerning both the original schedules and the contemplated re-writes (which Lycos signed and possessed) had all of the information Lycos needed to calculate what it would be paying (and for how long) under the initial lease schedule versus the re-write schedule that it was contemplating entering into.

[8]     CSI responsive statement of facts (Docket No. 164) ¶¶ I.A.8, 10 and corresponding notes 19, 26 and 30. Note also that there were other experts besides Mr. Fleming – whom CSI singles out in its brief – who also provide support for these opinions.

5

review (a) the Master Lease Agreement between the parties, (b) equipment schedules (all of which, without dispute, disclose monthly rental obligations and the term of the lease, in addition to other information), and (c) summary information concerning monthly payments on all schedules, thereby determining what Lycos was paying for monthly rent on an original schedule versus the monthly (lower) rent payment on the restructured schedule.[9] Lycos also takes out of context another snippet of Mr. Fleming's testimony concerning aggregate schedules.[10]

Lycos' unsupported charge that Mr. Fleming "submitted to this Court . . . an affidavit that both CSI and Mr. Fleming know has no factual basis" is simply inflammatory, based on no evidence (or a misconstruing of out-of-context snippets of Mr. Fleming's entire deposition) and should be disregarded.

B.    Lycos next alleges that CSI's experts' findings that the equipment schedules were leases and not loans (as Lycos argues) are invalid because none of the CSI experts are lawyers and did "no substantive analysis whatsoever as to any of the refinanced equipment schedules." Mot. at 7-8. Again, Lycos cites only the testimony of Mr. Fleming and claims, without basis, that he submitted a false opinion. While Mr. Fleming stated that he did not do an "accounting" test to determine whether FASB 13[11] was satisfied, that is not relevant to

---

[9]    *See* Deposition of Michael Fleming dated November 14, 2007 ("Fleming Dep.") at 28:8-31:30, the relevant excerpts of which are attached hereto as Exh. D  Mr. Fleming therefore reviewed the Master Lease agreement and various equipment schedules, all of which are similar in structure and content – i.e., there is no dispute that they fully disclosed the monthly rental payment obligations and the term of the lease.  Based on this and review of monthly rental summaries, Mr. Fleming properly concluded that Lycos had the information available to it in the lease documents to calculate what its obligations were under an existing lease schedule versus a proposed rewritten schedule for that equipment.

[10]    Mr. Fleming's quoted testimony (Mot. at 7) concerns "aggregate" schedules and is preceded by his testimony that, though he did not "present value" calculations, he did review the equipment schedules and summary information concerning them to determine that Lycos could have calculated, based on the contract documents available to it, the difference between its obligations under a current lease versus a proposed re-write of that lease. Fleming Dep. at 316:20-317:17 (Exh. D hereto).  That he did not perform any "calculations" concerning this does not invalidate his opinion that, based on the types of documents Lycos had available to it, these calculations could easily have been performed.

[11]    Though not relevant for this motion, FASB 13 requires that – for accounting purposes – a lessee must "capitalize" a lease where the present value of its lease payments over the term of the lease exceed ninety percent of

a determination whether a lease is, in fact, a loan.  Mr. Fleming did testify that he reviewed the Master Lease between the parties as well as some sample schedules and that he was looking for, but did not find, any instance where "equipment can pass to the user of the equipment at the end of the [lease] transaction."  Fleming Dep. at 33:8-34:19 (Exh. D hereto).  In short, if the lessee has the right to purchase the equipment at the end of the lease – especially for a low or nomininal cost known as a "bargain purchase option" – then there *may* be an issue whether a loan rather than a lease has been created.  However, Lycos has provided no evidence that it had the contractual right under the Master Lease or the equipment schedules to purchase – for a bargain or otherwise – the equipment it was leasing from CSI.  It is therefore proper for Mr. Fleming to opine, based on his review of the relevant information and his knowledge of the leasing industry, that the Lycos-CSI Master Lease and equipment schedules did not evidence loan transactions.

Moreover, CSI's experts' opinions are not "conclusory" simply because *one* of its several experts is not a lawyer and did not review each provision of all of the approximately 125 equipment schedules.  While Lycos' argument concerning the applicability of UCC section 1-201(37) is rebutted in CSI's summary judgment opposition (*see* Docket No. 163 at 22-28), CSI's experts' opinions – in addition to other evidence identified in the summary judgment papers – provide a proper evidentiary basis to rebut CSI's legal argument that equipment schedules 93 and 94 are not loans.  Further, even if the UCC provision cited by Lycos is applicable to those schedules, the factors to be considered under that provision are factual in nature.  *See* Lycos's summary judgment memorandum (Docket No. 148) at 26-28.  Lycos is therefore incorrect that it is a "legal determination" for the Court on summary judgment whether a transaction is a "lease or loan" under UCC section 1-201(37).  Mot. at 9-10.

---

the equipment value.  This, however, does not determine whether a lease is a loan or not – it only determines how a lessee must account for it under GAAP.

ME1 7033543v.1

C.      Lycos contends that certain of CSI's experts "contradicted" their expert reports when they testified on the issue of whether Lycos, under the terms of the Master Lease Agreement, had the right to return equipment at the end of a lease term or to "substitute[e] alternative equipment."  CSI's statement from its summary judgment fact response – not quoted by Lycos in its brief – states that "it was purely Lycos' decision to extend leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged)."  CSI's responsive statement of facts (Docket No. 164) ¶ I.C.1 at 10.  The experts' deposition testimony, however, is not inconsistent with that, in that the point they were all making is that Lycos always had the option to return the equipment to CSI at the end of a lease term, as the terms of CSI Master Lease provided.  *See* Declaration of Edward W. Little, Jr. ("Little Decl.") (Docket No. 168) Ex. 1, § 7.  There is nothing "inconsistent" with this, as Lycos claims, and there is no dispute that Lycos could, as an option, return the equipment at the end of the lease terms.  It is indeed ironic that Lycos raises the issue of "inconsistent" summary judgment affidavits when its own witnesses – particularly Brian Lucy – have submitted summary judgment affidavits effectively recanting their harmful deposition testimony.[12]

## C.    CSI Has Cited Its Evidence Disputing the "Material" Facts Put Forward by Lycos

Lycos finally argues – again with few examples – that CSI has failed to cite its evidence properly and has engaged in "argument."  Mot. at 11-12.  In fact, a full reading of CSI's

---

[12]       In Mr. Lucy's case, for example, he testified at deposition that he did not recall receiving or relying on the March 18, 2002 e-mail from CSI sales representative Paul Stenberg – which undercuts Lycos' arguments in this case that Lycos relied on Mr. Stenberg's e-mail to its detriment.  *See* Deposition of Brian Lucy, dated January 10, 2007 ("Lucy Dep."), at 52:8-53:9 (relevant portions attached hereto as Ex. E).  Mr. Lucy's "second" affidavit (Docket No. 145-2) – submitted with Lycos' summary judgment papers – completely contradicts this, stating that when he testified at deposition, Mr. Lucy had not "recalled" an affidavit he submitted earlier in the case in which he claims he did recall receiving Mr. Stenberg's e-mail.  As the First Circuit has held, statements in an affidavit submitted by an interested witness in connection with a motion for summary judgment cannot create a disputed material fact by contradicting deposition testimony in the absence of a satisfactory explanation of the reason for the change in testimony. *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  Mr. Lucy's belated recollection of prior events on the eve of summary judgment – which contradict his sworn deposition testimony – do not provide such a "satisfactory explanation."

responsive statements of fact on summary judgment (Docket Nos. 164, 166) shows that all material facts were cited to the record.  In some cases, CSI even addressed Lycos' raising of immaterial facts – and did so with citation to the contrary evidence in the record, though it was not obliged to do so.  Where Lycos claims CSI engaged in "argument," it is mistaken; CSI proffered facts from which the reasonable inferences to which it is entitled on summary judgment (as the nonmoving party) should be drawn, and it was entitled to rebut Lycos' misleading and, at times, argumentative "facts" with its own facts and to explain their relevance.

      A.     Lycos' citation to only a portion of a single paragraph of CSI's responsive fact section – at paragraph I.C.3 (Docket No. 164) – omits the record citations on this point to the evidence supplied by CSI's experts that CSI had no duty to disclose the information Lycos claims it failed to provide.  *See* Docket No. 164 at 11.  Lycos is therefore incorrect that CSI is rebutting its "facts" with unsupported assertions.

      B.     Lycos' argument concerning the testimony of Ernesto Galvan, one of its former Senior Tax Accountants – as recorded in a document he wrote, that it was Lycos' "policy" not to buy equipment that could be leased (Docket No. 164 at 4 n.12) – is nothing more that the "spin" Lycos wants to put on this issue, which is more appropriate for closing argument than for a dispositive motion.  The reasonable inference to be drawn in CSI's favro from Mr. Galvan's testimony is that Lycos' policy was to lease whenever it could, thereby undercutting Lycos' claims that it was misled into leasing (or extending its leases) because of fraudulent sales pressure or tactics by Lycos.

      C.     Lycos' claim that CSI used improper "argument" when responding to Lycos' use of the self-created term "mark up" is supported only by a fragment of a sentence from CSI's full page-long response (Docket No. 164 at 5).  A full reading of CSI's response shows

that CSI was responding to Lycos' created term "mark up" with expert evidence as well as citations to the deposition record. *See id.* There is nothing improper in citing the evidence contradicting Lycos' claims and, at the same time, explaining why Lycos' purported "evidence" is misleading or not giving it the proper inference.

## Conclusion

For the foregoing reasons and those set forth in the attachments hereto – as well as the evidence brought to the Court's attention by CSI in its responsive fact statements and supporting affidavits (Docket Nos. 164, 166, 167, 168) – CSI respectfully requests that the Court ***deny Lycos's Motion to Strike Portions of CSI's Local Rule 56.1 Statement*** (Docket No. 175) and provide CSI such other and further relief as this Court deems proper.

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  0211
Tel. (617) 449-6500

Dated:  January 11, 2008

## Certificate of Service

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be served on counsel for the other parties in this action electronically and by hand this 11th day of January, 2008.

/s/ Robert J. Kaler_____
Robert J. Kaler

10

**EXHIBIT A**

## EXHIBIT A

*(In responding to Lycos's claims that paragraphs of CSI's responsive summary judgment statements of fact – **Docket No. 164** – should be stricken or deemed admitted, in whole or in part, CSI has reproduced below, verbatim, the numbered paragraphs from Lycos's Rule 56.1 Statement, CSI's Response, and the purported reasons why Lycos believes the provisions should be struck or deemed admitted. The footnotes are from the original 56.1 statements, and refer to materials cited by the parties.)*

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | I. Count VII: Violation of 940 C.M.R. 3.05(1) and 3.16(2) and M.G.L. c. 93A, §§2 and 11 | | | |
| | A. Undisputed Facts Material to Lycos's Claim that CSI Violated 940 C.M.R. 3.05(1) and 3.16(2) and thus M.G.L. c. 93A, §§ 2 and 11[1] | | | |
| 1. | When Lycos and CSI entered into a Master Lease Agreement in December 1996 (the "Master Lease Agreement"), CSI had been in the computer equipment leasing business for almost twenty-five years. Lycos was a less than two-year-old Internet company based in Massachusetts. | Disputed as misleading. Lycos had some of the most sophisticated business entrepreneurs available at the time. Ted Philip, Lycos' Chief Financial Officer, received an MBA. degree from Harvard Business School and had spent years in the financial world, including at some of the world's largest financial institutions and corporations,[2] Thomas Guilfoile, Lycos' Senior Vice President of Finance and Administration, is a certified public accountant who worked at the international accounting firm of Ernst & Young prior to joining Lycos.[3] Among his work with Ernst & Young, Mr. Guilfoile performed lease | • *Undisputed Facts* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted, <br> • Statements such as "most sophisticated business entrepreneurs available" should be stricken as argumentative | • CSI has presented facts and cited to them. Lycos' *ipse dixit* that it did not is not argumentative. <br> • CSI's assertions concerning Lycos' level of sophistication is cited to the record evidence and is not "argumentative." Further, Lycos does not dispute this with opposing evidence. |

[*] In its exhibit to its Motion, Lycos included only the footnotes from CSI's 56.1 Response, and omitted the footnotes from its own 56,1 Statement. For ease of reference and comparison, CSI has done the same here. To the extent the Court wishes to examine the evidence that Lycos has used to support a given proposition, CSI also refers the Court to Dkt. No. 147.

[1] The use of Lycos' headings in its statement offsets is for ease of reference only and are disputed in their entirety to the extent a response is required

[2] Deposition of Edward Philip, dated Nov. 6, 2006 ("Philip Dep,") at 11:10-21, attached as Ex 1. to the accompanying Declaration of Kelly A. Gabos("Gabos Decl.")

[3] Deposition of Thomas Guilfoile, dated Dec 7, 2006 ("Guilfoile Dep.") at 10:13-11:2 (Gabos Decl. Ex. 2).

| ¶# | Lycos's 56.1 Statement[4] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | audits for clients to determine whether their leases qualified as capital leases or operating leases.[4] Both gentlemen signed the majority of the CSI-Lycos equipment schedules on behalf of Lycos. | | |
| 2. | While the person at Lycos responsible for leasing changed many times during the parties' seven-year relationship, CSI had a single account executive for Lycos the entire time: Paul Stenberg. Mr. Stenberg had more than fifteen years experience in computer equipment sales and leasing at the time the relationship began | Disputed as misleading. Lycos' intended implication here is that changes in Lycos personnel over time somehow contributed to a lack of understanding on Lycos' part of the need to track its leased assets or a general misunderstanding of leasing in general. As stated above, Lycos had very sophisticated officers overseeing its leasing and, in particular, leasing of equipment from CSI.[5] In addition, Lycos had available an in-house staff of lawyers and accountants as well as access to some of the most highly regarded outside accountants and lawyers Lycos admits that, on occasion, it hired outside leasing consultants (including Leaseforum, Inc. and Avnet Enterprise Solutions, Inc.) to review its leasing practices. In fact, Avnet Enterprise Solutions, Inc. ("Avnet") performed an audit of Lycos' leasing practices and advised Lycos as early as December 2000 that it had serious problems because of its failure to track all of its leased assets. Among other things, Avnet told Lycos in December 2000 that "identification and return of [leased] assets, at end of term is nearly impossible because Lycos lacks an accurate asset inventory. This results in costly evergreen payments or the buyout of non-productive assets."[6] Nowhere in its detailed report does Avnet blame these problems on any of Lycos' lessors, including CSI. | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br>• *Argumentative.* Statements such as Lycos having "very sophisticated officers overseeing its leasing" are argumentative and should be stricken. CSI's speculation in the first sentence about Lycos's intended implication should be stricken.<br>• *Unsupported.* The third, fourth, and last sentences should be stricken because they lack any citation to the record.<br>• *Immaterial.* Whether Lycos could have retained outside counsel or accountants is irrelevant to whether CSI had a duty to disclose the information to Lycos that Lycos has averred it should have disclosed. | • CSI presents facts which, by themselves and by their reasonable implications, controvert the facts presented by Lycos in a misleading light. CSI – as nonmoving party – is entitled to these inferences on summary judgment. *See, e.g.*, *Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c)).<br>• Lycos' implications in the evidence it cites (and fails to cite) are fair game for rebuttal, which CSI does with opposing facts. This is not argumentative – indeed, Lycos engages in this itself – and CSI is also entitled to raise the reasonable inferences which its facts demonstrate.<br>• Not every sentence of a statement must be footnoted. All of the material facts and their concepts are properly cited, such as the reference to the Avnet report which Lycos seeks to strike. |

