UNITED STATES DISTRICT COURT
For the District of Massachusetts

|  |  |  |
|---|---|---|
| CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL INC., | ) ) ) | ***LEAVE TO FILE UP TO 30-PAGE MEMO GRANTED BY ORDER DATED JUNE 13, 2007*** |
| Plaintiff, | ) | |
| v. | ) ) | |
| LYCOS, INC., | ) | C.A. No. 05-10017- RWZ |
| Defendant, | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) | **ORAL ARGUMENT** |
| Trustee Process Defendant. | ) ) | **REQUESTED** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CSI LEASING, INC.'S MOTION FOR SUMMARY JUDGMENT DISMISSING LYCOS' REMAINING COUNTERCLAIMS

Submitted by:

Robert J. Kaler, BBO No. 542040
Edward W. Little, Jr., BBO No. 628985
Kelly A. Gabos, BBO No. 666219
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. (617) 449-6500

*Counsel for Plaintiff CSI Leasing, Inc.*

Dated:  January 15, 2008

## TABLE OF CONTENTS

**Section**                                                                                                                                                          **Page**

**INTRODUCTION**………………...……………...……………………………...……..1

**SUMMARY OF ARGUMENT**…..………………...…………………………...……..1

**ARGUMENT**……………………………………………………………………………4

**I.**     **LYCOS' COUNTERCLAIM COUNTS I AND II, ALLEGING FRAUDULENT AND NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE EXTENSION LEASES, ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE** ………………………6

    **A.**     **CSI Had No Duty to Disclose Any Portion of Its Profits** …………………..7

    **B.**     **CSI Had No Duty to "Disclose" How Much Lycos Total Rent Would Increase Under the Extension Leases Because Lycos Knew and Could Calculate That for Itself** …………………………………8

    **C.**     **Lycos Cannot Have Been Fraudulently or Negligently Induced to Enter Into the Extension Leases By Mr. Stenberg's March 18, 2002 Email to Lycos CFO Brian Lucy Because It Had Already Signed All the Extension Leases at that Time** ………………………….13

    **D.**     **In Summary, Lycos Cannot Support Its Claim That It Was Fraudulently or Negligently Induced to Enter Into the Extension Leases**……………………………………………………………14

**II.**     **LYCOS' COUNTERCLAIM COUNT III, ALLEGING FRAUDULENT MISREPRESENTATION WITH RESPECT TO THE SALES AGREEMENT, IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE** …………………………………………………………………..14

**III.**     **LYCOS' COUNTERCLAIM COUNTS IV AND V, ALLEGING VIOLATIONS OF M.G.L. CHAPTER 231, § 85 AND CHAPTER 93A, §§ 2 AND 11, DO NOT LIE**……...…………………………..16

**IV.**     **LYCOS' COUNTERCLAIM COUNT VI, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, IS INSUPPORTABLE** ……………………………………………..17

**V.**     **LYCOS' COUNTERCLAIM COUNT VII, ALLEGING THAT CSI VIOLATED M.G.L. C. 93A, §§ 2 AND 11 IN ENTERING INTO THE EXTENSION LEASES AND THE SALES AGREEMENT WITH LYCOS, IS INSUPPORTABLE** ………………………………………...20

**VI.** **LYCOS' COUNTERCLAIM COUNTS XII AND XIII, ALLEGING THAT LYCOS IS ENTITLED TO A MASSIVE REFUND FROM CSI BASED ON LYCOS' CLAIMS OF "MONEY HAD AND RECEIVED" AND "UNJUST ENRICHMENT," ARE INSUPPORTABLE** …………………………………………………..22

**VII.** **LYCOS' COUNTERCLAIM COUNTS XIV AND XV, SEEKING VARIOUS DECLARATORY JUDGMENTS FOR LYCOS, ARE DERIVATIVE OF ITS OTHER CLAIMS, AND SHOULD BE DISMISSED FOR THE SAME REASONS** …………………………………….27

**CONCLUSION** …………………………………………………………….....28

## INTRODUCTION

Plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") respectfully submits this Memorandum of Law in Support of CSI's Motion for Summary Judgment Dismissing Lycos, Inc.'s Remaining Counterclaims (hereinafter "CSI's Motion").

## SUMMARY OF ARGUMENT[1]

This action, filed in January 5, 2005, began as an effort to recover a $310,000 account receivable owed to CSI under **(1)** the last two of a series of computer equipment leases (the "Leases") that CSI entered into with the defendant Lycos, Inc. ("Lycos") from 1996 to 2002, and **(2)** an August 2003 sales agreement (the "Sales Agreement") under which Lycos made a $3.7 Million payment to CSI, reaffirmed the validity of all the Leases, agreed to pay all remaining amounts owed under the Leases, and was thereafter to receive title to the Equipment.

Lycos has filed counterclaims which, in their current iteration,[2] **(1)** seek to rescind, and refund to Lycos most of the gross profit CSI earned on, any Leases that extended the amount of time Lycos could continue to use Equipment that it had already leased from CSI (hereinafter

---

[1]  For economy, CSI is citing where possible to record materials which are already on the docket, including the summary judgment affidavits of Lycos' counsel (Affidavits of Peter Acton and Thomas Bean – Docket Nos. 145 and 149 – and referred to herein as "Acton Aff." and "Bean Aff.") and the opposing summary judgment affidavits of CSI's counsel (Declarations of Kelly Gabos and Edward Little – Docket Nos. 167 and 168 – and referred to herein as "Gabos Decl." and "Little Decl."), as well as CSI's oppositions to Lycos' recent motions to strike (Docket Nos. 176-178).  CSI brings information to the Court's attention for purposes of this motion in the accompanying *Affidavit of Edward W. Little, Jr. in Support of Summary Judgment on Behalf of Computer Sales International, Inc.* ("Little SJ Aff."), to the extent not previously in the record.

[2]  Lycos' original theory was that it had been defrauded, and had overpaid CSI, because its Lease payments wound up totaling approximately 165% of the original cost of the equipment it had leased (the "Equipment").  In support of that theory, Lycos had argued that it simply never kept track of that original cost, and therefore did not know how much CSI was making on the Leases.  *See generally* Docket No. 43 (Transcript of May 12, 2005).

Discovery subsequently revealed, however, that Lycos could and did keep track of the original cost of the Equipment – because it had selected and ordered it – and that rather than returning the equipment at the end of each Lease term, Lycos had repeatedly extended the Leases in order to keep those assets off its balance sheet, conserve its cash, and avoid having to locate, return, and replace the assets.  As a result, **Lycos shifted its theory**, claiming that as a result of discovery in this case, it supposedly "uncovered" that the total amount it paid pursuant to some of the Extension Leases was higher than the so-called "residual value" for that Equipment carried on CSI's books at the time, and that under Mass. Attorney General's regulations and M.G.L. c. 93A, CSI had a legal obligation to disclose to Lycos what portion of Lycos' payments on each Extension Lease extension constituted this portion of its gross profit -to allow Lycos to make decision as to whether each transaction was "economically justifiable."

"Extension Leases"); and **(2)** seek to rescind, and refund to Lycos most of the purchase price it paid to CSI under, the Sales Agreement.

The purported grounds for these counterclaims (the "Lycos Counterclaims") are alleged "nondisclosures" and "misrepresentations" by CSI outside the four corners of the relevant contracts.[3]    Examining the nature and timing of these alleged "nondisclosures" and "misrepresentations," however, reveals that they cannot, on the undisputed facts of this case, support any of the eleven remaining counts in the Lycos Counterclaims.[4]    This is because:

**(1)**    As to the Extension Leases, <u>first</u>, CSI *had no legal duty* to disclose the following items that Lycos claims were "undisclosed" *prior* to its execution of each Extension Lease:

**(a)**    the amount, or "mark-up," of CSI's profit on each Extension Lease above a level that Lycos now claims would have been fair, given the low residual value for that Equipment on CSI's internal books at the time; and

**(b)**    the amount by which Lycos' overall payment obligations increased as a result of signing each Extension Lease, which Lycos now claims CSI failed to "disclose," *but which Lycos could calculate for itself* by comparing its total payment obligations under the original Leases, with its total payment obligations under the Extension Leases;

and <u>second</u>, CSI cannot be found to have defrauded Lycos into entering into the Extension Leases by making the false or misleading statements that Lycos claims were made *after* those Extension Leases were signed -- such as the statements in an email from CSI salesman Paul Stenberg to Lycos CFO Brian Lucy, dated March 18, 2002;

---

[3]    *See* Lycos Counterclaim ¶¶ 31-42 and generally ¶¶ 54-147 (Docket No. 122), the relevant contracts being the Leases and the Sales Agreement.

