UNITED STATES DISTRICT COURT
For the District of Massachusetts

|  |  |
|---|---|
| CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL INC., <br>           Plaintiff, <br>   v. <br><br> LYCOS, INC., <br>           Defendant, <br><br> BANK OF AMERICA f/k/a FLEET BANK, <br><br>           Trustee Process Defendant. | C.A. No. 05-10017- RWZ |

**PLAINTIFF CSI LEASING, INC.'S LOCAL RULE 56.1
CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
DISMISSING LYCOS' REMAINING COUNTERCLAIMS**

Pursuant to Local Rule 56.1, plaintiff and counterdefendant CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI") submits the following statement of undisputed material facts in support of its *Motion for Summary Judgment Dismissing Lycos' Remaining Counterclaims* ("Motion")[1]:

**I.    BRIEF BACKGROUND OF LYCOS**

1.    Lycos was conceived as an internet search engine in 1995 as the brainchild of a

---

[1] For economy, CSI is citing where possible to record materials which are already on the docket, including the summary judgment affidavits of Lycos' counsel (Affidavits of Peter Acton and Thomas Bean – Docket Nos. 145 and 149 – and referred to herein as "Acton Aff." and "Bean Aff.") and the opposing summary judgment affidavits of CSI's counsel (Declarations of Kelly Gabos and Edward Little – Docket Nos. 167 and 168 – and referred to herein as "Gabos Decl." and "Little Decl."), as well as CSI's oppositions to Lycos' recent motions to strike (Docket Nos. 176-178). CSI brings information to the Court's attention for purposes of this motion in the accompanying *Affidavit of Edward W. Little, Jr. in Support of Summary Judgment on Behalf of Computer Sales International, Inc.* ("Little SJ Aff."), to the extent not previously in the record.

Carnegie Mellon University scientist.[2] Following an initial public offering in 1995 which raised $75 million, Lycos' management recognized that it needed to "Get Big Fast" in order to compete in the new internet world.[3]

2.  Lycos grew its employee base into the thousands and acquired several competing companies by engaging in stock offerings at a cost of approximately $860 million.[4] By 2000, Lycos had completed an extremely successful secondary public stock offering and was sitting "on a war chest of over $600 million in cash" when it was approached by the Spanish conglomerate Terra Networks.[5]

3.  By the time the Lycos acquisition by Terra Networks closed in October 2000 for over $6 billion, the new Terra Lycos had more cash on hand than all but twenty-two companies in the world and was operating in 43 countries and 19 languages.[6] Terra sold Lycos to a South Korean company, Daum Communications, in October 2004, and the present litigation ensued two months later.[7]

4.  Lycos employed accounting and auditing professionals including KPMG, Arthur Andersen and Deloitte & Touche, as well as law firms including Hutchins & Wheeler, Hale & Dorr, Ropes & Gray and Cravath, Swaine & Moore and an in-house legal department of as many as six attorneys.[8]

5.  During the course of its leasing relationship with CSI, Lycos on several occasions persuaded CSI to sell it leased equipment at low prices in order for CSI to continue as a leasing

---

[2] *See generally* Plaintiff's Ex. 291 (B. Davis, *Speed is Life: Street Smart Lessons from the Front Lines of Business*, Chapter 4 (2001)) (Little SJ Aff. Ex. 11).  Mr. Davis is the founder of Lycos and was its Chief Executive Officer at all relevant times.
[3] *Id.*
[4] Plaintiff's Ex. 291 (B. Davis, *Speed is Life: Street Smart Lessons from the Front Lines of Business*, at 67) (Little SJ Aff. Ex. 11).
[5] *Id.* at 180-81.
[6] *Id.* at 185; *see also* Plaintiff's Ex. 501 (Little SJ Aff. Ex. 12).
[7] Second Lucy SJ Aff. ¶ 14 (Acton Aff. Ex. 3).
[8] Philip Dep. at 240-42 (Little SJ Aff. Ex. 6).

company for Lycos. Lycos would then resell in order to make "several hundreds of thousands" of dollars.[9]

