# EXHIBIT 1

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Timothy Wright

# January 12, 2007

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

Nicole E. Guilbert   22498

1    companies at the end of the lease terms were sort of the

2    least of your concerns?

3        A.   It was a low -- it wasn't a high priority.

4        Q.   It was not a high priority?

5        A.   It was not.

6        Q.   This page of the report in the last bullet point

7    that you see on the page says, "Lycos is not realizing

8    the maximum financial benefit from its operating

9    leases." And there is some further discussion of that

10   later in the report. Do you recall generally that there

11   was some indication from Avnet in the report that they

12   delivered to Lycos in 2000 that they thought Lycos was

13   not managing its equipment leases in the most economical

14   way possible?

15               MR. ACTON:  Objection.

16       Q.   (By Mr. Kaler)  You can answer.

17       A.   I'd say that was a statement of the glaringly

18   obvious.

19       Q.   In other words, it is true that Lycos was not

20   managing its leases with vendors like CSI in the most

21   economical way possible?

22       A.   Correct.

23               MR. ACTON:  Objection.

24       Q.   (By Mr. Kaler)  And what did you observe were the

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

1    reasons for that that Lycos was --

2        A.    A lot of the equipment when it came, you know,

3    the end of the lease period or beforehand was of no

4    value to Lycos.  I mean, it was -- it was worthless.

5    When we swapped out -- we rebuilt the Lycos search

6    engine and the Lycos home page and the Lycos properties,

7    we moved away from the digital platform to a Windows NT

8    platform.  We moved to a more updated network

9    architecture.

10        When we completed that migration from one

11   platform to another in order to handle the growth of the

12   product, to be more efficient in our dollars spending on

13   assets as we grew those networker properties, when that

14   migration happened from one platform to another, the old

15   digital equipment was no longer of any use to me and its

16   value in the marketplace was very low.  So our moving

17   equipment to one platform to another did not correspond

18   to anybody's lease schedule.  We moved it because that

19   was the right thing for the business at the time in

20   order to handle the growth of the network, the

21   performance issues, and the increasing complexity of the

22   products in the network.

23        And so as a -- in my role at the organization, my

24   job was to provide the most effective and high

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

52

1    performance platform for us to run our products on to be

2    competitive in the marketplace.

3        Q.   And as a result of that problem, was it the case

4    that Lycos was frequently paying -- making lease

5    payments to leasing companies for equipment that it

6    wasn't, at that particular time, use -- necessarily

7    using?

8                    MR. ACTON:  Objection.

9                    THE WITNESS:  I don't specifically

10                recall incidents of where that was the

11                case, but I'm sure it was.

12       Q.   (By Mr. Kaler)  In the report, if you go forward

13   to page 27, which is LYC 14575, do you see where under

14   Financial Needs summary, the Avnet folks reported that,

15   quote, To determine Lycos' financial needs, assessment

16   interviews were conducted with Tim Wright, Sam Ziba,

17   Frank Treu, and Ron Rainville.  Results of these

18   interviews were reviewed by AES consultants and combined

19   with an analysis of the available lease documentation to

20   produce the financial roadmap recommendations.  Do you

21   see that?

22       A.   I do.

23       Q.   And then if you keep your finger on that page and

24   you look back to page 14, you see there's a table for

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

65

1    with --

2        A.    No.  It probably wasn't -- that was probably not

3    the right word, not conflicted, but there were

4    objectives in here that made that one probably harder,

5    which was I wanted this stuff in the network quickly and

6    I didn't want some drawn out, protracted process --

7        Q.    Of inputting data you mean --

8        A.    -- of acquiring -- you know, it had to move

9    quicker.

10       Q.    Of course, you were aware that almost all of the

11   equipment that you were using for your operations, apart

12   from equipment that had been acquired from other

13   companies, was being leased by Lycos?

14       A.    Yes.

15       Q.    Okay.  And you did understand generally that

16   equipment that was leased in each case would have to be

17   returned to the lessor at some point in time?

18       A.    Mm-hmm.

19              MR. ACTON:  Objection.

20              THE WITNESS:  I did but the other

21          thing to bear in mind here was this was an

22          internet company where I was focussed on,

23          you know, three- to six-month rolling

24          windows.

