UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CSI LEASING, INC., f/k/a      )
COMPUTER SALES               )
INTERNATIONAL, INC.,         )
       Plaintiff,         )
                 )
vs.                          )      Civil Action
                 )      No. 05-10017-RWZ
                 )
LYCOS, INC.,                 )
       Defendant,         )
                 )
BANK OF AMERICA f/k/a FLEET   )
BANK,                        )
    Trustee Process Defendant.)

**HEARING ON MOTIONS FOR SUMMARY JUDGMENT**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
January 16, 2008
9:00 a.m.

\*   \*   \*   \*   \*

CATHERINE A. HANDEL, RPR-CM
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

```
 1
 2   APPEARANCES:
 3
 4   For the Plaintiff:
 5   McCARTER & ENGLISH, LLP
      (by Robert J. Kaler, Esq.,
 6        Edward William Little, Jr., Esq.,
          and Kelly A. Gabos, Esq.)
 7        265 Franklin Street
          Boston, MA 02110
 8
 9
10
11
     For the Defendant:
12
     McDERMOTT WILL & EMERY LLP
13   (by Thomas O. Bean, Esq., and
          Peter M. Acton, Jr., Esq.)
14        28 State Street
          Boston, MA 02109-1775
15
     - and -
16
          Mark Blais, Esq.
17        Deputy General Counsel of Lycos, Inc.)
18
19
20
21
22
23
24
25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Rya W. Zobel, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on January 16, 2008.)

THE COURT:  Good morning.  Please be seated.

Who is here for Computer Sales?

MR. KALER:  Kelly Gabos, Eileen Pellerin, Edward Little and Robert Kaler from McCarter & English.

THE COURT:  I'm sorry.  Say that again.  I have Mr. Little.  I have Mr. Kaler.

MR. KALER:  Yes.  Ms. Gabos is an associate in our office and Ms. Pellerin is a paralegal in our office.

THE COURT:  How do you spell your associate's name?

MR. KALER:  Gabos, G-a-b-o-s.

THE COURT:  G-a-b --

MR. KALER:  -- o-s.

THE COURT:  And first name?

MR. KALER:  Kelly, K-e-l-l-y.

THE COURT:  Okay.  I don't think I need to

1   write the paralegal's name.

2           MR. KALER:  Thank you, your Honor.

3           THE COURT:  Now, for the defendant.

4   Mr. Bean?

5           MR. BEAN:  Your Honor, Thomas Bean.  With

6   me is Peter Acton and also at counsel table is Deputy

7   General Counsel of Lycos, Mark Blais.

8           THE COURT:  How do you spell "Blais"?

9           MR. BEAN:  B-l-a-i-s.

10          THE COURT:  Thank you.

11          As I understand it, Lycos does not  dispute

12   that it owes to CSI the $300,000, or whatever.

13          MR. BEAN:  That's correct, your Honor.

14          THE COURT:  Why can't we just have an offer

15   of judgment?

16          MR. BEAN:  I don't know that we couldn't

17   have an offer of judgment on that, your Honor.  What

18   we're seeking to do, as we say, is have an off-set

19   against the amounts that we think --

20          THE COURT:  I understand.  But, I mean, if

21   it's owed, it's owed.

22          MR. BEAN:  Those amounts are owed, but only

23   if we haven't been defrauded.  We didn't pay those

24   amounts, your Honor, but we believe we've been

25   defrauded.

1     THE COURT:  That's a separate issue.

2     MR. BEAN:  Okay.

3     THE COURT:  I mean, that would provide the

4 set-off, if you will.

5     MR. BEAN:  Yes.

6     THE COURT:  But I don't know why an offer

7 of judgment couldn't be entered or the amount put in

8 escrow pending the rest of it.  I mean, there's no need

9 fighting over it.

10     MR. BEAN:  Well, the money has been

11 attached on trustee process, your Honor.  So, it has, in

12 effect, been put in es -- been set aside.  Your Honor

13 granted trustee process to CSI at the outset of the

14 case.

15     THE COURT:  You know, I always have -- I

16 mean, in any event, it seems to me that's out of the

17 case.  That is, the breach of contract or whatever --

18 whatever the theory is on the basis of which CSI claims

19 simply the amount of money.  It's agreed that that money

20 is owed.

21     So, now the question is, with respect to

22 CSI's claims, whether there is a 93A claim that would

23 double or treble and entitle them to attorney's fees,

24 right?

25     MR. BEAN:  Well, I don't think -- as to the

1    contract claim, no, your Honor.

2              THE COURT:  Not the contract claim, but

3    there are --

4              MR. BEAN:  The other claims.

5              THE COURT:  -- additional claims.

6              MR. BEAN:  There are other claims that

7    we're prepared to argue here today on summary judgment.

8              THE COURT:  I understand that, but there is

9    no dispute that the money is owed, right?

10              MR. KALER:  Correct.

11              THE COURT:  Now, if they were to pay you

12    that $300,000, would you go away?

13              MR. KALER:  If they dropped the

14    counterclaim, yes.

15              THE COURT:  Everybody has conditions.

16              MR. KALER:  Well, the counterclaim is about

17    $13 million.

18              THE COURT:  I understand that.  I

19    understand that.

20              MR. KALER:  But I've been fairly open about

21    that point.

22              THE COURT:  Now, I must tell you all that

23    when I get a summary judgment motion that has this pile

24    of papers (indicating), I really am very doubtful that

25    there isn't a single issue of fact.  That's one motion.

1   This is the other one.  I mean, really.

2                MR. BEAN:  Your Honor, I'm going to try and

3   make it as simple as I can today, if I may, because I

4   don't think there's a genuine issue of material fact in

5   dispute as to our motion or as to CSI's, as to the

6   motion as to CSI's claim, and if I may be --

7                THE COURT:  Well, as to your motion on the

8   counterclaim, you have the additional burden in that the

9   plaintiff rarely gets summary judgment.

10               So, let's start with your motion concerning

11  the plaintiffs' claims, that the plaintiffs complain.

12               MR. BEAN:  Well, I would be happy to speak

13  about those, your Honor.  I would prefer to start with

14  the others because I think it provides context, but I'm

15  happy to start with them, if that's what the Court would

16  prefer.

17               THE COURT:  Go ahead, whichever way you

18  want.

19               MR. BEAN:  Thank you.

20               We filed two summary judgment motions, your

21  Honor:  One as to our counterclaims and -- as to three

22  of the 13 counts of the counterclaim and one as to

23  CSI's.  And, as we say, if the Court grants our motion

24  for summary judgment as to Lycos' counterclaims and as

25  to CSI's claims, that would dispose of the case.  We

wouldn't object to the Court setting off the $300,000,

and then we wouldn't pursue the balance of ours claims

because, while we have different legal theories, we can

only get our damages once.

I'd like to take -- as I say, start with

our --

THE COURT: Let me ask you, with respect to

Counts XII and XIII of your counterclaim, the resolution

of that really depends on whether you characterize the

arrangement as an installment sale or as a financing

arrangement.

MR. BEAN: Yes.

THE COURT: This whole --

MR. BEAN: Or as a lease.

THE COURT: This whole enterprise was based

on a financing arrangement. At what point did it become

an installment sale?

MR. BEAN: It became an installment sale by

operation of law with respect to Schedules 93 and 94.

The test under §1-201(37) of the Uniform Commercial

Code, which ignores the intent of the parties at this

point, ignores the fact that a document is denominated a

lease or an installment sales contract, has a two-part

per se test.

The first test is whether or not the lessee

can cancel the lease at any time without making the remaining payments.

The parties agree that the lease has a hell-or-high-water clause that requires the lessee to make all the payments, regardless of whether it cancels the lease. So, that first test is satisfied.

The second test is whether, from the lessor's perspective at lease inception, the lessor expected the equipment to have a meaningful residual value at the end of the lease term. So, from the lessor's perspective at the inception of the lease, was there expected to be meaningful value at the end of the lease term?

CSI booked a residual value for the equipment of zero at the end of the lease term. So, while the parties may disagree about whether that equipment was really expected to be worth zero or a somewhat larger amount, there's no question that the only evidence in the record is that they booked it at zero as of the end of the lease term, and that's the only evidence in the record that looks from lease inception and what's expected as of the end of the lease term, that the equipment was expected to have little or no residual value. So, by operation of law, these are installment sales contracts.

1　　　　　　THE COURT:  That's the end of your

2　argument, really.

3　　　　　　MR. BEAN:  That's really the end of the

4　argument.  The only point I would make is they submitted

5　an unsigned appraisal from one of their experts saying

6　the equipment was worth $3 million in August of 2003.

