# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant ) | |
| In Counterclaim, ) | |
| v. ) | **LEAVE TO FILE** |
| ) | **MEMORANDUM OF UP TO** |
| LYCOS, INC., ) | **THIRTY PAGES GRANTED** |
| ) | **JUNE 13, 2007** |
| Defendant and Plaintiff ) | |
| In Counterclaim, ) | **ORAL ARGUMENT REQUESTED** |
| ) | |
| BANK OF AMERICA f/k/a FLEET BANK, ) | <u>**REDACTED**</u>**- WILL FILE** |
| ) | **UNREDACTED VERSION IF** |
| Trustee Process Defendant. ) | **COURTS GRANTS MOTION TO** |
| ) | **IMPOUND FILED FEB. 28, 2008** |

---

## LYCOS'S OPPOSITION TO
## CSI'S MOTION FOR SUMMARY JUDGMENT
## <u>DISMISSING LYCOS'S REMAINING COUNTERCLAIMS</u>

Respectfully Submitted,
LYCOS, INC.
By its attorneys,

Dated: February 29, 2008

Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
(617) 535-4000

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................. 1

FACTS ........................................................................................................ 2

ARGUMENT ...................................................................................................... 8

I. **CSI's Motion on Counts I and II Must Be Denied Because (A) CSI Seeks Relief on Claims Lycos is *Not* Asserting; (B) There is a Genuine Issue of Material Fact in Dispute On the Lone Lycos Claim on Which CSI Has Actually Moved; and (C) CSI Has Failed to Move on Several Theories Lycos *is* Asserting** ................................................................................. 8

    A. CSI's Motion Should be Denied as Moot as to Theories Lycos is Not Asserting. .................................................... 8

    B. CSI's Motion as to One Claim Lycos is Asserting Must Be Denied because it Fails as a Matter of Law and There is a Genuine Issue of Material Fact in Dispute ...................... 8

    C. CSI Has Not Moved For Summary Judgment on Several of Lycos's Claims for Fraudulent and Negligent Misrepresentation ................................................................. 13

II. **CSI is Not Entitled to Summary Judgment on Count III Because (A) There is No Genuine Issue of Material Fact in Dispute in Count III and Lycos Is Entitled to Summary Judgment as a Matter of Law; or (B) There is a Genuine Issue of Material Fact in Dispute. As Lycos's Claims in Counts IV and V are Derivative of Count III, CSI is Not Entitled to Summary Judgment on Those Counts** .................................. 14

    A. Not Only Has CSI Not Satisfied Its Burden of Demonstrating that Lycos Had Reason to Know Mr. Stenberg's Misrepresentations Were False, But the Court May Find that Lycos's Reliance was Reasonable and Grant Lycos Summary Judgment on Count III ........................ 15

    B. There is a Genuine Issue of Material Fact in Dispute Concerning Whether Lycos Knew or Had Reason to Know Mr. Stenberg's Representations Were False .......................... 19

III.   As Counts IV and V of Lycos's Counterclaim are
       Derivative of Count III, CSI Is Not Entitled to Summary
       Judgment on Counts IV or V and the Court May Exercise
       its Discretion to Grant Summary Judgment to Lycos on
       Both Counts ........................................................................ 19

IV.    Lycos Is *Not* Seeking Relief in Count VI for Breach of
       Implied Covenant of Good Faith and Fair Dealing on the
       Theory on Which CSI Has Moved for Summary Judgment ................. 19

V.     CSI Is Not Entitled to Summary Judgment on Count VII,
       Lycos's Claim that CSI Violated M.G.L. c. 93A, §§ 2 and 11
       in Fraudulently Inducing Lycos to Enter into the
       Refinancings and the Sales Agreement ........................................ 21

VI.    CSI Is Not Entitled to Summary Judgment on Lycos's
       Counterclaim for Money Had and Received and Unjust
       Enrichment in Counts XII and XIII ........................................... 24

       A.   As CSI is Not Entitled to Summary Judgment on
            Lycos's Fraud in the Inducement Claim, It is Not
            Entitled to Summary Judgment on Lycos's Claims for
            Unjust Enrichment and Money Had and Received.......................... 25

       B.   CSI's Defenses to Lycos's Argument that Schedules 93
            and 94 Were Installment Sales Contract Are Meritless .................... 25

       C.   CSI Does Not Even Address Lycos's Theory that CSI
            Was Unjustly Enriched Because Lycos Dramatically
            Overpaid It.............................................................. 28

VII.   As  CSI's  Claims  for  Fraudulent  and  Negligent
       Misrepresentation in Counts I-III Survive Summary
       Judgment, Lycos's Claim in Count XIV Survives Summary
       Judgment.  Additionally, CSI Is Not Entitled to Summary
       Judgment on Count XV ........................................................ 29

CONCLUSION ................................................................................. 30

## INTRODUCTION

The last time CSI moved for summary judgment, the Court commented that CSI and Lycos were like two ships passing in the night.  History has repeated itself.  In its "Motion for Summary Judgment Dismissing Defendant Lycos, Inc.'s Remaining Counterclaims" (the "Motion"), CSI has moved for summary judgment on claims Lycos is *not* asserting.  What's more, despite the title of its Motion, CSI has failed to move on claims Lycos *is* asserting.  It apparently believes it will have more success setting up strawmen and knocking them down than responding to Lycos's meritorious claims.

For example, CSI contends that Lycos's fraudulent and negligent misrepresentation claims in Counts I and II are based in part on  (a) CSI's failure to disclose to Lycos the amount of its gross profits on the lease refinancings; and (b) fraud in the inducement of schedules 93 and 94 resulting from an email Paul Stenberg sent four months *after* those schedules were signed.[1] *Lycos does not seek relief on **either** of these theories.*  Lycos does, however, seek relief on one theory on which CSI has moved as well as several other theories on which CSI has *not* moved.  As such, even if some of CSI's arguments had merit (they do not), CSI would not be entitled to summary judgment dismissing Lycos's "remaining counterclaims."

CSI's Motion also seeks to reargue issues this Court rejected the last time CSI moved for summary judgment.  Lycos will not tarry long with these.

Finally, CSI repeatedly asserts that Lycos knew and kept track of the original cost of the equipment it leased from Lycos.  Yet, the very evidence it cites to support this contention shows just the opposite.  It demonstrates that Lycos was *not* keeping track of and did *not* know the original cost of the equipment.

---

[1] CSI's Mem. in Support of its Mot. for  Summ. J. Dismissing Lycos's Remaining Countercls. (Dkt. No. 180) ("Memorandum") at 6-14.

# FACTS[2]

During their more than seven-year relationship pursuant to which CSI leased over 6,000 pieces of computer-related equipment to Lycos, CSI represented to the world and to Lycos that it was a company that was honest, fair, and ethical in its business dealings.

On its website, CSI:

- Declared that it engaged in "the highest levels of business conduct with regard to ethics, service and enhancement of reputation";[3]

- Represented that its business was "devoted to offering fair and flexible leasing options";[4]

- Stated that it worked directly with its customers to make "the best decisions" for their businesses;[5] and

- Described itself as its customers' leasing "partner," and boasted that its customers "trust [it] to manage the leasing process efficiently and ethically."[6]

CSI's co-founder, Chairman, and CEO, Kenneth Steinback,[7] further touted the importance of honesty and integrity in his business in interviews with the press and in an article he wrote during the CSI-Lycos relationship:

- "That I've built a company with great people, great customers, and with terrific integrity." (speaking about his proudest accomplishment).[8]

- "I would sacrifice dollars any time for integrity and goodwill."[9]

---

[2] This Court is familiar with the parties' relationship from its Memorandum in Support of its Motion for Summary Judgment as to Certain Claims in Counts VII, XII and XIII of its Counterclaims (Dkt. No. 148) and its Counterstatement of Undisputed Material Facts filed herewith. As such, Lycos will not provide a lengthy recitation of the facts herein. Instead, it will highlight just some of the evidence of CSI's wrongdoing that forms the bases for Lycos's claims. Citations in this memorandum are to the Affidavit of Thomas O. Bean (Dkt. No. 149) ("Bean Aff."); the Affidavit of Kelly A. Gabos (Dkt. No. 167) ("Gabos Aff."); the Declaration of Edward W. Little, Jr. (Dkt. No. 168) ("Little Decl."); the Affidavit of Edward W. Little, Jr. (Dkt. No. 182) ("Little S.J. Aff."); and the Affidavit of James M. Fraser ("Fraser Aff."), filed herewith.
[3] Bean Aff., Ex. 3, IA000006.
[4] *Id.* at IA000059.
[5] *Id.* at IA000023.
[6] *Id.* at IA000040.
[7] Fraser Aff., Ex. 21, 18:12-13.
[8] Fraser Aff., Ex. 43 at 2.
[9] *Id.*

- 2 -

CSI touted its membership in the Equipment Leasing Association, the leading trade association for the equipment leasing and finance industry,[10] on its website[11] and on its letterhead.[12] That Association:

- Expressly desires that lessees view equipment lessors as a "partner"[13] and "ally";[14]

- Promulgated a Code of Fair Business Practices (the "Code") to "notif[y] the public and business community that members intend to maintain a high level of ethics . . ."[15]; and

- Requires member lessors, such as CSI, to ensure that their employees comply with the Code,[16] which provides, in relevant part: "**A Member [such as CSI] shall disclose [to its lessees]** *all* **relevant information as to the terms and conditions of a transaction or service which** *may* **affect the [lessee's] decision**."[17]

Despite this ubiquitous public self-portrayal as a fair and ethical business, CSI's actual business practices and those of its account executive for Lycos, Paul Stenberg, evince a profound *lack* of honesty, fairness, and ethics.

