## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., )<br><br>Plaintiff and Defendant )<br>In Counterclaim, )<br><br>v. )<br><br>LYCOS, INC., )<br><br>Defendant and Plaintiff )<br>In Counterclaim, )<br><br>BANK OF AMERICA f/k/a FLEET BANK, )<br><br>Trustee Process Defendant. ) | C.A. No. 05-10017-RWZ<br><br><br>**REDACTED- WILL FILE UNREDACTED VERSION IF COURT GRANTS MOTION TO IMPOUND FILED FEBRUARY 28, 2008** |

### LYCOS'S (1) RESPONSE TO CSI'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT DISMISSING LYCOS'S REMAINING COUNTERCLAIMS, AND (2) MOTION TO STRIKE CERTAIN PORTIONS OF THAT STATEMENT

Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby responds to CSI's Local Rule 56.1 Statement In Support of its Motion for Summary Judgment (the "Statement") (Dkt. No. 181) and moves to strike certain allegations in that Statement on the grounds that they lack any citation to record evidence or cite to material that is inadmissible on summary judgment.[1]

## I.    BRIEF BACKGROUND OF LYCOS

1.    Lycos's Response:  Disputed; move to strike.  CSI's sole support for its assertions

---

[1]  Most of the citations herein refer to exhibits already filed with the Court, as follows: (1) Affidavit of Thomas O. Bean ("Bean Aff.") (Dkt. No. 149); (2) Affidavit of Peter M. Acton, Jr. ("Acton Aff.") (Dkt. No. 145); (3) the Declaration of Edward W. Little, Jr. ("Little Decl.") (Dkt. No. 168); and (4) Affidavit of Edward W. Little, Jr. ("Little S.J. Aff.") (Dkt. No. 182).  Materials cited herein that have not previously been filed with the Court on summary judgment are attached to the Affidavit of James M. Fraser ("Fraser Aff."), filed herewith.

in paragraph 1 is a book written by Lycos's former CEO, Robert Davis, after he left Lycos.  As the statements in that book are being offered for the truth of the matters asserted by an out-of-court declarant, were not signed under the pains and penalties of perjury (or otherwise), and were made after the author ceased serving as an officer of Lycos, they are inadmissible on summary judgment.  *Davila v. Corporacion de Puerto Rico*, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment."); *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (unsworn materials could be not be considered for summary judgment); *Reed Paper Co. v. Proctor & Gamble Distributing Co.*, 144 F.R.D. 2, 5 (D. Me. 1992) ("If the corporation is to be accountable for what was said, the person examined must have been an officer, director, or managing agent at the time the deposition was taken.").  Thus, the factual assertions in paragraph one must be stricken.

2.    Lycos's Response:  Disputed; move to strike.  Again, CSI relies exclusively on an unverified book for the truth of the matters asserted therein written after the author had left Lycos.  Accordingly, the factual assertions in this paragraph are not admissible on summary judgment and must be stricken.

3.    Lycos's Response:  Disputed; move to strike.  The allegations in the first sentence of paragraph 3 must be stricken for the same reason that the facts in paragraphs 1 and 2 must be stricken.

4.    Lycos's Response:  Disputed.  Lycos disputes that it (a) ever had an in-house legal department of as many as six attorneys,[2] and (b) that it had in-house legal counsel when it signed the Master Lease Agreement; it did not.[3]  Further, CSI's expert on industry standards has written that "even lessees who have negotiated several leases of various types of equipment in past years find themselves at a disadvantage in that their opponents are generally professionals who make

---

[2]  Fraser Aff., Ex. 18, 240:8-20.

BST99 1565838-1.057077.0012

their living negotiating equipment leases."[4]  That expert wrote further that "[u]nless finance and legal are well-versed in the subtleties of high-technology leasing, they will generally miss the import of a number of provisions, no matter how skilled they are."[5]  The same CSI expert concluded that Lycos was unsophisticated with respect to equipment leasing.[6]  Lycos's Chief Financial Officer[7] who signed the Master Lease Agreement in December 1996[8] had never been involved in any aspect of leasing equipment prior to joining Lycos a year earlier,[9] and first became involved in leasing shortly before signing the Master Lease Agreement with CSI.[10]

    5.    Lycos's Response:  Disputed; move to strike. The e-mail and testimony from the deposition of Sam Ziba do not support CSI's assertion concerning "persuading" CSI to sell Lycos leased equipment or making "several hundreds of thousands" of dollars on the resale of that equipment.  Accordingly, the allegations of this paragraph should be stricken.  *See, e.g., Rand v. M/A-Com, Inc.,* 824 F. Supp. 242, 266 (D. Mass. 1992) (striking 56.1 statement to the extent it was based on inaccurate citations).

## II.    THE LYCOS-CSI RELATIONSHIP

### A.    The Master Lease Schedules and Lycos's Business Experience

    6.    Lycos's Response:  Undisputed.

    7.    Lycos's Response:  Partially disputed; move to strike.  Lycos does not dispute the portion of the Master Lease Agreement quoted in the first sentence of paragraph 7.  The factual allegations of the second sentence are unsupported by any citation to the record and must be stricken.  *See, e.g., O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006)

---

[3]  *Id.* at 236:4-237:2.
[4]  Fraser Aff., Ex. 12, 52:7-12.
[5]  *Id.* at 44:9-14.
[6]  Fraser Aff., Ex. 12, 153:17-154:1.
[7]  Fraser Aff., Ex. 18, 16:5-8.
[8]  *Id.* at 28:9-23.
[9]  *Id.* at 20:22-24.
[10]  *Id.* at 25:15-26:6.

BST99 1565838-1.057077.0012

(striking unsupported assertions of fact from summary judgment record); *Powell v. City of Pittsfield*, 143 F. Supp. 2d 94, 101 n.1 (D. Mass. 2001) ("in accord with Local Rule 56.1, the court has had to ignore proffered 'facts' that contain no record citation").

Lycos does not dispute that it refinanced schedules in the middle of the lease term, e.g., refinancing schedules at least six months before the scheduled end of the term, but it does dispute that these refinancings simply "extended" the lease term. Instead, the leases being refinanced were terminated early and new leases were signed.[11] CSI admits in paragraph 13 of its Statement that these were "new" leases. Indeed, in most instances, the refinancings did more than simply terminate the existing lease and create a new lease; they split equipment from one schedule and combined it with equipment from other schedules. For example:

- the equipment on schedule 19 was combined with the equipment on schedules 21, 22, 23, 26 and 30 and refinanced onto schedule 43 at least six months before each of the schedules being refinanced was scheduled to terminate;

- the equipment on schedule 43 was then split and refinanced onto schedules 66B, 67A, and 68B, again more than six months before schedule 43 was scheduled to terminate; and

- finally, the equipment on schedules 66B, 67A, and 68B – some of which started out on schedule 19 – was refinanced onto schedules 93 and 94. Schedules 93 and 94 terminated on October 31, 2003 and October 31, 2004, respectively.[12]

8.    <u>Lycos's Response</u>:  Disputed; move to strike. The factual assertions in the first sentence are unsupported by citation to the record and must be stricken. *Powell,* 143 F. Supp. at

---

[11]  *See, e.g.,* Bean Aff., Ex. 22, at CSI0007677, ¶ 2; Bean Aff., Ex. 78. CSI account code 12550 on CSI's Sales Type Lease Journal Entries reflects CSI's net investment in the schedule that was being "early terminated" as a result of the refinance. Fraser Aff., Ex. 17, 192:21-193:13, 203:23-204:4; Bean Aff., Ex. 99.

[12]  Fraser Aff., Ex. 59, ¶ 2 (addendum 1 to schedule 43); Bean Aff., Ex. 26, at CSI0029730, ¶ 2; Bean Aff., Ex. 27, at CSI0031370, ¶ 2; Bean Aff., Ex. 28, at CSI0010136, ¶ 2; Bean Aff., Ex. 13, at CSI0027565, ¶ 2; Bean Aff., Ex. 14, at CSI0027741, ¶ 2.

