## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., ) | |
| ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant ) | |
| In Counterclaim, ) | |
| v. ) | |
| ) | **REDACTED- WILL FILE** |
| LYCOS, INC., ) | **UNREDACTED VERSION-** |
| ) | **IF THE COURT GRANTS** |
| Defendant and Plaintiff ) | **MOTION TO IMPOUND FILED** |
| In Counterclaim, ) | **FEBRUARY 28, 2008** |
| ) | |
| BANK OF AMERICA f/k/a FLEET BANK, ) | |
| ) | |
| Trustee Process Defendant. ) | |
| ) | |

### LYCOS'S COUNTER-STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION TO CSI'S MOTION FOR SUMMARY JUDGMENT DISMISSING LYCOS'S REMAINING COUNTERCLAIMS

As set forth more fully in its Opposition to CSI's Motion for Summary Judgment, CSI has curiously moved for summary judgment on many claims Lycos is *not* asserting but has not moved for summary judgment on several claims Lycos *is* asserting. To ensure that the Court is aware of at least some of the facts that form the bases for Lycos's counterclaims and to demonstrate CSI's misconception of Lycos's claims, Lycos presents this Counterstatement of Material Facts. This Counterstatement does not attempt to be an exhaustive list of all the facts Lycos would present to a jury if this case goes to trial; it is designed, however, to provide the Court with sufficient facts for the Court to understand the bases for Lycos's counterclaims.[1]

---

[1] Most of the citations herein refer to exhibits already filed with the Court, as follows: (1) Affidavit of Thomas O. Bean ("Bean Aff.") (Dkt. No. 149); (2) the Declaration of Kelly A. Gabos ("Gabos Decl.") (Dkt. No. 167); (3) the Declaration of Edward W. Little, Jr. ("Little Decl.") (Dkt. No. 168); and (4) Affidavit of Edward W. Little, Jr.

(continued…)

**Background**

1.      CSI and Lycos executed a Master Lease Agreement[2] and approximately 125 equipment schedules[3] pursuant to which CSI leased to Lycos over 6,000 pieces of computer-related equipment[4] between 1997 and 2005.[5]  More than one-third of these schedules were refinancings of earlier schedules, and many of them were themselves refinancings of earlier refinancings.[6]  All of the refinancings occurred at least six months before the scheduled end of the term of the lease, and nineteen of them occurred during the first two-to-four months of an equipment schedule.[7]  The various financings and refinancings enabled CSI to receive approximately $73 million in monthly payments from Lycos, over $45 million of which -- more than 63% of the total monthly payments -- were made pursuant to the refinanced schedules.[8]

2.      Late in the parties' relationship, CSI sold the leased equipment to Lycos for $3.775 million, subject to Lycos making the remaining lease payments on each schedule, lease payments that totaled approximately $13.8 million[9] (for a total of $17.575 million) for equipment that CSI's expert has opined was worth only $3 million at the time of the sale.[10]

---

("Little S.J. Aff.") (Dkt. No. 182).  Materials cited herein that have not previously been filed with the Court on summary judgment are attached to the Affidavit of James M. Fraser ("Fraser Aff."), filed herewith.
[2]   Little Decl., Ex. 1.
[3]   Bean Aff., Ex. 51, ¶ 5 and Exhibit B thereto.
[4]   Bean Aff., Ex. 13 at CSI0027499-564; Bean Aff., Ex. 14 at CSI0027657-740.
[5]   Bean Aff., Ex. 15 at CSI000236 (initial term commencing January 1, 1997); Bean Aff., Ex. 16 at CSI0023561 (initial term of 36 months commencing May 1, 2002).
[6]   Bean Aff., Ex. 51, ¶ 5 and Exhibits B and C thereto.
[7]   *E.g.*, Bean Aff., Ex. 51, ¶¶ 19-26 and Exhibits B and C thereto; Fraser Aff., Ex. 49, at Response No. 23 (CSI's Supplemental Response to Second Set of Ints.); *see also* Bean Aff., Ex. 21.
[8]   Bean Aff., Ex. 51, ¶ 34 and Exhibit G thereto.
[9]   Little Decl., Ex. 13, ¶¶ 2-4; Acton Aff., Ex. 16, ¶ 44 and Exhibit K thereto.
[10]   Gabos Decl., Ex. 22, at 14.

BST99 1565829-1.057077.0012

**The Complexity of Equipment Leasing
And Lycos's Lack of Sophistication
With Respect to It**

3.      Equipment leasing is a specialty within the field of finance.[11]  Professor James

Johnson, a CSI expert who has opined in this case on equipment leasing industry standards, has

written: "[u]nless finance and legal are well-versed in the subtleties of high-technology leasing,

they will generally miss the import of a number of [lease] provisions, no matter how skilled they

are."[12]

4.      According to Prof. Johnson, experience in negotiating equipment leases does not

obviate the need for specific knowledge of the subtleties of high technology leasing: "even

lessees who have negotiated several leases of various types of equipment in past years find

themselves at a disadvantage in that their opponents are generally professionals who make their

living negotiating equipment leases."[13]  Accordingly, he has concluded that "[i]t is rare that

negotiations are conducted on a level playing field."[14]

5.      Here, CSI, which claims to be the largest independent leasing company in the

United States,[15] had been in the equipment leasing business for almost twenty-five years when

the parties entered into a Master Lease Agreement[16] (the "Master Lease Agreement").[17]  Lycos

on the other hand, was a less than two-year-old start-up in the then-nascent internet industry.[18]

Its Chief Financial Officer,[19] who signed that agreement in December 1996[20] had never been

---

[11]  Fraser Aff., Ex. 12, 41:15-19.
[12]  Fraser Aff., Ex. 37, at 9.
[13]  Fraser Aff., Ex. 12, 52:7-12.
[14]  Fraser Aff., Ex. 40 at 26.
[15]  Bean Aff., Ex. 3 at IA000004.
[16]  Fraser Aff., Ex. 21, 14:2-10.
[17]  CSI's First Am. Compl., ¶ 11 (Dkt. No. 121); Little Decl., Ex. 1 at 1.
[18]  Bean Aff., Ex. 4 at PHIL000241.
[19]  Fraser Aff., Ex. 18, 16:5-8; 27:13-16.
[20]  Fraser Aff., Ex. 18, 28:9-23.

involved in any aspect of leasing equipment prior to joining Lycos a year earlier,[21] and had only

become involved in leasing shortly before signing the CSI lease.[22]  At the time the CFO signed

the Master Lease Agreement, Lycos did not have in-house counsel.[23]

     6.     The Master Lease Agreement contains four provisions that Prof. Johnson has

included in a book chapter entitled, "Rogue's Gallery of Gotcha's," lease provisions in which the

lessor has "got" the lessee.[24]  The "Gotcha" clauses in the Master Lease Agreement are:

     A.     an automatic renewal provision,[25] i.e., a provision that automatically
renews an equipment schedule for an additional period of time if the schedule is not properly and
timely terminated;[26]

     B.     an "interim rent" clause,[27] i.e., a provision pursuant to which the lessee
effectively extends the lease term by paying full per diem rent from the day the equipment is
installed until the day the lease actually commences, as opposed to simply paying the "interest"
on the use of the equipment during that period, a period that in the CSI-Lycos relationship
sometimes approached three months;

     C.     a "perfect return" clause,[28] i.e., a provision that requires the lessee to
return the equipment in strict accordance with certain return provisions that could not be
satisfied; and

     D.     "casualty value calculations"[29] (a.k.a. "Stipulated Loss Value") that spell
out the percentage by which a "base value" is to be multiplied by a percentage to determine the
amount the lessee is required to pay if the leased equipment is lost or destroyed.[30]  Prof. Johnson
has opined that the casualty value calculations in the CSI-Lycos equipment schedules were
"unjustifiable."[31]

---

[21] Fraser Aff., Ex. 18, 20:22-24.
[22] Fraser Aff., Ex. 18, 25:15-26:6.
[23] Fraser Aff., Ex. 18, 30:18-21.
[24] Fraser Aff., Ex. 12, 88:19-23; Fraser Aff., Ex. 39 at 56-58.
[25] Little Decl., Ex. 1, ¶ 2.
[26] Professor Johnson is the co-author of an article that argues that Courts should find automatic renewal clauses in a "full payout lease," i.e., one in which the lessor has a booked residual value of zero, to be "unconscionable" under section 2A-108 of the Uniform Commercial Code.  *See* Fraser Aff., Ex. 38 at 17.
[27] Little Decl., Ex. 1, ¶ 3.
[28] Little Decl., Ex. 1, ¶ 7.
[29] *Id.* ¶ 9.2; *e.g.*, Fraser Aff., Exs. 53 and 54.
[30] Fraser Aff., Ex. 39 at 56-58; Little Decl., Ex. 1, ¶ 9.2.
[31] Fraser Aff., Ex. 12, 90:20-24.

