## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL INC., | ) |
| | )     C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant | ) |
|     In Counterclaim | ) |
| v. | ) |
| | ) |
| LYCOS, INC., | ) |
| | ) |
|     Defendant and Plaintiff | ) |
|     In Counterclaim | ) |
| | ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) |
| | ) |
|     Trustee Process Defendant. | ) |

## AFFIDAVIT OF JAMES M. FRASER IN SUPPORT OF LYCOS'S OPPOSITION TO CSI'S MOTION FOR SUMMARY JUDGMENT DISMISSING LYCOS'S REMAINING COUNTERCLAIMS

I, James M. Fraser, hereby state under penalty of perjury that I am an attorney admitted to practice in the Commonwealth of Massachusetts, and an associate at McDermott Will & Emery LLP, the law firm that is counsel for Defendant and Plaintiff-in-Counterclaim, Lycos, Inc. in the above-captioned case. I have personal knowledge of the facts set forth herein.

Attached hereto are true and correct copies of certain documents in this case, as follows:

1.       Exhibit 1 hereto is a true and correct copy of excerpts from the deposition transcript of Philip Cagney in the above-captioned case. As CSI has designated this transcript "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

2.       Exhibit 2 hereto is a true and correct copy of excerpts from the deposition transcript of Lycos's 30(b)(6) designee, Julie Callagee, in the above-captioned case.

3. Exhibit 3 hereto is a true and correct copy of excerpts from the deposition transcript of Charles Cross in the above-captioned case.

4. Exhibit 4 hereto is a true and correct copy of excerpts from the deposition transcript of Peter Daley in the above-captioned case.

5. Exhibit 5 hereto is a true and correct copy of excerpts from the deposition transcript of Susan Franklin in the above-captioned case.

6. Exhibit 6 hereto is a true and correct copy of excerpts from the deposition transcript of Michael Fleming in the above-captioned case.

7. Exhibit 7 hereto is a true and correct copy of excerpts from the deposition transcript of Ernesto Galvan in the above-captioned case.

8. Exhibit 8 hereto is a true and correct copy of excerpts from the deposition transcript of Richard Guilander in the above-captioned case.

9. Exhibit 9 hereto is a true and correct copy of excerpts from the deposition transcript of Thomas Guilfoile in the above-captioned case.

10. Exhibit 10 hereto is a true and correct copy of excerpts from the deposition transcript of William Gillula in the above-captioned case.

11. Exhibit 11 hereto is a true and correct copy of excerpts from the deposition transcript of Lycos's 30(b)(6) witness, Thomas Hoye, in the above-captioned case.

12. Exhibit 12 hereto is a true and correct copy of excerpts from the deposition transcript of James Johnson in the above-captioned case.

13. Exhibit 13 hereto is a true and correct copy of excerpts from the deposition transcript of Peter Karol in the above-captioned case.

BST99 1565676-1.057077.0012

14.     Exhibit 14 hereto is a true and correct copy of excerpts from the deposition transcript of Joan Kersting in the above-captioned case.

15.     Exhibit 15 hereto is a true and correct copy of excerpts from the deposition transcript of Brian Lucy in the above-captioned case.

16.     Exhibit 16 hereto is a true and correct copy of excerpts from the deposition transcript of David Mammen in the above-captioned case.

17.     Exhibit 17 hereto is a true and correct copy of excerpts from the deposition transcript of Frederic O'Neal in the above-captioned case.

18.     Exhibit 18 hereto is a true and correct copy of excerpts from the deposition transcript of Edward Philip in the above-captioned case.

19.     Exhibit 19 hereto is a true and correct copy of excerpts from the deposition transcript of Brain Reale in the above-captioned case.

20.     Exhibit 20 hereto is a true and correct copy of excerpts from the deposition transcript of CSI's 30(b)(6) designee, Jeffery Rousseau, in the above-captioned case.  As CSI has designated this transcript "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

21.     Exhibit 21 hereto is a true and correct copy of excerpts from the deposition transcript of Kenneth Steinback (Part I) in the above-captioned case.  As CSI has designated this transcript "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

22.     Exhibit 22 hereto is a true and correct copy of excerpts from the deposition transcript of Kenneth Steinback (Part II) in the above-captioned case.  As CSI has designated this transcript "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

23.     Exhibit 23 hereto is a true and correct copy of excerpts from the deposition transcript of Paul Stenberg in the above-captioned case.

BST99 1565676-1.057077.0012

24.     Exhibit 24 hereto is a true and correct copy of excerpts from the deposition transcript of Monique Walsh in the above-captioned case.

25.     Exhibit 25 hereto is a true and correct copy of excerpts from the deposition transcript of Timothy Wright in the above-captioned case.

26.     Exhibit 26 hereto is a true and correct copy of excerpts from the deposition transcript of Sam Ziba in the above-captioned case.

27.     Exhibit 27 hereto is a true and correct copy of excerpts from Exhibits 4, 7, 15, and 17 marked at the deposition of Carolyn Simmons-Berry in the above-captioned case.

28.     Exhibit 28 hereto is a true and correct copy of excerpts from Exhibits 5, 6, 14, and 16 marked at the deposition of Carolyn Simmons-Berry in the above-captioned case.

29.     Exhibit 29 hereto is a true and correct copy of Exhibit 22 marked at the deposition of Carolyn Simmons-Berry in the above-captioned case.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

30.     Exhibit 30 is intentionally left blank.

31.     Exhibit 31 hereto is a true and correct copy of documents bates-numbered CSI0017836, 0017841-842, and 0018111-115, as produced by CSI in the above-captioned case.

32.     Exhibit 32 hereto is a true and correct copy of Exhibit 12 marked at the deposition of Michael Fleming in the above-captioned case.

33.     Exhibit 33 hereto is a true and correct copy of Exhibit 13 marked at the deposition of Michael Fleming in the above-captioned case.

34.     Exhibit 34 hereto is a true and correct copy of Exhibit 16 marked at the deposition of Michael Fleming in the above-captioned case.

35.    Exhibit 35 hereto is a true and correct copy of excerpts from Exhibits 21 and 22 marked at the deposition of Michael Fleming in the above-captioned case.

36.    Exhibit 36 hereto is a true and correct copy of Exhibit 627 marked at the deposition of Ernesto Galvan in the above-captioned case.

37.    Exhibit 37 hereto is a true and correct copy of Exhibit 4 marked at the deposition of James Johnson in the above-captioned case.

38.    Exhibit 38 hereto is a true and correct copy of Exhibit 8 marked at the deposition of James Johnson in the above-captioned case.

39.    Exhibit 39 hereto is a true and correct copy of excerpts from Exhibit 5 marked at the deposition of James Johnson in the above-captioned case.

40.    Exhibit 40 hereto is a true and correct copy of  "Look Before You Lease," co-authored by the deponent James Johnson and identified in his expert report as produced in the above-captioned case.

41.    Exhibit 41 hereto is a true and correct copy of Exhibit 395 marked at the deposition of Brian Lucy in the above-captioned case.

42.    Exhibit 30 hereto is a true and correct copy of Exhibit 512 marked at the deposition of Carolyn Simmons-Berry in the above-captioned case.

43.    Exhibit 43 hereto is a true and correct copy of Exhibit 2 marked at the deposition of Kenneth Steinback in the above-captioned case.

44.    Exhibit 44 hereto is a true and correct copy of Exhibit 7 marked at the deposition of Paul Stenberg in the above-captioned case.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

5

45.     Exhibit 45 hereto is a true and correct copy of excerpts from Exhibits 737 and 738 marked at the deposition of David Truesdell, and Exhibit 272 marked at the deposition of Edward Philip in the above-captioned case.  As Lycos has designated these documents "Confidential," it is filing this exhibit **UNDER SEAL.**

46.     Exhibit 46 hereto is a true and correct copy of the Affidavit of Peter Daley, dated December 5, 2006.

47.     Exhibit 47 hereto is a true and correct copy of the Affidavit of David Truesdell, dated February 28, 2008.

48.     Exhibit 48 hereto is a true and correct copy of excerpts from Lycos's Objections and Responses to CSI's First Set of Interrogatories, dated October 25, 2006.

49.     Exhibit 49 hereto is a true and correct copy of excerpts from Plaintiff Computer Sales International Inc.'s Supplemental Response to Defendant Lycos Inc.'s Second Set of Interrogatories, dated May 1, 2007.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

50.     Exhibit 50 hereto is a true and correct copy of a document bates-numbered CSI0039434, as produced by CSI in the above-captioned case.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

51.     Exhibit 51 hereto is a true and correct copy of a document bates-numbered CSI0041657, as produced by CSI in the above-captioned case.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

52.     Exhibit 52 hereto is a true and correct copy of a document bates-numbered CSI0033448-452, as produced by CSI in the above-captioned case.

53.     Exhibit 53 is hereto is a true and correct copy of documents bates-numbered CSI0028339, CSI0028985, CSI0030731, CSI0008709, CSI0012818, CSI0006749, and CSI0007130, as produced by CSI in the above-captioned case.

54.     Exhibit 54 hereto is a true and correct copy of documents bates-numbered CSI00017945, CSI0028627, CSI0029025, CSI0029731, CSI0030754, CSI0006787, and CSI0007130, as produced by CSI in the above-captioned case.

55.     Exhibit 55 hereto is a true and correct copy of a document bates-numbered CSI042367-68, as produced by CSI in the above-captioned case.

56.     Exhibit 56 hereto is a true and correct copy of a document bates-numbered CSI042372-374, as produced by CSI in the above-captioned case.

57.     Exhibit 57 hereto is a true and correct copy of a document bates-numbered CSI0041911-912, as produced by CSI in the above-captioned case.  As CSI has designated this document "Confidential," Lycos is filing this exhibit **UNDER SEAL**.

58.     Exhibit 58 hereto is a true and correct copy of a document bates-numbered CSI0002951, as produced by CSI in the above-captioned case.

59.     Exhibit 59 hereto is a true and correct copy of a document bates-numbered CSI0036055, as produced by CSI in the above-captioned case.

60.     Exhibit 60 hereto is a true and correct copy of documents bates-numbered CSI24029-034, as produced by CSI in the above-captioned case.

61.     Exhibit 61 is intentionally left blank.

BST99 1565676-1.057077.0012

62.    Exhibit 62 hereto is a true and correct copy of a Exhibit 27 marked at the

deposition of Paul Stenberg in the above-captioned case.


Dated:  February 29, 2008                     /s/ James M. Fraser
                                              James M. Fraser


## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February 2008, I caused a true and accurate copy of the within document to be delivered through the Court's ECF system and by hand to Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02111.


                                              /s/ Peter M. Acton, Jr.
                                              Peter M. Acton, Jr.

BST99 1565676-1.057077.0012

# EXHIBIT 1
# FILED UNDER SEAL

# EXHIBIT 2

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 1

UNITED STATES DISTRICT COURT

For the District of Massachusetts


No. 05-10017-RWZ


* * * * * * * * * * * * * * * * * * * * * *


COMPUTER SALES INTERNATIONAL, INC.,

                    Plaintiff,

vs.


LYCOS, INC.,

                    Defendant,

BANK OF AMERICA f/k/a FLEET BANK,

                    Trustee Process Defendant.

* * * * * * * * * * * * * * * * * * * * * *


    VIDEOTAPED DEPOSITION OF: JULIE CALLAGEE, a witness in

the above-entitled cause, taken before CINDY BERGLUND, CSR,

Registered Professional Reporter and Notary Public pursuant

to the applicable provisions of the Massachusetts Rules of

Civil Procedure, at the offices of GADSBY & HANNAH, LLP, 225

Franklin Street, Boston, MA 02110, on the 26th day of APRIL,

2006, commencing at 9:15 A.M.

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 46 |
| --- |

1  including buying out CSI equipment leases?
2  A. Yes
3  Q. And what do you mean by buying out equipment
4  leases?
5  A. We were making payments so at the end of the lease
6  term we would own the equipment
7  Q. In other words, the term "buy-out" referred to
8  making certain additional payments to the leasing
9  companies over and above what future lease payments
10 required as part of an agreement in which at the end of
11 the lease terms, the equipment would actually be owned
12 by Lycos?
13 A. Yes.
14 Q. Okay. And that's something that's not unusual in
15 the industry where you have equipment leases to
16 companies, is it?
17      ATTY BEAN: Objection.
18      THE WITNESS: Buying out of an equipment lease mid
19 term?
20 Q. Yes
21 A. I don't know the answer to that
22 Q. Buying out an equipment lease at the end of the
23 term but doing it a bit early, had you had experience
24 with that before?

| Page 47 |
| --- |

1  A. This is a new question and not related to the
2  industry, common in the industry?
3  Q. It is a new question
4  A. Could you repeat it?
5  Q. I can if you want me to
6  A. I would like you to
7  Q. Had you had any prior experience being involved
8  with buying out leases, Miss?
9  A. No. I don't recall any prior experience in buying
10 out leases.
11 Q. Had you worked with equipment finance leases at
12 any of your prior companies?
13 A. Well, as an auditor I had a wide variety of
14 experiences, but -- so I don't recall specifically
15 working on lease buy-out transactions
16 Q. Had you worked as an auditor on reviewing the
17 capitalization of equipment leases?
18 A. Yes
19 Q. So you were familiar with the process of how
20 companies accounted for equipment leases, whether as
21 operating leases or as capital leases?
22 A. Yes
23 Q. What other responsibilities did you assume in
24 addition to signing checks, group management, assuming

| Page 48 |
| --- |

1  responsibility for buying out the equipment leases
2  including CSI's leases with Lycos?
3  A. I would have also assumed responsibility for
4  wiring cash
5  Q. What else?
6  A. We had a substantial amount of cross-over in our
7  roles before Kevin left. So we had already worked on a
8  lot of things together. What specifically new
9  responsibilities I took over --
10 Q. It's difficult to pin down?
11 A. It is difficult to pin down, yes.
12 Q. Okay. You need to keep your voice up.
13 A. Do you want me to repeat?
14 Q. No. That's okay. I think they got it
15      Were there still four groups at this point:
16 Accounts payable, receivables, collections, general
17 ledger and revenue?
18 A. Yes
19 Q. And you said you took over group management. That
20 meant you took over the management of all four of those
21 groups to the extent you hadn't already been doing it?
22 A. Another person at Lycos assumed responsibility for
23 the revenue group
24 Q. Who was that?

| Page 49 |
| --- |

1  A. Jerry, J-E-R-R-Y, Lipet, L-I-P-E-T.
2  Q. But, otherwise, you had the other groups?
3  A. Purchasing reported directly to Brian Lucy
4  Q. Where was Monique Walsh? Was she in your
5  department?
6  A. Yes, she was
7  Q. What was her position at the time that you --
8  A. Staff accountant
9      ATTY BEAN: Let him finish his question
10 Q. Had she been reporting to you up to that time or
11 prior to that time?
12      ATTY. BEAN: Objection.
13 Q. You can answer
14 A. Yes
15 Q. How long had she been reporting to you?
16 A. In 2003, approximately, a year or two
17 Q. Now, the reason Lycos wanted to buy out its CSI
18 equipment leases was that Telephonica in Spain wanted
19 Lycos here in the U S to capitalize the leases,
20 correct?
21 A. Lycos wanted to buy out of the leases. One of the
22 reasons would have been to record them as capital
23 leases.
24 Q. Now, at this time in March of 2003, Lycos had been

13  (Pages 46 to 49)

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 74 |
|---|
| 1 Q. You can answer. |
| 2 A. No. |
| 3 Q. What about what I said is incorrect? |
| 4 A. I believe that this was done to calculate the |
| 5 buy-out. Not to specifically show the conversion on |
| 6 the financial statements to capital leases. |
| 7 Q. In fact, Miss, it was to address exactly the |
| 8 conversion of the leases. It makes no reference, in |
| 9 the title at least, to anything other than Lycos, Inc. |
| 10 lease analysis-conversion of leases at March 31, 2003, |
| 11 correct? |
| 12     ATTY BEAN: Objection |
| 13 Q. You can answer. |
| 14 A. Yes. |
| 15 Q. And then the second item down under CSI, I'll ask |
| 16 you to circle the word in blue and write your initials |
| 17 and the date around CSI, parens, lease conversion and |
| 18 then circle Scenario 1 as well in the same circle. |
| 19     Doesn't it say, Convert all equipment schedules to |
| 20 capital leases? |
| 21 A. (Witness complies) |
| 22 Q. Just mark that with the letter A and your |
| 23 initials. |
| 24 A. (Witness complies). Yes. |

| Page 75 |
|---|
| 1 Q. Within what you've marked as the letter A under |
| 2 Scenario 1, this projection said, Convert all equipment |
| 3 schedules to capital leases. Do you see that? |
| 4 A. Yes. |
| 5 Q. All these references, Miss, to conversion refer to |
| 6 converting the CSI leases from an accounting standpoint |
| 7 from operating leases to capital leases, correct? |
| 8 A. Yes. |
| 9 Q. And this analysis was done when -- rather, this |
| 10 analysis when it referred to converting equipment |
| 11 schedules opposite Scenario 1, it referred at that |
| 12 point under CSI, to the various equipment schedules |
| 13 that Lycos had entered into with CSI over the years, |
| 14 correct? |
| 15 A. Can you say the very last part again? |
| 16 Q. Sure. Where it said under CSI -- may I take your |
| 17 Exhibit for a second? |
| 18 A. Yes |
| 19 Q. You've circled in A, CSI lease conversion, and |
| 20 then Scenario 1 and Scenario 2 on this Exhibit, right? |
| 21 A. Yes. |
| 22 Q. Who prepared this, by the way? |
| 23 A. Does it say on the document? Lycos |
| 24 Q. Okay. And did you personally prepare it or did |

| Page 76 |
|---|
| 1 Ms Walsh or someone else for that matter? |
| 2     ATTY BEAN: Objection |
| 3     THE WITNESS: I don't know who prepared this |
| 4 schedule I don't believe that I prepared the |
| 5 schedule |
| 6 Q Okay But you know what it is? |
| 7 A I do know what it is |
| 8 Q Do you see the column headed, Equipment Value? |
| 9 A Yes, I do |
| 10 Q And if you go down that column to where you reach |
| 11 CSI Scenario 1, Convert all equipment schedules to |
| 12 capital leases, do you see the figure 43,510,135, |
| 13 that's dollars, right? |
| 14 A Yes, it is |
| 15 Q That was Lycos' record of the original cost of the |
| 16 equipment that had been purchased and leased to it by |
| 17 CSI as of that time, correct? |
| 18     ATTY BEAN: Objection |
| 19 Q You can answer |
| 20 A I believe that this wasn't -- I believe that what |
| 21 this was is it wasn't done to see the impact on the |
| 22 financial statements It was done to see more of the |
| 23 cash impact and to see if the buy-outs were reasonable |
| 24 Q Regardless of why it was done, that figure of |

| Page 77 |
|---|
| 1 $43,510,135 was Lycos' record of what the original |
| 2 equipment cost was of the equipment that CSI had leased |
| 3 to Lycos over the years, correct? |
| 4     ATTY BEAN: Objection |
| 5     THE WITNESS: I believe that this number rolls up |
| 6 from other schedules that we had and it was Monique's |
| 7 best attempt to pull together the equipment value based |
| 8 on base value off of leasing schedules |
| 9 Q Is what I said correct or not because if you want |
| 10 to deny it, you can deny it But this is squarely one |
| 11 of the subject matters that you were noticed about on |
| 12 behalf of the corporation If you want to deny on |
| 13 behalf of Lycos that this is not the cost of that |
| 14 equipment, then you can do so I want it to be crystal |
| 15 clear for the record It doesn't matter at this point, |
| 16 either you do or you don't |
| 17     I'll ask the question again. Isn't it true that |
| 18 this figure of $43,510,135 was Lycos' record at that |
| 19 time of the original equipment cost of all the |
| 20 equipment that it had leased from CSI over the years up |
| 21 to that point, except for any equipment you would have |
| 22 returned? |
| 23     ATTY BEAN: Objection |
| 24 Q. You can answer. |

20  (Pages 74 to 77)

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 78

1  A   This figure would have been Monique's best guess
2  at the cost. It was not my understanding of what the
3  cost was.
4  Q.  But it was her record at the time within Lycos of
5  what she thought the cost was, correct?
6  A.  It was a starting point that Monique asked Paul to
7  verify and Paul came back with a number closer to
8  60 million, 63 million dollars. So this was our
9  starting point.
10  Q.  Regardless of what you say or claim Monique said
11  or Paul said, this was Lycos' record as of March 2003
12  of what it thought the original equipment cost was of
13  all the equipment it had leased from CSI up to that
14  point, except for any that might have been returned.
15  Isn't that true?
16     ATTY BEAN: Objection.
17  Q.  You can answer.
18  A.  No
19  Q.  It was Lycos --
20  A.  This was our best guess. We didn't know the
21  equipment cost.
22  Q.  This was -- what your sworn testimony is then is
23  that this was Lycos' best guess as to what the original
24  equipment cost was of all the equipment that it had

Page 79

1  leased from CSI over the years, except for any that it
2  might have returned. Is that a fair statement?
3  A.  This was Monique's best guess based on the
4  information available to her, but as a company we had
5  different numbers.
6  Q.  In fact, Miss, these were the numbers that you had
7  in March of 2003 for the original equipment cost of all
8  the equipment that Lycos had leased from CSI. This was
9  the number you had at that time, correct?
10  A.  This was our starting point for the number and
11  when this schedule was put together, the buy-out figure
12  that was proposed was more than ten percent of the
13  equipment buy-out which lead us to believe that, well,
14  we were trying to work up to that number, we were
15  missing some of the equipment value because the buy-out
16  figure was too high
17  Q.  Did you mean it was more than ten percent of the
18  equipment cost?
19  A.  This analysis is one piece of information that
20  lead us to believe that, you know, that we still needed
21  to do some work on that number that we didn't have. We
22  hadn't accurately captured the equipment value. We
23  were working towards that and asking Paul to verify
24  that number when he came back with the 60 million

Page 80

1  dollar number, but it appeared that the buy-out
2  percentage, the buy-out number was too high. So we
3  weren't sure of our number and we thought there
4  certainly must be more equipment because the buy-out
5  was too high and then Paul later told us that the
6  number was higher.
7  Q.  Move to strike that portion of your answer that
8  goes beyond my question.
9  A.  Sorry
10  Q.  I'll ask the question again because you know that
11  this 43 5 million dollar number appears throughout
12  Lycos' records for 2003 as a representation of what it
13  thought the cost of the equipment that it had leased
14  from CSI was in total. You know that, don't you?
15  A.  No
16  Q.  We'll show you the documents, including some with
17  your name on them. But let's just take it one step at
18  a time and get into any issues with Monique Walsh and
19  Paul Stenberg later.
20     Did you ever have any conversations with Paul
21  Stenberg about what the original equipment cost was?
22  A.  I don't believe I did
23  Q.  All right. Well, then, let's confine ourselves to
24  what these documents show for the moment

Page 81

1     Certainly at this time in late March of 2003,
2  Lycos was recording on Exhibit 4 that it thought the
3  original cost of the equipment it had leased from CSI
4  in total was 43 5 million dollars, correct?
5     ATTY BEAN: Objection.
6  Q.  That's what it set down on this spreadsheet,
7  correct?
8     ATTY BEAN: Objection.
9     THE WITNESS: No.
10  Q.  Do you see the $43,510,135 figure?
11  A.  Yes.
12  Q.  And you know that, in fact, that is what the
13  original equipment cost was in total at that point of
14  all the equipment that CSI had leased to Lycos over the
15  previous years, approximately, don't you?
16  A.  I still don't know that we know what the
17  original -- exactly what the original equipment cost
18  was.
19  Q.  I don't say exactly. But approximately you know
20  that the total original equipment cost of all the
21  equipment that CSI leased to Lycos over the years up to
22  this point was, in fact, approximately 43 and a half
23  million dollars, don't you?
24     ATTY BEAN: Objection.

21 (Pages 78 to 81)

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 194 | Page 196 |
|---|---|

**Page 194**

1  negotiation probably related more to the fee and not to
2  the wording
3  Q  Okay
4  A  That's the legal stuff
5  Q  And if we look at Mr Kirk's e-mail to you in
6  Exhibit 25 and your response from August of 2003, I had
7  asked you originally, is it correct that Lycos accepted
8  LeaseForum's proposal to implement the Phase 2 work and
9  set up a negotiation aimed at reducing Lycos' remaining
10  future payment obligations to CSI, and you had said was
11  there a Statement of Work and I've just shown it to
12  you
13      Does that refresh your memory that Lycos, in fact,
14  did accept LeaseForum's proposal to do that?
15  A  Yes.
16  Q  And it formalized its acceptance of that proposal
17  in this Statement of Work that we have marked as
18  Exhibit 13A, which is signed approximately two months
19  after Mr Kirk's e-mail to you of August 8, which is
20  Exhibit 24, correct?
21  A  Yes
22  Q  And in Exhibit 13A, the references to LeaseForum
23  seeking to obtain a financial settlement regarding
24  compensation received or, quote, Contracted future

**Page 195**

1  obligations due CSI from client, unquote, the word
2  "client" referred to Lycos, correct?
3  A  Where exactly are you?  Yes, I'm sorry  I believe
4  the answer is yes  Yes.
5  Q  This is the second paragraph under the word
6  "work".
7  A  Yes  Okay.
8  Q  And the only contracted future obligations that
9  were due to CSI from Lycos at that time were the
10  payment obligations that Lycos had specifically agreed
11  to make only two months earlier in Exhibit 23A, the
12  buy-out agreement, correct?
13  A  I believe so, yes.
14  Q  Okay. And going to the next sentence in this
15  Exhibit 13A, Statement of Work, where it said, quote,
16  Such a settlement, referring there to a financial
17  settlement with CSI, correct?
18  A  Yes.
19  Q  Such a settlement may include, but will not be
20  limited to early termination  Then it said, quote,
21  Reduction in lease payment obligations, unquote  Do
22  you see that?
23  A  Yes  Yes
24  Q  And the reference there to LeaseForum agreeing to

**Page 196**

1  try to negotiate a settlement that might include
2  reduction in lease payment obligations, the reference
3  there to lease payment obligations was a reference to
4  the lease payment obligations that Lycos had
5  specifically contracted to make in Exhibit 23A two
6  months earlier, correct?
7  A  Yes
8  Q  And so the plan that Lycos and LeaseForum agreed
9  upon based on Mr Kirk's initial e-mail to you in
10  Exhibit 24 in August of 2003, and the plan that was
11  then implemented and formalized in this Exhibit 13A,
12  Statement of Work, was that LeaseForum would, on behalf
13  of Lycos, go out and try to negotiate with CSI in an
14  effort to get CSI to agree to reduce the lease payments
15  that Lycos had just contracted and agreed to make in
16  Exhibit 23A, isn't that true?
17      ATTY BEAN: Objection
18  Q  You can answer
19  A  It appears that --
20  Q  That's what he was going to do, right?
21      ATTY BEAN: Objection.
22  Q  You can answer
23  A  It was my understanding that they were going to
24  look further into the arrangement based on the quick

**Page 197**

1  drop of the buy-out price and those payments were the
2  payments that were due.
3  Q  But what Mr Kirk told you and Lycos on August 8
4  in Exhibit 24, his e-mail to you, was that they were
5  going to try to set up a negotiation to reduce Lycos'
6  remaining future payment obligations to CSI, correct?
7  A  Yes
8  Q  And he told Lycos that in August  Lycos approved
9  it and then formalized the arrangement in Exhibit 13A
10  which stated again that, LeaseForum will on behalf of
11  the client, which was Lycos, seek to establish a
12  financial settlement that would include but not be
13  limited to reduction in lease payment obligations,
14  correct?
15      ATTY. BEAN: Objection
16      THE WITNESS: I don't know that we approved the
17  August 8 e-mail. Things were finalized in Statement of
18  Work  I can speak that things were finalized in
19  Statement of Work 2 when Statement of Work 2 was
20  signed
21  Q  Statement of Work 2 was formalizing the agreement
22  with LeaseForum that Mr Kirk had outlined to you in
23  Exhibit 24, wasn't it?
24  A  Yes. I just can't say that Brian -- I can't say

50  (Pages 194 to 197)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  that Brian who was the CFO was agreeing to anything
2  that John said when he said it. Just that I can speak
3  to the fact that we did agree to Statement of Work 2
4  when we signed Statement of Work 2.
5  Q. Okay. But the fact is that Statement of Work 2
6  was formalizing an understanding that had been
7  originally proposed by Mr Kirk back in August in his
8  e-mail to you on August 8 in which he said they were
9  going to try to enter into a negotiation to reduce
10  Lycos' remaining future payment obligations?
11  A. Yes. I think John proposed that, but I don't know
12  that Brian went for it until --
13  Q. In fact --
14      ATTY BEAN: Let her finish.
15  Q. Go ahead.
16  A. I don't know that -- I think that John was a
17  pretty eager guy and I think he proposed it, but I
18  don't think that Brian actually agreed to it. I think
19  it took a while for Brian to agree to this Statement of
20  Work 2.
21  Q. But you don't know -- all you know is that what
22  you said in response almost immediately on August 10th
23  of 2003 was, Can you send me your proposed fee schedule
24  for CSI Phase 2. Brian is expecting a much lower rate

| Page 199 | Page 201 |
|---|---|

**Page 199**

1  than Phase 1 given the favorable outcome there.
2      Do you see that portion of your e-mail on the
3  first page of Exhibit 25?
4  A. I do. I think that I was pretty eager, too.
5  Q. Eager to go forward with Phase 2?
6  A. Well, I don't know. I was eager to respond to
7  John, I guess.
8  Q. When you did respond to John, you said, quote, Can
9  you send me your proposed fee schedule for CSI Phase 2
10  and then you said Brian is expecting a much lower rate
11  than Phase 1. You were referring to a lower rate for
12  Phase 2, correct?
13  A. Yes.
14  Q. And, therefore, you had discussed Mr Kirk's Phase
15  2 proposal with Brian Lucy before you sent this e-mail
16  on August 10, hadn't you?
17      ATTY BEAN: Objection.
18  Q. You can answer.
19  A. I may have. It does look like I did. I may have
20  been trying to give John a dig, too, and get him
21  prepped for a lower rate. I was -- I think that it was
22  Brian probably dragging his feet until October. Not
23  dragging his feet. Brian probably took a while to make
24  this decision.

**Page 200**

1  Q. Well, regardless of what your opinion may be about
2  whether Brian took a while to make the decision, if we
3  assume that your e-mail was honest and was not a
4  fabrication, you will agree with me that you could not
5  have found out from Brian Lucy that he was expecting a
6  much lower rate for Phase 2 than Phase 1 unless you had
7  discussed Phase 2 with Brian Lucy prior to writing this
8  e-mail on August 10, correct?
9      ATTY BEAN: Objection.
10  Q. You can answer.
11  A. I probably discussed going further with Brian. I
12  just don't -- I don't necessarily know that I had his
13  buy-in to that.
14  Q. But you had clearly discussed with Brian the Phase
15  2 proposal that Mr Kirk had made to you on August 8,
16  correct?
17      ATTY BEAN: Objection.
18  Q. You can answer.
19  A. I probably did.
20  Q. Okay. And there is -- the response that you had
21  got from Brian was not that he had any hesitancy about
22  Lycos moving forward with Phase 2, but, rather, that he
23  was expecting a much lower rate of compensation that
24  Lycos would have to pay to LeaseForum in Phase 2?

**Page 201**

1  A. I think that Brian was pretty -- Paul and Brian
2  were friends. I wasn't friends with Paul. So I think
3  that --
4  Q. We're talking about John.
5  A. Oh, no. No. I'm just saying that Brian would
6  have been hesitant to move ahead with Statement of Work
7  2. Not me.
8  Q. Regardless, again, of your opinion about what
9  Brian would have been hesitant to do which really isn't
10  based on anything, is it?
11  A. I think I'm missing the point. I'm sorry.
12      ATTY BEAN: Please don't insult the witness, Mr
13  Kaler. You have done that several times. Your opinion
14  is not based on anything, that's really unnecessary and
15  inappropriate.
16  Q. I'm not asking you your opinion as to whether
17  Mr Lucy would have hesitated or not. We can ask
18  Mr Lucy what he was doing.
19      I'm looking at your e-mail and what you said in
20  response to Mr Kirk when he told you, okay, now we
21  have agreed with CSI to pay them under the leases. Now
22  I'm going to turn around and try to negotiate with CSI
23  in an effort to reduce those lease payments. That's
24  what he was proposing, right?

51 (Pages 198 to 201)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

---

Page 202

1  A. I just want to say in good conscious what I was
2  trying to explain was he proposed this to me and I
3  wasn't the decision-maker.
4  Q. I'm just not asking whether you were the
5  decision-maker. The fact is that on August 8, Mr. Kirk
6  proposed to Lycos that Lycos have him proceed with
7  Phase 2. In fact, he said it was already underway and
8  he told you that the purpose of Phase 2 was to set up a
9  negotiation with CSI to reduce the amount of lease
10 payments that Lycos was going to have to make to CSI,
11 right?
12 A. That's right.
13 Q. And he told you that on the same day that Lycos
14 had specifically agreed to make all those payments in
15 full, correct?
16     ATTY BEAN: Objection.
17 Q. You can answer.
18 A. Just for clarity that, you know, I just want to be
19 careful here because this is written by me. So John
20 and I did have this discussion, but because I'm
21 testifying for the company, Brian has to speak for
22 Brian, like you said.
23 Q. I'm not asking you to speak for Brian. Again,
24 I'll ask the question a third time.

Page 203

1  A. Thank you.
2  Q. On August 8th of 2003, LeaseForum sent you an
3  e-mail proposing to Lycos, and, in fact, saying that a
4  Phase 2 stage of work was underway and that the goal of
5  that work was to set up a negotiation with CSI to force
6  a reduction in the lease payments that Lycos was going
7  to have to make to CSI in the future, correct?
8      ATTY BEAN: Objection.
9  Q. That's right, isn't it?
10     ATTY BEAN: Objection.
11 Q. You can answer.
12 A. That the e-mail, that it was going to reduce the
13 amount that we would have to pay in the future,
14 correct.
15 Q. Yes. And in response to LeaseForum's proposal to
16 you that what they were going to do in Phase 2 was to
17 try to set up a negotiation to reduce Lycos' obligation
18 to make the payments that it had just that day agreed
19 to make, you said to him, quote, Can you send me your
20 proposed fee schedule for Phase 2 Brian is
21 expecting a much lower rate than Phase 1, unquote.
22 Correct?
23     ATTY BEAN: Objection
24     THE WITNESS: I said that, yes.

Page 204

1  Q. Okay. You didn't say Brian was hesitating, did
2  you?
3  A. No, but I -- if the question is what the e-mail
4  says, we can all read the e-mail.
5  Q. And then the portion of the e-mail in which
6  Mr Kirk told you that they were going to set up a
7  negotiation, that their goal was going to be to reduce
8  Lycos' remaining future payment obligations to CSI, the
9  ones that Lycos had just agreed to make that day, that
10 language on reducing the lease payment obligations,
11 that appears again in the Statement of Work that we
12 have marked as Exhibit 13A where the parties agreed
13 that LeaseForum would work towards a financial
14 settlement that would include, but not be limited to,
15 reduction in lease payment obligations. That language
16 appeared again, correct?
17 A. Correct.
18 Q. And so that was the deal, wasn't it? That was the
19 deal?
20     ATTY BEAN: Objection
21 Q. Lycos and LeaseForum got together and agreed that
22 LeaseForum would go out and try to set up a negotiation
23 with CSI, force a financial settlement with CSI that
24 would reduce Lycos' lease payment obligations even

Page 205

1  though Lycos had just agreed to make all those lease
2  payment obligations in Exhibit 23A Isn't that true?
3      ATTY BEAN: Objection.
4  Q. You can answer.
5  A. Force a financial settlement?
6  Q. Let's see, In an effort to set up a negotiation to
7  reduce Lycos' remaining future payment obligations.
8  That was the deal?
9  A. The deal was what's here in Statement of Work 2,
10 yes
11 Q. And you knew as of the time that Lycos signed
12 Exhibit 23A in August of 2003, that even though Lycos
13 had specifically agreed to make all the lease payments
14 described in that agreement, you knew that LeaseForum
15 was going to try and negotiate a way out of it for
16 Lycos, correct?
17     ATTY BEAN: Objection.
18 Q. You can answer
19 A. No.
20 Q. Certainly, on August 8th of 2003 on the very day
21 that Lycos signed the buy-out agreement with CSI that
22 we have marked as Exhibit 23A, on that very day you
23 were being told by LeaseForum that the effort to reduce
24 Lycos' remaining future payment obligations to CSI had

52 (Pages 202 to 205)

4da438f8-62ed-49c6-a8d5-4851757eb1cd

Julie Callagee 4/26/2006
Computer Sales International v. Lycos, Inc.

Page 210

1    THE WITNESS: The e-mail from John is dated the
2    same day
3    Q   Okay  And, in fact, there are subsequent e-mails
4    in August and in September in which Mr. Kirk talks to
5    you about the work that they are doing to move ahead
6    with Phase 2, aren't there?
7    A   It seems like a lot of time has passed here  That
8    July date is when maybe in my mind -- I'm sorry  The
9    next question
10   Q   There were further communications between you and
11   Mr. Kirk about Phase 2 in August and September of 2003
12   after this initial exchange in which you said, Can you
13   send me your proposed fee schedule  Brian is expecting
14   a lower rate
15   A   Okay
16   Q   Do you remember having those communications?
17   A   I don't remember specifically what they were  I'm
18   not surprised that John and I continued to have a
19   dialogue
20   Q   And, in fact, LeaseForum continued to work on this
21   so-called Phase 2 for the remainder of August and into
22   September of 2003, didn't it?
23   A   Can I see the e-mails?
24   Q   I'm just asking you if you know that they did

Page 211

1    that? I'm suggesting that you do know that they did
2    that
3    ATTY. KALER: You may laugh, Tom, but I find this
4    testimony --
5    ATTY. BEAN: You are now clairvoyant that you know
6    what Ms Callagee knows  Congratulations
7    Q   Well, I think you remember  You did continue to
8    talk with him in August and September of '03 about what
9    they were doing on Phase 2, didn't you?
10   A   I was talking to him here, yes, and in August I --
11   Q   Okay, and the discussions continued in August and
12   September concerning the work they were doing on Phase
13   2, didn't they?
14   A   They could have
15   Q   Okay  And --
16   A   It seems --
17   Q   I'm sorry?
18   A   I mean, if you are telling me there's e-mails,
19   then I'm going to say they did
20   Q   Well, did you communicate with him by telephone?
21   A   Yes
22   Q   Did you talk with him by telephone about the Phase
23   2 work?
24   A   I don't remember specific telephone conversations,

Page 212

1    but I was conversing -- John is a communicator.  I
2    conversed with him a lot.
3    Q   At the time that Lycos signed Exhibit 23A, the
4    buy-out agreement --
5    A   Yes.
6    Q   -- Lycos was intending to try to set up a
7    negotiation, a further negotiation with CSI to try to
8    reduce its lease payment obligations.  It was intending
9    to do that, wasn't it?
10   ATTY. BEAN: Objection
11   Q   You can answer.
12   A   I think that I was  I think that the jury may
13   still have been out for Brian
14   Q   But you certainly were?
15   A   I was requesting a proposal so I was thinking
16   about it.
17   Q   Okay  And subsequently, we know that that
18   arrangement, that plan was put into effect and the
19   Statement of Work that we marked as Exhibit 13A was
20   eventually signed?
21   A   That's right.
22   Q   And did you at anytime seek -- strike that
23   Did you talk --
24   ATTY. BEAN: Can we take five?

Page 213

1    ATTY KALER: Let me just finish this line
2    Q   After -- when Exhibit 13A was signed, it provided
3    that the settlement or so-called financial settlement
4    with CSI that LeaseForum was going to try to arrange on
5    behalf of Lycos provided that with respect to that
6    settlement, LeaseForum was going to get a cut, sort of
7    a percentage of the amount that it could reduce the
8    lease payment obligation by, right?
9    A   Yes
10   Q   And so Lycos agreed with LeaseForum -- shortly
11   after it signed Exhibit 23A, it agreed to pay
12   LeaseForum a percentage of whatever amount it could get
13   CSI to reduce Lycos' payment obligation by, right?
14   ATTY. BEAN: Objection
15   Q   You can answer
16   A   On October 8 Lycos did that
17   Q   On October 8th of 2003?
18   A   On October 8th of 2003
19   Q   So two months after Lycos signed Exhibit 23A, it
20   formalized that arrangement in Exhibit 13A, correct?
21   ATTY. BEAN: Objection
22   Q   You can answer
23   A   It formalized what?
24   Q   It formalized the Phase 2 work arrangement, the

54  (Pages 210 to 213)

# EXHIBIT 3

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Computer Sales International, Inc. v. Lycos, Inc., et al.

Transcript of the Testimony of:

# Charles Cross

# November 13, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

James A. Scally  26588

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4    --------------------------------x

5    COMPUTER SALES INTERNATIONAL, INC.,

6         Plaintiff and Defendant-in-

          Counterclaim

7                                          Civil Action

     vs.                                   No. 05-10017-RWZ

8

     LYCOS, INC.,

9

          Defendant and Plaintiff-in

10        Counterclaim

11   and

12   BANK OF AMERICA f/k/a FLEET BANK,

13        Trustee Process Defendant

14   --------------------------------x

15

16         VIDEOTAPED DEPOSITION OF CHARLES CROSS, a

17        witness called by and on behalf of the Plaintiff,

18        taken pursuant to the applicable provisions of the

19        Federal Rules of Civil Procedure, before James A.

20        Scally, RMR, CRR, a Notary Public in and for the

21        Commonwealth of Massachusetts, at the offices of

22        McCarter & English, 265 Franklin Street, Boston,

23        Massachusetts, on Tuesday, November 13, 2007,

24        commencing at 9:25 a.m.

Charles Cross 11-13-2007
Computer Sales International, Inc v Lycos, Inc, et al

**54**

1    A  Well  I did not review the lease with respect to
2  some of the provisions which I thought were inapplicable to
3  the issues that were in this case  So I haven't done the
4  same kind of detailed review on all of the lease provisions
5  as I did on the ones that I thought were important to my
6  opinion  But I would say generally no
7    Q.  Okay.  Well, I just want to know what, if any,
8  other provisions you're going to testify at trial were
9  aberrant or --
10    A  Oh
11    Q.  -- outside accepted industry practice
12    A  The ones that we've circled are the ones that I
13  believe are important to this case and were the subject of
14  my opinion
15    Q  Okay  You -- you have not -- you have not formed
16  a professional opinion that any of the other provisions in
17  the -- in the lease are aberrant or unfair or outside the
18  accepted industry practice, correct?
19    A  It's a correct statement to say I had not formed
20  an opinion on that  yes
21    Q.  Okay  You have not formed an opinion?
22    A  I have not formed an opinion
23    Q.  Okay  What exactly is it about the first
24  provision, the one that you circled with the number 1 on

**55**

1  the second page of the lease, beginning with the words,
2  "And with all engineering changes prescribed by the
3  manufacturer prior to the termination of lessee's right of
4  possession incorporated in the unit, lessee at its expense
5  shall make any repairs necessary in order to certify the
6  equipment as eligible for manufacturer's prime shift
7  maintenance contract upon its return and shall have that --
8  and shall have the unit certified as eligible for the same
9  At the time the equipment is returned, lessee shall provide
10  a letter from the manufacturer certifying such maintenance
11  eligibility," unquote, that you consider to be aberrant or
12  unfair or outside accepted industry practice?
13    A  In -- in the context of the equipment being
14  leased, the return provisions, in my view, make it
15  impossible to return the equipment at the end of the lease
16  term
17    Q.  Why?
18    A  Because these equipment return provisions  in my
19  experience  are applicable to individual standalone items
20  of equipment  for example  a mainframe computer in the case
21  of a prime shift maintenance contract, rather than
22  thousands of individual items of computer laptops
23  monitors, peripherals, cables  disk drives  et cetera  that
24  were the subject of this lease  and I believe it impossible

**56**

1  for one to obtain a prime shift maintenance contract with
2  respect to that equipment  and impossible to obtain
3  manufacturer's certification as to the eligibility of this
4  equipment for that type of prime shift maintenance
5  contract
6    Q.  Have you ever attempted to do so for any of those
7  things?
8        MR BEAN:  Objection
9    Q.  You can answer.
10    A  Have I attempted to do what this contract
11  provision says?
12    Q.  Yes.
13    A  No  I have not
14    Q.  Okay.  The -- you said these apply to standalone
15  items  Do you agree that this provision could be satisfied
16  with respect to standalone items?  Assuming a prime shift
17  maintenance contract was available
18        MR BEAN:  Objection
19    Q.  You can answer.
20    A  Yes  I do
21    Q.  And if you had a dozen such individual standalone
22  items and a prime shift maintenance contract was available,
23  would you agree that you could comply with the provision?
24        MR BEAN:  Can we get some clarity on

**57**

1    what's meant by standalone items?
2        MR KALER:  I'm sorry  Tom  I'd like
3    to --
4        MR BEAN:  All right  I'll object
5    then
6        MR KALER:  I m using his words
7        MR BEAN:  Well  object
8  BY MR KALER:
9    Q  I mean standalone means the individual equipment
10    Would you agree that with a dozen pieces of
11  equipment, assuming a prime shift maintenance contract was
12  available, that you could comply with this provision?
13    A  Yes  I would agree with that
14    Q.  Okay  And would you agree that if you had 100
15  pieces of equipment, again, for which a prime shift
16  maintenance contract was available, that you could comply
17  with this provision?
18        MR BEAN:  Objection
19    Q  You can answer
20    A  As you go up in the number of items of equipment
21  it becomes increasingly difficult because the cost of
22  compliance becomes a material factor in the decision as to
23  whether you can return the equipment or not  So --
24    Q.  But leaving aside the question of cost, I'm just

15 (Pages 54 to 57)

Charles Cross 11-13-2007
Computer Sales International, Inc v Lycos, Inc , et al

| 350 |
|---|

1   A  No  I haven't

2   Q  You've just looked at the provisions in the

3 agreement and concluded that there should have been a

4 purchase option in the Lycos lease agreements with CSI,

5 right?

6   A  Based on, yes  standard industry practice  yes

7   Q  And you further offered the opinion that somehow

8 it was unfair for CSI not to include such a purchase option

9 in its leases with Lycos?

10   A  Yes, I did

11   Q  And if you assume, though, that Lycos knew

12 perfectly well that it could seek or request a purchase

13 option in its leases with CSI but simply did not, or chose

14 not to request it, upon what basis do you claim that it was

15 unfair for CSI not to include it?

16   A  Well, I – I don't think you can discern that

17 level of knowledge on the part of Lycos unless you have

18 that conversation  So it – it – it seems to me that, at

19 minimum  there – there has to be a disclosure of the topic

20 such that the parties can make a rational decision about it

21 and such that CSI knows that Lycos doesn't consider it

22 something that's important to it

23   Q  If – if we assume that what you've just said is

24 not true, that, in fact, if Lycos already knew about

| 351 |
|---|

1 purchase options and leases and that it was, therefore, not

2 necessary for Lycos to explicitly discuss it with CSI to be

3 fully aware of it, how can you say, if you assume that

4 Lycos knew about purchase orders – purchase options in

5 leases and consciously chose not to require or try to

6 negotiate purchase options in its leases with CSI, even

7 though it knew about the availability of such purchase

8 options from its dealings with other lessors, upon what

9 basis do you say that it was unfair for CSI to not include

10 it? If you assume Lycos knew about it, would you still say

11 it was unfair for Lycos – for CSI not to have included it?

12   A  Well  I probably would not characterize it per se

13 as unfair  I m just saying it s inconsistent with industry

14 practice that there would not be a disclosure and

15 discussion of the topic, because the lessor would have –

16 the lessor  you know  generally is – is going to disclose

17 again  the factors that are material to the lessee s

18 decision to lease  and that –

19   Q  If in fact –

20   A  – I believe  is one of those factors

21   Q  If in fact CSI know already that Lycos was dealing

22 with other lessors and had purchase options in some of its

23 leases with other lessors and Lycos did in fact know about

24 the availability of purchase options in – in leases, but,

| 352 |
|---|

1 again, chose not to discuss it with CSI, it chose not to

2 request it or try to negotiate it, in that scenario, you

3 would not say it was unfair or improper or aberrant for CSI

4 not to have included a purchase option in its leases, would

5 you?

6      MR BEAN:  Objection

7   Q  You can answer.

8   A  Again, I – I think the relationship between the

9 lessor and lessee requires that there be a specific

10 discussion of those kinds of material economic turns –

11 terns at the time that the lease deal is being formed

12   Q  Sir, there's no rule that requires an explicit

13 discussion of – of –

14   A  Well –

15   Q  – such things if you're dealing with a lessee

16 that already knows that it has the right to request or

17 negotiate a purchase option; isn't that true?

18   A  No. that's not true  I mean as a –

19   Q  Where's the rule?

20   A  Well, as a – if you look at the code of fair

21 business practices, for example –

22   Q  Doesn't require a purchase option.

23   A  Will you let me finish my answer. please

24   Q  I've only got a limited time.

| 353 |
|---|

1   A  I'm sorry

2      MR BEAN:  Let him finish his answer

3      MR. KALER:  Let him answer my --

4 my -- my specific question

5      MR BEAN:  You asked him where --

6      MR KALER:  He's using up my time --

7      MR BEAN:  -- is the rule --

8      MR KALER:  -- and so are you

9      MR BEAN:  -- and he was answering

10 it

11      MR KALER:  No --

12      MR BEAN:  He was answering it --

13      MR KALER:  I -- I promise --

14      MR BEAN:  -- and you're cutting him

15 off

16      MR KALER:  -- I'll bring him -- I'll

17 bring you back

18      MR BEAN:  You're cutting him off.

19      MR KALER:  I promise

20      MR BEAN:  You won't have --

21      MR KALER:  -- I'll bring him back

22      MR BEAN:  -- the right to bring him

23 back

24      MR. KALER:  I will, and I'll make a

89 (Pages 350 to 353)

Charles Cross 11-13-2007
Computer Sales International, Inc v Lycos, Inc , et al

354

1       motion --
2           MR BEAN: Fine  Be my guest
3           MR KALER: — and I promise you
4       it'll —
5   BY MR KALER:
6       Q.  The issue is this  I mean, there's obviously
7   nothing in the ELA code says you have to have a purchase
8   option in the lease, right?
9       A.  That's right. it does not mention specifically
10  having --
11      Q.  I mean there's no rule --
12      A.  -- purchase options in leases
13      Q.  -- of industry practice that you know of that
14  requires lessors to include purchase options in their
15  leases, right?
16      A.  When you use the word "rule," I guess I don't
17  quite know what that means  All I can tell you is that it
18  is standard industrial practice to include purchase options
19  in leases  It --
20      Q.  But that doesn't mean that it's improper not to
21  include them if the two parties, with knowledge, decide not
22  to, right?
23          MR BEAN: Objection
24      A.  Yes, but I believe that knowledge cannot be

355

1   assumed by each party on the part of the other; that there
2   needs to be a discussion of that issue in order for a full
3   and fair agreement to be reached
4       Q.  But you don't know whether such a discussion
5   occurred here, do you?
6       A.  I -- I don't
7       Q.  And if in fact there was no discussion but both
8   parties correctly perceived that the other party knew that
9   purchase options could be negotiated, then there d be no
10  need for a discussion, would there?
11          MR BEAN: Objection
12      A.  That is just Mr Kaler. just a -- a generalized
13  knowledge of what the other party may know in a nonspecific
14  context really does not inform the parties' decision to
15  enter into a specific lease with specific economic terms
16      Q.  All right  That's just -- that's your personal
17  view, though, correct?
18      A.  Well it's my view based on, you know, I think,
19  standard practices in the industry and the code of fair
20  business practices
21      Q.  The code of fair business practices -- have you
22  negotiated any leases that did not have a purchase option?
23      A.  Outside of the ones that I mentioned in the
24  micro-ticket area, no  I have not

356

1       Q.  Okay, but you have negotiated leases without
2   purchase options, right?
3       A.  I'll restate my answer  Except for that limited
4   segment of small computer equipment deals that I mentioned
5   before, I have never negotiated a lease without a purchase
6   option
7       Q.  All right  Again, if Lycos consciously chose not
8   to seek to include a purchase option in its equipment
9   leases with CSI, even though it knew that it -- it could,
10  then you would not blame CSI for not including such a
11  purchase option, would you?
12          MR BEAN: Objection
13      Q.  You can answer.
14      A.  I -- I would not use the word "blame," but I would
15  not consider it consistent with industry practice for that
16  issue to be discussed in the context of a specific
17  transaction being offered  So I --
18      Q.  When you say not consistent with industry
19  practice, are you saying that it was unfair to Lycos?
20      A.  It -- it is unfair as if they proposed a lease and
21  didn't include what the amount of the rent would be
22      Q.  Let me ask it this way: If Lycos consciously
23  chose not to try to negotiate or include in its leases with
24  CSI a purchase option, knowing full well that a purchase

357

1   option in equipment leases was something that it could
2   request or negotiate for, you would not consider it unfair
3   for CSI not to have included the purchase option, would
4   you?
5           MR BEAN: Objection
6       Q.  You can answer.
7       A.  If that noninclusion happened after a discussion
8   between CSI and Lycos about the availability of the
9   purchase option in the context of the specific lease being
10  negotiated  So --
11      Q.  Then you would not -- then you would not consider
12  it unfair?
13      A.  If it were specifically --
14      Q.  Discussed
15      A.  -- discussed and one party rejected it. then I
16  would not consider that unfair
17      Q.  Okay  And you don't know whether or not such a
18  discussion occurred in this case, right?
19      A.  I see no evidence in my review of deposition
20  transcripts that indicate that any such discussion
21  occurred
22      Q.  Okay  My question was: You don't know whether
23  any such discussion occurred, do you?
24      A.  I do not

90 (Pages 354 to 357)

# EXHIBIT 4

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## Computer Sales International, Inc. v. Lycos, Inc., et al.

Transcript of the Testimony of:

# Peter W. Daley

# December 7, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

James A. Scally  26592

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

COMPUTER SALES INTERNATIONAL, INC.,

     Plaintiff and Defendant-in-
     Counterclaim
                               Civil Action
vs.                              No. 05-10017-RWZ

LYCOS, INC.,

     Defendant and Plaintiff-in
     Counterclaim

and

BANK OF AMERICA f/k/a FLEET BANK,

     Trustee Process Defendant

-------------------------------x

       VIDEOTAPED DEPOSITION OF PETER W. DALEY, a

witness called by and on behalf of the Plaintiff,

taken pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before James A.

Scally, RMR, CRR, a Notary Public in and for the

Commonwealth of Massachusetts, at the offices of

McCarter & English, 265 Franklin Street, Boston,

Massachusetts, on Friday, December 7, 2007,

commencing at 9:17 a.m.

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
febf0038-0fca-4eb1-b570-90c08c65aebc

Peter W. Daley 12-7-2007

Computer Sales International, Inc. v. Lycos, Inc., et al.

**Page 46**

1   A. Well, let's back up. I just found those two.
2   They're the totals —
3   Q. Yes
4   A. — on C.
5   Q. Take your time
6   A. Now can I find the other two? (Pause.) I don't
7   see the valuations for columns D for Lycos and D for CSI,
8   4,252,352.52, and 1,037,015.97.
9   Q. Let me show you —
10      MR. KALER: If I may have a blank
11      exhibit sticker
12      (Discussion off the record )
13  Q. Let me show you what's been marked as Exhibit
14  753-A
15      (Exhibit 753-A, two-page portfolio
16      analysis, marked )
17  Q. Also produced to us yesterday  Do you recognize
18  this two-page portfolio analysis as setting forth the
19  version of the totals that appeared in the spreadsheet as
20  of the time you sent it to Mr Condon on August 24th of
21  2007?
22      MR. BEAN: Objection
23  Q. I think you'll find the numbers in those last four
24  columns match up perfectly.

**Page 47**

1   A. Yes, they do
2   Q. So is Exhibit 753-A the version of the — the
3   total numbers in the summary portion of the spreadsheet,
4   753, that appeared in the spreadsheet 753 at the time you
5   sent it to Mr Condon on August 24th of 2007?
6       MR. BEAN: Objection
7   Q. You can answer
8   A. These — this spreadsheet at this time was a work
9   in process.
10  Q. I'm just asking, are these the —
11  A. They were draft only.
12  Q. Are these the numbers, sir?
13  A. And these are — these views were subject to
14  change —
15  Q. Sir —
16  A. — and they —
17  Q. I'm just — I'm just asking you right now, because
18  is Exhibit 753-A the — a copy of the way the summary
19  sheet, the Lycos portfolio analysis summary sheet, in
20  Exhibit 753 appeared at the time that you sent 753 to Mr
21  Condon on August 24th of '07?
22  A. The numbers from the table in the table that I
23  sent to Mr. Condon match the information from a working
24  spreadsheet that I sent to Mr. Condon on that date.

**Page 48**

1   Q. And was Exhibit 753-A the version of the summary
2   portion of the spreadsheet that was in 753 when you sent it
3   to Mr Condon on that date, on August 24th?
4       MR. BEAN: Objection
5   Q. You can answer
6   A. I've answered it, but yes.
7   Q. Okay  And the numbers on Exhibit 753-A at the
8   time that you sent a version of Exhibit 753, the full
9   spreadsheet, to Mr Condon on August 24th, those numbers
10  appear to be totals, do they not?
11      MR. BEAN: Objection
12  Q. In — in particular, I'll just mark the line for
13  clarity, if I may, on — on the original exhibit  What
14  I'll mark with the letter A and a circle around it and an
15  arrow is the line which has the word "total "  Do you see
16  that?
17  A. I see that.
18  Q. Okay  And those numbers were the numbers that
19  were totalled in the spreadsheet at the time you sent it to
20  Mr Condon on August 24th, right?
21  A. Yes. Relating —
22  Q. Okay
23  A. — to —
24  Q. Relating to the different categories?

**Page 49**

1   A. — line A circled.
2   Q. Okay
3   A. Yes.
4   Q. And in each case, in the case of each column in
5   which those total numbers appeared, they were totalling up
6   all the subsidiary numbers above them in the spreadsheet.
7   correct?
8   A. Yes.
9   Q. And that spreadsheet at the time you sent it to
10  Mr Condon, as we see in 753, was roughly a few hundred
11  pages, depending on how you print it out, right?
12  A. Yes.
13  Q. And the numbers in Exhibit 753-A, these total
14  numbers were alternative valuations of the equipment, in
15  some cases just portions of the equipment, like schedules
16  93 and 94, that you had done, right?
17      MR. BEAN: Objection
18  Q. You can answer
19  A. The various totals represent various points in
20  time that I had decided that in the essence of time to
21  perform these calculations, as I mentioned earlier, that I
22  would pick these particular dates that we had discussed and
23  that I on my own did this valuation with all of these
24  different numbers.

13 (Pages 46 to 49)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
febf0038-0fca-4eb1-b570-90c08c65aebc

Peter W. Daley 12-7-2007

Computer Sales International, Inc. v. Lycos, Inc., et al.

Page 54

1    MR KALER: Okay. We need to change
2    the tape
3    MR BEAN: Let's take a break
4    THE VIDEOGRAPHER: Now going off the
5    record This is the end of tape number 1
6    The time is 10:38 a.m
7    (Recess.)
8    THE VIDEOGRAPHER: Now going back on
9    the record. This is tape number 2 The
10   time is 10:53 a.m
11   BY MR KALER:
12   Q. Mr Daley, you understand you're still under oath?
13   A. Yes.
14   Q. Did you have any conversations in any way about
15   this case during the break?
16   A. No.
17   Q. We received, I think, two sets of decline curves,
18   and I think -- I think the second one corrected an
19   arithmetic error in the columns, at least as I perceived
20   it Am I -- am I right?
21   A. Yes.
22   Q. I will give you -- I marked the old one as "old"
23   because I had -- I had seen a sort of precipitous drop in
24   the percentage which didn't strike me as being consistent

Page 55

1    with the calculations  So we were happy to receive the new
2    one, which I'll just mark as 754, I guess
3    (Exhibit 754, decline curve chart,
4    marked )
5    Q. And I can represent to you this is the second one
6    that we received, and can you simply tell us what Exhibit
7    754 is
8    A. This represents the decline rate curves that I
9    used in my valuation for the CSI equipment.
10   Q. Okay  Maybe you should just explain briefly what
11   decline curves are, as you used them.
12   A. In developing a residual value forecast, the
13   process is to historically look at fair market values of
14   particular machines in various -- in all categories of
15   equipment that are in my fair market value reports  So I
16   develop historically -- I take historical fair market value
17   reports, identify a particular machine that I'm looking at
18   that represents maybe a machine that a lessor wants to look
19   at. I have done this since 1987, when I started producing
20   residual value reports You take the information of the
21   fair market value for as long as you can, two, three, four
22   years, and when you compare that to either the list price
23   or the original equipment cost, you can develop
24   historically what that particular machine, be it PC or

Page 56

1    server, how it's going to react in the future. And once
2    you develop this curve or decline rate, you then use that
3    decline rate for the next generation of equipment. You can
4    then -- what we do is match up the curve that I had in
5    1987; I look at 1988 and if I determine if I need to -- if
6    this equipment is reacting along the same curve line. And
7    if it is, then I don't change the curve. If it is -- if
8    it's different, it's gone up or gone down, I look to see if
9    that is material, and if it is, then I tweak my forecast
10   for the next generation of equipment.
11   Q. Okay.
12   A. And you just carry this forward on all different
13   types of equipment so you end up with various decline rate
14   curves for all sorts of equipment.
15   Q. And -- and you have various decline rates in
16   Exhibit 754 for different types of equipment?
17   A. In the Lycos portfolio, yes.
18   Q. Okay  This is the -- I wasn't going to mark it.
19   This is the old version that we got. Can I just discard
20   this one? It's --
21   A. Please do.
22   Q. It's not -- not relevant  It was just an
23   arithmetic error, right?
24   A. Uh-huh.

Page 57

1    Q. Can we refer to Exhibit 754 curves, then, as the
2    decline -- decline rate curves or --
3    A. Yes.
4    Q. Okay  Looking at Exhibit 753-A, when you sent
5    this Exhibit 753-A, this information to Mr Condon as part
6    of the spreadsheet on August 24th, had you already
7    discussed with him the various alternative valuation
8    numbers that you had calculated?
9    A. We had discussed them, yes.
10   Q. And I'd like to just, if I may, walk through this,
11   because I want to understand what the headings are  I know
12   we sort of walked through them, and I have a general idea.
13   Particularly I think I misread the FRV; I didn't realize it
14   was fair return value  But in -- in column 1, the "FMV to
15   Lycos valuation A, FMV-IN as of equip commencement dates
16   for 93 and 94," the figure of 8,106,857, as clearly as you
17   can describe, can you describe what that category, what
18   that valuation category is referring to?  You said it
19   refers to the FMV, fair market value, to Lycos installed as
20   of, I gather, the commencement date of schedules 93 and 94?
21   Is that right?
22   A. That's correct.
23   Q. And what were the commencement dates for 93 and 94
24   that you're referring to?

15 (Pages 54 to 57)

febf0038-0fca-4eb1-b570-90c08c65aebc

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

Page 58

1    A. Okay. On this spreadsheet, for -- which was a
2    draft, 93 and 94 both commenced on 11/1/01. If you go to
3    this spreadsheet, what is this? 753?
4    Q. This is 753, the color one
5    A. Okay. If you go to page 1, and you look in the
6    very first column.
7    Q. Yes
8    A. That is the commencement date of schedule 93 and
9    94. Do you see at the top, "Equipment schedule date for 93
10   and 94"?
11   Q. I'm sorry
12   A. Right -- right there.
13   Q. Oh, I see. Okay. The first column
14   A. The first column. So that is -- that is part of
15   Chris Condon's input.
16   Q. Okay. So at the top of the first -- of column 1
17   on Exhibit 753-A. the reference there to fair market value
18   installed as of equipment commencement date for 93 and 94,
19   does that refer to the date of November 1st, '01, or the
20   commencement date of the schedules that went into 93 and
21   94?
22   A. No. The commencement -- the very first column on
23   the spreadsheet is the commencement date of 93 and 94. The
24   commencement date of the schedule that went into 93 and 94

Page 59

1    is over right under where it says "Lycos," the COS, it
2    says, "Midpoint install date equals assumed new equipment."
3    Q. Yes
4    A. Okay? And if you go over to here, this is the
5    schedule, this is the original equipment schedule.
6    Q. Ahh
7    A. So equipment schedule number 5 that had a midpoint
8    install date of 3/15/97 is part of schedule 94 because of
9    this 4
10   Q. Yes
11   A. Okay. And it basically was rolled up into lease
12   equipment schedule 94, and then the equipment commencement
13   date for 93 and 94 is in this very first column.
14   Q. Okay. Let me, just for reference --
15   A. Why don't you just take the top page off.
16   Q. You think so?
17   A. It would be easier than --
18   Q. That's fine. I'll just for the moment, then, use
19   the first page of Exhibit 753. Daley 000047, and for ease
20   of reference. I'll just number the columns left to right,
21   2, 3. 4 --
22   A. Because we already referenced some of these, why
23   don't you use A, B, C.
24   Q. Good idea. I'll number them -- letter them,

Page 60

1    rather  A, B, C, D  My Z, for reference, has a quantity,
2    QTY, at the top of it, okay?  I'll mark that AA, BB, so on
3    And I end with VV for victor
4    In Exhibit 753-A, column 1, where you refer to
5    fair market value installed as of equipment commencement
6    dates for numbers 93 and 94, were you then using
7    different -- you were adding up values at different
8    commencement dates for schedules that had been rolled into
9    93 and 94?
10   MR BEAN: Objection
11   Q. You can answer
12   A. Using this particular spreadsheet to arrive at the
13   value in column C, which is the fair market value installed
14   as of commencement date for 93 and 94, the objective -- and
15   this is -- again, I need to reiterate, it's a work -- it's
16   a draft -- was to take column Y, subtract it from column
17   A --
18   Q. Sorry. Hang on with me for a minute  (Pause )
19   Okay I apologize. Go ahead
20   A. Okay. So we took column Y, subtracted it from
21   column A, divided it by 30 to arrive at the number of
22   months from the theoretical first ship date, which is the
23   midpoint between the original install date and the
24   acceptance date of that particular equipment schedule.

Page 61

1    Q. Okay. So it's not the case that you valued all
2    the equipment as of November 1st, '01 in column 1  You
3    valued it as of different dates for the different schedules
4    that went into 93 and 94?
5    MR BEAN: Objection.
6    A. You --
7    Q. You can respond.
8    A. You -- we tried to determine the value on 11/1/01
9    of the equipment for 93 and 94. And this is the process
10   that we did, that I did, was to subtract the two and divide
11   by 30. I now came up with the age of the equipment on
12   11/1/01. Okay. Part of the age of the equipment is to
13   find out basically how old is it, so that I know where it's
14   going to fall on my decline curve when I get around to
15   obtaining that information.
16   Q. Okay.
17   A. So this is kind of like the first step.
18   Q. Okay. And doing the calculation in that way
19   resulted in the 8,105,857 that we see on line A --
20   MR BEAN: Objection
21   Q. -- correct? At least in this instance?
22   MR BEAN: Objection.
23   Q. You can answer
24   MS TESFAMARIAM: 106

16 (Pages 58 to 61)

febf0038-0fca-4eb1-b570-90c08c65aebc

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

| Page 62 | Page 64 |
|---|---|
| 1   Q I'm sorry. Doing the calculation in that way in<br>2 column 1 resulted in a figure of 8,106,857 on line A,<br>3 correct?<br>4      MR. BEAN: Objection<br>5   Q You can answer<br>6   A. Well, this -- there's more to the -- arriving at<br>7 the value than just subtracting two dates.<br>8   Q I understand. But doing the calculation for<br>9 column 1 in the way that you -- on Exhibit 753-A in the way<br>10 that you describe resulted in the 8.1 million that we have?<br>11   A. Along with other calculations.<br>12   Q Okay. Resulted in a total figure here of the<br>13 eight million --<br>14   A. Yes.<br>15   Q -- 106,857? Okay<br>16      MR. BEAN: Objection<br>17   Q In column 2, could you explain what you meant by<br>18 the -- the heading "Net FMV to CSI valuation A," I guess<br>19 you said "Fair return value as of equipment commencement<br>20 date for 93 and 94." What calculation did you do to derive<br>21 that valuation A?<br>22   A. Okay. On my draft report, because things change<br>23 and you didn't -- didn't -- you don't always get it right<br>24 the first time, basically I did exactly the same thing, | 1   A. No. There is a difference between column C and<br>2 column E.<br>3   Q On 753?<br>4   A. Yes. Well, I'm looking at the totals of 753-A.<br>5 Since this was a draft, I -- I mean I developed these<br>6 various columns in anticipation, and --<br>7   Q I see what you're saying. If you can tell me what<br>8 the methodology was, in other words, which columns -- we<br>9 recognize that some of the numbers in 753 in the subsidiary<br>10 columns may have differed. I just want to know how you<br>11 calculated it in terms of which columns would have been<br>12 subtracted from which columns.<br>13   A. Well, in looking at columns --<br>14   Q You need to be careful, because that's the<br>15 original exhibit. I'm not sure what you're doing.<br>16   A. I'm trying to match these columns with these.<br>17   Q Oh, all right<br>18   A. I'm just putting alphabetical numbers.<br>19   Q If that helps, that's all right. I'll give you<br>20 another copy of that if you want to mark it?<br>21   A. No. It's --<br>22   Q If that helps at all<br>23   A. I think that's -- see, fair market value -- I'm<br>24 confused without looking at the actual calculation here, |

| Page 63 | Page 65 |
|---|---|
| 1 subtract one date from the other --<br>2   Q Can you just refer to the first page of 753?<br>3   A. I subtracted the date in column Y from column A.<br>4   Q For each schedule?<br>5   A. For each schedule, for each line item --<br>6   Q Uh-huh<br>7   A. -- and did my calculation and my table look-up for<br>8 CSI and arrived at a value.<br>9   Q Using the decline curves?<br>10   A. The decline curves for CSI.<br>11   Q Okay And the result of that calculation in<br>12 column 2 on 753-A was the 3,507,248 that appears on line A<br>13 under that column 2, right?<br>14      MR. BEAN: Objection<br>15   Q You can answer<br>16   A. Yes, at this point in time.<br>17   Q Uh-huh. And then column 3, could you explain how<br>18 you -- what this "FMV to Lycos valuation B, FMV installed<br>19 as of November 1, '01 numbers 93 and 94," how that<br>20 valuation B was calculated?<br>21   A. I have to back up.<br>22   Q Okay<br>23   A. (Pause.) Well, I am --<br>24   Q If you would like to see the rest of the chart? | 1 but these appear to be the same calculation.<br>2   Q Okay<br>3   A. Because it's -- if I say fair market value<br>4 installed as of equipment commencement date for 93 and 94,<br>5 that's 11/1/01. And I'm looking in column C. And in<br>6 column E, "Fair market value installed as of 11/1/01 for 93<br>7 and 94" --<br>8   Q You mean column 4? I think we're -- we don't want<br>9 to use your letters to refer to the columns in 753-A I<br>10 think we want to use the numbers<br>11   A. Okay. Then 3.<br>12   Q Can you just cross out your letters, so that you<br>13 can still see them. but -- there you go.<br>14   A. Okay.<br>15   Q So you were saying?<br>16   A. Well, without actually looking at the calculation<br>17 that I made on that -- on the electronic version, it<br>18 appears that 1 and 3, by this definition, are the same<br>19 numbers, because fair market value installed as of<br>20 equipment commencement date for 93 and 94 is 11/1/01. If I<br>21 look to column 3, it says, "Fair market value installed as<br>22 of 11/1/01 for 93 and 94." So I think my heading is<br>23 probably -- I -- I might have an error there.<br>24   Q You said without looking at the electronic |

17 (Pages 62 to 65)

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

| Page 134 | Page 136 |
|---|---|
| 1  Q  Is that right? | 1      off the record  This is the end of tape |
| 2  A.  If -- you have to remember that this is a draft | 2      number 3  The time is 1:07 p m |
| 3  and this is -- was not the final document  That, in | 3          (Recess ) |
| 4  looking at that, those numbers, I understand, are basically | 4          THE VIDEOGRAPHER: Now going back on |
| 5  out of whack. | 5      the record  This is tape number 4  The |
| 6  Q  No, no  I'm not saying the numbers are out of | 6      time is 2:10 p m |
| 7  whack, sir  The only question I was asking was: When you | 7  BY MR KALER: |
| 8  use the 0 25 percent in saying that the -- when you say, | 8      Q  Mr Daley, you understand you're still under oath? |
| 9  for example, that a server is worth 25 percent -- is worth | 9      A.  Yes. |
| 10  to CSI 25 percent of what it's worth to Lycos, in the case | 10      Q  Did you discuss any aspect of the deposition or |
| 11  of an individual piece of equipment | 11  this case or my questions or your testimony during the |
| 12      A.  Yes. | 12  lunch break? |
| 13      Q  I mean these were all different dates | 13      A.  Yes. |
| 14      A.  Right. | 14      Q  What did you discuss? |
| 15      Q  So there's nothing wrong with that  When you say | 15      A.  We discussed my development of the Lycos curve, |
| 16  that a piece of equipment is worth to CSI 25 percent of | 16  which we -- I'd explained in here, and I explained it again |
| 17  what it's worth to Lycos, you're saying that -- or your | 17  to Mr. Bean. |
| 18  calculation values it to Lycos, that particular piece of | 18      Q  Oh, okay  He asked you to explain it to him |
| 19  equipment, at four times what your calculation values it to | 19  again? |
| 20  CSI -- | 20      A.  Yes. |
| 21          MR. BEAN: Objection | 21      Q  Okay  And did you say anything to him differently |
| 22      Q  -- is that right?  When you use the 0 25. | 22  than what you told us? |
| 23      A.  In that example, that is correct | 23      A.  No, I didn't. |
| 24      Q  Okay  And when -- and when you did the | 24      Q.  Okay  Did you have any other discussion about -- |

| Page 135 | Page 137 |
|---|---|
| 1  calculation for the other percentages beyond 25 months on | 1      A.  We talked briefly about the CSI developments, I |
| 2  Exhibit 754, is it the case, then, that once you get to | 2  mean the curves, and how I developed those, and my answer |
| 3  month number 42, for example, on the first page of Exhibit | 3  to him was exactly the same that we discussed here. |
| 4  754, we see that up until month 42, the percentage to CSI | 4      Q  Okay  You discussed the development of the |
| 5  is 15 4 percent, and then it drops at month 43 to 6 8 | 5  percentages in Exhibit 754 beginning at the 25th month? |
| 6  percent  Do you see that? | 6      A  Yes |
| 7      A.  Yes. | 7      Q  All right  Okay  Did you discuss any other |
| 8      Q  And we see the same pattern at month 42 where, on | 8  aspect of the case or your testimony or questions -- |
| 9  page Daley 23, at month 42 for Compaq equipment, it's 4 6 | 9      A.  No. |
| 10  percent, and then it drops to 2 2 percent at 43 and -- and | 10      Q  -- how you should answer -- |
| 11  so on throughout the Exhibit 754  That -- that particular | 11      A.  The weather -- |
| 12  drop is -- is intentional?  In other words, that's a | 12      Q  -- things like that? |
| 13  reflection of the -- the shift from -- at 42 months, at the | 13      A.  -- housing. |
| 14  43rd month from the decimal figures 0 54, 0 45, 0 43 -- | 14      Q  All right  Good |
| 15  excuse me, 0 54, 0 45, 0.64, and 0 58, lastly 0 49, in | 15      Having discussed Exhibit 754, I just want to |
| 16  the first column on the second page of 753-A, the shift in | 16  return to -- |
| 17  the 43rd month over to the lower percentage is 0 25 -- | 17      A  Sure. |
| 18      A.  That is -- | 18      Q  -- Exhibit 753-A -- |
| 19      Q  -- for those categories? | 19      A.  Yes |
| 20      A.  That is correct. | 20      Q  -- and just continue this process |
| 21          MR. KALER: Okay  All right  I | 21      In -- in calculating the values that you did in |
| 22      think I understand  Why don't we break for | 22  columns 2 and 4 of Exhibit 754, then, you used the CSI |
| 23      lunch | 23  decline rates beginning at the 25th month that are set |
| 24          THE VIDEOGRAPHER: We're now going | 24  forth in Exhibit 754 and were calculated as you've already |

35 (Pages 134 to 137)

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

| Page 150 | Page 152 |
|---|---|
| 1  A. Yes.<br>2  Q Okay That's the only point I'm making, that<br>3 they're grouped under valuation C<br>4     Let me now move, if I could, to the two columns to<br>5 the right, in column 9 and 10 In column 9, do you see where it was<br>6 headed "FMV to Lycos, valuation D, fair market value<br>7 installed for all as of 7/15/03"? Do you see that?<br>8  A. Yes.<br>9  Q Okay This was -- how did you calculate this<br>10 valuation in column 9?<br>11  A. Again, we start out with subtracting the midpoint<br>12 install date to 7/15/03.<br>13  Q That's in --<br>14  A. Column Y.<br>15  Q -- column Y of Exhibit 753<br>16  A To --<br>17  Q You're subtracting that from -- or subtracting<br>18 from that something?<br>19  A. The -- I'm subtracting 7/15/03, which is under the<br>20 midpoint on your second page, midpoint install date, down<br>21 to 7/15/03.<br>22  Q Okay So you're taking the information, the data<br>23 in column Y --<br>24  A. And subtracting that from 7/15/03. | 1  Q And the total value that you came up with, valuing<br>2 all the equipment on the schedules as of July 15th, '03,<br>3 using that calculation was this figure of $7,014,678 in<br>4 column 9 at line A; is that right?<br>5     MR. BEAN: Objection<br>6  Q You can answer<br>7  A. No.<br>8  Q Looking at Exhibit 753-A, column 9, going down to<br>9 line A, do you see the figure opposite -- on the "Total"<br>10 line --<br>11  A. Yes.<br>12  Q -- under column 9?<br>13  A. But that is not the total for 93 and 94.<br>14  Q The total -- that's the total for all the<br>15 schedules --<br>16  A. Yeah.<br>17  Q -- that you were valuing at that time, 93, 94, and<br>18 the other ones that -- that you were -- 89, 89-A, 100, and<br>19 200, right?<br>20  A That is correct.<br>21  Q Okay So we -- this valuation is different<br>22 because it -- it's not only a different date, it adds in a<br>23 couple of other schedules that were included at that time;<br>24 is that right? |

| Page 151 | Page 153 |
|---|---|
| 1  Q To get the age of the equipment as of 7/15/03<br>2  A. Correct.<br>3  Q Okay<br>4  A. And dividing by 30 --<br>5  Q To get the age and months?<br>6  A. -- come up with the number of months. That<br>7 appears in column T.<br>8  Q On 753?<br>9  A. On 753.<br>10  Q Okay<br>11  A. I then go to -- I need to develop the percent of<br>12 list price, so I go to column NN --<br>13  Q On 753<br>14  A. Yes. So I now have the number of months, and I go<br>15 to 7 -- to column NN; I go to my table look-up --<br>16  Q Which is our 754, which is part of the schedule?<br>17  A. Yes. For a server, Sun Microsystems, I go down<br>18 and pull off the value percent of list price -- or of<br>19 original equipment cost. I go to column PP, which is the<br>20 each price, multiply it times the quantity in column Z. I<br>21 then look to see if there's any unamortized soft costs, I<br>22 then take the sum of that and put it into column K.<br>23  Q Of 753?<br>24  A. Of 753. And which is column 9 of 753-A. | 1  A. Yes.<br>2  Q Okay And using the method of -- the calculation<br>3 method that you just described for column 9, the value that<br>4 you came up with for all the equipment on all the schedules<br>5 that you had, 93 and 94 and the other schedules that were<br>6 in existence as of July of '03 was this $7,014,678; is that<br>7 right?<br>8     MR. BEAN: Objection<br>9  A. That is --<br>10  Q You can answer<br>11  A. That is the value on 753-A on this draft report,<br>12 yes.<br>13  Q When you looked at -- column 10, the next column,<br>14 "Net fair market value to CSI, fair return value for all as<br>15 of 7/15/03," do you see that?<br>16  A. Yes.<br>17  Q Again, you were valuing in that column all the --<br>18 the equipment on all the schedules that you understood to<br>19 be extant at that time, not just 93 and 94, but also the<br>20 others, 89, 89-A, 100, and 200; is that right?<br>21  A. That was -- that was the value for all of the<br>22 equipment for all schedules for CSI, 93 through 200.<br>23  Q Okay And you used the same methodology to come<br>24 up with that value as you had used to come up with the |

39 (Pages 150 to 153)

Peter W. Daley 12-7-2007
Computer Sales International, Inc. v. Lycos, Inc., et al.

Page 198

1    answered --
2    Q   You would -- you would need --
3         MR. BEAN: Five times now
4    Q   You would need more information than that, sir --
5         MR. BEAN: Objection
6    Q   -- to conclude that a valuation predicated on your
7    own decline value curves was materially wrong across the
8    board --
9         MR. BEAN: Objection
10   Q   -- right?
11   A   When you -- when you look at data out at month 48
12   and the data is wrong, it replicates up the entire decline
13   curve.
14   Q   You -- my question was simply finding two or three
15   pieces of equipment out of hundreds and only two or three
16   pieces of equipment in three categories, not even the
17   larger categories that had sold below what you had valued
18   them at, that, in and of itself, would not --
19   A   To me --
20        MR. BEAN: Objection
21   Q   -- give you sufficient --
22        MR. BEAN: Let him finish
23   Q   -- reason to reach a professional opinion that
24   your entire valuation was wrong, would it?

Page 199

1         MR. BEAN: Objection  Asked and
2    answered six times
3    Q   You may answer
4    A   It raises enough.
5    Q   And those were questions -- but it does not, in
6    and of itself, give you a sufficient basis to conclude that
7    the values are wrong, does it?
8         MR. BEAN: Objection  Seven times
9    Q   Just says you need to look further, right?
10        MR. BEAN: Objection
11   Q   You can answer
12   A   I conclude that it raises enough of a question
13   based on that information that the rest of the -- the rest
14   of the decline rates needed to be looked at, but I made
15   the -- I made the decision that I believed that it affected
16   the rest of the equipment.
17   Q   You made the decision that it affected the rest of
18   the equipment?
19   A   That's why I can -- yes.
20   Q   Okay  Here's my -- the question is: You did
21   not -- that did not provide you with sufficient information
22   to conclude that the totals were wrong on 753-A, did it?
23   A   It --
24        MR. BEAN: Objection

Page 200

1    A   It -- it -- it provided me the information that I
2    believe that -- that those totals for Lycos were wrong.
3    Q   You -- are you saying that looking at two or three
4    PC's, two or three laptops, and two or three printers,
5    which is all you said you did, caused to you reach a
6    professional appraisal judgment that your entire analysis
7    in 753-A was wrong?
8         MR. BEAN: That's not all he said he
9    did
10        MR. KALER: That's a lie
11        MR. BEAN: He said the ratios were
12   out of whack  Look back at the transcript
13   Q   That's what you said you looked at
14        MR. BEAN: He also said he looked at
15   the ratios
16   A   I also looked -- I also looked at the ratios.
17   Q   Of course you looked at the ratios  I'm talking
18   about the pieces of equipment, sir, that you looked at
19   You said you looked at two or three laptops, two or three
20   printers, two or three communications devices  No servers
21   And you said those were the items of equipment actual sales
22   data that you looked at  Do you recall that?
23   A   Yes.
24   Q   All right  You -- you could not on the basis of

Page 201

1    looking at two or three laptops, two or three printers, and
2    two or three communications devices out of thousands and
3    finding that they were sold for something less than what
4    you valued at, you could not on the basis -- no
5    professional appraiser on the basis of that could conclude
6    that the entire valuation that you did in 753-A was wrong,
7    could they?
8         MR. BEAN: Objection.
9    A   Yes, I did.
10   Q   I beg your pardon?
11   A   Yes, I did.
12   Q   You say you did  When you sent -- but you used
13   values from 753-A and you put them in a final report,
14   Exhibit 739, correct?
15   A   Yes.
16   Q   And are you saying that when you certified in
17   Exhibit 739 that these values that you selected from 753-A
18   to put into your report, when you certified that they were
19   true and correct, you did so knowing full well that you had
20   concluded that Exhibit 753-A was wrong?
21   A   Well, first off, 753 -- is that 753-A?
22   Q   Yes
23   A   753-A was a work in process  It's a draft.
24   Q   That isn't what I asked

51  (Pages 198 to 201)

# EXHIBIT 5

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Susan S. Franklin

# October 25, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

James A. Scally  20864

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3

 4    ------------------------------------x

 5    COMPUTER SALES INTERNATIONAL, INC.,

 6         Plaintiff and Defendant-in-

           Counterclaim

 7                                        Civil Action

      vs.                                 No. 05-10017-RWZ

 8

      LYCOS, INC.,

 9

           Defendant and Plaintiff-in-

10         Counterclaim

11    and

12    BANK OF AMERICA f/k/a FLEET BANK,

13         Trustee Process Defendant

14    ------------------------------------x

15

16         DEPOSITION OF SUSAN S. FRANKLIN, a witness

17    called by and on behalf of the Plaintiff, taken

18    pursuant to the applicable provisions of the Federal

19    Rules of Civil Procedure, before James A. Scally,

20    RMR, CRR, a Notary Public in and for the Commonwealth

21    of Massachusetts, at the offices of McCarter &

22    English, 225 Franklin Street, Boston, Massachusetts,

23    on Wednesday, October 25, 2006, commencing at 9:17

24    a.m.
```

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc.

82

1    Q.  Let me show you what's been marked previously as
2  Exhibit 191  Is that the spreadsheet that you're referring
3  to?
4    A  Yes, it is
5    Q.  And is this a spreadsheet that you prepared in or
6  about June of 2003?
7    A  Yes, it is
8    Q.  And you prepared it as part of your analysis of
9  the leases that Lycos had entered into with CSI over the
10  previous years up to that point; is that right?
11         MR BEAN: Objection
12         MR FELDMAN: Objection
13    A  No, it's not correct
14    Q.  You prepared it as part of an analysis that you
15  were doing, correct?
16         MR FELDMAN: Objection
17         MR. BEAN: Objection
18    A.  I prepared it as part of an analysis of the leases
19  that remained active with CSI at this point
20    Q.  Right  You prepared it as part of an analysis of
21  the leases between CSI and Lycos that remained active at
22  that point, right?
23    A  Remained active  yes
24    Q.  Okay  Dating back to October of 1999, correct?

83

1    A  I do not know the date
2    Q  If you look at the first page of the spreadsheet
3  that you prepared, you see that the first lease listed,
4  number 1, is dated October 1999, correct?
5    A  I do not see a lease number 1
6    Q.  Beg pardon?
7    A  I don't see a lease number 1
8    Q.  No. I'm referring to the Arabic number in the
9  left column  Do you see what I'm referring to, 1 --
10    A  Yes
11    Q.  -- October '99?
12    A  Uh-huh
13    Q.  Okay. So the leases that you were analyzing dated
14  back to October of 1999, correct?
15         MR BEAN: Objection
16    Q.  You can answer.
17    A  It appears that there was activity in October of
18  '99
19    Q.  All right  You had received, in connection with
20  this analysis in Exhibit 191, you had received a set of
21  copies of the leases between CSI and Lycos that were still
22  active; is that right?
23         MR FELDMAN: Objection
24         MR BEAN: Objection

84

1    Q.  You can answer.
2    A.  Can you please repeat the question?
3    Q.  Did you not hear the question the first time?
4    A  I can't -- my left ear is a little clogged from
5  the cold, so --
6    Q.  Sorry. I was simply asking in connection with the
7  preparation of the -- this analysis, Exhibit 191, you had
8  received and reviewed a series of equipment leases between
9  CSI and Lycos, correct?
10         MR BEAN: Objection
11    Q.  You can answer.
12    A  I had reviewed documents provided to me by Lycos
13  yes
14    Q.  Okay.  And those documents were the leases, right?
15         MR FELDMAN: Objection
16    A.  Certain leases, yes
17    Q.  They were what you understood to be all the leases
18  that were active at the time, correct?
19         MR BEAN: Objection
20    Q.  You can answer.
21    A  What I understood to be the active leases at the
22  time, yes
23    Q.  And who told you they were the active leases?
24    A.  I was -- Lycos

85

1    Q.  Who at Lycos?
2    A  Julie Callagee
3    Q.  Okay.  And in the top left corner of Exhibit 191,
4  opposite the letter B, and the arrow where it says "ORG
5  OEC, $44,816,217" recorded what you understood to be the
6  original equipment cost for the equipment covered by the
7  leases that you reviewed, correct?
8         MR FELDMAN: Objection
9    Q.  You can answer.
10    A.  This is a printout of a working document.  At the
11  time that this was printed, the partial analysis of the
12  documents provided the base value stated on those documents
13  were adding up to: that number
14         MR KALER: I move to strike as
15    nonresponsive
16    Q.  I'll ask you how you got to it.
17         MR KALER: The laughter by counsel,
18    the prompting of the witness is part of the
19    record, but it's inappropriate
20    Q.  I'll ask you the question again.  When you wrote
21  the words "ORG OEC," you were referring to original
22  equipment cost of the equipment covered by the leases,
23  correct?
24         MR FELDMAN: Objection

22 (Pages 82 to 85)

Susan S. Franklin 10-25-2006
Computer Sales International, Inc v. Lycos, Inc

94

1  yes
2     Q. You weren't listening that cutely or acutely?
3        MR FELDMAN: Objection
4     Q. The point is that the analysis that you did in
5  preparing Exhibit 191 included your arriving at this figure
6  opposite the letter C, excess OEC, excess original
7  equipment cost $20,921,414, correct? It included your
8  arriving at that figure?
9     A. It's included in the spreadsheet, yes
10    Q. Okay. And you arrived at that figure by
11 subtracting the -- by taking what we've marked A, the total
12 CF, or total cash flow, of 65 million in the
13 bottom left corner of 191's first page, and subtracting
14 from it the original OEC, or original equipment cost,
15 figure at the top left portion of the page marked with the
16 letter B of 44 million, correct?
17    A. That number is the result of subtracting the 44-
18 million-dollar number stated above from the $65 million
19 stated below
20    Q. Okay. And you did the subtraction, right? Or you
21 caused the computer to do the subtraction, correct?
22    A. Correct
23    Q. And you labeled the result, "Excess OEC," or
24 excess original equipment cost, correct?

95

1     A. That is the label
2     Q. And then you calculated the percentage underneath
3  that of free CF, or free cash flow, 46.68 percent, correct?
4  Do you see that?
5     A. Yes, I do
6     Q. May I just take your original exhibit and just for
7  clarity I'll mark that with the letter E and an arrow going
8  to that number by the words "free CF."
9        What did the free CF, or free cash flow
10 percentage, represent in your calculation?
11    A. It appears to be the 20,921,414 divided by
12 44,816,217
13    Q. So to calculate that percentage, you took the
14 amount by which the total rent payments, total term rent
15 payments exceeded the original equipment cost and arrived
16 at the result of excess OEC of 20 million, 921 dollars and
17 414 cents, and then took that 20-million-dollar figure as
18 the numerator of a fraction with the denominator of which
19 you took the 44-million-dollar figure; is that right?
20       MR FELDMAN: Objection
21       MR. BEAN: Objection
22    Q. You can answer.
23    A. I arrived at it by dividing 20,921,414 by
24 44,816,217

96

1     Q. Is what I said correct?
2     A. No
3     Q. Why not?
4     A. Because you misspoke at the beginning of your
5  statement
6     Q. Where did I misspeak?
7     A. If you read it back to me, I can tell you where,
8  but you did
9     Q. Which part did I misspeak on? The original
10 equipment cost?
11    A. I don't recall  If you read it back to me, I can
12 tell you
13    Q. All right. Let's go through it again  Why did
14 you calculate the free CF, the free cash flow percentage in
15 the way that you did?
16       MR FELDMAN: Objection
17    A. It's the standard way of calculating it
18    Q. Exactly. It's a standard way of calculating what
19 the percentage of the excess of the rent over original
20 equipment cost is in proportion to the actual cost of the
21 equipment, right?
22    A. Mathematically, that is how you would do that
23 calculation, yes
24    Q. Okay. And essentially you were doing a

97

1  calculation of how much of a return you thought CSI had
2  gotten on its leases of these equipment over and above the
3  original equipment cost, right?
4     A. No
5     Q. When you said "free CF," free cash flow, what did
6  you mean?
7     A. It's not a -- it's not a return  It's a percent
8     Q. The question was: What did you mean when you
9  wrote "free CF"?
10    A. I mean the percent that the rents exceed the
11 estimated equipment cost at the time of this analysis
12    Q. Okay. And the original equipment cost, as you
13 recorded it here, at the time of this Exhibit 191
14 calculation for the leases, the equipment covered by the
15 active leases between CSI and Lycos was this 44,816,217-
16 dollar figure that appears opposite the letter B on the
17 first page of 191, correct?
18       MR FELDMAN: Objection
19       MR BEAN: Objection
20    Q. You can answer.
21    A. At the time of the analysis, this number
22 represents the base value stated in the contracts
23    Q. I understand that you're claiming that that's how
24 you calculated it, and we will come back to that.

25 (Pages 94 to 97)

Susan S Franklin 10-25-2006
Computer Sales International, Inc. v Lycos, Inc.

98

1    A   Okay
2    Q   But the issue is, the question that I asked you
3    is: You referred to the 44 million — you referred to the
4    original equipment cost of the equipment covered by these
5    leases as $44,816,217 on the top left corner of the first
6    page of Exhibit 191, correct?
7           MR FELDMAN: Objection
8    Q   That's how you referred to it?
9           MR. BEAN: Objection
10   A   Yes, it's labeled "Original OEC "
11   Q   Okay. And you labeled it, correct?
12   A   It's a placeholder, yes
13   Q   Okay  You labeled it, correct?
14   A   Yes, I labeled that placeholder
15   Q   Thank you.  Regardless of whether you call it a
16   placeholder, you placed the label "Original OEC" opposite
17   this number of $44,816,217, correct?
18   A   Correct
19   Q   Okay. And having referred — so you did refer to
20   that 44.8-million-dollar figure as the original equipment
21   cost of the equipment covered by these leases between CSI
22   and Lycos in this document, correct?
23          MR BEAN: Objection
24   Q   You can answer.

99

1    A   I don't understand the question
2    Q   You did refer to this 44,816,217-dollar number as
3    the original equipment cost of the equipment covered by
4    these leases between CSI and Lycos, correct?
5           MR BEAN: Objection
6    A   I don't understand the use of the word "referred
7    to "  Referred to it when?
8    Q   Referred to it here, miss, on the first page of
9    the exhibit.
10   A   I labeled it "Original OEC," correct
11   Q   Okay. And so you were referring to it on this
12   document, at least, as original equipment cost, correct?
13          MR FELDMAN: Objection.
14          MR. BEAN: Objection
15   Q   You can answer.
16   A   The label is a reference, if that's what you're —
17   Q   Yeah, that's what I mean.
18   A   — asking
19   Q   I'm sorry?
20   A   If that's what you're asking, the label is a
21   reference, yes
22   Q   Okay. It was your reference to this 44,816,217-
23   dollar number as being original equipment cost, right?
24   A   In this working document, correct

100

1    Q   Okay.  And you prepared this in June of 2003,
2    right?
3    A   Correct
4    Q   And you had an entry underneath — strike that.
5           In the lower left corner of Exhibit 191, you had
6    an entry "Excess OEC" which we've talked about, the
7    $20,921,414, and that's the amount by which you calculated
8    the total term rents that Lycos had paid exceeded the
9    original cost of the equipment covered by those leases,
10   correct?
11          MR. BEAN: Objection
12   Q   You can answer.
13   A   It's the amount, the total rents paid or to be
14   paid exceeded the estimated cost of the equipment based on
15   the base value stated in the schedules
16          MR KALER: Okay  Move to strike as
17          nonresponsive
18   Q   I'll get to how you calculated the OEC in a
19   moment, and we'll see whether if you add up the base values
20   it's that number?
21          MR FELDMAN: I'm going to move to
22          strike the editorial comment —
23   Q   Before we do —
24          MR FELDMAN: — at the beginning of

101

1          that question
2           MR KALER: Let's rephrase the
3          question
4    Q   The entry on the first page of Exhibit 191
5    opposite letter C entitled "Excess OEC," or excess original
6    equipment cost, of $20,921,414 was your calculation at the
7    time you did this analysis of how much the total term rents
8    that Lycos had paid to CSI and was then scheduled to pay to
9    CSI in the future under all of these active leases, the
10   amount by which that total exceeded what you had referred
11   to as the original equipment cost in the upper left corner
12   of the page; is that correct?
13          MR BEAN: Objection
14   Q   You can answer.
15   A   The 20,921,414 is the amount — the 65 737,632,
16   which was estimated to be the cash flows at the time that
17   the spreadsheet was produced for rents paid or to be paid
18   by Lycos to CSI
19   Q   Okay. And the 20 —
20   A   Exceeded —
21   Q   Sorry.
22   A   — the 44 816 217 which was estimated at this time
23   to be a number based on the base values
24   Q   Okay. Move to strike as to the base values

26 (Pages 98 to 101)

Susan S Franklin 10-25-2006
Computer Sales International, Inc. v Lycos, Inc

106

1      MR KALER: I'm going to take up the
2   subject of frivolous objections  Your
3   expressions and comments to the witnesses
4   while questions are pending, the looks that
5   you give them, and the improper objections
6   I'm entitled to ask leading questions of
7   one of your experts  I'll try and press on
8   as best I can despite the inflammatory
9   rhetoric  I'm just asking you to refrain
10  from making objections when there isn't a
11  basis for it
12  BY MR KALER:
13  Q.  There is some handwriting on this document on the
14  first page. Is it yours?
15  A.  What handwriting?  There's a lot of handwriting on
16  this document
17  Q.  Didn't I say the first page?
18  A.  Uh-huh
19  Q.  Top of the first page.
20  A.  The handwriting in black --
21  Q.  Yes
22  A.  -- ink?
23  Q.  Yes.
24  A.  Yes, that's my handwriting

107

1   Q.  And did you -- whose phone numbers are those?
2   A.  I believe the phone number on the left is Paul
3   Stenberg's cell phone number  I believe the one in the
4   middle is Paul Stenberg's office number  And the number on
5   the right is the telephone number of the vacation house I
6   was at for Fourth of July break
7   Q.  In 2003?
8   A.  Yes
9   Q.  In looking at the analysis that you did on the
10  first page of Exhibit 191, you never determined that the
11  original equipment cost of the equipment leased by CSI to
12  Lycos was $65,737,632, did you?
13      MR BEAN: Objection
14  Q.  You can answer.
15  A.  At the time of this analysis, the original
16  equipment cost was not known
17      MR KALER: Move to strike as
18  nonresponsive
19  Q.  I suggest that it was known, miss, and that you
20  did know and you recorded it here.
21  A.  I did not know it.
22  Q.  Okay.  You've been serving as an expert for Lycos
23  in this case for how long?
24      MR BEAN: Objection

108

1      MR FELDMAN: Objection
2   Q.  You can answer.
3   A.  I am a consultant providing expertise to Lycos.
4   yes
5   Q.  That's what I said.  How long have you been
6   serving as an expert consultant?
7      MR FELDMAN: Objection
8      MR BEAN: Objection
9   Q.  You can answer.
10  A.  I -- I began providing services to Lycos in June
11  of 2003
12  Q.  Okay.  Now, you never determined that the original
13  equipment cost of the equipment leased by CSI to Lycos was
14  $65,737,632, did you?
15  A.  At the time of this analysis. we did not know the
16  original equipment cost  However, we had run analyses on a
17  series of schedules and had determined that the rents on
18  those schedules, cumulative rents, exceeded the base value
19  stated on those schedules  This analysis begins with
20  schedule I believe in the 50s. there's a schedule 1 to
21  fifty something that preceded this, the cash flows indicate
22  65 million  If the cash flows of this match the pattern
23  that we had seen on the series that we looked at, we felt
24  that the 65 million could be considered a proxy for OEC

109

1      MR KALER: Move to strike as
2   nonresponsive
3   Q.  Did you hear the question that I asked you?
4   A.  I certainly did
5      MR FELDMAN: Objection
6   A.  Yes
7   Q.  Can you answer the question I asked you, which was
8   simply: Did you ever determine that $65,737,632 was the
9   original equipment cost of the equipment leased by CSI to
10  Lycos?
11  A.  At the time of the spreadsheet --
12  Q.  At any time
13  A.  -- we had only performed a partial analysis, and
14  that partial analysis indicated that 65 million was a proxy
15  for OEC
16  Q.  Was a proxy for OEC?
17  A.  Yes
18  Q.  You're claiming that -- are you saying that you
19  did determine that $65,737,632 was the original equipment
20  cost of the equipment covered by these leases?
21  A.  No  I'm saying that we had only done a partial
22  analysis  With the documents that we had, there were a few
23  equipment series that we could actually do a more in-depth
24  analysis on  Those few series showed a pattern  That

28 (Pages 106 to 109)

114

1  original equipment cost, did you?
2         MR. BEAN: Objection
3    Q. You can answer.
4    A. Again, if a label is a reference, it's labeled
5  "Total Cash Flow."
6    Q. My point, which I'm entitled to make, and I'm
7  going to ask the question again: You did not refer to this
8  65-million-dollar number on Exhibit 191 as the original
9  equipment cost of anything, did you?
10        MR FELDMAN: Objection
11        MR. BEAN: Objection
12   Q. You can answer.
13   A. I did not refer to it as original equipment cost
14   Q. Thank you.
15   A. It's clearly labeled "Total Cash Flow."
16   Q. And you did not refer to the original equipment
17  cost of the equipment leased by CSI to Lycos as $65 million
18  on any document, did you?
19        MR BEAN: Objection
20        MR FELDMAN: Objection
21   A. On any document, not to my recollection
22   Q. Okay. On the second page of this exhibit, or,
23  actually, the fourth, fifth page, Bates numbered AR 000748,
24  there's some additional handwriting. Is that yours?

115

1    A. Yes
2    Q. And you -- we see there's a reference to $700,000,
3  and, again, you had referred to that as a previous -- in
4  previous testimony?
5    A. Uh-huh
6    Q. I think I had asked you what you thought the
7  $700,000 was referring to, and what did you -- I think you
8  wanted to see the document?
9    A. Yes
10   Q. What were you referring to there?
11   A. That's the note I wrote down in my June 27th phone
12  call with Paul Stenberg
13   Q. And what were you referring to when you wrote the
14  700,000?
15   A. Actually, it was my July 7th call with Paul
16  Stenberg that I wrote that down
17   Q. Okay. These notes on page AR 000748 of Exhibit
18  191 were notes that you made during your July 7th telephone
19  call with Mr. Stenberg?
20   A. Correct
21   Q. And what were you referring to when you --
22   A. I was noting Mr Stenberg's comment that certain
23  schedules had not been rolled and CSI held a residual of
24  approximately 700,000 on those schedules

116

1    Q. Did he identify the schedules?
2    A. No
3    Q. And what's the next number that you wrote a
4  reference to, the $6,680,029? If you recall.
5    A. Mr Stenberg had made a comment about equity in
6  the transaction
7    Q. What had he said?
8    A. He said that CSI had 11 points in the deal
9    Q. All right. I was asking you what -- what prompted
10  you to make the note "$6,680,029" on this page?
11        MR FELDMAN: Objection
12   Q. You can answer.
13   A. I believe it's 11 percent of the 65,737,632
14   Q. In other words, it's 11 percent of the figure that
15  you had calculated was the total amount of term rents that
16  Lycos had paid and was scheduled to pay in the future under
17  the existing leases?
18        MR. BEAN: Objection
19   Q. As reflected on the first page of Exhibit 191
20  opposite the letter A?
21        MR BEAN: Objection
22   Q. It's that number?
23   A. It's 11 percent of --
24   Q. Of that number?

117

1    A. -- of that number
2    Q. Okay. And Mr. Stenberg never mentioned to you a
3  65-million-dollar original equipment cost number, did he?
4        MR. FELDMAN: Objection
5        MR. BEAN: Objection
6    Q. You can answer.
7    A. Mr Stenberg mentioned multiple equipment costs in
8  our original phone call
9    Q. The question that I asked you was specific.
10   A. Did he say 65,737,623? No
11   Q. Did Mr. Stenberg ever tell you the original
12  equipment cost was $65 million?
13   A. He said it was in the sixties
14   Q. You're saying he told you it was in the sixties in
15  the July 7th call or earlier?
16   A. The June 27th call
17   Q. Well, we'll go back to the June 27th call. Do you
18  have any notes of the June 27th call?
19   A. Those would be the notes I told you I did not
20  maintain.
21   Q. Okay. So the only notes that you claim to have of
22  the June 27 call in which you claim that Mr. Stenberg told
23  you that original equipment cost was in the sixties you --
24  you did not keep?

30 (Pages 114 to 117)

Susan S Franklin 10-25-2006
Computer Sales International, Inc v Lycos, Inc.

122

1    A  It was pretty clear in my mind  I don't think I
2  needed to write it down to remind myself of it. the numbers
3  he threw out in the conversation, other than the ones I
4  wrote down in the next conversation
5    Q.  Did you consider the numbers he had thrown out in
6  this June conversation significant?
7    A  At the time I didn't really know what to think of
8  the numbers thrown out in the conversation.  We only had at
9  that time done a partial analysis  We did not know what
10  the OEC was
11    Q  Had you done Exhibit 191?
12    A  This I had prior to the call, yes  I printed it
13  out and had it in front of me during the call
14    Q.  During the June call?
15    A  Yes
16    Q.  So when you had this – you had this Exhibit 191
17  in front of you in both the June call with Mr. Stenberg and
18  the July 7th call?
19    A  And the third call as well, yes
20    Q.  Okay.  And did you make notes on any portion of
21  Exhibit 191 during the June 2003 call in which you claim
22  Mr. Stenberg mentioned original equipment cost being in the
23  sixties?
24    A  It was an introductory call  Mr Stenberg clearly

123

1  stated he was not going to negotiate with me, so I did not
2  maintain the notes from the call
3    Q.  That's no reason not to maintain the notes from
4  the call, is it?
5    A  I didn't maintain –
6      MR FELDMAN: Objection
7    Q.  You can answer.
8      MR BEAN: There was no question
9      MR FELDMAN: That wasn't a question
10      MR KALER: That was a question
11      MR FELDMAN: That was a statement
12    Q.  It's a question. That's no reason not to keep the
13  notes of the call, is it?
14      MR BEAN: Objection
15    Q.  Just because he refused to negotiate with you
16  didn't mean you were going to stop, did it?
17    A  I don't –
18      MR FELDMAN: I would ask you to ask
19    her –
20    A  I don't recall my thinking at the time  I just
21  did not save the notes
22      MR FELDMAN: Mr Kaler, I ask you to
23    ask her one question at a time
24      MR KALER: Just stop interrupting

124

1  me, please
2    Q.  The question I asked you was:  Did you make any
3  notes of the June conversation with Mr. Stenberg on this
4  Exhibit 191 that you had in front of him when you were
5  talking with him?
6    A  In front of him or me?
7    Q.  I'm sorry.  That you had in front of you when you
8  were talking with him.
9    A  Doesn't appear that I wrote anything down on this
10  particular document at that time
11    Q.  Okay.  But you had Exhibit 191 in front of you in
12  the June conversation with Mr. Stenberg, correct?
13    A  Yes, I did
14    Q.  And it's your usual habit to make notes of phone
15  conversations on existing documents rather than just on
16  scraps of paper, right?
17      MR BEAN: Objection
18    Q.  You can answer.
19    A  Not necessarily
20    Q.  What was the nature of the notes that you claim
21  you made of the June 2003 conversation with Mr. Stenberg
22  that – that were thrown out?
23      MR BEAN: Objection
24    Q.  What kind of paper were they on?

125

1    A  What kind of paper?
2    Q.  Right.
3    A  Yellow stickies
4    Q.  Yellow stickies?
5    A  Likely  Or little squares of – the little pads
6  of paper that you have on your desk that you write notes
7  on
8    Q.  Are you sure you made any notes on such yellow
9  stickies during the June conversation with Mr Stenberg in
10  which you claim that he referred to the original equipment
11  cost as being in the sixties?
12    A  I know I wrote certain things down that I did not
13  maintain and I made many mental notes
14    Q.  Mental notes I'm not asking you about.
15      And you do not remember -- strike that.
16      You do not know whether you made any notes on
17  those yellow sticky papers or anywhere during the June
18  conversation with Mr. Stenberg that recorded his telling
19  you anything about original equipment cost, do you?
20    A  I may or may not have written that down  I don't
21  recall exactly what I wrote on the stickies
22    Q.  Okay  So you don't remember whether you made any
23  note of him talking about original equipment cost?
24    A  It was the primary gist of his conversation, of

32 (Pages 122 to 125)

138

1      MR KALER: I don't accept that, I'm
2   afraid
3      Q. But initially you've described what you said to
4   Mr. Stenberg about Lycos's position, correct?
5      A   Yes  You asked me to tell you about the phone
6   call
7      Q. Okay. And you've already described what you —
8   what you outlined initially, and what I'm saying is: Did
9   you say that to him pretty early in the conversation?
10      MR BEAN: Objection
11      MR FELDMAN: Objection
12   A   No
13   Q. All right  Describe the sequence of the
14   conversation as it went after you introduced yourself.
15   A. I introduced myself and I told him that the reason
16   for the call was to discuss the purchase price that CSI had
17   presented to Lycos
18   Q. Okay. What's your best memory of what else was
19   said in the conversation in the order in which it was said?
20   A   I told him that the purchase price was too high
21   Q. What else did you say at that point?
22   A   I told him that we had, based on our initial
23   analysis, and the base values that were listed in the
24   contracts, primarily the large contracts, 93, 94, was

139

1   approximately $25 million, a number of lease
2   schedules, based on the analysis, had rolled into 93 and
3   94, so 4 million 690 represented about 20 percent of $25
4   million, and that seemed extremely high for technology
5   equipment that had been five years old or older
6   Q. What were you referring to when you said 25
7   million?
8   A   The base value stated on the two largest contracts
9   that remained active, 93 and 94, which we had at the time
10   of the analysis noted were a roll-up of prior lease
11   schedules
12   Q. All right  What was said next?
13   A   Mr Stenberg corrected me and told me the OEC was
14   in the forties  So, therefore the number that they were
15   asking for was not 20 percent but 10
16   Q. When he said OEC was in the forties, you
17   understood him to be saying it was in the 40 — 40
18   millions?
19   A   40 millions  Yes, 40 millions
20   Q. And that, you understood him to be saying that the
21   original equipment costs, or OEC, was original equipment
22   cost?
23   A   Yes
24   Q. Okay. That is to say, you understood him to be

140

1   telling you that the original equipment cost of the
2   equipment covered by these leases was in the range of the
3   40 millions of dollars?
4   A   Was in the forties was what he said, yes
5   Q. Okay. By in the forties, you mean —
6   A   In the —
7   Q. — 42, 43, 44 —
8   A   — forties of millions of dollars
9   Q. — 45 millions of dollars?
10   A   At the time of the comment, I didn't know exactly
11   where  In the forties. In the forties of millions of
12   dollars
13   Q. Okay. Now at the time that he made that comment,
14   you had Exhibit 191 in front of you, correct?
15   A   Correct
16   Q. And you had referred on the first page of Exhibit
17   191 to that original equipment cost as being $44,816,217,
18   correct?
19      MR BEAN: Objection
20   A   That's what is listed, yes
21   Q. That's what you had listed on the document that
22   you were looking at, right?
23   A   That's correct
24   Q. Okay. So what he told you was consistent with

141

1   what you had listed on the first page of Exhibit 191 at
2   that point, correct?
3   A   Was consistent with
4   Q. Okay. What was said next —
5   A   No  That's a question  was consistent with  What
6   he told me was in the ballpark of the base value estimate
7   that was on this document, yes
8   Q. After he told you that the original equipment cost
9   was in the forties, what was said next?
10   A   That's when I told him that the cursory analysis
11   that we had done to this point revealed that CSI had
12   received in the form of rents their full investment in the
13   equipment and the yield, and that Lycos therefore believed
14   that what they should pay for the purchase price was zero
15   Q. And, again, in the form of rents, you're referring
16   to the 65 million, sort of total cash flow?
17   A   Not referring to any particular number there  I'm
18   referring to the fact that there seemed to be, based on the
19   analysis of the schedules on the last page here, 000749,
20   and another series which was not printed out at the time of
21   the call, a series of schedules in the 50s, I don't recall
22   exactly which one, that there was a pattern that rolled
23   leases, the cash flow from rents on rolled — rolled leases
24   was exceeding the base value printed on the actual

Susan S. Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc

142

1 schedules
2 Q. Okay. And what was said next?
3 A. Mr Stenberg said, "Well, you don't know what the
4 real OEC is, do yuh?" And then he said, "It's in the
5 sixties."
6 Q. And what -- what was said next?
7 A. I told him that I was charged with reaching an
8 agreeable number and, in the interest of time and reaching
9 a reasonable outcome, that Lycos was prepared to offer 2.7
10 million
11 Q. And what was said next?
12 A. He told me he was not going to negotiate with me,
13 and he hung up
14 Q. Is there anything else that you remember either of
15 you saying in this phone conversation?
16 A. Prior to him hanging up, I tried to reiterate
17 Lycos's position, but as I said, he hung up. But that's
18 pretty much all I recall
19 Q. How did you try to reiterate Lycos's position?
20 A. Just restate the comment about the rents
21 Q. In other words, you said again what you had said
22 before?
23 A. I started to say again to justify why Lycos felt
24 that way, but in light of that, they were extending 2.7

143

1 million to bring this to a conclusion
2 Q. Okay. Is there anything else you remember him
3 saying or you saying in that conversation?
4 A. I don't recollect anything else, no
5 Q. When he told you you don't know what the real OEC
6 was, it was in the sixties, he had already told you that
7 the original equipment cost was in the forties, correct?
8 A. Early in the conversation, he told me the
9 equipment cost was in the forties
10 Q. Okay. And then when he referred to it in the
11 sixties, he referred to that as the real OEC?
12 A. That's what he said
13 Q. Okay. And did you have an understanding that he
14 was referring to the other costs associated with the
15 purchasing of equipment other than just the purchase order
16 prices?
17 MR FELDMAN: Objection
18 MR BEAN: Objection
19 Q. You can answer.
20 A. I didn't question the number. He stated it; I had
21 no reason to question it. I just took it under advisement
22 at the time that's the number he said
23 Q. Did you ever rely on that number in negotiating
24 with CSI?

144

1 MR FELDMAN: Objection
2 MR BEAN: Objection
3 A. Did I rely on that number?
4 Q. You can answer.
5 A. I had no reason not to rely on the number. I
6 didn't know what the real OEC was at the time of the
7 negotiation
8 Q. Did you ever determine what the OEC was?
9 A. Did we ever determine --
10 Q. Yeah.
11 A. -- what the OEC was?
12 Q. Yeah.
13 A. We came up with an estimate of what we believed
14 the closest approximation of what OEC was
15 Q. And what was that number?
16 A. Again, based on face values in the contracts
17 Q. And what was that number?
18 A. I believe it was 46, in the 46-million-dollar
19 range
20 Q. All right. So it was within about 10 percent of
21 the 44-million-dollar figure that you had listed on Exhibit
22 191?
23 A. I'm sorry, I didn't hear the question
24 Q. It was within a couple million of the 44.8 million

145

1 that you'd listed on the first page of Exhibit 191?
2 A. I believe it was in the 46-million-dollar range
3 MR FELDMAN: Okay We're going to
4 take a break You finished your --
5 MR KALER: All right
6 MR. FELDMAN: -- conversation, in ten
7 minutes, not five minutes
8 MR KALER: We'll come back at 1:15
9 Thanks
10 THE VIDEOGRAPHER: Here ends tape 2,
11 off the record 12:13 p m
12 (Recess )
13 THE VIDEOGRAPHER: Here begins tape
14 number 3, back on the record, 1:20 p m
15 BY MR KALER:
16 Q. Ms. Franklin, you understand you're still under
17 oath?
18 A. Yes
19 Q. In between the first conversation that you had
20 with Mr. Stenberg in June of 2003 and the second
21 conversation that you had with him on I think you said July
22 9th, was it, of 2003?
23 A. July 7th
24 Q. July 7th of 2003, you did some work analyzing the

37 (Pages 142 to 145)

Susan S. Franklin 10-25-2006
Computer Sales International, Inc v. Lycos, Inc

---

230

1    Q. In the — on the web site, you don't say you used
2    a portion of it. You just say that you utilized RACOL
3    methodology in connection with analyzing the leases for
4    these lessors, including CSI, correct?
5    A   It does not say a portion, no
6    Q. Okay. And following your use of the RACOL
7    methodology to analyze Lycos' leases with CSI, you then
8    engaged in direct negotiations with Mr. Stenberg about the
9    buyout price, correct?
10        MR BEAN: Objection
11   A   I used my cash flow analysis in — yes, in my
12   negotiation with Mr Stenberg
13   Q. Okay. You used the RACOL methodology first to
14   establish the metrics, and then you engaged in discussions
15   with Mr. Stenberg, correct?
16        MR FELDMAN: Objection
17        MR BEAN: Objection
18   A   I used the cash flow analysis, which is a subset
19   of the RACOL methodology. when I discussed the purchase
20   price with Mr Stenberg
21   Q. Okay. You would agree, then, that you used at
22   least some of the RACOL methodology to analyze Lycos'
23   leases with CSI before you talked with Mr. Stenberg?
24        MR BEAN: Objection

---

231

1    A   Cash flows are a subset of the RACOL methodology
2    Q. Okay.
3    A   I used cash flows  It was not called RACOL at
4    the time
5    Q. Now, you said Mr. Stenberg hung up on you after
6    the first — at the end of the first call?
7    A   Yes.
8    Q. You were aware that he had a nondisclosure
9    agreement with Lycos at the time that prohibited him from
10   talking with anyone like you who just contacted him?
11   A   No, I was not aware of that
12   Q   Okay  You expressed a concern a moment ago about
13   a confidentiality agreement that you had with a client,
14   though, right?
15   A   Yes
16   Q. Okay. So you were familiar with the concept that
17   most people who were negotiating these lease arrangements
18   had confidentiality agreements with their customers?
19        MR FELDMAN: Objection  You can
20        answer
21        MR BEAN: Objection
22   A   I'm not aware of that
23   Q   I'm sorry, you weren't?
24   A   I'm not aware of whether he had a confidentiality

---

232

1    agreement or not
2    Q. No. But you're aware that most people in the
3    leasing industry who deal with their customers have
4    nondisclosure agreements with their customers?
5        MR FELDMAN: Objection
6        MR BEAN: Objection
7    A   I don't know
8    Q. In fact, LeaseForum had a standard nondisclosure
9    agreement for its dealings with its customers, correct?
10       MR FELDMAN: Objection
11   A   We have a standard nondisclosure agreement, yes
12   Q. Okay. So is it your opinion testimony, then, that
13   Mr. Stenberg somehow rudely hung up on you at the end of
14   the June telephone conversation?
15   A   I don't believe I said he rudely hung up on me  I
16   said he hung up
17   Q. Okay. He was not rude to you, was he?
18       MR FELDMAN: Objection
19       MR BEAN: Objection
20   A   I — I don't recall
21   Q. Okay. You don't recall him being rude anyway,
22   correct?
23   A   I said I don't recall
24   Q. Are you testifying that he hung up on you in the

---

233

1    middle of your trying to say something, or did the
2    conversation just reach a conclusion and then you both hung
3    up?
4    A   I don't recall
5    Q. So you're not saying that he hung up on you
6    rudely?
7    A   I don't recall
8    Q. Coming back to Exhibit 191 and the analysis that
9    you did, I would like you to take a look at a clearer copy
10   of that which we've marked as Exhibit 191-A.
11       (Exhibit 191-A, analysis, marked.)
12       MR FELDMAN: These are the
13       originals?
14       MR KALER: No, that's not the
15       original; that's the extra copy
16       MR FELDMAN: Could I ask you to make
17       sure you keep the originals —
18       MR KALER: They're being copied
19       MS PELLERIN: They're done
20       MR KALER: Oh, okay
21       MR FELDMAN: Okay  Thank you
22   BY MR KALER:
23   Q. Exhibit 191-A is a clearer copy of Exhibit 191
24   without the markings that we put on Exhibit 191. Do you

---

59 (Pages 230 to 233)

Susan S Franklin 10-25-2006
Computer Sales International, Inc. v. Lycos, Inc

---

262

1    MR FELDMAN: That's not — again,
2    that's —
3    Q. Isn't that —
4    MR FELDMAN: It's a —
5    Q. Isn't that —
6    MR FELDMAN: It's a statement to
7    you
8    Q. Isn't that —
9    Q. Isn't that — It's not a question
10   You don't have to answer
11   Q. Well, I'll ask it this way: Isn't that exactly
12   what you had done, analyzed the portfolio?
13   A  No, it is not
14   Q. And compared Exhibit 191 and 191-A?
15   MR BEAN: Objection
16   A  No, it is not
17   Q. You agree with me that 191 and 191-A looks like an
18   analysis of the lease portfolio, doesn't it?
19   MR BEAN: Objection
20   Q. You can answer.
21   A  I state that it's an analysis of the active lease
22   schedules
23   Q. Right  That's what I'm saying it was.
24   MR FELDMAN: Objection

---

263

1    Q. We agree.
2    A  We do not agree
3    Q. Okay. It was an analysis of all the active
4    schedules between CSI and Lycos at the time you did it,
5    right, except for 69-A?
6    MR BEAN: Objection
7    A  It's an analysis of the lease schedules, clarify
8    the word "active," to which Lycos was making — on which
9    Lycos was making rent payments at the time of the analysis,
10   yes
11   Q. Okay. Let's go back to your conversation with Mr.
12   Stenberg  We were on page AR 000748. And you said that
13   his early comment was not all the leases were rolls. What
14   was said next in that conversation?
15   A  Mr Stenberg volunteered that CSI had 11 points of
16   equity in the transaction
17   Q. And what did you understand 11 points of equity in
18   the transaction to mean?
19   A  For every dollar in equipment cost, they invested
20   11 cents
21   Q. And what do you mean by that, they had invested 11
22   cents? Do you mean that for every dollar they — of
23   equipment cost, they needed to recover 11 cents to recoup
24   their investment?

---

264

1    A  It's not exactly related to that, no
2    Q. What — what do you mean by they had an 11-cent
3    investment out of every dollar?
4    A  That's what 11 points means
5    Q. Yes.  But what does 11 percent investment mean,
6    then?
7    A  It means that for every dollar of equipment they have
8    11 cents invested in it
9    Q. What does it mean that they have 11 cents
10   invested, as you used the term?
11   A  It means that 89 cents is coming from someplace
12   else
13   Q. And where was the someplace else that you defined
14   it coming from?
15   MR FELDMAN: Objection
16   A  That I defined it coming from?
17   Q. In your use of the term
18   MR FELDMAN: Objection
19   MR BEAN: Objection
20   Q. You can answer.
21   A  Likely the discounting of the rent stream
22   Q. I'm sorry, what do you mean by that?
23   A  Discount the rent stream with the lender, who
24   gives you the 89 cents

---

265

1    Q  Doesn't 11 points of equity in the deal mean
2    approximately that the leasing company, for every dollar
3    that it puts into the deal, needs to get back about 11
4    cents in order to recoup its investment?
5    A  No
6    Q. That's not how you define it?
7    A  That's very simplistic  No  It's not how I
8    would —
9    Q. It's not sophisticated?
10   A  No
11   Q. Why don't you explain it to us the way you would
12   to a jury. What do you mean? What did you understand Mr.
13   Stenberg to be saying when you said he had — when he said
14   he had 11 points of equity in the deal?
15   MR FELDMAN: Objection
16   Q. Just in laypeople's terms
17   A  I think I explained that already  For every
18   dollar invested, he had 11 cents
19   Q. What does it mean to say he had 11 cents?
20   A  If I offered you a candy bar and you paid for 11
21   cents of it and Mr  Bean paid the other 89
22   Q. Okay. What next was said in the conversation?
23   A  I don't remember exactly
24   Q. Now, you took his reference to 11 points in the

---

67 (Pages 262 to 265)

Susan S Franklin 10-25-2006
Computer Sales International, Inc v. Lycos, Inc

266

1  deal and you translated that into the figure of $6,680,029
2  by multiplying -- taking 11 percent of the total amount of
3  the rents of 65 7 million that you'd calculated, right?
4     A  Yes, I believe that's what I did
5     Q.  Okay.  And you did that to determine what?
6     A  To just turn his comment into a number
7     Q.  And what number were you trying to turn it into by
8  applying the 11 percent to the total term rents?
9     A.  This was a partial analysis beginning with
10  schedules in the fifties, and in the prior conversation Mr
11  Stenberg had said the OEC was in the sixties  If he used
12  the 67 series as a -- as a -- if you look at the 67 series,
13  and you considered that that pattern had occurred on other
14  series in the portfolio, then you could deduce that 65
15  million was a likely proxy for OEC
16     Q  A likely proxy for OEC?
17     A  Correct
18     Q.  How could it possibly be a likely proxy for
19  anything?
20        MR FELDMAN:  Objection.
21     A  Because it's a number in the sixties, and Paul
22  said the OEC  the real OEC, is in the sixties
23     Q.  He had said to you in that same conversation that
24  the original equipment cost was in the forties?

267

1     A  He said that.
2     Q.  And then he said after you argued that the buyout
3  price should be less, he said the real OEC was in the
4  sixties, right?
5     A  That's correct
6     Q.  Okay  And you're saying it's because he said that
7  that you took his 11 percent and you multiplied it by the
8  cash flow that you had determined at 65 7 million, that's
9  your testimony?
10     A  I'm saying that because of the results of analyses
11  on certain aspects of the portfolio which showed the cash
12  flow far exceeded the base value, and because Mr Stenberg
13  had mentioned that the real OEC was in the sixties, I was
14  using 65 million as a proxy for the OEC  When he said he
15  had 11 points in, I multiplied the 65 by the 11
16     Q  And you did that to come up with what you thought
17  a standard buyout price would be --
18     A  No  I did that --
19     Q.  -- 6,680,029?
20        MR FELDMAN:  Just let Mr Kaler
21  finish
22        THE WITNESS:  I'm sorry
23        MR FELDMAN:  It's okay  He'll --
24  he'll let you finish  I think --

268

1     A  No  I did that because Mr Kaler said he had 11
2  points in and I wanted to just mathematically put that in a
3  number format instead of a percent.
4     Q.  So you wanted to try to determine how much CSI had
5  in the deal?
6     A  He mentioned it; I did the math
7     Q.  Okay.  He didn't mention it -- he didn't mention
8  the 6,680,000-dollar figure, though, did he?
9     A  He mentioned 11 percent points -- 11 points in the
10  deal
11     Q.  Why did you multiply it by the rents rather than
12  the original equipment cost?
13        MR FELDMAN:  Objection
14     Q.  You can answer.
15     A  Because rent was considered to be a proxy for OEC
16     Q  What do you mean by a proxy for OEC?
17     A.  A best estimate considering the analysis was only
18  done on a portion of the portfolio beginning with schedules
19  in the fifties, with the first schedule being 1
20     Q.  When you say schedules in the fifties, what do you
21  mean?
22     A  Schedules from fifty-something onward
23     Q.  Yes.
24     A  There were schedules beginning with number 1 that

269

1  had not been reviewed as part of this process
2     Q.  But they had nothing to do with your comparison of
3  original equipment cost for the active schedules versus
4  total cash flow for the active schedules, did they?
5        MR BEAN:  Objection
6     Q.  You can answer.
7     A  They had nothing to do with  They're not part of
8  this analysis, no
9     Q.  That's right.
10     A  However --
11     Q.  You did -- you set forth --
12        MR FELDMAN:  She said "however "  I
13     think you need to let her finish the
14     answer
15        MR. KALER:  Go ahead
16     A  However, Mr Stenberg had said in the prior phone
17  call that the real OEC was in the sixties  There are 50
18  schedules missing from the analysis  Could those 50
19  schedules equate to approximately 20 million in OEC?  It
20  was entirely possible
21     Q.  But you --
22     A  Did the cash flows far exceed the base values for
23  this portfolio?  Yes  they do
24     Q.  You weren't talking about buying out the equipment

68 (Pages 266 to 269)

# EXHIBIT 6

Volume 1, Pages 1-333

Exhibits: 1-28

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

        Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

        Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

        Trustee Process Defendant

       - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MICHAEL J. FLEMING

Wednesday, November 14, 2007, 9:12 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


- - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

Michael J. Fleming
Volume 1 - November 14, 2007

3 (Pages 6 to 9)

6

1   Q. How many times?
2   **A. Once in written only -- once just in**
3   **written, and once in oral.**
4   Q. You understand I'm going to ask you a
5   series of questions; right?
6   **A. Yes.**
7   Q. I'd like you to answer them to the best of
8   your ability. Would you do that?
9   **A. Yes.**
10  Q. And if there's any question that you do not
11  understand, would you ask me to rephrase it?
12  **A. I will.**
13  Q. And if you do answer a question, would it
14  be fair for me to assume that you've understood the
15  question; is that right?
16  **A. Yes.**
17  Q. You've never been qualified by a court as
18  an expert before; is that right?
19  **A. No.**
20  Q. You were the president of the Equipment
21  Leasing Association for approximately 27 years; is
22  that correct?
23  **A. Yes.**
24  Q. Was 27 years the right number?

7

1   **A. Twenty-seven years to the day.**
2   Q. You've been retained by CSI to serve as a
3   testifying expert in this case, have you not?
4   **A. Yes.**
5   Q. And in your capacity as a testifying expert
6   for CSI, you wrote three reports; is that right?
7   **A. Yes.**
8   **(Exhibits Fleming 1 through 3 marked for**
9   **identification.)**
10  Q. I'm going to show you what's been marked as
11  Fleming 1, 2, and 3, sir, and ask you if these are
12  true copies of the reports that you submitted.
13  **A. They appear to be so, yes.**
14  Q. Do you have any reason to believe they are
15  not?
16  **A. No, I have no reason to believe they are**
17  **not.**
18  Q. Did you reread these reports in preparation
19  for your deposition here today?
20  **A. I did.**
21  Q. And when did you reread them last?
22  **A. Monday.**
23  Q. And today is Wednesday?
24  **A. Uh-huh.**

8

1   Q. You have to answer yes or no for the court
2   reporter, sir.
3   **A. Yes.**
4   Q. And what else, if anything, did you do to
5   prepare for your deposition here today?
6   **A. Well, in addition to reading these reports,**
7   **I -- let me think. I met with counsel for CSI, with**
8   **people in the McCarter & English law firm.**
9   Q. When did you do that?
10  **A. Yesterday.**
11  Q. From approximately what time until what
12  time?
13  **A. From about 9:00 in the morning until about**
14  **6:00 or 7:00 in the evening.**
15  Q. Did you do anything else to prepare for the
16  deposition, other than reread your reports and meet
17  with people, attorneys from McCarter & English?
18  **A. I looked at material that had been provided**
19  **me yesterday.**
20  Q. What material was provided to you
21  yesterday?
22  **A. The deposition of Bruce Smith.**
23  Q. Anything else provided to you yesterday?
24  **A. No.**

9

1   Q. When were you retained by CSI as an expert
2   in this case?
3   **A. In the summer of 2006.**
4   Q. And had you -- approximately how many times
5   have you spoken since the summer of 2006 with
6   someone from McCarter & English about this case?
7   **A. Approximately six or seven times.**
8   Q. And about what was the total number of
9   hours, approximately, that you spent speaking with
10  them?
11  **A. Speaking and meeting, 90 to 100 hours.**
12  Q. And have you ever spoken with anyone from
13  CSI about this case?
14  **A. No.**
15  Q. Have you ever spoken with James Schallheim
16  about this case?
17  **A. No.**
18  Q. And how about James Johnson?
19  **A. No.**
20  Q. William Bosco?
21  **A. No.**
22  Q. I direct your attention to Page 6 of your
23  first report, Exhibit 1. And I'm directing your
24  attention to Paragraph 7, and specifically the

Michael J. Fleming
Volume 1 - November 14, 2007

12  (Pages 42 to 45)

42

1  that entered into this transaction, as companies do
2  all the time, to restructure transactions, and there
3  was no reason -- there was nothing I could see that
4  made it -- that anybody was compelled or any other
5  problem.
6      Q.  Well, there's nothing you saw on the seven
7  or eight schedules you reviewed; right?
8      A.  That's true.
9      Q.  And you don't know whether CSI charged
10  Lycos a fee for entering into those schedules;
11  right?
12      MR. KALER:  Objection.  But you can
13  answer.
14      A.  I don't know -- I don't know many details
15  of any fees, no.
16      Q.  And if CSI did charge a fee to Lycos for
17  entering into the restructured schedules, CSI should
18  have disclosed that fee; right?
19      MR. KALER:  Objection.
20      A.  What do you mean by "fee"?
21      Q.  Well, you wrote in your report that
22  undisclosed fees -- one of the reasons for the
23  development of the fair business practices was
24  undisclosed fees.  Do you recall that?

43

1      A.  Yes.
2      Q.  What did you mean by the use of the word
3  "fee" there?
4      A.  Well, a fee that a company -- a fee for a
5  particular thing that wouldn't be evident to a
6  person at the time that he entered into an agreement
7  and then later on they were charged with the fee or
8  assessed the fee.
9      Q.  Okay.  Do you have any idea whether Lycos
10  could have determined the present value of the
11  increase in the rents on the restructured schedules?
12      A.  Do I think they could have?
13      Q.  Yes.
14      A.  Well, I think they could have, yes.
15      Q.  What do you base that on?
16      A.  Well, because doing a present value on a
17  total number is pretty basic, and I would assume
18  that people in that company had that kind of skill.
19      Q.  And it's something you could do?
20      A.  I could do if I had, you know, my regular
21  computer program to do it.
22      Q.  What's your regular computer program?
23      A.  You can do it in Excel.
24      Q.  Can you do it on an HP 12C?

44

1      A.  Well, I have a 17A, I think.
2      Q.  Do you know how to use an HP 12C?
3      A.  I don't use an HP 12C, so I don't know.
4      Q.  But you didn't make -- you didn't look at
5  any of the underlying schedules to determine whether
6  or not Lycos could in fact have determined the
7  present value of the payments on the restructured
8  schedules, did you?
9      A.  Well, I would rely on the fact that they
10  had the total term and they had a total amount that
11  they were going to be obligated for, and so they
12  could do that.
13      Q.  And that assumes that all -- that you can
14  find on the restructured schedule the equipment from
15  the earlier schedule; right?
16      MR. KALER:  Objection.
17      A.  And I'm assuming that -- I am assuming that
18  that schedule would exist.
19      Q.  Okay.
20      (Exhibit Fleming 6 marked for
21  identification.)
22      Q.  What's been marked as Fleming Exhibit 6,
23  sir, is Plaintiff's Exhibit 56.  Have you seen that
24  document before, sir?

45

1      A.  Let's see; 56.  I don't think I have seen
2  this.
3      Q.  Okay.  I direct your attention to the
4  second- and third-to-last pages.  It's Addendum 1.
5  I'd like you to read the second- and third-to-last
6  pages.
7      A.  The whole page?
8      Q.  Yes.
9      A.  "Addendum 1" --
10      Q.  Not aloud.  Read it to yourself.
11      A.  Okay.
12      MR. KALER:  When you're done reading
13  that, Mr. Fleming, would you read the rest of the
14  document, so you're familiar with it, in its
15  entirety.
16      MR. BEAN:  I asked him to read two
17  pages.
18      MR. KALER:  I know, but I would like him
19  to familiarize himself with the rest of the document
20  before he answers questions about just the last two
21  pages of it, sir.  Just page through it, starting at
22  the first page and then --
23      MR. BEAN:  He's just killing time.
24      MR. KALER:  I'm not trying to kill time.

Michael J. Fleming
Volume 1 - November 14, 2007

94

1  expelled in the early 1980s to warrant expulsion?
2      **A. In one case -- well, actually, they were**
3  **similar. Basically, they had dealt with their**
4  **relations with funding sources where they had sold**
5  **transactions multiple times to multiple funding**
6  **sources.**
7      Q. Okay. And so that was the fact pattern in
8  the two expulsions that you just referenced?
9      **A. That's right.**
10     Q. So would it be fair to say, then, that the
11 Equipment Leasing Association has never sanctioned a
12 lessor for its actions in connection with a lessee?
13         MR. KALER: Objection.
14     **A. They have never sanctioned a member for**
15 **relations to the lessee, that I recall; yes, that's**
16 **true.**
17     Q. Please give me your education since high
18 school.
19     **A. Bachelor of arts degree, 1962, at Drake**
20 **University in Des Moines, Iowa; master of arts**
21 **degree, 1965, from Drake University. Those are my**
22 **degrees. And additional graduate work at the**
23 **University of Iowa and the University of Illinois at**
24 **Champaign-Urbana.**

95

1      Q. Your bachelor of arts, did you have a
2  major?
3      **A. History and economics.**
4      Q. And your master's?
5      **A. History and political science.**
6      Q. And your graduate work at the University of
7  Illinois?
8      **A. History.**
9      Q. Have you had any formal education in any
10 form of finance?
11     **A. What do you mean by "formal"?**
12     Q. Have you taken any classes in finance?
13     **A. Not in -- no.**
14     Q. Leasing is a form of finance, is it not?
15         MR. KALER: Objection.
16     **A. It's regarded generally by some people that**
17 **way. But it is --**
18     Q. Do you regard it --
19         MR. KALER: But, "It is what"? Let him
20 finish. "But it is what"?
21     **A. I said generally it's regarded in some**
22 **contexts as a form of finance.**
23     Q. The ELA refers to equipment leasing as a
24 form of finance on its website, does it not?

96

1      **A. It is -- I don't know what they say now. I**
2  **mean, I really don't know.**
3      Q. While you were president, the ELA referred
4  to equipment leasing as a form of finance, did it
5  not?
6      **A. It could be.**
7      Q. You're not sure.
8      **A. No, I'm saying -- no, I'm saying it depends**
9  **what the transaction was, if it was a financing**
10 **transaction. Sometimes it's a servicing**
11 **transaction, it's a renting transaction. So if you**
12 **want to use an umbrella that broad, you could say it**
13 **is a form of finance.**
14     Q. Equipment leasing of the type that CSI and
15 Lycos engaged in was a form of finance, was it not?
16         MR. KALER: Objection.
17     **A. I would say it was rental.**
18     Q. It was not finance?
19     **A. I would say it was not a financing.**
20     Q. What is the difference in your mind between
21 rental and finance?
22     **A. I'd say the difference is in what the end**
23 **user or the acquirer is getting. In one case you**
24 **are investing in or acquiring equipment. In the**

97

1  other you're acquiring the use of equipment.
2      Q. So in your mind, every time you use the
3  word "finance" it refers to a purchase; is that
4  right?
5         MR. KALER: Objection.
6      **A. It refers to the -- connotation was**
7  **that you were investing in equipment and that you**
8  **were financing it.**
9      Q. So every time there's a purchase -- every
10 time there's a financing, you consider that to
11 involve a purchase; right?
12         MR. KALER: Objection.
13     **A. That's too overly broad. I'd have to think**
14 **about it.**
15     Q. Well, in what circumstances -- can you
16 think of any circumstances when a lease of equipment
17 would be a financing?
18     **A. Well, if a lease of equipment was**
19 **financing, typically if the parties' intention was**
20 **that at the end of the transaction there was a**
21 **likelihood or a good possibility that the user of**
22 **the equipment was going to end up acquiring the**
23 **equipment. That's always been my reference point.**
24     Q. All right. Have you taken any classes,

Michael J. Fleming
Volume 1 - November 14, 2007

26 (Pages 98 to 101)

98

1  courses, programs in equipment leasing?
2      A. There are no courses, classes in equipment
3  leasing.
4      Q. Have you attended any seminars in equipment
5  leasing?
6      A. Many.
7      Q. Offered by whom?
8      A. Well, offered by, really by the Equipment
9  Leasing Association.
10     Q. Did you attend these programs on equipment
11 leasing?
12     A. I've attended innumerable.
13     Q. Do you hold any licenses or certifications?
14     A. Well, I hold a certification as an
15 association executive or association manager, but
16 that's my -- I hold that certification.
17     Q. And what does that mean?
18     A. That means that in association management
19 or not-for-profit organization management I hold a
20 certificate of accomplishment, which is awarded for
21 meeting a lot of tests, and you maintain it.
22     Q. What did you have to do to get this
23 certification?
24     A. Well, initially you take a day-long

99

1  examination in all aspects of association
2  management, organizational management -- finance,
3  not-for-profit law, those kind of things. And then
4  over the years you have to kind of keep it up to
5  date through activity.
6      Q. Was one part of that credentialing dealing
7  with human resources?
8      A. Human resources was part of that, although
9  it's not a major part; but it was part of it, yes.
10     Q. And you were the president of the ELA for
11 27 years?
12     A. That's right.
13     Q. And did you deal with employment matters
14 while you were at the ELA?
15     A. Yes.
16     Q. And part of what you did at the ELA was
17 that you provided advocacy on behalf of the trade
18 association before government entities, did you not?
19     A. That's right.
20     Q. And as part of that, you lobbied members of
21 Congress?
22     A. Right.
23     Q. Was there anyone else at the ELA who
24 lobbied members of Congress?

100

1      A. Over time we sometimes retained outside
2  lobbyists, and we in later years employed additional
3  staff to do that as well.
4      Q. And did the staff that you had, when they
5  entertained a member of Congress, did they seek
6  reimbursement from the ELA for their entertainment
7  expenses?
8      A. If it were reimbursable, yes.
9      Q. What were your standards for
10 reimbursability?
11     A. Well, as long as it stayed within certain
12 dollar thresholds and it was necessary and had a
13 purpose relating to whatever it was we were
14 advocating.
15     Q. So that the expenses had to have a business
16 purpose, a legitimate business purpose?
17     A. Well, they had to have a purpose related to
18 some objective and advocacy of the association, some
19 public-policy issue, some --
20     Q. Would you have thought it improper for one
21 of these lobbyists to seek reimbursement for
22 personal expenses?
23         MR. KALER: Objection
24     A. For personal expenses? Like what?

101

1      Q. Like taking a family vacation.
2          MR. KALER: Objection.
3      A. Unless this was something related to a
4  benefit to the association or the industry. There
5  was an occasion some people took family vacations or
6  took their family along on vacation in events that
7  might have a beneficial purpose for the
8  association -- if it was a political conference,
9  government conference, convention. So it would
10 depend.
11     Q. If the expenses were purely personal, had
12 nothing to do with the association, would you have
13 considered it improper for that employee to seek
14 reimbursement for those personal expenses?
15     A. Well, we would not --
16         MR. KALER: Objection.
17     A. I would not have approved reimbursement.
18     Q. And if the employee filed fraudulent
19 expense reports and you -- tens of thousands of
20 dollars of fraudulent expense reports, you would
21 fire that employee, would you not?
22         MR. KALER: Objection.
23     A. Well, what do you mean, now?
24 Unreimbursable or fraudulent?

Michael J. Fleming
Volume 1 - November 14, 2007

102

1    Q. Fraudulent·
2       MR. KALER: Objection.
3    A. I guess I'm trying to think what they would
4  be.
5    Q. Well, let me give you an example·
6    A. Okay.
7    Q. If the employee represented to the ELA that
8  he had entertained a customer, took the customer out
9  to dinner, for example, when in fact the ELA
10  representative took his family out to dinner, which
11  had nothing to do with a business purpose, you would
12  consider that a fraudulent expense report if the
13  employee sought reimbursement on those terms, would
14  you not?
15      MR. KALER: Objection.
16    A. I don't know if those would be my words,
17  but I would -- you know, we wouldn't approve it.
18    Q. Well, but you wouldn't know if the employee
19  had said that he -- that it was for a legitimate
20  business purpose; right?
21      MR. KALER: Objection·
22    A. Well, I mean, you know, if somebody
23  files -- if somebody files an expense account and
24  you look at it and you have real reason to believe

103

1  that this isn't for real, then you would ask about
2  it, you'd check on it; and if they said, "Oh, yes,
3  this is for real" and they could prove to me it was
4  real, then we would reimburse it.
5      Now, on the other hand, they might say,
6  "Lookit, it was something else," then we wouldn't
7  reimburse it.
8    Q. But let's assume that you did reimburse it,
9  because on its face it looked legitimate.
10    A. Okay.
11    Q. And subsequently you discovered that the
12  employee of the ELA had filed tens of thousand of
13  dollars of these false expense reports. Okay?
14    A. Uh-huh. Yes.
15    Q. You would fire that employee, would you
16  not?
17      MR. KALER: Objection.
18    A. Well, I would certainly consider some
19  discipline. There would be some action taken.
20    Q. You might consider not firing someone who
21  had filed tens of thousands of dollars of fraudulent
22  expense reports?
23      MR. KALER: Objection.
24    A. The test I would give, was it fraudulent or

104

1  were they just totally misinterpreting something?
2  But if it was clearly over -- just, you know, way
3  over the line, then some disciplinary action would
4  be considered.
5    Q. What type of disciplinary action?
6      MR. KALER: Objection.
7    A. It could be everything from reimbursement
8  required to, you know, holding back any employee
9  increase in their compensation, not giving them
10  their bonus, or it could be firing.
11    Q. So you wouldn't necessarily fire someone
12  who had embezzled money from the ELA?
13      MR. KALER: Objection.
14    A. Now we're up to embezzlement. Now we're up
15  to a different standard. If somebody embezzled
16  money, most likely they would be terminated.
17    Q. Intentionally filing false expense reports,
18  that would be embezzlement, would it not?
19      MR. KALER: Objection.
20    A. I'd want to know the context. I think I've
21  said that.
22    Q. I think I gave you an example. If the
23  employee took his family on vacation, took his wife
24  out to dinner, took his buddies to a strip club --

105

1    A. Right.
2    Q. -- and that had nothing to do with a
3  business purpose, that would be embezzlement if the
4  employee filed false expense reports for those,
5  wouldn't it?
6      MR. KALER: Objection.
7    A. It could very well be. You know, if this
8  will help: I mean, most likely the person would be
9  fired. But, you know, I think everything has to be
10  looked at in its own context.
11    Q. You're not a lawyer, are you?
12    A. No, I'm not.
13    Q. You're not a CPA, are you?
14    A. No.
15    Q. You're not a tax professional; right?
16    A. No.
17    Q. The ELA recently changed its name from the
18  Equipment Leasing Association to the Equipment
19  Leasing & Finance Association, did it not?
20    A. Right.
21    Q. That was simply a name change, rather than
22  a substantive change in the mission of the
23  organization?
24    A. I would say that's a true statement.

Michael J. Fleming
Volume 1 - November 14, 2007

42 (Pages 162 to 165)

162

1  equipment that Lycos had a booked residual value on
2  of $320,000; is that right?
3         MR. KALER:  Objection.
4     A.  That's right.
5     Q.  Are you aware that Mr. Stenberg, the
6  account executive, that his commissions were linked
7  by the difference between the amount Lycos paid on
8  the buyout and a threshold or minimum price that CSI
9  gave to him to quote a price?
10    A.  Yes.
11    Q.  Have you ever seen a -- have you ever seen
12 any sales compensation programs developed by
13 equipment leasing companies?
14    A.  Yes.
15    Q.  And have you ever seen one where the
16 account executive earns a bonus commission for the
17 customer entering into restructurings of the types
18 we've been discussing here today?
19    A.  Yes.
20    Q.  And you understand that Mr. Stenberg viewed
21 it as sort of the mission statement of CSI was to
22 rewrite equipment schedules?  Are you aware of that?
23        MR. KALER:  Objection.
24    A.  I'm not aware of that one way or the other.

163

1     Q.  Now, you've written a number of articles on
2  equipment leasing over time, have you not?
3     A.  Yes.
4     Q.  And when your name is at the bottom of the
5  article, in your capacity as president of the ELA,
6  the views you're expressing are those, not only your
7  views, but those of the Equipment Leasing
8  Association; right?
9         MR. KALER:  Objection.
10    A.  Yes.
11    Q.  You're familiar with a website called
12 leaseassistant.org, are you not?
13    A.  Leaseassistant.org?  I think -- if I'm not
14 mistaken, that is the old name for what the
15 association's website is.
16    Q.  What is the new name?
17    A.  Choose Lease.
18    Q.  You have in your writings about leasings
19 over the years referred on multiple occasions to a
20 lessee seeking a leasing partner, have you not?
21        MR. KALER:  Objection.
22    A.  Yes.
23    Q.  And it's your view, then, that a lessee
24 should view the lessor as its leasing partner;

164

1  right?
2         MR. KALER:  Objection.
3     A.  Or as being in a partnership, yes -- not
4  legal partnership, but, you know, a relationship
5  where they're trying to solve, in this case,
6  equipment problems, buying equipment, maintaining
7  equipment, so on.
8     Q.  And to try and solve them together, are
9  they not?
10        MR. KALER:  Objection.
11    A.  Pardon me?
12    Q.  The lessee is to view the lessor as its
13 ally, is it not?
14        MR. KALER:  Objection.
15    A.  Yes.  That's what I posited.
16    Q.  I show you what's been marked as Exhibit
17 11, sir.
18        (Exhibit Fleming 11 marked for
19 identification.)
20    Q.  Do you recognize what's been marked as
21 Exhibit 11?
22    A.  Yes.
23    Q.  It's an article that you wrote in your
24 capacity as president of the ELA, did you not?

165

1     A.  I didn't write it, but my name is on it.
2  This was done by a research firm that had done a
3  study for us.
4     Q.  But by putting your name on it, you adopted
5  it; right?
6         MR. KALER:  Objection.
7     A.  Yes.
8     Q.  And by having your name on it, it reflects
9  the views of the ELA, does it not?
10        MR. KALER:  Objection.
11    A.  Yes.
12    Q.  Turn to the third page, if you will.
13    A.  Uh-huh.
14    Q.  I direct your attention to the paragraph
15 with the heading that says, "Now you're ready to get
16 started."  Do you see that, sir?  About a quarter of
17 the way down the page, maybe a third of the way down
18 the page?
19    A.  No.
20    Q.  Do you see that, sir?
21    A.  No.
22    Q.  Is that a yes or a no?
23    A.  No.
24        MR. KALER:  I don't have it on mine,

Michael J. Fleming
Volume 1 - November 14, 2007

44 (Pages 170 to 173)

170

1   identification.)
2       **A. This is the same kind of an article as the**
3   **previous one, authored for me, reviewed by me, and**
4   **signed by me.**
5       Q. And by signing it, you've adopted the
6   statements in here; right?
7       **A. Yes.**
8           MR. KALER: Objection.
9       Q. And these statements reflect those of the
10  Equipment Leasing Association; right?
11      **A. Yes.**
12          MR. KALER: Objection.
13      Q. Direct your attention to the second page,
14  below the heading, "Moving forward in the new
15  economy." Do you see that?
16      **A. Yes, I do.**
17      Q. And it's your view that, quote, "Loyalty
18  and collaboration between lessors and lessees is
19  vital in the leasing industry," right?
20      **A. It's a good thing.**
21      Q. And it's also your view that a lessor must
22  understand a client's acquisition strategies,
23  technology innovation plans, business requirements,
24  core competencies, and shareholder pressures; right?

171

1       **A. Yes.**
2       Q. Now, do you see -- I direct your attention
3   to the top of Page 2, which is the end of a quote
4   from someone named Andrew Young, the president of
5   Acoustic Works. Do you see that?
6       **A. Uh-huh.**
7       Q. You have to answer yes or no, sir.
8       **A. Yes.**
9       Q. Do you know Andrew Young?
10      **A. No.**
11      Q. Go to the bottom of Page 1 of the article,
12  if you would. If you would read the sentence
13  beginning with, "I would like." Read Mr. Young's
14  quote.
15      **A. "'I would like lessors to be a partner**
16  **versus a vendor. I would like to have more of a**
17  **relationship with them, and I feel like they care**
18  **about the success of my company. When selecting my**
19  **financing partner, I am looking for this personal**
20  **relationship. I want to trust the guy is going to**
21  **make good business decisions and will talk to me and**
22  **be honest about potential mistakes,' said Andrew**
23  **Young, president of Acoustic Works."**
24      Q. And that quotation was included in there

172

1   because the ELA wants lessees to think of lessors as
2   their financing partners; right?
3           MR. KALER: Objection.
4       **A. They want them to think of -- a solutions**
5   **partner, yes.**
6       Q. And the ELA wants lessees to trust their
7   lessors to make good business decisions; right?
8           MR. KALER: Objection.
9       **A. Well, yes.**
10      Q. And you believe and -- you believe that
11  lessors should be honest about potential mistakes,
12  do you not?
13      **A. About potential mistakes that they would --**
14  **to the degree that they would know about them or be**
15  **aware of them or could anticipate them.**
16      Q. Okay. So in terms of knowing about the
17  lessee's -- going down, again, back to, "Moving
18  towards the new economy," where you talk about
19  lessors understanding a client's acquisition
20  strategies: An account executive is supposed to
21  think about what makes business sense for its lessee
22  customer, is it not?
23          MR. KALER: Objection.
24      Q. Let me rephrase that. A lessor's account

173

1   executive is supposed to think about what makes
2   business sense for its lessee customer, is it not?
3           MR. KALER: Objection.
4       **A. I'm going to say not necessarily. I mean,**
5   **you are now saying "is supposed to," as if that can**
6   **be enforced, as if that is a requirement. It's**
7   **desirable. It would be nice.**
8       Q. And it's desirable for a -- if the lessor
9   is to show loyalty to the lessee and collaborate
10  with the lessee, the lessor account executive needs
11  to share his opinions about proposed transactions in
12  terms of whether they meet the customer's business
13  objectives; right?
14          MR. KALER: Objection.
15      **A. Again, "supposed to" takes it to -- it**
16  **would be nice if. But I'm not here to say he is**
17  **supposed to. That's up to an individual company.**
18      Q. Well, you say in here that lessors must
19  understand a client's acquisition strategies,
20  technology innovation plans, business requirements,
21  core competencies, and shareholder pressures; right?
22      **A. Yes.**
23      Q. And that's a must, something lessors must
24  do?

Michael J. Fleming
Volume 1 - November 14, 2007

62 (Pages 242 to 245)

242

1  you would start from whatever the base was again.
2  And it indeed may not in that next sequence be in
3  fact a full payout. But I think where we have a
4  series of, some cases, three of these, the third
5  restructure, you are probably getting very close to
6  that. But it's always based on, you know, whatever
7  you are imputing as the original cost.
8      But I think that -- but within that
9  context, I think a lot of these restructured leases
10  would become finance leases.
11  Q. And by becoming finance leases, they become
12  installment sales contracts; right?
13  A. No.
14      MR. KALER: Objection.
15  A. No.
16      MR. KALER: Excuse me. Objection again
17  on grounds we're getting way beyond the expertise
18  area for which the witness is being proffered. I'll
19  let him answer.
20      MR. BEAN: The witness has opined that
21  all of these leases were true leases, not loans, so
22  it's not beyond that which he's opined.
23      MR. KALER: It is. You are in an
24  area —

243

1      MR. BEAN: Are you withdrawing that
2  opinion that he's giving?
3      MR. KALER: The CFO of Lycos said they
4  were not loans. You're saying that they're loans.
5  But your saying it doesn't make it so.
6      So again, just objection to the
7  question.
8  Q. Mr. Fleming, just because a lease says it's
9  a lease doesn't mean it's a lease as opposed to an
10  installment sales contract; right?
11      MR. KALER: Objection.
12  A. Pardon me?
13  Q. Just because a lease is called a lease on
14  the face of the document does not mean it's a true
15  lease; right?
16  A. That's true.
17      MR. KALER: Objection.
18  Q. Now, did you make any effort to determine
19  whether any of the original schedules — that's for
20  new equipment that CSI and Lycos entered into —
21  were themselves full-payout leases?
22      MR. KALER: Objection.
23  A. I did. I looked at the schedules that
24  we've already stipulated I looked at. They were 24

244

1  months. And the amortization of the payments over a
2  24-month period on a PV'd basis would not have
3  covered more than 89.9 percent of the value of the
4  equipment.
5  Q. What discount rate did you use when you did
6  that analysis?
7      MR. KALER: Objection.
8  A. As I recall, I was using a discount rate of
9  something around 8 percent, just as a number --
10  because I --
11      But the discount rate is just what I
12  would use. I have no idea what number Lycos used.
13  Q. And you did that analysis for the seven or
14  eight schedules that you considered; right?
15  A. Right.
16  Q. Who picked out which of the over 100
17  schedules —
18  A. I did.
19  Q. You decided to pick those seven?
20  A. Well, I picked them out because they
21  were -- you know, they were leases that had not been
22  rolled up yet, they were original leases, and so
23  they were easy ones to do.
24  Q. So you selected the schedules from the 125

245

1  that you would consider?
2  A. That's right.
3  Q. And you specifically did not choose any of
4  the restructured schedules; is that right?
5      MR. KALER: Objection.
6  A. Pardon me?
7  Q. You specifically did not choose any of the
8  originals, the restructured schedules.
9  A. No, not -- I didn't choose any of those. I
10  was looking at the original schedules.
11  Q. And you chose those because it was easier
12  to do the math?
13  A. Well, because they were in front of me.
14  They were in the documents I was looking at. I
15  mean, there was nothing unique about them as opposed
16  to some others. I just chose those.
17  Q. I'm sorry, maybe I wasn't clear. Did you
18  ever have the opportunity at the offices of CSI's
19  counsel to review all 125 schedules and pick which
20  ones you would take home with you to review?
21      MR. KALER: Objection.
22  A. I did not -- I had -- you and I -- let's
23  make sure we understand what we're talking about.
24      I had the option -- I saw or had as

Michael J. Fleming
Volume 1 - November 14, 2007

70 (Pages 274 to 277)

274

1  attention to the last paragraph at the bottom, that
2  begins with, "Because they trust us." Do you see
3  that, sir?
4        MR. KALER: First read the full page,
5  would you?
6    **A. This is to Stenberg.**
7    Q. Just read the bottom half, please.
8        MR. KALER: Read the entire document.
9  It's very brief.
10   **A. Okay.**
11   Q. I direct your attention to the sentence at
12 the bottom that says, "Because they trust us to do
13 quarterlies and pay a significant amount of stub,
14 they don't always know what is being invoiced to us.
15 Isn't that what we want?" Do you see that?
16   **A. Yes.**
17   Q. And you understand that Mr. Stenberg was
18 telling Mr. O'Neal that Lycos trusted CSI to do
19 quarterlies; right?
20       MR. KALER: Objection.
21   **A. I mean, that's what it says, yes.**
22   Q. And he also told Mr. O'Neal that Lycos
23 doesn't always know what is being invoiced to CSI;
24 right?

275

1        MR. KALER: Objection.
2    **A. Invoiced to CSI or to Lycos?**
3    Q. It says "invoiced to us," doesn't it?
4        MR. KALER: Objection to the witness
5  being asked to agree with the lawyer's
6  interpretation of a third party's document.
7    **A. So I'm assuming --**
8        MR. KALER: You don't have to assume
9  anything.
10   **A. I guess what --**
11       MR. KALER: I'm sorry, was the question
12 that he should assume something?
13   **A. I'm not sure what they're talking about.**
14   Q. So you don't understand what they're
15 talking about?
16   **A. No.**
17   Q. Does it concern you at all that Mr.
18 Stenberg was writing with reference to Lycos that
19 they "don't always know what is being invoiced, and
20 isn't that what we," CSI, "want?" Does that concern
21 you at all about Mr. Stenberg's integrity?
22       MR. KALER: Objection. "Invoiced to us"
23 is what it says. But in any event....
24   **A. So "they," being Lycos, "don't always know**

276

1  **what is being invoiced to CSI."**
2    Q. Right.
3    **A. So "Lycos doesn't know what's being**
4  **invoiced to us. Isn't that what we want?" I'm**
5  **really not sure what -- I mean, it does raise a**
6  **question, but I don't know what his meaning in this**
7  **sense -- I mean, I don't mean to be a grammarian**
8  **here. But he makes that sentence, which I don't**
9  **know if that's a throw-away line. But then he uses**
10 **a question mark instead of an exclamation point. To**
11 **me, that's -- to me, that's a difference. I think**
12 **he's asking the question rather than just throwing**
13 **that out as some kind of hyperbole. So I don't**
14 **know.**
15   Q. Does this statement raise questions in your
16 mind about Mr. Stenberg's integrity?
17       MR. KALER: Objection. That question
18 has just been asked, and it's just been answered.
19   **A. No, not about his integrity. Not about**
20 **integrity, no.**
21   Q. Does it raise questions in your mind about
22 whether he wanted to take advantage of Lycos?
23       MR. KALER: Objection.
24   **A. No, I don't see anything in there that**

277

1  **would result in taking advantage of Lycos.**
2    Q. Are you aware that CSI -- have you ever
3  seen a performance evaluation in the leasing
4  industry in which an account executive was evaluated
5  based on his ability to gain the trust and
6  dependency of the decisionmaker at the customer?
7    **A. No, I have not had occasion to see that.**
8    Q. You've never seen such a provision?
9        MR. KALER: Objection.
10   **A. I'm not saying -- I'm saying -- I'm not**
11 **saying that they don't exist, or I don't know that**
12 **they exist. I'm just saying I've never read one.**
13   Q. And it is the desire of leasing companies
14 generally to have the account executive gain the
15 trust and dependency of the decisionmaker at their
16 customer; right?
17       MR. KALER: Objection.
18   **A. Not dependency.**
19   Q. Trust?
20       MR. KALER: Objection.
21   **A. Trust.**
22   Q. Yes?
23       MR. KALER: Objection.
24   **A. I think you would want trust, but not**

Michael J. Fleming
Volume 1 - November 14, 2007

71 (Pages 278 to 281)

278

1  dependency.
2      Q.  Okay.  Now, by "you" wanting trust, you
3  mean the lessor wants to gain the lessee's trust;
4  right?
5          MR. KALER:  Objection.
6      A.  I guess I'm answering that in the context
7  that people who do business with each other over and
8  over each want the trust of the other.
9      Q.  Okay.  And so one of the parties here, the
10  lessor, wants to gain the trust of the lessee;
11  right?
12          MR. KALER:  Objection.
13      A.  I'm assuming he does.
14      Q.  And so it would be atypical, in your view,
15  if an account executive were evaluated based on his
16  ability to gain the dependency of the decisionmaker
17  at the customer; right?
18          MR. KALER:  Objection.  He didn't say
19  that
20      A.  I think evaluating based on dependency -- I
21  mean, "dependency" is a pejorative word, and I
22  don't -- I've never heard anybody talk about they
23  want to be -- have the customer dependent on them.
24  They'd like him to rely on them, they'd like to be

279

1  integrated with them, but not dependent on them.
2      Q.  And if a company wanted the customer to be
3  dependent upon them, part of the reason might be so
4  that the lessor could take advantage of the
5  customer; right?
6          MR. KALER:  Objection.
7      A.  If -- it's a big if.  If.  I don't know
8  that --
9      Q.  I'm going to ask you to assume that CSI
10  evaluated Mr. Stenberg in part on his ability to
11  gain the dependency of the decisionmaker at Lycos.
12      A.  Dependency for what?
13      Q.  Just "dependency" is the word in the
14  performance evaluation.
15      A.  To me, that's -- I don't even -- that's a
16  meaningless thing.
17      Q.  Well, what's been marked as Exhibit 24 is a
18  performance evaluation for Mr. Stenberg that was
19  previously marked as Stenberg Exhibit 5.
20          (Exhibit Fleming 24 marked for
21  identification.)
22      Q.  I'm going to direct your attention to the
23  last page, sir.
24          MR. KALER:  Look at the whole document.

280

1          MR. BEAN:  I'm not asking -- he's never
2  seen the document before, and I'm not asking him
3  about the rest of it.
4          MR. KALER:  Just page through it.
5          MR. BEAN:  There's no reason to page
6  through it other than to delay, Mr. Kaler.
7          MR. KALER:  You may not have the reason,
8  but I understand how you operate, and --
9          MR. BEAN:  I understand how you operate,
10  too, very well.
11          MR. KALER:  I want him to look at the
12  whole document.
13      A.  Now, you were focusing on which page?
14          MR. KALER:  He can't take down -- you
15  have to stop when he's talking.
16          MR. BEAN:  I was answering his question.
17      Q.  I direct your attention to the last page,
18  the middle row.  Do you see that?
19      A.  Yes.
20      Q.  And the second bullet says, "Develops an
21  ongoing business and personal bond of camaraderie,
22  trust, and dependency with the decisionmaker."  Do
23  you see that?
24      A.  Yes.

281

1      Q.  And do you see that CSI was evaluating Mr.
2  Stenberg on his ability to gain, among other things,
3  the trust and dependency with the decisionmaker at
4  his customer?
5          MR. KALER:  Objection.
6      A.  Well, what I see is, he's getting a 5 for
7  building and maintaining relationships through
8  professional and social skills, and then there are
9  three indicators of that, and each of those
10  indicators has further subparts.  And yes, in one of
11  the many subparts, they do list dependency.
12      Q.  Does it concern you as to whether CSI was
13  taking and planned to take advantage of Lycos
14  because they evaluated Mr. Stenberg in part on his
15  ability to gain the dependency of the decisionmaker
16  at his customer?
17          MR. KALER:  Objection.
18      A.  Well, it doesn't within the context of the
19  much bigger document, because that's only one
20  indicator of one item that's being used, of many
21  items.  So it's not like --
22          I mean, this gets pretty diluted.
23      Q.  So because it's one of many, it doesn't
24  concern you?

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

COMPUTER SALES              :

INTERNATIONAL, INC.,        :

                            :

        Plaintiff,          :

                            :

VS.                         : CASE NUMBER:  05-10017-RWZ

                            :

LYCOS, INC., ET AL.         :

                            :

        Defendants.         :


***************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ERNESTO GALVAN

FEBRUARY 20, 2007

***************************************


ORAL AND VIDEOTAPED DEPOSITION of ERNESTO GALVAN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on February 20, 2007, from 3:09 p.m. to 4:06 p.m., before PHYLLIS WALTZ, CSR, RPR, CRR, in and for the State of Texas, recorded by machine shorthand, at the offices of Vinson & Elkins, L.L.P., 1001 Fannin, 26th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

**Page 30**

```
 1   I -- I left
 2       Q.  Okay.  And this memorandum was prepared as
 3   part of your regular practice of doing that, correct?
 4       A.  Correct
 5       Q.  And you prepared the memorandum at the time,
 6   believing that the information in it was accurate,
 7   correct?
 8           MR ACTON:  Objection
 9       Q.  (BY MR. KALER)  You can answer.
10       A   Yes
11       Q.  And you prepared it in good faith with the
12   intention that it should help you and others in your
13   work, correct?
14           MR ACTON:  Objection
15       Q.  (BY MR. KALER)  You can answer.
16       A   Yes
17       Q   In the memorandum you said in the first
18   sentence -- well, first of all, the subject was Waltham
19   Personal Property Tax Return, and you addressed the memo
20   to, quote, tax files, parens, work papers, close parens,
21   unquote; is that correct?
22       A   Correct
23       Q.  And by that you intended to indicate that this
24   was a memo that was going to go into the work papers
25   that you've already described, correct?
```

**Page 31**

```
 1       A.  Correct
 2       Q   And in the memo itself the first sentence you
 3   wrote, quote, The following memo is to document the
 4   procedures, assumptions, and rationales taken in
 5   completing the Waltham Personal Property Tax Return,
 6   unquote; do you see that?
 7       A   Yes
 8       Q.  And, again, you were referring there to the
 9   fact that as part of your regular practice you were
10   trying to document in this memo the information you had
11   received and that you were assuming to be accurate and
12   were relying on in preparing that particular property
13   tax return, correct?
14           MR ACTON:  Objection
15       Q.  (BY MR. KALER)  You can answer
16       A   Correct.
17       Q.  And then in the second paragraph you stated,
18   It is Lycos' policy not to buy any equipment that can be
19   leased.  This includes, but is not limited to,
20   computers, parens, laptops, or desktops, fax machines
21   copiers, servers, printers, et cetera, close parens,
22   period, close quote.  Do you see that?
23       A.  Yes  I see it
24       Q.  And that's a statement that you made in this
25   Exhibit 627 document at the time that you wrote it.
```

**Page 32**

```
 1   correct?
 2       A   I do not remember it, but if it's there  yes
 3       Q.  And in including the statement that, quote, it
 4   is Lycos' policy not to buy any equipment that can be
 5   leased, unquote, you were recording information that you
 6   had acquired as a result of your working at Lycos and
 7   communicating with officials of Lycos, correct?
 8           MR ACTON:  Objection
 9       Q.  (BY MR. KALER)  You can answer.
10       A   It was just stating general practice that the
11   company did
12       Q   Okay.  And "the company" being Lycos?
13       A   Yes
14       Q.  And at the time did you have an understanding
15   as to why it was Lycos' policy not to buy any equipment
16   that it could lease; in other words, to lease wherever
17   possible?
18           MR ACTON:  Objection
19       A   No
20       Q.  (BY MR. KALER)  Okay.  And when you said,
21   quote, It is Lycos' policy to not buy any equipment that
22   can be leased, you were referring to the fact that it
23   was the company's policy to lease equipment rather than
24   buy it wherever it could, correct?
25           MR ACTON:  Objection
```

**Page 33**

```
 1       A   Define "policy "
 2       Q.  (BY MR. KALER)  You can answer.  Where you
 3   said, quote, it is Lycos' policy --
 4       A   Correct  But if you could please define it
 5       Q.  -- to not buy any equipment --
 6       A   The word "policy" --
 7       Q.  It was its practice.  You used the term
 8   policy.  So you know what it means, correct?
 9       A   I used it  but if you're asking was there --
10   did I see an ex- -- a document that explicitly said
11   this --
12       Q.  I'm not asking -- I'm not asking -- I'm not
13   asking that, sir.  My question is: With respect to what
14   you meant when you made the statement, It is Lycos'
15   policy not to buy any equipment that can be leased, what
16   were saying was that Lycos' policy was to lease
17   equipment rather than buy it --
18       A   It was their general practice to lease
19   technology equipment
20       Q.  Rather than buy it?
21       A   Yes
22       Q.  Is that correct?
23       Q.  Okay.  And you went on to say in this second
24   paragraph, quote, It is Lycos' policy to not buy any
25   equipment that can be leased, this includes, but is not
```

9  (Pages 30 to 33)

ERNESTO GALVAN - 2/20/07

1  personal property tax return, correct?
2      A    This is what --
3           MR ACTON:  Objection
4      Q.  (BY MR. KALER)  You can answer.
5      A    This is what I concluded
6      Q.  Sorry?
7      A    This is what I concluded
8      Q.  Okay.  And having concluded it, you put the
9  information into this work paper memo that you prepared,
10  correct?
11      A    Correct
12      Q.  And then in the last sentence of the memo you
13  wrote, quote  Lycos will use its cost for the cost
14  factor and its net book value as its market value
15  factor, unquote; do you see that?
16      A    Yes
17      Q.  What were you referring to there?
18      A    What -- what piece; the whole thing?
19      Q.  On the second page of this Exhibit 627 your
20  memo states, quote, Lycos will use its cost for the cost
21  factor and its net book value as its market value
22  factor, unquote; do you see that?
23      A    I see that   Without seeing the Waltham
24  Personal Property Tax Return it -- I can t tell you
25  exactly  but Lyc- -- the position that I took as a

Page 38

1  senior tax accountant there is that I would report the
2  cost basis of the property owned by Lycos to report the
3  cost factor and the net book value as the market value
4      Q.  And that was only for the equipment and
5  furniture actually owned by Lycos, correct?
6      A.  And Waltham
7      Q.  And Waltham.  But it -- but that did not cover
8  the equipment being leased, correct?
9      A    It appears so
10      Q.  All right  And this memorandum which we've
11  marked as Exhibit 627 was a memorandum that you kept in
12  your work paper files in the ordinary course of business
13  during the time that you were there, correct?
14           MR  ACTON:  Objection
15      Q.  (BY MR. KALER)  You can answer.
16      A    I guess it was in there
17      Q.  Okay.  And we see from your addressing it that
18  you addressed it to the tax files  work paper files at
19  the time you wrote it, correct?
20           MR ACTON:  Objection
21      A    Correct  it would have been --
22      Q.  (BY MR. KALER)  You can answer, sir.
23      A    It would have been with the Waltham Pers- --
24  it should have been with the Waltham Personal Property
25  Tax Return

Page 39

1      Q.   Okay  Because it was your regular practice to
2  keep your work papers associated with the tax returns in
3  files with those tax returns, correct?
4      A   Yes
5      Q.   And that's so that the business records of the
6  company would reflect the information and work paper
7  material that constituted the backup to its own tax
8  returns, correct?
9           MR  ACTON:  Objection.
10      Q.  (BY MR. KALER)  You can answer.
11      A    Correct
12      Q.  And you created this document sometime in
13  between January of 2001 and March or April of 2002 when
14  you left Lycos, correct?
15      A    Correct
16      Q.  Are you able to tell by looking particularly
17  at the reference to balance sheet as of 12/31/2000 on
18  the bottom of the first page, top of the second page
19  approximately when during that one-year period between
20  January of 2001 and March  April of 2002 you would have
21  prepared this memo?
22      A    No  I cannot
23      Q.  But it was sometime during that period,
24  correct?
25      A    It was some --

Page 40

1           MR  ACTON:  Objection
2      Q.  (BY MR. KALER)  It was sometime during that
3  period, correct?
4      A    It was sometime --
5           MR  ACTON:  Objection
6      Q.  (BY MR. KALER)  You can answer
7      A    It was sometime during --
8      Q.  It was sometime during the period -- period
9  between January of 2001 and March or April of 2002 when
10  you left Lycos, correct?
11      A    Yes
12      Q.  And it was Lycos' policy during that period
13  not to buy any equipment that it could lease, as you
14  understood it, correct?
15           MR  ACTON:  Objection
16      Q.  (BY MR. KALER)  You can answer.
17      Q.  Define "policy "
18      Q.  As you used it in the memo.
19           MR  ACTON:  Objection
20      Q.  (BY MR. KALER)  It was Lycos' policy,
21  practice, shall we say, not to buy any equipment that it
22  could lease?
23      A    It was their general practice --
24           MR  ACTON:  Objection
25      A.  (Continuing)  It was their general practice to

Page 41

11  (Pages 38 to 41)

ERNESTO GALVAN - 2/20/07

1  lease technology equipment, correct

2      Q    (BY MR. KALER) Rather than buy it, correct?

3      A    It was their general practice to lease

4  equipment, correct

04:04
5      Q.   As opposed to buying it, correct?

6      A    As opposed to buying it? I imagine so   If

7  you're going to lease it, you can't buy it

8      Q.   Okay. In other words, it was their general

9  practice to lease equipment, computer equipment, anyway

04:05
10  technology equipment, rather than buy it, correct?

11      A    Correct

12      Q.   And you do not know why Lycos had that policy,

13  do you?

14           MR. ACTON:  Objection

04:05
15      A    Nope. I was not privy to that

16      Q.   (BY MR. KALER) Okay. You just know the

17  policy existed, correct?

18           MR. ACTON:  Objection

19      Q    (BY MR. KALER) You can answer.

04:05
20      A    General practice  yes

21           MR. KALER:  Okay   No further questions

22           MR. ACTON:  I have no questions

23           MR. KALER:  All right   Thank you   I'll

24  only ask for the work papers that were subpoenaed to be

04:05
25  produced to us in some reasonable time and if we need to

Page 42

1  reopen the deposition for purposes of anything in those

2  work papers, we will have to do so, but it may very well

3  be that the papers that were covered by the subpoena

4  but not produced are not going to be important   So I'll

04:06
5  just ask that they be provided to us at some point so

6  we can review them

7           Otherwise, we'll consider the deposition

8  concluded.

9           THE WITNESS:  How do I deliver those to

04:06
10  you?

11           MR KALER:  Thank you

12           THE VIDEOGRAPHER:  We are off --

13           MR KALER:  You can deliver them to Mr  --

14           MR. ACTON:  We'll talk about that

04:06
15  afterwards   We'll just reserve our rights -- that was

16  the first I had heard about it   We'll just reserve our

17  rights about it

18           MR KALER:  Okay, that's fine   And I

19  think we can go off the record, Phyllis

04:06
20           THE VIDEOGRAPHER:  We are off the record

21  at 4:06 p m

22           (The deposition concluded at 4:06 p.m.)

23

24

25

Page 43

1           WITNESS CORRECTIONS AND SIGNATURE

2  ERNESTO GALVAN                    FEBRUARY 20  2007

3           Please indicate changes on this sheet of paper

   giving the change  page number  line number and reason

4  for the change  Please sign each page of changes

5  PAGE/LINE      CORRECTION      REASON FOR CHANGE

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

            ERNESTO GALVAN

25

Page 44

1           I, ERNESTO GALVAN  have read the foregoing

   deposition and hereby affix my signature that same is

2  true and correct  except as noted above

3

4           _____

            ERNESTO GALVAN

5

6  STATE OF T E X A S     )

   COUNTY OF _____  )

7

8           Before me, _____  on

   this day personally appeared ERNESTO GALVAN  known to

9  me, or proved to me under oath or through

   _____) (description of identity card or

10 other document)), to be the person whose name is

   subscribed to the foregoing instrument and acknowledged

11 to me that they executed the same for the purposes and

   consideration therein expressed

12

            Given under my hand and seal of office on

13 this  the _____ day of _____  _____

14

15

            _____

16          NOTARY PUBLIC IN AND FOR THE

            STATE OF TEXAS

17

18 My Commission Expires: _____

19

20

21

22

23

24

25

Page 45

# EXHIBIT 8

Volume 1, Pages 1 - 257

Exhibits:  1 - 8

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPUTER SALES INTERNATIONAL, INC.,

        Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

        Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

        Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    VIDEOTAPED DEPOSITION OF RICHARD E. GUILANDER

        Wednesday, November 1, 2006, 9:20 a.m.

            McDermott Will & Emery, LLP

                28 State Street

                Boston, Massachusetts


    - - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

            Farmer Arsenault Brock LLC

    50 Congress Street, Boston, Massachusetts 02109

            617-728-4404   Fax 617-728-4403

Richard E. Guilander
Volume 1 - November 1, 2006

| | 6 |
|---|---|
| 1 | Q. And what was the nature of that action? |
| 2 | A. My divorce. |
| 3 | Q. And the second time you were deposed, when, |
| 4 | approximately, was that? |
| 5 | A. That would have been 1983, '84 |
| 6 | Q. And what was the nature of that action? |
| 7 | A. That was a suit we had brought against a |
| 8 | customer for nonpayment. |
| 9 | Q. And when you say "we," do you mean CSI? |
| 10 | A. CSI |
| 11 | Q. I am here to ask you questions today about |
| 12 | the dispute between Lycos and CSI. I would ask that |
| 13 | you answer the questions that I ask you to the best |
| 14 | of your ability. Are you willing to do that? |
| 15 | A. Absolutely. |
| 16 | Q. Is there anything that's preventing you |
| 17 | today from answering questions honestly? |
| 18 | A. No |
| 19 | Q. Is there anything preventing you from |
| 20 | answering questions accurately? |
| 21 | A. No |
| 22 | Q. If you do not understand a question that I |
| 23 | have asked you, I would ask that you ask me to |
| 24 | rephrase that question; is that fair? |

| | 7 |
|---|---|
| 1 | A. That's fair. |
| 2 | Q. And if you think a question is ambiguous, I |
| 3 | would also ask that you ask me to rephrase it; is |
| 4 | that fair? |
| 5 | A. That's fair. |
| 6 | Q. If you answer a question, I will assume |
| 7 | that you understood the question that I've asked |
| 8 | you. Is that fair? |
| 9 | A. That's fair |
| 10 | Q. And there have been some issues with breaks |
| 11 | in previous depositions. If you feel as though you |
| 12 | need to take a break, please let me know and I will |
| 13 | try and accommodate you. |
| 14 | A. Okay. |
| 15 | Q. I would ask, though, if a question is |
| 16 | pending and you need to take a break, that you |
| 17 | respond to the question first before we go on break. |
| 18 | Is that fair? |
| 19 | A. That's fair. |
| 20 | Q. Have you ever been convicted of a crime? |
| 21 | A. No |
| 22 | Q. And you are, by the way, represented by |
| 23 | counsel here today; is that correct? |
| 24 | A. That's correct |

| | 8 |
|---|---|
| 1 | Q. And is that counsel representing you |
| 2 | individually? |
| 3 | A. No. |
| 4 | Q. He's representing you in your capacity as |
| 5 | an employee of CSI? |
| 6 | A. That's correct. |
| 7 | THE WITNESS: Right? |
| 8 | MR. LITTLE: Yes |
| 9 | Q. What did you do to prepare for this |
| 10 | deposition? |
| 11 | A. I arrived yesterday and went to counsel's |
| 12 | office and met with them. |
| 13 | Q. Prior to yesterday, did you do anything |
| 14 | else in preparation for this deposition? |
| 15 | A. No, I did not |
| 16 | Q. And yesterday, as you said, you met with |
| 17 | counsel. Is that the only time you've met with |
| 18 | counsel? |
| 19 | A. Yes. |
| 20 | Q. And how long was that meeting? |
| 21 | A. Probably six hours, seven hours. |
| 22 | Q. And did you review any documents in |
| 23 | preparing for this deposition that refreshed your |
| 24 | recollection as to the relationship between CSI and |

| | 9 |
|---|---|
| 1 | Lycos? |
| 2 | A. Yes. |
| 3 | Q. What documents did you review? |
| 4 | MR. LITTLE: I would object and direct |
| 5 | him not to answer on the grounds of work product, as |
| 6 | I think we've been doing in the other depositions. |
| 7 | Q. Okay, can you describe for me generally the |
| 8 | types of documents you reviewed? |
| 9 | MR. LITTLE: I'm going to object again |
| 10 | on the basis of work product and direct him not to |
| 11 | answer that. |
| 12 | Q. Do you know who Paul Stenberg is? |
| 13 | A. Yes |
| 14 | Q. Who is Paul Stenberg? |
| 15 | A. Paul Stenberg is senior vice-president, and |
| 16 | he manages the New England/Northeast region now |
| 17 | Q. When was the last time you spoke to Mr. |
| 18 | Stenberg? |
| 19 | A. It would have been last week. |
| 20 | Q. Did you discuss this case? |
| 21 | A. No |
| 22 | Q. Are you aware of the fact that Mr. Stenberg |
| 23 | was previously deposed in this case? |
| 24 | A. Yes. |

Richard E. Guilander
Volume 1 - November 1, 2006

22

1  Kansas City  It was really my charter to come up
2  and build this territory.
3      Q. And when you say "this territory," what are
4  you referring to?
5      A. In the New England area, New York, New
6  Jersey
7      Q. So at some point in building the region you
8  hired more people to work under you; is that
9  correct?
10     A. Yes, I did.
11     Q. When did you --
12         Did you hire Paul Stenberg?
13     A. Yes, I did
14     Q. When did you hire Paul Stenberg?
15     A. Oh, gosh. It -- I don't know the exact --
16  It had to be around that time frame, '93, '94, I
17  would assume  I really can't recall the exact date.
18     Q. And was Mr. Stenberg reporting to you?
19     A. Yes, he was
20     Q. Was there somebody in the company that was
21  in between the two of you in terms of the reporting
22  structure?
23     A  No  No, he reported directly to me
24     Q. And Mr. Stenberg was working out of the

23

1  Needham office at that time?
2      A. At the time I don't think it was Needham.
3  I used to stay at the Marriott at 93 and where the
4  highway is, and he was real close to that area.  I
5  don't think it was -- I don't think it was in
6  Needham.
7      Q. But it was in Massachusetts?
8      A. It was in Massachusetts, yes.
9      Q. And were other account executives hired in
10  and around the time Mr. Stenberg was hired?
11     A  Yes.
12     Q. Who?
13     A. I hired Brian O'Mara at the time as Paul.
14  I hired a gentleman -- I can't even think of his
15  name -- in Connecticut.  And then there's a
16  gentleman here that I hired like a year later, named
17  Tom Vaughan, in Boston.  And then after that, Tom
18  Messier, in Rhode Island.  Years later, Marcus
19  Cardella, in Connecticut; Michael Broderick, in New
20  York; Paul's brother, Brian, in New Jersey.
21     Q. And are those people still employed with
22  CSI today?
23     A. Some of them are.  Some of them are gone.
24     Q. Is Tom Messier still employed?

24

1      A. Tom Messier is still here, in Rhode Island.
2      Q. And Brian Stenberg?
3      A. Brian Stenberg is still here
4      Q. Michael Broderick?
5      A. Michael Broderick is gone.
6      Q. Do you know where he went?
7      A. I have no idea.
8      Q. What about Marcus Cardella?
9      A. Marcus Cardella is still at CSI, in
10  Connecticut.
11     Q. And Brian O'Meara?
12     A. Brian O'Mara is gone.
13     Q. Do you know where he went?
14     A  I do not.
15     Q. So, in addition to hiring personnel, what
16  were your other responsibilities as a manager for
17  the Eastern region?
18         MR. LITTLE: Objection.  You may answer.
19     A. That was -- that was pretty much my main
20  responsibility, is the hiring reps, getting offices
21  open.
22     Q. Is it fair to say that CSI was trying to
23  grow its business at that time?
24     A  Yes

25

1          MR. LITTLE: Objection.
2      Q. For how long were you a regional manager at
3  CSI?
4      A. I'm still one.
5      Q. And as a regional manager, are you
6  responsible for preparing performance evaluations
7  for CSI employees?
8      A  I used to be.  We stopped doing that
9  several years ago.
10     Q. When you say "we stopped doing that," what
11  do you mean by that?
12     A. The forms we used at the time were
13  inadequate to evaluate a marketing rep.  They also
14  had zero impact on their compensation, advancement,
15  anything.  It was basically a waste of time.
16     Q. When you say "several years ago," what do
17  you mean by that?
18     A. I would -- it was in the early 2000s when
19  we stopped, maybe before that
20     Q. And when you say they were "inadequate,"
21  what do you mean by that?
22     A. They were designed by, I believe, from what
23  I can recall, an outside company, with our HR gal at
24  the time; and they had no idea what the evaluation

Richard E. Guilander
Volume 1 - November 1, 2006

---

**134**

1  it?
2      MR. ACTON: Pardon?
3      MR. LITTLE: You mean what he understood
4  it to mean?
5      MR. ACTON: Let me withdraw the question
6  and ask it in a different way
7      Q. What do you understand the phrase "knows
8  who to talk to at CSI to gather the necessary
9  information and resources to put a deal together"
10  mean?
11      A. Well, for example, if a customer comes in
12  and says, "We have an EMC drive that's worth a half
13  a million dollars," he would have to understand who
14  to talk to to get the price, or equity investment
15  He would have to understand who to talk to to get
16  the credit evaluation  He would have to understand
17  who to talk to if we wanted to look at other -- like
18  a used, possibly, alternative for EMC  He would
19  have to know who to talk to to get a contract
20  prepared.
21      Q. And you thought Mr. Stenberg knew who to
22  talk to within CSI to do all those things?
23      A. I would think that every rep would know how
24  to do that

---

**135**

1      Q. Okay, what about in connection with a
2  rewrite?  Who would he need to talk to?
3      A. Basically the same people
4      Q. And when you say "people," just who do you
5  mean by that?
6      A. Well, pricing, he would have to get --
7  again, as we talked about, he'd have to get the --
8  his threshold from pricing to do that transaction
9  He would talk to legal to get the contracts
10  prepared.
11      Q. Anyone else?
12      A  I think that would be it
13      Q. So if Mr. Stenberg needed to get
14  information, he knew where to go for it.
15      A. As all our reps do.
16      Q. Do you know if in fact Mr. Stenberg did go
17  to these people to get his information?
18      A  I think --
19      MR. LITTLE: Objection
20      A  -- he would have to
21      Q. Well, we talked this morning about your
22  review of Mr. Stenberg's transcript; isn't that
23  correct?
24      A. That's correct

---

**136**

1      Q. And one of the things that we talked about
2  was Mr. Stenberg calculating numbers using his HP 12
3  calculator; isn't that correct?
4      A. That's correct.
5      Q. And the information that he was calculating
6  was information that was available to him in St.
7  Louis; isn't that correct?
8      A. I would assume it would be available
9      Q. And Mr. Stenberg didn't go to St. Louis to
10  get that information, did he?
11      A. I -- based on his testimony, he didn't need
12  to. He had it in his office.
13      Q. And you're assuming in answering that
14  question in the way you did that his calculation was
15  correct; isn't that correct?
16      A  I would have to assume that.
17      Q. I'd ask you to turn to the next page; and
18  I'd ask you to just take a minute to review the
19  header entitled Builds and Maintains Relationships
20  Through Professional and Social Skills.
21      A  Okay
22      Q. Have you had a chance to review that?
23      The second bullet says -- could you just
24  read that out loud.

---

**137**

1      A  "Developing ongoing business and personal
2  bond of camaraderie, trust, and dependency with
3  decisionmakers "
4      Q. You gave Mr. Stenberg a 5, meaning he
5  exceeded expectations, in his ability to do exactly
6  that, did you not?
7      A  I gave him 5 for that category, yes.
8      Q. And what was your basis for giving him that
9  score?
10      A. Again, it was personal observation and
11  recognition that, once he opened up a new account,
12  we continued to get ongoing business with that
13  customer.
14      Q. So it was your belief that Mr. Stenberg's
15  trust -- customers trusted him; isn't that correct?
16      A  I don't know if they needed to trust him.
17  The customers needed to trust CSI.  In terms of the
18  services we provide, again, they trust us to pay
19  their bills on time, they trust us when they return
20  equipment that the asset's going to be cleaned and
21  wiped. I don't know what the trust would be in a
22  marketing rep that they would have to trust.
23      MR ACTON: I'm going to move to strike
24  your answer as being nonresponsive.

---

# EXHIBIT 9

Page  1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------x

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-
      Counterclaim

                                 Civil Action
vs.                              No. 05-10017-RWZ

LYCOS, INC.,

      Defendant and Plaintiff-in-
      Counterclaim

and

BANK OF AMERICA f/k/a FLEET BANK,

      Trustee Process Defendant

--------------------------------x

        DEPOSITION OF THOMAS EDWARD GUILFOILE, a witness

called by and on behalf of the Plaintiff, taken

pursuant to the applicable provisions of the Federal

Rules of Civil Procedure, before James A. Scally,

RMR, CRR, a Notary Public in and for the Commonwealth

of Massachusetts, at the offices of McCarter &

English, 225 Franklin Street, Boston, Massachusetts,

on Thursday, December 7, 2006, commencing at 8:19

a.m.

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

## Page 6

| | | |
|---|---|---|
| 08:05:12 | 1 | THE VIDEOGRAPHER: We are now |
| 08:19:59 | 2 | recording and on the record  My name is |
| 08:20:02 | 3 | Tom Slinhood  I'm a legal video specialist |
| 08:20:05 | 4 | on behalf of O'Brien & Levine Court |
| 08:20:07 | 5 | Reporting  Our business address is 195 |
| 08:20:09 | 6 | State Street, Boston, Mass , 02109 |
| 08:20:12 | 7 | Today's date is 12/7/06, and the time |
| 08:20:15 | 8 | is 8:19 a m  This is a deposition of John |
| 08:20:20 | 9 | Patrick Kirk — |
| 08:20:22 | 10 | MR KALER: No  It's the deposition |
| 08:20:23 | 11 | of Thomas Guilfoile |
| 08:20:24 | 12 | MR DOWDEN: This is a deposition of |
| 08:20:25 | 13 | Thomas Guilfoile in the matter of Lycos. |
| 08:20:29 | 14 | Inc , plaintiff, versus Bank of America |
| 08:20:31 | 15 | MR KALER: Matter of CSI Leasing. |
| 08:20:36 | 16 | Inc , v Lycos |
| 08:20:37 | 17 | THE VIDEOGRAPHER: Versus the Bank of |
| 08:20:39 | 18 | America. Fleet Bank |
| 08:20:40 | 19 | MR KALER: They're just a trustee |
| 08:20:42 | 20 | defendant |
| 08:20:43 | 21 | THE VIDEOGRAPHER: In the United |
| 08:20:46 | 22 | States District Court of Massachusetts  CA |
| 08:20:52 | 23 | number — |
| 08:20:53 | 24 | MR KALER: 05-10017 |

## Page 7

| | | |
|---|---|---|
| 08:20:57 | 1 | THE VIDEOGRAPHER: This deposition is |
| 08:20:59 | 2 | being taken at 225 Franklin Street. Boston. |
| 08:21:02 | 3 | Massachusetts  on behalf of the plaintiff. |
| 08:21:04 | 4 | The court reporter is Jim Scally |
| 08:21:05 | 5 | Counsel will state their appearances |
| 08:21:07 | 6 | and the court reporter will administer the |
| 08:21:08 | 7 | oath |
| 08:21:08 | 8 | MR DOWDEN: Jim Dowden for the |
| 08:21:11 | 9 | witness |
| 08:21:11 | 10 | MR KALER: Robert Kaler. McCarter & |
| 08:21:13 | 11 | English. for plaintiff CSI Leasing Inc |
| 08:21:18 | 12 | MR BEAN: Thomas Bean for defendant |
| | 13 | and plaintiff in counter-claim Lycos Inc |
| | 14 | |
| | 15 | THOMAS EDWARD GUILFOILE. having been |
| | 16 | satisfactorily identified by the production |
| | 17 | of his driver's license and duly sworn by |
| | 18 | the Notary Public  was examined and |
| | 19 | testified as follows in answer to direct |
| | 20 | interrogatories: |
| 08:21:35 | 21 | |
| 08:21:35 | 22 | BY MR KALER: |
| 08:21:36 | 23 | Q  Good morning. Mr Guilfoile  Have you ever given |
| 08:21:40 | 24 | testimony under oath before? |

## Page 8

| | | |
|---|---|---|
| 08:21:41 | 1 | A  I have |
| 08:21:41 | 2 | Q  Do you understand that the questions that we put |
| 08:21:43 | 3 | to you today must be answered under oath. under the pains |
| 08:21:45 | 4 | and penalties of perjury? |
| 08:21:50 | 5 | A  I do |
| 08:21:50 | 6 | Q  Do you have any physical or mental impairments |
| 08:21:53 | 7 | that you know of that would interfere with your ability to |
| 08:21:56 | 8 | answer my questions truthfully and completely? |
| 08:21:59 | 9 | A  I do not |
| 08:21:59 | 10 | Q  You understand that if any of my questions are |
| 08:22:00 | 11 | unclear in any way. you can feel free to tell me that and |
| 08:22:03 | 12 | I'll be happy to try to clarify them for you? |
| 08:22:05 | 13 | A  I do |
| 08:22:05 | 14 | Q  And are you represented by counsel here today? |
| 08:22:08 | 15 | A  Yes  I am |
| 08:22:08 | 16 | Q  And who is that? |
| 08:22:09 | 17 | A  James Dowden from Ropes & Gray |
| 08:22:12 | 18 | Q  Can you just state your full name again? |
| 08:22:16 | 19 | A  Thomas Edward Guilfoile |
| 08:22:18 | 20 | Q  Where do you live? |
| 08:22:19 | 21 | A  Duxbury. Massachusetts |
| 08:22:22 | 22 | Q  What's your street address? |
| 08:22:23 | 23 | A  116 Powder Point Avenue |
| 08:22:28 | 24 | Q  And the ZIP code? |

## Page 9

| | | |
|---|---|---|
| 08:22:31 | 1 | A  02332 |
| 08:22:34 | 2 | Q  Do you have any other residences? |
| 08:22:36 | 3 | A  I do not |
| 08:22:37 | 4 | Q  Do you have any present plans to move from |
| 08:22:39 | 5 | Massachusetts? |
| 08:22:39 | 6 | A  I do not |
| 08:22:40 | 7 | Q  Are you married? |
| 08:22:41 | 8 | A  Yes |
| 08:22:42 | 9 | Q  Any children? |
| 08:22:43 | 10 | A  Yes |
| 08:22:44 | 11 | Q  How many? |
| 08:22:45 | 12 | A  Five |
| 08:22:47 | 13 | Q  The — could you tell us  what is your occupation? |
| 08:22:51 | 14 | A  I am a general partner at Highland Consumer Fund |
| 08:23:02 | 15 | Q  Can you briefly give us your educational |
| 08:23:04 | 16 | background?  Where did you go to college? |
| 08:23:06 | 17 | A  University of Notre Dame |
| 08:23:13 | 18 | Q  And your degree is in business? |
| 08:23:15 | 19 | A  Yes |
| 08:23:20 | 20 | Q  And you're also a certified public accountant; is |
| 08:23:23 | 21 | that right? |
| 08:23:23 | 22 | A  I am not |
| 08:23:24 | 23 | Q  Were you ever a certified public accountant? |
| 08:23:27 | 24 | A  I was. yes |

3  (Pages 6 to 9)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

| | | Page 14 |
|---|---|---|
| 08:28:45 | 1 | GUIL 000145 and then pages 000192 and 193, a portion of the |
| 08:28:56 | 2 | form S-3 and just direct your attention to the description |
| 08:29:00 | 3 | of your background on the second page |
| 08:29:10 | 4 | At the bottom of the second page there's a |
| 08:29:12 | 5 | description of your background which reads quote "Thomas |
| 08:29:16 | 6 | E Guilfoile has served as our vice president of finance |
| 08:29:19 | 7 | and administration since December 1996 and as our |
| 08:29:23 | 8 | controller since February 1996 Prior to joining Lycos |
| 08:29:27 | 9 | Mr Guilfoile was employed by Ernst & Young LLP from July |
| 08:29:32 | 10 | 1986 to February 1996. most recently as a senior manager in |
| 08:29:39 | 11 | Ernst & Young LLP's Entrepreneurial Services Group  Mr |
| 08:29:44 | 12 | Guilfoile holds a bachelor of business administration |
| 08:29:46 | 13 | degree in accounting from the University of Notre Dame and |
| 08:29:50 | 14 | serves as a director of AdOne  Inc ." unquote  Do you see |
| 08:29:54 | 15 | that? |
| 08:29:55 | 16 | A  Yes |
| 08:29:55 | 17 | Q  Is that an accurate description of your background |
| 08:29:57 | 18 | at the time? |
| 08:30:00 | 19 | A  Yes, it is |
| 08:30:01 | 20 | Q  I presume – are you still a director of AdOne |
| 08:30:01 | 21 | Inc ? |
| 08:30:06 | 22 | A  I am not |
| 08:30:07 | 23 | Q  So your – the degree that you – the college |
| 08:30:11 | 24 | degree that you obtained was actually a bachelor of |

| | | Page 15 |
|---|---|---|
| 08:30:13 | 1 | business administration degree in accounting from the |
| 08:30:16 | 2 | University of Notre Dame; is that right? |
| 08:30:18 | 3 | A  Yes |
| 08:30:25 | 4 | Q  When you joined Ernst & – and you worked as a |
| 08:30:30 | 5 | certified public accountant in the public accounting firm |
| 08:30:32 | 6 | of Ernst & Young for almost a decade, correct? |
| 08:30:42 | 7 | A  Yes |
| 08:30:42 | 8 | Q  During that time, can you describe for us what you |
| 08:30:44 | 9 | did at Ernst & Young?  You started out, presumably, as a |
| 08:30:49 | 10 | staff accountant, worked your way up to be a manager and |
| 08:30:52 | 11 | then a senior manager? |
| 08:30:54 | 12 | A  I did  I started as a staff accountant, became a |
| 08:30:57 | 13 | senior accountant, then a manager, and then a senior |
| 08:31:04 | 14 | manager |
| 08:31:11 | 15 | Q  How long did you work there in what's referred to |
| 08:31:15 | 16 | here as the entrepreneurial services group? |
| 08:31:22 | 17 | A  I don't know exactly what year I joined the |
| 08:31:25 | 18 | entrepreneurial services group |
| 08:31:27 | 19 | Q  Were you working on the audit side or the tax side |
| 08:31:29 | 20 | during the decade that you were at Ernst & Young? |
| 08:31:32 | 21 | A  On the audit side |
| 08:31:41 | 22 | Q  Were you working on the audits of public companies |
| 08:31:43 | 23 | or private companies or both? |
| 08:31:45 | 24 | A  Primarily private companies |

| | | Page 16 |
|---|---|---|
| 08:31:48 | 1 | Q  Did you work on the audits of any public |
| 08:31:50 | 2 | companies? |
| 08:31:51 | 3 | A  Yes |
| 08:31:52 | 4 | Q  What public companies did you work on the audits |
| 08:31:54 | 5 | of while you were at Ernst & Young? |
| 08:31:59 | 6 | A  The Boston Celtics limited partnership. Open |
| 08:32:13 | 7 | Environment Corporation are two that I recall |
| 08:32:18 | 8 | Q  And what were some of the larger private companies |
| 08:32:21 | 9 | that you worked on the audits of while you were at Ernst & |
| 08:32:24 | 10 | Young? |
| 08:32:29 | 11 | A  Let's see  I worked on a company such as Molton |
| 08:32:41 | 12 | Metal Technologies, Amray  I et's see  Corporate Software, |
| 08:33:06 | 13 | Sheraton Hotels Private Partnership, Canyon Ranch |
| 08:33:32 | 14 | Q  Any others you remember? |
| 08:33:35 | 15 | A  I think that's a representative sample  anyway |
| 08:33:39 | 16 | Q  During the decade that you worked at Ernst & |
| 08:33:44 | 17 | Young  did you in connection with the audits of various |
| 08:33:47 | 18 | companies that you worked on examine lease accounting |
| 08:33:50 | 19 | issues? |
| 08:33:52 | 20 | A  Yes |
| 08:33:54 | 21 | Q  What kind of lease accounting issues did you |
| 08:33:56 | 22 | examine during the decade that you were working with Ernst |
| 08:34:01 | 23 | & Young? |
| 08:34:03 | 24 | A  We performed various audit procedures related to |

| | | Page 17 |
|---|---|---|
| 08:34:06 | 1 | leasing |
| 08:34:08 | 2 | Q  What type of audit procedures relating to leasing? |
| 08:34:15 | 3 | A  Primarily determining whether a lease qualified as |
| 08:34:18 | 4 | a capital lease or an operating lease |
| 08:34:26 | 5 | Q  And what's your understanding of the distinction |
| 08:34:28 | 6 | between the two? |
| 08:34:32 | 7 | A  There are certain criteria that must exist in a |
| 08:34:35 | 8 | lease in order for it to be classified as a capital lease |
| 08:34:43 | 9 | Q  Can you briefly describe them? |
| 08:34:47 | 10 | A  An agreement which contains a bargain purchase |
| 08:34:53 | 11 | option would be required to be capitalized as a lease  An |
| 08:34:58 | 12 | agreement that in which the term of the lease exceeds 75 |
| 08:35:04 | 13 | percent of the useful life of that asset is required to be |
| 08:35:09 | 14 | capitalized  I believe if the terms of the lease indicate |
| 08:35:16 | 15 | that the net present value of the lease payments exceed 90 |
| 08:35:23 | 16 | percent of the fair value of that asset  it would also |
| 08:35:28 | 17 | require capitalization |
| 08:35:39 | 18 | Q  And what do you mean by capitalization?  If |
| 08:35:44 | 19 | something must be capitalized. what does that mean? |
| 08:35:48 | 20 | A  It means that the assets which were purchased |
| 08:35:50 | 21 | under that lease are required to be reported on the |
| 08:35:56 | 22 | company's balance sheet as both an asset and a liability |
| 08:36:07 | 23 | Q  When you say the assets purchased under that |
| 08:36:09 | 24 | lease. do you mean the assets leased under that lease? |

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376)  *  www.court-reporting.com

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

Page 18

08:36:12  1    A  The assets leased under that lease are treated as
08:36:15  2    if they are assets of the company and therefore as if they
08:36:20  3    were purchased
08:36:22  4    Q  And therefore the remaining payments have to be
08:36:25  5    treated as a debt on the company's balance sheet?
08:36:27  6    A  The remaining payments will be reducing the debt
08:36:31  7    on the balance sheet, yes
08:36:35  8    Q  And the debt is recorded as the cost of the
08:36:38  9    assets?
08:36:40  10   A  I'm sorry?
08:36:41  11   Q  The debt is recorded as the cost of the assets?
08:36:47  12   A  Not necessarily the case  The asset certainly
08:36:52  13   would be recorded as the value of the asset  The debt may
08:36:55  14   or may not at any point in time represent the same
08:36:58  15   Q  Okay  And if the lease has to be capitalized and
08:37:09  16   the asset recorded as a debt, that obviously can have an
08:37:13  17   effect on a company's debt/equity ratio?
08:37:17  18   A  Yes
08:37:18  19   Q  And a company's debt/equity ratio is one indicator
08:37:23  20   of its financial health, correct?
08:37:28  21   A  I think there are various ways to determine a
08:37:31  22   company's financial health, depending on its industry
08:37:34  23   Q  But the debt/equity ratio is one indicator that is
08:37:38  24   considered to be one indication of financial health, isn't

Page 19

08:37:42  1    it?
08:37:43  2    A  I wouldn't necessarily agree with that, no
08:37:46  3    Q  But, in any event, it's a -- it's a metric that's
08:37:49  4    typically calculated in connection with companies in terms
08:37:53  5    of evaluating their financial statements, right?
08:37:55  6        MR BEAN: Objection
08:37:56  7    Q  You can answer  In your experience
08:37:59  8    A  I'm sorry, could you repeat the question?
08:38:00  9    Q  Yeah  In your experience, the debt/equity ratio
08:38:03  10   is a metric that's normally calculated in connection with
08:38:06  11   evaluating a company's financial statements?
08:38:07  12   A  Again, I would not say it's normally used  In
08:38:10  13   some industries it's more significant than others
08:38:12  14   Q  Was it significant in Lycos' industry?
08:38:15  15   A  It was not
08:38:16  16   Q  Why not?
08:38:17  17   A  Well, it certainly wasn't in Lycos' case  because
08:38:21  18   Lycos had no debt and it had no need for debt
08:38:34  19   Q  Why not?
08:38:36  20   A  Because it had a very significant cash position
08:38:43  21   Q  Why did that mean it had no need for debt?
08:38:47  22   A  Because it was able to finance its operations out
08:38:51  23   of its own cash
08:38:55  24   Q  How much cash did Lycos typically have during the

Page 20

08:38:57  1    period that you worked there from '96 to 2001?
08:39:03  2        MR BEAN: Objection
08:39:04  3    Q  You can answer
08:39:06  4    A  It had various amounts of cash at various points
08:39:09  5    in time
08:39:10  6    Q  Can you give us an approximate range?
08:39:16  7    A  I would say anywhere between -- it was several
08:39:27  8    hundred millions of dollars
08:39:30  9    Q  How did Lycos manage all that cash during the
08:39:34  10   years that you worked there between 1996 and 2001?
08:39:40  11   A  Portions of it were invested; others were used for
08:39:44  12   operations
08:39:58  13   Q  Was Lycos losing money on its operations during
08:40:01  14   the years that you worked there?
08:40:03  15       MR BEAN: Objection
08:40:04  16   Q  You can answer
08:40:08  17   A  At some points in time Lycos was losing money from
08:40:12  18   operations
08:40:12  19   Q  Approximately what period of time was it losing
08:40:15  20   money?
08:40:21  21   A  1995  I don't know at what point it was
08:40:29  22   profitable from an operating standpoint  But certainly in
08:40:32  23   the early years it was
08:40:34  24   Q  Sorry?

Page 21

08:40:35  1    A  In the early years, it was unprofitable  I don't
08:40:39  2    recall what period it became profitable from operations
08:40:41  3    Q  Did it ever become profitable from operations
08:40:43  4    during the period of time that you worked there?
08:40:49  5        MR BEAN: Objection
08:40:50  6    Q  You can answer
08:40:58  7    A  I don't recall
08:41:04  8    Q  I show you a portion of Exhibit 434 -- sorry --
08:41:15  9    433, and I ask you to just turn to page GUIL 000539
08:41:33  10       MR DOWDEN: Do you have copies of
08:41:34  11   that?
08:41:34  12       MR KALER: I don't
08:41:44  13   Q  Beginning at page 533, you recognize that as a
08:41:47  14   copy of the prospectus for the stock offering that you
08:41:50  15   talked about earlier?
08:41:52  16   A  That's what it appears to be  yes
08:41:55  17   Q  Okay  And on page 539, do you recognize your
08:41:59  18   handwriting?
08:41:59  19       MR DOWDEN: Objection
08:42:00  20   Q  Marking up your copy of the prospectus?
08:42:04  21   A  No  I do not
08:42:05  22   Q  Whose handwriting is that, do you know?
08:42:06  23   A  I do not
08:42:15  24   Q  This was an offering at the beginning of 2000,

6  (Pages 18 to 21)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

## Page 26

| | | |
|---|---|---|
| 08:47:06 | 1 | meeting with them on Tuesday in preparation for coming here |
| 08:47:08 | 2 | to testify? |
| 08:47:09 | 3 | MR BEAN: Mr Dowden, I would ask |
| 08:47:12 | 4 | that you instruct the witness not to answer |
| 08:47:14 | 5 | the question on the grounds of attorney- |
| 08:47:15 | 6 | client privilege |
| 08:47:15 | 7 | MR DOWDEN: I will honor that |
| 08:47:17 | 8 | request and instruct you not to answer |
| 08:47:19 | 9 | Q Did you discuss how much you should remember — |
| 08:47:19 | 10 | MR BEAN: Mr Dowden. I would — |
| 08:47:21 | 11 | Q — in your testimony? |
| 08:47:22 | 12 | MR BEAN: — instruct you to |
| 08:47:25 | 13 | instruct the witness not to answer the |
| 08:47:26 | 14 | question |
| 08:47:26 | 15 | MR DOWDEN: I will honor the |
| 08:47:27 | 16 | request. Do not answer the question. |
| 08:47:29 | 17 | Q Who else was present at the meeting? Was the |
| 08:47:31 | 18 | Lycos attorney that met with you two days ago Mr Bean? |
| 08:47:33 | 19 | A Yes it was |
| 08:47:34 | 20 | Q Who else was present at the meeting? |
| 08:47:36 | 21 | A Mr Dowden |
| 08:47:40 | 22 | Q Anyone else? |
| 08:47:42 | 23 | A No |
| 08:47:42 | 24 | Q All right You do recall that CSI was the largest |

## Page 27

| | | |
|---|---|---|
| 08:47:55 | 1 | lessor of equipment to Lycos during the time that you |
| 08:47:59 | 2 | worked there. don t you? |
| 08:48:00 | 3 | MR DOWDEN: Objection |
| 08:48:01 | 4 | MR BEAN: Objection |
| 08:48:03 | 5 | A I recall that CSI was a lessor to Lycos |
| 08:48:08 | 6 | Q You recall that Lycos — that CSI was the largest |
| 08:48:11 | 7 | lessor of equipment to Lycos in terms of dollar volume. |
| 08:48:15 | 8 | don t you? |
| 08:48:16 | 9 | A I don't recall |
| 08:48:16 | 10 | Q You recall that you signed over 100 equipment |
| 08:48:19 | 11 | schedules between Lycos and CSI. don't you? |
| 08:48:23 | 12 | MR DOWDEN: Objection |
| 08:48:24 | 13 | A I don't recall |
| 08:48:24 | 14 | Q No recollection? |
| 08:48:27 | 15 | A You asked if I recalled signing over a hundred |
| 08:48:30 | 16 | documents I don't recall |
| 08:48:31 | 17 | Q I asked — will. I'll ask you now if you recall |
| 08:48:33 | 18 | having signed any leases between Lycos and CSI By leases |
| 08:48:39 | 19 | I mean equipment schedules |
| 08:48:44 | 20 | A I recall signing lease documents I don't recall |
| 08:48:47 | 21 | precisely which — which ones yes |
| 08:48:50 | 22 | Q And was it part of your duties and |
| 08:48:53 | 23 | responsibilities to review and sign equipment schedules |
| 08:48:56 | 24 | between Lycos and CSI? |

## Page 28

| | | |
|---|---|---|
| 08:48:59 | 1 | MR BEAN: Objection |
| 08:49:00 | 2 | Q You can answer |
| 08:49:05 | 3 | A I did sign lease documents or related schedules |
| 08:49:10 | 4 | for CSI. yes |
| 08:49:13 | 5 | Q And it was part of your duties and |
| 08:49:15 | 6 | responsibilities to do so? |
| 08:49:17 | 7 | A Yes |
| 08:49:22 | 8 | Q Would you describe for us in detail the |
| 08:49:27 | 9 | involvement that you had in the preparation of the |
| 08:49:33 | 10 | company's securities filings. filings with the Securities |
| 08:49:38 | 11 | and Exchange Commission. including the financial statements |
| 08:49:40 | 12 | and information that was submitted? |
| 08:49:45 | 13 | A I was a member of the team of people who helped |
| 08:49:49 | 14 | put together the documents |
| 08:49:55 | 15 | Q Were you the lead person? |
| 08:49:59 | 16 | A I don't know that there was necessarily a lead |
| 08:50:01 | 17 | person |
| 08:50:03 | 18 | Q Well, who else was on the team? |
| 08:50:07 | 19 | A It would have included lawyers, included people on |
| 08:50:11 | 20 | my staff who helped accumulate the information and prepare |
| 08:50:14 | 21 | the financials |
| 08:50:16 | 22 | Q Who were the people on your staff? |
| 08:50:20 | 23 | A Well. my controller was Brian Lucy Richard |
| 08:50:32 | 24 | Monroe was the accounting manager |

## Page 29

| | | |
|---|---|---|
| 08:50:43 | 1 | Q Anyone else? |
| 08:50:46 | 2 | A There were lawyers not working for me. but — |
| 08:50:49 | 3 | Q I'm talking about management of the company |
| 08:50:54 | 4 | A There were managers who would review documents. |
| 08:50:56 | 5 | yes |
| 08:50:57 | 6 | Q Who? |
| 08:50:59 | 7 | A Ted Philip. our CFO; Bob Davis our CEO |
| 08:51:14 | 8 | Q Did you receive stock options during the years |
| 08:51:16 | 9 | that you worked at the company? |
| 08:51:19 | 10 | A Yes. I did |
| 08:51:25 | 11 | (Exhibit 436, 12/01 letter marked) |
| 08:51:42 | 12 | Q I show you what's been marked as Exhibit 436 Is |
| 08:51:42 | 13 | this a copy of a letter that you received in or about |
| 08:51:47 | 14 | December of 2001 from Lycos then TerraLycos, enclosing a |
| 08:51:57 | 15 | detailed report on the status of your stock options and |
| 08:52:02 | 16 | which ones still remained outstanding and when they were |
| 08:52:08 | 17 | exercised? |
| 08:52:09 | 18 | A It appears so yes |
| 08:52:19 | 19 | (Exhibit 437 12/01 letter marked) |
| 08:52:21 | 20 | Q And I ll show you what's been marked as Exhibit |
| 08:52:18 | 21 | 437 Is that a copy of a letter that you received at or |
| 08:52:28 | 22 | about the time that you left Lycos? |
| 08:52:42 | 23 | A Yes. I believe so |
| 08:52:45 | 24 | Q The effective date of your termination from |

8 (Pages 26 to 29)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

| | Page 30 |
|---|---|
| 08:52:49 | 1  Lycos — the effective date of the termination of your |
| 08:52:51 | 2  employment with Lycos was November 15th of 2001; is that |
| 08:52:57 | 3  right? |
| 08:52:57 | 4      A  I believe that I seem to recall that it was |
| 08:53:01 | 5  actually December 15th |
| 08:53:03 | 6      Q  So it was subsequently extended a month? |
| 08:53:05 | 7      A  Yes |
| 08:53:06 | 8      Q  Okay  And so the report on your stock options |
| 08:53:15 | 9  that you received in Exhibit 436 you received two days |
| 08:53:18 | 10  after you left the company? |
| 08:53:21 | 11      A  I don t recall when I received it |
| 08:53:23 | 12      Q  Well  you received it shortly after you left the |
| 08:53:26 | 13  company anyway. correct? |
| 08:53:28 | 14      A  I don't recall having received it. |
| 08:53:30 | 15      Q  You produced it. sir |
| 08:53:33 | 16      A  The letter of the stock option grant? |
| 08:53:36 | 17      Q  Yeah  It's Bates numbered GUIL 0003049 |
| 08:53:40 | 18      A  Yes |
| 08:53:40 | 19      Q  Through 3055  You know that that indicates that |
| 08:53:44 | 20  you produced it from your own files |
| 08:53:46 | 21      A  Yes |
| 08:53:46 | 22      Q  Okay  You did receive it in or about December of |
| 08:53:51 | 23  2001. correct? |
| 08:53:52 | 24      A  I don t recall when I received it |

| | Page 31 |
|---|---|
| 08:53:54 | 1      Q  You have no idea whether you received it in 2001 |
| 08:53:56 | 2  or yesterday? |
| 08:53:58 | 3          MR. DOWDEN: Objection |
| 08:53:59 | 4          MR. BEAN: Objection |
| 08:54:02 | 5      A  I don't recall when I received it |
| 08:54:03 | 6      Q  So the answer to my question is yes, you don't |
| 08:54:06 | 7  recall whether you received it in 2001 or — or within the |
| 08:54:08 | 8  last month? |
| 08:54:09 | 9          MR. DOWDEN: Objection |
| 08:54:09 | 10          MR. BEAN: Objection |
| 08:54:11 | 11      A  The answer to the question is I don't recall when |
| 08:54:13 | 12  I received it |
| 08:54:15 | 13      Q  The question was: Do you have any time frame. |
| 08:54:18 | 14  general time frame? You didn't get it in the last |
| 08:54:20 | 15  month, right? |
| 08:54:22 | 16      A  That's correct |
| 08:54:22 | 17      Q  Okay  You know you didn't get it in the last |
| 08:54:24 | 18  year? |
| 08:54:25 | 19      A  That's correct |
| 08:54:27 | 20          (Exhibit 438 spreadsheet, marked ) |
| 08:54:27 | 21      Q  Okay  I'll show you what's been marked Exhibit |
| 08:54:34 | 22  438  This is a — spreadsheet that I've prepared |
| 08:54:40 | 23  summarizing  I think, the information on the grant detail |
| 08:54:54 | 24  report that starts on the second page of Exhibit 436 |

| | Page 32 |
|---|---|
| 08:54:58 | 1      A  Sorry  Who prepared?  I m sorry. I didn't hear |
| 08:55:01 | 2  you |
| 08:55:01 | 3      Q  I prepared it |
| 08:55:02 | 4      A  You prepared it |
| 08:55:03 | 5          MR. DOWDEN: Could we similarly  as |
| 08:55:05 | 6  we've done in previous depositions, mark |
| 08:55:07 | 7  this as confidential? |
| 08:55:08 | 8          MR KALER: Sure  Sure |
| 08:55:08 | 9          MR DOWDEN: Pursuant to the |
| 08:55:09 | 10  protective order in the case |
| 08:55:10 | 11          MR KALER: Yes  No problem |
| 08:55:12 | 12  BY MR. KALER: |
| 08:55:14 | 13      Q  Do you see where there is a simple spreadsheet |
| 08:55:16 | 14  that has taken the exercise dates that are shown on the |
| 08:55:21 | 15  stock option report that begins on the second page of 436 |
| 08:55:27 | 16  and has calculated out the amount of the net profit on each |
| 08:55:33 | 17  of your stock option exercises on the dates that the report |
| 08:55:40 | 18  shows the options were exercised? |
| 08:56:38 | 19      A  Yes  I understand how it was — |
| 08:56:38 | 20      Q  Okay |
| 08:56:39 | 21      A  — put together |
| 08:56:40 | 22      Q  Okay  And it is correct that during your tenure |
| 08:56:47 | 23  at Lycos you exercised options that you had been granted to |
| 08:56:54 | 24  purchase Lycos stock over a period of time extending from |

| | Page 33 |
|---|---|
| 08:56:58 | 1  1997 through the end of October of — of 2000? |
| 08:57:04 | 2          MR. DOWDEN: Objection |
| 08:57:05 | 3      Q  Is that correct? |
| 08:57:07 | 4      A  I did receive stock options  I don't recall the |
| 08:57:10 | 5  dates of exercise  no |
| 08:57:12 | 6      Q  Okay  But the dates of exercise are recorded. are |
| 08:57:14 | 7  they not. in the grant detail report that Exhibit 438 is |
| 08:57:18 | 8  based on  which starts at the second page of Exhibit 436? |
| 08:57:22 | 9      A  There are exercise dates on this report  yes |
| 08:57:25 | 10      Q  Okay  And you recognize the report as a document |
| 08:57:35 | 11  that Lycos prepared for a number of you who had received |
| 08:57:35 | 12  stock options to record — |
| 08:57:37 | 13          MR. DOWDEN: Which report are we |
| 08:57:40 | 14  talking about? |
| 08:57:40 | 15          MR. KALER: The — Exhibit 436. the |
| 08:57:42 | 16  second page. and continuing to the end |
| 08:57:47 | 17  of the document |
| 08:57:47 | 18      Q  You do recognize that grant detail report on GUIL |
| 08:57:55 | 19  003050 sequentially through 003055  You recognize that as |
| 08:58:03 | 20  a record generated by Lycos for you and a number of other |
| 08:58:08 | 21  people who had stock options to record information |
| 08:58:12 | 22  concerning your and their exercises of those options |
| 08:58:17 | 23  correct? |
| 08:58:18 | 24      A  I do recognize this report as one I had received. |

9  (Pages 30 to 33)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

| Page 170 | Page 172 |
|---|---|

**Page 170**

13:42:05  1  Q  But you just didn't -- had never had to account

13:42:07  2  for them?

13:42:07  3  A  I don't recall ever having, no

13:42:09  4  Q  Let me show you what's been previously marked as

13:42:11  5  Exhibit 297

13:42:25  6     (Discussion off the record.)

13:42:26  7  Q  297, I show you  I'm showing you what's been

13:42:36  8  marked Exhibit 297, and for the record, this is the Exhibit

13:42:46  9  297 which is an e-mail marked from John McMahon to Lycos

13:42:54  10  network employees dated May 8th of 2001  And I ask is this

13:43:13  11  a copy of an e-mail that you received a copy of during the

13:43:16  12  time that you were at Lycos?

13:43:25  13  A  I don't recall this e-mail

13:43:27  14  Q  But you do recall that in the spring of 2001, the

13:43:32  15  last -- your last year with the company, there were a

13:43:39  16  series of significant layoffs of Lycos employees that

13:43:43  17  occurred, correct?

13:43:45  18     MR BEAN: Objection

13:43:48  19  Q  You can answer, sir

13:43:49  20  A  I do recall that there were layoffs at some period

13:43:53  21  of time, yes

13:43:56  22  Q  And you also recall that there was an effort made

13:44:04  23  by Lycos beginning in early 2001 to reduce its expenses

13:44:13  24  because revenues were down?

**Page 171**

13:44:15  1     MR. DOWDEN: Objection.

13:44:16  2  Q  Okay

13:44:18  3     MR BEAN: Objection

13:44:18  4  Q  You can answer

13:44:20  5  A  I don't recall that, no

13:44:26  6  Q  After the closing of the Terra acquisition at the

13:44:30  7  end of October of 2000, we know that within a couple of

13:44:36  8  months Bob Davis resigned and Ted Philip shifted over to be

13:44:41  9  director of strategic acquisitions and so on  What did you

13:44:46  10  shift over into?

13:44:47  11  A  My title when I left TerraLycos was senior vice

13:44:51  12  president of strategic planning and M&A

13:44:56  13  Q  Had you assumed that title shortly after the

13:45:00  14  acquisition in October of 2000?  I mean a few months after

13:45:06  15  A  I don't recall when I took that position

13:45:07  16  officially

13:45:08  17  Q  When did you -- when did you cease performing

13:45:11  18  responsibilities as vice president of administration and

13:45:15  19  finance?

13:45:18  20  A  It was phased out shortly after the closing of the

13:45:21  21  transaction, and I don't recall

13:45:22  22  Q  Phased out shortly after the closing of the

13:45:26  23  transaction in October of 2000?

13:45:27  24  A  I don't recall the exact date of the closing

**Page 172**

13:45:29  1  A  It was October 31 of 2000  But, in any event,

13:45:34  2  shortly after that?

13:45:35  3  A  It was phased -- my responsibilities were phased

13:45:37  4  out, yes

13:45:38  5  Q  Okay  What was your understanding of why that

13:45:40  6  occurred?

13:45:42  7  A  I'm sorry, what was the question?  Why what was?

13:45:45  8  Q  What was your understanding of why that occurred,

13:45:46  9  that your responsibilities were phased out?

13:45:50  10  A  Because I was transitioning to a new role

13:45:53  11  Q  Yes  But why?

13:45:54  12  A  Because I chose not to remain in the role I was

13:45:57  13  in

13:46:00  14  Q  Did you continue to come to work at the company

13:46:02  15  five days a week after you shifted to the new role?

13:46:07  16  A  For the most part  After a while I did not, as

13:46:11  17  time went on

13:46:12  18  Q  Who took over your position as vice president of

13:46:16  19  finance and administration?

13:46:21  20     MR BEAN: Objection

13:46:22  21  Q  You can answer, sir  If anybody did

13:46:25  22  A  I don't recall that anyone did

13:46:37  23  Q  And you don't have any -- any recollection

13:46:40  24  whatsoever of expense-reduction initiatives being

**Page 173**

13:46:43  1  implemented after the beginning of 2001?

13:46:52  2  A  I recall the layoffs

13:46:53  3  Q  Okay  I suppose those were in a sense expense-

13:46:59  4  reduction measures, right?

13:47:00  5  A  Yes

13:47:01  6  Q  Okay  Do you recall any other expense-reduction

13:47:05  7  measures being implemented?

13:47:09  8  A  I do not, no

13:47:15  9  Q  Let me show you what's been previously marked as

13:47:17  10  Exhibit 56 -- excuse me -- 55  I'm sorry  This is

13:47:21  11  equipment schedule 93

13:47:27  12     MR KALER: I don't really have

13:47:28  13     copies of this, but you can look on with

13:47:30  14     him

13:47:30  15  Q  I just ask if you've seen this before  I may as

13:47:37  16  well show you Exhibit 56 at the same time  That's

13:47:42  17  equipment schedule 94  (Pause )  Do you recognize either

13:48:19  18  of those documents?

13:48:21  19  A  I don't recall these documents, no

13:48:31  20  Q  Do you recall having any discussions or

13:48:33  21  conversations at any time with anybody about equipment

13:48:35  22  schedules 93 or 94 during the time that you were at Lycos?

13:48:40  23     MR DOWDEN: Are Exhibits 55 and

13:48:43  24     56 --

44  (Pages 170 to 173)

Thomas  Edward  Guilfoile  12/7/2006
Computer  Sales  International,  Inc.  v.  Lycos,  Inc.

## Page 174

```
13:48:43   1        MR. KALER: I'm sorry  I meant
13:48:45   2     Exhibits 55 and 56
13:48:47   3     A  I do not recall that. no
13:48:50   4     Q  I'll take those back  By the time these documents
13:49:00   5   were executed October of 2001. had you shifted over to
13:49:05   6   your — out of the position of vice president of finance
13:49:08   7   and administration?
13:49:11   8     A  Again  I don't recall the exact dates  It was
13:49:14   9   you know kind of a phased-out period of time
13:49:17  10     Q  Well  we know that your separation letter dated
13:49:22  11   September of '01 had an effective date of November and I
13:49:25  12   think you said it eventually became December
13:49:29  13     A  Uh-huh.
13:49:29  14     Q  By the time you received Exhibit 437 in September
13:49:32  15   of '01  had you by that time shifted out of the position of
13:49:38  16   vice president of finance and administration?
13:49:41  17     A  Yes I had
13:49:43  18     Q  I show you what's been marked previously as
13:49:45  19   Exhibit 122  It's been identified as a report. or lease
13:49:50  20   assessment and inventory analysis report delivered to Lycos
13:49:54  21   by Avnet Computer Marketing in December of 2000  (Pause )
13:50:41  22   Have you ever seen that before?
13:50:43  23     A  I don't recall that I have  no
13:50:47  24     Q  Do you recall at any time during your tenure at
```

## Page 175

```
13:50:49   1   Lycos being informed that Lycos was having some outside
13:50:54   2   consultants look at its equipment lease portfolio?
13:50:59   3     A  I do not recall that. no
13:51:00   4     Q  Did Sam Ziba report to you directly during any
13:51:05   5   time at Lycos?
13:51:08   6     A  I don't believe he did. no.
13:51:09   7     Q  How about Ron Rainville?
13:51:14   8     A  No. he did not
13:51:15   9     Q  Tim Wright?
13:51:17  10     A  He did not.
13:51:26  11        MR. KALER: I have no further
13:51:27  12     questions at this time
13:51:29  13        MR. BEAN: I will have cross  I'd
13:51:31  14     like to take a 15-minute break. I need to
13:51:34  15     review portions of the transcript with the
13:51:36  16     court reporter
13:51:37  17        (Discussion off the record )
13:51:37  18        THE VIDEOGRAPHER: Time is 1:50
13:51:39  19     We're now off record
14:19:41  20        (Recess )
14:19:43  21        THE VIDEOGRAPHER: The time is 2:19
14:20:27  22     We are now back on record
14:20:29  23   BY MR BEAN:
14:20:29  24     Q  Good afternoon. Mr Guilfoile  My name is Thomas
```

## Page 176

```
14:20:32   1   Bean. I represent Lycos. in this litigation.
14:20:35   2        Did you personally ever calculate the net present
14:20:38   3   value of the stream of lease payments on any CSI equipment
14:20:42   4   schedule?
14:20:43   5        MR. KALER: Objection
14:20:46   6     A  I don't recall having done that. no
14:20:47   7     Q  Did you ever instruct your staff. anyone working
14:20:51   8   for you. to calculate the net present value of the stream
14:20:54   9   of lease payments on any equipment schedule between CSI and
14:20:59  10   Lycos?
14:20:59  11        MR. KALER: Objection
14:21:01  12     A  I don't recall specifically. no
14:21:03  13     Q  Did you ever instruct anyone at Lycos as to what
14:21:06  14   discount rate to use in calculating the net present value
14:21:10  15   of any equipment schedule between Lycos and CSI?
14:21:15  16        MR. KALER: Objection
14:21:18  17        MR. DOWDEN: You can answer to the
14:21:20  18     extent you remember
14:21:22  19     A  I don't recall  no
14:21:22  20     Q  Okay  Did you ever see any documents while you
14:21:28  21   were employed at Lycos reflecting a calculation by anyone
14:21:32  22   of the net present value of the stream of payments on any
14:21:37  23   equipment lease between CSI and Lycos?
14:21:39  24        MR. KALER: Objection.
```

## Page 177

```
14:21:41   1     A  I do not recall  no
14:21:44   2     Q  You don't recall whether you ever saw such a
14:21:45   3   document?
14:21:46   4     A  Yes
14:21:46   5        MR. KALER: Objection
14:21:48   6     Q  Do you have personal knowledge of whether Lycos
14:21:51   7   ever calculated the net present value of the stream of
14:21:55   8   payments on any equipment schedule between CSI and Lycos?
14:21:59   9        MR. KALER: Objection
14:22:00  10        MR. DOWDEN: Objection to the extent
14:22:03  11     you have a recollection  specific
14:22:04  12     recollection
14:22:04  13     A  I don't have a specific recollection. no
14:22:09  14     Q  Okay  Have you forgotten anything that — sort of
14:22:13  15   an awkward question — have you forgotten anything since
14:22:17  16   you've testified this morning?
14:22:18  17        MR. KALER: Objection
14:22:19  18        MR. DOWDEN: Objection
14:22:19  19     Q  Let me try to rephrase it
14:22:21  20        Do you recall your testimony from this morning
14:22:23  21   concerning whether Lycos ever calculated the net present
14:22:27  22   value of the stream of lease payments between CSI and
14:22:30  23   Lycos? Do you recall that testimony?
14:22:32  24        MR. KALER: Objection
```

45  (Pages 174 to 177)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

| | | Page 186 |
|---|---|---|
| 14:32:08 | 1 | Q All right. Going back to page 2, and I'm going to |
| 14:32:11 | 2 | ask you a question with reference to the question beginning |
| 14:32:14 | 3 | at line 10, did Lycos -- do you recall whether Lycos made a |
| 14:32:19 | 4 | determination with respect to the CSI leases as to whether |
| 14:32:23 | 5 | they should be treated -- let me rephrase that. |
| 14:32:28 | 6 | Do you -- |
| 14:32:29 | 7 | MR. KALER: Excuse me for just a |
| 14:32:31 | 8 | second. (Pause.) I'm sorry. 1 om, go |
| 14:32:36 | 9 | ahead. |
| 14:32:36 | 10 | Q Do you recall whether Lycos made a determination |
| 14:32:40 | 11 | with respect to any of the CSI leases as to whether the net |
| 14:32:43 | 12 | present value of the stream of lease payments exceeded 90 |
| 14:32:49 | 13 | percent of the value of the equipment? |
| 14:32:51 | 14 | MR. KALER: Objection |
| 14:32:54 | 15 | A I don't recall the specific calculations, no |
| 14:32:57 | 16 | Q Do you recall whether the calculations were even |
| 14:32:59 | 17 | performed? |
| 14:32:59 | 18 | MR. KALER: Objection |
| 14:33:03 | 19 | A I don't recall specifically, no |
| 14:33:05 | 20 | Q So you don't -- do you know whether the |
| 14:33:07 | 21 | calculations were performed of your personal knowledge? |
| 14:33:09 | 22 | MR. KALER: Objection |
| 14:33:11 | 23 | A I do not recall, no |
| 14:33:13 | 24 | Q Okay. Going to page 3, beginning with line 6, did |

| | | Page 187 |
|---|---|---|
| 14:33:47 | 1 | you -- do you recall whether you ever arranged for people |
| 14:33:52 | 2 | within Lycos to calculate the net present value of the |
| 14:33:57 | 3 | stream of lease payments under Lycos' equipment schedules |
| 14:34:01 | 4 | with CSI? |
| 14:34:02 | 5 | MR. KALER: Objection |
| 14:34:08 | 6 | A I can't recall specifically, no |
| 14:34:11 | 7 | Q Okay. Now, do you recall whether Lycos ever |
| 14:34:20 | 8 | determined the total of the future lease payments that it |
| 14:34:24 | 9 | was going to have to make under any equipment schedule with |
| 14:34:27 | 10 | CSI? |
| 14:34:28 | 11 | MR. KALER: Objection |
| 14:34:31 | 12 | A Again, I don't recall specific calculations, no |
| 14:34:34 | 13 | Q Okay. Do you recall whether any calculations were |
| 14:34:37 | 14 | ever performed? |
| 14:34:37 | 15 | MR. KALER: Objection |
| 14:34:40 | 16 | MR. DOWDEN: To the best of your |
| 14:34:41 | 17 | knowledge |
| 14:34:42 | 18 | A To the best of my knowledge, I do not recall that. |
| 14:34:44 | 19 | no |
| 14:34:50 | 20 | Q Now, you see on line 20 through 24 that Mr. Kaler |
| 14:34:59 | 21 | had asked you whether Lycos determined the total future |
| 14:35:02 | 22 | lease payments were that it was going to have to make under |
| 14:35:05 | 23 | a lease each time it entered into a lease with CSI, and you |
| 14:35:09 | 24 | had answered, "Correct." Your testimony just was that you |

| | | Page 188 |
|---|---|---|
| 14:35:12 | 1 | didn't recall Can you explain the change, if it is a |
| 14:35:18 | 2 | change, from your testimony from this morning? |
| 14:35:20 | 3 | MR. KALER: Objection And for the |
| 14:35:20 | 4 | record, I object to Lycos' attorney |
| 14:35:26 | 5 | leading The witness is identified with |
| 14:35:27 | 6 | him to give testimony contrary to his |
| 14:35:29 | 7 | previous testimony |
| 14:35:30 | 8 | MR. BEAN: There's no leading |
| 14:35:32 | 9 | MR. KALER: The leading is, I think, |
| 14:35:33 | 10 | obvious, but proceed |
| 14:35:34 | 11 | MR. DOWDEN: I object to that |
| 14:35:35 | 12 | MR. KALER: Subject to my objection |
| 14:35:37 | 13 | MR. BEAN: All right Let's try it |
| 14:35:38 | 14 | again |
| 14:35:38 | 15 | MR. KALER: I think this whole |
| 14:35:39 | 16 | procedure is highly improper |
| 14:35:41 | 17 | MR. BEAN: Mr. Kaler, please Don't |
| 14:35:43 | 18 | interrupt |
| 14:35:43 | 19 | MR. KALER: I'm doing the best I can |
| 14:35:46 | 20 | not to |
| 14:35:46 | 21 | MR. BEAN: Well, please don't |
| 14:35:46 | 22 | MR. KALER: But I do -- |
| 14:35:47 | 23 | MR. BEAN: You asked me not to Be |
| 14:35:48 | 24 | respectful and try to treat others as you |

| | | Page 189 |
|---|---|---|
| 14:35:51 | 1 | would have people treat you |
| 14:35:52 | 2 | MR. KALER: I appreciate that but |
| 14:35:53 | 3 | I've never done this And I do object |
| 14:35:56 | 4 | MR. DOWDEN: I object to the |
| 14:35:59 | 5 | characterization of the witness as a Lycos |
| 14:35:59 | 6 | witness This is an individual witness |
| 14:36:00 | 7 | MR. KALER: No I just meant |
| 14:36:02 | 8 | identified with Lycos A former employee |
| 14:36:04 | 9 | MR. BEAN: All right You're taking |
| 14:36:06 | 10 | up my time again all right? I am going to |
| 14:36:07 | 11 | charge this time to you if you continue. |
| 14:36:08 | 12 | Mr. Kaler |
| 14:36:09 | 13 | MR. KALER: Fine |
| 14:36:10 | 14 | MR. BEAN: All right |
| 14:36:12 | 15 | BY MR. BEAN: |
| 14:36:12 | 16 | Q In your understanding, is your -- is the testimony |
| 14:36:15 | 17 | you've given over the last few minutes consistent with your |
| 14:36:17 | 18 | testimony of this morning? |
| 14:36:18 | 19 | MR. KALER: Objection |
| 14:36:20 | 20 | A I believe it is, yes. |
| 14:36:22 | 21 | Q In what respect? |
| 14:36:24 | 22 | MR. KALER: Objection |
| 14:36:30 | 23 | A What -- what I was trying to articulate is in |
| 14:36:33 | 24 | order to account for leases -- |

48 (Pages 186 to 189)

Thomas Edward Guilfoile 12/7/2006
Computer Sales International, Inc. v. Lycos, Inc.

## Page 190

| 14:36:35 | 1 | Q  I'm sorry, articulate when?  This morning? |
| 14:36:37 | 2 | MR KALER:  Objection |
| 14:36:38 | 3 | A  Yes, this morning |
| 14:36:38 | 4 | Q  Okay |
| 14:36:39 | 5 | MR KALER:  Again, I object to the |
| 14:36:40 | 6 | witness being asked -- |
| 14:36:42 | 7 | MR BEAN:  Just say the word |
| 14:36:44 | 8 | "objection," Mr Kaler |
| 14:36:44 | 9 | MR KALER:  No, I can -- |
| 14:36:45 | 10 | MR BEAN:  The golden rule would be |
| 14:36:46 | 11 | something very good for you to understand |
| 14:36:48 | 12 | MR KALER:  I -- I can state |
| 14:36:49 | 13 | concisely the basis for my objection |
| 14:36:50 | 14 | MR BEAN:  I'm not asking for -- I |
| 14:36:50 | 15 | didn't ask for the basis for your |
| 14:36:52 | 16 | objection  In fact, I specifically request |
| 14:36:54 | 17 | that you not give the basis |
| 14:36:55 | 18 | MR KALER:  I do not think the |
| 14:36:57 | 19 | witness can be asked an opinion as to |
| 14:36:59 | 20 | whether one portion of his testimony is |
| 14:37:01 | 21 | consistent -- |
| 14:37:02 | 22 | MR BEAN:  Mr Kaler, please stop |
| 14:37:03 | 23 | talking |
| 14:37:03 | 24 | MR KALER:  -- is consistent -- |

## Page 191

| 14:37:03 | 1 | MR BEAN:  Please stop talking |
| 14:37:05 | 2 | MR KALER:  You're just making it |
| 14:37:06 | 3 | longer |
| 14:37:07 | 4 | MR BEAN:  All you're doing is |
| 14:37:08 | 5 | creating a better record for the special |
| 14:37:10 | 6 | master |
| 14:37:10 | 7 | MR KALER:  This is important  I'm |
| 14:37:13 | 8 | just objecting -- |
| 14:37:13 | 9 | MR BEAN:  Just say the word |
| 14:37:14 | 10 | "objection " |
| 14:37:14 | 11 | MR KALER:  -- on the ground that the |
| 14:37:14 | 12 | witness can't give an opinion -- |
| 14:37:14 | 13 | MR BEAN:  That's fine |
| 14:37:14 | 14 | MR DOWDEN:  Can we go back to the |
| 14:37:15 | 15 | question, please |
| 14:37:16 | 16 | MR BEAN:  Sure |
| 14:37:17 | 17 | MR KALER:  Let me finish my |
| 14:37:18 | 18 | sentence? |
| 14:37:18 | 19 | MR BEAN:  No, I don't want you to |
| 14:37:20 | 20 | finish your sentence  I want you to be |
| 14:37:22 | 21 | quiet and be respectful, please |
| 14:37:24 | 22 | MR KALER:  I just want to state the |
| 14:37:25 | 23 | objection that the witness can't be asked |
| 14:37:26 | 24 | to give an opinion as to one part -- |

## Page 192

| 14:37:28 | 1 | whether one part of his testimony is |
| 14:37:29 | 2 | consistent with another part. |
| 14:37:30 | 3 | MR. BEAN:  Thank you |
| 14:37:32 | 4 | BY MR. BEAN: |
| 14:37:34 | 5 | Q  Would you finish your response please sir? |
| 14:37:37 | 6 | A  Sure |
| 14:37:37 | 7 | MR KALER:  Objection |
| 14:37:39 | 8 | A  I -- my point was that accounting for leases, each |
| 14:37:46 | 9 | lease that's accounted for. a determination is made whether |
| 14:37:52 | 10 | or not it's an operating lease or an -- or a capital lease |
| 14:37:55 | 11 | in order to record it on the books of the company  And |
| 14:37:58 | 12 | there are certain tests that are done to determine whether |
| 14:38:02 | 13 | they -- they meet the capital lease criteria or the |
| 14:38:05 | 14 | operating lease criteria. I don't have specific knowledge |
| 14:38:07 | 15 | of those calculations being done in every instance or -- |
| 14:38:12 | 16 | nor do I recall the calculations done at all because I did |
| 14:38:15 | 17 | not perform them myself  However. given my -- my |
| 14:38:19 | 18 | background at Ernst and my experience at Lycos. I |
| 14:38:24 | 19 | understand that that, in order to determine the proper |
| 14:38:27 | 20 | accounting for those. those are how those leases are |
| 14:38:34 | 21 | accounted for |
| 14:38:36 | 22 | So do I remember specifically the calculations |
| 14:38:40 | 23 | done at Lycos?  No  Is that how -- are those the tests |
| 14:38:46 | 24 | that are done to determine how those leases are to be |

## Page 193

| 14:38:49 | 1 | accounted for?  Yes |
| 14:38:51 | 2 | Q  If Lycos determined that the net present value of |
| 14:38:55 | 3 | the stream of payments under an equipment schedule with CSI |
| 14:38:59 | 4 | exceeded 90 percent of the value of the equipment. would |
| 14:39:03 | 5 | Lycos have treated the equipment schedule as an operating |
| 14:39:07 | 6 | lease? |
| 14:39:08 | 7 | MR KALER:  Objection |
| 14:39:11 | 8 | A  Yes  If it met the criteria. it would be treated |
| 14:39:10 | 9 | as a capital lease |
| 14:39:18 | 10 | Q  Okay  But if it met the criteria. If the net |
| 14:39:21 | 11 | present value of a stream of payments exceeds 90 percent |
| 14:39:26 | 12 | of the value of the equipment  would it be proper to treat |
| 14:39:29 | 13 | that equipment schedule as an operating lease? |
| 14:39:31 | 14 | MR KALER:  Objection |
| 14:39:33 | 15 | Q  Does that meet the criteria? |
| 14:39:34 | 16 | MR DOWDEN:  Objection |
| 14:39:35 | 17 | MR KALER:  Objection |
| 14:39:37 | 18 | A  No. it does not |
| 14:39:38 | 19 | Q  So if Lycos treated an equipment schedule as an |
| 14:39:43 | 20 | operating lease, would it be fair to say, then  that |
| 14:39:48 | 21 | either, A. it determined that the criteria were met or. B. |
| 14:39:52 | 22 | that it made no such determination? |
| 14:39:52 | 23 | MR KALER:  Objection |
| 14:39:55 | 24 | MR DOWDEN:  Objection |

49  (Pages 190 to 193)

# EXHIBIT 10

Exhibits: 1 - 15                Volume 1, Pages 1 - 279

Exhibits:  1 - 15

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 05-10017-RWZ

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPUTER SALES INTERNATIONAL, INC.,

Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF E. WILLIAM GILLULA

Thursday, January 25, 2007, 9:07 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

- - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

E. William Gillula
Volume 1 - January 25, 2007

70

1    Q. 1997, 1998, 1999, 2000, 2001.
2    A. Up through 2007, that's correct.
3    Q. And you're aware that on a number of
4    occasions, those equipment schedules were terminated
5    early, right?
6         MR. KALER: Objection.
7    A. Yes.
8    Q. And you're aware that new equipment
9    schedules were signed, right?
10   A. I assume so.
11   Q. Well, you signed them.
12   A. Okay.
13   Q. Okay. Now, what term do you use to
14   describe a situation where an equipment schedule was
15   terminated early and then the equipment is put on a
16   new, longer-term schedule?
17        MR. KALER: Objection.
18   A. "Early termination/extension."
19   Q. "Early termination/extension"; okay. So
20   you don't use the term "roll-up" or "rewrite" or
21   "refinance"?
22        MR. KALER: Objection
23   A. No.
24   Q. Now, you're aware that CSI instituted a

71

1    bonus commission program for rewriting schedules
2    with personal computers effective July 1, 1999, are
3    you not?
4         MR. KALER: Objection.
5    A. I don't recall that.
6    Q. You don't recall that. And you don't
7    recall that Lycos and CSI refinanced virtually all
8    of the equipment -- excuse me; you don't recall that
9    there were early terminations and extensions of
10   virtually all of the Lycos schedules soon after CSI
11   instituted that PC rewrite program?
12        MR. KALER: Objection.
13   A. I don't recall the dates of those.
14   Q. But you recall that there were PC rewrite
15   programs?
16        MR. KALER: Objection.
17   A. PC rewrite?
18   Q. Yes.
19   A. As I said, I don't recall such a program.
20   Q. You don't recall a program whereby
21   salespeople earned a bonus commission if they did an
22   early termination/extension of an equipment schedule
23   with personal computers on it?
24   A. No.

72

1         MR. BEAN: May I have Exhibit 3?
2         MR. KALER: I'm sorry; are we marking
3    these as 1, 2, 3?
4         MR. BEAN: Not if they've been used
5    before. Not if they've been previously marked.
6         MR. KALER: Did you want to mark that as
7    3?
8         MR. BEAN: It's already marked. I'll
9    take care of it.
10   Q. CSI is a member of the Equipment Leasing
11   Association; is that right?
12   A. I believe so.
13   Q. And it has been since the 1980s, correct?
14   A. I believe so.
15   Q. Well, it's a member --
16   A. I don't know exactly how long we've been a
17   member.
18   Q. But it's been a member of the ELA for at
19   least ten years, right?
20   A. I believe so.
21   Q. And it's part of CSI's employee manual to
22   comply with the ethics of the Equipment Leasing
23   Association, is it not?
24        MR. KALER: Objection.

73

1    A. I'm not familiar with that section.
2    Q. Have you read the employee manual at CSI?
3    A. Not entirely.
4    Q. Have you read parts of it?
5    A. I don't recall.
6    Q. You are the chief operating officer of the
7    company, right?
8    A. Yes.
9         MR. KALER: Objection That's already
10   asked and answered.
11   Q. You are the president of the company,
12   right?
13        MR. KALER: Objection, asked and
14   answered.
15   A. Yes.
16   Q. Directing your attention to Page A-7 of
17   what was previously marked as Guilander Exhibit 3,
18   would you read the first paragraph aloud under CSI
19   Code of Ethics?
20        MR. KALER: Objection
21   A. "Our business incorporates a high degree of
22   financial services. CSI believes that our integrity
23   and ethics must be above reproach. CSI conducts its
24   business in accordance with the code of ethics of

E. William Gillula
Volume 1 - January 25, 2007

74

1  ELA, Equipment Leasing Association, and ASCDI,
2  Association of Service and Computer Dealers
3  International."
4      Q. By the reference to the code of ethics of
5  the ELA, CSI is referring to the ELA's fair business
6  practices, is it not?
7          MR. KALER: Objection.
8      A. I'm not familiar with it.
9      Q. You're not familiar with what?
10     A. With what the code -- what the ELA code of
11 ethics contains.
12     Q. Oh, you're not familiar with that?
13     A. No.
14         MR. KALER: Objection.
15     A. Not in detail.
16     Q. Do you have a general familiarity with the
17 ELA code of ethics?
18     A. General, yes.
19     Q. What do you understand it to provide?
20     A. To be honest with you, I have not read it,
21 so I don't know. I would think it's -- generally
22 talks about ethics, if it's a code of ethics.
23     Q. But you've never read it?
24     A. I don't believe so.

75

1      Q. Have you had the opportunity, have you
2  ever -- you're aware that CSI has a website, right?
3      A. Yes.
4      Q. And you're reviewed that website from time
5  to time?
6      A. No.
7      Q. Never reviewed it?
8      A. No.
9      Q. What's the purpose of having a website?
10         MR. KALER: Objection.
11     A. I assume there are various purposes.
12     Q. What's CSI's purpose?
13     A. I'm not -- it's not my area of expertise.
14     Q. Well, as the COO and president, you want
15 the website to accurately describe CSI, do you not?
16         MR. KALER: Objection.
17     A. I would -- yes.
18     Q. And you want it to fairly portray CSI's
19 business to the public, do you not?
20         MR. KALER: Objection.
21     A. Yes.
22     Q. And you wouldn't want any information on
23 the website that was inaccurate to the public?
24         MR. KALER: Objection.

76

1      A. No.
2      Q. And you wouldn't want any information to be
3  on the website that was misleading to the public,
4  right?
5          MR. KALER: Objection.
6      A. Right.
7      Q. And as the president, you're ultimately
8  responsible for the information that's on CSI's
9  website, are you not?
10         MR. KALER: Objection.
11     A. I'm not sure what you mean by
12 "responsible."
13     Q. Well, the people who prepare the website
14 material ultimately report to you, do they not?
15     A. Ultimately, that may be the case; either
16 may or can.
17     Q. But you've never reviewed the website to
18 determine whether the information on it fairly and
19 accurately presents CSI's business to the public?
20         MR. KALER: Objection.
21     A. No.
22     Q. Well, you are aware that if there's false
23 information on the website, that that could subject
24 CSI to investigation by the Federal Trade

77

1  Commission, are you not?
2          MR. KALER: Objection.
3      A. No.
4      Q. You're not aware of that?
5      A. No.
6          MR. KALER: Objection.
7          (Marked, Exhibit 1 )
8      Q. What's been marked as Gillula Exhibit 1 are
9  pages from CSI's website in 1999 that we have
10 obtained from an archive website. I'm going to show
11 it to you.
12     Now, direct your attention to the third
13 paragraph. If you could read the first two lines
14 aloud.
15     A. "Leasing is a great solution for companies
16 that need or want a high degree of flexibility in
17 their information technology planning. It allows
18 them to readily take advantage of new technology as
19 they need it and frees them from many of their
20 administrative burdens of equipment ownership."
21     Q. Now, how does leasing increase a customer's
22 or company's flexibility in their information
23 technology planning?
24         MR. KALER: Objection, but you can

# EXHIBIT 11

# O'BRIEN&LEVINE

### Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## Computer Sales International v. Lycos, Inc.

Transcript of the Testimony of:

# Thomas Hoye

# February 22, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Cindy Berglund   22921

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3

4      --------------------------------x

5    COMPUTER SALES INTERNATIONAL,

6              Plaintiff

7    vs.                                      Civil Action

8    LYCOS, INC.,                            No. 05-10017-RWZ

9              Defendant.

10     --------------------------------x

11

12                      - - -

13       Videotaped deposition of THOMAS HOYE, taken before

14   CINDY BERGLUND, CSR, Registered Professional Reporter and

15   Notary Public pursuant to the applicable provisions of the

16   Massachusetts Rules of Civil Procedure, at the offices of

17   MCCARTER & ENGLISH, 265 Franklin Street, Boston,

18   Massachusetts 02110, on the 22nd day of February, 2007,

19   commencing at 9:17 A.M.

20

21

22

23

24

                                                         1

Thomas Hoye 2-22-2007
Computer Sales International v Lycos, Inc

110

1  Mr. Fineberg informing Jeffrey Rousseau of the lawsuit in
2  January of 2004. So you've been designated to testify on
3  behalf of Lycos on that subject, is that right?
4  A  Yes
5  Q  And the Mr. Fineberg, you understand, is a
6  reference to Andrew Fineberg who was the general counsel
7  of Lycos in December of 2003 and January of 2004, is that
8  right?
9      ATTY ACTON: Objection
10     THE WITNESS: Yes
11  Q  (By Atty. Kaler) Okay. So I will ask you the
12  question: What evidence, if any, Does Lycos have that
13  CSI knew about the lawsuit in Exhibit 278 filed against
14  it by Lycos in December of 2003 prior to Mr. Fineberg
15  informing Jeffrey Rousseau of CSI about the lawsuit in
16  January of 2004?
17  A  Lycos currently has no such evidence
18  Q  Lycos has no --
19  A  Lycos has no evidence that CSI knew about the
20  lawsuit filed against it by Lycos in December of 2003
21  Q  Okay So Lycos has no evidence that CSI knew
22  about the lawsuit filed against it by Lycos in December
23  of 2003 in Exhibit 278, prior to Mr. Fineberg informing
24  Mr. Rousseau about the lawsuit in January of 2004, is

111

1  that right?
2  A  Yes
3  Q  The next subject matter that you've been asked
4  to -- I'll take that back -- been designated by Lycos to
5  testify about is --
6      ATTY KALER: Could I have Exhibit 627
7  Q  (By Atty. Kaler) The next subject matter that
8  you've been designated by Lycos to testify about is,
9  quote, The source and authenticity of the tax department
10  memorandum produced by Lycos on February 7, 2007 with
11  Bates numbers LYC 07104 and LYC 067105. How it was
12  prepared and preserved by Lycos, all information known to
13  the author of the memorandum about what is stated in the
14  memorandum, the date or dates when the memorandum was
15  prepared and all information available about, quote,
16  Lycos' policy not to buy any equipment that can be
17  leased, unquote, which is referenced in the memorandum
18  including, but not limited, to when, for how long and why
19  the policy was in effect at Lycos and who or what group
20  established it, unquote; is that correct?
21      In other words, you've been designated to testify
22  on that subject by Lycos?
23  A  Yes  That's correct
24  Q  And you understand that the tax department

112

1  memorandum that we are referring to is what we have
2  marked as Exhibit 627 in this case with these Bates
3  numbers LYC 07104 through -- LYC 067104 and 105?
4  A  Yes
5  Q  And in Exhibit No. 661, the first bullet point
6  that you referenced under No. 11 was that Lycos
7  acknowledges -- Lycos knows that this memorandum, Exhibit
8  627, was prepared by Ernesto Galvan and it was preserved
9  both in hard copy form in relevant tax binders and in
10  electronic form on Lycos' shared network, unquote. Is
11  that correct?
12  A  Yes
13  Q  Okay  And so Exhibit 627 was maintained and kept
14  by Lycos in the ordinary course of its business both in
15  hard copy form and in electronic form on its network,
16  correct?
17  A  Yes
18  Q  And a hard copy of the memorandum was kept in what
19  you refer to here as the relevant tax binders.
20     Were the relevant tax binders the binders for
21  Lycos' Waltham personal property tax return, and,
22  perhaps, other tax returns for that year?
23  A  I don't know
24  Q  Okay  The next bullet point under Item 11 in

113

1  Plaintiff 661 is one where -- why don't I ask you this
2  way: Could you tell us what information -- what is the
3  sum total of the information that Lycos has on this
4  subject, and if you want to just read from the second
5  bullet point if that's easier for you, I'll just ask it
6  in that form.
7      Can you tell us what other information Does Lycos
8  have on the subject that I have -- that you've been
9  designated to testify about in terms of how the memo was
10  prepared and what information it has about Lycos' policy
11  not to buy any equipment that can be leased?
12     ATTY ACTON: Objection
13     ATTY KALER: I can't ask it that way?
14     ATTY ACTON: Well, I'm objecting
15  specifically to the use of the word -- with
16  respect to Lycos' policy
17     ATTY KALER: Well, I'll ask --
18     ATTY ACTON: It's --
19     ATTY KALER: That's part of the subject
20  matter I read
21     ATTY ACTON: I'll withdraw the objection
22  because I can appreciate what you are trying to
23  do
24  Q  (By Atty Kaler) Okay. Can you just tell us what

29 (Pages 110 to 113)

Thomas Hoye 2-22-2007
Computer Sales International v Lycos, Inc

| 114 | | 116 | |
|---|---|---|---|
| 1 | information, what other information does Lycos have about | 1 | A  Yes |
| 2 | the source and authenticity of Exhibit 627, how it was | 2 | Q  Who wrote them? |
| 3 | prepared and preserved, what information is known to the | 3 | A  Peter Acton |
| 4 | author of the memorandum, the dates it was prepared and | 4 | Q.  Outside counsel for Lycos? |
| 5 | all information available to Lycos about what the memo | 5 | A  Outside counsel, correct |
| 6 | refers to as, quote, Lycos' policy not to buy any | 6 | Q.  In fact, Mr. Galvan did not testify that he was |
| 7 | equipment that can be leased, unquote, including, but not | 7 | unaware of a policy not to buy equipment that could be |
| 8 | limited to, for how long and why the policy was in effect | 8 | leased, did he? |
| 9 | at Lycos? | 9 | ATTY ACTON: Objection |
| 10 | A  Sure  Mr Galvan provided testimony at his | 10 | ATTY KALER: He never said that |
| 11 | deposition concerning the information that was known to | 11 | ATTY ACTON: Huh? |
| 12 | him at the time he prepared the memorandum | 12 | ATTY KALER: He never said he was unaware of |
| 13 | Lycos has no independent means of verifying what | 13 | a policy not to buy— |
| 14 | was known to Mr Galvan  a former employee of the company | 14 | ATTY ACTON: Well, we'll see — the |
| 15 | at the time  except that Mr Galvan has testified that he | 15 | transcript will say what it says, but I'm fairly |
| 16 | was unaware of any  quote  policy to not buy equipment | 16 | confident of what the transcript says |
| 17 | that could be leased and Lycos did not have a policy to | 17 | ATTY KALER: I have the transcript |
| 18 | not buy any equipment that could be leased | 18 | ATTY ACTON: Okay  Why don't we get it and |
| 19 | Mr Galvan testified that the substance of his | 19 | we can follow up on it  I'm not really sure that |
| 20 | memorandum was based on one or perhaps more than one | 20 | it's relevant |
| 21 | communication with Sam Ziba and Julie Callagee and his | 21 | ATTY KALER: Did we get the miniscript yet? |
| 22 | review of various lease agreements, including lease | 22 | MS PELLERIN: I haven't gotten a transcript |
| 23 | agreements with CSI | 23 | yet |
| 24 | Lycos has been unable to verify whether these | 24 | ATTY KALER: Oh, yes  I mean — |

| 115 | | 117 | |
|---|---|---|---|
| 1 | conversations took place or whether — or which or | 1 | MS PELLERIN: You might have gotten it, but |
| 2 | whether Mr Galvan  in fact  had those agreements | 2 | I didn't get it  It doesn't always come to me |
| 3 | available to him  but it has no evidence to suggest that | 3 | ATTY KALER: You realize that he's |
| 4 | either the conversation or review of the lease agreement | 4 | testifying on behalf of the company that Galvan |
| 5 | documentation did not take place | 5 | said this and if he didn't say it. I can impeach |
| 6 | Q.  I'm sorry. Go ahead. | 6 | the company. |
| 7 | A  I was going to say the memorandum was prepared on | 7 | ATTY ACTON: You are welcome to |
| 8 | August 13. 2001, excuse me, and then Lycos does not | 8 | ATTY KALER: I know Galvan didn't say he was |
| 9 | have a  quote  policy — or did not have a. quote  policy | 9 | unaware of a policy  He wrote it |
| 10 | to not buy any equipment that could be leased | 10 | ATTY ACTON: He didn't write the policy |
| 11 | Q.  Now, do you have any personal knowledge yourself | 11 | ATTY KALER: No  No  He wrote his memo |
| 12 | as to whether Lycos had or did not have a policy of not | 12 | He said — |
| 13 | buying equipment that could be leased? | 13 | ATTY ACTON: I think he referred to that |
| 14 | ATTY ACTON: Objection. | 14 | being a general practice at Lycos, but he said he |
| 15 | THE WITNESS: I do not | 15 | was unaware of any policy |
| 16 | Q  (By Atty. Kaler) Okay.  And these notes that you | 16 | ATTY KALER: No  No  No  He never said he |
| 17 | have just read from in your answer, you were reading from | 17 | was unaware of a policy |
| 18 | the second, third and fourth bullets under Paragraph 11 | 18 | ATTY ACTON: We'll see what the transcript |
| 19 | on Exhibit 661 on the fifth page, right? | 19 | says |
| 20 | A  Yes | 20 | ATTY KALER: But if you really want to have |
| 21 | Q.  And did you write those notes or did someone else | 21 | him testify to that  I mean  I'll just ask him |
| 22 | write them? | 22 | Q.  (By Atty. Kaler) Is it — so as the 30B — as the |
| 23 | A  I did not write those notes | 23 | person who is designated — Lycos' position then is that |
| 24 | Q.  Do you know who wrote them? | 24 | it never had — is it Lycos' position that the statement |

O'Brien & Levine Court Reporting Services
888 825 DEPO(3376) * www.court-reporting.com

Thomas Hoye 2-22-2007
Computer Sales International v Lycos, Inc

### 158

1    A  Yes
2    Q.  And do you specifically recall being asked whether
3    Lycos had a policy to not buy any equipment that could be
4    leased?
5    A.  Yes
6        ATTY KALER: Objection
7    Q.  (By Atty. Acton) And did Lycos have a policy to
8    not buy any equipment that can be leased?
9    A  No
10   Q.  And what is Lycos' basis for stating that it did
11   not have a policy to not buy any equipment that can be
12   leased?
13       ATTY KALER: Objection
14       THE WITNESS: A discussion I had with Kevin
15   Baillie
16   Q.  (By Atty. Acton) Okay. And when was that
17   discussion with Kevin Baillie?
18   A  It was this past Tuesday
19   Q.  Okay. And was that discussion generally in
20   connection with your preparation for testimony here today
21   with respect to the Subject Matter 11 that I just read?
22   A  Yes
23   Q.  Okay. And did you ask Mr. Baillie whether the
24   statement in the memorandum referred to in that subject

### 159

1   matter that Lycos' policy -- that Lycos had a policy to
2   not buy any equipment that can be leased, did you have a
3   discussion with Mr. Baillie concerning that statement?
4       ATTY KALER: Objection
5       THE WITNESS: Yes
6   Q.  (By Atty. Acton) Okay. And did you ask
7   Mr. Baillie whether Lycos had such a policy?
8       ATTY KALER: Objection
9       THE WITNESS: Yes
10   Q.  (By Atty. Acton) What did Mr Baillie say to you?
11       ATTY KALER: Objection
12       THE WITNESS: He said there was no such
13   policy
14       ATTY KALER: Objection
15       ATTY ACTON: You are objecting to his
16   answer?
17       ATTY KALER: I do object to his answer yes
18   Q.  (By Atty. Acton) When you spoke with Mr.
19   Baillie on last Tuesday, what did he say to you with
20   respect to whether Lycos had a policy to not buy any
21   equipment that can be leased?
22       ATTY KALER: Objection
23       THE WITNESS: Again, this is in relation to
24   Exhibit 627?

### 160

1   Q.  (By Atty. Acton) That's correct.
2   A  Can you repeat the question, please?
3   Q.  When you had the conversation last Tuesday with
4   Mr. Baillie concerning Exhibit 627, what did he say to
5   you with respect to whether Lycos had a policy to not buy
6   any equipment that can be leased?
7       ATTY KALER: Objection
8       THE WITNESS: He said there was never such a
9   policy in place
10   Q.  (By Atty. Acton) Okay  Did Mr  Baillie say
11   anything else to you concerning whether Lycos' policy --
12   whether Lycos had a policy to not buy any equipment that
13   can be leased?
14       ATTY KALER: Objection
15       THE WITNESS: Yes
16   Q.  (By Atty. Acton) What did he say?
17       ATTY KALER: Objection
18       THE WITNESS: He said that as a matter of
19   example, the company would. even though they could
20   lease furniture and fixtures. the company would
21   purchase furniture and fixtures rather than
22   leasing them
23   Q.  (By Atty. Acton) Okay. Anything else?
24   A.  He did also mention --

### 161

1       ATTY KALER: Objection to "anything else "
2       ATTY ACTON: Okay  I'll withdraw the
3   question
4   Q.  (By Atty. Acton) Do you recall providing testimony
5   concerning whether -- let me just find my point of
6   reference. Referring you back now to Exhibit 660 --
7   A  Uh-huh
8   Q.  -- which is the 30(b)(6) notice. Specifically
9   topic 6, the middle of the page. And so it is clear, the
10   topic is: Why did Lycos choose from 1996 to 2002 to
11   lease the computer equipment that it leased from CSI
12   instead of buying it, and what impact would it have had
13   on Lycos' financial statements if Lycos had bought that
14   equipment instead of leasing it from CSI. Do you see
15   that?
16   A  Yes
17   Q.  Do you recall providing testimony concerning that
18   subject matter here today?
19   A  Yes
20   Q.  And do you recall that you identified as one of
21   Lycos' objectives in leasing equipment was to preserve
22   cash?
23   A  Yes
24   Q.  Was Lycos' objective to preserve cash something

41 (Pages 158 to 161)

# EXHIBIT 12

James M. Johnson, Ph.D.                                    11/02/2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES INTERNATIONAL,         )
INC.,                                 )
          Plaintiff and               )
      Counterclaim Defendant,         )
                                      )
          vs.                         )
                                      )
LYCOS, INC.,                          )     CIVIL ACTION
      Defendant and                   )  NO. 05-10017-RWZ
      Counterclaim Plaintiff,         )
                                      )
          vs.                         )
                                      )
BANK OF AMERICA, f/k/a                )
FLEET BANK,                           )
      Trustee Process Defendant.      )



          Videotaped deposition of JAMES M. JOHNSON,

Ph.D., taken before NADINE J. WATTS, CSR, RPR, and

Notary Public, pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, at Suite 4500,

227 West Monroe Street, in the City of Chicago, Cook

County, Illinois, commencing at 9:05 o'clock a.m. on the

2nd day of November, A.D., 2007.

James M. Johnson, Ph.D.                                        11/02/2007

Page 34

1  fair to say that the students in your workshops are
2  people who are involved in equipment leasing for those
3  corporations?
4     A  I would say involved in some way, either
5  directly or peripherally.
6     Q  Have you had occasion to find out what the
7  educational background is of the students in those
8  classes?
9     A  It's just all over the map. I couldn't even
10 generalize what it is  They're probably all college
11 educated  Some are attorneys  Some are finance people.
12 Some are accountants. Some are -- in procurement  It's
13 just all over the place.
14    Q  Some of them have Bachelor's in Business
15 Administration; is that right?
16    A  Some do.
17    Q  Some have Master's in Business Administration;
18 is that right?
19    A  Some do.
20    Q  Some are lawyers, right?
21    A  Yes
22    Q  And some are certified public accountants?
23    A  Yes
24    Q  And --

Page 35

1     A  And some have degrees in literature
2     Q  What reasons do you give these companies for
3  telling them that they should hire you to train their
4  employees in equipment leasing?
5     A  I don't
6     Q  They come to you?
7     A  They come to me
8     Q  Okay. Have you had any discussions with any of
9  these companies as to the reasons they have come to you
10 for a class on equipment leasing?
11    A  There are a number of different reasons  Some
12 of these would be what I would call lessee workshops and
13 some are lessor workshops  So they have different
14 reasons for needing training or education
15    Q  What are the reasons that you've been asked or
16 you've -- you've been asked to conduct lessee workshops?
17    A  Some companies will say we are under a directive
18 to lease finance and we want to make sure that we know
19 what we need to know  So rather than figure it out on
20 their own, they'll hire me or someone like me to help
21 walk them through the material that they need to be
22 familiar with
23    Q  And the assumption -- do you assume then that
24 the people you are training don't have a sufficient

Page 36

1  background in equipment leasing?
2     MR. KALER: Objection  You can respond.
3     THE WITNESS: Some have background and some don't
4  Some resent my being there because we should know this
5  and some are all ears  So I really don't know how to
6  give you something more specific than that
7     MR. BEAN: Q  But your audience for these classes
8  are employees of corporations, right?
9     MR KALER: Objection
10    MR. BEAN: Q  Or governments
11    A  Yes
12    Q  And when you write your articles and books, your
13 expected audience are employees of corporations; is that
14 right?
15    A  Or governments, yes
16    Q  Okay. And some of the corporations that you've
17 provided training for are Fortune 100 companies, are
18 they not?
19    A  Yes
20    Q  What is meant by a Fortune 100 company?
21    A  On the Fortune 500 list, take the first 100.
22    Q  Okay. What does it mean to be a member of the
23 Fortune 500?
24    A  That you're a really big company.

Page 37

1     Q  Are you respected as an expert in the field of
2  equipment leasing in your view?
3     A  I believe I am.
4     Q  What is the basis for that belief?
5     A  This is my 15th trial.
6     Q  Any other reasons?
7     A  I receive probably half a dozen to a dozen calls
8  a year for people making queries about this is an issue
9  we have, would you be able to assist, are you available,
10 can you -- can you work with us in this area, here are
11 the parties involved, are you conflicted  And they all
12 call me.
13    Q  Any other reason you believe you're an expert in
14 this field?
15    MR. KALER: Well, objection, but you can respond.
16    THE WITNESS: I think the books and articles give me
17 a very wide audience or a potential audience. My very
18 first case, I was contacted because the lawyer who was
19 involved in the case was talking to a colleague of his
20 in New York and he kept referring to my book. He said,
21 I think I'll just go ask the author if he's interested
22    MR. BEAN: Q  You're familiar with a James
23 Schallheim, are you not?
24    A  Yes.

10 (Pages 34 to 37)

James M. Johnson, Ph.D.                                            11/02/2007

Page 38

1    Q  How are you familiar with him?
2    A  We serve together on the board of trustees of
3  the Equipment Leasing and Finance Foundation
4    Q  Any other way in which you're familiar with
5  Mr. Schallheim?
6    A  He's written articles for the Journal of
7  Equipment Lease Financing going back quite a ways, and I
8  reviewed his articles and talked to him about changes we
9  wanted him to make to the articles to make it acceptable
10  for publication
11    Q  Any other way you're familiar with
12  Mr. Schallheim?
13    MR KALER: Well, objection  It's too broad  But
14  you can respond
15    THE WITNESS: We discuss finance issues and leasing
16  issues from time to time, possible research
17  opportunities we might get involved in.
18       He sent me an e-mail about a month ago and said
19  he had -- there was a Fulbright scholar from a foreign
20  country, I believe it was China, and he was kind of
21  hosting her in the U S , and he was trying to get her
22  together with other finance faculty and people that were
23  experienced in equipment leasing, and asked me if I'd be
24  willing to spend some time with her, and I said

Page 39

1  certainly.
2    MR BEAN: Q  Do you have reason to believe that
3  Mr. Schallheim respects you as an expert in equipment
4  leasing?
5    A  I guess you'd have to ask him
6    MR. KALER: Objection
7    THE WITNESS: I really don't know
8    MR. BEAN: Q  No, I'm asking you for your -- Based
9  on what you've just said about Mr  Schallheim consulting
10  you and talking to you, do you have reason to believe
11  that he respects you as an expert in equipment leasing?
12    MR. KALER: Objection
13    THE WITNESS: I'm guessing now  I guess my best
14  guess is he probably does
15    MR. BEAN: Q  Okay  And do you know a Michael
16  Fleming?
17    A  Yes
18    Q  How do you know Mr. Fleming?
19    A  I've known Mr  Fleming for 27 or 28 years
20    Q  How is it you have known Mr. Fleming for that
21  period of time?
22    A  When he took over as executive director for the
23  forerunner of the Equipment Leasing and Finance
24  Foundation, which was then called American Association

Page 40

1  of Equipment Lessors, he wanted to energize the
2  association, and equipment leasing was becoming very
3  important.  And so he decided to start an education
4  initiative and contacted several business schools and
5  asked the deans of those business schools if they had
6  faculty that they think might be able to help him get a
7  new educational mission launched  And the dean -- I was
8  at Notre Dame at the time, and he said I have the
9  perfect guy for you if he's interested.
10       And so he came out to the Midwest and talked
11  with us and said this is what I want, and we evolved
12  what has now been a very long-term staple for them,
13  which is a three-day -- two- or three-day workshop
14  Principles of Leasing they call it  That's how I got to
15  know him to begin with  And then one thing just kept
16  leading to another
17    Q  And have you worked with him pretty regularly
18  over the past 25 years?
19    A  Not very much.  The first couple of years, when
20  he was trying to get new initiatives launched, we had a
21  fair amount of dealings with each other, and then he got
22  busy just running the association and didn't really have
23  any -- He passed the baton of running the educational
24  wing of the association to someone else.  So I've had

Page 41

1  very infrequent contact with him.
2       He was -- when he was president of the
3  Equipment Leasing and Finance Foundation, he was a
4  member of the board of trustees of the Equipment Leasing
5  and Finance Foundation, and so he was at the meetings
6  that I would be attending and we would -- I mean, we
7  didn't chat or spend the evening together, but I saw him
8  and had dealings with him once or twice a year for the
9  last seven or eight years
10    Q  Have you had any discussions with either
11  Mr. Schallheim or Mr. Fleming about this case?
12    A  No
13    Q  Any communications whatsoever?
14    A  No
15    Q  Equipment leasing is a specialty within the
16  field of finance, is it not?
17    MR KALER: Objection, vagueness, but you can
18  respond
19    THE WITNESS: Yes, I would say it was a specialty
20    MR. BEAN: Q  In fact, it's such a specialty that
21  unless finance and legal are well-versed in the
22  subtilties of high-technology leasing, they will
23  generally miss the importance of a number of provisions
24  no matter how skilled they are; isn't that right?

11 (Pages 38 to 41)

James M. Johnson, Ph.D.                                           11/02/2007

---

Page 50

1  should you be billed or charged for the phase-in?  So
2  that's another issue that we talk to them about.
3       Some of these are -- we probably -- we can
4  apply some of these issues to other equipment categories
5  other than just technology leasing.
6       Another issue is how long should you want the
7  lease term to be; do you want to have the right to
8  terminate early; do you want to have the right to renew
9  at the end?  Terminate early could be important if you
10 are involved in a company that's continuously
11 reinventing itself and you decide the equipment you
12 acquired a year-and-a-half ago you no longer need in
13 surplus, so do you have an early-out provision?
14      On the back end, we might want to renew the
15 lease because we can't get authorization to buy new
16 equipment, so we need to have something.  So having a
17 door on the back end might become important.  And there
18 are probably a number of additional issues.
19   Q  You don't cover all these issues in the class
20 you teach at -- in college, do you?
21   A  Not enough time, no.
22   Q  You only spend part of one class in your finance
23 class covering equipment leasing, do you not?
24   A  That's correct.

---

Page 51

1    Q  Now, form lease documents are prepared and
2  usually negotiated by experienced lawyers who specialize
3  in equipment lease financing; isn't that right?
4    A  The lawyers representing the leasing companies,
5  yes.
6    Q  Okay.  And most lessees enter the negotiations
7  at a severe disadvantage due to their lack of
8  experience; isn't that right?
9    MR. KALER:  Objection.
10   THE WITNESS:  That depends on whether they get help
11 or not.
12   MR. BEAN:  Q  Help from who?
13   A  Well, one of the things that I think every
14 business school preaches is that contracts are a big
15 deal.  And so if you don't understand the contracts
16 you're looking at, you need to seek guidance to be able
17 to fulfill your responsibilities.
18      (Document marked as Johnson Deposition
19      Exhibit 6 for identification.)
20   Q  What's been marked as Exhibit 6 is an article.
21 It's got the cover pages from a book called Equipment
22 Leasing and an article that you and Mr. Marks wrote.
23 It's an article from the book on Matthew Bender on
24 Equipment Leasing, Chapter 40, Lessee Concerns and

---

Page 52

1  Equipment Leasing.
2       I direct your attention to page -- the very
3  first page of the article, Chapter 40.  You wrote that
4  "most lessees enter the negotiations at a severe
5  disadvantage due to their lack of experience", right?
6    A  Yes
7    Q  And you wrote, even lessees who have negotiated
8  several leases of various types of equipment in past
9  years find themselves at a disadvantage in that their
10 opponents are generally professionals who make their
11 living negotiating equipment leases.
12   A  Yes
13   Q  And you also wrote that the lessee's problem is
14 exacerbated by the fact that most leases are prepared on
15 the basis of lessor-generated forms, right?
16   A  Yes
17   Q  And the pitfalls of dealing with the lessor's
18 document and its experienced counsel or business
19 negotiators often results in the lessee and its counsel
20 failing to spot undesirable and even unfair provisions,
21 right?
22   A  Yes
23   Q  Okay.  You would also agree that it's rare that
24 lease negotiations are conducted on a level playing

---

Page 53

1  field; isn't that right?
2    MR. KALER:  Objection.
3    THE WITNESS:  That depends on whether the lessee
4  gets assistance or not.
5    MR. BEAN:  Q  That it's fair that the lease
6  negotiations are conducted on a level playing field;
7  isn't that right?
8    MR. KALER:  Objection, that exact question was just
9  asked and was just answered.
10   MR. BEAN:  No, it was not answered.
11   MR. KALER:  I believe the answer was that depends,
12 and then it continued.  So it wasn't --
13   MR. BEAN:  Q  You wrote that sentence, sir, did you
14 not?
15   A  Barry did.
16   Q  Lease negotiations are conducted on a level
17 playing field.
18   A  Barry did
19   Q  Barry wrote that?
20   A  Yes.
21   Q  You know for certain that he wrote that sentence
22 and you didn't?
23   A  Yes
24   MR. KALER:  Objection.

---

14 (Pages 50 to 53)

James M. Johnson, Ph.D.                                    11/02/2007

**Page 86**

1  initial term of an equipment schedule shall continue for
2  the number of months specified therein and shall
3  automatically be extended for successive four-month
4  periods thereafter at the same monthly rental unless or
5  until terminated by either party giving the other party
6  not less than 60 days prior written notice. It says
7  that, right?
8      A  Yes.
9      Q  So absent 60 days prior written notice the
10 equipment schedule goes on -- gets renewed for
11 successive four-month terms indefinitely, right?
12     MR. KALER: Objection
13     THE WITNESS: If the lessee fails to notify within
14 60 days, then it can notify and the lease extends for
15 four months and then it would conclude.
16     MR. BEAN: Q  Let's try this again, sir.
17     MR. KALER: You can disregard the last --
18     MR. BEAN: Q  Let's try --
19     MR. KALER: Excuse me
20     MR. BEAN: Let's try this again, sir
21     MR. KALER: Stop speaking  please
22     MR. BEAN: Q  If the lessee does not provide --
23 Excuse me  Bob, you're taking my time up
24     MR. KALER: No, I don't care at this point  You

**Page 87**

1  can't say to my witness let's try this again and imply
2  that he hasn't been responsive to your questions
3  You're not only asking questions in bad faith, you're
4  misquoting him, you're shifting between documents  So
5  please knock it off
6      MR. BEAN: The jury is going to see this
7          Now, Mr Johnson --
8      MR. KALER: The jury is going to see this. The
9  witness is going to testify at trial.
10     MR. BEAN: I hope so
11         Professor Johnson, if the lessee does not
12 provide the lessor with 60 days advanced written notice,
13 the lease goes on in perpetuity, isn't -- of
14 termination, it goes on in perpetuity; isn't that right?
15     MR. KALER: Objection
16     THE WITNESS: I don't see it that way at all.
17     MR. BEAN: Q  You don't? So if the lessee fails to
18 give notice, the lease still terminates; is that your
19 opinion?
20     MR. KALER: Objection
21     THE WITNESS: If the lessee misses the 60-day
22 notification, the lease renews for four months
23     MR. BEAN: Q  And if the lessee never gives the
24 notification, the lease renews indefinitely; isn't that

**Page 88**

1  right?
2      MR. KALER: Objection.
3      THE WITNESS: Yes, if the lessee never says a word
4      MR. BEAN: Q  Okay  Now, to terminate --
5      A  May I --
6      MR. KALER: Go ahead
7      THE WITNESS: -- qualify this, please?
8      MR. BEAN: Q  Sure
9      A  I don't know of -- I can't find three leases
10 that don't have auto renewal provisions and by the
11 lessee saying nothing the lease just continues to roll
12 along
13     Q  It says here -- And you warned -- You consider
14 an automatic renewal policy clause to be part of a
15 Rogue's Gallery of Gotchas, don't you?
16     MR. KALER: Objection. Again, you're misquoting him
17 and you're specifically -- you're deliberating
18 misquoting him  Just please show him whatever it is
19     MR. BEAN: Q  Sir, I direct your attention to page
20 56 of your book Technology Leasing: Power Tools for
21 Lessees  Now, one of the -- your Chapter 10 is entitled
22 the Rogue's Gallery of Gotchas, right?
23     A  Yes
24     Q  And one of the provisions in that Rogue's

**Page 89**

1  Gallery of Gotchas is a discussion of automatic
2  renewals, right?
3      A  Yes.
4      Q  And so an automatic -- you would consider an
5  automatic renewal clause a gotcha, right?
6      MR. KALER: Objection, that's not what the article
7  says. You can't keep doing this. You can respond,
8  Professor
9      THE WITNESS: No, it all has to do with the notice
10 period and the renewal period
11     MR. KALER: We're going to take a break.
12     MR. BEAN: Q  Sir, let's get things we can't
13 dispute. Chapter 10 is entitled the Rogue's Gallery of
14 Gotchas, right?
15     A  Yes.
16     MR. KALER: Objection, asked and answered
17     MR. BEAN: Q  And one of the headings that you've
18 got within Chapter 10 is entitled Automatic Renewal,
19 right?
20     A  Yes.
21     Q  And one of the other headings is Perfect
22 Returns, is it not?
23     A  I'm sorry, on what page?
24     Q  On page 58.

23 (Pages 86 to 89)

James M. Johnson, Ph.D.                                          11/02/2007

Page 90

1     A  Yes
2     Q  And another one is Casualty Value Calculations,
3  right?
4     A  Yes
5     Q  Now, you say on the bottom -- last paragraph on
6  page 58, it says, "most casualty values we see (before
7  they are negotiated down) show an end-of-lease casualty
8  value for a 36-month lease equal to 35 to 55 percent of
9  the original equipment cost". It says that, right?
10    A  Yes
11    Q  And then it goes on to say, for most types of
12 technology equipment this amounts to almost pure upside,
13 right?
14    A  Yes
15    Q  Then it says, "if a lessor priced a technology
16 lease with a 5 percent residual, it is inconceivable
17 that a casualty value of 50 percent can be justified";
18 isn't that right?
19    A  Yes
20    Q  And so, in your view, if a lessor has a -- has a
21 5 percent residual or less, a casualty value of 50
22 percent or more is unjustifiable; isn't that right?
23    MR. KALER: Objection
24    THE WITNESS: Yes.

Page 91

1     MR. BEAN: Q  Now, let's go back to Article 2.2 --
2     MR. KALER: If we're changing --
3     MR. BEAN: Q -- of the master lease agreement
4     MR. KALER: Sorry, I need to take a break
5     MR. BEAN: That would be fine.
6     THE WITNESS: I'm sorry, Article 2.2 you said?
7     MR. BEAN: Yes, of the master lease agreement
8  We're going to take a short break
9     THE VIDEOGRAPHER: Here concludes tape No. 1  We
10 are going off the video record at 10:48 a.m.
11    (Recess was taken )
12    THE VIDEOGRAPHER: We are going back on the video
13 record at 10:59 p.m. -- or a.m. rather. Here begins
14 tape 2
15    MR. BEAN: Q  Good morning, Professor Johnson
16    A  Good morning
17    Q  You understand you're still under oath?
18    A  Yes
19    Q  One question I forgot to ask you earlier.
20 Directing your attention to your third report, do you
21 have that in front of you?
22    A  Yes
23    Q  Go to the second page if you would. You list
24 here the transcripts of the depositions of six

Page 92

1  individuals, do you not?
2     A  Yes
3     Q  And did you -- and do you recall your testimony
4  about how with regard to the transcripts listed in the
5  first report you received just excerpts of the
6  transcripts? Do you recall that?
7     A  Yes
8     Q  When you list the deposition of Joseph Phillip
9  Cagney, Paul Stenberg, Thomas Guilfoile, Edward Philip,
10 Joan Kersting and Frederick O'Neal, did you receive the
11 entire -- the transcript of the entire deposition from
12 Mr. Kaler or Mr. Little or just excerpts?
13    A  I believe I received the entire depositions
14 except for Mr Stenberg I believe was deposed for more
15 than one day  So I received one day's worth of
16 testimony for Mr Stenberg
17    Q  Okay. Did you read the entire transcript of
18 Mr. Guilfoile, Mr. Philip, Ms. Kersting, Mr. O'Neal and
19 Mr. Cagney and Mr. Stenberg that are listed on page 2 of
20 your third report?
21    A  Yes
22    Q  Thank you. Going back to the master lease
23 agreement and Article 2.2, in the very last sentence it
24 says -- We talked before the break about how a lessee

Page 93

1  needs to give notice of termination or Lycos needed to
2  give notice of termination to CSI not less than 60 days
3  prior to the end of the initial term.
4     A  Yes, I remember that
5     Q  Okay. And going to the next sentence, any
6  notice of termination -- These are -- The next sentence
7  covers four requirements for the termination to be
8  effective; isn't that right?
9        And let me read it so there's no ambiguity. It
10 says, any termination, one, must relate to all the
11 equipment described on that equipment schedule to which
12 the notice applies; two, will be effective only on the
13 last day of the initial term or on the last day of any
14 successor four-month period; three, will be effective
15 only if lessee returns all of the equipment to lessor in
16 accordance with the terms of the equipment schedule by
17 the day after the schedule termination date; and, four,
18 may not be unilateral revoked.
19       Did I read that correctly?
20    A  Yes
21    Q  Okay. Now, going to the third requirement that
22 the notice will be effective only if the lessee returns
23 all of the equipment to the lessor in accordance with
24 the terms of the equipment schedule by the day after the

24 (Pages 90 to 93)

James M. Johnson, Ph.D.                                    11/02/2007

---

Page 142

1    MR. BEAN: Q Did you do any analysis of any of the
2  leases to determine whether they were loans or true
3  leases under the Uniform Commercial Code?
4    A No
5    Q Did you do any analysis under accounting
6  standards to determine whether the leases were true
7  leases or not?
8    MR. KALER: Objection
9    THE WITNESS: Well, the term true lease I don't
10 believe applies to accounting
11   MR. BEAN: Q Did you do any analysis to determine
12 whether any of the leases between CSI and Lycos, any of
13 the renewals would have qualified as operating leases?
14   A I did --
15   MR. KALER: Objection
16   THE WITNESS: -- what was necessary
17   MR. BEAN: Q So you didn't do any?
18   MR. KALER: Objection
19   THE WITNESS: I didn't do any because I didn't feel
20 it was necessary
21   MR. BEAN: Q And did you do any analysis at all to
22 determine whether any of the leases were true leases
23 under the tax law?
24   MR. KALER: Objection.

---

Page 143

1    THE WITNESS: The characteristics that I just
2  outlined, the equipment was to revert to the lessor at
3  the end of the term. they had no option to buy it, there
4  was no dollar out provision, et cetera
5    MR. BEAN: Q And to your understanding -- Well,
6  don't the IRS guidelines cap the lease term at 80
7  percent of the life -- economic life of the leased
8  equipment?
9    MR. KALER: Objection
10   THE WITNESS: I think that -- I think that you can't
11 look at just one rule and say that each one is a hard
12 number
13   MR. BEAN: Q So it's your testimony then that
14 under the IRS guidelines a lease term can exceed 80
15 percent of the economic life of the equipment and still
16 have the lease be a true lease?
17   MR. KALER: Objection
18   THE WITNESS: I think that's a possibility.
19   MR. BEAN: Q Interim rent which CSI charged Lycos
20 on all of the original schedules is in your Rogue's
21 Gallery of Gotchas, isn't it --
22   MR. KALER: Objection
23   MR. BEAN: Q -- in the book entitled Technology
24 Leasing: Power Tools for Lessees on page 57?

---

Page 144

1    A Yes
2    Q Okay. Now, if a lessee has difficulty achieving
3  operating lease treatment on the payment of rents, a
4  lessor might use interim rent to help the lessee achieve
5  operating lease treatments on the rent payments, right?
6    A It could
7    Q Okay. In that situation, the lessor would
8  reduce the amount of the monthly rental payments, right?
9    A If that was the purpose, yes
10   Q And then charge the lessee interim rent, right?
11   A If that was the strategy, yes
12   Q Okay. So extending a lease from 24 months to 36
13 months or refinancing a lease from a 24-month period to
14 36 months, in financing the interim rent would not help
15 a lessee qualify for operating lease treatment, would
16 it?
17   MR. KALER: Objection
18   THE WITNESS: I don't know.
19   MR. BEAN: Q Well, if the present value of the
20 payments on a 24-month lease do not satisfy operating
21 lease treatment, financing the interim rent would not
22 enable it to -- the lease to satisfy operating lease
23 treatment, would it?
24   MR. KALER: Objection.

---

Page 145

1    THE WITNESS: I'm sorry. I think we've got two
2  scenarios going here
3    MR. BEAN: Q Sure All right Suppose the lessee
4  has a 24-month lease, okay, and the present value of
5  those payments equals 85 percent of the original cost of
6  the equipment
7    A Okay
8    Q That would qualify for operating lease
9  treatment, right?
10   A All of the conditions satisfied, yes
11   Q Okay. And now if the lessee decides it doesn't
12 want to pay interim rent but wants to finance the
13 interim rent and the interim rent is financed on what
14 now becomes a 36-month schedule, the present value of
15 the payments on the new schedule will exceed 85 percent
16 of the original cost of the equipment, right?
17   A I'm not sure because it has to do with the
18 lessor's structuring rate and the lessee's discount
19 rate
20   Q Well, let's assume all other things being equal.
21 The lessee has a discount rate, and using that discount
22 rate the monthly lease -- the present value of the
23 monthly lease payments is 85 percent of the original
24 equipment cost, okay?

---

Merrill Legal Solutions
(617) 542-0039

James M. Johnson, Ph.D.                                    11/02/2007

---

Page 150

1    Q And we saw that it had an interim rent clause,
2 right?
3    A Yes
4    Q And it had a perfect return provision, right?
5    MR. KALER: Objection
6    THE WITNESS: I need to review what I meant by
7 perfect returns.
8    MR. BEAN: Q Surely, sir. Let me read it to you
9 so there's no question. It says, this provision means
10 the lessee is required at lease end to produce all
11 leased units. Many such leases will go on to say that
12 the lease will remain in full force and effect until
13 all, but not all -- not less than all leased units are
14 returned. Especially with respect to personal computers
15 and laptops, the lessee should ensure that it can return
16 less than all units and has the right to purchase or
17 replace those units that are not in the required
18 condition or cannot be located. That's what you wrote,
19 right?
20    A Yes
21    Q Okay. And so Lycos did not have the right to
22 purchase or replace units that were lost, did it?
23    MR. KALER: Objection
24    THE WITNESS: I don't know that they ever asked to

---

Page 151

1 purchase equipment that they couldn't find before the
2 buyout in '03
3    MR. BEAN: Q Let me ask you the question again,
4 sir. Under the master equipment lease Lycos did not
5 have the right to purchase or replace any lost
6 equipment, did it?
7    MR. KALER: Objection
8    THE WITNESS: It had the right to replace equipment
9 with CSI's consent
10    MR. BEAN: Q Okay So it didn't have the right on
11 its own to provide substitute or replacement equipment,
12 did it?
13    MR. KALER: Objection
14    THE WITNESS: Did not have the contractual right,
15 yes
16    MR. BEAN: Q Okay And so there's a perfect
17 return provision in the master lease, right?
18    A Okay, right
19    MR. KALER: Objection
20    MR. BEAN: Q And we saw that there was a casualty
21 value calculation in the equipment schedules, right?
22    A Yes
23    Q Now, going back to equipment schedule 67 marked
24 as Exhibit -- this was Johnson 10, I direct your

---

Page 152

1 attention to the stip -- to the sales type lease journal
2 entry, which is page 434 in the lower right
3    A Okay
4    Q You see in the left-hand -- near the top third
5 of the page on the left-hand side there's a reference to
6 residual value, right?
7    A Yes
8    Q And the residual value is left blank, right?
9    A That's correct
10    Q And CSI's booked residual value on schedule 67
11 was zero, right?
12    A That would be my reading of this, yes.
13    Q Okay. And on schedule 67 we also saw that if
14 Lycos could not return the equipment at the end of the
15 lease term or for any equipment it couldn't return, it
16 would have to pay 55 percent of the base value, right?
17    A Or substitute like-kind equipment with CSI's
18 consent.
19    Q Okay. And so under the casualty value provision
20 in your Power Tools for Lessees --
21    A Page number, please?
22    Q 58. Schedule 67 is an example of a technology
23 lease with a less than -- less than 5 percent residual
24 value and a casualty value of over 50 percent, right?

---

Page 153

1    MR. KALER: Objection
2    THE WITNESS: Yes
3    MR. BEAN: Q Okay And, as a result, that
4 casualty value is unjustifiable in your view, right?
5    MR. KALER: Objection.
6    THE WITNESS: I don't think it's unjustified It's
7 what the parties agreed to
8    MR. BEAN: Q You wrote, and I'm going to quote,
9 sir, if a lessor priced a technology lease with a 5
10 percent residual value, it is inconceivable that a
11 casualty value of 50 percent can be justified. You
12 wrote that, right?
13    A Yes.
14    Q Okay. So --
15    MR. KALER: Mark this point point 2 in the
16 transcript, will you please
17    MR. BEAN: Q Summarizing, there's an automatic
18 renewal clause, an interim rent clause, a perfect return
19 clause and casualty value calculations. Based on the
20 inclusion of those provisions in the CSI/Lycos lease
21 it's your view that Lycos was unsophisticated when it
22 came to equipment leasing; isn't that right?
23    MR. KALER: Objection
24    THE WITNESS: I don't know if they were

James M. Johnson, Ph.D.                                    11/02/2007

Page 154

1  unsophisticated or just didn't care.
2      MR. BEAN: Q  One of those two things would be
3  true, right?
4      MR. KALER: Objection.
5      THE WITNESS: Well, maybe a third that I can't think
6  of right now
7      MR. BEAN: Q  Okay  You would teach -- you teach
8  people in your corporate seminars and your seminars for
9  government employees to seek to avoid precisely the kind
10  of provisions that were in the master lease agreement
11  and equipment schedules between CSI and Lycos; isn't
12  that right?
13      MR. KALER: Objection.
14      THE WITNESS: These are some of the things that I
15  tell them that they need to look at, yes.
16      MR. BEAN: Q  Okay.  And if Lycos was
17  unsophisticated as to equipment leasing, it wouldn't
18  even know to negotiate these provisions, right?
19      MR. KALER: Objection
20      THE WITNESS: It has a contract in front of it.
21  Successful business people should know to have a
22  contract negotiated by somebody competent to do so
23      MR. BEAN: Q  And the reason that the corporations
24  send its employees to you for training is -- and many of

Page 155

1  those employees already have been negotiating leases, is
2  because those employees were negotiating leases but were
3  not competent to do so, right?
4      MR. KALER: Objection
5      THE WITNESS: In some cases
6      MR. BEAN: Q  So not -- people who don't have the
7  expertise in equipment leasing that you train people on
8  are commonly negotiating equipment leases, aren't they?
9      A  In some cases
10      Q  In many cases, sir?
11      MR. BEAN: Objection
12      THE WITNESS: In some cases.
13      MR. BEAN: Q  Well, you've given over 300 seminars
14  to employees of large corporations and governments;
15  isn't that right?
16      A  Yes.
17      Q  And the reason those people are there is because
18  they're going to be negotiating -- many of them are
19  going to be negotiating equipment leases, right?
20      A  A fraction of them  Some will be managing
21  leases. Some will be in charge of operations, returns,
22  et cetera. A small number will be -- a small number
23  will be involved in negotiations
24      Q  All right. But they're all involved in the

Page 156

1  leasing process, right?
2      A  Most of them are, yes
3      Q  And most of them have been involved in the
4  leasing process before they take your seminar, right?
5      A  In some cases
6      Q  Well, most of them have been involved --
7      A  In some cases
8      Q  Well, with respect to some companies, is that
9  what you mean by some cases?
10      A  In some cases people are sent because I am now
11  the designated person to look into whether we should be
12  leasing and they're not doing any leasing. And I've
13  been told we need to find out more about this before we
14  jump in
15      Q  And in some cases the person's been involved in
16  the leasing process for some time, right?
17      A  Yes.
18      Q  And they've been doing -- they've been involved
19  in the leasing process without having had the training
20  that you offer?
21      A  Without having the training that I offer, yes.
22  They may have had training elsewhere.
23      Q  Okay.  But they may not have had training
24  elsewhere?

Page 157

1      A  May or may not.
2      Q  Okay.  In Power Tools for Lessees you sought to
3  address all of the topics that you think would typically
4  arise for a technology lessee, did you not?
5      A  No
6      Q  What topics do you think typically arise that
7  you did not address?
8      A  On short notice I couldn't tell you
9      Q  Well, did you try to address the topics that
10  most commonly arise?
11      A  Yes
12      Q  And one of the topics that you did not address
13  in the book Power Tools for Lessees was how to evaluate
14  whether to extend a lease on particular -- or refinance
15  a lease on particular terms; isn't that right?
16      A  We may have talked about lease extensions  I
17  can't remember right this second
18      Q  Okay.
19      A  Which is what we would usually call a renewal
20      Q  Okay.  And the lease extension, would that
21  typically involve simply an amendment extending the term
22  by a few months or would it typically involve
23  redocumenting the lease extension — lease entirely?
24      A  That would depend on what the lessee wanted

40 (Pages 154 to 157)

James M. Johnson, Ph.D.                                    11/02/2007

Page 158

1    Q  The usual practice is simply to extend the lease
2  a few months, is it not?
3    A  That depends on what the objective is
4    Q  Well, the objective is to keep the equipment for
5  a longer period of time.
6    A  Then one way to do that is to extend the lease,
7  yes.
8    Q  Okay.  Can you think of any reason a technology
9  lessee would rewrite or renew a 24-month equipment
10  schedule just two to four months into that schedule to
11  turn it into a 36-month schedule?
12    A  I've been thinking about that for three months
13    MR KALER: Objection
14    MR BEAN: Q  Okay  And what's your thought?
15    A  I have no idea
16    Q  One possibility, is it not, is that CSI – Lycos
17  trusted CSI to provide a leasing program that would work
18  for Lycos and be fair to Lycos; isn't that right?
19    MR KALER: Objection
20    THE WITNESS: I don't know if they trusted him or
21  not
22    MR BEAN: Q  You don't know?
23    A  I don't know if they trusted him or not
24    Q  Okay.  One of the things that technology lessors

Page 159

1  do in an effort to persuade people to lease from them is
2  to say that they're the experts in the leasing business,
3  right?
4    MR KALER: Objection
5    THE WITNESS: Yes
6    MR BEAN: Q  And they tell the lessee to leave the
7  driving, if you will, to the lessor, right?
8    MR KALER: Objection
9    THE WITNESS: I'm not sure what you mean by that
10    MR BEAN: Q  Well, lessors often tell lessees that
11  the lessee should consider the lessor to be its leasing
12  partner, right?
13    A  Some do
14    Q  CSI does, doesn't it?
15    A  I don't know  I haven't read their marketing
16  literature
17    Q  The reason you don't – one of the reasons lease
18  extensions don't come up that often is that it would
19  be – Technology equipment has an economic life of about
20  36 months typically, does it not?
21    A  It seems to, yes
22    Q  And so one of the reasons that lease extensions
23  are not a common topic for you in your seminars or in
24  your book is that technology lessees rarely extend

Page 160

1  equipment leases, right?
2    A  Let's make sure I remember what I said earlier
3  about what an extension is  Is an extension adding
4  months onto the end of an existing schedule or is it
5  rewriting it to extend the term?  Which one are you
6  asking me about?
7    Q  All right.  For present purposes let's call it
8  rewriting it.
9    A  Okay
10    Q  Okay.  One of the reasons that you don't address
11  in your book Technology Leasing: Power Tools for
12  Lessees and don't cover extensions of this type in your
13  seminar is that technology lessees typically don't want
14  to lease equipment for more than 36 months because the
15  equipment's old, right?
16    A  Well, some of them want the flexibility of being
17  able to extend  They want the option but not the
18  obligation
19    Q  Do you teach in any of your courses, whether at
20  the university, your seminars or in your writings, how a
21  lessee should analyze the cost of a lease extension?
22    A  A lease rewrite?
23    Q  A lease rewrite.
24    A  It hasn't come up.

Page 161

1    Q  In other words, you're not – it hasn't come up
2  because none of your students have asked about it or you
3  don't think it's important?  Why hasn't it come up?
4    A  It's not something you see often  that people
5  write a 24-month lease and then migrate to a 36-month
6  lease
7    Q  Do you have any idea why it doesn't come up that
8  often?
9    A  I have no idea
10    MR BEAN: Let's take a break for lunch
11    MR KALER: Sure.
12    MR BEAN: It's now --
13    THE WITNESS: You want to run a short clock so you
14  can catch your plane?
15    MR KALER: That's all right
16    THE VIDEOGRAPHER: We're going off the video record
17  at 12:25 p m
18    (Lunch recess was taken.)
19    THE VIDEOGRAPHER: Good afternoon  We are going
20  back on the video record at 1:29 p m  Here continues
21  tape 2
22    MR BEAN: Q  Good afternoon, Mr Johnson
23    A  Good afternoon
24    Q  You understand you're still under oath?

41 (Pages 158 to 161)

James M. Johnson, Ph.D.                                    11/02/2007

Page 182

1    A  Because when you have an existing term that's
2  different than an extension term, you can't really
3  compare the two
4     MR. BEAN:  Okay  Why don't you give me equipment
5  schedule 94
6     MR SELLERS: 93?
7     MR. BEAN: 94
8     MR SELLERS: Oh, 94?
9     (Document marked as Johnson Deposition
10      Exhibit 11 for identification )
11    MR BEAN: Q  What's been marked as Johnson Exhibit
12  11 has been previously marked as Plaintiff's Exhibit 56
13  It's equipment schedule 94
14      You have had the opportunity -- Equipment
15  schedule 94 is one of the documents you've reviewed
16  previously; isn't that right?
17    A  Yes
18    Q  Okay. Now, and you -- Directing your attention
19  to the second-to-last page of schedule 94, you see under
20  the chart under paragraph 2?
21    A  I'm sorry, which page?
22    Q  I think you're on the right page. Page 741.
23    A  741
24    Q  Okay. You see the chart under paragraph 2?

Page 183

1    A  Excuse me  Yes
2    Q  And you understand that approximately 30
3  schedules had equipment that rolled onto schedule 94,
4  right?
5    A  Yes
6    Q  And those 30 schedules terminated at different
7  times, right?
8    A  Yes
9    Q  And you understand that some of the equipment
10  from some of those 30 schedules went onto schedule 93 as
11  well, right?
12    A  Yes
13    Q  Okay. If you wanted to figure out the cost of
14  whether it made sense for Lycos to enter into schedules
15  93 and 94, what information would you need?
16    MR KALER: Objection to the term made sense. It
17  doesn't have any meaning. Tom  You can respond, but --
18    MR. BEAN: Q  Oh, okay  If you wanted to figure
19  out the economic cost for Lycos to enter into schedules
20  93 and 94 as compared to what it would have paid on the
21  existing schedules, how would you -- what information
22  would you have needed?
23    A  I would need to know the remaining term of each
24  of the terminated schedules or continuing-on schedules

Page 184

1  I'd need to know the rent for each schedule  I'd need
2  to know the rent under the new schedule.
3      And for this particular schedule, I would need
4  to know how they would account for the fact that some of
5  these schedules are going to be running out before the
6  end of the 94 term  So this is that coterminous issue I
7  talked about before
8    Q  Okay.  You said the rent for each schedule.
9  Now, you know the equipment for most of the schedules
10  that rolled on in 94 were split between 93 and 94?
11    A  Yes
12    Q  And so you'd have to go piece of equipment by
13  piece of equipment to find out what the old rent was and
14  what the new rent was, right?
15    A  If the -- Yes
16    Q  Okay.
17    THE VIDEOGRAPHER: Counsel, could I change tapes?
18    MR KALER: Go ahead
19    THE VIDEOGRAPHER: Thank you.  Here concludes tape
20  2  We are going off the video record at 1:58 p m
21    (Recess was taken )
22    THE VIDEOGRAPHER: We are going back on the video
23  record at 2:00 o'clock p m  Here begins tape 3
24    MR. BEAN: Q  Okay  And you'd also need to know

Page 185

1  again the end-of-lease costs, right?
2    A  Yes
3    (Document marked as Johnson Deposition
4      Exhibit 12 for identification )
5    Q  Okay.  What's been marked as Exhibit 12, sir, is
6  equipment schedule 68B.
7      Now, I would like to direct your attention to
8  page 2701 of schedule 94.  Excuse me, sir.
9
10    A  I'm sorry, 27 what?
11    Q  2701. I'm sorry, 7701. My mistake.  Are you
12  there, sir?
13    A  Yes
14    Q  Okay.  And so, for example, to do -- because you
15  have to do a piece-by-piece comparison of the rents
16  because the schedules were split, you'd have to take a
17  piece of equipment on schedule -- on page 7701 and trace
18  it back and find it on the earlier schedule from which
19  it came; is that right?
20    MR. KALER: Objection
21    THE WITNESS: Yes.
22    MR. BEAN: Q  And you'd have to do that for each of
23  the thousands of pieces of equipment on schedule 94,
24  right?

James M. Johnson, Ph.D.

Page 186

1    MR. KALER: Objection
2    THE WITNESS: I believe so
3    MR. BEAN: Q  Okay. The documents -- the original
4    lease, if you will, for the equipment listed on pages
5    7701 is schedule 68B, right?
6    A  I'm sorry, say it again
7    Q  I'm directing -- On page 7701, as part of
8    schedule 94, the predecessor lease for the equipment on
9    this page was for the -- all except for the bottom few,
10   was schedule 68B, right?
11   A  Yes
12   Q  Okay. And there's no description of the
13   equipment other than the vendor, the type and the model
14   and the serial number on page 7701, right?
15   A  That's what I see
16   Q  Okay. Directing your attention about ten --
17   Going under serial number, you see the reference about
18   ten from the top for 159893B?  Do you see that serial
19   number?
20   A  Yes
21   Q  Can you find that serial number anywhere on
22   schedule 68B, sir?
23   MR. KALER: Well, objection
24   THE WITNESS: I don't see it, no.

Page 187

1    MR. BEAN: Q  And so for at least that piece of
2    equipment there's no way Lycos could have compared the
3    rent on the old schedule with the rent on the new
4    schedule, right?
5    MR. KALER: Objection
6    THE WITNESS: I don't know  Looking at this
7    schedule, I don't see it
8    MR. BEAN: Q  Okay  And by this schedule, you mean
9    schedule 68B?
10   A  Yes
11   Q  Okay. Let's take a look at the next one, serial
12   No. 159893D, as in dog. Can you find that on schedule
13   68B?
14   A  I don't see it
15   Q  And so there's no way -- so based on the
16   information that CSI provided to Lycos, Lycos couldn't
17   have compared the cost for that piece of equipment in
18   rewriting schedule -- that piece of equipment?
19   MR. KALER: Objection
20   THE WITNESS: Well, my understanding is they always
21   had the original purchase orders
22   MR. BEAN: Q  Sir, you said to me -- Well, first of
23   all, what do you base that on?
24   A  Testimony of several people

Page 188

1    Q  Okay. Now, you testified a few minutes ago that
2    to do the economic analysis, compare the economic cost
3    of doing a rewrite, you had to know the rent on the
4    earlier schedule and the rent on the rewritten schedule,
5    right?
6    A  Yes
7    Q  And that information was not available to you
8    with respect to two pieces of equipment we've looked at
9    so far, right?
10   A  On this schedule, yes
11   Q  On schedule 68.
12   A  Yes
13   Q  Let's go on and look at another half a dozen
14   pieces of equipment.
15   You see on schedule 94, same page, you see the
16   group 16451201 through 1206?
17   A  I'm sorry, which page are we on?
18   Q  The same page of schedule 94, page 7701.
19   A  Okay
20   Q  Do you see the grouping 16451201 through 1206
21   under the serial number column?  It's in the middle of
22   the page, sir.
23   A  Yes
24   Q  See if you can find any of those serial numbers

Page 189

1    on schedule 68B.
2    A  Five different ones or six different ones?
3    Q  There's six different ones.
4    A  I don't see them
5    Q  And so for these six additional pieces of
6    equipment Lycos could not have calculated based on the
7    information provided to it by CSI a comparison of the
8    rents on schedule 68B for those pieces of equipment with
9    the rent on schedule 94, could it?
10   MR. KALER: Objection
11   THE WITNESS: Not looking at these two documents
12   MR. BEAN: Q  Okay  And you're not aware of any
13   other documents that were provided by CSI to Lycos that
14   would provide the information, the rent, on schedule 68B
15   for the eight pieces of equipment that you sought that
16   you just looked for --
17   MR. KALER: Objection:
18   MR. BEAN: Q -- are you?
19   A  I remember seeing the documents that indicated
20   that on the original schedules there were serial numbers
21   available
22   Q  And you can't find them on schedule 68B, can
23   you?
24   A  I don't see it on schedule 68B  You asked me if

48 (Pages 186 to 189)

James M. Johnson, Ph.D.                                    11/02/2007

Page 190

1  there was a way of knowing  I thought I was answering
2  your question
3      Q  Okay.
4      MR. KALER:  You were
5      MR. BEAN:  Q  You mean on the original schedules
6  you think the serial numbers that you were just looking
7  for might be there, sir?
8      A  Either on the final or on the draft that was
9  circulated
10     Q  Did you see -- What drafts were you referring
11 to?
12     A  The ones that Ms Kersting and Mr. O'Neal
13 referred to
14     Q  Have you seen any drafts?
15     A  I haven't seen any, no
16     Q  Now, CSI -- when equipment was split between
17 schedules, as it was for 93 and 94, CSI should have told
18 Lycos what the rent was for the equipment from schedule
19 68B that was going onto 94, the total of the rent on
20 those pieces of equipment, and the total of the rent on
21 schedule 94 for those same pieces of equipment,
22 shouldn't it?
23     MR. KALER:  Objection
24     THE WITNESS:  Yes.

Page 191

1      MR. BEAN:  Q  Okay
2      A  CSI could have either told them or else they
3  could have gone back to the original serial numbers that
4  they got when they did the original schedules
5      Q  Well, but the original serial numbers don't tell
6  you what the rent is on the schedule that's rolling onto
7  93 and 94, right?
8      MR. KALER:  Objection
9      THE WITNESS:  I thought the draft did
10     MR. KALER:  It does
11     MR. BEAN:  Q  There is no draft for a rewritten
12 schedule like 68B, is there?
13     A  I don't believe so, but I believe that the
14 original schedules all had numbers that Lycos could
15 verify  That's why they gave them the information.
16     Q  You testified a few minutes ago, Professor
17 Johnson, that to analyze the economic effect of
18 rewriting schedules onto 93 and 94 Lycos had to compare
19 the rent on the immediate predecessor's schedule for
20 each piece of equipment for that -- with that piece of
21 equipment's rent on schedule 93 and 94, right?
22     MR. KALER:  Objection  That is not what he said.
23 and you know that's not what he said  You just can't
24 keep doing this

Page 192

1      MR. BEAN:  Q  You may answer the question, sir
2      MR. KALER:  Read it back again
3      MR. BEAN:  I'll ask it again
4      MR. KALER:  Every second of this comes out of your
5  time.
6      MR. BEAN:  Q  To do an analysis of the economic
7  effect of rewriting schedule 68B onto 93 and 94 Lycos
8  would have to know the rent for each piece of equipment
9  on 68B that was rolling onto 93 and 94, right?
10     MR. KALER:  Objection
11     THE WITNESS:  I would say so
12     MR. BEAN:  Q  Okay.  And so the rent that may have
13 been available on an original schedule that preceded
14 schedule 68B would not be relevant to that analysis,
15 would it?
16     MR. KALER:  Objection
17     THE WITNESS:  I don't know
18     MR. BEAN:  Q  Well, if the rent on an original
19 schedule that preceded 68B was a different amount than
20 what it was on schedule 68B, using the rent from the
21 earlier schedule would lead to a misleading result,
22 wouldn't it?
23     MR. KALER:  Objection
24     THE WITNESS:  I don't know

Page 193

1      MR. BEAN:  Q  All right  Sir, did you undertake to
2  do any analysis of the cost to Lycos of rewriting any of
3  the schedules, in other words, comparing the rent on the
4  old schedule with the rent on a new schedule where the
5  equipment was split between schedules?
6      A  I didn't personally  I relied on Mr. Smith's
7  report
8      Q  Did you find anything in Mr. Smith's report, his
9  analysis of the cost of doing that, that you found
10 incorrect?
11     A  Yes
12     MR. KALER:  Objection
13     MR. BEAN:  Q  What in Mr. Smith's computations did
14 you find to be erroneous, if anything?
15     A  I found it to be misleading because of what was
16 omitted, and in my opinion what was omitted was that
17 there was no cost estimate for the schedules that were
18 running out where the equipment would be expiring on
19 their leases  So it's back to a coterminous problem
20 again.
21     Q  If you present value the equipment -- if you
22 present value the leases, that problem is solved, isn't
23 it?
24     A  No

# EXHIBIT 13

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

**Transcript of the Testimony of:**

# Peter D. Karol

# December 8, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

James A. Scally   21994

Peter D. Karol 12-8-2006
Computer Sales International, Inc v Lycos, Inc.

166

1     with that
2     Q.  Were there any outside attorneys for Lycos
3     present?
4     A.  I don't recall
5            MR KALER:  So I'm not sure what
6     you're telling him not to answer
7            MR BEAN:  This gentleman was the
8     general counsel of Lycos at the time and
9     acting in his capacity as such in attending
10    that meeting
11           MR KALER:  Well, you're — you're
12    claiming that
13           MR BEAN:  Well, you can ask him
14    that.
15           MR. KALER:  Okay  So you're claiming
16    privilege on the basis of this witness's
17    presence?
18           MR BEAN:  That's right
19           MR KALER:  Okay
20           MR BEAN:  There's also discussions
21    about — well, I don't want to get into it,
22    but we're claiming privileges, yes, on that
23    meeting
24           MR KALER:  Okay

167

1     BY MR. KALER:
2     Q.  So you had — did you have any discussions at that
3     meeting, then, that you can tell us about?
4            MR BEAN:  I'm instructing you not to
5     answer as to — you can talk at a very high
6     level, but no specifics  If you want to
7     give just the topic of the meeting, but
8     we're going to cut it off there
9            THE WITNESS:  I understand
10    A  The topic of the meeting was LeaseForum presenting
11    its — its findings with respect to how much money Lycos
12    paid to CSI
13    Q.  And how much money did they say Lycos had paid to
14    CSI?
15           MR BEAN:  I instruct you not to
16    answer the question
17    Q.  And other than that meeting, or as a result of
18    that meeting, did Lycos take any action?
19    A  No
20    Q.  Did there come a time after that meeting when
21    Lycos missed a monthly rental payment that it was otherwise
22    scheduled to make to CSI?
23    A  I don't recall whether it was a monthly rental
24    payment but I do recall that Lycos did not pay an amount

168

1     that was alleged to be owed to CSI, yes
2     Q.  Okay.
3     A  In the amount of I believe. $300 000,
4     approximately
5     Q.  Were there any other conversations that you recall
6     having with anyone at Lycos about LeaseForum?
7     A  I do not recall
8     Q.  Do you recall any conversations that you had with
9     anyone at Lycos when you were at Lycos about CSI?
10    A  Yes
11    Q.  What conversations do you recall?
12    A  Other than the conversations we've talked about so
13    far today, I remember a conversation I had with Brian Lucy
14    Q.  When was that?
15    A  I don't recall when
16    Q.  Do you recall the year?
17    A  I do not recall the year  I'm sorry
18    Q.  Were you general counsel at that time?
19    A  No, I was not
20    Q.  Okay.  What was the substance of the conversation?
21    A  Mr Lucy indicated to me that he couldn't get
22    the — he couldn't get the numbers to match his analysis,
23    the payments to CSI to match what he thought they should
24    be

169

1     Q.  Do you remember who was there when he said this?
2     A  It was just me and him
3     Q.  Do you recall anything else that he said or you
4     said?
5     A  Yes
6     Q.  What else?
7     A  He said, "But I trust Paul Stenberg  He told me
8     that the payments were accurate "
9            And I said, "Why do you trust Paul?"
10           He said, Brian said, "He's a friend of mine "
11           And I said, "But, Brian, he doesn't work for
12    Lycos."
13           And Brian said, "But he's a friend of mine  He
14    would never lie to me," or to that effect, the last part
15    And that's all I recall of that conversation
16    Q.  Where were the two of you when this conversation
17    occurred?
18    A  I was in Mr  Lucy's office
19    Q.  What was Mr. Lucy's position at the time of this
20    conversation?
21    A  I don't recall when — when exactly it happened,
22    but I believe he was the CFO at that time  Excuse me
23    Q.  And you know that he became the CFO in or about
24    spring of 2001?

43 (Pages 166 to 169)

# EXHIBIT 14

Volume 1, Pages 1-285

Exhibits: 1-30

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF JOAN KERSTING

Wednesday, December 13, 2006, 9:06 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


- - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

8 (Pages 26 to 29)

Joan Kersting
Volume 1 - December 13, 2006

26

| | | |
|---|---|---|
| 1 | A. A renewal is an extension of the equipment. | 09:31:41 |
| 2 | If a customer wants to keep equipment longer, | 09:31:49 |
| 3 | they'll enter into a renewal lease. | 09:31:52 |
| 4 | Q. Now, you said that in determining the | 09:31:55 |
| 5 | monthly rent on a SmartTrack lease, the lease rate | 09:31:57 |
| 6 | factor was multiplied by the cost of the equipment? | 09:32:00 |
| 7 | A. Yes. | 09:32:03 |
| 8 | Q. Does the original cost of the equipment | 09:32:03 |
| 9 | appear -- does the original cost of the equipment on | 09:32:09 |
| 10 | an equipment schedule appear anywhere on any | 09:32:16 |
| 11 | documentation that's provided by CSI to its | 09:32:18 |
| 12 | customers? | 09:32:20 |
| 13 | A. It's on the certificate of acceptance. | 09:32:21 |
| 14 | Q. And what does the certificate of acceptance | 09:32:30 |
| 15 | list? | 09:32:33 |
| 16 | A. The certificate of acceptance lists the | 09:32:33 |
| 17 | start date of the lease, the end date of the lease, | 09:32:36 |
| 18 | total monthly rental, stip loss base, a list of all | 09:32:39 |
| 19 | the equipments, equipment costs, soft costs, | 09:32:46 |
| 20 | lease-rate factors | 09:32:51 |
| 21 | Q. Does the original equipment cost -- and | 09:32:58 |
| 22 | that certificate of acceptance is executed by the | 09:33:00 |
| 23 | customer after all of the equipment is installed at | 09:33:02 |
| 24 | the customer's location on a SmartTrack lease; isn't | 09:33:06 |

27

| | | |
|---|---|---|
| 1 | that right? | 09:33:08 |
| 2 | A. Yes | 09:33:09 |
| 3 | Q. Is there any other document provided at any | 09:33:10 |
| 4 | time by CSI to its customer which lists the original | 09:33:17 |
| 5 | cost of the equipment on each equipment schedule? | 09:33:20 |
| 6 | A. Yes. | 09:33:22 |
| 7 | Q. What document is that? | 09:33:24 |
| 8 | A. There can be many documents. It can be the | 09:33:25 |
| 9 | purchase order that the customer issues. It can be | 09:33:28 |
| 10 | a quote that the customer has received from the | 09:33:32 |
| 11 | vendor. It can be an invoice from the vendor. | 09:33:34 |
| 12 | Q. I believe my question went to any documents | 09:33:42 |
| 13 | provided by CSI to the customer. | 09:33:44 |
| 14 | A. We provide those documents to the customer | 09:33:46 |
| 15 | Q. You provide the purchase order to the | 09:33:49 |
| 16 | customer that the customer provided to CSI? | 09:33:50 |
| 17 | MR. LITTLE: Objection. | 09:33:56 |
| 18 | A. We get approvals from the customers to pay | 09:33:58 |
| 19 | for the equipment, so we can do that in a few | 09:34:00 |
| 20 | different ways. One is to provide them with the | 09:34:03 |
| 21 | invoice from the manufacturer or the vendor. | 09:34:06 |
| 22 | Q. Any other documents, other than those | 09:34:12 |
| 23 | you've just identified, that CSI provides to its | 09:34:14 |
| 24 | customer at any time which list the cost of the | 09:34:17 |

28

| | | |
|---|---|---|
| 1 | equipment on a particular equipment schedule? | 09:34:19 |
| 2 | A. I think that's it. | 09:34:21 |
| 3 | Q. Now, you mentioned the terms base value and | 09:34:27 |
| 4 | stip loss schedule, I believe; is that right? | 09:34:32 |
| 5 | A. The base value, yes. | 09:34:35 |
| 6 | Q. Do you as part of your job -- | 09:34:36 |
| 7 | What is base value, by the way? | 09:34:38 |
| 8 | A. The base value is the stipulated loss | 09:34:41 |
| 9 | amount that the parties agree to if there's a loss | 09:34:49 |
| 10 | of the equipment. | 09:34:52 |
| 11 | Q. And are you involved in calculating the | 09:34:53 |
| 12 | base value on equipment schedules? | 09:34:58 |
| 13 | A. Sometimes | 09:35:00 |
| 14 | Q. And who else does that? | 09:35:02 |
| 15 | A. The lease administration group does it, | 09:35:03 |
| 16 | also. | 09:35:05 |
| 17 | Q. And who heads up the lease administration | 09:35:08 |
| 18 | group? | 09:35:14 |
| 19 | A. Angie Bader. | 09:35:15 |
| 20 | Q. I had about five witnesses testify that the | 09:35:17 |
| 21 | legal department does it, so we were looking forward | 09:35:20 |
| 22 | to seeing you | 09:35:23 |
| 23 | Did you calculate the base value on -- | 09:35:27 |
| 24 | let me rephrase that. You calculated the base value | 09:35:32 |

29

| | | |
|---|---|---|
| 1 | on many of the equipment schedules between CSI and | 09:35:34 |
| 2 | Lycos, did you not? | 09:35:37 |
| 3 | A. I don't know | 09:35:39 |
| 4 | MR. LITTLE: Objection. Motions to | 09:35:40 |
| 5 | strike are reserved, I take it? | 09:35:41 |
| 6 | MR. BEAN: Yes | 09:35:42 |
| 7 | MR. LITTLE: Okay, yes. Go ahead. | 09:35:44 |
| 8 | A. I don't know. I would have to look at | 09:35:46 |
| 9 | them | 09:35:48 |
| 10 | Q. You'd have to look at them. Would you | 09:35:49 |
| 11 | recognize if you'd calculated the base value? | 09:35:50 |
| 12 | A. Sometimes I would | 09:35:52 |
| 13 | Q. What methodology do you employ to calculate | 09:35:54 |
| 14 | the base value on an original equipment schedule, or | 09:35:57 |
| 15 | an equipment schedule for new equipment? | 09:36:00 |
| 16 | A. For new equipment? The base value is | 09:36:04 |
| 17 | typically the higher of the equipment cost or the | 09:36:07 |
| 18 | present value of the monthly rental stream | 09:36:12 |
| 19 | Q. And how about on a renewal? What | 09:36:19 |
| 20 | methodology do you employ to calculate the base | 09:36:29 |
| 21 | value? | 09:36:31 |
| 22 | A. Typically I would use the present value of | 09:36:32 |
| 23 | the monthly rental stream. | 09:36:35 |
| 24 | Q. Is there any documentation at CSI that | 09:36:46 |

Joan Kersting
Volume 1 - December 13, 2006

|  | 30 |  |
|---|---|---|
| 1 | specifies CSI's methodology for calculating base | 09:36:51 |
| 2 | value? | 09:36:56 |
| 3 | A. I don't have such a document. | 09:37:00 |
| 4 | Q. You just know from experience that that's | 09:37:01 |
| 5 | how you do it. | 09:37:02 |
| 6 | A. Yes | 09:37:04 |
| 7 | Q. By "renewal" did you mean to refer only to | 09:37:05 |
| 8 | leases that were extended at the end of the lease | 09:37:10 |
| 9 | term, or did you include within your definition of | 09:37:13 |
| 10 | renewal schedules that were extended in the middle | 09:37:17 |
| 11 | of the lease term? | 09:37:19 |
| 12 | A. It can be either one. | 09:37:20 |
| 13 | Q. Either one. And would your methodology for | 09:37:21 |
| 14 | calculating the base value on a renewal be the | 09:37:26 |
| 15 | present value of the monthly rental stream | 09:37:29 |
| 16 | regardless of whether it was renewed in the middle | 09:37:32 |
| 17 | of the lease or at the end of the lease? | 09:37:34 |
| 18 | A. If it were earlier in the lease, I might | 09:37:37 |
| 19 | use a different method. I would take that into | 09:37:42 |
| 20 | consideration. | 09:37:45 |
| 21 | Q What method might you use, then, if it were | 09:37:45 |
| 22 | renewed early in the lease? | 09:37:48 |
| 23 | A If it were renewed earlier, it's possible | 09:37:50 |
| 24 | that we might have an equity position in the | 09:37:51 |

|  | 31 |  |
|---|---|---|
| 1 | equipment, so the stip loss base might be higher | 09:37:54 |
| 2 | Q Does CSI disclose -- tell its customers | 09:38:09 |
| 3 | anywhere its methodology for calculating base value | 09:38:13 |
| 4 | on renewals? | 09:38:16 |
| 5 | MR. LITTLE: Objection You may answer | 09:38:22 |
| 6 | A I'm not sure what you mean It's in the | 09:38:23 |
| 7 | document that we provide to them | 09:38:25 |
| 8 | Q. What's in the document? | 09:38:28 |
| 9 | A. The stipulated loss base. | 09:38:28 |
| 10 | Q I understand that the number is in the | 09:38:30 |
| 11 | document But is the methodology explained to | 09:38:31 |
| 12 | customers anywhere? | 09:38:34 |
| 13 | A. I do not explain the methodology. | 09:38:39 |
| 14 | Q. Have you ever explained your methodology | 09:38:53 |
| 15 | for calculating base value on a renewal to Paul | 09:38:54 |
| 16 | Stenberg? | 09:38:59 |
| 17 | A Not that I recall | 09:39:01 |
| 18 | Q Have you ever explained your methodology | 09:39:04 |
| 19 | for calculating base value on a renewal to any | 09:39:07 |
| 20 | account executive at CSI? | 09:39:10 |
| 21 | A I don't recall doing that, no | 09:39:13 |
| 22 | Q. With respect to the stipulated loss value | 09:39:18 |
| 23 | percentages -- | 09:39:38 |
| 24 | You're familiar with the percentages on | 09:39:39 |

|  | 32 |  |
|---|---|---|
| 1 | the stip loss value schedule, are you not? | 09:39:41 |
| 2 | A. Yes. | 09:39:45 |
| 3 | Q. Do those percentages vary from customer to | 09:39:46 |
| 4 | customer? | 09:39:50 |
| 5 | A. They can, yes. | 09:39:51 |
| 6 | Q. Are you generally familiar with the stip | 09:39:52 |
| 7 | loss percentages that were used on the equipment | 09:40:04 |
| 8 | schedules between CSI and Lycos? | 09:40:05 |
| 9 | A. No. | 09:40:07 |
| 10 | Q But you calculated the base value? | 09:40:09 |
| 11 | MR. LITTLE: Objection | 09:40:13 |
| 12 | A. I calculated the base value on some of | 09:40:14 |
| 13 | them. | 09:40:15 |
| 14 | Q. And Angie Bader, you said that the lease | 09:40:19 |
| 15 | administration group sometimes calculates base | 09:40:23 |
| 16 | value; right? | 09:40:26 |
| 17 | A. Yes. | 09:40:27 |
| 18 | Q. Do you know what methodology the lease | 09:40:27 |
| 19 | administration group uses to calculate base value on | 09:40:29 |
| 20 | renewals? | 09:40:33 |
| 21 | A. They wouldn't calculate it on renewals | 09:40:38 |
| 22 | They would calculate it on SmartTrack-type leases. | 09:40:40 |
| 23 | Q. Leases of new equipment? | 09:40:42 |
| 24 | A. Of SmartTrack leases, not just new | 09:40:44 |

|  | 33 |  |
|---|---|---|
| 1 | equipment | 09:40:47 |
| 2 | Q Is a renewal a SmartTrack lease or not? | 09:40:48 |
| 3 | A It is not | 09:40:51 |
| 4 | Q Would it be fair, then, to say that only | 09:40:52 |
| 5 | the legal department calculates the base value on | 09:40:58 |
| 6 | renewals of equipment schedules? | 09:41:01 |
| 7 | A I think that generally, yes, the stip loss | 09:41:04 |
| 8 | base is calculated by the legal department on | 09:41:12 |
| 9 | renewals | 09:41:14 |
| 10 | Q And who in the legal department other than | 09:41:16 |
| 11 | you calculated the base value on renewals of | 09:41:22 |
| 12 | equipment schedules between CSI and Lycos? | 09:41:28 |
| 13 | A It could have been calculated by Phil | 09:41:34 |
| 14 | Cagney The present-value number is on the RFC | 09:41:42 |
| 15 | Q. RFC, the request for contract? | 09:41:46 |
| 16 | A Right | 09:41:50 |
| 17 | Q Would Mr Cagney have used the same | 09:41:51 |
| 18 | methodology for calculating base value on a renewal | 09:41:55 |
| 19 | that you use? | 09:41:58 |
| 20 | MR. LITTLE: Objection You may answer | 09:42:00 |
| 21 | A He's not calculating the base value He's | 09:42:05 |
| 22 | calculating the present value of the lease | 09:42:08 |
| 23 | Q. The present value of the remaining payments | 09:42:09 |
| 24 | on the lease? | 09:42:12 |

10 (Pages 34 to 37)

Joan Kersting
Volume 1 - December 13, 2006

**34**

| | | |
|---|---|---|
| 1 | A. Correct. | 09:42:12 |
| 2 | Q. And you said that when you calculate the | 09:42:21 |
| 3 | base value on a renewal, you also calculate it based | 09:42:24 |
| 4 | on the present value of the remaining payments on | 09:42:28 |
| 5 | the lease; right? | 09:42:30 |
| 6 | A. That's the number I use. I don't always | 09:42:32 |
| 7 | calculate it myself. I may use the number that's | 09:42:35 |
| 8 | already on the RFC. | 09:42:38 |
| 9 | Q. Do you use any methodology in calculating | 09:42:45 |
| 10 | base value on renewals other than the present value | 09:42:49 |
| 11 | of the payment on -- remaining payments on the | 09:42:54 |
| 12 | equipment schedule? | 09:42:57 |
| 13 | A. In general, I used what I explained before: | 09:42:59 |
| 14 | the present value of the monthly rental. I'm not -- | 09:43:04 |
| 15 | I'm sure that there are other numbers out there that | 09:43:07 |
| 16 | aren't the present value | 09:43:11 |
| 17 | Q. How are you sure of that? | 09:43:12 |
| 18 | A. Well, from time to time customers will ask | 09:43:14 |
| 19 | us to use a certain number as a base value | 09:43:15 |
| 20 | Q. Other than those circumstances where | 09:43:22 |
| 21 | customers ask you to use a certain number as a base | 09:43:23 |
| 22 | value, can you think of any circumstance when you | 09:43:25 |
| 23 | have employed a methodology in determining a base | 09:43:29 |
| 24 | value for a renewal other than the present value of | 09:43:34 |

**35**

| | | |
|---|---|---|
| 1 | the payments on the equipment schedule? | 09:43:37 |
| 2 | A. I think like I explained before, it could | 09:43:39 |
| 3 | be the present value, if it's early on in a renewal | 09:43:41 |
| 4 | It may also take into consideration an equity | 09:43:45 |
| 5 | position that we've taken in the equipment | 09:43:48 |
| 6 | Q. And in those cases where it's early on in | 09:43:52 |
| 7 | the schedule and CSI has taken an equity position in | 09:43:55 |
| 8 | the equipment, the base value -- | 09:43:58 |
| 9 | THE REPORTER: I'm sorry I didn't hear | 09:44:06 |
| 10 | that. | 09:44:08 |
| 11 | Q. In those circumstances where CSI has taken | 09:44:08 |
| 12 | an equity position in a schedule, perhaps because | 09:44:11 |
| 13 | it's early in the schedule, the base value on that | 09:44:15 |
| 14 | schedule would be more than the present value of the | 09:44:20 |
| 15 | lease payments, would it not? | 09:44:22 |
| 16 | MR. LITTLE: Objection | 09:44:24 |
| 17 | A. It may be. | 09:44:25 |
| 18 | MR. LITTLE: You may answer. | 09:44:26 |
| 19 | A. It may be, yes | 09:44:29 |
| 20 | Q. Would there ever be a circumstance where | 09:44:29 |
| 21 | the base value would be -- where CSI had an equity | 09:44:31 |
| 22 | position that would be less than the present value | 09:44:35 |
| 23 | of the payments on the equipment schedule? | 09:44:39 |
| 24 | A. An equity position less than the equipment | 09:44:42 |

**36**

| | | |
|---|---|---|
| 1 | value? | 09:44:45 |
| 2 | Q. No, I'm saying assume that CSI has an | 09:44:45 |
| 3 | equity position in an equipment schedule. Would the | 09:44:49 |
| 4 | base value ever be less than the present value of | 09:44:51 |
| 5 | the payments on that schedule? | 09:44:55 |
| 6 | MR. LITTLE: Objection. | 09:44:59 |
| 7 | A. The base value -- I think I said before, | 09:44:59 |
| 8 | the base value is always going to be the higher of | 09:45:01 |
| 9 | the equipment cost or the present value of the | 09:45:05 |
| 10 | lease. So the present value of the lease is always | 09:45:08 |
| 11 | going to be covered. | 09:45:10 |
| 12 | Q. Covered by the base value. | 09:45:13 |
| 13 | A. The stip loss base will always cover the | 09:45:14 |
| 14 | present value of the monthly rental stream. | 09:45:17 |
| 15 | Q. Are you familiar -- have you been to | 09:45:43 |
| 16 | seminars or programs in the leasing industry at | 09:45:48 |
| 17 | which stip loss percentages have been discussed? | 09:45:51 |
| 18 | A. Not that I recall. | 09:45:56 |
| 19 | Q. Are you familiar with how the percentages | 09:45:56 |
| 20 | on the CSI stip loss value schedule compares with | 09:46:01 |
| 21 | the percentages in the industry more generally? | 09:46:05 |
| 22 | A. I -- I don't recall looking at other | 09:46:12 |
| 23 | companies' stip loss base tables | 09:46:16 |
| 24 | Q. Now, you're familiar with the -- you said | 09:46:34 |

**37**

| | | |
|---|---|---|
| 1 | you were involved in the preparation of the lease | 09:46:37 |
| 2 | documentation; right? | 09:46:39 |
| 3 | A. I do prepare lease documents | 09:46:40 |
| 4 | Q. And so you're familiar with the process by | 09:46:42 |
| 5 | which a request for a contract comes in to CSI and | 09:46:45 |
| 6 | the lease documents are prepared and then sent out | 09:46:48 |
| 7 | to the customer; right? | 09:46:50 |
| 8 | A. Yes | 09:46:51 |
| 9 | MR. BEAN: Would you mark that as the | 09:46:56 |
| 10 | first exhibit, please. | 09:46:57 |
| 11 | (Exhibit Kersting 1 marked for | 09:46:58 |
| 12 | identification ) | 09:47:14 |
| 13 | Q. What's been marked as Exhibit 1, | 09:47:14 |
| 14 | Ms Kersting, is a two-page document, Bates number | 09:47:17 |
| 15 | CSI 0009959 and 9960 Do you recognize the form of | 09:47:20 |
| 16 | Exhibit 1? | 09:47:28 |
| 17 | A. Yes | 09:47:30 |
| 18 | Q What is it? | 09:47:30 |
| 19 | A This is a request for contract form, an | 09:47:31 |
| 20 | RFC | 09:47:35 |
| 21 | Q Do you see at the very top the date of | 09:47:35 |
| 22 | September 16th, 1999, and then your name? | 09:47:37 |
| 23 | A Yes | 09:47:39 |
| 24 | Q What's the significance -- why is your name | 09:47:41 |

Joan Kersting
Volume 1 - December 13, 2006

**38**

1    on this form?    09:47:43
2        A. My name is on it because it was sent to me    09:47:44
3    and I worked on it.    09:47:49
4        Q. Do you know who sent it to you? Can you    09:47:50
5    tell from looking at it?    09:47:53
6        A. I can't tell from looking at it, but    09:47:54
7    typically it would come from the marketing rep.    09:47:56
8        Q. From the account executive?    09:47:59
9        A. Yes.    09:48:00
10        Q. And you're aware that the account executive    09:48:02
11    for the Lycos account was Paul Stenberg, were you    09:48:04
12    not?    09:48:07
13        A. Yes.    09:48:07
14        Q. So in all likelihood this came from Mr.    09:48:08
15    Stenberg?    09:48:08
16        A. Yes.    09:48:11
17        Q. And Mr. Stenberg would have filled out the    09:48:11
18    information under Transaction Summary, would he not?    09:48:14
19        A. I don't know who fills that out. It comes    09:48:16
20    to me and it's filled out. I'm not sure if he's    09:48:21
21    gotten help from somebody else to do it.    09:48:25
22        Q. Do you see it before or after --    09:48:27
23        Do you see at the bottom where there's a    09:48:30
24    box for JPC/EWG? Do you see that?    09:48:31

**39**

1        A. Yes.    09:48:35
2        Q. And JPC is Phil Cagney, is it not?    09:48:35
3        A. Yes.    09:48:39
4        Q. And EWG is Bill Gillula; right?    09:48:39
5        A. Yes.    09:48:43
6        Q. Do you get this form from the account    09:48:43
7    executive before it goes to Mr. Cagney or Mr.    09:48:45
8    Gillula or after?    09:48:48
9        A. I get this form before it goes to them.    09:48:49
10        Q. And EJA in the lower right-hand stands for    09:48:52
11    Eric Ausubel; right?    09:48:58
12        A. Yes.    09:48:59
13        Q. And do you get this form before it goes to    09:48:59
14    Mr. Ausubel?    09:49:02
15        A. Yes.    09:49:02
16        Q. Are you the first person who sees this form    09:49:04
17    when it comes in from the account executive?    09:49:06
18        A. It's either me or someone in my department.    09:49:14
19        Q. I realized as soon as I said the first    09:49:17
20    person, it could have been the secretary was the    09:49:18
21    first person. But somebody in the legal department    09:49:21
22    first sees this; right?    09:49:23
23        A. Yes.    09:49:24
24        Q. Now, going down under Transaction Summary,    09:49:24

**40**

1    do you see where it says Rollover Threshold?    09:49:27
2        A. Yes.    09:49:30
3        Q. And you see the reference to Schedules 43,    09:49:30
4    48, 48A, 50B, 58, and 69?    09:49:33
5        A. Yes.    09:49:37
6        Q. What do you understand that Mr. Stenberg is    09:49:39
7    proposing in this request for contract?    09:49:43
8        MR. LITTLE: Objection. You may answer    09:49:46
9        A. What do I understand that he is --    09:49:52
10        Q. Yes. Request for contract, he's asking    09:49:54
11    that a contract be created; right?    09:49:56
12        A. Right    09:49:58
13        Q. And what type of contract -- what is he    09:50:01
14    proposing that that contract can provide?    09:50:03
15        A. He's asking that we do a 36-month lease at    09:50:09
16    the rent specified for the equipment that comes from    09:50:14
17    those schedules    09:50:16
18        Q. So his proposal is that all of the    09:50:17
19    equipment from those six schedules will move onto a    09:50:19
20    single schedule of 36 months; is that right?    09:50:24
21        A. Yes    09:50:27
22        Q. Now go to the second page, and do you see    09:50:27
23    typed in in the middle of the page where it says,    09:50:33
24    "Make ES number 68A"? Do you see that?    09:50:35

**41**

1        A. Yes    09:50:38
2        Q. Is that Mr Stenberg's proposal, that it be    09:50:40
3    Equipment Schedule No. 68A?    09:50:43
4        A. I don't know. It could have been on the    09:50:46
5    original request. It could have been put on there    09:50:50
6    by one of the people who has comments    09:50:55
7        Q. Go down to the bottom of the page. Do you    09:50:57
8    see the handwriting in the lower left?    09:51:00
9        A. Yes.    09:51:01
10        Q. That's your handwriting, is it not?    09:51:02
11        A. I don't know. It could be.    09:51:04
12        Q. You're not sure?    09:51:05
13        A. I'm not sure    09:51:06
14        Q. We'll look at some other of your    09:51:09
15    handwriting today that has your name on it, that    09:51:10
16    looks similar.    09:51:14
17        Any idea why the person wrote "Should be    09:51:15
18    68B rather than 68A"?    09:51:17
19        MR. LITTLE: Objection    09:51:21
20        A. I don't know    09:51:25
21        Q. Once you received this document marked    09:51:37
22    Exhibit 1 from the account executive, what's the    09:51:41
23    next step in the lease contract preparation process?    09:51:42
24        A. We would put the RFC in a folder and get    09:51:51

12 (Pages 42 to 45)

Joan Kersting
Volume 1 - December 13, 2006

| | | 42 |
|---|---|---|
| 1 | the comments from Phil and Eric. | 09:51:55 |
| 2 | Q. When you say put in it a folder, what do | 09:51:59 |
| 3 | you mean by that? Literally in a -- | 09:52:02 |
| 4 | A. It gets into a shared electronic folder. | 09:52:04 |
| 5 | Q. And then Phil and Eric would give their | 09:52:07 |
| 6 | comments on it? | 09:52:15 |
| 7 | A. Yes. | 09:52:15 |
| 8 | Q. And in the case of Exhibit 1, Mr. Cagney | 09:52:16 |
| 9 | approved it on 9/16/99; right? | 09:52:18 |
| 10 | A. Yes. | 09:52:22 |
| 11 | Q. And Mr. Ausubel just wrote "financing cont. | 09:52:22 |
| 12 | 60 days"? Do you see that? | 09:52:26 |
| 13 | A. Yes. | 09:52:29 |
| 14 | Q. So they both approved this; right? | 09:52:29 |
| 15 | MR. LITTLE: Objection. | 09:52:31 |
| 16 | A. I don't know that they both approved it. I | 09:52:32 |
| 17 | don't know that they made comments on it. | 09:52:34 |
| 18 | Q. What happens after they make comments in | 09:52:38 |
| 19 | the lease preparation process? | 09:52:41 |
| 20 | A. They will tell us if it's ready to be | 09:52:44 |
| 21 | prepared, and we'll prepare a contract. | 09:52:46 |
| 22 | Q. And then you'll prepare a contract. And | 09:52:48 |
| 23 | you or someone or one of the legal assistants will | 09:52:51 |
| 24 | prepare that contract? | 09:52:53 |

| | | 43 |
|---|---|---|
| 1 | A. Yes | 09:52:54 |
| 2 | Q. And will you prepare the contract exactly | 09:52:56 |
| 3 | as requested -- namely, in this case, a 36-month | 09:52:59 |
| 4 | extension of Schedules 43, 48, 48A, 50B, 58, and 69? | 09:53:03 |
| 5 | A. Well, the second page says that it's all | 09:53:10 |
| 6 | the equipment at those two locations, so I'm not | 09:53:12 |
| 7 | sure if, looking at this, if it's the whole | 09:53:16 |
| 8 | schedules or just those from those locations | 09:53:18 |
| 9 | Q. When you're referring to locations, you're | 09:53:24 |
| 10 | seeing some in Pittsburgh, some in Waltham, and some | 09:53:26 |
| 11 | in Santa Clara? | 09:53:29 |
| 12 | A. Yes | 09:53:30 |
| 13 | Q. Okay. Now, when you say -- | 09:53:32 |
| 14 | But it says "Equipment locations: All | 09:53:34 |
| 15 | equipment on the above schedules" -- right? At the | 09:53:37 |
| 16 | above addresses; right? | 09:53:40 |
| 17 | A. "All on the above schedules located in | 09:53:42 |
| 18 | Pittsburgh, Waltham, and Santa Clara." | 09:53:44 |
| 19 | Q. And so they were in Santa Clara -- | 09:53:47 |
| 20 | A. I'm not clear if there are other locations | 09:53:50 |
| 21 | on those schedules | 09:53:52 |
| 22 | Q. So if there were equipment at other | 09:53:54 |
| 23 | locations, that equipment would not be included in | 09:53:56 |
| 24 | the rollover; is that right? Or you're not clear on | 09:53:59 |

| | | 44 |
|---|---|---|
| 1 | that? | 09:54:02 |
| 2 | MR. LITTLE: Objection. | 09:54:03 |
| 3 | A. In the renewal, I don't know. | 09:54:03 |
| 4 | Q. Now, you're using the word "renewal." The | 09:54:06 |
| 5 | word on Exhibit 1 is "rollover." Do you have an | 09:54:09 |
| 6 | understanding that they mean the same thing? | 09:54:12 |
| 7 | A. I always call the schedules a renewal. I | 09:54:20 |
| 8 | think they're saying that they're rolling over | 09:54:24 |
| 9 | equipment from one schedule to another. But I don't | 09:54:28 |
| 10 | call them rollovers | 09:54:30 |
| 11 | Q. You don't call them rollovers, but | 09:54:32 |
| 12 | "rollovers" mean the same thing as "renewals" at | 09:54:34 |
| 13 | CSI, do they not? | 09:54:38 |
| 14 | MR. LITTLE: Objection. You may answer. | 09:54:39 |
| 15 | A. I think I already answered that. But I | 09:54:41 |
| 16 | think the rollover threshold is different than a | 09:54:43 |
| 17 | renewal contract. | 09:54:48 |
| 18 | Q. What is the rollover threshold? | 09:54:48 |
| 19 | A. That's the threshold number -- well, on | 09:54:51 |
| 20 | this one it indicates the schedules, that that's the | 09:54:55 |
| 21 | threshold number that is given to them by the | 09:54:58 |
| 22 | pricing group to do a renewal | 09:55:02 |
| 23 | Q. Is that a number -- is the number that's | 09:55:04 |
| 24 | given to them by the pricing group something | 09:55:06 |

| | | 45 |
|---|---|---|
| 1 | different than total threshold PV, as reflected on | 09:55:07 |
| 2 | Exhibit 1? | 09:55:13 |
| 3 | A. I don't know | 09:55:14 |
| 4 | Q. So we're at the stage in the lease | 09:55:23 |
| 5 | preparation process where you or your group drafts | 09:55:25 |
| 6 | the leases. What happens once the leases are | 09:55:30 |
| 7 | prepared? | 09:55:32 |
| 8 | A. The leases are prepared and they're sent | 09:55:34 |
| 9 | either to the account executive or to the customer | 09:55:36 |
| 10 | for signature | 09:55:40 |
| 11 | Q. In the case of Lycos, do you recall whether | 09:55:42 |
| 12 | it was CSI's practice to provide the leases that | 09:55:52 |
| 13 | have been prepared to the account executive or to | 09:55:55 |
| 14 | send them directly to Lycos? | 09:55:58 |
| 15 | A. I don't recall | 09:56:01 |
| 16 | Q. Did you ever talk with anyone employed by | 09:56:04 |
| 17 | Lycos? | 09:56:07 |
| 18 | A. I have | 09:56:07 |
| 19 | Q. With whom at Lycos have you spoken? | 09:56:11 |
| 20 | A. I know at one point I talked to one of the | 09:56:14 |
| 21 | lawyers about a certificate of incumbency. I don't | 09:56:17 |
| 22 | recall his name | 09:56:22 |
| 23 | Q. Have you talked to anyone else at Lycos, | 09:56:24 |
| 24 | ever? | 09:56:27 |

Joan Kersting
Volume 1 - December 13, 2006

**82**

1  say, then, that the additional 10 percent above 100    10:55:02
2  that you included early in your time at CSI was to    10:55:05
3  cover any residual value that CSI had booked for the    10:55:07
4  equipment schedule?    10:55:13
5        MR. LITTLE: Objection.    10:55:14
6     A  It was just a number that we used to cover    10:55:15
7  the stip loss.    10:55:20
8     Q  To cover the stip loss.    10:55:22
9     A  If the equipment was lost, they would pay    10:55:24
10  this amount.    10:55:27
11     Q  Okay, let's take a look at the last page of    10:55:28
12  Exhibit 3. So, as I read the schedule, if the    10:55:35
13  customer loses the equipment at the end of 36    10:55:46
14  months, it has to pay 55 percent of the base value    10:55:48
15  to CSI; is that right?    10:55:52
16     A  Yes.    10:55:58
17     Q  And that's in addition to the rental    10:55:58
18  payments that the customer has made to CSI for 36    10:56:00
19  months?    10:56:03
20     A  If it's at the end of the lease, yes, they    10:56:07
21  would have paid the monthly rental.    10:56:09
22     Q  And that would be -- and the customer would    10:56:13
23  have to pay CSI 55 percent of the base value even if    10:56:15
24  the customer had already paid CSI 100 percent of the    10:56:19

**83**

1  original cost of the equipment; is that right?    10:56:24
2     A  I don't -- I wasn't taking into    10:56:32
3  consideration the original cost of the equipment.    10:56:34
4  If they have paid the monthly rental, that was the    10:56:38
5  contractual amount.    10:56:41
6     Q  But suppose that under the monthly rental    10:56:43
7  the customer has paid --    10:56:45
8        Well, go back and look at Exhibit 2,    10:56:47
9  please, the first page. Do you see where it says,    10:56:50
10  "90 percent test, 108.08 percent"?    10:56:55
11     A  I see that.    10:56:59
12     Q  And you know how to calculate the present    10:57:01
13  value of a stream of rental payments; right?    10:57:03
14     A  I do.    10:57:10
15     Q  Are you aware that that reference next to    10:57:11
16  "90 percent test" indicates that the stream of    10:57:14
17  rental payments that Lycos was required to make    10:57:18
18  under Schedule 68B is 108.08 percent of the    10:57:21
19  original cost of the equipment?    10:57:25
20        MR. LITTLE: Objection.    10:57:27
21     A  I'm not aware of that.    10:57:27
22     Q  Do you know how to calculate the . .    10:57:33
23        But your understanding -- that $3.5    10:57:41
24  million number for base value, sitting here today,    10:58:02

**84**

1  you don't have a present memory of how you    10:58:05
2  calculated that, do you?    10:58:07
3     A  I do not.    10:58:08
4     Q  But that would equal -- taking a look at    10:58:09
5  Exhibit -- where would you --    10:58:16
6        In setting the base value, what    10:58:18
7  documents would you look at to determine what the    10:58:20
8  present value of the stream of rental payments was?    10:58:22
9     A  What documents would I look at?    10:58:30
10     Q  Yeah. Would you calculate the present    10:58:32
11  value of the stream of rental payments yourself, or    10:58:34
12  would you look at a particular document or    10:58:36
13  documents?    10:58:37
14     A  Sometimes I would calculate it myself.    10:58:38
15  Some RFCs have the number, the present-value number,    10:58:41
16  on them    10:58:45
17     Q  Do you know how to use an HP 12C?    10:58:45
18     A  Yes.    10:58:49
19     Q  Take a look at Exhibit 3  What is the    10:58:51
20  present value of the stream of rental payments on    10:58:56
21  Exhibit 3?    10:59:00
22     A  Using what interest rate?    10:59:00
23     Q  Well, how would you determine what interest    10:59:08
24  rate to use in determining the base value?    10:59:09

**85**

1     A  If there was an interest rate on the RFC, I    10:59:15
2  would typically use that.    10:59:19
3        MR. BEAN: Would you mark this as the    10:59:42
4  next exhibit, please    10:59:43
5        (Exhibit Kersting 4 marked for    10:59:44
6  identification )    11:00:02
7     Q  What's been marked as Exhibit 4,    11:00:02
8  Ms. Kersting, is a one-page document  It's the RFC    11:00:03
9  for Schedules, it says, 68B and 68C  It's CSI    11:00:06
10  0039956. Do you recognize what's been marked as    11:00:13
11  Exhibit 4?    11:00:16
12     A  I recognize this as the first page of an    11:00:18
13  RFC    11:00:24
14     Q  And what interest rate -- and you see that    11:00:26
15  the lease number is 68B and 68C. Do you see that?    11:00:28
16     A  Yes    11:00:31
17     Q  What interest rate does this RFC specify to    11:00:34
18  use in calculating the present value of Schedule 68B    11:00:39
19  and 68C?    11:00:43
20     A  On the transaction summary, it has an    11:00:45
21  assumed debt rate of 11  On the administrative use    11:00:50
22  only, it has a debt rate of 11.375.    11:00:56
23     Q  So assume that, if you had Exhibit 4 in    11:01:01
24  front of you and you were going to calculate the    11:01:04

30 (Pages 114 to 117)

Joan Kersting
Volume 1 - December 13, 2006

**114**

1  they told us what the problem was, we would try to  11:41:00
2  come up with a number, a stip loss base.  11:41:04
3     Q. And suppose the parties couldn't agree on  11:41:09
4  that?  11:41:12
5     A. I think we would agree on it.  11:41:12
6     Q. CSI and Lycos never negotiated the base  11:41:17
7  value for any of the schedules, did they?  11:41:23
8        MR. LITTLE: Objection.  11:41:27
9     A. I don't know that.  11:41:28
10     Q. You never negotiated the base value with  11:41:28
11  anyone from Lycos, did you?  11:41:31
12     A. I don't recall doing that.  11:41:33
13        MR. BEAN: Would you mark this as the  11:42:52
14  next exhibit, please.  11:42:54
15        (Exhibit Kersting 6 marked for  11:42:55
16  identification.)  11:43:17
17     Q. What's been marked as Exhibit 6,  11:43:17
18  Ms. Kersting, are lease documents relative to  11:43:20
19  Schedule 34 between CSI and Lycos. It's CSI 0020111  11:43:24
20  through 20114; it's 20136 through 20137, 39136 and  11:43:30
21  37, 40103 and 40104  11:43:44
22        Looking at the stip loss value table to  11:44:00
23  Schedule 34: This is a 24-month lease; correct?  11:44:06
24     A. Yes  11:44:13

**115**

1     Q. And do you see that the original cost of --  11:44:18
2  Taking a look at Page 39137, does that inform you as  11:44:26
3  to the original cost of the equipment that was  11:44:41
4  leased pursuant to Schedule 34?  11:44:48
5     A. That's what it looks like  11:44:50
6     Q. How much was the original cost of the  11:45:16
7  equipment on Schedule 34?  11:45:18
8     A. It's not clear to me if the original cost  11:45:19
9  was the 475,000 number or the 487,000 number  11:45:27
10     Q. When CSI references original equipment cost  11:45:34
11  in Paragraph 5 of -- when CSI references original  11:45:38
12  equipment cost, does it consider all the hardware  11:45:50
13  cost, or does it consider other costs as well?  11:45:53
14        MR. LITTLE: Objection  11:45:55
15     A. I don't know where you're talking about,  11:45:56
16  original equipment cost  11:45:58
17     Q. It's on -- Looking back to Schedule 35, the  11:46:00
18  prior exhibit, do you see the reference in Paragraph  11:46:13
19  5 on Page 20253 to manufacturer list price?  11:46:20
20     A. Yes  11:46:25
21     Q. What is included in manufacturer's list  11:46:25
22  price? Is it only hardware, or does it include  11:46:28
23  other costs as well?  11:46:32
24     A. In my mind, it would include hardware and  11:46:34

**116**

1  any associated software.  11:46:37
2     Q. How about freight?  11:46:40
3     A. It could include freight.  11:46:41
4     Q. And miscellaneous costs?  11:46:42
5     A. Any costs that we pay for under the lease.  11:46:44
6     Q. Now, looking back to Schedule 35: What is  11:46:50
7  the present value of the lease payment on Schedule  11:46:58
8  35?  11:47:00
9     A. 35 or 34?  11:47:00
10     Q. Schedule 34. I'm sorry.  11:47:06
11        Let's talk through how you're going to  11:47:17
12  do that calculation. What interest rate are you  11:47:19
13  going to use?  11:47:21
14     A. I would use the interest rate of 8 percent  11:47:22
15  that's on the worksheet, the RFC  11:47:25
16     Q. Okay, the RFC, CSI 00401-03?  11:47:29
17     A. Yes  11:47:39
18        My present value number is 460,450.  11:47:58
19     Q. And the original equipment cost was in your  11:48:06
20  mind either 475,000, approximately, or 487,000;  11:48:08
21  correct?  11:48:13
22        MR. LITTLE: Objection.  11:48:13
23     A. Based on the contract, the cost is the  11:48:19
24  470,000 for the hardware plus the 17,000 that we  11:48:24

**117**

1  spent on the software  11:48:29
2     Q. So the total amount -- the total cost of  11:48:32
3  the financing was approximately $487,000; right?  11:48:37
4        MR. LITTLE: Objection  11:48:41
5     A. The total amount that we expended on the  11:48:42
6  lease was 487,000.  11:48:45
7     Q. And that's the amount that you used to set  11:48:48
8  the base value  11:48:50
9     A. Yes  11:48:52
10     Q. And you said that the present value of the  11:48:53
11  stream of rental payments over 24 months was  11:48:56
12  approximately $460,450; right?  11:48:59
13     A. At 8 percent, yes  11:49:04
14     Q. So approximately $27,000 would not be paid  11:49:06
15  during the life of Equipment Schedule 34; 27,000 of  11:49:10
16  the original cost; is that right?  11:49:17
17     A. Could you rephrase that?  11:49:19
18     Q. Sure The portion of the original cost  11:49:22
19  that would not be paid during the life -- in monthly  11:49:25
20  payments under Schedule 34 would be approximately  11:49:28
21  $27,000; is that right? That's the difference  11:49:32
22  between the cost of 487,000 and the present value of  11:49:36
23  the lease payments of approximately 460,000.  11:49:38
24     A. Yes, that's the approximate difference.  11:49:44

56 (Pages 218 to 221)

Joan Kersting
Volume 1 - December 13, 2006

218

| | |
|---|---|
| 1 | the same; right? |
| 2 | A. Yes. |
| 3 | Q. Now, Lycos didn't reaffirm its obligation |
| 4 | to pay monthly rent on the schedules identified in |
| 5 | Paragraph 2 of the sales agreement -- let me |
| 6 | rephrase that. |
| 7 | In the sales agreement Lycos did not |
| 8 | reaffirm its obligation to pay monthly rent under |
| 9 | the schedules listed in Paragraph 2 of the sales |
| 10 | agreement, did it? |
| 11 | MR. LITTLE: Objection. |
| 12 | A. The agreement says that the leases continue |
| 13 | and that lessee shall pay the number of monthly rent |
| 14 | payments remaining under the leases plus applicable |
| 15 | taxes. |
| 16 | Q. Where are you looking? |
| 17 | A. Paragraph 4 |
| 18 | Q. Okay  It says that the leases shall |
| 19 | continue. But those leases were continuing |
| 20 | irrespective of the sales agreement; right? |
| 21 | MR. LITTLE: Objection |
| 22 | A. The leases were in effect. |
| 23 | Q. And they were continuing; right? |
| 24 | MR. LITTLE: Objection |

03:40:03
03:40:11
03:40:11
03:40:17
03:40:19
03:40:26
03:40:26
03:40:30
03:40:34
03:40:37
03:40:39
03:41:05
03:41:07
03:41:10
03:41:15
03:41:15
03:41:17
03:41:22
03:41:24
03:41:27
03:41:30
03:41:37
03:41:38
03:41:41

219

| | |
|---|---|
| 1 | A  They were leases that were in effect, yes |
| 2 | Q  And Lycos had the obligation -- had a |
| 3 | pre-existing obligation to pay the monthly rent |
| 4 | under those schedules as due from and after August |
| 5 | 2003; right? |
| 6 | MR. LITTLE: Objection |
| 7 | A  They had an obligation as of the dates the |
| 8 | schedules started to pay the monthly rental under |
| 9 | those leases |
| 10 | Q  This agreement is dated as of -- is |
| 11 | dated -- the sales agreement is dated July 15, 2003; |
| 12 | correct? |
| 13 | MR. LITTLE: Which one are we looking |
| 14 | at, Tom? |
| 15 | Q  I'm sorry, the one marked as Kersting 25 |
| 16 | No, what is the exhibit number on the |
| 17 | one before you? |
| 18 | A  26 |
| 19 | Q  Kersting 26 is dated July 26, 2003; right? |
| 20 | A  Yes. |
| 21 | Q  And that's because that's the date that Mr |
| 22 | Stenberg communicated to you Lycos's acceptance of |
| 23 | CSI's offer to purchase the equipment for 3 775 |
| 24 | million; isn't that right? |

03:41:43
03:41:49
03:41:53
03:41:56
03:42:00
03:42:07
03:42:08
03:42:15
03:42:18
03:42:30
03:42:33
03:42:37
03:42:40
03:42:42
03:42:43
03:42:52
03:42:54
03:42:55
03:42:56
03:43:01
03:43:01
03:43:06
03:43:10
03:43:14

220

| | |
|---|---|
| 1 | MR. LITTLE: Objection. |
| 2 | A. That's the date that I prepared the |
| 3 | contract |
| 4 | Q. You prepared the contract marked as |
| 5 | Kersting 26; is that right? |
| 6 | A. I prepared a contract on July 15th and sent |
| 7 | it to Lycos, and then it came back signed, but |
| 8 | altered |
| 9 | Q. And it came back on August 1st, 2003, |
| 10 | signed by Lycos, as seen in Exhibit 25; right? |
| 11 | MR. LITTLE: 20? |
| 12 | I'm sorry, the email that's dated August 1 |
| 13 | What exhibit is that? |
| 14 | A. On Exhibit 23. |
| 15 | Q. Okay, Exhibit 23 came back to you signed by |
| 16 | Lycos on August 1st, 2003, with certain alterations; |
| 17 | right? |
| 18 | A  Yes |
| 19 | Q. What alterations were there, if you know, |
| 20 | between the draft that came back to you on August 1, |
| 21 | 2003, and the draft you had sent on July 15, 2003? |
| 22 | A. I don't know all the changes |
| 23 | Q. Do you know any of the changes? |
| 24 | A. I know the "whereas" paragraphs were added. |

03:43:16
03:43:20
03:43:21
03:43:22
03:43:26
03:43:28
03:43:36
03:43:42
03:43:46
03:43:50
03:43:58
03:44:01
03:44:04
03:44:05
03:44:08
03:44:12
03:44:16
03:44:17
03:44:18
03:44:21
03:44:25
03:44:30
03:44:35
03:44:37

221

| | |
|---|---|
| 1 | Q  Anything else? |
| 2 | A  I believe Section -- Paragraph 4 was added |
| 3 | Q  Paragraph 4 was added by Lycos? |
| 4 | A  Yes |
| 5 | Q  Anything else? |
| 6 | A. That's all I can tell from looking at this |
| 7 | Q. I direct your attention to -- I'd like you |
| 8 | to compare the draft of the agreement that was |
| 9 | signed by Lycos on July 18, 2003, with the draft |
| 10 | that was signed by Lycos and CSI appearing as |
| 11 | Kersting 26. What differences, if any, are there? |
| 12 | A. What exhibit? |
| 13 | Q. I'd like you to compare the email -- the |
| 14 | exhibit -- attached to Kersting 23 with Kersting 26. |
| 15 | What if any differences are there between the two |
| 16 | sales agreements? |
| 17 | A. On Exhibit 26 the termination dates for 100 |
| 18 | and 200 are different. |
| 19 | Q. Okay. Anything else? |
| 20 | A. The due date is different. |
| 21 | Q. When you say "the due date," what do you |
| 22 | mean by that? |
| 23 | A. In Paragraph 3, the date by which the |
| 24 | payment will be made. |

03:44:41
03:44:43
03:45:02
03:45:06
03:45:08
03:45:15
03:45:23
03:45:27
03:45:32
03:45:40
03:45:45
03:45:51
03:45:54
03:45:59
03:46:05
03:46:09
03:46:34
03:46:36
03:46:39
03:46:57
03:47:09
03:47:11
03:47:12
03:47:15

Joan Kersting
Volume 1 - December 13, 2006

**250**

| | | |
|---|---|---|
| 1 | Monday, July 14, which is at the bottom of Page 1 to | 05:08:41 |
| 2 | O'Neal 24  Do you see that? | 05:08:44 |
| 3 | A.  Yes. | 05:08:46 |
| 4 | Q.  I'd like you to read, if you would, right | 05:08:47 |
| 5 | under "Paul" to, let's say, the third-from-last | 05:08:52 |
| 6 | sentence in that email. | 05:08:58 |
| 7 | A.  "Paul:  Please accept this email as | 05:09:02 |
| 8 | confirmation of Lycos' agreement to accept your | 05:09:05 |
| 9 | offer to purchase all but not less than all of the | 05:09:08 |
| 10 | equipment leased pursuant to all subject lease | 05:09:11 |
| 11 | schedules between Lycos and CSI for a purchase price | 05:09:14 |
| 12 | equal to 3,775,000 U.S. dollars.  Please prepare and | 05:09:17 |
| 13 | present the appropriate U.S. documentation to my | 05:09:24 |
| 14 | attention and review and comment, if any.  I will | 05:09:27 |
| 15 | forward the document to Lycos for their acceptance | 05:09:31 |
| 16 | and facilitate the execution thereof.  Lycos will | 05:09:33 |
| 17 | exercise its best efforts to turn the documentation | 05:09:37 |
| 18 | around by July 15th and wire the purchase price by | 05:09:39 |
| 19 | July 18th." | 05:09:42 |
| 20 | Q.  The questions you were asked related to | 05:09:47 |
| 21 | whether or not you believed an agreement had been | 05:09:48 |
| 22 | formed, an enforceable agreement had been formed | 05:09:51 |
| 23 | between Lycos and CSI  And my questions to you are: | 05:09:54 |
| 24 | Reading this, can you determine one way or the other | 05:09:59 |

**251**

| | | |
|---|---|---|
| 1 | whether or not under, for example, the Uniform | 05:10:02 |
| 2 | Commercial Code an enforceable agreement would have | 05:10:06 |
| 3 | been reached between the parties? | 05:10:08 |
| 4 | MR. BEAN:  Objection | 05:10:10 |
| 5 | A  After reviewing this, I would agree that | 05:10:17 |
| 6 | there was no agreement reached, because they asked | 05:10:18 |
| 7 | us to prepare documentation that they would review | 05:10:20 |
| 8 | and execute with the terms and conditions | 05:10:24 |
| 9 | Q.  So are you saying, then, that the terms and | 05:10:26 |
| 10 | conditions were for further negotiation between the | 05:10:31 |
| 11 | parties? | 05:10:34 |
| 12 | A  Yes | 05:10:35 |
| 13 | MR. BEAN:  Objection | 05:10:36 |
| 14 | A.  Yes | 05:10:36 |
| 15 | Q  Do you have an understanding of how sales | 05:10:38 |
| 16 | of goods over $500 need to be treated under the UCC | 05:10:43 |
| 17 | in order for that agreement to become in force? | 05:10:48 |
| 18 | A  Yes  The agreements need to be in writing | 05:10:51 |
| 19 | in order to be enforceable over $500 | 05:10:53 |
| 20 | Q.  Is it your understanding one way or the | 05:10:57 |
| 21 | other whether an email such as this, O'Neal Exhibit | 05:10:59 |
| 22 | 24, would constitute such a writing under UCC -- | 05:11:02 |
| 23 | under the UCC? | 05:11:05 |
| 24 | A  It's my opinion that this would not count | 05:11:07 |

**252**

| | | |
|---|---|---|
| 1 | as a writing under the UCC. | 05:11:09 |
| 2 | Q.  So is it fair to say, then, that what | 05:11:16 |
| 3 | Ms. Franklin is expressing to Mr. Stenberg, as far | 05:11:18 |
| 4 | as you understand it, is that the parties had | 05:11:21 |
| 5 | reached an agreement as to the price for the buyout | 05:11:22 |
| 6 | only at that time, July 14th, 2003? | 05:11:24 |
| 7 | A.  Yes. | 05:11:27 |
| 8 | Q.  You were asked some other questions by | 05:11:40 |
| 9 | Mr. Bean regarding $1 purchase options in sale | 05:11:42 |
| 10 | contracts.  Do you remember that? | 05:11:47 |
| 11 | A.  In lease agreements?  Yes. | 05:11:49 |
| 12 | Q.  In your experience at CSI, have you drafted | 05:11:53 |
| 13 | agreements before with $1 purchase options? | 05:11:57 |
| 14 | A.  Yes. | 05:12:00 |
| 15 | Q.  Can you tell us -- well, were those the | 05:12:00 |
| 16 | types of agreements that you were testifying about | 05:12:03 |
| 17 | earlier today? | 05:12:05 |
| 18 | MR. BEAN:  Objection | 05:12:07 |
| 19 | A.  Yes  What I meant was, in general an | 05:12:09 |
| 20 | agreement, a lease agreement that has a dollar | 05:12:12 |
| 21 | purchase option stated in it is a security | 05:12:15 |
| 22 | agreement. | 05:12:18 |
| 23 | Q.  Is that the -- those types of agreements | 05:12:20 |
| 24 | that you were talking about, is that the same type | 05:12:23 |

**253**

| | | |
|---|---|---|
| 1 | of agreement you were talking about in terms of the | 05:12:25 |
| 2 | sale agreement in August 2003 between CSI and Lycos? | 05:12:28 |
| 3 | And I'll direct your attention to Kersting Exhibit | 05:12:34 |
| 4 | 26 | 05:12:40 |
| 5 | I'll rephrase the question  Directing | 05:12:41 |
| 6 | your attention to Kersting 26:  Is this the type of | 05:12:44 |
| 7 | agreement that you were testifying earlier would | 05:12:51 |
| 8 | constitute a security agreement? | 05:12:54 |
| 9 | A.  No, this is not the type of agreement that | 05:12:58 |
| 10 | I was testifying to earlier | 05:13:00 |
| 11 | Q  And why is that? | 05:13:02 |
| 12 | A  This is a sale agreement that's more than a | 05:13:04 |
| 13 | dollar, during the term of a lease, that is meant to | 05:13:08 |
| 14 | convey title at the end of the leases  It's not a | 05:13:17 |
| 15 | dollar-purchase-option lease from the beginning of | 05:13:19 |
| 16 | the lease | 05:13:21 |
| 17 | Q  So is it your testimony, then, that the | 05:13:22 |
| 18 | sales agreement, Kersting 26, would not constitute a | 05:13:27 |
| 19 | security agreement, in your understanding? | 05:13:32 |
| 20 | MR. BEAN:  Objection | 05:13:37 |
| 21 | A  This agreement would not constitute -- | 05:13:43 |
| 22 | would not cause the leases to be considered security | 05:13:45 |
| 23 | agreements | 05:13:48 |
| 24 | Q  There were questions asked earlier today | 05:13:52 |

# EXHIBIT 15

# O'BRIEN & LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Brian Lucy

# January 10, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Linda Bernis   22525

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3    -------------------------------------x

4    COMPUTER SALES INTERNATIONAL, INC.,

5                    Plaintiff,

6    v.                      No. 05-10017-RWZ

7    LYCOS, INC.,

8                    Defendant.

9    -------------------------------------x

10

11

12

13       CONTINUED VIDEO DEPOSITION OF BRIAN

14    LUCY, a witness called on behalf of the

15    Plaintiff, taken pursuant to the provisions

16    of the Massachusetts Rules of Civil

17    Procedure, before Linda Bernis, a Registered

18    Professional Reporter and Notary Public in

19    and for the Commonwealth of Massachusetts,

20    at the offices of McCarter & English, 225

21    State Street, Boston, Massachusetts, on

22    Wednesday, January 10, 2007, commencing at

23    9:49 a.m.

24

1

Brian Lucy 1-10-2007
Computer Sales International, Inc v. Lycos, Inc.

---

**46**

1    to?
2    A    I believe, I would be referring to 93 and
3    94
4    Q    When you said if these numbers are, in fact,
5        correct, the numbers that you were referring
6        to were the numbers in the analysis of the
7        variance, weren't they?
8        MR DAVIDSON  Objection
9    A    Yes  I don't know if it was attached to
10        this document
11    Q    But it had been sent to you in Exhibit 86,
12        right?
13        MR DAVIDSON  Objection
14    A    It appears that it was, yes
15    Q    And when you said if these numbers are, in
16        fact, correct, the these numbers you were
17        referring to were the numbers in the
18        variance analysis that had been sent to you,
19        weren't they?
20        MR DAVIDSON  Objection
21    A    I don't know
22    Q    Does it make sense that that is what you
23        were referring to?
24        MR DAVIDSON  Objection

---

**47**

1        MR BEAN  Objection
2    A    Yes
3    Q    And what did you mean when you said, I would
4        have to ask unwind the refinancing?
5    A    I would ask to go back and undo the
6        refinancing
7    Q    Meaning unwind -- you use the shorthand
8        reference refinancing  You were referring
9        to schedules 93 and 94, the leases?
10    A    That's right
11    Q    But Lycos did not have any contractual right
12        to unwind schedules 93 and 94, that you knew
13        of, did it?
14        MR DAVIDSON  Objection
15        MR BEAN  Objection
16    Q    You can answer
17    A    I don't recall
18    Q    Why did you say if these numbers are, in
19        fact, correct I would have to ask to unwind
20        the refinancing?
21    A    Again, based on my recollection, Kevin had
22        told me that the refinancing didn't make
23        sense and there was a significant variance
24        He was looking for data from Paul  So I had

---

**48**

1        asked him to help Kevin with that analysis
2    Q    When you say he said the refinancing didn't
3        make sense, what did you understand him to
4        mean?
5    A    That there was a variance
6    Q    Well, there was supposed to be a variance
7        between what the pre-93/94 obligations of
8        Lycos were and the post-93/94 obligations,
9        right?
10    A    You know, I --
11        MR DAVIDSON  Answer his question
12    A    But I don't know what the definition of
13        variance is
14    Q    There was supposed to be some variance, some
15        increase in cost between pre-93/94 Lycos
16        obligations to CSI and post-93/94
17        obligations, wasn't there?
18    A    Right
19    Q    Because Lycos was extending virtually all of
20        its leases with CSI by, in some cases, a
21        number of years, correct?
22    A    That's correct
23    Q    The idea was it could keep its equipment, in
24        some cases, years longer?

---

**49**

1    A    That's right
2    Q    And Lycos, you understood that that meant it
3        was going to have to pay more money in total
4        to extend the leases because it was keeping
5        the equipment longer, right?
6    A    Because it was extending the term of the
7        lease, yes
8    Q    Okay  The item B, e-mail B on Exhibit 467
9        said, that's an e-mail that you got back
10        from Mr Stenberg a couple of minutes later,
11        or maybe a minute later, on the same day
12        March 7th, where he said, "as I said, I'm
13        working on the numbers to see where the
14        difference is  I've already seen where
15        you're missing a lot  Give me until early
16        next week."
17        Is that an e-mail you got back from
18        him at the time?
19    A    It appears so, yes
20    Q    Then e-mail C was your e-mail back to him
21        where you said, "I hear you, thanks  Also,
22        Mike Rixon was wondering if you could get
23        final four ticks for him, any chance?"
24        Do you see that?

---

13 (Pages 46 to 49)

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc.

54

1    with CSI prior to schedules 93 and 94 being
2    executed on one hand and what it became
3    obligated to pay in total to CSI after 93
4    and 94 was signed?
5    A   I don't recall
6    Q.   You don't recall whether you had any such
7        conversations with Mr. Stenberg; is that
8        right?
9    A   That's right
10   Q.   Did you have any conversations with anyone
11       other than the one conversation you
12       identified with Mr. Baillie about the issue
13       of the variance, or difference between what
14       Lycos' obligation to CSI had been prior to
15       schedules 93 and 94 and what they became as
16       a result of signing 93 and 94, other than
17       conversations with counsel?
18   A   I don't recall
19   Q.   Do you recall any other conversations or any
20       other things that you said to Mr. Baillie,
21       or that he said to you, any other
22       conversations with Mr. Baillie on this issue
23       other than what you've described?
24   A.   I don't recall

55

1    Q.   Were there occasions during your tenure at
2        Lycos when you and other folks at Lycos went
3        golfing with Mr. Stenberg?
4    A   Yes
5    Q.   Did he usually pay the course fees?
6    A   Yes
7    Q.   Did you or the other folks at Lycos have to
8        report on receiving such privileges?
9    A   Around golf, no
10   Q.   Or did you have to report on those kinds of
11       things provided to you by vendors on any
12       regular basis?
13   A   No
14   Q.   Did there come a time in 2002 when the
15       finance people in Madrid communicated to you
16       or your staff that they felt Lycos' leases
17       with CSI needed to be capitalized?
18   A.   I vaguely recollect that, but I'm not to the
19       date   I know at some point in that time
20       frame there was a request or question
21       regarding the treatment of our leases,
22       which, I think, we looked at some of those
23       e-mails this morning
24   Q.   You're referring to the e-mails that have

56

1    been marked as 463, 464, 465 and 466; is
2    that correct?
3    A   That's right
4    Q.   The inquiries that the people in Madrid were
5        making about how Lycos was accounting for
6        its leases, its equipment leases with CSI
7        and other vendors.  So it began with those
8        e-mails and culminated in the folks in
9        Madrid saying they thought the leases should
10       be capitalized; is that a fair statement?
11           MR DAVIDSON:  Objection
12           MR BEAN:  Objection
13   A   I don't recall where it culminated.
14   Q.   Certainly those e-mails, 464 through 466,
15       were part of the communications that you
16       folks were receiving from Madrid in early
17       2002 about the issue of how the CSI leases
18       should be accounted for, correct?
19   A   Yes
20   Q.   And some time after those communications
21       were received, there came a time when the
22       corporate finance people in Madrid informed
23       Lycos that they thought that the CSI leases
24       should be capitalized, correct?

57

1    A   I don't recall
2    Q.   You don't recall when that happened?
3    A   I don't recall them telling us that our
4        leases should be capitalized
5    Q.   Do you recall any of the folks at Deloitte
6        informing you folks that the leases needed
7        to be capitalized?
8    A   I don't recall
9    Q.   Do you remember any discussions about the
10       issue of the CSI leases, the accounting for
11       them changing from operating leases to
12       capital leases?
13   A   I vaguely recall some discussion   I don't
14       know with whom or when
15   Q.   In general, at some point, the decision was
16       made by Lycos to capitalize the CSI leases?
17   A   I don't recall
18   Q.   Do you recall at some point indicating to
19       Mr. Stenberg that you wanted to get from
20       him, from CSI, a buyout number for all of
21       the CSI leases, a price at which Lycos could
22       buy the equipment that it was then leasing
23       from CSI?
24   A.   I do — yes.

15 (Pages 54 to 57)

Brian Lucy 1-10-2007
Computer Sales International, Inc. v. Lycos, Inc

| 78 | |
|---|---|
| 1 | Do you see that? |
| 2 | A  I do see it |
| 3 | Q.  Do you recall receiving this e-mail and |
| 4 | memorandum from her in or about July of '03? |
| 5 | A  I don't |
| 6 | Q.  Do you recall what LeaseForum said to you |
| 7 | about the progress of their negotiations |
| 8 | with CSI or about anything having to do with |
| 9 | the CSI leases? |
| 10 | A  Not specifically, no |
| 11 | Q.  I'm sorry.  The one conversation you recall |
| 12 | having with her was what again? |
| 13 | MR DAVIDSON: Objection |
| 14 | Q.  Go ahead. |
| 15 | A  I remember her in my office talking to her |
| 16 | I don't know what we specifically talked |
| 17 | about |
| 18 | Q.  You don't know what she said to you? |
| 19 | A  No. |
| 20 | Q.  What's your understanding now of what she's |
| 21 | saying in the memo? |
| 22 | A  Today? |
| 23 | MR DAVIDSON: Objection |
| 24 | Q.  Yes. |

| 79 | |
|---|---|
| 1 | A  I'd have to read it |
| 2 | (Pause) |
| 3 | Q.  If I may, while you're look at it.  I'm |
| 4 | showing you Exhibit 194 because it appears |
| 5 | to be a more complete version.  There's a |
| 6 | fax cover sheet on 194, and then the second |
| 7 | page of 194 is the same memo which is the |
| 8 | second page of 193.  Then the third and |
| 9 | fourth pages appear to contain more |
| 10 | information in the form of documents.  You |
| 11 | can look at both.  I'd finish looking at 193 |
| 12 | and then have a look at 194. |
| 13 | A  Looking at this today, it appears she's |
| 14 | trying to recalculate a rollup |
| 15 | Q.  What do you mean by "rollup?" |
| 16 | A  Refinance |
| 17 | Q.  An extension of a lease? |
| 18 | A  Yes |
| 19 | Q.  From time to time during the course of |
| 20 | Lycos' relationship with CSI, did you folks |
| 21 | extend your leases of equipment that had |
| 22 | been leased from CSI by entering into new |
| 23 | leases that extended the term? |
| 24 | MR. BEAN: Objection. |

| 80 | |
|---|---|
| 1 | A.  I believe |
| 2 | Q.  You believe you did? |
| 3 | A  Yes |
| 4 | Q.  Okay.  What's your understanding of what she |
| 5 | was explaining here? |
| 6 | MR DAVIDSON: Objection |
| 7 | MR BEAN: Objection |
| 8 | A  I don't know  I don't know the point of |
| 9 | this |
| 10 | Q.  I show you what's been marked previously as |
| 11 | Exhibit 195.  Is this a copy of an e-mail |
| 12 | that you received from John Kirk of |
| 13 | LeaseForum on or about July 1, 2003, in |
| 14 | which he wrote, "FYI sent earlier today per |
| 15 | below," referring to the same memo, "please |
| 16 | suggest a good time for us to walk through |
| 17 | the attached.  Best, John." |
| 18 | Do you recall this? |
| 19 | A  I don't |
| 20 | Q.  Do you recall sitting down with them to go |
| 21 | through this memo? |
| 22 | A  I don't |
| 23 | Q.  Do you recall LeaseForum or Ms. Franklin or |
| 24 | anyone ever advising you that they felt that |

| 81 | |
|---|---|
| 1 | Lycos had been deceived by CSI in connection |
| 2 | with its leases? |
| 3 | A  In general, I do |
| 4 | Q.  Who do you recall telling you that? |
| 5 | A  I don't remember.  It was either Susan or |
| 6 | John.  I don't recall who |
| 7 | Q.  And do you recall anyone other than Susan |
| 8 | Franklin or John Kirk telling you that they |
| 9 | thought Lycos had been deceived by CSI in |
| 10 | its dealings with Lycos? |
| 11 | A  In general, I think, Kevin, Julie |
| 12 | Q.  Kevin Baillie? |
| 13 | A  Kevin Baillie and Julie |
| 14 | Q.  Julie Callagee? |
| 15 | A  Yes |
| 16 | Q.  Anybody else? |
| 17 | A.  Not that I recall |
| 18 | Q.  Did you ever think that CSI had deceived |
| 19 | Lycos in its dealings with Lycos over the |
| 20 | leases or the buyout? |
| 21 | MR BEAN: Objection |
| 22 | Q.  You can answer. |
| 23 | A.  Did I ever? |
| 24 | Q.  Yes. |

21 (Pages 78 to 81)

Brian Lucy 1-10-2007
Computer Sales International, Inc  v  Lycos, Inc

| 82 | | 84 | |
|---|---|---|---|
| 1 | A  Yes. | 1 | reconstructing of the active CSI leases, |
| 2 | Q.  When did you think that? | 2 | Lycos has authorized LeaseForum to perform a |
| 3 | A  After those people I just mentioned had told | 3 | full audit of all CSI/Lycos lease |
| 4 | that to me | 4 | arrangements.  Please work directly with |
| 5 | Q.  In the summer of 2003? | 5 | LeaseForum to come to a mutually acceptable |
| 6 | A  If that's the time frame, yes. | 6 | resolution.  Thanks, Brian." |
| 7 | Q.  How did they -- what did they tell you about | 7 | Do you see that? |
| 8 | how they thought Lycos had been deceived by | 8 | A  I do |
| 9 | CSI? | 9 | Q.  Do you remember writing this at the time? |
| 10 | A  I don't recall | 10 | A  No |
| 11 | Q.  Do you have any personal knowledge yourself | 11 | Q.  Do you recall that this was actually a draft |
| 12 | that Lycos was ever deceived by CSI in | 12 | e-mail that LeaseForum themselves had |
| 13 | connection with the leases or buyout? | 13 | written for you to send to Mr. Lucy? |
| 14 | A  No. | 14 | MR BEAN:  Objection? |
| 15 | Q.  Do you remember anything specific about | 15 | MR DAVIDSON:  Objection |
| 16 | anything Mr. Baillie or Ms. Callagee said to | 16 | Q.  In other words, they wrote it for you, sent |
| 17 | you about how they thought Lycos had | 17 | it to you and said send this to Stenberg? |
| 18 | deceived CSI? | 18 | MR DAVIDSON:  Objection |
| 19 | A  I don't recall | 19 | A  Can you restate, please? |
| 20 | Q.  When you say you believe that was the case | 20 | Q  Sure |
| 21 | in the summer of '03, you base that belief | 21 | Do you recall whether this e-mail |
| 22 | solely on what these people were telling | 22 | that we've marked A on Exhibit 196, was |
| 23 | you? | 23 | actually an e-mail written for you by the |
| 24 | A  That's right | 24 | people at LeaseForum and sent to you with |

| 83 | | 85 | |
|---|---|---|---|
| 1 | Q.  You didn't form any independent conclusion | 1 | the intent that you should forward it to Mr. |
| 2 | yourself? | 2 | Stenberg? |
| 3 | A  That's correct. | 3 | A  I do |
| 4 | Q.  You don't remember anything that they said | 4 | Q.  Okay. |
| 5 | about how Lycos was supposed to have | 5 | A  Yeah |
| 6 | deceived CSI? | 6 | Q.  And do you recall anybody explaining to you |
| 7 | A  No | 7 | why they had, why LeaseForum had drafted |
| 8 | Q.  I show what's been marked as Exhibit 196. | 8 | this e-mail for you to send to Mr. Stenberg? |
| 9 | Is this a copy of an e-mail. | 9 | A  I'm sorry |
| 10 | In Exhibit 196, I'll just direct | 10 | Q.  Do you recall anyone telling you why |
| 11 | your attention to the e-mail which I'll mark | 11 | LeaseForum had drafted this e-mail for you |
| 12 | with the letter A.  I'll also mark the one | 12 | to send to Mr. Stenberg? |
| 13 | above it with the letter B, and the last one | 13 | A  No. |
| 14 | with the letter C on Exhibit 196 in blue | 14 | Q.  Did Ms. Franklin ever talk with you, that |
| 15 | flair. | 15 | you can remember, about her conversations |
| 16 | Is the e-mail on the bottom of | 16 | with Mr. Stenberg? |
| 17 | Exhibit 196, that we've marked with the | 17 | A  No |
| 18 | letter A, a copy of an e-mail that you sent | 18 | Q.  Not that you remember? |
| 19 | to Paul Stenberg with a copy to Julie | 19 | A  No. |
| 20 | Callagee on or about July 1, 2003? | 20 | Q.  Okay.  E-mail B, the next item on 196, is |
| 21 | A  It appears to be, yes | 21 | that then a copy of an e-mail that you |
| 22 | Q.  And, at that time, your e-mail said, "Paul, | 22 | received back from Mr. Stenberg on or about |
| 23 | if LeaseForum and CSI cannot arrive at a | 23 | July 1, '03, where he said, "I'm out of the |
| 24 | reasonable negotiated settlement for the | 24 | office until next week.  I can be reached |

22 (Pages 82 to 85)

# EXHIBIT 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | C.A. No. 05 10017 RWZ |
| LYCOS, INC. | ) | |
| AND | ) | |
| BANK OF AMERICA F/K/A FLEET BANK, | ) | |
| TRUSTEE-DEFENDANT, | ) | |
| Defendant. | ) | |

<u>VIDEOTAPED DEPOSITION OF DAVID LEON MAMMEN</u>

Phoenix, Arizona
February 15, 2007
9:23 a.m.

**REPORTED BY:**
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

**PREPARED FOR:**
Mr. Peter M. Acton, Jr.

*(Copy)*



3030 North Central Avenue
Suite 1102
Phoenix, Arizona 85012

T 602 264 2230
   888 529 9990
F 602 264 2245

www.griffinreporters.com

Computer Sales International   v.
Lycos, Inc.

David L. Mammen
February 15, 2007

Page 17

[1] and return it to lessors at the expiration of lease terms?

[2]    MR. ACTON: Objection

[3]    THE WITNESS: Yes

[4]    Q: BY MR. KALER: And in those situations, did you

[5] try to provide some advice to customers as to how they

[6] could improve their operations so that they would be

[7] better able to return equipment to their lessors when it

[8] was due and not have to pay for extended leases?

[9]    A: We did

[10]    Q: And was that kind of consulting advice part of

[11] the services that you were in the business of providing

[12] when you worked at Avnet?

[13]    A: Yes

[14]    Q: Did you work — in providing these consulting

[15] services, did you work as part of a team at Avnet?

[16]    A: Yes

[17]    Q: How many other people were on the team that you

[18] were working on when you were providing these consulting

[19] services?

[20]    A: I believe there were five consultants at the

[21] time

[22]    Q: Do you remember who they were and what their area

[23] was?

[24]    A: Could you clarify the question. please?

[25]    Q: Sure

Page 18

[1]    Let me show you what's been previously

[2] marked in this case as Exhibit 532 For the record,

[3] Exhibit 532 is just a list of names and addresses  I

[4] believe these are all Avnet people  Do you recognize the

[5] names?

[6]    A: Yes

[7]    Q: Present or former Avnet people, I meant

[8]    Were any of the individuals on this list

[9] part of the team providing these consulting services when

[10] you worked there?

[11]    A: Ora Maughan worked with the asset management

[12] group  John Sweeney was a financial consultant in the

[13] Eastern Region  Those are all that I remember being

[14] directly involved in the technology migration center

[15] consultant group

[16]    Q: And you, David Mammen, were a financial

[17] consultant as well; correct?

[18]    A: My title was technology migration consultant

[19] And I believe John Sweeney's title at that time would have

[20] been financial services manager

[21]    Q: During the years that you were providing these

[22] consulting services to customers at Lycos, did you

[23] encounter occasionally circumstances where customers were

[24] actually paying more in total to lease equipment over a

[25] period of years than it would have cost them to buy the

Page 19

[1] equipment?

[2]    MR. ACTON: Objection

[3]    MR. KALER: You can answer

[4]    THE WITNESS: Yes

[5]    Q: BY MR. KALER: And could you describe the types

[6] of situations that you observed where customers found

[7] themselves in that situation?

[8]    MR. ACTON: Objection

[9]    THE WITNESS: In — well, certainly with

[10] leasing, there's always a finance charge involved, so the

[11] fair market value of the equipment would determine

[12] whether, in fact, a customer paid more during the lease

[13] period than the original purchase price of the equipment

[14]    Customers who were not able to return

[15] equipment on time and ran into evergreen situations would

[16] pay more than the value — the original value of the

[17] equipment

[18]    Q: BY MR. KALER: Customers who were not able to

[19] return the equipment, you mean at the end of the lease

[20] term?

[21]    A: Yes

[22]    Q: When you say — you said they would pay more than

[23] the original cost of the equipment?

[24]    A: Yes

[25]    Q: When you say they would get themselves into

Page 20

[1] evergreen situations, could you explain to us what you

[2] mean by evergreen situations?

[3]    A: Yes  In an evergreen situation, for whatever

[4] reason, customers were not prepared to return equipment at

[5] the termination of the lease  And a common business

[6] practice in that situation would be to evergreen the

[7] lease, to continue lease payments for whatever time period

[8] was agreed upon between the provider of the lease and the

[9] customer

[10]    Q: In other words, to extend the lease for a longer

[11] term of months or years?

[12]    A: That's correct

[13]    Q: And in those situations. did you observe that

[14] customers, if they did that, would frequently wind up

[15] paying more in total lease payments than it would have

[16] cost to buy the equipment?

[17]    MR. ACTON: Objection

[18]    THE WITNESS: Could you restate the

[19] question, please?

[20]    MR. KALER: Sure

[21]    Q: BY MR. KALER: In those situations where

[22] customers or companies evergreened their leases, did you

[23] observe instances where they spent more to — in total on

[24] leasing the equipment than it would have cost them to buy

[25] it originally?

# EXHIBIT 17

Exhibits:  1 - 30          Volume 1, Pages 1 - 320

Exhibits:  1 - 30

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No. 05-10017-RWZ

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMPUTER SALES INTERNATIONAL, INC.,

Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF FREDERIC K. O'NEAL

Friday, November 17, 2006, 9:05 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts

- - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404  Fax 617-728-4403

34 (Pages 130 to 133)

Frederic K. O'Neal - November 17, 2006

### 130

| | | |
|---|---|---|
| 1 | Q. But for a SmartTrack capital lease, this is | 11:49:45 |
| 2 | the form of the document that CSI would use to book | 11:49:51 |
| 3 | the lease, correct? | 11:49:54 |
| 4 | A. The SmartTrack's not relevant, but the | 11:49:55 |
| 5 | capital lease -- it's not just capital lease; it's | 11:50:00 |
| 6 | the capital lease treated as a sales-type lease. | 11:50:04 |
| 7 | That's what this form is used for | 11:50:07 |
| 8 | Q. When is a capital lease treated as a sales- | 11:50:08 |
| 9 | type lease? | 11:50:14 |
| 10 | A. At this period in time, all our capital | 11:50:15 |
| 11 | leases were treated as sales-type leases. | 11:50:22 |
| 12 | Q. At some point in time did that change? | 11:50:24 |
| 13 | A. Yes. | 11:50:27 |
| 14 | Q. When was that? | 11:50:27 |
| 15 | A. In -- near the end of -- approximately | 11:50:31 |
| 16 | around June of '04, we changed our accounting method | 11:50:37 |
| 17 | to include direct finance leasing as an option -- | 11:50:45 |
| 18 | direct finance leases as another option for booking | 11:50:48 |
| 19 | capital leases. | 11:50:51 |
| 20 | Q. All right. Now, this document was prepared | 11:50:53 |
| 21 | by Pam B. in June of 1999, right? | 11:50:58 |
| 22 | A. Yes | 11:51:06 |
| 23 | Q. And the booking document, the sales-type | 11:51:06 |
| 24 | lease journal entry is prepared only after the | 11:51:09 |

### 131

| | | |
|---|---|---|
| 1 | equipment has been accepted; is that right? | 11:51:11 |
| 2 | A. Well, the trigger for the booking is the | 11:51:14 |
| 3 | certificate of acceptance  So yes, I would say | 11:51:19 |
| 4 | after the equipment has been accepted, with an | 11:51:28 |
| 5 | exception that if there's soft costs associated with | 11:51:31 |
| 6 | it -- no, you're right; it's after the equipment is | 11:51:33 |
| 7 | accepted | 11:51:36 |
| 8 | Q. Just so we get this clear for the tape, the | 11:51:36 |
| 9 | sales-type lease journal entry is completed only | 11:51:40 |
| 10 | after the certificate of acceptance has been signed; | 11:51:43 |
| 11 | is that right? | 11:51:46 |
| 12 | A. Signed by us? | 11:51:48 |
| 13 | Q. Signed by the customer. | 11:51:50 |
| 14 | A. No. | 11:51:50 |
| 15 | Q. All right; let's get clear here.  When is | 11:51:53 |
| 16 | the sales-type lease journal entry prepared relative | 11:51:56 |
| 17 | to the signing of the certificate of acceptance? | 11:51:59 |
| 18 | A. In general, it's prepared after we've -- | 11:52:01 |
| 19 | the booking -- it can be made after we prepare the | 11:52:06 |
| 20 | certificate of acceptance | 11:52:11 |
| 21 | Q. After it's prepared? | 11:52:12 |
| 22 | A. Yes | 11:52:13 |
| 23 | Q. But before it's signed by the customer? | 11:52:13 |
| 24 | A. Yes. | 11:52:15 |

### 132

| | | |
|---|---|---|
| 1 | Q. And typically, I mean in this case, the | 11:52:17 |
| 2 | booking was done in June; the certificate of | 11:52:21 |
| 3 | acceptance was signed by Ms. Bader in early May. | 11:52:23 |
| 4 | A. Okay. | 11:52:27 |
| 5 | Q. Right? | 11:52:27 |
| 6 | A. Yes | 11:52:30 |
| 7 | Q. So you can prepare the certificate of | 11:52:33 |
| 8 | acceptance -- the sales-type lease journal entry any | 11:52:36 |
| 9 | time after you prepare the certificate of | 11:52:39 |
| 10 | acceptance; is that right? | 11:52:41 |
| 11 | A. Yes | 11:52:42 |
| 12 | Q. Can you ascertain the initials of the | 11:52:45 |
| 13 | person who approved this booking? | 11:52:47 |
| 14 | A. The "Approved by" line? | 11:52:50 |
| 15 | Q. Yes, sir. | 11:52:53 |
| 16 | A. I would think that's L.K | 11:52:54 |
| 17 | Q. Which stands for? | 11:52:59 |
| 18 | A. Laura Kelemetz | 11:53:00 |
| 19 | Q. Is the sales-type lease journal entry ever | 11:53:04 |
| 20 | provided to account executives? | 11:53:08 |
| 21 | A. Not to my knowledge | 11:53:10 |
| 22 | Q. Do you know whether sales-type lease | 11:53:14 |
| 23 | journal entries with respect to Lycos were ever | 11:53:17 |
| 24 | provided to Paul Stenberg? | 11:53:21 |

### 133

| | | |
|---|---|---|
| 1 | A. Not to my knowledge | 11:53:22 |
| 2 | Q. And CSI wouldn't provide the sales-type | 11:53:24 |
| 3 | lease journal entry to its customers, would it? | 11:53:28 |
| 4 | MR LITTLE: Objection | 11:53:31 |
| 5 | A. I wouldn't  To my knowledge, we don't | 11:53:33 |
| 6 | Q. Is the information contained on a sales- | 11:53:41 |
| 7 | type lease journal entry prepared in accordance with | 11:53:47 |
| 8 | FASB 13? | 11:53:50 |
| 9 | A. Yes | 11:53:51 |
| 10 | Q. Let's go through each of the categories on | 11:53:55 |
| 11 | the left-hand side of the page, starting at the top. | 11:53:57 |
| 12 | The lessee is Lycos, correct? | 11:54:01 |
| 13 | A. Yes. | 11:54:04 |
| 14 | Q. I'm sorry; I forgot to ask you this.  Pam | 11:54:06 |
| 15 | B., what's Pam's last name? | 11:54:10 |
| 16 | A. Barclay | 11:54:12 |
| 17 | Q. Is she still employed by CSI? | 11:54:13 |
| 18 | A. Yes | 11:54:16 |
| 19 | Q. This is Contract 144874, Schedule 45, | 11:54:16 |
| 20 | correct? | 11:54:20 |
| 21 | A. Yes. | 11:54:20 |
| 22 | Q. The installation period was from January | 11:54:21 |
| 23 | through March 1999, right? | 11:54:23 |
| 24 | A. Yes | 11:54:24 |

Frederic K. O'Neal - November 17, 2006

---

**190**

1    Q. 10-1.    14:00:32
2    A   10-1 --    14:00:33
3    Q. '99.    14:00:35
4    A '99, and it's an early term of 5-31-01    14:00:36
5 Three, five, twelve    So it's a 20-month renewal    14:00:49
6 term on the new lease is what I -- excuse me.    14:00:54
7    Q. There were 20 months remaining.    14:00:58
8    A. Yes, there are 20 months remaining; sorry.    14:01:00
9    Q. That's correct.    14:01:02
10    A All right    14:01:03
11      Is the number $624,949 22?    14:01:28
12    Q. This time you're within 10 cents. That's    14:01:33
13 very good. If you would write that number down on    14:01:37
14 your chart, next to -- write down Schedule 49-A, and    14:01:40
15 then put that number under the Net Investment in    14:01:44
16 Lease column.    14:01:47
17      (The witness complied.)    14:01:50
18    A So let me read it back to you    14:02:00
19 $624,949 22    14:02:05
20    Q. Thank you. And if you would also write on    14:02:06
21 your chart the FMV higher of C or D with respect to    14:02:08
22 Schedule 49-A.    14:02:11
23    A Are you talking about the $662,246 30?    14:02:14
24 That's the number?    14:02:21

---

**191**

1    Q. It's either 48 or 46. I can't read it.    14:02:23
2    A It's probably 48    14:02:28
3      (Marked, Exhibit 9 )    14:03:02
4    Q. What's marked as Exhibit 9 are certain    14:03:03
5 documents with respect to Schedule 61, they are LYC    14:03:05
6 04614 through 04620, and CSI 00392321, 39317 through    14:03:21
7 31920.    14:03:25
8      Direct your attention, Mr. O'Neal, to    14:03:36
9 Addendum 1 to Equipment Schedule No. 61. That is    14:03:39
10 Page LYC 04169.    14:03:43
11    A Okay    14:03:51
12    Q. If you could read Paragraph 2 aloud,    14:03:51
13 please?    14:03:54
14    A. Okay. "2 Early termination of existing    14:03:54
15 equipment schedules Commencement date," bold,    14:04:00
16 underscored "The equipment is installed at    14:04:05
17 lessee's location under Equipment Schedules 44 and    14:04:08
18 52 to Master Lease Agreement No 144B74 Lessee    14:04:12
19 unconditionally accepts the equipment for lease    14:04:19
20 under this lease. The initial term of Equipment    14:04:22
21 Schedule 44 is due to expire February 28, 2001 And    14:04:27
22 the initial term of Equipment Schedule 52 is due to    14:04:31
23 expire April 30, 2001 In consideration of lessee    14:04:36
24 entering into this lease, lessor will terminate    14:04:41

---

**192**

1 lessee's rental obligations under Equipment    14:04:45
2 Schedules 44 and 52 effective July 31, 1999.    14:04:49
3 Accordingly, the commencement date of the equipment    14:04:54
4 under this lease is August 1, 1999."    14:04:57
5    Q. Does that paragraph inform your thinking as    14:05:01
6 to whether Equipment Schedule 61 is an original, a    14:05:03
7 new equipment schedule, or a roll-up?    14:05:08
8    A Just based on this paragraph alone?    14:05:13
9    Q. Yes, sir.    14:05:17
10    A I would think that this schedule at least    14:05:17
11 involves some renewal equipment    14:05:19
12    Q. Direct your attention to the sales-type    14:05:21
13 lease journal entry, Page 39317. Do you see the    14:05:25
14 reference to early termination --    14:05:31
15    A I'm not there yet    14:05:32
16    Q. Sorry.    14:05:33
17    A Okay    14:05:34
18    Q. Do you see the reference to early    14:05:34
19 termination of Schedule 44?    14:05:36
20    A Yes.    14:05:37
21    Q. And do you see the reference to early    14:05:37
22 termination of Schedule 52?    14:05:41
23    A Yes    14:05:42
24    Q. And the amount under Account Code 14500 for    14:05:42

---

**193**

1 Schedule 44 is $155,322.23, correct?    14:05:49
2    A. Yes    14:05:54
3    Q. And the amount next to the early    14:05:54
4 termination for Schedule 52 is $562,209.22, correct?    14:05:55
5    A Yes    14:06:01
6    Q. And those represent, those numbers    14:06:01
7 represent CSI's investment in Schedules 44 and 52    14:06:05
8 respectively as of the time of the termination of    14:06:09
9 those schedules, correct?    14:06:11
10    A. They should represent -- I don't have a    14:06:12
11 recollection of what the 14500 account code is The    14:06:21
12 12550 -- I want to refresh my memory by looking at    14:06:29
13 some other journal entries    14:06:34
14    Q. Surely.    14:06:35
15    A. If the words were here, I could answer the    14:06:36
16 question, but I don't have all the associated    14:06:41
17 account codes with each account name.    14:06:44
18      To fully answer that question, I would    14:06:56
19 have to know what Account 14500 is.    14:06:58
20    Q. Does CSI have a document that lists the    14:07:00
21 meaning of its various account codes?    14:07:03
22    A We have a chart of accounts, yes.    14:07:04
23      MR BEAN: Would you mark that as    14:07:08
24 Exhibit 9-A, please?    14:07:09

---

50 (Pages 194 to 197)

Frederic K. O'Neal - November 17, 2006

194

| | | |
|---|---|---|
| 1 | (Marked, Exhibit 9-A ) | 14:07:10 |
| 2 | A. If you'd give me a second -- | 14:07:23 |
| 3 | MR. LITTLE: There's not a question. | 14:07:24 |
| 4 | Q. What's been marked as Exhibit 9-A is a | 14:07:26 |
| 5 | sales -- is a sub-ledger card for Schedule 61. It | 14:07:31 |
| 6 | appears to show that the commencement date of | 14:07:35 |
| 7 | Schedule 61 was 8-1-99, and the actual expiration | 14:07:37 |
| 8 | date was 9-30-99. Do you see that? | 14:07:41 |
| 9 | A. Can you -- when you were saying that, I | 14:07:48 |
| 10 | wasn't looking at it. The commencement date -- | 14:07:50 |
| 11 | Q. Commencement date was August 1, '99. | 14:07:56 |
| 12 | A. Yes. | 14:07:59 |
| 13 | Q. And the early expiration date was 9-30-99, | 14:07:59 |
| 14 | correct? | 14:08:02 |
| 15 | A. It says actual expiration date. | 14:08:03 |
| 16 | Q. 9-30-99? | 14:08:06 |
| 17 | A. Yes. | 14:08:07 |
| 18 | Q. With the assumption that the actual | 14:08:07 |
| 19 | expiration date of Schedule 61 was 9-30-99, would | 14:08:13 |
| 20 | you calculate CSI's net investment in the lease for | 14:08:17 |
| 21 | Schedule 61, please? | 14:08:21 |
| 22 | A. 9-30-99, so that's 10-1-99 | 14:08:37 |
| 23 | I calculate 22 months early. You agree | 14:09:02 |
| 24 | with that? | 14:09:07 |

196

| | | |
|---|---|---|
| 1 | employed in calculating the net investment of the | 14:11:00 |
| 2 | lease, you needed four pieces of information. You | 14:11:02 |
| 3 | needed to know the remaining term of the lease, | 14:11:04 |
| 4 | correct? | 14:11:06 |
| 5 | A. Yes. | 14:11:06 |
| 6 | Q. You needed to know the residual value of | 14:11:07 |
| 7 | the equipment on the lease, correct? | 14:11:10 |
| 8 | A. Booked residual value, yes. | 14:11:11 |
| 9 | Q. And you needed to know the implicit rate of | 14:11:13 |
| 10 | the lease, correct? | 14:11:16 |
| 11 | A. Yes | 14:11:17 |
| 12 | Q. And you needed to know the monthly payment, | 14:11:17 |
| 13 | correct? | 14:11:20 |
| 14 | A. Yes | 14:11:20 |
| 15 | Q. And without all four pieces of that | 14:11:20 |
| 16 | information, you couldn't have calculated the net | 14:11:22 |
| 17 | investment in the lease, could you? | 14:11:24 |
| 18 | A. That's kind of the definition of the net | 14:11:26 |
| 19 | investment in a lease, so I think I agree with that | 14:11:28 |
| 20 | Q. All right. Would you total up -- | 14:11:32 |
| 21 | A. But that's the lessor's net investment in | 14:11:33 |
| 22 | the lease | 14:11:37 |
| 23 | Q. I understand. | 14:11:37 |
| 24 | And would you total up the four numbers | 14:11:40 |

195

| | | |
|---|---|---|
| 1 | Q. Okay. | 14:09:07 |
| 2 | A. If I didn't make a mistake punching in the | 14:09:28 |
| 3 | numbers, I think that the net investment in lease | 14:09:31 |
| 4 | associated with Schedule 61 at 9-30-99 would be | 14:09:35 |
| 5 | $667,590.65; okay. | 14:09:41 |
| 6 | Q. Would you write that number under the | 14:09:49 |
| 7 | column Net Investment -- create a new row, if you | 14:09:51 |
| 8 | would, for Schedule 61, and then write the number | 14:09:55 |
| 9 | you just calculated under Net Investment in a Lease. | 14:10:01 |
| 10 | (The witness complied.) | 14:10:07 |
| 11 | Q. And then would you also write -- | 14:10:09 |
| 12 | A. Let me just read it back to you to make | 14:10:11 |
| 13 | sure I didn't -- $667,509.65 | 14:10:13 |
| 14 | Q. 509 or 590? | 14:10:17 |
| 15 | A. Oh; that's why I read it back | 14:10:21 |
| 16 | $667,590.65 | 14:10:24 |
| 17 | Q. Very good. And would you write the number | 14:10:28 |
| 18 | from the sales-type lease journal entry on Schedule | 14:10:30 |
| 19 | 61, please, where it refers to FMV higher of C or D? | 14:10:34 |
| 20 | A. Okay, and I think you're referring to the | 14:10:39 |
| 21 | $729,509.35? | 14:10:42 |
| 22 | Q. That's correct, yes. | 14:10:47 |
| 23 | (The witness complied.) | 14:10:49 |
| 24 | Q. Now, just to review the methodology you | 14:10:58 |

197

| | | |
|---|---|---|
| 1 | under Net Investment in the Lease that you have on | 14:11:45 |
| 2 | your chart, please, sir? | 14:11:47 |
| 3 | A. You already have the totals so you'll know | 14:11:49 |
| 4 | if I make a mistake? | 14:11:51 |
| 5 | Q. I have a number that's going to be very | 14:11:53 |
| 6 | close to yours, yes. You're going to be within | 14:11:55 |
| 7 | about a dollar, dollar and a half of my number. | 14:12:01 |
| 8 | (The witness complied.) | 14:12:17 |
| 9 | A. One sum is $2,784,037.56 | 14:12:17 |
| 10 | Q. Can you double-check that, please? | 14:12:24 |
| 11 | I'm sorry; say that again? | 14:12:29 |
| 12 | A. $2,784,037.56 | 14:12:30 |
| 13 | Q. Yes; if you would check it again, please. | 14:12:36 |
| 14 | A. Okay | 14:12:40 |
| 15 | (The witness complied.) | 14:12:41 |
| 16 | A. I don't remember the last number, but I | 14:13:02 |
| 17 | still have $2 million -- I don't still; the number I | 14:13:04 |
| 18 | calculated is $2,784,037.56 | 14:13:08 |
| 19 | Q. Can I see your chart for one second? | 14:13:15 |
| 20 | (A document was given to Mr. Bean.) | 14:13:17 |
| 21 | Q. Can I borrow the calculator? | 14:13:30 |
| 22 | (The calculator was given to Mr. Bean.) | 14:13:38 |
| 23 | Q. All right. Let me trouble you to do it one | 14:14:17 |
| 24 | more time, because I'm getting the number that | 14:14:19 |

52 (Pages 202 to 205)

Frederic K. O'Neal - November 17, 2006

202

1  direct your attention to Addendum No. 1 with respect   14:32:33
2  to Schedule 67, which describes what 67 is doing.   14:32:39
3  Direct your attention to Page 30903.   14:32:45
4    A. Okay   14:33:02
5    Q. Schedule 61, what it does is described in   14:33:04
6  Paragraph 2. Would you read that aloud, please?   14:33:08
7        MR. LITTLE: Did you say 61?   14:33:12
8        MR. BEAN: I'm sorry   14:33:14
9    Q. Schedule 67, Page 30903. This is Exhibit   14:33:15
10  10.   14:33:19
11    A. Read Paragraph 2?   14:33:21
12    Q. Please.   14:33:22
13    A. Okay. "Commencement date " Bold type,   14:33:23
14  underscored. "The equipment is installed at   14:33:27
15  lessee's location under Equipment Schedules 45, 49,   14:33:31
16  49-A and 61 to Master Lease Agreement No  144874.   14:33:35
17  Lessee unconditionally accepts the equipment for   14:33:43
18  lease under this lease  The initial terms of   14:33:46
19  Equipment Schedules 45 and 61 are due to expire on   14:33:50
20  March 31, 2001, and July 31, 2001, respectively.   14:33:55
21  The initial terms of Equipment Schedules 49 and 49-A   14:34:02
22  are due to expire on May 31, 2001  However, in   14:34:07
23  consideration of lessee's entering into this lease,   14:34:12
24  the initial terms of Equipment Schedules 45, 49,   14:34:16

203

1  49-A and 61 expire on September 30, 1999.   14:34:21
2  Accordingly, the commencement date of the equipment   14:34:28
3  under this lease is October 1, 1999."   14:34:31
4    Q. So do you understand, then, that Schedule   14:34:35
5  67 rolls up the equipment from Schedules 45, 49,   14:34:39
6  49-A and 61?   14:34:43
7    A. Yes, I recognize that some of those   14:34:47
8  equipment off those schedules is rolling into this   14:34:50
9  particular schedule.   14:34:52
10    Q. What tells you that it might not be all the   14:34:53
11  equipment on those schedules that's rolling into   14:34:56
12  this schedule?   14:34:58
13    A. Let me read it for content now   14:35:04
14      (Witness reviews document )   14:35:11
15    A. Ask me the question again   14:35:26
16    Q. What, if anything, suggests to you that not   14:35:27
17  all of the equipment on Schedules 45, 49, 49-A and   14:35:29
18  61 might be rolling onto 67?   14:35:33
19    A. There's nothing in this paragraph, but   14:35:38
20  since this is the only thing I've seen on this   14:35:41
21  lease, there could be other items  I know at least   14:35:44
22  some equipment's going on that schedule.   14:35:46
23    Q. Direct your attention to the sales-type   14:35:49
24  lease journal entry. Do you see, under the -- next   14:35:59

204

1  to the rows with Account Code 12550, you see early   14:36:05
2  termination number with respect to Schedule 45, do   14:36:09
3  you not?   14:36:11
4    A. Yes   14:36:12
5    Q. And the number that is listed on Schedule   14:36:13
6  67 is what, for early term -- Schedule 45, Account   14:36:16
7  Code 12550?   14:36:24
8    A. $642,226 03   14:36:26
9    Q. And that's within about 50 cents of the   14:36:31
10  number you calculated previously for CSI's net   14:36:33
11  investment in the lease for Schedule 45, correct?   14:36:35
12    A. Yes   14:36:39
13    Q. And with respect to Schedule 49, what is   14:36:40
14  the number next to Account Code 12550?   14:36:43
15    A. $501,557 11   14:36:48
16    Q. And that's about 50 or 60 cents within the   14:36:54
17  number you calculated for CSI's net investment in   14:36:57
18  the lease for Schedule 49, is it not?   14:37:00
19    A. Yes   14:37:03
20    Q. With respect to Schedule 49-A, what's the   14:37:03
21  number next to Account Code 12550?   14:37:06
22    A. $624,949 12   14:37:09
23    Q. And that's within about 25 cents of the   14:37:12
24  number you calculated as CSI's net investment in the   14:37:15

205

1  lease for Schedule 49-A, correct?   14:37:19
2    A. Yes.   14:37:22
3    Q. And what is the number for Account Code   14:37:22
4  12550 for Schedule 61?   14:37:26
5    A. $667,590.55.   14:37:29
6    Q. And that number is within 50 cents of the   14:37:32
7  number you calculated for CSI's net investment in   14:37:37
8  the lease for Schedule 61, correct?   14:37:39
9    A. Yes   14:37:41
10    Q. And down at the bottom, you see a number   14:37:41
11  for cost. Would you read that number, please?   14:37:44
12    A. $2,436,322.81.   14:37:47
13    Q. And that's within a dollar of the number   14:37:54
14  you calculated for the total of CSI's net investment   14:37:56
15  in Equipment Schedules 45, 49, 49-A and 61; is that   14:38:00
16  right?   14:38:08
17    A. Yes   14:38:08
18    Q. So CSI, in calculating its cost for   14:38:08
19  Schedule 67, has calculated its net investment in   14:38:12
20  the lease, correct?   14:38:15
21    A. Ask me that question again   14:38:18
22    Q. Okay. In calculating its cost for Schedule   14:38:19
23  67, CSI has a number that equals its net investment   14:38:24
24  in Schedules 45, 49, 49-A and 61, correct?   14:38:37

206

| | | |
|---|---|---|
| 1 | A. Net investment in lease, yes. | 14:38:42 |
| 2 | Q. For those four schedules? | 14:38:44 |
| 3 | A. Yes | 14:38:46 |
| 4 | Q. Now, look above under residual value on | 14:38:51 |
| 5 | Schedule 67. There's no number there, right? | 14:38:54 |
| 6 | A. Yes. | 14:38:56 |
| 7 | Q. And that means the residual value that CSI | 14:38:56 |
| 8 | has booked is zero, correct? | 14:38:59 |
| 9 | A. Yes. | 14:39:01 |
| 10 | Q. Now, were nothing else at work there, the | 14:39:03 |
| 11 | FMV higher of C or D on Schedule 67 should be equal | 14:39:06 |
| 12 | to $2,436,322.81, correct? | 14:39:11 |
| 13 | A. No | 14:39:19 |
| 14 | Q. Why not? | 14:39:20 |
| 15 | A. Well, there are different interest rates | 14:39:22 |
| 16 | involved in the calculation | 14:39:25 |
| 17 | Q. Now, if the interest rate were -- and | 14:39:26 |
| 18 | you're using an interest rate -- what interest rate | 14:39:33 |
| 19 | is used on Schedule 67? | 14:39:35 |
| 20 | A. The implicit rate is 8.78 percent. | 14:39:36 |
| 21 | Q. And so one possible explanation that the | 14:39:40 |
| 22 | FMV higher of C or D is more on Schedule 67 than it | 14:39:44 |
| 23 | is on -- with respect to the cost is that the | 14:39:50 |
| 24 | interest rate on Schedule 67 might be higher than it | 14:39:54 |

207

| | | |
|---|---|---|
| 1 | is on one or more of Schedules 45, 49, 49-A or 61, | 14:39:57 |
| 2 | correct? | 14:40:02 |
| 3 | A. I'm sorry; you didn't confuse me, but I | 14:40:03 |
| 4 | lost track because I thought you asked me a | 14:40:07 |
| 5 | different question with respect to that fair market | 14:40:12 |
| 6 | value higher of C or D. So you're changing -- | 14:40:14 |
| 7 | Q. Let's start over. | 14:40:18 |
| 8 | A. Okay | 14:40:20 |
| 9 | Q. What are the possible reasons, in your | 14:40:21 |
| 10 | mind, that the FMV higher of C or D, which is listed | 14:40:25 |
| 11 | on Schedule 67 as $2,970,525.50, is higher than the | 14:40:30 |
| 12 | $2,436,322.81 cost number? | 14:40:40 |
| 13 | A. Well, it's just an accounting mathematical | 14:40:47 |
| 14 | calculation. There's no real relationship between | 14:40:53 |
| 15 | the higher of C or D and the cost. This calculation | 14:40:58 |
| 16 | is just merely an accounting calculation to | 14:41:02 |
| 17 | determine implicit rate, and then you can see even | 14:41:07 |
| 18 | based on this calculation, we ultimately didn't use | 14:41:10 |
| 19 | that implicit rate; we used the actual debt rate | 14:41:13 |
| 20 | Q. The present value of the payments that | 14:41:16 |
| 21 | Lycos was to make to CSI under Schedule 67 is | 14:41:20 |
| 22 | $2,970,525.52, correct? | 14:41:28 |
| 23 | A. No. | 14:41:32 |
| 24 | Q. That's not the present value of the | 14:41:33 |

208

| | | |
|---|---|---|
| 1 | payments that Lycos is required to make under | 14:41:35 |
| 2 | Schedule 67? | 14:41:37 |
| 3 | A. Well, if you ask me, I would say the | 14:41:38 |
| 4 | accounting present value is the $2,913,128.06. This | 14:41:42 |
| 5 | number up here doesn't -- we just use that to | 14:41:54 |
| 6 | determine implicit rate. It doesn't go into our | 14:41:59 |
| 7 | books or records or any place else. | 14:42:04 |
| 8 | Q. Well, under Paragraph A on the sales-type | 14:42:05 |
| 9 | lease journal entry, it says, "PV of lease payment, | 14:42:09 |
| 10 | $2,970,525.52." That's what it says, doesn't it? | 14:42:12 |
| 11 | A. Yes | 14:42:17 |
| 12 | Q. And you're saying that's not the present | 14:42:18 |
| 13 | value of the payments that Lycos was required to | 14:42:20 |
| 14 | make under Schedule 67? | 14:42:22 |
| 15 | A. Well, it depends on what discount rate you | 14:42:24 |
| 16 | use. This is a formula with a discount rate | 14:42:30 |
| 17 | unrelated to Lycos's creditworthiness or anything | 14:42:35 |
| 18 | else. It's a formula to help us establish the | 14:42:40 |
| 19 | implicit rate | 14:42:43 |
| 20 | So you could say, I think Lycos's | 14:42:43 |
| 21 | implicit -- excuse me; debt rate is 9, and you'd | 14:42:48 |
| 22 | come up with a different number So this number | 14:42:51 |
| 23 | doesn't have, doesn't represent what you indicated | 14:42:55 |
| 24 | to me | 14:42:57 |

209

| | | |
|---|---|---|
| 1 | Q. All right, but in terms of debt rate, you | 14:42:57 |
| 2 | testified earlier that was a CSI number. That was a | 14:42:59 |
| 3 | number based on interest costs that CSI was | 14:43:03 |
| 4 | incurring, right? | 14:43:05 |
| 5 | A. No | 14:43:06 |
| 6 | Q. Does the debt rate have anything to do with | 14:43:07 |
| 7 | Lycos's credit rating? | 14:43:09 |
| 8 | A. Let me back up Which debt rate are you | 14:43:11 |
| 9 | talking about? | 14:43:13 |
| 10 | Q. Well, okay. On the sales-type lease | 14:43:14 |
| 11 | journal entry for Schedule 67, it says "ADR 8.78 | 14:43:16 |
| 12 | percent." Do you see that? | 14:43:21 |
| 13 | A. Yes | 14:43:22 |
| 14 | Q. Does that number have anything to do with | 14:43:22 |
| 15 | Lycos's creditworthiness? | 14:43:24 |
| 16 | A. If that relates to the financing of the | 14:43:26 |
| 17 | non-recourse note, that would include certain | 14:43:30 |
| 18 | decisions with respect to Lycos's creditworthiness | 14:43:38 |
| 19 | Q. And if this number -- and so -- | 14:43:40 |
| 20 | A. But as I sit here, I don't know if there's | 14:43:44 |
| 21 | credit enhancement or partial recourse I don't | 14:43:47 |
| 22 | know the circumstances of this loan | 14:43:50 |
| 23 | Q. So you believe that the net present value | 14:43:52 |
| 24 | of the payments Lycos is required to make is the | 14:43:55 |

68 (Pages 266 to 269)

Frederic K. O'Neal - November 17, 2006

266

| | | |
|---|---|---|
| 1 | just look at it for reasonableness to make sure that | 16:12:08 |
| 2 | the lease rate factor makes sense with respect to | 16:12:13 |
| 3 | the term. And then I'll also look at the cost cap. | 16:12:18 |
| 4 | Q. Anything else? | 16:12:24 |
| 5 | A. That's -- I may notice the installation | 16:12:25 |
| 6 | period, but that's the main thing that I will look | 16:12:31 |
| 7 | at. I will glance at certain paragraphs to see if | 16:12:37 |
| 8 | there's any information, for example, related to an | 16:12:41 |
| 9 | early termination; and then if there is, then I'll | 16:12:43 |
| 10 | look for some kind of firm term rental, also | 16:12:46 |
| 11 | Q. Do you review the lease document to see | 16:12:49 |
| 12 | whether or not there is a fair market value purchase | 16:12:52 |
| 13 | option? | 16:12:56 |
| 14 | A. I'm fortunate enough that usually if | 16:12:57 |
| 15 | there's one in there, it's identified for me on the | 16:13:00 |
| 16 | RFC. | 16:13:02 |
| 17 | Q. How common, in your experience, is it at | 16:13:03 |
| 18 | CSI for there to be a fair market value purchase | 16:13:07 |
| 19 | option? | 16:13:11 |
| 20 | A. I'm sorry; was your first question a dollar | 16:13:11 |
| 21 | purchase option? | 16:13:13 |
| 22 | Q. No; a fair market purchase option. | 16:13:14 |
| 23 | A. Excuse me; I'm sorry. I misunderstood you | 16:13:16 |
| 24 | I assume in general that they're fair market | 16:13:19 |

267

| | | |
|---|---|---|
| 1 | purchase options unless I have reason to believe | 16:13:23 |
| 2 | differently. | 16:13:25 |
| 3 | Q. Would it be fair to say, then, that the | 16:13:26 |
| 4 | great majority of CSI leases have fair market | 16:13:29 |
| 5 | purchase options in them? | 16:13:33 |
| 6 | A. I don't know if there's a specific | 16:13:34 |
| 7 | paragraph about fair market value purchase options. | 16:13:36 |
| 8 | If it's silent, then I assume that there's a fair | 16:13:41 |
| 9 | market value purchase option. | 16:13:44 |
| 10 | I don't read all the paragraphs in every | 16:13:45 |
| 11 | schedule, so I don't know the frequency from which | 16:13:48 |
| 12 | it says there is a fair market value purchase option | 16:13:50 |
| 13 | to when it says something else. I'm mostly | 16:13:53 |
| 14 | conscious of does it say, does it imply that there's | 16:13:56 |
| 15 | a dollar purchase option. That's really what I -- | 16:13:59 |
| 16 | that would be the exception I would be looking for. | 16:14:02 |
| 17 | Q. Okay, but your expectation based on your 16 | 16:14:04 |
| 18 | years at CSI is that there is a fair market value | 16:14:07 |
| 19 | purchase option in each master equipment lease? | 16:14:11 |
| 20 | MR. LITTLE: Objection. You can answer. | 16:14:14 |
| 21 | A. I don't know if the words are there | 16:14:16 |
| 22 | That's my basic understanding of what most of our | 16:14:17 |
| 23 | leases are, is fair market value purchase options | 16:14:20 |
| 24 | Q. And what's the basis for that | 16:14:25 |

268

| | | |
|---|---|---|
| 1 | understanding? | 16:14:27 |
| 2 | A. My 16 years of experience. | 16:14:32 |
| 3 | Q. Now, you mentioned earlier that CSI sends a | 16:15:07 |
| 4 | draft of an equipment schedule to its customers | 16:15:12 |
| 5 | before -- a draft of Exhibit A before it sends the | 16:15:16 |
| 6 | final Exhibit A, right? | 16:15:20 |
| 7 | A. Yes, generally | 16:15:21 |
| 8 | Q. And there is a spot on that draft Exhibit A | 16:15:22 |
| 9 | for the customer to initial it, right? | 16:15:26 |
| 10 | A. I don't know that. | 16:15:29 |
| 11 | Q. And do you know whether CSI makes an effort | 16:15:31 |
| 12 | to have its customers initial that spot? | 16:15:34 |
| 13 | A. I don't know that specifically. | 16:15:37 |
| 14 | (Marked, Exhibit 17.) | 16:15:43 |
| 15 | Q. What's been marked as Exhibit 17 is a | 16:16:03 |
| 16 | document called Plaintiff Computer Sales | 16:16:06 |
| 17 | International, Inc.'s Response to Defendant Lycos | 16:16:09 |
| 18 | Inc.'s First Interrogatories. | 16:16:12 |
| 19 | You mentioned, Mr. O'Neal, reviewing | 16:16:14 |
| 20 | some answers to questions in preparation for your | 16:16:17 |
| 21 | deposition. Is this what you answered, what you | 16:16:19 |
| 22 | reviewed? | 16:16:23 |
| 23 | A. No. | 16:16:27 |
| 24 | Q. Direct your attention to Schedule -- the | 16:16:28 |

269

| | | |
|---|---|---|
| 1 | Exhibit A towards the back, Lycos cost of sale | 16:16:35 |
| 2 | analysis. It's after Exhibit A. Did you have any | 16:16:38 |
| 3 | involvement in preparing this cost of sale analysis? | 16:16:42 |
| 4 | A. I wouldn't have had direct involvement, and | 16:16:48 |
| 5 | I don't recognize -- is this the complete schedule? | 16:16:52 |
| 6 | Q. This is what was provided to Lycos. | 16:16:57 |
| 7 | A. Okay. I wouldn't have prepared this | 16:16:59 |
| 8 | schedule, but if someone at CSI prepared this | 16:17:05 |
| 9 | schedule, it would most likely be somebody that | 16:17:10 |
| 10 | worked for me. I don't have specific recollection | 16:17:15 |
| 11 | of looking at this schedule | 16:17:18 |
| 12 | Q. Who, in your estimation, based on their job | 16:17:19 |
| 13 | duties, is most likely to have marked on or created | 16:17:24 |
| 14 | this schedule? | 16:17:27 |
| 15 | A. Most likely someone that works in the | 16:17:28 |
| 16 | accounting department. | 16:17:31 |
| 17 | Q. And who might those people be? | 16:17:32 |
| 18 | A. It could be a number of people. | 16:17:34 |
| 19 | Q. What are their names? | 16:17:37 |
| 20 | A. There are 15 people at least in the | 16:17:38 |
| 21 | accounting group. | 16:17:45 |
| 22 | Q. That same 15-person group? | 16:17:46 |
| 23 | A. It's a different 15-person group. | 16:17:48 |
| 24 | Q. All right. That's Ms. Todd's group? | 16:17:51 |

# EXHIBIT 18

# O'BRIEN &LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Edward Michael Philip

# November 6, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

James A. Scally   21280

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3

 4     -------------------------------x

 5     COMPUTER SALES INTERNATIONAL, INC.,

 6          Plaintiff and Defendant-in-

            Counterclaim

 7                                          Civil Action

       vs.                                  No. 05-10017-RWZ

 8

       LYCOS, INC.,

 9

            Defendant and Plaintiff-in-

10          Counterclaim

11     and

12     BANK OF AMERICA f/k/a FLEET BANK,

13          Trustee Process Defendant

14     -------------------------------x

15

16          DEPOSITION OF EDWARD MICHAEL PHILIP, a witness

17          called by and on behalf of the Plaintiff, taken

18          pursuant to the applicable provisions of the Federal

19          Rules of Civil Procedure, before James A. Scally,

20          RMR, CRR, a Notary Public in and for the Commonwealth

21          of Massachusetts, at the offices of McCarter &

22          English, 225 Franklin Street, Boston, Massachusetts,

23          on Wednesday, November 6, 2006, commencing at 9:15

24          a.m.
```

Edward Michael Philip 11-6-2006
Computer Sales International, Inc v. Lycos, Inc

## 10

1    and penalties of perjury?
2        A.  I understand
3        Q.  Do you have any physical or mental impairments
4    that you know of that would interfere with your ability to
5    answer my questions truthfully and completely?
6        A.  Not that I'm aware of
7        Q.  Do you understand that if any of my questions are
8    unclear in any way, you can feel free to tell me that and
9    I'll be happy to try to clarify them for you?
10       A.  I understand
11       Q.  And are you represented by counsel here today?
12       A.  I am
13       Q.  And who is that?
14       A.  Mr. Bodner and Mr. Dowden
15       Q.  Would you state your full name.
16       A.  Edward Michael Philip
17       Q.  Where do you live?
18       A.  Wayland, Massachusetts
19       Q.  How old are you?
20       A.  41
21       Q.  What's your street address?
22       A.  115 Draper Road
23       Q.  Do you have any other residences?
24       A.  Yes

## 11

1        Q.  Where?
2        A.  New Hampshire
3        Q.  What's the address?
4        A.  34 Rupert Road
5        Q.  Have you ever been convicted of a crime?
6        A.  No.
7        Q.  Can you just briefly describe your educational
8    background by years beginning with your graduation from
9    high school?
10       A.  I graduated from Christian Brothers High School in
11   1983, graduated from Vanderbilt University in 1987, and I
12   graduated from Harvard Business School in 1991
13       Q.  And can you briefly describe your employment
14   history from that time to the present?
15       A.  I worked for Salomon Brothers from 1987 to 1989; I
16   worked for Morgan Stanley in the summer of '90; I worked
17   for the Walt Disney Company from 1991 to 1995; I worked for
18   Lycos from 1995 through, I'm not exactly sure what my
19   resignation date was, but around 2003; I worked for
20   Decision Matrix Group from 2004 to 2005; and from 2006 to
21   the present, I work at Highland Capital Partners.
22       Q.  Other than meeting with counsel, have you done
23   anything to prepare for the deposition?
24       A.  I looked at some documents

## 12

1        Q.  What did you look at?
2        A.  Some -- I don't know what it's called  A
3    complaint or whatever that was provided to me, and a couple
4    analyst reports
5        Q.  Whose complaint did you look at?
6        A.  I need some help here
7        Q.  Do you know?  Do you remember?
8            MR. BODNER:  Testify to your best
9        recollection
10           THE WITNESS:  I'm sorry
11       A.  Whose complaint, can you --
12       Q.  Who was the plaintiff?
13       A.  The plaintiff was CSI, I assume
14       Q.  There is another related case where the plaintiff
15   was Lycos filed back in December of 2003.
16       A.  Then I'm not sure which one I looked at
17       Q.  Okay.  Have you met with anyone from Lycos in
18   preparation for the deposition?
19       A.  I have not
20       Q.  Have you met Mr. Bean before?
21       A.  Yes, I have
22       Q.  When did you meet him before?
23       A.  I believe it was Friday
24       Q.  Friday of last week?

## 13

1        A.  Yes.
2        Q.  And how long a meeting did you have -- by Mr.
3    Bean, you mean Lycos' counsel in this case, correct?
4        A.  Correct
5        Q.  Okay.  How long a meeting did you have with Mr. --
6    with Lycos counsel in this case last Friday?
7        A.  About an hour and a half
8        Q.  And it was in preparation for this deposition?
9        A.  Correct.
10       Q.  Had you met with any lawyers from Lycos before in
11   connection with this case, as far as you know?
12       A.  Not that I know of
13       Q.  Okay.  Who else was at the meeting?
14       A.  Mr Dowden
15       Q.  Anyone else?
16       A.  That's all
17       Q.  And what was the substance of your discussions
18   with Mr. Bean at the meeting?
19           MR. BEAN:  Mr. Bodner, I would ask
20       that as counsel to the witness you instruct
21       the witness not to answer the question on
22       the grounds of attorney-client work product
23       privilege
24           MR. BODNER:  For the company?

4 (Pages 10 to 13)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc

14

1    MR. BEAN: Yes.
2    MR. BODNER: I'll honor that request
3  and instruct you not to answer that, that
4  question.
5    MR. KALER: Okay. So Lycos is
6  claiming privilege as to all the
7  conversations between its counsel and the
8  witness?
9    MR. BEAN: I don't know that I'd say
10  all the conversations, but the question you
11  asked concerned the deposition preparation
12  of a former employee Friday afternoon, and
13  Lycos is taking the position that the
14  communications with Mr. Philip are
15  privileged --
16    MR. KALER: Okay
17    MR. BEAN: -- on Friday afternoon
18  BY MR. KALER:
19    Q. Has Mr. Bean or his law firm ever represented you
20  individually?
21    A. No
22    Q. Okay. And they don't represent you now
23  individually, as far as you know, right?
24    A. Correct

15

1    MR. KALER: Okay. Where did we stop,
2  253?
3    MS. PELLERIN: 253
4    MR. KALER: Why don't I just mark
5  them
6    (Exhibit 253, two 12/95 letters to
7  Mr Philip from Lycos marked )
8    MR. BODNER: Thank you Dep Ex 253?
9    MR. KALER: 253
10  BY MR. KALER:
11    Q. I show you what has been marked Plaintiff's
12  Exhibit 253.
13    MR. KALER: If I have extra copies,
14  Jim, I'll pass them to you
15    MR. DOWDEN: Thank you
16    Q. Is this a copy of a letter that you received from
17  Lycos in or about mid-December of 1995 offering you a
18  position of chief financial officer of the company?
19    A. I believe so
20    Q. Is that your signature on the second page?
21    A. Second page I believe so
22    Q. And then is the third page of the exhibit another
23  letter, this one dated December 11th, 1995, that you
24  received at or about that time clarifying the terms of the

16

1  offer?
2    A. I believe so
3    Q. And is that your signature on the third page?
4    A. I believe so
5    Q. Okay. You accepted an offer to become the chief
6  financial officer of Lycos in December of 1995; is that
7  right?
8    A. Correct
9    (Exhibit 254, amendment, marked )
10    Q. And I'll show you what's been marked Exhibit 254.
11  Is this a copy of an amendment to the -- two letters
12  that you signed in Exhibit 253 which you also signed on the
13  last page?
14    A. I believe so
15    Q. And do Exhibits 253 and 254 reflect, then, the
16  terms of your employment with Lycos at the time that you
17  began it?
18    A. I believe they do
19    Q. During the time that you were employed at Lycos
20  and throughout your tenure with the company, you had an
21  MBA, a masters in business administration, from Harvard
22  Business School, correct?
23    A. Correct
24    Q. And throughout your tenure with Lycos you had a

17

1  bachelor of science degree in economics and mathematics
2  that you had previously received from Vanderbilt; is that
3  right?
4    A. Correct
5    Q. Did you ever hold any professional licenses at any
6  time? CPA or certifications?
7    A. I believe I held a real estate license at one
8  point
9    Q. How long did you hold a real estate license?
10    A. I don't know
11    Q. Was it in Massachusetts?
12    A. No, it was not
13    Q. Where was it? California?
14    A. New York
15    Q. New York.
16    A. Yes
17    Q. When you were working at the investment banking
18  firms, did you obtain any securities licenses?
19    A. Not that I recall
20    Q. Any certifications as an investment advisor, or
21  any sort of certifications at all that you are aware of?
22    A. I don't believe so
23    Q. Okay. What did you do when you were at the
24  investment banking firms?

5 (Pages 14 to 17)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc

**18**

1   A. I was an analyst in the real estate group
2   Q. Both firms?
3   A. Oh, sorry. At Salomon Brothers
4   Q. Okay.
5   A. At Morgan Stanley, I was a summer associate
6   Q. At the time that you joined -- when did you start
7   with Lycos? Was it a few weeks after you signed the
8   letters in December of '95?
9   A. I don't recall the specific date
10  Q. Just generally.
11  A. Sometime in December
12  Q. Okay. How many employees did the company have at
13  the time?
14  A. I don't recall
15  Q. Roughly.
16  A. A dozen
17  Q. Where were its offices?
18  A. In Marlborough, Massachusetts
19  Q. Okay. And it was a private company at the time?
20  A. Correct
21  Q. When you joined Lycos in December of 1995, was it
22  your understanding that it was planning to do a public
23  offering of stock?
24  A. It was interested in that, yes

**19**

1   Q. Okay. And did it subsequently during your tenure
2   as chief financial officer do a public offering of its
3   stock?
4   A. It did
5   MR. KALER: Let's mark as Exhibit 255
6   a copy of what appears to be the prospectus
7   for that offering
8   (Exhibit 255, prospectus, marked )
9   MR. DOWDEN: Thank you
10  Q. Do you recognize Exhibit 255 as a copy of the
11  prospectus for the initial public offering of Lycos stock
12  in April of 1996?
13  A. I believe so
14  Q. Did you participate in the drafting or preparation
15  of any portions of this prospectus?
16  A. I did
17  Q. How did you participate?
18  A. I was one of the people that helped write it.
19  Q. Okay. Who else helped write it other than the
20  lawyers and so on?
21  A. Bob Davis, Tom Guilefoile, other members of
22  management
23  Q. Of Lycos?
24  A. Lycos.

**20**

1   Q. Okay. Was the information in it accurate at the
2   time it was issued, to the best of your knowledge?
3   A. To the best of your knowledge
4   Q. Okay. The third page of the document, this is a
5   two-sided document, so it's page 5, headed "Risk Factors,"
6   Bates numbered PHIL 000243, and that discussion continues
7   over to page PHIL 000250, do you see that discussion on
8   those pages that begins with the heading "Risk Factors"?
9   A. I do
10  Q. Was this discussion an accurate description of the
11  risk factors associated with Lycos, Inc., at the time that
12  this prospectus was issued?
13  A. I believe so
14  Q. And did you participate in drafting this
15  description of the risks associated with Lycos' business?
16  A. I believe so
17  Q. And the purpose of the prospectus was to advise
18  people who were considering, might be considering investing
19  money in the company as to what the risks associated with
20  its business were considered to be; is that right?
21  A. Correct
22  Q. Prior to coming to Lycos, had you been involved in
23  any aspect of leasing equipment?
24  A. I had not

**21**

1   Q. Had you been involved in leasing in conjunction
2   with your work in real estate?
3   A. Can you be more specific?
4   Q. Sure. You said you had a real estate license at
5   one time. Did you ever function as a broker?
6   A. I did not
7   Q. You did not.
8   A. No
9   Q. You just got the license?
10  A. Correct
11  Q. But you never practiced?
12  A. Correct
13  Q. Okay. Prior to coming to Lycos, had you ever
14  leased an automobile?
15  A. I had not
16  Q. Did you ever subsequently?
17  A. No, I have not
18  Q. Did you become involved in leasing of equipment
19  after you joined Lycos?
20  A. I did
21  Q. Okay. What was your first involvement -- well,
22  strike that.
23  At the time that you started with Lycos, I think
24  you said their offices were in Marlborough?

6 (Pages 18 to 21)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc

**22**

1  A  Correct
2  Q.  Did they have any other facilities?
3  A  We had an office in Pittsburgh
4  Q.  And do you happen to remember where it was in
5  Pittsburgh?
6  A  In a hotel  I don't remember the name
7  Q.  Okay.  What did that office do?
8  A  It was primarily an engineering function
9  Q.  What was the engineering function that it
10  performed?
11  A  Writing code and operating the Lycos web site
12  Q.  And who staffed it?
13  A  Are you asking for names?
14  Q.  Well, what categories of people staffed it?  If
15  you can remember the names, that would be fine.
16  A  Engineers
17  Q.  Approximately how many?
18  A  I don't recall
19  Q.  What hotel was it at?
20  A  I don't recall
21  Q.  And how large was the Marlborough facility when
22  you started?
23  A  Are you asking in square footage?
24  Q.  Sure.

**23**

1  A  I don't remember
2  Q.  Can you just give us a ballpark idea?
3  A.  5,000 square feet
4  Q.  What kind of equipment did you have, if any, on
5  site when you started in that office?
6  A  We had PC's for the individuals, and I believe we
7  had one server
8  Q.  Was any of that equipment owned by Lycos at the
9  time?
10  A  I believe it was all owned
11  Q.  Did there come a time when Lycos -- I should ask
12  about the equipment in Pittsburgh first.
13  Do you know whether the equipment in Pittsburgh
14  was owned by the company at that time when you started?
15  A  I believe it to be  yes
16  Q.  Okay.  Did there come a time when the company
17  started to lease equipment as opposed to purchasing it?
18  A.  There was
19  Q.  Approximately when did that begin?
20  A  I don't recall the date
21  Q.  Was it sometime in 1996, your first year?
22  A  I don't recall for sure
23  MR KALER:  Let's mark as --
24  (Exhibit 256, 6/96 letter to Mr

**24**

1  Philip from Digital Financial Services,
2  marked )
3  Q.  I want to show you what's been marked Exhibit 256.
4  Is this a copy of a letter that you received from Digital
5  Financial Services in or about June of 1996?
6  A.  I don't -- excuse me  I don't know if I received
7  this
8  Q.  Do you see that it's addressed to you?
9  A  I do
10  Q.  Okay.  Do you have any reason to think you did not
11  receive it?
12  A  I do not
13  Q.  Okay.  When you were with Lycos, at least in the
14  first year, was correspondence that was personally
15  addressed to you normally something that found its way to
16  you?
17  A  As far as I know.
18  Q  Okay  Do you see where the reference on this
19  letter is to equipment schedule number 6607769-003 between
20  Digital Financial Services as lessor and Lycos as lessee,
21  and it says, "Dear Mr. Philip, enclosed are the financing
22  documentation," and it goes on?
23  A  I see that
24  Q.  Does looking at this document refresh your

**25**

1  recollection that at least by June of 1996, you had become
2  involved in Lycos' leasing of computer equipment, at least
3  from one company, Digital?
4  A  It does not
5  Q.  Do you have any recollection of what equipment
6  from Digital Lycos was using in 1996?
7  A  We used Digital as our servers for the lycos com
8  web site
9  Q.  Were the servers located in Pittsburgh?
10  A  They were
11  Q.  What type of servers?
12  A  Digital.
13  Q.  No.  I meant the type.
14  A  Well  I wouldn't know
15  Q.  Okay.  What's your first memory of having been
16  involved in Lycos leases of equipment?  By that I mean the
17  earliest memory.
18  A  I would think it was signing the lease with CSI
19  (Exhibit 257, 11/96 letter to Mr
20  Philip from Avnet Computer Company,
21  marked )
22  Q.  Okay.  Before we go to that one, let me show you
23  what's been marked as Exhibit 257  Is that a copy of a
24  letter that you received from Avnet Computer Company in or

7 (Pages 22 to 25)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc

26

1  about November of 1996?
2      A. It's addressed to me, yes
3      Q. And is that your signature under the "Agreed and
4  accepted, Lycos, Inc." Signature block in the lower right
5  corner?
6      A. I believe so
7      Q. Does looking at this document refresh your
8  recollection that you did become involved in Lycos' leases
9  of computer equipment with at least one company other than
10 CSI in 1996?
11     A. I do recognize the name Avnet
12     Q. Okay. What do you recognize about Avnet?
13     A. Nothing other than the name
14     Q. Okay. Do you have a memory that in or about 1996
15 Lycos started leasing computer equipment from Avnet?
16     A. I don't
17     Q. Do you see where the reference line on this letter
18 refers to a lease schedule number L5649-01?
19     A. I see that, yes.
20     Q. Okay. Do you recognize or can you tell us what
21 equipment Lycos was leasing from Avnet in 1996, what type
22 of equipment?
23     A. I don't have a recollection of -- of that, other
24 than this letter here

27

1      Q. Okay. Does the description of the equipment, 18
2  IO modules, refresh your recollection at all?
3      A. It does not
4      Q. Does not, okay.
5          To the extent that Lycos was leasing computer
6  equipment in 1996, were you the individual within the
7  company who would have signed the documents associated with
8  those leases?
9      A. Potentially, yes
10     Q. Who else would have signed?
11     A. I think at the time, signing authority would have
12 been myself or Bob Davis or maybe Tom Guilefolle
13     Q. What were your duties and responsibilities as
14 chief financial officer in that first year, 1996?
15     A. I was responsible for the financial functioning of
16 the organization
17     Q. Did that include its expenses?
18     A. Correct.
19     Q. And leasing equipment would be one of its
20 expenses?
21     A. Correct
22     Q. What were its principal expenses in that first
23 year in descending order? I suppose the greatest expense
24 was employee costs?

28

1      A. Without an income statement, I wouldn't -- I
2  wouldn't recall
3      Q. Well, after employee costs, you had rent on just
4  the two facilities, Pittsburgh and Marlborough; is that
5  right?
6      A. I believe that to be the case
7          (Exhibit 258, 12/96 master lease
8          agreement and addendum, marked )
9      Q. Okay. Let me show you what's been marked Exhibit
10 258  Except for the last page, which was signed later, is
11 Exhibit 258 a copy of a master lease agreement and an
12 addendum to it that you signed on behalf of Lycos in
13 December of 1996?
14     A. It appears to be
15     Q. Is -- is that your signature on the sixth page of
16 Exhibit 258 under the heading, "Lessee:  Lycos, Inc."?
17     A. I believe so
18     Q. And did you write the title COO and the date
19 12/20/96 underneath your signature?
20     A. I believe so
21     Q. And then on the next page, is that your signature
22 as well in the lower right corner under "Lycos, Inc"?
23     A. I believe so
24     Q. And did you write in the terms "chief operating

29

1  officer" and "December 20th, 1996"?
2      A. I did not
3      Q. But you do recognize your signature?
4      A. Yes
5      Q. Is any of the handwriting on the first five pages
6  of the document yours?
7      A. I believe it to be my initials on page 5 and page
8  3
9      Q. And on page 5 it's your initials about a third of
10 the way up from the bottom, right above from paragraph
11 18.4, where it says "Lessee's Initials"?
12     A. I believe so
13     Q. When you say you believe so, you mean to the best
14 of your knowledge they are?
15     A. It appears like it is, yes.
16     Q. Okay. And then on page 3 of 6, the initials
17 you're talking about are the ones written in above
18 paragraph 10 just to the right of the word "insurance"?
19     A. Correct
20     Q. What did you cross out there?  Is that your
21 crossout?
22     A. I cannot tell
23     Q. But you initialed the change, anyway?
24     A. Correct

8 (Pages 26 to 29)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

30

1    Q. Who was Lycos' legal counsel at the time that you
2 executed this contract and the addendum?
3       MR BEAN: Objection
4    Q. You can answer.
5    A I don't recall specifically at the time
6    Q. Well, who was your legal counsel at the time you
7 went public in April of '96?
8    A It's a firm that no longer exists I'm struggling
9 to remember its name I don't recall the name
10    Q. All right. Well, if you remember it, will you
11 just mention it to me?
12    A I will
13    Q. And who were Lycos' outside auditors in the latter
14 part of 1996 after it was publicly traded now on NASDAQ?
15    A KPMG ~ KP Marwick.
16    Q. Peat Marwick?
17    A Peat Marwick
18    Q. Okay Did Lycos have inside in-house legal staff
19 at the time that you signed this contract or in the latter
20 part of 1996 generally?
21    A I don't believe so.
22    Q. Do you recall what lawyers you were using for
23 outside legal advice when you needed it in the latter part
24 of 1996?

31

1    A It was that firm I will come up with the name
2    Q. Okay Sure. Did you consult with legal counsel
3 before you signed this contract on behalf of Lycos?
4    A I don't recall
5    Q. You don't recall whether you did or not?
6    A Correct
7    Q. Prior to coming to Lycos in 1995, you had spent a
8 number of years as a senior executive for Walt Disney
9 Company, right?
10    A Correct
11    Q. Okay. Had you signed contracts in that capacity?
12    A I don't recall if I did
13    Q. Okay. Was it your practice when you joined Lycos
14 to get legal advice before entering into or committing the
15 company to contracts like this one, Exhibit 258?
16    A Case-by-case basis
17    Q. Did you ~ do you recall signing any contracts on
18 behalf of Lycos for which you did not seek legal advice
19 before signing?
20    A Yes
21    Q. Which contracts?
22    A Employment agreements I'm sure there were
23 others, but nothing comes to mind
24    Q. Was there a procedure within Lycos after it became

32

1 a publicly traded company whereby contracts would be
2 reviewed and vetted by legal counsel before you signed them
3 on behalf of the company?
4    A. Not a procedure, no.
5    Q. What was there?
6    A If we felt something needed to be reviewed, we
7 would obtain outside counsel for that
8    Q. Okay. Did you consult with outside counsel in
9 connection with this contract, as best you can remember,
10 before you signed it?
11    A I don't recall
12    Q. You don't recall whether you did or not?
13    A Correct
14    Q. What's your best guess? Given —
15       MR BODNER: Objection
16       MR BEAN: Objection
17    Q Given the nature of the contract?
18       MR. BODNER: Objection
19    Q. Would it have been a practice of yours to consult
20 outside legal counsel before signing a contract such as
21 this?
22    A Possibly But I don't recall
23    Q. Well, I'm not asking you whether you recall.
24 We've established that your testimony is that you don't

33

1 remember whether you sought legal advice before you signed
2 this master lease agreement on behalf of Lycos. That is
3 your testimony, correct —
4    A Correct
5    Q. — that you do not – you do not remember whether
6 you consulted legal counsel before you signed this master
7 lease agreement that's on the screen?
8    A. That's correct
9    Q. Okay. So my – my next question is: Given the
10 nature of this contract, the fact that it runs for several
11 pages, it has a fair amount of fine print, would it have
12 been your practice to consult with legal counsel before
13 signing such a contract on behalf of Lycos?
14    A Not necessarily
15    Q. Are you a lawyer?
16    A I am not a lawyer, no
17    Q. And have you ever been a lawyer?
18    A I have never been a lawyer
19    Q. Okay. Why would you not seek legal counsel before
20 signing an agreement like this?
21       MR BEAN: Objection
22    Q. You can answer.
23    A We would just look -- read through the agreement
24 and decide whether or not we needed legal help on it

9 (Pages 30 to 33)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc v Lycos, Inc

114

1           (Exhibit 287, equipment schedule,
2       marked.)
3       Q. Is Exhibit 287 a copy of still another equipment
4   schedule that you signed on behalf of Lycos and that Lycos
5   entered into with CSI in or about the summer of 2000?
6       A. Appears to be
7       Q. And that's your signature in the lower right
8   corner of the first page and also on the fourth page?
9       A. Appears to be
10      Q. And, again, do you see where the same provisions
11  that we've already talked about appear in that the
12  equipment is not specifically listed on the lease that you
13  signed but, rather, there's a general description of
14  categories on the second page and a monthly lease factor
15  specifying what the cost of the lease should be? Do you
16  see that?
17      A. I do
18      Q. Now, by way of example on Exhibit 287, did you
19  understand when you signed the leases that this schedule,
20  for example, and the others like it, that the monthly lease
21  rate factor on the second page, for example, the first one
22  here, 0.03875 times unit cost, was a factor which, when
23  multiplied by the cost of the unit, would tell you what the
24  monthly lease rental for that unit would be?

115

1           MR BEAN: Objection
2       Q. You can answer.
3       A. I don't recall what — what I remember from the
4   time
5       Q. Well, do you understand it now? Would you — I
6   guess what I'm asking you is would you have understood that
7   at the time?
8       A. If I read through the document and it was laid out
9   in the document  probably so
10      Q. Okay. Do you mean laid out in the document as it
11  is here?
12      A. Well, if it said what unit cost was and if it
13  defined the terms and such
14          (Exhibit 288, 7/12/00 equipment
15      schedule, marked )
16      Q. Let me show you what's been marked Exhibit 288.
17  Is Exhibit 288 a copy of another equipment schedule that
18  Lycos entered into with CSI and that you signed on or about
19  July 12th of 2000?
20      A. I believe so
21      Q. And, again, this schedule has the same language in
22  it as the previous ones in the sense that it does not list
23  specific items of equipment, but, rather, lists categories
24  that Lycos can, according to paragraph 3-A, go out and

116

1   obtain; is that correct?
2       A. Yes
3       Q. Okay.
4           (Exhibit 289, equipment schedule,
5       marked.)
6       Q. I show you what's been marked Exhibit 289. Is
7   this a copy of another equipment schedule that Lycos
8   entered into with CSI and that you signed on behalf of
9   Lycos?
10      A. Presumably, yes
11      Q. Okay. Okay.
12          (Exhibit 290, 9/00 proxy statement,
13      marked.)
14      Q. I show you what's been marked as Exhibit 290. I
15  ask you if you recognize Exhibit 290.
16      A. I recognize it by title
17      Q. Do you recognize it as a proxy statement that
18  Lycos filed in or about September of 2000?
19      A. Yes  But I haven't read the content, but it looks
20  like it
21      Q. Okay. On page CSI 0000025 —
22      A. Yes
23      Q. — and continuing over to 26 and 27 and 28, 29,
24  and 30, do you see there's a discussion of the proposed

117

1   acquisition of Lycos by Terra Networks?
2       A. I do
3       Q. And Lycos was acquired by Terra Networks when the
4   deal closed on October 31st of 2000, correct?
5       A. I'm not sure if that's the exact date, but in —
6       Q. Halloween?
7       A. — the general vicinity
8       Q. Okay. Prior to the – in the years prior to the
9   acquisition of Lycos by Terra, what involvement did you
10  have in efforts by Lycos to lower its operating expenses?
11      A. Can you be more specific with regard to lowering
12  its operating expenses, what you mean by that?
13      Q. Such as signing amendments to its leases with CSI
14  to lower its monthly lease expenses  But other kinds of
15  expense reduction measures as well.
16      A. We always employed good business practices. So we
17  weren't per se trying to lower expenses  We were trying to
18  do good business transactions
19      Q. Weren't there periods of time prior to Lycos'
20  acquisition by Terra when in fact you made -- you directed
21  and Lycos made conscious efforts to lower its operating
22  expenses in order to meet Wall Street's earnings
23  expectations?
24      A. Not that I recall, no

30 (Pages 114 to 117)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc v. Lycos, Inc

122

1    Q. And he goes on to say, quote, "One day early in
2    the fourth quarter of 1999, Ted Philip, Lycos CFO," that's
3    you, right?
4    A. Yes, that's me
5    Q. "Came into my office ashen and said that we
6    weren't going to meet our projections. 'The only way we're
7    going to avoid this,' he said, 'is to be bold, tough, and
8    Draconian. Are we up for it?'" Do you see that?
9    A. I do
10   Q. Okay. Do you recall what he's talking about?
11   A. Actually, I don't recall what he's talking about
12   Q. Okay. He goes on to say, quote, "We were. Had we
13   missed the forecast, the valuation of the company would be
14   cut in half overnight and our credibility would be shot,"
15   unquote. Do you see that?
16   A. I do
17   Q. By forecast, you understood him to mean missing
18   the earnings forecast, right?
19   A. That's correct
20   Q. And when he says, "Had we missed the forecast, the
21   valuation of the company would be cut in half overnight,"
22   he's referring to the market capitalization of the company;
23   is that correct?
24   A. I believe so

123

1    Q. He goes on to say, quote, "Slamming the brakes on
2    our fast-moving freight train, we stopped all advertising,
3    eliminated all outside contractors, and cut every
4    unnecessary expense we could find," unquote. Do you see
5    that?
6    A. I do
7    Q. What is your recollection of what you did to cut
8    every unnecessary expense you could find, as he puts it?
9    A. I actually don't recall this
10   Q. Do you recall any periods of time, sir, during
11   which the company cut expenses in part in an effort to meet
12   earnings requirements?
13   A. We were always watching the income statement
14   Q. Meaning watching, trying to keep your expenses
15   down?
16   A. And revenues up
17   Q. Okay. But I'm focusing on you – you were, among
18   other things, trying to keep your expenses down?
19   A. Not necessarily, no
20   Q. I'm not saying it's a bad thing. I'm just asking.
21   A. Well, at the time it was a bad thing  though
22   Q. What was a bad thing?
23   A. Trying to keep your expenses down
24   Q. Why would that be a bad thing?

124

1    A. Wall Street wanted us, wanted Internet companies
2    and expected Internet companies to spend a lot of money and
3    generally didn't care if they lost a lot of money
4    Q. Except when they had earnings projections, then
5    they cared a great deal, didn't they?
6    A. Some did; some didn't
7    Q. Certainly there were – certainly pretty much
8    throughout the years that you were CFO before the
9    acquisition by Terra, there were earnings expectations that
10   Wall Street had for the company, correct?
11   A. That's correct
12   Q. And one way to meet those earnings expectations
13   was to increase revenues, correct?
14   A. That's right
15   Q. And another way to try to make those earnings
16   expectations was to lower expenses, right?
17   A. No  Generally not  because never that I can
18   remember were our expenses ever expected to be sequentially
19   lower than in previous quarters
20   Q. Well, a quarter's only three months long.
21   Generally speaking, it would enhance Lycos' earnings if it
22   minimized its expenses, so long that minimizing the
23   expenses didn't hurt the operations of the company?
24   A. That's a statement you can make about all

125

1    businesses, correct
2    Q. Okay. So you'd agree?
3    A. I would agree that that is a general business
4    statement, yes
5    Q. Okay. Do you see where Mr. Davis goes on to state
6    in this book, quote, "We also worked hard to make sure
7    everyone understood the urgency of the crisis. We wanted
8    every employee to pitch in." Do you see that?
9    A. I do.
10   Q. You still have no memory of this circumstance?
11   A. No
12   Q. And he goes on to say, quote, "In a companywide
13   meeting, I explained what was happening and showed them,
14   among other things, comparable numbers at Yahoo!. If they
15   could succeed, so could we. I visited all of our locations
16   pointing out how carelessly we'd all been spending,"
17   unquote. Do you see that?
18   A. I do
19   Q. Did you accompany Mr. Davis on any of his visits
20   to these other locations where he pointed out how
21   carelessly they'd been spending?
22   A. I don't believe so
23   Q. Did you go to the companywide meeting concerning
24   what Mr. Davis refers to as "this crisis"?

32 (Pages 122 to 125)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

126

1   A. I don't recall that
2   Q. Do you see where he goes on to say, quote,
3   "Requests had already been submitted to hire another 200 or
4   300 employees. There were also requests to spend tens of
5   millions for computer systems and marketing. I explained
6   to our staff that we were no different than a household,
7   what goes out can't exceed what comes in," unquote. Do you
8   see that?
9   A. I do
10  Q. "In the long run, it's the only way we could keep
11  our jobs. Everyone rallied to the cause, and in the end we
12  beat the estimates." Do you see that?
13  A. I do
14  Q. Okay. So your testimony, sir, is that you have no
15  memory whatsoever of this crisis, as Mr. Davis describes
16  it, in the life of Lycos in – in or about the fourth
17  quarter of 1999; is that – is that correct?
18  A. That's correct
19  Q. Okay. And do you see where he quotes you as
20  saying -- he describes you as coming into his office in the
21  fourth quarter of 1999 ashen faced saying that you, that
22  Lycos was not going to meet its projections?
23  A. I see that
24  Q. Did you ever do that?

127

1   A. Not that I recall
2   Q. Okay. Do you remember whether or not you did? In
3   other words, is it possible you did and you don't remember?
4   A. It's certainly possible
5   Q. Okay. What about his quotation where he quotes
6   you as saying, quote, "The only way we're going to avoid
7   this," referring to not meeting the earnings expectations,
8   "is to be bold, tough, and Draconian  Are we up for it?"
9   Do you see that?
10  A. Yes, I do
11  Q. Did you say that to him?
12  A. Not that I'm aware of
13  Q. Okay. Do you recall whether or not you said it?
14  A. I do not recall that
15  Q. Okay. Is it possible that you did and you don't
16  remember?
17  A. It's possible
18  Q. Okay. Was this part of the book that you reviewed
19  before?
20  A. It is not
21  Q. Most people read the parts of drafts of books that
22  talk about them because they naturally want to know what
23  people are saying about them  Did you not do that?
24  A. I read some of the book, some of the early book

128

1   Q. Do you remember whether or not you read this part?
2   A. I don't remember whether or not I read it.
3   Q. Why did you read portions of the book?
4   A. He asked me to read some of it early on when it
5   was a manuscript
6   Q. Did he tell you why he wanted you to read it?
7   A. I think he wanted my opinion on whether or not he
8   should write a book
9   Q. Did he ask you to comment on any aspects of the
10  book to see if it was consistent with your memory or
11  accurate?
12  A. He did not
13  Q. And your testimony is you never had a concern with
14  reducing Lycos' operating expenses, or did I
15  mischaracterize what you said?
16  A. I think you mischaracterized it
17  Q. Okay. You were concerned in the ordinary course
18  with minimizing Lycos' operating expenses so long as you
19  could do so without harming the business, right?
20  A. I don't think that's the accurate way to put it
21  either
22  Q. All right. Tell us in your own words, what steps,
23  if any, were you taking to keep expenses down?
24  A. Well, you keep using the phrase "keep expenses

129

1   down." That's not what we were doing
2   Q. I'm suggesting it's exactly what you were doing.
3   A. Okay
4   Q. How would you phrase what you were doing?
5   A. I would phrase it as we were keeping expenses
6   under control within our model while building the top line
7   business
8   Q. Okay. I thought that's what I just said.
9   A. It's very different
10  Q. Ahh. Did you always phrase it that way in your
11  public statements or did you occasionally say, "We're
12  trying to keep expenses down"?
13  A. I can't say  I don't know
14  Q. Okay. Do you remember whether you ever said,
15  "We're trying to keep expenses down"?
16  A. I don't remember that
17  Q. Okay. You just said you were trying to keep
18  expenses under control.
19  A. Yes
20  Q. Consistent with your business model?
21  A. Yes
22  Q. When you say you were trying to keep expenses
23  under control, what do you mean?
24  A. Making sure that the amount that we spent was

33 (Pages 126 to 129)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc v Lycos, Inc

**130**

1  consistent with our growth
2  Q.  What do you mean "consistent with our growth"?
3  A.  We have to spend money to make money, and so if
4  you're going to grow, you have to spend in the appropriate
5  places in order to grow
6  Q.  What did you mean when you said "control
7  expenses"?
8  A.  Just make sure that the level of expenses were
9  appropriate for our expected growth
10  Q.  How did you do that?
11  A.  Reviewed the expenses we had in different
12  categories
13  Q.  What categories did you review the expenses that
14  you had in?
15  A.  Most categories
16  Q.  Can you describe what categories?
17  A.  Sure  Employee costs, advertising, I'm sure we
18  reviewed equipment cost  Everything that was on the income
19  statement
20  Q.  What equipment costs did you review?
21  A.  Whatever the cost of — of the equipment were for
22  the particular period we were in.
23  Q.  The particular quarter, you mean?
24  A.  It depends  Could be annual; could be quarterly

**131**

1  Q.  But by period, you mean a period of time?
2  A.  Yes
3  Q.  Months or particular year?
4  A.  Yes
5  Q.  And what were Lycos' principal equipment costs
6  during the years that you were CFO?
7  A.  The cost to run the Lycos services
8  Q.  Right. But what did that consist of?
9  A.  Servers, networking equipment, whatever else they
10  used in the service
11  Q.  And approximately how much did that cost ballpark
12  on a monthly basis?
13  A.  I don't know.
14  Q.  Who was most of the money being paid to for the
15  equipment that Lycos was using?
16  A.  I don't know
17  Q.  Wasn't it CSI?
18  A.  That's an assumption I would make  but I don't
19  know
20  Q.  Okay.  You would make that assumption because they
21  were the largest lessor to the company?
22  A.  That is my understanding
23  Q.  Okay  During the years you were CFO, was there
24  anybody other than you who was involved in the — in Lycos'

**132**

1  relationship with CSI in terms of signing contracts or
2  negotiating, communicating?
3  A.  I saw Mr  Guilefoile's signature on some of the
4  contracts
5  Q.  Anyone else that you know of?
6  A.  I didn't see anyone else's signatures
7  Q.  Right.  But I didn't ask you that.  I asked you
8  from your memory who else was involved that you think was
9  involved in dealing with CSI.
10  A.  I think is involved  Okay  Mr  Lucy  and that's
11  all I would think of other than names that I've seen today
12  Q.  Did you hire Brian Lucy?
13  A.  I was there when he was hired  yes
14  Q.  Approximately when was he hired?
15  A.  I don't remember
16  Q.  Who else was there when he was hired?
17  A.  Mr  Guilefoile
18  Q.  What did you folks hire him to do?
19  A.  I believe we hired him as an accounting manager,
20  some title like that
21  Q.  And what other positions did he hold with the
22  company?
23  A.  He eventually became controller
24  Q.  Anything else?

**133**

1  A.  After the merger, he became CFO, I believe
2  Q.  Did he report to you when he was controller?
3  A.  He did not.
4  Q.  Who did he report to?
5  A.  Mr  Guilefoile
6  Q.  Did Mr. Lucy report to you at any time?
7  A.  He did not.
8  Q.  Who did he report to when he was accounting
9  manager?
10  A.  I believe Mr  Guilefoile
11  Q.  During your tenure as CFO, how, if at all, did
12  controlling expenses affect the price of the stock of the
13  company?
14  MR  BEAN: Objection
15  Q.  You can answer
16  A.  It was an important piece
17  Q.  Why was it an important piece of keeping the stock
18  price up?
19  A.  I didn't say it was an important piece of keeping
20  it up  Just affect the stock price
21  Q.  Okay.  Why was it an important element in
22  influencing the stock price?
23  A.  Because if we didn't spend enough, we wouldn't
24  grow and meet expectations  If we spent too much, then

34 (Pages 130 to 133)

Edward Michael Philip 11-6-2006
Computer Sales International, Inc. v. Lycos, Inc.

### 238

1  answer.
2      THE WITNESS: Not going to object,
3  okay.
4    Q. You can answer.
5    A. We were in multiple buildings over time.
6    Q. What, if any, duties and responsibilities
7  did Mr. Snider have as you understood it for reviewing
8  contracts that the company was entering into?
9    A. Most contracts would go through the legal
10  department.
11    Q. Okay. Did that include things like the master
12  lease and equipment schedules with CSI?
13    A. He wasn't there for the master lease based on the
14  date you showed me.
15    Q. Right. But the later equipment schedules, would
16  it include?
17    A. I would think so.
18    Q. Okay. Where is he now, do you know? I mean in
19  terms of employment.
20    A. He's unemployed at the moment.
21    Q. Was he granted stock options also in Lycos stock?
22    A. Yes, he was.
23    Q. Which he cashed out at the acquisition?
24      (Discussion off the record.)

### 239

1    A. You'd have to ask him that.
2    Q. Okay. Who replaced Mr. Snider when he left as
3  general counsel?
4      (Discussion off the record.)
5    A. I believe Mr. Feinberg.
6    Q. Andrew Feinberg?
7    A. Correct.
8    Q. Where did he come from employmentwise?
9    A. He was working at Lycos when he replaced --
10    Q. In the law department?
11    A. In the law department, when he replaced Mr.
12  Snider.
13    Q. By the time of the acquisition in October of 2000
14  of Lycos by Terra, approximately how large was the law
15  department, in terms of the number of lawyers?
16    A. Four or five.
17    Q. Do you remember who the other attorneys were?
18    A. Dan Sullivan, John Salon.
19    Q. S-a-l-o-n?
20    A. That's correct.
21    Q. Does he have a brother Neil?
22    A. I don't know.
23    Peter Karol.
24    Q. K-a-r-o-l?

### 240

1    A. I believe it's a K. I don't know for sure.
2    Q. Okay.
3    A. There are one or two others that are escaping me.
4    Q. Okay. There were about half a dozen lawyers?
5    A. In that neighborhood.
6    Q. Okay. And this is in summer and fall of 2000?
7    A. I believe so.
8    Q. Okay. And so during most of the -- well, during
9  nearly all of the period that you were signing equipment
10  schedules with CSI on behalf of Lycos, you did have access
11  to an in-house legal staff at Lycos consisting of
12  several -- several attorneys, right?
13    A. Not in the beginning.
14    Q. Not in the beginning. In the beginning you
15  started '97 with just Mr. Snider. But, for example, by
16  August 1 of 2000, when you signed Exhibits 285-A and 286-A,
17  and the -- the extensions of the leases, you had access to
18  a legal staff of about four or five lawyers, right?
19      MR. BEAN: Objection.
20    A. That's correct.
21    Q. In-house?
22    A. That's correct.
23    Q. Okay. And it was the company's practice to have
24  the law department review lease schedules, contracts like

### 241

1  that?
2      MR. BEAN: Objection.
3    Q. The ones with CSI, correct?
4      MR. BEAN: Objection.
5    Q. You can answer.
6    A. I don't know if the ones with CSI, but contracts
7  in general, yes.
8    Q. Okay. And obviously these -- the deals with CSI
9  were contracts, right?
10    A. Correct.
11    Q. Did there come a time when you folks ceased using
12  Hutchins & Wheeler as outside law firm and started using
13  someone else, prior to the acquisition by Terra?
14    A. We used multiple law firms for multiple things.
15    Q. Okay. Other than using Cravath on the securities
16  fraud cases and Hutchins & Wheeler, what other law firms
17  did you use?
18    A. We used Ropes & Gray, we used --
19    Q. Do you mean Lycos used Ropes & Gray?
20    A. Yes.
21    Q. Lycos the company used the law firm that's
22  representing you personally in the deposition?
23    A. That's correct.
24    Q. Okay. Does Lycos still use Ropes & Gray?

61 (Pages 238 to 241)

# EXHIBIT 19

Volume 1, Pages 1-127

Exhibit: 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

Trustee Process Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF BRIAN REALE

Wednesday, January 31, 2007, 9:56 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


- - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

Brian Reale
Volume 1 - January 31, 2007

6

1   A. No, I have not.
2   Q. You understand that you're testifying under
3   oath; correct?
4   A. Yes.
5   Q. And you understand that you and only you
6   are responsible for the truthfulness of your
7   testimony; correct?
8   A. Yes.
9   Q. And I understand that you're an employee of
10  CSI and some of the things you may be asked to
11  testify about today may not be in CSI's interests,
12  but you understand that it's your obligation to tell
13  the truth, do you not?
14  A. Yes.
15  Q. What is your residential address?
16  A. 82 Constance Way, in North Attleboro, Mass.
17  Q. And how long have you lived there, sir?
18  A. About two and a half years.
19  Q. Where did you live before that?
20  A. In Norton, Mass. Do you want the address?
21  Q. Yes, please.
22  A. 74 Elm Street in Norton.
23  Q. How long did you live there?
24  A. Six years.

7

1   Q. Do you have any intention to move outside
2   the Commonwealth of Massachusetts?
3   A. No.
4   Q. Have you ever discussed the subject matter
5   of this litigation --
6        Do you know who Paul Stenberg is?
7   A. Yes.
8   Q. Who is he?
9   A. He's my manager at CSI.
10  Q. When you say your manager, he's your boss?
11  A. Correct.
12  Q. And how long has he been your manager?
13  A. Approximately six years.
14  Q. Have you had occasion to ever discuss the
15  subject of this litigation with Mr. Stenberg?
16  A. One time, when I received a phone call from
17  a gentleman named Sam Ziba, who informed me about
18  the case and asked me to relay some information to
19  Paul.
20  Q. Have you ever -- have you had any other
21  conversations with Mr. Stenberg about the subject
22  matter of this litigation?
23  A. No.
24  Q. Now, that conversation with Mr. Ziba --

8

1        You received a phone call from Mr Ziba?
2   A. Yes.
3   Q. When did you receive that phone call?
4   A. I would say it was maybe two years ago,
5   between one and two years ago.
6   Q. And did Mr. Ziba tell you why he was
7   calling?
8   A. Yes.
9   Q. What did he tell you?
10  A. He told me that, "Tell Paul I helped him
11  out today." I said, "What do you mean?" He said,
12  "I got a call from Lycos's lawyers about the
13  lawsuit." And I said, "Honest, I don't know what
14  you're talking about." He said, "Oh, you didn't
15  know Lycos is suing you guys?" And I said, "I had
16  no idea." And he said, "Yeah, you know, they're
17  suing you guys, and basically the guy," meaning the
18  lawyer, "asked me about things I've done with
19  Lycos -- you know, golf trips or dinners, things
20  like that." And I mean, Sam just said, "I've been
21  to a couple of dinners. That's it." Sam said, "How
22  can you be suing these guys? And we were, you know,
23  asking them to help us lowering our monthly rents
24  and Paul gave us options and we chose which option

9

1   we wanted to take and how can you sue them for that?
2   It's not their fault. They did what we asked." He
3   said, "I don't think they have a chance." He said,
4   "Tell Paul I tried to help him out. Have him give
5   me a call."
6   Q. So this call came out of the blue?
7   A. Uh-huh.
8   Q. Is that a yes, sir?
9   A. Yes.
10  Q. With the court reporter, you have to answer
11  audibly
12  A. Sorry.
13  Q. He can't take down head shakes
14  A. Sorry.
15  Q. Had you ever spoken to Mr Ziba before that
16  call?
17  A. Yes, he was a -- he had left -- he was a
18  customer of mine.
19  Q. How long did your call with Mr. Ziba last?
20  A. I would guess five, ten minutes, maybe.
21  Q. And the sole reason for his call was to
22  share this information with Mr. Stenberg?
23       MR LITTLE: Objection.
24  Q. That he had helped him out?

# EXHIBIT 20
# FILED UNDER SEAL

# EXHIBIT 21
# FILED UNDER SEAL

# EXHIBIT 22
# FILED UNDER SEAL

# EXHIBIT 24

# O'BRIEN & LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Monique Walsh

# September 18, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Nicole E. Guilbert  20511

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc.

```
 1                  UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MASSACHUSETTS

 3

 4     ----------------------------------------x

 5     COMPUTER SALES INTERNATIONAL, INC.,

 6                         Plaintiff

 7                                          Civil Action

 8     vs.                             No. 05-10017-RWZ

 9

10     LYCOS, INC.,

11                         Defendant,

12

13     BANK OF AMERICA f/k/a FLEET BANK,

14               Trustee Process Defendant

15     ----------------------------------------x

16          VIDEOTAPED DEPOSITION OF MONIQUE WALSH, a

17          witness called by and on behalf of the

18          Plaintiff, taken pursuant to Federal Rules of

19          Civil Procedure, before Nicole E. Guilbert, a

20          Notary Public in and for the Commonwealth of

21          Massachusetts, at McCarter & English, 225

22          Franklin Street, Boston, Massachusetts, on

23          Monday, September 18, 2006, commencing at

24          9:16 a.m.
```

1

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Monique Walsh 9-18-2006
Computer Sales International, Inc. v. Lycos, Inc

90

1          (Exhibit 55, Schedule 93, marked for
2     identification )
3          (Exhibit 56, Schedule 94, marked for
4     identification )
5     Q. (By Mr. Kaler) Just for reference, we've marked
6 as Exhibit 55 and 56 Equipment Schedules 93 and 94. And as
7 you can see on the face page of these, they were executed
8 by Lycos in October of '01 and then finally countersigned
9 in December of '01 by CSI. Is that consistent, generally,
10 with your memory that it was in the fall of '01 that these
11 refinance schedules were done?
12    A. That's what it says. I don't remember the exact
13 timeline
14    Q. Now, looking at your spreadsheet on the page on
15 the screen, do you see where under Equipment Value, the
16 column that you understood to be the column for the cost of
17 the equipment, you put the number 3,300,000 opposite
18 Schedule 93, correct?
19    A. That's what it says. yep
20    Q. And then you put 21,000,000 opposite Schedule 94,
21 correct?
22    A. That's what it says
23    Q. And how did you obtain those numbers since they
24 were not on Mr. Ziba's schedule? They're clearly not stip.

91

1 loss values, so you won't find them in the schedule.
2    A. Typically, what I did was I went and I looked at
3 the base value. That's roughly around there
4    Q. But that isn't --
5    A. I -- unless someone told me, the only way I would
6 get equipment value is I would go to the base value
7    Q. Take a look at the schedule. Tell us, as best you
8 can recall, where did you get --
9    A. This schedule or --
10    Q. No. No. I meant what's up on the screen. When
11 you filled in 3.3 million for Schedule 93, where did you
12 get that number?
13    A. Base value. It's not the same amount but it's
14 roughly --
15    Q. So you were the one who came up with those numbers
16 to put in the Equipment Value column; is that right?
17    A. I don't know if I explicitly got it from here or I
18 got it from an e-mail but typically if I was to get --
19 what I put in or what was labeled Equipment Value would be
20 the base value
21    Q. Well, you say, "typically." Did you -- so you did
22 this often?
23    A. No. Well -- just from memory, that would be what
24 I would use

92

1    Q. You do remember, then, getting the numbers for 93
2 and 94?
3    A. Well, I don't know where those numbers came from
4 because --
5    Q. That's the question I'm asking.
6    A. -- explicitly because if I had seen a number that
7 was to this -- rounded to this number, I would have used
8 that number. So that means I would -- I would think to
9 myself I didn't use -- I didn't see a number like this
10    Q. Can you --
11    A. I can't tell you explicitly where it came from
12 because if this was signed on 12/10 --
13    Q. You wouldn't have even had it --
14    A. Right
15    Q. -- at the time?
16    A. So I don't know where the numbers came from
17    Q. That's what I'm asking you
18    A. Unless it came in an e-mail from somewhere or --
19    Q. An e-mail from who?
20    A. I just don't know
21    Q. You would have inquired of somebody as to what
22 value you should use for 93 and 94 under Equipment Value,
23 wouldn't you?
24    A. I just don't know who I would have asked, if it

93

1 was somebody internal or from -- somebody from CSI
2    Q. But you got the information from someone?
3    A. I got it from somewhere. I just don't know where
4 I got it from
5    Q. What about the other numbers -- but you -- in any
6 event, you understood the number to reflect the original
7 cost of the equipment on that schedule -- on those
8 schedules, correct?
9    A. To be the base value
10    Q. Okay.
11    A. Whatever --
12    Q. In other words, whatever the original cost was?
13    A. Whatever base value of -- on the schedule means
14    Q. Right. But you understood this column, you've
15 already testified, to be Sam Ziba's record of what the
16 original cost of the equipment was, right, and you
17 carried --
18    A. Of what I perceived the column to be --
19    Q. Right. What you understood his column to be was
20 the cost of the equipment?
21    A. What we originally paid for it. Now, if that's
22 true or not, I'm not certain
23    Q. I'm just asking your understanding.
24    A. Right

24 (Pages 90 to 93)

# EXHIBIT 25

# O'BRIEN *&* LEVINE

## Court Reporting Services



### YOUR BOSTON CONNECTION...WORLDWIDE

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Timothy Wright

# January 12, 2007

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Nicole E. Guilbert   22498

1            UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3

4      ------------------------------x

5    COMPUTER SALES INTERNATIONAL,

6    INC.,

7                      Plaintiff

8                                       Civil Action

9    vs.                          No. 05-10017-RWZ

10

11   LYCOS, INC.,

12                   Defendant

13     ------------------------------x

14

15      VIDEOTAPED DEPOSITION OF TIMOTHY WRIGHT,

16         a witness called by and on behalf of the

17         Plaintiff, taken pursuant to applicable

18         provisions of the Massachusetts Rules of Civil

19         Procedure, before Nicole E. Guilbert, a Notary

20         Public in and for the Commonwealth of

21         Massachusetts, at McCarter & English, 225

22         Franklin Street, Boston, Massachusetts, on

23         Friday, January 12, 2007, commencing at

24         9:36 a.m.

1

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

---

**6**

1    and I'll be happy to try to clarify them for you?
2    A   I do
3    Q.   And are you represented by counsel?
4    A   I am
5    Q.   And who is that?
6    A   Peter
7    Q.   Mr. Acton?
8    A   Mr Acton
9    Q.   And he's also counsel for your former employer
10   Lycos?
11   A   I believe so
12   Q.   Where do you live, sir?
13   A   Lexington, Massachusetts
14   Q.   Can you give us your street address?
15   A   55B, for boy, Hancock Street in Lexington,
16   Massachusetts
17   Q.   And are you employed?
18   A   No
19   Q.   For how long have you been unemployed?
20   A   April '06 is when I left Geac
21   Q.   Left what?
22   A   Geac, G-e-a-c
23   Q.   And what was Geac?
24   A   Geac was an enterprise software company   It was

---

**7**

1    sold to Infor
2    Q.   Did you own stock in the company at the time it
3    was sold?
4    A   In Geac?
5    Q   Yes
6    A   Yes, I did
7    Q.   How long had you been with the company?
8    A   Since January either 1st or 2nd – I'm not
9    exactly sure which – of 2003
10   Q.   What did you get for your stock when the company
11   was sold?
12   A   Eleven dollars U S
13   Q.   Eleven dollars a share?
14   A   Yes
15   Q.   And how many shares did you own?
16   A   Well, I had options at various prices
17   Q.   Right
18   A   I don't know the exact number
19   Q.   What was the approximate dollar amount that you
20   netted as a result of the sale?
21   A   Boy, I haven't looked at that in a while
22   Probably between – around three, three and a half
23   million
24   Q.   Can you briefly give us your educational

---

**8**

1    background by years beginning with your graduation of
2    the English equivalent of secondary school.
3    A   Let me think   I graduated from Ackworth
4    Comprehensive School with three A levels in the '80s   I
5    went to City University in London where I did a bachelor
6    of science degree in computer science
7    Q.   When did you get that?
8    A   '87, '88 I think
9    Q.   And have you had any formal education after that?
10   A   I studied for a Ph D , which I never completed
11   Q.   Where did you study?
12   A   I continued at City University
13   Q.   In what subject were your studies?   Computer
14   science?
15   A   Computer science
16   Q.   And what year did you say you got your B.S.?
17   A   I'm not sure of the date   I think it was '87 or
18   '88, somewhere around there
19   Q.   What did you do after you – did you go right
20   into continuing Ph.D. study?
21   A   I did   I went right into doing a Ph D
22   Q   And at some point did you become employed full
23   time?
24   A   I did   I joined the University of the West

---

**9**

1    Indies in Barbados
2    Q.   As a professor?
3    A   As a lecturer, yep
4    Q.   How long did you stay there?
5    A   Two years
6    Q.   Then what did you do?
7    A   Then I was hired to set up an offshore publishing
8    business, software publishing business in Barbados by a
9    Canadian software company
10   Q.   What had you taught at the University of the West
11   Indies?
12   A   Mathematics and computer
13   Q.   And how long did you work on setting up the
14   offshore publishing company in Barbados?
15   A   I worked for that company in various forms for
16   about seven and a half, eight years
17   Q.   And then what'd you do?
18   A   Then I joined Lycos
19   Q.   Was Softkey the company?
20   A   It was   We changed the name from Softkey to The
21   Learning Company, but it started out as Softkey   And
22   actual fact, the company I was hired by was RTV Marin BV
23   (phonetic)
24   Q.   When you – what was the year you started at

---

3 (Pages 6 to 9)

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc

| 10 | |
|---|---|
| 1 | Lycos? |
| 2 | A  '99 |
| 3 | Q.  And what was the position you held when you |
| 4 | started? |
| 5 | A  CIO |
| 6 | Q.  Meaning chief information officer? |
| 7 | A  Correct |
| 8 | Q.  According to the Arthur Andersen records, you |
| 9 | served as senior vice president and chief technology |
| 10 | officer responsible for the day-to-day operation and |
| 11 | administration of all the properties in the Terra Lycos |
| 12 | network after the acquisition; is that correct? |
| 13 | A  That's correct |
| 14 | Q.  And did you pretty much do the same thing but for |
| 15 | Terra -- for Lycos alone before -- |
| 16 | A  No |
| 17 | Q.  -- the acquisition? |
| 18 | A  No  My role changed in the acquisition |
| 19 | Q.  How did it change? |
| 20 | A  Prior to the acquisition, I was responsible for |
| 21 | the operations of the website  Subsequent to the |
| 22 | acquisition, I was responsible for the development, Q/A, |
| 23 | and live operations  And I think at that point -- I'm |
| 24 | not exactly sure on the time -- but I also got IT, which |

| 11 | |
|---|---|
| 1 | was the -- what traditionally will be called MIS |
| 2 | Q.  Did you do anything to prepare for this |
| 3 | deposition - meeting with counsel, reviewing documents, |
| 4 | things like that? |
| 5 | A  I met with counsel |
| 6 | Q.  Who did you meet with? |
| 7 | A  Peter |
| 8 | Q.  When? Just today? |
| 9 | A  Wednesday |
| 10 | Q.  Okay  Meet with anybody else? |
| 11 | A  No |
| 12 | Q.  Did you do anything else to prepare? |
| 13 | A  Nope |
| 14 | Q.  During the time that you were at Lycos and then |
| 15 | Terra Lycos, did you always have the title of chief |
| 16 | information officer? |
| 17 | A  Yes |
| 18 | Q.  And in that capacity when you were working with |
| 19 | Lycos prior to the acquisition, did you come -- become |
| 20 | familiar with a project called Asset Portal? |
| 21 | A  I was familiar to the extent that it was an |
| 22 | ongoing project amongst many that we had going on, yeah |
| 23 | Q.  What was the Asset Portal project? |
| 24 | A  It was an attempt to enable my organization to |

| 12 | |
|---|---|
| 1 | manage or at least understand what assets were used to |
| 2 | run the products in our network |
| 3 | Q.  Did you review any documents when you met with |
| 4 | Lycos' counsel a few days ago? |
| 5 | A  I did |
| 6 | Q.  What did you review? |
| 7 | MR ACTON: I'm going to object |
| 8 | Q.  (By Mr. Kaler) Well, did you review anything |
| 9 | that refreshed your recollection? |
| 10 | A  Yeah |
| 11 | Q.  What'd you review?  You can answer. |
| 12 | THE WITNESS: What's it called?  I |
| 13 | don't know what the thing's called  The -- |
| 14 | it was an Avnet report |
| 15 | Q.  (By Mr. Kaler) Exhibit 122, which I show you |
| 16 | now? |
| 17 | MR ACTON: Do you have a copy for |
| 18 | me? |
| 19 | MR KALER: I do |
| 20 | THE WITNESS: This was it. yep |
| 21 | Q.  (By Mr. Kaler) And have you seen that -- you saw |
| 22 | that report before this week, right? |
| 23 | A  I would imagine I did  I can't recall seeing it |
| 24 | Q.  The -- when you started in 1999, when -- what was |

| 13 | |
|---|---|
| 1 | the month in 1999 that you started?  Do you recall? |
| 2 | A  November |
| 3 | Q.  Now, at that time, had you been involved in |
| 4 | equipment leases before? |
| 5 | A  No |
| 6 | Q.  How many people were working at Lycos when you |
| 7 | started there in November of '99?  Do you remember? |
| 8 | A  No |
| 9 | Q.  How big a company was it? |
| 10 | MR ACTON: Objection |
| 11 | Q.  (By Mr. Kaler) You can answer. |
| 12 | A  In what terms? |
| 13 | Q.  Financial or number of employees |
| 14 | A  I don't remember, to be honest |
| 15 | Q.  Give us a general sense of what the company was |
| 16 | like when you started. |
| 17 | MR ACTON: Objection |
| 18 | THE WITNESS: It was a large, |
| 19 | web-based, entrepreneurial. exciting |
| 20 | company |
| 21 | Q.  (By Mr. Kaler) It was using a certain amount of |
| 22 | computer hardware for its operations, right? |
| 23 | A  All sorts of computer hardware, yeah |
| 24 | Q.  When you assumed the position of chief |

4 (Pages 10 to 13)

Timothy Wright 1-12-2007
Computer Sales International, Inc v. Lycos, Inc

| 74 | 76 |
|---|---|
| 1  to be returned fairly shortly, you would have expected | 1  still under oath? |
| 2  there to be a larger list of items? | 2    A   I do |
| 3    A   Well, he's -- Victor said it was a four-month | 3    Q   The last page of Exhibit 500 contains an e-mail |
| 4  process  So figure that's  you know, 33 percent of a | 4  that we've seen previously regarding the Compaq DL360 |
| 5  year  If I looked at what I was buying on a quarterly | 5  cabinets and the request from Rich Palanza to buy out |
| 6  basis, it would be a considerably longer list than this | 6  some of the Avnet leases relating to those cabinets  Do |
| 7  So  you know, based on how much equipment I was adding | 7  you see that? |
| 8  to the network, I would have expected -- because the way | 8    A   Where are you -- |
| 9  -- the way hardware tends to work in Lycos, and it's | 9    Q   Last page, the very last e-mail. |
| 10  different to some of the organizations, you know, | 10        MR ACTON:  I think it's actually -- |
| 11  traditional enterprises, as we added new equipment on | 11        THE WITNESS:  So that's the first one |
| 12  top, because we were constantly revising and upgrading | 12    in the sequence? |
| 13  our products, old equipment would drop out the bottom | 13    Q   (By Mr. Kaler)  Yeah  I'm sorry.  From Rich |
| 14  Right | 14  Webster to Palanza |
| 15      I mean, it makes sense  We'd update the site, | 15    A   Yep  Okay |
| 16  we'd upgrade the site  hardware that we had  replaces | 16    Q   And then there's a series of e-mails that go back |
| 17  hardware that was old  I would have thought that would | 17  and forth culminating in a couple of e-mails that you |
| 18  be a longer list  That's all | 18  are copied on beginning, I think, at the -- on the |
| 19    Q   Okay. | 19  second page, the e-mail at the bottom of the second page |
| 20        (Exhibit 500, E-mail Chain, marked | 20  from Victor Turner  Who was Victor Turner in 2002? |
| 21    for identification ) | 21  Wasn't he your operations guy? |
| 22    Q   (By Mr. Kaler)  Let me show you what's been | 22    A   Well, he was in operations  I don't know what |
| 23  marked as Exhibit 500 -- | 23  his role was  I remember Victor  I'm sorry  I just |
| 24        MR ACTON:  Are we coming up to a | 24  don't remember what he did |

| 75 | 77 |
|---|---|
| 1    break? | 1    Q   Do you see where he says in the sixth line down |
| 2        MR KALER:  I think he has to change | 2  in his e-mail, quote, There are no technology |
| 3    the video in a moment | 3  initiatives at Terra Lycos being considered without Tim |
| 4        Just let me know when we have a | 4  Wright's knowledge, backing, and approval  Do you see |
| 5    minute left | 5  that? |
| 6        MR ACTON:  Can I have a copy? | 6    A   I do |
| 7        MR KALER:  Sure | 7    Q   That was true during your tenure, correct? |
| 8        THE WITNESS:  Want mine?  Oh, dear | 8    A   That's a bit of a stretch but -- |
| 9    Q   (By Mr. Kaler)  In Exhibit 500, there's a series | 9    Q   But basically it's true that you knew about all |
| 10  of e-mails in which, if I direct your attention to the | 10  the significant ones, right? |
| 11  second page at the bottom -- | 11    A   Yep |
| 12    A   Can I just read because it's important to get the | 12    Q   He goes on to say, quote, There are no financial |
| 13  context? | 13  concerns including leasing and technology refresh |
| 14    Q   Sure. | 14  initiatives, parens., being considered without Tim |
| 15        MR KALER:  Well, we can take a break | 15  Wright and Brian Lucy's knowledge, backing, and |
| 16    and start a new tape. | 16  approval  Do you see that? |
| 17        THE VIDEOGRAPHER:  We're now going | 17    A   I see that |
| 18    off the record  This is the end of Tape | 18    Q   That was generally true during your tenure with |
| 19    Number 1  The time is 11:15 a m | 19  the company also, wasn't it? |
| 20        (A brief recess was taken ) | 20        MR ACTON:  Objection |
| 21        THE VIDEOGRAPHER:  We're now going | 21        THE WITNESS:  No  No  That was not |
| 22    back on the record  This is Tape Number 2 | 22    -- that would not have been correct |
| 23    The time is 11:26 a m | 23    Q   (By Mr. Kaler)  Which part of it would not have |
| 24    Q   (By Mr. Kaler)  Mr. Wright, you understand you're | 24  been correct? |

20 (Pages 74 to 77)

Timothy Wright 1-12-2007
Computer Sales International, Inc. v. Lycos, Inc.

78

1      A   Financial concerns being considered  I wasn't in
2   the finance department  Our finance department was
3   extremely effective  They were run by Tom Guilfoile,
4   Ted Philip, Brian Lucy, Kevin Baillie  These guys were
5   one of the strongest finance teams I've ever worked
6   with  So if there were issues around financial
7   concerns  they would -- they would have been known and
8   managed by the finance organization, not by me
9      Q   But you'll agree that he is saying here that,
10  quote, There are no financial concerns including leasing
11  and technology refresh initiatives being considered
12  without your knowledge, backing, and approval.  That's
13  what he says in the e-mail?
14     A   He says --
15         MR ACTON:  Objection
16         THE WITNESS:  -- that
17     Q   (By Mr. Kaler)  Did you ever -- and you were
18  copied on the --
19     A   Can I state that I don't agree with what he
20  stated there?
21     Q   Sure.  The -- was he reporting to you at the
22  time?
23     A   No
24     Q   Do you see where in the e-mail chain above that,

79

1   the e-mail particularly on the first page of this
2   exhibit --
3      A   Which one?
4      Q   Well, first, the e-mail that I've just looked at
5   which we'll mark with the letter B -- make it A, the
6   e-mail from Victor Turner, do you see where you were
7   copied on it in the area that I circled?
8      A   Yes
9      Q   At the time that you got a copy of it or at any
10  time thereafter, did you ever e-mail anybody or tell
11  them that you thought that the statement about there
12  being no financial concerns including leasing and
13  technology refresh initiatives being considered without
14  your approval --
15         MR ACTON:  Object --
16     Q   (By Mr. Kaler)  -- was inaccurate?
17         MR ACTON:  Objection  That's not
18  what it says
19         MR KALER:  Yeah  I'm paraphrasing
20  I think that's in substance what it says
21  The jury can judge  It's on a screen --
22         THE WITNESS:  What was the question
23  again?
24     Q   (By Mr. Kaler)  The statement -- after you got

80

1   the e-mail that we see here, e-mail A, stating that
2   there are -- quote, There are no financial concerns
3   including leasing and technology refresh initiatives
4   being considered without Tim Wright and Brian Lucy's
5   knowledge, backing, and approval, did you e-mail back to
6   anybody or tell anybody that you thought that statement
7   was not accurate with respect to you?
8      A   I didn't think I had to  It was obvious that it
9   wasn't
10     Q   Well, it wasn't obvious -- it wasn't from the
11  e-mail because the e-mail said it was?
12     A   Right, but, you know
13     Q   The -- are you saying, sir, that you had no
14  involvement whatsoever in the financial aspects of --
15  financial concerns about the leasing of any of the
16  computer equipment that you were managing?
17         MR ACTON:  Objection
18     Q   (By Mr. Kaler)  I mean, you're not saying that,
19  are you?
20     A   The finance organization was responsible for all
21  financial aspects of their leasing arrangements  I
22  mean, that's -- we had a finance organization  It was
23  very effective
24     Q   Right.  But you were not so compartmentalized

81

1   that you had no concern?
2      A   No  There was communication
3      Q   Sure.  In other words, you would have relied on
4   them but you certainly, generally, had knowledge of the
5   financial aspects of leasing that the finance department
6   was trying to deal with.  Isn't that a fair statement?
7          MR ACTON:  Objection
8          THE WITNESS:  No
9      Q   (By Mr. Kaler)  There were -- you would -- in
10  fact, you would have to, of necessity in an organization
11  like Lycos, have precisely the kind of involvement that
12  I've just suggested that you did have.  You would have
13  to, of necessity, have had some knowledge of and
14  coordination with the financing department's efforts to
15  deal with financial aspect of acquiring all that
16  computer equipment that you wanted, right?
17     A   Well, you're asking a number of different
18  questions in there, so --
19     Q   You can answer
20     A   Did I select the hardware that was being
21  leased -- did I select the hardware that was being used
22  in our network, yes
23     Q   Okay.  So you selected the hardware that was
24  being leased, right?

21 (Pages 78 to 81)

Timothy Wright 1-12-2007
Computer Sales International, Inc  v  Lycos, Inc

82

1        MR ACTON: Objection
2        THE WITNESS: No  I selected the
3    hardware that was being used by Lycos to
4    run our production sites
5    Q. (By Mr. Kaler) This is not a game. You knew it
6 was being leased?
7    A  Well, you're putting the words into my mouth --
8    Q. I'm entitled to lead. I don't care what
9 Mr. Acton has told you during the break.
10       MR ACTON: Objection
11   Q. (By Mr. Kaler) Did you discuss your testimony
12 with Lycos' counsel during the break?
13       MR ACTON: Objection  Do not -- you
14    do not have to answer that question
15       MR KALER: Well, you're discussing
16    his testimony at this point
17   Q. (By Mr. Kaler) Anyway, my point is --
18   A  Let me be clear  This is 2002  I'm not sure
19 that we continued to lease hardware after the Terra
20 acquisition the same as we did prior to  You know, I
21 was -- I was running an organization of over 700 people
22   Q. Stay with me, would you?
23   A  I'm doing my best
24   Q. We have an e-mail and it's -- there's a whole

83

1 number of them. You see that Mr. Turner says that there
2 are no financial concerns including leasing being
3 considered without your approval and backing, right?
4        MR ACTON: Objection
5    Q. (By Mr. Kaler) That's what he says, right?
6        MR ACTON: That is not what he says
7    Q. (By Mr. Kaler) In substance
8 that's what he's saying there, right?
9        MR ACTON: Objection
10   Q. (By Mr. Kaler) You can answer  Is that correct,
11 sir?
12       MR ACTON: Same objection
13   Q. (By Mr. Kaler) I've blown up the sentence for
14 the jury on the screen and the jury can read where the
15 sentence reads that Lycos counsel is objecting to, It
16 says, quote, There are no financial concerns, parens.,
17 including leasing and technology refresh initiatives,
18 close parens., being considered without Tim Wright and
19 Brian Lucy's knowledge, backing, and approval, unquote.
20       MR ACTON: That's right
21   Q  (By Mr. Kaler) That's -- so in substance --
22       MR KALER: And I'll let the jury
23    judge and you can just object  You want to
24    do this fine, do it

84

1    Q. (By Mr. Kaler) I'm suggesting that what he's
2 saying in substance is that there were not any financial
3 concerns about the equipment leasing that were being
4 considered, you know, without your involvement?
5        MR ACTON: Same objection
6    Q. (By Mr. Kaler) You can answer
7        MR ACTON: And just so it's clear.
8    there are two names there, Tim Wright and
9    Brian Lucy
10       MR KALER: That's fine but at the
11    moment, Mr Lucy isn't denying that he had
12    involvement in this
13       THE WITNESS: Well, he did
14   Q. (By Mr. Kaler) He did have involvement and I'm
15 suggesting, sir, that so did you.
16   A  He was the financial controller  But I want to
17 be careful, you know  It says here, There are no
18 financial concerns being considered without Tim Wright
19 and Brian Lucy's knowledge -- backing and approval are
20 two different things
21   Q. Okay. So it might be a bit of an overstatement,
22 but I guess the real issue is --
23   A  It's a significant overstatement
24   Q. Okay. But it is true that you were generally --

85

1    A  -- aware
2    Q. -- aware of some of the financial concerns that
3 Lycos had concerning the leasing of computer equipment,
4 even though that may not have been the primary concern
5 on your end. You were generally aware that they had to
6 grapple with these financial issues pertaining to
7 leases, right?
8        MR ACTON: Objection
9    Q. (By Mr. Kaler) You can answer.
10   A  Yeah
11   Q. Do you see where the responsive e-mail from
12 Michael Kelmig on the next page, which I'll -- first
13 page which I'll just mark with the letter B -- who was
14 Kelmig by the way?
15   A  Michael was responsible for project management
16 within the overall technology and operations
17 organization  He reported directly to me
18   Q. And he states to Richard Palanza that, quote --
19 this is on the second line -- You should know that
20 requests on leasing information can only come from one
21 of the following people at Terra Lycos: Brian Lucy,
22 Kevin Baillie, Monique Walsh, Tim Wright, Michael
23 Kelmig, and Victor Turner  If you receive requests from
24 people outside of this group, those requests need the

22 (Pages 82 to 85)

Timothy Wright 1-12-2007
Computer Sales International, Inc. v Lycos, Inc

|  | 86 |
| --- | --- |
| 1 | approval of one of the parties. And I assume you |
| 2 | understood the point that he was making was simply that |
| 3 | requests for information on the lease of computer |
| 4 | equipment really should be responded to in the ordinary |
| 5 | course only if they come from that list of people and |
| 6 | that included yourself? |
| 7 | A  So this is the response that's telling people to |
| 8 | go through finance for any leasing-related issues |
| 9 | That's what this e-mail is telling you  You can -- |
| 10 | Q  I've read it. |
| 11 | A  Yeah  So if there was a clarification for what |
| 12 | Victor stated  then Michael was giving it here without |
| 13 | appearing critical of anybody  He said, "Kevin and |
| 14 | Monique work closely with our vendors regarding |
| 15 | equipment leases and buyouts  and any discussions with |
| 16 | one of our leasing vendors should be initiated and |
| 17 | conducted by them " |
| 18 | Q  Right. And you relied on them to conduct those |
| 19 | negotiations? |
| 20 | A  Yes |
| 21 | Q  And -- |
| 22 | A  Yes, I did |
| 23 | Q  But you would discuss with them, as necessary, |
| 24 | any questions that you had about the equipment leases? |

|  | 87 |
| --- | --- |
| 1 | A  No |
| 2 | Q  You never discussed with them anything about -- I |
| 3 | mean, that doesn't make any sense. |
| 4 | A  I don't even know who Monique is  I would have |
| 5 | discussions with Tom Guilfoile  Tom Guilfoile and Ted |
| 6 | Philip were my peers -- |
| 7 | Q  What about Brian Lucy after the acquisition? |
| 8 | A  After the acquisition, Brian became responsible |
| 9 | for the finance organization in the U S  He reported |
| 10 | directly to the CFO in Madrid, and I had -- I had |
| 11 | discussions with the CFO in Madrid  There were |
| 12 | presentations given by finance, but day-to-day |
| 13 | interaction with Brian on this, no  No, I did not |
| 14 | Q  But you had some inter -- you had the same kind |
| 15 | of interaction with Brian after -- Brian Lucy after he |
| 16 | assumed the CFO position that you'd had with Ted Philip |
| 17 | when he was CFO? |
| 18 | A  No |
| 19 | MR ACTON: Tom Guilfoile do you |
| 20 | mean? |
| 21 | MR KALER: No |
| 22 | THE WITNESS: Well, Tom Guilfoile was |
| 23 | the VP of finance  So the VP of finance |
| 24 | and CFO were now out of Madrid  and my role |

|  | 88 |
| --- | --- |
| 1 | as a global head of technology development |
| 2 | operations would have had me communicating |
| 3 | with the team in Madrid |
| 4 | Q  (By Mr. Kaler) But you worked in the same office |
| 5 | with Brian Lucy in Waltham. |
| 6 | A  But understand, my organization was in -- I don't |
| 7 | know how many countries  The vast majority of my role |
| 8 | and responsibility took me out of Waltham  Brian Lucy |
| 9 | worked for the guy in Madrid and with a gentleman by the |
| 10 | name of Steve Killain to ensure that the U S operations |
| 11 | ran cost effectively in the U S  market |
| 12 | Q  And who did you coordinate with, then, in terms |
| 13 | of obtaining additional computer equipment when Brian |
| 14 | Lucy was CFO beginning in February/March of 2001? |
| 15 | MR ACTON: Objection |
| 16 | Q  (By Mr. Kaler) You can answer. |
| 17 | A  The responsibility for that equipment was now on |
| 18 | the heads of the operations managers  So it would have |
| 19 | been primarily Vance Nakamoto, maybe Dow Hardy |
| 20 | Q  The operation managers -- |
| 21 | A  The operation managers |
| 22 | Q  They reported to you, sir, didn't they? |
| 23 | A  They did |
| 24 | Q  So it was within your department, right? |

|  | 89 |
| --- | --- |
| 1 | A  Yeah |
| 2 | Q  And -- |
| 3 | A  But in terms of communicating with Brian -- your |
| 4 | question was around communicating with Brian? |
| 5 | Q  Yes. |
| 6 | A  That would have been Dow and Vance would have |
| 7 | worked directly with Brian as their -- at their peer |
| 8 | level |
| 9 | Q  Are you swearing that you never communicated by |
| 10 | e-mail or orally with Brian Lucy on the subject of -- |
| 11 | A  No |
| 12 | Q  -- computer equipment leases? |
| 13 | A  No  I don't recall |
| 14 | Q  In fact, you did communicate with Brian Lucy from |
| 15 | time to time on the subject of Lycos's leasing computer |
| 16 | equipment? |
| 17 | A  I don't remember communicating with Brian on |
| 18 | that  I communicated with Brian but I don't remember |
| 19 | specific communications with Brian on any leasing |
| 20 | Q  What do you remember communicating with Brian |
| 21 | Lucy about beginning, again, in February/March of 2001 |
| 22 | when he became CFO? |
| 23 | A  My communications with Brian would have been |
| 24 | around budgets  would have been around operating |

23 (Pages 86 to 89)

# EXHIBIT 26

# O'BRIEN & LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Sam Ziba

# September 19, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Nicole E. Guilbert   20512

1         UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3

4     ----------------------------------x

5    COMPUTER SALES INTERNATIONAL, INC.,

6                      Plaintiff

7                                         Civil Action

8     vs.                            No. 05-10017-RWZ

9

10    LYCOS, INC.,

11                      Defendant,

12

13    BANK OF AMERICA f/k/a FLEET BANK,

14          Trustee Process Defendant

15    ----------------------------------x

16         VIDEOTAPED DEPOSITION OF SAM ZIBA, a

17    witness called by and on behalf of the

18    Plaintiff, taken pursuant to Federal Rules of

19    Civil Procedure, before Nicole E. Guilbert, a

20    Notary Public in and for the Commonwealth of

21    Massachusetts, at McCarter & Englilsh, 225

22    Franklin Street, Boston, Massachusetts, on

23    Monday, September 19, 2006, commencing at

24    9:12 a.m.

1

Sam Ziba 9-19-2006
Computer Sales International, Inc v Lycos, Inc

**6**

1  PROCEEDINGS
2
3  THE VIDEOGRAPHER:  Here begins
4  Videotape Number 1 in today's deposition of
5  Sam Ziba in the matter of Computer Sales
6  International, Inc , versus Lycos, Inc ,
7  Case Number 05-10017-RWZ  Today's date is
8  September 19, 2006  The time 9:12 a m
9  The video operator today is Jody
10  Urbati contracted by O'Brien & Levine
11  This deposition is taking place at McCarter
12  & English
13  Counsel, please voice identify
14  yourselves and state whom you represent
15  MR KALER:  Robert Kaler, McCarter &
16  English, for the plaintiff, CSI
17  MR BEAN:  Thomas Bean, McDermott,
18  Will & Emery, for defendant and
19  plaintiff-in-counterclaim, Lycos, Inc
20  THE VIDEOGRAPHER:  The court reporter
21  today is Nicole Guilbert of O'Brien &
22  Levine
23  Would the reporter please swear in
24  the witness

**7**

1  SAM ZIBA, having been satisfactorily
2  identified by the production of his
3  driver's license and duly sworn by the
4  Notary Public, was examined and testified
5  as follows in answer to direct
6  interrogatories:
7
8  BY MR KALER:
9  Q.  Have you ever given testimony under oath before?
10  A  Yes
11  Q.  Do you understand that the questions that we put
12  to you today must be answered under oath under the pains
13  and penalties of perjury?
14  A  Yes
15  Q.  Do you understand that if any of my questions are
16  unclear in any way, you can feel free to tell me that, and
17  I'll be happy to try to clarify them for you?
18  A  Yes
19  Q.  And do you understand that you and you alone are
20  responsible for the accuracy and completeness of your
21  testimony?
22  A  Correct
23  Q.  Where do you live, sir?
24  A  Framingham, Massachusetts

**8**

1  Q.  What's your street address?
2  A  26 Flanagan Drive
3  Q.  What's your date of birth?
4  A  2/19/1961
5  Q.  What's your occupation?
6  A  I'm the vice president of finance for GameLogic in
7  Waltham, Massachusetts
8  Q.  How long have you worked there?
9  A  Since summer of 2001
10  Q.  And what did you do before working at GameLogic?
11  A  I worked at Lycos
12  Q.  During what years did you work at Lycos?
13  A  From January of 2000 through 6/30/2001, or end of
14  June 2001
15  Q.  So for about a year and a half?
16  A  If the math agrees
17  Q.  And what was your position at Lycos during that
18  period of time that you worked there?
19  A  Director of operational planning or senior
20  director of operational planning
21  Q.  And what were your duties and responsibilities in
22  that position at Lycos?
23  A  I was responsible — I reported to Ron Saghi, who
24  was the president of the U S  operation, helping him

**9**

1  consolidate several entities that Lycos purchased in a
2  matter of  you know, a year, year and a half as far as —
3  and also eventually moved to the finance at some point —
4  exact date, I'm not sure — to help Tom Guilfoile with
5  managing the $700 million they had on the balance sheet
6  plus some leases, and also, at the same time, helping Ron
7  Saghi as well  So I had dual responsibilities
8  Q.  How did you help manage the several hundred
9  million dollars of cash and cash equivalents —
10  A  We basically had outsourced that to three
11  different firms
12  Q.  Who were the firms?
13  A  Bear Steams  I can't think of the — I actually
14  don't remember the other two
15  Q.  Do you remember the names of any of the people in
16  the outside —
17  A  No
18  Q.  So you had assistance from three outside firms; is
19  that right?
20  A  Correct
21  Q.  And you say Lycos had several hundred million
22  dollars in cash?
23  A  Yes, about 750 million, more or less  Could have
24  been higher than the other balances but that's the part

3 (Pages 6 to 9)

Sam Ziba 9-19-2006
Computer Sales International, Inc. v. Lycos, Inc.

---

**134**

1    A   Yes

2    Q.   These examples that I gave you are from 2000, and

3 I'll show you now this – did there come a time in 2000

4 towards the – I guess it was the fall that you were

5 interviewed by some of the people at Avnet who were

6 providing some lease consulting advice to Lycos about how

7 it should handle its leases?

8    A   Yeah  we were talking –

9       MR BEAN: Objection

10    Q.   (By Mr. Kaler) You can answer.

11       THE WITNESS: Yeah  We talked to

12    Avnet at some point

13       (Exhibit 122  Lease Assessment and

14    Asset Inventory Analysis Report  marked for

15    identification )

16    Q.   (By Mr. Kaler) I'm going to show you what's been

17 marked as Exhibit 122, a document produced by Lycos in this

18 case entitled "Lease Assessment and Asset Inventory

19 Analysis Report," December 15th of 2000.  First question is

20 have you ever seen this document before?

21    A   Want me to stop?

22    Q.   No. No. I'm sorry.  It's perfectly all right.

23    A   These are all appendixes  I'm sorry, the question

24 was?

---

**135**

1    Q.   Do you recognize this document?

2    A   This specific document, I've seen a document from

3 Avnet

4    Q.   Okay.  The best of your knowledge, is this the

5 document you saw?

6    A   Six years ago, I –

7    Q.   Well, this is what was produced to us by Lycos.

8 Do you believe this is the document you saw?

9    A   I do remember a report from Avnet

10    Q.   Did you read the report when you got it back then?

11    A   Not entirely, I have to say

12    Q.   No, but you read through some portions of it?

13    A   Bits and pieces of it, I read through

14    Q.   What was your understanding of why the report from

15 Avnet had been delivered to you folks at Lycos?

16       MR BEAN: Objection

17    Q.   (By Mr. Kaler) You can answer.

18    A   Asset inventory analysis giving us a database,

19 tracking stuff. I assume

20       THE VIDEOGRAPHER: Here ends

21    Videotape Number 2  Off the record 12:25

22    p m

23       (A brief recess was taken )

24       THE VIDEOGRAPHER: Here begins

---

**136**

1       Videotape Number 3 in today's deposition of

2    Sam Ziba  Back on the record 12:26 p m

3    Q.   (By Mr. Kaler) What was your understanding as to

4 who had – who at Lycos had sort of retained Avnet to do a

5 report on those subjects that you just mentioned?

6       MR BEAN: Objection

7       THE WITNESS: I don't recall Lycos

8    retaining Avnet

9    Q.   (By Mr. Kaler) Someone paid Avnet to obviously

10 prepare a – do all of this work?

11       MR BEAN: Objection

12       THE WITNESS: Your question is that

13    – if Lycos paid Avnet to do this?

14    Q.   (By Mr. Kaler) Right

15    A   I don't recall

16    Q.   Do you see where on page LYC14561 –

17    A   1456 – yep

18    Q.   In the project overview section of the report, the

19 third bullet point says, quote, All lease paperwork is

20 currently managed by Sam Ziba –

21    A   What page is that? I'm sorry  I have page 13 –

22    Q.   Page 13 –

23    A   Oh okay

24    Q.   – top of the page, third bullet point  Do you

---

**137**

1 see where the report says, "All lease paperwork is

2 currently managed by Sam Ziba.  In the future it may be

3 tracked in the future using PeopleSoft Financials"?

4    A   Yeah, I see that

5    Q.   At the time, at least as of December of 2000, you

6 were managing the lease paperwork for Lycos, correct?

7    A   I started at around that time, yes

8    Q.   And part of the management of the lease paperwork

9 included managing and tracing back to the purchase orders,

10 as we've seen, the CSI schedules that were being executed

11 as they were being executed?

12    A   That would have been part of the duties, yes

13    Q.   In the first page of this report, it's actually, I

14 think, five pages in, LYC14549 –

15    A   Yep

16    Q.   – it states that "Avnet was retained by Lycos to

17 perform an inventory of the Waltham and Santa Clara data

18 centers to integrate lease and service contract information

19 and make recommendations for financial process

20 improvement."  Do you recall generally that it was your

21 understanding that that's what Avnet was doing when they

22 were talking to you at this time?

23    A.   They were trying to keep track – create an

24 inventory  yes  They disclosed that to me

---

35 (Pages 134 to 137)

# EXHIBIT 27

11/18/98  15:22 FAX    &001/007



# *CSI*

# COMPUTER SALES INTERNATIONAL, INC.
### 10845 Olive Boulevard
### St. Louis, Missouri  63141
### telephone: (314)997-7010 ext. 323
### telecopy: (314)997-3192

## TELECOPY

**CAROLYN BERRY  *Contract Administrator***

Date:          November 18, 1998
To:            Michael Ripps
Company:       Lycos, Inc.
Fax Phone:     781-370-2600
Total Number of Pages (including cover page):  7

---

Dear Michael:

I am in the process of preparing the closing documents for your schedule #144874-029.
Following is the REVISED exhibit that shows all of the equipment purchased under
this lease.  It has been revised to reflect credits for equipment returned on purchase
order #218.  Per my earlier message, I am preparing the c/a's for both schedules
#144874-029 and 144874-031 for execution today.

Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

*Carolyn Berry*

Carolyn Berry

---

IF YOU HAVE ANY PROBLEMS RECEIVING THIS TELECOPY, PLEASE CALL
(314) 997-7010

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT
FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT OR THE EMPLOYER OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE
TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (1-
800-955-0960) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE US
POSTAL SERVICE. THANK YOU.

LYC 01993

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. TWENTY-NINE, MASTER LEASE NO. 144874

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P O NUMBER | INVOICE NUMBER | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MISC | | 9GB SCSI HARD DRIVE | 09143PB | 1150 | 236130 | NEW | 533.39 | 08/18/98 |
| | | | **PO NUMBER: 1150** | | | | | | |
| 10 | SEAGATE | | 9.1GB ULTRA SCSI HARD DRIVE | LM333958 LM341574 LM367678 LM376040 LM376069 LM379215 LM422201 LM425874 LM416611 LM433043 | 1212 | 4190696 | NEW | 337.92 | 08/13/98 |
| | | | **PO NUMBER: 1212** | | | | | | |

EQUIPMENT LOCATION: 5001 CENTRE AVE, PITTSBURG, PA 15213

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P O NUMBER | INVOICE NUMBER | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 6 | MISC | | USR QUAD DIGITAL MODEM SET W/ FAX | N/A | 1156 | 20943 | NEW | 529.33 | 08/04/98 |
| | | | **PO NUMBER: 1156** | | | | | | |
| 4 | DEC FR-72B6A-VB | F-FR-PCCAM-SC (2) DRIVE (1) CD ROM (1) DRIVE (1) F-FR-PCCAM-ED (1) | F2/300 5510MT 32MB MEMORY 3.2GB HARD DRIVE CD ROM 4.3GB HARD DRIVE 64MB MEMORY | KN813BALW1 KN811ALWS4 KN813BAHL8 KN813BAWE6 | 1199 | 815736 | NEW | 336.66 | 08/13/98 |
| 4 | MISC | | 19" MONITOR | TAX2100185 TAX2100758 TAX21012265 TAX21012321 | 1199 | 815406 | NEW | 522.61 | 08/13/98 |
| 5 | COMPAQ | MEMORY (2) DRIVE (1) CD ROM (1) ADAPTER (1) | P26EXA A159EDMT 32MB MEMORY 4GB HARD DRIVE CD ROM 10/100 ENET ADAPTER | JR25BTT72D071 3JETBTT72F43T 3JETBTT72F43F 3JETBTT72F43D 3JETBTT72F44V | 1199 | 815736 | NEW | 3113.02 | 08/13/98 |
| | | | **PO NUMBER: 1199** | | | | | | |
| 1 | CISCO 7206 | NPE-200 (1) NPE-128MB (1) C7200-I/O-FE (1) PWR-7200/2 (1) I/O-FLC2U04 (1) PA-A3-T3 (1) CX-AIP/DS3 (1) | 7206 ROUTER PROCESSING ENGINE 128MB MEMORY INPUT/OUTPUT CONTROLLER DUAL POWER OPTION I/O PCMCIA 20MB FLASH 1PORT ATM ENHANCED DS3 PORT ADAPTER ATM/DSC COAX INTERFACE PROCESSOR | 72625045 | 1205 | 11654 21300 | NEW | 51,635.54 | 09/04/98 |
| | | | **PO NUMBER: 1205** | | | | | | |
| 1 | DEC FR-72B6A-VB | F-FR-PCCAM-SC (2) DRIVE (1) CD ROM (1) DRIVE (1) F-FR-PCCAM-ED (1) | F2/300 5510MT 32MB MEMORY 3.2GB HARD DRIVE CD ROM 4.3GB HARD DRIVE 64MB MEMORY | KN811ALWF9 | 1216 | 815690 | NEW | 587.76 | 08/13/98 |
| 1 | MISC | | 19" MONITOR | TAX2100453 | 1216 | 815402 | NEW | 522.61 | 08/13/98 |
| | | | **PO NUMBER: 1216** | | | | | | |

LYC 01994

05/13/99  13:53 FAX                                                      ☑001/008

# *CSI*

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri  63141
telephone: (314)997-7010 ext. 323
telecopy: (314)997-3192

**DEFENDANT'S EXHIBIT**
Berry
0mm  2-6-07

### TELECOPY

CAROLYN BERRY  Contract Administrator

| | |
|---|---|
| Date: | May 13, 1999 |
| To: | Michael Ripps |
| Company: | Lycos, Inc. |
| Fax Phone: | 781-370-2600 |
| Total Number of Pages (including cover page): | 8 |

Dear Mr. Ripps:

I am in the process of preparing the closing documents for your lease schedule #144874-040A. Following is the exhibit that shows all of the equipment purchased under the lease. Please review this list for accuracy and contact me by Monday, May 24", should you find any discrepancies.

Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

*Carolyn Berry*

Carolyn Berry

IF YOU HAVE ANY PROBLEMS RECEIVING THIS TELECOPY, PLEASE CALL (314) 997-7010

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (1-800-955-0960) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE.  THANK YOU.

LYC 03033

05/13/99  13:53 FAX                                                      ☒002/008

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. FORTY-A, MASTER LEASE NO. 144574

| MACHINE QTY TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P O # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|
| 1 NETWORK APPLIANCE | | F760 FILER SYSTEM | 13421 | 257 | 23248 | NEW | $9,513.81 | 03/09/99 |
| | DRIVE (1) | 10B HARD DRIVE | | | | | | |
| | MEMORY (1) | 32MB MEMORY | | | | | | |
| | DRIVE (56) | 18GB FC-AL DISK DRIVE | | | | | | |
| | SHELF (8) | DUAL STORAGESHELF FCEB | | | | | | |
| | ADAPTER (1) | FC-AL ADAPTER W/CABL & TERM | | | | | | |
| | ADAPTER (1) | QUAD 10/100BASET ADAPTER | | | | | | |
| | CABLE (18) | POWER CABLE | | | | | | |
| | | PO NUMBER: 257 | | | | | | |
| 2 NETWORK APPLIANCE | | F760 FILER SYSTEM | 13409 13410 | 7246 | 23237 | NEW | $4,789.50 | 03/09/99 |
| | DRIVE (1) | 10B HARD DRIVE | | | | | | |
| | MEMORY (1) | 32MB MEMORY | | | | | | |
| | DRIVE (28) | 18GB FC-AL DISK DRIVE | | | | | | |
| | SHELF (4) | DUAL STORAGESHELF FCEB | | | | | | |
| | ADAPTER (2) | QUAD 10/100BASET ADAPTER | | | | | | |
| | CABLE (10) | POWER CABLE | | | | | | |
| | X221A (2) | 18GB FC-AL DISK DRIVE | | | | | | |
| | | PO NUMBER: 7246 | | | | | | |
| 1 NETWORK APPLIANCE | | F760 FILER SYSTEM | 13411 | 7247 | 23238 | NEW | $1,636.77 | 03/09/99 |
| | MEMORY (1) | 256MB MEMORY | | | | | | |
| | MEMORY (1) | 8MB MEMORY | | | | | | |
| | DRIVE (7) | 18GB FC-AL DISK DRIVE | | | | | | |
| | SHELF (1) | DUAL STORAGESHELF FCEB | | | | | | |
| | ADAPTER (1) | QUAD 10/100BASET ADAPTER | | | | | | |
| | CABLE (4) | POWER CABLE | | | | | | |
| | X221A (1) | CABLE FROMBOARD FC-AL | | | | | | |
| | | PO NUMBER: 7247 | | | | | | |

EQUIPMENT LOCATION: 2251 LAWSON LANE, SANTA CLARA, CA 95054

| MACHINE QTY TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P O # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|
| 1 COMPAQ | | P2/300 3000M | D807BRZ41D99 | 339 | 1117213 1115287 | NEW | $478.52 | 02/06/99 |
| | MEMORY (2) | 64MB MEMORY | | | | | | |
| | MEMORY (1) | 128MB MEMORY | | | | | | |
| | DRIVE (4) | 9.1GB HARD DRIVE | | | | | | |
| | DRIVE (1) | 18.2GB HARD DRIVE | | | | | | |
| | CONTROLLER (1) | RAID 2CHANNEL CONTROLLER | | | | | | |
| | MEMORY (1) | 256MB MEMORY | | | | | | |
| | DRIVE (2) | 4.3GB HARD DRIVE | | | | | | |
| | | PO NUMBER: 339 | | | | | | |
| 1 MISC | | SUN ULTRA 2 TELCO RACKMOUNT CLONE | R37385EY | 321 | J1208500 | NEW | $713.69 | 01/22/99 |
| | BOARD (1) | MOTHERBOARD | | | | | | |
| | POWER (1) | POWER SUPPLY | | | | | | |
| | CHASSIS (1) | CHASSIS | | | | | | |
| | PROCESSOR (2) | 300MHZ PROCESSOR/2MB CACHE | | | | | | |
| | MEMORY (8) | 128MB MEMORY | | | | | | |
| | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | |
| | CD ROM (1) | CD ROM | | | | | | |
| | CARD (1) | FAST 10/100BASET ENET CARD | | | | | | |
| 1 MISC | | SUN ULTRA 2 TELCO RACKMOUNT CLONE | R3738689 | 321 | J1208704 | NEW | $713.69 | 01/26/99 |
| | BOARD (1) | MOTHERBOARD | | | | | | |
| | POWER (1) | POWER SUPPLY | | | | | | |
| | CHASSIS (1) | CHASSIS | | | | | | |
| | PROCESSOR (2) | 300MHZ PROCESSOR/2MB CACHE | | | | | | |
| | MEMORY (8) | 128MB MEMORY | | | | | | |
| | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | |
| | CD ROM (1) | CD ROM | | | | | | |
| | CARD (1) | FAST 10/100BASET ENET CARD | | | | | | |
| | | PO NUMBER: 321 | | | | | | |

EQUIPMENT LOCATION: GUESTWORLD, 1825 W MAUD AVE, STE 201, SUNNYVALE, CA 94086

| MACHINE QTY TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P O # | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|
| 2 SUN A32-AA-R | | E250 SERVER | SE50F33BF 5831F4GAP | 1947 | 1775 | NEW | $1,753.23 | 01/07/99 |
| | 1191A (2) | 300MHZ PROCESSOR/2MB CACHE | | | | | | |

Page No. 1 of 7
144574-040AEX(CSH).xls

LYC  03032

07/07/99  15:18 FAX                                                    ☒001/004

# CSI

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri  63141
telephone:  (314)997-7010 ext. 323
telecopy:  (314)997-3192

**DEFENDANT'S EXHIBIT**
*Berry* 15

---

### TELECOPY

---

**CAROLYN BERRY  Contract Administrator**

Date:          July 07, 1999
To:            Mr. Michael Ripps
Company:       Lycos, Inc.
Fax Phone:     781-370-2600
Total Number of Pages (including cover page):  4

---

Dear Mr. Ripps:

I am in the process of preparing the closing documents for your lease schedule #144874-049. Following is the exhibit that shows all of the equipment purchased under the lease. Please review this list for accuracy and contact me within the next week should you find any discrepancies.

Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

*Carolyn Berry*

Carolyn Berry

---

IF YOU HAVE ANY PROBLEMS RECEIVING THIS TELECOPY, PLEASE CALL
(314) 997-7010

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED, IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (1-800-955-0960) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

LYC  03745

☑ 002/004

07/07/99  15:18 FAX

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. FORTY-NINE, MASTER LEASE NO. 144874

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | PO# | INVOICE # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 3COM | | SUPERSTACK II SWITCH 3X00 | N/A | 1638 | 94470 | NEW | $241.34 | 04/01/99 |
| | | | | | | PO NUMBER: 1638 | | | |
| 1 | SUN A14UEC29S6CJ | | ULTRA 2 SERVER 2/300 | SY43P25PD | 1645 | 94468 | NEW | $1,050.13 | 04/01/99 |
| | | MEMORY (1) | 256MB MEMORY | | | | | | |
| | | X7003A (2) | 128MB MEMORY | | | | | | |
| | | X7003A (1) | 1GB MEMORY EXPANSION | | | | | | |
| | | X2602A (1) | CPU/MEMORY BOARD 2 EMPTY SLOTS | | | | | | |
| 1 | SUN A14UEC29S6CJ | | ULTRA 2 SERVER 2/300 | SY44P222H | 1645 | 94468 | NEW | $964.63 | 04/01/99 |
| | | MEMORY (1) | 256MB MEMORY | | | | | | |
| | | X7003A (2) | 128MB MEMORY | | | | | | |
| | | | | | | PO NUMBER: 1645 | | | |
| 1 | DEC DMHUB-AA | | MULTISWITCH 900-8SLOT | N/A | 1673 | 94474 | NEW | $689.51 | 04/01/99 |
| | | I17A34-MA (1) | REDUNDANT POWER SUPPLY | | | | | | |
| | | HD345-AA (2) | 2MB FLASH CARD | | | | | | |
| | | DSRVZ-NC (2) | 32 PORT NAS ADAPTER | | | | | | |
| | | | | | | PO NUMBER: 1673 | | | |
| 1 | SUN SCXDSK060A25 | | STOREDGE MULTIPAK | S831G0051 | 1743 | 94472 | NEW | $369.96 | 04/01/99 |
| | | DRIVE (1) | 23.2GB HARD DRIVE | | | | | | |
| | | X7004A (1) | 256MB MEMORY | | | | | | |
| | | S214A (3) | 4.2GB HARD DRIVE | | | | | | |
| | | X1018A (1) | FAST/WIDE SCSI SBUS INTERFACE | | | | | | |
| | | X3856A (1) | 68PIN TO 68PIN SCSI CABLE | | | | | | |
| 1 | SUN SCXDSK060A25 | | STOREDGE MULTIPAK | S30401079 | 1743 | 94472 | NEW | $336.06 | 04/01/99 |
| | | DRIVE (1) | 23.2GB HARD DRIVE | | | | | | |
| | | X7004A (1) | 256MB MEMORY | | | | | | |
| | | S214A (3) | 4.2GB HARD DRIVE | | | | | | |
| | | X3856A (1) | 68PIN TO 68PIN SCSI CABLE | | | | | | |
| | | | | | | PO NUMBER: 1743 | | | |
| 1 | SUN RA20UEC1935/C | | E450 SERVER 300 | 845T1006 | 1847 | 94478 | USED | $1,545.00 | 04/01/99 |
| | | MEMORY (1) | 128MB MEMORY | | | | | | |
| | | DRIVE (1) | 4GB HARD DRIVE | | | | | | |
| | | X2240A (3) | 300MHZ CPU, 2MB CACHE | | | | | | |
| | | X7003A (2) | 128MB MEMORY | | | | | | |
| | | X5229A (1) | 9.1GB HARD DRIVE | | | | | | |
| | | X1033A (1) | 10BASET W/MII PCI ADAPTER | | | | | | |
| | | X9682A (1) | 550W POWER SUPPLY | | | | | | |
| | | CABLE (1) | 3' CABLE | | | | | | |
| | | | | | | PO NUMBER: 1847 | | | |
| 1 | MISC | | GLADIATOR 6700 W/DUAL CONTROLLERS | LP557792 | 2444 | 90400817A | NEW | $2,903.37 | 05/04/99 |
| | | CACHE (1) | 256MB CACHE UPGRADE | | | | | | |
| | | ADAPTER (2) | HOST ADAPTER D89 COPPER CONNECT | | | | | | |
| | | KIT (1) | PCI BUS INCL. D89 COPPER 35 EMULEX | | | | | | |
| | | DRIVE (24) | STORAGEWARE 3700 12 DRIVES | | | | | | |
| | | CHANNEL (1) | FIBER CHANNEL, CHASSIS DUAL I/O | | | | | | |
| | | STORAGE (1F) | FPCA STORAGEWARE 3700 | | | | | | |
| | | DRIVE (1) | 3.51F FIBER CHANNEL SCA DISK DRIVE | | | | | | |
| | | | | | | PO NUMBER: 2444 | | | |
| 5 | IBM 26453AU | | THINKPAD 600E P2/300PII | 78MYV43 | 2487 | 255906 | NEW | $111.53 | 04/29/99 |
| | | DRIVE (1) | 4GB HARD DRIVE | 78MYF07 | | | | | |
| | | MEMORY (2) | 32MB MEMORY | 78MTR92 | | | | | |
| | | CARD (1) | 10/100 ENET PCI CARD | 78MYJ23 | | | | | |
| | | | | 78MYN54 | | | | | |
| | | | | | | PO NUMBER: 2487 | | | |
| 1 | IBM 26453AU | | THINKPAD 600E P2/300PII | 78MYN95 | 2504 | 255907 | NEW | $110.18 | 04/29/99 |
| | | DRIVE (1) | 4GB HARD DRIVE | | | | | | |

Page No. 1 of 3
144874-049EX(CSB).xls

LYC 03746

# CSI

# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri  63141
telephone:  (314)997-7010 ext. 323
telecopy:  (314)997-3192

**DEFENDANT'S EXHIBIT**
Berry  17

## TELECOPY

__CAROLYN BERRY  Contract Administrator__

Date:            August 09, 2000
To:              Sandra Cuculiza
Company:     Lycos, Inc.
Fax Phone:   781-370-2600
Total Number of Pages (including cover page):   2

Dear Sandra:

I am in the process of preparing the closing documents for your lease schedule #144874-081.  Following is the exhibit that shows all of the equipment purchased under the lease.  Please note that the lease rate factors for the equipment may be subject to change per the contract.  Please review this list for accuracy and contact me within the next week should you find any discrepancies.

Please provide your comments no later than August 16, 2000.  Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

*Carolyn Berry*

Carolyn Berry

IF YOU HAVE ANY PROBLEMS RECEIVING THIS TELECOPY, PLEASE CALL (314) 997-7010

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (1-800-955-0960) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

CONFIDENTIAL
CSI0041427

08/09/00  08:21 FAX                                                          002 001

```
*************************
***    TX REPORT    ***
*************************

TRANSMISSION OK

TX/RX NO                4383
CONNECTION TEL                   17813702600
SUBADDRESS
CONNECTION ID           LYCOS
ST. TIME                08/09 08:20
USAGE T                 00'24
PGS. SENT               2
RESULT                  OK
```

# CSI

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri  63141
telephone: (314)997-7010 ext. 323
telecopy: (314)997-3192

## TELECOPY

CAROLYN BERRY  Contract Administrator

Date:      August 09, 2000
To:        Sandra Cuculiza
Company:   Lycos, Inc.
Fax Phone: 781-370-2600
Total Number of Pages (including cover page):   2

Dear Sandra:

I am in the process of preparing the closing documents for your lease schedule #144874-081. Following is the exhibit that shows all of the equipment purchased under the lease. Please note that the lease rate factors for the equipment may be subject to change per the contract. Please review this list for accuracy and contact me within the next week should you find any discrepancies.

Please provide your comments no later than August 16, 2000. Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

CONFIDENTIAL
CSI0041428

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. EIGHTY-ONE, MASTER LEASE NO. 144874

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 5 | IBM 2645-5EU | | THINKPAD 600X 7/300 | 78HRJID6 | BY78107 | 5209 | NEW | $149.07 | 06/15/00 |
| | | DRIVE (1) | 12GB HARD DRIVE | 78HRWG1 | BY90360 | | | | |
| | | MEMORY (2) | 64MB MEMORY | 78HRGR3 | BY91310 | | | | |
| | | DVD (1) | DVD ROM | 78HRFR6 | | | | | |
| | | CARD (1) | REALPORT CARDBUS ENET CARD | 78HXWA1 | | | | | |
| | | | PO NUMBER: 5209 | | | | | | |

EQUIPMENT LOCATION: 400-2 TOTTEN POND RD, WALTHAM, MA 02451-2000

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 2 | ORIGIN | | 200 SERVER 4/270 | 690D9BE7 | 3722 | 5121 | NEW | $1,564.21 | 06/15/00 |
| | | CACHE (1) | 4MB CACHE | 690DB22A | | | | | |
| | | DRIVE (2) | 9GB HARD DRIVE | | | | | | |
| | | MEMORY (2) | 256MB MEMORY | | | | | | |
| | | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | |
| | | CD ROM (1) | 32X CD ROM | | | | | | |
| | | DRIVE (1) | 24/48GB INT DAT TAPE DRIVE | | | | | | |
| | | | PO NUMBER: 5121 | | | | | | |

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 5 | VIEWSONIC | | 19" MONITOR | J04001401422 | BZ04807 | 5224 | NEW | $16.48 | 06/13/00 |
| | | | | J04001401423 | | | | | |
| | | | | J04001401424 | | | | | |
| | | | | J04001401425 | | | | | |
| | | | | J04001401428 | | | | | |
| 1 | HP C4253A | | LASERJET 4050N | 5USBC082129 | BZ04807 | 5224 | NEW | $56.60 | 06/13/00 |
| | | MEMORY (1) | 16MB MEMORY | | | | | | |
| | | CARD (1) | JETDIRECT CARD | | | | | | |
| | | | PO NUMBER: 5224 | | | | | | |

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 5 | IBM 6892-RAA | | PC300PL P3/600 | 23KNVBN | 29119T | 5234 | NEW | $69.62 | 06/20/00 |
| | | DRIVE (1) | 13.5GB HARD DRIVE | 23KNVGR | | | | | |
| | | MEMORY (1) | 64MB MEMORY | 23KNVFF | | | | | |
| | | VIDEO (1) | 4MB VIDEO MEMORY | 23KNVHD4 | | | | | |
| | | 33L5015 (1) | 8X DVD ROM | 23KNVKX | | | | | |
| | | 01K1137 (1) | 64MB MEMORY | | | | | | |
| | | 01K1138 (1) | 128MB MEMORY | | | | | | |
| 3 | VIEWSONIC | | 19" MONITOR | J04000901956 | 29119T | 5234 | NEW | $13.28 | 06/20/00 |
| | | | | J04000901600 | | | | | |
| | | | | J04000901599 | | | | | |
| | | | | J04000901598 | | | | | |
| | | | | J04000901597 | | | | | |
| | | | PO NUMBER: 5234 | | | | | | |

EQUIPMENT LOCATION: ONE ARSENAL MARKETPLACE, WATERTOWN, MA 02472

Page No. 1 of 1
144874-081EX(CSB).xls

CONFIDENTIAL
CSI0041426

# EXHIBIT 28

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. TWENTY-NINE, MASTER LEASE NO. 144874

**DEFENDANT'S EXHIBIT 5**
Barry 5
omm 2-6-07

EQUIPMENT LOCATION: 5001 CENTRE AVE, PITTSBURG, PA 15113

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | PO NUMBER | INVOICE NUMBER | NEW/USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE | PER PIECE EQUIP COST | PER PIECE SOFT COST | BUY NUMBER | TOTAL COST | TOTAL RENTAL | TOTAL SOFT COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MISC | | 9GB SCSI HARD DRIVE | 6910398 | 1150 | 216139 | NEW | $33.39 | 08/13/91 | 757 | 1935 | 151125 | 739.93 | 33.39 | 19.35 |
| | | | | | **PO NUMBER: 1150** | | | | | | | | | | |
| 10 | SEAGATE | | 9.1GB ULTRA SCSI HARD DRIVE | LM313958 LM341574 LM367676 LM376040 LM376069 LM377915 LM412204 LM423574 LM436611 LM413045 | 1212 | 410699 | NEW | $27.92 | 08/13/91 | 648.83 | 1946 | 151772 | 6,507.96 | 279.20 | 19.46 |
| | | | | | **PO NUMBER: 1212** | | | | | | | | | | |
| 6 | MISC | | USR QUAD DIGITAL MODEM SET W/FAX | N/A | 1156 | 20943 | NEW | $19.35 | 01/04/91 | 1946 | 115 | 151447 | 11,275.00 | 516.10 | 97.50 |
| | | | | | **PO NUMBER: 1156** | | | | | | | | | | |
| 4 | DEC FX-G186A-VB | | P2200 551046T | KNH19ALVH1 | 1199 | 81573A | NEW | $86.65 | 08/13/91 | 2103.08 | 2 | 27.79444444 | 151869 | 8,523.55 | 346.60 | 111.16 |
| | P-FR-PCCAM-EC (2) | | 32MB MEMORY | KNH19ALV34 | | | | | | | | | | | |
| | DRIVE (1) | | 3.2GB HARD DRIVE | KNH19AHL8 | | | | | | | | | | | |
| | CD ROM (1) | | CD ROM | KNH19DANE6 | | | | | | | | | | | |
| | DRIVE (1) | | 4.3GB HARD DRIVE | | | | | | | | | | | | |
| | P-FR-PCCAM-ED (1) | | 64MB MEMORY | | | | | | | | | | | | |
| 4 | MISC | | 19" MONITOR | TAX210018J TAX210079 TAX210265 TAX210032J | 1199 | 81540A | NEW | $22.61 | 08/13/91 | 557 | 2 | | 2,231.00 | 90.44 | 0.00 |
| | | | | | **PO NUMBER: 1199** | | | | | | | | | | |
| 5 | COMPAQ | | P2656A A1593DMT | | 1199 | 81573A | NEW | $113.02 | 08/13/91 | 2100.34 | 1 | 27.79444444 | 151869 | 14,412.17 | 565.10 | 138.97 |
| | MEMORY (1) | | 32MB MEMORY | 3H78BT72F47T | | | | | | | | | | | |
| | DRIVE (1) | | 4GB HARD DRIVE | 3H78BT72F33F | | | | | | | | | | | |
| | CD ROM (1) | | CD ROM | 3H78BT72F34D | | | | | | | | | | | |
| | ADAPTER (1) | | 10/100 ENET ADAPTER | 3H78BT72F44V | | | | | | | | | | | |
| | | | | | **PO NUMBER: 1199** | | | | | | | | | | |
| 1 | CISCO 7206 | | 7206 ROUTER | 72650945 | 1205 | 21654 21500 | NEW | $1,635.54 | 09/03/91 | 34592 | 1 | 5599.1 | 151465 151410 | 40,191.16 | 1635.54 | 5,599.10 |
| | NPE-200 (1) | | PROCESSING ENGINE | | | | | | | | | | | | |
| | NPE-7DMB (1) | | 128MB MEMORY | | | | | | | | | | | | |
| | C7200-IO-FE (1) | | INPUT/OUTPUT CONTROLLER | | | | | | | | | | | | |
| | PWR-7200Z (1) | | DUAL POWER OPTION | | | | | | | | | | | | |
| | I/O-FLASH (1) | | I/O PCMCIA 20MB FLASH | | | | | | | | | | | | |
| | PA-A3-T3 (1) | | 1 PORT ATM ENHANCED DS3 PORT ADAPTER | | | | | | | | | | | | |
| | CX-AJP-DS1 (1) | | ATM/DSC COAX INTERFACE PROCESSOR | | | | | | | | | | | | |
| | | | | | **PO NUMBER: 1205** | | | | | | | | | | |
| 1 | DEC FX-G186A-VB | | P2200 551046T | KNH11ALWP9 | 1216 | 81569 | NEW | $93.74 | 08/13/91 | 2103.33 | 2 | 52 | 151899 | 2,151.13 | 93.74 | 32.00 |
| | P-FR-PCCAM-EC (2) | | 32MB MEMORY | | | | | | | | | | | | |
| | DRIVE (1) | | 3.2GB HARD DRIVE | | | | | | | | | | | | |
| | CD ROM (1) | | CD ROM | | | | | | | | | | | | |
| | DRIVE (1) | | 4.3GB HARD DRIVE | | | | | | | | | | | | |
| | P-FR-PCCAM-ED (1) | | 64MB MEMORY | | | | | | | | | | | | |
| 1 | MISC | | 19" MONITOR | TAX210042 | 1216 | 81540 | NEW | $22.61 | 08/13/91 | 557 | 2 | | 557.00 | 22.61 | 0.00 |
| | | | | | **PO NUMBER: 1216** | | | | | | | | | | |

CONFIDENTIAL
GSI045822

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. FORTY-A, MASTER LEASE NO. 144874

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | P.O.# | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE | PER PIECE EQUIP COST | PER PIECE SOFT COST | BUY NUMBER | TOTAL COST | TOTAL RENTAL | TOTAL COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | NETWORK APPLIANCE | DRIVE (1) | F760 FILER SYSTEM | 1341I | 257 | 22324 | NEW | $9,558.05 | 010699 | 219781.5 | 1416.16 | 163734 | 221,203.66 | 9558.05 | 1,416.16 |
| | | DRIVE (1) | 1GB HEAD DRIVE | | | | | | | | | | | | 0.00 |
| | | MEMORY (1) | 12MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (36) | 18GB FC-AL DISK DRIVE | | | | | | | | | | | | 0.00 |
| | | SHELF (4) | DUAL STORAGESHELF FCBB | | | | | | | | | | | | 0.00 |
| | | ADAPTER (1) | FC-AL ADAPTER W/CABL & TERM | | | | | | | | | | | | 0.00 |
| | | ADAPTER (1) | QUAD 10/100BASET ADAPTER | | | | | | | | | | | | 0.00 |
| | | CABLE (18) | POWER CABLE | | | | | | | | | | | | 0.00 |

PO NUMBER: 257

| 2 | NETWORK APPLIANCE | DRIVE (1) | F760 FILER SYSTEM | 1340I | 2246 | 22327 | NEW | $5,421.06 | 030699 | 157402.4 | 37,045 | 163733 | 315,858.69 | 11842.16 | 74.09 |
| | | MEMORY (1) | 1GB HEAD DRIVE | 1340I | | | | | | | | | | | 0.00 |
| | | DRIVE (2) | 12MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (2) | 18GB FC-AL DISK DRIVE | | | | | | | | | | | | 0.00 |
| | | SHELF (4) | DUAL STORAGESHELF FCB | | | | | | | | | | | | 0.00 |
| | | ADAPTER (2) | QUAD 10/100BASET ADAPTER | | | | | | | | | | | | 0.00 |
| | | CABLE (10) | POWER CABLE | | | | | | | | | | | | 0.00 |
| | | X210A (1) | 18GB FC-AL DISK DRIVE | | | | | | | | | | | | 0.00 |

PO NUMBER: 2246

| 1 | NETWORK APPLIANCE | MEMORY (1) | F720 FILER SYSTEM | 1341I | 2247 | 22331 | NEW | $1,694.62 | 030699 | 39211.05 | 23.67 | 163735 | 39,234.71 | 1694.62 | 23.67 |
| | | MEMORY (1) | 128MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (1) | 1MB MEMORY | | | | | | | | | | | | 0.00 |
| | | SHELF (1) | 18GB FC-AL DISK DRIVE | | | | | | | | | | | | 0.00 |
| | | ADAPTER (1) | DUAL STORAGESHELF FCB | | | | | | | | | | | | 0.00 |
| | | ADAPTER (1) | QUAD 10/100BASET ADAPTER | | | | | | | | | | | | 0.00 |
| | | CABLE (4) | POWER CABLE | | | | | | | | | | | | 0.00 |
| | | X201A (1) | CABLE FOH-BOARD FC-AL | | | | | | | | | | | | 0.00 |

PO NUMBER: 2247

EQUIPMENT LOCATION: 2151 LAWSON LANE, SANTA CLARA, CA 95054

| 1 | MISC | | SUN ULTRA X TELCO RACK/MOUNT CLONE | 83326681 | 321 | IN20540 | NEW | $716.79 | 010299 | 15500 | 15 | 162981 | 15,515.00 | 716.79 | 15.00 |
| | | BOARD (1) | MOTHERBOARD | | | | | | | | | | | | 0.00 |
| | | POWER (1) | POWER SUPPLY | | | | | | | | | | | | 0.00 |
| | | CHASSIS (1) | CHASSIS | | | | | | | | | | | | 0.00 |
| | | PROCESSOR (2) | 300MGZ PROCESSOR/2MB CACHE | | | | | | | | | | | | 0.00 |
| | | MEMORY (8) | 128MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | | | | | | | 0.00 |
| | | CD ROM (1) | CD ROM | | | | | | | | | | | | 0.00 |
| | | CARD (1) | FAST 10/100BASET ENET CARD | | | | | | | | | | | | 0.00 |

PO NUMBER: 321

| 1 | MISC | | SUN ULTRA X TELCO RACK/MOUNT CLONE | 83326689 | 321 | IN20703 | NEW | $716.79 | 010699 | 15500 | 15 | 162981 | 15,515.00 | 716.79 | 15.00 |
| | | BOARD (1) | MOTHERBOARD | | | | | | | | | | | | 0.00 |
| | | POWER (1) | POWER SUPPLY | | | | | | | | | | | | 0.00 |
| | | CHASSIS (1) | CHASSIS | | | | | | | | | | | | 0.00 |
| | | PROCESSOR (2) | 300MGZ PROCESSOR/2MB CACHE | | | | | | | | | | | | 0.00 |
| | | MEMORY (8) | 128MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | | | | | | | 0.00 |
| | | CD ROM (1) | CD ROM | | | | | | | | | | | | 0.00 |
| | | CARD (1) | FAST 10/100BASET ENET CARD | | | | | | | | | | | | 0.00 |

PO NUMBER: 321

| | COMPAQ | | P2200 1000M | D307IB24I099 | 339 | 1117213 | NEW | $481.06 | 030699 | 12272.35 | 2 | 163962 | 12,272.35 | 481.06 | 0.00 |
| | | MEMORY (2) | 64MB MEMORY | | | 1115247 | | | | | | | | | 0.00 |
| | | MEMORY (1) | 128MB MEMORY | | | | | | | | | | | | 0.00 |
| | | DRIVE (4) | 9.1GB HARD DRIVE | | | | | | | | | | | | 0.00 |

DEFENDANT'S EXHIBIT
2-6-07

Page No. 1 of 8
144874-040AEX(CSB)

CONFIDENTIAL

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. FORT-NINE, MASTER LEASE NO. 144174

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | PO# | INVOICE # | NEW/USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE | PER PIECE EQUIP COST | PER PIECE SOFT COST | BUY NUMBER | TOTAL COST | TOTAL RENTAL | TOTAL SOFT COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 3COM | | SUPERSTACK II SWITCH 3900 | N/A | 1631 | 94470 | NEW | $312.17 | 04/01/99 | 6265.6 | 32.47 | 16447 | 12,531.20 | 491.34 | 0.00 |
| | | | | | | | | | | | | | | | 32.47 |
| | | PO NUMBER: 1638 | | | | | | | | | | | 37,916.00 | 1653.91 | 0.00 |
| 1 | SUN A14UEC3(5C) | | ULTRA 1 SERVER 2/200 | 5444T23FD | 1645 | 94468 | NEW | $1,633.91 | 04/01/99 | 37183.4 | 32.47 | 166447 | | 0.00 | 0.00 |
| | | MEMORY (1) | 256MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X7003A (1) | 128MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X7003A (1) | 1GB MEMORY EXPANSION | | | | | | | | | | | 0.00 | 0.00 |
| | | CPU/MEMORY BOARD 1 EMPTY SLOTS | | | | | | | | | | | | 0.00 | 0.00 |
| 1 | SUN A14UEC3(5C) | | ULTRA 1 SERVER 2/200 | 5844T231E | 1645 | 94468 | NEW | $966.81 | 04/01/99 | 22403.6 | 32.47 | 166447 | 22,430.07 | 956.81 | 32.47 |
| | | MEMORY (2) | 256MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X7003A (2) | 128MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | PO NUMBER: 1645 | | | | | | | | | | | | 0.00 | 0.00 |
| 1 | DEC DMHUB-AA | | MULTISWITCH 900-5SLOT | N/A | 1673 | 94474 | NEW | $691.00 | 04/01/99 | 11369.5 | 3531.84 | 166447 | 14,901.34 | 691.00 | 3,531.84 |
| | | H7H4AA (1) | REDUNDANT POWER SUPPLY | | | | | | | | | | | 0.00 | 0.00 |
| | | H9H5AA (1) | 24HIGH FAN CARD | | | | | | | | | | | 0.00 | 0.00 |
| | | DSWYZ-MC (1) | 1PORT HAS ADAPTER | | | | | | | | | | | 0.00 | 0.00 |
| | | PO NUMBER: 1673 | | | | | | | | | | | | 0.00 | 10.82 |
| 1 | SUN SGXD5K060A25 | | STOREDGE MULTIPAK | SB31G00S1 | 1743 | 94472 | NEW | $370.82 | 04/01/99 | 8594 | 10.815 | 166467 | 8,604.82 | 370.82 | 10.82 |
| | | DRIVE (1) | 23.1GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X7004A (1) | 256MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X314A (1) | 4.2GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X334A (1) | FASTWIDE SCSI 3BUS INTERFACE | | | | | | | | | | | 0.00 | 0.00 |
| | | X3834A (1) | 68PIN TO 68PIN SCSI CABLE | | | | | | | | | | | 0.00 | 0.00 |
| 1 | SUN SGXD5K060A25 | | STOREDGE MULTIPAK | SB31G01079 | 1743 | 94472 | NEW | $316.84 | 04/01/99 | 7303.6 | 10.815 | 166467 | 7,316.42 | 336.84 | 10.82 |
| | | DRIVE (1) | 23.1GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X7004A (1) | 256MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X314A (1) | 4.2GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X3834A (1) | 68PIN TO 68PIN SCSI CABLE | | | | | | | | | | | 0.00 | 0.00 |
| | | PO NUMBER: 1743 | | | | | | | | | | | | 0.00 | 0.00 |
| 1 | SUN RA31UEC3(5C) | | E450 SERVER 300 | 845T1006 | 1847 | 94478 | USED | $1,548.55 | 04/01/99 | 33372.45 | 616 | 166467 | 33,931.65 | 1548.55 | 616.00 |
| | | MEMORY (1) | 128MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | DRIVE (1) | 4GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X2240A (1) | 300MHZ CPU, 2MB CACHE | | | | | | | | | | | 0.00 | 0.00 |
| | | X7003A (1) | 128MB MEMORY | | | | | | | | | | | 0.00 | 0.00 |
| | | X5232A (1) | 9.1GB HARD DRIVE | | | | | | | | | | | 0.00 | 0.00 |
| | | X1075A (1) | 100BASET PCI FAST ADAPTER | | | | | | | | | | | 0.00 | 0.00 |
| | | X9834 (1) | 550W POWER SUPPLY | | | | | | | | | | | 0.00 | 0.00 |
| | | CABLE (1) | 2M CABLE | | | | | | | | | | | 0.00 | 0.00 |
| | | PO NUMBER: 1847 | | | | | | | | | | | | 0.00 | 0.00 |
| 1 | MISC | | GLADIATOR 4700 W/DUAL CONTROLLERS | LP317T92 | 2444 | 95400187A | NEW | $2,910.73 | 05/06/99 | 67350 | | 163473 | 67,350.00 | 2910.73 | 0.00 |
| | | CACHE (1) | 256MB CACHE UPGRADE | | | | | | | | | | | 0.00 | 0.00 |
| | | ADAPTER (1) | HOST ADAPTER DB9 COPPER CONNECT | | | | | | | | | | | 0.00 | 0.00 |
| | | KIT (1) | PCI 33 INCL DB9 COPPER 33 J BUNDLER | | | | | | | | | | | 0.00 | 0.00 |
| | | DRIVE (1) | STORAGEWARE 2700 11 DRIVES | | | | | | | | | | | 0.00 | 0.00 |
| | | CHANNEL (1) | FIBER CHANNEL CHASSIS DUAL I/O | | | | | | | | | | | 0.00 | 0.00 |
| | | STORAGE (1) | JFFCA STORAGEWARE 2700 | | | | | | | | | | | 0.00 | 0.00 |
| | | DRIVE (1) | 1.31P FIBER CHANNEL SCA DISK DRIVE | | | | | | | | | | | 0.00 | 0.00 |

DEFENDANT'S
EXHIBIT 14

CONFIDENTIAL
CSI045915

EXHIBIT "A"
LYCOS INC.
EQUIPMENT SCHEDULE NO. EIGHTY-ONE, MASTER LEASE NO. 144874

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW USED | MONTHLY RENTAL PER UNIT | COMMENCEMENT DATE | PER PIECE EQUIP COST | PER PIECE SOFT COST | BUY NUMBER | TOTAL COST | TOTAL RENTAL | TOTAL SOFT COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | IBM 2645-5EU | | THINKPAD 600X 7/300 | 7HRDRD6 | BY78107 | 5209 | NEW | $149.07 | 06/15/00 | 3416.2 | 35.636 | 174904 | 17,279.16 | 745.35 | 198.16 |
| | | DRIVE (1) | 11GB HARD DRIVE | 7HRDKVG1 | BY90340 | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | MEMORY (2) | 64MB MEMORY | 7HRDGD3 | BY91110 | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | DVD (1) | DVD ROM | 7HRDF76 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | CARD (1) | REALPORT CARDBUS ENET CARD | 7HRDKWA1 | | | | | | | | | 0.00 | 0.00 | 0.00 |

PO NUMBER: 5209
EQUIPMENT LOCATION: 400-2 TOTTEN POND RD, WALTHAM, MA 02451-2000

| 2 | ORIGIN | | 200 SERVER 4270 | 69X0D8E7 | 3722 | 5121 | NEW | $1,564.21 | 06/15/00 | 34651 | 1529.75 | 176599 | 72,361.50 | 3128.42 | 3,059.50 |
| | | CACHE (1) | 4MB CACHE | 69X0DB2A | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | DRIVE (2) | 9GB HARD DRIVE | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | MEMORY (2) | 256MB MEMORY | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | DRIVE (2) | 9.1GB HARD DRIVE | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | CD ROM (1) | 32X CD ROM | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | DRIVE (1) | 244/4GB INT DAT TAPE DRIVE | | | | | | | | | | 0.00 | 0.00 | 0.00 |

PO NUMBER: 5121

| 3 | VIEWSONIC | | 19" MONITOR | 19AQ491421 | B2D4807 | 5224 | NEW | $16.48 | 06/13/00 | 330.41 | | 174923 | 2,036.59 | 82.40 | 304.54 |
| | | | | 19AQ491423 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491424 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491425 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491428 | | | | | | | | | 0.00 | 0.00 | 0.00 |

| 1 | HP C4333A | | LASERJET 4050N | SUSDC082129 | B2D4807 | 5224 | NEW | $56.60 | 06/13/00 | 1379.15 | 60.90833333 | 174923 | 1,440.06 | 56.60 | 60.91 |
| | | MEMORY (1) | 16MB MEMORY | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | CARD (1) | JETDIRECT CARD | | | | | | | | | | 0.00 | 0.00 | 0.00 |

PO NUMBER: 5224

| 5 | IBM 6497-RAA | | PC300PL PIII600 | 23KNY6N | 291197 | 5234 | NEW | $69.62 | 06/02/00 | 1785 | | 176693 | 1,923.00 | 348.10 | 0.00 |
| | | DRIVE (1) | 13.5GB HARD DRIVE | 23KNYKR | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | MEMORY (1) | 64MB MEMORY | 23KNYNF | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | VIDEO (1) | 4MB VIDEO MEMORY | 23KNYGM | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | 31LS015 (1) | 8X DVD ROM | 23KNYCX | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | 01K1317 (1) | 64MB MEMORY | | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | 01K1378 (1) | 128MB MEMORY | | | | | | | | | | 0.00 | 0.00 | 0.00 |

PO NUMBER: 5234

| 5 | VIEWSONIC | | 19" MONITOR | 19AQ491956 | 291197 | 5234 | NEW | $13.21 | 06/20/00 | 340.62 | | 176693 | 1,703.10 | 66.40 | 0.00 |
| | | | | 19AQ491600 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491599 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491598 | | | | | | | | | 0.00 | 0.00 | 0.00 |
| | | | | 19AQ491597 | | | | | | | | | 0.00 | 0.00 | 0.00 |

PO NUMBER: 5234
EQUIPMENT LOCATION: ONE ARSENAL MARKETPLACE, WATERTOWN, MA 02472


DEFENDANT'S EXHIBIT

Page No. 1 of 1
144874-081EX(CSB)

CONFIDENTIAL
CSI045982

# EXHIBIT 29
# FILED UNDER SEAL

# EXHIBIT 30

# INTENTIONALLY
# LEFT
# BLANK

# EXHIBIT 31




# NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

### EQUIPMENT SCHEDULE NO. 64D Dated as of July 31, 2000

LESSOR:                          LESSEE:    **LYCOS, INC.**
                                            400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**      Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|--------------------------|
|     |                    |                             |             |          |           |                          |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 4 pages.

**EQUIPMENT LOCATION:**   660 3rd Street
                         San Francisco, California 94107

2. Monthly Rental for all Units: **$11,428.00**
3. Initial Term: **August 1, 2000 through May 31, 2003; Thirty-four (34) months**
4. Anticipated Installation Date: **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before **August 7, 2000.**

COMPUTER SALES INTERNATIONAL, INC.  LESSEE: LYCOS, INC.

By: _____        By: _____
       **E. WILLIAM GILLULA**
       PRESIDENT & COO

Title: _____        Title: _____ COO/CFO _____

Date: _____ AUG 0 4 2000 _____        Date: _____ 8/1/00 _____

PHS/BOST
144874-064D(skh)

CONFIDENTIAL
CSI0017836

 

**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 64D
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 64D, Master Lease Agreement No. 144874" (the "Lease"), is dated as of July 31, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Date:** The Equipment is installed at Lessee's location under Equipment Schedule 64A to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 64A expires on July 31, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is August 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 64A is June 1, 2000, and the total Monthly Rental is $12,219.00.

3.    **Serial Number Substitution:**

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical defect, or a casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

CONFIDENTIAL
CSI0017841




**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 64D, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.        LYCOS, INC.

By: _____        By: _____

Title: _____        Title: _____ COO / CFO _____
     E. WILLIAM GILLULA
       PRESIDENT & COO

Date: _____ AUG 0 4 2000 _____        Date: _____ 8/11/00 _____

PHS/BOST
144874-064D(tkh)

CONFIDENTIAL
CSI0017842



# ORIGINAL



## COMPUTER SALES INTERNATIONAL, INC.
10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

**EQUIPMENT SCHEDULE NO. 64F Dated as of October 30, 2000**

LESSOR:                          LESSEE:    **LYCOS, INC.**
                                            400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**      Waltham, Massachusetts 02154-2000

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4, 1996, are hereby incorporated herein and made a part hereof:

1. **Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|-------------------------|
|     |                    |                             |             |          |           |                         |

A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 2 pages.

**EQUIPMENT LOCATION:**    See Attached Exhibit "A"

2. Monthly Rental for all Units: **$5,545.23**
3. Initial Term: **December 1, 2000 through September 30, 2003; Thirty-four (34) months**
4. Anticipated Installation Date: **Already installed and accepted**
5. Addendum One hereto is incorporated herein by this reference.   ☒ (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before **November 6, 2000.**

**COMPUTER SALES INTERNATIONAL, INC.**    LESSEE: **LYCOS, INC.**

By: _____    By: _Thomas E. Guyther_

Title: _____    Title: _VP Finance & Admin_

Date: __E. WILLIAM GILLULA__             Date: _11·14·00_
           PRESIDENT & COO

PHS/BOST
144874-064F(gd)          NOV 2 2 2000

CONFIDENTIAL
CSI0018111



# ORIGINAL

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 64F, MASTER LEASE NO. 144874

$5,545.23

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|---|---|
| 3 | SUN A34ULD29S002E | | ENTERPRISE 220R 450 | S015H2B48 | 96864 | 357 ✓ | USED | $874.97 |
| | | DRIVE (1) | 18GB HARD DRIVE | S022H2604 | | | | |
| | | MEMORY (1) | 2GB MEMORY | S022H2616 | | | | |
| | | VIDEO (1) | 4MB VIDEO MEMORY | | | | | |
| | | X311L (2) | POWER CORD | | | | | |

PO NUMBER: 357

| 4 | COMPAQ | | PROLIANT DL380R 7/667 | D018DKM1K153 | BY21622 | 387 ✓ | USED | $236.44 |
| | | MEMORY (2) | 128MB MEMORY | D018DKM1K282 | | | | |
| | | MEMORY (1) | 256MB MEMORY | D018DKM1K329 | | | | |
| | | DRIVE (1) | 9GB HARD DRIVE | D019DKM1K671 | | | | |
| | | CPU (1) | 7/667 PROCESSOR OPTION | | | | | |

PO NUMBER: 387

| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 78TAGY9 | 292548 293244 | 417 ✓ | USED | $124 83 |

PO NUMBER: 417

| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 550H4W3 | 292773 293034 | 422 ✓ | USED | $122 80 |

PO NUMBER: 422

| 1 | LOGATO | | NETWORK SERVER MODULE F/UNIX | N/A | 98251 | 431 ✓ | USED | $257 65 |

PO NUMBER: 431

| 1 | IBM 2645-4EU | | THINKPAD 600X P3/500 | 78HMPP6 | 295602 296458 | 445 ✓ | USED | $120 24 |

PO NUMBER: 445

| 2 | NETWORK APPLIANCE | | STORAGE SHELF FC9 | 20318 | 39209 | 5741 ✓ | USED | $508 02 |
| | | DRIVE (7) | 18GB HARD DRIVE | 20447 | | | | |
| | | CABLE (2) | POWER CABLE | | | | | |

PO NUMBER: 5741

| 1 | APPLE | | G4 CPU 500 | XB0390TEJNX | 300427 | 60057 ✓ | USED | $113 56 |

PO NUMBER: 60057

EQUIPMENT LOCATION: 660 THIRD ST, SAN FRANCISCO, CA 94107

| 4 | IBM 6565-97U | | PC300PL P3/667 | 78CZGBR | 298052 | 60026 ✓ | USED | $44 96 |
| | | | | 78CZFMV | | | | |
| | | | | 78CZFZA | | | | |
| | | | | 23XA081 | | | | |

PO NUMBER: 60026

*Traced all P.O's to file*

Page No 1 of 2
I44874-064Fcx(gd) xls

CONFIDENTIAL
CSI0018112



**ORIGINAL**

EXHIBIT "A"
LYCOS, INC.
EQUIPMENT SCHEDULE NO. 64F, MASTER LEASE NO. 144874

$5,545.23

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | INVOICE # | PO # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|-----|--------------------|-----------------------------|-------------|----------|-----------|------|-----------|-------------------------|
| | | | EQUIPMENT LOCATION: 400-2 TOTTEN POND RD, WALTHAM, MA 02451 | | | | | |
| 4 | IBM 12J2-467 | | SELECTABASE F/TP | N/A | 299547 | 60047 | USED | $9.32 |
| 4 | LOGITECH | | KEYBOARD | N/A | 299542 | 60047 | USED | $0.58 |
| | | | PO NUMBER: 60047 | | | | | |
| | | | EQUIPMENT LOCATION: 1950 STEMMONS FRWY, STE 5001, DALLAS, TX 75207 | | | | | |

CONFIDENTIAL
CSI0018113



# ORIGINAL

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. 64F
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule 64F, Master Lease Agreement No. 144874" (the "Lease"), is dated as of October 30, 2000, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Commencement Date:** The Equipment is installed at Lessee's location under Equipment Schedule 64C to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. In consideration of Lessee's entering into this Lease, the Initial Term of Equipment Schedule 64C expires on November 30, 2000. Accordingly, the Commencement Date of the Equipment under this Lease is December 1, 2000. In further consideration of Lessee's entering into this Lease, the Commencement Date of all equipment under Equipment Schedule 64C is October 1, 2000, and the total Monthly Rental is $6,188.28.

3.    **Serial Number Substitution:**

a) As provided in section 9 of the Master Lease Agreement, Lessee may replace any Unit with an identical or improved specification machine (a "Substitute Unit") as a result of a warranty replacement or other mechanical defect, or a casualty loss situation. Lessee must notify Lessor of the replacement serial number and configuration of the Substitute Unit as required by section 9 of the Master Lease Agreement.

b) In addition to the circumstances set forth in (a) above, upon expiration of the Initial Term, Lessee may choose to return desktop PC, laptop PC, or PC monitor units with serial numbers other than those listed in the Certificate of Acceptance only upon the following conditions: the Substitute Units must be (1) of an identical or improved configuration as the Units being replaced, (2) in the condition required by section 7 of the Master Lease Agreement, and (3) owned by Lessee. Lessee must give Lessor written notice of the serial numbers of the Substitute Units along with a detailed list of which serial numbers they are replacing prior to their return to Lessor or else Lessor may decline to accept Substitute Units. Lessee hereby represents and warrants to Lessor that, upon delivery of any Substitute Units to Lessor, Lessee will be the absolute owner of the Substitute Units; the Substitute Units will be free and clear of all liens, charges and encumbrances; and Lessee will have full right, power and authority to transfer to Lessor title to the Substitute Units.

CONFIDENTIAL
CSI0018114



ORIGINAL

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. 64F, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.    LYCOS, INC.

By: _____    By: _Thomas E. Griffith_

Title: _____E. WILLIAM GILLULA_____    Title: _VP FINANCE & ADMIN_
          PRESIDENT & COO

Date: _____NOV 2 2 2000_____    Date: _11.14.00_

PHS/BOST
144874-064F(gd)

CONFIDENTIAL
CSI0018115

# EXHIBIT 32

Office World News: LeaseAssistant.org a new resource for business                    Page 1 of 3

LookSmart



FindArticles > Office World News > May 2001 > Article > Print friendly

## LeaseAssistant.org a new resource for business

Fleming, Michael J

Why should I lease equipment? What are the types of leases and how do they work? What types of companies lease? What are my financing options when I lease?

If you've ever had questions about equipment leasing or financing, here's where you can find the answers you need! The Equipment Leasing Association (ELA) has developed a website, LeaseAssistant.org, to provide potential lessees information about equipment leasing and financing to help them make informed equipment financing decisions.

LeaseAssistant.org, named "Site of the Week" by Information Week in March 2001, was designed to be the one-stop informational portal for financial decision-makers. Rich with information on leasing and strategic financing methods, LeaseAssistant.org offers objective answers to the questions businesspeople have about leasing equipment and demonstrates how this strategic financing option is a strategic means of leveraging capital and controlling costs.

### WHY WAS LEASEASSISTANT.ORG CREATED?

As a nonprofit organization representing over 850 leasing companies, ELA created LeaseAssistant.org to present unbiased third-party information to educate businesspeople about how equipment leasing and financing works. Although many businesspeople understand leasing and its benefits, there has never been a one-stop resource dedicated to answering questions about equipment leasing, until now

### WHO SHOULD USE LEASEASSISTANT.ORG?

LeaseAssistant.org is a resource for anyone interested in learning more about leasing. LeaseAssistant.org was originally developed for financial decision-makers, the treasurers and comptrollers of companies who buy or lease equipment.

### WHAT INFORMATION IS FEATURED ON LEASEASSISTANT.ORG?

ELA's LeaseAssistant.org is a veritable online encyclopedia for equipment financing and leasing. This easy to use, easy to navigate website provides visitors with information including leasing basics, case studies, market research, leasing news, a detailed list of what can be leased, a checklist of questions to ask when negotiating a lease, the differences between a lease and loan, how to select a financing partner, how to leverage leasing for business success, and a handy glossary of key leasing terms

LeaseAssistant.org also provides important points for companies to consider before, during, and after the leasing process. These tips get companies thinking about the entire leasing process from the initial acquisition of equipment to how the lease will affect the company and what happens at the end of the lease. This information is invaluable to lessees as they work through the leasing process

Equipment leasing isn't right for every business and LeaseAssistant.org is designed to help businesses decide if leasing is right for them. If a business does decide to lease, LeaseAssistant.org can help the potential lessee through the leasing process from what questions to ask leasing companies to how to choose a financial partner. Below are the answers to some of the questions most frequently asked by businesses interested in leasing

### HOW DOES A LEASE WORK?

Office World News: LeaseAssistant.org a new resource for business

As businesses prepare to compete and grow in a new millennium, many are searching for proven ways to address their equipment financing challenges. The old ways won't meet today's and tomorrow's needs. A solution for many businesses is equipment leasing.

ELA research shows that eight out of ten U.S. companies lease some or all of their equipment. Of all the ways to acquire equipment, leasing is the method most frequently used for all equipment types. In fact, almost any type of equipment can be leased-from fax machines and printing presses, to trucks and bulldozers.

Choosing to lease is a smart way to acquire equipment. There are three ways to acquire equipment-each business can select the way that best fits their company's needs.

Businesses can select and order equipment and then seek financing through a lessor;

Businesses can select equipment by working with a vendor or a manufacturer that offers leasing through its own subsidiary; or

Businesses can obtain equipment directly through a lessor

By signing the lease, the lessee assigns his or her purchase rights to the lessor, who already owns or who then buys the equipment as specified by the lessee. When the equipment is delivered, the lessee formally accepts it and makes sure it meets all specifications. The lessor pays for the equipment, and the lease takes effect

I'VE DECIDED TO LEASE; WHERE DO I START?

ELA, through LeaseAssistant.org, recommends businesses ask the following ten questions during the leasing process. These questions take into account all stages of a lease: before, during, and after

Before

1. How do I plan to use this equipment?

2. Does the leasing representative understand my business and how this transaction helps me to do business?

During

3. What is the total lease payment and are there any other costs that I could incur before the lease ends?

4. What happens if I want to change this lease or end the lease early?

5. How am I responsible if the equipment is damaged or destroyed?

6. What are my obligations for the equipment (such as insurance, taxes, and maintenance) during the lease?

7. Can I upgrade the equipment or add equipment under this lease?

After

8. What are my options at the end of the lease?

9. What are the procedures I must follow if I choose to return the equipment? 10. Are there any extra costs at the end of the lease?

## HOW DO I sELECT THE BEST FINANCING PARTNER FOR MY BUSINESS?

The key to success is selecting a financing partner that you are comfortable with. If all goes well, a lessor will be your partner in business for a long time, so the choice is an important one. Pricing is always a factor, but the relationship should be a primary consideration. It is important that the partner you choose helps you meet your strategic objectives and business goals. Remember that there are more than 850 equipment leasing and finance companies that belong to the Equipment Leasing Association of America (ELA). It should be noted that ELA members agree to follow the association's Code of Fair Business Practices, which advocates confidentiality regarding the lessee's financial information as well as proper disclosure to the lessee of all relevant information regarding the terms and conditions of the lease. To search for a financing partner online, visit ELIs corporate membership database at: www.elaonline.com

## Now YOU'RE READY TO GET STARTED

Whether potential lessees are looking for in-depth information or a quick overview, ELA's LeaseAssistant.org is the online encyclopedia for businesses considering equipment financing and leasing. If leasing is the right decision for your business, LeaseAssistant.org will be there to guide you through every step of the process. The information above is just a sample of the useful resources available on the site. It is the hope of ELA and its over 850 members, that LeaseAssistant.org will help potential lessees be as educated as possible about the benefits of leasing and the overall process of equipment leasing and financing.

Because ELA is committed to serving as a vital resource for businesses exploring equipment acquisition options, LeaseAssistant.org is constantly updated with the latest information of interest to potential lessees. Whether it is the results from a newly released industry research project or news article, all the news potential lessees need to know about the equipment leasing industry is just a click away.

There are tens of thousands of businesses each year that benefit from leasing or financing equipment. Leasing has been-and continues to be-a smart choice for many businesses, large and small. If an equipment acquisition is in your future, make sure you visit LeaseAssistant.org to learn how leasing can help your business.

EDITOR'S NOTES: Michael Fleming is the President of ELA, a nonprofit organization that provides a variety of assetbased financial products, primarily equipment leasing. 703/527-8655

Copyright B U S Publishing Group, Inc. May 2001
Provided by ProQuest Information and Learning Company. All rights Reserved

# EXHIBIT 33


**Lŏŏk**Smart

FindArticles > Office World News > Mar 2001 > Article > Print friendly

## Customer service and the leasing industry in the new economy

**EXHIBIT**

Fleming 13
HTTS 11/4/07

Fleming, Michael J

As successful business leaders know, repeat business depends on satisfied customers And customers are the most important variable in a successful business equation

Traditionally, lessors have successfully maintained close ties to their customers, providing stellar customer service and retaining top sales personnel The fundamentals of running a good business are critical to determining their success now and in the future Those fundamentals include skilled personnel, servicing the customer well, being operationally efficient and understanding good credit criteria. But these are not the only factors that determine success

Of growing importance is the ability to marry the new business rules brought on by e-commerce, with continued customer contact and nurturing of relationships that drive customer loyalty. This presents a challenge As the new economy is changing the rules of customer service, many in the leasing industry are faced with trying to implement electronic back-end applications processing while maintaining close personal client relationships

Nevertheless, the Internet has changed the way business is conducted and has become a required tool to enhance and extend customer relationships, reduce costs and shorten the time required to complete business processes Customers expect the benefits of technology: speed, access and efficiency, and lessors are using technology to reach customers, solve problems, make transactions faster and easier and lower administrative costs.

But technology can also present challenges With so much information available online, comparing products, services and prices is easier than ever This can lead to more competition for new business, with less personal interaction during the sales process and diminished customer loyalty. The bottom line? Speed sells, but it is still relationships that create long-term customers

How IS THE LEASING INDUSTRY MERGING THE TWO PRACTICES?

There are many leasing companies that are tackling the issue head on by combining practices of the old and new economies These companies are implementing IT processes while training sales personnel in relationship building techniques. The ultimate goal of this combination adds value to the customer by building and maintaining close relationships within the partnership while providing the speed and efficiency of the online functionality. And the changes dictated by the new economy will help the leasing industry overall through faster responses to queries and expedited approval of financing

DOES IT MAKE A DIFFERENCE?

Taking the high tech industry as one vertical example, how has technology affected leasing and customer service? Based on a recent study targeting high tech companies conducted by the Equipment Leasing Association (ELA), value-adds are what start-up companies are looking for in a lessor. High tech executives surveyed in the ELA study agreed that their industry is different than old economy companies in many ways They stated that leasing companies add value when they recognize these differences and tailor services to meet the fast-paced, convenience-driven, technology demands of "new economy" lessees

"I would like lessors to be a partner versus a vendor. I would like to have more of a relationship with them and feel like they care about the success of my company. When selecting my financing partner, I am looking for this personal relationship I want to trust the guy is



going to make good business decisions and will talk to me .. and be honest about potential mistakes," said Andrew Young, president of Acoustic Works.

## WHAT IS CHANGING?

Many companies in the leasing industry are adopting technology-- focused methods to better serve all their clients They include:

Process reengineering to reduce costs creates the need for an increased use of technology Many leasing companies are recognizing the need for enhanced IT services and, rather than taking valuable time to build the services in-house, they outsource the entire IT process The applications offered through this process make the entire leasing process faster, more seamless, and generally more efficient.

Several of the changes made include:

Scoring models to automate the underwriting process;

Servicing platforms to enable online customer access to lease information;

Online application engines; and

Sophisticated tracking systems to facilitate the workflow of an application throughout the decisioning process.

It is important to note that the leasing industry is not moving to a fully-- automated system because they do not want to hurt the valuable customer relationships they have spent so much time, effort and money to build.

## MOVING FORWARD IN THE NEW ECONOMY

Although much in the leasing industry is changing, the basics are the same: loyal customers are the best source of steady revenue and keeping customers happy is the name of the game. Loyalty is gained by understanding the customer and their market.

Loyalty and collaboration between lessors and lessees is vital in the leasing industry Lessors must understand a client's acquisition strategies, technology innovation plans, business requirements, core competencies and shareholder pressures As the process gets more complex, lessors are using, expanding, enhancing and leveraging their market knowledge by diversifying beyond traditional products, increasing their service offerings and investing in web-enabled tools

As leasing companies compete in this new economy, they are maintaining a dedication to enhancing customer relationships while delivering the efficiency of the electronic economy. Successfully executing a dual strategy creates a distinct competitive advantage.

BY MICHAEL J. FLEMING, PRESIDENT EQUIPMENT LEASING ASSOCIATION

EDITOR'S NOTES: Michael J. Fleming is the president of ELA, a nonprofit organization headquartered in Arlington, VA ELA represents more than 800 member companies, which provide a variety of asset-based financial products, primarily equipment leasing. 703/527-8655

Copyright B U S Publishing Group, Inc Mar 2001
Provided by ProQuest Information and Learning Company All rights Reserved

# EXHIBIT 34





# About ELFA Home

Equipment Leasing and Finance Association
1825 K Street NW, Suite 900, Washington, DC 20006
PH: 202.238.3400    FX: 202.238.3401
Email: Email ELFA    Office: Directions

- 2006 Annual Report
- Download a PDF version of this About ELFA page
- Equipment Leasing And Finance Association
- ELFA Members
- Economic Contribution Of Equipment Finance
- ELFA Research
- ELFA Advocacy
- ELFA Legal
- ELFA International

**ELFA Members: Also see Your ELFA**

## Equipment Leasing And Finance Association

The Equipment Leasing and Finance Association (ELFA) is the trade association representing financial
services companies and manufacturers engaged in financing the utilization and investment in capital goods.
ELFA members are the driving force behind the growth in the commercial equipment finance market and
contribute to capital formation in the U.S. and abroad.

ELFA has more than 750 members including:

- Independent leasing and finance companies
- Broker and packagers
- Captive finance companies
- Investment banks
- Commercial banks
- Service providers
- Diversified financial services companies

ELFA members are engaged in a dynamic and growing sector of finance that is crucial to the general
economy of the U.S. and global markets. Overall, ELFA members are responsible for financing a substantial
portion of the nation's capital expenditure budget through a multitude of financial products and strategies.
Members are engaged in originations and primary and secondary market financing activities

ELFA is the principal source for industry best practices and professional, business and ethical standards.
ELFA serves three basic missions on behalf of our membership:

- a forum for industry development
- a platform to advocate for the industry and
- the principal resource for industry information and ethical standards

## ELFA Members

Top

- Companies Listed in PDF file
- Lite Member Directory (for Non-members)
- Full Member Directory (for ELFA Members)

# Economic Contribution Of Equipment Finance

Equipment finance facilitates the growth and expansion of the U.S. and global economies by providing multiple financing products for companies to acquire and employ plant, equipment and software, thereby enhancing business investment and capital formation. ELFA members include most of the nation's largest financial services companies and manufacturers as well as regional and community banks and independent medium and small finance companies throughout the country. ELFA membership also includes a number of global financial and manufacturing companies operating in the U.S.

Our members' clients range from Fortune 100 companies to small and medium sized enterprises to governments and non- profits. An important contribution of the industry lies in providing access to capital because equipment acquisition and utilization impacts goods-producing and service-providing industriesÑvirtually all sectors of the economy. Quite simply, ELFA members finance the supply chain.

ELFA members finance most types of capital equipment and software including:

- Commercial and corporate aircraft
- IT equipment and software
- Rail cars and rolling stock
- Vessels and containers
- Trucks and transportation equipment
- Construction and off-road equipment
- Business, retail and office equipment
- Medical technology and equipment
- Manufacturing and mining machinery and equipment

ELFA members operate in four basic markets:

- Micro Ticket Market, consisting of transactions under $25,000
- Small Ticket Market, consisting of transactions of $25,000 to $250,000
- Middle Market, consisting of transactions of $250,000 to $5 million, and
- Large Ticket Market, consisting of transactions of greater than $5 million

Companies involved in the origination and financing of commercial equipment include:

- Independents, which are not affiliated with any one manufacturer or bank and who purchase equipment from various manufacturers and may go to the capital markets for funding
- Captives, which are companies set up by a manufacturer or equipment dealer to finance the sale or lease of its own products to end-users
- Banks, which finance the sale or lease of equipment

# ELFA Research

Top

ELFA is the premier source for statistics, benchmarking and analyses covering the equipment finance sector. Vital analyses and statistics covering the equipment finance sector such as the annual Survey of Industry Activity, compensation surveys, the Monthly Leasing and Finance Index 25 (MLFI-25) and others help members assess their business and benchmark among the industry

# ELFA Advocacy

Top

ELFA is proactive in representing member interests. ELFA is the industry's principal advocate before federal and state policymakers, regulators and standard setting bodies, as follows:

- Federal advocacy efforts involve providing certainty and transparency by preserving the tax, financial and business principles which affect equipment finance.
- ELFA works with and monitors the activities of agencies including the Federal Deposit Insurance Corporation, Department of the Treasury, Comptroller of the Currency, Securities and Exchange Commission and other financial regulators on matters affecting lease and finance transactions, with the Department of Commerce on its international programs, and with the Department Transportation, which regulates the rail, aircraft and maritime sectors.
- ELFA works closely with business, trade groups and other stakeholders representing key segments of the leasing and finance industry.
- ELFA monitors the activities of regulators and standard setters and maintains proactive and effective communic- tions with the Financial Accounting Standards Board, the International Accounting Standards Board and other organizations.
- ELFA monitors and analyzes proposed legislation and regulation and becomes directly involved with state legislatures and executive departments on actions affecting the leasing and finance industry. Key issues include taxes, fees, electronics recycling, ethics and environmental policy.

# ELFA Legal

Top

Advocacy aimed at preserving the legal principles on which the industry thrives is a key element of ELFA's legal program. ELFA engages in a broad range of substantive activities to support and promote core value areas through our General Counsel and committee structure, such as:

- federal bankruptcy reform legislation,
- the proposed Interagency Statement on Complex Structured Financial Transactions issued by the SEC and federal banking agencies, and
- state legislative proposals in Utah and Wisconsin concerning end-of-lease term provisions.

# ELFA International

Top

Equipment finance in foreign nations is an important growth area for many ELFA members. Thus ELFA is a player in efforts to develop a model leasing law for enactment by other nations, particularly those with developing economies which would benefit from the capital formation provided by lease financing.

Top

© 1996–2007, Equipment Leasing and Finance Association. All rights reserved
Equipment Leasing and Finance Association, 1825 K Street NW, Suite 900, Washington, DC 20006
Phone: 202.238.3400 | Fax: 202.238.3401



# Advocacy Home

ELFA is proactive in representing member interests. ELFA is the industry's principal advocate before federal and state policymakers, regulators and standard setting bodies, as follows:

- Federal advocacy efforts are designed to achieve and maintain a positive legislative and regulatory regime that provides certainty and transparency for equipment finance transactions. This is accomplished by preserving the tax, financial and business principles which affect the equipment finance sector.
- ELFA works with and monitors the activities of agencies including the Department of the Treasury, Federal Deposit Insurance Corporation, Comptroller of the Currency, Securities and Exchange Commission and other financial regulators on matters affecting lease and finance transactions, with the Department of Commerce on its international programs, and with the Department Transportation, which regulates the rail, aircraft and maritime sectors.
- ELFA has a pro-active State Government Relations program that monitors, analyzes and directly engages legislation affecting the leasing and finance industry together with corresponding regulations. Serving as an advocate before multi-state organizations representing state legislators and government agencies is a fundamental component of our efforts.
- ELFA promotes collaboration with stakeholders at the state and federal levels by reaching out to allied businesses and trade groups
- ELFA monitors the activities of regulators and standard setters and maintains proactive and effective communications with the Financial Accounting Standards Board, the International Accounting Standards Board and other organizations.
- ELFA membership supports the advocacy efforts through participation in the grassroots network program and the ELFA Political Action Committee, LeasePAC

© 1996–2007, Equipment Leasing and Finance Association. All rights reserved.
Equipment Leasing and Finance Association, 1825 K Street NW, Suite 900, Washington, DC 20006
Phone: 202.238.3400 | Fax: 202.238.3401



## EQUIPMENT LEASING AND FINANCE ASSOCIATION

The Equipment Leasing and Finance Association (ELFA) is the trade association representing financial services companies and manufacturers engaged in financing the utilization and investment in capital goods ELFA members are the driving force behind the growth in the commercial equipment finance market and contribute to capital formation in the U S and abroad

ELFA has more than 750 members including:
- Independent leasing and finance companies
- Captive finance companies
- Commercial banks
- Diversified financial services companies
- Broker and packagers
- Investment banks
- Service providers

ELFA members are engaged in a dynamic and growing sector of finance that is crucial to the general economy of the U S and global markets Overall. ELFA members are responsible for financing a substantial portion of the nation's capital expenditure budget through a multitude of financial products and strategies Members are engaged in originations and primary and secondary market financing activities

ELFA is the principal source for industry best practices and professional. business and ethical standards ELFA serves three basic missions on behalf of our membership:
- a forum for industry development
- a platform to advocate for the industry and
- the principal resource for industry information and ethical standards

## ECONOMIC CONTRIBUTION OF EQUIPMENT FINANCE

Equipment finance facilitates the growth and expansion of the U S and global economies by providing multiple financing products for companies to acquire and employ plant. equipment and software. thereby enhancing business investment and capital formation ELFA members include most of the nation's largest financial services companies and manufacturers as well as regional and community banks and independent medium and small finance companies throughout the country ELFA membership also includes a number of global financial and manufacturing companies operating in the U S

Our members' clients range from Fortune 100 companies to small and medium sized enterprises to governments and non-profits An important contribution of the industry lies in providing access to capital because equipment acquisition and utilization impacts goods-producing and service-providing industries—virtually all sectors of the economy. Quite simply, ELFA members finance the supply chain

ELFA members finance most types of capital equipment and software including:
- Commercial and corporate aircraft
- Rail cars and rolling stock
- Trucks and transportation equipment
- Business. retail and office equipment
- Manufacturing and mining machinery and equipment
- IT equipment and software
- Vessels and containers
- Construction and off-road equipment
- Medical technology and equipment



ELFA members operate in four basic markets:
- Micro Ticket Market. consisting of transactions under $25,000
- Small Ticket Market, consisting of transactions of $25,000 to $250,000
- Middle Market, consisting of transactions of $250,000 to $5 million. and
- Large Ticket Market. consisting of transactions of greater than $5 million

Companies involved in the origination and financing of commercial equipment include:
- Independents. which are not affiliated with any one manufacturer or bank and who purchase equipment from various manufacturers and may go to the capital markets for funding
- Captives. which are companies set up by a manufacturer or equipment dealer to finance the sale or lease of its own products to end-users
- Banks. which finance the sale or lease of equipment

## ELFA RESEARCH
ELFA is the premier source for statistics. benchmarking and analyses covering the equipment finance sector  Vital analyses and statistics covering the equipment finance sector such as the annual *Survey of Industry Activity,* compensation surveys. the Monthly Leasing and Finance Index 25 (MLFI-25) and others help members assess their business and benchmark among the industry.

## ELFA ADVOCACY
ELFA is proactive in representing member interests  ELFA is the industry's principal advocate before federal and state policymakers. regulators and standard setting bodies  as follows:
- Federal advocacy efforts involve providing certainty and transparency by preserving the tax. financial and business principles which affect equipment finance
- ELFA works with and monitors the activities of agencies including the Federal Deposit Insurance Corporation. Department of the Treasury, Comptroller of the Currency, Securities and Exchange Commission and other financial regulators on matters affecting lease and finance transactions, with the Department of Commerce on its international programs. and with the Department Transportation, which regulates the rail. aircraft and maritime sectors
- ELFA works closely with business, trade groups and other stakeholders representing key segments of the leasing and finance industry.
- ELFA monitors the activities of regulators and standard setters and maintains proactive and effective communications with the Financial Accounting Standards Board. the International Accounting Standards Board and other organizations
- ELFA monitors and analyzes proposed legislation and regulation and becomes directly involved with state legislatures and executive departments on actions affecting the leasing and finance industry  Key issues include taxes. fees. electronics recycling, ethics and environmental policy.

## ELFA LEGAL
Advocacy aimed at preserving the legal principles on which the industry thrives is a key element of ELFA's legal program ELFA engages in a broad range of substantive activities to support and promote core value areas through our General Counsel and committee structure. such as:
- federal bankruptcy reform legislation.
- the proposed Interagency Statement on Complex Structured Financial Transactions issued by the SEC and federal banking agencies. and
- state legislative proposals in Utah and Wisconsin concerning end-of-lease term provisions

## ELFA INTERNATIONAL
Equipment finance in foreign nations is an important growth area for many ELFA members  Thus ELFA is a player in efforts to develop a model leasing law for enactment by other nations. particularly those with developing economies which would benefit from the capital formation provided by lease financing



# EXHIBIT 35





ELFA CFBP — 1997-2001

ELFA - 000048



# Code of Fair Business Practices

### Purpose

The Equipment Leasing Association (ELA) *Code of Fair Business Practices* signifies voluntary assumption by members of the obligation of self-discipline and notifies the public and business community that members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Association enforces the *Code of Fair Business Practices* by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any member lessor found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate lessors to maintain the highest possible ethical conduct.

### Preamble

Whereas the leasing industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by

ELFA - 000049

leasing them; and

Whereas, many of those engaged in the leasing industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among lessors, lessees, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry

Now, therefore, the ELA hereby adopts on October 13, 1992, the following *Code of Fair Business Practices* for commercial transactions, subject to applicable Federal and State laws:

## Section 1

### General Standards of Professional Conduct

1. A Lessor should conduct himself with integrity and dignity and encourage such conduct by others in the industry.

2. A Lessor should encourage practices and should conduct his activities in a manner which reflects credit on himself and the industry.

3. A Lessor should act with competence and strive to maintain and improve his competence and that of others in the industry.

4. A lessor should use proper care and

ELFA - 000050

exercise independent professional judgment.

## Section 2

**The Lessor or Intermediary and His Relationship to the Lessee**

In dealing with a Lessee, a Lessor or an Intermediary should:

1. Disclose all relevant information as to the terms and conditions of the lease which may affect the Lessee's decision;

2. Hold in strict confidence all financial information supplied by the Lessee on a confidential basis;

3. In the event the Lessee is advised by the Lessor or Intermediary about taxes, accounting or legal aspects of the lease, recommend independent verification from the Lessee's tax, accounting or legal counsel, and;

4. Treat in a fiduciary capacity all funds received from the Lessee which may be returned to the Lessee.

## Section 3

**The Lessor and His Relationship with the Vendor**

In dealing with Vendors a Lessor should:

1. Not make payments to salesmen of the Vendor without the knowledge of the Vendor;

ELFA - 000051

2  Comply with all valid terms and
conditions of the Vendor contract which
are not in dispute, and:

3  Inform the Vendor immediately if the
Lessee refuses to accept the leased
equipment or otherwise fails to comply
with the terms of the Lessor's purchase
order to the Vendor.

## Section 4

### The Intermediary and His Relationship to the Lessor as a Funding Source

A. In dealing with an Intermediary, a Lessor
should:

1  Hold a strict confidence all information
pertaining to a lease supplied by such
intermediary on a confidential basis,
and:

2  Not make payments to a salesman of an
Intermediary without the knowledge of
the Intermediary.

B. In dealing with a Lessor, an Intermediary
should:

1. Reveal all relevant aspects of a lease
proposal to a Lessor which may affect
the Lessor's decision;

2. Correctly represent his relationship to
and agreements with Lessees:

3. Not make representations to a Lessee on
behalf of a Lessor without the Lessor's
express approval, and;

ELFA - 000052




ELFA CFBP — 2002-2003

ELFA - 000059

Code of Fair Business Practices

- Purpose
- Preamble
- Section I: General Standards of Professional Conduct
- Section II: Exchange of Credit Information
- Section III: Enforcement Provisions

Purpose
The Equipment Leasing Association (ELA) Code of Fair Business Practices signifies voluntary assumption by Members of the obligation of self-discipline and notifies the public and business community that Members intend to maintain a high level of ethics and professional service. In essence it proclaims that, in return for the faith that the public and business community places in them, the Members accept the obligation to conduct their activities in a way that will be beneficial to the public and business community.

The Code of Fair Business Practices applies to the conduct of ELA Members in connection with equipment lease or finance transactions and/or services. The Association enforces the Code of Fair Business Practices by receiving and investigating complaints of violations of the Code and by taking appropriate disciplinary action against any Member found to have violated its Code. In the final analysis, however, it is the desire for the respect and confidence of the industry and of the public and business community that should motivate Members to maintain the highest possible ethical conduct.

Back to Top

Preamble
Whereas, the equipment leasing and finance industry has evolved because of the increasing need by general commerce for competent, objective, and trustworthy advice with regard to the acquisition of capital goods, and the need to acquire the use of such capital goods by leasing or other financial arrangements; and

Whereas, many of those engaged in the industry have joined together in an organization known as the Equipment Leasing Association of America; and

Whereas, despite a wide diversity of interest and activities among ELA Members, Clients, their financial intermediaries, agents, and representatives, there are nevertheless certain fundamental standards of conduct which should serve as guiding principles for all engaged in the industry.

Now, therefore, the ELA hereby adopts on October 13, 1992, and revises on October 27, 2001 the following Code of Fair Business Practices for commercial equipment lease and finance transactions and/or services, subject to applicable Federal and State laws:

ELFA - 000060

Back to Top

Section I

General Standards of Professional Conduct

1. A Member shall conduct itself with honesty, integrity, forthrightness and dignity and shall encourage such conduct by others in the industry.

2. A Member shall encourage practices and shall conduct activities in a manner which reflects credit on the Member and the industry.

3. A Member will not take any actions, or induce a Client or any other party to take any action that results in the Client breaching the provisions of a contract or agreement.

4. A Member shall act with competence and strive to maintain and improve its competence and that of others in the industry.

5. A Member shall use proper care and exercise independent professional judgment.

6. A Member which has an actual or potential conflict of interest with respect to an activity shall disclose the nature of the conflict in writing to the concerned parties.

7. A Member shall disclose all relevant information as to the terms and conditions of a transaction or service which may affect the Client's decision.

8. A Member shall not knowingly misrepresent facts to another Member or Client concerning any aspect of a transaction, service or Client.

9. A Member shall hold in strict confidence all financial and other information supplied by the Client or another Member on a confidential basis.

10. A Member shall recommend independent verification from the Client's tax, accounting or legal counsel in the event the Client is advised by the Member, who is not the Client's counsel, about taxes, accounting or legal aspects of a transaction.

11. A Member shall treat in a fiduciary capacity all funds received from the Client which may be returned to the Client.

12. A Member shall not make payments to a representative of another party without the consent of that party.

13. A Member shall not make representations to a Client on behalf of another party without the other party's express approval.

14. A Member shall not knowingly mislead a Client as to its source of funds or ultimate successful conclusion of a transaction.

15. A Member shall encourage and assure that its employees and representatives comply with this Code of Fair Business Practice.

ELFA - 000061

# EXHIBIT 36



## Tax Department Memorandum

Subject:    Waltham Personal Property Tax Return

To:    Tax Files (workpapers)

From:    Ernesto J. Galvan

Date:    2:39:04 PM

The following memo is to document the procedures, assumptions and rationales taken in completing the Waltham Personal Property Tax Return.

It is Lycos' policy to not buy any equipment that can be leased. This includes but is not limited to, computers (laptops or desktops, fax machines, copiers, servers, printers, etc.). As a result, even though Lycos has operations and offices in various states, it's inventory of equipment owned by it is very limited.

In speaking with various members of the Lycos team (Sam Ziba, and Julie Callagee) and reviewing the various lease agreements (Banc of America, Avnet, Compaq, CSI) it was determined that none of the lease companies lose the right of ownership of these assets. Inasmuch, the lease equipment companies also retain full right to depreciate these assets and receive the tax benefits of such depreciation.

In addition, the lease agreements are very explicit in that they retain responsibility for filing and paying personal property tax for this equipment. Julie Callagee verified for me that among them, CSI sends Lycos a separate property tax bill, for personal property taxes CSI paid on behalf of Lycos.

I also verified with Julie that all leased equipment is NOT included in Lycos' fixed assets detailed roll forwards or reflected in the balance sheet. Thus, Lycos only reflects a rental expense in the P&L for the leasing of this equipment.

In conclusion, since all leased equipment has already been reflected in the personal property tax returns of the various leasing companies, Lycos will not reflect the market value of said equipment in its own Waltham Personal Property Tax Return, and reflect only that equipment and furniture actually owned by Lycos, and reflected in the balance

[ FILENAME p ]

PLAINTIFF'S
EXHIBIT NO 627
2/20/07  PYH

sheet as of 12/31/2000.  Lycos will use its cost for the cost factor and it net book value as its market value factor.

[ FILENAME p ]

LYC 067105

# EXHIBIT 37

James M Johnson
*Capacity Management Review* Jul 1997; 25, 7; ABI/INFORM Global
pg 1

# Demand Technology's
# *Capacity Management Review*

### A MONTHLY REPORT ON ENTERPRISE-WIDE COMPUTER CAPACITY MANAGEMENT

**Volume 25, No. 7**                                                    **July 1997**

## High-tech leasing nightmares and how to avoid them

by James M. Johnson, Ph D , Northern Illinois University

If it were possible to become an expert in just one of the many aspects of leasing, the clear choice is in analyzing contract documents  The contract is the real deal, contrary by an overly aggressive what all attention turns to it is the cornerstone of what is boring as it may be, it is and understand the terms and contract before it is signed  Once the signature dries, it is too late Anything that can then be extracted with minimal emotional and financial duress from the lessor is generally due to sheer luck .

regardless of assurances to the leasing rep  The contract is the event of a dispute, and legally enforceable  As absolutely essential to read conditions of every lease

One common reaction to this contention is that "we have finance and legal people to handle that " Unfortunately, this is often not entirely

*PLEASE TURN TO PAGE 9*

## Network modeling made simple, but not simple-minded

by Dr  Michael A. Salsburg, Zitel Corporation

A sign of how mature a technology has become is its end-user simplicity.  Consider the complexity of Babbage's original calculating engines or even the amount of effort that used to be expended programming computers with punch cards  Our highly evolved computer technology now allows us to program on a simple workstation with an advanced Graphical User Interface (GUI)  In another domain, consider the complexity of elevators  There was a time when a full-time operator was necessary to ensure the safety of elevator passengers.  Today, we can mindlessly push a button

As a technology evolves, common, repetitive tasks are embedded in the system, requiring less input from the end-user and more intelligence in the product itself

In computer performance analysis, performance modeling reached its first level of maturity with the central server model  This model was

*PLEASE TURN TO PAGE 3*

### Inside.

**1    Network modeling made simple**

Dr. Michael Salsburg describes NetArchitect's simplified approach to network performance modeling using an actual example of its application.

**23  Institute Calendar**

**24  Digestions and Digressions**

Reproduced with permission of the copyright owner  Further reproduction prohibited without permission


EXHIBIT
Johnson 4
11 207



# High-tech leasing nightmares, continued.

true. Unless finance and legal are well-versed in the subtleties of high-technology leasing, they will generally miss the import of a number of provisions, no matter how skilled they are. (Note: I was asked to review a number of leasing contracts developed by inhouse counsel of major firms that began a significant leasing program. In every case, important contractual features had been omitted, drawn up incorrectly, or favored the lessor needlessly. I'm commenting on this point to indicate how difficult it is to properly draft a lease or analyze the lease contract of a lessor without relevant experience or training.)

A second reaction is that "if we don't catch everything, so what? It's just a lease, and we have every intention of returning the equipment at the end of the term, and the contract is just a collection of esoteric gobbledygook fussed over by the lawyers. We're just renting the equipment and we know what the lease payment is — that's all we need to know."

This article will attempt to persuade the reader of the importance of contract analysis by IS and IT personnel. It will discuss features of the worst lease I have seen in twenty years. The really bad news is that the lease is in use today. The really good news is that firms can change their policies and practices to avoid signing one of these onerous lease documents.

It will be convenient to give this lease a code name for future reference. For reasons that will become painfully apparent, it will be dubbed the *Do-Loop Lease*. The remainder of this article will outline some key provisions of the Do-Loop lease, explain their economic significance, and offer the reader some valuable courses of action in the summary section.

## Key features of the Do-Loop Lease.

It should be pointed out that there is little standardization of anything in the leasing industry, and thus identical terms often have multiple meanings. Due to this lack of standardization, a description of the Do-Loop Lease is necessarily generalized. Do-Loop Leases vary from lessor to lessor in terms of individual features, but they have one very important feature in common — their *end-of-lease* terms.

The end-of-lease significance of the Do-Loop Lease is best understood by first describing what happens in a "normal" lease. A lease is normally thought of as providing the lessee with the temporary possession and use of someone else's property for a contractually agreed upon period of time. At the end of the contract

About the author: Dr. James M. Johnson had been an educator, consultant, advisor and author to the leasing industry for the past 20 years. He is author of the Equipment Leasing Association's industry standard text, *Fundamentals of Finance for Equipment Lessors* (1990, 2nd ed.), author of more than 50 articles on business finance and leasing, acts as an expert witness in leasing disputes, is an advisor and educator to lessors and lessees alike, and has conducted over 100 workshops on leasing for private firms and associations. Johnson is a professor of Finance in the Graduate School of Business at Northern Illinois University, is principal of a Lease Consulting firm, Mark Financial Services, and is a Senior Consultant for ICN, Inc.



Reproduced with permission of the copyright owner. Further reproduction prohibited without permission

# High-tech leasing nightmares, continued._____

term, subject to standard notification provisions, the user can do one of three things:

(1)  return the leased property to the lessor

(2)  attempt to negotiate an extension of the lease, or

(3)  attempt to negotiate the purchase of the property.

See Figure 1. These end-of-lease (EOL) actions have one very important feature in common — what happens at EOL is entirely up to the lessee. At EOL, the lessee has no additional financial obligations beyond returning the property (with reasonable wear and tear) unless the lessee wants to extend or buy. Let's say that again: *in a standard lease at EOL, the lessee has no further financial obligation to the lessor except at the lessee's sole discretion*

With a Do-Loop Lease, however, the lessee's financial obligation is *not* concluded upon making all required lease payments during the agreed upon lease term. In fact, a number of unsuspecting (or uninitiated) lessees only begin to realize the full implications of the Do-Loop Lease when they attempt to return the leased property at the end of the lease term

When a Do-Loop lessee attempts to return the leased property at lease expiration, even when it does so within the prescribed notification period, it is informed that simply returning the leased property is not one of the choices. At this point in the deliberations, the lessee generally pulls out the lease contract and begins (perhaps unfortunately for the first time) to examine the EOL requirements of the lease (yes, *requirements*).

There it is. In black and white. The contract specifies that at the end of the lease term, the lessee *must* make one of three elections:

FIGURE 1. NORMAL END-OF-LEASE ACTIONS

(1)  purchase the property under lease at a mutually agreed upon price,



| Lessee | Equipment | Direction | Condition | Lessor |
|--------|-----------|-----------|-----------|--------|
| ☺ | 💻 | → | none | ☹ |
| Return the equipment |
| ☹ | 💻 | ← | ↑ (1) | ☺ |
| Extend the lease |
| ☹ | 💻 | ← | $ → | ☺ |
| Purchase the equipment |

(2)  extend the lease for one year at the same lease rate, or

(3)  enter into a new lease for property of equal or greater value to that currently under lease. See Figure 2.



---

© 1997 DEMAND TECHNOLOGY, INC  (800) 531-6143    *Capacity Management Review*

Reproduced with permission of the copyright owner  Further reproduction prohibited without permission



# High-tech leasing nightmares, continued.

*Ding number one.* The Do-Loop Lease also usually says that should the lessor and lessee not be able to come to terms after attempting to negotiate either Option 1 or Option 3, then Option 2 will kick in by default. The Do-Loop Lease wording is typically ambiguous about what happens at the end of a one-year renewal, but a fair reading of these contracts suggests that the lessee must choose among Options 1 through 3 ...again. This looks like a Fortran do-loop that reads: 1 GO TO 1; hence the appropriateness of our code name for it. Is there any way to ever get out of this lease? *Ding number two and ding number three.* See Figure 3 and Figure 4.

The lessee may decide to get in-house counsel's opinion as to the enforceability or legality of the EOL requirements in the Do-Loop Lease contract. Counsel is typically of the opinion that the provisions, alas, are enforceable by the lessor. *Ding number four.*

Is the Do-Loop Lease really legally enforceable? Yes. Have Do-Loop lessors successfully enforced these end-of-lease provisions in court? Yes. Can it get worse? Yes — the Do-Loop Lease also generally specifies which state law will prevail in litigation and, worse, that the loser pay attorney's fees. *Ding number five.*

Why are the three end-of-lease choices considered to be so onerous? This is what we explore next. A casual reading of the end-of-lease elections often does not cause concern among the uninitiated, especially when a leasing rep is describing the great flexibility built into the lease. "What else could you possibly want that we don't offer you in this lease? This lease lets you buy the equipment if you want, renew if you choose, or swap it out for new equipment. What else is there?"...Stay tuned.

## The financial burden of the Do-Loop-End-of-Lease provisions.

The main thing to keep in mind about this lease is that the lessee *must* select one of the end-of-lease choices — giving the leased property back is not an option! *Ding number six.*

Option 1. Purchasing the leased property. The process stops and the EOL requirement has been fulfilled if the lessee purchases the leased property for a mutually agreed



FIGURE 2  DO-LOOP END-OF-LEASE ACTIONS




eproduced with permission of the copyright owner  Further reproduction prohibited without permission

# High-tech leasing nightmares, continued.



**FIGURE 3. THE ENDLESS LOOP**

upon price. Why is this a big deal? Doesn't "mutually agreed upon price" sound reasonable? Yes, it does. And that is exactly the problem. "Mutually agreeable" conjures up an image of two reasonable professionals using their best efforts to arrive at a fair price. See Figure 5. Stop right there. The term *mutually agreeable* has no relationship to the concepts of fair market value, reasonableness, arms-length, or anything else. "Mutually agreeable" means simply this: what the two parties are willing to agree to. Period. It does not have to be reasonable. It does not have to have any relation to fair market value. It does not require — or even permit — an arbitrator to intervene if the two parties cannot agree. In fact, the standard Do-Loop Lease indicates that the position of the two parties is final — no role may be played by appraisers, intermediaries, equipment dealers or anyone else. If the lessor and lessee do not, *at their sole discretion*, agree upon a purchase price, then the price is not mutually agreed to, and the lessee must pursue Option 2 or Option 3. Quick question: does the lessor have any incentive to negotiate a fair price? In a word, no. Why? Because either Option 2 or Option 3 will kick in. *Ding numbers seven and eight.*

Option 2. One-year lease renewal. Is this a costly option? In a word, yes. If the lease is for high-technology equipment, then paying the base term rental rate for an additional year is a much



**FIGURE 4. WAYS OUT OF THE DO-LOOP LEASE.**

higher lease payment than could be negotiated in advance — when the lessee is bargaining from strength. See Figure 6. Not only is the renewal rate — which is the same as the initial term rate — higher than could be easily negotiated in advance, but the renewal term is very long. A survey of high tech leasing contracts by the author indicates one to three months is the norm. All in all, the cost of this option is a *minimum* of

Reproduced with permission of the copyright owner  Further reproduction prohibited without permission



Case 1:05-cv-10017-RWZ   Document 191-39   Filed 02/29/2008   Page 7 of 9

# High–tech leasing nightmares, continued._____ (

50 percent higher than one would expect to prenegotiate in a standard lease, and is likely to cost 90 percent more than most leases due to a combination of higher lease rate per period, and number of periods. I have little difficulty prenegotiating renewals rates 25 to 50 percent of the base term lease rate due to the substantial decline in equipment value over the lease term. *Ding number nine.*

Option 3. Negotiate a new lease for property of equal or greater value. This option permits the lessee to end the original lease if a new lease is entered into for new property. Although this may sound reasonable, the problem is that the new lease terms and conditions are not required to be the same as the original lease. See Figure 7. Thus, this option should be read as follows: "The lessee may enter into a new lease for property of equal or greater value than the original lease *at terms and conditions yet to be determined.*" Does this sound like the same problem as Option 1 with "mutually agreeable" language? Yes. Does this mean that Option 3 terms can be unreasonable or at rates higher than fair market value? Yes. *Ding number ten.*

## Summary and courses of action.

The key feature of the Do-Loop Lease is that the lessee does not fulfill its financial commitment merely because it makes timely payments throughout the lease term. This is where the financial obligations of most leases end, but is only the end of phase one of an n-phase Do-Loop Lease. Kids can call it the *never ending lease.*

Should the lessee try to negotiate a purchase of the property, the price is not

## Option #1
## Purchasing a Lease

**Mutually agreeable price**    **?**    **fair market value**
              **=**

## NOT!

FIGURE 5  PURCHASING THE LEASE

FIGURE 6. EXTENDING THE LEASE.

## Option #2
## Extending a Lease



**if negotiated up front**

**if not**





_July 1997_     © 1997 DEMAND TECHNOLOGY, INC  (941) 261–8945     _Page 15_ (

eproduced with permission of the copyright owner. Further reproduction prohibited without permission

# High-tech leasing nightmares, continued._____

required to be reasonable or have any relationship to fair market value (and usually does not) If a new lease for new property is negotiated, the terms and conditions are generally much less favorable than the first lease (even ignoring the very unreasonable EOL options) since the lessee has no bargaining power

Thus, the *bare minimum* one should expect to pay as a penalty in a Do-Loop Lease is an extra year's rent at the same rate paid during the lease term. Further, even if rent is paid for an additional year, it is not clear that the lessee can walk away even then — the lessee may be caught in a perpetual do-loop. *Remember, the one option the lessee does not have with this type of lease is to simply return the property at the end of the lease term*

## How to avoid Do-Loop Leases.

The best way to avoid the provisions of the do-loop lease is not to sign one in the first place. This requires that each lessor form lease be carefully read and understood or development of one's own lease

The existence of the Do-Loop lease, more than any other factor, is motivation to carefully read any lease agreement before signing it Although most leases are much less predatory than the Do-Loop lease, virtually all leases have provisions that a creditworthy lessee should weed out Unfortunately, finance and legal personnel cannot always be depended upon to catch such language if they are not well-versed in high-tech leasing transactions Many types of contracting have their own subtleties, and leasing is no exception Thus, the burden often falls upon the user of the equipment: The user must assess the business purposes behind the asset acquisition and determine which lease provisions require renegotiation.

What else can be done to avoid the ten dings summarized above? The lessee can, in concert with other personnel, attempt to prenegotiate general lease terms and conditions with several major lessors *before there is any deal on the table* Since there is no drop dead date when a deal must close, it is difficult for a lessor to get the upper hand using this method of ding avoidance



FIGURE 7. ENTERING INTO A NEW LEASE?

### Option #3
### Negotiating a new Lease

**"at terms...**
**to be determined"**  **?**
**=**  **fair market value**

**Not!**



---

Reproduced with permission of the copyright owner  Further reproduction prohibited without permission



# High-tech leasing nightmares, continued.

The best strategy, however, is for the lessee firm to develop its *own* form lease. Think of a lessor-drafted lease as a carefully constructed minefield of dings. Every time a lease proposal is solicited from multiple lessors, each lessor's minefield must be explored with a "sweeper" to avoid financial explosions or dings. By having its own lease form containing the terms and conditions of importance to the lessee, the situation is completely reversed, and dings become much more difficult for the lessor to plant.

Either of these strategies — prenegotiating lessor drafted contracts or using a lessee drafted contract — helps the lessee save enormous time, energy and cash, in deal after deal. The goal is ding and do-loop avoidance. Whatever time is invested in such a venture will pay dividends far into the future. It will also enable the lessee to avoid signing an unfamiliar (and ding-laden) contract under the duress of an imminent deadline.

# How to help minimize your exposure to Do-Loop leases

The existence of the Do-Loop Lease, more than any other factor, is motivation to carefully read any lease agreement before signing it. Although most leases are much less predatory than the Do-Loop lease, virtually all leases have provisions that a creditworthy lessee should weed out. Unfortunately, finance and legal personnel cannot always be depended upon to catch such language if they are not well-versed in high-tech leasing transactions. Many types of contracting have their own subtleties, and leasing is no exception. Thus, the burden often falls upon the user of the equipment. The user must assess the business purposes behind the asset acquisition and determine which lease provisions require renegotiation.

What else can be done to avoid the ten dings summarized in the article above? The lessee can, in concert with other personnel, attempt to pre-negotiate general lease terms and conditions with several major lessors *before there is any deal on the table*. Since there is no drop dead date when a deal must close, it is difficult for a lessor to get the upper hand using this method of ding avoidance.

The best strategy, however, is for the lessee firm to develop its *own* form lease. Think of a lessor-drafted lease as a carefully constructed minefield of dings. Every time a lease proposal is solicited from multiple lessors, each lessor's minefield must be explored with a "sweeper" to avoid financial explosions or dings. By having its own lease form containing the terms and conditions of importance to the lessee, the situation is completely reversed, and dings become much more difficult for the lessor to plant.

Either of these strategies — prenegotiating lessor drafted contracts or using a lessee drafted contract — helps the lessee save enormous time, energy and cash, in deal after deal. The goal is ding and do-loop avoidance. Whatever time is invested in such a venture will pay dividends far into the future. It will also enable the lessee to avoid signing an unfamiliar (and ding-laden) contract under the duress of an imminent deadline.



eproduced with permission of the copyright owner   Further reproduction prohibited without permission

# EXHIBIT 38

# The Lease Contract: Sales Tool Opportunities

By James M. Johnson, Ph D , and Barry S. Marks

A number of provislons have worked their way into lessor contracts that lessors may be willing to exchange for the marketing advantage it may provide their sales force

I n 1995, Dun & Bradstreet conducted a study for the Foundation for Leasing Education titled *Understanding the Equipment Leasing Marketplace* The study was undertaken in large part "to identify factors contributing to lessee satisfaction " The research addressed five key questions, including criteria that lessees consider when selecting a leasing company; what attributes contribute to and enhance lessee satisfaction; and how lessors can improve their relationship with lessees

Among D&B's key findings are that having "no hidden costs or surprises" and "having everything spelled out up front" are key factors that influence the lessee's choice of a leasing company. Heading the list of reasons for lessee dissatisfaction are "lack of communication" and "lessor inflexibility "

Interestingly, articles appearing in this journal and its sister publication, *Equipment Leasing Today*, since the appearance of the D&B study include one that describes in some detail a number of methods for getting the better of lessees during end-of-lease negotiations, while another discusses the importance of redrafting lessor contracts to take back all the rights granted to lessees in UCC Article 2A

## EXAMINING THE LEASE CONTRACT

In this article, we offer some constructive observations relevant to the findings of the D&B study, focusing on the lease contract itself. We believe there are a number of provisions that have worked their way into lessor contracts that lessors may be willing to exchange for the marketing advantage it may provide their sales force

By reengineering the leasing contract, interested lessors should be able to achieve the simultaneous benefits of increasing customer satisfaction (reducing contractual hidden costs or surprises) while using the more lessee-friendly provisions as selling points

This process should be beneficial to lessors in light of increased competition and improved lessee education. Recent years have seen the emergence of "lessee consultants" in middle-market transactions and increasing popularity of lessee-oriented leasing seminars, including those by traditional lessor educators

Many lessees have begun preparing their own lease forms to be attached to bid requests, and at least one lessee consultant is marketing a computer leasing form for this purpose. Clearly, lessees are getting smarter and even the most traditional lessor-oriented form language must be subjected to cost-benefit analysis from a marketing perspective.

We deliberated over whether we should group contractual issues by ease of lessor acceptance but decided against it: We would rather focus the presentation on issues to consider rather than engender an unnecessary debate over our ranking of issues. Further, since the lessor (for that matter, anyone else) dictates contractual language to lawyers at its own peril, we couch each issue raised as a question for internal discussion rather than as points mandated for change

The purpose of this article will be served by offering a representative sample of contractual issues. It is not our intention to assert the following six issues are either the most important or exhaustive of the contractual landscape. If the discussion encourages individual lessors to internally reevaluate their contractual documents with an eye toward improving lessee relationships, our intent will be accomplished

One final note: Practical considerations mandate that this article be written in a gen-

EXHIBIT

Johnson 8

11 2 07

eral fashion Many of the comments that follow should be considered in light of the type and cost of equipment, extent of residual exposure, length of term, and other factual circumstances applicable to the lease in question. As a general rule of thumb, our observations assume a middle-market or small-ticket, form-driven transaction rather than a heavily negotiated leveraged or other large-ticket lease

### 1. Interim Rent: Should your lessee be penalized by interim rent provisions?

If there is one thing lessee consultants successfully use to get a client's attention, it is an explanation of interim rent  The classic example given is a five-year full payout lease with quarterly rental payments  The consultant will posit delivery on the 15th day of the first month of the quarter and explain how the lessee is required to pay a per diem, amounting to an additional 75 days of amortization of the equipment cost, from acceptance to the first day of the second quarter

The consultant will show that calculating the per diem as 1/90th of the quarterly rental payment effectively extends the lease term for 75 days, entitling the lessor to be paid in full over the originally negotiated five years, plus an additional 75 days worth of rent

The hypothetical is one that lessees easily understand and generally is a selling point for the lessee advisor  Unfortunately, the situation blurs considerably where the lease is not a full payout lease (such as a computer lease in which the lessor faces a substantial residual risk) or where the lessor's cost of funds is not fully recovered by the "interest component" of the rental payment

In their form document language, lessors might well consider including shortening the term at the back end by a number of days equal to the interim period (thereby making the door-to-door lease term equal to what it would be absent the interim rent)  Alternatively, the lessor may wish to disclose at the time the lease is negotiated that the interim payment will be an interest-only component at an agreed upon rate

### 2. Contest Rights: Should your lessee have the right to contest the imposition of liens and taxes that are its responsibility under the lease? Who should control contests in indemnified situations?

Lessor contract language providing the lessee with contest rights is rare  Yet with states searching vigorously for additional tax

revenue, the number of instances in which equipment owners are subjected to overzealous tax authorities continues to increase  When the lessee advisor explains the complete lack of contest rights to the lessee client, lessees are anxious to "remedy" the situation

Language regarding the lessee's right to institute and control certain contests involves another argument in favor of liberalizing form lease language  Where the lessor fails to take the initiative and give "reasonable" contest provisions under its own documentation, it may be forced to negotiate unfavorable language out of a lessee response

As lessees become more sophisticated, they tend to demand the right to:

1) contest the imposition of liens against the equipment without being required to remove those liens by bonding or paying the underlying obligation;

2) contest the amount or assessment of ad valorem, rental, and other taxes, both by administrative appeal and litigation;

3) contest the loss of tax deductions and other indemnified income tax losses; and

4) control litigation covered by the general indemnity, using counsel of their choice

Reasonable contest provisions addressing these four concerns will often defuse a potentially explosive point of negotiation  Moreover, a "reasonable" position by the lessor in the form document can provide limitations on contest rights that protect the lessor  These same matters, if raised by the lessee in response to the absence of a suitable contest provision, may become difficult for the lessor

For example, many lessors are willing to allow the lessee to contest the imposition of state and local taxes by appropriate proceedings, including both administrative efforts and trial-level litigation  All such actions are required to be at the lessee's sole risk and expense, and the lessee not only should be required to keep the lessor fully informed but to allow the lessor to participate in the process if it chooses to do so

On the other hand, if the drafting is left to the lessee, the lessor may be faced with language permitting unlimited appeals without any additional showing of the merit of the lessee's argument (such as a favorable legal opinion). This can result in lengthy delay and can involve the lessor in facing potential additional exposure from irate state taxing authorities  Many lessees want to contest state and local taxes in the lessor's name, asking for a virtual power of attorney  Further, lessor-drafted provisions may limit contest rights to significant tax claims, so that the lessor is not involved in contests of minimal amount



If there is one thing
lessee consultants
successfully use to
get a client's
attention, it is an
explanation of
interim rent

Reasonable contest
provisions will often
defuse a potentially
explosive point of
negotiation

Contests regarding

the imposition of

liens or general

liability, if permitted

under the lessor's

documents, will

usually be limited to

those that do not

place the lessor in

any risk of criminal

liability or any

material risk of the

loss of its

ownership interest

in the equipment.

Similarly, contests regarding the imposition of liens or general liability, if permitted under the lessor's documents, will usually be limited to those that do not place the lessor in any risk of criminal liability or any material risk of the loss of its ownership interest in the equipment When these provisions are drafted by the lessee's counsel, the language is often much broader, placing the lessor in the position of arguing for provisions that should simply be agreed to from the beginning

### 3. Sublease: Should your lessee have the right to sublease equipment without your prior consent?

It used to be gospel that the lessee could not sublease without the lessor's consent "not to be unreasonably withheld." The writers' recent experience, however, indicates that an increasing number of lessees are asking why, if they continue to remain legally obligated under the primary lease, they should not be permitted to sublease the equipment to a sublessee of their choosing The arguments advanced to lessees by their advisors are compelling and center around subleasing being an efficient method of creating a synthetic termination of the lease in a way that can significantly reduce the cost of leasing equipment that has become surplus to the lessee's needs

There are many instances where granting the lessee this right is unacceptable, particularly where the equipment requires highly specialized maintenance, use, or storage, or where misuse of the equipment could subject the lessor to liability For example, broad sublease rights for aircraft would certainly seem to be an unreasonable lessee request, at least where the aircraft is initially operated by a major airline

On the other hand, where equipment is not potentially hazardous and is already maintained by a professional maintenance organization or easily maintained by the lessee itself, liberal sublease rights would seem a reasonable lessee request Lessors would be well advised, of course, to provide these rights subject to certain restrictions, all of which should be certified by the lessee at the time the sublease is initiated

For example, the lessor would probably want to ensure that the equipment does not leave the country (in most instances); that the lessee is capable of maintaining -- or will continue the maintenance contract for — the equipment; that the sublease does not extend beyond the term of the initial lease; and that the sublessee is aware that it will be responsible for any additional state or local taxes The

lease form should require that subleases be subject and subordinate to the primary lease and the lessee's (sublessor's) rights should be assigned to the primary lessor

### 4. Movement: Should your lessee be allowed to remove the equipment to another location without your consent?

Having the right to move particular types of equipment, like the right to sublease, is another right lessees are being advised to secure Again, it can be a highly useful tool to reduce the cost of leasing equipment no longer required As businesses continue to reengineer, reinvent, downsize, outsource, and generally reshape themselves, having the right to move equipment to another location is viewed as a considerable financial advantage

It is sometimes difficult for the lessor to explain why the lessor's consent should be necessary for movement of the equipment to another location. Of course, the lessor should always be notified in advance if the equipment is to be moved so that it can prepare additional UCC filings, calculate ad valorem and rental taxes, and check local laws for any other requirements In addition, even the most tenacious lessees understand that the lessor has the right to know where its equipment is located at all times

Where the notice concept evolved into a consent requirement across the board for all types of equipment, however, we have been unable to determine This example of lessor inflexibility is often negotiated out of form documents in the early stages of negotiation but nevertheless is an unnecessary irritant

### 5. Automatic Renewal: Should your lessee be required to give advance written notice if it desires to return equipment at the end of the term, or face automatic extension of the lease for a lengthy period?

Each of the writers has been involved in disputes and even litigation over the past two years where lessors have attempted to enforce "automatic renewal" clauses in leases These clauses go beyond the mere (and entirely reasonable) provisions stating that if the lessee fails or refuses to return the equipment as required at the end of the lease term, the term will be extended on a month-to-month basis Such provisions are often necessary to protect the lessor from the lessee's claim that it has a de facto right to extend the lease at its then fair rental value — a position that a few judges have accepted under a rather confused interpretation of the rules of equity

Automatic renewal clauses are those requiring the lessee to give advance written notice as much as 270 days before the end of its term if it desires to return the equipment Failing to provide the required notification can result in the lease being automatically renewed for a minimum term, from one month to the more typical one year, and in some instances for as long as the entire initial lease term

From the writers' experience, few (if any) lessees truly understand the operation of this provision While it may be justified in certain circumstances, such as variations on the First Amendment lease, with certain synthetic lease structures and other situations where the initial lease does not involve full payout, we find the automatic renewal clause difficult to support where the initial lease is a full payout arrangement and the extended period, at the initial rental rate, constitutes a windfall for the lessor

To date, we understand that no court has accepted this as an example of an unconscionable provision under UCC Article 2A-108 We expect, however, such an argument to be acceptable in the near future, particularly where lease language makes it difficult for a layman or inexperienced counsel to understand the intent of the parties at first reading

Lessors doing business in New York should also be aware of Section 5-901 in the New York Statute That statute prohibits automatic renewal clauses which, if the lease is governed by New York law or the lessee can make the argument should be governed by New York law, may impair enforceability of these provisions In short, the statute requires the lessor to provide notice to the lessee that the lease is approaching a deadline for providing nonrenewal notification to the lessor

### 6. Return Provisions: Should your lessee be required to return equipment to any location desinated by you?

In contrast to the automatic renewal argument, this item is a pure economic point without a clear right or wrong The writers recently attended a lessee seminar in which lessee consultants argued that the lessee should never pay return costs The argument runs like this: "The lessee pays the freight and installation charge when the equipment is delivered through the lessor's calculation of rent The lessor will factor the same cost in any lease to a subsequent lessee or in the sales price to a purchaser Accordingly, the lessee should not be required to pay any cost of redelivery, but should simply ready the equipment for the lessor's pick-up at the lessee's location "

We neither accept nor reject these arguments but point out to lessees (and lessors) that failure to cover these costs in the documents can impair the lessor's anticipated residual position in leased equipment.

Nevertheless, lessors should be aware that lessees increasingly are being counseled to refuse to pay redelivery costs This position merits development of a fallback position by the lessor, such as requiring return to a limited area—to a major service or remarketing location For example, language requiring the lessee to bear the cost and risk of shipment where the lessor selects the means and carrier can be difficult to support in negotiations with an aggressive and sophisticated lessee

### SUMMARY AND CONCLUSION

As pointed out initially, our purpose is not to preach fairness for lessees so much as to suggest possible responses to the 1995 Dun & Bradstreet survey and escalating lessee demands In form-driven transactions, such as small-ticket and middle-market leases, the form itself may be a selling tool A lessor's failure to take the high ground initially in the drafting may result in its being faced with a lessee-generated form—or at least language generated by lessee counsel. In many cases, these lessee proposals will be unreasonable and can lead to protracted negotiations and an unnecessary waste of time and good will.

Lessors so disposed may find opportunities to reinvent their documentation to enhance their position in the marketplace and attempt to preempt the current trend of lessee-drafted lease contract language

It is the writers' position that the time has come for lessors to recognize that a large percentage of their customers will no longer simply sign the form without a thorough reading of it. These customers will expect the lessor to demonstrate that the lease form addresses the kinds of issues discussed above, creating a competitive advantage for creative lessors Thus in today's market, the best form may not be the one that is the most favorable to the lessor in the first instance.

*James M Johnson, Ph D, is a professor at Northern Illinois University, DeKalb, and principal of Mark Financial Services Barry S Marks is an attorney specializing in leasing for Berkowitz, Lefkovits, Isom & Kushner, Birmingham, Ala Both serve on the Journal's Editorial Review Board*

In contrast to the automatic renewal argument, return provisions constitute a pure economic point without a clear right or wrong

# EXHIBIT 39

# Technology Leasing
## Power Tools for Lessees



**EXHIBIT**

Johnson 5

/1·2·07

James M. Johnson, Ph.D.
Barry S. Marks, Esq.

Leasing Power Tools Press
www.leasingpress.com

# Chapter 10

## The Rogue's Gallery of Gotcha's

Before leaving our overview of leasing documentation issues, we want to list some of the most common, and sometimes most onerous, provisions in "standard" equipment leases. The key point here is that these terms and conditions are truly typical. Standard lease contracts are devised by lessor's counsel to protect the lessor's interests. It should be no surprise, then, that form agreements placed in front of a lessee appear somewhat one-sided—they are!

### Automatic Renewal

This might be termed the book-of-the-month club provision, meaning that lessee inaction causes it to owe more money. An automatic renewal is a provision under which, at the end of the lease term, the lease continues and the term is renewed for a specified period of time. In order to avoid automatic renewal, the lessee is required to give the lessor advanced written notice at some time well in advance of the end of the term. Obviously, an automatic renewal provision reduces or eliminates the lessor's residual value risk when the lessee fails to provide timely notice.

Where the lessor has structured the leases so that it will cover virtually all of its investment through the rental payments—a practice increasingly common in technology leasing—payments during an automatic renewal period are sheer gravy to the lessor. In fairness, if the lessee fails to give notice and continues to use the equipment, the lessor is entitled to be compensated. The equipment does belong to the lessor, after all, and if the lessor does not know whether the lessee will

return it or when, arrangements cannot be made to re-lease or sell the equipment. We strongly suggest, however, that the lessor be required to give the lessee notice of the end of the term or at least notice of the commencement of the month-to-month renewals. Otherwise, the lessee may find itself paying invoices (or having its account debited) for an indefinite period of time, long after the lessor has been paid out for its investment in the equipment.

### Interim Rent

As described above, the other side of the coin to automatic renewals is interim rent, in which the lessee pays a per diem rental from the time the equipment is initially accepted to the first day of the following month or quarter. This effectively extends the term of the lease, and the lessee is paying additional rent. It also becomes difficult to make a meaningful comparison between two lessor bids if one bids with interim rent and one does not. See the chapter on lease versus lease analysis for detailed examples of this point.

### Deemed Acceptance

The term "deemed" means to assume something has occurred whether it has or not. Provisions that force a lease to automatically commence are dangerous. Common language we see might be phrased: "lessee is deemed to accept the equipment upon delivery." Such a "deemed" provision may allow a lease to commence whether the lessee has seen the equipment, inspected it, or tested it. Since most leases cannot be cancelled for any reason whatsoever (unless the lessee negotiates for the inclusion of that option), it should be considered essential to have the right to test the equipment before being financially obligated under the lease. Deemed acceptance language should be avoided whenever possible.

## In Default

Limiting the lessee's right or options to circumstances where it is not "in default," as opposed to situations where an "event of default" has occurred and all grace periods expired, is a common means of eliminating the lessee's rights and preventing its exercise of its negotiated options. The moment a lease payment is a day late, or a required label falls off a leased piece of equipment requiring labeling, the lessee is "in default."

## Vendor Issues

Particularly unfair where the lessor is a vendor-affiliate, are situations in which the lessee is required to continue to make payments for non-performing equipment or to indemnify the lessor against patent, copyright or trademark issues without recourse to the lessor. These issues can be avoided by carefully reviewing the supply contract at the same time as the lease.

## Contest Rights

Most form leases do not permit the lessee to contest or challenge the imposition of taxes, the loss of income tax benefits, the imposition of liens or to control the general indemnity litigation. Lessors have no economic incentive to limit, lower, or challenge tax payments, since they are entitled to full reimbursement from the lessee. For that reason alone, even if you are dealing with a terrific and conscientious lessor, the lessee needs the ability to have a measure of control over these tax matters.

## Perfect Returns

This provision means the lessee is required, at lease end, to produce all leased units. Many such leases will go on to say that the lease will remain in full force and effect until all but not less than all leased units are returned. Especially with respect to personal computers and laptops, the lessee should insure that it can return less than all units, and has the right to purchase or replace those units that are not in the required condition or cannot be located.

## Casualty Value Calculations

Casualty values are seldom subjected to close scrutiny by lessees, and oftentimes contracts are signed by lessees without seeing a casualty schedule. Aside from the unknown exposure this can subject the lessee to, how can a lessee know what the insurable risk is if it does not know the insured value?

Casualty values may contain many sources of revenue enhancement. The use of inappropriately low discount factors, the inclusion of hidden charges or the use of an inflated residual value are common means of granting the lessor a windfall following a casualty event.

Most casualty schedules we see (before they are negotiated down), show an end-of-lease casualty value, for a 36-month lease, equal to 35 to 55 percent of original equipment cost. For most types of technology equipment, this amounts to almost pure upside. If a lessor priced a technology lease with a five percent residual value, it is inconceivable that a casualty value of 50 percent can be justified.

# EXHIBIT 40

# Look before you lease

## Pitfalls and opportunities in leasing business equipment

### By BARRY S. MARKS and JAMES M. JOHNSON

**D**id you know that eight out of 10 American companies lease some or all of their business equipment? Put another way, nearly one-third of all business investment in equipment is financed with some form of equipment lease. Despite changes in tax laws and economic conditions, equipment leasing remains one of the most popular means of financing business-equipment acquisitions in this country.

Like many types of financing, equipment leasing is form-driven. Counsel unfamiliar with key legal, tax and business considerations important to this type of financing often fail to spot problem language in some of the forms.

This article will focus on some of the more common "gotcha's" in lessor-generated form documents. Although the article will deal chiefly with financing provided by third-party lessors (as opposed to equipment vendors), most of the considerations listed below are applicable to a wide variety of equipment leases, including

*Marks is a shareholder with Berkowitz, Lefkovits, Isom & Kushner in Birmingham, Ala. Johnson is a professor of finance in the Graduate School at Northern Illinois University in Dekalb, Ill.*

third-party and vendor leases, true leases and leases intended as secured transactions, short-term and "full pay-out" leases, leases of various types of equipment and leases of various sizes. Although advice will generally be given to lessee counsel, counsel for lessors should consider lessee priorities and options in tailoring forms to specific transactions.

Before looking at the terms of the typical lease, a few words about the role of lessee counsel are appropriate. Counsel, particularly in-house counsel representing lessees, need to be aware that equipment leasing is a specialty having a limited overlap with other types of financing. Form documents are prepared, and usually negotiated, by experienced lawyers who specialize in equipment-lease financing. It is rare that the negotiations are conducted on a level playing field.

Adding to the problem is the danger that the client will actually work against its own counsel. If the client has selected the leasing company prior to initiating negotiations on documentation, the leasing company has an immediate advantage and a strong disincentive where negotiating is concerned.

Finally, lessee counsel needs to assemble information about the cir-

cumstances of the negotiations before proceeding. The correct response to lessor demands often requires an understanding of the lessor's and lessee's respective priorities:

● *Know your lessor* — Leasing companies come in many varieties, including banks, brokers, equipment specialists, captives, independents and companies of all sizes. Each has a different level of flexibility as to various matters, such as the ability to provide future funding for upgrades or equipment additions, regulatory and practical limitations on the acceptable amount of end-of-term exposure (the "residual assumption"), and the ability to fund the transaction should a change occur in prevailing interest rates or other circumstances between execution and delivery.

● *Know your equipment* — Will the equipment require special maintenance and does the lessee want to provide this maintenance in-house? Is it likely that the equipment will require upgrades or modifications during the lease term? Is it likely that the equipment will become obsolete or otherwise undesirable during the lease term? Is it likely that the equipment will become essential to the lessee's business so that the lessee will want the right to purchase the equip-

*26*

Thomas Tomek



---

## Key limitations on equipment use

- Ability to move equipment to new location
- Ability to secure financing for equipment upgrades
- Right to modify or improve equipment
- Right to remove modifications free of lessor claims

---

ment at the end of the term for a pre-agreed purchase price?

● *Know your client* — Is the lessee likely to merge or undergo another change of circumstances during the lease term? Is the lessee particularly rate-sensitive? Does the lessee have other means of financing equipment? Is it likely to be necessary to move the equipment during the term or to make other arrangements?

Some of the most serious problems with equipment leases come at the very outset. Most leases provide that the lease term does not start until the *acceptance date* (or *commencement date*), which is the date on which the lessee signs an *acceptance certificate* indicating that it has inspected the leased equipment and found it to be in acceptable condition.

Once the acceptance certificate is signed, the lease become irrevocable and is an absolute obligation of the lessee. Virtually all equipment leases contain a *hell or high water clause* stating that the lessee must make payments in all events, even if the equipment fails to function properly. The hell or high water clause is never negotiable. Lessor counsel usually responds by comparing the lease to a loan financing, in which the borrower is not permitted to cease making payments to the bank should the collateral fail to function as desired.

With this in mind, it is crucial that the lease provides that the lessee has the absolute right to reject equipment that does not properly function. Consider the two following provisions regarding commencement of the lease term:

The lessee shall be deemed to accept the equipment upon its delivery and installation by the

supplier and shall evidence such acceptance by execution of an acceptance certificate.
Upon delivery, the lessee shall inspect the equipment and, if the lessee determines in its sole discretion that the equipment functions properly, the lessee shall execute an acceptance certificate.

A second, related issue is whether the term of the lease begins prior to the date the lessor makes payment to the vendor. Should the lessor be entitled to a 30-, 60- or 90-day "float" while the lessee is paying lease rentals? Is there a danger (given the size and nature of the leasing company) that the lessor will go out of business and be unable to make the required payment to the vendor after the lessee has signed an *irrevocable* lease?

A third issue that often escapes attention at the outset of a lease is the matter of *interim rent*. Most leasing companies, and many lessees, prefer to pay rent on the first or fifteenth day of the month. Because the lease term starts on execution of the acceptance certificate, it is unlikely that the actual lease commencement date will fall on the first or fifteenth day.

Most leases provide that the lessee pays interim rent during the period from actual acceptance to the pre-agreed first rental payment date. On its face, it seems perfectly logical to calculate this rental as $1/30^{th}$ of a monthly rent payment (or $1/90^{th}$ of a quarterly payment).

Consider, however, that the lessee generally calculates the amount of rent it will be paying over the agreed term of the lease: 36, 48, 60 months, etc. Paying a full interim rent can increase the lease term by as much as 29 days (89 days in a quarterly rent lease).

In some circumstances, this does not present a problem for the lessee. Often, however, the lease is a *full pay-out lease*, in which the lessee is aware that it is repaying the full initial purchase price of the equipment with implicit interest over the lease term. If so, by paying interim rent, the lessee is paying more than the entire purchase price of the equipment. Even in a shorter-term lease, the additional payment is something for which the lessee has not bargained.

Standard responses often acceptable to the lessor include shortening the lease term by the number of days during the interim rent period or requiring the lessee to pay only an interest factor between acceptance and the first day of the rental term. Many lessors, especially those who will delay actually paying the vendor for the equipment, are willing to forego interim rent altogether.

From an equipment-use perspective, leases are generally more restrictive than secured loans. Most form leases prohibit movement of the equipment to a new location without "lessor's prior written consent." If the lessee desires to move the equipment, it should negotiate the right to do so by simply giving the lessor advance notice.

The issue of modifications and upgrades is key to many types of equipment, particularly technology equipment. Absent strong language in the lease, and a lessor with the ability to do so, the lessee has no right to obtain additional financing for equipment upgrades.

Moreover, many leases contain language prohibiting any alterations or modifications of leased equipment without prior written consent of the lessor. Many leasing companies are willing to permit at least readily removable alterations if the lessee requests this right during the documentation negotiations.

Consider also the effect of the following language on the lessee's ability to obtain financing for any modification or upgrade:

Any item of equipment attached to the equipment shall become an

accession and deemed owned by the lessor upon attachment.

This language, which can subject the lessor (and the lessee through indemnification obligations) to additional income taxes, can prevent the lessee financing a desired upgrade or addition through a third-party institution or bank. Again, where the modification can be removed without substantial damage to the leased equipment, the lessee should have the right to do so.

Equipment leases are designed to run for a specified term and then, absent a purchase option, obligate the lessee to return the equipment to the lessor. Often, however, the lessee will need flexibility in dealing with the equipment. This is particularly true in the case of technology equipment and where the lessee's circumstances may change because of the availability of more productive technology.

Many lessors are willing to allow the lessee an *early termination option* (ETO). If a lease is silent with regard to an ETO, the default cost to the lessee will normally be all (undiscounted) remaining lease payments — a highly unattractive option. Under an ETO, the lessee may terminate the lease by either returning the equipment to the lessor or arranging for its sale to a third party. In either event, the lessee is responsible to pay a *termination value*, calculated as an amount to preserve the yield the lessor originally anticipated earning over the full lease term.

A termination value schedule may be incorporated into a lease, which specifies the termination value to be paid during any month of the lease. Such values are typically expressed as a percentage of the original cost of the equipment under lease. A termination value as of a particular month is generally equal to the present value of remaining lease payments (that would have been paid had the lease run its full course) plus the present value of the residual value originally booked by the lessor, adjusted for tax effects.

Many lessors inflate residual assumptions when calculating termination value to protect potential

windfall profits on the equipment. Savvy lessees, however, understand that termination values so calculated leave a lessor better off than had the lease run full term because (1) the lessor's yield is preserved; (2) any sales proceeds obtained for the returned equipment is pure "upside," and (3) equipment returned prior to the end of the lease term is typically more valuable than the end-of-term residual value assumed by the lessor in agreeing to the lease. Termination values can be lessened by astute negotiation focusing on the lessor's actually anticipated residual value.

Other lessees may prefer an *early buy-out option* (EBO). An EBO gives the lessee the right to purchase the equipment from the lessor for a pre-agreed amount. Again, this purchase price covers the lessor's anticipated return.

The difference between the two is fairly obvious: Under an ETO, the lessee parts with the equipment for an agreed-upon cost to cancel. Under an EBO, the lessee purchases the equipment during the lease term. As such, the EBO really protects only the lessee's initial cost-of-funds assumption; if interest rates fall or lessee acquires additional funding ability, an EBO may be preferable. On the other hand, the cost of exercising an EBO will normally be significantly higher than an ETO. This is because the lessor's hoped-for residual upside must be recovered, as well as the conservative residual estimate the lessor originally assumed. Further, the lessee

will in all likelihood be required to pay sales tax on exercising the EBO, since title will pass to the lessee — a cost not relevant to the ETO case.

A third, often overlooked, alternative is the *sublease* right. Subleasing is often available where the lessor is not in the position to offer an ETO or an EBO, or the lessee cannot negotiate either of those two options on acceptable terms. In order to avail itself of the sublease option, however, the lessee must be in a position to market equipment to similarly situated lessees who may be better able to use the leased equipment. In a large organization, prospective lessees could be sister companies, which might make the search for a potential user less daunting.

Common to virtually all leases is a requirement that the lessee insure the leased equipment and be responsible in the event the equipment is damaged or destroyed. Among the key issues to be considered in this portion of the lease are whether the lessee desires the right to apply insurance proceeds to replace leased equipment (preserving the financing and expediting acquisition of replacement equipment) and how the lessee's obligation with respect to loss or destruction is calculated.

Most leases provide that the lessee must pay (through insurance proceeds or otherwise) the *stipulated loss value* (SLV) or *casualty value* of the equipment. In theory, the SLV simply compensates

## Provisions adding flexibility

- Early termination option — Lease terminated. Equipment returned to lessor. Lessee guarantees lessor return when equipment sold to third party.
- Early buyout option — Lease terminated. Lessee purchases equipment for pre-agreed price.
- Sublease right — Lease term continues, with lessee obligations remaining in place. Equipment possession transferred to a sublessee who pays rental to lessee (or to lessor by assignment).
- Assignment right — New lessee assumes original lessee obligations under lease. Original lessee is released.

the lessor for its anticipated return on the lease at the end of the term

SLV and EBO values are very much the same, since the lessor is disposing of its interests in the leased equipment under either scenario. An SLV value for any month during the lease should equal the present value of remaining lease payments and originally booked residual value (as in the ETO case), adjusted for tax effects. The lessor often increases the residual value component to cover its potential upside on disposition of leased equipment. In fact, SLVs typically are significantly higher than their theoretical value because of aggressive residual value components (and lack of lessee understanding). Significant improvement (reduction) in the cost of SLVs can be achieved by vigorous negotiation.

Before leaving this area, counsel should be careful as to the wording of any replacement "option." Many lease forms currently *require* the lessee to replace equipment that has been destroyed. The option to replace should always rest in the lessee because that company should be fully compensated through payment of SLV. Also, care must be taken as to the precise wording of what is permissible as replacement equipment. Standard language often requires identical replacement equipment, or equipment from the same manufacturer. Greater flexibility in substitutable equipment is desirable in most cases.

At the end of the lease term, most leases state that the lessee must return the equipment to: "a location designated by the lessor within the continental United States." Return is to be at the lessee's own cost and exposure,

but often by a common carrier or other means selected by the lessor.

Many consultants urge that the lessee not agree to pay the cost of return of the equipment as the purchase price usually includes the cost of freight-in. The lessee should be aware, however, that refusing to pay for return delivery usually results in higher lease rates because it affects the lessor's assumed end-of-term residual-value recovery.

A better negotiating position is often to limit the areas to which the equipment must be returned, such as return within a 100-mile radius of the lessee's place of business, or to negotiate a cap as to the financial obligation to be incurred by the lessee.

Another common pitfall is language reading as follows:

At the end of the term, the lessee shall deliver the equipment to a location within the continental United States specified by the lessor, fully de-installed and crated and recertified by the manufacturer for future use.

This language would require the lessee to cease using the equipment, de-install it and have it checked by the manufacturer for recertification *during* the lease term. Better language requires the lessee to begin these procedures at the end of the term, assuring the lessee full use of the equipment during the entire lease term.

As to purchase and renewal options, the best advice is for the lessee's counsel to read carefully the printed form. Many draftsman insert in "standard" language terms such as the following:

So long as the lessee is not in default hereunder, the lessee shall

have the option to purchase the equipment at its fair market value (as determined by the lessor)"; or "at the greater of fair market value or 10 percent of the original equipment costs ... "; or " ... at the fair market value as determined by mutual agreement or, if the parties cannot agree, by an appraiser selected by lessor ..."

Many of the problems with these types of language are readily apparent. What is not so apparent is the use of the term "in default." Unless otherwise defined, this would deny the lessee the right to exercise its purchase option (or, if used elsewhere, its early termination, early buy-out, replacement or renewal option) if the lessee is one day late in providing annual financial statements, paying a property tax or taking any other action. Better language reads "so long as no event of default has occurred and is continuing hereunder," giving the lessee the benefit of any grace period.

In the case where options to renew the lease or purchase the equipment at lease end are important, it is important to have a more objectively determined fair market value process than the standard provisions summarized above. Many leases are silent altogether regarding such options.

Also, the stated language requires the lessee to purchase the "equipment," which is likely to be read as "all but not less than all equipment." If the lessee desires the right to purchase only selected portions of the equipment, the language should so state. The language is particularly onerous if the lease covers many types of equipment, such as a computer, telephone system and fleet of delivery vans.

Because of its popularity, equipment leasing has emerged as a distinct form of financing. Counsel faced with lessor-generated documents should be aware that it is not merely negotiating another loan-type arrangement, but attempting to work in a field dominated by full-time specialists. Careful reading and education will go far in leveling the playing field ✦



## Return and purchase option

- Who must pay cost of return, shipping, insurance, de-installation?
- To what location must the equipment be delivered?
- When must de-installation, cleaning and shipping be completed?
- When is its start?
- How is fair market value calculated?
- May lessee purchase less than all equipment?

# EXHIBIT 41

PLAINTIFF'S
EXHIBIT
395

**From:**     Andrew Feinberg/O=Lycos
**Sent:**     Tuesday, July 22, 2003 1:25 PM
**To:**       joseF.Mateu@corp.terra.com
**Cc:**       Brian Lucy/O=Lycos@Lycos; ignacio.ponce@corp.terra.com;
              elias.rv@corp.terra.com; Julie Callagee/O=Lycos@Lycos; Peter
              Karol/O=Lycos@Lycos
**Subject:**  Re: URGENT Leases Liabilities
**Attach:**   Pertinent Terms and Conditions.doc

Pepe,

In response to your request, I have attached below Peter Karol's evaluation of
our rights, obligations and alternatives with respect to the leases.

My understanding of the facts from our finance group is that we cannot
realistically return all of the equipment as per the lease terms, let alone in
the original condition. To do so would include identifying several hundred
pieces of equipment and decommissioning them in accordance with each lease
expiration. We believe this to be operational impossibility, especially in
light of lower headcount and the migration to Tdata in Miami. While it might
be possible to negotiate something better than the full penalty cost, we would
likely be foresaking the buyout opportunity if we tried. We collectively
believe it is not possible to achieve a negotiation that lowers the contractual
penalty price (approximately >$34 million) to anywhere near the buyout price
(approx. $3.8 million).

Please let me know if I can provide any further information.

Andy
----- Forwarded by Andrew Feinberg/Lycos on 07/22/2003 09:12 AM -----

Peter Karol
07/21/2003 06:05 PM

To: Julie Callagee/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

According to the Lease, in the event we cannot return any piece of Equipment,
we either have to buy an identical piece of Equipment to replace it, or pay the
Stipultaed Loss Value of such piece of Equipment (according to the Schedules,
the Stipulated Loss Value for any Equipment piece is either 73.3% or 55% of its
original cost). Since we will not be returning any Equipment, we are talking
about paying EITHER approximately 58% (a blended rate) of approximately 66
million dollars (the full original cost of all the Equipment) OR the buyout
amount that LeaseForum negotiated, which is approximately 3 million.

Peter D. Karol

LYC 22514

*Deputy General Counsel*
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

**F**

Julie Callagee
07/21/2003 05:55 PM

To: Peter Karol/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

Confirmed.  One item to note -- the percentage on two of the lease schedules is
73.3% and on the other two is 55%.

**E**

Peter Karol
07/21/2003 04:24 PM

To: Julie Callagee/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

According to the Lease, in the event we cannot return any piece of Equipment,
we either have to buy an identical piece of Equipment to replace it, or pay the
Stipultaed Loss Value of such piece of Equipment (according to the Schedule,
the Stipulated Loss Value for any Equipment piece is 73.3% of its original
cost). Since we will not be returning any Equipment, we are talking about
paying either 73.3% of roughly 60 million dollars (the full original cost of
all the Equipment) OR the buyout amount that LeaseForum negotiated, which is
roughly 3 million. [Julie please confirm these numbers].

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

**D**

LYC 22515

Julie Callagee
07/21/2003 03:51 PM

To: Andrew Feinberg/Lycos@Lycos, Peter Karol/Lycos@Lycos
cc:
Subject: Re: URGENT Leases Liabilities

Peter,

Attached please find a summary of the Terms & Conditions that José Mateu
references. I will bring down the original contracts and the schedules that
provide the stipulated loss values.

The schedules stipulate that if we do not return all of the leased equipment we
must pay CSI

73.3% of the original equipment value on schedules 93 & 200
55% of the original equipment value on schedules 94 & 100


Thanks,

Julie


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Julie Callagee          Assistant Controller
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Lycos Inc.
A subsidiary of Terra Networks S.A.
100 Fifth Avenue,
Waltham, MA  02451
Phone 781.370.2827
Fax 781.370.2892


Andrew Feinberg
07/21/2003 01:53 PM

To: JoseF.Mateu@corp.terra.com
cc: Brian Lucy/Lycos@Lycos, Julie Callagee/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

Understood.

LYC 22516

Brian/Julie, could you provide me with a copy of the applicable leases?  Many thanks.

Andy

JoseF.Mateu@corp.terra.com
07/21/2003 02:00 PM

To: andrew.feinberg@corp.terralycos com
cc: peter.karol@corp.terralycos com, elias.rv@corp.terra.com,
Ignacio.Ponce@corp.terra.com, Brian.Lucy@corp.terralycos.com
Subject: URGENT Leases Liabilities

Dear Andy,

Lycos leases of software, hardware, office equipment, etc... seem to have a
penalization clause in case that after the expiration of the contract the goods
which have been leased cannot be returned or in an acceptable state. Because,
according to the finance department, the level of this risk occurring is real
and high in its materiality, discussions have been initiated with the lessors
to change the lease into a purchase whose consideration would be lower than the
cost of the risks occurring.
Assuming as a correct assumption the general statements above mentionned, I
need urgently to know the real scope of our duties and liabilities with respect
to the return of the assets to the lessors after the expiration of the
contract.
Regards,

José Mateu

P.D. Although I am not in such a hurry with respect to the nightsurf
interpretation request of its representations and subsequent disclaimers I
would like to have your opinion by the end of the week the latest.

LYC 22517

Este mensaje se dirige exclusivamente a su destinatario y puede contener
información CONFIDENCIAL sometida a secreto profesional o cuya divulgación esté
prohibida en virtud de la legislación vigente. Si ha recibido este mensaje por
error, le rogamos que nos lo comunique inmediatamente por esta misma vía o por
teléfono (34 91 4523913) y proceda a su destrucción.
Nótese que el correo electrónico vía Internet no permite asegurar ni la
confidencialidad de los mensajes que se transmiten ni la correcta recepción de
los mismos. En el caso de que el destinatario de este mensaje no consintiera
la utilización del correo electrónico vía Internet, rogamos lo ponga en nuestro
conocimiento de manera inmediata.

This message is intended exclusively for its addressee and may contain
information that is CONFIDENTIAL and protected by a professional privilege or
which disclosure is prohibited by law. If this message has been received in
error, please immediately notify us via e-mail or by telephone (34 91 4523913)
and delete it.
Please note that Internet e-mail does not guarantee the confidentiality or the
proper receipt of the messages sent. If the addressee of this message does not
consent to the use of Internet e-mail, please communicate it to us immediately.

LYC 2251B

# EXHIBIT 42

**Carolyn Simmons-Berry**

| | |
|---|---|
| **From:** | Sandra.Cuculiza@corp.terralycos.com |
| **Sent:** | Tuesday, June 12, 2001 9:38 AM |
| **To:** | Carolyn Simmons-Berry |
| **Subject:** | Re: DRAFT COPY OF EXHIBIT "A" FOR LEASE SCHEDULE #144874-083A |

A 

144874-083AEX(CS B).xls

<div style="border:1px solid">

**EXHIBIT**

512

</div>

Carolyn,

The only discrepency I show is on PO# 11682, I show 5 Hard Drives instead of 7 and 12 power cords instead of 2. Please call me if you have any questions.

Thanks

Sandra

Carolyn Simmons-Berry <carolyn simmons@csileasing.com> on 06/12/2001 08:46:40 AM

To:    "'Sandra Cuculiza'" <scuculiza@lycos.com>
cc:

Subject:  DRAFT COPY OF EXHIBIT "A" FOR LEASE SCHEDULE #144874-083A

Sandra:

I am in the process of preparing the closing documents for your lease schedule #144874-083A.  Attached is the exhibit that shows all of the equipment purchased under the lease. Please note that the lease rate factors
for the equipment may be subject to change per the contract.  Please review the list for accuracy and contact me within the next couple of days should you find any discrepancies.

Please provide your comments no later than June 15, 2001.  Should you have any questions or comments, please do not hesitate to contact me.

Thank you!

Carolyn Berry

 <<144874-083AEX(CSB).xls>>

Carolyn Berry
Contract Administration Supervisor
Phone:  (314) 810-8875
Fax:  (314) 997-3192
Email:  Carolyn.Berry@csileasing.com

(See attached file: 144874-083AEX(CSB).xls)

1

CONFIDENTIAL
CSI0040962

# EXHIBIT 43

 

## IN THE SPOTLIGHT





### KEN STEINBACK
**TAKING CARE OF BUSINESS**

By Christine Imbs

"Go the extra mile and keep your nose clean. I know it sounds trite, but it's the best advice I can give."

Trite or not, coming from Ken Steinback this advice is worth taking. As chairman, CEO and co-founder of Computer Sales International, Steinback has built one of the largest independent IT leasing companies in the world with over $800 million in assets. And in the 30 plus years CSI has existed, they've never experienced a layoff or loss.

"I think the major thing that I contribute this to is that we take care of our customers," he explains. "If you don't, you won't survive."

This is a simple philosophy to be sure, but one that works, especially when you have the right people to back you up. And according to Steinback, the right people mean everything.

"The absolute secret to success is people," he continues. "We have some of the very best working for us. And I've been doing business with some of the same people since the beginning, for instance the same lawyers, bankers, and insurance people. It's something I learned from my uncle."

Steinback says his father died when he was still very young, so his uncle was a big influence in his life, particularly when it came to business.



**April 2005**



Meet "PR Boomer"
Laurna Godwin,



Antarctica is a favorite baby
boomer spot.



ST. LOUIS REGIONAL CHAMBER
& GROWTH ASSOCIATION
www.stlrcga.org

"My uncle was a very smart businessman," he says. "He taught me a lot about the business world, about integrity and consistency. I had a lot of respect for him."

That respect shows in the way Steinback runs his operation. He treats people the way he himself would want to be treated. And with an attitude like that, success is inevitable.

"I'm confident that no one walks around saying it's miserable doing business with CSI," he comments. "I'm sure there are companies that have that reputation, but I don't want to be one of them. I would sacrifice dollars any time for integrity and goodwill."

If it's true that a man reaps what he sows, then Steinback's harvest is indeed bountiful. Just how much came to light when he was diagnosed with cancer. Not only did his family and friends rally around him, but so did his business colleagues.

"I went through some bad stuff, but my support system was there for me," he says. "They kept my spirits up and kept me going. Of course, being told you have cancer puts a level of what's important on the table. I spent more time with family and friends, and I stayed away from the business for about year. It was hard, but because of the caliber of people I do business with, I was able to walk away knowing everything was under control."

With "the bad stuff" hopefully behind him, the sixty-one-year-old Steinback says he'd like to eventually double the size of CSI. "It's the easiest way to grow in this business," he says. "We're one of the leaders in this industry. And as the industry evolves and new technologies are introduced, we're going to have to be there to provide something to our customers or we aren't going to retain our market share."

As for his proudest accomplishment, without missing a beat he says, "That I've built a company with great people, great customers, and with terrific integrity. Sure, I've obviously been rewarded for some of this stuff, but that doesn't mean as much to me as what this company stands for. If a customer calls with a problem we resolve it. And that's easy for me. I'm not a fighter. I'm a lover."

## TalkingPOINTS

BORN: St. Louis
FAMILY: Wife, Marilyn; 2 grown children, 2 grandchildren
EDUCATION: B.S. in Business Administration from Washington University in St. Louis
ARMED FORCES: Army veteran who served as a first lieutenant in charge of the Berlin data center
AWARDS: 2004 Greater St. Louis Top 50 Companies Award; 1999 Ernst & Young Entrepreneur of the Year Award for the St. Louis Region
HOBBIES: "Fishing, golf, and time with my family. I'm also an avid baseball fan which makes me a little crazy."
FAVORITE BOOKS: "Anything that makes me laugh."
FAVORITE MOVIES: See "Books."



## TECHNOLOGY↑
### GATEWAY

www.technologygateway.org



Dr. Steven Teitelbaum supports recruiting great faculty and great students.



St. Louis hoops it up with the 2005 NCAA Final Four.



Ken Steinback believes in going the extra mile.

# EXHIBIT 44
# FILED UNDER SEAL

# EXHIBIT 45
# FILED UNDER SEAL

# EXHIBIT 46

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) | |
| v. | ) | |
| LYCOS, INC., | ) | **AFFIDAVIT OF PETER W. DALEY** |
| Defendant and Plaintiff-in-Counterclaim, | ) | |
| and | ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) | |
| Trustee Process Defendant | ) | |

I, Peter W. Daley, do hereby depose under oath and state as follows:

1.    I have been retained to serve as an expert on behalf of Lycos in the above-referenced case.

2.    In August 2007, I provided a draft Exhibit J to Mr. Condon that contained preliminary in-place values for the Lycos-CSI equipment.

3.    A true and accurate copy of that Exhibit J is attached to Mr. Condon's affidavit.

4.    Before providing that Exhibit to Mr. Condon in August 2007, I inserted the following language in the "header":

> These notes are incomplete and have been prepared for personal use only. No one may rely on them for any purposes. All views are subject to change as additional information becomes available or is clarified.

5.    The "draft" Exhibit J that I provided to Mr. Condon was, as reflected by the

language in the header, my draft notes.

Signed under the penalties of perjury, this 5-th day of December, 2007.

Peter W. Daley

# EXHIBIT 47

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMPUTER SALES | ) | C.A. No. 05-10017-RWZ |
| INTERNATIONAL, INC., | ) | |
| | ) | |
|     Plaintiff and Defendant-in- | ) | |
|     Counterclaim, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LYCOS, INC., | ) | **AFFIDAVIT OF DAVID W. TRUESDELL** |
| | ) | |
|     Defendant and Plaintiff-in- | ) | |
|     Counterclaim, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET | ) | |
| BANK, | ) | |
| | ) | |
|     Trustee Process Defendant | ) | |

I, David W. Truesdell., do hereby depose under oath and state as follows:

1.      I am a Certified Public Accountant who serves as a Partner in McGladrey & Pullen, LLP., a leading national business accounting firm. Prior to my work with McGladrey & Pullen, I served as the Managing Partner and Director of Accounting and Auditing at Ziner, Kennedy & Lehan, LLP. I also served as the Director of Accounting and Auditing at Kennedy & Lehan (predecessor to Ziner, Kennedy & Lehan) from 1986 to 1999. In 1970, I graduated from Harvard University with a bachelor's degree in economics, and I have been a registered CPA in Massachusetts since 1974. I am an active member of numerous professional organizations, including the Massachusetts Society of CPAs, for which I have served as President and Vice President, and Chairman of several committees.

2.      I have personal knowledge of the facts set forth herein.

3.      I was retained as an expert on behalf of Lycos in this case. I have reviewed numerous documents produced by Lycos and CSI including Lycos' financial statements and annual reports, lease documents between CSI and Lycos, and the audit "workpapers" of Lycos's accountants (KPMG, Deloitte & Touche, Arthur Anderson, and PricewaterhouseCoopers) during the years Lycos did business with CSI.

4.      As part of my work in this case, I searched the auditors' work papers produced apparently in response to the thorough subpoenas served on them by CSI to ascertain whether there was any evidence of either Lycos or its accountants conducting the test set forth in Financial Accountant Standards Board 13 with respect to the leases between CSI and Lycos to determine whether they qualified for operating lease treatment.

5.      I found one KPMG memo from the audit at July 31, 1999 – the end of Lycos's fiscal year end, that states: "According to prior year test work, KPMG concluded that the present value of Lycos's payments were less than 90% of the equipment cost. Per Rich Munroe, the attributes of the leases entered into in the current year are similar to those of prior years, therefore, the classification of the leases appears reasonable." Thus, it appears that no testing under FASB 13 was done for any leases entered into during the fiscal year ending July 31, 1999. In addition, I found no indication of FASB 13 testing of leases in the auditor work papers for any of the subsequent years, and no indication that Lycos itself ever tested any of the refinanced leases.

6.      That I have not found any evidence that Lycos or its auditors performed this test is consistent with my conclusion that the CSI leases were not material to Lycos' financial statements. In addition, it would not have been uncommon for an auditor to rely on prior year test work when dealing with similar transactions that were not material.

7.    I tested the 2000 and 2001 re-writes (schedules 64B, 64D, 64F, 66C, 66E, 66G, 66I, 67B, 67D, 67F, 67H, 69C, 69E, 69G, 69I, 85, 86, 89, 89A and 90) to determine whether they would qualify for operating lease treatment.  Because I did not know the "fair value" of the equipment at the time it was rewritten onto these schedules, to be conservative, I assumed that the equipment was new even though I knew it was at least two months old and in most cases older.  Even with this conservative assumption, my testing reveals that Lycos could not have concluded that the leases qualified for operating lease treatment under the FASB 13 test unless it had an incremental borrowing rate in excess of 20%, a rate that would not have been applicable to a company with hundreds of millions of dollars of cash in the bank.  This further supports the conclusion that neither Lycos nor its auditors actually tested the leases to determine whether they qualified as operating leases.

8.    While I have not tested any of the other refinanced leases to determine whether they would qualify as operating leases because I didn't know what the fair value of the equipment was on those leases at the time of the refinancings, because the equipment on the refinanced schedules was used, and the present value of the payments on the refinanced schedules was generally higher than the present value on the original schedules (for those schedules where such a comparison is possible), it follows that if the original schedules did not qualify as operating leases, the refinanced schedules would not have qualified as operating leases either.

Signed under the penalties of perjury, this 28th day of February 2008.

David W. Truesdell

- 3 -

# EXHIBIT 48

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COMPUTER SALES<br>INTERNATIONAL, INC., | ) | C.A. No. 05-10017-RWZ |
| | ) | |
| Plaintiff and Defendant-in-<br>Counterclaim, | ) | |
| | ) | |
| v. | ) | |
| | ) | **LYCOS'S OBJECTIONS AND RESPONSES** |
| LYCOS, INC., | ) | **TO CSI'S FIRST SET OF** |
| | ) | **INTERROGATORIES** |
| Defendant and Plaintiff-in-<br>Counterclaim, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BANK OF AMERICA f/k/a FLEET<br>BANK, | ) | |
| | ) | |
| Trustee Process Defendant | ) | |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

Plaintiff-in-Counterclaim, Lycos, Inc. ("Lycos"), hereby submits its Objections and Responses to

Plaintiff and Defendant-in-Counterclaim, Computer Sales International, Inc.'s ("CSI"), First Set

of Interrogatories to Lycos.

### PRELIMINARY STATEMENT

Fact discovery in this case is ongoing. It is scheduled to close on January 31, 2007, more

than three months from now. In addition, no expert discovery has been taken in this case to date.

Accordingly, as set forth in the General Objections below, the responses provided herein are

based upon the present knowledge of Lycos after reasonable investigation and inquiry. Lycos

reserves the right to amend, modify, withdraw, or supplement these Objections and Responses to

Interrogatories as it deems necessary to ensure their accuracy. If it is subsequently determined

relevant information, speak with persons knowledgeable about the issues, and provide the

requested information, it necessary reserves all rights.

Without waiving the foregoing General Objections, Lycos further responds to the

Interrogatories as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 1:

1.     State the basis for, including all evidence supporting, your claim that you have
suffered damages as a result of the acts and omissions of CSI that are alleged in your amended
answer and counterclaim in this action -- explaining in your answer, *inter alia*, exactly what
dollar amount(s) of damages you have suffered, how each dollar amount of damages was
calculated, which dollar amount of damages you claim was caused by which acts and omissions
of CSI, and why each dollar amount of alleged damages would not have incurred anyway in
order for Lycos to have had the use of the equipment it leased from CSI for the period it used it.

### RESPONSE TO INTERROGATORY NO. 1:

Lycos objects to Interrogatory No. 1 on the grounds that it is overly broad and unduly

burdensome, as well as premature, with more than three months remaining in fact discovery.

Lycos is still gathering and developing facts to prove all of its damages.  Those facts also may be

subject to expert analysis and opinion.  Subject to and without waiving the foregoing objections

or its General Objections, Lycos states as follows:

Rolled Up Equipment Schedules[1] -- While there may be a number of ways in which Lycos

may calculate its damages on the Rolled Up Equipment Schedules, one possible formulation is

that its damages equal the amount by which (a) the net present value of the stream of lease

payments on each Rolled-Up Equipment Schedule *plus* the net present value of the residual value

of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease

Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b) the net present

---

[1]  The "Rolled-Up Equipment Schedules" include schedules 17, 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61,
65, 66, 66A, 66B, 67, 67A, 68, 68A, 68B, 68C, 93 and 94

BST99 1517349-4 057077 0012

value of the payments that were to have been made during the remaining term of the immediately

preceding equipment schedule(s) but that were cancelled according to the terms of the Rolled-Up

Equipment Schedule, *plus* the net present value of the residual value of the equipment on the

immediately preceding schedule(s) attributable to assets that were leased pursuant to the Rolled-

Up Equipment Schedules. In performing the analysis under sub-paragraph "(b)" above, the

present value is to be calculated as of the commencement date of each Rolled Up Equipment

Schedule using, as a discount rate, the implicit rate determined by CSI for the immediately

preceding equipment schedule(s).

For example, schedules 45, 49, 49A, and 61 were rolled-up onto schedule 67. CSI's

"FMV (Higher of C or D)" under "(a)" from the formula above equals $2,970,525.52.[2] The net

present value of the remaining rents that were to have been paid under the preceding schedules

totaled $2,165,212.53.[3] The net present value of the residual value of the equipment on the

immediately preceding schedules attributable to assets that were leased pursuant to Schedule 67

was $271,110.65.[4] The total for sub-paragraph "(b)" is therefore $2,436,323.18. Thus, the

amount of CSI's mark-up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-

paragraph "(b)," was $534,202.34, or approximately 22% of the terminating values from

Schedules 45, 49, 49A and 61.

Rewritten Equipment Schedules[5] – While there may be a number of ways in which Lycos

may calculate its damages on the Rewritten Equipment Schedules, one possible formulation is

that those damages equal the amount by which (a) the net present value of the stream of lease

---

[2] CSI0039434.
[3] This is the total of the following present values of the stream of remaining lease payments for the following schedules: 45 - $527,328.39; 49 - $429,622.99; 49A - $591,501.41; 61 - $616,759.74.
[4] The discount rate used in calculating the above present values was as follows for the following schedules: 45 – 9.21%; 49 and 49A – 9.25%; and 61 – 9.08%.
[5] The Rewritten Equipment Schedules include schedules 64B, 64D, 64F, 66C, 66E, 66G, 66I, 67B, 67D, 67F, 67H, 69C, 69E, 69G, 69I, 85, 86, 89, 89A, and 90.

BST99 1517349-4.057077.0012

payments on each Rewritten Equipment Schedule *plus* the net present value of the residual value

of the equipment on that schedule, as reflected by the number on each CSI Sales Type Lease

Journal Entry next to the language, "FMV (Higher of C or D)", *exceeded* (b)(i) the net present

value of the stream of lease payments over the term of the schedule it replaced *plus* (ii) the net

present value of the inferred residual value of the equipment on such replaced schedule, had that

schedule been booked. In making the net present value calculations under sub-paragraph "(b),"

the same discount rates used under sub-paragraph "(a)" should be used. To infer the residual

value under sub-paragraph "(b)(ii)", a declining balance calculation should be employed. To do

this, one should start with the original cost of the equipment and the residual value actually

booked by CSI on each Rewritten Equipment Schedule, and then calculate CSI's implied

monthly reduction in the value of the asset as a constant percentage of the remaining asset value

at the beginning of each month, and then use that constant percentage rate to infer a residual

value as of the end of the term of the schedule that was combined with each Rewritten

Equipment Schedule.

　　　For example, Schedule 66D was rewritten as Schedule 66G two months into Schedule

66D. The "FMV (Higher of C or D)" on Schedule 66G was $408,369.80.[6] The net present value

of the stream of lease payments on Schedule 66D was $308,510.51. The net present value of the

inferred residual was $30,125.90.[7] The total was $338,636.41. Thus, the amount of CSI's mark-

up, i.e., the amount by which sub-paragraph "(a)" exceeded sub-paragraph "(b)," was 69,733.39,

or approximately 22% of the original tangible equipment cost.

---

[6] CSI0039420. The number used by CSI and the number used herein are a penny different due to rounding.
[7] The original cost of the hardware was $321,105.00. CSI's booked a residual value for that equipment of $13,550
after 36 months. *Id.* That implies a monthly erosion in tangible asset value of 8.417252%. Thus, the implied
residual after 24 months would have been $38,920.21.

The bates numbers of the documents from which Lycos's damages on the Rolled-Up Equipment Schedules and the Rewritten Equipment Schedules may be determined are listed in the e-mail (and the accompanying attachment) from Eileen Pellerin to Thomas Bean dated August 23, 2006 and the letter from Edward Little to Thomas Bean dated September 11, 2006 (collectively, the "CSI Letters"). Other documents that contain pertinent information include, without limitation, CSI0041651-41668.

While Lycos has not yet calculated the precise amount of its damages applying the foregoing formulae to each of the Rewritten and Rolled-Up Equipment Schedules (further analysis and perhaps discovery is necessary), it has determined that (a) its damages are approximately $1.3 million and $6.1 million on Schedules 93 and 94, respectively, and (b) that its aggregate damages for all Rolled-Up and Rewritten Equipment Schedules are in the range of $15.0 - $16.0 million. Lycos is also entitled to interest at the statutory rate on such amount.

The acts and omissions committed by CSI that caused damage to Lycos and of which Lycos is presently aware are described in response to Interrogatory Nos. 2 and 3. These acts and omissions damaged Lycos by at least the dollar amounts set forth above. To the extent Lycos might be required to prove which dollar amount of damages was caused by which acts and omissions of CSI, Lycos states that it has not yet made that determination because discovery remains ongoing. Lycos states generally that the acts and omissions described sub-paragraphs "A", "B" and "D" of the Response to Interrogatory No. 2 and the Response to Interrogatory No. 3 caused these damages.

Lycos would not have incurred such damages if it had known of CSI's fraudulent acts and omissions during the parties' relationship. In particular, it would not have entered into the

-7-

Rolled-Up and Rewritten Equipment Schedules and paid the excessive amounts required under those documents.

Sales Agreement - Lycos states that its damages in relation to the Sales Agreement are in the amount of $3.775 million, before statutory interest. As a result of the acts and omissions committed by CSI, through Paul Stenberg, as described in the Responses to Interrogatory Nos. 2 and 3 below, CSI fraudulently induced Lycos to enter into the Sales Agreement at a purchase price of $3.775 million, when the subject equipment had little or no market value. Indeed, CSI itself had determined that the fair market value threshold of the equipment was only $350,000 as early as November, 2002, a long time prior to Lycos's eventual purchase of that equipment (after that equipment had declined even further in value). CSI0041643-41646. CSI's booked residual for the equipment at the end of the equipment schedules was approximately $230,000. CSI0038070-71, CSI0039692, and CSI0039698. Neither of those facts was ever disclosed to Lycos.

Lycos's damages with respect to the Sales Agreement were caused by the acts and omissions described in response to Interrogatory Nos. 2 and 3. Specifically, Lycos overpaid by $3.775 million as a result of CSI's fraud. Because Lycos's damages arise from fraud in the sale of personal property, those damages will be automatically trebled pursuant to M.G.L. ch. 231, § 85J.

In total, therefore, based on the above, Lycos's actual damages, before any trebling, are in the amount of approximately $18.775 - $19.775 million. Lycos also would be entitled to interest at the statutory rate on its damages and to its reasonable attorneys' fees and costs.

**INTERROGATORY NO. 2:**

State the basis for, including all evidence supporting, your claim that CSI engaged in fraudulent or negligent misrepresentation that caused harm to Lycos as alleged in your amended

- 8 -

answer and counterclaim in this action – explaining in your answer, *inter alia,* exactly which individuals representing CSI engaged in which fraudulent or negligent misrepresentation in their dealings with which individuals representing Lycos, each date or dates when they did so, exactly what they said or failed to disclose that you claim constituted fraudulent or negligent misrepresentation, what you claim they should have disclosed that they failed to disclose, who at Lycos relied on any such statements or omissions to their detriment, what they did in reliance thereon, and when and how they did so.

## RESPONSE TO INTERROGATORY NO. 2:

Lycos objects to Interrogatory No. 2 on the grounds that it is overly broad and unduly burdensome, as well as premature with more than three months remaining in fact discovery. Lycos is still gathering and developing the facts to prove all of its claims. Those facts also may be subject to expert analysis and opinion. Subject to and without waiving the foregoing objections or its General Objections, Lycos states as follows:

CSI, through Mr. Stenberg, made fraudulent and negligent misrepresentations in its dealings with several Lycos employees and/or representatives of Lycos including, without limitation, Edward Philip, Thomas Guilfoile, Michael Ripps, Sam Ziba, Brian Lucy, Kevin Baillie, Julie Callagee, Monique Walsh, and Susan Franklin. CSI's fraudulent and negligent misrepresentations included, without limitation, the following:

A.    Fraudulent Acts of Commission – Mr. Stenberg intentionally misrepresented to Messrs. Lucy and Baillie in an e-mail dated March 18, 2002, that:

1.    the present value of the payments due under Equipment Schedules 93 and 94 was $23,727,000, when he knew or could readily have ascertained from CSI employees in St. Louis that that the present value of those payments exceeded $25,900,000;

2.    Lycos's obligations under the "old leases" totaled $20,215,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the *un*discounted payment obligations under those leases totaled approximately $17.6 million, and the total

-9-

obligations under those leases, when discounted to present value, were several million less than that;

        3.     the difference between the present value of the payments Lycos would be required to make under Schedules 93 and 94 and the obligations under the "old leases" was $3,512,000, when he knew or could readily have ascertained from CSI employees in St. Louis that the difference between the present value of the payments under Schedules 93 and 94 and the *un*discounted obligations under the old leases exceeded $8.0 million, and the difference between the discounted payments under Schedules 93 and 94 and the discounted payments under the old leases was several million higher.

        4.     when he used a discounted present value number for Schedules 93 and 94 and an *un*discounted number for the "old schedules," he knew that such a comparison was misleading because the comparison was between "apples" and "oranges";

        5     when the leases were refinanced, CSI recouped about 5-7% of the $3.5 million differential, when he knew or could readily have ascertained from CSI employees in St. Louis that both the percentage and the differential were false;

        6.     CSI injected a 10-13% residual in the original leases, when he knew or could readily have ascertained from CSI employees in St. Louis that, because of the multiple refinancings that had occurred before Schedules 93 and 94, CSI's remaining residual on the schedules that rolled onto Schedules 93 and 94 was at most a few percent, such that it was misleading to advise Lycos that CSI had originally injected a 10-13% residual; and

        7.     the total cost of the equipment on Schedules 93-94 was "around $63 million," when he knew or could have readily ascertained from CSI employees in St. Louis that

CSI's records reflected an original total cost of the equipment on those schedules, according to CSI, was approximately $34.3 million. CSI046071.

Documents evidencing the falsity of Mr. Stenberg's representations include those identified in the CSI Letters, CSI041653, and Mr. Stenberg's e-mail to Messrs. Lucy and Baillie dated March 18, 2002, LYC24631-32.

Mr. Stenberg made the foregoing misrepresentations at a time when he knew Lycos was considering "unwinding" Schedules 93 and 94 and in response to pointed questions from Messrs. Lucy and/or Baillie about the economic impact on Lycos of those schedules. *See* LYC24633. Mr. Stenberg, knowing that Lycos was relying on him for information, made such misrepresentations in an effort to induce Lycos *not* to pursue an unwinding of Schedules 93 and 94, thereby preserving a multi-million dollar windfall for CSI and himself (indeed, an unwinding may have resulted in Mr. Stenberg losing more than $1 million in commissions on those schedules alone). *See* CSI039750. Lycos would have had the right to unwind those schedules because of, among other things, the acts and omissions described in sub-paragraph "D" of this Response No. 2. Lycos, through Messrs. Lucy and Baillie, reasonably relied on Mr. Stenberg's misrepresentations. Had they known these representations were false, Lycos would (i) have unwound the transactions and/or stopped payment of monthly rent; and (ii) not have agreed to pay CSI an additional $3.775 million pursuant to the Sales Agreement.

B.    Fraudulent Acts of Commission - Echoing a misrepresentation he made in his email of March 18, 2002, Mr. Stenberg intentionally misrepresented to Susan Franklin of LeaseForum, who was acting on behalf of Lycos at the time, during a telephone call on or about June 27, 2003, that the original cost of the equipment Lycos leased from CSI exceeded $60 million, when he knew, or could readily have ascertained from CSI employees in St. Louis, that

- 11 -

the original cost thereof was much lower. The evidence demonstrating these statements were false will include the testimony of Ms. Franklin and Mr. Rousseau, CSI's Answers to Lycos's First Set of Request for Admissions, CSI's Answers to Lycos's Interrogatories, bates nos. AR00868-869 and CSI046071, and the documents referenced in the CSI Letters.

The persons at Lycos who relied on Mr. Stenberg's intentional misrepresentations to Ms. Franklin included Mr. Lucy and Julie Callagee. Mr. Lucy and Ms. Callagee relied on the foregoing intentional misrepresentations in (1) causing Lycos to make more than $12 million in monthly rent payments to and for the benefit of CSI with respect to the schedules then outstanding between Lycos and CSI; (2) entering into the Sales Agreement; and (3) causing Lycos to pay CSI $3.775 million pursuant to the Sales Agreement.

C.    Fraudulent Acts of Commission - By email of June 30, 2003, in an attempt to pressure Lycos to agree to purchase all equipment on outstanding equipment schedules for $4.691 million on that day, Mr. Stenberg intentionally misrepresented to Brian Lucy that his "approval from the banks [would] expire today"[8] when he knew that no bank approval was necessary for CSI to enter the transaction and thus there was no approval expiration date on that day or any day. Mr. Stenberg made this statement, unbeknownst to Lycos, in an attempt to secure a commission for himself on the Sales Agreement before the end (June 30, 2003) of CSI's 2003 fiscal year.

On July 1, 2003, Lycos advised CSI, through Mr. Stenberg, that if LeaseForum and CSI could not arrive at a reasonable settlement for Lycos to purchase the equipment, CSI would have LeaseForum perform a full audit of all CSI/Lycos equipment schedules. CSI042716-42717. In response to that information, in addition to repeating his false claim that bank approval of the

---

[8] CSI042367.

- 12 -

deal had expired the previous day, Mr. Stenberg responded with yet another falsity, "easy tough guy I am not sure if I can do it anymore." *Id.* Mr. Stenberg knew at that time that his ability to enter the Sales Agreement was wholly unaffected by the passage of one day. In a subsequent e-mail on July 1, 2003 and again on July 23, 2003, Mr. Stenberg repeated his misrepresentation that he needed the banks' approval for the Sales Agreement. CSI042375-42376, AR11507.

D.    Fraudulent Acts of Omission - CSI, through Mr. Stenberg told Lycos "half-truths" in connection with each Rewritten and each Rolled-Up Equipment Schedule by disclosing to Lycos the amount of the proposed new monthly payment and lease term, but failing to disclose, as he was required to do under the common law and the Attorney General's Regulations including, without limitation, 940 C.M.R. 3.16(2), and Equipment Leasing Association's Fair Business Practice provision number 7 then in effect, the following:

1.    that the net present value of the stream of lease payments Lycos would be making under the proposed Rolled-Up and Rewritten Equipment Schedules included substantial "mark-ups" in the net present value outstanding under the existing equipment schedule(s) such that Lycos would have to pay millions of dollars above what the rental payments should have been after refinancing the schedules. For example, the net present value of the remaining stream of payments of the equipment schedules that were cancelled and rolled onto Schedule 93 plus the net book value of the respective outstanding residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687. The net present value of the stream of payments plus the net book value of the respective outstanding residuals under Schedule 93 was $1,441,368.10. *See* CSI039686 and documents identified in the CSI Letters. Thus, CSI charged Lycos a mark-up of over 930% simply to refinance the equipment onto Schedule 93. CSI failed to disclose this fact

- 13 -

ü

to Lycos. The bates numbers of the documents supporting the foregoing factual assertions are

identified in the CSI Letters.

        2.     the net present value outstanding on each equipment schedule at the time

each schedule was rewritten or rolled-up. For example, CSI failed to disclose to Lycos that the

net present value of the remaining stream of payments of the equipment schedules that were

cancelled and rolled onto Schedule 93 plus the net present value of the respective outstanding

residuals was, at the time they rolled onto that schedule, $139,689.47. CSI039687.

        3.     that the "Base Value"[9] with respect to the equipment on the Rolled-Up and

Rewritten Equipment Schedules, would *not* equal the original equipment cost but, instead, would

be inflated to a number selected by CSI well above that cost.[10] Throughout the parties'

relationship, Addendum No. 1 to the original equipment schedules between Lycos and CSI stated

that the "Base Value" would equal the "vendor list price," the "equipment cost" or the

"manufacturer's list price." *See generally* the documents evidencing the original equipment

schedules identified in the CSI Letters and more specifically, but without limitation, CSI034306-

34309, LYC00087, and CSI004710-4712. Yet, on the Rewritten and Rolled-Up Equipment

Schedules, the Base Value generally did not equal the "vendor list price" or "equipment cost."

Indeed, there was no apparent relationship between the two. For example, Addendum No. 1 to

Schedule 67E states that the Base Value of the equipment on that schedule was to be the

"Equipment Cost." CSI032166-32168. The cost of the hardware on that schedule totaled

$907,993.82. (Even if soft costs and freight were to be added to this number, the total cost was

---

[9] The Stipulated Loss Value Schedules establish the formula for determining the amount Lycos would be required to pay CSI if the equipment Lycos leased from CSI were lost or damaged. The "Base Value" is the number by which a percentage is multiplied to determine how much Lycos would be required to pay

[10] The documents evidencing this allegation include the documents identified in the CSI Letters.

- 14 -

$966,572.05.) Yet, when the equipment on Schedule 67E was rolled onto Schedule 67H, *and no new equipment was added*, CSI set the Base Value more than $125,000 higher at $1,091,002.00. CSI0032727. If anything, the fair market value of the equipment when it went onto Schedule 67H was lower than it was when it was purchased because the equipment was used when it went onto 67H. *See* documents identified in the CSI Letters and Exhibit A to CSI's Answers to Lycos's First Set of Interrogatories.

   4. the original acquisition cost of the equipment on all but a few of the equipment schedules. CSI maintained the original acquisition cost of the equipment on its computers and had the ability to run a report with respect to these costs within minutes. *See* Tr. of Deposition of Michelle Thompson. It even printed out those costs for its internal use,[11] but did not give Lycos the portion of the printout containing the original equipment cost until very late in the parties' relationship. *Compare, e g*, CSI040995-41001 with LYC07559-7563. Rather, CSI intentionally provided Lycos with a version of its printout that omitted the original acquisition cost of the equipment in an effort to make it near-impossible for Lycos to figure out the acquisition cost.

   5. it maintained a well-orchestrated and targeted internal scheme to manipulate the leasing process and cause Lycos to rewrite leases repeatedly, even though such rewrites caused damage to Lycos. Specifically, CSI maintained Sales Compensation Plans for each fiscal year that governed, among other things, the triggering of commission payments and the amount of commissions to be paid to account executives such as Mr. Stenberg. These plans were designed to provide incentives to account executives such as Mr. Stenberg to cause CSI's customers to rewrite by not only making rewrites commissionable events, but also by rewarding

---

[11] *See, e g*, CSI045807, 45828, 45832, 45836, 45844, 45851, 45856, 45862, 45868, and 45877.

account executives during certain years with greatly enhanced commission percentages on rewrites of outdated personal computers. *See* CSI Compensation Plans for Paul Stenberg, CSI44223-44257, CSI44258-44296, CSI44297-44333, CSI44334-44369, CSI44370-44406, CSI044468-44469, CSI044473-044492, CSI044470-44472, CSI44493-44512, and PC Rewrite program, CSI44407.

        6.     it perpetrated a scheme to cause Lycos to trust and depend on Mr. Stenberg for his expertise in leasing, and induced Lycos not to investigate Mr. Stenberg's intentional misrepresentations and "half-truths" described herein. CSI evaluated Mr. Stenberg based on his ability to "develop an ongoing business and personal bond of camaraderie, trust and dependency with [the] decision maker" at Lycos. *See, e.g.*, CSI044211-44222. His supervisor concluded that he had succeeded in this and gave him the highest possible rating in his performance evaluations. CSI044216, CSI044220. His supervisor's evaluation of him was well-founded. Mr. Stenberg indeed gained Lycos's trust and dependency by, among other things, responding to certain of its requests for information, entertaining Lycos employees on occasion, and acting as Lycos's account executive for the entire seven-year relationship. Mr. Stenberg worked for CSI during a time when Lycos was a fledgling internet start-up company and when the internet boom took flight in the late 1990s. As Mr. Stenberg was aware, this era of the Internet required fast movement and Lycos executives and employees at the time were consumed with their day-to-day responsibilities. Mr. Stenberg also knew that Lycos lacked expertise in leasing. As a result, Lycos looked to and trusted Mr. Stenberg to provide sound leasing solutions and advice and Mr. Stenberg was aware that Lycos was largely dependent upon him in this role.

       Moreover, Mr. Stenberg was the only person consistently involved in the CSI-Lycos lease relationship during the years that relationship existed. Given the nature of the times and

Internet businesses in general, Mr. Stenberg worked with a series of different people at Lycos on the leasing of equipment. Each time a new person from Lycos took over the leases, Mr. Stenberg enjoyed a significant advantage in information, as he knew the entire history of the parties' leasing practices and transactions. Mr. Stenberg (ab)used Lycos's trust in and reliance on him, as well as his informational advantage, to defraud Lycos and reap millions of dollars in commissions.

       7.     it had perpetrated a scheme to put Lycos in the position of having to either rewrite equipment lease schedules indefinitely or buy-out the leased equipment at a price substantially in excess of the then fair market value of the equipment. CSI implemented this scheme, in part, by inflating the Base Value, as discussed above, and establishing Stipulated Loss Value Percentages which, if paid, would enable CSI to recover an exorbitant amount, well in excess of not only the then reasonable value of the equipment, but any industry norm or reasonable profit as well. For example, under Schedule 48, according to CSI, the net present value of the stream of payments Lycos was required to make totaled 108% of the original cost of the equipment. CSI039222. Yet, if Lycos were unable to return that equipment at the end of the 36 month lease term, Lycos would have been contractually obligated to pay an additional 55% of the Base Value, for a total of 163% of the original cost of the equipment, equipment that would have had little or no resale value and that CSI would prefer not to have had returned. CSI0014610. The documents cited in the CSI Letters and the testimony of Philip Cagney are among the evidence on which Lycos intends to rely to support this claim.

The effect of the inflated Base Value and Stipulated Loss Value percentages came to a head when Lycos sought to negotiate a purchase price for the equipment it had been leasing from CSI. At that time, in summer, 2003, Lycos had already paid interim and monthly rent to and for

- 17 -

the benefit of CSI aggregating more than $55.8 million on account of equipment that CSI claims had an original cost of less than $46 million, and had an obligation to pay significant additional monies.

The fair market value threshold of the equipment Lycos wanted to purchase was $350,000. CSI determined that Mr. Stenberg would earn a commission if he sold the equipment for more than that amount. Mr. Stenberg, who knew Lycos was unable to return the equipment for a variety of reasons (including CSI's stringent equipment return policies), then quoted Lycos a purchase price of $4.691 million for the equipment, more than *twelve* times the equipment's booked residual value. Lycos determined that because it could not return the equipment, it would be required either to extend the equipment leases again or make stipulated loss payments to CSI at the end of equipment schedules totaling more than $30 million (for obsolete equipment having little or no resale whatsoever). Thus, CSI's scheme of establishing unreasonably high base values and stipulated loss value percentages put Lycos in the position of having to pay an unreasonably high price relative to the then fair market value of the equipment. While Lycos was able to negotiate a purchase price of $3.775 million after threatening to audit CSI's equipment schedules, Lycos still paid CSI more than ten times the amount of the equipment's booked residual value and an even greater multiple above the fair market value of the equipment.

Mr. Stenberg failed to make the foregoing disclosures at or shortly before Lycos executed each Rolled-Up or Rewritten Equipment Schedule. The individuals at Lycos who relied on one or more of CSI's "half-truths" described in sub-paragraph "D" above to the detriment of Lycos included Tom Guilfoile, Edward Philip, Sam Ziba, Mike Ripps, and Brian Lucy. These individuals relied on CSI's misrepresentations in (a) entering into the Rolled-Up and Rewritten Equipment Lease Schedules, (b) causing Lycos to make more than $58 million in payments to

- 18 -

and for the benefit of CSI with respect to the Rolled-Up and Rewritten Equipment Schedules; (c)

entering into the Sales Agreement; and (d) causing Lycos to pay CSI $3.775 million pursuant to

the Sales Agreement.

## INTERROGATORY NO. 3:

3.    State the basis for, including all evidence supporting, your claims that CSI "has
unjustly received and obtained money from Lycos well above any reasonable or fair total
compensation" and "has unjustly received and obtained possession of money from Lycos well
above any reasonable or fair total compensation, without CSI providing any consideration to
Lycos in terms of reducing or eliminating its (Lycos') obligations at the end of the terms of the
"rolled up schedules" – explaining, in your answer, *inter alia*, how much money you claim that
CSI has unjustly received, the date or dates when it unjustly received any such monies, and what
"consideration" you claim CSI should have given to Lycos.

## RESPONSE TO INTERROGATORY NO. 3:

Subject to and without waiving its General Objections, Lycos refers to its answers to

Interrogatories Nos. 1 and 2 above.  In addition, Lycos states that: (a) CSI maintains that Lycos

paid CSI over $72 million to lease equipment that had, according to CSI, an original cost of

$45.5 million; (b) CSI, through Mr. Stenberg, quoted Lycos a buyout price for the equipment of

$4.691 million at various times during the period from November, 2002 through June, 2003 even

though CSI's booked residual value for the equipment, was approximately $1.5 million when

calculated in August, 2001,[12] and the equipment had a fair market value of little or nothing at the

time of the quote and the sale.

## INTERROGATORY NO. 4:

4.    State the basis for, including all evidence supporting, your claims that CSI has
violated the Massachusetts Unfair Trade Practices Statute, M.G.L. c. 93A, Sections 2 and 11 –
explaining in your answer, *inter alia*, exactly what unfair or deceptive acts or practices were
committed by CSI, who at CSI committed them and when, and what specific harm they caused
Lycos.

---

[12] CSI041655-41656.

## VERIFICATION

I, Kevin Baillie, being duly sworn, hereby depose and state that I am an officer of Lycos,

Inc. I verify that the foregoing Responses to CSI's First Set of Interrogatories to Lycos, Inc. are

made on behalf of Lycos, Inc., that most of the matters stated therein are not within my personal

knowledge, and that the facts stated therein have been assembled by persons assisting Lycos, Inc.

in this case. Upon information and belief, the facts stated therein are true and correct based on

the information in the possession of Lycos, Inc. and its professionals at this time.

/s/ Kevin Baille
Kevin Baillie

AS TO OBJECTIONS:

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston MA 02109
(617) 535-4000

## CERTIFICATE OF SERVICE

I, Peter M. Acton, Jr., hereby certify that on this 25th day of October, 2006, a true and
correct copy of the foregoing document was served by electronic mail and first-class mail on the
following:

Robert J. Kaler
Edward W. Little, Jr.
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
rkaler@mccarter.com
elittle@mccarter.com

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr.

- 28 -

BST99 1517349-4 057077 0012

# EXHIBIT 49

# FILED UNDER SEAL

# EXHIBIT 50
# FILED UNDER SEAL

# EXHIBIT 51
# FILED UNDER SEAL

# EXHIBIT 52

**NON ORIGINAL**

# CSI

## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314) 997-7010

MAILING ADDRESS:
Post Office Box 16264
St. Louis, MO 63105

### EQUIPMENT SCHEDULE NO. TWELVE Dated as of December 12, 1997

LESSOR:

**COMPUTER SALES INTERNATIONAL, INC.**

LESSEE:  **LYCOS, INC.**
500 Old Connecticut Path
Framingham, Massachusetts 01701-4576

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the Master Lease Agreement No. 144874 dated December 4, 1996, are hereby incorporated herein and made a part hereof:

### 1. Equipment:

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY LEASE RATE FACTOR PER UNIT |
|---|---|---|---|---|---|---|
| * | DEC, NEC | | DESKTOPS 200MHZ OR FASTER | | NEW | .0393 TIMES UNIT'S COST |
| * | DEC, NEC | | DESKTOPS LESS THAN 200MHZ | | NEW | .0397 TIMES UNIT'S COST |
| * | DEC, NEC | | NOTEBOOKS LESS THAN 200MHZ | | NEW | .0397 TIMES UNIT'S COST |
| * | DEC, NEC | | NOTEBOOKS 200MHZ OR FASTER | | NEW | .0392 TIMES UNIT'S COST |
| * | HP | | LASERJET PRINTERS | | NEW | 0397 TIMES UNIT'S COST |
| * | | | MISCELLANEOUS HARDWARE | | NEW | .042 TIMES UNIT'S COST |

**EQUIPMENT LOCATION:**   To Be Supplied By Lessee Upon Installation

2. Monthly Lease Rate Factor for all Units:  See Addendum One
3. Initial Term:  **February 1, 1998 through January 31, 2000;  Twenty-four (24) months**
4. Anticipated Installation Date:  **December 1, 1997 through January 31, 1998**
5. Addendum One hereto is incorporated herein by this reference.  [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before **December 19, 1997.**

**COMPUTER SALES INTERNATIONAL, INC.**  LESSEE: **LYCOS, INC.**

By: _____

Title: ~~WILLIA J GILLULA~~
~~CHIEF OPERATING OFFICER & CFO~~

Date: ~~DEC 2 6 1997~~

By: _Thomas E. Guilfoil_

Title: _VP Finance / Ad_

Date: _12/15/97_

PHS/BOST
144874-012rev(skh)

CONFIDENTIAL
CSI0033448

## ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. TWELVE
### MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Twelve, Master Lease Agreement No. 144874" (the "Lease"), is dated as of December 12, 1997, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Controlling Terms:** This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2. **Lessor's Purchase of Equipment:**

a) Lessor will purchase the Equipment directly from the vendor(s) designated by Lessee.

b) The Total Cost of the Lease (hardware, software license fees and other costs) is not to exceed $500,000.00. If Lessee wants this Lease to cover costs greater than $500,000.00, Lessor, in its sole discretion, may pay the additional costs.

c) Lessor is not liable for any failure or delay in delivery caused by the manufacturer, vendor or any other party or condition not within Lessor's control.

**\*3. Quantities; Monthly Rental:**

a) This Equipment Schedule covers all machines of the type(s) listed that are installed at Lessee's facilities between December 1, 1997 and January 31, 1998, inclusive. At this time, Lessee is unable to specify exactly how many Units will be installed; therefore, the "quantity" column has been left blank. As Lessee determines the quantities of Equipment it requires, Lessee shall have the applicable vendor send to Lessor invoices which will reference this Lease and which will specify machine type(s), quantities, equipment location(s), sales price, serial number(s) and installation date(s) of the Units ordered by Lessee. Upon receipt of each properly prepared invoice, Lessor shall remit the sales price to the vendor.

b) Monthly Rental per Unit will equal the "Monthly Lease Rate Factor" for that Unit, which is specified in the Equipment Schedule, multiplied by the Unit's cost. On February 1, 1998, or as soon thereafter as is reasonably practicable, Lessee shall execute a Certificate of Acceptance for all installed Equipment, which Certificate verifies the actual quantities of machines; and the Monthly Rental per Unit and the total Monthly Rental for the Equipment Schedule, both of which will be expressed as dollar amounts.

4. **Initial Term:** The twenty-four (24) month Initial Term shall start on February 1, 1998, and expire on January 31, 2000. Lessee shall pay to Lessor Daily Rental as set forth in Section 3 of the Master Lease, for each Unit of Equipment for each day from, and including, its installation date through, but not including, February 1, 1998. Daily Rental shall be due in a lump sum on February 1, 1998.

CONFIDENTIAL
CSI0033449

5. **Stipulated Loss Value**:  Because the actual quantities of Equipment are unknown at this time, specific dollar amounts cannot be listed on the Stipulated Loss Value Schedule.  Instead, "Manufacturer list price" has been specified so that, at the time of a loss, the Stipulated Loss Value shall be equal to the present manufacturer list price for the Unit times the applicable percentage.  The parties agree, however, that on February 1, 1998, or as soon thereafter as reasonably practicable, a new Stipulated Loss Value Schedule specifying a dollar amount Base Value shall be executed.

6. **Software License Fees and Other Costs**:  In consideration of Lessee's entering into this Lease, Lessor shall pay on Lessee's behalf various operating and/or application software license fees so that Lessee may use such software packages in connection with the Equipment.  Lessor may also pay other costs related to the Equipment, on Lessee's behalf.  Lessee shall reimburse Lessor for such costs by (i) paying a daily charge equal to one-thirtieth of the Soft Cost Factor set forth below times the cost of the software license fee or other cost for each day from and including the date Lessor pays such fees or costs through, but not including February 1, 1998, such total daily charges to be paid in a lump sum on February 1, 1998, and (ii) making a monthly payment to Lessor equal to .0462 (the "Soft Cost Factor") times the cost of the applicable software license fees or other costs.  The resulting monthly payment amount will then be assigned on a pro-rata basis (pro-rated by Unit cost) to Units of Equipment and will be treated as additional rental for the lease of the Equipment.  The total amount of software license fees and other costs will not exceed twenty-five percent (25%) of the Total Cost of the Lease, without Lessor's prior written consent.  Because Lessor makes payments as invoices are received throughout the installation period, the percent of software license fees and other costs to the Total Cost of the Lease is generally not known until the final reconciliation of the Lease.  If Lessor determines that the total amount of software license fees and other costs exceed twenty-five percent (25%) of the Total Cost of the Lease, Lessor shall have the option to exclude the excess software license fees and other costs from this Lease and Lessee agrees to reimburse Lessor for such amounts.

7. **Interest Rate Contingency**:  The Lease Rate and Soft Cost Factors (the "Rate Factors") specified in this Lease are based upon the yield to maturity of U.S. Treasury notes maturing in January 2000 (the "Treasury Yield"); the Treasury Yield is currently 5.71%.  Lessor intends to obtain a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral (the "Loan").  If, at the time the Loan is closed, the *then current* Treasury Yield exceeds 5.71%, then the Rate Factors shall be increased by .0001 for each 25 basis points by which the *then current* Treasury Yield exceeds the current Treasury Yield of 5.71%.  The Rate Factors will be increased only until the *then current* Treasury Yield exceeds the current Treasury Yield by 300 basis points.  Any increases in the Treasury Yield in excess of 300 basis points will have no further effect on the Rate Factors.  Increases of the Treasury Yield by increments of less than 25 basis points will have no effect on the Rate Factors.

8. **Financing Contingency:**  Lessor's performance hereunder is conditioned upon Lessor obtaining a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral.  In the event Lessor cannot obtain such a loan within sixty (60) days after Lessor's receipt of signed lease documents from Lessee, then Lessor shall so notify Lessee and shall have no further obligations hereunder.

9.  **Installation and Maintenance:**  Lessee, at its expense, shall have the installation of the Equipment; the maintenance of the Equipment during the Initial Term or any extended term; and, the de-installation of the Equipment prior to its return to Lessor performed by the manufacturer.  When the Equipment is returned, Lessee shall provide Lessor with a Certificate of Maintainability from the manufacturer.  All software licenses assigned to the Equipment will remain with the Equipment and will be transferred to Lessor at the time the Equipment is returned.

CONFIDENTIAL
CSI0033450

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Twelve; Master Lease No. 144874; as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.

By: _____

Title: E TELLA PUELLULA
CHIEF OPERATING OFFICER & CFO

Date: DEC 22 1997

LYCOS, INC.

By: _Thomas G. Guilfoile_

Title: _VP Finance & Adm._

Date: _12/15/97_

PHS/BOST
144874-012rev(skh)

CONFIDENTIAL
CSI0033451



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER:  TWELVE

MASTER LEASE AGREEMENT NUMBER:  144874

BASE VALUE:  Manufacturer List Price

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor:_____

Lessee:_____

PHS/BOST

144874-012/rev(skh)

CONFIDENTIAL
CSI0033452

# EXHIBIT 53

NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $672,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | | |
| 1 | 108.5 | 13 | 90.1% |
| 2 | 106.9 | 14 | 88.6 |
| 3 | 105.4 | 15 | 87.1 |
| 4 | 103.9 | 16 | 85.6 |
| 5 | 102.4 | 17 | 84.0 |
| 6 | 100.8 | 18 | 82.5 |
| 7 | 99.3 | 19 | 81.0 |
| 8 | 97.8 | 20 | 79.4 |
| 9 | 96.3 | 21 | 77.9 |
| 10 | 94.7 | 22 | 76.4 |
| 11 | 93.2 | 23 | 74.9 |
| 12 | 91.7 | 24 and thereafter | 73.3 |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-065(aad)

CONFIDENTIAL
CSI0028339



NON-ORIGINAL

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,440,000 00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-066(aad)

CONFIDENTIAL
CSI0028985

NON-ORIGINAL



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66I

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $985,000 00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

      Lessee: _____

PHS/BOST

144874-066I(pw)

CONFIDENTIAL
CSI0030731



**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



**CSI**

# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-EIGHT

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $4,200,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-068(skh)

**CONFIDENTIAL**
**CSI0008709**





**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy.

# CSI

# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 69G

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,031,403.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-069G(skh)

CONFIDENTIAL
CSI0012818



**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,390,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-085(skh)

CONFIDENTIAL
CSI0006749



**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



**CSI**

# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $725,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-086(gd)

CONFIDENTIAL
CSI0007130

# EXHIBIT 54



# ORIGINAL



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 64D

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $340,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-064D(skh)

CONFIDENTIAL
CSI0017945

ORIGINAL



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $672,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% |
| 1 | 108.5 | 14 | 88.6 |
| 2 | 106.9 | 15 | 87.1 |
| 3 | 105.4 | 16 | 85.6 |
| 4 | 103.9 | 17 | 84.0 |
| 5 | 102.4 | 18 | 82.5 |
| 6 | 100.8 | 19 | 81.0 |
| 7 | 99.3 | 20 | 79.4 |
| 8 | 97.8 | 21 | 77.9 |
| 9 | 96.3 | 22 | 76.4 |
| 10 | 94.7 | 23 | 74.9 |
| 11 | 93.2 | 24 and thereafter | 73.3 |
| 12 | 91.7 | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-065(aad)

CONFIDENTIAL
CSI0028627

ORIGINAL



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: SIXTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $1,440,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST
144874-066(asd)

CONFIDENTIAL
CSI0029025



**ORIGINAL**



# *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 66B

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $530,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 | 58.1 |
| 10 | 94.7 | 23 | 74.9 | 35 | 56.5 |
| 11 | 93.2 | 24 | 73.3 | 36 and thereafter | 55.0 |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-066B(skh)



# ORIGINAL

 **CSI**

## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: 661

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $985,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-0661(pw)

**CONFIDENTIAL
CSI0030754**



**ORIGINAL**



# COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-FIVE

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $2,390,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-085(s1b)

**CONFIDENTIAL**
**CSI0006787**



**NON-ORIGINAL**
No security interest in an Equipment Schedule may
be created or perfected by possession of this copy



**CSI**

## *COMPUTER SALES INTERNATIONAL, INC.*

10845 Olive Boulevard
St. Louis, Missouri 63141
(314)997-7010

LESSEE: LYCOS, INC.

STIPULATED LOSS VALUE SCHEDULE TO EQUIPMENT SCHEDULE NUMBER: EIGHTY-SIX

MASTER LEASE AGREEMENT NUMBER: 144874

BASE VALUE: $725,000.00

| MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) | MONTHLY PAYMENTS MADE | STIPULATED LOSS VALUE (PERCENT OF BASE VALUE) |
|---|---|---|---|---|---|
| 0 | 110.0% | 13 | 90.1% | 25 | 71.8% |
| 1 | 108.5 | 14 | 88.6 | 26 | 70.3 |
| 2 | 106.9 | 15 | 87.1 | 27 | 68.8 |
| 3 | 105.4 | 16 | 85.6 | 28 | 67.2 |
| 4 | 103.9 | 17 | 84.0 | 29 | 65.7 |
| 5 | 102.4 | 18 | 82.5 | 30 | 64.2 |
| 6 | 100.8 | 19 | 81.0 | 31 | 62.6 |
| 7 | 99.3 | 20 | 79.4 | 32 | 61.1 |
| 8 | 97.8 | 21 | 77.9 | 33 | 59.6 |
| 9 | 96.3 | 22 | 76.4 | 34 and thereafter | 58.1 |
| 10 | 94.7 | 23 | 74.9 | | |
| 11 | 93.2 | 24 | 73.3 | | |
| 12 | 91.7 | | | | |

In the event of a loss of less than all of the Equipment listed on the above Equipment Schedule, the Stipulated Loss Value shall be allocated to the Units lost in the same proportion as the Monthly Rental per Unit for the lost Units bears to the Monthly Rental for all Units listed on the Equipment Schedule.

Initialed by Lessor: _____

Lessee: _____

PHS/BOST

144874-086(gd)

CONFIDENTIAL
CSI0007130

# EXHIBIT 55

| Message3183 |
| --- |
| **Subject:** Re: |
| **From:** Brian.Lucy@corp.terralycos.com |
| **Date:** 6/30/2003 4:15:35 PM |
| **To:** Paul Stenberg |
| **Message Body** |

I'm at the dentist right now. They are telling me that they would like me to ask you to work with them to review the math supporting the buyout number.

B

_____

Sent from my BlackBerry Wireless Handheld

_____

------ Original Message ------
From: Paul Stenberg [Paul.Stenberg@csileasing.com]
Sent: 06/30/2003 04:12 PM
To: "Brian Lucy@corp.terralycos. Lucy (E-mail)" <Brian Lucy@corp terralycos com>

I gather your out.

Well, my approval from the banks expire today. If you chose to do it, I suggest you sign it w/ a contigency ( upon Terra' corps approval) and fax it to Barb Minch at 314-997 7844 tonight. If you do it, take 75k off the price and initial it.

I am sure lease forum would like a check for 19k for doing nothing

e-mail me and let me know.

y

| Outlook Header Information |
| --- |
| Sender Name: Brian.Lucy@corp.terralycos.com |
| Received By: Paul Stenberg |
| Delivery Time: 6/30/2003 4:15:35 PM |
| Creation Time: 6/30/2003 4:14:32 PM |
| Modification Time: 6/30/2003 7:15:42 PM |
| Submit Time: 6/30/2003 4:19:18 PM |
| Importance: Normal |
| Priority: Normal |

CSI042367
CONFIDENTIAL

Sensitivity: Normal
Flags: 1 = Read
Size: 8253

**Standard Header Information**

Received: from CSISMTP ([10.1.13.76]) by CSIEXG02 csileasing com with SMTP (Microsoft Exchange Internet Mail Service Version 5 5.2653.13)
 id NYAR0ZKV; Mon, 30 Jun 2003 15:14:32 -0500
Received: from Unknown [209.202.242.8] by csismtp – SurfControl E-mail Filter (4 6); Monday, 30 June 2003; 15:14:35
Message-ID: <OF38A74A70.BD17F39E-ON85256D55.006FA195@ma lycos.com>
From: Brian.Lucy@corp.terralycos.com
To: "Paul Stenberg" <Paul.Stenberg@csileasing.com>
Date: Mon, 30 Jun 2003 16:19:18 -0400
Subject: Re:
MIME-Version: 1.0
Content-Type: multipart/alternative;
 boundary="=_ NextPart_ST_15_14_36_Monday_June_30_2003_15004"
X-MIMETrack: Serialize by Router on BBMail01/Lycos(Release 5.0.12 February 13, 2003) at 06/30/2003 04:19:20 PM,
 Serialize complete at 06/30/2003 04:19:20 PM

This message is in MIME format. Since your mail reader does not understand
this format, some or all of this message may not be legible.

--=_ NextPart_ST_15_14_36_Monday_June_30_2003_15004
Content-Type: text/plain;
 charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

--=_ NextPart_ST_15_14_36_Monday_June_30_2003_15004
Content-Type: text/html;
 charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

--=_ NextPart_ST_15_14_36_Monday_June_30_2003_15004--

CSI042368
CONFIDENTIAL

# EXHIBIT 56

| | Message3197 | |
|---|---|---|
| **Subject:** | Re: LeaseForum discussions | |
| **From:** | Brian.Lucy@corp.terralycos.com | |
| **Date:** | 7/1/2003 11:12:07 AM | |
| **To:** | Paul Stenberg | |
| | **Message Body** | |

What I say ?

----------------------

Sent from my BlackBerry Wireless Handheld

-----

----- Original Message -----
From: Paul Stenberg [Paul.Stenberg@csileasing.com]
Sent: 07/01/2003 10:46 AM
To: Brian Lucy@corp terralycos.com
Subject: RE: LeaseForum discussions


easy tough guy I am not sure if I can do it anymore

-----Original Message-----
From: Brian Lucy@corp terralycos.com
[ mailto.Brian Lucy@corp.terralycos com]
Sent: Tuesday, July 01, 2003 7:49 AM
To: Paul Stenberg
Cc: Julie Callagee
Subject: LeaseForum discussions


Paul- If LeaseForum and CSI cannot arrive at
a reasonable negotiated settlement for the restructuring of the active CSI
leases, Lycos has authorized LeaseForum to perform a full audit of all CSI
/ Lycos lease arrangements.

Please work directly with LeaseForum to come to a mutually acceptable
resolution.

Thanks,

Brian

CSI042372
CONFIDENTIAL

Sent from my BlackBerry Wireless Handheld

## Outlook Header Information

Conversation Topic: LeaseForum discussions
Sender Name: Brian.Lucy@corp.terralycos.com
Received By: Paul Stenberg
Delivery Time: 7/1/2003 11:12:07 AM
Creation Time: 7/1/2003 11:11:09 AM
Modification Time: 7/1/2003 2:25:30 PM
Submit Time: 7/1/2003 11:15:54 AM
Importance: Normal
Priority: Normal
Sensitivity: Normal
Flags: 1 = Read
Size: 9226

## Standard Header Information

Received: from CSISMTP ([10.1.13.76]) by CSIEXG02.csileasing.com with SMTP (Microsoft
Exchange Internet Mail Service Version 5.5.2653.13)
id NYAR061G; Tue, 1 Jul 2003 10:11:09 -0500
Received: from Unknown [209.202.242.8] by csismtp - SurfControl E-mail Filter (4.6); Tuesday,
01 July 2003, 10:11:07
Message-ID: <OFECD45512.FAEC9F69-ON85256D56.0053DA86@ma.lycos.com>
From: Brian.Lucy@corp.terralycos.com
To: "Paul Stenberg" <Paul.Stenberg@csileasing.com>
Date: Tue, 1 Jul 2003 11:15:54 -0400
Subject: Re: LeaseForum discussions
MIME-Version: 1.0
Content-Type: multipart/alternative;
 boundary="--=_NextPart_ST_10_11_08_Tuesday_July_01_2003_8314"
X-MIMETrack: Serialize by Router on BBMail01/Lycos(Release 5.0.12 [February 13, 2003]) at
07/01/2003 11:15:55 AM,
 Serialize complete at 07/01/2003 11:15:55 AM

This message is in MIME format. Since your mail reader does not understand
this format, some or all of this message may not be legible.

----=_NextPart_ST_10_11_08_Tuesday_July_01_2003_8314
Content-Type: text/plain;
 charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

----=_NextPart_ST_10_11_08_Tuesday_July_01_2003_8314
Content-Type: text/html;

CSI042373
CONFIDENTIAL

charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

------ NextPart_ST_10_11_08_Tuesday_July_01_2003_8314--

CSI042374
CONFIDENTIAL

# EXHIBIT 57
# FILED UNDER SEAL

# EXHIBIT 58

**RIGINAL**



## COMPUTER SALES INTERNATIONAL, INC.

10845 Olive Boulevard                          MAILING ADDRESS:
St. Louis, Missouri 63141                      Post Office Box 16264
(314)997-7010                                  St. Louis, MO 63105

**EQUIPMENT SCHEDULE NO. NINETEEN Dated as of April 2, 1998**

LESSOR:                          LESSEE:  **LYCOS, INC.**
                                          400-2 Totten Pond Road
**COMPUTER SALES INTERNATIONAL, INC.**     Waltham, Massachusetts 02154

Lessor and Lessee named above hereby agree that, except as modified or superseded by this Equipment Schedule or any Addenda hereto, all of the terms and conditions of the **Master Lease Agreement No. 144874** dated December 4, 1996, are hereby incorporated herein and made a part hereof:

**1. Equipment:**

| QTY | MACHINE TYPE/MODEL | FEATURE (QUANTITY PER UNIT) | DESCRIPTION | SERIAL # | NEW/ USED | MONTHLY RENTAL PER UNIT |
|---|---|---|---|---|---|---|
| A detailed list of Equipment is set forth on the attached Exhibit "A" which consists of 2 pages. |||||||
| **EQUIPMENT LOCATION:**   160 Water Street Williamstown, Massachusetts 01267 |||||||

2. Monthly Rental for all Units: **$11,615.00**
3. Initial Term: **Twenty-four (24) months**
4. Anticipated Installation Date: **March 1998**
5. Addendum One hereto is incorporated herein by this reference. [X] (check box if applicable)
6. A photocopy of this Equipment Schedule, and any exhibits or addenda hereto, may be filed as a precautionary Uniform Commercial Code Financing Statement to evidence Lessor's interest in the Equipment.
7. At Lessor's option, this Equipment Schedule shall not be effective unless signed by Lessee and returned to Lessor on or before **April 9, 1998.**

COMPUTER SALES INTERNATIONAL, INC.  LESSEE: LYCOS, INC.

By: _____ E. WILLIA~~___~~          By: _Thomas G. Guigful_
            CHIEF ~~___~~

Title: _____ APR 1 3 1998 _____    Title: _VP Finance & Adm___

Date: _____        Date: _4/7/98_

PHS/BOST
144874-019(skh)

**CONFIDENTIAL**
**CSI0002951**

# EXHIBIT 59





**NON-ORIGINAL**

No security interest in an Equipment Schedule may
be created or perfected by possession of this copy

ADDENDUM ONE TO EQUIPMENT SCHEDULE NO. FORTY-THREE
MASTER LEASE AGREEMENT NO. 144874

This Addendum One to "Equipment Schedule Forty-three, Master Lease Agreement No. 144874" (the "Lease"), is dated as of January 5, 1999, and is entered into, by and between COMPUTER SALES INTERNATIONAL, INC. ("Lessor") and LYCOS, INC. ("Lessee").

Notwithstanding anything to the contrary contained in the Lease between the parties hereto, dated on even date herewith and with respect to certain computer equipment (the "Equipment"), and in consideration of the mutual promises, covenants, and conditions in the Lease and contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    **Controlling Terms:**  This Addendum One shall become a part of the Lease and shall be read together with the Lease as one single document. To the extent that there shall be any conflicts as between the terms and provisions contained in the Lease and those contained herein, the terms and provisions set forth herein shall control.

2.    **Early Termination of Existing Equipment Schedules; Commencement Date:**  The Equipment is installed at Lessee's location under Equipment Schedules Nineteen, Twenty-one, Twenty-three, Twenty-six and Thirty to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment for lease under this Lease. The Initial Term of Equipment Schedule Nineteen is due to expire April 30, 2000, the Initial Terms of Equipment Schedules Twenty-three and Twenty-six are due to expire July 31, 2000, the Initial Term of Equipment Schedule Twenty-one is due to expire May 31, 2000, and the Initial Term of Equipment Schedule Thirty is due to expire October 31, 2000. In consideration of Lessee entering into this Lease, Lessor agrees to terminate Lessee's rental obligations under Equipment Schedules Nineteen, Twenty-one, Twenty-three, Twenty-six and Thirty effective December 31, 1998. Accordingly, the Commencement Date of the Equipment under this Lease is March 1, 1999.

3.    **Financing Contingency:**  Lessor's performance hereunder is conditioned upon Lessor obtaining a fixed-rate, non-recourse loan, using only the Equipment and the Lease as collateral. In the event Lessor cannot obtain such a loan within sixty (60) days after Lessor's receipt of signed lease documents from Lessee, then Lessor shall so notify Lessee and shall have no further obligations hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum One to Equipment Schedule No. Forty-three, Master Lease No. 144874, as of the date set forth below.

COMPUTER SALES INTERNATIONAL, INC.        LYCOS, INC.

By: _____        By: _____

Title: ____E. WILLIAM GILLULA_____        Title: __VP Finance / Admin_____
          CHIEF OPERATING OFFICER * CFO

Date: _____JAN 2 5 1999_____        Date: _____1/6/99_____

PHS/BOST
144874-043(pw)

CONFIDENTIAL
CSI0036055

# EXHIBIT 60

| From: | Julie Callagee/O=Lycos |
|---|---|
| Sent: | Tuesday, July 22, 2003 11:11 AM |
| To: | John Kirk <jkirk@LeaseForum.com>; "Susan S. Franklin" <ssf@LeaseForum.com> |
| Subject: | Re: URGENT Leases Liabilities |
| Attach: | Pertinent Terms and Conditions doc |

Here you go.

----- Forwarded by Julie Callagee/Lycos on 07/22/2003 11:11 AM -----

Brian Lucy
07/22/2003 09:57 AM

To: Andrew Feinberg/Lycos@Lycos
cc: Julie Callagee/Lycos@Lycos, Peter Karol/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

How's this

Operational feasibility of returning the equipment
Based on discussions with our finance group and through a cursory review of our
contractual obligations with our Lessor, it is our understanding that we are
contractually obligated to return all of the leased equipment to our lessor in
exactly the same way it was received. This would include identifying several
hundred pieces of equipment and decommissioning them in accordance with each
lease expiration. We believe this to be operational impossibility, especially
in light of lower headcount and the migration to Tdata in Miami. We may be
able to negotiate more favorable terms, but because Lycos ceased leasing new
equipment from the lessor two years ago, we believe our Lessor would have
diminished interest in negotiating in good faith. Based on discussions with
Finance, Lycos will not be returning any equipment - now or when these leases
terminate.

Financial exposure of not taking current buy-out offer
Furthermore, once we fail to return all the equipment exactly as it was
received and in accordance with the lease expiration date (on time), the
Agreement states that we must buy out of any unreturned equipment at an
(average) of 58% of original cost. We may be able to negotiate a more
favorable rate (less than 58%), but because Lycos ceased leasing new equipment
from the lessor two years ago and because we have no contractual rights as far
as a buy out negotiation, we believe our Lessor would have diminished interest
in negotiating in good faith. The contractual buy out would be approximately
$34 million (rough estimate), compared to the existing buyout price of approx.
$3.8 million. Obviously, buying out now eliminates significant risks to the
Company.

Because this equipment cannot be located/returned, the significant cost
implications of not exercising the buy out offer and the unfavorable

LYC 24029

negotiating position we will be in to negotiate a buy out at the end of the lease term (when we admit to our Lessor that we cannot return this equipment and HAVE TO buy out), we support Brian's decision to buy out of the leases immediately.

Andrew Feinberg
07/22/2003 09:17 AM

To: Brian Lucy/Lycos@Lycos, Julie Callagee/Lycos@Lycos, Peter Karol/Lycos@Lycos
cc:
Subject: Re: URGENT Leases Liabilities

Brian/Julie/Peter: Here's the proposed email. What say you?

Pepe,

In response to your request, I have attached below Peter Karol's evaluation of our rights, obligations and alternatives with respect to the leases. My understanding of the facts from our finance group is that we cannot return all of the equipment, let alone in the original condition. While it might be possible to negotiate something better than the full penalty cost if we were to try to return the equipment that we have identified and can locate, we would be likely forsaking the buyout opportunity if we tried. We collectively believe it is not possible to achieve a negotiation that lowers the penalty price (approximately >$34 million) to anywhere near the buyout price (approx. $3 million).

Please let me know if I can provide any further information.

Andy
----- Forwarded by Andrew Feinberg/Lycos on 07/22/2003 09:12 AM -----

Peter Karol
07/21/2003 06:05 PM

To: Julie Callagee/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

According to the Lease, in the event we cannot return any piece of Equipment, we either have to buy an identical piece of Equipment to replace it, or pay the Stipultaed Loss Value of such piece of Equipment (according to the Schedules, the Stipulated Loss Value for any Equipment piece is either 73.3% or 55% of its original cost). Since we will not be returning any Equipment, we are talking about paying EITHER approximately 58% (a blended rate) of approximately 66

LYC 24030

million dollars (the full original cost of all the Equipment) OR the buyout
amount that LeaseForum negotiated, which is approximately 3 million.

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue
Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

Julie Callagee
07/21/2003 05:55 PM

To: Peter Karol/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

Confirmed. One item to note - the percentage on two of the lease schedules is
73.3% and on the other two is 55%.

Peter Karol
07/21/2003 04:24 PM

To: Julie Callagee/Lycos@Lycos
cc: Andrew Feinberg/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

According to the Lease, in the event we cannot return any piece of Equipment,
we either have to buy an identical piece of Equipment to replace it, or pay the
Stipultaed Loss Value of such piece of Equipment (according to the Schedule,
the Stipulated Loss Value for any Equipment piece is 73.3% of its original
cost). Since we will not be returning any Equipment, we are talking about
paying either 73.3% of roughly 60 million dollars (the full original cost of
all the Equipment) OR the buyout amount that LeaseForum negotiated, which is
roughly 3 million. [Julie please confirm these numbers].

Peter D. Karol
Deputy General Counsel
Terra Lycos
100 Fifth Avenue

LYC 24031

Waltham, MA 02451
Mailstop 525
Phone: 781-434-3142
Fax: 781-370-3433
Email: peter.karol@corp.terralycos.com

Julie Callagee
07/21/2003 03:51 PM

To: Andrew Feinberg/Lycos@Lycos, Peter Karol/Lycos@Lycos
cc:
Subject: Re: URGENT Leases Liabilities

Peter,

Attached please find a summary of the Terms & Conditions that José Mateu
references. I will bring down the original contracts and the schedules that
provide the stipulated loss values.

The schedules stipulate that if we do not return all of the leased equipment we
must pay CSI

73.3% of the original equipment value on schedules 93 & 200
55% of the original equipment value on schedules 94 & 100

Thanks,

Julie

**************************************************************************
Julie Callagee              Assistant Controller
**************************************************************************
Lycos Inc.
A subsidiary of Terra Networks S.A.
100 Fifth Avenue,
Waltham, MA 02451
Phone 781.370.2827
Fax 781.370.2892

Andrew Feinberg
07/21/2003 01:53 PM

To: JoseF.Mateu@corp.terra.com

LYC 24032

cc: Brian Lucy/Lycos@Lycos, Julie Callagee/Lycos@Lycos
Subject: Re: URGENT Leases Liabilities

Understood.

Brian/Julie, could you provide me with a copy of the applicable leases?  Many
thanks.

Andy


JoseF.Mateu@corp.terra.com
07/21/2003 02:00 PM

To: andrew.feinberg@corp.terralycos.com
cc: peter.karol@corp.terralycos.com, elias.rv@corp.terra.com,
Ignacio.Ponce@corp.terra.com, Brian Lucy@corp.terralycos.com
Subject: URGENT Leases Liabilities



Dear Andy,

Lycos leases of software, hardware, office equipment, etc... seem to have a
penalization clause in case that after the expiration of the contract the goods
which have been leased cannot be returned or in an acceptable state. Because,
according to the finance department, the level of this risk occurring is real
and high in its materiality, discussions have been initiated with the lessors
to change the lease into a purchase whose consideration would be lower than the
cost of the risks occurring.
Assuming as a correct assumption the general statements above mentionned, I
need urgently to know the real scope of our duties and liabilities with respect
to the return of the assets to the lessors after the expiration of the
contract.
Regards,

José Mateu

P.D. Although I am not in such a hurry with respect to the nightsurf
interpretation request of its representations and subsequent disclaimers I
would like to have your opinion by the end of the week the latest.

LYC 24033

Este mensaje se dirige exclusivamente a su destinatario y puede contener
información CONFIDENCIAL sometida a secreto profesional o cuya divulgación esté
prohibida en virtud de la legislación vigente. Si ha recibido este mensaje por
error, le rogamos que nos lo comunique inmediatamente por esta misma vía o por
teléfono (34 91 4523913) y proceda a su destrucción.
Nótese que el correo electrónico vía Internet no permite asegurar ni la
confidencialidad de los mensajes que se transmiten ni la correcta recepción de
los mismos. En el caso de que el destinatario de este mensaje no consintiera
la utilización del correo electrónico vía Internet, rogamos lo ponga en nuestro
conocimiento de manera inmediata.

This message is intended exclusively for its addressee and may contain
information that is CONFIDENTIAL and protected by a professional privilege or
which disclosure is prohibited by law. If this message has been received in
error, please immediately notify us via e-mail or by telephone (34 91 4523913)
and delete it.
Please note that Internet e-mail does not guarantee the confidentiality or the
proper receipt of the messages sent. If the addressee of this message does not
consent to the use of Internet e-mail, please communicate it to us immediately.

LYC 24034

# EXHIBIT 61

# INTENTIONALLY
# LEFT
# BLANK

# EXHIBIT 62



85 Wells Avenue
Suite 200
Newton, Massachusetts 02159
(617) 928 3535
Fax: (617) 928 3536

TO:        Micheal Ripps – Lycos, Inc.

FROM:      Paul Stenberg – CSI

DATE:      May 26, 1998

RE:        Sun

Lycos is currently paying CSI $61,068/mo on Equipment Schedules 5A, 5B, 5C, 5D, 5E, 5F, 5G due to expire April 30, 1999.

CSI proposes to cancel these Equipment Schedules June 30, 1998, and rewrite them into a new Twenty-Four (24) month lease. In addition, in corporate the new equipment into the lease ($511,566.50). Rate is as follows:

| Lease Term | Lease Rate |
|---|---|
| 24 month | $65,615/mo |

Also, the equipment you are acquiring can be obtained used for about $100,000 less, but because this is a new Data Center, I suggest the new equipment.

Micheal, let me know. This would free up more credit lines and keep your budget in-line. I need to know by week's end.

CURRENT

5A    1,798
5B    3,075
5C    32,913
5D    13,910
5E    5,885
5F    920
5G    3,367
      61,068

EXHIBIT
STENBERG
27

