

June 13, 2008

VIA CM/ECF ELECTRONIC FILING

Lisa Urso
Clerk to the Honorable Rya W. Zobel
United States District Judge
United States District Court - Massachusetts
One Courthouse Way
Boston, MA 02210

Robert J. Kaler
Partner
T. 617.449.6507
F. 617.607.9141
rkaler@McCarter.com

McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
T. 617.449.6500
F. 617.607.9200
www.mccarter.com

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

Re:  *Computer Sales International, Inc. v. Lycos, Inc.*, C.A. No. 05-10017-RWZ
     (United States District Court - Massachusetts)

Dear Ms. Urso:

We have received a copy of a letter from Lycos, Inc. ("Lycos") to the Court in the above-referenced action, dated June 11, 2008, *see* Docket No. 203 (the "Lycos letter"), setting forth various arguments concerning the summary judgment issues that were discussed with the Court at our last hearing in this case on May 28, 2008.

We respectfully request leave to submit this brief reply to those arguments on behalf of our client Computer Sales International, Inc. n/k/a CSI Leasing, Inc. ("CSI"), and ask that this letter be called to the Court's attention in response to the Lycos submission.

**1.**    The Lycos letter repeats the same arguments made in Lycos' summary judgment papers: **(a)** that its leases with CSI were analogous to loans, **(b)** that its lease extensions were analogous to "refinancings" of mortgage loans, *see* Lycos letter at p.1, 2nd para.; and **(c)** that what it calls "the terminating balances of the leases, i.e., the present value of the remaining rents plus the present value of the residual [value of the leased equipment]" were "equivalent to [*sic* the] outstanding principal balance on a loan."  *See* Lycos letter at p. 2, 4th para.

**2.**    Based on these premises, the Lycos letter then argues that CSI's profit on the lease extensions was $13 million higher than, or "marked up" above, what Lycos' experts have opined a reasonable rate of return (*i.e.* profit) would have been on a series of refinanced loans -- had the principal balances on those loans equaled, in the case of each extended lease (assuming it were viewed as a loan), the present value of the remaining rent due on that lease plus the present value of the residual worth of the equipment being leased.

**3.**    As CSI has stated in its summary judgment papers, the problem with this theory is that it is an analytical construct with no basis in law or in fact.  There is no evidence in the record that Lycos ever thought its leases with CSI were loans, for

Lisa Urso
Clerk to the Honorable Rya W. Zobel
June 13, 2008
Page 2

example, and the undisputed evidence shows that during the entire 7-year period of the parties' relationship, Lycos accounted for and reported all its leases and extended leases with CSI -- in all its audited financial statements, in all its official SEC filings, and in all its annual reports to shareholders -- as true operating leases, gaining substantial tax and accounting benefits as a result. It is also undisputed that those financials, filings, and reports have never been restated with respect to the treatment of the CSI leases.

4.  The undisputed facts also show that the Lycos-CSI lease extensions were not analogous to refinancings of mortgage loans because Lycos **did not own** the property being used under its leases with CSI, the way a mortgage loan borrower owns the property securing its loan. As a result, whenever Lycos extended its use of the leased equipment, it could lawfully be charged whatever price it would agree to pay for the right to continue using that equipment for a longer period of time than previously agreed -- because it did not own it.

5.  Nevertheless, in an effort to make out an actionable "nondisclosure" claim against CSI in connection with the lease extensions that occurred prior to the allegedly deceptive March 18, 2002 email (*see* Counts I-II, and the lease extension portions of Counts V-VII, of the Lycos Counterclaim), the Lycos letter uses a hypothetical recharacterization of those lease extensions as loan refinancings (which they were not) to argue that Lycos was unlawfully charged "hidden" or "embedded" fees above what the Lycos letter characterizes as the "terminating balance," which Lycos analogizes to the "principal" balance of a loan, of each lease being extended.

6.  The record shows, however, that **(a)** no evidence supports this argument, **(b)** Lycos is estopped by its own conduct from claiming that its lease extensions were really loan refinancings, and **(c)** this Court has already rightly dismissed Lycos' two previous attempts to add usury claims, as well as its claims for a declaratory judgment that its leases with CSI were really loans. *See* Orders of July 28, 2006 and August 29, 2007. Moreover, as CSI has explained in its summary judgment papers, it did not, as a matter of law, have any duty to disclose to Lycos how much of the agreed lease extension payments it considered profit, let alone how much was profit above any particular benchmark amount that could be hypothesized by analogizing the leases to loans as Lycos has done.

7.  As in the case of a hardware store that extends a customer's lease of a snowblower long after it has paid for itself without detailing how much more money it will make on the lease extension above what it would have made under the previous lease (assuming a particular residual value for the snowblower it expects to be returned to it), CSI was not obliged to disclose to Lycos the extent to which its profits **(a)** exceeded the cost it incurred in purchasing the computer equipment it was leasing to Lycos, or **(b)** exceeded what CSI would have "earned" -- assuming a particular "residual" value for the equipment being leased that would ultimately be

Lisa Urso
Clerk to the Honorable Rya W. Zobel
June 13, 2008
Page 3

returned to it -- on any of the prior leases it was extending. Rather, Lycos knew what its total rent payments would be for each lease extension, and specifically agreed to those payments. That is all the law requires for an enforceable contract.

**8.** In many respects, this is common sense, but the Lycos letter, like Lycos' voluminous summary judgment submissions, makes the issues seem much more complicated than they are, and no matter how CSI tries to summarize Lycos' arguments, Lycos always characterizes CSI's summary as wrong. There comes a point, however, when a party's refusal to allow its position to be summarized in good faith by an opponent raises a question as to the credibility of that position. CSI respectfully submits that this is the situation here, and that Lycos' continuing submissions to the Court are less an effort to answer outstanding questions than they are to create an impression of complexity to justify a trial of lease extension claims as to which there are no genuinely disputed issue of material fact, and no legitimate legal grounds.

**9.** As part of this effort, the Lycos letter unfairly implies that the testimony of Mike Fleming, the former President of ELA and an expert retained by CSI in this case, somehow supports Lycos' "mark-up" theory because he talked about the ELA Code discouraging such things as undisclosed end-of-lease charges and the like that the customer literally is not made aware that it will have to pay until after it signs the lease. In fact, however, Mr. Fleming has testified that there were no such "undisclosed fees" here, and that CSI did not violate any part of the ELA Code. Lycos has not presented, and cannot present, any legally sufficient evidence to the contrary because it is undisputed that it always knew, when it signed its lease extensions, the amounts that it was agreeing to pay.

**10.** Lastly, regarding Lycos' request for an immediate status conference and scheduling of a trial date in the Fall of this year, CSI respectfully suggests that - even apart from scheduling difficulties - such a conference would be premature until the summary judgment motions are decided, because resolution of those motions will have an enormous effect on counsel's good faith estimates as to the length and complexity of any anticipated jury trial in this matter.

Thank you for your attention to this matter.

Respectfully submitted,


/s/Robert J. Kaler
Robert J. Kaler
*Counsel for CSI*

RJK:ob
cc:    Thomas O. Bean, Esq. (via CM/ECF and e-mail)

ME1 7448507v.1