UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL INC., )<br>Plaintiff, )<br>v. )<br> )<br>LYCOS, INC., )<br>Defendant, )<br> )<br>BANK OF AMERICA f/k/a FLEET BANK, )<br> )<br>Trustee Process Defendant. )<br> ) | C.A. No. 05-10017- RWZ |

**PLAINTIFF CSI LEASING, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE
THE TESTIMONY OF LYCOS' EXPERT CHARLES CROSS**

Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
David Himelfarb, BBO No. 649596
dhimelfarb@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. (617) 449-6500

*Counsel for CSI Leasing, Inc. f/k/a
Computer Sales International, Inc.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

SUMMARY OF ARGUMENT ......................................................................................................1

STATEMENT OF RELEVANT FACTS .......................................................................................2

I.    LYCOS'S REMAINING CLAIMS ...................................................................................2

II.    LYCOS'S MISREPRESENTATION CLAIMS ................................................................4

III.    THE COURT'S SEPTEMBER 26, 2008 ORDER .............................................................6

ARGUMENT ..................................................................................................................................7

I.    THE LEGAL STANDARD ...............................................................................................7

II.    CROSS'S PROPOSED TESTIMONY SHOULD BE EXCLUDED ................................8

    A.    CROSS'S "LEASE STRUCTURE" OPINION SHOULD BE EXCLUDED ON RELEVANCE GROUNDS .........................................................9

    B.    CROSS'S "REFINANCINGS AND MARK-UPS" OPINION SHOULD BE EXCLUDED AS IRRELEVANT .................................................................12

    C.    CROSS'S "FAIR BUSINESS PRACTICE NORMS" OPINION SHOULD BE EXCLUDED IN LIGHT OF THE COURT'S ORDER ..................14

    D.    CROSS'S EXPERTISE AND RELIANCE OPINION IS BASED ON FLAWED METHODOLOGY ................................................................................16

CONCLUSION .............................................................................................................................17

## TABLE OF AUTHORITIES

**CASES**

*Agri-Mark, Inc. v. Niro, Inc.*, 214 F. Supp. 2d 33 (D. Mass 2002) ................................................. 8

*Chamberlin & Burnham, Inc. v. Cohn*, 158 N.E.2d 846 (Mass. 1927) ...................................... 11

*Cipollone v. Yale Indus. Prod., Inc.,* 202 F.3d 376 (1st Cir. 2000) ................................................ 7

*Cummings v. The Standard Register Co*. 265 F.3d 56 (1st Cir. 2001) ........................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............................ 7, 8, 12, 17

*Equip. & Sys. For Indus., Inc. v. Northmeadows Consrt. Co.*, 798 NE.2d 571 (Mass. App. Ct. 2003 ) ................................................................................................................. 3

*Hancock Bank and Trust Co. v. Shell Oil Co.*, 309 N.E.2d 482 (Mass. App. Ct. 1974) ................................................................................................................................. 11

*Hochen v. Bobst Group, Inc.*, 290 F.3d 446 (1st Cir. 2002) ............................................................ 7

*J.F. White Contracting Co. v. M.B.T.A.*, 666 N.E.2d 518 (Mass. App. Ct. 1996) ........................ 11

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 7

*O'Connor v. Merrimack Mut. Fire Ins. Co.*, 897 N.E.2d 593 (Mass. App. Ct. 2008) ................................................................................................................................. 3

*Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F. 3d 68, 80-1 (1st Cir. 2002) ................................................................................................................................. 7

**STATUTES**

Mass. Gen. L. ch. 231, § 85J ............................................................................................................. 3

Mass. Gen. L. ch. 93A ....................................................................................................................... 3

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 551 (Liability for Nondisclosure) ...................................... 13, 14

**RULES**

940 C.M.R. 3.16(2) ............................................................................................................................ 5

Federal Rule of Evidence 702 ........................................................................................................... 7

Plaintiff and defendant-in-counterclaim CSI Leasing, Inc., f/k/a Computer Sales International, Inc. ("CSI"), respectfully moves to exclude the testimony of defendant Lycos' Inc.'s expert Charles Cross ("Cross"), a lawyer and putative leasing expert who seeks to offer an expert opinion that CSI's lease agreements with Lycos did not comport with "reasonable and customary standards and practices in the industry," including the standards promulgated by the Equipment Leasing and Finance Association ("ELFA") (formerly the Equipment Leasing Association ("ELA")). *See* Expert Witness Report of Charles Cross dated August 31, 2007 at 7 and 25 (attached hereto, without exhibits, as Exhibit A) (the "Cross Report").

