# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) |
| v. | ) ) |
| LYCOS, INC., | ) ) ) |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) ) |
| and | ) ) |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) |
| Trustee Process Defendant. | ) ) |

C.A. No. 05-10017-RWZ

## LYCOS' OPPOSITION TO CSI'S MOTION *IN LIMINE* TO PRECLUDE LYCOS FROM INTRODUCING SO-CALLED CONFUSING, MISLEADING, AND UNFAIRLY PREJUDICIAL LOAN ANALOGIES

In its Motion *in Limine* to Preclude Defendant and Plaintiff-in-Counterclaim Lycos, Inc. ("Lycos") From Introducing Confusing, Misleading, and Unfairly Prejudicial Loan Analogies (Dkt. No. 215; the "Motion"), Plaintiff and Defendant-in-Counterclaim Computer Sales International, Inc. ("CSI") seeks to preclude Lycos from referring to the leases that the parties entered into as loans, analogizing the leases to loans, or "using loan terminology or concepts in describing its claims about the Leases or its damages" including, apparently, such common terms as fee, premium, mark-up, and refinancing.[1]

---

[1] Motion at 2; *See* Memorandum of law in support of CSI's Motion (Dkt. No. 216; the "Memorandum") at 3.

CSI seeks these sweeping exclusions despite the facts that: (a) one of the issues to be tried with respect to Counts XII and XIII of Lycos' counterclaims is whether schedules 93 and 94 are leases or loans; (b) CSI's internal documents use loan concepts to describe the Lycos-CSI transactions; (c) CSI's experts, the Equipment Leasing & Finance Association (the "ELFA"), and finance institutions, make the same comparisons and analogies, and use the same terminology, that CSI proposes be excluded here in educational materials that they have published on leasing; (d) CSI's experts use some of the very terminology that CSI now seeks to exclude in the expert reports they submitted in this case; (e) nearly all of the terminology that CSI objects to is not "loan" terminology per se, but "*finance*" terminology; and (f) the term "mark-up" was, in fact, used by CSI employee Paul Stenberg to describe the very conduct that forms the basis of Lycos' fraud in the inducement of the refinancings claim. Indeed, it was *CSI's* expert, Professor James Schallheim, who once wrote: "There is, without question, great similarity between debt [loan] and lease contracts."[2]

Not only are the analogies and terminology at issue here appropriate but, contrary to CSI's claim that they will confuse or mislead, the analogies and terminology are intended—indeed necessary—to simplify matters and assist the jury in understanding the complicated concepts involved in the lease transactions in this case. CSI's Motion has no merit and should be denied.

---

[2] James S. Schallheim, *Lease or Buy? Principles for Sound Corporate Decision Making* 93 (1st ed. 1994) ("*Lease or Buy*"). True and accurate copies of the relevant pages of *Lease or Buy* are attached hereto as **Exhibit A**.

I. **ARGUMENT**

   A. **NOT ONLY MUST THE JURY CONSIDER THE LEASE/LOAN DISTINCTION IN DECIDING COUNTS XII AND XIII, BUT ANALOGIES BETWEEN LEASES AND LOANS AND USE OF FINANCE TERMINOLOGY WILL HELP THE JURY UNDERSTAND THIS CASE.**

Federal Rule of Evidence 401 provides that relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." *United States v. Maravilla*, 907 F.2d 216, 220 (1st Cir. 1990) (quoting FRE 401). Lycos has alleged that it was fraudulently induced into repeatedly refinancing its equipment schedules with CSI in a series of structures and transactions that CSI's co-Chief Financial Officer described as "complex" and "convoluted".[3] Following those refinancings, Lycos alleges that it was fraudulently induced by CSI into purchasing that equipment. In addition to making claims for fraud, in Counts XII and XIII of its counterclaim, Lycos alleges that schedules 93 and 94 were installment sales contracts—i.e., loans—under the Uniform Commercial Code. This Court has already permitted those Counts to go to trial. As set forth more fully below, analogies between leases and loans, as well as the terminology that CSI seeks to exclude, are highly relevant (indeed, integral) to the presentation and understanding of the above claims.

