UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL, INC.,<br>    Plaintiff,<br>v.<br><br>LYCOS, INC.,<br>    Defendant,<br><br>BANK OF AMERICA f/k/a FLEET BANK,<br>    Trustee Process Defendant. | C.A. No. 05-10017- RWZ<br><br>**REDACTED PURSUANT TO PROTECTIVE ORDER** |

### OPPOSITION OF PLAINTIFF CSI LEASING, INC. TO "LYCOS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE AMOUNTS REALIZED BY FORMER LYCOS EXECUTIVES THROUGH THE EXERCISE OF LYCOS STOCK OPTIONS"

Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
Kelly A. Gabos, BBO No. 666219
kgabos@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. (617) 449-6500

*Counsel for CSI Leasing, Inc. f/k/a*
*Computer Sales International, Inc.*

ME1 8215420v.1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

SUMMARY OF ARGUMENT ..................................................................................................1

STATEMENT OF RELEVANT FACTS ...................................................................................4

ARGUMENT ...............................................................................................................................7

A.     AMOUNT OF LYCOS' DECISION MAKERS' STOCK OPTION PROFITS IS HIGHLY PROBATIVE OF THEIR STATE OF MIND AND MOTIVATION CONCERNING LEASING DECISIONS. ...........................................................................7

B.     THE HIGH PROBATIVE VALUE OF EVIDENCE AS TO THE EXTENT OF THE FINANCIAL GAIN WHICH MOTIVATED LYCOS' OFFICERS IS NOT "SUBSTANTIALLY OUTWEIGHED" BY ANY PREJUDICIAL EFFECT OF THAT EVIDENCE. ................................................................................................................9

CONCLUSION ..........................................................................................................................14

ME1 8215420v.1

# TABLE OF AUTHORITIES

**CASES**

*Berman Enterprises, Inc. v. Local 333, United Marine Div.*, 644 F.2d 930 (2nd Cir. 1981) .................................................................................................................... 9

*Connelly v. Hyundai Motor Co.*, 351 F.3d 535 (1st Cir. 2003) ........................................ 13

*Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684 (1st Cir. 1994) ................................ 11

*Ferrara & DiMercurio v. St. Paul Mercury Insurance Co.*, 240 F.3d 1 (1st Cir. 2001) ................................................................................................................... 11

*McElwain v. Harris*, C.A. No. 1:05-CV-93-JAW, 2006 WL 931920 (D.N.H. Apr. 6, 2006) ................................................................................................................ 11

*Onujiogu v. United States*, 817 F.2d 3 (1st Cir. 1987) .................................................... 11

*Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472 (1st Cir. 2000) ....................... 10

*Sheppard v. River Valley Fitness One, LP*, 428 F.3d 1 (1st Cir. 2005) ............................ 9

*United States v. DeCologero*, 530 F.3d 36 (1st Cir. 2008) .............................................. 9

*United States v. Ferguson*, Cr. No. 3:06CR137, 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ................................................................................................. 12, 13

*United States v. Flemmi*, 402 F.3d 79 n.8 (1st Cir. 2005) .............................................. 11

*United States v. Quattrone*, 441 F.3d 153 (2nd Cir. 2006) ............................................. 13

*United States v. Tavares*, 21 F.3d 1 (1st Cir. 1994) ....................................................... 14

*Verdana Beach Club L.P. v. W. Sur. Co.*, 936 F.2d 1364 (1st Cir. 1991) ....................... 11

**RULES**

Fed. R. Evid. 401 ............................................................................................................. 7

Fed. R. Evid. 402 ............................................................................................................. 7

Fed. R. Evid. 403 ..................................................................................................... passim

Fed. R. Evid. 404(b) ...................................................................................................... 14

ME1 8215420v.1

Plaintiff CSI Leasing, Inc. f/k/a Computer Sales International, Inc. ("CSI"), respectfully opposes *Lycos' Motion in Limine No. 2* ("Lycos' motion") (Dkt. No. 218) which seeks to exclude any reference at trial to the amounts made by senior Lycos, Inc. ("Lycos") decisionmakers on the exercise of their Lycos stock options in 2000, during the time they were extending Lycos equipment leases.

