# EXHIBIT A

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Michael Ripps

# November 14, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Christy L. Freyberg   21832

1          (Exhibit 342 was marked for

2          identification, original retained by

3          Mr. Kaler, copy attached at the end of the

4          original transcript.)

5      Q.    Exhibit 342, which I show you now, is that

6    a copy of a subpoena with which you were served in this

7    case?

8      A.    Yes, it is.

9      Q.    Did you gather any documents in response to

10   the subpoena, or electronic records?

11     A.    No, I didn't.

12     Q.    Do you have any documents or electronic

13   records responsive to the subpoena?

14     A.    No, I don't, other than my tax returns.

15     Q.    Do those tax returns show what you made on

16   stock options and how many stock options you exercised

17   of Lycos?

18     A.    They should.

19     Q.    What approximately did you make in total in

20   exercising Lycos stock options?

21     A.    I would say approximately a million

22   dollars.

23     Q.    Okay.  And over approximately what period

24   of time did you earn that one million dollars on --

1    correct?

2      A.    I had equity in the company, yes.

3      Q.    Okay.  In other words, you had an interest

4    in the price of Lycos stock going up; right?

5          MR. BEAN:  Objection.

6      Q.    You can answer.

7      A.    I mean, I was a shareholder in the company.

8      Q.    That meant you had a financial interest in

9    the price of Lycos stock going up because you had

10   options to buy it at a certain price; right?

11     A.    As a stock option holder, yes, I would like

12   to see my investment increase.

13     Q.    Okay.  And the investment -- your

14   investment increased by the price of Lycos stock going

15   up; correct?

16     A.    Yes.

17          (Exhibit 343 was marked for

18          identification, original retained by

19          Mr. Kaler, copy attached at the end of the

20          original transcript.)

21     Q.    Let me mark as Exhibit 343 what appears to

22   be a copy of a letter addressed to you dated

23   December 24th of 1997.  Is this a copy of a letter that

24   you received in or about late December of 1997 offering

1     Q.    Generally was that distinguishable from the

2     stock options that you were granted?

3     A.    I can't remember the specific aspects of

4     the program.  I believe it was outside the stock option

5     program.

6     Q.    Okay.  It permitted you to periodically

7     purchase stock with your own funds or did your employer

8     contribute?  What do you remember?

9     A.    I can't remember.

10    Q.    During the course of your employment at

11    Lycos, and I mean during the entire period that Lycos

12    was paying you, even when you went over to Asia, but

13    focusing now on the early period because I think that's

14    what's relevant, did you become involved in handling

15    Lycos equipment leases?

16    A.    Yes.

17    Q.    How did you become involved?

18    A.    As I generally recall, when I joined the

19    company, the relationship with the equipment lease

20    companies was turned over to me.

21    Q.    Who was it turned over to you from?

22    A.    I can't recall exactly.  It was either

23    Brian Lucy or Tom Guilfoile.

24    Q.    And were you told what responsibilities you

1    A.    I can't recall.  I mean, it would -- it

2  could have been anything from personal laptops to

3  servers.  I can't recall specifically.

4    Q.    Would you describe the procedure that was

5  followed when Lycos leased pieces of equipment from

6  CSI.

7    A.    I can't recall the exact process.  I

8  believe internally there was a PO to order the

9  equipment and then within the process we'd work with,

10  in this case, Paul to get financing to buy the

11  equipment.

12    Q.    All right.  So Lycos would issue a purchase

13  order to order the equipment?

14    A.    I think so.  I can't recall specifically.

15    Q.    Well, just generally what were the steps

16  that were followed?

17    A.    Again, generally I can't recall seven years

18  ago exactly or over seven years ago.

19    Q.    Well, it continued, in your case, up 'til

20  2000 --

21    A.    Right.

22    Q.    -- that you handled the leasing; right?

23    A.    Yes.

24    Q.    And during that time there were a whole

1    series of equipment leases that -- that you handled for

2    Lycos with CSI; right?

3       A.    Yes.

4            (Exhibit 348 was marked for

5       identification, original retained by

6       Mr. Kaler, copy attached at the end of the

7       original transcript.)

8       Q.    For example, Exhibit 348 is a copy of a

9    series of letters that you received, and the last page

10   being a fax that you received, from CSI, all in

11   November of 1998 and the last page in February of 1999;

12   is that right?

13           Do you recognize these documents generally

14   as correspondence that you received from CSI in or

15   about late 1998 and early 1999?

16      A.    Generally they look like something I would

17   receive, yes, but I don't recall these specifically.

18      Q.    The first letter on the first page of

19   Exhibit 348 refers to enclosing executed copies of

20   equipment schedule Nos. 35 and 36, master lease

21   agreement No. 144874.  Do you see that?

22      A.    Yes.

23      Q.    It was the practice during the time that

24   you were handling leasing from basically the early part

1    of 1998 up until the early fall of 2000, when you left

2    for Asia, for CSI to send the fully executed equipment

3    schedules or leases to your attention after they were

4    signed by CSI; correct?

5         MR. BEAN:  Objection.

6    Q.    You can answer.

7    A.    I don't recall exactly.

8    Q.    But do you remember generally that you were

9    the one who was receiving the leases?

10   A.    Yeah.  Generally.

11   Q.    Generally yes?

12   A.    Yes.

13   Q.    Okay.  The second page of Exhibit 348 in

14   the first sentence appears to be a letter that informs

15   you that Avnet Computer has invoiced Computer Sales

16   International for certain equipment, and then it lists

17   the equipment and the total amount of the purchase

18   price of the equipment.  Do you see that?

