**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMPUTER SALES INTERNATIONAL, INC.,<br><br>Plaintiff and Defendant-in-Counterclaim,<br><br>v.<br><br>LYCOS, INC.,<br><br>Defendant and Plaintiff-in-Counterclaim,<br><br>and<br><br>BANK OF AMERICA f/k/a FLEET BANK,<br><br>Trustee Process Defendant. | ) | C.A. No. 05-10017-RWZ |

**LYCOS' OPPOSITION TO CSI'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE CONCERNING "INACCURATE" EXPENSE REPORTS OF ITS LYCOS ACCOUNT REPRESENTATIVE**[1]

Computer Sales International, Inc. ("CSI") has moved to preclude highly relevant evidence concerning the knowledge, motive, plan, honesty and bias of the single most important witness in this litigation, Paul Stenberg (the "Motion"). Specifically, CSI asks this Court to exclude all admittedly-falsified expense reports Mr. Stenberg submitted to CSI on the Lycos, Inc. ("Lycos") account (the "Fraudulent Expense Reports"),[2] claiming in essence that such evidence would be

---

[1] Lycos infers that CSI does *not* seek to exclude evidence of Mr. Stenberg's "accurate" expense reports. CSI provides no guidance, however, as to how the Court and Lycos should distinguish Mr. Stenberg's "inaccurate" expense reports from his "accurate" expense reports when, of the hundreds of expense reports totaling $175,000 he submitted to CSI representing that he had entertained Lycos, he testified that only approximately $50,000-$60,000 of those reports were legitimate; it is not possible to tell from the face of most of the reports which are "accurate" and which are "inaccurate", and Mr. Stenberg does not remember specifics of many of the reports. Thus, even if there were grounds to grant the Motion (there are not), it would be impossible to implement the relief CSI has requested

[2] CSI characterizes the expense reports at issue in the Motion as simply "inaccurate." Given that Mr. Stenberg has admitted that he intentionally falsified many of his Lycos-related expense reports for personal gain, this characterization is clearly misleading. These expense reports were not the product of innocent mistakes.

unfairly prejudicial to CSI because it is bad for its defense even though Mr. Stenberg claims they were "legitimate marketing expenses." CSI's arguments have no merit in fact or law.

As set forth more fully below, the Fraudulent Expense Reports were "part and parcel" of Mr. Stenberg's scheme to generate as much money from the Lycos account as possible. He "wined and dined" Lycos employees to gain their friendship and confidence, used the leverage from that friendship and confidence to refinance dozens of equipment schedules when Lycos had no reason to do so, and then used Lycos, because it was a large customer, to file tens of thousands of dollars of fraudulent expense reports that he knew CSI would approve simply because Lycos was a large customer. Moreover, Mr. Stenberg's *modus operandi* for the refinancings and the expense reports was the same: he churned and churned and churned them.

The Fraudulent Expense Reports are also directly probative of Mr. Stenberg's credibility and significant bias, as he lied repeatedly both to Lycos and CSI during the same time period (and under oath at his deposition in this case) and is now beholden to CSI due to the light punishment it gave him after it discovered that Mr. Stenberg had filed tens of thousands of dollars in false expense reports. The jury will need to decide whether to believe Mr. Stenberg on such penultimate issues as, among others, his desire to gain Lycos' trust and whether he believed Lycos trusted him, whether he sought to hide information from Lycos, whether the refinancings were Mr. Stenberg's or Lycos' idea, the reasons for Lycos' alleged desire to enter the refinancings, and whether he intentionally sought to defraud Lycos. Mr. Stenberg's credibility is therefore paramount in this case.

The Court should deny CSI's Motion and allow the highly probative expense reports, both accurate and false, at trial. The Fraudulent Expense Reports do not threaten any prejudice to CSI that could possibly outweigh their probative value; in fact, the only real prejudice to CSI is that the jury will hear about Mr. Stenberg's misconduct and CSI's lack of appropriate response to it. As a matter of law, such prejudice to a party's case is not "unfair" within the meaning of Rule 403.

## FACTS RELEVANT TO THE EXPENSE REPORTS

1. Paul Stenberg is *the* single most important witness in this case. Whereas Lycos had different people involved in equipment leasing at various times, Mr. Stenberg was CSI's lone account representative for Lycos during the parties' entire seven-year relationship.[3] Mr. Stenberg is the person who arranged for and admitted he "marked up" the equipment refinancings, did not tell Lycos he had marked them up,[4] and made over $5 million in commissions from the refinancings and the sale of the equipment.[5] He is the person who wrote an internal e-mail stating that Lycos trusted him[6] and gained perfect scores on his performance evaluation for gaining the "trust and dependency" of the decision-maker at Lycos.[7] He is the person whom another CSI employee described in an internal e-mail as "sensitive" to information being disclosed to Lycos.[8] He is the person to whom CSI's co-CFO attributed in an internal e-mail certain "infamous" rewrites involving Lycos.[9] He is the person who provided false information to Lycos in an e-mail exchange in which Lycos questioned the increase in cost of one of the refinancings, admittedly lied to Lycos when he told Lycos he needed to close the sale of the equipment before a date certain or he would lose bank approval,[10] and twice misrepresented the original cost of the equipment to Lycos.[11] He is the person who once sent an internal e-mail entitled his "Tom Cruise Mission Statement" detailing CSI's business model (in stark contrast to CSI's purported value-added objectives on its website at the time) of getting the leases in the door, rewriting them, and

