UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
COMPUTER SALES, INC., f/k/a    *
COMPUTER SALES INTERNATIONAL, *
INC.,                          *
             Plaintiff,        * Civil Action
                               * No. 05-10017-RWZ
      - vs. -                   *
                               *
LYCOS, INC.,                   *
             Defendant.        *
```

**JURY TRIAL**
Day 4 Session 2
BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley US. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
June 4, 2009
11:20 a.m.


*   *   *   *   *


LISA W. STARR, RPR, CRR
Tel:  (617) 771-8336

```
 1    APPEARANCES
 2
      FOR THE PLAINTIFF:
 3        McCARTER & ENGLISH, LLP
          BY:  Robert J. Kaler, Esq.,
 4             Edward William Little, Jr., Esq.
               David Himelfarb, Esq.,
 5             Kelly Gabos, Esq.
          265 Franklin Street
 6        Boston, Massachusetts  02110
          Tel:  (617) 449-6500
 7        e-mail:  Rkaler@mccarter.com

 8    FOR THE DEFENDANT:
          McDERMOTT WILL & EMERY, LLP
 9        BY:  Thomas O. Bean, Esq.
               Peter M. Acton, Jr., Esq.
10        28 State Street
          Boston, Massachusetts  02109-1775
11        Tel:  (617) 535-4000
          e-mail:  Tbean@mwe.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2    Witness              Direct   Cross   Redirect   Recross
     JOAN KERSTING
3    (By Mr. Gacioch)                4
     (By Mr. Kaler)                              34
4
     JOAN KERSTING
5    (By Mr. Gacioch)       26

6    EDWARD PHILIP
     (By Mr. Bean)          38
7

8

9

10

11

12                    E X H I B I T S

13   Exhibit No.
                        None Marked
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2

 3           (The following proceedings were held in open

 4      court before the Honorable Rya W. Zobel, United States

 5      District Judge, United States District Court, District

 6      of Massachusetts, at the John J. Moakley United States

 7      Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

 8      June 4, 2009.

 9                (Jury entered the courtroom).

10           THE COURT:  Please be seated.  You may

11      proceed.

12                      JOAN KERSTING, resumed

13      CONTINUED CROSS EXAMINATION

14      BY MR. GACIOCH:

15      Q.   Ms. Kersting, I'm GOING to ask Mr. O'Keefe to pull

16      up Exhibit 10, page 5, that I believe you looked at with

17      Mr. Kaler on direct examination.  Do you recognize

18      Exhibit 10, page 5?

19      A.   The Stipulated Loss Table, yes.

20      Q.   That's the Stipulated Loss Table to Exhibit 100

21      between Lycos and CSI?

22      A.   That's correct.

23      Q.   You talked very briefly how the Stipulated Loss

24      Table works.  But more generally, the Stipulated Loss

25      Table describes the amount that CSI has the contractual
```

11:22:13 (line 10)
11:22:33 (line 15)
11:22:55 (line 20)
11:23:12 (line 25)

1    right to require a lessee, like Lycos, to pay if

2    equipment is lost or destroyed?

3    A.    Yes, this is agreed upon that the lessee would pay

4    if equipment is lost or destroyed.

11:23:30  5    Q.    CSI has the right at its option to require the

6    lessee to make that payment?

7    A.    They can do that.

8    Q.    And the way you figure out, as I believe you

9    discussed with Mr. Kaler, what the specific payment is,

11:23:42 10    is you take the base value figure that you see there two

11    lines under where Mr. O'Keefe has highlighted, and you

12    multiply that by a percentage, depending on how far

13    along in the lease we are at that point.  Is that fair?

14    A.    The concept is correct.  The base value dollar

11:24:02 15    amount is actually set forth in the Certificate of

16    Acceptance.

17    Q.    That's a very good point.  So when you initially

18    agreed to an equipment schedule with a lessee like

19    Lycos, the base value just says "equipment cost", as

11:24:18 20    appears here on Schedule One Hundred; is that correct?

21    A.    That's correct.  At the time they enter into the

22    schedule, we don't know how much equipment they're going

23    to be leasing.  So the lease says that at that time it

24    will be noted as the equipment cost.  But when we know

11:24:33 25    what goes on the schedule, a dollar amount will be in

1    the Certificate of Acceptance.

2    Q.   The dollar amount will replace just the equipment

3    cost?

4    A.   The dollar amount will be the base value.

11:24:45 5    Q.   And you made a very good point there, which is that

6    because you don't know, how long did it take for you to

7    know exactly how much equipment is on a given schedule

8    after that schedule is agreed upon?

9    A.   It depends on the installation period for the

11:24:58 10   schedule.

11   Q.   It could be three months, perhaps?

12   A.   It could be three months, could be shorter, longer.

13   Q.   Could be up to six months, couldn't it?

14   A.   Could be.

11:25:08 15   Q.   Over that period of time, CSI and Lycos don't know

16   what specific pieces of equipment would necessarily be

17   on that lease; isn't that correct?

18   A.   I would say CSI doesn't know.  I think Lycos

19   probably has an idea.  They're selecting the equipment.

11:25:25 20   Q.   They're selecting the equipment directly from a

21   manufacturer?

22   A.   Or vendor, yes.

23   Q.   So maybe from Dell, for example, or from IBM?

24   A.   Correct.

11:25:33 25   Q.   And then they report back to CSI what specific

1    equipment they've selected; is that correct?

2    A.    Correct.

3    Q.    And CSI then adds that specific equipment to what

4    was otherwise a more general equipment schedule.   Is

11:25:46 5    that a fair statement?

6    A.    Lycos issues purchase orders and generally orders

7    the equipment.   The vendor sends the invoices to CSI.

8    At that point, we put it on the schedules, yes.

9    Q.    Because CSI is leasing the equipment?

11:26:04 10    A.    CSI is leasing the equipment, yes.

11    Q.    The equipment Lycos has selected directly from some

12    third party?

13    A.    Correct.

14    Q.    In fact, the equipment schedules, number One

11:26:13 15    Hundred, when they're initially signed before that

16    installation period, they just set forth a cap in the

17    total amount of equipment, dollar value, that Lycos can

18    lease; isn't that correct?

19    A.    That's correct.

11:26:25 20    Q.    So Lycos can choose to lease whatever specific

21    equipment it opts to up to that dollar value.   Is that a

22    fair statement?

23    A.    They can select the equipment they want.   The dollar

24    cap, I believe, is, can be increased at our consent.

11:26:44 25    Q.    At CSI's consent?

1    A.    Correct.

2    Q.    So when you initially signed the equipment lease

3    like Schedule One Hundred, what CSI is doing is saying

4    to Lycos, you can have up to X dollars of equipment on

11:26:56 5    this lease; you go select which specific equipment and

6    how much.  Is that fair?

7    A.    That's correct.

8    Q.    Now, the stipulated loss value, once it's replaced

9    with a dollar figure -- in fact, you can go to an

11:27:16 10    example.  Let's go to Exhibit 1035.2, please.

11           Ms. Kersting, I'm showing you, do you see on

12    the screen another stipulated loss value table?  Do you

13    see that?

14    A.    Yes?

11:27:34 15    Q.    And that's for a different equipment schedule

16    between CSI and Lycos?

17    A.    It's for Equipment Schedule Thirty-Five.

18    Q.    And this is an example of an equipment schedule

19    where CSI has determined the total amount of equipment

11:27:47 20    and put that, put a base value in in place of just

21    manufacturer cost; is that correct?

22    A.    There was a base value, right.

23    Q.    So the way that if Lycos -- suppose with me, for a

24    moment, that Lycos were to lose all of the equipment on

11:28:05 25    Schedule Thirty-Five in a period of time during the

1    lease, the way you figure out how much the stipulated

2    loss amount is is you take that $338,000 figure and you

3    multiply by the percentage, depending on how many

4    payments Lycos had already made.  Is that correct?

11:28:21 5    A.    Correct.

6    Q.    So, for example, under Schedule Thirty-Five, if you

7    look at the right-hand column of the table, if Lycos had

8    made 24 payments already, CSI would have the contractual

9    right to charge it 73.3 percent of that $338,000; is

11:28:40 10   that correct?

11   A.    If there was a total loss of all the equipment.

12   Q.    Exactly.

13   A.    That would be the stipulated loss amount.

14   Q.    And Stipulated Loss Table is designed so that the

11:28:52 15   number of monthly payments made extends for the number

16   of months that the lease is scheduled to lapse; is that

17   correct?

18   A.    I'm sorry, I didn't hear the question.

19   Q.    For a 24-month lease, the stipulated loss value

11:29:06 20   table has 24 entries for the percentage value; is that

21   correct?

22   A.    It actually has 25.

23   Q.    Because there is a zero?

24   A.    Correct.

11:29:16 25   Q.    And if it were a 36-month lease, the monthly

1    payments would go out to payment number 36; is that

2    correct?

3    A.   Yes.

4    Q.   Is it true that CSI -- One of your jobs is actually

11:29:29  5    to calculate the base value number that you see there

6    highlighted on this exhibit; isn't that correct?

7    A.   I calculate the base value on some contracts, and

8    the lease administration group calculates that on other

9    contracts.

11:29:44  10    Q.   And to calculate the base value on a new equipment

11    schedule, you use the higher of two numbers generally;

12    isn't that correct?

13    A.   That's correct.

14    Q.   And one of those numbers is what the equipment

11:29:56  15    originally cost CSI to buy from whatever vendor Lycos

16    has chosen.  Is that fair?

17    A.   Yes.

18    Q.   And the other number is the present value of the

19    rental payments that CSI expects to receive under that

11:30:10  20    lease?

21    A.   Yes.

22    Q.   So you would agree with me that the base value

23    always equals at least what the equipment cost CSI to

24    purchase; is that correct?

11:30:23  25    A.   It's the higher of the two numbers.  On a new lease,

1    it would be the higher of the two numbers.

2    Q.   So it may be what the original equipment cost was or

3    it may be something more; is that correct?

4    A.   If the present value of the monthly rental stream is

11:30:40 5    higher, it would be that number.

6    Q.   And if it's lower, it would be the original

7    equipment cost?

8    A.   Yes.

9    Q.   Now, for a renewal lease on equipment that CSI is

11:30:49 10   already leasing under a different equipment schedule,

11   you disregard the original equipment cost; isn't that

12   correct?

13   A.   Yes.

14   Q.   You just use, the primary factor that you use is

11:31:01 15   just again the present value of the anticipated monthly

16   rental stream?

17   A.   That's the main factor we use, yes.

18   Q.   So there's no necessary relation to the original

19   equipment?

11:31:14 20   A.   There may be if a renewal is done early in the term.

21   But typically, on a renewal, the stipulated loss base is

22   the present value of the rental payments.

23   Q.   And when you calculate that base value, when you

24   calculated that on schedules with Lycos, you are not

11:31:32 25   aware that Lycos ever asked you to change the base value

1    or asked CSI to change that base value during

2    negotiations, are you?

3    A.   I don't have a recollection that they asked me to

4    change it.

11:31:42 5    Q.   You'll recall over the course of the hundred or more

6    schedules that the company signed, you don't recall that

7    there were any that Lycos specifically asked you to set

8    a different base value than you had calculated?

9    A.   Not that I recall.

11:32:00 10    Q.   Now, you -- CSI doesn't explain the methodology for

11    calculating base value to customers like Lycos; isn't

12    that correct?

13    A.   Explain how we calculate the base value?

14    Q.   Explain what you just explained to me, that you use

11:32:16 15    the higher of two different numbers.  You don't tell

16    your lessee that that's how you've chosen the base

17    value; isn't that correct?

18    A.   I didn't tell the lessee that that's how I chose it.

19    I put the number in the contract, and they agreed to it.

11:32:32 20    Q.   And that methodology, how you chose the number, is

21    not explained in any of the lease documents, either; is

22    that correct?

23    A.   That's correct.

24    Q.   Now, CSI often funds its equipment leases by taking

11:32:48 25    out loans from banks; isn't that right?

A.    That's correct.

Q.    So after you set up an equipment schedule with a customer and have chosen the equipment, the customer has chosen the equipment to be on that schedule, you may pass that off to be funded directly by a bank that CSI uses; isn't that correct?

A.    We may assign that to a bank, yes.

Q.    And when CSI does that, it always calculates the rental payments so that if the lessee fully pays the 24 or 36 months of payments, that completely pays off CSI's bank; is that correct?

A.    The promissory note that CSI signs is the same as the rental payments due under the lease.

Q.    So if, for example, on the stipulated loss value schedule for Schedule Thirty-Five that you see in front of you, when Lycos, if Lycos had made that 24th payment and it made all 23 before it, that would have completely paid off CSI's lender on Schedule Thirty-Five; isn't that correct?

A.    Assuming that there were no late fees, yes.

Q.    If they had been paid timely, you're saying?

A.    Yes.

Q.    So you would agree with me that if at that point or after that point there was a total loss of all the equipment, that 73.3 percent doesn't go to CSI's lender,

1    right?

2    A.   If they made the 24th payment, it would not go to

3    the lender.  The stip loss would come to CSI.

4    Q.   Thank you.  Ms. Kersting, you are familiar with --

11:34:35  5    withdrawn.

6             For each equipment lease that CSI enters into

7    with any customer, it records in its financial

8    statements what's called a residual value; isn't that

9    correct?

11:34:46 10    A.   I know -- I've heard the term "residual value".  I'm

11   not an accountant.  I don't do that.  I don't keep the

12   books.

13   Q.   But the residual value is what CSI, as far as you

14   are aware, as one of CSI's lawyers and officers, the

11:35:04 15   residual value is the amount that CSI believes the

16   equipment will be worth at the end of the term of that

17   lease; is that correct?

18   A.   It's an accounting convention of what CSI thinks the

19   equipment is worth.  We take a conservative approach.

11:35:19 20   Q.   Would it be fair to say that it's the value that CSI

21   believes the equipment is worth at the end of the lease?

22   A.   No, I don't think that's the case.

23   Q.   Did you give a deposition in this case, Ms.

24   Kersting?

11:35:33 25   A.   I did.

1   Q.   And was that approximately three years ago now?

2   A.   Yes.

3   Q.   A little bit faded in time.  And during that

4   deposition, you swore to tell the truth to the questions

11:35:43  5   that Mr. Bean asked you?

6   A.   Yes, I did.

7   Q.   And Mr. Bean asked you at the beginning of the

8   deposition if you had any confusion about his questions

9   that you could ask him to rephrase that question, and he

11:35:57 10   would rephrase it and ask you a different question;

11   isn't that correct?

12   A.   Correct.

13   Q.   And you agreed that that was a fair agreement

14   between the two of you?

11:36:04 15   A.   Yes.

16   Q.   And in fact during the course of the deposition,

17   several times you did ask Mr. Bean to do that, didn't

18   you?

19   A.   Yes.

11:36:10 20   Q.   And he obliged every time?

21   A.   Yes.

22   Q.   And at that deposition, didn't you testify in

23   response to --

24          MR. GACIOCH:  Actually, let's play 97-24.

11:37:02 25          THE COURT:  Is it worth it?

