UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES, INC., f/k/a        *
COMPUTER SALES INTERNATIONAL,      *
INC.,                              *
            Plaintiff,             * Civil Action
                                   * No. 05-10017-RWZ
      - vs. -                      *
                                   *
LYCOS, INC.,                       *
            Defendant.             *


**JURY TRIAL**
Day 6 Session 2
BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley US. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
June 8, 2009
11:20 a.m.


*   *   *   *   *


LISA W. STARR, RPR, CRR
Tel:  (617) 771-8336

1    APPEARANCES

2
     FOR THE PLAINTIFF:
3          McCARTER & ENGLISH, LLP
           BY:  Robert J. Kaler, Esq.,
4               Edward William Little, Jr., Esq.
                David Himelfarb, Esq.,
5               Kelly Gabos, Esq.
           265 Franklin Street
6          Boston, Massachusetts  02110
           Tel:  (617) 449-6500
7          e-mail:  Rkaler@mccarter.com

8    FOR THE DEFENDANT:
           McDERMOTT WILL & EMERY, LLP
9          BY:  Thomas O. Bean, Esq.
                Peter M. Acton, Jr., Esq.
10         28 State Street
           Boston, Massachusetts  02109-1775
11         Tel:  (617) 535-4000
           e-mail:  Tbean@mwe.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2    Witness              Direct   Cross   Redirect   Recross
      KENNETH STEINBACK
 3    (By Mr. Bean)          6

 4    FREDERICK O'NEAL
      (By Mr. Bean)              21
 5
      PHILIP CAGNEY
 6    (By Mr. Gacioch)           32

 7

 8

 9

10

11                       E X H I B I T S

      Exhibit No.                              Page
12                       None Marked

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Rya W. Zobel, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on June 8, 2009.

THE COURT:  Please be seated.  What is the issue?

MR. BEAN:  Two points, your Honor.  One, in terms of specifically requesting it, we did not.  The other is these are Cross examination documents.  They are not impeachment nor prior statements of Mr. Cross. We didn't receive any notice of them; they are not on the exhibit list.  We saw them for the first time this morning.  They are not impeachment.

THE COURT:  So what do you want me to do?

MR. BEAN:  I would like you to strike all of Mr. Cross's testimony concerning those documents or advise the jury.

THE COURT:  I'll think about it.  What else?

MR. BEAN:  That's all.

THE COURT:  Okay.  Let's bring the jury in.

MR. BEAN:  The other thing, your Honor, if

1   you could instruct the parties that any document that is

2   not specifically for impeachment, prior statements of

3   the witness, should be on exhibit lists.

4           THE COURT:  Counsel are so instructed.

11:19:51  5           MR. KALER:  Yes.  This was impeachment by

6   contradiction.  It's proper.

7           THE COURT:  That doesn't mean you shouldn't

8   produce a document.  How long will you be with this

9   witness?

11:20:16 10           MR. BEAN:  Fifteen, twenty minutes, your

11   Honor.

12           THE COURT:  How long will the cross be?

13           MR. KALER:  Maybe ten minutes, if there is a

14   cross.

11:20:25 15           THE COURT:  Are we on track?  I mean, I know

16   we're on track because the time is limited, and we'll do

17   it within that time.  Any chance of reducing the time?

18           MR. KALER:  I think we may finish early.

19           MR. BEAN:  It's hard to predict.

11:20:45 20           THE COURT:  Well, Mr. Kaler has used up more

21   than eleven hours of his time.

22           MR. KALER:  That must be including today.

23           THE COURT:  It is including today, but you

24   were almost ten yesterday, I mean last week.

11:21:00 25           MR. KALER:  We should state our time

1 calculations.

2       THE COURT:  No, I don't want your time

3 calculations.  I told you, my time calculations are it.

4 I'm keeping copious track, detailed track.  At the end

11:21:13 5 of Friday, you had 9 hours and 47 minutes.

6       MR. KALER:  I should know what the Court's

7 time is at the end of the day just to make sure.

8       (Jury entered the courtroom).

9       THE COURT:  Eleven hours, two minutes as of

11:21:48 10 now.  Please be seated.

11       **KENNETH STEINBACK, sworn**

12       THE CLERK:  Could you state your name and

13 spell your last name for the record?

14       THE WITNESS:  Kenneth Bruce Steinback,

15 S-T-E-I-N-B-A-C-K.

16 DIRECT EXAMINATION

17 BY MR. BEAN:

18 Q.  Good morning, Mr. Steinback.

19 A.  Good morning.

11:22:29 20 Q.  You were one of the founders of CSI in the early

21 1970s, were you not?

22 A.  Yes.

23 Q.  And you served as Chairman and Chief Executive

24 Officer from before 1996 until sometime last year; is

11:22:43 25 that right?

```
 1    A.    That is correct.
 2    Q.    You own one-third of the stock in CSI; is that
 3    right?
 4    A.    Approximately.
 5    Q.    And CSI considers itself to be financing experts in
 6    financing computer equipment hardware; is that right?
 7    A.    We're leasing experts, and that's the business we're
 8    in.
 9    Q.    Thank you.  You spent time with CSI's lawyers
10    preparing for your testimony here today, did you not?
11    A.    Yes.
12    Q.    Approximately how many times did you meet with CSI's
13    lawyers to discuss your testimony?
14    A.    A few.
15    Q.    Approximately how many hours in total did you spend
16    preparing for your testimony here today?
17    A.    Two hours.
18    Q.    Until at least 2006, the United States sales
19    managers for CSI reported directly to you; is that
20    right?
21    A.    That is correct.
22    Q.    And CSI does not have a sales training program for
23    new account representatives, does it?
24    A.    We do not have a specific training program for our
25    sales reps because we hire pros's in the business, hire
```

1   from the competition, from some of the biggest firms,

2   IBM, Hewlett-Packard, Dell.  These people all know how

3   to sell.  We bring them into St. Louis for a few days,

4   train them who to talk to, how to deal with specific

11:24:09 5   issues, put them back in the field, and we put them to

6   work.

7   Q.   One of the pros that you hired in 1990 was Paul

8   Stenberg, right?

9   A.   Correct.

11:24:18 10   Q.   And CSI promoted Mr. Stenberg as the regional

11   manager for the Northeast effective July 1, 2001,

12   correct?

13   A.   That is correct.

14   Q.   You were involved in his promotion; is that right?

11:24:29 15   A.   I was involved, but I was out -- I was not at work

16   much from October of 2000 until the end of, the

17   beginning of 2003 because I was out for cancer

18   treatment, and I wasn't in the office very much at all.

19   And I was in therapy most of the time.

11:24:51 20   Q.   Mr. Steinback, if you could answer my question, I

21   would appreciate it.

22   A.   Could you restate it?

23   Q.   Mr. Stenberg reported directly to you from the time

24   he was promoted in July of 2001 until at least November

11:25:07 25   of 2006; is that right?

1   A.   Yes.

2   Q.   You spoke with Mr. Stenberg every two or three weeks

3   while you were supervising him?

4   A.   Yes.

11:25:14  5   Q.   Mr. Stenberg has been an executive of CSI since his

6   promotion in 2001; is that right?

7   A.   Marketing and regional manager.

8   Q.   He is currently the regional sales manager in the

9   Northeast; is that right?

11:25:27 10   A.   That's correct.

11   Q.   CSI issues compensation plans for its salespeople

12   such as Mr. Stenberg each year, does it not?

13   A.   Yes, it does.

14   Q.   When Mr. Stenberg was an account representative, his

11:25:38 15   annual compensation was based on commissions he earned

16   during the year; is that right?

17   A.   That is correct.

18   Q.   And the amount of commission he earned depended on

19   him leasing or selling equipment above a threshold

11:25:49 20   amount, right?

21   A.   Not entirely.

22   Q.   He earned a small portion of his commission based on

23   just writing a lease; is that right?

24   A.   Well, I don't know if it was a small portion.  I

11:26:00 25   can't answer that.  I can only tell you that our

1    salespeople get, earn commissions from a variety of

2    sources, some from the amount of money that they earn

3    over and above the threshold, which is just a number

4    that we give for commission purposes to our salesperson.

11:26:23 5    Q.    And the threshold is set by CSI; is that right?

6    A.    Yes, by somebody within CSI.

7    Q.    Right.  The threshold is the minimum price for which

8    the salesperson can sell or lease equipment so long as

9    senior management at CSI approves the final price,

11:26:43 10    right?

11    A.    Yes.

12    Q.    A salesman needs senior management's approval to

13    sell or lease equipment, even at any price above the

14    threshold, right?

11:26:54 15    A.    No.

16    Q.    It doesn't require senior management's position?

17    A.    No.

18    Q.    Senior management is always aware of the amount for

19    which the account executive is selling or leasing above

11:27:07 20    the threshold, is it not?

21    A.    In most cases, yes.

22    Q.    An account executive who leases new equipment above

23    a threshold earns a commission, right?

24    A.    Yes.

11:27:19 25    Q.    If the account executive rewrites that same

1    equipment on another schedule above the threshold, he

2    earns another commission, right?

3    A.   Possibly.

4    Q.   Well, if it's above the threshold, he earns a

11:27:30  5    commission, does he not?

6    A.   Well, it depends how the threshold is calculated,

7    meaning if there was any remaining present value that

8    was still part of the transaction.  In other words, the

9    unpaid amount that they still owed, the number of lease

11:27:46 10    payments they still owed on the lease.

11    Q.   But the threshold considers the present value of the

12    remaining payments on a lease, does it not?

13    A.   Like I said, in most cases.

14    Q.   Okay.  And if the salesperson rewrites the equipment

11:28:00 15    schedule a third time, he would typically earn another

16    commission, right?

17    A.   Possibly.

18    Q.   And if he rewrites it a fourth time, he would earn

19    another commission above the threshold; isn't that

11:28:12 20    right?

21    A.   Possibly.

22    Q.   In fact, Mr. Stenberg in this case rewrote Lycos'

23    equipment, some of the equipment on Lycos' schedule,

24    four times, did he not?

11:28:24 25    A.   I don't know.  I'm not familiar with the Lycos

1    financial situation on any of their leases.

2    Q.   When CSI's salespeople rewrote equipment schedules

3    above the threshold, CSI made more money, did it not?

4    A.   Could you repeat the question?

11:28:39  5    Q.   Sure.  When CSI's salespeople rewrote equipment

6    schedules above a threshold, CSI made more money; isn't

7    that right?

8    A.   Not necessarily at all because the threshold is

9    based on what we said the equipment cost us at that

11:28:57 10    point in time, meaning what we had it on our books for,

11    which is irrelevant to the user.  And it might be a loss

12    at that point in time.

13    Q.   Well, if the salesperson rewrites the equipment

14    above what CSI has on its books, CSI earns money then,

11:29:20 15    right?

16    A.   Yes.

17    Q.   And the threshold is typically what CSI has the

18    lease on its books for, right?

19    A.   No, not necessarily at all.

11:29:29 20    Q.   If CSI knows a customer cannot return equipment at

21    the end of a lease term, it will charge a customer a

22    higher price for a buyout, will it not?

23    A.   Absolutely.  We can't get the equipment back, and we

24    can't remarket it.

11:29:46 25    Q.   The point is, in most cases, it's worth more money

1  to CSI to have the customer keep the equipment than

2  return it; isn't that right?

3  A.   Not in all cases.

4  Q.   I direct your attention -- CSI has a leasing, has a

11:30:18 5  subsidiary called EPC, does it not?

6  A.   Yes.

7  Q.   And one of the parts of EPC's business is to

8  remarket equipment that was returned to CSI that was on

9  lease, right?

11:30:27 10  A.   Yes.

