UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES, INC., f/k/a   *
COMPUTER SALES INTERNATIONAL, *
INC.,                         *
            Plaintiff,        * Civil Action
                              * No. 05-10017-RWZ
      - vs. -                 *
                              *
LYCOS, INC.,                  *
            Defendant.        *


**JURY TRIAL**
Day 5 Session 2
BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley US. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
June 5, 2009
11:35 a.m.


*   *   *   *   *


LISA W. STARR, RPR, CRR
Tel:  (617) 771-8336

```
1    APPEARANCES

2
     FOR THE PLAINTIFF:
3        McCARTER & ENGLISH, LLP
         BY:  Robert J. Kaler, Esq.,
4             Edward William Little, Jr., Esq.
              David Himelfarb, Esq.,
5             Kelly Gabos, Esq.
         265 Franklin Street
6        Boston, Massachusetts  02110
         Tel:  (617) 449-6500
7        e-mail:  Rkaler@mccarter.com

8    FOR THE DEFENDANT:
         McDERMOTT WILL & EMERY, LLP
9        BY:  Thomas O. Bean, Esq.
              Peter M. Acton, Jr., Esq.
10       28 State Street
         Boston, Massachusetts  02109-1775
11       Tel:  (617) 535-4000
         e-mail:  Tbean@mwe.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2    Witness              Direct   Cross   Redirect   Recross
      CHARLES CROSS
 3    (BY Mr. Bean)           6
      (BY Mr. Kaler)                  55
 4

 5

 6

 7

 8

 9                      E X H I B I T S

10    Exhibit No.
                        None marked
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2

 3              (The following proceedings were held in open

 4       court before the Honorable Rya W. Zobel, United States

 5       District Judge, United States District Court, District

 6       of Massachusetts, at the John J. Moakley United States

 7       Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

 8       June 5, 2009.

 9              THE COURT:  Please be seated.  Let me try to

10       be perhaps a little clearer as to what I think is

11       appropriate for this witness' testimony and what is not.

12              I believe that he is able to talk about

13       customary standards and practices, what is done in the

14       industry, not what should be done; that is, aspirational

15       codes of conduct, can't testify about that.

16              He cannot tell us what fair practices are; he

17       can tell us what are customary practices.  So all of the

18       aspirational stuff goes out.

19              He can tell us whether the lease agreements

20       in this case are in accordance with customary standards,

21       and if he opines that they are not, he may tell us in

22       what respects in his expert opinion they are not.

23              He may tell us in general about the relative

24       roles of lessor and lessee in structuring this kind of

25       agreement.  He cannot tell us about the relative
```

11:35:12 (line 10)
11:35:31 (line 15)
11:35:47 (line 20)
11:36:07 (line 25)

1    knowledge base and reliance of these parties.  Doesn't

2    know anything about that.  That's for the jury to

3    decide.  But he can tell us in general what the relative

4    role of lessor and lessee in the lease agreements are.

11:36:28 5        So that's what we are going to do.  I

6    devoutly hope that both counsel will accept my ruling

7    and not make me do it again.

8        As for this weekend, I am inclined to issue

9    an order to enjoy this weekend and not spend the weekend

11:37:22 10   turning out more memos.  It will be very helpful to the

11   jury and to me.

12        (Jury entered the courtroom).

13        THE COURT:  Please be seated.  Would you like

14   me to explain to the jury what I told you?

11:38:35 15       MR. KALER:  Yes, your Honor.

16        THE COURT:  Members of the jury, as you know,

17   there have been disagreements among counsel about what

18   is appropriate to be offered into evidence and what is

19   not.  We have made a number of rulings.  And here with

11:38:48 20   respect to this witness, this is what I have now ruled,

21   trying to be clearer than perhaps earlier rulings had

22   been.

23        One, the witness may testify about customary

24   standards and practices; that is, what is done within

11:39:04 25   this industry of equipment leasing.  He cannot testify

1    about what should be done.  So codes of ethics,

2    aspirational rules, are not part of his testimony.  What

3    is done, what is the customary practice within the

4    industry.

11:39:20  5         Second, he may tell us whether the lease

6    agreements in this case are in accord with those

7    standards.  And if they are not, in what respects they

8    are not in accord with the customary standards within

9    the industry.  This, by the way, is very common for

11:39:37  10   experts to talk about in all different contexts.

11         Third, he may tell us about the relative

12   roles of a lessor and lessee within this industry in

13   general.  He cannot tell us what particular knowledge

14   and such the people in this case had.

11:40:00  15        So he's talking about the industry, the

16   standards and the knowledge of the industry and how

17   these compare with that standard and that knowledge.

18         Mr. Kaler, your objection is noted.

19         MR. KALER:  Thank you, your Honor.

20              *   *   *   *   *

21              **CHARLES CROSS, resumed**

22   DIRECT EXAMINATION

23   BY MR. BEAN:

24   Q.  Approximately how many documents did you have

11:40:28  25   available to review?

1    A.    Again, I believe I had available to review all of

2    the documents that have been produced by either party in

3    this transaction, which I saw from the numbers in the

4    lower right-hand corners were in the tens of thousands.

11:40:42  5    Q.    Did you have the opportunity to review the

6    deposition transcripts of any of the witnesses in this

7    case?

8    A.    Yes, I have reviewed deposition transcripts of a

9    number of officers and employees of both CSI and Lycos

11:40:57 10    and, also, of experts that have been retained by CSI and

11    Lycos.

12    Q.    Have you reached any opinions based on your

13    twenty-five years of experience, your review of the

14    Master Lease and equipment schedules, the other

11:41:09 15    documents provided by the parties, and your research in

16    the industry?

17    A.    Yes, I have.

18    Q.    What are your opinions?

19    A.    Well, I reached opinions as to what the relative

11:41:21 20    levels of sophistication of lessors and lessees are

21    generally in the industry and as to CSI and Lycos, in

22    particular, and also what relevant standards are in the

23    industry with respect to the trust and reliance that a

24    lessee places on a lessor generally in the industry, as

11:41:40 25    well as in this particular situation.

Q.   Did you render an opinion as to whether or not the CSI Master Lease is aberrant in any way in the industry or consistent with industry standards?

A.   I rendered an opinion as to --

11:41:53    MR. KALER:  Objection.  Consistent within industry standards is what was excluded, I thought.

THE COURT:  No.

MR. KALER:  I thought the issue was customary.

11:42:04    THE COURT:  Well, he said customary industry standards.

MR. KALER:  If it's customary, that's the issue.

A.   Yes.  I rendered an opinion as to whether the lease documentation between the parties in this case was consistent with customary standards and practices in the industry.

Q.   And what was your opinion in terms of the relative sophistication of the parties in this case?

11:42:32    MR. KALER:  Objection.

THE COURT:  I think what he can say is whether it fits within the standard or not.  I don't know if that's what the question is.

MR. BEAN:  Well, the question was going to

11:42:47    the relevant sophistication of the parties based on his

1    review of the lease documents and the other documents

2    that he saw.

3              THE COURT:  I think what I said was he can

4    tell us whether the lease agreements were in accordance

11:43:01 5    with the standard, and he can tell us about the relative

6    roles of lessor and lessee in structuring agreements

7    within the industry.  And then he can tell us whether

8    the agreements comport with the standard and whether

9    the, in this instance, relative roles of lessor and

11:43:24 10   lessee were in accordance with the standard but not, I

11   told you, can he testify about the relative knowledge

12   base and reliance of these parties in this case.

13   Q.   Mr. Cross, what was your opinion as to whether or

14   not the CSI Master Lease comported with industry

11:43:49 15   standards?

16   A.   In many respects it does comport to industry

17   standards, but in simple key respects it does not

18   comport to industry standards.

19   Q.   And what is your opinion as to industry standards as

11:44:01 20   it relates to the relative reliance or sophistication,

21   the relationship between lessors and lessees in the

22   industry?

23   A.   Well, the relationships between lessors and lessees

24   in the industry are, they have varying levels of

11:44:19 25   sophistication.  The lessor holds itself out as an

1    expert in equipment leasing and finance.  And the lessee

2    may or may not be sophisticated, but the lessee often is

3    not sophisticated because it has its own business to

4    run.  It must devote its time and energy to the business

11:44:41  5    that it actually is trying to conduct itself.

6          And so, it leaves, in essence, leaves the

7    driving to the lessor in order to provide products and

8    solutions to the Lessee's equipment needs that are

9    consistent with what the lessee needs to grow its

11:44:59 10    business.

11          So the lessee is, I guess, an expert in using

12    equipment, but the lessor is the expert in how the

13    equipment is financed.

