UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


COMPUTER SALES, INC., f/k/a    *
COMPUTER SALES INTERNATIONAL, *
INC.,                          *
              Plaintiff,       * Civil Action
                               * No. 05-10017-RWZ
      - vs. -                  *
                               *
LYCOS, INC.,                   *
              Defendant.       *


**JURY TRIAL**
Day 7 Session 2
BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE



UNITED STATES DISTRICT COURT
John J. Moakley US. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
June 9, 2009
11:20 a.m.



*   *   *   *   *



LISA W. STARR, RPR, CRR
Tel:  (617) 771-8336

```
1    APPEARANCES

2
     FOR THE PLAINTIFF:
3         McCARTER & ENGLISH, LLP
          BY:  Robert J. Kaler, Esq.,
4              Edward William Little, Jr., Esq.
               David Himelfarb, Esq.,
5              Kelly Gabos, Esq.
          265 Franklin Street
6         Boston, Massachusetts  02110
          Tel:  (617) 449-6500
7         e-mail:  Rkaler@mccarter.com

8    FOR THE DEFENDANT:
          McDERMOTT WILL & EMERY, LLP
9         BY:  Thomas O. Bean, Esq.
               Peter M. Acton, Jr., Esq.
10        28 State Street
          Boston, Massachusetts  02109-1775
11        Tel:  (617) 535-4000
          e-mail:  Tbean@mwe.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2    Witness                Direct  Cross  Redirect  Recross

3

4

5

6

7

8                      E X H I B I T S

9    Exhibit No.                                    Page

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

     (The following proceedings were held in open court before the Honorable Rya W. Zobel, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on June 9, 2009.

     THE COURT:  Please be seated.

**THOMAS GUILFOYLE, resumed**

CROSS EXAMINATION

BY MR. KALER:

Q.   You are no longer employed by Lycos, is that correct?

A.   That's correct.

Q.   You have been meeting with your lawyers since?

A.   That's correct.

Q.   Your legal counsel in connection with your appearing in this case is being paid by Lycos, correct?

A.   That's correct.

Q.   And you met with counsel for Lycos prior to your testimony, right?

A.   I did, yes.

Q.   To try to get some understanding of what they're claiming in the case, correct?

1    A.    Correct.

2    Q.    You communicated to us some of your understanding of

3    some of the issues that are involved in the case,

4    correct?

11:13:59 5    A.    Correct.

6    Q.    You referred to, in your testimony, having stock

7    options in the company when you were there, correct?

8    A.    Yes.

9    Q.    One of the features of the stock options you had was

11:14:17 10    that they would be accelerated and immediately vested,

11    in other words, immediately payable, in the event the

12    company was sold to a larger or other company, right?

13    A.    Correct.

14    Q.    If we look briefly at a time line that we've used as

11:14:33 15    a demonstrative before, directing your attention, is it

16    right, then, Lycos was founded by venture capitalists in

17    June of '95?

18    A.    That's correct.

19    Q.    You joined the company sometime in 1996, I think you

11:14:53 20    said?

21    A.    February of 1996.

22    Q.    February of '96.  Do you recall that that was when

23    Lycos signed a lease with Digital for the equipment in

24    Pittsburgh?

11:15:02 25    A.    I don't recall that lease, no.

1    Q.   But you do recall the public offering in April of

2    1996 when Lycos raised the 48 million?

3    A.   Yes, I do.

4    Q.   And do you recall in November of '96 that Lycos

11:15:13 5    signed another Master Lease with Avnet?

6    A.   I don't recall that specifically, no.

7    Q.   But you do recall the signing of the Master Lease

8    with CSI, right?

9    A.   I do remember that we signed a lease with CSI, yes.

11:15:25 10   Q.   You were involved in the negotiation of the Master

11   Lease, right?

12   A.   I don't believe I was, no.

13   Q.   If we look at Exhibit 89, and we go to the

14   Certificate of Incumbency --

11:15:45 15          THE COURT:   That has to do with the signature

16   issue, does it not?   It doesn't go to the issue of

17   negotiation, does it?

18          MR. KALER:   The signature issue relates to

19   the other document, which I was about to show the

11:15:59 20   witness, your Honor, Exhibit 84.

21          If we go five or six pages, can we just

22   scroll into the document, Steve?

23   Q.   We're looking at pages LYC 00353, the "Remedies"

24   section of the Master Lease.   Do you recognize the

11:16:43 25   handwriting there?

1    A.    I do not, no.

2    Q.    Do you know who in your department was working on

3    the Master Lease in December of 1996?

4              MR. BEAN:    Objection.    Assumes facts not in

11:16:52  5    evidence that someone in his department was working on

6    it.

7              MR. KALER:    Yes, well this came from Lycos'

8    file.

9              MR. BEAN:    It doesn't mean that the

11:16:59 10    handwriting came from anyone in his group.

11    Q.    Well, do you know who anywhere at Lycos was working

12    on the Master Lease Agreement?

13    A.    I don't recall, no.

14    Q.    And do you remember signing the Certificate of

11:17:11 15    Incumbency for Mr. Philip to sign the Master Lease?

16    A.    I don't recall that, no.

17    Q.    But you don't doubt that you did?

18    A.    A Certificate of Incumbency?

19    Q.    Yes.    If you look at Exhibit 84 --

11:17:24 20    A.    Yes, that was my signature, yes.

21    Q.    And if you go back to Exhibit 84 -- I'm sorry, 89.

22              MR. KALER:    I'm looking for the December

23    certification, if possible.    It's page 2 of the exhibit,

24    I think.

11:18:31 25    Q.    Bates number CSI 0000116.    In December of 1996, you

1    signed this document authorizing Mr. Philip to sign the

2    Master Lease, right?

3    A.    That is my signature, yes.

4    Q.    During the period of time that you were at Lycos, if

11:18:59 5    we go back to the time line, one of the things that most

6    of you had with the company, certainly the senior

7    management, were stock options, right?

8    A.    Correct.  Most everyone in the company had stock

9    options, yes.

11:19:13 10   Q.    One of the things you were looking to do is build

11    the company up and hopefully sell it at some point,

12    right?

13    A.    Not necessarily.  Selling a company wasn't a goal.

14    We were a public company.

11:19:23 15   Q.    Yes, you were public.  And within a couple of years,

16    in October of 2000, you were sold in a transaction

17    valued at a little over five billion dollars, right?

18    A.    Correct.

19    Q.    And all of the stock options that you had at that

11:19:35 20   time were accelerated, and you exercised them, correct?

21    A.    Correct.

22    Q.    And so did a number of other senior executives of

23    the company at that time?

24    A.    I don't know specifically about other people.

11:19:47 25   Q.    During this period, between the founding of the

1    company by a venture capitalist in '95 and October of

2    2000, one of the things that the company had to do once

3    it went public in April of '96 was issue quarterly

4    earnings reports, correct?

11:20:03  5    A.   Yes.

6    Q.   And the quarterly earnings reports were, as you

7    understood it, monitored by analysts on Wall Street as

8    part of their assessment of the value of the company in

9    its stock, right?

11:20:17 10    A.   Yes.  Different investment banks would write

11   research reports on the company, and they filed it, yes.

12   Q.   The research reports would report how much in

13   revenue had come in every quarter on the business minus

14   expenses, right?

11:20:31 15    A.   Correct.

16   Q.   And you were aware that the Wall Street analysts who

17   were reporting on the stock had their own sort of

18   conceptions as to what the range should be of Lycos'

19   earnings each quarter, right?

11:20:43 20    A.   Many of them would print estimates, yes.

21   Q.   And it was your understanding certainly that whether

22   Lycos met or did not meet those expectations would

23   likely have an effect on the stock price, right?

24   A.   I don't know specifically what would have made a

11:21:01 25    stock go up or down.

1    Q.    But you were aware that the earnings reports would

2    generally affect the stock price, right?

3    A.    I don't necessarily know that, but investment banks

4    wrote their research reports based on their own

11:21:14 5    opinions.

6    Q.    Yes.  In any event, the content of the earnings

7    reports would be affected by each quarter how much

8    expenses Lycos had incurred that quarter versus how much

9    revenue had come in, right?

11:21:27 10    A.    Our financial reports, yes, would have reflected

11    both of those.

12    Q.    And Lycos, like a lot of Internet companies, was

13    losing money during those years, right?

14    A.    Yes.

11:21:38 15    Q.    From an operational basis?

16    A.    Yes.

17    Q.    Another factor that you knew Wall Street analysts

18    were considering was how much cash the company had on

19    hand as a result of its public offerings, right?

11:21:49 20    A.    I don't know if the investment banks would report

21    that.  We would report it as part of our quarterly

22    reports, yes.

23    Q.    And the reason the cash balances were reported

24    quarterly, in part, as you understood it, was so that

11:22:02 25    people who owned stock in the company or were interested

1   in it would know whether Lycos was able to maintain its

2   cash balances as it continued with its operations,

3   right?

4   A.   Well, as a public company, you are required to

11:22:15   5   disclose all of your financial information, cash, on the

6   balance sheet, yes.

7   Q.   To the extent that that cash balance was, began to

8   decline, generally speaking, you were aware that that

9   would have a negative effect on the perception of the

11:22:32   10   company, right?

11   A.   I don't believe so, no.

12   Q.   One of the things that you tried to do, however, was

13   to maintain those cash balances as high as possible,

14   right?

11:22:41   15   A.   That was not a specific goal of the company, no.

16   Q.   One of the things you were doing with the cash was

17   you were investing it in various types of investments so

18   that the cash itself would earn more money for the

19   company, right?

11:22:57   20   A.   Sure.  We wanted to both safeguard it and, to the

21   extent we could, earn interest on it, yes.

22   Q.   Now, one of the things the company had was no debt

23   during the time you were there, right?

24   A.   Correct, other than obligations for leases, they had

11:23:12   25   no debt.

1  Q.   You analogized the leases repeatedly to loans.  But

2  the fact is, sir, the leases with CSI were not ever

3  reported by Lycos as loans to anyone, were they?

4  A.   They were reported as lease commitments, but they

11:23:27 5  were not referred on the balance sheet as debt, no.

6  Q.   My question was they were never reported to anybody

7  as loans, were they?

8  A.   They were not recorded as debt on the balance sheet,

9  no.

11:23:36 10  Q.   Were they ever reported to anyone as loans?

11  A.   Again, they were disclosed as leases not reported as

12  debt on the balance sheet.

13  Q.   Can you answer the question I have asked you?

14            MR. BEAN:  I believe he has.

11:23:51 15            THE COURT:  Aren't debt and loans essentially

16  the same thing?

17            MR. KALER:  It is these distinctions that

18  they are basing their case on.

19            THE COURT:  That may go out.  Can you tell us

11:24:02 20  whether they were recorded as loans rather than debt?

21            THE WITNESS:  I distinguish between the two,

22  but, no, they were not recorded as loans on the balance

23  sheet.

24  Q.   And the outside auditors reviewed the transactions

11:24:13 25  and also reported them as operating leases, correct?

1    A.    I don't know what the auditors' procedures were, but

2    they audited our financial statements as a whole, yes.

3    Q.    You know what they recorded, do you not?

4    A.    I know their opinion on our financial statements,

11:24:29  5    yes.

6    Q.    And their opinion on your financial statements was

7    to confirm the representation that the transactions with

8    CSI were leases, correct?

9    A.    No.   They opined on our financial statements as a

11:24:40 10    whole, not on a specific transaction.

11    Q.    And you reported to them as we saw in Exhibit 2245

12    that the transactions, that the leases were just that,

13    operating leases, correct?

14    A.    I personally don't recall disclosing anything to the

11:25:02 15    auditors specifically about leases.

16    Q.    I thought you were shown this exhibit on your direct

17    examination, sir.   And on the second page, you were --

18    particularly, your attention was called to the statement

19    at the top of the page, "The company's rationale for

11:25:17 20    accounting for this lease as an operating lease is as

21    follows."   Do you see that?

22    A.    Yes.

23    Q.    And then above, it's clear that it's referring to

24    leases with Avnet and CSI Computer, correct?

11:25:37 25    A.    Correct.

1   Q.   So in this exhibit, which you were shown by Lycos'

2   counsel on direct examination, it's clear, is it not,

3   that Lycos was reporting to its own auditors that the

4   transactions with CSI were leases, correct?

11:25:49  5   A.   Correct.

6   Q.   Thank you.  Now, you testified about your

7   impressions with Mr. Stenberg, but you do not recall the

8   specifics of any conversations that you had with Mr.

9   Stenberg on the subject of CSI leases, do you?

11:26:09 10   A.   No, I don't recall the specifics of our

11   conversations.

12   Q.   And you don't recall having conversations with

13   anyone else at CSI during the time you were at Lycos, do

14   you?

11:26:22 15   A.   No, I do not.

16   Q.   You don't recall having conversations with anyone

17   else at Lycos about what they thought about Mr.

18   Stenberg, do you?

19   A.   I had a general impression, but I don't remember

11:26:32 20   specific conversations, no.

21   Q.   So whatever general impression that you had had,

22   would it be influenced, sir, by the meetings that you

23   had recently with attorneys for Lycos?

24           MR. BEAN:  Objection.

11:26:42 25           THE COURT:  You may answer that.

1    A.    No, I don't believe that would have had an

2    influence, no.

3    Q.    The time during which you were at Lycos involved

4    your signing a series of leases that Lycos entered into

11:27:01 5    with CSI, executing them on behalf of the company,

6    correct?

7    A.    Correct.

8    Q.    And some of those leases were original leases for

9    new equipment that was being leased by Lycos from CSI,

11:27:11 10    correct?

11    A.    Correct.

12    Q.    And some of those leases were leases that were

13    essentially new leases but extending Lycos' period of

14    use of equipment that it already had in its facilities,

11:27:25 15    correct?

16    A.    A refinancing, if you will, yeah.  Yes, I do recall.

17    Q.    You say "refinancing, if you will."  But the term

18    "refinancing" usually refers to loans.  So if I may,

19    could we stay with leases at this point?

11:27:39 20    A.    Okay.

21    Q.    There were some leases that you signed with CSI that

22    were not for equipment that was just being acquired but,

23    rather, were leases, new leases, to extend Lycos' period

24    of use of equipment that it already had in its facility

11:27:53 25    under a prior lease which was being canceled, right?

A.    Yes.

Q.    And under the accounting rules, Lycos had to treat those new leases from the standpoint of analyzing whether they could be operating leases in the same way that it had to treat original leases; that is, it had to look at the present value of the future payment stream, right?

A.    Generally speaking, that's how leases were treated, yes.

Q.    Okay.  And so, if you have an original lease here on one side of the ledger, so to speak, as part of the accounting that has to be done for it at the outset of the lease, you knew that the company had to look at present value if the future payment stream, in other words, just add up the gross future payments that had to be made under the lease, correct?

A.    Yes.

Q.    And it had to reduce them to present value, which essentially means how much money would I need to have in the bank now to pay out this payment stream going forward to the end, right?

A.    Correct.

Q.    And in doing that calculation as to an original lease, the company could then take a present value of those future payments, right?

A.   Yes.

Q.   And then if a proposal was made partway through that lease to extend it, one of the things that the company could do at the point where that lease was being extended was it could look at the remaining present payments, the remaining future payments under that lease, and it could present value those to decide how much money it still had to pay under the original lease, right?

A.   Suppose it could, yes.

Q.   And then it could also, and in fact it was required, also, on any extended lease that it signed to look anew at the same accounting issues in that it had to add up the future payments that it was agreeing to make under the extended lease and present value them and do the operating value test again, right?

          MR. BEAN:  Objection.  Mr. Kaler is suggesting that they were required to do the test.  It is thus asking for an opinion of an expert.

          MR. KALER:  That is an improper speaking objection.

          THE COURT:  Gentlemen, the objection is sustained because you are asking an expert opinion instead of what they did.

Q.   What you were aware of at the time in terms of what

1    you did was you take the present value of the extended

2    lease payments and present value them and determine

3    whether that made the operating lease test, correct?

4    A.   I don't recall what was done.  I didn't do those

11:30:34 5    calculations myself, so I don't recall.

6    Q.   But you knew that somebody in your organization

7    would do them?

8    A.   I don't know if they did or not.

9    Q.   But you knew that someone was supposed to do it

11:30:42 10   under the accounting rules, correct?

11   A.   Overall, we are required to disclose leases as

12   operating or capital leases.  But, again, it depends on

13   the materiality of the leases.  I know often times once

14   a lease is determined as whether or not it's operating

11:30:59 15   or capital, if similar leases have the same terms, for

16   example, we wouldn't necessarily have to go and

17   recalculate each one of those if it had already been

18   done.  So I don't know specifically what was done.

19   Q.   Yes.  What you just described is the so-called --

11:31:14 20             THE COURT:  May we have a question?

21   Q.   What you just described is the so-called once an

22   operating lease, always an operating lease practice that

23   was frequently followed by companies in that period,

24   right?

11:31:24 25             MR. BEAN:  Objection.

