```
                UNITED STATES DISTRICT COURT FOR
                  THE DISTRICT OF MASSACHUSETTS

COMPUTER SALES, INC., f/k/a )
COMPUTER SALES INTERNATIONAL)
INC.                        )
          Plaintiff,        )
                            )
vs.                         )    Civil Action
                            )    No. 05-10017-RWZ
                            )
LYCOS, INC.,                )
          Defendant.        )
```

**JURY TRIAL**
**DAY FIVE - FIRST SESSION**

```
        BEFORE THE HONORABLE RYA W. ZOBEL
        UNITED STATES DISTRICT COURT JUDGE

           UNITED STATES DISTRICT COURT
          John J. Moakley U.S. Courthouse
                1 Courthouse Way
            Boston, Massachusetts 02210
                  June 5, 2009
                   9:00 a.m.
```

```
                  *  *  *  *  *
```

```
        CATHERINE A. HANDEL, RPR-CM, CRR
              Official Court Reporter
          John J. Moakley U.S. Courthouse
          1 Courthouse Way, Room 5205
                Boston, MA 02210
                (617) 261-0555
```

```
1   APPEARANCES:

2

3   For the Plaintiff:

4   McCARTER & ENGLISH, LLP
    (By Robert J. Kaler, Esq.,
5        Edward William Little, Jr., Esq.,
         David Himelfarb, Esq.,
6        and Kelly Gabos, Esq.)
         265 Franklin Street
7        Boston, MA 02110

8

9

10

11  For the Defendant:

12  McDERMOTT WILL & EMERY LLP
    (by Thomas O. Bean, Esq.,
13       Peter M. Acton, Jr., Esq.
         David Q. Gacioch, Esq.,
14       and James Fraser, Esq.)
         28 State Street
15       Boston, MA 02109-1775

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

1

2

3                         EXAMINATION INDEX

4

5   EDWARD PHILIP

6         CONTINUED DIRECT BY MR. BEAN . . . . .    4
          CROSS BY MR. KALER . . . . . . . . . .    9
7         REDIRECT BY MR. BEAN  . . . . . . . .    67
          RECROSS BY MR. KALER  . . . . . . . .    73
8

9

10  CHARLES CROSS

11        DIRECT BY MR. BEAN . . . . . . . . .    74
          VOIR DIRE BY MR. KALER . . . . . . .    89
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            (The following proceedings were held in open

 3   court before the Honorable Rya W. Zobel, United States

 4   District Judge, United States District Court, District of

 5   Massachusetts, at the John J. Moakley United States

 6   Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

 7   June 5, 2009.)

 8                      (Jury enters courtroom.)

 9                      THE COURT:  Good morning.  Please be

10   seated.

11                      Mr. Philip, you remain under oath.  You

12   understand that?

13                      MR. PHILIP:  Yes, ma'am.

14                      THE COURT:  Okay.  Mr. Bean, you may

15   continue.

16                      EDWARD PHILIP, PREVIOUSLY SWORN.

17                 CONTINUED DIRECT EXAMINATION

18   BY MR. BEAN:

19       Q.  Good morning, Mr. Philip.

20       A.  Good morning.

21       Q.  If there were no benefits to Lycos from a rewrite

22   other than longer lease term, would you have signed a

23   rewrite if you knew there was a charge for entering into

24   it?

25                      MR. KALER:  Objection.
```

```
 1                    THE COURT:  Well, I will take it de bene.

 2                    You remember what that means, right?

 3                    (Jurors nod.)

 4        A.   The only way we would do it is if there were an

 5   economic or business reason to do it, and if there were no

 6   benefits, no, it wouldn't make any sense.

 7        Q.   Are you familiar with what's called an income

 8   statement?

 9        A.   Yes, I am.

10        Q.   What do you understand an income statement to be?

11        A.   Income statement is what we looked at yesterday

12   that has the sales on it and then all the expenses and it

13   eventually comes down to the profit for the business.

14        Q.   Sure.

15                    MR. BEAN:  Mr. O'Keefe, would you go to

16   Page No. 12 of Exhibit 2,002, please.

17                    MR. O'KEEFE:  could you turn the system

18   on, please?

19        Q.   Mr. Philip, could you describe for the jury what

20   they're looking at.

21        A.   On Page 12?

22        Q.   Yes, sir.

23        A.   Okay.  This is the income statement for Lycos for

24   the years 1996 -- excuse me -- 1995 through 1999 and,

25   again, the revenues are the sales, and then it shows all
```

PDF created with pdfFactory trial version www.pdffactory.com

 1  the costs of the businesses, the expenses, and it comes

 2  down to profit or loss.

 3      Q.   And are you familiar with the concept of a

 4  balance sheet?

 5      A.   Yes, I am.

 6              MR. BEAN:  Mr. O'Keefe, would you go to

 7  Page 37 of this document, please.

 8      Q.   Is this a balance sheet, sir?

 9      A.   Yes, it is.

10      Q.   And what does it show?

11      A.   That shows all the assets and the liabilities and

12  stockholders' equity for the business.

13      Q.   Do you know whether Wall Street analysts

14  following Lycos during the years 1995 through 1999 were

15  focusing on the balance sheet or the income statement or

16  one or the other?

17              MR. KALER:  Objection.

18              THE COURT:  How would he know that?

19              MR. BEAN:  Based on conversations with

20  analysts or based on his understanding of what was

21  influencing stock price.

22              THE COURT:  And the objection is hearsay?

23              MR. KALER:  Yes.

24              THE COURT:  But it's not being offered for

25  the truth of what they say.  It is being offered for this

PDF created with pdfFactory trial version www.pdffactory.com

 1  witness' knowledge, which is highly relevant to the issues

 2  in the case.

 3                    MR. KALER:  Then there should be a

 4  foundation as to who said what when.

 5                    THE COURT:  It doesn't matter.  It's what

 6  he heard, what he understood that's the relevant.  You may

 7  cross-examine about the rest of it.

 8                    MR. KALER:  Thank you.

 9     A.  I was in constant dialogue with the Wall Street

10  analysts and we talked about both the income statement and

11  the balance street.

12     Q.  Do you have a sense of which -- did you have an

13  understanding of whether one was more important to them

14  than the other?

15     A.  The income statement is more important than the

16  balance sheet.

17     Q.  If moneys were due to a company such as CSI as

18  the end of a quarter, but they hadn't been paid as yet,

19  would those expenses still be reported on the income

20  sheet?

21     A.  If they hadn't been paid?

22     Q.  Yes.

23     A.  Yes.  They would still have to be shown on the

24  income statement, yes.

25     Q.  Why is that?

PDF created with pdfFactory trial version www.pdffactory.com

```
1        A.   Well, when you have an expense, whether you pay

2   it or not, you have to reflect it in your income

3   statement, and then it would also reflected on the balance

4   sheet, but you can't -- the reason for that is you want to

5   make sure that the income statement reflects all the costs

6   for running the business during the period in which you

7   were operating the business.  And so, even if you paid it

8   or not, it still has to be shown.

9                    MR. BEAN:  Thank you, Mr. Philip.

10                   THE COURT:  That's it?

11                   MR. BEAN:  Yes, your Honor.

12                   THE COURT:  Members of the jury, let me

13  try to explain to you the exchange I just had with

14  counsel.

15                   We have a rule that says -- the so-called

16  hearsay rule, that says that a witness cannot tell us what

17  he heard outside of the courtroom in order to prove -- the

18  proof of what he heard.

19                   So, for example, if the question is

20  whether it was raining in Waltham at 7 o'clock this

21  morning, the witness cannot tell us that X told him it was

22  raining at 7 o'clock this morning in Waltham.

23                   If, on the other hand, the question is not

24  whether it was raining, but the effect of rain on the

25  witness' state of mind; that is, he was wondering whether
```

```
 1  he needed to take an umbrella this morning and it's
 2  important for the jury to know what decision he made, he
 3  said, Well, somebody told me it was raining in Waltham
 4  this morning.  I, therefore, decided to take an umbrella.
 5                 There the issue is not whether it was, in
 6  fact, raining, but what the impact was on his state of
 7  mind of somebody telling him it was raining, and the
 8  second is not hearsay because it is not being offered to
 9  show that it was raining, but simply the effect on this
10  witness' preparation, state of mind, knowledge, whatever.
11  So that's why that evidence came in, and it cannot be
12  taken as what, in fact, the analysts said, but only what
13  the impact on him was.
14                 MR. KALER:  May I proceed, your Honor?
15                 THE COURT:  Yes.  Sorry.
16                 MR. KALER:  No problem.
17                 Could we put up Exhibit 1 on the screen.
18                      CROSS-EXAMINATION
19  BY MR. KALER:
20     Q.  The master lease -- this is the master lease that
21  you signed in --
22     A.  I'm sorry, my screen is not working.  There's
23  nothing on there.
24                 MR. KALER:  Can we put the witness'
25  screen --
```

1          THE COURT:  Maybe it's not turned on.

2    There's a little button.  Do you have a green light?

3          THE WITNESS:  It's on.  Thank you.

4          THE COURT:  I had the same problem.

5      Q.   This is the master lease agreement that you saw

6    yesterday that you signed in December of 1996, correct?

7      A.   Correct.

8      Q.   And then if we go to the seventh page of Exhibit

9    1, we saw the addendum -- if we can blow that up -- that

10   you talked about yesterday.  Do you see that?

11     A.   I do.

12     Q.   And, in particular, you talked about the change

13   in Paragraph 3, the express remedies, deleting four

14   percent from the discount rate and inserting --

15          THE COURT:  Can we have a question without

16   a large preamble, please.

17          MR. KALER:  Yes, I do, your Honor.

18     Q.   If we put up the trial testimony from yesterday,

19   Page 66, Line 9, and blow that up.  You testified

20   yesterday that -- you were asked:  "Do you have," going to

21   Addendum 1 -- referring to the lease -- "in Subsection B1

22   of the express remedies provision where it says, 'Delete

23   four percent, insert six percent,' is that something you

24   would have suggested?"

25          You said, "I don't think so."

PDF created with pdfFactory trial version www.pdffactory.com

1           And then you were asked, "What leads you to think

2     you didn't?"

3           And you said, "Well, I didn't have any experience

4     with these kinds of documents.  So, I don't know why I

5     would have made those changes," correct?

6         A.   Correct.

7         Q.   But a month prior to signing the lease agreement

8     with CSI, you signed Exhibit 281, in which, on the third

9     page -- if we blow up the third page -- you signed in the

10    lower right-hand corner and you wrote above at the top of

11    the page in the early termination provision, changed to

12    the discount where you were increasing it from four

13    percent to five percent, correct?

14        A.   Yes.

15        Q.   And that's your handwriting, deleting the 4

16    percent and making it 5 percent and your initials,

17    correct?

18        A.   That's my initials.  I'm not sure it's my

19    handwriting on the four to five percent, but it's

20    definitely my initials.

21        Q.   So, you were authorizing a change in that lease

22    agreement with Avnet in November of 1996 -- if we can go

23    back to the first page -- to change the discount rate from

24    four to five percent in the event of early termination?

25        A.   That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And then you did the same thing, did you not, in

2    Exhibit 282, which we put up on the screen, also signed on

3    the same day.  These were two equipment schedules under an

4    existing master lease you had with Avnet, correct?

5    A.   I believe so.

6    Q.   And then if you go to the third page of that

7    document, we see that, again, in November of 1996, you

8    signed an equipment schedule lease with Avnet in which you

9    made the same change, crossing out the discount rate of

10   four percent and at the top of the page, you making it

11   five percent, correct?

12   A.   Correct.

13   Q.   And those are your initials authorizing the

14   change?

15   A.   Yes, they are.

16   Q.   You had, in fact, had experience -- at the time

17   that you signed the master lease with CSI, you had had

18   specific experience the previous month with altering the

19   discount rate in one of your leases -- these lease

20   agreements which you had with Avnet, correct?

21   A.   It appears I made that change, yes.  I don't

22   recall having experience with it.

23   Q.   I'll also show you, because we don't have it on

24   the...

