UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

COMPUTER SALES, INC., f/k/a )
COMPUTER SALES INTERNATIONAL)
INC.                        )
          Plaintiff,        )
                            )
vs.                         )    Civil Action
                            )    No. 05-10017-RWZ
                            )
LYCOS, INC.,                )
          Defendant.        )


**JURY TRIAL**
**DAY SEVEN - FIRST SESSION**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
June 9, 2009
9:00 a.m.


*  *  *  *  *


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4   McCARTER & ENGLISH, LLP
     (By Robert J. Kaler, Esq.,
 5        Edward William Little, Jr., Esq.,
          David Himelfarb, Esq.,
 6        and Kelly Gabos, Esq.)
          265 Franklin Street
 7        Boston, MA 02110

 8

 9

10

11   For the Defendant:

12   McDERMOTT WILL & EMERY LLP
     (by Thomas O. Bean, Esq.,
13        Peter M. Acton, Jr., Esq.
          David Q. Gacioch, Esq.,
14        and James Fraser, Esq.)
          28 State Street
15        Boston, MA 02109-1775

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    EXAMINATION INDEX

4

PHILIP CAGNEY

5

        CONTINUED DIRECT BY MR. GACIOCH . . . .    4
6       CROSS BY MR. KALER . . . . . . . . . .   38
        REDIRECT BY MR. GACIOCH . . . . . . . .  57
7       RECROSS BY MR. KALER  . . . . . . . . .  62

8

9

THOMAS E. GUILFOILE

10

        DIRECT BY MR. BEAN . . . . . . . . . .   63

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              P R O C E E D I N G S

 2            (The following proceedings were held in open

 3    court before the Honorable Rya W. Zobel, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States

 6    Courthouse, 1 Courthouse Way, Boston, Massachusetts, on

 7    June 9, 2009.)

 8                    (Jury enters courtroom.)

 9                    THE COURT:  Good morning.  Please be

10    seated.

11                    Mr. Cagney, we will proceed now, but

12    without swearing you again, but you remain under oath.  Do

13    you understand?

14                    MR. CAGNEY:  Yes, I do.

15                    THE COURT:  Okay.  You may proceed.

16                    MR. GACIOCH:  Thank you, your Honor.

17                    PHILIP CAGNEY, PREVIOUSLY SWORN.

18              CONTINUED DIRECT EXAMINATION

19    BY MR. GACIOCH:

20        Q.  Good morning, Mr. Cagney.

21        A.  Good morning.

22        Q.  You testified yesterday that you currently report

23    to Mr. Steve Hamilton; is that correct?

24        A.  Yes, it is.

25        Q.  Sorry, we need to turn on your mike.
```

1                    MR. GACIOCH:  May I approach, your Honor?

2                    THE COURT:  Yes.  It may not be turned on.

3       Q.   Try now.

4       A.   Yes, it is.

5                    THE COURT:  We hear you.

6       Q.   Much better.

7       A.   Okay.

8       Q.   And Mr. Hamilton is the president of CSI; is that

9  correct?

10      A.   Yes, he is.

11      Q.   And Mr. Hamilton supervises in addition to you

12 other senior officers of CSI?

13      A.   Today that is right, yes.

14      Q.   And he evaluates your performance on a periodic

15 basis?

16      A.   That would be correct.

17      Q.   And the same for other senior officers of CSI?

18      A.   Yes.

19      Q.   And was Mr. Hamilton present in the courtroom for

20 your testimony yesterday?

21      A.   Yes.

22      Q.   And is he present again here today?

23      A.   Yes.

24      Q.   Would you please point him out for the jury,

25 please.

```
 1      A.   (Indicating) Back row.

 2      Q.   Thank you.

 3           Mr. Cagney, you testified yesterday that a CSI

 4  salesperson receives a commission -- again, over

 5  simplified -- that's based upon a percentage of CSI's

 6  margin on a particular transaction; is that correct?

 7      A.   Yes.

 8      Q.   And you testified that margin is the rough

 9  equivalent to gross profit for CSI; is that correct?

10      A.   That is correct.

11      Q.   And you were careful to distinguish between gross

12  profit and net profit; is that fair?

13      A.   Yes, that is.

14      Q.   And one of the reasons that gross profit and net

15  profit are not the same number is because you have to pay

16  the salesperson's commission out of the gross profit; is

17  that fair?

18      A.   That would be one of the many costs that we have

19  to cover, yes.

20      Q.   So, for instance, a transaction where

21  Mr. Stenberg's commission, has we discussed, was 26 and a

22  half percent of margin, you have to take out that 26 and a

23  half percent, among other things, to make gross profit

24  into CSI's net profit; is that fair?

25      A.   That would be one of the things we have to take
```

PDF created with pdfFactory trial version www.pdffactory.com

1   out, yes.

2       Q.   And you pay your salespeople -- let me rephrase

3   that.

4            CSI pays commissions to its salespeople generally

5   a couple of months after a transaction closes; is that

6   fair?

7       A.   I think a couple of months is about right.

8       Q.   It may vary a little bit either way?

9       A.   Yes, it might.

10      Q.   Now, under the compensation plan for salespeople

11  that was in place at CSI in the late 1990s and early part

12  of this decade, only certain types of lease transactions

13  were commission eligible; is that correct?

14      A.   I'm not positive on that one.  I don't recall --

15  I mean, I didn't read the compensation plan at that time.

16      Q.   Okay.  Is it fair to say that certain

17  compensation or commission-related transactions required

18  your approval for the commission to be paid?

19      A.   The -- it would require my okay, my approval,

20  before our legal department would send out the contract.

21      Q.   Understood.

22           Mr. Cagney, a lease extension is different from a

23  lease rewrite; isn't that correct?

24      A.   In what way?

25      Q.   Well, under CSI's compensation plans, for

PDF created with pdfFactory trial version www.pdffactory.com

1   example, a lease extension is treated differently than a

2   lease renewal or rewrite; isn't that correct?

3       A.  I don't think so.

4              MR. GACIOCH:  Can you pull up 2157,

5   please, Mr. O'Keefe.  You can start with Page 1.

6       Q.  Mr. Cagney, do you see in front of you Exhibit

7   2157?

8       A.  Yes.

9       Q.  And do you recognize it to be a CSI compensation

10  plan for the fiscal year 1999?

11      A.  That is what it says, yes.

12      Q.  And in this case it's Mr. Stenberg's; is that

13  fair?

14      A.  Looks like it.

15      Q.  Do you have any reason to doubt that this is, in

16  fact, the authentic document?

17      A.  I do not have a reason, no.

18      Q.  In fact, down at the bottom right corner -- it's

19  very small and I apologize, but you can see that it's --

20  it was Bates numbered by CSI itself.  Do you see that down

21  there in the left corner where it says "CSI" and then a

22  number?

23      A.  Right.  I'm not familiar how all the numbering

24  works.

25             MR. KALER:  We'll stipulate CSI produced

PDF created with pdfFactory trial version www.pdffactory.com

1   it.

2                   MR. GACIOCH:  Could we go, Mr. O'Keefe,

3   please, to Page 21.

4                   THE COURT:  Members of the jury, when

5   counsel engage in efforts to find information from each

6   other before trial, they have to produce documents, and

7   such, as I think I explained to you.

8                   They have a right to agree to or ask the

9   Court to enter what are called protective orders.  So,

10  certain information may be confidential and they don't

11  want the whole world to know about it, and that's what

12  this stuff is about.  It's confidential, attorney's eyes

13  only, and they may limit it to just the lawyers, the

14  outside lawyers.  They may limit it to the rest -- the

15  whole world can't see except certain designated people,

16  and so on.

17                  So, the whole purpose of is this -- and

18  sometimes they redact things, so that nobody can see it at

19  all -- is to protect internal secrets.  They may be trade

20  secrets.  They may be financial secrets, whatever, and it

21  is a perfectly appropriate thing to do that.

22                  MR. GACIOCH:  May I proceed?

23                  THE COURT:  Yes, please.  Sorry.

24                  MR. GACIOCH:  No problem.

25                  Mr. O'Keefe, if you could highlight that

1    middle section.

2        Q.   Mr. Cagney, I've asked Mr. O'Keefe to move into

3    the document to what's labeled Page 20 at the bottom.  The

4    cover sheet is not numbered.  So, it's actually Page 21 on

5    the record.

6             It's a little bit grayed out, but do you see the

7    top box there that Mr. O'Keefe has brought up that says

8    "Special case lease renewals"?  I can give you a paper

9    copy if it's easier to the read.

10       A.   I can make that out.

11       Q.   Okay.  And without going into the details, the

12   next five bullet points, if you could skim those quickly.

13       A.   (Examining.)

14       Q.   Basically described how commissions will be

15   calculated on these renewals; is that fair?

16       A.   (Examining) Yes.

17       Q.   And, in fact, the left bullet point, No. 5, says,

18   "In order to be commissionable, a lease renewal of less

19   than six months must be pre-approved by Mr. Gillula or

20   yourself; is that correct?

21       A.   That is correct.

22                 MR. GACIOCH:  And if you could drop that

23   down, please, Mr. O'Keefe, and go to the next -- the

24   bottom of the page.

25       Q.   Do you see the box that Mr. O'Keefe has brought

PDF created with pdfFactory trial version www.pdffactory.com

1   up here that says, "Special case lease extension"?

2        A.   Yes.

3        Q.   And the compensation plan that CSI has put

4   forward for Mr. Stenberg here says, "A lease extension is

5   not eligible for commission earnings," period; isn't that

6   correct?

7        A.   That is what it says, but I'm not sure that --

8   I'm not sure that lease extension -- what the definition

9   of that is.

10       Q.   Well, this is CSI's own document, isn't it?

11       A.   As I previously said, I have never seen this

12  document.

13       Q.   I think Mr. Kaler has indicated it was a --

14            THE COURT:   Well, he hasn't seen it.

15  That's the answer.

16       Q.   So, it would be -- Mr. Stenberg, we've already

17  discussed yesterday, received commissions on several of

18  his transactions with Lycos; isn't that correct?

19       A.   That would be correct.

20       Q.   For instance, the transactions in September of

21  1999?

22       A.   Yes.

23       Q.   And the transaction that became Schedules 93 and

24  94?

25       A.   I assume he did, yes.

PDF created with pdfFactory trial version www.pdffactory.com

 1      Q.   Now, turning back to Schedules 93 and 94, where

 2  we left off yesterday.  You told us that Mr. Stenberg

 3  specifically requested a structure that assured at least

 4  $5 million of markup; isn't that correct?

 5      A.   That was one of the requests, yes.

 6      Q.   One of, in fact, several?

 7      A.   Yes.

 8              MR. GACIOCH:  And can we bring up 2046,

 9  please, Mr. O'Keefe.

10      Q.   I'm going to show you -- we discussed this

11  exhibit yesterday a bit, Mr. Cagney.  Do you see...

12              MR. GACIOCH:  We'll do the top third of

13  the email, if you would, please.

14      Q.   This was the email that you sent to your margin

15  notification group; isn't that correct?

16      A.   Yes.

17      Q.   And you sent that because you were notifying

18  senior management that a high-margin deal was going to

19  happen; is that correct?

20      A.   That would be correct.

21      Q.   And we discussed yesterday that you called the

22  deal "complex, convoluted" there.  In fact, "very complex,

23  very convoluted" there in the first two sentences, three

24  sentences; is that correct?

25      A.   I did say that at the time, yes.

1     Q.   And you chose those words purposely, didn't you?

2     A.   I tend to be a little verbose in my emails, but I

3  guess I did.  Yes, I did say that.

4     Q.   In deposition you told us specifically that you

5  had chose those words advisedly?

6     A.   I don't remember that I said it that way, but...

7     Q.   And you used those words because the structure

8  was different than most other deals that CSI had done?

9     A.   The structure was different because we were not

10  terminating all of the leases at the same time and because

11  we were leaving the financing in place on many of the

12  schedules so that we could make the letter of credit

13  smaller than it otherwise would have needed to be, yes.

14     Q.   A letter of credit that CSI's credit department

15  was requiring be posted?

16     A.   As part of the transaction, we required a letter

17  of credit, yes.

18     Q.   Because the portion of the transaction covered by

19  the letter of credit was not already secured by bank debt;

20  is that correct?

21     A.   Right, on the new schedule, the payments we were

22  not going to be able to finance because Lycos' credit was

23  not all that hot.

24     Q.   So, it wasn't secured by bank debt; is that a

25  fair statement?

1      A.   The new payments, correct.

2      Q.   The new payments?

3      A.   Yes.

4      Q.   Now, when we discussed the complex and convoluted

5  structure yesterday, you told us that it was complex and

6  convoluted from CSI's point of view, but your belief was

7  that it wasn't from Lycos'; is that fair to say?

8      A.   I was trying to make -- I mean, yes, it is in the

9  sense that from Lycos' standpoint and, really, from the --

10  what I would call the big picture standpoint, we were

11  reducing their payments significantly and, as a whole,

12  they would have, basically, two sets of obligations, a

13  two-year obligation, a two-year contract, if you will, and

14  a three-year obligation.  So, from that standpoint, that

15  was, in my mind, what the primary result of this was, yes.

16      Q.   In addition to other obligations from leases that

17  were rolling onto 93 and 94 at various times; is that

18  fair?

19      A.   Not quite.  Those obligations we were looking at

20  in total.  So, at the beginning, before we executed 93 and

21  94, they had a lease obligation of around $1.2 million.

22  After we executed 93 and 94, in total, including 93 and 94

23  and all the other schedules, that payment obligation

24  dropped from a million two -- and I'm rounding here.

25      Q.   Obviously.

PDF created with pdfFactory trial version www.pdffactory.com

1      A.   -- to about -- I think it was 830,000.

2      Q.   Spread over a number of different schedules at

3  various points in time; is that fair to say?

4      A.   Yes.

5      Q.   And schedules that had different payment

6  obligations with respect, for instance, to whom Lycos had

7  to make payment?

8      A.   Because we were leaving the existing bank debt in

9  place, Lycos prior to executing that 93 and 94 had been

10  paying various banks as well as ourselves.  So, by doing

11  what we did, by structuring the contract as we did, we

12  kept that -- many of those obligations in place.  So that,

13  yes, they were paying multiple corporations, yes.

14      Q.   So, of the total rent reduction that you just

15  described, for example, on a monthly basis, within the

16  Lycos' new overall total monthly rent for different

17  periods of time, it was actually cutting checks for

18  different portions of that to different entities; isn't

19  that fair?

20      A.   Yes, they would have to make multiple payments

21  totaling that 830,000.

22      Q.   And, in fact, at one point they came to CSI

23  looking for some clarification as to whom which payments

24  had to be made; isn't that correct?

25      A.   My understanding is, yes, that they did ask for

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    clarification and we responded to that.
 2                    MR. GACIOCH:  Now, if you could drop that
 3    down, please, Mr. O'Keefe, and go to the last -- the last
 4    full paragraph Mr. Cagney wrote.  Correct, that one right
 5    there.
 6         Q.  Mr. Cagney, do you see here you wrote that,
 7    "Paul" -- that's Mr. Stenberg; is that correct?
 8         A.  Yes, that is.
 9         Q.  "Paul says everything is a go on this, but we'll
10    see when it comes to actually putting their signature on
11    the bottom line of what should be some very interesting
12    looking contracts."  Did you write that?
13         A.  Yes, I did say that.
14         Q.  And by "their signature" you meant Lycos'
15    signature?
16         A.  That would be correct.
17         Q.  And you were referring in this comment to, again,
18    the lease transaction structure; isn't that correct?
19         A.  I was referring specifically to the lease
20    contract for 93 and 94.
21         Q.  And the structure of those contracts; is that
22    fair to say?
23         A.  I was referring to the contracts.
24         Q.  When you said "interesting looking," the
25    interesting looking part was the complicated structure of
```