[4] GabosDecl Ex.2 at 16:21-17:4.
[5] See supra f 1.
[6] Affidavit of Thomas Bean ("Bean Aff") Ex. 24 at LYC14559 (emphasis added).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | • The implication of Lycos' statements are that personnel at Lycos did not have the experience to determine what information, if any, they needed. CSI's reference to the experienced and skilled personnel at Lycos is in rebuttal to this and is not "immaterial" to the facts raised by Lycos. |
| 3. | Mr. Stenberg operated out of CSI's offices in Newton and Needham, Massachusetts He communicated regularly with Lycos personnel in Massachusetts and delivered documents to Lycos there, Lycos executed lease documents in Massachusetts and made payments to CSI from Massachusetts banks during the parties1 relationship | Disputed as misleading. During the relevant time, CSI and Lycos had agreed that Missouri law would apply to their relationship. The Master Lease Agreement Number 144874 dated December 4, 1996 ("Master Lease"), which governed the parties' rights and obligations as well as the terms of the subsequent equipment lease schedules between CSI and Lycos, expressly provided that Missouri law would apply: 18.6 GOVERNING LAW: THIS MASTER LEASE AND ALL EQUIPMENT SCHEDULES AND ANY OTHER INSTRUMENT EXECUTED IN CONNECTION HEREWITH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED UNDER, THE LAWS OF THE STATE OF MISSOURI[7] | • *Undisputed Facts*. Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted. <br> • In its December 6, 2005 Memorandum of Decision denying CSI's Motion to Dismiss or for Summary Judgment, the Court found that, notwithstanding the choice-of-law provision in the Master Lease, Massachusetts law applied to Lycos's fraud in the inducement claims because, inter alia, both parties reside in Massachusetts and the conduct occurred in Massachusetts. Mem. of Dec. at 4. | • CSI presents specific facts disputing Lycos' statements, including the inferences thereof. Moreover, the facts used in CSI's Response are also used in its summary judgment opposition and demonstrate disputed issues of material fact. <br> • CSI's citation of the choice of law provision in the parties' agreement is a factual assertion to rebut CSI's statements implying that the relationship between the parties was exclusively within Massachusetts. Indeed, Lycos agreed in writing that Missouri law would govern that relationship. |
| 4. | During their relationship, CSI and Lycos executed a Master Lease Agreement and approximately 125 equipment schedules with respect thereto. Pursuant to these documents, CSI leased to Lycos | Disputed as misleading The Master Lease is a written document executed by Lycos' then Chief Operating Officer Ted Philip on December 20, 1996 It contemplates equipment schedules to be entered between the parties for equipment to be leased subsequently by Lycos, as well as other | • *Undisputed Facts*,. Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted. | • CSI presents specific facts disputing Lycos' statements, including the inferences thereof. Moreover, the facts used in CSI's Response are also used in its summary judgment |

[7] Master Lease § 18 6, attached as Ex.. 1 to CSI's First Amended Complaint, dated Dec 4, 2006 (Docket No. 1.21) (emphasis in original).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | over 6,000 pieces of computer-related equipment between 1997 and 2005. The Master Lease Agreement contemplates the execution of one or more equipment schedules incorporate by reference the terms of the Master Lease Agreement, list the specific equipment being leased pursuant to that schedule, and contain other terms such as monthly rent and the term of the schedule. | aspects of the parties' relationship such as payment of taxes, delivery and return of the leased equipment, care of the equipment, loss or damage to the equipment, defaults and remedies, among other provisions.[8] Though the specific length of any subsequent equipment schedules under the Master Lease are specified in each schedule, the Master Lease provides that the initial term of each schedule "shall automatically be extended for successive four month periods"[9] unless terminated by either party providing sixty (60) days notice (a term negotiated by the parties down from 120 days).[10] During the relevant time, Lycos entered into a series of equipment schedules which in some cases extended its rental of equipment already on lease to it. | • *Unsupported*. The last sentence contains no citation to the record and should therefore be stricken<br>• *Bad Faith*- Again, CSI is unwilling to admit even the most fundamental background facts. | opposition and demonstrate disputed issues of material fact.<br>• Not every sentence in a responsive statement needs a citation; only those which are in material dispute.  Lycos does not and cannot contradict that it entered into equipment schedules "which in some cases extended its rental of equipment already on lease."<br>• CSI is not acting in bad faith. CSI need not accept the misleading facts and implications there from in Lycos' statements, and it is entitled to bring to the Court's attention contrary facts as well as to point out all reasonable inferences there from which are in its favor.  *See, e.g., Landry v. Mier*, 921 F. Supp. 880, 882 (D. Mass. 1996) (quoting Fed. R. Civ. P. 56(c). |
| 5. | Forty-four of the approximately 125 schedules were refinancings of earlier schedules. Many of these refinancings were themselves refinancings of earlier refinancings. | Disputed as misleading. The evidence suggests that Lycos sought operating lease treatment for its lease of assets."[11] Further, it was Lycos' policy at all times not to buy equipment that could be leased instead.[12] For its own reasons — including | • *Undisputed Facts.*. Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to | • CSI presents specific facts disputing Lycos' statements, including the inferences thereof. Moreover, the facts used in |

---

[8] See generally Ex. 1 to CSI's First Amended Complaint (Docket No 121).
[9] Master Lease § 2.2, attached as Ex, 1 to CSI's First Amended Complaint (Docket No. 121)
[10] Philip Dep at 51:7-13 (Gabos Decl. Ex. 1)
[11] Affidavit of James Schallheim, Ph D {"Schallheim Aff ")l; Affidavit of James Johnson, Ph D. ("Johnson Aff) 26, 33, 39; Affidavit of Michael Fleming ("Fleming Aff ')*18, 63-64. These affidavits from experts retained on behalf of CSI are attached as Exs. 3-5, respectively, to the Affidavit of Kelly A. Gabos.
[12] Deposition of Ernesto Galvan, dated Feb 20, 2007 ("Galvan Dep ") at 32:3-13 (Gabos Decl. Ex. 6)

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | an effort to lower its monthly expenses[13] - Lycos agreed to extend its leases with CSI until finally required by its parent company in Spain to "buyout" the leases.[14] | contradict Lycos's facts, Lycos's facts should be deemed admitted. In fact, CSI's bad faith is evident from its failure even to admit the most basic facts of the case.<br><br>• *Argumentative and Immaterial* CSI's assertion in the first sentence of what the evidence "suggests" should be stricken. Then, instead of citing the record evidence it believes "suggests" that Lycos wanted operating lease treatment, it cites only its experts Furthermore, whether Lycos wanted "operating lease treatment" is immaterial to the facts averred by Lycos and to Lycos's non disclosure claims<br><br>• *Unsupported*. CSI's assertion that Lycos had a particular policy "at ail times" is not supported by the two-paragraph memo to which it cites,. The memo was written years after the parties' relationship commenced, and does not specify any time period whatsoever.<br><br>• *Inadmissible*-expert. In paragraph 25 of his affidavit, Mr. Schallheim makes vague/con elusory reference to "capital structure" of "internet stocks at that time". He does not state he undertook any analysis with respect to those stocks (statement is in passive voice) let alone explain what analysis he | CSI's Response are also used in its summary judgment opposition and demonstrate disputed issues of material fact.<br><br>• CSI's "suggestion" of the reasonable implications of the evidence it cites are entirely proper on summary judgment. Fed. R. Civ. P. 56(c). Citation to expert opinion is entirely proper – Lycos does not explain its bald assertion that it is improper. Lycos' desire for operating lease treatment is relevant in that Lycos is claiming that it was an unsophisticated corporation that was mislead by a single sales person of CSI (Paul Stenberg).<br><br>• Lycos' claim that the testimony and memorandum from Mr. Galvan, a senior tax officer at Lycos, is not relevant or is unreliable goes more to the weight of that evidence than to whether it is proper at summary judgment.<br><br>• Lycos' claims that CSI's expert opinions are improper are disingenuous. First, the proper forum for challenging those opinions is in a *Daubert* motion, which it has not filed. Second, |

---

[13] Deposition of Paul Stenberg, dated Jan, 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated January 12,2007 ("Wright Dep") at 102:15-104:4 (Gabos Decl, Ex, 9)

[14] Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl. Ex.. 7).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | undertook. He does not state in his affidavit which stocks he looked at, how he picked them, why it was appropriate to compare those stocks to Lycos, whether there were stocks he looked at that were inconsistent with his conclusory opinion, how he analyzed the stocks, whether there was anything in the record to suggest Lycos was aware of this purported practice among "internet stocks, or for which time period his assertion applies Because Mr. Schallhein's statement provide no facts or analysis, but simply conclusion, his opinions should be stricken.<br>• *Inadmissible*-expert. In paragraph 33 of his affidavit, Mr. Johnson makes a vague reference to unnamed Lycos "executives" being "focused" on expenses (without saying whether those "executives" were even responsible for expenses), and an unspecified document (which is not identified) in which Mr. Philip allegedly indicated Lycos was making progress in "achieving their EBITDA profit margin"—a statement that does not support the statement that the best economic decision was not a priority for Lycos. Mr. Johnson did not review transcripts for any Lycos executives that would have been responsible for controlling operating expenses (and, if he had, he would have found testimony that reducing expenses was not Lycos's priority during the years Lycos was a public company); as such, there is no | the bases for Prof. Schallheim's opinions on behalf of CSI are set forth in several expert reports, and Lycos deposed Prof. Schallheim on those reports. To the extent they believe his opinions are not reliable, the proper challenge is in a full *Daubert* proceeding.<br>• Again, Lycos has not challenged Prof. Johnson's testimony under Daubert. They also do not explain why his testimony and opinions must be ignored if he "did not review" certain deposition transcript (and there is no requirement he do so to make his opinion reliable or admissible). The bases for Prof. Johnson's opinions are set forth in several expert reports, and Lycos has deposed him as well.<br>• The same goes for Lycos' challenge to Mr. Fleming, another of CSI's experts with over thirty years in the leasing industry. That he did not "review Lycos' auditors' records" provides no basis for disregarding his evidence at summary judgment, and there is no requirement that he do so in arriving at his opinions. |

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | factual basis for his opinion.<br>• *Inadmissible*-expert. In paragraph 18 of his affidavit, Mr. Fleming states the "record indicates that Lycos and its auditors did perform this test frequently." There is no basis for making this statement because he did not review any of Lycos's auditors records or any records from Lycos in which the test was performed. The remaining statements made by Mr. Fleming are general, conclusory, unsupported. In his deposition, Mr. Fleming admitted he did not do any analysis to see if any of the refinanced leases, in fact, qualified as operating leases. Fleming Tr., Ex B, at 66:23-67:2. (If he had, he would have found that none of the refinanced schedules would have qualified for operating lease treatment.) | |
| 6. | The forty-four refinanced schedules were numbered 38, 43, 49A, 50A, SOB, 51, 52, 53, 54, 55A, 60, 61, 64B, 64D, 64F, 65, 66, 66A, 66B, 66C, 66E, 66G, 661, 67, 67A, 67B, 67D, 67F, 67H, 68, 68A, 68B, 68C, 69C, 69E, 69G, 691, 85, 86, 89, 89A, 90, 93, and 94 (individually and collectively, the "Refinanced Schedules".) As part of these refinancings, equipment from a single schedules was sometimes split into two or mote separate | Disputed as misleading  The decision how to allocate equipment between schedules on a lease extension could be for many reasons — including a lessee's desire to keep track of the leased equipment by type or location,[15] It was not simply a decision by the lessor, which Lycos implies is intended to confuse or obfuscate | • *Undisputed Facts*. Because CSI disputes Lycos's assertions based only its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted.<br>• *Unsupported*, fn. 15: CSI relies on Mr. Cagney for the proposition of how equipment was allocated between schedules But, in the portion of the transcript CSI cites to, Mr. Cagney specifically states he did "not really" know why equipment was allocated as | • CSI provides citation to deposition testimony of one of its officers to rebut the assertions of Lycos.  That Lycos disagrees with that testimony provides no basis for striking it.<br>• The citation to Mr. Cagney's testimony provides evidence of the reasons why certain equipment is allocated in certain ways on a re-written schedule. It was not offered as his personal knowledge why these |

---

[15] Deposition of Philip Cagney, dated Sept, 27, 2006 ("Cagney Dep.") at 348:12- 349:9 (Gabos Decl, Ex. 10); Deposition of Joan Kersting, dated Dec, 13, 2006 ("Kersting Dep,,") at 76:9-77:1 (Gabos Decl. Ex. 11)..

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | schedules, and equipment from two or more schedules was sometimes combined on a single schedule. Attached as Exhibit C to the Affidavit of Bruce D Smith, which is being filed herewith, is a flow chart that shows the history of financings and refinancings of Lycos equipment schedules including the splitting and combining of equipment described above. | | it was on the Lycos-CSI schedules he was being examined about. It is undisputed, for example, that CSI allocated equipment on schedules 93 and 94.. Cagney Tr.. (Ex. E) at 164:22-166:13,244:23-245:14, <br>• *Unsupported.* There is no citation for the last sentence of this paragraph. It should therefore be stricken | allocations were done in these particular cases. <br>• Not every sentence in responsive statements needs to be cited – only those concerning material facts for the Court's attention. Discussion of the reasonable inferences of the evidence is proper. |
| 7. | At the time of the refinancings, CSI told Lycos it its new monthly payment would be -- almost always an amount lower than it had been on the schedules being refinanced -- and that Lycos would be able to retain the equipment for an extended term. With respect to at least certain schedules, Lycos expected that it would pay slightly more over the life of a refinanced schedule because it had use of the equipment for a longer period of time thus resulting in it paying more interest. | Disputed. Lycos never understood that it was "paying more in interest" on its extended schedules, as this is a loan (not a lease) concept[16] Mr. Guilfoile, who signed many of the equipment schedules on behalf of Lycos, testified he understood the schedules were reported by Lycos as leases, not loans.[17] Lycos always knew exactly what it was agreeing to pay, and had to in order to account for each lease properly. | • *Inadmissible-expert* Whether a transaction is a lease or a loan is a decision left to the Court on summary judgment and not experts. While Messrs. Fleming, Johnson, and Schallheim opine that the Lycos-CSI transactions are leases, they each admitted in deposition that they did not perform any analysis to determine whether, in fact, the transactions are leases or loans. Fleming Tr., Ex. B, 66:5-67:19; Johnson Tr., Ex. C, 142:1-4; Schallheim Tr., Ex D, 230:19-231:11. Indeed, none of them is a lawyer or an accountant. <br>• *Inadmissible-Evidentiary,* Whether Mr. Guilfoile, a former Lycos employee who is not a lawyer, believes Lycos reported the schedules as leases or loans is irrelevant to the factual statements made by Lycos in its 56.1 Statement. Whether the transactions are | • Whether a lease is, in fact, a loan is not a pure issue of law and is subject to fact determination. CSI has several facts indicating the CSI-Lycos leases were not loans, including, but not limited to, CSI's experts. As to the bases for those experts' conclusions that the leases were not loans, those are set forth in their several reports and their testimony, to the extent Lycos questioned them on that issue. Lycos has not moved under *Daubert* to strike the experts' opinions, and CSI reserves its right to respond fully to the extent Lycos ever does move under *Daubert*. <br>• See above. Mr. Guilfoile's testimony is relevant on the factual question of whether the |