[4]    There were originally fifteen (15) counts in the Lycos Counterclaims, but four (4) of them, Counts VIII, IX, X and XI (making various claims of usury), were dismissed by this Court in its Order of August 29, 2007. Accordingly, the Lycos Counterclaims presently consist of Fraudulent and Negligent Misrepresentation in the inducement of the Extension Leases, Fraudulent Misrepresentation in the inducement of Sales Agreement, breach of implied covenant of good faith and fair dealing, money had and received, unjust enrichment, violation of M.G.L. c. 231, §85J, M.G.L. c. 93A, §§ 2 and 11, and Declaratory Judgment.

(2)     As to the Sales Agreement, Lycos cannot, as a matter of law, have "reasonably relied" on the misrepresentations or nondisclosures that it has alleged were made prior to its execution of the Sales Agreement, because at that time Lycos was *a sophisticated multinational conglomerate* with extensive experience in leasing and purchasing computer equipment, and was being advised and represented in connection with the Sales Agreement by *an expert leasing consultant* whose own records and testimony reflect that she knew the facts that Lycos argues were misrepresented or concealed; and finally,

(3)     Lycos is barred, under the doctrine of equitable estoppel, from arguing as it does that the Leases and Extension Leases were somehow either **(a)** "loans" on which CSI earned too high a rate of return, or **(b)** "installment sales contracts" as to which no further payments for the Equipment should have been owed to CSI once they were signed – and that therefore, the $3.7 Million purchase price that Lycos paid to acquire the Equipment under the Sales Agreement was somehow an impermissible "double payment." *See* Counterclaim ¶¶ 135-39 (Docket No. 122). In fact, Lycos' specific claim addressing the installment sales contract issue was dismissed by the Court.  *See id.* ¶¶ 92-103 and Order of August 29, 2007 (allowing dismissal of Lycos' Counterclaim Counts VIII[5], IX, X and XI).

Importantly, these are legal issues that will have to be addressed at some point, because a jury cannot decide such issues.  It would make good sense to try to address them now, however, at the summary judgment stage, rather than in the middle of a trial on Lycos' Counterclaims, which if it has to occur will be difficult, expensive, and complicated.  Another reason to address these issues now, and to scrutinize the Lycos Counterclaims carefully in advance of trial, is that

---

[5]     By order of August 29, 2007, the Court dismissed, among other claims, Counterclaim Count VIII – seeking declaratory relief that Schedules 93 and 94 "[e]vidence a [l]oan and [s]ecurity [a]greement" on the basis of Lycos' "installment sales contract" argument under UCC § 1-201(37).  Lycos' attempt to back-door this claim in through its unjust enrichment counterclaim should be denied for the same reasons and those set forth herein.

there is substantial evidence that Lycos brought these Counterclaims *in bad faith*,[6] using contingently paid witnesses, and that Lycos conspired to challenge the validity of the Leases at the very moment it was signing the Sales Agreement with CSI confirming their validity, and promising to pay them in full.

For all of these reasons, which are discussed in greater detail below, CSI's Motion should be considered and allowed before trial.

## <u>ARGUMENT</u>

"The objective of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Rojas-Ithier v. Sociedad Espanola De Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005)(quoting *Wynne v. Tufts Univ. Sch. Of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)). "The existence of *some* alleged factual dispute between the parties does not defeat an otherwise properly supported motion for summary judgment – the requirement is that there be no *genuine* issue of *material* fact." *Mailloux v. Town of Littleton*, 473 F. Supp. 2d 177, 182-83 (D. Mass. 2007)(emphasis in original)(internal quotations and citation omitted). Furthermore, summary judgment is appropriate where the nonmoving party cannot show "sufficient [evidence] to establish the existence of an element essential to that party's case." *Rojas-Ithier*, 394 F.3d at 43.

In this case, it is undisputed that **(1)** Lycos paid CSI only what it had contractually agreed to pay CSI under the Leases and the Sales Agreement, **(2)** Lycos admittedly knew the prices it was agreeing to pay to lease and then buy the Equipment when it did, **(3)** Lycos was a large publicly traded company, and a sophisticated user of leasing services dealing with a number of

---

[6]     *See Response of Computer Sales International, Inc. to Lycos' Local Rule 56.1 Statement of Undisputed Material Facts with Respect to Lycos' Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim*, dated Nov. 19, 2007 (Docket No. 164) ¶ 11; *Response Of Computer Sales International, Inc. To Lycos's Local Rule 56.1 Statement Of Undisputed Material Facts With Respect To Lycos's Motion For Summary Judgment On All Counts Of Computer Sales International's Amended Complaint*, dated Nov. 19, 2007 (Docket No. 166) ¶¶ 15-16 .

leasing companies, when it entered into the Extension Leases and the Sales Agreement with CSI, **(4)** Lycos' had its own internal legal and accounting staff as well as outside leasing and accounting experts reviewing and approving the operative contracts with CSI, **(5)** there is no claim that CSI failed to honor its commitments under the Extension Leases and the Sales Agreement, and **(6)** according to Lycos' own Chief Information Officer, it was "glaringly obvious" that Lycos was not managing its leases with vendors in the most economical way possible, and that it was moving equipment from "one platform to another" because Lycos considered it "the right thing for the business at the time," and that it was not a "burning issue" for Lycos what would be happening several years down the road when its leases came to an end; rather, the immediate goal was satisfying Lycos' growing appetite and need for equipment.[7]

It is now several years later, and Lycos has gone from a "dot.com" start-up that engaged in a highly successful initial public offering in 1996 that enriched the former Lycos executives who testified in this case, to its acquisition for $12 Billion by the well-known Spanish conglomerate of Terra Networks that further enriched these executives, to its bargain basement sale in 2004 to Daum Communications, a South Korean telecommunications company, for $75 Million. The Lycos Counterclaims[8] invite this Court, and a Jury, to step into the middle of CSI-

---

[7] Deposition of Timothy Wright ("Wright Dep.") dated January 12, 2007, 50; 51-52; 65-66 (Little SJ Aff. Ex. 1).

[8] There were originally fifteen (15) counts in the Lycos Counterclaims, but four of them (Counts VIII, IX, X and XI) which made various claims characterizing the leases as loans and alleging "usury" were dismissed by this Court in its Order of August 29, 2007 (electronic Court Docket, unnumbered). Accordingly, the Lycos Counterclaims presently consist of the following:

  Count I -- Fraudulent Misrepresentation in the Inducement of Rolled-Up and Re-Written Equipment Schedules;
  Count II -- Negligent Misrepresentation in the Inducement of Rolled-Up and Re-Written Equipment Schedules;
  Count III -- Fraudulent Misrepresentation in the Inducement of Sales Agreement;
  Count IV -- Violation of M.G.L. c. 231, §85J);
  Count V -- Violation of M.G.L. c. 93A, §§ 2 and 11 by Violating M.G.L. c. 231, § 85J and 940 C.M.R. 3.16(3));
  Count VI -- Breach of Implied Covenant of Good Faith and Fair Dealing);
  Count VII -- Violation of M.G.L. c. 93A, §§ 2 and 11 in Entering into the Rewrites and Roll-Ups, and

ME1 7030956v.1

Lycos transactions that were consummated years ago, and to retroactively impose broad new disclosure obligations on the sophisticated parties to those transactions.   This is neither permissible nor appropriate.