## II. THE LYCOS-CSI RELATIONSHIP

### A. The Master Lease, Schedules and Lycos' Business Experience

6. The Master Lease Agreement ("Master Lease") is a written document executed by Defendant Lycos, Inc.'s ("Lycos'") then Chief Operating Officer Edward M. "Ted" Philip ("Mr. Philip") on December 20, 1996. Little Decl. (Docket No. 168) Ex. 1. The Master Lease contemplates that CSI, as lessor, and Lycos, as lessee, would enter subsequent equipment schedules concerning the leasing of specific equipment. *Id.*

7. The Master Lease provides that the initial term of each schedule "shall automatically be extended for successive four month periods"[10] unless terminated by either party providing sixty (60) days notice).[11] During the relevant time, Lycos entered into a series of equipment schedules which in some cases extended its rental of equipment it was already leasing.

8. Lycos' senior officers who oversaw its leasing needs and obligations – and, in particular, leasing of equipment from CSI and other lessors – were well-educated and experienced business people. Mr. Philip, Lycos' Chief Financial Officer, received an M.B.A degree from Harvard Business School and worked for several years in the financial world, including at some of the world's largest financial institutions and corporations.[12]

9. Thomas Guilfoile, Lycos' Senior Vice President of Finance and Administration, is a certified public accountant who worked at the international accounting firm of Ernst & Young

---

[9] Deposition of Sam Ziba, dated Sept. 19, 2006 ("Ziba Dep.") at 198-99; Plaintiff's Ex. 127 (Little SJ Aff. Ex. 13).
[10] Master Lease § 2.2, attached as Ex. 1 to CSI's First Amended complaint (Docket No. 121).
[11] Deposition of Edward M. "Ted" Philip, dated Nov. 6, 2006 ("Philip Dep.") at 51:7-13 (Gabos Decl. Ex. 1) (Docket No. 167).
[12] Philip Dep. at 11:10-21 (Gabos Decl. Ex. 1).

-3-

prior to joining Lycos.[13] Among his work with Ernst & Young, Mr. Guilfoile performed lease audits for clients to determine whether their leases qualified as capital leases or operating leases.[14] Mr. Guilfoile testified that Lycos' transactions with CSI "were leases, not loans,"[15]

10. Messrs. Philip, Guilfoile and Lucy have testified that they understood that as a result of entering into the Extension Leases, the aggregate cost to Lycos would increase. Although they now argue, in affidavits recently submitted after the close of discovery, that they just did not know *by how much* those aggregate payments would go up, it is undisputed that they had all the information they needed to calculate them.[16]

### B. Lycos Hires Outside Leasing Experts - 2000

11. Lycos hired outside leasing consultants including Leaseforum, Inc. and Avnet Enterprise Solutions, Inc., to review its leasing practices. Avnet Enterprise Solutions, Inc. ("Avnet") performed an audit of Lycos' leasing practices and advised Lycos as of December, 2000 that Lycos had serious problems because of its failure to track all of its leased assets.

12. Among other things, Avnet told Lycos in December 2000 that "identification and return of [leased] assets, at end of term is nearly impossible *because Lycos lacks an accurate asset inventory*. This results in costly evergreen payments or the buyout of non-productive assets."[17] Nowhere in its detailed report does Avnet blame these problems on any of Lycos' lessors, including CSI.

13. During the relevant time, Lycos negotiated and entered into a series of equipment

---

[13] Deposition of Thomas Guilfoile, dated Dec. 7, 2006 ("Guilfoile Dep.") at 10:13-11:2 (Gabos Decl. Ex. 2).
[14] Guilfoile Dep. at 16:21-17:4 (Gabos Decl. Ex. 2).
[15] *See* Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).
[16] Summary Judgment Affidavits of Edward Philip and Thomas Guilfoile ("Philip SJ Aff." and "Guilfoile SJ Aff.") ¶ 4 (Acton Aff. Exs. 1, 2); Second Affidavit of Brian Lucy ("Second Lucy Aff.") ¶ 9 (Bean Aff. Ex. 11). Current Lycos CFO, Kevin Baillie, also testified that he knew Lycos would pay more money to CSI as result of extending its leases, but just not how much more. Deposition of Kevin Baillie, dated Dec. 21, 2006 ("Baillie Dep.") at 93 (Little SJ Aff. Ex. 5).
[17] *Lycos's Motion for Partial Summary Judgment* (Docket No. 146) and the Bean Aff. (Docket No. 149) Ex. 24 at LYC14559 (emphasis added).