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

66

1      Q.    (By Mr. Kaler)  Understood.  Understood.

2      A.    And so something which, you know, hey, you're

3   going to have to worry about this four years from now,

4   okay, right, you know --

5      Q.    Not really something that was --

6      A.    That was not a burning issue for me.

7      Q.    Let's just jump ahead to one other section of

8   this report, if we go to page 31.  At the top of the

9   page, there's a heading Maintenance Schedule Only, and

10   it says, "Lycos' current IT acquisition strategy focuses

11   on 36-month operating leases"?

12      A.    Okay.

13      Q.    And is that a correct statement at the time in or

14   about 2000 that you were --

15      A.    I have no idea.

16      Q.    But you -- you did have an understanding

17   generally the difference between operating leases and

18   capital leases?

19      A.    I --

20            MR. ACTON:  Objection.

21            THE WITNESS:  -- didn't pay any

22        attention to it.

23      Q.    (By Mr. Kaler)  Those accounting concepts were

24   not really at the forefront of your concern?

# EXHIBIT 2

| From: | Michael Ripps <mripps@lycos-asia.com> |
|---|---|
| Sent: | Wednesday, September 6, 2000 9:30 AM |
| To: | Peter Karol/O=Lycos@Lycos |
| Subject: | FW: |
| Attach: | att1.eml |

EXHIBIT NO. 356
11/14/06  CF

this guy is unbelievable!

-----Original Message-----
From: Paul Stenberg
To: mripps@lycos-inc.com
Sent: 9/6/00 9:12 PM
Subject: RE:

Got yopur phone message this morning.  I talked to him yesterday and said it
would be there today.  It was two weeks ago that you sent the email and I
was on vaca.  Sorry for any inconvenice

-----Original Message-----
From: mripps@lycos-inc.com [mailto:mripps@lycos-inc.com]
Sent: Tuesday, August 15, 2000 10:17 AM
To: phs@mktg.csileasing.com
Cc: pkarol@lycos-inc.com; mripps@lycosasia.com
Subject:

Hello Paul,

I hope all is well with you and you've had a good summer - I'm sorry I missed
you on my last couple of weeks in Boston.   Before I left, we had a dinner at
Morton's which you graciously offered to cover (even though you unfortunately
couldn't make it);  Pete Karol in our legal group picked up the tab, and I
believe that I forwarded you the receipt a while ago for reimbursement.  Do you
mind following up to see if you received the bill, and if you didn't

please
let
me know (via e-mail)?  And if you did receive it, could you forward Pete
the
money?  Pete has gambling debts to cover and would really appreciate the
funds
(joking), but seriously Pete did everyone a favor by picking up the
check.

Thanks in advance and drop me a note to let me know how everything is
going;
I
can still be reached at my old e-mail address.

Michael
- att1.eml

LYC 22244

# EXHIBIT 3

EXHIBIT

**340**

| From: | Michael Ripps <mripps@lycos-asia.com> |
|---|---|
| Sent: | Wednesday, September 6, 2000 9:48 AM |
| To: | Peter Karol/O=Lycos@Lycos |
| Subject: | RE: FW: |
| Attach: | att1 .eml |

fucking goy! tell him we'll pay CS1 "shortly".

-----Original Message-----
From: pkarol@lycos-inc.com
To: Michael Ripps
Sent: 9/6/00 9:26 PM
Subject: Re: FW:

The Guy is a worthless liar! See below, he already responded to your prior email
AUgust 16! He's now acting like he just got it. He called me yesterday and
introduced himself as a representative from my credit card company wanting to
know why I didn't pay my bill yet. What an asshole.

Brian agreed last week to run this through Lycos, so I'll get reimbursed for the
meal next paycheck (next Friday). THe irony is that if his check really does get
here today, I have to sign it over to Brian and lose another week's float.

I hate Stenburg - he should offer me something for the inconvenience.

ANyway, in the big picture, not a big deal. Thanks for following up.

Hope all's well over there, and you and Dan are enjoying yourselves this week.