7　　　　　　Well, there are three problems with that

8　appraisal and its applicability to this case:

9　　　　　　One is he looked at the equipment.  He

10　valued it as the value installed to Lycos.  Under the

11　law, you look at the value to the lessor at the end of

12　the lease term, which is typically less.

13　　　　　　Second, as I say, he valued it as of August

14　2003.  That was not the end of the lease term for

15　Schedules 93 and 94.  The end of the lease term was

16　September 30 -- excuse me -- October 31st, 2003 for

17　Schedule 93, and October 31st, 2004, 15 months after his

18　appraisal, for Schedules 93 and 94.

19　　　　　　Finally, he didn't look at the value as

20　projected from lease inception.  He looked at it as of

21　August 2003.  So, the only evidence you have in the

22　record, your Honor, is their booked value of zero

23　projected from lease inception as of the end of the

24　lease term.  It's an installment sales contract.

25　　　　　　THE COURT:  What was the end of the lease

1   term in relationship to the creation of Schedules 93 and

2   94?

3           MR. BEAN:  Well, in Schedule 93 it was two

4   years and this equipment was several years old already

5   at that time.  And on Schedule 94 it was a three-year,

6   36-month lease.  The lease inception for both was

7   November 1, 2001, and for Schedule 93, the end date was

8   October 31, 2003, 24 months later and 36 --

9           THE COURT:  At the time that Schedules 3

10  and 4 were created, which was a consolidation of what

11  had happened before, you're saying that at that point

12  they projected a zero value, residual value, in each

13  instance?

14          MR. BEAN:  That's correct, your Honor.

15          THE COURT:  And Schedules 93 and 94 pertain

16  to different equipment?

17          MR. BEAN:  Yes, that's true.

18          THE COURT:  So, why do you look at it as of

19  the consolidation and not as of the beginning of the

20  lease -- of the entire lease arrangement?

21          MR. BEAN:  Well --

22          THE COURT:  I mean, Schedules 93 and 94

23  occurred before the lease ran out, didn't it, before the

24  end of the lease?

25          MR. BEAN:  Before the end of the preceding

1   leases ran out, everything got rolled onto 93 and 94,

2   that's correct, your Honor.

3              But, as I said, we don't say, although we,

4   frankly, think we could make this argument, but we're

5   not going to push it, is that they were installment

6   sales contracts even before they got rolled onto 93 and

7   94, but we think it's a very easy case that the moment

8   the equipment rolled onto 93 and 94, because there was a

9   hell-or-high-water clause and because the projected

10  residual value as of November 21, 2001 was zero, they

11  were, by operation of law, installment sales contracts

12  and, as I said, the law is --

13             THE COURT:  Well, I don't quite follow

14  that.  If, in fact, they were lease agreements before

15  then and the Schedules 93 and 94 were simply a

16  consolidation of what remained at that point, why are

17  they deemed to be new contracts that suddenly become

18  installment sales contracts?

19             MR. BEAN:  The Master Lease Agreement

20  expressly says that each lease is considered a separate

21  contract.  When Schedules 93 and 94 were created, they

22  overrode, superseded, and resulted in the termination of

23  all the earlier lease schedules and, as I said, the

24  Master Lease Agreement says each schedule is a separate

25  contract.  So, 93 and 94 need to be looked at

1    independently.  They are separate lease contracts

2    independent of everything that rolled onto them.

3                THE COURT:  Well, if they were still under

4    the Master Lease Agreement, why are they not still

5    leases?

6                MR. BEAN:  Your Honor, as I said -- the law

7    is very clear -- just because something is denominated a

8    lease doesn't mean it's a lease.

9                Also, the contracts are the lease

10   schedules, which incorporate by reference the terms of

11   the Master Lease Agreement, but, as I said, the Master

12   Lease Agreement expressly provides that each schedule is

13   a separate contract.  And so, some of the schedules, if

14   you apply the test under §1-201(37), might be true

15   leases and some of them, when you apply that same test,

16   might be installment sales contracts and, as I said,

17   there are only two factors to consider under §1-201(37).

18   Whether --

19                THE COURT:  What is §1-201(37)?  That's the

20   Uniform Commercial Code?

21                MR. BEAN:  Yes, your Honor, and that's the

22   same in Missouri and Massachusetts.

23                This is a very frequently-litigated issue,

24   whether something is an installment sales contract or a

25   true lease, according to White & Summers and the cases.

1          As I said, it's a two -- very simple per se

2    two-part test:  Is there a hell-or-high-water clause and

3    is there a projected -- meaningful projected residual

4    value for the lessor at the end of the lease term?

5          As I said, the only evidence in the record

6    of projecting the value of the equipment as of the end

7    of the lease term to the lessor is CSI's book residual

8    value of zero.

9          THE COURT:  Okay.

10         MR. BEAN:  All right.  And it follows very

11   simply.  Because those are installment sales contracts,

12   Lycos became the owner of that equipment when it signed

13   Schedules 93 and 94, subject to CSI's security interest

14   in the equipment, depending -- which would exist until

15   Lycos made all the remaining payments.

16         As the Court, I think, is aware, Lycos also

17   paid $3.775 million in August because it didn't know

18   they were installment sales contracts at the time to

19   purchase the equipment.

20         So, Lycos paid for the equipment on

21   Schedules 93 and 94 twice.  It paid for them by becoming

22   the owner of the equipment, by making all the lease

23   payments, and then it made this $3.775 million payment.

24         THE COURT:  Was it not obligated under the

25   hell-or-high-water clause to continue to make the lease

1   payments regardless?

2         MR. BEAN: Yes.

3         THE COURT: Well, then, if that's the case,

4   it wasn't double payment. It was simply a contractual

5   obligation and then separately it bought the stuff.

6         MR. BEAN: The lease payments were not

7   double payments, your Honor. What was a double payment

8   was the lump sum payment of $3.775 million, the portion

9   of that $3.775 million that Lycos paid to CSI in August

10   of 2003 that was allocable to Schedules 93 and 94.

11         THE COURT: Why is that a double payment?

12   It now bought the stuff.

13         MR. BEAN: Well, your Honor, Lycos --

14   because these are installment sales contracts, Lycos

15   bought the stuff on November 1, 2001, when it signed

16   Schedules 93 and 94. It bought it subject to CSI's

17   security interest.

18         And so, Lycos became the owner at that

19   point and as soon as -- it's like buying a car. When

20   you buy a car and finance it, you become the owner of

21   the equipment when you purchase it, subject to the

22   bank's lien and the --

23         THE COURT: But that was my question. Did

24   they not have an ongoing obligation under the original

25   lease agreement to make the lease payments?

1          MR. BEAN:  Yes, and we're not seeking those

2     moneys back.

3          THE COURT:  But since it had that

4     obligation, but then also bought them, why doesn't it

5     also have to pay for them?

6          MR. BEAN:  It paid for them by making the

7     lease payments on Schedules 93 and 94.  It became --

8          THE COURT:  Who says?  I mean, why is that

9     the case?

10          MR. BEAN:  Well, because if this is an

11     installment sales contract, then under §1-201(37) of the

12     Uniform Commercial Code, Lycos becomes the owner subject

13     to CSI's security interest in the equipment.

14          THE COURT:  No, but -- I guess where we're

15     parting company is that I'm asking whether the lease

16     doesn't continue and, therefore, the lease obligation --

17     the lease payment obligations continue regardless.

18          MR. BEAN:  It does.

19          THE COURT:  And regardless of the fact that

20     Lycos then also buys the equipment?

21          MR. BEAN:  Lycos --

22          THE COURT:  I mean, they are separate

23     obligations.

24          MR. BEAN:  The lease payments were an

25     obligation.  If Lycos -- when Schedules 93 and 94 --

1          THE COURT:  Let me see if I can clarify
2    it.  I'm sorry.
3          MR. BEAN:  I'm sorry.
4          THE COURT:  No.  It was an afterthought.
5    So, I'm interrupting you.
6          Unless the lease says that when you finish
7    paying the lease payments, you own the thing, you own
8    the equipment, then it seems to me that the fact that
9    they're obligated to continue to make lease payments
10   does not affect whether they also buy the equipment at
11   some point in between.
12          MR. BEAN:  What I'm suggesting to you is,
13   if this is an installment sales contract, which we say
14   it is, the law provides -- just like when you finance a
15   car, when you make that last -- you become the owner of
16   the car, your name is on the title, when you buy the
17   car.  It's subject to the bank's lien.  As soon as you
18   make that last payment, and you've been the owner all
19   along, the bank's lien is removed.