- Not only did CSI *not* ensure that its employees complied with the ELA's Code, but its ███████████, President and COO, co-CFO, ███████████████ *have never even read the Code.*[18]

- Even though the plain language of the Code places the onus of disclosure on the lessor, when asked what information other than the new rent and term CSI discloses to a lessee in connection with a refinancing, CSI's Chairman and CEO, Kenneth Steinback responded, ██████████████████████████[19]

- Mr. Stenberg, an officer and part-owner of CSI,[20] adopted the company's "don't ask, don't tell" approach. For example:

  ➢ Early in CSI's relationship with Lycos he wrote, 
  ;[21] and

---

[10] Fraser Aff., Ex. 34. The Equipment Leasing Association recently changed its name to the "Equipment Leasing and Finance Association".
[11] Bean Aff., Ex. 3 at IA000006-007.
[12] Fraser Aff., Ex. 62.
[13] Fraser Aff., Ex. 6, 163:18-22.
[14] *Id. at* 164:12-15.
[15] Fraser Aff., Ex. 35 at ELFA000049.
[16] *Id.* at 000061, ¶ 15.
[17] *Id.* at 000061, ¶ 7 (emphases added).
[18] Fraser Aff., Ex. 23, 229:16-22; Fraser Aff., Ex. 1, 39:16-40:1; Fraser Aff., Ex. 10, 73:16-74:24; Fraser Aff., Ex. 22, 11:12-20.
[19] Fraser Aff., Ex. 22, 82:22-83:12.
[20] Fraser Aff., Ex. 21, 30:8-9; Fraser Aff., Ex. 23, 557:6-9.

BST99 1565824-1.057077.0012

➢ When Lycos requested basic information as to the cost of particular equipment on a lease, a CSI employee wrote an internal e-mail to Mr. Stenberg saying ██████████████████████████████████████████[22]

• Not only was Mr. Stenberg *sensitive* about simply sharing information with Lycos, but he apparently was *sensitive* about sharing *accurate* information with Lycos as well. For example:

➢ when Lycos questioned him about the amount of the aggregate increase in rent it would have to pay as a result of the refinancing of thirty-one equipment schedules onto schedules 93 and 94 and threatened to unwind those refinancings[23] on which he stood to earn a $2 million commission,[24] Mr. Stenberg told Lycos:

❖ to "rest easy" because the increase was only $3.5 million[25] when, in fact, the increase was over $10.5 million;[26] and

❖ that the original cost of the equipment Lycos had leased was "around $63 million,"[27] when it was actually $45 million on all the schedules;[28]

➢ during negotiations with respect to the Sales Agreement on which Mr. Stenberg earned an over $515,000 commission,[29] he

❖ reiterated the lie he had told earlier saying that the original cost of the equipment exceeded $60 million;[30] and

❖ [32]

• Despite CSI's public commitment to help its lessees make the "best decisions for their businesses," Mr. Stenberg stated under oath in deposition that he was ████████████████[33] ████████████████████████████████[34]

---

[21] Bean Aff., Ex. 69 (emphasis added).
[22] Fraser Aff., Ex. 29.
[23] Bean Aff., Ex. 23 at LYC24633.
[24] Bean Aff., Ex. 59 at CSI44451-452; Bean Aff., Ex. 51, ¶ 49 and Exhibit L thereto.
[25] Bean Aff., Ex. 46 at LYC24631.
[26] Bean Aff., Ex. 51, ¶¶ 36-41.
[27] Bean Aff., Ex. 23 at LYC24633.
[28] Bean Aff., Ex. 66, Exhibit A thereto.
[29] Bean Aff., Ex. 51, ¶ 50.
[30] Fraser Aff., Ex. 5, 142:3-5.
[31] Fraser Aff., Ex. 55.
[32] Fraser Aff., Ex. 23, 301:23-302:1.
[33] *Id.* at 156:11-18.
[34] *Id.* at 234: 21-235:3.

BST99 1565824-1.057077.0012

- At the same time Mr. Stenberg was lying to and withholding information from Lycos, and refusing to provide it with the benefit of his expertise, he gained Lycos's trust.[35] CSI awarded him the highest possible score on his performance evaluations for ███████████████████████████████████████████████████████████ [36]

- Rather than sharing his opinions with Lycos, he saved them for internal distribution at CSI. In an e-mail to several senior executives at CSI which he referred to as his "Tom Cruise Mission Statement," Mr. Stenberg stated bluntly, using Lycos as his example, that the business of CSI was to ████████████████████████████████████ ██████ [37] Nowhere in this internal e-mail did Mr. Stenberg mention the formula of its business as CSI represents on its website: integrity, ethics, flexible solutions, and helping his customer make good business decisions.[38] Instead, he was responding to a commission structure set up by CSI that blindly rewarded him for █████████████████████ ██████████████████████████████████ [39]

In repeatedly refinancing Lycos's equipment schedules in the middle of their term, CSI:

- split equipment between schedules and combined that equipment with equipment from other schedules in connection with many of the refinancings,[40] something that made it impossible for Lycos to figure out the full financial impact of those refinancings.[41]

- embedded more than $13.708 million in hidden fees and mark-ups in the monthly rent on the refinanced equipment schedules,[42] and without even telling Lycos that there was an added charge to refinance, let alone telling Lycos the magnitude of that charge.[43]

- caused Lycos to enter into nineteen refinancings of 24-month equipment schedules to 36-month schedules just two-to-four months into their terms,[44] refinancings that CSI's co-CFO referred to internally as "infamous rewrite deals,"[45] and CSI's expert admitted that he could think of no business reason for doing.[46]

- initially rolled/financed Lycos's interim rent into the monthly rent of the 24-to-36 month refinancings, but once it realized that it had so duped Lycos into entering into these refinancings, stopped rolling/financing the interim rent into the refinanced schedule and simply charged Lycos the interim rent *plus* a higher hidden fee or mark-up.[47]

---

[35] Bean Aff., Ex. 33, ¶ 13.
[36] Bean Aff., Ex. 74 at CSI044216; Bean Aff. Ex. 75 at CSI044220; Fraser Aff., Ex. 8, 136:22-137:13.
[37] Bean Aff., Ex. 61 at CSI0042468.
[38] *Id.*
[39] Bean Aff., Ex. 52 at CSI44229, CSI44232, CSI44241; Bean Aff., Ex. 53 at CSI44260, CSI44268, CSI44277; Bean Aff., Ex. 54 at CSI44303-304, CSI44315; Bean Aff., Ex. 55 at CSI44340-341, CSI44352; Bean Aff., Ex. 56 at CSI44376-377, CSI44388; Bean Aff., Ex. 57 at CSI044468, CSI044477, CSI044482; Bean Aff., Ex. 58 at CSI044470, CSI044497, CSI044502.
[40] Bean Aff., Ex. 51, Exhibit C thereto.
[41] *See* discussion, *infra*, at 9-11.
[42] Bean Aff., Ex. 51, ¶ 34; *see also id.*, Exhibit G thereto (detailed breakdown).
[43] Bean Aff., Ex. 6, ¶ 4 ; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.
[44] Fraser Aff., Ex. 49, Answer to Interrogatory No. 23.
[45] Bean Aff., Ex. 30.
[46] Fraser Aff., Ex. 12, 158:8-15.
[47] *Compare* Fraser Aff., Ex. 49, Answer to Interrogatory No. 23; *with* Bean Aff., Ex. 51, Exhibit G thereto.

BST99 1565824-1.057077.0012

- structured schedules 93 and 94 in a manner that CSI described internally as ███████████████[48] so that Mr. Stenberg would earn at least █ million in margin[49] on which to base his commission on those refinancings.[50]

- CSI told Lycos on the original equipment schedules (as opposed to the refinanced schedules) that the "Base Value," i.e., the number on the "Stipulated Loss Value Table" that was part of each equipment schedule (by which a percentage would be multiplied to determine how much Lycos would be required to pay CSI if Lycos lost or damaged some of the leased equipment) would equal the "manufacturer's cost" of the equipment,[51] yet did not tell Lycos that on the refinanced schedules, "Base Value" would *not* equal the manufacturer's cost, but would equal the present value of the rental payments on the new schedule,[52] thus leading Lycos to continuously use the wrong number in attempting to determine the original cost of the equipment.[53]

The repeated refinancings enabled CSI to reap almost double its customary rate of

return[54] and Mr. Stenberg to rake in millions of dollars in commissions:

- Lycos paid CSI more than $73 million in monthly payments,[55] 63% of which were made pursuant to the refinanced schedules,[56] for equipment that had an original cost of approximately $45 million.[57]

- Late in the parties' relationship, CSI sold the leased equipment to Lycos for an additional $3.775 million, subject to Lycos making $13.8 million in then remaining lease payments on the existing schedules.[58]  CSI's appraisal expert has opined that the equipment on those schedules, for which Lycos was to make total payments of almost $17.6 million ($13.8 million in future rent plus the $3.775 million purchase payment), was worth only $3 million at the time of the Sales Agreement.[59]

- Mr. Stenberg took home over █ million in commissions on the Lycos relationship,[60] more than ███ million of which was earned on the refinancings[61] and over ██████ of which was earned on the sale of the equipment.[62]

---

[48] Bean Aff., Ex. 68.
[49] Fraser Aff., Ex. 1, 266:14-267:13.
[50] Fraser Aff., Ex. 1, 124:8-14.
[51] Fraser Aff., Ex. 52, at CSI0033450, ¶ 5.
[52] Fraser Aff., Ex. 14, 31:2-13.
[53] *See* chart *infra* at 18.
[54] Bean Aff., Ex. 51, ¶ 35; Fraser Aff., Ex. 21, 103:22-104:20. .
[55] Bean Aff., Ex. 51, ¶ 34.
[56] *Id.*
[57] Bean Aff., Ex. 66, Exhibit A thereto.
[58] Little Decl., Ex. 13, ¶ 3; Bean Aff., Ex. 51, ¶ 44 and Exhibit K thereto.
[59] Gabos Decl., Ex. 22, at 14.
[60] Bean Aff., Ex. 51, ¶ 49 and Exhibit L thereto; *see* Bean Aff., Ex. 59.
[61] Bean Aff., Ex. 51, ¶ 49 and Exhibit L thereto; *see* Bean Aff., Ex. 59.
[62] Bean Aff., Ex. 51, ¶ 50.