- 4 -

101 n.1.  Lycos does not dispute that Mr. Philip received an M.B.A. from the Harvard Business

School or that he worked for Salomon Brothers for two years early in his career, Morgan Stanley

for one summer, and the Walt Disney Company for approximately four years.[13]  Prior to joining

Lycos, however, Mr. Philip had no experience with equipment leasing[14] and, according to CSI's

expert, "even lessees who have negotiated several leases of various types of equipment in past

years find themselves at a disadvantage in that their opponents are generally professionals who

make their living negotiating equipment leases."[15]

    9.    Lycos's Response:  Disputed; move to strike.  Lycos disputes that Mr. Guilfoile is

a certified public accountant - he is not.[16]  The citation in footnote 14 to pages 16-17 of Mr.

Guilfoile's transcript does not support the assertion that he performed "lease audits" for clients

when he worked at Ernst & Young.  As such, that assertion must be stricken. *Rand,* 824 F. Supp.

at 266.  Lycos does not dispute that when Mr. Guilfoile worked there, Ernst & Young analyzed

whether client leases qualified as capital leases or operating leases.[17]

    Lycos also disputes CSI's assertions in the last sentence.  Mr. Guilfoile ceased being

involved in equipment leasing at Lycos approximately one year before schedules 93 and 94 were

signed.[18]  Therefore, Mr. Guilfoile has no personal knowledge of schedules 93 and 94, the only

schedules Lycos is alleging on summary judgment were "loans" rather than "leases, rendering

any opinion he might have irrelevant and inadmissible on summary judgment.  *Garside v. Osco*

*Drug, Inc*., 895 F.2d 46, 49 (1st Cir. 1990) (holding summary judgment evidence inadmissible if

it is not based on personal knowledge).  Further, (a) Lycos objected to CSI's question as to

---

[13] Fraser Aff., Ex. 18, 11:15-21.
[14] *Id.* at 18:6-11.
[15] Fraser Aff., Ex. 12, 52:7-12.
[16] Fraser Aff., Ex.  9, 9:20-22.
[17] *Id.* at 16:21-17:4.
[18] *Id.* at 171:17-172:4.

BST99 1565838-1.057077.0012

whether the transactions were leases or loans because it called for a legal conclusion;[19] (b) Mr. Guilfoile is not a lawyer;[20] and (c) Mr. Guilfoile "recalled" that the transactions were leases even though there is no evidence in this case that either he or anyone else at Lycos analyzed whether, under section 1-201(37) of the Uniform Commercial Code, any of the transactions qualified as leases or loans as a matter of law.[21]  Even CSI's expert has conceded that whether a transaction is a lease or loan is a matter of economic substance, not form, and that what the parties call the transactions is irrelevant.[22]  In fact, CSI referred internally to the monies it would be receiving on schedules 93 and 94 as ████████████████[23] and booked the schedules as ████████ leases.[24]

10.    Lycos's Response:  Disputed; move to strike.  The factual assertions in the first sentence is unsupported by any citation to the record and must be stricken.  *Powell,* 143 F. Supp.2d at 101 n.1.  Moreover, Messrs. Philip, Guilfolie, and Lucy's testimony that they knew Lycos would pay more for having the use of the equipment for a longer period of time is not at all inconsistent with their testimony that they did not know by how much those payments would go up in the aggregate.

The citations in footnote 16 that CSI uses to support the assertion that "it is undisputed that [Lycos] had all the information [it] needed to calculate the extent to which the payments would go up" do not support that assertion and should be stricken.  *Rand,* 824 F. Supp. at 266. Moreover, Lycos disputes it had all the information that it needed to calculate the extent to which the aggregate payments would go up relative to the amount it was paying to lease that equipment

---

[19] *Id.* at 203:4-11
[20] *Id.* at 13:23-14:19
[21] *Id.* at 203:4-11.
[22] Fraser Aff., Ex. 6, 243:8-16.
[23] Fraser Aff., Ex. 51.
[24] Bean Aff., Exs. 83-84.

BST99 1565838-1.057077.0012

on the equipment schedules before they were refinanced.[25]  When many of the schedules were refinanced, the equipment on them was split between two or more successor schedules.[26]  Equipment on these successor schedules was combined with equipment from other schedules so that the equipment on the successor schedules was different from the equipment on a single or even a group of predecessor schedules.[27]  For example, when schedule 43 was refinanced, some of the equipment from that schedule was refinanced onto schedule 66B,[28] some of it was refinanced onto schedule 67A,[29] and the some of it was refinanced onto schedule 68B.[30]  The equipment on schedules 66B, 67A, and 68B was not, however, simply a subset of the equipment that had been on schedule 43.  In addition to the equipment from schedule 43, equipment from schedule 48 was refinanced onto schedule 66B;[31] equipment from schedules 48A and 58 was refinanced onto schedule 67A;[32] and equipment from schedule 48 was refinanced onto schedule 68B.[33]

CSI's expert agreed that to calculate the economic cost of entering into schedule 94, Lycos would need to have known the remaining term of each of the terminating schedules or continuing-on schedules, the rent for each terminating schedule, the rent under the new schedule, how the parties would account for the fact that some of the predecessor schedules were going to be running out before the end of schedule 94's term, and the difference in rent for each of the thousands of pieces of equipment on schedule 94.[34]  That expert conceded that he could not

---

[25]  Bean Aff., Ex. 51, ¶¶ 31-33.
[26]  *See infra* notes 28 through 33 and accompanying text.
[27]  *See infra* notes 28 through 33 and accompanying text.
[28]  Bean Aff., Ex. 26 at CSI0029730, ¶ 2.
[29]  Bean Aff., Ex. 27 at CSI0031370, ¶ 2.
[30]  Bean Aff., Ex. 28 at CSI0010136, ¶ 2.
[31]  Bean Aff., Ex. 26 at CSI0029730, ¶ 2.
[32]  Bean Aff., Ex. 27 at CSI0031370, ¶ 2.
[33]  Bean Aff., Ex. 28 at CSI0010136, ¶ 2.
[34]  Fraser Aff., Ex. 12, 183:18-184:15.

perform this analysis using the information CSI provided to Lycos[35] and the evidence shows that CSI did not otherwise provide this information to Lycos.[36]

That Lycos did not possess the necessary information is further illustrated by Mr. Stenberg's March 18, 2002 e-mail, in which it is undisputed that he made numerous misrepresentations to Lycos.[37] On March 7, 2002, Brian Lucy, Lycos's CFO, asked Mr. Stenberg whether Lycos's calculation as to the aggregate amount by which the rent payments on schedules 93 and 94 would go up over the previous schedules was accurate.[38] In response, Mr. Stenberg, who at that time had worked in the leasing industry for over twenty years[39] and had serviced the Lycos account since its inception, told Mr. Lucy that Lycos's "total for the new lease obligation was wrong" and that he should "rest easy."[40] Lycos relied on Mr. Stenberg's representation in not pursuing the matter further.[41]

### B.    Lycos Hires Outside Leasing Experts – 2000

11.    _Lycos's Response_:  Disputed; move to strike.  The factual assertions in paragraph 11 to CSI's Statement contain no citations to the record and therefore must be stricken.  _Powell_, 143 F. Supp.2d at 101 n.1.  Further, Lycos disputes several of CSI's assertions:

(a)  Avnet did not perform an "audit" of Lycos's leasing practices[42] ("This is not an all-encompassing analysis of IT return on investment (ROI).  Instead, it examines several opportunities for financial, operational, and technical enhancements.");

(b)  Part of Lycos's difficulty in tracking equipment arose from CSI's splitting of equipment among schedules during refinancings that occurred _before_ Avnet performed its work

---

[35]  _Id._ at 185:5-192:24.
[36]  Bean Aff., Ex. 14, CSI0027657-27740.
[37]  Bean Aff., Ex. 46; Bean Aff., Ex. 51, ¶ 36.
[38]  Bean Aff., Ex. 23.
[39]  Fraser Aff., Ex. 23, 16:22-19:2.
[40]  Bean Aff., Ex. 46.
[41]  Bean Aff., Ex. 33, ¶ 16.
[42]  Bean Aff., Ex. 24 at LYC14549.