7.    When asked whether the inclusion of the above "gotcha" provisions in the Master Lease Agreement demonstrated that Lycos was unsophisticated with respect to equipment leasing, Prof. Johnson responded, "I don't know if they were unsophisticated or just didn't care."[32]  Lycos did care, as evidenced by the testimony of its Chief Financial Officer who signed the agreement that Lycos wanted to make sure that the amount it spent on leases and other expense items was consistent with its growth.[33]

8.    Not only did the Master Lease Agreement contain these four "gotcha" provisions, but that Agreement, contrary to the typical Master Lease Agreement between CSI and its other lessees, did not give Lycos the right to purchase the equipment at the end of the lease term for the then fair market value or any other price.[34]  In addition, the Master Lease gave CSI absolute discretion to decide whether, if a piece of equipment were lost, Lycos could substitute a comparable piece of equipment or pay CSI the "unjustifiable" Stipulated Loss Value.[35]

**The Equipment Leasing Association's
And CSI's View of the Relationship between
Lessors And Lessees**

9.    Perhaps because of the complexity of equipment leasing as a form of finance, the former President of the Equipment Leasing Association ("ELA"), the leading trade association and lobbying arm of equipment lessors,[36] who is an expert for CSI in this case, has written on multiple occasions that lessees should view their lessor as a "partner"[37] and "ally."[38]  He has written that "[l]oyalty and collaboration between lessors and lessees is vital in the leasing

---

[32]  Fraser Aff., Ex. 12, 153:17-154:1.
[33]  Fraser Aff., Ex. 18, 129:17-130:9.
[34]  Fraser Aff., Ex. 17, 267:21-268:2; *see generally*, Little Decl., Ex. 1.
[35]  Little Decl., Ex. 1., ¶ 9.2.
[36]  Fraser Aff., Ex. 6, 99:10-22; *see generally* Fraser Aff., Ex. 34.
[37]  Fraser Aff., Ex. 6, 163:18-22.
[38]  Fraser Aff., Ex. 6, 164:12-15.

industry."[39]  To this end, leasing companies including CSI routinely convey a "leave the driving

to us" approach to equipment leasing.[40]  For instance, CSI's website during the parties'

relationship stated that CSI "works hard to develop lasting relationships with [its] customers,

which is reflected in [its] full-service approach to the entire leasing process."[41]  In so doing, the

website said that CSI leads its customers "every step of the way, from initial discussions with

[its] leasing executives to disposal of assets at the end of a lease."[42]

      10.    The ELA wants lessees to "trust" their lessors to make good business decisions.[43]

To achieve this goal, it believes that leasing companies generally want to have the account

executive gain the trust of the decision-maker at the customer.[44]

      11.    As a member of the ELA, CSI represented on its website during its relationship

with Lycos that CSI's customers "trust [it] to manage the leasing process efficiently and

ethically, while catering to their own unique needs."[45]  In fact, CSI referred to itself on its web-

site as its lessees' leasing "partner."[46]

      12.    CSI also made numerous other representations on its website, including that: it

engages in "the highest levels of business conduct with regard to ethics, service and

enhancement of reputation";[47] its business is "devoted to offering fair and flexible leasing

options";[48] its formula as "simple – we build strong relationships based on personalized attention

---

[39] Fraser Aff., Ex. 33 at 2.
[40] *See* Bean Aff., Ex. 3 at IA000023, 0025, 038-041.
[41] *Id.* at IA000041.
[42] *Id.*
[43] Fraser Aff., Ex. 6, 172:6-9.
[44] *Id.* at 277:13-278:1.
[45] Bean Aff., Ex. 3 at IA000040.
[46] *Id.*
[47] *Id.* at IA000006.
[48] *Id.* at IA000059.

- 6 -

and superior service";[49] and it works directly with its customers to make "the best decisions" for

their businesses.[50]

## CSI's Gains the Trust of Lycos

13.    While the person at Lycos responsible for equipment leasing changed many times

during the parties' nine-year relationship,[51] CSI had a single account executive for Lycos the

entire time: Paul Stenberg.[52]  Mr. Stenberg had more than fifteen years of experience in

computer equipment sales and leasing at the time the relationship began.[53]  He knew that CSI

would evaluate his performance based on, among other things, his ability to ███████████████

█████████████████████████████████████[54]

14.    Mr. Stenberg knew early in the parties' relationship that Lycos trusted him.  He

wrote in an internal e-mail to CSI personnel in April 1998:


[55]

By "stub," Mr. Stenberg was referring to "interim rent,"[56] one of Prof. Johnson's "gotcha"

provisions.[57]

15.    Mr. Stenberg was not the only CSI employee who knew that Lycos trusted him.

Mr. Stenberg's supervisor, Richard Guilander,[58] observed Mr. Stenberg interacting with Lycos,

---

[49]  *Id.*
[50]  *Id.* at IA000023.
[51]  Fraser Aff., Ex. 23, 33:15-35:22; Bean Aff. Ex. 7, 26:10-27:11; Fraser Aff., Ex. 326, 136:24-137:7; Fraser Aff., Ex. 9, 27:17-28:7; Fraser Aff., Ex. 15, 48:16-19, 55:4-15.
[52]  Fraser Aff., Ex. 23, 29:20-30:13.
[53]  *Id.* at 16:22-19:2.
[54]  Bean Aff., Ex. 74, at CSI044216;  Bean Aff. Ex. 75, at CSI044219-20; Fraser Aff., Ex. 8, 136:22-137:13.
[55]  Bean Aff. Ex. 69.
[56]  Fraser Aff., Ex. 23, 220:11-12.
[57]  Fraser Aff., Ex. 12, 143:19-144:1.
[58]  Fraser Aff., Ex. 8, 22:18-19.

- 7 -

and then awarded him a perfect score on his performance evaluation for his ability to 

███████████████████████████████████████████[59]

16.    Lycos did, in fact, trust Mr. Stenberg.  Brian Lucy, a Lycos Chief Financial

Officer who signed several of the equipment schedules between the parties including the two

largest, Schedules 93 and 94, has testified that:

A.    his predecessors as CFO had worked with Mr. Stenberg for years and, as such, he came to trust Mr. Stenberg;

B.    Mr. Stenberg led him to believe that he (Mr. Stenberg) fully understood the leasing business whereas there was much of it that he (Mr. Lucy) did not understand;

C.    He relied on Mr. Stenberg's expertise and integrity to advise Lycos of the full business and financial implications of "rolling up" the equipment lease schedules;

D.    He viewed Mr. Stenberg as a business partner, and believed Mr. Stenberg assumed and accepted Lycos's trust in him; and

E.    Mr. Lucy socialized on a number of occasions with Mr. Stenberg, such that Mr. Stenberg had gained his friendship as well as his trust.[60]

17.    At least one other Lycos employee, Peter Karol, knew that Mr. Lucy trusted Mr.

Stenberg.  At some point after Mr. Lucy became CFO of Lycos in spring 2001, Mr. Lucy advised

Mr. Karol that he could not get the lease payments to CSI to match up.[61]  Mr. Lucy told Mr.

Karol, "But I trust Paul Stenberg.  He told me that the payments were accurate."[62]  When Mr.