This testimony should be excluded because CSI's compliance with industry standards is not relevant to the issues remaining in this case, including whether CSI made certain misrepresentations to Lycos, either affirmatively or by omission. Additionally, much of Cross's opinion relates to the Master Lease Agreement ("MLA"), but Lycos has not asserted any claims in this lawsuit challenging the propriety of the MLA. Rather, this action revolves around the parties' re-writes and roll-ups of equipment schedules and the subsequent Sales Agreement (on which Cross expresses no opinion). As such, whether or not the MLA contains terms which Cross believes are less favorable to Lycos than terms successfully negotiated by other lessors is irrelevant to the issues in dispute in this case.

Cross also employs flawed methodologies for some of his opinions and seeks to give opinions that will confuse, rather than assist, the trier of fact. For all of these reasons, Cross's opinion should be excluded.

## SUMMARY OF ARGUMENT

The Cross Report, which was prepared on August 31, 2007, is largely irrelevant in light of the Court's September 26, 2008, Memorandum of Decision and Order ("Order") which has significantly recast the facts that Lycos must show to prove its case. At the time Cross prepared

his Expert Report, Lycos was operating under a theory – fully adopted and embraced by Cross – that a lessor, particularly one that was a member of ELA, was under a general duty to disclose to a lessee *all material facts* relating to a leasing transaction. Lycos subsequently advocated this position to the Court in connection with the parties' cross-motions for summary judgment, and the Court ultimately declined to accept it, ruling that absent the creation of a fiduciary relationship between CSI and Lycos, CSI had no duty to disclose any facts, other than the ones CSI did in fact disclose. *See* Order at 10-11. The Cross Report expresses no opinion on whether such a relationship ever existed, and Cross lacks the qualifications to do so.

The Court's Order further impacts the Cross Report in another fundamental way. Cross's Report is grounded on the conclusion that the Master Lease Agreement ("MLA") between CSI and Lycos is unfair and overly onerous. Because the Court has found that CSI had no disclosure obligations unless and until a fiduciary relationship was created, and because Lycos does not allege that such a relationship existed at the time the MLA was executed by the parties (the MLA was signed on December 20, 1996, by Lycos and on January 10, 1997, by CSI), but rather developed over time through CSI's account representative, Paul Stenberg, taking Lycos employees on "golf outings, dinners, concerts and sporting events," (*see* Answer to CSI's First Amended Complaint and Counterclaim of Lycos, Inc. ("Counterclaim"), ¶ 14), there is no basis upon which to hold CSI liable for the provisions of the MLA with which Cross takes issue.

These deficiencies, coupled with various other irrelevant and flawed opinions Cross seeks to offer, discussed below, warrant the exclusion of Cross's proposed testimony.

## STATEMENT OF RELEVANT FACTS

### I.   LYCOS'S REMAINING CLAIMS

Following the Court's September 26, 2008, Order, Lycos' remaining claims in the case are: (a) fraudulent and negligent misrepresentation in the inducement of rolled-up and rewritten

equipment schedules (Counts I and II); (b) fraudulent misrepresentation in the inducement of the Sales Agreement (Count III); (c) fraud in the inducement of the Sales Agreement pursuant to Mass. Gen. L. ch. 231, § 85J[1] (Count IV); (e) Mass. Gen. L. ch. 93A (arising from the alleged fraud in the inducement of the Sales Agreement and the "rewrites" and "roll ups") (Counts V and VII); (f) money had and received (Count XII); (g) unjust enrichment (Count XIII); (h) declaratory judgment as to whether Lycos owes any money to CSI (Count XIV); and (i) declaratory judgment as to whether Lycos can retain the equipment (Count XV).[2]  *See* Counterclaim.

The Cross Report does not offer any opinions as to the propriety of the Sales Agreement. *See* Cross Report.  As such, the only Counterclaims on which Cross's testimony would arguably have any bearing are claims I and II alleging fraudulent[3] and negligent[4] misrepresentation.[5]

---

[1]  Mass. Gen. L. ch. 231, § 85J, states, "Whoever, by deceit or fraud, sells personal property shall be liable in tort to a purchaser in treble the amount of damages sustained by him."  *Id.*

[2]  Counts VIII-XI were dismissed pursuant to an endorsed Order of the Court dated August 29, 2007, in response to CSI's Motion to Dismiss.