   *1. As Part of its Decision on Counts XII and XIII, the Jury Will be Required to Decide Whether Schedules 93 and 94 are Leases or Loans.*

In Counts XII and XIII, Lycos alleges that schedules 93 and 94 were installment sales contracts, i.e., loans. Having failed to obtain summary judgment on those counts,[4] CSI's Motion seeks to undermine the very theory this Court has authorized Lycos to present at trial by

---

[3] Cagney Tr. at 284:9-15. True and accurate copies of the relevant pages of Mr. Cagney's transcript are attached hereto as **Exhibit B**.

[4] *See* Memorandum of Decision (Dkt. No. 207; the "Summary Judgment Decision") at 13-19.

excluding evidence that is required to support that theory.  Were Lycos barred from making loan references in connection with these Counts, it would be required to ask the jury to decide whether those schedules are leases or loans without even telling the jury what it was deciding.[5]  Lycos would further be forced to call those schedules "leases" while attempting to prove otherwise—which would be untenable and unfairly prejudicial to Lycos.  Accordingly, CSI's Motion as to schedules 93 and 94 must be denied.

    2.    *Loan Analogies are Not Only Relevant, But Highly Probative of Lycos' Claims and Will be Helpful to the Jury.*

Aside from schedules 93 and 94 and the Sales Agreement, Lycos agrees that the relationship between CSI and Lycos was one of lessor-lessee.  Nonetheless, CSI booked all of the schedules internally as "sales type" leases (i.e., as loans) and, in a chapter of his book entitled "the Concept of the Equivalent Loan," CSI's expert, Prof. Schallheim, wrote:

> There is, without question, great similarity between debt and lease contracts.  Lease contracts, especially financial leases, commit the lessee to a series of fixed payments as does a loan contract.  In the case of default, the lessor can repossess the asset, sell or release it, and sue the lessee for any deficiencies—like any other creditor.[6]

In that same chapter, Prof. Schallheim also wrote:

> The comparison of leasing to borrowing is the foundation of the popular leasing model by Myers, Dill, and Bautista (MDB) . . . . It is worth noting some important assumptions inherent in the MDB model.  First and foremost, the firm regards lease payments as contractual obligations, equivalent to interest and principal payments on the firm's debt.[7]

Another CSI expert, James Johnson, has similarly written:

---

[5] CSI's Motion is simply a veiled attempt to get this Court to reconsider its decision where none of the requirements for a true motion to reconsider can be met.  A motion for reconsideration should be granted "only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law."  *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000).  CSI cannot and does not even attempt to demonstrate any of these bases for reconsideration because they do not exist.

[6] *Lease or Buy* at 93.

[7] *Lease or Buy* at 94, 99.

> If a firm leases, it signs a contract obligating itself to unconditionally make a stream of payments at specific times over a contractual term. This sounds a lot like debt service payments on a loan. Second, the lessor has the right to repossess the leased equipment should the lessee default on its promised obligations in the lease. This also sounds like we are describing a secured loan. It is very much like a secured lender's right to repossess secured equipment when a borrower defaults. *Because of these characteristics, it is considered a **resolved issue** among financial analysts to view a lease as a form of secured borrowing and analyze it accordingly.*[8]

In another book written by Prof. Johnson, he analogizes between leasing and loan concepts to help explain the concept of a "balloon payment" at the end of a lease.[9] To help the reader understand a balloon payment in a leasing arrangement, Prof. Johnson writes: "By definition, balloon payment financings do not call for steady and complete amortization throughout the financing term, but rather back end a significant portion of the investment recovery. *An easy way to see this is to consider an extreme balloon payment loan . . . .*"[10] The ELFA, the chief trade organization for the equipment leasing industry and for which another CSI expert, Michael Fleming, served as Executive Director for twenty-seven years, uses the terms "leasing" and "financing" interchangeably throughout its web-site.[11] Finance institutions such as the World Bank also make such analogies.[12]

CSI's experts, the ELFA, and neutral third-parties make these analogies because laypeople, such as jurors, understand loans and loan terminology. Laypeople have mortgages,

---

[8] James M. Johnson, Barry S. Marks, *Technology Leasing Power Tools for Lessees* (1st ed. 2002) at 194 (emphasis supplied). True and accurate copies of the relevant pages from this book are attached hereto as **Exhibit C**.

[9] James M. Johnson, *Fundamentals of Finance For Equipment Lessors* (2d ed. 1990) at 51-52, 56. True and accurate copies of the relevant pages from this book are attached hereto as **Exhibit D**.