## SUMMARY OF ARGUMENT

In pursuing its multimillion dollar counterclaim against CSI, its former equipment lessor, Lycos is alleging that it was defrauded by CSI into extending its equipment leases, supposedly by virtue of CSI failing to disclose the financial implications of those lease extensions to Lycos. Because CSI, as a matter of law, had no duty to disclose such "financial implications" to Lycos absent a fiduciary relationship with Lycos, Lycos is trying to prove that it "trusted" CSI – and that CSI allegedly accepted that trust – to the point where a fiduciary relationship arose in which CSI owed Lycos a duty to advise Lycos regarding its leasing transactions.[1] A central issue with respect to this claim is whether in fact Lycos trusted CSI.

In their Motion, Lycos attempts to short-circuit the presentation of critical evidence by minimizing the probative value of the millions of dollars made by senior Lycos' executives in the exercise of stock options during the Lycos-CSI relationship – which amounts were made possible by, among other things, those executives' keeping expenses low and obtaining favorable accounting treatment for their equipment leases. Lycos then argues that CSI should be limited at trial to proving the existence of the stock options, but not the amount of profits that the Lycos executives stood to gain, and did gain, through their exercise.

---

[1] The Court has already held on summary judgment that the transactions at issue were arms-length and simply between a lessor and lessee and that no disclosure obligations were required absent the creation of a fiduciary relationship. *See Memorandum of Decision and Order* ("SJ Order"), dated September 26, 2008 (Dkt. No. 207).

ME1 8215420v.1

This argument is not persuasive, and Lycos fails to explain, conversely, why it should be allowed to admit similar evidence concerning the amount of commissions (over $5 million) that CSI's account executive Paul Stenberg made during the seven-year leasing relationship between the two companies.

In seeking exclusion of the stock option profits earned by Lycos executives as a result of their financial policies (including leasing all Lycos equipment and keeping it off the Lycos balance sheet), Lycos tries to construct an argument that admitting this evidence could cause a jury "to judge those executives improperly for their wealth (particularly in the face of the current economic situation and the alleged abuses engaged in by senior executive of banks and other businesses), and confuse the real issues in the case." Incredibly, it argues that those "real issues" are "relate[d] to Lycos, not former employees of the company." Motion at 3. These arguments makes little sense, because obviously, the financial motivation and intentions of the Lycos executives who repeatedly chose to extend Lycos leases with CSI **is** relevant.

First, one of the central issues in the case is those very executives: how they were motivated by their acknowledged financial interest in the stock price of the company which was affected by their lease accounting and leasing decisions; how they were intent on selling the company in a short period of time, thereby essentially not caring whether they could account for and return leased equipment after the expiration of the equipment leases; and their general state of mind concerning whether they were relying on Mr. Stenberg and/or CSI to guide their leasing decisions. Second, the fact that those executives profited greatly from their decisions cannot be deemed "unjustly prejudicial," nor can the current state of the economy be used as an excuse to prevent CSI from fully defending itself.

2

In this regard, what Lycos fails to acknowledge is that these executives are not low level employees who, by virtue of their salaries and 401(k) plans have a tangential "financial interest" in Lycos. These were the senior officers who founded the company, were directly responsible for its bottom line, and were directly involved in all issues of asset management and expense containment – including intimate involvement with Lycos' equipment leasing decisions. Specifically, these executives – Edward "Ted" Phillip, Thomas Guilfoile, and Michael Ripps (the Chief Financial Officer, Vice President of Finance & Development and the Director of Finance, respectively) – as well as other officers, founded Lycos and made all decisions on company operations (including leasing), which were guided in large part by their personal financial interests in maximizing the value of the stock options they had received, which became more valuable as Lycos' stock price climbed.