19   A.    Yes.

20   Q.    And then the third page of the exhibit,

21   that's -- the second page is LYC02607.  The next page,

22   LYC02412, the same letter says Dell -- the third page

23   of the exhibit says Dell has invoiced Computer Sales

24   International for the equipment, and then it lists an

1     Q.    You can answer.

2     A.    In charge of the lease agreements?

3     Q.    Right.  As director of finance, you had

4     responsibility for the lease agreements with CSI;

5     right?

6     A.    I was working with CSI, that's correct.

7     Q.    Okay.  And you were copied, as we see in

8     the upper right corner, on this document; correct?

9     A.    Yes.

10    Q.    And it's dated June of 2000; correct?

11    A.    (Witness nods head affirmatively.)

12    Q.    Is that right?

13    A.    Yes.  Appears to be.

14    Q.    Okay.  So it's obviously a summary of lease

15    agreements that was sent to you.  Isn't it, in fact,

16    the type of document that you were regularly copied on

17    within Lycos --

18          MR. BEAN:  Objection.

19    Q.    -- during the time you were director of

20    finance?

21          MR. BEAN:  Objection.

22    Q.    You may answer.

23    A.    I don't recall.

24    Q.    Are you telling us you don't remember

# EXHIBIT B

ME1 8196544v.1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
|     Plaintiff and Defendant-in-Counterclaim, | ) ) ) | |
| v. | ) ) | |
| LYCOS, INC., | ) ) | **AFFIDAVIT OF EDWARD M. PHILIP** |
|     Defendant and Plaintiff-in-Counterclaim, | ) ) ) | |
| and | ) ) | |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) | |
|     Trustee Process Defendant | ) | |

I, Edward M. Philip, do hereby depose under oath and state as follows:

1.     I was employed at Lycos, Inc. ("Lycos") in Massachusetts from December 1995 until January 2004. From 1995 until approximately February 2001, I was Lycos's Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"). Beginning in February 2001 until my departure in 2004, I served as Lycos's Senior Vice President of Special Projects.

2.     I have personal knowledge of the facts set forth herein.

3.     Beginning in 1997, Lycos and Computer Sales International, Inc. ("CSI") entered into numerous equipment schedules for the lease of technology equipment that Lycos used to operate its business. In my capacity as Lycos's COO and CFO, I signed certain equipment schedules with CSI on behalf of Lycos. More specifically, I signed CSI equipment

schedules 1, 2, 4, 5, 7, 64C, 64D, 66F, 66G, 67E, 67F, 69F, and 69G on behalf of Lycos.

Of those thirteen schedules, 1, 2, 4, 5, 7, 64C, 66F, 67E, and 69F were schedules pursuant to

which Lycos leased new computer equipment from CSI, while equipment schedules 64D, 66G,

67F, and 69G were refinancings (the "Refinanced Schedules") of earlier schedules with CSI.

Prior to joining Lycos, I had no experience with equipment leasing.

4.      I have no recollection of anyone ever telling me that the present value of the

payments to be made under the Refinanced Schedule(s) plus the present value of the residual

value of the equipment under the Refinanced Schedules exceeded the present value of the

remaining payments that would have been made under the terminating schedule(s) plus the

present value of the estimated residual value of the equipment under the terminating

schedule(s). More generally, I have no recollection of anyone ever telling me that CSI was

charging Lycos a mark-up, fee, or other premium in connection with the Refinanced

Schedules. Further, I am unaware of anyone at Lycos that knew CSI was charging such a

mark-up, fee, or premium. While I would have expected that Lycos would pay more interest

over the life of a refinanced schedule because it had use of the equipment for a longer period

of time, if anyone had told me that CSI was charging such a mark-up, fee, or premium on the

Refinanced Schedules, I would not have signed the Refinanced Schedules on the terms set forth

therein.

5.      During my tenure as COO and CFO at Lycos, I worked out of Lycos's offices

in Massachusetts. It was my ordinary business practice to request, and in fact it was the case,

that documents for my signature were sent to those offices. While I did have occasion to travel

for business, it was my ordinary business practice to sign documents requiring my signature,

such as leases and equipment schedules with lessors, while I was in those offices.  I have no

recollection, nor do I have any reason to believe, that I deviated from this ordinary business

practice when signing the equipment schedules with CSI.

Signed under the penalties of perjury, this _30_ day of August, 2007.

Edward M. Philip

# EXHIBIT C

# O'BRIEN & LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

Transcript of the Testimony of:

# Edward Michael Philip

# November 6, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130   888.825.DEPO(3376)

James A. Scally   21280

1    Q.  Okay.  Which pieces do you remember reading?

2    A.  I don't recall which ones.

3    Q.  Just generally.

4    A.  Just pieces about Lycos.

5    Q.  Did you read the portions of the draft of the book

6  that referred to you?

7    A.  I don't know if I read them all.

8    Q.  But you read some of them?

9    A.  I read some of them, yes.

10      (Exhibit 291-A, excerpts of Exhibit

11     291, marked.)

12    Q.  I show you what's been marked as Exhibit 291.

13      MR. BODNER:  291-A?

14      MR. KALER:  I beg your pardon.

15     291-A.  Which is a photocopy of just

16     certain portions of Exhibit 291.

17    Q.  And I'll direct your attention to the two pages of

18  text which are the last two pages of the document and ask

19  you to just read those two pages.

20    A.  These two pages.

21    Q.  Yes.  290 -- excuse me -- 109 and 102 -- rather,

22  109 and 110 from the book.