---

[3] *See* Stenberg Tr. at 23, 30: 11-13. The relevant pages of Mr. Stenberg's transcript are attached hereto as **Exhibit A**. All of the exhibits referenced in this Opposition are true and accurate copies.
[4] *See* Stenberg Tr., Ex. A, at 521:12-522:13.
[5] Attached hereto as **Exhibit B** is a chart of the commissions paid to Mr. Stenberg.
[6] Attached hereto as **Exhibit C** is an e-mail that Mr. Stenberg sent in which he states Lycos that trusted CSI.
[7] Attached hereto as **Exhibit D** are the pertinent pages from a performance evaluation of Mr. Stenberg. (*see* page CSI044216.)
[8] Attached hereto as **Exhibit E** is an e-mail Carolyn Simmons-Berry sent to Mr. Stenberg concerning his sensitivities.
[9] Attached hereto as **Exhibit F** is an e-mail from Mr. Cagney in which he refers to the "infamous" rewrites.
[10] *See* Stenberg Tr., Ex. A, at 300:23- 302:1
[11] Attached hereto as **Exhibit G** is the March 18, 2002 e-mail that Mr. Stenberg sent to Kevin Baillie at Lycos.

then selling the equipment back to the customer.[12] He is the person who, upon hearing of Lycos' initial lawsuit against CSI, wrote an internal e-mail to CSI's co-CFO saying, "My brother called and asked me about the Lycos Situation. I am sure we do not want this to get out."[13]

2. CSI is the largest independent leasing company in the United States.[14] Its co-founder, Chairman, and CEO during the parties' relationship, Kenneth Steinback,[15] often touted the importance of honesty and integrity in his business when speaking with the press and in an article he wrote during the CSI-Lycos relationship:

> "That I've built a company with great people, great customers, and with terrific integrity." (speaking about his proudest accomplishment).[16]
>
> "I would sacrifice dollars any time for integrity and goodwill."[17]

3. CSI's account representative during the parties' entire relationship was Mr. Stenberg.[18] In 2001, over four years after that relationship began, Mr. Stenberg was promoted to northeast Regional Manager at CSI.[19] Employees promoted to this position at CSI typically give up their accounts.[20] In this case, however, CSI deviated from the norm and permitted Mr. Stenberg, whom it had determined had gained the "trust" and "dependency" of Lycos,[21] to retain the Lycos account.[22] Lycos became Mr. Stenberg's only account from that point forward.[23]

---

[12] Attached hereto as **Exhibit H** is Mr. Stenberg's "Tom Cruise" mission statement.
[13] Attached hereto as **Exhibit I** is the e-mail Mr. Stenberg sent to Mr. Cagney concerning the "Lycos situation."
[14] Attached hereto as **Exhibit J** are the relevant pages from CSI's website.
[15] Steinback Tr. (vol. 1) at 18:12-13. Attached hereto as **Exhibit K** are the relevant pages of volume one of Mr. Steinback's transcript.
[16] Attached hereto as **Exhibit L** is an interview with Mr. Steinback; *see* page 2.
[17] *Id.*; Steinback Tr., Ex. K., 66:12-15.
[18] Stenberg Tr., Ex. A, 30: 11-13.
[19] Attached hereto as **Exhibit M** are documents reflecting that Mr. Stenberg was named Regional Manager. (*see* CSI044468.)
[20] Stenberg Tr., Ex. A, 177:17-23.
[21] Ex. D.
[22] Stenberg Tr., Ex. A, 177:17-23.
[23] *Id.* at 320:24-321:4.

4. CSI published an Employee Manual which Paul Stenberg acknowledged as having received.[24] This employee manual:

A. contains a Code of Ethics that provides that: "CSI believes that our integrity and ethics must be above reproach. CSI conducts its business in accordance with the "Code of Ethics of the ELA" Equipment Leasing Association and ASCDi: Association of Service and Computer Dealers International."[25]

B. contains Examples of Unacceptable Conduct:. "Unacceptable conduct includes, but is not limited to, "Falsification of company records during employment interview or on application or other official documents," "theft, fraud . . ." and "willful or repeated violation of company rules."[26]

C. states: "[v]iolations of this Policy, unethical conduct and illegal acts are all forbidden and may result in discipline, including termination of employment and, in the case of illegal acts, criminal and/or civil prosecution."[27]

5. CSI's specific policy concerning reimbursement of expenses provides: "All entertainment at the company's expense must have a legitimate business objective. Expenses relating to customers entertainment will be reimbursed, provided receipts with detailed descriptions (i.e. who, what company, when, where and what was discussed) accompany the expense report."[28]

6. To reflect the seriousness of its expense reimbursement policy, the cover page to every employee request for expense reimbursement contained the following statement that Paul

---

[24] Attached hereto as **Exhibit N** are the relevant pages from the CSI employee manual. (*see* CSI043206.)
[25] *Id.* at CSI043114.
[26] *Id.* at CSI043198.
[27] *Id.* at CSI043189.
[28] Attached hereto as **Exhibit O** is the relevant page from CSI's expense report policy.