```
 1              MR. GACIOCH:  I believe it is, your Honor.
 2    Q.   Ms. Kersting, I apologize.
 3              THE COURT:  Why don't you read her the
 4    question and answer from the transcript?
11:37:17 5     MR. GACIOCH:  I'd be happy to.  May I
 6    approach the witness, your Honor?
 7              THE COURT yes.
 8    Q.   Ms. Kersting, I'm handing you a document.  Do you
 9    recognize this as a copy of the transcript of that
11:37:33 10   deposition?
11    A.   Yes.
12    Q.   And you reviewed and signed this document later on
13    after the deposition was taken?
14    A.   Yes.
11:37:41 15   Q.   And you had the opportunity at that point to make
16    any changes to your answers during the deposition that
17    you thought the court reporter has mistranscribed?
18    A.   Yes.
19    Q.   And if you turn with me to -- I apologize, there are
11:37:55 20   four pages per page, but if you turn to page 25, the big
21    page 25 at the top, which covers pages 94 to 97, and do
22    you see where at page 97 is at the bottom corner?
23    A.   Yes.
24    Q.   And line 24.  You tell me if I misread this.
11:38:25 25             Mr. Bean asked you:  "Well, the stipulated
```

```
 1   loss value, I mean, CSI books are residual value for its

 2   equipment, does it not?"

 3          Was your answer yes?

 4   A.   Yes.

 5   Q.   Then he went on to ask you:  "Okay, that's the value

 6   it believes the equipment will be worth at the end of

 7   the lease term, right?"

 8          Your answer was "Right."  Is that correct?

 9   A.   Yes.

10   Q.   Thank you, Ms. Kersting.  Ms. Kersting, changing our

11   focus a bit to the Sales Agreement that you discussed

12   with Mr. Kaler, CSI and Lycos entered into that

13   agreement in the summer of 2003?

14   A.   Yes.

15   Q.   And you were the primary draftsperson at CSI for

16   that agreement; is that correct?

17   A.   I drafted the agreement originally for CSI, yes.

18   Q.   And that agreement was the form that eventually was

19   used with some modification?

20   A.   With a great deal of modification by Lycos, yes, by

21   LeaseForum.

22   Q.   In fact, you mentioned that LeaseForum made some

23   errors in its modifications; is that right?