11  Q.   EPC trades used computer equipment, does it not?

12  A.   That's one of the things it does.

13  Q.   And CSI employs approximately 150 people at EPC who

14  do nothing but trade used computer equipment; is that

11:30:40 15  right?

16  A.   That is not correct.  We employ a total of about 150

17  people, but they don't all trade equipment.

18  Q.   But many of them do, right?

19  A.   No, that's not true, either.

11:30:58 20  Q.   I direct your attention to --

21          MR. BEAN:  May I approach, your Honor?

22          THE COURT:  Yes.

23  Q.   -- page 90 of your deposition, sir.  I asked you:

24  "How does CSI determine the fair market value of a piece

11:31:14 25  of equipment?"  And you answered:  "Because we trade

1    that equipment at EPC, usually on a daily or a monthly

2    or a yearly basis.  We have 150 people that do nothing

3    but trade machines, basically out there, and we know

4    what the used market is, so we know what the value is."

11:31:32 5            Did I read that correctly?

6    A.   Yes.

7    Q.   CSI has been a member of the Equipment Leasing

8    Association for over twenty-five years, has it not?

9    A.   Yes.

11:31:54 10    Q.   And it advertises its membership in the ELA on its

11    website, does it not?

12    A.   Yes.

13    Q.   And it puts its membership in the ELA as an item on

14    its letterhead of its business, on its stationery?

11:32:13 15    A.   I believe so.

16    Q.   And CSI expects its employees to comply with the ELA

17    Code of Fair Business Practices, does it not?

18    A.   We expect our employees to comply with good business

19    practices, period.

11:32:27 20    Q.   Well, CSI expects its employees to comply with ELA

21    Code of Fair Business Practices, does it not?

22    A.   We expect our employees to behave and have ethics

23    second to none, just like I said the first time.

24    Q.   CSI doesn't provide its employees with any training

11:32:51 25    in the ELA fair business practices, does it?

1          MR. KALER:  Objection, your Honor.

2          THE COURT:  What's the objection?

3          MR. KALER:  The ELA code questions.  I

4    thought there was an order in limine --

11:33:03  5          THE COURT:  The question was whether it

6    provides training on good business practices.

7          MR. KALER:  I think it was more specific as

8    to whether it provided --

9          THE COURT:  The question specifically was,

11:33:13  10   was it not?

11         MR. BEAN:  It was on whether they provided

12   any training in those fair business practices.

13         MR. KALER:  In the ELA code.

14         THE COURT:  You used fair business practices,

11:33:22  15   so I didn't understand that to be ELA code.

16   BY MR. BEAN:

17   Q.   I direct your attention to your screen, sir.  Do you

18   see, this is a page from the CSI Employee Handbook, is

19   it not?

11:33:49  20   A.   It looks so.

21   Q.   Okay.  Do you have any reason to believe it's not?

22   A.   No.

23   Q.   Do you see in the middle paragraph, starting with

24   the second sentence, it says:  "CSI believes our

11:34:02  25   integrity and ethics must be above reproach."  Do you

1    see that?

2    A.   Yes.

3    Q.   And do you see that "CSI conducts business in

4    accordance with the Code of Ethics of the ELA, Equipment

11:34:14 5    Leasing Association."  Do you see that?

6    A.   Yes.

7    Q.   That's a reference to the ELA fair business

8    practices, isn't it?

9    A.   Yes.

11:34:22 10    Q.   So CSI does expect its employees to comply with the

11    ELA Code of Fair Business Practices, isn't that so?

12             MR. KALER:   Objection.  Again, we're just

13    getting into ELA code.

14             THE COURT:   What's the objection?

11:34:33 15             MR. KALER:   I thought that the ELA code was

16    covered under the order in limine relating to

17    questioning about specific ELA code provisions.

18             THE COURT:   Well, he's asking about training

19    with it.  I don't know what really, what difference it

11:34:49 20    makes, frankly.

21    Q.   Sir, so CSI does require its employees to comply

22    with the ELA Code of Fair Business Practices?

23    A.   We expect our employees to behave properly.  And

24    that's the same as the ELA code.

11:35:03 25             Let me explain to everybody that I was, in

1    1988 and from 1980 to '88, I was on a board of what was

2    called the Computer Dealers and Lessors Association,

3    which was 360 companies in the business of leasing and

4    remarketing computer equipment.  In 1988, I became

11:35:25  5    chairman for two years, headquartered in Washington,

6    D.C.  We had a Code of Ethics.  I was on the Ethics

7    Committee.  I helped write the Code of Ethics for the

8    CELA during that time.  It was a very large

9    organization, a big staff.  That Code of Ethics is the

11:35:43 10    same, similar, Code of Ethics as the ELA.

11              So having read it, we know how to follow it.

12    We do follow it, and we understand it.

13    Q.   Mr. Steinback, as of the date of your deposition in

14    November 2006, you had never read the ELA Code of Fair

11:36:01 15    Business Practices, had you?

16    A.   That is correct, because I helped write a code that

17    was the same exact code, so I never had to read it.

18    Q.   And you testified during that deposition that you

19    were not even familiar with the ELA Code of Fair

11:36:16 20    Business Practices, didn't you?

21    A.   I don't know if I said that or not, but I can tell

22    you I am familiar with it because the words of the CELA

23    Code of Ethics is almost identical to the ELA code.

24              MR. BEAN:  May I approach, your Honor?

11:36:48 25              THE COURT:  Yes.

Q.   On page 115 of the transcript of your deposition,
sir, I asked you:  "Are you familiar with the Code of
the Ethics of the Equipment Leasing Association?"  And
you said:  "Not specifically."
          Did I read that correctly?
A.   Yeah, yes.
Q.   But you do expect your employees to act, their
conduct to be above reproach; isn't that right?
A.   Yes.
Q.   And you've been quoted in articles quoted in the
media discussing the importance of integrity in your
business at CSI; isn't that right?
A.   Yes.
Q.   And you've also written articles about the
importance of integrity in business, have you not?
A.   Yes.
Q.   You wouldn't want anyone working at CSI who did not
have great integrity, would you?
A.   In most cases, no.
Q.   CSI's customers trust it to manage the leasing
process efficiently and ethically, do they not?
A.   Our customers trust us to do certain things under
the lease.  They trust us to pay for the equipment on
time.  They trust us to bill them correctly.  They trust
us to pay their personal property tax and file them

```
 1    correctly.  All the administrative tasks that go with a
 2    lease, that's what they trust us for.
 3    Q.   Those are contractual obligations that CSI has under
 4    the lease, right?
 5    A.   I can't refer to that.
 6    Q.   But CSI's customers trust it to manage the leasing
 7    process efficiently and ethically, right?
 8    A.   I don't understand what you mean by managing the
 9    leasing process.
10    Q.   CSI has a website, does it not?
11    A.   Yes.
12    Q.   And you've had the opportunity to review it from
13    time to time, have you not?
14    A.   Yes.
15    Q.   CSI's website accurately describes CSI's business
16    practice, does it not?
17    A.   Yes, it does.
18    Q.   And the website states:  "Our customers trust CSI to
19    manage the leasing process efficiently and ethically
20    while catering to their own unique needs."  Does it not?
21    A.   Yes.
22    Q.   And that was a true statement when CSI put it on its
23    website?
24    A.   It's a true statement with respect to what we do for
25    the lease and the lessee, and I just stated what they
```

11:38:19  5
11:38:33 10
11:38:40 15
11:38:55 20
11:39:08 25

1    were.  Pay for the equipment on time, on a timely basis,

2    we bill them properly, we take care of the personal

3    property tax.  We take care of whatever the customer

4    asks us to do, we try to accommodate them.  That's what

11:39:25  5    we do.  We don't recommend hardware.  We don't give

6    accounting advice.

7    Q.  In 2001, CSI was seeking investors to enable it to

8    expand its business worldwide, was it not?

9    A.  We were looking for some outside investors, but it

11:39:51 10    wasn't necessarily capital.

11              MR. BEAN:  No further questions, your Honor.

12              THE COURT:  Any cross?

13              MR. KALER:  No, your Honor.

14              THE COURT:  Thank you, Mr. Steinback.  You

11:40:16 15    are excused.

16              (Witness excused).

17              THE COURT:  Who is next?

18              MR. BEAN:  Fred O'Neal.

19                   **FREDERICK O'NEAL, sworn**

11:41:20 20              THE CLERK:  Please be seated.  If you could

21    state your full name for the record, spelling your last

22    name.

23              THE WITNESS:  Frederick Kent O'Neal,

24    O-'N-E-A-L.

11:41:34 25              THE COURT:  You may proceed.

1    DIRECT EXAMINATION.

2    BY MR. BEAN:

3    Q.   You've been continuously employed by CSI since 1990;

4    is that right?

11:41:43  5    A.   Yes.

6    Q.   That's approximately nineteen years?

7    A.   Yes.

8    Q.   You began as Vice President and Treasurer, right?

9    A.   Yes.

11:41:49 10    Q.   And you're currently Executive Vice President,

11   co-CFO, and Treasurer, right?

12   A.   Yes.

13   Q.   You own stock in CSI?

14   A.   Yes.

11:41:59 15    Q.   You prepared for your testimony here today by

16   meeting with CSI's counsel, did you not?

17   A.   I have met with CSI's counsel, yes.

18   Q.   Approximately how many times?

19   A.   Five or less.

11:42:12 20    Q.   Approximately how many hours did you spend preparing

21   for your testimony?

22   A.   With counsel?

23   Q.   Yes, please.

24   A.   Seven to ten or less.

11:42:22 25    Q.   And about how many on your own or with others, not

1    CSI's counsel?

2    A.    Thinking about the case, more than ten.

3    Q.    Thank you.  You earned a Bachelor of Science in

4    accounting in 1979, did you not?

11:42:36  5    A.    I did.

6    Q.    And then you went to work with Price-Waterhouse for

7    three years?

8    A.    Yes.

9    Q.    You passed the examination to be a certified public

11:42:45 10    accountant the first time you took the exam, did you

11    not?

12    A.    Yes.

13    Q.    But you never applied for a license?

14    A.    That's correct.

11:42:52 15    Q.    You also hold a Master's in business administration

16    from Washington University?

17    A.    Yes.

18    Q.    And at CSI, you are responsible for accounting and

19    financial reporting, are you not?

11:43:02 20    A.    Yes.

21    Q.    The accounting and financial reporting group is

22    responsible for making journal entries, among other

23    things; is that right?

24    A.    Yes.

11:43:12 25    Q.    And other things they do is they consolidate the

1   financial statements?

2   A.   Yes.

3   Q.   And they prepare the audited financial statements?

4   A.   Yes.

11:43:20 5   Q.   CSI's financial statements have been audited by

6   Ernst & Young since 1996; is that right?

7   A.   Since 1996 and prior to that.

8   Q.   Thank you.  You are familiar with the Statement of

9   Financial Accounting Standards No. 13?

11:43:36 10   A.   Yes.

11   Q.   And that's entitled "Accounting for Leases", right?

12   A.   Yes.

13   Q.   Let me show it to you --

14   A.   I believe you.

11:43:49 15            THE COURT:  Don't do that.  What we need to

16   hear and what the jury needs to hear from you is what

17   you remember, not what counsel remembers.  I didn't mean

18   to impune counsel --

19   Q.   The Statement of Accounting Standards No. 13 is

11:44:22 20   often referred to as FASB 13?

21   A.   Yes.

22   Q.   And those are issued by the Financial Accounting

23   Standards Board?

24   A.   Yes.

11:44:31 25   Q.   And you've been familiar with FASB 13 since the

1    1980s; is that right?

2    A.   Yes.

3    Q.   And FASB 13 is an important part of the lease

4    accounting process at CSI; is that right?