14    Q.   Mr. Cross, let's take a look at Exhibit 1 and see if

11:45:16 15    you can explain what in the Master Lease and associated

16    documents are consistent with industry standards and

17    what you believe are not consistent.

18    A.   Well, in a general sense, this Master Equipment

19    Lease Agreement is what we call in the industry a net

11:45:33 20    hell-or-high-water lease.  What that means is that

21    almost all of the obligations of ownership of the

22    equipment are transferred to the lessee.

23          So the lessee has to treat the equipment as

24    though it owns it.  It has to insure it, for example,

11:45:48 25    has to maintain it.  It bears the risk of loss of the

1    equipment just like an owner would if the equipment is

2    lost.  It indemnifies the lessor for any losses or

3    injuries to third parties.  If the equipment should blow

4    up or electrocute somebody, then the lessee has to

11:46:11  5    indemnify the lessor for a third-party claim in respect

6    to that.  The lessee is responsible for paying all taxes

7    on the equipment.  The lessee is responsible for

8    basically all of the costs and expenses associated with

9    the equipment during the lease term.

11:46:26 10         So in that respect, this lease is in

11    conformity with general industry practices.

12         Where I think it falls out of conformity with

13    general industry practices is in the inclusion of

14    several provisions that I believe were inapplicable to

11:46:45 15    the particular equipment that was leased in the

16    equipment schedules, and the omission of a provision

17    which, in my experience, is always found in these kinds

18    of transactions, and that is the existence of a purchase

19    option.

11:46:59 20         So to deal with the first issue, which is the

21    relationship between these provisions and, in

22    particular, the return and renewal provisions of this

23    lease, what I guess I would do first is, if we could

24    look at Section 2.2 of the Lease Agreement.  Again, it's

11:47:24 25    not necessarily that these provisions standing alone are

1    a problem, but the way the lease is constructed, you

2    often have to look first in this section and then in

3    this section, and then you might have to look at the

4    equipment schedule in order to put it all together to

11:47:40  5    figure out what will happen if the particular event

6    arises.

7    Q.   Mr. Cross, as you're explaining, please feel free to

8    ask Mr. O'Keefe to highlight anything you would like him

9    to highlight for the jury.

11:47:55 10    A.   In this particular version, 2.2, it's titled

11    "Initial Term," but it relates to more than the initial

12    term because it has what we call in the industry an

13    automatic renewal provision in it.

14           And if we look at starting with the initial

11:48:11 15    term of the equipment, starting with the word "the", and

16    just please highlight that sentence down to the word

17    "written notice."

18           THE COURT:  Mr. Cross, I think the blue dot

19    is there because you inadvertently touched the screen.

11:48:43 20    A.   So what we have here is it does comply with the

21    initial terms.  And when we look at the initial term,

22    we'll see 24 or 36 months as the initial term.

23           It goes on to say that it's automatically

24    extended for successive four-month periods at the same

11:49:00 25    monthly rental; that is, the rental they pay during the

1   initial term will continue during this successive

2   four-month term, which again can keep going for four

3   months and four months and four months, unless certain

4   conditions are met.  And the conditions of this

11:49:15 5   paragraph prescribes that there is a termination, that

6   it relates to all of the equipment, and that --

7   Q.   With provision would you like him to highlight?

8   A.   I'm sorry.  The termination must relate to all of

9   the equipment, which is Clause (i).  And then if we look

11:49:37 10   at Clause (iii), little i's, it's effective only if the

11   lessee returns all of the equipment to the lessor in

12   accordance with the terms of the equipment schedule.

13           Now, that, again, standing alone is not a bad

14   provision.  But what we have to do now is look at what

11:49:56 15   are those return provisions.  In order to find out what

16   those return provisions are, we need to go to Section 7

17   of this Master Lease.  If we can go down to the last two

18   sentences, please, if you could highlight those starting

19   with the words "Lessee, at its expense."

11:50:36 20           Now, one of the general principles in the

21   industry that's really important is if you have a return

22   provision, it's very important that it actually match

23   the equipment that is subject to the lease.  And so, one

24   of the problems, we're putting a fairly specific

11:50:56 25   provision into the Master Lease, is it's going to be

1   read into the terms of all of the schedules that the

2   parties executed.

3            Here what we see are the requirements for the

4   return of the equipment.  What it says is lessee shall

11:51:09 5   make any repairs necessary in order to certify the

6   equipment as eligible for the manufacturer's prime shift

7   maintenance contract upon the return.  It says it has to

8   get a letter from the manufacturer certifying that that

9   maintenance eligibility exists.

11:51:31 10            For certain kinds of equipment, this may be

11   okay.  If you look at the particular equipment subject

12   to the equipment schedules, this provision, in my

13   opinion, is practically impossible to comply with

14   because when we look at the equipment schedules, we'll

11:51:45 15   see things like switches, routers, cables, peripherals,

16   monitors, laptops, all sorts, thousands and thousands,

17   literally, of little pieces of computer equipment that

18   apparently Lycos would obtain and then assemble into its

19   existing computer system or to build a new system.  But

11:52:08 20   that means that there has to be such a thing as a prime

21   shift maintenance contract available for that kind of

22   equipment in order for Lycos to be able to comply with

23   this provision.

24            If there is no such thing available for this

11:52:23 25   kind of equipment, and if they can't go to the

1    manufacturer and say to the manufacturer I need you to

2    certify in writing that this cable right here is

3    eligible for your prime shift maintenance contract, then

4    Lycos can't comply with the section.

11:52:39  5        So what's the consequence of that?  If we go

6    back now to Section 2.2, if Lycos cannot return all of

7    the equipment as required by this Section 7, then the

8    lease renews at full monthly rent for four months.  And

9    if at the end of that four months they can't comply, it

11:53:02 10   renews again for four months at full monthly rent, and

11    so on and so on and so on.

12        So this is one of the major areas where I

13    found this lease to be totally at variance with common

14    industry practice.  So that's one area.

11:53:20 15        Another area where I found the lease to be

16    inconsistent with industry standards is in the concept

17    of stipulated loss values.  Now, stipulated loss values

18    are values that the lessee has to pay to the lessor if

19    it can't return an item of equipment or if the equipment

11:53:43 20   suffers a casualty.

21    Q.   Do you want to go to one of the stipulated loss

22    value tables, Mr. Cross?

23    A.   Sure.  Actually, if we can first look at the Master

24    Lease Agreement and find the section where it first

11:53:58 25   references stipulated loss value.  I don't recall

1    offhand what that is.

2    Q.   Section 9.2, perhaps?

3    A.   I'm sorry, that's fine, thank you.  If we look at

4    Section 9.2, we see, and let's highlight the section

11:54:17  5    that says starting with the language "If a unit is lost,

6    destroyed or stolen," and just scroll down to the end of

7    that paragraph.

8         So stipulated loss value, as you can see from

9    this provision, is an amount that the lessee has to pay

11:54:45 10    the lessor if it can't return an item of equipment.

11    And, typically, that happens because it's lost, it's

12    stolen, again, it may have burned up or blown up, what

13    have you.  But whatever the reason is that the equipment

14    is damaged or lost to the extent that it can't be

11:55:04 15    repaired, then CSI at its option can either allow the

16    lessee to return that item of equipment, return an

17    identical, quote unquote, identical item of equipment to

18    the lessor, or it can pay a stipulated loss value with

19    respect to that item.

11:55:23 20         Now, on its face again, this doesn't seem all

21    that bad.  But if we then go to the stipulated loss

22    value tables that we see attached to any equipment

23    schedule, we see that the stipulated loss values that

24    are set forth in those tables far, far exceed both the

11:55:42 25    balance that is owed to the lessor under the lease at

1    the time that the loss occurs and at the end of the term

2    that it exceeds by many multiples the residual value

3    that the lessor has booked.

4    Q.   I'm sorry for interrupting.

11:56:02  5    A.   I'll finish my explanation first, and then we can go

6    to the tables themselves just to show what the documents

7    say.

8            Now, I just want to talk about typical

9    practice of this.  What happens typically in this

11:56:16  10    industry is that the stipulated loss values actually

11    reflect the declining lease balance that the lessor has

12    in the equipment.  So if, for example, I pay a hundred

13    thousand dollars for an item of equipment and I've

14    booked a residual value of 10 percent of that, in other

11:56:30  15    words, I need $10,000 at the end of the lease term in

16    order to make myself whole, then I would expect the

17    stipulated loss values to start at an amount that's

18    maybe a little bit above that hundred thousand dollars.