```
 1              THE COURT:  Sustained.  We're talking about
 2   Lycos.
 3              MR. KALER:  I am talking about Lycos.
 4              THE COURT:  You said companies.
 5   Q.  That was, as you said, the practice that Lycos
 6   followed in those years.  Once it did the original
 7   calculation on the original lease, are you saying that
 8   on the extended leases it would just not do the
 9   calculation again?
10   A.   I'm sorry, I don't recall exactly what Lycos did
11   back then.
12   Q.   But you do know that under the accounting rules with
13   which you are familiar -- you were at Ernst & Young
14   before you came to Lycos for about ten years, right?
15   A.   Yes, I was.
16   Q.   And one of the specific things you did at Lycos was
17   you reviewed company's accounting for their operating
18   leases to see if they met the test, right?
19              MR. BEAN:  I think he just misspoke.
20   Objection.
21              THE COURT:  You just misspoke.
22   Q.   You worked at Ernst & Young for ten years --
23   A.   I was an auditor at Ernst & Young.  One of the
24   responsibilities often in audit was to periodically test
25   leases for capital or auditing classification.
```

11:31:31 (line 5)
11:31:46 (line 10)
11:32:00 (line 15)
11:32:17 (line 20)
11:32:30 (line 25)

1  Q.   One of the things you were aware of at the time was

2  if a company entered into a new lease that extended

3  their old lease, under the accounting rules, when

4  they're supposed to do the present value calculation

11:32:51  5  under the new lease and see if it met the test to

6  determine whether a lease is extended --

7  A.   I'm not sure what the accounting rules say about

8  that specific situation.

9  Q.   Do you remember giving a deposition in the case when

11:33:01 10  we discussed the issue?

11  A.   I don't remember this issue specifically, no.

12  Q.   Are you saying -- you testified on direct

13  examination that this is the test, 90 percent of the

14  present value, to determine whether the lease is an

11:33:18 15  operating lease, correct?

16  A.   Correct.

17  Q.   Are you saying that you don't know whether that test

18  needs to be applied to a new lease that extends the term

19  of use?

11:33:29 20  A.   I don't know specifically how that calculation, I

21  don't know what the accounting rules say about a

22  situation in a refinancing or an extension.  I'm not

23  exactly sure what the accounting rules would say.

24  Q.   So you are saying you don't know whether it needed

11:33:44 25  to be done on an extended lease?

```
 1    A.   I know that all leases need to be classified as
 2    either operating or capital.  I'm just simply saying
 3    that in that specific situation, I don't know what the
 4    accounting rules would say how the test should be
 5    amended or altered.
 6    Q.   All right.  But all leases, regardless of what they
 7    are, at the outset of the lease, whether they are an old
 8    lease or new lease, the test has to be done, right?
 9              MR. BEAN:  Objection.
10              THE COURT:  I don't think that's what he
11    said.  Are you asking him whether --
12              MR. KALER:  I am, your Honor.
13              THE COURT:  Well, so the question is does the
14    test have to be done on old and new leases.
15    A.   All leases need to be classified as either operating
16    or --
17              THE COURT:  No, but do you have to do the
18    test each time?
19              THE WITNESS:  Yes.  I believe it needs to be
20    determined.  I just don't know how that test in a
21    refinanced lease, I don't know exactly what the
22    accounting rules would say how that is done.  I don't
23    know if you go back to the original lease and do the
24    entire stream of payments, or if you start with a new
25    lease and just do the remaining payments.  I'm not
```

1    exactly sure of the accounting rules.  That's all I'm

2    saying.

3    Q.   But certainly your outside auditors who were

4    reporting on your leases would know whether the test

11:35:00 5    needed to be done on both an old lease and a new lease?

6              MR. BEAN:  Objection.

7              THE COURT:  Sustained.

8    Q.   Sir, wasn't this very issue one of the issues on

9    which you advised clients during the ten years you were

11:35:15 10   at Ernst & Young addressing the accounting for their

11   operating leases?

12   A.   I don't remember this specific issue coming up with

13   my clients, no.

14   Q.   Let's assume that it was a requirement.  Certainly,

11:35:28 15   Lycos was capable of taking a new lease with proposed

16   payments in the future and present valuing those

17   payments, right?

18   A.   Yes.

19   Q.   And, therefore, whenever Lycos entered into a new

11:35:40 20   lease to extend its period of use of equipment that it

21   already had in its shop under an old lease, Lycos was

22   perfectly capable of present valuing the future payments

23   that it was considering making under the extended lease

24   and comparing that to the future payments that were

11:35:57 25   remaining under its old leases, right?

1    A.    It was capable of doing that.

2    Q.    And the difference between those two, what Mr. Bean

3    refers to as markup, is something that Lycos could

4    readily calculate in that way, right?

11:36:08 5              MR. BEAN:  Objection.

6              THE COURT:  You may answer.

7    A.    I'm certain that the people in my organization knew

8    how to do present value calculation study.  They could

9    have done that, yes.

11:36:18 10   Q.    And if you wanted to evaluate the price that was

11   being proposed on an extended lease, one of the ways in

12   which financial people would do it is they would simply

13   say, look, how many additional payments times the

14   monthly rate am I being asked to make under the extended

11:36:37 15  lease, I can present value that, and then how many

16   payments am I being asked to make under the remainder of

17   the original lease, and they could present value that,

18   and they could compare them, correct?

19             MR. BEAN:  Objection.

11:36:49 20             THE COURT:  Sustained.

21   Q.    As part of prudent financial management, you and

22   your organization did try to assess the financial

23   implications of any contracts that you entered into

24   before you signed them, correct?

11:37:04 25  A.    Yes, that's a fair statement.

```
 1    Q.   And it's fair to say that during the years that you
 2    were at Lycos, you signed dozens of contracts, right?
 3    A.   Yes, I signed numerous contracts.
 4    Q.   The company was at one point entering into joint
 5    venture agreements with other companies outside the
 6    United States, correct?
 7    A.   Correct.
 8    Q.   And it was acquiring companies within the United
 9    States, correct?
10    A.   Correct.
11    Q.   And in all of those instances, the company had to
12    sign contracts governing the terms of the acquisition of
13    those businesses, correct?
14    A.   Correct.
15    Q.   In some cases, the significance of those contracts,
16    financially, it was in the millions of dollars, correct?
17    A.   Correct.
18    Q.   And the company during the years that it was public
19    and had the annual reports that you were shown, it had
20    law firms and accounting firms advising it in connection
21    with those transactions, correct?
22    A.   Often times we did, yes.
23    Q.   It had agreements with advisors who were advising
24    it, describing the kind of advice they would give,
25    correct?
```

11:37:19 (line 5)
11:37:28 (line 10)
11:37:39 (line 15)
11:37:52 (line 20)
11:38:08 (line 25)

```
        1    A.   I'm sorry, could you repeat that question?