25                    MR. KALER:  May I approach, your Honor?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                     THE COURT:  Yes.
 2        Q.  ...on the screen.  It hasn't been scanned yet, a
 3   third exhibit, Defendant's 2366.
 4                     MR. KALER:  It's 2366, the defendant's
 5   exhibit.
 6                     MR. BEAN:  Could we have a moment, your
 7   Honor?
 8                     MR. KALER:  Sure.
 9                     THE COURT:  What did you show the witness
10   just now?
11                     MR. KALER:  Defendant's Exhibit 2366.
12                     THE COURT:  Which is what?
13                     MR. KALER:  Which is a third lease
14   agreement with Avnet, executed by the witness in November
15   of --
16                     THE COURT:  Can we just have one question
17   about it --
18                     MR. KALER:  Yes.
19                     THE COURT:  -- to focus in on what you
20   want to know from him.
21                     MR. KALER:  Thank you, your Honor.
22        Q.  On the third page, sir, again, you signed this
23   lease agreement and also made the same change to the
24   discount rate, increasing it to five percent, correct?
25        A.  Correct.
```

1     Q.   Does that refresh your recollection that at the
2  time you signed Exhibit 1 -- can you put that on the
3  screen -- the master lease with CSI, you had had prior
4  experience in altering the discount rate in your lease
5  agreements with suppliers with lessors?

6     A.   It does not -- I don't recall that, but it does
7  appear that I made the change.

8     Q.   And then you also testified yesterday -- if we
9  put up Page 66, Line 21 of your testimony in the
10 transcript.  You were asked:  "And do you recall signing
11 any other lease agreements prior to signing the CSI lease
12 agreement?

13        And you answered:  "Just the Avnet agreement."
14 Correct?

15     A.   That's correct.

16     Q.   But didn't you sign Exhibit 192 with Digital
17 Financial Services months before the execution of the CSI
18 master lease, specifically in February of 1996?

19               MR. KALER:  If we scroll down the page and
20 go to --

21               THE COURT:  Let him answer the question,
22 please.

23               MR. KALER:  Okay.

24     A.   Can you show me the signature?  Because I don't
25 remember this --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1      Q.   Yes.

 2                MR. KALER:  Could we go to second -- could

 3   we go to the second page.

 4                May I approach, your Honor?  I'll give the

 5   witness a hard copy.

 6                THE COURT:  Yes.

 7      A.   I see it here.

 8      Q.   I'll give you a hard copy.

 9      A.   Sure.  Thank you.

10      Q.   Is this not an agreement, sir, a lease agreement

11   which you entered into with Digital Financial Services in

12   February of 1996, some ten months before you signed the

13   CSI lease agreement?

14      A.   I don't know.  I could take a minute to read it.

15      Q.   Please.

16      A.   (Examining.)

17                MR. KALER:  Can we go to the second page

18   and blow up the signature block.

19      A.   It does appear to be a lease agreement.

20      Q.   And is it a lease agreement that you signed on

21   the second page, sir?

22      A.   Yes, it is.

23      Q.   Again, in or about February of 1996?

24      A.   Yes, it is.

25      Q.   And if I can show you Exhibit 201.  Isn't this a
```

PDF created with pdfFactory trial version www.pdffactory.com

1  further agreement that -- lease agreement that you signed

2  in July of 1996?

3           MR. KALER:  May I approach, your Honor?

4           THE COURT:  Yes.

5      A.   Thank you.

6      Q.   Exhibit 201 is a second lease agreement schedule

7  that you entered into with Digital Financial Services in

8  July of 1996, some six months before the CSI lease

9  agreement, correct?

10     A.   It looks like it, yes.

11     Q.   And that's your signature in the lower left

12  corner on the second page, correct?

13     A.   That's correct.

14     Q.   Does that refresh your recollection that you had

15  had a series of lease agreements and a master lease with

16  Digital Financial Services in addition to Avnet prior to

17  looking at the CSI lease agreement?

18     A.   It does not.

19     Q.   But you don't dispute it?

20     A.   I don't dispute it.  I just don't recall it.

21     Q.   And coming back to Exhibit 1, the master lease

22  agreement in this case, you testified...

23           MR. KALER:  If we go to Page 64, Line 19

24  of the transcript from yesterday -- I'm sorry, Page 65,

25  yes, Line 19 again, and -- I'm sorry, 64 Line 19.  My

PDF created with pdfFactory trial version www.pdffactory.com

1  apologies.

2      Q.   And you were asked some questions about the

3  addendum, which we had up on the screen a moment ago, to

4  the master lease with CSI, and you said:  "The reason I

5  think that I probably did have a lawyer look at it is I

6  certainly would not have had the knowledge to write an

7  addendum in this way," and you talked about the legalese.

8  Do you remember that?

9      A.   I do.

10             MR. KALER:  If we go to a portion of

11  Exhibit 2, which is Bates number LYC 00342, the very first

12  page, 342 on -- the very first page of the exhibit.

13      Q.   This is a file marked, "Master Lease" from Lycos'

14  files, and I just want to show you on the second...

15             MR. KALER:  Go to the page LYC 0350 from

16  the document and scroll through to the next couple of

17  pages.

18      Q.   Do you recognize this as a marked-up copy of the

19  draft of the CSI master lease before it was signed from

20  Lycos' file?

21      A.   I do not.

22      Q.   On the page next, if we could stop right there,

23  in the remedies provision, do you see where there is some

24  handwriting, five or six percent, and then the words

25  underneath -- if you can yellow out those words -- "and to

1   the extent permitted by law"?

2        A.   I do.

3        Q.   And do you recognize the handwriting?

4        A.   No, I don't.  It's definitely not mine, though.

5        Q.   Yes.  But Mr. Guilfoile was working with you at

6   Lycos in December of 1996, when the CSI master lease came

7   into Lycos for review, correct?

8        A.   That is correct.

9        Q.   And Mr. Guilfoile...

10                 MR. KALER:  If we now look at Exhibit 89

11  and go to Page 116, CSI 116.  More pages in, I think,

12  Steve, about another eight.  There we are, and blow that

13  up.

14       Q.   You see that it was Mr. Thomas Guilfoile, VP  of

15  finance administration who signed the certificate of

16  incumbency confirming on behalf of Lycos that you were

17  authorized to sign the master lease, correct?

18       A.   His signature is on the page.  Can I take a

19  minute to read this?

20       Q.   Please.

21       A.   (Examining) That's correct.

22       Q.   You said yesterday in your testimony -- if we

23  pull up Page 65, Line 24 of your testimony from

24  yesterday.  You were asked at Line 24, "Were you aware in

25  1996 of anyone at Lycos who had prior experience with

1  equipment leasing?"

2        And the answer, going over to the top of the next

3  page, if you can blow that up, was:  "Not to my" --

4              MR. KALER:  Can you blow up that portion,

5  Steve.  Sorry.

6     Q.   "Not to my knowledge.  I don't think anybody

7  did."  Correct?

8     A.   Correct.

9     Q.   But Mr. Guilfoile, as we see in Exhibit 435 -- go

10 to the first page.  Do you recognize that as the Form S-3

11 registration statement for Lycos?

12    A.   I do.

13    Q.   And you folks had to file those with the

14 government?

15    A.   That's correct.

16    Q.   Go to the second page of the exhibit.  At the

17 bottom of the page, there's a bio of Mr. Guilfoile, where

18 it says that he had served as vice-president of finance

19 administration and described him as someone who had been

20 employed at Ernst & Young for ten years, from July '86 to

21 February '96 before coming to Lycos, right?

22    A.   Correct.

23    Q.   And he had a degree in accounting, correct?

24    A.   Correct.

25    Q.   He was a Certified Public Accountant, sir, in

PDF created with pdfFactory trial version www.pdffactory.com

1  December of 1996, when he was working with you at Lycos,

2  correct?

3      A.   Yes, he was.

4      Q.   And Mr. Guilfoile, you are aware, had years of

5  experience at Ernst & Young, doing accounting for

6  operating leases and capital leases in his capacity as a

7  Certified Public Accountant reviewing the operations of

8  public and private companies, correct?

9      A.   That I can't speak to.  I don't know.

10     Q.   You are aware, however, that he's given a

11 deposition in this case?

12     A.   Yes.

13     Q.   Have you read it?

14     A.   I have not.

15     Q.   Mr. Guilfoile, at least to the extent he had

16 knowledge of the accounting issues relating to operating

17 and capital leases, was someone that you worked with in

18 connection with the review of the CSI master lease, wasn't

19 he?

20     A.   I don't recall working on the CSI master lease.

21 So, I don't know.

22     Q.   Are you saying -- can you tell us whether or not

23 Mr. Guilfoile did?

24     A.   I don't know.

25     Q.   But it's possible he did do it?

PDF created with pdfFactory trial version www.pdffactory.com

 1      A.    Absolutely possible.

 2                  THE COURT:   No.

 3      Q.    If we look at the portion of Exhibit 2 that we

 4  were looking at and, in particular, the page that we were

 5  looking at, 353, the language in the lower left corner

 6  there, "and to the extent permitted by law," the

 7  handwritten language, was someone -- it was made by

 8  somebody working at Lycos on this file?

 9                  MR. BEAN:   Objection.

10                  THE COURT:   I mean, he can ask it.   I

11  don't know how the witness would know that.

12                  MR. BEAN:   Okay.

13      A.    I don't know the answer to that question.

14      Q.    But what we do know, if we go to Exhibit 1, is

15  that that language appears in the addendum, wound up in

16  the addendum to the master lease?

17                  MR. KALER:   Sixth or seventh page, Steve.

18                  THE COURT:   You can certainly argue that,

19  Mr. Kaler.

20                  MR. KALER:   Yes.

21      Q.    You do see the language there, sir, above your

22  signature?

23      A.    (Examining) Yes.

24      Q.    Now, you said at Page 70, Line 10 of your trial

25  testimony yesterday...

PDF created with pdfFactory trial version www.pdffactory.com

 1              MR. KALER:  If you can put that on the

 2  screen, Page 70, Line 10.

 3      Q.  Well, you were asked the question:  "Mr. Philip,

 4  did you know at any point in time that you served as CFO

 5  that rewriting equipment schedules would increase the

 6  present value of a stream of payments on a rewritten

 7  schedule or the present value of the payments on the

 8  schedule being rewritten."

 9          And then if we go down to the bottom of the page,

10  at Line 19, you said, "I do not recall knowing" --

11              THE COURT:  Mr. Kaler, could we not have a

12  direct question without all of this reading of prior

13  testimony?

14              MR. KALER:  Yes, your Honor.

15              THE COURT:  Thank you.

16      Q.  Isn't it the case, sir, that Lycos, in order to

17  complete its financial statements, had to do a present

18  value calculation of the future stream of payments that it

19  had obligated itself to make under all its lease

20  agreements?

21      A.  I don't know.

22      Q.  Do you know that the company was treating all of

23  its equipment leases at that point as operating leases?

24      A.  I don't remember if we treated them as operating

25  or capital, actually.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   But you do know the difference between operating

2  leases and capital leases, correct?

3    A.   There's an accounting difference, yes.

4    Q.   Yes.  And the accounting difference has to do

5  with, among other things, whether the present value of the

6  future payments that one has to make under the lease

7  exceeds 90 percent of the fair market value of the

8  equipment, correct?

9    A.   Give or take, something like that, yes.

10   Q.   Yes.  And whether Lycos could take those

11  equipment leases and take them off its balance sheet and

12  put them in a footnote was determined, in part, by the

13  various accounting tests that had to be applied, including

14  that one?

15               MR. BEAN:  Objection.

16               THE COURT:  If he knows.

17               MR. BEAN:  Talking about the effects of

18  taking something off a balance sheet.  I mean, Mr. Kaler

19  seems to be testifying as to what the accounting effect of

20  is --

21               THE COURT:  No.  He's asking the witness

22  whether that would be the effect, and he's entitled to do.

23               MR. BEAN:  All right, if that would be the

24  effect.

25   A.   I'm not sure.  I'm not an accountant.  So, that's

1   not my area of expertise.

2       Q.   You had Mr. Guilfoile to assist in that effort,

3   right?

4       A.   That's correct.

5       Q.   But you did know generally that in order to make

6   the determination, has someone has to do present value

7   calculation?

8                   COURT REPORTER:   I'm sorry, I lost your

9   question.

10      Q.    You do know that in order to make that

11  determination, someone has to do a present value

12  calculation of what the future payments are under the

13  lease?

14      A.   That's correct.

15      Q.   And so, although you may not personally have

16  known what the present value of the future payments were

17  that were going to have to be made under both original

18  leases and extended lessees, you do know that somebody

19  within Lycos had to do that analysis to complete the

20  financial statements, correct?

21                  MR. BEAN:   Objection.   Just assuming --

22  it's assuming the witness doesn't know.   He said,

23  "assuming you don't know."   I'm not sure who we're --

24                  MR. KALER:   I never said ",assuming you

25  don't know."   I just said, "assuming you didn't do it

1   yourself."

2               MR. BEAN:  Okay.  I'm sorry.  That's fine.

3       Q.   I understand you didn't do it yourself, but you

4   do know that someone within Lycos, in order to complete

5   the accounting statements, had to do those prevent value

6   calculations, correct?

7       A.   That's correct, it had to be done.

8       Q.   So, while you may not have known the present

9   value of the original leases versus the extended leases,

10  someone at Lycos would have had to know, right?

11              MR. BEAN:  Objection, your Honor.  This

12  man is not an accountant and he's not a CPA, and he's

13  asking him to give opinions on what the accounting

14  practice is on certain things.

15              THE COURT:  He can tell us he doesn't do

16  it.  I mean, I don't know where we're going with this, but

17  he can what he knows or doesn't know.  If he doesn't know,

18  he'll tell us he doesn't know.