PDF created with pdfFactory trial version www.pdffactory.com

1    those contracts; is that fair to say?

2         A.   Well, at this point in time -- I'm not a lawyer.

3    So, I had referred -- basically, given my approval to our

4    legal department to prepare the contracts.  It was really

5    up to them to figure out how to clearly and succinctly as

6    best they could prepare those for Lycos and I would assume

7    that Lycos -- if they did not understand the contracts,

8    that there would have been some negotiation or some

9    clarification on that.

10        Q.   You never asked Lycos if they understood the

11   contracts, did you?

12        A.   Personally, no.

13        Q.   You're not aware that Mr. Stenberg ever did that,

14   are you?

15        A.   I do not know that.

16                  MR. GACIOCH:   Can you pull up 55, please,

17   Mr. O'Keefe.

18        Q.   Mr. Cagney, do you see on your screen in front of

19   you Exhibit 55, which I believe you identified yesterday

20   as the Equipment Schedule 93?  Mr. O'Keefe can bring up

21   the top of it, if that's easier.

22        A.   That does look like the first page of Equipment

23   Schedule 93.

24        Q.   There are, in fact, I think, about 75 pages

25   behind that or give or take; is that fair to say?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   My recollection is that most of them is the

2  equipment listing, yes.

3              MR. GACIOCH:   And, in fact, if we could

4  now pull up 56.

5    Q.   Mr. Cagney, do you recognize Exhibit 56 as the

6  first page of Schedule 94?

7    A.   Yes, I do.

8    Q.   And, again, that was the schedule that had

9  several pages of contract equipment listing behind it?

10   A.   Right.   The equipment listing was most of it.

11  When I reviewed it, it looked like the legal language was

12  two or three pages.

13             MR. GACIOCH:   Now, if we could pull up

14  Page 69, if you would, of Exhibit 55.

15   Q.   Mr. Cagney, what I'm going to ask Mr. O'Keefe to

16  do is to pull up the Addendum 1 portion of each of these

17  agreements for you to look at, if that's possible.

18             MR. GACIOCH:   Go on to 55.   That's...

19   Q.   Mr. Cagney, I've asked Mr. O'Keefe to put side by

20  side the Addendum 1 charts from 55 and 56.   Do these look

21  familiar to you generally?   I'd be happy to show you the

22  entire document, if you would like.

23   A.   Generally, yes, they do look familiar.

24   Q.   Now, let's look, for example, at Equipment

25  Schedule 65.   Do you see at the top left there, which is

PDF created with pdfFactory trial version www.pdffactory.com

1   the chart from Schedule 93, Exhibit 55, where it lists

2   existing Schedule 65?

3       A.   Yes.

4       Q.   Okay.  And it says that the equipment from

5   Schedule 65, or at least some of it, will terminate on

6   10/31 of '01 and move onto Schedule 93 on 11/1 of '01; is

7   that correct?

8       A.   For the equipment that -- for some of the

9   equipment on Schedule 65.  Some of it was accepted onto --

10  I think the top one is Schedule -- is that 93 or 94?

11      Q.   I'll represent to you it's 93 on top of --

12      A.   Okay.  Okay.

13      Q.   So, some of the equipment was moving onto

14  Schedule 93 on October 31st to start on November 1st; is

15  that correct?

16      A.   That's correct.

17      Q.   And then if you look down at the one for 94,

18  which is at the bottom of the page, you see Equipment

19  Schedule 65 there, and some of the equipment from Schedule

20  65 was moving onto Schedule 94; is that correct?

21      A.   That is correct.

22      Q.   Now, if you look at Schedule 64 -- let's go back

23  to the top chart there from 93.  Do you see Equipment

24  Schedule 64 there at the top?

25      A.   Yes.

1      Q.   Now, just like 65, some of the equipment was

2  moving from Schedule 64 onto Schedule 93; is that correct?

3      A.   Correct.

4      Q.   And it was moving on at January 31st, February

5  1st of 2002?

6      A.   Yes.

7      Q.   But the rest of the equipment on Schedule 64, if

8  you look down at the bottom chart, was moving onto

9  Schedule 94; isn't that correct?

10     A.   Yes.

11     Q.   And that moved on October 31st and November 1st

12 of the prior year; isn't that correct?

13     A.   Yes.

14     Q.   So, it would be fair to say, sir, that Equipment

15 Schedule 64 lost some of its equipment onto Schedule 94 in

16 October of '01, continued in force for three or four

17 months with a portion of its equipment, and then lost that

18 equipment to Schedule 93 early next year?

19     A.   Yes.

20     Q.   And Schedule 64 is not the only schedule that did

21 that; is that fair to say?

22     A.   That's correct.

23     Q.   In fact, Schedule 81 right below it did the same

24 thing, did it not, if you compare the two charts?

25     A.   Yes.

1    Q.   The decision about which equipment to roll onto
2   which schedule at what time was a decision -- was not
3   Lycos' decision, was it?

4    A.   I believe it was Lycos' request to split the
5   equipment into two different schedules.

6    Q.   And did you hear that from Mr. Stenberg?

7    A.   Yes.

8    Q.    You never heard that from Lycos directly?

9    A.   I have not talked to Lycos directly.

10   Q.   The decision as to when to roll which equipment
11  onto which schedule was actually based upon your
12  recommendation, wasn't it?

13   A.   Yes, it was.

14   Q.   And that was a recommendation that you made to
15  Mr. Stenberg?

16   A.   Yes, it was.

17            MR. GACIOCH:   Let's go back to 2044, if
18  you would, please, Mr. O'Keefe.

19   Q.   Mr. Cagney, I think we just began discussing this
20  before the Court went into recess yesterday.  Do you
21  recognize Schedule 2044?

22            MR. GACIOCH:   You can pull up the header,
23  if you would, Mr. O'Keefe.

24   A.   I recognize it.

25   Q.   Email from Ms. Thompson to Mr. Stenberg copying

PDF created with pdfFactory trial version www.pdffactory.com

1   you?

2       A.   Yes.

3                 THE COURT:   Excuse me.   Can we do

4   something about that arrow that doesn't appear to belong?

5                 MR. GACIOCH:   If I may approach, your

6   Honor?

7                 I think, Mr. Cagney, if you touch the

8   clear button down there, just touch the screen down there.

9                 THE COURT:   Thank you.

10                MR. GACIOCH:   You're welcome.

11                THE COURT:   I used to be able to do it,

12  but my new screen --

13                THE WITNESS:   I didn't touch it.

14                THE COURT:   You did and you fixed it.

15      Q.   Mr. Cagney, Michelle Thompson worked for you at

16  the time?

17      A.   Yes, she did.

18      Q.   And, as we discussed, I believe, yesterday just

19  before we went into recess, this email concerns an early

20  version of Ms. Thompson working on the structure of what

21  would become 93 and 94; is that fair?