---

[16] Fleming Aff "' 11,17-21; Johnson Alf 14-20; Schallheim Aff. 11-12 (Gabos Decl Exs. 3-5, respectively).
[17] Guilfoile Dep at 203:4-11 (Gabos Decl, Ex. 2).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | leases or loans is a question of law. <br>• *Inadmissible-Unsupported.* The last sentence of CSI's Response contains no citation to the record and should therefore be stricken. | leases between CSI and Lycos were loans (they were not, according to CSI's evidence). <br>• Not every sentence in responsive statements needs to be cited – only those concerning material facts for the Court's attention. Discussion of the reasonable inferences of the evidence is proper. |
| 8. | What Lycos did not expect, and what CSI did not disclose, was that CSI embedded a mark-up in the monthly payments on almost every refinancing. Mr. Stenberg himself has admitted that he "marked-up" the leases  CSI internal accounting records show that CSI marked-up the amounts of the monthly payments on the Refinanced Schedules such that the value of each of the Refinanced Schedules (i.e., the present value of the payments plus the present value of the residual of the equipment, the amount CSI expected to realize at the end of the lease term), exceeded the value of the terminating schedules (i.e., the present value of the payments plus the present value of a loan, the outstanding principal balance of the loan as of the | Disputed.  According to three of CSI's experts - two with doctorates in finance and many years of academic study in leasing and one with over twenty years of experience as the president of the Equipment Leasing Association ("ELA") - who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[18] Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule),[19] Nor is it proper to "us[e] the language of a loan," as Lycos claims, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and not loans[20] The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked~up" the leases is | • *Undisputed Facts.* Because CSI disputes Lycos's assertions based only on its belief that they are misleading and does not provide specific facts to contradict Lycos's facts, Lycos's facts should be deemed admitted. <br>• *Immaterial Dispute -* Whether the term "mark-up" is an industry term is irrelevant. Neither Lycos nor its expert have argued the "mark-up" is such a term. Lycos's expert is simply using the term "mark-up" to define the portion of the profits wrongly earned by CSI and thus Lycos's damages  Lycos's cited to Mr. Stenberg's use of the term "mark-up" because he voluntarily used it Lycos is not suggesting that he has adopted Lycos's expert's definition of the term. <br>• *Argumentative.* The use of phrases such as "fabricated theory without merit" is argumentative and should therefore be stricken, | • CSI has provided contrary facts to rebut Lycos' assertions, though those assertions by Lycos were misleading and incomplete. <br>• Lycos' use of the term "mark up" is done as if this term is common in the industry.  That is not correct, and CSI has provided evidence to rebut that. What Lycos is essentially arguing is an improper "mark-up" which CSI failed to disclose to Lycos is, in fact, nothing more than a portion of CSI's gross profits based on Lycos' desire to lease equipment and continue leasing that equipment. Lycos cites no authority for the proposition that gross profit (or, in Lycos' terms, a "mark up") must be disclosed. <br>• Lycos claim that CSI's expert |

---

[18] Fleming Aff.  14-52; Johnson Aff.  25-26; Schallheim Aff.  15-20 (Gabos Decl Exs. 3-5, respectively).

[19] Fleming Aff,.  11-16; Johnson Aff,  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively).

[20] Fleming Aff,   17-21; Johnson Aff.  14-20; Schallheim Aff.  11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep at 203:4-11 (Gabos Decl. Ex. 2)

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | moment after the refinancing exceeded the outstanding principal balance as of the moment before the refinancing even though no points, fees, or mark-up was disclosed. | misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was create well after Mr. Stenberg gave his deposition), Mr. Stenberg testified that he "marked-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[21] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment, The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[22] | • *Argumentative* CSI misstates Lycos's theory. Lycos agrees CSI was entitled to earn a profit on the refinancings and Lycos's damage calculation does not include the profits that CSI is rightfully entitled to receive for Lycos's extended use of the equipment. Whether CSI had to disclose its gross profits is not at issue.<br>• *Inadmissible*-Expert, (n. 19) Mr. Fleming's conclusory statement that Lycos "could easily calculate the costs of restructuring leases from the information it had," is belied by his admitted lack of analysis  See Motion, at 6.<br>• *Inadmissible*-Expert. (n. 19) Mr. Johnson's affidavit contradicts his deposition testimony. Mr. Johnson admitted that where equipment was split or rolled one would have to go piece by piece of equipment to compare rents and that this could not be done for some schedules (and he undertook no analysis to see if it could be done). Johnson Tr., Ex. C, at 183:18-184:15, 185:7-193:7. He also admitted Lycos would need to know the end-of-lease costs Id at 184:24-185:2  Ultimately, he admitted that he did not undertake "any analysis of the cost to Lycos of rewriting any of the schedules, in other words, comparing the rent on the old schedule with the rent on a new | Mr. Fleming did not perform a proper "analysis" is without basis and is more properly resolved in a *Daubert* proceeding.  CSI addresses this fully in its Opposition brief.  Further, Lycos does not set forth what a proper "analysis" would be in order to survive a *Daubert* motion.<br>• Same with regard to Prof. Johnson.  Lycos provides no basis why Prof. Johnson should have undertaken the type of analysis Lycos advocates or why his testimony should be disregarded for this.  In fact, the bases for Prof. Johnson's opinions are set forth in his expert reports and deposition testimony, none of which CSI has moved to strike under *Daubert*.<br>• Lycos does not explain why it contends that a portion of Prof. Schallheim's affidavit is "conclusory" or "irrelevant," and saying it does not make it so.  There is no dispute that Lycos had the equipment schedules, which clearly identified monthly rent and the period of time for the payment of rent – whether it was on an |

[21] Stenberg Dep. at 521:17-522:13 (Gabos Decl Ex 8).
[22] See generally Fleming Aff; Johnson Aff ; Schallheim Aff. (Gabos Decl Exs. 3-5, respectively)

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | schedule where the equipment was split between schedules 1 and that the sole basis of his opinion was Mr. Smith's (Lycos summary judgment expert affiant) report (Johnson Tr. at 193:1-7), wherein Mr. Smith concludes that Lycos lacked the information to perform this analysis.<br>• *Inadmissible*-Expert, Non-responsive, (n. 19) The paragraphs cited by CSI from Mr. Schallheim's affidavit are conclusory and, with respect to paragraph 14 of his affidavit, irrelevant. | original or proposed re-write to an original schedule. As stated by CSI's experts, this is all that Lycos needed in order to decide whether to return the equipment or extend any given lease. Lycos did not need to know what CSI booked as residual value on a lease or what its gross profit was on any given lease. |
| 9. | Mr., Stenberg has admitted that he marked-up the leases | Disputed. As stated, Mr. Stenberg did not "admit" to the mark-up theory created by Lycos' experts.. The testimony of Mr. Stenberg that Lycos cites as an admission is misleading, as Mr., Stenberg is only testifying that he "market-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[23] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment. The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[24] | • *Undisputed Facts* Because Lycos does not contend that Mr. Stenberg has admitted to the mark-up theory created by Lycos's experts, Lycos's facts are undisputed.<br>• *Argumentative.* The last sentence of the paragraph that refers to what it claims is Lycos's "underlying and faulty assumption" is argumentative and should therefore be stricken.<br>• *Irrelevant.* CSI's dispute as to the last sentence is irrelevant because Lycos is not arguing that CSI was not entitled to charge more than its booked residual when Lycos extended the leases of equipment | • Lycos' statement is misleading, and CSI disputed it with facts. Those facts are set forth in its responsive statement.<br>• CSI's statements are not argumentative and are properly citing to CSI's evidence which counters the assertions by Lycos.<br>• CSI's statements are relevant, as Lycos' theory is predicated in part on the idea that CSI charged "too much" and was not entitled to a profit above what Lycos now attempts to retroactively impose as a "reasonable" profit. |
| 10. | The internal refinancing process at CSI was such that CSI knew it was | Disputed. According to three of CSI's experts who directly refute Lycos' expert Bruce Smith, | • *Undisputed Facts.* Lycos's allegations in this paragraph concerns the internal | • CSI disputes Lycos' facts and cites to appropriate evidence. |

[23] Stenberg Dep at 521:17-522:13 (Gabos Decl. Ex.. 8).
[24] See generally Fleming Aff; Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | charging Lycos a mark-up and the approximate magnitude of that mark-up not only before each refinanced equipment schedule was signed, but before it was even prepared. That process worked as follows: (a) When an account executive such as Mr. Stenberg asked for pricing on a refinancing, CSI would calculate a "commissionable threshold," i.e., the amount above which he would earn a commission. This "threshold" would be based on the value of the terminating schedule(s), i.e., the present value of the remaining lease payments plus the present value of the residual on the existing schedule(s), less an amount equal to the present value of the estimated residual on the new schedule(s), an amount CSI sometimes referred to as "equity in." (b) Mr. Stenberg would then, in his words, "markup" this threshold and quote a price to Lycos. If it appeared the refinancing would proceed, Mr. Stenberg would complete the "left"' side of a form called Request for Contract. Among other things, he would fill in the boxes entitled "Total threshold PV" - the commissionable threshold he had been given plus soft costs, the | the term "mark-up" is not used in the industry and is a fabricated theory without merit.[25] Further, even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether a duty to disclose what is essentially the lessor's gross profits on a transaction exists, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[26] Nor is it proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own former officers agree that the transactions between Lycos and CSI were leases and not loans.[27] What Lycos terms an improper and undisclosed "mark-up" is simply profit on a transaction in which Lycos had chosen to maintain possession of equipment it was leasing from CSI for, in some cases, an additional 50% time period.[28] | refinancing process at CSI. CSI does not dispute any of Lycos's facts concerning that process. Accordingly, those facts should be deemed admitted.<br><br>• *Immaterial Dispute* Lycos is not claiming mark-up is a term used in the industry. Lycos is also not claiming that CSI had a duty to disclose its gross profits. Whether the term to describing the rewriting of equipment schedules is "renewal" or "refinancing" is also immaterial.<br><br>• *Inadmissible*-Expert, As noted above, the question of whether the transactions are "leases" or "loans" is for the Court to decide. Moreover, as noted above, CSI's experts admittedly performed no analysis to determine whether the transactions were leases or loans. | Lycos' claims that it did not are simply wrong.<br><br>• Lycos is using the term "mark up" as if it is a standard term in the industry. CSI rebuts this with evidence to which it cites. Lycos' use of the term "refinancing" is also improper in that Lycos is attempting to use the language of loans, not leases, and CSI has evidence that the transactions at issue were not loans.<br><br>• Whether the leases are loans is not a pure question of law, and CSI has evidence that the leases were not loans. Lycos is wrong that CSI's experts did not "analysis" to determine whether the leases were, in fact, loans, and the bases for their conclusions are set forth in the experts' reports as well as their testimony, to the extent they were asked at deposition. |

[25] Fleming Aft. 11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs.. 3-5, respectively).
[26] Fleming Aff. 60-62; see generally Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).
[27] Fleming Aff. 17-21; Johnson Aff 14-20; Schallheim Aff; 11-12 (Gabos Dec!., Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11.. (Gabos Decl Ex. 2).
[28] Fleming Aff. 31 (Gabos Decl Ex. 3).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | "Estimated PV1' - the estimated present value of the rents on the new schedule(s), and the "estimated margin" - the difference between the "Total threshold PV" and "Estimated PV." (c) After completing the RFC Mr. Stenberg would send it to Ms. Kersting or someone in the legal department, who would circulate it for approval. If the request were approved, someone in the legal department would then prepare the lease contract. | | | |
| 10. | Because CSI had calculated both the Total Threshold PV and the "Estimated PV" before each refinanced schedule was prepared, and thus before it was executed, CSI knew that: the present value of the rents on the new schedule(s) > the present value of the remaining rents plus the present value of the estimated residual value on the schedule(s) being refinanced, minus the present value of the residual on the new schedule(s). | 10. [sic] Disputed. CSI had internal records concerning how it booked a given lease transaction, but there is no evidence that Lycos "knew" anything concerning the "mark-up" theory now advocated by Lycos. Again, CSI has evidence that directly refutes the "mark-up" theory created by Lycos' expert Bruce Smith, including that the term "mark-up" is not used in the industry and is a fabricated theory without merit.[29] Even assuming the validity of Lycos' "mark-up" theory, there is disputed evidence as to whether there exists a duty to disclose what is essentially the lessor's gross profits on a transaction, and Lycos at all times could easily calculate what it would pay under an existing equipment schedule versus on a proposed re-write (as it the contracts clearly stated the monthly payment and the term of each schedule).[30] | • *Undisputed Facts* Again, Lycos's facts concern the internal refinancing process at Lycos. CSI not dispute this process as described by Lycos. Accordingly, Lycos's facts should be deemed admitted.<br>• *Immaterial Dispute*. As noted above, Lycos is not claiming that "mark-up" is a term used in the industry.<br>• *Argumentative* The statement that "there is no evidence that Lycos 'knew' anything concerning the 'mark-up' ...." is argumentative and relevant only in that it is an admission that CSI did not disclose the mark-up to Lycos. Lycos does not contend that CSI should have disclosed its gross profits to it. | • CSI disputes Lycos' facts and cites to appropriate evidence. Lycos' claims that it did not are simply wrong.<br>• Lycos is using the term "mark up" as if it is a standard term in the industry.  CSI rebuts this with evidence to which it cites. Lycos' use of the term "refinancing" is also improper in that Lycos is attempting to use the language of loans, not leases, and CSI has evidence that the transactions at issue were not loans.<br>• Again, Lycos' use of the term "mark up" as an accepted term in the industry is not proper. What Lycos has created as a "mark up" is nothing more than |

---

[29] Fleming Aff.  11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively)
[30] Fleming Aff.  60-62; see generally Johnson Aff.; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | a lessor's gross profit, and Lycos provides not authority that there is any duty to disclose gross profit to a lessee. |
| 11. | In addition, because he estimated his "margin," i.e. , an amount equal to the Estimated PV minus the Threshold PV Mr. Stenberg and CSI knew the approximate magnitude of the mark-up before the CSI legal department even prepared an equipment schedule. | Disputed The testimony of Mr. Stenberg that Lycos cites as an admission that he "marked-up" the leases or "knew the approximate magnitude of the mark-up" is misleading, as he is not adopting the theory advocated by Lycos' expert Smith (which was created well after Mr. Stenberg gave his deposition). Mr. Stenberg testified that he "marked-up" a price for a lease extension above what the CSI accounting department had determined was his "commissionable threshold"[31] — not that he was adopting Lycos' term "mark-ups," which were the amounts charged to it for extended periods that it retained use of the leased equipment. Moreover, the testimony of Mr. Stenberg cited by Lycos is mischaracterized, as Mr. Stenberg was reviewing a specific document that he was unsure he himself had filled out, and he is discussing a present value calculation of a rental stream at 11 percent — with no mention of residual values, which is a component of Lycos' "mark-up" theory.,[32] The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residua! value of equipment, which CSI's experts confirmed is not the case.[33] | • *Undisputed Facts* Lycos's facts concern what Mr. Stenberg and CSI knew before the parties entered into a refinancing, CSI does not dispute what they knew and when they knew it<br>• *Immaterial Dispute*, As noted above, Lycos does not contend that "mark-up" is a term used in the equipment leasing industry,<br>• *No Dispute*. Lycos does not contend that "somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of equipment." | • CSI's statement provides facts which, by themselves and their reasonable inferences, rebut the assertions of Lycos.<br>• See above for the issue concerning "mark up" as an industry term and the parties' dispute concerning that.<br>• Lycos' damages are calculated in part on the basis that CSI charged "too much" – that is, made too much of a gross profit above what Lycos decides, sua sponte, is the proper amount of profit a lessee is entitled to make.  This is relevant and is disputed, as set forth in CSI's responsive facts statement. |
| 12. | [sic] Omitted | Omitted. | | N/A |
| 13. | Lycos would not have entered into | Disputed- The only evidence Lycos has that it | • CSI acknowledges that the Affidavits | • As explained in greater detail in |