**I.     LYCOS' COUNTERCLAIM COUNTS I AND II, ALLEGING FRAUDULENT AND NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE EXTENSION LEASES, ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE**

Counts I and II of Lycos' Counterclaim, relating to the Extension Leases that Lycos entered into with CSI between 1998 and 2001, allege **(1)** that CSI failed to disclose to Lycos, before it signed the Extension Leases, how much gross profit CSI would be earning on those Extension Leases above what Lycos now claims a "reasonable" rate of return would have been (given that the residual value[9] of the Equipment being carried on CSI's books was zero or at least very low), **(2)** that CSI failed to disclose to Lycos, when CSI told Lycos that its monthly rent payments would go down, how much more in total rent it would pay over the extended terms of the Extension Leases, and **(3)** that CSI's salesman Paul Stenberg sent a false and misleading email to Lycos' CFO Brian Lucy on March 18, 2002 -- four months *after* Lycos and CSI entered into the last two Extension Leases.[10]

Lycos can prevail on these claims only if it can show that **(a)** CSI had a duty to disclose

---

the Sales Agreement;
*Counts VIII-XI -- (Usury, etc.)-- **DISMISSED BY ORDER OF AUG. 29, 2007***;
Count XII -- Money Had and Received;
Count XIII -- Unjust Enrichment;
Count XIV -- Declaratory Judgment as to Whether Lycos Owes Any Money to CSI;
Count XV -- Declaratory Judgment as to Whether Lycos May Retain the Equipment.

[9]     Essentially, residual value is an accounting concept whereby a lessor places a future value on equipment at the start of a lease.  If the lessor ultimately realizes more than the recorded residual value, the lessor achieves accounting profit.  If the lessor realizes less than the residual value, an accounting loss is incurred.  In either case, the ultimate outcome to the lessor is unknown until disposition of the equipment.

[10]     *See* Lycos Counterclaim ¶¶ 54-58 (Fraudulent Misrepresentation as to the Extension Leases), ¶¶ 59-62 (Negligent Misrepresentation as to the Extension Leases), and ¶¶ 63-69 (Fraudulent Misrepresentation as to the Sales Agreement) (Docket No. 122).

that which Lycos claims it failed to disclose, **(b)** Lycos reasonably relied to its detriment on CSI's alleged nondisclosures and misrepresentations, and **(c)** Lycos suffered damages which were proximately caused by that reliance. *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 241-42 (D. Mass. 1999); *Mailloux,* 473 F. Supp. 2d at 189 (granting summary judgment where there were no facts to show that plaintiff reasonably relied on defendant's promise to hire him). It cannot do so on the undisputed facts of this case, for the following reasons.

### A.    CSI Had No Duty to Disclose Any Portion of Its Profits

First, as to Lycos' claim that CSI should have disclosed that portion of its gross profit that Lycos now claims was unfairly high, it is well-settled that a business is not required to disclose the amount of its profits on a particular transaction in which it is providing goods or services.[11] *See, e.g., Castelli v. Lien*, 910 S.W.2d 420, 429-30 (Tenn. App. 1995)("merchants are entitled to make a profit and, except for the most extreme circumstances, are not required to divulge to their customers their profit margin, overhead, operating costs, or other similar information"). As the court recognized in *Castelli*, this is true even though one party to a negotiation may be influenced not to enter into a transaction if it knew the other side's profit margin, and thought it was too high. *Id.*

In a free market economy, price competition among suppliers – not disclosure of profit margins – is what acts as a check on unreasonably high profits. Thus, knowing the amount of a

---

[11]    Nor was there any legal requirement for CSI to disclose to Lycos its internal accounting booked residual values. Lycos own expert, Charles Cross, admits that leasing companies do not typically disclose these to leasing customers. This only makes sense, as these are internal and proprietary estimates that may not even ultimately be accurate. A leasing company's residual values are entirely irrelevant to a lessee's decision making process as to whether to enter into a lease or sale and there is no evidence that any Lycos employee ever even asked CSI for its own internal accounting residual values.

seller's profits is not considered "material" to a buyer's decision on whether to buy.[12]  *See Commonwealth v. AmCanEnterpirses, Inc.*, 47 Mass. App. Ct. 330, 335 (1999); *Sheehy v. Lipton Indus., Inc.*, 24 Mass. App. Ct 188, 195 (1987).

Nevertheless, Lycos has tried to assert that its supposed blind "trust" in CSI salesman Paul Stenberg somehow created a fiduciary relationship that required CSI to make disclosures as to its profits, but this is incorrect as a matter of law, because as the First Circuit has pointed out, "courts have repeatedly cautioned that 'the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.'"  *Indus. General Corp. v. Sequoia Pacific Sys. Corp*, 44 F.3d 40, 44 (1st Cir. 1995)(quoting *Superior Glass Co. v. First Bristol County Nat'l Bank*, 380 Mass. 829, 832 (1980)); *Winlake II, Inc. v. Mercier*, 2006 WL 1360855, at *6 (Mass. Super. May 3, 2006)("[T]he concept of fiduciary relationship, and its attendant duties, has not been extended to purely commercial transactions.").   This is particularly so when Lycos where a highly sophisticated party, and there is strong evidence that it actually placed no trust in Mr. Stenberg.[13]

Finally, Lycos' attempts to impose a duty on CSI to disclose of its profits under the Massachusetts Attorney General Regulations, even though the Extension Leases and Sales

---

[12]        In this case, Lycos – now under new ownership – is claiming "buyer's remorse" and arguing that it wishes it had never extended any of the CSI leases.  But it cannot, as a matter of law, create a special legal disclosure requirement in such situations for a leasing company to explain the "impact" of those deals to the party sitting across from it at the bargaining table. CSI clearly had no duty to disclose the details of its expected profits or the "impact" of the Extension Lease and Sales Agreement transactions to Lycos, or to anyone.  *See Nei v. Burley*, 388 Mass. 307, 310 (1983)("They dealt at arm's length with each other and there was no peculiar duty to speak.  There were no material misrepresentations on which the buyers relied.");  *Winlake II, Inc. v. Mercier*, 2006 WL 1360855, at *7 (Mass. Super. May 3, 2006)("The plaintiffs' claim based upon Mercier's nondisclosures is, thus, one of 'mere failure to reveal,' which does not itself amount to a claim for fraud.")(citing *Nei*, 388 Mass. at 310).

[13]        E-mails between Lycos personnel prior to the time they entered into Schedules 93 and 94 also demonstrate that Lycos never trusted Mr. Stenberg.  In fact, in various emails Lycos executives referred to Mr. Stenberg as "a worthless liar", a "f***ing goy", a "crook", a person whose job it was to "maximize CSI's profit, not Lycos'" and "unbelievable", culminating in Lycos' in-house counsel stating in 2000 that he "hated" Mr. Stenberg.  *See* Little SJ Aff. Exs. 2 and 3 (LYC 22243-47); Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Gabos Decl. Ex. 16).

Agreement provide that Missouri law applies, and there is no allegation that the choice of law contractual provision was procured by fraud.[14]

Even assuming, however, that the Massachusetts regulations could apply (which CSI does not concede), the two regulations upon which Lycos relies for its argument that CSI had a duty to disclose its profits simply do not apply to the disclosure of profits between two sophisticated businesses.[15] *See In re New England Dental Center*, 291 B.R. 229, 241 (Bankr. D. Mass. 2003)("[T]he regulations [including § 3.16(2)] were not meant to apply to mundane negotiations between businesses...[and] to so apply them, and thereby to require complete disclosure from both ends of a business deal, would eviscerate the very notion of negotiating.").

Similarly, 940 CMR § 3.05(1) also does not contemplate the type of disclosure at issue here. *See, e.g., Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 986 F.2d 605, 605-06 (1st Cir. 1993)(finding that use of word "fresh" on defendant's pasta labels and in its advertising did not have the "capacity to deceive" under § 3.05(1)); *see also Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 396 n. 18 (2004)(discussing Attorney General regulations in context of advertising that may deceive consumers).

**B.    CSI Had No Duty to "Disclose" How Much Lycos Total Rent Would Increase Under the Extension Leases Because Lycos Could Calculate That for Itself**

Second, as to Lycos' claim that CSI should have "disclosed" to Lycos, in addition to telling Lycos how much its monthly rental would go down, how much Lycos' total rent under each Extension Lease was going to increase above what it had been under the prior Leases, *but Lycos admittedly already had this information* on the face of the Extension Leases, which set forth, in each case, both the term of months, and the amount of rent to be paid each month -- such that Lycos could simply add them up.