schedules which in some cases extended the lease term of equipment it was already leasing.[18] These extensions were not "refinancings"[19] but were new leases which helped Lycos achieve its stated goals of lowering monthly rent payments.[20]

14. Lycos' officers, including Mr. Guilfoile, have confirmed under oath at deposition that Lycos not only understood them to be leases but reported them as such in the company's public financial statements.[21]

15. Mr. Guilfoile, Lycos' Senior VP of Finance and Administration who signed many of the equipment schedules, testified that Lycos tested each schedule it entered into with CSI to see that it met the standard for operating lease classification.[22]

### III. LYCOS' EXTENSIONS OF LEASE SCHEDULES – SCHEDULES 93/94

#### A. Equipment Schedules 93 and 94

16. Two of the largest extensions were Schedules 93 and 94. The equipment schedules that were re-written into Schedules 93 and 94 are clearly identified in the documentation exchanged between CSI and Lycos.[23]

17. At the time of execution of Schedules 93 and 94, the parties agreed that CSI's performance under the new schedules was "conditioned upon [Lycos'] delivery to [CSI] of an

---

[18] *See*, for example, Acton Aff. (Docket No. 145), Ex. 26 (equipment schedule 66B stating that the equipment thereunder was already "installed at [Lycos'] location under Equipment Schedules Forty-three and Forty-eight" to the Master Lease).

[19] Affidavit of James S. Schallheim ("Schallheim Aff.") dated Nov. 18, 2007 at ¶¶ 11-12; Affidavit of James M. Johnson ("Johnson Aff.") dated Nov. 18, 2007 at ¶¶ 14-20; Affidavit of Michael Fleming ("Fleming Aff. ") dated Nov. 18, 2007 at ¶¶ 17-21 (all attached, respectively as Exs. 3-5 to Gabos Decl).; Guilfoile Dep. at 203:4-11 (Gabos Decl. Ex. 2).

[20] Deposition of Brian Reale ("Reale Dep.") dated Jan. 31, 2007 at 11:3-9, attached as Ex. 3 to the Declaration of Edward W. Little Attaching Relevant Portions of the Case Record In Opposition to Lycos, Inc.'s Motion for Summary Judgment on All Counts of CSI's Amended Complaint ("Little Decl.") (Docket No. 168) dated Nov. 19, 2007 and filed with CSI's Opposition papers to Lycos' Motions for Summary Judgment.

[21] Guilfoile Dep. at 203:4-11 (Little Decl. Ex. 2).

[22] Guilfoile Dep. at 79:21-80:9 (Gabos Decl. Ex. 2).

[23] Acton Aff. Exs. 6, 7.

irrevocable, unconditional standby letter of credit" under agreeable terms.[24] In an effort to assist Lycos, the $11 million amount of the letter of credit was actually less than it otherwise would have been, as CSI structured the deal to leave the existing debt in place on the existing schedules.[25]

18. Lycos sought to re-write its CSI lease portfolio because it wanted to lower its monthly spending.[26] In May 2001, Lycos' Human Resources Officer John McMahon notified all employees that Lycos was "sharpening [its] focus on bottom line results," which included "expense reduction initiatives"[27] – i.e., layoffs and other measures.[28] Similarly, Lycos sought to reduce its monthly expenses.[29]

19. At all relevant times, it was Lycos' policy to forego purchasing equipment if it could lease it instead.[30]

20. Tim Wright, Lycos' own Chief Information Officer, testified that it was "glaringly obvious" that Lycos was not managing its leases with vendors in the most economical way possible.[31] He further testified that Lycos was moving equipment from "one platform to another" because it considered that "the right thing for the business at the time," and that it was not a "burning issue" for Lycos what would be happening several years down the road when its leases came to an end – rather, the immediate goal was satisfying Lycos's growing appetite and