Michael Ripps <mripps@lycosasia.com> on 08/15/2000 08:28:48 PM

LYC 22245

To:    Peter Karol/Lycos@Lycos

cc:

Subject: FW:

Unfortunately, he needs to be pushed; his number is 617-928-3535 if you want
to harass him.
-----Original Message-----
From: Paul Stenberg [mailto:PHS@mktg.csileasing.com]
Sent: Wednesday, August 16, 2000 1:54 AM
To: mripps@lycos-inc.com
Subject: RE:

Hey , great hearing from you.  Please, please, keep in touch.  Hope the
family is adjusting fine.

I will call him shortly.

-----Original Message-----
From: mripps@lycos-inc.com [mailto:mripps@lycos-inc.com]
Sent: Tuesday, August 15, 2000 10:17 AM
To: phs@mktg.csileasing.com
Cc: pkarol@lycos-inc.com; mripps@lycosasia.com

LYC 22246

Subject:

Hello Paul,

I hope all is well with you and you've had a good summer - I'm sorry I missed
you on my last couple of weeks in Boston.  Before I left, we had a dinner
at
Morton's which you graciously offered to cover (even though you unfortunately
couldn't make it);  Pete Karol in our legal group picked up the tab, and I
believe that I forwarded you the receipt a while ago for reimbursement.  Do
you
mind following up to see if you received the bill, and if you didn't please
let
me know (via e-mail)?  And if you did receive it, could you forward Pete the
money?  Pete has gambling debts to cover and would really appreciate the funds
(joking), but seriously Pete did everyone a favor by picking up the check.

Thanks in advance and drop me a note to let me know how everything is going;
I
can still be reached at my old e-mail address.

Michael

<<att1.eml>> - att1.eml

LYC 22247

# EXHIBIT 4

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc., et al.

**Transcript of the Testimony of:**

# Brian David Lucy

# November 10, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   21702

Brian David Lucy  11-10-2006
Computer Sales International, Inc. v. Lycos, Inc., et al.

14

1    it's been, you know, five years or three years.

2        Q.   Okay.  Did you have the capability to search your

3    computer for any documents that you might have deleted but

4    that might still be retrievable on your hard drive?

5        A.   No.

6        Q.   Okay.  Did you search any other locations other

7    than your home for records?

8        A.   No.

9        Q.   Okay.  And are you satisfied that all documents

10   and electronic records that you have in your possession

11   have been produced to us in response to the subpoena?

12       A.   Yes.

13       Q.   Would you briefly describe your educational

14   background by years beginning with your graduation from

15   high school.

16       A.   In 1984 I attended Villanova University,

17   graduating in 1988.

18       Q.   What degree?

19       A.   Bachelor of arts in political science.

20       Q.   That was your major?

21       A.   That's right.

22       Q.   And then what did you do?

23       A.   Then I graduated from Salem State in '91 with a

24   bachelor of science in accounting.

Brian David Lucy  11-10-2006
Computer Sales International, Inc. v. Lycos, Inc., et al.

15

1    Q.   A second bachelor's degree?

2    A.   That's right.

3    Q.   And were you at Salem, then, from 1988 to 1991?

4    A.   Not -- not full-time.

5    Q.   What were you doing part-time?

6    A.   Waiting tables, moving furniture.

7    Q.   Where were you born originally?

8    A.   In the Boston area.

9    Q.   Where?  South shore, west?

10   A.   I think north shore.

11   Q.   North shore.  And --

12   A.   I don't recall that far back.

13   Q.   Okay.  What did you do when you got your -- got

14   out of Salem State?

15   A.   I went to work for KPMG.

16   Q.   Were you a certified public accountant at that

17   time?

18   A.   No.

19   Q.   When did you become a certified public accountant?

20   A.   I'm not sure of the exact date, but approximately

21   1995.

22   Q.   And were you at KPMG at that time?

23   A.   Yes.

24   Q.   So you started at KPMG as what, staff?

Brian David Lucy  11-10-2006
Computer Sales International, Inc. v. Lycos, Inc., et al.