20          The same is true here.  CSI became the
21   owner of the -- Lycos became the owner of the equipment
22   when it entered into Schedules 93 and 94, subject to
23   CSI's lien.  And so, Lycos assumes it made --
24          THE COURT:  But it became the owner why?
25          MR. BEAN:  Because it was -- because it's

1    an installment sales contract.  It's like anything you

2    buy on layaway, you're the owner of.  Anything you

3    finance, you're the owner, whether it's your house, it's

4    a mortgage, you're the owner of it as soon as you --

5                    THE COURT:  But you still have an

6    obligation to make -- so, the lease payments, you say,

7    now are what?

8                    MR. BEAN:  They were payments on account --

9    in effect, a loan.  In other words, we made monthly

10    payments, which when we made the last payment, CSI's

11    lien, like the lien on your car title, would be removed.

12                    THE COURT:  Yes, but it gets removed only

13    when you finish paying the lease payments.

14                    MR. BEAN:  Exactly.  And that's why we

15    didn't have to make the $3.775 million payment to become

16    the owner of the equipment at the end of the lease term.

17    We were going to become the owner of the equipment at

18    the end of the lease term whether we made -- by

19    operation of law, whether we made that $3.775 million

20    payment or not.  And so, the portion of that --

21                    THE COURT:  If they had said that the

22    equipment has a value of one dollar, then it would not

23    be a lease payment, a residual value of one dollar?

24                    MR. BEAN:  Then it's certainly an

25    installment sales contract, your Honor, by operation of

law.

    THE COURT:  If it has -- you said it has zero residual value.

    MR. BEAN:  If it has no significant -- the law is if it has no significant residual value at the end.  The law is no --

    THE COURT:  If you had said $100 for each.

    MR. BEAN:  I don't think that's a significant residual value, but here the only evidence we have is a booked residual of zero.  So, I think there's no dispute of fact that there was no meaningful residual value, and even if they said -- as I said, the only evidence is that they booked it at zero, and the standard is meaningful residual value.

    Have I been clear on why --

    THE COURT:  I understand.  I guess what I'm doing is sort of not wanting to accept that rule, because it -- you know, in the context of a financing arrangement, to suddenly change it like this --

    MR. BEAN:  Your Honor --

    THE COURT:  -- gives me trouble.

    MR. BEAN:  Well, your Honor, White & Summers in the Uniform -- in their treatise on the Uniform Commercial Code said this issue of whether something is a true lease or a loan, installment sales

contract is one of the most frequently-litigated issues under the UCC.  There are literally dozens and dozens of cases, and both parties have cited them to you.

THE COURT:  Which suggests that there is some problem with the rule.  I mean, if people have to keep litigating the issue --

MR. BEAN:  Well, here's the good news, your Honor.  The rule was -- §1-201(37) was amended in 1988 because of all the -- in part, because of all the litigation, and what it did was create this per se test, because courts had developed this 15-factor test and all these tests and there was inconsistency in the law.  And so, the drafters of the UCC said, We're going to create a bright line per se test and if you can satisfy two requirements, hell-or-high-water clause and no meaningful residual value to the lessor at the end of the lease term as projected, then you have an installment sales contract or loan.

THE COURT:  Okay.

MR. BEAN:  All right.  I appreciate that -- you know, that the re-characterization of a lease as a loan is a very, very common issue.

Let me talk to Count VII, because I think I'm able to make it simpler than even the papers.

THE COURT:  Well, Count VII also gives me

1  trouble because what you're doing is turning a 93A claim

2  into a claim under a regulation.

3              MR. BEAN:  Well, the regulation was

4  promulgated pursuant to -- under Chapter 93A, Section

5  2(c).

6              THE COURT:  Yes, but was it intended to

7  change the requirements?

8              MR. BEAN:  No, and we're not arguing that

9  it does.  All we're --

10             THE COURT:  You're arguing that you don't

11 have to prove reliance.

12             MR. BEAN:  That's well-established under

13 93A law.  There are --

14             THE COURT:  So, why do we need the Attorney

15 General's regulations?

16             MR. BEAN:  Well, what makes this case

17 possible on summary judgment is that if we can satisfy

18 the Attorney General's regulations, under numerous SJC

19 decisions, including a fairly recent one in Aspinall vs.

20 Philip Morris, a violation of the regulations is a per

21 se violation of 93A.

22             I can't suggest to you I can prove

23 reasonable reliance on summary judgment, but I don't

24 need to.  Under the regulations and 93A law, as

25 construed by the Supreme Judicial Court, a violation of

1    the regulations is a per se violation of 93A.

2              THE COURT:  Now, as I understand it, your

3    argument is that CSI told half-truths concerning the

4    refinancing.

5              MR. BEAN:  Yes.  Here's what I would like,

6    if I can, your Honor.  These are the refinancings and I

7    would like the Court -- I hope the Court's eyes are

8    better than mine, but this is an example, Schedule 19

9    here.  Schedule 19 was refinanced the first time onto

10   Schedule 43.  As you can see, the equipment on 19 was

11   combined with the equipment on 21, 23, 26 and 30 onto

12   Schedule 43.  Then that same equipment on 43 was then

13   split among three schedules, Schedule 67B, Schedule 67A,

14   and Schedule 66B.

15             The equipment was refinanced a third time

16   when the equipment on these schedules -- and we don't

17   even know right now where the equipment on 19 was split

18   up among -- was refinanced onto Schedule 93 and Schedule

19   94.

20             Every single time a refinancing occurred --

21   and there were 44 of them here.  Every single time CSI

22   charged Lycos a fee, a premium, a markup, a cost for

23   refinancing, a hidden fee that it did not disclose, and

24   that's what this case is about.  They churned these

25   leases so that we paid a fee for refinancing when

Schedule 19 was refinanced onto Schedule 43, a fee that was not disclosed. And, as I said, whether you call it a fee, premium, markup, points, it really doesn't matter. It is a charge for refinancing.

When this equipment was Schedule 43 onto these schedules, again, we were charged a fee, a premium, a markup, points, that were not disclosed to us, a hidden cost. And, again, when we refinanced onto Schedules 93 and 94, we were charged -- this was almost an $8 million fee. We were charged a fee, a premium, a markup for the privilege of refinancing.

Now, why did CSI have to tell us about that fee? And fees, by the way, on all the refinancing totaled over $13.7 million.

The Supreme Judicial Court in <u>Kannavos vs</u>. <u>Annino</u>, quoting a treatise, cited a restatement of torts as well for the well-established common law principle, and I quote:

"If a party speaks with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all material facts bearing upon the point that lie within his knowledge."

In other words, if there is a discussion of a topic in connection with a transaction, the party

1 who discusses it must disclose all material facts within

2 its knowledge and the --

3        THE COURT: The banks now with their

4 sub-prime loans are going to be in serious trouble if

5 you're right.

6        MR. BEAN: Well, this is not me, your

7 Honor. This is not even the AG's regulations. This is

8 the Supreme Judicial Court quoting a treatise and citing

9 the restatement of torts. So, this is not something

10 that is novel in any way.

11        The First Circuit in V.S.H. Realty, a

12 business-to-business case in which the defendant

13 disclosed half-truths, said, quote:

14        "The duty to disclose to avoid

15 misrepresentations is so strong, that the deceived party

16 is not charged with failing to discover the truth."

17        So, there are two legal principles here at

18 issue that are operative: One is if there was a

19 discussion about a subject, CSI was bound to disclose to

20 Lycos all material facts within its knowledge; and,

21 second, if these are half-truths, as we say, Lycos had

22 no obligation to discover the half-truths. In other

23 words, he who is defrauded can't be criticized for not

24 discovering it.

25        Now, we say for purposes of this case, that

all the -- all we're saying the Attorney General's
regulations do is codify this common law and, therefore,
they apply business to business.

          We understand the concern that applying
those regulations business to business, if they refer to
everything in the world, might create some
uncertainties, and those were the concerns, I think,
that Judge Young had in First New England Dental, but
all we're saying the GA regulations do, for purposes of
summary judgment, is codify this common law, and they
don't impose -- we're not arguing that those regulations
impose any obligations on a lessor, such as CSI, other
than the obligations it already had under well-settled
common law.

          This interpretation of the AG's regulations
is one that's been adopted by the Attorney General.  We
have an affidavit from an Assistant Attorney General in
which he describes the AG's interpretation of the
regulations, but both the Massachusetts Appeals Court
have upheld the application of these regulations in a
business-to-business context in AmCan Enterprises, and
the First Circuit has also applied them in the business-
to-business circumstances in V.S.H. Realty.

          So, all we're saying, your Honor, is the
parties -- let me move on -- let me -- just in terms of

1  how this shakes out in terms of damages before getting

2  into what was --

3                    THE COURT:  I failed to tell you at the

4  beginning, I have another hearing at 10 o'clock.