BST99 1565824-1.057077.0012

Not content to cheat Lycos alone, Mr. Stenberg cheated CSI as well.  CSI then looked the

other way for months after Lycos exposed his embezzlement before "slapping him on the wrist":

- From 1997-2003, Mr. Stenberg filed at least [64]

- CSI learned of Mr. Stenberg's misconduct in August 2006, when, during his
deposition, Mr. Stenberg was confronted with numerous falsehoods ███████[65]
Despite having Mr. Stenberg's own admissions, CSI's Asst. General Counsel supposedly
conducted an official investigation of Mr. Stenberg's conduct that lasted several months
and delivered the results of that investigation to CSI's General Counsel in or about
December 2006.[66]  CSI then waited more than three months until March 2007, after fact
discovery had closed, to "punish" Mr. Stenberg by requiring him to ██████████
██████████[67]██████████[68] He
remains a CSI executive in charge of the company's entire northeast region and several
account executives working in that region.[69]

So much for Mr. Steinback "sacrific[ing] dollars any time for integrity and goodwill."

---

[63] Bean Aff., Ex. 62.
[64] Fraser Aff., Ex. 23, 123:3-124:5; 184:24-185:7; 188:11-189:22, 193:20-195:10.
[65] Fraser Aff., Ex. 20, 24:15-25:1, 26:25-27:4; Fraser Aff., Ex. 21, 153:16-154:13; Fraser Ex. 23, 3:2-3.
[66] Fraser Aff., Ex. 20, 182:9-184:15.
[67] Bean Aff., Ex. 62. ███████████████████
████████████ Fraser Aff., Ex. 23, 198:24-199:8.
[68] Bean Aff., Ex. 62.
[69] Id.

BST99 1565824-1.057077.0012

## ARGUMENT

I.   **CSI's Motion on Counts I and II Must Be Denied Because (A) CSI Seeks Relief on Claims Lycos is *Not* Asserting; (B) There is a Genuine Issue of Material Fact in Dispute On the Lone Lycos Claim on Which CSI Has Actually Moved; and (C) CSI Has Failed to Move on Several Theories Lycos *is* Asserting.**

    A.   <u>CSI's Motion Should be Denied as Moot as to Theories Lycos is Not Asserting.</u>

In response to a CSI interrogatory that asked Lycos to "state the basis" for its fraudulent and negligent misrepresentation claims in Counts I-III,[70] Lycos provided a detailed, ten-page answer that described, based on the discovery taken to date, all of its claims and supporting evidence therefor.[71] That answer listed three fraudulent/negligent acts of *commission* and seven fraudulent/negligent acts of *omission*, i.e., failure to disclose information CSI had a duty to disclose, with supporting citations to the record.

CSI has moved for summary judgment arguing that it did not have a duty to disclose its gross profits to Lycos and that Lycos could not have relied on Paul Stenberg's admittedly false March 18, 2002 e-mail in entering into refinanced Schedules 93 and 94 in fall, 2001.[72] Yet, nowhere in Lycos's interrogatory answer or anywhere else has Lycos ever made those arguments. As such, CSI's Motion as to those theories must be denied as moot.

    B.   <u>CSI's Motion as to One Claim Lycos is Asserting Must Be Denied because it Fails as a Matter of Law and There is a Genuine Issue of Material Fact in Dispute.</u>

CSI argues that it had "no duty to 'disclose' how much Lycos's total rent would increase under the extension leases because Lycos could calculate that for itself." [sic][73] Implicit in this argument is that if Lycos could *not* have calculated that amount for itself, CSI would have had a duty to disclose it. As set forth more fully below, Lycos could *not* have calculated this amount.

---

[70] Fraser Aff., Ex. 48 at 8-9. [Lycos's Obj. and Responses to CSI's First Set of Ints.]. While this section of Lycos's Memorandum is limited to Lycos's claims for fraudulent and negligent misrepresentation in the refinancing of equipment schedules set forth in Counts I and II, Lycos has also asserted a claim for fraudulent inducement of the Sales Agreement in Count III.
[71] *Id.* at 9-19.
[72] *Id.*
[73] Memorandum at 8.

One of CSI's experts admitted as much.[74]  Thus, even under CSI's construction of the law, it failed to satisfy its duty to disclose.  But more importantly, as this Court held in denying CSI's motion for summary judgment earlier in this litigation, CSI had a duty to disclose as a matter of law *regardless* of whether Lycos could have "done the math" because it told Lycos "half-truths."

1.    Lycos Could Not Have "Done the Math" To Ascertain the Magnitude of the Increase in Rent on the Equipment on Each of the Refinanced Schedules.

CSI claims Lycos could have calculated the difference in rent on each new schedule and compared it with the remaining rents on the schedule(s) being refinanced.  Despite devoting more than four pages of its memorandum to this topic,[75] CSI fails to provide a single example of how Lycos could have done this.  Instead, it blithely and baldly asserts, "Lycos could simply add them up."[76]  As a result of CSI's failure to adduce any specific evidence to support its contention that Lycos could have "done the math," CSI has not even met its threshold burden on summary judgment; this Court should therefore deny the Motion on that basis alone.[77]

The reason CSI did not provide an example of how Lycos could have "done the math" is that it knows, due to the number, structure, and complexity of the refinancings, that Lycos could *not* simply have "added the numbers up."  When many of the schedules were refinanced, the equipment on them was split between two or more successor schedules.  Equipment on these successor schedules was combined with equipment from other schedules so that the equipment on the successor schedules was different from the equipment on a single or even a group of predecessor schedules.  For example, when schedule 43 was refinanced, some of the equipment from that schedule was refinanced onto schedule 66B,[78] some of it was refinanced onto schedule

---

[74]  Fraser Ex. 12, 183:18-184:15; 185:5-192:24.
[75]  Memorandum at 9-13.
[76]  Memorandum at 9.
[77]  *Gillis v. SPX Corp.,* 511 F.3d 58, 65 (1st Cir. 2007) (summary judgment warranted due to nonmovant's failure to provide relevant data); *see* Fed. R. Civ. P. 56(c).
[78]  Bean Aff., Ex. 26 at CSI0029730, ¶ 2.

67A,[79] and the some of it was refinanced onto schedule 68B.[80]  The equipment on schedules 66B, 67A, and 68B was not, however, simply a subset of the equipment that had been on schedule 43.  In addition to the equipment from schedule 43, equipment from schedule 48 was refinanced onto schedule 66B;[81] equipment from schedules 48A and 58 was refinanced onto schedule 67A;[82] and equipment from schedule 48 was refinanced onto schedule 68B.[83]  Pictorially, the refinancing of the equipment on schedule 43, 48, 48A, and 58, looked like this:



Comparing the total rent on schedule 68B with the remaining rent on schedule 43 would have been a comparison between the rent on one set of equipment with the rent on a different set of equipment, an "apples to oranges" comparison.  Even if Lycos had compared the total rents on 66B, 67A, and 68B with the total remaining rents on schedule 43, that would also have been "apples to oranges" because schedules 66B, 67A, and 68B contained equipment that did not come from schedule 43.  Thus, Lycos could *not* have ascertained the aggregate increase in rent from the refinancing of the equipment on schedule 43 simply by "adding up the rents."

The problem was even more pronounced for schedules 93 and 94, schedules which CSI referred to internally as ██████████████████[84]  This was because of the number of schedules involved, the inaccuracies in the list of equipment CSI gave to Lycos, and the staggered manner in which CSI scheduled the equipment to roll onto schedules 93 and 94.  Specifically, CSI

---

[79]  Bean Aff., Ex. 27 at CSI0031370, ¶ 2.
[80]  Bean Aff., Ex. 28 at CSI0010136, ¶ 2.
[81]  Bean Aff., Ex. 26 at CSI0029730, ¶ 2.
[82]  Bean Aff., Ex. 27 at CSI0031370, ¶ 2.
[83]  Bean Aff., Ex. 28 at CSI0010136, ¶ 2.
[84]  Bean Aff., Ex. 68.

split the equipment that rolled onto schedules 93 and 94 not just from one or two schedules, but from *thirty-one* predecessor schedules. CSI then structured the rollover such that some of the equipment from the predecessor schedules rolled onto schedule 94 at the inception of schedule 94, while the balance of the equipment on those schedules rolled onto schedule 93 at a later time.[85] Further, while CSI purported to list the number of the predecessor schedule from which each piece of equipment rolled onto schedule 94,[86] neither CSI nor its expert could find that equipment on the predecessor schedule.[87] Thus, Lycos could not even have found all of the thousands of pieces of equipment on the predecessor schedules never mind compared the rents on schedules 93 and 94 with the predecessor rents. Accordingly, because Lycos could *not* have performed the calculations, CSI's argument fails and its Motion should be denied.