BST99 1565838-1.057077.0012

in late 2000 (which was four years after the Lycos-CSI relationship had begun);[43]

        (c) CSI's expert testified that high technology equipment lessees generally have difficulty returning all the leased equipment[44] and CSI itself markets the fact that its services are necessary for a lessee because tracking leased equipment takes "tremendous effort" and is a "full-time" job;[45]

        (d) neither Lycos nor Avnet had access to CSI's internal accounting records—thus neither discovered that CSI had charged Lycos millions of dollars in hidden costs;[46] and

        (e) Lycos did not retain LeaseForum until June 2003,[47] more than a year *after* CSI and Lycos entered into their last equipment schedule.[48]

        12.    <u>Lycos's Response</u>: Partially disputed; move to strike. Lycos does not dispute that CSI has accurately quoted language from Avnet's report in the first two sentences of paragraph 12. Avnet's assertion that Lycos's alleged failure to maintain an accurate asset inventory resulted in "costly evergreen[49] payments" is, however, wrong because Lycos had refinanced those equipment schedules;[50] accordingly, the additional payments were not "evergreen" payments. The third sentence of paragraph 12 contains no citation to the record and therefore must be stricken. *Powell,* 143 F. Supp.2d at 101 n.1. As evidenced by the above, Avnet was also unaware that the equipment schedules had been refinanced, did not discover that CSI had charged Lycos millions of dollars in hidden costs,[51] and apparently did not even review the Master Lease

---

[43] *See*, *e.g.*, Bean Aff., Ex. 24 (cover page); Bean Aff., Ex. 51, Exhibit C thereto (referencing, among others, schedules 30, 31 and 43).
[44] Fraser Aff., Ex. 12, 94:7-14.
[45] Bean Aff., Ex. 3 at IA000040, IA000064.
[46] Bean Aff., Ex. 51, ¶¶ 31-33.
[47] Little Decl., Ex. 17 at LYC 18880.
[48] Bean Aff., Ex. 16 at CSI0023561.
[49] Fraser Aff., Ex. 16, 19:25-20:12.
[50] *See* Bean Aff., Ex. 51, ¶ 5 and Exhibits B and C thereto.
[51] Bean Aff., Ex. 51, ¶¶ 31-33.

BST99 1565838-1.057077.0012

Agreement.[52]

13.    Lycos's Response:  Disputed; move to strike.  The citation in footnote 18 does not support CSI's assertions in the first sentence of paragraph 13 in CSI's Statement.  Accordingly, those assertions should be stricken. *Rand,* 824 F. Supp. at 266.  There is no evidence of any substantive negotiations between CSI and Lycos regarding the refinancings and no evidence that Lycos ever made any change to any of the refinanced equipment schedules received from CSI.

For the reasons set forth in paragraph 7 above, and as CSI admits in the second sentence of paragraph 13 of its Statement, the refinancings were "new leases" and not "extensions" of old leases.  CSI ██████████████████████████████████████████ ████████ which was consistent with a refinancing and *not* an extension.[53]  The Equipment Leasing and Finance Association, of which CSI is a member, refers to leasing as a form of "finance."[54]

The allegations in the third sentence of paragraph 13 must be stricken because Mr. Reale's testimony does not support CSI's assertion that Lycos achieved or even stated a goal of lowering monthly rent payments. *Rand,* 824 F. Supp. at 266.  Moreover, Mr. Reale's testimony is inadmissible hearsay because it is offered for the truth of the matter (*Davila,* 498 F.3d at 17) and was derived from a telephone conversation he had with Sam Ziba more than four years[55] after Mr. Ziba, who was never an officer at Lycos and who was employed by Lycos for only eighteen months, had left Lycos.[56] S*ee Reed Paper,* 144 F.R.D. 2, 5 (D. Me. 1992) ("If the corporation is to be accountable for what was said, the person examined must have been an officer, director, or managing agent at the time the deposition was taken."); *cf. Siguel v. Trustees of Tufts College,*

---

[52]   *See generally* Bean Aff., Ex. 24.
[53]   E.g., Fraser Aff., Ex. 50.
[54]   Fraser Aff., Ex. 6, 95:14-22; Fraser Aff., Ex. 34.
[55]   Mr. Reale was deposed in January 2007.  He testified that his conversation with Mr. Ziba occurred about two years earlier.  Fraser Aff., Ex. 19, 7:4-9:5.

1990 U.S. Dist. LEXIS 2775 (D. Mass. 1990) (acts of former officer could not be imputed to company). Lycos disputes that its goal—stated or otherwise—was to lower its monthly payments.[57] Lycos's CFO, Mr. Philip repeatedly testified that lowering monthly lease payments was *not* a priority for Lycos.[58]

14.     Lycos's Response:  Disputed; move to strike. *See* Lycos's Response to paragraph 9, *supra* which is incorporated herein.  In addition, Lycos notes that CSI cites only to the testimony of Mr. Guilfoile.  Any suggestion that his testimony may be attributed to officers of Lycos other than Mr. Guilfoile must be stricken because there is no support for that proposition. In addition, Mr. Guilfoile ceased being involved with equipment leasing at Lycos before Lycos entered into schedules 93 and 94, the only schedules Lycos is claiming on summary judgment were loans rather than leases.  Mr. Guilfoile, therefore lacks personal knowledge of schedules 93 and 94, rendering any opinion he might have irrelevant and inadmissible on summary judgment. *Garside*, 895 F.2d at 49.

15.     Lycos's Response:  Disputed.  The testimony that CSI relies on in paragraph 15 of its Statement is misleading because later in his deposition Mr. Guilfoile corrected his testimony on this subject.  As CSI notes, at one point in his deposition Mr. Guilfoile testified that Lycos tested each schedule to see if it met the standard for operating lease classification.  Later, he clarified and corrected this testimony, stating that he did not know whether Lycos did test each schedule and that he personally *never* tested the leases.[59]  Nonetheless, as Mr. Guilfoile ceased being involved with equipment leases in October 2000,[60] he would have no personal knowledge of Lycos's equipment leasing practices after he ceased such involvement and employment and, in

---

[56]  Mr. Ziba left Lycos in June 2001.  Fraser Aff., Ex. 26, 8:12-20.
[57]  Fraser Aff., Ex. 18, 117:8-24.
[58]  *Id.* at 123:10-124:19.
[59]  *Id.* at 186:10-23; 192:5-193:1.
[60]  *Id.* at 171:6-172:4.

particular, no personal knowledge of Lycos's actions with respect to schedules 93 and 94.