Karol asked why Mr. Lucy would trust Mr. Stenberg, who did not work for Lycos, Mr. Lucy

responded, "But he's a friend of mine.  He would never lie to me."[63]

---

[59] *Id.* at 136:22-137:13.
[60] Bean Aff., Ex. 33, ¶ 13.
[61] Fraser Aff., Ex. 13, 168:21-169:24.
[62] *Id.*
[63] *Id.*

18.    In July 2001, more than four years after the commencement of the parties'

relationship, Mr. Stenberg was promoted to Regional Manager at CSI.[64] 

In this case, however, CSI

permitted Mr. Stenberg, who had gained the          and

of Lycos, to retain the Lycos account.[65]

[66]

**Industry Standards on Disclosure
Of Information to Lessees**

19.    In part to facilitate lesors gaining the trust of their lessees, the ELA has adopted a

Code of Fair Business Practices (the "Code") that the ELA informs lessees about in trade and

popular media publications.[67]  The preamble to that Code provides:

> The Code of Fair Business Practices signifies voluntary assumption by members
> of the obligation of self-discipline and notifies the public and business community
> that members intend to maintain a high level of ethics and professional services.
> In essence it proclaims that, in return for the faith that the public and business
> community places in them, the members accept the obligation to conduct their
> activities in a way that will be beneficial to the public and business community.[68]

20.    During the parties' relationship, the Code specifically provided:

> **A Member [such as CSI] shall disclose [to its lessees] all relevant information
> as to the terms and conditions of a transaction or service which may affect
> the [lessee's] decision.**[69]

21.    Part of the reason the ELA adopted this disclosure standard was that some lessors

had been charging lessees "undisclosed fees,"[70] something the ELA thought was inappropriate.

---

[64]  Bean Aff., Ex. 57, at CSI044468.
[65]  Fraser Aff., Ex. 23, 177:17-23.
[66]  *Id.* at 320:24-321:4.
[67]  Fraser Aff., Ex. 32 at 3.
[68]  Fraser Aff., Ex. 35 at ELFA000049, ELFA000060.
[69]  Fraser Aff., Ex. 35 at ELFA000061, ¶ 7.
[70]  Fraser Aff., Ex. 6, 42:21-43:1.

BST99 1565829-1.057077.0012

22.    The ELA promulgated the Code to "notif[y] the public and business community that members intend to maintain a high level of ethics and professional services."[71]  The Code is also intended to ensure that lessors' employees comply with the Code.[72]

**The Corporate Culture of CSI**

23.    CSI's co-founder, Chairman, and CEO, Kenneth Steinback,[73] touted the importance of honesty and integrity in his business when speaking with the press and in an article he wrote during the CSI-Lycos relationship:

> "That I've built a company with great people, great customers, and with terrific integrity." (speaking about his proudest accomplishment).[74]
>
> "I would sacrifice dollars any time for integrity and goodwill."[75]

24.    Notwithstanding these representations, Mr. Steinback has made statements in this litigation which directly conflict with these public comments and more accurately describe the corporate culture at CSI.  When asked whether CSI gives any information to a lessee in connection with the refinancing of a lease other than the new monthly rate and the new term, Mr. Steinback said, ███████████████████████████[76]

25.    Mr. Stenberg and CSI applied this "don't ask, don't tell" philosophy to the Lycos-CSI relationship.  Specifically,

> A.    as noted above, Mr. Stenberg once wrote: ██████████████ ███████████████████████████; and

> B.    When Monique Walsh of Lycos asked Carolyn Simmons-Berry of CSI in December 2003 to fax her the invoice with respect to certain equipment on schedule 200 to

---

[71]  Fraser Aff., Ex. 35 at ELFA000049, ELFA000060.
[72]  *Id.* at ELFA000061, ¶ 15.
[73]  Fraser Aff., Ex. 21, 18:12-13.
[74]  Fraser Aff., Ex. 43 at 2.
[75]  *Id.*; Fraser Aff., Ex. 21, 66:12-15.
[76]  Fraser Aff., Ex. 22, 82:22-83:1.

"confirm the total cost of these selected pieces of equipment,"[77] Ms. Simmons-Berry sent an e-mail to Mr. Stenberg saying,



[78]

26.    Consistent with this corporate culture, even though CSI has been a member of the ELA for over twenty-five years,[79] touts that membership on its letterhead[80] and on its website,[81] and the Code provides that "[a] Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practices, "[82] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[83] In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, President and COO, and CSI's co-CFO all testified to having never read the Code.[84]

27.    CSI, however, represented on its web-site during the Lycos relationship, that it provides "continual professional development of its personnel."[85] In truth, CSI has admitted that it provides ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[86] ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[87] ▮▮▮▮▮▮▮▮▮▮▮▮▮[88] When deposed in 2006, Mr. Stenberg, who

---

[77] Fraser Aff., Ex. 29.
[78] *Id.* (emphasis added).
[79] Fraser Aff., Ex. 21, 31:18-24.
[80] Fraser Aff., Ex. 62.
[81] Bean Aff., Ex. 3, at IA000006-007.
[82] Fraser Aff., Ex. 35, at ELFA000061, ¶ 15.
[83] Fraser Aff., Ex. 23, 229:16-22.
[84] Fraser Aff., Ex. 1, 39:16-40:1; Fraser Aff., Ex. 10, 74:4-24; Fraser Aff., Ex. 22, 11:12-20.
[85] Bean Aff., Ex. 3 at IA 000006.
[86] Fraser Aff., Ex. 21, 44:7-45:10; Fraser Aff., Ex. 23, 226:24-227:15.
[87] Fraser Aff., Ex. 23, 227:8-10.
[88] *Id.* at 227:13-15.

BST99 1565829-1.057077.0012

joined CSI in 1993,[89] recalled attending ████████████████████████████

████████████████████[90]

28.     CSI's compensation system also reflected the company's culture.  Mr. Stenberg

was compensated primarily on a commission basis pursuant to a detailed compensation plan

developed by CSI.[91]  His commissions were calculated in significant part on the extent to which

█████████████████████████████████████████████████████

████████████████████████[92] a number often referred to at CSI as the

"margin" on a deal.[93]  While Mr. Stenberg admitted that he ███████████████████

███████████████████████████████, CSI provided him with

████████████████████████████[94]  Despite having worked on the Lycos

account for eight years and set the pricing on 126 equipment schedules, when asked how he

came up with the price he quoted Lycos, he said, it ████████████████████████

██████████████████████████[95]

29.     CSI's commission plan applied both to ████████████████████

████████████████████████[96]  Accordingly, every time a customer

refinanced an equipment schedule, Mr. Stenberg ████████████████████████

████████████████[97] ████████████████████████████

---

[89] *Id.* at 18:24-19:1.
[90] *Id.* at 226:24-227:7.
[91] Bean Aff., Exs. 52-57.
[92] Fraser Aff., Ex. 1, 102:11-22; Bean Aff., Ex. 52 at CSI44229, CSI44232, CSI44241; Bean Aff., Ex. 53 at CSI44260, CSI44268, CSI44277; Bean Aff., Ex. 54 at CSI44303-304, CSI44315; Bean Aff. Ex. 55 at CSI44340-341, CSI44352; Bean Aff., Ex. 56 at CSI44376-377, CSI44388; Bean Aff., Ex. 57 at CSI044468, CSI044477, CSI044482; Bean Aff., Ex. 58, at CSI044470, CSI044497, CSI044502.
[93] Fraser Aff., Ex. 23, 83:17-21.
[94] Fraser Aff., Ex. 23, 278:1-281:20.
[95] Fraser Aff., Ex. 23, 521-522:13.
[96] Bean Aff., Exs. 52-57.  *Compare* Bean Aff., Ex. 51, ¶ 5 (list of Refinanced Schedules), *and*  Exhibit B thereto, *with* Bean Aff., Ex. 59 (commissions earned per schedule), and Bean Aff., Ex. 51, Exhibit L thereto.
[97] *See supra* notes 92, 96.