[3]  A claim for damages from fraudulent misrepresentation "requires proof that (1) the defendant made a misrepresentation of fact; (2) it was made with the intention to induce another to act upon it; (3) it was made with the knowledge of its untruth; (4) it was intended that it be acted upon, and that it was in fact acted upon; and (5) damage directly resulted therefrom."  *Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co.*, 798 N.E.2d 571, 574 (Mass. App. Ct. 2003 ) (holding that general allegations of refusal to execute certain refinance agreements did not state cause of action with sufficient particularity).

[4]  In order to recover for negligent misrepresentation a plaintiff must prove that the defendant "(1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information."  *O'Connor v. Merrimack Mut. Fire Ins. Co.*, 897 N.E.2d 593, 600 (Mass. App. Ct. 2008).

[5]  Counts V and VII, alleging violations of Mass. Gen. L. ch. 93A, are derivative of Counts I, II, and III.  *See* Order, at 12 (holding that "Count[] V … [is] derivative of Count III [(alleging fraudulent misrepresentation in the inducement of the Sales Agreement)] and in the case of Count VII, also derivative of Counts I and II).").

## II.     LYCOS'S MISREPRESENTATION CLAIMS

Lycos does not make a distinction in this case between conduct it alleges as fraudulent and conduct it alleges as negligent.  Rather, Lycos identifies certain acts or omissions it deems as being misrepresentations, presumably leaving it to the jury to decide whether the act or omission, if established, is either fraudulent or negligent.  *See*, *e.g.*, Lycos's Objections and Responses to CSI's First Set of Interrogatories ("Lycos Int. Resp.") (attached hereto as Exhibit B) ("CSI, through Mr. Stenberg, made fraudulent and negligent misrepresentations in its dealings with several Lycos employees ….   CSI's fraudulent and negligent misrepresentations included, without limitation, the following …."); Order at 10-12 (discussing fraudulent and negligent misrepresentation claims together).

Lycos does, however, distinguish between affirmative conduct and omissions it alleges constitute misrepresentation.  In particular, Lycos alleges that CSI made certain intentional misrepresentations: (1) in a March 18, 2002 email (*see* Counterclaim ¶¶ 40-42; Lycos Int. Resp., Response 2); (2) in a June 27, 2003 telephone conference call (*see* Counterclaim, ¶¶ 43-44; Lycos Int. Resp. 2); (3) in a series of emails dated June 30, 2003, July 1, 2003, and July 23, 2003 (*see* Lycos Int. Resp. 2); and (4) in connection with the Sales Agreement (*see* Counterclaim, ¶¶ 47-51).  Cross's proffered opinion neither sheds, nor purports to shed, any light on whether these affirmative representations are actionable.  This stands to reason because, if an affirmative statement is made that is false, the trier of fact need look no further than the statement itself and the effect on the listener to determine if a tort was committed.  The question of what is standard and customary in the leasing industry is therefore not relevant to Lycos's affirmative misrepresentation claims.

By default, therefore, the only possible relevance Cross's testimony can have in this case is on the issue of whether any alleged ***omission*** on the part of CSI is actionable.  For its

misrepresentation by omission claim, Lycos argues that "CSI … failed to disclose to Lycos the millions of dollars in mark-ups CSI charged Lycos as a result of the 'roll-ups' and 'rewrites' …." Counterclaim, ¶ 38. In its Interrogatory Responses, Lycos gives a substantially lengthier explanation of this claim, stating as follows:

> CSI, through Mr. Stenberg told Lycos "half-truths" in connection with each Rewritten and each Rolled-Up Equipment Schedule by disclosing to Lycos the amount of the proposed new monthly payment and lease term, but failing to disclose, as he was required to do under the common law and the Attorney General's Regulations, including, without limitation, 940 C.M.R. 3.16(2), and Equipment Leasing Association's Fair Business Practice provision number 7 then in effect, the following:
>
> 1.   that the net present value of the stream of lease payments Lycos would be making under the proposed Rolled-Up and Rewritten Equipment Schedules included substantial "mark-ups" in the net present value outstanding under the existing equipment schedule(s) such that Lycos would have to pay millions of dollars above what the rental payments should have been after refinancing the schedules….
>
> 2.   the net present value outstanding on each equipment schedule at the time each schedule was rewritten or rolled-up….
>
> 3.   that the "Base Value" with respect to the equipment on the Rolled-Up and Rewritten Equipment Schedules, would *not* equal the original cost but, instead, would be inflated to a number selected by CSI well above that cost….
>
> 4.   the original acquisition cost of the equipment on all but a few of the equipment schedules….
>
> 5.   it maintained a well-orchestrated and targeted internal scheme to manipulate the leasing process and cause Lycos to rewrite leases repeatedly, even though such rewrites caused damage to Lycos….
>
> 6.   it perpetrated a scheme to cause Lycos to trust and depend on Mr. Stenberg for his expertise in leasing, and induced Lycos not to investigate Mr. Stenberg's intentional misrepresentations and "half-truths" described herein….
>
> 7.   it had perpetrated a scheme to put Lycos in the position of having to either rewrite equipment lease schedules indefinitely or buy-out the leased equipment at a price substantially in excess of the then fair market value of the equipment….