[10] *Id.* at 52.

[11] True and accurate copies of relevant pages from the ELFA's web-site are attached hereto as **Exhibit E**.

[12] The World Bank defines net investment in a lease as the sum of the present value of the rent payments plus the present value of the estimated residual, and then states "Although this calculation may look complicated, net investment in a lease is analogous, if not identical, to principal outstanding, particularly for amortizing loans." Rebuttal Report of Bruce Smith at 3. True and accurate copies of the relevant pages from Mr. Smith's Rebuttal Report are attached hereto as **Exhibit F**.

car loans, and student loans and understand basic notions of principal and interest better than they do things like net present values, residual values, discount rates, and lease rate factors. Thus, contrary to CSI's claim in its Motion, the reason that CSI's experts make these analogies, and the reason Lycos and its experts want to make such analogies here, is to explain Lycos' case to the jury using examples and terminology that they are more likely to understand. This is exactly the kind of analogy that is permissible because it will assist the trier of fact in resolving whether Lycos was defrauded by CSI. *See, e.g., United States v. Garcia-Morales,* 382 F.3d 12, 18-19 (1st Cir. 2004) (testimony about structure and operation of typical drug conspiracy was relevant and helpful to jury in understanding drug and conspiracy case). Any potential confusion could readily be addressed through an appropriate limiting instruction to the jury.

       3.    *The Terminology that CSI Seeks to Exclude is Finance Terminology and, Because Leasing is a Form of Finance, is Appropriate.*

CSI requests that Lycos be excluded from using terminology that it misleadingly characterizes as "loan terminology."[13] According to CSI, this includes terms like fee, premium, refinancing, and mark-up.[14] CSI requests this despite the fact that its expert, Mr. Fleming, submitted an expert report in this case stating that the ELFA enacted its Fair Business Practices to ensure "that there be no surprise responsibilities or conditions for the lessee in the transaction terms and conditions" including "any *fees*" and that "[a]mong the early practices that the leasing community opposed were . . .[u]ndisclosed *fees* that were not mentioned specifically."[15] The crux of Lycos' fraud claims relating to the refinancings is exactly that: whether CSI should have

---

[13] *E.g.*, Memorandum at 1.

[14] *Id.*

[15] Fleming Report at 6-8 (emphases added). True and accurate copies of the relevant portions of Mr. Fleming's report are attached hereto as **Exhibit G**.

disclosed to Lycos that it charged Lycos an undisclosed fee or mark-up when it refinanced the equipment schedules.

The same is true of the term "premium." Again, CSI ignores the words used by its own experts in this case. Both in his report[16] and during his deposition,[17] Prof. Schallheim used the term "premium" on more than one occasion in connection with the stipulated loss values contained in most leasing arrangements, including that between CSI and Lycos. Messrs. Fleming, Johnson, and Schallheim used the terms "premium" and "fee" because those terms are not unique or specific to loans. Instead, they are *finance* terms and, thus, are entirely appropriate here because leasing, according to the ELFA itself, is a form of finance.[18]

The term "mark-up" was the term Mr. Stenberg used to describe how CSI would price the Lycos refinancings. Specifically, Mr. Stenberg testified that, after receiving a threshold from CSI (i.e., the amount above which he would receive a commission), he would, in his words, "mark-up" this threshold and quote a price to Lycos.[19] For CSI to seek to exclude the use of the very term that the account executive at the center of this litigation used to describe his conduct and that forms the basis of Lycos' claims is silly. As with the other terms that CSI objects to, there is nothing pejorative or misleading about the term "mark-up."

---

[16] Schallheim Third Report at 4 ("there is usually an early payoff 'penalty' (or call premium) built into these stipulated loss value schedules."). True and accurate copies of the relevant portions of Mr. Schallheim's Third Report are attached hereto as **Exhibit H**.

[17] Schallheim Tr. at 150:7-19, 254:1-255:19, 256:8-17. True and accurate copies of the relevant pages from Mr. Schallheim's transcript are attached hereto as **Exhibit I**.

[18] Fleming Tr. at 95:14-22. True and accurate copies of the relevant pages of Mr. Fleming's transcript are attached hereto as **Exhibit J**. *See also* Rebuttal Report of Bruce Smith at 3 (quoting the ELFA website: "ELFA members are engaged in a dynamic and growing sector of finance that is crucial to the general economy of the U.S. and global markets. Overall, ELFA members are responsible for financing a substantial portion of the nation's capital expenditure budget through a multitude of financial products and strategies.").