Although Lycos disputes the relationship between Lycos' leasing decisions and its stock price, CSI has expert and other evidence it will present which demonstrates how leasing decisions affected the value of those executives' stock options. In the end, CSI is entitled – and their counsel is obligated – to present in their defense that Lycos' senior officers were motivated for their decisions concerning leases in large part by the many millions of dollars they knew they would reap as Lycos stock price steadily climbed and was ultimately purchased by a third party conglomerate (Spain's Telefonica, S.A.) at a premium.

Furthermore, the evidence of the amount these executives ultimately made on their stock options bears directly on not only their bias but also on whether they actually ever reposed "trust and confidence" in CSI, a question that Lycos has put squarely at issue in alleging that CSI became Lycos' "fiduciary." CSI's defense, in large part, is that it does not make sense that corporate executives who knew they had so much to gain from successful management of their

company would have trusted Mr. Stenberg (the account executive one of its outside leasing vendors) to the point where they placed such important decisions as the leasing of $45 million worth of critical operational computing equipment in his hands. The evidence also bears independently on the bias of these witnesses in Lycos' favor.

For all of these reasons, as more fully discussed below, the Lycos motion should be properly denied.

## STATEMENT OF RELEVANT FACTS

### Stock Option Profits of Senior Lycos Decision Makers

Senior executives at Lycos – including founders of the company and those who directly oversaw, and were responsible for, Lycos' equipment leasing – received stock options which ultimately earned them millions of dollars when Lycos stock price rose dramatically as a result of their management of the company, including their management of its leasing policies. Some of those who are percipient trial witnesses are:

> Michael Ripps: As explained in another brief CSI is submitting,[2] Mr. Ripps was the Lycos Director of Finance and Administration between December 1997 and the fall of 2000 – a key period of time in which Lycos extended many of its equipment leases with CSI. More importantly, Mr. Ripps was the main officer at Lycos overseeing and handling the company's equipment leases at this time. When Mr. Ripps first joined Lycos in late 1997, he testified that "the relationship with the equipment lease companies was turned over to me," including Lycos' leases with CSI with which he worked and for whose leases he had responsibility.[3] Mr. Ripps generally recalled that, from early 1998 until he left in the fall of 2000, it was the practice "for CSI to send the fully executed equipment schedules or leases to [Mr. Ripps'] attention after they were signed by CSI."[4] He

---

[2] See CSI's Opposition to Lycos' Motion in Limine No. 1 (concerning Lycos' attempt to exclude a derogatory statement made by Mr. Ripps in a private email concerning Paul Stenberg), filed contemporaneously with the present Opposition.
[3] Deposition of Michael Ripps ("Ripps Dep."), dated, Nov. 14, 2006, at 26:17-20; 33:24-34:3; 94:3-9 (selected portions thereof attached as Ex. A)
[4] Ripps Dep. at 34:23-35:12.

4

testified that he received approximately $1 million from the exercise of his Lycos stock options in addition to years of six figure salaries.[5]

Edward "Ted" Phillip: Mr. Phillip was one of the founders of Lycos and was employed by Lycos from its inception in December 1995 until he left in January 2004 (well after Lycos entered into the 2003 Sales Agreement.[6] From 1995 until February 2001, Mr. Philips was Lycos' Chief Operating Officer and Chief Financial Officer.[7] Mr. Philip personally signed, on behalf of Lycos, thirteen equipment schedules with CSI, four of which were lease extensions which Lycos has put at issue in this case.[8] At his deposition, Mr. Philip admitted that his stock options in Lycos gave him a "personal financial interest" in the share price of the company.[9] He further testified that, through the end of 1999, he had a net profit before taxes on his personal sale of Lycos option of almost ▬▬▬.[10] When Lycos sold itself to Telefonica at the end of October 2000, Mr. Philip personally made an additional ▬▬▬ on that transaction.[11]