23    A.  (Pause.)  Okay.

24    Q.  Do you see where on page 109 of Exhibit 291-A

1    carrying over to 110, the last two pages of the exhibit,

2    it's those pages of 291 as well.  About halfway down the

3    page on Exhibit 109 there's a paragraph that starts, quote,

4    "Lycos never joined the stampede for growth at any cost,

5    and from the beginning we aimed to be profitable.  To some

6    extent we had no choice.  Unlike so many other web start-

7    ups, we weren't showered with venture money.  Venture

8    capital comes with a lot of strings attached, not the least

9    of which is dilution of equity," unquote.  Do you see that?

10       A.  I do.

11       Q.  And then immediately after that, do you see where

12   Mr. Davis wrote, "Further, as a public company, we had

13   presented an earnings-based financial model that we were

14   expected to follow."

15         Is that correct?  Had Lycos as a public company

16   when you were CFO presented an earnings-based financial

17   model which you felt you were expected to follow?

18       A.  We did, yes.

19       Q.  And he goes on to say, quote, "We were proud to

20   stand by that model and proud of the reputation for

21   consistency that we developed.  In fact, for the 19

22   consecutive quarters I was at the helm, we met or exceeded

23   Wall Street's expectations."  Do you see that?

24       A.  I do.

1      Q.   And what do you understand him to be referring to

2    when he said "Wall Street expectations"?

3      A.   Wall Street had a financial model driven by

4    revenues that -- and by pages that they graded us against.

5      Q.   Okay.  And he goes on to say, "Meeting these

6    numbers wasn't an option; it was an obligation.   The one

7    time we came close to missing our earnings forecast, we

8    nearly turned the company inside out to recover," unquote.

9    Do you see that?

10     A.   I do.

11     Q.   And what did you understand him to be referring to

12   when he said earnings forecast?

13     A.   The earnings of the company.

14     Q.   Okay.  By that you mean revenue minus expenses?

15     A.   Not that simple, but --

16     Q.   Essentially?

17     A.   Essentially, yes.

18     Q.   Okay.  He goes on to say, quote, "It came during a

19   period when we were aggressively buying companies and

20   hiring employees.  During that particular quarter we had

21   hired close to 200 people, boosting total staffing by

22   nearly 30 percent, and we were advertising heavily,"

23   unquote.  Do you see that?

24     A.   I do.

1    Q.  And he goes on to say, quote, "One day early in

2    the fourth quarter of 1999, Ted Philip, Lycos CFO," that's

3    you, right?

4    A.  Yes, that's me.

5    Q.  "Came into my office ashen and said that we

6    weren't going to meet our projections.  'The only way we're

7    going to avoid this,' he said, 'is to be bold, tough, and

8    Draconian.  Are we up for it?'"  Do you see that?

9    A.  I do.

10    Q.  Okay.  Do you recall what he's talking about?

11    A.  Actually, I don't recall what he's talking about.

12    Q.  Okay.  He goes on to say, quote, "We were.  Had we

13    missed the forecast, the valuation of the company would be

14    cut in half overnight and our credibility would be shot,"

15    unquote.  Do you see that?

16    A.  I do.

17    Q.  By forecast, you understood him to mean missing

18    the earnings forecast, right?

19    A.  That's correct.

20    Q.  And when he says, "Had we missed the forecast, the

21    valuation of the company would be cut in half overnight,"

22    he's referring to the market capitalization of the company;

23    is that correct?

24    A.  I believe so.

1      Q.  He goes on to say, quote, "Slamming the brakes on

2    our fast-moving freight train, we stopped all advertising,

3    eliminated all outside contractors, and cut every

4    unnecessary expense we could find," unquote.  Do you see

5    that?

6      A.  I do.

7      Q.  What is your recollection of what you did to cut

8    every unnecessary expense you could find, as he puts it?

9      A.  I actually don't recall this.

10     Q.  Do you recall any periods of time, sir, during

11   which the company cut expenses in part in an effort to meet

12   earnings requirements?

13     A.  We were always watching the income statement.

14     Q.  Meaning watching, trying to keep your expenses

15   down?

16     A.  And revenues up.

17     Q.  Okay.  But I'm focusing on you -- you were, among

18   other things, trying to keep your expenses down?

19     A.  Not necessarily, no.

20     Q.  I'm not saying it's a bad thing.  I'm just asking.

21     A.  Well, at the time it was a bad thing, though.

22     Q.  What was a bad thing?

23     A.  Trying to keep your expenses down.

24     Q.  Why would that be a bad thing?

1      A.  Wall Street wanted us, wanted Internet companies

2    and expected Internet companies to spend a lot of money and

3    generally didn't care if they lost a lot of money.

4      Q.  Except when they had earnings projections, then

5    they cared a great deal, didn't they?

6      A.  Some did; some didn't.

7      Q.  Certainly there were -- certainly pretty much

8    throughout the years that you were CFO before the

9    acquisition by Terra, there were earnings expectations that

10   Wall Street had for the company, correct?

11     A.  That's correct.

12     Q.  And one way to meet those earnings expectations

13   was to increase revenues, correct?

14     A.  That's right.

15     Q.  And another way to try to make those earnings

16   expectations was to lower expenses, right?

17     A.  No.  Generally not, because never that I can

18   remember were our expenses ever expected to be sequentially

19   lower than in previous quarters.

20     Q.  Well, a quarter's only three months long.

21   Generally speaking, it would enhance Lycos' earnings if it

22   minimized its expenses, so long that minimizing the

23   expenses didn't hurt the operations of the company?