Stenberg signed over one hundred times: "I hereby certify that the above expenditures represent cash spent for legitimate company business only and includes no items of personal nature."[29]

7. Early in his deposition, when Mr. Stenberg was asked whether he always complied with CSI's guidelines for expense reimbursement, he said "Yes, yes."[30]

8. While he served as Lycos' account executive, Mr. Stenberg requests for expense reimbursement totaled approximately $175,000. Mr. Stenberg sought reimbursement for, among other things, golf outings, expensive dinners, sporting events, hotel bills, and alcohol.[31]

9. Notwithstanding his testimony early in his deposition that he always complied with CSI's guidelines for expense reimbursement, he admitted later in that deposition that only perhaps $50,000-$60,000 of the expenses for which he had written down Lycos as the customer were legitimate.[32]

10. Mr. Stenberg contends that he wrote down that Lycos was the party he entertained even when he was entertaining prospects or other customers because it would "be the easiest to get reimbursed."[33] While Mr. Stenberg claimed that the non-Lycos expenses were also to reimburse himself for expenses that were not reimbursable under CSI's policy,[34] he admittedly did not keep track of the amount for which he contends CSI did not reimburse him.[35]

11. When asked at his deposition about his statement that he had discussed "quarterly" leases with Lycos at the 1999 All-Star Game, he said "It was a false statement, but you know..."[36]

---

[29] Stenberg Tr., Ex. A, at 129:4-130:1; **Exhibit P** is a sample expense report reflecting that certification.
[30] Stenberg Tr., Ex. A, at 113:6-16.
[31] Attached hereto as **Exhibit Z** are sample expense reports of Mr. Stenberg.
[32] Stenberg Tr., Ex. A, at 198:24-199:8.
[33] *Id.* at 156: 19-22. *See also* CSI's Memorandum at 13.
[34] *Id.* at 160:4-13.
[35] *Id.* at 196:23-197:3.
[36] *Id.* at 147:10-14.

12. When asked whether his supervisor knew he was filling out false expense reports, Mr. Stenberg testified: "My *theme* is going to be that these were legitimate marketing expenses, and even though I put Lycos on them, there were other vendors and everyone there."[37]

13. Several of Mr. Stenberg's expense reports were false on their face. For example, Mr. Stenberg, a youth lacrosse coach,[38] sought reimbursement for taking one Lycos employee to Papa Gino's in the middle of a Tuesday afternoon in Needham (Lycos was located in Waltham), where they spent over $72 purchasing three large pizzas and twelve small cokes.[39] Mr. Stenberg claimed to have taken his wife and two Lycos employees and their spouses to a Chinese restaurant on Valentine's Day.[40] The receipt shows that the "six" of them spent $37 on dinner, and left no tip.[41] On another occasion, Mr. Stenberg represented on his expense report that he had taken Lycos employees to Roche Brothers, a grocery store, where they spent almost $200.[42] Finally, Mr. Stenberg sought reimbursement for a charge his wife had made to her credit card for purchasing over $630 in lobsters, allegedly for entertaining one Lycos employee and his family.[43]

14. During the period Mr. Stenberg was filing false expense reports, his family was growing to a total of five children,[44] and the mortgage indebtedness on his ever-larger principal residences was increasing from $244,000 to $1.8 million.[45]

15. During his deposition, Mr. Stenberg admitted under oath to the inaccuracy/falsity of tens of thousands of dollars of expense reports.[46]

---

[37] *Id.* at 202: 5-10 (emphasis added).
[38] *Id.* at 12:1-18.
[39] Attached hereto as **Exhibit Q** is a copy of Mr. Stenberg's expense report for Papa Gino's.
[40] Attached hereto as **Exhibit R** is a copy of Mr. Stenberg's February 14, 1998 expense report.
[41] *Id.*
[42] Attached hereto as **Exhibit S** is a copy of Mr. Stenberg's expense report for Roche Brothers.
[43] Attached hereto as **Exhibit T** is Mr. Stenberg's expense report for the Lobster Trap.
[44] Stenberg Tr., Ex. A, at 11:9-10.
[45] *See* first pages of mortgages on Mr. Stenberg's principal residences attached hereto as **Exhibit AA**. The last two mortgages, which were granted the same day, total $1.8 million.
[46] *See, e.g.,* Ex. A at 129:19-130:17; 198:24-199:24.