24   A.   Yes.

25   Q.   What were those errors?
```

A.   Originally, when it came to us, they had an error in

the termination date on, either it was Schedule One

Hundred and Two Hundred or one of the two.

Q.   In fact, you see on the screen in front of you, I

think Mr. O'Keefe has pulled up Exhibit 3, I realize

this is a different version, but generally where in the

contract are those?  Is it in the page in front of you?

A.   Well, there is an error on that page on a paragraph

reference.  In paragraph No. 1 there is a reference to

paragraph 4 that was lined out and replaced with the

number 5.

Q.   And that was an error that LeaseForum had made?

A.   Yes.

Q.   And then down below in paragraph 2 right there, the

existing schedules, was that where you had mentioned

that LeaseForum also made an error when the termination

dates of the schedules were?

A.   In the version that was first sent to me, yes, there

was an error in that.  That was later corrected.

Q.   Those were errors that you corrected once you saw

them?

A.   Yes.

Q.   They were more -- you agree they were more

sloppiness errors than substantive errors, maybe?

A.   I don't know if they were sloppiness errors.  They

1    had a substantive effect on the contract.

2    Q.   They weren't necessarily -- those were errors in

3    terms of transcribing information from other places in

4    the document or from other documents; is that correct?

11:41:02  5    A.   I had to send them the back-up documentation to show

6    them that they were errors, so I'm not sure if there was

7    a transcription error or not.

8    Q.   But you made those changes?

9    A.   Correct.

11:41:14  10   Q.   And the agreement was re-executed correctly?

11   A.   It was.

12   Q.   And isn't it true that while, if you flip to the

13   signature page, the signatures on the bottom of

14   Exhibit 3 occurred in early August; isn't that correct?

11:41:46  15   A.   Yes.

16   Q.   But Lycos and CSI had agreed on the price for

17   Exhibit 3 by about July 15; isn't that right?

18   A.   I don't remember when the price was agreed on.  The

19   date of the contract was July 15.

11:42:02  20   Q.   The date at the top of the contract is July 15?

21   A.   Yes.

22   Q.   Is Mr. O'Keefe actually pulling up right now what

23   you were talking about, Ms. Kersting, dated July 15?

24   A.   That's the date that the agreement is dated.

11:42:31  25   Q.   And that's -- do you recall that that was the date

1    that Lycos and CSI agreed upon a price, or the subject

2    of the documentation being completed?

3    A.   I don't recall.  I didn't discuss the price with

4    Lycos.

11:42:48  5    Q.   Would it refresh your recollection to review your

6    deposition testimony on that subject?

7    A.   Okay.

8    Q.   If you could just take a look at the deposition

9    transcript that I think you have there and turn to page

11:43:04 10    252, and I can give you a big page reference.  Just read

11    it to yourself.  You don't have to read it out loud.

12    Large page 64.  It's 252, lines 2 through 7.  Do you see

13    your testimony there?

14         Does that refresh your recollection, Ms.

11:43:31 15    Kersting?

16    A.   This was LeaseForum saying that Lycos had accepted

17    the price on July 14, 2003.  This was not Lycos saying

18    it.

19    Q.   That the parties have reached an agreement for the

11:43:49 20    price of the buyout as of July 14, 2003?

21    A.   That's what Ms. Franklin is saying, yes.

22    Q.   That was the same price that ultimately appeared in

23    the contract?

24    A.   I don't know what price is referred to on that page.

11:44:02 25    Q.   Okay.  Well, we can pull up Exhibit 2137-A, please.

1    If we could go down to the very bottom third of the page

2    -- actually, let's go to the top header first.

3              Ms. Kersting, do you recognize on the screen

4    Exhibit 2137-A as an e-mail that you sent to Mr. O'Neal

11:44:30 5    and Mr. Cagney?

6    A.   Yes.

7    Q.   And down below, it's forwarding several e-mails

8    below that.  Do you see that?  Do you see it forwards an

9    e-mail from Mr. Stenberg to you, and then he was

11:44:58 10   actually forwarding one from Ms. Franklin to him.  Do

11   you see that?

12   A.   Yes.

13   Q.   And the e-mail chain is dated between June 14 and

14   July 15 of 2003, if you look at all three e-mails?

11:45:14 15   A.   Can we scroll down?

16   Q.   Absolutely.

17   A.   Yes.

18   Q.   Just take the bottom third and enlarge it.  Do you

19   see this is Ms. Franklin's e-mail that you were speaking

11:45:27 20   of?

21   A.   It is.

22   Q.   It's dated July 14, 2003?

23   A.   Yes.

24   Q.   And do you see down about four lines into the text

11:45:34 25   it says Lycos is accepting CSI's offer to purchase all

1    the equipment on all of these schedules for a price

2    equal to 3.775 million dollars.  Do you see that?

3    A.   I see that.

4    Q.   And that's the same price that ultimately was

11:45:52  5    reflected in Exhibit 3, the final agreement; is that

6    right?

7    A.   That's correct.

8    Q.   Ms. Kersting, the Sales Agreement didn't change

9    Lycos' -- let me withdraw that.

11:46:09  10          The Sales Agreement, Exhibit 3, it didn't

11    modify Lycos' existing obligations to pay rent under the

12    schedules that are listed down there at the bottom

13    quarter of the page, did it?

14    A.   That's correct.  They needed to continue to make

11:46:25  15    their rental payments.

16    Q.   The rental payments that they already needed to

17    under Schedules One Hundred and Two Hundred and several

18    others?

19    A.   Correct.

11:46:33  20    Q.   And those payments, the monthly rental remains the

21    same for all those schedules?  I'll ask you a better

22    question.

23          Once the Sales Agreement was signed, that

24    didn't change the monthly rental amount on those

11:46:47  25    schedules, did it?

1    A.   The Sales Agreement did not change the monthly

2    rentals.

3    Q.   The Sales Agreement didn't change the length of time

4    that they had to pay that rent, did it?

11:46:58 5    A.   It did not.

6    Q.   Those remained just as it had been before the Sales

7    Agreement?

8    A.   Right.

9         MR. GACIOCH:  Can you pull up 42, please?

11:47:13 10    Q.   Ms. Kersting, I'm going to show you Exhibit 42.  I

11    believe you have a copy because you discussed it with

12    Mr. Kaler on direct.  Do you recognize Exhibit 42, a

13    letter from Ms. Cherrick?

14    A.   Yes.

11:47:25 15    Q.   And this is one of the default letters that you

16    discussed with Mr. Kaler on direct examination?

17    A.   Yes.

18    Q.   Do you see the "Re" line at the top of Ms.

19    Cherrick's letter?

11:47:39 20    A.   Yes.

21    Q.   It says it's regarding Equipment Schedules One

22    Hundred and Two Hundred under what is CSI's Master Lease

23    Agreement with Lycos; isn't that correct?

24    A.   Yes.

11:47:49 25    Q.   And Ms. Cherrick's letter, as Mr. Kaler pointed out,

1    indicates that Lycos had defaulted under those two

2    schedules?

3    A.   Yes.

4    Q.   Exhibit 42 doesn't make any mention of any default

11:48:04  5    under the Sales Agreement, does it?

6    A.   It does not.

7              MR. GACIOCH:   43, please.

8    Q.   Exhibit 43, Ms. Kersting, is Mr. Rousseau's letter

9    that you and Mr. Kaler discussed on direct examination?

11:48:23 10    A.   Yes.

11    Q.   And I'll ask you the same question.  Exhibit 43

12    doesn't make any reference to any default of the Sales

13    Agreement, does it?

14    A.   It does not.

11:48:36 15              MR. GACIOCH:   Can you go to Exhibit 422,

16    please?

17    Q.   Ms. Kersting, this may be one that you want to take

18    a longer look at because I don't believe Mr. Kaler

19    showed it to you.  Are you familiar with Exhibit 422 as

11:48:52 20    another letter from Mr. Rousseau to Lycos?

21    A.   Yes.

22    Q.   And do you see, this is another letter indicating

23    that Lycos has defaulted and telling Lycos it has to

24    cure that default; isn't that correct?

11:49:14 25    A.   That's correct.

```
 1   Q.   And do you see any reference in this exhibit to the

 2   Sales Agreement?

 3   A.   No.

 4             MR. GACIOCH:  Your Honor, if I could just

 5   have a moment.

 6             (Pause)

 7             MR. GACIOCH:  Your Honor, we have no more

 8   cross examination.  We have designated Ms. Kersting as a

 9   witness, and we'd be happy to do our short additional

10   direct examination and let her go back to St. Louis.

11   Alternatively, we'd be happy to call her back today or

12   tomorrow.

13             THE COURT:  It's up to you.  You don't object

14   if he does his direct now, do you?

15             MR. KALER:  No.  He can either reserve --

16             THE COURT:  He wants to go ahead so she can

17   go back.

18             MR. KALER:  Oh, that's fine.  I don't know

19   what her schedule tomorrow is or the next day.

20             MR. GACIOCH:  I would just as soon get her

21   out of here today.