11:44:42   5    A.   Yes.

6    Q.   You're familiar with a document at CSI called a

7    Sales Type Lease Journal Entry, are you not?

8    A.   I am familiar with it, yes.

9    Q.   The accounting group that reports to you prepares

11:44:54   10    that document?

11    A.   That's correct.

12    Q.   And the information contained on a Sales Type Lease

13    Journal Entry is prepared in accordance with FASB 13, is

14    it not?

11:45:04   15    A.   Yes.

16    Q.   And the Sales Type Lease Journal Entry is a type of

17    journal entry CSI uses if a lease does not qualify for

18    operating lease treatment under FASB 13?

19    A.   Yes.  If it's a capital lease, we book it as a

11:45:20   20    sales-type lease.

21    Q.   And one reason a lease might not qualify for

22    operating lease treatment is if the present value of the

23    lease payments exceeds 90 percent of the original cost

24    of the equipment on that schedule; is that right?

11:45:35   25    A.   If it exceeds the cost, it's a capital lease.  I'm

1    not sure if you said -- I'm not sure I followed your

2    negative.  If the present value exceeds 90 percent, it's

3    a capital lease.  If it doesn't, then it's an operating

4    lease.

11:45:50 5    Q.   Thank you.

6              MR. BEAN:  If you could put up 1067.3.

7    Q.   You recognize what's before you as a Sales Type

8    Lease Journal Entry form, do you not, sir?

9    A.   I do.

11:46:30 10   Q.   If you look in the upper left, you can see it

11   concerns Lycos?

12   A.   Yes.

13   Q.   And it concerns Schedule 67 for Lycos, right?

14   A.   Yes.

11:46:43 15   Q.   And looking over on the right-hand side where it

16   says 90 percent test, do you see the number 119.57

17   percent?

18   A.   I do.

19   Q.   And that means that the present value of the lease

11:46:59 20   payments on Schedule 67 exceed the original cost of the

21   equipment by almost 20 percent; isn't that right?

22   A.   No.  But can I see the whole screen again?

23   Q.   Sure.

24   A.   Thank you.  No, that's not what it means.

11:47:20 25   Q.   Looking on the left-hand side, do you see where it

1    says "Payment monthly, $91,668"?

2    A.   Yes, I see that.

3    Q.   And you see there's nothing next to "Residual

4    value", right?

11:47:36 5    A.   That's right.

6    Q.   That means that the book residual value on this

7    schedule is zero, does it not?

8    A.   Yes.

9          MR. BEAN:  If you could go to document

11:47:57 10    1049.5.

11    Q.   Now, this is a Sales Type Lease Journal Entry for

12    Schedule 45 for Lycos, right?

13    A.   I don't think so.

14    Q.   I'm sorry, Schedule 49, sir.  I misspoke.

11:48:12 15    A.   Yes.

16    Q.   And you see there that there is a residual value

17    there for about $83,875, right?

18    A.   Yes, I see that.

19    Q.   And remember Schedule 49, if you would, as we move

11:48:26 20    back to the Sales Type Lease Journal Entry for schedule

21    67.

22    A.   I'll try.

23    Q.   Okay.  1067.3.  And you see, if you look in the

24    middle of the page, one of the schedules, the E/T in the

11:48:45 25    middle of the page refers to early termination, does it

1   not?

2   A.   Yes.

3   Q.   And if you could highlight the early termination

4   next to Schedule 49, please.  Schedule 49 was one of the

11:49:13 5   schedules that was terminated early when Schedule 67 was

6   written; is that right?

7   A.   Yes.  What I'm looking at here, there was an early

8   termination of 49 that involved Schedule 67.

9   Q.   And on Schedule 67, there's no residual, right.

11:49:34 10   A.   Yes, that's correct.

11   Q.   And so, through the payments on Schedule 49, CSI

12   covered its residual risk.  Would that be fair to say?

13   A.   I don't think that's fair.

14   Q.   Well, there was a residual booked on Schedule 49,

11:49:53 15   right?

16   A.   Yes.

17   Q.   And the residual on Schedule 67 is booked as zero,

18   right?

19   A.   On 67?  Yes.

11:50:03 20   Q.   Okay.  And these lease journal entries are not

21   provided to the customer, right?

22   A.   No, not to my knowledge.

23   Q.   And you understand that under FASB 13, the estimated

24   residual value of leased property is defined to be the

11:50:25 25   estimated fair value of the leased property at the end

1    of the lease term, are you not?

2    A.   You're paraphrasing it, but, yes, I understand that.

3    Q.   Let me show it to you.  Let me show you Exhibit 2053

4    and direct your attention to page 6.

11:50:58 5            MR. BEAN:  If you could highlight the phrase

6    under H, please, blow up H.

7    Q.   By the way, I'm sorry if I forgot to ask you this.

8    CSI books its residual in accordance with FASB 13, does

9    it not?

11:51:14 10   A.   It does, yes.

11   Q.   And paragraph is entitled "Estimated Residual Value

12   of Leased Property," right?

13   A.   Yes.

14   Q.   And it defines the estimated value of leased

11:51:29 15   property to be "The estimated fair value of the leased

16   property at the end of the lease term," does it not?

17   A.   Yes.  And then it goes onto define something else in

18   paragraph 5F.

19   Q.   Paragraph 5F defines when the lease term ends, does

11:51:47 20   it not?

21   A.   I haven't read the whole paragraph, but it defines

22   lease term.

23   Q.   Now, the term "fair value" is defined on the prior

24   page, is it not?

11:52:01 25           MR. BEAN:  If you could go back one page,

1    please, and highlight C.

2              THE WITNESS:  Should I be going forward?

3              MR. BEAN:  Whatever is easier for you, sir.

4    Page 5 of the document.

11:52:13 5    Q.   And fair value is defined to be the price for which

6    the property could be sold in an arm's length

7    transaction between unrelated parties.  Do you see that?

8    A.   Yes, I see that.

9    Q.   And so, when CSI books a residual value, it does so

11:52:33 10   to determine the value for which the property could be

11   sold in an arm's length transaction between unrelated

12   parties at the end of the lease term; is that right?

13   A.   It books a value for which it could be sold.  But I

14   think there are a range of values that could be sold.

11:52:50 15   Q.   Okay.  But CSI books it within that range of values

16   of what it could be sold for between third parties?

17   A.   Well, we try to book it below the residual value,

18   book below the highest value.

19   Q.   But within a range -- within the range?

11:53:10 20   A.   Well, range may not be the right term.  Range can be

21   a wide range.  There can be a range of values, and CSI

22   books a conservative residual value, generally lower

23   than the highest value at the end of a lease.

24   Q.   You've testified that the gross proceeds on

11:53:31 25   remarketed equipment at the end of the lease term of two

1     or three years is roughly double the booked residual

2     value, have you not?

3     A.    That's -- I don't think I said that.  I know which

4     report you're talking about.  And if you're saying in

11:53:54 5     general, if property comes to the end of the lease term,

6     on average, over a certain period of time, we've

7     realized about two times the residual value.

8     Q.    And that's on a gross basis, right?

9     A.    That's correct.

11:54:08 10     Q.    And your figure of double the booked residual does

11     not include the costs that CSI incurs when it remarkets

12     the equipment; isn't that right?

13     A.    The remarketing cost -- that's correct.

14     Q.    And it doesn't include the cost of fixing up or

11:54:27 15     repairing the equipment; isn't that right?

16     A.    I don't know.  We don't have that many fix-up costs.

17     So I would say generally, yes, it does not include

18     fix-up costs.

19     Q.    And it doesn't include any commission that might be

11:54:48 20     applicable; is that right?

21     A.    That's correct.

22     Q.    And it doesn't include any costs of transporting the

23     equipment, does it?

24     A.    No.  If you're talking about the two times, that's

11:55:09 25     correct.

1          THE COURT:  Is this a good time to stretch?

2          MR. BEAN:  Sure.

3          (Pause)

4     Q.   The booked residual value, as we saw on the

11:56:00  5     definition of FAS 13, is between two unrelated third

6     parties, right?

7     A.   When it defines fair market value, it talks about

8     unrelated, sale of two unrelated products, yes.

9     Q.   So it's not necessarily value to CSI or value to the

11:56:18 10     customer, right?

11     A.   No.  I think it's -- that's an interesting question.

12     I think that's -- are you talking about the residual

13     value that we book?

14     Q.   The residual value that you book is the fair market

11:56:32 15     value for which the property you estimated could be sold

16     between two unrelated third parties, right?

17     A.   Well, not exactly.  We could estimate that it could

18     be sold for more in certain situations.  But in general,

19     we'll book a lower residual value so that if we're wrong

11:56:51 20     in our estimate, then we don't incur a loss in the

21     remarketing.

22     Q.   Just to clarify, if CSI books a lease, if it books a

23     transaction pursuant to a Sales Type Lease Journal

24     Entry, that would be a capital lease, right?

11:57:10 25     A.   That's correct.

```
 1    Q.    Not an operating lease?

 2    A.    That's right.

 3              MR. BEAN:  Thank you.  No further questions.

 4              THE COURT:  Any cross?

 5              MR. KALER:  No questions.

 6              THE COURT:  Thank you, Mr. O'Neal.

 7              (Witness excused)

 8              THE COURT:  Who is next?

 9              MR. BEAN:  Philip Cagney.

10                  PHILIP CAGNEY, SWORN

11              THE CLERK:  If you could state your full name

12    for the record, spelling your last name.

13              THE WITNESS:  Joseph Philip Cagney,

14    C-A-G-N-E-Y.

15              THE COURT:  You may proceed.

16    DIRECT EXAMINATION

17    BY MR. GACIOCH:

18    Q.    Good morning, sir.

19    A.    Good morning.

20    Q.    Where do you live, Mr. Cagney?

21    A.    Chesterfield, New Jersey.

22    Q.    For whom do you work?

23    A.    CSI Leasing.

24    Q.    What's your title with CSI Leasing?

25    A.    I am Executive Vice President and Co-chief Financial
```

11:57:19  5

11:58:01 10

11:58:16 15

11:58:23 20

11:58:31 25

1    Officer.

2    Q.    And is it true that you report directly to Mr.

3    Gillula, the president of CSI?

4    A.    Not currently.

11:58:41  5    Q.    Who do you currently report to?

6    A.    Steve Hamilton.

7    Q.    What is Mr. Hamilton's position?

8    A.    President.

9    Q.    You received an MBA degree in 1986; isn't that

11:58:51 10    correct?

11    A.    That's correct.

12    Q.    And your concentration, to the extent you could call

13    it that, your MBA, was in finance; is that correct?

14    A.    That's correct.

11:58:59 15    Q.    And you've worked for CSI since 1986?

16    A.    Yes.

17    Q.    And you've been an officer of the company since

18    1989; isn't that correct?

19    A.    That is correct.

11:59:07 20    Q.    And you've been co-Chief Financial Officer of CSI

21    since approximately 2005?

22    A.    I think it was actually co-Chief Financial Officer

23    was 2003.

24    Q.    Since 2003.  And you receive an annual salary, isn't

11:59:20 25    that correct?

            1    A.    Yes, I do.

            2    Q.    And you also receive, in addition to your salary, an

            3    annual bonus; is that correct?

            4    A.    In some years.

11:59:27    5    Q.    A bonus that would be based upon CSI's financial

            6    performance in that year?

            7    A.    That is correct.

            8    Q.    CSI had approximately 1.2 billion dollars in assets

            9    at the end of its 2008 fiscal year; isn't that correct?

11:59:42   10    A.    Sounds about right.

           11    Q.    You own about two percent of CSI's outstanding

           12    stock?