19    And they would come down to an amount that's just a

11:56:46  20    little bit above that $10,000

21            So, again, the lessor, if the worst happens

22    and we lose a piece of equipment, the lessor gets its

23    balance fully paid from the stipulated loss value, but

24    it doesn't receive multiples of what it is owed because

11:57:00  25    the stipulated loss value is so far out of synch with

1    what is actually ordered under the lease.

2            So if we could briefly go to a stipulated

3    loss value schedule or any schedule.

4    Q.   Take a look at 1049.1, please.

11:57:21  5    A.   If we start with this one, the way that CSI and

6    Lycos structured their leases is that initially when the

7    equipment schedule was signed there would be the

8    stipulated loss value schedule.  And as I think has been

9    explained earlier in the testimony, all of the equipment

11:57:37 10    hasn't yet been identified at this point.  So they set a

11    base value which here says "Manufacturer List Price,"

12    and I think we saw some exhibits yesterday that said

13    equipment cost, but the idea is with all of these

14    schedules the base value would be equal to the original

11:57:54 15    equipment cost.

16            Then we see the values that CSI places into

17    the stipulated loss value table, which start at 110

18    percent and run down in a 24-month schedule to 73.3

19    percent.

11:58:09 20            So the reason that this varies so much from

21    industry practice is that let's say a loss happened on

22    day one before any payment had been made.  They've just

23    bought a hundred thousand dollars worth of equipment.

24    Lycos has to pay them $110,000 if they can't replace the

11:58:25 25    equipment at that point in time.

1        As bad as that sounds, if we get to month 24,

2    when Lycos, when CSI has literally booked a residual

3    value of 15 percent, they have to pay 73.3 percent of

4    that original value.

11:58:42 5        And so, this is really at variance with

6    industry practice with respect to the setting of

7    stipulated loss values.

8        The third item that I'd like to refer to, and

9    this is perhaps the most important one, is, again, the

11:58:57 10    lack of a purchase option.

11        Now, a purchase option in a lease agreement

12    gives the lessee the ability to buy the equipment at the

13    end of the lease term for either fair market value, a

14    fixed purchase option price, or a nominal amount, such

11:59:15 15    as a dollar or $101.  And the reason that's very

16    important to the lessee is that if for some reason the

17    lessee can't return the equipment at the end of the term

18    and they don't want to pay 73.3 percent of its original

19    cost in order to get out of the lease, they can buy the

11:59:33 20    equipment for its fair market value.  And with respect

21    to computer equipment, that fair market value is

22    typically going to be around the residual value that the

23    lessor has booked.

24        So if the lessor has booked 15 percent, it's

11:59:47 25    done that because it expects to get 15 percent for the

1    equipment at the end of the lease term, either by

2    selling it to the lessee pursuant to the purchase option

3    or, upon the return of the equipment to the lessor, it

4    sells it to a third party.

12:00:01  5         So in my experience, and I mentioned earlier

6    that I've prepared or reviewed thousands of equipment

7    leases, including over a thousand computer equipment

8    leases, I have never, ever seen a lease of this type;

9    that is, a lease with like a 24/36-month term for an

12:00:26 10   amount of equipment that computes at original cost, say,

11   10 or $20,000  I have never, ever seen or prepared a

12   lease that did not have a purchase option.

13         Again, the reason that's important is that

14   that is ultimately how the lessee can exit the lease if

12:00:45 15   he can't comply with the terms.  So he can return the

16   equipment, and if the return provisions aren't

17   reasonably related to the equipment, that's something

18   that the lessee can actually do.  But if for some

19   reason, even under reasonable term provisions, he can't

12:01:01 20   return the equipment, he can buy it for the fair market

21   value or for the fixed purchase option price that the

22   parties agreed to when they initially entered into the

23   document.

24         So, to me, what these three elements working

12:01:16 25   together did in terms of setting the table is that once

1    the Master Equipment Lease Agreement had been signed by

2    Lycos and CSI, and at that point basically put it in the

3    folder, put it away, and the parties do all of their

4    business, at that point the parties actually conducted

12:01:36  5    business under the equipment schedules which, again, is

6    consistent with industry practice.  Everything proceeds

7    fine for awhile unless and until you get into a point

8    where the lessee and lessor want to negotiate an

9    end-of-term exit or a refinancing or a rewrite or an

12:02:00 10    early termination.  And the problem at that point for

11    the lessee is that unwittingly by signing the Master

12    Equipment Lease Agreement and not understanding the

13    import of these kinds of provisions if they are

14    unsophisticated, they have really lost their bargaining

12:02:16 15    power in terms of we can exit the lease at a fair price

16    by industry standards either at the end of the original

17    lease term or at some point during the term if they want

18    to refinance or roll up schedules, they lack that

19    bargaining power.

12:02:36 20          So it puts them at a very disadvantageous

21    position from a contract bargaining standpoint.

22    Q.   Was there anything about the -- are you familiar

23    with the frequency with which computer equipment

24    schedules in the industry are rolled up or rewritten?

12:02:53 25    A.   Yeah.  In my experience, it happens infrequently.  I

1    would say maybe five or ten percent of the leases ever

2    entered into may have some kind of rewrite or roll-up

3    during the middle of the term.  So, yeah, it's a

4    relatively uncommon practice because you've got to have

12:03:15  5    a 24-month, 36-month term, the parties obviously enter

6    into a particular equipment schedule, and it just

7    proceeds ahead, and they act in accordance with it for

8    however long that term is.  And at the end of the term

9    the lessee may exercise its purchase option or returns

12:03:33  10   the equipment in accordance with the return standards

11   that are capable of being complied with.

12   Q.   Have you seen a chart or are you familiar with one

13   that shows the picture of the rewrites in this case?

14   A.   Well, yes.  What I did and my colleague, Bruce

12:03:52  15   Smith, who is also a consultant to 42 North, we both

16   reviewed all of the equipment schedules and determined

17   what equipment schedules were for original new equipment

18   and what equipment schedules were refinancings or

19   rewrites of existing equipment schedules.

12:04:09  20         And Bruce prepared a chart that shows how the

21   schedules were either rolled up or rewritten throughout

22   the history of the relationship between Lycos and CSI.

23         MR. BEAN:  Mr. O'Keefe, could you put that

24   chart up so Mr. Cross may explain it.

12:04:41  25   A.   Just so you're familiar, again, with some of the

1    terminology that we use in the industry and in this

2    case, you may hear the term "rewrite" and the term

3    "roll-up."  In the industry, when we're talking about a

4    roll-up, what we're talking about is when a number of

12:05:00  5    original equipment schedules are rolled up into a single

6    consequent lease schedule.

7         So, as we look at this chart, we can see that

8    49A, which was itself, as it turns up, a roll-up of

9    Schedules 34 and 35 --

12:05:18  10   Q.   Can you highlight that, Mr. O'Keefe?

11   A.   And Schedule 52, which was a portion of an equipment

12   schedule number 32 -- I'm sorry, we have 45, 49, 61, and

13   49A all being rolled up into Equipment Schedule 67.

14        So as testimony is presented in this case and

12:05:46  15   you see all these different equipment schedule numbers,

16   just be aware that some of them represent original

17   equipment schedules and some of them represent a

18   schedule where either a single or multiple prior

19   schedules have been rewritten or rolled up into that

12:06:03  20   schedule.

21        When I refer to a rewrite, I'm usually just

22   talking about where an entire schedule has just been

23   rewritten or refinanced into a new entire schedule.  So

24   exactly the same equipment is on the second schedule as

12:06:16  25   was on the preceding schedule.

1        MR. BEAN:  Mr. O'Keefe, could you highlight

2   that, please?

3   A.   It would be any of the boxes where there's just a

4   single arrow going into another box.  So if we look at

12:06:34 5   the lower right-hand corner, it might be 69D into 69G.

6   You get the point.

7        So that's what roll-ups and rewrites are.

8   And so, in the context of doing these roll-ups and

9   rewrites, it's important to know, obviously, what

12:07:01 10   equipment is being tracked from one schedule into

11   another.  And it's also important to know how your

12   balance from one schedule is being carried over into a

13   subsequent balance.

14        MR. BEAN:  Mr. O'Keefe, can you put the chart

12:07:17 15   up again and highlight it.

16        THE COURT:  I understand your testimony to be

17   that it is unusual in the context of the practice in the

18   industry?

19        THE WITNESS:  That's correct, your Honor.

12:07:26 20        THE COURT:  Okay.

21   A.   And where it does occur in the practice of the

22   industry, it is typical for the lease balance of the

23   lease schedule or equipment schedule that's being

24   terminated to be carried over into the lease balance of

12:07:41 25   the subsequent schedule.