        2    Q.   You had agreements with advisors from time to time

        3    detailing the kind of advice they would give?

        4    A.   I can't think specifically.  I don't know, for
11:38:25 5    example, with our law firm if we had an agreement as to

        6    what kind of advice we would give.

        7    Q.   Did you usually have a retainer letter where the law

        8    firm outlines the kind of advice they would give?

        9    A.   It's possible, but I don't recall that specifically,
11:38:38 10   no.

       11    Q.   With your outside accounting firms, you certainly

       12    know there was always an engagement letter because you

       13    had been in public accounting?

       14    A.   Yes.
11:38:46 15   Q.   One of the things the accounting firm did was put in

       16    the kind of advice they were going to give you, right?

       17    A.   They would outline what their services would be,

       18    yes.

       19    Q.   There was never any contract between Lycos and CSI
11:38:59 20   for CSI to give advice to Lycos on leasing, was there?

       21    A.   I don't recall such agreement, no.

       22    Q.   There were just leases, right?

       23    A.   As far as I know.  I don't recall any other

       24    agreement.
11:39:09 25   Q.   And CSI was not the only company that Lycos was
```

1 leasing from during the years that you were there, was

2 it?

3 A.   No.   I recall two other companies.   One was Avnet,

4 and one was Digital Leasing.   I don't recall if there

11:39:28 5 were others.

6 Q.   And the company's policy generally was to lease its

7 computer equipment, correct?

8 A.   Generally speaking, yes.

9 Q.   And one of the reasons the company was leasing

11:39:37 10 computer equipment was that it conserved cash.   You

11 could take a hundred thousand dollar server and have it

12 in the door and running for a monthly fee starting out

13 for a very small fraction of the price, right?

14 A.   That wasn't the purpose of us leasing equipment.   As

11:39:58 15 I said earlier, we had plenty of cash.   Leasing

16 equipment was generally done, if you had a piece of

17 equipment that was rapidly obsolete, for example, and

18 you may not want to own it, you would rather lease it

19 because it had a relatively short life span.   But cash

11:40:13 20 wasn't a motivator, no.

21 Q.   In fact, if you used up cash from your cash

22 balances, one of the things, generally for acquisitions

23 of equipment, one of the things you would have to report

24 was the corresponding reduction in your cash balances,

11:40:29 25 right?

1    A.    We were required to file a cash flow statement, yes.

2    Q.    And one of the reasons that you leased equipment was

3    so that you could return it to the leasing company if it

4    became obsolete at the end of the lease term, right?

11:40:42 5    A.    As I said, on equipment that rapidly is obsolete,

6    generally speaking, there's not a great benefit to

7    owning it.   Therefore, we would lease it so that at the

8    end of the lease, we would either negotiate to buy it if

9    we wanted to keep it or get a new piece of equipment or

11:41:01 10    just return it.

11    Q.    And one of the things you were aware of during the

12    years that you worked at Lycos was that leasing is a

13    pretty competitive business from the leasing company's

14    standpoint, right?

11:41:13 15    A.    You know, I don't really recall what the environment

16    was back then.

17    Q.    As part of prudent fiscal management, do you recall

18    participating in any discussions about the various lease

19    rates that were being offered by the competing leasing

11:41:26 20    companies in an effort to get Lycos' business?

21    A.    I don't recall that, no.

22    Q.    You have, I think, a business degree from the

23    University of Notre Dame, right?

24    A.    Yes, I do.

11:41:47 25    Q.    And at the time that you joined Lycos in December of

1    1996, you were still a certified public accountant,

2    right?

3    A.   Yes.  I joined in February of 1996.  Yes, I was at

4    that time.

11:42:00  5    Q.   Okay.  And you had worked on the audits of some

6    pretty large private companies while you were at Ernst &

7    Young, right?

8    A.   I did many audits.  I was in the entrepreneurial

9    services group, which is primarily smaller services, but

11:42:17 10    I did some public companies as well.

11    Q.   You worked on the audits of the Boston Celtics

12    Limited Partnership?

13    A.   I did.

14    Q.   And Sheraton Hotels Private Partnership?

11:42:27 15    A.   Yes.

16    Q.   And during the decade you were there, you

17    particularly examined lease accounting issues, right?

18    A.   I had -- on occasion, if my clients had leasing,

19    significant leasing obligations, I would do some

11:42:41 20    periodic testing of it, yes.

21    Q.   Now, your duties and responsibilities as controller

22    and VP Finance of Lycos included all aspects of the

23    financial operation of the company, correct?

24    A.   Yes, it did.

11:42:52 25    Q.   And that included the company's leasing operations

1    with regard to how they were recorded on the financial

2    statements, right?

3    A.   Yes, I had overall responsibility for financial

4    reporting.

11:43:02  5    Q.   And one of the documents you looked at on direct

6    examination, I think, was our Exhibit 272, particularly

7    page 53 of that document, the Commitments and

8    Contingencies Footnote.  It would be 930.

9         One of the things you were responsible for

11:43:26 10   ultimately was the accuracy of the information set out

11   in the company's financial reports in this Commitments

12   and Contingencies Footnote, right?

13   A.   I had ultimate responsibility for all of our

14   financial reporting.  As I said, I did not prepare these

11:43:40 15   schedules specifically, but I would have reviewed the

16   financial statements as a whole.

17   Q.   Now, in your ten years at Ernst & Young auditing

18   other companies' financial statements, you became

19   familiar generally with the way in which the Commitments

11:43:55 20   and Contingencies Footnote of a financial statement got

21   prepared, right?

22   A.   Yes.

23   Q.   And that's because all operating leases, the

24   outstanding future payment obligations under them, have

11:44:03 25   to be reported in the Commitments and Contingencies

1   Footnote each year,?

2   A.   Yes, the gross payments have to be disclosed.

3   Q.   So what the company has to do is on the original

4   leases, or any other kind of leases, whether they are

11:44:18 5   extending the term of use of the equipment or whether

6   they are just originally leasing it, the company must

7   report what future financial obligations it has

8   undertaken on its operating leases, right?

9   A.   Correct.

11:44:31 10   Q.   And that means the company has to know what those

11   future obligations are under all its leases, right?

12   A.   Yes.

13   Q.   And the way in which it does that customarily is it

14   keeps track of them internally, typically on some kind

11:44:45 15   of spreadsheet, that lists all the payment obligations

16   that the payments represent and adds them up?

17          MR. BEAN:   If we could limit this to what

18   Lycos is doing, if he knows.

19          MR. KALER:   I am not limiting it.   I am

11:45:00 20   asking him if he was aware of an accounting when he came

21   to Lycos that that's how it was maintained.

22          THE COURT:   Say that again.

23          MR. KALER:   I'm asking if the witness was

24   aware when he came to Lycos that that's how a

11:45:13 25   Commitments and Contingencies Footnote was prepared.

1          THE COURT:  The real question is what did

2    Lycos do and what did Lycos know.

3    Q.   Lycos had to do the same thing in terms of preparing

4    some kind of record of what its outstanding lease

11:45:27  5    obligations were each year, right?

6    A.   Yes.

7    Q.   And then all of those obligations and the

8    obligations for rental operating leases had to be added

9    up and projected forward in the Commitments and

11:45:40 10    Contingencies Footnote, right?

11    A.   Yes.

12    Q.   So there's no question in your mind that Lycos

13    during the years that you were there knew what it had

14    agreed to pay under all of its operating leases at any

11:45:56 15    given point in time, right?

16          MR. BEAN:  Objection.

17          THE COURT:  He may tell us what he knew.

18    A.   Yes.  In order to complete the requirement for

19    commitments and contingencies, it would have had to

11:46:11 20    disclose all of its future commitments under lease

21    obligations.

22    Q.   And one of the ways in which Lycos made its

23    determination as to whether it would sign leases with

24    CSI and other leasing companies was it examined the

11:46:24 25    financial implications of doing so in each case, right?

1   A.   I'm sorry, I'm not clear on your question.

2   Q.   One of the things that Lycos did before signing

3   contracts with leasing companies was to examine the

4   financial implications of doing so as part of prudent

11:46:42 5   financial management, right?

6   A.   Yes.

7   Q.   And the most basic financial implication it would

8   examine is how much is the company being asked to pay

9   going forward over and above what we've already

11:46:54 10   committed to paying, right?

11   A.   Again, I don't recall what the specific process was

12   back then.

13   Q.   Each time that Lycos entered into a lease that was

14   an extension of its term of use of equipment that it had

11:47:09 15   already leased before, each time it did that, it

16   acquired an additional time period during which you

17   could use the equipment, right?

18   A.   If it was extending the term, yes.

19   Q.   And it was paying a price to get that additional

11:47:24 20   term of use of the equipment it was renting, right?

21   A.   It would have paid additional interest, obviously,

22   for the additional months of use, yes.

23   Q.   But it wasn't interest that it was paying, sir, was

24   it; it was rental payments, correct?

11:47:37 25   A.   Rental payments which carried implied interest in

1    them.

2    Q.   Well, you can take any future payment stream and

3    reduce it back to present value and calculate, if you

4    want, on a piece of paper with a calculator what the

11:47:50  5    imputed interest rate is, right?

6    A.   Correct.

7    Q.   But the fact is, that's different from interest

8    payment on a loan because the transactions here were

9    leases, right?

11:48:00  10    A.   They were leases, but, again, I view them to be as

11    loans that carry an imputed interest rate as well.

12    Q.   And if Lycos wanted to, it could calculate the

13    imputed interest rate on any particular lease contract

14    by simply adding up the payments going forward that it

11:48:19  15    was agreeing to make and reducing them back to present

16    value, right?

17    A.   Yes.

18    Q.   In other words, just a mathematical calculation,

19    right?

11:48:27  20    A.   It is.

21    Q.   If I sign a contract to make payments for a service

22    over a period of two or three years, and the service is

23    carpentry, for example, I can take those payments and

24    reduce them back to present value and come up with an

11:48:42  25    imputed interest rate, right?