19      A.   Somebody had to do it.

20      Q.   Understood.

21              And if we -- you were looking at the balance

22  sheet a little while ago.  You are aware, generally, that

23  operating leases, although they're off the balance sheet,

24  you have to report in your financial statements what your

25  expected future payments are, the non-cancellable ones, in

PDF created with pdfFactory trial version www.pdffactory.com

1  what's called a commitments and contingencies footnote in

2  the balance sheet?

3      A.   I don't recall that.

4      Q.   The testimony that you gave -- oh, may I just ask

5  you, one of the accountants that you had working for you

6  during the period you were at Lycos was Brian Lucy,

7  correct?

8      A.   That's correct.

9      Q.   You eventually replaced Mr. Guilfoile as the

10 chief financial officer -- actually, he replaced you as

11 chief financial officer and then --

12     A.   Different role, but he was the chief financial

13 officer at one point of Lycos itself, yes.

14     Q.   You did rely on your accountants to do most of

15 the financial statement work; is that fair?

16     A.   When you refer to, "accountants", who are you

17 referring to, the KPMG?

18     Q.   Yes, and your internal accountants.  I was

19 referring to them generally.

20     A.   Well, the internal team would do the original

21 team and then KPMG would then look over the work.

22     Q.   In the years that Lycos had a relationship with

23 CSI, then, after your own staff would make the various

24 present value determinations as to what the future

25 payments that were going to have to be made under the

PDF created with pdfFactory trial version www.pdffactory.com

 1  leases and extended leases, their work would be reviewed

 2  by outside auditors at KPMG, right?

 3      A.  Correct.

 4      Q.  And KPMG is one of the so-called big four or five

 5  accounting firms in the world?

 6      A.  That's correct.

 7      Q.  And they signed off on your financial statements

 8  after they were issued, correct?

 9      A.  That is correct.

10      Q.  You testified at Page 59, Line 20 of your

11  testimony -- you were asked if you understood the concept

12  of a lease.  And you said yes, and you explained what you

13  understood that to mean there --

14              COURT REPORTER:  I'm sorry, I'm having

15  trouble hearing you.

16              MR. KALER:  I'm sorry.

17      Q.  You said yesterday in your testimony that,

18  "Leasing, in my view, is just a way to finance the

19  purchase of something, whether it's a car or equipment.

20  And so, you had your choice, you could" -- if we go to the

21  next page -- "either pay for it with cash or pay for it

22  over time through leasing."  And you said it was very

23  similar, right?

24      A.  Correct.

25      Q.  But the difference between paying for something

PDF created with pdfFactory trial version www.pdffactory.com

1  in cash and leasing it is that if you pay for it in cash,

2  you own it.  Whereas, if you lease it, you don't own it

3  and have to return it at the end of the lease term,

4  correct?

5      A.   That is correct.

6      Q.   And in business school, particularly at Harvard

7  Business School, there's a whole course devoted to the

8  business choice between buying assets and equipment --

9              THE COURT:  What does that have to do with

10  this case?

11             MR. KALER:  I think it is relevant to what

12  was covered on direct.

13             THE COURT:  Not to my understanding.

14             MR. KALER:  Well, then I'll press on

15  quickly.

16     Q.   But is there such a course?

17             THE COURT:  No, we're not getting into

18  that.  It is irrelevant to this case.

19             MR. KALER:  Thank you.

20     Q.   The concept of a purchase option in leases was

21  something you were familiar with when you were at Lycos,

22  whether you had one or you didn't, right?

23     A.   I don't recall.

24     Q.   If you look at Exhibit 201, the agreement with

25  Digital that you signed, the schedule.  Was there a

PDF created with pdfFactory trial version www.pdffactory.com

1  purchase option in that agreement?

2      A.  I don't remember this agreement.  I could read

3  through it and check.

4      Q.  Okay.

5      A.  Which number was this on the hard copy?

6      Q.  201.

7      A.  So, the question is, is there...

8                  THE COURT:  Could you please repeat the

9  question for the witness.

10                 MR. KALER:  Yes.

11     Q.  I can call your attention to it.  Paragraph F,

12 "Purchase Option," the bottom of the page.

13                 THE COURT:  And what's the question?

14     Q.  There was a purchase option in this contract that

15 you signed, correct?

16     A.  (Examining.)

17                 THE COURT:  Which contract is this?

18                 MR. KALER:  This is the contract entered

19 into in July of 1996.

20                 THE COURT:  With whom?

21                 MR. KALER:  Exhibit 201.  With Digital.

22                 THE COURT:  CSI?

23                 MR. KALER:  No.  This is a contract -- a

24 lease agreement signed by the witness six months before

25 with CSI.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  Okay.

2      A.   Yes, there's purchase option in here.

3      Q.   You were familiar with purchase options in

4  equipment leases at the time you were looking at the CSI

5  lease because you had signed leases with purchase options

6  before, correct?

7      A.   I don't remember CSI -- doing the CSI lease.  So,

8  I really don't know.

9      Q.   You do certainly know today that -- if we put up

10 Exhibit 1 -- that the CSI lease -- the master lease, at

11 least, did not have a purchase option?

12     A.   That is my understanding, yes.

13     Q.   At Page 72, Line 18 of your testimony yesterday,

14 you said -- you were asked this question that's listed

15 here:  "If anyone had told you that CSI was charging a

16 fee, points or markup to enter into a rewritten schedules,

17 would you have signed the rewritten schedules?"

18          And then you gave the answer that we see there

19 where you said, "It would depend on a multitude of

20 factors."

21          And if we scroll down to just look at the rest of

22 your testimony.

23               STEVE:  Next page?

24               MR. KALER:  Yes.

25     Q.   You were asked about what factors.  And you said,

1  "I wouldn't be interested in paying more money for the

2  equipment if we were going to go for a longer period of

3  time.  It's just that it would be" -- and could you yellow

4  out just the "additional interest" -- "there would be

5  additional interest for that period of time."  And then

6  you went on to give --

7                 THE COURT:  What's the question?

8     Q.   You testified yesterday that you would not want

9  to pay more than additional interest to extend your lease

10  of equipment for a longer period of time, right?

11    A.   Correct.

12    Q.   And by "interest" you meant like interest on a

13  loan, correct, five or ten percent?

14    A.   That's correct.

15    Q.   But interest on a loan is different because you

16  were borrowing money and there is a principle balance,

17  right?  Because there's no principle balance on a lease,

18  is there?

19    A.   Well, isn't that the same thing?  Because you're

20  -- you've got an asset that you're leasing.  And so, it

21  used the value of that asset, just like the principle

22  balance on a loan.

23    Q.   The analogy is one that you can make, but, in

24  fact, you knew at the time you signed the master lease

25  that there was no principle balance under the lease, that

PDF created with pdfFactory trial version www.pdffactory.com

1    it was a true lease, correct?

2        A.   Well, I don't remember signing the lease.  So, I

3    can't say what I remember, but I don't understand your

4    point.

5                MR. KALER:  Can we look at Exhibit 1, the

6    master lease, Paragraph --

7                THE COURT:  No, let's not.  Let's have a

8    series of direct questions without reading these documents

9    and the testimony over and over again, please.

10               MR. KALER:  I'll do the best I can.

11       Q.   You do recall that the master lease that you

12   signed did say that it was a true lease and not anything

13   else?

14       A.   I don't know you mean by a "true lease."

15       Q.   When you signed the lease agreement, sir, you --

16   Lycos did not receive any money from CSI, like you would

17   receive from a bank when you borrow money, did you?

18       A.   We received the equipment, which to me is the

19   same thing.

20       Q.   But the equipment was physical equipment that you

21   were renting from CSI, correct?

22       A.   Leasing from them, yes.

23       Q.   And CSI was not loaning you money, was it?

24       A.   No.  They were loaning us the equipment, in

25   essence.

1     Q.  At Page 75, Line 5, the Court asked you:  "If you

2 had known that there was more than just an interest rate

3 amount or such a fee, what would you have done?"

4        And you said, "Depending on the size of the

5 markup, you would have looked at the period of time we

6 were going to have to have the equipment over and see if

7 it made sense for the additional payments for that

8 period."

9        And if we scroll down.  You said, "I probably

10 would have done an analysis on it," correct?

11    A.  That's correct.

12          MR. KALER:  If we put up Exhibit 22, the

13 analysis done by Ms. Walsh in November of 2001 on the CSI

14 leases after refinancing.

15    Q.  If we scroll across that page, isn't that the

16 kind of analysis that you were referring to yesterday that

17 you would expect someone to do when looking at the option

18 of extending a lease?

19          MR. KALER:  And if you could blow up the

20 top half.

21    A.  I don't know who Ms. Walsh is and I don't know

22 this document.

23    Q.  Do you remember Minnie Walsh working in the

24 accounting department at the time you were there?

25    A.  Minnie Walsh?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   She worked for Kevin Baillie and then after that

2  Brian Lucy.

3    A.   Doesn't ring a bell.

4    Q.   But certainly within Lycos, when it was extending

5  its leases with leasing companies, one of the things you

6  wanted to do was understand the implications of the lease

7  extensions, correct?

8    A.   I don't remember ever talking about that, no.

9    Q.   But you knew that someone within Lycos had to do

10  that, if only for the financial statements, correct?

11    A.   I don't know what they did with regard to

12  refinancings.  I think at the end of the quarter, they had

13  to take a look at -- to reflect it appropriately on the

14  financial statements.

15    Q.   Exactly.  And in order to do that, if they were

16  extending the leases and undertaking -- obligating the

17  company to make further payments going forward, they would

18  have to do some sort of analysis showing how much of a

19  greater commitment the company was incurring, right, in

20  order to report it on the financials?

21    A.   No, not when they're -- not when these documents

22  were done.  They would have to do it in aggregate when --

23  when they were doing the reporting.

24    Q.   Yes.  And the way they do it in the aggregate is

25  they don't await until the end of the year.  They keep a

PDF created with pdfFactory trial version www.pdffactory.com

1  spreadsheet record during the course of the year and keep

2  it updated, so that at the end of the year, it's pretty

3  much all done and they can give it to the auditors.

4       A.   That I don't have knowledge of.

5       Q.   But certainly the information has been gathered?

6       A.   Again, I don't have knowledge of that.

7       Q.   This particular extension deals with equipment

8  Schedules 93 and 94 with CSI, and you were involved in

9  equipment schedules -- in approving the extension of

10  Equipment Schedules 93 and 94 with CSI in the fall of

11  2001, correct?

12      A.   I don't have any knowledge of that.

13               MR. KALER:  If we look at Exhibit 300 and

14  blow it up.  Blow up just the top -- first the bottom

15  part.

16      Q.   Your signature appears in the lower right corner

17  of this document, correct?

18      A.   Yes.

19      Q.   And underneath the word, "Confirmed Lycos;" is

20  that correct?

21      A.   That is apparently my signature.

22      Q.   And you signed it on or about January 8th of

23  2002?

24      A.   I have a hard time believing that I would have,

25  but it does appear to be my signature.

```
 1      Q.   And then on the top half of the page, we see that

 2  the re line on this letter refers to equipment schedule

 3  numbers 94, dated October 2nd, 2001 to the master lease

 4  between Lycos and CSI, right?

 5      A.   I see it says that there, yes.

 6      Q.   One of the things that you had to do from time to

 7  time was sign documents with CSI confirming that the

 8  transactions relating to extension of its leases would go

 9  through, correct?

10      A.   I don't recall that.

11      Q.   In this case you signed this document for that

12  purpose, though, correct?

13      A.   I'm surprised that I signed anything on that

14  date, but it does appear to be my signature.

15              THE COURT:  Can we stop for a moment to

16  stretch, please?

17              MR. KALER:  Yes, your Honor.

18              (Stretch break.)

19              THE COURT:  All set?

20              MR. KALER:  Yes.

21              And if we look at Exhibit 87.1, the last

22  page, and we blow that up.

23      Q.   Do you see that this is an analysis done of the

24  Schedule 93 and 94 extension showing, if we scroll across

25  to the right, all of the original schedules and the
```

1  implications of extending all those leases?

2     A.   I don't know what this is.

3     Q.   Have you ever seen it before?

4     A.   Not that I know of.

5     Q.   But is it fair to say that you would have

6  expected at the time Schedules 93 and 94 were signed with

7  CSI, that someone within Lycos would have done a

8  comprehensive analysis of the financial implications of

9  signing those contracts for Lycos?

10    A.   I was not the chief financial officer at that

11 point.  So, I really don't know what people were doing.

12    Q.   But, certainly, when you -- you were still on the

13 board, correct?

14    A.   That is correct, yes.

15    Q.   The company had been sold approximately a year

16 earlier to Terra Networks in Spain, correct?

17    A.   That's correct.

18    Q.   And you had exercised stock options in connection

19 with that sale, correct?

20              MR. BEAN:  Objection, your Honor.  This is

21 going beyond the scope of direct.

22              THE COURT:  Well, I think --

23              MR. BEAN:  There was no discussion of

24 stock option.