22      A.   This is a pretty early version of it, yes.

23                MR. GACIOCH:   If we go to Page 3,

24  Mr. O'Keefe.

25      Q.   I believe you told...

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. GACIOCH:  We can blow up the entire
 2   chart, if possible, please.
 3         Q.   Mr. Cagney, I believe you told us yesterday that
 4   this was a chart that you personally prepared; is that
 5   correct?
 6         A.   I did prepare that, yes.
 7         Q.   And this was a summary of at the time you
 8   prepared the chart what was going to be the financial
 9   structure of 93 and 94 from a commission point of view; is
10   that correct?
11         A.   This was my analysis of it, yes.
12         Q.   And so, for example, the margin on Schedule 93 in
13   your analysis was going to be $1.334 million?
14         A.   Yes.
15         Q.   And the margin on Schedule 94 was going to be
16   $6.5 million; is that correct?
17         A.   That was an initial margin and then it was
18   adjusted further down on the page.
19         Q.   It was adjusted further down.
20              So, the combined initial margin for the two that
21   you calculated there was just over $7.8 million?
22         A.   Right, prior to adjustments.
23         Q.   Prior to adjustments.
24              And then there are some adjustments for certain
25   small fees -- or small by the standards of this
```

PDF created with pdfFactory trial version www.pdffactory.com

1  transaction, not probably by yours or mine, and you

2  adjusted that down to -- I believe it's 7.62 million; is

3  that correct.

4      A.   Yes.   Right.   We adjusted for about 200,000 fees.

5      Q.   And then that's the number from which you

6  initially calculated Mr. Stenberg's 26.5 percent

7  commission; is that correct?

8      A.   This was my initial estimate and then ultimately

9  someone else set the margin.

10     Q.   And your initial estimate was that Mr. Stenberg's

11 commission would be just over $2 million?

12     A.   Again, prior to some adjustments that we made

13 later.

14     Q.   Correct.   Now, you mentioned that there was a

15 letter of credit associated with this transaction?

16     A.   Yes.

17     Q.   And CSI had to determine how large a letter of

18 credit to require based upon the structure of the

19 transaction; is that fair?

20     A.   That would be fair.

21     Q.   In fact, I think you just told us that part of

22 what you were doing in putting the transaction together

23 was trying to create a structure that minimized the size

24 of that letter of credit; is that fair?

25     A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

1              MR. GACIOCH:   Can we go to Page 7, please,

2    and let's just enlarge the whole chart, if you would.

3       Q.   I'm flipping to Page 7 of the same exhibit, 2044,

4    Mr. Cagney.   This chart -- if you take a quick look over

5    it.   This chart analyzes the size of the letter of credit

6    amount and what exposure CSI might have over and above

7    that letter of credit; isn't that correct?

8       A.   Yes.   What this would do would be -- if we

9    analyzed the letter of credit amount -- which initially we

10   set the letter of credit at $11 million in total.   Lycos

11   did not want to do $11 million for the term of the lease.

12   So, Lycos requested that we reduce the letter of credit

13   over the term of the lease as payments were made.   So, as

14   you can see, in the third column there, it starts at $11

15   million and ultimately reduces down to $1 million at the

16   very bottom.

17             MR. GACIOCH:   Mr. O'Keefe, drop that down,

18   if you would, please, next column over -- actually, pull

19   the chart back up, but I think Mr. Cagney was referring to

20   this column right here (indicating).

21      Q.   Mr. Cagney, is that the column you were referring

22   to?

23      A.   Yes, it is.

24      Q.   Now, right next to that column, just to the

25   right, do you see a column that says 14487493?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes, I do.

2    Q.    And then next to that there's a column for

3    14487494?

4    A.    Yes.

5    Q.    Now, Column 493 is the rent payments to be

6    received under Schedule 93; is that correct?

7    A.    I believe that's what it was.

8    Q.    And --

9    A.    I did not -- first of all, I just -- just to

10   clarify, I did not prepare this document.

11   Q.    Understood.

12   A.    Okay.

13   Q.    But looking at it now -- you would understand if

14   you were looking at it now that 14487493 is a reference to

15   Schedule 93 with Lycos, correct?

16   A.    That would make sense, yes.

17   Q.    And 14487494 is for Schedule 94?

18   A.    I believe so, yes.   That makes sense.

19   Q.    And if you look at the columns for those two

20   schedules and you run across to the next column, "Total

21   Cashflow," is it fair to say that the total cashflow

22   column is -- appears to be adding Schedules 93 and 94 rent

23   payments into a total rent payment?

24   A.    Yes.   I mean, I would have to compare the rents

25   to see whether they were accurate versus the contract, but

1  assuming that it is, the -- the column marked "Total

2  Cashflow" looks to be adding Schedule 93 and 94.

3            MR. GACIOCH:  Okay.  Can we go to the next

4  page, Mr. O'Keefe, Page 8, and do the same thing with the

5  whole chart, please.

6      Q.  Mr. Cagney, this is the very next page, which

7  appears to be a very similar chart.  Would you agree it's

8  got many of the same -- similar columns, the letter of

9  credit amount, 93, 94?

10     A.  Yes, it looks similar.

11     Q.  And there's a "Total Cashflow" column under

12  column one that, again, appears to add the rent payments

13  under 93 and 94, along with a pay-off rent adjustment

14  column; does that appear to be the case?  Take a look for

15  a second.

16     A.  It does, but I really do not know what that

17  refers to.

18     Q.  Okay.  Fair enough.

19          Do you see at the top of the page it says,

20  "Principal amount as of 12/1/01"?

21     A.  I do see that.

22     Q.  And that number is a bit over 13 million?

23     A.  Tell me again what column you are looking at.

24     Q.  At the very top of the page, actually above the

25  column letters where Mr. O'Keefe highlighted.  It says 13

PDF created with pdfFactory trial version www.pdffactory.com

1  million?

2       A.   Yes, I do see that.

3       Q.   And that's the same number that appears at the

4  top of the "Beginning Balance" column, right, 13 point --

5       A.   Yes.

6       Q.   Okay.  And there's a note rate over on the top

7  left corner of 2.25 percent; isn't that correct?

8       A.   That is correct.  That is the internal rate that

9  we use to try to analyze the letter of credit.

10      Q.   Mr. Cagney, take a second to look over this chart

11  and let me know if I'm correct to say that in preparing

12  this chart, CSI was breaking down Lycos' total rent

13  payment under 93 and 94 into a component of interest and a

14  component of principal and calculating an ending balance

15  each month; is that fair to say?

16      A.   It's the structure we used.  That's not what we

17  were doing with this analysis.

18      Q.   Well, Mr. Cagney, take a look at the chart.

19  Doesn't each one of the "Total Rent Payment" columns equal

20  a total of "Interest and Principal" for --

21                  MR. KALER:  Objection.  Argumentative.

22                  THE COURT:  No.  He may answer that, if he

23  can.

24      A.   The purpose of the document was at any point in

25  time to compare the letter of credit amount with the

PDF created with pdfFactory trial version www.pdffactory.com

 1   remaining obligation that Lycos paid and if Lycos

 2   defaulted, would the letter of credit cover our remaining

 3   payments.  That was the purpose of the document.

 4      Q.  I understand that, Mr. Cagney, but my question

 5   was:  If you compare the "Total Rent Payment" column under

 6   cashflow with the "Interest and Principal" columns over

 7   here, isn't it correct to say that CSI was breaking Lycos'

 8   total rent payments into a component of interest and a

 9   component of principal?

10                MR. KALER:  Objection.  Argumentative and

11   repetitive.

12                THE COURT:  Well, the witness hasn't

13   answered.

14                MR. KALER:  I thought he had, your Honor.

15                THE COURT:  No.

16      Q.  Take any row you want, Mr. Cagney.

17      A.  We used that format, but, again, it was only in

18   the context of being able to do the analysis comparing

19   letter of credit to remaining obligation on Lycos' part.

20      Q.  Mr. Cagney, is there any column in this chart

21   based -- I understand these are large numbers to add in

22   your head, but is there any column -- row of this chart

23   that it appears that the "Total Rent Payment" column,

24   total cashflow, does not equal the sum of principal and

25   interest on the further right-hand side of the chart?

PDF created with pdfFactory trial version www.pdffactory.com

1   Take a look down each row, if you need to.

2        A.   (Examining.)

3                     THE COURT:  Well --

4        A.   No --

5                     THE COURT:  I don't know if the question

6   -- it's not the sum of.  You have interest, less principal

7   and you end up with total cashflow, I think.

8                     MR. GACIOCH:  That's correct, your Honor.

9   If you add interest and principal, sometimes they're

10  negative numbers.

11                    THE COURT:  Oh, I see what you're saying.

12  Okay.

13       Q.   But if you add those numbers, positive or

14  negative, Mr. Cagney, would you agree that they equal

15  total cashflow?

16       A.   It looks that way, yes.

17                    MR. GACIOCH:  And, Mr. O'Keefe, can we go

18  back to Page 7, please, and bring up that chart.

19       Q.   This is the chart that we just looked at,

20  Mr. Cagney, on Page 7?

21       A.   Yes.

22       Q.   Correct?

23       A.   Yes, it is.

24       Q.   And this chart also has a -- breaks the total

25  cashflow amount in this column here that we've identified

PDF created with pdfFactory trial version www.pdffactory.com

1  as the total rent paid under 93 and 94, into a component

2  of interest and a component of principal, doesn't it?

3      A.   It does do that, but, again, it was only in the

4  matter of comparing the letter of credit to what Lycos

5  would owe at any point in time in the lease.

6      Q.   Fair enough.

7          Now, Mr. Cagney, you have no opinion as to

8  whether the Schedule 93 and 94 transaction represented a

9  good business deal for Lycos; is that fair?

10     A.   I don't know that that's fair.  There were --

11 Lycos had reasons to do the transaction.  CSI had reasons

12 to do the transaction.

13     Q.   Mr. Cagney, during your deposition didn't

14 Mr. Bean ask you if you have any opinion as to whether it

15 represented a good business deal for Lycos?

16     A.   It's possible.

17              MR. GACIOCH:   261325, please.

18              (The following is from a videotape:

19              "Q.  Now, when you said the contracts were

20          very interesting, you were referring to..."

21              (Videotape stopped.)

22     Q.   Mr. Cagney, we'll find that in a second.

23          You don't ever question or ask yourself whether a

24 deal that a CSI account executive tells you a customer

25 wants to do makes sense for the customer; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

1          A.   Generally, no.

2          Q.   Had you not needed to fulfill Mr. Stenberg's

3    request for $5 million of margin on the Schedules 93 and

4    94, you could have structured that transaction

5    differently, couldn't you?

6          A.   Yes, I could have structured the transaction a

7    number of different ways.

8          Q.   You could have done -- had you not needed to fill

9    that request for $5 million of margin, you could have done

10   so in a way that made the net present value of Lycos'

11   payments lower, couldn't you?

12         A.   Yes, I could have.

13         Q.   Could you have done so in a way that made Lycos'

14   monthly rent payments lower, couldn't you?

15         A.   I could have done that, yes.

16         Q.   You could have done so in a way that would have

17   saved Lycos quite a bit of money relative to what it ended

18   up paying, couldn't you?

19         A.   I could have done that, but then CSI would have

20   made less gross profit.

21         Q.   Let's talk about the --

22                   THE COURT:   Excuse me.   How much more do

23   you have?

24                   MR. GACIOCH:   Probably about five minutes,

25   your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  We'll wait.

2      Q.  Mr. Cagney, in the fall of 2002, Mr. Stenberg

3  obtained a threshold for selling to Lycos all of the

4  equipment that Lycos was already leasing; isn't that

5  correct?

6      A.  That is correct.

7              MR. GACIOCH:  And pull up Exhibit 2047,

8  please, Mr. O'Keefe, and this is going to be on the

9  screen, if you would.

10     Q.  Mr. Cagney, I'm showing you 2047.  I realize this

11 is very difficult to read on the screen because of the

12 grayed-out portion.  So, would you like to have a hard

13 copy?  Would that make it easier?

14     A.  No, that's okay.

15     Q.  Okay.  If it turns out that you would, just let

16 me know.

17     A.  Right.  Okay.

18     Q.  Do you recognize Exhibit 2047 as an email from

19 Michelle Thompson to Paul Stenberg in October of 2002?

20     A.  Yes, I do.

21     Q.  And it copies you?

22     A.  Yes.

23     Q.  And Ms. Thompson is telling Mr. Stenberg that the

24 threshold to turn these leases, the leases that are listed

25 below, into one dollar purchase option leases is $350,000;

PDF created with pdfFactory trial version www.pdffactory.com

1   is that correct?

2        A.   I think that's actually the leases above, but

3   very similar.  I think there is one extra lease up there.

4        Q.   Okay.  The leases that are listed in the subject

5   line?

6        A.   Correct.

7        Q.   And do you understand those to be the existing

8   Lycos schedules at that time?

9        A.   Yes.

10        Q.   So, Mr. Stenberg was authorized to sell all that

11   equipment to Lycos for $350,000; is that correct?

12        A.   He was authorized to turn -- that was his

13   threshold to --

14        Q.   I'm sorry, I cut you off.  Go ahead.

15        A.   That was his threshold if he wanted to amend

16   those leases to have a one dollar purchase option.

17        Q.   So, what that means, as you told us yesterday,

18   was Mr. Stenberg was thereby authorized to add a one

19   dollar purchase option for $350,000 or any amount above

20   that; is that correct?

21        A.   That was his threshold, yes.

22        Q.   So, it is correct that he was authorized to do

23   that for $350,000?

24        A.   It would have passed my approval, but I do not

25   sign the contracts.  So --

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   But you authorized the business terms of the
2  transaction?
3    A.   I do, but there are still -- at the time Bill
4  Gillula signed the contracts and he the ultimately had the
5  final say on whether he would allow the deal or not.
6    Q.   Mr. Cagney, are you aware of any time that you
7  authorized a threshold and Mr. Gillula did not authorize
8  the deal?
9    A.   I am not.
10             MR. GACIOCH:   Can we go to...
11   Q.   CSI had already recovered its equity investment
12 in most of the equipment at that point through the 93 and
13 94 transaction; is that correct, assuming all payments
14 were made?
15   A.   Assuming all -- assuming they made all the
16 payments on 93 and 94 -- why don't you rephrase your
17 question with regards to what schedules.
18   Q.   I would be happy to.
19             The vast majority of the equipment that CSI was
20 leasing to Lycos at that time was being leased under
21 Schedules 93 and 94; is that fair?
22   A.   Most of the equipment, yes.  We had entered into
23 a couple of other schedules, yes.
24   Q.   Those are the ones, I believe, that were listed
25 on the email?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.   Yes.

2    Q.   And with respect to the equipment on Schedules 93

3  and 94, the transaction that created those schedules had

4  recovered CSI's equity investment, again, assuming all

5  rental payments were made to the end of the term?

6    A.   Assuming they continued to make payments under 93

7  and 94, we would have recovered our equity investment.

8              MR. GACIOCH:  Can I have 2049, please.

9    Q.   Mr. Cagney, do you recognize Exhibit 2049 as a

10 CSI buy/sell exchange worksheet?

11   A.   Right.  We would refer to that as a, "Request for

12 contract," but, yes.

13   Q.   Okay.  And this is from Mr. Stenberg?

14   A.   Yes.

15   Q.   And he has checked "sell" there at the top of the

16 page; isn't that correct?

17   A.   Yes.

18              MR. GACIOCH:  And, your Honor, I've gone a

19 little bit longer, I believe, than I told your Honor.  So,

20 if you need me to stop to take a break at some point.

21              THE COURT:  Thank you.

22   Q.   And you see the contract price that Mr. Stenberg

23 is proposing, Mr. Cagney?

24   A.   I see what he was proposing at the time, yes.

25   Q.   And what was that contract price that Mr. O'Keefe

 1    just highlighted?

 2         A.   Looks like 4,669,000.

 3         Q.   And down below he lists a sales/buy price of

 4    4.691 million; isn't that correct?

 5         A.   Yes.

 6         Q.   And we've already said his threshold was

 7    $350,000?

 8         A.   Yes.

 9         Q.   So, the margin on that deal if it had gone

10    through at that price would have been -- where it says

11    estimated margin, $4.3 million; is that correct?

12         A.   Had it happened at that price, yes.  Ultimately

13    the price came down quite a bit.

14         Q.   In other words, Mr. Stenberg was at that point

15    proposing to offer the equipment at about 13 times his

16    threshold; is that correct?

17         A.   I'll trust your math on that, but, yes.

18         Q.   CSI ultimately sold the equipment to Lycos for

19    3.775 million; isn't that correct?

20         A.   My recollection is, yes.

21         Q.   Which was more than ten times Mr. Stenberg's

22    $350,000 threshold; isn't that correct?

23         A.   Sounds about right.

24         Q.   Mr. Stenberg made his percentage commission on

25    the entire difference between the $350,000 and 3.775

PDF created with pdfFactory trial version www.pdffactory.com

1  million, didn't he?

2      A.  Yes.

3              MR. GACIOCH:  Thank you, your Honor.  I

4  have no further questions.

5              THE COURT:  We'll stretch.

6              (Stretch break.)

7              THE COURT:  Mr. Kaler, you may cross-

8  examine.

9              MR. KALER:  Thank you, your Honor.

10                 **CROSS-EXAMINATION**

11 BY MR. KALER:

12     Q.  Mr. Cagney, is the threshold level that you were

13 asked about on direct examination -- is the threshold

14 level the point at which CSI actually starts to make money

15 on a net basis?

16     A.  No, not on a net basis.  It's really the point --

17 the dollar amount that we hope to start earning some gross

18 profit.

19     Q.  And what percent of gross profit actually becomes

20 net profit or was becoming net profit to CSI in those

21 years?

22     A.  Historically, I believe, the -- our pre-tax

23 income is like 10 or 15 percent of gross profit.

24     Q.  So, if gross profit was 5 million, you're talking

25 500,000 of net profit?

PDF created with pdfFactory trial version www.pdffactory.com

1        A.    Something in that range, yes.

2        Q.    And if the salesperson only sells at threshold or

3   just above threshold, is the company likely to make a net

4   profit?

5        A.    No.

6        Q.    Are there transactions that you encountered at

7   CSI where the company lost money on a net basis, even

8   though the gross margin was above threshold?

9        A.    I mean, there are -- we have lost money on

10  transactions, yes.

11       Q.    The schedule that you were asked about, 93 and

12  94 --

13       A.    Yes.

14            MR. KALER:  If we could put up Exhibit 55

15  and just blow up the half bottom.

16       Q.    Were you aware at the time those contracts were

17  signed, that Lycos' chief financial officer, Mr. Lucy, was

18  a Certified Public Accountant?

19       A.    I was not aware at the time, but --

20            MR. GACIOCH:  Objection, your Honor.  Move

21  to strike.  Mr. Kaler is testifying.  The witness has said

22  he has no personal knowledge.

23            MR. KALER:  I asked if he was aware.

24       Q.    Did you have any contact with him?

25       A.    At some point in time I did talk to Brian, yes.

PDF created with pdfFactory trial version www.pdffactory.com

 1      Q.   And what was the occasion of your conversation

 2  with him?

 3      A.   I believe it was when they were talking to

 4  LeaseForum and he wanted some clarification on some of the

 5  leases.

 6      Q.   Okay.  That was later on?

 7      A.   That was way later, yes.  Not during this time

 8  frame, no.

 9      Q.   All right.  Let's look at Schedules 93 and 94.

10          You testified on direct examination that part of

11  what you were doing was reducing Lycos' monthly rent

12  payments from 1.1 million down to, I think you said, about

13  830,000?

14      A.   Almost $1.2 million down to $830,000.

15      Q.   Now, at the time Schedules 93 and 94 were signed,

16  the total acquisition cost of the equipment that CSI had

17  bought was around $43 million, right?

18      A.   I think that's correct, yes.

19      Q.   And at that time in October of 2001, had Lycos

20  yet paid in total to CSI that $43 million back?

21      A.   I don't think so.  There was still a lot of

22  payments left under the existing schedules.  So, I think

23  we were under -- I don't think we recovered the 43 million

24  yet, no.

25      Q.   So, on a cash basis, CSI still had not made its

PDF created with pdfFactory trial version www.pdffactory.com

1  cash back?

2      A.   Correct.

3              MR. GACIOCH:   Objection, your Honor.

4  Leading.

5              THE COURT:   He's entitled to.   He's doing

6  cross, just as you were leading when you were doing

7  cross -- or, rather, Mr. Bean was.

8              MR. GACIOCH:   I understand that, your

9  Honor.   I believe that your Honor had revised your ruling

10 slightly for senior officers of the company who had been

11 prepared by counsel.

12             THE COURT:   No, I didn't make a general

13 ruling.   I will take it piece by piece.   So long as it

14 isn't disruptive and useful, I will allow the leading, but

15 after a while I may not.

16             MR. GACIOCH:   Thank you, your Honor.

17             MR. KALER:   I concede the point and I'll

18 try not to lead as much as I can.

19     Q.   The questions that you were just asked on direct

20 examination about CSI had already covered its residual,

21 assuming all payments were made.   With regard to that

22 assumption about all payments being made, how far into the

23 future were payments supposed to be made under Schedules

24 93 and 94?

25     A.   Well, there were two obligations, one obligation

PDF created with pdfFactory trial version www.pdffactory.com

1  for 24 months, one obligation for 36 months.

2      Q.   And by that do you mean 36 months, in other

3  words, three years after October of '01, the payments

4  still had to be made?

5      A.   Right.   Schedule 93 went 24 months or two years

6  from November 1st of 2001.   Schedule 94 went three years

7  from November 1st of 2001.

8      Q.   At the time that you were working on Schedules 93

9  and 94, did you perceive any risk that Lycos might default

10 on that payments and not make them?

11     A.   Yes, I sure did.

12     Q.   And what was the nature of your assessment of the

13 risk that CSI was taking in entering into these extensions

14 and reducing the amount of money that was coming into CSI

15 by 350,000 a month?

16     A.   Well, the biggest risk, obviously, was the credit

17 risks, that they would not make payments for the full

18 duration of the lease terms.

19     Q.   Now, at this time in the fall of 2001, was Lycos

20 still a freestanding public company whose financial

21 statements you could get easy access to?

22     A.   I don't think so.

23     Q.   Did there come a time when Lycos became part of a

24 larger conglomerate, Terra Networks, and you had

25 difficulty getting financials?

PDF created with pdfFactory trial version www.pdffactory.com

1     A.   Yes.

2     Q.   And what was the impact of that on your ability

3 to assess whether payments that Lycos was making should be

4 reduced on the order of magnitude of $350,000 a month?

5     A.   Well, it made it very difficult.  In the past

6 prior to 93 and 94, we had been able to finance most of

7 the leases that Lycos had wanted us to do, you know, the

8 43 million that you talked about, but it was a struggle.

9 We had to use ten different banks, I think, but going

10 forward, we did not have anybody to finance them.

11     Q.   At the time when Mr. Stenberg approached you

12 about this deal, did he tell you that Lycos wanted to

13 reduce its monthly payments by approximately 350,000?

14     A.   Yes, he did.

15     Q.   And at that time the monthly payments were

16 totaling about 1.1 million a month; is that right?

17     A.   Almost 1.2, yes.

18     Q.   Some of them were made directly to the banks from

19 whom CSI had borrowed money and some were made to CSI?

20     A.   Correct.

21     Q.   And at that time did CSI have loan arrangements

22 with banks pursuant to which it had pledged the

23 preexisting leases as security?

24           MR. GACIOCH:  Objection, your Honor.

25 Mr. Kaler's questions are not only leading, but he's

PDF created with pdfFactory trial version www.pdffactory.com

 1  asking two or three questions at a time.

 2          MR. KALER:  Well, then I'll break it down.

 3     Q.   Prior to the execution of 93 and 94, when you

 4  were working on the deal, had CSI pledged some of the

 5  leases that were being folded into 93 and 94 to banks as

 6  security for loans?

 7     A.   We would finance the leases with banks and --

 8  based on Lycos' credit and the equipment as collateral.

 9     Q.   And was any portion of the $1.1 million a month

10  that Lycos was paying at that point being, in turn, paid

11  to banks or even in some cases paid directly to banks?

12     A.   Yes.

13     Q.   And as part of this transaction, which you've

14  described as complex and convoluted from CSI's standpoint,

15  what did you have to do with respect to restructuring the

16  loan agreements that CSI had with its banks in order to

17  get them to agree to do the extension that Lycos wanted?

18     A.   There's at least ten of the schedules that we

19  actually had to pay the banks off.

20     Q.   Pay them off in what sense?

21     A.   We had to -- because they were -- we were

22  reducing the rents on some schedules all the way down to

23  zero, as part of 94, we had to pay off -- I don't know --

24  $3.5 million, $4 million to the banks in order to get them

25  to release their obligation on that.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1        Q.   And as part of the structuring of the
 2   transaction, did you pretty much handle all of the
 3   negotiations with the banks to get them to agree to do
 4   that for CSI so that CSI could turn around and reduce
 5   Lycos' --
 6                   MR. GACIOCH:  Objection, your Honor.
 7                   THE COURT:  Can we have a simple question,
 8   please?
 9                   MR. KALER:  Okay.
10        Q.   Did you handle pretty much the negotiations with
11   the banks?
12        A.   Personally I did not.
13        Q.   And who handled that at CSI?
14        A.   Probably Eric Ausubel would have been the guy who
15   dealt with the banks.
16        Q.   Now, from the standpoint of the structuring of
17   the transaction, were there some equipment schedules that
18   had been pledged to banks and others that had not been?
19        A.   I believe that, yes, there were some that were
20   pledged to banks and some that we had not yet financed.
21        Q.   And this goal of reducing from 1.1 million to
22   850,000 per month, did you have any understanding from
23   Mr. Stenberg as to how much, in addition to that reduction
24   of rent, Lycos wanted to extend out its period of use of
25   the equipment?
```