---

[31] Stenberg Dep. at 521:17-522:13 (Gabos Decl. Ex 8)

[32] Bean Aff. Ex 65 at 490:3-491:23

[33] See generally Fleming Aff; Johnson Aff; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | any of the Refinanced Schedules on the terms that it did if CSI had told it about the mark-ups. | would not have entered into any lease extensions if it had known about the mark-ups are found in the summary judgment affidavits of its former officers who are defending their involvement in lease extensions which Lycos now alleges were bad business decisions.[34] CSI, on the other hand, has contrary evidence that Lycos wanted or needed to extend their leases with CSI for many business reasons, including Lycos' desire not to capitalize the leases[35] (and instead continue to claim operating lease accounting treatment for them),[36] their desire to lessen monthly expenses[37] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94), and their inability to return a large portion of the leased equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment).[38] In fact, in trying to convince its parent company to agree to the proposed $3 77 million buyout of the CSI leases, an internal email sent by Lycos' Assistant Controller to its in-house counsel makes clear that it could not return CSI's equipment and was at a negotiating disadvantage: [I]t is our understanding that we [Lycos] are contractually obligated to return all of the leased equipment to our lessor [CSI] in exactly the same | of its former officers establish that Lycos would not have entered into the refinancings if they had known of the mark-ups. It provides no evidence to refute these affidavits. Lycos's facts should therefore be deemed admitted. <br><br> • *Inadmissible*-Unsupported. Whether Lycos had a policy to lease equipment, or sought operating lease treatment of its leases, is immaterial. The memo cited by CSI in does not support the proposition that Lycos did not want to capitalize the leases. | CSI's Opposition brief, Lycos is impermissibly attempting to rebut the unfavorable deposition testimony of certain of its key witnesses with an affidavit created for summary judgment purposes. The law is clear that that is not allowed. <br><br> • Lycos' "spin" on the testimony and memorandum of its former senior tax official is not relevant. The memorandum he wrote mentions that it is Lycos' policy to lease rather than buy. This is material and rebuts Lycos' argument that it was duped by CSI into extending its leases with CSI. |

[34] Bean Aff Exs. 6, 1,12.

[35] Lycos's policy was not to buy when it could lease instead Galvan Dep. at 32:3-13 (Gabos Decl. Ex, 6).

[36] In fact, it was Lycos' parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003.. Callagee Dep. at 49:17-50:4 (Gabos Decl Ex. 7). Moreover, Mr Guilfoile, Lycos Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification. Guilfoile Dep. at 79:21-80:9 (Gabos Decl, Ex. 2).

[37] Deposition of Brian Reale ("Reale Dep .") at 11:3-9 (Gabos Decl. Ex. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl Ex. S3); Stenberg Dep (Aug 24, 2006) at 110:15-111:7.

[38] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625

[39] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625 (capitalization in original; emphasis supplied).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
|  |  | way it was received. This would include identifying several hundred pieces of equipment and decommissioning them in accordance with each lease expiration. We believe this to be operational impossibility,... Obviously, buying out now eliminates significant risks to the Company. Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the lease term (when we admit to our Lessor that we cannot return this equipment and HAVE TO buy out), we support Brian [Lucy's] decision to buy out of the leases immediately.[39] |  |  |
| 14. | The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules and approximately double its average rate of return on its equipment leases generally. | Disputed.  Again, the term "mark-ups" is not used in the industry and is a theory that CSI's experts have opined is without merit.[40]  There is no obligation for a lessor to disclose what is essentially an element of its profits, and Lycos at all times was given the information that it needed to decide whether to enter into the lease extensions of which it now complains.[41] | • *Undisputed Facts.*  Because CSI does not even respond to Lycos's assertion as to CSI's yield resulting from the mark-ups, Lycos's facts should be deemed admitted.<br><br>• *Immaterial Dispute and Argument.* Lycos does not contend that "mark-up" is a term used in the industry or that CSI was required to disclose its profits. | • CSI does respond to the assertions and implications of Lycos' fact statement.<br>• Lycos has consistently used the term "mark-up" – which it created itself – as if it were used in the leasing industry as something which must be disclosed.  It is not, is essentially Lycos' gross profit (or a portion thereof), and is not required to be disclosed.  CSI has evidence supporting this, which it cites. |
|  | B.  Facts Concerning Lycos's Claim for Actual Damages |  |  |  |
| 1. | Lycos paid CSI more than $72 million in rent payments on account | Disputed. Lycos did pay a total of approximately $72 million to lease, over a five to seven year | • *Undisputed Facts*.  While CSI claims to dispute certain facts, it then proceeds to | • CSI admits the totals paid; it does not admit the portion of |

---

[40] Fleming Aff.  11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively).
[41] Fleming Aff.  60-62; see generally Johnson Aff; Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | of equipment that had an original acquisition cost of approximately $45 million  Over $45 5 million of these monthly payments (more than 63% of the total monthly payments) were made pursuant to the Refinanced Schedules. Of the over $27 million difference between the approximately $45 million original acquisition cost and more than $72 million in monthly payments, more than $13 708 million resulted from CSI's undisclosed mark-ups on the Refinanced Schedules. | period, equipment owned by CSI which had an original cost of $45 million. The characterization of the payments as including something improper — i.e., "mark-ups" — sets a false premise and is Lycos' belated and argumentative characterization of the payments and, according to CSI's experts, lacks merit.[42]  As stated previously, CSI has presented evidence that the "mark-up" theory created by Lycos has no basis in fact or industry practice, and that CSI acted properly.[43] | admit many of the facts Lycos alleged, and provides no evidence to dispute any of the facts alleged. Accordingly, Lycos's facts should be deemed admitted. <br>• *Immaterial Dispute*. Lycos does not contend that "mark-up" is a term used in the leasing industry. | the assertions that sets up the false premise that "mark ups" should have been, but were not, disclosed to Lycos.  CSI's evidence against this is clear and has been cited. |
| 2. | A chart presenting the amount of the mark-up, by Refinanced Schedule, along with a column from CSI's journal entries headed "gross profit," is attached to the Affidavit of Bruce D. Smith, filed herewith, as Exhibit C  On many occasions, the "gross profit" recorded by CSI on its Sales Type Lease Journal Entries equaled the precise amount of "mark-up" calculated by Lycos's expert. | Disputed.  For the reasons stated above, there are no "mark-ups," as Lycos is using that term in its theory that CSI failed to disclose its profits, and CSI's disclosures and actions concerning Lycos's lease extensions were proper and within industry standards.[44] | • *Undisputed Facts* While CSI claims to dispute facts, it does not even respond to Lycos's facts concerning the manner in which he was compensated. It claims that his manner of compensation is irrelevant. Hence there is no genuine issue of material fact in dispute and Lycos's facts should be deemed admitted. <br>• *Inadmissible -Unsupported*, The first two sentences contain no citation to the record and therefore must be stricken. | • Lycos' equating of a portion (or all) of CSI's gross profits to an improper "mark up" is not correct and has been disputed by CSI's evidence. <br>• Lycos is simply incorrect that CSI has provided no citation to the record.  See note 44, as cited, and the evidence provided therein. |
| | C.  Additional Undisputed Facts Material to Lycos's Claim for Multiple Damages Under M.G.L.  c. 93A, § 11 | | | |
| 1. | Mr. Stenberg was compensated primarily on a commission basis | Disputed, but irrelevant. Mr. Stenberg, as other sales representatives at CSI, earned a portion of | • *Undisputed Facts*  CSI concedes that any dispute as to Lycos's facts is | • CSI disputes Lycos' assertions, and provides citations to the |

[42] Schallheim Aff.  11-16 ; Johnson Aff  8-13; Schallheim Aff.  3-14 (Gabos Decl. Exs. 3-5, respectively).
[43] See generally Fleming Aff; Johnson Aff; Schallheim Aff (Gabos Decl. Exs. 3-5, respectively).
[44] Fleming Aff.  22-29; Johnson Aff.  28-39; Schallheim Aff.  7-10, 15-20 (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | pursuant to a detailed compensation plan developed by CSI., His commissions were calculated in significant part on the extent to which the present value of the monthly payments on an equipment lease exceeded an internal "commissionable threshold" amount set by CSI This commission plan applied both to the lease of new equipment as well as to the refinancing of used equipment already under lease. Accordingly, every time a customer refinanced an equipment schedule, Mr. Stenberg would earn another commission on equipment that was already under lease  During the period from July 1, 1999 through June 30, 2001, CSI also provided Mr. Stenberg with a 20% bonus commission every time one of his customers refinanced an equipment schedule with personal computers on it CSI referred to this as the "PC rewrite bonus" program. Mr. Stenberg also earned commissions when CSI sold equipment to one of his customers that had been under lease based on the extent to which the price for which CSI sold the equipment | his compensation in commissions which were based on leasing that CSI did with customers — but this is irrelevant. The implication of Lycos' statements is that Mr. Stenberg, due to a purported incentive to do additional leases, somehow convinced a sophisticated company like Lycos to enter into bad business transactions that they otherwise would not have done. This is contradicted by the following evidence, among others: (a) Lycos was run by several highly-educated and experienced business leaders, including many entrepreneurs who, in addition to their own expertise, also had available to them accountants, lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in December 2000 that its leasing practices were problematic);[45]  (b) Lycos itself never trusted Mr. Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony demonstrate;[46]  and (c) it was purely Lycos's decision to extend its leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[47] | irrelevant.  Because CSI does not provide any specific evidence to dispute those facts, those facts should be deemed admitted.<br>• *Undisputed Facts*  The first sentence is without citation to the record and should therefore be stricken.<br>• *Argumentative*. The second sentence is pure argument, and should therefore be stricken<br>• *Note*: That one of CSI's in-house counsel thought Mr. Stenberg was a "worthless liar" and counseled Mr. Lucy not to trust him demonstrates that Mr. Lucy did trust Mr. Stenberg. | record – despite that Lycos' claims concerning Mr. Stenberg and his compensation are not relevant.<br>• The citations to the record are proper and not argumentative. As stated previously, it is proper for CSI to state its contrary facts and explain the reasonable inferences that are permitted to be drawn there from.  Such inferences are not "impermissible argument."<br>• The notion that Mr. Lucy along trusted Mr. Stenberg is an inference Lycos draws; however, the reasonable inference CSI draws from all the evidence is that Lycos did not trust Stenberg – whom certain officers called a "liar," or worse. |

---

[45] See supra  1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl. Ex. 14).

[46] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]the Guy is a worthless liar"! and an "a**hole," to which Mr Ripps replies with another disparaging remark concerning Mr, Stenberg. See Gabos Decl.. Ex. 15.. In addition, Mr. Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg — "[w]hy do you trust Paul [Stenberg]?. . . [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec 8, 2006 ("Karol Dep ") at 168:21-169:15 (Little Decl. Ex. 16).

[47] Fleming Aff. 62; Johnson Aff.  22 (Gabos Decl. Exs. 3-4, respectively).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | exceeded his "threshold" set by CSI. | | | |
| 2. | Within months after the PC rewrite bonus program became effective in July 1999, Mr. Stenberg asked CSI's co-CFO about that program to ascertain the commissions he would receive if he refinanced Lycos equipment schedules. | Disputed, but irrelevant. Again, Mr. Stenberg earned a portion of his compensation in commissions, The implication of Lycos' statements, however, is that any incentive Mr. Stenberg for his customers to extend their leases translates into an ability to pressure a sophisticated company like Lycos to enter into business transactions that they otherwise would not have done. This is contradicted by the evidence already set forth in the preceding paragraph. | • *Undisputed Facts* Not only does CSI admit that any disputes are irrelevant, but not one assertion in this paragraph is supported by citation to the record. Accordingly, CSI's "facts" should be stricken and Lycos's facts deemed admitted. | • CSI does not state that the dispute of fact is irrelevant, only that the initial facts raised by Lycos are irrelevant to its summary judgment motion. Though Lycos raises irrelevant facts, CSI rebuts them with its own contrary facts. |
| 3. | CSI then prepared a chart for internal use that calculated Mr. Stenberg's threshold, a calculation that necessitated calculating the present value of the payments on the schedules being refinanced and the booked residual value of the equipment on those schedules, When Mr. Stenberg asked that a chart be prepared for Lycos showing the effect of the refinancings, however, he asked that the chart list the schedules being refinanced, the new rent, the old rent, the "savings," and the new term. The chart did not disclose the existence of millions of dollars in mark-ups charged on those refinancings. | Disputed, but irrelevant. The import of Lycos' statements is that Mr. Stenberg did not disclose to Mr. Ripps his "commissionable threshold" — that is, the threshold he is provided internally for accounting purposes to determine his commission — which is akin to a company disclosing its gross profits on a deal to a customer. As CSI's experts have made clear, that is not done in the industry, and there is no obligation to make such a disclosure.[48] Again, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[49] The underlying and faulty assumption in Lycos' entire statement is the notion that somehow CSI was not entitled to charge more than the booked residual value of equipment when Lycos extended its leases of that equipment, which CSI's experts confirmed is not the case.[50] | • *Undisputed Facts*. CSI admits that any factual dispute is irrelevant, and does not provide specific evidence of any disputes. Accordingly, Lycos's facts should be deemed admitted.<br>• *Argumentative, unsupported, non-responsive*. The first sentence of CSI's Response is argument unsupported by citation to the record. It should therefore be stricken. The balance is argument that misstates Lycos' position as Lycos does not contend that CSI was not entitled to charge more than its booked residual value or that mark-up is a term used in the leasing industry. | • CSI does not state that the dispute of fact is irrelevant, only that the initial facts raised by Lycos are irrelevant to its summary judgment motion. Though Lycos raises irrelevant facts, CSI rebuts them with its own contrary facts.<br>• CSI does not misstate Lycos' position and does not engage in impermissible "argument." CSI is entitled to bring forth evidence, including the inferences there from, to demonstrate a disputed issue of fact (which, in some cases, are not material facts which Lycos has raised). Fed. R. Civ. P. 56(c). |
| 4. | Soon thereafter, CSI and Lycos refinanced, in the words of CSI's | Disputed and misleading. CSI's evidence demonstrates that it was Lycos's desire to re-write | • *Undisputed Facts*. Because CSI does not provide specific evidence to dispute | • CSI puts forward facts which on their face and by their |

---

[48] Fleming Aff,  44-52; Johnson Aff.  25-27; Schallheim Aff.  7 (Gabos Decl. Exs. 3-5, respectively).
[49] Fleming Aff,  11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively).
[50] See generally Fleming Aff., Johnson Aff., Schallheim Aff. (Gabos Decl. Exs. 3-5, respectively)