---

[14]    Missouri law has no comparable regulations.
[15]    *See* Counts I, III, VII, of Lycos' Counterclaim, ¶¶ 54-58, 63-69, 85-91 (Docket No. 122).

In this regard, it is undisputed that at the time it executed the Extension Leases, Lycos was being managed by its own highly educated, compensated and sophisticated executives,[16] two of whom were CPA's – Ted Philip, Tom Guilfoile and Brian Lucy – three individuals who all signed Leases with CSI on behalf of Lycos.  All three of these individuals have admitted that they *understood* that as a result of entering into the Extension Leases, the aggregate cost to Lycos would increase.  Although they now argue, in affidavits recently submitted after the close of discovery, that they just did not know *by how much* those aggregate payments would go up, it is undisputed that they had all the information they needed to calculate them.[17]

Significantly, none of these three can point to any misrepresentation they received with respect to any extended lease.  Mr. Philip recalls no dealings with CSI or Mr. Stenberg, nor any discussion regarding CSI with anyone on his team at Lycos (Mr. Guilfoile, Mr. Lucy, Sam Ziba and Michael Ripps).[18]   Mr. Guilfoile not only recalls no misrepresentations made by CSI, he does not even recall extending any CSI leases.[19]   Mr. Lucy testified that he has no personal knowledge of Lycos ever being deceived by CSI – he only now thinks Lycos may have been

---

[16]    Edward M. "Ted" Philip served in various roles at Lycos, including Chief Financial Officer.  He graduated from Vanderbilt University with degrees in Economics and Mathematics, and also earned a MBA from Harvard Business School.  *See* Deposition of Edward M. Philip, dated Nov. 6, 2006 ("Philip Dep.") at 11:7-21 (Gabos Decl. Ex. 1).  Prior to joining Lycos in 1995 he was employed at Salomon Brothers and the Walt Disney Company.  *Id.* at 11, 17.  Mr. Guilfoile graduated from the University of Notre Dame with a degree in accounting and became a certified public accountant in Massachusetts in 1989.  He worked as a senior manager at Ernst & Young before joining Lycos in 1996 as its Controller, then Vice President of Finance and Administration.  *See* Deposition of Thomas Guilfoile, dated Dec. 7, 2006 ("Guilfoile Dep.") at 10:13-11:2 (Gabos Decl. Ex. 2).  Mr. Lucy joined Lycos in 1996, eventually working his way up to Chief Financial Officer.  He has undergraduate degrees from Villanova University and Salem State University.  Prior to joining Lycos he was a certified public accountant and worked as an accountant and auditor at KPMG.  *See* Deposition of Brian Lucy, dated Nov. 10, 2006 ("Lucy Dep.") at 14-16 (Little SJ Aff. Ex. 4).

[17]    Summary Judgment Affidavits of Edward Philip and Thomas Guilfoile ("Philip SJ Aff." and "Guilfoile SJ Aff.") ¶ 4 (Acton Aff. Exs. 1, 2); Second Affidavit of Brian Lucy ("Second Lucy Aff.") ¶ 9 (Bean Aff. Ex. 11).  Current Lycos CFO, Kevin Baillie, also agrees that he knew Lycos would pay more money to CSI as result of extending its leases, just but not how much more.  Deposition of Kevin Baillie, dated Dec. 21, 2006 ("Baillie Dep.") at 93 (Little SJ Aff. Ex. 5).

[18]    Philip Dep. at 81-83 (Little SJ Aff. Ex 6).  No "team" member at Lycos has testified to any misrepresentation they received from CSI before a lease was executed.

[19]    Guilfoile Dep. at 124-25 (Little SJ Aff. Ex. 7).

deceived because of what others have told him, though he cannot recall or articulate what those others told him was involved in the deception.[20]

In this regard, although Lycos argues that its executive team at the time was somehow unable to ever understand the CSI transactions, it is undisputed that Lycos' own in-house counsel reviewed and approved the legal terms of the sale agreement and also reported to the parent company that the lease terms were in a form that was common in the United States.[21] Also, and tellingly, after objection and a hearing with the Discovery Master, Leaseforum (Lycos' expert leases consultants retained in June 2003) was ordered to produce a memo dated December 1, 2003 that it had provided to Lycos senior management. The memo stated that while CSI's lease documentation was "within the broad range of acceptable commercial practices" and that "Lycos does have a responsibility to evaluate business decisions effectively."[22]

In any event, even if Lycos now believes that the Extension Leases were too confusing, or that it had insufficient information to make an informed decision as to whether or not to enter into them, it cannot seek legal redress years later by claiming it did not understand what it was signing due to poor explanation on CSI's part. "One who signs a writing that is designed to serve as a legal document is presumed to know its contents." *Hull v. Attleboro Sav. Bank,* 33 Mass. App. Ct. 18, 24 (1992); *see also Leasecomm Corp. v. Akpaffiong*, 2007 WL 3309455, at *5 (Mass. App. Div. Oct. 31, 2007) (reversing trial court decision which held lessee did not understand legal terms of credit card machine lease she signed for her hair care business).

---

[20]    Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep. 2"), at 82 (Little SJ Aff. Ex. 8).

[21]    *See* Plaintiff's Ex. 398 (Little SJ Aff. Ex. 9) (e-mail from Lycos in-house counsel Peter Karol to Lycos' Spanish parent company confirming that provision in lease – specifically, the stipulated loss tables and values – with CSI are "not uncommon" in the United States).

[22]    *See* Memorandum from Leaseforum to Lycos, dated Dec. 1, 2003 (LYC 22780) concerning "Timeline for CSI Effort" (Little SJ Aff. Ex. 10). This Memorandum was sent to Mr. Lucy, who had been working with Leaseforum for over six months, yet the March 2002 email is never mentioned in the Leaseforum memo.

ME1 7030956v.1

Finally, although Lycos tries to create a special status for itself by suggesting the equipment leasing in general was intrinsically impossible for it to understand Lycos was not the poor, unsuspecting and vulnerable "internet start-up" that it now makes itself out to have been. To the contrary, the evidence reveals that:

- Lycos was conceived as an internet search engine in 1995 as the brainchild of a Carnegie Mellon University scientist. Following an initial public offering in 1995 which raised $75 million, Lycos management recognized that it needed to "Get Big Fast" in order to compete in the burgeoning new internet world. *See generally* Plaintiff's Ex. 291 (B. Davis, *Speed is Life: Street Smart Lessons from the Front Lines of Business*, Chapter 4 (2001) (Little SJ Aff. Ex. 11)**.**

- Lycos thereafter set out upon a course that proceeded to grow its employee base into the thousands and aggressively acquire several competing companies by offering stock offerings at a cost of approximately $860 million. *Id.* at 67.

- By 2000, Lycos had completed an extremely successful secondary public stock offering and was sitting "on a war chest of over $600 million in cash" when it was approached by the Spanish conglomerate Terra Networks. *Id.* at 180-81.

- By the time the Lycos acquisition by Terra Networks closed in October 2000 for over $6 billion, the new Terra Lycos had more cash on hand than all but twenty-two companies in the world and was operating in 43 countries and 19 languages. *Id.* at 185; *see also* Plaintiff's Ex. 501 (Little SJ Aff. Ex. 12).

- Terra sold Lycos to a South Korean company, Daum Communications, in October 2004 and this current litigation ensued two months later. Second Lucy SJ Aff. ¶ 14 (Acton Aff. Ex. 3).

- Lycos employed a team of accounting and auditing professionals including KPMG, Arthur Andersen and Deloitte & Touche, law firms including Hutchins & Wheeler, Hale & Dorr, Ropes & Gray and Cravath, Swaine & Moore and an in-house legal department of as many as six attorneys. Philip Dep. at 240-42 (Little SJ Aff. Ex. 7).