---

[24] Acton Aff. Ex. 6 at CSI0027566 ¶ 3; Ex. 7 at CSI0027742 ¶ 3.
[25] Deposition of Philip Cagney, dated Sept. 27, 2006 ("Cagney Dep.") at 245:7-19; 256:2-9 (Little Decl. Ex. 4).
[26] Deposition of Paul Stenberg, dated Jan. 19, 2007 ("Stenberg Dep.") at 696:11-13; 697:3-14 (Gabos Decl. Ex. 8); Deposition of Timothy Wright, dated Jan. 12, 2007 ("Wright Dep.") at 102:15-104:4 (Gabos Decl. Ex. 9).
[27] E-mail from John McMahon to Lycos Network Employees, dated May 8, 2001 (Gabos Decl. Ex. 18).
[28] Wright Dep. at 94:21-95:3 (Gabos Decl. Ex. 9).
[29] Reale Dep. at 11:3-9 (Gabos Decl. Ex. 12); Deposition of Eric Ausubel, dated Jan. 5, 2007 ("Ausubel Dep.") at 140:5-17 (Gabos Decl. Ex. 13); Stenberg Dep. (Aug. 24, 2006) at 110:15-111:7.
[30] Deposition of Ernest Galvan ("Galvan Dep.), dated Feb. 20, 2007 at 32:3-13 (Gabos Decl. Ex. 6).
[31] Deposition of Lycos Chief Information Officer Timothy Wright at 50; 51-52; 65-66 (Little SJ Aff. Ex. 1 – selected portions).

ME1 6978471v.4

need for equipment.[32]

21. Lycos did not want to capitalize the leases, and instead continued to claim operating lease accounting treatment for them).[33] Lycos also did not have the ability to return a large portion of the leased equipment because Lycos could not locate it (a fact it kept from CSI, the owner of the equipment).[34]

22. It was Lycos' decision to extend its leases, as it had other options available to it, including return of the leased equipment (or substitution, if the equipment was lost or damaged).[35]

### IV. E-MAIL OF MARCH 18, 2002

23. On March 18, 2002, Mr. Stenberg wrote an e-mail to Lycos personnel regarding Lycos' payments under the old schedules and the newly extended leases.[36] Lycos claims that it relied on this e-mail in continuing its payments under the extended leases and in executing the agreement to purchase the equipment in August 2003.[37]

24. Mr. Stenberg wrote the March 18, 2002, email three months after Lycos and CSI entered into Schedules 93 and 94 in December, 2001.[38] In the e-mail, Mr. Stenberg stated, "I have come up with the following so far."[39] Mr. Lucy said he would "take a look" at the information, but he never responded to Mr. Stenberg.[40]

25. At his deposition in this case, Mr. Lucy did not recall receiving the March 18,

---

[32] *Id.*

[33] Lycos' parent company in Spain, Terra Networks, eventually required Lycos to capitalize all of its leases, which was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003. Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7).

[34] E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625.

[35] Johnson Aff. ¶ 22; Fleming Aff. ¶ 62 (Gabos Decl. Exs. 4-5, respectively).

[36] Bean. Aff. Ex. 46.

[37] Lycos's Answer to CSI's First Amended Complaint and Counterclaim of Lycos, Inc. (Docket No. 122)¶¶ 40-51; *see generally* Lycos Motion for Partial Summary Judgment (Docket No. 146).

[38] Bean Aff. Ex. 46.

[39] Bean Aff. Ex. 46.

[40] Bean Aff. Ex. 46.

ME1 6978471v.4

2002 e-mail from Mr. Stenberg and did not recall relying "in any way" on the statements made by Mr. Stenberg in the e-mail.[41] Mr. Lucy further testified that he has no personal knowledge of Lycos ever being deceived by CSI – he stated that he now thinks Lycos may have been deceived because of what others have told him, though he cannot recall or articulate what those others told him was involved in the deception.[42]

26. Mr. Philip recalls no dealings with CSI or Mr. Stenberg, nor any discussion regarding CSI with anyone on his team at Lycos (Mr. Guilfoile, Mr. Lucy, Sam Ziba and Michael Ripps).[43]

27. Mr. Guilfoile recalls no misrepresentations made by CSI, nor does he recall extending any CSI leases.[44]

28. On January 7, 2004, after Lycos had first filed suit against CSI, that Leaseforum's John Kirk informed the Lycos "Team" (including Lycos' outside counsel) that he had found the March 18, 2002 e-mail and that it "*may* be important."[45]