16

```
 1        A.    Staff accountant, that's right.

 2        Q.    Okay.  Were you on the audit side or the tax side?

 3        A.    Audit.

 4        Q.    And how long did you remain a staff accountant?

 5        A.    I don't recall.

 6        Q.    What was your next position?

 7        A.    I think senior accountant or senior auditor.  I'm

 8   not sure.

 9        Q.    And what was your next position after that?

10        A.    It was supervising senior.

11        Q.    And your next position after that?

12        A.    That was it.

13        Q.    And when in 1995 did you leave KPMG?

14        A.    I didn't.

15        Q.    What happened in 1995?

16              MR. DAVIDSON:  Objection.

17              MR. BEAN:  Objection.

18        Q.    Did you stay with KPMG?

19        A.    Yes.

20        Q.    Until when?

21        A.    '96.

22        Q.    Okay.  And when in 1996 did you leave?

23        A.    June.

24        Q.    And why did you leave?
```

# EXHIBIT 5

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Kevin Cameron Baillie

# December 21, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   21972

Case 1:05-cv-10017-RWZ   Document 182-2   Filed 01/15/08   Page 22 of 44

Kevin Cameron Barnie 12-21-2006
Computer Sales International, Inc. v. Lycos, Inc.

93

1             MR. BEAN:  Objection.

2        A.   I knew that as a result of extending the lease

3   period by a certain amount of number of years, that Lycos

4   would pay CSI more money under the leases.

5        Q.   Okay.  And you knew it would pay quite a bit more

6   money, correct?

7             MR. BEAN:  Objection.

8        A.   I did not know how much more money it would pay.

9        Q.   Well, you knew that it was not an insubstantial

10   amount, right?

11             MR. BEAN:  Objection.

12        A.   I didn't know what the amount was.  I was

13   attempting to find that out.

14        Q.   In fact, sir, Lycos had in its possession

15   equipment schedules 93 and 94 at the time that you were

16   trying to find that out, correct?

17             MR. BEAN:  Objection.

18        A.   Yes.

19        Q.   And -- and therefore Lycos was in a position

20   itself to calculate the total amount of additional money

21   that it was going to have to pay CSI under those schedules

22   93 and 94 in the fall of 2001, wasn't it?

23        A.   Lycos was attempting to calculate that in these

24   schedules that we're looking at now.

# EXHIBIT 6

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Edward Michael Philip

# November 6, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

ORIGINAL

James A. Scally   21280

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

11

1    Q.   Where?

2    A.   New Hampshire.

3    Q.   What's the address?

4    A.   34 Rupert Road.

5    Q.   Have you ever been convicted of a crime?

6    A.   No.

7    Q.   Can you just briefly describe your educational

8    background by years beginning with your graduation from

9    high school?

10   A.   I graduated from Christian Brothers High School in

11   1983, graduated from Vanderbilt University in 1987, and I

12   graduated from Harvard Business School in 1991.

13   Q.   And can you briefly describe your employment

14   history from that time to the present?

15   A.   I worked for Salomon Brothers from 1987 to 1989; I

16   worked for Morgan Stanley in the summer of '90; I worked

17   for the Walt Disney Company from 1991 to 1995; I worked for

18   Lycos from 1995 through, I'm not exactly sure what my

19   resignation date was, but around 2003; I worked for

20   Decision Matrix Group from 2004 to 2005; and from 2006 to

21   the present, I work at Highland Capital Partners.

22   Q.   Other than meeting with counsel, have you done

23   anything to prepare for the deposition?

24   A.   I looked at some documents.

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

17

1    bachelor of science degree in economics and mathematics

2    that you had previously received from Vanderbilt; is that

3    right?

4        A.   Correct.

5        Q.   Did you ever hold any professional licenses at any

6    time?  CPA or certifications?

7        A.   I believe I held a real estate license at one

8    point.

9        Q.   How long did you hold a real estate license?

10       A.   I don't know.

11       Q.   Was it in Massachusetts?

12       A.   No, it was not.

13       Q.   Where was it?  California?

14       A.   New York.

15       Q.   New York.

16       A.   Yes.

17       Q.   When you were working at the investment banking

18   firms, did you obtain any securities licenses?

19       A.   Not that I recall.

20       Q.   Any certifications as an investment advisor, or

21   any sort of certifications at all that you are aware of?

22       A.   I don't believe so.

23       Q.   Okay.  What did you do when you were at the

24   investment banking firms?

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

1      Q.   I didn't ask you that.  You don't recall who told

2   you that Paul Stenberg interacted with them?

3      A.   That's correct.

4      Q.   What else do you remember about the individuals

5   who relied on one or more of CSI's half-truths?  This

6   statement.