5                    MR. BEAN:  All right.

6                    THE COURT:  So, we need to finish with this

7  case at least by 10:15.

8                    MR. BEAN:  Okay.

9                    Your Honor, this is a memo that was sent by

10  Diane Kopitsky of CSI to Mike Ripps of Lycos, and it

11  reflects the information that was disclosed to Lycos in

12  connection with every refinancing.

13                    THE COURT:  Mr. Kaler can't see.

14                    MR. BEAN:  I'm sorry.

15                    MR. KALER:  That's all right.

16                    MR. BEAN:  Here's a new schedule.  They

17  told Lycos what the new term was.  They told Lycos what

18  schedules were being renewed and they told Lycos the new

19  rent, the old rent and the savings in rent, the

20  difference between the two.

21                    What they did not tell Lycos was that

22  buried within this new rent was a charge for

23  refinancing, points, a premium, a markup.  And so, every

24  single -- so, here's just -- in applying Kannavos, the

25  parties discussed the cost to Lycos of refinancing.

As a result, CSI was bound to disclose to Lycos all material facts within its knowledge concerning that cost. One of the facts that CSI knew was it was charging Lycos a premium, a fee, a markup, points, for the privilege of refinancing.

And what is undisputed -- and that's why I think this is a summary judgment case. What is undisputed is they knew they were charging a premium. They didn't disclose that premium to Lycos. Lycos would not have entered into the refinancings and paid fees of $13.7 million if it had been told about the premium, and this occurred in the business context.

What's more, your Honor --

THE COURT: Could they have just charged a plain fee of the -- whatever they charged, plus the $13 million?

MR. BEAN: Well, the $13 million was the fee.

THE COURT: Okay.

MR. BEAN: Okay. And that $13 million --

THE COURT: No. I mean, the rent. Could they have charged rent including that fee?

MR. BEAN: If they had disclosed the fee, yes, of course.

THE COURT: Well, assume it wasn't a fee.

1   Assume it was just rent.

2              MR. BEAN:  Well, rent --

3              THE COURT:  I mean, they told -- as I

4   understand it, they told Lycos exactly what Lycos was

5   going to have to pay.  They just didn't break it down

6   into rent and fees.

7              MR. BEAN:  And they didn't break it down

8   into rent and fees, although they booked it on their own

9   books separately, okay?

10             Here was the advantage of charging this

11  fee:  Like a bank, when you charge points, you can book

12  that revenue immediately on your books and records.

13  Call it revenue.  The lease payments have to be

14  amortized over the life of the loan.

15             THE COURT:  This is the harm to Lycos?

16             MR. BEAN:  Right.  We know that we have

17  to --

18             THE COURT:  Or the benefit to CSI?

19             MR. BEAN:  The benefit to CSI, that's

20  right.  We knew --

21             THE COURT:  But from the point of view of

22  Lycos, if they said you owe rent of X plus -- or let's

23  say X, and the savings or the increases, whatever it is,

24  how is Lycos harmed by not knowing that the rent

25  includes other components?

1          MR. BEAN:  Because if CSI had told Lycos it

2     was charging Lycos $13.7 million in fees for the

3     privilege of refinancing, it wouldn't have entered into

4     these transactions.  It would never have agreed --

5          THE COURT:  But from the point of view of

6     CSI, one can see this as an accounting issue.  That is,

7     they divide what they charge Lycos so that they can

8     write off some of it now or take income, some of it now

9     rather than later.  Why would Lycos care about that?

10          MR. BEAN:  Lycos wouldn't care about how

11     CSI booked it.  It would care, however, about how much

12     it was going to pay.

13          THE COURT:  But it knows how much it was

14     going to pay.

15          MR. BEAN:  It knew the monthly rent.  CSI

16     was bound, as a matter of law, to disclose to Lycos that

17     it was charging Lycos a fee or a premium, okay?

18          We're not saying -- we're not saying they

19     had to disclose to us their gross profits or any profits

20     or any internal financial information at all.  We are

21     not arguing that.  We're simply saying they had a duty

22     to tell us in the same way that when you or anyone else

23     or a commercial entity goes to a bank and the bank says,

24     Well, we're going to charge you two points on this, they

25     had a duty to tell us they were going to charge a fee

because they discussed the issue of cost to us.

　　　　And in terms of materiality, you have the affidavits from all three men who signed these equipment schedules saying, If we had been told there was a fee or a premium, we would not have signed the schedules on these terms, and that's not pretty -- not too remarkable, your Honor, given that the fee was $13.7 million.  These were hidden costs.

　　　　THE COURT:  But that was -- you know, the $13.7 million was, in a sense, a mythical figure.  It was the accounting figure that CSI put on this.

　　　　MR. BEAN:  It was -- I wouldn't call it "mythical."  They booked it that way.  They represented to their --

　　　　THE COURT:  Okay.

　　　　MR. BEAN:  -- auditors that that was moneys that they were taking in and able to realize revenue right then, and we're not seeking back --

　　　　THE COURT:  I mean, "mythical" may not be the right word, but it's an arbitrary figure on their part.  It's arbitrary at least as you explain it, arbitrary in the sense that you know how much you're going to pay and you agree to how much you're going to pay and then you complain that some of it was characterized by them for their books in a different

1   way.

2               MR. BEAN:  It's not mythical, your Honor.

3   And the reason is --

4               THE COURT:  No, it's not mythical in the

5   sense that it was paid, but it's an arbitrary division

6   of the total.

7               MR. BEAN:  I don't think so.  Let me say

8   why, and this is how CSI booked it:

9               When CSI -- every time there was a

10  refinancing that Mr. Stenberg approached -- CSI

11  contemplated about, he was given what was called a

12  threshold, and the threshold was the present value of

13  the remaining payments on the existing leases, plus the

14  present value of the booked residual on those leases.

15  In other words, what was CSI's net investment in the

16  lease?  We call it loan balance.  They don't like loan

17  terms, but, frankly, your Honor, they used terms

18  "interest" and "principle."

19              Just to give you an idea -- and I probably

20  should have brought this up when we were discussing

21  Schedules 93 and 94.  This is their calculation --

22              THE COURT:  It's okay, Mr. Kaler.  I can't

23  see it, either.

24              MR. BEAN:  Okay.  This is in Schedule --

25  Exhibit 85 to my affidavit, your Honor, Page 41557.  The

1  only thing that's important to show is Schedules 93 and

2  94 -- and they call it "interest" and "principle," words

3  of a loan.

4          But the point is, it's not arbitrary in

5  terms of how this markup, this fee, was calculated and

6  how we're calculating and how they did it.

7          You look at what was the -- and I'm going

8  to use a loan term here -- the outstanding principle

9  balance on a loan.  For a lease it's the present value

10  of the remaining lease payments, plus the present value

11  of the residual.  Call it the loan balance.  Let's say

12  it's $100.

13          When we refinanced, now the present value

14  of the rent payments, plus the present value of the

15  residual, was, say, $120.

16          In other words, it's if you walked into a

17  bank and your outstanding principle balance on your loan

18  is $100, and you walk out and the outstanding principle

19  balance is $120 because you've been charged a premium, a

20  fee, a markup, that you haven't been told about, and

21  because -- although we don't think --

22          THE COURT:  But you're told it's now $120.

23          MR. BEAN:  We're told what our monthly rent

24  is, that's right.

25          THE COURT:  Right

1            MR. BEAN:  But they're obligated to tell us

2    as a matter of law all facts within their knowledge that

3    may be material to our decision.  That's what the

4    regulations say.  That's what the common law says.

5            THE COURT:  What's more material than

6    knowing you're going to pay more now than you did

7    before?

8            MR. BEAN:  Of course we knew we were going

9    to pay more.  We knew we were going to pay more rent

10   because we were extending the lease term, and we're not

11   seeking those additional rent moneys back.  We know we

12   have to pay additional rent, but the regulations are

13   very clear.

14           THE COURT:  Well, why do you know you have

15   to pay additional rent over -- I mean, why -- you knew

16   that the rent was higher than it was before.

17           MR. BEAN:  We knew that the -- the rent was

18   lower than it was before, your Honor.  The rent -- each

19   monthly rent payment, as you can see, was lower.  The

20   new rent was $30,000 on Schedule 65.  The old rent was

21   $50,000, with a savings, according to CSI, of 19 --

22           THE COURT:  So, where does the additional

23   amount come in?

24           MR. BEAN:  The additional amount is buried

25   in the new rent.

1          THE COURT:  But if the new rent is lower

2     than the old rent, I don't understand why you're

3     complaining.  I mean, I'm --

4          MR. BEAN:  Okay.  The reason the new rent

5     is lower -- it's like if you got a 15-year mortgage and

6     you go to a 30-year mortgage.  Your payments go down,

7     but overall you pay more because you have interest.