>2.    CSI Had a Duty to Disclose the Difference Between the Total Amount of Rent Lycos Would Pay on the Refinanced Schedules With the Total Amount of Rent it Would Pay for the Same Equipment If Lycos Did Not Refinance.

CSI had a duty to disclose the full impact of the refinancings to Lycos for two reasons: first, because CSI told Lycos half-truths, and second, because Lycos reposed trust and confidence in CSI and CSI voluntarily assumed and accepted that position of trust.[88]

As to the former, this Court previously rejected the same argument of CSI the last time CSI moved for summary judgment:

>CSI's argument that it was under no duty to disclose the full financial impact of the rolled-up schedules is unavailing. Massachusetts law is clear that 'a party who discloses partial information that may be misleading' – such as the representations allegedly made by CSI to Lycos -- 'has a duty to reveal all of the

---

[85] For example, some of the equipment on schedule 67 rolled onto schedule 94 on November 1, 2001, while the balance of the equipment did not roll onto schedule 93 until October 1, 2002. Bean Aff., Ex. 13 at CSI0027565; Bean Aff., Ex. 14 at CSI0027741.

[86] Bean Aff., Ex. 14, CSI10027657-740.

[87] Fraser Aff., Ex. 12, 185:5-192:24; *e.g.*, Fraser Aff., Ex. 20, 314:15-322:17.

[88] *Reed v. A.E. Little & Co.*, 256 Mass. 442, 448-49 (1926); Restatement (Second) of Torts 551(2)(a) provides in relevant part: "(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . (a) matters known to him that the other is entitled to know because of a fiduciary relationship or other similar relation of trust and confidence between them . . . ." This section has been cited with favor by federal and state courts in Massachusetts. *See, e.g., Roadmaster Indust., Inc. v. Columbia Mfg. Co., Inc.*, 893 F. Supp. 1161, 1179 (1995); *Rood v. Newberg*, 48 Mass. App. Ct. 185, 192 (1999).

material facts he knows to avoid deceiving the other party.' <u>V.S.H. Realty, Inc. v. Texaco, Inc</u>., 757 F.2d 411, 414 (1st Cir. 1985); <u>see</u> <u>Zimmerman v. Kent</u>, 575 N.E.2d 70, 76 (Mass. App. Ct.  1991).

Thus, because CSI disclosed only "part of the truth,"[89] i.e., the amount of the rent and term on the new schedules, it had a duty to disclose, and Lycos is not charged with failing to discover,[90] the full financial impact of the refinancings.

With respect to the latter, Lycos's CFO testified that he trusted Mr. Stenberg[91] -- testimony that was corroborated by Lycos's in-house counsel[92] relied on Mr. Stenberg's expertise and integrity to advise Lycos of the full business and financial implications of refinancing equipment schedules, viewed Mr. Stenberg as a business partner, and believed Mr. Stenberg assumed and accepted Lycos's trust in him.[93]  As evidence of CSI's *acceptance* of that trust, Mr. Stenberg wrote in an internal e-mail to CSI early in the parties' relationship saying: ██████████████████████████[94]  Further, CSI specifically evaluated its account executives on their ability to ████████████████████████ at their customers.  Mr. Stenberg was rewarded with a perfect score on his performance evaluation based on this metric.[95]  Accordingly, because CSI had a duty to disclose, CSI's Motion should be denied.[96]

---

[89]  Section 529 of the Restatement (Second) of Torts, which has been cited favorably by both the First Circuit and the Supreme Judicial Court, *V.S.H. Realty, Inc. v. Texaco, Inc*., 757 F.2d 411, 414-15 (1st Cir. 1985); *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708, 711 (1969), provides that a "statement that contains only favorable matters and omits all reference to unfavorable  matters is as much a false representation as if all the facts stated were untrue." *Id*., § 529, cmt. a.

[90]  *V.S.H. Realty,* 757 F.2d at 415 (the "duty [to disclose] to avoid misrepresentation is so strong that the deceived party is not charged with failing to discover the truth.")

[91]  Bean Aff., Ex. 33, ¶¶ 13(A), 16.

[92]  Fraser Aff., Ex. 13 , 168:21-169:24.

[93]  *Id.*

[94]  Bean Aff., Ex. 69 (emphases added).

[95]  Bean Aff., Ex. 74 at CSI044216;  Bean Aff. Ex. 75 at CSI044220; Fraser Aff., Ex. 8, 136:22-137:13.

[96]  As CSI has adduced no evidence demonstrating that Lycos could "do the math" and Lycos has adduced evidence demonstrating it could not, it is undisputed that Lycos could *not* do the math.  Accordingly, and because CSI has had an adequate opportunity to present whatever evidence it has adduced on the defense that it has raised, this Court has the authority to grant summary judgment *to Lycos* on Count I.  *National Expositions v. Crowley Maritime Corp.,* 824 F.2d 131, 133 (1st Cir. 1987) (where party has notice of factual issues and fails to adduce evidence, court can grant summary judgment *sua sponte*).

C.    CSI Has Not Moved For Summary Judgment on Several of Lycos's Claims for Fraudulent and Negligent Misrepresentation.

As noted above, Lycos's claims for fraudulent and negligent misrepresentation in Counts I and II with respect to the refinancings are based on certain fraudulent acts of *commission* and certain fraudulent acts of *omission*. Lycos will not detail all of those here because CSI has moved for summary judgment on only one of the alleged fraudulent acts of *omission* and has failed to move for summary judgment on any of the acts of *commission*.

In brief, Lycos's claims in Counts I-II for fraudulent acts of *omission* on which CSI has not moved include:

1.    CSI had a duty to disclose to Lycos that it had embedded a hidden fee or mark-up in the monthly rents on the refinancings that aggregated $13.708 million. (This is similar to one of the claims on which Lycos has moved for summary judgment and which CSI has opposed, but curiously not a claim on which CSI has moved for summary judgment.) If CSI had disclosed this information, Lycos would not have entered into the refinancings on the terms that it did, would not have paid CSI the $13.708 million in hidden fees and mark-ups,[97] and thus would not have incurred that amount in damages. Contrary to CSI's "straw man" argument, Lycos is *not* seeking to recover as damages the millions of dollars in additional rent it paid on the refinancings because it had the use of the equipment for a longer period of time. Thus, Lycos is *not* seeking to recover CSI's "gross profits."

2.    CSI had a duty to disclose the aggregate original cost of the equipment being rolled onto schedules 93 and 94. CSI disclosed on the original equipment schedules that the aggregate cost to acquire the equipment on each schedule would equal the "Base Value" number appearing on that schedule's Stipulated Loss Value table[98] -- a number on which Lycos relied on in calculating the "equipment value" on internal spreadsheets for both original and refinanced

---

[97]  Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.
[98]  *E.g.,* Fraser Aff., Ex. 52 at CSI0033450, ¶ 5.

schedules.[99]  CSI was thus obliged to disclose (a) that the Base Value on the refinanced schedules did *not* equal the equipment's acquisition cost, and (b) the actual acquisition cost of the equipment on the refinanced schedules.  If it had fulfilled these obligations, Lycos would not have entered into schedules 93 and 94 on the terms that it did[100] and thus would not have paid CSI the more than $7.4 million in hidden fees or mark-ups on those schedules.[101]

Lycos's claims in Counts I-II for fraudulent/negligent acts of commission *on which CSI has not moved* include:

3.    In his March 18, 2002 e-mail, Mr. Stenberg intentionally misrepresented to Lycos both (i) the difference between the amounts Lycos had agreed to pay under schedules 93 and 94 with the amounts Lycos would have been required to pay if it had not entered into those schedules and (ii) the original cost of the equipment.[102]  These misrepresentations succeeded in inducing Lycos not to unwind schedules 93 and 94,[103] something it would have had the right to do because CSI had defrauded Lycos into entering them. (As set forth below, Lycos also relied on this e-mail in entering into the Sales Agreement.)

CSI has not moved for summary judgment on these claims in Count I and II. Accordingly, CSI is not entitled to summary judgment on those Counts.

**II.    CSI is Not Entitled to Summary Judgment on Count III Because (A) There is No Genuine Issue of Material Fact in Dispute in Count III and Lycos Is Entitled to Summary Judgment as a Matter of Law; or (B) There is a Genuine Issue of Material Fact in Dispute.  As Lycos's Claims in Counts IV and V are Derivative of <u>Count III, CSI is Not Entitled to Summary Judgment on Those Counts.</u>**

The gravamen of CSI's argument on Count III is the same as it was the last time the Court denied CSI's summary judgment motion (and motion for reconsideration) on Lycos's claim for fraud in the inducement of the Sales Agreement: Lycos did not rely on Mr. Stenberg's

---

[99]  *See* equipment cost comparison charts, *infra* at 18.
[100]  Bean Aff., Ex. 33, ¶ 18.
[101]  Bean Aff., Ex. 51, Exhibit G thereto.
[102]  Bean Aff., Ex. 51, ¶¶ 36-41.
[103]  Bean Aff., Ex. 11, ¶ 7.

representations and it knew or had reason to know that Mr. Stenberg's statements that the original cost of the equipment exceeded $60 million were false such that its reliance on those misrepresentations was unreasonable.[104]  CSI's arguments fail because: (1) the undisputed evidence is that Lycos did in fact rely on those statements, and the spreadsheets on which CSI now relies show that Lycos did *not* have reason to believe those statements were false (thus entitling *Lycos* to summary judgment on Count III); and (2) at the very least, there is a genuine issue of material fact concerning whether Lycos knew or had reason to know that Mr. Stenberg's statements were false such that the reasonableness of Lycos's reliance on those statements is a question of fact for the jury to decide.[105]

> A.    Not Only Has CSI Not Satisfied Its Burden of Demonstrating that Lycos Had Reason to Know Mr. Stenberg's Misrepresentations Were False, But the Court May Find that Lycos's Reliance was Reasonable and Grant *Lycos* Summary Judgment on Count III.