In fact, Lycos's records and those of its accountants demonstrate that Lycos did *not* test each schedule it entered into with CSI to see if it met the standard for operating lease classification and that Lycos never tested *any* of the refinanced schedules.[61]  If Lycos *had* performed that test, it would have concluded that the refinanced schedules did *not* meet the applicable standard for operating lease treatment.[62]  Even CSI's expert testified that if Lycos had properly tested the equipment leases, it would have concluded that at least some did not qualify as operating leases.[63]

### III.     LYCOS' EXTENSIONS OF LEASE SCHEDULES — SCHEDULES 93/94

####       A.       Equipment Schedules 93 and 94

16.     Lycos's Response:  Disputed.  Lycos disputes that schedules 93 and 94 were "extensions"; in fact, the "Addendum 1" to each of those schedules specifically lists the date the predecessor schedule was to terminate and the new, earlier termination date.[64]  Lycos does not dispute that the equipment schedules that were refinanced onto schedules 93 and 94 are clearly identified in the documentation, but it does dispute that the *equipment* that was refinanced is clearly identified in the documentation.  It is not.[65]  In an internal e-mail, CSI's co-chief financial officer, who developed the structure for schedules 93 and 94, himself described them as

███████████████████████[66]

17.     Lycos's Response:  Partially disputed.  Lycos does not dispute that schedules 93 and 94 gave CSI the right to condition its performance of its obligations under those schedules upon Lycos's delivery of an irrevocable, unconditional, standby letter of credit.  Lycos does

---

[61]  Fraser Ex. 47, ¶¶ 4-6.
[62]  Fraser Ex. 47, ¶¶ 7-8.
[63]  Fraser Aff., Ex. 12, 323:9-326:22.
[64]  *See, e.g.,* Bean Aff., Ex. 28 at CSI0010136, ¶ 2.
[65]  Fraser Aff., Ex. 12, 185:5-192:24.

dispute, however, that schedules 93 and 94 were structured to "assist Lycos." The testimony cited by CSI from its co-CFO in footnote 25 of its Statement supports the opposite conclusion: the letter of credit was structured to keep the existing debt in place because that was the way CSI's account executive wanted it.[67] Indeed, CSI required the letter of credit as security for Lycos's payment obligations.[68]

18.    Lycos's Response:  Partially disputed.  From 1998-2001, Lycos had $150 to over $500 million in cash in the bank.[69] Although, like any business, Lycos wanted to control expenses while building the top line business, reducing monthly expenses was not a goal of the company.[70]

Lycos' financial statements during the period from 1998 through 2001 show that Lycos's expenses increased markedly each year.[71] Thus, CSI's blanket suggestion that Lycos wanted to reduce its expenses at all times is inaccurate and unsupported.  Lycos does not dispute that, at some point in 2001, it began an initiative to reduce its expenses where it made sense to do so. Lycos's equipment lease payments, however, were immaterial, from an accounting perspective, to its total expenses at the time[72] and Lycos would not have entered into schedules 93 and 94 to reduce monthly expenses on the terms that it did if CSI had disclosed the hidden charge or mark-up.[73] Moreover, there is no evidence Lycos ever desired to reduce expenses at any cost and irrespective of the long-term effects.  Indeed, the only evidence is to the contrary.[74]

19.    Lycos's Response:  Disputed; move to strike.  CSI's assertion that Lycos had a policy to lease equipment is neither supported by the citation upon which CSI relies nor by the

---

[66]  Bean Aff., Ex. 81.
[67]  Fraser Aff., Ex. 1, 244:23-245-14.
[68]  Bean Aff., Ex. 13,  CSI0027566, ¶ 3; Bean Aff., Ex. 14, CSI0027742, ¶ 4.
[69]  Fraser Aff., Ex. 45.
[70]  Fraser Aff., Ex. 18, 117:18-24, 124:1-3, 129:5-7, 130:3-9.
[71]  Fraser Aff., Ex. 45.
[72]  Fraser Aff., Ex.  47, ¶ 6.
[73]  Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.

BST99 1565838-1.057077.0012

record as a whole in this case and should therefore be stricken.  CSI's assertion is based on a single memo to the file written by a junior employee in August 2001 (after nearly all of the schedules had been executed) concerning an unrelated, local property tax issue.[75]  Contrary to CSI's statement that Lycos had such a policy "at all relevant times," the memo addresses one moment in time (when it was written) and says *nothing* about any other time period during the parties' eight-year relationship.  (Indeed, there is no evidence in the record of this so-called policy existing at any other time period.)  In fact, Lycos did not, *at any time*, have an official policy of foregoing purchasing equipment and leasing it instead.[76]  The employee who drafted that memo repeatedly testified that he did not intend to suggest that Lycos had such a policy, but only that Lycos had a "general practice" of leasing equipment.[77]  That employee joined Lycos in January 2001,[78] after all but a handful of the Lycos-CSI equipment schedules had been signed and left Lycos sixteen months later in April or May 2002.[79]  Thus, this junior employee could not have had any personal knowledge of anything related to Lycos' leasing prior to 2001 or after the first quarter of 2002.

20.   <u>Lycos's Response</u>:  Disputed; move to strike.  Tim Wright was never Lycos' Chief Operating Officer or Chief Financial Officer, and he never managed, oversaw, or was responsible for Lycos' equipment leasing.[80]  Mr. Wright was merely suggesting that, in hindsight, it was obvious that Lycos had overpaid for its leases.  Further, the citation to Mr. Wright's transcript in footnote 32 for the proposition that Lycos's immediate goal was satisfying Lycos's growing "appetite and need for equipment" does not support that assertion and should be stricken.  *Rand,*

---

[74]   *Id.*
[75]   Fraser Aff., Ex. 36; Fraser Aff., Ex. 11, 113:24-115:10, 160:3-22.
[76]   Fraser Aff., Ex. 11, 113:24-115:10, 160:3-22.  Mr. Galvan himself repeatedly testified that he was unaware of any policy and that he understood only that at the time he wrote the memo that it was Lycos's  "general practice" to lease equipment. *E.g.,* Fraser Aff., Ex. 7, 32:3-11, 41:20-42:1.
[77]   Fraser Aff., Ex. 7, 33:12-19.
[78]   *Id.* at 7:6-8.
[79]   *Id.* at 7:18.

BST99 1565838-1.057077.0012

824 F. Supp. at 266.

21.    Lycos's Response:  Disputed; move to strike.  CSI's citation to Ms. Callagee's testimony in footnote 33 of CSI's Statement does not support the assertion that Lycos did not want to capitalize the leases prior to August 2003.  The only evidence regarding Lycos' objectives in this regard is the undisputed testimony of Lycos's former Controller and Vice President of Finance, who testified that operating lease treatment was *not* a major factor in Lycos' decision to lease equipment.[81]  Ms. Callagee testified only that *one of the reasons* Lycos wanted to buy out of the leases was to treat them as capital leases.[82]  Accordingly, the entire first sentence should be stricken.  *Rand,* 824 F. Supp. at 266.  Indeed, CSI's account executive for Lycos, Mr. Stenberg, testified that whether the Lycos leases were operating leases "never came up" in conversation with Lycos during the parties' entire eight-year relationship.[83]

As for the second sentence in paragraph 21, Lycos does not dispute that, in July 2003 (the date of the e-mail to which CSI cites for support), Lycos could not return all of the equipment.  That e-mail, however, does not support the assertion that Lycos could not return a "large portion" of the equipment, and CSI's unsupported characterization should be stricken.  *Rand,* 824 F. Supp. at 266.  Lycos also disputes that CSI was the owner of the equipment on schedules 93 and 94 in July 2003.  Under applicable law, because those transactions were installment sales contracts rather than true leases,[84] Lycos became the owner of the equipment on their effective dates.

22.    Lycos's Response:  Disputed.  While Lycos did agree to enter into the equipment refinancings, it would not have done so on the terms that it did if CSI had disclosed to Lycos the

---

80  Fraser Aff., Ex. 25, 9:24-11:1; 77:12-78:8; 80:13-23.
81  Fraser Aff., Ex. 9, 18:15-19:20.
82  Fraser Aff., Ex. 2, 49:17-23.
83  Fraser Aff., Ex. 23, 71:18-72:24.
84  *See* Lycos's Mem. Supp. of its Mot. for Summ. J. on Certain of its Claims in Counts XII and XIII (Dkt. No.

$13.708 million in hidden fees or mark-ups it was charging Lycos.[85]

Although the Master Lease Agreement obligated Lycos to "make any repairs necessary in order to certify the Equipment as eligible for the manufacturer's prime shift maintenance upon its return . . ." (Little Decl., Ex. 1, ¶ 7 (Dkt. No. 168)), there is no such thing as a "prime shift maintenance contract" for the type of equipment Lycos leased from CSI.[86]  Thus, it was impossible for Lycos to comply with the Agreement's return provisions.  Furthermore, contrary to CSI's assertion in the second sentence, Lycos did *not* have the right under the Master Lease Agreement to substitute alternative equipment if the equipment was lost or damaged.[87]  Lycos only had such ability if CSI, in its sole discretion, permitted Lycos to return substitute equipment, and CSI's co-CFO testified that CSI preferred *not* to get equipment back from lessees at the end of a lease.[88]

## IV.    E-MAIL OF MARCH 18, 2002

23.    Lycos's Response:  Partially disputed.  Lycos does not dispute that on March 18, 2002, Mr. Stenberg wrote an e-mail to Lycos's CFO regarding, among other things, payments under the old schedules and the newly refinanced schedules, 93 and 94.  Lycos does not dispute that it relied on this e-mail in continuing its payments under those schedules and in executing the agreement to purchase the equipment in August 2003.  Lycos does dispute, however CSI's contention that those schedules were leases.[89]  As a matter of law, they were not.