BST99 1565829-1.057077.0012

 [98] CSI referred to this as the

_____ [99]

30.    Mr. Stenberg _____ when CSI sold equipment to one of his customers that had been under lease based on the extent to which the price for which CSI sold the equipment _____.[100]

31.    Summarizing his understanding of the foregoing, Mr. Stenberg once wrote to CSI managers in an e-mail he called his "Tom Cruise Mission Statement":

 [101]

Mr. Stenberg even cited Lycos in this e-mail as his sole example of what CSI's business model could achieve.[102]  Mr. Stenberg did not mention fairness, integrity, ethics, superior service, or flexible solutions, i.e., the supposed formula of CSI according to Mr. Steinback.[103]

32.    Despite the Code's requirement that lessors conduct themselves with integrity, and despite CSI's pledge on its website that it "works to create customized lease terms and conditions to fit the user's business needs, technology needs and budget constraints," that its customers "trust" it to manage the leasing process "efficiently and ethically," the reality of CSI's corporate culture, as explained by Mr. Stenberg himself, is that account executives should turn a blind eye toward and not attempt to sway a trusting lessee away from bad business deals:

---

[98]  Bean Aff., Ex. 55 at CSI44364; Bean Aff., Ex. 56 at CSI044399-400.
[99]  Bean Aff., Ex. 60.
[100]  Bean Aff., Ex. 52 at CSI44229-232, CSI44235; Bean Aff., Ex. 53 at CSI44268-271; Bean Aff., Ex. 54 at CSI44306-310; Bean Aff., Ex. 55 at CSI44341, CSI44343; Bean Aff., Ex. 56 at CSI44379-383; Bean Aff., Ex. 57 at CSI044483; Bean Aff., Ex. 58 at CSI0044502-503; _see also_ Bean Aff., Ex. 63.
[101]  Bean Aff., Ex. 61, at CSI0042468.
[102]  _Id._
[103]  _Id._

Q. 

A.

Q.

A. [104]

. . . .

Q.

A. [105]

33.     As with a corporate culture that encourages its employees to abuse the trust of its customers, CSI's corporate culture permitted its employees to abuse the trust CSI placed in them, as evidenced by the fact that 

[106]

34.     CSI learned of Mr. Stenberg's misconduct in August 2006,[107] when, during his deposition, Mr. Stenberg was confronted with ████████████████ produced to Lycos in this litigation and admitted under oath ████████[108] Despite having Mr. Stenberg's own admissions, CSI's Asst. General Counsel supposedly conducted an official investigation of Mr. Stenberg's conduct that lasted several months and delivered the results of

---

[104] Fraser Aff., Ex. 23, 214:15-24.
[105] *Id.* at 234:21-235:3.
[106] *Id.* at 129:4-130:1; Fraser Aff., Ex. 44 (Stenberg Ex. 7).
[107] Fraser Aff., Ex. 20, 24:15-25:1, 26:25-27:4; Fraser Aff., Ex. 21, 153:16-154:13; Fraser Ex. 23, 3:2-3.
[108] *See, e.g.*, Fraser Ex. 23, 129:20-130:17.

that investigation to CSI's General Counsel in or about December 2006.[109]  CSI then waited

more than three months until March 2007, after fact discovery had closed, to "punish" Mr.

Stenberg by requiring him to



[110]

[111]

[112]

    35.    One of CSI's experts, the twenty-seven year former President of the Equipment

Leasing Association and a Certified Association Executive,[113] testified if an employee

he would most likely be fired.[114]

**Certain Provisions of the Master Equipment
Lease and Equipment Schedules**

    36.    The Master Lease Agreement provides, in pertinent part:

> Lessee's obligation to pay the Monthly Rental and all other sums due hereunder
> shall be unconditional and shall not be subject to any setoff, abatement,
> counterclaim, recoupment, defense, cancellation, repudiation, rejection of
> equipment, revocation of acceptance of equipment or any other right that Lessee
> may have against Lessor.[115]

In construing this clause, CSI argued earlier in this case that:

> These types of clauses, known as 'hell or high water' provisions . . . require the
> lessee to make payments under the lease 'come hell or high water,' without regard
> to defenses that the lessee might wish to assert against the lessor, and without any
> right of recoupment.[116]

---

[109]  Fraser Aff., Ex. 20, 182:9-184:15.
[110]  Bean Aff., Ex. 62.

                                        Fraser Aff., Ex. 23, 198:24-199:8.

[111]  Bean Aff., Ex. 62.
[112]  *Id.*
[113]  Fraser Aff., Ex. 6, 6:20-7:1; Fraser Aff., Ex. 31.
[114]  Fraser Aff., Ex. 6, 104:22-105:10.
[115]  Ex. 1 to CSI's Am. Compl., ¶ 5 (Dkt. No. 121).
[116]  CSI's Mem. in Supp. of Mot. Dismiss Def.'s Countercl. at 3 (Dkt. No. 16) (March 10, 2005).

BST99 1565829-1.057077.0012

37.     Each equipment schedule also contains information pertinent to the parties' relationship.  Each schedule lists the monthly rent and the term of the schedule, and contains an "Exhibit A" that provides some description of the equipment being leased.[117]  None of the schedules discloses that CSI routinely charged Lycos a fee or mark-up for the privilege of refinancing.[118]

38.     The "Exhibit A" with respect to the original schedules describes each type of equipment being leased, the quantity of each type of equipment of each under lease, and the monthly rent for each piece of equipment.  CSI sent this "short form" Exhibit A to Lycos for review before many schedules were executed and attached it as an exhibit to the equipment schedules.[119]

39.     CSI also maintained internally a "long-form" Exhibit A that contained all of the information on the "short form" Exhibit A it sent to Lycos, but also listed the original cost of each piece of equipment and the aggregate cost of the equipment on each schedule.[120]  Consistent with its corporate culture, CSI did not provide this "long form" Exhibit A to Lycos.[121]  Only after Lycos had executed approximately 120 of the 125 schedules and had specifically requested information concerning the original cost of the equipment on the last few original schedules did CSI disclose to Lycos the "long-form" Exhibit A.[122]

40.     At the time each original equipment schedule was executed, the parties did not know what the aggregate cost of the equipment on that schedule would be.  Accordingly, each

---

[117]  CSI's Am. Compl., ¶ 11 (Dkt. No. 121); *id.* at Exhibit 1 thereto.
[118]  See, e.g., Bean Aff., Exs. 13 and 14.
[119]  *E.g.*, Fraser Aff., Ex. 2.
[120]  *See, e.g.*, Fraser Aff., Ex. 28.
[121]  *Compare* Fraser Aff., Ex. 28, *with* Fraser Aff. Ex. 27.
[122]  *See, e.g.*, Fraser Aff., Ex. 42.

BST99 1565829-1.057077.0012

original equipment schedule contained a provision similar to the following concerning the

amount Lycos would be required to pay CSI if the leased equipment were lost or damaged:

> Stipulated Loss Value.  Because the actual quantities of Equipment are unknown
> at this time, specific dollar amounts cannot be listed on the Stipulated Loss Value
> Schedule.  Instead, "Manufacturer's list price" has been specified so that, at the
> time of a loss, the Stipulated Loss Value shall be equal to the present
> manufacturer list price for the Unit times the applicable percentage.  The parties
> agree, however, that [after all the equipment has been purchased], a new
> Stipulated Loss Value schedule specifying a dollar amount Base Value shall be
> executed.[123]

41.    On the refinanced schedules, however, CSI simply listed a dollar amount for the

"Base Value," an amount Lycos believed equaled the original cost of the equipment on that

schedule.[124]  According to Mr. Stenberg ███████████████████████████████████████████

███████████████████████████████████████████████[125] ███████████████████████████████

███████████████[126]

### The Refinancing of Equipment Schedules

42.    As noted above, forty-four of the equipment schedules were refinancings.[127]

Many of these refinancings were themselves refinancings of earlier refinancings.[128]

43.    As part of these refinancings, equipment from a single schedule was sometimes

split into two or more separate schedules, and equipment from two or more schedules was

sometimes combined onto a single schedule.  For example,

A.    the computer equipment on schedule 19, which was originally effective
April 1, 1998, was combined with the equipment on schedules 21, 22, 23, 26 and 30 and
refinanced onto schedule 43 at least six months before each of the schedules being refinanced
was scheduled to terminate;

---

[123]  *See, e.g.,* Fraser Aff., Ex. 52 at CSI0033450, ¶ 5.
[124]  Fraser Ex. 24, 90:14-91:6.
[125]  Fraser Aff., Ex. 23, 92:14-23.
[126]  *Id.* at 92:24-93:4; Fraser Ex. 14, 114:6-12.
[127]  Bean Aff., Ex. 51, Exhibit B thereto.
[128]  *Id.*

B.     the equipment on schedule 43 was then split and refinanced and refinanced onto schedules 66B, 67A, and 68B, again more than six months before schedule 43 was scheduled to terminate.