Lycos Int. Resp. 2 (footnotes omitted).

### III. THE COURT'S SEPTEMBER 26, 2008 ORDER

In its summary judgment Order, the Court, in discussing Lycos's fraudulent and negligent misrepresentation claims, held in part that

> [w]hen it signed the equipment schedules Lycos knew how much it would pay to rent the equipment. Although Lycos attempts to analogize the financial arrangement to a loan and the equipment schedules to "refinancings" of the loan, this analogy is inapt. The relationship between CSI and Lycos - as set forth in the MLA and equipment schedules - was simply one of lessor-lessee. The agreements are not purchase agreements and neither the MLA nor the equipment schedules provide that the new rent price will be based on the original equipment cost or the original rent. ***As such, the only material information required to be disclosed was the total amount of rent charged for use of the equipment. CSI was not required to disclose how it calculated the rent.***

*Id.* at 10-11 (emphasis added). Lycos admits that CSI disclosed the total amount of rent charged. *See* Lycos Int. Resp. 2. ("CSI … told Lycos 'half-truths' in connection with each Rewritten and each Rolled-Up Equipment Schedule ***by disclosing to Lycos the amount of the proposed new monthly payment and lease term*** ….") (emphasis added).

The Court went on to hold, however, "[a]lthough CSI did not, as a general matter, have a duty to disclose the financial implications of the equipment schedules to Lycos, a duty to disclose such information could be found if Lycos establishes that it trusted CSI and its agent Stenberg and CSI accepted this trust." *Id.* at 11.[6]

Thus, the only remaining issues for the jury to decide in connection with Lycos's misrepresentation by omission claims is whether: (a) a fiduciary relationship developed at some point in time between the parties (*id.* at 11); and (b) if such a relationship developed, whether CSI was under an obligation to disclose the "financial implications" of the re-writes and roll-ups

---

[6] Cross's Report confirms CSI's contention, which the Court adopted in Order, that the only information CSI had to disclose, assuming a fiduciary duty existed, is the financial impact of the leases ***to Lycos***. CSI was under no obligation to disclose how profitable the equipment schedules, roll-ups, and re-writes were to it. *See* Cross Report at 27 ("lessors do not typically disclose their own internal economics to lessees ….").

-6-

to Lycos after that relationship had been established. In assessing the relevance of Cross's proffered testimony, it must therefore be determined whether each of his proposed opinions has any relevance to CSI's alleged failure to disclose the purported "mark-ups" or to the specific omissions as to which Lycos is seeking redress.

## ARGUMENT

### I.   THE LEGAL STANDARD

Federal Rule of Evidence 702, as amended pursuant to the Supreme Court decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), governs the admission of expert testimony as to scientific or other specialized knowledge. *See Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F. 3d 68, 80-1 (1st Cir. 2002). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "Rule 702 … assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'" *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)).

"'The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.'" *Hochen*, 290 F.3d at 452. (citing *Cipollone v. Yale Indus. Prod., Inc.,* 202 F.3d 376, 380 (1st Cir. 2000)); *see also Cummings v. The Standard Register Co*. 265 F.3d 56, 64 (1st Cir. 2001) ("the trial court must

perform a gatekeeping function and decide whether the proposed testimony, including *methodology* employed by the witness in arriving at the proffered opinion, rests on a *reliable foundation* and is *relevant* to the facts of the case") (emphasis in original, internal quotations and citation omitted).