[19] Stenberg Tr. at 521:12-522:13, which can be found at Exhibit 65 to the Affidavit of Thomas O. Bean (Dkt. Nos. 149, 156) filed in Support of Lycos' Motion for Partial Summary Judgment. CSI has designated Mr. Stenberg's transcript as confidential and, as such, Lycos cannot attach it hereto. Lycos will provide the Court with a separate copy of the relevant portions of Mr. Stenberg's transcript upon request.

Not only is each of the foregoing terms not uniquely loan terminology, each is necessary to explain an element of Lycos' fraud claim. Among other things, to make a claim for fraud, Lycos needs to show that it suffered damages as a result of CSI's fraudulent misrepresentations/omissions. *See, e.g., Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 575 N.E.2d 70 (1991). Lycos claims that, every time an equipment schedule was refinanced, CSI charged it an undisclosed "fee" or "mark-up" and that Lycos would not have agreed to the refinancings on the terms that it did if CSI had disclosed to Lycos the $13.708 million in total hidden fees or mark-ups it had charged Lycos during the parties' relationship. Lycos seeks to recover those undisclosed fees or mark-ups. To explain its damages calculation, as well as the very nature of the fraud (i.e., that CSI charged it a hidden fee or mark-up) to the jury, Lycos needs to be able to use the foregoing terminology to avoid confusing the jury.

The terms "financing" and "refinancing" are general finance terms that refer to leases as well as loans.[20] As Mr. Smith notes in his Rebuttal Report, the title of the flagship publication of the ELFA is the *Journal of Equipment Lease Financing*.[21] Articles on the ELFA web-site use the term "refinance" as well: "As firms seek to refinance synthetic leases, not all of the displaced volume will automatically move into the sale/leaseback market"[22] and "GE Healthcare Financial has filed a regulatory document with the Securities and Exchange Commission seeking the return of four imaging units: Molecular Imaging had been trying to refinance the equipment leases."[23]

---

[20] *See, e.g.,* www.lowermylease.com ("Lower Your Monthly Payment by Refinancing Your Auto Lease Online!"). A true and accurate copy of this web-page is attached hereto as **Exhibit K**.

[21] Smith Rebuttal at 3.

[22] A true and accurate copy of the relevant portions of this article is attached hereto as **Exhibit L** (refinancing discussed under header "Sale/Leaseback Flow Expected to Swell as FASB Prepares to Drain Synthetic Leases").

[23] A true and accurate copy of the relevant portions of this article is attached hereto as **Exhibit M** (refinancing discussed under header "GE Healthcare Rejects Molecular Imaging Lease Proposal" on page 2).

In fact, the term "refinance" is probably the most accurate and understandable term to describe what Lycos and CSI did. Each time an equipment schedule was "re-done," CSI terminated the old schedule and instituted a new schedule. The termination of the old schedule and commencement of a new schedule is reflected on documents entitled "Addendum One" to the refinanced schedules. For example, Addendum One to Equipment Schedule 68B reads as follows:

> The Equipment is installed at Lessee's location under Equipment Schedules Forty-three and Forty-eight to Master Lease Agreement No. 144874. Lessee unconditionally accepts the Equipment under this Lease. *The Initial Terms of Equipment Schedules Forty-three and Forty-eight are due to expire February 28, 2002 and May 31, 2002, respectively. However, in consideration of Lessee's entering into this Lease, the Initial Terms of Equipment Schedules Forty-three and Forty-eight expire on September 30, 1999.* Accordingly, the Commencement Date of the Equipment under this Lease is October 1, 1999.[24]

Thus, the term CSI wants to use to describe what the parties did—a lease "extension"—is simply inaccurate. The original leases were, under the Addendum Ones, affirmatively *not* "extended." Instead, they were expressly terminated. The other term suggested by CSI—"rewrite"—is not common vernacular among laypersons and could be confusing to a jury.