Brian Lucy: Brian Lucy started at Lycos in July 1996 as one of its first employees.[12] In February 1999 he became the Controller of Lycos, and from March 2001 to February 2004,[13] he served as Lycos' Vice President and Chief Financial Officer.[14] Lycos is claiming that Mr. Lucy was one of the Lycos officials who was mislead by CSI's Mr. Stenberg.[15] During his tenure at Lycos, Mr. Lucy received over ▬▬▬ before taxes from the exercise of his Lycos stock options.[16]

Tom Guilfoile: Mr. Guilfoile started at Lycos in February 1996 as the Controller and later became the Vice President of Finance and Administration in December 1996 and the Senior Vice President of Strategic Planning and Mergers and Acquisitions for Terra Lycos (Lycos' successor company) in late 2000.[17] He left Lycos in December 2001. Mr. Guilfoile, a former accountant, further testified in

---

[5] Ripps Dep. at 13:19-22. As a stock option holder in Lycos, Mr. Ripps acknowledged that he had a "financial interest in the price of Lycos stock going up" and that he "would like to see my investment [in Lycos] increase." Id. at 15:2-12.
[6] See Affidavit of Edward M. Philip ("Philip Aff."), dated Aug. 30, 2007, ¶ 1 (attached hereto as Ex. B).
[7] Philip Aff. ¶ 1.
[8] Philip Aff. ¶ 3.
[9] Deposition of Edward Philip ("Philip Dep."), dated Nov. 6, 2006, at 147:9-13 (selected portions thereof are attached hereto as Ex. C)
[10] Philip Dep. at 143:15-6.
[11] Philip Dep. at 150:16-151:2.
[12] Deposition of Brian Lucy ("Lucy Dep."), dated Nov. 10, 2006, at 21:17-22:2 (selected portions thereof attached hereto as Ex. D).
[13] Lucy Dep. at 33:9-11.
[14] Lucy Dep. at 21:12-16.
[15] See Lycos' Local Rule 56.1 Statement of Undisputed Facts (Dkt. No. 147) at 9-15.
[16] Mr. Lucy received approximately ▬▬▬ in 1998, ▬▬▬ in 1999, ▬▬▬ in 2001. Lucy Dep. at 74:14-75:22, and Plaintiff's Deposition Exhibits 330-332 (attached hereto as Exh. E).
[17] Deposition of Thomas Guilfoile ("Guilfoile Dep."), dated Dec. 7, 2006, at 42:15-45:15 (selected portions of which are attached hereto as Ex. F); see also Affidavit of Thomas E. Guilfoile ("Guilfoile Aff."), dated Aug. 31, 2007, ¶ 1 (attached hereto as Ex. G).

5

deposition that Lycos calculated amounts and reviewed each of its leases to determine how to account for it[18] – i.e., either as an operating lease or a capital lease. Mr. Guilfoile has further testified that he personally signed, on behalf of Lycos, 105 equipment schedules with CSI, thirty-five of which were lease schedule extensions at issue in this case.[19] Mr. Guilfoile personally made over ▇▇▇▇▇▇ as a result of exercising his Lycos stock options.[20]

**CSI's Evidence Concerning Lycos' Desire to Control Expenses, Including Leasing**

The amounts made personally on stock options by Lycos' decision makers is clearly relevant on the issue of whether anyone with such a potential financial upside in Lycos financial future would trust an outside leasing salesman to direct its multi-million dollar leasing decisions. Separately, however, CSI also has expert opinion evidence that Lycos' decisions concerning whether to capitalize or continue operating accounting treatment for its leases impacted Lycos' financial statements and its stock price (thereby affecting the value of those decision makers' stock options). CSI expert William Bosco explained how Lycos' accounting for its leases as operating versus capital leases would report lower amounts of debt with higher profits which, in turn, would mean a higher stock price for Lycos.[21] CSI expert Professor James Schallheim also opines that investors in Lycos would have looked unfavorably on long-term debt – including capital lease treatment of the CSI leases – which was a motivating factor in Lycos' decision makers' desire to continue extending their leases and accounting for them as operational rather than capital.[22]

In his deposition, though Lycos' former CFO Ted Phillip fenced with CSI's counsel over whether Lycos wanted to "keep its expenses" down, he finally conceded that Lycos was always looking to "control" or "manage" its expenses. In a book written by Lycos' founder and former

---

[18]  Guilfoile Dep. at 79:21-80:14.
[19]  Guilfoile Aff. ¶ 3.
[20]  Guilfoile Dep. at 41:22-42:7.
[21]  See Deposition of William Bosco ("Bosco Dep."), dated Dec. 11, 2007, at 265:9-267:11 (attached hereto as Ex. H).
[22]  See Deposition of James Schallheim ("Schallheim Dep."), dated Nov. 16, 2007, at 161:2-162:1 (attached hereto as Ex. I).

Chief Executive Officer Robert Davis, Mr. Davis describes a "crisis" time in the fourth fiscal quarter of 1999 when Mr. Philip entered his office "ashen faced" and told Mr. Davis Lycos would not meet Wall Street's expectations.[23] Though Mr. Philip testified he did not recall this specifically – admitting it was possible it happened according to Mr. Davis's version of events in his book – Mr. Davis discussed immediate efforts by Lycos to control its costs so that it met Wall Street's earnings expectations. Mr. Philip did recall that Lycos controlled and managed its expenses where it could, including its equipment leasing expenses.[24]

## ARGUMENT

### A. Amount of Lycos' Decision Makers' Stock Option Profits is Highly Probative of Their State of Mind and Motivation Concerning Leasing Decisions.

For admission at trial, evidence must be relevant in that it makes the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401, 402. The evidence concerning the amount of profits personally realized by key Lycos' decision makers' on lease issues are relevant to show their state of mind, their motivation and their bias. CSI further has expert evidence (though disputed by Lycos) that the leasing decisions made by Lycos' officers had a positive impact on Lycos' stock price, and CSI is entitled to argue that Lycos' decision makers made leasing decisions on their own, independent of any alleged trust or reliance on Mr. Stenberg, and for their own personal gain with regard to increasing the value of their stock options.

Ironically, Lycos intends to offer as evidence of Mr. Stenberg's alleged "motive to defraud" the fact that Mr. Stenberg made several million dollars in commissions over the seven-year CSI-Lycos relationship.[25] How Lycos can argue that this compensation evidence is relevant

---

[23] *See generally* Philip Dep. at 119:17-127:17.
[24] Philip Dep. at 129:17-131:22.
[25] *See*, for example, Lycos' memorandum in support of summary judgment (Dkt. No. 148) at 5 & n. 28.

7

ME1 8215420v.1

for Lycos' efforts to show motive but not for CSI to do the same is unclear and unconvincing.

In its Motion, Lycos argues that the only relevant facts regarding stock options are the fact that executives at Lycos had them, whether they acted improperly to increase the value of those options (through decision affecting the company's stock price) and whether treatment of those leases by Lycos affected the company's stock price. Motion at 2-3. Allowing Lycos to truncate this evidence as a compromise would prejudice CSI's defense of itself from Lycos' multi-million dollar damage claim would be like allowing CSI a gun to defend its claims but not allowing it to load that gun: all employees of a company may have some motivation to act for their company simply to keep their jobs – but when personal fortunes worth millions of dollars are at stake, as they surely were here, CSI is entitled to argue that those decision makers acted very differently, especially when trying to position Lycos financially for the sale to Telefonica which ultimately made them multi-millionaires.

Lycos' proposed "compromise" on stock option evidence would also preclude introduction of key evidence on the state of mind of those at Lycos responsible for leasing decisions – that is, what motivated them to enter into the lease extensions which Lycos now claims were induced by CSI's alleged fraud? In order to show that, CSI must present information showing that these executives had more at stake in Lycos' future financial situation than simply a continued salary and occasional bonus. CSI must also present that these executives had huge (and personal) potential fortunes to make based on their decisions affecting Lycos' stock price, which is true, and that there decisions were motivated in large part by the expectation of large, multi-million dollar personal wealth. That these ultimately came to pass – that these decision makers, whom Lycos calls "unsophisticated," ultimately made the millions of dollars they expected to make – is highly relevant on issues of motivation and trust.

CSI is further entitled to explore the amounts made by these former Lycos officers – including compensation and bonuses, in addition to stock option grants and profits therefrom – in exploring their bias in favor of Lycos when they testify at trial. It is axiomatic that extrinsic evidence may be admitted as relevant to demonstrate a witness' bias, subject as with all relevant evidence to the balancing against "unjustly prejudicial evidence" under Fed. R. Evid. 403. *See, e.g., United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) (trial judge has discretion to balance witness bias evidence, which is relevant, against unjustly prejudicial value); *Sheppard v. River Valley Fitness One, LP*, 428 F.3d 1, 12 (1st Cir. 2005) (bias or prejudice of witness may be proved through extrinsic evidence, including evidence of settlement offers and acceptances) (citation omitted).

In the case of witness compensation, however, which is relevant and admissible "to impeach the credibility" of the witness, the risk of unfair prejudice is low where the evidence is used as "simply one of many pieces of evidence . . . without undue emphasis or unscrupulous references." *Berman Enterprises, Inc. v. Local 333, United Marine Div.*, 644 F.2d 930, 938-39 (2nd Cir. 1981) (salary evidence allowed in as relevant to several issues, including witness bias, and was not unduly emphasized).

**B.    The High Probative Value of Evidence as to the Extent of the Financial Gain Which Motivated Lycos' Officers Is Not "Substantially Outweighed" by Any Prejudicial Effect of That Evidence.**

Unable to rebut the relevance of the stock option profit evidence, Lycos focuses its motion on what it claims would be an "unfairly prejudicial" effect of the evidence, which Lycos claims is "substantial" and warrants exclusion under Fed. R. Evid. 403. Specifically, Lycos claims that the evidence would cause the jury to depart from rational thought and decide the case on an "improper basis" or on an "emotional one" by "judging those [Lycos] executives improperly for their wealth," especially in the current economic downturn. Motion at 3.

This argument is not persuasive, and Lycos' related claim that the "real issues" in the case "relate to Lycos, not individual former employees of the company," makes no sense, as a corporation is made up of individual employees who act on its behalf. *Id.* By placing the alleged "trust and confidence" of its own employees at issue, Lycos has made the actions and motivations of those employees a key issue in the case. It cannot now say that personal financial information concerning their motivations is "unjustly" prejudicial in the sense that warrants exclusion under Rule 403. To the contrary, the law is clear that where evidence is "fundamental to the central issues" in a case, exclusion of the evidence – even though prejudicial – is disfavored.[26]

Here, there is a dispute as to whether Lycos' senior officers were "duped" into extending leases because of trust they allegedly reposed in CSI's account executive. It is highly relevant what other motives those officers may have had to independently undertake certain leasing transactions – including personal financial gain – and the amounts they stood to make on their Lycos holdings goes to their bias as witnesses.

In this regard, the First Circuit is clear that relevant but prejudicial evidence, in itself, not excludable due to its prejudicial impact. Though the Rule 403 balancing is "a quintessentially fact-sensitive enterprise,"

> [t]he fact that a piece of evidence hurts a party's chances does not mean it

---

[26] For example, where a plaintiff was suing for cerebral palsy allegedly caused by medical malpractice, it was improper for the trial court to bar the plaintiff under Fed. R. Evid. 403 from appearing in court during trial because of potential prejudice to the defendant doctors. *Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472, 479 (1st Cir. 2000). In reversing, the First Circuit held that the plaintiff's presence at trial

> was fundamental to the central issue in the case: causation. When proffered evidence relates to the central issue in a case, it is a difficult matter indeed to show that the prejudicial effect of that evidence substantially outweighs its highly probative nature, as Rule 403 requires.

*Id.* (citation omitted).

10

> should automatically be excluded. If that were true, there would be precious little left in the way of probative evidence in any case. The question is one of "unfair" prejudice – not of prejudice alone.

*Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir. 1987) (cited in *Ferrara & DiMercurio v. St. Paul Mercury Insurance Co.*, 240 F.3d 1, 6-7 (1st Cir. 2001) (upholding Judge Harrington's admission of prejudicial but probative information on motive and opportunity); *see also Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 690-91 (1st Cir. 1994) (holding "[a]ll evidence is meant to be prejudicial; elsewise, the proponent would be unlikely to offer it. . . . [E]vidence cannot be kept from the jury merely because it hurts a party's chances. . . . The element that triggers a need to exclude evidence under Rule 403 is not prejudice, but *unfair* prejudice") (emphasis in original; citations omitted).

"Unfair" prejudice – of the type which may lead to exclusion of minimally probative evidence – is that evidence having an "undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. Courts are quick to note, however, that "trials were never meant to be antiseptic affairs," *Verdana Beach Club L.P. v. W. Sur. Co.*, 936 F.2d 1364, 1372 (1st Cir. 1991), and that evidence is "unfairly prejudicial if it 'invites the jury to render a verdict on an improper emotional basis.'" *United States v. Flemmi*, 402 F.3d 79, 86 n.8 (1st Cir. 2005) (quotation omitted). Even in matters of personal injury, where evidence such as photographs may lead to highly emotional reactions from jurors, the probative nature of the evidence trumps whatever prejudice may result. *See, e.g., McElwain v. Harris*, C.A. No. 1:05-CV-93-JAW, 2006 WL 931920 (D.N.H. Apr. 6, 2006) at *2-3 (allowing into evidence accident scene photographs, evidence of cars' speeds and defendants' crossing of double line).

Lycos argues that, given the current economy and the "alleged abuses by executives of banks and other businesses" in the news, there is a heightened prejudice it will suffer before the

11

jury if evidence of the amount of its decision makers' stock option profits is admitted. This action was filed in 2005. The fact that the economy has only recently soured, and unrelated corporate scandals have come to light, is obviously no fault of CSI's and cannot be held against it in presenting its case.

Lycos itself raised hundreds of millions of dollars through public offerings and acquisitions of other companies, all of which is detailed in its public filings and which will be offered for the purpose of showing, among other things, that Lycos was not a "babe in the wood" lured into making bad business decision by one CSI salesman. That is not the issue in this Motion. Most people do not stumble into making tens of millions of dollars; it is rare, and CSI is entitled to show that Lycos' equipment leasing decision makers were savvy, educated and sophisticated managers who knew what they were doing and made decisions with absolutely no reliance on Paul Stenberg. The amount of their stock option profits, and not just the fact that they "made money" on those options, is central to this and other issues.

Other cases have made clear that wealth itself, and the amounts of a company's or an individual's financial gain, is not the type of prejudice – undue or otherwise – which calls for exclusion where the evidence itself is probative on relevant issues. Recently, a district court allowed the admission of evidence concerning a defendant's participation in a deferred compensation plan in which corporate stock was involved because it was relevant to proving motive. While evidence of a corporate officer's salary and bonus was irrelevant because they were "not affected by [the company's] stock price," evidence of stock grants to a deferred compensation plan was relevant to motive. *United States v. Ferguson*, Cr. No. 3:06CR137, 2007 WL 4240782 (D. Conn. Nov. 30, 2007) at * 1 ("[e]vidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving

the fraud"):

> The overall number of shares [defendant] received over the duration of his participation in the plan, then, was tied to AIG's [the comapany's] performance. [Defendant] also could take early payouts for some of his allocated shares, and he would receive the market value of those shares at the time of the payout. In light of [Defendant's] financial interest in AIG's performance, evidence of the deferred compensation plan is relevant to [Defendant's] motive to manipulate AIG's financial statements to maintain AIG's stock price.

*Id.* The probative nature of this kind of evidence is not "substantially outweighed by its risk of undue prejudice" under Rule 403. *Id.* Similarly, evidence of the Lycos decision makers' profitability on stock options – which are time to Lycos' stock performance – is relevant to showing the motives (as well as the state of mind) of those decision makers in handling expenses, including equipment leasing.

Moreover, where motive and state of mind are at issue, a limiting instruction from the court that a verdict cannot be based "simply because of [a party's] wealth" may be given, and Rule 403 will not exclude evidence of a defendant's salary where it is challenged – as Lycos does here – on the basis that it "invite[s] the jury to engage in class-based bias." *United States v. Quattrone*, 441 F.3d 153, 187 (2nd Cir. 2006) (salary information, establishing defendant's motive to obstruct an IPO allocation investigation, was relevant on motive issue; court rejected defendant's argument that salary information was unduly prejudicial and invited "class-based bias" due to his wealth).

In fact, in arguing that the amount of the decision makers' stock option profits should be excluded under Fed. R. Evid. 403, the cases Lycos cites are sharply distinguishable from the situation here. In *Connelly v. Hyundai Motor Co.*, 351 F.3d 535 (1st Cir. 2003), for example, the First Circuit affirmed the trial court's exclusion of evidence that a father had received two prior citations for failing to properly seatbelt his son, who dies in the automobile accident in question

13

– but this was done on the basis of improper character evidence under Rule 404(b) and on impeachment grounds, not on the issue of "undue prejudice" under Rule 403, which Lycos has raised here. The defendant there was able to accomplish its impeachment in another way without the need to inject improper character evidence.

Likewise, in *United States v. Tavares, 21 F.3d 1 (1st Cir. 1994)*, on which Lycos also relies, the Court found there was no probative value of admitting the nature – as opposed to the fact – of a defendants' prior conviction. 21 F.3d at 5 ("there exists no reason, other than the government's desire to color the jury's perception of the defendant's character, for revealing the nature of the defendant's prior felony"). Unlike the *Tavares* case, none of the Lycos former officers are parties (they are witnesses), there are no criminal implications, the evidence is highly probative, and the arguable prejudicial value of personal financial gain is nothing approaching evidence of the nature of a prior felony conviction.

## CONCLUSION

For the foregoing reasons, plaintiff CSI Leasing, Inc. respectfully requests that the Court deny Lycos Motion *in Limine* No. 2, and grant CSI such other relief as the Court deems just and proper.

Respectfully submitted,

CSI LEASING, INC. f/k/a COMPUTER SALES INTERNATIONAL, INC.
By its attorneys,

/s/ Robert J. Kaler
Robert J. Kaler, BBO No. 542040
rkaler@mccarter.com
Edward W. Little, Jr., BBO No. 628985
elittle@mccarter.com
Kelly A. Gabos, BBO No. 666219
kgabos@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
Tel. (617) 449-6500

Dated:  March 13, 2009

## CERTIFICATE OF SERVICE

I, Edward W. Little, Jr., hereby certify that I caused a true copy of the foregoing pleading to be serve on counsel for the other parties in this action electronically by CM/ECF notification, by e-mail and by first class mail, postage prepaid, this 13th day of March, 2009.

/s/ Edward W. Little, Jr.
Edward W. Little, Jr.

15

ME1 8215420v.1