24     A.  That's a statement you can make about all

1    businesses, correct.

2    Q.  Okay.  So you'd agree?

3    A.  I would agree that that is a general business

4    statement, yes.

5    Q.  Okay.  Do you see where Mr. Davis goes on to state

6    in this book, quote, "We also worked hard to make sure

7    everyone understood the urgency of the crisis.  We wanted

8    every employee to pitch in."  Do you see that?

9    A.  I do.

10    Q.  You still have no memory of this circumstance?

11    A.  No.

12    Q.  And he goes on to say, quote, "In a companywide

13    meeting, I explained what was happening and showed them,

14    among other things, comparable numbers at Yahoo!.  If they

15    could succeed, so could we.  I visited all of our locations

16    pointing out how carelessly we'd all been spending,"

17    unquote.  Do you see that?

18    A.  I do.

19    Q.  Did you accompany Mr. Davis on any of his visits

20    to these other locations where he pointed out how

21    carelessly they'd been spending?

22    A.  I don't believe so.

23    Q.  Did you go to the companywide meeting concerning

24    what Mr. Davis refers to as "this crisis"?

1      A.  I don't recall that.

2      Q.  Do you see where he goes on to say, quote,

3   "Requests had already been submitted to hire another 200 or

4   300 employees.  There were also requests to spend tens of

5   millions for computer systems and marketing.  I explained

6   to our staff that we were no different than a household,

7   what goes out can't exceed what comes in," unquote.  Do you

8   see that?

9      A.  I do.

10      Q.  "In the long run, it's the only way we could keep

11   our jobs.  Everyone rallied to the cause, and in the end we

12   beat the estimates."  Do you see that?

13      A.  I do.

14      Q.  Okay.  So your testimony, sir, is that you have no

15   memory whatsoever of this crisis, as Mr. Davis describes

16   it, in the life of Lycos in -- in or about the fourth

17   quarter of 1999; is that -- is that correct?

18      A.  That's correct.

19      Q.  Okay.  And do you see where he quotes you as

20   saying -- he describes you as coming into his office in the

21   fourth quarter of 1999 ashen faced saying that you, that

22   Lycos was not going to meet its projections?

23      A.  I see that.

24      Q.  Did you ever do that?

1    A.   Not that I recall.

2    Q.   Okay.  Do you remember whether or not you did?  In

3    other words, is it possible you did and you don't remember?

4    A.   It's certainly possible.

5    Q.   Okay.  What about his quotation where he quotes

6    you as saying, quote, "The only way we're going to avoid

7    this," referring to not meeting the earnings expectations,

8    "is to be bold, tough, and Draconian.  Are we up for it?"

9    Do you see that?

10   A.   Yes, I do.

11   Q.   Did you say that to him?

12   A.   Not that I'm aware of.

13   Q.   Okay.  Do you recall whether or not you said it?

14   A.   I do not recall that.

15   Q.   Okay.  Is it possible that you did and you don't

16   remember?

17   A.   It's possible.

18   Q.   Okay.  Was this part of the book that you reviewed

19   before?

20   A.   It is not.

21   Q.   Most people read the parts of drafts of books that

22   talk about them because they naturally want to know what

23   people are saying about them.  Did you not do that?

24   A.   I read some of the book, some of the early book.

1      down." That's not what we were doing.

2      Q.  I'm suggesting it's exactly what you were doing.

3      A.  Okay.

4      Q.  How would you phrase what you were doing?

5      A.  I would phrase it as we were keeping expenses

6      under control within our model while building the top line

7      business.

8      Q.  Okay.  I thought that's what I just said.

9      A.  It's very different.

10     Q.  Ahh.  Did you always phrase it that way in your

11     public statements or did you occasionally say, "We're

12     trying to keep expenses down"?

13     A.  I can't say.  I don't know.

14     Q.  Okay.  Do you remember whether you ever said,

15     "We're trying to keep expenses down"?

16     A.  I don't remember that.

17     Q.  Okay.  You just said you were trying to keep

18     expenses under control.

19     A.  Yes.

20     Q.  Consistent with your business model?

21     A.  Yes.

22     Q.  When you say you were trying to keep expenses

23     under control, what do you mean?

24     A.  Making sure that the amount that we spent was

1    consistent with our growth.

2        Q.  What do you mean "consistent with our growth"?

3        A.  We have to spend money to make money, and so if

4    you're going to grow, you have to spend in the appropriate

5    places in order to grow.

6        Q.  What did you mean when you said "control

7    expenses"?

8        A.  Just make sure that the level of expenses were

9    appropriate for our expected growth.

10       Q.  How did you do that?

11       A.  Reviewed the expenses we had in different

12   categories.

13       Q.  What categories did you review the expenses that

14   you had in?

15       A.  Most categories.

16       Q.  Can you describe what categories?

17       A.  Sure.  Employee costs, advertising, I'm sure we

18   reviewed equipment cost.  Everything that was on the income

19   statement.

20       Q.  What equipment costs did you review?

21       A.  Whatever the cost of -- of the equipment were for

22   the particular period we were in.

23       Q.  The particular quarter, you mean?

24       A.  It depends.  Could be annual; could be quarterly.

1     Q.   But by period, you mean a period of time?

2     A.   Yes.

3     Q.   Months or particular year?

4     A.   Yes.

5     Q.   And what were Lycos' principal equipment costs

6   during the years that you were CFO?

7     A.   The cost to run the Lycos services.

8     Q.   Right.  But what did that consist of?

9     A.   Servers, networking equipment, whatever else they

10   used in the service.

11     Q.   And approximately how much did that cost ballpark

12   on a monthly basis?

13     A.   I don't know.

14     Q.   Who was most of the money being paid to for the

15   equipment that Lycos was using?

16     A.   I don't know.

17     Q.   Wasn't it CSI?

18     A.   That's an assumption I would make, but I don't

19   know.

20     Q.   Okay.  You would make that assumption because they

21   were the largest lessor to the company?

22     A.   That is my understanding.

23     Q.   Okay.  During the years you were CFO, was there

24   anybody other than you who was involved in the -- in Lycos'

# FILED UNDER SEAL

## Pursuant to

## Order Regarding the Handling of Confidential Information Produced in Discovery (Dkt. No. 61)

1    options be as high as possible?

2        A.  That would be a preference.  Not always the

3    determining factor, but the preference.

4        Q.  Okay.  Sometimes it's a judgment as to whether

5    it's likely to go down?

6        A.  Or whether or not I just want to take some money

7    off the table.

8        Q.  Okay.  I understand.

9            Would it be fair to say that throughout 1997,

10    1998, and 1999, because you held this, these options, you

11    had a personal financial interest in the -- in the share

12    price of Lycos?

13        A.  That would be fair, yes.

14        Q.  Okay.  Particularly a personal financial interest

15    in the share price of Lycos being as high as reasonably

16    possible?

17        A.  Yes, that's correct.

18        Q.  Okay.  The exhibit that we've marked as Exhibit

19    292 is also a document that was generated by, in this case,

20    TerraLycos after the acquisition by Terra, correct?

21        A.  Yes.

22        Q.  And it's a bit more complicated because you have

23    to apply the collar factor to the figures, the 2.15?

24        A.  Well, they -- the factor of number of shares of

# FILED UNDER SEAL

## Pursuant to

## Order Regarding the Handling of Confidential Information Produced in Discovery (Dkt. No. 61)

# EXHIBIT D

ME1 8196544v.1

# O'BRIEN&LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc., et al.

Transcript of the Testimony of:

# Brian David Lucy

# November 10, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)**

James A. Scally  21702

1      A.  Yes.

2      Q.  Did you write this description of your position or

3   did somebody else at Lycos write it?

4      A.  I don't recall.

5      Q.  Someone at Lycos wrote it, right?

6      A.  Yes.

7      Q.  Okay.  It describes you as a member of the senior

8   staff and, quote, "responsible for all finance, accounting,

9   and administration functions in the United States"; is that

10   correct?

11      A.  That's right.

12      Q.  And you were -- you had that responsibility as CFO

13   from approximately March of 2001 until you left the company

14   in 2004, correct?

15      A.  I believe it was February of 2004, but

16   approximately, yes.

17      Q.  Okay.  It goes on to say that you joined the

18   company in 1996 as one of the first Lycos employees and

19   that, quote, "During his tenure, he has successfully

20   overseen and integrated the finance function for 13 diverse

21   acquisitions and participated in two NASDAQ equity

22   financings, raising nearly $575 million for the company,"

23   unquote.  Do you see that?

24      A.  Yes.

1    Q.  Is that an accurate statement --

2    A.  Yes.

3    Q.  -- as to what you did?  Okay.

4        It goes on to say that, quote, "An active

5    participant in strategic planning, forecasting and

6    execution, Mr. Lucy has successfully implemented fiscal

7    discipline and has maintained tight controls over the

8    financial performance of the company, helping to reduce

9    expenses and improve EBITDA quarter over quarter throughout

10   his tenure," unquote.  Do you see that?

11   A.  Yes.

12   Q.  Is that an accurate statement of what you did as

13   well?

14   A.  To my recollection.

15   Q.  To your recollection, yes?

16   A.  Yes.

17   Q.  Okay.  It goes on to say, quote, "Prior to joining

18   Lycos, Mr. Lucy was employed by KPMG LLP in the high

19   technology, manufacturing, retail, and distribution group,"

20   unquote.  Do you see that?

21   A.  Yes.

22   Q.  Is that a correct statement?

23   A.  Yes.

24   Q.  And it goes on to say, quote, "While there he

1    A.  No.

2    Q.  Who did he report to, do you know?

3    A.  Tom Guilefoile.

4    Q.  And what was Tom Guilefoile's position during that

5    time?

6         MR. BEAN:  Objection.

7    Q.  You can answer.

8    A.  During what time?

9    Q.  The time that you were controller from

10   approximately February of '99 until February, March of '03.

11   A.  I believe he was vice president of finance.

12   Q.  Was that a different department from the

13   accounting department?

14        MR. BEAN:  Objection.

15   Q.  You can answer, sir.

16   A.  It -- it included the accounting department.  It

17   was a broader definition.

18   Q.  I see.  So finance included accounting and what

19   other functions?

20   A.  Purchasing, M&A, certainly leasing.

21   Q.  Leasing was its own sort of subdepartment?

22   A.  Yeah.

23        MR. BEAN:  Objection.

24   Q.  Who was in charge of it?

# EXHIBIT E

# **FILED UNDER SEAL**

## Pursuant to

## Order Regarding the Handling of Confidential Information Produced in Discovery (Dkt. No. 61)

# EXHIBIT F

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Computer Sales International, Inc. v. Lycos, Inc.

### Transcript of the Testimony of:

# Thomas Edward Guilfoile

# December 7, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

James A. Scally  21971

1    purchase that stock?  Isn't that true?

2       A.  Yes.

3       Q.  Okay.  And one of the factors that you knew

4    affected the price of Lycos stock during your tenure at

5    Lycos was the extent to which Lycos was able to meet the

6    earnings expectations of the Wall Street analysts who were

7    evaluating the stock.  Is that a fair statement?

8       A.  Again, I can't -- I can't sit here and determine

9    exactly what moves a stock of any company on any particular

10   day.

11      Q.  Well, I'm not asking you to do that.  I'm just

12   asking you for your -- to confirm that your general

13   understanding was that it would be better for the -- it

14   would be more likely to keep the price of Lycos stock up if

15   Lycos met its quarterly and annual earnings expectations.

16   That's common business sense, isn't it?

17      A.  Generally speaking, yes.

18      Q.  Okay.  And you certainly were aware of that

19   general business concept during the years you worked at

20   Lycos, correct?

21      A.  Yes.

22      Q.  And during the years that you worked at Lycos, in

23   total as a result of all of these stock option exercises

24   that are detailed on Exhibit 438 and the source document in

# FILED UNDER SEAL

## Pursuant to

## Order Regarding the Handling of Confidential Information Produced in Discovery (Dkt. No. 61)

1     Q.  You can answer, sir.

2     A.  Yes.

3     Q.  Who else was working there at the time?

4     A.  Bob Davis, Ted Philip, Jeffrey Crown, Ben Bassi,

5     William Townsend, and then there were a number of people in

6     Pittsburgh as well.

7     Q.  Were you the only certified public accountant

8     working for the company when you started?

9     A.  I don't know.

10    Q.  Among senior management, were you the only

11    certified public accountant working for the company when

12    you started?

13    A.  I don't know their backgrounds.

14    Q.  You didn't know about Mr. Philip's or Mr. Davis's

15    background?

16    A.  I don't know if they're a CPA.

17    Q.  Even today you say you don't have any knowledge as

18    to whether either of those two people were a certified

19    public accountant?

20    A.  I don't know for sure.

21    Q.  During the years that you worked as a CPA at

22    KPMG --

23    A.  I did not.

24    Q.  It wasn't KPMG.  It was Ernst & Young.

1    A.  Yes.

2    Q.  At Ernst & Young, did you ever do any accounting

3  work for Lycos?

4    A.  No.

5    Q.  Okay.  So they were never a client of Ernst when

6  the time -- during the time you were there?

7    A.  No, they were not.

8    Q.  Okay.  How did you find out about the Lycos

9  opportunity?

10    A.  I was introduced to it through a former employee

11  of Ernst & Young.

12    Q.  Who was that?

13    A.  Andy Hajduky.

14    Q.  When you started at the company, was it leasing

15  any computer equipment?

16    A.  I don't recall.

17    Q.  Was it utilizing any computer equipment?  Do you

18  not recall that?

19    A.  No.  The company had computers when I started,

20  yes.

21    Q.  Okay.  And you were -- you assumed the position of

22  director of finance and administration when you started,

23  right?

24    A.  I did not, no.

1      Q.  What did you start out as, controller?

2      A.  Controller.

3      Q.  And how long did you remain just the controller

4   before you became the director of finance and

5   administration?

6           MR. DOWDEN:  Objection.

7           MR. BEAN:  Objection.

8      Q.  You can answer the question, sir.  Just as if you

9   were at trial.  Just answer.

10     A.  December 1996.

11     Q.  Okay.  So you spent about ten months as controller

12   and then in December of '96 they added to your

13   responsibilities and made you vice president of finance and

14   administration?

15     A.  Correct.

16     Q.  Okay.  And you remained in those -- did you remain

17   controller after you became vice president of finance and

18   administration?

19     A.  I did not.

20     Q.  You did not?  Do you see where it says in page

21   GUIL 000192, the 2000 proxy statement, the first sentence

22   that you had -- you "served as our controller since

23   February 1996"?

24           MR. DOWDEN:  What exhibit number are

1    accounted for, correct?

2    A.  Correct.

3    Q.  And in determining how the company's leases with

4    CSI and other leasing companies would be accounted for, one

5    of the things Lycos had to do was determine whether they

6    had to be capitalized or whether they could be treated as

7    operating leases, correct?

8    A.  Correct.

9    Q.  And in order to make that determination, one of

10    the things that Lycos had to do was to determine the net

11    present value of the future payments that it was going to

12    have to make under each of its leases with CSI and the

13    other leasing companies, correct?

14    A.  Correct.

15    Q.  And in order to determine the net present value of

16    the future lease payments that it was going to have to pay

17    under those leases, it first had to determine what the

18    total aggregate amount of the future lease payments was

19    before then reducing it back to present value, right?

20    A.  Correct.

21    Q.  Okay.  And so as part of your duties and

22    responsibilities, although you may not have done it

23    personally, you arranged for people within Lycos to

24    calculate what the future lease payments were that Lycos

1    had to make under its leases with CSI whenever you were

2    doing, you know, the accounting calculation to determine

3    how those leases should be accounted for, correct?

4       A.   Correct.

5       Q.   And you did that on an annual -- at least an

6    annual basis, because you issued annual financial

7    statements; is that right?

8       A.   We would do them on each individual lease as we

9    entered into them.

10      Q.   Okay.  And so each time Lycos entered into a lease

11   with CSI, it would determine what the total future lease

12   payments were that it was going to have to make under that

13   lease, correct?

14      A.   Correct.

15      Q.   Okay.  And you had been talking before the break

16   about -- we'd been having what might be described as an

17   argument over the issue of cash flow projections and et

18   cetera.  Would you like to explain to me what the method of

19   expense budgeting was and the point that you were trying to

20   make?

21      A.   Sure.  What I was trying to say is that our focus

22   in the budgeting process was on the expense, not on the

23   cash flow.  So, for example, if you were to buy a piece of

24   equipment and pay for it on day one, the cash is out the

# EXHIBIT G

09/04/07   07:16 FAX 7818615499          Highland Capital Partner                    ☒002

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC., | ) ) ) | C.A. No. 05-10017-RWZ |
| Plaintiff and Defendant-in-Counterclaim, | ) ) ) |  |
| v. | ) ) |  |
| LYCOS, INC., | ) ) | **AFFIDAVIT OF THOMAS E. GUILFOILE** |
| Defendant and Plaintiff-in-Counterclaim, | ) ) ) |  |
| and | ) ) |  |
| BANK OF AMERICA f/k/a FLEET BANK, | ) ) ) |  |
| Trustee Process Defendant | ) ) |  |

I, Thomas E. Guilfoile, do hereby depose under oath and state as follows:

1.       I was employed at Lycos, Inc. ("Lycos") in Massachusetts from February 1996 until December 2001.  During that time, I served as Lycos's Controller beginning in February 1996, and as its Vice President of Finance and Administration beginning in December 1996, until the sale of Lycos in 2000, and thereafter as Senior Vice President of Strategic Planning and Mergers and Acquisitions for Terra Lycos until my departure in 2001.

2.       I have personal knowledge of the facts set forth herein.

3.       Beginning in 1997, Lycos and Computer Sales International, Inc. ("CSI") entered into numerous equipment schedules for the lease of technology equipment that Lycos used to operate its business.  In my capacity as Vice President of Finance and Administration, I signed equipment schedules 5A-5E, 5G, 6, 8-40, 40A, 43-45, 47-48, 48A, 49, 49A, 50, 50A-50B, 51-55, 55A, 56, 56A, 57-58, 58A, 60-61, 64, 64A-64B, 64F, 65-66, 66A-66C, 66E, 66I, 67, 67A-67D,

67H, 68, 68A-68C, 69, 69A, 69C-69E, 69I, 70, 72-76, and 81-83, 83A, 84-86 on behalf of
Lycos.  Of these 105 schedules, 70 were schedules pursuant to which Lycos leased new
computer equipment from CSI, while 35 were refinancings of earlier schedules with CSI.
Specifically, schedules 38, 43, 49A, 50A, 50B, 51, 52, 53, 54, 55A, 60, 61, 64B, 64F, 65, 66,
66A, 66B, 66C, 66E, 66I, 67, 67A, 67B, 67D, 67H, 68, 68A, 68B, 68C, 69C, 69E, 69I, 85, and
86 were refinanced schedules (collectively, the "Refinanced Schedules").

      4.      I have no recollection of anyone ever telling me that the present value of the
payments to be made under the Refinanced Schedule(s) plus the present value of the residual
value of the equipment under the Refinanced Schedules exceeded the present value of the
remaining payments that would have been made under the terminating schedule(s) plus the
present value of the estimated residual value of the equipment under the terminating schedule(s).
More generally, I have no recollection of anyone ever telling me that CSI was charging Lycos a
mark-up, fee, or other premium in connection with the Refinanced Schedules.  Further, I am
unaware of anyone at Lycos that knew CSI was charging such a mark-up, fee, or premium.
While I would have expected that Lycos would pay more interest over the life of a refinanced
schedule because it had use of the equipment for a longer period of time, if anyone had told me
that CSI was charging such a mark-up, fee, or premium on the Refinanced Schedules, I would
not have signed the Refinanced Schedules on the terms set forth therein.

      5.      During my entire tenure at Lycos, I worked at Lycos's offices in Massachusetts.
When I signed equipment schedules on behalf of Lycos, I did so when I was in Massachusetts.
During that period I was Vice President for Finance and Administration, Lycos maintained its
bank accounts at banks in Massachusetts and made monthly payments to CSI from accounts with

-2-

those banks.  I remember meeting Paul Stenberg on a number of occasions on business and a few

times socially.  On each of those occasions, we met in Massachusetts.

Signed under the penalties of perjury, this $\underline{3|}$ day of August, 2007.

Thomas E. Guilfoile

# EXHIBIT H

Page 1

Volume 1, Pages 1-289

Exhibits:  1-12

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10017-RWZ

COMPUTER SALES INTERNATIONAL, INC.,

      Plaintiff and Defendant-in-Counterclaim

vs.

LYCOS, INC.,

      Defendant and Plaintiff-in-Counterclaim

vs.

BANK OF AMERICA, F/K/A FLEET BANK,

      Trustee Process Defendant

      ------------------------------------

VIDEOTAPED DEPOSITION OF WILLIAM J. BOSCO, JR.

Tuesday, December 11, 2007, 9:25 a.m.

McDermott Will & Emery, LLP

28 State Street

Boston, Massachusetts


--------- Alan H. Brock, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

1    companies that have to file various documents with

2    the SEC that those are generally prepared by

3    in-house and outside lawyers for the company?

4         MR. BEAN:  Objection.

5      A.  Accountants and lawyers, yes.  I think it

6    would be -- the board of directors have a

7    responsibility of making sure that the management is

8    hiring competent people.

9      Q.  I'd like to turn your attention to Exhibit

10    1, which is your first report, and in particular

11    Page 3, Paragraph 4.  I want to read that into the

12    record.  "In my opinion, if the leases were

13    capitalized, it would have been detrimental to the

14    financial results of Lycos, as Lycos would have had

15    to report significant amounts of debt in the form of

16    capitalized lease obligations, and its reported

17    profits would have been lower due to reporting of

18    depreciation and interest expense from the

19    capitalized leases, rather than lease rent expense."

20    Have I read the first sentence of Paragraph 4

21    correctly?

22      A.  Yes.

23      Q.  Can you tell me the bases for your opinion

24    in that sentence?

1     A. Well, that's because I know what the

2     accounting results are when leases are capitalized.

3     An asset is recorded and a liability is recorded

4     equal to the present value of the minimum lease

5     payments. So that liability would be considered

6     debt. And from an accounting -- from a profit-and-

7     loss perspective, the pattern of expense when you

8     have a capitalized lease is high in the early years

9     and declines, as opposed to in an operating lease,

10    when it's level. And so therefore the initial

11    periods of the lease have -- show higher costs, the

12    later periods show lower costs. But there's a time

13    value to earnings, and investors like to see profits

14    now, not later.

15       Q. The second sentence, "Investors would pay

16    less for the stock of Lycos due to the higher

17    leverage and lower profits/higher losses." Did I

18    read that correctly?

19       A. Yes.

20       Q. What is the basis for making that

21    statement?

22       A. It's just general business experience and

23    having worked in the leasing industry, knowing that

24    operating-lease treatment is a major driver in many

1    lease-structuring situations, where lessees desire

2    operating-lease treatment because it will end up

3    showing less leverage and higher profits or lower

4    losses.

5        Q.  And from that you draw that higher profits,

6    lower losses tracks to a higher stock price?

7            MR. BEAN:  Objection.

8        A.  A higher stock price or a better rating by

9    investment analysts.  I mean, I'm looking right now

10   at Lycos's 2000 financial statements, and they don't

11   show any debt at all.

12       Q.  Mr. Bean was asking you questions

13   concerning whether or not you were aware one way or

14   the other if Lycos's outside auditors tested each

15   and every lease that Lycos entered into with CSI.

16   Do you recall that line of questioning?

17       A.  Yes.

18       Q.  And he was also asking you whether or not

19   you were aware one way or the other if Lycos itself

20   tested each of its leases; is that correct?

21       A.  Yes.

22       Q.  Do you have a basis for opining one way or

23   the other whether or not Lycos did a test for each

24   of its leases that it entered into with CSI?

# EXHIBIT I

VOLUME 1

PAGES 1 - 327
EXHS. 1 - 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*
Computer Sales International,       \*
Inc.,                              \*
        Plaintiff and Defendant   \*
        in Counterclaim           \*
                                    \*
                                    \*
v.                                 \*
                                    \*   Civil Action
                                    \*
Lycos, Inc.,                       \*
        Defendant and Plaintiff   \*   No. 05-10017-RWZ
        in Counterclaim           \*
v.                                 \*
                                    \*
                                    \*
Bank of America f/k/a Fleet       \*
Bank,                              \*
        Trustee Process Defendant \*
                                    \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


Videotaped Deposition of James S. Schallheim, Ph.D.
            Friday, November 16, 2007
            McDermott Will & Emery LLP
            28 State Street - 34th Floor
            Boston, Massachusetts 02109


- - - - - - - - - -   J. EDWARD VARALLO, RMR, CRR   - - - - - - - - - -
            COURT REPORTER
FARMER ARSENAULT BROCK LLC       BOSTON, MASSACHUSETTS
            617.728.4404
        evarallo@fabreporters.com

1    That's my --

2       Q.   What is the basis for your assertion that

3    Lycos wanted to keep long-term debt off its books?

4       A.   My basis for that argument is that the

5    typical, quote, Internet, unquote, company has

6    virtually no or zero long-term debt and capital

7    leases and typically lots of cash.

8       Q.   You have no knowledge whatsoever, sir, do

9    you, as to whether Lycos cared about keeping long-

10   term debt off its books, do you?

11      MR. KALER:  Objection.

12      A.   My answer to this question is from the

13   market, stock market point of view.  I don't care

14   what Lycos is thinking other than the fact that they

15   want to maximize their stock price, and investors

16   are looking at the stock profile.

17      Q.   And it is your testimony, then, that

18   during the Internet bubble investors would have

19   looked negatively on the placement of long-term debt

20   on Lycos's books?

21      A.   That's my conjecture.  And the basis of

22   that conjecture is that I look at other Internet

23   companies at the time showing that they had

24   virtually no debt and then again, just a conjecture,

1    because I can't predict market reaction, but I think

2    investors would have raised some very red flags if

3    Lycos came along as one of the very few Internet

4    companies that showed long-term debt; the market

5    might say, well, what's going on here?

6        Q.   But those investors knew by reading the

7    footnotes what the magnitude of Lycos's long-term

8    lease commitments were, didn't they?

9        MR. KALER:  Objection.

10       A.   And that is a very good question because

11   it goes back to our earlier discussion of what's the

12   value of off-balance-sheet financing, which I don't

13   know, but it appears that the investors seem to

14   think that not on the balance sheet is a good thing.

15       Q.   Well, you saw that other Internet

16   companies did not -- Your testimony is that other

17   Internet companies did not have long-term debt on

18   the balance sheet.

19       A.   Yes.

20       Q.   But you don't know whether that was

21   something that Wall Street cared about, do you?

22       MR. KALER:  Well, objection, asked and

23   answered.

24       A.   And that is my conjecture, and I don't