16. Despite having Mr. Stenberg's own admissions of filing inaccurate expense reports, CSI took no disciplinary action against him. Again, despite Mr. Stenberg's own admissions, the Chairman of CSI directed the company's Assistant General Counsel to investigate Mr. Stenberg's expense reports.[47] The Assistant General Counsel delivered the results of that investigation to CSI's General Counsel months later in December 2006.[48]

17. CSI then waited more than three months (and until two weeks after fact discovery had ended,) before sending a letter requiring Mr. Stenberg to make restitution by repaying, over a one-year period and without interest, of only $60,000 of the $115,000-$125,000 he had admitted to obtaining by filing false expense reports between 1997 and 2003 (the "Sanction Letter").[49] *It neither fired, suspended nor demoted Mr. Stenberg.*[50] He remains a CSI executive in charge of the company's entire northeast region and its several account executives working in that region.[51]

18. One of CSI's experts, the former President of the Equipment Leasing Association and a Certified Association Executive,[52] testified that if an employee embezzled by filing false expense reports, he would most likely be fired.[53]

## ARGUMENT

While CSI has failed to identify precisely what the Motion seeks to exclude relative to the "inaccurate" expense reports, the Motion's broad phrasing apparently covers: (a) Mr. Stenberg's testimony concerning the reports, (b) the reports themselves, (c) testimony by CSI employees other than Mr. Stenberg concerning CSI's investigation of Mr. Stenberg's expense reports (the

---

[47] Ex. K. at 151:20-24; 152- 154:19. Steinback Tr. (vol. 2) at 15:18-22. Attached hereto as **Exhibit U** are the relevant pages of volume two of Mr. Steinback's transcript.

[48] Rousseau Tr. at 182:9-184:15. Attached hereto as **Exhibit V** are the relevant pages of Mr. Rousseau's transcript.

[49] Attached hereto as **Exhibit W** is the Sanction Letter. The actual amount of Mr. Stenberg's embezzlement appears to have been much greater than $60,000. Indeed, Mr. Stenberg admitted under oath that perhaps only $50,000-$60,000 of his more than $170,000 in expenses was "legitimate." Stenberg Tr., Ex. A, at 198:24-199:8.

[50] Ex. W.

[51] *Id.*

[52] Fleming Tr. at 6:20-7:1. Attached hereto as **Exhibit X** are copies of the relevant pages of Mr. Fleming's transcript.

[53] *Id.* at 104:22-105:10.

"Investigation Testimony", and (d) the Sanction Letter (collectively, the "Evidence"). For the reasons set forth below, all of this evidence should be admitted at trial.

## I. The Fraudulent Expense Reports Are Admissible Because They Are "Part and Parcel" of Mr. Stenberg's Conduct In this Case.

The Fraudulent Expense Reports are relevant under Fed. R. Evid. 401 and 402 because they relate to the determination of a fact that is of consequence to the matter to be tried,[54] namely, Mr. Stenberg's efforts to gain and then abuse Lycos' trust to maximize his financial gain. Indeed, the Fraudulent Expense Reports were "part and parcel" of Mr. Stenberg's scheme to maximize his personal financial gain by repeatedly refinancing the equipment schedules.

Specifically, Mr. Stenberg sought to gain Lycos' trust by, among other things, offering to purchase tickets to sporting events and concerts for Lycos. While in some cases, he offered the tickets, in others, he claims that Lycos requested the tickets.[55] To satisfy what he claims were Lycos' requests, he maintains that he sometimes purchased the tickets from a broker where he was required to pay more than face value.[56] Because Mr. Stenberg claims that CSI would not reimburse him for the amounts he paid above face value,[57] he submitted "inaccurate" expense reports, including reports for personal items, to, in his words, "make himself whole" for the amounts he paid over the face value of the tickets.[58] Thus, according to Mr. Stenberg, the

[54] *See* Fed. R. Evid. 401: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Fed. R. 402: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible" (emphasis added).

[55] Stenberg Tr., Ex. A, at 148:1-3.

[56] *Id.* at 127:16-20.

[57] *Id.*

[58] Mr. Stenberg's explanation in this regard appears to be a lie. The receipts attached to his expense reports and the expense reports themselves demonstrate that Mr. Stenberg sought and obtained from CSI the full value of all monies he spent on tickets with brokers. Furthermore, Mr. Stenberg could not provide any specific examples of spending above the amounts disclosed in the ticket receipts and CSI otherwise produced no information that would rebut the expense reports themselves and corroborate Mr. Stenberg's testimony. It is more likely that Mr. Stenberg simply concocted this story and lied under oath in an attempt to excuse his criminal conduct and hopefully strengthen his image as a witness in this case for CSI.

Fraudulent Expense Reports emanated directly from his efforts to improve/maintain his relationship with Lycos; they were part and parcel of his effort to gain Lycos' trust and his scheme to make as much money as possible to support his growing family and growing indebtedness.

Once he gained Lycos' trust, Mr. Stenberg repeatedly refinanced the Lycos equipment schedules. This caused Lycos to become the largest customer of Mr. Stenberg's[59] and one of the largest of CSI's.[60] Because it was a large customer, Mr. Stenberg knew that he could submit expense reports naming Lycos as the party he entertained and CSI would readily approve them.[61] Thus, the tickets and dinners he provided, which improved the trust/relationship, led to the refinancings, which in turn resulted in Mr. Stenberg being able to obtain ready approval of the Fraudulent Expense Reports for sports tickets and other events (even where the expense reports were suspicious on their face), which led to CSI believing that he had a close relationship with Lycos and authorizing him to retain the Lycos account even after he was promoted,[62] which in turn led to more refinancings. What's more, Mr. Stenberg's *modus operandi* for both the refinancings and the Fraudulent Expense Reports was the same: he "churned" the accounts.

Because the Fraudulent Expense Reports were, for the reasons set forth above, part and parcel of Mr. Stenberg's scheme, they do not constitute extrinsic evidence and are thus not barred from admission by Rule 404(b). *See United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005) ("Rule 404(b), by its very terms, excludes only extrinsic evidence – evidence of other crimes, wrongs or acts – whose probative value *exclusively* depends upon a forbidden inference of criminal propensity.") (emphasis added); *U.S. v. David*, 940 F.2d 722, 737 (1st Cir. 1991)

---

59 *Id.* at 156:9-18.

60 Cagney Tr. at 250:17-251:6. Attached hereto as **Exhibit Y** are copies of the relevant pages of Mr. Cagney's transcript.

61 Stenberg Tr., Ex. A, at 156:19-23.

62 Stenberg Tr., Ex. A, at 177:17-23.

("Evidence which is part and parcel of the crime being tried is simply not 'other crimes' evidence within the ambit of Rule 404(b).")

Because the Fraudulent Expense Reports also concern facts of consequence in the litigation, they are also not "extrinsic" evidence within the meaning of Rule 608(b). *United States v. Andujar*, 49 F.3d 16, 26 (1st Cir. 1995) ("It is well settled that a party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter. . . . A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence. . . . ") (internal citations omitted); *U.S. v. Boulerice*, 325 F.3d 75, 82 n.5 (1st Cir. 2003) ("Extrinsic evidence' is evidence of specific instances of conduct 'not relevant in the litigation to establish a fact of consequence,' i.e., evidence of a 'collateral matter.'").

Finally, to exclude the Fraudulent Expense Reports under Rule 403, CSI must show that the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CSI acknowledges, as it must, that "[w]hen proffered evidence relates to the central issue in the case, it is a difficult matter indeed to show that the prejudicial effect of that evidence substantially outweighs its highly probative value, as Rule 403 requires." *Rubert-Torres v. Hosp. San Pablo, Inc.*, 205 F.3d 472, 479 (1st Cir. 2000).

Here, not only do the Fraudulent Expense Reports relate to at least one of the central issues in the case (trust), but there is nothing prejudicial, let alone "unfairly" prejudicial, in their admission at trial. Albeit inconsistent with reality, Mr. Stenberg claims, and CSI, through its sanction requiring him only to make restitution over time, apparently agrees, that the expenses Mr. Stenberg incurred were legitimately for other customers and prospects, or otherwise to make

himself whole for expenses he incurred.[63] Thus, apparently, in his and CSI's view, he did nothing seriously wrong. Moreover, he was simply purchasing dinners, sporting event tickets, alcohol, trips to Nantucket, ski trips with his family and the like. Although, as a general matter, there is nothing "unfairly" prejudicial about purchasing such items for personal consumption, there certainly can be no "unfair prejudice" if Mr. Stenberg did nothing seriously wrong.

CSI relies heavily on *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835 (10th Cir. 1988), for the proposition that the Tenth Circuit found that a trial judge did not abuse his discretion in concluding that evidence of an employee's embezzlement was not relevant to the amount that Telum owed Hutton under the lease. This case is entirely inapposite. Unlike here, there was no connection in *Tellum* between the alleged embezzlement and the central issues in that case. The employee apparently stole some of the lease payments, something that did not involve the lessee. In contrast, as noted above, Mr. Stenberg's "inaccurate" expense reports were part and parcel of his scheme to gain Lycos' trust and maximize his earnings from the account. They are thus central to Lycos' fraud claims. Further, there was no dispute in *Tellum* that the employee had embezzled money from his employer. Here, CSI takes the position that Stenberg simply filed "inaccurate" expense reports. CSI appears to be talking out of one side of its mouth in denying that Mr. Stenberg did anything seriously wrong, and then, out of the other, relying on a case in which an employee indisputably embezzled money from his employer. Indeed, Mr. Stenberg testified, in fact labeled it his "theme," that the "inaccurate" expenses were "legitimate marketing expenses."[64] There can be nothing inflammatory about "legitimate marketing expenses." Thus, *Tellum* does not apply.

[63] Stenberg Tr., Ex. A, at 133:6-14.
[64] Stenberg Tr., Ex. A., at 202:7-10.

Even if the Fraudulent Expense Reports were "unfairly prejudicial," their importance does not outweigh, let alone substantially outweigh, their probity. Just last year the First Circuit upheld a District Court's admission of false application for a medical license. The Court concluded that a witness' lie to the government in an application for a license was highly probative of his character for truthfulness. It reasoned that "temporal considerations favored use of the evidence; the defendant's answers were not remote in time, but rather were roughly contemporaneous with the criminal conduct with which he had been charged. And, finally, the central factual issue at trial revolved around the defendant's intent. Hence, his credibility was highly relevant to the outcome of the case." *U.S. v. Shinderman*, 515 F.2d 5, 17 (1st Cir. 2008) (internal citation omitted). As in *Shinderman*, Mr. Stenberg's Fraudulent Expense Reports were contemporaneous with the refinancings and Sales Agreement, and relate to a central issue in the case: Mr. Stenberg's intent to gain Lycos' trust and abuse that trust to unjustly enrich himself and CSI.

CSI speculates that the Fraudulent Expense Reports "may" confuse the jury into believing that Lycos was charged for some of the expenses.[65] This is silly. Lycos has never claimed that it was ever charged for those expenses and CSI could, in any event, readily obviate any risk of such confusion by asking CSI witnesses whether these costs were passed on to Lycos. The answer would be "no," thus eliminating any potential confusion. CSI imagines further that "the use of Lycos' name in the expense reports might cause the jury to believe that the expenses were part of the leases or meant to induce Lycos to act in a particular way when there is no evidence of this."[66] CSI is right that there would be no evidence of this, thus eliminating any potential confusion.

Accordingly, the Fraudulent Expense Reports are relevant evidence under 401 and 402 and their admission is not otherwise barred.

---

[65] CSI Memorandum at 8.
[66] *Id.*

## II. Even if the Fraudulent Expense Reports Are Not Admissible as "Part and Parcel" of Mr. Stenberg's Scheme, the Sanction Letter, and the Investigation Testimony are Admissible Under Fed. R. Evid P. 404(b).

"Evidence is admissible under Fed. R. Evid. 404(b) when it satisfies a two-step analysis . . ." *U.S. v. Guyon*, 27 F.3d 723, 729 (1st Cir. 1994). First, "the evidence must have 'special relevance' to an issue in the case such as intent or knowledge, and must not include 'bad character' or propensity as a necessary link in the inferential chain." In analyzing whether the evidence is "specially probative of an issue in this case – such as plan, intent or knowledge[67] – probative value 'must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged." *U.S. v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996). Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

With respect to the first prong, the Evidence has "special relevance" to Mr. Stenberg's plan to make as much money from the Lycos account as possible, and his knowledge that CSI would readily approve expenses incurred for a customer providing unprecedented profit margins. Mr. Stenberg refinanced the Lycos schedules to cause Lycos to become a large account, thus enabling him to submit expense reports he knew CSI would readily approve. This was his "plan" to make as much money from the Lycos account at a time when his family and mortgages were growing.

The Evidence also has "special relevance" to the potential inconsistency between its Chairman's public statements about ethics and integrity, the statements in CSI's Employee Manual, and the paltry sanction CSI imposed. Either Mr. Stenberg did not do anything seriously wrong, as he and CSI contend, or he did. If he did, then CSI's limited sanction reflects CSI's turning of a blind eye and "intent" to condone Mr. Stenberg's misconduct, even to the point of

[67] *U.S. v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000).

treating him differently than its policies might have otherwise dictated *because of the pending litigation*.

With respect to the second prong of the test, "[w]hen proffered evidence relates to the central issue in the case, it is a difficult matter indeed to show that the prejudicial effect of that evidence substantially outweighs its highly probative nature, as Rule 403 requires." *Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d at 479. Moreover, CSI must show not only that the evidence is prejudicial, but that it is "unfairly" prejudicial. *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977).

For the reasons set forth above in Part I, the Evidence is not prejudicial, let alone "unfairly" prejudicial. While CSI also makes the bald statement that the evidence is confusing, it fails to articulate any reasons CSI cannot easily obviate any minimal confusion by asking a few questions of its witnesses. The evidence is *not* confusing--Mr. Stenberg has clearly articulated his "theme" and the jury can decide whether to believe him or not.

## III. Even if the Fraudulent Expense Reports Were Not Otherwise Admissible, They Are Admissible Under Rule 608(b) To Impeach CSI's Witnesses.

### A. The Inaccurate Expense Reports, the Sanction Letter, and the Investigation Testimony Will Be Offered for More than Truthfulness Alone and Are Otherwise Not "Extrinsic Evidence."

The Advisory Committee Note to the 2003 Amendment to Rule 608(b) states in relevant part as follows:

> The Rule has been amended to clarify that ***the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering the evidence is to attack or support the witness' character for truthfulness***. *See United States v. Abel*, 469 U.S. 45 (1984); *United States v. Fusco*, 748 F.2d 966 (5th Cir. 1984) (***Rule 608(b) limits the use of evidence*** 'designed to show that the witness has done things ***unrelated to the suit being tried***, that make him more or less believable per se") . . . .

(emphases added). Thus, Rule 608(b) does not bar admission of the Fraudulent Expense Reports, the Sanction Letter, or the Investigation Testimony for two reasons: first, as discussed above, this

evidence is being offered to show, among other things: (a) Mr. Stenberg's (i) scheme to generate as much money from the Lycos account for himself as possible, (ii) bias, and (iii) desire to persuade CSI that he should keep the Lycos account even after being promoted so he could continue to churn and reap commissions from the account; and (b) that CSI's behavior is inconsistent with its public statements and employee manuals by (i) not disciplining Mr. Stenberg immediately after learning he had filed false expense reports, (ii) strategically waiting to sanction him until after fact discovery was over in this case, and (iii) not firing, demoting, suspending, or otherwise punishing him for filing false expense reports and allowing him to continue supervising CSI personnel having responsibilities for other customer accounts. Thus, the Evidence is not being introduced "solely" to attack Mr. Stenberg's or CSI's character for truthfulness.

Second, the Fraudulent Expense Reports, the Sanction Letter, and the Investigation Testimony are not "extrinsic" evidence within the meaning of Rule 608(b). As the Court in *Fusco* stated, the "principles, embodied in Federal Rule of Evidence 608 and in the common-law rule against bolstering an unattacked witness, limit the use of evidence designed to show that the witness has done things, ***unrelated to the suit being tried***, that make him more or less believable per se." 748 F.2d at 998 (emphasis added). The First Circuit has written similarly, "It is well settled that a party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter. . . . A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence. . . . " *United States v. Andujar*, 49 F.3d 16, 26 (1st Cir. 1995) (internal citations and quotation marks omitted); *accord U.S. v. Boulerice*, 325 F.3d 75, 82 n.5 (1st Cir. 2003) ("'Extrinsic evidence' is evidence of specific instances of conduct 'not relevant in the litigation to establish a fact of consequence,' i.e., evidence of a 'collateral matter.'") As discussed above, the Fraudulent Expense Reports, the Sanction Letter, and the Investigation Testimony are all relevant to several "facts of consequence" in this litigation.

B. Even if the Fraudulent Expense Reports, Sanction Letter, and Investigation Testimony Were Extrinsic Evidence, Lycos May Still Examine CSI Witnesses Concerning Them.

*i.* *Lycos May Examine Mr. Stenberg Concerning the Evidence.*

As noted above, Mr. Stenberg is without question *the* single most important witness in this case. Lycos intends to examine him on a multitude of substantive issues, including without limitation: (i) his intent and efforts to gain Lycos' trust, (ii) his expertise in equipment leasing; (iii) his knowledge of Lycos' trust in and reliance on his expertise; (iv) his knowledge of Lycos' lack of experience in equipment leasing, (v) an e-mail he wrote early in the relationship in which he discusses Lycos' trust in him and CSI, (vi) the facts and circumstances concerning how each of the groups of refinancings came about, (vii) why the equipment was repeatedly split up and combined among various schedules in connection with the refinancings, (viii) his compensation and bonus plan, which encouraged him to refinance personal computers and sell the equipment to his customers, (ix) his failure to disclose material information, including the charging of a mark-up, in connection with the refinancings, (x) his representations to Lycos in connection with the Sales Agreement, (xi) his performance evaluations in which he garnered a perfect score for gaining the "trust and dependency of the decision-maker" at Lycos, (xii) the fact that and reasons he was permitted to retain the Lycos account after he was promoted to Regional Manager, and (xiii) the millions of dollars he realized from his relationship with Lycos.

Under Fed. R. Evid. 607, Lycos has the right to impeach Mr. Stenberg's testimony when it examines him. *United States v. Richardson*, 421 F.2d 17, 40 (1st Cir. 2005) (the Federal Rules of Evidence permit a party to impeach its own witness); Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness."). In so doing, Lycos intends to ask Mr. Stenberg about the Fraudulent Expense Reports, which are highly probative of his knowledge, motive, plan, and honesty (i.e., character for truthfulness). Under

Rule 607, Lycos has the right to conduct this examination regardless of whether the Fraudulent Expense Reports and the Sanction Letter are themselves admissible because Rule 608(b) applies only to extrinsic evidence, and Mr. Stenberg's oral testimony is not extrinsic evidence.[68]

Lycos also intends to examine Mr. Stenberg about the light sanction he received from CSI as a result of embezzling tens of thousands of dollars from the company to show his extraordinary bias as a witness on behalf of CSI, whose own expert testified that an employee who embezzled by filing false expense reports would ordinarily be fired. Nevertheless, CSI, a company that claims that its "integrity and ethics must be above reproach," specifically lists falsification of official company documents and fraud as unacceptable conduct, and subjects employees who engage in unethical or illegal acts to termination or criminal prosecution, gave Mr. Stenberg a "tap on the wrist." It delayed sanctioning him for seven months after learning of his false reports and then took action against him only after fact discovery closed in this case. Perhaps because Mr. Stenberg is a key witness in this case for CSI and made CSI a lot of money on the Lycos account, it did not fire, demote, or suspend Mr. Stenberg, or, as often happens when an employee is caught falsifying expense reports for personal gain, report him to the criminal authorities. Instead, it simply required him to make restitution, over time and without interest, of a portion of the monies he had embezzled from CSI. Mr. Stenberg is clearly beholden to CSI at this point.

---

[68] Even if the Fraudulent Expense Reports and Sanction Letter were, themselves, inadmissible (rather, they are admissible for the reasons set forth below), Lycos may use them to refresh Mr. Stenberg's recollection. *U.S. v. Shinderman*, 515 F.2d 5, 18 (1st Cir. 2008) ("[Rule 608(b)] has never been construed to require that a writing used to refresh a witness's recollection [] be independently admissible in evidence. The case law holds the contrary. . . . For another thing, "nothing [in Rule 608(b)] prohibits the use of documents merely to refresh the recollection of a witness who is the target of impeachment") (quoting in part 28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure*: *Evidence*, § 6117, at 12 (1993 and Supp. 2007)).

Further, if Mr. Stenberg testifies inconsistently with his or CSI's prior testimony, Lycos may use that prior testimony to impeach him. *United States v. Winchenbach*, 197 F.3d 548, 557 (1st Cir. 1999) (it is a "time-honored tenet that prior inconsistent statements ordinarily may be used to impeach a witness's credibility."). "Rule 613(b), rather than 608(b), applies when two statements, one made at trial and one made previously, are irreconcilably at odds. In such an event, the cross-examiner is permitted to show the discrepancy by extrinsic evidence if necessary – not to demonstrate which of the two is true but, rather to show that the two do not jibe (thus calling the declarant's credibility into question)." *Id.* at 558-59 (contrasting Fed. R. Evid. 613(b) and 608(b)).

The First Circuit has held that "extrinsic evidence is admissible to show bias." *United States. v. Gomes*, 177 F.3d 76, 81 (1st Cir. 1999) (citing *United States v. Abel*, 469 U.S. 45, 51 (1984) and *U.S. v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1994)). The rationale for this rule is as follows:

> The dominant principle is that evidence showing the 'emotional partiality' of a witness 'is always significant in assessing credibility,' for 'the trier must be sufficiently informed of the underlying relationships, circumstances and influences operating on the witness so that, in light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probably human reaction. Courts are therefore very liberal in accepting testimony relevant to a showing of bias.'

*United States v. Rios Ruiz*, 579 F.2d 670, 673 (1st Cir. 1978) (quoting 3 Weinstein's Federal Evidence § 607[03] pp. 607-26).

Here, the Evidence provides the basis for Mr. Stenberg's "emotional partiality" to testify in CSI's favor. Further, because Mr. Stenberg's bias is crucial in this case involving trust, it is vital that the jury hear all of the evidence that might induce Mr. Stenberg to "mutate" his testimony.

*ii.* *Lycos May Examine Other CSI Witnesses Concerning the Evidence.*

Lycos intends to call other CSI witnesses, such as CSI's Chairman, Kenneth Steinback, and its Assistant General Counsel, Jeffrey Rousseau. It intends to examine Mr. Steinback concerning the company's ethical standards, its equipment leasing practices, its compensation plan and business model, typical rates of return on its equipment leasing business, and other substantive matters. It intends to examine Mr. Rousseau on, among other things, the Verified Complaint and affidavits he has filed in the case concerning Lycos' default under the equipment leases for which CSI seeks to recover money, and other substantive matters. It also intends to ask both of them about the investigation of the Fraudulent Expense Reports and the Sanction Letter.

Thus, because Lycos intends to examine other CSI witnesses on a multitude of substantive matters in this case, Lycos has the right to impeach their testimony as well, including by examining them about the Fraudulent Expense Reports and the Sanction Letter. Additionally, for

the reasons set forth above, CSI cannot satisfy its burden of showing that the "probative value [of such evidence] is substantially outweighed by the danger of unfair prejudice."

C. CSI's Contention that Lycos Should Not Be Permitted to Examine Mr. Stenberg Under Rule 608(b) on Direct Examination as an Adverse Witness is Without Merit.

Even if the only relevance of the Fraudulent Expense Reports were to inquire into Mr. Stenberg's character for truthfulness, which is not the case, and even if they were "extrinsic evidence," which is not the case, this Court would have discretion to permit Lycos to inquire about them on cross-examination. Given the centrality of Mr. Stenberg and his character for truthfulness to Lycos' fraud claims, the Court should permit Lycos to inquire about them.

CSI surmises that it may not call Mr. Stenberg as part of its case if his testimony is not necessary or would only be cumulative.[69] Because of Mr. Stenberg's importance in the case, were CSI not to call him, it would be purely for strategic reasons to shield his penchant for lying and greed from the jury. The Court should not reward CSI for trying to play games with the truth.

CSI then argues that Lycos should not be permitted to examine Mr. Stenberg on direct examination with the Fraudulent Expense Reports. It reasons that Lycos might wish to call Lycos "merely for the purpose of producing the unfairly prejudicial effects" from the questions regarding his inaccurate expense reports.[70] As set forth in detail above, Lycos intends to examine Mr. Stenberg on a multitude of substantive issues in this case because it considers him "the" single most important witness in the litigation. Provided Lycos does examine him on these substantive issues, the decisions cited by CSI at 18-19 of its Memorandum are inapposite.

[69] CSI Mem. at 18.
[70] *Id.* at 19-20.

WHEREFORE, Lycos respectfully requests that the Court enter an Order:

1. Denying the Motion; and

2. Granting Lycos such other relief as may be appropriate and just.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Dated: March 13, 2009

/s/ Thomas O. Bean
Thomas O. Bean (BBO# 548072)
Peter M. Acton, Jr. (BBO# 654641)
James M. Fraser (BBO# 664605)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
(617) 535-4000
tbean@mwe.com
pacton@mwe.com
jfraser@mwe.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2009 the foregoing Motion was filed through the ECF system and thus was sent electronically to Counsel for CSI, Robert J. Kaler, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02110.

/s/ Peter M. Acton, Jr.
Peter M. Acton, Jr.

BST99 1612925-4.057077.0012