22             MR. KALER:  That would be fine.

23             THE COURT:  Members of the jury, what's

24   happening is that Mr. Gacioch wants to examine this

25   witness not only about the things that they talked about
```

11:49:34  (line 5)
11:49:52  (line 10)
11:50:07  (line 15)
11:50:20  (line 20)
11:50:35  (line 25)

1    before but about some new items.  So now she is his

2    witness.  However, she is at the other side, so he can

3    probably lead her.  But he can go beyond the topics that

4    he's just discussed with her.

11:50:54  5         Now I really have a complicated schedule here

6    to make sure when we come back to Mr. Kaler, he can only

7    do what was done on cross.

8         You may proceed.

9         MR. GACIOCH:  Thank you, your Honor.

11:51:17 10        THE COURT:  Excuse me, we need to stretch.

11        (Pause).

12                    **JOAN KERSTING**

13   DIRECT EXAMINATION

14   BY MR. GACIOCH:

11:52:12 15  Q.   Ms. Kersting, isn't it true that all the equipment

16   schedules that CSI enters into with a customer like

17   Lycos are individually numbered?

18   A.   Yes.  Each schedule has a number.

19   Q.   Those are the numbers like Thirty-Five and One

11:52:26 20  Hundred and Two Hundred that we've been discussing?

21   A.   Yes.

22   Q.   And those numbers are unique within CSI's

23   relationship with a specific customer.  Does that make

24   sense?  Each customer, there aren't duplicate schedule

11:52:41 25  numbers within a given customer, but there may be across

1    customers?

2    A.    That's correct.

3    Q.    It's just a way of identifying which equipment

4    schedule one is talking to at the time?

11:52:53  5    A.    Yes.

6    Q.    The people who were at CSI who are generally

7    responsible for numbering those schedules are you and

8    the legal assistants who worked for you; isn't that

9    correct?

11:53:02 10    A.    Typically, the number is just the next sequential

11    number.  It's selected out of our system by the

12    secretaries who type the contract.

13    Q.    Exactly.  So, if, for example, we looked at Schedule

14    Thirty-Five, if that was the most recent schedule at

11:53:18 15    that point, absent some special request, the next

16    schedule would just be Thirty-Six?

17    A.    Typically, yes.

18    Q.    Now, CSI and Lycos -- well, CSI didn't follow that

19    standard practice or that usual practice with Lycos, did

11:53:36 20    it?

21    A.    That's correct.

22             THE COURT:  I'm sorry, did you say did or did

23    not?

24             MR. GACIOCH:  Did not.

11:53:47 25    Q.    In fact, Mr. Stenberg was the account executive for

1    the Lycos account?

2    A.   He was.

3    Q.   And he usually requested specific schedule numbers

4    for Lycos schedules; isn't that correct?

11:53:58 5    A.   On his requests for contracts, he would sometimes

6    note that it should be a schedule of a certain number.

7    I don't know if the request came from the customer or

8    from him.

9    Q.   You don't know one way or the other?

11:54:12 10   A.   Right.

11            MR. GACIOCH:  Mr. O'Keefe, can you pull up

12   Exhibit B.2-B for me, please?

13   Q.   Ms. Kersting, do you see on your screen Exhibit

14   1068-B.2?

11:54:36 15   A.   Yes.

16   Q.   And do you recognize this generally as a CSI request

17   for contract form?

18   A.   Yes.

19   Q.   Mr. O'Keefe is enlarging the header.  Do you see

11:54:52 20   that this is specifically a request for a contract form

21   for Lycos?

22   A.   Yes.

23   Q.   And the marketing rep over there in the top right

24   corner is PHS?

11:55:01 25   A.   Yes.

1    Q.    Which is Mr. Stenberg?

2    A.    Paul Stenberg.

3    Q.    This left side of the Request For Contract, are they

4    called RFCs sometimes?  Is that a term you use?

11:55:19 5    A.    Yes, it's an abbreviation.

6    Q.    The left side box for Request For Contract or RFC

7    requests over rollover threshold the existing in place

8    lease schedules that Mr. Stenberg is asking be rolled

9    over or renewed into a new schedule; isn't that correct?

11:55:41 10    A.    Yes.

11    Q.    So in this case, Mr. Stenberg is asking that the

12    existing schedules 43, 48, 48-A, 50-B, 58, and 69 be

13    rolled over into a new schedule between CSI and Lycos;

14    isn't that correct?

11:56:00 15    A.    Well, he's doing something that's affecting those

16    schedules.  I can't tell just from looking at this piece

17    if they are renewing or if he's early terminating them.

18    Q.    Fair enough.

19          MR. GACIOCH:  Mr. O'Keefe, if you could drop

11:56:14 20    that down and go to page 2 of this same exhibit and

21    enlarge the "Additional Comments" box there.

22    Q.    These are comments that Mr. Stenberg would have made

23    on the RFC coming to you and the legal assistants

24    working with you, generally?

11:56:33 25    A.    Generally, that's where the account executive would

1    put comments, yes.

2    Q.   So here Mr. Stenberg wrote "E/T above schedules new

3    36 month lease eff. 10/1 for the above locations,"

4    correct?

11:56:53 5    A.   Yes.

6    Q.   You understood Mr. Stenberg to be saying to early

7    terminate the schedules just discussed and move that on

8    to a new 36-month lease effective 10/1 for the above

9    locations?

11:57:07 10    A.   Yes.

11    Q.   And Mr. Stenberg the next line down asks you to make

12    this Equipment Schedule Number 68A; is that correct?

13    A.   That's correct.

14    Q.   We've already discussed that the existing, that

11:57:28 15    Schedule 69 already existed at that time, didn't it?

16    A.   From this, yes.

17    Q.   So Mr. Stenberg was not, was making a request to go

18    backwards in sequence to go to 68-A rather than just to

19    use the next number in the sequence; is that right?

11:57:44 20    A.   It was out of the sequence order, yes.

21    Q.   And Mr. Stenberg did this on other requests for

22    contract with Lycos, too, didn't he?

23    A.   It was on another Lycos request, yes.

24    Q.   Where you have an existing schedule that was an

11:58:05 25    existing number and Mr. Stenberg would ask for another

1    number that was earlier in the sequence; is that

2    correct?

3    A.   I don't know if there were other ones that were

4    earlier in the sequence, but I know there would be

11:58:14  5    requests for certain numbers on the contracts.

6    Q.   Let me show you another exhibit, 1064-B.4.

7         Do you recognize this as another Request For

8    Contract form?

9    A.   Yes.

11:58:38 10    Q.   And you see it's also for Lycos?

11    A.   Yes.

12    Q.   And Mr. Stenberg is the marketing rep there

13    indicated in the top right?

14    A.   Yes.

11:58:49 15    Q.   And you see as Mr. O'Keefe has it enlarged that the

16    existing equipment schedule that Mr. Stenberg is talking

17    about is 72 there under Rollover Threshold?  Do you see

18    that, Ms. Kersting?

19    A.   Yes.

11:59:04 20    Q.   So Exhibit 72 already exists at this time?

21    A.   Schedule Seventy-Two.

22    Q.   Yes, Schedule Seventy-Two.

23    A.   Yes.

24    Q.   And if you go to page 2, can you enlarge the

11:59:21 25    "Additional Comments"?  Ms. Kersting, these are again

1    comments from Mr. Stenberg, the account executive?

2    A.    I believe so, yes.

3    Q.    He asks you to early terminate Schedule Seventy-Two

4    and to replace it with Schedule 64B.S. isn't that

11:59:39  5    correct?

6    A.    To make the new Schedule 64B, that's correct.

7    Q.    And Ms. Kersting, during the time that CSI was

8    leasing equipment to Lycos, CSI frequently rewrote the

9    Lycos equipment schedules, original schedules, or new

12:00:09 10    equipment schedules, onto renewal schedules just a few

11    months into their original term; isn't that right?

12                MR. KALER:   Objection.

13                THE COURT:   If she knows, she can tell us.

14                MR. KALER:   The objection is to the

12:00:24 15    terminology that CSI rewrote.

16    A.    Releases that were renewed early on in the term,

17    yes.

18    Q.    In fact, there were several leases that were

19    rewritten just three or four months into their original

12:00:39 20    24-month terms; isn't that correct?

21    A.    I don't know how many, but there were leases that

22    were rewritten in the early term, yes.

23    Q.    And it was unusual at that point for CSI to rewrite

24    schedules very early in their term with its customers,

12:00:57 25    wasn't it?

1 A. It was unusual, yes.

2 Q. In fact, isn't it true that you can't recall any CSI

3 customer with whom that happened other than Lycos?

4 A. I think that's probably true.

12:01:13  5    MR. GACIOCH:  Pull up Exhibit 2132, please.

6 Q. Ms. Kersting, I'm showing you Exhibit 2132.  Do you

7 recognize this as an e-mail from you to Kristin Putnam?

8 A. Yes.

9 Q. And Kristin Putnam is one of the legal assistants at

12:01:38 10 CSI who works in your department?

11 A. She is.

12 Q. And you wrote to Ms. Putnam that -- you were

13 forwarding to Ms. Putnam an e-mail that you had received

14 from Mr. Stenberg; isn't that correct?

12:01:51 15 A. Yes.

16 Q. And that was a request for a renewal of a Lycos

17 lease?

18 A. Yes.

19 Q. And you wrote to Ms. Putnam there:  "Will you handle

12:02:03 20 this please?  We do a lot of these where he terms the

21 lease after a couple of months."  Is that what you

22 wrote?

23 A. Yes.

24 Q. And what you were saying was that you do a lot of

12:02:13 25 these where Mr. Stenberg terminates Lycos leases after a

1    couple of months; is that correct?

2    A.   Where Lycos terminates these leases.  It's an

3    agreement between us, yes.

4    Q.   Well, you wrote, "He terms the lease"?

12:02:30  5    A.   Yes, and it says it's a request to CSI.

6    Q.   And the "he" was Mr. Stenberg in this case?

7    A.   That's correct.

8    Q.   You can't recall anyone other than Mr. Stenberg, any

9    other account executive at this time, who was

12:02:42 10    terminating leases after a couple of months and writing

11    renewal leases with CSI customers, can you?

12    A.   I don't recall any others, no.

13              MR. GACIOCH:  No further questions.

14              THE COURT:  All right.  Mr. Kaler, you may

12:02:57 15    redirect and cross.

16    REDIRECT EXAMINATION

17    BY MR. KALER:

18    Q.   You were asked about the default letters that were

19    sent by CSI to Lycos.

12:03:10 20              MR. KALER:  Can we put up Exhibit 42?

21    Q.   In particular, you were asked about the "Re" line

22    referring to the equipment schedules and Master Lease.

23    Do you recall that?

24    A.   Yes, I do.

12:03:28 25    Q.   And you were asked about the default letters not

1   referring to the Sales Agreement.  Do you recall that?

2   A.   Yes.

3   Q.   Did the Sales Agreement require default letters to

4   be sent in the event of a default?

12:03:47 5   A.   We wouldn't be required to declare an event of

6   default.  It would be our option if we wanted to declare

7   that.

8   Q.   The requirement that says notices of default, does

9   that appear in the Sales Agreement and not the Master

12:04:12 10   Agreement?

11   A.   That's correct.  The notice requirement is for the

12   leases and not the sale.

13   Q.   Okay.  Is that why the Sales Agreement isn't

14   referred to in the notices, because it's not required?

12:04:27 15             MR. GACIOCH:  Objection, your Honor.

16             THE COURT:  It's not there.

17             MR. KALER:  Okay.

18   Q.   The stip loss value tables that you were asked

19   about, for example, on Exhibit 10 on, I think it's the

12:04:46 20   last page, you were asked about these stip loss tables.

21   Do you recall that?

22   A.   Yes.

23   Q.   And the percentages in them and the payments

24   required in the event that the equipment was lost?

12:05:09 25   A.   Yes.

1   Q.   Was Lycos ever charged any stip loss values at any

2   time during CSI's relationship with Lycos?

3   A.   No.

4   Q.   Did Lycos ever report to CSI, to your knowledge,

12:05:21 5   that they had lost any equipment?

6   A.   Not that I know of.

7   Q.   Did Lycos ever complain, or its lawyers, complain to

8   you about the stip loss tables that they had agreed to?

9   A.   No.

12:05:50 10   Q.   In the event that Lycos did lose any equipment, did

11   they have any alternative substitution rights under any

12   schedules that they could exercise in lieu of paying

13   stip loss values?

14   A.   Yes.   Schedule One Hundred and Two Hundred, at

12:06:09 15   least, had a serial number substitution provision in

16   them.

17   Q.   What does that mean with respect to Schedules One

18   Hundred and Two Hundred?

19   A.   That means that they could return other units in

12:06:23 20   substitution of the units that are under the lease.

21   Q.   You said at one point during your cross examination

22   that CSI was conservative in booking residual values.

23   What did you mean?

24   A.   I mean that we typically pick a low number for

12:06:54 25   accounting purposes.

1    Q.   Are you really involved in the process of booking

2    residuals or accounting?

3    A.   I am not.

4              MR. KALER:   Nothing further, your Honor.

12:07:18  5              THE COURT:   Okay.  Anything else, Mr.

6    Gacioch?

7              MR. GACIOCH:   Nothing further.

8              THE COURT:   Thank you, Ms. Kersting.  You are

9    excused.

12:07:31 10              (Witness excused)

11              THE COURT:   Who is next?

12              MR. KALER:   The Plaintiff rests with Ms.

13    Kersting, your Honor.

14              THE COURT:   It rests?

12:07:41 15              MR. KALER:   Yes.

16              THE COURT:   Okay.  Here comes the defense.

17    Who is your first witness?

18              MR. BEAN:   Thank you, your Honor.  Ted

19    Philip.  I believe he's in the hall.

12:08:53 20                    **EDWARD PHILIP, sworn**

21              THE CLERK:   Please state your full name for

22    the record, spelling your last name.

23              THE WITNESS:   Edward Michael Philip,

24    P-H-I-L-I-P.

12:09:04 25              THE COURT:   You may proceed.

DIRECT EXAMINATION

BY MR. BEAN:

Q.   Good morning, Mr. Philip?

A.   Good morning.

Q.   Are you familiar with a company known as Lycos?

A.   I am.

Q.   How are you familiar with it?

A.   I was one of the early employees of the company and part of the management team.

Q.   What positions did you have at Lycos?

A.   I was originally the Chief Financial Officer and then the Chief Operating Officer as well.

Q.   During what period of time were you employed by Lycos?

A.   Late 1995 until early 2004.

Q.   Are you an employee of Lycos today?

A.   I am not.

Q.   Do you own any stock in Lycos?

A.   I do not.

Q.   Do you have any financial interest in the outcome of this litigation?

A.   I do not.

Q.   What were your responsibilities as Chief Financial Officer?

A.   I was responsible for overseeing the financial

1    operations of the business, including things like

2    accounting, finance, leasing, as well as other areas

3    like the technology of the business and those types of

4    areas.

12:10:09  5    Q.   Did you have separate duties as Chief Operating

6    Officer?

7    A.   I did.  As Chief Operating Officer, more of the

8    operational side of the business; for example, the

9    websites that ran like Lycos.com and Wired.com I was

12:10:28 10    responsible for as well.

11    Q.   To whom did you report during your time at Lycos?

12    A.   The Chief Executive Officer, CEO.

13    Q.   Was there a senior management team at Lycos while

14    you were there?

12:10:44 15    A.   Yes, there was.

16    Q.   Were you a member of that?

17    A.   Yes, I was.

18    Q.   What were the responsibilities of the senior

19    management team during the years that you served as CFO

12:10:53 20    and COO?

21    A.   The team was responsible for setting the direction

22    of the company, the strategy of the business, and each

23    person had responsibilities with regard to that

24    strategy.

12:11:03 25    Q.   Would it be fair to say that you were familiar with

1   the business of Lycos during the years that you worked

2   there?

3   A.   Yes, I was.

4   Q.   What was the business of Lycos during the period

12:11:11   5   that you served as Chief Financial Officer and Chief

6   Operating Officer?

7   A.   Well, the business of Lycos started out as a search

8   engine like Google, where you would simply come to

9   Lycos.com, put in the search word, and we would return

12:11:28  10   results.

11         Over time, it became more of what we call a

12   portal, which meant that we tried to add additional

13   content, like stock quotes, sports scores, those types

14   of things, to the business to bring more people into the

12:11:43  15   website and keep them for a longer period of time.

16   Q.   What was the growth rate or objective of Lycos

17   during this period of time when the company was in its

18   infancy?

19   A.   Well, the objective was to attract as many people as

12:11:58  20   we possibly could to the site so that we could sell

21   advertising and later sell e-commerce to the people that

22   came to the site.

23   Q.   What was the state of development of the Internet

24   when Lycos was founded?

12:12:14  25   A.   Well, when the company was founded in 1995, most

1  people hadn't even heard of the Internet.  There was

2  really no business model; there was no industry that we

3  could look at and say that's what we want to follow.

4         So, we were kind of feeling our way in the

12:12:32 5  dark as we were building the company.

6  Q.   And what were you trying to do to build the company?

7  A.   Well, we were trying to, again, bring in as many

8  people as we could into the website so we could sell

9  advertisement and grow as quickly as we could.

12:12:50 10  Q.   When you talk about growing as quickly as we could,

11  what was the thinking or reasoning behind that?

12  A.   Well, when you look at your ability to sell

13  advertising or to sell goods and services, known today

14  as electronic commerce, on the site, you need to have a

12:13:05 15  lot of people come to the site because advertisers

16  aren't going to pay you to advertise on your service if

17  you don't have a lot of people.  The same way that, for

18  example, ABC or CBS or any of the television stations

19  try to put compelling content on their side, shows on

12:13:22 20  their site, to attract users so that they can then sell

21  more value-added advertising.

22  Q.   What were some of the things that Lycos was doing to

23  expedite its growth?

24  A.   Well, we were constantly adding additional content

12:13:37 25  to our site.  When we first started, again, it was just

1  a little search box.  Then we added things like the

2  sports scores, we added the stock tickers, we added

3  horoscopes, all those types of things, e-mail, that

4  people would use on a daily basis to get them to come to

12:13:57  5  the site more often.  Again, the same way that a

6  television station would have different content so that

7  the kids come to the television station during the day,

8  the adults come at night, we would do the same type of

9  thing with Lycos.

12:14:15  10  Q.   Was Lycos involved at all with any mergers or

11  acquisitions?

12  A.   We acquired a number of companies over the five

13  years that I was there, and then eventually sold the

14  company as well.

12:14:27  15  Q.   When you say a number of companies, could you give

16  some examples?

17  A.   Sure.  We bought additional websites.  So, in

18  addition to Lycos.com, we bought WiseWire and Wired and

19  Tripod and a bunch of others in order to try and round

12:14:47  20  out the type of offer we had for our users, again so

21  that we could attract all kinds of users and sell more

22  advertising.

23  Q.   Did the company enter into any partnerships with any

24  entities?

12:15:00  25  A.   We did.  We created versions of Lycos throughout the

1    world.   We created Lycos Europe as a partnership with

2    Bertelsmann, the largest media company in Europe.   We

3    created Lycos Asia where we were running websites, and a

4    lot of the Asian companies, Lycos Japan, Lycos Korea.

12:15:26 5    So we were doing partnerships around the world.

6    Q.   And how did Lycos raise money for its operations?

7    A.   Originally, we raised money through venture capital.

8    And then the company went public in 1996 on the NASDAQ

9    stock market.

12:15:45 10    Q.   What does it mean to go public?

11    A.   It means that you take a company that is held by

12    private shareholders, generally venture capitalists, and

13    then you sell shares on the stock exchange so that the

14    general public can own shares in the business.

12:16:06 15    Q.   How hard were you and others at Lycos working during

16    this period of time?

17    A.   Well, we worked incredibly hard.   It was a very

18    difficult time in all of our lives.   We sacrificed

19    tremendously personally when working.   On average, I

12:16:27 20    would say we worked 80 hour weeks, and a lot of times we

21    slept on the floor or the couch of our offices so that

22    we could get an early start again the next morning and

23    keep working.

24    Q.   During what period of time were you working 80-hour

12:16:40 25    weeks?

1    A.    Since when I started in December of 1995 until

2    pretty much we sold the company in 2000.  So about five

3    years.

4    Q.    When you joined Lycos in 1995, approximately how

12:16:54 5    many employees did it have?

6    A.    I think I was the 18th employee.  I believe that

7    number is correct.

8    Q.    And by the year 2000, around the time 2000,

9    approximately how many employees did you have?

12:17:09 10    A.    I think we had a couple of thousand employees at

11    that point.  We had grown significantly.

12    Q.    So you had about 18 employees in 1995; is that

13    right?

14    A.    Correct.

12:17:22 15    Q.    And then you think a couple of thousand just five

16    years later?

17    A.    Yes, I believe that's correct.

18    Q.    What were the reasons in the increase in the number

19    of employees during this period?

12:17:28 20    A.    Well, the company was growing so rapidly that we had

21    to try and keep up with the growth by adding additional

22    employees.  A lot of the employees that we added were

23    engineers because we were adding new services to the

24    business; for example, e-mail and personal home pages,

12:17:46 25    those types of things.

1            And then we also, as we were growing and

2      attracting more users, we built a very large advertising

3      sales force and commerce sales force.

4      Q.   Did Lycos use outside vendors or service providers

12:18:00 5     during this period that you served as Chief Financial

6      Officer?

7      A.   All the time, yes.

8      Q.   Could you give some examples of vendors and service

9      providers?

12:18:09 10    A.   Well, we used a lot of outside software vendors.

11     Our whole computer platform was built on outside

12     computer equipment, whether it was Digital Equipment,

13     DEC, or PCs or Oracle databases.  We built a whole thing

14     on top of third-party software.

12:18:33 15    Q.   Were there vendors other than software providers

16     outside the area of Lycos' areas of expertise?

17     A.   Sure.  We used lawyers, accountants, consultants,

18     real estate brokers.  There were a lot of outside

19     parties that we counted on.

12:18:54 20    Q.   Did Lycos lease any equipment during this period?

21     A.   We did.

22     Q.   And do you recall any of the vendors who Lycos used?

23     A.   We used Avnet at first, I believe, and then CSI.

24     Q.   And with respect to these outside suppliers, to what

12:19:12 25    extent, if at all, did Lycos rely on these suppliers?

1   A.   We relied very heavily on suppliers because in some

2   cases we didn't have the expertise and they did; in some

3   cases, we didn't have the time to really focus on

4   things.  We often relied on outside third parties.

12:19:35 5   Q.   Would Lycos during this period because of the growth

6   rate, etcetera, rely on oral statements by third

7   parties?

8            MR. KALER:  Objection:  Leading.

9            MR. BEAN:  I'll rephrase the question, your

12:19:46 10   Honor.

11   Q.   Would Lycos rely on any oral statements of any of

12   these third parties?

13   A.   Yeah, we would rely on what they told us, yes.  We

14   were asking them for advice.

12:20:00 15   Q.   Why would you rely on them?

16   A.   Well, in some cases we didn't have the expertise to

17   do it ourselves.  In other cases, we didn't have the

18   time to do things ourselves.  And so, we'd rely on third

19   parties.

12:20:14 20   Q.   Can you give some examples of the third parties on

21   whom Lycos relied or trusted during the period that you

22   worked there?

23   A.   For example, real estate brokers.  We moved our

24   offices several times as we grew, and we needed

12:20:30 25   additional real estate space, so we would rely on the

1    broker to do a market analysis for us and help us decide

2    the best place for us to locate the offices.

3              Accountants would come in and help us decide

4    how we had to account for certain financial

12:20:48  5    transactions.  Investment bankers.  We relied on a bunch

6    of folks.

7    Q.   What about equipment lessors?

8    A.   Yeah.  We didn't have a lot of or any, that I knew

9    of, equipment leasing expertise internally.  That's why

12:21:04 10   we got involved with third parties to lease.

11   Q.   You mentioned that Lycos was a public company for a

12   period of time?

13   A.   Yes, it was.

14   Q.   What does that mean in terms of making filings with

12:21:16 15   the United States government?

16   A.   There are regulations by the Securities and Exchange

17   Commission that tell you on a quarterly, an annual

18   basis, as well as when anything important happens, you

19   have to file certain documents.  And we complied with

12:21:31 20   those.

21   Q.   Who at Lycos was responsible for those public

22   filings with the Securities and Exchange Commission?

23   A.   Ultimately, I was.

24   Q.   As Chief Financial Officer -- let me show you what's

12:21:46 25   been marked as Exhibit 2002.  It's been admitted.

1          MR. BEAN:  May I approach, your Honor?

2     Q.   Mr. Philip, do you recognize what I just handed you?

3     A.   I do.

4     Q.   What do you recognize it to be?

12:22:02 5     A.   This is our Annual Report for 1999.

6     Q.   Now, when you say Annual Report, what does that

7     mean?

8     A.   Well, you're required by the Securities and Exchange

9     Commission to file something called a 10-K, which is the

12:22:16 10    financial information for the year.  And then most

11    companies will supplement that with what's called an

12    annual report, which is a bit of a write-up about the

13    year, what was accomplished, some pictures, those types

14    of things, as a document to go with the dry financial

12:22:35 15    documents.

16    Q.   As the Chief Financial Officer of Lycos from 1995

17    through 2001, what was your understanding of Lycos'

18    approach -- I'm sorry, I think I just misspoke.  When

19    did you cease serving as Chief Financial Officer?

12:22:52 20    A.    I believe it was February of 2001.

21    Q.   For the period that you were there, from December of

22    1995 through February 2001, what was your understanding

23    of Lycos' approach to financial management?

24    A.   Can you explain what you mean by financial

12:23:09 25    management?

1    Q.   Sure.  In terms of managing expenses, making

2    investment decisions, deciding how to operate.

3    A.   Right.  Well, we felt that we were a prudent team of

4    businesspeople that made smart business decisions for

12:23:27  5    the long-term health of the business.  We would try and

6    maximize our growth and spend money appropriately in

7    order to maximize that growth.

8    Q.   When you say spend money appropriately, what do you

9    mean by that?

12:23:44 10    A.   Well, there's a lot of choices you have to make as a

11    team of businesspeople.  You have to look at how fast

12    you think it's prudent to grow and then what you need to

13    do in order to grow that quickly.

14         For example, a lot of our competitors were

12:24:00 15    spending a lot of money advertising on television, and

16    we didn't think that was a prudent way to spend money

17    because you didn't get a return; you didn't grow fast

18    enough based on that television advertising.

19         We advertised in many other ways that we

12:24:17 20    thought was prudent.

21    Q.   Was Lycos trying to lower its expenses during the

22    period that you served as Chief Financial Officer?

23    A.   Well, no, I wouldn't say lower expenses is the right

24    way to phrase it.  We were always very careful in how we

12:24:31 25    spent money and what we spent it on.  But we were very,

1    very aware that in order to grow, you have to spend

2    money.

3              And so, again, I think prudence is the right

4    word.  We prudently spent money in order to grow.

12:24:48 5    Q.   Did you participate in any telephone conversations

6    with analysts from Wall Street who were following Lycos'

7    stock?

8    A.   Yes, I did.

9    Q.   Did you have an understanding of what Wall Street

12:25:00 10   and potential investors were thinking about what they

11   wanted to see in Lycos' growth?

12             THE COURT:  Excuse me.  Mr. Bean, why is his

13   understanding relevant to this case?  I think what

14   you're really asking him is what the analyst said.

12:25:15 15            MR. BEAN:  Yes, your Honor.

16             THE COURT:  Right, which you can't really do.

17   So his understanding is not particularly relevant to the

18   questions that the jury has to decide.

19             MR. BEAN:  I think his understanding is very

12:25:27 20   relevant because CSI takes the position that Lycos

21   entered into these roll-ups and rewrites to reduce

22   expenses.  And the company's position on whether it

23   needed to reduce expenses and its understanding as to

24   Wall Street, I think, is important.

12:25:41 25            THE COURT:  Well, talk about the

1   understanding concerning expenses then.  It's not clear

2   to me why his understanding of what Wall Street thought

3   bears on that, except to the extent that you want to get

4   in what Wall Street thought.

12:25:59  5        I think we understand each other, right?

6        MR. BEAN:  As long as that's the Court's

7   ruling and we don't get to that on either side, I'm

8   fine.  Thank you.

9   BY MR. BEAN:

12:26:08 10  Q.  In terms of Lycos' expenses, would you say that they

11  were growing quarter by quarter, going up and down?  How

12  would you characterize that?

13  A.  They grew every quarter.  If you look at our

14  financial statements, they grew every quarter, and they

12:26:22 15  grew significantly every quarter because, again, we were

16  spending aggressively, but prudent, in order to grow the

17  revenue of the business.

18  Q.  What was your understanding as CFO of the impact of

19  Lycos' expenses on its stock price?

12:26:37 20        MR. KALER:  Objection:  Calls for an expert

21  opinion.

22        THE COURT:  No.  You may have the question.

23  A.  Can you tell me the question again, please?

24  Q.  Sure.  What was your understanding of the impact, if

12:26:56 25  any, of Lycos' expenses on its stock price?

1    A.   Well, as far as we were concerned, there was very

2    little impact, if any impact, of expenses on the stock

3    price.  What Wall Street cared about, if you kind of

4    take yourself back into the heyday of the Internet, what

12:27:19  5    Wall Street cared about was how fast a company was

6    growing.  That's all it cared about.  They wanted us to

7    grow as fast as possible.

8             One of the things we often got criticized for

9    was we didn't spend enough money.  They used to call us

12:27:33 10    the prudent Yankee company here in the Northeast, and

11    everyone else was in Silicon Valley spending money like

12    crazy.  We were much more careful to manage our expenses

13    but, at the same time, grow at a level that we felt was

14    appropriate.

12:27:50 15    Q.   When you say growth, how was that reflected in the

16    company's financials?

17    A.   What we referred to as the top line or the revenues

18    of the business.  So how much advertising you sold, how

19    much commerce that you did on a site, that's really what

12:28:05 20    Wall Street, in my view, cared about.

21    Q.   With respect to revenue, is there another word for

22    that?

23    A.   Sales.

24    Q.   I direct your attention to Exhibit 3023 on the

12:28:22 25    screen.

1              MR. KALER:   There is an objection to this.

2              MR. BEAN:   Let me back up.   It might be

3      helpful.

4      Q.   I direct your attention to Exhibit 2002.   It's your

12:28:43  5    hard copy page 12, Mr. Philip.   I believe it's coming up

6      on the screen.

7              MR. BEAN:   I'm sorry, is this the selected

8      financial data?   Do you have the page up with selected

9      financial data?

12:29:21 10            Now, go to the next page, please.

11     Q.   What are we looking at, Mr. Philip?   Could you

12     describe it to the jury, please?

13     A.   Sure.   This is the revenue and expenses and,

14     therefore, earnings of Lycos on an annual basis.   So in

12:29:40 15   1996, 1997, 1998, 1999.

16     Q.   And can you direct the jury --

17             MR. BEAN:   Can you highlight the line that

18     says "Total Operating Expenses", please?   It's about in

19     the middle of the page.

12:30:12 20   Q.   Could you describe for the jury what's been

21     highlighted, Mr. Philip?

22     A.   Those are the costs associated with running the

23     business.   There's a bunch of different costs that enter

24     into it, but there are like computer costs, our sales

12:30:31 25   team, how much we spend on marketing, what's called in

1   here general and administrative, which is the management

2   team, accounting, finance, all the people at the

3   headquarters.

4   Q.   Okay.  And what -- can you describe for the jury

12:30:49 5   what happened to Lycos' expenses during the period for

6   1995 through 1999?

7   A.   Well, they went up significantly.  If you look at it

8   from right to left, so the $82,805 to the 173 million

9   dollars, that was the increase in expenses over time, of

12:31:18 10   operating expenses over time of the business.

11   Q.   And to the best of your knowledge, did these

12   operating expenses continue to increase after the year

13   ending July 31, 1999?

14        MR. KALER:  Objection:  Leading.

12:31:30 15        THE COURT:  He may answer that.

16   A.   I believe they did.

17   Q.   Okay.  They did through the period that you were

18   there?

19   A.   I believe so.

12:31:39 20   Q.   I direct your attention to the next-to-last page of

21   this exhibit, sir.  And what is this?

22   A.   This is the quarterly high and low stock prices of

23   Lycos over that same period of time.

24   Q.   And very briefly, what does this chart show happened

12:32:11 25   to the Lycos stock price during this period of time?

1    A.   It shows for the most part that it increased

2    significantly over time.

3    Q.   Let's go back to Exhibit 3023.

4         MR. KALER:   There is an objection to this

12:32:32  5    exhibit.

6         THE COURT:   What's the objection?

7         MR. KALER:   That it suggests a causal

8    relationship between the two for which there is no

9    foundation.   It is an expert question.

12:32:41 10        THE COURT:   I don't know, but it simply shows

11   two lines.

12        MR. KALER:   Well, it's a graph, a chart, and

13   the objection was that there is no foundation for a

14   causal relationship to be shown between rising expenses

12:32:54 15   and the stock price rising, which is what I think it's

16   intended to suggest.

17        MR. BEAN:   No, we're not suggesting a causal

18   relationship.   We're just plotting two lines because

19   Mr. Kaler has been suggesting that Lycos wanted to

12:33:07 20   reduce expenses to keep the stock price propped up.

21        THE COURT:   Well, I don't think he said the

22   latter.   He can tell us that stock prices and expenses

23   went along the same way.   I don't know who made this

24   chart, so I don't know if it's admissible as evidence,

12:33:24 25   in any event.

1          MR. BEAN:  We're only seeking for it to be a

2     chalk for the witness to describe.

3          THE COURT:  So let the witness just tell us.

4          MR. BEAN:  Thank you.

12:33:32 5     BY MR. BEAN:

6     Q.  What do you see on this chart?  Would you describe

7     this chart, Mr. Philip?

8          THE COURT well, no, I don't want him to

9     describe the chart, either.  He can get to the bottom

12:33:43 10    line of what we want to ask him about, stock and

11    expenses.

12          MR. KALER:  Would you take it down off the

13    screen?

14          THE CLERK:  I thought the jury could see it.

12:33:56 15         THE COURT:  It's off.  I turned it off now.

16    Q.  What was your understanding --

17          THE COURT:  I'm turning it off.  We don't

18    need it.  We're just going to go ahead and ask the

19    questions.

12:34:14 20         MR. BEAN:  All right.

21    Q.  What was your understanding of the impact, if any,

22    of expenses on stock price?

23          MR. KALER:  Objection.  It calls for an

24    opinion as to the relationship between the rising

12:34:26 25    expenses --

1          THE COURT:  Why can't he tell us that?  He

2     lived through it.  He can tell us his observation.

3          MR. KALER:  I'm objecting on the grounds that

4     it's an expert opinion.  I understand --

12:34:40  5          THE COURT:  I think the question is really

6     what did he observe.

7          MR. BEAN:  Precisely, your Honor.

8     Q.   What did you observe, Mr. Philip, in terms of stock

9     price and expenses, if anything?

12:34:51 10   A.   Well, the stock price was really a function of

11    revenue growth.  And the more that our revenue grew and

12    the faster our revenue grew, generally, the more Wall

13    Street rewarded the company with a higher stock price.

14         Expenses were important.  We were not and

12:35:12 15   would not spend money frivolously, but we understood and

16    Wall Street understood that in order to grow the top

17    line, you have to spend money.  And so, we did.  And I

18    think you saw that on that chart earlier where it grew

19    from almost nothing to 173 million in expenses in a

12:35:32 20   year.

21         MR. BEAN:  If you could go back, Mr. O'Keefe,

22    to that same page, Selected Financial Data, page 12.  If

23    you could highlight the line "Basic and Diluted Net Loss

24    Per Share."

12:36:39 25   Q.   What does this show, Mr. Philip?

1    A.    This shows that the loss per share, meaning for each

2    share of stock that was outstanding and in shareholders'

3    hands, the loss per each share increased fairly

4    significantly over time.

12:37:01 5    Q.    And going back to the next-to-last page of this

6    document, what, if any, impact did the losses the

7    growing loss per share have on the stock price?

8                MR. KALER:   Objection.

9                MR. BEAN:   Let me ask the question without

12:37:26 10   suggesting if there was any causal relationship.

11   Q.    Did the stock price continue to go up despite the

12   growing losses per share?

13   A.    It did, yes.

14   Q.    And again, what was it that you believed was driving

12:37:38 15   Lycos' stock price during the period you served as Chief

16   Financial Officer?

17   A.    It was my strong belief that it was both a number of

18   users that the service had and revenue, or sales.

19   Q.    Sales?

12:37:56 20   A.    Yeah.

21   Q.    What were your qualifications -- how old were you

22   when you joined Lycos?

23   A.    I believe I was twenty-nine when I joined Lycos.

24   Q.    And what were your qualifications, if any, for

12:38:09 25   serving as Chief Financial Officer and Chief Operating

1   Officer of this Internet start-up?

2   A.   I started my career in finance as an investment

3   banker and then attended Harvard Business School and

4   then spent five years in the finance organization of the

12:38:25 5   Walt Disney Company.

6   Q.   Prior to joining Lycos, had you had any experience

7   whatsoever with equipment leasing?

8   A.   I had not, no.

9   Q.   Had you ever received any training in equipment

12:38:35 10   leasing?

11   A.   No.

12   Q.   Did any of your course work at the Harvard business

13   school cover equipment leasing?

14   A.   Not that I remember.

12:38:41 15   Q.   Prior to joining Lycos, have you ever had any

16   education, training, or experience in equipment leasing?

17   A.   No.

18   Q.   Have you ever leased a car?

19   A.   No, I have not.

12:38:52 20   Q.   Do you understand the concept of a lease?

21   A.   Yes.

22   Q.   What do you understand it to be?

23   A.   Well, leasing, in my view, is just a way to finance

24   the purchase of something, whether it's a car or

12:39:06 25   equipment.  And so, you had your choice.  You could

1    either pay for it with cash or you could pay for it over

2    time through leasing.  It's very similar to doing a

3    loan.

4                MR. KALER:  Objection and move to strike,

12:39:16  5    your Honor.  If the witness has no knowledge of leasing,

6    he can't be giving an opinion on what it consists of.

7                THE COURT:  No, it may stand.

8    Q.   Mr. Philip, were you involved in equipment leasing

9    at Lycos?

12:39:30 10   A.   Yes, I was.

11   Q.   When did you first become involved?

12   A.   When we first started leasing equipment.  I don't

13   remember the date, but I believe it was 1996.

14   Q.   What was your role in connection with equipment

12:39:43 15   leasing?

16   A.   Well, I was the Chief Financial Officer.  So, at the

17   end of the day, I was responsible for the equipment

18   leasing.

19   Q.   Are you familiar with the reasons that Lycos leased

12:39:54 20   computer equipment rather than bought it?

21   A.   Yes.

22   Q.   And what were those reasons?

23   A.   Well, as I mentioned a minute ago, it's just a way

24   to pay for the equipment, or just paying for it over

12:40:07 25   time, rather than up front.  And when you have something

1   like computer equipment that becomes obsolete very

2   quickly, we just felt it was better to lease it than it

3   was to buy it.

4   Q.   Approximately how much cash did Lycos have from 1995

12:40:27 5   to 2000 as it changed, would you tell the jury?

6   A.   I can look it up in this document.  I don't remember

7   offhand, but we had a lot of cash.

8   Q.   Perhaps would page 12 of your copy, that page that

9   says Selected Financial Data, reflect the cash?

12:40:56 10   A.   Page 12 would not.  However, the balance sheet in

11   here should.  Am I allowed to look?

12           THE COURT:  You can keep looking at it, sure.

13           MR. KALER:  You'll find the balance sheet on

14   page 37.

12:41:19 15           THE WITNESS:  Thank you.

16   A.   So, on page 37 --

17   Q.   Could you wait one minute until Mr. O'Keefe gets

18   there?

19   A.   Oh, I'm sorry.

12:41:42 20           MR. BEAN:  If you could highlight the line,

21   Cash and Cash Equivalents.

22   Q.   Approximately how much cash did Lycos have at the

23   end of each of July 31, 1998 and 1999?

24   A.   At the end of the July year, we had about 154

12:42:06 25   million dollars worth of cash.  And at the end of the

1    July 1999 year, we had about 153 million dollars worth

2    of cash.

3    Q.   Was Lycos on an August 1st to July 31st fiscal year

4    at this time?

12:42:21 5    A.   Yes, we were.

6    Q.   Did Lycos have a policy of leasing?

7    A.   I don't think we had a policy, no.

8    Q.   And I'm sorry if I've asked you this, but what was

9    the reasoning behind leasing again, equipment leasing?

12:42:38 10    A.   As you can see, we had a lot of cash.  But just like

11    when you think about buying a car, it's an economic

12    decision.  And what we were trying to do is maintain our

13    flexibility in case we wanted to use the cash to buy

14    other companies, to advertise more, for whatever

12:42:58 15    purposes that we might need it for.

16            And so, financing, again, allowed -- leasing

17    allowed us a way to finance it instead of using the cash

18    up front.

19    Q.   In terms of -- was saving money on equipment leasing

12:43:14 20    anything that was a priority for Lycos at this point?

21    A.   Well, again, saving money on everything was

22    important for us because we were very careful about how

23    we spent our money.  But we wouldn't try and save money

24    on anything that was not a good economic decision and a

12:43:29 25    good fundamental business decision for the long-term

1    health of the business.

2    Q.   When you say the "long-term health of the business",

3    what do you mean?

4    A.   Well, when you are a public company, you have an

12:43:41  5    obligation to your shareholders to create long-term

6    value or, in other words, to make the company as

7    valuable as you can over time.  And you could very

8    easily decide to make silly short-term decisions.  We

9    could spend all that cash that we had doing Superbowl

12:43:59 10    ads that might work for a couple of months, but it's

11    certainly not going to create long-term value for the

12    company.  So we were always trying to make a smart

13    long-term decision.

14             MR. BEAN:  Would you go to Exhibit 1, please,

12:44:12 15    Mr. O'Keefe?

16    Q.   Do you recognize what's marked as Exhibit 1, Mr.

17    Philip?

18    A.   Yes, I do.

19    Q.   What do you recognize it to be?

12:44:26 20    A.   This is the Master Lease Agreement between CSI and

21    Lycos.

22    Q.   I direct your attention to the signature page.  Do

23    you recognize the signature on page 6 of the document,

24    sir?

12:44:48 25    A.   Yes.  That's my signature.

1    Q.   And on the next page, is that your signature?

2    A.   Yes, it is.

3    Q.   Did you consult with a lawyer before signing the

4    Master Lease Agreement in 1996?

12:45:06 5    A.   I don't know if I did or I didn't.

6    Q.   Is there anything in the document that suggests to

7    you whether you did or didn't?

8                 MR. KALER:   Objection.

9                 THE COURT:   What's the objection?

12:45:15 10                 MR. KALER:   Calls for an opinion as to

11    whether there's anything in the document.

12                 THE COURT:   No.   It is asking him whether

13    there's something that triggers his --

14                 MR. KALER:   Well, if it's refreshing

12:45:24 15    recollection, I have no objection.   It wasn't phrased

16    that way.

17    A.   The one thing that makes me think that I probably

18    would have --

19    Q.   What page are you looking at, sir?

12:45:37 20    A.   The one on the screen, the Addendum.

21    Q.   Yes, sir.

22    A.   The reason I think that I probably did have a lawyer

23    look at it is I certainly would not have had the

24    knowledge to write an addendum to the lease this way.

12:45:51 25    Q.   Is there any particular provision in the Addendum

1    which suggests to you that perhaps a lawyer was involved

2    on Lycos' behalf?

3    A.   It's really the whole thing.  The way that it's

4    written, it's written in legalese, and that's not

12:46:14  5    something that I would have done.

6    Q.   On page 1 of the Master Lease, do you see in

7    paragraph 2.2 that the number "120" has been crossed

8    out, and there is a line to the number "60"?

9    A.   Yes.

12:46:26 10    Q.   And is that your handwriting?

11    A.   It's hard to say.  I don't think so, but it's hard

12    to say.

13    Q.   Okay.  Going to page 3 of the document, paragraph

14    10, do you see your initials there?

12:46:41 15    A.   I do.

16    Q.   Do you know whether you scratched out the language

17    that was there?

18    A.   I don't know if I was the one that actually

19    scratched it out, but those are my initials okaying the

12:46:55 20    change.

21    Q.   Before signing this Master Lease Agreement, do you

22    recall discussing it with anyone at Lycos?

23    A.   I don't recall.

24    Q.   Were you aware in 1996 of anyone at Lycos who had

12:47:10 25    prior experience with equipment leasing?

1   A.   Not to my knowledge.  I don't think anybody did.

2   Q.   Looking at the Master Lease Agreement, what was your

3   rationale, if you recall, for the change in Section 2.2

4   to reduce the number of days from 120 to 60?

12:47:35  5   A.   I don't recall the agreement.

6   Q.   I'm sorry, sir?

7   A.   I don't recall why I would have changed the

8   agreement.

9   Q.   Do you have, going to the Addendum 1, it says in

12:47:51 10   subsection B1 of the Express Remedies Provision, where

11   it says:  "Delete 4 percent.  Insert 6 percent," is that

12   something you would have suggested, sir?

13   A.   I don't think so.

14   Q.   What leads you to think you didn't?

12:48:07 15   A.   Well, I didn't have any experience with these kinds

16   of documents, so I don't know why I would have made

17   those changes.

18   Q.   When you say you didn't have any experience, had you

19   signed any lease agreements prior to signing this one?

12:48:21 20   A.   We used Avnet before we used CSI.  So, yes.

21   Q.   And do you recall signing any other lease agreements

22   prior to signing the CSI Lease Agreement?

23   A.   Just the Avnet agreement.

24   Q.   When was the last time you had an opportunity to

12:48:39 25   read the Master Lease Agreement?

1   A.   I looked over it a couple of weeks ago.

2   Q.   Does the Master Lease Agreement give Lycos an option

3   to purchase the equipment at the end of the lease term?

4   A.   It does not, no.

12:48:54 5   Q.   Did you or, to the best of your knowledge, anyone at

6   Lycos ask CSI if it could have a purchase option?

7   A.   I don't know.

8   Q.   Did you ask?

9   A.   I don't know.

12:49:05 10   Q.   You don't recall?

11            THE COURT:   He says he doesn't know.

12   Q.   What was your understanding at the time you signed

13   the Master Lease Agreement of how it would be used in a

14   CSI-Lycos relationship?

12:49:19 15   A.   I don't recall.

16   Q.   When you served as Chief Financial Officer, did you

17   have an understanding of whether Lycos was rolling up or

18   rewriting equipment schedules with CSI?

19   A.   I don't recall having that knowledge.

12:49:35 20   Q.   Did you review any equipment schedules that you had

21   signed in preparation for your testimony here today?

22   A.   Yes.

23   Q.   And what did you find?

24   A.   I found that there were, I think, four equipment

12:49:48 25   leases that I signed over that period of time.

1    Q.    Four in total?

2    A.    Four in total, I believe, yes.

3    Q.    And were any of them original schedules or rewrites

4    or anything like that?

12:49:59  5    A.    I believe that there were both original and

6    rewrites.

7    Q.    Okay.   I direct your attention to Exhibit 1064-D.

8    Do you see your signature on the first page?

9    A.    Yes, I did.

12:50:24 10    Q.    Do you have an understanding of whether this is an

11    original schedule or a rewrite schedule, Mr. Philip,

12    looking at the document?

13    A.    Is there any way you can make it slightly bigger?

14    Thank you.

12:50:46 15              I believe this is a rewrite.

16    Q.    What leads you to believe that?

17    A.    Because Section 4 there says:   "Already installed

18    and accepted."

19    Q.    At the time you signed this schedule, what was your

12:51:00 20    understanding of what was happening to the term of the

21    schedule?

22    A.    I don't recall signing this schedule.

23    Q.    You don't recall signing it?

24    A.    Right.

12:51:07 25    Q.    Do you have an understanding, looking at the

1    document, of what the term of this schedule would be?

2    A.   The term is August of 2000 through May of 2003.

3    Q.   Okay.  And do you have an understanding looking at

4    the document of what the monthly rent for it would be?

12:51:27  5    A.   $11,428.

6    Q.   At the time that you signed the refinance schedule,

7    did you have an understanding of how the total payments

8    on the new schedule, the refinanced schedule, or

9    rewritten schedule, would relate to the total payments

12:51:45 10    on the earlier schedule?

11    A.   I don't have a recollection of signing it, so I

12    can't really say.

13    Q.   Are you familiar with the phrase "present value"?

14    A.   Yes, I am.

12:51:57 15    Q.   What do you understand it to mean?

16    A.   Present value is a concept that takes payments or

17    cash flows in the future and then brings them back to

18    today and says the value of all those payments in the

19    future are taxed today.

12:52:18 20    Q.   What was your relationship between the value of the

21    stream of payments on the rewritten schedule and the

22    present value on the stream of payments on the schedule

23    that was being rewritten?

24         MR. KALER:  Objection.  No foundation for

12:52:30 25    knowledge as to what his understanding was.  He says he

1    doesn't recall.

2              THE COURT:  I don't know -- I mean, I think

3    he's right.  Unless you lay a foundation, then the

4    question shouldn't be asked.

12:52:45  5              Actually, part of my difficulty with both

6    counsel, if you keep asking the witnesses about the

7    witness' understanding, what you really want to

8    establish is not really understood but what he knew and

9    what the situation was.  Isn't that correct?

12:53:00 10   Q.   Mr. Philip, did you know at any point in time that

11   you served as Chief Financial Officer that rewriting

12   equipment schedules would increase the present value of

13   the stream of payments on the rewritten schedule over

14   the present value of the payments on the schedule being

12:53:18 15   rewritten?

16              MR. KALER:  Objection.

17              THE COURT:  He may answer whether he knew

18   whether it would, not that it would.

19   A.   I do not recall ever knowing if that would be the

12:53:32 20   case.

21   Q.   At the time you were signing the rewritten

22   schedules, do you have any recollection of anyone

23   telling you that there would be a charge for entering

24   into the rewritten schedules, such as a fee or points or

12:53:47 25   markup?

1      MR. KALER:  Objection, your Honor.

2      THE COURT:  Objection sustained.

3      MR. BEAN:  I think I asked if anyone told

4  him.  I was getting at did anyone tell him.

12:53:57  5      MR. KALER:  Objection.

6      THE COURT:  The objection is sustained.

7  Q.  At the time you signed the rewritten equipment

8  schedules, if someone had told you that the present

9  value of the payments on the refinanced schedules was

12:54:08 10  going to be higher than on the original schedules, what

11  would you have done?

12      MR. KALER:  Objection.

13      THE COURT:  Well, it's a hypothetical

14  question as to which the premise has not yet been

12:54:30 15  established.  Do you understand?  My problem is that you

16  are assuming as a fact that there was a charge or a

17  markup or whatever in the question.  And there is so far

18  no evidence of that.

19      MR. BEAN:  Okay.  I'm presenting it as a

12:54:46 20  hypothetical question, your Honor.

21      THE COURT:  But then the problem is that

22  you're asking him for an opinion.

23      MR. BEAN:  Your Honor, I can provide the

24  Court with case law to the effect that in a fraud case

12:54:57 25  where the person didn't know --

1          THE COURT:  I'll tell you what.  He may have

2     the question de bene.

3          That, members of the jury, assumes certain

4     facts to be so.  He may ask the question because in the

12:55:11  5     normal course of events in the trial, you have to go 1,

6     2, 3.  And if he needs any facts that he anticipates to

7     be 4, then he would have to come back to this witness,

8     and that wouldn't really work.

9          So he may have the question with the

12:55:26 10     understanding that he will establish a premise that is

11     not yet there.  And then if he doesn't establish the

12     premise, then you will need to disregard the answer

13     here.

14          So that's how you may proceed.  And Mr.

12:55:40 15     Kaler's objection is noted.

16          MR. KALER:  Thank you, your Honor.

17          MR. BEAN:  Thank you, your Honor.

18     Q.   If anyone had told you that CSI was charging a fee,

19     points, or markup to enter into the rewritten schedules,

12:55:51 20     would you have signed the rewritten schedules?

21     A.   Well, I think it would all depend on the magnitude

22     of those things.  And it would depend on whether or not

23     it was a smart business decision.

24     Q.   What were the factors that you would consider in

12:56:06 25     deciding whether the fee was reasonable and whether the

1    decision was a smart business decision?

2    A.   Well, I wouldn't be interested in paying more money

3    for the equipment if we were going to go for a longer

4    period of time.  It's just that there would be

12:56:22  5    additional interest over that period of time.

6    Q.   When you say more money, what do you mean by that?

7    A.   Well, if you look at the value of the equipment that

8    we were leasing, that essentially was financed or leased

9    over a period of time.

12:56:38  10          If we were going to extend the period of time

11    that that was leased over, I wouldn't want to pay more

12    for that equipment.

13    Q.   When you say more for the equipment, what do you

14    mean by that?

12:56:48  15    A.   I mean the value of the equipment, of the total

16    payments, if you add up the total payments over the

17    period of time, other than additional interest because

18    you have it for a longer period of time, I certainly

19    would not have wanted to pay the more aggregate payment

12:57:09  20    for it.

21    Q.   And could you talk about that in terms of present

22    value?

23    A.   Well --

24          MR. KALER:   Objection, your Honor.  This is

12:57:18  25    really expert testimony from a witness who has said he

1    doesn't even recall the transactions that he signed.

2           THE COURT:  I think that's right.  He has

3    already explained it anyhow.

4           MR. BEAN:  Okay.

12:57:28 5   Q.   If someone had told you there was a fee or a charge

6    or points, what might you have done?

7           MR. KALER:  I object.

8           THE COURT:  Overruled.  I'm taking it de

9    bene.

12:57:38 10          MR. KALER:  The objection is it was asked

11   before, I think.

12          THE WITNESS:  Can I answer?

13          THE COURT yes.

14   A.   I would have asked -- I would want to know how much

12:57:49 15   are those fees or markups or points so that I could make

16   an intelligent business decision as to whether or not it

17   made sense.

18   Q.   How would you evaluate whether or not a fee or a

19   point or a markup was reasonable?

12:58:07 20          MR. KALER:  Objection, your Honor.  It just

21   seems we're going well beyond the basic question and

22   into expert opinion.

23          THE COURT:  We're asking -- he's asking on

24   the assumption he will prove that there was a markup,

12:58:24 25   he's asking the former Chief Financial Officer and Chief

1   Operating Officer what his response would have been had

2   he known it.  That is not an unreasonable question.

3   A.   I'm sorry, can you repeat the question?

4   Q.   Sure.

12:58:39  5         THE COURT:  If you had known there was such a

6   fee, what would you have done?

7   A.   Well, I would have done analysis on it.  So, for

8   example, to use an extreme example, if it were a penny,

9   then it probably would have been okay to refinance it

12:58:53 10  for a longer period of time.  But depending on the size

11  of the markup or the number of points or those types of

12  things, I would have looked at the period of time that

13  we were going to have the equipment over and see if it

14  made sense to pay additional payments in order to have

12:59:12 15  it for that period of time.

16         The problem with equipment leasing is the

17  longer you go, the equipment becomes less and less

18  valuable at the end, or, in other words, the residual

19  value.

12:59:25 20         MR. KALER:  Objection, your Honor, and move

21  to strike that opinion on the issue of leasing as the

22  witness has testified that he has no opinion on leasing

23  and whether --

24         THE COURT:  Is there any dispute about that?

12:59:38 25  I mean, the older the equipment is, the less value it

1    has.   Is there any dispute about that?

2            MR. KALER:   There is a dispute as to the

3    magnitude of the reduction.

4            THE COURT:   But he didn't talk about

12:59:49  5    reduction.

6            MR. KALER:   I thought he was, your Honor.   I

7    take the Court's ruling on the subject.

8            THE COURT:   Why don't we suspend here until

9    tomorrow morning.

12:59:59 10            Court is in recess until two, this case until

11    nine tomorrow, and I will see you promptly.

12            (Jury was dismissed).

13            THE COURT:   Court is in recess.

14            (Whereupon, the hearing adjourned at 1:00

15    p.m.)

16

17

18

19

20

21

22

23

24

25

1

2

3                          C E R T I F I C A T E

4        I, Lisa W. Starr, Registered Professional
     Reporter/Certified Realtime Reporter, do hereby certify
5     that the foregoing transcript, from Page 1 to Page 76,
     constitutes to the best of my skill and ability a true
6     and accurate transcription of my stenographic notes
     taken in the matter of Civil Action No. 05-10017-RWZ,
7     Computer Sales International, Inc. Vs. Lycos, Inc.

8

     _____
9     Lisa W. Starr, RPR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25