           13    A.    That's about right.

           14    Q.    Mr. Cagney, did you meet with Mr. Kaler and CSI's

11:59:51   15    lawyers in preparation for your testimony today?

           16    A.    Yes.

           17    Q.    About how many times, sir?

           18    A.    Three or four.

           19    Q.    For a total of about how many hours?

12:00:01   20    A.    Eight hours, maybe.

           21    Q.    CSI is a member of the Equipment Leasing

           22    Association, is it not?

           23    A.    Yes, it is.

           24    Q.    That's something that appears on CSI's website and

12:00:17   25    its letterhead?

```
 1    A.    I think so.

 2    Q.    And you know that the Equipment Leasing Association

 3    maintains a set of fair business practices; isn't that

 4    correct?

 5    A.    Yes.

 6    Q.    You haven't read those --

 7              MR. KALER:  Objection.

 8              THE COURT:  I don't know yet where he's

 9    going, but I'm sure Mr. Gacioch will not put in

10    cumulative testimony.  Correct?

11              MR. GACIOCH:  That's correct, your Honor.

12    Q.    Have you personally read those fair business

13    practices?

14    A.    At some point in time, I think I have.

15    Q.    Has that been since your deposition in this case?

16    A.    Yes.

17    Q.    You were asked at that deposition whether you had

18    read those?

19    A.    Correct.

20    Q.    You have not received any training from CSI in those

21    practices, have you?

22    A.    No training, no.

23    Q.    Mr. Cagney, do you supervise other CSI employees as

24    part of your job?

25    A.    Yes, I do.
```

12:00:24 (line 5)
12:00:34 (line 10)
12:00:44 (line 15)
12:00:51 (line 20)
12:01:02 (line 25)

1    Q.   Do you fill out periodic performance evaluations for

2    those employees?

3    A.   Yes, I do.

4    Q.   The result of those evaluations are taken into

12:01:10 5    account when those employees' compensation is

6    determined; is that correct?

7    A.   Yes, it is.

8    Q.   As a supervisor, you are aware that CSI expects you

9    to fill out those performance evaluations carefully?

12:01:22 10    A.   Yes, it is.

11    Q.   You also are aware that CSI expects those

12    evaluations to be accurate; isn't that correct?

13    A.   Sure.

14    Q.   Mr. Cagney, is one of your jobs at CSI to supervise

12:01:34 15    the operations department?

16    A.   It's called by a different name now, but yes.

17    Q.   As of a couple of years ago, it was called the

18    operations department?

19    A.   That is correct.  I don't know if I was supervising

12:01:48 20    at the time, though.  At some point in time, I picked

21    that up.

22    Q.   And the operations department -- actually, what is

23    the department called now?

24    A.   The return management group.

12:01:56 25    Q.   Return management group.  The return management

1    group is responsible for managing returns at the end of

2    leases?

3    A.    It's part of the responsibility.

4    Q.    That's one of their responsibilities?

12:02:06  5    A.    Yes.

6    Q.    And the employees in the return management group

7    audit the returns to make sure that the customers have

8    returned all of the equipment, is that fair to say?

9    A.    They do not do the audits, no.

12:02:17 10    Q.    When you gave your deposition, you stated the

11    operations employees performed those audits; isn't that

12    correct?

13    A.    Don't recall.

14    Q.    Somebody does the audit?

12:02:27 15    A.    EPC does the audit.

16    Q.    And that's to make sure that CSI's customers

17    returned all of the equipment that they are supposed to

18    at the end of a lease?

19    A.    Yes.

12:02:36 20    Q.    And they check to make sure that all that equipment

21    is in good working condition?

22    A.    Yes.

23    Q.    And you are aware, Mr. Cagney, that CSI's customers

24    sometimes have difficulty locating all of the leased

12:02:48 25    equipment; isn't that correct?

1    A.    I suppose it happens.

2    Q.    And is it fair to say that you believe that CSI has

3    the right to bill customers for any missing items?

4    A.    I'm not a lawyer, but yes, we have the right to do

12:03:01  5    that.

6    Q.    Including small peripheral items, such as cables and

7    memory cards; isn't that correct?

8    A.    I don't know exactly what the contracts says on

9    that, but I assume so.

12:03:12 10    Q.    Your belief is that based upon your understanding

11    managing that department, your belief is that CSI has

12    that right to bill for cables and memory cards; isn't

13    that right?

14    A.    We have the right, but we don't always do that, yes.

12:03:25 15    Q.    You believe that CSI has the right to enforce the

16    stipulated loss provisions of its contract; isn't that

17    correct?

18    A.    I assume so.  If it's in the contract, we would have

19    that right.

12:03:34 20    Q.    And isn't it fair to say that the operations

21    department, or I believe the return management group

22    closely aligns its practices with CSI's contractual

23    rights?

24    A.    I assume so.

12:03:49 25    Q.    You are not aware of CSI ever having told a customer

1    that it won't enforce the stipulated loss provision?

2    A.   Why don't we back up.  The stip loss issue I don't

3    think would have anything to do with the return

4    management group.

12:04:07 5    Q.   But are you aware of CSI ever telling a customer

6    that it won't enforce the stip loss provision?

7    A.   I'm not aware.

8    Q.   Besides supervising the return management folks at

9    CSI, part of your job is to set what are called

12:04:22 10   threshold pricing of leases and sales; is that correct?

11   A.   Yes.

12   Q.   And that's for CSI salespeople to sell those leases

13   and sales?

14   A.   Correct.

12:04:29 15   Q.   And you also approve requests for leased contracts

16   that come in?

17   A.   Yes.

18   Q.   And you had those responsibilities during the course

19   of CSI's relationship with Lycos?

12:04:38 20   A.   Yes.

21   Q.   CSI pays its salespeople on a commission basis;

22   isn't that correct?

23   A.   That is one of the ways they are paid, yes.

24   Q.   They are on commissions on the leases and the sales

12:04:49 25   that they secure with CSI's customers?

1    A.    Correct.

2    Q.    And those commissions, this is going to be a vast

3    oversimplification, I apologize, but it's applied by

4    applying a percentage to the return over margin?

12:05:05  5    A.    Yes.

6    Q.    And the margin is the amount that CSI realizes on

7    the particular transaction over the threshold that

8    you've set; is that fair?

9    A.    On a lease transaction, the margin would be the

12:05:15 10    present value of lease over and above the threshold.

11    Q.    That difference is what you would call the margin?

12    A.    Yes.

13    Q.    And you would, again oversimplified, apply a

14    percentage amount to that margin to determine the

12:05:27 15    commission that the salesperson would earn?

16    A.    Yes.

17    Q.    And at CSI, it's fair to say, that margin roughly

18    equates with the term "profit"; isn't that correct?

19             MR. KALER:   Objection.

12:05:37 20             THE COURT:   What's the objection?

21             MR. KALER:   Lack of foundation for the

22    question.  I don't know whether we're talking gross

23    profit, net profit.

24             MR. GACIOCH:   Your Honor, I'll represent that

12:05:47 25    these are Mr. Cagney's own words, not mine.

1              MR. KALER:  In that case...

2   Q.   Mr. Cagney, does margin usually mean profit at CSI?

3   A.   Margin would be like the gross profit of the price

4   that we quote to the customer, yes.  That's not the net

12:06:05 5   income profit.

6   Q.   It's the gross profit?

7   A.   It would be similar to a gross profit type number,

8   yes.

9   Q.   You testified in your deposition that margin usually

12:06:16 10   means profit?

11   A.   I don't recall that.

12              MR. GACIOCH:  Can you put up 283 line 12 and

13   13, please?

14   Q.   Before you do that, Mr. Cagney, did you give a

12:06:27 15   deposition in this case?

16   A.   Yes.

17   Q.   About how long ago was that?

18   A.   September of 2006.

19   Q.   You were under oath at that time?

12:06:33 20   A.   Yes, I was.

21   Q.   And you promised to tell the truth in your answer?

22   A.   Yes.

23   Q.   And you told Mr. Bean that you would ask him to

24   clarify any questions that you didn't understand?

12:06:42 25   A.   Yes.

1            (Excerpt from videotaped deposition was

2    played for the jury).

3    Q.    Is that testimony you gave?

4    A.    That's correct.

12:06:55 5    Q.    The threshold amount is the minimum price for which

6    a CSI salesperson can sell a certain piece of equipment

7    or group of equipment; isn't that correct?

8    A.    Could you repeat it one more time, please?

9    Q.    Absolutely.   The threshold amount that you set for a

12:07:13 10   particular transaction is the minimum price that the

11   salesperson can charge a customer for that transaction?

12   A.    That's correct.

13   Q.    The salesperson earns a small percentage commission

14   for getting the deal right at that margin, is that fair

12:07:26 15   to say?

16   A.    At that point in time, on a lease transaction, that

17   is correct.

18   Q.    The salesperson at that point in time earned a

19   larger percentage commission by bringing the deal in

12:07:37 20   over the threshold?

21   A.    That is correct.

22   Q.    And is it fair to say in broad strokes for you to

23   determine these numbers based on the net present value

24   of certain economic terms of the transaction?

12:07:48 25   A.    Are you talking -- not in an original lease.

1    Q.    On a rewrite?

2    A.    On an extension, yes.

3    Q.    One of the figures that you would use to do that

4    calculation would be the net present value of the stream

12:08:03  5    of lease payments you anticipate; is that correct?

6    A.    Rephrase that, please.

7    Q.    Happy to.  To calculate the margin on a given

8    transaction, one of the data points you would bring into

9    that calculation is the net present value of the

12:08:19 10    expected lease payments that are going to come; is that

11    correct?

12    A.    Threshold or margin?

13    Q.    Margin is based on threshold, isn't it?

14    A.    Margin is based upon the actual results compared to

12:08:32 15    threshold, yes.

16    Q.    So in calculating your threshold and eventually the

17    margin that you calculate from that, one of the data

18    points that you consider is the present value of the

19    anticipated rental payments; is that fair to say?

12:08:47 20    A.    That would be used in the margin calculation.

21    Q.    And another data point that you would use is the net

22    present value of the residual that CSI has booked for

23    that equipment?

24    A.    That might be a component of threshold.

12:09:03 25    Q.    And net present value is a way of comparing values

```
 1    of different future payments; is that correct?
 2    A.   That would be a fair statement.
 3    Q.   For instance, streams of rental payments over the
 4    course of the lease?
12:09:16  5    A.   Yes.
 6    Q.   And it's a way, if you'll allow me to colloquialize,
 7    comparing apples to apples --
 8    A.   From a time value standpoint.
 9    Q.   Once you determine the threshold, it's up to the
12:09:31 10    salesperson to determine the price?
11    A.   That is correct.
12    Q.   And the salesperson generally tries to secure the
13    highest price that he or she can for CSI?  Is that
14    generally a fair statement?
12:09:43 15    A.   That would be fair.
16    Q.   Because that's what ultimately determines the amount
17    of his or her commission on the transaction?
18    A.   Yes.
19    Q.   And you've already said -- pardon me.  I'll rephrase
12:09:55 20    that.
21         The salesperson can't offer pricing to a
22    customer before knowing what the threshold on the deal
23    is.  Is that a fair statement?
24    A.   That would be fair.
12:10:04 25    Q.   Because he or she wouldn't know what the minimum
```

1     allowed price was, right?

2     A.   Correct.

3     Q.   And wouldn't know what the basis for his or her

4     commission determination would be?

12:10:13  5     A.   Correct.

6     Q.   Do you know Mr. Paul Stenberg?

7     A.   I do know him, yes.

8     Q.   And what's Mr. Stenberg's current position?

9     A.   He is one of our marketing managers.

12:10:28 10     Q.   And he previously was CSI's account executive for

11     Lycos?

12     A.   Yes.

13     Q.   And account executive is another way of saying

14     salesman at CSI?

12:10:39 15     A.   Yes.

16     Q.   I'm sorry, I cut you off.  Was that yes?

17     A.   Yes.

18     Q.   I apologize.  Mr. Stenberg was considered at that

19     time to be one of CSI's top salespeople; isn't that

12:10:50 20     correct?

21     A.   I don't know how you would say top.  In what

22     respect?

23     Q.   For instance, in bringing in high margin deals?

24     A.   He was a good producer of margin, yes.

12:11:06 25     Q.   And at your deposition, either you or Mr. Bean used

1    the word "top" person, is that fair?

2    A.   Yes.

3    Q.   And Lycos was one of the largest accounts at CSI

4    during that time.  Would that be fair?

12:11:21  5    A.   That would probably be fair.

6    Q.   Mr. Stenberg secured for CSI some very large margin

7    rewrites with Lycos, didn't he?

8    A.   Yes.

9    Q.   And when Mr. Stenberg became a manager, he retained

12:11:32 10    responsibility for the Lycos account; isn't that

11    correct?

12    A.   That's correct.

13    Q.   In fact, isn't it true that he retained only the

14    Lycos account when he became a manager?

12:11:40 15    A.   Yes.

16    Q.   That was because he developed a good relationship

17    with Lycos?

18           MR. KALER:  Objection.  Lack of foundation or

19    knowledge as to the relationship.

12:11:51 20           MR. GACIOCH:  If the witness doesn't know or

21    understand the question, he certainly can indicate it.

22    A.   I wasn't involved in the decision on when he was

23    promoted to manager whether or not to keep the Lycos

24    account.

12:12:03 25    Q.   Okay.  But more generally, your understanding was

1   that he had developed a good relationship with Lycos?

2   A.   I would assume so.

3   Q.   A relationship that, for instance, allowed him to

4   get deals done?

12:12:13  5        THE COURT:  Well, now you're going a bit

6   beyond what he knows.  He can assume it, but he doesn't

7   know it.

8        MR. GACIOCH:  Your Honor, I'll represent that

9   Mr. Cagney has factually given this testimony before, if

12:12:26  10   I may have the question.

11        THE COURT:  Okay.

12   Q.   Mr. Cagney, isn't it fair to say --

13        THE COURT:  Yes, but the question as to

14   whether they were appropriate questions was not decided

12:12:35  15   at that point.  I mean, you're not asking him about

16   things that he may or may not really know of his own

17   personal knowledge.

18        MR. GACIOCH:  I understand, your Honor.  I'm

19   only offering it because he testified as of his own

12:12:46  20   personal knowledge before that a relationship allowed --

21        THE COURT:  Well, I don't know if it's of his

22   own personal knowledge before because nobody tested it,

23   right?  There was no objection.

24        MR. GACIOCH:  I don't believe there was an

12:12:57  25   objection, your Honor.  I believe an objection to the

1    form of that question would have been made at that time

2    for it to be valid now.

3            THE COURT:  But the objection isn't to the

4    form; it's to the substance.

12:13:10  5   Q.   Is it fair to say, Mr. Cagney, that Mr. Stenberg's

6    lease deals with Lycos were probably the largest at CSI

7    during the early part of this decade?

8    A.   That's probably a fair statement, yes.

9    Q.   Mr. Stenberg earned commissions of up to 26 and a

12:13:24 10   half percent of the margin of those deals?

11   A.   I believe that's the right number.

12   Q.   Are you familiar with the concept of interim rent,

13   Mr. Cagney?

14   A.   Yes.

12:13:46 15   Q.   Interim rent is the rent that a lessee pays between

16   the acceptance date of a piece of equipment and the date

17   the lease is firmly scheduled to start?

18   A.   Correct.

19   Q.   And CSI sometimes refers to that as stub rent, or

12:14:01 20   stub?

21   A.   Stub, an expression that's sometimes used.

22   Q.   Some of CSI's lessees negotiate to remove interim

23   rent provisions from leases, isn't that correct?

24   A.   Yes.

12:14:13 25   Q.   Lycos did not do that?

1    A.   Correct.

2    Q.   In fact, would you agree that Lycos paid "a

3    significant amount of stub"?

4    A.   I don't know that I would call it significant or

12:14:23 5    not, but they did pay, yes.

6    Q.   Mr. Stenberg referred to it as a significant amount

7    of stub in an e-mail to you?

8    A.   He may have.  I don't recall that.

9              MR. GACIOCH:  Could we pull up 2142A, please.

12:14:39 10   Q.   You're going to see on your screen an exhibit.  If

11   it's hard to read, I can give you a paper copy.

12              Do you see Exhibit 2142A, Mr. Cagney?

13   A.   I'm reading it right now.

14   Q.   Let me know when you're done reading it.

12:15:08 15   A.   Yes, I've finished.

16   Q.   2142A is an e-mail from Mr. Stenberg to you and

17   Mr. O'Neal?

18   A.   Yes.

19   Q.   It was dated April 22, 1998?

12:15:17 20   A.   Correct.

21   Q.   If you would go down with me to the third paragraph

22   that Mr. Stenberg wrote, do you see where he says -- I'm

23   sorry, in the subject of the e-mail is "Lycos"?

24   A.   Yes.

12:15:29 25   Q.   Do you see in the third paragraph where Mr. Stenberg

          1    wrote "Because they trust us to do quarterlies and pay a

          2    significant amount of stub"?

          3    A.   Yes.

          4    Q.   And that was his statement to you and to Mr. O'Neal?

12:15:42  5    A.   Correct.

          6    Q.   Do you see the second half where it says:  "They

          7    don't always know what is being invoiced to us.  Isn't

          8    that what we want?"  That is what he wrote, isn't it?

          9    A.   That is what he wrote.

12:15:58 10    Q.   Mr. Cagney, it's fair to say that the net present

         11    value on the monthly rental payments on a new equipment

         12    schedule doesn't entirely cover as a general matter what

         13    CSI paid for the equipment on that schedule; isn't that

         14    correct?

12:16:10 15    A.   You're talking about an original schedule?

         16    Q.   An original or new.

         17    A.   An original schedule, it would usually be correct,

         18    yes.

         19    Q.   Original schedule, you're using that to mean

12:16:22 20    schedule that involves newly purchased equipment?

         21    A.   Correct.

         22    Q.   As opposed to a renewal?

         23    A.   Yes.

         24    Q.   And the portion on an original schedule that's not

12:16:33 25    covered by those rental payments is CSI's residual

1    equity investment; is that correct?

2    A.   I would call it our equity investment.

3    Q.   And CSI makes a large part of its profit by finding

4    ways to secure payment for that residual equity

12:16:48 5    investment; is that correct?

6    A.   I'm not sure that I would put it exactly that way,

7    but we make an equity investment in equipment.  We book

8    a residual.  And at some point in time, we hope to

9    recoup that equity investment.

12:17:04 10   Q.   In fact, you hope to recoup that residual amount and

11   then some; isn't that so?

12   A.   We hope so.

13   Q.   There are a number of ways that CSI does that?

14   A.   Correct.

12:17:14 15   Q.   One of which would be to sell the equipment, for

16   instance, to the customer at the end of a lease term?

17   A.   Correct.

18   Q.   Another would be to get the equipment back from a

19   customer and sell to somebody else?

12:17:23 20   A.   Correct.

21   Q.   Another way would be for CSI to extend the lease

22   with that customer for a new term?

23   A.   Yes.

24   Q.   Or to have the lease continue month to month?

12:17:32 25   A.   Yes.

1   Q.   And another way that CSI recovers the equity

2   investment is to rewrite that schedule into a new

3   schedule; is that correct?

4   A.   Yes.

12:17:40 5   Q.   And all these are ways that CSI makes part of its

6   profit?

7   A.   Part of our gross profit would be doing it that way,

8   yes.

9   Q.   And all these are parts of CSI's business; is that

12:17:51 10   correct?

11   A.   They are all parts of our business, yes.

12   Q.   CSI -- of those options, CSI prefers to rewrite a

13   schedule versus to just sell the equipment to somebody

14   else when it gets it back.  Is that fair to say?

12:18:04 15   A.   Prefers?  I don't know that I would ever refer to it

16   as a preference.

17   Q.   Well, it makes better economic sense for CSI to

18   rewrite a lease than to try to get the equipment back at

19   the end of the lease term to resell.  Is that fair?

12:18:20 20   A.   That would be fair.

21   Q.   It's more profitable for CSI to do it that way

22   generally?

23   A.   Usually.

24   Q.   And it also eliminates, a rewrite of that type would

12:18:30 25   eliminate the risk that CSI wouldn't recover that?

1    A.   It would hopefully eliminate the residual value

2    risk, although the equipment would still have value at

3    the end, so we hope to make -- down the road, there is

4    still risk if the equipment doesn't come back.

12:18:46  5    Q.   Because it might not come back?

6    A.   Yes.

7    Q.   And if it does come back, you've got to then turn

8    around and find a buyer for it?

9    A.   That is correct.

12:18:55 10    Q.   So all things being equal, you would prefer to

11   rewrite the schedule with the existing customer?

12   A.   If possible.

13   Q.   And would it be fair to say that there are generally

14   two types of rewrites?  Let me make it more specific.

12:19:09 15   One type of rewrite is where you just take one existing

16   schedule and terminate that schedule and rewrite it onto

17   one new schedule.  Is that fair to say?

18   A.   Okay.

19   Q.   And there's a second type of rewrite where you might

12:19:22 20   terminate multiple existing schedules and move that

21   equipment onto one or more new schedules?

22   A.   I don't normally make that distinction, but...

23   Q.   They are both rewrites?

24   A.   Yes.

12:19:35 25   Q.   In either case, the rewrite terminates what's

1    already existing and replaces it with one or more new

2    schedules?

3    A.    Usually, yes.

4    Q.    And to get approval for a rewrite from you and for

12:19:49  5    others, a CSI salesperson has to secure a price that

6    will cover the equity investment that CSI has in the

7    equipment; is that correct?

8    A.    That's correct.

9    Q.    And that's something that --

12:20:00 10    A.    I'll back up.  I mean, it depends on how much longer

11    they are keeping the equipment.

12    Q.    Okay.

13    A.    For some shorter-term extensions, we may still need

14    equity.

12:20:12 15    Q.    As a general matter, unless it's a very short-term

16    extension, one of your goals in reviewing the pricing of

17    the deal is to insure that CSI's equity investment is

18    covered?

19    A.    Again, even for a 12-month extension, I still need

12:20:30 20    to see equity in the deal.  So I set the threshold based

21    on the equipment and how much longer the equipment is

22    going to be on lease.

23              MR. GACIOCH:  Can you pull up 1089, please,

24    the first page.

12:20:47 25    Q.    Do you see on your screen, Mr. Cagney, Exhibit 1089?

1   A.   Yes.

2   Q.   And do you recognize Exhibit 1089 to be Equipment

3   Schedule No. 89 between CSI and Lycos?

4   A.   Yes.

12:21:03 5   Q.   And dated June 29, 2001?

6   A.   Yes.

7          MR. GACIOCH:  Could we go to page 18, please?

8   Q.   Again, Mr. Cagney, if you would like a paper copy at

9   any point, let me know.

12:21:18 10   A.   Okay.

11   Q.   And page 18 of that same exhibit is the Addendum 1

12   to that lease?

13   A.   Yes.

14   Q.   I'm going to have Mr. O'Keefe enlarge paragraph 2.

12:21:36 15   Do you see Exhibit 89 is a rewrite of schedule -- I'm

16   sorry.  Schedule 89 is a rewrite of Schedule 83.  Does

17   that appear there in the commencement date where it says

18   the initial term of Schedule 89 expires?

19   A.   I'm reading it.

12:22:04 20   Q.   Sure.

21   A.   Can you repeat your question?

22   Q.   The paragraph that you just read indicates that 89

23   is a rewrite of equipment that already exists on

24   Schedule 83?

12:22:26 25   A.   The equipment on 89 is coming from Schedule 83, yes.

```
         1    Q.   Okay.

         2    A.   I don't know that it's all of the equipment on 83.

         3    Q.   Some of the equipment, anyway?

         4    A.   Yes.

12:22:36 5    Q.   And assuming a zero residual value, do you recall,

         6    Mr. Cagney, that CSI's gross profit on Schedule 83 was

         7    about $237,000?

         8    A.   I don't recall that.  I'm sure you could probably

         9    show it to me.

12:22:53 10   Q.   We'll find you an exhibit for that.  Going back to

        11    the first page if you would, please.  This was --

        12             MR. GACIOCH:  Let's take down 89 for a moment

        13    and go to 1038, please.

        14    Q.   Mr. Cagney, I'm going to show you Exhibit 1038.

12:23:19 15   That's Equipment Schedule 83 between CSI and Lycos?

        16    A.   Yes.

        17    Q.   And it's dated at the top there December 27, 2000?

        18    A.   Yes.

        19    Q.   And it's signed shortly after that time, is that

12:23:33 20   fair?

        21    A.   That is correct.

        22    Q.   Now, Schedule 89, as we just looked at, was a

        23    rewrite, you said, of at least part of the equipment

        24    that was on Schedule 83?

12:23:45 25   A.   Correct.
```

```
 1    Q.   And we covered the fact that 89 was signed in June

 2    of 2001?

 3    A.   I believe that's the case, yes.

 4    Q.   So about six months after, seven months after -- six

 5    months after 83 was originally written?

 6    A.   Yes.

 7    Q.   Now, 83 was a 24-month schedule; isn't that correct?

 8    You can see there the initial term?

 9    A.   Yes.

10    Q.   So that equipment was rewritten onto Schedule 89

11    just a quarter of the way under the initial term?

12    A.   That's correct.

13    Q.   Mr. Stenberg frequently rewrote Lycos schedules very

14    early in their terms, didn't he?

15              MR. KALER:  Objection to the characterization

16    of Mr. Stenberg rewriting.  These are signed lease

17    agreements between two parties.  It's argumentative.

18              MR. GACIOCH:  I can rephrase if the Court

19    would like.

20    Q.   Mr. Cagney, is it fair to say that Mr. Stenberg on

21    behalf of CSI and Lycos entered into rewritten schedules

22    very early in their terms quite frequently?

23    A.   We did some of these, yes.  Again, the frequency or

24    the number, I don't know that I would call it a lot or a

25    little.
```

12:23:58
12:24:12
12:24:25
12:24:37
12:24:57

```
 1    Q.   Mr. Stenberg and Lycos did so as early as two months

 2    into an existing schedule term; isn't that correct?

 3    A.   That's the earliest that I remember, yes.

 4              MR. GACIOCH:   Could you pull up 2042, please,

 5    Mr. O'Keefe?

 6    Q.   Mr. Cagney, I'm showing you Exhibit 2042.   Mr.

 7    O'Keefe has enlarged the header.   Do you see that this

 8    is an e-mail that you sent to Kristin Putnam on January

 9    29, 2001?

10    A.   Yes.

11    Q.   And you copied several other CSI employees,

12    including Mr. Gillula and Mr. Steinback?

13    A.   Yes.

14    Q.   Ms. Putnam was an employee in CSI's legal department

15    at that point?

16    A.   Yes.

17    Q.   And Mr. Steinback at that time was chairman?

18    A.   Yes.

19    Q.   And your e-mail was regarding Mr. Stenberg rewriting

20    the Lycos equipment schedule; is that correct?   You can

21    take a second to read it.

22    A.   Yes.

23    Q.   And your e-mail here or your text says "OK'd"?

24    A.   Yes.

25    Q.   Meaning you had approved the transaction?
```

12:25:12 (line 5)
12:25:29 (line 10)
12:25:42 (line 15)
12:26:01 (line 20)
12:26:26 (line 25)

1    A.    I had approved it to go to legal.

2    Q.    You wrote:  "Another early (two months into a 24

3    month schedule) term and extend on Lycos 82"?

4    A.    Yes, I did.

12:26:42 5    Q.    And lower down, do you see in the e-mail that you

6    forwarded, you were forwarding an e-mail from Ms.

7    Kersting to Ms. Putnam?

8    A.    Yes.

9    Q.    You see Mr. Kersting wrote:  "We do a lot of these

12:27:00 10   where he terms the lease after a couple of months."

11   A.    Yes.

12   Q.    You understand "terms" to mean terminates?

13   A.    Yes.

14   Q.    And you understood "he" to mean Mr. Stenberg; is

12:27:11 15   that correct?

16   A.    Yes.

17   Q.    You thought that Mr. Stenberg's practice of

18   rewriting with Lycos original schedules just a few

19   months into their terms was unusual, didn't you?

12:27:20 20   A.    I think in my deposition I said something like that,

21   yes.

22   Q.    Which means it was true?

23   A.    Correct.

24   Q.    And during the period of time of the CSI-Lycos

12:27:30 25   relationship, you are not aware of any other customer

1    with whom CSI so frequently rewrote schedules early in

2    their terms; isn't that correct?

3    A.   At that time, this would have been a little unusual

4    to do it this early, yes.

12:27:43  5    Q.   You are not aware of any other customer that did

6    that, are you?

7    A.   Not at that time.

8            MR. GACIOCH:  Can we go to Exhibit 2043,

9    please.

12:27:52 10            THE COURT:  Is this a good time to stretch?

11            MR. GACIOCH:  Absolutely, your Honor.

12            (Pause)

13            THE COURT:  You may proceed.

14            MR. GACIOCH:  Thank you, your Honor.

12:29:41 15    Q.   Mr. Cagney, I'm showing you what's been marked as

16    Exhibit 2043, which appears to be an e-mail from Ms.

17    Simmons-Berry.  Do you see it forwards an e-mail from

18    you?

19    A.   Yes.

12:29:57 20    Q.   And it is an e-mail from Angie Bader?

21    A.   Yes.

22    Q.   And Ms. Simmons and Ms. Bader were CSI employees,

23    were they not?

24    A.   Yes.

12:30:10 25    Q.   Take a minute to read the e-mail.

```
          1    A.    I'm done.

          2    Q.    In the e-mail you said "Paul S", meaning Paul

          3    Stenberg?

          4    A.    Yes.

12:30:27  5    Q.    "Paul S is sending out another Lycos schedule."

          6    A.    Correct.

          7    Q.    "As per past schedules," you give Ms. Speak and Ms.

          8    Bader what lease factors Mr. Stenberg uses --

          9    A.    Yes.

12:30:46 10    Q.    And you say, "He wants all Cisco and Sun to be under

         11    the miscellaneous standalone"?

         12    A.    Correct.

         13    Q.    And "Even though there will be a better desktop"?

         14    A.    Yes.

12:31:04 15    Q.    And not in the cheaper lease rate factor?

         16    A.    Yes.

         17    Q.    Mr. Stenberg chose not to put the Cisco and Sun into

         18    the cheaper lease factor?

         19    A.    That was some negotiated price between CSI and

12:31:18 20    Lycos, yes.

         21    Q.    You wrote in the next sentence, "This also might

         22    wind up being one of his infamous rewrite deals," isn't

         23    that correct?

         24    A.    Yes.

12:31:29 25    Q.    You don't ever recall asking Mr. Stenberg why he was
```

1   rewriting Lycos equipment schedules so early in their

2   terms, do you?

3   A.   No.

4   Q.   You don't ever recall Mr. Stenberg telling you about

12:31:39  5   it, do you?

6   A.   No.

7   Q.   You don't recall asking anyone at Lycos about why

8   they would want to enter into any such a transaction?

9   A.   Yes.

12:31:46 10   Q.   Mr. Stenberg's rewrite deals generated large margins

11   for CSI, didn't they?

12   A.   They generated margins for CSI, yes.

13   Q.   Is it fair to say they generated large margins for

14   CSI?

12:31:58 15   A.   I guess.

16   Q.   Some of the most substantial margins in those years;

17   isn't that correct?

18   A.   Sure.

19   Q.   And Lycos paid significant additional present value

12:32:06 20   as a result of rewriting its equipment schedules as

21   compared to what it would have paid on the originals;

22   isn't that correct?

23   A.   That would usually be the case, yes.

24   Q.   CSI did not disclose to Lycos its method of pricing

12:32:20 25   these deals; isn't that right?

1   A.   I mean, I don't know what Paul and Lycos discussed.

2   I gave thresholds; Paul gave prices.  There was a

3   negotiation that came to agreement.  I don't know what

4   was involved in those discussions.

12:32:36  5   Q.   You weren't present for any of those negotiations,

6   were you?

7   A.   No.

8   Q.   You never spoke to anyone from Lycos, did you?

9   A.   There was one meeting very early in the relationship

12:32:45  10   that I had.

11   Q.   Not about the rewrites?

12   A.   No.

13   Q.   So to the extent you understand there were

14   negotiations, that's based upon what Mr. Stenberg may

12:32:53  15   have told you?

16   A.   Just the assumption I make for all of our

17   transactions.

18   Q.   So you don't have any specific information that

19   there were negotiations in this case?

12:33:02  20   A.   No, I don't.

21   Q.   Is it fair to say that you don't know that CSI ever

22   told Lycos how it went about pricing the threshold and

23   margin of these deals?

24   A.   Well, I view threshold as an internal pricing

12:33:16  25   calculation that we do.  Then beyond that, Paul

1    negotiates the price, or he discusses the price with

2    Lycos, and then we send out contracts.

3    Q.   And you are not aware that during those discussions

4    Mr. Stenberg ever explained how CSI priced the deal out?

12:33:32 5    A.   No.  No, I'm not.

6    Q.   And it's not CSI's general practice to disclose that

7    information; isn't that correct?

8    A.   No.  I think that's an internal confidential

9    mechanism.  How we come up with our pricing, I wouldn't

12:33:46 10   consider that to be any of their business.

11   Q.   Okay.  CSI had ready access to the original

12   equipment cost of equipment that appeared on rewrite

13   schedules; isn't that correct?

14   A.   Should have been in our computer system somewhere.

12:34:00 15   Q.   Exactly.  Someone could generate a report from the

16   computer system from the rewrite that would explain the

17   cost?

18   A.   Correct.

19   Q.   A customer like Lycos would have to ask CSI; isn't

12:34:16 20   that correct?

21   A.   Usually, yes.

22   Q.   With respect to rewrite, CSI does not usually

23   provide the original equipment cost in the contract?

24   A.   I don't know what relevance it has, but I don't

12:34:30 25   think it's in the contract, no.

1    Q.   Isn't it true, Mr. Cagney, that in 1999,

2    specifically in the summer of 1999, CSI instituted a PC

3    rewrite bonus?

4    A.   I vaguely recall that, yes.

12:34:42 5    Q.   That was a bonus program for CSI's salespeople?

6    A.   Yes.

7    Q.   It rewarded them over and above their normal

8    commissions for specifically rewriting leases that

9    included PCs?

12:34:54 10    A.   For specifically extending PCs.

11    Q.   And your understanding was because PCs were less

12    upgradable than other types of equipment?

13    A.   Correct.

14    Q.   So they had perhaps shorter economic lives?

12:35:07 15    A.   No, I wouldn't say that.  It is just they would not

16    be upgradable like an AS400 or some other bigger server

17    that might be upgradable or add more disks.  PCs

18    generally stay a PC.  It doesn't impact their economic

19    length, I don't think.

12:35:27 20    Q.   It was harder for CSI to convince customers to

21    rewrite leases that included PCs.  Is that a fair

22    statement?

23    A.   One more time, please.

24    Q.   Absolutely.  Because of the upgradability issue, it

12:35:41 25    was harder for CSI to convince customers to rewrite

```
 1   leases that included PCs than it would be, for example,

 2   other types of equipment?

 3   A.   That's possible, yes.

 4   Q.   Now, in September of 1999, Mr. Stenberg requested

 5   thresholds to rewrite all existing Lycos schedules;

 6   isn't that correct?

 7   A.   September of '99?  I'm not -- the time frame is --

 8   Q.   Are you familiar with Diane Kopitsky?

 9   A.   Yes.

10   Q.   Who is Ms. Kopitsky?

11   A.   She used to be an employee of CSI's.

12   Q.   She was an employee during the late 1990s through

13   about 2000, 2001?

14   A.   I think so.

15   Q.   And she worked for you during that period of time?

16   A.   For part of that time, yes.

17   Q.   One of her tasks was to calculate thresholds for

18   salespeople?

19   A.   Yes.

20            MR. GACIOCH:  I'm going to put up on the

21   screen 2054.

22   Q.   Mr. Cagney --

23            MR. GACIOCH:  May I approach, your Honor?

24            THE COURT:  Yes.

25   Q.   Mr. Cagney, I'm going to show you 2054.  I'm not
```

12:35:57
12:36:15
12:36:25
12:36:42
12:37:01

1   going to ask you to read it, but if you could take a

2   look at it, do you recognize that handwriting as Ms.

3   Kopitsky's?

4   A.   I think so.

12:37:12 5   Q.   If I represent to you that she will later identify

6   it as hers, would you take my representation?

7   A.   Sure.

8   Q.   And Ms. Kopitsky was working for you, you said?

9   A.   She was doing rewrite thresholds, extension

12:37:31 10   thresholds, she would be working for me.

11   Q.   Mr. Cagney, showing you Exhibit 2054 on the screen,

12   do you see where Ms. Kopitsky wrote "Paul S" at the top

13   left?

14   A.   Yes.

12:37:45 15   Q.   She wrote "9/1" on the top right?

16   A.   Yes.

17   Q.   And page 2, the next page, do you see here where it

18   says:   "Lycos, E/T at 9/30/99, 24 month schedule at

19   11/1"?

12:38:06 20   A.   Correct.

21        MR. GACIOCH:   And then if you drop that down,

22   please, Mr. O'Keefe, and enlarge the handwriting at the

23   bottom.

24   Q.   Mr. Cagney, do you see here where Ms. Kopitsky wrote

12:38:19 25   "To Paul from DK, good luck"?

1   A.   Yes.

2   Q.   And she said "Sent via fax 9/10/99"?

3   A.   Yes.

4   Q.   And so, do you see in the middle of the page, Mr.

12:38:34 5   Cagney, where Ms. Kopitsky has calculating thresholds

6   for Mr. Stenberg?

7   A.   Yes.

8   Q.   And quite a number are Lycos leases?

9   A.   Correct.

12:38:47 10   Q.   Does that refresh your recollection as to the timing

11   of this rewrite?

12   A.   Yes, it does.

13   Q.   Now, once Mr. Stenberg received the thresholds here

14   that you see that were just up, he would be authorized

12:39:09 15   to negotiate or to basically determine a price with

16   Lycos; isn't that correct?

17   A.   Yes.

18   Q.   And you see again at the bottom of the page, Ms.

19   Kopitsky faxed this information to Mr. Stenberg on

12:39:22 20   September 10?

21   A.   That's her note on this, yes.

22         MR. GACIOCH:  2057, please, Mr. O'Keefe.

23   Q.   Mr. Cagney, I'm showing you Exhibit 2057.  I

24   apologize for the flashing in the top right corner.

12:39:42 25   Just ignore that.

         1           Do you see this as an e-mail from you to

         2   Ms. Kersting dated September 13th of 1999?

         3   A.   Yes.

         4   Q.   And you copy several people on this e-mail,

12:39:58  5   including Ms. Kopitsky?

         6   A.   Yes.

         7   Q.   And Mr. Gillula, Mr. Steinback, Mr. O'Neal?

         8   A.   Yes.

         9   Q.   And you see where the subject of your e-mail is

12:40:08 10   "Lycos Requests"?

      11   A.   Correct.

      12   Q.   Now, the 13th was a Monday.  Do you see where it

      13   says that at the top of the e-mail?

      14   A.   Sure.

12:40:15 15   Q.   So the 10th, when Ms. Kopitsky faxed that page to

      16   Mr. Stenberg, would have been a Friday, right?

      17   A.   That would be correct.

      18   Q.   Now, you see that you write on Monday afternoon that

      19   you okayed all five Lycos requests?

12:40:32 20   A.   That's correct.

      21   Q.   And "This is the big one if we can get it done"?

      22   A.   Correct.

      23   Q.   "Paul is rewriting almost every Lycos schedule out

      24   there."

12:40:41 25   A.   Correct.

```
 1    Q.   And Mr. Stenberg's combined margin on that rewrite
 2    is just over two million dollars?
 3    A.   Yes.
 4    Q.   So that's two million dollars over and above the
 5    threshold that you've set for Mr. Stenberg to do the
 6    deal.  Is that fair?
 7    A.   That would be the margin -- yeah, that would be the
 8    margin on the deal if he got it.
 9    Q.   And if he got it, that is the number that his
10    commission percentage would be multiplied by.  Is that a
11    fair statement?
12    A.   That's correct.
13    Q.   Now, on top of this, he also could earn a PC rewrite
14    bonus if there were PCs involved in the transaction?
15    A.   If there were PCs, yes.
16              MR. GACIOCH:   Could we go to 2056, Mr.
17    O'Keefe, please.
18    Q.   Mr. Cagney, I'm showing you Exhibit 2056.  Do you
19    recognize this as an e-mail from you to Ms. Kopitsky?
20    A.   Correct.
21    Q.   And that's, again, dated on Friday, September 10?
22    A.   Correct.
23    Q.   And if you look -- just take a second, if you would,
24    to read what you wrote.
25    A.   I'm done.
```

12:40:50 (line 5)
12:41:02 (line 10)
12:41:21 (line 15)
12:41:39 (line 20)
12:41:58 (line 25)

1    Q.   Do you see where you've indicated to Ms. Kopitsky

2    that "Paul called me to talk about the PC rewrite

3    bonus"?

4    A.   Yes.

12:42:07 5    Q.   And by Paul, you meant Mr. Stenberg?

6    A.   Yes.

7    Q.   And you told him how to structure the transaction or

8    how you would structure it to insure that he got the

9    bonus he was entitled to?

12:42:20 10    A.   I just said we could figure it out.

11    Q.   You could figure it out.  Okay.

12              Now, Lycos signed the rewritten schedules

13    that were proposed on Thursday, September 16.  Do you

14    recall that or not?

12:42:32 15    A.   I don't recall the dates.

16              MR. GACIOCH:  Can we pull up 1065, please,

17    Mr. O'Keefe.  And go down to -- actually, do the header

18    if you would, please.

19    Q.   I apologize, Mr. Cagney.  Do you see Mr. O'Keefe has

12:42:54 20    enlarged the header of Exhibit 1065?

21    A.   Okay.

22    Q.   And you see it says Equipment Schedule No. 65 dated

23    as of September 14, 1999?

24    A.   Yes.

12:43:09 25    Q.   And you see that Lycos, a Lycos representative has

1    signed that schedule on September 16th of 1999?

2    A.   Yes.

3    Q.   Now, September 13th was a Monday.  So September 16th

4    was that Thursday?

12:43:25 5    A.   Correct.

6    Q.   And I'd be happy to show you, but would you take my

7    representation that the other schedules that were

8    involved here have the same schedule date?  I would be

9    happy to show them to you, if you would prefer.

12:43:39 10   A.   That's fine.

11   Q.   Do you have any reason to believe that they don't?

12   A.   No.

13   Q.   So Lycos signed these equipment schedules less than

14   a week after Mr. Kopitsky had provided the threshold

12:43:49 15   pricing to Mr. Stenberg?

16   A.   Okay.

17   Q.   Is that correct?

18   A.   Sounds like it.

19   Q.   And only three days after you had approved the

12:43:56 20   pricing of the deal on Monday; does that sound correct?

21   A.   Yes.

22   Q.   I'd like to talk now for a moment about Schedules 93

23   and 94.

24   A.   Okay.

12:44:06 25   Q.   Those were Mr. Stenberg's two largest rewrites with

1    Lycos?

2    A.    That's correct.

3    Q.    And you are familiar with those transactions; is

4    that correct?

12:44:13 5    A.    Yes.

6    Q.    In fact, you played an important role in

7    restructuring those transactions, didn't you?

8    A.    I helped structure the leases, yes.

9    Q.    They were quite complicated to do, weren't they?

12:44:25 10    A.    A little bit.

11    Q.    You were responding to several specific requests for

12    Mr. Stenberg for particular transaction structure.   Is

13    that fair to say?

14    A.    Correct, that's right.

12:44:36 15    Q.    Mr. Stenberg requested a rewrite structure that

16    would reduce Lycos' monthly payment?

17    A.    That's correct.

18    Q.    Mr. Stenberg specifically requested a structure that

19    would separate PCs from non-PCs coming off the existing

12:44:50 20    schedules; is that right?

21    A.    That was one of the requests, yes.

22    Q.    One of several.   And Mr. Stenberg specifically

23    requested a structure that would minimize the amount of

24    a letter of credit that CSI's credit department was

12:45:03 25    requiring?

1    A.    I don't think that was in the initial request, but

2    at some point in time that became one of the issues.

3    Q.    As the transaction was being developed?

4    A.    Correct?

12:45:11  5    Q.    And Mr. Stenberg also specifically requested a

6    rewrite structure that would guarantee him at least five

7    million dollars of margin for determining his

8    commission; isn't that correct?

9    A.    Yes.

12:45:24  10              MR. GACIOCH:   Can we pull up Exhibit 2045,

11   please.

12   Q.    I've had Mr. O'Keefe enlarge the header of 2045.  Do

13   you see this is an e-mail from you to Mr. Stenberg on

14   August 30, 2001?

12:45:44  15   A.    Yes.

16   Q.    You copied Mr. Pratt and Ms. Thompson?

17   A.    Yes.

18   Q.    And the subject matter is Lycos?

19   A.    Yes.

12:45:52  20   Q.    This may be a little easier for me to give you a

21   paper copy of.  I apologize that I don't have one handy.

22   A.    I can read that.

23   Q.    Would it be fair to say that Exhibit 2045 concerns a

24   structure of a transaction that resulted in Schedules 93

12:46:37  25   and 94?

A.   It's pretty close to the structure.  It looks like
the dates are a little bit off from what we finally
wound up with, but it's more or less the structure.

Q.   That's the subject matter?

12:46:53  A.   Correct, yeah.

Q.   And at the end of the first paragraph, Mr. Cagney,
do you see at the end of the first paragraph where
you've written to Mr. Stenberg, "I have come pretty
close to maintaining your 24 million dollar PV from
12:47:17  10/1/01, thereby assuring the five million dollars of
margin"?

A.   Correct.

Q.   That was the five million dollars of margin that
Mr. Stenberg specifically requested?

12:47:28  A.   Yes.

Q.   And that five million dollars was what Mr.
Stenberg's commission would be based off of for the
deal.  Is that fair to say?

A.   At the time, yeah, that's what we were thinking the
12:47:39  margin would be on the deal.

Q.   And Mr. Stenberg's commission for this deal was
going to be about 26 and a half percent; is that
correct?

A.   I think that's what the compensation plan was.

12:47:49  Q.   I'd be happy to show you a document, if you would

1    like.

2    A.    Sure.

3            MR. GACIOCH:  Can we pull up 2044, please.

4    Q.    Mr. Cagney, do you see Exhibit 2044 on your screen?

12:48:04 5    A.    Yes.

6    Q.    It's an e-mail from Ms. Thompson to Mr. Stenberg

7    copying you?

8    A.    Correct.

9    Q.    August 8th of 2001?

12:48:12 10    A.    Yes.

11            MR. GACIOCH:  Mr. O'Keefe, let's go forward

12    two pages, please.

13    Q.    Mr. Cagney, do you see on your screen, it still may

14    be a little bit small, this is a Lycos 93 and 94

12:48:30 15    summary?

16    A.    Correct.

17    Q.    You prepared the summary?

18    A.    Yes, I did.

19    Q.    Do you see down on the bottom right-hand side where

12:48:37 20    it says "Final margin", and approximately 7.6 million

21    dollars?

22    A.    Correct.

23    Q.    And do you see next to that 26.5 commission?

24    A.    My understanding at the time was that's what his

12:48:58 25    commission would have been.

1    Q.   And that 26 and a half percent commission from Mr.

2    Stenberg equaled just over two million dollars; isn't

3    that correct?

4    A.   Correct.

12:49:09  5        MR. GACIOCH:  If we could go back, Mr.

6    O'Keefe, to Exhibit 2045.

7    Q.   I'm going to take us down to the meat of this,

8    Mr. Cagney, the fifth to the last paragraph.  This was,

9    again, you writing to Mr. Stenberg about the structure

12:49:35 10   of the transaction?

11   A.   Yes.

12   Q.   And is it fair to say that you said, "The

13   documentation will be a little tricky"?

14   A.   I did say that.

12:49:43 15   Q.   Was that because all of the equipment was coming off

16   of different schedules at different times?

17   A.   Correct.

18   Q.   And the equipment was going to terminate at

19   different times over the course --

12:49:55 20   A.   That's correct.

21   Q.   Which made your calculations difficult?

22   A.   Moderately so.  I mean, it wasn't that difficult for

23   me.

24   Q.   You had to bring a number of different factors into

12:50:07 25   play --

1    A.    A little bit more than usual.

2    Q.    Separate pieces of equipment or different groups of

3    equipment separately?

4    A.    Different termination dates.

12:50:16 5    Q.    Because there were several existing schedules that

6    were going to be all wrapped up into 93 and 94; is that

7    correct?

8    A.    That is correct.

9    Q.    And those different existing schedules had different

12:50:26 10    end dates that you had to take into account?

11    A.    Yes.

12    Q.    Now, you don't know whether Mr. Stenberg ever

13    explained the structure of the transaction to Lycos, do

14    you?

12:50:34 15    A.    I do not know.

16    Q.    Is it fair to say that the Schedule 93 and 94

17    transaction was a large margin deal for CSI?

18    A.    Yes.

19    Q.    Probably its largest margin deal in all of 2001?

12:50:48 20    A.    In 2001, yes.

21    Q.    CSI's margin for, we just saw on the other exhibit,

22    2044, that CSI's margin was going to be as much as 7.6

23    million dollars?

24    A.    Correct.

12:51:03 25    Q.    And you had described the business deal that

1    resulted in 93 and 94 as a good deal for CSI.  Is that

2    fair?

3    A.   That would be a fair statement.

4    Q.   The transaction, for instance, completely covered

12:51:14  5    CSI's residual equity; isn't that right?

6    A.   That would be correct.

7    Q.   And CSI also earned a significant margin on the

8    deal?

9    A.   There was significant margin on the deal.

12:51:29  10          MR. GACIOCH:  Can we go to 2046, please, Mr.

11   O'Keefe?  Let's do the top.

12   Q.   Mr. Cagney, I'm showing you Exhibit 2046.  We've

13   enlarged the top half.  Do you recognize this as an

14   e-mail that you sent to Ms. Minch and Mr. Gillula and

12:51:52  15   several other CSI employees?

16   A.   Yes, I do.

17   Q.   And the subject is "Lycos worksheet"?

18   A.   Correct.

19   Q.   And you were sending this on September 27, 2001?

12:52:00  20   A.   Yes, I was.

21   Q.   And this was about Schedules 93 and 94; isn't that

22   correct?

23   A.   Yes, it was.

24   Q.   And you wrote "To everyone on my 'margin

12:52:11  25   notification' group"?

1    A.    Yes.

2    Q.    And it wasn't a formal list --

3    A.    It was the people that were addressed up above.

4    Q.    And you collected those people all together as your

12:52:27 5    "Margin notification group" --

6    A.    It was my department plus a couple other senior

7    management people.

8    Q.    You wrote below "This is a big one"?

9    A.    Yes.

12:52:37 10    Q.    This is "Paul's big Lycos rewrite"?

11    A.    Yes.

12    Q.    And you said, for example, that -- down in the

13    second paragraph, do you see where it starts

14    "Depending"?

12:52:52 15    A.    Yes.

16    Q.    You said:  "Depending upon which debt rate we

17    finally use, the margin is between 5.9 million and 7.2

18    million (you read them right)"?

19    A.    That's correct.

12:53:06 20    Q.    You wrote "you read them right" because it was a

21    large margin?

22    A.    It was a large margin at the time, right.

23    Q.    And you also wrote back in the first paragraph that

24    the structure of 93 and 94 was "complex convoluted"?

12:53:26 25    A.    I did write that.

1    Q.   That was, again, because the equipment was stopping

2    and starting at different times?

3    A.   I mean, from Lycos's perspective, we put out there a

4    pretty easy deal.  PCs you have 24 months of 149,000

12:53:42 5    everything else you have 36 months at 680,000, pure and

6    simple.  That was the total obligation for the total

7    portfolio.

8         From our standpoint, we had credit concerns,

9    we had to leave the existing leases in place with

12:53:57 10   something a little bit different for us.  We were able

11   to lower the letter of credit that we needed to do.  So

12   instead of all the equipment starting at one time, we

13   had to keep it on the old leases.  And then as those

14   terminated, it would renew onto this new schedule.

12:54:13 15        So structure-wise, from how we had to write

16   up the contract, yeah, it was maybe a little complicated

17   from that standpoint.  But the basic overall structure

18   he really wasn't that complicated.

19        MR. GACIOCH:  Could we go, Mr. O'Keefe, to

12:54:29 20   Exhibit 55, please?

21   Q.   Do you recognize Exhibit 55, Mr. Cagney, as

22   Equipment Schedule 93?

23   A.   Yes, I do.

24        MR. GACIOCH:  Mr. O'Keefe, can we go to what

12:54:49 25   will be page 69 in this document?

1   Q.   Do you recognize this page as the Addendum 1 to

2   Schedule 93?

3   A.   Yes.

4          MR. GACIOCH:   And let's go to the chart at

12:55:09 5   the bottom, Mr. O'Keefe.

6   Q.   Mr. Cagney, Mr. O'Keefe is enlarging the bottom.  Do

7   you see it says, "Commencement dates; start of initial

8   term; total monthly rental"?

9   A.   Correct.

12:55:23 10   Q.   It indicates this is a rewrite of several schedules

11   that are listed there in the first and second and third

12   lines?

13   A.   The equipment is extending from those schedules onto

14   93 and 94.

12:55:34 15   Q.   It breaks down in that chart all these different

16   equipment schedules that are existing?

17   A.   Correct.

18   Q.   And that they have different termination dates?

19   A.   Correct.

12:55:42 20   Q.   They have different commencement dates?

21   A.   That is correct?

22   Q.   And they have different monthly rentals for the

23   units that are terminating on the equipment schedules;

24   is that correct?

12:55:50 25   A.   Yes.

1    Q.    In other words, equipment was rolling onto or off

2    of, in this case, onto 93 and 94 at different times

3    during the lease?

4    A.    That is correct.

12:55:59  5    Q.    So Lycos' monthly rental over the course of 93 and

6    94 was going to change over the course of the lease?

7    A.    No, that's not correct.  The rent on 93 and 94 would

8    change, but the total rent that they were paying on

9    their entire portfolio would stay the same.

12:56:16 10    Q.    In other words, the rent coming off of one in the

11    middle of Schedule 93, for example, equipment might roll

12    on from a terminating schedule that would then be

13    included at that point in the rent on 93?

14    A.    Correct.

12:56:28 15    Q.    Which would mean that the monthly rent that Lycos

16    had paid the previous month would be --

17    A.    Not in total.

18    Q.    Not in total?

19    A.    Not in total.

12:56:40 20          MR. GACIOCH:  Let's go to the next page, Mr.

21    O'Keefe.

22    Q.    You see at the top of the page, Mr. Cagney, you see

23    where it says the total monthly rent for the leases is

24    as follows, and it lists different periods of time?

12:56:55 25    A.    Right.  So that is just for Schedule 93.

1    Q.   And then it shows the different monthly rents that

2    Lycos would have to pay for different periods?

3    A.   Correct.  We're trying to make as clear as we could

4    for them what their obligation under 93 would be.

12:57:08 5    Q.   There is a similar chart for 94?

6    A.   Yes, there is.

7    Q.   That shows the equipment schedules coming onto 94

8    for different times?

9    A.   Um-hmm.

12:57:18 10   Q.   And different total rents specifically for 94?

11   A.   Specifically for 94.

12   Q.   Just like the chart?

13   A.   I believe that's the case.

14              MR. GACIOCH:  Let's go to 2044, please.

12:57:34 15   Q.   Mr. Cagney, we've already discussed 2044.  Do you

16   see this is the e-mail that you've already identified

17   from Ms. Thompson?

18   A.   Yes.

19   Q.   And she was performing an analysis, you said, of

12:57:50 20   what eventually became Schedules 93 and 94?

21   A.   The e-mail is the quote that she originally sent

22   down.

23   Q.   CSI's credit department was, eventually required

24   Lycos to post a letter of credit to this transaction?

12:58:09 25   A.   Correct.

```
 1    Q.   And that letter of credit, or Mr. Stenberg had
 2    wanted when that issue came up, wanted the transaction
 3    to be structured, among other things, to minimize that
 4    letter of credit.  Is that a fair statement?
 5    A.   Yeah.  I mean, I don't know whether or not -- I
 6    don't know what discussions there were.  But, for
 7    example, on this schedule, had we done it originally,
 8    they would have needed like a 24 or 25 million dollar
 9    letter of credit.
10    Q.   So you restructured as such that it could be
11    lettered?
12    A.   Correct.
13              THE COURT:  We need to suspend here until
14    tomorrow morning at nine.
15              To the jury, I hope you have a good afternoon
16    and evening.  I look forward to seeing you tomorrow
17    morning at nine.
18              (Jury was excused)
19              THE COURT:  Court is in recess until then.
20              (Whereupon the hearing adjourned).
21
22
23
24
25
```

12:58:22  (line 5)
12:58:36  (line 10)
12:58:46  (line 15)

1

2

3                    C E R T I F I C A T E

4

5        I, Lisa W. Starr, Registered Professional

6    Reporter/Certified Realtime Reporter, do hereby certify

7    that the foregoing transcript, from Page 1 to Page 85,

8    constitutes to the best of my skill and ability a true

9    and accurate transcription of my stenographic notes

10    taken in the matter of Civil Action No. 05-10017-RWZ,

11    Computer Sales International, Inc. Vs. Lycos, Inc.

12

13

14    _____

15    Lisa W. Starr, RPR, CRR

16

17

18

19

20

21

22

23

24

25