1        So, for example, if I bought a piece of

2   equipment for a hundred thousand dollars, and I've now

3   paid it down to $50,000 via my lease payments, and I

4   then rewrite that schedule into a new schedule, I would

12:07:54 5   expect to see the balance on the new schedule be $50,000

6   because that's what it is under the old schedule.

7        Now, there may certainly be a charge for

8   doing the rewrite.  And typically, that's, in a

9   non-default situation, yeah, the lessor incurs some

12:08:13 10   costs in doing that kind of rewrite.  They may have to

11   reapprove the credit, may have to take a lease out of

12   their own funding facility where they funded the first

13   lease and put this new lease into it, administrative or

14   overhead costs associated with that.  So I may expect to

12:08:30 15   see a mark-up, if you will, or an explicit fee charge

16   that is roughly equal to the amount that it costs the

17   lessor to do the work associated with the rewrite.

18        Typically, in my experience, that amount is

19   equal to one month's rent or two months' rent or may be

12:08:49 20   one or two percent of the existing lease balance.  So

21   that's what I see in the industry when this is done.

22   Again, it's done infrequently, but when it is done,

23   that's the kind of markup that I typically see.

24        MR. BEAN:  Could you put up 1067.2?

12:09:19 25   Q.   What is this, Mr. Cross?

A.   We are looking at CSI's internal accounting

documents.   This is information known only to CSI

because it's an internal record and not known to Lycos.

          This is an example of actually what we were

just looking at on that chart, the combination of four

schedules, 45, 49, 49A, and 61, into a new schedule

called 67.  And what we can see here is that CSI has

calculated a terminating balance, called a net book

value in leasing, but it's equivalent to a principal

balance on the loan, which totals $2,436,323.  So that,

in essence, represents the total principal balance

that's owed on these four lease schedules.

          What they have done on the right side is they

have calculated a new principal balance, which is called

actually PV on the right-hand side of $2,913,128.

          And so, what they've done, and this is when

Bruce Smith and I speak of markup --

          MR. KALER:  Your Honor, I object.  None of

this is in his report, the reference to principal,

balancing.

          THE WITNESS:  It certainly is.

          THE COURT:  I said he could tell us how these

agreements vary from industry practice.  That's what he

is explaining.

          MR. KALER:  Yes.  The issue is disclosure,

1   lack of disclosure in the report.

2           MR. BEAN:  Markup is discussed in his report.

3           THE COURT:  Wait a minute.  I believe that

4   the witness is complying with the order that I made

12:11:05  5   explaining practice and explaining how in this case the

6   practice was done differently, the agreement was done

7   differently.

8           MR. KALER:  Yes, it's not the order.  It's

9   not in the record.  It's the disclosure, not talking

12:11:25 10   about principal balance.

11           THE COURT:  I don't know about that.

12           Members of the jury, this is his report.  I

13   don't remember everything that's in it.

14           MR. ACTON:  Your Honor, page 8 of his report,

12:11:39 15   continuing onto page 9.

16           THE COURT:  In general, I have to rely on

17   counsel in doing what is in the ruling and what is

18   within the report.

19           MR. KALER:  It talks about markups but not --

12:12:01 20           THE COURT:  Whatever you call it, you know,

21   if he used the word markup because it was markup.  But

22   what he's saying is there is a difference from industry

23   practice by the way in which these numbers were

24   represented.  I think he is entitled to do that.  And

12:12:18 25   you're saying that's not in the report?

1          MR. KALER:  The notion of principal balance

2     is not.  He talks about markups in the report, but he's

3     going beyond and not appropriately.

4          THE COURT:  I mean, whatever he calls it, are

12:12:31 5     you saying he didn't describe what he is now telling us?

6          MR. KALER:  He didn't describe it in these

7     terms, attempting to analogize it in that way.

8          MR. ACTON:  Your Honor, I would refer you to

9     page 21 of the report, paragraph beginning with

12:12:54 10     "However."  Next to a hundred thousand dollars, he's

11     referring to principal balance.

12          MR. KALER:  He didn't do an analysis of CSI's

13     documents the way he is testifying now and address that

14     issue.

12:13:15 15          THE COURT:  I'm sorry?

16          MR. KALER:  He did not do an analysis of

17     CSI's documents.  The reference on that page is

18     analogizing this to a new mortgage which, again, is

19     something that was excluded.  That's the reference to

12:13:26 20     principal balance of the new mortgage.  He's not

21     referring to CSI's documents.

22          He's -- it's beyond the scope.  If he wants

23     to speak about analogizing generally, that's fine.

24          THE COURT:  If he's going to do that, you

12:13:40 25     will certainly object that he's talking about --

1          MR. KALER:  Well, the Court has held he can

2     analogize it.  It's just that he can't go to CSI's

3     documents --

4          THE COURT:  You know --

12:13:52  5          MR. KALER:  That's the objection.

6          THE COURT:  The objection is noted.  You may

7     proceed.  What's the next question?

8          Part of what they are now doing is letting

9     the witness decide what he's going to say.  Maybe you

12:14:03 10   can direct the witness a little bit.  Although, in some

11    ways it's a whole lot easier to understand when you can

12    keep going.

13    BY MR. BEAN:

14    Q.   Mr. Cross, please keep going.

12:14:13 15   A.   I've totally lost my place at this point.

16          THE COURT:  What's the next question?

17    Q.   If we can go back to that 1067.2.  I don't know if

18    you finished explaining your point, Mr. Cross.

19    A.   My experience in the industry standard, industry

12:14:32 20   practice would be that if I had a $2,436,323 net book

21    value on a terminating lease or lease schedule or number

22    of leases, then I would expect to see that number as the

23    starting balance on the subsequent lease schedule.

24    That's my only point.

12:14:51 25   Q.   What does the difference between the starting

1  balance on the new lease schedule and the ending balance

2  on the old lease schedule represent, in your view?

3          MR. KALER:  Objection.

4          THE COURT:  As an industry matter.

12:15:08  5  A.   As an industry matter, that's what I referred to and

6  what Dr. Smith refers to as markup.

7  Q.   And what was the amount of the markup on this one

8  particular schedule?

9  A.   On this particular schedule, it looks like it's

12:15:22  10  about $450,000.  It's the difference between the actual

11  PV number and the number that appears at the bottom of

12  that calculation.

13  Q.   And have you ever seen in the industry anywhere a

14  markup of $450,000?

12:15:41  15  A.   I would prefer --

16          MR. KALER:  Objection, your Honor.  There's

17  no foundation for that question.  You would have to go

18  through internal accounting records of leasing

19  companies, and there's no foundation that he's done

12:15:52  20  that.  These are internal accounting calculations of the

21  leasing company looking at what its profit is.  Unless

22  he's looked at the internal accounting records of every

23  other company --

24          THE COURT:  Find out what he's done.  I

12:16:04  25  thought he told us he's looked at thousands of leases.

1          MR. KALER:  These aren't leases.  These are

2     internal accounting documents.  There's no evidence the

3     witness has reviewed all of the accounting records

4     behind all of the leases he's looked at.  Unless there

12:16:21 5     is a foundation --

6          MR. BEAN:  I'll lay a foundation.

7     Q.   You testified earlier that typical markup in the

8     industry was one or two percent or one or two --

9          MR. KALER:  Objection.

12:16:35 10          THE COURT:  He did testify to that.

11     Q.   What was the basis for that opinion?

12          MR. KALER:  I object to that opinion on

13     grounds that there is no foundation --

14          THE COURT:  It is in evidence.  I will allow

12:16:44 15     it to stay in evidence.  He has already testified to it.

16          What's the basis for it?

17     A.   The basis for it is that I've done about 100

18     refinancings over the course of my career.  And one of

19     my responsibilities in doing those financings is to,

12:17:02 20     again, do a credit and pricing review to make sure that

21     the numbers that are provided to me by my pricing and

22     credit people are accurately placed into the document,

23     and then we make sure we haven't made a mistake such

24     that we would be losing money, such as the beginning

12:17:24 25     balance is lower than the ending balance of the

1    schedule.

2            So while I don't prepare those numbers, one

3    of my responsibilities has been to review and make sure

4    that those numbers are protecting my company's position

12:17:35  5    in the documents.

6    Q.   In your opinion, is a markup like we're seeing on

7    Schedule 67.2 typical or atypical in the industry?

8            MR. KALER:   Objection.

9            THE COURT:   Overruled.

12:17:47 10    A.   I believe it is atypical of the industry.

11    Q.   And did you have an opportunity to review the other,

12    many of the other requests for contract between CSI and

13    Lycos?

14    A.   At some point, I reviewed all of the requests for

12:18:01 15    contract because I had a series of notebooks about three

16    feet wide that I understand contained all of the

17    Equipment Schedules, Requests For Contract, sales-type

18    entry journals, and Addendum 1's and all of the related

19    documentation that related to these equipment schedules.

12:18:20 20    So, yes.

21    Q.   And did you see other requests for contract on

22    rewrites or roll-ups that had markups?

23    A.   Yes, I did.

24    Q.   And can you talk generally about what you saw?

12:18:31 25    A.   They vary in amount and percentage.  But generally,

1   whenever a schedule was either rewritten into a

2   subsequent schedule or schedules were rolled up into a

3   subsequent schedule, there was an excess of this actual

4   number over the terminating balance number of the

12:18:53  5   schedules that were being terminated.

6           THE COURT:  Let's stop for a moment and

7   stretch.

8           (Pause).

9   BY MR. BEAN:

12:19:36 10  Q.  Mr. Cross, you testified earlier -- were there any

11  other provisions in -- well, let me back up.

12          Are you aware of anyone other than yourself

13  who has written about some of the provisions that you

14  have described that you thought were atypical in the

12:19:53 15  industry?

16  A.  Well, I think they've been written about by numerous

17  other authors.  There are two major publications that

18  the ELFA has called *Equipment Leasing Today* and the

19  *Equipment Lease Finance Journal* where a variety of

12:20:11 20  authors are commenting on these practices.

21          I know of Professor James Johnson, for

22  example, because he and I both contribute to the ELA's

23  online kind of legal discussion forum from time to time.

24  And I'm familiar with those works because he's been

12:20:27 25  published in those articles, and I did review some of

1    his work in connection with his expert reports.

2    Q.   Have you read any books that have been read by

3    Professor Johnson?

4    A.   Not in their entirety, but I've read chapters.

12:20:41 5    Q.   What chapters have you read?

6            MR. BEAN:  May I approach, your Honor?

7    Q.   Are you familiar with the book that I've just shown

8    you?

9    A.   Yes, I am.  I've actually seen this book prior to my

12:21:00 10   involvement in this case.

11   Q.   What is the book?

12   A.   It's called *Technology Leasing:  Power Tools For*

13   *Lessees.*

14   Q.   And who wrote it?

12:21:09 15   A.   Professor Johnson and Barry Marks, who is an

16   acquaintance of mine, who is an outside attorney for the

17   industry.

18   Q.   And who is Professor Johnson?

19   A.   He is a professor at Northwestern University.

12:21:22 20   Q.   Have you read any of the chapters in that book?

21   A.   Yes, I have.  At one point or another, I think I've

22   read this entire book.  But usually what I've done is

23   used it when I need advice on a topic, I'll look at it,

24   among other books, and see if it can provide me with an

12:21:38 25   answer.

Q.   Is any chapter -- does any chapter in that book

address provisions that lessees in the industry should

be concerned about having in their leases?

MR. KALER:  Objection, your Honor.  This is

12:21:50 not a learned treatice --

THE COURT:  Not only that, but you're asking

about reliance, not by the expert, but by others.  The

objection is sustained.

MR. BEAN:  I was looking for support for

12:22:04 Mr. Cross' opinion.

THE COURT:  Okay.  He's read it.

Q.   Are you aware of any CSI leases -- let me back up.

You identify the absence of a purchase option

as something that you thought was atypical?

12:22:19 A.   That's correct.

Q.   Where would you typically see a purchase option?

A.   You may see it in the Master Equipment Lease

Agreement, but because it's an economic term of the

transaction, we typically see it in the equipment

12:22:30 schedule to the transaction because, again, you came up

with a variety of purchase options.  There may be fair

market value, or 10 percent in another, or might be a

dollar in another.

So it's typically a clause within either the

12:22:45 equipment schedule or an addendum to the schedule.

1  Q.   Are you familiar with any CSI leases that do have

2  purchase options?

3  A.   Well, when I was conducting my search for other

4  leases generally in the industry, I did come across a

12:22:59  5  lease between CSI and, I believe it's a company called

6  Innotrac, and that was, in many respects, very similar

7  to this lease, but it contained, I believe, a fair

8  market value purchase option.

9          MR. BEAN:  Can you put up Exhibit 2010,

12:23:16  10  please.

11  Q.   All right, let's move onto a different topic while

12  we're looking for that.

13          What, if anything, did you see about CSI's

14  use of the term of base value or base value numbers?

12:23:45  15  Was there anything in that that was unusual in the

16  industry?

17  A.   Not initially.  Base value clearly was intended to

18  represent original equipment cost, at least with respect

19  to the schedules that were for new equipment.

12:23:58  20          What I found from reviewing CSI's internal

21  records was that apparently that definition changed when

22  we got to the refinancing or rewritten schedules because

23  it no longer represented original equipment costs.  But

24  I was able to determine that it represented, in essence,

12:24:16  25  this new principal balance of the new schedule after the

1    prior schedules had been terminated.

2            So it shifted, the definition shifted between

3    the time of the new schedules and the time of the

4    refinanced schedules.

12:24:32  5            MR. BEAN:  Could you put up Exhibit 3025.

6            MR. KALER:  Objection to this as beyond the

7    scope of the witness' report.  And he's giving an

8    opinion apparently about CSI documents that he looked

9    at.

12:24:45  10            THE COURT:  As I understand, the question has

11    to do with a particular lease here.  But I don't know

12    how or what the witness has been talking about just now

13    about face value in any way is industry practice or not.

14    Q.   When a schedule is rewritten, the lease, the

12:25:03  15    equipment is out there for a longer period of time,

16    right?

17    A.   Well, the equipment has been subject to the

18    schedules for some period of time, yes.

19    Q.   What typically happens to the base value over time?

12:25:17  20            MR. KALER:  Objection.  There's no evidence

21    that the witness would know that.

22            THE COURT:  Why not?

23            MR. KALER:  There's no foundation for him to

24    have any knowledge of what the base value or stipulated

12:25:31  25    cost is.

1          THE COURT:   The concept, not numbers.

2   Q.   What typically happens to the base value when

3   schedules are rewritten?

4   A.   It is typically industry practice that base value

12:25:43 5   will decline over time in accordance with the decline of

6   the lease balance itself because once one has entered

7   into an equipment schedule, you're starting to pay down

8   on that original equipment cost.

9          So, again, although the industry doesn't use

12:26:02 10   the term necessarily "base value", there are other terms

11   that are kind of synonymous with it.  And so, what you

12   would see if you're going to use base value as the

13   number that you're running your stipulated loss values

14   off of, you would expect the base value in the

12:26:19 15   subsequent or rewrite schedule to again equal whatever

16   the balance was on the schedule that just terminated.

17   So it's again carried over into the new schedule.

18   Q.   Did you have an opportunity to review the base

19   values that CSI had on the roll-ups to see the extent to

12:26:36 20   which they comported with this industry practice?

21   A.   They did not comport with this industry practice.

22          MR. BEAN:   Can you put up Exhibit 3025,

23   please?

24   Q.   Can you explain what we're looking at?

12:26:49 25   A.   Yes.   These are actually the same schedules that I

1    believe we were just talking about.

2             MR. KALER:  Objection.  Is this just being

3    offered as a demonstrative.

4             MR. BEAN:  Yes.  All of the underlying

12:27:00  5    information is from exhibits in evidence.  The

6    stipulated loss value tables for 45, 49, 49A, 61, 67 are

7    all in evidence.

8             MR. KALER:  If it's a demonstrative, I have

9    no objection.

12:27:13 10             THE COURT:  Members of the jury, we use

11    different terms.  A demonstrative or a chalk is an

12    explanation made by an expert witness based on the

13    documents that are in evidence and in which he's simply

14    trying to explain to you graphically what he is telling

12:27:28 15    you in words.

16    Q.   Could you explain what we're looking at, Mr. Cross?

17             THE COURT:  But it's not in evidence.  You'll

18    do your own calculations.

19    A.   Yes, what is stated on this demonstration screen is

12:27:44 20    the original base values for the four schedules, 45, 49,

21    49A, and 61.  So these are the numbers that actually

22    appear in that line called "Base Value" on those

23    equipment schedules.

24             And as we just saw, all of these four

12:28:01 25    schedules were rolled up into Schedule 67 after having

1    some payments made on them.  And yet, the base value

2    under the schedule is under the base schedules that are

3    rolled up (unintelligible).

4    Q.   Can we look at 1067.1.  What is this, Mr. Cross?

12:28:44  5    A.   This is the stipulated loss value schedule to

6    Equipment Schedule 67.  As we can see, the base value is

7    the $2,850,000 that we were just talking about.  So this

8    is, again, it represents, in essence, the principal

9    balance of the new schedule on day one of that schedule.

12:29:07 10    Q.   And --

11    A.   And then, again, as we said before, you apply the

12    stipulated loss value percentages to that number in

13    order to determine what would need to be paid to the

14    lessor if the lessor allowed you to do it if there was a

12:29:20 15    loss to the equipment.

16    Q.   Typically in the industry, approximately -- if a

17    lessee wants to have a lease treated as an operating

18    lease, approximately what percentage of the original

19    equipment cost is paid over the term of the lease to the

12:29:34 20    lessor?

21           MR. KALER:  Objection.  There is no

22    foundation for the witness to give an expert opinion for

23    the criteria of operating an operating lease.  And it's

24    not in his report.

12:29:46 25    Q.   What typically is the percentage of original

 1   equipment cost in the industry as paid by a lessee over

 2   the term of the lease?

 3   A.   I'm sorry, could you say that once more?

 4   Q.   Sure.  I think I was rather inartful there.   I

 5   apologize.

 6          In the industry, what percentage of the

 7   original equipment cost is typically paid by a lessee to

 8   the lessor over the term of the lease?

 9   A.   If we're talking about operating leases from an

10   accounting standpoint --

11          MR. KALER:  Objection.  I don't think the

12   witness can talk about operating leases.

13          THE COURT:  Why not?

14          MR. KALER:  Because he has no expertise in

15   accounting, and it's not in his report that he'll give

16   an opinion about what the percentage of base value to

17   extended price is going to be under an operating lease.

18   We're not on fair notice --

19          THE COURT:  This is in general.

20          MR. KALER:  But he has no foundation for

21   knowing how companies treat their leases as operating

22   leases or not.  He's never done it.  He's not an

23   accountant.  That's the objection.

24          MR. BEAN:  We'd be pleased to lay a

25   foundation, if necessary.

1          THE COURT:  Do that.

2    Q.   Mr. Cross, what familiarity, if any, do you have

3    with operating leases?

4    A.   I'm quite familiar with operating leases.  In fact,

12:30:58  5    it does appear in my report.  In fact, I attached as an

6    exhibit to my report the FASB that applies to operating

7    leases.

8    Q.   What is an operating lease, as you understand it?

9    A.   Well, an operating lease is -- back up just a

12:31:13  10   second.

11          When you enter into a lease, the asset, the

12   equipment that is subject to a lease, can either be an

13   asset on the balance sheet of the lessee, or it can be

14   what's called off balance sheet.  And there are very

12:31:29  15   specific accounting rules that say whether or not an

16   asset will be on the balance sheet of the lessee or not.

17   And many times, lessees want to have assets off balance

18   sheet, and sometimes they want them to have on balance

19   sheet.

12:31:43  20          So, depending on how you structure your

21   lease, you can produce a particular desired accounting

22   result.

23          THE COURT:  Excuse me.  Do you understand

24   what he is talking about?  Okay.

12:31:55  25   A.   The standards that are in the accounting standards,

and particularly in an accounting standard that's called

FAS-13, is that if the net present value of all of the

future rentals under the contract is less than 90

percent of the original equipment cost, then that means

12:32:18  that you've paid less than 90 percent of the original

equipment cost through those rents, then that means it

can be an accounting lease for accounting purposes, and

you don't have to put that asset and the liability

associated with the lease onto your balance sheet.

12:32:32      If it goes over 90 percent, then you do have

to treat that equipment as though you owned it for

accounting purposes.  And the lease, quote unquote,

that's associated with that equipment becomes a loan for

financial statement purposes, and it's shown on your

12:32:50  financial statements as such.

          MR. KALER:  Your Honor, I object and move to

strike the answer.  None of this is in his expert

report, and he's not qualified to give an opinion on

accounting standards, there are four requirements to be

12:33:04  an operating lease.

          THE COURT:  Are you now the expert?

          MR. KALER:  No, your Honor, but I've read

enough to know that this gentleman is not an expert,

either, and should not be giving an opinion about

12:33:14  operating lease treatment.  And I really didn't --

1          THE COURT:  Where is it in the report, Mr.

2     Cross?

3          THE WITNESS:  I'd be happy to look at the

4     report.  I might need to see the supplemental reports as

5     well.  I'm sorry to take up the Court's time.

6          If we look, your Honor, at my responsive

7     report of September 24, 2007, there is a specific --

8          THE COURT:  Is that bound into the same

9     volume that has the original?

10         THE WITNESS:  I don't believe so, your Honor,

11    but I don't know exactly what you have in front of you.

12         THE COURT:  Can I have a copy of it?  Let Mr.

13    Kaler see it.

14         I don't want you to talk to the witness, but

15    I want you to understand from the witness what he's

16    looking at.  Frankly, I don't understand why we're

17    getting so sidetracked.  The question has to do with

18    residual value related to original.

19         MR. BEAN:  Precisely, your Honor.

20         THE COURT:  Why don't we just go back to

21    that.

22         THE WITNESS:  I'm happy to do that, your

23    Honor.  I just want to state --

24         THE COURT:  No, no.  It's okay.

25    Q.  Mr. Cross, on a lease that has been, which has been

1   paid down over time and through a roll-up or a rewrite,

2   what happens to the residual value of the equipment over

3   time?

4   A.   Well, assuming that your roll-up or rewrite is going

12:35:25 5   to extend the term beyond the original term, then one

6   would expect that the residual value is going to

7   decrease because the equipment is obviously older at the

8   end of that restructured treatment than it was at the

9   end of the original term.

12:35:41 10   Q.   And the equipment on Schedule 67 that we're looking

11   at, I believe you said that had been under lease before?

12   A.   Yes.  It represented a roll-up of four prior

13   schedules which, in turn, themselves some of which were

14   roll-ups from prior schedules.

12:35:54 15   Q.   And what is the stipulated loss value percentage

16   that we see on Schedule 67?

17   A.   We have --

18   Q.   At the end of 36 months.

19   A.   Schedule 67 did have a 36-month term.  So at the end

12:36:09 20   of 36 months, the stipulated loss value would be 55

21   percent of $2,850,000 if all of the equipment were to

22   have been lost or destroyed.

23   Q.   How common or atypical is that in the industry,

24   particularly in the computer equipment industry,

12:36:31 25   particularly when there have been roll-ups as a result

1    of earlier schedules where there were payments?

2    A.   Well, again, in this context, whether we're talking

3    about a refinanced schedule or an original schedule --

4              THE COURT:   I think he told us all before.

12:36:45  5    My notes indicate that the stipulated loss value far

6    exceeds the value at different times, especially at the

7    end of the lease from that which is --

8              MR. BEAN:   The only point I'm trying to make

9    is where you have a roll-up or a rewrite, where the

12:37:02 10    equipment is older, the difference is more profound.

11              THE COURT:   He said that before, too.

12              MR. BEAN:   All right.   Very good.

13    Q.   What is this, Mr. Cross?

14    A.   This is the Master Lease Agreement, and I believe

12:37:32 15    there is a schedule attached to it as well, between CSI

16    and Innotrac Corp. which I found on one of my web

17    searches for computer equipment leases.

18    Q.   Does this lease contain a purchase option?

19    A.   I believe it does.

12:37:49 20    Q.   Go to the third-to-last page, please, and then we'll

21    go to the second-to-the-last page.   I believe you had it

22    as 2011?

23              THE COURT:   What are we waiting for?

24              MR. BEAN:   We're trying to get the Innotrac

12:38:57 25    lease back on the screen.   Let me see if I can move on.

1          THE COURT:  Can we just have a question about

2     it?

3          MR. BEAN:  I wanted to show the jury the

4     purchase option, what it looked like.

12:39:21 5    Q.   This is the Innotrac lease.  If you could turn to

6     the third-to-last page, please, the Addendum 1, what are

7     we looking at, Mr. Cross?

8     A.   This is part of what CSI's equipment schedule

9     document package is, and this is labeled Addendum One to

12:39:48 10   Equipment Schedule Number One.

11    Q.   I'm going to turn ahead to the second page, and I

12    direct your attention to paragraph 8.

13    A.   Yes.  That's the purchase option.

14    Q.   And what type of purchase option is this?

12:40:02 15   A.   This is a fair market value purchase option.

16    Q.   Where do you see that?

17    A.   That appears in the fifth line, I'm sorry, appears

18    first in the fourth line, that the lessee can purchase

19    equipment at fair market value, and if they cannot

12:40:24 20   agree, there will be an appraisal process.

21    Q.   What does it mean to have a fair market value

22    option?  What does that mean?

23    A.   It means at the end of the lease term, if the lessee

24    wants to purchase the equipment, it tells the lessor

12:40:39 25   that it wants to purchase the equipment, and then they

1     enter into an agreement as to what that fair market

2     value is.  If they can't so agree, then they go to an

3     outside third-party appraiser, one or more, to determine

4     what that value is.  Once that value is set, at the end

12:40:56  5     of the lease term, the lessee pays the lessor whatever

6     that fair market value is, and title to the equipment is

7     transferred to the lessee.

8              THE COURT:  Excuse me.  What was the nature

9     of the equipment, or what was the equipment that was

12:41:09  10     subject of this lease?

11              THE WITNESS:  Of this specific schedule?

12              THE COURT:  Yes.

13              THE WITNESS:  I couldn't tell, your Honor,

14     because these public websites don't have all of the

12:41:20  15     documents on them.

16     Q.  Are you familiar with there being fair market value

17     options in computer equipment leases, Mr. Cross?

18     A.  Yes.  It's universal, in my experience, not just

19     common.

12:41:39  20     Q.  Is there anything else in the CSI-Lycos lease

21     documentation that in your opinion is inconsistent with

22     industry practice, something we haven't talked about

23     already?

24     A.  Well, I think with respect to the issues set forth

12:41:56  25     in my report, I think I have hit all of those issues at

1   this point.

2   Q.   Could you just summarize those for the jury, please?

3   A.   Sure.  It is the return provisions, which I believe

4   in the context of the particular equipment subject to

12:42:10 5   this lease were impossible to comply with.  And that in

6   turn fed into this automatic evergreen renewal clause

7   that said if you can't return the equipment, then you

8   just keep renewing the lease and renewing the lease and

9   renewing the lease and paying full monthly rent during

12:42:28 10   each of those renewals.

11          The fact that the stipulated loss values bore

12   no relationship to equipment cost or to the lessor's

13   lease balance during the term of the lease, or little

14   relationship, I should say, and that there was no

12:42:43 15   purchase option in the lease which would allow the

16   lessee to purchase the equipment at the end of the lease

17   term.

18   Q.   Did you mention the frequently of the refinancings

19   and the markups?

12:42:55 20   A.   I thought we were just talking about.

21   Q.   Anything else in the relationship between the

22   parties?

23   A.   As we discussed, with respect to the refinancings,

24   both the volume and frequency of the refinancings was

12:43:08 25   atypical in my experience.  And the markup between the

1    old balance and the new balance was very atypical in my

2    experience because I would expect to see it be much less

3    than what it was.

4    Q.   Mr. Cross, are you familiar with the general

12:43:25 5    practice in the industry as to who takes the lead in the

6    leasing relationship --

7           In terms of the level of understanding of

8    lessees and lessors about equipment leasing, whether one

9    is typically more sophisticated, could you comment on

12:43:47 10    that?

11           MR. KALER:  Objection.

12           THE COURT:  What's the objection?

13           MR. KALER:  On the grounds that I don't think

14    his comment on the sophistication of lessors and lessees

12:43:57 15    generally is one for which there is adequate foundation

16    for him to give an opinion as an expert on the issue.  I

17    think he may have alluded to it in his reports, but my

18    objection is --

19           THE COURT:  He can tell us about the relative

12:44:14 20    roles of lessor and lessee in the industry.

21           MR. BEAN:  Thank you, your Honor.  I

22    apologize for my inarticulate question at this hour.

23    Q.   What is the relative role --

24           THE COURT:  Do you want to quit now?

12:44:28 25           MR. BEAN:  If I were honest, your Honor, in

1    responding to that --

2    Q.   Mr. Cross, what is the relative role of lessors and

3    lessees in the industry?

4    A.   Well, again, as I said before, I think the lessees

12:44:41 5    are the experts in using the equipment, so they are the

6    ones that go out and select it and negotiate with the

7    vendor the purchase price and the ones that obviously

8    use it in the course of their business.  But the lessor

9    is the expert in the financing of that equipment.  So it

12:44:57 10   is the one that has a much greater level of knowledge

11   and expertise in terms of the financial structuring of

12   the lease or loan.

13   Q.   Is there a typical approach that is taken by lessors

14   when dealing with lessees relative to the documentation?

12:45:16 15          MR. KALER:  Objection.  There's no foundation

16   for the witness to give an opinion on what the industry

17   practice is on how contracts are negotiated.  Perhaps

18   he's done a survey of how they are negotiated, but if he

19   has, we have not heard it, nor is it in his report.

12:45:33 20          THE COURT:  In his experience, based on his

21   experience, he may tell us what he has observed in this

22   regard.

23   A.   Yes.  Based on my direct experience in negotiating

24   with lessees and in preparing lease documents, my

12:45:50 25   experience is that the lessors are typically, although

1    not always, more sophisticated than the lessees; and

2    that that's one of the reasons that lessees choose

3    lessors, and choose amongst lessors, by the way, because

4    it isn't just one lessor that's out there trying to

12:46:10 5    pitch a company for business.  CFOs of companies are

6    getting pounded all of the time by different leasing

7    companies trying to get them to use them as their

8    primary financing source.

9         What happens typically is that the lessors

12:46:28 10   make their pitch to the decision maker in the company.

11   The decision maker in the company decides which leasing

12   company it wants to use for its equipment leasing and

13   financing transactions based on, I guess, the quality of

14   the approach that the lessor's account executive has

12:46:47 15   taken and the lessee's evaluation of the ability of the

16   lessor to perform and to provide the products and

17   services that it needs.

18        MR. KALER:  I object, your Honor, to the

19   witness giving an opinion about whether the involvement

12:47:02 20   of the account executive, what the involvement of that

21   and the decision-making process is without some

22   foundation of him knowing.

23        THE COURT:  Mr. Kaler, he is giving us a

24   general picture based on his experience.  He is never

12:47:16 25   going to do it in precisely the words and terms that you

1    would want him to do it.

2    Q.   Based on your experience in the industry over

3    twenty-five years, to what extent do lessees typically

4    rely on lessors?

12:47:32 5    A.   Lessees rely extensively on lessors because, again,

6    the lessee typically doesn't have in-house expertise in

7    evaluating leases either from an accounting or a tax

8    standpoint.

9              MR. KALER:  I object to that, your Honor.  I

12:47:47 10   really think he cannot give an opinion on whether --

11             THE COURT:  Mr. Bean, let us have short

12   answers.

13             So typically, Mr. Cross, your experience is

14   that that is the way it is --

12:48:04 15   A.   Typically, Mr. Bean, typically the lessee does rely

16   on the lessor to provide the leasing products and

17   services that it needs in order to help it acquire

18   equipment that it needs to run its business.

19   Q.   And to what extent do you consider equipment leasing

12:48:25 20   to be a specialized field of knowledge?

21   A.   Equipment leasing is a highly specialized field of

22   finance within financed products generally.  I know

23   there's about 150 or 200 lawyers from across the country

24   that attend the ELA Legal Forum each year.  That's, I

12:48:47 25   believe, the premiere forum for that kind of activity in

          1     the country.

          2               So it's a pretty small group of people that

          3     really understand the ins and outs of leasing.

          4               MR. BEAN:  May I have a moment, your Honor?

12:49:07  5               THE COURT: Yes.

          6     Q.  Mr. Cross, in your experience, in addition to the

          7     reliance, to what extent do lessees typically trust

          8     lessors for their advice?

          9               MR. KALER:  Objection.

12:49:31 10               THE COURT:  I don't know how he can tell us

         11     that.

         12     Q.  Mr. Cross, are you being paid to testify here today?

         13     A.  Yes, I am.

         14     Q.  How much are you being paid?

12:49:39 15     A.  My company is paid at a rate of $450 per hour.  And

         16     42 North is paying me $250 per hour.

         17     Q.  Is your compensation contingent in any way on any

         18     opinions you've given today?

         19     A.  No, it is not.

12:49:57 20     Q.  Is your compensation contingent in any way on the

         21     outcome of this case?

         22     A.  No, it is not.

         23     Q.  Thank you, Mr. Cross.

         24               THE COURT:  Let's stretch.

12:50:12 25               (Pause)

1          THE COURT:  All right, Mr. Kaler.  You may

2     proceed.

3     CROSS EXAMINATION

4     BY MR. KALER:

12:50:42 5     Q.   Mr. Cross, on that last point, at least as of the

6     time of your deposition, your company had billed

7     approximately $300,000 to Lycos for your services as an

8     expert in this case, correct?

9     A.   Yeah, I believe that's between me and Dr. Smith,

12:50:58 10     that's a correct number.

11     Q.   You mark up Dr. Smith's hourly rate in your bills to

12     Lycos, right?

13     A.   Dr. Smith and I submit a monthly invoice to Lycos

14     which contains our hours.  And Lycos receives a bill

12:51:11 15     equal to the number of hours times $450.

16     Q.   Right.  And Mr. Smith's billing to you is less than

17     that per hour, right?

18     A.   Both Dr. Smith and I are being paid by 42 North $250

19     an hour, so the company is keeping the difference

12:51:31 20     between what it bills to Lycos and what we receive.

21     Q.   I think your deposition was a little over a year

22     ago.  Can you tell us how much you have billed to today?

23     A.   It really hasn't increased too much because after my

24     deposition there really wasn't much activity, at least

12:51:53 25     until April of this year.  So I haven't really billed

1  any significant additional amounts of money because all

2  of the activity has taken place in the last month or so.

3  Q.   So it's about three hundred thousand?

4  A.   Yeah.  So far, yes.  Then there will be the

12:52:08 5  additional charges for the trial work.

6  Q.   One of your major points or arguments or opinions is

7  that in leases, in your experience, there's always a

8  purchase option, right?

9  A.   That's correct, yes.

12:52:23 10  Q.   You were at BankVest in the law department for a

11  period of time, correct?

12  A.   I was Senior Vice President and General Counsel of

13  BankVest, yes.

14  Q.   And you were responsible for the contents of all of

12:52:40 15  BankVest's leases during this period of time, right?

16  A.   Yes, I was.

17  Q.   And there was a BankVest Standard Master Lease,

18  right?

19  A.   There was, yes.

12:52:48 20          MR. KALER:  Can we put up Exhibit 710 and

21  turn to the page of that document which is, I think, the

22  sixth page -- I'm sorry, let's start first at the second

23  page and blow up the first paragraph.

24  Q.   Do you see that this appears to be a Master

12:53:23 25  Equipment Lease Agreement dated as of February 2, 1999

1    between BankVest and LeaseVest Capital?

2    A.    That's what it says, yes.

3    Q.    And if we go two or three pages into the document,

4    five pages in, if you can go to the bottom of the

12:53:57 5    preceding page, do you see the language in the

6    stipulated loss value definition of this BankVest lease

7    where it says:  "As used in this lease shall mean, for

8    any particular date," and then continues, "the net

9    present value of all rental payments payable throughout

12:54:44 10    the remaining term of the applicable lease schedules

11    plus the amount of any purchase or renewal option or

12    obligation with respect to the equipment or, if there is

13    no such option," and that refers to the purchase option,

14    right?

12:55:08 15    A.    Yes.

16    Q.    If there is no such purchase option, then the fair

17    market value at the end of the term, referring to a stip

18    loss value?

19    A.    Yes.

12:55:19 20    Q.    And so, this BankVest lease of your own company at

21    the time you were there provided for the possibility

22    that there might either be a purchase option in an

23    equipment lease or, if there is no such option, then

24    something else.  It also provided for the possibility

12:55:44 25    that a lease might not have a purchase option, correct?

A.   It provides for that possibility, yes.

Q.   And the reason it provides for that possibility is that BankVest itself on occasion enters into equipment leases where the customer has not requested a purchase option and, therefore, it's not included in the leases, correct?

A.   That's incorrect.

Q.   Well, certainly, if a purchase option is not included in the lease, then there are -- it's a different contract, right?

A.   Well, it's a contract without a purchase option, yes, right.

Q.   One of the issues with respect to leasing you know generally is that if a purchase option is included in a lease, depending on the type of purchase option, there can be a problem because the taxing authorities can treat certain types of leases that have bargain purchase options, for example, as essentially installment sales contracts.  And that can accelerate the tax obligation. You are aware of that from a lawyer's standpoint, right?

          MR. BEAN:  Objection, your Honor.

          THE COURT:  He's not testifying as a lawyer.

Q.   You are aware of that from your experience in leasing, surely?

A.   Absolutely.

1    Q.    I thought as much.  And sometimes one of the

2    concerns that corporations have is they want to treat

3    their leases as off the books, as you say, standard

4    operating leases, and they don't want there to be any

12:57:22 5    question, and that the purchase option they had

6    negotiated might at later time be looked at as a bargain

7    option?

8    A.    That's correct.

9    Q.    And without getting into the particulars of any

12:57:38 10   particular situation, it is reasonable under some

11   circumstances for a corporation that wants to be

12   absolutely sure that the lease contract it has entered

13   into is a pure lease and not in any way a sale, it would

14   not be you unreasonable for a corporation in that

12:57:59 15   situation to enter into a lease which did not have

16   itself in it at that time a purchase option.  That could

17   be a reasonable business decision, right?

18   A.    No, I don't believe it would be a reasonable

19   business decision.

12:58:10 20   Q.    But the issue of whether or not it would be a

21   reasonable business decision to either put a purchase

22   option in a lease or not put a purchase option in a

23   lease is not something that you have ever addressed, is

24   it?

12:58:27 25   A.    Oh, it's an issue that I have addressed all the

1   time, of course.

2   Q.   So you have addressed all the time of whether a

3   purchase option should or should not be put into a

4   lease?

12:58:39 5   A.   No, because it has been my standard practice for

6   whomever I have ever worked that there will be a

7   purchase option in every lease.

8   Q.   Well, I'm addressing whether or not you have ever

9   had to decide in this instance there should not be a

12:58:55 10   purchase option.

11           MR. BEAN:   Objection.   I don't think there

12   was a question.

13           MR. KALER:   That is the question.

14   Q.   Have you ever been confronted with a situation in

12:59:03 15   which you've had to decide, for example, with BankVest,

16   obviously, there are situations where there is no such

17   purchase option, the possibility is provided for there,

18   in the BankVest --

19   A.   I think you're mischaracterizing the Lease

12:59:17 20   Agreement.   It does in the Master Lease specify that

21   there is a possibility that there would be no option.

22   But BankVest always had a purchase option in the

23   equipment schedules, as I indicated earlier in my

24   testimony.

12:59:28 25   Q.   Yes.   But in this official document, the BankVest

1   lease --

2   A.   By the way, I can't identify this document as a

3   BankVest lease.

4   Q.   In this form, at least, the possibility of there not

12:59:42 5   being a purchase option in the lease is mentioned,

6   right?

7   A.   Yes.  I would consider this a savings clause.

8   Q.   A savings clause.  And a savings clause is

9   traditionally a reference to a situation that is

12:59:59 10   intended to provide for a situation that might occur, in

11   this case, specifically the possibility that there might

12   be a Master Lease or Equipment Schedule that did not

13   have a purchase option.

14   A.   That is not my understanding of savings clause.  A

01:00:13 15   savings clause is to protect the parties against an

16   unintended consequence of something.  For example,

17   elsewhere in this lease you will find a provision that

18   says if any provision of this lease is unenforceable, it

19   does not affect the validity of any of the other

01:00:31 20   provisions.  They provide a mechanism by which that can

21   be corrected.

22          In the case of a purchase option, I would say

23   it's possible that someone makes a mistake, and the

24   purchase option is lost.  Those are the kinds of

01:00:47 25   consequences that this language is intended to address.

1    Q.   Well, what this language is intended to address is

2    what you were telling us.

3                THE COURT:   I believe he said that it is

4    designed to protect the parties against the unforeseen.

01:01:03  5                I think we need to suspend here until Monday

6    morning at nine.

7                Members of the jury, I hope you have a

8    wonderful weekend, that you enjoy the good weather we

9    are supposed to have, and that you will be back at nine

01:01:18 10    o'clock on Monday morning.

11                (Jury was excused).

12                THE COURT:   Court is in recess until nine

13    o'clock on Monday.

14                (Whereupon, the hearing adjourned at 1:00

15    p.m.)

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5      I, Lisa W. Starr, Registered Professional

6  Reporter/Certified Realtime Reporter, do hereby certify

7  that the foregoing transcript, from Page 1 to Page 62,

8  constitutes to the best of my skill and ability a true

9  and accurate transcription of my stenographic notes

10  taken in the matter of Civil Action No. 05-10017-RWZ,

11  Computer Sales International, Inc. Vs. Lycos, Inc.

12

13

14  _____

15  Lisa W. Starr, RPR, CRR

16

17

18

19

20

21

22

23

24

25