```
 1              MR. BEAN:  Objection.  Now we're getting into
 2    hypotheticals, your Honor.
 3              THE COURT:  How much more do you have?
 4              MR. KALER:  Not too much longer, your Honor.
11:48:54 5        THE COURT:  I don't know how much that is, so
 6    we'll stretch.
 7              (Pause)
 8              THE COURT:  You may proceed.
 9              MR. KALER:  Thank you.
11:49:32 10   BY MR. KALER:
11    Q.  You were aware under the leases that you signed with
12    CSI that Lycos had an obligation to return the equipment
13    at the end of the lease term, correct?
14    A.   I believe that to be the case in the leases I
11:49:44 15   signed, yes.
16    Q.   And you were also aware when you signed the
17    contracts that CSI was not as a result of your signing
18    those contracts disbursing money to Lycos, right, the
19    way a bank does when it's a loan?
11:50:01 20   A.   That is correct.
21    Q.   Instead, the equipment was coming into Lycos' shop,
22    and it was paying rent on it every month, right?
23    A.   Yes.
24    Q.   If we could just take a look at some of the
11:50:15 25   contracts that you did sign, for example, if we can pull
```

1    up Exhibit 447, is this an example of an equipment

2    schedule lease that you signed with CSI in May of 2000?

3    A.    That is my signature, yes.

4    Q.    And under paragraph 4, we see that this was a lease

11:50:48 5    for equipment that was already installed and accepted in

6    Lycos' facilities, right?

7    A.    Yes, that's what it says.

8    Q.    So it was one of the leases extending your period of

9    use of equipment that had been previously leased, right?

11:51:03 10   A.    Well, I can't really tell from here whether that is

11   the case or not.

12   Q.    Can we go to the second to the last page of the

13   exhibit?  Is this an addendum -- these are typically

14   only five-, six-page documents, right?

11:51:24 15   A.    From what I recall, yes.

16   Q.    And is this the addendum to this Schedule 66E that

17   you signed on or about the same date?

18   A.    That looks to be the case, yes.

19   Q.    And in the second paragraph of this part of the

11:51:38 20   contract, it is stated simply, paragraph 2, that the

21   equipment is installed at Lessee's location under

22   Equipment Schedule 74 to Master Lease, right?

23   A.    Yes.

24   Q.    And then Exhibit 446, if we could put it up, is that

11:52:01 25   Equipment Schedule 74, right?

A.    Yes.

Q.    And as you see in Exhibit 447, the document that you

signed on May 22nd of 2000, Exhibit 447, as contrasted

with Exhibit 446, we see that you signed Exhibit 446 in

11:52:44 January of 2000, and then about five months later, in

May of 2000, you signed the extension lease, correct?

A.    I'm sorry, I can't tell exactly how they are

connected.   74 and Equipment Schedule 66E?

Q.    Yes.   Do you remember when I showed you these in

11:53:20 your deposition?

A.    I don't recall these specifically, no.

Q.    Exhibit 447, which you signed in May, we know that

447 was an extension lease of equipment already

installed and accepted, correct?

11:53:43 A.    Yes.

Q.    And we know if we go to the addendum page of this

exhibit that the equipment at this time had been

installed under Equipment Schedule 74, correct?

A.    Addendum 1 to Equipment Schedule 66E?

11:54:12 Q.    I'm looking at paragraph 2.   Yes, that's what it is.

Do you see the statement where it says:   "The equipment

is installed at Lessee's location under Equipment

Schedule 74" right above your signature?

A.    Yes.   And then it refers to Schedule 66E.

11:54:34 Q.    The first sentence is what I'm referring your

1    attention to, sir.

2    A.   Yes.

3    Q.   "The equipment is installed at Lessee's location

4    under Equipment Schedule 74."

11:54:43 5    A.   Yes, I see that.

6    Q.   It was your practice generally to read contracts

7    before you signed them at the time, true?

8    A.   Not necessarily.  If I had had someone in my staff

9    review something beforehand, I wouldn't have necessarily

11:54:54 10   felt the need to read it myself.

11   Q.   Either you would have reviewed it or you would have

12   had someone you trusted on your staff to review it to

13   make sure it was proper?

14   A.   Generally, for someone to put together all of the

11:55:07 15   documents necessary and get it prepared for my approval,

16   yes.

17   Q.   And you knew when you were signing the contracts

18   that you were binding the company, right?

19   A.   Yes, I did.

11:55:16 20   Q.   And so, having in mind that Equipment Schedule 74,

21   can we go then to Exhibit 446 and put that page beside

22   it?  Exhibit 446 is the Equipment Schedule 74 on the

23   right that you signed, had signed back in January,

24   right?

11:55:35 25   A.   Yes.

1    Q.   And you see that in Exhibit 447, the document that

2    you signed in May of 2000 on the left, Lycos, in effect,

3    extended its lease of the equipment that it had

4    previously leased under Exhibit 446 from 24 months

11:55:55   5    effectively out to 36 months?  May I refresh your

6    recollection with the deposition?

7    A.   I can't read it, so I'm not exactly sure.

8    Q.   Let me, if I may, play from your deposition just to

9    refresh your memory page 132, line 14.

11:56:25   10           MR. BEAN:  Can he show the witness his

11   deposition rather than play it?  The witness hasn't said

12   he doesn't recall, either.  Can you give him a hard

13   copy?  Perhaps that would be the best way to refresh his

14   recollection.

11:56:39   15           THE COURT:  Thank you for the instruction.

16           MR. KALER:  May I approach, your Honor?  I

17   have a hard copy.

18           THE COURT:  Yes.

19   Q.   Can I direct your attention, sir, to page 132, line

11:57:23   20   14 to 132, line 12 of your deposition where we talked

21   about these two schedules.

22   A.   132 line 14?

23   Q.   Yes.  Do you see where we were talking about these

24   two schedules?

11:57:39   25   A.   Yes.

Q.   And does looking at that refresh your recollection
that in signing Exhibit 447 in May of 2000, about four
months after you signed Exhibit 446, Lycos, in effect,
extended its lease of the equipment that it had
11:57:54 previously leased under Exhibit 446 from 24 months
effectively out to 36 months?

A.   Yes, I see that.

Q.   Okay.  And does that refresh your recollection that
that's what you did in this instance?

11:58:11 A.   Yes, that appears to be.

Q.   And do you recall, I think during your deposition I
went through a number of examples of this where I gave
you an opportunity to review the leases, and it
refreshed your memory that that's exactly what you did
11:58:24 in these cases?

A.   Yes, I recall that.

Q.   You did know what you were doing when you signed
these extension leases, correct?

         MR. BEAN:  Objection.

11:58:34          MR. KALER:  You can answer.  I'm sorry, your
Honor.  That's a habit picked up from depositions.  I
really apologize.

         THE COURT:  You may answer the question.  The
objection is overruled.

11:58:50 A.   I don't recall specifically signing this lease, so I

1    don't know exactly what I was thinking then.

2    Q.   No, I was just asking do you recall at your

3    deposition I went through a couple of examples.

4    A.   Yes, I do recall.

11:59:01  5    Q.   You did see, according to the documents, you had

6    signed a number of extensions?

7    A.   Yes, I recall that.

8    Q.   I think my question was did you know what you were

9    doing when you signed the extensions --

11:59:12  10                MR. BEAN:  Objection.

11                THE COURT:  I thought he said he didn't

12    remember.

13    Q.   You don't remember, okay.  You were asked about

14    whether you would have entered into these extensions if

11:59:42  15    you had known there was a difference in the present

16    value of the payments that you were agreeing to make.

17    Do you recall that?

18    A.   Yes, I do.

19    Q.   And by that, did you understand Mr. Bean to be

11:59:53  20    referring to a difference between the present value of

21    the remaining payments under the old lease and the

22    present value of the payments you were agreeing to

23    undertake under the new leases?

24    A.   Yes.

12:00:03  25    Q.   And it is clear that you had the capability and your

1    staff had the capability to compare the present values

2    of those two future payment streams at the time you

3    signed the extension, correct?

4    A.   Had the capability of calculating present value,

12:00:22 5    yes.

6    Q.   So you could have determined the amount of any

7    so-called markup if you had wanted to, correct?

8    A.   Correct.  I don't recall if it was done, but we had

9    the capability, yes.

12:00:33 10    Q.   And what you said is that in comparing those two and

11    saying that you would not have done the extension lease

12    if there was an increase in present value, what you are

13    really saying is that you would have wanted the extended

14    lease not to have an imputed interest rate greater than

12:00:56 15    the imputed interest rate on the remaining original

16    lease, right?

17    A.   No, that's not what I was saying.  I was saying that

18    the original loan amount should not have changed.

19    Q.   But it was not a loan, was it?

12:01:11 20    A.   Well, again, yes, it was a lease.  I considered it

21    to be a loan.

22    Q.   You don't remember how you considered it at the

23    time, do you?

24    A.   I always considered leases to be a form of a loan.

12:01:25 25    Q.   But you know from your experience in accounting,

1    sir, that they are not loans and they are not treated as

2    loans in accounting statements, right?

3    A.    Depending on whether they are capital or operating,

4    they are treated differently.

12:01:37 5    Q.    And these were operating leases, which are not

6    treated as loans, correct?

7    A.    They are not treated as loans on financial

8    statements.

9    Q.    And certainly, the contracts are contracts of lease,

12:01:48 10    not contracts to borrow money, correct?

11    A.    Well, again, I considered them, whether they were

12    capital or operating, I considered it to be a loan.

13    That's how I have always referred to leasing

14    arrangements.

12:02:00 15    Q.    My question, sir, was the contracts that you signed

16    were contracts of lease or rental, not contracts of

17    loan, correct?

18    A.    Correct.

19    Q.    And coming back to my question about present value,

12:02:12 20    what you are saying is that when Mr. Bean was asking you

21    whether you would have done the transactions if you had

22    known that there was a difference in the present value,

23    what you were really saying is that, you are saying now

24    that the imputed interest rate on the original lease

12:02:30 25    from the beginning as contrasted with the imputed

1    interest rate, the extended lease, you're saying, should

2    have been the same, correct?

3    A.   No.  What I was saying was I would not have expected

4    the original amount of the loan to have changed.  I

12:02:45  5    would have expected the interest rate or the terms to

6    have changed but not the original amount.

7    Q.   But it wasn't a loan, sir.  Can we stay with my

8    question, which is the leasing?

9              THE COURT:  I think he just answered your

12:02:55 10    question.

11    Q.   The lease extensions that you did during the course

12    of the time at Lycos, were there other certified public

13    accountants within Lycos examining the transaction?

14    A.   I don't recall if anyone else specifically reviewed

12:03:12 15    the lease.

16    Q.   You mentioned the people who assisted you as

17    including Mr. Lucy and Julie Callagee, correct?

18    A.   Correct.

19    Q.   They were both certified public accountants when

12:03:30 20    they were at Lycos, correct?

21    A.   I know Brian Lucy was a certified public accountant

22    at the time he started at Lycos.  I'm not sure about

23    Julie.

24    Q.   And your argument, sir, you're saying that you would

12:03:34 25    not have expected certain present values on the extended

1  leases to go up from what they were under the original

2  leases.  What you're basically saying is you think the

3  price on the extended leases was higher than it should

4  have been, right?

12:03:50 5  A.   That's not what I said.  I simply said I wouldn't

6  have expected the original loan amount to have changed.

7  Q.   You keep saying loan amount.  Did you discuss the

8  characterization of these contracts as loans with Lycos'

9  attorneys before you came here to testify?

12:04:08 10         MR. BEAN:  Objection.  His counsel was

11  present.  These are all privileged communications.

12         THE COURT:  I don't know about that.  If his

13  counsel was present and other people were present, it's

14  no longer privileged.

12:04:22 15         MR. BEAN:  Company counsel was speaking with

16  him in his capacity as a former employee, and his

17  counsel was present.

18         THE COURT:  I think he is entitled to inquire

19  about what was said in the process of preparing him for

12:04:34 20  testifying.

21         MR. BEAN:  Substantively?

22         THE COURT:  Substantively, unless it was his

23  counsel who gave the advice.  But in this case, we have

24  three parties.

12:04:44 25         MR. BEAN:  Well, Lycos' counsel was present

1    on behalf of a former officer of the company.  Mr.

2    Guilfoyle's counsel is here.  The only people who were

3    present were the three of us.

4              THE COURT:  But you were there as Lycos'

12:04:59  5    counsel.

6              MR. BEAN:  In connection with a former

7    employee.  In connection with a former officer of the

8    company who is being asked to testify only about his

9    activities as a former officer.

12:05:14 10              MR. KALER:  Your Honor, I submit that --

11              THE COURT:  Just a minute.  Does Mr.

12    Guilfoyle's counsel -- can I have your name, please?

13              MR. DAY:  Yes, my name is Alfred Day.  I

14    would likewise object to the question to the extent that

12:05:33 15    it calls for the substance of communications between

16    counsel and the witness.

17              THE COURT:  But on what basis?  Because you

18    were there as his counsel, but so was a third party,

19    namely Lycos.

12:05:46 20              MR. DAY:  That's correct, your Honor, but

21    Mr. Bean has correctly stated that the privilege

22    attaches to the communications between Mr. Bean and --

23    the communications --

24              THE COURT:  Whose privilege is Mr. Bean

12:06:07 25    preserving?

1          MR. BEAN:  The company's.

2          THE COURT:  Let me explain to the jury.

3   There are a number of privileges, as a witness may

4   decline to testify about certain things under certain

12:06:18  5   circumstances.  For example, you all know about the

6   Fifth Amendment of the Constitution.  No witness can be

7   forced to testify that he has committed a crime.

8          Similarly, there is a privilege with respect

9   to communications between a client and a lawyer.  Mr.

12:06:33 10   Guilfoyle cannot be forced to testify about

11   conversations he had with Mr. Day, who is his lawyer.

12   That privilege disappears if the conversation takes

13   place in the presence of a third party because at that

14   point it's no longer privileged.

12:06:47 15          The idea of the privilege, the

16   attorney-client privilege so-called, is that people

17   should feel free to tell their lawyers anything so that

18   the lawyer has all the information necessary to give

19   proper advice.  But when a third party comes into the

12:07:03 20   picture, then the privilege disappears because it has

21   already been in the context of the conversation

22   broadcast to somebody else.

23          I have trouble understanding why in the

24   context of this series of questions the presence of

12:07:19 25   Lycos by you, Mr. Bean, does not destroy the privilege

1   between Mr. Guilfoyle and his counsel, Mr. Day.

2          MR. BEAN:  We have a privilege with Mr.

3   Guilfoyle in his capacity as a former officer of the

4   company.  He is not -- he's only --

12:07:36 5          THE COURT:  A testimonial privilege?

6          MR. BEAN:  Yes, your Honor.

7          THE COURT:  I don't understand that.

8          MR. BEAN:  Well, he is a former officer of

9   the company.  He is being asked to testify only in his

12:07:45 10  capacity as a former officer.  Lycos is paying his

11  counsel, as has been established.

12          I believe your Honor ruled this the other

13  day, when we tried to get in with Mr. Philip, I believe

14  your Honor --

12:07:57 15         THE COURT:  Let's go onto something else,

16  Mr. Kaler, while I think about this.  I certainly don't

17  wish to make a ruling that destroys a privilege, but I

18  have trouble with this one because I'm not aware of a

19  privilege between a company and its former officer which

12:08:11 20  is a privilege in the sense that the attorney-client

21  privilege exists.

22          MR. BEAN:  Well, if it were beyond the scope

23  of his activities as a former officer, I would agree

24  with your Honor.  But the question is limited to his

12:08:24 25  activities as a former officer of the company.

1          MR. KALER:  I just point out that Lycos --

2          THE COURT:  You may continue the questioning

3    on another topic until I can work this out.

4          MR. KALER:  Thank you, your Honor.  I don't

12:08:37  5    have too much more.

6          THE COURT:  Well, you said that about a half

7    an hour ago.

8          MR. KALER:  I was close to the end.  This was

9    one of the last --

12:08:44  10          THE COURT:  If you insist on the question --

11          MR. KALER:  I do insist on the question.

12    Lycos has already --

13          THE COURT:  I don't want to hear the

14    argument.  If you insist on the question, I will make a

12:08:56  15    ruling.

16          MR. KALER:  I feel I must ask it, your Honor.

17    BY MR. KALER:

18    Q.   Let us just look at the contracts that you did sign,

19    sir, and I'll just put them up briefly as we walk

12:09:03  20    through.  Exhibit 440, during the period of time that

21    you were at Lycos and signing equipment schedules with

22    CSI and other lessors, you understood that Lycos was

23    leasing different types of equipment, correct?

24    A.   Yes.

12:09:29  25    Q.   And Exhibit 441 is one of the schedules that you

1    signed on behalf of Lycos, this one in '97, correct?

2    A.   Yes, that's my signature.

3    Q.   Exhibit 442 is another schedule that you signed?

4    A.   Yes.

12:09:51 5    Q.   Exhibit 443 is a schedule that you signed, correct?

6    A.   Correct.

7    Q.   Exhibit 444 is another lease that you signed with

8    CSI?

9    A.   Yes.

12:10:08 10   Q.   Exhibit 446 is the one we've seen that you've

11   signed.  Exhibit 447, actually, I think we've already

12   seen.  You signed that one as well?

13   A.   Yes.

14   Q.   And then Exhibit 448 is another lease you signed

12:10:29 15   with CSI, this one in 1999, correct?

16   A.   Correct.

17   Q.   Exhibit 449 is another lease that you signed with

18   CSI, this one in February of 2000, correct?

19   A.   Correct.

12:10:45 20   Q.   And Exhibit 450 is another schedule that you signed

21   on behalf of Lycos, correct?

22   A.   Yes.

23   Q.   Exhibit 451 is another schedule that you signed on

24   behalf of Lycos?

12:11:08 25   A.   Yes.

1    Q.   Exhibit 452 is another schedule you signed, this one

2    back in June of '99?

3    A.   Correct.

4    Q.   Exhibit 453 is one that you signed, correct?

12:11:24  5    A.   Correct.

6    Q.   In the case of all of these schedules, you were

7    aware that there was computer equipment that Lycos was

8    using in a variety of facilities that Lycos maintained,

9    correct?

12:11:47 10    A.   We did have more than one facility, yes.

11   Q.   There were occasions, were there not, in which Lycos

12   negotiated what they call sale and leaseback

13   transactions with CSI in which Lycos agreed to sell

14   equipment to CSI, and then CSI agreed to lease the

12:12:16 15   equipment back to Lycos, right?

16   A.   I didn't recall those specifically at the time, but

17   I was shown some of those, I believe, at my deposition.

18   Q.   Exhibit 455, if we go to the next page, that's a

19   purchase agreement that you signed in October of 1999

12:12:42 20   for one such sale and leaseback transaction, right?

21   A.   That is my signature, yes.

22   Q.   Is it fair to say, sir, that during this period

23   Lycos was familiar with complex, sophisticated

24   transactions because it was doing business all over the

12:12:57 25   world and agreeing to contracts in different parts of

1   the world?

2   A.   I wouldn't say we had expertise in any sophisticated

3   financial arrangements, but we were doing business all

4   over the world, yes.

12:13:13 5   Q.   In your annual reports, you described, among other

6   things, all of the various contracts that you were

7   entering into with partners in Europe and the Far East

8   to develop your Internet business, right?

9   A.   Yes.

12:13:28 10   Q.   Certainly, those contracts were sophisticated

11   contracts, were they not?

12   A.   I think each contract probably had varying degrees

13   of sophistication.

14   Q.   And with the hundreds of millions of dollars in the

12:13:43 15   bank that you had --

16          THE COURT:   May we have a question?

17   Q.   You certainly had the ability --

18          MR. KALER:   Thank you, your Honor.

19   Q.   You certainly had the ability to obtain whatever

12:13:54 20   sophisticated legal and accounting advice you wanted

21   from your accounting firms and law firms, the ones that

22   you listed in the financials?

23   A.   Yes, we had access to those resources.

24   Q.   And it wasn't just you who had had prior experience

12:14:09 25   in dealing with equipment leases from an accounting

1    standpoint.  You had a number of other people on your

2    staff who did that as well, right?

3    A.   I do know that Brian Lucy was a CPA, and I don't

4    know specifically what his experience was with regard to

12:14:23 5    leasing, though.

6    Q.   Coming back to the question that I had asked you

7    about your analogizing these leases to loans, was that a

8    subject that you discussed, sir, in your meetings with

9    Lycos' attorneys prior to coming here to testify?

12:14:44 10           THE COURT:  Is there a joint defense

11    agreement in this case?

12           MR. BEAN:  There's only one defendant, your

13    Honor.  Only one defendant, Lycos.  As I said, Mr.

14    Guilfoyle --

12:14:55 15           THE COURT:  So, where does the privilege with

16    respect of an officer, former officer, and the

17    corporation come from?

18           MR. BEAN:  The corporation's privilege.  The

19    corporation has a privilege as to communications with

12:15:09 20    its former officers where counsel are involved.

21           As I said, I realize -- we'd be happy to

22    provide the Court with case law on this.  We think this

23    is a pretty clear issue.  We don't have it at our

24    fingertips.  We didn't ask CSI's witnesses about it

12:15:26 25    because we didn't think it was an issue.

1          THE COURT:  It seems to me if Mr. Kaler has a

2    very specific question as to whether counsel advised him

3    to lie, for example, he can answer that.  And if you

4    want to ask a specific question because I don't remember

12:15:40  5    exactly what the question was that you are pressing.

6    And not his counsel, Lycos' counsel.

7          MR. KALER:  Yes.

8          MR. BEAN:  Reserve my objection.

9          THE COURT:  Did they ask a specific question,

12:15:56 10    or did they tell him a specific thing, then I will

11    consider that question in this context.

12          MR. BEAN:  Go slowly, if you would.

13    BY MR. KALER:

14    Q.   Did Lycos' counsel say to you in these meetings

12:16:07 15    prior to your testimony that Lycos was claiming in this

16    case that the leases with CSI were like loans?

17          THE COURT:  You are objecting to that?

18          MR. BEAN:  Yes, your Honor.

19          THE COURT:  Well, you know, I'm not prepared

12:16:21 20    to rule on this now.  I think it's a dangerous area, and

21    I'm happy to get your law, and the witness can come back

22    if it's absolutely necessary, although I doubt that.  In

23    any event, I'm not prepared to rule on that now.  For

24    the moment, he may not answer.

12:16:38 25          For the moment, and without prejudice, the

1    objection is sustained.

2             MR. KALER:  May I just say absent a common

3    interest is my issue, but we can brief it.

4             THE COURT:  I don't understand.

12:16:48  5      MR. KALER:  Absent a showing of common

6    interest, there is no privilege is our contention.

7             THE COURT:  I said I would hear you on the

8    law in due course.  At the moment, I'm not prepared to

9    rule on it.

12:16:59 10     MR. KALER:  I understand.  On that basis,

11   I'll suspend the examination.  We've completed all the

12   other subject matters that I want to discuss.

13            THE COURT:  So you're finished with this

14   witness subject --

12:17:13 15     MR. KALER:  I had a couple of other

16   questions, but they are of the same variety.  They would

17   not be many questions, but they would be directed to

18   this issue.

19            THE COURT:  Any redirect?

12:17:25 20     MR. BEAN:  No, your Honor.

21            THE COURT:  Thank you, Mr. Guilfoyle.

22   Subject to your maybe having to come back, you are

23   excused.

24            (Witness excused).

12:17:36 25     THE COURT:  Who is next?

```
     1              MR. BEAN:  David Truesdell.
     2              DAVID TRUESDELL, sworn
     3              THE CLERK:  Please state your full name for
     4     the record, spelling your last name.
12:18:41  5         THE WITNESS:  My name is David Wheeler
     6     Truesdell, T-R-U-E-S-D-E-L-L.
     7     DIRECT EXAMINATION
     8     BY MR. BEAN:
     9     Q.   Good afternoon, Mr. Truesdell.
12:18:53 10     A.   Good afternoon.
    11     Q.   Are you employed, Mr. Truesdell?
    12     A.   Yes, I am.
    13     Q.   Where are you employed?
    14     A.   I'm employed by McGladrey & Pullen.
12:19:03 15     Q.   What is McGladrey & Pullen?
    16     A.   It is the fifth largest CPA firm or accounting firm
    17     in the country.
    18     Q.   Are you a certified public accountant?
    19     A.   Yes, sir, I am.
12:19:13 20     Q.   For approximately how many years have you been a
    21     certified public accountant?
    22     A.   Approximately thirty-five years.
    23     Q.   What do you do at McGladrey & Pullen?
    24     A.   I do a variety of things.  I have an audit client
12:19:25 25     practice myself.  In other words, I am responsible for
```

1    audits of clients, which would mean organizing the

2    staff, making sure they conduct the audit in accordance

3    with the auditing standards, reviewing the work papers

4    at the end of the audit, and also reviewing the

12:19:41 5    financial statements.

6              I also serve in a capacity where I review the

7    work of other audit partners in the firm.  So in my

8    role, I have to approve their work as well before the

9    financial statements can be issued.

12:19:58 10             I also serve in other capacities in the firm.

11   I have some management responsibilities, I'm on the

12   management committee for the local offices, and I also

13   have been involved in national committees involving

14   application of some relatively new auditing standards

12:20:16 15   across the firm.

16   Q.   Have you been engaged in auditing pretty much

17   throughout your thirty-five years as a certified public

18   accountant?

19   A.   Yes, sir, I have, except for a two-year period.

12:20:28 20   Q.   What industries have you been involved with during

21   your career as an accountant?

22   A.   I've been involved in a number of industries,

23   high-tech industries, computer software companies,

24   high-tech engineering companies.  Also have been

12:20:44 25   involved in retail companies.  One of the clients I

1   served until recently was Roche Bros. Supermarkets, for

2   example.

3          Also have worked on manufacturing companies,

4   manufacturers of printing equipment.  I guess food

12:21:01 5   manufacturer would be Stacy's Pita Chips.  That was my

6   audit until a few years ago when they were sold to

7   Pepsi.  A variety.

8          Distribution companies, wholesale lumber

9   companies, other things like that.

12:21:17 10          THE COURT:  Excuse me, are you calling this

11   witness as an expert or a fact witness?

12          MR. BEAN:  As an expert, your Honor.

13          THE COURT:  On what issue?

14          MR. BEAN:  There are four issues, your Honor.

12:21:26 15          THE COURT:  As an expert accountant?

16          MR. BEAN:  Yes.

17          THE COURT:  On certain accounting issues?

18   The case?

19          MR. BEAN:  Yes.

12:21:32 20          THE COURT:  Is there any objection to his

21   qualifications, Mr. Kaler?

22          MR. KALER:  Yes, your Honor.

23          THE COURT:  As an accountant?

24          MR. KALER:  No, certainly not as an

12:21:41 25   accountant.  I'm not requesting to voir dire the

1    witness.  It seems to me I can cross examine his

2    testimony.  Certainly, he is a certified public

3    accountant.  When you say challenge qualifications, I

4    might do it on cross examination, but I think certainly

12:21:58  5    we can accept him as a CPA.

6              THE COURT:  You may proceed, Mr. Bean.

7              MR. BEAN:  Thank you, your Honor.

8    BY MR. BEAN:

9    Q.   For those two years when you were not working in

12:22:07  10   public accounting, what were you doing?

11   A.   I was the controller of Lily Truck Leasing Company.

12   Lily was a lessor of trucks to a variety of different

13   customers.

14   Q.   And what did Lily do -- were you involved in the

12:22:22  15   accounting function at Lily?

16   A.   Yes.  I was the controller.  I was the Chief

17   Financial Officer in the company.  It was my

18   responsibility to maintain the financial records of the

19   company, to work with the independent audit firm when

12:22:33  20   they came in to audit our records.  And also, I reported

21   directly to the president, and it was my responsibility

22   to keep him updated on the business affairs of the

23   company.

24   Q.   Did you do any work with the lessees of Lily Truck

12:22:47  25   Leasing with respect to how leases were treated?

A.   Yes, I did.  Lily Truck Leasing leased under what
was called a full service lease, so we provided not only
the equipment but also maintenance and other services.
So we would frequently get questions from our clients
12:23:05  who were being questioned by their accountants just
about this whole question of whether the leases with
Lily were capital operating leases for the lessees, for
the companies that we were leasing to.

So, it was not uncommon for me to get a call
12:23:20  from a CFO at one of these companies asking me to give
information to them to help them talk to their auditors
and explain whether the lease should be treated as a
capital or an operating lease.

Q.   Would you describe for the jury the scope of your
12:23:33  work in this case?

A.   I started working on this case a little over two
years ago, January of '07.  I reviewed a number of
deposition transcripts of a lot of the people who have
been involved in this case.  I reviewed financial
12:23:49  statements of both Lycos and CSI.  I reviewed a lot, or
actually all of the lease schedules, the sales type
lease schedules that have been, I guess, at issue in
this case; reviewed research reports.  There was some
analysts on Wall Street that were following Lycos,
12:24:11  following the stock, and I read their reports and read

1   some other background information related to the

2   Internet boon as well.

3   Q.   Were there any documents that you ever requested

4   that I provide you with that you had not previously seen

12:24:27 5   that related to this case?

6   A.   Yes, there were.

7   Q.   And did I provide you with those documents?

8   A.   Yes, sir, you did.

9   Q.   Were there ever any documents that you requested

12:24:36 10   that I did not provide you with?

11   A.   No, sir.

12   Q.   And did you write several reports in this case?

13   A.   Yes, I did.

14   Q.   Approximately how many hours did you spend devoted

12:24:46 15   to and doing your research and writing those reports?

16   A.   I spent approximately 700 hours, myself and other

17   people on the staff, which amounts to about fifteen

18   weeks' worth of time.

19   Q.   Are you being paid to testify here today?

12:25:00 20   A.   Yes, I am.

21   Q.   Were you being paid to review the documents and

22   write your report?

23   A.   Yes, I am.

24   Q.   How much are you being paid?

12:25:08 25   A.   My hourly rate is currently $450 an hour.  At the

1    beginning of the case it was $385, I believe.

2    Q.    Is that what you're being paid?

3    A.    Yes.

4    Q.    Is your compensation based upon the opinions that

12:25:21  5    you render or the outcome of this case?

6    A.    No, it is not.

7    Q.    Have you testified as an expert witness before?

8    A.    Yes, I have.

9    Q.    Approximately how many times?

12:25:29  10    A.    Approximately ten to twelve times.

11    Q.    Did you assess whether the reductions in monthly

12    rent that Lycos realized from rolling up its equipment

13    schedules with CSI were material to Lycos' financial

14    statements?

12:25:42  15    A.    Yes, I did, in three distinct periods.

16    Q.    Were you asked to ascertain whether Lycos was

17    required under the accounting rules to test the leases,

18    the refinancing and rolled-up leases to determine

19    whether they qualified for operating lease treatment?

12:25:59  20            MR. KALER:   Objection:   Leading.

21    Q.    Why don't you describe the nature of the subjects of

22    which you rendered an opinion?

23            MR. BEAN:   There were four of them.   I just

24    didn't want him to forget.

12:26:12  25    A.    One of the topics was whether there was a

1   requirement for Lycos to evaluate its leases with CSI,

2   or any lessor, frankly.

3           Another topic that I was asked about was what

4   the accounting definition in the Financial Accounting

12:26:30 5   Standards, what the accounting definition was for

6   residual value.

7           Lastly, I was asked whether there were any

8   benefits, that CSI recognized any benefits in its

9   financial statements to its recording of sales type

12:26:45 10   leases as opposed to direct financing leases.

11  Q.  And with respect to your opinion on the issue of

12  whether the rent reductions that Lycos experienced as a

13  result of refinancing its equipment schedules were

14  material to Lycos' financial statements, what did you

12:27:00 15  conclude in your expert view?

16          MR. KALER:  Objection.  There's no

17  foundation.

18          THE COURT:  He may answer that.  Counsel is

19  entitled to ask the conclusion before he gets into the

12:27:13 20  foundation with respect to an expert.

21  A.  I'm sorry, could you repeat that?

22  Q.  Sure.  With respect to the issue of whether the rent

23  reductions that Lycos experienced as a result of

24  refinancing its equipment schedules and whether they

12:27:26 25  were material to Lycos' financial -- what was your

1   opinion?

2          MR. KALER:   My objection to the use of the

3   term "refinancing" is the objection I should have made,

4   which is not the proper word.

12:27:38 5          THE COURT:   You may have the question.   You

6   may answer.

7   A.   Thank you.   Yes, I concluded that the rent

8   reductions achieved were not material to the Lycos

9   financial statements in any of those three periods.

12:27:52 10   Q.   With respect to your opinion on whether Lycos was

11   required to test the refinanced equipment schedules to

12   determine whether they satisfied the requirements for

13   operating lease treatment, what was your expert opinion?

14   A.   In my expert opinion, Lycos was not required to test

12:28:07 15   them because they were not material.   And in my opinion,

16   they were not material to the Lycos financial

17   statements, and financial accounting pronouncements do

18   not relate to immaterial items.

19   Q.   With respect to your opinion regarding the meaning

12:28:20 20   of the phrase "estimated residual value" as used in FASB

21   13, what was your opinion?

22   A.   That's fairly simple.   There is a definition right

23   in the FASB 13 that says the estimated residual value is

24   the estimate of the fair value of the equipment at the

12:28:35 25   end of the lease.

```
 1   Q.   And what is the definition of fair value used in
 2   that?
 3   A.   Fair value, like a fair market value or the value
 4   between a willing buyer and willing seller.
 5   Q.   On the issue of whether CSI derived a financial
 6   benefit from booking its equipment schedules as sales
 7   type leases, what was your expert opinion?
 8             MR. KALER:  There is objection to this, your
 9   Honor.  It gets into issues pertaining to CSI's
10   financial statements that we have taken a position is
11   irrelevant to this case.
12             THE COURT:  Well, we've heard a lot about how
13   CSI treated these leases.  So it seems to me that it's
14   perfectly appropriate to inquire about that.
15             MR. KALER:  Oh, it's not how it treated the
16   leases is not the issue.  The issue relates to the
17   financial statements in later years and whether they
18   were restated to --
19             THE COURT:  I think that was the question.
20             MR. BEAN:  No, it wasn't, your Honor.
21             MR. KALER:  I thought it was.
22   Q.   The question was whether CSI derived a financial
23   benefit from booking its equipment schedules with Lycos
24   as sales type leases?
25   A.   It did derive a benefit from booking the leases as a
```

12:28:45 12:28:57 12:29:09 12:29:23 12:29:33

1    sales type lease instead of a direct financing lease

2    because it was able to recognize gross profit at the

3    inception of the lease; whereas, under operating lease

4    standards it would not have been able to do that, or

12:29:50  5    operating or direct financing it would not have been

6    able to do that.

7    Q.   Going to the first topic, Materiality of Rent

8    Reductions, what do you mean by the phrase "material"?

9    A.   Material, it's a judgment that auditors have to

12:30:05  10   make, at least in my position if I was looking at it as

11   an auditor judgment.  Materiality is discussed in

12   several authoritative pronouncements.  The Financial

13   Accounting Standards Board has discussed materiality

14   indicating that, they indicate there is a range between

12:30:28  15   5 and 10 percent of net income would be considered

16   material to a financial statement item.

17            MR. BEAN:  Could you put up No. 2189, Mr.

18   O'Keefe?

19   Q.   Now, when you refer to the Financial Accounting

12:30:44  20   Standards Board, is this what you were referring to,

21   this document, Mr. Truesdell?

22   A.   Yes.  This is a Statement of Financial Accounting

23   Concepts No. 2.

24   Q.   I'm sorry for interrupting.  I just want to put the

12:30:55  25   documents before the jury in a cursory fashion.

1    A.   The second group that has opinions or has expressed

2    guidance about what materiality is would be the American

3    Institute of CPAs, and that's the national body of

4    certified public accountants.  At this point in time,

12:31:12  5    they were responsible for writing auditing standards for

6    both public and privately held companies.  And the AICPA

7    has a similar view of materiality.  They describe it as

8    the amount of an error in a financial statement that

9    would change a user's opinion about those financial

12:31:30 10    statements.

11            The AICPA also goes on to describe how an

12    auditor should be evaluating the effects of errors in

13    the course of an audit of financial statements.  In

14    other words, the AICPA guidance says that an auditor

12:31:47 15    should evaluate errors both individually and in total

16    when evaluating whether the financial statements are

17    materially stated.

18            MR. BEAN:  Could you put up document 2187,

19    please, and highlight the top part.

12:32:04 20    Q.   Is this the document you were referring to when you

21    were referring to auditing standards of the American

22    Institute of Certified Public Accountants?

23    A.   Yes, sir, it is.

24    Q.   Were there any other standards that you relied on in

12:32:16 25    rendering your opinion?

1    A.    Yes.   The Securities and Exchange Commission, which

2    is the government regulator, principal government

3    regulator of the stock market, also has come up with

4    guidance on what is material.   Their guidance follows

12:32:31  5    the same line as the financial accounting standards

6    board.   They talk about a threshold of 5 percent being a

7    reasonable place to start, but they also go on to

8    indicate that there is judgment involved; it's not just

9    a strict numerical threshold.

12:32:49 10              MR. BEAN:   Could you put up No. 2190, please.

11    Q.    Now, is this the publication of the Securities and

12    Exchange Commission that you were referring to, Mr.

13    Truesdell?

14    A.    Yes, sir, it is.

12:33:01 15    Q.    And in sum, what do these standards say about

16    materiality, or what constitutes materiality?

17    A.    Well, as I said, materiality is basically an amount

18    or an item that would influence the reader of financial

19    statements.   Is it big enough to influence somebody

12:33:16 20    whose reading financial statements or to cause them to

21    change their opinion about the financial statements that

22    they're looking at?

23    Q.    Were there any other sources that you considered

24    regarding materiality perhaps specific to Lycos?

12:33:29 25    A.    Yes, sir, there were.

1    Q.   And what did you consider?

2    A.   There was a memorandum from Arthur Andersen who was

3    the audit firm for Lycos at December 31, 2001, and there

4    is a discussion there in that memo about the auditors up

12:33:45 5   at Terra Networks, which was the parent company, wanting

6    to be informed of any adjustments that exceeded 1.5

7    million dollars.  That was under the caption

8    "materiality."

9            I evaluated that.  As I mentioned, the AICPA

12:34:04 10  statements indicate that you have to evaluate errors or

11   adjustments both on an individual basis, but then also

12   on a cumulative basis.  So as I looked at this, I took

13   that into account that this might be a lower threshold

14   than the materiality would be.

12:34:20 15  Q.   Were there any other of Lycos' former accountants

16   who had written on what it wanted information about,

17   what might constitute materiality?

18   A.    Yes.  I found also a memo from Deloitte & Touche,

19   who was doing the audit.  Actually, I believe it was a

12:34:39 20  third quarter review, third quarter of 2003, I believe

21   it was.  And in that memo, they had asked the people at

22   the local level to inform them or people up at the Terra

23   Networks, the parent company level, of any adjustments

24   for that quarter, the three-month period, that exceeded

12:34:59 25  2.5 million.

1           So, again, I looked at that, and again I

2    thought that was perhaps more like a lower threshold,

3    and also questioned at the time whether that was 2.5

4    million for one quarter, whether that would equate to 10

12:35:12 5   million dollars over the course of a year.

6    Q.   Now, do the standards that you've used, are they

7    different in any way from Internet companies, or do

8    these same standards apply to Internet companies as well

9    as all of the other industries that you've described as

12:35:24 10  having worked with?

11   A.   They apply the same.

12   Q.   What threshold of materiality did you ultimately

13   use?

14   A.   I used initially a 5 percent threshold as my initial

12:35:40 15  threshold.

16   Q.   Could you give an example to the jury, please, of

17   what you mean by 5 percent, and 5 percent of what?

18   A.   Sure.  If Lycos had a loss of 100 million dollars

19   for one year, 5 percent of the 100 million dollars would

12:35:53 20  be 5 million dollars.

21          So, essentially what I'm saying is that a

22   user of the financials would probably not care if the

23   loss was 95 million or 105 million.  Either way, it's a

24   very large loss.  It's just 5 million dollars one way or

12:36:09 25  another on a hundred million dollars is not all that

1    significant.  It's not going to affect how people look

2    at the results of the company.

3    Q.    What time periods did you assess?  Were there any

4    particular groups of rewrites or roll-ups that you

12:36:23 5    assessed?

6    A.    Yes.  There were three groups.  A group of roll-ups

7    in September of 1999.  There were a series of rewrites

8    that occurred from January 2000 all the way through, I

9    believe it was April of 2001.  And then finally, the

12:36:39 10   Schedules Ninety-Three and Ninety-Four, which were done,

11   I believe, in October of 2001.

12   Q.    Did you prepare an overview chart that reflects

13   Lycos' cash rent savings with its cash position?

14   A.    Yes, sir, I did.

12:36:51 15          MR. BEAN:  Would you put up Exhibit 3030.

16   Q.    Would you describe this to the jury, please?

17   A.    Yes.  This is a chart, it's comparing Lycos' cash

18   balance versus the rent savings that I calculated on the

19   refinancings.  The amounts are all in thousands.

12:37:12 20          MR. KALER:  Excuse me.  Can we all agree that

21   this is a demonstrative?

22          MR. BEAN:  Yes.

23   A.    So if you look, the first two columns, it's kind of

24   hard to see the second one, but the first two columns to

12:37:24 25   the left represent January 2000.  And Lycos at that

1   point had cash balances of approximately 629 million

2   dollars.  And the maximum rent savings that I calculated

3   from those roll-up transactions in 1999 was

4   approximately $2,759,000.

12:37:45 5          So you can see graphically, when I'm talking

6   about in terms of materiality, that's such a small

7   number in relation to the cash balance.

8          The same analysis for 2000, at December 2000,

9   I looked at the matching rent savings that I calculated

12:38:00 10   for the 2000 to 2001 rewrites, which was $2,400,000,

11   approximately.  Lycos at that point had, it looks like

12   706 million dollars in cash.  Again, the rent savings

13   were really trivial compared to the amount of cash.

14          Lastly, as of December 2001, looking at the

12:38:21 15   savings, the potential rent savings for the November

16   2001 roll-up Schedules Ninety-Three and Ninety-Four, I

17   calculated that maximum potential saving at about 5.5 or

18   5.6 million dollars, and Lycos at the time had 482

19   million dollars in cash.

12:38:40 20   Q.   Okay.  Just one question, sir.  You had said about

21   5.6 million.  I believe on your chart it shows 4.5

22   million.

23   A.   I'm sorry, I was going between 4.5 and 4.6.  It's

24   $4,558,000.

12:39:00 25   Q.   And in performing your analysis during each of these

1    three time periods, what methodology did you employ?

2    A.    In general, I took the monthly rents from the leases

3    prior to the roll-up or prior to the change and compared

4    them to the rent amounts, the monthly rent amounts, that

12:39:19  5    were established under the new leases.

6    Q.    Let's go first to the 1999 roll-ups?

7              MR. BEAN:  Could you put up Exhibit 3031,

8    please.

9    Q.    Again, this is a demonstrative.  Could you try to

12:39:34 10    explain this to the jury in the simplest fashion you

11    can, sir?  Not that the jury needs a simple explanation,

12    but there are a lot of numbers here.

13    A.    Yes.  This is a materiality analysis that I did for

14    the 1999 roll-ups.  And if you look at the very top two

12:39:51 15    column headings, I have one called "Old Leases" and one

16    called "New Leases."

17              So in very simple terms, I took a list.

18    There were 39 schedules that got rolled up into new

19    ones.  I took the lease payments, and that's all the

12:40:13 20    various items in color in that column in the old lease

21    --

22    Q.    Would it be helpful for you to have a copy of your

23    report?

24    A.    Yes, it would be.

12:40:41 25              MR. BEAN:  May I have a moment, your Honor?

1          (Pause)

2    Q.   Mr. Truesdell, if you can touch that screen, you may

3    be able to work the pointer as you direct the Court's

4    and the jury's attention.

12:41:31 5    A.   Okay.  So in the Old Lease column, there is a lot of

6    information, lease date and months and all sorts of

7    stuff.  But what I was really getting at was the total

8    payments under the old leases amounted to $821,840.

9    That was the amount that was due under the old leases.

12:41:56 10              I then took the new leases --

11              THE COURT:  Touch the bottom left of the

12    screen, and then all of these will go away, I think.

13    Now you can start over again.

14    A.   So the $821,000, and then -- which was the amount

12:42:35 15    due under the original leases under the rolled-up

16    leases, under the new leases, the monthly rental was

17    $592,000, approximately.

18              So I took those two amounts down in this

19    little table here at the bottom.

12:42:50 20    Q.   I'm sorry, where is the 592, sir?

21    A.   Looking at the wrong schedule.  I meant to say it

22    was $629,000, which was under the new lease category.

23    Q.   Okay.

24    A.   So I took that, those two numbers, 821 down in the

12:43:23 25    box down here, I took the monthly rent before, $821,000,

1    subtracted the monthly rent after of $629,000 to arrive

2    at a difference of $192,000 a month, multiplied by 12

3    months to get an annual total maximum reduction rent

4    total of 2.3 million dollars.

12:43:46  5    Q.   Where did you get the information that you presented

6    on this chart?

7    A.   I got this information from CSI's Sales Type Journal

8    Lease entries.

9    Q.   And so, the total of the maximum total rent

12:44:01  10    reduction you say is 2.3 million?

11    A.   Yes, sir.

12    Q.   Then what did you do?  Did you look at Lycos'

13    financial statements to make a comparison?

14    A.   Yes, sir, I did.

12:44:09  15        MR. BEAN:  Would you put up 2002, page 28,

16    please?  And could you highlight the line "Net Loss" for

17    the year ending July 31, 1999, Mr. O'Keefe, in the

18    middle.

19    Q.   And what was the net loss in 1999?

12:44:38  20    A.   The net loss in 1999 was approximately 52 million

21    dollars.

22    Q.   And how did the 2.3 million dollars annual

23    difference in rent compare?  What percentage was that?

24    A.   I didn't do it as a percentage per se, but I took my

12:44:53  25    5 percent threshold, I took 5 percent, which was the

1    threshold for materiality I was using, and multiplied it

2    by the 52 million dollars, and came up with an amount of

3    what I considered the materiality threshold as

4    $2,600,000.

12:45:09  5    Q.    So the 2.3 was below that?

6    A.    Right.

7    Q.    Did your analysis in the chart we looked at reflect

8    a change from the earlier analysis you had done?

9    A.    Yes, sir, it did.

12:45:18 10    Q.    And what did you determine was in error on the

11   earlier analysis?

12   A.    In my earlier analysis, and I think it still shows

13   up on the calculation we were just looking at, there

14   were two new lease schedules that I didn't have

12:45:31 15   available at the time.  And I did not include -- I

16   didn't think it was important to include those because

17   not including them would have essentially made the

18   difference, the rent difference greater, which would

19   have favored CSI in terms of this case.  So since I

12:45:51 20   was -- I thought it was already not material, that there

21   was no point making the reduction in rent even smaller.

22            So I found the extra leases, put the numbers

23   in, and came up with a dollar number.

24   Q.    And the analysis that you performed, did you feel

12:46:08 25   that you did it in such a way as to favor CSI as much as

1    possible?

2    A.    Absolutely.

3    Q.    And did you consider any qualitative factors in

4    assessing materiality?

12:46:18 5    A.    When I did the calculation the first time, the 5

6    percent of materiality, the calculation of the rent

7    savings was slightly above the 5 percent.  It was like

8    2.5 million, and the number I came up with was 2.8

9    million.

12:46:34 10           So, as I said, the materiality is not

11    strictly a number, it's not a fixed number; there's

12    judgment involved with it, too.  And one of the things I

13    was considering, as I said, materiality is all about

14    influencing or what would influence the users of

12:46:52 15    financial statements.  So I did some research in terms

16    of Lycos' financial statements for the three years prior

17    to that, or the three years, I guess, that were in that

18    same period, and arrived at the conclusion that Lycos'

19    stock price was not following its net income or loss.

12:47:15 20    It was more appropriately or more accurately following

21    the increases in revenues or expenses.

22           MR. BEAN:  Could you put up Exhibit 3029,

23    please?  This is another demonstrative.

24    Q.    Is this something you prepared, sir?

12:47:27 25           MR. KALER:  Excuse me, your Honor.  There is

1   objection to this witness giving an opinion on the

2   effect of stock price on the company on revenues versus

3   earnings on its grounds that he is not qualified to do

4   that.

12:47:41  5          THE COURT:  At the moment, I don't know what

6   his question is.

7   Q.   Did you prepare this chart?

8   A.   Yes, I did.

9   Q.   Could you describe it?

12:47:55 10  A.   Yes.  The left-hand side of the chart shows in

11   dollars, and that will be the scale that I use for

12   revenues, expenses, and net loss of Lycos.

13          The columns in the graph, there are three

14   columns, one sort of a blue and a red and a pale yellow,

12:48:11 15   those all represent dollar amounts, and they are keyed

16   on that left-hand scale.

17          So, as you can see, the revenue for the

18   fiscal year ended July 31, 1999, was less than expenses;

19   therefore, there was a loss --

12:48:27 20          THE COURT:  Well, I think the witness can

21   tell us what he observed from the books.  He cannot tell

22   us the causal connection between revenue, expenses, and

23   the value of the stock.

24          MR. BEAN:  That's fine, your Honor.  I'm just

12:48:41 25   asking him to describe what he sees.

1          THE COURT:   That he can do.

2          MR. BEAN:   Thank you.

3     Q.   If you could continue, Mr. Truesdell.

4     A.   Yes.   Continuing with the columns now, just the

12:48:50 5    columns, in July 31st of 1998, as you can see, the

6     revenues in the blue were just over 50 million, expenses

7     were approaching a hundred million, and the loss was 28

8     million or something like that, as you can see the bar

9     going down below --

12:49:10 10         THE COURT:   Members of the jury, what the

11    witness can tell us is what he saw, but he cannot tell

12    us that the reason the stock price went down is because

13    of what is above the line.

14    A.   What's below the line is just a net loss for the

12:49:23 15   company; it's not the stock price.

16          The third set of columns is July 31, 1999.

17    Again, revenue has increased significantly.   It's now

18    approaching 150 million.   Expenses have also increased

19    dramatically, approaching 200 million.   The loss at this

12:49:41 20   point is now just over 50 million.   It's 52 million,

21    which we saw just a minute ago on the financial

22    statements that were displayed.

23          So it's really showing that revenues and

24    expenses for Lycos were increasing dramatically during

12:49:58 25   this period of time.   The loss, the yellowish line was

1   getting worse during that period of time.   In other

2   words, they were losing more money year after year.

3            Now, let's focus on the lines.   The lines in

4   the graph, the scale for those is on the right-hand side

12:50:16  5   of the chart.   And that runs from zero to $80, and

6   that's price per share for Lycos.

7            So I plotted both the high and the low price

8   per quarter, which is information that I obtained out of

9   the Lycos financial statements.   And what you can see is

12:50:33 10   that the price of Lycos stock, the highs and the lows,

11   were both increasing along with the increases in revenue

12   and expenses.   And there seemed to be no effect,

13   relationship to the worsening losses --

14            MR. KALER:   Objection to the causation

12:50:52 15   aspect.

16            THE COURT:   I think he was careful enough to

17   word that.   Objection is overruled.

18   Q.   Did you review any articles written by Wall Street

19   analysts during this period to determine whether the

12:51:05 20   sort of pattern that we're seeing with Lycos' stock

21   price and its income and expenses was typical or

22   atypical during this period?

23            MR. KALER:   Objection.

24            THE COURT:   No, I don't think so.

12:51:16 25   Q.   In your opinion, did the rent reductions that Lycos

1    realized from the September 1999 roll-ups have a

2    material impact on its financial statements?

3    A.   No, sir, I don't believe they did.

4    Q.   Going onto the 2000-2001 rewrites --

12:51:30  5            MR. BEAN:  Could you put up 3027, please.

6    Q.   Is this a chart that you prepared, sir?

7    A.   Yes, it is.

8    Q.   And could you describe it, please?

9    A.   Yes.  This is, as I said before, the 2000 to 2001

12:51:53 10  rewrites extended over a fairly long period of time, I

11   think it's like sixteen months.  So what I did in this

12   chart is I compared, for each set of leases that were

13   rewritten in a particular month, I compared the old

14   lease amount, the old lease rent versus the new lease

12:52:14 15  rent.  And what you can see here, on the left -- let me

16   back up.

17            For January 2000, there are two columns.  The

18   bluish kind of column, just over 150,000, represents the

19   monthly rental charge that Lycos was paying before the

12:52:35 20  rewrite.  The reddish column to the right of it

21   represents the amount of the payment after the rewrite.

22   You can see they are relatively close to each other.  I

23   did that all the way through this period of time.

24            In March of 2000, there were a few small

12:52:52 25  rewrites.  Obviously, the monthly rent was not very

1    great at that point.  April of 2000, June of 2000.  The

2    biggest impact in terms of rental expense, rental

3    payments, was in October of 2000, where you can see the

4    monthly rental payments are almost 200,000 prior to the

12:53:16  5    rewrites and were somewhere closer to 150 afterwards.

6    Q.   And did you calculate an estimate -- what was your

7    methodology in calculating Lycos' rent savings in

8    connection with the 2000-2001 rewrites?

9    A.   In this case, since the rewrites occurred over quite

12:53:34 10   a long period of time, I either had the choice of trying

11   to figure out when each set of leases renewed, or what I

12   did from the purpose of being conservative is I just

13   assumed all the leases were rewritten as of January of

14   2000, which would give the largest possible rent

12:53:55 15   reduction for Lycos, which would be favoring CSI in this

16   case.  So I assumed they all happened at once and

17   calculated how much that rent reduction would be.

18   Q.   And what was the rent reduction that you calculated?

19   A.   I calculated a number of just over a million

12:54:13 20   dollars, I believe.

21   Q.   Could you take a look at your report?

22   A.   Yes.

23   Q.   Page 1.

24   A.   For the 2000 to 2001 rewrites?

12:54:28 25   Q.   Yes, sir.

A.   The annualized difference that I showed on this

report was just over a million dollars.

Q.   And did you consider interim rent in your

calculation?

A.   Yes, sir, I did.

Q.   What did you do?

A.   For all but two schedules, 89 and 90, interim rent,

I also added that in as though it was part of the

expense Lycos was going to be having to incur.  And

that, again, was conservative because that interim rent

was going to be financed or be paid over a period of

time.  It was not paid all on that first month when I

assumed it did.  Again, I was being as conservative as I

could to give CSI sort of every benefit of the doubt.

        MR. KALER:  Objection to the references to

giving CSI the benefit of the doubt, your Honor.  If we

could just stick to the opinions.  It's the third time

it's been mentioned.  I don't know whether it favors one

side or the other.  I just don't think the witness

should be opining on that issue.

        THE COURT:  It's part of the picture, isn't

it?

Q.   Why did you not consider interim rent for Schedules

89 and 90?

A.   Because it was my understanding that that rent was

1    actually paid in cash and not rolled into the new

2    leases.

3    Q.   So what was the total amount of the rent reduction

4    for the 2000-2001 rewrites?

12:55:47  5    A.   The maximum potential rent reduction, the way I

6    calculated, again, assuming it all happened on day one

7    and not being spread over a period of time, which would

8    make the reduction as large, larger, really, than it

9    was, was 2.3 million to 2.4 million, and I compared that

12:56:09 10    --

11            MR. BEAN:  Could we go to Exhibit 737,

12    please, page 4 and if you could highlight the numbers --

13    Q.   What is this, Mr. Truesdell?  What are we looking

14    at?

12:56:24 15    A.   This is now the Lycos financial statement for the

16    year ended December 31, 2001 and for the period from

17    October 28, 2000 to December 31, 2000.

18    Q.   So what did you do?

19    A.   I took, since the December 2000 period was only two

12:56:49 20    months, I took that loss of 41 million dollars, 41 and a

21    half million dollars, and multiplied it by six to come

22    up with an annualized amount, which I arrived at an

23    amount of 249 million as the annualized loss that I was

24    going to base my materiality on.

12:57:08 25            So I took that number, 249 million,

1    multiplied it by my 5 percent threshold.  I came to a

2    number of 12 million some-odd thousand dollars.  And the

3    difference, or the rent savings, maximum potential rent

4    reduction, was only 2.3 million, well below my

12:57:29  5    materiality threshold.

6             So I concluded that that rent reduction would

7    not be material.

8             THE COURT:  I didn't follow this on this

9    chart at all.

12:57:36 10             MR. BEAN:  Thank you, your Honor.

11             THE COURT:  I don't know that it's material.

12    That is, that I didn't follow it.

13    Q.   Mr. Truesdell, you've got about two minutes.  See if

14    you can explain it again, please.

12:57:58 15             THE COURT:  Where are the numbers you're

16    referring to?

17             MR. BEAN:  Do you want to highlight the

18    number 41 million, Mr. O'Keefe.

19             THE WITNESS:  How about the whole right-hand

12:58:09 20    column?

21    Q.   So we're starting with the number of 2.3 or 2.4

22    maximum rent savings, right?

23    A.   Let me back up a little bit.  Because Lycos had

24    entered into a transaction with Terra Networks and was

12:58:23 25    now no longer an independent company, I didn't have the

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:58:45 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 12:59:02 | 10 |

1    normal financial statements for Lycos.  Their fiscal

2    year end was July 31.  You've seen me talking about July

3    31, 1996, '97, '98, '99.  After July 31, 1999, Lycos was

4    not an independent publicly-traded company for annually

5    reported purposes.  This was the first financial

6    statement that I was able to find that reflected

7    activity for the 2000 period, but it was only two months

8    in 2000, essentially November and December of 2000.

9             THE COURT:  So these are the two months'

10   figures, and you then multiplied them by 6?.

11            THE WITNESS:  Yes.

12            THE COURT:  And where are the multiplied

13   figures?

14            THE WITNESS:  You do not see them here.

15   Q.   How much approximately, 4 times 6 is approximately

16   what?

17   A.   24, or 240.  It's 249 million dollars was the number

18   I arrived at.

19   Q.   So the 41 million multiplied by 6 is approximately

20   249 million.  And --

21            THE COURT:  I think we need to suspend.

22   Q.   How does the 2.4 million maximum rent savings

23   compare to that 249 million?

24   A.   Five percent of the 249 million was 12 million.  So

25   the 2.4 million was well below the materiality

1    threshold.

2    Q.   So was the rent savings material or not?

3    A.   No, it was not.

4              THE COURT:   All right.   We will start again

12:59:55 5   tomorrow morning.   Thank you.

6              (Jury was excused).

7              THE COURT:   Court is in recess until two,

8    this case until nine tomorrow morning.

9              (Whereupon the hearing adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       C E R T I F I C A T E

4

5       I, Lisa W. Starr, Registered Professional

6    Reporter/Certified Realtime Reporter, do hereby certify

7    that the foregoing transcript, from Page 1 to Page 86,

8    constitutes to the best of my skill and ability a true

9    and accurate transcription of my stenographic notes

10   taken in the matter of Civil Action No. 05-10017-RWZ,

11   Computer Sales International, Inc. Vs. Lycos, Inc.

12

13

14   _____

15   Lisa W. Starr, RPR, CRR

16

17

18

19

20

21

22

23

24

25