25              THE COURT:   -- he's entitled to go there

PDF created with pdfFactory trial version www.pdffactory.com

1  on the issue of credibility or bias, but the question is

2  highly limited in accordance with the in limine ruling.

3                      MR. KALER:  Understood.

4       A.   I'm sorry, the question is?

5       Q.   In the fall of 2002, after having worked at the

6  company for approximately four years, the company was sold

7  to Terra Networks, right?

8       A.   After five years.

9       Q.   And by that time you had stock options

10 accumulated that you could exercise at the time of the

11 sale of the company to Terra Networks, correct?

12      A.   I could exercise them any time.

13      Q.   And during the course of the years that you

14 worked at Lycos, you had a direct personal financial

15 interest in the price of Lycos stock as a result of your

16 options, correct?

17      A.   I did.

18      Q.   You testified that the expenses that Lycos was

19 incurring during the period of time that it was leasing

20 from CSI did not affect its stock price, correct?

21      A.   I don't know that that was my testimony.

22      Q.   Are you saying that the amount of expenses

23 that --

24                      THE COURT:  No, he didn't -- he's not

25 saying that.  You asked him whether he gave certain

PDF created with pdfFactory trial version www.pdffactory.com

1    testimony.  He said, "I don't know if that's my

2    testimony."  And now you're turning it around as to

3    whether it is a fact or not.  It would be perfectly okay

4    to ask whether it's a fact, to begin with.

5                    MR. KALER:  Understood.  This was the

6    reason I was showing him his testimony from yesterday, but

7    I didn't want to do that again.

8        Q.   But is it your position, sir, that the amount of

9    expenses that Lycos was incurring quarter in and quarter

10   out during the years 1995 through -- up until the sale in

11   2000 had no affect on its stock price?

12       A.   No, I don't think I ever said that.  I think I

13   said that the stock price was generally driven by the

14   sales of the company and the number of users that the

15   Websites had.

16       Q.   The stock price was also significantly affected

17   by quarterly earnings reports that Lycos had to issue as a

18   public company during the four years before it was sold to

19   Terra Networks, correct?

20       A.   That is correct.

21       Q.   And the quarterly earnings reports that Lycos had

22   to issue in the years from 1996, when it went public in

23   April, right up until September of 2000, just before it

24   was sold, those quarterly earnings reports consisted of

25   the company's revenues, minus the expenses for the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   quarter, correct?
 2       A.   A number of other things, but, yes, it included
 3   that.
 4       Q.   And to the extent that the company could reduce
 5   earnings in the quarter -- excuse me.  To the extent that
 6   the company could increase earnings in the quarter by
 7   reducing its expenses, that would have a favorable effect
 8   on its stock price generally, correct?
 9       A.   Not necessarily, no.
10       Q.   And did your -- Bob Davis was your boss, correct?
11       A.   That is correct.
12       Q.   And he stayed on as the vice-chairman of the
13   company into 2001, correct?
14       A.   I'm not sure what his time was.
15               MR. KALER:  May I approach, your Honor?
16               THE COURT:  If you're going to show the
17   counsel what --
18               MR. BEAN:  This book is -- I'm not sure
19   for which purpose he's using it because it has not been
20   agreed to as an admitted document.
21               THE COURT:  He can show it to the witness.
22               MR. KALER:  I'm going to lay a foundation.
23               MR. BEAN:  Do you have a copy?
24               MR. KALER:  I think you have yours.  I
25   have only two.
```

1        Q.   Do you recognize this book <u>Speed is Life</u>,

2    published by Bob Davis, your colleague and founder of

3    Lycos, in 2001, correct?

4        A.   I do.

5        Q.   And it indicates on the bottom back flap of the

6    book that he continued to serve as the company's vice-

7    chairman -- he continues, present tense, to serve as the

8    company's vice-chairman?

9        A.   Continues today.

10       Q.   No.  At the time he published the book.

11       A.   Yes.

12       Q.   And on Page 109 of the book and going over to the

13   top of Page 110, could I ask you to just read the

14   paragraph to yourself at the bottom of Page 109, beginning

15   with, "It came..." and continuing over to the top of Page

16   110, the third line.

17       A.   Third line?  Okay.

18            (Examining) Okay.

19       Q.   Do you see where he describes an incident --

20            MR. BEAN:  Objection, your Honor.  This

21   book is hearsay, and I'm not sure what Mr. Kaler is using

22   it for, but I just want to be careful as we proceed.

23            MR. KALER:  Your Honor, it is non-hearsay,

24   an admission -- and we have a short bench memo if the

25   subject comes up.  I apologize, but it's important to our

PDF created with pdfFactory trial version www.pdffactory.com

1  case.

2              THE COURT:  Everything is important to

3  your case, Mr. Kaler.

4              Why is it not an admission?  I mean, I

5  don't know what it is, but why isn't it an admission?

6              MR. GACIOCH:  Your Honor, if I may argue

7  the point.

8              Mr. Davis was not speaking on behalf of

9  Lycos when he wrote this book.  This was his own personal

10 memoir later on.  So, it's his description -- recounting

11 facts that he recalls for his own purposes is not a

12 statement on the company's behalf.

13             THE COURT:  Why is that not the case?

14             MR. KALER:  Your Honor, in --

15             THE COURT:  Let me explain to the jury.

16             I explained to you hearsay before and I

17 explained to you what is hearsay and what is not hearsay,

18 but even if something is hearsay, it sometimes comes into

19 evidence.  There are a whole lot of exceptions to the

20 rule.  One of them is that if a -- am I going off the

21 reservation?

22             LAW CLERK FRIDAY:  No.  No.  You're right.

23             THE COURT:  I have a law clerk who knows

24 all the law.  I don't know any of it.  And I must tell you

25 that when I told my colleagues that I tried to explain to

PDF created with pdfFactory trial version www.pdffactory.com

1   the jury about the hearsay rule, they were appalled

2   because they think it to be very complicated.

3              But, in any event, one of the exceptions

4   is that if the other side said something that is against

5   the other side's interest, then that may be an admission

6   and because people aren't expected to say bad things about

7   themselves or about their interest, we think that that may

8   be reliable enough.

9              The whole purpose of the hearsay rule is

10  to exclude from evidence things that are unreliable and

11  that's what we are talking about.

12             So, here, the question is whether this

13  statement that Mr. Kaler is trying to get into evidence

14  now is a statement of the author of the book, made as the

15  executive officer or chief executive officer or whatever

16  he was at the time, or was he simply writing a memoir.

17  So, that's the issue.

18             Yes, Mr. Gacioch.

19             MR. GACIOCH:  As I believe the Court will

20  agree, Rule 801 requires for it to be an admission that it

21  be the party's own statement, a statement made by a

22  person authorized to make a statement --

23             THE COURT:  Well, yes, but the party, who

24  is a corporation --

25             MR. GACIOCH:  Correct.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                  THE COURT:  A statement by an officer of
 2   the corporation is a statement of the party.  The question
 3   here is whether he was speaking as an officer of the
 4   corporation or in some other capacity.
 5                  MR. GACIOCH:  Correct, but the statement
 6   in question here is Mr. Davis' in recounting the book, not
 7   Mr. Philip's statement, and Mr. Davis has to have been
 8   speaking in his capacity authorized by Lycos.
 9                  THE COURT:  May I see the book?
10                  Can you go to another point while I study
11   the book?
12                  MR. KALER:  Yes, your Honor.
13                  And I can also just provide the portion
14   that's at issue.  It's not the whole book.
15                  THE COURT:  The time period in question
16   about which you're asking is when?
17                  (Attorney Kaler hands book to the Court.)
18                  MR. KALER:  The time period is 2001.  The
19   author was --
20                  THE COURT:  Okay.  That's all I want to
21   know.
22                  MR. KALER:  I'm sorry.
23                  THE COURT:  The time period in question is
24   2001.  We'll go to another topic while I read the book.
25                  MR. GACIOCH:  Thank you, your Honor.
```

```
 1                 MR. KALER:  Section is quoted in the memo,
 2   if that helps you.
 3                 THE COURT:  Do you guys stay up all night
 4   writing memos in anticipation of erroneous rulings on my
 5   part?
 6                 MR. KALER:  Except for the last part, yes.
 7                 THE COURT:  You shouldn't do that.
 8                 MR. KALER:  That's what my wife tells you.
 9                 THE COURT:  Yes, she's absolutely right.
10                 As some of us know, and a couple of the
11   jurors and I know, women are always right and since I'm
12   not running for the Supreme Court, I can say that.
13        Q.  Mr. Philip, did you ever meet Paul Stenberg?
14        A.  I don't know.  I've been trying to figure out if
15   I have, but I'm not sure that I ever did.
16        Q.  And you personally never relied on any advice
17   from him, did you?
18        A.  I don't recall meeting him, so I don't think so.
19        Q.  The equipment schedules that you signed in this
20   case, you said, I think yesterday, there were four that
21   you remembered.  There may have been a few more.
22                 MR. KALER:  Can we just put up on the
23   screen Exhibit 283.
24        Q.  Is this one Schedule 64D that you signed in or
25   about August of 2000?
```

PDF created with pdfFactory trial version www.pdffactory.com

1     A.   It appears to be, yes.

2     Q.   And it referred to the equipment in Paragraph 4

3 as having been already installed and accepted, correct?

4     A.   Correct.

5     Q.   And that meant to you, as you said yesterday,

6 that you knew it was an extension of a previous lease,

7 correct?

8     A.   I know that now.  I don't recall signing this.

9     Q.   When you testified yesterday about sort of your

10 understanding of leasing, were you talking about what your

11 understanding was back in the years you were with Lycos

12 signing these agreements or were you talking about what

13 your understanding is today?

14     A.   I don't recall what my understanding was back

15 then.  So, I'm just saying what my knowledge is.

16     Q.   And how did you get your understanding today?

17     A.   Just from general knowledge of leasing, you know,

18 leasing cars, houses, those types of things.

19     Q.   Did you get some of that knowledge from the Lycos

20 lawyers who have been representing you in this connection

21 with -- or, rather, the lawyers -- Lycos has been paying

22 for your lawyers in connection with this case, right?

23     A.   That's correct.

24     Q.   Okay.  And did you have occasion to have some

25 meetings with Lycos' counsel in this case or was it just

PDF created with pdfFactory trial version www.pdffactory.com

1   with the lawyers that Lycos is paying for?

2     A.  Both.

3     Q.  So, you actually had a chance to meet with Lycos'

4   counsel in this case to discuss what your testimony would

5   be and what your understanding of leasing was?

6     A.  That is correct.

7     Q.  Did they provide you with some information on

8   their views as to what leasing is like?

9           MR. BEAN:  Objection, your Honor.  I

10  believe that Mr. Davis' counsel -- Mr. Philip's counsel is

11  privileged communication to the extent what information

12  was provided.

13           MR. KALER:  I'm not asking that.  I'm --

14           MR. BEAN:  You asked that we provide --

15  was there information provided, and we're getting awful

16  close.

17           MR. KALER:  I was asking about your

18  conversations with trial counsel here.

19           THE COURT:  But to the extent that trial

20  counsel are advising him, a former officer, with respect

21  to his testimony as a former officer, I think you're

22  treading pretty close.

23           MR. KALER:  If there's a claim of

24  privilege that's being made --

25           THE COURT:  He's just made it.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. KALER:  Understood.

2      Q.   Exhibit 283 refers, does it not, on the last page

3   to the schedule that's being extended, doesn't it?

4          MR. KALER:  I think we'll need to go to

5   the addendum section, which is on Page 330.  Just keep

6   scrolling, and if you can blow up that section.

7      Q.   Do you see where in Paragraph 2...

8          MR. KALER:  Can you just yellow that,

9   Steve.

10     Q.   Commencement date, it refers -- this document you

11  signed, 283, refers to the, quote, "Equipment is installed

12  at lessee's location under Schedule 64A"?

13     A.   (Examining.)

14     Q.   In the first sentence.

15     A.   Yes, I'm just reading the whole thing to make

16  sure.

17     Q.   Please.

18     A.   That's what it says, yes.

19     Q.   And you signed this addendum on the very next

20  page, right?

21     A.   That's my signature, yes.

22          MR. KALER:  And if we go back then to the

23  page we just looked at and go blow up that section.

24     Q.   You knew when you signed this two-page addendum

25  then, that the equipment covered by this lease extension

PDF created with pdfFactory trial version www.pdffactory.com

1   was already installed in Lycos' facilities under a prior

2   schedule, Schedule 64A?

3        A.   You keep asking me if I know, but I don't

4   remember signing this.  So, I don't know what I knew at

5   the time.

6        Q.   All right.  That's fair.

7             Let me show you Exhibit 283A, which is the

8   Equipment Schedule 64A, the prior schedule.  There's some

9   handwriting on it.  Do you recognize Mr. Guilfoile's

10  signature?

11       A.   I do.

12       Q.   And there's some handwriting in the upper right

13  corner on this copy of the schedule.  Do you recognize

14  that?

15       A.   No.

16       Q.   Both you and Mr. Guilfoile were authorized to

17  sign lease agreements with CSI during the time you were

18  there, correct?

19       A.   I don't know.  You showed me that I was, but I

20  haven't seen that he was authorized.  He certainly did

21  sign.

22       Q.   There is a certificate of incumbency, but I won't

23  show it to you right now.

24       A.   Okay.

25             MR. KALER:  Could we turn to Exhibit 284A.

PDF created with pdfFactory trial version www.pdffactory.com

1      Q.   Is this another schedule that you signed where --

2      A.   That is my signature, yes.

3      Q.   And, again, on Paragraph 4, under, "Equipment

4  location, anticipate installation date," it said the

5  equipment was already installed and accepted?

6      A.   That's what it says.

7      Q.   So, you knew, again, that this was another

8  extension of a previously-existing lease, right?

9      A.   Again, you're asking what I knew.  I don't recall

10 these agreements.  So, I don't know what I knew at the

11 time.

12     Q.   Was it your practice to read the contracts

13 generally before you signed them?

14     A.   Some contracts.

15     Q.   And if you did not read the contracts before

16 signing them, did you usually have someone else at least

17 review them to make sure that what you were signing was a

18 prudent contract for the company to enter into?

19     A.   Absolutely.

20     Q.   And you always wanted to know what the financial

21 implications were of contracts that you were signing,

22 correct?

23     A.   I can't say that I always wanted to know.

24     Q.   Did you consider it part of your duties and

25 responsibilities when signing contracts to make sure

PDF created with pdfFactory trial version www.pdffactory.com

1  before you signed them on behalf of the corporation and

2  its shareholders, that the contracts were -- had either

3  been properly reviewed by someone else or were fully

4  understood by you?

5      A.   I trusted my team.  And so, if my team brought me

6  a contract and they had reviewed it, then I was

7  comfortable.

8      Q.   The idea was, as part of your management

9  responsibilities, you put in place a structure that would

10  ensure that you would not be signing contracts unless they

11  were in the best interest of Lycos, correct?

12     A.   That is correct.

13              MR. KALER:  If we look at Exhibit 284A --

14  I'm sorry, that's the wrong one.  Thank you, Steve.

15     Q.   If we look at 285A, is this a further equipment

16  schedule that you signed on behalf of Lycos in 2000?

17     A.   It appears to be.

18     Q.   And, again, in Paragraph 4, we see under

19  "Anticipated installation date," that it referred to the

20  equipment as having been already installed, right?

21     A.   That's what it says.

22     Q.   And I think you testified yesterday on your

23  direct examination -- you were asked whether that

24  generally indicated to you now at least that the lease you

25  were being shown was an extension.  Do you recall that?

PDF created with pdfFactory trial version www.pdffactory.com

1      A.   I do recall that, yes.

2      Q.   So, we can agree on that point?

3      A.   That I know that now, yes.

4      Q.   Okay.  And then if you look at Exhibit 286A, is

5   this the same situation again?

6                 MR. KALER:   And we just highlight the

7   "already installed" part.

8      A.   It appears to be.

9      Q.   And then if we look at Exhibit 287, you also

10  signed some original equipment schedules, like this one

11  where the anticipated -- the equipment was not already

12  there, but new equipment was being leased; is that right?

13     A.   Yes.

14     Q.   And exhibit -- this one is for Schedule 69F,

15  right?

16     A.   How do I know that?

17     Q.   I'm sorry.  Top of the page.

18     A.   Top of the page, yes.

19     Q.   And Exhibit 288, is this still another original

20  schedule that you signed?

21     A.   It appears to be.

22     Q.   And if we look at Exhibit 283, is this still -- I

23  believe we've covered this one.

24                 COURT REPORTER:   I'm sorry, I didn't hear

25  the answer.

```
 1                    THE COURT:  I don't think there was a
 2    question.
 3                    MR. KALER:  No question.
 4         Q.  Who else other than you and Mr. Guilfoile were
 5    involved in working on the leases that Lycos had with its
 6    various leasing companies while you were at Lycos, do you
 7    recall?
 8         A.  The entire period of time?
 9         Q.  Well, at any time, generally speaking, yes.
10         A.  Brian Lucy would have been involved and I believe
11    Mike Ripps was involved as well.
12         Q.  And how was Mike Ripps involved in the leasing of
13    equipment from CSI, particularly or generally?
14         A.  I don't know.
15         Q.  How was he involved in leasing generally?
16         A.  He was, I believe, vice-president of finance.
17    So, I think it fell under him, but I don't really have any
18    recollection of how he was involved.
19         Q.  Coming back, then, to the issue of -- actually,
20    may I ask you to take a look at Exhibit 270, the 1997
21    annual...
22                    MR. KALER:  Actually, I'm sorry, Steve.
23    Could we make it Exhibit 271.  It's a bit clearer.
24         Q.  You recognize that as the 1998 financial
25    statement -- annual report, I'm sorry, for the company?
```

1      A.   Yes.

2      Q.   And if we turn to Page PHIL 850.  You actually

3  were the -- you were actually the -- PHIL indicates these

4  documents came from your file?

5      A.   I guess so.

6      Q.   And in the middle of the page in Paragraph 6 --

7  blow up that paragraph.  There's a, "Commitments and

8  Contingencies" footnote.  Do you generally recognize what

9  this footnote was supposed to reflect?

10      A.   Reading it now?

11      Q.   Yes.

12      A.   I'm sorry, the question is?

13      Q.   Do you generally understand what this is?

14      A.   Yes.

15      Q.   And could you tell us what it is?

16      A.   It looks like the level of commitments or

17  payments that Lycos would have to make in certain years

18  under all kinds of agreements.  For example, the rent of

19  the building where we operate -- or all the buildings

20  where we operated, any other contracts we had, which would

21  have included leases, as well as other things like search

22  referral agreements.

23      Q.   Okay.  It would have included all operating lease

24  agreements, be it real estate or equipment, and so on?

25      A.   Yes.

 1      Q.   And this was the -- this is an example of what we

 2 were talking about before, the commitments and

 3 contingencies footnote, in which the company has to

 4 disclose what it's going to have to -- what it's

 5 undertaken to have to pay in years going forward under

 6 operating leases of equipment and everything else, right?

 7      A.   That's what this is, yes.

 8      Q.   And that footnote also appears in Exhibit 272,

 9 the document you were being shown on direct examination,

10 the 1999 annual report -- if we could put that up -- does

11 it not?

12      A.   What page?

13      Q.   Page PHIL 000930.

14           MR. KALER:   I think you're at 893, Steve.

15 So, it's another three pages.

16      A.   I have it in front of me.   That is, yes.

17      Q.   So, you have a hard copy?

18      A.   I have a hard copy.

19           MR. KALER:   The preceding page.   And just

20 blow up just the top, Steve.

21      Q.   These are the notes to the consolidated financial

22 statements of Lycos for 1999?

23      A.   Correct.

24      Q.   And, again, this year it makes -- the company

25 reports that it leases its facilities and certain other

PDF created with pdfFactory trial version www.pdffactory.com

 1  equipment and it lists all the expected future payments

 2  under all its operating leases for the required four

 3  periods -- or five, actually, 2000 through '03 and then

 4  thereafter, right?

 5      A.  Correct.

 6      Q.  Do you recall who on your staff was responsible

 7  for preparing the materials that went into the commitments

 8  and contingencies footnote each year?

 9      A.  Well, ultimately as CFO, it was me, and then we

10  had a whole team of people that worked on -- the entire

11  accounting department.

12      Q.  And one of the things that you explained on

13  direct examination was that you folks tried to be very

14  prudent in terms of your -- the expenses that you

15  undertook, right?

16      A.  Correct.

17      Q.  And in order to be prudent in the expenses that

18  you undertook to pay out, you had to understand very, very

19  clearly what those expenses were going to be under the

20  contracts you were signing, right?

21      A.  Yes.

22      Q.  You would never have signed lease agreements with

23  outside leasing companies without at least understanding

24  what kind of financial implications they had?

25      A.  Well, the payments are easy.  They're on the

PDF created with pdfFactory trial version www.pdffactory.com

1  front of the lease.  So, you knew what the payment was.

2      Q.   And over the course of your time at Lycos, Lycos

3  entered into leasing agreements with perhaps five or six

4  different leasing companies, including Bank of America,

5  Avnet and Digital, as we saw, and other companies, right?

6      A.   I don't know.  I don't recall Bank of America.  I

7  don't recall Digital.

8      Q.   Was there someone below you who was handling the

9  leasing arrangements generally?

10     A.   Depending -- yes, always, but depending --

11  different people depending on the time period.

12     Q.   So, you delegated or someone else under you

13  delegated that responsibility to someone else?

14     A.   That's correct.

15     Q.   So, your knowledge of what Lycos knew at the time

16  is necessarily limited, right?

17     A.   I would say, yeah, that's correct.

18     Q.   Coming back to the issue of the effect of

19  expenses on the quarterly earnings report that had to be

20  issued and then the effect of the quarterly earnings

21  report on stock, stock price --

22                 THE COURT:  Can we have a question?

23                 MR. KALER:  Yes.  I was coming back to

24  that issue that we had departed from, which is having to

25  do with the book.

1     Q.   Perhaps I could ask generally.

2          You did participate in the preparation of the

3 quarter's earnings reports that Lycos issued to the public

4 during the time that you were at Lycos, correct?

5     A.   I did.

6     Q.   And, again, I'm directing your attention to the

7 period prior to the sale to Terra Networks when Lycos was

8 a freestanding public company.  And what was the procedure

9 generally for putting together the quarterly earnings

10 reports?

11    A.   The accounting team would prepare the quarterly

12 financial statements and then I would review them and then

13 we would do a write-up based on the performance that we

14 had during that quarter and then we would announce the

15 earnings.

16    Q.   And, generally speaking, the earnings reports

17 issued quarterly did have some effect on the stock price,

18 correct?

19    A.   Absolutely.

20    Q.   And, in fact, the earnings reports issued

21 quarterly, in your experience, were sort of eagerly

22 anticipated by those who held stock in the company that

23 you talked to and analysts that you talked to, right?

24    A.   Eagerly anticipated?  Yeah, I guess so.  I'm not

25 sure really what that means.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Understood.  But if you were interested in Lycos

2 or you owned stock in it, you would want to sort of

3 monitor the quarterly earnings, is my point?

4    A.   That's a fair statement.

5    Q.   Okay.  And the key integral elements to the

6 quarterly earnings were how much money has come into the

7 company and how much expenses has it had to pay out and

8 what's sort of the net difference, right, simplified?

9    A.   Well, the things that people were most interested

10 in were how did our viewership increase or decrease during

11 the quarter and how were we monetizing -- in other words,

12 how well were we doing selling advertising and commerce

13 and those two -- those things based on that viewership.

14    Q.   So, wasn't it important that the quarterly

15 earnings meet Wall Street's expectations for each quarter

16 in order to keep the stock price where it was?

17              MR. BEAN:  Objection, your Honor.

18 Important to whom?

19    Q.   Important to the analysts and stockholders with

20 whom you spoke.

21              MR. BEAN:  Objection, your Honor.

22              THE COURT:  I don't understand what you're

23 trying to prove with this question.  What Wall Street

24 thought or what he thought, or what?

25              MR. KALER:  The witness gave testimony on

PDF created with pdfFactory trial version www.pdffactory.com

1  direct examination --

2                    THE COURT:  What are you trying to prove?

3                    MR. KALER:  -- that the quarterly earnings

4  reports, which consisted of revenue minus expenses --

5                    THE COURT:  Just gave give me a simple

6  answer, Mr. Kaler.

7                    MR. KALER:  That reducing expenses was

8  critical to preserving the stock price of Lycos and

9  keeping it high.

10                   THE COURT:  Okay.  So, ask him that.

11                   MR. KALER:  Yes.

12                   MR. BEAN:  That's his understanding.

13     Q.  It was important to keeping the stock price high,

14  that the expenses of Lycos be kept within a certain range

15  each quarter so that the earnings would be able to meet

16  Wall Street's expectations, to your knowledge; isn't that

17  true?

18     A.  There is a model that each Wall Street analyst

19  had.  They're all different.  And they expected us to fall

20  within that model, that's correct.

21     Q.  And if in any given quarter, Lycos' quarterly

22  earnings reports reported earnings outside that model, you

23  knew during the time you were at Lycos that that could

24  have an adverse effect on the stock price, correct?

25     A.  Or a positive effect.

1    Q.  Or a positive effect.  If it was above their

2  expected earnings, it would be positive, but you knew that

3  if it was below expected earnings, it would have a

4  negative effect on the stock price?

5    A.  Well, that all depends because if it -- if we had

6  a negative earnings -- if we were worse on the earning

7  side than they had expected, but we were significantly

8  higher on the revenue side, then they may have looked at

9  it as though we invested more heavily in growth and they

10  might have been okay with that.  I can't really speak to

11  that, but --

12    Q.  But other things being equal?

13    A.  Other things being equal, yes.  They would not

14  want us to have spent a lot more money than they were

15  expecting.

16    Q.  And because of that, one of the things that you

17  did when you were at Lycos was to try to control expenses,

18  not minimize them too much, but have enough expenses, but

19  also keep them within bounds so that the quarterly

20  earnings reports would stay within Wall Street

21  expectations, right?

22    A.  Just want to make sure that that's an accurate

23  statement.  Can you say it one more time, please?

24    Q.  Sure.  I can make it simpler, no problem.

25      One of the things you tried to do was manage your

PDF created with pdfFactory trial version www.pdffactory.com

1  expenses so that the earnings reports each quarter would

2  come within the expectations of the Wall Street analysts?

3     A.   That is correct.

4     Q.   And in some instances, you had to cut expenses in

5  individual quarters in order to satisfy yourself that the

6  earnings reports were going to fall within the

7  expectations of Wall Street analysts?

8     A.   See, that's where I think we're disagreeing,

9  because you're saying "cutting expenses."  If you look at

10 our expenses every quarter, they increase significantly

11 every quarter.

12    Q.   Yes, but what you did in certain points is make

13 sure that the expenses didn't increase too much?

14    A.   I did that every day because I was managing a

15 good business.

16    Q.   And you were incurring additional expenses and

17 reducing other expenses continuously, right?

18    A.   Yes.

19    Q.   And there was a period of time early in the

20 fourth quarter of 1999 -- I think you said on your direct

21 examination you were on July 31 fiscal year?

22    A.   That's correct.

23    Q.   So, the fourth quarter of 1999 would have been

24 May, June, July of 1999, correct?

25    A.   That would be correct.

 1     Q.   And there came a time in the fourth quarter of

 2   1999 when you went into Bob Davis', your colleague's

 3   office and said, you know, We don't think we're going to

 4   meet Wall Street's expectations and we have to cut

 5   expenses?

 6     A.   Well, I read that in the book because you just

 7   asked me to turn to that, but I don't recall that ever

 8   happening.

 9     Q.   The book -- the portion of the book you're

10   referring to --

11               THE COURT:   The book is not admissible.

12   It is not an admission by Lycos.   It is Mr. Davis'

13   reminisces and self-congratulatory prose.

14     Q.   Do you recall an occasion when a gentleman by the

15   name of Don Pratt from CSI Leasing came up to Boston and

16   Waltham to visit you to talk about a deficiency that had

17   been -- had occurred where Lycos had owed some money on

18   January 1st and had not paid it until February 4th?

19     A.   I don't know who Don Pratt is.

20     Q.   Do you recall meeting with anyone from CSI during

21   the course of your tenure at Lycos who came up to meet

22   with you and said that there was this default?  And do you

23   recall telling him that none of the vendors -- a lot of

24   the vendors had been held up on payments from Lycos

25   because Lycos wanted to keep its cash balances high for

1  the quarter?

2      A.   I don't remember that.   I don't believe that ever

3  happened.

4      Q.   One of the things -- do you recall whether or not

5  it happened, sir?

6      A.   I do not recall whether or not it happened.

7      Q.   Okay.   One of the things that you had to do in

8  addition to controlling expenses each quarter was -- you

9  knew that in the quarterly earnings reports, the company's

10  cash balances were also reported, correct?

11                  MR. BEAN:   Objection, your Honor.   There's

12  a prefatory remark that I'm not sure --

13                  THE COURT:   Let's have a question without

14  preamble.

15      Q.   One of the things you knew in addition to the

16  expense issue is you had to report your cash balances

17  quarterly, correct?

18      A.   On the balance sheet, yes.

19      Q.   Okay.   And one of the features of Lycos was it

20  had a lot of cash in the bank, on the one hand, and then

21  it had a business it was running, on the other hand, which

22  was reporting its quarterly earnings, right?

23      A.   That's correct.

24      Q.   And most of the cash had been obtained from

25  public offering of stock, right?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   That's correct.

2    Q.   And it was as if one had, say, a grocery store

3  business which was just breaking even, but the owners had

4  $50,000 in the bank, in the sense that you could report

5  your cash balance over here and that was, of course,

6  important, but you also had to report how your business

7  was running to the shareholders who were trying to value

8  it; i's that a fair statement?

9    A.   For every public company, yes, that's correct.

10   Q.   Exactly.  And one of the things you recognized

11 while you were at Lycos was that the people who owned

12 stock in the company would be interested in both aspects

13 of the company's operations, both its quarterly earnings

14 and what its cash balances were each quarterly, correct?

15   A.   They would want to know that we had enough cash

16 to run our business, but we always had well more than we

17 needed.

18   Q.   Yes.  But they would also want to know whether

19 that cash balance was reducing over time in such a way

20 that would it indicate that you were drawing on your cash

21 reserves to run the business from a cash basis, right?

22   A.   That's the nature of a company that's losing

23 money, which Lycos was for a lot of its --

24   Q.   Exactly.  And the extent to which it is losing

25 money and using up its cash to fund its operations, that

PDF created with pdfFactory trial version www.pdffactory.com

1  is one of the indicators that you knew analysts and

2  shareholders would look at in valuing the company, right?

3      A.   Again, I'm sure that entered into it.

4      Q.   Other things being equal?

5      A.   But sales and market share were the really

6  important things, but I'm sure they looked at that as

7  well.

8      Q.   Okay.  And so, one of the things you were also

9  interested in every quarter was, as much as possible,

10  keeping your cash balances as high as possible, right,

11  within the model that you had built?

12      A.   Well, we never really built a model on cash.  We

13  always wanted to conserve cash if we can, as I think is

14  just a prudent thing to do, but we never had any real cash

15  model.

16      Q.   But the -- it is correct that you knew that if

17  you reported significant reductions in cash quarter to

18  quarter, other things being equal, that would have a

19  negative effect on your stock price?

20      A.   No, that's not the case.

21      Q.   Certainly it would influence analysts' view of

22  the company?

23      A.   It may make them more excited about the business

24  because we were investing heavier in the business.  I

25  think you just can't make that blanket statement.

```
 1      Q.   Okay.  But other things being equal, you did try

 2  to keep that out --

 3                   THE COURT:  How can you talk about other

 4  things being equal in a situation like the stock market

 5  and analysts?

 6                   MR. KALER:  Understood.

 7      Q.   One of the reasons that Lycos leased its computer

 8  equipment was to conserve its cash, correct?

 9      A.   That's one of the reasons, yes.

10                   MR. KALER:  Thank you.  Nothing further.

11                   THE COURT:  Let's stretch.  Do you have

12  any redirect?

13                   MR. BEAN:  Very brief.  Very brief, your

14  Honor.

15                   THE COURT:  May I return the --

16                   LAW CLERK FRIDAY:  Yes.

17                   (Stretch break.)

18                   THE COURT:  You may proceed, Mr. Bean.

19                   REDIRECT EXAMINATION

20  BY MR. BEAN:

21      Q.   Mr. Philip, would you on behalf of Lycos have

22  made a short-term decision to reduce expenses in a quarter

23  based -- to meet your understanding of Wall Street

24  expectations if that decision would have had an adverse

25  impact on the company in the long run?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   Not if it would have had an adverse decision --
2  adverse impact, no.
3    Q.   Specifically, would you have entered into
4  rewritten equipment schedules to reduce monthly payments
5  in a particular quarter if the rewrite would increase
6  Lycos' expenses for that schedule over the long run?
7    A.   Well, again, it depends, because it would
8  increase the expenses because you're paying more interest,
9  but in terms of -- if it were more expensive to do it, I
10  would not have done that.
11    Q.   Let me rephrase the question.
12       Would you have entered into a rewritten equipment
13  schedule to reduce monthly rent during a quarter to meet
14  Wall Street expectations if do doing so would increase the
15  present value of the rental stream of payments?
16              MR. KALER:   Objection.
17              THE COURT:   What's the objection?
18              MR. KALER:   Calls for an opinion as to
19  what he would have done in a hypothetical situation when
20  he's testified he doesn't recall even contracts of
21  extension that he signed.
22              THE COURT:   Well, your questions implied
23  certain things that he's trying to disavow now.  I think
24  he's entitled to the question.
25    A.   No, I don't think I would have.

PDF created with pdfFactory trial version www.pdffactory.com

1     Q.   Why not?

2     A.   Well, it just wouldn't have been a good business

3  decision, plus the rent payments under the leases were not

4  such a significant number that it would really have made a

5  big impact.

6     Q.   Direct your attention to the Exhibit 2,002, Page

7  12 again, the income statement.  Do you have an

8  understanding, Mr. Philip, of what percentage -- you see

9  operating expenses increased from 82,000 to 173 million

10  over a four-year period.  Do you see that?

11     A.   I do.

12     Q.   And at the same time those expenses were

13  increasing at that rate, Lycos' stock price was going up,

14  right?

15     A.   Yeah.  It went up and down.  It was volatile on a

16  daily basis, but over that period of time, it went up,

17  yes.

18     Q.   And do you have an understanding of what

19  percentage of Lycos' operating expenses -- or approximate

20  percentage equipment leases were?

21     A.   I actually don't know.

22     Q.   Is there anything in this document that you could

23  look at that might help your understanding of that?

24     A.   Well, that commitment page.  I believe it was

25  Page 53.

PDF created with pdfFactory trial version www.pdffactory.com

1     Q.    Okay.

2                 MR. BEAN:  Mr. O'Keefe, if you could go to

3     Page 53.

4     A.    The only thing about this is that it --

5     Q.    I'm sorry.  Let's wait until everyone is there,

6     please.

7     A.    I'm sorry.

8     Q.    It's numbered Page 53, Bates Page 930.

9                 THE COURT:  What's the question?

10    Q.    What...

11                MR. BEAN:  Thank you, Mr. O'Keefe.

12    Q.    What inference -- what about the commitment and

13    contingencies page tells you anything about the relative

14    percentage of expenses that leases -- future lease

15    obligations were?

16    A.    It's hard to tell from this page exactly because

17    it includes so many things, but operating leases are

18    included in this.  So, the 14 million -- some piece of

19    that -- and I don't know how much offhand -- some piece of

20    that would be the leases.  So that would be -- if you

21    included it all, which it's not, because it's all the

22    facilities that we rented and other things, that would be

23    the 14 million out of the approximately 173 million, I

24    believe.

25    Q.    So, maybe five percent, approximately?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1        A.   I don't know.  I can't speculate to that.

 2        Q.   I was just trying to do the math.

 3             Now, you spoke on cross-examination about relying

 4   on your team for entering into lease arrangements, right?

 5        A.   Correct.

 6        Q.   Who was your team, again?

 7        A.   Depends on the period of time.

 8        Q.   Sure.  During the period from 1996 through 2000,

 9   were there various people?

10        A.   Tom Guilfoile, Brian Lucy, Mike Ripps, Jeff

11   Schneider, and then they each had teams working for them

12   as well.

13        Q.   Do you have an impression or understanding as to

14   whether those people relied on Paul Stenberg's advice in

15   connection with leasing?

16                  MR. KALER:  Objection.

17                  THE COURT:  The objection is sustained.

18        Q.   You spoke on cross-examination about your

19   understanding about -- of the difference, if any, between

20   leases and loans.  Do you recall that?

21        A.   Yes.

22        Q.   What do you understand -- do you think of them

23   differently or similarly?

24                  MR. KALER:  Objection.

25                  THE COURT:  What's the objection?
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    MR. KALER:  It's cumulative.

 2                    THE COURT:  It's cumulative?  Well, he's

 3   now cross-examining what you brought out.  That may be

 4   cumulative, but he's certainly entitled to do it.

 5                    MR. KALER:  Okay.

 6      A.  I think of them as financing tools.  So,

 7   different ways to finance something instead of having to

 8   pay for it up-front.

 9      Q.  When you say, "different ways of financing,"

10   what's your understanding of the difference between them,

11   if any?

12      A.  Well, they're very similar.  You pay both

13   principle and interest on both of them.  So, they're very

14   similar, similar tools.

15                    MR. KALER:  Objection.  Move to strike.

16                    THE COURT:  No.

17      Q.  Mr. Philip, you mentioned the name Michael Ripps

18   earlier, did you not?

19      A.  I did.

20      Q.  And do you know where Mr. Ripps lives today?

21      A.  Athens, Georgia.

22                    MR. BEAN:  Thank you, your Honor.

23                    THE COURT:  Any recross?

24                    MR. KALER:  Just very briefly.

25
```

```
 1              RECROSS-EXAMINATION
 2  BY MR. KALER:
 3     Q.   On this issue of managing expenses -- could you
 4  just look at Exhibit 261, the first page.  It's in
 5  evidence.
 6          On the second page of this document, it shows you
 7  signed...
 8              MR. KALER:  And if we go back to the first
 9  page and blow up just the middle portion.
10              MR. BEAN:  Your Honor, we're getting into
11  the stock option issue, which the Court has --
12              MR. KALER:  I'm not getting --
13              THE COURT:  I haven't heard a question
14  yet.  Can we just have a question without even looking at
15  stuff.
16     Q.   Is this an example of some of the stock options
17  that you were granted --
18              THE COURT:  Well, I don't know how that is
19  within the scope of the redirect just now.
20              MR. KALER:  It goes to the witness' issue
21  of managing expenses, but --
22              THE COURT:  No.
23              MR. KALER:  Understood.
24              THE COURT:  I don't understand that to be
25  related.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    MR. KALER:  Then I have no further
 2  questions, your Honor.
 3                    THE COURT:  Thank you, Mr. Philip.  You
 4  are excused.
 5                    THE WITNESS:  Thank you.
 6                    (Witness steps down.)
 7                    THE COURT:  Who is next, Mr. Bean?
 8                    MR. BEAN:  Mr. Charles Cross.
 9                    THE COURT:  But we get to stretch.
10                    LAW CLERK FRIDAY:  Could you remain
11  standing.
12                    (Stretch break.)
13                    THE COURT:  All right.  You may swear the
14  witness.
15                    LAW CLERK FRIDAY:  Please raise your right
16  hand, sir.
17                    CHARLES CROSS, SWORN.
18                    LAW CLERK:  Please be seated.
19                    If you could state your full name for the
20  record, spelling your last name.
21                    MR. CROSS:  Sure.  My name is Charles
22  cross, C-r-o-s-s.
23                       DIRECT EXAMINATION
24  BY MR. BEAN:
25       Q.  Good morning, Mr. Cross.
```

1    A.   Good morning.

2    Q.   Mr. Cross, are you employed?

3    A.   Yes, I am.

4    Q.   Where are you employed?

5    A.   I am the senior vice-president and general

6  counsel of Greystone Equipment Finance Corporation in

7  Burlington, Massachusetts.

8                  THE COURT:  Of what?

9                  THE WITNESS:  Greystone Equipment Finance

10 Corporation.

11                 THE COURT:  G-r-a-y-s-o-n?

12                 THE WITNESS:  G-r-e-y-s-t-o-n-e.

13                 THE COURT:  Oh, Greystone, sorry.

14                 THE WITNESS:  Yes, in Burlington,

15 Massachusetts.

16   Q.   Mr. Cross, how long have you worked in the --

17 what is the business of Greystone Equipment Finance?

18   A.   It is an equipment leasing and financing company.

19   Q.   How long have you worked in the equipment leasing

20 and finance industry?

21   A.   25 years now.

22   Q.   For what companies have you worked?

23   A.   I've worked for a number of companies, including

24 independent leasing companies and leasing subsidiaries of

25 banks.  So, for example, Bank of New England, Fleet Bank,

1    and KeyBank, leasing subsidiaries and independent leasing

2    companies, Signal Capital Corporation, 42 North Structured

3    Finance, BankVest Corporation, and my current employer.

4         Q.   Could you describe your experience in the

5    equipment leasing industry.

6         A.   Yes.  Well, in the course of the 25 years that

7    I've spent in the industry, most of that has been spent as

8    a senior officer in -- either senior counsel or general

9    counsel.  And so, I've in the course of that experience

10   either reviewed or prepared thousands of equipment leasing

11   documents, including well over a thousand computer

12   equipment leasing transactions, and I have both developed

13   policies and procedures for my companies to originate and

14   document these leases.  I've worked closely with pricing

15   and credit personnel to make sure that the terms of the

16   transaction are accurately stated in the documents.  I've

17   worked with customers negotiating those documents,

18   negotiating amendments to those documents during the term

19   and negotiating and administering end of term purchase

20   options, renewal options, and return of equipment when and

21   if equipment is returned at the end of a lease term.

22                   THE COURT:  Mr. Bean, are you offering

23   this witness as an expert?

24                   MR. BEAN:  I will be.

25                   THE COURT:  On what subject?

```
 1              MR. BEAN:  On the subject of the -- two

 2   subjects, your Honor, the relative sophistication of the

 3   parties and what -- and the nature of trust in the

 4   equipment leasing industry and in this case, in

 5   particular, how equipment lessors do business.

 6              THE COURT:  Is there objection to his

 7   qualifications to speak on those operations.

 8              MR. KALER:  Yes, your Honor.

 9              THE COURT:  All right.  Then we'll just go

10   forward and do the -- let me explain to you, members of

11   the jury.

12              The witnesses you've heard heretofore are

13   what we call fact witnesses.  They participated in the

14   events and they tell you about them.

15              Mr. Cross wasn't there.  He can tell you

16   nothing about who said what and who signed what papers.

17   He is being offered to tell you how the industry works, in

18   essence, and what factors are taken into account by

19   various people, according to the industry, what the

20   customs of the industry are.

21              First of all, there is a question as to

22   whether he is sufficiently trained and has sufficient

23   experience and understanding to be able to give you an

24   expert opinion.  Once we get over that -- once we get over

25   that in the courtroom, the job is not yet done for you.
```

```
1                    With respect to an expert's testimony, you
2     have to make the same general judgment about the
3     believability of the witness that you make with respect to
4     every other witness.  However, experts are allowed to give
5     you opinions about what the practice was and how it was
6     done and whether there was compliance or not.
7                    When you come to judge his opinion, you
8     need to review, again, his qualifications and determine
9     whether you are satisfied that his education, experience
10    and understanding are such that you will credit the
11    opinion.  That is a different step from general
12    credibility of the witness, as we had talked about with
13    respect to all the others.
14                    Do you understand the distinction I'm
15    trying to make?
16                        (Jury responds in the affirmative.)
17                    THE COURT:  Okay.  So, at the moment,
18    there is not agreement that this witness is qualified to
19    give you the opinions that Mr. Bean wishes to elicit.  So,
20    we will continue to hear about his qualifications.
21                    If Mr. Kaler wishes to cross-examine him
22    about his qualifications before he gives you any opinions,
23    he's entitled to do that.  So, we'll see where we go.
24        Q.   Mr. Cross, has your experience been from the
25    perspective of the lessor, the lessee, or both?
```

1    A.   Predominately for the lessor, but sometimes for

2  the lessee because sometimes the people that I've worked

3  for lease equipment as well as doing leasing in the

4  ordinary course of their business.

5    Q.   And, again, approximately how many equipment

6  leases have you worked with in your career?

7    A.   Well, again, I've either prepared or reviewed

8  literally thousands of equipment leases during the course

9  of the 25 years that I've been in the industry and with

10 respect to computer leasing well over a thousand such

11 computer lease agreements.

12    Q.   What is your experience with different forms of

13 equipment lease contracts?

14    A.   Well, I'm familiar predominantly with three

15 different kinds of forms of contracts:  One is a stand-

16 alone lease contract where all of the legal boilerplate,

17 if you will, and the transaction terms were in one

18 document.  The other is the form of lease that we see here

19 in this case where you have a master lease that provides

20 the general terms of the transaction and then you have

21 separate equipment schedules where you have specific

22 economic terms for each transaction in those schedules.

23         And then third form, which is called a major

24 market lease.  It's really a big document.  It's very

25 thick, hand-typed, which is negotiated on a case-by-case

PDF created with pdfFactory trial version www.pdffactory.com

1 basis, usually for hundreds of millions of dollars of

2 equipment at one time.  So, those are the three basic

3 forms that I'm familiar with.

4  Q. In terms of knowing -- what's your basis for

5 understanding what the norms are in the industry?

6  A. Well, it's my experience --

7     MR. KALER:  Objection, your Honor.

8 Industry norms is specifically covered by the Court's

9 order in limine.  It's Part C of his report, their

10 business practice norms, and I believe it was excluded.

11     MR. BEAN:  Your Honor, you specifically

12 granted Part A, which is about what the norm -- the

13 relative sophistication of the parties and that relates to

14 industry norms.  We have a bench memo for your Honor and

15 it's going to come up --

16     THE COURT:  Everybody spends the night

17 writing memos.

18     MR. BEAN:  I'm sorry.

19     THE COURT:  This, members of the jury, is

20 after I had made rulings on this already.

21     MR. BEAN:  Your Honor has already ruled, I

22 believe, that this stuff is coming in to show the relative

23 sophistication of the parties.

24     THE COURT:  Go on to something else while

25 I study my ruling.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. BEAN:  Thank you, your Honor.

2     Q.  Have you worked for any companies that have

3  acquired or purchased leases from other companies?

4     A.  Yes.  Actually, most of the companies that I have

5  worked for both originate leases on their own and they

6  also purchase leases from other leasing companies.  So, I

7  have become familiar not only with the forms of my own

8  companies, but also with the leasing forms of many other

9  companies from whom I bought leases over the course of my

10 career.

11    Q.  When you say, "many other companies," can you

12 give an proximate number?

13    A.  It would certainly be dozens and dozens of other

14 companies, because most of my companies have done business

15 at one time or another with other major bank leasing

16 companies, other independent leasing companies.  So, there

17 are very many of them.

18    Q.  Are you a member of any professional

19 organizations in the equipment leasing industry?

20    A.  Yes.  Well, through my employer I've been a

21 member of the Equipment Leasing and Finance Association

22 for the entire 25 years that I've been in the industry and

23 I've been a member of its legal committee twice in my

24 career, including currently.

25    Q.  What is the Equipment Leasing and Finance

1 Association?

2     A.  Well, I think it's widely regarded as, really,

3 the premier trade association of the equipment leasing and

4 finance industry.  So, it -- many, many lessors, including

5 CSI and including my company, are members of the Equipment

6 Leasing and Finance Association.

7     Q.  Has the Equipment Leasing and Finance Association

8 established any fair business practices with which its

9 members have agreed to comply?

10             MR. KALER:  Objection on grounds that this

11 has been excluded from his report.

12             THE COURT:  What I excluded was whether

13 CSI acted in compliance with industry standards or with

14 its own fair business practices.  That's out, and that's

15 the only thing that's out.

16             MR. KALER:  I thought that's what was

17 being asked.

18             MR. BEAN:  No.  We're simply -- well, I'll

19 proceed.

20     Q.  Mr. Cross, are you familiar with the reasons

21 these fair business practices were developed?

22             MR. KALER:  Objection.

23             THE COURT:  Why do we need to get into the

24 fair business practices if we can't talk about them, if

25 there is no -- if I've ruled out any expertise on that?

1        MR. BEAN:  What I believe you have ruled

2   out, your Honor, is any testimony on whether CSI has

3   violated them.  The fact that they exist and what they

4   provide and whether it is up for -- whether CSI has

5   violated them, I think, is for the --

6        THE COURT:  What's the point of

7   establishing that there are such if you can't get into

8   whether they violated them?

9        MR. BEAN:  I think it's up to -- the jury

10  will decide whether they violated them.

11       THE COURT:  No, we're not going into them.

12       MR. BEAN:  Your Honor, we have a claim for

13  negligent misrepresentation and a claim for knowing and

14  willful misconduct.  The ELA fair business practices

15  represent a standard of care in the industry.

16       MR. KALER:  I object to that, your Honor.

17       THE COURT:  No, we're not going into it.

18  We've dealt with it.

19       MR. BEAN:  I'd like to provide the Court

20  with a bench memo at the break, if I might.

21       THE COURT:  You're welcome to do that.

22  We'll file it.  We may even read it.

23       MR. BEAN:  Thank you.

24  Q.  What, if any, seminars have you attended or given

25  on equipment leasing in the past ten years?

1      A.   Well, actually, for the entire 25 years that I've

2  been a member of the Equipment Leasing and Finance

3  Association, I've attended the annual legal forum of that

4  association, which is a meeting of both in-house and

5  outside counsel that are involved in the equipment leasing

6  industry, and in a number of those equipment -- a number

7  of those forums I've conducted seminars and presented

8  papers to the people attending those legal forums.

9           In the past ten years, actually, I did three such

10  presentations.  The most recent legal forum which was just

11  a couple of months ago and the topics were leasing fraud,

12  evergreen renewal provisions in leases and the use of

13  leases -- the use of actual lease documents to document

14  what are essentially loans, and in the past I've done such

15  topics as buying and selling leases, general courses on

16  lease documentation, how you negotiate a lease, and I've

17  done some equipment-specific section -- sessions including

18  aircraft financing and -- and, again, methods by which

19  companies can fund leases or finance leases.

20      Q.   What articles, if any, have you written on

21  equipment leasing --

22      A.   I wrote --

23      Q.   -- where they were published?

24      A.   I'm sorry.  In addition to the articles that are,

25  I believe, kept on the ELFA Website, I've published in the

PDF created with pdfFactory trial version www.pdffactory.com

1   *Journal of Equipment Lease Finance* an article which was

2   about special tax and accounting aspects associated with

3   special lease products, and I've written chapters and

4   edited chapters for an ELFA publication which was called

5   *Executive's Guide to Remedies*.  So that included, I

6   believe, chapters on fraud and -- it's escaping me right

7   at the moment, but the others were -- I think it was four

8   chapters in all.  I wrote two and I edited two.

9        Q.   How did you become involved in this case?

10       A.   I was approached by a colleague of mine at 42

11  North, who told me that she had been approached by a

12  representative of Lycos and that Lycos was interested in

13  retaining an expert in connection with this case.

14       Q.   And how did you get involved?

15       A.   Well, the colleague presented this opportunity to

16  us at 42 North and she spoke specifically to me about it

17  and the president of our company and we met and then we

18  met with you to discuss the case.

19       Q.   What were your initial reactions to hearing about

20  the case before you read any of the lease documents?

21                 MR. KALER:   Objection.

22                 THE COURT:   Sustained.

23       Q.   Did you write a report -- what did you do -- did

24  you write a report?

25       A.   Yes, I actually wrote a report and I believe two

1    supplements to that report.

2        Q.   What documents did you review or have available

3    to you in connection with writing that report?

4        A.   Well, I had available to me literally tens of

5    thousands of pages of documents that had -- which I

6    understood to be all of the documents that have been

7    presented by either party in this case.

8            What I specifically focused on were the master

9    equipment lease agreement that we've seen, the various

10   equipment schedules that items of equipment were leased

11   under, internal accounting documents of CSI that related

12   to those equipment schedules.  I also reviewed some leases

13   from other leasing companies that I wasn't personally

14   involved in, just as a kind of reality check on what my

15   own knowledge was.  I reviewed expert reports of CSI

16   experts, expert reports of Lycos experts, deposition

17   testimony of both experts and fact witnesses in the case,

18   emails, correspondence, as I found it relevant to the

19   opinions that I was asked to offer, and I think I read at

20   one point -- at least skimmed some of the financial

21   statements of the companies.  I looked at commission

22   programs and performance reviews.

23           So, I had available to me what I understand is

24   almost everything in the case and then I tried to choose

25   out of that huge volume of papers the stuff that I thought

PDF created with pdfFactory trial version www.pdffactory.com

1  was relevant to the matters that I was asked to address

2  opinions to.

3      Q.   Approximately how many hours did you devote to

4  reviewing documents and writing your report?

5      A.   I'd say it was around 300 hours in reviewing the

6  documents and writing the report and the supplements to

7  the report.

8      Q.   So, it's about six, seven weeks full time?

9      A.   Yeah.   It wasn't done in a six- or a seven-week

10 stretch like that, but it would end up being the

11 equivalent to that, yes.

12     Q.   And what would you say the basis would be for you

13 to render opinions on the relative sophistication of the

14 parties in this case?

15             MR. KALER:   Objection.

16             THE COURT:   He may tell us that.

17             THE WITNESS:   I'm sorry, your Honor?

18             THE COURT:   You may answer that.

19     A.   Well, I --

20             THE COURT:   But wait a minute.   Before we

21 get there, are you done with qualifications?

22             MR. BEAN:   These are the last two

23 questions.   I'm asking him simply to summarize the basis

24 -- you know, the grounds under which he could render

25 opinions.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    THE COURT:  Okay.  Not what the opinion
 2   is, but --
 3                    MR. BEAN:  Right.
 4       A.   Sure.  Well, in the context of, again, preparing
 5   and reviewing thousands of equipment lease agreements and
 6   in negotiating with lessees about these lease agreements,
 7   I've become aware of the level of sophistication of
 8   lessees in the industry as compared to the relative
 9   sophistication of lessors in the industry, both in terms
10   of my own employers and lessors, but also, again, lessors
11   from whom I've bought equipment lease contracts.  So, it's
12   by direct personal observation in hundreds and hundreds of
13   negotiations.
14       Q.   And did you apply those direct personal
15   observations in 25 years of experience to the master lease
16   and equipment schedules in this case?
17                    MR. KALER:  Objection.  Leading.
18                    THE COURT:  He may answer.
19       A.   Yes, I did.
20       Q.   Okay.  Do you have an understanding -- what's the
21   basis for your understanding of the relationship between a
22   lessor and lessee in terms of the levels of reliance a
23   lessee might place on a lessor typically in the industry?
24                    MR. KALER:  Objection.
25                    THE COURT:  I think we're getting away
```

```
 1   from qualifications and on to the matters.

 2                    MR. BEAN:  All right.  I will offer the

 3   witness.

 4                    THE COURT:  Do you have any voir dire of

 5   the witness on qualifications?

 6                    MR. KALER:  Yes, I do, your Honor.

 7                    THE COURT:  Go ahead.

 8                    VOIR DIRE EXAMINATION

 9   BY MR. KALER:

10      Q.  Mr. Cross, you had never testified as an expert

11   before, have you?

12      A.  No, I haven't.

13      Q.  You've never been qualified as an expert witness

14   before, have you?

15      A.  No, I haven't.

16      Q.  You've never provided an expert opinion of any

17   kind before, except as a lawyer giving legal advice,

18   right?

19      A.  Well, in my capacity as a senior manager of my

20   various employers, I've provided opinions on more than

21   just legal matters, but I've not provided it in the

22   context of a court hearing like this before, no.

23      Q.  You've never provided an expert opinion other

24   than as a lawyer?

25                    THE COURT:  I'm sorry?
```

1    Q.   You've never provided an expert opinion other

2  than as a lawyer?

3    A.   No, that's not what I said.  I said as a senior

4  manager outside of my discipline as an lawyer, I have

5  offered expert opinions internally for my employers on

6  matters other than as to the law, but I've not done

7  anything in a court context.

8    Q.   You're a lawyer by training, right?

9    A.   That's part of my training, yes.

10    Q.   You've never worked for a company that was

11  exclusively an equipment the lessor, have you?

12    A.   Almost all of the companies I've worked for have

13  been exclusively equipment lessors.

14    Q.   Do you remember giving a deposition in this --

15           THE COURT:  No, we're not getting into

16  that.

17    Q.   So, you're saying that the companies that you've

18  worked for have been exclusively equipment lessors?

19    A.   Yes, equipment leasing and finance companies,

20  exactly.

21    Q.   You have no licenses or certifications of any

22  kind from the equipment leasing field, have you?

23    A.   No.

24    Q.   You've never yourself been involved in any time

25  in setting industry standards, have you?

1    A.   Well --

2              THE COURT:  You know, if you're going to

3    open up the topic of industry standards, you can bet your

4    bottom dollar that Mr. Bean will jump right into it

5              MR. KALER:  I'll withdraw the question.

6    Q.   In your first job out of law school, you began

7    advising lessees on small-ticket leases, correct?

8    A.   Actually, my first job out of law school I spent

9    five years in private practice as a lawyer with a private

10   law firm.  My first job in the industry was in 1984 and

11   that was with a company that did middle -- what's called

12   middle-market leasing, which was generally leases between

13   250,000 and $2 million, say.

14             MR. KALER:  The Court does not want me to

15   use his deposition, I understand?

16             THE COURT:  I don't understand the point

17   of using the deposition.  It means a lot of on the screen,

18   back and forth, asking questions, Now do you remember

19   saying such and so.  And he says, No, I don't remember,

20   but then you read it anyhow.  I mean, what's the point?

21             MR. KALER:  To impeach because I've

22   testified -- I've asked this witness--

23             THE COURT:  We're only talking about

24   qualifications now and I don't think you need to impeach

25   with respect to that.

1           MR. KALER:  Understood.

2           THE COURT:  And we're taking the recess as

3    soon as you're done.

4       Q.  You went to work for New England Leasing, which

5    is a lessor?

6       A.  New England Merchant Leasing Company, which was a

7    subsidiary of the Bank of New England.

8       Q.  Right.  And New England Leasing did not have a

9    master lease for computer equipment, correct?

10      A.  It had a master lease, which was used in a wide

11   variety of contexts, including computer equipment.

12      Q.  You're saying it had a master lease for computer

13   equipment?

14      A.  What I said was it had a master lease that was

15   used for a wide variety of equipment, including computer

16   equipment.

17      Q.  Right.  It just didn't have one specifically

18   for --

19      A.  That's correct.

20      Q.  And you will agree that -- you went to work at

21   Signal Capital Corp., which was a middle-market lessor

22   after that, meaning at least between 100,000 and two to

23   three million, right?

24      A.  Yes.

25      Q.  And then that was acquired by Fleet?

PDF created with pdfFactory trial version www.pdffactory.com

1      A.   Yes.

2      Q.   You do not recall -- then you went to BTM

3  Capital?

4      A.   That's right, and that was the successor to Bank

5  of New England.

6      Q.   You don't recall doing any computer equipment

7  leases at BTM, do you?

8      A.   I don't recall specific computer equipment leases

9  at BTM, but they did do computer leasing, amongst other

10  types of equipment.

11      Q.   Then you went to BankVest, right?

12      A.   Yes, then I went to BankVest Capital.

13      Q.   Where you did small-ticket leasing?

14      A.   Yes.  We did some middle-market leasing at

15  BankVest Capital Corporation, but it was predominantly a

16  small-ticket leasing company.

17      Q.   And after BankVest you went to Key Global

18  Finance, which was part of KeyBank, right?

19      A.   That's right, yes.

20      Q.   And your duties there were primarily legal,

21  right?

22      A.   No.  I was a managing director and legal counsel

23  there.  So, yes, certainly, I would say that the majority

24  of what I did there was in the legal context, but, again,

25  in a leasing company such as that, you're exposed to and

PDF created with pdfFactory trial version www.pdffactory.com

1    participating in decisions that go far beyond legal

2    issues.

3        Q.   And while there you also did off balance leases

4    of real estate, right?

5        A.   Yes, that's correct.

6        Q.   And at some point Key Global renamed itself to 42

7    North Structured Finance, which is your company, right?

8        A.   I am currently -- a little more detail on that.

9    Yes, that's a correct statement, it did become 42 North

10   Structured Finance.  While at 42 North Structured Finance,

11   we actually formed my current employer and I have slowly

12   -- I have become a consultant now to 42 Structured Finance

13   while being full time employed by Greystone Equipment

14   Finance Corporation.

15       Q.   And have you drafted any computer equipment

16   leases yourself?

17       A.   Well, yes.  Sure.  Yes.

18       Q.   And have you drafted any computer equipment

19   computer leases?

20       A.   Yes, I have.

21       Q.   And have you done so in your capacity as a lawyer

22   in all the various positions that you've held?

23       A.   Yes, that's correct.

24       Q.   And have you ever, from a standpoint of a -- from

25   a business standpoint, made a decision as to whether to

PDF created with pdfFactory trial version www.pdffactory.com

1  enter into a leasing contract or not on behalf of

2  yourself, your own company?

3      A.  I've had credit authority at most of the

4  companies which I've worked.  So, I have -- I would not

5  say that I exercised it as a primary matter, but I

6  contribute to the decision-making process in deciding

7  whether or not to pursue with a particular lease with a

8  particular customer.

9      Q.  You would not say you've done that as a primary

10  matter, is that what you said?

11     A.  That's a fair statement, yes.  That's not my

12  primary responsibility.

13     Q.  Have you ever at any of your employers ever had

14  the final say in deciding whether or not to sign on the

15  dotted line of a lease of computer equipment?

16     A.  Yes, I have.

17     Q.  Where was that?

18     A.  Again, I would say I had the -- let me

19  distinguish between -- I had the final say.  I did not

20  generally exercise it because, typically, I would leave

21  that function to my credit department, but I had credit

22  authority, which allowed me to say, yes, I approval this

23  deal and I have signing authority to permit me to sign the

24  deal.

25     Q.  Did you ever sign any computer equipment lease

1  yourself?

2      A.   Yes.  I can't be specific about that, but I have

3  signed many equipment leases, including computer equipment

4  leases.

5      Q.   You can't be specific, meaning can you tell us a

6  single major computer lease that you both signed and made

7  the decision to enter into?

8      A.   No, I can't recall specifics names.

9              THE COURT:  I find that the witness is

10 generally qualified to speak about the topics on which I

11 allow him to testify.  That does not absolve you, as I

12 explained to you before, of your responsibility to, again,

13 judge his qualifications when you come to judge his

14 opinions.

15             We will now take the recess.

16             LAW CLERK FRIDAY:  All rise, please.

17             (Jury excused.)

18             (Recess taken.)

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2                          CERTIFICATE

3        I, Catherine A. Handel, Official Court Reporter of the

4   United States District Court, do hereby certify that the

5   foregoing transcript, from Page 1 to Page 96, constitutes

6   to the best of my skill and ability a true and accurate

7   transcription of my stenotype notes taken in the matter of

8   Civil Action No. 05-10017-RWZ, Computer Sales

9   International, Inc. vs. Lycos, Inc.

10

11  June 5, 2009              /s/Catherine A. Handel, RPR, CRR
    Date                      Catherine A. Handel, RPR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25