PDF created with pdfFactory trial version www.pdffactory.com

 1                    MR. GACIOCH:  Objection, your Honor.

 2    Again, compound question.

 3                    THE COURT:  Can we just have simple

 4    questions without preambles, please?

 5                    MR. KALER:  Yes, your Honor.

 6                    THE COURT:  Thank you.

 7       Q.   Did Mr. Stenberg tell you how much longer Lycos

 8    wanted to use the equipment?

 9                    MR. GACIOCH:  Objection, your Honor.

10    Hearsay.

11                    THE COURT:  No, I think it's not being

12    offered for the truth of it.  It's being offered for what

13    he understood, and for that it is not hearsay.

14                    MR. GACIOCH:  May we have a limiting

15    instruction, your Honor?

16                    THE COURT:  The jury understands that.  I

17    explained it to them in great detail.

18                    MR. GACIOCH:  Thank you.

19       A.   Paul had specifically requested that the

20    equipment on all the existing schedules be split into a

21    24-month lease and 36-month lease, and we did that.

22       Q.   Do you recall him telling you that Lycos had

23    asked for that split?

24       A.   I do not recall.

25       Q.   From the standpoint of the customer, Lycos, if we

PDF created with pdfFactory trial version www.pdffactory.com

1    could look at Exhibit 2044 which you were shown on direct,

2    and if we could turn to the page of that exhibit which is,

3    actually, the second-to-last page.  Do you recognize...

4              MR. KALER:  Can we blow up that page.

5        Q.   Do you recognize the printed portion of the page

6    and, I suppose, the handwritten portion?

7        A.   Yes.

8        Q.   You were shown it on direct.

9        A.   Yes, I do.

10       Q.   And those are notes and a print-out analysis that

11   you did?

12       A.   Yes, they are.

13       Q.   And what were you depicting in the typewritten

14   portion of the analysis?

15       A.   In the typewritten portion, basically, there were

16   a few different columns, but the first column is just the

17   original schedule number, the second column is the

18   expiration date or termination date of that original

19   schedule.  Then we have the break-out, as I just

20   mentioned, between the equipment that would go onto the

21   two-year lease and the equipment that would go onto the

22   three-year lease.

23       Q.   Now, the three-year lease that we just

24   highlighted, it's referred to as "non-PC."  What types of

25   categories of computer equipment are we talking about

PDF created with pdfFactory trial version www.pdffactory.com

1   there?

2        A.   Mostly servers and networking equipment.

3        Q.   And, as I think you pointed out, most of Lycos'

4   portfolio of leases was incorporated into 93 and 94 at

5   this time, right?

6        A.   Yes.

7        Q.   The effect from the customer's standpoint...

8                   MR. KALER:  Can we put up the

9   demonstrative which we provided to everybody.

10       Q.   Is this a document that will help you explain

11  what the effect of the transaction on Lycos was?

12       A.   Yes.

13       Q.   The document has a column, first column, "Number

14  of old schedules that were extended."  Can you tell us

15  what that depicts?

16       A.   That represents, strictly speaking, the number of

17  original schedules -- and I think the total is 31 -- and

18  that were schedules involved with renewing under Schedule

19  93 and 94.

20       Q.   And the next column, "Number of extra months of

21  use" has a sub-column, "Schedule 94, servers and

22  networking," and then a Schedule 93 column.  What do the

23  numbers in those columns represent?

24       A.   Those numbers in the second and third column

25  there are the number of months by which their use of

PDF created with pdfFactory trial version www.pdffactory.com

1   equipment was extended.  So, for example, in the first

2   schedule, from -- again, everything started November 1st

3   of 2001.  They now have 37 months -- actually, that's

4   probably not a good example because that lease had already

5   terminated one month early, but that was the number of

6   extra months that they got on either the 36-month schedule

7   or the 24-month schedule.

8       Q.  And you've listed there nine schedules that

9   extended out an additional 25 months for the servers and

10  an additional 13 months for the PCs; is that right?

11      A.  That is correct.

12      Q.  And then is the same rule -- can we apply the

13  same rule of interpretation that four schedules consisted

14  of servers that were being extended out for another almost

15  two years of use on the servers and ten months on the PCs,

16  and so on?

17      A.  Correct.

18      Q.  And did that mean that the equipment, if it came

19  back to CSI at all, would not come back until anywhere

20  from between one to three years later?

21      A.  Not exactly.

22      Q.  What did it mean?

23      A.  What it meant was Schedule 93, the equipment

24  would be coming back two years later.  Schedule 94, three

25  years later.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And at the bottom of the page, can you tell us

2  what the original rent versus new rent and the rent

3  reduction numbers mean?

4    A.   The original rent was the total rent of all the

5  31 schedules before we did 93 and 94.  The new rent was

6  Lycos' total rental obligation once 93 and 94 were

7  executed, and that reduction then was about $360,000,

8  which was about a 30 percent reduction.

9    Q.   And at this time, then, was essentially equipment

10  with an acquisition cost of about $40 million, give or

11  take, being extended for use by Lycos for another two to

12  three years?

13    A.   Yes, they had more use of the equipment for the

14  term shown here.

15    Q.   And did you achieve the rent reduction that

16  Mr. Stenberg had told you the customer wanted on a per

17  month basis?

18             THE COURT:  He just told us $361,817 a

19  month.

20             THE WITNESS:  Right.

21    Q.   Now, you were asked about the letter of credit.

22  The preexisting schedules -- had CSI required Lycos to

23  post a letter of credit to secure its payments under those

24  leases?

25    A.   Not on the original schedules, no.

PDF created with pdfFactory trial version www.pdffactory.com

1        Q.   And under those original schedules, then, was

2    there a payment stream in the future that CSI was looking

3    to Lycos to make, but on an unsecured basis, except for

4    the leases?

5                    MR. GACIOCH:  Objection.

6                    THE COURT:  I don't understand that.

7        Q.   Was there a payment stream under the original

8    lease?

9        A.   There was a payment stream, some of which was

10   financed, some of which was not.

11       Q.   Was there any letter of credit, that is to say a

12   guarantee by a bank, in place as you were putting together

13   93 and 94 to secure those payments?

14       A.   Not a letter of creditor, no.

15       Q.   Had the banks that had loaned CSI money agreed to

16   do so without Lycos posting a letter of credit?

17       A.   No.  I mean, in the past, yes, but in the future,

18   no.

19       Q.   In the future, no?

20       A.   Right.

21       Q.   Was the intent of the letter of credit to cover

22   the aggregate additional obligation that Lycos was

23   undertaking?

24       A.   That was the intent, yes.

25       Q.   And the amount of the letter of credit, the $11

PDF created with pdfFactory trial version www.pdffactory.com

 1  million, did Lycos ultimately issue a letter of credit for

 2  approximately that additional amount?

 3      A.   Yes, they did.

 4      Q.   And did CSI actually have any negotiations with

 5  Lycos at the time you were working on this extension

 6  concerning the posting of the letter of credit?

 7                MR. GACIOCH:  Objection, your Honor.  Lack

 8  of personal knowledge.

 9                THE COURT:  Well, if he knows of his

10  personal knowledge, he can tell us.  If you don't, then

11  tell us you don't know.

12                Personal knowledge means that you know it

13  by virtue of having participated in the discussions or

14  observed something, but not what you know because somebody

15  told you.

16                THE WITNESS:  Okay.

17      A.   Well, at the time Don Pratt worked for me and I

18  knew that the original -- what I had requested -- what I

19  had requested was a straight $11 million letter of credit.

20  I know that Lycos asked for that not to be constant and

21  they wanted to drop the letter of credit over the term of

22  the leases.

23                THE COURT:  But you know that because

24  Lycos told you or because Mr. -- whatever his name was

25  told you?

PDF created with pdfFactory trial version www.pdffactory.com

 1                     THE WITNESS:   Because Don Pratt, who

 2   worked for me, told me that they had requested.

 3                     MR. GACIOCH:   Move to strike.

 4                     THE COURT:   So, the second part is

 5   hearsay.

 6        Q.   And you were asked on direct examination whether

 7   at some point in the discussions there was information

 8   provided by CSI to Lycos concerning what payments had to

 9   be made to who and when under 93 and 94?

10        A.   I think I was asked that, yes.

11        Q.   And if you look at Exhibit 87A, which is in

12   evidence.

13                     MR. KALER:   And blow up the top portion of

14   it and particularly -- actually, go to the second page and

15   blow up, if you can, the top quadrant.

16        Q.   Did you become aware at some point that your -- a

17   person in your department, Mr. Pratt, had forwarded a

18   spreadsheet to Mr. Stenberg to give to Lycos detailing --

19   if we can scan across the right -- all the payments that

20   were going to have to be made under Schedules 93 and 94

21   over the next two or three years and who they should be

22   made to?

23                     MR. GACIOCH:   Objection.   This is hearsay.

24                     THE COURT:   The question is whether he was

25   aware that Mr. Pratt prepared and sent this to Lycos?

1          MR. KALER:  Yes.

2          THE COURT:  What is the purpose of the --

3  I mean, what does it prove that he is aware or is not

4  aware?

5          MR. KALER:  Because he was the top --

6          THE COURT:  You're really trying to prove

7  that this was given to Lycos, not that he was aware of it,

8  right?

9          MR. KALER:  Well, no, I don't think

10 there's any dispute about it being given to Lycos, but the

11 suggestion was made that Schedules 93 and 94 were too

12 confusing to read as to where the payments needed to be

13 made.

14         THE COURT:  Well, I know, but his

15 awareness doesn't clarify that confusion, does it?

16         MR. KALER:  Well, I don't think there's a

17 dispute that it was sent and I was trying to respond to

18 the point that -- by pointing out that he was aware that

19 information was provided to Lycos of this nature telling

20 him who --

21         THE COURT:  Yes, but what you're really

22 trying to prove was that Lycos wasn't confused or was

23 given clarification.  And Mr. Cagney's acknowledge or

24 awareness of that is irrelevant, is it not?

25         MR. KALER:  I suppose one could argue

PDF created with pdfFactory trial version www.pdffactory.com

1  that.

2              THE COURT:  All right.

3              MR. GACIOCH:  Thank you, your Honor.

4      Q.  In any event, in the course of structuring the

5  transaction, the period of -- were you doing various

6  analyses of the transaction to determine its financial --

7  what financial impact it would have on CSI?

8      A.  I was involved in setting the threshold, setting

9  the structure, and then doing the margin analysis, yes.

10     Q.  And was the letter of credit that Lycos -- did

11 CSI ultimately agree -- did you agree to have the letter

12 of credit be a declining letter of credit, that as they

13 made payments in the future, the letter of credit amount

14 that they would have to post would reduce?

15     A.  Yes, CSI agreed to a declining letter of credit.

16     Q.  Did you have any understanding at the time you

17 were doing your assessment of the financial implications

18 of the transaction, as to whether Lycos was doing any

19 analyses on its end as to the financial implications of

20 the transaction to Lycos?

21              MR. GACIOCH:  Objection, your Honor, based

22 upon hearsay.

23              THE COURT:  I don't know that yet.  You

24 know, we don't have to object to everything.

25              MR. GACIOCH:  Okay, your Honor.

1    A.   What I know is that similar to your question or

2 two ago, I was asked -- well, who are -- about who are

3 they paying.  I did not do an analysis of exactly who they

4 were paying, but I broke out the schedules by are they

5 paying the bank, are they paying by CSI, and there's an

6 email to that effect.  So, I knew that there were some

7 discussions regarding clarification of the structure,

8 okay?

9         And that I also know that when we sent out the

10 contract in October, we did not sign it until December,

11 because we were waiting for all the letter of credit

12 issues to be resolved.

13    Q.   And did there come a time in December when Lycos

14 did actually have its bank issue a letter of credit for an

15 additional $11 million?

16    A.   Yes, they finally did.

17    Q.   And was CSI's agreement, as you understood it, on

18 Schedules 93 and 94 conditioned on getting that letter of

19 credit?

20    A.   Yes.  The contracts are very clear that both 93

21 and 94 are conditioned upon getting the $11 million letter

22 of credit.

23    Q.   Why did CSI require that?

24    A.   Because we needed that as security, if you want

25 to call, in case Lycos stopped paying.

PDF created with pdfFactory trial version www.pdffactory.com

1      Q.   Did CSI honor its commitments in Schedules 93 and

2   94?

3      A.   I think so, yes.

4      Q.   You were also asked about the sale transaction in

5   the summer of 2003 and, in particular, you were asked

6   about the amount of the margin that was reflected on a

7   document -- or, actually, you were asked about the

8   threshold, I think, in the summer of 2003?

9      A.   Correct.

10     Q.   And the point was made that the threshold was --

11               THE COURT:  What's the question?

12     Q.   Was that threshold of 350,000 on the sale --

13   again, was that the point at which CSI would break even

14   from a net profit standpoint on the transaction?

15     A.   No.  That was a recovery of a residual value.

16   So, that price, if we quoted 350,000, would have been the

17   price at which we would start to make gross profit, not

18   net profit.

19               MR. KALER:  Nothing further.

20               THE COURT:  Any redirect?

21               MR. GACIOCH:  Very briefly, your Honor.

22                    **REDIRECT EXAMINATION**

23   BY MR. GACIOCH:

24     Q.   Mr. Cagney...

25               MR. GACIOCH:  May I proceed, your Honor?

 1          THE COURT:  Yes.

 2     Q.   Mr. Cagney, I would like to go back to

 3 Mr. Kaler's demonstrative that you and he discussed.

 4          MR. GACIOCH:  And, actually, we don't have

 5 it electronically.  Steve, would you mind bringing it up?

 6     Q.   Now, Mr. Cagney, as you discussed with Mr. Kaler,

 7 the demonstrative here shows the number of extra months

 8 that Lycos was to receive use of certain equipment,

 9 correct?

10     A.   Yes.

11     Q.   And it shows the rent reduction down at the

12 bottom; isn't that correct?

13     A.   Yes, it does.

14     Q.   Does this demonstrative show the increase in

15 present value of payments that Lycos was to make under 93

16 and 94?

17     A.   It does not.

18     Q.   How big was that increase in present value,

19 total?

20     A.   I don't know the exact number.

21     Q.   Ballpark figure.

22     A.   We were hoping to make $5 million of gross

23 profit.  So, I think it was a little bit more than that.

24     Q.   That doesn't appear on this demonstrative, does

25 it?

1        A.    It does not, no.

2        Q.    Doesn't it appear on -- I'll withdraw that.

3        A.    Again, that would be -- that's what we earned on

4   the deal.  That's the price on the deal.

5        Q.    That's the price on the deal from CSI's

6   perspective?

7        A.    Correct.

8        Q.    Now, you discussed at some length with Mr. Kaler

9   about the risk that Lycos might not make payments under 93

10  and 94; is that --

11       A.    Correct.

12       Q.    That's one of the reasons why you pursued the

13  letter of credit?

14       A.    Yes.

15       Q.    Lycos posted the letter of credit, did it not?

16       A.    Yes, they did.

17       Q.    Meaning, that had Lycos not paid a payment, CSI

18  had the right to draw directly from that letter of credit?

19       A.    Yes.

20       Q.    Lycos made every payment due under 93 and 94,

21  didn't they?

22       A.    I do not know that.

23       Q.    Do you have any reason to believe it didn't?

24       A.    I'm not sure.  I do not know, really.

25       Q.    You've never received any information that Lycos

PDF created with pdfFactory trial version www.pdffactory.com

1  did not?

2      A.   No.

3              MR. GACIOCH:   And, lastly, if we can go

4  back to 2044, please.

5      Q.   Mr. Cagney, I'm going to show you again Exhibit

6  2044 that was what you and I discussed and I think what

7  you and Mr. Kaler discussed.

8              MR. GACIOCH:   If we could go to page --

9  two, three, four, five -- the sixth page, please.  That's

10 the one right there, and enlarge the whole thing, if you

11 would.

12     Q.   Mr. Cagney, do you recognize the page of Exhibit

13 2044 that's in front of you?

14     A.   Sort of.  I mean, I saw it at my deposition and

15 at the time I wasn't quite sure what it was.

16     Q.   Okay.  Do you see -- whose handwriting is that,

17 do you know?

18     A.   It is my handwriting.

19     Q.   It's your handwriting.  And you see where on

20 Exhibit 2044 it lists Schedules 93 and 94 over here on the

21 left column?

22     A.   That is correct.

23     Q.   Okay.  And it lists monthly rentals for various

24 schedules; isn't that right?

25     A.   Yes.

1     Q.   And termination dates; isn't that right?

2     A.   Mm-hmm.  Yes.

3     Q.   It also lists the residual value of the equipment

4  on those schedules, does it not, far right column?

5     A.   Yes.

6     Q.   Isn't it true that the residual value of the

7  equipment on 93 and 94 was zero?

8     A.   We did book a zero residual value, yes.

9     Q.   In fact, you booked a zero residual value for the

10  equipment on every outstanding Lycos schedule at that

11  time; isn't that correct?

12     A.   I'm just trying to look at the timing.  I'm not

13  sure that -- whether 100 and 200 had been booked as of

14  that time.

15     Q.   Well, do you see 100 and 200 down here on the

16  left column?

17     A.   Right.

18     Q.   Okay.

19     A.   I'm just saying I'm not sure that we had booked a

20  residual value at that time.

21     Q.   Understood.

22          With the exception of 100 and 200, you booked a

23  residual value of zero on all the other schedules,

24  correct?

25     A.   I believe that's the case, yes.

PDF created with pdfFactory trial version www.pdffactory.com

1      MR. GACIOCH:  I have no further question.

2      THE COURT:  Any recross?

3      **RECROSS-EXAMINATION**

4 BY MR. KALER:

5  Q.  Just are you familiar with CSI's policy on

6 booking residual values in terms of what ranges they use

7 when leases are extended out for this many years?

8  A.  I mean, usually we book a very conservative

9 residual value once we have recovered our investment.

10      MR. KALER:  Thank you.

11      MR. GACIOCH:  Nothing further.

12      THE COURT:  Thank you, Mr. Cagney.  You

13 are excused.  Who is next?

14      (Witness steps down.)

15      MR. BEAN:  Thomas Guilfoile.

16      THE COURT:  We get to stretch.

17      (Stretch break.)

18      LAW CLERK FRIDAY:  Would you, please,

19 remain standing, sir, and raise your right hand.

20      THOMAS E. GUILFOILE, SWORN.

21      LAW CLERK FRIDAY:  Thank you.  Please be

22 seated.

23      If you could state your full name for the

24 record, spelling your last name.

25      MR. GUILFOILE:  Thomas Edward Guilfoile,

1  G-u-i-l-f-o-i-l-e.

2                   THE COURT:  You may proceed.

3                   MR. BEAN:  Thank you, your Honor.

4                   **DIRECT EXAMINATION**

5  BY MR. BEAN:

6      Q.   Good morning, Mr. Guilfoile.

7      A.   Good morning.

8      Q.   Mr. Guilfoile, are you familiar with the company

9  known as Lycos?

10     A.   Yes, I am.

11     Q.   And how are you familiar with it?

12     A.   I was employed there from 1996 until 2001.

13     Q.   When you joined Lycos in 1996, how old were you?

14     A.   I was 32 years old.

15     Q.   What positions did you have at Lycos between 1996

16  and 2001?

17     A.   I was hired there as the controller in February

18  of 1996, and I became the vice-president of finance and

19  administration in December of 1996, and then after the

20  merger with Terra, I became the senior vice-president of

21  strategic planning and mergers and acquisitions.

22     Q.   What background or qualifications did you have at

23  the time to serve in those positions?

24     A.   Prior to joining Lycos, I was a public accountant

25  with the firm of Ernst & Whinney, which later became Ernst

PDF created with pdfFactory trial version www.pdffactory.com

1    & Young.

2       Q.   What were your duties as vice-president for

3    administration and finance?

4       A.   I was responsible for the day-to-day financial

5    operation of the company, everything which would have

6    included the accounting, certain relations, public

7    reporting, budgeting and forecasting, purchasing, which

8    would have included equipment purchasing and the leasing

9    of that equipment.

10      Q.   Did you have -- what role, if any, did you have

11   in the management of Lycos' cash?

12      A.   I was also responsible for management of our

13   cash, the treasury of our organization.  So, investing the

14   cash, the disbursement of the cash, collections, things of

15   that nature.

16      Q.   Do you have an understanding of the amount of

17   cash that Lycos had during the period from 1996 through

18   2001?

19      A.   Yes.  Since the company's public offering in

20   April of 1996, it had at various times several hundred

21   millions of cash.

22      Q.   Do you recall approximately how much cash it had

23   each year from 1996 through 2001?

24      A.   Generally speaking, it had, I think, 150 million

25   or so in 1996, and then we did some subsequent offerings

PDF created with pdfFactory trial version www.pdffactory.com

1  as well in, which case then we had several hundred million

2  more than that, but I don't remember specifically the

3  amounts, no.

4      Q.  When Lycos was bought by Terra in 2000, did it

5  have access to additional cash?

6      A.  It did.  In addition to acquiring Lycos, Terra

7  also contributed about $2 billion into the global Terra

8  Lycos organization.

9      Q.  And did Lycos have access to some of that cash?

10     A.  Yes, it did.

11     Q.  What was your approach to managing Lycos' amounts

12 of cash?

13     A.  Well, we always tried to be fiscally prudent and

14 do what was best for the company in the long term and try

15 and improve shareholder value for the long term.

16     Q.  When you say improve shareholder value for the

17 long term, what do you mean by that?

18     A.  Well, we were a public company.  So, we had

19 public shareholders.  And so, we always were trying to do

20 what was best in driving the value of the company for our

21 shareholders over the long term.

22     Q.  Did you have -- I believe you mentioned you had

23 some responsibility for equipment leasing that fell under

24 you?

25     A.  Yes, I did.

1       Q.   Do you have any day-to-day responsibility for

2   equipment leasing?

3       A.   No, but I oversaw the organization.

4       Q.   Do you recall the names of some of the people who

5   worked for you who had day-to-day responsibility for

6   equipment leasing?

7       A.   Well, it varied at different times, but there

8   were people such as Sam Ziba, Michael Ripps, Brian Lucy,

9   and then there were people within the accounting

10  organization that had various responsibilities, people

11  such as Julie Callagee, Rich Munroe, Kevin Baillie.

12      Q.   Was there a line item in the Lycos budget for

13  equipment leasing?

14      A.   Well, not -- we had a capital budget, of course,

15  but we didn't necessarily have a cash budget for leasing.

16  We had an expense budget overall.

17      Q.   And was leasing one component of that expense

18  budget?

19      A.   Well, certainly.  As I said, we would have a

20  capital additions budget in which we would decide how much

21  equipment the company needed overall and then some of that

22  equipment might have been purchased and amortized and

23  others, it might have been leased and paid for, you know,

24  monthly as a leasing expense.

25      Q.   Did any of the people you mention have

PDF created with pdfFactory trial version www.pdffactory.com

 1  responsibility for managing the entire capital budget

 2  expense line item?

 3      A.   Well we all shared different responsibilities

 4  within the organization, but all of them were responsible

 5  for maintaining the budgeting process.

 6      Q.   Do you recall -- would you have asked any of them

 7  at any time to reduce the equipment leasing expenses?

 8      A.   I would have asked anybody, if it was prudent in

 9  the long term, to reduce our expenses.  Obviously, we

10  would have wanted to do that, but there was no reason to

11  reduce cash, for instance, in the near term because we had

12  plenty of cash, but we wanted to be prudent and reduce our

13  expenses all over, yes.

14      Q.   As vice-president of administration and finance,

15  did you have financial interest in Lycos' success, long-

16  term success?

17      A.   I did.  Actually, I believe nearly all the

18  employees at Lycos had a financial interest in the value

19  of the company.

20      Q.   And when you say, "the value of the company," is

21  that a short-term value or a long-term value or how would

22  you assess that?

23      A.   It would be a long-term value.  Most of the

24  employees received stock options and the stock options

25  vested over a period of years.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   And when you say they "vested over a period of

2   years," what did that -- what does that mean?

3    A.   Well, a stock option is a right to acquire stock

4   at a price determined as the value of the stock on the day

5   it was granted to you, and then you are -- have the right

6   to buy that stock in the future and that right vests or is

7   earned over a period of time.  So, for example, if you had

8   4,000 shares of stock that vested over four years, at the

9   end of each year you would be entitled to buy a thousand

10   shares of stock at that price.

11    Q.   Do you have any financial interest in Lycos

12   today?

13    A.   I do not.

14    Q.   Are you employed there today?

15    A.   No, I'm not.

16    Q.   Do you have any financial interest in the outcome

17   of this litigation?

18    A.   I do not.

19    Q.   Do you have any reason to be here other than to

20   tell the truth?

21    A.   I do not, no.

22    Q.   Prior to joining Lycos, what, if any, experience

23   did you have with equipment leasing?

24    A.   Well, I was an auditor at Ernst & Young and in

25   connection with my duties there, I would review leases of

1  our clients primarily to determine whether they were

2  operating leases or capital leases.

3      Q.   Prior to going to work for Lycos, had you had any

4  experience as a lessor or a lessee of equipment?

5      A.   I did not, no.

6      Q.   Now, could you describe your -- what you did as

7  an auditor as it related to equipment leases.

8      A.   Well, as I said, generally my responsibilities

9  were to periodically test some of the leases of my clients

10 to determine whether they fit the criteria for being

11 recognized as a capital lease or an operating lease.

12     Q.   What is that test or tests, the best you recall?

13     A.   Well, the general difference between a capital

14 lease and an operating lease is that a lease that is

15 categorized as capital lease is recorded on the financial

16 statements differently than an operating lease.

17          In the case of a capital lease, the asset that is

18 being leased is actually treated as if it were purchased

19 and it appears on the balance sheet of the company as both

20 an asset and as a liability for the obligation under the

21 lease agreement.

22          In the case of an operating lease, it actually is

23 treated simply as rent expense and it does not appear on

24 the balance sheet of the company, but it appears through

25 the income statement in the form of rent expense.

PDF created with pdfFactory trial version www.pdffactory.com

1      Q.   What involvement, if any, did you personally --

2  I'm sorry for jumping ahead.

3           Are you familiar with the tests established under

4  the financial accounting rules to determine whether a

5  lease -- or how a lease qualifies for either operating or

6  capital lease treatment?

7      A.   Yes, I am.   There are, really, three main tests

8  to determine whether a lease is a capital lease:

9           One would be if there is a bargain purchase

10 option that allows the company to purchase the equipment

11 at the end of the lease for a nominal amount, say, a

12 dollar or something like that.

13          There's also a test in determining what the

14 present value of the future payments under the lease are.

15 If those future -- the present value of those future

16 payment streams exceed 90 percent of the value of the

17 equipment, then it would classify a capital lease.

18          And then, finally, there is a test relating to

19 the term of the lease.   If the term of the lease exceeds

20 75 percent of the useful life of the asset, then it would

21 require categorization as a capital lease.

22     Q.   What involvement, if any, did you personally have

23 at Lycos in determining whether the equipment leases with

24 CSI qualified for operating or capital lease treatment?

25     A.   I did not perform those tests personally myself.

1      Q.   Do you have a belief as to whether Lycos was

2   required to perform the 90 percent test on each CSI/Lycos

3   equipment schedule during the years that you were serving

4   as vice-president of administration and finance?

5      A.   Well, we were a public company.  So, we were

6   required to have -- present our financial statements to

7   the public and to the SEC.  So, generally speaking, we had

8   a responsibility to report our lease obligations as either

9   capital or operating leases.

10        Again, I did not personally perform those tests,

11   but, generally speaking, one would determine whether or

12   not a lease qualified as a capital or operating lease and

13   once you determine that, each additional equipment

14   schedule that is subject to that lease or falls under the

15   same terms would, generally speaking, be also qualified

16   similarly.

17        So, you wouldn't necessarily have to do it on

18   every single equipment schedule for that lease in its

19   entirety and, also, there's some materiality test as well.

20   If it was not a material obligation, then it wouldn't fit

21   the criteria necessarily.

22      Q.   Do you recall being asked a similar question

23   during your deposition by Mr. Kaler as to whether or not

24   you knew that the 90 percent test was being performed by

25   Lycos?

1          MR. KALER:  Objection.  This is
2  bolstering.  There's no foundation for the question.
3          THE COURT:  I don't know.  At the moment,
4  the question is yes or no.
5          MR. BEAN:  Right.
6     A.  Yes.
7     Q.  And what did you respond -- do you recall your
8  response?
9          THE COURT:  What's the purpose of that, to
10 repeat what he just said or to contradict it?
11         MR. BEAN:  To explain what he said at his
12 deposition.
13         THE COURT:  Why do we need that?  I mean,
14 he can tell us what he means by what he said here.
15    Q.  And do you understand your testimony that you've
16 given this morning, that reflects your view?
17    A.  Yes, I do.
18    Q.  Who on your team, if anyone -- if there were any
19 testing going on to determine whether or not CSI's leases
20 with Lycos were operating or capital leases, who on your
21 team would have been involved with that test?
22    A.  I believe that probably would have fallen under
23 the responsibilities of either Rich Munroe, Julie Callagee
24 or Brian Lucy or Kevin Baillie at various times.
25    Q.  Direct your attention to Exhibit 2245.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. BEAN:  If you could highlight the top,

2   the, "Lycos, Inc. Leases 7/31/99," and highlight the Bates

3   number in the lower right, please.

4      Q.   Do you see this document, Mr. Guilfoile?

5      A.   Yes, I do.

6      Q.   And do you understand that it's a work paper

7   completed by -- was KPMG Lycos' auditors in the late

8   1990s?

9      A.   Yes, it was.

10     Q.   And do you understand this to be a work paper of

11  KPMG?  Is that the way it appears to you?

12     A.   That's what it appears to be, yes.

13         MR. BEAN:  If you could go to -- and if

14  you could highlight the "Summary" at the top, the language

15  under, "Summary."

16     Q.   And this memo concerns a discussion of Lycos'

17  operating leases on its books.  Do you see that?

18     A.   Yes.

19         MR. BEAN:  If you could go to the second

20  page of this document, please, and go to the paragraph --

21  do you see where it says at the top -- if you could

22  highlight the top paragraph under, "Avnet and CSI

23  Computer."

24     Q.   And this is a reference to Lycos leasing computer

25  equipment with Avnet and CSI.  Do you see that?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1        A.   Yes, I do.

 2        Q.   And you see also that the company accounts for

 3   these as operating leases?

 4        A.   Yes.

 5                  MR. BEAN:  And if you could unhighlight

 6   that and now...

 7        Q.   It then explains here the company's rationale for

 8   accounting for the leases as operating leases.  Do you see

 9   that?

10        A.   Yes.

11        Q.   And there are a number of reasons.

12                  MR. BEAN:  If you could highlight No. 4,

13   please, Mr. O'Keefe.

14        Q.   And do you see in the second sentence that -- the

15   first sentence, "In a prior year KPMG had concluded that

16   the present value of Lycos' lease payments were less than

17   90 percent of the equipment cost."  Do you see that?

18        A.   Yes, I do.

19        Q.   And do you also see that per -- Rich Munroe, who

20   was he, sir?

21        A.   He was the accounting manager.

22        Q.   And he advised KPMG that the attributes of the

23   leases in the current year were similar to those in prior

24   years?

25                  MR. KALER:  Objection.  It's hearsay.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    THE COURT:  It's in evidence.

 2                    MR. KALER:  The document doesn't say who

 3    advised who.

 4        Q.  Was it your understanding, in reviewing this

 5    document, that Lycos was not testing its leases after July

 6    31, 1999, because they had been tested in prior years --

 7                    MR. KALER:  Objection.

 8        Q.  -- and found to be operating leases?

 9                    MR. KALER:  Objection.  Leading.

10        Q.  What was your understanding, sir, as to whether

11    Lycos was testing its leases for operating lease treatment

12    after the date of this memo?

13                    MR. KALER:  Objection.  No foundation for

14    personal knowledge.

15                    THE COURT:  No.  If he knows, he can tell

16    us.  If he knows from personal knowledge, he can tell us.

17    If you know it because somebody told it to you, then don't

18    tell us what you know.

19        A.  I don't recall specifically if such tests were

20    performed, no.

21        Q.  At the time of your deposition, had you seen this

22    memo from KPMG?

23        A.  I had not, no.

24                    MR. BEAN:  If you could pull up Exhibit

25    2002, please, and go to Page -- it's PHIL 930.  Would you
```

PDF created with pdfFactory trial version www.pdffactory.com

1  highlight the commitments and contingencies section.

2      Q.   Mr. Guilfoile, what do you understand is included

3  in the commitments and contingencies section footnote in

4  Lycos' annual report?

5      A.   I'm sorry, could you repeat the question?

6      Q.   Sure.  What do you understand is included in the

7  commitments and contingencies section of the footnote --

8  commitments and contingencies footnote in Lycos' financial

9  report?

10              MR. KALER:  Objection.  If it says to his

11  understanding, if he knows what was in it, I have no

12  objection.

13              MR. BEAN:  Right now I'm just asking

14  generally does he know what goes in commitments and

15  contingencies footnote.

16              MR. KALER:  I have no objection to that

17  question.

18      A.   Yes.  As a public company, you're required to

19  schedule out all of your future non-cancellable minimum

20  payments due under your leases over a five-year period and

21  thereafter for -- so, for four years and then the fifth

22  year thereafter and, in addition, you're required to

23  disclose the actual rent expense under those leases as

24  well on an annual basis.

25      Q.   And does this section include both real estate

1  leases as well as equipment leases?

2      A.   It would, yes.  That is the requirement, yes.

3      Q.   Do you have personal knowledge of what the people

4  on your team did to complete this section of the

5  personal -- of the financial statements?

6      A.   I don't.

7                  MR. BEAN:  You can take that down,

8  please.

9      Q.   Once Lycos had confirmed that it had received

10  equipment on a new equipment schedule, would there have

11  been any reason to continue to track the cost of the

12  equipment, the original the cost of the equipment on that

13  schedule?

14                  MR. KALER:  Objection.

15                  THE COURT:  He may tell us whether he did

16  or didn't.

17      A.   If it were an operating lease, there would be no

18  reason to continue --

19                  MR. KALER:  Objection.

20                  THE COURT:  What's the objection?

21                  MR. KALER:  I thought the Court had ruled

22  that he could tell us whether it did or not.

23                  THE COURT:  You know, we are really --

24                  MR. KALER:  I'll withdraw.

25                  THE COURT:  We can have an objection to

 1  every question from both sides and we'll be sitting here

 2  making rulings.

 3                    MR. KALER:  Understood.

 4                    THE COURT:  And it's big like how many

 5  angels can dance on the head of a pin.

 6                    MR. KALER:  I'll withdraw the objection.

 7                    THE COURT:  I wasn't just talking to you,

 8  Mr. Kaler.

 9                    MR. KALER:  I understand.

10                    THE COURT:  It is endemic to this case.

11  You're making me work too hard.

12      Q.   Mr. Guilfoile, you may answer the question.

13      A.   I'm sorry.  Could you repeat the question?

14      Q.   Sure.  If Lycos had determined that its leases

15  with CSI and its other equipment lessors were operating

16  leases or were treating them as operating leases, would

17  there have been any reason for Lycos to keep track of the

18  original cost of the equipment?

19      A.   It wouldn't have been because in that case, the

20  equipment wouldn't have belonged to Lycos.  It would have

21  belonged to the leasing company.

22      Q.   Well, would there be any accounting reason to

23  keep track of the original cost of the equipment?

24      A.   No.

25                    MR. KALER:  Objection.  Calls for an

PDF created with pdfFactory trial version www.pdffactory.com

 1  expert opinion.  There's no foundation.

 2              THE COURT:  I understood him to be an

 3  expert in his capacity.  I mean, he's talking about the

 4  controller and the vice-president of administration and

 5  finance.

 6      Q.  Are you a Certified Public Accountant,

 7  Mr. Guilfoile?

 8      A.  I was formerly.  I no longer am.

 9              THE COURT:  He's not here as a Certified

10  Public Accountant expert, but he is here as the person who

11  knows what Lycos did.  So, in that sense, he may answer.

12      Q.  Was it part of your duties and responsibilities

13  at Lycos to sign equipment schedules that concerned

14  equipment between -- that Lycos leased from the CSI?

15      A.  Yes, it was.

16      Q.  And did you sign some equipment schedules?

17      A.  Yes, I did.

18      Q.  Approximately how many did you sign?

19      A.  I believe it was over 100.

20      Q.  During what period of time did you sign equipment

21  schedules with CSI on Lycos' behalf?

22      A.  I believe I began sometime in 1997 and probably

23  would have continued through into 2000.

24      Q.  What was the process by which schedules were

25  provided to you for signature?

PDF created with pdfFactory trial version www.pdffactory.com

1      A.   Well, generally speaking, we would have a review

2   process so we would -- someone would determine whether or

3   not the equipment had been received, that it was in good

4   working condition, and it had been approved and accepted.

5   They would match it against the invoice and the cost of

6   the equipment, and then someone else would also review the

7   leasing schedule and match those all up and then bring

8   them to me for signature.

9      Q.   When you signed them, were you typically in your

10  office at Lycos in Massachusetts?

11     A.   Typically, yes.

12     Q.   Did you read all the equipment schedules before

13  you signed them?

14     A.   No, not necessarily.  If they had been reviewed

15  by others, I wouldn't have felt a need to --

16     Q.   Why not?

17     A.   -- to read them.

18         I trusted the people who worked for me to have

19  done their job and have made sure that it was appropriate

20  for my signature.  So...

21     Q.   During the period from 1996 to 2001, how hard

22  were you working?

23     A.   I would say very hard.  It was a period of time

24  of explosive growth of the company.  We were -- it wasn't

25  unusual for us to work 20-hour days.  I often just slept

PDF created with pdfFactory trial version www.pdffactory.com

1    on the floor of my office to get a few hours of sleep.

2    Occasionally I would splurge and go to the Motel Six for

3    two or three hours of sleep, but, generally speaking,

4    Monday through Thursday were 18- to 20-hour days and I

5    would go home on Fridays and come back on Monday morning.

6         Q.   Did you personally ever negotiate the terms of

7    any CSI equipment schedule?

8         A.   No, I did not.

9         Q.   Do you know approximately how many of the over

10   100 equipment schedules that you signed were original

11   schedules for the lease of new equipment?

12        A.   I believe roughly 70 of the 100 or so.

13        Q.   And what about the other 30 or 35, what were

14   those?

15        A.   I think they would have been either rolled-up

16   type schedules, in which case we would have taken numerous

17   schedules and rolled them up into a single schedule under

18   a single payment.

19        Q.   Do you have an understanding -- did you have an

20   understanding at the time as to Lycos' purpose in entering

21   into rollups?

22        A.   Yes.  Our purpose was really just to simplify

23   things.  We had -- we were purchasing a lot of equipment

24   and we had a number of disparate schedules and to simplify

25   things, we wanted to bring them all under one single

PDF created with pdfFactory trial version www.pdffactory.com

1   schedule.

2       Q.   What do you mean by, "disparate schedules" and

3   "one single schedule"?

4       A.   A lot of different pieces of equipment purchased

5   at various times that would have had different terms --

6   different ending terms, and such, and just to simplify

7   things, we wanted to get them all together into a simple

8   schedule.

9       Q.   Do you have an understanding of the phrase

10  "present value"?

11      A.   I do, yes.

12      Q.   What do you understand it to mean?

13      A.   Present value is the value of a future stream of

14  payments into today's dollars.

15      Q.   What was your understanding at the time you

16  signed the rollups as to whether the present value of the

17  lease payments on the new schedules would be more, less,

18  or the same as the present value of the rents on the

19  schedules being rolled up?

20              MR. KALER:  Objection.  Lack of

21  foundation.

22              THE COURT:  I don't understand that.

23              MR. KALER:  He has not laid a foundation

24  that this witness even considered that issue or remembers

25  what he considered.

```
 1                    THE COURT:  If he didn't and if he doesn't
 2   know, he'll tell us.
 3                    Did you consider this?
 4                    THE WITNESS:  Yes.  It would -- there
 5   would be no reason for the present value to have changed.
 6   We were simply consolidating schedules into a single
 7   schedule.  So, the present value wouldn't have changed.
 8   Some of the terms may have changed, but not the present
 9   value.
10                    MR. KALER:  I object and move to strike
11   the opinion that there is no reason for present value to
12   change when you're extending a lease two to three years.
13                    THE COURT:  Well, that's his opinion.  I
14   mean, that's his statement.  There's no reason to the
15   strike it.  You may cross-examine on it.
16                    MR. KALER:  I will cross-examine.
17       Q.  Did you have an understanding as to what would
18   happen to the gross amount of the payments if you extended
19   the lease terms?
20       A.  If we extended the terms, the gross payments
21   would have changed and would have gone up.
22       Q.  Why would that be?
23       A.  Because we would be paying out additional
24   interest, obviously, over a longer period of time.
25       Q.  Did anyone ever suggest to you that the present
```

PDF created with pdfFactory trial version www.pdffactory.com

1    value of the payments on a rolled up equipment schedule

2    would be increasing as a result of your consolidating

3    schedules into one?

4        A.   No.

5        Q.   And what was -- can you give an example of what

6    you mean by the present value staying the same?

7        A.   Well, I guess if you had a loan with a bank that

8    you were refinancing --

9            MR. KALER:   Objection, your Honor, to this

10   opinion testimony, giving an analogy that Mr. Bean has

11   been arguing throughout the case.   This witness is both

12   not competent to give the analogy and there's been no

13   foundation for him testifying as a factual matter on these

14   issues.

15           THE COURT:   He's being asked to explain a

16   phenomena that he has described; namely, present value

17   doesn't change, and that's what he's trying to do, as I

18   understand it.

19           MR. BEAN:   Yes, your Honor.

20       A.   Similar to if you had a bank loan that you were

21   refinancing, the interest rate may change or the term of

22   the loan may change, but the principal amount would not

23   change.

24       Q.   What do you mean, the principal amount wouldn't

25   change when you refinance?

1    A.   The original amount of the loan.

2    Q.   Now, did you sign -- do you have an understanding

3    of the term "rewrite"?

4    A.   Yes, I do.

5    Q.   And do you have an understanding that some

6    schedules that you signed simply extended the term --

7    terminated a 24-month schedule and created a new 36-month

8    schedule?

9    A.   Yes, I do.

10   Q.   And did you find that out during the course of

11   this litigation?

12   A.   Yes.

13   Q.   And what was your reaction when you learned that

14   you had signed rewritten equipment schedules?

15              MR. KALER:   Objection, your Honor.   If

16   there's --

17              THE COURT:   No.   The objection is

18   sustained.

19   Q.   Did you have an understanding -- did you ever

20   know at the time you were signing equipment schedules in

21   the late 1990s and into 2000, whether Lycos was rewriting

22   any of its equipment schedules?

23   A.   I didn't -- I don't recall that to be the case,

24   no.

25   Q.   Can you think of a reason that Lycos would enter

PDF created with pdfFactory trial version www.pdffactory.com

1    into a 24-month equipment schedule and shortly thereafter

2    convert it into a 36-month equipment schedule?

3         A.   I can't think of a reason why that would happen,

4    no.

5         Q.   Do you have an understanding of what's meant by

6    the term "interim rent"?

7         A.   Yes, I do.

8         Q.   What do you understand it to be?

9         A.   Well, interim rent is the amount of rent that you

10   -- we would pay between the time that a piece of equipment

11   was delivered and the time that that equipment was

12   actually installed and ready for use.

13        Q.   If one of your -- the people who worked for you,

14   one of the people on your team, had told you that he was

15   recommending that Lycos convert a 24-month schedule into a

16   new 36-month schedule to finance interim rent, what would

17   you have said?

18        A.   I wouldn't know why we would want to do that.

19        Q.   Why is that?

20        A.   Well, there would be no reason to finance --

21   generally interim rent is only a matter of weeks or a

22   couple of months and we didn't have any cash needs

23   particularly that we would need to finance such a short

24   period of time.  So, I don't understand why we would want

25   to -- we would have wanted to do that.

PDF created with pdfFactory trial version www.pdffactory.com

1      Q.   How much cash, again, did you have in this time

2  in 1999?

3                     THE COURT:   No.   We've done that several

4  times.

5                     MR. BEAN:   Thank you.

6      Q.   If you had wanted to refinance on an interim

7  rent, how might you have done that?

8      A.   I'm sorry.   Could you repeat that?

9      Q.   If Lycos had wanted to finance interim rent, how

10  might it have done that?

11      A.   Well, I assume that we would have made that

12  decision at the outset and, you know, financed the entire

13  lease, including interim rent at that time.

14      Q.   And how would that relate to the need to enter

15  into a 24-month schedule and then convert it just a few

16  months later?

17      A.   That wouldn't have been required.

18      Q.   It wouldn't have been required because you would

19  have financed the interim on the initial schedule?

20      A.   Yes, we would have already financed that.

21      Q.   Was reducing rents on its leases with Lycos one

22  of Lycos' business objectives?

23      A.   Well, as I said, we were always trying to be

24  prudent.   If we could save money in the long term, we

25  would have done it, but there was no reason to try to save

PDF created with pdfFactory trial version www.pdffactory.com

1  cash in the near term at the expense of the long term if

2  it didn't have a long-term benefit.

3     Q.   And if one of the people responsible for leasing

4  on a day-to-day basis had suggested to you that Lycos

5  rolled up or rewrite equipment schedules to save monthly

6  rent, what would you have said?

7     A.   Again, unless there was a long-term benefit to

8  saving money, there would have been no reason for us to do

9  it.

10     Q.   And if there had been an increase in the present

11  value of the rents as a result of rolling up or rewriting,

12  would you have done that?

13     A.   No, I would not have.

14     Q.   Isn't it saving money desirable?

15     A.   It is desirable.  As I said, in the long term,

16  it's desirable, but if it cost us more in the long term,

17  then it would not have been prudent for us to do.

18     Q.   Did anyone ever tell you that CSI was including a

19  charge in the Lycos rent every time Lycos entered into a

20  rollup or rewritten equipment schedule?

21              MR. KALER:  Objection.

22              THE COURT:  You may answer.

23     A.   No.

24     Q.   If they had told you, made such a statement that

25  there was a charge for rolling up or rewriting equipment

PDF created with pdfFactory trial version www.pdffactory.com

1  schedules, how would you have responded?

2      A.   Well, you know, if you are refinancing a loan,

3  oftentimes if you can save money in the long term and you

4  wanted to pay a nominal charge to do that, a point or

5  something like that, that might have been possible, but to

6  pay a significant amount of money would not have made

7  sense, no.

8      Q.   Are there terms under which Lycos might have

9  refinanced equipment schedules with CSI?

10     A.   Again, I don't recall specifically having done

11 that, but, again, if there was some nominal charge to pay

12 in order to reduce the interest rate long term, for

13 example, and save money, perhaps we might have done

14 something like that.

15     Q.   Did you ever meet with -- did you ever have a

16 meeting with Paul Stenberg?

17     A.   I recall meeting him on several occasions, yes.

18     Q.   And did you have a -- based on those meetings and

19 your conversations, did you have an opinion as to his

20 understanding of equipment leasing?

21                 MR. KALER:  Objection.

22                 THE COURT:  No, I don't think we'll go

23 there.

24     Q.   Do you have an understanding -- did you have a

25 belief as to what Paul Stenberg's knowledge was of

PDF created with pdfFactory trial version www.pdffactory.com

1  equipment leasing?

2            MR. KALER:  Objection.

3            THE COURT:  Are you objecting to the

4  belief or what?

5            MR. KALER:  I'm objecting to the question

6  on grounds that it, essentially, seeks hearsay through the

7  back door, so to speak.

8            THE COURT:  It's not hearsay.  He may tell

9  us his impression of Mr. Stenberg's knowledge of equipment

10 leasing based on his meeting with Mr. Stenberg.

11     A.   I believed him to be very knowledgeable in the

12 area of equipment leasing.

13     Q.   And what was the basis for that?

14     A.   Well, he worked for a leasing company.  In our

15 discussions, I recall him to appear to be a very

16 intelligent person and I know that my team did a lot of

17 business with him and the majority of our leasing business

18 was done with CSI.  So, I know that they trusted his

19 opinion and his expertise.

20            MR. KALER:  I object and move to strike.

21 There's no foundation for this witness to give testimony

22 as to who treated who, your Honor.

23            THE COURT:  You may have his impression

24 based on his observation.

25     Q.   Do you have an understanding, based on your

1   personal observation, of the relationship between the

2   people on your team who had day-to-day responsibility and

3   Mr. Stenberg?

4       A.   I believe they had a close relationship, yes.

5       Q.   What causes you to believe that?

6       A.   Well, one, by the amount of business we did with

7   CSI.  I know that they trusted him and I know as a result

8   of that work, they met with him on many occasions.

9                MR. KALER:  I object.  Move to strike the

10  expression they "trusted him."

11               THE COURT:  No.  He is telling us what he

12  observed.  The question specifically asked about his

13  observations.

14      Q.   What was your understanding of the knowledge of

15  your -- what experience -- I'm sorry.

16           Do you have an understanding of the level of

17  experience your team had with equipment leasing?

18      A.   Well, I don't believe that anyone had extensive

19  experience with equipment leasing.  There were several

20  members of my team who had been accountants or C.P.A.s in

21  the past.  So, I believe that they probably had a general

22  knowledge, as did I, but I'm not aware of anyone having

23  significant expertise in that area, no.

24      Q.   Were you comfortable with that your team trusting

25  Mr. Stenberg?

PDF created with pdfFactory trial version www.pdffactory.com

 1              MR. KALER:  Objection, again, to the

 2  question.

 3              THE COURT:  I think you're going a bit

 4  far.

 5      Q.   What were your priorities -- what were the

 6  priorities of your group at CSI during the late 1990s,

 7  early 2000's, when Lycos was leasing equipment from CSI?

 8      A.   I'm sorry, my priorities at CSI?

 9      Q.   I'm sorry, if I misspoke.  Your priorities at

10  Lycos, your business priorities.

11      A.   Well, the number one priority was growing the

12  business and obtaining market share and my

13  responsibilities, in particular, were over the financial

14  organization.  So, managing the business, managing the

15  growth, controlling the costs, managing the cashflow, et

16  cetera.

17      Q.   To what extent did these priorities affect Lycos'

18  willingness to rely on third parties, such as CSI?

19      A.   Well, as I mentioned before, we were certainly

20  busy and growing very, very fast.  So, we often relied on

21  outside experts, whether it be lawyers or accountants,

22  consultants, the software developers, leasing experts in

23  the case of CSI.  So, it was pretty common for us to use

24  outsiders.

25              MR. BEAN:  Thank you.  If I may have one

PDF created with pdfFactory trial version www.pdffactory.com

1    moment, your Honor.

2              (Pause.)

3              MR. BEAN:  No further questions at this

4    time.

5              THE COURT:  Why don't we take the morning

6    recess now and then start with the cross-examination after

7    that.

8              (Jury excused.)

9              THE COURT:  Court is in recess.

10             THE FOLLOWING TAKES PLACE

11             OUTSIDE THE PRESENCE OF THE JURY:

12             MR. BEAN:  Your Honor, at some point if I

13   could request a ruling on the request we made yesterday

14   concerning the documents that were used with Mr. Cross

15   where we asked that that testimony be stricken.  I just

16   don't want to forget.

17             MR. KALER:  We would like to have a chance

18   to respond.

19             THE COURT:  Did you spend the night

20   writing a memo?

21             MR. KALER:  No, your Honor.  We checked it

22   out before we used the documents.

23             (Recess taken.)

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1

2                           CERTIFICATE

3        I, Catherine A. Handel, Official Court Reporter of the

4   United States District Court, do hereby certify that the

5   foregoing transcript, from Page 1 to Page 93, constitutes

6   to the best of my skill and ability a true and accurate

7   transcription of my stenotype notes taken in the matter of

8   Civil Action No. 05-10017-RWZ, Computer Sales

9   International, Inc. vs. Lycos, Inc.

10

11  June 9, 2009               /s/Catherine A. Handel, RPR, CRR
    Date                       Catherine A. Handel, RPR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25