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | co-CFO, "almost every Lycos schedule out there." In addition to resulting in millions of dollars of mark-ups for CSI, Mr. Stenberg earned hundreds of thousands of dollars in commissions and bonus commissions on these refinancings | its CSI lease portfolio because it wanted to lower its monthly rental payments.[51] Just months earlier in May 2001, Lycos' Human Resources Officer John McMahon had notified all employees that Lycos was "sharpening our focus on bottom line results," which included "expense reduction initiatives"[52] — i.e., layoffs and other measures.[53] As stated previously, CSI's experts reject Lycos' theory concerning mark-ups and the notion that these transactions were "refinancings" of loans rather than true leases.[54] | any of Lycos's facts, Lycos's facts should be deemed admitted.<br>• *Non-responsive.* The transactions at issue in Lycos's 56,1 Statement took place in fall, 1999 (see Ex, 70 to Dec!, of T. Bean); what McMahon wrote in 2001 is of no import,<br>• *Inadmissible-Expert* As discussed above, whether the refinancings were leases or loans is a question of law for the Court. | reasonable inference, dispute the assertions and implications made by Lycos. The citations to the record are clearly stated.<br>• Schedules 93/94 were consummated in early November 2001. Lycos' financial condition, as expressed by Mr. McMahon, is relevant to show Lycos' motive to lower its monthly payments, among other things.<br>• As stated, whether a lease is in fact a loan is not a pure issue of law, and CSI has come forward with facts which rebut Lycos' assertions that the leases – including schedules 93/94 – were actually loans or conditional sales, as Lycos alleges. |
| 5. | Mr. Stenberg himself that addressed the role of refinancing as part of CSI's business in an e-mail he wrote to CSI managers that he called his "Tom Cruise Mission Statement" He wrote: "What is our business? It's getting deals and eventually | Disputed and misleading. Mr. Stenberg does not mention "refinancings" of loans, and it is clear from the testimony of CSI's experts to testimony from Lycos itself that these transactions were always treated and accounted as leases.[55] Further, Mr. Stenberg's testimony makes clear why it is not CSI's business model to always | • *Undisputed Facts* While Stenberg may have referred to the "refinancings," as "rewrites," this distinguish [sic] is immaterial. Because CSI has simply sought to explain the quotations from its web-site and Mr. Stenberg but does not disputed them, Lycos's facts should | • CSI disputes Lycos' facts with evidence. Lycos' particular "spin" on those facts is irrelevant for summary judgment purposes. Again, CSI has evidence that the equipment schedules and Master Lease did |

---

[51] Deposition of Paul Stenberg, dated Jan. 19, 2007 ("Stenberg Dep..") at 696:11-13; 697:3-14 (Gabos Decl Ex.. 8); Deposition of Timothy Wright, dated Jan, 12,2007 ("Wright Dep ") at 102:15-104:4 (Gabos Decl. Ex. 9)
[52] E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex, 18).
[53] Wright Dep at 94:21-95:3 (Gabos Decl. Ex. 9).
[54] Fleming Aff. 11-21; Johnson Aff. 8-20; Schallheim Aff. 11-14 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex, 2)
[55] Fleming Aff. 17-21; Johnson Aff. 14-20; Schallheim Aff. 11-12 (Gabos Decl. Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2)

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | turning them into Smart track and then re-writing them- At the expiration of the lease, we sell it to them. Period." Mr. Stenberg even cited Lycos in this e-mail as his sole example of what CSI's business model could achieve. | advocate lease extensions because there are a "[l]ot of times rewrites don't make sense."[56] | be deemed admitted | not evidence "loans" but were, in fact leases. |
| 6. | According to CSI's website in effect during all or a portion of the parties' relationship, CSI's customers "trust [it] to manage the leasing process efficiently and ethically, while catering to their own unique needs," CSI's chairman also testified that he expected the company's account executives to conduct themselves with "honesty, integrity, forthrightness, and dignity " Notwithstanding that, when Lycos asked him in deposition whether CSI gives any information to a customer in connection with a refinancing other than the new monthly rate and the new term he responded: "It depends - it depends on what they ask for." Mr. Stenberg also once wrote to the co-CFOs of CSI: "Because they trust us to do quarterly's and pay a significant amount of stub, they don't always | Disputed and misleading. Lycos' citations to CSI's website and out-of-context testimony[57] concerning what CSI discloses to customers is irrelevant to whether CSI was required to disclose any portion of its gross profit on its lease transactions (which Lycos calls an improper "mark up") — and which CSI's experts state is not done or required in the industry.[58] As to Mr. Stenberg's comment ("isn't that what we want?"), he explained in his deposition that customers may want to add the software costs into the leases with the hardware cost rather than pay out of pocket separately for the software.[59] | • *Undisputed Facts.* CSI does not dispute Lycos's quotations from its web-site, the deposition of its chairman, or the deposition of Stenberg. Instead, it seeks to explain those statements. Accordingly, Lycos's facts should be deemed admitted. | • CSI's facts dispute the statements and implications of Lycos' citation to web pages. Rather than "explaining" the statements, it sets forth the facts as well as the reasonable inferences there from, which is proper. Fed. R. Civ. P. 56(c). |

---

[56] Stenberg Dep Aug 24, 2006, at 244:8-15 (Gabos Decl. Ex 8)

[57] CSI's Chairman answered Lycos' questioning by stating that information provided to customers is essentially fact specific Bean Aff. Ex. 20 at 83:1-84:20 (testimony of Kenneth Steinback) For example, there is no need to disclose equipment cost information to customers because "[t]hey have it" already, as they— not CSI— select and procure the equipment they ultimately lease from CSI id.

[58] CSI's experts have opined that the term "mark ups" are not used in the industry and are a fabrication of Lycos for purpose of this litigation. Fleming Aff. 11-16; Johnson Aff. 8-13; Schallheim Aff. 13-14 (Gabos Decl. Exs. 3-5, respectively). Further, these types of disclosures are neither required nor common in the industry. Id.

[59] Stenberg Dep. at 225:21-226:7 (Gabos Decl. Ex 8).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | not know what is being invoice to us <isn't that what we want?" | | | |
| 7. | As a result of these "infamous" refinancings, of the more than $4.7 million in commissions Mr. Stenberg earned on the Lycos equipment schedules alone, he reaped more than $3.4 million - 72% of his total commissions—from refinancings. | Disputed and irrelevant. Again, the transactions were leases, not loans that were "refinanced," and Lycos understood this and treated them as such.[60] | • *Undisputed Facts.* Because CSI does not even respond to Lycos's facts let alone provide specific evidence to dispute them, Lycos's facts should be deemed admitted.<br>• *Immaterial Dispute* The use of the word "refinancing" rather than "rewrite" is a semantic disagreement. | • CSI disputes the facts and implications of Lycos, and its contrary facts are cited.<br>• The use of "refinancing" is more than a semantic disagreement – Lycos uses it to argue that the transactions were loans (with too high a yield for CSI) and not leases. This is incorrect, though it forms a cornerstone of Lycos' damages and liability theories, and CSI has rebutted this with evidence. |
| 8. | In July 2001, Mr. Stenberg was promoted to Regional Manager. Employees promoted to this position at CSI typically give up their individual accounts, but CSI deviated from the norm and permitted Mr. Stenberg to retain the Lycos account A few months later, CSI and Lycos entered into what CSI referred to internally as the "big one"- a refinancing of over thirty schedules, almost all of which | Disputed and misleading. The evidence shows that Lycos wanted to lessen its monthly spending for many reasons including: (a) the "expense reduction initiatives" mentioned in Mr. McMahon's memorandum to all employees[61] ; (b) Lycos' desire not to capitalize the leases[62] (and instead continue to claim operating lease accounting treatment for them)[63]; (c) its stated desire to lessen monthly expenses[64] (including an approximate $400,000 monthly savings by entering into Schedules 93 and 94); and (d) its inability to return a large portion of the leased | • *Undisputed Facts.* Because CSI does not respond to Lycos's facts let alone provide specific evidence to dispute them, Lycos's facts should be deemed admitted.<br>• *Immaterial Facts.* Whether Lycos wanted to reduce its monthly expenses, treat them as operating leases, or had a policy of not purchasing equipment it could lease, is immaterial to the question of whether CSI failed to disclose information it was required, as | • CSI does respond to Lycos' factual assertions. The implication of Lycos' facts is that Mr. Stenberg was motivated to force Lycos into entering schedules 93/94 because he was compensated for that extension. CSI is entitled to rebut by showing, among other things, that Lycos had its own incentives to enter the lease extensions regardless |

[60] Fleming Aff. 17-21; Johnson Aff. 14-20; Schallheim Aff. 1-12 (Gabos Decl Exs. 3-5, respectively); Guilfoile Dep, at 203:4-11 (Gabos Decl. Ex. 2)
[61] E-mail from John McMahon to Lycos Network Employees, dated May 8,2001 (Gabos Decl. Ex 18).
[62] Lycos' policy was not to buy anything that it could lease instead. Galvan Dep, at 32:3-13 (Gabos Decl. Ex. 6)
[63] In fact, it was Lycos's parent company in Spain, Terra Networks, that eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003. Callagee Dep, at 49:17-50:4 (Gabos Decl.. Ex.. 7). Moreover, Mr. Guilfoile, Lycos' Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification Guilfoile Dep. at 79:21-80:9 (Gabos Decl Ex 2).
[64] Deposition of Brian Reale ("Reale Dep ") at 11:3-9 (Gabos Decl. Exh. 12); Deposition of Eric Ausubel, dated Ian. 5, 2007 ("Ausubel Dep,") at 140:5-17 (Gabos Decl. Ex, 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-111:7.

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | themselves had previously been refinanced - onto two new schedules known as schedules 93 and 94., CSI developed a structure that terminated some schedules early and caused some, but not all, of the equipment to roll onto schedule 94 immediately while allowing other schedules to run their term until rolling onto schedules 93 and 94 more than a year later. CSI's co-CFO himself described the structure and the documents evidencing this refinancing in an internal CSI email as "complex" and "convoluted." Mr. Stenberg, who earned the highest possible scores on his performance evaluations for knowledge of equipment leasing and gaining the trust of the decision-maker at his customers, made over $2 million dollars in commissions on the refinancing of schedules 93 and 94 alone. | equipment because they could not locate it (a fact they kept from CSI, the owner of the equipment)[65] Furthermore, CSI structured the deal to benefit Lycos and minimize the amount of the letter of credit it had to post by leaving the existing debt in place on the existing schedules.[66] | a matter of law, to disclose.<br>• *Unsupported Facts* There is no evidence to support the proposition that Lycos wanted to "lower its monthly payments" to "claim operating lease treatment." Neither the Callagee transcript citation nor the Guilfoile transcript citation (which misstates his testimony-he later corrected himself and stated he did not know whether Lycos tested each schedule for operating lease classification) support the proposition for which CSI offers them,. Further, Ms Callagee's e-mail, sent in July, 2003 (fn 65), is irrelevant as it was sent two years after the transaction described in the Lycos's facts.<br>• Unsupported Facts  Mr. Cagney testified that the structure was what Mr.. Stenberg (of CSI) "wanted to do" (Tr. at 245:7-19).. Whether the structure "benefited" Lycos or CSI as CSI now claims is not supported by Mr. Cagney's testimony and is irrelevant because there is no evidence to suggest Lycos requested a letter of credit as small as possible and, more importantly, does not obviate the fact that Mr. Cagney testified that the structure was "complex" and "convoluted." | of Mr. Stenberg.  CSI has done so.<br>• Lycos' motives for entering schedules 93/94 are not "immaterial."  CSI disputes that it had any duty to disclose its gross profits (which Lycos has called "mark ups"), but it is relevant also to the issue of causation and reliance:  Lycos had its own desire to extend its leases with CSI due to Lycos' financial condition at the time and would have done so regardless of disclosures from CSI (even assuming such disclosures were required).<br>• CSI has put forward much evidence that Lycos wanted to lower its monthly lease payments, and need not recite it again here.  See CSI's responsive statements of fact.  Lycos' further discussion of the weight to be accorded CSI's evidence is not relevant to a determination on summary judgment.<br>• Lycos' citation to Mr. Cagney's testimony is, again, its own "spin" on that.  The evidence supporting CSI's contrary position on these issues is set forth in its responsive fact |

[65] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex 14) at LYC19624-625
[66] Cagney Dep. at 245:7-19; 256:2-9 (Gabos Decl. Ex. 10)

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | statement. |
| 9. | A few months after the commencement of schedules 93 and 94, Lycos discovered what appeared to be a more than $11 million increase in the gross payments it would be required make under those schedules as compared with the amounts it would have been required to make had it not refinanced. In response, Lycos's Chief Financial Officer, Brian Lucy, wrote an e-mail to Mr. Stenberg in which he said: I would expect a slight increase in our 0[ut]/S[tanding] commitment, but this is a problem that would need to be rectified in short order.  If these numbers are in fact correct, I would have to ask to unwind the refinancing. | Disputed and misleading. Mr. Lucy's e-mail to Mr. Stenberg in March 2002 was written long after Lycos had already entered into Schedules 93 and 94 and begun paying its new lower monthly rent — and therefore the e-mail could not have formed any basis for Lycos entering into those transactions. Further, it was based on information admittedly given to it by Mr. Stenberg months earlier;[67] that Lycos did not bother to review that information prior to executing Schedules 93 and 94 only highlights that Lycos needed to achieve the cost savings and other goals for which Lycos extended its leases (see preceding paragraph). As for the implication that Lycos could "unwind the refinancing" even if it wanted to, Lycos presents no evidence that it had the right to rescind a deal that it had voluntarily entered months before and prior to its review of information it allegedly was now questioning. | • *Undisputed Facts.*  Because CSI does not dispute Lycos's facts, let alone with specific evidence, Lycos's facts should be deemed admitted<br>• *Argumentative*. CSI's entire response is an argument as to why Mr. Stenberg's e-mail in March, 2002 - an e-mail not even mentioned in Lycos's facts - is irrelevant to the discussion. | • CSI has disputed the "facts" Lycos puts forward, and demonstrated that they are incomplete and misleading.<br>• CSI is entitled to put forward its own relevant facts (and the inferences there from) to demonstrate that Lycos is not showing the complete situation and that its misleading assertions are disputed by contrary facts.  *See* Fed. R. Civ. P. 56(c). |
| 10. | Mr. Stenberg responded in an e-mail to Mr. Lucy assuring him that this was not the amount of the difference, in which he wrote:  This is what I have so far so you can rest easy.<br>      Present Value of Lease $23,727,000<br>      Obligation of old Leases $20,215,000<br>      Difference 3,512,000 | Disputed as misleading. Again, the e-mail from Mr. Stenberg came well after Schedules 93 and 94 were entered into by the parties. It was described by Mr. Stenberg as a work in progress ("I have come up with the following so far"), and Mr. Lucy said he would "take a look" at it — but the evidence shows that he never responded to Mr. Stenberg on this. CSI has evidence that no one at Lycos ever relied on this e-mail in any event[68] — and, in fact, importance was only attached to the email when litigation started between the parties At his deposition in this case, Mr. Lucy never recalled receiving the March 18, | • *Undisputed Facts*  Because CSI does not even respond to Lycos's quotation from Mr. Stenberg's e-mail, let alone refute it with specific facts, Lycos's facts should be deemed admitted.<br>• *Argumentative*  Whether Lycos relied on this e-mail is immaterial to Lycos's c. 93A claims. The question is whether Mr. Stenberg made knowing and willful misrepresentations. | • CSI does, in fact, respond to Lycos' assertions and provides a complete picture of the situation to dispel the misleading and narrow view presented by Lycos.  It is entitled to do this as the nonmoving party on summary judgment.<br>• CSI's facts are not "argumentative," and it is nonsensical that Lycos claims that "[w]hether Lycos relied on |

---

[67] Bean Aff. Ex. 31 at L YC24612 ("The obligations under the new refinanced leases came from the schedule below that you mailed to Monique [Walsh, of Lycos]").

[68] Johnson Aff.  65-68 (Gabos Decl. Ex, 4).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | 2002 e-mail from Mr. Stenberg and did not recall relying "in any way" on the statements made by Mr. Stenberg in the e-mail.[69] In fact, it was not until January 7, 2004 — after Lycos had first filed suit against CSI — that Lease forum's John Kirk informed the "Team" (including Lycos' outside counsel) that he had found the March 18, 2002 e-mail and that it "may be important."[70] It is clear that Lycos never relied on any statements made by Mr. Stenberg in the March 2002 e-mail and that it was not until Lycos had filed suit and was searching for a claim did it attribute any importance to this e-mail. | | this e-mail is immaterial," when Lycos is claiming this as an element of its fraud case. |
| 11. | Mr. Lucy, who had no background in equipment leasing and trusted Mr. Stenberg, did not pursue the matter further. | Disputed. Mr. Stenberg has testified at length concerning the March 18, 2003 email.[71] However, it was not a matter of "trust" that caused Mr. Lucy not to "pursue the matter further." Lycos did not trust Mr. Stenberg — at times, Lycos referred to him as a "worthless liar" —and its in-house counsel cautioned Mr. Lucy not to rely on Mr. Stenberg because "he [Stenberg] doesn't work for Lycos."[72] In addition, the evidence is clear that Mr. Lucy cannot recall the March 2002 e-mail from Mr. Stenberg (much less any reliance he placed on it), and it was not until litigation had commenced that Lycos' litigation consultant and witness — | • *Undisputed Facts* CSI does not even respond to Lycos's facts, let alone controvert them with specific evidence.. Accordingly, Lycos's facts should be deemed admitted.<br>• *Argumentative.* That one in-house lawyer at Lycos cautioned Mr. Lucy against trusting Mr. Stenberg demonstrates, or at least implies, that Mr. Lucy did trust Mr. Stenberg. Otherwise, there would have been no point in in-house counsel's cautioning Mr Lucy. | • CSI responds to the factual assertions of Lycos – including the issue of "trust" raised by Lycos in its statement – and provides facts showing that Lycos in fact did not trust Mr. Stenberg.<br>• Lycos' "spin" on the unfavorable statements of Lycos' in-house officers is irrelevant to summary judgment. The fact is that CSI has evidence that Lycos did not trust Stenberg – referring to him |

---

[69] Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep ") at 52:8-53:20 (Gabos Decl. Ex. 19}

[70] E-mail from John Kirk to Lycos' litigation "Team," dated Jan 7, 2004 (Gabos Decl. Ex 20)

[71] Stenberg Dep. (Aug. 26,2006) at 352:3-388:23 (Gabos Dec1. Ex.. 8).

[72] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar and an a\*\*hole, to which Mr. Ripps replies with another disparaging remark concerning Mr Stenberg See Gabos Decl. Ex. 15. In addition, Mr Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on and "trusted" Mr. Stenberg, "[w]hy do you trust Paul [Stenberg]? [H]e doesn't work for Lycos " Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Little Decl. Ex 16).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | who had and still has a contingent financial interest in the outcome of the case[73] — determined it could be of use in creating a claim against CSI (see preceding paragraph) | | as a "worthless liar" among other bad epithets – and this is proper to dispute Lycos' theory that Lycos was duped into extending leases because it "trusted" one of CSI's salespersons. |
| 12. | Yet, contrary to Mr. Stenberg's representation, the gross difference in the amount of the payments on schedules 93 and 94 exceeded the payments on the schedules refinanced by almost $10.5 million. CSI's internal accounting records also reveal that regardless of whether one used the 8.16% discount rate Mr. Stenberg had used when he requested that CS1 write schedules 93 and 94, or the 12.64% rate he apparently used to cause the gross payments on those schedules to equal his discounted number of $23,727,000, the difference was more than double the $3.5 million he represented to Lycos | Disputed and irrelevant. Mr. Stenberg testified concerning the e-mail.[74] As stated, Lycos has no evidence that it ever relied (or even recalled) the March 18, 2002 e-mail from Mr. Stenberg, In fact, it was only upon commencement of litigation that the e-mail was reviewed and used as a basis for claims brought against CSI (See preceding paragraph) | • *Undisputed Facts.* CSI does not dispute, let alone provide evidence of facts controverting, Lycos's facts. Accordingly, those facts should be deemed admitted.<br>• *Immaterial Facts.* Whether Lycos relied on Mr. Stenberg's e-mail is irrelevant to Lycos's c. 93A claim. | • CSI addresses, with contrary evidence, Lycos' "evidence" concerning the e-mail from Stenberg and that it relied on that e-mail.  As stated in its Opposition brief, CSI has evidence that Mr. Lucy, the primary recipient of the e-mail, did not even recall receiving it, let alone rely on it.  Mr. Lucy's testimony on this is not properly contradicted by the summary judgment affidavit he later signed and which Lycos submitted with its papers.<br>• Whether Lycos' reliance on Stenberg's e-mail is relevant as a matter of law to Lycos' 93A claims is disputed.  However, there is not dispute that CSI's reliance (or lack thereof) on the e-mail goes to causation – and there is no dispute that Mr. Stenberg's e-mail, which came months *after* Lycos completed its lease extensions, in no way |

---

[73] Susan Franklin, founder and principal of Leaseforum, admitted under oath that Leaseforum holds a contingent financial interest in the outcome of this case Deposition of Susan Franklin, dated Feb. 21, 2007 ("Franklin Dep.") at 373:5-8 (Gabos Decl. Ex. 21)

[74] Stenberg Dep (Aug. 24, 2006) at 352:3-388:23 (Gabos Decl. Ex. 8).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | | | "caused" it to enter any lease extension. |
| 13. | Two leasing experts Lycos retained during the course of its relationship with CSI - both of whom issued written reports to Lycos - did not uncover the existence of or CSI's methodology for implementing the mark-ups. Lycos uncovered them only through an expert with a Ph.D. in mathematics and twenty-eight years of experience in equipment leasing who spent hundreds of hours reviewing CSI's internal financial records and other material in this case. | Disputed. Lycos' "[t]wo leasing experts" did not uncover the "mark-ups" because there are no such things., CSI's experts have testified to that, as well as the fact that CSI made the necessary disclosures to Lycos and otherwise acted properly and within industry standards.[75] Lycos' expert PhD in mathematics essentially created this theory which has no basis in industry practice and, in essence, seeks to require disclosure of a lessor's profits on leasing transactions — which is not the case.[76] | • *Undisputed Facts* CSI does not even respond to Lycos's facts, let alone provide specific evidence controverting them.<br>• *Immaterial Facts* As noted above, whether the term "mark-up" is used in the leasing industry is immaterial to Lycos's claims. | • CSI is properly disputing Lycos' contention that "mark ups" – a term it creates itself for this case – were not "discovered" until Lycos retained its own experts. Again, "mark ups" are nothing more than the nefarious term Lycos attempts to apply to CSI's gross profits – which CSI disputes vigorously with facts in the record. |
| 14. | The mark-ups enabled CSI to earn almost double the rate of return it earned on Lycos's new equipment schedules and approximately double its average rate of return on its equipment leases generally. | Disputed and misleading. According to three of CSI's experts — two with doctorates in finance and many years of academic study in leasing and one well over twenty years of experience as the president of the Equipment Leasing Association ("ELA") — who directly refute Lycos' expert Bruce Smith, the term "mark-up" is not used in the industry and is a fabricated theory without merit.[77] | • *Undisputed Facts.* CSI does not provide evidence to refute Lycos's assertion that it earned almost double the rate of return it earned on new equipment schedules and approximately double its average rate of return. Accordingly, Lycos's facts should be deemed admitted,<br>• *Immaterial Facts.* Whether the term "mark-up" is used in the leasing industry is immaterial. | • The premise of Lycos' assertion is that "mark ups" were improper and undisclosed and allowed CSI to reap an improper benefit from Lycos. CSI has disputed this with the evidence it identifies in its fact response.<br>• See above concerning the argument that "mark up" is a created term which essentially stands for CSI's gross profits, which it need not disclose as a matter of law or industry practice. |
| 15. | When CSI later sold the equipment to Lycos, Mr, Stenberg earned yet | Disputed as misleading, and irrelevant.. Mr. Stenberg, as other sales representatives at CSI, | • *Undisputed Facts* CSI does not provide evidence controverting Lycos's | • CSI's dispute is not "irrelevant;" as stated many |

---

[75] Fleming Aff  11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively).
[76] See generally Fleming Aff; Johnson Aff,; Schallheim Aff (Gabos Decl. Exs. 3-5, respectively)
[77] Fleming Aff.  11-16; Johnson Aff.  8-13; Schallheim Aff.  13-14 (Gabos Decl. Exs. 3-5, respectively).

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | another commission, an additional $513,750 in commissions, an amount Mr. Stenberg complained to CSI's chairman and CEO to be inadequate. | earned a portion of his compensation in commissions which were based on leasing that CSI did with customers — but this is irrelevant.. The implication of Lycos' statements is that Mr. Stenberg, due to a purported incentive to do additional leases, somehow convinced a sophisticated company like Lycos to enter into bad business transactions that they otherwise would not have done This is contradicted by the following evidence, among others: (a) Lycos was run by several highly-educated and experienced business leaders, including many entrepreneurs who, in addition to their own expertise, also had available to them accountants, lawyers, and consultants who advised them (in fact, one such consultant advised Lycos in December 2000 that its leasing practices were problematic;[78] (b) Lycos itself never trusted Mr. Stenberg, as an internal Lycos document calling Mr. Stenberg a "worthless liar" and testimony demonstrate;[79] and (c) it was purely Lycos' decision to extend its leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[80] | facts as to the amount of commission Mr. Stenberg earned or that he complained to CSI's chairman about that amount Accordingly, Lycos's facts should be deemed admitted. Indeed, CSI describes its disagreement with Lycos's facts as "irrelevant."  • *Unsupported Facts.* The first two sentences of CSI's response contain no citation to the record. Accordingly, they should be stricken. | times above, CSI provides its contrary facts concerning assertions made by Lycos which are themselves not relevant to its summary judgment motion.  • There is no need to cite each sentence to the record, as Lycos claims. Only material facts need be cited, and CSI has done this here and elsewhere. |
| | II. Counts VII-XIII - Alleged Unjust Enrichment and Money Had and Received | | | |
| | A. Alleged "Undisputed" Facts Material to Lycos' Claim that CSI is | | | |

---

[78] See Supra 1-2; E-mail from Julie Callagee to in-house counsel Peter Karol (Gabos Decl. Ex. 14).

[79] In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated September 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**ho le," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg.. See Gabos Decl. Ex 15. In addition, Mr. Karol testified that he told Brian Lucy — the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg — "why do you trust Paul [Stenberg]? [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec 8, 2006 ("Karol Dep ") at 168:21-169:15 (Little Decl. Ex 16)

[80] Fleming Aff. 52; Johnson Aff. 22 (Gabos Decl. Exs. 3-4, respectively)

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | Liable to It on these Claims | | | |
| 1. | The Master Lease Agreement provides, in pertinent part: Lessee's obligation to pay the Monthly Rental and all other sums due hereunder shall be unconditional and shall not be subject to any setoff, abatement, counterclaim, recoupment, defense, cancellation, repudiation, rejection of equipment, revocation of acceptance of equipment or any other right that Lessee may have against Lessor. | Disputed as misleading, but not material. Lycos quotes language from section 5 of the Master Lease Agreement Number 144874 (the "Master Lease") to which both CSI and Lycos agreed at the inception of their relationship.[81]  As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of both parties — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the financing that they no to do business."[82] | • *Undisputed Facts.* Because CSI asserts that Lycos's facts are only "misleading," and does not provide specific evidence of any facts controverting Lycos's facts, Lycos's facts should be deemed admitted,. <br> • *Bad Faith.* CSI's failure to admit language quoted directly from the Master Lease Agreement demonstrates its bad faith in responding to Lycos's facts. | • CSI brings forth evidence disputing both the assertions and their implications by Lycos, which it is entitled to do under Rule 56(c). <br> • CSI has not disputed the language quoted – it disputes only the implication Lycos makes with that language, and CSI brings forth contrary evidence which precludes summary judgment. |
| 2. | In construing this clause, CSI argued earlier in this case that: These types of clauses, known as 'hell or high water' provisions require the lessee to make payments under the lease 'come hell or high water,' without regard to defenses that the lessee might wish to assert against the lessor, and without any right of recoupment. | Disputed as misleading, but not material.  As CSI has explained in previous submissions, the quoted provision — as with the other provisions in the Master Lease governing the rights and obligations of both parties — is necessary as it the "enforceability of these clauses that permits equipment finance companies [such as CSI] themselves to obtain the Financing that they need to do business.[83]  Both parties agreed to the Master Lease, as evidenced by their signatures.[84] | • *Undisputed Fact*s. CSI admits that any dispute it has is "not material" Further CSI does not provide specific evidence to refute any of Lycos's facts. Accordingly, Lycos's facts should be deemed admitted.. <br> • *Bad Faith*  CSI's failure to admit what it argued to the Court in the past is further evidence of its bad faith in responding to Lycos's facts. | • CSI brings forth evidence disputing both the assertions and their implications by Lycos, which it is entitled to do under Rule 56(c). <br> • CSI has not disputed the language quoted – it disputes only the implication Lycos makes with that language, and CSI brings forth contrary evidence which precludes summary judgment. |
| 3. | Pursuant to equipment schedules 93 and 94 dated November 1, 2001, Lycos and CSI refinanced the | Disputed. It is not proper to use the term "refinancing" as Lycos calls the lease extensions, as both CSI's experts as well as Lycos' own | • *Undisputed Facts.*  Because CSI does not provide any evidence disputing Lycos's facts, Lycos's facts should be | • CSI is disputing the entire premise of Lycos' statement which is misleading in that it |

---

[81] See Ex. 1 to CSI's Amended Complaint,  5 (Docket No 121).

[82] CSI's Memorandum of Law in Support of Plaintiff Computer Sales International, Inc '.s Motion to Dismiss Defendant Lycos, Inc s Counterclaim, dated Mar. 10, 2005, at 3-4 (Docket No. 16).

[83] CSI's Memorandum of Law in Support of Plaintiff Computer Sales international, Inc 's Motion to Dismiss Defendant Lycos, Inc *s Counterclaim, dated Mar. 10, 2005, at 3-4 (Docket No. 16)

[84] Ex 1 to CSI's Amended Complaint (Docket No 121).

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | equipment on thirty-one equipment schedules Those schedules expired by their terms on October 31, 2003 and October 31, 2004, respectively. | former officers agree that the transactions between Lycos and CSI were leases and not loans.[85] | deemed admitted.<br><br>• *Immaterial Dispute.* The use of the term "refinancing" rather than "rewrite" is a semantic difference. The word "refinancing" does not imply a transaction is a loan rather than a lease. Whether the CSI-Lycos transactions were loans or leases is a question for the Court, | uses the term "refinanced," which implies these were loans and not leases. CSI has disputed this with contrary evidence. It is not a matter of "semantics," as Lycos contends. |
| 4. | CSI maintained sales type lease journal entries in accordance with Financial Accounting Standards 13 ("FASB 13"). Under FASB 13, CSI's "estimated residual value" was to equal the equipment's expected "fair value" at the end of the lease term, FASB 13 defines "fair value" as the "price for which the property could be sold in an arm's-length transaction between unrelated parties " | Disputed. While CSI maintained its records in accordance with Financial Accounting Standards Board ("FASB") standards generally, Lycos is incorrect that "CSI's estimated residual value' was to equal the equipment's expected 'fair value' at the end of the lease term" — in fact, its own expert Bruce Smith disputes this. Mr. Smith admitted to the accuracy of a statement on his website that "[Leasing companies often find themselves with seasoned assets on their books that have a current market value well in excess of the book value" but that current accounting rules "prohibit writing up the residual to current market value."[86] | • *Undisputed Facts.* CSI admits that it maintained its books in accordance with FASB. Lycos then simply quotes FASB for what FASB provides. What FASB provides is not a dispute of material fact as the Court can read FASB and construe what it provides | • CSI disputes the entire premise of Lycos' statement – that its residual value booked for accounting purposes equals the estimated "fair value" of the equipment at lease end. CSI has come forward with expert and other evidence contradicting this. |
| 5. | At the time CSI booked equipment schedules 93 and 94, it recorded an estimated residual value in accordance with FASB 13 of zero dollars for that equipment as of the end of their terms. | Disputed. Lycos is incorrect that FASB 13 required CSI to book its residual values at zero or that this approximated the true value of the equipment at the end of lease — in fact, Lycos' own expert Bruce Smith disputes this, Mr. Smith admitted to the accuracy of a statement on his website that "[l]easing companies often find themselves with seasoned assets on their books that have a current market value well in excess of the book value" but that current accounting rules | • *Undisputed Facts* Because CSI does not provide evidence controverting Lycos's fact as to the amount of residual value CSI had booked for schedules 93 and 94, Lycos's facts should be deemed admitted.<br><br>• *Immaterial Fact* Under section 1-201(37) of the UCC, one question is whether the length of the lease term exceeded the economic life of the | • CSI disputes the premise of Lycos' statement as to the requirements of FASB or GAAP. The entirety of Lycos' assertions are therefore misleading and rebutted by evidence proffered by CSI.<br><br>• What Lycos raises concerning the UCC is an issue of fact, which CSI has disputed, and |

---

[85] Fleming Aff  17-21; .Johnson Aff  14-20; Schallheim Aff.  11-12 (Gabos Decl., Exs. 3-5, respectively); Guilfoile Dep. at 203:4-11 {Gabos Decl. Ex. 2)

[86] Deposition of Bruce Smith, dated Nov. 9, 2007 ("Smith Dep"), attached as Ex 17 to Gabos Decl.

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | "prohibit writing up the residual to current market value,[87] Moreover, CSI's expert Robert Zises has appraised the equipment leased by Lycos from CSI as of August 2003 to have had a fair market value of approximately $3,000,000[88] - and there was also substantial "in-place" value to Lycos for the equipment[89] | equipment. None of the lease terms ended in August 2003. Accordingly, Mr. Zises valuation of the equipment in August 2003 is immaterial | which further demonstrates that an analysis under UCC § 1-201(37) is not a pure issue of law, as Lycos has contended. As for Mr. Zises valuations, as well as those of CSI, those are addressed in CSI's Opposition brief. |
| 6. | In Summer 2003, CSI and Lycos entered into a Sales Agreement pursuant to which CSI sold to Lycos all of the equipment on thirteen equipment schedules, including schedules 93 and 94, on the terms set forth in that agreement including, without limitation, an up-front payment of $3.775 million | Disputed as misleading  The Sales Agreement Number 199614 ("Sales Agreement") executed on August 8, 2003 by Lycos (and by CSI three days later) makes clear that CSI "retains title" to the leased equipment until the leases are satisfied in full.[90]  Therefore, though Lycos had achieved its goal of capitalizing its leases as required by its parent company,[91] it did not have title to the equipment at that time or any time prior. | • *Undisputed Facts*  Because CSI does not provide specific evidence disputing the facts asserted by Lycos, Lycos's facts should be deemed admitted. <br> • *Argument*. Instead of responding to Lycos's facts, CSI makes argument based on the Sales Agreement | • Lycos misses the point that the equipment was not "sold," as Lycos uses the term, in August 2003 – title had not passes, per the terms of the Agreement, until equipment was bought by Lycos with all lease terms, including full payment of rents.  The facts set forth by CSI are to contradict the misleading assertions Lycos makes. |
| | B.  Alleged "Undisputed" Facts Material to Lycos's Claim for Damages Under Theories of Unjust Enrichment and Money Had and Received | | | |
| 1. | Lycos paid to CSI all the amounts due under equipment schedules 93 and 94. | Disputed as misleading, and irrelevant. Lycos has no damages.[92]  In any event, Lycos' claim that it "paid twice" for Schedules 93 and 94 — that it, its argument that a percentage of the $3.77 million it paid to buyout its leases with CSI under the Sales Agreement it executed on August 8, | • Undisputed Fads.  Because CSI adduces no evidence to refute Lycos's assertion that it paid all amounts due under schedules 93 and 94, Lycos's facts should be deemed admitted. <br> • Argumentative. Instead of responding | • CSI refutes the misleading assertion that Lycos has complied with its obligations under the Sales Agreement or the leases and that it did not "pay twice" for equipment.  CSI |

[87] Deposition of Bruce Smith, dated Nov 9, 2007 ("Smith Dep ."), attached as Ex. 17 to Gabos Decl.
[88] Expert Report of Robert Zises, dated Aug. 30, 2007, at 14 (Gabos Decl. Ex 22) (sections I and II).
[89] Fleming Aff.  29-74; Johnson Aff.  24; Schallheim Aff.  18 (Gabos Decl. Exs. 3-5, respectively).
[90] Ex. 10 to CSI's Amended Complaint (Docket No, 121) 5.
[91] Deposition of Julie Callagee, dated Apr 26,2006 ("Callagee Dep.") at 49:17-50:4 (Gabos Decl Ex. 7).
[92] Johnson Aff.  69-71; Schallheim Aff.  40-44 (Gabos Decl. Exs. 4-5, respectively).

31

| ¶# | Lycos's 56.1 Statement[*] | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| | | 2003 should be apportioned — ignores the fact that it could not have "paid twice" because title expressly did not pass to Lycos at the time of the August 2003 Sales Agreement.[93] | to Lycos's facts, CSI proffers legal argument. This argument should be stricken. | does so with contrary evidence. <br> • CSI is not engaging in legal argument but is merely setting forth the reasonable inferences of the evidence it cites. |
| 2. | Lycos paid to CSI the $3.775 million due under the Sales Agreement on August 1, 2003. | Disputed as misleading, and irrelevant. See preceding paragraph | • *Undisputed Facts*. Again, because CSI provides no evidence disputing any of Lycos's facts, Lycos's facts should be deemed admitted. | • CSI refutes the misleading assertion that Lycos has complied with its obligations under the Sales Agreement or did not have further obligations to honor the continuing equipment schedules. CSI does so with contrary evidence. |
| 3. | The Sales Agreement covered thirteen equipment schedules numbered 64F, 661, 67H, 691, 85, 86, 89, 89A, 90, 93, 94, 100 and 200 (the "Thirteen Schedules"). | Disputed as misleading, and irrelevant. See preceding paragraph | • See above. | • CSI refutes the misleading assertion that Lycos has complied with its obligations under the Sales Agreement or the leases. CSI does so with contrary evidence. |
| 4. | Apportioning the payment of $3,775,000 to the thirteen schedules in accordance with the value of the lease as represented by the present value of the remaining rents plus the present value of the residua! as of August 1, .2003 (the date of the first rent payment following the date of the Sales Agreement) reveals that 75.618603% of this amount is attributable to schedules 93 and 94 together with the six schedules that subsequently rolled into 93 and 94. | Disputed as misleading, and irrelevant. See preceding paragraph | • See above. | • CSI refutes the misleading assertion that Lycos has complied with its obligations under the Sales Agreement or the leases and that it did not "pay twice" for equipment. CSI does so with contrary evidence. |

---

[93] Ex. 10 to CSI's Amended Complaint (Docket No. 121) at 5

| ¶# | Lycos's 56.1 Statement* | CSI's Response | Lycos's Reason(s) to Strike/Deem Admitted | CSI's Response to Lycos' Challenge |
|---|---|---|---|---|
| 5. | Multiplying this apportionment percentage times the total payment of $3,775,000, reflects that Lycos paid $2,854,602 in connection with such schedules | Disputed as misleading, and irrelevant. See preceding paragraph | • See above. | • CSI refutes the misleading assertion that Lycos has complied with its obligations under the Sales Agreement or the leases and that it did not "pay twice" for equipment. CSI does so with contrary evidence. |

# EXHIBIT B



888.825.DEPO (3376)
www.court-reporting.com

Making Your Case

O'BRIEN&LEVINE

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc., et al.

Transcript of the Testimony of:

# Peter W. Daley

# December 7, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)



ORIGINAL

James A. Scally   26592

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

152

1        Q.   And the total value that you came up with, valuing

2    all the equipment on the schedules as of July 15th, '03,

3    using that calculation was this figure of $7,014,678 in

4    column 9 at line A; is that right?

5                    MR. BEAN:   Objection.

6        Q.   You can answer.

7        A.   No.

8        Q.   Looking at Exhibit 753-A, column 9, going down to

9    line A, do you see the figure opposite -- on the "Total"

10   line --

11       A.   Yes.

12       Q.   -- under column 9?

13       A.   But that is not the total for 93 and 94.

14       Q.   The total -- that's the total for all the

15   schedules --

16       A.   Yeah.

17       Q.   -- that you were valuing at that time, 93, 94, and

18   the other ones that -- that you were -- 89, 89-A, 100, and

19   200, right?

20       A.   That is correct.

21       Q.   Okay.  So we -- this valuation is different

22   because it -- it's not only a different date, it adds in a

23   couple of other schedules that were included at that time;

24   is that right?

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

153

1      A.    Yes.

2      Q.    Okay.  And using the method of -- the calculation

3  method that you just described for column 9, the value that

4  you came up with for all the equipment on all the schedules

5  that you had, 93 and 94 and the other schedules that were

6  in existence as of July of '03 was this $7,014,678; is that

7  right?

8                    MR. BEAN:  Objection.

9      A.    That is --

10     Q.    You can answer.

11     A.    That is the value on 753-A on this draft report,

12  yes.

13     Q.    When you looked at -- column 10, the next column,

14  "Net fair market value to CSI, fair return value for all as

15  of 7/15/03," do you see that?

16     A.    Yes.

17     Q.    Again, you were valuing in that column all the --

18  the equipment on all the schedules that you understood to

19  be extant at that time, not just 93 and 94, but also the

20  others, 89, 89-A, 100, and 200; is that right?

21     A.    That was -- that was the value for all of the

22  equipment for all schedules for CSI, 93 through 200.

23     Q.    Okay.  And you used the same methodology to come

24  up with that value as you had used to come up with the

# EXHIBIT C

EXHIBIT
753 A

These notice are incomplete and have been prepared for personal use only. No one may rely on them for any purpose. All views are subject to change as additional information becomes available or is clarified.

## Lycos Portfolio Analysis

# Lycos Portfolio Analysis

These notes are incomplete and have been prepared for personal use only. No one may rely on them for any purpose. All views are subject to change as additional information becomes available or as clarified

| Mfg Point Install Date = Assumed / NBV Ex. | Qty | Machine Type/Model | Feature | Asset # | Description | Serial # | Lease Term | Monthly Rent Per Unit | Tot Rent | Qtrs | FMV % on Comm Date | FMV % @ 11/1/01 | FMV % @ 10/31/03 | FMV % @ 10/31/04 | FMV % @ 7/18/02 | FMV % for 83 thru 200 | Hard Cost of Equipment/Each | Soft Cost Each | Total Soft Cost | Total Hard Cost of Equipment | Total Cost of Each Saleable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | Printer |
| 04/30/05 | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | Comm | $5,131,007.27 | 70.0% |
| 07/31/04 | | | | | | | | | | | | | | | | | | | | $2,210,047.76 | 4.0% |
| 11/01/01 | | | | | | | | | | | | | | | | | | | | $6,340,055.02 | 4.2% |
| 10/31/03 | | | Comm | | | | | | | | | | | | | | | | Disk | $2,637,653.12 | 0.0% |
| 10/31/04 | | Server | 0.25 | | | | | | | | | | | | | | | | | $749,045.23 | 4.0% |
| 07/15/03 | | PC | 0.15 | | | | | | | | | | | | | | | | | $3,386,499.35 | 56.0% |
| 0.54 | | Monitor | 0.25 | | | | | | | | | | | | | | | | Laptops | $2,146,077.33 | |
| 0.48 | | Printer | 0.25 | | | | | | | | | | | | | | | | | $240,591.74 | |
| 0.43 | | Disk | 0.05 | | | | | | | | | | | | | | | | | $2,386,669.07 | |
| 0.64 | | Laptop | 0.25 | | | | | | | | | | | | | | | | Monitors | $411,325.87 | |
| 0.58 | | | | | | | | | | | | | | | | | | | | $38,934.06 | |
| 0.40 | | | | | | | | | | | | | | | | | | | | $450,265.93 | |
| 0.48 | | | | | | | | | | | | | | | | | | | PCs | $3,355,914.76 | |
| | | | | | | | | | | | | | | | | | | | | $382,844.36 | |
| | | | | | | | | | | | | | | | | | | | | $3,718,759.12 | |
| | | | | | | | | | | | | | | | | | | | Printers | $108,599.17 | |
| | | | | | | | | | | | | | | | | | | | | $18,607.89 | |
| | | | | | | | | | | | | | | | | | | | | $127,206.06 | |
| | | | | | | | | | | | | | | | | | | | Servers | $21,234,032.49 | |
| | | | | | | | | | | | | | | | | | | | | $2,552,616.42 | |
| | | | | | | | | | | | | | | | | | | | | $23,786,668.91 | |
| | | | | | | | | | | | | | | | | | | | $5.34 | $56,023,625.11 | |
| | | | | | | | | | | | | | | | | | | | 89-200 | $6,180,319.46 | |
| | | | | | | | | | | | | | | | | | | | Total | $62,254,144.56 | |

# EXHIBIT D

COPY

1

Volume 1, Pages 1-333

Exhibits:  1-28

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

        Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

        Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

        Trustee Process Defendant

    ------------------------------------

    VIDEOTAPED DEPOSITION OF MICHAEL J. FLEMING

    Wednesday, November 14, 2007, 9:12 a.m.

        McDermott Will & Emery, LLP

            28 State Street

        Boston, Massachusetts


    --------- Alan H. Brock, RDR, CRR ---------

    Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

    617-728-4404   Fax 617-728-4403

316

| | | |
|---|---|---|
| 06:02:32 | 1 | Q.    That language is not clear, is it? |
| 06:02:34 | 2 | MR. KALER:   Objection. |
| 06:02:37 | 3 | A.    You know, literally it would mean whatever |
| 06:02:42 | 4 | the fair market value of the equipment was worth in |
| 06:02:45 | 5 | a secondary market, he would give it to them.  This |
| 06:02:49 | 6 | is what it would say to me. |
| 06:02:51 | 7 | Q.    And this is sort of a side agreement |
| 06:02:54 | 8 | between Mr. Stenberg on behalf of CSI and Lycos; |
| 06:02:58 | 9 | right? |
| 06:02:59 | 10 | MR. KALER:   Objection. |
| 06:03:00 | 11 | A.    If he has the authority to do that, yes, |
| 06:03:02 | 12 | that's what that would be. |
| 06:03:03 | 13 | Q.    And this is the kind of side agreement that |
| 06:03:05 | 14 | the industry frowns on; right? |
| 06:03:07 | 15 | MR. KALER:   Objection. |
| 06:03:08 | 16 | A.    Well, but it only frowns on it when it's |
| 06:03:15 | 17 | not known to all parties.  Most side agreements that |
| 06:03:20 | 18 | are frowned on are side agreements that are made as |
| 06:03:24 | 19 | part of originating new transactions. |
| 06:03:30 | 20 | Q.    Mr. Fleming, your opinions on the |
| 06:03:33 | 21 | standardness of the CSI-Lycos master lease agreement |
| 06:03:38 | 22 | concern only the master lease agreement and not an |
| 06:03:41 | 23 | opinion on the standardness of the schedules; right? |
| 06:03:44 | 24 | MR. KALER:   Objection. |

FARMER ARSENAULT BROCK LLC

317

| | | |
|---|---|---|
| 06:03:44 | 1 | A.    That's true. |
| 06:03:46 | 2 | Q.    You didn't do an analytic comparison |
| 06:03:50 | 3 | between the present value of the rents on any |
| 06:03:53 | 4 | original schedule and any succeeding restructured |
| 06:03:57 | 5 | schedule, did you? |
| 06:03:58 | 6 | A.    Not present value, no.  But I did, as I |
| 06:04:04 | 7 | say, in some of the worksheets -- there were |
| 06:04:07 | 8 | agreements and other testimony -- there were |
| 06:04:12 | 9 | numbers, there were columns, there were totals.  I |
| 06:04:13 | 10 | looked at those.  But I didn't do any further |
| 06:04:16 | 11 | analytics. |
| 06:04:16 | 12 | Q.    And you said that you thought that Lycos |
| 06:04:18 | 13 | could have compared the aggregate amount of rent on |
| 06:04:20 | 14 | a group of schedules that were rolled onto another |
| 06:04:24 | 15 | group of schedules to compare the costs; right? |
| 06:04:27 | 16 | MR. KALER:  Objection. |
| 06:04:27 | 17 | A.    When we were talking about 93 and 94, yes. |
| 06:04:30 | 18 | Q.    And you didn't do any analytics to see |
| 06:04:32 | 19 | whether that could be determined, did you? |
| 06:04:34 | 20 | MR. KALER:  Objection. |
| 06:04:34 | 21 | A.    No. |
| 06:04:34 | 22 | Q.    And if you looked at it only on a gross |
| 06:04:39 | 23 | basis, group of schedules, you couldn't do the 90 |
| 06:04:41 | 24 | percent test to determine whether the restructured |

28

| | | |
|---|---|---|
| 10:00:33 | 1 | A.   Did you want me to read which exhibits are |
| 10:00:35 | 2 | the ones? |
| 10:00:36 | 3 | Q.   Sure.  Which exhibits represent lease |
| 10:00:39 | 4 | documents -- by "lease documents," we're referring |
| 10:00:43 | 5 | to something that Lycos and CSI signed, representing |
| 10:00:48 | 6 | an equipment schedule; right? |
| 10:00:50 | 7 | A.   Right. |
| 10:00:50 | 8 | Q.   So which exhibits that you reviewed |
| 10:00:54 | 9 | constitute an equipment schedule evidencing a |
| 10:00:57 | 10 | restructured transaction signed by Lycos and CSI? |
| 10:01:03 | 11 | A.   Well, let me see which ones are signed, |
| 10:01:05 | 12 | because I'm not sure which ones were signed.  Most |
| 10:01:08 | 13 | of them that I looked at were schedules. |
| 10:01:11 | 14 | Q.   Okay, which are the schedules? |
| 10:01:13 | 15 | A.   Let me read the exhibit. |
| 10:01:14 | 16 | Q.   Sure. |
| 10:01:15 | 17 | A.   23 A. |
| 10:01:17 | 18 | Q.   Let's just take a look at that one for a |
| 10:01:19 | 19 | second.  Callagee 23 A? |
| 10:01:22 | 20 | A.   Yes.  21 A, 22, 191, 191 A, 191 B, 192, |
| 10:01:55 | 21 | 696 -- or is it 646?  696 -- 636, 635, and 194 were |
| 10:02:16 | 22 | documents that I looked at to see the impact of the |
| 10:02:24 | 23 | restructured transactions. |
| 10:02:40 | 24 | Q.   Of the documents that you just listed, sir, |

29

| | | |
|---|---|---|
| 10:02:44 | 1 | is any one of them an equipment schedule? |
| 10:02:50 | 2 | A.   No, I don't believe they are. |
| 10:02:52 | 3 | Q.   So isn't it the case, then, sir, that you |
| 10:02:55 | 4 | did not review a single equipment schedule |
| 10:02:57 | 5 | reflecting the restructuring, as you've defined that |
| 10:03:02 | 6 | term earlier? |
| 10:03:02 | 7 | A.   Not the schedule of equipment. |
| 10:03:04 | 8 | MR. KALER:  Objection. |
| 10:03:09 | 9 | Q.   So on what did you base -- to determine |
| 10:03:13 | 10 | whether or not the restructuring of the equipment |
| 10:03:17 | 11 | was commercially reasonable, as you've described it, |
| 10:03:21 | 12 | you would have had to compare an original equipment |
| 10:03:23 | 13 | schedule and a restructured equipment schedule, |
| 10:03:26 | 14 | would you not? |
| 10:03:27 | 15 | A.   I looked at the results of the schedule. |
| 10:03:30 | 16 | Q.   The results of the restructured -- |
| 10:03:32 | 17 | A.   The numbers, what the obligations were for |
| 10:03:35 | 18 | payments. |
| 10:03:36 | 19 | Q.   Which of the exhibits that you have just |
| 10:03:38 | 20 | identified reflect the obligations -- the payments |
| 10:03:42 | 21 | and the obligations? |
| 10:03:43 | 22 | A.   Well, several of them -- several of them |
| 10:03:49 | 23 | had those.  191 is a worksheet.  191 A is a |
| 10:04:07 | 24 | worksheet.  191 B was a worksheet that worked |

FARMER  ARSENAULT  BROCK  LLC

30

| | | |
|---|---|---|
| 10:04:17 | 1 | through examples of an original schedule and |
| 10:04:21 | 2 | transaction that then was subsequently rolled into |
| 10:04:24 | 3 | another one. |
| 10:04:25 | 4 | Q.  Well, for example, let's take a look at 191 |
| 10:04:29 | 5 | B; okay? |
| 10:04:33 | 6 | A.  Uh-huh. |
| 10:04:34 | 7 | Q.  Tell me which transaction -- what did you |
| 10:04:40 | 8 | consider a restructured schedule?  Which of the |
| 10:04:43 | 9 | schedules listed on 190 B is a restructured |
| 10:04:46 | 10 | transaction? |
| 10:04:52 | 11 | A.  Well, let's see.  It would be a |
| 10:05:04 | 12 | transaction -- |
| 10:05:05 | 13 | Let's see.  64 A was rolled into 64 D. |
| 10:05:14 | 14 | Q.  And how do you know that, sir? |
| 10:05:16 | 15 | A.  I'm relying on the accuracy of this |
| 10:05:20 | 16 | document. |
| 10:05:20 | 17 | Q.  Okay.  So you didn't go to look at the |
| 10:05:22 | 18 | underlying document, did you? |
| 10:05:23 | 19 | A.  No, I did not. |
| 10:05:24 | 20 | Q.  And what was the rent on 64 A before it was |
| 10:05:30 | 21 | restructured? |
| 10:05:31 | 22 | A.  $12,219 is what this worksheet indicates. |
| 10:05:38 | 23 | Q.  All right, and what was the rent after it |
| 10:05:41 | 24 | was restructured? |

FARMER ARSENAULT BROCK LLC

31

| | | |
|---|---|---|
| 10:05:42 | 1 | A.   $14,428. |
| 10:05:47 | 2 | Q.   Where did you see that, sir? |
| 10:05:48 | 3 | A.   In the next -- in the next column of the |
| 10:05:51 | 4 | rollup -- well, where you see 64 A was rolled to 64 |
| 10:05:58 | 5 | D, and then we would have to go and find -- and we'd |
| 10:06:04 | 6 | have to find 64 D.  And 64 D is the next column. |
| 10:06:13 | 7 | Q.   All right.  So the rent on 64 A was how |
| 10:06:16 | 8 | much? |
| 10:06:17 | 9 | A.   The original rent was 12,219. |
| 10:06:23 | 10 | Q.   Right. |
| 10:06:24 | 11 | A.   And the new rent appears to be 14,428. |
| 10:06:28 | 12 | Q.   Okay, so the rent went up when it was |
| 10:06:31 | 13 | restructured? |
| 10:06:31 | 14 | A.   No, the rent went down, from 12,000 down to |
| 10:06:35 | 15 | 11,000. |
| 10:06:36 | 16 | Q.   I'm sorry, I thought you said 14,000. |
| 10:06:38 | 17 | A.   I'm sorry. |
| 10:06:39 | 18 | Q.   All right.  But you don't know whether any |
| 10:06:42 | 19 | of the information in 191 B is accurate, do you? |
| 10:06:46 | 20 | A.   No, I am relying on this document. |
| 10:06:51 | 21 | Q.   So identify for me any other restructured |
| 10:06:54 | 22 | schedules that you can see on 191 B? |
| 10:06:58 | 23 | A.   Well, you have 64 C was rolled into 64 F. |
| 10:07:17 | 24 | And you have 74 was rolled into 66 E. |

FARMER ARSENAULT BROCK LLC

33

| | | |
|---|---|---|
| 10:09:24 | 1 | know, looking at this document, whether any |
| 10:09:26 | 2 | additional fees were charged to Lycos in connection |
| 10:09:28 | 3 | with any of these restructurings, do you? |
| 10:09:30 | 4 | A. I don't know -- I don't know the details of |
| 10:09:32 | 5 | any fees that might have been. |
| 10:09:36 | 6 | Q. Okay, and did you do any calculations at |
| 10:09:38 | 7 | all to determine -- |
| 10:09:42 | 8 | Well, do you know how to determine |
| 10:09:44 | 9 | whether or not a document is a lease or a loan? |
| 10:09:47 | 10 | A. I think I do. |
| 10:09:48 | 11 | Q. And how do you understand that to occur? |
| 10:09:50 | 12 | A. Well, a lease -- are you talking about this |
| 10:09:57 | 13 | for accounting purposes? There's a lot of tests for |
| 10:10:01 | 14 | it. |
| 10:10:01 | 15 | Q. Let's go with accounting purposes. |
| 10:10:02 | 16 | A. Well, for accounting, the primary tests are |
| 10:10:07 | 17 | present-valuing the total number of payments to see |
| 10:10:16 | 18 | whether or not it's higher or lower than 90 percent |
| 10:10:20 | 19 | of the original equipment value. |
| 10:10:21 | 20 | Q. Okay, and did you do that for any of the |
| 10:10:23 | 21 | schedules listed on Schedule 191 B? |
| 10:10:25 | 22 | A. No, I did not. That wasn't one of the |
| 10:10:28 | 23 | things I was looking for. |
| 10:10:29 | 24 | Q. Okay. Did you -- what are the other tests |

FARMER ARSENAULT BROCK LLC

34

10:10:33   1    for determining whether a document is a true lease

10:10:36   2    or a loan?

10:10:36   3        A.   Basically, if you have a -- if the

10:10:45   4    document -- if the equipment can pass to the user of

10:10:51   5    the equipment at the end of the transaction, it's

10:10:53   6    typically not considered a loan -- I mean,

10:10:56   7    considered a lease.

10:10:57   8        Q.   Anything else?  And did you look at any of

10:11:02   9    the schedules, any of the restructured schedules to

10:11:04   10   determine whether the equipment would pass to Lycos

10:11:06   11   at the end of the term?

10:11:07   12       A.   I looked at the master lease agreement.

10:11:09   13       Q.   But you understand that dollar purchase

10:11:12   14   options are often contained in the equipment

10:11:14   15   schedules; right, sir?

10:11:16   16       A.   But not in these, but not in the master

10:11:20   17   lease.

10:11:21   18       Q.   I understand.

10:11:21   19       A.   The master lease governs.

10:11:23   20       Q.   I understand, but the master lease

10:11:25   21   incorporates the terms of the equipment schedules,

10:11:26   22   does it not?

10:11:27   23       A.   Yes.

10:11:28   24       Q.   And you understand from your years of

FARMER ARSENAULT BROCK LLC

# EXHIBIT E

# O'BRIEN & LEVINE

## Court Reporting Services



### YOUR BOSTON CONNECTION...WORLDWIDE

## Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Brian Lucy

# January 10, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

Linda Bernis   22525

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

52

1    A.    Yes.

2    Q.    Then you see where in E, that's another copy

3          of Mr. Stenberg's e-mail back to you and F

4          is a copy of your e-mail back to him asking

5          for the final four ticks.

6                Do you see that?

7    A.    I do.

8    Q.    Then directing your attention to the e-mail

9          which we've marked as G, which begins on the

10         second page of Exhibit 88 and continues over

11         to the top of the third page, LYC 24631 and

12         32.

13               Is that e-mail that we've marked G,

14         a copy of an e-mail that you received from

15         Mr. Stenberg in or about late March of 2002

16         with a copy to Mr. Baillie?

17   A.    It appears.

18   Q.    Do you remember receiving the e-mail?

19   A.    No.

20   Q.    What was your understanding of what this

21         e-mail meant when you received it?

22   A.    I don't recall receiving it.

23   Q.    So you don't recall what your understanding

24         was concerning this e-mail in March of 2002

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

53

1       because you don't recall receiving it?

2   A.   That's right.

3   Q.   Do you recall relying in any way on any of

4       the statements that Mr. Stenberg made in

5       this e-mail?

6           MR. BEAN:  Objection.

7           MR. DAVIDSON:  Objection.

8   Q.   You can answer.

9   A.   I don't recall.

10   Q.   The e-mail marked H says, it appears to be

11       an e-mail that you wrote back to Mr.

12       Stenberg on March 18, 2002 in which you

13       said, "Thanks a bunch for doing this.  Kevin

14       is out this week.  When he gets back, we

15       will take a look.  Brian."

16           Is that correct?

17   A.   That's right.

18   Q.   Do you recall sending that e-mail back to

19       Mr. Stenberg?

20   A.   No.

21   Q.   Did you have any conversations with Mr.

22       Stenberg at any time about this issue of the

23       variance or difference between what Lycos

24       had been obligated to pay under its leases