- During the course of its leasing relationship with CSI, Lycos on multiple occasions persuaded CSI to sell it leased equipment at low prices in order for CSI to continue as a leasing company for Lycos. Lycos would then resell in order to make "several hundreds of thousands" of dollars. Plaintiff's Ex. 127 (Little SJ Aff. Ex. 13); Deposition of Sam Ziba, dated Sept. 19, 2006 ("Ziba Dep.") at 198-99 (Little SJ Aff. Ex. 14);

In short, the undisputed evidence shows that during the years it was entering into the Extension

Leases, Lycos was as sophisticated a consumer of equipment leasing services as could be, and was not in any way relying on CSI to tell it what its total obligations under its Extension Leases – which it could obviously calculate for itself – were.

    **C.**    **Lycos Cannot Have Been Fraudulently or Negligently Induced to Enter Into the Extension Leases By Mr. Stenberg's March 18, 2002 Email to Lycos CFO Brian Lucy Because It Had Already Signed All the Extension Leases at that Time**

Third, as to Lycos' claim that it was fraudulently or negligently induced to enter into the Extension Leases as a result of CSI's salesman Paul Stenberg's allegedly false and misleading email of March 18, 2002 to Lycos' CFO Brian Lucy, it is undisputed that that email was not sent to or received by Lycos until March 18, 2002 -- *over four (4) months <u>after</u> Lycos and CSI entered into the last two Extension Leases.*  As a matter of law, therefore, the statements in that email cannot support a claim that Lycos was fraudulently or negligently induced to enter into any of the Extension Leases.  *See Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1, 10 (D. Mass. 2004)(borrower's fraud claim failed because the statement on which he allegedly relied occurred after he signed loan agreement).  *See also Zuckerman v. McDonald's Corp.*, 35 F. Supp. 2d 135, 146-47 (D. Mass. 1995)(granting summary judgment on intentional and negligent misrepresentation claims because there was no evidence of detrimental reliance).

Lycos, however, makes a peculiar argument on this issue, claiming that the March 18, 2002 email can support its fraud claim as to the Extension Leases that it signed months earlier because, supposedly, it would have taken steps to "unwind" the Extension Lease transactions but for its reliance on that email.  The problem, however, as evidenced by the Extension Leases and their Master Lease, which are in the record of this case, is that Lycos *had no right to "unwind" the Extension Leases*.  Accordingly, there is no basis upon which it can claim, as to those Extension Leases, that they were induced by the email.

-13-

### D.   In Summary, Lycos Cannot Support Its Claims That It Was Fraudulently or Negligently Induced to Enter Into the Extension Leases

Lycos' Counterclaim Counts I and II are premised on the alleged non-disclosures, misrepresentations, and half-truths that are discussed above.  Since those cannot, as a matter of law, support Lycos' claims that it was fraudulently or negligently induced to enter into the Extension Leases, either because there was no duty to disclose, or because the alleged misrepresentation was admittedly not made until after the last Extension Leases were signed, summary judgment dismissing Counts I and II of that Counterclaim is clearly warranted.

## II.   LYCOS' COUNTERCLAIM COUNT III ALLEGING FRAUDULENT MISREPRESENTATION WITH RESPECT TO THE SALES AGREEMENT, IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE

Unlike Counts I and II related to the Extension Leases, Count III of Lycos' counterclaim concerns the Sales Agreement agreed to by the parties in August 2003, and alleges that Lycos was fraudulently induced to enter into that Sales Agreement allegedly false and misleading statements in the March 18, 2002 email sent by CSI's salesman Mr. Stenberg to Lycos CFO Mr. Lucy seventeen (17) months earlier, one of which, dealing with the original cost of the Equipment covered by the Leases,[23] was allegedly restated by Mr. Stenberg in the Summer of 2003 to a Lycos' leasing expert and chief negotiator for the Sales Agreement transaction, Susan Franklin.

Lycos' CFO Brian Lucy signed the Sales Agreement on behalf of Lycos.  Significantly, he testified in his deposition that he had no recollection whatever of receiving or relying on the

---

[23]     Lycos alleges that Mr. Stenberg misstated the original cost of the Equipment, which Lycos selected, ordered and approved before CSI paid the vendors, as approximately $63 million in the aggregate – when the actual original cost paid to those vendors was approximately $45 million.  Lycos' Counterclaim (Docket No. 122), ¶¶ 41, 63-69.  Mr. Stenberg denies this.  Deposition of Paul Stenberg, dated Aug. 24, 2006 ("Stenberg Dep.") at 359:16-361:21 (Gabos Decl. Ex. 8).

March 2002 email or its contents.[24]  More recently, however, he has submitted an affidavit in support of Lycos' summary judgment motion claiming that he *now* remembers Mr. Stenberg's March 18, 2002 email, and after further contemplation, believes it was part of what induced him to sign the Sales Agreement over four years earlier.[25]

It is undisputed, however, that more than 17 months passed after the email was written before Lycos – with the advice of its entire in-house legal department, and the services of an expert leasing consultant – chose to sign the Sales Agreement.  The evidence is also clear that Lycos' consultant *knew* the original cost of the Equipment, as a result of her own analysis of the CSI-Lycos Leases, when Mr. Stenberg made an allegedly false statement to her about that cost in June of 2003.  In fact, she had *already* concluded by June 27, 2003 that the original equipment cost of the CSI equipment had been approximately $44 Million, and that the Lease payments ("CF" or cash flow) made by Lycos to CSI had exceeded the original equipment cost by over $20 million.[26]

In addition, Lycos' own spreadsheets, created *before and after* the March 2002 email, repeatedly recorded the cost of the CSI equipment to be in the mid-$40 million range,[27] and

---

[24]     Lucy Dep. 2 at 52-53 (Little SJ Aff. Ex. 8).

[25]     Lycos claims that it would have taken action to "unwind" the transaction in March, 2002 if Mr. Stenberg had not made the alleged misrepresentations and Lycos was aware of the true cost of the equipment, but Lycos could not have unwound the transaction **because it was already bound.**  *See JSB Indus., Inc. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103, 108 (D. Mass. 2006)(dismissing complaint against successor payroll company because plaintiff made no allegations that if successor had revealed precursor's fraud, that plaintiff could have recovered its money).  Moreover, the email concerned only two extended leases (Schedules 93 and 94), not all the extended leases under Counts I and II.

[26]     *See* Plaintiff's Ex. 191A (Little SJ Aff. Ex. 15)(filed under seal).  This spreadsheet created by Leaseforum clearly shows the distinction between "OEC" of $44 million versus "CF" – or cash flow (i.e., total payments) – of $63 million.  Thus, any claim that Lycos did not understand how much it had paid and how much the equipment originally cost is insupportable.

[27]     *See, e.g.*, spreadsheet of Lycos' Sam Ziba, as of June 2001 (Little Aff. Ex. 16), which lists "equipment values" for all equipment leases, including those with CSI; spreadsheet created by Monique Walsh on October 22, 2002 (produced electronically under CD, marked as Plaintiff's Ex. 45) (Little Aff. Ex. 17); spreadsheet created by Monique Walsh on July 14, 2003 (Little Aff. Ex. 18) at LYED202465.  See also note 26, *infra*.

Lycos was admittedly in a position to determine and keep track of that cost because it selected and negotiated the price of all the Equipment that it leased from CSI.   Under these circumstances, it is clear that Lycos did not rely at all, and could not in any event have reasonably relied, on either the March 18, 2002 email, or the alleged statements of Mr. Stenberg about original equipment cost, in entering into the Sales Agreement.  For this reason, summary judgment dismissing Count III of Lycos Counterclaim is also warranted.

## III.    LYCOS' COUNTERCLAIM COUNTS IV AND V, ALLEGING VIOLATIONS OF M.G.L. CHAPTER 231, § 85J AND CHAPTER 93A §§ 2 AND 11, DO NOT LIE

Counts IV and IV of Lycos' Counterclaim allege that by fraudulently inducing Lycos to enter into the Sales Agreement, CSI **(a)** violated M.G.L. c. 231, § 85J, which states that "[w]hoever, by deceit or fraud, sells personal property shall be liable in tort to a purchase in treble the amount of damages sustained by him," and **(b)** violated M.G.L. c. 93A, §§ 2 and 11 by virtue of violating c.231, § 85J.

These counts fail because, as discussed above, Lycos cannot satisfy the requirements for a legitimate fraud claim under the statute.[28]   There are no facts to show Lycos reasonably relied on any statements by CSI in entering into the Sales Agreement or the Extension Leases.  To the contrary, the evidence is that Lycos sought to purchase the Equipment to avoid the consequences of its own failure to maintain and account for the equipment so that it could be returned to CSI at the end of the Lease terms, and that the Sales Agreement was a part of "Phase II" of Lycos' plan to force CSI to return money to Lycos under the Extension Leases, even though Lycos had just reaffirmed that the lease payments would be honored as part of the Sales Agreement .[29]

---

[28]      *See*  Section II, *supra*.

[29]      *See*  Acton Aff. Ex. 18 (e-mail from Mr. Kirk of Leaseforum to Ms. Callagee at Lycos, dated August 8, 2003 – the very day Mr. Lucy of Lycos signed the Sales Agreement with CSI in which Lycos reaffirmed all of its lease obligations – stating that "Phase 2 has commenced," in which Lycos would seek to renegotiate and decrease its lease obligations going forward).

For these reasons, summary judgment dismissing Counts IV and V of Lycos' Counterclaim is warranted.

## IV.    LYCOS' COUNTERCLAIM COUNT VI, FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, IS INSUPPORTABLE

Count VI of Lycos' Counterclaim alleges that CSI acted in "bad faith" by failing to disclose certain aspects of its profits under the Extension Leases as alleged in its fraud claims, by making alleged misrepresentations about those transactions, and by proposing unreasonable base value and stipulated loss value percentages in the equipment schedules, to which Lycos agreed, and which Lycos claims persuaded it to buy the Equipment.[30]  The evidence on which Lycos relies with regard to these claims is legally insufficient to make out a breach of implied covenant claim, however.

The implied covenant of good faith and fair dealing prohibits a party to a contract from exercising a judgment conferred by the express terms of that contract "in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. App. 1996); *accord Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001)("'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'")(quoting *Druker v. Roland Wm. Jutras Assoc.*, 370 Mass. 383, 385 (1976)).

To prevail on this claim, Lycos would have to present "substantial evidence" that CSI acted in bad faith or engaged in unfair dealing ***in its performance*** of its contractual obligations to Lycos.  *Oliver*, 939 S.W.3d at 410 (emphasis added); *see also BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007)(plaintiff claiming breach of the covenant must show more than defendant's unreasonable actions; plaintiff must show bad faith "directed toward

---

[30]    *See* Lycos' Counterclaim ¶¶ 80-84 (Docket No. 122).

evading the spirit of the contract"); *accord Sheehy,* 24 Mass. App. Ct. at 193 n. 5 ("[The] covenant **pertains to bad faith in the performance** of a contract, not in its execution."). Thus, the implied covenant applies "only to conduct **during performance** of the contract, <u>not</u> to conduct occurring prior to the contract's existence…." *Accusoft*, 237 F.3d at 45.

Furthermore, to the extent Lycos is basing any portion of its claim for breach of the implied covenant on a failure to disclose CSI's profits or the total increase in lease payments due to an extension, that likewise fails as a matter of law. As explained above, CSI had no duty to disclose its profits or total increase in lease obligations to Lycos. Massachusetts law is clear that **failing to disclose that which a party has no affirmative duty to disclose cannot provide a basis for a claim for breach of the implied covenant**. *See, e.g.*, *Alfeo v. Dinsmore*, 68 Mass. App. Ct. 249, 256 (2007) (where buyer had no affirmative duty to disclose to sellers that buyer had a pending mortgage on real estate, sellers could not prevail on claims for fraud and breach of the implied covenant of good faith and fair dealing); *see also In re Greenberg*, 229 B.R. 544, 550 (Bankr. D. Mass. 1999) (no violation of implied covenant of good faith and fair dealing where lender did not explain prepayment option to borrower, as there was no such legal duty to do so).

Moreover, as a matter of law, Lycos cannot claim that CSI's alleged non-disclosures or misrepresentations *prior to* either of the relevant contracts constitute the grounds for this breach of implied covenant claim, nor can it use this covenant "to create rights and duties not contemplated by the provisions of the contract or the contractual relationship" between the parties merely because it is now unhappy with its well-thought-out and rational decision to purchase the equipment. *See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385-86 (2004); *accord Cordry v. Vanderbilt Mortgage & Fin., Inc.*, 370 F. Supp. 2d 923, 930 (W.D. Mo. 2005)("'good faith' does not implies a limitless duty or obligation and cannot

-18-

'override the express terms of the agreement'")(quoting *Taylor Equip. Inc. v. John Deere Co.*, 98 F.3d 1028, 1031 (8th Cir. 1996)(applying South Dakota law)).

There is no evidence, for example, that CSI acted in bad faith in agreeing to allow Lycos to purchase of the Equipment for $3.7 Million plus payoff of the remaining Lease payments. *See Schell v. LifeMark Hosps. of Missouri*, 92 S.W.3d 222, 230 (Mo. App. 2002)("Because the duty of good faith, even expansively conceived, is not one of candor…hard bargaining is not *per se* bad faith.")(emphasis in original)(internal quotations and citations omitted)*; see also BJC Health Sys.*, 478 F.3d at 915 ("the implied duty of good faith and fair dealing does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract"); *Chokel v. Genzyme Corp.,* 449 Mass. 272, 276 (2007)("[t]he scope of the covenant is only as broad as the contract that governs the particular relationship" and it "does not supply terms that the parties were free to negotiate, but did not")(internal quotes and citations omitted).

In fact, the evidence is that Lycos utilized an expert leasing consultant, Leaseforum, which it selected and retained, to negotiate all aspects of the Sales Agreement, including the amount of the purchase price -- and internal Lycos emails show that in 2003, it was pleased with the $3.7 million buyout offer from CSI, as it was able to negotiate the price down from $4.69 million and in purchasing the equipment, it would not have to pay the stipulated loss values for the equipment it could not locate and return.[31]

Also, the Equipment had a substantial value to both CSI and Lycos at the time of the Sales Agreement and at the expiration of the leases, a value much higher than the $3.7 million buyout price. After objection and a hearing before the Discovery Master, Lycos was ordered to

---

[31]    *See* Plaintiff's Ex. 398 (Little SJ Aff. Ex. 9) (e-mail from Lycos in-house counsel Peter Karol to Lycos' Spanish parent company confirming that provision in lease – specifically, the stipulated loss tables and values – with CSI are "not uncommon" in the United States).

produce an analysis done and considered by Lycos own expert, but withheld from his original production, which showed that the value of the equipment to Lycos in the Summer of 2003 was in excess of $7 million.[32]  Lycos' same expert concluded that, if the buyouts would have taken place at the conclusion of each individual lease instead of at one time in the Summer of 2003 (a process that would not have reached conclusion until 2005 and was not what its Spanish parent company had directed), the value of the equipment to Lycos would still have been in excess of $2.5 Million.

In short, there is no evidence "that [CSI] acted with the sort of dishonest purpose or conscious wrongdoing necessary for a finding of bad fair or unfair dealing."  For these reasons, summary judgment dismissing Count VI of Lycos' Counterclaim is warranted.  *Schultz v. Rhode Island Hosp. Trust Nat'l Bank*, 94 F.3d 721, 730 (1st Cir. 1996).

## V.   LYCOS' COUNTERCLAIM COUNT VII, ALLEGING THAT CSI VIOLATED M.G.L. c. 93A, §§ 2 & 11 IN ENTERING INTO THE EXTENSION LEASES AND THE SALES AGREEMENT WITH LYCOS, IS INSUPPORTABLE

Lycos bases its Counterclaim Count VII on the argument that CSI violated 940 CMR § 3.05(1) and § 3.16(2) when it failed to disclose certain facts, including CSI's profits under the Extension Leases. First and foremost, as discussed above in the section on Lycos' fraud claims, these regulations do not apply to transactions between sophisticated businesses.  *See In re New England Dental*, 291 B.R. at 241.[33]  Even under general common law disclosure requirements,

---

[32]     Peter Daley, Lycos' valuation expert, testified at deposition that he had valued all of the equipment Lycos purchased from CSI at over $7 million as of July 2003.  *See* Exs. B & C to Opposition of CSI to Lycos' Motion to Strike LR 56.1 Statement (Docket No. 178) (testimony and worksheet of Mr. Daley supporting $7 million valuation).  This valuation was never disclosed in Lycos' expert report from Mr. Daley and was only learned after CSI successfully moved to compel production of this information.

[33]     In addition, as discussed in Section I, *supra*, CSI had no general duty to disclose its profits or the aggregate increase in total lease payments to Lycos.

CSI had no duty to disclose its profits.[34]  *See Nei*, 388 Mass. 307, 310 (1983).

Moreover, the undisputed facts also show that CSI *did* disclose to Lycos the full extent of its lease payments under the Extension Leases, and Lycos was fully aware of the original cost of the Equipment, and the substantial value of the Equipment, when it entered into the Sales Agreement in 2003.[35]  CSI even negotiated a lower price with Lycos for the purchase of the equipment.[36]  The evidence also suggests that the information that CSI supposedly failed to disclose was not material to Lycos because Lycos entered into these transactions out of necessity and financial prudence.[37]

In short, viewing the evidence as a whole, CSI's actions in no way reach the requisite level of "rascality" or egregiousness required for liability under M.G.L. 93A, § 11.  *See Livingstone Flomeh-Mawutor v. Banknorth, N.A.*, 350 F. Supp. 2d 314, 321 (D. Mass. 2004)(granting summary judgment because "no reasonable jury could find that the Bank's alleged unfair or deceptive acts or practices attained a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce")(internal quotations and citation omitted); *see also New England Fin. Res., Inc. v. Coulouras*, 30 Mass.

---

[34]     *See* Section I, *supra*.

[35]     Lycos had been tracking all of its leases, including those with CSI, since the inception of the relationship. When Sam Ziba, Lycos' Director of Operational Planning, left Lycos in June 2001, he forwarded to Julie Callagee, Lycos' Assistant Controller, a spreadsheet titled "Summary of Equipment Lease Agreements."  *See* Plaintiff's Ex. 19 (Little SJ Aff. Ex. 16).  That spreadsheet includes its leases with CSI, among other lessors, and specifies each equipment schedule, the "equipment value," "lease factor," term (in months) of each schedule, the start/end dates of the schedule, the monthly payment for each schedule, and a host of other detailed information.  Upon Mr. Ziba's departure from Lycos, Ms. Callagee forwarded it to Monique Walsh, another Lycos operational employee, to update and monitor. (Little SJ Aff. Ex. 19).  This spreadsheet was produced electronically to CSI (Plaintiff's Ex. 45) and the metadata indicates it was created by Tom Guilfoile, Lycos' Senior VP of Finance, on May 20, 1996, and was last updated in December 2002. (Little SJ Aff. Ex. 20) (portions of electronic spreadsheet produced).

[36]     *See* Plaintiff's Ex. 398 (Little Aff. Ex. 9) (e-mail from Lycos in-house counsel Peter Karol to Lycos' Spanish parent company confirming that provision in lease – specifically, the stipulated loss tables and values – with CSI are "not uncommon" in the United States).  As discussed above, *supra* note 32, the price paid by Lycos was *less* than what its own expert estimated the equipment to be worth to Lycos at the time of the Sale.

[37]     Deposition of Timothy Wright ("Wright Dep.") dated January 12, 2007, 50; 51-52; 65-66 (Little SJ Aff. Ex. 1).

App. Ct. 140, 148 (1991)(affirming lower court holding that there was no deception because the defendants "knew precisely what they were doing" when they entered into the transaction).

Furthermore, summary judgment dismissing the 93A clam is also warranted because Lycos cannot demonstrate that CSI's actions caused Lycos any harm. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 103 (D. Mass. 1998)(internal quotations and citation omitted); *Heller Fin. v. Ins. Co. of North America*, 410 Mass. 400, 409 (1991)("[W]hile Heller need not show actual reliance on the misrepresentation, *the evidence must warrant a finding that a causal relationship existed between the misrepresentation and the injury*.")(emphasis added); *Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 730 (1989)("[I]n the absence of a causal connection between the alleged unfair acts and the claimed loss, there can be no recovery.").

In fact, because Lycos received financial benefits, and specifically entered into the transactions with CSI to reap those financial benefits, it cannot now demonstrate that CSI's alleged violation of M.G.L. c. 93A caused it any damage. *See Mass. Farm Bureau,* 403 Mass. at 730 (no causation under Chapter 93A because "Farm Bureau ma[de] no claim ... that it misunderstood the terms of the second rate plan ... and there was not evidence of any lack of understanding in that regard."). Also, Mr. Stenberg's March, 2002 email occurred months *after* the parties executed Schedules 93 and 94, and therefore could not have caused Lycos to enter into those Extension Leases. For these reasons, summary judgment dismissing Count VII of Lycos' Counterclaim is warranted.

## VI.    LYCOS' COUNTERCLAIM COUNTS XII AND XIII, ALLEGING THAT LYCOS IS ENTITLED TO A MASSIVE REFUND FROM CSI BASED ON LYCOS' CLAIMS OF "MONEY HAD AND RECEIVED " AND "UNJUST ENRICHMENT, ARE INSUPPORTABLE

Counts XII and XIII of Lycos' Counterclaim seek restitution via allegations of money

-22-

had and received and unjust enrichment, respectively. A claim of money had and received "lies for restitution of money that belongs in good conscience to the plaintiff, but was obtained by the defendant by duress or other means making it unjust for the defendant to keep the money." *White v. Camden County Sheriff's Dept.*, 106 S.W.3d 626, 634 (Mo. App. 2003)(internal quotations and citation omitted); *accord Jelmoli Holdings, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14, 17 n. 2 (1st Cir. 2006)("Money had and received is based on money, or its equivalent, which in equity and good conscience should be returned to the claimant and is often styled as money that should be returned where one is unjustly enriched at another's expense.")(internal quotations and citation omitted).

Similarly, "[u]njust enrichment occurs where a benefit is conferred upon a person in circumstances in which its retention by him of that benefit without paying its reasonable value would be unjust." *White*, 106 S.W.3d at 634; *accord Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005)("Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience.")(internal quotations and citation omitted). Under either theory, there are no material facts demonstrating that CSI obtained any "unjust" benefit at the expense of Lycos.

In fact, because Lycos received valuable consideration in entering the Extension Leases and purchasing the equipment under the Sales Agreement (in the form of reduced monthly rental payments and a mutually agreed upon reduced sales price), CSI's retention of Lycos' payments is in no way unjust *See Dickey v. Royal Banks of Missouri*¸ 111 F.3d 580, 584 (8th Cir. 1997)(reversing judgment for money had and received against bank because the "transfer of money to the [b]ank cannot be called unjust in light of the fact that it merely satisfied a debt that was concededly owed" and the fact that plaintiff "received consideration for his assignment").

Moreover, there is nothing unjust about the payments to CSI because CSI received only those payments that Lycos agreed to pay – amounts Lycos negotiated under the Sales Agreement and amounts fully disclosed to Lycos under the Extension Leases. *See Community Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 560 (1998)("Unjust enrichment, as a basis for restitution, requires more than a benefit. The benefit must be *unjust*, a quality that turns on the reasonable expectations of the parties.")(emphasis in original).

Nevertheless, Lycos count XII and XIII claims for money had and received and unjust enrichment seek to revisit and rescind, and refund to Lycos most of the gross profit CSI earned on, both the Extension Leases and the Sales Agreement.[38] The purported grounds are, again, the alleged "nondisclosures" and "misrepresentations."

In particular, as to the portion of its Counterclaims seeking to rescind the Extension Leases, Lycos argues[39] that the monthly payments it agreed to make under the Extension Leases improperly included an amount of gross profit in excess of what Lycos' now claims a fair rate of return would have been **(a)** if Lycos' original Leases of the relevant Equipment *had been loans*; **(b)** if the present value of the remaining payments due on these original Leases when they were each extended, plus CSI's then-booked "residual value"[40] for the relevant Equipment covered by each Lease, are viewed as outstanding principal balances on a series of loans; and **(c)** if the Extension Leases are viewed as loan refinancings.

Having set forth its position in this way, Lycos argues that CSI's action in charging

---

[38]    *See* Lycos Counterclaim at ¶¶ 128-139 (Docket No. 122).

[39]    *See Lycos's Memorandum of Law in Support of Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of its Counterclaim*, 12-25 ("Argument" Part "I") (Docket No. 148 – hereafter, "Lycos SJ Memo on Certain Counterclaims").

[40]    The terms "residual value," in this context, refers to the straight line depreciated dollar amount that CSI is permitted to "book," or record as an asset amount in its financial records, to represent the value of its ownership of the Equipment it had leased to Lycos. The "in place" value of that Equipment to Lycos would obviously be much higher. *See* Affidavit of James S. Schallheim, Ph.D. ("Schallheim Aff.") ¶ 43 (Gabos Decl. Ex. 3); Affidavit of James M. Johnson, Ph.D. ("Johnson Aff.") ¶ 22 (Gabos Decl. Ex. 4); Affidavit of Michael Fleming ("Fleming Aff.") ¶ 74 (Gabos Decl. Ex. 5).

Lycos what it did on each Extension Lease, even though the total amount of the agreed monthly payment was fully disclosed, was like a lender secretly increasing, or "marking up," the principal amount due on a loan when a borrower refinances and extends that loan,[41] because CSI charged more than what Lycos now thinks a fair rate of return would have been, based on its review of CSI's internal accounting and profitability records in discovery – which, of course, were not available to Lycos at the time of the relevant transactions, but which CSI produced in response to discovery requests in this case.

Similarly, as to the portion of its Counterclaims seeking to rescind the Sales Agreement, and force a refund of a portion of the purchase price paid under it, Lycos argues[42] that although it accounted for all the Extension Leases as "off-balance sheet" operating leases throughout its history, the last two major extensions, nos. 93 and 94, are more properly viewed, in retrospect, as part of ***"installment sales contracts"*** under the Uniform Commercial Code -- supposedly because CSI's booked residual value on much of the equipment had depreciated down to zero at the time of those Extensions.

Based on this argument, Lycos claims that **(a)** no further payment for the purchase of the Equipment covered by those last two extensions was owed to CSI at the end of those Extension Lease terms, **(b)** the portion of the Sales Agreement lump sum purchase price of $3.7 Million "attributable" to the purchase of that Equipment constituted "double payment" for that Equipment, and **(c)** the Sales Agreement should be simply "rescinded," and that portion of the purchase price refunded to Lycos.[43]

What is fatal to Lycos' arguments as to rescission of both the Extension Leases and the Sales Agreement is that, as Lycos' own Vice President of Finance and Administration Thomas

---

[41]    *See* Lycos SJ Memo on Certain Counterclaims (Docket No. 148) at 6-7.
[42]    *See* Lycos SJ Memo on Certain Counterclaims (Docket No. 148) at 25-30 ("Argument" Part "II").
[43]    *See* Lycos SJ Memo on Certain Counterclaims (Docket No. 148) at 25-30 ("Argument" Part "II").

Guilfoile admitted in his deposition, Lycos' transactions with CSI "were leases, not loans,"[44] and no law or regulation limits the amount that a willing lessor can charge a willing lessee for a lease or lease extension--rather, that is a matter governed by the free market, which in the leasing area is highly competitive.[45]

Indeed, it is undisputed that Lycos accounted for all the Extension Leases as *operating leases* throughout its history and  not as conditional sales contracts as to which taxes would have been immediately due, and different financial and accounting treatment required.  Lycos treated the Extension Leases as operating leases in its annual audited financial statements (thereby gaining substantial benefits from treating them as such), expressly agreed, in the Sales Agreement, that the Extension Leases were all *valid and enforceable leases*, and *never* treated them as loans - which would have had to be reflected on its balance sheets as long-term debt.

Under these circumstances, basic principles of estoppel prohibit Lycos from now claiming that the transactions were really loans, that the last two Extension Leases were really conditional sales contracts and that the August 2003 Sales Agreement constituted "paying twice" for the equipment.[46]  In addition, Lycos' arguments on these points as well are disputed factually -- in part by CSI's officials, in part by conflicting testimony from Lycos' own witnesses, and also by expert testimony.[47]

---

[44]    *See* Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[45]    *See* Fleming Aff. ¶¶ 8, 17-21 (Gabos Decl. Ex. 5); Johnson Aff. ¶¶ 10, 14-20 (Gabos Decl. Ex. 4); Schallheim Aff. ¶¶ 11-12 (Gabos Decl. Ex. 3).

[46]    Fleming Aff. ¶¶ 63-64 (Gabos Decl. Ex. 5).  As the Court held in *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435, 1441 (11th Cir. 1986), a party's treatment of an agreement as a lease through beneficial tax and other financial structuring estops the party from later arguing that the lease was not a lease but a security agreement or a mortgage.  The court stated: "The inconsistency here is appellant's assertion of mortgagor status after it has entered into a lease agreement with appellee.  This turnabout is particularly offensive to equitable principles since [the claimant] Martin Bros. has received significant benefits, namely lower rent and operating costs, from executing a lease agreement . . . .". *Id.*

[47]    *See generally* Schallheim Aff., Johnson Aff., Fleming Aff. (Gabos Decl. Exs. 3-5); *see also* Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5 (expressly detailing under August 2003 Sales Agreement that title to equipment did *not* pass to Lycos until all conditions of remaining leases were satisfied).

Because there are no facts demonstrating CSI received an "unjust" benefit through the payments Lycos made under the Extension Leases or the Sales Agreement, and because the facts clearly demonstrate that the transactions at issues were valid and enforceable leases, and not loans, this Court should properly grant summary judgment to CSI on Counts XII and XIII of Lycos' Counterclaim.

## VII.  LYCOS' COUNTERCLAIM COUNTS XIV AND XV, SEEKING VARIOUS DECLARATORY JUDGMENTS FOR LYCOS, ARE DERIVATIVE OF ITS OTHER CLAIMS, AND SHOULD BE DISMISSED FOR THE SAME REASONS

The facts are undisputed that Lycos breached its contractual obligation to CSI by failing to make all the required lease payments under the Extension Leases.  Specifically, by defaulting under Schedules 100 and 200, and refusing to pay its remaining rental payments from November 2004 through April 2005, Lycos breached the Master Lease and the individual equipment schedules.  It is therefore not entitled to any declaratory relief that it has no obligation to make these remaining payments to CSI.

With respect to ownership of the equipment, the Master Lease specifically states that it was a true lease, not a security agreement, and that Lycos would "protect and defend [CSI's] title to the [e]quipment."[48] There is also a specific provision in the Sales Agreement requiring Lycos to make all remaining payments under its leases, and then, only after Lycos made all those payments, would title of the equipment pass from CSI to Lycos.[49]  The facts are undisputed that Lycos failed to make its remaining payments under Schedules 100 and 200.  Accordingly, Lycos is not entitled to any declaratory relief that it has acquired title to the equipment in these schedules, and summary judgment dismissing Counts XIV and XV of Lycos' Counterclaim is warranted.

---

[48]    Master Lease Agreement No. 144874. ¶ 18.1 (Little Decl. Ex. 1) (Docket No. 168).
[49]    Sales Agreement No. 199614, ¶ 5 (Little Decl. Ex. 13) at CSI0013364 (Docket No. 168-2).

## CONCLUSION

For all of these reasons, plaintiff CSI Leasing, Inc. respectfully submits that its Motion for Summary Judgment as to All Counts of Lycos' Counterclaim should be properly granted.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), CSI Leasing, Inc. hereby requests oral argument on all issues raised in the above Motion.

Respectfully submitted,

CSI LEASING, INC. f/k/a/ COMPUTER SALES INTERNATIONAL, INC.
By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
Tel. (617) 449-6500

Dated:  January 15, 2008

## Certificate of Service

I, Robert J. Kaler, hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by first class mail postage prepaid this 15th day of January, 2008.

/s/ Robert J. Kaler_____
Robert J. Kaler

ME1 7030956v.1