29. The information in the March 18, 2002 email was based on information Mr. Stenberg admittedly gave to Lycos months earlier.[46]

30. Lycos' internal spreadsheets, created both before and after the March 2002 e-mail, recorded the cost of the CSI equipment to be in the mid-$40 million range.[47] Lycos was aware of the original cost of the equipment and the substantial value of the equipment when it

---

[41] Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep.") at 52:8-53:20 (Gabos Decl. Ex. 19).
[42] Deposition of Brian Lucy, dated Jan. 10, 2007 ("Lucy Dep. 2"), at 82 (Little SJ Aff. Ex. 8).
[43] Philip Dep. at 81-83 (Little SJ Aff. Ex 6). No "team" member at Lycos has testified to any misrepresentation they received from CSI before a lease was executed.
[44] Guilfoile Dep. at 124-25 (Little SJ Aff. Ex. 7).
[45] E-mail from John Kirk to Lycos' Litigation "Team," dated Jan. 7, 2004 (Gabos Decl. Ex. 20).
[46] Bean Aff. Ex. 31 at LYC24612 ("The obligations under the new refinanced leases came from the schedule below that you emailed to Monique [Walsh, of Lycos]").
[47] *See, e.g.*, spreadsheet of Lycos' Sam Ziba, as of June 2001 (Little Aff. Ex. 16), which lists "equipment values" for all equipment leases, including those with CSI; spreadsheet created by Monique Walsh on October 22, 2002 (produced electronically under CD, marked as Plaintiff's Ex. 45) (Little Aff. Ex. 17); spreadsheet created by Monique Walsh on July 14, 2003 (Little Aff. Ex. 18) at LYED202465.

entered into the Sales Agreement in 2003.[48]

31.     Lycos referred to Mr. Stenberg as a "worthless liar" – and its in-house counsel cautioned Mr. Lucy not to rely on Mr. Stenberg because "he [Stenberg] doesn't work for Lycos."[49]

## V.   LYCOS' DECISION TO CAPITALIZE ITS LEASES – THE SALES AGREEMENT

### A.   CSI Provides Scenarios for Lease Buy-Out

32.     Lycos' parent company in Spain, Terra Networks, required Lycos to capitalize all of its leases, and this was the impetus for the buyout negotiations which culminated in the Sales Agreement in August 2003.[50]

33.     In October, 2002, Mr. Stenberg presented two scenarios to Mr. Lucy to capitalize the leases: Lycos could either (a) do a "lump sum" payout of $26,819,623 and take title to the equipment upon payment, an offer which Lycos rejected, or (b) pay $4.69 million now, continue paying all of its lease obligations into the future and take title upon final payment on the leases ("[t]itle [of the equipment] will pass to Lycos at the expirations of these leases.")[51]

---

[48]     Lycos had been tracking all of its leases, including those with CSI, since the inception of the relationship. When Sam Ziba, Lycos' Director of Operational Planning, left Lycos in June 2001, he forwarded to Julie Callagee, Lycos' Assistant Controller, a spreadsheet titled "Summary of Equipment Lease Agreements." *See* Plaintiff's Ex. 19 (Little SJ Aff. Ex. 16). That spreadsheet includes its leases with CSI, among other lessors, and specifies each equipment schedule, the "equipment value," "lease factor," term (in months) of each schedule, the start/end dates of the schedule, the monthly payment for each schedule, and a host of other detailed information. Upon Mr. Ziba's departure from Lycos, Ms. Callagee forwarded it to Monique Walsh, another Lycos operational employee, to update and monitor. *Id.* Ex. 19. This spreadsheet was produced electronically to CSI (Plaintiff's Ex. 45) and the metadata indicates it was created by Tom Guilfoile, Lycos' Senior VP of Finance, on May 20, 1996, and was last updated in December 2002. *Id.* Ex. 20 (portions of electronic spreadsheet produced).

[49]     In an e-mail from Lycos in-house counsel Peter Karol to Michael Ripps, dated Sept. 6, 2000, Mr. Karol says of Mr. Stenberg that "[t]he Guy is a worthless liar" and an "a**hole," to which Mr. Ripps replies with another disparaging remark concerning Mr. Stenberg. *See* Gabos Decl. Ex. 15. In addition, Mr. Karol testified that he told Brian Lucy – the Lycos officer who supposedly "relied on" and "trusted" Mr. Stenberg – "[w]hy do you trust Paul [Stenberg]? . . . [H]e doesn't work for Lycos." Deposition of Peter Karol, dated Dec. 8, 2006 ("Karol Dep.") at 168:21-169:15 (Gabos Decl. Ex. 16).

[50]     Deposition of Julie Callagee, dated Apr. 26, 2006 ("Callagee Dep.") Callagee Dep. at 49:17-50:4 (Gabos Decl. Ex. 7).

[51]     E-mails of October 22 and 24, 2002 from Paul Stenberg to Brian Lucy (Little Decl. Exs. 8 and 9, respectively).

ME1 6978471v.4

34. The offer to sell the equipment to Lycos for $4.69 million included among other things, that (a) CSI would retain title to the equipment until all of the existing leases terminated at their stated times (including some in late 2004 and one in 2005) and (b) title would only pass at that time provided Lycos was not then in default under the leases, including in its lease payment obligations.[52]

35. Lycos did not accept the $26.8 million "lump-sum" scenario from Mr. Stenberg,[53] and it ultimately agreed to proceed with the second scenario – a payment with continuing monthly lease payments – though for an amount lesser than $4.69 million.[54]

### B. Leaseforum Assists Lycos in Negotiating Buy-Out

36. On June 27, 2003, Lycos' Assistant Controller, Julie Callagee ("Ms. Callagee") sent Mr. Stenberg a letter informing him that Lycos had "retained Leaseforum, Inc. to perform various services with respect to the assessment, negotiation and execution of leases."[55] Lycos' agent Leaseforum, a consultant it had hired to negotiate the buyout of the CSI equipment,[56] through its principal Susan Franklin ("Ms. Franklin"), had contacted Mr. Stenberg by phone earlier that day.[57] Mr. Stenberg testified he received this call "out of the blue" and had "no idea that was coming."[58]

37. When he received her call, Mr. Stenberg was unsure whether Ms. Franklin represented Lycos and, after being informed by Lycos that she did, he negotiated with her. Mr. Stenberg testified he was not worried about any audit and he told Mr. Lucy to "go ahead and do

---

[52] Acton Aff. Ex. 9 at CSI0023157 ¶¶ 2, 4.
[53] Deposition of Susan Franklin, dated Oct. 25, 2006 ("Franklin Dep.") at 129:5-14 (stating that parties were engaged in counterproposals at this time of negotiation) (Little Decl. Ex. 5).
[54] Acton Aff. Exs. 6, 7.
[55] Acton Aff. Ex. 11.
[56] Acton Aff. Ex. 11.
[57] Franklin Dep. at 117:15-118:10 (Little Decl. Ex. 5).
[58] Acton Aff. Ex. 32 at 295:12-17.

it [the audit]."[59]

38.   Ms. Franklin had concluded by June 27, 2003 that the original equipment cost of the CSI equipment had been approximately $44 million, and that the Lease payments ("CF" or cash flow) made by Lycos to CSI had exceeded the original equipment cost by over $20 million.[60]

39.   After agreeing to a purchase price of $3.775 million, Susan Franklin of Leaseforum stated:

> Please prepare and present the appropriate documentation to my attention to review and comment, if any. I will forward the documents to Lycos for their acceptance and facilitate the execution thereof. Lycos will exercise its best efforts to turn the documentation around by July 15th and wire the purchase price by July 18th.[61]

Ms. Franklin also attached to her e-mail an addendum of additional terms for CSI's review.

40.   Mrs. Franklin, founder and principal of Leaseforum, admitted under oath that Leaseforum holds a contingent financial interest in the outcome of this case.[62]

41.   On July 16, 2003, Joan Kersting ("Ms. Kersting") of CSI's legal department submitted to Lycos a draft offer in which Lycos' payment on the leases had to continue and title to the equipment being sold expressly did not pass to Lycos until all remaining rent payment were made).[63]

42.   Ms. Kersting testified that she understood Lycos was "reaffirming the monthly rental obligations under the leases."[64]

---

[59] Acton Aff. Ex. 32 at 295:21-24.
[60] *See* Plaintiff's Ex. 191A (Little SJ Aff. Ex. 15). This spreadsheet created by Leaseforum clearly shows the distinction between "OEC" of $44 million versus "CF" – or cash flow (i.e., total payments) – of $63 million. Any claim that Lycos did not understand how much it had paid and how much the equipment originally cost does not hold up.
[61] Acton Aff. Ex. 29 at AR001433.
[62] Deposition of Susan Franklin, dated Feb. 21, 2007 ("Franklin Dep.") at 373:5-8 (Gabos Decl. Ex. 21).
[63] Acton Aff. Ex. 9 at CSI0023157 ¶ 4.
[64] Action Aff. Ex. 13 at 258:18-24 (deposition testimony of Joan Kersting dated December 13, 2006).

### C.  Lycos' Counsel Acknowledges CSI's Lease Terms Are "Common"

43.  Lycos' in-house counsel reviewed and approved the legal terms of the sale agreement and also reported to Lycos' parent company that the lease terms were in a form that was common in the United States.[65]

44.  Lycos' partner and agent Leaseforum produced a memorandum dated December 1, 2003 that it had provided to Lycos senior management.  The memo stated that CSI's lease documentation was "within the broad range of acceptable commercial practices" and that "Lycos does have a responsibility to evaluate business decisions effectively."[66]

### D.  Lycos Internally Acknowledges a Lack of Ability to Return CSI's Equipment

45.  On July 22, 2003, Ms. Callagee sent an e-mail to Peter Karol, in-house counsel at Lycos, stating Lycos was at a negotiating disadvantage and could not return CSI's equipment:

> [I]t is our understanding that we [Lycos] are contractually obligated to return all of the leased equipment to our lessor [CSI] in exactly the same way it was received.  ***This would include identifying several hundred pieces of equipment and decommissioning them in accordance with each lease expiration.  We believe this to be operational impossibility***, . . .
>
> Obviously, buying out now eliminates significant risks to the Company.  Because this equipment cannot be located/returned, the significant cost implications of not exercising the buy out offer and the unfavorable negotiating position we will be in to negotiate a buy out at the end of the lease term (***when we admit to our Lessor that we cannot return this equipment*** and HAVE TO buy out), we support Brian [Lucy's] decision to buy out of the leases immediately.[67]

46.  Mr. Lucy communicated to Mr. Stenberg on July 24, 2003, that Lycos' parent

---

[65]  *See* Plaintiff's Ex. 398 (Little SJ Aff. Ex. 9) (e-mail from Lycos in-house counsel Peter Karol to Lycos' Spanish parent company confirming that provision in lease – specifically, the stipulated loss tables and values – with CSI are "not uncommon" in the United States).

[66]  *See* Memorandum from Leaseforum to Lycos, dated Dec. 1, 2003 (LYC 22780) concerning "Timeline for CSI Effort" (Little SJ Aff. Ex. 10).  This Memorandum was sent to Mr. Lucy, who had been working with Leaseforum for over six months, yet the March 2002 email is never mentioned in the Leaseforum memo.

[67]  E-mail from Julie Callagee to Peter Karol, dated July 22, 2003 (Gabos Decl. Ex. 14) at LYC19624-625 (capitalization in original; emphasis supplied).

-12-

ME1 6978471v.4

company in Spain had not as of that time authorized any buyout.[68]

> I'm in Spain right now for the earnings release. At the same time I'm trying to get my boss, Elias, to give me the green light. He's close to approving this, but hasn't formally done so just yet.[69]

47. In an August 1, 2003 e-mail, Ms. Kersting noted errors in the prior draft of the Sales Agreement that needed to be corrected as well as an issue concerning sales tax acceleration, and she testified to substantive changes made in the agreement finally executed by the parties.[70]

48. Lycos signed Sales Agreement Number 199614 ("Sales Agreement"), on August 8, 2003, and CSI signed it three days later, on August 11, 2003.[71]

49. The Sales Agreement provides that CSI "retains title" to the leased equipment until the leases are satisfied in full.[72] Title expressly did not pass to Lycos at the time of the Sales Agreement.[73]

## VI. LYCOS AND LEASEFORUM SECRETLY PLAN TO RENEGOTIATE CSI LEASES

50. On August 8, 2003 – the day on which Mr. Lucy executed the Sales Agreement for Lycos – John Kirk ("Mr. Kirk") of Leaseforum confirmed with Ms. Callagee of Lycos a plan to renegotiate and reduce the remaining future lease payments Lycos was simultaneously affirming to CSI that it would continue to pay:

> We have completed phase 1 of the work with CSI. ***Phase 2 has commenced.*** The phase 2 effort is a continuation under statement of work 001 [between Lycos and its agent Leaseforum]. ***Our current work on the CSI/Lycos relationship is aimed at setting up a negotiation to reduce Lycos remaining future payment obligations to CSI. It is also conceivable that a cash settlement or payment by CSI to Lycos unrelated***

---

[68] Little Decl. Ex. 7.
[69] E-mail from Brian Lucy to Paul Stenberg dated July 24, 2003 (Little Decl. Ex. 7).
[70] Acton Aff. Ex. 13 at 21:7-223:5 (deposition testimony of Joan Kersting dated December 13, 2006).
[71] Little Decl. Ex. 13 (executed Sales Agreement).
[72] Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5.
[73] Ex. 10 to CSI's Amended Complaint (Docket No. 121) at ¶ 5.

*to the remaining payments could eventuate* and we would expect any such payment to be applied against the baseline as well as used as the basis for calculating Lease Forum's fees. In any event the final calculation of reduction in CSI baseline costs will of course take into account our mutual success in phase 1 in reducing Lycos' residual buy out of the CSI leases.[74]

51. Lycos and Leaseforum had executed a Statement of Work 1 ("SOW 1") as of June 17, 2003, in which Leaseforum would review Lycos' current leasing practices and, among other things, "outline available options" for Lycos.[75] Under SOW 1, Leaseforum was entitled to receive twenty-five percent (25%) of monies saved by Lycos in its lease negotiations with Lycos' lessors.[76] The signed Statement of Work No. 002 states that "Client [Lycos] desires *to continue a partnership* with Leaseforum."[77]

52. There is no evidence that anyone at Lycos, including Ms. Callagee, ever responded to Mr. Kirk that Leaseforum should stop work on implementing "Phase 2."

53. Lycos filed a complaint against CSI in December, 2003, entitled *Lycos, Inc. v. Computer Sales International, Inc.*, Civil Action No. 03-5057. Lycos subsequently withdrew that Complaint.

## VII. LYCOS' EXPERTS VALUE ALL EQUIPMENT IN EXCESS OF $7 MILLION AS OF JULY 2003

54. Lycos' own valuation expert Peter Daley has valued all of the leased equipment as of July 2003 at more than $7 million, and as of November 2001 (at the time that Schedules 93 and 94 were executed), at over $14 million.[78]

---

[74] Acton Aff. Ex. 18 (portion of e-mail from John Kirk of Leaseforum to Julie Callagee marked "A") (emphasis added).
[75] Statement of Work No. 1, dated June 17, 2003, between Leaseforum and Lycos (Little Decl. Ex. 17).
[76] Little Decl. Ex. 17 at LYC18884.
[77] Action Aff. Ex. 23 at LYC18887.
[78] Deposition of Peter Daley ("Daley Dep."), dated Dec. 7, 2007 at 152:1-153:1-22 attached as Exhibit B to the *Opposition of CSI Leasing, Inc. to Lycos's Motion to Strike Portions of CSI's Local Rule 56.1 Statement With Respect to Lycos's Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of its Counterclaim* ("CSI Opposition to Lycos's Motion to Strike Counterclaim Facts") (Docket No. 178); Spreadsheet

-14-

ME1 6978471v.4

Respectfully submitted,

COMPUTER SALES INTERNATIONAL, INC.

By its attorneys,

/s/ Robert J. Kaler_____
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
Tel. (617) 449-6500

Dated:  January 15, 2008

**Certificate of Service**

I, Edward W. Little, Jr., hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically and by first class mail, postage prepaid, this 15th day of January, 2008.

/s/ Edward W. Little, Jr.\_\_\_\_\_
Edward W. Little, Jr.

---

prepared by Peter Daley attached as Exhibit B to *CSI Opposition to Lycos's Motion to Strike Counterclaim Facts* (Docket No. 178).

-15-

ME1 6978471v.4