7      A.   Can you be more specific with your question,

8   please?

9      Q.   Sure.  How did you rely on any one or more of

10   CSI's alleged half -- half-truths?

11      A.   If half-truths were given to my team and that was

12   the information that they based their decisions on, then I

13   relied on that.

14      Q.   What team?

15      A.   The people you're reading in the document.

16      Q.   I didn't read anybody else.  I just read you.

17      A.   Mr. Guilefoile, Mr. Ziba, and Mr. Ripps, and Mr.

18   Lucy.

19      Q.   All right.  So you do remember that they were the

20   people who were dealing with Mr. Stenberg?

21      A.   No.  I'm saying that's what this document says.

22      Q.   Do you remember who at Lycos was dealing with CSI

23   other than you and Mr. Guilefoile?

24      A.   I don't remember dealing with CSI.  I -- I think I

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

82

1    said that earlier.

2         Q.    You signed -- you signed the contracts --

3         A.    Yes.

4         Q.    You edited portions of the contracts.  Correct?

5         A.    I initialed it.

6         Q.    You signed correspondence with CSI verifying Mr.

7    Guilefoile's authority to sign contracts with CSI, correct?

8         A.    Correct.

9         Q.    And Mr. Guilefoile signed correspondence to CSI

10   verifying your authority to sign contracts with CSI,

11   correct?

12        A.    Correct.

13        Q.    And you did sign contracts with CSI, correct?

14        A.    Correct.

15        Q.    Multiple times, correct?

16        A.    Correct.

17        Q.    Okay.  You were in fact dealing with CSI, weren't

18   you?

19               MR. BODNER:  Objection.

20               MR. BEAN:  Objection.

21        Q.    You can answer.

22        A.    I was signing documents provided by CSI, yes.

23        Q.    You were signing contracts between Lycos and CSI,

24   correct?

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

1      A.    Correct.

2      Q.    And you were editing some of those contracts

3   before you signed them, correct?

4      A.    I initialed edits that were made.

5      Q.    Okay.  And then you signed the contracts?

6      A.    Correct.

7      Q.    Okay.  And you don't consider that dealing with

8   CSI?

9      A.    I don't consider it interacting with CSI, no.

10      Q.    Did you ever have any conversations with Paul

11   Stenberg?

12      A.    I don't recall having conversations with Paul

13   Stenberg, no.

14      Q.    Okay.  So you have no memory whatsoever of

15   anything that Paul Stenberg ever said to anyone, correct?

16                MR. BEAN:   Objection.

17      Q.    You can answer.

18      A.    Correct.

19      Q.    Did anyone in Lycos ever tell you anything that

20   Paul Stenberg had ever said to them?

21      A.    Not that I recall.

22      Q.    Okay.  So you do not have any memory of anyone

23   ever telling you anything that Lycos had -- that Mr.

24   Stenberg had said to them?

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

240



1      A.   I believe it's a K.  I don't know for sure.

2      Q.   Okay.

3      A.   There are one or two others that are escaping me.

4      Q.   Okay.  There were about half a dozen lawyers?

5      A.   In that neighborhood.

6      Q.   Okay.  And this is in summer and fall of 2000?

7      A.   I believe so.

8      Q.   Okay.  And so during most of the -- well, during

9  nearly all of the period that you were signing equipment

10  schedules with CSI on behalf of Lycos, you did have access

11  to an in-house legal staff at Lycos consisting of

12  several -- several attorneys, right?

13     A.   Not in the beginning.

14     Q.   Not in the beginning.  In the beginning you

15  started '97 with just Mr. Snider.  But, for example, by

16  August 1 of 2000, when you signed Exhibits 285-A and 286-A,

17  and the -- the extensions of the leases, you had access to

18  a legal staff of about four or five lawyers, right?

19               MR. BEAN:  Objection.

20     A.   That's correct.

21     Q.   In-house?

22     A.   That's correct.

23     Q.   Okay.  And it was the company's practice to have

24  the law department review lease schedules, contracts like

Case 1:05-cv-10017-RWZ  Document 182-2  Filed 01/15/08  Page 31 of 44

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

241

1     that?

2                    MR. BEAN:  Objection.

3        Q.   The ones with CSI, correct?

4                    MR. BEAN:  Objection.

5        Q.   You can answer.

6        A.   I don't know if the ones with CSI, but contracts

7     in general, yes.

8        Q.   Okay.  And obviously these -- the deals with CSI

9     were contracts, right?

10       A.   Correct.

11       Q.   Did there come a time when you folks ceased using

12    Hutchins & Wheeler as outside law firm and started using

13    someone else, prior to the acquisition by Terra?

14       A.   We used multiple law firms for multiple things.

15       Q.   Okay.  Other than using Cravath on the securities

16    fraud cases and Hutchins & Wheeler, what other law firms

17    did you use?

18       A.   We used Ropes & Gray, we used --

19       Q.   Do you mean Lycos used Ropes & Gray?

20       A.   Yes.

21       Q.   Lycos the company used the law firm that's

22    representing you personally in the deposition?

23       A.   That's correct.

24       Q.   Okay.  Does Lycos still use Ropes & Gray?

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

1    A.   I don't know.

2    Q.   Okay.

3    A.   We used Hale and Dorr.  We used most of the firms

4  around town.

5    Q.   In Boston?

6    A.   Yes.

7    Q.   The major corporate firms?

8    A.   That's correct.

9    Q.   And certainly during the period that you were

10  signing the equipment schedules with CSI, you had access to

11  outside legal counsel if you wanted to -- to use it, right?

12    A.   That's correct.

13    Q.   Including some of the largest law firms in Boston,

14  correct?

15    A.   That is correct.

16    Q.   I think you said that Mr. Guilefoile was a CPA who

17  had come to Lycos from a public accounting firm, KPMG did

18  you say?

19    A.   Ernst & Young.

20    Q.   Ernst & Young, excuse me.  And were there any

21  other CPA's on his staff at Lycos?

22    A.   I believe Mr. Lucy is a CPA.

23    Q.   Anyone else?

24    A.   I'm not sure.

# EXHIBIT 7

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Thomas Edward Guilfoile

# December 7, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

James A. Scally  21971

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

9

| | | |
|---|---|---|
| 1 | A. | 02332. |
| 2 | Q. | Do you have any other residences? |
| 3 | A. | I do not. |
| 4 | Q. | Do you have any present plans to move from |
| 5 | | Massachusetts? |
| 6 | A. | I do not. |
| 7 | Q. | Are you married? |
| 8 | A. | Yes. |
| 9 | Q. | Any children? |
| 10 | A. | Yes. |
| 11 | Q. | How many? |
| 12 | A. | Five. |
| 13 | Q. | The -- could you tell us, what is your occupation? |
| 14 | A. | I am a general partner at Highland Consumer Fund. |
| 15 | Q. | Can you briefly give us your educational |
| 16 | | background?  Where did you go to college? |
| 17 | A. | University of Notre Dame. |
| 18 | Q. | And your degree is in business? |
| 19 | A. | Yes. |
| 20 | Q. | And you're also a certified public accountant; is |
| 21 | | that right? |
| 22 | A. | I am not. |
| 23 | Q. | Were you ever a certified public accountant? |
| 24 | A. | I was, yes. |

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

10

1    Q.   When did you first become a certified public

2    accountant?

3    A.   I believe it was 1989.

4    Q.   And you took the exam in Massachusetts?

5    A.   I did, yes.

6    Q.   And how long did you remain licensed as a

7    certified public accountant here in Massachusetts?

8    A.   I don't know precisely.

9    Q.   Approximately.

10   A.   Approximately around, until about 1996 or 1997.

11   Q.   About the time you joined Lycos?

12   A.   Yes.

13   Q.   At the time you joined Lycos in -- in or about

14   December of 1996, you were still a licensed certified

15   public accountant; is that right?

16   A.   I was.

17   Q.   And it was sometime after that that you allowed

18   your license to lapse?

19   A.   Yes.

20   Q.   Can you briefly describe your employment

21   background beginning with your graduation from high school?

22   Excuse me.   Graduation from college.

23   A.   College.   I was a -- I worked at Ernst & Young in

24   Boston until 1996, with Lycos until 2001, the Decision

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

11

1    Matrix Group until 2005, and now currently Highland

2    Consumer Fund.

3        Q.   What was the Decision Matrix Group?

4        A.   It was a company that was formed to acquire

5    companies in the research and consulting industries.

6        Q.   You received a subpoena to produce documents in

7    this case?

8        A.   I did, yes.

9        Q.   And you have produced through your counsel some

10   documents?

11       A.   Yes, I have.

12       Q.   I just want to mark portions of those for the

13   record.

14            MR. KALER:  There appear to be two

15            volumes relating to a stock offering by

16            Lycos at the beginning of 2000.  The first

17            volume is Bates number GUIL 000001

18            sequentially through 000790, and we'll mark

19            that as Exhibit 435 -- 433.

20            And the -- what appears to be the

21            second volume is Bates number GUIL 000791

22            sequentially through GUIL 001388.  We will

23            mark that as Exhibit 434.

24            Exhibit 434 has what appears to be a

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

12

1          photocopy of the binding of that volume

2          indicating it's volume 2.  We don't have a

3          photocopy of whatever was on the binding

4          cover of 433, but it appears that it was

5          volume 1.

6               (Exhibit 433, IPO binding documents,

7          marked.)

8               (Exhibit 434, IPO binding documents,

9          marked.)

10    Q.    In either event, may I just show you these two

11 exhibits and ask you to just simply tell us what -- what

12 they are.  I'm not asking you to read through them,

13 obviously.  Just identify them for us.

14    A.    They appear to be the binding documents from a

15 public offering of Lycos stock.

16    Q.    And you produced -- you found these documents

17 among your records and produced them in response to the

18 subpoena?

19    A.    Yes.

20    Q.    And is Exhibit 433, then, the first, volume 1, and

21 Exhibit 434, volume 2?

22    A.    I would assume so.  It's not labeled.  So I don't

23 know.

24    Q.    Does the original have a label on it similar to

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

13

1     the one on the first page of 434?

2          A.   No.

3          Q.   Okay.  So the original was just a bound volume?

4          A.   Oh.  I -- I don't know.  I assume it had a cover.

5     I don't --

6          Q.   Okay.

7          A.   Without seeing it, I don't know.

8          Q.   Exhibit 434 shows that the bound volume had your

9     name printed on it.  Was there some reason you got a

10    personalized set of these volumes, personalized in the

11    sense that they printed your name on the volumes?

12         A.   I don't think that was unusual.  There were other

13    people who also got copies such as that.

14         Q.   Who are the other people within Lycos who did?

15         A.   I do not know.

16         Q.   You participated in the stock offering?

17         A.   I did.

18         Q.   How did you participate?

19         A.   I was the vice president of finance and

20    administration for Lycos.

21                   (Exhibit 435, excerpt of Exhibit 433,

22              marked.)

23         Q.   I show you what's been marked for convenience as

24    Exhibit 435.  It's a portion of Exhibit 433 Bates numbered

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

14

1      GUIL 000145 and then pages 000192 and 193, a portion of the

2      form S-3, and just direct your attention to the description

3      of your background on the second page.

4           At the bottom of the second page, there's a

5      description of your background which reads, quote, "Thomas

6      E. Guilfoile has served as our vice president of finance

7      and administration since December 1996 and as our

8      controller since February 1996.  Prior to joining Lycos,

9      Mr. Guilfoile was employed by Ernst & Young LLP from July

10     1986 to February 1996, most recently as a senior manager in

11     Ernst & Young LLP's Entrepreneurial Services Group.  Mr.

12     Guilfoile holds a bachelor of business administration

13     degree in accounting from the University of Notre Dame and

14     serves as a director of AdOne, Inc.," unquote.  Do you see

15     that?

16       A.    Yes.

17       Q.    Is that an accurate description of your background

18     at the time?

19       A.    Yes, it is.

20       Q.    I presume -- are you still a director of AdOne,

21     Inc.?

22       A.    I am not.

23       Q.    So your -- the degree that you -- the college

24     degree that you obtained was actually a bachelor of

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

1   business administration degree in accounting from the

2   University of Notre Dame; is that right?

3       A.   Yes.

4       Q.   When you joined Ernst & -- and you worked as a

5   certified public accountant at the public accounting firm

6   of Ernst & Young for almost a decade, correct?

7       A.   Yes.

8       Q.   During that time, can you describe for us what you

9   did at Ernst & Young?  You started out, presumably, as a

10  staff accountant, worked your way up to be a manager and

11  then a senior manager?

12      A.   I did.  I started as a staff accountant, became a

13  senior accountant, then a manager, and then a senior

14  manager.

15      Q.   How long did you work there in what's referred to

16  here as the entrepreneurial services group?

17      A.   I don't know exactly what year I joined the

18  entrepreneurial services group.

19      Q.   Were you working on the audit side or the tax side

20  during the decade that you were at Ernst & Young?

21      A.   On the audit side.

22      Q.   Were you working on the audits of public companies

23  or private companies or both?

24      A.   Primarily private companies.

Case 1:05-cv-10017-RWZ   Document 182-2   Filed 01/15/08   Page 42 of 44
Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

124

1    you see that?

2        A.    Yes, I do see that.

3        Q.    What fraudulent or negligent misrepresentations,

4    if any, did CSI make to you?

5                    MR. DOWDEN:  Objection.

6                    MR. BEAN:  Objection.

7        Q.    You can answer.

8        A.    I can't recall specifics, no.

9        Q.    Okay.  In connection with the same document, on

10   page 18, there's a statement at the bottom of the page

11   that, quote, "Mr. Stenberg failed to make the foregoing

12   disclosures at or shortly before Lycos executed each

13   rolled-up or rewritten equipment schedule.  The individuals

14   at Lycos who relied on one or more of CSI's half-truths

15   described in subparagraph D above to the detriment of Lycos

16   included," and then the first name listed is you, Tom

17   Guilfoile.  Do you see that?

18       A.    I do.

19       Q.    What half-truths of CSI, if any, did you rely on

20   to the detriment of Lycos?

21                   MR. DOWDEN:  Objection.

22                   MR. BEAN:  Objection.

23       Q.    You can answer.

24       A.    I'm not familiar enough with the information to be

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

125



1    able to recall.

2        Q.   Okay.  So as you sit here today, you don't know of

3    any, correct?

4        A.   I don't recall.

5        Q.   Okay.  I show you -- were there occasions during

6    your tenure at Lycos when Lycos extended leases of

7    equipment with CSI that it had previously entered into?  In

8    other words, signed an equipment schedule that had the

9    effect of extending the amount of time that Lycos could use

10   equipment that it had already leased?

11       A.   I don't recall that, no.

12       Q.   I show you what's been marked as Exhibit 446.

13                 (Exhibit 446, 1/00 equipment

14            schedule, marked.)

15                 MR. KALER:  446, for the record, is

16            equipment schedule 74.

17       Q.   Is this a copy of an equipment schedule, number

18   74 -- designated number 74 that you signed on behalf of

19   Lycos on or about January 6th of 2000?

20                 MR. DOWDEN:  Objection.

21                 MR. BEAN:  Objection.

22       A.   I don't recall this document specifically.

23       Q.   But you recognize your signature on it, right?

24       A.   It does appear to be my signature, yes.

Thomas Edward Guilfoile 12-7-2006
Computer Sales International, Inc. v. Lycos, Inc.

1      Q.   Do you still hold any options in stock relating to

2   successors of Lycos?

3      A.   I do not.

4      Q.   CSI's leases, or Lycos' leases with CSI were

5   always reported as leases by Lycos during the time you were

6   there, in other words, not -- not loans.  They were

7   reported as leases, right?

8            MR. BEAN:  Objection.

9            MR. DOWDEN:  Objection.

10     Q.   You can answer.

11     A.   My recollection, yes.

12     Q.   Okay.  And the reporting of -- by Lycos of CSI's,

13  of its leases with CSI as leases occurred both in its

14  filings with the Securities and Exchange Commission and in

15  its reports to shareholders and in its financial

16  statements, correct?

17          MR. DOWDEN:  Objection.

18          MR. BEAN:  Objection.

19     Q.   You can answer.

20     A.   I'm sorry, can you repeat that?

21     Q.   The reporting of Lycos' leases with CSI as leases

22  occurred both in Lycos' filings with the US Securities and

23  Exchange Commission and in its proxy statements and various

24  other reports to shareholders and in its financial