8     You're borrowing the money for a longer period of time.

9          We're not complaining about paying the

10    additional interest.  We're complaining about the fact

11    that buried within this new rent was not just additional

12    interest because the lease term was being extended to 36

13    months.  We're complaining because there was a fee,

14    which they -- they knew about.  They calculated.

15          THE COURT:  Okay.  I get it.

16          MR. BEAN:  And they awarded over $5 million

17    in commissions to Mr. Stenberg for.

18          THE COURT:  I would ask you to conclude

19    this part of it and then I would like to hear from

20    Mr. Kaler and I'll give you a little bit of time at the

21    end to go into your other summary judgment motion.

22          MR. BEAN:  Sure.  If I may.

23          What the regulations provide is that no

24    claim or representation shall be made by any means

25    concerning a product -- and product includes services --

that has the capacity or tendency of effect of deceiving
buyers, which includes lessees, in any material respect.
And Section 3.162 says, "Any legal entity that fails to
disclose to a lessee any fact, the disclosure of which
may have influenced the lessee not to enter into the
transaction, is a violation of 93A here."

What happened here was CSI charged a fee
that, in effect, increased the principle balance of the
lease, not just charged additional interest. We don't
have a problem with paying the additional interest.

And just to give you an example of how the
profits break out, okay, we paid $73.7 million for
equipment that had an original cost of less than $45
million. We paid --

THE COURT: I think that's true of my
mortgage, too.

MR. BEAN: Well, it probably is true of
your mortgage, but what your bank didn't do, your Honor,
was charge you $13.7 million in fees as a percentage of
$45 million, I wouldn't think.

THE COURT: How do I know?

MR. BEAN: Well, they should tell you. And
CSI here should have told Lycos, because under Kannavos
and under the regulations, they're obligated to tell us
any fact that may be material that's within their

1  knowledge.  They knew about this charge and they didn't

2  -- and they didn't tell us about it, and we're not --

3  it's not as if we're being greedy here, because we

4  aren't.

5          Of the $28.6 million in profit -- that is

6  the difference between $73 million in rent payments and

7  a original cost of the equipment, $45 million -- the

8  markup at the inception of the refinance schedules is

9  $13.7 million, something if they -- and the other

10  sources of profit were almost $15 million.

11          CSI's typical yield, its profit, its rate

12  of return, according its chairman, is 12 to 15 percent.

13  Its rate of return on the original, not refinanced

14  schedules, was 13 to 14 percent.  Its rate of return on

15  the refinanced schedules was over 26 percent because of

16  these hidden costs.

17          If the Court awards us the $13.7 million,

18  CSI will still earn -- still have earned on these

19  transactions its customary profit of 12 to 15 percent.

20  We're not being greedy.  We're simply seeking back the

21  premiums that they didn't disclose to us, the hidden

22  costs that they didn't disclose to us, so they can earn

23  a return that's consistent with the return they have on

24  all transactions.  Thank you.

25          THE COURT:  Thank you.

1           Mr. Kaler.

2           MR. BEAN:  Your Honor, if I may.  This goes

3      to your first question.  As I said, I was going to do

4      the arguments in return.

5           These are CSI's booking ledgers for

6      Schedules 93 and 94, and perhaps the Court can't read

7      it, but was this a loan or a lease?  They call it a

8      sales-type lease.  Sale, sales-type lease.  So, thank

9      you.

10          THE COURT:  Thank you.

11          MR. KALER:  If I may, your Honor, I would

12     like to just respond very briefly to the two motions by

13     just making one or two points on each that Mr. Bean has

14     filed, and then I want to offer what I think is a key to

15     understanding all the issues in the case, which has

16     become sort of a very complicated situation, which may

17     be -- I started by filing the suit --

18          THE COURT:  I'm sorry.  By?

19          MR. KALER:  By commencing the action to

20     recover an account receivable.

21          The first summary judgment motion that

22     Lycos filed on Counts XII and XIII of its counterclaim

23     essentially asks the Court to re-characterize the lease

24     arrangements that Lycos had --

25          THE COURT:  No, it doesn't.  It says the

statute, the Uniform Commercial Code, characterizes it. It doesn't ask me to do it.

MR. KALER: Yes, but the Uniform Commercial Code does not permit a party like Lycos to enter into lease -- it permits a court in bankruptcy to recast contracts. It permits the taxing authorities under certain circumstances to recast contracts, and the Uniform Commercial Code provides to the public the criteria that are going to be used for the courts and the taxing authorities to make those determinations --

THE COURT: Do the criteria apply in this case?

MR. KALER: No. The Eleventh Circuit held in the case that we cited in our brief, the <u>Martin Brothers Toolmakers</u> case, that, "A party's treatment of an agreement as a lease to claim beneficial tax and financial structuring estops the party from later arguing that the lease was not a lease, but it was a security agreement."

THE COURT: Is there any evidence to suggest that the residual value was other than zero?

MR. KALER: Oh, yes. In fact, just a few weeks ago we filed an emergency motion to get the rest of Lycos' expert's analysis. He valued it at $14 million in the fall of 2001 and $8 million in the -- at

the time that the sales agreement was entered into with Lycos, and approximately $2-1/2 million at the very end of the lease terms, and then we have our own expert's valuations and --

THE COURT:  How did the company treat it on its books?

MR. KALER:  The company has to, under accounting rules, depreciate its leased assets down to -- not anything too high.  It can't overvalue its assets.  The accounting criteria, like all accounting criteria, are complicated.  They depreciate down to what's referred to as booked -- fair value for booking purposes.

All leasing companies, rather than being aggressive about what they think they can get for the equipment, straight-line appreciate it down to zero.  So that, as I'm going to show in a moment with the timeline, that's all that Lycos did.

What the equipment was actually worth --

THE COURT:  You mean CSI?

MR. KALER:  Excuse me.  That's what CSI did.

What the equipment was actually worth is far, far more, but the point that I'm making with respect to --

1          THE COURT:  Yes, but what counts?  For

2    purposes of the Uniform Commercial Code, what counts,

3    this after-the-fact valuation or how you treated it on

4    the books of CSI?

5          MR. KALER:  It's not governed by how you

6    treated it on the books.  That's the fallacy in their

7    technical argument, which is that because there's a

8    residual book value of zero, that means CSI expected not

9    to get anything on it, and that's ridiculous.  That's

10   not what any leasing company thinks.

11          If they don't extend their leases,

12   typically they're going to make a portion of their

13   profit on the sale of that equipment.  They can't

14   overvalue it to their investors.  So, they straight-line

15   depreciate it.

16          What Lycos did in this case is after

17   discovery revealed that the gap between the monthly they

18   were paying on the leases and the original equipment

19   cost couldn't be used as a basis for a claim -- because

20   they were tracking it.  We have the spreadsheets.

21          We gave them our residual -- we gave them

22   all our accounting records.  They asked for it.  It's

23   discoverable.  We gave it to them.  They found that we

24   straight-line depreciated it to zero and they

25   constructed a new argument.

The fundamental response in the first motion, because I want to get to the timeline, is that you can't treat leases over a decade -- a $100 million company cannot treat its leases over the course of a decade as operating leases, off-the-books operating leases, obtain the financial benefits of doing that, and then sign a sales agreement in 2003 that reaffirms the validity of the leases as operating leases and treat them throughout to the taxing authorities for purposes of their deductions -- all their financial statements are reviewed by the big four accounting firms -- all treat them as operating leases throughout and then come back years later now and say, Look, if you apply the criteria of the Uniform Commercial Code here, these are really conditional sales contracts. The Greeks have a word for that. It's sophistry. It sounds good, but when you step back and look at it, it doesn't lie.

The other -- and then, of course, there's some technical arguments, which I just made under the UCC.

The second motion that they're making is the Chapter 93A motion, and the timeline will help us a little bit, but I just want to remind the Court that one of the things that Lycos claimed here was usury, and the usury counts were dismissed for a simple reason, that

these were leases and not loans, but what has happened
here is that in the interest of coming up with the
damages claim, Lycos has promulgated an argument that
they essentially were loans.

            And I need about five minutes to just take
what has become sort of a complicated counterclaim and
just put it on the timeline, and if I can do that, I
believe that you'll understand what happened here and I
can almost make the notes on one page of the --

            THE COURT:  Can you give one to my law
clerk, please?  Because she can't see the board.

            MR. KALER:  Yes.  Thank you.

            (Attorney Kaler hands documents to the Court
             and law clerk.

            MR. KALER:  This is what happened here if I
try to look at dispassionately:

            We've moved for summary judgment as well on
the duty to disclose issue.  It's clear to me we're
entitled to summary judgment on some of it.  Some of it
may have to go to trial, but this is why:

            This timeline is quite simple.  At the left
we have the first contract the parties entered into and
on the right we have the last contract they entered
into.

            The first contract was a Master Lease

Agreement, which contemplated that individual equipment schedules, each of which would be independent leases, would be signed. It's a standard leasing arrangement. And pursuant to that Master Lease, beginning in 1997, a whole series of original leases, original equipment schedules, were entered into, and they were typically two- or three-year schedules, as is standard, and they were for equipment leases. So, some would run from '97 to '99, and some would run out to '98, and so on.

And what happened here was Lycos was growing; $50 million in sales in '98, $100 million in '99, and they were acquiring other companies, and as they leased the equipment, they could keep the expense off their balance sheet.

Now, recent studies say, Well, that doesn't help you much financially, but back then the model for an Internet start-up company was a clean balance sheet and lots of cash. So, they treated them as operating leases, and their financial officer said we leased all of our equipment for financial purposes, and that was the driver.

They got the equipment in there and they were growing by leaps and bounds. So, as they got towards the end of each lease, they would start extending the leases and they would get extended out for

another two or three years, and that was the pattern.
In each case they knew how much they were paying under
the original leases and what they're paying under the
new leases.

It is true that they shifted equipment
around in cases from an old lease to a new lease.  We
think it was because they had a lot of different
locations.  The parties agreed upon it, such that you
probably couldn't track what you were paying for a
particular PC under the old lease, how much your rent
would go up, but in the aggregate you clearly could
track it.

And these lease extensions continued, and
this is important.  The last lease extensions were done
in October of 2001, at Point X, four months before the
Stenberg email, which I concede is an email that they
say was inaccurate, false, fraudulent, misleading, and
so on.  And they argue they shouldn't have reasonably
relied on it, but it's enough for a fraud claim.

They say after they entered into the last
extension leases, 93 and 94 --

THE COURT:  Stenberg was a CSI person?

MR. KALER:  He was a CSI account rep.  He
worked with them throughout.  He's heavily commissioned
and it's a highly competitive business.  Lycos by this

time, '01, was dealing with a dozen other leasing companies.  We were their biggest.  We had about a 75 percent share, and because they were extending their leases, this was profitable arrangement.

If I rent a snow blower, a ten-year-old snow blower, from my hardware store, it's long since paid for itself, but I pay full rates.

So, the leases get extended, and the last extension in '93, '94 consolidates, basically, all their leases and extends them out into '05, in some cases. They rewrite their whole portfolio and they extend it out.

Now, the Stenberg email doesn't happen until March of '02, four months later.  So, the key to unlocking all the issues is to look at, Okay, what were the alleged misrepresentations or false statements or unfairness back here to the left of the Stenberg email and -- because I concede everything changes to the right.

But to the left of it, there's no evidence in the record of any dispute between the parties. They're humming along.  They're doing their lease extensions.

What Lycos has gone back and now argued is that what was not disclosed were two categories of

information:  The first category is they say there was a
half-truth.

We were told, again, up until Schedules 93
and 94 -- because that's the last extension.  We were
told that our monthly rent would go down, but we were
not told how much -- to extend the leases, because
they're using them for a longer term.  We were not told
how much in the aggregate our total rent payments would
go up.  Although all three of their affidavits, Philip,
Guilfoile and Lucy, say I knew -- I did understand that
our rent was going to up in total because we were
extending the term.  Their CFO said that it was
glaringly obvious that they did not take the most
economical approach to leasing.  Their priorities were
elsewhere.  The stock price was skyrocketing and they
were doing stock-to-stock deals to buy other companies.
They weren't worried about the amount of equipment that
they had on lease or what they might do with it at the
end of it.  They were hanging on for dear life.

The total amounts, therefore, they knew
were going to go up, but what Lycos is now arguing is
that they were not told a specific amount.

And our response to that is:  You had all
the information to figure that out yourself.  All you
needed to do was multiply the number of months times --

1          THE COURT:  Does that excuse CSI from

2    telling them?

3          MR. KALER:  Yes.  Sure.  I mean, we --

4          THE COURT:  They could figure out what the

5    premiums were for?

6          MR. KALER:  In effect, we did tell them

7    because we told them under each new lease, Here is the

8    schedule of rents.  Here is the monthly rent.  And all

9    they had to do was multiply it out.  We know they could

10   do it because in early November of '01, there's a

11   separate sheet analysis where they did just that and

12   they generated it themselves.

13         THE COURT:  Does the law permit a lender to

14   say, Well, you can figure it out?

15         MR. KALER:  Well, the truth in lending

16   disclosure requirements for consumers in bank loans are

17   very different from business-to-business leasing.

18         THE COURT:  Well, I'm talking about

19   business-to-business leasing.

20         MR. KALER:  In business-to-business

21   leasing, no, there's no requirement or there's no duty

22   to state the obvious, which is that you have your old

23   lease.  Here's your new lease.  You're going to use it

24   for another three or four years.

25         THE COURT:  Was it really obvious?

1          MR. KALER:  Yes, because all they had to do

2  was take the number of months, times the dollar amount a

3  month under the new lease and compare it to the number

4  of months, times the dollar amount of months under the

5  old leases that were being folded into that new lease.

6          THE COURT:  They're required to do that?

7          MR. KALER:  They're charged by law with

8  knowing what they're doing up to a certain point and I

9  guess what we're saying is that this is well before the

10  point at which the law would intervene to say, Look,

11  you've got to do something more.

12          THE COURT:  So, you do not disagree with

13  Mr. Bean that there is an obligation at some point, but

14  you say you hadn't reached that point yet?

15          MR. KALER:  Yes.  I mean, clearly, in every

16  transaction, there's got to be a point at which one

17  party has an obligation to disclose certain things to

18  another, but we're far short of that point.  Now, that's

19  not only the argument.

20          THE COURT:  Why is that?

21          MR. KALER:  Why are we short of it?

22          THE COURT:  Yes.

23          MR. KALER:  Because the law does not impose

24  on commercial parties the obligation to tell the other

25  party what a reasonable person would expect the other

1  party would already know or could figure out for itself.

2          THE COURT:  And the reasonable person would

3  understand this situation, even though equipment gets

4  mixed and goes from one schedule to another schedule,

5  and so on?

6          MR. KALER:  Yes.  And the reason is that if

7  -- that spider's web chart -- we prepared a different

8  one, which is just a simpler straight line.  The

9  spider's web is only because they're tracking where all

10 the equipment went.

11         The reality is the way these transactions

12 were done -- Lycos was acquiring businesses every year

13 and equipment was moving to a different location and it

14 was moving to different places.  The senior management

15 of the company clearly knew -- it was also acquiring new

16 equipment.

17         So, each time they extended the leases,

18 they knew what was being -- what previous leases were

19 being folded in, even if they split off equipment.

20         I agree, you couldn't in all instances take

21 a particular mini computer out of thousands and say,

22 Okay, how much would we have paid had we stopped the

23 leases on this at Point X and never extended them, but

24 nobody calculated that.  Neither side calculated that.

25 They did it in the aggregate.  They acted as normal

1  commercial entities.

2  So, that argument they can't prevail on,

3  but the second argument they make is this profit

4  argument, and there are two branches in this period.

5  This branch is what they are -- they've constructed --

6  their first argument was:  You deceived us because we

7  didn't know how much in the aggregate we were paying as

8  opposed to our original equipment cost for everything.

9  We pointed out that you bought it.  You selected it.

10  You priced it, and you then assigned the purchase orders

11  to us.  Besides, here's a spreadsheet where you're

12  tracking it.

13  When we produced our internal records, they

14  latched onto the residual value of zero, and what they

15  said was, Look -- and this comes out of bankruptcy -- at

16  the end of each of these leases --

17  THE COURT:  What do you mean, it comes out

18  of -- you mean the rule of law comes out of bankruptcy?

19  MR. KALER:  Yes, the concept of kind of

20  recasting this --

21  THE COURT:  Okay.

22  MR. KALER:  Things are a lot -- I don't

23  practice as much in bankruptcy, but the rules are

24  different there.

25  Residual value on a company -- lessor's

books is not zero at the end of an ordinary lease.  It's a certain amount because they're still conservative, but certainly by the time these leases were extended at least once, residual value on CSI's books -- because they're not permitted to -- and they don't want to value it too high, because if they value too high, then they have to take a loss later -- is pretty much down to zero.  No one thinks the equipment is worth zero to Lycos.  In fact, Lycos' own expert last month valued it way out here at $14 million and further out at $8 million.  No one thinks the value is really zero, but what they did was, Look, you booked it at zero and your accounting rules say you're supposed to book it down to fair value.

I know what the accounting rules say.  They do say book it down to fair value.  It's supposed to be an approximation.

The practice is to book it conservatively, because who knows what fair value is.  It's a matter of opinion, but there's a difference between booked residual value and real market value, and there's a further difference between those two and the value to the company, Lycos, that has it installed in its facilities.  Arguably, there the value is what's the replacement cost.  What will it cost to replace it.

1          So, the point is -- what they are saying

2     is, Let's assume the equipment is worth zero here.

3     Looking back at these transactions, it's terrible.

4     You've charged us a huge amount and you charged us a

5     very hefty rent to extend these leases out, particularly

6     at '93 and '94, and what they are saying is the booked

7     residual value is essentially zero.  Plus, the present

8     value of the future lease payments under the extended

9     leases is like the principle balance on a loan.  And

10    they're saying that if I compare a reasonable interest

11    rate on that principle balance to the -- to what we've

12    got here, you earned more than a reasonable rate of

13    return would have been on that balance if it was treated

14    as a loan.

15          It's a complicated argument that at its

16    core has a fallacy in it.  It's a construct, and it's a

17    construct that with the dismissal of the usury counts --

18    that's why they pled usury.  They wanted to recast the

19    leases as loans.  They weren't loans.

20          We all know that in the equipment leasing

21    field, what typically happens is the leasing companies

22    sort of -- they think in terms of a return on

23    investments.  Sometimes they talk about what's the rate

24    of return on a lease, even though it's not a loan.  It's

25    really a lease.  They argue imputed rates of return.

They carry over concepts of finance and loans into leasing, but that doesn't make a lease a loan, and they confirmed these were leases and, of course, they've treated them as leases.

So, to the left of the Stenberg email, those are the non-disclosures and half-truths that they're relying on. They don't have anything else. And Counts I and II of their counterclaim are for this period, the extended leases.

The one other thing they argue about the extended -- and we've moved for summary judgment as to those two counts, the only two that I really think we're entitled to summary judgment on.

The other argument they make is this Stenberg email. They say in this Stenberg email, Paul Stenberg was asked, Look, we've done this analysis -- they sent him the analysis they did that I referred to a moment ago back in November where they said, Look, this shows that under 93, 94, we're going to be paying $11 million more than we otherwise would have paid.

And the response was: Of course, you're using the equipment for another couple of years.

He wrote an email back, which is, arguably, misleading, but it was after the transaction was entered into. And they say but it's still relevant to back

here.  Here's a fraudulent statement because if we had

known the truth here, we would have unwound the

transactions, but the record shows they had no contract

right to unwind the transactions.

THE COURT:  Even if there was fraud?

MR. KALER:  Well, but the fraud here --

THE COURT:  Was disclosed there.

MR. KALER:  The fraud here is not any --

there's no claim here that he was disclosing here what

was undiscovered here.  The two are unrelated.  They're

not saying that he, you know, mis-disclosed something.

And, in any event, the caselaw that we've cited on

reliance -- it's sort of axiomatic, that you can't argue

you were fraudulently induced to enter into a

transaction based on something someone said after you

entered into the transaction.  You can argue that you

didn't have the full facts beforehand and -- but what

they're arguing beforehand makes no sense for the

reasons I've stated.

Lastly, the -- once you get to this point,

the Stenberg email, they sent a spreadsheet saying,

Look, we're paying a lot more.  Is this right?

And he wrote back and said, Look, I think

there are some errors here.  I'm still working on it.

They responded, finally, and said, Okay,

fine, and then the parties let it drop.

And what happened after that was for about 17 months, beginning -- certainly towards the end of '02, Lycos decided it needed capitalize the leases. Why? Because back here in 2000, Lycos was purchased by one of the largest companies in the world, Terra Networks in Spain. That's when the executives cashed out and that was their exit strategy.

So, they're now part of a huge conglomerate for all these periods of time, and that company said, Look, you've had these leases on extension for about four years. You need to capitalize them and buy them, do what you will. So, they negotiated.

And at this point they got the involvement of Leaseforum, this contingently-compensated expert, who comes in about June of 2003 and has a phone conversation with Mr. Stenberg in which she claims that he repeated some of the things they say he said in the email, particularly that the original cost of the equipment was $63 million, when it was really $40 million.

Now, she has testified she had a spreadsheet in front of her and we put it in the record. She had the original equipment cost laid out there to within five percent, $44 million. She said, Here's what I think you've paid Lycos, $65 million.

1   Here's the spread.  The evidence is she knew
2   everything.
3            But let's assume there's still enough for a
4   fraud claim based on that, because that's only a couple
5   of months before the sales agreement.  We've argued that
6   this email back here and her account of the telephone
7   conversation is not enough, doesn't rise to the level of
8   reasonable reliance to justify what is Count III of
9   their claim, the sales agreement fraud -- fraudulent
10  inducement, and I concede that that's a matter that
11  could go to trial.
12           If this case goes to trial on the whole
13  thing, it's a mess.  It's a real mess, because we have
14  difficulty grappling with the issues back here,
15  nondisclosure and the explanation that I just gave to
16  the Court, I'm not sure I could make a jury understand,
17  because -- without a background in bankruptcy law and
18  legal concepts.
19           Here it's a straight fraud claim by them,
20  and I understand.  They've got this argument here.
21           The sales agreement, once it was signed --
22  and the subject of our counterclaim is that what we
23  uncovered is that the consultant had a plan to get Lycos
24  out from under these leases that they had signed back in
25  '02 that we're extending out to '05, and the first phase

was to get the sales agreement signed because they had a problem.

The record shows -- and it's not disputed -- they couldn't return almost a third of the equipment because they didn't know where it was. They didn't have the resources to return it. The Internet bubble burst in 2001. They started laying off people at that point. They couldn't come out and rip all this equipment out. They treated it as if they owned it, according to their CFO, and there was a liquidator -- a stipulated loss value table where if they couldn't return the equipment at the end of the leases, they had to pay a certain percentage of its cost, and they would have been liable for tens of million of dollars and they realized all that in the summer of '03.

CSI is sitting there, having made a good amount of money on these extension leases. They're about to close out the deal. And what happened was that they negotiated the $3.7 million purchase price, pay a lump sum now and then at the end -- and then continue to make all the payments under the leases, whose validity Lycos re-affirmed, and that's the deal. It's called a lease buy-out. The other option would have been for Lycos to pay $25 million in cash and buy it outright then, but this was the way they did it and they

1 structured it.

2 And the evidence is that the consultant

3 pretty much knew everything.  She sent analyses of what

4 Mr. Bean outlined to you to Lycos in the summer of '03.

5 So, the problem that I had was when we

6 realized that on the -- at the very time they signed the

7 sales agreement -- and I didn't know this when we filed

8 the suit -- they had re-affirmed the validity of the

9 leases.  At that very moment they were saying, We're now

10 going to start phase two, and phase two is to

11 renegotiate what we have to pay going out to '05 under

12 the leases.

13 And I looked at that contract -- we looked

14 at the contract.  They said they would pay the leases.

15 They re-affirmed the validity of the leases.  I don't

16 like fraud claims between sophisticated commercial

17 parties because they're so often *pyrrhic*.  They're just

18 -- but in this case, the evidence seemed to be very

19 clear that they knew exactly what they were doing.

20 First they had to lock in the sale and then they were

21 going to come back and make an allegation, which three

22 months later in the state court complaint they did.  In

23 December of '03 they said, We've sued you.

24 That's fraud and that's the basis for our

25 own fraud claim and the abuse of process claim and the

1   breach of implied covenant of good faith and fair

2   dealing.  It's out here.  It's not back here.  We don't

3   have any claim back here other than the account

4   receivable.

5          So, in the papers we filed yesterday --

6   because some of it we used the new expert material we

7   got -- we filed like a 20-page memo, and we just said,

8   basically, Counts I and II back here, they don't have

9   any claims for unjust enrichment, money hadn't received,

10   fraud, negligent misrepresentation.  There was no duty

11   to disclose what they say we didn't disclose.  They can

12   rely on the Stenberg email going forward, but not going

13   backwards.  That's out.  They really don't have any

14   claim there.

15          We've also argued for summary judgment to

16   the right, but that's debatable.  It's a question of

17   whether or not there should be reasonable reliance under

18   those circumstances by a sophisticated party.

19          So, in response, I guess, to the summary

20   judgment motion that Mr. Bean has made about 93A and the

21   money he hadn't received and unjust enrichment counts,

22   it seems to us reasonably clear that he's certainly not

23   entitled to summary judgment on that for the reasons

24   I've stated.

25          And my colleague reminds me that on the 93A

claim, although you don't have to show reliance, you've got to show causation.

The bulk of their damages claim is the amount of this markup above the percentage return that they claim we should have gotten. Their expert is a mathematician and he just calculated. It's not a mythical number, but it's an abstract number. It's an abstraction, and for that reason, the damages claimed, although dangerous because it's so large, is ultimately not a valid one.

Where they, arguably, have a claim is on the sales agreement, but there are so many disputed issues of fact there, I'm not even sure I'm entitled to summary judgment on that issue, but the one thing that's clear is that Lycos is not entitled to summary judgment on its claims and that, arguably, before trial the Court should, perhaps, look at our summary judgment motion, at least the portion that I've talked about, because these duty to disclose issues are going to have to be addressed one way or the other at some point.

THE COURT: Did we set a schedule for filing -- so, I get these serial motions now. So, I have the defendant's and now I have the plaintiff's?

MR. KALER: Well, the serial motion is probably my fault. Our motion I delayed on because we

1  got some additional expert material in the last month or

2  so on the valuation of the equipment, and that's not

3  Mr. Bean's fault.  He followed some long motions a long

4  time ago and that's why -- and I don't intend,

5  necessarily, to try to argue that motion, but I'm trying

6  to argue the whole case, and we requested oral argument

7  on our summary judgment motion.  I'm not sure it's

8  needed.  I've sort of tried to lay out to the Court what

9  I've said, and to suggest that before this case goes to

10  trial, we really would ask the Court to look at the

11  period prior to the Stenberg email and the core

12  arguments that Lycos is making, because ultimately we

13  believe those should be out of the case and what should

14  remain, at best, is the dispute about the -- that Lycos

15  is making about the sales agreement, and we moved for

16  summary judgment on it, but they can make an argument,

17  and our --

18            THE COURT:  So, why don't I just deny it?

19            MR. KALER:  Well, the Court probably may do

20  that.  On the other hand, I don't want to waive the

21  argument that a reasonable lawyer could make that a $100

22  million company, a big conglomerate, shouldn't be

23  relying and can't rely on those kinds of emails, but --

24            THE COURT:  So, what you're saying is that

25  the dispute really is about $2 million or $7 million?

1          MR. KALER:  Yes.

2          THE COURT:  $3.5 million?

3          MR. KALER:  Yes.  I mean, they've got an

4     argument there and we have an argument coming back.

5     We've got a damages claim and, you know, it's like all

6     damages claims.  It tries to posit what would have

7     happened if we wouldn't have entered into the sales

8     agreement but for the representation that the leases

9     were valid.

10         Well, that's true.  Their motion -- one of

11    their motions to strike, that wasn't clear.

12         COURT REPORTER:  I'm sorry, I can't hear

13    you.

14         MR. KALER:  I really apologize.  I'm sorry.

15    I apologize.

16         COURT REPORTER:  I can't hear you.

17         MR. KALER:  I'm sorry.  I apologize.

18         The point is that the -- I'm not sure where

19    I was, but I think this is a good point to conclude.

20         THE COURT:  All right.  Since you are not

21    sure that you need argument on the second one, I will

22    wait to see what the defendant has to say about that and

23    either schedule or not, as I deem appropriate, and if I

24    schedule it, then we can revisit this, because I have a

25    distinct feeling they are related.  So, I probably

1  shouldn't even deal with this until I get a sense of

2  what Mr. Kaler is arguing.

3              MR. KALER:  I don't want to be unfair to

4  Mr. Bean because he would properly point out that he

5  filed in September, but I think that's true.  It's not a

6  long motion that we made.  The local rules, statements,

7  I think, about twelve pages, the analyst about 25, and

8  it just makes -- points --

9              THE COURT:  How do you file these 25-page

10 memos?  I thought the limit was 20.

11             MR. KALER:  There was leave to file up to

12 30, I'm afraid, the Court granted us both back in June

13 of last year.

14             THE COURT:  I think that was my clerk, not

15 me.  If I had seen it, I probably would have denied it.

16             MR. KALER:  But that was the --

17             THE COURT:  All right.

18             MR. BEAN:  May I be heard very briefly,

19 your Honor?

20             THE COURT:  You've got two minutes.

21             MR. BEAN:  Thank you.

22             I feel like I'm in a political campaign,

23 where the other side is telling me about arguments I'm

24 not making.  We're not arguing anything about the

25 Stenberg email on summary judgment, except as it relates

to multiple damages and what was, apparently, conceded
to be a misrepresentation. We're simply -- and we're
not arguing that they should have told us what the
aggregate cost was on the leases. We're not arguing
those things at all.

We're arguing simply that they should have
told us about the premium they were charging us for the
privilege of refinancing. That's all we're arguing.
And I think it's undisputed they didn't tell us and it
was material to our decision to enter into the
transactions.

Very briefly on the equitable estoppel,
because the Court did not allow the parties to -- did
not allow reply briefs. That was sort of the trade-off
for the 30-page brief.

For equitable estoppel to apply --

THE COURT: I must have looked at those.

MR. BEAN: Well, actually, it happened in
chambers, your Honor.

For equitable estoppel to apply as set
forth in the First Circuit's decision in <u>Plumely</u> cited
by Mr. Kaler, you have to show that we knew a fact -- a
certain fact was the case and that they didn't know it,
and that is whether these are installment sales
contracts or leases. We had no booked residual, no

residual at all.  So, we didn't know that the equipment
was valueless at the end.

THE COURT:  Why is it irrelevant what the
appraisals say the value was?

MR. BEAN:  Because none of the appraisals,
except for one of our appraisers, looks at the projected
residual value at the end.  None of them do.  And that
one, that's not part of the record.  I believe -- I
don't recall the precise amount, but all you have in the
record is their booked residual value zero.  And,
frankly, I think that's the most reliable evidence of
what the equipment was worth.

Usury counts were denied on a motion to
amend.  The Court didn't write a decision.  The Court
hasn't addressed this lease versus loan issue in any
substantive way.

So, I think, you know -- and on this issue
of whether we could have figured it out.  Sure, we can
multiply the monthly rent, times the number of months,
but that's not what we're arguing wasn't disclosed to
us.

And with the equipment being split from
schedule to schedule, that's really not useful
information.  You can't compare apples to apples, what
the rent was on an old schedule and what the rent is on

1    a new schedule because you've got different equipment on
2    the new schedule than you had on the old schedule.
3                 As far as our knowing it, two experts
4    looked at this before we got into this case, your Honor,
5    and nobody figured out that they were charging us a
6    premium.  The only way we figured it out is when we got
7    their internal financial records and saw that they had
8    booked these as sale-type leases -- they're calling them
9    sales, they were -- and that they had a premium they
10   were charging us that they hadn't disclosed to us.
11   Thank you very much.
12                THE COURT:  Thank you.  I will take the
13   papers and I will decide how to deal with these motions
14   when I look at -- after I look at Mr. Kaler's motion.
15                MR. BEAN:  May we have until the -- we were
16   just served with that about 9 o'clock last night --
17   middle of February, your Honor?
18                THE COURT:  Sure.  When do you want to file
19   them?
20                MR. BEAN:  Let me just look at my calendar.
21   If the Court -- the reason -- how about the 15th of
22   February?
23                THE COURT:  Fine.
24                MR. BEAN:  We'll file our responses.
25                And did the Court -- I'm sort of betwixt

1    and between here.  We would like to see this case resolved

2    this year.  It's a little over three years old.

3                  Did the Court want to set a trial date in

4    the event it denied summary judgment or --

5                  THE COURT:  In the event summary judgment is

6    denied, and there are certain counts as to which there is

7    no summary judgment, in any event, I will set a trial date

8    and --

9                  MR. BEAN:  You'll set out --

10                 THE COURT:  -- at that point it won't be a

11   problem to find time.

12                 MR. BEAN:  Okay.  Will the Court send out

13   notice about that?

14                 THE COURT:  We will send out a notice about

15   pretrial conference at that point.

16                 MR. BEAN:  Okay.  Thank you, your Honor.

17                 THE COURT:  Thank you very much.

18                 MR. KALER:  Thank you, your Honor.

19                 (Adjourned, 10:18 a.m.)

20

21

22

23

24

25

1        CERTIFICATE

2             I, Catherine A. Handel, Official Court

3    Reporter of the United States District Court, do hereby

4    certify that the foregoing transcript, from Page 1 to Page

5    67, constitutes to the best of my skill and ability a true

6    and accurate transcription of my stenotype notes taken in

7    the matter of Civil No. 05-10017-RWZ, CSI Leasing, Inc.

8    vs. Lycos, Inc.

9

10

11   _____        /s/Catherine A. Handel
     Date                           Catherine A. Handel, RPR-CM
12

13

14

15

16

17

18

19

20

21

22

23

24

25