There is no genuine issue of material fact in dispute as to whether Lycos actually relied on Mr. Stenberg's misrepresentations in entering into the Sales Agreement.  Brian Lucy, who signed the Sales Agreement on behalf of Lycos, filed an affidavit with this Court just months after leaving Lycos in which he testified to his reliance on Paul Stenberg's March 2002 representation that the original cost of the equipment was "around $63 million."[106]  CSI has no evidence to rebut that testimony.  Moreover, numerous internal Lycos e-mails sent in July, 2003 – when Lycos was analyzing whether to enter into the Sales Agreement – directly reflect Lycos's reliance on Mr.

---

[104]  *Compare* Memorandum at 14-16 *with* CSI Mem. Of Law In Support of Mot. For Partial Summ. J. as to Its Complaint and Mot. To Dismiss or for Summ. J. as to the Am. Countercl. of Lycos (Dkt. No. 25) at 11-14
[105]  Mem. of Dec. (Dec. 6, 2005) at 8-11, 13 (Dkt. No. 46).
[106]  CSI argues that because Mr. Lucy did not remember at his deposition Mr. Stenberg's March 18, 2002 e-mail in which Mr. Stenberg represented that the original cost of the equipment was "around $63 million," Lycos could not reasonably have relied on Mr. Stenberg's multiple (mis)representations that the original cost of the equipment exceeded $60 million dollars. Memorandum at 14-15.  CSI's decision to ignore Mr. Lucy's affidavit filed years before his deposition and his affidavit filed after his deposition when his recollection had been refreshed, and instead to focus on his deposition in which it did not provide him with his prior affidavit to refresh his recollection, is disingenuous.  Moreover, that Mr. Lucy did not recall this e-mail on the day of his deposition years later is irrelevant to whether Lycos actually relied on that e-mail at the time in question.

Stenberg's representation to Susan Franklin that the original cost of the equipment was more than $60 million.[107]  Again, CSI cannot rebut this direct and contemporaneous evidence of reliance.

Unable to rebut that Lycos did rely on Mr. Stenberg's misrepresentations, CSI's sole defense to Lycos's fraud in the inducement claim in Count III is that Lycos knew or should have known that Mr. Stenberg's representations were false.  In denying CSI's earlier motion for summary judgment, this Court observed that while CSI was correct that in Massachusetts a party may not claim reasonable reliance where the party could have discovered the falsity through investigation, it noted that such rule applies *only* where the statement at issue is "preposterous or palpably false."[108]  CSI does not even attempt to argue that Mr. Stenberg's misrepresentations to Mr. Lucy were "preposterous" or "palpably false."  As such, CSI's Motion should be denied.

To support its tenuous logic of arguing, in effect, that Lycos knowingly relied on numbers it knew or should have known to be false (Mr. Stenberg's) rather than on numbers it knew or should have known to be true, CSI relies on a spreadsheet (Little Ex. 15) prepared by Lycos's leasing consultant, Susan Franklin.  Review of Little Ex. 15 along with Ms. Franklin's deposition transcript demonstrates that Lycos did *not* have reason to know that Mr. Stenberg's misrepresentations were false and that it was reasonable for Lycos to rely on them.

Ms. Franklin flatly stated under oath that she did *not* know the original cost of the equipment during the time she was negotiating the buyout with CSI,[109] and that she had performed an analysis of only the then "active" lease schedules.[110]  Ms. Franklin's spreadsheet, Little Ex. 15, corroborates her testimony.  The numbers on that spreadsheet in the row to the right of the word "Schedule" demonstrate that she recorded the original equipment cost ("OEC") for fewer than half of the 126 equipment schedules entered between the parties, and that none of

---

[107]  *E.g.*, Fraser Aff., Ex. 41 at LYC 22514 ; Fraser Ex. 60 at LYC 24030-31.
[108]  Mem. of Dec. at 8-9.
[109]  Fraser Ex. 5, 108:12-16.
[110]  Fraser Ex. 5, 262:17-22.

those schedules had a number below 64.[111] Thus, her analysis was, as she testified at her

deposition, merely a "partial" analysis.[112] She, therefore, did not know, and had no reason to

know, the *total* OEC.

Not only was Ms. Franklin's analysis incomplete, but because CSI failed to fulfill its

obligation to disclose to Lycos that "Base Value" did not equal original equipment cost on the

refinanced schedules, Ms. Franklin erroneously used the "Base Value" number as the number for

OEC on both the original and refinanced schedules.[113] The following chart showing a sample of

schedules reflects Ms. Franklin's error due to CSI's non-disclosure:

|  | Equipment Value Listed On Little Ex. 15 | Base Value (as reflected on Stipulated Loss Value Tables) [114] | Actual OEC According to CSI[115] |
|---|---|---|---|
| **Schedule 64D** | $   340,000 | $   340,000 | $   300,179.20 |
| **Schedule 65** | $   672,000 | $   672,000 | ----------------[116] |
| **Schedule 66B** | $   530,000 | $   530,000 | ----------------- |
| **Schedule 66** | $1,440,000 | $1,440,000 | ----------------- |
| **Schedule 66I** | $   985,000 | $   985,000 | $   893,821.79 |
| **Schedule 85** | $2,390,000 | $2,390,000 | $1,234,516.77 |
| **Schedule 86** | $   725,000 | $   725,000 | $1,208,106.78 |

Given that Ms. Franklin knew that a "partial" analysis of the schedules showed an OEC in the mid-

$40 million range, she had "no reason *not* to rely on" Mr. Stenberg's representation that the OEC

for *all* the schedules exceeded $60 million, particularly when Mr. Stenberg had served the Lycos

account for seven years and Ms. Franklin had been consulting to Lycos for only a few weeks.

CSI also argues that Lycos's own spreadsheets (Little Ex. 16-18) demonstrate that Lycos

knew the OEC.[117] As CSI must know from reviewing those spreadsheets, Lycos's spreadsheets

---

[111]  Little S.J. Aff., Ex. 15.  Fraser Ex. 5, 108:15-24.
[112]  Fraser Aff., Ex. 5, 85:3-13.
[113]  *Id. at* 86:3-17, 97:12-22, 100:4-15, 101:22-23, 108:15-24.
[114]  Fraser Aff., Ex. 54.
[115]  Bean Aff., Ex. 66, Exhibit A thereto.
[116]  CSI did not list an original equipment cost for schedules 65, 66, and 68, apparently admitting that it, like Lycos, did not know what the original cost of the equipment was on these schedules.
[117]  Memorandum at 15.

BST99 1565824-1.057077.0012

list fewer than half of the 126 schedules entered into by the parties.[118]  They therefore reflect, as

did Ms. Franklin's analysis, only a "partial" analysis, showing that the OEC for the equipment on

*some* of the schedules appeared to be in the mid-$40 million range.  Moreover, even as to the

schedules that *were* included in the spreadsheet, the OEC is wrong for almost all the refinanced

schedules because Lycos, like Ms. Franklin, used the erroneous "Base Value" numbers for OEC:

|  | Equipment Value On Internal Lycos Spreadsheets[119] | Base Value (as reflected on Stipulated Loss Value Tables) [120] | Actual Original Equipment Cost According to CSI[121] |
|---|---|---|---|
| Schedule 65 | $   672,000 | $   672,000 | ----------------- |
| Schedule 68 | $4,200,000 | $4,200,000 | ----------------- |
| Schedule 69G | $1,031,403 | $1,440,000 | $   860,009.07 |
| Schedule 66 | $1,440,000 | $1,440,000 | ----------------- |
| Schedule 66I | $   985,000 | $   985,000 | $   893,821.79 |
| Schedule 85 | $2,390,000 | $2,390,000 | $1,234,516.77 |
| Schedule 86 | $   725,000 | $   725,000 | $1,208,106.78 |

Simply put, these spreadsheets, which reflect only a partial analysis of assumed OEC numbers

that CSI admits were wrong, cannot possibly support CSI's argument that Lycos knew or should

have known the total OEC.  In fact, because Lycos's records showed an OEC that appeared to be

in the mid-$40 million range for fewer than half of the schedules and because CSI had the total

OEC readily available at the click of a button, it was reasonable for Lycos to believe Mr.

Stenberg's representation that the OEC for *all* the schedules exceeded $60 million.  Accordingly,

CSI's Motion as to Count III should be denied.  Moreover, because the very same documents on

which CSI relies prove that Lycos did *not* know the OEC and that CSI failed to disclose that Base

Value did not equal the OEC on the refinanced schedules, this Court should exercise its discretion

to grant summary judgment to *Lycos* on Count III.[122]

---

[118]  *See* Little Aff., Exs. 16-18, which start at schedule 61, and thus includes no information from schedules 1-60.
[119]  Little Aff., Exs. 16-18.
[120]  Fraser Aff., Ex. 53.
[121]  Bean Aff., Ex. 66, Exhibit A thereto.
[122]  *See* note 96, *supra*.

    B.    There is a Genuine Issue of Material Fact in Dispute Concerning
          Whether Lycos Knew or Had Reason to Know Mr. Stenberg's
          <u>Representations Were False.</u>

At a minimum, the above facts demonstrate that there is a genuine issue of material fact in

dispute as to whether Lycos knew or should have known that Mr. Stenberg's misrepresentations

were false.  As this Court held in denying CSI's earlier motion for summary judgment on Lycos's

fraudulent and negligent misrepresentation claims, "[r]eliance is generally a question of fact for

the jury. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 16 (1st Cir. 2004)."[123]

CSI's Motion on Count III should be denied on this ground alone.

**III.    As Counts IV and V of Lycos's Counterclaim are Derivative of Count III, CSI Is Not
          Entitled to Summary Judgment on Counts IV or V and the Court May Exercise its
          <u>Discretion to Grant Summary Judgment *to Lycos* on Both Counts.</u>**

Lycos brought Count IV under M.G.L. c. 231, § 85J, a statute that provides for treble

damages for fraud or deceit in the sale of personal property.  If, as Lycos claims in Count III, CSI

fraudulently induced it to purchase personal property, i.e., computer equipment, pursuant to the

Sales Agreement, Lycos will automatically be entitled to treble damages under this statute.

Lycos brought Count V under c. 93A, §§ 2 and 11.  If CSI fraudulently induced Lycos to

enter into the Sales Agreement or if it violated section 85J in connection therewith, it necessarily

violated 93A as well.[124]  As both Counts IV and V are derivative of Count III and CSI is not

entitled to summary judgment on Count III, it is not entitled to summary judgment on Counts IV or

V either, and because, for the reasons set forth above, *Lycos* is entitled to summary judgment on

Count III, the Court should grant Lycos summary judgment on Counts IV and V as well.

**IV.    Lycos Is *Not* Seeking Relief in Count VI for Breach of Implied Covenant of Good Faith
          <u>and Fair Dealing on the Theory on Which CSI Has Moved for Summary Judgment.</u>**

According to CSI, Lycos contends CSI acted in bad faith by failing to disclose certain

aspects of its profits under the refinanced schedules, making alleged misrepresentations about

---

[123]  Mem. of Dec. at 8.
[124]  *Briggs v. Carol Cars, Inc.*, 407 Mass. 391, 396, 553 N.E.2d 930, 933 (1990).

BST99 1565824-1.057077.0012

those transactions, and proposing unreasonable base value and stipulated loss value percentages.[125] It then argues that because a claim for breach of the implied covenant of good faith and fair dealing applies only to acts taken during the *performance* or *administration* of a contract[126] rather than acts taken *before* the contract is formed, it is entitled to summary judgment.[127]  (Tellingly, CSI failed to advise the Court of this case law with respect to its own breach of the implied covenant claim against Lycos – which is based on the allegation that *Lycos* fraudulently induced CSI to enter into the Sales Agreement.)[128]  However, Lycos's claim for breach of the implied covenant of good faith and fair dealing is in fact based on CSI's bad faith in the performance and administration of the Master Lease Agreement and the equipment schedules.

The First Circuit has held that the implied covenant of good faith and fair dealing prohibits a party to a contract from "doing anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of" that contract.[129]  Similarly, this Court has observed that the "covenant operates 'to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.'"[130]

Here, Lycos's claim concerns CSI's actions in proposing that Lycos refinance an existing equipment schedule in the middle of a lease term to lower its monthly rent *without* making the disclosures addressed above.  In so doing, CSI deprived Lycos of its contractual right to permit the leases to run to term by paying the somewhat higher monthly rent with the significantly lower aggregate cost, i.e., *without* the millions in hidden fees or mark-ups.  In other words, CSI's misrepresentations and failure to disclose the mark-ups and other information described above

---

[125]  Memorandum at 17-20.
[126]  *Linton v. New York Life Insurance and Annuity Corporation*, 392 F. Supp. 2d 39, 42 (D. Mass. 2005) (Zobel J.)
[127]  Memorandum at 16-19.
[128]  CSI's Opp'n to Lycos's Mot. for Summ. J. on all Counts of CSI's Am. Compl. at 21.  Thus, CSI has simply highlighted the failure of its claim against Lycos.
[129]  *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001); *see also Acetylene v. Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. App. 1996) (prohibiting party from acting "in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract").
[130]  *Linton*, 392 F. Supp. 2d at 42.

BST99 1565824-1.057077.0012

deprived Lycos of the right to obtain the fruits, i.e., the use of the equipment at the *non-marked-up rent payments*, on the existing equipment schedules for the remainder of the lease terms. CSI's Motion as to Count VI should therefore be denied.

**V.    CSI Is Not Entitled to Summary Judgment on Count VII, Lycos's Claim that CSI Violated M.G.L. c. 93A, §§ 2 and 11 in Fraudulently Inducing Lycos to Enter into the Refinancings and the Sales Agreement.**

CSI makes a hodgepodge of arguments to supports its contention that it is entitled to summary judgment on Lycos's claim in Count VII for violation of M.G.L. c. 93A, §§ 2 and 11. In short, it maintains that (a) 940 CMR §§ 3.05(1) and 3.16(2) (the "Regulations") do not apply to "sophisticated" businesses,[131] (b) it disclosed all the information it was required to disclose under the common law, (c) Lycos knew the OEC and the value of the equipment when it entered into the Sales Agreement in June, 2003, (d) it did not behave in a "rascalous" manner, and (e) even if CSI had done some things wrong, those wrongs did not "cause" Lycos any damages. Lycos will dispose of these arguments seriatim.

First, CSI's argument that the Regulations do not apply to "sophisticated" businesses fails as a matter of law and fact. With respect to the law, which Lycos has addressed in greater detail in its Memorandum in Support of its Motion for Summary Judgment on Certain of its Claims in Counts VII, XII, and XIII against CSI  (Dkt. No. 148), the First Circuit has observed that "[s]ophistication of the parties is not mentioned in 93A and the amendment of 93A to cover business entities did not limit the statute's protection to small, unsophisticated businesses."[132] Thus, it has applied the Regulations to businesses without discussing their level of sophistication.[133] Not only has CSI cited no law to support its assertion that the Regulations are limited to "unsophisticated" businesses, but there is nothing in the language of the Regulations, which were promulgated under section 2(c) of

---

[131] By distinguishing between "sophisticated" and "unsophisticated" businesses, CSI is apparently conceding that the Regulations do apply to some businesses and therefore to the business-to-business context.
[132] *V.S.H. Realty,*, 757 F.2d at 418.
[133] *Id.*

93A,[134] to suggest that they should be construed more narrowly than the statute itself. Indeed, the Massachusetts Attorney General, who promulgated the Regulations and whose interpretation of them is entitled to "substantial deference"[135] and will be overturned only if it is "arbitrary, unreasonable or inconsistent with the plain terms of the rule itself,"[136] has construed the Regulations as applying to businesses generally.[137]

Even if the Regulations were limited in their application, there is a genuine issue of material fact in dispute concerning whether Lycos was "sophisticated" with respect to equipment leasing. Based on his review of the one-sided Master Lease Agreement between CSI and Lycos, CSI's expert opined that Lycos was either "unsophisticated" about equipment leasing or "didn't care" about it.[138] As evidenced by its modification of certain relatively minor provisions of the Master Lease Agreement[139] and the testimony of its CFO who signed that Master Lease Agreement,[140] Lycos *did* care – leading to the inexorable conclusion of CSI's own expert that Lycos was unsophisticated with respect to equipment leasing. Of course, if Lycos *were* sophisticated with respect to equipment leasing, it would have known better than to pay over $73 million in rent for equipment that originally cost $45 million. This is a classic case where the "proof is in the pudding."

Second, as set forth in Part I above, Lycos's claims in Count I for fraudulent misrepresentation survive summary judgment. As such, to the extent Lycos's 93A claim is derivative of those claims, it, too, survives.

Third, as set forth in Part II above, Lycos was unaware of the original cost of the equipment at the time it entered into the Sales Agreement.

---

[134]  940 C.M.R. §§ 3.05, 3.16; *see also Aspinall v. Philip Morris Companies*, 442 Mass 381, 96 n. 18, 813 N.E.2d 476, 488 (2004); *Greenery Rehabilitation Group v. Antaramian*, 36 Mass. App. Ct. 73, 78, 628 N.E.2d 1291, 1294 (1994) (cited with approval in *Aspinall*).
[135]  *Smith v. Winter Place LLC*, 447 Mass. 363, 367-68, 851 N.E.2d 417, 421 (2006).
[136]  *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 782 407 N.E.2d 297, 310 (1980).
[137]  Bean Aff., Ex. 40.
[138]  Fraser Aff., Ex. 12, 153:17-154:1.
[139]  Fraser Aff., Ex. 18, 29:5-24; Little Decl. Ex. 1 at ¶¶ 2.2 and 10.1.
[140]  Fraser Aff., Ex. 18, 28:15-20.

BST99 1565824-1.057077.0012

Fourth, with respect to CSI's "rascality," the First Circuit has observed that "[o]ne can commit a chapter 93A violation without behaving like a 'rascal,' if one violates consumer protection or public safety laws" such as 940 C.M.R. 3.16.[141] It has similarly observed that "in [*Sheehy* and] other cases where a court found chapter 93A liability for violations of Mass. Regs. Code tit. 940, § 3.16(2), no mention was made of the 'rascality' standard."[142] Thus, because Lycos is not required to prove rascality under the Regulations, and a violation of the Regulations is a per se violation of c. 93A,[143] Lycos is not required to prove "rascality" to obtain a judgment under c. 93A for violation of the Regulations.

That said, CSI's rascality in this case is *overwhelming*. For a list of just *some* of CSI's "rascalous" conduct, see the "Facts" of this Memorandum. This pattern of unfair and deceptive conduct would raise the eyebrow of even one inured to the rough and tumble of commerce.[144]

Finally, CSI argues that "Lycos cannot demonstrate that CSI's actions caused Lycos any harm."[145] This is just silly. Lycos has already adduced evidence that it would not have entered into the refinancings on the terms that it did if CSI had disclosed the hidden fees or mark-ups,[146] and thus would not have paid $13.708 million in such hidden fees or mark-ups. Lycos's payment of those fees or mark-ups, which were directly "caused" by CSI's fraudulent or negligent acts of omission and commission, represent Lycos's damages under those theories. As to the Sales Agreement, if CSI

---

[141] *Cablevision of Boston v. Public Improvement Comm'n of Boston,* 184 F.3d 88, 106 (1st Cir. 1999) (citing 940 C.M.R. 3.16); *J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 144 (D. Mass. 2005)

[142] *Brennan v. Carvel Corp.*, 929 F.2d 801, 813 (1st Cir. 1991); *Commonwealth v. AmCan Enters.*, 47 Mass. App. Ct. 330, 335-36, 712 N.E.2d 1205, 1209-10 (Mass. App. Ct. 1999) (affirming summary judgment against a business for violating the Regulations without discussing rascality).

[143] *Aspinall v. Philip Morris Companies,* 442 Mass. 381, 396 n.18, 813 N.E.2d 476, 488 n.18 (2004) (quoting *Purity Supreme, Inc. v. Attorney Gen*., 380 Mass. 762, 769-71, 407 N.E.2d 297, 304 (1980)); *see Greenery Rehabilitation Group v. Antaramian*, 36 Mass. App. Ct. 73, 78, 628 N.E.2d 1291, 1294 (1994) ("One can violate § 2 of G.L. c. 93A, as interpreted in 940 Code Mass. Regs. § 3.16(2) . . . by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase."), *cited with approval* in *Aspinall*, 442 Mass. at 395, 813 N.E.2d at 487.

[144] *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149 (1979) ("objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce").

[145] Memorandum at 22.

[146] Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.

BST99 1565824-1.057077.0012

had made the requisite disclosures and/or had Mr. Stenberg not misrepresented the original cost of the equipment in his March 2002 e-mail and again in his conversation with Ms. Franklin, Lycos would not have paid CSI an additional $3.775 million pursuant to that Agreement.[147]  There is no question that CSI's fraudulent acts of commission and omission caused Lycos substantial harm.

## VI.    CSI Is Not Entitled to Summary Judgment on Lycos's Counterclaim for Money Had and Received and Unjust Enrichment in Counts XII and XIII.

Lycos's claims in Counts XII and XIII for money had and received and unjust enrichment are based on three theories.[148]  The first theory – one on which the Court has already ruled in Lycos's favor in denying CSI's last motion for summary judgment – is that if Lycos were to prevail on its claim in Count I for fraud in the inducement, it would be entitled either to rescind the equipment schedules and Sales Agreement and seek restitution, or seek damages in tort.[149] The second theory, which Lycos has discussed in some detail in its own summary judgment motion, is that because schedules 93 and 94 were, by operation of law, installment sales contracts under the section 1-201(37) of the Uniform Commercial Code, Lycos paid twice to purchase the equipment on those schedules such that it is entitled to the portion of the $3.775 million paid pursuant to the Sales Agreement allocable to schedules 93 and 94.[150]  The third theory is that Lycos paid CSI more than $73 million to rent, and an additional $3.775 million to purchase, equipment that had an original cost of $45 million.  CSI's Motion addresses only the second of these theories.  On that basis alone, CSI's Motion with respect to Counts XII and XIII must be denied.  Lycos will nevertheless address each theory.

---

[147]  Bean Aff., Ex. 33, ¶ 23.
[148]  CSI makes a fourth argument related to rescission based on claims Lycos is again not asserting.  Memorandum at 24-25.  It argues that Lycos's right to rescind depends on its characterization of the original and refinanced equipment schedules as loans rather than leases.  That is not true.  Lycos's right to rescind has nothing to do with whether the original or refinanced schedules were leases or loans.  As the Court properly observed, Lycos's rescission claim is based on CSI's fraudulent inducement of the refinanced schedules and the Sales Agreement. Mem. of Dec. at 14-15.  Again, CSI sets up a straw man for the purpose of knocking it down, thus implicitly admitting the weakness of its arguments as to the claims Lycos is actually asserting.
[149]  Mem. of Dec. at 15.
[150]  Lycos's Mem. in Support of Partial Summ. J. at 26-30 (Dkt. No. 148).

BST99 1565824-1.057077.0012

A.    As CSI is Not Entitled to Summary Judgment on Lycos's Fraud in the Inducement Claim, It is Not Entitled to Summary Judgment on Lycos's Claims for Unjust Enrichment and Money Had and Received.

Because the Court has already ruled in Lycos's favor on this issue, Lycos will simply

quote the paragraph from the Court's earlier decision:

> Lycos's counterclaim also seeks return of the money already paid by Lycos to CSI under theories of money had and received and unjust enrichment. CSI moves to dismiss these claims, arguing that such claims are unavailable where the defendant was paid pursuant to a contract. As Lycos points out, however, were Lycos to prevail on its claim for fraud in the inducement, the agreements would be voidable. See Nash v. Trs. Of Boston Univ., 946 F.2d 960, 966-67 (1st Cir. 1991); Yorke v. Taylor, 124 N.E.2d 912, 914-15 (Mass. 1955). Lycos would then be entitled either to rescind the lease schedules and Sales Agreement and seek restitution, or to seek damages in tort, since fraud in the inducement may serve as a basis for either tort liability or for rescission. See Kenda Corp. v Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 224 (1st Cir. 2003). Because the election of remedy is generally made after a verdict is entered, see Dopp v. HTP Corp., 947 F.2d 506, 515 (1st Cir. 1991), Lycos is entitled to pursue those counts of its counterclaim. Accordingly, the motion to dismiss or for summary judgment is denied as to Counts [XII and XIII].[151]

B.    CSI's Defenses to Lycos's Argument that Schedules 93 and 94 Were Installment Sales Contract Are Meritless.

As Lycos argued in its motion for summary judgment, because schedules 93 and 94 were

installment sales contracts within the meaning of section 1-201(37) of the Uniform Commercial

Code (indeed, CSI booked them on a "Sales Type" Lease Journal Entry[152] and referred to the

income from them as "interest" and "principal"),[153] Lycos became the owner of the equipment on

schedules 93 and 94 when it entered into those schedules. CSI admits that Lycos made all the

payments due under those schedules.[154] Because, as a matter of law, Lycos became the owner of

the equipment when it entered into those schedules, the portion of the $3.775 million Lycos

subsequently paid CSI under the Sales Agreement that is allocable to those schedules represented a

---

[151]  Mem. of Dec. at 14-15. Note: the Court's decision refers to Counts VI and VII. Those were the numbers of the Counts in Lycos's Counterclaim in effect at the time the Court rendered its decision. Since then, Lycos filed a new Counterclaim in response to CSI's Amended Complaint in which the Counts for unjust enrichment and money had and received became Counts XII and XIII.

"double-payment" that CSI should return to Lycos.[155]  CSI makes three arguments in response but does not refute Lycos's contention that schedules 93 and 94 were installment sales contracts.

First, CSI contends that Lycos received "valuable consideration" in the form of reduced monthly rents[156] -- sometimes by a few hundred dollars[157] -- that somehow justifies the $13.708 million in hidden fees or mark-ups.  While CSI may think saving a few hundred or thousand dollars per month is "valuable consideration" as compared with $13.708 million in hidden fees or mark-ups, that is for a jury to decide.[158]

With respect to the Sales Agreement, CSI's suggestion that the Court and a jury should overlook its failure to disclose hidden fees or mark-ups and Mr. Stenberg's lies because it reduced its purchase price by $800,000 (but only after Lycos threatened to audit the CSI-Lycos relationship),[159] is basically saying, "Lycos's claim should be dismissed because CSI did not defraud it out of as much money as it originally planned after CSI determined that Lycos might catch on to its wrongdoing with an audit."  CSI's reduction in the sales price from $4.69 million to $3.775 million was underwhelming given that it had authorized Mr. Stenberg to sell the equipment for as low as ▮▮▮▮▮[160] after having already received $73 million in rent for equipment that originally cost $45 million.  Again, it is for a jury to decide whether, in good conscience, CSI should be permitted to have abused Lycos as it did.

---

152  Bean Aff., Exs. 83-84.
153  Fraser Aff., Ex. 51.
154  Fraser Aff., Ex. 20, 450:5-10; CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121).
155  Put another way, if Lycos effectively purchased the equipment when it entered into schedules 93 and 94, then the Sales Agreement, as it relates to those schedules, would necessarily be unenforceable for lack of consideration and Lycos would entitled to the return of the monies paid with respect thereto.
156  Memorandum at 23.
157  For example, when Lycos refinanced the equipment on schedule 64A onto schedule 64D, its monthly rent declined by less than $800, from $12,219 to $11,428.  Similarly, when Lycos refinanced schedule 64C onto schedule 64F, its monthly rent declined from $6,188 to $5,545. Fraser Aff., Ex. 31.
158  *See, e.g., O'Keefe v. McDonnell Douglas Corp.*, 918 F. Supp. 1338, 1344 (E.D. Mo. 1996) (party who received money to which it was not entitled was subject to claim for unjust enrichment); *Blue Cross Health Srvs., Inc. v. Sauer*, 800 S.W.2d 72, 76 (Mo. App. 1990) ("The appropriate action when one party has been unjustly enriched through the mistaken payment of money by the other party is an action at law for money had and received.").
159  Fraser Aff., Ex. 56.
160  Fraser Aff., Ex. 23, 277:19-278:2.

Second, CSI argues Lycos should be estopped from advancing the argument that schedules 93 and 94 were installment sales contracts because Thomas Guilfoile, a non-lawyer, former Lycos employee, testified that he thought the transactions "were leases, not loans."[161]  As a threshold matter, Mr. Guilfoile was not even involved with leasing at Lycos when schedules 93 and 94 were signed.[162]  As such, he has no personal knowledge and is not competent to render an opinion on whether those schedules were leases or loans.  More importantly, however, the test of whether schedules 93 and 94 were leases or loans is an objective one under 1-201(37).[163]  Even if Mr. Guilfoile were competent, his "opinion" is legally irrelevant.

Finally, CSI contends that Lycos should be equitably estopped from arguing that schedules 93 and 94 were conditional sales contracts because it accounted for them as operating leases, and because Lycos agreed in the Sales Agreement that the equipment schedules referenced therein were leases.[164]  To make out a claim for equitable estoppel under federal common law,[165] Massachusetts law,[166] and Missouri law,[167] CSI is required to satisfy four elements: (1) Lycos must have known the facts; (2) Lycos must have intended that CSI act upon its conduct;  (3) CSI must have been ignorant of the true facts; and (4) CSI must have relied on the estopping conduct to its detriment.  CSI cannot satisfy *any* (nor did it try in its Memorandum), let alone *all*, of these elements.

First, CSI not only admits in its Memorandum, but *argues*, that Lycos represented in its *internal* accounting records that its transactions with CSI were leases.  As such, CSI has

---

[161]  Memorandum at 25-26.

[162]  Fraser Aff., Ex. 9, 171:1-172:4; 174:10-17.

[163]  *In re PSINet, Inc.*, 271 B.R. 1, 44 (S.D.N.Y. 2001) ("The intent of the parties at the time the agreement was entered into is irrelevant to the determination of whether a true lease has been established."); *Carlson v. Giachetti*, 35 Mass. App. Ct. 57, 616 N.E.2d 810, 813 (1993) (same).  Official Cmt. (1987) ("Reference to the intent of the parties to create a lease or security interest has led to unfortunate results.").

[164]  Memorandum at 25-26.

[165]  *Plumley v. S. Container*, 303 F.3d 364, 374 (1st Cir. 2002) (citations omitted).

[166]  *Boutilier v. John Alden Life Ins.*, 2000 WL 1752623, *9 (D. Mass. 2000).

[167]  *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 133 (Mo. 2007). While *Ethridge*  did not list detrimental reliance as an elements, other decisions of Missouri appellate courts have.  *See, e.g., Littlefield v. Edmonds*, 172 S.W.3d 903, 908 (Mo. Ct. App. 2005).

BST99 1565824-1.057077.0012

not presented, and will not be able to present, any evidence demonstrating that Lycos had knowledge of facts that would render schedules 93 and 94 loans.

Second, because Mr. Stenberg has admitted that *CSI did not even know Lycos's tax and accounting treatment of the leases*,[168] CSI cannot show that Lycos took any action demonstrating an intent that CSI act on its tax and accounting treatment of schedules 93 and 94.

Third, CSI did not even know how Lycos was treating schedules 93 and 94 for accounting purposes. Thus, there is no basis for it to contend that it took any action based on Lycos's treatment of them as leases, let alone any action that was detrimental to it.

Fourth, in terms of knowing the "true facts," CSI booked schedules 93 and 94 as "sales" type leases,[169] and even referred to the monies it was earning from them in an internal analysis as "principal" and "interest."[170]  CSI itself has argued in this case that the terms "principal" and "interest" are "loan," not "lease," terms.[171]

CSI's equitable estoppel defense thus fails.[172]

## C.    CSI Does Not Even Address Lycos's Theory that CSI Was Unjustly Enriched Because Lycos Dramatically Overpaid It.

That Lycos paid CSI over $76.775 million to lease and then purchase equipment that originally cost $45 million, resulting in CSI obtaining almost double its customary rate of return on the refinanced equipment schedules,[173] shocks the conscience.  As such, CSI's retention of the $13.708 million in hidden fees or mark-ups, and retention of the full $3.775 million purchase price for the equipment, would constitute "retention of money or property of another against the

---

[168]  Fraser Aff., Ex. 23, 72:13-24.
[169]  Bean Aff. Exs. 83-84.
[170]  Fraser Aff. Ex. 51.
[171]  CSI's Opp. to Lycos's Motion for Partial Summ. J. as to Counts VII, XII, and XIII of its Countercl., at 2-3 (Dkt. No. 163).
[172]  While CSI cites an *In re Martin Bros. Toolmakers, Inc.,* 796 F.2d 1435 (11th Cir. 1986), an Eleventh Circuit case, the party claiming estoppel in that case would have suffered significant prejudice as a result of treating the transactions as loans rather than leases—namely the loss of rights it had to remove tenants and relet the premises and otherwise "significantly reduce its ability to generate industrial development." *Id.* at 1441. Here, CSI's only detriment would be an adverse ruling from the court that recognizes the economic realities, i.e., these were loans and not leases of the transactions. Yet, adverse rulings from a court are by their very nature detrimental. Lycos can hardly be said to have reaped a benefit by paying exorbitant mark-ups, and CSI's "detriment" is one of its own making because it was the one who structured the transactions and charged the mark-ups. CSI also reaped significant financial rewards from the transactions, regardless of whether they are leases or loans, particularly in light of the fact that even if the Court awards Lycos the damages it has requested on summary judgment, CSI will still earn its usual and customary rate of return on the Lycos transactions.
[173]  Bean Aff., Ex. 51, ¶ 35. Fraser Aff., Ex. 21, 103:22-104:20.

BST99 1565824-1.057077.0012

fundamental principles of justice or equity and good conscience."[174]  CSI has not even sought

summary judgment on this theory, and is therefore not entitled to it.

**VII.    As CSI's Claims for Fraudulent and Negligent Misrepresentation in Counts I-III Survive Summary Judgment, Lycos's Claim in Count XIV Survives Summary Judgment.  Additionally, CSI Is Not Entitled to Summary Judgment on Count XV.**

In Count XIV, Lycos seeks a declaration that, due to CSI's fraud, Lycos does not owe

additional money to CSI, i.e., for non-payment under schedules 100 and 200.  The Court's decision

denying CSI's last motion for summary judgment disposes of CSI's motion on this Count:

> . . . if Lycos prevails on its fraud in the inducement claim, it will be entitled to rescind the contract, in which case the 'hell or highwater' clause like all of the other contract provisions, will be void. . . . Because material facts remain in dispute as to whether Lycos has a defense to or is entitled to rescind the agreements, summary judgment on CSI's complaint is inappropriate and the motion is therefore denied.[175]

In Count XV, Lycos seeks a declaratory judgment that Lycos is the owner of the

equipment under all of the schedules other than 100 and 200 by virtue of having made all of the

payments owed to CSI under those schedules.  That relief is based on the plain language of the

Sales Agreement that repeatedly states that title to the equipment on each schedule would pass to

Lycos free and clear upon Lycos's completion of the payments on that schedule.[176]  In other

words, Lycos does not need to make all the payments on all the schedules to take title to the

---

[174] *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005) (quoted by CSI in its Memorandum at 23).

[175] Mem. of Dec. at 16-17.

[176]  "Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules . . . effective on their respective termination dates, except as stated in paragraph 5 below . . . ." (Sales Agreement, ¶ 1);

"Each Lease will terminate on its respective Terminate Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease." (Sales Agreement, ¶ 2  Paragraph 2 states lists the "Termination Date" for each schedule);

"With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date." (Sales Agreement, ¶ 5);

" . . . (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all liens, claims and encumbrances of any kind except those caused or incurred by Buyer, if any . . ."  (Sales Agreement, ¶ 7).

equipment on which it did make all the payments. CSI has admitted that Lycos made all payments required under all schedules other than 100 and 200.[177] Thus, title passed to Lycos long ago with respect to the equipment on all of the schedules other than 100 and 200. As Lycos is the owner of the equipment on those schedules, CSI's motion for summary judgment on Count XV should again be denied.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety, and Lycos should be granted summary judgment on Counts III, IV, and V hereunder.

                                        LYCOS, INC.

Dated: February 29, 2008                /s/ Thomas O. Bean
                                        Thomas O. Bean (BBO# 548072)
                                        Peter M. Acton, Jr. (BBO# 654641)
                                        McDERMOTT WILL & EMERY LLP
                                        28 State Street
                                        Boston MA 02109
                                        (617) 535-4000

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2008, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

                                        /s/ Peter M. Acton, Jr.
                                        Peter M. Acton

---

[177] Fraser Aff., Ex. 20, 450:5-10 ; CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121).

BST99 1565824-1.057077.0012