24.    Lycos's Response:  Partially disputed. Lycos does not dispute that Mr. Stenberg wrote the March 18, 2002 e-mail, but disputes CSI's assertion that the parties entered into

---

148) at 26-28.
[85]  Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.
[86]  Fraser Aff., Ex. 3, 54:23-56:5.
[87]  Little Decl., Ex. 1, ¶ 9.2.
[88]  Fraser Aff., Ex. 1, 316:17-317:23.
[89]  Mem. in Supp. of its Mot. for Summ. J. (Dkt. No. 148) at 26-28.

BST99 1565838-1.057077.0012

schedules 93 and 94 in December 2001.[90]  Lycos further disputes that the second sentence in

paragraph 24 of CSI's statement accurately reflects either the substance or context of that e-mail.

Mr. Stenberg wrote that e-mail in response to an e-mail from Lycos's CFO, Brian Lucy, in which

Mr. Lucy asked about the difference in lease payments between the old and new schedules, and

said that Lycos would seek to unwind schedules 93 and 94 if the difference were as large its

calculation indicated.[91]  Mr. Stenberg, who had over 20 years of experience in computer sales

and leasing at the time[92] and who had served the Lycos account since its inception, responded by

making numerous misrepresentations in this e-mail.[93]  Mr. Stenberg did not just write, "This is

what I have so far," as CSI misleadingly states, he wrote: "This is what I have so far *so you can

rest easy*."[94]  Mr. Lucy followed his advice and "rested easy"; he did not investigate the veracity

of Mr. Stenberg's assertions because he trusted Mr. Stenberg.[95]  Lycos did not seek to unwind

those schedules and continued to make its monthly payments.[96]

     25.   <u>Lycos's Response</u>:  Disputed.  In his April 27, 2005 Affidavit ( Dkt. No. 33) (the

"First Affidavit") that he signed approximately six months after he left Lycos and approximately

eighteen months *before* the date of the deposition to which CSI refers (taken January 10, 2007),

Mr. Lucy testified that because he trusted Mr. Stenberg, he had no reason to (and in fact did not)

investigate the truthfulness of the assertions Mr. Stenberg had made in his March 18, 2002 e-

mail.[97]  Mr. Lucy explained in detail in his Second Affidavit the reason he did not recall his

testimony in his First Affidavit at the time of his deposition:

---

[90]  Bean Aff., Ex. 13, CSI0027498; Bean Aff., Ex. 14, CSI0027656 (stating initial term shall commence
November 1, 2001, Lycos having signed the Agreement in October 2001).
[91]  Bean Aff., Exs. 23.
[92]  Fraser Aff., Ex. 23, 16:22-19:2.
[93]  Bean Aff., Ex. 51, ¶¶ 36-43.
[94]  Bean Aff., Ex. 46 (emphasis added).
[95]  Bean Aff., Ex. 33, ¶ 16; Bean Aff., Ex. 11, ¶ 7.
[96]  Acton Aff., Ex. 15, 450:2-10.

4.      My memory of events in 2003 and before was less clear during my deposition in January 2007 than it was when I signed the First Affidavit in April 2005.  As a result, I did not recall the substance of that First Affidavit or certain events in March 2002 during the second day of my deposition.  Specifically, but without limitation, I did not recall the paragraphs of my First Affidavit that concerned an e-mail from Paul Stenberg to me dated March 18, 2002 (the "E-Mail").  I also do not recall being asked about the paragraphs of my First Affidavit that concerned the E-Mail during my second day of my deposition.

5.      Since the second day of my deposition, I have had the time to and have in fact reviewed the First Affidavit.  The First Affidavit, which includes the E-Mail, has refreshed my recollection as to the general subject matter of the E-Mail.

6.      On March 18, 2002, I received the E-Mail.  In the E-Mail, Mr. Stenberg advised me, among other things, that the analysis Lycos had done was incorrect and that the variance was only approximately $3.5 million.  He also advised me that the total cost of the equipment was "around $63 million".

7.      As more fully set forth in paragraph 13 of the First Affidavit, because I had no background in equipment leasing and I trusted Mr. Stenberg, I did not investigate the veracity of his statements in the E-Mail.  Had I known the above statements were false, I believe I would have pursued unwinding schedules 93 and 94 or otherwise caused Lycos not to perform under them.  In addition, I believe I would not have caused Lycos to pay $3.775 million to CSI to purchase the equipment on the then outstanding schedules.[98]

Lycos disputes the second sentence of paragraph 25 of CSI's Statement to the extent it purports to ascribe Mr. Lucy's testimony to any time period other than 2003—the time period about which Mr. Lucy was testifying.[99]  Lycos admits that Mr. Lucy did not know CSI had deceived him when he signed equipment schedules in 2001 and the Sales Agreement in 2003, or when Mr. Stenberg made misrepresentations to Mr. Lucy in his March 18, 2002 e-mail.[100]

26.      Lycos's Response:  Disputed.  Lycos does not dispute that, at the time of his deposition, Mr. Philip testified that he did not recall dealings with CSI.  That is not surprising, given that Lycos's claims are based in substantial part on CSI's failure to disclose information to Lycos.  Mr. Philip testified that if he had been told about the mark-ups he would not have signed

---

[97]  Bean Aff., Ex. 33, ¶ 16.
[98]  Bean Aff., Ex. 11, ¶¶ 4-7.
[99]  Fraser Aff., Ex. 15, 81:18-82:24.

the refinancings.[101]

27.    Lycos's Response:  Disputed.  Lycos does not dispute that, at the time of his deposition, Mr. Guilfoile testified that he recalled no misrepresentations made by CSI or even extending any CSI leases.  Again, this is not surprising given that Mr. Guilfoile testified that CSI did not tell him about the mark-ups and that he would not have signed the refinancings if he had been told about them.[102]

28.    Lycos Response:  Undisputed.  Lycos has since found that such e-mail contained numerous false and misleading representations. *See* discussion, *supra*,[103] ¶¶ 23-25.

29.    Lycos Response:  Disputed.  Little, if any, of the information in the March 18, 2002 e-mail is based on information Mr. Stenberg gave to Lycos months earlier.  Specifically, Mr. Stenberg states in the March 18, 2002 e-mail that: (a) the present value of the new lease is $23,727,000; (b) the obligation under the old leases is $20,215,000, (c) the difference is $3,512,000; (d) the total original cost of the equipment was around $63 million; and (e) that CSI injects a 10-13% residual in the leases.[104]  Contrary to CSI's assertion, this information had *not* been provided to Lycos months earlier.[105]

30.    Lycos's Response:  Disputed.  Lycos was not aware of the original cost of the equipment or the supposed substantial value of that equipment when it entered into the Sales Agreement in mid-2003.  The internal Lycos spreadsheet CSI refers to in paragraph 30 (Little Ex. 16) shows that the "equipment value" for approximately forty of the 126 equipment schedules the parties entered into[106] (beginning with schedule number 64) was in the mid-$40 million range. The spreadsheet gives no indication as to the value of the equipment on the other approximately

---

[100]  Bean Aff., Ex. 51, ¶¶ 36-43.
[101]  Bean Aff., Ex. 6, ¶ 4.
[102]  Bean Aff., Ex. 12, ¶ 4.
[103]  Bean Aff., Ex. 51, ¶¶ 36-43.
[104]  Bean. Aff., Ex. 46.

- 19 -

eighty-six schedules into which the parties entered.[107]

In addition, the numbers Lycos listed on its internal spreadsheets in Little S.J. Exhibits 16-20 (Dkt. No. 182) under "equipment value" are inaccurate because of misrepresentations made by CSI to Lycos concerning "base values."  When Lycos prepared the internal spreadsheets CSI cites in Little S.J. Exhibits 16-20, it used "base value" figures that appear on the Stipulated Loss Value tables of the refinanced schedules for the original equipment cost.[108]  The original equipment schedules provided that the "base value" of the equipment would equal the manufacturer's cost or the original equipment cost.[109]  Lycos, however, learned for the first time in discovery that for the refinanced schedules, the base value did *not* equal the original equipment cost, but equaled the net present value of the monthly rental payments[110]-- a fact that CSI did not disclose to Lycos (indeed, Mr. Stenberg himself did not even know this).[111]  Thus, a comparison of the "equipment value" on the internal Lycos spreadsheets shows that it matched the "base value" figures reflected in the Stipulated Loss Value Tables but did not match the actual original cost of the equipment as reflected in CSI's Supplemental Response to Lycos's First Set of Interrogatories.

---

[105] *See* Bean Aff., Ex. 23 at LYC24633.
[106] Bean Aff., Ex. 51, ¶ 5.
[107] *See* Little S.J. Aff, Ex. 16.
[108] Fraser Aff., Ex. 24, 90:14-91:6.
[109] *See, e.g.*, Fraser Aff., Ex. 52, ¶ 5.
[110] Fraser Aff., Ex. 14, 29:13-22.
[111] *Id.* at 31:14-17.

BST99 1565838-1.057077.0012

For example:

| | Equipment Value On Internal Lycos Spreadsheet - Ex. 16 to Little Aff. | Base Value (as reflected on Stipulated Loss Value Tables to Equipment Schedules) [112] | Original Equipment Cost According to CSI [113] |
|---|---|---|---|
| Schedule 65 | $  672,000 | $  672,000 | ----------------- |
| Schedule 68 | $4,200,000 | $4,200,000 | ----------------- |
| Schedule 69G | $1,031,403 | $1,440,000 | $  860,009.07 |
| Schedule 66 | $1,440,000 | $1,440,000 | ----------------- |
| Schedule 66I | $  985,000 | $  985,000 | $  893,821.79 |
| Schedule 85 | $2,390,000 | $2,390,000 | $1,234,516.77 |
| Schedule 86 | $  725,000 | $  725,000 | $1,208,106.78 |

Thus, Lycos's spreadsheets upon which CSI relies do not support the assertion that Lycos knew the original cost of the equipment (either in the aggregate or on each schedule). If Lycos had known, it would not have relied on CSI's inaccurate "base value" numbers.

When presented with these spreadsheets during a deposition, Lycos confirmed that the numbers therein were CSI's base value numbers and that Lycos was not sure whether they were accurate – they were only Lycos's "best guess."[114]

Mr. Stenberg then misrepresented to Lycos in March 2002,[115] and again in late June 2003[116] that the original cost of the equipment was approximately $63 million (approximately $20 million more than Lycos's spreadsheets indicated based on approximately 40 of the 126 the schedules), a number on which Lycos relied in performing its internal analysis of the 2003 buyout of the equipment on all of the schedules.[117] Given that Lycos's "best guess" at the time reflected an original equipment cost in the mid-$40 million range for just some of the equipment, Mr. Stenberg's representations as to an

---

[112] Fraser Aff., Ex. 53.
[113] Bean Aff., Ex. 66, Exhibit A thereto.
[114] Fraser Aff., Ex. 2, 77:9-78:3.
[115] Bean Aff. Ex. 46
[116] Fraser Aff., Ex. 5, 117:11-13.
[117] *E.g.*, Fraser Aff., Ex. 41 at LYC 22514, bracket "F"; Fraser Ex. 60, LYC 24030-31.

aggregate original cost of $63 million did not seem unreasonable to Lycos.[118]

31.  <u>Lycos Response</u>:  Disputed.  *Lycos* never referred to Mr. Stenberg as a "worthless liar" in any context relating to its leasing relationship with CSI.  Peter Karol, who was not an executive or decision-maker at Lycos at the time of this statement and was never responsible for Lycos's leases with CSI, referred to Mr. Stenberg as a "worthless liar" in an e-mail after Mr. Stenberg failed to repay him for the cost of an expensive dinner for Lycos employees—a dinner that Mr. Stenberg had agreed in advance to pay for—not as a result of anything Mr. Stenberg did or said in connection with the CSI-Lycos leases.[119]  Not surprisingly, Mr. Karol became upset after Mr. Stenberg promised to pay for the dinner, then failed to reimburse him punctually, and then failed to respond to e-mails about the subject.[120]

Regarding Mr. Karol's remark to Mr. Lucy in 2001, Mr. Karol knew that Mr. Lucy, Lycos;s CFO and the signatory on several equipment schedules including schedules 93 and 94, trusted Mr. Stenberg.[121]  Mr. Lucy, who was a decision-maker at Lycos, has corroborated this testimony—attesting to the fact that he did trust Mr. Stenberg.[122]

## V.    LYCOS' DECISION TO CAPITALIZE ITS LEASES — THE SALES AGREEMENT

### A.    CSI Provides Scenarios for Lease Buy-Out

32.  <u>Lycos Response</u>: Partially disputed.  Lycos does not dispute that Terra Networks, its parent company in July, 2003, wanted Lycos to capitalize its leases with CSI and the other leasing companies with which Lycos did business, and that this was one of the reasons Lycos entered into buyout negotiations in June 2003.  Lycos disputes CSI's characterization of when the Sales Agreement was signed.  The Sales Agreement, which is dated July 15, 2003 and was signed

---

[118]  Fraser Aff., Ex. 5, 122:7-10; 143:10-144:7.
[119]  *See* Little Aff., Exs. 2-3.
[120]  Little Aff., Ex. 3.
[121]  Fraser Aff., Ex. 13, 169:8-169:15.
[122]  Bean Aff., Ex. 31, ¶¶ 13, 16.

by Lycos on July 18, 2003 was re-signed in August 2003 to correct minor errors in the form of the agreement.[123]

33.    Lycos's Response:  Partially disputed; move to strike.  CSI's assertion that Lycos rejected the "lump sum" payout of $26,819,623 is unsupported by citation to the record and should be stricken.  *See, e.g., Rand,* 824 F. Supp. at 266.  Otherwise, undisputed.

34.    Lycos's Response:  Disputed.  The offer CSI cites to in this paragraph was made in June 2003.  It does *not* provide that CSI would retain title to the equipment until all of the existing leases terminated at their stated times and does *not* provide that title would only pass at that time provided Lycos was not then in default under the leases.  Contrary to CSI's assertion, it provides that title to the equipment under each schedule would pass once Lycos made all the payments required under that schedule.[124]  Paragraph two thereof listed the termination date of each schedule.[125]

35.    Lycos's Response:  Undisputed.

**B.    Leaseforum Assists Lycos in Negotiating Buy-Out**

36.    Lycos's Response:  Partially disputed.  Lycos disputes the assertions in this paragraph to the extent they suggest that LeaseForum was its agent for any purpose other than negotiating the buyout.  The General Services Agreement between LeaseForum and Lycos states that "It is understood by the parties that LeaseForum is an independent contractor and not an employee or agent of [Lycos]."[126]

37.    Lycos's Response:  Disputed; move to strike.  The allegations in the first sentence of paragraph 37 of CSI's Statement should be stricken because they are unsupported by citation

---

[123]  Fraser Aff., Ex. 14, 221:7-223:5; Little Decl., Ex. 14.
[124]  Acton Aff., Ex. 9, ¶ 2 ("With respect to each Lease, Seller retains full title to the Equipment until the date the Lease terminates as listed in paragraph 2 above.")
[125]  *Id.*
[126]  Little Decl., Ex. 17, ¶ 5.

- 23 -

to the record. *See, e.g., O'Brien,* 440 F. Supp. 2d at 5 n.1; *Powell*, 143 F. Supp. 2d at 101 n.1.  In addition to complaining to Mr. Lucy about LeaseForum's involvement because he did not want to deal with a consultant,[127]



.[128]  In an effort to discourage an audit,

38.    Lycos's Response:  Disputed.  The spreadsheet CSI cites to in footnote 60 is undated.  Thus, CSI's references to June 27, 2003 must be stricken.  *Rand,* 824 F. Supp. at 266. Moreover, Ms. Franklin did not conclude that the original equipment cost was approximately $44 million until months after the Sales Agreement was signed.  Ms. Franklin testified that she merely "estimated," based on her partial analysis of schedules numbered in the "fifties" and higher, that the original equipment cost *on those schedules* was approximately $44 million.[132] She knew, however, that her analysis was incomplete because more than fifty schedules were missing from her analysis.[133]  Also, as Lycos had done, Ms. Franklin incorrectly used on the erroneous Base Value numbers provided by CSI to estimate the cost.[134]  Thus, when Mr. Stenberg told her that the original cost for all of the schedules was in the sixty million range, and she estimated it was in the mid-40 million range for fewer than fifty of them, she had no reason

---

[127]  Fraser Aff., Ex. 23, 294:21-295:11.
[128]  *Id.* at 294:21-295:11 (Stenberg Tr.).
[129]  Fraser Aff., Ex. 55 at CSI042367
[130]  Fraser Aff., Ex. 23, 301:6-8, 23-302:1.
[131]  Fraser Aff., Ex. 56.
[132]  Fraser Aff., Ex. 5, 268:15-269:20.
[133]  *Id.* at 269:16-20.
[134]  *See id.* at 85:3-86:17.

BST99 1565838-1.057077.0012

not to believe him.[135]  That Lycos considered Mr. Stenberg's original equipment cost figure to be the correct one is clear from Lycos's internal e-mails in which it repeatedly uses an original equipment cost in the mid-$60 million range in its analysis of the buyout.[136]

     39.    **Lycos's Response:**  Partially disputed.  Lycos does not dispute the allegations contained in the first sentence of this paragraph.  The second sentence contains no citation to the record and should therefore be stricken.  It should also be stricken to the extent the reference to "additional terms" is a legal term of art, as opposed to an assertion of fact, related to § 2-207 of the UCC. *City of Waltham v. United States Postal Service*, 786 F. Supp. 105, 120 (D. Mass. 1992) (refusing to consider legal conclusions set forth in Rule 56.1 statement).

     40.    **Lycos's Response:**  Partially disputed.  Lycos does not dispute that, at the time of her deposition, Ms. Franklin believed LeaseForum held a contingent financial interest in the outcome of this case.

     41.    **Lycos's Response:**  Disputed.  Paragraph 4 of the draft Sales Agreement provides as follows: "SELLER RETAINS TITLE: With respect to *each* Lease, Seller retains full title to the Equipment until the date the Lease terminates as listed in paragraph 2 above. . . ."[137] Paragraph 2 lists the termination dates of schedules 85 and 86 as December 31, 2003, the termination date of schedules 89, 89A, and 90, as of July 31, 2004, the termination date of schedule 93 as October 31, 2003, the termination date of schedule 94 as October 31, 2004, and the terminate date of schedules 100 and 200 as April 30, 2005.[138]  Accordingly, Lycos became the owner of the equipment on those schedules when it made the payments due under them.

     42.    **Lycos Response:**  Undisputed.

---

[135] *Id.* at 143:10-144:7.
[136] *E.g.*, Fraser Aff., Ex. 41 at LYC 22514, bracket "F"; Fraser Ex. 60, LYC 24030-31.
[137] Acton Aff., Ex. 9, ¶ 4 (emphasis added)
[138] *Id.* ¶ 2.

**C.    Lycos' Counsel Acknowledges CSI's Lease Terms Are "Common"**

43.    <u>Lycos's Response</u>:  Disputed.  Lycos's in-house counsel did review the legal terms

of the Sales Agreement.[139]  When conducting that review, he did not have the authority to nor did

he review or approve those terms in a business sense.[140]  In the e-mail that CSI relies on in its

Statement, Mr. Karol states that (1) buying out equipment is something that was not uncommon

in the United States, and (2) it is common for leases/contracts to contain stipulated loss

provisions—his e-mail has nothing to do with whether the business terms in either the Sales

Agreement or leases were common or whether stipulated loss values of 73% or 55% were

reasonable from a business standpoint.[141]  In fact, contrary to CSI's assertion in footnote 65 of its

Statement, he does not refer to stipulated loss values in his e-mail at all.[142]  Moreover, CSI's

leasing experts have testified and written that the value of high technology equipment at the end

of three years is approximately zero to ten percent.[143]

44.    <u>Lycos Response</u>:  Disputed; move to strike.  As a threshold matter, "partner" and

"agent" are legal terms of art inappropriate for a statement of undisputed facts and should thus be

stricken.  *See, e.g., City of Waltham,*  786 F. Supp. at 120 (refusing to consider legal conclusions

set forth in Rule 56.1 statement).  CSI also fails to cite any evidence to support its assertion that

LeaseForum was Lycos's agent for any purpose other than negotiating buyout of Lycos's

equipment leases.  Accordingly, these references should be stricken.  *O'Brien*, 440 F. Supp. 2d at

5 n.1; *Rand,* 824 F. Supp. at 266.  Lycos disputes that LeaseForum was its agent for any purpose

relative to the CSI equipment schedules other than negotiating the buyout.  The General Services

Agreement between LeaseForum and Lycos states that "It is understood by the parties that

---

[139]  Aff. of P. Karol (Dkt. No. 37), ¶¶ 2-3.
[140]  *Id.* ¶ 2-4.
[141]  Little Aff. Ex. 9.
[142]  *Id.*
[143]  Fraser Aff., Ex. 12, 78:2-7.

BST99 1565838-1.057077.0012

LeaseForum is an independent contractor and not an employee or agent of [Lycos]."[144]
LeaseForum was never Lycos's "partner."

Footnote 67 to this paragraph is misleading in that LeaseForum did not find the March
2002 e-mail until January 2004 (Gabos Decl. Ex. 20), and the memo was written in December
2003. Accordingly, the memo could not possibly have mentioned the March 18th e-mail.

**D.    Lycos Internally Acknowledges a Lack of Ability to Return CSI's Equipment.**

45.    Lycos's Response:  Partially disputed; move to strike.  Lycos disputes that the
memo that CSI relies on states that Lycos was at a "negotiating disadvantage" at the time it was
negotiating the Sales Agreement.  The memo says nothing of the sort.[145]  Accordingly, that
language in the prefatory clause should be stricken. *See, e.g., O'Brien*, 440 F. Supp. 2d at 5 n.1;
*Rand,* 824 F. Supp. at 266.

To the extent Lycos was at a disadvantage, it was not caused by Lycos's inability to return
some of the equipment, but rather because, contrary to the typical CSI lease[146] as well as
equipment leases in general,[147] neither the Master Lease nor the equipment schedules  provided
Lycos with a purchase option.[148]  Further, (1) Lycos did not have the right to substitute
equipment, and (2) no one could comply with the Master Lease Agreement's onerous return
provisions.[149]

46.    Lycos Response:  Partially disputed.  Lycos and CSI had already agreed on the
price for the sale of goods on July 14, 2003.[150]

---

[144] Little Decl., Ex. 17, ¶ 5.
[145] *See* Little S.J. Aff., Ex. 10.
[146] Fraser Aff., Ex. 17, 267:17-23.
[147] Fraser Aff., Ex. 3, 350:7-10; 356:1-6.
[148] *See generally* Little Decl., Ex. 1 (Dkt. No. 168).
[149] *See* discussion in Lycos's response to paragraph 22, *supra*.
[150] Acton Aff., Ex. 29 at AR001433; Fraser Aff., Ex. 23, 309:12-21; Fraser Aff., Ex.14, 252:2-7.

BST99 1565838-1.057077.0012

47.    Lycos's Response:  Partially disputed.  Lycos admits that Ms. Kersting noted certain minor errors in the draft of the Sales Agreement Mr. Lucy had signed on July 18, 2003 and faxed to CSI on August 1, 2003 that needed to be corrected.  Ms. Kersting did not testify that there were any substantive changes between the version Mr. Lucy signed and the version of the agreement that was finally executed by the parties.[151]

48.    Lycos's Response:  Disputed as misleading.  Lycos signed the Sales Agreement dated July 15, 2003[152] on July 18, 2003,[153] and re-signed it on August 8, 2003, one week *after* it wired the agreed-upon $3.775 million purchase price to CSI.[154]

49.    Lycos Response:  Disputed.  As reflected in the following language from the Sales Agreement, Lycos became the owner of the equipment on each schedule (to the extent it was not already the owner) as of the Termination Date of each schedule:

> A.    "Buyer agrees to buy and Seller agrees to sell all but not less than all of the items of equipment leased to Buyer under the Existing Schedules . . . effective on their respective termination dates, except as stated in paragraph 5 below . . . .";
>
> B.    "Each Lease will terminate on its respective Terminate Date, provided Buyer has then fulfilled all its obligations under the applicable Lease including, but not limited to, its obligation to timely make the Remaining Rental Payments (as defined in Section 4 below) and to pay any and all other charges arising under the Lease."  Paragraph 2 states lists the "Termination Date" for each schedule;
>
> C.    "With respect to each Lease, Seller retains full title to the Equipment until its respective Termination Date."; and
>
> D.    " . . . (i) on termination of the applicable Lease, except as noted in paragraph 5 above, and provided Buyer has paid the full sales price hereunder, Seller will pass to Buyer title to the Equipment free and clear of all

---

[151]  Fraser Aff., Ex. 14, 220:23-223:5.
[152]  Little Decl., Ex. 13.
[153]  Acton Aff., Ex. 3, ¶ 11 and Exhibit A thereto.  Lycos faxed the signed Sales Agreement to CSI on August 1, 2003. *Id.*; *see also* Acton Aff., Ex. 13, 206:6-11.
[154]  Acton Aff., Ex. 14.

BST99 1565838-1.057077.0012

liens, claims and encumbrances of any kind except those caused or incurred by Buyer, if any . . ."[155]

## VI. LYCOS AND LEASEFORUM SECRETLY PLAN TO RENEGOTIATE CSI LEASES

50.  <u>Lycos's Response</u>:  Disputed.  Lycos disputes that Mr. Kirk was "confirming a plan to renegotiate and reduce the remaining future lease payments Lycos was simultaneously affirming to CSI that it would continue to pay."[156]  The undisputed evidence is that Ms. Callagee did not have the authority to approve work on behalf of Lycos and that, as of August 8, 2003, Lycos had not authorized LeaseForum to perform *any* work on what Mr. Kirk referred to as Phase II.[157]  In fact, Lycos did not authorize LeaseForum to audit the CSI-Lycos leases until October 2003.[158]

Moreover, the quoted language states only that LeaseForum was going to analyze the Lycos leases with the "aim," if the analysis so warranted, of setting up a negotiation.  It does *not* suggest unilateral payment stoppage by Lycos, which would not make any sense given that (a) Lycos had already paid CSI the $3.775 million to purchase the equipment and, according to the Sales Agreement, Lycos would not become the owner of the equipment on each schedule until it made the lease payments on that schedule, and (ii) there was an outstanding letter of credit securing the lease payments on schedules 93 and 94 such that if Lycos stopped payment unilaterally at any point, CSI could have drawn on that letter of credit.

51.  <u>Lycos Response</u>:  Disputed.  Statement of Work No. 1 does not state that LeaseForum would review Lycos's current leasing practices and, among other things, "outline available options" for Lycos.  Instead, it says,

---

[155] Little Decl., Ex. 13, ¶¶ 1, 2, 5 and 7.
[156] Bean Aff., Ex. 11, ¶ 12.
[157] Fraser Aff., Ex. 2, 197:16-198:20, 199:19-24; 200:20-201:7; 205:11-19.

- 29 -

> For lease schedules designated by [Lycos] and entered into the "Assigned Lease Schedules" list below (each a "Lease"), LeaseForum will research, direct, consult and negotiate end of lease strategies, purchase prices, renewal rates or other costs or penalties related to satisfying [Lycos's] end of lease obligations. ("Lease Satisfaction Amounts"). . . . "[u]on acceptance of a Lease Satisfaction Amount by a lessor, LeaseForum will invoice [Lycos] and [Lycos] will pay LeaseForum . . . an amount equal to twenty five percent (25%) of the difference between the Lease Satisfaction Amount and the 'BaseLine'; as herein set forth.

As opposed to being "partners" in any sense of the word, the General Services Agreement between LeaseForum and Lycos states that "It is understood by the parties that LeaseForum is an independent contractor and not an employee or agent of [Lycos]."[159]

    52.    <u>Lycos's Response</u>:  Undisputed.  There is also no evidence that, before October 8, 2003, anyone at Lycos ever authorized anyone at LeaseForum to *start* doing work on "Phase 2."[160]

    53.    <u>Lycos's Response</u>:  Undisputed.

## VII.    LYCOS' EXPERTS VALUE ALL EQUIPMENT IN EXCESS OF $7 MILLION AS OF JULY 2003

    54.    <u>Lycos Response</u>:  Disputed.  CSI's Statement refers to *preliminary calculations* performed by Mr. Daley concerning the value of the equipment to *Lycos*[161] that were, as Mr. Daley repeatedly testified at his deposition, "draft," "wrong," and "out of whack".[162]  The spreadsheets that CSI's counsel and Mr. Daley were discussing during the portions of his deposition to which CSI cites in its Statement contains the following language on top of each page:

\

---

[158] Acton Aff., Ex. 23 at LYC18888.
[159] Little Decl., Ex. 17, ¶ 5.
[160] Fraser Aff., Ex. 2, 212:6-16.
[161] Fraser Aff., Ex. 4, 47:2-11; Fraser Aff., Ex. 46, ¶¶ 4-5.
[162] CSI's Statement refers to testimony concerning Exhibit 753 and 753-A, marked at Mr. Daley's deposition. Fraser Aff., Ex. 46, ¶¶ 4-5; *see, e.g.,* Fraser Aff., Ex. 4, 47:2-11, 57:23-58:4, 60:4-17; 62:17-63:1; 64:3-6; 134:1-5; 153:2-12 (testifying spreadsheets were "draft"); *Id.* at 134:1-5; 199:20-200:2, 200:24-201:23. (testifying that the numbers in his draft as to the values to Lycos were wrong and out of whack).

BST99 1565838-1.057077.0012

These notes are incomplete and have been prepared for personal use only. No one may rely on them for any purpose- all views are subject to changes as additional information becomes available or is clarified.

Mr. Daley did not publish these "out of whack" values in his expert report.  Furthermore, CSI's appraisal expert who testified that he complied with proper appraisal practices in publishing his valuations in his expert report and believed that his valuations were accurate, has opined that the value of the equipment *to Lycos* was much lower.

                                      Respectfully submitted,

                                      LYCOS, INC.

Dated: February 29, 2008              /s/ Thomas O. Bean
                                      Thomas O. Bean (BBO# 548072)
                                      Peter M. Acton, Jr. (BBO# 654641)
                                      McDERMOTT WILL & EMERY LLP
                                      28 State Street
                                      Boston MA 02109
                                      (617) 535-4000

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on this 29th day of February, 2008, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.

                                      /s/ Peter M. Acton, Jr.
                                      Peter M. Acton Jr.

BST99 1565838-1.057077.0012