C.     The equipment on schedules 66B, 67A, and 68B – some of which started out on schedule 19 – was refinanced onto schedules 93 and 94.  Schedules 93 and 94 terminated on October 31, 2003 and October 31, 2004, respectively.[129]

Thus, the computer equipment that was leased initially on schedule 19 effective April 1998 was refinanced three times, was both combined and split, and was five and half years old by the time schedule 93 terminated and six and a half years old at the end of schedule 94.  ███████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

44.     Attached as **Exhibit C** to Exhibit 51 to the Bean Affidavit[130] is a flow chart that shows the history of financings and refinancings of Lycos equipment schedules including the splitting and combining of equipment described above.

45.     There were three large groups of refinancings: the "roll-up" of "virtually every Lycos schedule out there" that occurred in September 1999, the rewrite of nineteen schedules in 2000 and early 2001, just two-to-four month after the inception of each of those schedules, and the roll-up of thirty-one schedules in late 2001 onto schedules 93 and 94.

The September 1999 Refinancings

46.     On Friday September 10, 1999, just two months after CSI ██████████████████

████████████████████████████████████████████████████████,[131] Mr.

---

[129]   Fraser Aff., Ex. 59, ¶ 2; Bean Aff., Ex. 26 at CSI0029730, ¶ 2; Bean Aff., Ex. 27 at CSI0031370, ¶ 2; Bean Aff., Ex. 28 at CSI0010136, ¶ 2; Bean Aff., Ex. 13 at CSI0027565, ¶ 2; Bean Aff., Ex. 14 at CSI0027741, ¶ 2.
[130]   Bean Aff., Ex. 51.
[131]   Bean Aff., Ex. 55 at CSI44364.

BST99 1565829-1.057077.0012

Stenberg ███████████████████████████████████████████

███████████████████████████ [132]

47.    That same day, CSI prepared a chart for Mr. Stenberg ████████████



██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████ [133] Calculation of the ██████████████████

████████████████████████████████████████

████████████████ [134] This list did not break the schedules into any groups, but

simply listed them in numerical order.

48.    On Monday, September 13, 1999, Mr. Stenberg submitted four different

documents to CSI called ██████████████████████████████████

██████████████████████████████████████ [135]

49.    Mr. Stenberg asked CSI to prepare a chart for Lycos showing the effect of the

refinancings. ████████████████████████████████████

█████████████████ [136]

50.    CSI prepared that chart on September 15, 1999, and delivered it to Lycos. [137]

51.    The very next day, September 16, 1999 – ██████████████████████

██████████████████████████████████████ -- CSI

---

[132]  Bean Aff., Ex. 60 at CSI0041994.
[133]  Bean Aff., Ex. 71 at CSI0041902, CSI0041904-905 (column "TH"); Bean Aff., Ex. 72; Bean Aff., Ex. 29 at 55:2-8; 69:19-24.
[134]  Bean Aff., Ex. 71, at CSI0041902 (column PVLP@7%); Bean Aff., Ex. 87, 40:5-16; *see also* Fraser Aff., Ex. 10, 67:6-13; 85:1-86:2 (Cagney Tr.); Bean Aff., Ex. 87, 40:5-16.
[135]  Bean Aff., Ex. 64 at CSI0039381, CSI0039964; *see, e.g.,* Fraser Aff., Ex. 57.
[136]  Bean Aff., Ex. 29, 119:20-120:23; Bean Aff., Ex. 73; Bean Aff., Ex. 64. *Compare* Bean Aff., Ex. 64 (provided to Lycos) *with* Bean Aff., Ex. 72 (provided to Mr. Stenberg/CSI).
[137]  Bean Aff., Ex. 64.

and Lycos entered into several schedules that refinanced, in the words of CSI's co-CFO, "almost every Lycos schedule out there"[138] *without* "free rent" for the month of October.

52.     In connection with each of these refinancings, CSI embedded a "hidden charge" for refinancing in the new monthly rent aggregating in the millions of dollars.  In other words, it charged Lycos an added fee or mark-up in connection with the refinancing that it did not disclose to Lycos.  ███████████████████████████████████████████

████████████████████████████████[139]

The 2000-2001 Rewrites

53.     Between March 2000 and April 2001, Lycos and CSI entered into nineteen 24-month equipment schedules (the "Preliminary Schedules").  Each of these schedules was rewritten just *two- to-four months* after their commencement to become 36-month schedules (the "Rewritten Schedules").  Because Mr. Stenberg earned a commission on each of the rewrites,[140] Mr. Stenberg turned nineteen commissions into thirty-eight commissions by rewriting these schedules.

54.     When asked at his deposition why Lycos would repeatedly enter a 24-month schedule only to rewrite it two-to-four months later into a 36-month schedule, Mr. Stenberg claimed that this was done because ████████████████████████████████

█████████████████████████████████████[141]  Mr. Stenberg conceded, however, that ██████████████████████████████████████████

████████████████████████████████████████[142]

---

[138]  Bean Aff., Ex. 70.
[139]  *Compare* Bean Aff., Ex. 64 (schedules identified therein), *with* Bean Aff., Ex. 59, at CSI44442, *and* Bean Aff., Ex. 51, Exhibit L thereto.
[140]  Bean Aff., Exs. 55-56.
[141]  Fraser Aff., Ex. 23, 65:8-66:4.
[142]  *Id.* at 67:2-68:9.

Since Mr. Stenberg's testimony, CSI has admitted that it did not finance the interim rent on all of the rewrites, thereby contradicting Mr. Stenberg's purported explanation.[143]

55.     At his deposition, Lycos asked CSI's expert, Prof. Johnson, whether he could think of any reason a technology lessee such as Lycos would rewrite or renew a 24-month equipment schedule just two-to-four months into that schedule to turn it into a 36-month schedule.  Prof. Johnson responded: "I've been thinking about that for three months."  When Lycos asked, "what's your thought?" he said, "I have no idea."[144]

56.     CSI's co-CFO referred internally to these rewrites as ███████[145]

57.     In fact, CSI, apparently knowing that Mr. Stenberg would rewrite each of these original schedules at inception, did not even book them ████████████████

████████████████████████████████████[146]

58.     The rewriting of these schedules often saved Lycos only a few hundred dollars per month.  For example, as one of CSI's experts has observed, when schedule 64C was rewritten into schedule 64F, Lycos reduced its rent by $643 per month, an annual reduction of $7,288; and when schedule 64A was rewritten as schedule 64D, Lycos's monthly rent was reduced by $791, an annual reduction of $8,965.[147]  The hidden fee or mark-up on schedules 64D and 64F, where Lycos saved approximately $16,000 per year to extend a 24-month lease to a 36-month lease, totaled over ███████[148]

---

[143]  Fraser Aff., Ex. 49, Response No. 23.
[144]  Fraser Aff., Ex. 12, 158:8-15.
[145]  Bean Aff., Ex. 30 at CSI0041088.
[146]  Bean Aff., Exs. 78-80.
[147]  For example, when Lycos refinanced the equipment on schedule 64A onto schedule 64D, its monthly rent declined by less than $800, from $12,219 to $11,428.  Similarly, when Lycos refinanced schedule 64C onto 64F, its monthly rent declined from $6,188 to $5,545. Fraser Aff., Ex. 31.
[148]  Bean Aff., Ex. 51, Exhibit G thereto.

59.     As time passed during these rewrites, CSI increased the amount of the mark-up such that by the end, the mark-ups on the rewrites from schedules 83 to 89 and from 84 to 90 were over ▉▉▉▉ each.[149]

60.     The aggregate mark-up on the Rewritten Schedules totaled almost ▉▉▉ million, thereby enabling Mr. Stenberg to earn almost ▉▉▉▉ in commissions on the "preliminary schedules," and an additional ▉▉▉▉ on the Rewritten Schedules.[150]

The Refinancing Onto Schedules 93-94

61.     In fall 2001, CSI and Lycos refinanced thirty-one existing schedules onto schedules 93 and 94.  CSI's co-Chief Financial Officer, who developed the structure for that refinancing,[151] described it in an internal CSI email as ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[152]

62.     In fact, he developed this ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ to ensure that Mr. Stenberg achieved his objective of having at least ▉▉▉▉▉▉▉▉▉[153] ▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[154] ▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[155]

63.     The structure of schedules 93 and 94 provided for termination of some of the equipment on some of the existing schedules before the end of their term, while letting the balance of the equipment on those schedules run to the end of their term, and then having it "roll on" to schedules 93 and 94 over time.[156]  For example, equipment schedule 66 was scheduled to

---

[149]  *Id.*
[150]  *Id.*
[151]  Fraser Aff., Ex. 1, 164:22-165:4.
[152]  Bean Aff., Ex. 68.
[153]  Fraser Aff., Ex. 1, 266:14-267:13; Bean Aff., Ex. 68.
[154]  Fraser Aff., Ex. 1, 124:20-22.
[155]  Fraser Aff., Ex. 1, 255:17-19.
[156]  *See* Bean Aff., Ex. 13 at CSI0027565, ¶ 2; Bean Aff., Ex. 14, at CSI0027741, ¶ 2.

- 22 -

terminate on September 30, 2002.[157]  But when schedules 93 and 94 were written, some of the

equipment on schedule 66 was terminated effective October 31, 2001 and rolled onto schedule

94 effective November 1, 2001, while the balance of the equipment remained on schedule 66

until September 30, 2002, and then rolled onto schedule 93.[158]

64.    The refinancing onto schedules 93 and 94 increased Lycos's payments by almost

$10.5 million over what they would have been had Lycos not refinanced.[159]  In discussing this

refinancing, CSI's co-CFO wrote in an internal e-mail,


[160]

65.    CSI maintained its books and records in accordance with Financial Accounting

Standards 13 ("FASB 13").[161]  Under FASB 13, CSI was to book the "estimated residual value"

of the equipment in an amount equal to the equipment's expected "fair value" at the end of that

lease term.[162]  FASB 13 defines "fair value" as the "price for which the property could be sold in

an arm's-length transaction between unrelated parties."[163]

66.    CSI determined at the inception of schedules 93 and 94 that, in accordance with

FASB 13 the "fair value" of the equipment to CSI as of the end of those schedules would be

---

[157]  Bean Aff., Ex. 13, at CSI0027565, ¶ 2; Bean Aff., Ex. 14, at CSI0027741, ¶ 2.
[158]  Bean Aff.., Ex. 13, at CSI0027565, ¶ 2; Bean Aff., Ex. 14, at CSI0027741, ¶ 2.
[159]  Bean Aff.., Ex. 51, ¶¶ 36-41.
[160]  Bean Aff.., Ex. 68.
[161]  Fraser Aff., Ex. 17, 133:6-9.
[162]  Bean Aff., Ex. 45, ¶ 5(h).
[163]  Id. ¶ 5(c).

- 23 -

BST99 1565829-1.057077.0012

zero.[164] This means that because CSI had no "investment" in the lease, i.e., the residual value, all payments received on those schedules would, in the words of one of CSI's experts, be "sheer gravy," i.e., all profit.[165]

67.     CSI, which knew that the equipment would be essentially valueless at the end of the respective lease terms, required Lycos to post a declining-balance letter of credit in the amount of $11 million to secure Lycos's payment obligations.[166] CSI prepared an analysis comparing the amounts owed under schedules 93 and 94 with the amount available under the declining-balance letter of credit and referred to the amounts owed under those schedules as part "principal" and part "interest."[167]

68.     Schedules 93 and 94 do not list the equipment on them with sufficient detail to enable even an expert to determine the original cost of the equipment on those schedules. While those schedules purportedly list the equipment schedules from which the equipment on them came, even CSI's own expert could not find pieces of the equipment on the predecessor schedule.[168] Accordingly, there was no way that Lycos could ascertain the original cost of the equipment that ultimately rolled onto schedules 93 and 94.[169]

---

[164] Bean Aff., Ex. 51, Exhibit K thereto, column headed "residual"; Fraser Aff., Ex. 10, 154:12-16, 299:17-23; Bean Aff., Exs. 83-84. The booked present value of the residual value on the sales type lease journal entry for schedules 93 and 94 is blank because the residual value on an undiscounted basis ██████████ is $0. Fraser Aff., Ex. 1, 154:9-11, 299:17-18.
[165] Fraser Aff., Ex. 39 at 56.
[166] Fraser Aff., Ex. 1, 269:1-3.
[167] Fraser Aff., Ex. 51.
[168] Fraser Aff., Ex. 12, 185:5-192:24.
[169] Bean Aff., Ex. 33, ¶ 17; Bean Aff., Ex. 51, Exhibit C thereto.

BST99 1565829-1.057077.0012

CSI's Failure to Disclose its "Hidden Charge"
and The Original Equipment Cost

69.    At the time of each refinancing, CSI told Lycos what its new monthly payment

would be—almost always an amount lower than it had been on the schedules being refinanced—

and that Lycos would be able to retain the equipment for an extended term. [170]

70.    With respect to at least certain of the refinanced schedules, Lycos expected that it

would pay slightly more over the life of a refinanced schedule because it had use of the

equipment for a longer period of time.[171]

71.    What Lycos did not expect,[172] and what CSI did not tell Lycos,[173] was that CSI

would include within the monthly rent a hidden fee or "mark up" as an added charge for the

refinancing.[174]  Mr. Stenberg himself has admitted that he ████████ the leases.[175]  Using the

language of a loan, it was as if the lender charged the borrower points on a loan, did not disclose

that it was charging points, included those points in the refinanced principal, and then buried

repayment of the points in the monthly note payments, while internally treating the points as

revenue earned up-front rather than amortizing them over time.

72.    The internal refinancing process at CSI was such that CSI knew it was charging

Lycos a mark-up and the approximate magnitude of that mark-up not only before each

refinanced equipment schedule was signed, but before it was even prepared:

A.    When an account executive such as Mr. Stenberg asked for pricing on a
refinancing, CSI would ██████████████████████████ [176] ████████████████████

---

[170]  Bean Aff., Ex. 64; Fraser Aff., Ex. 23, 258:13-263:19; Fraser Aff., Ex. 22, 81:22-82:3.  *Compare* the $36,514.00 monthly rent and term on the terminating schedule 69D (Bean Aff., Ex. 21, CSI12816, ¶ 2), *with* the $34,672.00 monthly rent on the refinanced schedule (*Id.* at CSI0012803).
[171]  Bean Aff., Ex. 23 at LYC24633; Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 4; Bean Aff., Ex. 12, ¶ 9.
[172]  Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 4; Bean Aff., Ex. 12, ¶ 9.
[173]  Fraser Aff., Ex. 23, 258:13-263:19, 522:23-524:2.
[174]  Bean Aff., Ex. 51, ¶¶ 8-30 and Exhibit G thereto, column "C".
[175]  Fraser Aff., Ex. 23, 521:12-522:13.
[176]  Bean Aff., Ex. 87, 160:24-161:8.

- 25 -

██████████████[177]██│█████████████████████████████

██████████████████[178]███████████████████████████

█████[179]███████████████████████████████████[180]██

       B.     Mr. Stenberg would then, in his words, ████████████████████
████████████████████[181]  CSI gave him no guidelines or formula whatsoever on
the amount by which he could or should ███████████████[182]  If it appeared that the refinancing
would proceed, Mr. Stenberg would complete the "left" side of a form called ████████████
████████[183]  Among other things, he would ██████████████████████████████████
██████████████████████████████████████████[184]████████████
█████████████████[185] and █████████████████████
███████████████████████[186]

       C.     After completing the ████, Mr. Stenberg would send it to Ms. Kersting or
someone in the legal department,[187] who would circulate it for approval.[188]  If the request were
approved, someone in the legal department would then prepare the lease contract.[189]

    73.     Because CSI had calculated both the ████████████████████████████

before each refinanced schedule was prepared, and thus before it was executed, CSI knew that:

the present value of the rents on the new schedule(s)



the present value of the remaining rents plus the present value of the estimated residual value on the schedule(s) being refinanced, minus the present value of the residual on the new schedule(s)

---

177  Bean Aff., Ex. 52 at CSI44229-232; Bean Aff., Ex. 53 at CSI44265-268, Bean Aff., Ex. 54 at CSI44303-306; Bean Aff., Ex. 55 at CSI44340-343; Bean Aff., Ex. 56 at CSI44376-379.
178  Bean Aff., Ex. 87, 40:5-16.
179  Fraser Aff., Ex. 1, 101:2-6.
180  On a new equipment schedule, CSI determines this threshold by deducting the "equity in," i.e., the present value of the residual value (Bean Aff., Ex. 98 at 101:2-6) from the hardware costs. *Id.* at 122:24-123:2.
181  Fraser Aff., Ex. 23, 521:12-522:13.
182  *Id.*
183  *Id.* at 82:15-20; Fraser Aff., Ex. 14, 37:13-38:21.  Copies of certain Requests for Contract are available at Bean Aff., Exs. 88-92.
184  Fraser Aff., Ex. 1, 123:14-17 █████████████████████████████████████████████████████████
█████████████████████ (*e.g.*, Bean Aff., Ex. 41 at CSI0005632, ¶ 6) and no new equipment was added (*e.g.*, Bean Aff., Ex. 22 at CSI0007677, ¶ 2).
185  Fraser Aff., Ex. 23, 491:7-14.
186  *Id.* at 491:18-21.  The "actual margin" equals the actual present value of the rents minus the Total Threshold PV; Fraser Aff., Ex. 1, 123:18-20.
187  Fraser Aff., Ex. 14, 37:13-38:16.
188  *Id.* at 41:21-42:7.
189  *Id.* at 42:18-43:1; *see* Fraser Aff., Ex. 23, 82:4-20.

- 26 -

74.     In addition, because he estimated his ███████████████████████

████████████████████████[190] Mr. Stenberg and CSI knew the approximate

magnitude of the mark-up before the CSI legal department even prepared the contract.

75.     At a certain point, Lycos endeavored to keep track of what it thought was the

original cost of the equipment on the active schedules.  It prepared internal spreadsheets that

listed "equipment value" next to each schedule.[191]  Lycos, based on the original schedules'

assertion that "base value" equaled manufacturer's cost, and not having been provided with the

"long form Exhibit A," listed the equipment value on the refinanced schedules in an amount

equal to the Base Value reflected on those schedules.[192]  The following chart shows the

equipment value on Lycos's internal spreadsheets (Little Ex. 16-18), the Base Value as reflected

on the Stipulated Loss Value Tables, and the true original equipment cost according to CSI's

Answers to Interrogatories.

| | Equipment Value On Internal Lycos Spreadsheets[193] | Base Value (as reflected on Stipulated Loss Value Tables)[194] | Equipment Cost According to CSI[195] |
|---|---|---|---|
| Schedule 65 | $   672,000 | $   672,000 | ----------------- |
| Schedule 68 | $4,200,000 | $4,200,000 | ----------------- |
| Schedule 69G | $1,031,403 | $1,440,000 | $   860,009.07 |
| Schedule 66 | $1,440,000 | $1,440,000 | ----------------- |
| Schedule 66I | $   985,000 | $   985,000 | $   893,821.79 |
| Schedule 85 | $2,390,000 | $2,390,000 | $1,234,516.77 |
| Schedule 86 | $   725,000 | $   725,000 | $1,208,106.78 |

---

[190]  Fraser Aff., Ex. 23, 491:18-21.
[191]  Little Aff., Ex. 23.
[192]  Fraser Aff., Ex. 24, 90:14-91:6.
[193]  Little Aff., Exs. 16-18.
[194]  Fraser Aff., Ex. 53.
[195]  Bean Aff., Ex. 51, and Exhibit G thereto.

In mid-2003, Lycos's lease consultant also prepared a chart in which she, too, recorded the original equipment cost by referring to the schedules' "Base Value." The chart below, which contains a sample of schedules for which Ms. Franklin listed the OEC on Little Ex. 15, shows some of these errors:

| | Equipment Value On Little Ex. 15 | Base Value (as reflected on Stipulated Loss Value Tables)[196] | Actual Original Equipment Cost According to CSI[197] |
|---|---|---|---|
| Schedule 64D | $  340,000 | $  340,000 | $300,179.20 |
| Schedule 65 | $  672,000 | $  672,000 | ----------------- |
| Schedule 66B | $ 530,000 | $ 530,000 | ----------------- |
| Schedule 66 | $1,440,000 | $1,440,000 | ----------------- |
| Schedule 66I | $  985,000 | $  985,000 | $  893,821.79 |
| Schedule 85 | $2,390,000 | $2,390,000 | $1,234,516.77 |
| Schedule 86 | $  725,000 | $  725,000 | $1,208,106.78 |

76.    Unbeknownst to Lycos, as well as its leasing consultant, however, the Base Value on the refinanced schedules did not equal the original cost of the equipment on those schedules.[198] Instead, it equaled the present value of the monthly payment on the refinanced schedules.[199]

**Lycos's Would Not Have Entered Into
The Refinancings If CSI Had Disclosed
The Original Equipment Cost or the Mark-Ups**

77.    Over the life of the parties' relationship, Lycos paid CSI more than $72 million in rent payments[200] on account of equipment that had an original acquisition cost of approximately $45 million.[201]

---

[196] Fraser Aff., Ex. 54.
[197] Bean Aff., Ex. 66, Exhibit A thereto.
[198] Fraser Aff., Ex. 14, 29:13-23, 31:2-13, 82:11-83:5.
[199] *Id.* at, 29:13-23.
[200] Bean Aff., Ex. 17, Response No. 3.

78.     Over the life of the parties' relationship, Lycos paid CSI over $13.708 million in hidden fees or mark-ups on the refinancing of equipment schedules.[202]

79.     Lycos would not have entered into any of the refinanced schedules on the terms that it did if CSI had told it about the hidden fees or mark-ups,[203] or have entered into schedules 93 and 94 if it had known the extent to which the amount it would pay in rent exceeded the original cost of the equipment.[204]   Because of, among other things, the splitting of equipment between schedules and CSI's failure to disclose relevant information in general, neither of these were calculations Lycos had sufficient information to make.[205]

80.     Of the more than ███ million in commissions Mr. Stenberg earned financing and refinancing the Lycos equipment schedules,[206] he reaped more than ███ million – 72% of his total commissions—from the refinancings alone.[207]

**Paul Stenberg's Affirmative Misrepresentations**

81.     In March 2002, a few months after the commencement of schedules 93 and 94, Lycos discovered what appeared to be a more than $11 million increase in the gross payments it would be required make under those schedules as compared with the amounts it would have been required to make had it not refinanced.[208]   Lycos's then CFO, Brian Lucy, sent an e-mail Mr. Stenberg in which he said:

> I would expect a slight increase in our O[ut]/S[tanding] commitment, but this is a problem that would need to be rectified in short order.  If these numbers are in fact correct, I would have to ask to unwind the refinancing.[209]

---

[201] Bean Aff., Ex. 66, Exhibit A thereto.
[202] Bean Aff., Ex. 66, Exhibit A thereto.
[203] Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.
[204] Bean Aff., Ex. 33, ¶ 18.
[205] Bean Aff., Ex. 33, ¶ 17.
[206] Bean Aff., Ex. 51, ¶ 49 and Exhibit L thereto; *see* Bean Aff., Ex. 59.
[207] Bean Aff., Ex. 59.
[208] Bean Aff., Ex. 23, at LYC24612 (Bracket B).
[209] Bean Aff., Ex. 23 at LYC24633.

82.    Mr. Stenberg responded in an e-mail to Mr. Lucy assuring him that this was not the amount of the difference. He wrote:

This is what I have so far *so you can rest easy*.
Present Value of Lease              $23,727,000
Obligation of old Leases            $20,215,000
Difference                          $ 3,512,000[210]

83.    Mr. Stenberg further represented in this e-mail that the original cost of the equipment was "around $63 million. "[211]

84.    Mr. Lucy, who had no background in equipment leasing and trusted Mr. Stenberg, followed his advice to "rest easy," and did not pursue the matter further.[212]

85.    Contrary to the representation of Mr. Stenberg, who had over ▮ million in commissions at stake in connection with schedules 93 and 94,[213] the gross difference in the amount of the payments on schedules 93 and 94 exceeded the payments on the schedules refinanced, as noted above, by almost $10.5 million.[214] CSI's internal accounting records also reveal that regardless of whether one used the ▮▮▮▮▮▮▮▮ Mr. Stenberg had used when he requested that CSI write schedules 93 and 94,[215] or the ▮▮▮▮ rate he apparently used to cause the gross payments on those schedules to equal his discounted number of $23,727,000, the difference was more than double the $3.5 million he represented to Lycos.[216]

**The Sales Agreement**

86.    As Lycos and CSI began discussing the possibility of Lycos purchasing the equipment it had been leasing from CSI,[217] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[210]  Bean Aff., Ex. 46 at LYC24631 (emphasis added).
[211]  *Id.*
[212]  Bean Aff., Ex. 11, ¶ 7; Bean Aff., Ex. 33, ¶ 16.
[213]  Bean Aff., Ex. 51, ¶ 49 and Exhibit L thereto
[214]  *Id.* ¶¶ 36-41.
[215]  *Id.* ¶ 38, (referring to Requests for Contract found at Bean Aff., Ex. 76 and Bean Aff., Ex. 77).
[216]  *Id.* ¶¶ 36-41.

above which he would earn a commission on the sale of the equipment.[218]  Mr. Stenberg then

quoted Lycos a price for the equipment of $4.69 million, more than *twelve times* his threshold,

subject to Lycos making the remaining lease payments.[219]

87.    In mid-June 2003, Lycos retained LeaseForum, a lease consulting firm, to assist it

in negotiating buyout prices with all its equipment lessors including CSI.[220]

88.    In late June 2003, Ms. Franklin spoke with Mr. Stenberg for the first time.[221]  Ms.

Franklin advised Mr. Stenberg during that conversation that she thought that a price of $4.69

million represented approximately 20% of the Base Value (believing that Base Value equaled

original equipment cost) for equipment that was five years or older.[222]  He responded by saying,

"Well, you don't know what the real O[riginal] E[quipment]C[cost] is, do yuh?"  And then he

said, "It's in the sixties [millions]."[223]  Subsequently, Mr. Stenberg told Ms. Franklin he would

not negotiate a price for the sale of the equipment with her and hung up.[224]

89.    Ms. Franklin communicated to Lycos Mr. Stenberg's representation that the

original cost of the equipment was in the sixty million dollar range.[225]  This amount was

consistent with the "around $63 million" number Mr. Stenberg represented to Lycos in his

March 2002 e-mail.[226]

90.    On June 30, 2003, Mr. Stenberg e-mailed Mr. Lucy to advise him that █████

████████████████████████████████████████████████████████

---

[217]  Little Decl., Ex. 8.
[218]  Bean Aff., Ex. 19.
[219]  Fraser Aff., Ex. 23, 278:4-6.
[220]  Little Decl., Ex. 17.
[221]  Fraser Aff., Ex. 5, 118:8-23.
[222]  *Id.* at 138:22-139:11.
[223]  *Id.* at 142:3-5.
[224]  *Id.* at 122:20-123:2; 142:12-13; 231:5-7.
[225]  *Id.* at 143:23-144:7.
[226]  Bean. Aff., Ex. 46.

BST99 1565829-1.057077.0012

██████████████████████████████████████[227] Mr. Stenberg knew, as he admitted

in his deposition, that ████████████████████████████████████████

███████████[228]

91.    The next day, Mr. Lucy sent Mr. Stenberg an e-mail in which he advised him that

if LeaseForum and CSI could not arrive at a reasonable negotiated purchase price, he would

authorize LeaseForum to conduct a full audit of the CSI-Lycos relationship.[229]  Mr. Stenberg's

response was, "████████████████████████████,"[230]

92.    Approximately a week later, after Lycos had threatened the audit, Mr. Stenberg

reduced his sale price by over $800,000 from $4.69 million to $3.775 million, but gave Lycos a

deadline of July 15, 2003 to accept that offer.[231]

93.    Lycos, relying in part on Mr. Stenberg's representation that the original

equipment cost was in the "sixties" million dollar range,[232] authorized Ms. Franklin to accept

CSI's offer.

94.    On July 14, 2003, a day before Mr. Stenberg's deadline, Ms. Franklin sent Mr.

Stenberg an e-mail on behalf of Lycos accepting CSI's $3.775 million offer.[233]

95.    On August 1, 2003, Lycos wired the $3.775 million payment to CSI.[234]

████ Mr. Stenberg earned an additional ███████ in commissions on the sale of the

equipment,[235] an amount Mr. Stenberg ███████████████████████████

[227] Fraser Aff., Ex. 55.
[228] Fraser Aff., Ex. 23, 301:23-302:1.
[229] Fraser Aff., Ex. 56 at LYC221646).
[230] Id.
[231] Fraser Aff., Ex. 23, 309:7-11.
[232] Bean Aff., Ex. 33, ¶¶ 22-23.
[233] Acton Aff., Ex. 29 at AR001433.
[234] Bean Aff., Ex. 39; Bean Aff., Ex. 86, 179:19-22.

BST99 1565829-1.057077.0012

█████████████████████████[236]  In fact, he told Mr. Steinback that ███████████████

███████████████████████████████████████████████

97.     After August 1, 2003, Lycos paid CSI over $13.5 million under the schedules

listed in the Sales Agreement including, without limitation, schedules 93 and 94.[237]

98.     If Lycos had known that (i) Mr. Stenberg had misrepresented the original

equipment cost by over $15 million, (ii) it was scheduled to pay CSI over $72 million in rent for

equipment that had an original cost of $45 million, or (iii) CSI had charged it over $13.7 million

in hidden fees or mark ups to enter into the refinanced schedules, it would not have agreed to pay

CSI an additional $3.775 million to purchase the equipment.[238]

Respectfully submitted,

LYCOS, INC.

Dated: February 29, 2008

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

---

[235]  Bean Aff., Ex. 51, ¶ 50. ████████████████████████████████

████████████

[236]  Bean Aff., Ex. 100 at CSI0042454.

[237]  Fraser Aff., Ex. 20, 450:5-10; CSI's Am. Compl. ¶¶ 18-19, 25-26, 30-31 (Dkt. No. 121); Bean Aff., Ex. 51, ¶ 44.

[238]  Bean Aff., Ex. 33, ¶ 22. Bean Aff., Ex. 6, ¶ 4; Bean Aff., Ex. 11, ¶ 9; Bean Aff., Ex. 12, ¶ 4.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 29th day of February, 2008, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.


<u>/s/ Peter M. Acton, Jr.</u>
Peter M. Acton Jr.

BST99 1565829-1.057077.0012