To be relevant under *Daubert*, evidence must "fit" the facts of the case, and must "assist the jury in determining the existence of any fact of consequence." *Agri-Mark, Inc. v. Niro, Inc.*, 214 F. Supp. 2d 33, 45 (D. Mass 2002) (citing *Daubert*, 509 U.S. at 591-93). Evidence offered by the expert must also be "reliable," meaning that it is valid. *See Daubert*, 509 U.S. at 590. Reliability of expert evidence generally involves consideration of many factors, including (1) whether the theory can be tested; (2) whether the theory has been the subject of peer-review; (3) whether the theory has a known error rate; and (4) whether the theory has been generally accepted in the relevant community. *See Agri-Mark*, 214 F. Supp. 2d at 45. However, the test for reliability is "flexible" and the Court may consider other factors or a combination of these in determining reliability. *Id.*

## II.    CROSS'S PROPOSED TESTIMONY SHOULD BE EXCLUDED

Cross's Report purports to give an "opinion as an expert with respect to reasonable and customary standards and practices in the [leasing] industry and CSI's compliance with such standards in its relationship with Lycos," including:

> (a) the lease structure between the parties, including (i) repair and maintenance provisions and practices; (ii) return provisions; (iii) prepayment and early terminations; (iv) calculation of casualty payments and stipulated loss values and the use of such values in a lease; (v) pricing and residual pricing; (vi) end-of-term options to renew, purchase and return [of] equipment; and (vii) lease terminations, rewrites and upgrades;
>
> (b) refinancings or rewrites of existing leases and mark-up practices related thereto;
>
> (c) normal fair business practices within the industry; and

> (d) the relative roles of lessors and lessees in structuring a lease, including their relative knowledge bases, typical lessor expertise and reliance by the lessee on such expertise.

*Id.* at 7-8. Each one of these categories is discussed, in turn, below.

### A. CROSS'S "LEASE STRUCTURE" OPINION SHOULD BE EXCLUDED ON RELEVANCE GROUNDS

Cross's "lease structure" opinion comprises his assessment as to how the provisions of the MLA relate to similar leases in the industry. With regard to the "lease structure," Cross's Report opines that:

> CSI's lease structure was not consistent with reasonable industry standards and practices for leases of this type because the Equipment Schedules: provided no right or option to Lycos to purchase the Equipment …, included onerous return provisions …, included an "evergreen" extension clause … and included Stipulated Loss Values that bore little relationship to CSI's lease balance, CSI's booked residual value or the fair market value of the Equipment ….

*Id.* at 8.

While this opinion is couched in terms of being an opinion about the Equipment Schedules, as the Court is aware, the terms of the Equipment Schedules were governed by the MLA.[7] The MLA, however, is not at issue in this lawsuit for two reasons. First, Lycos has not alleged in its Counterclaims that CSI made any misrepresentations in connection with the execution of the MLA (nor does it have any other claims seeking to challenge the validity of the MLA). Second, even if Lycos did seek to challenge the MLA, it would be precluded from doing so by the Court's Order because, as noted earlier, CSI could only be said to have had a duty to disclose ***if a fiduciary relationship were created***, and Lycos does not contend (and the facts do

---

[7] Cross recognizes this later in his Report, where he states, "The Master Lease provides the overall general terms and conditions applicable to all Equipment Schedules and each Equipment Schedule provides the specific business terms applicable to a particular transaction, incorporating by reference the terms of the Master Lease." Cross Report at 10.

not support) that CSI and Lycos entered into a fiduciary relationship *at the time* the MLA was signed.

In fact, the Court has already found that this relationship, at inception, was solely one of lessor-lessee.  *See* Order at 11 ("The relationship between CSI and Lycos - as set forth in the MLA and equipment schedules - was simply one of lessor-lessee.") (footnote omitted). Recognizing this fact, Lycos alleges that CSI's employee, Paul Stenberg, tried to cultivate Lycos's trust *over time*, such that, at some undisclosed point during the parties' relationship (which point Lycos does not articulate), a fiduciary relationship was created requiring CSI to disclose to Lycos the "financial implication" of the Lease renewals.  *See id.* at 12 (noting Lycos's argument that "Stenberg cultivated Lycos' trust"); *see also* Counterclaim at ¶¶ 14-15 (stating that Lycos's relationship with Stenberg "***evolved*** into what Lycos considered to be a collegial business association and leasing partnership" and "[t]hrough his professional and social interactions with Lycos employees, Mr. Stenberg sought to gain Lycos's trust, confidence, and dependency.") (emphasis added).  Because there was no fiduciary relationship at the time the MLA was signed, however, the fact that the MLA may contain terms that Cross believes are more onerous than terms successfully negotiated by other lessees in the industry is irrelevant in light of the Court's holding that CSI did not have a general duty to disclose.  *See* Order at 11.

Moreover, as noted above, to be admissible Cross's testimony must have some relevance to Lycos's existing misrepresentation by omission claims, and it is clear that his "lease structure" opinion does not.  Lycos's "misrepresentation by omission" claims basically amount to an allegation that, prior to rolling-up and rewriting the equipment schedules, CSI should have disclosed to Lycos what the financial implications of those rewrites and roll-up would be.  That the MLA had no express purchase option, allegedly had onerous return provisions, included an

"evergreen" extension clause, and allegedly contained unfair Stipulated Loss Values (the points Cross wishes to testify about in his "lease structure" opinion) has no relevance to what CSI should have disclosed prior to rolling up and/or re-writing any Equipment Schedules. Likewise, the fact that the Equipment Schedules did not contain terms Cross is accustomed to seeing in other equipment schedules is simply irrelevant to this case because Lycos is not arguing that CSI was obligated to include more favorable terms in the Equipment Schedules than the ones which were actually included--but rather, Lycos contends that CSI failed to properly disclose the financial ramifications of the Equipment Schedules it did enter into.[8]

Furthermore, to the extent Cross seeks to opine that: (a) he is familiar with and has reviewed other leases in the industry; and (b) based on that, he finds the MLA and Equipment Schedules to be more onerous than those other leases, the question remains, what is the relevance of that conclusion? After all, the fact that a deal contains unfavorable terms to one party, without more, certainly does not create a cause of action. *See*, *e.g.*, *J.F. White Contracting Co. v. M.B.T.A.*, 666 N.E.2d 518, 520 (Mass. App. Ct. 1996) ("when language in a contract is unambiguous … enforcement of such contracts will not be denied because of hardship to one of the parties") (internal citations omitted); *Hancock Bank and Trust Co. v. Shell Oil Co.*, 309 N.E.2d 482, 483 (Mass. App. Ct. 1974) ("Once it appears that there was consideration to support a contract … courts have traditionally declined to relieve a party from the terms of a contract merely because he made what he regards as a bad or uneven bargain"); *Chamberlin & Burnham, Inc. v. Cohn*, 158 N.E.2d 846, 848 (Mass. 1927) ("parties are bound by the terms of their own

---

[8] Cross's Report is actually adverse to Lycos's misrepresentation claims in some respects because he concludes that the onerous terms of the MLA - which Lycos has not challenged in this suit - gave CSI "no practical alternative but to acquiesce to CSI's terms or face the prospect of default or paying full base rents potentially in perpetuity for equipment that was rapidly becoming technologically obsolescent." Cross Report at 20. From a practical standpoint, what this in fact means is that, to the extent Lycos "got a bad deal" in this case, it is not because it relied on any misrepresentation on the part of CSI, but because it had "no practical alternative" given the strict requirements of the MLA which it voluntarily signed.

contract and cannot be relieved from a bad bargain simply because the agreement may be foolish and improvident"). If this were not the law, courts would be hopelessly clogged with parties, such as Lycos, who want to be saved from deals they knowingly struck, but later came to regret.

For all of these reasons, Cross's "Lease Structure" opinion should be properly excluded.

### B. CROSS'S "REFINANCINGS AND MARK-UPS" OPINION SHOULD BE EXCLUDED AS IRRELEVANT

Cross's "Refinancing and Mark-ups" opinion is that:

> [(a)] It is not common practice to rewrite existing leases for existing equipment when the lessee is not in default.
>
> [(b)] Where this does occur, it is customary industry practice to either to [*sic*] (i) charge and disclose a relatively nominal fee of up to 2% of the outstanding lease balance for such a refinancing; or (ii) charge a Mark-up which is readily ascertainable from the face of the documents.

Cross Report at 8.

With regard to this first opinion -- that it is not common to rewrite existing leases -- this opinion should be excluded on relevancy grounds. Whether or not this practice is *common in the industry* tells us nothing about whether the practice is improper if it does occur. In fact, later in his Report, Cross concedes that "[t]here are legitimate business reasons for refinancing an existing transaction and, as a matter of form, for doing so as a redocumentation, as opposed to amending of the existing transaction." *Id.* at 20. Cross therefore concedes that while not necessarily a common practice, it is nevertheless not an improper one.

The relevancy of this opinion is further called into question because Lycos does not allege in this case that the refinancings were improper; rather, it claims that CSI should have disclosed the financial implications of the refinancings to it before doing the deal. Cross's opinion that it is uncommon to rewrite existing leases absent a default is irrelevant to this claim, and as a result should be excluded. *See Daubert*, 509 U.S. at 591 (holding that testimony must

-12-

be "sufficiently tied to the facts of the case" in order to be admissible) (citation and internal quotation marks omitted).

Likewise, Cross's opinion that "[t]he Mark-ups in this Case deviated from customary industry practices …." Cross Report at 23, should be excluded because this opinion is also not relevant to Lycos's misrepresentation claims, and contradicts the Court's express findings as to the legally applicable scope of the parties' respective obligations. In this case, Lycos does not allege that CSI had an obligation to disclose what customary industry practices were, rather, it alleges that CSI should have disclosed the financial implications of the re-writes and roll-ups *to it* (*i.e.*, how the deals would impact Lycos's particular situation). And as the Court has already held, this duty to disclose only arises if a fiduciary duty is first established.

Under these circumstances, whether other leasing companies charge less (such as out-of-pocket charges plus up to 2% of the outstanding lease balance, which Cross opines is the norm, *see id.*) has no bearing on the issue of whether CSI ***should have better disclosed and explained*** to Lycos what it was charging.[9] In other words, Lycos is not challenging in this case the amount of the CSI's profit, it is challenging CSI's alleged failure to disclose the profit. Thus, whether other companies in the industry charge a lower mark-up is not relevant or helpful to the jury.

Lastly, to the extent Cross seeks to testify that a lessor's profit margin, or "mark-up," generally should be disclosed to lessors, such testimony will not help the jury determine whether this information would have been relevant to Lycos. For this inquiry, the Court should be guided by the Restatement (Second) of Torts § 551 (Liability for Nondisclosure), which states:

> (2)   One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, (a) matters

---

[9] As noted earlier, Lycos does not allege, and Cross does not opine, that CSI had an obligation to disclose to Lycos the benefits of the alleged mark-up to CSI. Rather, the inquiry is whether CSI explained the implications of the mark-up to Lycos. As Cross concedes in his report, "lessors do not typically disclose their own internal economics to lessees …." *See* Cross Report at 27.

-13-

> known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them ….

*Id.* Comment *c.* of the Restatement (Comment on Subsection (2)), explains, however, that:

> A person under the duty stated in this Subsection is required to disclose only those matters that ***he has reason to know will be regarded by the other as important in determining his course of action in the transaction in hand***. He is therefore under no duty to disclose matter that the ordinary man would regard as unimportant unless he knows of some peculiarity of the other that is likely to lead him to attach importance to matters that are usually regarded as of no moment.

*Id.* (emphasis added). Cross never opines in his Report that the disclosure of lessor profits is *important* to lessees, much less that it was something that would have been important to the lessee Lycos (and given that the majority of his experience is as a lessor, he would not be qualified to provide such an opinion). Rather, his Report is limited to the opinion that mark-ups are *typically* disclosed or apparent from the face of the document. Even if a lessor's profit were typically disclosed, however, that would not mean that it was important to lessees.

Furthermore, the Court has already found that the only information that needs to be disclosed (absent a fiduciary relationship, which Cross does not presuppose) is the total amount of rent charged for the use of the equipment. *See* Order at 11 ("As such, the only material information required to be disclosed was the total amount of rent charged for use of the equipment. CSI was not required to disclose how it calculated the rent.") *Id.* at 11. Thus, Cross's opinion therefore seeks to impose a standard that is different from what the Court already found the applicable standard to be, and for this reason, should be excluded.

### C. CROSS'S "FAIR BUSINESS PRACTICE NORMS" OPINION SHOULD BE EXCLUDED IN LIGHT OF THE COURT'S ORDER

The next part of Cross's Report purports to give an opinion on "fair business practice norms," opining that "CSI failed to conform with well-recognized fair business practices in the industry that CSI itself said it had expressly adopted and that, at a minimum, required disclosure

-14-

of all relevant information as to the terms and conditions of the lease which may affect the Lessee's decision." Cross Report at 9 (emphasis added). This opinion, which rests on the ELA and ELFA standards, and CSI's reference to those standards in its advertising, should be stricken because the Court has already declined to accept Lycos' argument that these standards, and CSI's reference to them on its webpage, created a general duty to disclose.

In this regard, Lycos argued, in its Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim (Docket # 146), that CSI had an obligation "to divulge *all* … material facts,"[10] basing its argument, in part, on the claim that "'generally accepted commercial and industry standards' impose a duty on a commercial lessee … to disclose information to prevent a representation from being misleading."[11]  In the Order, the Court both denied Lycos's Motion and declined to accept Lycos' general "duty to disclose" argument. *See id.* at 11 ("CSI did not, as a general matter, have a duty to disclose the financial implications of the equipment schedules to Lycos ….").

Under these circumstances, if Cross were permitted to testify that "well-recognized fair business practices in the industry … required disclosure of all relevant information as to the terms and conditions of the lease which may affect the Lessee's decision," Cross Report at 9, he would not only be giving an impermissible legal opinion, he would be giving an opinion that is expressly contrary to the Court's Order, which is the law of the case, and which found that industry standards ***do not*** impose such an obligation. Rather, as the Court has already found, only if a relationship of trust was cultivated, given, and accepted, thereby transforming a lessor-

---

[10]  *See* Lycos's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Certain Claims in Counts VII, XII, and XIII of Its Counterclaim (Docket # 148), at 12 (citation and internal quotation marks omitted).

[11]  *See id.* at 13 (citation omitted).

lessee relationship into a fiduciary one, would any obligation have arisen. For this reason, Cross's "fair business practice norms" opinion should be excluded.

### D. CROSS'S EXPERTISE AND RELIANCE OPINION IS BASED ON FLAWED METHODOLOGY

The final "opinion" Cross seeks to give, which he captions his "expertise and reliance" opinion, is not an expert opinion at all, much less an opinion about industry standards (which is what Cross purports to have expertise on), but rather constitutes pure advocacy, amounting to an assessment that Lycos was unsophisticated because it signed a deal that was unfavorable for it. In addition to the fact that the jury is perfectly capable of deciding for itself whether Lycos was sophisticated, however, and thus no expert testimony is needed on this issue, Cross's conclusion is based on backwards logic.

Cross states, for example, that "[b]ased on my review of the lease documents, … Lycos and its officers were generally inexperienced, unsophisticated and uninformed about equipment leasing and equipment and equipment leasing products." Cross Report at 9 (emphasis added). He later emphasizes that "[t]he terms to which Lycos agreed indicate that it was inexperienced, unsophisticated and uninformed about leasing and leasing products." *Id.* at 34. In short, Cross's report indicates that he has formed the opinion that because the MLA was, in his view, very favorable to CSI, Lycos must have been unsophisticated to have agreed to such a deal.

This kind of analysis, however, cannot withstand judicial scrutiny, as there are obviously any number of reasons which could explain why Lycos entered into the MLA other than a purported lack of sophistication - *e.g.*, a sophisticated party can enter into a bad deal (assuming this point for the sake of this argument only) because it failed to do its diligence, because it is was concerned with other things at the time, such as keeping equipment costs off of its balance sheet or maximizing the value of top executive's stock options, because it simply did not wish to

invest the time in negotiating the transaction, or any one of a litany of other reasons. The mere fact that the terms of the MLA are allegedly onerous (which is the only bases Cross gives for his opinion), does not mean that Lycos necessarily had to have been unsophisticated to enter into the deal. There may be multiple other explanations for such an action, and Cross's report contains no indication that he ever even considered such alternative explanations. As a result, his methodology cannot be said to be sound, and this portion of his opinion should also be excluded.

## CONCLUSION

For the foregoing reasons, Computer Sales International, Inc., respectfully requests that this Court allow its *Daubert* Motion to Preclude the testimony of Mr. Cross.

> Respectfully submitted,
>
> CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL, INC.
>
> By its attorneys,
>
> /s/ Robert J. Kaler_____
> Robert J. Kaler, BBO No. 542040
> rkaler@mccarter.com
> Edward W. Little, Jr., BBO No. 628985
> elittle@mccarter.com
> David Himelfarb, BBO No. 649596
> dhimelfarb@mccarter.com
> McCarter & English LLP
> 265 Franklin Street
> Boston, MA 02110
> Tel. (617) 449-6500

Dated: February 27, 2009

## CERTIFICATE OF SERVICE

I, Edward W. Little, Jr., hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically by CM/ECF notification, by e-mail and by first class mail, postage prepaid, this 27th day of February, 2009.

> /s/ Edward W. Little, Jr._____
> Edward W. Little, Jr.