Lycos believes that the distinction between "lease" and "loan" will be clear to the jury because the parties will be describing all of the equipment schedules other than 93 and 94 as leases and specifically raising the issue of whether schedules 93 and 94 are leases or loans. Accordingly, while Lycos acknowledges that the Court in its Summary Judgment Decision wrote that the analogy between a "lease and a loan" was "inapt," Lycos notes that the parties did not (a) brief the Court on the appropriateness of the lease/loan analogy or the term "refinancing" in their summary judgment papers; or (b) provide the Court the publications of CSI's experts, the ELFA, and financial institutions discussed above. Moreover, CSI's Motion attempts to use the Court's

---

[24] A true and accurate copy of this Addendum One is attached hereto as **Exhibit N**.

statement to expand it to include terminology that it has mischaracterized as loan terminology. Lycos therefore invites the Court to consider the scope and limitations of its conclusion in light of the above information.

### B. Use of Lease/Loan Analogies and Terminology Will Not be Unfairly Prejudicial, and Even if it Were Somewhat Prejudicial, That Prejudice is Outweighed by the Probity of the Analogies and Terminology.

Federal Rule of Evidence 403 is an extraordinary remedy that should be used sparingly. *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) quoting *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. Unit B 1982)). The "general rule is that the balance should be struck in favor of admission." *Dente v. Riddell, Inc.*, 664 F.2d 1, 6 (1st Cir. 1981). Where a party seeks to exclude the essential elements of a claim based on Fed. R. Evid. 403, the burden on the requesting party is significant and the Court should exclude the evidence only if the danger of "unfair prejudice" substantially outweighs its probative value. *Espeaignnette v. Gene Tierney Co.*, 43 F.3d 1, 8 (1st Cir. 1994) (finding that trial court abused its discretion when it excluded evidence that "bore directly on an essential element of the plaintiff's *prima facie* case").

CSI has not met its burden to show that the evidence and arguments that Lycos will present at trial are *unfairly* prejudicial. *Id.* at 8 ("the Company's failure in its brief to illustrate how the excluded evidence would be unfairly prejudicial to its case confirms our conclusion" that the evidence was improperly excluded). To determine whether Lycos was defrauded by CSI, a jury needs the ability to understand the nature of the fraud that Lycos says took place, and Lycos and its experts need the authority to present and explain the evidence in a manner that a jury will understand. As set forth above, CSI's experts, the ELFA, and financial institutions make use of analogies and draw comparisons to loans in educational materials that they have written on leasing for the purposes of helping readers understand the concepts they are

attempting to communicate—to make the concepts easier to understand. What Lycos seeks to do at trial is no different. As CSI's co-CFO himself observed, these transactions were "complex" and "convoluted." The concepts and terminology involved—net present values, residual values, discount rates, lease rate factors—will likely not be readily understood by a jury. Providing simple analogies to a loan or mortgage will not confuse or mislead—it will simplify, explain and assist the jury in reaching a verdict. Moreover, the terminology that CSI seeks to exclude is not loan-specific terminology and, in any event and as is set forth above, is necessary to explain essential elements of Lycos' fraud claim.

The only specific potential prejudice identified by CSI is that it will somehow be confused with a lender if Lycos is allowed to make analogies to a loan or to use terminology that is nothing more than finance terminology. This is something that can easily be addressed by CSI either through evidence (such as the Master Lease Agreement), cross-examination of Lycos' finance expert, or a request for an appropriate jury instruction, and does not warrant exclusion of the highly probative and useful evidence and arguments at issue.

- 12 -

## II. CONCLUSION

WHEREFORE, Lycos respectfully requests that this Court enter an order:

(1) denying CSI's Motion; and

(2) granting Lycos such other and further relief as is appropriate under the circumstances.

<table>
<tr><td></td><td>Respectfully submitted,<br><br>LYCOS, INC.<br>By its attorneys,</td></tr>
<tr><td>Dated: March 13, 2009</td><td>/s/ Thomas O. Bean<br>Thomas O. Bean (BBO #548072)<br>Peter M. Acton, Jr. (BBO #654641)<br>James M. Fraser (BBO #664605)<br>McDERMOTT WILL & EMERY LLP<br>28 State Street<br>Boston, MA 02109<br>(617) 535-4000<br>tbean@mwe.com<br>pacton@mwe.com<br>jfraser@mwe.com</td></tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2009 the foregoing Opposition Motion was filed through the ECF system and thus was sent electronically to Counsel for CSI, Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02110.

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr.